John W. Dillon (SBN 296788)
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P.,<br><br>Plaintiffs,<br><br>vs.<br><br>CALIFORNIA ATTORNEY GENERAL ROB BONTA, SAN DIEGO COUNTY SHERIFF KELLY MARTINEZ, AND SAN DIEGO COUNTY DISTRICT ATTORNEY SUMMER STEPHAN,<br><br>Defendants. | Case No. **'23CV0474 JES DDL**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br>**42 U.S.C. § 1983** |

# INTRODUCTION

1. In *District of Columbia v. Heller*, the Supreme Court made clear that "The 18th-century meaning [of the term "arms"] is no different from the meaning today." 554 U.S. 570 at 581 (2008). That is to say, "arms" are "'[w]eapons of offence, or armour of defence.'" *id*. (quoting 1 Dictionary of the English Language 107 (4th ed.) (reprinted 1978)), and further defined the term to mean "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Id*. (quoting 1 A New and Complete Law Dictionary (1771)).

2. There can be no question that knives are "arms" protected under the plain text of the Second Amendment because the "Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 at 2132 (2021) (quoting *Heller*, 554 U.S. at 582). And indeed, the Supreme Court made clear in *Bruen* that the Second and Fourteenth Amendments protect the right to acquire, possess, and carry arms for self-defense and all other lawful purposes—inside *and* outside the home.

3. Despite Supreme Court precedent, the State of California completely prohibits the possession, carry, sale, offers for sale, loans, transfers, and gifting of common automatically opening knives with blade lengths of two inches and greater. *See* Cal. Penal Code §§ 17235, 21510, and 21590 (the "Knife Ban").

4. The Defendants' enforcement of the Knife Ban denies individuals who reside in or visit California their fundamental, individual right to keep and bear these common, constitutionally protected arms.

5. Because the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense," *Bruen*, 142

S. Ct. at 2118, the Defendants' enforcement of the Knife Ban must be declared unconstitutional and enjoined.

## PARTIES

6. Plaintiff Knife Rights, Inc. ("Knife Rights") is a 501(c)(4) member advocacy organization incorporated under the laws of Arizona with a primary place of business in Gilbert, Arizona. Knife Rights serves its members, supporters, and the public through efforts to defend and advance the right to keep and bear bladed arms. Knife Rights has members and supporters in California, including in San Diego County, California. The interests that Knife Rights seeks to protect in this lawsuit are germane to the organization's purposes. Knife Rights sues on behalf of its members, including the Individual Plaintiffs herein. Plaintiff Knife Rights is hereinafter referred to as the "Institutional Plaintiff." The Institutional Plaintiff's members include peaceable, law-abiding individuals in California that wish to exercise their right to bear arms through the acquisition, possession, and carriage of automatically opening knives prohibited under Defendants' enforcement of the Knife Ban.

7. Plaintiff James Miller is an adult natural person, a citizen of the United States, and a resident of San Diego County, California. Plaintiff Miller is a peaceable, non-violent individual who is eligible to keep and bear arms under State and federal law. Plaintiff Miller wishes and intends to acquire, possess, and carry an automatically opening knife with a blade length of two inches or more for lawful purposes, including self-defense. Plaintiff Miller would acquire, possess, and carry such a knife but for the Defendants' enforcement of the laws, policies, practices, and customs at issue in this case and his reasonable fear of arrest and prosecution for violation of the Knife Ban. Plaintiff Miller is a member of Plaintiff Knife Rights, Inc.

8. Plaintiff Garrison Ham is an adult natural person, a citizen of the United States, and a resident of San Diego County, California. Plaintiff Ham is a peaceable, non-violent individual who is eligible to keep and bear arms under State and federal law. Plaintiff wishes and intends to acquire, possess, and carry an automatically opening knife with a blade length of two inches or more for lawful purposes, including self-defense. Plaintiff Ham would acquire, possess, and carry such a knife but for the Defendants' enforcement of the laws, policies, practices, and customs at issue in this case and his reasonable fear of arrest and prosecution for violation of the Knife Ban. Plaintiff Ham is a member of Plaintiff Knife Rights, Inc.

9. Plaintiff Eliot Kaagan is an adult natural person, a citizen of the United States, and a resident of San Diego County, California. Plaintiff Kaagan is a peaceable, non-violent individual who is eligible to keep and bear arms under State and federal law. Plaintiff Kaagan wishes and intends to acquire, possess, and carry an automatically opening knife with a blade length of two inches or more for lawful purposes, including self-defense. Plaintiff Kaagan would acquire, possess, and carry such a knife but for the State's enforcement of the laws, policies, practices, and customs at issue in this case and his reasonable fear of arrest and prosecution for violation of the Knife Ban. Plaintiff Kaagan is a member of Plaintiff Knife Rights, Inc.

10. Plaintiffs Miller, Ham, and Kaagan are hereinafter collectively referred to as the "Individual Plaintiffs."

11. Retailer Plaintiff North County Shooting Center, Inc. ("NCSC") is a California business, doing business as "North County Shooting Center," and is a state and federally licensed firearms retailer, knife retailer, shooting range, and training facility in San Marcos, California, within San Diego County. Plaintiff NCSC brings this action on behalf its customers and would-be customers who wish to

acquire automatically opening knives prohibited under Defendants' enforcement of the Knife Ban, and would sell such arms to its customers but for the Defendants' enforcement of the laws, policies, practices, and customs at issue in this case and the reasonable fear of arrest, prosecution, and other penalties including but not limited to fines, loss of property, and the loss of the license to sell firearms for violation of laws prohibiting the acquisition, possession, sale, and carriage of automatically opening knives proscribed under the Knife Ban. Plaintiff NCSC is a member of Plaintiff Knife Rights, Inc.

12.  Retailer Plaintiff PWGG, L.P. ("PWG") is a California limited partnership doing business as "Poway Weapons & Gear" and "PWG Range." Plaintiff PWG is a state and federally licensed firearms retailer, knife retailer, shooting range, and training facility in Poway, California, within San Diego County, California. Plaintiff PWG brings this action on behalf its customers and would-be customers who wish to acquire automatically opening knives prohibited under Defendants' enforcement of the Knife Ban, and would sell such arms to its customers but for the State's enforcement of the laws, policies, practices, and customs at issue in this case and the reasonable fear of arrest, prosecution, and other penalties including but not limited to fines, loss of property, and the loss of the license to sell firearms for violation of laws prohibiting the acquisition, possession, sale, and carriage of automatically opening knives with a blade length of two inches or more. Plaintiff PWG is a member of Plaintiff Knife Rights, Inc.

13.  Defendant Rob Bonta is the Attorney General of the State of California. Under Article 5, section 13 of the California Constitution, Attorney General Bonta is the "chief law officer of the State" with a duty "to see that the laws of the state are uniformly and adequately enforced." Defendant Bonta is also the head of the California Department of Justice (DOJ). The DOJ's Division of Law Enforcement's

Bureau of Firearms is charged with regulation and enforcement actions regarding firearms and ammunition, including that of the Retailer Plaintiffs' respective businesses. The Attorney General and DOJ maintain an office in San Diego, California. Defendant Bonta is sued in his official capacity.

14. Defendant Sheriff Kelly Martinez is the elected Sheriff and chief law enforcement officer for the County of San Diego, California. As Sheriff, she exercises, delegates, or supervises all the powers and duties of the San Diego County Sheriff's Office, including enforcing the Knife Ban. Defendant Martinez is sued in her official capacity.

15. Defendant District Attorney Summer Stephan is the chief prosecutor for the County of San Diego, California. As District Attorney, she exercises, delegates, or supervises all the powers and duties of the San Diego District Attorney's Office, including enforcing and prosecuting the Knife Ban. Defendant Stephan is sued in her official capacity.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988, as this action seeks to redress the deprivation under color of the laws, statutes, ordinances, regulations, customs, and usages of the State of California, of the rights, privileges or immunities secured by the United States Constitution.

17. Venue lies in this Court under 28 U.S.C. § 1391, as the events giving rise to Plaintiffs' claims arose or exist in this District in which the action is brought.

## STATEMENT OF FACTS

18. California completely prohibits the possession, carriage, sale, offers for sale, loans, transfers, and gifting of common automatically opening knives it

classifies as "switchblade knives" with blade lengths of two inches or greater. *See* Cal. Penal Code §§ 17235, 21510, and 21590.

19. Under the statutes, a "switchblade knife" means "a knife having the appearance of a pocketknife and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by a flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever." Cal. Penal Code § 17235.

20. Under Penal Code section 17235, a "switchblade knife does not include a knife that opens with one hand utilizing thumb pressure applied solely to the blade of the knife or a thumb stud attached to the blade, provided that the knife has a detent or other mechanism that provides resistance that must be overcome in opening the blade, or that biases the blade back toward its closed position." *Id*. (internal quotations omitted). Knives that are not defined by the State as a "switchblade knife" are not at issue in this case.

21. In California, "[e]very person who does any of the following with a switchblade knife having a blade two or more inches in length is guilty of a misdemeanor: (a) Possesses the knife in the passenger's or driver's area of any motor vehicle in any public place or place open to the public. (b) Carries the knife upon the person. (c) Sells, offers for sale, exposes for sale, loans, transfers, or gives the knife to any other person." Cal. Penal Code § 21510.

23. In at least one instance, a California appellate court has held that the State's Knife Ban extends to possession even within a private residence. *See In re S.C. v. S.C.,* 179 Cal.App.4th 1436 (2009) (police discovery of a switchblade in defendant juvenile's pocket during a search conducted at a private residence could

result in defendant being found to have violated then-Penal Code § 653k[1] even though defendant did not possess the knife in a public place or place open to the public). As such, under the Knife Ban, there is a direct threat of criminal prosecution for the mere *possession* of common automatically opening knives with a blade length of two inches or more even in one's home.

24. Moreover, the unlawful possession or carrying of any switchblade knife is a nuisance, and thus, such knives are subject to surrender and destruction under Penal Code §§ 18000 and 18005. Cal. Penal Code § 21590.

25. Automatically opening knives are "arms" under the plain text of the Second Amendment. Moreover, Plaintiffs' desire to keep and bear these arms for self-defense and other lawful purposes, and this conduct is covered by the plain text of the Second Amendment. The Second Amendment presumptively protects the arms proscribed under the Knife Ban and the Plaintiffs' intended conduct. *See Bruen*, 142 S. Ct. at 2126.

26. To justify an arm regulation, "the government must demonstrate that the regulation is consistent with the Nation's historical tradition of [arms] regulation." *Bruen*, 142 S.Ct. at 2126, 2130.

27. The Knife Ban has no historical pedigree nor justification in the Nation's history and tradition of arms regulation. Indeed, the Knife Ban dates only to 1957. *See People v. Bass*, 225 Cal.App.2d 777, 780 (1963) ("In 1957 … the Legislature [] added section 653k to the Penal Code, declaring every person to be guilty of a misdemeanor who carried concealed upon his person a switchblade knife having a blade over 2 inches in length. In 1959 the word 'concealed' was deleted[.]").

---

[1] Cal. Penal Code section 653k was reorganized and renumbered to Cal. section 21510.

31. Automatically opening knives were first produced in the 1700s. *See* RICHARD V. LANGSTON, THE COLLECTOR'S GUIDE TO SWITCHBLADE KNIVES 30 (2001); *see also*, TIM ZINSER ET. AL., SWITCHBLADES OF ITALY 7-8 (2003).

32. By the mid-nineteenth century, factory production of automatically opening knives made them affordable to everyday customers. *See* RICHARD V. LANGSTON, THE COLLECTOR'S GUIDE TO SWITCHBLADE KNIVES 30, at 7 (2001).

33. Indeed, on Plaintiffs' information and belief, millions of automatically opening knives have been in common use for many decades.

34. Automatically opening knives are also common jurisdictionally. As of January 2023, at least 42 states allow the possession of automatically opening knives that California bans, and at least 32 states permit the public carry of said knives in some manner.

35. The automatically opening knives prohibited under the Defendants' enforcement of the Knife Ban are like other constitutionally protected knives (that do not have the blade fixed in place) in all relevant respects: They have a blade, a handle or grip, and the blade rests within the handle or grip of the knife when closed or collapsed, and when open or extended is "fixed" into a usable position (likewise through friction, geometry, or mechanical design) and may be used in the same manner as any other common knife.

36. Automatically opening knives "are particularly easy to open with one hand." *See*, *e.g.*, David Kopel, Clayton Cramer, and Joseph Edward Olson, *Knives and the Second Amendment*, UNIVERSITY OF MICHIGAN JOURNAL OF LAW REFORM, vol. 47, at 175 (Fall 2013). "Prohibitions on carrying knives in general, or of particular knives, are unconstitutional. For example, bans of knives that open in a convenient way (*e.g.*, switchblades, gravity knives, and butterfly knives) are

unconstitutional." *Id*. at 167.

37.   Defendants' enforcement of the Knife Ban denies individuals who reside in California, including the named Individual Plaintiffs, Retailer Plaintiffs' customers and would-be customers, and the Institutional Plaintiff's members their fundamental, individual right to keep and bear these common, constitutionally protected arms for lawful purposes, including self-defense.

38.   Automatically opening knives, including those prohibited under the Knife Ban, are in common use for lawful purposes throughout the vast majority of the United States. As such, they are not (and could not be) *both* dangerous *and* unusual arms.

## COUNT ONE
## DEPRIVATION OF CIVIL RIGHTS
## RIGHT TO KEEP AND BEAR ARMS
## U.S. CONST., AMENDS. II AND XIV
## (42 U.S.C. § 1983)

39.   Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

40.   There is an actual and present controversy between the parties.

41.   The Second Amendment to the United States Constitution provides:

> A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed.

42.   The Fourteenth Amendment to the United States Constitution provides in relevant part that:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United

> States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

43. The Second Amendment is fully applicable to the States through the Fourteenth Amendment's Due Process and Privileges or Immunities Clauses. *McDonald*, 561 U.S. at 750 (2010); *id.* at 805 (Thomas, J., concurring).

44. In *Heller*, 554 U.S. 570 (2008), the Supreme Court declared unconstitutional the District of Columbia's laws that, among other things, prevented Mr. Heller from having a handgun "operable for the purpose of immediate self-defense." 554 U.S. 570 at 635. The word "immediate" means, as is relevant here, "occurring, acting, or accomplished without loss or interval of time," i.e. "instant," "existing without intervening space or substance," and "acting or being without the intervention of another object, cause, or agency." *See*, *e.g.*, https://www.merriam-webster.com/dictionary/immediate.

45. The Supreme Court "already recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances. The Second Amendment's reference to arms does not apply only to those arms in existence in the 18th century." *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582).

46. "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. "Thus, even though the Second Amendment's definition of arms is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense. *Cf. Caetano v. Massachusetts*, 577 U. S. 411, 411-412,

136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016) (per curiam) (stun guns)." *Id*.

47. In *Caetano*, Justice Alito issued a concurring opinion, joined by Justice Thomas, explaining that, in determining whether an arm is protected under the Second Amendment, "the pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes today." *Caetano v. Massachusetts*, 577 U.S. 411 at 420. Indeed, the Massachusetts Supreme Judicial Court "offered only a cursory discussion of that question, noting that the 'number of Tasers and stun guns is dwarfed by the number of firearms.'" *Id.*, quoting 470 Mass., at 781, 26 N.E.3d, at 693. "This observation may be true, but it is beside the point. Otherwise, a State would be free to ban all weapons except handguns, because handguns are the most popular weapon chosen by Americans for self-defense in the home." 577 U.S. 411 at 420 (quoting *Heller*, 554 U.S. at 629) (cleaned up).

48. As Justice Alito further explained, "[t]he more relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States." *Id*. (quoting *People v. Yanna*, 297 Mich. App. 137, 144, 824 N. W. 2d 241, 245 (2012) (holding Michigan stun gun ban unconstitutional) (cleaned up).

49. In *Bruen*, the Court reaffirmed principles it clearly applied in *Heller*. *Bruen* also reiterated, among other things, that "the Second Amendment extends, prima facie, to *all* instruments that constitute bearable arms." *Id*. at 2132 (emphasis added).

50. There can be no dispute over the proper approach to evaluating Second Amendment claims. First, the Court must determine whether "the Second Amendment's plain text covers an individual's conduct" that is being restricted by a challenged law or policy. *Bruen*, 142 S. Ct. at 2129 – 30. Second, if the answer is

1  yes, the conduct is presumptively protected, and the burden then falls to the
2  government to justify the challenged restriction by "demonstrating that it is
3  consistent with the Nation's historical tradition of firearm regulation*.*" *Id*. at 2130.
4  If the government cannot make this demonstration, the restriction is unconstitutional,
5  full stop. No interest-balancing or levels-of-scrutiny analysis can or should be
6  conducted. *Id*. at 2127.

51. Automatically opening knives—including those proscribed under the Knife Ban—are widely possessed and used for lawful purposes across much of the Country.

52. *Bruen* confirms that the Second Amendment's plain text covers the arms (knives) and conduct Plaintiffs wish to engage in (keep and bear the subject arms). *Bruen also* confirmed that *Heller* already conducted the relevant historical analysis for determining whether a particular arm falls within the Second Amendment's protection. In order for a ban of an arm to be consistent with this Nation's history of firearm regulation, the government must demonstrate that the banned arm is both "dangerous and unusual." *Id*. at 2143. Arms that are in "common use today" simply cannot be banned. *Id.*

53. When an arm is possessed and used by thousands for lawful purposes, it is "in common use" and it is protected—full stop. If an arm is in common use, it necessarily cannot be *both* "dangerous and unusual." And moreover, even arms not "in common use" cannot be banned so long as they are no more dangerous than other arms that are in common use.

54. Even if the numerical quantity of any arm is difficult to establish, an arm being in common use can be proved by categorical and jurisdictional commonality. If an arm is categorically analogous or similar enough to a protected arm and that it is lawful for them to be sold to private citizens in the majority of

states, then the arm is common. As such, it cannot be both "dangerous and unusual" if it is lawful to possess and use in a majority of the Country.

55. Commonality is a metric that operates in one direction: An arm that is initially uncommon can become common over time, but an arm that is common cannot become uncommon. As the Supreme Court explained [with respect to handguns], "Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today." *Bruen*, 142 S. Ct. at 2143. Thus, given their common possession in the majority of states, even if automatically opening knives were at one time considered by some to be dangerous and unusual weapons, they are not and cannot be so today.

56. Defendants' enforcement of the Knife Ban prohibits constitutionally protected arms and conduct, and thus violates the Second and Fourteenth Amendments to the United States Constitution.

57. "The constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U. S., at 780 [plurality opinion]).

58. "The very enumeration of the [Second Amendment] right takes out of the hands of government"— including Defendants — "the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *District of Columbia v. Heller*, 554 U.S. 570, 635 (emphasis in original).

59. Plaintiffs Miller, Ham, and Kaagan desire and intend to exercise their right to keep and bear an automatically opening knife with a blade length of two inches or more for lawful purposes including self-defense, and would do so, but for

the Defendants' enforcement of the Knife Ban.

60. Retailer Plaintiffs NCSC and PWG desire and intend to sell automatically opening knives with a blade length of two inches or more to their customers for lawful purposes, and would, but for Defendants' enforcement of the Knife Ban. Like the Individual Plaintiffs and the Retailer Plaintiffs, the Institutional Plaintiff's individual members and retailer members' customers desire and intend to exercise their right to keep and bear an automatically opening knife with a blade length of two inches or more for lawful purposes, and would, but for the Defendants' enforcement of the Knife Ban.

61. Plaintiff Knife Rights' California members desire and intend to exercise their right to keep and bear automatically opening knives with a blade length of two inches or more for lawful purposes including self-defense, and would do so, but for Defendants' enforcement of the Knife Ban.

62. Defendants have been and are actively enforcing the Knife Ban against the Plaintiffs and similarly situated individuals and retailers. Plaintiffs reasonably fear that the Defendants will continue to enforce the Knife Ban against them.

63. By enforcing California's Knife Ban against the Individual Plaintiffs, Retailer Plaintiffs, and Institutional Plaintiff's members, Defendants have violated the Plaintiffs' rights protected under the Second and Fourteenth Amendments.

64. The Defendants' enforcement of the laws, policies, practices, and customs at issue in this case against Plaintiffs and other similarly situated members of the public cause injury and damage actionable under federal law, 42 U.S.C. §1983. Plaintiffs thus seek declaratory and injunctive relief and the recovery of attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1. A declaratory judgment that the Knife Ban and Defendants' enforcement of the Knife Ban violates the right to keep and bear arms protected under the Second and Fourteenth Amendments to the U.S. Constitution;

2. Preliminary and permanent injunctive relief restraining the Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of the injunction, from enforcing the Knife Ban;

3. Nominal damages as to Defendants Sheriff Martinez and District Attorney Stephan;

4. All other and further legal and equitable relief, including injunctive relief, against Defendants as necessary to effectuate the Court's judgment, and/or as the Court otherwise deems just and equitable; and,

5. Attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

Respectfully submitted this 15th day of March 2023.

DILLON LAW GROUP, APC

*/s/ John W. Dillon*
John W. Dillon

Attorneys for Plaintiffs