1  ROB BONTA
   Attorney General of California
2  R. MATTHEW WISE
   Supervising Deputy Attorney General
3  JANE REILLEY
   Deputy Attorney General
4  KATRINA UYEHARA
   Deputy Attorney General
5  State Bar No. 349378
     1300 I Street, Suite 125
6    P.O. Box 944255
     Sacramento, CA 94244-2550
7    Telephone: (916) 210-7867
     Fax: (916) 324-8835
8    E-mail: Katrina.Uyehara@doj.ca.gov
   *Attorneys for Defendant Rob Bonta, in his*
9  *official capacity as Attorney General of the*
   *State of California*

10

## IN THE UNITED STATES DISTRICT COURT

11

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12

13

14

| | |
|---|---|
| **KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P.,** | 3:23-cv-00474-JES-DDL |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT ATTORNEY GENERAL ROB BONTA'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA,** | Date: April 22, 2024<br>Time: 10:00 a.m.<br>Dept: 4B<br>Judge: The Honorable James E. Simmons, Jr. |
| Defendant. | Trial Date: None set<br>Action Filed: March 15, 2023 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

BACKGROUND ............................................................................................ 2

PROCEDURAL HISTORY ............................................................................ 3

LEGAL STANDARD ..................................................................................... 4

ARGUMENT .................................................................................................. 4

    I.     Plaintiffs Cannot Meet Their Burden of Establishing That the Challenged Statutes Implicate the Second Amendment's Plain Text ........................................................................................................ 5

          A.    The Switchblade Knives Regulated by the Challenged Statutes Are Not Commonly Used or Suitable for Self-Defense ................................................................................................ 6

          B.    The Switchblade Knives Regulated by the Challenged Statutes Are Dangerous and Unusual ..................................... 9

    II.    The Challenged Statutes Are Consistent with the Nation's Historical Tradition of Regulating Similar Weapons ......................... 11

          A.    The Challenged Statutes Fit Comfortably Within a Long Tradition of Regulating of Bowie Knives, Impact Weapons, and Other Dangerous and Deadly Weapons ........... 12

          B.    The Surveyed Restrictions Are Relevantly Similar to California's Switchblade Restrictions ..................................... 17

CONCLUSION ............................................................................................. 19

i

Mem. of P's & A's in Support of Def.'s Mot. for Summ. J. (3:23-cv-00474-JES-DDL)

# TABLE OF AUTHORITIES

**Page**

CASES

*Aymette v. State*
21 Tenn. 152 (Tenn. 1840) ...................................................................... 14

*Barrios v. Holder*
581 F.3d 849 (9th Cir. 2009) ................................................................... 10

*Brumback v. Ferguson*
No. 1:22-CV-03093-MKD, 2023 WL 6221425 (E.D. Wash. Sept.
25, 2023) .................................................................................................... 5

*Craft v. U.S.*
403 F.2d 360 (9th Cir. 1968) ................................................................... 10

*Crowlery Cutlery Co. v. U.S.*
849 F.2d 273 (7th Cir. 1988) ................................................................... 10

*District of Columbia v. Heller*
554 U.S. 570 (2008) .........................................................................*passim*

*Fall v. Esso Standard Oil Co.*
297 F.2d 411 (5th Cir. 1961) ................................................................... 10

*Frlekin v. Apple, Inc.*
979 F.3d 639 (9th Cir. 2020) ..................................................................... 4

*Fyock v. Sunnyvale*
779 F.3d 991 (9th Cir 2015) .................................................................... 10

*Haynes v. Tennessee*
24 Tenn. 120 (Tenn. 1844) ...................................................................... 14

*In re Gilbert R*
211 Cal. App. 4th 514 (Cal. Ct. App. 2012) ........................................ 1, 3, 8

*In re S.C.*
179 Cal. App. 4th 1436 (Cal. Ct. App. 2009) .......................................... 11

*McDonald v. City of Chicago*
561 U.S. 742 (2010) ................................................................................... 6

Page

*Nat'l Ass'n for Gun Rights v. Lamont*
__ F. Supp. 3d. __ (D. Conn. Aug. 3, 2023) ....................................................... 10

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
597 U.S. 1 (2022) ................................................................................*passim*

*People ex rel. Mautner v. Quattrone*
211 Cal. App. 3d 1389 (Cal. Ct. App. 1989)........................................ 18

*S.D. Myers, Inc. v. City & County of San Francisco*
253 F.3d 461 (9th Cir. 2001) ................................................................ 4

*Teter v. Connors*
459 F. Supp. 3d 989 (D. Haw. 2020) ................................................... 10

*Teter v. Lopez*
2024 WL 719051 (9th Cir. Feb. 2, 2024) ............................................ 10

*Teter v. Lopez*
76 F.4th 938 (9th Cir. 2023) ................................................................. 10

*U.S. v. Alaniz*
69 F.4th 1124 (9th Cir. 2023) ................................................................ 6

*U.S. v. Olloque*
580 Fed. Appx. 584 (9th Cir. 2014) .................................................... 11

*U.S. v. Salcedo*
452 F.2d 1201 (9th Cir. 1971) .............................................................. 10

*United States v. Miller*
307 U.S. 174 (1939) ........................................................................ 6, 7

*United States v. Salerno*
481 U.S. 739 (1987) ............................................................................. 4

*Wa. State Grange v. Wa. State Republican Party*
552 U.S. 442 (2008) ............................................................................. 4

# TABLE OF AUTHORITIES
### (continued)

**Page**

STATUTES

California Penal Code
    § 653k ................................................................................... 2
    § 17235 ........................................................................... *passim*
    § 21510 ........................................................................... *passim*
    § 21510, subds. (a)-(c) ........................................................ 3
    § 21590 ........................................................................... *passim*

COURT RULES

Federal Rules of Civil Procedure
    Rule 56 ................................................................................. 4
    Rule 56(a) ........................................................................... 4

OTHER AUTHORITIES

4 Blackstone, *Commentaries on the Laws of England* 148 (1769) ........................ 10

**INTRODUCTION**

Over sixty-five years ago, amid a proliferation of crimes committed with switchblade knives, California enacted a law making it a misdemeanor to publicly possess, carry, sell, loan, or transfer a switchblade knife (1) with a blade of two or more inches in length, which (2) does not have a detent[1] or similar safety mechanism. Cal. Penal Code §§ 17235, 21510. A few years later, California defined "the unlawful possession or carrying of any switchblade knife" as a nuisance, allowing such knives to be confiscated by law enforcement. *Id.* § 21590.

Plaintiffs bring a facial challenge to each of the three statutes identified above. Plaintiffs' Second Amendment claim fails at both steps of the text-and-history analysis set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). Plaintiffs cannot meet their burden of establishing that their proposed course of conduct—publicly possessing, carrying, selling, loaning, or transferring switchblade knives with blades two inches in length or longer—is protected by the plain text of the Second Amendment. Because Plaintiffs cannot show that switchblade knives with blades two inches or longer are commonly used for lawful self-defense, and such weapons are dangerous and unusual, they have not satisfied *Bruen*'s threshold inquiry.

Moreover, even if Plaintiffs were able to meet their burden at *Bruen*'s textual step, their claims would nonetheless fail at *Bruen*'s second step because the challenged laws are "consistent with the Nation's historical tradition of firearm regulation," and thus are constitutional. *Bruen*, 597 U.S. at 24. States and localities have long exercised their police powers to enact restrictions when a new weapon technology—like the switchblade and its historical predecessors—is invented, begins to proliferate in society, and causes public concern. Here, there is a well-

---

[1] A "detent" is "'a device . . . for positioning and holding one mechanical part in relation to another in a manner such that the device can be released by force applied to one of the parts.'" *In re Gilbert R*, 211 Cal. App. 4th 514, 518 (Cal. Ct. App. 2012) (quoting Merriam-Webster definition of "detent").

established historical tradition of regulating the possession and carry of bladed and dangerous weapons dating back to the antebellum era. California's regulations on switchblade knives with blades two inches or longer fit comfortably within this historical tradition.

Because there are no triable issues of material fact as to the constitutionality of the challenged laws, this Court should enter judgment for Defendant.

## BACKGROUND

The laws challenged by Plaintiffs—Penal Code sections 17235, 21510, and 21590—have been operative for over half a century.[2] Although Plaintiffs refer to this statutory scheme as a "Knife Ban," ECF No. 1 (Complaint) at ¶ 3, this characterization is belied by the plain language of the provisions. Far from banning all switchblade knives—much less all knives—California law merely places reasonable restrictions on certain types of switchblade knives with blades that are two inches in length or longer.

Penal Code section 17235 defines "switchblade knife" as follows:

"[S]witchblade knife" means a knife having the appearance of a pocketknife and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, **the blade or blades of which are two or more inches in length** and which can be released automatically by the flick of a button, pressure on the handle, flip of the writ or other mechanical device, or is released by the weight of the blade or by any time of mechanism whatsoever. **"Switchblade knife" does not include** a knife that opens with one hand utilizing thumb pressure applied solely to the blade of the knife or a thumb stud attached to the blade, provided that the knife has a detent or other mechanism that provides resistance that must be overcome in opening the blade, or that biases the blade back towards its closed position."

Cal. Penal Code § 17235 (emphasis added). Section 21510 specifies that taking any of the following actions with a "switchblade knife" (as defined in section 17235)

---

[2] These laws were enacted as section 653k of the California Penal Code. Section 653k included both the definition of "switchblade" now in section 17235, and the restrictions on possession, carrying, sale, loan or transfer in section 21510. Def. Ex. 1 (AB 202 – Legislative History Summary).

constitutes a misdemeanor: (a) possessing the knife "in the passenger's or driver's area of any motor vehicle in any public place or in any place open to the public; (b) carrying the knife upon one's person; and (c) selling, offering or exposing for sale, loaning, transferring, or gifting the knife to any person. *Id.* § 21510, subds. (a)-(c). Section 21590 defines the unlawful possession or carrying of any "switchblade knife" in violation of section 21510 as a "nuisance," allowing law enforcement officers to confiscate such weapons. *Id.* § 21590.[3]

Thus, the challenged Penal Code provisions do not ban automatic knives outright. The statutory scheme places no restrictions on any knives with blades shorter than two inches in length. It does not implicate any knife—regardless of blade length—with a "detent or other mechanism that provides resistance that must be overcome in opening the blade, or biases the blade back towards its closed position." Cal. Penal Code § 17235. Knives that may be opened with one hand that have a detent or similar mechanism, which "serve an important utility to many knife users, as well as firefighters, EMT personnel, hunters, fishermen, and others," are legal in California. *In re Gilbert R*, 211 Cal. App. 4th 514, 612 (Cal. Ct. App. 2012) (citing Assem. Com. on Public Safety, Analysis of Sen. Bill No. 274 (2001-2002 Reg. Sess.). Only switchblade knives that (1) have blades two inches in length or longer and (2) do not have a detent or similar mechanism—which, as explained below, are not in common use for lawful self-defense—are subject to regulation.

## PROCEDURAL HISTORY

Last year, Plaintiffs—three individuals, two federally licensed firearm retailers, and Knife Rights, Inc.—filed a complaint against the California Attorney General for declaratory and injunctive relief, bringing a single claim that California Penal Code sections 17235, 21510, and 21590 violate their Second Amendment

---

[3] Penal Code section 21590 was added in 1963 as an amendment to California's nuisance statute. Def. Ex. 2 (AB 3045 – Legislative History Summary) at p. 21.

1 | rights. Having completed discovery, the parties now file dispositive motions.

2 | **LEGAL STANDARD**

3 | Under Federal Rule of Civil Procedure 56, a party is entitled to summary

4 | judgment if the "movant shows that there is no genuine dispute as to any material

5 | fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

6 | 56(a); *see also Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020).

7 | Here, Plaintiffs raise facial challenges against Penal Code sections 17235,

8 | 21510, and 21590. Facial challenges are "disfavored" because "a ruling of

9 | unconstitutionality frustrates the intent of the elected representatives of the people."

10 | *Wa. State Grange v. Wa. State Republican Party*, 552 U.S. 442, 449 (2008). They

11 | are "the most difficult challenge[s] to mount successfully, since the challenger must

12 | establish that no set of circumstances exists under which the [law] would be valid."

13 | *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also S.D. Myers, Inc. v.*

14 | *City & County of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001) (holding the

15 | Ninth Circuit will apply *Salerno* in facial challenges, except for certain First

16 | Amendment challenges until directed otherwise by the Supreme Court). As shown

17 | below, Plaintiffs cannot meet this high burden.

18 | **ARGUMENT**

19 | In *Bruen*, the Supreme Court announced a new standard for adjudicating

20 | Second Amendment claims "centered on constitutional text and history." 597 U.S.

21 | at 22–24. Under this "text-and-history" framework, the Court must first determine

22 | whether Plaintiffs have met their burden of establishing that the "Second

23 | Amendment's plain text covers" their "proposed course of conduct." *Id.* at 24. If the

24 | answer is no, there is no Second Amendment violation. If the answer is yes, "the

25 | Constitution presumptively protects that conduct," and "[t]he government must then

26 | justify its regulation by demonstrating that it is consistent with the Nation's

27 | historical tradition of firearm regulation." *Id*.

28 |

*Bruen* also recognized that the Second Amendment is not a "regulatory straightjacket." *Bruen*, 597 U.S. at 30. And Justice Kavanaugh—joined by Chief Justice Roberts—wrote separately to underscore the "limits of the Court's decision." *Id*. at 79 (Kavanaugh, J., concurring). Justice Kavanaugh reiterated *Heller*'s observation that "the Second Amendment allows a 'variety' of [weapons] regulations" (*id.* at 80 (quoting *Heller*, 554 U.S. at 636)) and emphasized that the non-exhaustive list of "presumptively lawful regulatory measures" set forth in *Heller* remain constitutional (*id*. at 81 (quoting *Heller*, 554 U.S. at 626–27, 627 n.26)).

Penal Code sections 17235, 21510, and 21590 are constitutional under the Second Amendment because they satisfy the text-and-history standard set forth in *Bruen*. At the outset, the particular subset of switchblade knives that are regulated under California's statutory regime are not presumptively protected by the plain text of the Second Amendment because they are not commonly used for self-defense and are dangerous and unusual. But even if Plaintiffs could show that the challenged statutes burden conduct presumptively protected by the Second Amendment, California's restrictions should be upheld because they are consistent with the Nation's tradition of weapons regulation.

## I. PLAINTIFFS CANNOT MEET THEIR BURDEN OF ESTABLISHING THAT THE CHALLENGED STATUTES IMPLICATE THE SECOND AMENDMENT'S PLAIN TEXT

Plaintiffs cannot demonstrate that the challenged statutes burden any conduct that is presumptively protected by the Second Amendment. Under the text-and-history standard for adjudicating Second Amendment claims, the party challenging a restriction under the Second Amendment must first demonstrate that the law regulates conduct that is presumptively protected by the Second Amendment. *Bruen*, 597 U.S. at 24; *see also Brumback v. Ferguson*, No. 1:22-CV-03093-MKD, 2023 WL 6221425, at *4 (E.D. Wash. Sept. 25, 2023) ("[I]t is Plaintiffs' burden to demonstrate the plain text of the Second Amendment covers conduct prohibited" by

the challenged law). If Plaintiffs cannot meet this burden, then the Court need not proceed further.

### A. The Switchblade Knives Regulated by the Challenged Statutes Are Not Commonly Used or Suitable for Self-Defense

The Supreme Court has made clear that "the right secured by the Second Amendment is not unlimited" and does not extend to "a right to keep and carry any weapon whatsoever in any manner for whatsoever and for whatever purpose." *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 629). Rather, the Second Amendment only protects those weapons that are "'in common use at the time' for lawful purposes like self defense." *Heller*, 554 U.S. at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)); *see also Bruen*, 597 U.S. at 21 (referencing whether the subject "weapons [are] 'in common use' today for self-defense" (quoting *Heller*, 554 U.S. at 627)); *see also U.S. v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) (recognizing at the threshold stage, courts must consider "whether the weapon at issue is 'in common use' today for self-defense") (quoting *Heller*, 554 U.S. at 580). This analysis requires courts to consider the primary use or purpose of that weapon and its suitability for self-defense. *Heller*, 554 U.S. at 629.

The specific subset of switchblades that are regulated by the challenged statutes do not constitute "Arms" protected by the Second Amendment because they are not commonly used for self-defense. In *Heller*, *McDonald*, and *Bruen*, the Supreme Court held out "individual self-defense" as "'the *central component*' of the Second Amendment right." *Bruen*, 597 U.S. at 29 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010), in turn quoting *Heller*, 554 U.S. at 599). And while the Court in those three cases invalidated strict laws that effectively precluded most law-abiding citizens from possessing or carrying all handguns— "the quintessential self-defense weapon," *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 629)—the Court reiterated that "the right secured by the Second Amendment is not unlimited" and does not extend to "a right to keep and carry any

6

weapon whatsoever in any manner whatsoever and for whatever purpose," *id*. at 21 (quoting *Heller*, 554 U.S. at 626).

On the contrary, the Second Amendment protects only those weapons that are "'in common use at the time' *for lawful purposes like self defense*." *Heller*, 554 U.S. at 624 (emphasis added) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). This "important limitation on the right to keep and carry arms," recognized in *Heller*, remains a critical limitation on the Second Amendment following *Bruen*. *See Bruen*, 597 U.S. at 81 (Kavanaugh J., concurring). Here, the record confirms that the regulated switchblades are not self-defense weapons.

*Bruen* makes clear that the test for Second Amendment protection of a particular weapon is common *use*, not common *ownership*. *See* 597 U.S. at 38 (referring to "commonly *used* firearms for self-defense") (emphasis added). Plaintiffs' bald allegation that "on Plaintiffs' information and belief, millions of automatically opening knives have been in common use for many decades," even if assumed true, thus fails to establish that these knives are commonly used *for self-defense*. ECF No. 1, Complaint at p. 8, ¶33 (emphasis added). Indeed, Plaintiffs do not provide any evidence that switchblades are in common use for self-defense. Pl. Knife Rights' Resp. to Def.'s Interrog., p. 3–4. Sales figures and ownership statistics are insufficient—even so, Plaintiffs only offer sales estimates. Rather, to determine whether a weapon is in common use for self-defense, courts must consider the suitability of the weapon and the actual use of the weapon for self-defense. *See Heller*, 554 U.S. at 629 (explaining the "reasons that a citizen may prefer a handgun for home defense," including that handguns are easier to store in a location that is readily accessible in an emergency, are easier to lift and aim than a long gun, and can be used with a single hand while the other hand dials the police).

As the record in this case clearly establishes, the switchblade knives regulated by California's statutory regime are not even suitable for "ordinary self-defense." *Bruen*, 597 U.S. at 60. To begin with, as both Plaintiffs' and Defendant's experts

7

agree, extensive training is required to use a switchblade knife safely and effectively for self-defense. *Compare* Escobar Decl., ¶ 27, 31, 40, *with* Ex. Janich 3, pp. 33, 36. Training knives—knife models that replicate the actual feel of a knife but are dull—are often used to train individuals on how to use a knife for self-defense. Ex. Janich 3, pp. 63. However, very few knife companies produce training knives for their automatic switchblade knives. Ex. Janich 3, pp. 63. As a result, it can be difficult to practice using a switchblade for self-defense.

There are also significant psychological barriers to using knives for self-defense. A self-defense situation involving a switchblade is inherently a close-combat encounter—one that will likely require the cutting of tissue, ligaments, and muscles, and result in subsequent blood loss. Escobar Decl., ¶ 34–35; *see also* Ex. Janich 3, pp. 34–36 (identifying the quadriceps and median and ulnar nerves as prime targets for knife self-defense). The nature of such an encounter raises the significant question whether an ordinary person would be capable of effectively using a knife for self-defense. Escobar Decl., ¶ 35–36.

Aside from such psychological barriers, switchblades are generally ill-suited for self-defense. All switchblades store the blade within the handle of the knife. Both out-the-front and folding knives require the user to seat the knife in their hand in a certain way to avoid injury upon deployment of the blade. Escobar Decl., ¶ 21. In addition, users may struggle to disengage the safety on the switchblade or may accidentally deploy the knife, causing injury to the user. Escobar Decl., ¶ 31–32; *see also In re Gilbert R*., 211 Cal. App. 4th at 612 (recognizing that the detent exception to Penal Code section 21510 is "prudent and a matter of public safety as [a detent] will ensure the blade will not inadvertently come open"). As a result, users risk injury and delay in attempting to deploy a switchblade for self-defense.

Switchblade knives must also lock in place in order to be used for self-defense. This is supposed to happen automatically, but on occasion, these knives can fail to lock and are rendered effectively unusable. Escobar Decl., ¶ 30. In

contrast, fixed blade knives must only be unsheathed to be ready to use, and folding knives without automatic features give their users tactile feedback that the knife has locked into place. Escobar Decl., ¶ 30. By their very nature, an automatic switchblade knife consists of more complicated mechanical moving parts that can fail. Escobar Decl., ¶ 21; Rivas Decl., ¶ 21

And folding switchblades can be even more difficult to use because they require an even more complicated multi-step, fine-motor-skill operation to reveal the blade of the knife. Escobar Decl., ¶ 24–28. This fine motor skill requires training and practice to be used in an actual, adrenalized self-defense scenario. Escobar Decl., ¶ 27. Bringing a folding switchblade to bear in a high-stress self-defense situation is difficult. *Compare* Escobar Decl., ¶ 26–27, *with* Ex. Janich 3, pp. 33.

In short, a switchblade is a far cry from the "quintessential self-defense weapon" discussed in *Heller* and *Bruen*. It requires its users to be trained in close hand-to-hand combat, to be psychologically prepared to slash or stab in self-defense, and to use fine motor skills to deploy the blade.[4] Because Plaintiffs cannot establish that switchblades are commonly used for self-defense, their claims fail at the threshold.

## B. The Switchblade Knives Regulated by the Challenged Statutes Are Dangerous and Unusual

In addition to being ill-suited for self-defense, the subset of switchblade knives that are regulated by the challenged statutes fall outside the scope of the Second Amendment for the separate reason that they are dangerous and unusual weapons. In *Heller*, the Supreme Court made clear that it did not intend to cast doubt on the constitutionality of longstanding prohibitions traditionally understood to be outside the scope of the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570,

---

[4] For these reasons, militaries all over the world prefer fixed blade knives. Escobar Decl., p. 11.

626 (2008); *see also Fyock v. Sunnyvale*, 779 F.3d 991, 996–97 (9th Cir 2015). One such "historical tradition" is the prohibition on "dangerous and unusual weapons." *Heller*, 554 U.S. at 627. Blackstone, a leading historical source cited by *Heller* on this point, elaborated on this tradition and explained that "[t]he offense of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace . . . and is particularly prohibited." 4 Blackstone, *Commentaries on the Laws of England* 148 (1769). A weapon qualifies as dangerous and unusual if it has some heightened "level of lethality or capacity for inquiry" that makes the weapon "especially dangerous." *Nat'l Ass'n for Gun Rights v. Lamont*, __ F. Supp. 3d. __, 2023 WL 4975979, at *16 (D. Conn. Aug. 3, 2023).

Federal courts across the country have long recognized that switchblades are uniquely dangerous weapons that are not typically possessed for law-abiding purposes. *See Crowley Cutlery Co. v. U.S.*, 849 F.2d 273, 278 (7th Cir. 1988) ("Switchblade knives are more dangerous than regular knives because they are more readily concealable and hence more suitable for criminal use."); *Fall v. Esso Standard Oil Co.*, 297 F.2d 411, 416–17 (5th Cir. 1961) ("It is now well settled beyond a doubt that a switchblade knife is a dangerous weapon.").[5] Numerous Ninth Circuit cases confirm the relationship between such knives and criminal activity. *See, e.g.*, *Barrios v. Holder*, 581 F.3d 849, 853 (9th Cir. 2009) (noting that in Guatemala a gang cut a person seeking immigration relief with a switchblade); *U.S. v. Salcedo*, 452 F.2d 1201 (9th Cir. 1971) (finding that a switchblade knife and a container of heroin found by a Border Control Agent supported a drug smuggling conviction); *Craft v. U.S.*, 403 F.2d 360, 362 (9th Cir. 1968) (affirming conviction

---

[5] The district court in *Teter v. Connors* similarly held that butterfly knives—like switchblades—are often associated with gang activity and present a danger to public safety. 459 F. Supp. 3d 989, 992–93 (D. Haw. 2020). The district court's decision was reversed by a three-judge panel of the Ninth Circuit, which determined that whether a weapon is "dangerous and unusual" is an issue "as to which [the government] bears the burden of proof in the second prong of the *Bruen* analysis," *Teter v. Lopez*, 76 F.4th 938, 949-50 (9th Cir. 2023). That opinion was vacated when the Ninth Circuit agreed to rehear the case en banc. *Teter v. Lopez*, 2024 WL 719051, at *1 (9th Cir. Feb. 2, 2024).

for the illegal importation of marijuana and switchblades); *U.S. v. Olloque*, 580 Fed. Appx. 584, 584 (9th Cir. 2014) (affirming conviction of possession and intent to distribute drugs noting that officers found a switchblade amongst drug paraphernalia). California courts have similarly recognized that switchblades are not typically possessed by law-abiding citizens for lawful purposes. *See, e.g.*, *In re S.C.*, 179 Cal. App. 4th 1436, 1441 (Cal. Ct. App. 2009) ("A switchblade carried on the person represents a constant threat to others, whether carried in public or in private. A switchblade carried at home, for example, is dangerous to family members and house guests during an argument."). These cases provide additional evidence that the switchblade is uniquely dangerous, thus placing the proposed conduct outside the scope of the Second Amendment.

## II. THE CHALLENGED STATUTES ARE CONSISTENT WITH THE NATION'S HISTORICAL TRADITION OF REGULATING SIMILAR WEAPONS

Even if Plaintiffs could establish that California's statutory scheme implicates the plain text of the Second Amendment, their facial challenge would still fail at the second step of the *Bruen* analysis because the challenged statutes are consistent with the Nation's historical tradition of regulating similar weapons. As noted above, the government need only identify a "well-established and representative historical *analogue*"—not a "historical twin" or "dead ringer"—to the challenged laws, which is "relevantly similar" in terms of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 30.

The regulation of weapons throughout U.S. history tends to follow a similar regulatory sequence: certain weapons become associated with criminality or threats to public order and safety after proliferating in society; and subsequently the government enacts a variety of restrictions on that particular weapon, while leaving a range of alternatives available to law-abiding citizens for self-defense. Spitzer Decl., ¶ 12, 60. This regulatory tradition includes historical precursors to modern-day switchblade regulations, including regulations of the Bowie knife and other

dangerous weapons. Here, Defendant has identified 136 historical laws from 49 states and the District of Columbia regulating Bowie knives, and even more laws regulating the use of dangerous weapons through carry restrictions and taxes. Spitzer Decl., Ex. C; *see also* Spitzer Decl., ¶ 43–44, Ex. B, C, D; Rivas Decl., Ex. 2–47.

**A. The Challenged Statutes Fit Comfortably Within a Long Tradition of Regulating of Bowie Knives, Impact Weapons, and Other Dangerous and Deadly Weapons**

In the nineteenth century, it became more common for Americans to publicly carry and use a variety of deadly weapons, such as Bowie knives, dirks, and pocket pistols.[6] Rivas Decl., ¶ 4. Rates of homicide and the lethality of weapons rose together, and as deadly weapons became more prevalent in public spaces, lawmakers responded by regulating these weapons. Rivas Decl., ¶ 12. Such laws were enacted based on the prevailing view of the time that a person who carried a deadly weapon was likely to be a ruffian, burglar, or assassin—a person predisposed to settle personal disagreements by blood rather than law. Rivas Decl., ¶ 12; *see also* Spitzer Decl., ¶. 39

Of those weapons, no other weapon serves as a better analogy to the types of switchblade knives that California currently regulates than the Bowie knife. In the antebellum era, the Bowie knife became one of the most widely regulated weapons. The Bowie knife was a large, single-edged knife infamously used by Jim Bowie to kill a man in a duel in 1827. Spitzer Decl., ¶ 34; *see also* Rivas Decl., ¶ 18. The story of Jim Bowie and the mythology related to his story led to the proliferation of the knife.[7] Spitzer Decl., ¶ 35; Rivas Decl., ¶ 19. The knife's distinctive features,

---

[6] While the majority of this brief focuses on the Bowie knife, other fighting knives, like the dirk and dagger, also proliferated during this period. Rivas Decl., ¶ 14–16. These fighting knives were often addressed alongside Bowie knives in historical laws. *See generally* Spitzer Decl., Ex. D.

[7] This is not unlike the switchblade itself, which experienced heightened popularity following its prevalence in pop culture and the media in the 1950s and

along with Bowie's death at the Alamo in 1836, led to widespread interest in and proliferation of the knife. Spitzer Decl., ¶ 35; Rivas Decl., ¶ 15.

Featuring a long, thin blade, the Bowie knife was designed for interpersonal fighting in a time when single-shot pistols were unreliable and inaccurate. Spitzer Decl., ¶ 36. The exact details of the original bowie knife are unknown, but versions of the knife became more standardized over time. Rivas Decl., ¶ 18. For example, some folding Bowie knives existed. Rivas Decl., ¶ 22. However over time, the Bowie knife came to generally be recognized as a large, eight to twelve-inch knife with a clipped blade—one with a sharpened swedge making it more lethal, with the point generally aligned with the handle. Rivas Decl., ¶ 18. The knife was widely used in fights and duels, even though this practice was widely disfavored. Spitzer Decl., ¶ 36–37.

The public safety concerns surrounding Bowie knives and other thin long-bladed knives were ubiquitous. Spitzer Decl., ¶ 43. Accordingly, states enacted a variety of restrictions on the Bowie knife throughout the nineteenth century, including open and concealed carry prohibitions and criminal penalty enhancements, and imposed taxes on individuals and dealers. Spitzer Decl., ¶ 45–46.

Most states regulated Bowie knives by enacting carry restrictions. Fifteen states banned both open and concealed carry of Bowie knives. Spitzer Decl., ¶ 46. Twenty-nine states enacted laws barring concealed carry of Bowie knives. Spitzer Decl., ¶ 46. In addition, seven states enhanced the criminal penalties for those who used Bowie knives to commit a crime. Spitzer Decl., ¶ 46.[8]

---

1960s. Spitzer Decl., ¶ 15.
  [8] From the beginning of the twentieth century, forty-nine states plus the District of Columbia restricted Bowie knives. Spitzer Decl., ¶ 43. Forty-one states and the District of Columbia barred or restricted Bowie knives by name. *Id*. The other eight states enacted laws restricting the category or type of knife that was embodied by the Bowie knife, but did not mention them by name. *Id*.

Some states prohibited the sale of certain kinds of knives altogether. Rivas Decl., ¶ 32. Tennessee enacted a law in 1838 criminalizing "any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons whatsoever" who "shall sell or offer to sell, or shall bring into this State, for the purpose of selling, giving, or disposing of in any manner whatsoever any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick." Rivas Decl., ¶ 32 (quoting Ex. 7.)

Such regulations—if they were ever challenged—withstood judicial scrutiny. In *Aymette v. State*, 21 Tenn. 152, 153 (Tenn. 1840), for example, the Supreme Court of Tennessee upheld a conviction for the concealed carry of a Bowie knife. The Court recognized that the prohibition against wearing the Bowie knife was justified because such knives were "usually employed in private broils, and [] are efficient only in the hands of the robber and the assassin." *Id*; *see also* Spitzer Decl., ¶ 39. Similarly, in *Haynes v. Tennessee*, the Tennessee Supreme Court upheld a conviction for the concealed carry of a Bowie knife. The Court recognized that the statute was designed "to prohibit the wearing of bowie knives and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life." 24 Tenn. 120 (Tenn. 1844); *see also* Spitzer Decl., ¶ 40.

Some states also enacted laws taxing the possession and sale of dangerous weapons to discourage their use. Rivas Decl., ¶ 29. At least three states—Alabama, North Carolina, and Mississippi—taxed the personal possession of certain weapons, including large fighting knives like dirks and Bowie knives. Rivas Decl., ¶ 29; *see also id.*, Ex. 11 at 24–29. The rates of these taxes were often so high as to be prohibitive. *Id*. ¶ 29. In the late-nineteenth century, some municipalities also imposed personal taxes on the value of residents' dirks and Bowie knives. *Id.* ¶ 30.

In addition, some states imposed prohibitive occupation taxes upon dealers to discourage the sale and use of deadly weapons. Through revenue bills that were

reenacted year after year, Alabama, Georgia, and Mississippi taxed dealers of deadly weapons. Rivas Decl., ¶ 31. In Georgia, for example, dealers of pistols, toy pistols, shooting cartridges, dirks, and Bowie knives were taxed $100 a year in 1884, 1886, 1888, 1890, 1892, and 1894. *Id.*[9]

The challenged statutes are also relevantly similar to laws regulating clubs and other impact weapons that date back to the Founding era. Throughout our nation's history, there is a robust tradition of regulating clubs and other impact weapons, such as bludgeons, billy clubs, slungshots, and sandbags. *See* Spitzer Decl., Ex. C-D. Like knives, these other impact weapons date back to ancient times. *Id.*, ¶ 51. These weapons were used to strike others and were associated closely with criminal use. *Id.* Consequently, they were ubiquitously regulated by state governments, which enacted laws primarily regulating their carry. *Id.* Every state in the nation had laws restricting one or more types of club weapons. *Id.*

The earliest known law that broadly regulated "clubs" dates back to 1664. Spitzer Decl., ¶ 54. Seven states—New York (1664), Massachusetts (1750), Maine (1786), Virginia (1792), Delaware (1797), Kentucky (1798), Mississippi (1799)—enacted these laws in the seventeenth and eighteenth centuries. *Id.*, Ex. C. Six states—Alabama (1805), Arkansas (1835), Indiana (1804, 1855, 1881), Mississippi (1804), Missouri (1818), Texas (1889)—enacted laws regulating clubs in the nineteenth century. *Id.* Two states—Indiana (1905) and Missouri (1923)—regulated clubs in the early twentieth century. *Id.*

In addition to laws regulating clubs generally, states also enacted laws specifically regulating the billy club, a heavy, hand-held rigid club made of wood, plastic or metal. Spitzer Decl., ¶ 53. At least sixteen states had laws regulating billy

_____

[9] While the aforementioned laws focus on Bowie knives, these laws often also addressed other concealable weapons considered dangerous at the time, including pocket pistols, dirks, daggers, saps, slungshots, and other large knives. Spitzer Decl., ¶ 42–43; Rivas Decl., ¶ 27; *see also* Spitzer Decl., Ex. D. The concealability of these weapons is distinct from rifles, muskets, and shotguns, which were carried openly and not likely to be used in the commission of crimes. Rivas Decl., ¶ 11.

clubs, the earliest of which dates back to a Kansas law enacted in 1862. *Id.*; *see also id.*, Ex. C. Together, these sixteen states enacted a total of forty-six separate billy club laws over the years. *Id.* Eleven states enacted similar laws in the early twentieth century. *Id.*

States also enacted laws regulating the bludgeon, a short stick with a thickened or weighted end. Spitzer Decl., ¶ 52. The earliest known law regulating bludgeons dates back to 1799 in New Jersey. *Id.* Twelve states enacted similar laws in the eighteenth and nineteenth centuries. *Id.*; *see also id.,* Ex. C. Four states—Michigan (1927, 1929), New Jersey (1927), New York (1911, 1913, 1931), North Dakota (1915)—regulated bludgeons in the early twentieth century. *Id.*

Similarly, states regulated the slungshot, also known as a "blackjack," which is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle. Spitzer Decl., ¶ 55. The earliest known law regulating slungshots was enacted in 1850. *Id.*, ¶ 57. Forty-three states enacted a total of seventy-one laws in the nineteenth century, and a total of twelve in the twentieth century, regulating slungshots. *Id.*, ¶ 55; *see also id.,* Ex. C-D.

States also regulated sandbags—also known as "sand clubs"—which consisted of sand poured into a bag, sack, sock, or similar tube-shaped fabric. Spitzer Decl., ¶ 58. The earliest known law regulating sandbag use was enacted in 1866. *Id.* Ten states enacted fourteen similar laws—seven laws in the nineteenth century, and seven laws in the early twentieth century. *Id.*, ¶ 55; *see also id.,* Ex. C-D.

Only four states did not specifically regulate any of these five specific impact weapons (clubs, billy clubs, bludgeons, slungshots, and sand bags) by name. Spitzer Decl., ¶ 59. But in three of those states, such specific laws would have been redundant because they had broad laws against the carrying of any concealed, dangerous, or deadly weapon. *Id.*

The challenged statutes fit comfortably within this long and unbroken tradition of regulating Bowie knives, impact weapons, and other dangerous and deadly weapons.

**B.  The Surveyed Restrictions Are Relevantly Similar to California's Switchblade Restrictions**

The surveyed Bowie knife, impact weapon, and dangerous and deadly weapon restrictions enacted from the nineteenth century are relevantly similar to California's switchblade restrictions in light of their comparable burdens and justifications. *See Bruen*, 597 U.S. at 29 (modern regulation must "impose a comparable burden on the right of armed self-defense" that is "comparatively justified"). Indeed, many of the historical laws regulating Bowie knives and other dangerous weapons were actually significantly more burdensome than California's switchblade restrictions.

First, California's statutory scheme regulates only a subset of switchblade knives—namely, those with blades two inches or longer *and* without a detent or other similar mechanism. In contrast, many of the historical analogues identified herein were far broader in scope and made no exceptions for particular types of knives—in many cases, these laws regulated *all* concealed knives and deadly weapons generally.[10] *See generally* Spitzer Decl., Ex. D. As two examples of this breadth, Louisiana prohibited "any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon." Rivas, Decl., ¶ 28 (citing Rivas Ex. 16, 1813 La., ch. 5). Similarly, St. Louis, Missouri made it unlawful to conceal "any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, *or any knife resembling a bowie knife, or any other dangerous or deadly weapon.*" Spitzer Decl., Ex. D, pp.

---

[10] There were many different styles and names of knives, such that Americans sometimes struggled to distinguish them. These definitions could also change geographically and over time. Rivas Decl., ¶ 14.

Defendant's Mem. of P's & A's ISO Summary Judgment Motion (3:23-cv-00474-JES-DDL)

49–50 (quoting Ordinances of the City of St. Louis, Misdemeanors, §§ 9–10, emphasis added). An 1886 law journal emphasized that the breadth of the catch-all phrase "other deadly weapon" implied "similarity in the deadly character of weapons, such as can be conveniently concealed about one's person, to be used as a weapon of offence or defense." Rivas Decl., ¶ 13 (citing Rivas Decl., Ex. 6).

Second, the Bowie knife, impact weapon, and dangerous and deadly weapons restrictions were especially burdensome in an era where the single-shot pistol—the precursor to the quintessential self-defense weapon—was unreliable, inaccurate, and widely disfavored. [11] Rifles, muskets, and shotguns were primarily used for militia service and hunting, Rivas Decl., ¶ 11, while large knives and other deadly weapons were more reliable self-defense weapons. Rivas, Decl. ¶ 12.[12] Here, California's law leaves a range of weapons available for lawful self-defense, including handguns.

The modest burdens imposed by California's switchblade laws and its analogues are comparably justified by pressing public-safety concerns. In response to a rise in crime and public concern, forty-nine states and the District of Columbia enacted laws restricting the Bowie knife. Spitzer Decl., ¶ 43–44; Rivas Decl., ¶ 12. Here, for similar reasons, forty states, including California, and the federal government enacted laws restricting switchblades. One California court observed that "the dramatic rise in switchblade crimes nationwide, as noted in the Congressional reports and hearings, must also have been evident to the California Legislature when it passed [Penal Code sections 17235 and 21510]." *People ex rel.*

---

[11] Handguns were single-shot devices and largely unreliable. In contrast, fighting knives, like the Bowie knife, worked in wet and dry conditions and did not need to be reloaded. Rivas Decl., ¶ 14.

[12] Recognizing that dangerous weapons primarily were used for crime but could sometimes be used for self-defense, some historical laws included exceptions for when the weapons were used for self-defense. *See, e.g.*, Spitzer Decl., Ex. D (Oregon 1898; Plainfield, New Jersey, 1895; West Virginia 1891; Montana, 1885; West Virginia 1882; Arizona, 1871; California, 1861; Mississippi, 1840).

*Mautner v. Quattrone*, 211 Cal. App. 3d 1389, 1396 (Cal. Ct. App. 1989) (citing Sen. Rep. No. 1980, 85th Cong., 1st Sess., and H.R. No. 9820, H.R. No. 10618, H.R. No. 111289, 85th Cong., 2d Sess., pp. 1–33 (1958) [bills of the Federal Switchblade Act].) Indeed, in a study of historical newspapers available online, news stories referencing switchblades and switchblade crimes were relatively low up until 1945, Spitzer Decl., ¶ 21–25, but after 1945, such stories rose precipitously. Spitzer Decl., ¶ 21–22.[13] This was particularly true after 1950 and persisting throughout the decade. Spitzer Decl., ¶ 21–22. California's switchblade restrictions—like its historical predecessors—were thus enacted in response to an increase in the use of such weapons in criminal activity.

## CONCLUSION

This Court should enter summary judgment in favor of Defendant.


Dated: March 6, 2024                    Respectfully submitted,

                                        ROB BONTA
                                        Attorney General of California
                                        R. MATTHEW WISE
                                        Supervising Deputy Attorney General
                                        JANE REILLEY
                                        Deputy Attorney General



                                        */s/ Katrina Uyehara*
                                        KATRINA UYEHARA
                                        Deputy Attorney General
                                        *Attorneys for Defendant Rob Bonta,*
                                        *Attorney General of the State of*
                                        *California*

---

[13] Since police and court conviction records from the 1950s are largely inaccessible, historical newspapers are the best record to derive an estimate of switchblade crime. Spitzer Decl., ¶ 15–16, 21; *see also* Ex. Hardy 4, pp. 72–73.

# CERTIFICATE OF SERVICE

Case Name: **Knife Rights, Inc., et al. v.**
**California Attorney General**
**Rob Bonta, et al.**

No. **3:23-cv-00474-JES-DDL**

I hereby certify that on <u>March 6, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT ATTORNEY GENERAL ROB BONTA'S MOTION FOR SUMMARY JUDGMENT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>March 6, 2024</u>, at Sacramento, California.

|  |  |
|---|---|
| Eileen A. Ennis | *Eileen A. Ennis* |
| Declarant | Signature |

SA2023301419
37919382.docx