John W. Dillon (SBN 296788)
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P.,

Plaintiffs,

vs.

CALIFORNIA ATTORNEY GENERAL ROB BONTA, ET AL.,

Defendants.

Case No. 23-CV-0474-JES-DDL

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

1

# TABLE OF CONTENTS

2
<u>Page</u>

3   I.      INTRODUCTION ..................................................................... 1

4   II.      LEGAL STANDARDS .............................................................. 2

5   III.     STATEMENT OF UNDISPUTED FACTS ................................ 3

6   IV.     ARGUMENT ............................................................................ 6

7         A. Automatically Opening Knives Are Arms Protected
8            By The "Plain Text" Of The Second Amendment ............................... 6

9         B. Defendants Cannot Justify The California Knife Ban:
            Automatically Opening Knives Are In Common Use
10          And Are Not Both Dangerous and Unusual. ...................................... 10

11            1. Automatically Opening Knives Are "In Common Use." ............... 13

12                 (i)       Total Number Establishes Common Use. ........................... 16

13                 (ii)     Categorical Commonality Is Also Satisfied. ....................... 19

14                 (iii)    Automatically Opening Knives
                           Are Common Jurisdictionally. ............................................ 20

15         C. The Knife Ban Cannot be Historically Justified. ............................... 21
16                 (i)       Bowie Knife and Other Weapons Regulations

17   V.      CONCLUSION ....................................................................... 26

18

19

20

21

22

23

24

25

26

27

28

---

# TABLE OF AUTHORITIES

Page

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ......................................... 3

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ............................... 7, 13, 14, 17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................... 2, 3

*City of Akron v. Rasdan*, 105 Ohio App.3d 164, 663 N.E.2d 947
    (Ohio Ct. App., 1995) ...................................................................... 10

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................. *Passim*

*Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) ........................................ 5

*Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ............................ 7, 14

*Griffin v. State*, 47 A.3d 487 (Del. 2012) ............................................................ 9

*Heller v. District of Columbia* (*Heller II*)
    670 F.3d 1244 (D.C. Cir. 2011) .................................................... 12

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) .................................................. 16

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) .......................................... 7

*Mackall v. State*, 283 Md. 100, 387 A.2d 762 (1978) ........................................ 8

*McDonald v. Chicago*, 561 U. S. 742 (2010) ............................................... 1, 13

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ............................................ 21

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2021) ............... *Passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) ............................................................ 1, 7

*People v. Bass*, 225 Cal.App.2d 777 (1963) ..................................................... 22

*People v. Yanna*, 297 Mich. App. 137
    824 N. W. 2d 241 (2012) .................................................................. 13

*Russell Fouts v. Bonta*,
    Case No. 19-cv-1662-BEN-JLB, 2024 WL 751001 at *1 ................. 14, 25

*In re S.C. v. S.C.,* 179 Cal.App.4th 1436 (2009) ................................................ 4

*State v. Deciccio*, 315 Conn. 79, 105 A.3d 165 (2014) ....................................... 9

*State v. Delgado*, 692 P.2d 610 (Or. 1984) ......................................... 8, 9, 20, 23

*State v. Griffin*, 2011 Del Super LEXIS 193, *26,
   2011 WL 2083893 (Del Super Ct., May 16, 2011) ....................................9

*State v. Herrmann*, 366 Wis. 2d 312, 873 N.W.2d 257 (2015)............................9

*State v. Montalvo*, 229 N.J. 300, 162 A.3d 270 (2017)........................................9

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
   809 F.2d 626 (9th Cir. 1987) ...........................................3

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017)............................5

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) .........................................7

**Cal. Penal Code**

Section 653k..............................................................................4
Section 17235 .................................................................1, 2, 3, 8, 26
Section 18000..............................................................................4
Section 18005..............................................................................4
Section 21510 .................................................................1, 3, 4, 26
Section 21590 .................................................................1, 3, 4, 26

**Federal Rules of Civil Procedure**

Rule 56 .......................................................................................2
Rule 56(a).................................................................................2

**U.S. Constitution**

Second Amendment ................................................................ *Passim*

Fourteenth Amendment.......................................................... 10

Federal Switchblade Act ....................................................16, 17

**Other Authorities**

1 Malachy Postlethwayt, *The Universal Dictionary of Trade
   and Commerce* (4th ed. 1774).........................................5

1 *Dictionary of the English Language* 107 (4th ed.) (reprinted 1978).................5

H. Peterson, *Daggers and Fighting Knives
   of the Western World* 12 (2001)................................................9

## I.   INTRODUCTION

Undoubtedly, automatically opening knives are "arms" in common use and protected under the plain text of the Second Amendment. The "Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2132 (2021) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). Indeed, the Supreme Court made clear in *Heller* and *Bruen* that the Second Amendment protects the right to acquire, possess, and carry arms for self-defense *and all other lawful purposes* — inside and outside the home. *Bruen*, 142 S. Ct. 2111.

"The constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S.Ct. at 2156 (quoting *McDonald v. Chicago*, 561 U. S. 742, 780 (2010) [plurality opinion]). "The very enumeration of the [Second Amendment] right takes out of the hands of government"— including Defendants — "the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 635 (emphasis in original). The Second Amendment removes the government's ability to step into the shoes of the people and decide what arms are "best" or "ideal" for self-defense and other lawful purposes.

Despite Supreme Court precedent, Defendants prohibit the possession, carry, sale, offers for sale, loans, transfers, or giving of common automatically opening knives with blade lengths of two inches or longer. See Cal. Penal Code §§ 17235, 21510, and 21590 ("California Knife Ban"). Defendants' enforcement of the California Knife Ban denies individuals who reside in or visit California their fundamental, individual right to keep and bear these common, constitutionally protected arms. Knives that open automatically are useful tools for everyday carry,

recreation, hunting, utility, *and* for self-defense. These are undisputed facts.

Despite belonging to a category of common arms in California and in every state, Defendants enforces an extreme prohibition on all aspects of owning and possessing these common bladed arms. Defendants' enforcement of the California Knife Ban unconstitutionally infringes on the fundamental rights of Plaintiffs and other similarly situated individuals who reside in California to keep and bear constitutionally protected arms in common use—specifically automatically opening knives or "switchblades" through its outright ban. See Penal Code section 17235.

Under the standard established in *Heller* and reaffirmed in *Bruen*, arms cannot be banned unless the government proves that, as part of the historical inquiry detailed in *Bruen*, the arm in question is *both* dangerous *and* unusual;. said differently, there is no dispute that automatically opening knives, or "switchblades," are in common use and are not both "dangerous" and "unusual."

Because the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense," *Bruen*, 142 S.Ct. at 2118, Defendants' enforcement of the California Knife Ban must be declared unconstitutional and enjoined. Accordingly, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for summary judgment, invalidate the California Knife Ban as unconstitutional, and permanently enjoin its enforcement.

## II.    LEGAL STANDARDS

Plaintiffs move for summary judgment under the Federal Rules of Civil Procedure Rule 56.  Summary judgment is appropriate when the pleadings and evidence demonstrate that no genuine issue exists as to any material fact and that the moving parties are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once a movant who does not have the burden of proof at trial makes a properly supported motion, the burden shifts to the nonmovant to show that a summary judgment should not be

granted. *Id.* at 321–325. Unsubstantiated assertions "'are not competent summary judgment evidence.'" *Celotex,* 477 U.S. at 324. "A party opposing such a summary judgment motion … must set forth and support by evidence specific facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–257(1986). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

## III.   STATEMENT OF UNDISPUTED FACTS

California prohibits the possession, carry, sale, offers for sale, loans, transfers, or giving of common automatically opening knives with blade lengths of two inches or longer that it classifies as "switchblade knives." See Cal. Penal Code §§ 17235, 21510, and 21590.

Under Penal Code § 17235, a "switchblade knife" means "*a knife having the appearance of a pocketknife* and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by a flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever." *Id.* (emphasis added). Under that same statute, a "switchblade knife" does "not include a knife that opens with one hand utilizing thumb pressure applied solely to the blade of the knife or a thumb stud attached to the blade, provided that the knife has a detent or other mechanism that provides resistance that must be overcome in opening the blade, or that biases the blade back toward its closed position." *Id.* "Switchblade knives," as defined, are the only knives at issue in this case.

In California, "[e]very person who does any of the following with a switchblade knife having a blade two or more inches in length is guilty of a misdemeanor: (a) Possesses the knife in the passenger's or driver's area of any motor

vehicle in any public place or place open to the public. (b) Carries the knife upon the person. (c) Sells, offers for sale, exposes for sale, loans, transfers, or gives the knife to any other person." Cal. Penal Code § 21510.

In at least one instance, a California court has held that the California Knife Ban extends to possession even within a private residence. *See In re S.C. v. S.C.,* 179 Cal.App.4th 1436 (2009) (police discovery of a switchblade in defendant juvenile's pocket during a search conducted at a private residence could result in defendant being found to have violated then-Penal Code § 653k[1] even though defendant did not possess the knife in a public place or place open to the public). As such, in California, there is a direct threat of criminal prosecution for the mere *possession* of "switchblade knives."

Moreover, Defendants' unconstitutional enforcement scheme mandates that the unlawful possession or carry of any switchblade knife is a nuisance; and thus, such knives are subject to surrender and destruction under Penal Code §§ 18000 and 18005. See Cal. Penal Code § 21590.

The California Knife Ban, enforced by Defendants, places an outright ban on the possession, carry, sale, offers of sale, loans, transfers, or giving, of "switchblade knives," and as such, the ban unconstitutionally infringes on the fundamental right to keep and bear arms, despite that such knives are commonly used arms protected by the Second Amendment.

Automatically opening knives are "arms" under the Second Amendment's plain text. *Bruen*, 142 S.Ct. at 2132. In *Heller*, the Supreme Court made clear that "[t]he 18th-century meaning [of the term "arms"] is no different from the meaning today." 554 U.S. at 581. That is to say, the term "arms" generally referred to "'[w]eapons of offence, or armour of defence.'" *Id*. (quoting 1 Dictionary of the

---

[1] California Penal Code section 21510 was formerly Penal Code § 653k.

English Language 107 (4th ed.) (reprinted 1978)). Moreover, contemporaneous sources confirm that, at the time of the Second Amendment's adoption, the term "arms" was understood to generally extend to bladed weapons. See 1 Malachy Postlethwayt, *The Universal Dictionary of Trade and Commerce* (4th ed. 1774) (including among 'arms' fascines, halberds, javelins, pikes, and swords). Because the plain text of the Second Amendment includes bladed weapons and, by necessity, "switchblades," the Second Amendment presumptively guarantees keeping and bearing such instruments. *Bruen*, 142 S. Ct. at 2135.

In this case, Plaintiffs also desire to keep and bear these bladed arms for self-defense and other lawful purposes. See Appendix in Support of Plaintiffs' Motion for Summary Judgment ("Appendix"), KR0013, KR0018, KR0024, KR0031, KR2154, KR2160. Plaintiffs are "ordinary, law-abiding, adult citizen[][s], and are therefore unequivocally part of the people whom the Second Amendment protects." *Bruen*, at 2129-30. See KR0013, KR0018, KR0024, KR0031, KR2154, KR2160.

The actions at issue—namely, the ability for Plaintiffs, Knife Rights members, and other similarly situated California residents and visitors to California to manufacture, sell, distribute, transport, purchase, possess, loan, transfer, give, and carry bladed arms—in this case, automatically opening knives—unquestionably falls within the plain text of the Second Amendment protecting the right to "keep and bear arms." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Among these rights is "the ability to acquire arms." *Id*. at 677-78 (citing to *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)).

Automatically opening knives were first produced in the 1700s. SeeKR0157, KR0842. By the mid-nineteenth century, factory production of automatically opening knives made them affordable to everyday customers. See KR0157. "George Schrade was one of the most prolific and influential inventors in American cutlery history. In 1892-93, he introduced his Press-Button knife. It was the first switchblade

suited to mass production methods, although automatic opening knives made by hand had been around for more than a century." See KR0130, KR2062.

Despite that automatically opening knives are common numerically, jurisdictionally, and categorically—and thus not both "dangerous and unusual"— Defendants' enforcement of the California Knife Ban denies individuals who reside and visit in California, including the named Individual Plaintiffs, Retailer Plaintiffs' customers, would-be customers, and Plaintiff Knife Rights' members, their fundamental right to keep and bear these common, constitutionally protected arms for all lawful purposes.

## IV.   ARGUMENT

### A.   Automatically Opening Knives Are Arms Protected By The "Plain Text" Of The Second Amendment.

According to the constitutional framework established in *Heller*, and recently affirmed in *Bruen*, the first step in determining the validity of a Second Amendment challenge to an arms ban is to determine whether the conduct that Plaintiffs wish to vindicate is protected by the Second Amendment's plain text. The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." This text controls, and not any interest-balancing policy or means-end scrutiny arguments that may be advanced by Defendants because:

> While judicial deference to legislative interest balancing is understandable — and, elsewhere, appropriate — it is not deference that the Constitution demands here. *The Second Amendment "is the very product of an interest balancing by the people," and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense.*

*Bruen*, 142 S.Ct. at 2131, emphasis added (citing *Heller*, 554 U.S. at 635).

Pursuant to *Bruen*, rather than a two-step interest-balancing (means-end approach), courts must "assess whether modern firearms regulations are consistent

with the Second Amendment's text and historical understanding." *Bruen, 142 S.Ct.* at 2132. Stated another way, courts must first interpret the Second Amendment's text, as informed by history. When the plain text of the Second Amendment covers an individual's conduct, the Constitution presumptively protects that conduct. *Id.* at 2129–30. "In other words, it identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 n.73 (2d Cir. 2015). The burden is placed on the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearms regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2116, 2130 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)). If the government cannot meet its burden, the law or regulation is unconstitutional — full stop. No interest-balancing, means-end/scrutiny analysis can be conducted. *Id.* at 2127, 2129-2130.

The knives prohibited by the California Knife Ban indisputably are "arms" covered by the plain text of the Second Amendment. The Second Amendment extends to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller* acknowledged this threshold point. *Heller*, 554 U.S. at 582. See also *United States v. Daniels*, 77 F.4th 337, 341-342 (5th Cir. 2023) (citing *Bruen*, 142 S.Ct. at 2132, and pointing out that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated"). "[B]earable arms" also include all arms "commonly possessed by law-abiding citizens for lawful purposes." *Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015). *See also Caetano v. Massachusetts*, 577 U.S. 411 (2016) (unanimously vacating a lower court decision upholding a conviction based on Massachusetts' ban on stun guns); and *Russell Fouts v. Bonta*, Case No. 19-cv-1662-BEN-JLB, 2024 WL 751001 at *1 (S.D. Cal. Feb. 23, 2024) ("Americans have an

individual right to keep and bear arms, whether firearms or less lethal arms").

Automatically opening knives, or "switchblades," are categorically "jackknives"[2] or pocket knives. Merriam-Webster dictionary defines "pocketknife" as "a knife that has one or more blades that fold into the handle and that can be carried in the pocket. KR0139. Further, Defendants' experts agree that automatically opening knives are a type of folding pocket knife. See KR1386, KR1481-KR1482, KR1985, KR2064, and KR1876. In fact, California's definition of the term "switchblade" under Penal Code section 17235 explicitly states that a "switchblade" is a knife "*having the appearance of a pocketknife*." KR0009.

In the United States, "knives have played an important role in American life, both as tools and as weapons. The folding pocketknife, in particular, since the early 18th Century has been commonly carried in America and used primarily for work, but also for fighting." *State v. Delgado*, 692 P.2d 610, 613-614 (Or. 1984); *see also* KR0152-KR0153. "[T]hey were apparently used by a great majority of soldiers to serve their numerous personal needs." See KR0293.

Knives in general are indisputably "bearable arms" commonly possessed for "lawful purposes." *Heller*, 554 U.S. at 625. Defense experts Dr. Brennan Rivas and Robert Escobar confirm this undisputed fact. KR2062-KR2064, KR1917-KR1920. As such, automatically opening knives are necessarily "bearable arms." In fact, according to defense expert Escobar, automatically opening knives fall under two of the three categories of knives. KR1876. *Bruen* acknowledges that knives are protected arms noting that "[i]n the medieval period, '[a]lmost everyone carried a knife or a dagger in his belt.'" *Bruen*, 142 S.Ct. at 2140, quoting H. Peterson, *Daggers and Fighting Knives of the Western World* 12 (2001). "While these knives

_____

[2] See https://www.thefree dictionary.com/jackknife; and *Mackall v. State*, 283 Md. 100, 387 A.2d 762, 769, n. 13.

were used by knights in warfare, '[c]ivilians wore them for self-protection,' among other things." *Bruen*, at 2140; and *Heller*, 554 U.S. at 590. In early colonial America, "edged weapons were also absolutely necessary." KR0209. At the time of the Second Amendment's ratification, every state required ordinary citizens to own some type of edged weapon as part of the militia service laws. KR0209, and KR0263-KR0264.

Courts have also held that knives are arms protected by the Second Amendment. See *State v. Deciccio*, 315 Conn. 79, 128, 122, 105 A.3d 165 (2014). (holding dirk knives were "'arms' within the meaning of the second amendment.") ("[T]heir more limited lethality relative to other weapons that, under *Heller*, fall squarely within the protection of the second amendment— *e.g.*, handguns — provides strong support for the conclusion that dirk knives also are entitled to protected status; *State v. Delgado*, 298 Or. 395, 692 P.2d 610, 613-614 (1984) (Oregon Supreme Court held that Oregon's ban on the possession of switchblades violated the Oregon Constitution's right to arms and that a switchblade is constitutionally protected based on historical predecessors); *State v. Herrmann*, 366 Wis. 2d 312, 325, 873 N.W.2d 257, 263 (2015) (Wisconsin Court of Appeals overturned a conviction for possession of a switchblade as unconstitutional; "[w]hether knives are typically used for self-defense or home security as a general matter is beside the point. . . it is undisputed that Herrmann possessed his switchblade inside his home for his protection"); *State v. Montalvo*, 229 N.J. 300, 162 A.3d 270 (2017) (New Jersey Supreme Court held that machete-type knives are protected by the Second Amendment); *State v. Griffin*, 2011 Del Super LEXIS 193, *26 n.62, 2011 WL 2083893 (Del Super Ct., May 16, 2011) ("a knife, even if a 'steak' knife, appears to be a 'bearable arm' that could be utilized for offensive or defensive purposes.") *reversed and remanded on other grounds*, *Griffin v. State*, 47 A.3d 487 (Del. 2012); *City of Akron v. Rasdan*, 105 Ohio App.3d 164, 663 N.E.2d 947 (Ohio Ct. App., 1995) (holding the "right to keep and bear arms" under the Ohio

1   Constitution extends to knives).

2        Because knives, including automatically opening knives, are unquestionably

3   arms protected by the plain text of the Second Amendment, Plaintiffs and other

4   similarly situated law-abiding California residents and visitors seeking to purchase,

5   acquire, sell, transfer, possess, loan, give, or carry these knives within California—

6   are also covered by the Second Amendment's plain text. Thus, Defendants' bear the

7   sole and heavy burden of justifying the California Knife Ban as consistent with the

8   Nation's historical tradition of regulating such arms. *Bruen*, 142 S.Ct. at 2126; and

9   it is not a correct application of *Bruen* to lump together other weapons as somehow

10  analogues to justify the California Knife Ban. The knife laws must be closely

11  analogous to justify criminalizing a person's acquisition or possession of

12  automatically opening knives (which is nothing more than a form of pocket knife);

13  and such laws must be from the relevant historical period—namely, 1791 (adoption

14  of the Second Amendment) or secondarily, 1868 (Fourteenth Amendment adoption).

15  *Bruen*, 142 S.Ct. at 2136-2137.

16   **B.    Defendants Cannot Justify The California Knife Ban:**
17           **Automatically Opening Knives Are In Common Use And Are Not**
18           **Both Dangerous And Unusual.**

19        Defendants cannot meet their heavy burden of justifying the California Knife

20  Ban as consistent with the Nation's historical tradition of regulating such arms.

21  Notably, *Heller* established the relevant contours of this tradition: Bearable arms are

22  presumptively protected by the Second Amendment and cannot be banned unless

23  they are *both* dangerous *and* unusual. *Bruen*, 142 S.Ct. at 2128. And the Supreme

24  Court spelled out that this was a *historical matter*. *Id.* When it discussed the State's

25  argument as to colonial-era bans on the offense of affray (carrying of firearms to

26  "terrorize the people"), the *Bruen* Court stated:

27                At most, respondents can show that colonial legislatures
                 sometimes prohibited the carrying of "dangerous and
28               unusual weapons"—a fact we already acknowledged in

---

*Heller*. […] Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those "in common use at the time," as opposed to those that "are highly unusual in society at large." […] Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." […] Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

*Bruen*, 142 S.Ct. at 2143 (citing *Heller*, 554 U.S. at 627, 629).

Thus, *Bruen* is clear: To prevail under a "historical tradition" analysis, Defendants must meet the heavy burden to justify the challenged California Knife Ban by offering appropriate historical analogues from the relevant time period, *i.e.*, primarily the Founding era. "Much like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." 142 S.Ct. at 2132.

In *Bruen*, when considering the appropriate historical analogues from the relevant period, the Court found that respondents in that case that the offered historical evidence to justify prohibitions on the carry of firearms was from five historical sources: "(1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries." 142 S.Ct. at 2135-36. However, when considering the historical evidence presented, the Supreme Court in *Bruen* made a fundamental distinction regarding what evidence was to be considered.

Noting that "not all history is created equal," the *Bruen* Court stated that

constitutional rights "are enshrined with the scope they were understood to have *when the people adopted them*. […] The Second Amendment was adopted in 1791" *Bruen*, 142 S.Ct. at 2136 (citing *Heller*, 554 U.S. at 634-35 (emphasis original). Thus, the Court cautioned against "giving post enactment history more weight than it can rightly bear." *Id*. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Id* at 2137 (citation omitted). In examining the relevant history that was offered, the *Bruen* Court noted that "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id*. at 2137 (citing *Heller*, 554 U.S. at 614).

Bruen also made clear that 20th-century historical evidence was not to be considered. *Id.* at 2154, n.28 ("We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence … does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.")

In sum, under *Bruen,* some evidence *cannot* be appropriate historical analogues, such as late 19th-century and 20th-century laws, those laws rooted in racism, laws that have been overturned (such as total handgun bans), and laws that are *inconsistent* with the original meaning of the constitutional text. *Bruen,* 142 S.Ct. at 2137 ("post-ratification adoption or acceptance of laws … inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.") (citing *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). These sources of evidence must be disregarded.

In *Caetano*, Justice Alito issued a concurring opinion, joined by Justice Thomas, explaining that, in determining whether an arm is protected under the

Second Amendment, "the pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes today." *Caetano v. Massachusetts*, 577 U.S. 411 at 420. As Justice Alito explained, "[t]he more relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States." *Id*. (quoting *People v. Yanna*, 297 Mich. App. 137, 144, 824 N. W. 2d 241, 245 (2012) (holding Michigan stun gun ban unconstitutional) (cleaned up). Notably, the arm does not have to be used for self-defense. When an arm is possessed by thousands for lawful purposes, it is "in common use" and it is protected — full stop. Further, if an arm is in common use, it necessarily cannot be *both* "dangerous and unusual." It also follows that even arms not "in common use," cannot be banned so long as they are no more dangerous than other arms that are in common use. In short, Defendants have not, and cannot, historically support the California Knife Ban at issue here.

### 1.  Automatically Opening Knives Are "In Common Use."

In *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court struck bans on handguns, "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629. A detailed examination of their commonality was unnecessary. Nonetheless, here, the California Knife Ban is unconstitutional because these knives are "in common use" under any reasonably applied metric.

*Heller* noted that the Second Amendment's protection of arms in common use "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627. Indeed, a weapon that is "unusual" is the antithesis of a weapon that is "common" — so an arm "in common use" cannot also be "dangerous and unusual." In short, a "weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 136 S. Ct. at 1031 (Alito, J.,

concurring) (emphasis in original). Thus, whether automatically opening knives are "dangerous and unusual" "is a contention as to which Defendants bear the burden of proof in the second prong of the *Bruen* analysis." See *Russell Fouts v. Bonta*, at *3. Defendants cannot meet their heavy burden.

**First**, Defendants cannot credibly assert that automatically opening knives are "dangerous and unusual" or uncommon simply because California has prohibited the sale, purchase, transfer, importation, possession, loan, giving, and carry of automatically opening knives within California. "The more relevant statistic" is that millions of these knives "have been sold to private citizens" who "may lawfully possess them in 45 States." See *Caetano*, 136 S.Ct. 1027, 1032 (2016).

**Second**, Defendants' experts have failed to present evidence sufficient to create a genuine factual dispute over whether automatically opening knives are "dangerous and unusual." The court in *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) noted that in determining whether a weapon is both dangerous and unusual, "we consider whether the weapon has uniquely dangerous propensities and whether the weapon is commonly possessed by law-abiding citizens for lawful purposes."

Here, as stated above, the automatically opening knife is simply a variation of the folding pocket knife. Defense experts do not dispute this fact. See KR1386, KR1481 ("both can be carried in the pocket…" "they both fold"); see also KR2064. Like any folding knife, automatically opening knives do not possess any "uniquely dangerous propensities."

Defense experts also fail to identify any uniquely dangerous propensities of switchblades or identify any verifiable link to use in any crime. In Mr. Escobar's report, he discusses several characteristics he claims increase the danger of using a switchblade for self-defense. However, in his deposition, Mr. Escobar admits that each characteristic identified in his report are *not exclusive* to switchblades and apply

to either all folding knives or all knives in general. See KR1878-KR1880, KR1881-KR1882, KR1889, KR1891-KR1892, KR1898-KR1899, KR1900, KR1901, KR1903, KR1905, KR1906-KR1907, KR1914-KR1915, KR1925, KR1929-KR1930, KR1932-KR1934, and KR1935. Moreover, Mr. Escobar makes clear that the alleged problematic characteristics he identifies for "switchblades" are not a threat to the general public, but only *possibly* to the user. KR1915.

In other defense expert reports, namely, from Messrs. Spitzer, Rivas, and Escobar—none of them refer to or cite any crime data relating to switchblades spanning from 1958 to 2024 (also an irrelevant time period). See KR0830, KR1148, and KR1345. In fact, the only "crime data" from any period relied on by Mr. Spitzer is derived from a *single* 1950's magazine article and a Senate report from 1958.[3] See KR1158-KR1160; see also KR0586, KR0605 ("Given that 99% of switchblades were never used for any illegal purpose, the assertion that they are only used for or suited for murder, assault, and robbery is demonstrably false.").

Finally, no one disputes that handguns (or any firearm) are more dangerous than any knife. Defendants' expert explicitly stated that firearms are unequivocally more deadly than any knife. KR1449 ("Obviously, a knife is dangerous but less dangerous than a pistol"), KR1450, KR1451 ("in present day, handgun far more dangerous than a knife"); see also KR1930-KR1932. The simple fact that a firearm can project lethal force over distance makes them more dangerous than any knife. Nonetheless, as a matter of law, the relative dangerousness of handguns (including significant use by criminals) is *insufficient* to justify any prohibition on these arms.

---

[3] Also, in his report, Mr. Escobar asserts there is ample evidence that switchblades are used for criminal activity. However, to support this claim, he does not cite to crime data of any kind in the United States. To the contrary, Mr. Escobar references criminal use of *razor blades in Australia* and *Navaja knives in Spain*. Neither of which support that switchblades are used for criminal purposes. KR1870-KR1872, KR1874, KR1875.

Folding pocket knives are a less lethal/dangerous arm and defense experts agree. See KR1449, KR1450, KR1451, and KR1930-KR1932. Thus, automatically opening knives cannot be held to be uniquely both "dangerous *and* unusual" to justify any kind of ban.

According to binding Supreme Court precedent in *Heller* and *Bruen*, if an arm is not *both* dangerous *and* unusual—and thus, in common use—it cannot be banned as a matter of law.[4] However, California law prohibits the purchase, possession, sale, transfer, loan, giving, and carry of these common folding knives in violation of the Second Amendment rights of Plaintiffs and other similarly situated citizens.

### (i)    Total Number Establishes Common Use.

In establishing whether an arm is "in common use," "[s]ome courts have taken the view that the total number of a particular weapon is the relevant inquiry." *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016). Using this metric, the legislative history of the Federal Switchblade Act has already established that automatically opening knives have been in common use since at least the 1950s. KR0349-KR0350. According to Senate Report No. 1980, "In the United States, 2 manufacturers have a combined production of *over 1 million switchblade knives a year*." KR0571; see also KR0349-KR0350, KR0603, KR0605l, KR1431-KR1432, and KR1161.

This same report states elsewhere that, "It is estimated that the total traffic in this country in switchblade knives exceeds 1,200,000 *per year*." KR0349 (emphasis added); KR0571. "In the area of Fort Bliss, Tex., alone, there are more than 20 establishments selling these knives." KR0350. The Senate report acknowledges at the time that just mail-order services and magazines were "sending out about "3,000

---

[4] Notably, Mr. Escobar, author of *Deadly Ingenuity: A History of Unusual Weapons From Around the World and Across Time*, acknowledges that his book does not discuss *common weapons* like the Bowie Knife, Arkansas Toothpicks, folding knives, switchblades, or balisongs/butterfly knives. KR1852-KR1853.

or 4,000 of these knives out each month." KR0473.

By the 1890s, automatically opening knives were in mass production and "fast becoming the most useful cutting tool one could carry and gaining in popularity and public acceptance." KR0644. Defense experts agree. KR2061-KR2064. "Over a 50-year period from the mid-1890s to the mid-1940s, there had been approximately 20 different companies who had manufactured switchblades knives in this country." KR0644.  "There were switchblades specifically designed for hunters, fishermen, soldiers, farmers, veterinarians, mechanics, office workers, seamstresses, high school girls, Boy Scouts, and also for Girl Scouts." KR0644.; see also KR2062-KR2064. "After World War II, the popularity of the switchblades exploded. Department stores such as Macy's were selling them. Every kid and young man wanted one if they didn't already have one." KR0650-KR0651. Since the Federal Switchblade Act in 1958, "the Italian switchblade stiletto has had a renaissance and is nearly as popular today [in the U.S.] as it first was in the 1950s." *Id*. By comparison, the commonality of automatically opening knives in 1958 dwarfs the number used to establish the commonality of tasers and stun guns in *Caetano*.[5]  See *Caetano*, 577 U.S. at 420.

"By the nineteenth century, the design of the knife changed, offering a more pocket-friendly style that gained widespread popularity in Europe. Over time, several variations of the switchblade were created by French, Spanish, Italian, and American Knifemakers, each offering their own unique variations on how the blade would be exposed." KR0217. According to defense experts, this "pocket-friendly style" automatically opening knife encompassed the vast majority of automatically

---

[5]  The Court in *Caetano* did not draw unnecessary distinctions between stun guns and tasers. Nor is there any constitutionally legitimate reason to separately categorize manually opened folding pocket knives and automatically opening pocket knives. Constitutionally, they are identical.

opening knives in circulation. KR0842, KR2067 ("On the size and styling of early switchblades knives produced in the United States," see Erickson, *Antique American Switchblades* pages 25-143).

"With the arrival of the Industrial Revolution, switchblades began to be mass produced and sold at lower costs, therefore making them more readily available. In the early 1900s, George Schrade, Founder of Geo. Schrade Knife Co., dominated the American switchblade market, with his automatic version of jackknives and pocketknives." KR0217. "When the mid-1900s rolled in, these knives were mass produced by various companies worldwide, and advertised as "compact, versatile multi-purpose tools." *Id*.

Today, automatically opening knives are just as popular, if not more popular, than in the early 1900s. They are useful tools for everyday carry, recreation, hunting, utility, and self-defense. KR2062-KR2063; see also KR1918-KR1920. This fact was also acknowledged by *both* the Department of Justice and the Secretary of Commerce in 1958. KR0575-KR0577.

Moreover, reviewing three of the largest online knife retailers in the country (BladeHQ.com, KnifeWorks.com, and KnifeCenter.com), there are thousands of different models of automatically opening knives for sale for lawful use. Specifically, BladeHQ.com lists approximately 6,909 models of automatically opening knives; knifeworks.com lists approximately 786 models; and KnifeCenter.com lists approximately 989 models. Because automatically opening knives are in common use, they cannot be *both* "dangerous and unusual."[6]

Today, automatically opening knives—including those prohibited under the

---

[6]                                    https://www.bladehq.com/cat--Automatic-Knives--40; https://www.bladehq.com/cat--Out-The-Front-Automatics--41; https://knifeworks.com/automatic-knives/; https://www.knifecenter.com/shop/automatic-knives.

California Knife Ban—are widely possessed and used for lawful purposes across much of the country. KR0147 (Push button knives are "some of the more popular types of pocketknife made today"); see also KR2062-KR2063; KR1918-KR1920. In fact, today, there are at least 33 U.S. manufacturers/retailers that produce automatically opening knives, or knives that fall within California's definition of "switchblade," on a commercial scale today. *Id.*, at KR0035-KR0036.

With this standard in mind, the California Knife Ban cannot be justified. Automatically opening knives have been in common use since the early 1900s and continue to be in common use today. Indeed, these banned "switchblades" are in common use in all respects — they are in common use by sheer number; they are in common use categorically and functionally; and they are in common use jurisdictionally.

### (ii)     Categorical Commonality Is Also Satisfied.

An arm "in common use" can also be proven by categorical commonality. *Heller*, 554 U.S. at 624, 627 (emphasis added). Under *Heller*, the arm must be among "the *sorts* of weapons" or "of the *kind*" that are "in common use at the time." *Id*. Automatically opening folding knives have no practical or constitutional distinction from other folding pocket knives in that they have a blade, a handle or grip, and the blade rests within the handle or grip when closed or collapsed, and when open or extended is "fixed" into a usable position (*e.g.*, assisted opening knives, manually opening knives). These knives are indistinguishable in their function and use. KR1974-KR1975, KR21246-KR2150, KR0036-KR0037, and KR0593-KR0594. They all operate as *pocket knives* that can be opened with one hand. *Id.* available at: https://kniferights.org/Folding_Knife_Comparison.; Defense experts agree. Of the three categories of knives—fixed blade, folding, and out-the-front—automatic opening knives fall under two of these three categories, folding and out-the-front. KR1875.

In fact, many models of folding knives are available in various versions so the user can choose their preferred method of opening. KR2146-KR2150; *see also State v. Delgado*, 298 Or. 395, 403 (1984) ("The only difference is the presence of the spring-operated mechanism that opens the knife. We are unconvinced by the state's argument that the switchblade is so 'substantially different from its historical antecedent' (the jackknife) that it could not have been within the contemplation of the constitutional drafters.")

Today, automatically opening knives fall under the category of folding pocket knives — an arm possessed in millions of households in the United States. KR2152; see also KR2064. According to estimates from American Knife & Tool Institute, as many as 35,695,000 U.S. households own a pocket knife. KR2152. Moreover, assisted opening and one-hand opening knives—which are functionally identical to automatically opening knives—are approximately 80% of all knives sold in the United States. *Id*. Because automatically folding knives are categorically folding pocket knives*;* and folding knives are legal in all 50 states, they are in common use.

### (iii)   Automatically Opening Knives Are Common Jurisdictionally.

An arm— specifically, automatically opening knives—cannot be both "dangerous and unusual," if they are both lawful to possess and used in a *vast majority* of the United States. Automatically opening knives are *entirely legal* to manufacture, sell, purchase, transfer, possess, and carry in a majority of states in this country. KR0133-KR0136. Thus, automatically opening knives are also in common use *jurisdictionally*.

As of February 2024, at least 45 states allow the sale, purchase, transfer, acquisition, and possession of automatically opening knives that are prohibited by the California Knife Ban; and at least 36 states permit the public carry of said knives in some manner. KR0133-KR0136. Moreover, since 2010, nineteen states have repealed bans/restrictions on automatically opening knives. KR0033. Thus, as these

knives are in common use jurisdictionally, they cannot be considered "dangerous and usual" justifying the California's Knife Ban.

## V.   THE KNIFE BAN CANNOT BE HISTORICALLY JUSTIFIED

The historical analysis has been conducted by the Court in *Heller*. *Heller* decided the underlying historical principle: only dangerous *and* unusual arms can be categorically banned. This Court need only apply that historical principle to the facts in this case, just as done in *Heller* and *Bruen*. There is no need for any further historical analysis. Any attempt by Defendants to engage in such analysis would be asking "to repudiate the [Supreme] Court's historical analysis," which this Court "can't do." *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012). In any event, Defendants cannot historically support the ban at issue here.

In fact, the challenged California Knife Ban has *no historical pedigree*, nor justification in this Nation's history and tradition of arms regulation. Nor does the California Knife Ban address any kind of "unprecedented societal concerns" and "dramatic technological changes" that would require a more nuanced historical approach. This case concerns a type of folding pocket knife and an age old social ill: criminal use of knives. KR2024. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

Defense expert Rivas also admits to finding only one state statute throughout the entire 19th Century that prohibited the sale of any kind of knife.[7] KR2096-

---

[7] In his report, Professor Spitzer references one additional 1881 Arkansas law banning the carrying and sale of certain weapons. His remaining laws largely address concealed carry or are regulations on impact weapons in the late 1800s—far removed from the relevant Founding era. KR1148, 1799.

KR2098. Additionally, Dr. Rivas admits she was unable to identify a single law that prohibited the possession of any kind of knife throughout the entire 19th Century. KR2096-KR2099. The same is true for the preceding—and more relevant— Founding era. Both Prof. Spitzer and Dr. Rivas also admit that the vast majority of the laws referenced in their reports only restrict the act of *concealed carry* of certain weapons and nothing more. KR2096-KR2099; KR0830; KR1148; and KR1483. This historical analysis could end here with Defendants' experts' admissions, as Defendants have failed to justify its *broad ban* with relevant analogous laws during and secondarily after the Founding era.

Indeed, the California Knife Ban dates only to 1957. *People v. Bass*, 225 Cal.App.2d 777, 780 (1963) Not only was this significantly past the relevant Founding era in which Defendants must provide analogous laws to justify the ban; it is also several decades after automatically opening knives were introduced into the United States and chosen by the people as a common arm. There is no question that such a ban is well beyond the time period in which this Court may consider when evaluating any relevant historical analogues argued by Defendants.

In contrast, folding knives have long been in common use as "most colonist carried knives for their daily needs—utilizing both fixed and folding blades." KR0202. In the United States, "knives have played an important role in American life, both as tools and as weapons. The folding pocketknife, in particular, since the early 18th Century has been commonly carried by men in America and used primarily for work, but also for fighting." *State v. Delgado*, 692 P.2d 610, 613-614 (Or. 1984); see also KR0152. "At the time of the Revolutionary War, they were used by a great majority of soldiers to serve their numerous personal needs." KR0203.

Moreover, American bans on possession or sale to legal adults of particular arms from 1607 through 1899 are *exceedingly rare*. KR0657.

There were no prohibitions on any particular type of arm, ammunition,

> or accessory in any English colony that later became an American State.
> The only restriction in the English colonies involving specific arms was
> a handgun and knife carry restriction enacted in Quaker-owned East
> New Jersey in 1686…. The 1684 East Jersey restriction on carry was in
> force at most eight years, and was not carried forward when East Jersey
> merged with West Jersey in 1702. That law imposed no restriction on
> the possession or sale of any arms.

KR0671; see also KR1802-KR1807.

At the time of the Founding era, the preferred means of addressing the general threat of violence was to *require* law-abiding citizens to be armed. As *Heller* observed, "Many colonial statutes required individual arms-bearing for public-safety reasons. Colonies required arms carrying to attend church, public assemblies, travel, and work in the field." KR0677. The statutes that required the keeping of arms—by all militia and some non-militia—indicate some of the types of arms that were so common during the colonial period that it was practical to mandate ownership. These mandates regularly included bladed weapons/knives. *Id.*, KR0678.

In fact, firearms *and* cutting weapons were ubiquitous in the colonial era, and a wide variety existed of each. Yet they were not banned. The historical record up to 1800 provides no support for general prohibitions on any type of arms. KR0701. In fact, during the colonial era, there were *no bans on knives of any kind*. According to Defendants' expert, prohibitions on the sale or possession of any kind of knife were virtually non-existent throughout the entire 19th Century. KR1476, KR1483, KR209, KR2086-KR2099.

Defendants and their experts place considerable weight on concealed carry restrictions on Bowie knives during the 19th Century to justify the California Knife Ban. Yet, California does not prohibit the purchase, sale, possession, transfer, loaning, or open carry of Bowie knives, dirks, daggers, or any kind of large fixed blade knife. These large "fighting knives" (as described by Defendants' experts) are legal in California. Nevertheless, it is undisputable that there are no outright

prohibitions on the manufacture, sale, possession, and carry of any kind of knife during the Founding era, or the 19th Century. Defendants are thus forced to rely on mid-to-late 19th Century Bowie knife *concealed carry regulations* to attempt to justify the California Knife Ban. However, these regulations fall well short of any analogous historical justification for California's outright prohibition on automatically opening knives and come far too late after the Founding era — contradicting the plain text of the Second Amendment.

**First**, Prof. Spitzer and Dr. Rivas were unable to identify a single prohibition on the sale, purchase, transfer, or possession on any kind of knife during the Founding era. KR0830 and KR1148.

**Second**, with the exception of an 1838 Tennessee restriction and an 1881 Arkansas restriction on the sale of Bowie knives, each and every bowie knife restriction in the 19th Century only restricted the *mode of carrying such knives* — mostly restricting concealed carry of Bowie knives, but allowing for the open carry of Bowie knives.[8] KR0830, KR1148; see also KR1476, KR1483, KR209, KR2086-KR2099. Notably, Professor Spitzer states twice that 15 states banned all carrying of Bowie knives (by banning both concealed carry and open carry). KR1169. However, of these 15 state laws cited by Spitzer, four explicitly restrict concealed carry only; another four are city ordinances, and not state laws; and one is an election day restriction. KR1233-KR1235, KR1242-KR1343.

None of these laws prohibited the possession, transfer, purchase, manufacture, loan, giving, *and* open carry of Bowie knives. KR0830 and KR1148; see also

---

[8] According to Prof. Spitzer's expert report, six states enacted laws that restricted both open carry *and* concealed carry (Arizona (1889), Arkansas (1881), Hawaii (1852), Oklahoma (1890), Texas (1871), and West Virginia (1882). However, Hawaii was an independent kingdom in 1852, Oklahoma was a territory, and Texas and West Virginia has exceptions for good cause.

KR1476, KR1483, KR209, KR2086-KR2099. Additionally, many of the concealed carry restrictions identified by defense experts explicitly permitted concealed carry for travelers or while traveling or explicitly exempted pocket knives from any kind of concealed carry restriction. KR1170, KR1450-KR1451, KR1242-KR1343.

**Third**, with the exception of the single 1838 Tennessee law, the laws referenced above all come well *after* the relevant period this Court must consider. In fact, nearly all of them come after 1870. KR1162-KR1172.

**Fourth**, any reliance by Defendants on mid-to-late 19th Century restrictions on various impact or blunt force weapons is also patently insufficient to justify the State's ban on automatically opening knives as they also come far too late and well beyond the relevant Founding era to be relied on according to *Heller* and *Bruen*, as most of these laws come after the Civil War. KR1171-KR1175; KR1484-KR1485; see also *Fouts v. Bonta*, 2024 WL 751001, at *5 (S.D. Cal. Feb. 23, 2024). They also discuss a completely different category of arms. Finally, defense experts' reliance on these late 1800s restrictions on impact weapons does not justify any knife ban as these impact weapon laws do not justify prohibitions on blunt force weapons themselves. *Fouts v. Bonta*, No. 19-CV-1662-BEN-JLB, 2024 WL 751001 (S.D. Cal. Feb. 23, 2024).

## V.    CONCLUSION

Based on the foregoing, Plaintiffs request that this Court issue an order finding that California Penal Code sections 17235, 21510, and 21590, are unconstitutional. Plaintiffs also request that the challenged Penal Code sections be permanently enjoined.

March 6, 2024                              Respectfully submitted,

DILLON LAW GROUP, APC

_____
John W. Dillon

---