John W. Dillon (SBN 296788)
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KNIFE RIGHTS, INC.; ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P., <br><br> Plaintiffs, <br><br> v. <br><br> CALIFORNIA ATTORNEY GENERAL ROB BONTA, <br><br> Defendants. | Case No. 23-cv-0474-JES-DDL <br><br> Hon. James E. Simmons, Jr. Magistrate Judge Hon. David D. Leshner <br><br> **APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> **Part I: Bates No. KR0001-KR0085** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# APPENDIX INDEX

| Exhibit | Document | Author | Doc. No. |
|---|---|---|---|
| **A** | Declaration of John W. Dillon in Support of Plaintiffs' Motion for Summary Judgment | John W. Dillon | KR0002 |
| **B** | California Penal Code sections 17235, 21510, and 21590 | Legal Citation | KR0009 |
| **C** | Declaration of Garrison Ham in Support of Plaintiffs' Motion for Summary Judgment | Garrison Ham | KR0013 |
| **D** | Declaration of Eliot Kaagan in Support of Plaintiffs' Motion for Summary Judgment | Eliot Kaagan | KR0018 |
| **E** | Declaration of John Phillips in Support of Plaintiffs' Motion for Summary Judgment | John Phillips | KR0024 |
| **F** | Declaration of Doug Ritter in Support of Plaintiffs' Motion for Summary Judgement | Doug Ritter | KR0031 |
| **G** | Excerpts from THE COLLECTOR'S GUIDE TO SWITCHBLADE KNIVES 30 (2001) | Richard V. Langston | KR0039 |
| **H** | Excerpts from SWITCHBLADES OF ITALY 7-8 (2003) | TIM ZINSER ET. AL., | KR0121 |
| **I** | Excerpts from Pocket Knives: The Collector's Guide to Identifying, Buying, and | Bernard Levine | KR0127 |

| | Enjoying Vintage Pocket Knives | | |
|---|---|---|---|
| **J** | National Switchblade Laws Update | Evan Nappen | KR0133 |
| **K** | Pocketknife Definition & Meaning: Merrium-Webster | Merrium-Webster Dictionary | KR0139 |
| **L** | Excerpts from American Knives: The First History and Collectors' Guide | Harold L. Peterson | KR0143 |
| **M** | Knives and the Second Amendment | David B. Kopel, Clayton E. Cramer, & Joseph Olson | KR0149 |
| **N** | Excerpts from Swords & Blades of the American Revolution | George G. Neumann | KR0199 |
| **O** | Excerpts from Arms and Armor in Early Colonial America 1526-1783 | Harold L. Peterson | KR0205 |
| **P** | Excerpts from Knife Bible: History & Modern Knowledge | A.J. Cardenal | KR0211 |
| **Q** | The Second Amendment Rights of Young Adults | David B. Kopel & Joseph G.S. Greenlee | KR0220 |
| **R** | Senate Report No. 1429, Juvenile Delinquency, Report of the Committee of the Judiciary United States Senate (85th Cong., 2d sess.) Made by its Subcommittee on Juvenile Delinquency Pursuant to S. Res. 52 as extended (85th | Senate Report | KR0340 |

| | | | |
|---|---|---|---|
| | | Cong., 1st sess.) Together with Individual Views | | |
| | **S** | Hearing Before the Subcommittee to Investigate Juvenile Delinquency of the Committee on the Judiciary United States Senate Eighty-Fifth Congress First Session, Pursuant to S.Res.52 Eighty-Fifth Congress Investigation of Juvenile Delinquency in the United States, December 4, 1957 | Subcommittee Hearing Report | KR0372 |
| | **T** | Senate Report No. 1980 | Senate Report | KR0570 |
| | **U** | Criminal Use of Switchblades | Paul A. Clark | KR0586 |
| | **V** | Excerpts from Antique American Switchblades | Mark Erickson | KR0642 |
| | **W** | History of Latama Cutlery | Latama Cutlery | KR0646 |
| | **X** | The History of Bans on Types of Arms Before 1900 | David B. Kopel & Joseph G.S. Greenlee | KR0655 |
| | **Y** | *Expert Report and Declaration of Brennan Rivas* | Dr. Brennan Rivas | KR0830 |
| | **Z** | *Expert Report and Declaration of Robert Spitzer (with Plaintiffs Highlights)* | Professor Robert Spitzer | KR1148 |
| | **AA** | *Expert Report and Declaration of Robert Escobar* | Robert Escobar | KR1345 |
| | **AB** | Deposition Transcript of Professor Robert J. Spitzer, February 7, 2024. | Aptus Court Reporting | KR1365 |

| AC | Deposition Transcript of Dr. David T. Hardy, February 15, 2024 | Veritext Legal Solutions | KR1516 |
|---|---|---|---|
| AD | Deposition Transcript of Michael Janich, February 8, 2024 | Veritext Legal Solutions | KR1673 |
| AE | Rebuttal Report and Declaration of David T. Hardy Rebutting Expert Reports and Declarations of Robert Spitzer and Dr. Brennan Rivas | David T. Hardy | KR1799 |
| AF | Deposition Transcript of Robert Escobar, February 9, 2024 (with Plaintiffs' highlights) | Aptus Court Reporting | KR1822 |
| AG | Michael Janich's Expert Rebuttal Report and Declaration Rebutting Expert Report and Declaration of Robert Escobar | Michael Janich | KR1967 |
| AH | Deposition Transcript of Brennan Rivas, February 12, 2024 (with Plaintiffs' highlights) | Aptus Court Reporting | KR1993 |
| AI | Pictures of Automatic Opening Knife Advertisements | Various Authors | KR2127 |
| AJ | Comparison Photographs of various knife models (manual vs. automatic) | Various Authors | KR2145 |
| AK | *Sporting Knives and Tools in America: Essential to Daily Life* Summary Report | American Knife and Tool Institute | KR2152 |
| AL | Declaration of Darin Prince in Support of Plaintiffs Motion for Summary Judgment | Darin Prince | KR2154 |
| AM | Declaration of James "Jim" Miller in Support of Plaintiffs Motion for Summary Judgment | James "Jim" Miller | KR2160 |

| AN | Article *The Toy That Kills*, published by Woman's Home Companion in November 1950 | Jack Harrison Pollack | KR2166 |
| --- | --- | --- | --- |

March 6, 2024,

Respectfully submitted,

DILLON LAW GROUP, APC

*/s/ John W. Dillon*
John W. Dillon
Attorney for Plaintiffs

**PLAINTIFFS EXHIBIT A**

KR0001

John W. Dillon (SBN 296788)
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P., | Case No. 3:23-CV-0474-JES-DDL |
| Plaintiffs, | Hon. James E. Simmons, Jr. Magistrate Judge Hon. David D. Leshner |
| vs. | |
| CALIFORNIA ATTORNEY GENERAL ROB BONTA, | **DECLARATION OF JOHN W. DILLON IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | |

DECLARATION OF JOHN W. DILLON IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

KR0002

# DECLARATION OF JOHN W. DILLON

I, John W. Dillon, declare as follows:

1.     I counsel for Plaintiffs in the above-titled action. I am an attorney licensed in the State of California. I am over the age of 18, have personal knowledge of the facts referred to in this declaration, and am competent to testify to the matters stated below.

2.     I have personally verified the documents described below an used the factual information within each document in the drafting of the Points and Authorities in Support of Plaintiffs' Notice of Motion and Motion for Summary Judgment.

3.     The documents identified below have been identified and included in as separate Exhibits in Plaintiffs' Appendix in Support of Plaintiffs' Motion for Summary Judgment.

4.     Attached to Plaintiffs Appendix as **Exhibit B**, is a true and correct copy of California Penal Code sections 17235, 21510, and 21590.

5.     Attached to Plaintiffs Appendix as **Exhibit C**, is a true and correct copy of the Declaration of Garrison Ham in Support of Plaintiffs Motion for Summary Judgment

6.     Attached to Plaintiffs Appendix as **Exhibit D**, is a true and correct copy of the Declaration of Eliot Kaagan in Support of Plaintiffs Motion for Summary Judgment

7.     Attached to Plaintiffs Appendix as **Exhibit E**, is a true and correct copy of the Declaration of John Phillips in Support of Plaintiffs Motion for Summary Judgment

8.     Attached to Plaintiffs Appendix as **Exhibit F**, is a true and correct copy of the Declaration of Doug Ritter in Support of Plaintiffs Motion for Summary Judgment

KR0003

9.      Attached to Plaintiffs Appendix as **Exhibit G**, is a true and correct copy of the *Collector's Guide to Switchblade Knives* (2001) by Richard V. Langston.

10.     Attached to Plaintiffs Appendix as **Exhibit H**, is a true and correct copy of excerpts from *Switchblades of Italy* (2003), by Tim Zinser et al.

11.     Attached to Plaintiffs Appendix as **Exhibit I**, is a true and correct copy from *Pocket Knives: The Collector's Guide to Identifying, Buying, and Enjoying Vintage Pocket Knives*, by Bernard Levine.

12.     Attached to Plaintiffs Appendix as **Exhibit J**, is a true and correct copy of the *National Switchblade Laws Update*, by Evan Nappen.

13.     Attached to Plaintiffs Appendix as **Exhibit K**, is a true and correct copy of the Merrium-Webster: "Pocketknife" Definition and Meaning, by Merrium-Webster.

14.     Attached to Plaintiffs Appendix as **Exhibit L**, is a true and correct copy of excerpts from *American Knives: The First History and Collector's Guide*, by Harold L. Peterson.

15.     Attached to Plaintiffs Appendix as **Exhibit M**, is a true and correct copy of *Knives and the Second Amendment*, by David B. Kopel, Clayton E> Cramer, & Joseph Olson

16.     Attached to Plaintiffs Appendix as **Exhibit N**, is a true and correct copy of excerpts from *Swords & Blades of the American Revolution*, by George G> Neumann.

17.     Attached to Plaintiffs Appendix as **Exhibit O**, is a true and correct copy of excerpts from *Arms and Armor in Early Colonial America 1526-1783*, by Herold L. Peterson.

18.     Attached to Plaintiffs Appendix as **Exhibit P**, is a true and correct copy of excerpts from *Knife Bible: History & Modern Knowledge*, by A.J. Cardenal.

19.     Attached to Plaintiffs Appendix as **Exhibit Q**, is a true and correct copy of *The Second Amendment Rights of Young Adults*, by David B. Kopel & Joseph G.S. Greenlee.

20.     Attached to Plaintiffs Appendix as **Exhibit R**, is a true and correct copy of Senate Report No. 1429, Juvenile Delinquency, Report of the Committee of the Judiciary United States Senate (85th Cong., 2d sess.) Made by its Subcommittee on Juvenile Delinquency Pursuant to S. Res. 52 as extended (85th Cong., 1st sess.) Together with Individual Views.

21.     Attached to Plaintiffs Appendix as **Exhibit S**, is a true and correct copy of Hearing Before the Subcommittee to Investigate Juvenile Delinquency of the Committee on the Judiciary United States Senate Eighty-Fifth Congress First Session, Pursuant to S.Res.52 Eighty-Fifth Congress Investigation of Juvenile Delinquency in the United States, December 4, 1957.

22.     Attached to Plaintiffs Appendix as **Exhibit T**, is a true and correct copy of Senate Report No. 1980.

23.     Attached to Plaintiffs Appendix as **Exhibit U**, is a true and correct copy of *Criminal Use of Switchblades*, by Paul A. Clark.

24.     Attached to Plaintiffs Appendix as **Exhibit V**, is a true and correct copy of excerpts from *Antique American Switchblades*, by Mark Erickson.

25.     Attached to Plaintiffs Appendix as **Exhibit W**, is a true and correct copy of *History of Latama Cutlery*, by Latama Cutlery.

26.     Attached to Plaintiffs Appendix as **Exhibit X**, is a true and correct copy of The History of Bans on Types of Arms Before 1900, by David B. Kopel & Joseph G.S. Greenlee.

27.     Attached to Plaintiffs Appendix as **Exhibit Y**, is a true and correct copy of Defendant's *Expert Report and Declaration of Brennan Rivas.*

KR0005

28.     Attached to Plaintiffs Appendix as **Exhibit Z**, is a true and correct copy of Defendant's *Expert Report and Declaration of Robert Spitzer.*

29.     Attached to Plaintiffs Appendix as **Exhibit AA**, is a true and correct copy of Defendant's *Expert Report and Declaration of Robert Escobar.*

30.     Attached to Plaintiffs Appendix as **Exhibit AB**, is a true and correct copy of Deposition Transcript of Professor Robert J. Spitzer, February 7, 2024.

31.     Attached to Plaintiffs Appendix as **Exhibit AC**, is a true and correct copy of the Deposition Transcript of Dr. David T. Hardy, February 15, 2024.

32.     Attached to Plaintiffs Appendix as **Exhibit AD**, is a true and correct copy of Deposition Transcript of Michael Janich, February 8, 2024.

33.     Attached to Plaintiffs Appendix as **Exhibit AE**, is a true and correct copy of Plaintiffs' Rebuttal Report and Declaration of David T. Hardy Rebutting Expert Reports and Declarations of Robert Spitzer and Dr. Brennan Rivas.

34.     Attached to Plaintiffs Appendix as **Exhibit AF**, is a true and correct copy of Deposition Transcript of Robert Escobar, February 9, 2024.

35.     Attached to Plaintiffs Appendix as **Exhibit AG**, is a true and correct copy of Plaintiffs' Michael Janich's Expert Rebuttal Report and Declaration Rebutting Expert Report and Declaration of Robert Escobar.

36.     Attached to Plaintiffs Appendix as **Exhibit AH**, is a true and correct copy of Deposition Transcript of Brennan Rivas, February 12, 2024.

37.     Attached to Plaintiffs Appendix as **Exhibit AI**, is a true and correct copy of Pictures of Automatic Opening Knife Advertisements.

38.     Attached to Plaintiffs Appendix as **Exhibit AJ**, is a true and correct copy of Comparison Photographs of various knife models (manual vs. automatic).

39.     Attached to Plaintiffs Appendix as **Exhibit AK**, is a true and correct copy of *Sporting Knives and Tools in America: Essential to Daily Life* Summary Report, published by the American Knife & Tool Institute.

4
DECLARATION OF JOHN W. DILLON IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

KR0006

40. Attached to Plaintiffs Appendix as **Exhibit AL**, is a true and correct copy of the Declaration of Darin Prince in Support of Plaintiffs Motion for Summary Judgment.

41. Attached to Plaintiffs Appendix as **Exhibit AM**, is a true and correct copy of the Declaration of James "Jim" Miller in Support of Plaintiffs Motion for Summary Judgment.

42. Attached to Plaintiffs Appendix as **Exhibit AN**, is a true and correct copy of the article *The Toy That Kills*, by Jack Harrison Pollack, published by Woman's Home Companion in November 1950.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and this declaration was executed on March 1, 2024 in Carlsbad, California.

By: _____
John W. Dillon

# PLAINTIFFS' EXHIBIT B

**KR0008**

---

West's Annotated California Codes
  Penal Code (Refs & Annos)
    Part 6. Control of Deadly Weapons (Refs & Annos)
      Title 1. Preliminary Provisions (Refs & Annos)
        Division 2. Definitions (Refs & Annos)

West's Ann.Cal.Penal Code § 17235

§ 17235. Switchblade knife defined

Effective: January 1, 2012
Currentness

As used in this part, "switchblade knife" means a knife having the appearance of a pocketknife and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by a flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever. "Switchblade knife" does not include a knife that opens with one hand utilizing thumb pressure applied solely to the blade of the knife or a thumb stud attached to the blade, provided that the knife has a detent or other mechanism that provides resistance that must be overcome in opening the blade, or that biases the blade back toward its closed position.

**Credits**

(Added by Stats.2010, c. 711 (S.B.1080), § 6, operative Jan. 1, 2012.)

**Editors' Notes**

**LAW REVISION COMMISSION COMMENTS**

2010 Addition

Section 17235 continues the second paragraph of former Section 653k without substantive change. [38 Cal.L.Rev.Comm. Reports 217 (2009)].

Notes of Decisions (3)

West's Ann. Cal. Penal Code § 17235, CA PENAL § 17235
Current with urgency legislation through Ch. 1 of 2024 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**                                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated California Codes
Penal Code (Refs & Annos)
Part 6. Control of Deadly Weapons (Refs & Annos)
Title 3. Weapons and Devices Other than Firearms (Refs & Annos)
Division 5. Knives and Similar Weapons (Refs & Annos)
Chapter 5. Switchblade Knife (Refs & Annos)

West's Ann.Cal.Penal Code § 21510

§ 21510. Possession, carrying, sale, loan or transfer of switchblade knife prohibited

Effective: January 1, 2012
Currentness

Every person who does any of the following with a switchblade knife having a blade two or more inches in length is guilty of a misdemeanor:

(a) Possesses the knife in the passenger's or driver's area of any motor vehicle in any public place or place open to the public.

(b) Carries the knife upon the person.

(c) Sells, offers for sale, exposes for sale, loans, transfers, or gives the knife to any other person.

**Credits**
(Added by Stats.2010, c. 711 (S.B.1080), § 6, operative Jan. 1, 2012.)

**Editors' Notes**

**LAW REVISION COMMISSION COMMENTS**

2010 Addition

Section 21510 continues the first paragraph of former Section 653k without substantive change.

See Sections 16965 ("passenger's or driver's area"), 17235 ("switchblade knife"). [38 Cal.L.Rev.Comm. Reports 217 (2009)].

Notes of Decisions (15)

West's Ann. Cal. Penal Code § 21510, CA PENAL § 21510
Current with urgency legislation through Ch. 1 of 2024 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated California Codes
  Penal Code (Refs & Annos)
    Part 6. Control of Deadly Weapons (Refs & Annos)
      Title 3. Weapons and Devices Other than Firearms (Refs & Annos)
        Division 5. Knives and Similar Weapons (Refs & Annos)
          Chapter 5. Switchblade Knife (Refs & Annos)

West's Ann.Cal.Penal Code § 21590

§ 21590. Unlawful possession or carrying of switchblade knife deemed nuisance

Effective: January 1, 2012

Currentness

The unlawful possession or carrying of any switchblade knife, as provided in Section 21510, is a nuisance and is subject to Sections 18000 and 18005.

**Credits**

(Added by Stats.2010, c. 711 (S.B.1080), § 6, operative Jan. 1, 2012.)

**Editors' Notes**

**LAW REVISION COMMISSION COMMENTS**

2010 Addition

With respect to a switchblade knife, Section 21590 continues former Section 12028(a) without substantive change.

See Section 17235 ("switchblade knife"). [38 Cal.L.Rev.Comm. Reports 217 (2009)].

West's Ann. Cal. Penal Code § 21590, CA PENAL § 21590
Current with urgency legislation through Ch. 1 of 2024 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# PLAINTIFFS' EXHIBIT C

KR0012

John W. Dillon (SBN 296788)
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P.,

Plaintiffs,

vs.

CALIFORNIA ATTORNEY GENERAL ROB BONTA,

Defendant.

Case No. 3:23-CV-0474-JES-DDL

Hon. James E. Simmons, Jr.
Magistrate Judge Hon. David D. Leshner

**DECLARATION OF GARRISON HAM IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

KR0013

# DECLARATION OF GARRISON HAM

I, Garrison Ham, declare as follows:

1. I am a party in the above-titled action. I am over the age of 18, have personal knowledge of the facts referred to in this declaration, and am competent to testify to the matters stated below. This declaration is executed in support of Plaintiffs' motion for summary judgment.

2. I am an adult natural person, a citizen of the United States, and a resident of San Diego County, California.

3. I am a peaceable, non-violent individual who is eligible to keep and bear arms under State and federal law.

4. I am a member of Plaintiff Knife Rights Inc., who is also a named Plaintiffs in this matter.

5. As a part of my Second Amendment right to keep and bear arms, I wish and intend to acquire, possess, and carry an automatically opening knife with a blade length of two inches or more for lawful purposes, including self-defense. If I was able to legally acquire, possess, and carry such knives, I also would use the knife for various daily, utility purposes and carry it with me on a daily basis for everyday use and self-defense.

6. It is my understanding that an automatically opening knife with a blade length of two inches or more is defined as a "switchblade" pursuant to California Penal Code section 17235.

7. It is my understanding, pursuant to California Penal Code section 17235, "a knife having the appearance of a pocketknife and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by a flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever."

KR0014

8.    It is also my understanding that under California Penal Code section 21510, "[e]very person who does any of the following with a switchblade knife having a blade two or more inches in length is guilty of a misdemeanor: (a) Possesses the knife in the passenger's or driver's area of any motor vehicle in any public place or place open to the public. (b) Carries the knife upon the person. (c) Sells, offers for sale, exposes for sale, loans, transfers, or gives the knife to any other person."

9.    Moreover, the unlawful possession or carrying of any switchblade knife is a nuisance, and thus, such knives are subject to surrender and destruction under California Penal Code §§ 18000 and 18005 according to California Penal Code section 21590.

10.    I would acquire, possess, and carry such a knife but for the State's enforcement of the laws, policies, practices, and customs at issue in this case and my reasonable fear of arrest and prosecution for violation of California's Knife Ban.

11.    I have confirmed that it is unlawful for me to purchase any knife defined as a switchblade under California law, through my personal review of the California Penal Code sections identified above and through visiting various online and storefront knife retailers. In each of these instances, my ability to acquire, purchase or possess an automatically opening knife defined as a switchblade under California law has been denied due to the unconstitutional ban on said knives in California.

12.    As a direct result of the California Knife Ban, my constitutional rights have been injured by the State's prohibition on my ability to legally purchase, acquire, possess, and carry automatically opening knives defined as switchblades under California law. This injury would be redressed by a favorable ruling from this Court, namely, declaring the challenged California Penal Code sections unconstitutional and issuing a permanent injunction against their enforcement. Said differently, California Penal Code sections 17235, 21510, and 21590 stand as an absolute barrier to my ability to purchase, acquire, possess, loan, give, and carry automatically opening knives defined as switchblades under California law.

2
DECLARATION OF GARRISON HAM IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OR MOTION AND MOTION FOR PRELIMINARY INJUNCTION; OR ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT

KR0015

13.     If this case secures the relief that it seeks, that barrier will be removed. Once removed, I will immediately purchase, acquire, possess, and carry automatically opening knives defined as switchblades under California law, including my options to loan or gift one or more such knives. Until then, however, I cannot exercise my constitutional right to keep and bear automatically opening knives due to my fear of prosecution for violating California Penal Code sections 17235, 21510, and 21590.

14.     It is my understanding that automatically opening knives are "arms" under the plain text of the Second Amendment or any common sense meaning of the term. Moreover, I desire to keep and bear an automatically opening knife for self-defense and other lawful purposes, and this conduct is covered by the plain text of the Second Amendment.

15.     Based on my review of the California Penal Code sections, there is no exception of any kind that would allow me to lawfully acquire, purchase, possess, loan, transfer/give, or carry a "switchblade" knife as defined under California law.

16.     I believe that California Penal Code sections 17235, 21510, 21590 are unconstitutional and therefore respectfully request that this Court rule in Plaintiffs' favor, declare that the relevant California Penal Code sections are unconstitutional and immediately issue a permanent injunction preventing their enforcement against myself, the other named Plaintiffs, Plaintiffs Knife Rights Inc. and it's members, and all other California residents or visitors to California.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and this declaration was executed on March 1, 2023 in San Diego, California.

By: _____
Garrison Ham

# PLAINTIFFS' EXHIBIT D

KR0017

John W. Dillon (SBN 296788)
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

Attorney for Plaintiffs

1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

8
9
10
11

| | |
|---|---|
| KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P., | Case No. 3:23-CV-0474-JES-DDL |
| Plaintiffs, | Hon. James E. Simmons, Jr. Magistrate Judge Hon. David D. Leshner |
| vs. | |
| CALIFORNIA ATTORNEY GENERAL ROB BONTA, | **DECLARATION OF ELIOT KAAGAN IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | |

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF ELIOT KAAGAN IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

KR0018

**DECLARATION OF ELIOT KAAGAN**

I, Eliot Kaagan, declare as follows:

1.     I am a party in the above-titled action. I am over the age of 18, have personal knowledge of the facts referred to in this declaration, and am competent to testify to the matters stated below. This declaration is executed in support of Plaintiffs' motion for summary judgment.

2.     I am an adult natural person, a citizen of the United States, and a resident of San Diego County, California.

3.     I am a peaceable, non-violent individual who is eligible to keep and bear arms under State and federal law.

4.     I am a member of Plaintiff Knife Rights Inc., who is also a named Plaintiffs in this matter.

5.     As a part of my Second Amendment right to keep and bear arms, I wish and intend to acquire, possess, and carry an automatically opening knife with a blade length of two inches or more for lawful purposes, including self-defense. If I was able to legally acquire, possess, and carry such knives, I also would use the knife for various daily, utility purposes and carry it with me on a daily basis for everyday use and self-defense.

6.     It is my understanding that an automatically opening knife with a blade length of two inches or more is defined as a "switchblade" pursuant to California Penal Code section 17235.

7.     It is my understanding, pursuant to California Penal Code section 17235, "a knife having the appearance of a pocketknife and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by a flick of a button, pressure on the handle, flip of the wrist or other

2

DECLARATION OF ELIOT KAAGAN IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; OR ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT

KR0019

mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever."

8.     It is also my understanding that under California Penal Code section 21510, "[e]very person who does any of the following with a switchblade knife having a blade two or more inches in length is guilty of a misdemeanor: (a) Possesses the knife in the passenger's or driver's area of any motor vehicle in any public place or place open to the public. (b) Carries the knife upon the person. (c) Sells, offers for sale, exposes for sale, loans, transfers, or gives the knife to any other person."

9.     Moreover, the unlawful possession or carrying of any switchblade knife is a nuisance, and thus, such knives are subject to surrender and destruction under California Penal Code §§ 18000 and 18005 according to California Penal Code section 21590.

10.     I would acquire, possess, and carry such a knife but for the State's enforcement of the laws, policies, practices, and customs at issue in this case and my reasonable fear of arrest and prosecution for violation of California's Knife Ban.

11.     I have confirmed that it is unlawful for me to purchase any knife defined as a switchblade under California law, through my personal review of the California Penal Code sections identified above and through visiting various online and storefront knife retailers. In each of these instances, my ability to acquire, purchase or possess an automatically opening knife defined as a switchblade under California law has been denied due to the unconstitutional ban on said knives in California.

12.     As a direct result of the California Knife Ban, my constitutional rights have been injured by the State's prohibition on my ability to legally purchase, acquire, possess, and carry automatically opening knives defined as switchblades

KR0020

under California law. This injury would be redressed by a favorable ruling from this Court, namely, declaring the challenged California Penal Code sections unconstitutional and issuing a permanent injunction against their enforcement. Said differently, California Penal Code sections 17235, 21510, and 21590 stand as an absolute barrier to my ability to purchase, acquire, possess, loan, give, and carry automatically opening knives defined as switchblades under California law.

13.     If this case secures the relief that it seeks, that barrier will be removed. Once removed, I will immediately purchase, acquire, possess, and carry automatically opening knives defined as switchblades under California law, including my options to loan or gift one or more such knives. Until then, however, I cannot exercise my constitutional right to keep and bear automatically opening knives due to my fear of prosecution for violating California Penal Code sections 17235, 21510, and 21590.

14.     It is my understanding that automatically opening knives are "arms" under the plain text of the Second Amendment or any common sense meaning of the term. Moreover, I desire to keep and bear an automatically opening knife for self-defense and other lawful purposes, and this conduct is covered by the plain text of the Second Amendment.

15.     Based on my review of the California Penal Code sections, there is no exception of any kind that would allow me to lawfully acquire, purchase, possess, loan, transfer/give, or carry a "switchblade" knife as defined under California law.

16.     I believe that California Penal Code sections 17235, 21510, 21590 are unconstitutional and therefore respectfully request that this Court rule in Plaintiffs' favor, declare that the relevant California Penal Code sections are unconstitutional and immediately issue a permanent injunction preventing their enforcement against myself, the other named Plaintiffs, Plaintiffs Knife Rights Inc. and it's members, and all other California residents or visitors to California.

DECLARATION OF ELIOT KAAGAN IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; OR ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT

KR0021

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and this declaration was executed on March 1, 2023 in San Diego, California.

By: _____

Eliot Kaagan

KR0022

# PLAINTIFFS' EXHIBIT E

KR0023

1   John W. Dillon (SBN 296788)
2   jdillon@dillonlawgp.com
    **DILLON LAW GROUP APC**
3   2647 Gateway Road
4   Suite 105, No. 255
    Carlsbad, California 92009
5   Phone: (760) 642-7150
6   Fax: (760) 642-7151

7   Attorney for Plaintiffs

8              **UNITED STATES DISTRICT COURT**
9
       **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
10

11

12  KNIFE RIGHTS, INC., ELIOT          Case No. 3:23-CV-0474-JES-DDL
13  KAAGAN, JIM MILLER, GARRISON
    HAM, NORTH COUNTY SHOOTING         Hon. James E. Simmons, Jr.
14  CENTER, INC., and PWGG L.P.,       Magistrate Judge Hon. David D.
                                       Leshner
15                 Plaintiffs,
16
17         vs.                         **DECLARATION OF JOHN PHILLIPS IN
                                       SUPPORT OF PLAINTIFFS'
18  CALIFORNIA ATTORNEY                MEMORANDUM OF POINTS AND
19  GENERAL ROB BONTA,                 AUTHORITIES IN SUPPORT OF
                                       NOTICE OF MOTION AND MOTION
20                 Defendant.          FOR SUMMARY JUDGMENT**
21

22

23

24

25

26

27

28

**DECLARATION OF JOHN PHILLIPS**

I, John Phillips, declare as follows:

1.    I am a party in the above-titled action, through my business Poway Weapons and Gear (PWG). I am over the age of 18, have personal knowledge of the facts referred to in this declaration, and am competent to testify to the matters stated below. This declaration is executed in support of Plaintiffs' motion for summary judgment.

2.    I am an adult natural person, a citizen of the United States, and a resident of San Diego County, California.

3.    I am a peaceable, non-violent individual who is eligible to keep and bear arms under State and federal law.

4.    I am a member of Plaintiff Knife Rights Inc., who is also a named Plaintiff in this matter.

5.    I am the owner of Poway Weapons and Gear (PWG), a firearms range and retailer in Poway, California. PWG is the largest indoor range in California, serving just under 200,000 visitors per year and supporting almost 6,000 members that are roughly 65 percent male and 35 percent female. PWG employs 37 full-time employees as well as additional seasonal staff as needed.

6.    PWG is also a 5-Star range/retailer as certified by the National Shooting Sport Foundation. At PWG, we take the sale and responsible use of firearms very seriously. We provide firearms training to over 8,000 students per year and interact on our ranges with countless more people. Since opening our range and training center in 2014, we have helped educate over 50,000 students. PWG is a strong supporter of our nation's Second Amendment rights and proudly complies with every step in the regulatory process to meet our own 5-Star standards relative to reputable firearms sales. We take great pride in our record of compliance with local, state, and

1

DECLARATION OF JOHN PHILLIPS IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; OR ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT

KR0025

federal laws and regulations, while also helping ensure the local community can benefit from PWG's efforts through firearms legal education.

7.     As a part of PWG's retail business, PWG retails in and offers for sale various forms and models of knives for self-defense and other lawful purposes.

8.     As a part of my Second Amendment right to keep and bear arms, as well as the Second Amendment rights of my customers and would-be customers, I wish and intend to purchase, acquire, possess, sell, transfer, and carry various models of automatically opening knives with blade lengths of two inches or more for many lawful purposes, including self-defense. Not only would I acquire these knives personally for various lawful purposes, but through my business, I would acquire these knives and lawfully sell them to my customers and would-be customers for self-defense and other lawful purposes through my retail storefronts.

9.     It is my understanding that an automatically opening knife with a blade length of two inches or more is defined as a "switchblade" pursuant to California Penal Code section 17235.

10.     It is my understanding, pursuant to California Penal Code section 17235, "a knife having the appearance of a pocketknife and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by a flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever."

11.     It is also my understanding that under California Penal Code section 21510, "[e]very person who does any of the following with a switchblade knife having a blade two or more inches in length is guilty of a misdemeanor: (a) Possesses the knife in the passenger's or driver's area of any motor vehicle in any public place or place open to the public. (b) Carries the knife upon the person. (c) Sells, offers for sale, exposes for sale, loans, transfers, or gives the knife to any other person."

12.     Moreover, the unlawful possession or carrying of any switchblade knife is a nuisance, and thus, such knives are subject to surrender and destruction under California Penal Code §§ 18000 and 18005 according to California Penal Code section 21590.

13.     As such, it is unlawful for me to personally purchase, acquire, possess, sell, transfer, or carry knives defined as "switchblade" knives under California law. It would also be unlawful for my business, to purchase, acquire, possess, sell, transfer, or carry knives defined as "switchblade" knives under California law for sale in my shop to customers and would-be customers.

14.     To be clear, I would both personally, and through my business, purchase, acquire, possess, and carry such knives but for the State's enforcement of the laws, policies, practices, and customs at issue in this case and my reasonable fear of arrest, loss of federal firearms license, and prosecution for violation of California's Knife Ban.

15.     I already have established retail businesses and clientele in California surrounding the sale of various arms (including knives). As such, the only step required for me to begin selling automatic opening knives through PWG would be to acquire them from manufacturers and distributors. However, I am prohibited from doing so due to California law. In other words, I am ready, willing, and able to purchase and sell automatic opening knives, and the only thing stopping me is my fear of prosecution for violating California Penal Code sections 17235, 21510, and 21590. Acquiring and selling automatically opening knives with blade lengths two inches and more is not some far-off, undefinable goal that I may someday take part in. But for the challenged California Knife Ban, I would place an order tomorrow to acquire automatic opening knives and begin to sell them as part of my business.

16.     As a direct result of the California Knife Ban, myself and my business, PWG, as well as my customers and would-be customers are injured by our collective inability to legally purchase, sell, offer for sale, expose for sale, loan, transfer, or give

"switchblade knives" due solely to California law. This injury would be redressed by a favorable ruling form this Court, namely, declaring unconstitutional and issuing a permanent injunction against enforcement of the challenged penal code sections. Once this absolute barrier is removed by this Court, PWG will immediately acquire, purchase, sell, offer for sale, expose for sale, and transfer, switchblade knives. Until then, my business sales and profit-generating capability are lower than they otherwise would be if I were able to purchase and then advertise, market, and sell another new line of knives ("switchblade knives") to my existing and prospective customers.

17.    It is my understanding that automatically opening knives are "arms" under the plain text of the Second Amendment or any common sense meaning of the term. Moreover, I desire to keep and bear an automatically opening knife for self-defense and other lawful purposes, and this conduct is covered by the plain text of the Second Amendment.

18.    Based on my review of the California Penal Code sections, there is no exception of any kind that would allow me or my customers to lawfully purchase, acquire, purchase, possess, or carry a "switchblade" knife as defined under California law.

19.    PWG brings this case on behalf of itself, and as a representative of a class of similar entities consisting of licensed California retailers too numerous to individually name or include as parties to this action. They are licensed firearms and knife retailers in California that are injured because they are now prohibited from purchasing, acquiring, selling, supplying, delivering, or giving automatically opening knives defined as "switchblades" under California law.

20.    I believe that California Penal Code sections 17235, 21510. 21590 are unconstitutional and therefore respectfully request that this Court rule in Plaintiffs' favor, declare that the relevant California Penal Code sections are unconstitutional and immediately issue a permanent injunction preventing their enforcement against myself, the other named Plaintiffs, PWG customers and would-be customers,

KR0028

1   Plaintiffs Knife Rights Inc.'s members, and all other California residents or visitors

2   to California.

3         I declare under penalty of perjury under the laws of the United States that the

4   foregoing is true and correct, and this declaration was executed on February 28, 2023

5   in Poway, California.

6

7                                          By: _____
                                                John Phillips
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' EXHIBIT F**

KR0030

1  John W. Dillon (SBN 296788)
2  jdillon@dillonlawgp.com
   **DILLON LAW GROUP APC**
3  2647 Gateway Road
4  Suite 105, No. 255
   Carlsbad, California 92009
5  Phone: (760) 642-7150
6  Fax: (760) 642-7151

7  Attorney for Plaintiffs

8
                **UNITED STATES DISTRICT COURT**
9
        **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
10

11

12  KNIFE RIGHTS, INC., ELIOT            Case No. 3:23-CV-0474-JES-DDL
    KAAGAN, JIM MILLER, GARRISON
13  HAM, NORTH COUNTY SHOOTING           Hon. James E. Simmons, Jr.
14  CENTER, INC., and PWGG L.P.,         Magistrate Judge Hon. David D.
                                         Leshner
15              Plaintiffs,

16
        vs.
17
                                         **DECLARATION OF DOUG RITTER IN**
18  CALIFORNIA ATTORNEY                  **SUPPORT OF PLAINTIFFS'**
    GENERAL ROB BONTA,                   **MEMORANDUM OF POINTS AND**
19                                       **AUTHORITIES IN SUPPORT OF**
                                         **NOTICE OF MOTION AND MOTION**
20              Defendant.               **FOR SUMMARY JUDGMENT**

21

22

23

24

25

26

27

28

---

Declaration of Doug Ritter in Support of Plaintiffs' Memorandum of Points and Authorities in Support of Notice of Motion and Motion for Summary Judgment

KR0031

**DECLARATION OF DOUG RITTER**

I, Doug Ritter, declare as follows:

1.      I am not a party in the above-titled action. I am over the age of 18, have personal knowledge of the facts referred to in this declaration, and am competent to testify to the matters stated below. This declaration is executed in support of Plaintiffs' motion for summary judgment.

2.      I am the Chairman and Executive Director of Knife Rights Foundation, Inc. (Knife Rights).

3.      Plaintiff Knife Rights, Inc. ("Knife Rights") is a section 501(c)(4) member advocacy organization incorporated under the laws of Arizona with a primary place of business in Gilbert, Arizona. Knife Rights serves its members, supporters, and the public through efforts to defend and advance the right to keep and bear bladed arms. Knife Rights has members and supporters in California and states throughout the Country. The interests that Knife Rights seeks to protect in this lawsuit are germane to the organization's purposes. Knife Rights sues on behalf of its members, including the Individual Plaintiffs Mr. Miller, Mr. Kaagan, and Mr. Ham, as well as the Retailer Plaintiffs North County Shooting Center and Poway Weapons and Gear. Knife Rights, Inc. members include peaceable, law-abiding individuals in California that wish to exercise their right to keep and bear arms through the manufacture for sale, sale, transfer, acquisition, purchase, loan, transfer, possession, and carriage of automatically opening knives with blade length of two inches or more prohibited under Defendants' enforcement of the California Penal Code sections 17235, 21510, and 21590 ("California Knife Ban").

4.      Organized in 2006, Knife Rights' mission is to, among other things, ensure that federal and state restrictions placed on knives are not only repealed, but stopped from ever being enacted. Knives are one of mankind's oldest and most commonly used tools, and their ownership and lawful possession, use, and carry are

KR0032

fully protected by the Second Amendment. Knife Rights seeks to ensure that the right to keep and bear these bladed arms is well protected through legislative efforts, defense of owners' civil rights through litigation and advocacy, and public education. Knife Rights serves its members, supporters, and the public through these efforts to defend and advance the right to keep and bear bladed arms.

5.      As a direct result of Knife Rights efforts, 44 bills repealing knife bans in 27 states and more than 175 cities and towns have been successful since 2010 (as of February 2024). Additionally, Knife Rights has been responsible for defeating 12 anti-knife bills in seven states, and has obtained favorable court decisions throughout the country.

6.      As to bans on automatically opening knives or "switchblades," Knife Rights has taken part in or supported efforts to successfully repeal such bans in approximately 19 states. A more detailed list of Knife Rights' legislative and litigation accomplishments is found on the Knife Rights website located at: https://kniferights.org/about/accomplishments. These accomplishments are incorporated by reference herein.

7.      Knife Rights also serves its supporters and the public through the promotion of education regarding state and federal knife laws and regulations and the defense and protection of the civil rights of knife owners nationwide. As a part of Knife Rights' efforts to educate knife owners, Knife Rights compiles and reviews the various knife laws and regulations in each state. This compendium helps to ensure that knife owners remain in compliance with federal and states' laws with regard to possessing and carrying various types of knives.

8.      Knife Rights has published a downloadable app, "LegalBlade," which summarizes each states' knife laws by "Knife Type" and provides the user with information on whether specific knives are legal for "Possession," "Open Carry," and "Concealed Carry" in each state. LegalBlade also provides each state's relevant knife/weapon statutes.

2
Declaration of Doug Ritter in Support of Plaintiffs' Memorandum of Points and Authorities in Support of Notice of Motion and Motion for Summary Judgment

KR0033

9.      Knife Rights is taking part in this legal action to further pursue the stated goals and purposes of the organization — and they are to expend substantial time, effort, money, and other resources directed at ensuring the Second Amendment right to bladed arms is fully protected throughout the United States.

10.      Knife Rights has members and supporters in California and states throughout the country. The interests that Knife Rights seeks to protect in this lawsuit are germane to the organization's goals and purposes. Specifically, the ability for Knife Rights' members to exercise their Second Amendment right to keep and bear arms through the acquisition, purchase, sale, transfer, giving, possession, and carry of automatically opening knives in California.

11.      Thus, Knife Rights sues on behalf of its members, including the Individual Plaintiffs James "Jim" Miller, Eliot Kaagan, and Garrison Ham, retailer Plaintiffs North County Shooting Center and Poway Weapons and Gear, and other Knife Rights members, and other similarly situated California residents and visitors who are being denied their Second Amendment right. Knife Rights' members include peaceable, law-abiding individuals in California and many other states that wish to exercise their right to keep and bear arms through the manufacture for sale, sale, transfer, distribution, acquisition, purchase, possession, and carry of automatic opening knives, all of which is prohibited under the California Knife Law, which violation of includes criminal fines and imprisonment. Our members would engage in the acts identified above with respect to such knives, but for their fear of the prohibitions and criminal penalties found in the California Knife Ban

12.      As Chairman and Executive Director of Knife Rights and based on my work with various state legislatures, I am familiar with the current status of the federal and state knife laws and regulations in the United States, including the state of California.

13.      As Chairman and Executive Director of Knife Rights, I have also reviewed the relevant California Penal Code sections that pertain to automatically

opening knives or "switchblades." Specifically, I am familiar with California Penal Code sections 17235, 21510, and 21590 and their prohibition on the acquisition, possession, purchase, Sale, offers for sale, exposes for sale, loans, transfers, or giving the knife to any other person.

14.     Applying the California Penal Code section 17235 definition of "switchblade," I visited the websites of various knife manufacturers that manufacture and sell automatic knives throughout the United States.

15.     Specifically, I visited the following knife manufacturers websites: (a) Bear & Son, (b) Benchmade Knife Co., (c) Buck Knives, (d) Guardian Tactical, (e) Gerber, (f) Hogue, (g) Kershaw, (h) Microtech Knives, (i) Pro-Tech Knives, (j) SOG Knives, (k) Ashville/Paragon Knives, (l) Boker Knives, (m) BRS Bladerunners Systems, (n) Medford Knife & Tool, (o) Colonial Knife, (p) Heretic Knives, (q) Rick Hinderer Knives, (r) Shrade, (s) Spartan Blades, (t) Spyderco, (u) CobraTec, (v) Piranha, (w) RavenCrest Tactical, (x) Templer Knife, (y) Benchmark[1], (z) Heed Industries (aa) Axial Knives, (ab) Columbia Riber Knife & Tool, (ac) Elite Outfitting Solutions, (ad) GT Knives, (ae) Hawk Knife Designs, (af) Knives of Alaska/DiamondBlade Knives, (ag) Southern Grind, (ah) Takcom Knives, (ai) Telum Tactical (Black Rock Outdoors), and (aj) Terrain 365.

16.     All of the companies listed above offer knives for sale and distribution that fall under the definition of "switchblade" under California Penal Code section 17235.

17.     Based on my review of the above-named knife manufacturer websites, there are at least 33 U.S. based manufacturer/retailers of automatically opening

---

[1] The knife manufacturers Piranha and Benchmark do not have their own websites. However, in my review of online knife retailers I found several models of knives from both Piranha and Benchmark offered for sale that fall under California Penal Code section 17235's definition of "switchblade."

knives that meet Penal Code section 17235's definition of "switchblade" which currently offer at least one model of "switchblade" for sale.

18.    On August 8, 2023 I conducted demonstrations of the deployment of various types of folding and fixed blade knives that were videoed for inclusion as an exhibit in this lawsuit. The video is available at the following link:

https://kniferights.org/Folding_Knife_Comparison

19.    The demonstration used a total of 10 folding knives and one fixed blade knife, all currently available for purchase in the U.S. and legal to be possessed and carried in the state of Arizona where the demonstration was done.

20.    The specific knives used in the demonstration were the (i) Kershaw Mini- Random Task Assisted Thumb Stud Opener (Ken Onion design); (ii) Kershaw Natrix Manual Tab Opener; (iii) Kershaw Natrix Assisted Tab Opener; (iv) Terrain 365 P38 DA Double Action Automatic; (v) Terrain 365 P38 AT Manual Thumb Stud Opener; (vi) Pro-Tech TR-5 Automatic; (vii) Pro-Tech TR-5 SA Assisted Thumb Opener; (viii) Hogue Doug Ritter RSK Auto Automatic; (ix) Spyderco Sage Manual Thumb Hole Opener; and (x) Victorinox Swiss Army Tinker; (xi) ESEE Izula (Fixed Blade).

21.    In this demonstration, I provided a visual comparison of these knives and demonstrations of their operation to establish certain facts.

22.    **First**, all of the demonstrated folding knives including manual one hand opening folding knives, assisted opening folding knives and automatically opening (switchblade) folding knives can be opened at equal speeds.

23.    **Second**, because there is no practical or functional difference between the opening speed of these various knives having different opening mechanisms, they are all simply variations of common folding pocket knives which are possessed and owned by millions of Americans.

24.    **Third**, because there is no practical or functional difference between the opening speed of these various knives, their size, or their function, automatically

1  automatically opening (switchblade) knives that are prohibited by California Penal

2  code sections 17235, 21510, and 21590 cannot be "more dangerous" than the other

3  folding knives that are not prohibited.

4    25.   **Fourth**, a folding knife, regardless of opening mechanism, cannot be

5  deployed and put to use as quickly as a fixed blade knife. Additionally, because no

6  folding knife, including an automatically opening (switchblade) folding knife, can

7  be of use for any purpose until it is fully open and held in a position to use for the

8  task at hand, it is not more dangerous than a fixed blade knife that is deployed from

9  its sheath ready to use for the task at hand without repositioning in the hand.

10    26.   Notably, based on my personal knowledge of California knife

11  restrictions, I understand that California does not prohibit the possession, purchase,

12  sale, transfer, loan, giving or open carrying of any kind of fixed blade knife,

13  including Bowie knives, dirks, and daggers.

I declare under penalty of perjury under the laws of the United States that the
foregoing is true and correct, and this declaration was executed on March 1, 2024 in
Gilbert, Arizona.

By: _____
Doug Ritter

KR0037

**PLAINTIFFS' EXHIBIT G**

KR0038

# THE COLLECTOR'S GUIDE TO

# SWITCHBLADE

# KNIVES



## An Illustrated Historical and Price Reference

### RICHARD V. LANGSTON

KR0039

**KR0040**

**KR0041**

# THE COLLECTOR'S GUIDE TO SWITCHBLADE KNIVES

KR0042

**KR0043**

# THE COLLECTOR'S GUIDE TO
# SWITCHBLADE
# KNIVES



## An Illustrated Historical and Price Reference

RICHARD V. LANGSTON

PALADIN PRESS • BOULDER, COLORADO

Athens Regional Library
2025 Baxter Street

KR0044

*The Collector's Guide to Switchblade Knives:*
*An Illustrated Historical and Price Reference*
by Richard V. Langston

Copyright © 2001 by Richard V. Langston

ISBN 1-58160-283-9
Printed in the United States of America

Published by Paladin Press, a division of
Paladin Enterprises, Inc.
Gunbarrel Tech Center
7077 Winchester Circle
Boulder, Colorado 80301 USA
+1.303.443.7250

Direct inquiries and/or orders to the above address.

PALADIN, PALADIN PRESS, and the "horse head" design
are trademarks belonging to Paladin Enterprises and
registered in United States Patent and Trademark Office.

All rights reserved. Except for use in a review, no
portion of this book may be reproduced in any form
without the express written permission of the publisher.

Neither the author nor the publisher assumes
any responsibility for the use or misuse of
information contained in this book.

Visit our Web site at: www.paladin-press.com

**KR0045**

To Bruce MacDonald and Eddie Wuppesahl:

Duty, honor, courage.

Thanks for the chance to write this book. I wish you could be

here to read it.

KR0046

## ACKNOWLEDGMENTS

Although there are many who contribute to a project such as a book, if an author is very lucky he may find a few who, through their belief and backing, actually turn an idea into reality. In that respect I have been truly blessed.

For that I would like to thank my wonderful and patient wife, Judy, as well as my son, Robroy, for all his time and technical assistance.

I would also like to especially thank Mark Erickson. His assistance in assessing and appraising the collection, finding difficult examples of these items, and in general volunteering his time and knowledge to make this project a success was invaluable.

KR0047



# TABLE OF CONTENTS

INTRODUCTION    · 1 ·

## EVOLUTION OF THE AUTOMATIC KNIFE          SECTION 1

CHAPTER 1: A Little History    · 5 ·

CHAPTER 2: Walden, New York: "The Little Sheffield of America"    · 7 ·

CHAPTER 3: George Schrade: The Father of the Automatic Knife    · 11 ·

CHAPTER 4: The Schrade Cutlery Company    · 15 ·

CHAPTER 5: Companies, Product Lines, and Relationships    · 17 ·

CHAPTER 6: Styles, Kit Knives, and Imports    · 25 ·

CHAPTER 7: Opening Mechanisms    · 29 ·

CHAPTER 8: Categories of Collectible Autos    · 33 ·

**KR0048**

AN ILLUSTRATED REFERENCE FOR IDENTIFYING AND VALUING AUTOMATIC KNIVES

# SECTION 2

CHAPTER 9: Grading Knives · 37 ·

Sheffield George Wostenholm Celebrated 5-Inch Folding Dirk · 40 ·

Automatic Knife Company Wilzen Patent 3-Inch Model · 41 ·

Hatch Cutlery Company 3 1/4-Inch Model under Wilzen Patent · 42 ·

Press Button One-Armed Man's Knife · 43 ·

Press Button Invincible 5-Inch Model · 44 ·

Press Button Victor 5-Inch Model · 45 ·

Press Button Guardian 5-Inch Model · 46 ·

Press Button Business 4-Inch Model · 47 ·

Press Button 2 7/8-Inch Double Blade "St. Augustine" Commemorative · 48 ·

Press Button 3 3/8-Inch "Home Insurance Company" Advertising Knife · 49 ·

Press Button 3 3/8-Inch Double Blade with Jigged-Bone Handle · 50 ·

Press Button 3 3/8-Inch Double Blade (One File) with Ivory Celluloid Handles · 51 ·

Press Button 3 3/8-Inch "Johann Hoff" Advertising Knife · 52 ·

Press Button 3 3/8-Inch "White Mountain Refrigerators" Advertising Knife · 53 ·

Schrade Cutlery Company Model 1543 3/4, 4 7/8-Inch Clip Blade · 54 ·

Schrade Cutlery Company Model 1543, 4 7/8-Inch Clip Blade · 55 ·

Schrade Cutlery Company Model 1613 3/4, 4 7/8-Inch Saber Blade · 56 ·

Schrade Cutlery Company Model G1543 3/4 Hunter's Pride 4 7/8-Inch Clip Blade · 57 ·

Schrade Cutlery Company Model 1544 3/4 BM Forest King 4 7/8-Inch Clip Blade · 58 ·

Schrade-Made Remington Contract Model R2403, 4 7/8-Inch Clip-Blade · 59 ·

Schrade Cutlery Company Model 1553 3/4, 4 1/4-Inch Clip Blade · 60 ·

Schrade Cutlery Company Model 7444M, 2 7/8-Inch Double Blade with Marine Pearl Celluloid Handles · 61 ·

Schrade Cutlery Company Model 7444E, 2 7/8-Inch Double Blade with Black-and-Pearl Celluloid Handles · 62 ·

Schrade Cutlery Company Salesman's Sample 2 7/8-Inch with File, Blade and Bail, and Imitation Ivory Celluloid Handles · 63 ·

Schrade Cutlery Company Model 0740W Stamped "Office Knife" 3 3/8-Inch Double Blade with Imitation Ivory Celluloid Handles · 64 ·

Schrade Cutlery Company Model SS7404AC, 3 3/8-Inch Double Blade with Black-and-Pearl Celluloid Handles · 65 ·

KR0049

Schrade Cutlery Company Model 7404ST 3 3/8-Inch with Tortoise Celluloid Handles   · 66 ·

Schrade Cutlery Company Model 7404WT 3 3/8-Inch with Imitation Ivory Celluloid Handles   · 67 ·

Schrade Cutlery Company  Model 7404ACT 3 3/8-Inch Double Blade with Orange-Swirl Celluloid Handles   · 68 ·

Schrade Cutlery Company Model 7404 Blue 3 3/8-Inch Double Blade with Blue-Swirl Celluloid Handles   · 69 ·

Schrade Cutlery Company Model 7404AC 3 3/8-Inch Double Blade with Mottled-Gray Celluloid Handles   · 70 ·

Schrade Cutlery Company Model 7404ACT 3 3/8-Inch Double Blade with Multicolored Celluloid Handles   · 71 ·

Schrade Cutlery Company Model 7403, 3 3/8-Inch Double Blade with Jigged-Bone Handles   · 72 ·

Schrade Cutlery Company Model 7413, 3 3/8-Inch Double Blade with Clip-Style Main Blade and
          Jigged-Bone Handles   · 73 ·

Schrade Cutlery Company Model 7404KT 3 3/8-Inch Double Blade with Brown Celluloid Handles   · 74 ·

Schrade Cutlery Company Model 7404K 3 3/8-Inch Double Blade with Butter-and-Molasses Celluloid Handles   · 75 ·

Schrade Cutlery Company Model 7503B 3 3/4-Inch Double-Blade with Bone Handles and Full Bolsters   · 76 ·

Schrade Cutlery Company Model 7503T 3 3/4-Inch Double Blade with Bone Handles and Tip Bolsters   · 77 ·

Schrade Cutlery Company Model 7504SB 3 3/4-Inch Double Blade with Butter-and-Molasses Handles   · 78 ·

Schrade Cutlery Company Model 7504SB 3 3/4-Inch Double Blade with Tortoise Celluloid Handles   · 79 ·

Schrade Cutlery Company 4-Inch Fishtail, Possible Prototype   · 80 ·

Schrade-Walden Model 155, 4 1/4-Inch with Shackle, Clip Blade   · 81 ·

Schrade-Walden Model 155, 4 1/4-Inch without Shackle, Clip Blade   · 82 ·

Schrade-Walden 4 1/4-Inch Possible Prototype, Clip Blade   · 83 ·

Schrade-Walden Model M.C.-1, 4 1/4-Inch with Jigged Orange-Plastic Handles   · 84 ·

Camillus Model M.C.-1, 4 1/4-Inch with Jigged Orange-Plastic Handles   · 85 ·

Logan/Smyth Model M.C.-1, 4 1/4-Inch with Jigged Orange-Plastic Handles   · 86 ·

Schrade-Walden Model 744, 2 7/8-Inch Double Blade with Embossed Stainless-Steel Handles   · 87 ·

Schrade-Walden G1514, 4-Inch Fishtail Bowtie (with Fixed Crossbar)   · 88 ·

Schrade-Walden Model 151, 4-Inch Fishtail with Candystripe Celluloid Handles and Clip Blade   · 89 ·

Schrade-Walden Model 151, 4-Inch Fishtail with Butterscotch-Swirl Celluloid Handles and Clip Blade   · 90 ·

Flylock 5-Inch with Clip Blade   · 91 ·

Flylock 4 1/8-Inch with Clip Blade   · 92 ·

Flylock 2 7/8-Inch with Embossed Gold Handles and Bail   · 93 ·

Flylock 2 7/8-Inch with Embossed Silver Handles   · 94

Flylock 3 3/8-Inch with Blue-Swirl Celluloid Handles   · 95 ·

Flylock 3 3/8-Inch with Black Composition Imitation Bone Handles and Tip Bolsters   · 96 ·

Flylock 9-Inch Letter Opener   · 97 ·

KR0050

Presto 5-Inch with Brown Jigged-Bone Handles and Clip Blade   · 98 ·

Presto 5-Inch with Brown Bone Handles, Clip Blade, Rare Small Tang Marking   · 99 ·

Presto 5-Inch with Brown (Brain) Plastic Handles and Clip Blade   · 100 ·

Presto 5-Inch with Nickel-Silver Fixed–Cross Guard Bolster and Clip Blade   · 101 ·

Presto 5-Inch with Brown Peach-Seed Jigged-Bone Handles, Clip Blade, and Floating Derby Guard   · 102 ·

Presto 5-Inch with Brown (Brain) Plastic Handles, Clip Blade, and Floating Derby Guard   · 103 ·

Presto Large Commando 5-Inch   · 104 ·

Presto Small Commando 4 1/8-Inch   · 105 ·

Presto 4 1/8-Inch with Grooved-Bone Handles and Clip Blade   · 106 ·

Presto Mark–2   · 107 ·

Presto–George Schrade 3-Inch Pull Ball   · 108 ·

JCN Company (Presto–George Schrade Contract) 3-Inch Pull-Ball with Gold-Plate Handles   · 109 ·

Presto–George Schrade 3 3/8-Inch Single Blade   · 110 ·

Presto–George Schrade Model 6000, 4-Inch Fishtail   · 111 ·

Presto 9-Inch Letter Opener with Bone Handles   · 112 ·

Presto 8-Inch Letter Opener   · 113 ·

Hammer 4 1/4-Inch Candystriped Toothpick with Fixed Guard   · 114 ·

Hammer 4 1/4-Inch Candystriped Toothpick   · 115 ·

Hammer 4 1/4-Inch Toothpick with White-Pearl Handles   · 116 ·

Hammer 4 1/4-Inch Toothpick with Buttermilk Cracked-Ice Handles   · 117 ·

Hammer 4 1/4-Inch Toothpick with Cream Cracked-Ice Handles   · 118 ·

Hammer 3 1/2-Inch with White Imitation Pearl Handles   · 119 ·

Hammer, 3 1/2-Inch with Black Imitation Jigged-Bone Handles   · 120 ·

Hammer 3 1/2-Inch with Marbled Gray-Blue Swirl Handles   · 121 ·

Edgemaster 3 1/2-Inch with Tan-Swirl Celluloid Handles   · 122 ·

Edgemaster 3 1/2-Inch with Green-Swirl Celluloid Handles   · 123 ·

Edgemaster 4-Inch Fishtail with Orange-Swirl Handles   · 124 ·

Shur-Snap Colonial 4-Inch Fishtail with Yellow-Swirl Plastic Handles   · 125 ·

Shur-Snap Colonial 4-Inch Fishtail with Cream/Yellow-Swirl Plastic Handles   · 126 ·

Shur-Snap Colonial, 4-Inch Fishtail with Brown-Swirl Handles   · 127 ·

Shur-Snap Colonial 4-Inch Fishtail with Caramel-Swirl Handles   · 128 ·

Shur-Snap Colonial 4-Inch Fishtail Bowtie with Yellow Celluloid Handles   · 129 ·

Shur-Snap Colonial 4-Inch Fishtail Bowtie with Black Imitation Jigged-Bone Handles   · 130 ·

KR0051

Bowie 4-Inch Fishtail   · 131 ·

Shur-Snap Jumbo Jack 5-Inch with Fixed Guard   · 132 ·

Shur-Snap 4-Inch Stubby with Fixed Guard   · 133 ·

Shur-Snap 4-Inch with Plastic Handles, Bail, and Clip Blade   · 134 ·

Edgemaster 4-Inch with Plastic Handles, Bail, and Clip Blade   135

A.C. Manufacturing Company Aerial 4 1/2-Inch Back-Spring-Release with Stag Handles   · 136 ·

Jaeger Brothers (Made by Aerial Mfg.) 4 1/2-Inch Back-Spring-Release with Stag Handles   · 137 ·

Case Model H1211 1/2, 4-Inch Fishtail with Bone Handles   · 138 ·

Case Model 5171L 5 1/2-Inch with Stag Bone Handles   · 139 ·

Case Model 5161L 4 1/2-Inch with Stag Bone Handles   · 140 ·

Case Bradford C61050L 5 1/8-Inch Coke-Style Zipper-Release Model   · 141 ·

KA-BAR Grizzly Model 2179L 5 1/2-Inch   · 142 ·

KA-BAR Little Grizzly Model 21107L 5 1/4-Inch with Winterbottom Handles   · 143 ·

KA-BAR Model 21105, 4 1/2-Inch Bent Lever with Stag Bone Handles   · 144 ·

KA-BAR Model 21105 Union (Double Stamped) 4 1/2-Inch with Stag Bone Handles   · 145 ·

Queen 5-Inch Toothpick (with Safety)   · 146 ·

Queen 5-Inch Toothpick (without Safety)   · 147 ·

Remington Model R17, 2 3/4-Inch Pull-Ball   · 148 ·

Remington Model R8065 3 3/8-Inch with Yellow Celluloid Handles   · 149 ·

J.A.S. 4 1/2-Inch Dual-Action Custom   · 150 ·

Virginia INOX 4 5/8-Inch Scrimshaw Lever Release with Shotgun Puller   · 151 ·

Baron 4 1/2-Inch Lever Action with Plastic Stag Handles   · 152 ·

Boker Tree Brand Model 715, 4 1/4-Inch Side Lever with Etched Spear Blade   · 153 ·

Unmarked Boker Style 4 1/2-Inch Side Lever, Complete Back and Interior Hand File Worked   · 154 ·

Graef and Schmidt Welkut 4 1/2-Inch Side Lever with Stag Handles and Spear Blade   · 155 ·

Deer Hoof 4 1/4-Inch Knife   · 156 ·

EDGECO Chinese-Made 4 1/8-Inch Lever Release   · 157 ·

NATO Military 4 1/8-Inch Lever Release   · 158 ·

Chinese Dragon 4 1/4-Inch Lever Release   · 159 ·

FES Champion 3 3/4-Inch   · 160 ·

Stiletto Siciliano Italian Set of Four   · 161 ·

Stiletto with Tang Mark "INOX," Button Release, 11-Inch (Open)   · 162 ·

Ackermanscher Picklock Stiletto 8 3/4-Inch (Open)   · 163 ·

**KR0052**

EDGECO 8 3/4-Inch Stiletto with Blue-Plastic Handles    · 164 ·

EDGECO 8 3/4-Inch Stiletto with Green-Plastic Handles    · 165 ·

Stiletto (Unknown Manufacturer, Currently Being Produced) 8 3/4-Inch with White-Plastic Handles    · 166 ·

Rizzuto Korean-Made 8 3/4-Inch (Open) Stiletto    · 167 ·

EDGECO 8 3/4-Inch Stiletto with Stag Handles    · 168 ·

EDGECO 5-Inch Out-the-Front Model    · 169 ·

Top-Button 4 1/2-Inch Out-the Front Pen Knife    · 170 ·

EDGE Kit Italian 4 3/4-Inch Out-the-Front Release, Blade Etched, Black Handles    · 171 ·

EDGE Italian 4 3/4-Inch Out-the-Front Release with Red Handles    · 172 ·

EDGECO Taiwan Front Release 4 3/4-Inch    · 173 ·

ONYX 5-Inch Automatic Front-Opening    · 174 ·

NATO Military Taiwan 4 3/4-Inch Out-the-Front Model    · 175 ·

NATO Military Korea 4 3/4-Inch Front Release    · 176 ·

Chinese-Made Model 1600 Smith & Wesson Clone    · 177 ·

(Unknown Manufacturer) Stainless-Steel 4 1/2-Inch with Gray Brushed Blade and Scale Release    · 178 ·

Smith & Wesson 5-Inch U.S. Army Issue Model    · 179 ·

Carl Schlieper 8-Inch (Open) Model    · 180 ·

West German 5 1/4-Inch Military Gravity Knife    · 181 ·

Bonza 5 1/2-Inch Spring-Assist Model    · 182 ·

OSS-Style 4 3/8-Inch Gravity Knife    · 183 ·

EDGE Kit Mexican 4 1/4-Inch with Wood Handles and Back Pull Release    · 184 ·

Butterfly Knife 4 3/4-Inch    · 185 ·

(Unknown Manufacturer) Stainless 4-Inch Lever-Swing Model    · 186 ·

Boker–Matic, 4 1/4-Inch Spring-Retraction Release    · 187 ·

Meyerco 4 1/2-Inch Strut 'N' Cut Mechanism    · 188 ·

EDGECO 4-Inch English Flop-Over Knife    · 189 ·

Schrade Cutlery Company 3 1/8-Inch Double-Ring-Opening Knife    · 190 ·

Three 1 1/2-Inch Picklock Key Chain Stilettos    · 191 ·

Assorted 3-Inch Push Knives    · 192 ·

Eagle Pencil Company 2 3/4-Inch Gravity Eraser Knife    · 193 ·

Hickok Back-Pull Gentleman's Cam Knife 2 1/2-Inch    · 194 ·

SARCO 3-Inch Back-Pull Cam Knife    · 195 ·

H.H.H. (German) 2 1/4-Inch Two-Bladed Bottom Spring-Release Knife    · 196 ·

KR0053

Brevett 2 1/4-Inch Two-Bladed, Bottom Spring-Release with Bail   · 197 ·

Figural 2 1/2-Inch 1997 "Hong Kong" Commemorative   · 198 ·

Three Chinese-Made Figural 2-Inch Handguns with Blades   · 199 ·

Two Chinese-Made Figural 3-Inch Warrior Knives with Roman Motif   · 200 ·

European Figural 3-Inch "Venice" Commemorative Knife in the Shape of a Gondola   · 201 ·

Edgemaster My-T-Mite 2 1/2-Inch   · 202 ·

Snappy Colonial 2 1/2-Inch Fishtail   · 203 ·

Imperial Mini Jack 2 1/4-Inch Model   · 204 ·

Combination Butane Lighter and 2-Inch Blade   · 205 ·

Primitive pre-1900 9-Inch Knife with Gunstock-Pattern Horn Handles   · 206 ·

Maxam Tanto 5-Inch Lockback Model   · 207 ·

KR0054

**KR0055**



# INTRODUCTION

This book was written to give the reader an understanding of a much maligned tool, the automatic knife, often referred to as the "switchblade." For many years these utensils were used and appreciated with no more trepidation than a soup spoon. However, in the 1950s switchblades were declared illegal in many places because of media hype; the aspirations of some politicians for a menace to chase (real or imagined); and the public's propensity to be inflamed by such threats as rock and roll, motorcycles, and black leather jackets. These laws vary from state to state and in some cases from locality to locality. To say these laws are nebulous, arbitrary, and capricious is an understatement. As a peace officer for 26 years, I believe that these laws prove the following observation, "Laws enforced unequally are at best unfair, and although stupid laws may be the *law*, they are no less *stupid*. In fact, having unfair or stupid laws may be worse than having no laws."

The fact remains that automatic knives are a definite part of history and deserve to be studied. I hope that reading this volume will give the reader an understanding of their history, as well as some means of determining their value as collector's items.

This book is divided into two sections. The first section explores the background of switchblades and examines who and what played a part in their evolution and why. The second section provides a reference to readers who are

1

KR0056

interested in determining—for whatever reason, if only to identify Grandpa's old knife on the mantle—the age, value, and history of their own automatic knives.

To make the reference section more effective, I have included photographs of most of the styles and types of knives offered by knife companies. In the past it has been difficult to find a concise reference with photographs showing the different styles of switchblades and their evolution. Most previous volumes on automatic knives have had only a few photos of these knives because of the age of the knives; instead, they have relied on drawings from old catalogs and diagrams to illustrate the examples. This is because the writers of such volumes did not have access to numerous examples in one place or collection. All of the knives shown in this book are in a private collection, which made it possible for me to include actual photographs of the knives in this book.

The photos show the front and back of each knife, as well as a grading system. It must be noted that the grading of knives is at best subjective. Some evaluators use a system consisting of such terms as *poor (P)*, *fair (F)*, *very good (VG)*, *excellent (E)*, *near mint (NM)*, and *mint (M)*. (The term *mint*, as used in this book, means as new.) Others use a rating system of 1 to 6, with the higher number being the better knife. Both systems often add a plus or minus sign to the grade to make it more specific. To arrive at accurate determinations, many factors must be considered, including, but not limited to, age, condition, and rarity. So what it boils down to is that the value is often in the eye of the beholder and not ironclad. To put it simply, a knife is worth what you are willing to pay for it and directly proportional to how badly you want it.

The knives in this book are given a wide estimated value range and are graded in both systems, with pluses or minuses (e.g., very good = VG/4+). It should be noted that all the knives depicted herein are in working order; therefore, they are not parts knives. The gradation of even one lower designation represents a very large devaluation in the system in older, rarer knives. For example, going from "mint" to the next lower rating of "near mint" (or from a 6 to a 5++) could mean thousands of dollars in the value of a knife.

Availability of the knives also affects their value. Often a scarce knife in marginal condition brings a higher price than a similar but more common model in mint condition. For example, a Press Button Guardian in just functional condition can be worth more than a pristine Invincible model. Both knives are the same size, and the only difference between them is the cross guard. However, the latter was made for almost 30 years, whereas the former was manufactured for only 9 years, making it rarer and thus more valuable.

The reader must also understand that many of these companies made these same style knives under many tang markings (company names). These were called *contract knives*. For example, the Schrade Company produced knives for a multitude of companies under various tang markings, including Keen, Case, and Remington. The value of contract knives is often different from that of knives manufactured under the name of the original maker. It is not my intention to have examples of each tang marking from each company represented in this book, but rather to provide an example of the majority of styles and sizes.

The last major point the reader should understand while reading this book is that all values are retail. That is to say, if you went as a legal buyer to a legal seller (merchant or dealer), these are the price ranges for switchblades in similar conditions that you would most likely have to pay. Of course, you may be fortunate enough to buy a cigar box at a yard sale and find a pristine KA-BAR Grizzly in it for $10, but at least after reading this book, you will understand what you have just purchased, as well as what it is likely worth.

The purpose of the reference section is to allow the reader to identify the variables and have a better understanding of them, *not* to make him an expert appraiser, any more than a person could become a gemologist simply by looking at photographs of diamonds in a book.

KR0057

# SECTION 1



# EVOLUTION OF THE AUTOMATIC KNIFE

**KR0058**

**KR0059**



# CHAPTER 1

# A LITTLE HISTORY

The idea of writing a book about automatic knives is one that I have had for about 45 years. It began the moment I saw my first switchblade. I was about 7 years old, and an older cousin who was staying at our house showed me a metal, scaled, small folding hunter (what was probably a Presto 4 1/4-inch). It must have made quite an impression on me because I still remember the incident vividly. About two years later my family moved to Walden, New York, which was the home of modern (post–Civil War) U.S.-made automatic knives. Every day on the way to school, I would cross High Bridge and see the remains of the once majestic New York Knife Company. If I walked the two blocks it took to cross the other bridge in town, I would go past the defunct Walden Knife Company, which produced the first practical factory-made automatic knives in this country. This site was where Walden Knife, under the leadership of its president, Edward Whitehead, had formed a partnership in 1894 with George Schrade (who, as we will see in Chapter 3, was truly the father of the automatic mechanism).

In effect, the history of the factory-produced automatic knife in the United States begins with the union between the Walden Knife and George Schrade and ends in 1958, when, for all intents and purposes, the legal manufacture of automatic knives in the United States ended. However, the history of the automatic knife is actually several hundred years old; in one form or another, it is as old as knife making itself.

KR0060

Man has always sought to improve his utensils, especially those used as weapons. The desire for concealment, comfort, and something a bit different from the next guy's in one's knives is human nature. For the most part, these old (going back to the 1700s) mostly European (e.g., English, German, Spanish) knives were hand-produced custom pieces for the very rich, not factory made. However, there are some exceptions, most notably those made by the Sheffield Company in England, which produced a limited number of standard styles in the 1800s. Suffice it to say that these early knives are now quite rare and expensive and are mentioned here mostly as historical curiosities. You probably won't see them outside museums or in private collections, and so I won't go into a lot of detail on them in this book.

That said, the first knife pictured in this book is an automatic Sheffield, which, all in all, has withstood the years fairly well. It is under the tang marking of George Wostenholm Celebrated, which would date it somewhere between 1850 and 1900. This would make it among the very earliest production auto openers.

Although the Sheffield autos predated him, George W. Korn is credited with the actual invention of the switchblade in 1883. Korn's knives are, as with the Sheffields, among the rarest of these early autos. Among the criteria for selecting knives for this book were that they must be (1) functional and (2) from my personal collection. At this time I cannot offer a photograph of a Korn that meets both of those criteria.

The next historical advance was the Wilzen knife, patented on April 9, 1889. This was a small lever-activated knife that, when the lever on either end was pushed to the left, allowed the blade to open to about 30 degrees, making it possible for the blade to be fully opened without breaking a nail (some of these had a match striker instead of a nail notch). The first examples of these knives were sold by the Auto (Automatic) Knife Company of Middletown, Connecticut (1891–1893). In 1893 Walter Hatch purchased the firm and operated it under the Hatch Cutlery Company name until 1894, when it moved to Buchanan, Michigan. In 1899 production shifted to South Milwaukee, Wisconsin, until sometime in the early 1900s, when the company went out of business. These knives were produced under the Wilzen patent. Examples of both of these rather rare knives appear in the pictorial section of this book. (It should be noted that the Wilzen in this book only has one blade; apparently a blade was lost and the knife repaired at some time during its 110-year lifetime. However, if so, it was done so long ago and so well that it is difficult to determine whether it was actually made that way.)

During this period several other knife mechanisms were offered to the public. The Napanoch Knife Company produced a knife based on patents by Ernst Ruettgers of Brooklyn, New York (December 27, 1898, and December 24, 1901) for the Lever Cutlery Company.

In 1893, W.W. Pellet received a patent for a knife that had blade lifts attached to the top of the blade. Knives made under this patent were marketed with the tang markings of Halstaff and Company and the Pellet's Patent. Although these knives were not full automatics, they were a significant step in the evolution of the mechanical knife. Just as with the evolution of species, many forms are discarded in favor of more effective or efficient designs. This is natural selection at work. That is why many mechanisms are continually being tried and offered to the public. (In Chapter 7 of this book, I discuss various examples of automatic or rapid-opening mechanisms.)

KR0061

# CHAPTER 2



# WALDEN, NEW YORK:

## "The Little Sheffield of America"

To understand how the switchblade evolved, we must go back to the beginnings of the cutlery industry in this country. Now, it is not my intention to trace the complete history of knives in the United States, only to show how the development of knives in general affected the development of the automatic knife specifically.

The first relatively crude knives or tools in the New World were probably handmade by blacksmiths. Most of them were brought by immigrants from Europe, where the industrial revolution had made their construction possible. This was not a viable solution to a young, vibrant nation where these tools were in great demand. Plus, most of the early settlers had come from the same countries in which the knives were being manufactured, and many of the immigrants had experience making knives in their home countries.

In 1843 one of the earliest U.S. knife factories was established near Waterbury, Connecticut. Many of the cutlers and workers at the Waterville Cutlery Company were Europeans who had immigrated to this country to escape the long hours, poor working conditions, and low wages of their homeland. The expertise and individualism of these early immigrants, combined with the bountiful waterpower of the northeast, led to the development of knife-making firms throughout New England during this period.

KR0062

## NEW YORK KNIFE COMPANY

In 1852, poor wages and working conditions prompted 16 immigrant Sheffield cutlers to leave Waterville and establish the New York Knife Company in Mattawan, New York (later renamed Beacon.) This little village is on the eastern side of the Hudson River across from Newburgh, New York, about 15 miles upriver on the opposite side of West Point. One of these disgruntled cutlers was a man named Thomas J. Bradley, who along with his son, Thomas W. (Tom) Bradley, was instrumental in influencing the history of knife making in this country.  Although neither Bradley nor his son ever produced any automatic knives, both figured prominently in determining where and when automatic knives were produced. In their own way the Bradleys became as important as George Schrade in the evolution of spring steel.

In 1856 Bradley moved his New York Knife Company to Walden, New York, a small, growing industrial village about 11 miles west of Newburgh. Walden was soon to become the seat of the cutlery industry in America. The Bradleys and Walden were suited for each other. Prior to 1856 Walden was a small rural village with a few mills: cotton, lumber, and of course grist. The area was not much different from any New England village except it had a waterfall and the Wallkill River running through the middle of it. With abundant and cheap waterpower at their disposal, Bradley and the other cutlers in the area flourished. The New York Knife Company made some of the finest pocket knives ever produced and served as an economic boon for the small town.

The fledgling U.S. cutlery industry did have a problem, however: competition from Europe. Workers' wages and conditions were much better in the United States, which meant that European cutlers could produce knives as good as or better than U.S. products and still ship and sell them here at lower prices than their American counterparts.

Young Tom Bradley was an insightful, intuitive young man who had served well during the Civil War, retiring as a colonel and later receiving the Medal of Honor for his actions during the war. While in the army, the younger Bradley met various people who would later play significant parts in history. One of his acquaintances was a young man from Ohio named William McKinley. It appears that Bradley and McKinley got to know each other quite well, a relationship that later paid dividends for Bradley and the U.S. cutlery industry as a whole.

After the war, Tom returned home to work in the family business. When Tom succeeded his father as president of the New York Knife Company in 1869 or 1870, European imports were driving many U.S. cutlery firms out of business. Bradley refused to lay off any of his workers and kept his production levels up, despite the low demand for U.S.-made knives. Indeed his company produced so many knives that he would tell workers to take boxes of knives home and store them. Needless to say this further endeared him to his workers and to the village of Walden, but his actions later proved good for his business as well.

In 1890 while in the U.S. House of Representatives, Republican William McKinley got the McKinley Tariff Act passed and signed into law by Republican President Benjamin Harrison, shortly before the 1890 midterm elections. The McKinley Tariff Act raised the already high protective duties on most imports, including knives. Suddenly, all the U.S. cutlery firms were scrabbling to get production going, which meant obtaining material, training people, and doing many other things quickly. Bradley simply patted his experienced work force on the back and asked everyone to bring in those boxes of knives they had been storing through the years.

This prosperity was not long lived, however. The tariff act failed to stabilize farm prices while raising those for many household commodities. Resentment from farmers and settlers in the South and West led to the Republicans losing control of Congress in 1890 and of the White House in 1892. So it was no surprise that under pressure McKinley and other Republicans started to favor the more politically expedient position of lowered tariffs. McKinley defeated Democratic candidate William Jennings Bryan in the presidential election of 1896 and again in 1900. In 1901 McKinley was assassinated, and Theodore Roosevelt, who was less friendly to business interests in the East, became president. Bradley, once again reading the proverbial writing on the wall, ran successfully for U.S. Congress in 1902 and sold his family company the next year.

There was yet another way in which the Bradleys influenced the history of the automatic knife. In 1870 a group of employees of the New York Knife Company were on their lunch break, playing the latest form of a

KR0063

game that had just been actively promoted by (and is often erroneously attributed to) a fellow who went to school about 35 miles away at West Point. His name was Abner Doubleday, and, as I am sure you can guess, the game was baseball. When Colonel Bradley saw his employees playing this new game, he flew into a rage and forbade them to play it while on duty, lunch break or not, because he felt it was "undignified." Some of the employees promptly quit and started the second knife firm in Walden, the Walden Knife Company.

## WALDEN KNIFE COMPANY

Walden Knife started as a cooperative venture, as did most of these early cutlery firms. In 1874, the company was incorporated as Walden Knife and bought a factory of its own on the Wallkill River about one-half mile downstream from New York Knife by what is now Walden's lower dam. The locals always referred to this as the "lower shop." (For historical accuracy, it should be noted that the first home of Walden Knife was the Ericsson Engine Company factory.)

The Walden Knife Company played no part in the history of the switchblade until it went into partnership with George Schrade around 1894. This union led to the press-button line of knives, and between 1894 and 1903 Walden Knife and Schrade sold more than a million press-button knives. When George Weller, the company's main stockholder, retired, the E.C. Simmons Company bought his stock and gained control of the company. The knives were then marketed through E.C. Simmons Hardware Company in St. Louis, Missouri. Walden Knife then became home to the Keen Kutter line of knives.

In 1903 George Schrade sold his interest and patents to the company, and by 1911 Walden Knife employed more than 600 workers and made more than 2,500 patterns, including the press-button line. (George Schrade is discussed in more detail in Chapter 3.)

In 1923 Winchester merged with Walden Knife and moved the company to New Haven, Connecticut. Winchester had also absorbed another local knife manufacturer, the Napanoch Knife Company, which had made contract knives for Keen Kutter in the early 1900s.

I bring up these company mergers and acquisitions only to show why all of these knives, and the later Winchesters, seem so close in pattern and style. In some cases, these companies all used the same machines and dies as they changed hands or merged. Also many employees moved with each transaction, so it could very well have been that the same workers were making the knives for the various firms.

In 1923 a few of the Walden Knife employees attempted to resume making knives in Walden. This short-term experiment produced mostly smaller patterns for fraternal organizations. These knives are tang-marked "ORANGE Knife Walden NY," and obviously are quite rare. (The word *orange* was used because Walden is in Orange County.)

• • •

There were eventually three knife companies in Walden (the third being the Schrade Cutlery Company, discussed in Chapter 4), and these three firms produced knives under many labels, brands, and product lines. During the early part of the 20th century as many as half the knives sold in the United States were made in Walden, which was nicknamed the "little Sheffield of America." To this day Walden is one of the few small towns in America with a statue of William McKinley in the town square.

KR0064

**KR0065**

# CHAPTER 3



# GEORGE SCHRADE:

## The Father of the Automatic Knife

George Schrade was truly the father of the American automatic knife. In order for the reader to understand the magnitude of Schrade's contribution to the development and promotion of these knives, I will relate some relevant biographical background about this prolific inventor and entrepreneur.

George Schrade was born the son of Jacob and Henrietta Heim Schrade of Williamsport, Pennsylvania. The Schrades were the parents of four sons, George, William, J. Lewis, and Joseph, all of whom exhibited abilities as practical engineers. From early on George was both handy and inquisitive, and his career included the invention and design of numerous items, including the player piano.

To the public George was best known as the inventor of the press-button knife and the safety push button; however, to cutlery manufacturers he was better known for the various pieces of automatic knife-making machinery that he invented. His cutlery machinery inventions included, among others, the shield-boring machine (for inserting knife shields), the bolster machine (for trimming excess metal from stamping), the heating machine (for hardening blades from tip to tang), the neck

**KR0066**

drawing machine (another tempering device), the bone-jigging machine (for inletting patterns on handles), and the cleaver and knife grinder (for sharpening).

As mentioned, the partnership between George Schrade and the Walden Knife Company in Walden was formed in 1894 and lasted until 1903 when Schrade sold his patents and remaining interest to Walden Knife (which by then had become a subsidiary of E.C. Simmons Hardware Company). In 1904 George Schrade and two of his brothers, William and Louis, erected a three-story frame building on East Main Street in Walden and formed the Schrade Cutlery Company (discussed in depth in the next chapter).

Like the Walden Knife Company, Schrade Cutlery Company was known for doing contract work, which is why many similar automatic knives bearing the tang markings of various companies are actually Schrade-made knives. Keen Cutter, Case, Remington, E.C. Simmons, and Sears and Roebuck are just some of these companies that contracted with Schrade for knives.

Around 1907 George Schrade improved the design of his original press-button knives, which had often been criticized for not having a safety. The new design had a button farther down the bolster and a slide-button safety, and could have as many as four automatic blades in one knife.

In 1910 George Schrade sold his interest in the Schrade Cutlery Company to his brother J. Louis and went to England, where he attempted to market his machines. From England, George and his son George M. traveled to Germany; it was there, in Solingen, that George Schrade opened his next factory. It is believed that Schrade picked Solingen because of the quality of steel produced there.

While in Solingen, George Schrade invented a new style of automatic knife, called the *Springer*. This was a side-lever-activated knife that is still made in Germany by some companies (e.g., Boker and Hubertus). Even though Schrade had supposedly sold his patents for this style to a German company, in 1916 the German government confiscated the factory and its equipment for the war effort. In 1916 Schrade returned home to the United States.

In 1917, fresh from his ventures in Germany, Schrade invented still another type of switchblade mechanism, the Flylock. At this point, he licensed or sold his patent rights for the Flylock mechanism to the Challenge Cutlery Company. He then went to work for Challenge, and from 1925 until 1929 these Flylock knives were made under the Challenge name. In 1929 the Challenge Company went bankrupt.

In return for money owed to him by Challenge, Schrade was given some cutlery machinery, enabling him to start still another knife company. In 1929 he opened the George Schrade Knife Company in Bridgeport, Connecticut, using the Presto Knife Company logo. The original Schrade Company (now named the Schrade–Walden Cutlery Company), owned by George's brothers, immediately brought suit against George's new company, claiming infringement on a patent sold to them by George himself. The fact that the patent had run out and that George was the inventor of the original design helped him win the suit. In fact, the case was thrown out, and Schrade–Walden Cutlery had to pay legal costs. (As a long-time student of both the Presto Knife Company and Schrade–Walden Knife Company lines of knives, I must say that they bear a striking resemblance to one another in their structure, styles, and mechanisms. )

George's son George M. joined him at the George Schrade Presto Knife Company. The company produced several other types of knives, some of which were not autos but kept the company financially viable. The company did manufacture a few automatic styles, including the pull ball and flying jack, for its own distribution as well as those produced under contract, such as the Case 4217 or Remington quick point. George Schrade died on September 9, 1940, but his company, under the leadership of son George M. and grandson Theodore, continued to prosper and at one time employed more than 100 people. During World War II the company produced a large push-button knife, called the Commando, for paratroopers. In 1956, Boker Knife bought the George Schrade Presto Knife Company and ran it until 1958 when changes in the law basically forced its closure.

• • •

George Schrade's impact on the cutlery world was truly revolutionary. Even if you exclude his mechanical innovations that advanced the automated manufacturing of knives, his contributions just in the area of automatic knives were overwhelming.

KR0067

He was directly responsible for the line of automatic knives produced by the Press Button Knife Company (Walden Knife Company affiliation), the Schrade Cutlery Company, the Flylock (Challenge) Knife Company, and the Presto Knife Company. (For more information on the knives produced by these companies, see Chapters 4 and 5.)

KR0068

KR0069



# CHAPTER 4

# THE SCHRADE CUTLERY COMPANY

As already mentioned, in 1904 George Schrade formed the Schrade Cutlery Company with his brothers William and Louis. This company was without a doubt the most influential and important manufacturer of automatic knives in the United States.

A large measure of the success of the Schrade Cutlery Company can be attributed to its modernization of the production process. This process used a system of dies, jigs, and gauges that guaranteed a consistently high quality in its knives. The Schrade Cutlery Company maintained its exacting standards by constantly improving its equipment through the years.

In 1918 Schrade Cutlery opened a branch several miles to the southwest in Middletown (run by another brother, Joseph), which was operated until 1932, when the Great Depression forced its closing. In 1946 the company was sold to the Imperial Knife Associated Companies, owners of the Imperial Knife Company and the Ulster Knife Company. The name at that time was changed to Schrade–Walden Cutlery Corporation. About 10 years later production of the company's knives was moved to Ellenville (some miles to the northwest of Walden), but, for all intents and purposes, by this time the production of switchblades had ceased.

The Schrade Cutlery Company used several tang-marking systems. The first and rarest was "SCHRADE CUT CO. WALDEN, NY. GERMANY," used from

KR0070

1904. The next was "SCHRADE CUT CO" in a half-circle over "WALDEN, NY" in a straight line. "Schrade Cut Co" was adopted after World War I and used until shortly after World War II. In the mid-1950s this was changed to "SCHRADE WALDEN NY USA" You might find a late automatic knife with this last stamping, but it would be rare because by its adoption virtually all switchblade production had ended. (NOTE: An exception to this was the M.C.-1, about which more below.)

It should be noted that reprints of the Schrade catalog E and supplements, with pictures and descriptions of knives made during the late 1920s and 1930s, are available. The reprint (edited by A.G. Russell) features black and white drawings, as did most of the catalogs of that era. Although the reprints do not show the vibrancy and color of the knives, they do offer a wealth of information about other aspects of the knives.

The knife aficionado who compares the lineup of the original Schrade Press Button knives with the knives made by the Schrade Cutlery Company will be struck by the similarity of the lines and sizes of the knives. There is a line of 2 7/8-inch, two-bladed, double-button knives; 3 3/8-inch, two-bladed, double-button knives; and 3 3/4-inch, two-bladed, double-button knives. These have various blade styles and nail files, and come with or without bolsters.

The line of Schrade folding hunters included a 4 1/4-inch (Model 1553 3/4) and 4 7/8-inch single blade with clip or saber-style blades. The 4 7/8-inch version with floating guard is now called the Hunter's Pride. Other 4 7/8-inch models were the Schrade Hunting Knife and the Forest King, with either celluloid or pyralin handles and bronze or steel linings. Although these were not the same size as Press Button's, they were similar.

Additional styles were also introduced during this period, including the dagger-type push-button, with safety, 4 inches long (some variations in size were made in this style), with or without a fixed blade guard. It is commonly called a "fishtail" because of the distinctive shape of its back bolster. With the fixed cross guard this style is also known as a "bowtie" or "bowtie fishtail."

Other standard-shaped knives that were produced were a 3 3/8-inch and 3 3/4-inch single-blade, single-button styles, as well as at least one model of double 3 3/8-inch blades of stainless steel.

Another interesting auto model was a combination letter opener and safety push-button knife, which incorporates a 3 3/8-inch single-blade knife and a 5 1/2-inch letter opener into one unit.

The new Schrade line did incorporate additional handle materials from the original press-button line (e.g., various colors of celluloid, gold plating, Im jigged bone), thus expanding the options. Still, the main styles and sizes remained the same. (NOTE: The "Im" in the original catalogs refers to the handles actually being jigged bone and not stag or deer antler. The Im designation was later dropped, and the jigged bone was considered a form of stag.)

During World War II both Schrade and Presto made several models of automatic knives for the military. Schrade first made a model approximately 4 1/4 inches long with jigged plastic handles and bail (its civilian model was the same except it had no bail). These knives were essentially the same as the basic 1553 3/4, 4 1/4-inch model (folding hunter) except for the handle material, which was jigged plastic instead of bone stag.

From 1958 through the early 1960s Schrade made a knife on military contract—the lone exception to the company's stoppage of production of automatic knives. This style was named the M.C.-1. It was styled after the 4 1/4-inch folding hunter but was approximately 4 1/2 inches in length with a bail on the 2 1/2-inch knife-blade side of the handle. The handles were bright orange (for visibility), and the other side had a hook-style, manually opening (parachute) shroud cutter. Eventually, three companies (Schrade, Camillus, and Logan/Smyth) produced these knives. Of these three companies' products, that of Logan/Smyth (the last company to produce them) was by far the worst in terms of quality. Ironically, because their poor quality has made it hard to find existing examples in good condition, the Logan/Smyth models have appreciated dramatically in value.

KR0071



## CHAPTER 5

# COMPANIES, PRODUCT LINES, AND RELATIONSHIPS

This chapter explores several automatic knife companies that all started on different tracks but ultimately shared one thing in common: the manufacture of automatic knives.

Press Button, Flylock, and Presto Knife were discussed briefly in the chapters on George Schrade and the Schrade Cutlery Company. In this chapter I will examine the lines of knives each company produced and reiterate how the basic styles—dating back to the press-button knives first produced by Walden Knife—remained virtually the same.

### PRESS BUTTON

The Press Button (licensed by George Schrade and a division of the Walden Knife Company) line of automatic knives included basic styles and sizes that were made by all the companies with which George Schrade was involved. Small variances emerged as the knives were refined over the years, but even a novice couldn't help but see the resemblance among the knives from the various companies. Noting the subtle differences, it is almost like looking at succeeding generations of one family.

17

**KR0072**

The initial line of Press Button knives included a group of two-bladed, two-button-release knives that were 2 7/8 inches in length. (Measurements refer to closed lengths unless otherwise specified.) This particular line was called the Ladies' Press Button Knife. This knife was available in sterling silver (denoted by an SS after the model number—e.g., 300 SS). It came with a brass liner and was also available in Im stag, various celluloids, German silver, and pearl. The 300 series had two blades; the 400 series had a nail file in place of the smaller blade; the 600 series also had two blades but was distinguished by having a polished full crocus with cap and bolster. The 700 series also had the cap and bolster but also a nail file, the same as the 400 series. (It must be remembered that these companies did a lot of contract work and would adapt the knives to whatever the customer wanted, such as using various tang markings, handle materials, and advertisements, as well as other small differences.)

The metal-handled knives produced by Press Button (sterling and nickel silver) were usually embossed with ornate designs or pictorial reliefs. Some of the scenes were Old Man Winter, a satyr head, and personalized advertising. There was also a line of what could be called "early commemoratives," including ones for the cities of St. Augustine, Florida, and Washington, D.C.

The next larger line of Push Button knives were the 100 and 200 series of two-bladed pocket knives. These were 3 3/8 inches in length and basically used the same design, mechanisms, and handle material as the 2 7/8-inch versions. The 200 series had a nail file.

Press Button also introduced a line called the Mechanics' Press Button Knives. These larger knives, 3 11/16 inches in length, were made of heavier material to withstand extremely hard use. These knives, Models 115 through 119, were advertised as being sturdier than the smaller models and particularly useful to mechanics, farmers, fishermen, and hunters. They were all supposed to be in Im stag, and their only variation was in the type of blade: 115—clip and spey; 116—spear and spey; 117—clip and pen; 118—spear and pen; 119—clip and spear; 115G—clip and punch; and 117G—spear and punch.

Press Button had two lines of folding one-bladed knives. The smaller line (Models 500, 507, 510, and 517) featured a 4-inch Farmer's Press Button iron-lined (later steel) model with German silver bolsters. This line came with either Im stag or ebony handles and a spear or clip-point blade that was crocus-polished on one side and etched "Business." The larger line (Models 1000, 1005, 1007, 1100, and 1200) comprised the sportsman, hunter, and fisherman lines. They also were handled in Im stag and ebony. The Model 1200 had a saber-style blade, while the 1005 (the Victor Model, which was so etched) had a floating cross guard. The other models (designated Models 1000, 1007, and 1100) with clip, spear, or saber were etched "Invincible." All were crocus-polished on the opposite side.

Press Button also produced the Hobo, a one-handed man's knife also sometimes called the Civil War Veteran's knife. This knife was 5 inches long with a curved handle. The scales were one-piece stamped aluminum embossed with a floral design. The single blade had a cutting edge on the convex arc below the three tines. Most of these were tang-marked "Press Button Knife Company Walden NY." However, some were marked with the name of the medical prosthesis companies that contracted for and sold them. These were one-bladed, one-button knives.

The last Press Button model to consider is the 5-inch folding hunter with a fixed guard, which came out well after Schrade had left Walden Knife. This knife was not produced until 1914, and since Walden Knife stopped production in 1923, it was only produced for nine years, which means it is now hard to find. Unlike the Victor and Invincible models, this 5-inch folding hunter had a fixed cross bar with the guard pointed up on one side and down on the other. The blade is etched with an eagle in flight and a scroll marked "Guardian." It has a clip blade.

## FLYLOCK

The Flylock Knife Company was owned by the Challenge Cutlery Company of Bridgeport, Connecticut. The Flylock line included the basic 2 7/8-inch two-button, two-bladed (small pen) knives and the 3 3/8-inch two-button, two-bladed (medium pen) knives, as well as the same knives in 3 1/2 inches. Some had bottom bolsters and folding guards and came with hawkbill, clip, and spear blades. Handle materials for these items included composition, jigged bone, metal, Bakelite, celluloid, imitation jigged bone, sterling silver, and gold

KR0073

plate. Flylock also had a 7 7/8-inch and a 9-inch letter opener with a one-bladed automatic on one side and regular fixed blade on the other.

In addition to these models, Flylock also had a 3 5/8-inch Boy Scout–type knife with an auto spear-type blade, a regular screwdriver-bottle opener, and an awl that opened manually. Another model was the 3 5/8-inch knife with three blades: sheep's foot, pen knife, and large spear (only the spear operated automatically). Most of the bolsters were of nickel silver.

Of course, Flylock offered other models as well. However, because of the mechanisms used and the limited time in which they were produced, these knives—as well as viable histories and complete catalogs on them—are becoming increasingly difficult to find.

## PRESTO

The Presto line of knives was produced by George Schrade Knife Company of Bridgeport, Connecticut. As with any of these companies, none of the specifications given about Presto knives is ironclad. Presto's research and development department tried out all kinds of new ideas, so oddball prototypes or specimens may surface today.

The large folders were produced in a 5-inch version, with floating guard, fixed guard, or straight version (no guard) with clip blades. They had nickel-silver bolsters and handles made of jigged bone, plastic, or metal. A version with the long clip blade was used on several models: the 5-inch folding hunter and 4 1/2-inch one-bladed model in the style of a farmer's jack or Wharncliff knife.

During World War II, Presto also produced 5-inch and 4 1/8-inch folding hunters with shackle for the armed forces. These steel-handled knives were etched "Commando." Presto also contracted knives, but unlike the original Schrade Company (which put the contracting company's name on the tang), Presto would often leave its Presto tang and simply etch the blade with the contracting company's name. For example, "Remington" would be etched on blade and "Presto B port CT" on the tang.

(NOTE: From the beginning all these knives usually bore etchings on their blades denoting their styles. Most of these etchings have long since disappeared because they were electroplated. The least expensive of the etching methods, electroplating was also the least durable. Often salesmen's samples were acid-etched with the model name or the word *sample*. These etchings will last the life of the knife.)

Presto's 4 1/8-inch line of small folders came handled in the same materials as the large folders. Presto also had a hawkbill model and a fixed-guard model, as well as one in the long-clip-blade style. The 3 3/8-inch line of doubles used celluloid, stainless steel, grooved bone, jigged-bone, smooth-bone, and plastic, as well as the usual metal materials. The 3 3/8-inch models were also made in a single-bladed version, with and without bolsters, in long-clip and spear-blade style.

The 2 7/8-inch line of small doubles was, it seems, replaced by another line of small knives called the pull-ball. This knife was 3 inches long. It released its one blade when a small ball (in some cases in the form of a die or an eight-ball) was pulled. These knives were made with all types of handling materials (e.g., aluminum, steel, Bakelite, plastic) and came in a myriad of colors. A 4 1/4-inch version of this style was produced with a jigged-bone handle and long-clip blade.

Many of the pull-balls were contracted to other companies and appeared as Remington or Case models. JCN, a jewelry company, had them made with a shackle and marketed them as fob knives, often in gold plate.

Presto also made an 8 1/4-inch letter opener, in addition to its 9-inch model (similar to the style used by Flylock). The shorter letter opener had a slightly different style fixed blade. Some of the other more unusual models included a 3 7/8-inch clip-style blade with jigged-bone handles, a 3 5/8-inch single blade with long-clip blade and plastic handles, a 3 1/2-inch double blade, and a 3 5/8-inch double switch with both blades on the same side.

Presto also carried a 4-inch line of fishtail knives in celluloid, with and without fixed guards (bowties). Some of these models had bottom and top bolsters of nickel silver, but several models had no bolsters. This line of knives was etched "Presto." The specifics for identification of these are as follows: Model 4000, no guard top and bottom bolsters; Model 4500 top bolster; Model 5000, fixed cross guard top bolster and bottom bolster; Model 5500 fixed cross guard top bolster only, no bottom bolster; and Model 6000 no bolsters.

KR0074

Presto and Schrade both made contract knives, which bear the names of the contracted companies. Just to cite a couple of examples, Sears and Roebuck at one time sold a beautiful model of the Hunter's Pride, made by Schrade, with a bright red handle under its label, and military bases sold contracted models with etched parachutes on them.

The point is that many variations of these knives exist. Likely, any existing example of a prototype or specialized contract knife in excellent condition will be quite rare. And until prices escalate to the point that it becomes profitable to counterfeit these pieces, they will remain scarce. It is more likely that you may find one of these knives that has had some obvious repair made, such as having a spring replaced or a new handle put on. After all, some of these items are 100 years old, so you can expect that a small slip of metal might have broken and been replaced.

Finally, most of the Presto/George Schrade tang markings will be what is called the "large marking." The most common marking is as follows: "PRESTO, PAT, 30-40 MADE IN USA GEO. SCHRADE KNIFE CO, INC, B'PT, CONN." However, a small tang marking was used on earlier knives: "PRESTO, PAT. PENDING, G.SCHRADE, B'PORT,CT" (still upper case but written in smaller size). This early marking is quite rare and more valuable than the larger version. You may also encounter this earlier marking in large text. It is neither as rare nor valuable as the one with small lettering.

## IMPERIAL

The Imperial Knife Company began in 1917 when brothers Michael and Felix Mirando left the Empire Knife Company in Winsted, Connecticut, and started their own firm in Providence, Rhode Island. The Mirandos, who came from several generations of Italian cutlers, started out making skeleton frames for knives intended for pocket watch fobs. The Imperial Knife Company quickly prospered, and in 1919 the Mirandos were joined by a childhood friend from Italy, Domenic Fazzano.

By the 1920s, however, sales of pocket watches had begun to decline because of the introduction of the wrist watch. By 1929, with the effects of the Depression beginning to be felt, Imperial needed new products to replace the slumping fob knives. Imperial filled this void with bumped-up bolster knives and shell-wrapped knives. The public responded well to the lower priced products, and these two knives, as well as several other innovations, proved a boon to the company.

A shell knife is one with a molded, three-dimensional, concave hollow handle over the liner, and often with bolsters overlapping the ends of the handle. This design also proved quite favorable for automatic knives. The shell knife was inexpensive but eye-catching because it came in a wide range of celluloid or painted handle materials.

Imperial's product line included numerous stampings: "IMPERIAL KNIFE COMPANY," "IMPERIAL/PROV. R. I. HAMMER BRAND," "I.K.C.O.," "JACK-MASTER," "TOPSY," and "JACK O MATIC," to name just a few. From 1936 on, the company used the old New York Knife Company logo of the arm and hammer, which it had legally obtained. However, this shared logo was the two companies' only similarity. Imperial also used the circle with a crown in its logo.

By 1940 Imperial was the world's largest cutlery manufacturer, producing up to 100,000 knives per day. During World War II Imperial began to work with Ulster Knife (under the ownership of Albert and Henry Baer) in Ellenville, New York, and Schrade in Walden, New York, to supply various models of knives for the war effort. In 1943 Imperial and Ulster jointly opened the Kingston Knife Cutlery Company. In 1947 Albert and Henry Baer bought out Schrade and formed a partnership with Imperial, creating the Imperial Knife Associated Companies, under the leadership of the Baer brothers, the Mirandos, and Fazzano. In effect, this created the largest automatic knife manufacturer of the time.

Shell knives in serpentine, fishtail, Texas toothpick, and other styles could be produced and sold for a minimal cost. Often, these knives were given away as prizes at carnivals or sold off cardboard racks in candy stores for less than a dollar.

Sales of these low-priced shell knives, coupled with sales of the regular Schrade line of quality automatic knives (both under the Schrade marking and as contract knives for a host of other knife companies), resulted in a huge number of autos being distributed in this country until the enforced end of production in 1958. These same shell-type knives have continued to be produced since 1958 but without the automatic feature.

KR0075

## COLONIAL

At about the same time that Imperial was developing its niche, another company was beginning along similar lines, the Colonial Knife Company. It was founded by brothers Frederick, Dominick, and Anthony Paolantonio, who had learned their knife-making trade in Italy and for a time had worked for the Empire Knife Company. Like Imperial, the Colonial Knife Company was based in Providence, Rhode Island, and specialized in making skeletons for knives used as pocket fobs. In many cases, Colonial's automatic knives were virtually identical to the ones produced by Imperial. Colonial produced knives under many names, including Colonial Ambassador, Old Cutler, Ranger, Forestmaster, Shur-Snap, Topper, and Anvil. (It should be noted that many of these knives were actually produced by Schrade.)

## AERIAL (JAEGER)

The Aerial Cutlery Manufacturing Company was founded in Duluth, Minnesota, in 1910 by Fred, Richard, and Chris Jaeger (along with Thomas Madden upon purchase of the Morris Cutlery Company). In 1912 the name was shortened to Aerial Cutlery Company, and the company was moved to Marinette, Wisconsin.

Although Aerial was known mainly for its production of picture-handled knives (a knife with a clear plastic or transparent handle with an advertisement or scene, often a risqué picture) and later barber supplies, razors, and so forth, it also produced a style of switchblade known as the backspring release. A plate at the top of this knife was pushed backward to release the blade. This knife was 4 1/2 inches long and had a 3-inch blade. Various models had handles of bone, celluloid, and (rarely) pearl.

Aerial was in business roughly from 1912 until 1944. It produced knives under several different markings: "Aerial Cutlery Mfg Co., Duluth, MN"; "Aerial Cutlery Mfg. Co., Marinette, WI"; "Jaeger Bros., Marinette, WI"; and "Aerial Cutlery Co., Marinette, WI."

By the mid-1940s Aerial had stopped producing pocket knives. During the war Aerial produced M1 bayonets for the military and continued making barber and beauty supplies. Aerial also did contract work for such customers as Belknap Hardware and Butler Brothers. In addition, a backspring switchblade knife, in bone and with the familiar Dog's Head shield used by Union Cutlery on it, also appeared under the tang marking of "Union Cutlery Co, Olean, N.Y. USA (KA-BAR)." I do not know whether this knife was made on contract from Aerial, but the collector should be aware of its existence.

(NOTE: In 1972 or 1973, almost 30 years after Aerial stopped making these knives, more than 2,000 mint knives were found in a warehouse, some of which were reportedly automatics. They were sold at collectors' market value, which devalued their price. With the unexpected glut now out of the market, the price for Aerial knives has stabilized, and they are becoming rare once again.)

## QUEEN CUTLERY

Originally known as the Queen City Cutlery Company from 1919–1945, this Titusville, Pennsylvania, company began as a moonlighting endeavor by six foremen of the Schatt and Morgan Cutlery Company. Its long cutlery history, product line, and numerous tang markings, though interesting, do not pertain to automatic knives, with the exception of one knife: a 5-inch Im jigged bone, black, toothpick style bearing the tang marking of the 1932–1955 queen dot crown tang. Two models of this automatic knife were made: with and without a lock. Neither model locks in the open position. The release is a blade hook and pin. Some of these automatic knives were handled in pearl. Since 1946 the company has been known simply as the Queen Cutlery Company.

## KA-BAR (UNION CUTLERY COMPANY/UNION RAZOR COMPANY)

The Union Cutlery Company, known as the Union Razor Company until 1909, of Olean, New York, adopted its famous KA-BAR trademark in 1923. KA-BAR is a well-known and well-researched firm that has had many fine books and articles written about its history and products. KA-BAR never carried a large line of automatic knives, but it did produce several models that are much in demand by collectors today.

KR0076

The largest of these KA-BAR autos was the 2179L, or Large Grizzly. About 2,000 Large Grizzlies were made, some of which were etched. "KA-BAR" was marked on the front tang, and "UNION CUTLERY CO. OLEAN NY" on the back. The handle on most models, which measured 5 1/2 inches closed, was stag, but a few were celluloid. Because of the brittleness of celluloid and the fact that only a very few of these KA-BAR knives were handled in it to begin with, celluloid-handled Large Grizzlies are extremely scarce today.

KA-BAR also produced the 21107L, or Little Grizzly, automatic knife. Even fewer of these were produced, so it is even rarer than its larger brother. Its handle material was usually winterbottom bone (stag). It was tang-marked "KA-BAR."

The mechanism on both the Large and Little Grizzlies was a bit unusual in that a piece of steel runs along one side of the handle, with the button on the bolster of the other. When it is pressed, it allows the back spring to release and kick out the blade. These are the only two models that KA-BAR made with this mechanism. Both models are massive and beautiful, but I have found the mechanism a bit clumsy.

It has been rumored for years that because of their scarcity and high price some Little Grizzly knives have been copied. There are very few actual photos or even drawings of this knife, so if purchasing one, you should have faith in the seller or be very familiar with the knife.

KA-BAR had a side-lever (bent-lever, no-fulcrum style) 4 1/2-inch auto, as well. The 21105 Model was handled in stag, the 61105 in bone, and the T1105 in celluloid. Actually, the tang markings on the 21105 varied, with the earliest being "UNION CUT CO" (the lever on these was round on the bottom with a hollow in the middle in the shape of a heart-like triangle). The next model made had "UNION CUT CO Olean NY" on one side of the tang and "KA-BAR" on the other. This model had a plain (no design), more rectangular lever with a small rectangular hole. Examples of this model were usually a bit heavier and seemingly thicker than the models that came before or after it. The last in this line was marked "KA-BAR" and had a lever like its predecessor, except that the top of the lever had seven raised horizontal lines across it on the bottom half.

"KA-BAR" also made one other type of auto called the Switchblade Hunter (Model 61126L), which was 4 1/2 inches and had the same action and style as the Jaeger or Aerial (as was previously mentioned). Some of these had a shield in the shape of the Dog's Head in the handle and were marked "Union Cutlery Co" or "Union Cut Co Olean, NY USA."

## CASE

The Case Cutlery Company of Bradford, Pennsylvania, is perhaps the best chronicled, researched, and written about knife company in the world. Case had a wide assortment of automatic knives in its line, but many were contract knives made by Schrade or other companies, including fishtails, pull-balls, folding hunters, double pen knives, push knives, and just about any other style in the regular Schrade line. Note that there may be small differences on the Case folding hunter's knife (e.g., a slightly different jigging is used on the Case handles than on the Schrade knives). Collectors should be aware that although these are the same basic knives as produced under the Schrade tang, those with a Case tang mark have a higher value.

Case also had several contract automatic models that weren't made by Schrade. The first models were the 4 3/8-inch 5161L, 5161LSAB, and 6161L. All were side-lever, hinge-release knives made from 1920 to 1940 under the Case-tested "XX" tang. The 6161L model was handled in green bone, the others in stag. Two larger versions of the same knife, the 5171L and 6171L, were also made in the same handle materials, but some were lower bolster stamped. These knives are also found with the "R. Case and Son Bradford, Pennsylvania" tang marking.

The last of the Case automatic knives to be discussed is the automatic zipper knife. There were two models produced from 1920 to 1940 under the tested "XX" tang (they can also be found with the "R. Case and Son, Bradford, Pennsylvania" marking). The first model is the 5 1/8-inch coke-style knife. It has a zipper-button side release, jigged bone handles, and a flat blade. The green-bone model has no lower bolster. The other style was a clasp 5 1/2-inch version and came in Model 5172 (genuine stag) and Model 6172 (green bone). The zipper knife and the 71 lever line (mentioned earlier) are sought after by spring steel

KR0077

and Case collectors, and command some startling prices. Some are more than 80 years old and they were never produced in great numbers to begin with, so examples in good condition are difficult to find in the collector's market.

KR0078

**KR0079**

# CHAPTER 6



# STYLES, KIT KNIVES, AND IMPORTS

M any of the knives examined in this chapter are foreign made. The fact is that although automatic knives have been illegal in many parts of the United States since 1958, most of the world's nations have no such restrictions, and manufacturers in these countries have continued making them

## STYLES

### Side-Lever-Lock

The side-lever-lock (or springer) lever-action knife (sometimes called the *switchblade jack*) was invented by George Schrade when he operated his cutlery company in Germany. It would be difficult (if not impossible) to chronicle the total number of companies and nations that have produced this type of knife. Presently, quality side-lever-lock knives are being produced by Hubertus and Boker in Germany.

Side-lever-lock knives were made of various handle materials (e.g., stag, jigged bone, mother-of-pearl) and in several sizes. Some have multiple blades (although usually only the main blade is automatic), and many of these have fixed guards, which can be used to pull spent shotgun shells from various gauges of barrels. Some knives are still being made this way, but they are mainly for show, since most

**KR0080**

modern shotguns have automatic ejectors. Inexpensive models and makes of these are still produced in China, India, Korea, Spain, and other countries.

There are several variations on the mechanisms used by these knives, usually involving the release (e.g., bent lever, fulcrum). Still, the outward appearance of the knives is the same.

Because there are many fine reference books on the mechanisms of side-lever-lock knives and because a complete study of the collection of this one style, its history, and the companies that made (and still make) it would consume volumes, I will not go into great detail about this style. However, the collector of general automatic knives should have a working knowledge of side-lever-lock knives.

### Stiletto

The stiletto style is usually associated with Italy, Spain, France, and Germany. It was an offshoot of the Spanish *navaja* clasp-type knife, which was used for everything from cutting bread and cheese to fighting, and was also influenced by the folding dirk-style knife. Of course, the stiletto was hardly a general-purpose knife, being designed and used primarily as a stabbing knife. Stilettos and their portrayal as the weapon of choice for juvenile delinquents and various unsavory characters contributed heavily to the legislation that outlawed switchblades in this country in 1958.

The stiletto had one slender bayonet-type blade with the point area back to about one-third of the blade in a double edge (or at least if not fully double edged, an unsharpened double on the back of the blade). It was made with fixed and floating cross guards. Handle materials included stag, horn, bone, plastic, mother-of-pearl, and ivory, and their attractiveness usually added to the allure of the knife's sleekness.

Stiletto switchblades lock by having a pin fit into a flat piece of steel on the backspring of the knife. This type of mechanism can use several ways to release the blade from its locked-open position. The method that seems most desirable to present collectors is what is called the picklock, in which the thumb is used to lift the backspring and release the blade. This method was used on earlier stilettos. A lever release on the back of the knife was also used on some models; when this release was pressed, it lifted the backspring.

Many stilettos have a button release, where pressing the button (in the locked-open position) released the blade. (These have no flat piece on the backspring for the pin, and this mechanism is often employed with floating-guard type of knives.)

The release method used most at present is the bolster release, in which pressing the left bolster on the top point and pushing downward swivels the bolster and lifts the flat metal lock off the pin, thus releasing the blade.

The stiletto is a popular knife, and some collectors specialize in it exclusively. It was produced by numerous companies and in many countries, and less expensive versions are still being made all over the world, including many Third World countries. As with the side-lever-release knife, before acquiring a stiletto the general collector should have a good working knowledge of the various mechanisms, places of origin, ages, and relative values of stilettos.

### Figural

Figural knives are usually small knives in the shape of an animal or object (e.g., gun, gondola, eagle) with metal handles, or they are made of metal with an embossing depicting an event, animal, or object. These switchblades are usually made as key-chain-type knives and employ various opening mechanisms. Some of them are quite old, and they make an interesting, relatively inexpensive collectible.

### KIT KNIVES

Kit knives, a phenomenon of the 1980s, were in effect an attempt to find a legal avenue for the sale of switchblade knives in the United States. The kits are most often associated with the Edge Company. Although the Edge Company eventually stopped selling these automatic knife kits, the initial concept was rather clever. Instead of selling whole knives, Edge sold knife kits and made it abundantly clear that putting them together could be illegal in some places.

The kits offered several styles, including Italian (in-and-out) front releases, stilettos, lever actions, and even a Mexican pull-ball version. The stilettos basically used a screw instead of a rivet to hold the blade to the

KR0081

front bolster, so by simply attaching the blade to the handle, you had a working spring-steel knife. And since the screw often came loose anyway, the owner could throw it away and use a rivet instead or simply put a drop of epoxy or clear lacquer to hold it in place.

The front (in-and-out styles) came with a full-length spring action and blade, which were put together in a hollow handle. These knives were made as contract knives for Edge and often carried the country of manufacture as well as the Edge logo or tang marking ("EDCO" or "EDGECO"). The high-end stag-handled stilettos were well made and had brass bolsters. The stilettos were of the turn-bolster-release type. These knives were contracted from Korea, China, India, and other places.

The concept of kit knives is still used today, especially for inexpensive imports. Kits can be found today in sealed cardboard-backed plastic packages. The original Edge kits came in plastic bags with instructions. Original unopened kits are rare today, as are etched-blade examples.

The Edge Company also sold an OSS gravity knife and eventually sent all the customers who had purchased them a notification that these knives might not conform to the law. The Edge Company eventually stopped selling these knives and instead started marketing regular knives. As Edge eased out of the auto market, it offered for sale a list of manufacturers that sold automatics.

The Edge concept is still being used by companies selling not only kit knives, but also regular knives that can be adapted for use with a spring. Both are assembled by the owner (if that is his intent.)

I believe that these kit knives will appreciate in value for several reasons. First, they were made during a relatively short time (approximately 10 years). Second, they were expensive and of poor quality obtained (with a few exceptions). Third, they had to be assembled by the individuals who bought them. Even inexpensive automatics made in a factory had some degree of quality control; the kit knives had none. The parts were simply put in a bag or box and sent to the buyer. Many of these actions were faulty; and this, coupled with inexperienced consumers' attempting to put them together, resulted in a high mortality rate for these knives. All these factors led to a scarcity of kit knives in decent condition today—assuming of course that a warehouse full of them is not found in the future. Furthermore, most of these knives, although made under contract, carried the Edge tang or etching, making them easy to differentiate from similar knives produced today.

## IMPORTS

With the advent of the Internet there has been yet another turn in the evolution of the automatic knife in the United States. The Net has given those interested in buying switchblades a chance to find sellers from all over the world, thus directly affecting the collector's market. Many styles that up until a few years ago were uncommon have been put back into production and are being marketed over the Internet. Also many of the higher quality and brand-name knives are being manufactured not only by the original companies, such as Hubertus and Boker, but also by companies in China, Korea, India, and various Third World nations, and are being sold at a fraction of the cost of the originals. Although not of the same quality, these cloned knives still perform quite well.

Even in the United States automatic knives are still being made and sold over the counter. Benchmark and Smith & Wesson are two companies that make and sell automatic knives to peace officers and military personnel only.

KR0082

**KR0083**



# CHAPTER 7

# OPENING MECHANISMS

M y intention here is to familiarize the reader with opening mechanisms; this chapter is certainly not meant to be a full discourse on the entire field of alternate opening devices.

## FULL-SPRING STYLES

One type of opening mechanism found on many in-and-out front loaders is the double full spring. In front-end in-and-out models, two full-mechanism-length springs are used: one to release the blade and one to retract it. In this type of mechanism there is always tension on one spring, which means that it is the only style of auto that can be stored open or closed. (In general, autos should be stored open to keep the pressure off the spring. In this case, one spring is always under tension.)

Some small European pocket, pen, or souvenir knives also employ a full-length spring. However, it is only a release, and even though some of the knives have two springs, it is not the same mechanism as above, and each spring is for a separate blade (e.g., blade or nail file on each side).

**KR0084**

## GRAVITY STYLES

The gravity-style knife, which is in the same category as switchblades according to the law in this country, is a study in itself. So in the interest of brevity, I am only going to touch on several of the better known versions of gravity knives in this book.

The gravity-style knife is just what its name implies: the blade opens because of gravity. This usually means that this type of knife has a hollow handle with a blade in it, so that when the knife is pointed down and a lever or button depressed, the blade is released and falls into the open position. It can be locked in the fully opened or fully closed position. Knives that use the gravity-opening mechanism include the World War II OSS Model knife (now being reproduced), the German paratrooper knife (of which there are several versions), and a style made by Bonza in Germany that, unlike the first two examples, employs a light spring to assist in opening the knife (also being reproduced). By swinging the arm, the user of the spring-assisted Bonza can increase the speed of the blade's release. The original Bonzas are becoming rare.

Gravity-style knives are also made as standard side-opening folders. Some have front-weighted blades (such as Tanta style) and have a thumb knob for opening. However, right from the box, these can be used as a gravity opener (they also have a lock-back feature). These knives are as fast as any automatic ever made and are perfectly legal. Such knives can be purchased for as little as $5, but higher priced versions, which have a well-made ratchet or ball bearing mechanism, are also available and are perfectly legal.

Gravity knives have been around as long as automatics—or because of their simplicity maybe even longer. In the latter part of the 19th century, the Eagle Pencil Company produced a small tube-type knife with a small (about 1 1/4-inch) blade that was gravity-released by pressing a small button on the back of the tube. It was held in place by a small pair of grabbers that opened or closed with the button. The small knife was designed to be used as an "eraser" (or, more accurately, a "scraper" to scrape a mistake off a letter). "Erasing" was also one of the functions of the automatic blades on the Schrade letter opener.

## RATCHET STYLES

Not all ratchet knives were the high-tech styles mentioned earlier. Ratchet knives were produced in a size similar to that of the Schrade pull-ball style, mostly after 1958. These ratchet knives also worked by pulling a piece at the back of the knife, which in turn pulled a wheel with notches in it, thereby opening the knife. Pushing the end in closed the knife. Some ratchet knives had animal heads or bottle openers on them and were sold by inexpensive jewelry companies as watch fobs or key chains. Similar models of small ratchet knives were produced by the Schrade and Sergeant Knife companies under such names as Zip it, Switch-a-Roo, and Clip it in the 1980s. These were marketed as a legal alternative to an automatic knife.

## BUTTERFLY STYLES

Butterfly knives are usually associated with the Philippines and South Seas, but they are made all over the world. In the right hands, and with a bit of practice on the part of the user, they can be as fast as any style of automatic knife ever made.

The butterfly opening device consists of two handles and a blade, with each handle (actually a half-handle) attached by a pin to each side of the blade. The handles form a hollow to allow the blade to rest inside in the closed position. A small hooking device on the bottom holds the blade closed inside the handles. Flipping the handles opens the knife, and the knife can be secured with the hook in the open position. The handles are often made of metal because the weight assists in flipping the handle.

## CUSTOM STYLES

Knives with custom opening mechanisms also present a range of opportunities for the collector. The resurgence of custom knife makers has produced many mechanisms and materials; the quality of these modern cutlers' work can be magnificent. Even though most mechanisms on custom knives are presently

KR0085