John W. Dillon (SBN 296788)
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

KNIFE RIGHTS, INC.; ELIOT
KAAGAN, JIM MILLER, GARRISON
HAM, NORTH COUNTY SHOOTING
CENTER, INC., and PWGG L.P.,

                    Plaintiffs,

        v.

CALIFORNIA ATTORNEY
GENERAL ROB BONTA,

                    Defendants.

Case No. 23-cv-0474-JES-DDL

Hon. James E. Simmons, Jr.
Magistrate Judge Hon. David D.
Leshner

**APPENDIX IN SUPPORT OF
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

**Part II: Bates No. KR0086-
KR0438**

being made by commercial knife companies (mostly European), the variations presented in these custom models are superb: e.g., halo knives (rapid front-release, razor-like blades); split-scale releases (where the scale pivot acts as the release mechanism); remakes of the KA-BAR Grizzly mechanism (with adjustment screws for correct torque and firing). One interesting mechanism is the dual-release knife (or "dually"), a folding Buck (hunter style) that opens, closes, and functions as a normal lock-back knife. However, depressing a flush inlaid circle shield permits the knife to function as an automatic. In fact, the shield is so flush and natural looking that it may be engraved, as might have been done with any such medallion on any knife. One of the first autos to use this style of custom mechanism is tang-marked "JAS." The introduction of this release fostered several variations on this hidden mechanism and can now be found on Buck or Case knives, or even on inexpensive clones of large folding hunters from India, Pakistan, China, and other countries. What the customer can have custom made is limited only by his imagination and budget.

## MISCELLANEOUS MECHANISMS

It would be impossible to cover all the opening mechanisms that have been used throughout the years. Still before concluding this chapter, I would like to touch briefly on a few others.

### Push

Push knives, which are also a variation of the rapid-opening knife, are made in various forms from key-chain knives to box cutters. Although usually not an expensive item, they can be quite pricey and can be a field of collectibles unto themselves, as with some older Case models.

Push knives use an opening device introduced only a few years ago that is known as the strut-and-cut mechanism, which uses a wheel by the front bolster to open the knife. Boker makes a push knife that uses a split scale, allowing the knife to be pushed into place: the scale is moved back and the blade locked; turning the scale again releases the blade, which is then retracted by a spring.

### Flop-Over

Flop-over knives are one of the oldest types of quick-opening knives and are similar to a barber's straight razor. The lever is an extension of the back of the blade, which simply pivots the blade that is secured by one pin in the front bolster.

### Lever

Various lever knives have also entered the marketplace as a legal alternative to the switchblade. These are variations of the cam knife.

### Ballistic

Ballistic knives extort a spring that literally shoots a blade from the knife when it is fired. The blade can penetrate a 3 3/4-inch piece of plywood at 30 feet. This knife has been around for quite some time; the Russian military used a version of it, which was then cloned by a manufacturer in Florida. Knives with this kind of mechanism, in a live, fireable condition, are quite illegal. Perhaps what is most ironic is that ballistic knives fall into the same category as a 98-year-old 3 3/4-inch Schrade double-safety knife, which would not seem to offer the same threat to society as a ballistic knife.

KR0086

**KR0087**



# CHAPTER 8

# CATEGORIES OF COLLECTIBLE AUTOS

The field of collecting knives is quite complicated and a subject worthy of its own book. The numerous variations within each category of knife make collecting both challenging and rewarding.

Identifying and valuing knives can be complicated by many factors, and the collector should not be surprised by any oddities he may come across. All the cutlery companies had research and development departments or at least designers who routinely presented new options and models to be incorporated into a company's lineup. Many of the original models were one of a kin., Fortunately some of these early prototypes are still around today to tempt collectors and serve as missing links to help researchers and collectors understand the evolution of switchblades. One example is the Press Button auto with safety (a small tab that could be pushed up to lock the blades), which was the forerunner of the Schrade style (which included a different button and push-up locks). Additionally, some models were produced for only a few years. For example, the Guardian (press-button model) was produced only from 1914 until 1923, which makes existing specimens extremely rare and valuable.

Other factors also yielded some odd knives for today's collector to sort out. For example, certain models often incorporated specific variations for contract companies such as Sears and Roebuck. Even knives that were put together by

KR0088

factory workers and were not on contract for another company could vary from the original catalog version, so that almost any combination can be found today.

A particular knife could well be a composite of several knives of one or more eras, whether by original intent or by repairs made during its 100-year journey, thus presenting variations on what is commonly found. It is usually not too difficult to tell whether knives are modern counterfeits by looking to see if any modern materials or design elements were employed in their construction, as well as by examining their markings.

Often, producing a special model on contract or adapting a model because of an insufficient supply of a certain handle material or color resulted in the creation of knives that were never catalogued. The same model of Flylock (folding hunter) may have a large or small release button, depending on what was in stock the day it was made. These knives are not fakes; rather, they fill a unique niche in the evolution of the automatic knife. For the collector, a find of this nature that can be authenticated is very exciting.

Essentially, collectors of automatics should decide what model, brands, or types they want to specialize in. Some options include the following:

1. *Pre-1850 one-of-a-kind autos.* Realize, however, that each knife is quite rare and will cost thousands of dollars. For the average collector, this is not a realistic choice.
2. *Switchblades from the Civil War era (1860s) until 1958.* Most of these would fall into the categories and brands described previously in this book. Also, as discussed earlier, aside from a few very early one-of-a-kind foreign knives (e.g., Sheffields or hand-made German, Spanish, and Italian specimens), automatics in this country really began with the partnership between the Walden Knife Company and George Schrade in 1894.
3. *Post-1958 automatics.* This category includes everything made after the year switchblades were outlawed to the present.
4. *Specific types of autos.* Many collectors have become specialists in a particular style of knife—stilettos, for example, which have been bringing excellent prices. Unfortunately, this same fact makes the types that are particularly desirable, especially the older ones, difficult and expensive to obtain. Some collectors even specialize in certain types of mechanisms.
5. *Crossovers.* Within any style of knife (e.g., military), individual companies offer their own fields and crossover fields of collectibles. For example, a Schrade Paratrooper knife might be collected as a knife made by Schrade or as a military knife by someone who specializes in military knives or memorabilia. Knives for one-armed Civil War veterans can be collected both as a press-button auto and  an old prosthetic device, also making them crossover collectibles.
6. *Custom knives.* Numerous custom knife makers are making one-of-a-kind automatic knives for their clients, and many are much in demand by collectors. These can be collected based on type or maker.
7. *Knives based on origin.* Some collectors might buy only imports, while others specialize in early American autos. Or collectors might limit their purchases to knives from specific nations (e.g., Germany), manufacturers (e.g., Schrade Cutlery), or areas of the world (e.g., Europe).

What a collector decides to collect is limited only by his imagination and, increasingly, his budget.

KR0089

# SECTION 2



# AN ILLUSTRATED REFERENCE FOR IDENTIFYING AND VALUING AUTOMATIC KNIVES

KR0090

**KR0091**



# GRADING KNIVES

To say that knife grading is controversial is a gross understatement. There are many different opinions and "systems" for grading knives, but none that is universally accepted. Sentiment, profit margin, pride, and lack of knowledge should not affect the grading of a knife, but the effect that these factors can have on the value placed on specimens can be breathtaking. Knives that have been heavily sharpened and even have some rust on the blade have been classified as "mint" by some knife owners or traders.

As already mentioned, "mint" is probably the most misused term in knife collecting. True mint knives will command much higher prices than even knives that are graded as "near mint"—20 percent or more than a knife with one tiny flaw and 20 to 100 percent more than knives graded as "good to excellent." Mint means just that: in mint condition. The knife should look exactly as it did the day it left the factory with no flaws, not even tiny ones (unless the peculiarity, or defect, was known to have existed when the knife left the factory).

## FACTORS IN GRADING KNIVES

### The Condition of the Blade

The first thing to consider when grading a knife is the condition of the blade. Is it full length? Has it been sharpened? If so, is the blade still full or down some?

KR0092

Is it heavily sharpened? Are there heavy scratches on the blade? Has it been "bellied" from oversharpening? Are there signs of rust or pitting?

The darkening of a blade from age, often referred to as its patina, is not a big consideration. Most collectors don't mind the patina and leave the knife as is, but patina can be polished away and one would never be able to tell it had ever been there if polishing is done properly.

A broken blade affects the value tremendously, even if it's just at the tip. Other blade factors that significantly affect the value are nicks, the condition of the tang stamp, and the presence and quality of an etching (if the blade was factory etched).

### Type and Condition of the Handles

The next consideration is the type and condition of the handles. The type of handle material often has an important effect on the value. Such materials as jigged bone, tortoise, stag, and pearl often enhance the value of a knife. Many of the old switchblades incorporated celluloid into the handles. It's very important to take proper care of knives when they have celluloid handles because of that material's fragility.

Things to consider when evaluating the condition of the handles are cracks (often found near pins in the handle), breaks, chips, shrinking, and whether the material is original to the knife. Metal bolsters, both tip and full, may also enhance the value of a knife, but their condition must be considered.

### Functioning

The next thing to consider when grading a knife is its overall functioning. Does it work as it should? If the spring is broken, you can automatically deduct $50 or more from its value for repairs to make it work properly. If it does function, does the blade open all the way? If so, does it lock in the open position? (Most switchblades require that you activate the release, usually a button, to close the blade.) If you can push the blade closed without activating the release, you most likely have a problem. When the blade is closed, does it "seat" properly (i.e., is the tip of the blade inside the knife and not protruding)? You should also check to make sure the safety functions properly, if the knife was equipped with one.

### Availability

Availability is a major factor in assessing the value of an automatic knife. This is the basic theory of supply and demand: rare models of anything demand a much higher price than more common examples. Of course, if a knife is really rare, as in a one-of-a-kind prototype or presentation piece, it can be extremely difficult to place a value on it. If a knife is a truly unique, what is it worth?

Many knives were produced in limited quantities. Certain knives tended to be used more than other types, and it is often harder to find them in "mint" or even "excellent" condition. This should increase the value of such a knife if you do find one in nice condition.

## GRADING SYSTEM USED IN THIS BOOK

Most grading systems use a name or numerical method to denote the condition and value of each knife. In order to more accurately grade both of these factors, I use a double-designation system. For example, say a knife is in "mint" condition. In my system, outlined below, this knife would be graded M/6. The first element, M, describes the condition of the knife in descriptive form, while the second element, 6, indicates its numerical ranking (based on a scale of 1–6, with 6 being perfect or mint). Note that, if the condition of the knife warrants it, the grade may be further clarified by the addition of a plus (+) or minus (-) sign (or for "near mint" two plus signs). Below is the key to the grades used in this section:

KR0093

> Mint = M/6
> Near Mint = NM/5++
> Excellent = Ex/5, + or -
> Very Good = VG/4, + or -
> Good = G/3, + or -
> Fair = F/2 (functional but with broken handle, blade, etc.)
> Poor = P/1 (parts knife, nonfunctional)

You must remember, however, that there are exceptions to every rule, and this (as well as any other grading system) is only a guide.

On another note, the percentages noted in the descriptions of the blades and handles on the following pages refer to the overall condition of the blade or handle, not to the amount of knife material that survives from its use through the years. Of course, the amount of use would be factored into the percentage reflecting the blade's or handle's overall condition. The percentage is not listed for all the knives because it is not always a significant factor in appraising a knife. For example, sometimes the rarity of a knife overrides the condition of the blade or handle.

All lengths given in the descriptions are closed unless otherwise indicated. With those knives that have front and back photos, the top photo shows the front of the knife.

KR0094





**KNIFE:** Sheffield George Wostenholm Celebrated, 5 inches, one-bladed, handle button release, folding dirk, stag bone handles, blade etched "I*XL." Tang marked "GEORGE WOSTENHOLM CELEBRATED." (NOTE: This marking was used from 1850–1890.)

**BLADE:** 92 percent, approximately 3/16-inch short and sharpened, heavy patina, pitting, but etching is legible and sharp.

**HANDLES:** Nice old stag, large diagonal crack across front handle, hairline crack on bottom edge. Old repair with rivet.

**FUNCTION:** Great snap, locks tight.

**COMMENTS:** Very rare. Condition not as important on a piece this rare.

**VALUE:** $2,200–$3,000+          **MINT:** $6,000          G/3

KR0095

An Illustrated Historical and Price Reference                                                41





**Knife:** Automatic Knife Company, under Wilzen patent April 9, 1889; 3 inches; embossed metal handles. Originally a two-bladed, lever-activated model; one blade missing (the repair was apparently done many years ago). One side shows a steeple chase race and horseshoes, the other a group of 19th-century bicycle riders. Tang marked "AUTOMATIC KNIFE CO., WILZEN'S PATENT."

**Blade:** 90 percent, 1/16-inch short and sharpened, patina, some pitting.

**Handles:** Appear to be cast silver, excellent for age.

**Function:** OK, lever release and blade function correct on remaining blade.

**Comments:** Examples and photos of these knives in any condition have become quite rare.

**Value:** $375–$450+                    **Mint:** $750                    VG/4

**KR0096**





**KNIFE:** Hatch Cutlery Company, 3 1/4 inches, double blade with match striker notches on blades, embossed floral sterling handles, lever-assist knife, sideward movement of lever opens knife 20 percent. The mechanism was designed to allow easier opening of the pocket knife. Manufactured under the Wilzen patent. Tang marked "HATCH CUTLERY CO., SO. MILWAUKEE, WI, PAT. Apr 9, 1889."

**BLADE:** 90 percent. Main: 1/8-inch short and sharpened, some light pitting. Second: 1/16-inch short and sharpened.

**HANDLES:** Embossed sterling, floral pattern.

**FUNCTION:** Lever releases excellent; manually opened blades stiff.

**COMMENTS:** Patent April 9, 1889. These knives are becoming increasingly rare; examples and photos of them are quite scarce. (NOTE: These knives were produced under the Hatch name when Walter P. Hatch took over the Automatic Knife Company, thereby acquiring the Wilzen lever automatic patent and renaming the company.)

**VALUE:** $400–$475+                **MINT:** $650                Ex/5

**KR0097**





**KNIFE:** Press Button One-Armed Man's Knife, also called Civil War Veteran's Knife, 5 inches. Handle is silver-colored embossed aluminum. Tang marked "PRESS BUTTON KNIFE CO., WALDEN, N.Y." NOTE: Some of these knives were contracted and distributed by prosthetic device companies; knives under contract companies' tang markings are quite rare and valuable.

**BLADE:** 98 percent, patina and light scratches, very full tines.

**HANDLES:** Cast aluminum, very good.

**FUNCTION:** Excellent, seats deep.

**COMMENTS:** Hard to find! Most of the examples still around are dented, corroded, or rusted, and often the fork tines are broken.

**VALUE:** $500–$600 Rare                 **MINT:** $900                 Ex/5

**KR0098**





**KNIFE:** Press Button Invincible Model, 5 inches, clip blade, German silver bolster, steel lined, brown picked-bone handles with shackle. Tang marked "PRESS BUTTON KNIFE CO., WALDEN, N.Y."

**BLADE:** 95 percent, 1/8-inch short, pitted on backside near tang, sharpened and cleaned.

**HANDLES:** Nice bone.

**FUNCTION:** Good action, seats deep.

**COMMENTS:** Brass lanyard ring (not original).

**VALUE:** $275–$350                **MINT:** $550                VG/4+

**KR0099**

AN ILLUSTRATED HISTORICAL AND PRICE REFERENCE                                          45





**KNIFE:** Press Button Victor Model, 5 inches, clip blade, German-silver bolster, steel lined, brown picked-bone handles, folding guard. Tang marked "PRESS BUTTON KNIFE CO., WALDEN, N.Y."

**BLADE:** 96 percent, 3/16-inch short, light sharpening, hint of etch (point of V and top line).

**HANDLES:** Nice bone, small pin crack on bottom, small repair near bolster.

**FUNCTION:** Good, seats deep.

**COMMENTS:** Folding (floating cross bar) guard original and intact (often missing)

**VALUE:** $350–$450                    **MINT:** $650                    Ex/5

**KR0100**





**KNIFE:** Press Button Guardian Model, 5 inches, clip blade, steel lined, nickel-silver bolster, fixed cross guard, brown picked-bone handles. Blade lightly etched with eagle and Guardian logo, made around 1914. Rare. Tang marked "PRESS BUTTON KNIFE CO., WALDEN, N.Y."

**BLADE:** 96 percent, 3/16-inch short, some pitting, visible etch (part of eagle and Guardian).

**HANDLES:** Beautiful bone. Perfect.

**FUNCTION:** Great; seats well.

**COMMENTS:** Rare piece! Very authentic. (NOTE: This style was only made from 1914 until 1923 when Press Button went out of business. Any example of them in any condition is highly sought after in the collector's market.)

**VALUE:** $1,100–$1,500 Rare           **MINT:** $2,000                 Ex/5

**KR0101**





**Knife:** Press Button Business Model, 4 inches, clip blade, steel lined, German-silver bolster, brown picked-bone handles. Tang marked "PRESS BUTTON KNIFE CO., WALDEN, N.Y."

**Blade:** 1/8-inch short, heavily ground (tang stamp affected).

**Handles:** Missing one pin, repaired (piece glued in, bottom pin).

**Function:** Sits a little "proud" but works great.

**Comments:** Hard to find in great shape because they were small enough to be used a lot, and most have been heavily sharpened; good example; very functional.

**Value:** $175–$250                    **Mint:** $600                    G/3

**KR0102**





**KNIFE:** Press Button, 2 7/8 inches, double blade, sterling-silver, front embossed with Indian and palm tree, back reads "ST. AUGUSTINE, FLORIDA, SETTLED 1565," with scene. Tang marked "PRESS BUTTON KNIFE CO., WALDEN, N.Y."

**BLADES:** Main: 97 percent, light sharpening and patina. Pen: 98 percent, light sharpening and patina.

**HANDLES:** Sterling silver with scenes of historic St. Augustine, Florida; one handle loose.

**FUNCTION:** Sluggish but works, and pen blade is a little sloppy; but both lock and seat OK.

**COMMENTS:** This is a rare knife that shows an example of a 2 7/8-inch, double-bladed Walden Press Button knife with embossed metal (sterling) handles. It was one of the first commemorative knives related to the Schrade Company. This policy is still used by the company, which pioneered the concept.

**VALUE:** $175–$275                    **MINT:** $550                    G/3





**Knife:** Press Button, 3 3/8 inches, embossed sterling handles. One side has Old Man Winter scene, the other side "Compliments of Home Insurance Co., N.Y." Double blade. Tang marked "PRESS BUTTON KNIFE CO., WALDEN, N.Y., U.S. Pat. 470605."

**Blade:** Main: 90 percent, 3/8-inch short, sharpened, patina and light pitting. Pen: 85 percent, 1/4-inch short, sharpened, patina and light pitting.

**Handles:** Sterling, missing one pin and patina.

**Function:** Good action, tight.

**Comments:** Head of satyr on handles. This represents an example of a 3 3/8-inch, double-bladed Walden Press Button with embossed metal (sterling) handles.

**Value:** $175–$275                    **Mint:** $475                    VG/4

**KR0104**

THE COLLECTOR'S GUIDE TO SWITCHBLADE KNIVES





**KNIFE:** Press Button, 3 3/8 inches, jigged-bone handles, double blade. Tang marked "PRESS BUTTON KNIFE CO., WALDEN, N.Y., U.S. Pat. 470605."

**BLADE:** Main: 84 percent, 3 3/8-inch short, heavily sharpened, patina, scratched. Pen: 86 percent, 3/16-inch short, heavily sharpened, patina.

**HANDLES:** Beautiful jigged bone, perfect!

**FUNCTION:** Both blades "kick back," master a bit high.

**COMMENTS:** Condition of blades hurts the value.

**VALUE:** $175–$275                    **MINT:** $450              VG/4+

KR0105





**KNIFE:** Press Button, 3 3/8 inches, double blade, small blade nail file, imitation ivory celluloid handles. Tang marked "PRESS BUTTON KNIFE CO., WALDEN, N.Y., U.S. Pat. 470605."

**BLADE:** Main: 1/4-inch short, heavily sharpened, cleaned and lightly pitted. File: 1/16-inch short; file worn and ground.

**HANDLES:** Ivory celluloid chipped and a bit rough.

**FUNCTION:** Both blades sit "proud"; master has "wobble."

**COMMENTS:** This knife shows the tremendous effect that condition has on value.

**VALUE:** $75–$150                    **MINT:** $350                    G/3-

KR0106





**KNIFE:** Press Button, 3 3/8 inches, double blade, imitation ivory handles marked "Compliments of Johann Hoff." Tang marked "PRESS BUTTON KNIFE CO., WALDEN, N.Y., U.S. Pat. 470605."

**BLADE:** Main: 1/8-inch short, sharpened, some rust. Pen: 1/8-inch short, sharpened, light scratches.

**HANDLES:** Ivory celluloid. With advertising; front handle loose; slight shrinking.

**FUNCTION:** Good, small blade sticks, both look and seat OK.

**COMMENTS:** An example of this company's 3 3/8-inch double-blade advertising type knife in celluloid.

**VALUE:** $125–$175                    **MINT:** $350                    VG/4-

**KR0107**

An Illustrated Historical and Price Reference                                    53





**Knife:** Press Button, 3 3/8 inches, double blade, imitation ivory handles marked "White Mountain Refrigerators" on one side and "The Chest With the Chill in it" on the other. Tang marked "PRESS BUTTON KNIFE CO., WALDEN, N.Y., U.S. Pat. 470605."

**Blade:** Main: 1/8-inch short, sharpened, some rust.
        Pen: 1/8-inch short, sharpened, some rust.

**Handles:** Ivory celluloid. With advertising.

**Function:** Good, both lock and seat OK.

**Comments:** This piece is an example of this company's 3 3/8-inch double-blade, advertising-type knife in celluloid.

**Value:** $125–$175                    **Mint:** $350                    VG/4-

**KR0108**





**KNIFE:** Schrade Cutlery Company Model 1543 3/4; 4 7/8 inches, clip blade, steel lined, steel bolster, jigged brown bone handles. Tang marked "SCHRADE CUT. CO., WALDEN, N.Y., U.S. PATS, DEC 21, 09, SEPT 13, 10, JUNE 6, 16."

**BLADE:** 80+ percent, 1/4-inch short, heavily sharpened, patina and light pitting.

**HANDLES:** Nice bone, good color, excellent!

**FUNCTION:** Good action, seats OK.

**COMMENTS:** Even though the blade is down, good example with excellent handles.

**VALUE:** $150–$225                    **MINT:** $525                    G/3

**KR0109**





**Knife:** Schrade Cutlery Company Model 1543, 4 7/8 inches, clip blade, steel lined, steel bolster, jigged brown bone handles. Tang marked "SCHRADE CUT. CO., WALDEN, N.Y., U.S. PATS, DEC 21, 09, SEPT 13, 10, JUNE 6, 16."

**Blade:** 1/4-inch short, some pitting, scratches, and patina.

**Handles:** Nice bone, deep jig, 3/8-inch repair near bolster and 5/8-inch crack on front.

**Function:** Good action, seats deep.

**Comments:** This is a nice knife, but repairs detract from value even when done well.

**Value:** $200–$275                    **Mint:** $525                    VG/4-

**KR0110**





**KNIFE:** Schrade Cutlery Company Model 1613 3/4, 4 7/8 inches, saber blade, steel lined, nickel-silver bolster, jigged brown bone handles. Tang marked "SCHRADE CUT. CO., WALDEN, N.Y., U.S. PATS, DEC 21, 09, SEPT 13, 10, JUNE 6, 16."

**BLADE:** 95 percent, 1/8-inch short, heavily sharpened, patina and light pitting, no etch.

**HANDLES:** Nice bone, 3/8-inch repair by bolster.

**FUNCTION:** Great snap! Locks good, seats deep.

**COMMENTS:** Blade originally etched "Schrade Hunting Knife." This style of blade was only used on the 1613 3/4 model large folding hunter.

**VALUE:** $250–$325                    **MINT:** $600                    VG/4-

**KR0111**





**KNIFE:** Schrade Cutlery Company Hunter's Pride Model G1543 3/4, 4 7/8 inches, clip blade, steel lined, nickel-silver bolster, folding guard, jigged-bone handles. Tang marked "SCHRADE CUT. CO., WALDEN, N.Y., U.S. PATS, DEC 21, 09, SEPT 13, 10, JUNE 6, 16."

**BLADE:** 98 percent, 1/16-inch short, very full, light scratches, original nickel guards.

**HANDLES:** Jigged-bone handles.

**FUNCTION:** Great action, locks tight, seats deep.

**COMMENTS:** Blades were electro-etched, and through the years this etching often wore off (original etching "Hunter's Pride"). The floating guard often broke or was missing.

**VALUE:** $375–$475                     **MINT:** $650                     Ex/5

**KR0112**





**KNIFE:** Schrade Cutlery Company Forest King Model 1544 3/4 BM, 4 7/8 inches, clip blade, steel lined, nickel-silver bolster, buttermilk celluloid handles. Tang marked "SCHRADE CUT. CO., WALDEN, N.Y., U.S. PATS, DEC 21, 09, SEPT 13, 10, JUNE 6, 16."

**BLADE:** 95+ percent, scratches, light pitting, sharpened.

**HANDLES:** Buttermilk, nice.

**FUNCTION:** Good action, seats well.

**COMMENTS:** This model was often electro-etched "Forest King." These knives have become quite rare and are sought after because of the celluloid imitation pearl (called "marine pearl" by the Schrade Company) used on the handles.

**VALUE:** $500-600              **MINT:** $800              Ex/5

**KR0113**



# ABOUT THE AUTHOR

Richard Langston saw his first automatic knife at age 7 and fell under its spell. His early infatuation was destined to become a life-long love affair when he moved at age 9 with his family to Walden, New York, often referred to as the "Little Sheffield of America" since it was the home of the Schrade Cutlery, New York Knife, and Walden Knife companies. Here, he became fascinated by the stories told by townspeople about these heralded cutlery companies and their products. He loved all the knives, but it was the switchblade that stole his heart.

Rich's abiding interest in these old knives and their manufacturers prompted him to learn as much about them as possible. It soon became apparent to him, however, that there was not an authoritative reference to automatic knives, their history, and their value for collectors, and also that there was a great need for such a guide. Being a father to five children and having a career as a lieutenant with the New York State Department of Correction delayed his being able to produce this reference book. Now that he is retired, Rich is able to do historical research and lecture on the subject that he loves. He and his wife live Wallkill, New York.

If you would like more information about switchblades or would like for Rich to evaluate a knife, he can be reached by e-mail at: lt632ret@frontiernet.net.

KR0114

**KR0115**

KR0116

ATHENS REGIONAL LIBRARY SYSTEM

3 1001 00031745 4

Athens-Clarke County Library
2025 Baxter Street
Athens, GA 30606
(706) 613-3650
Member: Athens Regional Library System

KR0117

KR0118



It has been more than 20 years since a major work on switchblades has been published, and never has one showcased as many different types of automatic knives as Rich Langston's welcome new book. *The Collector's Guide to Switchblade Knives* contains a history of the early cutlery industry in the United States, a detailed examination of the evolution of switchblade knives, and a user-friendly illustrated guide that helps collectors and novices alike identify all kinds of automatic knives from one-of-a-kind museum-quality antiques to Great-Grandfather's old folder that's been gathering dust in the attic for the past 100 years.

Using a dual grading system, this reference gives an honest appraisal of more than 160 automatic knives based on manufacturer, tang markings, condition, availability, functioning, opening mechanism, and handle and blade materials. All of the knives in this book are from the author's personal collection, which he has been assembling since the age of 7 when he saw his first switchblade and fell under its spell. The knives include examples from the early days of the fledgling cutlery industry in New England to the current imports finding their way into the United States (despite the restrictive laws in the late 1950s that all but outlawed switchblades in this country). New opportunities to acquire and trade switchblades through such Web sites as eBay have sent prices skyrocketing, making older price guides totally unreliable.

This handsome hardcover addition to the cutlery library is for collectors, switchblade aficionados, edged-weapons enthusiasts, historians, or anyone even thinking of buying or selling a switchblade.

A PALADIN PRESS BOOK • ISBN 1-58160-283-9



9 781581 602838

00000

KR0119

**PLAINTIFFS' EXHIBIT H**

KR0120



# SWITCH BLADES
## *Of Italy*

BY TIM ZINSER, DAN FULLER AND NEAL PUNCHARD
PHOTOGRAPHY BY BEN SALTZMAN

KR0121

# *Introduction*



*S*witchblade. The word conjures images from hundreds of movies: James Dean defending his honor at the planetarium; Glenn Ford disarming Vic Morrow in the classroom; Ernest Borgnine and Frank Sinatra facing off in a Honolulu alley. People who have never seen an automatic knife in person have been force-fed media images for fifty years. And those images have endowed the humble automatic knife with some fairly heavy social baggage, demonstrating the old Hollywood axiom that image is everything. Viewed from a pragmatic perspective, the chief historical function of the automatic knife has been that of a simple tool, useful when one needs a knife that is both small and can be opened with one hand. More mothers and grandmothers wielded switchblades in the last century than all the teenage gang bangers together. With the sock stretched over the darning egg, one hand held the work while the handy little Schrade could be opened one-handed to cut the thread. Or the stockman could hold an animal's lead and perform whatever task was at hand by flipping open his Case 6171. Not to be disingenuous, of course, the automatic knife was also identified as a favorite of teenage bad boys at least as early as 1950 ("The Toy that Kills," *Ladies Home Companion*, November 1950, p. 38ff). In any case, both descriptions probably lack something of the truth, especially by the 1950s.



*Switchblade*. The very word itself may bear some of the responsibility for the negative image that led to its being banned in 1958. And such a perfect word it is. Somehow it is hard to imagine "press button," "push button," "automatic," or even "spring knife" engendering sufficient media and governmental attention to accomplish what the 1958 Switchblade Act accomplished. What a word, *switchblade*. And we don't even know where the word came from. It first appeared in the nineteenth century as a variant of knife switch, a device for closing an electrical circuit, but there is no evidence of any transfer from electricity to automatic knife. Most dictionaries, including those devoted to slang, suggest that the word first appeared about 1946, but provide no etymology or other information about its origin. The most intriguing source suggests that the first written of the word can

KR0122

be found in Langston Hughes' poem "The Negro Mother." This is an appealing detail in that much slang has always derived from one subculture or another, and African-American culture has probably been the richest source. The problem is that no available copy of the poem contains the word. This does not mean that Hughes did not use the term, perhaps in an earlier draft, but it creates a dead end to that particular search.

Despite the mystery surrounding the origin of the word, there is one aspect that is nearly universal. Ask anyone, whether a person who has only seen switchblades in the movies or an advanced collector, to close his eyes and visualize a switchblade and almost without exception he will think of an Italian stiletto. Considering that both the term and the knife arrived in this country almost simultaneously in the years after World War II, it is perhaps not surprising that the two are essentially synonymous. Of course, there are switchblades that are not Italian stilettos, and there are Italian stilettos that are not switchblades, but to the mainstream culture of the modern world they amount to the same thing.

So it is not surprising that the hottest area of switchblade collecting and the richest area for historical study is the Italian stiletto—not that much background is known. As with the word itself, much of the history of the Italian switchblade is rather murky, but a good bit of painstaking research has provided some of the answers. Before we dive into that discussion, however, several things need to be observed. First, these Italian switchblades have more in common with baseball cards and comic books than with fine Renaissance daggers or even Randall knives. Even Latama, the purveyor of perhaps the finest quality knives, advertised switchblades as "novelties". And even the Italian craftsmen who made the knives didn't take them seriously. The blades were

seldom hardened—meaning that they would not hold an edge—nor were they intended to be working knives or used for anything—except perhaps stabbing. Perhaps part of the enduring charm of the Italian stilettos is their essential uselessness. In truth, their only real virtues are that they look neat and that there is something quintessentially cool about a knife that opens by pushing a button. While there are a few instances of an Italian switchblade being used in a fight—and those instances are very few, despite what unsubstantiated media reports say—it would not be a serious knife fighter's choice of weapon. Any decent fixed-blade military or hunting knife would be a much better choice. But the psychological effect, a slim blade whipping out with a sinister "snick," the characteristic that Hollywood has exploited in over 400 films, that is an advantage that belongs to the switchblade alone.

In the pages that follow, you will see appealing blades, unique knives, beautiful handles, and intricate mechanisms. As with so many collectibles, however, most of these characteristics were incidental to their original manufacture. Collectors wax poetically over the beauty of the horn scales. Enthusiasts talk at length about minor variations in button attachment and placement, about minor variations in mechanism, about differences between steel and brass liners, about short versus long bolsters, about slight differences in blade grinds. Little of this was of importance to the knifemakers themselves except as it made their task easier, speeded up the process, or represented an improvement in function. Which is not to say that the cutlers did nor take pride in their work. In fact, it is the fact that they did take such pride that accounts for much of the knives' appeal today. But these old cutlers were also realists and never thought that they were laboring in "the golden age" of switchblades or turning out *objets d'arts* for the ages.



coltellerie "BUFALO"

KR0123

5

# Before Switchblades:
## The Folding Knife



A stick for digging termites may have been early man's first tool, but his first tool of significance was the knife. In fact, the knife remains as important today as it ever was, and it could be argued that it was a more important technological advance than even the wheel. Without a knife in some form, grain could not have been harvested, meat could not have been butchered, enemies could not have been dispatched. Do you believe your computer to be indispensable? Consider your knife. You couldn't eat, dress, or shave without the knife in one of its myriad forms. From childbirth to the guillotine, some sharp-edged cutting tool is part of the absolute, visceral fabric of our lives.

Considering the importance of knives in the development of human civilization, it is little wonder that the history and development of cutlery is an impossibly broad subject for any one study, but before we focus on automatic knives, some background

6

KR0124

information may prove useful. From the earliest flint scraper or obsidian blade, there was a steady—but slow—progression in the technology of cutlery from the first metal knives of bronze through the iron age up to the development of steel. Before there could be automatic knives, though, there had to be folding knives. For whatever reason — convenience or concealment one must assume — some enterprising knifemaker living in the Roman Empire created the folding knife. These first folders lacked a backspring and were held in position, open or closed, solely by friction. Early metal springs were used on the first wheelock rifles in the middle of the sixteenth century and were rather too large and crude-looking to have had much attraction for knifemakers.

Today, the term "spring knife" may conjure up an image of a modern automatic, but the term originally referred to the first folding knives to be constructed with a back spring, which helped hold a knife open or closed and was invented sometime around the middle of the eighteenth century. What seems to have made possible this revolutionary step in the history of the folding knife was the invention of a much improved and much smaller spring by the clockmaker Benjamin Huntsman, in 1742.

This modification marked a significant advance in the utility of the folding knife, and the fascination and experimentation with springs that must have been involved resulted shortly thereafter in a spring-fired folding blade knife, a knife better known today as a switchblade. The first spring-fired blade that can be authenticated appeared in Europe, probably Italy, in the late eighteenth century, with knifemakers in other countries, especially France and England, not far behind.

Those first automatic knives of the late 1700s-early 1800s, including those made in Italy, were not so far removed from the modern stiletto-style Italian switchblades. Upon comparison, both

*This knife is the oldest known Italian switchblade, circa late 1700s-1800. It is marked Prioletta, the name of an old Italian cutlery family. The knife measures 13" long and features horn handles. The release button and rocking arm are all exposed. The picklock blade release is similar to those of the 1950s.*

**KR0125**

**PLAINTIFFS' EXHIBIT I**

KR0126



# POCKET-
# KNIVES

### THE COLLECTOR'S GUIDE TO IDENTIFYING, BUYING,
### AND ENJOYING VINTAGE POCKETKNIVES















## Bernard Levine

KR0127

# POCKET-KNIVES

## THE COLLECTOR'S GUIDE TO IDENTIFYING, BUYING, AND ENJOYING VINTAGE POCKETKNIVES

**Bernard Levine**



COURAGE BOOKS

KR0128

# CONTENTS

INTRODUCTION **6**

HISTORY OF POCKETKNIVES **9**

JACK KNIFE, PEN KNIFE, AND
MULTI-BLADE **12**



MAKING POCKETKNIVES **23**

THE MOST POPULAR BRANDS
OF POCKETKNIVES **28**

FANCY HANDLES **57**



HAND CRAFTED FOLDING KNIVES **63**

COUNTERFEITS **67**

KEYS TO COLLECTING POCKETKNIVES **70**

FURTHER READING **74**
USEFUL ADDRESSES **79**
INDEX **80**

KR0129

THE MOST POPULAR BRANDS OF POCKETKNIVES



ABOVE
**Schrade LB-7 folding hunter, custom scrimshaw deer head by Jim Gullette, Greer, South Carolina, 1979.**



ABOVE
**Schrade Cutlery Co., Walden, N.Y., four blade senator penknife. Schrade "peach seed" jigged bone.**



ABOVE
**Schrade Cutlery Co., Walden, N.Y., Safety Push Button Knife, celluloid handles. (Note: in the United States, switchblade knives are illegal to transport in interstate commerce, and illegal to possess in all but two or three states.)**

day. After 1960 the trademark DIAMOND EDGE was applied to more of these knives.

In 1943 the Mirandos and Fazzano joined forces with Albert M. Baer of Ulster, and in 1946 they together took over Schrade Cutlery Co. The resulting Imperial Knife Associated Companies become the world's leading cutlery manufacturer.

## SCHRADE CUTLERY CO./G. SCHRADE/ SCHRADE-WALDEN/IMPERIAL-SCHRADE

George Schrade was one of the most prolific and influential inventors in American cutlery history. In 1892–93 he introduced his Press-Button knife. It was the first switchblade suited to mass production methods, although automatic opening knives made by hand had been around for more than a century.

In 1903 George Schrade sold the rights to this knife, which has the release button in the front bolster, to Walden Knife Co., then owned by E. C. Simmons Hardware Co. The following year, he and his brothers Louis and William started their own Schrade Cutlery Co., also in Walden, New York. Besides a full line of conventional knives, they made Schrade Safety Push Button knives, with the release in the handle and, after 1906, with a sliding safety latch beside the button. More significantly, George Schrade invented and manufactured an array of automatic machines for making and assembling pocketknife components, which were widely adopted across the U.S., and in Britain, France, and Germany.

In 1925 George Schrade formed the George Schrade Knife Co. in Bridgeport, Connecticut. Its ultra-modern knives, such as the patented "Wire-Jack," excite less collector interest today than the more traditional patterns made by Schrade Cutlery Co.

George Schrade died in 1945, and the following year his brothers sold Schrade Cutlery Co. to "Kingston" (Ulster and Imperial, see pages 38 and 39). The resulting Imperial Schrade Associated Companies adopted the brand name SCHRADE-WALDEN for its premium line made in Schrade's old Walden, New York, plant. Schrade-Walden knives are more popular with collectors today than are the older ones from Schrade Cutlery, (perhaps because they are more familiar).

In 1942 Albert M. Baer of Ulster had brought his brother,

KR0130

——— THE MOST POPULAR BRANDS OF POCKETKNIVES ———



Henry, into the firm. In the early 1950s Henry Baer became the president of the Schrade division, and Schrade's premium "Uncle Henry" line is named after him.

After World War II Imperial Knife Associated Cos. both expanded and consolidated. At various times the firm owned major factories in France, Germany, and England (1977–1982). The Walden operation was closed about 1973. In 1984 Fazzano and the Mirandos sold their interests to Albert M. Baer, and the firm became Imperial Schrade Corporation. All U.S. pocket and sport knife production was consolidated in a new plant in Ellenville. Today all the "Jackmaster" type knives are made in Listowel, Ireland.

Today Schrade offers a wide array of commemorative and limited edition knives for collectors. Best known is the annual "Schrade Scrimshaw" wildlife series, made since 1976.

**CAMILLUS CUTLERY CO.** In 1894 Charles Sherwood built and operated a small pocketknife plant in Camillus, New York. From 1896 to 1898 he leased it to Millard Robeson. Then,

**ABOVE**
**Annual "Schrade Scrimshaw" wildlife limited edition set.**



**ABOVE**
**Two A. W. Wadsworth & Sons, Austria, deerfoot folding knives, imported by Adolph Kastor & Bros., New York, from Bohemia prior to World War I.**

KR0131

# PLAINTIFFS' EXHIBIT J

KR0132



HOME | ATTORNEYS | PRACTICE AREAS | GUN LAW BOOKS ▾ | TESTIMONIAL | BLOG | CONTACT | SUBSCRIBER PORTAL ▾

 

(732) 389-8888    SCHEDULE A CONSULTATION

You are Viewing a Members-Only article
Click Here to go back to Portal

# NATIONAL SWITCHBLADE LAWS UPDATE

*Date posted: April 24, 2023*



**National Switchblade Laws Update**

By Evan F. Nappen, Attorney at Law

I wrote the book Knife Laws of the U.S.: Loopholes, Pitfalls & Secrets. Since its publication in 2015 many states have repealed their anti-knife laws.

Here is an update on the progress of the Knife Liberty Movement with regards to switchblade law reform throughout the United States.

45 States now allow possession to one degree or another (as of April 15, 2023).

KR0133

36 States have no restrictions on possession or everyday/open carry.

29 States allow concealed carry.

19 Switchblade Ban or Restriction Repeals since 2010: Alaska, Indiana, Kansas, Maine, Missouri, Montana, New Hampshire, Nevada, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Virginia and Wisconsin

As of April 15, 2023: Alphabetical listing of a summary of states where civilian possession of switchblade/automatic knives are legal with any limitations noted. Dates are when ban was repealed.  ( * = Concealed Carry also legal)

Alabama*

Alaska* 2013

Arizona*

Arkansas*

California* (under 2 inches)

Colorado* 2017 (concealed under 3.5 inches for all knives)

Connecticut* (with valid hunting or fishing license OR 1.5 inches and under)

Florida *

Georgia* 2012

Idaho* (vague limitations on concealed carry, but permitted with CCW)

Illinois* 2017 (requires FOID card)

Indiana* 2013

Iowa* (concealed with CCW)

Kansas* 2013

Kentucky

Louisiana* 2018 – 2022 (concealed carry 2022)

Maine 2015

Massachusetts* (1.5 inches or less)

https://www.evannappen.com/exclusive-1/

KR0134

5/4/23, 2:03 PM                                                   Knife Ban Lawsuit - Evan Nappen Attorney At Law

Maryland

Michigan* 2017

Minnesota (for "collectors" and/or as "curios or antiques")

Mississippi

Missouri 2012

Montana* 2019

Nebraska

Nevada 2015

New Hampshire* 2010

New Jersey (for "lawful purpose" including specifically hunting & fishing, but no sales.)

New York (with valid hunting, fishing or trapping license, but no sales – NOTE: Gravity Knives and Balisongs LEGAL)

North Carolina

North Dakota

Ohio* 2021

Oklahoma* 2015 (Repeal was of the carry ban, possession was already legal)

Oregon* (concealed with CCW)

Pennsylvania 2022

Rhode Island* (concealed must be 3-inches or less)

South Carolina*

South Dakota*

Tennessee* 2014

Texas* (concealed with CCW) 2013

Utah* 2011 (concealed with CCW)

**KR0135**

Vermont* (under 3 inches)

West Virginia 2020

Virginia* 2022 (Concealed 2023)

Wisconsin* 2016

Wyoming

## Leave a comment

Comment *

POST COMMENT

## What our customers say

 Rating

**4.0** ★★★★☆  106  reviews

Write a review

 **C R**
8 days ago
★★★★★
My experience with the Evan Nappen law  rm was excellent.

 **Joe Matarese III**
9 days ago
★★★★★
Lou and Evan Nappen are the very best with 2A matters in NJ

 **L Socas**
1 month ago
★★★★★
Incredibly invaluable service. Very quick, professional, friendly

 **STEVEN SALVESEN**
1 month ago
★★★★★
They KNOW firearms law.

They are truly dedicated to the
Read more

court of law. Very satisfied with
Read more

response time. Very patient and
Read more


Posted on
Google


Posted on
Google

Posted on
Google

Posted on
Google

# CONTACT US

**EVAN F. NAPPEN ATTORNEY AT LAW, PC**

📞  732-389-8888

🕐  Open · Closes 5PM

📍  21 Throckmorton Ave.
    Eatontown, NJ 07724

GET DIRECTIONS







© 2023 Evan F. Nappen Attorney At Law,
PC. All Rights Reserved. Privacy Policy
Disclaimer

# PLAINTIFFS' EXHIBIT K

KR0138

← | pocketknife | ✕  🔍

Dictionary | Thesaurus

# pocketknife noun

pock·et·knife | ˈpä-kət-ˌnīf 🔊

Synonyms of *pocketknife* ›

: a knife that has one or more blades that fold into the handle and that can be carried in the pocket

## Recent Examples on the Web

Old Mustangs had dashboards that resembled a good *pocketknife*, simple and purposeful with bits of tidy icing.

— Sam Smith, *Car and Driver*, 25 July 2023

Ward did not have a *pocketknife* on him, the complaint said.

KR0139

POCKETKNIFE Definition & Meaning - Merriam-Webster

| Dictionary | Thesaurus |
|---|---|

— Hugh Garvey, *Sunset Magazine*, 21 Apr. 2023

See More ⌄

These examples are programmatically compiled from various online sources to illustrate current usage of the word 'pocketknife.' Any opinions expressed in the examples do not represent those of Merriam-Webster or its editors. Send us feedback about these examples.

## First Known Use

1676, in the meaning defined above

## Time Traveler

**The first known use of *pocketknife* was in 1676**

See more words from the same year

**KR0140**

Dictionary                                                              Thesaurus

NGLISH - SPANISH-ENGLISH TRANSLATION

BRITANNICA ENGLISH - ARABIC TRANSLATION

Browse the Dictionary:  A   B   C   D   E   F   G   H   I   J   K   L   M   N   O   P   Q   R   S   T   U   V   W   X   Y   Z   0-9   BIO   GEO

Home  |  Help  |  About Us  |  Shop  |  Advertising Info  |  Dictionary API  |  Contact Us  |  Join MWU  |  Videos  |
Word of the Year  |  Kid's Dictionary  |  Law Dictionary  |  Medical Dictionary  |  Privacy Policy  |  Terms of Use

Browse the Thesaurus  |  Browse the Medical Dictionary  |  Browse the Legal Dictionary  |  Browse the Kid's Dictionary

© 2023 Merriam-Webster, Incorporated

**KR0141**

# PLAINTIFFS' EXHIBIT L

KR0142

# AMERICAN
# KNIVES

## THE FIRST HISTORY AND COLLECTORS' GUIDE



## Harold L. Peterson

KR0143

# AMERICAN KNIVES

## THE FIRST HISTORY
## AND
## COLLECTORS' GUIDE

*by*

Harold L. Peterson

CHARLES SCRIBNER'S SONS · NEW YORK

KR0144

# CONTENTS

| | PREFACE | vii |
|---|---|---|
| I | *KNIFE NAMES* | 1 |
| II | *KNIVES OF THE EXPLORERS AND COLONISTS* | 6 |
| III | *THE BOWIE AND ITS ASSOCIATES* | 25 |
| IV | *ARMY KNIVES* | 71 |
| V | *NAVAL DIRKS AND OTHER KNIVES* | 95 |
| VI | *THE INDIAN AND HIS KNIFE* | 115 |
| VII | *POCKET KNIVES* | 129 |
| VIII | *THE MANUFACTURE AND SHARPENING OF KNIVES* | 143 |
| | APPENDIX | |
| | *A List of American Makers, Marks and Dealers* | 157 |
| | INDEX | 173 |

KR0145

*CHAPTER VII*

# POCKETKNIVES



FIGURE
159

*Early 17th-century pocketknife found at Jamestown. It has one blade as well as a small cup for measuring powders and so may well have belonged to one of the first apothecaries in the colony.*

U. S. NATIONAL MUSEUM

O<small>F ALL</small> the forms of knives, the pocketknife has perhaps been man's most universal companion. Excavated specimens from Roman sites indicate that the folding pocketknife was popular at least as early as the first century A.D. In its infinite variations it is the possession of almost every man today. For centuries it has been both a household neighbor and the comrade of soldiers and sailors; the small boy's dream and the comfort of the aged whittler.

Throughout its history it has been known by a variety of names—clasp knife, pocketknife, jackknife, Barlow knife and penknife are a few of the commonest. Some of these are general terms. Some refer to specific designs.

One of the commonest of the specific names is "jackknife." It is also one of the oldest. European documents record the name as early as 1672, and it is probably much older. It occurs frequently in American colonial documents, and during the Revolution at least two states, New York and New Hampshire, required their militia to carry one. British and French soldiers also carried jackknives during that war, and many have been recovered from various forts and camp sites.

**129**

KR0146

Case 3:23-cv-00474-JES-DDL   Document 34-3   Filed 03/06/24   PageID.1037   Page 63 of 354

**FIGURE 172**



Premium Stock

Dogleg

Muskrat Knife

Serpentine Jack

Swell End Jack

Cattle

Sleeveboard Pen

Lobster Pen

Congress Pen

Fish Knife

Push Button

Senator Pen

Pruning

Utility

Barlow

Easy-opener

Equal End Jack

Electrician's

*Some of the more popular types of pocketknife made today.* FROM The Cutlery Story BY LEWIS D. BEMENT, COURTESY THE ASSOCIATED CUTLERY INDUSTRIES.

KR0147

# PLAINTIFFS' EXHIBIT M

**KR0148**

# KNIVES AND THE SECOND AMENDMENT

David B. Kopel,[1] Clayton E. Cramer[2] & Joseph Edward Olson[3]

*This Article is the first scholarly analysis of knives and the Second Amendment. Under the Supreme Court's standard in* District of Columbia v. Heller, *knives are Second Amendment "arms" because they are "typically possessed by law-abiding citizens for lawful purposes," including self-defense.*

*There is no knife that is more dangerous than a modern handgun; to the contrary, knives are much less dangerous. Therefore, restrictions on carrying handguns set the upper limit for restrictions on carrying knives.*

*Prohibitions on carrying knives in general, or of particular knives, are unconstitutional. For example, bans of knives that open in a convenient way (e.g., switchblades, gravity knives, and butterfly knives) are unconstitutional. Likewise unconstitutional are bans on folding knives that, after being opened, have a safety lock to prevent inadvertent closure.*

---

1. Adjunct Professor of Advanced Constitutional Law, Denver University, Sturm College of Law. Research Director, Independence Institute, Denver, Colorado. Associate Policy Analyst, Cato Institute, Washington, D.C. Professor Kopel is the author of fifteen books and over eighty scholarly journal articles, including the first law school textbook on the Second Amendment: NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (Vicki Been et al. eds., 2012). Kopel's website is DAVE KOPEL, http://www.davekopel.org (last visited Aug. 20, 2013).

2. Adjunct History Faculty, College of Western Idaho. Mr. Cramer is the author of CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM (1999) (cited by Justice Breyer in McDonald v. City of Chicago, 130 S. Ct. 3020, 3132 (2010) (Breyer, J., dissenting)), and ARMED AMERICA: THE REMARKABLE STORY OF HOW AND WHY GUNS BECAME AS AMERICAN AS APPLE PIE (2006), and co-author of, among other articles, Clayton E. Cramer & Joseph Edward Olson, *What Did "Bear Arms" Mean in the Second Amendment?*, 6 GEO. J.L. & PUB. POL'Y 511 (2008) (cited by Justice Scalia in District of Columbia v. Heller, 554 U.S. 570, 588 (2008)), and Clayton E. Cramer, Nicholas J. Johnson & George A. Mocsary, *"This Right is Not Allowed by Governments that Are Afraid of the People": The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified*, 17 GEO. MASON L. REV. 823 (2010) (cited by Justice Alito in *McDonald*, 130 S. Ct. at 3039 n.21, 3041 n.25, 3043). Mr. Cramer's website is CLAYTON CRAMER'S WEB PAGE, http://www.clayton cramer.com (last visited Aug. 20, 2013).

3. Professor of Law, Hamline University School of Law, A.B. University of Notre Dame, J.D. (distinction) Duke University, LL.M. University of Florida. Professor Olson is the author of a book on federal taxation, thirteen articles in various fields, and four amicus briefs to the U.S. Supreme Court on Second Amendment issues, as well as co-author of Clayton E. Cramer & Joseph Edward Olson, *What Did "Bear Arms" Mean in the Second Amendment?*, 6 GEO. J.L. & PUB. POL'Y 511 (2008).

The authors thank Michael P. O'Shea, Eugene Volokh, Robert Dowlut, and Rhonda L. Thorne Cramer for their comments and suggestions.

KR0149

I<span style="font-variant:small-caps">NTRODUCTION</span>

Although Second Amendment cases and scholarship have focused on guns, the Second Amendment does not protect the right to keep and bear firearms. The Amendment protects "arms," of which firearms are only one category. Only about half of U.S. households possess a firearm, and many of those households have only one or two firearms.[4] In contrast, almost every household possesses several knives, not including table knives. This Article analyzes Second Amendment protection for the most common "arm" in the United States—the knife.

Part I explains the differences among various types of edged weapons. It covers bayonets, swords, folding knives, automatic knives, switchblades, gravity knives, butterfly knives, and the targets of knife control in the nineteenth century, namely Bowie knives and Arkansas Toothpicks. After a review of the knives, Part II provides criminological data in support of the intuitively obvious proposition that knives are less dangerous than guns. Part III then analyzes the important nineteenth century jurisprudence involving Bowie knives and Arkansas Toothpicks. Part IV concludes the background review for why knives, as weapons, are constitutionally protected arms and argues that the Second Amendment protects knives generally, thus including all of the knives discussed in the earlier parts (with the possible exception of the now-obscure Arkansas Toothpick).

Part V considers the various standards of review that have been used for Second Amendment cases after the Supreme Court's standard-setting decision in *District of Columbia v. Heller.* Applying even the weakest relevant standard of review, intermediate scrutiny, it seems clear that some knife laws are unconstitutional, namely: bans on knives that open in a convenient manner, such as switchblades, gravity knives, and butterfly knives; bans on folding knives that have a safety lock; and laws that restrict carrying knives more stringently than carrying handguns. Part VI of this Article bolsters the argument that knives are constitutionally protected arms and describes some of the more oppressive, and likely unconstitutional, knife control laws in various states and cities.

---

4.    *Variable Owngun: Have Gun in Home,* G<span style="font-variant:small-caps">ENERAL</span> S<span style="font-variant:small-caps">OCIAL</span> S<span style="font-variant:small-caps">URVEY</span>, http://www3.norc.org/GSS+Website/Browse+GSS+Variables/Subject+Index/ (follow "G" hyperlink; then follow "Guns" hyperlink; then follow "Ownership" hyperlink; then follow "HAVE GUN IN HOME" hyperlink) (last visited Aug. 20, 2013) (when asked if they had a gun in their home, 44.3 percent of those polled said yes, 54.9 percent no, and 0.8 percent refused to answer); G<span style="font-variant:small-caps">ARY</span> K<span style="font-variant:small-caps">LECK</span>, P<span style="font-variant:small-caps">OINT</span> B<span style="font-variant:small-caps">LANK</span>: G<span style="font-variant:small-caps">UNS AND</span> V<span style="font-variant:small-caps">IOLENCE IN</span> A<span style="font-variant:small-caps">MERICA</span> 54 (1991).

Case 3:23-cv-00474-JES-DDL   Document 34-3   Filed 03/06/24   PageID.1041   Page 67 of 354

I. Knives by Type

In the movie *Crocodile Dundee* (1986), when the hero is threatened by a New York City criminal with a switchblade, he says, "That's not a knife" and then pulls out a much larger blade and says, "*That's* a knife!"[5] Defining the different types of knives is a necessary first step because so much of the history of laws regulating knives is built around distinguishing which types of knives were regulated. Even so, the definition of many knife terms, as used in legislation and common parlance, is very unclear.

For modern general usage of the word knife, Wiktionary.com is a good guide. The website offers three definitions:

1. A utensil or a tool designed for cutting, consisting of a flat piece of hard material, usually steel or other metal (the blade), usually sharpened on one edge, attached to a handle. The blade may be pointed for piercing.
2. A weapon designed with the aforementioned specifications intended for slashing and/or stabbing and too short to be called a sword. A dagger.[6]
3. Any blade-like part in a tool or a machine designed for cutting, such as the knives for a chipper.[7]

This Article will ignore the third definition, which relates to the knives or blades in machines, such as wood-chippers. For the first definition (tools and utensils) and the second definition (short weapons), the physical description is the same; only the purpose of the knife is different. This Article focuses on "knife" as used in both the first and second definitions. In practice, most knives are suitable as tools and as weapons, but, of course, the reason that the Second Amendment is relevant to knives is their use as a weapon, which the first two definitions, and not the third, cover.

This Part presents an overview of knife use, the different types of knives, and how they are distinguished for legal and functional purposes. In addition, it details how many of the legal distinctions

---

5. Actually, the knife in the movie was a prop, and there was no real knife like it. In response to consumer demand, one company has started making a real knife that is a near-replica of the movie knife. *See* Fletcher Knives, *Crocodile Dundee Knife Finally in Production!!!!*, Bladeforums.com (May 1, 2010, 9:10 AM), http://www.bladeforums.com/forums/show thread.php/737272-Crocodile-Dundee-knife-finally-in-production!!!!. Of course, in New York City, carrying either of those knives is illegal. *See* N.Y.C., N.Y., Admin. Code § 10-133 (2010).
6. In the interest of precision, it should be noted that a "dagger" is a type of knife; all daggers are knives, but most knives are not daggers.
7. *Knife*, Wiktionary, http://en.wiktionary.org/wiki/knife (last updated July 11, 2013, 10:19 PM).

KR0151

between different types of knives are based on perception, rather than objective definitions related to public safety or the nature of the right to keep and bear arms.

## A. Knives as Tools

By far the most frequent use of a knife is as a tool. As the Oregon Supreme Court observed in 1984 while summarizing the history of knives in America, "[i]t is clear, then, that knives have played an important role in American life, both as tools and as weapons. The folding pocketknife, in particular, since the early 18th century has been commonly carried by men in America and used primarily for work, but also for fighting."[8]

The twentieth century, the penknife was an essential accessory for every student or literate adult.[9] As the name suggests, the penknife was used for cutting and slitting a quill or sharpening a pencil.[10] Even after the steel pen rendered the quill obsolete, the term persisted for any small, folding pocketknife.[11] Schoolchildren frequently carried penknives, as is attested by the knife's frequent appearance in elementary school readers of the nineteenth century.[12] Of course, the penknife was also often used for the many other common purposes of knives.

Knives are important tools in many activities, such as hunting, where they are used by sportsman to fillet a fish or skin an animal. Many occupations continue to rely upon utility knives, such as

---

8.   State v. Delgado, 692 P.2d 610, 614 (Or. 1984).

9.   *See* SIMON MOORE, PENKNIVES AND OTHER FOLDING KNIVES 25–27 (1988); *see also* JOHN MASON, MASON'S FIRST HOME & SCHOOL READER 75–76 (1874); CHARLES W. SANDERS, THE SCHOOL READER: THIRD BOOK 58 (50th ed. 1846).

10.   *See* MOORE, *supra* note 9, at 25.

11.   *Id.* at 27.

12.   *See, e.g.*, RICHARD EDWARDS & J. RUSSELL WEBB, ANALYTICAL THIRD READER 161 (1867); MASON, *supra* note 9, at 75–76; LEWIS B. MONROE, THE FOURTH READER 39–40 (1872); SANDERS, *supra* note 9, at 58. As an anecdotal example of this, one of the authors has carried a pocketknife every day of his life since third grade in 1955. He has never given a moment's thought to the legality of this common practice.

Case 3:23-cv-00474-JES-DDL   Document 34-3   Filed 03/06/24   PageID.1043   Page 69 of 354

roofers,[13] electricians,[14] and construction workers.[15] Knives are often part of combination tools that many Americans carry with them, such as Swiss Army knives and Leatherman Multi-Tools. However, knives with even the most utilitarian purposes, such as box cutters (with a one inch blade), can be used as weapons, as the hijackers demonstrated on 9/11.[16]

## B. Bayonets

A bayonet is designed to be mounted on the muzzle of a firearm.[17] Historically, some bayonets were just thrusting weapons with a point and without a sharpened edge.[18] Over the last century, bayonets have become shorter, shrinking from the size of a short sword to the size of a typical knife,[19] and modern bayonets have sharpened edges. Post-World War II designs evolved to recognize the more frequent use of the bayonet as a tool—for example, for opening ration cases or for use as a handheld weapon.[20] As a result, the

---

13.     *See, e.g.*, Black & Decker, The Complete Guide to Roofing & Siding 58 (Brett Martin et al. eds., 2004). See *United States v. Irizarry*, 509 F. Supp. 2d 198 (E.D.N.Y. 2007), for details of a prosecution of a person that started when a police officer noticed that the defendant was carrying a "Husky Sure-Grip Folding Knife," which the defendant used at the direction of his employer "for cutting sheet rock." *Id.* at 199–203.

14.     *See, e.g.*, Greg Fletcher, Residential Construction Academy: House Wiring 67 (2004) (describing use of a knife by electricians for opening boxes, stripping insulation, and as a substitute screwdriver for small screws).

15.     *See, e.g.*, Myron R. Ferguson, Drywall: Professional Techniques for Great Results 51 (Matthew Teague & Jessica DiDonato eds., 4th ed. 2012).

16.     *Box Cutters Found on Other September 11 Flights*, CNN.com (Sept. 24, 2001), http://archives.cnn.com/2001/US/09/23/inv.investigation.terrorism/.

17.     Note that a rifle with a bayonet on it and without ammunition is functionally equivalent to a Roman spear or javelin. Both are arms.

18.     *See* J.H. Bill, *Sabre and Bayonet Wounds; Arrow Wounds*, *in* 2 The International Encyclopedia of Surgery 101, 101 (John Ashhurst, Jr., ed., 1882) (discussing the nature of bayonet wounds and explaining that the edges of such wounds reflect the unsharpened nature of the edges).

19.     *See* Stephen Bull, Encyclopedia of Military Technology and Innovation 36 (2004). Older bayonets, such as the World War I version designed for the Springfield 1903-A3 rifle, were thinner, lighter, seventeen-inch versions of the Roman gladius sword and could be used as a short sword. Military fashion in bayonets continued to evolve so that hundreds of thousands of these bayonets were cut down to eight inches in length for use during World War II on the M1 Garand rifle. *See* Martin J. Brayley, Bayonets: An Illustrated History 228-35, 249 (2004); Anthony Carter, The Bayonet: A History of Knife and Sword Bayonets 1850–1970, at 115, 121 (1974).

20.     *See, e.g.*, John Burgess, The War Comes to Me: An Autobiographic History of World War II 45 (2007) (use of bayonet to open C-rations); Hondon B. Hargrove, Buffalo Soldiers in Italy: Black Americans in World War II 136 (1985) (concerning use of bayonets and knifes as handheld weapons in combat).

blade design became shorter, wider, and thicker, playing multifaceted roles for the late-twentieth-century soldier.[21]

Although anything with a blade can be used as an offensive or defensive arm, World War II saw the introduction of the M4 bayonet, which was specifically designed to be useful as a handheld weapon.[22] In the post-Cold War era, bayonets were designed to serve not only as fighting knives but also as wire cutters, box cutters, or improvised pry bars.[23]



U.S. M9 BAYONET[24]

## C. Swords

A sword is "[a] long-bladed weapon having a handle and sometimes a hilt and designed to stab, cut or slash."[25] There is no precise distinction between a short sword and a long knife (such as a long bayonet). Indeed, the long, sharpened-edged bayonets of the late nineteenth and early twentieth centuries were called "sword bayonets."[26] An 1881 dictionary observed a change in social customs: a sword is "a blade of steel, having one or two edges, set in a hilt, and used with a motion of the whole arm. . . . In the [eighteenth] century every gentleman wore a sword; now the use of the weapon is almost confined to purposes of war."[27]

A person can look at a pocketknife, then look at a medieval broad sword with a forty-eight-inch blade, and readily identify which is the "knife" and which is the "sword." However, for intermediate blade length, the distinction is not so clear. What about a

---

21.   *See* BULL, *supra* note 19, at 36 (discussing changing nature of the bayonet post-World War II).

22.   *See* BRAYLEY, *supra* note 19, at 232; CARTER, *supra* note 19, at 121.

23.   *See* BRAYLEY, *supra* note 19, at 249; BULL, *supra* note 19, at 36; FRED J. PUSHIES, WEAPONS OF DELTA FORCE 64 (2002).

24.   From author Cramer's personal collection.

25.   *Sword*, WIKTIONARY, http://en.wiktionary.org/wiki/sword (last updated July 11, 2013, 12:22 PM).

26.   *See* B.E. Sargeaunt, *The History of the Bayonet*, 44 J. MILITARY SERVICE INST. U.S. 251, 255–56 (1909).

27.   THOMAS WILHELM, A MILITARY DICTIONARY AND GAZETTEER 565 (rev. ed. 1881).

fixed blade knife with a fourteen-inch blade or an eighteen-inch machete?

As a Second Amendment issue, the knife/sword distinction is not particularly important. If the Second Amendment protects one, it protects the other.[28] This Article concentrates on knives, but most of the analysis applies equally to swords.

### D. Folding Knives

Many state and local regulations distinguish between fixed blade knives and folding knives,[29] possibly because of the misguided assumption that a fixed blade knife is a weapon whereas a folding knife is just a tool. Of course, many utility knives, such as those used for linoleum installation and wood veneering, are fixed blade, as are many sportsmen's knives and virtually all kitchen cutlery.[30]

Some folding knife laws make further distinction between knives that lock open and those that do not; some statutes put folding knives that lock in the same category as fixed blade knives.[31] Legislators may think that a locking, folding knife can be used as a weapon, whereas a folding knife that does not lock is a tool. The reason for this view is simplistic: a locking knife will not close on your hand when it meets resistance in a fight. While this is true, a locking knife also will not close on your hand when it meets resistance when used as a tool. The lock prevents the blade from closing on your fingers; this is equally important when roofing a house and when fighting for your life. The distinction between folding knives that lock and those that do not is therefore not a sound basis upon which to make distinctions of what is a weapon and what is a tool.

Furthermore, most folding knives possess the very useful feature that they can be opened with one hand, which is particularly advantageous when the other hand is otherwise occupied. The traditional

---

28.  Just as handguns and long guns are both Second Amendment arms.

29.  *E.g.*, Kan. Stat. Ann. § 21-6301(2) (2012) (prohibiting concealed carry of "a dagger . . . dangerous knife, straight-edged razor, [or] stiletto," but exempting "an ordinary pocket knife with no blade more than four inches in length").

30.  *See, e.g.*, Mike Burton, Veneering: A Foundation Course 28 (rev. ed. 2006).

31.  *Compare* Cal. Penal Code § 171b (West 2013) (locking folding knives and fixed blade knives where blade exceeds four inches prohibited in government buildings), *and id.* § 626.10(a) (fixed blade knives where the blade exceeds two and one half inches and locking folding knives, regardless of blade length, prohibited on primary and secondary school grounds), *with id.* § 626.10(b) (locking folding knives allowed on college campuses regardless of length, while fixed blade knives longer than two and one half inches prohibited on college campuses).

KR0155

tall ships motto, "[o]ne hand for yourself and one for the ship,"[32] presents an obvious application for such a knife. Similarly, a rancher holding an animal's lead with one hand can use the other to open a knife and free the beast from an entanglement. This feature shows that folding knives, whether locking or not, can as easily be viewed as tools as they can be viewed as weapons.

In addition to distinctions between folding and fixed blade knives, precisely how the knife opens makes a great deal of difference in many state laws. For example, if the blade is opened by inserting a thumb into a small indentation, hole, or post near the top of the blade and pushing, then it is legally unrestricted in almost all jurisdictions.[33] If, after the thumb has begun pushing on the indentation to open the blade, a spring helps finish the job, then the knife is called an "assisted opening" (AO) knife.[34] Popular models of AO knives include the Kershaw Leek, Benchmade Torrent, and Buck Rush.[35] These knives are legally unrestricted under federal law and most state laws.

Suppose instead that the knife has a button in the handle, and when the button is pushed, a spring then pushes the blade open automatically. Then, the knife is called a "switchblade," which is one type of "automatic knife."[36] Under federal law and a minority of state laws, automatic knives face far greater restrictions.[37]

## E. Automatic and Gravity Knives

An automatic knife is biased towards opening via a spring; some type of latch or lock must keep the blade retained in the handle until needed. For example, when the switchblade knife is folded, the internal spring is always pressuring the blade towards opening. The blade is restrained by a latch or lock. When the user presses a button, the latch or lock is released. The blade automatically springs open and typically locks in the open position.

---

32.   The Oxford Dictionary of Proverbs 146 (Jennifer Speake & John Simpson eds., 5th ed. 2008).

33.   *See infra* notes 40–41, 50–52 and accompanying text.

34.   *See* Actuating Opening System for Folding Knife, U.S. Patent No. 8,359,753 (filed Jan. 30, 2008).

35.   *See, e.g., Kershaw Assisted Openers & SpeedSafe Knives,* Kershaw Knives Direct, http://www.kershawknivesdirect.com (follow "Assisted Openers" hyperlink under "Categories") (last visited Aug. 20, 2013).

36.   *See* Commonwealth v. Lawson, 977 A.2d 583, 583 n.2 (Pa. Super. Ct. 2009) (explaining that automatic knives are forms of switchblades).

37.   *See, e.g.,* 15 U.S.C. § 1241(b) (2006); 18 Pa. Cons. Stat. Ann. § 908 (West 2013); Haw. Rev. Stat. § 134–52 (2011).

KR0156

A second automatic knife is the "out the front" knife (OTF). An OTF is not a folding knife.[38] When the button is pushed, the blade is pushed out the front of the handle by the spring. A third automatic knife is the gravity, or inertia, knife. This knife has no spring; the weighting of the blade and the absence of a bias towards closure are such that, as soon as a lock is released, gravity (if the tip of the knife blade is facing down) or a modest amount of centrifugal force will cause the blade to move into the open position.[39] Then, the blade must be manually locked into the open position or else it will slide back into the handle as soon as any force is applied (e.g., during cutting or thrusting).

Thus, there are three types of knives that are particularly easy to open with one hand: switchblade, out the front, and gravity. Of these, the first two are properly called "automatic knives." However, poorly written statutes create confusion about the definitions. The 1958 Federal Switchblade Act (FSA) limits the importability and interstate commerce of "switchblades."[40] Many state and local laws copy the federal definition.[41] Unfortunately, the federal definition of "switchblade" includes out the front knives, gravity knives, and real switchblades.[42]

Automatic knives were first produced in the 1700s,[43] with the earliest custom made for wealthy customers.[44] By the mid-nineteenth century, factory production of automatic knives made them affordable for ordinary consumers.[45] During World War II, American paratroopers were issued switchblade knives "in case they [became] injured during a jump and needed to extricate themselves from

---

38.  *See* Jerry Ahern, Armed for Personal Defense 77–78 (2010) (explaining how an "out the front" knife works).

39.  *See* N.Y. Penal Law § 265.00(5) (2013). Gravity knives can be either out-the-front or side-openers. *See* Richard V. Langston, The Collector's Guide to Switchblade Knives 30 (2001).

40.  15 U.S.C. § 1242 (1958). Another statute prohibits possession of switchblade knives in territories, overseas, or in "Indian country," except for "any individual who has only one arm" and who uses a blade less than three inches in length. *Id.* §§ 1243–44. Some state laws prohibiting possession or carrying of switchblades also exempt any "one-armed person" from these prohibitions. *E.g.*, Mich. Comp. Laws Ann. § 750.226a (West 2004).

41.  *E.g.*, Haw. Rev. Stat. § 134-52 (2011).

42.  15 U.S.C. § 1241(b) (1958). By interpretation, some state laws also cover butterfly knives, which are discussed *infra* Part I.F.

43.  *See* Langston, *supra* note 39, at 5–6.

44.  *See id.* ("For the most part, these old (going back to the 1700s) mostly European (e.g., English, German, Spanish) knives were hand-produced custom pieces for the very rich, not factory made.").

45.  *See id.* One of the first U.S. factories was the Waterville Cutlery Company, founded in 1843 in Waterbury, Connecticut. *Id.* at 7.

KR0157

their parachutes."[46] The switchblade enabled them to cut themselves loose with only one hand.[47]

In the 1950s, there was great public concern about juvenile delinquency.[48] This concern was exacerbated by popular motion pictures of the day, such as *Rebel Without a Cause* (1955), *Crime in the Streets* (1956), *12 Angry Men* (1957), and *The Delinquents* (1957), as well as the very popular Broadway musical *West Side Story*. These stories included violent scenes featuring the use of automatic knives by fictional delinquents. Partly because of Hollywood's sensationalism, the public associated the switchblade with the juvenile delinquent, who would flick the knife open at the commencement of a rumble with a rival gang or some other criminal activity. This was an important part the origin of the many statutes imposing special restrictions on switchblades.[49]

Recently, there have been two attempts to blur the distinction between automatic knives and non-automatic knives. In 2009, U.S. Customs and Border Protection issued a new regulatory interpretation of the Federal Switchblade Act that would treat most one-hand opening folding knives as automatics.[50] This new interpretation contradicted decades of previous Customs interpretation of the federal switchblade statute and would have covered the non-automatic, assisted opening knives, which have an indentation, hole, or stud to assist opening as opposed to a button that activates a spring.[51] The proposed new interpretation caused such an uproar that Congress

---

46.     United States v. Irizarry, 509 F. Supp. 2d 198, 204 (E.D.N.Y. 2007).

47.     *Id.*

48.     For a general analysis of the interaction between concerns about mass media and its perceived effects on juvenile delinquency in the 1950s, see James Gilbert, A Cycle of Outrage: America's Reaction to the Juvenile Delinquent in the 1950s (1986), and Frankie Y. Bailey & Donna C. Hale, Popular Culture, Crime, and Justice (1998). For a differing point of view emphasizing a failure to understand teenage culture, see David Matza & Gresham M. Sykes, *Juvenile Delinquency and Subterranean Values*, 26 Am. Soc. Rev. 712 (1961).

49.     *See* Gilbert, *supra* note 48, at 160 (stating that switchblade laws were passed as a result of concerns over juvenile delinquency); Thomas Doherty, Teenagers and Teenpics: Juvenilization of American Movies 40 (rev. ed. 2002) (discussing the media focus on juvenile delinquency and switchblades).

50.     *See* U.S. Customs & Border Prot., *Proposed Revocation of Ruling Letters and Revocation of Treatment Relating to the Admissibility of Certain Knives with Spring-Assisted Opening Mechanisms*, Customs Bull. & Decisions, May 22, 2009, at 5.

51.     *See id.* A federal switchblade is a knife which "opens automatically . . . by hand pressure applied to a button or other device in the handle of the knife," or where gravity or inertia allows the blade to slide out of the handle. *See* 15 U.S.C. § 1241(b) (2006). New York State law refers to "centrifugal force" (not inertia) in the state definition. N.Y. Penal Law § 265.00(5) (2013). Both statutes are attempting to describe the same kind of knife.

quickly revised the federal statute to make it clear that non-automatic folding knives with a bias towards closure are not within the federal definition of "switchblade."[52]

As detailed below, Manhattan District Attorney Cyrus Vance, Jr. has been doing something similar with the New York State switchblade and gravity knife statute.[53] He has been bringing criminal cases against persons who possess, carry, or sell non-automatic folding knives with a bias towards closure and charging them with violation of the state's ban on gravity knives and switchblades. These prosecutions are abusive. Unfortunately, many persons or businesses charged under the statute have lacked the resources to fight the charges by bringing in expert witnesses who can explain knife mechanics to the court.[54] Thus, there have been many out-of-court settlements with retailers, from whom Vance's office has pocketed significant amounts of money.[55]

Partly because of Vance's prosecutions, some state legislatures are proactively preventing similar abuses. These legislatures have repealed their decades-old ban on switchblades, gravity knives, or other banned knives such as dirks, daggers, and stilettos.[56] Other legislatures have enacted preemption statutes that eliminate local

---

52.     *See* Department of Homeland Security Appropriations Act of 2010, Pub. L. No. 111-83, sec. 562, § 4, 123 Stat. 2142, 2183 (2009) (codified at 15 U.S.C. § 1244 (2012)).

53.     *See* Press Release, N.Y. Cnty. Dist. Attorney's Office, District Attorney Vance Announces Major Investigation of Illegal Knives in New York (June 6, 2010), *available at* http://www.kniferights.org/VancePressRelease062010.pdf; *Knife Rights Contests DA's Claims, Tactics in Knife Retailer Shakedown*, KNIFE RIGHTS, http://www.kniferights.org/index.php?option=com_content&task=view&id=113&Itemid=1 (last visited Oct. 3, 2013). *Cf.* United States v. Irizarry, 509 F. Supp. 2d 198, 209 (E.D.N.Y. 2007) (case arising from a police search of a workman who was seen carrying a Husky Sure-Grip Folding Knife).

54.     *Manhattan District Attorney Shakes Down Honest Knife Retailers*, KNIFE RIGHTS, http://www.kniferights.org/index.php?option=com_content&task=view&id=113&Itemid=1 (last visited Oct. 3, 2013). For a civil rights lawsuit based on the Vance prosecutions, see Complaint, *Knife Rights, Inc. v. Vance*, 2011 WL 7567075 (S.D.N.Y. 2011) (No. 11 CV 3918). However, Vance has not exclusively targeted the legally defenseless. *See* Press Release, N.Y. Cnty. Dist. Attorney's Office, *supra* note 53.

55.     *Manhattan District Attorney Shakes Down Honest Knife Retailers, supra* note 54.

56.     *See* H.R. 1665, 2010 Gen. Ct., Reg. Sess. (N.H. 2010) (removing all references to knives in section 159:16 of the New Hampshire Code, which prohibits the carrying of certain weapons); S. 489, 96th Gen. Assemb., 2d Reg. Sess. (Mo. 2012) (repealing switchblade ban in section 571.020 of the Missouri Code); H.R. 2347, 62nd Leg., Reg. Sess. (Wash. 2012) (narrowing and clarifying definition of "spring-blade" knives in section 9.41.250 of the Washington Code); H.R. 2033, 2013 Leg., Reg. Sess. (Kan. 2013) (preempting local ordinances, plus repealing ban on switchblades, dirks, daggers, and stilettos); H.R. 33, 28th Leg., Reg. Sess. (Alaska 2013) (preempting local ordinances; repealing ban on switchblades); H.R. 1563, 118th Gen. Assemb., 1st Reg. Sess. (Ind. 2013) (repealing ban on switchblades); H.R. 1862, 83d Leg., Reg. Sess. (Tex. 2013) (repealing ban on switchblades).

Narrowly defined, a stiletto has "one slender bayonet-type blade with the point area back to about one-third of the blade" and is partially or fully double-edged. Historically, it was particularly popular in Italy, France, Spain, and Germany. LANGSTON, *supra* note 39, at 26.

bans on switchblades and other local knife ordinances that are more restrictive than state law.[57]

### F. Butterfly Knives

Butterfly knives, also known as balisongs, are sometimes named explicitly in state or local knife laws and are occasionally considered to fall within a state or local definition of "switchblade."[58] A butterfly knife consists of two handle sections that, when the knife is closed, completely cover the blade.



A Butterfly Knife Open and Closed[59]

By holding one handle and rotating the other handle away from the closed position, it is possible to open the knife and bring the two handles together. The handles may then lock together, although not all do. In some states, the lock is the difference between

---

57.    *See* S. 1015, 108th Gen. Assemb., Reg. Sess. (Tenn. 2013); *supra* note 54.

58.    *See, e.g.*, State v. Riddall, 811 P.2d 576, 578–80 (N.M. Ct. App. 1991) (holding that a balisong is a switchblade as defined by New Mexico statute); People v. Quattrone, 260 Cal. Rptr. 44, 44 (Cal. Ct. App. 1989) (holding that a balisong was a switchblade under California statute). *But see, e.g.*, Taylor v. McManus, 661 F. Supp. 11, 14 (E.D. Tenn. 1986) (ruling that balisongs are not switchblades under federal law); State v. Strange, 785 P.2d 563, 566 (Alaska Ct. App. 1990) (ruling that balisongs are neither switchblades nor gravity knives); People v. Mott, 522 N.Y.S.2d 429, 430 (N.Y. Cnty. Ct. 1987) (ruling that balisongs are not gravity knives).

59.    Photograph supplied by Knife Rights, Inc.

KR0160

a legal and an illegal knife.[60] Many experts believe that a butterfly knife is the strongest and safest folding knife because the blade cannot fold closed inadvertently on the operator so long as the operator has a firm grasp on the handles.[61] In contrast, a lock-blade folding knife can experience a lock failure, although this is rare for well-constructed knives.

An experienced operator can also flip the butterfly handle into the open position using only one hand. Like the switchblade, the butterfly knife's use in movies has given it an undeserved reputation as a criminal's weapon.[62] As with the switchblade, opening one is visually interesting and frightening to some persons unfamiliar with knives, creating a belief that it is an extremely dangerous weapon necessitating special legislative attention.[63]

All the knives described above are primarily tools, although they can also be used as weapons. Conversely, knives may be designed as weapons but used primarily as tools. A judge or juror's perception of the purpose of a knife may be quite different from the owner's or the designer's perception. The knives discussed below, however, are ones that some governments have historically believed to need special regulation or prohibition.

### G. Bowie Knives and Arkansas Toothpicks

America's first period of knife control was in 1837–1840, when the nation experienced a panic over the Bowie knife and the Arkansas Toothpick.[64] This Section discusses the knives' historical use, while the strange legal history of Bowie knives and Arkansas Toothpicks in the nineteenth century is detailed below in Part III.

---

60.   *See, e.g.*, Taylor, 661 F. Supp. at 14–15 (holding that the required step of locking the knife into an open position takes it out of the category of automatic knives).

61.   *See Paradox*, COLD STEEL, http://www.coldsteel.com/Product/24P/PARADOX.aspx (last visited Aug. 20, 2013) ("They are designed to rotate 180 degrees around the blade's unique split tang and use strong opposing spring tension to lock the blade open or hold it firmly closed. Don't worry about it taking two hands to get it into action, since once it's opened it will never close inadvertently.").

62.   For a representative list of films in which balisongs are used, see *Balisongs in the Movies*, BALISONGCOLLECTOR.COM, http://www.balisongcollector.com/movies.html (last visited Aug. 20, 2013).

63.   *See* Michael Burch, *Butterfly Knives Take Wing*, 28 KNIVES 26, 26, 30 (2008).

64.   *See* CLAYTON E. CRAMER, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC 85–96, 105–12 (1999) (discussing the tragedies and breathless newspaper coverage associated with this panic).

The Bowie knife became famous when used by Colonel Jim Bowie at the "Sandbar Fight" by the lower Mississippi River on September 19, 1827.[65] Rezin Bowie, Colonel Jim's brother, was the actual maker of the knife. He described his creation thusly: "The length of the knife was nine and a quarter inches, its width one and a half inches, single-edged, and blade not curved."[66] According to Rezin, the knife was designed for bear hunting.[67] Based on the known details of Rezin's knife, absolutely nothing about it was novel. Its fame soon made this style of knife in high demand and increasingly popular.[68]

Yet, the knife gained such popularity that many people use "Bowie knife" to describe knives that have curved blades or blades much longer than nine inches.[69] Today, a common description of the "Bowie knife" is a large fixed blade (almost always much longer than Rezin's nine inch long blade), sharpened on one edge (per Rezin's original model), with a relatively thick spine and a clip point.[70] This modern usage does not describe Rezin Bowie's original knife. Ironically, it also does not describe the custom knives that professional cutlers later produced for Rezin or Jim Bowie.[71]

The problem of the Bowie knife's notoriety as a fighting knife extends back to the first weeks after the Sandbar Fight. Newspaper and magazine reports of the event were often highly inaccurate.[72] The term "Bowie knife" entered the American vocabulary from these reports and then crossed the Atlantic. American and English manufacturers began using the term for a wide variety of large knives. Some knives had clip points, and others did not; some were straight, and others were curved; some were single-edged, and others were double-edged; some had crossguards, and others did not. There was also great variance in length. The only thing these knives had in common was that they were big, and all of them were considered particularly suitable for self-defense and hunting.[73] Historian Norm Flayderman, an expert in Bowie and other knives,

---

65.    *See* Raymond W. Thorp, Bowie Knife 6–8 (1948); Norm Flayderman, The Bowie Knife: Unsheathing an American Legend 285–89 (2004).

66.    R.P. Bowie, *Letter to the Editor*, Planter's Advocate, Aug. 24, 1838, *reprinted in* Marryat, 1 A Diary in America, With Remarks on Its Institutions 291 (1839).

67.    *Id.*

68.    *See* Flayderman, *supra* note 65, at 491–92.

69.    *See* Sears v. State, 33 Ala. 347, 348 (1859); J.R. Edmondson, The Alamo Story: From Early History to Current Conflicts 122–23 (2000).

70.    *See* Jim Woods, *How to Pick a Perfect Knife*, Popular Mechanics, Aug. 1982, at 78, 78–80.

71.    *See* Flayderman, *supra* note 65, at 491–92.

72.    *See id.* at 289–91.

73.    *See id.* at 490–92.

KR0162

Case 3:23-cv-00474-JES-DDL Document 34-3 Filed 03/06/24 PageID.1053 Page 79 of 354

both antique and modern, concludes that "there is no one specific knife that can be exactingly described as a Bowie knife."[74]

Today, several states outlaw carrying a "Bowie knife" without defining the term.[75] Thus, today's citizens who are subject to Bowie knife laws have no way of knowing whether they are forbidden to carry a straight knife that closely matches Rezin Bowie's design or the curved knives that are commonly called "Bowie knives." The state's definition may even include a knife that is neither, but has the words "Bowie Knife" written on it.[76] The chilling effect of this vagueness is obvious.

The Arkansas Toothpick's history is interwoven with that of the Bowie knife. There are some Mississippi tax receipts from the antebellum era, as well as some other writings, which expressly distinguish an "Arkansas Toothpick" from a "Bowie knife."[77] Narrowly defined, Arkansas Toothpicks have triangular blades up to eighteen inches long, sharpened on both edges.[78]



ARKANSAS TOOTHPICK[79]

However, Flayderman concludes that "Arkansas Toothpick" was, in its predominant usage, simply another marketing term for "Bowie knife."[80]

## II. CRIMINOLOGICAL CONSIDERATIONS: IS A KNIFE MORE DANGEROUS THAN A GUN?

Under the Supreme Court's decision in *District of Columbia v. Heller*, handguns, as a general class, are protected by the Second

---

74.   *Id.* at 490.

75.   *See* ALA. CODE § 13A-11-50 (LexisNexis 2005); GA. CODE ANN. § 16-11-127.1 (2011); ME. REV. STAT. ANN. tit. 25, § 2001-A (2012); MISS. CODE ANN. § 97-37-1 (2012); N.C. GEN. STAT. § 14-269 (2011); OKLA. STAT. tit. 21, § 1272 (2011); R.I. GEN. LAWS § 11-47-42 (2012); TEX. PENAL CODE ANN. § 46.01 (West 2012); VA. CODE ANN. § 18.2-308 (2009).

76.   *See generally* FLAYDERMAN, supra note 65, at 490.

77.   *Id.* at 265–66.

78.   *See* WILLIAM FOSTER-HARRIS, THE LOOK OF THE OLD WEST 120–22 (2007).

79.   Drawing by Rhonda L. Thorne Cramer.

80.   FLAYDERMAN, *supra* note 65, at 265–74.

KR0163

Amendment.[81] This is so notwithstanding the frequent use of handguns in violent crimes, including homicide. *Heller* acknowledged that, even though handgun misuse represents a major public safety problem, "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table."[82] If handguns may not be prohibited, in spite of the clear public safety concerns, then a category of arm that is less dangerous clearly may not be prohibited, either.

Are knives more dangerous than guns? Quite the opposite. In 2010, "[k]nives or cutting instruments" were used in 13.1 percent of U.S. murders, behind firearms (67.5 percent) and handguns specifically (46.2 percent), but ahead of blunt objects (4.2 percent), shotguns (2.9 percent), and rifles (2.8 percent).[83] The thirteen percent includes *all* knives, including steak knives, butcher knives, linoleum knives, and other "cutting instruments," such as screwdrivers (sharpened and otherwise), straight razors, and other instruments made into weapons by the inventiveness of criminals.[84]

Robberies for which the FBI has detailed information are overwhelmingly committed with firearms (47.9 crimes/100,000 people), not knives or other cutting instruments (9.1/100,000).[85] Knives and other cutting instruments are actually in last place in the FBI statistics for robbery, even behind "other weapon."[86] Similarly, in the category of aggravated assault, sharp objects are in last place for weapon type (47.9/100,000 people), behind firearms (51.8), personal weapons (69.0), and other weapons (83.3).[87]

---

81.   District of Columbia v. Heller, 554 U.S. 570, 628–29 (2008) ("The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family,' would fail constitutional muster.") (quoting Parker v. District of Columbia, 478 F.3d 370, 400 (D.C. Cir. 2007)).

82.   *Id.* at 2822 ("We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution.")

83.   *See Crime in the United States 2010, Expanded Homicide Data Table 11*, FBI, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10shrtbl11 .xls (last visited Aug. 20, 2013). For some homicides, the type of firearm is unknown, which is why the "firearm" figure is higher than the figures for handguns, rifles, and shotguns added together.

84.   *See id.*

85.   *Crime in the United States 2010, Table 19*, FBI, http://www.fbi.gov/about-us/cjis/ucr/ crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10tbl19.xls (last visited Aug. 20, 2013).

86.   *Id.*

87.   *Id.*

Unsurprisingly, data show that gunshots are more lethal than knife wounds. Harwell Wilson and Roger Sherman's 1960 study of hospital admissions for abdominal wounds found that abdominal stabbing cases ended in death 3.1 percent of the time, while 9.8 percent of abdominal gunshot wounds were lethal.[88] An examination of 165 family and intimate assaults (FIA) in Atlanta, Georgia in 1984 found similar results. Firearms-associated FIAs were three times more likely to result in death than "FIAs involving knives or other cutting instruments."[89]

Another study examined all penetrating traumas ("firearm or stabbing injury") in New Mexico that "presented to either the state Level-1 trauma center or the state medical examiner" from 1978 to 1993.[90] This study found that, although nonfatal injury rates were similar for firearms and stabbing (34.3 per 100,000 persons per year for firearms, 35.1 per 100,000 persons per year for stabbing), firearm fatality rates were much higher than for knives: 21.9 vs. 2.7.[91] In other words, thirty-nine percent of firearm penetrating traumas were fatal, compared to 7.1 percent of knife penetrating traumas. Thus, firearm injuries were 5.5 times more likely to result in death than were knife injuries. Not all of the penetrating traumas in New Mexico were criminal attacks. Fifty-five percent of the penetrating deaths were suicides, and four percent of the penetrating deaths were accidents.  There was insufficient information to determine the breakdown of weapon type by category.[92]

Knives in general are far less regulated than firearms. There are no mandatory background checks, no prohibitions on interstate sales (except for switchblades),[93] and no serial number requirements. The least expensive knives are considerably less expensive than the cheapest firearms.[94] Only about half of American homes

---

88.  Harwell Wilson & Roger Sherman, *Civilian Penetrating Wounds of the Abdomen*, 153 Annals Surgery 639, 640 (1961).

89.  Linda E. Saltzman et al., *Weapon Involvement and Injury Outcomes in Family and Intimate Assaults*, 267 JAMA 3043, 3043 (1992).

90.  Cameron Crandall et al., *Guns and Knives in New Mexico: Patterns of Penetrating Trauma, 1978–1993*, 4 Acad. Emergency Med. 263, 263 (1997).

91.  *Id.*

92.  *Id.* at 264. As for the remaining firearm deaths classified as "homicide," about six to twelve percent of them were probably justifiable homicides committed with firearms by persons who were not law enforcement officers. This is calculated by multiplying the 7.1–12.9 percent of civilian legal defensive homicides by the percentage of those homicides committed with firearms. Kleck, *supra* note 4, at 114, 148. It is unknown whether a similar percent of the knife homicides were justifiable.

93.  *See* 15 U.S.C. § 1242 (2006).

94.  Searching Amazon.com on September 29, 2012 found more than 298 matches for "combat knife" under 25 dollars, and 114 matches under 10 dollars. By comparison, even the cheapest single-shot .22 rifles (which would only be used by *very* stupid criminals) at the

have a gun, but almost every home has several knives, including tools, steak knives, and butcher knives. At the same time, these easily obtained arms are used far less often than firearms for murder, robbery, and aggravated assault. Thus, knives are far less dangerous than guns. Any public safety justification for knife regulation is necessarily less persuasive than the public safety justification for firearms regulation.

## III. BOWIE KNIVES AND THE NINETEENTH CENTURY CASES

During the nineteenth century, Bowie knives were commonly present in many areas of the United States. Contemporary sources leave no question that Bowie knives, Arkansas Toothpicks, and similar knives were a common part of American life until well after the Civil War—and not just for decoration, hunting, or slicing tough cuts of meat.[95] "[F]or those crossing the plains," such knives were "a necessity."[96] An account of Gold Rush California describes how masquerade balls in California would generally have "No weapons admitted" signs at the entrance.[97] An observer tells us that:

> [I]t was worth while to go, if only to watch the company arrive, and to see the practical enforcement of the weapon clause. . . . Most men draw a pistol from behind their back, and very often a knife along with it; some carried their bowie-knife down the back of the neck, or in their breast; demure, pious looking men . . . lifted up the bottom of their waistcoat, and revealed the butt of a revolver; others, after having already disgorged a

---

Cabela's website on the same date was $99.99. The cheapest repeating .22 rifle, the Mossberg 702 Plinkster, was $139.99.

95.    A few representative articles of the period illustrating the widespread violence associated with edged weapons (along with many other deadly weapons) include: *Scenes at New Orleans*, THE LIVING AGE, Oct.–Dec. 1852, at 528; *Editor's Easy Chair*, 11 HARPER'S NEW MONTHLY MAG. 411, 411–12 (1855); MARRYAT, *supra* note 66, at 106–10; *Colonel Bowie and his Knife*, TEMPLE BAR, July 1861, at 120; GEORGE COMBE, 2 ON THE UNITED STATES OF NORTH AMERICA 93–95 (1841); AMERICAN ANTI-SLAVERY SOCIETY, AMERICAN SLAVERY AS IT IS 202–05 (1839). Among the well-known authors whose writings about America during this period included mention of Bowie knives were: CHARLES DICKENS, AMERICAN NOTES (1842) and GREAT EXPECTATIONS (1861); OLIVER WENDELL HOLMES, AUTOCRAT OF THE BREAKFAST TABLE (1857) (Americans are the "Romans of the modern world . . . our army sword is the short, stiff pointed gladius of the Romans; and the American bowie knife is the same tool, modified to meet the daily want of civil society."); JULES VERNE, FROM THE EARTH TO THE MOON (1st English ed. 1873) (1865); Bret Harte, *The Outcasts of Poker Flat*, OVERLAND MONTHLY, Jan. 1869; MARK TWAIN, ROUGHING IT (1872); *all cited in* FLAYDERMAN, *supra* note 65, at 72–73.

96.    FLAYDERMAN, *supra* note 65, at 88.

97.    J.D. Borthwick, *Three Years in California*, 2 HUTCHINGS' ILLUSTRATED CAL. MAG. 169, 171 (1857).

Case 3:23-cv-00474-JES-DDL   Document 34-3   Filed 03/06/24   PageID.1057   Page 83 of 354

> pistol, pulled up the leg of their trousers, and abstracted a
> huge bowie-knife from their boot; and there were men, terri-
> ble fellows, no doubt, but who were more likely to frighten
> themselves than any one else, who produced a revolver from
> each trouser pocket, and a bowie knife from their belt. If any
> man declared that he had no weapon, the statement was so
> incredible that he had to submit to be searched.[98]

During the 1850s, because of conflict in the Territory of Kansas
between free soil and pro-slavery settlers, anti-slavery groups in New
England sent arms to the free soilers, including rifles, revolvers, and
Bowie knives.[99]

An important reason that the Bowie knife was typically possessed
for self-defense was that it was, in some respects, superior to fire-
arms. The black gunpowder used in the early and mid-nineteenth
century was vulnerable to atmospheric moisture. At close quarters,
a single-shot firearm has obvious limitations for self-defense. The
widespread adoption of the metallic cartridge in the late 1850s, and
the Colt's multi-shot revolvers in the 1840s, solved some of these
problems, though it was not until the mid-1860s that medium cali-
ber (.38 or larger) firearms with metallic cartridges became
common. Before then, the Bowie knife often had a better chance
than the handgun of stopping a criminal attacker; at least, a pru-
dent defender would often want to carry a Bowie as a back-up
arm.[100]

About a decade after the first appearance of the Bowie knife,
some southern states began passing laws against the knife. Alabama
imposed a one hundred dollar tax on the transfer of any Bowie
knife or Arkansas Toothpick[101]—the equivalent of at least $5,000 in
today's money.[102] In 1837, Tennessee prohibited carrying such

---

98. *Id.*

99. *See* Flayderman, *supra* note 65, at 106 (citing William Elsey Connelley, The Life of Preston B. Plumb, 1837–1891 (1913)) (three-term U.S. Senator from Kansas recalls receiving a shipment including 250 Bowie knives); David B. Kopel, *Beecher's Bibles*, *in* 1 Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law 58 (Gregg Lee Carter ed., 2d ed. 2012).

100. *See* Flayderman, *supra* note 65, at 485–87.

101. An Act To Suppress the Use of Bowie Knives, no. 11, 1837 Ala. Acts Called Sess. 7 (1837).

102. The price of gold in 1840 was fixed at $20.67 per ounce. Statistical Abstract of the United States 863 (1942). As of June 2, 2013, gold price was $1,387 per ounce, a 6,710 percent increase. *See* Goldprice, http://goldprice.org/. While gold price change alone is not a completely effective measure of price inflation because of changes in production efficiencies, it is at least a good starting point for a proxy.

knives.[103] An attempt to add pistols to the 1838 Tennessee bill failed.[104]

This attempt to regulate knives produced several nineteenth century cases involving Bowie knives.[105] These cases mostly followed the Tennessee Supreme Court's 1840 case, *Aymette v. State*,[106] which was wrong on its facts and later specifically repudiated by *Heller*.[107] The Tennessee Supreme Court in *Aymette* upheld the ban on the concealed carry of Bowie knives and Arkansas Toothpicks, holding that the Tennessee Constitution's guarantee of a right to keep and bear arms for the common defense "does not mean for *private defence,* but being armed, they may as a body, rise up to defend their just rights, and compel their rulers to respect the laws."[108] According to *Aymette*, the Bowie knife was not suitable for "civilized warfare" but was instead favored by "assassins" and "ruffians."[109] Significantly, the

---

103.   An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, 22 Tenn. Gen. Assemb. Acts 200 (1838).

The Bowie knife was also banned in Arkansas. The ban was repealed on February 5, 1973 in "emergency" legislation, which declared that knife manufacturing "has brought much favorable publicity to this State, that the prohibitions placed upon the sale of Bowie knives are unneeded . . . [and] that that immediate removal of such restrictions would have a favorable impact upon the economy of this state. Therefore an emergency is hereby declared to exist, and this act being necessary for the preservation of the public peace, health and safety . . . ." FLAYDERMAN, *supra* note 65, at 280.

104.   *Tennessee Legislature,* DAILY REPUBLICAN BANNER (Nashville), Jan. 13, 1838, at 2.

105.   One of the first problems encountered by the anti-Bowie laws was vagueness. In *Haynes v. State,* the Tennessee Supreme Court dealt with the complaint that the statute was vague and overbroad. 24 Tenn. (5 Hum.) 120, 122 (1844). The Tennessee statute applied to "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick . . . ." Ch. 137, 22 Tenn. Gen. Assemb. Acts 200.

The defendant, Stephen Haynes, was charged in Knox County with carrying "concealed under his clothes, a knife in size resembling a bowie-knife." At trial, the witnesses disagreed about whether Haynes's knife was a Bowie knife. Some said that it was too small and too slim to be a Bowie knife and would properly be called a "Mexican pirate-knife." The jury found Haynes innocent of wearing a Bowie knife but guilty on a second charge "of wearing a knife in size resembling a bowie-knife." *Haynes,* 24 Tenn. (5 Hum.) at 120–21.

The Tennessee Supreme Court agreed that the legislature could not declare "war against the name of the knife" alone. A strict application of the letter of the law might well result in some injustices: "for a small pocket-knife, which is innocuous, may be made to resemble in form and shape a bowie-knife or Arkansas tooth-pick" and would thus be illegal. The court concluded that the law must be construed "within the spirit and meaning of the law" and relied on the judge and jury to make this decision as a matter of fact. *Haynes,* 24 Tenn. (5 Hum.) at 122–23.

106.   Aymette v. State, 21 Tenn. (2 Hum.) 154 (1840).

107.   *See* District of Columbia v. Heller, 554 U.S. 570, 613 (2008).

108.   *Aymette,* 21 Tenn. (2 Hum.), at 157–58 (1840).

109.   *See id.* at 158–60. The entire decision in *Aymette* is guided by Tennessee's narrow arms provision: "[T]he words that are employed must completely remove that doubt. It is declared that they may keep and *bear* arms for their *common defence.*" *Id.* at 158. The opinion repeatedly ties the right solely to the "common defence."

KR0168

Case 3:23-cv-00474-JES-DDL   Document 34-3   Filed 03/06/24   PageID.1059   Page 85 of 354

Tennessee Constitution's guarantee, unlike the Second Amendment, contains the qualifying phrase, "for their common defence," which the U.S. Senate considered and rejected for the Second Amendment.[110]

The other major nineteenth century Bowie knife precedent, which is not part of the *Aymette* line, comes from Texas. In 1859, the Texas Supreme Court, in *Cockrum v. State,* ruled that, under the Texas Constitution's right to arms and the Second Amendment, "[t]he right to carry a bowie-knife for lawful defense is secured, and must be admitted."[111] At the same time, the court upheld enhanced punishment for manslaughter perpetrated with a Bowie knife.[112] The court elaborated on the Bowie knife:

> It is an exceeding destructive weapon. It is difficult to defend against it, by any degree of bravery, or any amount of skill. The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. The sword may be parried. With these weapons men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill, or with a certainty of killing, when the intention exists. The bowie-knife differs from these in its device and design; it is *the instrument of almost certain death.*[113]

A plausible explanation for this perception of the Bowie knife as "the instrument of almost certain death" is that it made a bloody mess of a person because of the size of its blade. This is especially true when compared to a pen-knife or dagger, but even more so when compared to a bullet (which had almost surgical, cosmetic consequences during the low velocity, black powder era). Hence, the Bowie Knife was a relatively gruesome weapon.[114]

Additionally, the judicial and legislative fear of Bowie knives may have come from concerns about poor people or people of color. As

---

*Aymette* is the urtext for the "civilized warfare" interpretation of the right to keep and bear arms, by which all persons have a right to own arms, but only arms which are useful for militia purposes. For a sympathetic treatment of the nineteenth century's "civilized warfare" cases, see Michael P. O'Shea, *Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition and the Scope of "Bearing Arms" for Self-Defense,* 61 Am. U. L. Rev. 585, 642–50 (2012).

110.  S. Journal, 1st Cong., 1st Sess. 129 (1789).
111.  Cockrum v. State, 24 Tex. 394, 402 (1859).
112.  *Id.* at 403.
113.  *Id.* at 402–03 (emphasis added).
114.  Even modern high velocity bullets, while producing large hydrostatic expansions within a person, produce exit wounds only two to three times the diameter of the entry wound. *See* Martin L. Fackler, *Wound Profiles,* Wound Ballistics Rev., Fall 2001, at 25 (examining damage in living tissue in experiments at the Letterman Army Institute of Research, Wound Ballistics Laboratory).

KR0169

the defendant's attorney argued before the Texas Supreme Court in *Cockrum*:

> A bowie-knife or dagger, as defined in the code, is an ordinary weapon, one of the cheapest character, accessible even to the poorest citizen. A common butcher-knife, which costs not more than half a dollar, comes within the description given of a bowie-knife or dagger, being very frequently worn on the person. To prohibit such a weapon, is substantially to take away the right of bearing arms, from him who has not money enough to buy a gun or a pistol.[115]

Some other state supreme court decisions picked up where *Aymette* left off, holding that some knives are not militia arms. In *English v. State*, the Texas Supreme Court apparently forgot the *Cockrum* decision and justified a ban on "the carrying of pistols, dirks [a short dagger], and certain other deadly weapons" by arguing that these are not arms of the militia: "The terms dirks, daggers, slungshots, sword-canes, brass-knuckles and bowie knives, belong to no military vocabulary. Were a soldier on duty found with any of these things about his person, he would be punished for an offense against discipline."[116] *English* cites no authority for its claim with respect to the military use of the knives of various sorts, and the claim appears to be false.[117] Similar to *Aymette*, *English* recognized that bayonets and swords, unlike the knives in question, were "arms" protected by the Second Amendment.[118]

Similarly, the West Virginia Supreme Court of Appeals in *State v. Workman* held that the arms protected by the Second Amendment:

> must be held to refer to the weapons of warfare to be used by the militia, such as swords, guns, rifles, and muskets—arms to be used in defending the State and civil liberty—and not to pistols, bowie-knives, brass knuckles, billies, and such other weapons as are usually employed in brawls, street-fights, duels,

---

115.   Cockrum, 24 Tex. at 395–96.

116.   English v. State, 35 Tex. 473, 473, 477 (1872).

117.   *Id.* at 477–78. For use of the bowie knife as a militia arm, see *infra* notes 124–28 and accompanying text.

118.   *English*, 35 Tex. at 476 ("The word 'arms' in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense. The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine . . . .")

KR0170

and affrays, and are only habitually carried by bullies, black-guards, and desperadoes, to the terror of the community and the injury of the State.[119]

*Heller* held that *Aymette* "erroneously, and contrary to virtually all other authorities," read the right to keep and bear arms as limited to the threat to overthrow a tyrannical government.[120] *Heller* repudiated *Aymette* and its progeny, *English* and *Workman*. Moreover, even if *Heller* had adopted *Aymette*'s rule that there is an individual right to own all militia-suitable arms, the Bowie knife is a militia arm. It may not have been standard equipment for the Tennessee militia in 1840, but there is plenty of evidence of its militia use in the rest of the United States.

The Republic of Texas won its independence from Mexico at the Battle of San Jacinto on April 21, 1836. At the decisive phase of the battle, the 700 Texas volunteers were storming the Mexican breast-works. The fighting was hand-to-hand. The Texans had broken their rifles by using them as clubs against the standing army of the Mexican dictator, Antonio Lopez de Santa Anna Perez de Lebron. The Texans next fired their pistols, but had no time to reload. The Texans, "then drawing forth their bowie-knives, literally cut their way through dense masses of living flesh."[121] The Mexican army, "unused to this mode of combat with huge Bowie-knives and the buts [sic] of guns, precipitately gave way; and while the shouts of Goliad and the Alamo rung in their ears, nearly one-half of the Mexican army was laid asleep in . . . death."[122] In an eighteen-minute battle, Texas became a nation.[123]

Bowie knives were most clearly militia arms during the Civil War:

The Mississippi Riflemen . . . [i]n addition to their rifle, . . . carried a sheath-knife, known as the bowie-knife. . . . This is a formidable weapon in a hand-to-hand fight, when wielded by men expert in its use, as many were in the Southwestern States,

---

119.   State v. Workman, 14 S.E. 9, 11 (W. Va. 1891).

120.   District of Columbia v. Heller, 554 U.S. 570, 613 (2008).

121.   Charles Edwards Lester, Sam Houston and His Republic 97 (1846), *quoted in* Flayderman, *supra* note 65, at 59.

122.   Edward Stiff, The Texan Emigrant 324–25 (1840), *quoted in* Flayderman, *supra* note 65, at 64. Goliad was the site of another battle, where Santa Anna had murdered 280 American prisoners.

123.   *See generally* Stephen L. Moore, Eighteen Minutes: The Battle of San Jacinto and the Texas Independence Campaign (2003).

where it was generally seen in murderous frays in the streets and bar-rooms.[124]

Other Mississippi militiamen were "armed with the rifles, shot-guns, and knives which they had brought from their homes."[125] As further evidence of the prevalence of Bowie knives among Civil War soldiers, below are contemporary drawings of crudely made daggers and Bowie knives that were "in common use among the insurgent troops from the Mississippi region."[126]



WEAPONS OF THE INSURGENTS. [127]

    While the then-Southwest (Mississippi, Louisiana, Arkansas, and Texas) was the Bowie knife's original territory, the knife was ubiquitous on both sides of the Civil War, carried by soldiers from every part of the nation.[128] The claims of *Aymette* and *Workman* that knives were not militia arms are clearly erroneous.

---

124.   Benson J. Lossing, 1 Pictorial History of the Civil War in the United States of America 479 n.2 (1866).

125.   *Id.* at 541 n.2.

126.   *Id.*

127.   *Id.* Other accounts referencing soldiers carrying Bowie knives, without apparently being in violation of military discipline, include Comte de Paris, 1.3 History of the Civil War in America 271 (Louis F. Tasistro trans., 1875); James R. Gilmore, Personal Recollections of Abraham Lincoln and the Civil War 110–11 (1899); D.M. Kelsey, Deeds of Daring by Both Blue and Gray 300 (1883); Wm. H. Russell, The Civil War in America 175 (1861); Samuel M. Schmucker, The History of the Civil War in the United States: Its Cause, Origin, Progress and Conclusion 987 (1865); Samuel M. Schmucker, 1 A History of the Civil War in the United States; with a Preliminary View of its Causes 188 (1863); John G. Walker, *Jackson's Capture of Harper's Ferry, in* 2 Battles and Leaders of the Civil War 604, 607 (Robert Underwood Johnson & Clarence Clough Buel eds., 1887).

128.   *See* Flayderman, *supra* note 65, at 125–68.

## IV. Knives as Constitutionally Protected Arms

This Part explains how knives are protected by the Second Amendment. Section A points out that the Second Amendment is for "arms," not just for "firearms." Being a militia-suitable arm is sufficient, but not necessary, for the Second Amendment to apply, and Section B details the history of knives as militia arms. *Heller*'s determination that handguns are within the scope of the Second Amendment was mainly based on the fact that handguns are useful for self-defense; Section C shows that knives are also useful for self-defense. Courts that have interpreted the Second Amendment have recognized the enormous technological improvements in firearms since 1791. In contrast, as Section D explains, the knives of today are not very different from the knives of 1791. Accordingly, Second Amendment protection of modern knives is especially clear. Part E argues that, under modern Second Amendment doctrine, the right to carry knives in public places for lawful self-defense must at least be co-extensive with the right to carry handguns.

### A. Which Arms does the Constitution Protect?

According to *District of Columbia v. Heller*, the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation."[129] *Heller* ruled that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," with "arms" defined (pursuant to a Founding Era dictionary) as "any thing that a man . . . takes into his hands, or useth . . . to cast at or strike another."[130]

As a starting point, all knives seem to be within the scope of the Second Amendment, just as all firearms are. Like firearms, a knife can be carried by an individual and used as a weapon. Of course, some knives, like some firearms, are better suited to this purpose than others, but all knives and all firearms can be possessed, carried, and used in case of confrontation. The *Heller* opinion, however, excludes some types of arms from Second Amendment protection: "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."[131]

---

129.   District of Columbia v. Heller, 554 U.S. 570, 592 (2008).

130.   *Id.* at 581–82 (quoting T. Cunningham, 1 A New and Complete Law Dictionary (1764)).

131.   *Id.* at 625. For an application, see *People v. Yanna*, 824 N.W.2d 241, 242, 245 (2012) (holding unconstitutional a state law "which prohibits possession of Tasers and stun guns by

*Heller* makes it clear that the protected arms are not solely those that are suitable for militia use. The right to bear arms "did not refer only to carrying a weapon in an organized military unit" but also included doing so as part "of the natural right of defense."[132] By this reasoning, any weapon that could be used for either militia duty or for private self-defense qualifies as an "arm." Although militia use is not necessary to show that something is a Second Amendment "arm," militia use is sufficient to do so. Knives are indisputably militia arms.

## B.  Knives as Militia Arms

Knives have long been part of American military equipment. The federal Militia Act of 1792 required all able-bodied free white men between eighteen and forty-five to possess, among other items, "a sufficient bayonet."[133] This establishes both that knives were common *and* were arms for militia purposes. Colonial militia laws required that men (and sometimes all householders, regardless of sex) own not only firearms but also bayonets or swords; the laws sometimes required carrying swords in non-militia situations, such as when going to church.[134] In New England, the typical choice for

---

private individuals;" Tasers, "while plainly dangerous, are substantially less dangerous than handguns," which *Heller* found protected).

132.  *Heller*, 554 U.S. at 585.

133.  Militia Act, ch. 33, 1 Stat. 271 (1792).

134.  For laws of the colonies of New Hampshire, New Haven, New Jersey, New Plymouth, New York, North Carolina, Rhode Island, and Virginia, see: An Act for the Regulating of the Militia, N.H. May 13, 1718, *in* Acts and Laws, Passed by the General Court or Assembly of His Majesties Province of New-Hampshire in New-England 91 (B. Green 1726) (requiring that all soldiers and householders have "a good Sword or Cutlash"); Records of the Colony and Plantation of New Haven, from 1638 to 1649, at 25–26 (Charles J. Hoadly ed., Case, Tiffany & Co. 1857) (requiring everyone that bears arms have "a sworde"); *id.* at 131, 201 (all males aged sixteen to sixty must have "a sword"); Aaron Leaming & Jacob Spicer, The Grants, Concessions, and Original Constitutions of the Province of New Jersey 78 (2d ed., Honeyman & Co. 1881) (1752) (every male aged sixteen to sixty must have "a sword and belt"); The Compact with the Charter and Laws of the Colony of New Plymouth 115 (William Brigham ed., Dutton and Wentworth 1836) (every Sunday, one quarter of the men, on a rotating basis, must carry arms to church; along with a gun and ammunition, carrying a "sword" was required); 1 Documents Relating to the Colonial History of the State of New York 50 (Berthold Fernow ed., Weed, Parsons & Co. 1887) (militiamen must have a good gun and bayonet); An Act for the Better Regulating the Militia of this Government, N.C. 1715, *in* 23 The State Records of North Carolina 29 (Walter Clark ed., Nash Bros. 1904) (a fine for those not appearing with a "well-fixed sword" when ordered); An Act for the Better Regulating of the Militia, *in* Laws and Acts of Rhode Island, and Providence Plantations Made from the First Settlement in 1636 to 1705, *reprinted in* The Earliest Acts and Laws of the Colony of Rhode Island and Providence Plantations, 1647–1719 at 57, 106–07 (John D. Cushing ed., 1977) ("a Sword or Bayenet"); Acts and Laws, Of His Majesties Colony of Rhode-Island, and Providence Plantations in America 87, *reprinted in* The

KR0174

Case 3:23-cv-00474-JES-DDL   Document 34-3   Filed 03/06/24   PageID.1065   Page 91 of 354

persons required to own a bayonet or a sword was the sword because most militiamen fulfilled their legal obligation to possess a firearm by owning a "fowling piece" (an ancestor to the shotgun, particularly useful for bird hunting), and these firearms did not have studs upon which to mount a bayonet.[135]

Well after the nation's founding, knives continued to be an important tool for many American soldiers. During World War II, American soldiers, sailors, and airmen wanted and purchased fixed blade knives, often of considerable dimensions.[136] At least in some units, soldiers were "authorized an M3 trench knife, but many carried a favorite hunting knife."[137] The Marine Corps issued the Ka-Bar fighting knife.[138] As one World War II memoir recounts, "[t]his deadly piece of cutlery was manufactured by the company bearing its name. The knife was a foot long with a seven-inch-long by one-and-a-half-inch-wide blade. . . . Light for its size, the knife was beautifully balanced."[139] Vietnam memoirs report that Ka-Bar and similar knives were still in use, but "not everybody is issued a Ka-Bar knife. There are not enough to go around. If you don't have one, you must wait until someone is going home from Vietnam and gives his to you."[140] Even today, some Special Forces units regularly carry combat knives.[141]

---

Earliest Acts and Laws of the Colony of Rhode Island and Providence Plantations, 1647–1719 at 135, 223 (John D. Cushing ed., 1977) ("one good Sword, or Baionet"); An Act for the Better Supply of the Country with Armes and Ammunition, Act 4, Va. Apr. 1684, in 3 The Statutes at Large; Being a Collection of all the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 13 (William Waller Hening ed., Samuel Pleasants 1812) (soldiers must furnish themselves with "a sword, musquet and other furniture fitt for a soldier"); An Act for the Better Regulation of the Militia, ch. 2, Va. Nov. 1738, in 5 The Statutes at Large, *supra*, at 16–17 (militiamen who are "horse-men" must have a sword or cutlass).

135.  *See* Clayton E. Cramer, Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie 97–98 (2006).

136.  *See* Walter E. Burton, *Knives for Fighting Men*, Popular Science, July 1944, at 150, 150, 153.

137.  Gordon L. Rottman, U.S. Special Warfare Units in the Pacific Theater 1941–45, at 27 (2005).

138.  To be precise, "Ka-Bar" is only one manufacturer of post-WWII fighting knives. "Ka-Bar" is sometimes used in a generic sense, in the same way some people call any cola soda a "Coke."

139.  E.B. Sledge, With the Old Breed: At Peleliu and Okinawa 21 (Presidio Press 2007) (1981).

140.  *See, e.g.*, John Corbett, West Dickens Avenue: A Marine at Khe Sanh 149 (2003).

141.  *See, e.g.*, Pushies, *supra* note 23, at 63–64.

### C. Protection Beyond Militia Arms

The Second Amendment does not protect solely militia arms. As *Heller* points out, those in the Founding Era valued firearms in part because they were useful "for self-defense and hunting."[142] Thus, knives that are useful for self-defense or hunting are also within the scope of the Second Amendment.[143]

In the past, some states imposed special restrictions on certain types of knives while leaving swords alone.[144] Often, the particular knives singled out for extra restrictions were those that could open most easily, likely because legislatures feared that such knives would be used offensively.[145]

The distinction, however, does not make much sense. Guns can be used offensively or defensively. The very characteristic that makes a gun so useful for defense—the ability to project force at a distance, rather than in close contact—also makes the gun particularly dangerous as an offensive weapon. The difference between offensive and defensive is not the type of gun but the intent of the user and the circumstances of use. The same is true for anything with a blade; the characteristics that make any particular bladed instrument handy for self-defense will also make it usable for offense. Again, the user, not the instrument, is the difference.

The question of whether knives qualify as a type of arm suitable for self-defense seems almost trivial. Knives are self-evidently useful for self-defense. Indeed, almost every type of knife would be useful for self-defense against an attacker armed with fists or other personal weapons, a knife, or an impact weapon such as a billy club.[146] Although a knife is most definitely not an ideal defensive weapon against an attacker armed with a handgun, at very close range, as is the case with many crimes of violence, it would generally be more effective than barehanded defense or begging for mercy.

In some situations, a knife might not be the best choice for self-defense because to use it requires one to be inches from the attacker. Nonetheless, it can be an effective deterrent to attack for

---

142.   District of Columbia v. Heller, 554 U.S. 570, 599 (2008).

143.   A knife that is useful for hunting does not have to be a knife that is useful for taking the animal; a knife that can be used to clean the meat off the animal would also qualify.

144.   *E.g.*, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, 22 Tenn. Gen. Assemb. Acts 200 (1838) (banning carrying or purchasing Bowie knives and Arkansas Toothpicks, but affecting no other weapon).

145.   *See supra* Part I.E–F.

146.   There are specialized knives whose blades are surrounded such that they can be used to cut rope or seat belts but are essentially useless as a stabbing weapon. Butter knives are also useless for self-defense. A ban on them would not violate the Second Amendment because they are only useful as tools.

the same reason that a firearm is; the attacker must decide whether the risk of being seriously injured or killed justifies continuing the attack. In at least some situations, the attacker will see the knife and remember an urgent appointment elsewhere.

Some schools of self-defense instruction, such as Michael Janich's Martial Blade Concepts, specialize in teaching defensive knife use.[147] Many people, including police officers carrying defensive handguns, also carry a backup defensive knife, in case the handgun malfunctions or runs out of ammunition.[148] The Ka-Bar TDI Law Enforcement knife is designed for this purpose, with a small fixed blade and a distinctive angled grip made for carrying on a belt.[149]

A knife may also be the best or only available defensive choice for persons who, for a variety of reasons, may choose not to own a firearm. Most knives are substantially cheaper than the cheapest firearm. The poorest Americans are also the most at risk of being victims of crime.[150] A ten-dollar knife may be an option where a $130 used rifle is not.

Similarly, a person who chooses a knife for self-defense may live in an area where firearms (even after the *McDonald v. Chicago* decision, which incorporated the Second Amendment against state and local government[151]) are more strictly regulated than knives. For example, a knife that can be bought and taken home right away provides at least some protection during the period of days, weeks, or months that it may take to get government permission to own a firearm.

A person may also be reluctant to own a firearm out of concern that he may be unable to adequately secure it from his children. Although knives are still dangerous, a parent may conclude that the danger of a knife is sufficiently self-evident to a child, and that it represents a very minor risk compared to a firearm. While many people keep their guns in a safe or lockbox, almost every home has

---

147.   *See* MARTIAL BLADE CONCEPTS: PRACTICAL PERSONAL-DEFENSE SKILLS FOR TODAY'S WORLD, http://www.martialbladeconcepts.com/Home.aspx (last visited Aug. 20, 2013).

148.   *See, e.g.*, Greg Ellifritz, *Should Police Officers Carry Fixed Blade Knives?*, ACTIVE RESPONSE TRAINING (Feb. 4, 2013), http://www.activeresponsetraining.net/should-police-officers-carry-fixed-blade-knives; Randall, *Police Knives: Carrying and Training*, BLUESHEEPDOG.COM, http://www.bluesheepdog.com/police-knives/ (last visited Aug. 20, 2013).

149.   *TDI Law Enforcement Knife*, KA-BAR, http://www.kabar.com/knives/detail/76 (last visited Aug. 20, 2013).

150.   *See* PATSY KLAUS & CATHY MASTON, BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 1995, at 21 tbl.14 (2000) (victimization rates by annual family income: 75.0/1,000 for those from families with income below $7,500, dropping consistently in every income category to 37.7/1,000 for those at $75,000 per year and above).

151.   McDonald v. City of Chicago, 130 S. Ct. 3020 (2010).

several kitchen knives lying in drawers or in a block on the kitchen counter.

The fact that knives in general may be less effective for self-defense than handguns does not generally strip knives of Second Amendment protection. Whether a particular arm is the ideal choice for self-defense does not affect whether that arm is constitutionally protected. In *Heller*, Dick Heller owned a .22 caliber revolver, which is about the weakest self-defense firearm possible.[152] The Court upheld Mr. Heller's right to own the gun, despite the fact that a higher caliber handgun would be more effective at stopping an attacker.[153] Likewise, a folding knife with a three-inch blade is not as powerful a defensive arm as a sword or a handgun. The Second Amendment protects individual discretion to choose which defensive arm is most suitable for the individual, based on his or her particular circumstances.

### D.  Technological Changes

*Heller* explicitly rejected the notion that the Second Amendment protects only the types of arms that were in existence in 1789, when Congress sent the Second Amendment to the states for ratification.[154] Claiming that the Second Amendment only protects 1789 guns is like saying that the First Amendment protects only the hand cranked printing press and not television. On the other hand, if a particular firearm model is a modern equivalent of a 1789 flintlock rifle, musket, or 1789 handgun, then it is clear that such a firearm is within the Second Amendment's scope.

Virtually every modern knife is comparable to the knives of 1789. Knives and other edged weapons were at least as common in English and U.S. society in the eighteenth century as they are today, appearing frequently in a variety of contexts. They were commonly

---

152.  *Compare .22 Results in fps*, Ballistics by the Inch, http://www.ballisticsbytheinch.com/22.html (last visited Aug. 20, 2013), *with .25 Auto Results in fps*, Ballistics by the Inch, http://www.ballisticsbytheinch.com/25auto.html (last visited Aug. 20, 2013).

153.  District of Columbia v. Heller, 554 U.S. 570, 629–31 (2008) (upholding Heller's right to possess a handgun in his home); *see also* Jorge Amselle, *Choosing the Best Caliber for Self-Defense*, American Rifleman (May 4, 2011), http://www.americanrifleman.org/articles/best-caliber-self-defense/ ("[The .38 special] cartridge is considered by many experts to be the minimum necessary for adequate personal protection."); Paul W. Abel, *Calibers for Defense*, Shoot-N-Iron Prac. Shooting & Training Acad., http://www.shoot-n-iron.com/calibers-for-defense.asp (last visited Aug. 22, 2013) ("I personally do not recommend either [.32 or .25 calibers] for defensive purposes. Both calibers are lacking in velocity and bullet expansion.").

154.  *See Heller*, 554 U.S. at 582.

sold, carried, used as tools,[155] and occasionally misused as offensive weapons.[156]

While modern knives are made of superior materials, from a functional perspective knives have advanced far less since 1789 than have firearms, printing presses, or the myriad of other technologies whose constitutional protections are indisputable.[157] Even the switchblade is old; the first spring-ejected blades appeared in Europe in the late eighteenth century.[158]

Gun prohibition advocates have long argued that modern firearms are far more deadly than single-shot, muzzle-loading firearms of 1789 and thus do not enjoy the protections of the Second Amendment.[159] They lost that argument in *Heller*.[160] There is no similar argument with respect to knives. While firearms have changed from single-shot to multi-shot, the knives of 2013 have exactly one blade, just like the knives of 1789.

---

155.  *See, e.g.*, W. Ludlam, An Introduction and Notes, on Mr. Bird's Method of Dividing Astronomical Instruments 6 (1786) (for making astronomical instruments); Philip Luckombe & William Caslon, A Concise History of the Origin and Progress of Printing 351 (1770) (used in setting type); Temple Henry Croker et al., 3 The Complete Dictionary of Arts and Sciences, "Tanning Engines" (describing the machine used for tanning leather).

156.  *See, e.g.*, King v. Hardy, in The Proceedings in Cases of High Treason, Under a Special Commission of Oyer and Terminer 303–05 (1794) (a merchant in London describing his sale of knives with springs that hold them open; "they lay in my show glass, and in the window for public sale."); King v. Chetwynd, No. 8 Part 3 The Proceedings on the King's Commissions of the Peace, and Oyer and Terminer 313 (1743) (a dispute over a slice of a cake led to an assault involving a pocket knife); *Particulars of Margaret Nicholson's Attempt to Assassinate His Majesty*, 10 The European Mag., and London Rev. 117 (1786) (describing Margaret Nicholson's attempt on King George III's life).

157.  *See* Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime and Public*, 44 Williamette L. Rev. 699, 716–22 (2008) (comparing firearms to other advancing technologies which enjoy constitutional protections).

158.  Tim Zinser et al., Switchblades of Italy 7–8 (2003).

159.  *See Heller*, 554 U.S. at 582 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment.").

160.  *Id.* ("We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, *e.g.*, Reno v. American Civil Liberties Union, 521 U.S. 844, 849 (1997), and the Fourth Amendment applies to modern forms of search, *e.g.*, Kyllo v. United States, 533 U.S. 27, 35–36 (2001), the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").

### E. The Scope of the Right to Keep and Bear Knives

*Heller* addressed not only the right to keep a gun in the home but also the right to *bear* arms. Although *Heller* allows carry bans in "sensitive places," the opinion recognized a general right to carry.[161] Some lower courts have resisted *Heller*'s language about the right to carry, and the issue may need another Supreme Court case for a final resolution.[162]

Today, in forty-two states, adults who pass a fingerprint-based background check and a safety training class can obtain a permit to carry a handgun for lawful protection.[163] As a practical matter, the right to bear arms is already in effect in these states. In some states, these licenses are specifically for concealed *handguns* and do not allow the licensee to carry a concealed knife.[164] The reason for this peculiar situation is that these laws were enacted with the support of the National Rifle Association and other gun rights activist groups that were concerned about the right to carry firearms and did not pay attention to other arms, such as knives.[165] A few years ago, Knife Rights—the first proactive organization dedicated to

161.   *See id.* at 584 ("At the time of the founding, as now, to 'bear' meant to 'carry.' When used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—confrontation.") (citations omitted).

162.   *See, e.g.,* Smith v. U.S., 20 A.3d 759, 764 (D.C. 2011) (affirming the conviction of a Washington, D.C. police officer, wrongfully terminated and awaiting reinstatement, who was arrested for carrying a handgun within the District); Piszczatoski v. Filko, 840 F. Supp. 2d 813, 820 (D.N.J. 2012) ("The Second Amendment does not protect an absolute right to carry a handgun for self-defense outside the home, even if the Second Amendment may protect a narrower right to do so for particular purposes under certain circumstances."); Richards v. County of Yolo, 821 F. Supp. 2d 1169, 1174 (E.D. Cal. 2011) ("Based upon this, Heller cannot be read to invalidate Yolo County's concealed weapon policy, as the Second Amendment does not create a fundamental right to carry a concealed weapon in public."). *But see* Moore v. Madigan, 702 F.3d 933, 942 (7th Cir. 2012) (overturning a ban on carrying in any form, open or concealed); People v. Aguilar, 2013 IL 112116 (Second Amendment is violated by a general ban on bearing arms).

163.   Clayton E. Cramer & David B. Kopel, *"Shall Issue": The New Wave of Concealed Handgun Permit Laws,* 62 Tenn. L. Rev. 679 (1995); O'Shea, *supra* note 109, at 598–601. With the exception of California, Delaware, Hawaii, Maryland, Massachusetts, New Jersey, New York, and Rhode Island, all the other states have an objective process by which most law-abiding adults can obtain a permit to carry, or do not need a permit. *See generally* Bureau of Alcohol, Tobacco, Firearms and Explosives, State Laws and Published Ordinances — Firearms (31st ed. 2011), *available at* https://www.atf.gov/files/publications/download/p/atf-p-5300-5-31st-editiion/2010-2011-atf-book-final.pdf.

164.   Oregon is fairly typical in prohibiting concealed carry of any knife "that projects or swings into position by force of a spring or by centrifugal force [or] any dirk [or] dagger," Or. Rev. Stats. § 166.240 (2011), but allows concealed carry of a *firearm* if licensed, *id.* §§ 166.250, .291. Idaho, by comparison, prohibits carrying "any dirk, dirk knife, bowie knife, dagger, pistol, revolver or any other deadly or dangerous weapon" unless the carrier is licensed to carry a concealed *weapon.* Idaho Code Ann. § 18-3302(7) (2013).

165.   *See About NRA-ILA,* NRA-ILA, http://www.nraila.org/about-nra-ila.aspx (last visited Aug. 20, 2013).

knives—was created.[166] Had such an organization existed when these concealed carry laws were enacted, inclusion of knives would have been more likely.

Given the current understanding of the Second Amendment and the criminological evidence discussed above, if a state government decides that a particular individual is responsible enough to carry a concealed, loaded handgun in public places throughout the state, the state cannot forbid that person from carrying a concealed knife.

## V. STANDARDS OF REVIEW

Post-*Heller* courts are using a wide variety of analytical tools to evaluate Second Amendment claims. Sometimes, a statute is so flagrantly unconstitutional that there is no need to formulate a multi-step test.[167] A law that prohibits activity "near" the core right of self-defense (such as a ban on target ranges) may receive "not-quite strict scrutiny."[168] Alternatively, a court might apply the "history and tradition" test.[169] Some courts have used intermediate scrutiny, particularly for laws that involve persons who have already demonstrated themselves to be more likely than most to misuse a firearm.[170] This Part tests some knife laws against the weakest possible relevant standard, intermediate scrutiny.[171] Although intermediate scrutiny is not the correct standard in all cases, these analyses are telling because if a knife control fails intermediate scrutiny, then it will fail all of the more rigorous standards as well.

As *U.S. v. Skoien* states, "[i]n its usual formulation, [the intermediate scrutiny] standard of review requires the government to establish that the challenged statute serves an important governmental interest and the means it employs are substantially related

---

166.   *See* Richard Grant, *Move Over, NRA. Meet the Knife Lobby,* MOTHER JONES (Nov./Dec. 2012), http://www.motherjones.com/politics/2012/12/knife-rights-second-amendment.

167.   *See, e.g., Moore,* 702 F.3d at 942 (holding a near-complete ban on bearing arms unconstitutional).

168.   *See, e.g.,* Ezell v. City of Chicago, 651 F.3d 684, 708–09 (7th Cir. 2011) (granting a preliminary injunction against a ban on firing ranges).

169.   *See* Heller v. District of Columbia (*Heller II*), 670 F.3d 1244, 1274–75 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (suggesting that restrictions be analyzed under an approach based on text, history, and tradition).

170.   *See, e.g.,* United States v. Skoien, 614 F.3d 638, 641–44 (7th Cir. 2010) (en banc) (applying something similar to intermediate scrutiny to a ban on possessing firearms for persons convicted of domestic violence misdemeanors).

171.   Rational basis is not available because a fundamental right is involved. *See* District of Columbia v. Heller, 554 U.S. 570, 628 n.27 (2008); McDonald v. City of Chicago, 130 S. Ct. 3020, 3050 (2010).

to the achievement of that interest."[172] Courts have repeatedly held that, under intermediate scrutiny, it is not enough for the government to assert that it has a legitimate public interest.[173] In *Turner Broadcasting System, Inc. v. FCC*, the Court ruled that, under intermediate scrutiny, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."[174]

This Part applies intermediate scrutiny to three particular types of knife laws: laws that ban possessing certain knives in the home (Section A), laws that allow carrying knives for some purposes but not for self-defense (Section B), and laws that allow carrying handguns but not knives (Section C). The Article argues that all three types of laws fail intermediate scrutiny.

### A. Home Possession

Criminal prosecutions for home possession of knives are rare, for the obvious reason that only in unusual circumstances would such possession come to the attention of law enforcement. Nevertheless, the statutes on home possession violate the Second Amendment because law-abiding persons are not able to possess certain knives in their homes. Most jurisdictions that have a ban on home possession of a certain knife also forbid the sale of such a knife, thus making it doubly impossible for a law-abiding person to have the knife at home.

Justifying a ban on home possession or the sale or transfer of a constitutionally protected arm requires the government to offer more than "impressionistic observations" in order to pass intermediate scrutiny.[175] The government must also demonstrate that replacing the banned category of knives with some other, equally dangerous arm would not easily defeat the ban. For example, a ban on revolvers with two-inch barrels would have no public safety benefit if semiautomatic pistols of similar dimensions remained legal. As long as the purchase and possession of a ten-inch Wusthof Chef's

---

172.  U.S. v. Skoien, 587 F.3d 803, 805 (7th Cir. 2009), *vacated en banc*, 614 F.3d 638 (7th Cir. 2010).

173.  *See, e.g.*, Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 661–66 (1994) ("This obligation to exercise independent judgment when First Amendment rights are implicated is not a license to reweigh the evidence *de novo*, or to replace Congress' factual predictions with our own. Rather, it is to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence.").

174.  *Id.* at 664.

175.  *See* State v. Delgado, 692 P.2d 610, 612 (Or. 1984).

Knife is legal, can any knife ban actually produce a genuine reduction in injuries? Thus, bans on the home possession of switchblades, gravity knives, Bowie knives, and so on are probably unconstitutional.

## B. Carrying for Limited Purposes

Lower courts still disagree about the scope of the Second Amendment right to bear arms, and the issue may eventually be decided by the Supreme Court.[176]

Even before the Supreme Court directly recognized that the Second Amendment protects a right to keep and bear arms for personal as well as collective uses, there were still other constitutional limits on carry bans. In the 1995 case *City of Akron v. Rasdan*, the Ohio Court of Appeals upheld a city ordinance banning the carrying of knives "having a blade two and one-half inches in length or longer" against claims of overbreadth and vagueness, but ruled that the ordinance went too far in prohibiting "an *unreasonable* amount of activity that is inherently innocent, harmless, and useful. The most obvious examples of this type of innocent activity include carving, hunting, fishing, camping, scouting, and other recreational activities in which carrying a knife is an integral and often essential part of that activity."[177]

This is an accurate but not comprehensive list. One particularly important item is missing: self-defense. Because knives with blades of longer than two and one-half inches are among Second Amendment "arms" post-*Heller* and especially post-*McDonald, Rasdan* must be read as protecting a right to carry such knives for lawful defense of self and others. The *Rasdan* court distinguished the Akron ordinance from ordinances that were upheld in decisions such as *City of Seattle v. Riggins* and *People v. Ortiz* because the laws in those other states provided "a sufficient number of exceptions to criminal liability" to qualify as "reasonable exercises of the police power."[178]

---

176.  *See, e.g.*, Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012) (holding that a near-complete ban on carrying firearms in public is unconstitutional), *reh'g denied*, 708 F.3d 901 (7th Cir. 2013); Kachalsky v. County of Westchester, 701 F.3d 81 (2d Cir. 2012) (holding that a statute requiring applicants show a special need for self-protection before being granted a license to carry did not violate Second Amendment), *cert. denied*, 133 S. Ct. 1806 (2013) (denying petition despite seven amicus briefs in support, including a brief from twenty states).

177.  City of Akron v. Rasdan, 663 N.E.2d 947, 950–53 (1995).

178.  *Id.* at 953 (citing City of Seattle v. Riggins, 818 P.2d 1100, 1104 (Wash. Ct. App. 1991); People v. Ortiz, 479 N.Y.S.2d 613, 619 (N.Y. Crim. Ct. 1984)).

Notably, the *Rasdan* court was using the rational basis standard, but, after *Heller* and *McDonald*, rational basis does not suffice.[179] If there is going to be a general ban, with exceptions for permissible purposes for carrying (e.g., while hunting or hiking), then there must be an exception that encompasses lawful self-defense. It is possible that laws which set forth conditions for lawful defensive carry, such as a licensing system, might be evaluated under intermediate scrutiny,[180] but a law which categorically outlaws defensive carry is necessarily unconstitutional.[181]

### C. Bans on Carrying Certain Knives but not Handguns

As detailed below in Part VI, some state or local laws allow carrying one knife of a certain blade length while forbidding carrying another knife that has the same blade length, based on whether the knife is a folder or a fixed blade, is a folder that can or cannot be locked, or is a folder that is opened with one mechanism rather than another. To meet even the intermediate standard of scrutiny, laws making such distinctions must be based on clear evidence that these features are a public safety problem, rather than mere conjecture.[182] Given that *Heller* tells us that a handgun ban cannot pass intermediate scrutiny,[183] it seems very doubtful that any of the distinctions in the above paragraph can pass intermediate scrutiny.

If there is a right to carry handguns, then a ban on carrying a knife longer than X inches must be based on evidence that such a knife is more dangerous than a handgun. Given the quality of twenty-first century handguns, this is an impossible showing. Any rule of interpretation that allowed more restrictive laws for the

---

179. *See* District of Columbia v. Heller, 554 U.S. 570, 628 n.27 (2008); McDonald v. City of Chicago, 130 S. Ct. 3020, 3050 (2010).

180. *See, e.g.*, Kachalsky (2d Cir. 2012).

181. *See, e.g.*, Ezell v. City of Chicago, 651 F.3d 684 (7th Cir. 2011); People v. Aguilar, No. 112116, 2013 WL 112116 (Ill. Sept. 12 2013).

182. In cases on commercial speech and in other First Amendment contexts, the Supreme Court has similarly held that "conjecture" does not satisfy the government interest requirement. *See, e.g.*, Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 392 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden."); Edenfield v. Fane, 507 U.S. 761, 770–71 (1993) (noting that the government's "burden is not satisfied by mere speculation or conjecture," but only by "demonstrat[ing] that the harms [the government] recites are real and that its restriction will in fact alleviate them to a material degree").

183. *Heller*, 554 U.S. at 628–29 ("Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family,' would fail constitutional muster.").

bearing of edged weapons than for firearms cannot qualify as alleviating "these harms in a direct and material way" and thus fails intermediate scrutiny.[184]

Besides lethality, there are some other ways in which knives are less dangerous than handguns. A gunshot fired in self-defense may pass through the criminal and hit an innocent bystander, or a defensive shot may miss the criminal and hit a bystander. The same is true for criminal misuse of guns.[185] These risks occur not only in public places but also from shots fired within a residence. In contrast, a knife used for self-defense has no risk to innocent bystanders similar to a stray bullet.

Because knives are less dangerous than handguns, which may legally be carried, any law that regulates the possession or carrying of knives, even the biggest and scariest knives (for those persons who find them scary), is indefensible under intermediate scrutiny. At the least, intermediate scrutiny requires an "important" government interest;[186] it is difficult to see how the government could even have a rational interest, let alone an important interest, in preventing the carrying of knives by people who can lawfully carry handguns.

## VI. Examples of Knife Laws that Pose Constitutional Problems

State and local knife laws are often bewilderingly complex, and, as a result, it is very easy for a person with no criminal intent to break these laws. Prosecutors and police do not treat the severe state and local laws as relics of the nineteenth century. Instead, the laws are often vigorously enforced today against persons who are not engaged in *malum in se* behavior.

The enormous political attention on gun regulation means that most Americans have relatively little idea of the extent to which knives are subject to startlingly severe laws. These laws frequently concern carrying but may also forbid manufacture, sale, purchase,

---

184.  *See* Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 664 (1994); People v. Yanna, 824 N.W.2d 241, 244–45 (Mich. App. 2012).

185.  *See, e.g.*, Lawrence W. Sherman et al., *Stray Bullets and "Mushrooms": Random Shootings of Bystanders in Four Cities, 1977–1988*, 5 J. Quantitative Criminology 297, 297 (1989) (There was a "rapid increase in both bystander woundings and killings since 1985 in all four cities. . . . [But] total bystander deaths appear to comprise less than one percent of all homicides in these cities."); H. Range Hutson et al., *Adolescents and Children Injured or Killed in Drive-By Shootings in Los Angeles*, 330 New Eng. J. Med. 324, 325 (1994) ("Among the victims who had firearms injuries, 122 (28 percent) had no gang affiliation . . .").

186.  *See, e.g.*, Craig v. Boren, 429 U.S. 190, 197 (1976).

KR0185

or even possession in one's home of a knife. In many respects, the variations in state and local knife regulation are far more curious and unexpected than the variations in gun regulation. Even within a particular state, the variations of what and where something is legal can be confusing.

One reason for the anomaly is that almost all states have some form of legislative or judicial preemption for gun control.[187] Thus, in many states, local governments are greatly restricted in what, if any, gun control laws they may enact, and gun laws are supposed to be uniform within the state.[188] In contrast, only a few states have knife preemption, and those are recent enactments.[189]

### A.  Washington

Washington is one of the many states without knife preemption. Leslie Riggins was arrested in 1988 in Seattle while waiting for a bus because he had a knife in a sheath on his belt.[190] He was charged with possession of a fixed blade knife.[191] Riggins explained that he originally intended to go fishing with his brother outside of Seattle, but because of a change of plans, Riggins had "ended up using the knife to assist in roofing his brother's house."[192]

Riggins might well have had reason to believe that he was within his rights to carry the knife. One part of the Seattle ordinance prohibiting carrying a fixed blade knife exempted "[a] licensed hunter or licensed fisherman actively engaged in hunting and fishing activity including . . . travel related thereto."[193] When Riggins started his travels, he had planned to go fishing and thus was within the "travel related thereto" exemption.[194] Another exemption protected "[a]ny person immediately engaged in an activity related to a

---

187.  *Firearms Preemption Laws*, NRA-ILA (Dec. 16, 2006), http://www.nraila.org/news-issues/fact-sheets/2006/firearms-preemption-laws.aspx?s=Preemption&st=&ps=.

188.  *See* STEPHEN P. HALBROOK, 2 FIREARMS LAW DESKBOOK app. A (2010).

189.  *See* Act of Apr. 29, 2010, ch. 204, 2010 Ariz. Sess. Laws 1005 (codified at ARIZ. REV. STAT. ANN. § 13-3120 (2012)) (first state to preempt knife laws); Restrictions on Political Subdivisions Regarding the Regulation of Knives, ch. 272, 2011 Utah Laws 1092 (codified at UTAH CODE ANN. §§ 10-8-47.5, 17-50-332 (2012)); An Act Relative to State Authority Over Firearms and Ammunition, ch. 139, 2011 N.H. Laws 141 (codified at N.H. REV. STAT. ANN. § 159:26 (2012)); Act of May 2, 2012, act 753, 2012 Ga. Laws (codified at GA. CODE ANN. § 16-11-136 (2012)).

190.  City of Seattle v. Riggins, 818 P.2d 1100, 1101 (Wash. Ct. App. 1991), *rev'd*, 846 P.2d 1394 (Wash. Ct. App. 1993).

191.  SEATTLE, WASH., MUN. CODE § 12A.14.080(B) (2013).

192.  *Riggins*, 818 P.2d at 1101.

193.  MUN. CODE § 12A.14.100(A).

194.  *See Riggins*, 818 P.2d at 1101.

KR0186

lawful occupation which commonly requires the use of such knife, provided such knife is carried unconcealed."[195] Here is where Riggins ended up in trouble. Earlier in the day, Riggins had been using the knife for such a purpose (roofing his brother's house), but by the time he returned home by bus, he was no longer *immediately* engaged in that activity.[196] At this point, his only hope for an exemption from the "dangerous knife" carrying ban would have been "carrying such knife in a secure wrapper or in a tool box."[197]

The state appellate court held that Riggins did not fall within "any one of the three fairly broad exemptions" to Seattle's knife ordinance, and the court was unwilling to recognize that a day that had started with Riggins's knife exempted for a fishing trip had changed as his plans changed.[198] Nothing in the *Riggins* decision suggests that Riggins had engaged in any behavior that was either dangerous or criminal. Had Riggins gone fishing with his brother and, at the end of the day, been returning home by bus, there would have been no criminal conviction.

Washington has a strong state constitutional guarantee of the right to keep and bear arms, and the Washington State Supreme Court has enforced this provision conscientiously when the case has involved a firearm.[199] However, the intermediate appellate court brushed off Riggins's constitutional claim, gave the ordinance "every presumption . . . of constitutionality," and upheld the Seattle ordinance under a mere "reasonable and substantial" test.[200]

The *Riggins* decision was in 1991 and involved only the state constitution. Both *District of Columbia v. Heller* (2008) and *McDonald v. Chicago* (2010) struck down bans on the possession of handguns without even needing to resort to a standard of scrutiny; the ban on handgun possession in those cases was so plainly contrary to the constitutional text that there was no need to proceed to choosing a

---

195.   Mun. Code § 12A.14.100(B).

196.   *See Riggins*, 818 P.2d at 1101, 1104 ("Riggins has failed to show that his conduct falls within one of the ordinance's exemptions.").

197.   Mun. Code § 12A.14.100(C).

198.   *See Riggins*, 818 P.2d at 1102, 1104, *rev'd on other grounds*, 846 P.2d 1394 (Wash. Ct. App. 1993).

199.   *See, e.g.*, State v. Rupe, 683 P.2d 571, 594–97 (Wash. 1984) (ordering defendant's ownership of an AR-15 excluded from penalty phase of murder trial because of chilling effect on right to keep and bear arms).

200.   *Riggins*, 818 P.2d at 1102–03 ("Where legislation tends to promote the health, safety, morals, or welfare of the public and bears a reasonable and substantial relationship to that purpose, every presumption will be indulged in favor of constitutionality."), *rev'd on other grounds*, 846 P.2d 1394 (Wash. Ct. App. 1993).

level of scrutiny.[201] The *Riggins* approach to the Washington Constitution's protections is therefore contrary to the approach that the U.S. Supreme Court outlined for Second Amendment cases since, according to the Supreme Court, broad bans on ownership or carrying (keeping and bearing) are *per se* unconstitutional. Were *Riggins* to come before the Washington Supreme Court today, it would almost certainly strike down Seattle's overly broad ban on carrying such knives. An example of the federal approach to broad bans after *Heller/McDonald* occurred in 2012 when the Seventh Circuit correctly applied the *Heller/McDonald* model to Illinois, which was the only state to prohibit defensive gun carrying in public places.[202] Because the ban was per se unconstitutional, Judge Richard Posner's decision struck down the Illinois ban without needing to get into three-tiered scrutiny.[203] The Washington State Supreme Court would be obligated not simply to consider the constitutionality of the Seattle ordinance with respect to the Washington State Constitution, but with the much more demanding standards of *McDonald*.

Alternatively, a future Washington state court might simply apply the *Riggins* "substantial" test (which echoes the language of intermediate scrutiny) with some genuine rigor and ask whether there was any substantial relation to public safety in an ordinance that would have let a future defendant similarly situated to Riggins carry his knife home in one way after a day of fishing but required that he carry it in a different way after a day of roofing. As in any case involving heightened scrutiny (strict or intermediate), the burden of proof would be on the government.[204] Depending on how the Supreme Court finally decides what standard of scrutiny to apply to the Second Amendment, an appeal to the Second Amendment

---

201.   *See* District of Columbia v. Heller, 554 U.S. 570, 628–29 (2008) ("Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family,' would fail constitutional muster."); McDonald v. City of Chicago, 130 S. Ct. 3020, 3050 (2010) ("In Heller, we held that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense. Unless considerations of stare decisis counsel otherwise, a provision of the Bill of Rights that protects a right that is fundamental from an American perspective applies equally to the Federal Government and the States.").

202.   *See* 720 Ill. Comp. Stat. 5/24-1 (2011), *invalidated by* Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012); People v. Aguilar, No. 112116, 2013 WL 112116, at *5–8 (Ill. Sept. 12 2013) (Striking down a comprehensive ban on carrying loaded firearms in public places and by someone who was hardly an upstanding citizen: "That said, we cannot escape the reality that in this case, we are dealing not with a reasonable regulation but with a comprehensive ban.").

203.   *See Madigan*, 702 F.3d at 941–42.

204.   *See, e.g.*, Craig v. Boren, 429 U.S. 190, 196–204 (1976).

KR0188

might produce a similar result to *Riggins*, or strike down the Seattle ordinance.

## B. California

Can a person legally carry a knife in California? He can carry a fixed blade knife on California's college campuses if the blade is not longer than two-and-one-half inches.[205] Folding knives are unrestricted by state law on college campuses,[206] though some campuses may have more restrictive rules. On primary and secondary school grounds, the law is the same for fixed blades as on college campuses (banned if more than two-and-one-half inches), but all folding knives are banned, regardless of blade length, if the blade can lock open.[207] On the other hand, a person can carry a knife with a fixed blade up to four inches into a government building.[208] He can also carry a folding knife into a government building with a blade up to four inches, but *only if* the blade does not lock open.[209]

*Heller* affirmed the permissibility of special restrictions on arms carrying in "sensitive places, such as schools and government buildings."[210] However, even presuming that California can legally enact some special restrictions on knife carrying in those places, the actual restrictions are irrational. There is no reason why lock-blade folders are allowed and non-locking folders are banned in one location while just the opposite is the rule in another location.

For carrying in public places in general (not in sensitive places), California law is at least coherent at the state level. A person can openly carry any knife. He can concealed carry almost any folding knife. The one exception is that he cannot carry a switchblade with a blade longer than two inches in any fashion, open or concealed.[211]

However, California has no preemption for knife laws, and some California cities, such as Los Angeles, Oakland, and San Francisco, have their own, more restrictive (and inconsistent) ordinances. Los Angeles prohibits open carry of knives with blades that are three

---

205.   *See* Cal. Penal Code § 626.10(b) (West 2013).

206.   *See id.*

207.   *Id.* § 626.10(a). A folder that does not lock open is more dangerous because the blade might fold in unexpectedly and cut a hand. Persons who are familiar with knife safety therefore usually prefer to carry folders that lock open.

208.   *See id.* § 171b(3).

209.   *Id.*

210.   District of Columbia v. Heller, 554 U.S. 570, 626 (2008).

211.   Cal. Penal Code § 21510 (West 2012).

inches or longer (with some exemptions).[212] Similarly, Oakland
prohibits carrying knives with blades three inches or longer, but
also "any snap-blade or spring-blade knife" (older terms for switch-
blades), regardless of knife length.[213] San Francisco prohibits
loitering while carrying a concealed knife with a blade three inches
or more long, or carrying a concealed switchblade knife of any
length.[214] Because of the complexity of California state laws and lo-
cal ordinances, it would be very easy to unintentionally break the
law while carrying a knife with no criminal intent.

## C. District of Columbia

The District of Columbia is already famous for its unusual and
extreme firearms laws, some of which were struck down in *Heller*
and others of which are the subjects of ongoing litigation.[215] The
District is also the home of equally severe knife laws. D.C. law pro-
hibits not only carrying a pistol without a license but also "any
deadly or dangerous weapon capable of being so concealed."[216]
This prohibition applies not simply in public places; the statute
adds an additional penalty for doing so "in a place other than the
person's dwelling place, place of business, or on land possessed by
the person."[217]

It does not matter whether the knife is actually carried con-
cealed. The fact that the knife is *concealable* makes open carrying a
crime. The punishment for carrying in the home is "a fine of not
more than $1,000 or imprisonment for not more than 1 year, or
both."[218] In other words, carrying a carving knife (or even a paring
knife) to the dining room table in the District of Columbia appears
to be a criminal offense.

Prosecutions for home carry of knives seem to be rare in D.C.,
likely because such carrying would rarely come to the attention of

---

212. LOS ANGELES, CAL., MUN. CODE § 55.10 (2012) (exemptions include "where a person
is wearing or carrying a knife or dagger for use in a lawful occupation, for lawful recreational
purposes, or as a recognized religious practice, or while the person is traveling to or re-
turning from participation in such activity.").

213. OAKLAND, CAL., MUN. CODE §§ 9.36.010–.020 (2012).

214. SAN FRANCISCO, CAL., MUN. POLICE CODE, art. 17 § 1291 (2012).

215. *See* Heller v. District of Columbia (*Heller II*), 670 F.3d 1244, 1248–49 (D.C. Cir. 2011)
(affirming basic registration requirements for rifles and a ban on many semi-automatic rifles
and on detachable rifle magazines holding more than ten rounds, while remanding for fur-
ther consideration of long gun registration period and of unusual registration requirements
for all guns, such as fingerprinting, training, and periodic re-registration).

216. *See* D.C. CODE § 22-4504(a) (2012).

217. *Id.*

218. *Id.* § 22-4515.

law enforcement. In *Heller*, the Supreme Court struck down a similar D.C. ban on carrying guns that even prohibited a person who had a lawfully registered rifle in the home from carrying the gun from the bedroom into the kitchen in order to clean it.[219] Like the D.C. gun carry ban, the D.C. knife carry ban is grotesquely overbroad and a plain violation of the Second Amendment.

### D. New York

Glenn Reynolds's recent article, *Second Amendment Penumbras*, argues that, by analogy to the First Amendment, the "chilling effect" doctrine should be applied to the right to keep and bear arms.[220] While Reynolds's arguments concern firearms, they just as accurately apply to knife laws. Many restrictions and regulations adopted "[d]uring our nation's interlude of hostility toward guns in the latter half of the twentieth century" suggest that:

> the underlying goal is to discourage people from having anything to do with firearms at all. . . . At present, Americans face a patchwork of gun laws that often vary unpredictably from state to state, and sometimes from town to town. Travelers must thus either surrender their Second Amendment rights, or risk prosecution.[221]

One example of the chilling effect of knife regulation comes from New York City. Defendant John Irizarry was arrested in Brooklyn when a police officer noticed a folding knife sticking out of his pocket.[222] The police officer decided (as it turns out, incorrectly) that this was a gravity knife[223] and stopped Irizarry. Irizarry explained that he used the "Husky Sure-Grip Folding Knife" as part of his job, as did indeed turn out to be the case. The police officer arrested him anyway, leading to the discovery of a concealed pistol.

Irizarry sought to suppress the discovery of the pistol because the search was subsequent to an arrest for something that was not a crime. The federal court ruled in Irizarry's favor because the knife in question was not a gravity knife within the definition of New York

---

219.    *See* District of Columbia v. Heller, 554 U.S. 570, 630–31, 635 (2008).

220.    Glenn Harlan Reynolds, *Second Amendment Penumbras*, 85 S. Cal. L. Rev. 247, 251 (2012).

221.    *Id.* at 251–52.

222.    United States v. Irizarry, 509 F. Supp. 2d 198, 199 (E.D.N.Y. 2007).

223.    The precise definition of a "gravity knife" is discussed *supra* Part III.E. Irizarry's knife was plainly not a gravity knife. *See id.* at 210.

law, but also because "[t]he widespread and lawful presence of an item in society undercuts the reasonableness of an officer's belief that it represents contraband."[224] The defendant's Husky Sure-Grip Folding Knife is a proprietary product sold by Home Depot, which sold 67,341 units in 2006 in New York state alone.[225] The manufacturer of a competing but similar knife reported that it sold 1,765,091 units nationally in 2006.[226] Although the courts did eventually find in Irizarry's favor, any observer of what happened would rightly conclude that carrying even a completely legal knife in New York City is looking for trouble with the police. These onlookers would therefore choose not to exercise their constitutional right to carry knives, meaning their conduct would be chilled.

The courts ruled for Irizarry, but the New York City government did not learn its lesson. In 2010, Manhattan District Attorney Cyrus Vance, Jr. threatened criminal charges against Home Depot, Ace Hardware, and a number of hardware, general, and sporting goods retailers for selling knives that the District Attorney characterized as "illegal knives."[227] As a result of the threat of criminal prosecution and to avoid going to trial on charges, these retailers signed settlement agreements and turned over $1.9 million to finance a so-called public education campaign and other anti-knife efforts by the District Attorney.[228]

The specific claimed violations in this instance involved gravity knives or switchblades. Again, as in the *Irizarry* case, Home Depot pointed out that "[t]hese are common knives" often used in construction and home improvement projects.[229] Some of the arrests associated with these "illegal knives" demonstrate that the definition of "gravity knife" under New York law is subject to abusive prosecution. New York police arrested the noted painter John Copeland a few months after District Attorney Vance's aforementioned settlement with the chain stores for carrying a Benchmade three-inch folding knife, on the allegation that it was a "gravity knife."[230]

Although charges were eventually dropped against Copeland because his lawyer was able to show that Copeland is a serious artist

---

224.   *Id.* at 209.
225.   *Id.* at 203–04.
226.   *Id.* at 204.
227.   *See* Press Release, N.Y. Cnty. Dist. Attorney's Office, *supra* note 53.
228.   *See id.*
229.   John Eligon, *14 Stores Accused of Selling Illegal Knives*, N.Y. Times (June 17, 2010), http://www.nytimes.com/2010/06/18/nyregion/18knives.html?_r=1&.
230.   *See* Melissa Grace, *Artist Furious for Being Busted on Weapons Possession Over a Pocket Knife He Uses for Work*, Daily News (Jan. 26, 2011), http://www.nydailynews.com/new-york/artist-furious-busted-weapons-possession-pocket-knife-work-article-1.155163#ixzz2KSCt0Z5z.

KR0192

and used the knife in his work for cutting canvas,[231] it does not take much effort to imagine the results if someone who lacked a national reputation or a well-paid attorney had been arrested under the same circumstances. Police arrested Copeland because they thought that they saw a knife in his pants pockets. There was no allegation of any criminal misuse.[232]

Another example of the zeal with which New York City enforces its knife laws—with no connection to criminal misuse—is the story of Clayton Baltzer. Baltzer's "fine-arts class at Baptist Bible College & Seminary in Clarks Summit, Pa." went on a field trip to the Metropolitan Museum of Art.[233] In a subway station, a plainclothes police officer grabbed Baltzer by the arm because his pocketknife clip was visible.[234] Unlike Copeland, Baltzer was convicted and sentenced to a $125 fine and two days of community service. Baltzer has learned his lesson: "I don't plan on visiting New York unless I have to."[235]

## E.  State Regulation of Switchblades

One of the most important state supreme court decisions regarding knives is *State v. Delgado*.[236] There, the Oregon Supreme Court struck down Oregon's ban on the manufacture, sale, transfer, carrying, or possession of switchblades on the grounds that it violated

---

231.  *Id.*

232.  *See id.*

233.  Jeb Phillips, *Bible-College Student's Pocketknife Spoils Trip to New York City*, Columbus Dispatch (June 12, 2012), http://www.dispatch.com/content/stories/local/2012/06/12/knife-trouble-in-a-new-york-minute.html.

234.  New York City's Administrative Code has the unusual requirement that all knives be carried concealed. *See* N.Y.C., N.Y., Admin. Code § 10-133 (2010). The officer interpreted the visibility of the clip as a violation of the law:

> Baltzer has carried a pocketknife almost everywhere since he was a 14-year-old camp counselor. He clips it on his pocket so that the clip is visible, but the knife isn't. He always uses two hands to open it, the way most people would a regular pocketknife. . . .

> In Baltzer's telling, the officer tried to flick it open and couldn't. He handed it to another officer, who did flick it open after several tries.

> Baltzer was arrested and charged with the highest degree of misdemeanor under New York law. He had another knife in his backpack, a fixed-blade one he used to whittle for kids at a special-needs camp in Pennsylvania. He forgot he had it in his bag. Police confiscated that one, too.

Phillips, *supra* note 233.

235.  Phillips, *supra* note 233.

236.  State v. Delgado, 692 P.2d 610 (Or. 1984).

the Oregon Constitution's "right to bear arms" provision.[237] The defendant, Joseph Delgado, "was walking with a companion on a public street. The two appeared disorderly to an officer nearby, and when the defendant reached up as he passed a street sign and tapped or struck it with his hand, the officer confronted both individuals and conducted a pat down search."[238] In the course of that search, officers found a switchblade knife concealed in Delgado's pocket, which he claimed that he carried for self-defense.[239]

The Oregon Supreme Court built upon a previous decision, *State v. Kessler*, which had recognized that "the term 'arms,' as contemplated by the constitutional framers, was not limited to firearms but included those hand-carried weapons commonly used for personal defense."[240] *Kessler* had recognized that possession of billy clubs was protected in one's home.[241] *Delgado* extended *Kessler*'s decision and recognized that a switchblade knife was also a protected arm under the state's constitution.[242]

The state argued that the switchblade knife "is an offensive weapon used primarily by criminals."[243] The Oregon Supreme Court decided that the distinction between defensive and offensive weapons was unpersuasive because the characteristics of defensive and offense of weapons strongly overlap: "It is not the design of the knife but the use to which it is put that determines its 'offensive' or 'defensive' character."[244]

The Oregon Supreme Court also engaged in originalist analysis, observing that possessing and carrying pocketknives is deeply embedded in European and American history. The court wrote that "knives have played an important role in American life, both as tools and as weapons. The folding pocketknife, in particular, since the early 18th century has been commonly carried by men in America and used primarily for work, but also for fighting."[245]

What about the switchblade? The state had argued that the switchblade is fundamentally different from its historical ancestor, the folding pocketknife, which would have been known when the Oregon Constitution was drafted in 1859. The Oregon Supreme Court was not persuaded:

---

237.   *Id.* at 610.
238.   *Id.* at 611.
239.   *Id.*
240.   *See id.* at 611 (citing State v. Kessler, 614 P.2d 94, 98 (Or. 1980)).
241.   *Kessler*, 614 P.2d at 100.
242.   *Delgado*, 692 P.2d at 611, 614.
243.   *Id.* at 612.
244.   *Id.*
245.   *Id.* at 613–14.

KR0194

> We are unconvinced by the state's argument that the switch-blade is so "substantially different from its historical antecedent" (the jackknife) that it could not have been within the contemplation of the constitutional drafters. They must have been aware that technological changes were occurring in weaponry as in tools generally. . . . This was the period of development of the Gatling gun, breach loading rifles, metallic cartridges and repeating rifles. The addition of a spring to open the blade of a jackknife is hardly a more astonishing innovation than those just mentioned.[246]

The Oregon Supreme Court noted that the 1958 Federal Switch-blade Act was based on the theory that switchblades were "almost exclusively the weapon of the thug and the delinquent."[247] The *Delgado* court, however, observed that the relevant congressional testimony "offers no more than impressionistic observations on the criminal use of switch-blades."[248] The *Delgado* decision did not completely forbid the state from regulating the manner in which a switchblade might be carried. The state could prohibit the concealed carry of a switchblade; the complete prohibition on sale, transfer, manufacture, or possession, however, was unconstitutional.[249]

Unlike Oregon, some states continue to ban even the home possession of switchblades.[250] If switchblades are "typically possessed . . . for lawful purposes," then the bans are unconstitutional under *Heller*. Of course, in a state where switchblades are banned, everyone who owns a switchblade is, by definition, a criminal. Besides that, bans on the sale of switchblades will have made it impossible for law-abiding citizens to obtain them, so the switchblades will not be in "typical" use in that state. A law passed during a moral panic sixty years ago might thus end up trumping the Constitution because its prohibition has made that weapon "not typically possessed . . . for lawful purposes."[251]

We can see this problem in *Lacy v. State*, in which the Indiana Court of Appeals upheld a ban on the possession of automatic knives on the grounds that "switchblades are primarily used by

---

246. *Id.* at 614.

247. *Id.* at 612 (quoting S. Rep. No. 85-1980 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3435).

248. *Id.*

249. *See id.* at 614.

250. *E.g.*, Colo. Rev. Stat. § 18-12-102 (2012) (possession of gravity or switchblade knives is a felony, even in one's home); Tenn. Code Ann. § 39-17-1302 (2012) (possession, manufacture, transportation, repair, or sale of a switchblade knife is a class A misdemeanor).

251. *See* District of Columbia v. Heller, 554 U.S. 570, 625 (2008).

KR0195

criminals and are not substantially similar to a regular knife or jack-knife."[252] If they are illegal, then by definition they will be "primarily used by criminals,"[253] as any prohibited arm would be.

Lacy quotes *Crowley Cutlery Co. v. U.S.* to refute the Oregon Supreme Court's position in *Delgado* that switchblade knives are not intrinsically different from other knives.[254] *Crowley* argued that switchblade knives "are more dangerous than regular knives because they are more readily concealable and hence more suitable for criminal use."[255] It requires no expert testimony to demonstrate that this claim is incorrect. A switchblade knife's handle, when closed, must be at least as long as the blade. In this respect, it is no different from any folding knife; the enclosure must be slightly longer than the blade. No switchblade knife can be any more concealable than its non-automatic counterpart.

Besides that, all one need do is look at states where switchblades are not banned, and one will see that switchblades are indeed typically possessed by law-abiding citizens for legitimate purposes.

CONCLUSION

Knives are among the "arms" protected by the Second Amendment. They easily fit with the Supreme Court's *Heller* definition of protected arms, namely that they be usable for self-defense and typically owned by law-abiding citizens for legitimate purposes.

Statutes that ban or impose special restrictions based on how a knife opens, or on whether an opened knife can be locked open, cannot survive any form of heightened scrutiny analysis. Indeed, many laws regulating knives cannot even survive rational basis scrutiny. As we have previously observed, knives are among the arms that Americans have a right to bear, and their lower lethality relative to handguns means that there is not even a *rational basis* for laws that regulate carrying knives more restrictively than carrying handguns.

---

252.   Lacy v. State, 903 N.E.2d 486, 492 (Ind. Ct. App. 2009).

253.   *See id.* at 488, 491–92.

254.   Delgado, 692 P.2d at 614 ("We are unconvinced by the state's argument that the switch-blade is so 'substantially different from its historical antecedent' (the jackknife) that it could not have been within the contemplation of the constitutional drafters. They must have been aware that technological changes were occurring in weaponry as in tools generally.")

255.   Crowley Cutlery Co. v. United States, 849 F.2d 273, 278 (7th Cir. 1988). Note that the plaintiff's suit had far more serious problems than the question of the criminal nature of switchblades. The Court of Appeals wrote: "this is not to say that the issue of the Switchblade Knife Act's constitutionality necessarily is frivolous. It is the specific grounds articulated by Crowley that are frivolous, and make the suit frivolous." *Id.* at 279.

This Article has not aimed to resolve definitively every question about knife laws in the United States. Rather, it has endeavored to provide a starting point for further study and to examine some of the prohibitions that may be most clearly unconstitutional under the Second Amendment. In a practical sense, the most frequent way that Americans exercise their Second Amendment rights is by owning and carrying knives. Knife rights are worthy of judicial protection and of further scholarly study.

KR0197

# PLAINTIFFS' EXHIBIT N

**KR0198**



# Swords & Blades of the American Revolution

## of the American Revolution

the encyclopedia of
bladed weapons—
swords, bayonets, spontoons,
halberds, pikes, knives,
daggers, and axes—
used by both sides,
on land and sea,
in America's struggle
for independence

*by George C. Neumann*

KR0199



# Swords & Blades of the American Revolution

## by George C. Neumann

Rebel Publishing Co., Inc.

KR0200

# Contents

| | Preface | 6 |
|---|---|---|
| Chapter 1 | BLADES IN THE EARLY COLONIES | 8 |
| Chapter 2 | COLD STEEL ON THE BATTLEFIELD | 16 |
| Chapter 3 | LINES OF BAYONETS: The Ultimate Weapon! | 22 |
| Chapter 4 | THE FLASHING SWORD: Draw Me Not Without Reason Sheath Me Not Without Honor! | 51 |
| Chapter 5 | STATELY POLEARMS: A Lingering of Prior Centuries | 190 |
| Chapter 6 | KNIVES AND DAGGERS: Carve, Skin, Stab, and Scalp | 227 |
| Chapter 7 | THE BELT AND CAMP AXE: To Clear the Land and Defend It! | 252 |
| | Glossary of Terms | 276 |
| | Nomenclature Summary | 278 |
| | Bibliography | 280 |
| | Index | 285 |

KR0201

# carve, Skin, Stab, and Scalp

Knives and daggers were personal necessities to the early American. They served him in a wide variety of uses, including cleaning game, home chores, fighting, trading with the Indians, and as cooking-eating utensils.

## THREE BASIC KNIFE CATEGORIES

Although there was great variance in individual design, most can be classified into three general categories.

*The Belt Knife*     For use as both a tool and a weapon; a single-edged blade (with or without a false edge) designed primarily for cutting, but also capable of a stabbing stroke.

*The Dagger*     Developed for fighting, it normally mounted a symmetrical tapering blade having at least two edges. The design is most effective as a thrusting and stabbing weapon.

*The Dirk*     Originally it denoted an even-tapering blade similar to the dagger, with only one edge sharpened; about the end of the American Revolution the term began to describe short naval side arms mounting either dagger or knife blades.

## EARLY ATLANTIC COLONIES 1607-1700

In the 1500's daggers were considered normal articles of dress for European gentlemen. During the first half of the 1600's, however, they began to disappear from portraits of the aristocracy. Knives and daggers were losing their cultural significance to the civilian sword (see "small swords", Chapter IV).

In the colonies these short-edged weapons had very real importance, and references continue to mention their employment here through the 1600's. Scant description survives of the actual pieces carried by the colonists during this period, but it is assumed that the contemporary European designs predominated. The prevailing practice stressed daggers for the skilled fighting man and knives for everyday use.

*The Utility Knife*     While military men emphasized the dagger, most colonists carried knives for their daily needs—utilizing both fixed and folding blades. They also found it an important commodity in trading with



**6.VI RIFLEMAN'S "PATCH KNIFE":** The American rifleman usually carried his accessories in a hunting bag with a shoulder strap and powderhorn. His small knife for cutting bullet patches and minor chores was often carried in a sheath attached to the strap (as shown here), the inboard side of the bag, or in the bag itself. Note the loading block (which held bullets already wrapped for fast loading).

*The Sgian Dubh* It was also the practice by many Scots to carry a small companion knife to the dirk. References in the first half of the 18th century describe its popular carrying place as in the sleeve near the arm pit. By the end of the 1700's it had acquired the name "sgian dubh" ("black knife"), and was inserted into the top of the stocking. Most have a straight knife blade and a dark carved wooden grip (often heather root). The great majority of surviving sgian dubhs date after 1800.

## POCKET KNIVES (#33.K to #56.K)

Folding knives have been found in Roman sites as early as the 1st century, and by the 1700's they had undergone little basic change. As America developed and its frontiers moved inland, the custom of wearing belt knives waned in coastal areas. The result was a great increase in folding knives to the point where they became almost universal accessories. Specimens vary from long (10-12 inches) bladed varieties for fighting, to small 2-3 inch specimens for trimming quill pens. Contemporary references called them "pocket knives", "jackknives" (origin of this name uncertain), "clasp knives", "spring knives", and "folding knives". At the time of the Revolutionary War they were apparently used by a great majority of soldiers to serve their numerous personal needs. Orders from New York, New Hampshire, and Massachusetts actually listed them as required accessories.

Because of this widespread use, surviving examples vary greatly, but were mostly single-bladed (with or without a holding spring), and had a simple metal handle mounted with panels of wood, horn, bone, iron, ivory, or mother-of-pearl. Although multi-accessory blades for the jackknife did not become popular until the 1850's, some 18th century specimens are found with forks, fleams (bleeders), saws, or heavy needles. *(Note: Unless otherwise identified, all photographed weapons and equipment are from the author's personal collection.)*

KR0203

23

**PLAINTIFFS' EXHIBIT O**

KR0204



ARMS AND ARMO    N/A
= = preowned = = =

CELLANEOUS/MISCE   GREEN/ECOMM

HAROLD L. PETERSON

# Arms and Armor in Colonial America

## 1526-1783



KR0205

# Arms and Armor
# in Colonial America
# 1526–1783

## Harold L. Peterson

*with a new Introduction by*
**Beverly A. Straube**
JAMESTOWN REDISCOVERY
ASSOCIATION FOR THE PRESERVATION OF VIRGINIA ANTIQUITIES

DOVER PUBLICATIONS, INC.
Mineola, New York

KR0206



*THE COMPANY OF MILITARY COLLECTORS*
*& HISTORIANS*

Through its Reviewing Board, takes pride in sponsoring this book and in recommending it as a standard work of reference in the field of American military history.

COLONEL HARRY C. LARTER, USA, Ret.
*President*

REVIEWING BOARD

COLONEL ARCADI GLUCKMAN, USA, Ret.
MR. C. O. v. KIENBUSCH
LIEUTENANT COLONEL HERMANN W. WILLIAMS, JR., USAR
COLONEL FREDERICK P. TODD, USAR, *Editor-in-Chief*

WASHINGTON, D. C.

# Contents

### BOOK I

#### THE AGE OF COLONIZATION AND EXPLORATION
#### 1526-1688

Page

Introduction  -  -  -  -  -  -  -  -  -  -  3
*Chapter 1.*  Firearms  -  -  -  -  -  -  -  -  7
*Chapter 2.*  Ammunition and Equipment  -  -  -  -  53
*Chapter 3.*  Edged Weapons -  -  -  -  -  -  -  69
*Chapter 4.*  Armor  -  -  -  -  -  -  -  -  103

### BOOK II

#### THE FRENCH WARS AND THE REVOLUTION
#### 1689-1783

Introduction  -  -  -  -  -  -  -  -  -  -  155
*Chapter 5.*  Firearms  -  -  -  -  -  -  -  -  159
*Chapter 6.*  Ammunition and Equipment  -  -  -  -  227
*Chapter 7.*  Edged Weapons -  -  -  -  -  -  -  253
*Chapter 8.*  Armor  -  -  -  -  -  -  -  -  307

Appendix: The Compleat Souldier  -  -  -  -  -  317
Bibliography  -  -  -  -  -  -  -  -  -  337
Index -  -  -  -  -  -  -  -  -  -  347

[xvii]

KR0208

Chapter Three

# *Edged Weapons*

IT WAS STATED previously that the early colonist's firearm was his most important single weapon. It should not be deduced from this, however, that he could have carried on with that weapon alone. Edged weapons were also absolutely necessary. Firearms were needed to engage an enemy at a distance, but once the conflict became hand-to-hand, they were useless because of the length of time required to load them. The bayonet with which the modern soldier converts his gun to a polearm did not come into general use in America until after the close of the period under consideration, and so the explorers and settlers were forced to carry separate weapons. Also, during the early years there were certain groups, notably the Spanish lancers, the pikemen, and some of the targeteers who carried no firearms at all. These groups, however, gradually disappeared as they were found to be impractical in woodland warfare. Finally, there were some specialized edged weapons such as arms emblematic of rank or justice, hatchets, and the like designed and used for specific purposes.

Of all the various forms of edged weapons, the one in most widespread usage throughout the whole period was the sword. All men on military duty whether they carried a firearm or not were required to have a sword. Since all able-bodied men in a colony were normally called upon for such duty, this meant that all had to be familiar with the use of that weapon. Consequently, it is not surprising frequently to find more swords than guns listed in inventories and estates, or to learn that more have survived the ravages of time. It is interesting to note also that when Captain John Smith left Virginia in 1608 he reported that there were on hand in the colony more swords than men and that in 1618 a Committee for Smythes Hundred in Virginia recommended that 40 swords and daggers be provided for 35 men expecting to come from England.[1]

[ 69 ]

KR0209

**PLAINTIFFS' EXHIBIT P**

KR0210

# KNIFEBIBLE

## History & Modern Knowledge

**A. J. Cardenal, MSc ICT, MSc GIS**
**Geographic Information Scientist**

*with* **Sharon Steel,** *as* **Culinary Contributor**

**KR0211**

*Content Disclaimer:*

*This book was written with the intent to educate readers on knives and some of their uses. This book covers different types of knives, knife brands, and knife steels. The book or its authors do not encourage readers to purchase such items if the particular jurisdiction where they reside does not grant them the permission to legally purchase and own such items. This book also covers knife exercises, knife maintenance, bushcraft, knife fighting, culinary arts, and knife history. The book or its authors do not encourage readers to engage in activities that can be harmful or hazardous to themselves or others. We also to not encourage readers to engage in illegal activities with any form of item considered a lethal weapon, such as a knife. Before engaging in activities that involve a knife, consult with a local attorney to make sure laws are not broken. In addition, working or training with knives can be physically and mentally demanding, therefore consult with a physician before engaging in such activity. The book or its authors are not responsible for any activity performed by its readers, under any circumstance.*

*Warning: Reader discretion is advised. Some of the content in this book is not suited for minors/children under the age of 18. Some of the content might be upsetting in nature and can trigger a negative, unwanted response in certain readers, such as trauma survivors, individuals with common phobias and readers with visual sensitivities. This book contains violent content, which may be too intense for some readers. The content in this book is intended for an older audience.*

Knife Bible, History & Modern Knowledge. Copyright © 2022 by A.J. Cardenal.

All rights reserved. Printed in the United States of America.

No part of this book may be used or reproduced in any manner whatsoever without written permission except in the case of brief quotations embodied in critical articles and reviews.

For information address Knife Bible, LLC,

P.O. Box 1358, Leesburg, VA 20177

https://www.knifebible.com

**FIRST EDITION**

**Designed by A. J. Cardenal**

ISBN 978-0-578-82945-6 (hardcover)

KR0212

# TABLE OF CONTENTS

1. Beginning
   a. History of the Knife // 19
       i. Stone Age // 20
      ii. Copper Age // 22
          1. Linear-Band Keramic (LBK) Culture // 23
     iii. Bronze Age // 24
          1. Cucuteni-Trypillia Culture // 24
          2. Funnel-Beaker Culture // 25
          3. Maykop Culture // 25
          4. Yamnaya Culture // 26
          5. Corded Ware Culture // 27
          6. Battle Axe Culture // 28
          7. The Koryos // 28
          8. Egyptian Empire // 29
      iv. Iron Age // 32
          1. Zhou Dynasty // 32
          2. The Sword of Goujian // 33
          3. The Scythians // 33
          4. The Persian Empire // 35
          5. Sparta // 37
          6. Macedonia // 38
          7. The Parthians // 39
          8. Han Dynasty // 40
          9. Celts of Britain // 41
          10. Germanic People // 42
          11. Punic Wars // 43
          12. The Roman Empire // 44
          13. The Gupta Empire of India // 51
       v. Middle Ages // 52
          1. Attila the Hun and The Sword of Mars // 54
          2. The Vandals // 54
          3. Byzantine Empire // 55
          4. Charlemagne and The Sword of Joyeuse // 57
          5. The Viking Age // 57
          6. The Kievan Rus // 62
          7. Samurai // 64
          8. El Cid and His Mystical Sword // 67
          9. Medieval India & the Mughal Empire // 68
          10. Genghis Khan & the Mongol Empire // 74
          11. William Wallace – Battle of Stirling Bridge // 76
          12. The Ottoman Empire // 77
          13. The Aztecs // 81
      vi. The Renaissance Period // 82
          1. Hundred Years' War // 89
          2. Ming Dynasty // 94

KR0213

3. The Landsknechts  // 96
4. Polish Winged Hussars  // 97
5. Early Settlers of America  // 98
vii. Knives of the 1600s  // 99
1. Dining Knife  // 99
2. Early Western European Folding Knife  // 100
3. The First Steel-Edge Straight Razor  // 103
4. Colonial Ironworks  // 104
5. Eating Utensils in Colonial America  // 104
viii. The Age of Enlightenment  // 105
1. Seven Years' War/French and Indian War  // 105
2. Butterfly Knife a.k.a Balisong  // 106
ix. The Industrial Revolution  // 107
1. Switch Blades  // 107
2. Laguiole  // 108
3. Hoe-Shaped Razor  // 108
4. American Revolutionary War & Declaration of Independence  // 109
5. The United States and Territorial Expansion  // 111
x. American Frontier  // 113
1. James Bowie and his Infamous Fighting Knife  // 114
2. American Civil War  // 115
3. A Return to Nature  // 118
xi. The 1900s  // 119
1. World War I  // 120
2. The Great Depression  // 125
3. World War II  // 126
xii. Knives of the Indigenous People  // 131
1. The Ulu  // 131
2. The Karambit  // 133
3. Parang – Jungle Knife  // 134
4. Golok  // 135
5. The Dayak Mandau Sword  // 136
6. Bolo Knife  // 136
7. The Puukko  // 137
8. Leuku  // 140
b. **Modern Knives  // 143**
i. Influential People in the Knife Community (Past & Present)  // 144
ii. Knife Companies  // 161
1. Chris Reeve Knives  // 163
2. ESEE Knives  // 167
3. Fallkniven  // 171
4. Gransfors Bruk  // 175
5. LionSTEEL  // 179
6. L.T. Wright Knives  // 183
7. Opinel  // 189
8. TOPS Knives  // 193
9. Victorinox Swiss Army  // 197

## 2. Evolution
   a. **Steel** // 203
      i. Blade Steels and their Performance Levels // 204
      ii. Steels v. Low Temperatures // 207
      iii. Knife Steels // 209
        1. Alloying Elements // 209
        2. Carbon Steels // 210
        3. Tool Steels // 212
        4. Stainless Steels // 217
        5. Atypical Steels // 226
        6. Laminated Steels // 227
      iv. Blade Coating v. No Coating // 230
      v. Blade Grinds // 232
      vi. Blade Types // 233
      vii. Knife Tangs // 234
      viii. Edge Tpes // 235
      ix. Knife Parts - Fixedblade // 236
      x. Knife Parts - Folder // 237
      xi. Straight Razor Grinds // 238
      xii. Traditional Pocketknife Designs // 239
      xiii. Knife Handle Material // 241
      xiv. Knifemaking // 248
        1. Forging // 248
        2. Stock Removal // 252
      xv. Blade Maintenance // 255
        1. Knife Sharpening // 255
        2. Knife Storage // 276

## 3. Revelation
   a. **Knife Applications** // 279
      i. Culinary // 281
        1. Knife Types // 283
        2. KIKUICHI // 287
        3. What to Look for in a Knife // 292
        4. Profile: Chef Mike Pirolo // 295
        5. How Much Should You Pay // 298
        6. Coltelleire Berti // 301
        7. Your Essentials // 306
        8. Messermeister // 319
        9. Grip It Cut It // 326
        10. Profile: Christina Martinez // 329
        11. Outdoor Living // 333
          a. Profile: The Whole Ox // 337
          b. Profile: Jacqueline Pirolo // 343
          c. Opinel // 346
        12. Care & Storage // 347
        13. Chelsea Miller Knives // 353

KR0215

      ii.  Bushcraft Techniques  // 361
            1.  Field Maintenance Kit  // 363
            2.  Water  // 364
            3.  Processing Game  // 365
            4.  Cooking  // 365
            5.  Shelter  // 366
            6.  Campsite  // 366
            7.  Orientation  // 368
            8.  Chopping  // 370
            9.  Batoning  // 372
            10. Tent Pegs  // 372
            11. Splitting Wedge  // 373
            12. Notching/Carving  // 374
            13. Traditional Fire-Starting Methods  // 376
            14. Tinder  // 382
            15. Selecting Firewood  // 393
      iii.  Wood Carving  // 397
      iv.  Using a Saw  // 403
      v.  Using an Axe to Process Firewood  // 404
      vi.  Using a Hatchet to make Kindling  // 405
      vii.  Knots  // 406
      viii.  Grip Exercises  // 407
      ix.  Knife Fighting  // 411
**b.  Knife Superstitions  // 421**
**c.  Purchasing a Knife  // 424**
**d.  Social Media Highlights  // 428**
**e.  Janka Hardness Rating Bar Chart  // 430**
**f.  Angle Sharpening Guide  // 433**
**g.  Rockwell Hardness Test  // 434**
**h.  Knife Company List  // 435**

KR0216

# THE INDUSTRIAL REVOLUTION (1760–1840)

The Industrial Revolution marked the beginning of a new era for humanity. Industrialization led to the mass production of goods, which resulted in the replacement of rigorous handmade work-flows. The meticulous approach that went into producing crafted items was now the job of machines. Iron making, textiles, and various other industries were influenced by many new innovations of the nineteenth century. The Industrial Revolution, which began in Britain, rapidly gained momentum as it was reproduced throughout the world, impacting the traditional lifestyles of all social classes. The infrastructure of countries changed dramatically, as now there were more rapid ways to commute, communicate, and manufacture goods. As the wheels of industrialization spun faster, engines burned greater fuel, thereby releasing more energy into the atmosphere. This period, though necessary for bringing forth the modern age, also marked an important transition where this robust locomotive was steaming toward a new epoch, with little sign of slowing down. Advancements in metallurgy made it possible for the development of stronger, more efficient steels, which could be used in a number of applications, one of which was knives. Stronger knife steels meant that blades would not break as often and could maintain an edge for longer periods of time.

## Switchblades

In the mid-eighteenth century, switchblades made their first appearance in Sheffield, England. These knives became popular for their spring-loaded blades, which would "fold out" from the handle with the simple push of a button. Around the late eighteenth century, spring-operated knives were used as folding spike bayonets, also referred to as "pigstickers," on flintlock guns. By the nineteenth century, the design of the knife changed, offering a more pocket-friendly style that gained widespread popularity in Europe. Over time, several variations of the switchblade were created by French, Spanish, Italian, and American knifemakers, each offering their own unique variations on how the blade would be exposed. These variations were either via pushbutton or lever-lock. With the arrival of the Industrial Revolution, switchblades began to be mass produced and sold at lower costs, therefore making them more readily available. In the early 1900s, George Schrade, Founder of Geo. Schrade Knife Co., dominated the American switchblade market, with his automatic versions of jackknives and pocketknives. When the mid-1900s rolled in, these knives were mass produced by various companies worldwide, and advertised as "compact, versatile multi-purpose tools." George Schrade died in 1940, and his sons sold Geo. Schrade Knife Co. in 1956 to the Boker Knife Co. of New Jersey.

When American soldiers returned from Europe after World War II, they brought back the stilet-to-style switchblades to the States. First introduced in Italy in the 1950s, this style of switchblade appeared more threatening, due to its double edge and needle tip design. The simultaneous rise in crime on American streets by people who just so happened to be carrying switchblades, raised eyebrows in communities and did not help to subdue its already threating appearance. News outlets had a field day misrepresenting the stiletto-style switchblade, further pushing a heightened state of fear into the community. By this point, people viewed the knife as a violent, lethal weapon that had no place in our society. In the late 1950s, the switchblade was condemned, and anyone seen with this knife was categorically viewed as a criminal. Negative news portrayal of the knife ultimately gained the attention of the United States Congress, resulting in the banned sale of switchblade knives, which led to the inevitable closure of the Geo. Schrade Knife Co. in 1958. The ban on switchblades not only occurred in the United States though, as countries throughout Europe also prohibited the sale of these knives.

The closure of the Geo. Schrade Knife Co. did not mark end of the company, because earlier in 1946,

Schrade Cutlery Co. (Schrade's second knife company), was purchased by Imperial Knife Associated Companies. Long story short, the modern Schrade company is derived from this predecessor.

## Laguiole

In 1829, Laguiole was founded by Pierre-Jean Calmels in Laguiole, France, a commune located in the Aveyron department of southern France. In 1829, Calmels conceived of the very first knives. One was a pocketknife called the *capuchadou*, meant to be used during one's daily tasks from field to table. The other was a variation of the original Spanish navaja. This pocketknife was approximately a quarter of the size and slimmer in design, in comparison to the original. Calmels's "navaja" sometimes featured a corkscrew, which in 1880, was included in the knife's permanent design. This effortless feature linked his Laguiole to the emergence of a "bottled wine society."

## Hoe-shaped Razor

In 1847, a man by the name of William Henson invented the hoe-shaped razor, though it did not gain widespread popularity until 1880. In the early twentieth century, King Camp Gillette, a travelling salesman, combined the hoe-shape razor with a double-edge disposable/replaceable razor. The problem at the time was that the razors were not as easy to manufacture. After some thorough research and a partnership with MIT Professor William Nickerson, Gillette figured out a way to stamp out the blades from thin sheets of high carbon steel. Their efforts resulted in the first batch of *Gillette* razors that were released for use by 1903.



Fig. 80.
U.S. National Archives
National Archives Identifier: 7451921
Local Identifier: 775134
Creator(s): Department of the Interior. Patent Office.
(1849 - 1925) (Most Recent)
From: Series: Utility Patent Drawings, 1837 - 1911
Record Group 241: Records of the Patent and Trademark Office, 1836 - 1978

This item was produced or created: 11/15/1904
The creator compiled or maintained the series between: 1837 - 1911

KR0218

# PLAINTIFFS' EXHIBIT Q

KR0219

# THE SECOND AMENDMENT RIGHTS OF YOUNG ADULTS

By David B. Kopel[1] & Joseph G.S. Greenlee[2]

## Contents

Introduction................................................................................495
I.   The Supreme Court ..............................................................499
   A.   District of Columbia v. Heller.......................................499
   B.   Principles from Other Supreme Court Cases ................505
      1.   The militia is protected by the Second Amendment ................505
      2.   18-to-20-year-olds have historically been understood as part of the militia ..................................................505
      3.   Militiamen were required to supply their personal arms, which the government could not deprive them of .............................................507
II.  Glossary, and cultural background....................................510
   A. Glossary of arms and accoutrements in militia laws......................511
      1.   Firearms ignition systems ......................................512
      2.   Types of firearms ..................................................514
      3.   Edged or bladed weapons and accoutrements...........................518
      4.   Ammunition and related accoutrements...................................520
      5.   Gun care ...............................................................521
      6.   Arms carrying and storage .....................................522
      7.   Pole arms...............................................................523
      8.   Horses and tack accoutrements ...............................524
      9.   Armor ...................................................................525
      10.    Other field gear ..................................................525
   B. Types of persons covered by arms mandates ..................526

[1]   Adjunct Professor of Constitutional Law, Denver University, Sturm College of Law; Research Director, Independence Institute, Denver, Colorado; Associate Policy Analyst, Cato Institute, Washington, D.C., http://davekopel.org.
[2]   Fellow in Constitutional Studies and Firearms Policy, Millennial Policy Center; Steamboat Institute, Emerging Leaders Advisory Council; J.D. 2014, Denver University, Sturm College of Law, http://josephgreenlee.org.

KR0220

Electronic copy available at: https://ssrn.com/abstract=3205664

C. "Trained to arms from their infancy" ................................................ 530

III. The Colonial and Founding Periods ................................................ 533

A. New Jersey: "all able-bodied Men, not being Slaves … between the Ages of sixteen and fifty Years" ........................................................... 536

B. Maryland: "his her or their house" ................................................... 540

C. North Carolina: Land grants for properly armed persons "above the age of fourteen years" ............................................................................ 544

D. South Carolina: "all male persons in this Province, from the age of sixteen to sixty years" ....................................................................... 548

E. New Hampshire: males under seventy .......................................... 551

F. Delaware: "every Freeholder and taxable Person" ....................... 555

G. Pennsylvania: No service "without the consent of his or their parents or guardians, masters or mistresses" ..................................... 559

H. New York: "every able bodied male person Indians and slaves excepted" .................................................................................................. 564

I. Rhode Island: parents and masters must furnish arms ................. 568

J. Vermont: "the freemen of this Commonwealth, and their sons" .. 570

K. Virginia: "ALL men that are fitting to beare armes, shall bringe their peices to the church" ................................................................... 573

L. Massachusetts Bay: "from ten yeares ould to the age of sixteen yeares" .................................................................................................... 583

M. Plymouth Colony: "each man servant" ................................... 586

N. Georgia: No going to church without arms ...................................... 587

O. Connecticut: "all persons shall beare Armes that are above the age sixteene yeeres" ................................................................................... 588

IV. Federal Laws ................................................................................ 589

V. Nineteenth and Early Twentieth Century State Laws and Cases—and Their Role in Modern Litigation ................................................ 595

A. State Laws and Cases ....................................................................... 596

B. Modern Circuit Cases ....................................................................... 601

   1. Rene E. ........................................................................................ 601

   2. National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms, Explosives ........................................................................ 601

   3. National Rifle Association v. McCraw .................................... 603

   4. Horsley v. Trame .................................................................... 604

KR0221

Electronic copy available at: https://ssrn.com/abstract=3205664

    5.   Ezell v. City of Chicago ............................................................ 605

VI.    Current State Laws .................................................................... 605

A.    State laws with special arms restrictions on young adults ............ 606

B.    Policy ........................................................................................... 611

VII.    Conclusion .................................................................................. 613

## INTRODUCTION

Since the Supreme Court's 2008 decision in *District of Columbia v. Heller*, lower courts have analyzed diverse Second Amendment issues. One question is whether young adults—that is, persons aged 18-to-20—have Second Amendment rights. This article suggests that they do. Indeed, under *Heller*'s originalist methodology, this is an easy question.

*Heller* provided a methodology for determining whether a person, activity, or arm is protected by the Second Amendment.[3] The Court analyzed founding-era sources, including constitutional text and history, to determine the scope of the Second Amendment at the time of ratification.[4] The Court also looked to 19th century sources, but explained that these "do not provide as much insight into its original meaning as earlier sources."[5] We will take the same approach in this article to determine whether young adults aged 18-to-20 have the right to keep and bear arms.

Part I examines what the Supreme Court has said, explicitly and implicitly, about the Second Amendment rights of young adults.

Parts II and III survey colonial and founding-era sources. Part II begins with a glossary of various terms that were used in militia statutes. These show some of the arms and accoutrements that Americans were required to possess. The various items illustrate that the right to arms does not include only firearms and ammunition. The right also includes, for example, edged weapons and gun-cleaning equipment. Part II also describes the arms culture of early America, where it was a point of national pride that people were trained to arms "from their infancy."

Part III then surveys all the militia statutes from the earliest colonial days through 1800. The survey pays particular attention to two issues. The first is the age for militia service or for other forms of mandatory arms

---

[3]    District of Columbia v. Heller, 554 U.S. 570, 595 (2008).

[4]    *Id.* at 576 ("In interpreting this text, we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'") (quoting United States v. Sprague, 282 U.S. 716, 731 (1931)).

[5]    *Id.* at 614.

KR0222

Electronic copy available at: https://ssrn.com/abstract=3205664

498          Southern Illinois University Law Journal          [Vol. 43

possession.  As the statutes demonstrate, arms possession was mandatory for militiamen and for other categories of people.  In some colonies, for example, every head of a house, regardless of gender, had to possess arms.  So did men who were too old for militia service.  The most common ages for mandatory militia service were from 16 to 60.  But by the end of the eighteenth century, the militia mandate had been narrowed in most states to 18 until 45 or 50.

The second issue in Part III is the types of arms that militiamen—and the many other people required to possess arms—were supposed to own.  Part III tracks the evolution of these laws, as they become more specific about requiring various accoutrements—such as gun cleaning equipment, holsters, and ammunition storage devices—and the laws' attempts to ensure that the public possesses modern arms.

Part IV describes federal laws regarding the ages for arms possession. These include the 1792 statute making 18-year-olds into members of the federal militia (as they are today, by statute), the 1968 Gun Control Act setting age limits on purchases in gun stores, and the 1994 federal law restricting handgun possession by persons under 18.

Part V covers the five leading post-*Heller* federal circuit court cases on age limits for exercising Second Amendment rights.  Two of these cases relied heavily on cases and statutes from the nineteenth century; thus, in the course of discussing the cases, we survey the nineteenth century developments.  By the end of the century, a substantial minority of states that placed some restrictions on handgun acquisition by persons under 21.

Finally, Part VI describes some of the present-day state laws that limit firearms acquisition or possession by young adults (18 to 20).  Part VI also considers various past and present age limits in American law for different activities, such as voting, vices (e.g., alcohol, gambling), marriage, and the right to keep and bear arms.

In conclusion, this article finds that there is some historical precedent for extra regulation for handgun acquisition by young adults, and very little for extra restrictions on long gun acquisition.  Pursuant to *Heller*, extra regulations for young adults may be permissible, but prohibitions or quasi-prohibitions are not. The Second Amendment rights of young adults include a core right affirmed in *Heller*: acquiring and keeping a handgun in the home for lawful self-defense.

KR0223

Electronic copy available at: https://ssrn.com/abstract=3205664

## I.  THE SUPREME COURT

Consider the following syllogism:

The militia has the right to keep and bear arms;
18-to-20-year-olds are part of the militia;
Therefore, 18-to-20-year-olds have the right to keep and bear arms.

The Supreme Court's precedents have held that items one and two are correct.[6]  As will be detailed in Part III, those precedents are correct because colonial and Founding Era militia statutes included young adults.

The *Heller* case affirmed that militiamen have the right to arms and also held that the Second Amendment right is not exclusively for the militia.[7]  Further, according to *Heller*, whoever does have the right to arms has that right for all lawful purposes; these include not only militia service, but also self-defense, hunting, target practice, and so on.[8]

### A. *District of Columbia v. Heller*

The *Heller* Court held that the Second Amendment guarantees an individual right, and the right is not dependent on service in a militia.  But the Court made clear that the militia is protected. Indeed, all nine Justices agreed that individual militiamen are protected by the Second Amendment. The disagreement between the Justices was whether the right extends beyond the militia, with the majority holding that it does.

The majority stated:

the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia.  The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting.  But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms

---

[6]    *See* discussion *infra* Part I.
[7]    *Heller*, 554 U.S. at 596; *see also* discussion *infra* Part IA.
[8]    *Id.* at 614 ("[T]he right to keep arms involves, necessarily, the right to use such arms for all the ordinary purposes, and in all the ordinary modes usual in the country, and to which arms are adapted, limited by the duties of a good citizen in times of peace.") (quoting Andrews v. State, 50 Tenn. (3 Heisk.) 165, 178-79 (1871)). *Cf.* David B. Kopel & Joseph G.S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 ST. L.U.L.J. 193, 204-12 (2017) (surveying post-*Heller* federal Circuit Court decisions, which unanimously find that the right to arms includes self-defense, militia, hunting, target shooting, and all other lawful purposes).

**KR0224**

Electronic copy available at: https://ssrn.com/abstract=3205664

was the reason that right—unlike some other English rights—was codified in a written Constitution.[9]

The dissenting opinions similarly recognized that the Second Amendment prevented the militia from being disarmed. Justice Stevens's dissent stated that "the purpose of the Amendment [was] to protect against congressional disarmament, by whatever means, of the States' militias."[10] The Amendment protects "the collective action of individuals having a duty to serve in the militia that the text directly protects,"[11] because the Amendment "was a response to concerns raised during the ratification of the Constitution that the power of Congress to disarm the state militias and create a national standing army posed an intolerable threat to the sovereignty of the several States."[12]

Justice Breyer's dissent noted the "general agreement among the Members of the Court that the principal (if not the only) purpose of the Second Amendment is found in the Amendment's text: the preservation of a 'well regulated Militia.'"[13] After all, the first clause of "[t]he Amendment itself tells us that militia preservation was first and foremost in the Framers' minds."[14]

Although the dissents disagreed with the majority that the right extends beyond the militia, the Court was unanimous that individuals in the militia were fully protected by the Second Amendment, and that the right was codified because the Founders and the public were horrified by the prospect of the government disarming the militia. As explained below, the militias of every colony and state, and the federal militia, included 18-to-20-year-olds. Young adults have been part of the militia from the seventeenth century through the twentyfirst. As Justice Breyer pointed out, the District of Columbia's militia at the time *Heller* was decided included "[e]very able-bodied male citizen resident within the District of Columbia, of the age of 18 years and under the age of 45 years."[15]

The *Heller* majority further indicated that 18-to-20-year-olds have Second Amendment rights by explaining:

---

[9]     *Heller*, 554 U.S. at 599. The majority added: "Does the preface fit with an operative clause that creates an individual right to keep and bear arms? It fits perfectly, once one knows the history that the founding generation knew and that we have described above." *Id.* at 598. Because one reason the right was codified was to protect the militia, an interpretation that did not include the entire militia would destroy this "perfect fit."

[10]    *Id.* at 660–61 (Stevens, J., dissenting). Justice Stevens's dissent was joined by Justices Souter, Ginsburg, and Breyer.

[11]    *Id.* at 645.

[12]    *Id.* at 637.

[13]    *Id.* at 706 (Breyer, J., dissenting). Justice Breyer's dissent was joined by Justices Souter, Ginsburg, and Stevens.

[14]    *Id.* at 715.

[15]    D.C. CODE ANN. § 49-401 (West 1889); *Heller*, 554 U.S. at 707 (Breyer, J., dissenting).

**KR0225**

Electronic copy available at: https://ssrn.com/abstract=3205664

the ordinary definition of the militia [i]s all able-bodied men. From that pool, Congress has plenary power to organize the units that will make up an effective fighting force.  That is what Congress did in the first Militia Act, which specified that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia." Act of May 8, 1792, 1 Stat. 271.  To be sure, Congress need not conscript every able-bodied man into the militia, because nothing in Article I suggests that in exercising its power to organize, discipline, and arm the militia, Congress must focus upon the entire body. Although the militia consists of all able-bodied men, the federally organized militia may consist of a subset of them.[16]

Because the militia consists of "all able-bodied men," because "Congress has plenary power to organize … an effective fighting force" "from that pool" of "able-bodied men," and because "[t]hat is what Congress did in the first Militia Act" by organizing the able-bodied men between eighteen and forty-five, the Court recognized 18-to-20-year-olds as part of the militia; as such, they necessarily have the right to keep and bear arms.

Perhaps, one could argue, that although 18-to-20-year-olds were part of the militia, they were not trusted with arms outside of their militia service. But the *Heller* majority rejects this, since it affirms the right to arms for all lawful purposes.[17]  While the English militia of the time was often supplied with centrally-stored arms that were only brought out for practice days, American militiamen were expected to keep their own arms at home, and to be proficient with those arms.[18]

As *Heller* explained, "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they

---

[16]   *Heller*, 554 U.S. at 596.

[17]   *Id.* at 636-37 ("Whether [the Second Amendment] also protects the right to possess and use guns for nonmilitary purposes like hunting and personal self-defense is the question presented by this case. The text of the Amendment, its history, and our decision in *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), provide a clear answer to that question." (citation omitted)).  *See also* McDonald v. City of Chicago, 561 U.S. 742, 780 (2010) ("the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."); Caetano v. Massachusetts, 136 S. Ct. 1027, 1028 (2016) (per curiam) ("the [lower] court used 'a contemporary lens' and found 'nothing in the record to suggest that [stun guns] are readily adaptable to use in the military.'  But *Heller* rejected the proposition 'that only those weapons useful in warfare are protected.'") (citing *Heller*, 554 U.S. at 624–25) (internal citation omitted).

[18]   NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAWS AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 110-11, 136-40, 175-86, 237-40 (2d ed. 2017) (comparing and contrasting English and American militia and arms cultures and laws).

Electronic copy available at: https://ssrn.com/abstract=3205664

possessed at home to militia duty."[19]  The Court quoted with approval a previous Supreme Court decision, *United States v. Miller*, discussed *infra*, which stated that "ordinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time."[20]

The Court also quoted "the most famous" late 19th-century legal scholar: "judge and professor Thomas Cooley, who wrote a massively popular 1868 Treatise on Constitutional Limitations." Cooley explained that "[t]he alternative to a standing army is 'a well-regulated militia,' but this cannot exist unless the people are trained to bearing arms."[21]  Further, as quoted by the Court, "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use."[22]

Similarly, the Court quoted John Norton Pomeroy, another late-19th-century scholar, stating that the purpose of the Second Amendment is

> to secure a well-armed militia .... But a militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons. To preserve this privilege, and to secure to the people the ability to oppose themselves in military force against the usurpations of government, as well as against enemies from without, that government is forbidden by any law or proceeding to invade or destroy the right to keep and bear arms.[23]

And the Court quoted Benjamin Vaughan Abbott, another late-19th-crentury scholar, who said: "Some general knowledge of firearms is important to the public welfare; because it would be impossible, in case of war, to organize promptly an efficient force of volunteers unless the people had some familiarity with weapons of war."[24]

The *Heller* dissent was of a similar mind, explaining that "the Framers recognized the dangers inherent in relying on inadequately trained militiamen 'as the primary means of providing for the common defense.'"[25] The dissent acknowledged that "during the Revolutionary War, '[t]his force, though armed, was largely untrained, and its deficiencies were the subject of

---

[19]   *Heller*, 554 U.S. at 627.

[20]   *Id.* at 624 (quoting United States v. Miller, 307 U.S. at 179).

[21]   *Heller*, 554 U.S. at 616-17.

[22]   *Id.* at 617-18 (quoting THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 271 (1880)); *Id.* at 617 ("Cooley understood the right not as connected to militia service, but as securing the militia by ensuring a populace familiar with arms.").

[23]   *Id.* at 618 (quoting J.N. POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES § 239 152-53 (1868)).

[24]   *Id.* at 619 (citing B. ABBOTT, JUDGE AND JURY: A POPULAR EXPLANATION OF THE LEADING TOPICS IN THE LAW OF THE LAND 333 (1880)).

[25]   *Id.* at 653 (quoting Perpich v. Dep't of Def., 496 U.S. 334, 340 (1990)).

Electronic copy available at: https://ssrn.com/abstract=3205664

bitter complaint.'"[26]  The dissent quoted George Washington stating that, "The firmness requisite for the real business of fighting is only to be attained by a constant course of discipline and service."[27]  And Alexander Hamilton, who wrote that "War, like most other things, is a science to be acquired and perfected by diligence, by perseverance, by time, and by practice."[28]

These sources show that those in the militia were expected not only to provide their own arms, but also to practice with them frequently.  All nine Justices shared that understanding.

The majority made clear that the right included, but was not limited to, the militia.  "'Keep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else*."[29]  The Court cited an opinion by the Georgia Supreme Court which "perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause…":

> The right of the whole people, *old and young*, men, *women and boys*, and *not militia only*, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree; and all this for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State.[30]

*Heller*'s most definitive recognition that 18-to-20-year-olds have Second Amendment rights came in the Court's discussion of who "the people" in the Second Amendment are.  The operative clause of the Second Amendment states that "the right of *the people* to keep and bear arms, shall not be infringed."[31]  As the Court observed, "*the 'militia' in colonial America*

---

26    *Id.* (citing Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 HARV. L. REV. 181, 182 (1940)).

27    *Id.* at 654.

28    *Id.* at 653 n.17 (Stevens, J., dissenting) (The Federalist No. 25).  While these statements from Washington and Hamilton expressed frustration with the militia, they nonetheless demonstrate that the Founders rejected the idea of disarming a substantial segment of the militia, leaving them largely untrained and unfamiliar with firearms when called to duty.  *See also* MARK W. KWASNY, WASHINGTON'S PARTISAN WAR: 1775–1783, at 337-38 (1996) ("Washington learned to recognize both the strengths and the weaknesses of the militia.  As regular soldiers, militiamen were deficient….He therefore increasingly detached Continentals to support them when operating against the British army….Militiamen were available everywhere and could respond to sudden attacks and invasions often faster than the army could.  Washington therefore used the militia units in the states to provide local defense, to suppress Loyalists, and to rally to the army in case of an invasion….Washington made full use of the partisan qualities of the militia forces around him.  He used them in small parties to harass and raid the army, and to guard all the places he could not send Continentals….Rather than try to turn the militia into a regular fighting force, he used and exploited its irregular qualities in a partisan war against the British and Tories.").

29    *Heller*, 554 U.S. at 583 (emphasis in original).

30    *Id.* at 612–13 (quoting Nunn v. State, 1 Ga. 243, 251 (1846)) (emphasis added).

31    U.S. CONST., amend. II (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=3205664

*consisted of a subset of 'the people'*—those who were male, able bodied, and within a certain age range."[32]  Thus, because 18-to-20-year-olds were part of the militia, 18-to-20-year-olds were also part of "the people." It is "*the right of the people* to keep and bear arms" that the Second Amendment protects.[33]

As *Heller* observed, "Logic demands that there be a link between the stated purpose and the command."[34]  The prefatory clause may assist in interpreting the operative clause.[35]  The Second Amendment's prefatory clause makes it clear that, at a minimum, the main clause protects the entire militia.

The *Heller* Court held that the core of the Second Amendment includes keeping a handgun in the home for lawful defense.[36]  The Supreme Court reiterated that holding in *McDonald v. City of Chicago*.[37]  In the modern United States, some young adults maintain their own homes. Some of them are married.  Some of them are raising children in their home.  To deprive these householders of the right to possess a handgun in their homes for lawful defense thus infringes on the core of their Second Amendment rights.

The Supreme Court's "first in-depth examination of the Second Amendment"[38] demonstrated that 18-to-20-year-olds have Second Amendment rights, because: 1) the militia is protected by the Second Amendment; 2) 18-to-20-year-olds have historically been understood as part of the militia; and 3) militiamen were required to supply their personal arms, which the government could not deprive them of.  But the Court had established this long before *Heller*.

---

32   *Heller*, 554 U.S. at 580 (emphasis added).  Elsewhere, the majority quoted Thomas Cooley with approval: "The meaning of the provision undoubtedly is, that *the people, from whom the militia must be taken*, shall have the right to keep and bear arms." *Id.* at 617 (emphasis added).  The quotation similarly treats the militia as a subset of "the people."

33   The Court's full discussion on "the people":
     What is more, in all six other provisions of the Constitution that mention "the people," the term unambiguously refers to all members of the political community, not an unspecified subset.  As we said in *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990):
          "'[T]he people' seems to have been a term of art employed in select parts of the Constitution .... [Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."
     This contrasts markedly with the phrase "the militia" in the prefatory clause.  As we will describe below, the "militia" in colonial America consisted of a subset of "the people"— those who were male, able bodied, and within a certain age range.
     *Heller*, 554 U.S. at 580.

34   *Id.* at 577.

35   *Id.* at 577-78.

36   *Id.* at 628, 635 ("the home [is] where the need for defense of self, family, and property is most acute;" "the right of law-abiding, responsible citizens to use arms in defense of hearth and home.").

37   McDonald v. City of Chicago, 561 U.S. 742, 886 (2010).

38   *Heller*, 554 U.S. at 635.

Electronic copy available at: https://ssrn.com/abstract=3205664

## B.  Principles from Other Supreme Court Cases

### 1. The militia is protected by the Second Amendment

While the text of the Second Amendment[39] is sufficient to prove that the Founders understood the militia as having the right to keep and bear arms, the Court emphasized the point in *United States v. Miller*:[40] "With obvious purpose to assure the continuation and render possible the effectiveness of [militia] forces the declaration and guarantee of the Second Amendment were made.  It must be interpreted and applied with that end in view."[41]  While *Miller* has been criticized for its "conceptually flawed concentration on the amendment's militia purpose,"[42] since the case had little to do with the militia, *Miller* correctly affirmed that the Second Amendment prevents the government from rendering militia forces ineffective.  Disarming 18-to-20-year-olds would render them ineffective militia forces in the Founders' view, especially because militiamen were expected to provide their own arms.

### 2.  18-to-20-year-olds have historically been understood as part of the militia

That 18-to-20-year-olds were included in the federal militia and each state's militia at the time of the founding will be established below, in Parts III and IV.  But it is also important to note that the Supreme Court has in every instance understood the militia to include 18-to-20-year-olds.

Citing the constitutional militia, as identified in Article 1, Section 8 of the Constitution, the Court in *Hamilton v. Regents of the University of California*, explained that "[u]ndoubtedly every state has authority to train its able-bodied male citizens of suitable age appropriately to develop fitness, should any such duty be laid upon them, to serve in the United States Army or in state militia (always liable to be called forth by federal authority to execute the laws of the Union, suppress insurrection, or repel invasion…)"[43]  The *Hamilton* case involved university students who did not wish to participate in the mandatory militia training required by state law.  Then as now, many students at the University of California were ages 18 to 20.

---

[39]  The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST., amend. II.

[40]  United States v. Miller, 307 U.S. 174, 178 (1939).

[41]  *Id.* at 178.

[42]  Don B. Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 259 (1983).

[43]  Hamilton v. Regents of the Univ. of Cal., 293 U.S. 245, 260 (1934) (citing U.S. CONST., art. 1, § 8, cls. 12, 15 and 16).

Electronic copy available at: https://ssrn.com/abstract=3205664

The *Miller* Court recognized that "the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators . . . show plainly enough that the Militia comprised all males physically capable of acting in concert for the common defense. 'A body of citizens enrolled for military discipline.'"[44] *Miller* then offered examples:

The General Court of Massachusetts in 1784 "provided for the organization and government of the Militia. It directed that the Train Band should 'contain all able bodied men, from sixteen to forty years of age, and the Alarm List, all other men under sixty years of age.'"[45]

The New York Legislature in 1786 "directed: 'That every able-bodied Male Person, being a Citizen of this State, or of any of the United States, and residing in this State, (except such Persons as are herein after excepted) and who are of the Age of Sixteen, and under the Age of Forty-five Years, shall … be enrolled.'"[46]

The General Assembly of Virginia in 1785, the U.S. Supreme Court explained, "directed that 'All free male persons between the ages of eighteen and fifty years,' with certain exceptions, 'shall be inrolled or formed into companies.'"[47]

In *Perpich v. Department of Defense*, the Court acknowledged that "[i]n the early years of the Republic" Congress "command[ed] that every able-bodied male citizen between the ages of 18 and 45 be enrolled" in the militia.[48] *Perpich* also pointed out that at the turn of the twentieth century, the "The Dick Act divided the class of able-bodied male citizens between 18 and 45 years of age into an 'organized militia' to be known as the National Guard of the several States, and the remainder of which was then described as the 'reserve militia,' and which later statutes have termed the 'unorganized militia.'"[49] As the Court noted, "[i]t is undisputed that Congress was acting pursuant to the Militia Clauses of the Constitution in passing the Dick Act."[50]

In *Presser v. Illinois*, the Court declared:

> It is undoubtedly true that *all citizens capable of bearing arms* constitute the reserved military force or reserve militia of the United States as well as of the states, and, in view of this prerogative of the general government, as well as of its general powers, the states cannot, even laying the constitutional provision in question out of view, prohibit *the people* from

---

44    *Miller*, 307 U.S. at 179. This language was favorably quoted in *Heller*, 554 U.S. at 595.
45    *Id.* at 180 (quoting The General Court of Massachusetts, January Session 1784 (Laws and Resolves 1784, c. 55, pp. 140, 142)).
46    *Id.* at 180-81 (quoting New York Legislature, an Act passed April 4, 1786 (Laws 1786, c. 25)).
47    *Id.* at 181 (quoting The General Assembly of Virginia, 1785 (12 Hening's Statutes, c. 1, p. 9 et seq.)).
48    Perpich v. Dep't of Def., 496 U.S. 334, 341-43 (1990).
49    *Id.* at 342.
50    *Id.*

KR0231

Electronic copy available at: https://ssrn.com/abstract=3205664

keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable *the people* from performing their duty to the general government.[51]

Thus, the *Presser* Court, like the *Heller* Court, specified that the militia is part of "the people"—as in "the people" who have the right "to keep and bear arms" protected by the Second Amendment.[52] The militia identified by the *Presser* Court consists of "all citizens capable of bearing arms," which most certainly includes 18-to-20-year-olds, since the federal militia statute at the time included 18-to-20-year-olds.[53]

### 3. Militiamen were required to supply their personal arms, which the government could not deprive them of

According to the Supreme Court, militiamen were required to provide their own private firearms and were expected to achieve and maintain proficiency with those arms to ensure the effectiveness of the militia.

As *Miller* put it, "the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators . . . show . . . that ordinarily when called for service these men [in the militia] were expected to appear bearing arms *supplied by themselves* and of the kind in common use at the time."[54] The *Miller* Court provided founding-era examples from Massachusetts, New York, and Virginia: New York required "[t]hat every Citizen so enrolled and notified . . . provide himself, at his own Expense, with a good Musket or Firelock, a sufficient Bayonet and Belt, a Pouch with a Box therein to contain not less than Twenty-four Cartridges suited to the Bore of his Musket or Firelock, each Cartridge containing a proper Quantity of Powder and Ball, two spare Flints, a Blanket and Knapsack."[55]

---

[51]  Presser v. Illinois, 116 U.S. 252, 265-66 (1886) (emphasis added).

[52]  *Cf.* Voisine v. United States, 136 S. Ct. 2272, 2291 (2016) (Thomas, J., dissenting) ("To be constitutional, therefore, a law that broadly frustrates an individual's right to keep and bear arms must target individuals who are beyond the scope of the 'People' protected by the Second Amendment.").

[53]  *See infra* Part IV.
Following precedent, the Court's opinion in *McDonald* incorporated the Second Amendment on the basis of the Fourteenth Amendment's Due Process Clause, which protects every "person." Concurring, Justice Thomas preferred to use the Fourteenth Amendment's Privileges or Immunities Clause, which protects "citizens." *McDonald*, 561 U.S. at 850 (Thomas, J., concurring). Because non-citizens who have declared their intent to naturalize are subject to militia duty, they would have to be within the scope of "the militia" and therefore "the people" who are protected by the Second Amendment. *See* 10 U.S.C. § 246 (2019) (including in the militia all able-bodied males from 17 to 45 "who are, or who have made a declaration of intention to become, citizens of the United States.")

[54]  *Miller*, 307 U.S. at 179 (emphasis added).

[55]  *Id.* at 180–81 (quoting New York Legislature, an Act passed April 4, 1786 (Laws 1786, c. 25)).

Electronic copy available at: https://ssrn.com/abstract=3205664

Massachusetts mandated each militiaman to "equip himself, and be constantly provided with a good fire arm, &c."[56]

Under Virginia law,

> The defense and safety of the commonwealth depend upon having its citizens properly armed and taught the knowledge of military duty."  So "[e]very officer and soldier shall appear . . . armed, equipped, and accoutred, as follows: * * * every non-commissioned officer and private with a good, clean musket carrying an ounce ball, and three feet eight inches long in the barrel, with a good bayonet and iron ramrod well fitted thereto, a cartridge box properly made, to contain and secure twenty cartridges fitted to his musket, a good knapsack and canteen, and moreover, each non-commissioned officer and private shall have at every muster one pound of good powder, and four pounds of lead, including twenty blind cartridges . . . . .And every of the said officers, non-commissioned officers, and privates, *shall constantly keep* the aforesaid arms, accoutrements, and ammunition, ready to be produced whenever called for by his commanding officer.[57]

Recently, in the 2016 *Caetano v. Massachusetts*, the Court reaffirmed that "*Miller* and *Heller* recognized that militiamen traditionally reported for duty carrying 'the sorts of lawful weapons that they possessed at home.'"[58]

Or as the 1990 Court said in *Perpich*, "in the early years of the Republic, Congress . . . command[ed] that every able-bodied male citizen between the ages of 18 and 45 . . . *equip himself* with appropriate weaponry…."[59]  The Court wrote that Congress's "choice of a dual enlistment system [for the militia] is just as permissible as the 1792 choice to have the members of the militia arm themselves."[60]

---

56   *Id.* at 180 (quoting The General Court of Massachusetts, Jan. sess. 1784 (Laws and Resolves 1784, c. 55, pp. 140, 142)).

As in some other states, militiamen "under the control of parents, masters or guardians" were expected to be supplied with arms by their parents, masters, or guardians. General Court of Massachusetts, *supra*, at 142–43. *See also* Part III (listing statutes that required parents, masters, or guardians to supply arms to their dependents).  In a militia where duty began at age 16, there would be plenty of militiamen who were not yet living independently, and who could not afford their own arms.  As for young people who were already supporting themselves, they typically had to provide their own arms.

Citing seventeenth century laws from the colony of Massachusetts, *Miller* noted that "[c]lauses intended to insure the possession of arms and ammunition by all who were subject to military service appear in all the important enactments concerning military affairs." *Miller*, 307 U.S. at 180 (citing Osgood, 1 The American Colonies In The 17th Century, ch. XIII).

57   *Miller*, 307 U.S. at 181-82 (The General Assembly of Virginia, October, 1785 (12 Hening's Statutes c. 1, p. 9 et seq.)) (emphasis added).

58   Caetano v. Massachusetts, 136 S. Ct. 1027, 1032 (2016).

59   Perpich v. Dep't of Def., 496 U.S. 334, 341-43 (1990) (emphasis added).

60   *Id.* at 350.  Under the modern dual enlistment system, volunteers in the National Guard dually enlist in the National Guard of their state and in the National Guard of the United States.  The Guardsmen are state actors unless called into federal service. In either capacity, their arms are supplied by the federal government.  The National Guard is the "organized" part of the militia. 10 U.S.C. § 246

Electronic copy available at: https://ssrn.com/abstract=3205664

The Court said something similar in *Houston v. Moore* in 1820.[61]  The Court stated that the congressional militia statutes were within Congress's enumerated Article I militia power to declare "what arms and accoutrements the officers and privates shall provide themselves with."[62]

In other cases, the Court has confirmed that depriving militiamen of their personal arms would violate their right to keep and bear arms.  As discussed above, the *Presser* Court explained that because the Constitution authorizes Congress to call forth the armed citizenry, "the states cannot . . . prohibit the people from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the general government."[63] Since Congress needs to be able to depend on the people being armed, the states cannot disarm them. The *Presser* Court's vision depends on an armed populace.[64]

In *McDonald*, the Court found

> the 39th Congress' response to proposals to disband and disarm the Southern militias is instructive.  Despite recognizing and deploring the abuses of these militias, the 39th Congress balked at a proposal to disarm them.  Disarmament, it was argued, would violate the members' right to

---

(2019).  The "unorganized" militia is all other able-bodied males ages 18 to 45, except for ministers and other exempt persons. 10 U.S.C. § 247 (2019).

61     Houston v. Moore, 18 U.S. (5 Wheat.) 1 (1820).

62     *Id.* at 14.

63     *Presser v. Illinois*, 116 U.S. 252, 265-66 (1886); U.S. CONST., art I, § 8, cl. 16 ("To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions.") (Calling Forth Clause).

The *Presser* point was reiterated with approval in a 1900 case:

> In *Presser* v. *Illinois*, 116 U. S. 252, 29 L. ed. 615, 6 Sup. Ct. Rep. 580, it was held that the Second Amendment to the Constitution, in regard to the right of the people to bear arms, is a limitation only on the power of Congress and the national government, and not of the states.  It was therein said, however, that as all citizens capable of bearing arms constitute the reserved military force of the national government the states could not prohibit the people from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the general government.

Maxwell v. Dow, 176 U.S. 581, 597 (1900), *abrogated on other grounds by* Williams v. Florida, 399 U.S. 78 (1970).  *Presser* had been interpreted to hold that the right to keep and bear arms is not one of the Fourteenth Amendment "privileges or immunities of citizens of the United States" protected from state infringement.  Similar holdings applied to most of the rest of the Bill of Rights.  The work of incorporating items in the Bill of Rights into the Fourteenth Amendment has instead been accomplished by the Due Process of Law clause of the Fourteenth Amendment. *See, e.g.*, McDonald v. City of Chicago, 561 U.S. 742 (2010) (plurality opinion by Justice Alito relies on Due Process; concurrence by Justice Thomas relies on Privileges or Immunities).

64     *See also Houston*, 18 U.S. (5 Wheat.) at 52 (Story, J., dissenting) ("Yet what would the militia be without organization, arms, and discipline?").

**KR0234**

Electronic copy available at: https://ssrn.com/abstract=3205664

bear arms, and it was ultimately decided to disband the militias but not to disarm their members.[65]

Thus, the *McDonald* Court suggested what the *Presser* Court flat out said: individual militiamen could not be deprived of their private firearms.

Nothing the Supreme Court has ever written about the militia can be construed to exclude 18-to-20-year-olds. The Court has repeatedly confirmed that militiamen were expected to provide their own private firearms, and to be proficient with those arms. What is more, the Court has twice stated that the militia is a subset of "the people"—the same "people" the Second Amendment protects. Finally, the Court has recognized that any law that would disarm "the people"—and especially the militia—would be unlawful.

The Court's unwavering descriptions of the militia and the young adults therein are solidly supported by the historical record. Besides the colonial period and Founding Era sources quoted by the Court above, we will in Part III examine *every* colonial and state militia statute up to 1800. They demonstrate that young adults are part of the militia.

## II.  GLOSSARY, AND CULTURAL BACKGROUND

Before surveying the early state laws, we provide some background. Part A is a glossary of terms used in colonial and state laws regarding equipment that members of the public were required to possess. As will be detailed in Part III, the requirements often applied beyond militiamen. The arms mandates encompassed the militia, many males not in the militia, and sometimes women.

Previous scholarship has not paid much attention to the particular arms that were required. Because American discussion of the right to keep and bear arms has been so fixated on gun control, scholars have noted that most militiamen needed a long gun, while officers and cavalry needed handguns. This is true as far as it goes, but there was much more. Requirements for a knife, a sword, or both were very common.

Of course ammunition was mandatory Post-*Heller*, courts have readily accepted that ammunition is part of the right to arms and is likewise subject to the arms rights limits that were articulated in *Heller*.[66] In addition to the

---

[65]  *McDonald*, 561 U.S. at 780 (citations omitted).

[66]  *See, e.g.*, Jackson v. City & Cty. of San Francisco, 746 F.3d 953, 967-68 (9th Cir. 2014) ("the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them") (internal quotations omitted); United States v. Pruess, 703 F.3d 242, 245 (4th Cir. 2012) (treating Supreme Court legal rules about guns as having the same meaning for ammunition); Ezell v. City of Chicago, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."); Herrington v.

KR0235

ammunition that would have to be brought to militia muster, further reserves kept at ammunition were required.[67]

Also mandatory was equipment for the cleaning and carrying of arms and ammunition.  Horsemen had to have certain horse tack, and everyone needed various field gear, such as knapsacks and blankets.

Next, in Part B, we explain the American attitude that prevailed during the seventeenth and eighteenth centuries: part of what makes America different from—and better than—Europe, is that Americans start becoming proficient with arms when they are children.

A. Glossary of arms and accoutrements in militia laws

English spelling did not begin to become standardized until the late eighteenth century, so the reader will find that the statutes spell many of the words below in diverse ways.

The militia statutes required possession of arms (e.g., guns, swords), ammunition, and also equipment for arms—including repair, maintenance, carrying, storage, and home manufacture. The most common term for the other items was *accoutrements*: "Generally defined as a soldier's personal equipment excepting clothes and weapons."[68] These would include "cartridge boxes, pouches, belts, scabbards, canteens, knapsacks, powder horns, etc."[69] They are necessarily part of the Second Amendment right, since

---

United States, 6 A.3d 1237, 1243 (D.C. 2010) (right to ammunition is coextensive with the right to firearms); Andrews v. State, 50 Tenn. (3 Heisk.) 165, 178 (1871) ("The right to keep arms, necessarily involves the right . . . to purchase and provide ammunition suitable for such arms").

[67]   A muster is a periodic assembly of militiamen; the militiamen must prove that they have the certain requisite arms by bringing them the muster.  To "pass muster" is to pass the inspection. A muster would not necessarily involve drill or practice.  As detailed in Part III, some militia statutes required militiamen (and others) to possess reserves of bullets and gunpowder at home, beyond the quantity that would have to be brought to muster.

[68]   GEORGE C. NEUMANN & FRANK J. KRAVIC, COLLECTOR'S ILLUSTRATED ENCYCLOPEDIA OF THE AMERICAN REVOLUTION 8 (1975); *see also Accoutrements Definition*, CHARLES JAMES, AN UNIVERSAL MILITARY DICTIONARY (4th ed. 1816) ("ACCOUTREMENTS, in a military sense, signify habits, equipage, or furniture of a soldier, such as buffs, belts, pouches, cartridge boxes, &c.").
An older, similar term was "furniture," in the sense of furnishing.  For example, the first written guarantee of arms rights in Anglo-American law was the 1606 Virginia charter.  It gave settlers the perpetual right to import "the Goods, Chattels, Armour, Munition, and Furniture, needful to be used by them, for their said Apparel, Food, Defence or otherwise."  7 Federal and State Constitutions Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America 3783, 3786 (Francis Newton Thorpe ed., 1909). As of 1606 (and for long after), the word "armor" included arms.  The word "apparel" in the Virginia Charter had the narrow meaning of equipment for fighting, including defensive clothing, and the broader meaning of other necessities, such as ordinary clothing.

[69]   NEUMANN & KRAVIC, *supra* note 68, at 8.

Electronic copy available at: https://ssrn.com/abstract=3205664

they are necessary to the use of arms.[70] In the same sense, "the freedom of the press" is not just about owning printing presses, but also includes the relevant accessories, such as printing ink, ink magazines, moveable type, etc., and indeed the entire system of gathering, publishing, and distributing periodicals, pamphlets, and books.[71]

### 1.  Firearms ignition systems

*Matchlock*.  When the English settlers began arriving in Virginia in 1607, the predominant ignition system for firearms was the matchlock. When the trigger is pulled, a slow-burning cord is lowered to a small pan (the *priming pan* or *firing pan*).  The lit end of the cord ignites a small quantity of gunpowder in the firing pan.  The flame from the gunpowder travels along a narrow channel to the touch-hole—a small hole next to the main charge of gunpowder, in the gun's barrel.  The flame that enters via the touchhole ignites the main powder charge.

The matchlock was the main type of ignition system in Great Britain during the seventeenth century.[72]  Although the first English settlers came to America with matchlocks, Americans upgraded to more sophisticated guns (flintlocks) much earlier than the British did, because the burning cord makes it much more difficult to have a firearm always ready for immediate use. The

---

70    Constitutional rights thus implicitly protect those closely related acts necessary to their exercise. "There comes a point ... at which the regulation of action intimately and unavoidably connected with [a right] is a regulation of [the right] itself." Hill v. Colorado, 530 U.S. 703, 745, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (Scalia, J., dissenting).  The right to keep and bear arms, for example, "implies a corresponding right to obtain the bullets necessary to use them," Jackson v. City and County of San Francisco, 746 F.3d 953, 967 (C.A.9 2014) (internal quotation marks omitted), and "to acquire and maintain proficiency in their use," Ezell v. Chicago, 651 F.3d 684, 704 (C.A.7 2011). See District of Columbia v. Heller, 554 U.S. 570, 617-618, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (citing T. Cooley, General Principles of Constitutional Law 271 (2d ed. 1891) (discussing the implicit right to train with weapons)); United States v. Miller, 307 U.S. 174, 180, 59 S.Ct. 816, 83 L.Ed. 1206 (1939) (citing 1 H. Osgood, The American Colonies in the 17th Century 499 (1904) (discussing the implicit right to possess ammunition); Andrews v. State, 50 Tenn. 165, 178 (1871) (discussing both rights).  Without protection for these closely related rights, the Second Amendment would be toothless.  Likewise, the First Amendment "right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise." McConnell v. Federal Election Comm'n, 540 U.S. 93, 252, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (Scalia, J., concurring in part, concurring in judgment in part, and dissenting in part).
       The same goes for the Sixth Amendment and the financial resources required to obtain a lawyer…
    Luis v. United States, 136 S. Ct. 1083, 1097-98 (2016) (Thomas, J., concurring).
71    In the Bill of Rights, "the press" and "arms" are synecdoches.  That is, they use a part of a term to refer to the whole—like calling an automobile "my wheels."  "The press" refers not only to printing presses, but also to communications that do not involve a printing press, such as handwritten flyers or television broadcasting.  Likewise, "arms" includes defensive devices (armor) and devices that raise an alarm (literally, a call to arms). *See* David B. Kopel, *The First Amendment Guide to the Second Amendment*, 81 Tenn. L. Rev. 417, 448 (2014).
72    Johnson et al., *supra* note 18, at 140–42.

**KR0237**

Electronic copy available at: https://ssrn.com/abstract=3205664

matchlock's burning cord also impeded concealment in the woods.[73] Matchlocks usually did not work at all in the rain, and only sometimes in the damp.[74]  The safety problem of burning rope near gunpowder is apparent.

The slow-burning cord is called the *match* or *match rope*.[75]  The cord burns on both ends.[76]  When matchlocks were the predominant firearm, militia statutes might also specify the requirement for a sufficient quantity of match, expressed by the total length of match rope.

*Firelock* or *flintlock*.[77]  In a flintlock, the gunpowder is ignited by flint striking a piece of steel and producing sparks.  The steel is a part of the gun.  The flint (which eventually wears out and must be replaced) is held in the jaws of a movable vise that is a part of the gun.

Flintlocks are faster to reload and to fire than matchlocks.  And they are much less likely to *misfire* (fail to ignite).[78]

Many militia statutes from the latter eighteenth century specify that the firearm must be a firelock *or* some more specific type of firearm (e.g., musket, rifle).  This is a violation of the rule against surplusage, since the other type of firearm would still be a flintlock.  The rule against surplusage was not as prominent in eighteenth century drafting as it is today.

*Lock*, *gun lock*.  What we today call the *action* of a firearm.  It is the part of the gun that performs the mechanical work of firing the ammunition.  It has small moving parts that must be carefully fitted to each other.  The distinction between a matchlock and a flintlock was the difference in the lock.

All of the types of guns described in the next section could be either matchlocks or flintlocks (except when specifically noted otherwise).  Matchlocks were the most common in the early seventeenth century, but were subsequently displaced by flintlocks.  As noted above, Americans were

---

[73]  *Id.* at 220.

[74]  *Id.*

[75]  GEORGE C. NEUMANN, BATTLE WEAPONS OF THE AMERICAN REVOLUTION 6 (2011).

[76]  *Id.* at 6-7.  The rope was usually made from flax tow or hemp tow. *Id.*  "Tow" is defined *infra*, text at note 140.  It was soaked in saltpeter (a gunpowder ingredient). The two ends of the cord would be ignited the same way that any other fire was ignited at the time, such as by striking two pieces of metal against each other, or rubbing two sticks to create a spark.  What we call "matches" in the twenty-first century are paper or wood sticks with sesquisulfide of phosphorus attached to the tip.  As common consumer items, they were preceded in the nineteenth century by matchsticks with white phosphorus tips.  The principle was discovered in 1669, but it was not practical to apply due to the difficulty in obtaining phosphorus. *See* Anne Marie Helmenstine, *History of Chemical Matches*, THOUGHTCO. (Jan. 3, 2018), https://www.thoughtco.com/history-of-chemical-matches-606805

[77]  RICHARD M. LEDERER, JR., COLONIAL AMERICAN ENGLISH 88 (1985).

[78]  A well-trained user could fire up to five shots per minute, depending on the gun. W.W. GREENER, THE GUN AND ITS DEVELOPMENT 66-67 (9th ed. 2010); CHARLES C. CARLTON, THIS SEAT OF MARS: WAR AND THE BRITISH ISLES 1585-1746, at 171-73 (2011).  Because ignition time (the interval from when the trigger is pressed until the shot is fired) is shorter for flintlocks, shooting at a moving target became much easier. TOM GRINSLADE, FLINTLOCK FOWLERS: THE FIRST GUNS MADE IN AMERICA 13 (2005).

Electronic copy available at: https://ssrn.com/abstract=3205664

514          Southern Illinois University Law Journal          [Vol. 43

much quicker to adopt flintlocks than were their British cousins. This is one of the many ways that Americans and British arms cultures have diverged since the earliest times.[79]

By the time of the Revolution, the large majority of American and British guns were flintlocks, although presumably there may have been some poorer people whose only gun was an old matchlock.

## 2. Types of firearms

Guns that can fire more than one shot without reloading are called *repeaters*. They were invented in the late sixteenth century, but they were much less common than single-shot guns.[80] Until the second quarter of the nineteenth century, repeaters were much more expensive to produce than single-shot guns. All the guns described below (except for the *blunderbuss*) could be repeaters, but relatively few of them were.

*Musket*. The musket is a long gun which has a smooth *bore* (the interior of the barrel). If the bore is not smooth, but instead has grooves, the firearm is a *rifle*, not a classic musket.[81] Muskets are not highly accurate, but they did not need to be. The standard European fighting method of the time was massed lines of infantry, so a high rate of fire in the enemy's general direction was sufficient.

*Bastard musket*. Shorter and lighter than a standard musket.

---

[79]   *See* JOHNSON ET AL., *supra* note 18, at 171-74, 239-40 (summarizing divergence of American and British arms cultures, in part because Americans adopted much of Indian arms culture).

[80]   *Id.* at 142–44, 223–24; David B. Kopel, *Firearms Technology and the Original Meaning of the Second Amendment*, REASON (Apr. 3, 2017, 9:34 PM), https://reason.com/volokh/2017/04/03/firearms-technology-and-the-or.

[81]   Rifled muskets were invented in the latter part of the 18th century but did not see widespread use by Americans in this period.

KR0239

Electronic copy available at: https://ssrn.com/abstract=3205664

*Snaphaunce*.  An early version of the flintlock.[82]  "During the 17th century, *snaphaunce* commonly referred to any flintlock system."[83]

*Fusee*, *fuse*, *fuze*, *fuzee*, *fusil*.  Often, a synonym for flintlock.[84]  More precisely, "a light, smoothbore shoulder arm of smaller size and caliber than the regular infantry weapon."[85]

*Carbine* or *carabine*.  In the seventeenth century, a long gun with a smaller bore than a musket.  By the eighteenth, also shorter and lighter than a musket.  Well-suited for horsemen.[86]  The word could "denote almost any small-calibre firearm irrespective of barrel length."[87]

*Caliver*.  A matchlock larger than a carbine but smaller than a musket.[88]

The various smaller long guns typically had smaller bores (the empty interior of the barrel).  Their smaller bullets were less powerful but were more aerodynamically stable at longer distance.  Also, the smaller bore meant that a given quantity of lead could produce more bullets for the particular gun.

*Fowling piece*.  A smoothbore long gun well-suited for bird hunting.  In contrast to the classic musket, a fowling piece had a lighter barrel and stock, and its muzzle was slightly flared, to increase the velocity of the birdshot.[89]

---

[82]   PATRICK A. MALONE, THE SKULKING WAY OF WAR: TECHNOLOGY AND TACTICS AMONG THE NEW ENGLAND INDIANS 34 (1991) (explaining that "[t]he true snaphaunce, rarely used in New England" differs from the "true" flintlock in how the cover of the firing pan is connected to the rest of the gun lock. American sources often do not use the different terms with precision.).

"Snaphaunce" may derive from the Dutch word for "chicken thief," based on "the occupation of the inventors." GEORGE CAMERON STONE, A GLOSSARY OF THE CONSTRUCTION, DECORATION AND USE OF ARMS AND ARMOR IN ALL COUNTRIES AND IN ALL TIMES 233 (1999).  The mechanical action of a snaphaunce (and of a flintlock), "resembled the pecking motion of a bird."  BILL AHEARN, MUSKETS OF THE REVOLUTION AND THE FRENCH & INDIAN WARS 98 (2005).  The resemblance "appears to be the origin of the term cock which was the English 18th-century word used for this component." *Id.*

The "cock" (sometimes called the "hammer") is the pivoting part of the flintlock that holds the flint in screw-tightened jaws.  When the trigger is pressed, the cock falls forward so that the flint strikes an immobile piece of hardened steel (the *frizzen*, *steel*, or *battery*).  The collision produces a shower of sparks that fall into the firing pan and ignite the gunpowder. NEUMANN, *supra* note 75, at 7.

To cock a gun is to pull the cock (or today, the hammer) backwards so that it is ready fire. JAMES, *supra* note 68.  The *sear* is an internal part that holds the cock in its backwards position.  The more advanced sears of the eighteenth century had an intermediate position (half-cock) that facilitated loading, without risk of the gun firing.  If the sear malfunctioned and released the cock, then the gun "went off half-cocked."

[83]   NEUMANN, *supra* note 75, at 8 (italics in original).

[84]   STONE, *supra* note 82, at 242; JIM MULLINS, OF SORTS FOR PROVINCIALS: AMERICAN WEAPONS OF THE FRENCH AND INDIAN WAR 53, 65 (2008) (when matchlock muskets, snaphaunces, and true flintlocks were used by European armies, "fusil" or "fire-lock" meant a flintlock musket; by the mid-eighteenth century, "the term 'fusil', 'fuzee' or 'fusee' came to be used by the English to denote a wide variety of light-weight guns.").  "Fusil" was also used to mean "carbines."

[85]   NEUMANN, *supra* note 75, at 19.

[86]   STONE, *supra* note 82, at 163.

[87]   STUART REID, THE FLINTLOCK MUSKET: BROWN BESS AND CHARLEVILLE 1715-1865 (2016).

[88]   STONE, *supra* note 82 at 158.

[89]   J. N. GEORGE, ENGLISH GUNS AND RIFLES 85 (Palladium Press 1999) (1947); GRINSLADE, *supra* note 78, at 5.

**KR0240**

Electronic copy available at: https://ssrn.com/abstract=3205664

During the Revolution, many fowling pieces were employed as militia arms. Ideally, although not always in practice, they would be retrofitted to allow for the attachment of a bayonet.[90]

*Rifle*. A long gun with interior grooves (*rifling*). The grooves make the bullet spin on its axis, greatly improving aerodynamic stability and thus adding considerable range. Little-used in New England prior to the Revolution, but popular elsewhere, especially in frontier areas.

*Pistol*. Any handgun. (Unlike today, when a semi-automatic pistol is distinct from a revolver.) Most handguns of the time were single-shot, although there were some expensive models that could fire multiple shots without reloading.[91] Handguns ranged from large holster pistols to small pocket pistols.[92] They were often carried by officers.[93]

*Blunderbuss.* The name perhaps comes from the Dutch "donder-buse" or "thunder gun."[94] The blunderbuss was notable for its flared muzzle, which made reloading easier while riding on a stagecoach or aboard a water vessel. It could be loaded with a single very large bullet, but the more common load was twenty large pellets, or even up to fifty.[95] It was devastating at close range, but not much use beyond twenty yards.[96] In the Revolution, it was most useful for "street control, sentry duty and as personal officer

---

[90]  GRINSLADE, *supra* note 78, at 5, 54, 63 ("In times of Indian raids or war, the family fowling-piece served the need for a fighting gun."); MULLINS, *supra* note 84, at 49 (The classic fowling piece lacked the musket's swivels for attachment of a sling.).
The first identifiably American-made arms are fowling pieces built in the seventeenth century by Dutch settlers in the Hudson River Valley. AHEARN, *supra* note 82, at 101. As the American fowler evolved, influenced by the English and by immigrant French Huguenot gunsmiths, "The result was the development of a unique variety of American long fowler. These American long guns served as an all-purpose firearm. When loaded with shot, they were suited to hunt birds and small game, and when loaded with a ball, they could provide venison for the table. In times of emergency, they were needed for militia, and more than a few saw service in the early colonial wars as well as the Revolution." *Id.* As a British officer noted after the battles of Lexington and Concord in 1775, ''These fellows were generally good marksmen, and many of them used long guns made for Duck-Shooting.'' FREDERICK MACKENZIE, A BRITISH FUSILIER IN REVOLUTIONARY BOSTON, BEING THE DIARY OF LIEUTENANT FREDERICK MACKENZIE, ADJUTANT OF THE ROYAL WELCH FUSILIERS, JANUARY 5-APRIL 30, 1775, at 67 (Allen French ed., 1926; rprnt. ed. 1969) (quoting an unnamed officer).

[91]  CHARLES WINTHROP SAWYER, FIREARMS IN AMERICAN HISTORY: 1600 TO 1800, at 194-98, 215-16 (1910) (late eighteenth century American pistols with two to four rounds); NEUMANN, *supra* note 75, at 259 (double-barreled pistols used by many French officers).

[92]  LEE KENNETT & JAMES LAVERNE ANDERSON, THE GUN IN AMERICA: THE ORIGINS OF NATIONAL DILEMMA 208-11 (1975).

[93]  NEUMANN, *supra* note 75, at 231, 275 (explaining that most pistols were smoothbores, but some models had rifling).

[94]  D.R. BAXTER, BLUNDERBUSSES 13 (1970); GEORGE, *supra* note 89, at 59.

[95]  GEORGE, *supra* note 89, at 92-93.

[96]  *See* Baxter, *supra* note 94; James D. Forman, The Blunderbuss 1560-1900 (1994).

KR0241

Electronic copy available at: https://ssrn.com/abstract=3205664

weapons."[97]   A blunderbuss could be a very large handgun.[98]   Or it could have a short stock attached and be used as a shoulder arm.

*Horse-pistols.*  "[S]o called from being used of horseback, and of a large size."[99]

*Case of pistols.*  Handguns were often sold in matched pairs.[100]  A "case of pistols" is such a pair.  Also called a "brace of pistols."

*Gun.*  In the usage of the time, any long gun, but not a handgun.

*Peece*, *peice.*  Today, *piece.*  Any firearm.

In the period before the Revolution, most American gunsmiths used imported locks (the moving part of the firearm).[101]  The use of recycled parts was also common.[102]  So, for example, a damaged fowling piece might be repaired with some lock parts scavenged from a musket.  Thus, the above categories of firearms should not be viewed as rigidly divided.  There were many hybrids.[103]  The variety of American firearms and edged weapons was further increased by the fact that America at all times, including after the Revolution, was a major export market for older, surplus European arms— not only from the United Kingdom, but also from Germany, France, Spain, and the low countries; to these would be added firearms scavenged from the various European armies that fought in colonial wars or the American Revolution.[104]

Whatever the specifics of any state or colony's arms requirements, Americans went to war with a very wide variety of personal arms, not always necessarily in precise compliance with the narrowest definitions of arms that might appear in a militia equipment statute.  At Valley Forge in 1777, Baron Von Steuben was encamped with the Continental Army, most of whose members had brought their personal firearms to service.  Von Steuben observed that "muskets, carbines, fowling pieces, and rifles were found in the same company."[105]

---

[97]   NEUMANN, *supra* note 75, at 20.
[98]   *See, e.g., id.*, at 247 ("blunderbuss holster pistol").
[99]   JAMES, *supra* note 68, at 638; *see also* NEUMANN, *supra* note 75, at 263 (American horseman pistol).
[100]  Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 WILLAMETTE L. REV. 699, 709, 719 (2008).
[101]  GRINSLADE, *supra* note 78, at 1, 5, 15, 23-25.
[102]  *Id.*
[103]  ERIK GOLDSTEIN & STUART MOWBRAY, THE BROWN BESS 40-41 (2010); GRINSLADE, supra note 78, at 5, 23 ("The distinction between fowlers and muskets in the eighteenth century was not always clear-cut.  Those manufactured from existing parts shared a common appearance, often combining aspects of both fowler and musket.").  For example, the locks from French muskets that were captured during France's various wars in North America were often recycled into use on American fowlers.
[104]  GEORGE G. NEUMANN, SWORDS & BLADES OF THE AMERICAN REVOLUTION 7, 53 (3d ed. 1991).
[105]  Friedrich Kapp, The Life of Frederick William Von Steuben 117 (2d ed. 1859), https://ia802700.us.archive.org/33/items/lifeoffrederickw00kappuoft/lifeoffrederickw00kappuoft.pdf.

Electronic copy available at: https://ssrn.com/abstract=3205664

### 3. Edged or bladed weapons and accoutrements

Most firearms could fire only one shot, after which the user might have to take several seconds to reload.  So, at close quarters, a firearm would be good for only one shot. If a person carried a pair of pistols (a *brace*), then he or she could fire two shots.  But there would be no time to reload anything more against an adversary who was within arm's reach.  So edged weapons were essential to self-defense.[106]

*Bayonet.*  A dagger or other straight knife that can be attached to the front of a gun.  The word comes from Bayonne, France, the bayonet-manufacturing capital.[107]

The bayonet could be used for all the purposes of any knife.  In European-style combat—and much of the combat of the American Revolution—when the two armies met at close quarters, the bayonet would be attached to the end of the long gun, so that the long gun could be used as spear or pole-arm.  Compared to muskets, rifles were longer, thinner, and more fragile, and thus poorly suited for use with a bayonet.

Some militiamen who lacked bayonets used daggers for up-close fighting.[108]  Typically they had a double-edged blade, about six to ten inches long.[109]

*Knife.*  Same meaning as today.

*Jack knife.*  As today, a folding pocket knife.  Blades could range from three to twelve inches.[110]  Primarily for use as a tool, although available as a last-resort weapon.

*Sword.*  Same meaning as today.  The next four items are types of swords. Some militia statutes required a "sword or hanger" or a "sword or cutlass," or some similar formulation.  Again, this is a violation of the rule against surplusage, but that rule was apparently not much in mind when statutes were drafted in the eighteenth century.

---

[106]  Harold L. Peterson, Arms and Armor in Colonial America 1526-1783, at 69-101 (Dover 2000) (1956).

[107]  Bayonne had long been a manufacturing center for cutlery and weapons.  While it is generally agreed that bayonets were invented around 1640, there are several stories about how the invention happened. Logan Thompson, Daggers and Bayonets: A History 61-62 (1998).  According to one version, "Some peasants of the Basque provinces, whilst on an expedition against a company of bandits, having used all their ammunition, were driven to the desperate necessity of inserting their long knives into the mouths of their arquebuses [an early type of long gun], by which means they routed their adversaries." W.W. Greener, The Gun and Its Development 626 (9th ed. 1910).

[108]  Neumann, *supra* note 104, at 228.

[109]  *Id.* at 229-30.

[110]  *Id.* at 231.  Some jackknives were multitools, also containing forks, saws, heavy needles, or "bleeders" (used to pierce veins in medical treatment). *Id.* at 231, 248.

KR0243

Electronic copy available at: https://ssrn.com/abstract=3205664

*Broad sword.* Has a straight, wide, single-edged blade. "It was the military sword of the 17th century as distinguished from the civil sword, the rapier. It was also the usual weapon of the common people."[111]

*Hanger.* By one definition, a "short sword (blade averaging twenty-five inches) having at least one cutting edge.[112] Alternatively, a lightweight saber.[113] A classic saber has a curved blade, thick back, and a handguard.[114]

*Cutlass* or *cutlash.* In the seventeenth and early eighteenth century, "used interchangeably with the term 'hanger'."[115]

*Simeter.* Today, *scimitar.* Precisely speaking, a sword with a very curved blade that is narrow and thick. Often associated with Persia or the Middle East.[116] In usage of the time, "a short sword with a convex edge."[117]

*Scabbard* or *bucket.* The former remains in modern usage. A container for carrying or storing the sword. Similar to a holster for pistols.

*Belt*, *girdle*, or *strap.* A sword or bayonet could be carried in a waist belt.[118] A belt could also be used for attaching holsters, scabbards, etc. Some equipment could be held by shoulder belts.[119]

*Swivel.* Rings on a firearm to which a sling can be attached.[120]

*Hatchet.* Same meaning as today. "'Axe', 'hatchet', and 'tomahawk' were used interchangeably in America during most of the 18th century."[121]

*Tomahawk.* In a militia context, similar to a hatchet. Before European contact, Indian tomahawks had a stone attached to the end and were used as clubs, but not as cutting tools. Indian-European trade put steel blades into Indian hands, and led to the development of the bladed tomahawk, familiar to viewers of cinematic Westerns.[122] One popular American innovation was the pipe tomahawk, which could be used for smoking as well as cutting.[123]

---

[111] STONE, *supra* note 82, at 150-51.
[112] NEUMANN, *supra* note 104, at 54.
[113] STONE, *supra* note 82, at 280 (also, a Scotch word for dagger).
[114] In the modern sport of fencing, "saber" has a narrower definition. The saber is one of three types of modern fencing swords, the others being épée and foil.
[115] NEUMANN, *supra* note 104, at 58.
[116] STONE, *supra* note 82, at 544 (cross-referencing "scimiter" to "shamshir"), 550-53.
[117] JAMES, *supra* note 68, at 789.
[118] *Id.* at 51.
[119] *Id.* "Girdle" at the time was the same as "belt." LEDERER, *supra* note 77, at 102.
[120] JAMES, *supra note* 68, at 388.
[121] NEUMANN, *supra* note 104, at 253. The "American axe" was smaller than its European ancestor, and better-suited for carrying in a belt. Redesign of the pole, the attachment mechanism, and the blade shape made the American axe sturdier and better suited for chopping. *Id.* at 255-57.
[122] HAROLD L. PETERSON, AMERICAN INDIAN TOMAHAWKS 8-9 (2d ed. 1971).
[123] NEUMANN, *supra* note 104, at 257.

Electronic copy available at: https://ssrn.com/abstract=3205664

*4. Ammunition and related accoutrements*

*Powder.*  All of the gunpowder of the seventeenth and eighteenth centuries was what we today call *blackpowder*.  It is a mixture of sulfur, charcoal, and saltpeter (which comes from decayed animal waste) and can be produced at home.[124]

*Bullets.*  All bullets of the time were spheres.  As described above, most of the guns of the seventeenth and eighteenth centuries were smoothbores.[125]  They could be loaded with either a single bullet (a *ball*, better for long distances) or several smaller pellets (*shot*, better for bird-hunting, and for defense at shorter distances).  Many militia statutes required the possession of "sizeable" bullets.[126]  At the least, this rules out the tiny pellets that would be used for hunting small birds like partridges or doves.

*Swan shot* and *goose shot*.  Multiple large pellets suitable for hunting the aforesaid birds.[127]  Today, used in shotguns.  In the seventeenth and eighteenth century, usable in all smoothbore handguns or long guns, which is to say all firearms except rifles.

*Buck-shot.*  Multiple large pellets for deer hunting.  Today, one of the largest types of shotgun pellets.[128]

*Ramrod.*  Today, the vast majority of new firearms are breechloaders.  They are loaded from the back of the gun, near the firing chamber.  Breechloaders were invented in the mid-seventeenth century, but they were very expensive.[129]  By far the most common guns at the time were muzzleloaders, which are loaded from the front of the gun, the *muzzle*.

To load a muzzleloader, the user first pours gunpowder down the muzzle.  Next, the user uses a pole, the ramrod, to ram the bullet all the way down the barrel.[130]

The ramrod is also used for cleaning a gun and for extracting an unfired bullet, as described below.

*Scour* or *scowerer.*  A ramrod.[131]

*Match.*  The slow-burning cord used to ignite a matchlock.  If quantities are specified, one fathom equals six feet.

---

[124] *See generally* DAVID CRESSY, SALTPETER: THE MOTHER OF GUNPOWDER (2012).  Modern gunpowder, invented in the latter part of the nineteenth century, burns more efficiently, and thus produces much less smoke and residue.

[125] JOHNSON ET AL., *supra* note 18, at 220-23.

[126] *See infra* Parts III.A. (N.J.), B. (Md.), C. (N.C.), E. (N.H.), H. (N.Y.), and J. (Vt.).

[127] *Cf.* R.A. STEINDLER, THE FIREARMS DICTIONARY 250 (1970).  "Swan drops" used for hunting swan weigh 29 grains each and are .268 inches in diameter.  "Goose drops" were smaller than swan drops.  *Id.*

[128] *Id.* at 250 (largest shotgun pellets are "small & large buck shot").

[129] JOHNSON ET AL., *supra* note 18, at 142-44.

[130] STEINDLER, *supra* note 127, at 188 (ramrod is usually wood, but can be metal; also usable as a cleaning tool).

[131] JAMES, *supra* note 68, at 791.

**KR0245**

Electronic copy available at: https://ssrn.com/abstract=3205664

*Wadding*.  Made of tow, hay, or straw.  Rammed into the gun after the powder has been poured, and before the bullet is rammed down, it prevented the powder from scattering.[132]

*Patches*.  Often the bullet would be wrapped in linen or some other fabric.[133]  This made it easier to ram the bullet down the barrel.  The patch also helped to provide a gas seal around the bullet; the seal kept the expanding gas of the gun powder explosion from escaping the barrel before the bullet did.  The expanding gas was thus kept behind the bullet, the better to increase the velocity of the traveling bullet.

*Cartouche, Cartridge*.  Paper cartridges were in use by the mid-seventeenth century.[134]  These were cylinders that contained a premeasured amount of gunpowder, plus the bullet. The user would tear open the cartridge and then pour the powder into the muzzle.  Then the user would ram the bullet down the muzzle.  Although paper cartridges were common at the time of the Revolution, some gun users, including riflemen and many militiamen, still poured in gunpowder from a flask or horn, rather than from cartridges.[135]

*Flints*.  For igniting the powder in a flintlock firearm.  Since the flint is softer than the steel that the flint strikes, it will eventually need to be replaced.[136]  So militia laws often mandated possession of certain quantities of flints.

## 5.  Gun care

To reach all the way down the muzzle and to the bottom of the barrel, cleaning tools would often be attached to the *ramrod* or *scour*, described above.[137]

*Worm*.  A corkscrew-shaped device attached to the end of the ramrod.  Used for cleaning and also for extracting an unfired bullet and other ammunition components from a firearm.[138]

*Brush*.  As in modern gun cleaning, a small brush.

---

[132]  *Id.* at 612.

[133]  *See, e.g.*, JOHN G.W. DILLIN, THE KENTUCKY RIFLE 15, 50, 65 (Palladium Press 1998) (1924); William De V. Foulke, Foreword, in *id.* at vi, viii; GREENER, *supra* note 78, at 623-24.

[134]  REID, *supra* note 87, at 20 (quoting JOHN VERNON, THE YOUNG HORSEMAN 10 (1644)).

[135]  NEUMANN & KRAVIC, *supra* note 68, at 66.

[136]  REID, *supra* note 87, at 33. A properly shaped flint (one that had been well-knapped) would need to be replaced after about ten to fifteen shots. *Id.*

[137]  GOLDSTEIN & MOWBRAY, *supra* note 103, at 53.  The tip of the ramrod would be threaded for attachment of cleaning equipment. *Id.*

[138]  NEUMANN & KRAVIC, *supra* note 68, at 264; STEINDLER, *supra* note 127, at 278. Also, "wormer." LEDERER, *supra* note 77, at 246.

**KR0246**

Electronic copy available at: https://ssrn.com/abstract=3205664

*Wire* or *wier.*  Also, *picker.*  The priming wire was for cleaning the flashpan and the touch hole—the small hole where the fire from the priming pan connected with the main powder charge.[139]

*Tow*.  Tow is a loose ball of coarse and unspun waste fibers from hemp or linen production.[140]  It is used for gun cleaning, for wadding, and for tinder.[141]

*Screw driver*.  This has the same meaning as today.  A screw driver is used for cleaning and repairs, especially for the gun lock.[142]  Also, it can be used to loosen or tighten the cock's jaws in order to change the flint.[143]

## 6. *Arms carrying and storage*

*Holster*.  This has the same modern definition.  A holster is used for carrying a handgun or a short long gun, usually attached to the body by a belt or can be attached to a horse saddle.[144]  Some later statutes specify that the holsters must have bear skin covers.[145]

*Scabbard* or *bucket.*  Similar to a holster.[146]

*Horn*, *powderhorn*, or *flask.*  This is used for gunpowder carrying.[147] For most colonists, the most common horn came from cattle, rams or similar animals.[148]

*Charger*, *shot bag* (or *pouch*, *badge*).  The charger is a bulb-shaped flask for carrying powder, attached to metal components that release a premeasured quantity of powder. [149] *Shot bag/pouch/badge* may refer to this device.[150]  The terms may also refer to bags for carrying bullets.[151]

---

[139]   NEUMANN & KRAVIC, *supra* note 68, at 264.

[140]   *Id.* at 269; MULLINS, *supra* note 82, at 48.

[141]   MULLINS, *supra* note 84, at 48; NEUMANN & KRAVIC, *supra* note 68, at 161, 262.

[142]   MULLINS *supra* note 84, at 48 (explaining that the screwdriver is necessary to remove the lock for cleaning and oiling).

[143]   NEUMANN & KRAVIC, *supra* note 68, at 264.

[144]   *Holster Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com /dictionary/holster (last visited Jan. 13, 2019).

[145]   *See infra* Parts III.E. (N.H.), F. (Del.), and G. (Penn.)

[146]   *Scabbard Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com /dictionary/scabbard#other-words (last visited Jan. 13, 2019); *Bucket Definition*, 1 THE NEW SHORTER OXFORD ENGLISH DICTIONARY 293 (4th ed. 1993) ("4. A (usu. leather) socket or rest for a whip, carbine, or lance.").

[147]   *Powderhorn Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/ dictionary/powder%20horn (last visited Jan. 13, 2019).

[148]   RAY RILING, THE POWDER FLASK BOOK 13 (1953).  See *id*. at 171 for instructions on how to make a horn.

[149]   STONE, *supra* note 82, at 563.

[150]   RILING, *supra* note 148, at 256-57, 430-31.

[151]   *See* MULLINS, *supra* note 84, at 43-44.

KR0247

Electronic copy available at: https://ssrn.com/abstract=3205664

*Cover for the lock*.  As noted above, a *gun lock* (today, it is called the *action*) is the part of the gun that performs the mechanical work of firing the ammunition.[152]  A cover protects the gun lock from the elements.[153]

*Wax*.  This is used to protect firearms from rain.[154]  For example, it can be used to cover the opening of the muzzle and prevent water from entering.[155]

*Cartouche box*.  This is what we call a cartridge box today.  Its purpose is for storage and carrying of cartridges.[156]

*Bandelero* or *cross belt*.  Today, it is referred to as a *bandolier*.  A waist or shoulder belt with attachments for carrying units of ammunition or of premeasured powder, usually in the form of a leather strip worn over the chest, containing cartridges in individual loops.[157]  The cross belt is a pair of crossing strips, or a single belt "passing obliquely across the breast."[158]

*Mould*.  Today, it is called a *mold*.  It is used to cast molten lead into ammunition balls.[159]  This shows that militiamen, and all the other persons subject to arms mandates, were expected to be able to produce their own ammunition.

### 7.  Pole arms

*Pike*.  This is a spear with a thrusting or cutting weapon attached to the end.[160]  European armies of the seventeenth century were usually a mixture of pikemen and musketmen.[161]   The use of pikes declined during the eighteenth century, especially in America.[162]  In the first two years of the Revolution, when some soldiers lacked firearms, pikes were re-introduced for infantry, since they were readily made from locally available materials.[163]

---

[152]   *Glossary of Firearms Related Terms*, THE FIREARMS GUIDE, http://www.thefirearms.guide/glossary (last visited Jan. 13, 2019).

[153]   JAMES, *supra* note 68, at 444 (explaining that a "lock-cover" is "a piece of leather or oil-cloth").

[154]   Doug Wicklund, *Caring for Your Collectible Firearms*, NAT'L RIFLE ASS'N, 2-3, http://www.nramuseum.org/media/1007361/caring%20for%20your%20collectible%20firearms%20by%20doug%20wicklund.pdf (last visited Jan. 13, 2019).

[155]   *Id.*

[156]   RILING, *supra* note 148, at 483.  "Cartouche" is the French word for "cartridge."  Cartouche boxes were used for carrying paper cartridges; these contained the bullet and a measured quantity of gunpowder, wrapped in paper. *Id.*

[157]   STONE, *supra* note 82, at 91-92; NEUMANN, *supra* note 75, at 21.

[158]   *Crossbelt Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/crossbelt (last visited Jan. 13, 2019).

[159]   NEUMANN, *supra* note 75, at 21.  Some molds were for a single bullet, while others could cast multiple bullets. *Id.*

[160]   STONE, *supra* note 82, at 501.

[161]   RODNEY HILTON BROWN, AMERICAN POLEARMS, 1526-1865: THE LANCE, HALBERD, SPONTOON, PIKE, AND NAVAL BOARDING WEAPONS 17-18 (1967).

[162]   *Id.* at 18, 34.

[163]   NEUMANN, *supra* note 104, at 192-93.

Electronic copy available at: https://ssrn.com/abstract=3205664

The pikes used during the Revolutionary War were usually twelve to sixteen feet long, could be anchored in the ground, and were especially useful for defending entrenched positions.[164]

   *Espontoon* or *spontoon.*  This is a six-foot-long pole-arm, similar to a pike but shorter.[165]  It was carried by Revolutionary infantry officers.[166]  "It was an officer's primary weapon, since it allowed him to keep his eyes on the battle at all times … Furthermore, his signals could be seen from a distance in the din and disorder of the battlefield, when voice commands might be indistinguishable."[167]

   *Lance.*  It is a horseman's spear, the same meaning as today.[168]

### 8. Horses and tack accoutrements

   *Dragoon* or *trooper.*  This means a horse-mounted soldier.[169]

   *Saddle.*  This has the same meaning as today.[170]

   *Bridle.*  This also has the same as today.[171]

   *Pillion.*  This refers to a rear extension on a saddle allowing for a second rider.[172]

   *Valise holsters*.  These are saddle-mounted holsters, similar to modern *saddlebags*, that could be used for carrying large handguns.[173]

   *Breastplate*.  Straps that prevent the saddle or harness from sliding. They attach to the front of the saddle.[174]

---

[164]   *Id.* at 193.

[165]   *Id.* at 191.

[166]   *Id.* at 191-92.

[167]   Joseph Mussulman, *Espontoon*, DISCOVERING LEWIS & CLARK, http://www.lewis-clark.org/article/2366 (last visited Jan. 13, 2019) ("For Lewis and Clark the espontoon also served as a walking-stick on rough or slippery terrain, as a prop to steady a rifle for a long shot, and as a weapon. Lewis killed a rattlesnake with his (May 26, 1805), and Clark killed a wolf (May 29, 1805)."); *see also* STONE, *supra* note 82, at 580. *See generally* MERIWETHER LEWIS AND WILLIAM CLARK, THE JOURNALS OF THE LEWIS & CLARK EXPEDITION (Gary Moulton ed. 1983).

[168]   STONE, *supra* note 82, at 407-09. *See generally* BROWN, *supra* note 161.

[169]   LEDERER, *supra* note 77, at 72 (dragoon).  "Whereas cavalry fought on horseback, dragoons scouted, pursued, and moved on horseback, but dismounted to fight." *Id.*  The militia statutes do not appear to have such a precise meaning. Some statutes call anyone with a horse a "dragoon," and other statutes call anyone with a horse a "trooper."  The statutes do not distinguish cavalry from dragoons/troopers.

[170]   *Saddle Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/saddle (last visited Jan. 13, 2019).

[171]   *Bridle Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/bridle (last visited Jan. 13, 2019).

[172]   *Pillion Definition*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/ dictionary/english/pillion (last visited Jan. 13, 2019).

[173]   *Valise Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/valise (last visited Jan. 13, 2019).

[174]   Jane Myers, Horse Safe: A Complete Guide to Equine Safety 83 (2005).

Electronic copy available at: https://ssrn.com/abstract=3205664

*Crupper.*  This has a similar function to a breastplate, except it attaches to the rear of the saddle or harness.[175]  Alternatively, it can be armor for a horse's hind quarters.[176]

*Spurs.*  This definition has remained the same.[177]  Militia statutes might also specify boots suitable for being attached to spurs.

*Hands.*  This is the standard unit of measure for a horse's height.[178]  Today, one hand is equivalent to four inches.[179]  The typical minimum size for a militia horse was 14 or 14 ½ hands (66 or 68 inches).[180]  The measure is from the ground to the horse's withers, the top of its shoulders.[181]

### 9.  Armor

In the early decades of American settlement, when Indians with arrows were the principal opponent, many Americans wore armor on at least part of their bodies.[182]  For purposes of mobility, leather or quilted jackets became popular; they would not always stop an arrow, but they couldmitigate its damage.[183]  Once the Indians acquired firearms in large quantities, armor was generally abandoned.[184]  By the time of the Revolution, most soldiers did not wear armor; the exceptions were body armor for some specialized engineers, and metal headgear for cavalry.[185]

### 10.  Other field gear

*Knapsack, blanket, and canteen.*   These are the same as modern definitions.[186]

---

[175]  *Crupper Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com /dictionary/crupper (last visited Jan. 13, 2019).

[176]  STONE, *supra* note 82, at 195.

[177]  *Spur Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/ dictionary/spur (last visited Jan. 13, 2019).

[178]  *Hand*, ENCYCLOPEDIA BRITANNICA, https://www.britannica.com/science/hand-measurement (last visited Jan. 13, 2019).

[179]  *Id.*

[180]  *See* 1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, BEING THE FIRST SESSION OF THE FIRST CONGRESS-3RD SESSION OF THE 13TH CONGRESS, MARCH 4, 1789–SEPT. 13, 1814, at 814 (1826); Parts III.C. (North Carolina) and III.F. (Delaware) *infra*.

[181]  *Hand*, *supra* note 178.

[182]  PETERSON, *supra* note 106, at 132-42.

[183]  *Id.* at 142-51; *See also id.* at 43 (noting 1645 Massachusetts General Court mandate that every family have "a canvas coat quilted with cotton wool as defense against arrows").

[184]  *Id.* at 149.

[185]  *Id.* at 307-16.

[186]  Knapsack    Definition,    Merriam-Webster    Dictionary,    https://www.merriam-webster.com/dictionary/knapsack (last visited Jan. 13, 2019); Blanket Definition, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/blanket (last visited Jan. 13, 2019);

**KR0250**

Electronic copy available at: https://ssrn.com/abstract=3205664

*Haversack*.  This bag is like a knapsack but carried over only one shoulder.[187]

### B. Types of persons covered by arms mandates

In modern times, when we think about "the militia," we are mainly thinking about males 18 to 45 (or in previous times, 16 to 50 or 60, *infra*). (As used in this article, the ages mean "at least X" and "under Y."  In other words, if the militia was males ages 16 to 50, the militia obligation would begin on a person's sixteenth birthday, and end on his fiftieth birthday.)  Precisely speaking, these enrolled men were a subset of the whole militia—the whole militia consisting of everyone who was able to fight, as detailed in Part I.  The enrolled militiamen had to engage in group drills and might be marched away from home for military service.  In the seventeenth and eighteenth centuries, the scope of persons who were required to possess arms was broader than just the enrolled militia.[188]

The arms requirements for other categories of persons were sometimes contained in statutes with the title "militia," and sometimes in other statutes.[189]  Likewise, statutes requiring that males 16-60 be armed were often but not always titled as "militia" laws.

The categories below explain the different classes of people who might have to be armed.  Examples of the statutory uses of the various terms below will be found in Part III, the survey of seventeenth and eighteenth century militia statutes.

*Trained band*.  This was the term in some states or colonies for the enrolled portion of the militia that is required to participate in training (i.e. males 16 or 18 to 45, 50, or 60).[190]  It could be sent away from home for military missions, although deployments outside the colony or state were disfavored.[191]

The phrase was copied from Elizabethan England.  There, "trained band" referred to a subset of the enrolled militia who received extra training; membership in the English trained band was based on social class. Yeomen—small farmers who owned their own land—could be in the trained band, while lower classes, such as tenants, were not.[192]  In American usage, though, "trained band" or "band," usually refer to the entire enrolled militia.

---

*Canteen   Definition*, MERRIAM-WEBSTER  DICTIONARY,  https://www.merriam-webster.com/dictionary/canteen (last visited Jan. 13, 2019).

[187] *Haversack   Definition*, MERRIAM-WEBSTER  DICTIONARY,  https://www.merriam-webster.com/dictionary/haversack (last visited Jan. 13, 2019).

[188] *See infra* Part III.

[189] *Id.*

[190] *Id.*

[191] *Id.*

[192] JOHNSON ET AL., *supra* note 18, at 110.

**KR0251**

Electronic copy available at: https://ssrn.com/abstract=3205664

One early statute in Maryland did provide extra training for a subset of the enrolled militia.  Unlike in England, this subset was chosen by merit— physical fitness and courage—rather than by class.[193]

*Alarm list.*  This refers to every other male who was capable of fighting. They were required to possess the same specified arms as members of the trained band (i.e., the enrolled militia) but were not required to participate in training or to serve in ordinary expeditions.[194]

Alarm list duty was limited to emergencies, especially, to join in defense of the town or community when under attack.  People on the alarm list were primarily: 1. People with an occupational exemption from trained band service (e.g., physicians in some colonies), or 2. People above the age for trained band service.[195]  For example, someone who was fifty-two years old. Alarm list duty would usually have some upper limit, such as age sixty or seventy.

In practice, when a town was under attack, everyone who could fight would fight, including women and children.[196]

*State armies.*  Although sometimes described as part of the militia, state armies were distinctive in several regards.  State armies were established for temporary periods during wartime.[197]  They fought in Indian Wars, in the numerous wars against the French colonies in America, and the Revolution.[198]

Unlike militia service, state army service was not a universal obligation of every able-bodied male.  State armies were select forces with longer enlistment terms than the ordinary militia.[199]  They were more willing to be deployed to other states or colonies.[200]  To the extent possible, their ranks were filled by volunteers.[201]  To the extent necessary, conscription was used, with each town or other locality having an obligation to supply a certain number of men.[202]  State armies comprised a considerable fraction of

---

[193]  *See infra* Part III.B (1658 statute).

[194]  *See infra* Part III.

[195]  *Id.*

[196]  *See, e.g.*, STEVEN C. EAMES, RUSTIC WARRIORS: WARFARE AND THE PROVINCIAL SOLDIERS ON THE NEW ENGLAND FRONTIER, 1689-1748, at 28-29 (2011).

[197]  JOHNSON ET AL., *supra* note 18, at 226, 281.

[198]  *Id.* at 225, 235, 283.  The wars with the French were the War of the League of Augsburg (1689-97) (known in America as King William's War), the War of the Spanish Succession (1701-13) (Queen Anne's War, in America), and the War of Jenkins' Ear (1741-48) (against France's ally Spain; including an attempted Spanish invasion of Georgia). The latter war blended into the War of the Austrian Succession (1744-48) (King George's War).  Finally, the French & Indian War (1754-63) (known to the British as the Great War for Empire). *Id.* at 245.  For participation by the armies of the various colonies, *see, e.g.*, RENÉ CHARTRAND, COLONIAL AMERICAN TROOPS 1610–1774 (2002) (3 vols.).

[199]  JOHNSON ET AL., *supra* note 18, at 226, 281.

[200]  *Id.* at 226, 281.

[201]  *Id.* at 226-27.

[202]  *Id.* at 194, 226-228, 230.

KR0252

American fighters during the Revolution, fighting alongside the Continental Army and the state militias.[203]

*Householder*, *freeholder, taxable person*, *titheable person.*   Many statutes required that these persons possess arms, whether or not they were enrolled in the militia.

A householder is the head of a house, regardless of sex.[204]  For example, a widow, or any other woman living independently could be a householder.

A *freeholder* owns real property.  A single woman could be a freeholder.

The meaning of "taxable" "titheable" (or tithable) person, varied by jurisdiction; some laws exempted government officials, or "immigrants, indigents, and incapacitated persons."[205]   In Virginia, everyone over 16 except for free white women was titheable (that is, taxable under a head or capitation tax).[206]  The revenue could be used for a colony or state's established church[207]or for secular purposes.[208]

A man aged 65 years old might be too old for the enrolled militia, but he could still be taxable or titheable.  Depending on the laws of the particular colony, he might still be required to possess arms.

A fifty-two-year-old widow maintaining her own household would not be in the enrolled militia or the alarm list but would be required to keep arms as a householder.  Depending on her colony's laws, she might also be a taxable or titheable person.

Accordingly, women were sometimes legally required to possess arms in Massachusetts, Maryland, Delaware, New Hampshire, Vermont, and Connecticut.[209]  Although they were never required to serve in the enrolled

---

[203]   *Id.* at 203, 281, 283.

[204]   *Householder Definition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/householder (last visited Jan. 13, 2019).

[205]   *See* John Witte, Jr., *Tax Exemption of Church Property: Historical Anomaly or Valid Constitutional Practice?* S. CAL. L. REV. 363, 371-72 (1991).

[206]   *See* Terri L. Snyder, *Marriage on the Margins: Free Wives, Enslaved Husbands, and the Law in Early Virginia*, 30 L. & HIST. REV. 141, 166 (2012):
   Local courts were especially anxious to establish accurate lists of all taxable persons in any given jurisdiction.  Throughout the colonial period, definitions of which persons were taxable changed, but by 1723, everyone over the age of 16 was taxable, except for free white women.  And it certainly was the case that individuals concealed their dependents in order to reduce their annual tax burden.  In order to prevent them from so doing, Virginia law required households to provide a list of tithables to the tax collector.
   *See also* James R. Campbell, *Dispelling the Fog about Direct Taxation*, 1 BRIT. J. AM. LEG. STUD. 109, 163 n. 215 (2012) (Massachusetts "poll taxes were imposed on the same set of tithable persons that Virginia and North Carolina taxed").

[207]   *See* Godwin v. Lunan, Jeff. 96, 104, 1771 WL 3, 5 (Va. 1771).

[208]   *See* Commonwealth v. Justices of Fairfax Cty. Court, 4 Va. (2 Va. Cas.) 9, 10 (1815) ("to erect the bridges and causeways in the said mandamus mentioned, and to levy the cost of the same on the tithable persons of the said county of Fairfax").

[209]   *See* Part III, *infra.*

Electronic copy available at: https://ssrn.com/abstract=3205664

militia, they were part of the militia in the broadest sense: all able-bodied persons capable of bearing arms.

*Servants*.  The statutes detailed in Part III sometimes have special rules for servants.  For example, a statute requiring people to provide their own arms may include an exception requiring a master provide his or her servant with arms.  Since the servant was, by definition, not living independently, the servant might be not be able to afford all the necessary arms and accoutrements.  Many servants were free laborers.  They were free persons who entered into voluntary contracts to supply services, such as household help or farm work.

*Indentured servants* were free immigrants who had signed contracts entitling the other party to use or sell their labor for a period of years.[210]  For example, a poor Englishman, Irishman, or German who wished to emigrate to America might receive free passage in exchange for an indenture for several years, four years being most common.[211]  The indenture contract was assignable; the master might use the indented laborer for a while, and then sell the indenture to someone else.[212]  Other indentured servants  were convicted criminals who had been given a choice between execution in England, or transportation to America followed by a period of indentured servitude, usually seven years.[213]  Like slaves, indentured servants were not legally free; they could not marry, travel, or trade without their master's consent.[214]

At the end of an indenture, the former master was usually required to give the former servant "freedom dues"—land, goods, or money allowing the ex-servant to begin independent life.[215]   In Maryland, Virginia, North Carolina, and South Carolina, freedom dues included a gun for male ex-servants.[216]

*Bought servants*.   An indentured servant was also called a "bought servant."[217]  Some militias statutes excluded "bought" or "indented" servants or allowed militia service only with the master's consent.  Presumably, this was to prevent indentured servants from choosing militia service as a means

---

[210]   Mary Sarah Bilder, The Struggle over Immigration: Indentured Servants, Slaves, and Articles of Commerce, 61
        Mo. L. Rev. 743, 752-53 (1996).
[211]   *Id*. at 754-56.
[212]   *Id*. at 758.
[213]   *Id*. at 754, 756-57.
[214]   *Id*. at 758.
[215]   *Id*. at 759.
[216]   OHNSON ET AL., supra note 18, at 185-86.
[217]   See York Freedom Suits (1685-1715), VIRTUAL JAMESTOWN, http://www.virtualjamestown.org/yorkfreedomsuits1685_1715.html (last visited Jan. 13, 2019) (Mar. 24, 1686/7 judgement that plaintiff, "having truely served her Limited time as a bought Servant" of decedent, should be paid her freedom dues out of decedent's estate) (quoting 7 York County Deeds, Orders, and Wills 292).

Electronic copy available at: https://ssrn.com/abstract=3205664

to evade their indenture contracts.  Textually, the "bought servant" statutes did not apply to free laborers, who were hired servants.

*Slaves* were also called "servants" or sometimes "servants for life."[218] Imported slaves were Africans sold by Africans to trans-Atlantic slave traders, following capture in war or kidnapping.[219]  Non-imported slaves were Indians captured in war (often by other Indians, and then sold to the English); their slavery/servitude was not necessarily for life.[220]  Although slaves were bought and sold, the term "bought servant" does not seem to encompass them, at least as the term was used in Pennsylvania.[221]

As Part III details, practices varied about whether indentured servants or slave servants were part of the enrolled militia.  In general, the former were usually included, and the latter usually excluded, but there were exceptions in both directions.

C. "Trained to arms from their infancy"

Firearms were a way of life in early America.  It was common for American children to be familiar with firearms, a circumstance that gave the Americans confidence leading up to the Revolutionary War.  On July 8, 1775, the Continental Congress warned King George III that the Americans' superiority with arms, due to their training beginning in childhood, would make them a formidable foe: "Men trained to Arms from their Infancy, and animated by the Love of Liberty, will afford neither a cheap or easy Conquest."[222]

---

[218]  *E.g.*, Respublica v. Betsey, 1 U.S. (1 Dall.) 469, 470 (Pa. 1789) ("The words 'freemen and free-women,' seem to have been used in opposition to the word 'slaves,' or 'servants for life'") (interpreting Pennsylvania's gradual abolition statute in favor of Betsey's freedom).

[219]  *The Capture and Sale of Enslaved Africans*, INT'L SLAVERY MUSEUM, http://www. liverpoolmuseums.org.uk/ism/slavery/africa/capture_sale.aspx (last visited Jan. 13, 2019) (also noting that some Africans were sold to European traders as criminal punishment or for default on debt); Sheldon M. Stern, *It's Time to Face the Whole Truth About the Atlantic Slave Trade*, HIST. NEWS NETWORK (Aug. 13, 2007), https://historynewsnetwork.org/article/41431.

[220]  *See* Robin v. Hardway, Jeff. 109, 1772 WL 11 (Va. 1772) (noting 1670 Virginia statute "that all servants not being Christians, imported into this country by shipping, shall be slaves for their life time," but "Indians taken in war by any other nation, and by that nation that takes them sold to the English…shall serve, if boys and girls, until thirty years of age, if men and women, twelve years and no longer.").

[221]  *See* Gary B. Nash, *Slaves and Slave Owners in Colonial Philadelphia*, in AFRICAN AMERICANS IN PENNSYLVANIA: SHIFTING HISTORICAL PERSPECTIVES 43, 46 (Joe Trotter & Eric Ledell Smith eds. 1997) (quoting 1756 message from Pennsylvania Assembly to the Governor, complaining about British recruitment of Pennsylvania indentured servants for the British army in the French & Indian War: "If the Possession of a bought Servant…is… rendered precarious…the People [will be] driven to the Necessity of providing themselves with Negro Slaves…").

[222]  1 JOURNALS OF THE AM. CONGRESS FROM 1774-1788, at 106-11 (adopted July 8, 1775) (1823) (emphasis added).

**KR0255**

Electronic copy available at: https://ssrn.com/abstract=3205664

This same argument was asserted by John Zubly, a Savannah minister and recent immigrant from Switzerland.[223]  He warned the British that "In the strong sense of liberty, and the use of firearms almost from the cradle, the Americans have vastly the advantage over men of their rank almost every where else."[224]  He added that American children were "shouldering the resemblance of a gun before they are well able to walk."[225]

Similarly, David Ramsay, a legislator from South Carolina and delegate to the Continental Congress, pointed out that, "Europeans, from their being generally unacquainted with fire arms are less easily taught the use of them than Americans, who are from their youth familiar with these instruments of war."[226]  He noted that "[f]or the defence of the colonies, the inhabitants had been, from their early years, enrolled in companies, and taught the use of arms."[227]

Thomas Jefferson, explained what was going on in America to his Scottish friend: "[w]e are all in arms, exercising and training old and young to the use of the gun."[228]  Once the Revolution began, Jefferson suggested that the reasons American battle casualties were so much lower than British ones was  "our superiority in taking aim when we fire; every soldier in our army having been intimate with his gun from his infancy."[229]

So too was Jefferson.  His father, Colonel Peter Jefferson, taught him to use a firearm at a young age.[230]  When Thomas was 10 years old, his father was confident enough to send the boy into the wilderness alone with nothing but his firearm, to learn self-reliance.[231]  By the time Thomas was 14, his father "had already taught him to sit his horse, fire his gun, boldly stem the Rivanna when the swollen river was 'Rolling red from brae to brae,' and press his way with unflagging foot through the rocky summits of the contiguous hills in pursuit of deer and wild turkeys."[232]

---

[223]  *Zubly, John Joachim*, BIOGRAPHICAL DIRECTORY OF THE U.S. CONGRESS, http://bioguide.congress.gov/scripts/biodisplay.pl?index=Z000015 (last visited Jan. 13, 2019).

[224]  PETER A. DORSEY, COMMON BONDAGE: SLAVERY AS METAPHOR IN REVOLUTIONARY AMERICA 53 (2009).

[225]  *Id.*

[226]  1 DAVID RAMSAY, THE HISTORY OF THE AMERICAN REVOLUTION 181 (Liberty Fund 1990) (1789).

[227]  *Id.* at 178.

[228]  3 Am. Archives 4th Ser. (Clark & Force) 621 (1840).

[229]  Letter from Thomas Jefferson to Giovanni Fabbroni (June 8, 1778), *in* THOMAS JEFFERSON, WRITINGS 760 (Merrill D. Peterson, ed.,1984).  In precise legal usage, "infancy" meant the same as "minority."  The word was not used exclusively in the modern sense, in which an "infant" is younger than a toddler.  As the above quotes indicate, toddler age was when some Americans began learning to use arms.

[230]  *Id.*

[231]  DUMAS MALONE, JEFFERSON THE VIRGINIAN 46-47 (1948) (Vol. 1 of Dumas Malone, Jefferson and His Time).

[232]  HENRY S. RANDALL, 1 THE LIFE OF THOMAS JEFFERSON 14-15 (1865).  The "brae to brae" quote is a verse popularized by Sir Walter Scott. 1 MEMOIRS OF THE LIFE OF SIR WALTER SCOTT, part 4, ch. 2, at 52 (1838).

Electronic copy available at: https://ssrn.com/abstract=3205664

Having valued the firearms training of his childhood, Thomas Jefferson suggested that his 15-year-old cousin, Peter Carr, become similarly acquainted with firearms.[233] Jefferson told Carr that "a strong body makes a strong mind," and recommended two hours of exercise every day. Jefferson continued: "[a]s to the species of exercise, I advise the gun.  While this gives a moderate exercise to the body, it gives boldness, enterprise and independence to the mind. . . . Let your gun therefore be the constant companion of your walks."[234]  "Another nephew tells us that Jefferson believed every boy should be given a gun at the age of ten, as Jefferson himself had been."[235]

The Adamses felt the same way.  "Militiamen on the way to Lexington and Concord stopped at a farm in Braintree, Massachusetts.  To their amusement, 8-year-old John Quincy Adams, son of Abigail and John Adams, was executing the manual of arms with a musket taller than he was."[236]  When John Adams had been a nine-or ten-year-old schoolboy, he loved to engage in sports, "above all, in shooting, to which diversion I was addicted to a degree of ardor which I know not that I ever felt for any other business, study, or amusement."[237]  He would leave his gun by the schoolhouse door, so that he could go hunting as soon as classes ended.[238]

Ordinary people were just as determined to teach the young how to use arms.  John Andrews, an aid to British General Thomas Gage, recounted an incident in which Redcoats were unsuccessfully trying to shoot at a target on the Boston Common.[239]  When an American mocked them, a British officer dared the American to do better.  The American repeatedly hit the target.[240]  As Andrews noted, "The officers as well as the soldiers star'd, and tho't the Devil was in the man.  Why, says the countryman, I'll tell you *naow*.  I have got a *boy* at home that will toss up an apple and shoot out all the seeds as its coming down."[241]

Or in the words of the *Boston Gazette*, "[b]esides the regular trained militia in New-England, all the planters sons and servants are taught to use

---

233   THOMAS JEFFERSON, WRITINGS 816-17 (Merrill D. Peterson ed. 1984).
234   *Id.*
235   Kates, *supra* note 42, at 229 (1983) (citing T. JEFFERSON RANDOLPH, NOTES ON THE LIFE OF THOMAS JEFFERSON (Edgehill Randolph Collection) (1879)).
236   DAVID HACKETT FISCHER, PAUL REVERE'S RIDE 289 (1995).  A manual of arms is a drill in which the gun user presents the firearm or other arm in a series of positions (e.g., right shoulder arms, left shoulder arms, fix bayonet, unfix bayonet, etc.). *Manual of Arms Definition*, VOCABULARY.COM, https://www.vocabulary.com/dictionary/manual%20of%20arms (last visited Jan. 13, 2019).
237   3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 257-59 (Lyman Henry Butterfield ed., 1961).
238   *Id.*  When the schoolmaster told him to stop, he stored the gun at the nearby home of an old woman.  *Id.*
239   Letter dated Oct. 1, 1774, 1 Am. Archives 4th Ser. (Clark & Force) 58-59 (1840).
240   *Id.*
241   *Id.*

**KR0257**

Electronic copy available at: https://ssrn.com/abstract=3205664

the fowling piece from their youth, and generally fire balls with great exactness at fowl or beast."[242]

Later, during the debates on ratification of the Constitution, Virginia's Richard Henry Lee emphasized: "to preserve liberty, it is essential that the whole body of the people always possess arms, and be taught alike, *especially when young*, how to use them."[243]

## III.  THE COLONIAL AND FOUNDING PERIODS

Before we begin a colony-by-colony survey of militia laws, we can summarize some common characteristics of laws among the colonies and states, from the creation of different colonies in the seventeenth or early eighteenth century, through the end of the eighteenth century.

First, the most common age for militia duty was 16 to 50 years.  The maximum often went as high as 60.  The minimum was sometimes 18, and never higher (except for one 19-year period in Virginia).  In 1792, Congress enacted the Uniform Militia Act (hereinafter UMA), to govern militia when called into federal service.  The federal ages were 18 to 45, and several states revised their laws to make the state militia ages conform to the federal militia ages.[244]

The survey below in this Part III includes over 250 different enactments, as colonies and states revised and updated their militia laws.  They also include many instances in which the colony or state enacted a militia statute that by its terms would expire in one year or a few years.  Then, at the appropriate time, the colony would pass a new militia law, with the same terms as the old law.  Because the royal governors, appointed by the king, would control the militia once it was in active service, some colonial legislatures were averse to permanent militia laws, which might give the royal governor too much unilateral power.[245]

The frequent renewals and revisions of colonial and early state militia laws reflect the legislatures' continuing determination that persons over 18-

---

[242]   BOSTON GAZETTE, Dec. 5, 1774, at 4; *See also* HAROLD F. WILLIAMSON: WINCHESTER: THE GUN THAT WON THE WEST 3 (1952) (quoting English visitor to New England in 1774, "in the cities you scarcely find a Lad of 12 years that does not go a Gunning"); DAVID HARSANYI, FIRST FREEDOM: A RIDE THROUGH AMERICA'S ENDURING HISTORY WITH THE GUN 57-58 (2018) (quoting 1760s visitor to the Valley of Virginia: "A well grown boy at the age of twelve or thirteen years was furnished with a small rifle and a shot-pouch. He then became a fort soldier, and has his port-hole assigned him. Hunting squirrels, turkeys and raccoons soon make him expert in the use of his gun.") (citing Daniel Boorstin, *The Therapy of Distance*, 27 AMERICAN HERITAGE (no. 4 June 1976)).

[243]   17 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 363 (John P. Kaminski & Gaspare J. Saladino eds. 1995) (emphasis added).

[244]   Uniform Militia Act, 1 Stat. 271-72 (1792).

[245]   *See, e.g.*, Theodore H. Jabbs, The South Carolina Colonial Militia, 1663-1733 (1973) (unpublished Ph.D. dissertation, U. of N.C. Chapel Hill) (available in ProQuest Dissertations & Theses Global).

Electronic copy available at: https://ssrn.com/abstract=3205664

years-old be well-armed.  The *only* militia law that did not have a minimum age of 18 or less was from Virginia in 1738–57.[246]

 Before discussing militia laws of the colonies and states one-by-one, we should emphasize that the militia was *not* the only institution in which young adults were required to use arms.  Three related duties also required young adults (like other adults) to bring their arms to help protect the community.  All of these had long-established roots in common law.  Sometimes the colonies enacted relevant statutes, but often they simply relied on the common law tradition.

First, all able-bodied men from 15 or 16 to 60 were obliged to join in the "hue and cry" (*hutesium et clamor*) to pursue fleeing criminals.[247] Pursuing citizens were allowed to use deadly force if necessary to prevent escape.[248]

Second, there was "watch and ward"—guard duty for towns and villages.  "Ward" was the daytime activity, and "watch" the nighttime activity.[249]  The patrols would be arranged by a sheriff, constable, justice of the peace, or other official.[250]

Third, there was the *posse comitatus*.  This is the power of the sheriff, coroner, magistrate, or other officials to summon all able-bodied males to assist in keeping the peace.[251]  Posse service could include a few men helping a sheriff serve a writ, or it could include many men helping a sheriff suppress a riot.[252]  The traditional minimum age for posse service was 15 or 16 years; some commentators said the upper age limit was 70, while others said there was no limit.[253]  Shortly before being appointed to the U.S. Supreme Court

---

[246]   *See infra* Part III.K.

[247]   Statute of Winchester, 13 Edward I, chs. 4-6 (1285) (formalizing hue and cry system; requiring all men aged fifteen to sixty to possess arms and armor according to their wealth; lowest category, having less than "Twenty Marks in Goods," must have swords, knives, bows, and other small arms)

[248]   *See* 2 FREDERICK POLLOCK & FREDERIC W. MAITLAND, THE HISTORY OF ENGLISH LAW BEFORE THE TIME OF EDWARD I, at 575-81 (1895); 4 WILLIAM BLACKSTONE, COMMENTARIES *290-91 (describing hue and cry as still in operation); Statute of Winchester, 13 Edward I, chs. 4-6 (1285).

[249]   ELIZABETH C. BARTELS, VOLUNTEER POLICE IN THE UNITED STATES 2 (2014).

[250]   MICHAEL DALTON, OFFICIUM VICECOMITUM: THE OFFICE AND AUTHORITIE OF SHERIF 6, 40 (Lawbook Exchange 2009) (1923) (sheriff's oath includes supervising the watch and ward, by reference to his oath specifically to uphold the Statute of Winchester); WILLIAM ALFRED MORRIS, THE MEDIEVAL ENGLISH SHERIFF 150, 228-29, 278 (1927); WILLIAM LAMBARDE, EIRENARCHA 185, 341 (London, Newbery & Bynneman 1581); FERDINANDO PULTON, DE PACE REGIS & REGNI 153a-153b (Lawbook Exchange 2007) (1609).

[251]   David B. Kopel, The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement, 104 J. CRIM. L. & CRIMINOLOGY 761, 763 (2015).

[252]   See *id*. at 796.

[253]   CYRUS HARRELD KARRAKER, THE SEVENTEENTH-CENTURY SHERIFF: A COMPARATIVE STUDY OF THE SHERIFF IN ENGLAND AND IN THE CHESAPEAKE COLONIES, 1607–1689, at 176-77 (1930) (reprinting an April 29, 1643, warrant for summoning the posse comitatus, applying to persons above the age of sixteen years and "under the age of three score years and able to travel, with such arms or weapons as they have or can provide"); Mordecai M'Kinney, The United States CONSTITUTIONAL MANUAL 260 (Harrisburg, Penn., Hickock & Cantine 1845) (all men above the

Electronic copy available at: https://ssrn.com/abstract=3205664

by President Washington, James Wilson stated in 1790 that "No man above fifteen and under seventy years of age, ecclesiastical or temporal, is exempted from this service."[254]

The *posse* was a vital institution not only in colonial days, but throughout the nineteenth century. As the Supreme Court explained in 1855, a sheriff "may command the *posse comitatus* or power of the country; and this summons, every one over the age of fifteen years is bound to obey, under pain of fine and imprisonment."[255]

The duties of hue and cry, watch and ward, and *posse comitatus* were male only. However, as will be detailed below, some colonies also required arms possession by any householder, regardless of sex. In addition, most of the colonies required arms carrying under certain circumstances, such as when traveling out of town, or when going to public assemblies, especially to church.[256] Usually these laws applied without age limits (i.e., to any able-bodied traveler), or to anyone able to bear arms. Sometimes they applied to militiamen, whose minimum age was 16 or 18.[257]

In short, the age at which Americans were expected to use their own arms to help enforce the law (including by defending themselves) usually was age 15 or 16. These requirements encompassed the vast majority of males, and also included some females. The age at which Americans were expected to bring their own arms to serve in a military capacity, in the militia, usually was 16 or 18.

In the following survey of militia laws, the states are listed in the order that they ratified the Second Amendment.[258]

---

age of fifteen years, "not aged or decrepid"); GEORGE WEBB, THE OFFICE AND AUTHORITY OF A JUSTICE OF PEACE 252 (Williamsburg, William Parks 1736) ("all Males Persons therein, whether Freemen, or Servants, above the Age of 15 Years, and able to travel") (citing LAMBARDE, supra note 250, at 309); EDWARD COKE, 2 INSTITUTES OF THE LAWS OF ENGLAND 194 (Lawbook Exchange 2002) (1628) (ch. 17) ("being above 15 and under 70"); HENRY POTTER, THE OFFICE AND DUTY OF A JUSTICE OF THE PEACE 243 (Raleigh, Joseph Gales 1816); JOHN STEPHEN, SUMMARY OF THE CRIMINAL LAW 46 (Philadelphia, J.S. Littell 1840) (ages fifteen and over, with no upper age limit).

[254]  JAMES WILSON, *Lectures on Law*, *in* 2 COLLECTED WORKS OF JAMES WILSON 1017 (Kermit L. Hall & Mark David Hall eds., 2007) (Ch. VII, "The Subject Continued. Of Sheriffs and Coroners").

[255]  South v. Maryland *ex rel.* Pottle, 59 U.S. (1 How.) 396, 402 (1856).

[256]  NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 183-85 (2d ed. 2017).

[257]  *Id.*

[258]  The colonial and early state laws are available in the Session Laws Library of Hein Online. Many are also available on Google Books or other public Internet sources, as indicated by the URL in the footnote.

Electronic copy available at: https://ssrn.com/abstract=3205664

A.  New Jersey: "all able-bodied Men, not being Slaves … between the Ages of sixteen and fifty Years"

The English took control of what became New Jersey in 1664, ousting the Dutch from their "New Netherland" colony.[259]  New Jersey's first militia act was passed in 1704. It required "[t]hat every Captain within this Province … make a true and perfect List of all the Men … between the Age of Sixteen and Fifty years … Every one of which so listed shall be sufficiently armed with one good sufficient Musquet or Fuzee well fixed, a Sword or Bagonet, a Cartouch-box or Powder-horn, a pound of Powder, and twelve sizeable Bullets."[260]  The next militia act, passed roughly a decade later, kept the same requirements for the arms and ages of militiamen.[261]

A 1722 statute retained the sixteen to fifty ages, while revising the ammunition requirements.[262]  After the 1722 act expired, it was replaced by a 1730 law with the same ages and arms,[263] which was continued in 1739.[264]

On May 8, 1746, a renewed militia act was necessary because America had been drawn into Great Britain's most recent war with France and Spain. Like earlier statutes, the 1746 act set the militia age "between the Age of Sixteen and Fifty Years" and required that each militiaman "be sufficiently armed with one good sufficient Musket or Fuzee well fixed, a Sword or Bayonet, a Cartouch-Box or Powder-Horn," plus bullets and powder.[265]  This act was continued in 1749,[266] 1753,[267] 1766,[268] 1770,[269] and 1771.[270]

Also in 1746, New Jersey passed an act to raise 500 troops for a state army expedition against Canada.[271]  This act made it unlawful for an officer

---

[259]   *A Short History of New Jersey*, NJ.GOV, https://www.nj.gov/nj/about/history/short_history.html (last visited Jan. 13, 2019).

[260]   2 BERNARD BUSH, LAWS OF THE ROYAL COLONY OF NEW JERSEY 49 (1980).  The Act provided an exception for "Ministers, Physitians, School-Masters, Civil Officers of the Government, the Representatives of the General assembly, and Slaves."  This act was continued in 1711. *Id.* at 96 (Sixth Assembly, First Session 6 Dec. 1710 – 10 Feb. 1710/11).

[261]   *Id.* at 133.  This Act repeated the exemptions of the 1709 Act and added an exception for "Millers." *Id.*

[262]   *Id.* at 289 ("three Charges of Powder and three sizeable Bullets").
        The exceptions in the 1722 Act were for "the Gentlemen of his Majestys Council and the Representatives of General Assembly, Ministers of the Gospel, the Civil Officers of the Government, and all Field Officers and Captains that here-to-fore bore Commission in the Militia of this Province, and all that now do or shall hereafter bear such Commission, Physitians, School-Masters, Millers, and Slaves." *Id.*

[263]   *Id.* at 410 (limited to seven years).

[264]   1738/9 N.J. Laws ch. 165 (limited to seven years).

[265]   3 BERNARD BUSH, LAWS OF THE ROYAL COLONY OF NEW JERSEY 5 (1980).

[266]   1749 N.J. Laws ch. 232.

[267]   1753 N.J. Laws ch. 257.

[268]   1766 N.J. Laws ch. 422.

[269]   1770 N.J. Laws ch. 520.

[270]   1771 N.J. Laws ch. 539.

[271]   BUSH, *supra* note 265, at 15.

Electronic copy available at: https://ssrn.com/abstract=3205664

"to inlist any young Men under the Age of Twenty One Years, or any Slaves who are so for Term of Life, bought Servants, or Apprentices, without the Express Leave in Writing of their Parents or Guardians, Masters or Mistresses." [272]   Similarly, during the French & Indian War, acts to raise small groups of state army soldiers (one in 1755[273] and two in 1756[274]) set the minimum age for enlistment for out-of-colony service without consent of a parent, guardian, or master.

Permission from parents or masters was necessary for enlistment in the state army, but not the in-state militia.  A 1757 supplement to the militia act kept the age for militia "between the Age of Sixteen and Fifty Years."[275]

Two decades later, in the midst of the Revolutionary War, New Jersey passed a 1777 militia act, "to defeat the Designs of the *British* Court, and to preserve and defend the Freedom and Independence of the United States of *America*."[276]  "[A]ll able-bodied Men, not being Slaves … between the Ages of sixteen and fifty Years … and [] capable of bearing Arms" constituted the militia.[277]  This act was set to automatically expire after one year.[278]  The following year a new act was put in place. Again, the militia was "all effective Men between the Ages of sixteen and fifty Years."[279]

Near the end of the war, in 1781, New Jersey passed its militia law that would be in place when it ratified the Second Amendment on November 20, 1789:[280]

> And Be It Enacted, That the Captain or Commanding Officer of each Company shall keep a true and perfect List or Roll of all effective Men

---

[272]   *Id*.
[273]   *Id*. at 307.
[274]   *Id*. at 385, 425.
[275]   *Id*. at 502.  The Act excepted "the Gentlemen of his Majesty's Council, the Representatives of the General Assembly, Protestant Ministers of the Gospel of every Denomination and Persuasion, Magistrates, Sheriffs, Coroners, Constables, and all Field Officers, and Captains, who heretofore have, now do, or hereafter shall bear such Commissions; Ferry Men, one Miller to each Grist Mill, bought Servants, and Slaves."
[276]   1776 N.J. *Laws* 26.
[277]   *Id*.
[278]   *Id*.
[279]   1778 N.J. Laws 44-45.  This Act excluded "the Delegates representing this State in the Congress of the United States, the Members of the Legislative-Council and General Assembly, the Judges and Justices of the Supreme and Inferior Courts, the Judge of the Court of Admiralty, the Attorney-General, the Secretary, the Treasurer, the Clerks of the Council and General Assembly, the Clerks of the Courts of Record, the Governor's private Secretary, Ministers of the Gospel of every Denomination, the Presidents, Professors and Tutors of Colleges, Sheriffs and Coroners, one Constable for each Township, to be selected by the Court of Quarter-Sessions of the County, two Ferrymen for each publick Ferry on the Delaware, below the Falls at Trenton, and one for every other publick Ferry in this State, and Slaves."
[280]   1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, BEING THE FIRST SESSION OF THE FIRST CONGRESS-3RD SESSION OF THE 13TH CONGRESS, MARCH 4, 1789–SEPT. 13, 1814, at 313-14 (1826).

Electronic copy available at: https://ssrn.com/abstract=3205664

> between the Ages of sixteen and fifty Years, residing within the District of such Company . . . And Be It Enacted, That every Person enrolled as aforesaid shall constantly keep himself furnished with a good Musket, well fitted with a Bayonet, a Worm, a Cartridge-Box, twenty-three Rounds of Cartridges sized to his Musket, a Priming Wire, Brush, six Flints, a Knapsack and Canteen, under the Forfeiture of Seven Shillings and Sixpence for Want of a Musket, and One Shilling for Want of any other of the aforesaid Articles, whenever called out to Training or Service . . . Provided always, That if any Person be furnished as aforesaid with a good Rifle-Gun, the Apparatus necessary for the same, and a Tomahawk, it shall be accepted in Lieu of the Musket and the Bayonet and other Articles belonging thereto.[281]

The act further required that "each Person enrolled…also keep at his Place of Abode one Pound of good merchantable Gunpowder and three Pounds of Ball sized to his Musket or Rifle…"[282] At least three times a year, a Sergeant would inspect the home of every man between sixteen and fifty to ensure he had the proper "Arms, Accoutrements, and Ammunition."[283]

In 1792, Congress enacted the UMA, organizing the militia of the United States, pursuant to enumerated powers under Article I, section 8, clause 16.[284] It provided a detailed list of equipment and defined the federal militia as free white males aged 18 to 45.[285] (The Act is discussed in Part IV, *infra*.) Over the next several years, most states revised their militia statutes to bring their state militias into conformity with the federal militia. Since individuals were subject to a militia summons from their state or the federal government, the state governments were making it easier for state militiamen to simultaneously comply with federal requirements.

New Jersey was one of the first states to take account of the federal law, enacting a new militia law in 1792.[286] The minimum age was raised to 18, and maximum age lowered to 45.[287] Copying the federal law, New Jersey required that "every non-commissioned Officer and Private of the Infantry (including Grenadiers, Light Infantry and Artillery) until supplied with Ordnance and Field Artillery, shall have a good Musket or Firelock, a sufficient Bayonet and Belt, two spare Flints and a Knapsack, a Pouch with a Box not less than twenty-four Cartridges suited to the Bore of his Musket or Firelock, each Cartridge containing a proper Quantity of Powder and Ball; or with a good Rifle, Knapsack, Pouch and Powder-Horn, twenty Balls suited

---

281  1780 N.J. Laws 42-43.
282  *Id.*
283  1780 N.J. Laws 43.
284  Uniform Militia Act, 1 Stat. 271 (1792).
285  *Id.*
286  1792 N.J. Laws 850.
287  *Id.* at 853.

KR0263

Electronic copy available at: https://ssrn.com/abstract=3205664

to the Bore of his Rifle, and a Quarter of a Pound of Powder; and shall appear so armed, accoutred and provided, when called out to exercise or into Service."[288]

As for commissioned officers, they had to be "armed with a Sword or Hanger and Espontoon."[289]  And for "those of Artillery . . . with a Sword or Hanger, a fuzee, bayonet and belt, and a Cartridge-Box containing twelve Cartridges."[290]  Troops of Horse had to provide themselves with "a Sword and Pair of Pistols."[291]   Light-Horsemen and Dragoons had to provide themselves with "a Pair of Pistols, a Sabre and Cartouch-Box containing twelve Cartridges for Pistols."[292]

A 1797 supplement required the assessor of each town to compare the list of 18-to-45-year-olds in the community to the list of persons enrolled for military duty, and to ensure that everyone 18 and older who was not exempted was keeping the proper arms and fulfilling his militia duties.[293]

A 1799 revision eliminated non-whites from the militia.[294]  Persons who were granted militia exemptions (e.g., physicians, clergy) had to pay a three-dollar annual fee.[295]  In case the militia were "called into actual service," exempted persons too would be liable to serve.[296]

As with all militia acts, there was financial punishment for people who neglected their duties to acquire requisite arms, to meet for training, and to serve.[297]  For militiamen who were "minors, living with their parents, and others having the proper care of charge of them, and those of apprentices," the fines were to "be paid by their respective parents, guardians, masters or mistresses, or levied of their respective goods and chattels."[298]

Military forces of the period used music for morale and for signals during the heat of combat. New Jersey provided rules for voluntary enlistment of military musicians: "any youth of the age of twelve years, and not exceeding the age of eighteen years, shall, with the consent of approbation of his parents, attach himself to any company of militia for the purpose of learning to beat the drum, play on the fife or blow the trumpet."[299]

---

288    *Id.* at 852.
289    *Id.*
290    *Id.*
291    *Id.*
292    *Id.* at 852–53.
293    1797 N.J. Laws 219-20.
294    1799 N.J. Laws 609.
295    WILLIAM PATERSON, LAWS OF THE STATE OF NEW JERSEY 441 (1800).
296    *Id.*
297    *Id.* at 440.
298    *Id.*
299    *Id.* at 448.

Electronic copy available at: https://ssrn.com/abstract=3205664

## B.  Maryland: "his her or their house"

Maryland's arms mandate extended to every head of a house, regardless of sex or age. A 1638/9 act required

> that every house keeper or housekeepers within this Province shall have ready continually upon all occasions within his her or their house for him or themselves and for every person within his her or their house able to bear armes one Serviceable fixed gunne of bastard muskett boare one pair of bandeleers or shott bagg one pound of good powder foure pound of pistol or muskett shott and Sufficient quantity of match for match locks and of flints for firelocks and before Christmas next shall also find a Sword and Belt for every such person as aforesaid.[300]

Further, "every householder of every hundred haveing in his family three men or more able to beare armes shall Send one man completely armed for every such three men and two men for every five and so proportionately."[301]  The act contemplated many persons within a family, including minors, bearing arms.[302]

A 1654 act mandated "that all persons from 16 yeares of age to Sixty shall be provided with Serviceable Armes & Sufficient Amunition of Powder and Shott ready upon all occasions."[303]

In 1658, the Council of Maryland adopted "Instructions directed by the Governor and Councell to the severall Captaines of the respective Commissions."[304]  Captains had to make "a perfect list" of "all persons able to beare Armes within theyr respective divisions that is of all men betweene 16 and 60 yeares of Age."  From that list, the "fittest" people were to be

---

[300] 1 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY OF MARYLAND JANUARY 1637/8—SEPTEMBER 1664, at 77 (William Hand Browne ed, 1883).  For dates in this article, readers should be aware that in the English-speaking countries, the calendar changed from Old Style (Julian) to New Style (Gregorian) in 1752.  Under the Old Style, the New Year began on March 25 (the traditional date of the Annunciation to the Virgin Mary), not January 1.  So, the people of Maryland considered the above date to be 1638, not 1639.  We have generally rendered dates in New Style.  Scholars using Western European date citations between 1582 (when France adopted the New Style calendar) and 1752 should be aware that the days between January 1 and March 24 may be assigned to a different year, depending on the country.  The shift can also move the calendar date as far forward as 11 days; for example, July 1 Old Style can become July 12 New Style.  The shift occurs because New Style remedied the incorrect number of leap year days in Old Style.  New Style omits leap years every 100 years, except for every 400th year.  So, under New Style, there was no leap year day in 1800 or 1900, but there was one in 2000.

[301] Id. at 77-78.

[302] Id.

[303] Id. at 347.

[304] 3 PROCEEDINGS OF THE COUNCIL OF MARYLAND, 1636-1667, at 345 (reprint 1965), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000003/html/am3--345.html (last visited Jan. 13, 2019).

KR0265

Electronic copy available at: https://ssrn.com/abstract=3205664

selected to form the "constant Trayned Band."[305]   In addition, every householder had to provide himself and "every man able to beare Armes in his house" with sufficient ammunition and a well-fixed gun.[306]

Twenty years later, a new militia act kept the ages "between sixteen and sixty yeares of age."[307]   Like its predecessors, it required that each "appeare and bring with him one good serviceable fixed Gunn and six shoots of Powder."[308]   Troopers were required to bring their own horses, and "to find themselves with sword Carbine Pistolls Holsters & Amunition."[309]

The 1681 militia law retained the age and arms requirements,[310] and was continued in 1682.[311]   Ages and arms remained the same in successor acts of 1692,[312] 1695,[313] 1698,[314] 1699,[315] 1704,[316] 1708,[317] 1709,[318] 1711,[319]

---

[305]   *Id.* (basing fitness on "theyr Ability of Body, Estate, & Courage.")

[306]   *Id.*

[307]   7 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, OCTOBER 1678-NOVEMBER 1683, at 53 (1889), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000007/html/am7--53.html (last visited Jan. 13, 2019).

[308]   *Id.* at 54.

[309]   *Id.* at 55.

[310]   *Id.* at 188.

[311]   *Id.* at 438.

[312]   13 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, APRIL 1684-JUNE 1692, at 554 (1894), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000013/html/am13--554.html (last visited Jan. 13, 2019).

[313]   Also, in 1695, Maryland took an additional step to ensure that militiamen maintained the arms they were required to provide themselves, by marking them so they could be identified and so that potential buyers knew not to purchase those arms. 38 ACTS OF THE GENERAL ASSEMBLY HITHERTO UNPUBLISHED 1694-1698, 1711-1729, at 55 (1918), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000038/html/am38--55.html (last visited Jan. 13, 2019).

[314]   1698 Md. Acts 99, https://quod.lib.umich.edu/e/evans/N29557.0001.001/1:9.44?rgn=div2;view=fulltext.

[315]   22 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, MARCH 1697/8-JULY 1699, at 562-63 (1883), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000022/html/am22--562.html (last visited Jan. 13, 2019).

[316]   26 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, SEPTEMBER,1704-APRIL, 1706, at 269-70 (1906), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000026/html/am26--269.html (last visited Jan. 13, 2019).

[317]   27 PROCEEDINGS AND ACTS OF THE GENERAL ASSEMBLY, MARCH,1707-NOVEMBER, 1710, at 370 (1907), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000027/html/am27--370.html (last visited Jan. 13, 2019).

[318]   *Id.* at 483.

[319]   38 ARCHIVES MD. ONLINE, *supra* note 313, at 128.

Electronic copy available at: https://ssrn.com/abstract=3205664

1714,[320] 1715,[321] 1719,[322] 1722,[323] and 1733.[324]

In 1756, Maryland passed another militia act, and kept the militia age at 16 to 60.[325] This act changed the ammunition requirement to "nine Charges of Gun-powder and nine Sizeable Bulletts." Troopers needed to provide themselves with "a pair of good Pistols a good Sword or Hanger half a pound of Gun-powder and twelve Sizeable Bulletts and a Carbine --well fixed with a good Belt Swivel and Buckett."[326]

The Conventions of the Province of Maryland that took place in Annapolis in 1775 and 1776 produced two militia laws. Both Conventions determined "[t]hat every able bodied effective freeman within this province, between sixteen and fifty years of age . . . enroll himself in some company of militia."[327] The 1777 convention retained the new maximum of 50 years and excluded non-whites.[328] A 1778 militia act did not change the ages or arms requirements.[329]

Then in 1781, the legislature passed "An Act to raise two battalions of militia for reinforcing the continental army, and to complete the number of select militia." The minimum age remained sixteen.[330] The new law ordered local governments to draft one or two men to serve the Continental Army. It allowed lieutenants to play favorites: "to ease the good people, from the draught, every free male idle person, above 16 years of age, who is able bodied, and hath no visible means of an honest livelihood, may be adjudged

---

[320]   29 Proceedings and Acts of the General Assembly, Oct. 25, 1711-Oct. 9, 1714, at 437 (1909).

[321]   30 Proceedings and Acts of the General Assembly, April 26, 1715-August 10, 1716, at 277 (1910), Archives Md. Online, http://aomol.msa.maryland.gov/000001/000030/html/am30--277.html (last visited Jan. 13, 2019).

[322]   36 Proceedings and Acts of the General Assembly, July 1727-August 1729 with an appendix of statutes previously unpublished enacted 1714-1726, at 534 (1916), Archives Md. Online, http://aomol.msa.maryland.gov/000001/000036/html/am36--534.html (last visited Jan. 13, 2019).

[323]   34 Proceedings and Acts of the General Assembly, October 1720-1723, at 480 (1914), Archives Md. Online, https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/000001/000034/html/am34--480.html (last visited Jan. 13, 2019).

[324]   39 Proceedings and Acts of the General Assembly, 1733-1736, at 113 (1919), Archives Md. Online, http://aomol.msa.maryland.gov/000001/000039/html/am39--113.html (last visited Jan. 13, 2019).

[325]   52 Proceedings and Acts of the General Assembly, 1755-1756, at 450 (1935), Archives Md. Online, https://msa.maryland.gov/megafile/msa/speccol/sc2900/sc2908/000001/000052/html/am52--450.html (last visited Jan. 13, 2019).

[326]   Id. at 458.

[327]   78 Proceedings of the Conventions of the Province of Maryland, 1774-1776, at 20 (1836), Archives Md. Online, http://aomol.msa.maryland.gov/000001/000078/html/am78--20.html (last visited Jan. 13, 2019); id. at 74.

[328]   An Act to Regulate Militia, 1777 Md. Laws, Ch. XVII, Sec. II (expired in 1785), http://aomol.msa.maryland.gov/megafile/msa/speccol/sc4800/sc4872/003180/html/m3180-0361.html .

[329]   203 HANSON'S LAWS OF MARYLAND 1763-1784, at 192-93 (1787), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000203/html/am203--192.html (last visited Jan. 13, 2019).

[330]   MARYLAND HISTORICAL SOCIETY, 18 ARCHIVES OF MARYLAND: MUSTER ROLLS AND OTHER RECORDS OF SERVICE OF MARYLAND TROOPS IN THE AMERICAN REVOLUTION 1775-1783 at 374 (1900).

**KR0267**

Electronic copy available at: https://ssrn.com/abstract=3205664

a vagrant by the lieutenant, and by such adjudication he is to be considered as an enlisted soldier."[331]

When Maryland ratified the Second Amendment on December 19, 1789,[332] every militia it had ever assembled consisted of men sixteen and older, who provided their own firearms.

The first time Maryland increased its militia age was in 1793, when it modified its laws to align with the federal Uniform Militia Act of 1792. This new militia statute raised the minimum age to eighteen and lowered the maximum age to forty-five.[333]

A 1793 supplement included a provision for a "one complete company of infantry annexed to each regiment within this state, to be furnished with arms and accoutrements at the expense of the state … composed of men between the ages of twenty-one and thirty years."[334] This provision for select companies of infantry did not change the requirement for all other able bodied males between 18 and 45 to enroll in the general militia, and to provide their own personal arms.[335] As the Act explained, "the privates and non-commissioned officers of the said company, as they shall respectively arrive at the age of thirty years, shall be dismissed from the company … and

---

[331]   203 HANSON'S LAWS OF MARYLAND 1763-1784, at 279 (1787), ARCHIVES MD. ONLINE, http://aomol.msa.maryland.gov/000001/000203/html/am203--279.html (last visited Jan. 13, 2019).

[332]   1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, *supra* note 280, at 307-09.

[333]   WILLIAM KILTY, THE LAWS OF MARYLAND: 1785-1799, ch. LIII, at 455 (1800), https://play.google.com/books/reader?id=SZxaAAAAYAAJ&hl=en&pg=GBS.PT447.   There were exemptions for "quakers, menonists and tunkers, and persons conscientiously scrupulous of bearing arms, and the apprentices of their trade." Excusal on grounds of disability required a certificate from "the surgeon of the regiment to which he shall belong, or some reputable physician in his neighbourhood." *Id.* at 460. Quakers, Mennonites, and Dunkers are pacifist Protestant denominations. The Dunkers are also known as the Church of the Brethren and have Baptist roots.

[334]   A Supplement to the Act, Entitled, An Act to Regulate and Discipline the Militia of this State, 1798 Md. Laws, Ch. C, Section XXIII, ARCHIVES MD. ONLINE, http://aomol.msa. maryland.gov/megafile/msa/speccol/sc4800/sc4872/003181/html/m3181-1319.html (last visited Jan. 13, 2019). These state-provided arms were to be used only for militia duty. If used for "hunting, gunning or fowling" or not kept "clean and in neat order," the firearm would be forfeited to the state and the militiaman would be forced to obtain a private firearm, which by comparison, was perfectly legal and expected to be used for non-militia purposes. *Id.* at Ch. C, Section XXX.

[335]   Since the supplemental act did not address the arms requirement established in the original act passed earlier that year, the following provision still applied:

> That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack; a pouch with a box therein, to contain not less than twenty-four cartridges suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and, ball; or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder, and shall appear so armed, accoutred and provided, when called out to exercise or into service.

KILTY, *supra* note 333, ch. LIII, at 455.

Electronic copy available at: https://ssrn.com/abstract=3205664

shall be subject to militia duty in the same manner as other citizens above the age of thirty years."[336]

In 1799, Maryland's final militia act of the eighteenth century copied federal law by calling for "all able bodied white male citizens between 18 and 45 years of age."[337]

C.  North Carolina: Land grants for properly armed persons "above the age of fourteen years"

In 1663, eight noblemen were granted the Carolina territory—which included what is now North Carolina and South Carolina—as a reward for their support of King Charles II as he was "restored" to the throne.  The Charter of Carolina gave these men the authority to "to levy, muster and train all sorts of men, of what condition or wheresoever born … to make war and pursue the enemies."[338]

Pursuant to "Concessions and Agreements" in 1664, "All inhabitants and freemen of Carolina above seventeen years of age and under sixty shall be bound to bear arms and serve as soldiers whenever the grand council shall find it necessary."[339]  To encourage settlement and to ensure that the settlers would be able to protect themselves, land grants were given to every properly armed freeman, every freewoman with an armed servant, plus additional land for each armed person produced who was "above the age of fourteen years" and had "a good firelock or matchlock bore, twelve bullets to the pound, ten pounds of powder, and twenty pounds of bullets."[340]  The Fundamental Constitutions of Carolina in 1669 repeated the 1664 Concessions and Agreements rules for people 17-60.[341]

A 1712 letter from North Carolina's acting Governor Thomas Pollock to Lord John Carteret recalled that "at the last assembly with much struggling we obtained a law that every person between 16 and 60 years of age able to carry arms that would not go out to the war against the Indians, should forfeit and pay £5."[342]

---

[336]   *Id.* at Ch. C, Section XXX.
[337]   1 THOMAS HERTY, A DIGEST OF THE LAWS OF MD. 369 (1799).
[338]   CHARTER OF CAROLINA (Mar. 24, 1663), http://avalon.law.yale.edu/17th_century/nc01.asp.
[339]   AMERICA'S FOUNDING CHARTERS: PRIMARY DOCUMENTS OF COLONIAL AND REVOLUTIONARY ERA GOVERNANCE 232 (Jon L. Wakelyn ed. 2006) (Concessions and Agreements, Jan. 11, 1664) (available on Google Books).
[340]   *Id.* at 210-11.
[341]   1 THE STATE RECORDS OF NORTH CAROLINA 205 (1886).
[342]   *Id.* at 877 (letter of Sept. 20, 1712).  The war was North Carolina and its Indian allies against the Tuscarora Indians and their Indian allies. *See* DAVID LA VERE, THE TUSCARORA WAR: INDIANS, SETTLERS, AND THE FIGHT FOR THE CAROLINA COLONIES (2016).  The Cartaret family were among the proprietors of North Carolina. STEWART E. DUNAWAY, LORD JOHN CARTERET, EARL GRANVILLE: FAMILY HISTORY AND THE GRANVILLE GRANTS IN NORTH CAROLINA 56 (2013).

KR0269

Electronic copy available at: https://ssrn.com/abstract=3205664

The minimum militia age of sixteen was maintained in a 1715 act, declaring that "the Militia of this Governmt. shall consist of all the Freemen within the same between the years of Sixteen years & Sixty."[343]   This included free blacks. Each militiaman had to provide himself with "a good Gun well-fixed Sword & at least Six Charges of Powder & Ball."[344]

The enrollment of all freemen of all colors aged 16 to 60 was retained in a 1740 act.[345]  These freemen had to appear with "a good Gun well fixed and a Sword or Cutlass and at least twelve Charges of powder and Ball or Swan Shot"[346] (Swan shot is large shotgun pellets.)

The next act in 1746 kept the same ages, but included servants in addition to freemen.[347]  It also slightly modified the arms requirement, mandating that each militiaman appear with "a Gun, fit for service, a Cartouch Box, and a Sword, Cutlass, or Hanger [a type of sword], and at least Twelve Charges of Powder and Bail, or Swan Shot, and Six Spare Flints"[348] This act was extended for another five years in 1749,[349] and another three years in 1754.[350]  The 1756 act slightly modified the necessary arms and equipment, specifically requiring tools for gun cleaning.[351]  When this act was amended and continued in 1759, the arms and ages were unchanged.[352]

The 1760 law introduced different arms mandates for mounted militiamen, including a pair of handguns plus a lightweight long gun.  Every trooper (horseman) needed "Holsters, Housing, Breast-Plate and Crupper, a Case of good Pistols, a good Broad Sword, Twelve Charges of Powder, Twelve sizeable Bullets, a Pair of Shoe-Boots, with suitable Spurs, and a Carbine well fixed, with a good Belt, Swivel and Bucket."[353]

---

[343]  1715 N.C. Sess. Laws 29.

[344]  *Id.*

[345]  *An Act for the better Regulating the Militia of this Government*, N.C. OFF. ARCHIVES & HIST., http://www.ncpublications.com/Colonial/editions/Acts/militia.htm (last updated Dec. 31, 2000).

[346]  *Id.*

[347]  An Act for the better Regulating the Militia of this Government, 1746 N.C. Sess. Laws 244, http://docsouth.unc.edu/csr/index.php/document/csr23-0016.

[348]  *Id.*

[349]  An Act for Altering, Explaining, and Continuing an Act, Intituled, an Act for the better Regulating the Militia in this Government, 1749 N.C. Sess. Laws 330, http://docsouth.unc.edu/csr/index.php/document/csr23-0022.

[350]  1754 N.C. Sess. Laws 266, http://docsouth.unc.edu/csr/index.php/document/csr25-0031.

[351]  An Act for the better Regulation of the Militia, and for other Purposes, 1756 N.C. Sess. Laws 334, http://docsouth.unc.edu/csr/index.php/document/csr25-0034 ("a well fixed Gun, and a Cartridge Box, and a Sword, Cutlass or Hanger, and have at least nine Charges of Powder and Ball, or Swan Shot, and three spare Flints, and a Worm and Picker").

[352]  An Act to Amend and Continue an Act, Intituled, an Act for the better Regulation of the Militia, and for other Purposes, 1759 N.C. Sess. Laws 393, http://docsouth.unc.edu/csr/index.php/document/csr25-0040.

[353]  An Act for Appointing a Militia, 1760 N.C. Sess. Laws 521, http://docsouth.unc.edu/csr/index.php/document/csr-0040.  This act was continued later that same year, and again in 1762. An Act to amend and continue an Act intitled An Act for appointing a Militia, 1760 N.C.

Electronic copy available at: https://ssrn.com/abstract=3205664

The militia act of 1764 had similar age and arms requirements, except that swan shot was now mandatory for infantry.[354]  The act was continued in 1766.[355]  Then in 1768, "sizeable Bullets" were restored as an acceptable alternative to swan shot.[356]

The 1770 act eliminated a conscientious objector exemption and ordered "all Male Persons of the people called Quakers, between the age of Sixteen and Sixty" to enlist in the militia.[357]  Additionally, the act provided that "the Father or where there is no Father living, the Mother of each and every Person under the age of Twenty One Years, shall be liable to the Payment of the Fines becoming due from their respective sons so under age."[358]

The 1774 militia act retained the age and arm requirements.[359]  Perhaps reflecting wartime arms shortages, the 1777 act was less specific about particular firearms, requiring only that "each Militia soldier shall be furnished with a good Gun, shot bag and powder horn, a Cutlass or Tomahawk."[360]  The maximum age was reduced: "the Militia of every County shall consist of all the effective men from sixteen to fifty years of age."[361]

With the American Revolution raging, the 1779 act kept the maximum age of 50 and the minimum of 16.[362]  Religious exemptions were restored for "Quakers, Menonists, Dunkards, and Moravians."[363]  "[E]ach Militia Soldier [had to] be furnished with a Good Gun, Shot bag a Cartouch Box or powder Horn, a Cutlass or Tomahawk."[364]

---

Sess. Laws 535, http://docsouth.unc.edu/csr/index.php/document/csr23-0041; 1762 N.C. Sess. Laws 585, http://docsouth.unc.edu/csr/index.php/document/csr23-0043.

[354]  An Act for appointing a Militia, 1764 N.C. Sess. Laws 596, http://docsouth.unc.edu/csr/index.php/document/csr23-0044.

[355]  An Act to amend & Continue An Act, Intitled An Act for Appointing a Militia, 1766 N.C. Sess. Laws 496, http://docsouth.unc.edu/csr/index.php/document/csr25-0049.

[356]  An Act for establishing a Militia in this Province, 1768 N.C. Sess. Laws 761, http://docsouth.unc.edu/csr/index.php/document/csr23-0049.

[357]  An Act for an Addition to, and Amendment of an Act, entitled, An Act for Appointing a Militia, 1770 N.C. Sess. Laws 787, http://docsouth.unc.edu/csr/index.php/document/csr23-0051.

[358]  *Id.* at 788. Similarly, "the master, and where there is no master, the mistress of all such Apprentices and Servants shall be liable to the Payment of Fines becoming Due from their respective Apprentices and Servants." *Id.*

[359]  An Act to Establish a Militia for the Security and Defence of this Province, 1774 N.C. Sess. Laws. 940-41, http://docsouth.unc.edu/csr/index.php/document/csr23-0054.

[360]  An Act to Establish a Militia in this State, 1777 N.C. Sess. Laws 1, http://docsouth.unc.edu/csr/index.php/document/csr24-0001.

[361]  *Id.*

[362]  An Act to Regulate and Establish a Militia in this State, 1779 N.C. Sess. Laws 190, https://docsouth.unc.edu/csr/index.php/document/csr24-0005.

[363]  *Id.* "Menonists" encompasses several Protestant sects who trace their origin to the Dutch pacifist priest Menno Simons.  "Dunkards" derived their name from their practice of full-immersion baptism.  Moravians descend from the early fifteenth century Czech Protestant reformer Jan Hus. Mainly from central Europe, they became pacifist after failed uprisings in the seventeenth century.

[364]  *Id.* at 191.

Electronic copy available at: https://ssrn.com/abstract=3205664

The 1781 act was more flexible on the requisite arms. Infantry needed "a good gun and shot bag, and powder horn or cartouch box, and have sack."[365]  Cavalry troopers needed "a gun, sword, and cartouch box."[366]

The following year, "An Act for Raising troops to compleat the Continental Battalions of this State, and other purposes" was passed.  This was a draft for the Continental Army.  Subject to the draft were "all the inhabitants . . . between the ages of sixteen and fifty."[367]  To prevent the widespread community practice of filling draft ranks with the most vulnerable and least motivated, the act specified that "no British or Hessian deserter who hath not been a resident of this State twelve months, or orphan or apprentice under eighteen years of age, Indian, sailor or negro slave, shall be received as a substitute for any class volunteer or draft whatever."[368]  So a 19-year-old who was drafted could hire an older man to serve as a substitute, but could not hire a 17-year-old orphan.

After the war was over, the 1785 act raised the minimum militia age to 18. Militiamen included "all freemen and indented servants" (but not servants for life, a/k/a slaves).  Militiamen had to arm themselves with "a well fixed gun and cartouch-box, with nine charges of powder made into cartridges and sizeable bullets or swan-shot, and one spare flint, worm and picker."[369]

North Carolina's 1787 militia law[370] was in effect when it ratified the Second Amendment on December 22, 1789.[371]  The militia law kept the militia as "all freemen and indented servants within this State, from eighteen to fifty years of age."[372]  The required arms and equipment were now more specific and varied by role in the militia.[373]

For commissioned officers in the infantry, "side arms" (handguns) "or a spontoon" (a pole arm). For private and non-commissioned officers, a musket or rifle, plus a cartridge box, powder horn, shot pouch "in good condition," "nine charges of powder made into cartridges with sizeable balls

---

[365] An Act to regulate and establish a Militia in this State, 1781 N.C. Sess. Laws 359, http://docsouth.unc.edu/csr/index.php/document/csr24-0010.

[366] *Id.* at 366.

[367] An Act for Raising troops to compleat the Continental Battalions of this State, and other purposes, 1782 N.C. Sess. Laws 413, http://docsouth.unc.edu/csr/index.php/document/csr24-0012.

[368] *Id.* at 414.

[369] An Act for Establishing a Militia in This State, 1785 N.C. Sess. Laws 710, http://docsouth.unc.edu/csr/index.php/document/csr24-0016.

[370] An Act for Establishing a Militia in this State, 1787 N.C. Sess. Laws 813, http://docsouth.unc.edu/csr/index.php/document/csr24-0017.

[371] 1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, *supra* note 280, at 311–12.

[372] An Act for Establishing a Militia in this State, 1787 N.C. Sess. Laws 813, http://docsouth.unc.edu/csr/index.php/document/csr24-0017.

[373] *Id.* at 814.

Electronic copy available at: https://ssrn.com/abstract=3205664

or swan-shot," a spare flint, and one worm and picker.[374]  As for artillerymen, they "shall be armed and accoutred with small arms in the same manner of the infantry, except the non-commissioned officers, who shall have swords instead of fire-arms."[375]

Horsemen, whether officers or privates, needed "a strong, serviceable horse, at least fourteen hands high, with a good saddle, bridle, holsters, one pistol, horseman's sword and cap, a pair of shoe boots and spurs," plus "a proper cartouch-box and cartridges all in good order."[376]

North Carolina's next militia bill, passed on December 29, 1792, conformed to the federal Uniform Militia Act of 1792.  The minimum age remained 18, while the maximum dropped to 45.  The mandatory arms paralleled the federal statute.  Each infantryman was required to "provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, a knapsack, a pouch with a box therein to contain not less than 24 cartridges suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball ; or with a good rifle, knapsack, shot-pouch and powder-horn, 20 balls suited to the bore of his rifle, and a quarter of a pound of powder." [377]

The state's final militia act of the eighteenth century was passed in 1796.  It improved consistency with federal law and kept the previous age and arms requirements.[378]

## D.  South Carolina: "all male persons in this Province, from the age of sixteen to sixty years"

South Carolina was formally separated from North Carolina in 1729 but began making its own laws before that.  Its first militia statute was enacted in 1703.[379]  It included "all and every the inhabitants from the age of sixteen years to sixty."[380]  It required "each person or soldier" to appear "with a good sufficient gun, well fixed, a good cover for their lock, one good cartridge box, with at least twenty cartridges of good powder and ball, and one good belt or girdle, one ball of wax sticking at the end of the cartridge box, to defend the

---

[374]   *Id.*
[375]   *Id.*
[376]   *Id.*
[377]   1792 N.C. Sess. Laws 33, https://babel.hathitrust.org/cgi/pt?id=nc01.ark:/13960/t8sb53g1g; view= 1up;seq=33.
[378]   1796 N.C. Sess. Laws 57, https://babel.hathitrust.org/cgi/pt?id=nc01.ark:/13960/t6n02562t; view= 1up;seq=57.
[379]   9 THE STATUTES AT LARGE OF SOUTH CAROLINA: CONTAINING THE ACTS RELATING TO ROADS, BRIDGES AND FERRIES, WITH AN APPENDIX, CONTAINING THE MILITIA ACTS PRIOR TO 1794, at 617 (David J. McCord ed., 1841),  https://books.google.com/books/about/The_Statutes_at_ Large_ of_South_Carolina.html?id=t7Q4AAAAIAAJ.
[380]   *Id.*

**KR0273**

Electronic copy available at: https://ssrn.com/abstract=3205664

arms in rain, one worm, one wier and four good spare flints, also a sword, bayonet or hatchet."[381]

The arms and age requirements were retained in the 1707 militia act.[382] This act was revived and continued in 1721.[383]  The 1721 act made only minor changes for arms; militiamen now had to bring at least a quarter pound of powder, and only twelve cartridges instead of twenty.[384]  Additionally, troops of horse or dragoons had to provide themselves with "holsters and a pair of pistols, a carbine and sword."[385]  The next act, in 1734, was identical to 1721.[386]

South Carolina's 1737/8 militia act is lost.[387]  A 1739 supplement did make it clear that militia arms were to be kept at home: "all persons who are liable to bear arms, shall constantly keep in their houses such arms, furniture, ammunition and accoutrements."[388]

A 1747 act affirmed that it was "lawful to . . . call together all male persons in this Province, from the age of sixteen to sixty years." It also made "every person liable to appear and bear arms . . . keep in his house, or at his usual place of residence, and bring with him to such muster, exercise or training, one gun or musket, fit for service, a cover for his lock, one cartridge box," twelve cartridges, horn or flask filled with at least a quarter pound of gun powder, a shot pouch with appropriate bullets, "one girdle or belt, one ball of wax . . . to defend his arms in rain, one worm and picker, four spare flints, a bayonet, sword or hatchet."[389]

The next militia act was passed over four decades later, in 1778.[390]  It applied to "all male free inhabitants . . . from the age of sixteen to sixty years."[391] Every militiaman had to "constantly keep in good repair, at his place of abode . . . one good musket and bayonet, or a good substantial smooth bore gun and bayonet, a cross belt and cartouch box" that could hold thirty-six rounds, "twelve rounds of good cartridges," plus "half a pound of spare powder and twenty-four spare rounds of leaden bullets or buck-shot," a cover for the gunlock, wax, worm picker, and "one screw driver or

---

381   *Id.* at 618.
382   *Id.* at 625-26.
383   *Id.* at 631.
384   *Id.* at 632.
385   *Id.* at 639.
386   *Id.* at 641.
387   3 THE STATUTES AT LARGE OF SOUTH CAROLINA 487 (Thomas Cooper, ed., 1838) ("The original not to be found.").
388   9 THE STATUTES AT LARGE OF SOUTH CAROLINA, *supra* note 379, at 643.
389   *Id.* at 645-47.  This act was followed in 1760 by an act establishing and regulating the artillery company that was formed out of the Charleston militia. *Id.* at 664.
390   *Id.* at 666.
391   *Id.* at 672.

Electronic copy available at: https://ssrn.com/abstract=3205664

550          Southern Illinois University Law Journal          [Vol. 43

substantial knife." Instead of the musket plus bayonet, a militiaman could choose "one good rifle-gun and tomahawk or cutlass."[392]

South Carolina's 1782 militia act kept the minimum age at 16 but lowered the maximum age to 50.[393] A temporary act in 1783 left the age and arms requirements unchanged.[394]

The minimum age was raised for the first time in South Carolina's history in the militia act of 1784, which defined the militia when the state ratified the Second Amendment on January 19, 1790.[395] The 1784 act "excused from militia duty, except in times of alarm . . . all persons under the age of eighteen years or above the age of fifty years."[396] Thus, men under 18 or over 50 could still be forced to serve in an emergency.

The necessary arms were revised in 1791. Firearms were "a good musket and bayonet . . . or other sufficient gun."[397] Edged arms were "a good and sufficient small sword, broad sword, cutlass or hatchet."[398] Along with the usual cartouch box, powder horn or flask, shot bag or pouch, spare flint, and ammunition.[399]

Almost exactly one year later, on December 21, 1792, an act[400] was passed that continued the Acts of 1784 and 1791, until the state could "arrange the militia agreeable to the Act of the United States in Congress."[401] The South Carolina militia expressly included free people of every color within the state: "all free negroes and Indians, (nations of Indians in amity with the State excepted,) Moors, mullattoes and mestizoes,[402] between the ages of eighteen and forty-five, shall be obliged to serve in the said militia."[403]

Finally, in 1794, the state organized its militia "in conformity with the act of Congress."[404] The South Carolina militia was "every citizen who shall,

---

[392] *Id.* at 672-73.
[393] *Id.* at 682.
[394] *Id.* at 688.
[395] 1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, *supra* note 280, at 309–11.
[396] 9 THE STATUTES AT LARGE OF SOUTH CAROLINA, *supra* note 379, at 689–90.
[397] *Id.* at 691.
[398] *Id.*
[399] *Id.*
[400] *Id.* at 347-59.
[401] *Id.* at 358.
[402] Mixed-race descent of whites and Indians. The Indian amity language meant that an Indian who lived among South Carolinians was subject to militia duty. Because Indian tribes were legally separate nations, Indians of friendly tribes who lived with the tribe could not be subject to militia duty.
[403] *Id.* at 358.
[404] 8 THE STATUTES AT LARGE OF SOUTH CAROLINA: CONTAINING THE ACTS RELATING TO CORPORATIONS AND THE MILITIA 485 (David J. McCord ed., 1841), https://books.google.com.fj/books?id=4EgUAAAAYAAJ.

Electronic copy available at: https://ssrn.com/abstract=3205664

from time to time, arrive at the age of eighteen years."[405]  It excluded "all persons under the age of eighteen, and above the age of forty-five years."[406]  Additionally, "all free white aliens or transient persons, above the age of eighteen and under the age of forty-five years, who have resided or hereafter shall or may reside in this state for the term of six months [were] subject and liable to do and perform all patrol and militia duty which shall or may be required by the commanding officer" of the district."[407]  The required arms were the same as the federal Uniform Militia Act.[408]

E.  New Hampshire: males under seventy

New Hampshire's first militia act was passed in 1687.[409]  It demanded "that no person whatsoever above Sixteene yeares of age remaine unlisted."[410]  Equipment was "a well fixed musket" with a barrel at least three feet.[411]   The caliber was large: "the bore for a bullett of twelve to the pound."[412]  Also necessary were bandoliers and a cartridge box, plus bullets and powder.[413]  Officers had the option of allowing their men to have "a good pike and sword" instead of the musket.[414]

As for horsemen, "every soldier belonging to the horse" had to bring "a good serviceable horse covered with a good saddle with holsters breastplate and crupper a case of good pistolls and sword and halfe a pound of powder and twenty sizable bulletts . . . And every trooper have at his usuall place of abode a well fixed Carabine with belt and swivel."[415]

The next act, in 1692, changed the militia from all "persons" over sixteen to all males over 16.[416]  For arms, everyone had to be "well provided

---

[405]   *Id.* at 487.
[406]   *Id.* at 492.
[407]   *Id.* at 493.  The "patrol" was the slave patrol—nighttime patrols to catch slaves who were off their master's land, and to search slave quarters for weapons.  The patrol and the militia had separate origins and were legally distinct.  However, as the text indicates, below the Mason-Dixon line, the patrol and the militia were related. *See generally* SALLY E. HADDEN, SLAVE PATROLS: LAW AND VIOLENCE IN VIRGINIA AND THE CAROLINAS (2001).
[408]   8 THE STATUTES AT LARGE OF SOUTH CAROLINA: CONTAINING THE ACTS RELATING TO CORPORATIONS AND THE MILITIA, *supra* note 404, at 498.  This law was supplemented later in 1794, but the supplement did not affect the age limits nor arms requirements. *Id.* at 501-02.
[409]   1 LAW OF NEW HAMPSHIRE: PROVINCE PERIOD 221 (Albert Stillman Batchellor ed., 1904), https://play.google.com/store/books/details?id=YSgTAAAAYAAJ.
[410]   *Id.*
[411]   *Id.*
[412]   *Id.*  That is, one pound of lead would make twelve bullets.  This was slightly larger than .75 caliber, which is 13 round bullets per pound. RED RIVER BRIGADE, http://www.redriverbrigade.com/lead-ball-per-pound/ (last visited Jan. 13, 2019).
[413]   1 LAWS OF NEW HAMPSHIRE: PROVINCE PERIOD, *supra* note 397.
[414]    *Id.*
[415]   *Id.* at 221-22
[416]   *Id.* at 537.

**KR0276**

Electronic copy available at: https://ssrn.com/abstract=3205664

w'th a well fixed gun or fuse," plus "Sword or hatchet."[417]  Along with the typical colonial requirements for gunpowder and bullets, a knapsack, a cartridge box, a powder horn, and flints.[418]

The above had stated how much ammunition the militiaman had to bring when called to muster—the periodic militia inspections for sufficiency of arms.  Besides that, every militiaman had to keep more at home: "every Sooilder Shall have at his habitation & abode one pound of good pouder & twenty Sizable bullets."[419]

A 1704 act did not change the militia ages or arms.[420]  But the following act did. "An Act for the Regulating of the Militia" in 1718 established New Hampshire's first upper militia age limit, providing that "all Male Persons from Sixteen Years of Age to Sixty [] shall bear Arms."[421]

The primary arms mandate applied to "every Listed Souldier and Housholder (except Troopers)."[422]  In other words, the head of a house was required to have the specified arms, even if the head were not militia-eligible.  These arms were "a well fix'd, Firelock Musket, of Musket or Bastard-Musket bore, the Barrel not less than three foot and a half long; or other good Fire-Arms, to the satisfaction of the Commission Officers of the Company."[423]  Now, the mandatory equipment included gun cleaning tools: "a Worm and Priming Wire fit for his Gun."[424]  Mandatory edged arms were "a good Sword or Cutlash."[425]

As for horsemen, they needed "a Carbine, the Barrel not less than Two Foot and half long, with a Belt and Swivel, a Case of good Pistols with a Sword or Cutlash, a Flask or Cartouch Box, One Pound of good Powder, Three Pound of sizeable Bullets, Twenty Flints, and a good pair of Boots, and Spurs."[426]

Acts passed in 1719[427] and 1739/40[428] did not affect the age limits or arms requirements.  A 1754 revision made the parents over persons under twenty-one liable for fines imposed for their sons' militia delinquency or neglect.[429]

---

[417]    *Id.*

[418]    *Id.*

[419]    *Id.*

[420]    2 ALBERT STILLMAN BATCHELLOR, LAWS OF NEW HAMPSHIRE, PROVINCE PERIOD 61-62 (1913), https://play.google.com/store/books/details?id=PbxGAQAAIAAJ.

[421]    *Id.* at 284.

[422]    *Id.* at 285.

[423]    *Id.*

[424]    *Id.*

[425]    *Id.*

[426]    *Id.*

[427]    *Id.* at 347 ("An Act in Addition to the Act for the Regulating the Militia").

[428]    *Id.* at 575 ("An Act in Addition to an Act Entituled, An Act for Regulating the Militia").

[429]    3 LAWS OF NEW HAMPSHIRE, PROVINCE PERIOD 83 (Henry Harrison Metcalf ed., 1915), https://play.google.com/store/books/details?id=n7xGAQAAIAAJ.

**KR0277**

Electronic copy available at: https://ssrn.com/abstract=3205664

Thus, the social expectation of the time was that parents would ensure that their sons sixteen and older had particular guns, swords, and so on, and that the sons would keep the arms in good condition and practice with them.

In 1773, New Hampshire lowered the maximum militia age from 60 to 50, "it having been found by Experience that persons attending after the Age of Fifty Years was not for the Publick advantage."[430]

After the Revolution began, a comprehensive new militia law was enacted.[431]  It retained the recently established age limits of 16 to 50.[432]

Any "good Fire Arm" was acceptable.  Also mandatory was a "good Ramrod."[433]  The latter was used to ram the bullet down the muzzle, into the firing chamber.  It was essential to the use of a muzzle-loading gun.  While some militia statutes specified a ramrod, many left it to implication.  By requiring that a gun be "well fixed" or "good," the less specific statutes implicitly required all appropriate accoutrements, including the ramrod.

For gun cleaning, the worm and priming wire had long been mandated. The new laws had an additional item: a brush.[434]

Two types of edged weapons were needed.  First, "a Bayonet fitted to his Gun."[435]  In close quarters fighting, an infantryman would attach the bayonet to the front of his gun.  Then the gun would be used as a spear.  Since there was a bayonet, there had to be "a Scabbard and Belt therefor."[436]

Besides the bayonet, one additional edged weapon was mandatory: "a Cutting Sword, or a Tomahawk or Hatchet."[437]

The ammunition items were: "Pouch containing a Cartridge Box, that will hold fifteen Rounds of Cartridges at least, a Hundred Buck Shot, a Jack Knife and Tow for Wadding, six Flints, one Pound of Powder, forty Leaden Balls fitted to his Gun."[438]

Finally, field supplies: "Knapsack and Blanket, a Canteen or Wooden Bottle sufficient to hold one Quart."[439]

Persons who were self-sufficient had to supply themselves with the required items.  As for others, "all Parents, Masters, and Guardians, shall

---

[430]   *Id.* at 590.
[431]   4 LAWS OF NEW HAMPSHIRE, REVOLUTIONARY PERIOD 39 (Henry Harrison Metcalf ed., 1916) ("An Act for forming and regulating the Militia within the State of New Hampshire in New England, and for repealing all the Laws heretofore made for that purpose"), https://play.google.com/store/books/details?id=P71GAQAAIAAJ.
[432]   *Id.*
[433]   *Id.* at 42.
[434]   *Id.*
[435]   *Id.*
[436]   *Id.*
[437]   *Id.*
[438]   *Id.*
[439]   *Id.*

Electronic copy available at: https://ssrn.com/abstract=3205664

furnish and equip those of the Militia which are under their Care and Command."[440]

In the War of Independence—for national survival—arms duties were expanded even to 65-year-olds. All men "from Sixteen years of Age to Sixty five" who were *not* part of the militia ("the Training Band") were required to provided themselves the same "Arms and Accoutrements." This applied to men "of sufficient Ability" (able-bodied).[441]

Later, four years into the war, in 1780, New Hampshire enacted a new militia law.[442] The militia was ages sixteen and fifty.[443] The militiamen had to attend musters and drills, and sometimes had to march off to fight in distant locations.

Under the 1780 law, all males under 70 who were capable of bearing arms were put on the "alarm list."[444] This meant that they had to have all the same arms and gear as militiamen.[445] If there were an attack on their town, or nearby, they would come forth with their arms.

The New Hampshire statute reflected a common American practice. Whenever a small town was attacked, everybody who was able to fight as needed, including women, children, and the elderly.[446]

The 1780 firearms requirement was more specific than its 1776 predecessor, requiring "a good Musquet."[447] The bayonet was still mandatory, but a second edged weapon was not.[448] Captains and Subalterns were to be "furnished with a half pike or Espontoon" (pole arms) or a "Fusee [lightweight long gun] and Bayonet and also with a Sword or Hanger."[449]

In 1786, New Hampshire repealed all previous militia laws, and enacted a comprehensive new statute.[450] This was the state's militia law when it ratified the Second Amendment on January 25, 1790.[451] The minimum age remained at 16—where it had been throughout all of New Hampshire's

---

[440] *Id.*

[441] *Id.* at 46.

[442] *Id.* at 273 ("An Act for Forming & Regulating The Militia within this State, and for Repealing All the Laws heretofore made for that Purpose.").

[443] *Id.* at 274.

[444] *Id.* at 276.

[445] *Id.*

[446] *See, e.g.*, STEVEN C. EAMES, RUSTIC WARRIORS: WARFARE AND THE PROVINCIAL SOLDIERS ON THE NEW ENGLAND FRONTIER, 1689-1748, at 28-29 (2011).

[447] *Id.* at 276-77.

[448] *Id.*

[449] *Id.* at 277.

[450] 5 LAWS OF NEW HAMPSHIRE, FIRST CONSTITUTIONAL PERIOD 177 (Henry Harrison Metcalf ed., 1916), https://play.google.com/store/books/details?id=iKkwAQAAMAAJ. An addition to this act was passed in September of 1786, but it did not affect the age limits or arms requirements. *Id.* at 197.

[451] 1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, *supra* note 280, at 303-04.

KR0279

Electronic copy available at: https://ssrn.com/abstract=3205664

history.  The maximum age fell to 40, its lowest yet.[452]  Older men were on the alarm list until age 60.[453]

Arms were the same as in 1780.[454]  As before, militiamen "under the care of parents masters or Guardians" were "to be furnished by them with such Arms and accoutrements."[455]

A 1792 militia law introduced a racial element; the militia consisted of "every free, able bodied white male citizen of this State resident therein who is, or shall be of the age of eighteen years and under the age of Forty years."[456]

The 1792 arms requirements were mostly the same as before, with some additional details.  For example, commissioned officers had to have "a pair of Pistols, the holsters of which to be covered with bear-skin Caps."[457] Commissioned officers might have an espontoon (a pole arm often used for signaling), but field officers would not.[458]  Again, "parents, Masters, or Guardians" had to furnish their charges with "Arms and Accoutrements."[459] And again they were "liable for the neglect and non appearance of such persons . . . under their care."[460]

In 1795 the starting militia age was lowered back to sixteen, where it had been until recently.[461]  Perhaps the 1792 age-eighteen law was in deference to the federal Uniform Militia Act passed earlier that year.  Later, the people decided that they wanted to keep their traditional lower age.

F.  Delaware: "every Freeholder and taxable Person"

First a colony of Sweden and then the Netherlands, Delaware was taken by the English in 1664.  Initially, New York claimed it.  A statute New York passed in 1671 to defend against Indian attacks along the Delaware River became Delaware's first militia act.  It required "That every Person that can

---

[452]   5 LAWS OF NEW HAMPSHIRE, FIRST CONSTITUTIONAL PERIOD, *supra* note 450, at 177.
[453]   *Id.* at 178.
[454]   *Id.* at 180.
[455]   *Id.* at 179.  Also, as usual, "Parents Masters and Guardians shall be liable for the Neglect and Non Appearance of such persons as are under their Care and are liable by Law to train." *Id.* at 181.
[456]   6 LAWS OF NEW HAMPSHIRE, SECOND CONSTITUTIONAL PERIOD 84-85 (N.H. Sec'y of State ed., 1917) (available on Google Books).
[457]   *Id.* at 88.
[458]   *Id.* at 89.
[459]   *Id.*
[460]   *Id.*
[461]   *Id.* at 263-64 ("[E]very free, able bodied, white male citizen of this State resident therein who is or shall be of the age of sixteen years, and under forty years of age, under such exceptions as are made in this act, shall be enrolled in the Militia, and shall in all other respects be considered as liable to the duties of the Militia, in the same way and manner, as those of the age of eighteen years and upwards.  And every citizen enrolled and liable as aforesaid; shall, while under the age of twenty one years be exempt from a poll tax.").
Other additions to the 1792 militia law were enacted in 1793. *Id.* at 110 (assigning certain militia units to regiments), 1795 (*id.* at 279), and 1798 (*id.* at 545).

Electronic copy available at: https://ssrn.com/abstract=3205664

beare Arms from 16 to 60 years of Age, bee allways provided with a convenient proportion of Powder & Bullett fit for Service, and their mutual Defence."[462]

Eventually, Delaware got its own legislature, but the three compact counties were too small to merit a royal governor.  Consequently, the Governor of Pennsylvania was also the Governor of Delaware.  Delaware did not enact a militia statute until 1740.[463]  It required "all the inhabitants and freemen" aged fifteen to sixty-three to "provide and keep . . . a well-fixed firelock or musket," plus ammunition supplies and cleaning tools.[464]

The next year, a new law required males from 17 to 50 years to enlist.  Besides that, everyone else who was living self-sufficiently ("every Freeholder and taxable Person") had to have the same arms as militiamen.[465]

Because "the Subjects of the French King, and their Savage Indian Allies . . . in the most cruel and barbarous Manner, attacked and murdered great Numbers" of colonists, the Assembly of the Counties of New Castle, Kent, and Sussex enacted a militia law in 1756.[466]  This militia law for the French & Indian War was for the people to "assert the just Rights, and vindicate the Honour, of His Majesty's Crown, but also to defend themselves and their Lives and Properties, and preserve the many invaluable Rights and Privileges that they enjoy under their present Constitution and Government."[467]

The militia law covered every male "above Seventeen and under Fifty Years of Age (except bought Servants, or Servants adjudged to serve their Creditors)."[468]  The gun was to be a musket or rifle.[469]  The next year the militia act was extended "so long as the War proclaimed by his Majesty against the French King shall continue and no longer."[470]

After the Revolution began, Delaware enacted several militia statutes in 1778.  The foundational act "establishing a Militia within this State" included "each and every able-bodied, effective, Male white Person between the Ages of Eighteen and Fifty."[471]  Militiamen had to provide their own

---

[462]  George H. Ryden, Delaware—The First State in the Union 103-104 (1938), https://archives.delaware.gov/wp-content/uploads/sites/156/2017/05/DE_Terc_Publications.pdf.

[463]  1 Laws of the State of Delaware 175 (1797), https://play.google.com/store/books/details?id=GXJKAAAAYAAJ).

[464]  Id. at 175, 178.

[465]  Ryden, supra note 462, at 117.  A "freeholder" owned real property.  Single women could be freeholders.  A tenant was not a freeholder, but could be a taxable person.

[466]  Arthur Vollmer, Military Obligation: Delaware Enactments 179 (1947).

[467]  Id.

[468]  Id.

[469]  Id. at 180.

[470]  Ryden supra note 462, at 126.

[471]  AN ACT of the General Assembly of the Delaware State for establishing a militia within the said state, 1778 Del. Acts, March Adjourned Session 3-4.  The several acts from the March 1778 session are separately paginated, so each new act begins on its own page 1.

KR0281

Electronic copy available at: https://ssrn.com/abstract=3205664

"Musket or Firelock with a Bayonet," plus the cartridge box, cartridges, priming wire, brush, and six flints. For 18-to-20-year-olds who could not afford the mandatory arms, the parents had to provide them, if the parents could afford them.[472]

Another law punished people who bought from militiamen the arms or accoutrements that militiamen were supposed to always keep. If the illicit buyer were a man 18 to 50, the punishment could include six months' service in the militia.[473] The third act in 1778 provided regulations for the militia "whilst under Arms or embodied" (i.e., in active service).[474] A 1779 supplement specified the punishment for persons between 18 and 50 who failed to appear for militia duty with the required arms.[475]

A comprehensive new militia act in 1782 included "every able-bodied effective Male white Inhabitant between the Ages of eighteen and fifty years."[476] Again, parents who could afford to had to provide the required arms to persons aged 18-to-20 who could not afford them.[477] Arms were the same as before.[478]

The act that established the militia when Delaware ratified the Second Amendment on January 28, 1790,[479] was passed in 1785.[480] Each white male 18-50 whose taxes were at least twenty shillings a year had to provide equipment "at his own expence."[481] As for apprentices and persons over 18 and under 21, their parent or guardian would provide the arms—*if* the militiaman's estate were at least eighty pounds, or if the parent paid "six pounds annually towards the public taxes."[482]

Arms were "a musket or firelock, with a bayonet," a cartridge box with twenty-three cartridges, "a priming wire, a brush and six flints, all in good order." [483] Fines for neglect were to be paid by militiamen "of full age or by the parent or guardian of such as are under twenty-one years."[484] The

---

[472]  *Id.* at 4-5.
[473]  An Act against Desertion, and harboring Deserters, or dealing with them in Certain Cases, 1778 Del. Acts Mar. Adjourned Sess. 1-3.
[474]  Rules and Articles, for the better regulating of the militia of this State, whilst under Arms or embodied, 1778 Del. Acts Mar. Adjourned Sess. 1.
[475]  A Supplement to an Act, intitled, An Act for establishing a Militia within this State, 1778 Del. Acts Oct. Regular Sess. 14.
[476]  AN ACT for establishing a Militia within this State, 1, Jan. Adjourned Sess. 1782, http://heinonline.org/HOL/P?h=hein.ssl/ssde0069&i=1.
[477]  *Id.* at 3.
[478]  *Id.*
[479]  1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, *supra* note 280, at 307.
[480]  An Act for Establishing a Militia, 1785 Del. Acts. May Adjourned Sess. 11.
[481]  *Id* at 13.
[482]  *Id.*
[483]  *Id.*
[484]  *Id.*

Electronic copy available at: https://ssrn.com/abstract=3205664

guardian could charge his ward for the expense when the time came for "settling the accounts of his guardianship."[485]

Like most states, Delaware enacted a new militia law after the federal Uniform Militia Act passed in 1792. Delaware's 1793 act included "each and every free able bodied white male citizen of this state, who is or shall be of the age of eighteen years, and under the age of forty-five years."[486] However, "all young men under the age of twenty-one years, and all servants purchased *bona fide*, and for a valuable consideration, [were] exempted from furnishing the necessary arms, ammunition and accoutrements . . . and [were] exempted from militia duties and fines during such minority or servitude, except in cases of rebellion, or an actual or threatened invasion."[487]

In other words, servants and males 18 to 20 would not be fined if they did not participate in drills. Additionally, they would not be fined if they lacked the requisite equipment. Of course, if they wanted to keep arms and train, they could.

Required arms mostly tracked the federal law, with some more detail for horsemen.[488]

A 1796 supplement revised the organization and regulation of the militia, and again included able-bodied white males from 18 to 45.[489] The act also forbade volunteer militias, because there were "a number of free able bodied white men in this state, between the ages of eighteen and forty-five years, who neglect and refuse to muster and do militia duty, in the companies

---

[485]   *Id.*

[486]   2 LAWS OF THE STATE OF DELAWARE 1134 (1797), https://babel.hathitrust.org/cgi/pt?num=1134&u=1&seq=641&view= image&size=100&id=njp.32101042903870&q1=twenty-one.

[487]   *Id.* at 1135. In other words, hired servants were part of the enrolled militia. Indentured servants were not, except in emergencies. Textually, slaves were "purchased…for a valuable consideration," but we are not certain whether they too would be part of the militia during an emergency. *Cf. supra* note 221 (distinguishing "bought" servants from African slaves).

[488]   *Id.* at 1136.

   [E]very non-commissioned officer and private of the infantry (including grenadiers and light infantry, and of the artillery shall have a good musket or firelock, a sufficient bayonet and belt, two spare flints and a knapsack, a pouch, with a box therein to contain not less than twenty-four cartridges suited to the bore of his gun, each cartridge to contain a proper quantity of powder and ball, or with a good rifle, knapsack, shot pouch and powder horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; the commissioned officers of the infantry shall be armed with a sword or hanger, and an espontoon, and those of artillery with a sword or hanger, a fuzee, bayonet and belt, and a cartridge box to contain twelve cartridges; the commissioned officers of the troops of horse shall furnish themselves with good horses of at least fourteen hands and a half high, and shall be armed with a sword and pair of pistols, the holsters of which shall be covered with bear skin caps; each light-horseman or dragoon shall furnish himself with a serviceable horse at least fourteen hands and an half high, a good saddle, bridle, mail pillion and valise holsters, and a breast plate and crupper, a pair of boots and spurs, a pair of pistols, a sabre, and cartouch box to contain twelve cartridges for pistols; the artillery and horse shall be uniformly clothed in regimentals, to be furnished at their own expence.

[489]   *Id.* at 1225.

KR0283

Electronic copy available at: https://ssrn.com/abstract=3205664

in which they have been enrolled . . . and yet meet together with arms in bodies distinguished and known by the name of Volunteer Companies."[490]

Delaware's hostility to volunteer companies was not the national norm. In fact, the federal Uniform Militia Act expressly recognized independent volunteer companies.[491]  The UMA set forth the conditions and regulations for independent militia service in the federal militia.[492]

Delaware passed its final militia act of the eighteenth century in 1799.[493] The scope of the militia remained the same.[494]  The arms were mostly the same: for the infantryman, "a good musket" plus a bayonet, or "a good rifle." Commissioned officers needed "a sword or hanger, a fusee, bayonet," and troopers had to be "armed with a sabre and pair of pistols." [495]

Men 18 to 20 were again exempted from fines for non-performance of militia duties "during such minority, except in cases of rebellion or any actual invasion of this State."[496]

G.  Pennsylvania: No service "without the consent of his or their parents or guardians, masters or mistresses"

In the days when Pennsylvania was claimed by New York, a 1671 law required "every person that can bear arms from 16 to 60 years of age, be always provided with a convenient proportion of powder and bullet fit for service, and their mutual defence."[497]  This meant "at least one pound of powder and two pounds of bullet."[498]  As backup to insufficient armament by the people, "his Royal Highness' Governor [N.Y. Gov. Francis Lovelace] is

---

[490]   *Id.* at 1234 (noting that besides the concern about the state militia, Delaware also worried about "the assembling of large bodies of armed men, who do not acknowledge, and refuse to submit to, the legal military establishment.").

[491]   More effectually to provide for the National Defence by establishing an Uniform Militia throughout the United States (Uniform Militia Act) (UMA), 1 Stat. 271, 274, §§ 10-11.

[492]   *Id.* (providing "And whereas sundry corps of artillery, cavalry, and infantry now exist in several of the said states, which by the laws, customs, or usages thereof have not been incorporated with, or subject to the general regulations of the militia: SEC. 11. Be it enacted, That such corps retain their accustomed privileges, subject, nevertheless, to all other duties required by this Act, in like manner with the other militia").

[493]   An Act to Establish an Uniform Militia throughout this State, 3 Del. Laws 82 (1798), https://babel. hathitrust.org/cgi/pt?q1=militia;id=njp.32101042904340;view=image;seq=88;start=1;sz=10;page =search;num=82.

[494]   *Id.*

[495]   *Id.* at 84-85.  Unlike muskets or fowling pieces, rifles of the time were too fragile to use with bayonets.

[496]   *Id.* at 84.

[497]   *Ordinances for Defence*, in DUKE OF YORKE'S BOOK OF LAWS 450 (1664), https://babel.hathitrust.org/cgi/pt?q1=ARMS;id=hvd.32044022680946;view=image;start=1;sz=10 ;page=root;size=100;seq=466;num=450.

[498]   *Id.*

Electronic copy available at: https://ssrn.com/abstract=3205664

willing to furnish them out of the magazine or stores, they being accountable and paying for what they shall receive, to the Governor or his order."[499]

Five years later, it was mandated that:

> Every Male within this Goverment from Sixteen to Sixty years of age, or not freed by public Allowance, shall if freeholders at their own, if sons or Servants at their Parents and Masters Charge and Cost, be furnished from time to time and so Continue well furnished with Armes and other Suitable provition hereafter mentioned . . . Namely a good Serviceable Gun, allowed Sufficient by his Military Officer to be kept in Constant fitness for present Service, with a good sword bandeleers or horne a worme a Scowerer a priming wire Shott Badge and Charger one pound of good powder, four pounds of Pistol bullets or twenty four bullets fitted to the gunne, four fathom of Serviceable Match for match lock gunn four good flints fitted for a fire lock gunn.[500]

As for horsemen, their mandatory arms were "Holsters, Pistolls, or Carbine, and a good Sword."[501]

Pennsylvania became a separate colony in 1681, following a royal grant to the Quaker aristocrat William Penn.[502]  Early Pennsylvania was the only colony without an organized functional militia.[503]  Political power was in the hands of Quakers, many of whom (not all) were pacifists.[504]  Additionally, the Quakers had generally non-violent relations with Indians, and thus less need for collective self-defense.[505]

However, after the French & Indian War began in 1754, George Washington raised and paid for an army of Virginians to fight the French in the Ohio River Valley, and attitudes began to change.[506]  Because of non-Quaker immigration, Quaker hegemony over Pennsylvania politics had been challenged in the previous decades.[507]  Then in 1755 Pennsylvania passed an

---

[499] *Id.*
[500] CHARTER TO WILLIAM PENN, AND LAWS OF THE PROVINCE OF PENNSYLVANIA, PASSED BETWEEN THE YEARS OF 1682 AND 1700, PRECEDED BY DUKE OF YORK'S LAWS IN FORCE FROM THE YEAR 1676 TO THE YEAR 1682, at 39 (1676).
[501] *Id.* at 43.
[502] *Pennsylvania History 1681-1776: The Quaker Province*, PA. HIST. & MUSEUM COMMISSION, http://www.phmc.state.pa.us/portal/communities/pa-history/1681-1776.html (last visited Jan. 13, 2019).
[503] *Id.*
[504] DAVID B. KOPEL, THE MORALITY OF SELF-DEFENSE AND MILITARY ACTION: THE JUDEO-CHRISTIAN TRADITION 384-89 (2017) (describing diverse Quaker views on defense of self and others, during and before the American Revolution).
[505] PAUL A.W. WALLACE, INDIANS IN PENNSYLVANIA 142-46 (2d ed. 2005); *see also*, Thomas J. Sugrue, *The Peopling and Depeopling of Early Pennsylvania: Indians and Colonists, 1680-1720*, 116 PA. MAG. HIST. & BIO. 3 (Jan. 1992) (explaining the relationship of Penn's settlers with the Indians as, although not typically characterized by war, not always idyllic and generous).
[506] WALLACE, *supra* note 505, at 147-59.
[507] JACK D. MARIETTA, THE REFORMATION OF AMERICAN QUAKERISM, 1748-1783, at 132-22 (2007).

Electronic copy available at: https://ssrn.com/abstract=3205664

act to formalize voluntary militias wanting to defend the colony.[508]  The 1755 militia law explained the assembly was respecting the conscience rights of Quakers (most of whom were unwilling to fight) *and* the conscience rights of people of other faiths, who did want to join in associations for community defense.[509]

Minors and indentured servants could not join the new militia without the consent of their superiors: "no youth under the age of twenty-one years nor any bought servant or indented apprentice shall be admitted to enroll himself or be capable of being enrolled in the said companies or regiments without the consent of his or their parents or guardians, masters or mistresses, in writing under their hands first had and obtained."[510]  Later in 1755, as the pressures of war were growing, the assembly adopted a non-binding resolution "that it be recommended to all male white persons within this province, between the ages of sixteen and fifty years, who have not already associated, and are not conscientiously scrupulous of bearing arms, to join the said [militia] association immediately."[511]

Five months later, Pennsylvania imposed a special tax on "every male white person capable of bearing arms, between the ages of sixteen and fifty years" who had *not* joined a militia.[512]  This penalty was reaffirmed by "Resolutions directing the Mode of Levying Taxes on Non-Associators in Pennsylvania" two months later.[513]  Finally, the entire militia act was repealed on July 7, 1756.[514]

In 1755, and the first half of 1756, Quakers had been under pressure.[515]  They were willing to pay taxes in general, knowing that some of the revenue would be used for military activity.[516]  Most of them were pacifists, and they were not only unwilling to fight, but they were also unwilling to pay a special tax levied on them for not fighting, especially because they knew the tax would be used for the military.[517]

---

[508]   5 The Statutes at Large of Pennsylvania from 1682-1801, at 197 (1898), https://babel.hathitrust.org/cgi/pt?view=image;size=125;id=mdp.39015050623548;q1=militia;page=root;seq=203;num=197;orient=0.

[509]   *Id.* (The act began: "Whereas this province was first settled by (and a majority of the assemblies ever since been of) the people called Quakers, who, though they do not, as the world is now circumstanced, condemn the use of arms in others, yet are principled against bearing arms themselves."  The militia/associator statute was non-compulsory for everyone: "for them by any law to compel others to bear arms and exempt themselves would be inconsistent and partial").

[510]   *Id.* at 200.

[511]   8 The Statutes at Large of Pennsylvania from 1682 to 1801, at 492 (1902).

[512]   *Id.* at 539.

[513]   *Id.* at 512.

[514]   5 Statutes at Large of Pennsylvania, *supra* note 508, at 201, https://babel.hathitrust.org/cgi/pt?view=image;size=125;id=mdp.39015050623548;q1=militia;page=root;seq=207;num=201.

[515]   Marietta, *supra* note 507, at 141-58.

[516]   *Id.* at 136-37.

[517]   Kopel, *supra* note 504, at 388.

Electronic copy available at: https://ssrn.com/abstract=3205664

During the eighteenth century, Americans grappled with how to deal with conscientious objectors.[518]   Sometimes a mutually acceptable accommodation was found.[519]

Once the Revolutionary War began, Pennsylvania had to create a formidable militia. By this time, non-Quakers held the political power.[520] The new militia law of 1777 was for "every male white person usually inhabiting or residing within his township, borough, ward or district between the ages of eighteen and fifty-three years capable of bearing arms."[521]

For conscientious objectors, Pennsylvania adopted a variant of the practice used in some other colonies: the reluctant man subject to militia service could pay for a substitute to serve in his stead.  In some states, this would be simply be a negotiated contract between the conscript and the substitute.  In Pennsylvania, the fee or penalty was apparently to be paid to the militia itself, which could then hire a substitute.[522]   Pennsylvania allowed for appeals if the objector thought the fee too high.[523]   For militiamen 18 to 20, the parents could appeal the fee, as could masters of indentured servants who were 18 to 20.[524]

The 1777 Act was non-specific on equipment, requiring only a militiaman's "arms and accoutrements" be "in good order."[525]   This Act was supplemented in 1777, without affecting age limits or arms.[526]

A new Act in 1780, five years into the Revolutionary War, kept the ages at 18 to 53, and reiterated the non-specific mandate for arms and accoutrements "in good order."[527]   This Act was Pennsylvania's militia act

---

[518]   *See* LIBERTY AND CONSCIENCE: A DOCUMENTARY HISTORY OF CONSCIENTIOUS OBJECTORS IN AMERICA THROUGH THE CIVIL WAR 3-67 (Peter Brock ed. 2002).  For example, the constitutions of Vermont, New Hampshire, Kentucky, and Tennessee included specific protections for conscientious objectors. JOHNSON ET AL., *supra* note 18, at 293, 296, 386.  When ratifying the Constitution, the states of Maryland, Virginia, North Carolina, and Rhode Island asked for conscientious objector protections for the federal militia power. *Id.* at 313, 322, 327, 328.  James Madison included such a protection in his draft of what became the Second Amendment, but the clause was removed in the Senate, based on the argument that that matter was best left to legislative discretion. *Id.* at 335-37.

[519]   *See generally* LIBERTY AND CONSCIENCE, *supra* note 518 (describing examples of persecution and tolerance).  Accommodations were easier for the non-Quaker pacifists, who did not object to paying war taxes or special fees for exemptions from military duty. *Id.* at 48.

[520]   MARIETTA, *supra* note 507, at 219-20 (noting that from 1774 onward the Pennsylvania Assembly was under control of non-Quakers who advocated vigorous confrontation with Great Britain).

[521]   9 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 77 (1903); MARIETTA, *supra* note 507, at 225-29.

[522]   9 STATUTES AT LARGE OF PENNSYLVANIA, *supra* note 521, at 77.

[523]   *Id.*

[524]   *Id.* at 87 ("[I]f any parent, guardian, master or mistress of any person between the ages of eighteen and twenty-one years or of any other person made liable to serve in the militia by this act shall think him or herself aggrieved by any of the rates, fines or sum or sums of money agreed for in the procuring of substitutes . . . he, she or they may appeal").

[525]   *Id.* at 80.

[526]   *Id.* at 131.

[527]   10 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 144-46 (1904).

Electronic copy available at: https://ssrn.com/abstract=3205664

when it ratified the Second Amendment on March 10, 1790.[528]  There was a
supplement in 1780,[529] repeal and replacement of that supplement in 1783,[530]
more supplements in 1783[531] and 1788,[532] and a repeal of parts of those
supplements in 1790.[533]  None of these changed the ages or the arms.

During the Revolutionary War, not long after the 1780 Militia Act
had been enacted, the assembly established the Pennsylvania
Volunteers.[534]  The Pennsylvania Volunteers were a state army, similar
to the armies raised by other states.  Every militia company had to
"provide or hire one able-bodied man not less than eighteen or more
than forty-five years of age" to serve in the Pennsylvania
Volunteers.[535]  Notably, the whites-only provision from the militia law
was omitted. As was true throughout the seventeenth and eighteenth
centuries in America, whatever racial limits existed on militia or other
military service tended to be repealed or overlooked under the pressure
of wartime exigencies.[536]

After Congress passed the federal UMA in 1792, Pennsylvania enacted
conforming legislation in 1793.[537]  The Act tracked the federal militia
definition: free white males 18 to 45.[538]  The mandatory arms and
accoutrements within the Act copied the extensive federal list.[539]

Like neighboring Delaware, Pennsylvania relaxed the peacetime
requirements for young adults.[540]  "[A]ll young men under the age of twenty-
one years, and all servants purchased bona fide and for a valuable
consideration," had to enroll in the militia.[541]  But "during such minority or
servitude," they were exempt from training and from fines for not having the

---

[528]   1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, *supra* note 280, at 306-
07.

[529]   10 STATUTES AT LARGE OF PENNSYLVANIA, *supra* note 527, at 225.

[530]   11 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 91-93 (1906). (The new
1783 supplement stated that it applied to "young men who have arrived to the age of eighteen
years.").

[531]   *Id.* at 161.

[532]   13 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 41 (1908).

[533]   *Id.* at 451, https://books.google.com/books?id=HRxEAAAAYAAJ&printsec=frontcover&source=
gbs_ge_summary_r&cad=0#v=onepage&q=MILITIA&f=false.

[534]   10 STATUTES AT LARGE OF PENNSYLVANIA, *supra* note 527, at 191.

[535]   *Id.*

[536]   JOHNSON ET AL., *supra* note 18, at 194.

[537]   14 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 454 (1909),
https://babel.hathitrust.org/cgi/pt?q1=militia;id=mdp.39015050623514;view=image;start=1;sz=10
;page=root;size=100;seq=460;num=454.

[538]   *Id.* at 455.

[539]   *Id.* at 457-58.

[540]   2 Laws of the State of Delaware 1135 (1797).

[541]   14 STATUTES AT LARGE OF PENNSYLVANIA, *supra* note 537, at 456.

Electronic copy available at: https://ssrn.com/abstract=3205664

requisite equipment.[542]   The exception did not apply "in cases of rebellion, or an actual or threatened invasion of this or any of the neighboring states."[543]

Pennsylvania's final militia act of the eighteenth century was passed in 1799.[544]   It kept the previous act's age limits of 18 and 45,[545] as well as the peacetime exemptions.[546]   However, the new act explicitly allowed "sons who are not subject to the militia law may be admitted as substitutes for their fathers."[547]   In other words, if a 42-year-old father were summoned into the militia, the 17-year-old son could choose to serve in his stead.   The arms requirements were slightly modified, with more elaboration of accoutrements for horsemen, and making sure handgunners had "bear skin caps" for their holsters.[548]

H.  New York: "every able bodied male person Indians and slaves excepted"

New York's first militia act came among The Duke of York's Laws in 1665.[549]   It provided that:

> Every Male within this Government from Sixteen to Sixty years of age, or not freed by public Allowance, shall if freeholders at their own, if sons or Servants at their Parents and Masters Charge and Cost, be furnished from time to time and so Continue well furnished with Armes and other Suitable provition hereafter mentioned: under the penalty of five Shillings for the least default therein Namely a good Serviceable Gun, allowed Sufficient by his Military Oficer to be kept in Constant fitness for present Service, with a good sword bandeleers or horne or worme a Scowerer a priming wire Shott Badge and Charger one pound of good powder, four pounds of Pistol bullets or twenty four bullets fitted to the gunne, four fathom of Serviceable Match for match lock gunn four good flints fitted for a fire lock gunn.[550]

---

542   *Id.*

543   *Id.*

544   16 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 276 (1911), https://play.google.com/store/books/details?id=zRtEAAAAYAAJ&rdid=book-zRtEAAAAYAA J&rdot=1.

545   *Id.*

546   *Id.* at 278.

547   *Id.* at 297.

548   *Id.* at 281.

549   1 THE COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION, INCLUDING THE CHARTERS TO THE DUKE OF YORK, THE COMMISSION AND INSTRUCTIONS TO COLONIAL GOVERNORS, THE DUKES LAWS, THE LAWS OF THE DONAGAN AND LEISLER ASSEMBLIES, THE CHARTERS OF ALBANY AND NEW YORK AND THE ACTS OF THE COLONIAL LEGISLATURES FROM 1691 TO 1775 INCLUSIVE 49-50 (1896).

550   *Id.*

KR0289

Electronic copy available at: https://ssrn.com/abstract=3205664

Troopers had to "keepe and maintaine a good Horse Fitted with Sadle, bridle, Holsters, Pistolls or Carbine, and a good Sword."[551]

The act additionally provided that: "In defence of himself his wife Father or Mother Children or Servants a man may Lawfully use force to resist any attempt made to that purpose."[552]  Thus, the right of 18-to-20-year-olds to use arms in self-defense was expressly guaranteed.

A 1684 law ensured that persons exempted from the militia still kept the militia arms in their homes.[553]

In 1691, New York lowered the minimum militia age, so that "noe person whatsoever from fifteen to Sixty years of Age remaine unlisted."[554]

The arms were typical of the time: For every foot soldier, "a well fixed musket or fuzee" for officers, "a good pike or Sword or lance and pistoll."[555] At home, every foot soldier was to have "one pound of good powder and three pound of Sizeable bulletts," and every Trooper (horseman) had to "have at his usuall place of abode a well fixed Carabine with belt and Swivell and two pounds of fine powder with Six pounds of Sizeable bulletts."[556]

The minimum age for militia service was raised back to 16 in 1702.[557] The militia arms remained unchanged.[558]  The 1702 act was continued in 1706,[559] 1708,[560] 1709,[561] 1710,[562] 1711,[563] 1712,[564] 1713,[565] 1715,[566] 1716,[567] 1717,[568] 1718,[569] and 1720.[570]

A new act in 1721 applied to every "[p]erson whatsoever from Sixteen to Sixty Years of Age."[571]  Foot soldier equipment was nearly the same as before.[572]  Many subsequent acts kept the same age limits and arms

---

[551] *Id.* at 54.
[552] *Id.* at 15.
[553] *Id.* at 161 ("all persons though freed from Training by the Law yet that they be obliged to Keep Convenient armes and ammunition in Their houses as the Law directs to others").
[554] *Id.* at 231.
[555] *Id.* at 232.
[556] *Id.*  "Fine powder" is gunpowder made of very small grains.  Small grains burn faster and more uniformly.  Hence, "fine powder" propels the bullet faster than does powder with larger grains.
[557] *Id.* at 500.
[558] *Id.* at 500-01.
[559] *Id.* at 591.
[560] *Id.* at 611.
[561] *Id.* at 675.
[562] *Id.* at 706.
[563] *Id.* at 745.
[564] *Id.* at 778.
[565] *Id.* at 781.
[566] *Id.* at 868.
[567] *Id.* at 887.
[568] *Id.* at 917.
[569] *Id.* at 1001.
[570] 2 THE COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION 1 (1894).
[571] *Id.* at 84-85.
[572] *Id.*

Electronic copy available at: https://ssrn.com/abstract=3205664

requirements.  There were new acts (all which had interim continuations) in 1724,[573] 1739,[574] 1743,[575] and 1744.[576]  The 1746 act told soldiers to appear with nine rounds of ammunition, rather than the previous number of six.[577]  The requirement was lowered back to six in 1755.[578]  The age and arms requirements remained the same in the acts of 1764[579] and 1772.[580]

On April 1, 1775, less than three weeks before the Revolutionary War would begin, New York enacted a new militia law.[581]  This act retained the same arms requirements as its predecessors, and kept the minimum age at 16, but lowered the maximum age to 50.[582]

The 1775 law was for "every Person."[583]  In the middle of the war, in 1778, the 1775 law was narrowed to "every able bodied male person Indians and slaves excepted."[584]  The new arms requirement was "a good musket or firelock fit for service," plus the bayonet, sixteen rounds of ammunition, and the usual accoutrements.[585]

In 1778, the British, "adopted terror tactics across upstate New York to divert American forces away from more southern battle fields and to inhibit American's ability to produce food and supplies from the large war effort."[586]  A statute that year established "a night watch in the counties of Ulster, Tryon,

---

[573]  *Id.* at 187.  The act was continued in 1728, *id.* at 421; and in 1730, *id.* at 657; then in 1731, *id.* at 698; again in 1732, *id.* at 734; and in 1733, *id.* at 858; and 1735, at 905; and 1736, *id.* at 922; and 1737, *id.* at 947.

[574]  3 COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION 3 (1894), https://babel.hathitrust.org/cgi/pt?id=umn.319510021585399;view=1up;seq=11.  The act was continued in 1740, *id.* at 69; in 1741, *id.* at 168; and 1742, *id.* at 224.

[575]  *Id.* at 296.

[576]  *Id.* at 385.  This act was continued in 1745. *Id.* at 510.

[577]  *Id.* at 511, 513.  This act was continued in 1746, *id.* at 621; then again in 1747, *id.* at 648; then in 1753, *id.* at 962; and again in 1754, *id.* at 1016.

[578]  *Id.* at 1051.  This act was continued twice in 1756, 4 COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION 16, 101 (1894), https://babel.hathitrust.org/cgi/pt?id=mdp.39015011398438;view=1up;seq=22; twice in 1757, *id.* at 187, 293; then in 1759, *id.* at 363; in 1760, *id.* at 475; in 1761, *id.* at 553; in 1762, *id.* at 636; and in 1763, *id.* at 698.

[579]  *Id.* at 767; continued in 1765, *id.* at 852; in 1766, *id.* at 915; and in 1767, *id.* at 952.

[580]  5 COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION 342 (1894), https://babel.hathitrust.org/cgi/pt?id=mdp.39015011398420;view=1up;seq=348.

[581]  *Id.* at 732.

[582]  *Id.*

[583]  *Id.* at 342.

[584]  LAWS OF THE STATE OF NEW YORK: PASSED AT THE SESSIONS OF THE LEGISLATURE HELD IN THE YEARS 1777, 1778, 1779, 1780, 1781, 1782, 1783, AND 1784, INCLUSIVE, BEING THE FIRST SEVEN SESSIONS 62 (1886), https://books.google.com/books?id=D8GwAAAAMAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=snippet&q=%22every%20able%20bodied%20male%20person%20Indians%20and%20slaves%20excepted%22&f=false. (Hereinafter LAWS OF THE STATE OF NEW YORK: PASSED AT THE SESSIONS 165-66.) The act was amended in 1778, *id.* at 86, and 1779, *id.* at 157.  The age limits and arms requirements were unaffected.

[585]  *Id.*

[586]  Stefan Bielinski, *Albany County*, *in* THE OTHER NEW YORK: THE AMERICAN REVOLUTION BEYOND NEW YORK CITY, 1763-1787, at 165-66 (Joseph S. Tiedemann & Edward R. Fingerhut eds. 2006).

KR0291

Electronic copy available at: https://ssrn.com/abstract=3205664

Charlotte, Dutchess, and Albany."[587]  Service on the watch was required of "every able bodied male inhabitant, Indians and slaves excepted…from sixteen years of age till sixty."[588]

A 1780 act "to raise troops for the defence of the frontiers" required "all the male inhabitants (slaves excepted) of the age of sixteen years and upwards" to provide themselves with "a good musket or firelock" plus seventeen rounds of ammunition.[589]

Militia acts of 1780 and 1782 retained the age limits and arms requirements of 1778.[590]

In 1783, New York passed "AN ACT to authorize his excellency the governor to raise troops for the defence of the frontiers."[591]  It included "all the male inhabitants and sojourners of the age of sixteen years and upwards . . . excepting slaves," and ordered each of them to possess the usual equipment.[592]

In 1786, New York passed the law defining its militia.[593] That was the definition in effect when the state ratified the Second Amendment on February 24, 1790.[594]  The law defined the New York militia as "every able-bodied male person, being a citizen of this state, or of any of the United States, and residing in this state (except such persons as are herein after excepted) and who are of the age of sixteen, and under the age of forty-five years."[595]

The arms were "a good musket or firelock," 24 bullets, "a sufficient bayonet" and other standard items."[596]  In 1787, New York amended the 1786 law without change to ages or arms.[597]

Finally, in 1793 New York aligned with the federal UMA.[598]  The minimum age rose to 18, while the maximum remained at 45—both ages the

---

[587] LAWS OF THE STATE OF NEW YORK PASSED AT THE SESSIONS, *supra* note 584, at 94.
[588] *Id.* at 95.
[589] *Id* at 232.
[590] *Id.* at 237, 441.
[591] *Id.* at 529.
[592] *Id.*
[593] 1 LAWS OF THE STATE OF NEW YORK: COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE 227 (Thomas Greenleaf 1792), https://books.google.com/books?id=9Hs4AAAAIAAJ&pg=PA26&dq=new+york+state+laws+1779&hl=en&sa=X&ved=0ahUKEwiCvauHn_LZAhVEVWMKHSToDG8Q6AEIKTAA#v=onepage&q=militia&f=false.
[594] 1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, *supra* note 280, at 304-06.
[595] *Id.*
[596] *Id.* at 228.
[597] *Id.* at 454.
[598] 3 LAWS OF THE STATE OF NEW YORK: COMPRISING THE CONSTITUTION AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE TWENTIETH SESSION, INCLUSIVE 58 (1797), https://books.google.com/books?id=Mns4AAAAIAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q=militia&f=false.

Electronic copy available at: https://ssrn.com/abstract=3205664

same as for the federal militia.[599]  The arms requirement copied the federal statute.[600]

## I.  Rhode Island: parents and masters must furnish arms

Rhode Island established a militia in 1673, consisting of persons from 16 to 60 years old.[601]  Each militiaman was required to "at all times hereafter have on[e] good gun or muskitt Fitt for Service one pound of good powder & thirty bullits at Least."[602]  If a son or servant had no valuable estate of his own, his parents or master would be liable for any fines imposed upon him.[603]  A 1677 revision retained the laws for ages and arms.[604]

A 1700 statute specified that persons subject to militia service also had to serve on watch and ward (day and night guard duty in towns).[605]  The Act elaborated on the arms requirements, mandating that each militiaman appear with a "Good & Sufficient muskett or Fuze a Sword or Bayenet, Catooch box or Bandelers wth twelve Bulets fit for his Piece half a Pound of Powder & Six good Flints."[606]

A 1718 law provided that "all male Persons . . . from the Age of Sixteen, to the Age of Sixty Years, shall bear Arms."[607]  Arms were "one good Musket, or Fuzee, the Barrel whereof not to be less than three foot and an half in length," plus a sword or bayonet, a pound of gunpowder, thirty bullets, six flints, and a cartridge box.[608]

---

[599]   *Id.*

[600]   *Id.*

[601]   LAWS AND ACTS OF HER MAJESTIES COLONY OF RHODE ISLAND, AND PROVIDENCE-PLANTATIONS MADE FROM THE FIRST SETTLEMENT IN 1636 TO 1705, at 23 (1896), https://books.google.com/books?id=VZs0AQAAMAAJ&pg=PA48&lpg=PA48&dq=%22an+act+for+ye+better+regulating+ye+militia%22+%2B+%22rhode+island%22&source=bl&ots=HHzuIT QDoD&sig=UB5aPjlcOOwaXouze0Dru3PGdUI&hl=en&sa=X&ved=0ahUKEwiT6a3MpL_aAh Vq4oMKHb9jB0oQ6AEIKzAA#v=onepage&q=at%20least&f=false.

[602]   *Id.*

[603]   *Id.*

[604]   *Id.* at 25.

[605]   *Id.* at 48.  The statute was miswritten: "all persons wthn this Colony Above ye Age of Sixteen Years & Under ye Age of Sixteen Yeares as well housekeepers as others Shall be Obliged to watch or ward."  Read literally, no one was required for perform watch and ward, since no one can be "Above" and "Under" the "Age of Sixteen Years."  Presumably the intended and understood upper age limit remained 60.

[606]   *Id.*

[607]   THE CHARTER AND THE ACTS AND LAWS OF HIS MAJESTIES COLONY OF RHODE-ISLAND, AND PROVIDENCE-PLANTATIONS IN AMERICA, 1719, at 86 (Sidney S. Rider, ed. 1895), https://archive.org/details/thecharteractsla00rhod/page/86.

[608]   *Id.* at 87.

**KR0293**

Electronic copy available at: https://ssrn.com/abstract=3205664

The next act appeared in 1755, at the beginning of the French & Indian War.[609]   It did not revise ages or arms.[610]   An addition in 1756 made the parents of militiamen under 21 liable for unpaid fines for neglect of duty.[611] A 1774 amendment left arms and ages unchanged.[612]

Rhode Island created a state army in 1776, a regiment to serve for three months.[613]   The Rhode Island army was to be "composed of six Men as Soldiers of every Hundred of the male Inhabitants of Sixteen Years of Age, and upwards."[614]   As the quota indicates, at least some of the soldiers were to be raised by conscription, with each town to supply a quota if there were not sufficient volunteers. The soldiers of this regiment had the option of having the town provide their arms, or an enlistment bonus was available for soldiers who furnished their own arms.[615]

This policy of soldiers providing their own arms was typical during the Revolution.[616]   The Continental Army generally refused volunteers who could not supply their own arms.[617]   State armies sometimes accepted unarmed volunteers, while offering bonuses to recruits with their own arms.[618]

A new militia law was enacted in 1779.[619]   The new law would be Rhode Island's militia act when it ratified the Second Amendment on June 7, 1790.[620]   The lower age limit remained at 16, but the upper age limit dropped to 50.[621]   "[E]ach and every effective Man as aforesaid [had to] provide, and at all times be furnished, at his own Expence (excepting such Persons as the Town-Councils of the Towns in which they respectively dwell or reside shall adjudge unable to purchase the same) with one good Musquet, and a Bayonet fitted thereto, with a Sheath and Belt, or Strap, for the same, one Ram-rod, Worm, Priming-wire and Brush, and one Cartouch-Box."[622]

---

[609]   An Act in Addition to the several Acts regulating the Militia in this Colony, 1755 R.I. Laws, Jan. Sess. 71.
[610]   Id.
[611]   An Act in addition to, and Amendment of the several Acts regulating the Militia, 1756 R.I. Laws, Feb. Sess. 73.
[612]   An Act in addition to, and amendment of, an Act entitled "An Act regulating the Militia of this Colony," 1774 R.I. Laws, Dec. Sess. 150.
[613]   An Act for raising a Regiment, to serve for Three Months, 1776 R.I. Laws, Nov. Called Sess. 6.
[614]   Id.
[615]   Id. at 7.
[616]   JOHNSON ET AL., supra note 18, at 283.
[617]   Id.
[618]   Id.
[619]   An Act for the better forming, regulating and conducting the military Force of this State, 1779 R.I. Laws, Oct. Regular Sess. 29.
[620]   1 JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES, supra note 280, at 312-13.
[621]   An Act for the better forming, regulating and conducting the military Force of this State, 1779 R.I. Laws, Oct. Regular Sess. 29.
[622]   Id. at 32.

KR0294

Electronic copy available at: https://ssrn.com/abstract=3205664

Then in 1781 Rhode Island passed a law to raise a militia force of 1,200 men, with the statutory guarantee that the term of service would be only one month, and they were "not to be marched out of" the state.[623]  The number of men each county raised depended on the number of militia-aged men (16 to 50) within that county.[624]  "[E]ach of the non-commissioned Officers and Soldiers" had to "furnish himself with a good Musket, Bayonet, Cartouch-Box, Knapsack, and Blanket."[625]  Later that year, a similar law aimed to raise another 500 "able-bodied effective Men."[626]  Again, the number of required recruits per county was based on the number of militia-aged men within the county.[627]  Arms were the same as before, except that "a good Fire-Arm," was sufficient, rather than only a musket.[628]

Following the 1792 federal UMA, a 1794 law adopted the federal ages and arms.[629]  More militia laws were passed in 1795, 1796, 1798, and 1799, none of them altering ages or arms.[630]

## J.  Vermont: "the freemen of this Commonwealth, and their sons"

Vermont declared its independence from the competing claims of New York and New Hampshire in January 1777.[631]  A constitution was adopted in July.[632]  Because New York and New Hampshire still claimed Vermont, Vermont was rebuffed from its attempt to send delegates to Congress.  So,

---

[623]   An Act for embodying and bringing into the Field Twelve Hundred able-bodied effective Men, of the Militia, to serve within this State for One Month, from the Time of their Rendezvous, and no longer Term, and not to be marched out of the same, 1781 R.I. Laws, Feb. Adjourned Sess. 5.

[624]   Id.

[625]   Id. at 8.

[626]   An Act for incorporating and bringing into the Field Five Hundred able-bodied effective Men, of the Militia, to serve within this State for one Month, from the Time of their Rendezvous, and no longer, and not to be marched out of the same, 1781 R.I. Laws, May Second Sess. 11.

[627]   Id.

[628]   Id. at 15.

[629]   An Act to organize the Militia of this State, 1794 R.I. Laws, Mar. Adjourned Sess. 14.

[630]   An Act establishing a Company of Horse, by the Name of The Independent Light Dragoons of the Second Regiment of Militia in the County of Newport, 1795 R.I. Laws, Jan. Adjourned Sess.  33; An Act in Addition to, and Amendment of, the Act entitled "An Act to organize the Militia of this State," 1796 R.I. Laws, Feb. Adjourned Sess. 33; An Act for calling out the Militia, 1798 R.I. Laws, June Adjourned Sess. 13; An Act in Addition to an Act, entitled "An Act to organize the Militia of this State," 1799 R.I. Laws, Feb. Sess. 17.

[631]   Harvey Strum & Paul G. Pierpaoli, Jr., Vermont, in THE ENCYCLOPEDIA OF THE WARS OF THE EARLY AMERICAN REPUBLIC, 1783-1812: A POLITICAL, SOCIAL, AND MILITARY HISTORY 705 (Spencer C. Tucker et al. eds. 2014).

[632]   Id.; Celise Schnieder, The Green Mountain Boys Constitute Vermont, in THE CONSTITUTIONALISM OF AMERICAN STATES 79 (George E. Connor & Christopher W. Hammons eds. 2008); Sanford Levinson, The 21st Century Rediscovery of Nullification and Secession in American Political Rhetoric: Frivolousness Incarnate, or Serious Arguments to be Wrestled With? 67 ARK. L. REV. 17, 49 (2014). See generally FREDERIC FRANKLYN VAN DE WATER, THE RELUCTANT REPUBLIC: VERMONT, 1724-91 (1941); Peter S. Onuf, State-Making in Revolutionary America: Independent Vermont as a Case Study, 67 J. AM. HIST. 797 (1981).

KR0295

Electronic copy available at: https://ssrn.com/abstract=3205664

starting in 1777, it operated as something of an independent republic. Vermont had its own currency and postal service, and exchanged ambassadors with France and the Netherlands.[633]  In 1791, Vermont applied to join the Union, and was admitted.[634]

The 1777 Vermont Constitution drew on Pennsylvania's 1776 Constitution, which was the first state constitution adopted after the Declaration of Independence.[635]  Vermont copied Pennsylvania's right to hunt: "that the inhabitants of this State, shall have liberty to hunt and fowl, in seasonable times, on the lands they hold, and on other lands (not enclosed)."[636]

Vermont's Declaration of Rights included human rights language, based on models from Pennsylvania, Massachusetts, and Virginia, that would, with variations in wording, become ubiquitous in American state constitutions:

> That all men are born equally free and independent, and have certain natural, inherent and unalienable rights, amongst which are the enjoying and defending life and liberty; acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety.[637]

and

> That every member of society hath a right to be protected in the enjoyment of life, liberty and property, and therefore, is bound to contribute his proportion towards the expense of that protection, and yield his personal service, when necessary, or an equivalent thereto.[638]

This language is irreconcilable with a law that requires a person to contribute his personal service but deprives that person of the right to protect his own life.

The Constitution further provided "[t]hat the people have a right to bear arms for the defence of themselves and the State."[639]  This language is irreconcilable with a law that requires a person to bear arms for the defense of the state but would prohibit that person from bearing arms for defense of himself.

---

[633]    Strum & Pierpaolia, supra note 631.
[634]    Levinson, supra note 632, at 50.
[635]    Schneider, supra note 632, at 82.
[636]    VT. CONST. ch. II, art. XXXIX (1777), http://avalon.law.yale.edu/18th_century/vt01.asp.
[637]    Id. at ch. II, art. I.
[638]    Id. at ch. I, art. IX.
[639]    Id. at ch. I, art. XV.

Electronic copy available at: https://ssrn.com/abstract=3205664

The Vermont Constitution's Declaration of Rights was separate from the Plan or Frame of Government.[640]  The latter provided that "[t]he freemen of this Commonwealth, and their sons, shall be trained and armed for its defence, under such regulations, restrictions and exceptions, as the General Assembly shall, by law, direct."[641]

In 1779, Vermont enacted a statute "for forming and regulating the militia; and for encouragement of military skill, for the better defence of this state."[642]  It provided that "all male persons, from sixteen years of age to fifty, shall bear arms."[643]  The arms mandate was not militia-only; it applied to "every listed soldier and other householder."[644]

The firearm could be "a well fixed firelock, the barrel not less than three feet and a half long, or other good fire-arms."[645]  The edged arm was to be "a good sword, cutlass, tomahawk or bayonet."[646]  For cleaning, a soldier or "other householder" needed "a worm, and priming-wire, fit for each gun." Suitable ammunition storage for a solider could be with "a cartouch box, or powder-horn and bullet-pouch."[647]  Adequate supplies were at least a pound of gun powder, four pounds of bullets, "and six good flints."[648]

Militia regulations were changed twice in 1780, and again in 1781,[649] but the age limits and arms requirements were not impacted.[650]

In 1786, Vermont wrote a new constitution.[651]  The convention entertained and rejected a proposal to change the 1777 language of "a right to bear arms for the defence of themselves and the State" into "a right to bear arms for the defence of the community."[652]

The same year, a new militia act kept the minimum militia age at 16, but lowered the maximum age to 45.[653]  The gun mandate was changed to "a good musket or firelock."[654]  The bayonet was now mandatory.[655]  The new

---

[640]    See *Id.* at ch. I-II.
[641]    *Id.* at ch. II, art. 5.
[642]    VERMONT STATE PAPERS, BEING A COLLECTION OF RECORDS AND DOCUMENTS, CONNECTED WITH THE ASSUMPTION AND ESTABLISHMENT OF GOVERNMENT BY THE PEOPLE OF VERMONT; TOGETHER WITH THE JOURNAL OF THE COUNCIL OF SAFETY, THE FIRST CONSTITUTION, THE EARLY JOURNALS OF THE GENERAL ASSEMBLY, AND THE LAWS FROM THE YEAR 1779 TO 1786, INCLUSIVE 305 (1823).
[643]    *Id.* at 307.
[644]    *Id.*
[645]    *Id.*
[646]    *Id.*
[647]    *Id.*
[648]    *Id.*
[649]    1781 Vt. Acts Feb. Sess. viii.
[650]    VERMONT STATE PAPERS, supra note 642, at 415; 1780 Vt. Acts Mar. Sess. i.
[651]    VERMONT STATE PAPERS, supra note 642, at 518; VT. CONST. (1786), http://avalon.law.yale.edu/18th_century/vt02.asp (last visited Jan. 13, 2019).
[652]    VERMONT STATE PAPERS, supra note 642, at 518.
[653]    1786 Vt. Acts Oct. Sess. 6.
[654]    *Id.*
[655]    *Id.* at 8.

**KR0297**

Electronic copy available at: https://ssrn.com/abstract=3205664

law made separate provisions for horsemen; each dragoon had to provide "a case of good pistols, a sword or cutlass not less than three and one half feet in length," plus a pound of gunpowder, "three pounds of sizeable bullets," and eight flints.[656]  Since horsemen would have at least two guns (the pair of handguns) they needed a bigger supply of flints.[657]

Ages and arms were kept the same in the 1787 militia act.[658]  This was the act in effect when Vermont ratified the Second Amendment on November 3, 1791.[659]

In 1793, Vermont revised its constitution again and also passed a militia act in response to the federal UMA. Vermont's 1793 constitution kept the same arms guarantees as before.[660]  The new militia act repealed all previous militia laws.[661]  The new law applied to "each and every free, able-bodied white male citizen . . . who is, or shall be of the age of sixteen years, and under the age of forty-five."[662]  Like New Hampshire, Vermont diverged from the federal act by keeping a minimum militia age of sixteen.[663]

Every non-commissioned officer and private had to "constantly keep himself provided with a good musket, with an iron or steel rod, a sufficient bayonet and belt, two spare flints, a priming wire and brush, and a knapsack ; a cartridge box and pouch, with a box therein, sufficient to contain not less than twenty-four cartridges suited to the bore of his musket."[664]  Horsemen were required to provide themselves with "a pair of pistols, and sabre, and cartridgebox to contain twelve cartridges for pistols."[665]  Cavalry officers needed "a pair of pistols, and sword."[666]

K. Virginia: "ALL men that are fitting to beare armes, shall bringe their peices to the church"

Virginia enacted a myriad of laws in the seventeenth century regarding firearms ownership, many of which allowed or required 18-to-20-year-olds to bear arms.  It was not until 1639 that Virginia enacted a statute expressly

---

656  *Id.* at 7.
657  *Id.*
658  1787 Vt. Acts Feb. & Mar. Sess. 94.
659  JOURNAL OF THE FIRST SESSION OF THE SENATE OF THE UNITED STATES OF AMERICA, BEGUN AND HELD AT THE CITY OF NEW YORK, MARCH 4, 1789, AND IN THE THIRTEENTH YEAR OF THE INDEPENDENCE OF THE SAID STATES 377-78 (1820).
660  VT. CONST. (1793).
661  1793 Vt. Acts – Oct. Sess. 19.
662  *Id.* at 20.
663  1 LAWS OF NEW HAMPSHIRE: PROVINCE PERIOD, 1679-1702, at 221 (Albert Stillman Batchellor ed., 1904).
664  1793 Vt. Acts – Oct. Sess. at 30.
665  *Id.* at 26.
666  *Id.*

Electronic copy available at: https://ssrn.com/abstract=3205664

requiring arms ownership.[667]  Previous statutes simply assumed that everyone already did possess arms, and thus ordered arms-carrying when traveling, going to church, or working in the fields.  The church mandate reflected the general risks of travel, and the more specific risk that when a large number of people are densely gathered indoors, they are easy targets for hostiles intent on mass killing.

- 1623: "That no man go or send abroad without a sufficient partie will armed."[668]

- 1624: "That men go not to worke in the ground without their arms (and a centinell upon them)."[669]

- 1624: "That the commander of every plantation take care that there be sufficient of powder and amunition within the plantation under his command and their pieces fixt and their arms compleate."[670]

- 1632: "NOE man shall goe or send abroade without a sufficient party well armed."[671]

- 1632: "NOE man shall goe to worke in the grounds without theire armes, and a centinell uppon them"[672]

- 1632: "ALL men that are fitting to beare armes, shall bringe their pieces to the church"[673]

- 1632: "NOE man shall goe to worke in the grounds without theire armes, and a centinell uppon them places where the commander shall require it"[674]

---

[667]  1 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 226 (1809).

[668]  *Id.* at 127.
      The above dates are listed by the New Style year, whose new year begins on January 1.  Until 1752, Englishmen used the Old Style calendar, whose new year begins on March 25.  Thus, the above enactment in March is 1624 to the modern reader but was considered 1623 by Virginians of the time.

[669]  *Id.*

[670]  *Id.*

[671]  *Id.* at 173.

[672]  *Id.*

[673]  *Id.*

[674]  *Id.* at 198.

**KR0299**

Electronic copy available at: https://ssrn.com/abstract=3205664

- 1632: "ALL men that are fittinge to beare armes, shall bringe their peices to the church"[675]

- 1639: "ALL persons except negroes to be provided with arms and ammunition or be fined at pleasure of the Governor and Council"[676]

- 1643: "masters of every family shall bring with them to church on Sundays one fixed and serviceable gun with sufficient powder and shott"[677]

- 1645: "all negro men and women, and all other men from the age of 16 to 60" could be drafted to carry on war against the Indians.[678] This indicates that persons over 16 were considered capable of bearing arms.

- 1659: "That every man able to beare armes have in his house a fixt gunn two pounds of powder and eight pound of shott at least"[679]

- 1662: "that every man able to beare armes have in his house a fixed gun, two pound of powder and eight pound of shot at least"[680]

- 1676: "that in goeing to churches and courts in those tymes of danger, all people be enjoyned and required to goe armed for their greate security"[681]

Also in 1676, Virginia enacted a law "for the safeguard and defence of the country against the Indians."[682]  The number of militiamen to be supplied by the counties was based on "the number of tytheables of each county."[683] Persons over 16 were considered titheable (required to pay a tax), thus indicating that the minimum age for the militia was 16.[684]

Laws in 1676 expressly authorized persons to carry arms anywhere, but not in large groups. After a short-lived rebellion involving crowds of armed men, the legislature prohibited armed gatherings of more than five people:

---

675  *Id.*
676  *Id.* at 226.
677  *Id.* at 263.
678  *Id.* at 292.
679  *Id.* at 525.
680  2 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 126 (1823).
681  *Id.* at 333.
682  *Id.* at 326.
683  *Id.* at 350.
684  *Id.* at 84 (defining what persons are tithable).

Electronic copy available at: https://ssrn.com/abstract=3205664

whereas by a branch of an act of assembly made in March last, liberty is granted to all persons to carry their armes wheresoever they goe, which liberty hath beene found to be very prejudiciall to the peace and wellfaire of this colony. Bee it therefore further enacted by this present grand assembly, and the authority thereof, and it is hereby enacted, that if any person or persons shall, from and after publication of this act, presume to assemble together in armes to the number of five or upwards without being legally called together in armes the number of five or upwards, they be held deemed and adjudged as riotous and mutinous, and that they be proceeded against and punished accordingly.[685]

Acts passed in 1679[686] and 1682[687] made no changes to the ages or arms requirements of militiamen. In 1684, arms requirements were made more specific, and separate standards were enacted for mounted militiamen:[688]

every trooper of the respective colonies of this country, shall furnish and supply himself with a good able horse, saddle, and all arms and furniture, fitt and compleat for a trooper, and that every foot soldier, shall furnish himselfe, with a sword, musquet and other furniture fitt for a soldier, and that each trooper and foot soldier, be provided with two pounds of powder, and eight pounds of shott, and shall continually keep their armes well fixt, cleane, and fitt for the king's service.[689]

These more specific arms requirements were complemented by another law establishing troops of horsemen.[690] Horsemen's arms requirements were now more detailed, requiring three guns: "a case of pistolls, a carbine, sword and all other furniture usuall and necessary for horse souldiers or troopers."[691]

Militia-related acts were passed in 1692,[692] 1693,[693] 1695,[694] and 1699,[695] but none of them addressed age limits or arms requirements.

In 1701, "An act for the better strengthening the frontiers and discovering the approaches of an enemy" was passed.[696] It provided 500-

---

[685]   *Id.* at 381. The precipitating event was Bacon's Rebellion, a short-lived uprising of frontiersman who marched on the capital because they were disgruntled with the colonial government's failure to protect them from Indians. *See* JAMES D. RICE, TALES FROM A REVOLUTION: BACON'S REBELLION AND THE TRANSFORMATION OF EARLY AMERICA (2013).

[686]   2 HENING, *supra* note 682, at 433.

[687]   *Id.* at 498.

[688]   3 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 13 (1823).

[689]   *Id.* at 14.

[690]   *Id.* at 17.

[691]   *Id.*

[692]   *Id.* at 98, 115.

[693]   *Id.* at 119.

[694]   *Id.* at 126.

[695]   *Id.* at 176.

[696]   *Id.* at 205.

KR0301

Electronic copy available at: https://ssrn.com/abstract=3205664

acre land grants, with the proviso that the grantee keep "upon the said land one christian man between sixteen and sixty years of age perfect of limb, able and fitt for service."[697]  Such men should be "continually provided with a well fixt musquett or fuzee, a good pistoll, sharp simeter, tomahauk and five pounds of good clean pistoll powder and twenty pounds of sizable leaden bulletts or swan or goose shott to be kept within the fort directed by this act besides the powder and shott for his necessary or usefull shooting at game..."[698]  In other words, the frontier guardians would keep at home small quantities of gunpowder for ordinary use, but their larger reserves of gunpowder would be kept in a fort.  The gunpowder of the time was blackpowder, which is volatile, so large quantities often were centrally stored, ideally in reinforced brick buildings.[699]

Virginia's first elaborate militia act was passed in 1705.[700]  The militia included "all male persons whatsoever, from sixteen to sixty years of age . . . to serve in horse or foot."[701]  An infantryman needed "a firelock, muskett or fusee well fixed, a good sword," cartridge box, and ammunition.[702]  He had to bring six rounds of ammunition to muster.  Additionally, he had to "have at his place of abode two pounds of powder and eight pounds of shott, and bring the same into the field with him when thereunto specially required."[703]

A horseman needed the usual tack and ammunition accoutrements along with a pair of pistols and a sword.[704]  He had to bring eight rounds of ammunition to muster.[705]  At his usual place of abode, he also had to keep a well fixed carabine, two pounds of powder and eight pounds of shot.[706]

The act made it unlawful for creditors to seize a militiaman's arms as payment for debts.[707]  If a creditor nevertheless took someone's militia equipment, the seizure would "be unlawful and void."[708]  Any "officer or person that presumes to make or serve the same" (e.g., a sheriff serving a writ of attachment) would "be lyable to the suit of the party grieved, wherein double damages shall be given upon recovery."[709]  Later in the century, the

---

[697]   *Id.*
[698]   *Id.* at 206-07.
[699]   JOHNSON ET AL., *supra* note 18, at 250.
[700]   3 HENING, *supra* note 688, at 335.
[701]   *Id.* at 336.
[702]   *Id.*
[703]   *Id.*
[704]   *Id.* at 338.
[705]   *Id.*
[706]   *Id.*
[707]   *Id.* (The required arms and accoutrements were "free and exempted at all times from being impressed upon any account whatsoever, and likewise from being seized or taken by any manner of distress, attachment, or writt of execution.")
[708]   *Id.*
[709]   *Id.*

KR0302

Electronic copy available at: https://ssrn.com/abstract=3205664

federal UMA would likewise make militia equipment immune from seizure for debts.[710]

Subsequent Virginia acts of 1705[711] and 1711[712] kept the age and arms rules. A 1720 act appropriated one thousand pounds to distribute "to each christian titheable [subject to taxation], one firelock, musket, one socket,[713] bayonet fitted thereto, one cartouch box, eight pounds bullet, two pounds powder, until the whole one thousand pounds be laid out."[714]

A 1723 act made "the colonel, or chief officer of the militia of every county, have full power and authority to list all free male persons whatsoever, from twenty-one to sixty years of age, within his respective county, to serve in horse or foot."[715] However, "nothing in this act contained, shall hinder or debar any captain from admitting any able-bodied white person, who shall be above the age of sixteen years, to serve in his troop or company, in the place of any person required by this act to be listed."[716] In other words, 16-20-year-olds could be hired or could volunteer as substitutes for older men.

The arms requirements were elaborate. For horsemen, a good serviceable horse, tack accoutrements, "holsters, and a case of pistols, cutting sword, or cutlace, and double cartouch box."[717] At home, they had to keep a carbine, plus "one pound of powder, and four pounds of shot."[718]

Infantry needed "a firelock, musket, or fuzee, well fixed, and bayonet fitted to such musquet or fuzee, or a good cutting sword or cutlace," along with the cartridge box.[719] Reserves to be kept at home were the same powder and shot as for horsemen.[720]

Again, militiamen's arms were immune from creditors.[721]

---

[710]   1 Stat. 271, § 1 (1792) ("And every citizen so enrolled, and providing himself with the arms, ammunition and accoutrements, required as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales, for debt or for the payment of taxes.").

[711]   3 HENING, *supra* note 688, at 362.

[712]   4 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 9 (1823).

[713]   Located near the muzzle of a gun, the socket was used to attach the bayonet to the gun, so that the gun could be used as a pole-arm at close quarters. J.N. GEORGE, ENGLISH GUNS AND RIFLES 80-81 (1947).

[714]   4 HENNIG, *supra* note 712, at 77-78.

[715]   *Id.* at 118.

[716]   *Id.* at 125.

[717]   *Id.*

[718]   *Id.*

[719]   *Id.*

[720]   *Id.* at 120.

[721]   *Id.* at 121.

> And for an encouragement of every soldier to provide and furnish himself, according to the directions of this act, and his security to keep his horse, arms and ammunition, when provided, *Be it enacted, by the authority aforesaid,* That the horses and furniture, arms and ammunition, provided and kept, in pursuance of this act, be free and exempted at all items from being impressed upon any account whatsoever; and likewise, from being seized or taken by any manner of distress, attachment, or writ of execution. And that

Electronic copy available at: https://ssrn.com/abstract=3205664

Acts passed in 1727,[722] 1732,[723] and 1734[724] made no changes to the militia ages or arms.

Virginia's 1738 act "for the settling and better Regulation of the Militia,"[725] appears to be the only militia act in the colonial or founding era that excluded persons aged 18-to-20.  The militia under this act consisted of "all male persons, above the age of one and twenty years."[726]

With the French & Indian War underway, Virginia passed several militia-related acts in 1757.  The first act augmented the already-existing forces in the field by allowing officers to add certain men between 18 and 50.[727]  Reflecting a still greater need for additional forces, Virginia's 1757 militia act restored the minimum age to 18 and set the maximum age at 60.[728]  Soldiers had to furnish themselves with "a firelock well fixed, a bayonet fitted to the same," and keep an extra pound of powder and "four pounds of ball" at home.[729]

Three other acts were passed in 1757; the first preventing mutiny and desertion,[730] the second preventing invasions and insurrections,[731] and the third protecting against Indian attacks.[732]  None addressed militia ages.

Acts passed in 1758[733] and 1759[734] made no changes to the militia's age limits or arms requirements.

Like other colonies, Virginia had various exemptions from militia duty.  A 1762 amendment ensured that "every person so exempted shall always keep in his house or place of abode such arms, accoutrements, and ammunition, as are by the [1757] act required to be kept by the militia."[735]  The 1757 act was continued in 1771.[736]

---

every distress, seizure, attachment, or execution, made or served upon any of the premises, be unlawful and void: And that the officer or person that presumes to make or serve the same, be liable to the suit of the party grieved: wherein double damages shall be given upon a recovery.

[722]   *Id.* at 197.

[723]   *Id.* at 323.

[724]   *Id.* at 395.

[725]   5 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 16 (1823).

[726]   *Id.*

[727]   7 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 69, 70 (1823).

[728]   *Id.* at 93.

[729]   *Id.* at 94.  This act was continued in 1759. *Id.* at 274.

[730]   *Id.* at 87.  This act was continued in 1758, *id.* at 169, and 1759, *id.* at 280.

[731]   *Id.* at 106.  This act was continued in 1758, *id.* at 237, and 1759, *id.* at 384.

[732]   *Id.* at 121.

[733]   *Id.* at 171.  This act was amended in 1758, but the ages and arms of militiamen remained unchanged. *Id.* at 251.

[734]   *Id.* at 279.

[735]   *Id.* at 534, 537.  The printed volume does not have a page 535 or 536.

[736]   8 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 503 (1823).

Electronic copy available at: https://ssrn.com/abstract=3205664

The American Revolution began on April 19, 1775, when armed Americans resisted British attempts to seize firearms and gunpowder at Lexington and Concord, Massachusetts. In Virginia, A Convention of Delegates for the Counties and Corporations in the Colony of Virginia was held in the summer of 1775. The first enactment of the Convention was "An ordinance for raising and embodying a sufficient force, for the defence and protection of this colony."[737] The ordinance established militia age limits of 16 and 50.[738] Every militiaman had to "furnish himself with a good rifle, if to be had, or otherwise with a tomahawk, common firelock, bayonet, pouch, or cartouch box, three charges of powder and ball, and appear with the same at the place appointed for mustering, and shall constantly keep by him one pound of powder and four pounds of ball."[739]

In 1777, Virginia passed its first militia act as a state, with Patrick Henry as governor.[740] "An Act for regulating and disciplining the Militia" applied to "all free male persons, hired servants [not indentured], and apprentices, between the ages of sixteen and fifty years."[741] "The county lieutenant, colonels, lieutenant colonels, and major" had to appear "with a sword."[742] Every captain and lieutenant needed a "firelock and bayonet, a cartouch box, a sword, and three charges of powder and ball."[743] Ensigns needed a sword.[744] Non-commissioned officers and privates had to have

> a rifle and tomahawk, or good fire-lock and bayonet, with a pouch and horn, or a cartouch or cartridge box, and with three charges of powder and ball; and, moreover, each of the said officers and soldiers shall constantly keep

---

[737] 9 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 9 (1823). According to the statutory compiler, "In the original, the title of this ordinance is wanting; nor are any of the chapters numbered. The title here inserted from the Chancellors' Revisal, edi 1785, p. 30, and the late edition of the Ordinances of 1816, p. 29." Id.

[738] Id. at 16.

[739] Id. at 28. A militia ordinance passed at the Convention held the following year did not change the militia ages. Id. at 139. Nor did an act passed in October of 1776. Id. at 267.
A report from July 28, 1775, mentioned a British major who was killed in action, and had four balls lodged in his body. "The Americans load their rifle-barrel guns with a ball slit almost in four quarters, which when fired out of those guns breaks into four pieces and generally does great execution." Alexander Purdie, VA. GAZETTE (Oct. 20, 1775), http://research.history.org/DigitalLibrary/va-gazettes/VGSinglePage.cfm?IssueIDNo=75.P.74.

[740] 9 HENNIG, supra note 737, at 267.

[741] Id. This act was amended in 1781, but the amendment did not change the required arms or ages. 10 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 416 (1823).

[742] 9 HENING, supra note 737, at 268.

[743] Id.

[744] Id.

Electronic copy available at: https://ssrn.com/abstract=3205664

one pound of powder and four pounds of ball, to be produced whenever called for by his commanding officer.[745]

Virginia also passed an act in 1777 to raise troops for the Continental Army.[746] "[A]ble bodied young men above the age of sixteen years" were eligible for enlistment.[747]

Another 1777 act required "all free born male inhabitants of this state, above the age of sixteen years" to "renounce and refuse all allegiance to George the third" and swear to "be faithful and bear true allegiance to the commonwealth of Virginia, as a free and independent state."[748] Because 16-year-olds were old enough to fight, they were old enough to decide whether their loyalty lay with the king or the commonwealth.

Another statewide law in 1777 left arms and ages unchanged.[749]

The militia laws had educational exemptions, but these were tightened in May 1777, by "An act for regulating and disciplining the militia of the city of Williamsburg and borough of Norfolk."[750]  Its purpose was "FOR forming the citizens of Williamsburg, borough of Norfolk, and the professors and students of William and Mary college, into a militia."  The William & Mary militia included "all male persons between the ages of sixteen and fifty years."[751]

Later that year, an October 1777 "Act for speedily recruiting the Virginia Regiments on the continental establishment and for raising additional troops of Volunteers" called for drafting single men above eighteen and with no children for the Continental Army.[752]

Virginia passed many militia laws in 1778, but none of these changed the militia ages or arms.[753]  Nor did the militia-related acts passed in 1779.[754]

Three acts regarding the militia were passed in 1781.  The first was "to raise two legions for the defence of the state."[755]  Neither this act, nor its amendment added that same year, altered the arms or ages of militiamen.[756]

---

[745]  *Id.* at 268-69.
[746]  *Id.* at 275.
[747]  *Id.*
[748]  *Id.* at 281.
[749]  *Id.* at 291.
[750]  *Id.* at 313.
[751]  *Id.*
[752]  *Id.* at 337, 339.
[753]  *Id.* at 445, 449, 452, 454, 458.
[754]  10 HENING, *supra* note 741, at 18, 23, 28, 32, 83.  One act, entitled "An Act for raising a body of Volunteers for the defence of the commonwealth," allowed two battalions responsible for protecting the western frontiers to furnish themselves "with such clothing, arms, and accoutrements, as are most proper for that service." *Id.* at 20.
[755]  *Id.* at 391.
[756]  *Id.* at 410.

KR0306

Electronic copy available at: https://ssrn.com/abstract=3205664

The second 1781 act was "for ascertaining the number of militia in this state."[757]   It ordered "captains or commanding officers of the respective companies in their several counties," to make "an exact list of each company, distinguishing all such as are under eighteen years of age."[758]

The third 1781 act was "for enlisting soldiers to serve in the continental army."[759]   It made no mention of arms or ages, but it did require that a Continental soldier be at least "five feet four inches tall."[760]

A 1782 act added some equipment detail for cavalry: "horseman's sword and cap, one pistol, and a pair of holsters."[761]

In 1784, Virginia increased its militia's minimum age to 18, and kept the maximum age at 50.[762]   Militiamen were required to appear "armed, equipped, and accoutred" according to rank.[763]   "The county lieutenants, lieutenant colonels commandant, and majors, with a sword; the captains, lieutenants, and ensigns, with a sword and espontoon."[764] Noncommissioned officers and privates needed to supply themselves "with a good clean musket, carrying an ounce ball,[765] and three feet eight inches long in the barrel, with a good bayonet and iron ramrod well fitted thereto."[766] Plus also "a cartridge box properly made, to contain and secure twenty cartridges" and "a good knapsack and canteen."[767]

Previously, militiamen had simply been told to keep an extra pound of powder and four pounds of lead at home, and to bring it with them if they were called into action.  Now, to prove that they possessed such quantities, they had to bring to "every muster…twenty blind cartridges."[768]   Further "each sergeant shall have a pair of moulds fit [to] cast balls for their respective companies."[769]

Finally, "the militia of the counties westward of the Blue Ridge, and the counties below adjoining thereto," could forego the muskets, and instead choose "good rifles with proper accoutrements."[770]

---

[757]   *Id.* at 396.
[758]   *Id.*
[759]   *Id.* at 433.
[760]   *Id.*
[761]   11 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 173 (1823).
[762]   *Id.* at 476.
[763]   *Id.* at 478.
[764]   *Id.*
[765]   That meant 16 balls to the pound of lead.  This is slightly smaller than .69 caliber, which is 15 balls to the pound. *Lead ball, per pound*, RED RIVER BRIGADE (Jan. 26, 2014), http://www.redriverbrigade.com/lead-ball-per-pound/.
[766]   11 HENING, *supra* note 761, at 478-79.
[767]   *Id.* at 479.
[768]   *Id.*  The meaning of "blind cartridge" is obscure.  It may mean a standard paper cartridge.
[769]   *Id.*
[770]   *Id.*

Electronic copy available at: https://ssrn.com/abstract=3205664

The following year, Virginia passed the act[771] that defined its militia when it ratified the Second Amendment on December 15, 1791,[772] making the Amendment part of the Constitution.  Virginia ratified nine other amendments on the same day, enshrining them in the Constitution, and making December 15 the birthday of the Bill of Rights.[773]

The 1785 Virginia act included in the general militia "all free male persons between the ages of eighteen and fifty years."[774]  Some young men would get extra training in a

> light company to be formed of young men, from eighteen to twenty-five years old, whose activity and domestic circumstances will admit of a frequency of training, and strictness of discipline, not practical for the militia in general, and returning to the main body, on their arrival at the latter period, will be constantly giving thereto a military pride and experience, from which the best of consequences will result.[775]

These light companies were "in all respects [] subject to the same regulations and orders as the rest of the militia."[776]  For all the militia, the requisite arms were the same as before.[777]

On December 22, 1792, Virginia passed a new militia law in response to the federal Uniform Militia Act, to "carry the same into effect."[778]  The act provided for the continuation of the same "light company" "of young men from eighteen to twenty-five years age" that had been established in Virginia's previous militia act.[779]  The 1792 Virginia law made no changes in the age limits.  A 1799 amendment did not address ages or arms.[780]

L.  Massachusetts Bay: "from ten yeares ould to the age of sixteen yeares"

Virginia's ratification of the Second Amendment and of nine other Amendments made the Bill of Rights the supreme law of the land, effective

---

[771]  12 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 9 (1823).  This act was amended in 1786, but it did not impact the age limits or arms requirements. *Id.* at 234.

[772]  JOURNAL OF THE FIRST SESSION OF THE SENATE OF THE UNITED STATES OF AMERICA, *supra* note 659, at 361.

[773]  U.S. CONST. amends. I-X.

[774]  12 HENING, *supra* note 771, at 10.

[775]  *Id.* at 14-15.

[776]  *Id.* at 15.

[777]  *Id.* at 12.

[778]  13 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 340 (1823).

[779]  *Id.* at 344.

[780]  2 THE STATUTES AT LARGE OF VIRGINIA: FROM OCTOBER SESSION 1792, TO DECEMBER SESSION 1806 [I.E. 1807], INCLUSIVE, IN THREE VOLUMES, (NEW SERIES,) BEING A CONTINUATION OF HENING 141 (1835).

Electronic copy available at: https://ssrn.com/abstract=3205664

December 15, 1791.[781]    The three states that had not yet acted—
Massachusetts, Georgia, and Connecticut—therefore had no reason to take
up the issue.  Yet in all three of these states, ratification of the Second
Amendment and the rest of the Bill of Rights was placed on the legislative
agenda in early 1939.  These 1939 ratifications were apparently enacted to
make a statement at a time when right-wing fascists (e.g., Mussolini, Hitler,
Franco), and left-wing fascists (e.g., Stalin, Mao) were wantonly murdering
disarmed victims.  The first state to ratify in 1939 was Massachusetts, on
March 2.[782]

    In the colonial period and Founding Era, the Bay State had especially
strong laws for mass armament.  In 1631, Massachusetts Bay enacted a law
mandating that all adult males be armed.[783]  A 1637 statute required everyone
18 and older to "come to the publike assemblies with their muskets, or other
peeces fit for servise, furnished with match, powder, & bullets."[784]

    Young people of both sexes were expected to be proficient with arms.
A 1645 statute mandated that "all youth within this jurisdiction, from ten
yeares ould to the age of sixteen yeares, shalbe instructed, by some one of
the officers of the band,[785] or some other experienced souldier…upon the
usuall training dayes, in the exercise of armes, as small guns, halfe pikes,
bowes & arrows."[786]  There was an exemption for conscientious objectors;
youths would not have to train "against their parents minds."[787]

    In the 1770 Boston Massacre, British soldiers fired on a crowd that was
pelting them with stones and ice balls.  John Adams served as defense
attorney.[788]  Both sides agreed that the soldiers and the crowd each had the
right to carry arms for self-defense.  "The court's charge to the jury asserted
the traditional duty of private persons to respond to the hue and cry and to
carry arms: 'It is the duty of all persons (except women, decrepit persons,
and infants under fifteen) to aid and assist the peace officers to suppress riots

---

[781]    U.S. CONST. amends. I-X.
[782]    JOURNAL OF THE SENATE OF THE COMMONWEALTH OF MASSACHUSETTS 369 (1939).  For the
essential similarity of the totalitarian "fascist," "communist," or "national socialist" regimes, *see*,
*e.g.*, Arthur M. Schlesinger, Jr., The Vital Center: The Politics of Freedom (1949).
[783]    KYLE F. ZELNE, A RABBLE IN ARMS: MASSACHUSETTS TOWNS AND MILITIAMEN DURING KING
PHILIP'S WAR 28 (2009).
[784]    1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND
190 (Nathaniel B. Shurtleff ed., 1853).
[785]    The "trained band."  In American usage, either the militia in general, or an elite militia unit that
received extra training.  In British usage, only an elite unit.
[786]    2 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND
99 (Nathaniel B. Shurtleff ed., 1853).
[787]    *Id.*
[788]    JOHN ADAMS, 3 LEGAL PAPERS OF JOHN ADAMS 5-6 (L. Kinvin Wroth & Hiller B. Zobel eds.,
1965).

KR0309

Electronic copy available at: https://ssrn.com/abstract=3205664

& c. when called upon to do it.  They may take with them such weapons as are necessary to enable them effectually to do it.'"[789]

As political tensions mounted, the British tried to suppress political meetings.  They could not do so, for the Redcoats were far outnumbered by armed Americans, including teenagers.  When British General sent two companies of Redcoats to dissolve an illegal town meeting in Salem, soldiers backed down when swarms of armed patriots began to appear.[790]  Gage's aide John Andrews wrote:

> there was upwards of three thousand men assembled there from the adjacent towns, with full determination to rescue the Committee if they should be sent to prison, even if they were Oblig'd to repel force by force, being sufficiently provided for such a purpose; as indeed they are all through the country—every male above the age of 16 possessing a firelock with double the quantity of powder and ball enjoin'd by law.[791]

At the time Massachusetts ratified the Constitution on February 6, 1788, its militia laws provided for "the train-band to contain all able-bodied men, from sixteen to forty years of age, and the alarm-list all other men under fifty years of age."[792]

Every militiaman "not under the control of parents, masters or guardians, and being of sufficient ability therefore in the judgment of the selectmen of the town in which he shall dwell," had to "equip himself, and be constantly provided with a good fire-arm," plus a ramrod, cleaning tools, a bayonet and scabbard, a cartridge box to hold "fifteen cartridges at least," plus six flints, one pound of powder, forty leaden balls suitable for this firearm, a haversack, blanket, and canteen."[793]  Officers and cavalrymen had to provide themselves with horses plus associated equipment, and a carbine (a shorter, lighter-weight long gun, well-suited for use while mounted).[794]

Militiamen who failed to equip themselves with the required arms could be fined.[795]

Regarding militiamen who *were* "under the control of parents, masters or guardians," the parent, master, or guardian was responsible for providing the equipment, and could be fined for failure to do so.[796]  Both servants and

---

[789]   *Id.* at 285.
[790]   RAY RAPHAEL, A PEOPLE'S HISTORY OF THE AMERICAN REVOLUTION: HOW COMMON PEOPLE SHAPED THE FIGHT FOR INDEPENDENCE 55 (2002).
[791]   *Id.*
[792]   I. THOMAS & E.T. ANDREWS, THE PERPETUAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS FROM THE ESTABLISHMENT OF ITS CONSTITUTION IN THE YEAR 1780 TO THE END OF THE YEAR 1800, at 339 (1801).
[793]   *Id.* at 340-41.
[794]   *Id.* at 347.
[795]   *Id.* at 341.
[796]   *Id.*

Electronic copy available at: https://ssrn.com/abstract=3205664

young people who were living at home were, presumably, not yet earning enough income to live independently, so they might not be able to afford their own arms.

For older militiamen who were genuinely unable to afford arms, the town would be responsible for providing them.[797]  The donated arms remained town property and could not be sold by the militiaman.[798]

M.  Plymouth Colony: "each man servant"

By 1939, Plymouth had long ceased to exist as an independent political entity.  Even in the early days, it had been overshadowed by its larger and culturally similar neighbor, the Massachusetts Bay Colony.  In 1691, Plymouth chose assimilation with Massachusetts; it was a defensive measure, since New York was trying to annex Plymouth.[799]  So we cover Plymouth Colony in order with Massachusetts Bay.

Plymouth's first written arms mandate came in 1632.[800]  "[E]very freeman or other inhabitant must provide for himselfe and each under him able to beare arms a musket and other serviceable peece with banderoes and other apurtanances," plus two pounds of powder and 10 pounds of bullets.[801]  This was reenacted in 1636, specifying that it included "each man servant."[802]  As in Massachusetts, the master had to provide the arms for the servants, many of whom presumably could not afford their own.[803]

A 1643 update revised the required firearms.[804]  A comprehensive recodification in 1671 specified that the militia is "every man from the age sixteen and upwards."[805]  It also required smiths to repair arms and to charge the same rates they charged for other work.[806]  In 1676, old-fashioned matchlocks (ignited by burning cord) were no longer acceptable for the militia; the gun had to be a flintlock or a snaphaunce (ignited by a spark from flint striking steel).[807]  A 1681 revision added the requirement to possess a sword or cutlass.[808]

---

[797]    *Id.*
[798]    *Id.*
[799]    DAVID S. LOVEJOY, THE GLORIOUS REVOLUTION IN AMERICA 347 (1972).
[800]    THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 30-31 (William Brigham ed., 1836).
[801]    *Id.* at 31.
[802]    *Id.* at 44-45.
[803]    *Id.*
[804]    *Id.* at 74 (service guns should be matchlocks, snaphaunces [an early version of the flintlock], or flintlocks, not longer than four and a half feet, and of a bore at least the size of a caliver or a bastard musket).
[805]    *Id.* at 285-86.
[806]    *Id.* at 286.
[807]    *Id.* at 184.
[808]    *Id.* at 192.

Electronic copy available at: https://ssrn.com/abstract=3205664

**KR0311**

Like the other colonies, Plymouth had many indentured servants.  After their term of service was completed, they became legally free.  The age of attaining freedom would vary of course, but it could include people in their late teens or early twenties.  Former male servants, or other male single persons, could not set up their own households unless they possessed the requisite arms and ammunition.[809]  If they did not, they had to work for someone who would buy the arms and ammunition for them.[810]

N. Georgia: No going to church without arms

Georgia did not get around to ratifying the Second Amendment until March 18, 1939.[811]  It was only three days after Hitler had invaded Czechoslovakia.  As was the typical Nazi practice, one of the first acts of the dictatorship was to confiscate arms from the new subjects.[812]

In 1791, when the Second Amendment became part of the Constitution, Georgia required males between 16 and 50 to serve in the militia and provide their own arms.[813]  The arms requirement was "one rifle musket, fowling-piece or fusee fit for action, with a cartridge box or powder-horn answerable for that purpose with six cartridges or powder and lead equal thereto and three flints."[814]

A 1770 Georgia law, copied from South Carolina, imposed fines on those in the militia who came to church unarmed.[815]

---

[809]   *Id.* at 35.

[810]   *Id.*  On top of the individual requirement to possess arms, towns had to have their own: two flintlocks and two swords per 30 men. *Id.* at 84.  These could be available as a reserve in case of breakage during war; they could also be furnished to persons who could not afford their own.

[811]   ACTS AND RESOLUTIONS OF THE GENERAL ASSEMBLY OF THE STATE OF GEORGIA 1414 (1939).

[812]   *See, e.g.*, THE TIMES (London), Mar. 16, 1939, at 16b.
> Immediately a proclamation, bordered in red and bearing the German eagle and swastika which is now familiar to every Czech town and village, was posted…Under this proclamation no one was allowed in the streets after 8 p.m. . . .; all popular gatherings were forbidden; and weapons, munitions, and wireless sets were ordered to be surrendered immediately.  Disobedience of these orders, the proclamation ended, would be severely punished under military law.

[813]   19 (pt. 2) THE COLONIAL RECORDS OF THE STATE OF GEORGIA 348 (Allen D. Candler ed., 1911), https://books.google.com/books?id=1TMTAAAAYAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false.

[814]   *Id.* at 353.

[815]   19 (pt. 1), *id.* at 137-40.  Georgia continued to mandate the carrying of arms in non-militia contexts in the nineteenth century.  An 1806 law required "All male white inhabitants . . . from the age of eighteen to forty-five years . . . to appear and work upon the several roads, creeks, causeways, water-passages, and bridges" and to "carry with him one good and sufficient gun or pair of pistols, and at least nine cartridges to fit the same, or twelve loads of powder and ball, or buck shot." OLIVER H. PRINCE, DIGEST OF THE LAWS OF THE STATE OF GEORGIA 407, 409 (1822), https://books.google.com/books?id=9tUtYuEuWC0C&pg=PA339&dq=georgia+1786+laws&hl=en&sa=X&ved=0ahUKEwjj9Ym0nafeAhVhpoMKHaLIC0IQ6AEIRzAF#v=onepage&q=%22gun%22&f=false.

Electronic copy available at: https://ssrn.com/abstract=3205664

O. Connecticut: "all persons shall beare Armes that are above the age sixteene yeeres"

The Nutmeg State was also slow in its Second Amendment ratification, finally acting on April 19, 1939.[816]  The date was the anniversary of the battles of Lexington and Concord, when the American Revolution had begun in 1775.[817]  On that date, American militia and irregulars had repulsed British efforts to confiscate arms.  But 164 years later, totalitarianism was on the march.  Italian tyrant Mussolini had invaded Albania on Good Friday, April 7, 1939, and conquered the small nation in a few days.[818]

When Connecticut was founded in 1636, its government ordered that "every souldier" should have "in his own howse in a readiness" two pounds of gunpowder and twenty lead bullets.[819]  A more detailed law in 1637 ordered "that all persons shall beare Armes that are above the age sixteene yeeres."[820]  Commissioners and church officers were exempt.[821]  "[E]very military man" had to have "continually in his house" half a pound of powder and two pounds of bullets.[822]  Towns were required to have specified reserves of gunpowder and lead bullets.[823]

Central stores of bullets and gunpowder were important in case of extended fighting.  The colonists' personal supplies of ammunition might run out.  During wartime, roads might be captured by the enemy, so a town might not be able to bring in more gunpowder and lead from outside.

In 1650, the colony ordered "[t]hat all persons that are above the age of sixteene yeares, except magistrates and church officers, shall beare Armes…; and every male person … aboue the said Age, shall have in continuall readines, a good muskitt or other gunn, fitt for service, and allowed by the Clark of the Band."[824]

---

[816]   JOURNAL OF THE SENATE OF THE STATE OF CONNECTICUT, JAN. SESS., 1939: PART 2, at 1403 (1939), https://babel.hathitrust.org/cgi/pt?id=mdp.39015067981400;view=1up;seq=193.

[817]   *See, e.g.*, ALLEN FRENCH, THE DAY OF CONCORD AND LEXINGTON: THE NINETEENTH OF APRIL, 1775 (1984).

[818]   Albania had won its independence from the Ottoman Empire, in a 1908-12 war in which Albanians demanded, inter alia, the right to bear arms.  But in 1928 King Zog, an authoritarian ruler, had banned arms for all tribes but his own. OWEN PEARSON, ALBANIA AND KING ZOG: INDEPENDENCE, REPUBLIC AND MONARCHY 1908-1939, at 21, 26-27, 299, 304 (2005).

[819]   1 PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 3 (J. Hammond Trumbull ed., 1850).

[820]   *Id.* at 15.

[821]   *Id.*

[822]   *Id.*

[823]   *Id.* at 15-16.

[824]   *Id.* at 542-43; CODE OF 1650, BEING A COMPILATION OF THE EARLIEST LAWS AND ORDERS OF THE GENERAL COURT OF CONNECTICUT 72-73 (Silas Andrus ed., 1822).

KR0313

Electronic copy available at: https://ssrn.com/abstract=3205664

New Haven, a separate colony until 1662, required males 16 to 60 to have "a good serviceable gun…to be kept in a constant fitness in all Respects for service."[825]  Also necessary were a "a good sword," bandoleers, a powder horn, worm, scourer, priming wire, shot bag, charger, "and whatsoever else is necessary for such service."[826]  The ammunition minimum was at least "a pound of good powder" plus "four pounds of pistol bullets" or twenty-four long gun bullets, plus match for a matchlock or flints for a flintlock.[827]

Connecticut ratified the Constitution a week after Georgia on January 9, 1788.  Under the state law of the time, "[A]ll male Persons, from sixteen Years of Age to Forty-five, shall constitute the Military Force of this State."[828]  Although not part of "the military force," all "Householders under fifty-five Years of Age" had to "be furnished at their own Expence" with the same arms as the militia.[829]

These arms were "a well fixed Musket, the Barrel not less than three Feet and an Half long, and a Bayonet fitted thereto, with a Sheath and Belt or Strap for the same."[830]  Militiamen, males under fifty-five, and householders also needed a ramrod, worm, priming-wire, and cartridge box with "fifteen rounds of Cartridges, made with good Musket Powder and Ball, fitting his Gun."[831]  Also needed were "six good Flints" and "one Canteen holding not less than three Pints."[832]

Light-Dragoons (horsemen) had to have "a Case of good Pistols…one Pound of good Powder, three Pounds of sizable Bullets, twelve Flints, a good pair of Boots and Spurs."[833]

## IV.  FEDERAL LAWS

The Continental Congress, consisting of delegates from the thirteen colonies,[834] began exercising powers of national sovereignty in 1774.[835] Independence was formally declared in 1776.  In 1781, the Continental

---

[825] NEW-HAVEN'S SETTLING IN NEW-ENGLAND AND SOME LAWES FOR GOVERNMENT: PUBLISHED FOR THE USE OF THAT COLONY 60-61 (1656).
[826] Id. at 61.  The worm was a device for cleaning the barrel and for extracting an unfired bullet from a firearm.  The priming wire was for cleaning the touch hole—the small hole where the fire from the priming pan connected with the main powder charge in the barrel.
[827] Id.
[828] ACTS AND LAWS OF THE STATE OF CONNECTICUT IN AMERICA 144 (1786).
[829] Id. at 145.
[830] Id. at 150.
[831] Id.
[832] Id.
[833] Id.
[834] Georgia was unrepresented at the 1774 Convention because it was preoccupied by an Indian uprising, and dependent on the British for supplies.
[835] Documents from the Continental Congress and the Constitutional Convention, 1774 to 1789, LIBR. CONGRESS, https://www.loc.gov/collections/continental-congress-and-constitutional-convention-from-1774-to-1789/articles-and-essays/timeline/1773-to-1774/ (last visited Jan. 13, 2019).

Electronic copy available at: https://ssrn.com/abstract=3205664

Congress turned into the Confederation Congress, when the Articles of Confederation were ratified.[836]  During the Revolution, the Congress did its best to provide for the Continental Army. But management of the wartime militia was far beyond the administrative capacity of the Congress.

Under the Articles of Confederation, every state was obliged to "always keep up a well regulated and disciplined militia, sufficiently armed and accoutered."[837]   While the militias were a state responsibility, the Confederation Congress could requisition the states to supply land forces "for the common defense."[838]  Also, Congress could appoint militia officers above the rank of colonel when the state militia forces were in national service.[839]  Under a federal requisition, the state legislature had the duty to "raise the men and cloath, arm and equip them in a soldier like manner," with the Confederation Congress paying the expense.[840]

The Confederation Congress drew up a militia plan, putting married men and single men in different classes.  The militia were to be "All the free male inhabitants of each state from 20 to fifty, except such as the laws of the State shall exempt, to be divided into two general classes; one class to consist of married and the other class of single men."[841]  Required arms for infantry and dragoons were similar to, although less detailed than, the state laws.[842]

The Articles of Confederation gave Congress few powers to legislate directly on the people, instead requiring Congress to act through the state governments.  As far as we can tell, the 1783 congressional militia plan did not have much influence.

The United States Constitution, proposed in 1787 and ratified in 1789, was intended to change things.  Congress was given a list of enumerated powers, by which it could directly act on the people.[843]  Article I, section 8

---

[836]   ARTICLES OF CONFEDERATION OF 1781.
[837]   ARTICLES OF CONFEDERATION OF 1781, art. VI.
[838]   ARTICLES OF CONFEDERATION OF 1781, art. VII.
[839]   *Id.*
[840]   ARTICLES OF CONFEDERATION OF 1781, art. IX.
[841]   25 JOURNALS OF THE CONTINENTAL CONGRESS 741 (Oct. 23, 1783), https://memory.loc.gov/cgi-bin/query/r?ammem/hlaw:@field(DOCID+@lit(jc02544).
[842]   Each class to be formed into corps of Infantry and Dragoons, organized in the same manner as proposed for regular troops.

> Those who are willing to be at the expense of equipping themselves for Dragoon service to be permitted to enter into that corps, the residue to be formed into the Infantry; this will consult the convenience and inclinations of different classes of citizens.
>
> Each officer of the Dragoons to provide himself with a horse, saddle &c. pistols and sabre, and each non-commissioned officer and private with the preceding articles and these in addition, a carbine and cartouch box, with twelve rounds of powder and ball for his carbine, and six for each pistol.
>
> Each officer of the Infantry to have a sword, and each non-commissioned officer and private, a musket, bayonet and cartouch box, with twelve-rounds of powder and ball.

*Id.* at 741-42.
[843]   U.S. CONST., art. I, § 8.

Electronic copy available at: https://ssrn.com/abstract=3205664

**KR0315**

contained two militia clauses.[844]  Clause 15 (the Calling Forth Clause) gave Congress power "To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions."[845]  Clause 16 (the Arming Clause) gave Congress power:

> To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.[846]

After several years of prodding by President Washington, Congress exercised its power to organize and to provide for arming the federal militia. The Militia Act of 1792 (Uniform Militia Act) was signed into law by President Washington on May 8, 1792.[847]  The Act provided:

> That each and every free able-bodied white male citizen of the respective States, resident therein, who is or shall be of age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia, by the Captain or Commanding Officer of the company, within whose bounds such citizen shall reside, and that within twelve months after the passing of this Act. And it shall at all time hereafter be the duty of every such Captain or Commanding Officer of a company, to enroll every such citizen as aforesaid, and also those who shall, from time to time, arrive at the age of 18 years, or being at the age of 18 years, and under the age of 45 years (except as before excepted) shall come to reside within his bounds; and shall without delay notify such citizen of the said enrollment, by the proper non-commissioned Officer of the company, by whom such notice may be proved.  That every citizen, so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch, with a box therein, to contain not less than twenty four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapsack, shot-pouch, and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear so armed, accoutred and provided, when called out to exercise or into service, except, that when called out on company

---

[844]   U.S. CONST., art. I, § 8.
[845]   U.S. CONST., art. I, § 8, cl. 15.
[846]   U.S. CONST., art. I, § 8, cl. 16.
[847]   More effectually to provide for the National Defence by establishing an Uniform Militia throughout the United States,1 Stat. 271 (1792) (Uniform Militia Act) (UMA).  The UMA was sometimes called the Second Militia Act, since a statute enacted earlier that year had provided a system for calling forth the militia in times of necessity.  To provide for calling forth the Militia to execute the laws of the Union, suppress insurrections and repel invasions, 1 Stat. 264 (1792).

Electronic copy available at: https://ssrn.com/abstract=3205664

days to exercise only, he may appear without a knapsack.  That the commissioned Officers shall severally be armed with a sword or hanger, and espontoon; and that from and after five years from the passing of this Act, all muskets from arming the militia as is herein required, shall be of bores sufficient for balls of the eighteenth part of a pound; and every citizen so enrolled, and providing himself with the arms, ammunition and accoutrements, required as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales, for debt or for the payment of taxes.[848]

The legislative history of the Militia Act reveals why eighteen was selected as the minimum age.  Secretary of War Henry Knox had presented an ambitious militia plan to Congress in 1790.[849]  Knox wanted to create a national select militia, founded on intensive training of males aged 18 to 20.[850]  Even in a Federalist-dominated Congress, the idea was anathema.  As opponents pointed out, the nascent federal government did not have the administrative capability to establish an effective national militia.

For the more realistic 1792 statute, Knox explained that "[t]he period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen."[851]  Knox acknowledged that "military age has generally commenced at sixteen," but Knox instead set the bar at 18 because "the youth of sixteen do not commonly attain such a degree of robust strength as to enable them to sustain without injury the hardships incident to the field."[852]  Knox also stated that "all men of the legal military age should be armed."[853]  Representative Jackson of Georgia agreed "that from eighteen to twenty-one was found to be the best age to make soldiers of."[854]

Knox's first, rejected, plan had implied that the select militia of 18-20 would be armed by the federal government.  This brought stern objection:

Representative Wadsworth warned that supporters of the federal arming proposal seemed to be suggesting that large segments of the population would be armed by the government, with the attendant dangers: "At first it appeared to be intended for the benefit of poor men who were unable to spare money enough to purchase a firelock: but the gentleman from Delaware (Mr. Vining) had mentioned apprentices and young men in their non-age: he would be glad to know whether there was a man within these walls, who wished to have so large a proportion of the community by the United States, and liable to be disarmed by the government, whenever it should be thought proper."  Masters could be expected to furnish arms to

---

[848] *Id.*

[849] 1 ANNALS OF CONG. app. 2141-61 (Jan. 18, 1790).

[850] *Id.* at 2146.

[851] *Id.*

[852] *Id.* at 2153.

[853] *Id.* at 2145-46.

[854] *Id.* at 1860.

**KR0317**

Electronic copy available at: https://ssrn.com/abstract=3205664

> their apprentices.  As to other young men, "their parents would rather give them guns of their own, than let them take others from the U.S. which were liable to be taken away at the very moment they were most wanted."[855]

The notion that the federal government might be able to take provided arms away from 18-to-20-year-olds set off alarm bells.

The idea that 18-year-olds should be part of the militia was hardly controversial.  They had been part of every colonial and state militia from the very beginning, except for a nineteen-year period in Virginia in the middle of the eighteenth century.  George Washington believed that 18 was the ideal age for militia enrollment.[856]  Nearly a decade before he signed the Militia Act of 1792, he wrote to Alexander Hamilton that, "the Citizens of America … from 18 to 50 Years of Age should be borne on the Militia Rolls" and "so far accustomed to the use of [arms] that the Total strength of the Country might be called forth at a Short Notice on any very interesting Emergency."[857]

Congress made no changes to the 1792 Militia Act until the Civil War, when an 1862 revision removed the word "white" from the definition of the militia.[858]

By the early twentieth century, the 1792 Act was in obvious need of revision.  Muskets, powderhorns, and flints were no longer the appropriate equipment for militiamen.  President Theodore Roosevelt, a gun enthusiast and National Rifle Association (NRA) member,[859] declared: "Our militia law is obsolete and worthless."[860]

A new law, the Dick Act (named for its sponsor, Charles Dick) repealed the 1792 Act and replaced it with the modern definition of the militia of the United States.[861]  This militia consisted of all able-bodied male citizens between 18 and 45 years of age, and also aliens who have declared intent to naturalize.[862]  The "organized militia" was the National Guard of the several States.[863]  Everyone else was part of the "reserve militia," which later statutes labeled the "unorganized militia."[864]

---

[855]   14 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS: DEBATES IN THE HOUSE OF REPRESENTATIVES 62 (1992).

[856]   26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick ed., 1938).

[857]   Id.

[858]   Militia Act of 1862, 12 Stat. 597 (July 17, 1862).

[859]   For information on Roosevelt, guns, and the NRA, see, e.g., THEODORE ROOSEVELT, HUNTING TIPS OF A RANCHMAN (NRA Heritage Library 1999) (1885); THEODORE ROOSEVELT, GOOD HUNTING: IN PURSUIT OF BIG GAME IN THE WEST (1907); Ashley Halsey, Jr., Theodore Roosevelt, Trailblazer among Hunter-Conservationists, THE AMERICAN RIFLEMAN, June 1972, at 14, 16.

[860]   14 MESSAGES AND PAPERS OF THE PRESIDENTS 6672 (Bureau of National Literature, 1917).

[861]   Dick Act, ch. 196, 32 Stat. 775 (1903).

[862]   Id.

[863]   Id.

[864]   Id.

Electronic copy available at: https://ssrn.com/abstract=3205664

There was no mandate for personal possession of arms.  Nor, except for the National Guard, was there any provision for the federal government to provide arms.

In the current version of the statute:

> (a) The militia of the United States consists of all able-bodied males at least 17 years of age and, except as provided in section 313 of title 32, under 45 years of age who are, or who have made a declaration of intention to become, citizens of the United States and of female citizens of the United States who are members of the National Guard.
>
> (b) The classes of the militia are--
> (1) the organized militia, which consists of the National Guard and the Naval Militia; and
> (2) the unorganized militia, which consists of the members of the militia who are not members of the National Guard or the Naval Militia.[865]

In 1903, Congress created the National Board for the Promotion of Rifle Practice (NBPRR).[866]  It did not require citizens to possess arms or to practice with them, but it encouraged them to do so.  The NBPRR developed a close relationship with the NRA, which had been founded in 1871, growing from concerns about the poor marksmanship of Union soldiers during the Civil War.[867]  By statute, the NBPRR and the NRA were linked.[868]  The NRA was the NBPRR's agent for distributing heavily discounted surplus arms to the American public, via NRA gun clubs.[869]

The National Guard Association (an association of state entities), the National Board for the Promotion of Rifle Practice (a federal entity), and the National Rifle Association (a membership organization) developed a close and mutually supportive relationship.  Their boards of directors often overlapped.[870]

Through this relationship, over the course of the twentieth century the federal government put millions of military-grade firearms into the hands of

---

[865] 10 U.S.C. § 246 (2019).  There are various occupational exemptions; conscientious objectors may be required to perform noncombat duty. 10 U.S.C. § 247 (2019).

[866] *The National Matches History*, CIVILIAN MARKSMANSHIP PROGRAM http://thecmp.org/competitions/cmp-national-matches/the-national-matches-history/ (last visited Jan. 13, 2019).

[867] *A Brief History of the NRA*, NAT'L RIFLE ASS'N (2018), https://home.nra.org/about-the-nra/.

[868] Act of Mar. 3, 1905, ch. 1416, 33 Stat. 986-87.

[869] *Id.*

[870] JEFFREY A. MARLIN, THE NATIONAL GUARD, THE NATIONAL BOARD FOR THE PROMOTION OF RIFLE PRACTICE, AND THE NATIONAL RIFLE ASSOCIATION: PUBLIC INSTITUTIONS AND THE RISE OF A LOBBY FOR PRIVATE GUN OWNERSHIP 182 (May 10, 2013) (unpublished Ph.D. dissertation, Ga. St. U.), https://scholarworks.gsu.edu/history_diss/33/; RUSSELL S. GILMORE, CRACKSHOTS AND PATRIOTS: THE NATIONAL RIFLE ASSOCIATION AND AMERICA'S MILITARY-SPORTING TRADITION, 1871-1929 (1974) (unpublished Ph.D. dissertation, Univ. of Wisc.) (available in ProQuest Dissertations & Theses Global).

KR0319

Electronic copy available at: https://ssrn.com/abstract=3205664

private American citizens, including young adults aged 18 to 20.  This bore fruit in World War II.  With the National Guard federalized and sent into overseas service, coastal security was provided by the unorganized militia, "whose ages ranged from 16 to 65, served without pay and provided their own arms."[871]

The federal Gun Control Act of 1968 required all persons "engaged in the business" of selling firearms to obtain a Federal Firearms License.[872] ("FFL"; the term is used for both the license and the licensee.)  An FFL may not deliver a handgun to a person under 21, or a rifle or shotgun to a person under 18.[873]  As the Supreme Court later noted, the 1968 Act aimed to keep guns away from "juveniles, criminals, drug addicts, and mental incompetents."[874]

The FFL rule for handgun deliveries will be discussed in Part V.B., which examines the unsuccessful challenge to the statute in *NRA v. BATF* (5th Cir.).

In 1994, Congress prohibited handgun possession by minors (under 18), with certain exceptions.[875]  That law was upheld by the First Circuit in *Rene E.*, which is discussed below in Part V.A.

## V.  NINETEENTH AND EARLY TWENTIETH CENTURY STATE LAWS AND CASES—AND THEIR ROLE IN MODERN LITIGATION

Our article in the previous issue of the Southern Illinois University Law Journal surveyed nineteenth and early twentieth century state laws and cases about firearms restrictions on young people.[876]  We also examined the five leading post-*Heller* federal circuit cases involving challenges to state or federal arms laws aimed at young people.  In this Part, we will summarize the findings from that Article.  In the interests

---

[871]   Don B. Kates, *Handgun Prohibition*, 82 MICH. L. REV. 204, 272, (1983) (citing Office of the Assistant Secretary of Defense, U.S. Dept. of Defense, *U.S. Home Defense Forces Study*, 58, 62-63 (1981)).

[872]   Gun Control Act of 1968, Pub. L. No. 99-308, 100 Stat. 449, 450 (1968); 18 U.S.C. § 923, 27 C.F.R. § 478.41.

[873]   18 U.S.C. § 922(b)(1) (2019).

[874]   Huddleston v. United States, 415 U.S. 814, 828 (1974).  The federal legislation aimed to curb crime by keeping "firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." *Id.* at 824.

A study of the 1968 law found that it had no impact on the share of 18-to-20-year-olds arrested for homicide, robbery, or aggravated assault. Gary Kleck, *The Impact of the 1968 Gun Control Act's Restrictions on Handgun Purchases by Persons Age 18 to 20* (2011), https://ssrn.com/abstract=1843526.

[875]   18 U.S.C. 922(x)(2) (2019).

[876]   David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. U. L.J. 119 (2018).

Electronic copy available at: https://ssrn.com/abstract=3205664

of concision, many of the footnotes and many details of the discussion from the original article are omitted in this summary.

## A.  State Laws and Cases

As in the colonial period and the Founding Era, there were no age-based arms restrictions in the early republic or the Jacksonian period.  The first age restrictions appear in the South shortly before the Civil War.  In 1856 Alabama prohibited giving handguns to male minors.  In 1860 Kentucky outlawed providing handguns to minors, free blacks, or slaves.  Other than these two laws, age-based restrictions did not appear until the last quarter of the nineteenth century.

As of 1899, there were forty-six states in the Union.  Nineteen of them had some sort of law involving handguns and minors and the other twenty-seven had no such laws.  No state criminalized handgun possession by minors.  Ten states generally prohibited handgun transfers to minors; four of those ten had exceptions for self-defense, hunting, or home possession, and Alabama's law was only for males.  Of these ten statutes, five expressly prohibited loans, while the other five were phrased in terms that could be construed to refer only to permanent dispositions.

Three other states did not restrict transfers in general, but did restrict sales (Delaware, Mississippi) or dealer sales (Wisconsin).  Five states required parental consent for handgun transfers to minors (Illinois, Iowa, Kentucky, Missouri, and Texas).  Nevada simply prohibited concealed carry.

No state restricted long gun purchases by minors, long gun loans to minors, or other long gun transfers to minors, such as gifts.

Modern courts have cited about a dozen cases that involved these statutes.  We examined each of those cases, as well as precedents used in those cases.  The majority of those cases did not involve constitutional issues.  Instead, the decisions were about rules for issues on appeal, the facts of tort liability in a particular situation, and so on.

Four cases did have some substantive analysis of the rights of young people.  Tennessee's *State v. Callicutt* (1878) upheld a statute against giving handguns to minors.[877]  *Callicutt* was explicitly founded on the Tennessee Supreme Court's 1840 *Aymette v. State*.[878]  According to *Aymette*, the Second Amendment right to "bear" arms only means bearing arms while actively serving in a militia.[879]  The *Heller* Court expressly denounced *Aymette*: "This odd reading of the right is, to be sure, not the one we adopt."[880]  Accordingly, *Calicutt* should have little weight as a modern precedent.

---

[877]   State v. Callicutt, 69 Tenn. 714 (1878).
[878]   Aymette v. State, 21 Tenn. (2 Hum.) 154 (1840).
[879]   *Id.* at 158.
[880]   District of Columbia v. Heller, 554 U.S. 570, 613 (2008).

KR0321

Electronic copy available at: https://ssrn.com/abstract=3205664

The Georgia Supreme Court in 1911 upheld a 1910 statute that prohibited the carrying of firearms without a license and did not make licenses available to persons under 18.[881]  The same statute made it illegal to "knowingly sell, or furnish, any minor with 'any pistol, dirk, bowie knife, or sword cane, except under circumstances justifying their use in defending life, limb, or property.'"[882]

The Georgia court in *Glenn v. State* made numerous errors.  First, it interpreted the statute as a complete prohibition on persons under 18 from possessing pistols.[883]  The interpretation is plainly incorrect, since the statute expressly allowed possession for self-defense.

Second, the Georgia court asserted in dicta that all modern handguns could be banned for everyone.[884]  Of course, that assertion is contrary to *Heller*.[885]  That assertion was also contrary to the Georgia Supreme Court's 1846 decision in *Nunn v. State*, which struck down a state ban on almost all handguns.[886]  The *Nunn* decision is quoted and lauded by *Heller* more than any other precedent.[887]  As of 1846, repeating handguns were already well-established and common in the market.

Most egregiously, the *Glenn* court upheld the statute under the theory that minors have *no* rights that the legislature is bound to respect:

> It is entirely within the province of the Legislature, in the exercise of the police power of the state, to prohibit, on the part of minors, the exercise of any right, constitutional or otherwise, although it might only have the right in the case of adults to regulate and restrict such rights.[888]

*Glenn*'s ratio decidendi is contrary to modern precedent.[889]  It is also plainly wrong under the law of the time.  If Glenn were correct that minors have no constitutional rights, then the Georgia Constitution of 1877, which

---

[881]   Glenn v. State, 72 S.E. 927 (Ga. Ct. App. 1911).

[882]   *Id.* at 928.

[883]   *Id.* ("We conclude, therefore, that the act of 1910 not only prohibits minors under the age of 18 years from obtaining license to have a pistol or revolver on their persons, but that the clear intendment of said act is to prevent minors from having about their persons at all this character of weapons, and this construction is in harmony with the general legislation of the state on the subject of minors.").

[884]   *Id.* at 929.

[885]   *Heller*, 554 U.S. 570.

[886]   Nunn v. State, 1 Ga. 243 (1846).

[887]   *Heller*, 554 U.S. 570.

[888]   *Glenn*, 72 S.E. at 928-29.

[889]   *See, e.g.*, Application of Gault, 387 U.S. 1, 13 (1967) (holding that "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone" and that juveniles have the right to counsel, right to notice of charges, right to confront and cross-examine witnesses, and right against self-incrimination); Tinker v. Des Moines Indep. Cty. Sch. Dist., 393 U.S. 503, 511 (1969) ("Students in school as well as out of school are 'persons' under our Constitution.  They are possessed of fundamental rights which the State must respect…").

Electronic copy available at: https://ssrn.com/abstract=3205664

was still in effect in 1911, would have been no barrier to the Georgia legislature enacting laws against some or all minors: to take their property without due process of law, to banish them from the state, to inflict cruel and unusual punishments on them, to require Georgia minors to profess belief in an official state religion, to punish their dissent from said religion as heresy, to forbid them from criticizing government officials of Georgia, to search their houses without warrants, to forbid them to petition government, and to punish them with ex post facto laws and bills of attainder.[890]  The absurdity of the proposition is self-evident.

The most thorough analysis of the arms rights of young people came from the Kansas Supreme Court in *Parman v. Lemmon*.[891]  The case was initially decided one way, then reversed following rehearing, so that the original dissent became the opinion of the court.

The issue was whether a 20-gauge Winchester pump-action shotgun was a "dangerous weapon" prohibited by the Kansas statute that made it a misdemeanor to "sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, sling shot, or other dangerous weapons, to any minor, or to any person of notoriously unsound mind."[892]

Applying esjudem generis, the court held that long guns are not covered by the phrase "dangerous weapons."[893]  The shotgun "is such a common implement that, if the lawmakers intended to include it in the prohibited list, it is extremely unlikely they would have failed to mention it."[894]

Moreover, "the right of the people to keep and bear arms … is a basic principle of statecraft of deep concern to all who are clothed with authority and who feel their responsibility to hand on undiminished to future generations those liberties which are our proud American heritage."[895]

The experience from the first days of the Atlantic colonies through the Indian Wars of the late nineteenth century in Kansas had meant that

> the rifle over the fireplace and the shotgun behind the door were imperatively necessary utensils of every rural American household.  And it was just as imperative that the members of such household, old and young, should know how to handle them. And it was almost equally true that,

---

[890]   *See* GA. CONST. of 1877, art. I, § 1, parts 3, 7, 12, 15, 16, 24, § 3, part 2 (enumerating prohibitions on aforesaid types of government action, and not limiting the protections to only adults).

[891]   Parman v. Lemmon, 244 P. 227 (Kan. 1925).

[892]   *Id.* at 228 (citing R. S. 38-701).   R.S. 38–702 made it unlawful for minors to possess these "dangerous weapons." *Id.*

[893]   "The rule, 'ejusdem generis' ordinarily limits the meaning of general words to things of the same class as those enumerated under them." *Id.* at 229 (citing 2 Words and Phrases, Second Series, 225).

[894]   *Id.* at 232 (Mason, J., dissenting) (later became opinion of the court).

[895]   *Id.* at 231 (Dawson, J., dissenting) (later became opinion of the court).

Electronic copy available at: https://ssrn.com/abstract=3205664

unless a man were trained in the use of the rifle and shotgun in his boyhood, he seldom learned to use them.[896]

Announcing the reversal following the petition for rehearing, the Kansas Court explained:

> [I]t is reasonable to conclude that the Legislature did not intend to make law violators of 60 per cent. of the militia of the state, it being estimated that 60 per cent. of the personnel of that body are minors; that it did not intend to prohibit students under 21 years of age in the colleges from taking military training; that it did not intend to prohibit young men under 21 years of age from taking out hunters' licenses and hunting, that it did not intend to prohibit young men who have not yet reached the age of 21, who reside on the farms and ranches, from carrying and using shotguns and rifles when necessity requires.
>
> These suggestions and many others have had the consideration of the court. We do not deem it necessary to discuss the question at length, nor to analyze the cases. We are of the opinion that, if the Legislature of 1883 had intended to include shotguns in the prohibited list of dangerous weapons, it would have specifically mentioned them.
>
> . . .
>
> By a change of view on the part of some of the Justices, the dissenting opinion at the time of the first decision has now become the controlling voice of the court, and further discussion is needless.[897]

None of the Justices in *Parman* seemed to see a problem with the law against giving handguns to minors, which the Justices characterized as being needed occasionally for self-defense; the court's focus was on long guns, which it characterized as the typical arm of rural self-defense, the ordinary arm of the militia, and a daily tool for rural life.

The final case that involved arms and minors was Virginia's *United States v. Blakeney*.[898] It did not involve any law that targeted the arms rights of minors. Instead, the issue was application of the general rule that minors could not enter into enforceable contracts without the consent of their parent or guardian.[899]   (In the latter twentieth century, the age of majority for exercise of contract and property rights without parental consent would be

---

[896]   *Id.*
[897]   *Id.* at 233.
[898]   *United States v. Blakeney*, 44 Va. (3 Gratt.) 405 (1847).
[899]   *Id.*

Electronic copy available at: https://ssrn.com/abstract=3205664

lowered to 18 in most states, the age that continues to prevail as the national norm.)

The Supreme Court of Appeals of Virginia held that 18-to-20-year-old "minors" were to be treated as adults in the context of bearing arms.[900] Blakeney was a 19-year-old who volunteered for military duty, and regretting his decision, argued that a minor could not enter into a valid contract.[901] The court held the contract valid, based in part on the fact that as a 19-year-old, Blakeney had the mental and physical capacity to bear arms.[902]

The court explained that "children" were exempted from military service because they are incapable of handling arms:

> No person is naturally exempt from taking up arms in defence of the State; the obligation of every member of society being the same. They only are excepted who are incapable of handling arms, or supporting the fatigues of war. This is the reason why old men, children, and women are exempted.[903]

By contrast, "We know, as a matter of fact, that at the age of eighteen, a man is capable intellectually and physically of bearing arms."[904] And since 18-year-olds were just as capable as 21-year-olds of both carrying arms and consenting to military service, the court held that 18-to-20-year-olds were bound by military enlistments just as adults over 21 were.[905] The general rule about contracts

> has no application to the subject. The capacity of all citizens or subjects able to bear arms to bind themselves to do so by voluntary enlistment, is in itself a high rule of the public law, to which the artificial and arbitrary rule of the municipal law forms no exception.[906]

In sum, the statutory and case law record on the nineteenth and early twentieth centuries provide no support for age-based restrictions on long guns. There were a minority of states with age-based restrictions on handguns. The largest group in the minority would be those that either banned retail sales or required parental permission for sales. Laws broad enough to prohibit parents from letting minors use handguns existed in five states. Few cases from the period address the arms rights of minors, and of those, hardly any can be considered valid precedents in light of *Heller* and other modern doctrine.

---

[900] *Id.* at 414-15.
[901] *Id.* at 406-07.
[902] *Id.* at 425.
[903] *Id.* at 408.
[904] *Id.* at 418.
[905] *Id.* at 416.
[906] *Id.* at 409–10.

Electronic copy available at: https://ssrn.com/abstract=3205664

## B. Modern Circuit Cases

Our Article in the previous issue reviewed the nineteenth and early twentieth century history and tradition in the context of their use by the five post-*Heller* Circuit Court of Appeals cases examining the arms rights of young people. We will summarize the analysis of those cases.

### 1. Rene E.

In *United States v. Rene E.*, the First Circuit upheld the 1994 federal statute (discussed in Part IV) that prohibits handgun possession by persons under 18.[907] The court emphasized the importance of the statute's exceptions, such as self-defense in the home, ranching, hunting, militia service, and so on.[908]

For historical support, *Rene E.* relied primarily on the state cases discussed above.[909] This is thin support, for reasons that we summarized above, and detailed in the previous Article.

Regarding the Founding, *Rene E.* could not cite any original American source—hardly surprising in light of the many statutes detailed in Part III, *supra*. The colonial and early state governments had repeatedly mandated that persons 16 and older (or sometimes 18, 15, or 10) be armed.

Instead, the First Circuit cited some modern law review articles stating that the Founders believed that unvirtuous persons could be disarmed.[910] The paradigmatic examples in these articles were persons who were disloyal to the government during wartime, as well as slaves and hostile Indians. The point of the article is true enough, but nothing from the colonial or founding periods indicates that young people were considered unvirtuous people who should be disarmed. The statutory evidence is quite the opposite.

### 2. National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms, Explosives

In this case, the Fifth Circuit upheld the 1968 federal statute that prohibits persons 18-20 from buying handguns in retail stores.[911] The statute does not prohibit young adults from acquiring firearms from persons who are

---

[907]   United States v. Rene E., 583 F.3d 8 (1st Cir. 2009).
[908]   *Id.* at 13-14.
[909]   *Id.* at 14-15.
[910]   *Id.* at 15-16.
[911]   Nat'l Rifle Ass'n v. Bureau of Alcohol, Firearms, and Explosives, 700 F.3d 185 (5th Cir. 2012); 18 U.S.C. § 922(x)(2) (2019).

Electronic copy available at: https://ssrn.com/abstract=3205664

*not* "engaged in the business of selling arms."[912]  The statute allows persons 18 and older to buy long guns from stores (and from others).

The strongest part of the court's historical analysis was its list of state statutes.  As discussed above, by 1899 there were fifteen states that prohibited minors from buying handguns in stores, and three more that required parental permission.  These restrictions were not the majority approach, but neither were they eccentric.

For earlier history, the opinion was weaker.  As the court stated (without citation), gun control laws did exist at the time of the Second Amendment and before.[913]  This was true, but there were no age restrictions on buying, owning, or carrying firearms.

There were laws that "targeted particular groups for public safety reasons."[914]  These were laws aimed at slaves, Indians, and, during wartime, "laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation."[915]  The disarmament of persons not considered citizens (slaves and Indians), or who demonstrated disloyalty, should not create precedent for targeting other "particular groups" whose loyalty is unquestioned.[916]  The Fifth Circuit also cited William Rawle, whose 1825 constitutional law treatise was cited with approval in *Heller*.[917]  Rawle, as fully quoted in *Heller*, wrote that persons who "abused" the right to arms could be disarmed.[918]  The Fifth Circuit chopped Rawle to make it appear that he supported disarmament of people who had never abused the right, but whom the government might consider prospectively dangerous.[919]

Like the Georgia Supreme Court in the 1911 *Glenn* case, the Fifth Circuit resorted to the claim that minors lack constitutional rights.[920]  As the court pointed out, the age majority at common law was 21.[921] Therefore,

> If a representative citizen of the founding era conceived of a 'minor' as an individual who was unworthy of the Second Amendment guarantee, and conceived of 18–to–20–year–olds as 'minors,' then it stands to reason that

---

[912]   *NRA v. BATF*, 700 F.3d at 189.
[913]   *Id.* at 200.
[914]   *Id.*
[915]   *Id.*
[916]   *Id.*
[917]   *Id.* at 201.
[918]   WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 125-26 (William S. Hein & Co. 2003) (2d ed. 1829), https://books.google.com/books?id=ak EbAAAAYAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=fal se; District of Columbia v. Heller, 554 U.S. 570, 607-08 (2008) (quoting RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA).
[919]   *NRA v. BATF*, *supra* note 918, 700 F.3d at 201 (quoting RAWLE, *supra* note 913).
[920]   *Id.*
[921]   *Id.*

Electronic copy available at: https://ssrn.com/abstract=3205664

the citizen would have supported restricting an 18–to–20–year–old's right to keep and bear arms.[922]

The Fifth Circuit's speculation is contrary to all the evidence. Persons under 21 were certainly minors under the common law of the Founding Era. Thus, their independent exercise of contract and property rights was limited. However, there is no evidence "a representative citizen" (or anyone else) in the Founding Era considered all minors "unworthy of the Second Amendment guarantee."[923] To the contrary, state and federal laws of the Founding Era are unanimous that minors aged 18-to-20 *were* considered worthy of the Second Amendment guarantee. As had been the case from the earliest colonial days, they were part of the militia and were required to possess their own arms. Massive and uncontradicted evidence from the Founding Era shows that 18-to-20-year-olds *did* have the right to keep and bear arms, and indeed were required by law to exercise that right.

Assuming arguendo that young adults have Second Amendment rights, the Fifth Circuit applied intermediate scrutiny. The court chose intermediate scrutiny in part because the federal law did not prohibit minors from acquiring handguns for home defense or for other lawful purposes.[924]

The Fifth Circuit found laws against 18-20-year-olds supportable by *Heller*'s emphasis on arms possession by "responsible" citizens.[925] As the Fifth Circuit accurately stated, persons 18-to-20 commit gun crimes at a higher rate than do older people.[926] The same can be said of persons 21-to-25, who commit crimes at a higher rate than do people over 25. The same is true for persons 60-to-65, who commit crimes at a higher rate than do persons over 65. The same point can also be made based on race. Americans of some races commit violent crimes at higher rates than persons of other races. Likewise, males perpetrate violent crimes at a much higher rate than females.

As the Fifth Circuit acknowledged, law-abiding, responsible citizens are at the core of the Second Amendment right.[927] Their rights should not be forfeited because of irresponsible behavior by other persons of the same age, race, or sex.

### 3. *National Rifle Association v. McCraw*

Here the Fifth Circuit upheld the Texas statute that prevented 18-to-20-year-olds from applying for a license to carry handguns for lawful protection

---

[922]    *Id.* at 202.
[923]    *Id.*
[924]    *Id.* at 206-07 (quoting District of Columbia v. Heller, 554 U.S. 570, 628-30, 635 (2008)).
[925]    *Id.* at 206.
[926]    *Id.* at 206-07.
[927]    *Id.*

Electronic copy available at: https://ssrn.com/abstract=3205664

in public places.[928]  Having recently decided *NRA v. BATF*, the Fifth Circuit did not engage in further historical analysis.[929]  The court reiterated the *BATF* theory that "the conduct burdened by the Texas scheme likely 'falls outside the Second Amendment's protection.'"[930]  Also like the *BATF* court, the *McCraw* court applied intermediate scrutiny in an abundance of caution and upheld the law for similar reasons.[931]

However, the court skipped part of the intermediate scrutiny analysis. In strict scrutiny, the government must prove that there is no "less restrictive alternative."  Under the more relaxed standard of intermediate scrutiny, the government must prove that there is no "substantially less burdensome alternative."  The plaintiffs had argued that instead of banning licensed carry for young adults, Texas could have a more rigorous licensing system for young adults, compared to applicants over 21.  The *McCraw* court dismissed that alternative and said that "less restrictive alternative" is not part of intermediate scrutiny.[932]  True enough, but "substantially less burdensome alternative" is part of intermediate scrutiny, and the court offered no explanation for refusing to consider it.

### 4.  *Horsley v. Trame*

Illinois requires that residents obtain a firearm owner's identification (FOID) card before acquiring or possessing a firearm.[933]  In *Horsley v. Trame*, the plaintiff challenged the requirement that FOID card applicants between 18 and 21 obtain the consent of a parent or guardian.[934]  The parental permission rule has a safety valve, by which an applicant can instead apply for consent from the Director of the Illinois firearms license office.[935]  If the office denies the permission, the applicant can appeal to a court.[936]

The Seventh Circuit decided that it need not decide whether it agreed with the Illinois Attorney General that the Second Amendment does not

---

[928]   Nat'l Rifle Ass'n of Am., Inc. v. McCraw, 719 F.3d 338 (5th Cir. 2013).
[929]   *Id.*
[930]   *Id.* at 347 (quoting Nat'l Rifle Ass'n v. Bureau of Alcohol, Firearms, and Explosives, *supra* note 911, 700 F.3d at 203).
[931]   *Id.*
[932]   *Id.* at 349.
[933]   430 ILL. COMP. STAT. 65 (2013).
[934]   Horsley v. Trame, 808 F.3d 1126 (7th Cir. 2015).  The law, 430 ILL. COMP. STAT. 65/4(a)(2)(i), requires an applicant to submit evidence that "[h]e or she is 21 years of age or over, or if he or she is under 21 years of age that he or she has the written consent of his or her parent or legal guardian to possess and acquire firearms and firearm ammunition and that he or she has never been convicted of a misdemeanor other than a traffic offense or adjudged delinquent, provided, however, that such parent or legal guardian is not an individual prohibited from having a Firearm Owner's Identification Card…"
[935]   430 ILL. COMP. STAT. 65/10 (2013).
[936]   *Id.*

KR0329

Electronic copy available at: https://ssrn.com/abstract=3205664

apply to persons under 21.[937]  Regardless, the law was valid since it is not prohibitory, since young adults have a higher crime rate, and since the parental permission law has a safety valve similar to what has been allowed for abortion.[938]

### 5.  Ezell v. City of Chicago

Ezell challenged a Chicago ordinance that prohibited anyone under 18 from entering a shooting range.[939]  Chicago argued that persons under 18 have no Second Amendment rights.[940]  But the nineteenth century statutes on handgun sales were not much help for a total ban on practice with any firearm.  As the Seventh Circuit observed, "There's zero historical evidence that firearm training for this age group is categorically unprotected.  At least the City hasn't identified any, and we've found none ourselves."[941]

Chicago was "left to rely on generalized assertions about the developmental immaturity of children, the risk of lead poisoning by inhalation or ingestion, and a handful of tort cases involving the negligent supervision of children who were left to their own devices with loaded firearms."[942]  Since the government could address these concerns with "a more closely tailored age restriction—one that does not *completely extinguish* the right of older adolescents and teens in Chicago to learn how to shoot in an appropriately supervised setting at a firing range," the law violated the Second Amendment.[943]

### VI. CURRENT STATE LAWS

Part VI surveys current state laws that impose special limits on arms possession or acquisition by young adults.  We do not include state statutes that mimic federal law (such as preventing gun stores from selling handguns to young adults).  We do not address state laws that apply only to persons under 18.  Nor do we address laws, such as the Texas law discussed in the *McCraw* case above, that set the minimum age for a defensive handgun carry license at 21.  The majority of states do set 21 as the carry permit age, while a minority set the age at 18.  A few states, such as Texas, which have a general rule of 18, allow carry permits for young adults in certain circumstances, such

---

[937]    *Horsley*, 808 F.3d at 1130.

[938]    *See id.* at 1127, 1130-32.

[939]    Ezell v. City of Chicago (*Ezell II*), 846 F.3d 888 (7th Cir. 2017).  The *Ezell I* case held unconstitutional the city's ban on all shooting ranges within city limits. Ezell v. City of Chicago (*Ezell I*), 651 F.3d 684 (7th Cir. 2011).

[940]    *Id.* at 896.

[941]    *Id.*

[942]    *Id.* at 898.

[943]    *Id.* (emphasis in original).

Electronic copy available at: https://ssrn.com/abstract=3205664

as a young adult who is currently serving in, or has been honorably discharged from, the armed forces.[944]

As has been true throughout American history, state militia laws include 18-to-20-year-olds. Fifteen state constitutions specify that the starting age for militia service is 18.[945] Two state constitutions, Indiana and Wyoming, specify the starting militia age as 17.[946] Uniquely, the Kansas Constitution makes 21 the starting militia age.[947] The constitutions of Illinois and Montana used to declare that the militia was males 18 to 45; the constitutions were revised to broaden the militia obligation to all able-bodied persons, regardless of age or sex.[948] For many other states, the constitution grants the legislature authority to define the militia, and the legislature has passed laws including 18-to-20-year-olds.

Section A of Part VI describes state laws imposing special limits on firearms acquisition or possession by young adults. Section B discusses the varying age limits for different activities, past and present.

A.  State laws with special arms restrictions on young adults

*California*. "No person, corporation, or firm shall sell, loan, or transfer a firearm to a minor, nor sell a handgun to an individual under 21 years of age."[949] The only circumstance under which a Californian aged 18-20 may purchase a handgun is if the handgun is an antique.[950]

Parents and grandparents (with parental permission) may loan long guns to minors for indefinite periods.[951] Other persons may loan long guns to minors (with parental permission) for up to 30 days.[952]

---

[944]   TEX. CODE ANN. § 411.172(g).
[945]   ARIZ. CONST. art. XVI, § 1; ARK. CONST. art. XI, § 10; COLO. CONST. art. XVII, § 1; IDAHO CONST. art. XIV, § 1; IOWA CONST. art. VI, § 1; KY. CONST. § 219; ME. CONST. art. VII, § 5; MISS. CONST., § 214; N.M. CONST. art. XVIII, § 1; N.D. CONST. art. XI, § 16; OHIO CONST. art. IX, § 1; S.C. CONST. art. XIII, § 1; S.D. CONST. art. XV, § 1; UTAH CONST. art. XV, § 1; WASH. CONST. art. X, § 1.
[946]   IND. CONST. art. XII, § 1; WYO. CONST. art. XVII, § 1.
[947]   KAN. CONST. art. VIII, § 1.
[948]   ILL. CONST. of 1870, art. XII, § 1; MONT. CONST. of 1889, art. XIV, § 1. Illinois now provides that "The State militia consists of all able-bodied persons residing in the State except those exempted by law." ILL. CONST. art. XII, § 1; MONT. CONST. art. VI, § 13(2).1.
       In both states, current laws show that the newer provisions still include 18-to-20-year-olds. *See* 20 ILL. COMP. STAT. 1805/1 ("All able-bodied citizens of this State . . . between the ages of 18 and 45 . . . shall be subject to military duty and designated as the Illinois State Militia"); MONT. CODE ANN. § 10-1-103(1) ("the organized militia [] consists of the national guard and the Montana home guard"); 32 U.S.C. § 313 ("To be eligible for original enlistment in the National Guard, a person must be at least 17 years of age and under 45").
[949]   CAL. PENAL CODE § 27505(a) (West 2011).
[950]   *Id.* (b)(1).
[951]   *Id.* (b)(2), (3).
[952]   *Id.* (b)(4).

Electronic copy available at: https://ssrn.com/abstract=3205664

A parent may loan a handgun to a minor for sporting activities, agriculture, ranching, or theatrical and entertainment events that use firearms props.[953]  The loan may last no longer than "the amount of time that is reasonably necessary to engage in" the activity.[954]

Other persons may loan handguns to minors for the same purposes, if written permission from the parent or legal guardian is presented to the lender.[955]  The same time limits apply, with the addition proviso that the loan may never exceed ten days.[956]

Thus, a minor may never be transferred a handgun for lawful defense of self and others, even in the parental home, and even in situations of imminent peril.

*Connecticut.*  A state certificate is necessary to own a handgun, and only persons at least 21 years old may apply for the certificate.[957]

*Delaware.*  No person shall sell to someone under 21 "any pistol or revolver, or stiletto, steel or brass knuckles, or other deadly weapon made especially for the defense of one's person."[958]  The prohibition does not apply "to toy pistols, pocket knives or knives used for sporting purposes and in the domestic household, or surgical instruments or tools of any kind."[959]

*District of Columbia.*  Persons may only possess firearms that have been registered with the Municipal Police Department.[960]  Persons under 18 may not register.  Persons 18 to 20 may register if the registrant provides a notarized permission statement from a parent or guardian.[961]  In the notarized statement, the parent or guardian must "assume[] civil liability for all damages resulting from the actions of such applicant in the use of the firearm to be registered; provided further, that such registration certificate shall expire on such person's 21st birthday."[962]

*Florida.*  "A person younger than 21 years of age may not purchase a firearm.     The     sale     or     transfer     of     a     firearm to a person younger than 21 years of age may not be made or facilitated by a licensed importer, licensed manufacturer, or licensed dealer."[963]  Thus, persons under 21 may borrow firearms, or receive them as gifts from private

---

[953]   *Id.* (b)(5)(A).
[954]   *Id.* (b)(5)(B).
[955]   *Id.* (6)(A), (B).
[956]   *Id.* (6)(C), (D).
[957]   Conn. Gen. Stat. § 29-36f(a).
[958]   Del. Code Ann. tit. 24, § 901.
[959]   *Id.* § 903.
[960]   D.C. Code § 7-2502.01(a).
[961]   *Id.* § 7-2502.03(a)(1)(A).
[962]   *Id.* § 7-2502.03(a)(1)(B).
[963]   Fla. Stat. § 790.065(13) (2018).

Electronic copy available at: https://ssrn.com/abstract=3205664

persons.    The restrictions on persons under 21 do not apply to servicemembers.[964]

*Hawaii.*  Permits to acquire firearms may be issued "to citizens of the United States of the age of twenty-one years or more."[965]  Permits may also be issued to aliens under certain circumstances, including to aliens 18 or older "for use of rifles and shotguns for a period not exceeding sixty days, upon a showing that the alien has first procured a hunting license."[966]

*Illinois.*  To purchase or own a firearm, a person must have a Firearm Owner's Identification (FOID) Card.[967]   Applicants under 21 must have written permission from a parent or guardian.[968]   The parent giving permission must not be someone who is prohibited from owning a firearm (e.g., a convicted felon).[969]   The under-21 applicant must, in addition to satisfying generally applicable eligibility requirements, have no misdemeanor convictions other than traffic offenses, and must never have been adjudged delinquent.[970]

As discussed in the section on *Horsely v. Trame*, *supra*, there is a safety valve provision for situations in which parental permission is denied or is unavailable.  Any applicant who is denied can petition the Director of State Police for relief.[971]   The applicant may present evidence, and the State Attorney must be notified and have an opportunity to oppose the petition for relief.  The applicant must prove that "granting relief would not be contrary to the public interest."[972]  A rejected applicant may appeal to state court.[973]

*Iowa.*  In 2017, the legislature repealed a law that had forbidden minors under 14 from temporarily possessing a handgun under any circumstances, even while under direct parental supervision at a target range.[974]

Under current law, anyone who "sells, loans, gives, or makes available a rifle or shotgun or ammunition for a rifle or shotgun to a minor" is guilty of a serious misdemeanor.[975]  Anyone who does the same for a handgun or handgun ammunition is guilty of a serious misdemeanor.[976]

---

[964]    *Id.*
[965]    HAW. REV. STAT. § 134-2(d) (2017).
[966]    *Id.*
[967]    430 ILL. COMP. STAT. 65/2.
[968]    *Id.* 65/4(a)(2)(i).
[969]    *Id.*
[970]    *Id.*
[971]    *Id.* 65/10(c).
[972]    *Id.* 65/10(c)(3).
[973]    *Id.*
[974]    IOWA CODE § 724.22(8); 2017 Iowa Acts 555.
[975]    IOWA CODE, *supra* note 975, § 724.22(1).
[976]    *Id.* § 724.22(2).   Ammunition in .22 caliber is considered rifle ammunition, not handgun ammunition.   *Id.* § 724.22(6).

**KR0333**

Electronic copy available at: https://ssrn.com/abstract=3205664

However, a parent, guardian, spouse (if over 18), or anyone else with express permission from such persons may allow a minor to possess rifles, shotguns, and ammunition therefor.[977]

For handguns, the authorizing parent, guardian, or spouse must be over 21, and the person under 21 may possess the handgun only while under direct supervision.[978]   Alternatively, the supervision may be provided by an instructor.[979]  Any supervisor or instructor who is intoxicated at the time is guilty of child endangerment.[980]

If the minor with the handgun is under 14, the parent, guardian, or spouse is strictly liable for any resulting damages.[981]

Persons 18-to-20 may possess firearms and ammunition without need for parental or spousal permission "while on military duty or while a peace officer, security guard or correctional officer" if the job requires it.[982]  They may also possess arms while receiving instruction from an instructor who is at least 21.[983]

It is unlawful to store a loaded gun in such a manner that "a minor under the age of fourteen years is likely to gain access to the firearm" without the permission of the minor's parent.[984]  Storage is *per se* compliant with the statute if the gun has a trigger lock or is "placed in a securely locked box or container, or placed in some other location which a reasonable person would believe to be secure from a minor under the age of fourteen years."[985]  There is no violation of the law unless a minor does actually access the firearm, and then unlawfully exhibits the firearm in a public place or injures someone by using the firearm unlawfully.[986]  There is no violation "if the minor obtains the firearm as a result of an unlawful entry by any person."[987]

*Maryland.*  Under Maryland law, a "regulated firearm" is a handgun or certain long guns that have been labeled "assault weapons."[988]  Of course there are still laws for other guns, namely rifles and shotguns that are not "assault weapons," but these laws are less stringent than the laws for "regulated firearms."

In general, a person under 21 may not possess a regulated firearm.[989]  Possession is allowed for temporary transfers if the person under 21 will be

---

[977]   *Id.* § 724.22(3).
[978]   *Id.* § 724.22(5).
[979]   *Id.*
[980]   *Id.* § 724.22(9).
[981]   *Id.* § 724.22(8).
[982]   *Id.* § 724.22(4).
[983]   *Id.*
[984]   *Id.* § 724.22(7).
[985]   *Id.*
[986]   *Id.*
[987]   *Id.*
[988]   MD. CODE ANN. PUB. SAFETY § 5-101(r) (2018).
[989]   *Id.* § 5-133(d)(1).

Electronic copy available at: https://ssrn.com/abstract=3205664

"under the supervision of another who is at least 21 years old" and the parents or guardian consent.[990]  Possession is also allowed if the person needs the firearm for employment.[991]  Temporary transfers are also permitted to participants in marksmanship training who are supervised by an instructor.[992]  Also lawful is "the possession of a [regulated] firearm for self-defense or the defense of others against a trespasser into the residence of the person in possession or into a residence in which the person in possession is an invited guest."[993]

*Massachusetts*.  A "Class A" license is necessary to possess a handgun or long guns that are dubbed "assault weapons."[994]  The Class A license also functions as a license to carry; the issuing law enforcement agency has the discretion to issue the license to allow carrying only for sports and target practice, or to issue as a defensive carry permit.[995]  Class A licenses may not be issued to persons under 21.[996]

*New Jersey*.  In general, persons under 18 may not "purchase, barter or otherwise acquire a firearm" and persons under 21 may not do so for handguns.[997]  Further, no one under 18 "shall possess, carry, fire or use a firearm."[998]  The same is true for handguns for persons under 21.[999]

Exceptions are for gun use "[i]n the actual presence or under the direct supervision of his father, mother or guardian, or some other person" who has the appropriate gun possession permit from the state.[1000]  Also allowed is "competition, target practice, instruction, and training" at a firing range.[1001]  Finally, persons can possess the guns "during the regularly designated hunting season," if they have a hunting license and have passed a hunter safety course.[1002]

*New York*.  A license is necessary to possess a handgun.[1003]  Licenses may be issued only to persons who are at least 21.[1004]  But if the applicant has been honorably discharged from the armed forces, no age restriction applies.[1005]

---

[990]   *Id.* § 5-133(d)(2)(i).
[991]   *Id.* § 5-133(d)(2)(v).
[992]   *Id.* § 5-133(d)(2)(iv).
[993]   *Id.* § 5-133(d)(2)(vi).
[994]   MASS. GEN. LAWS ch. 140, § 131(a).
[995]   *Id.* § 131(d).
[996]   *Id.* § 131(d)(iv).
[997]   N.J. STAT. ANN. § 2C:58–6.1(a).
[998]   *Id.* § 2C:58–6.1(b).
[999]   *Id.*
[1000]  *Id.* § 2C:58–6.1(b)(1).
[1001]  *Id.* § 2C:58–6.1(b)(3).  The range must have been approved by a local governing body or by the National Rifle Association. *Id.*
[1002]  *Id.* § 2C:58–6.1(b)(4).
[1003]  N.Y. PENAL LAW § 400.00(15).
[1004]  *Id.* § 400.00(1).
[1005]  *Id.*

KR0335

Electronic copy available at: https://ssrn.com/abstract=3205664

*Ohio.*  No one shall sell any firearm to a person under 18, or a handgun to a person under 21.[1006]  Nor shall anyone "furnish" such guns to such persons, "except for lawful hunting, sporting, or educational purposes, including, but not limited to, instruction in firearms or handgun safety, care, handling, or marksmanship under the supervision or control of a responsible adult."[1007]  Persons 18-to-20 may acquire handguns if they are law enforcement officers or active duty members of the armed forces who have received certain training.[1008]

*Rhode Island.*  A permit is necessary to purchase or acquire a handgun.[1009]  Permits are not issued to persons under 21.[1010]

## B. Policy

In American law, different activities have been subject to different age limits.  Under the U.S. and state constitutions, the age for service in elective offices is sometimes 18, but also may be 21, 25, 30, or (for President) 35.[1011]  Activities that are considered by some to be vices—such as alcohol, tobacco, recreational marijuana, and gambling—have sometimes been prohibited, sometimes unregulated, and sometimes had age limits of 18 or 21.[1012]  The trend of the 1960s and the 1970s was for lower age limits for vices, while in recent decades many states have moved to 21.

Perhaps the most important decision a person will ever make is marriage.  Certainly, the decision to marry is more momentous than the decision about whether to drink a beer.  Today, in every state, the age for marriage *without* parental consent is 16, 17, or 18.[1013]  The age is lower (or there is no age limit) when there is parental consent.[1014]

In every state, the age at which a criminal defendant can be prosecuted as an adult is no older than eighteen, and usually younger.  Eighteen-year-olds are subject to conscription into the U.S. military, notwithstanding vehement parental objection.  With parental consent, persons under 18 may enlist in the U.S. Armed Forces.[1015]

---

[1006]   OHIO REV. CODE ANN. § 2923.21(A)(1)-(2).

[1007]   *Id.* (A)(3).

[1008]   *Id.* (B).

[1009]   11 R.I. GEN. LAWS ANN. § 11-47-35.

[1010]   *Id.* § 11-47-35(a)(1).

[1011]   *See, e.g.*, U.S. CONST. art II, § 1 (35 for President); ILL. CONST. art. V, § 3 (25 for statewide constitutional officers); IOWA CONST. art. III, § 4 (21 for the Iowa House of Representatives).

[1012]   *See, e.g.*, Michael Phillip Rosenthal, *The Minimum Drinking Age for Young People: An Observation*, 92 DICK. L. REV. 649 (1988).

[1013]   *State-by-State Marriage "Age of Consent" Laws*, FINDLAW (2018), https://family.findlaw. com/marriage/state-by-state-marriage-age-of-consent-laws.html.

[1014]   *Id.*

[1015]   *Are You Eligible to Join the Military?*, MILITARY.COM (2018), https://www.military.com/join-armed-forces/join-the-military-basic-eligibility.html.

KR0336

Electronic copy available at: https://ssrn.com/abstract=3205664

For voting, the usual starting age used to be 21. That was lowered to 18 by the Twenty-Sixth Amendment, ratified in 1971, and applying to all federal and state elections.[1016] That young adults did not have voting rights in the Founding Era is not evidence that young adults lacked arms rights. Some states had property requirements for voting, and higher property requirements for election to the legislature or the governorship.[1017] No one would contend that people who did not own a certain amount of property were excluded from the Second Amendment.

After the Nineteenth Amendment in 1920 guaranteed women the right to vote, Justice Sutherland, writing for the Court, praised "the great—not to say revolutionary—changes which have taken place since that utterance, in the contractual, political, and civil status of women, culminating in the Nineteenth Amendment."[1018] Although laws could still take into account the physical differences between men and women, laws could not treat women like children, by imposing special restrictions on female contract rights that could not constitutionally be imposed on men.[1019]

Although Justice Sutherland's strong defense of the competence and free choices of women was later swept away when the New Deal Supreme Court abandoned nearly all judicial protection of the right of contract, Justice Sutherland turned out to be on the right side of history. Since the 1970s, very few laws that impose special disabilities on account of sex are considered constitutional.

Similar observations can be made about the rights of young adults, and the constitutional guarantee of their voting rights in 1971. The trend over the last half-century has been towards recognizing that people who bear the burdens of adulthood—including military conscription and liability to criminal prosecution as an adult—also have the rights of adulthood. In general, the rights of young adults include the same contract and property rights as of older persons. The only notable exception to the trend of recognizing young adult rights has been re-raising the age for various "vices," such as alcohol. Under American law, none of these vices are constitutionally protected; instead, these vices can be—and sometimes have been—prohibited for the entire population, regardless of age.[1020]

---

[1016]   U.S. CONST. amend. XXVI.

[1017]   *See* DONALD S. LUTZ, POPULAR CONSENT AND POPULAR CONTROL: WHIG POLITICAL THEORY IN EARLY STATE CONSTITUTIONS 90-91 (1980) (Ga., S.C., Pa., N.C., and N.H. limited voting to taxpayers; Mass. required £60 of property, N.J. £20, and N.Y. £20; Md. required 50 acres, and Del. a freehold).

[1018]   *See* Adkins v. Children's Hospital, 261 U.S. 525, 553 (1923), *overruled by* West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937); U.S. CONST. amend. XIX.

[1019]   *Adkins*, *supra* note 1018, at 401 ("nor is there ground for distinction between women and men, for, certainly, if women require a minimum wage to preserve their morals men require it to preserve their honesty").

[1020]   *See* Rosenthal, *supra* note 1012.

KR0337

Electronic copy available at: https://ssrn.com/abstract=3205664

The right to arms is just the opposite.   While the Twenty-First Amendment affirms very broad state power over alcohol, up to and including prohibition, the Second Amendment guarantees the right to keep and bear arms.[1021]   As has been detailed above, the original meaning of the Second Amendment recognized that young adults have a right and duty to keep and bear arms.

## VII. CONCLUSION

If the Second Amendment is interpreted according to the original public meaning, as *Heller* says it must be, the Constitution contains a clear rule for the arms rights of young adults.   It is beyond dispute that when the Second Amendment was ratified, young adults had the right to keep and bear arms. State and colonial assemblies collectively legislated on the militia hundreds of times, revising many subjects.   The militia entry age was 15-18.   Sixteen was the most common.   The only 21-year-old law existed for two decades in colonial Virginia; that law was repealed long before the Second Amendment was adopted.   From the first federal militia laws to the present, the militia of the United States has always included eighteen-year-olds.   During the nineteenth and twentieth centuries, the federal government worked to put arms in their hands.

According to *Heller*, the innermost core of the Second Amendment is the right to keep a handgun in the home for lawful self-defense.   Laws that prohibit or nearly prohibit young adults from doing so are unconstitutional.

---

[1021]   U.S. CONST. amends. II, XXI.

KR0338

Electronic copy available at: https://ssrn.com/abstract=3205664

**PLAINTIFFS' EXHIBIT R**

KR0339

Case 3:23-cv-00474-JES-DDL   Document 34-3   Filed 03/06/24   PageID.1230   Page 256 of 354

| 85TH CONGRESS<br>2d Session | SENATE | REPORT<br>No. 1429 |
| --- | --- | --- |

# JUVENILE DELINQUENCY

---

## REPORT

OF THE

## COMMITTEE ON THE JUDICIARY
### UNITED STATES SENATE
(85th Cong., 2d sess.)

### MADE BY ITS SUBCOMMITTEE ON
### JUVENILE DELINQUENCY

PURSUANT TO

## S. Res. 52 as extended
(85th Cong., 1st sess.)

TOGETHER WITH

## INDIVIDUAL VIEWS



MARCH 27, 1958.—Ordered to be printed

---

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1958

20008

KR0340

## COMMITTEE ON THE JUDICIARY*

### JAMES O. EASTLAND, Mississippi, *Chairman*

ESTES KEFAUVER, Tennessee
OLIN D. JOHNSTON, South Carolina
THOMAS C. HENNINGS, Jr., Missouri
JOHN L. McCLELLAN, Arkansas
JOSEPH C. O'MAHONEY, Wyoming
SAM J. ERVIN, Jr., North Carolina
JOHN A. CARROLL, Colorado

ALEXANDER WILEY, Wisconsin
WILLIAM LANGER, North Dakota
WILLIAM E. JENNER, Indiana
ARTHUR V. WATKINS, Utah
EVERETT McKINLEY DIRKSEN, Illinois
JOHN MARSHALL BUTLER, Maryland
ROMAN L. HRUSKA, Nebraska

SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY IN THE UNITED STATES

(85th Congress)

### THOMAS C. HENNINGS, Jr., Missouri, *Chairman*

SAM J. ERVIN, Jr., North Carolina
ESTES KEFAUVER, Tennessee
JOHN A. CARROLL, Colorado

WILLIAM LANGER, North Dakota
ALEXANDER WILEY, Wisconsin
JOHN MARSHALL BUTLER, Maryland

JAMES L. SULLIVAN, *Chief Counsel*
ERNEST A. MITLER, *Special Counsel*
CARL L. PERIAN, *Research Director*

*The late Honorable Matthew M. Neely of West Virginia served as a member of both the Committee on the Judiciary and the Subcommittee To Investigate Juvenile Delinquency until his death on January 18, 1958.

II

# CONTENTS

———

|  |  | Page |
|---|---|---|
| I. | The national juvenile delinquency picture | 1 |
| II. | Activities of the subcommittee | 2 |
| III. | Problems studied during 1957 | 4 |
| IV. | Legislation of the subcommittee | 4 |
|  | Switchblade knives | 5 |
|  | Firearms legislation | 7 |
|  | Résumé of subcommittee legislation | 8 |
| V. | Armed Forces induction policies | 8 |
| VI. | Study of institutions for juvenile delinquents | 13 |
|  | Recommendations | 16 |
| VII. | The handling of delinquent and incorrigible children in the public school systems | 16 |
| VIII. | Other activities of the subcommittee | 20 |
| IX. | Delinquency among Indian children | 21 |
|  | Statement of Senator Alexander Wiley | 24 |

III

KR0342

**KR0343**

| 85TH CONGRESS<br>*2d Session* | SENATE | REPORT<br>No. 1429 |
|---|---|---|

## JUVENILE DELINQUENCY

MARCH 27, 1958.—Ordered to be printed

Mr. HENNINGS, from the Committee on the Judiciary, submitted the following

# REPORT

Senate Resolution 89, which was adopted by the Senate on June 1, 1953, provided that the Committee on the Judiciary, or any authorized subcommittee thereof, was authorized and directed to conduct a full and complete study of juvenile delinquency in the United States. It stipulated that such an investigation give special attention to (1) determining the extent and character of juvenile delinquency in the United States and its causes and contributing factors, (2) the adequacy of existing Federal laws dealing with youthful offenders, (3) sentences imposed on, or other correctional action taken with respect to, youthful offenders by Federal laws dealing with youthful offenders, and (4) the extent to which juveniles are violating Federal laws relating to the sale or use of narcotics.

Pursuant to the authorization in Senate Resolution 89, the Senate Subcommittee To Investigate Juvenile Delinquency was organized and commenced an investigation of juvenile delinquency. Although the time limitation of the original resolution was January 31, 1954, the Senate has each year since that time authorized a continuation of the study. During 1957 the subcommittee operated pursuant to Senate Resolution 52,* agreed to January 30, 1957, as amended by Senate Resolution 191.

## I. THE NATIONAL JUVENILE DELINQUENCY PICTURE

In previous reports of the subcommittee, it was indicated that the upward trend in juvenile delinquency among those in the 10 to 17 years of age group has been in evidence since 1948. In 1956, for the eighth consecutive year there was a tremendous increase in the number of juvenile court cases. During that year, there were 520,000 juvenile delinquency cases brought before the juvenile courts. (That year was the first time data were collected on a national representative sample of juvenile courts by the Children's Bureau of the Department of Health, Education, and Welfare.) This constitutes a 21 percent

---

*On January 29, 1958, by an order of the Senate the time for filing reports was extended to February 21, 1958, and by a further order on February 21, 1958, was extended to March 17, 1958. On March 17, 1958, by a further order of the Senate, the time was extended to March 31, 1958.

1

KR0344

2 JUVENILE DELINQUENCY

increase in 1956 over 1955, or the largest yearly increase in any of the previous 8 years. This increase seems to be substantiated by the FBI arrest data for children under 18 which shows a 17 percent increase in 1956 over 1955. This figure represents 2.2 percent of the children in the 10 to 17 years of age group of our population.

In the 8-year period from 1948 through 1956, juvenile court cases more than doubled while the child population of that age group increased only 19 percent. As in previous years, the increase is at a much greater rate in rural areas than in urban areas, and the ratio of 5 boy delinquents to every 1 girl delinquent is still in evidence.

Based on the Bureau of Census predictions for the number of boys and girls in the 10 to 17 year age group in 1965, we will have approximately 44 percent more children in this category than in 1956. Once again, the subcommittee's prediction still holds that if our delinquency rate continues its upward trend at the same rate it has during the years 1948 through 1956, approximately a million children will appear before the courts in 1965.

In the year 1956, there were upwards of 1,300,000 boys and girls coming to the attention of local law-enforcement officers. Approximately one-fourth of the police cases are referred to juvenile courts. The remaining juvenile court cases are referred from individuals and other agencies in the community.

Although we feel that much progress has been made in the development of new and dynamic programs for the handling of the delinquency problem, we realize that it is an on-going, long-range problem and one that requires on-going, long-range scrutiny, evaluation, reevaluation, and study. In spite of our progress in the field of delinquency, we find a 21 percent increase in juvenile court cases in the latest year for which we have complete data—and only 3 percent of this increase can be attributed to the increase in population of children of juvenile court age. While many may wonder at the apparent lack of success of our efforts to combat delinquency, the subcommittee feels that if it were not for these efforts our delinquency rates would be increasing at an even greater pace than at present.

## II. Activities of the Subcommittee

During the past 4 years the Subcommittee To Investigate Juvenile Delinquency has investigated a number of environmental and psychological situations, which are all germane to the subject of juvenile delinquency. Because of the makeup of the staff, which includes people with training in the fields of both law and the social sciences, we have been able to go into areas concerning delinquency which previously were virgin fields. Because of the nature of the subcommittee, we have been able to investigate many situations which necessitated not only the power to subpena and investigate legally, but the social-psychological knowledge to interpret and intelligently react to the data we gathered. As a result, the subcommittee has come up with many sound bills, reports, and recommendations backed and given the sanction of both the legal professions and the behavioral and educational sciences.

Where it was felt Federal action or Federal legislation was necessary as a remedy or solution, such action was initiated or the needed legislation introduced. Where it was felt necessary to make strong recom-

mendations to organizations such as the movie industry, the television industry, the comic book industry, the post office, and a host of other institutions throughout the United States, they have been made through the reports of the subcommittee. In addition, attention has been focused nationally on many areas throughout the United States that had problems that were specific to the area, but also had nation-wide implications. This technique has had far-reaching effects in stimulating local communities to action, State governments to action, and indeed the Federal Government to action.

In going throughout the country, the subcommittee would gather in one place and at one time experts from the many, many fields of human endeavor that might touch upon delinquency, and through the interchange of ideas we have crystallized many plans for action, many thoughts, and much more competent activity in relation to the delin-quency problem. The subcommittee has, in effect, acted as a catalyst, bringing about the combination of many heretofore diverse elements in the field of juvenile delinquency. By applying the prestige of the United States Senate to a situation, we have encouraged and actually achieved the difficult task of getting various institutions, organiza-tions, and agencies within communities to forfeit the individual nature of their activities and to combine and coordinate their efforts in an attempt to combat their own delinquency problems.

The volume of correspondence and the nature of the requests and inquiries made to the subcommittee and the stature of the organiza-tions requesting the information that we have, testifies to the fact that the Nation looks in part to the Federal Government for leadership in finding solutions to so vexing a problem. In carrying out its function of investigation, study, evaluation, and dissemination of information received, the subcommittee has listened to and examined some 1,200 witnesses in public and executive hearings, studied the programs of scores of local community agencies, State agencies, and Federal agencies, collected statistics on a great number of factors relating to delinquency, analyzed and made recommendations in regard to studies and statutes, and conducted a variety of hearings in 26 cities.

Our most recent effort has been the development of what the subcommittee calls a total community plan for the handling of juvenile delinquency. The subcommittee observed throughout its years of study that the main problems in the handling of juvenile delinquency are (1) the lack of trained and skilled workers in the field of delinquency; and (2) where these workers are available to agencies, there is a lack of coordination, guidance, and accountability by a central administrative body, which in turn waters down their effectiveness. In view of the first problem, the subcommittee has been steadfastly attempting to get State and city officials to enact legislation which would alleviate the shortage of trained personnel in this field by providing motivation in the form of funds and grants.

In relation to the second problem, the subcommittee in December 1957 planned extensive hearings in the city and State of New York, from which it hoped to develop this total community plan to promote the concept of a central administrative agency for coordinating the activities of all agencies and institutions handling delinquency in any one geographical or political area. Information acquired through our investigations and from the testimony of the many witnesses from public and private agencies in New York is to be incorporated into

KR0346

**4**                    JUVENILE DELINQUENCY

a detailed and extensive report. From the nature and volume of the correspondence received by the subcommittee, we know this information is needed and desired throughout the United States.

Unfortunately, because of the chairman's illness we were unable to complete the hearings in New York, and we are now in the process of gathering a wealth of data from that city and from that State which will be included in a report to be issued this year.

### III. Problems Studied During 1957

During 1957, the subcommittee, under Senate Resolution 52, as amended by Senate Resolution 191, continued its investigations into the causes and contributing factors and related areas of juvenile delinquency as outlined in the resolutions.

The subcommittee conducted studies and investigations on a limited basis in five major areas. These included (1) the interstate traffic in guns and switchblade knives used by many youths and youth gangs in large urban areas; (2) the recruitment and induction of juvenile offenders and former juvenile offenders into the Armed Forces; (3) methods of handling incorrigible and delinquent children in the school systems of several large cities; (4) a preliminary investigation by subcommittee staff members of a number of State training schools with the view of determining how the Federal Government can assist in strengthening and improving the treatment programs in these schools; and (5) a hearing in New York City which centered around that city's programs for the prevention, treatment, and rehabilitation of juvenile delinquents. The ultimate object of these hearings is to develop a model system of coordinating the activities in any geographic or political area for other cities to utilize in handling their juvenile delinquency problem.

### IV. Legislation of the Subcommittee

During the 1st session of the 85th Congress, the subcommittee drafted and introduced 11 pieces of legislation which it was believed would aid in remedying situations discovered during previous investigations. Included in this legislation were S. 2558, a bill which would outlaw interstate transportation of switchblade knives to help keep them out of the hands of juveniles; three measures aimed at improving facilities and programs for the treatment of juvenile drug addicts were introduced as a result of the subcommittee's hearings on that subject; and the so-called omnibus bill, which was introduced in the 84th Congress and passed by the Senate near the end of that session, was refined in light of later study and reintroduced in the 85th Congress as S. 431. This is one of the most important pieces of legislation ever to be proposed for alleviating the juvenile delinquency problem across the Nation, and, if enacted into law, should greatly increase the effectiveness of agencies and institutions fighting delinquency.

Staff members participated in hearings held by other committees on bills which were originally introduced by this subcommittee. One of these bills, S. 1659, which proposed that the District of Columbia enter into the reciprocal enforcement of support agreement with other States, was reported out of the District Committee as S. 2032 and passed in July of 1957. The passage of this bill closed a great loophole

**KR0347**

JUVENILE DELINQUENCY                                    5

in the welfare services of the District of Columbia and the States surrounding it.

Members of the staff also reevaluated the so-called border legislation, which had been introduced in the previous Congress as S. 959. The purpose of this bill was—

> to prohibit juveniles unaccompanied by parent or guardian from going outside the United States without a permit issued by the Attorney General for such purpose.

The object of the original measure was to keep juveniles under 18 from exposure to prostitution, liquor, narcotics, and pornographic literature, which were found to be readily available to them in several towns along the United States-Mexico border. Preliminary investigation indicated that the above conditions still exist. Letters of inquiry were sent to the attorneys general of all the Southwestern States and to district attorneys of all border towns. Venereal disease, narcotics, and prostitution figures were brought up to date to support the following proposed legislation—a concurrent resolution requesting the President and the Department of State to initiate negotiations for a treaty with the Republic of Mexico (1) to control the movement of unescorted juveniles entering border communities and (2) to alleviate by cooperative action the serious conditions of narcotics traffic, vice, and pornography that exist in many Mexican border towns. This could be implemented by the utilization of existing statutes whereby the Department of State can order the immigration authorities to impose departure control through cards of identification. This procedure is provided for in the Code of Federal Regulations (title 22, par. 53.5, based on sec. 215) of the Immigration and Naturalization Act (Public Law 414, 82d Cong.). While this law authorizes travel control over United States citizens only during wartime or in a national emergency, Presidential Proclamation 3004, January 23, 1953 (vol. 18, Federal Register), activates this statute. Conferences were held by the subcommittee staff with representatives of the Bureau of Immigration and Naturalization and the Department of State. The subcommittee has failed in its efforts to develop any interest on the part of the people concerned with this problem in terms of legislative proposals or executive action.

*Switchblade knives*

An investigation was conducted by the staff of the subcommittee into the use of dangerous weapons by juveniles, with special emphasis on the interstate traffic and importation of switchblade knives. The major manufacturers, importers, and many of the major distributors of switchblade knives were interviewed and their methods of operation studied.

In an effort to determine the severity of the problem on a community level, the major police departments in the United States were sent questionnaires. Other questionnaires were mailed to a selected number of mail-order purchasers of these knives.

S. 2558 was introduced in the 1st session of the 85th Congress and is presently pending before the Senate Committee on Interstate and Foreign Commerce. Under existing law, there is no penal prohibition against the interstate movement of switchblade knives. S. 2558, if enacted into law, would prohibit interstate traffic in these knives and

KR0348

has special provisions for dealing with those selling to a person under the age of 18 years.

The subcommittee's investigation disclosed that many of these knives were manufactured abroad and distributed by firms in this country who handle numerous items in addition to switchblade knives. It was established that these items were being widely distributed through the mail by distributors to the various States that had local laws prohibiting possession, sale, or distribution of switchblade knives. This fact, the subcommittee feels, points out the need for Federal control of the interstate shipment of these instruments, since local legislation is being systematically circumvented through the mail-order device.

In the United States, 2 manufacturers have a combined production of over 1 million switchblade knives a year. Both concerns are important cutlery manufacturers and the manufacture of switchblade knives represents only a small part of their business. It is estimated that the total traffic in this country in switchblade knives exceeds 1,200,000 per year. The questionnaires returned by police chiefs throughout the country indicate that many switchblade knives have been confiscated from juveniles. The police chiefs, almost without exception, indicate that these vicious weapons are on many occasions the instrument used by juveniles in the commission of robberies and assaults. Of the robberies committed in 1956, 43.2 percent were by persons under 21 years of age. A switchblade knife is frequently part of the perpetrator's equipment in this type of crime. In New York City alone in 1956, there was an increase of 92.1 percent of those under 16 arrested for the possession of dangerous weapons, one of the most common of which is the switchblade knife.

Out of several hundred questionnaires sent by the subcommittee to purchasers of switchblade knives, whose names were derived from a distributor's mailing list, 133 responses have been received. Seventy-five percent of the purchasers were under 20 years of age, and of this group, 43 percent were between 11 and 15 years of age. Of the persons responding to the questionnaire, only a small portion claimed that the knives were secured for a constructive purpose.

In addition to the interviews with manufacturers and distributors and the receipt of information from questionnaires, staff contact was made with some of the purchasers in the immediate area and numerous retail stores. The proprietors of these stores conceded that the bulk of the demand for switchblade knives came from juveniles, some as young as 8 or 9 years of age.

A major outlet for the switchblade knife are military supply stores which are located near military installations. Some of the manufacturers and distributors felt that the purchase of these articles by military personnel, even though they might be 17- and 18-year-olds, was not objectionable. A questionnaire sent to the provost marshal in most of the major Army installations established that the possession of these knives was contrary to post regulations and that frequent assaults had occurred in which these knives had been used within the confines of the installation. These articles are not used in connection with training for military purposes. The one exception is an order for automatic-opening knives that was placed by the Department of Defense for parachutists to use in cutting their ropes. However, these

knives were issued directly to military personnel and were not secured through Army-Navy supply stores.

During 1956 at Fort Bragg, N. C., it was necessary for the military police to confiscate from personnel 161 switchblade knives—an average of 3 a week.   At Fort Sill, Okla., 75 of these knives were confiscated as a result of aggravated assault in 1956.   In the area of Fort Bliss, Tex., alone, there are more than 20 establishments selling these knives.

One of the largest manufacturers and several of the major distributors of switchblade knives said they would be glad to abandon manufacturing and distributing the article if it were banned on a Federal footing.

In response to the subcommittee's questionnaire, police chiefs from all sizable communities, with few exceptions, uniformly supported the enactment of legislation prohibiting the interstate traffic in these articles.

Although over 20 States have an explicit prohibition against the sale of the automatic-opening knife, and many more have a general kind of prohibition against possession with intent to use any kind of dangerous article, the dissemination of approximately 1,200,000 of these articles, many of them going into the States where there are local prohibitions against their distribution and many of them getting into the hands of juveniles, shows the need for Federal controls.

The proposed legislation directed against the interstate traffic in these articles provides for a maximum fine of $2,000 and/or a 5-year prison sentence, with a maximum fine of $5,000 if an interstate sale is made to a juvenile under 18.

*Firearms legislation*

Questionnaires were sent to police departments throughout the United States concerning the interstate movement of firearms and its impact on juvenile delinquency.   The questionnaire was directed at the desirability of including pistols and revolvers in the type of firearms that must be registered with the Treasury Department under the National Firearms Act.   At present they are exempt from registration.   The other point of inquiry was to learn the views of police chiefs on an amendment to the Federal Firearms Act (15 U. S. C. 901–901).

This proposed amendment would require a manufacturer or dealer, licensed pursuant to the Federal Firearms Act, to conform with all State laws governing the purchase of firearms.   At present a manufacturer or dealer, licensed pursuant to the Federal Firearms Act (15 U. S. C. 901–909), is required to predetermine and observe State laws governing the purchase of firearms only in instances where the State requires that a license be obtained for the purchase of such firearms. The underlying purpose of the suggested change in the law is to broaden the pertinent sections of the Federal Firearms Act (15 U. S. C. 902 (c)) to require the Federal licensed manufacturer or dealer to conform with all State statutes relative to the sale, purchase, and possession of firearms.   This would mean that in any State that had such legislation, the Federal out-of-State licensed manufacturer or dealer shipping firearms into the State would be required to notify a designated authority of the sale.

At present, many firearms are moving across State lines and falling into the hands of young persons without the knowledge of the author-

8          JUVENILE DELINQUENCY

ities.  The reaction of the police chiefs to the questionnaire was mixed, and further study is being given to the problem before a definite position is taken.  However, it was firmly established that firearms can move with considerable freedom from State to State in a manner sometimes inimical to the public good.  It was found to be easy for a juvenile to respond to a gun ad in many of the magazines and to secure a weapon through the mail.

The following résumé indicates the bills that have been introduced by the subcommittee and the present status of the bills:

*New legislation, 85th Cong.*

| Bill No. | Comments |
|---|---|
| S. 675 | A bill to amend sec. 2314, title 18, U. S. Code, with respect to the transportation in interstate commerce of articles obtained by false or fraudulent pretenses, representations, or promises or through any scheme or artifice to defraud.  (Senators Kefauver, Langer, and Hennings—Referred to Committee on the Judiciary.) |
| S. 980 | A bill to authorize the establishing by the Surgeon General of an aftercare posthospital treatment program for drug addiction and for other purposes.  (Senators Kefauver, Hennings, Langer, Payne, and Javits—Referred to the Committee on Labor and Public Welfare.) |
| S. 981 | A bill to create an Advisory Committee on Drug Addiction in the Department of Health, Education, and Welfare.  (Senators Kefauver, Hennings, Langer, Payne, and Javits—Referred to the Committee on Labor and Public Welfare.) |
| S. 982 | A bill to establish a hospital of the Public Health Service in one of the Pacific Coast States, especially equipped for the treatment of persons addicted to the use of habit-forming drugs.  (Senators Kefauver, Hennings, Langer, and Javits—Referred to the Committee on Labor and Public Welfare.) |
| S. 2558 | A bill to amend title 18, U.S. Code, to prohibit interstate traffic in switchblade knives and to prevent these instruments from getting into the hands of juveniles.  (Senators Kefauver, Hennings, Butler, and Clark—Referred to the Committee on Interstate and Foreign Commerce.) |

*Resubmitted legislation, 85th Cong.*

| 85th Cong. bill No. | 84th Cong. bill No. | Comments |
|---|---|---|
| S. 355 | S. 2103 | A bill to amend the law relating to indecent publications in the District of Columbia.  (Senators Kefauver, Hennings, and Langer—Referred to the Committee on District of Columbia. |
| S. 356 | S. 2190 | A bill to amend the act entitled "An act to create a juvenile court in the District of Columbia," so as to provide for the appointment of a referee.  (Senators Kefauver, Hennings, and Langer—Referred to the Committee on District of Columbia.) |
| S. 357 | S. 2101 | A bill to amend sec. 7 of the Juvenile Court Act of the District of Columbia.  This bill puts the Director of Social Work under the judge.  (Senators Kefauver, Hennings, and Langer—Referred to the Committee on District of Columbia. |
| S. 431 | S. 728 and S. 4267 | A bill to provide for assistance to and cooperation with States in strengthening and improving State and local programs for the diminution, control, and treatment of juvenile delinquency.  (Senators Kefauver, Hennings, and Langer—Referred to the Committee on Labor and Public Welfare.) |
| S. 588 | S. 3021 | A bill to amend title 18, United States Code, to make unlawful certain practices in connection with the placing of minor children for permanent free care or for adoption.  (Senators Kefauver, Langer, and Thye—Referred to Committee on the Judiciary.) |
| S. 1659 | S. 2105 | A bill to make uniform the law of reciprocal enforcement of support in the District of Columbia.  (Senators Hennings, Kefauver, and Langer—Referred to the Committee on District of Columbia, reported out as S. 2032, and passed into law.) |

## V. ARMED FORCES INDUCTION POLICIES

In our Report No. 130, issued early in 1957, the subcommittee indicated the problems attendant to induction or recruitment by the Armed Forces of former delinquents.  The summary of recommenda-

tions in that report indicated that because of the great number of former delinquents who make up the available manpower pool for the United States Armed Forces, the rejection of all of them would not be feasible.   We further indicated that the indiscriminate admission of all former delinquents into the armed services is just as unwise. While we felt that the present policy of the Air Force, for example, of admitting some delinquents and rejecting others is a desirable procedure, we indicated that the present criteria for doing so were unsound.   The subcommittee recommended that detailed studies of the careers of former delinquents who have already served in the Armed Forces be made to determine those delinquents who did perform well as against those who did not perform well.   From these studies, prediction scales could then be developed to more efficiently use our manpower in any future emergency.

During the course of the year the subcommittee found that the Air Force had initiated such a study at Lackland Air Force Base.   A wealth of data was gathered by persons in the field of juvenile delinquency and criminology who were hired as consultants to the Air Force, and upwards of $900,000 was spent in conducting the research.   However, because of lack of funds to complete the study, the Air Force Research and Development Center dropped the project and the data are now stored in a warehouse at Lackland.   The information contained in them is not being utilized by the Air Force or anyone else, and its is the opinion of the subcommittee that the final stage of this vast research—the analysis of the data gathered and the setting up of the prediction scales—should be completed if the money already spent is not to be a total loss.   Over and above this, the value of the prediction scale that could be derived from this information is inestimable to the safety and future of this Nation.

The subcommittee staff studied a series of military establishments responsible for the induction and recruitment of Armed Forces personnel.   Recruiting officers were interviewed at the station level, at a United States Army recruiting district which recruits personnel for 1 of the 6 Army areas in the United States, and at the corresponding Army Headquarters.

In regard to the acceptance of former juvenile delinquents for service in the Armed Forces, the recruiting manuals of the various services stipulate certain offenses that, once committed, make the individuals ineligible for entry into the service.   There is no compromise.   No attempt is made to determine whether or not the former delinquent has been rehabilitated and is presently a good prospect for service.   The fact that he committed the offense precludes his serving and the recruiting officer has no alternative but to refuse to accept the application.

On the other hand, the recruiter has the discretion of admitting potential recruits with minor violations.   (It is ironic that while a single traffic offense may not preclude the entry of a youth into the service, the commission of 2 or 3 traffic offenses requires a waiver and can result in the individual being refused entry.   On the other hand, an adult with a similar series of traffic offenses is not ineligible to enter the service.)

There is a third group of former delinquents who are eligible for being waived into the service.   In order to accomplish this, the recruiter must fill out waiver forms which are in turn sent to the com-

KR0352

mander of his recruiting district.  At this stage, the available record of the former delinquent is studied and a recommendation is made to either accept or reject the potential recruit.  (If the juvenile court record is not made available, the individual's case is not even considered, which is a problem discussed in another part of this report.) This recommendation is then forwarded to the headquarters command of the Army area where final disposition is made of the case.

At this stage an individual with no particular background in the field of crime or delinquency determines on the basis of the information supplied him by the commander of the recruiting district whether or not the waiver should be granted.  The subcommittee was told by the officers at the intermediate level (who made the more adequate study of the individual) that sometimes there seemed to be no rhyme or reason for some of the action taken on their recommendations.  At times people that they strongly recommended be rejected were accepted at headquarters command of the Army area or vice versa. The subcommittee was given examples of persons with minor offenses being rejected while a person with a relatively serious offense was accepted.  The subcommittee plans to study this situation further and issue a report, suggesting changes in this procedure.

Another problem indicated in Report No. 130 was the controversy between correctional people in the field of delinquency, many of whom regard their records on former delinquents as confidential, and the military recruitment and induction personnel, who need this information as a basis for rejection or acceptance of any former delinquent. This situation was most acute in those areas where the juvenile court refused to cooperate with recruiting officers which ended any chance the former delinquent might have had of getting into the service. Many juvenile courts justify this stand, however, by claiming that the recruiters are not qualified to interpret the records which many times include psychiatric data.

On the other hand, recruiters claim that juvenile court judges give enlistment in the service as an alternative to probation or sentence. This practice was so common that the Armed Forces issued regulations to prohibit the entry of any person who was released from probation in order to enlist.

In order to gain an exact picture of the practices of juvenile courts in regard to this problem, the subcommittee staff sent 250 questionnaires to juvenile courts throughout the Nation.  We found a wide variety of practices that ranged from a complete rejection of any attempts by the military to gain information on the record of a former delinquent to a workable arrangement with the military to aid them in the determination of acceptance or rejection.

The following excerpts from several questionnaires indicate the wide divergence in philosophy of various juvenile courts on this problem and the difficulties encountered at times due to the non-uniformity of State laws in regard to releasing the records of former delinquents.  The following statements are in answer to the question:

Have you ever denied records requested by a juvenile delinquent or by a recruiting officer for the purpose of enlisting the juvenile in some branch of the armed services?

JUVENILE DELINQUENCY                                              11

Hon. Leo J. Yehle, judge of children's court, county of Onondaga, Syracuse, N. Y.:

> Have not denied records requested by a delinquent.  It is our policy in accordance with our law to deny records to the armed services and others.

Hon. W. Rhodes Clay, judge, county court of Fayette County, Lexington, Ky.:

> No.  But I believe denial in some instances would have been more just to the applicant because of wrong conclusions by recruiting officer or staff in examining the records.

Hon. William R. Collinson, judge of juvenile court, Greene County, Springfield, Mo.:

> Such information has never been denied.  However, under the new Juvenile Code of Missouri going into effect August 29, 1957, the disclosure of this type of information is expressly prohibited by law except upon written order of the judge of the juvenile court having jurisdiction.  All recruiting offices and selective service boards should be required to operate in accordance therewith.

Hon. Arthur L. Eno, judge, district court of Lowell, Lowell, Mass.:

> Yes.  Records are given to recruiting officers, providing only that the consent is given by the juvenile offender himself or his parents, or with the permission of the presiding justice of this court.

Hon. John J. Connelly, judge, Boston Juvenile Court, Boston, Mass:

> No.  Two or three years ago, because of the enlistment and selective service officers denying the right of service to boys and girls who had made a mistake because of their immaturity and childhood and from that time had been good citizens, we threatened to withhold records of delinquency. The armed services in this area are now cooperating with our court by the more judicious use of records.

Hon. Carlton F. McNally, judge, courthouse, St. Paul, Minn.:

> We do not turn over files to any branch of the armed services, since we feel that the record itself is a private one. However, upon written authorization from the parents or guardian of the juvenile, the probation department gives information from the file—selecting all relevant information.

Hon. Forrest R. Shanaman, judge, courthouse, Reading, Pa.:

> Yes, when the complaint was a minor one, or when the delinquent act was not considered symptomatic behavior, or when the boy was with a group and was not the instigator.

Hon. Orman W. Ketcham, judge, juvenile court of the District of Columbia, Washington, D. C.:

> It has been the policy of this court to deny such requests made by recruiting officers.  Requests by juvenile delinquents to inspect their own legal (as distinct from social)

12                         JUVENILE DELINQUENCY

records are usually granted.   However, the court makes an exception in cases where, in its judgment, the nature of the offense—homicide, arson, sexual perversion—would clearly tend to disqualify the former juvenile delinquent from enlistment in the military service.

The following statements are in answer to the question:

Have there been any instances in your court in the last year where the probation period of a delinquent was waived on condition that he enlist in some branch of the armed services?   Do you favor or oppose this policy?

(Hon. Harry L. Eastman) John J. Mayar, director of social services, Cuyahoga County Juvenile Court, Cleveland, Ohio:

No.  This court is firmly opposed to using enlistment in the armed services as an alternative to probation or commitment to an institution.  We believe it is most unwise for a judge in any court, not just juvenile, to state to the delinquent or defendant in an adult court words to the effect that if he doesn't enlist in some branch of the service, he will be "sent away."  The armed services have a great deal to offer the young men and women of our country, but his experience is is something which the boy himself should want and not something which is offered to him as an alternative to being committed to a training school.  We are most willing, as a rule, to cooperate fully with the recruiting office in releasing our jurisdiction in those cases where it is believed that the individual would make a good member of the armed services and where the plan for enlistment was initiated by the boy and his family and not the court.

Hon. French Clements, judge, Probate Court of Vanderburgh County, Evansville, Ind.:

In the past year no probation period has been waived on condition that subject enlist in any branch of the armed services.  I am opposed to waiving a probation period for the sole purpose of permitting or forcing any person to enlist in any branch of the armed services.  A situation could exist which would warrant a release from probation to enable one to enlist.

Hon. W. W. Woolfolk, judge, Fulton County Juvenile Court, Atlanta, Ga.:

It depends upon the individual person involved.  There have been instances where a recruiting officer would check a boy out and find that everything else was in order and would ask that the court dismiss him from probation so that he could enter the armed services free of civil restraints.  There have been some instances where the court felt that the offense was not sufficiently serious to stand in the boy's way and bar him from entering the service, and in such cases we have waived probation and dismissed him from our jurisdiction.  I feel that, when handled properly, this can be beneficial both to the young man involved and the armed services.

KR0355

(Hon. Nathan J. Kaufman) Simon Pilzner, assistant chief probation officer, Wayne County Juvenile Court, Detroit, Mich.:

> Yes, many times. Waiver of probation in favor of enlistment only when indicated as first offender, or type of delinquency where court uses its discretion. We also favor predating of termination of probation because formal closing of case sometimes takes approximately 3 months. (Many services demanded "off probation 6 months prior to enlistment" before acceptable to them.)

Hon. August C. Taveria, judge, Third District Court of Bristol, New Bedford, Mass.:

> There have been many instances in this regard and I have no opposition to this policy.

Hon. Edwin L. Swope, district judge, courthouse, Albuquerque, N. Mex.:

> Yes. I favor such a policy because military service solves the problem for many boys 17 years of age who are not required to attend school and cannot find employment.

Hon. James H. Montgomery, Jr., judge, juvenile and domestic relations court, Richmond, Va.:

> We have terminated our probation in order that the individual can be accepted into the armed services. We do not think that the fact that a boy is on probation should be considered when he tries to enlist. When we dismiss our action, we then lose control of the boy, and if he is rejected for service, there is no way the court can resume jurisdiction.

The returned questionnaires are now in the process of being tabulated. A report will be issued by the subcommittee on the basis of our study, in which we will make recommendations to the National Association of Juvenile Court Judges, which members of the subcommittee hope will help settle the issue.

## VI. STUDY OF INSTITUTIONS FOR JUVENILE DELINQUENTS

A study was initiated in 1957 of the State correctional schools for boys and girls in the United States. This study, while still continuing, has developed to the point that certain positive findings can be presented, as well as a number of constructive recommendations.

The superintendents and senior staff members of many of these institutions were conferred with. Twenty-two of these institutions were visited, and close to 100 boys and girls who had been at these institutions were interviewed. In addition, reports relating to the State correctional schools and all other related literature on this subject were studied. In the case of brutality and immoral conduct between the staff and the juveniles, corroborative material and judgments of conviction have been obtained.

Over 33,000 juveniles reside each year in all State and local training schools in the United States. These youngsters very often represent the so-called hard core delinquents. They are the group that require the most intensive utilization of all the techniques and skills the community has available.

14                         JUVENILE DELINQUENCY

They are youngsters who are in the formative years of their lives and are more amenable and responsive to an intelligent and well-rounded treatment program than adult offenders who are inmates of State and Federal penal institutions.   Ironically, in many States the adult correction program has developed in a progressive manner much more rapidly than the juvenile correction program, possibly because until the past 7 years the community's interest has been more intensively focused on adult, rather than juvenile, institutions.

In the past 10 years there has been a sharp change in the philosophy of those responsible for the administration of these institutions. Formerly, many administrators believed that their function was purely to hold juveniles in secure custody and to rehabilitate and correct their charges by the use of punitive and repressive measures.  Corporal punishment, frequently extending into brutality, was commonplace. Regimentation, rigid discipline, and a never-ending series of rules and regulations, which the normal person might find difficult to conform to, were the backbone of the traditional training school program.   All of the superintendents who conferred with the staff of the subcommittee expressed a concern in developing a helpful treatment program for the juveniles in their institutions.   They were all equally anxious to eliminate as much as possible the arbitrary use of repressive measures and corporal punishment.  This healthy change in attitude has, of course, been reflected by a great improvement in the programs of many of the State correctional schools. Unfortunately, despite the desires of the superintendents who were interviewed, many of the State correctional schools, in practice, still continue to be institutions dominated by the use of force where young people can only continue to develop an already hostile and bitter attitude toward society.

This condition is attributable principally to the inability of State correctional schools to obtain trained, skilled, and understanding staff on the supervisory and custodial level.   The intentions of the administrative staff often are enlightened and constructive, and an excellent program can be formulated in theory and on paper, but this sound structure and beginning has little value if the staff is unable or unwilling to carry it out.

Frequently strict regulations against the use of corporal punishment are ignored by staff members who are unskilled in dealing with juveniles, and despite instructions to the contrary from the superintendent, force and threats are resorted to to solve many of the typical problems that arise when dealing with a group of delinquents and sometimes emotionally disturbed juveniles.

Legislation has been drafted for introduction to establish in the Division of Juvenile Delinquency Service of the Children's Bureau, Department of Health, Education, and Welfare, a training center to develop skilled, professional staff for employment in institutions and agencies for delinquents.   The establishment of this institution, it is hoped, will make possible a sound training program not only for administrators, but for those on the supervisory and custodial level in the State correctional schools.  Not only will the training of staff improve the programs in the institutions, but employees of a higher caliber will be attracted to work in these institutions if they have an opportunity for developing professional skills that will permit them to advance in the institutional field.

JUVENILE DELINQUENCY                             15

The significance of the proposed legislation is best illustrated by an analysis of some of the subcommittee's preliminary findings regarding State training schools.

It is commonly agreed by all professional people working in the institutional field that individualized treatment and a homelike surrounding is the most effective setting for helping delinquent youngsters who must be separated from their homes. The United States Children's Bureau publication, Institutions Serving Delinquent Children, recommends:

> Living groups in training schools should not exceed a maximum of 20 students, even when they are fairly homogeneous (p. 43).

Furthermore, it is the consensus of opinion that the schools should be limited in size and that the staff should be sufficient in number not to be overwhelmed by the sheer mechanics of daily living. In many of the urban States, the correctional schools have as many as 500–800 boys in their custody; rarely does the number fall under 250 in the public institutions. In one midwestern State training school, they often have over 200 boys over and above the number for which the school was designed. Confronted with this overcrowding and lack of staff members, the following gains in the juvenile correctional field are a tribute to an uphill fight by many devoted superintendents and staff members who are dedicating their careers to work in these institutions.

One critical area that has received special attention in many of the State training schools is the improvement and development of their academic program. This was illustrated in a visit to the State Training School for Boys, Milledgeville, Ga. Recognizing that there are many boys at the school who cannot benefit from a standard school program, the school superintendent, Mr. Ireland, has established a program for slow learners and boys of limited capacity. In this program the emphasis is not only on learning the rudiments of writing and reading, but on training in the elementary, routine mechanics of daily living. Reading defects have been found to be a characteristic of many delinquent youngsters. This specialized program, which is executed without pressure and in an informal way, enables many of these youngsters to equip themselves with the basic tools necessary to navigate in society. This, in turn, relieves them of much of their hostility. At the Federal reformatory, Ashland, Ky., a specialized course for boys who have reading defects is being developed, with the prospect of great success. Many of the other institutions visited were in the process of developing special classes for boys or girls who had reading problems.

Brutal and immoral conditions were found to exist in certain of the training schools. Often a situation was found where a good school with a good staff had several employees of sadistic or perverted leanings, whose practices were not always brought to the attention of the responsible persons in the administration.

Questionnaires were sent to social work schools to determine the extent to which they were training staff for employment in State correctional schools. The responses indicated an awareness of the need for expansion of curriculum in this direction. Several of the schools have developed courses along this line. The New York School

KR0358

of Social Work is rapidly expanding its program in this field.   Almost uniformly, the schools stated that few of their students were interested in employment in correctional schools due to the low pay, poor professional status of many of the schools, rapid change of staff—sometimes for political reasons—and generally the lack of opportunity to do really constructive work in a surrounding that focused its attention on custody rather than treatment.

*Recommendations*

1. Each State, through its universities and social work schools, and the Federal Government, through the Department of Health, Education, and Welfare, should establish training centers for the development of trained and understanding staff to work in State correctional institutions.   Special focus should be given to training cottage supervisors, who are at present usually the least trained—and yet the most vital—persons dealing with boys and girls in State correctional institutions.   Employment in these schools should be put on a career basis, with good pay and chance for advancement in the department operating the school.   This would attract a higher caliber personnel for employment in these institutions.

2. A program of halfway houses—residential centers for boys and girls who have been released from State correctional institutions—should be developed.   Often boys and girls are released from institutions to return to a home where conditions are so critical and undesirable that it is impossible for them to adjust properly to the community.   Every large city and community should have available a residence where these young people could live upon release.   They would be free to participate in all community affairs, have the benefit of a limited treatment program in the residence, and could visit their home on occasion.   Several already exist—one being the Stuyvesant House in New York City—and they have been very successful.

3. Men and women being employed for work in correctional institutions should be more closely screened to make certain that their background is one of emotional stability and good character.   By being more careful in employment of these people, there will be less chance of sadistic or perverted individuals obtaining entry into an atmosphere peculiarly suited to their desires.

4. Further emphasis should be made in developing special classes and instruction for slow learners and especially for retarded readers.

Thus far the investigation into training schools has been on a limited basis and conclusions and recommendations made herein will necessarily be supplemented upon completion of the subcommittee's investigation.

The subcommittee hopes to investigate conditions in many more of the State and Federal training schools this year, with a view toward developing a program whereby the State and Federal Governments can work together to raise the standards of institutions housing these unfortunate children.

## VII. The Handling of Delinquent and Incorrigible Children in the Public School Systems

Increasingly serious problems in the Nation's public school systems with delinquent and incorrigible youth have resulted in much publicity with reference to the expulsion of these unmanageable children and

the handling of mentally disturbed children. The subcommittee began studying this problem when it became apparent that right here in the Nation's Capital child guidance and mental health facilities available to the school system were almost totally lacking, and, as a result, school officials were faced with the unfortunate situation of expelling unmanageable children, turning them out into the streets, as it were, and releasing them from any sort of formal control or formal treatment program. The subcommittee staff made a study of this situation and found that Washington, D. C., is one of the major cities woefully lacking in ancillary facilities for handling school problems. Mentally disturbed children in the District must wait 12 to 18 months before they can be given any help. During this time, of course, their condition can, and usually does, become much worse. They can and do increasingly become a threat to society, while less and less amenable to treatment. In a nearby Maryland county the brutal murder of a junior high school girl by a classmate who had been a long-time mental case brought forth statements from school and mental health officials that the major reason for this occurrence was the lack of adequate facilities in the area for handling mentally disturbed children in the schools. School officials knew the boy was emotionally disturbed long before his illness erupted so violently, but they were at a loss over what to do with him because of this lack of facilities.

The increasingly serious problems in both the District and neighboring county school systems, including three other murders committed by pupils, resulted in much publicity with reference to the handling of these children and the expulsion of unmanageable children. On looking into the District situation, it was found that incorrigible children were in danger of being turned loose from schools to roam the streets until they were picked up by the police.

The subcommittee offered the superintendent of schools of the District its help in developing an emergency plan to handle the juveniles who became so dangerous that they had to be removed from school. We also offered our help in initiating a long-range preventive plan to keep the more serious cases from developing. Suggestions and recommendations were made to the school system by the subcommittee by correspondence and interviews, and the latest communication to the subcommittee from the District school superintendent indicates that these incorrigible children will not be excluded from any formal handling. Instead, a team composed of 1 psychologist, 1 psychiatrist, and 2 social workers from the health department will review the cases of children who may have to be excluded. This team will study and evaluate each case prior to exclusion and make recommendations for placement or care after the pupil is excused from school. (The services of these professional people were obtained by the Commissioners' Youth Council from the District Health Department, and they were assigned to the Department of Pupil Appraisal, Study, and Attendance.)

A good example of the overpowering odds against which the District school officials must work is the situation in which the subcommittee found the District schools' Pupil Appraisal, Study, and Attendance Department. At the time of our inquiry, this department was composed of 10 people who administered individual psychological examinations. The unit has three functions: (1) To conduct group tests of achievement and intelligence; (2) to make psychologi-

KR0360

cal studies of behavior problems and to make recommendations based on these studies; and (3) to handle attendance problems.

In 1956, 5,928 children were referred to the department for psychological testing. They were able to complete the examination of 1,212 referrals. The remaining 4,716 were sent back to school the following fall with a request to the principal to send back only the serious cases. Of the thousands of referrals, only those cases held to be emergencies are given attention, while the incipient delinquents remain in the files indefinitely, or until such time as they become emergency cases. The staffing of this special services department has not been kept in line with pupil expansion. The obvious weaknesses in the program are: (1) The majority of the children cannot be handled; and (2) many recommendations made to parents by this department are not acted upon. There are no followup facilities to determine if their recommendations have been carried out. When recommendations for other school services are made, such as referral to a speech correction class, the child is put on a waiting list and given a temporary excuse from school. This may result in the child staying out of school several days, several weeks, or sometimes indefinitely. The school system has no facilities whatever for certain types of physical and mental cases.

This division had available for 2 hours a week the services of a psychiatrist, which consisted mainly of advice to the rest of the staff. Emergency cases were referred to public health clinics; however, these too are overcrowded.

There is also, within the District school system, a series of special classes to which are referred children who are relatively normal emotionally, but have some sort of school or home problem for which temporary treatment is determined to be necessary. They are referred from regular classrooms by the principals of the various schools. Children referred to these special classes are placed in (1) citywide adjustment classes, of which there are 3 in the District; and (2) separate community school type adjustment classes, of which there are 13 in the District.

Ideally, in each school there should be 1 class of this type for the older boys and 1 for the younger boys in order to keep them separated. In the District, teachers who handle these classes need no special qualifications other than those required for the average schoolteacher. All 3 of the citywide classes which handle these problem children have untrained instructors, as it is virtually impossible to get persons who have been especially equipped to handle them because of the extremely low salary which the Board of Education is able to pay. As indicated above, the special classes which exist in the city school system, such as remedial reading and speech classes, are not equipped to handle all of the referrals.

During the year two young inexperienced teachers were put in charge of special classes for problem children with the understanding that if the job was too difficult for them they should notify the principal, whereupon they would be released. They both did find the job too difficult. The assistant superintendent in charge of junior high schools in the District told the subcommittee, "When you have reached the bottom of the barrel, there is nothing else you can do." He was not criticizing the ability of these two teachers, but the situation wherein young teachers, as yet unskilled in handling disciplinary problems, were asked to cope with a group of the worst behavior

JUVENILE DELINQUENCY 19

problems in the District school system. The subcommittee is in full agreement with the superintendent and in sympathy with the District School Board. In its 1958 budget request, the reading specialists for senior high schools, the remedial reading classes for senior and junior high schools, and classes for the mentally retarded were eliminated along with the request for pupil counselors for junior high schools.

The members of the subcommittee are aware of the importance of this type of personnel in handling incipient behavior problems. The fact that delinquents invariably are characterized by an inability to read is an indication of their lack of ability to perceive and understand the world they live in—a great factor, psychologists tell us, in their delinquent behavior. The fact that the junior high school age is one of great stress and strain, during which many vexing problems arise, should be evidence enough of the need for special counselors for these young people. However, when it is realized that it is these problem situations that often result in delinquent behavior, the need for this type of personnel is magnified many times.

In view of the present situation in the District of Columbia school system, where it was necessary to exclude students because of misconduct, where children with problems must wait for special classes or services that may never come, where teachers with no special training to do so are asked to handle problem classes—in view of this, the members of the subcommittee entreat the Congress of the United States to appropriate the necessary money to make the school system of the Nation's Capital one that can be emulated, rather than one that is inadequate in terms of personnel and available facilities.

The subcommittee is aware of the fact that this is a problem faced by every large community in the United States. For example, New York schools have been beset by this problem of incorrigible and delinquent youth who disrupt and deteriorate classroom procedures. In looking for solutions to this situation, the subcommittee staff made a study of the so-called "600" school system in the city of New York, which is a series of 15 schools to which unmanageable and incorrigible children can be referred by their teachers. The members of the subcommittee feel that this group of schools is part of the answer to the problem of unmanageable children.

We will go into a much more detailed analysis of the effectiveness of the "600" schools in the forthcoming report on the New York hearings.

In reference to the District of Columbia situation, the subcommittee cannot emphasize enough the responsibility that the District Commissioners have in seeing to it that the schools of the Nation's Capital are more adequately staffed with better trained and better paid personnel. We would like to commend the Commissioners' Youth Council on its "maximum benefits" project, which is bringing to bear all of the available community services on the emotionally disturbed pupils of a Washington school in a high delinquency area. This is a beginning, but it is only one school. If more dynamic steps are not taken, such as those outlined in the District of Columbia Health Department proposals for strengthening and establishing additional mental health services for the schools and the school board's proposals for increased personnel to handle problem children, the District may at some future date find itself in a situation similar to that which now plagues other large cities.

## VIII. Other Activities of the Subcommittee

Throughout the year just past the subcommittee staff distributed upwards of 10,000 copies of reports and printed transcripts of hearings to a wide variety of professional and nonprofessional organizations and agencies and individuals throughout the country. Six thousand of the subcommittee's Report No. 130, the so-called omnibus report, were distributed. While numerous requests for this report are still received, there are only a limited number left which are distributed to congressional offices and to professional organizations and agencies. This report covered a wide variety of factors associated with the delinquency problem. Discussed in great detail were such subjects as rehabilitation of juvenile drug addicts, venereal diseases among juveniles, recreation, housing projects, therapeutic services, urban youth commissions, and family services dealing with the prevention of delinquency. Other areas covered in the report were juvenile vandalism, the effect of economic need and slum areas on delinquency, juvenile drinking, youth gangs, and the effect of punishment and discipline in rehabilitating juvenile delinquents. Other topics discussed were police services for juveniles, juvenile courts, detention of children in the United States, training schools, and forestry camps. This report was hailed by the press and professional people as bringing progressive concepts into the public spotlight in regard to this Nation's juvenile delinquency problem.

The subcommittee still receives hundreds of requests by letter and phone for subcommittee publications which are now out of print. Many of these reports have been quoted widely in the professional journals. Many have also been quoted widely and incorporated into the permanent literature of the juvenile delinquency field, as evidenced by publications such as college textbooks which appeared during the past year.

The subcommittee also issued a report during the year on juvenile delinquency in St. Louis. While this report was in effect a critical evaluation of the juvenile delinquency fighting facilities in the city of St. Louis, it was regarded by that city as a highly objective one and was in part responsible for that city's streamlining its delinquency-handling machinery.

During the past year some of the Nation's largest and most well-known dealers in pornographic literature were indicted or received maximum prison sentences under the law. These pornographers were originally pointed out by the subcommittee through investigation by the subcommittee staff and their activities brought to light through public hearings.

Because the subcommittee has been the only agency in this country's history to publish complete works on the relationship between the mass media and juvenile delinquency, which included our reports on the motion picture, television, and comic book industries, we are still considered by the public to be a focal point for registering complaints regarding these media. Because of this, we receive much correspondence in relation to our work in the area of removing objectionable and harmful contents from them. We are also in a position to pass on to these industries the complaints we receive and to keep them alert as to public opinion about their products.

## IX. Delinquency Among Indian Children

The subcommittee, in October 1954, under the acting chairmanship of subcommittee member Senator William Langer of North Dakota, began a series of hearings covering Indian reservations in the States of North Dakota, South Dakota, New Mexico, Arizona, Utah, Colorado, Nevada, California, Wyoming, Montana, and Idaho, to determine the increase in the incidence of juvenile delinquency on reservations. Numerous Indian leaders and public officials, who have jurisdiction over Indian affairs, had written to the subcommittee urging that these hearings be held.

The subcommittee, on September 1, 1955, issued an interim report (No. 1483) entitled "Juvenile Delinquency Among the Indians," which was a 239-page document relating extensively to many of the problems that confront the Indian people on Indian reservations throughout the United States which may have an impact on the incidence of delinquency on the part of Indian youth. The report brought to the attention of Congress the very low average yearly income of the Indian family, the physically deteriorated area in which they live, the poor living conditions on Indian reservations, coupled with the difficulty of Indians obtaining gainful employment or loans for their small businesses, farms, or ranches. This economic factor had a direct relationship to the delinquency pattern among Indian children.

Also brought to the attention of Congress was the poor health conditions and lack of health facilities on Indian reservations, the lack of proper welfare and youth services on the reservations, and the need for greater public education facilities and improvement of the educational services rendered by the Bureau of Indian Affairs.

It was further pointed out that law and order on the Indian reservations need great improvement and that lack of funds and personnel was the most contributing factor to such laxity of enforcement of law and order as found on the different reservations.

The subcommittee made extensive conclusions and recommendations which were submitted to the Congress of the United States.[1] Several of these recommendations have been enacted into law and others have been acted upon by the executive branch of the Government, primarily through the Bureau of Indian Affairs and the United States Health Service.

During this past year, primarily through the energetic services of Senator William Langer, the subcommittee's activities as regards the American Indian have been geared toward improvement of the financial status of the American Indian family, as well as improvement in health, education, welfare, and recreational services. The subcommittee has participated in numerous conferences dealing with problems affecting the American Indian people and their reservations. One of these conferences was a 10-day conference of Indian chiefs representing 40 tribes from the States of Oklahoma, Kansas, and Mississippi, held at Dallas, Tex. This regional conference was called by Indian Affairs Commissioner Glen L. Emmons, where he and his staff members and Bureau of Indian Affairs area personnel met with the Indian chiefs to discuss the many facets of Indian affairs on Indian reserva-

---

[1] See Subcommittee Rept. No. 1483, 84th Cong., 2d sess., an interim report on juvenile delinquency among the Indians, pp. 44–48.

KR0364

22                         JUVENILE DELINQUENCY

tions.  The subcommittee was represented at this conference in lieu
of conducting open hearings which had been previously scheduled.
One of the principal subjects was the providing of sources of jobs for
the Indian people.  The Indian chiefs believe that although the
relocation program aided in obtaining employment for Indians in
major cities, gainful employment had to be provided for the Indian
family in or near his reservation.  Another topic of great interest
and concern to the Indian chiefs attending this conference was the
increase in juvenile delinquency among the Indian youths.  Much of
this 10-day conference revolved around this important social problem
and resolutions were passed by the group urging effective measures
be taken to combat juvenile delinquency on Indian reservations.  To
effectuate the concern of the Indian chiefs throughout the country of
the need for job opportunities in or near Indian reservations, Senator
Langer, joined by 19 Senators, introduced Senate bill 809 to provide
loans or grants to Indian reservations for the purpose of encouraging
industry in or near the reservations.[2]  The Senators who cosponsored
this legislation were as follows: Senators O'Mahoney, Kefauver,
Thye, Case of South Dakota, Young, Magnuson, Dworshak, Morse,
Chavez, Mundt, Church, Jackson, Murray, Barrett, Bible, Bricker,
Kerr, Humphrey, and Mansfield.

The jewel bearing plant at Rolla, N. Dak., which has been in
operation since 1952, has been hiring almost exclusively Indian labor
and has become a model in the encouragement of industry at or near
Indian reservations.  Six other industrial plants have been put into
operation at Gallup, N. Mex.; Flagstaff, Ariz.; Cherokee, N. C.;
Lame Deer, Mont.; Casa Grande, Ariz.; and Zuni, N. Mex.  These
plants hire almost exclusively Indian labor.

The subcommittee has participated in several other conferences
relating to the many problems facing the American Indian on the
Indian reservation.  The Governors' Interstate Indian Council met
in Oklahoma City on October 24, 25, and 26, and was attended by
representatives from each of the States where Indian reservations are
located.  At this conference, discussion was held dealing with Indian
affairs.  Subcommittee member William Langer, in submitting a
statement to the conference, in part stated as follows:

> The Indian people through their leaders have expressed the
> desire that they want to provide for themselves and their
> children by obtaining stable and gainful employment so that
> they may become a self-sustaining people and not depend, any
> more than necessary, on the services accorded by the Federal
> and State Governments.  Not only will they be more self-
> sustaining economically, but it will further establish in them
> the strong family and community pride that has always been
> a part of the Indian people.
>
> I have no doubt in my mind that with the bringing of in-
> dustries to the Indian people, jobs will be created.  The
> creation of jobs means a higher income level per Indian
> family.  The higher level of income per Indian family means
> better opportunities for education, better housing, better
> health, and better recreation for the Indian people, resulting
> in less need for the heartbreaking requests for welfare aid.

---
See remarks ro S. 809 as reported in Congressional Record appendix on January 23, 1957

KR0365

A more recent conference was sponsored by Arrow, Inc., on November 25 and 26, 1957, which was a session of Indian leaders and Indian youth and was most encouraging in meeting the problems of Indian youth on the various Indian reservations.

The subcommittee feels that since Congress has jurisdiction over the Indian people, the subcommittee should continue to examine conditions affecting the youth on Indian reservations which may lead to delinquency.   The subcommittee will continue to present to the Congress of the United States the recommendations in its 1955 report, which has not yet been acted upon by the Congress.   Since the hearings were begun in 1954, there has been improvement in the fields of health, education, welfare, law, and order.   Much improvement is needed in the field of creating job opportunities and improving the financial plight of the American Indian family.   Only until improvement in these categories is sufficiently shown can the delinquency patterns of Indian youth be reduced considerably.

## INDIVIDUAL VIEWS OF SENATOR ALEXANDER WILEY

I generally concur in the committee report. I also wish to direct thought to these matters:

### DANGERS

Juvenile delinquency is coming more and more to be recognized as a problem with dangerous implications. From 1955 to 1956, juveniles brought to court increased 21 percent.

From 1948 through 1956, juvenile court cases more than doubled, compared with an increase in the juvenile population of only 19 percent.

### AWARENESS OF THE DANGER

The Senate Subcommittee on the Study of Juvenile Delinquency in the United States is doing a commendable job in helping to alert the country to these dangers.

The subcommittee has published specific reports on its investigations. These include studies of the influences toward juvenile delinquency resulting from crime and horror stories told in some comic books, television shows, and motion pictures. The subcommittee also issued a report on obscene and pornographic literature. And it published reports with respect to the aid in solving the problem of juvenile delinquency which is being given, and can increasingly be expected, from churches and schools.

The overall reports of the subcommittee have discussed many aspects of the problem and have coordinated the conclusions of the separate specific reports.

The number of requests for these publications indicate the welcome reception given by the public to the information which the subcommittee has gathered.

### CAUSES

It is, of course, axiomatic that the center of the life of a growing child is in the home. It has long been recognized, and continues to be true, that the happy home produces no juvenile delinquents, unless there is some unfortunate and unusual outside influence.

But, under the stresses of the modern machine age, the home is finding it increasingly difficult to keep its strength and position. And children do not always receive the loving care which it may have been easier to show in a home midst quiet surroundings in a small town or village in the good old days.

Activities which help maintain and rebuild the influence of home life will, in my judgment, help reduce the problems of juveniles.

### COMMUNITY AGENCIES

If and when the home fails, there are in most communities local agencies which are usually well prepared to help the youngster out of his trouble and toward a new life. However, in other places, due to

24

lack of available funds or lack of modern training, or lack of coordination, the agencies and institutions provided for juvenile care are not in position to achieve what they would like to do.

### A LOCAL PROBLEM

However, this does not mean that the problem does not continue to be a local one.  The Federal Government can supply information and suggestions which the local community may consider, debate, and adopt or reject.  It is only when a problem is beyond the capacity of the locality and of the State, and also poses a problem of national magnitude, that the Congress should focus attention on the situation.  However, the Federal and State Governments have a continuing function of disseminating helpful information.

### WISCONSIN PROJECT

As an illustration of what can be done locally and in the States to cope with this problem, I call attention to one of the best plans which I have seen.  It is, quite naturally, one evolved, or worked out, by the Wisconsin State Board of Public Welfare.  In the introduction to a report on this plan, the director of the State department of public welfare, Mr. Wilbur J. Schmidt, and the director of the division for children and youth, Mr. Fred DelliQuadri, state their policy as follows:

> Every dollar and every hour of service invested in prevention can bring a much greater return in conservation of human resources and in savings of public welfare dollar expenditures.  But the job of prevention is one which is accomplished primarily in the local community and only by the civic effort and concern of many citizens, parents, and young people.  The State agency's role in prevention, therefore, becomes to a larger extent one of consultation, education, and assistance to local citizens and officials to help them do a better job of prevention.

Information concerning this program was introduced by me into the record of the hearing on juvenile delinquency in New York City and so was made available for possible use there.

As the Senate subcommittee report indicates:

> Our most recent effort has been the development of what the subcommittee calls a total community plan for the handling of juvenile delinquency.  The subcommittee observed throughout its years of study that the main problems in the handling of juvenile delinquency are:  (1) The lack of trained and skilled workers in the field of delinquency; and (2) where these workers are available to agencies, there is a lack of coordination, guidance, and accountability by a central administrative body, which in turn waters down their effectiveness.

### WISCONSIN'S PROGRAM ORIENTED AROUND LOCAL COMMUNITY

As an example of what States are doing, I call attention to the Wisconsin demonstration project prospectus which gives some worth-

26                              JUVENILE DELINQUENCY

while guidelines which other States may find useful.  For instance, it says:

> In the words of Governor Thomson, this is to be "an experimental program designed to bring together—at the community level—all the skills necessary for successful preventive work in the field of juvenile delinquency and youth guidance."
>
> Nationwide, there is an accelerated interest in and concern about the observable increase in family breakdown, community disorganization, and the mounting costs of these social ills.
>
> Wisconsin has long recognized that treatment in the community is preferable to institutional treatment, that research is needed into the causal factors of social ills, and that if social welfare programs are truly to serve the socially and economically disadvantaged, they must be preventive in nature.
>
> The greatest effort to date, both in State and local community services, has been in the treatment of the individual who is already delinquent, neglected, emotionally disturbed, or dependent.  In recent years efforts have been intensified in Wisconsin toward the developing and strengthening of all services for families in the community.  This preventive work, within legal and financial limits, involved a broad program of community education and community organization, including assistance to citizens and local officials through surveys and consultation seeking to improve local recreation, education, health, welfare, law enforcement, and juvenile court services.  The greatest continuing gap in prevention is in services designed to reach those families and those children especially vulnerable to social ills, before the onset of social breakdown in the individual or within the family.

### CONCLUSIONS

And so, there should issue a clarion call, to each community and to each religious, civic, and governmental organization in each community, to increase and intensify its efforts to locate any and all juvenile delinquency problems in its community and to bring all of the forces for good to bear upon their solution.

1. Local community social services should be brought to their best level of operation.

2. Families which are running into difficulties should be able to find expert advice and guidance locally.

3. Schools should identify problem children promptly and make corrective guidance available to them immediately.

4. Families of those problem children should be advised how to help them.

5. Local community social services should be coordinated so as to be available to the family in time to help it solve its problems before it breaks up.

6. Great effort should be made to prevent mental and emotional damage from happening to children and to make them feel loved by their families and a wanted part of their communities.

KR0369

7. Physical disabilities, which in turn can result in disabilities in spelling and reading, should be corrected to bring the child in closer and more understanding contact with his fellows.  A sickly fellow, or one with poor, uncorrected eyes or otherwise inferior, may react with dangerous hostility toward the world in which he lives.  (Of course, many children can adjust to a situation of being different from and inferior to the crowd; but others need special help in doing so.  There is a broad range of disability problems, any one of which may create a situation which will trigger an antisocial attitude.)

8. Such legislation as is additionally necessary should be passed by the local, State, and Federal Governments to keep harmful influences like pornographic, horror, and crime stories away from children and young people.

9. The Federal Government should encourage the establishment of training schools for institutional personnel which is going to supervise or come in contact with juvenile adjustments committed to institutions.

10. Institutional programs should be for the purpose of the curing and correcting, as well as the humane punishment, of juvenile delinquents so that, when their terms are over, they will increasingly come well-adjusted and law-abiding members of society.

11. The effect of unemployment in weakening the home and lessening the needed respect in which a son holds his father should be fully appreciated by those in position to act.

12. The impact of the immigration of labor and families from the country and small town to the city, from the South to the North, is unsettling to the family and its influences for good, and so ways must be found to reestablish the home environment.

13. In youth programs, let the activity fit the child.  Especially in the period of adolescence, there is the surge of new energy, new interests, and new needs.  It is essential that the youth's dynamic spirit be attracted by activities which will fully utilize his energies and enthrall his ambition.  Personal attention to the needs of different youngsters, or at least different types of youngsters, is usually essential if a program is to succeed in arousing his interest.  Some may respond more to the opportunity to study, some more to music and beauty, others only to the most vigorous games.  The school, playground, or other program director must have the great skill of being able to inspire the youngsters whom he directs, because, in a real sense, he is trying to supply the guidance and inspiration all too lacking in the impersonal world in which many underprivileged youth must live.

Youth direction and guidance of a type which can inspire the young person to selflessly devote himself to a cause (or to improve himself for a future career)—such leadership is needed.

14. And, finally, only if the community (whether city, neighborhood, town, or village) and the State, and all of the private organizations in the community and the State, cooperate wholeheartedly toward meeting the modern crisis of increasing juvenile delinquency will our free America remain the safe, happy, and constructive land we know and love so well.

ALEXANDER WILEY.

○ ·

KR0370

**PLAINTIFFS' EXHIBIT S**

KR0371

# JUVENILE DELINQUENCY

**(New York Programs for the Prevention and Treatment of
Juvenile Delinquency)**

## HEARING

BEFORE THE

### SUBCOMMITTEE TO INVESTIGATE
### JUVENILE DELINQUENCY

OF THE

### COMMITTEE ON THE JUDICIARY
### UNITED STATES SENATE

EIGHTY-FIFTH CONGRESS

FIRST SESSION

PURSUANT TO

## S. Res. 52

**EIGHTY-FIFTH CONGRESS**

INVESTIGATION OF JUVENILE DELINQUENCY IN THE
UNITED STATES

DECEMBER 4, 1957

Printed for the use of the Committee on the Judiciary



UNITED STATES
GOVERNMENT PRINTING OFFICE
20873                      WASHINGTON   1958

KR0372

## COMMITTEE ON THE JUDICIARY

JAMES O. EASTLAND, Mississippi, *Chairman*

| | |
|---|---|
| ESTES KEFAUVER, Tennessee | ALEXANDER WILEY, Wisconsin |
| OLIN D. JOHNSTON, South Carolina | WILLIAM LANGER, North Dakota |
| THOMAS C. HENNINGS, JR., Missouri | WILLIAM E. JENNER, Indiana |
| JOHN L. McCLELLAN, Arkansas | ARTHUR V. WATKINS, Utah |
| JOSEPH C O'MAHONEY, Wyoming | EVERETT McKINLEY DIRKSEN, Illinois |
| MATTHEW M. NEELY, West Virginia | JOHN MARSHALL BUTLER, Maryland |
| SAM J. ERVIN, JR., North Carolina | ROMAN L. HRUSKA, Nebraska |

————

SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY IN THE UNITED STATES

THOMAS C. HENNINGS, JR., Missouri, *Chairman*

| | |
|---|---|
| MATTHEW M. NEELY, West Virginia | WILLIAM LANGER, North Dakota |
| SAM J. ERVIN, JR., North Carolina | ALEXANDER WILEY, Wisconsin |
| ESTES KEFAUVER, Tennessee | JOHN MARSHALL BUTLER, Maryland |

JAMES L. SULLIVAN, *Chief Counsel*
ERNST A. MITLER, *Special Counsel*
CARL L. PERIAN, *Research Director*

II

**KR0373**

# CONTENTS

Statement of—

    Cohen, Frank J., director of student services, Graduate School of   **Page**
      Public Administration and Social Service, New York University___   50
    Dumpson, James R., incoming first deputy commissioner of welfare,
      New York City Welfare Department, New York, N. Y_____   80
    Harriman, Hon. Averell, Governor, State of New York, Albany, N. Y_   10
    Jansen, Dr. William, superintendent, Board of Education, city of
      New York_____   89
    Johnson, Hugh, street club worker, Council of Social and Athletic
      Clubs, New York City Youth Board, New York, N. Y_____   93
    Kahn, Dr. Alfred J., professor of social work at the New York School of
      Social Work, Columbia University, and consultant, Citizens' Com-
      mittee for Children of New York City, Inc_____ 33, 48
    Lightfoot, Harrison, street club worker, Council of Social and Athletic
      Clubs, New York City Youth Board, New York, N. Y_____   93
    McCloskey, Mark A., chairman, New York State Youth Commission
      Albany, N. Y_____   25
    McGraw, Walter, producer of radio and television documentaries,
      New York, N. Y_____   43
    Norman, Sherwood, director of detention services, National Probation
      and Parole Association_____   61
    Poe, John W., executive director, Youth House, New York, N. Y____   55
    Rogers, Arthur J., director of community relations, Council of Social
      and Athletic Clubs, New York City Youth Board, New York, N. Y_   93
    Schmais, Aaron, street club worker, Council of Social and Athletic
      Clubs, New York City Youth Board, New York, N. Y_____   93
    Whelan, Ralph, executive director, New York City Youth Board, New
      York, N. Y_____   84

Statement submitted by—

    Alt, Herschel, executive director, Jewish Board of Guardians, 228
      East 19th Street, New York, N. Y_____  145
    Carey, Gerald J., assistant to the chairman, New York City Housing
      Authority_____  171
    Carpenter, H. Daniel, director of Hudson Guild, 436 West 27th Street,
      New York, N. Y_____  155
    Cooper, Hon. Irving Ben, chief justice, Court of Special Sessions,
      100 Centre Street, New York, N. Y_____  176
    Gallagher, Rev. Robert E., executive director, Catholic Charities
      Guidance Institute, New York, N. Y_____  140
    Gamso, Dr. Rafael R., medical superintendent, Riverside Hospital,
      North Brother Island, foot of East 134th Street, New York, N. Y_  150
    Hill, Hon. John Warren, presiding justice, Domestic Relations Court,
      135 East 22d Street, New York, N. Y_____  167
    Hotchkiss, Henry G., president, Federation of Protestant Welfare
      Agencies, Inc., New York, N. Y_____  143
    Kennedy, Stephen P., police commissioner, New York City Police
      Department, New York, N. Y_____  164
    Linda, Joseph M., youth parole director, Boys' Training Schools Home
      Service Bureau, 88 Reade Street, New York, N. Y_____  122
    Louchheim, Joseph H., deputy commissioner, State Department of
      Social Welfare, 112 State Street, Albany, N. Y_____  106
    Murtagh, Hon. John M., chief city magistrate, Magistrates' Courts,
      100 Centre Street, New York, N. Y_____  160
    Papanek, Dr. Ernst, executive director, Wiltwyck School for Boys,
      Post Office Box 71, Esopus, N. Y_____  131
    Phelan, Joseph F., Jr., executive director, the Children's Village,
      Dobbs Ferry, N. Y_____  125

III

**KR0374**

Statement submitted by—Continued

Powers, Sanger B., director, Division of Corrections, State Department of Public Welfare, 104 East Dayton Street, Madison, Wis____ **187**

Rieber, Frederick C., deputy commissioner, New York City Department of Correction, 100 Centre Street, New York, N. Y_____ **103**

Rogers, Arthur J., director of community relations, Council of Social and Athletic Clubs (supplemental statement of street workers)____ **99**

Scarborough, Donald D., superintendent, New York State Vocational Institution, Coxsackie, N. Y_____ **120**

Schwarz, Mrs. Sanford, 41 West 83d Street, New York, N. Y_____ **190**

Stark, Hon. Abraham, president, City Council, City Hall, New York, N. Y_____ **168**

Wiley, Hon. Alexander, United States Senator from the State of Wisconsin_____ **6**

## EXHIBITS

*Number and Summary of exhibit*

1. Copies of Senate Resolution 52 and Senate Resolution 191, 85th Congress, 1st session_____ **3**
2. Copy of resolution authorizing subcommittee to hold hearings in New York_____ **4**
3. Prospectus for a demonstration project on prevention of juvenile delinquency and related social ills, June 1957_____ **7**
4. Community services program of the Division for Children and Youth, State Department of Public Welfare, a report, February 1956_____ **\*5**
5. Public Child Welfare in Wisconsin, Child Welfare Report No. 7_____ **\*5**
6. Chart: Community Functions in Dealing With Delinquents, excerpt from a forthcoming book, Planning Community Services for Children in Trouble, by Alfred J. Kahn, Citizen's Committee for Children of New York City, Inc_____ **39**
7. Chart: The tragic case of Ronald Marrone_____ **44**
8. Detention of Children in the United States, by Sherwood Norman, director of detention services, National Probation and Parole Association_____ **62**
9. Statement of the NPPA on S. 1455 and similar bills to control juvenile delinquency_____ **65**
10. Statement on juvenile detention by Sherwood Norman_____ **65**
11. Regional Detention Centers, an article submitted by Mr. Sherwood Norman from the NPPA News, January 1957, volume 36, No. 1___ **71**
12. Chart: Organizational chart of the New York City Youth Board____ **84**
13. Chart: Council of Social and Athletic Clubs, New York City Youth Board_____ **93**
14. Chart: Questionnaire on switchblades_____ **96**
15. Department of Correction Profile, from the Kings County Grand Juror (May 1957), official organ of the Kings County Grand Jurors' Association, Inc_____ **105**
16. Classification and Treatment, article submitted by Abraham G. Novick, superintendent, New York State Training School for Girls, from the January 1958 issue of the NPPA Journal_____ **108**
17. Achieving Integration Between the Juvenile Delinquent and His Community, article submitted by Abraham G. Novick, published in Federal Probation, June 1956_____ **115**
18. The prehospitalization personality structure of patients at Riverside Hospital generalized into five descriptive groups by Dr. Donald Gerard, associate visiting psychiatrist at Riverside Hospital_____ **154**
19. Excerpts from the 1954 and 1955 Annual Reports of the Office of the District Attorney of Kings County submitted by Edward S. Silver, district attorney of Kings County, for inclusion in the hearings of the Senate Subcommittee To Investigate Juvenile Delinquency_____ **180**

*On file with the subcommittee.

**KR0375**

# JUVENILE DELINQUENCY

## (New York Programs for the Prevention and Treatment of Juvenile Delinquency)

---

### WEDNESDAY, DECEMBER 4, 1957

UNITED STATES SENATE,
SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY
OF THE COMMITTEE ON THE JUDICIARY,
*New York, N. Y.*

The subcommittee met, pursuant to call, at 10 a. m., in room 905, United States Courthouse, Foley Square, New York City, N. Y., Senator Thomas C. Hennings, Jr. (chairman of the subcommittee) presiding.

Present: Senators Hennings and Kefauver.

Also present: Representatives Multer, Anfuso, Powell, Zelenko, and Dooley; James L. Sullivan, chief counsel; Ernest A. Mitler, special counsel; Carl Perian, research director; Elizabeth McGill, chief clerk; and Bernard Fensterwald, administrative assistant to Senator Hennings.

Chairman HENNINGS. The committee will come to order.

I will ask the reporter to insert in the record my opening statement.

(The statement referred to follows:)

OPENING STATEMENT BY SENATOR THOMAS C. HENNINGS, JR., CHAIRMAN, SENATE SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY, AT HEARINGS, NEW YORK CITY, DECEMBER 4, 1957.

We are delighted to be in New York City to begin the first of 3 days of hearings. At the outset, I want to make it abundantly clear that this committee does not intend to criticize any agency or any individual in this great city. We wish to be entirely constructive. New York was chosen as the place for these hearings because of the large dimensions of the problem here and the magnitude of the effort to combat it.

I am especially happy that my colleague from the Senate and the committee, Senator Estes Kefauver, is with us for these hearings, as he has served on the committee since it was created by the Senate, and he has a great interest in problems affecting young people.

Along with Senator Kefauver, I have served as a member of the Committee To Investigate Juvenile Delinquency since its inception and have been chairman since last January. This has been one of the most challenging and interesting of my many Senate assignments. Long before that, however, I had been concerned with the welfare of our young people. As assistant district attorney of the city of St. Louis in the early 1930's and district attorney in the early 1940's, I was constantly faced with the fact that human tragedy is inevitable if our young people are not given proper guidance and understanding treatment. During these years, it was my sad duty to prosecute hundreds of youngsters who had been called up before the court on criminal charges. I am now chairman of the Senate Committee on National Penitentiaries and have had opportunity to see many institutions for youths who have gotten into trouble.

1

KR0376

Believing that all children are deserving of our interest and support, I have been for many years an active member of the Big Brothers organization, as well as other organizations which attempt to steer our young people into constructive paths.

Before we begin, I should like to thank all who have made these hearings possible. We have received the fullest support and cooperation from the State of New York through the office of Governor Averell Harriman; from the city of New York through the office of Mayor Wagner; and from many public and private agencies, whose assistance has enabled us to assemble the facts and material for these hearings. On behalf of myself, the other members of the committee, and the staff, I extend to you our deepest appreciation.

This investigative group was commissioned by the Senate 4 years ago to determine the extent, scope, and character of juvenile delinquency in the United States, which had been increasing at an alarming rate. We were also instructed to make recommendations and develop legislation, where feasible and necessary, at the Federal level.

At this point I should like to say, and I feel sure that my good friend, the distinguished senior Senator from Tennessee, will agree with me, that we do not believe that the Federal Government should become caretakers of the Nation's delinquents. However, now that delinquency has become what many consider to be the country's No. 1 social problem, it is felt that the Federal Government has a definite responsibility in assisting communities in coping with a problem which in many cases cannot be effectively dealt with by local resources alone.

In this connection, I should like to point out that during the last session of the Congress Senator Kefauver, Senator Langer, and I introduced S. 431, a bill designed to give such assistance to States. A similar bill passed the Senate during the 84th Congress, but unfortunately it was too late in the session for action to be taken by the House of Representatives. By means of the grants-in-aid device, funds would be provided for the training of personnel, for the improvement and extension of services for children and youth, and for a limited amount of risk capital to be used to launch and temporarily maintain new and experimental programs. If enacted into law, we feel that this measure would be of inestimable help in combating delinquency at the local level.

Throughout the committee's investigations, we noted many studies and experimental programs being developed to bring order out of the chaos that prevailed over the delinquency problem. Many of these fell by the wayside; others proved to be fruitful. For example, we have learned that delinquent behavior can be predicted with a fairly reasonable degree of accuracy; the spotlight has been thrown on many of the problems inherent in developing an efficient delinquency program; and we are much further along in the development of new techniques for treating and rehabilitating a variety of delinquent types.

What we hope to obtain at these hearings is a very frank appraisal of the various programs instituted in this State, with an equally frank appraisal of their success. We are here to learn as much as we can about these new developments now that the uproar has subsided somewhat and some clear thinking and planning has been done. We also want to see what progress has been made in setting up the machinery to handle the various facets of the overall problem and, more important, analyze the effectiveness of that machinery.

In our previous hearings across the country, we have found that many times agencies and groups, private and public, were attempting to deal with a situation that was overwhelming. Too often, because of a lack of direction and coordination, well-intentioned efforts were being dissipated.

If I may be permitted to paraphrase that well-known saying of Mark Twain about the weather, it seemed that everyone was talking about delinquency, but no one was doing anything about it. It has also been said that delinquency seems to increase in direct ratio to the conferences held on combating it. Well, it is true that there has been a great deal of talk about delinquency, but we also feel that much has been learned—enough so that now the knowledge which has been gained can be assembled into a program that will provide communities with the tools necessary to protect and aid their children and young people.

We have selected New York City for these hearings because your problem is unique and at the same time similar to that of other communities. It is unique only in the physical sense, simply because New York is the largest city in the country; it is similar because most of your problems here can be found elsewhere. New York also has many fine programs, experimental and in operation, preventive and rehabilitative, which can be adapted to the needs of other cities and towns.

**KR0377**

While we expect to hear much discussion during the next few days, we also hope that our efforts here and elsewhere will result in a blueprint for action that can remove what has been one of the greatest stumbling blocks in the treatment of juvenile delinquency—a lack of coordination of community effort.  We further hope that such a plan will provide a definite course of action for those working on this problem; that we can show communities how they can better use their existing facilities and what additional facilities should be developed.

From the many fine witnesses scheduled to be heard during the course of these hearings, we shall explore the three broad areas in the treatment of delinquency: (1) early detection and prevention; (2) diagnosis and placement; and (3) re-education and rehabilitation.

Concerning detection and prevention, it is felt that this area holds the greatest promise for the control of delinquency.  Now that we have the techniques, such as the Gleuck's delinquency prediction scale, for the early detection of delinquency-prone youngsters, we should like to know to what extent and with what success these new tools are being used.  In terms of human and monetary values, it is, of course, to the best interest of the individuals concerned and society to prevent delinquency whenever and wherever possible.

One of the most important factors in the treatment process, we feel, is the proper diagnosis and placement of delinquent boys and girls, and the necessity for this type of classification is just beginning to receive the attention it deserves.  The haphazard placement of children in whatever facility available, be it jail or foster home, seems to be giving away slowly, but we hope surely, to diagnosis and classification along the lines of modern scientific thinking on this subject.  As this method of placement is relatively new, the testimony which we shall hear on this phase of delinquency treatment should be of great value to the many communities which have not yet set up such machinery.

The last broad area in the treatment of delinquency is the reeducation and rehabilitation of youngsters adjudicated delinquent and committed to correctional institutions.  While what has been referred to as the "reform of the reform school" has ostensibly been going on for many years, our investigations reveal that in far too many instances these institutions are not doing the rehabilitative job that should be done, and the treatment of youngsters in many of these schools is, to say the least, repressive.  Here, too, we want to know what progress you have made in equipping young people to become useful, constructive members of society on their release from your institutions.

Under these broad areas of treatment, we know that here in New York you have many programs, operated by both private and public agencies, and we want to find out where these programs fit in the overall plan in the fight against delinquency.  Such an appraisal, we feel, can be of value to your own program as well as to those of other communities.

Our youth are our greatest asset; we owe it to ourselves and to them to provide the best environment possible for their growing up.  It will require the best effort from all of us, whether we are lawyers, Senators, psychiatrists, educators, judges, social workers, or parents.  Our place in the world tomorrow may well be determined by what we do for our children today.

Chairman HENNINGS. At this time I submit for the record, and ask they be made part of the record, Senate Resolution 52, authorizing the existence of the committee and also the resolution signed by the six members of the Subcommittee on Juvenile Delinquency authorizing these hearings and authorizing that we take testimony from several witnesses who may appear.

I will hand these to you, Mr. Reporter, for inclusion in the record.

(The resolutions referred to were marked "Exhibits 1 and 2," and read as follows:)

### EXHIBIT No. 1

[S. Res. 52, 85th Cong., 1st sess.]

#### RESOLUTON

*Resolved,* That the Committee on the Judiciary, or any duly authorized subcommittee thereof, is authorized under sections 134 (a) and 136 of the Legislative Reorganization Act of 1946, as amended, and in accordance with its jurisdiction specified by rule XXV of the Standing Rules of the Senate insofar as they relate to the authority of the Committee on the Judiciary to conduct a

**KR0378**

full and complete study of juvenile delinquency in the United States, including (a) the extent and character of juvenile delinquency in the United States and its causes and contributing factors; (b) the adequacy of existing provisions of law, including chapters 402 and 403 of title 18 of the United States Code, in dealing with youthful offenders of Federal laws; (c) sentences imposed on, or other correctional action taken with respect to, youthful offenders by Federal courts, and (d) the extent to which juveniles are violating Federal laws relating to the sale or use of narcotics.

Sec. 2. For the purposes of this resolution, the committee, from February 1, 1957, to January 31, 1958, inclusive, is authorized to (1) make such expenditures as it deems advisable; (2) to employ, upon a temporary basis, technical, clerical, and other assistants and consultants: *Provided*, That the minority is authorized to select one person for appointment, and the person so selected shall be appointed and his compensation shall be so fixed that his gross rate shall not be less by more than $1,200 than the highest gross rate paid to any other employee; and (3) with the consent of the heads of the departments or agencies concerned, and the Committee on Rules and Administration, to utilize the reimbursable services, information, facilities, and personnel of any of the departments or agencies of the Government.

Sec. 3. The committee shall report its findings, together with its recommendations for legislation as it deems advisable, to the Senate at the earliest practicable date, but not later than January 31, 1958.

Sec. 4. Expenses of the committee under this resolution, which shall not exceed $50,000, shall be paid from the contingent fund of the Senate upon vouchers approved by the chairman of the committee.

———

[S. Res. 191, 85th Cong., 1st sess.]

RESOLUTION

*Resolved*, That section 4 of S. Res. 52, Eighty-fifth Congress, first session, authorizing an investigation of juvenile delinquency in the United States, agreed to on January 30, 1957, is amended by striking out "$50,000" and inserting in lieu thereof "$60,000".

———

Exhibit No. 2

RESOLUTION

*Resolved by the Subcommittee of the Committee on the Judiciary to Investigate Juvenile Delinquency in the United States*, That pursuant to subsection (3) of rule XXV, as amended, of the Standing Rules of the Senate (S. Res. 180, 81st Cong., 2d sess., agreed to February 1, 1950) and committee resolutions of the Committee on the Judiciary, adopted January 20, 1955, that Senator Thomas C. Hennings, Jr., and such other members as are present are authorized to hold hearings of this subcommittee in New York, N. Y., on December 4, 5, and 6, 1957, and such other days as may be required to complete these hearings, and to take sworn testimony from witnesses.

Agreed to this 27th day of November, 1957.

> Thomas C. Hennings, Jr., *Missouri.*
> Estes Kefauver, *Tennessee.*
> Matthew M. Neely, *West Virginia.*
> Sam J. Ervin, Jr., *North Carolina.*
> William Langer, *North Dakota.*
> Alexander Wiley, *Wisconsin.*
> John Marshall Butler, *Maryland.*

Senator Kefauver. I, too, would like to submit a brief statement for the record.

Chairman Hennings. The statement will be included in the record.

KR0379

(The statement referred to follows:)

STATEMENT BY SENATOR ESTES KEFAUVER AT HEARINGS OF THE SENATE SUB-
COMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY IN NEW YORK CITY,
DECEMBER 4, 1957

First, I want to thank my good friend, our chairman, Senator Hennings, and
say that it is always a pleasure to serve with him. Since our days in the House
of Representatives, we have worked together on many assignments and jointly
sponsored much legislation. On most issues we have happily found ourselves
fighting for the same objectives, and in no other area is this truer than in the
field of child welfare. And I also feel that our work with the Subcommittee to
Investigate Juvenile Delinquency has been both challenging and rewarding.

I, too, am appreciative of the assistance given to the subcommittee by New
York State and city officials not only during this current investigation, but also
during our past visits to this great State. We know of the efforts being made
by Governor Harriman, Mayor Wagner, and others to combat delinquency, and
we have a full appreciation of their problem. Their enlightened leadership and
their forward-looking attitude toward this problem have been instrumental in
giving young people a better outlook and in providing them with adequate
educational opportunities.

As to the theme of our discussions here, I feel very strongly that such hear-
ings as our chairman, Senator Hennings, is conducting can serve a useful purpose
in the fight against delinquency. During previous years, we investigated many
of the environmental factors which might contribute to the delinquency of our
young people, such as crime and horror comic books, narcotics, motion pictures,
and television. We also explored the ways in which the school and the church
could help in combating delinquency, the manner in which communities across
the country were handling their delinquency problems, and the impact of lack
of job opportunities on youthful behavior.

From the wealth of testimony received by the subcommittee, we discovered
that there were many and varied tools and techniques for dealing with delin-
quency. We also found that there were many divergent views on the use of
these tools and techniques. To effectively treat unfortunate young persons who
run afoul of the law, it is, of course, necessary that these points of view be
reconciled so that our treatment of youngsters does not become an ideological
football for the various professions concerned with juvenile delinquency. For-
tunately, we found most workers in these professions willing to respect the point
of view of others and to keep the welfare of children as their primary objective.

There has been a period of testing, of trial and error, in attempting to find
methods for coping with the blight of delinquency, which has spread so rapidly
across our land. During these years, we were much like doctors trying to treat
an ailment without knowing fully its nature or cause. And while much remains
to be learned about causation, we do feel that at this time our knowledge is
great enough so that the disease can be contained and alleviated to a more
substantial degree. There is no magic cure nor any pat answer to this problem;
however, it is now imperative that we utilize in the most effective and economical
way possible all the knowledge and tools at our disposal.

If we here today, by examining and evaluating your many fine programs for
aiding young people, can assimilate information which will help others to better
deal with this perplexing problem, I feel that this subcommittee will have made
a significant contribution to the fight against delinquency.

Chairman HENNINGS. I would like to enter into the record at this
time a statement and three exhibits submitted by my colleague and
fellow member of this committee, Senator Alexander Wiley. Senator
Wiley had hoped to be here today but couldn't because of urgent Sen-
ate business. Instead, he requested me to enter his statement into
the record along with these 3 exhibits, which will be marked exhibits
3, 4, and 5.

(The documents referred to as exhibits Nos. 4 and 5 are on file
with the subcommittee.)

**KR0380**

(The statement referred to and exhibit 3 read as follows:)

STATEMENT OF SENATOR WILEY TO BE PRESENTED TO THE SENATE SUBCOMMITTEE
ON JUVENILE DELINQUENCY AT NEW YORK CITY, DECEMBER 4 TO 6, 1957

For some time now I have been waiting for the opportunity to present to this subcommittee a story of the progress being made in one State in the prevention of juvenile delinquency. It is a story which should bring a ray of light and of hope in a picture that has in recent years been most dark and disheartening. I refer, of course, to the rapid rise in the incidence of juvenile delinquency all across the Nation as reported year after year since World War II by both the FBI and the United States Children's Bureau.

I have been following closely the progress being made by Wisconsin's unique and pioneering community services program in their State welfare department's division for children and youth. This is a statewide delinquency prevention program set up in 1948, just a little less than 10 years ago. It is a broad-scale program, with many facets, which reaches out into all corners of the State and down into the grassroots through an intensive program of citizen participation in self-appraisal and study of local community life, involving young people as well as adults.

While the story of Wisconsin's program has received some national notice in articles written about it in Reader's Digest, Christian Science Monitor, and Parade magazine, it has not received the national attention it deserves as a practical model for what could be done in every one of our 48 States. I have recently been glad to note that the United States Children's Bureau has issued a monograph for national distribution entitled "Public Child Welfare in Wisconsin" (October 1957) which does a fine job of telling about the pioneering work that is being done in my State.

I am placing at the disposal of this subcommittee three documents relating to Wisconsin's delinquency prevention program, which I believe will be useful to the Congress in drafting the kind of Federal program of aid to the States which will enable a strong and concerted nationwide drive against juvenile delinquency.

(1) Community Services, a report to the Wisconsin State Board of Public Welfare, February 1956.

(2) Public Child Welfare in Wisconsin, Child Welfare Report, No. 7, United States Children's Bureau, October 1957; and

(3) Prospectus for a Demonstration Project on Prevention of Juvenile Delinquency and Related Social Ills, June 1957.

I want to devote the rest of this statement to this third document, a Prospectus for a Demonstration Project, because it represents a distillation of the experience of the Wisconsin program of the last 10 years and points the direction in which Wisconsin now wants to move in delinquency prevention, if it can receive the aid and assistance needed from the Federal Government.

### WISCONSIN'S PROPOSED DEMONSTRATION PROJECT

By way of introduction, I would like to give credit to Gov. Vernon Thomson, Wisconsin's chief executive, for personally having initiated and promoted the idea for this demonstration. With the support of the Wisconsin Legislature, enabling legislation was enacted into law in September 1957 which sets up a small appropriation for the purpose of proceeding with the detailed design of this project and authorizing negotiations looking toward financial support for this project from Federal agencies and private foundations. The quotations are excerpts from the project prospectus. (See exhibit No. 3.)

### CONCLUSION

In conclusion, I again want to commend the descriptive and explanatory material about Wisconsin's program to your most serious study and consideration. It offers a plan, tested by 10 years of experience, which might well be a model for other States across the Nation. Aside from its many specific accomplishments which are detailed in the material I am making available to the subcommittee, the fact which is perhaps the most important of all is that this is a program which is grounded in the most fundamental tenets of our democracy, involving as it does the broadest and most active kind of grassroots citizen participation in local community life.

**KR0381**

Exhibit No. 3

PROSPECTUS FOR A DEMONSTRATION PROJECT ON PREVENTION OF JUVENILE
DELINQUENCY AND RELATED SOCIAL ILLS, JUNE 1957

### THE PROJECT

In the words of Governor Thomson, this is to be "an experimental program designed to bring together—at the community level—all the skills necessary for successful preventive work in the field of juvenile delinquency and youth guidance."

The purpose of this project is well stated by a quotation from Governor Thomson's message to the State legislature, January 10, 1957, in which he asked for legislative approval for "the development of a demonstration program, in 1 or 2 communities, to provide intensified welfare services, applying all the modern and best known approaches to the problem of juvenile delinquency and related social ills. These approaches should be combined with sound research techniques and in such combination can develop and prove the best methods of prevention of delinquency and mental illness in the community. Such an intensified demonstration program should prove the wisdom of cash outlays for an earlier detection and earlier management of family problems. Expenditures in this area can represent true economy, through the savings of institutional costs as well as in saving wasted lives of human beings."

### BACKGROUND

Nationwide, there is an accelerated interest in, and concern about, the observable increase in family breakdown, community disorganization, and the mounting costs of these social ills. In planning welfare services, Wisconsin has recognized the disturbing features of these socioeconomic developments—the high incidence of mental illness and mental deficiency, expanding needs for adequate medical care facilities and the tremendous expenditures needed for such care, the alarming number of youth who have difficulties in adjusting to their environment, the increasing number of broken families—and the attendant costs both in cash outlays as well as in the wasted lives of human beings.

Wisconsin has long recognized that treatment in the community is preferable to institutional treatment, that research is needed into the causal factors of social ills, and that if social welfare programs are truly to serve the socially and economically disadvantaged, they must be preventive in nature. Further, there is agreement that there must be an integrated approach in social welfare— in treating the individual in his family and community setting—in evaluating existing resources available—and in cooperatively making maximum use of the scarce supply of skilled staff.

The goal of prevention in public welfare is the reduction and elimination, so far as possible, of delinquency, crime, dependency, child neglect, mental illness, alcoholism, family breakdown, and such other social ills as are the concern of public welfare institutions and services. State and community services that are preventive in nature comprehend:

1. Strengthening of all services or programs which contribute to the healthy growth and development of families and of all children and youth, but without reference to any particular child.

2. Services designed to reach those families and those children especially vulnerable to social ills, before the onset of social breakdown in the individual or within the family.

3. Services focused upon giving the earliest possible treatment to the child and his family where delinquency, neglect, emotional disturbance, or dependency already exist. The goal should be rehabilitation and prevention of recurrence or progression into more serious delinquency, crime, mental illness, or dependency.

The greatest effort to date, both in State and local community services, has been in the treatment of the individual who is already delinquent, neglected, emotionally disturbed, or dependent. In recent years efforts have been intensified in Wisconsin toward the developing and strengthening of all services for families in the community. This preventive work, within legal and financial limits, involved a broad program of community education and community organization, including assistance to citizens and local officials through surveys and consultation, seeking to improve local recreation, education, health, welfare, law enforcement, and juvenile court services. The greatest continuing gap in prevention

**KR0382**

is in services designed to reach those families and those children especially vulnerable to social ills, before the onset of social breakdown in the individual or within the family. Evidence of this has been found in the studies of such authorities as the Gluecks of Harvard and Community Research Associates in St. Paul, Minn., San Mateo, Calif., and Winona, Minn., in which data are presented to indicate that most of our social-service agencies are not geared to prevention through treatment of early referrals, but that they expend almost all their skills and resources upon treatment, rehabilitation, and handling of acute and advanced cases of social breakdown. The experience of other States such as California and New York also indicates that there is a need to develop ways and means of "reaching the unreached" for effective prevention.

In view of these ideas and developments, it has been deemed desirable to undertake a project to demonstrate the methods and practicality of doing preventive work in a community. It has been decided to concentrate on juvenile delinquency as a major example of social breakdown in the community and to proceed on the assumption that forces which prevent delinquency are also effective in preventing other community social problems.

### PURPOSE

The organization of community services for effective prevention of social ills is, in large measure, a problem of having the needed services available in the needed amount, in the place needed, at the needed time. The purpose of this project will be to demonstrate that, by bolstering all existing services for children and families up to an optimum standard, and by creating a systematic program to coordinate case finding, referral and treatment, a community can more effectively reduce the incidence and severity of social ills.

The project will include demonstration of what is meant by preventive services designed to reach children and families most in need of such service and experimentation with and research into the possibilities of early identification and referral for treatment of the child who is most vulnerable to delinquency. Some of the methods that will be demonstrated and experimented with are:

    1. Early identification in the school of the child who may be most vulnerable to delinquency or emotional disturbance.

    2. Early treatment in a community clinic.

    3. Family diagnosis and treatment.

    4. Coordination of agency programs to work with families.

Experimentation and demonstration of preventive methods should enable establishment of a preventive pattern and a goal for future community programs that is proven and is realistic. Hopefully, this project will enable discovery and demonstration of effective means of reducing institutional commitments and the number of wasted lives brought about by reason of delinquency.

### PLAN OF OPERATION

A basic premise of the State department of public welfare's community services program is that the most effective program to prevent juvenile delinquency is one which strengthens services for all children and youth while focused at the same time upon early identification and treatment of the child with adjustment problems which may lead to delinquency, criminality, and mental illness. Essentially, the project will be set up to put this premise into operation.

### ADMINISTRATION AND ORGANIZATION

This project would be administered under the auspices of the State department of public welfare pursuant to statutory authorization and supporting appropriations. The director of the department shall appoint the staff necessary for the conduct of the project, all of whom shall be subject to civil-service regulations. It is anticipated that the life of this project must be for a minimum of 6 years, assuming that the first year will be spent in recruiting staff, designing the project, and working out agreements with the cooperating community.

It is assumed that the project cannot demonstrate the effectiveness of prevention programs unless presently functioning services are administered on as nearly an optimum level as possible. The plan of operation, therefore, calls for first bringing existing services of the selected community up to an acceptable

KR0383

standard of operation particularly in the following areas (based on such factors as workers-case load ratio, professional qualifications, etc.) :

1. Family and children's services (including juvenile court services).
2. Public-assistance programs.
3. Guidance clinics or psychiatric services.
4. Juvenile law enforcement.
5. Recreation and group work services.
6. Public health nursing services.
7. Public-school services.
8. Youth employment.
9. Adult probation and parole services.

Of particular importance is the need for a clinic facility to provide the treatment services necessary. Reports on other community projects all emphasize the futility of discovering cases who need help unless treatment can be provided them.

A central project staff or agency will need to be created to be responsible for coordination of case finding, referral and treatment followup and research. It is assumed that this agency will at the outset set up some method of registration and reporting in which all cooperating agencies will participate. This will provide part of the data for research-and-evaluation purposes. This agency will also provide services concentrated on coordinated case finding, problem evaluation, and referral.

### ADVISORY COMMITTEE

It is important to emphasize that this project will involve both a demonstration of certain community services in operation as well as evaluative research as inseparable parts of a single process. This structure makes it desirable that there be an advisory committee to make suggestions as to the scope of the demonstrations, the selection of the project county, and the filling of the key position of project director. Here the multiprofessional approach can have its impact through representation of technical experts from public and voluntary agencies and professions.

### LOCAL PROJECT COMMITTEES

Local committees will also be needed to represent all local interests of the sponsor community. These committees should likewise be as representative as possible of all of the local professional groups and public and voluntary agencies that would be involved in the project.

The selection of the technical advisory committee and the local project committees would be by the State board of public welfare as authorized by existing law; the latter appointments being made with the advice and recommendation of appropriate local government bodies and community groups.

### BUDGET AND FINANCES

The term of this demonstration project should be not less than 5 years following the first year during which the preliminary project design and community agreements will need to be worked out. It is felt that a minimum of 5 full years of operation will be needed to produce sufficient data from which any reliable conclusions can be drawn. In order to estimate the cost requirements for this project, an appraisal was made of the needs to carry on a demonstration in one county. That county was selected because its resources are well known, it is on the county system of relief, and it has recently conducted a community self-appraisal.

The technique used to estimate the cost was to evaluate what was needed to bring existing services up to a desirable standard of operation. For example, it was estimated that if the selected county were to participate in a demonstration, additional caseworkers would be needed in the public assistance program in order to provide more casework services to assistance recipients. It was also felt that guidance clinic services would need to be established to provide adequate treatment resources in the community. Child-welfare services would need to be increased in order to permit more intensive casework. Caseworkers would have to be available in the schools in order to permit experimentation with and development of early treatment methods. Case finding and referral services would need to be created in order to develop case-finding

**KR0384**

techniques and to coordinate evaluation and referral of cases so as to make the best use of community resources. In addition, a staff of researchers and clerks would be needed to set up methods of collecting and analyzing data and reporting on the progress and results of the project.

Chairman HENNINGS. Governor Harriman, I would like to say we are indeed honored to have you here this morning. We are indeed honored to have the head of the Empire State of the Union come all the way from Albany on such a day as this to give us the benefit of your views and some idea of the work being done in the State and under your auspices and under your administration.

We appreciate the efforts you have made to come here today. We know it has been a matter of some inconvenience to you, and we welcome you.

On behalf of the Senate Judiciary Committee and on behalf of the Subcommittee on Juvenile Delinquency, we are delighted to have you, and you may proceed in any fashion you wish. You may read your statement or extemporize, or intersperse, or any way that you would like to do it, Governor.

## STATEMENT OF HON. AVERELL HARRIMAN, GOVERNOR OF THE STATE OF NEW YORK

Governor HARRIMAN. Thank you, Senator Hennings.

I want to express my appreciation, for myself and the people of New York, that you and Senator Kefauver of the Senate Subcommittee to Investigate Juvenile Delinquency have come to New York State, and I am particularly grateful, too, for the Members of the Congress who have come and are with us this morning. I am glad to see they are members of both parties, because in New York State we have both parties working together on this important problem, and as far as I know, there has been no interjection of any political consideration in this attack on juvenile delinquency that we are making here. It is a common problem in which all the people are working together.

The hearings which your committee has been holding have done much to attract public attention to the seriousness of the problem of juvenile delinquency and to bring forth, I believe, sound and workable proposals for dealing with it.

Congressional hearings of this type are of great value as a source of information to the public as well as a source of information to the Congress, and it does help to arouse public opinion, which, after all, is essential in dealing with any problem, social problem, of this kind.

In your letter inviting me to testify, you stated that the purpose of these hearings will be, and I quote, to "focus attention on the positive and constructive programs operating in New York for the prevention of delinquency and the rehabilitation of delinquent youths," which you suggest could provide a "blueprint for other communities across the country in dealing with the serious social problem of delinquency."

I am grateful for this high praise, and I hope and trust we deserve it.

Any consideration of the institutions which deal with juvenile delinquency must begin with the most important of all: the family. It is weakness in some families which makes necessary the creation of outside agencies to supplement these deficiencies. The efforts of all

**KR0385**

such agencies must primarily be directed toward strengthening the family. No outside agency can ever wholly make up for family weaknesses.

It is clear that any serious concern for the youth of our Nation will direct itself first of all to those things which make for a rich and rewarding family life. The love and affection of family ties, the spiritual life of our people, the kind of houses they live in, their jobs, the condition of their health, the quality of their education, schools and schoolteachers, these are the truly important things and must command our best efforts.

Yet beyond these fundamentals there are other things which can be done for our youth to keep them out of trouble and to help those who get into it. This is the special area of concern, as I understand it, of your committee, and I will address myself to it, if I may.

In New York State, this work is carried on by a great variety of agencies, public and private, religious and secular, of which the State is only one and by no means the most important. We believe that the State has a responsibility, in fact an obligation, to do everything it can to diminish the personal tragedy and the high cost of delinquency.

But the problem contains moral aspects in which the State is not competent to act, and other aspects in which it cannot act efficiently as private agencies or community activities.

The basic work of prevention and control of juvenile delinquency must take place at the community level, in the first instance. It must begin in the home and must be carried on by our local government, religious and welfare organizations, and civic activities of all types.

The object of the State is not to supplant these agencies, but to support them. We provide funds which help them carry on their work. We provide information as to how they might do a better job. And we keep a continuous watch on the whole picture to spot any gaps in the total program.

This job is done through our State youth commission, made a permanent agency of the State government last year, consisting of a chairman, who is here today, Mr. Mark McCloskey, and eight members, each of whom is actively associated with private, municipal, or religious youth programs in the various parts of the State.

And, incidentally, its members have been selected by the government in direct cooperation with the leaders of the State legislature, so that it has the support of both political parties as well as the administration.

Within the State government, the chairman is assisted by a committee of the heads of the nine State departments most directly concerned with youth welfare, and this committee also includes the Lieutenant Governor, who has taken an active interest in this problem.

The youth commission provides on the State level a point at which the many private and public agencies working in this field can come together to compare notes, exchange ideas, coordinate their programs, and make certain nothing important is being overlooked.

The commission has made a practice of traveling about the State, meeting with its youth board counterparts at the county and municipal and city government level, discussing local problems at public meetings, with citizens who know about them firsthand.

KR0386

There are now 11 such youth boards of local municipalities, cities or counties, serving areas which have over 2,600,000 youths under 21 years of age. We expect soon to have several more.

The State pays one-half the annual costs of these boards, up to a maximum of $15,000 each—$75,000 being provided for the 5 counties of New York City. These youth boards perform the same function at their level of government as does the youth commission on the State level.

Through the youth commission, New York, I believe, is the only State in the Nation which provides direct financial assistance for youth programs in local communities. We find that is of value. It gives initiative, it gives guidance, and in addition to which, it gives an opportunity to exchange ideas between the local youth boards.

In addition to the youth board contributions, this assistance takes two other forms: Aid to recreation projects and aid to youth service projects.

Last year the State provided $1,365,000 for recreation projects in over 900 communities throughout the State, and I am glad to say the local communities did more than match those funds. They expended several times that sum on this work, recreational work.

We provided over three-quarters of a million dollars for youth service projects, which are defined as "any experimental plan or organized activity, other than a youth bureau or recreation project, which has for its purpose the detection, prevention, or treatment of youth delinquency and which is operated by or under the direction of a municipality."

An example would be the street-gang project here in New York City which has enabled trained social workers to go out into the streets and work with the fighting gangs which have caused so much trouble. The project has been effective.

I am glad to understand that you will call one of these young men who has done such gallant work in this field, and I think you will be thrilled by the accounts of what can be accomplished in redirecting the normal effervescence and energies of youth from bad purpose to good.

I should say to better, in the first instance, and eventually to good, we hope.

This summer, when there was a new outbreak of gang fighting in the city—I suppose many of you have seen accounts of this in the newspapers—the State of New York offered an additional $100,000, matched by the city, to enable the New York City Youth Board to assign additional workers to the remaining gangs that were not being covered. I think of the 200 gangs, about 60 had been covered, and this would make it possible to cover another 50, and the record seems to show that those that have not been covered by these workers were the ones that were creating the greatest trouble.

This, I think, is a good example of the State using its resources to encourage an effective local program where it is subject to special strain.

Other youth service projects include aid for visiting teachers who go into homes to help parents understand the special problems and needs of their children, police juvenile bureaus which are staffed by officers specially trained to work with youths, and employment services to help young people find and keep after-school jobs.

KR0387

All of these efforts are designed to keep kids out of trouble, and to give them healthy outlets for their energies, instead of leaving them to make convicts out of themselves.

I am not, of course, covering—which I am sure will be covered by other witnesses—the splendid work that is being done by the various religious and charitable organizations and boys clubs and YMCA's and Jewish Youth, and others.   They are the ones, of course, that have made an imprint on the life of our city.

For those under 16 who do get into trouble, rather than punishment they are sent to State schools, where every effort is made to rehabilitate them.   There are at present five such schools operated by the State department of social welfare.

Last year, 2,440 boys and girls were committed to them, an increase of 110 percent over 1949.   The number has been increasing, not only because more are being committed, but also because there are fewer private institutions to which they can be sent.

This has made it necessary to increase State facilities.   Under present expansion plans, our facilities will have increased 40 percent over 1954, and we may have to expand still further.

I am particularly pleased that your committee will have an opportunity to hear directly from some of the fine men who are directors of these institutions.   I have visited them many times during the period since I have been Governor, and I have always come away with admiration for the dedicated and valuable work which is being done by the staff to help young people placed under their care, and encouraged by the number of those that are rehabilitated and do not get into further trouble.

Of course, there are many that return to their life, and a good deal of that is due to the family environment that they go back to.

Now, for the first time in the State's history, we are developing forest camp facilities for juvenile offenders aged 16 to 21.   I understand other States, particularly California, have successfully operated forest camps.

A little over a year ago we opened our first such camp at Pharsalia in the upstate county of Chenango.   Here 50 boys are occupied year-round doing needed conservation work.   They are in a forest which was owned by the State, and where there have been plantations of trees.   They work under the supervision of specially trained employees of the youth division of our department of correction, and also conservation foresters from the conservation department.

The boys at Pharsalia, which is the name of the camp, lead a rugged life, but a healthy life, and they are not in prison.   It is entirely open.   Their attitude reflects it, as I can testify from my visit there.

It has proved such a success that we are expediting completion of a similar camp in a neighboring county of Schuyler, which will open next spring.   I hope we can extend them still further.

Here in New York City there has recently been a considerable amount of public concern over the disruptive influence in some of our schools created by wholly undisciplined and wholly uncontrollable youngsters.   There is no doubt that even a very small minority in a school can greatly interfere with the school program generally.

20873—58——2

KR0388

Thus these troubled youngsters are not only hurting their own prospects for the future, but are interfering with the education of their fellow students.

We must, it seems to me, give serious consideration to giving the school authorities in such cases the leverage of excluding such disruptive and uncontrollable elements from the schools and to have them either transferred to special schools, some of which now exist, or, at least for the older boys, give them the opportunity of acquiring the discipline and training that comes from employment.

I understand that many people are giving these ideas some thought, and we would welcome any ideas the committee would have on this subject.

It is also, of course, important to have trained personnel in the schools able to identify potential delinquents at an early age.

May I say that the State is also—this is an interjection and off the subject—attempting identification of the talented youths and giving them an opportunity to attain their highest capability, which I think all of us agree is so necessary in this day of scientific revolution and other very important needs for skilled specialists in many fields.

Chairman HENNINGS. I am sure the Governor, when he was our distinguished Ambassador to Russia, saw that in Russia the fit and capable are given the opportunity to go ahead, the especially gifted children, irrespective of the family means or income to send them to school.

I visited Russia 3 years ago and learned that the ability of the family to send a boy or girl to school has no bearing upon how far he may go. It is up to the child or young man or young woman himself or herself as to what they do, and they are making enormous progress in that direction in scientific fields.

Governor HARRIMAN. Senator, what you say is very pertinent. We, of course, take pride in what we are doing for the handicapped and the less well equipped youngster to bring him up, and I do not suggest in any way that we diminish that work, but I think we have coming home to us the need for giving even greater attention than is being given.

There are, of course, in New York City, special high schools which give special education to the more talented in science, but we do believe that greater work can be done in identifying at an early age those students who have special talents in whatever field it may be.

And I think that is a new area in which we can accomplish even more than is being accomplished at the present time, for the reasons that you give.

Of course, in Russia, as you well know, it is mechanical. The youngster's talents are identified, and then he is given the opportunity that the government feels is best for the state.

That, of course, does develop certain very skilled people, but it is not the kind of system that I think we want to follow. We want to give opportunity, not compulsion.

Chairman HENNINGS. I have not suggested that. But there the children go to school earlier in the morning and stay later in the evening, and their vacation period is much shorter than ours here in the United States.

**KR0389**

Governor HARRIMAN. Well, they work harder, and the teachers——
Chairman HENNINGS. They work much harder.

Governor HARRIMAN (continuing). The teachers work much harder, and of course so do the people in the factory.

On several occasions in the past, I have noted the importance of having psychologists available to the schools for the purpose that I speak of, identifying potential delinquents. And may I say there are startling cases where the youngsters have shown some sign of getting confused, and then developing into criminal activity, which have nothing to do with gangs or associations with others, but simply resulted from their psychological condition.

And I am glad to say we have some psychologists, but I think that is an area in which we can strengthen our school faculties.

I am sure that in these cases—there was one youngster who committed a murder where I commuted the sentence to life imprisonment because it seemed clear it was not entirely his fault. He had been a brilliant student, and then became confused and became more and more difficult, and then committed a crime for which I felt he was not responsible. Society was responsible in that his mental condition had not been identified 4 or 5 years sooner.

In many cases, it is possible through such activity to see that youngsters who appear to be headed for trouble receive special attention and care; and certainly the numbers who are in our mental institutions, we believe in this State that if we get those who are confused early, whether it be boys or elderly people, boys or girls or elderly people, we can save them from greater difficulty.

In this outline of our activities in New York, I am sure you will recognize many features contained in the Delinquent Children's Act, introduced by members of your committee in last year's session of the Congress.

I think it is fair to say that this legislation, if enacted, would assist this State and the other States of the Union to do what New York State is already doing in the field of juvenile delinquency, and would contribute to what we are already doing in New York State. I think it is good legislation, and I would hope it would become early law.

In the meantime, there are two specific, immediate things which the Federal Government can do, I feel, to assist the States in this field.

The first concerns narcotics. This past week a senior official of the Department of Justice, testifying before a New York joint legislative committee, declared that New York was the illicit narcotics capital of the Nation and would remain so until remedial legislation was enacted by the State.

I have no wish to enter a dispute on the merits of this particular statement, but I do wish to point out that New York State has not in any sense been oblivious of this problem. Two years ago, in a special message to the legislature, I outlined a broad program for narcotic control which was substantially adopted by the legislature. Penalties for drug peddling were increased and convictions made easier. Funds were provided for experimental work in the cure of drug addiction and a special program for paroled addicts was begun.

We recognize that drug addiction is in a sense a human weakness or disease that leads to crime, and unfortunately some of our youth are involved in this drug addiction.

KR0390

Whatever the extent of our efforts, so long as drugs continue to be smuggled into the State, there will continue to be drug addiction.

I want to point out that New York, generally speaking, is the passenger entry port from many nations, and a very large percentage of the passengers come in here, and it is open to smuggling rather more than most of the communities in the Nation.

And the job of combating smuggling is a Federal responsibility, not a State responsibility. The fact is that the Federal Government is not providing enough men to do the job.

As I pointed out in my message to the legislature 2 years ago, in the port of New York the number of port patrol officers, whose job it is to prevent smuggling, has actually been cut by one-third since 1953.

This is not the fault of the Congress. The administration made the cuts and has never asked that they be restored. If the Federal Government truly cares about these "living dead," as they are described, let it first of all fulfill its responsibility at least to keep the instruments of death out of our city and State and country.

Secondly, I would like to bring to your attention the proposal made to the Secretary of Defense by myself and Governor Leader of Pennsylvania, for the use of vacant military establishments as summer camps for teen-age boys, school-age boys.

It is universally recognized that one of the soundest kinds of character building and delinquency prevention programs is summer camping, under proper supervision and leadership. During the summer, our great cities are filled with thousands of young boys stewing in idleness, too old to play at home, too young to work, with few wholesome outlets for their energies and no chance whatever for the rich and rewarding experience that summer camp can provide.

Of course, there are some hundred thousand youngsters who do have an opportunity to go to camp from New York City, as an example. This is perhaps 10 percent. But there is no greater amount, there are no more that are leaving, that are having this opportunity, than a decade ago, even though the school population has gone up some 17 or 18 percent.

Most of these activities, of course, are privately financed.

We find, at the same time, in many parts of the country there are military bases, some of them located in excellent camping country, which are not being used, but are being maintained for emergency use.

We proposed to the Secretary of Defense that the Federal Government join with the State and local governments in a summer camp program to develop the physical fitness and good citizenship of young boys, many of whom, of course, would go into the military service, although there was no suggestion that those camps be used for any military training, but for other types of education and athletic opportunity, health-building activity. These youngsters would otherwise have no such opportunity.

We asked that the Federal Government supply the needed mess and other equipment which have been available at these camps, as well as mess and maintenance personnel. The last was not essential, but would be desirable.

We proposed an experimental program at Sampson Air Base on Lake Seneca that would take about 10,000 boys a year from our two

**KR0391**

States for the first few years, as a pilot project. The same, of course, might be done by other States that wished to join in the program. After some experience, it could be expanded on a nationwide basis.

I would like you, if I may, to have a copy of the memorandum outlining this program which Governor Leader and I submitted to the Secretary on October 30.

Chairman Hennings. We will be very happy to have it, Governor, and make it a part of the record of these proceedings.

Governor Harriman. All right. I would be very grateful if the committee would take an interest in this.

(The memorandum referred to follows:)

### MEMORANDUM

October 30, 1957.

To: The Secretary of Defense
From: Governor Harriman of New York and Governor Leader of Pennsylvania

#### BACKGROUND

1. There is widespread and justifiable concern throughout the country, and particularly in our large cities, over teen-age crime and juvenile delinquency.
2. It is universally recognized that one of the soundest kinds of delinquency prevention programs is summer camping, under proper supervision and leadership.
3. In many of our largest cities thousands of boys spend their summers in idleness on the streets, with little opportunity for wholesome outlet of their natural energies, and have no chance to benefit by a healthy and valued summer camp experience. The private agencies do a great deal but cannot meet the need.
4. In various parts of the country, there are vacant military establishments which could be used for summer programs, or even year-round programs of this kind.
5. Through the establishment of his Committee on Physical Fitness, President Eisenhower has indicated his great interest in promoting the physical fitness of American youth.
6. The Defense Department would appear to have a large stake in improving the physical fitness and also the mental and spiritual fitness, of future service personnel.

#### PROPOSAL—IN GENERAL

That the Federal Government, through the Department of Defense, cooperate with State and local governments in a camp program for youngsters who need such a program, both for the development of physical fitness and good citizenship. The Federal Government's contribution would be to make vacated military facilities available, to supply needed mess and other equipment, and to supply maintenance and mess personnel. The State governments, in cooperation with interested communities, and with private agencies wherever practicable, would undertake responsibility for the selection of youngsters and for the operation of the camping programs. The program would be experimental, but should be undertaken for at least 2 or 3 years to determine its value.

#### SPECIFIC PROPOSAL

1. Sampson Air Base on Seneca Lake in central New York is currently vacant and seems well adapted for a program along the lines described. It has three units along the lake which could easily accommodate 5,000 campers, and which have large fields, mess halls, and enclosed recreational facilities, in addition to the lake front itself. The country around Sampson is suitable for hikes, cook-outs, overnight camping, etc.
2. The Governors of New York and Pennsylvania jointly request the Secretary of Defense to direct that part of Sampson Air Base be set aside for a cooperative camping program for the development of physical fitness and citizenship in young people, and that necessary equipment and maintenance and mess personnel be provided.
3. So far as New York's part of the program is concerned, the target for the summer of 1958 is a camp program for 2,000 boys at a time, with three 3-week

**KR0392**

sessions. For Pennsylvania a comparable program is envisioned for 1,500 boys at a time. In each case, the details of the program would be worked out in consultation with the communities involved and experienced private agencies. It is expected that the communities would undertake primary responsibility for selecting the boys, working with local school systems and private agencies. The State and local communities will share the cost of staff, food, transportation, and other expenses.

Chairman HENNINGS. The committee will, I assure you, give it study and thought and consideration.

Governor HARRIMAN. There is a great need to give youngsters some tie. And I think all of us who have worked in that field will say the same thing: That we found of all the experiences the under-privileged youngsters have, and sometimes privileged youngsters have, that the experience of going to camp, and what they have learned and what they have gained from such an experience, and a feeling of greater usefulness in society, is greater than they have achieved from any other experience.

In our meeting with Secretary McElroy, he showed considerable interest in the program, but he indicated the Defense Department was preparing to abandon Sampson Air Base entirely, and did not intend to keep it available as a standby defense facility.

However, there are other alternatives here in New York State. There is Camp Hero on Montauk Point, Long Island, which is partially vacant, and we have asked the Defense Department whether it would cooperate with us this summer in a program there. It is small, it would be a smaller undertaking.

We would appreciate anything this committee can do to stimulate the interest and support of this type of program on the part of the Defense Department as well as the Department of Health, Education, and Welfare.

Incidentally, Secretary Marion Folsom was kind enough to attend the conference, and indicated some interest in it.

Again, I should like to express my appreciation to this committee for giving me the opportunity to appear here today. I feel, if I may say so, the committee is performing a valuable public service in calling attention to the problem of juvenile delinquency. I am sure that from these hearings will come sound and new ideas, at least ideas that are not generally understood or known, both for preventing delinquency and for dealing with it when it occurs.

I shall look forward with keen interest and patience to receiving the committee's recommendation and report, and I assure you that I and my associates in the State government will give it every consideration and will be ready to continue to cooperate with you in any way we can do so.

Chairman HENNINGS. Governor Harriman, we are most grateful to you for your thoughtful and illuminating statement. You have been especially successful in obtaining funds in the State of New York for this work, and you faced up to the problem and recognized that it is a problem which exists.

I would like to call on Senator Kefauver, who has served on this committee for 4½ years, since it was originally organized, to either ask you a question, Governor, or make a statement.

Would you like to do that, Senator?

Senator KEFAUVER. Well, thank you, Senator Hennings.

I am very happy to have this opportunity of being in New York with my colleague, Senator Hennings. We have worked together in the House of Representatives a long time, and in the Senate, and usually work together for the same cause, and that certainly is particularly true of this problem of juvenile delinquency.

It is good to have this opportunity of being here with so many of our fellow Members of the House of Representatives.

I want to join Senator Hennings in saying to you, Governor Harriman, that you certainly are to be commended as the Governor of this great State, upon the leadership you have shown in first trying to give the youth of this State a better educational and health opportunity, a better chance for a useful and good life.

I feel that you have also pioneered and have shown imagination and leadership in the various methods that have been devised and techniques for rehabilitation of youngsters who may have gone wrong, to get them back on the right road.

New York State and New York City both have many new programs which you have tried successfully, and I know that you realize the problem fully, and you and the city government are to be commended upon the substantial efforts to do something about it.

Your suggestions here in this statement I think are very, very useful.

I have been interested, Governor Harriman, as has Senator Hennings and our other colleagues here, as you have in doing something about this summer camp or forestry camp program for boys. We have had bills pending in the Congress which we have not been able to get passed.

But I think on a beginning basis, you have shown a way in which the Federal Government can put to use some of its facilities which are not being used for military purposes, and they are located all over the country, on a cooperative basis with the States and cities to furnish summer camps to boys and girls who need something to do in the summer, and that this is certainly something that we ought to do our part in at the Federal level.

I want to join in expressing appreciation for your work with this committee and your cooperation with us, Governor Harriman.

Governor HARRIMAN. May I comment, Senator, on that?

Chairman HENNINGS. Yes, Governor, please.

Governor HARRIMAN. This program that led to the interest of using some of the military facilities that should be maintained as standby, for summer camps for boys, we have had some experience in New York in this field. We have had State parks.

Governor Smith was very active some 35 years ago, and some of our citizens, public-minded citizens, were active in establishing State parks, and one of them that I was a commissioner of for many years had offered camping facilities in the park.

They built the facilities in the park, and then turned them over to private organizations to operate. I think that if you will consider this seriously, I would suggest for your consideration that procedures be established by which, through cooperation among Federal and State and municipal governments—I think in cooperation with the schools in the selection of youngsters that should be given the opportunity, but the actual operation of units within the camp should be done by private agencies who already have skills in this field rather

**KR0394**

than have it operated by a government—such a program could be initiated, it would be of tremendous value.

It is the personal contact that is so important, and we are all familiar with the success that has been had by private organizations that are involved.

One of the great problems will be to obtain the services of counselors, and that is why, one of the reasons, the organizations have limited their activity and the number of ideas we have in attempting to encourage youngsters.

We might even give credit to those students who are at our teachers colleges who go and take a couple of months in the summer, because they certainly learn from that experience. There may be other ways of stimulating the availability of counselors.

I think the park system in New York State, as a result of the work that has been done many years ago, is a contributing factor, and our great Adirondacks and Catskill forest reserves have given us an opportunity for camping facilities, camping areas, but we lack facilities.

And that is where perhaps the Federal Government's military establishments can help us materially, and it could be done on an experimental basis without too much cost; whereas if we attempted to build up new facilities, of course it would cost vast sums of money.

I may say that I—if I may be personal, Senator Kefauver—I welcome you here in this activity. We all recall your presence some years ago in activities relating to citizens who were not behaving properly, and your work at that time was of very considerable value to our community, and we are still gaining from the work that your committee did at that time in connection with crime and rackets.

Senator KEFAUVER. Well, I thank you for your reference to the work of our crime committee back in those days, Governor Harriman. That was one of the reasons Senator Hennings and I were interested in this committee, because my feeling certainly was that many of these unfortunate individuals were such a burden to our society, if they had had a better chance in the beginning, they might have been useful citizens rather than racketeers and gangsters.

So that is the reason, that is one reason I am so happy to see your good program here.

Governor HARRIMAN. Yes.

Chairman HENNINGS. Governor, as a felony trial prosecutor for 6 years in my early youth and later as a district attorney of St. Louis, I had the unfortunate duty and obligation to see these cases by the hundreds in a criminal courtroom.

Also, as chairman of the Committee on Federal Penitentiaries and Reformatories, I visit those places not only in this country but in England, France, Germany, and other countries abroad, to do something about penology and rehabilitation, and to see what we can do to save some of these men and women who have never had a real chance in life.

After having been in the Big Brother movement for 30 years as a working Big Brother, having been president of that organization in St. Louis, having served as a national director, I had the high honor of being named Big Brother of the Year in 1955.

I make that reference only to indicate that some of us have lived with this problem pretty closely. You spend 8 years in a criminal

**KR0395**

court building, and you are handling felony cases, boys of 17 and over, and you see the human wreckage and the waste of human material that occurs because of nobody doing anything about it.

Part of the function of this committee is to disabuse some of the commonly held notions about this problem.

When in London about 3 years ago, I said to an inspector at Scotland Yard: "You know, Inspector, many people think that the juvenile delinquency problem in America would be cured if we got rid of television."

He said, "Why it is quite the contrary. Television keeps them off the streets. That is one reason we don't have the problem here any more. Our rate is diminishing constantly."

I would like to at this time acknowledge the presence of the distinguished Members of the House of Representatives, Congressman Multer, Congressman Anfuso, Congressman Zelenko, Congressman Dooley, and Congressman Adam Clayton Powell, and to welcome you gentlemen.

We appreciate the interest of you gentlemen in coming here today, and we hope to have the pleasure of hearing from you later on during these proceedings.

You are all busy, and especially the Governor, coming down here from Albany, has given us great encouragement and great inspiration.

One problem, Governor, do you not believe, is the disabusing of people of the generally held misconception that somebody else ought to do this job, and that some agency is going to do it rather than its being a local community problem essentially, as you said?

There are so many people who think that, "Well, you don't have to take your coat off and work with the boy; somebody else is going to take care of it, some trained social worker."

And, as fine as they are, they cannot do it all, and many of the boys will not come to the agencies. We find that true in many of the cities where we visited. They will not come to the YMCA. They will not go to the Big Brothers. They will not go to the playgrounds or the boys clubs.

They want to go somewhere else.

So the problem is to bring the boy in, somehow or other; and, as you suggested, gangs are not necessarily bad things. Boys have gangs or clubs, and they are going to have them from now on, and always have had them. But the question is the direction these gangs take.

One reason we came here is that about 4 years ago we heard some New York witnesses in this connection in Washington, and we were so impressed by the work that was being done in this State and in this city that we came here, not on a witch hunt, not to expose anybody or to embarrass anybody, but to set up in a report a sort of pilot and model project so that other cities and places might be enlightened by it.

Senator Kefauver and I have introduced a bill, Senate bill 980, to authorize the establishing by the Surgeon General of an aftercare, posthospital treatment program for drug addiction and other purposes, and that bill is now pending before the Senate.

Senator Kefauver and Senator Langer and I introduced another bill to provide assistance and cooperation to States in strengthening and improving State and local programs for the diminution, control, and treatment of juvenile delinquency.

**KR0396**

We are not only holding hearings, but we are also pushing legislation in this field, and we are trying to make this a realistic and practical committee and not a sensational one, and for that reason we have come here to be enlightened and to learn and to have the benefit of the views and ideas of you, as Governor of this great State, and other officials who are working with you in the city and in the State administration.

I thank you again, Governor, for your statement.

I think the Congressmen will appear later.

Mr. SULLIVAN. Senator, we have witnesses waiting here, and unless we proceed——

Chairman HENNINGS. Counsel has arranged an order of witnesses, gentlemen, and if you distinguished Members of the House would be good enough to bear with us, I think Mr. McCloskey is the next witness.

Governor HARRIMAN. Senator, before I leave, may I express to you my personal gratitude, as well as the State, for the work you are doing, not only in this field, but in the whole field of penology, probation, and parole. Certainly that is an area that needs a great deal of more thought, and we need to exchange views.

It is a subject which we are giving a good deal of attention to in New York State, and there is much to be done.

Chairman HENNINGS. What has become of Elmira, Governor? I went to school at Cornell University, which is near Elmira, and the Elmira Reformatory.

Is that still a reformatory?

Governor HARRIMAN. Yes; it is.

Chairman HENNINGS. It is still used?

Governor HARRIMAN. Yes, it is used, and I hope the methods have somewhat improved during the intervening years, but we have much to learn.

And I am glad you are also giving attention to the narcotics problem, because that is so closely tied to the whole problem of crime in our State.

Chairman HENNINGS. I introduced the marihuana bill when I was in the House, the marihuana stamp tax bill, and it was passed in 1936, and that is another phase of the problem, although marihuana is not strictly classified as a narcotic, as you know. It does not come under the Harrison Act.

Governor HARRIMAN. But there is a field where there must be cooperation between the Federal, State, and local governments, and we have not found the solution, and we welcome assistance.

Chairman HENNINGS. Thank you very much, Governor Harriman.

Governor Harriman, would you be good enough to come and sit up here with us?

Governor HARRIMAN. I would be happy to.

Chairman HENNINGS. And perhaps interrogate some of the witnesses.

At this time, I would like to give the distinguished Members of the House of Representatives an opportunity to say anything that they care to say; and later on if they care to testify more fully, we would be very glad to hear from any or all of you gentlemen.

Representative MULTER. Chairman Hennings.

Chairman HENNINGS. Congressman Multer.

KR0397

Representative MULTER. Senator Kefauver, Governor Harriman, may I, and I believe I express the sentiments of my colleagues in the House of Representatives as well as my own, extend to you our gratitude for having set this hearing up for these 3 days, giving us your very valuable time in the city of New York to this very important problem.

We are grateful to you for coming here, and the Members of the House from the metropolitan area are very happy that you invited us to participate in these hearings.

We are certain that they will bring forth much valuable material. It is an indication that you and our great Governor, Governor Harriman, are not only alert to this important problem, but that you are doing something and will do something about it.

I am sure that we in the House look forward to the opportunity for bills such as S. 431, which you and Senator Kefauver introduced, coming to us so that we can join you in positive action in attacking this important problem and solving it, if it can be solved.

Thank you, sir.

Chairman HENNINGS. Thank you very much, Congressman Multer, and we welcome your cooperation and, indeed, we solicit your cooperation, and we know we will have it.

Your presence here indicates your interest and your concern and your sincerity in doing something about this problem. As I said to the Governor a moment ago, it is a matter of taking your coat off sometime and getting to work, not just making speeches and talking about it. And that is what we are trying to do.

I want to make it abundantly clear that we did not come here for the purpose of showing how bad conditions are in New York. We have found that they are bad everywhere in this country, and we have had hearings in virtually every large city in the country.

Mr. Kefauver was chairman of the committee last year, and we went to Boston, Philadelphia, Miami, Nashville. Even in Senator Kefauver's own State, there seems to be some trouble down there occasionally.

We find it runs very much to type. We had hearings in St. Louis for 2 or 3 days, my own city.

And what you are doing here in New York is unique, Governor Harriman. It is unique in terms of the imagination that is being applied to this program and to this problem. And for that reason, we have come, as I say, to be enlightened and to learn.

If Mr. McCloskey will be good enough to come forward, we would be very glad to hear from you, sir.

Representative ANFUSO. Senator, before Mr. McCloskey——

Chairman HENNINGS. Excuse me.

Representative ANFUSO. I would like to make a very short statement.

Chairman HENNINGS. Excuse me, Congressman. I thought Congressman Multer was making a statement for all Congressmen.

Indeed, we would be very glad to hear from any of you and all of you.

Representative ANFUSO. I certainly join in the sentiments expressed by Congressman Multer, and I am sure he spoke for all of the Members of the House here present.

I should like to have you consider adding to your S. 431, if you can, a provision to include a Crime Prevention Bureau under the Department of Justice.

**KR0398**

I have introduced such a bill, and I should be glad to send it to your committee.

The reason for such an inclusion, I think——

Chairman HENNINGS. We know, indeed, do we not, Congressman Anfuso, that prevention is a great deal better than rehabilitation and imprisonment?

Representative ANFUSO. Yes.

Chairman HENNINGS. For the Big Brother organization gets these boys before they get into trouble, boys from broken homes, boys who are likely to get into trouble, and assign an older man to them, and that man works with them and treats them as a little brother, as the name would indicate.

Representative ANFUSO. That is right.

Chairman HENNINGS. I did not mean to interrupt you.

Representative ANFUSO. My second suggestion is whether or not any thought has been given to the use of Ellis Island for the use of some kind of a youth program.   We have that island, which has been vacated by the Immigration Service.

Chairman HENNINGS. I went over there to inspect it as a member of the Prison and Reformatory Committee not so long ago.   That was before it was vacated.

Representative ANFUSO. I think that island could be utilized for some kind of useful activities, not only for a summer camp, but all-year-around program.

Chairman HENNINGS. It is indeed accessible.

Representative ANFUSO. Yes.

Those are the two ideas I have.

Chairman HENNINGS. That is splendid.

Congressman Powell, have you anything to say at this time?

Representative POWELL. I would like to testify when there is an opportunity to, not to interfere with witnesses who have been called.

Chairman HENNINGS. Congressman Dooley.

Representative DOOLEY. I, too, am delighted to be permitted to testify.   I was interested in what the Governor said about camp life.

Chairman HENNINGS. I guess you went to camp.

I was counselor of a camp, and went to boys camp as a counselor for a number of years, and started camping as a Boy Scout.   You learn a lot of things which you do not forget.

You learn how to cook, you learn how to lug a canoe over a portage. You learn how to paddle the right way, and not the city-park way. You learn all sorts of things that the boys do not learn in cities ordinarily.

And you, as a great athlete, I have known you and known of you for many years.   You were one of the great football players of all time.

I happen to have been a track coach when I was in law school. We know what athletics means, too.   And Governor Harriman was a crew coach at Yale, and we know that youthful effervescence and excess energy can be worked out by athletic activity and good, clean, healthy competition, about as well as any other way available to us.

KR0399

Even though a boy cannot be a varsity athlete, he can engage in some sport or have some outlet rather than just hanging around the corner and poolroom and the saloon in the evening.

Does Mr. Zelenko wish to say anything?

Mr. SULLIVAN. He left.   He will be back.

Chairman HENNINGS. Now then, if we may hear from Mr. McCloskey. We are running just a little bit behind time.  I do not want to rush you, Mr. McCloskey.  You have a very distinguished record, and we are so grateful to you for being here.

We would like to have you proceed in any way that you please. You are a distinguished holder of the Presidential Medal of Merit, and you have been director of the bureau of community education for New York City's Board of Education for 17 years, and we feel you are one authority from whom we especially want to hear.

So would you proceed?

## STATEMENT OF MARK A. McCLOSKEY, CHAIRMAN, NEW YORK STATE YOUTH COMMISSION

Mr. McCLOSKEY. Thank you very much, Senator Hennings.

Governor Harriman has made a broad and comprehensive statement upon the work of the State and his ambition for the camps and other activities that lead not only to the prevention of delinquency, but improving the whole quality and life of our young people in the State.

And so, we have this approach that I am sure will bring interesting questions, but I will start off by saying 1 or 2 things that may be worthwhile in terms of our program here in the State.

We begin on the supposition, Senator, that this job is to be done where people are face to face, older people and young people, in the communities out over the State, and therefore our slogan really is that we are supporting the communities of New York State, not supplanting their responsibiliy.   That they cannot avoid, any more than the State can avoid its responsibility for being involved in this program.

And so, we have this approach that I am sure will be interesting to you, because you have revealed the athletic records of everybody here, reaching all the way over from one side to the other.

In our town, here in New York, and in many big cities and, as a matter of fact, in many rural areas, there is not an opportunity, because our recreational activities and programs have never had a chance to quite catch up with the growth of our population and the density of the population in the city, so kids who may never become——

Chairman HENNINGS. We found that to be true virtually everywhere, Mr. McCloskey.

Mr. McCLOSKEY. So the State has, in virtually all but a few communities throughout the State, put some seed money, some gambler's money, if you will, used in its right sense, into the small towns, from the smallest hamlet to this big city of ours at this end of the State.

And that money has brought out about four times the amount that the State has been putting in, because what they needed was a start on their recreation programs.

Not only did it bring out the money, but it brought out the concern, that thing that you were talking about, the involvement of a whole

**KR0400**

host of people in this program rather than a limited number of professionals.

I would think a lot of people would like to fob it off on a limited group, but it cannot be done.

Chairman HENNINGS. Right.

Mr. McCLOSKEY. So in all our communities throughout the State, you brought out a whole host of local resources that have been interested in this building.

I do not have the time, but it would be interesting if we did this morning, to talk about towns where the various trades came out and helped to build a town recreation hall, the wisdom and ingenuity with which the towns have dealt with this problem.

So, on the positive side, this is a very interesting thing. All the way from here, all the way to the ends of the State, every community has had benefit of the State's seed money, and has added immeasurably to it.

The second thing is this business of finding gaps in the services. We run into them even in our distribution of the kinds of aid that children need when they get into difficulty or to keep them from getting into difficulty.

And so, at the Governor's direction, the formula of the State of New York has been changed so that beyond the recreation, we have money that we can say to any town all the way from Dunkirk down here to Brooklyn, through the New York City Youth Board, "If you have a gap in the fence of services, we are willing to step in and help you."

One of the best things about that bill and the use of that money is that it is flexible. We are not tied and corseted in some narrow way in dealing with this. We say to the town, "Really take a look at yourself, take stock."

And we commence, Senator, at that point with 3 or 4 people, a lean staff, that will say to the town, "We know what they are doing here, there, and elsewhere, and we will help, add to what you have got, see where the holes are and see how we can help you fill them."

The other thing I would like to talk about is, we have been working in this State on the basis of nonisolation of agencies. We have been having these town meetings that the Governor has spoken about, all the way from Plattsburg up in the sparsely settled Clinton County, and the other day in Dunkirk. And we have been in the big cities and the small cities.

And these are working parties. These are people who run the Boy Scouts, the Big Brothers. They are the school people, they are the probation officers, all the people who are actively engaged in a whole host of voluntary activities like the parent-teachers' association.

They sit down and sweat it out together, adding up on the town's facilities.

But the youth commission does not do that alone. The youth commission brings in people from the State probation department, from the mental hygiene department, from the State education department.

We have a very difficult thing, this business of cooperation, but it is being worked out.

The Governor mentioned in his statement that we had an interdepartmental committee. That is the way it works. It goes right down

**KR0401**

to the town and works from each one of these departments with the people in the community.

I am not going to say any more about the town meetings, except I cannot get over the editorial in the Watertown Times, which said it is just as far from Watertown to Albany, just as far as it is from Washington to New York, and so forth, but it has been a good thing for us to go through the State in a slow, pedestrian, but hard-working fashion to deal with that job.

I think I have said enough now to suggest some questions, probably, to either Senator Kefauver or your friends here from the House of Representatives, but I would like now a last word, to say one word more about the camps without being redundant about it.

It is true that I have been working on this job a long time. I have been here over on the West Side waterfront for 20 years. My wife and I ran a camp for children, and we believed so intensely and so earnestly in this business of taking kids out of what very often in the summertime is a hot, something comparable to a letter file, that is what you put them in, and out of it.

And I think a good many parts of our town and other big cities through the State have that problem.

And it is the Governor's ambition, as we have gone through the State looking at some of these places, to find some place where kids can get off our sidewalks in the summer and where they will work their bodies and where they will do the kind of things you were interested in at college, and move in the water and see something of the open country.

This I know from my firsthand experience, and this is one of the most exciting and unique things that has been attempted, and I hope that the State gets its chance to do that particular job.

Chairman HENNINGS. May I ask you, Mr. McCloskey, what programs have been developed by the State youth commission with respect to large housing projects, where large numbers of low-income families are thrown together?

Mr. McCLOSKEY. Well, the law we operate under, and a very sensible law it is, too, Senator, is that we work through the municipality and through the New York City Youth Board, and when they report, as they do, under a very comprehensive program we have—understand, you remember, we're partners to the tune of $1,270,000—we work very closely with other youth boards through the State, and we know in the housing authorities, the projects through the city, that there have been some recreational facilities that have been built which have been unmanned because there is a very uneven distribution of services through this and every other city.

It is hard to catch up with the rebuilding of the city, and some money goes from the youth board in New York to the housing project.

The same thing is true in Rochester in the housing projects, and the housing project in Buffalo.

Then we have been trying, because when a housing establishment is built, you have to rearrange your services in the community and very often we have to do there what the Governor spoke about before, to wit, the street gang, to try to get kids that kind of shy off from the conventional agency, what we call here in New York the hard-to-reach kids.

KR0402

Chairman HENNINGS. They do shy off, do they not?

Mr. McCLOSKEY. They certainly do.

Chairman HENNINGS. We discovered that.

Mr. McCLOSKEY. I think that is all right. There is no reason why they should all be Boy Scouts or something of that sort. They need and want a variety of opportunities, and some organizations have a program suited to one more than the other.

But we have been working through the municipalities and the housing projects through the State.

Chairman HENNINGS. Thank you; Mr. McCloskey.

Do any of the distinguished Members of the House of Representatives wish to ask Mr. McCloskey any questions or make any observations?

Representative DOOLEY. Senator, may I make one observation, if I may?

Chairman HENNINGS. Mr. Dooley.

Representative DOOLEY. I made a cursory survey of the situation in Westchester County when I found I was going to join this committee in these hearings, and in those areas where facilities are provided for amusement, pleasure, swimming, fishing, and boating, and the like, there was not 1 case of juvenile delinquency in a population of 28,000 people in the town of Mamaroneck, village of Larchmont, and village of Mamaroneck.

On the other hand, where the pressure of social situations existed, there were a number of cases in the same period.

So from that, I draw the conclusion that it may be inductive reasoning that environment is a very important matter in this whole matter.

Mr. McCLOSKEY. I am pleased to hear you say that, Congressman Dooley, because we have been involved with Westchester County, some of the State money goes into the county, and last year in several of the communities in Westchester, our people who are wise in recreational programs came down and surveyed some of the types, one by one, through Westchester, in order to—they have got a good recreation program in Westchester, but it is never good enough, and I think their recommendations have helped in the improvement of it.

I am glad to hear you say it is valuable.

Representative DOOLEY. The State has given us wonderful help, Mr. McCloskey.

Thank you, Senator.

Mr. McCLOSKEY. Thank you very much.

Chairman HENNINGS. Thank you.

Are there any other questions?

Representative ANFUSO. All I want to say is, coming from a good Republican, giving credit to a Democratic administration, it is a good compliment. It is well deserving. I think you are entitled to that compliment, Governor Harriman.

Chairman HENNINGS. We think there are some good Republicans.

Mr. McCLOSKEY. Well, to tell you, Representative Anfuso, we are a bipartisan group.

Representative DOOLEY. This is a nonpartisan committee.

KR0403

Chairman HENNINGS. As a matter of fact, I went to a meeting at the White House yesterday, the bipartisan meeting of the President, and this subject came up in a rather indirect way in terms of training our youth in terms of national defense, building our Nation through building up our young people.

I have never believed that the term "juvenile delinquency" quite applied. I have always preferred to use the phrase "young people in trouble." I do not know just what a delinquent is.

It seems to me that it is unfortunate that it has come into general usage and common understanding, because it gives a boy or girl a tag. Once a youth is tagged as a delinquent, I sometimes feel, he begins to think: "Maybe I am a delinquent, maybe I am always going to be a delinquent."

These kids are in trouble, by and large, and it is society's fault, and the fault of all of us, and it is the duty of all of us to try to do something about it.

I feel very strongly about that.

Mr. McCLOSKEY. Senator, we roughly would like to think in this State that we will give no kid a past, because if you have a past, it is very difficult to have any kind of a future, and that is the philosophy that we are working on.

Chairman HENNINGS. That is right, exactly.

I wonder if Mr. Sullivan, the counsel of our committee, has any questions to ask Mr. McCloskey.

Mr. SULLIVAN. Just one, Mr. McCloskey.

Our investigation here has indicated that there is a difference between the real hard core delinquent or the real hard core problem family, and the child of the family that might be helped by additional recreational facilities.

Do you find these real hard-core families or these real hard-core children in upstate New York, as well as the more densely populated cities?

Mr. McCLOSKEY. I have been accustomed for a long time to hear the American family given the rough end of people's tongues. As a matter of fact, in the west end slum areas, you can find that you have some of the finest children, and then you run over on the other side with some pretty poor stuff.

They are the ones to work on. They are back in the pockets of rural areas. You will find them, for instance, where the State is making a study now on poverty, poverty in many ways, because this State is a forerunner of this approach at getting at these hard pockets of poverty of all kinds, poverty of spirit, economic poverty, and poverty in many ways.

Well, you will find a great many of those families there, but I just want to make it clear that I am not going to subscribe to the idea that all people who live in poor or underprivileged neighborhoods are poor familymakers. The poor familymakers are there. There are poor familymakers in the rural areas, as well, in New York.

Chairman HENNINGS. We have found that to be true in these hearings.

Mr. McCLOSKEY. I am glad to hear that, because we believe that firmly. But we are determined that those hard-core families should be dealt with—those are poor words, "dealth with"—that they will be helped to get strength enough to do their own job.

20873—58——3

**KR0404**

cv-00474-JES-DDL   Document 34-3   Filed 03/06/24   PageID.1295

As a matter of fact, their ambition to do with the community and their ambition to do with the families. We would like to make the families strong enough to do the job.

If they are that poor, I say don't give up the kids because they are from hard core families, and I think you will hear people testify here later of the various ways we are trying to get at that, and I think we were delighted the other day at a meeting on our poverty area in New York State study—I do not like that word, but you know what I mean—that we had been able to get some people who were now going to work directly with those families they were so much worried about.

It is true, both city and statewide.

Mr. SULLIVAN. I think we have no further questions. I think we had better move on. Thank you very much.

Chairman HENNINGS. I believe Congressman Powell had a question.

Representative POWELL. Thank you.

Chairman HENNINGS. We will be glad to hear from you, Congressman.

Representative POWELL. Mr. McCloskey, out of your vast experience in social work, and not as an official, do you favor a crash program from the United States Congress to help States set up youth commissions similar to the one we have in New York State, which is——

Mr. McCLOSKEY. I do, Congressman Powell. But I would not want to have anybody under the impression that this State or any other State should wait until that happens, because the Governor testified on the bill before the Senate here 6 or 7 months ago, and we have had, I don't know whether the bill got out of committee or not—did it, Senator?

But at any rate, Governor Harriman went on to say we have taken hold of this job in the State of New York, and if we did, if there was help, that we would like it on the basis of establishing a formula that would take into consideration the fact that we had really gone to work.

That is one of the things we are concerned with. We would like a good deal of the research to be done, and the figures, the statistical work, in Washington. I think in some States it would be welcomed, some of the technical aid and experienced people from Washington.

I do not want to feel we are isolationists here, but we really have a whole host of able people in the State to draw on. But I see the need and desirability of it, but I wanted to make that one thing clear: that if they begin to establish a formula for helping youth boards, that they would take into consideration the fact that the State of New York has gotten on its job.

Thank you.

Chairman HENNINGS. That is very encouraging to hear, Mr. McCloskey.

Senator Kefauver, have you any questions or observations?

Senator KEFAUVER. Thank you, Mr. Chairman.

I know we have all been very much interested in the good work of the New York Youth Commission, and I would like to ask just 2 or 3 questions about the work.

In the first place, how many members of the commission are there, Mr. McCloskey?

KR0405

Mr. McCLOSKEY. There are 9 members, a chairman and 8.

Senator KEFAUVER. Then part of the very important work is to encourage and sponsor the setting up of State and municipal or local youth commissions. Just how do you go about that?

Mr. McCLOSKEY. Well, we have an example here in the city of New York. We do not ask other cities to take the example of the city of New York. We ask the other communities to look at their own problem and then see how they can benefit by sewing together the various groups that are concerned with children in their own municipality, and the theory often is that they shall not operate an agency, but that they shall be conveners and be aware of where the problems are in their communities, and they will see to it this gap finding that I spoke of before, that that is done; that they will carry on, for instance, as in the city of Buffalo, we have been—all of us are concerned, aren't we, about the question of automobiles being stolen by young ones? It is one of the problems of our time, a 15- or 14-year old who knows how to drive or he can't drive.

So we have been campaigning in there. So in that city, the youth board carries on, because it could involve all the religious groups, because it had members from the religious groups, from the educational group, from the welfare groups, from industry, labor, the newspaper and radio, all worked on this business of trying to make Buffalo aware of the need for protecting their cars, things in their cars, locking them, the lectures by the PTA to their own kids in the schools.

It was a full approach to the job. That is how it comes. It comes out of the need of and the community's ability to see the desirability of coordinating their efforts.

We are an individualistic people, and our agencies are, too.

Senator KEFAUVER. In other words, as I understand, Mr. McCloskey, under the overall direction of the State Youth Commission, the local youth boards are created, and part of their responsibility is to try to coordinate and bring together on a cooperative basis all of the local groups, religious and educational, boys' clubs, and various organizations that may be working in the youth field, so that they try to prevent overlapping and duplication and have cooperation between them. Is that correct?

Mr. McCLOSKEY. That is correct.

Senator KEFAUVER. I think that is a very important function, because we find in some places a whole lot being done in this area on this side of the track, and very little being done on the other side of the track.

Mr. McCLOSKEY. Well, I want to point out, Senator, they are appointed by the municipality. We encourage them, but they are set up by the municipalities themselves.

Senator KEFAUVER. I understand also that—by the way, when was the State Youth Commission law passed?

Mr. McCLOSKEY. I think it was about 9 or 10 years ago, but it was in temporary status, and anything that is temporary has a rough and hard time going .

Three years ago it was established, after hearings were held throughout the State in 11 of our large cities, bringing people in, and the recommendations to the Governor, and the Governor's recommendation back to the legislature.

**KR0406**

Senator Kefauver. In other words, the Governor had a special message to the legislature about it 3 or 4 years ago?

Mr. McCloskey. That is right.

Senator Kefauver. Then tell us something of what you have done to increase and enlarge the activities of the training schools in the State.

Mr. McCloskey. The training schools do not come under my direct supervision. Children under 16 years of age, Senator, go under the auspices of the Department of Welfare; and over that age, the Department of Correction.

And I believe we have men coming on here, I just want to say——

Chairman Hennings. I want to say to Senator Kefauver, there will be testimony from those.

Mr. McCloskey. But I want you to know that we are concerned, too, the whole State is concerned, and before these men come, I would like to say that our Commission has come and visited the institutions, and we are very proud of this most difficult kind of job.

All the young ones who are sieved out of our society finally come into those institutions, and I am boundless in my admiration of the people who struggle with it 24 hours a day, day after day. They are dedicated people. You could not do it otherwise.

Chairman Hennings. They are dedicated people. They are not working for money, but for satisfaction.

Mr. McCloskey. That is right.

Senator Kefauver. I take it, Mr. McCloskey, by getting the local groups to participate, that in that way the amount of money that would be spent and the amount of active, personal interest that would be taken, is tremendously enlarged; is that your experience?

Mr. McCloskey. That is right.

Senator Kefauver. Well, thank you very much. I congratulate you upon your good work.

Mr. McCloskey. Thank you very much, Senator.

Chairman Hennings. Thank you very much, Mr. McCloskey, for coming here to enlighten the committee, and giving it the benefit of your broad and comprehensive experience.

Our next witness is Dr. Alfred J. Kahn.

Dr. Kahn, will you please come forward, sir? We welcome you here today.

I might say that Dr. Kahn was born in New York City, and lives now in Scarsdale, N. Y., and is the author of a number of major studies dealing with delinquency and community planning for children in trouble, the most recent of which, For Children in Trouble, was published in June 1957.

He is also author of A Court for Children, 1953; Police and Children, and Children Absent from School.

He has written numerous articles in this field, and has participated actively in Federal, State, and city programs.

I believe, too, Doctor, that you were the first recipient of the Social Welfare doctorate awarded in the State of New York.

**KR0407**

**STATEMENT OF DR. ALFRED J. KAHN, PROFESSOR OF SOCIAL WORK AT THE NEW YORK SCHOOL OF SOCIAL WORK, COLUMBIA UNIVERSITY, AND CONSULTANT, CITIZENS' COMMITTEE ON CHILDREN OF NEW YORK CITY, INC.**

Dr. KAHN. Yes, sir.

Chairman HENNINGS. And you are a member of the National Association of Social Workers, and technical consultant to the New York City Community Mental Health Board, the National Probation and Parole Association, and that you led the workshops and work groups at the 1950 White House Conference on Children.

We welcome you here today, and we will be very glad to hear from you. You may proceed in any way that you please, by reading your statement or interspersing or making an oral statement and putting the prepared statement in the record. We will be very glad to have you do any of those things.

Dr. KAHN. Thank you.

I would like to do several of those in conjunction with one another, if I may, Mr. Chairman.

Chairman HENNINGS. Yes.

Dr. KAHN. Senator Hennings and Senator Kefauver, Governor Harriman, gentlemen:

I first want to thank you for the opportunity of following our distinguished Governor and chairman of the State Youth Commission who, in the minds of all of us in this city and State, are making a major contribution in providing leadership in this field.

I want to thank you for the opportunity of appearing before you to present some of the conclusions of 9 years of research and study of services for children in trouble. You see, I, too, like that phrase better than the other one.

These studies have been carried on under the auspices of the Citizens' Committee for Children of New York City, Inc., to which I serve as consultant.

We have, in this period, completed studies of truancy, police work with children, and Children's Court. Most recently we have published a study of the ways in which community services have failed some of those most in need of help.

As a result, our major attention is currently directed at the problem of planning an integrated system of community services to deal with children in trouble. We are now studying possible structures for city-wide planning, coordination, integration of services, as well as ways of assuring responsible, continuous, persistent work with those in trouble on a neighborhood or regional basis—what we are calling "case accountability," which I would like to explain after a while.

We are also trying to define the appropriate role of each major agency, police, courts, schools, church, and so forth, into an overall integrated community plan in an urban area.

All of this work is still in progress. Although several monographs and one book, which you were kind enough to list, have already appeared, the major volume in the project, major approach, is For Children in Trouble.

**KR0408**

I would like to emphasize one area: Although we have considerable data about shortages of resources and facilities, lack of qualified personnel, need for training facilities, and so on, and I am ready to answer questions on those, I know that these subjects have been and will be discussed by others.

I should like, rather, to emphasize the importance of thinking about a system of services, an integrated system of services, not of individual agencies and programs.

In fact, from everything we have seen and discovered, it is clear that programs are doomed to a continued high rate of failure, and they are high, as we have seen from the statistics around the country, unless we cease to see the problem of dealing with delinquents from the vantage point only of the police, the courts, the schools, the clinics, or any other single service.

A community must clarify the functions essential to an overall approach to children in trouble and assure the adequate development and provision of such functions. The roles of agencies may vary from place to place, or from time to time.

Individual agencies must be willing to adapt themselves to changing knowledge and needs. The crucial objective in planning is to guarantee all essential functions; otherwise:

Children may be unnoticed until problems are aggravated and severe or, as we will show later, tragic;

Decisions are not based on sound criteria;

Decisions do not derive from adequate case study;

Children and families are lost in the gaps between agencies and programs;

Case finding does not assure adequate and effective service; opportunities are lost;

The extent and nature of resource gaps are not understood and publicized;

There is inadequate cooperation between agencies;

Children or their parents are seen from limited perspectives, and the basic problems are not dealt with.

These are the consequences, we feel, if one talks of individual agencies rather than a community system, and if one does not concern oneself with guaranteeing all the essential functions in a community rather than being sure that a few agencies are themselves very good.

In talking about structure and mechanisms and functions, as I mean to, a somewhat abstract discussion and perhaps not as dramatic as it might be if I do not talk about cases, I do not mean to imply that programs cannot operate without dedicated people or that proper definitions which I am going to be talking about substitute for sound impulses and goals.

I take it for granted that we need personnel who care about results and, most important, care about children and parents.

I am convinced, too, that community plans are empty except in an atmosphere of what I have been calling responsibility and accountability. An agency is not an entity unto itself. It is a community instrument with a job to do, ever responsible to do it better, to report honestly its problems and failures, and to find its place as an agency in a total community effort.

**KR0409**

In relation to the individual served, the agency is accountable to the remainder of the community for what it does and does not do. We are not involved in ceremony and process. We are involved in doing a job that has to have successful results.

Where the agency itself fails or gives up, others should know and be asked to take over, rather than feel that the agency has to cover up because it has not been successful.

The chart now before you lists the functions we have identified—and I will come to it in a few moments; we do not have to move it at the moment—the functions we have identified as a basic to a community system of services, and I shall define them briefly and indicate, from our research findings, the results of failure to guarantee their effective implementation.

I have not written out the remarks to follow, and shall make my comments informal when I get up to the chart.

Before doing so, however, I wish to stress again that the problems which arise are not the fault of any agency, of any one service. Each agency may work conscientiously and do its job, and yet the total program may not be effective enough without adequate planning, coordination, and evaluation.

If the individual agency is willing to see itself as part of a community system of services, and to accept responsibility within that system, much is accomplished.

The agency cannot act of itself, however, and have adequate perspective about the total system. A communitywide planning and coordinating structure—for instance, the sort of structure described by Mr. McCloskey for some of our municipalities—as well as a local mechanism for integration of agency services, is still necessary if agencies are to work well together, and if the individual case is to show the benefits of a systematic, substantial rehabilitative effort.

It need hardly be added, after this kind of introduction, that delinquency is too complex a phenomenon to be affected in any basic way by magical, single-formula solutions. Some of the proposed remedies may have real merit in the context of a balanced community program. Thus, a community may need more youth police for patrol, such as recently provided in New York City, patrol, apprehension, or detection; or may need specialized schools for a small minority too disruptive for the school system, but able to respond to a special program.

And I might add, these schools should know what they are trying to do, whom they are serving, and how they are going to help them.

Or a parent education program may be helpful and needed.

Each of these proposals may have merit, and they belong in a total effort. I would raise major questions about anybody who offered any one of them as a solution.

Chairman HENNINGS. They are certainly no panaceas. We have discovered that everywhere.

Dr. KAHN. Your last report made that very clear.

Chairman HENNINGS. I think Senator Kefauver will agree, as you suggest, in our last report we undertook to say that there are many, many devices and means to be availed of and which must be used to alleviate or to mitigate this problem in general.

KR0410

Dr. KAHN. That is right.

Chairman HENNINGS. There are so many people who think if you do away with horror comic books or do away with crime on television, which teaches boys and girls what they call in police circles the M. O., the modus operandi, how to break in a house and how to unlock a door with a skeleton key, and so on, it would take care of the situation.

We heard so much of that, and there have been a great many witnesses in the past 4½ years that Senator Kefauver and I have served on this committee, who have come in and said, "If you have a curfew law, for example, that will cure everything.  That will take care of everything."   Or "If you have a lot of playgrounds, that will take care of it."

And, as we all know, and I think you have done us the honor to have read our report, we tried to make that abundantly clear.

Dr. KAHN. Yes.

Although many of these items, I am sure you would agree, belong in a total program, none is a panacea.

Chairman HENNINGS. Yes.

Dr. KAHN. I make this point largely to emphasize that some of these proposals are in themselves unsound, some of these single-formula proposals.

For instance, a good number of them ignore all that is known about the deprivation and disrupted family lives of the delinquents, and of the inadequacy of their parents to cope with their own responsibilities, let alone the responsibilities of their children.

And I would so classify so-called solutions which emphasize punishing parents alone, in one way or another, for their inadequacy, or urging the woodshed for young offenders who have known very little except the woodshed for most of their lives.

Chairman HENNINGS. Yes.   We had a judge from Chicago 2 or 3 years ago who used that very phrase.   He said the woodshed was the solution; take them out and take a barrel stave to them or a birch, and that will cure the whole thing.

Dr. KAHN. That is right.

Chairman HENNINGS. Or lock them up.  "Lock them up; it will teach them a lesson.   Give them the treatment."

Dr. KAHN. Somebody should give them some statistics about what people do after they have been locked up.

Chairman HENNINGS. And the judge really believed that, and he came to Washington to testify and to tell us that.

I do not reflect upon his character, but I do question the degree of thoughtfulness that he has devoted to this problem.

Excuse me for interrupting.

Dr. KAHN. Thank you.

A final word before turning to the chart.

I am not addressing myself at this moment to what we might call basic prevention; that is, the ways in which to decrease the deviant,

KR0411

annoying antisocial behavior that we have been addressing ourselves to. I am not talking about what we can do to end that kind of behavior in the world. I have been asked by counsel to do other things.

If I were, I should have to discuss the things in the world about us that affect the kind of community and family life that develops in various parts of our country. I would have to discuss the general level of morality and conduct. I would have to talk about the amount of social mobility in this country.

I would have to talk about the behavior of well-publicized adults after whom some youths choose to model themselves. I would have to talk about the inadequacies of incentives offered to young people to defer the pleasures of the moment in favor of long-range goals.

I want only to point out that in a real sense, our delinquency rates represent a major social failure in which all of us have a part, and because of this failure, the social and antisocial conduct to which we are addressing ourselves is frequent and often violent.

And, in a sense, we are accountable, all of us, for these failures, and therefore it is quite proper that the United States Senate and House of Representatives address themselves to the problem of what we can, as a community and a society, do about these problems.

Communities require adequate forces for protection, for apprehension of violators, and to deter those who would break the law, and again I am not talking about what we can do to protect our communities. I understand the police will make a presentation about this program.

This program must be carried out with respect for individual rights, or we lose what we seek to protect. Sometimes protection requires continued custody in secure institutions. Sometimes, because this is the only interim possibility while we study a case; sometimes because we honestly do not know how to help some categories of people.

Chairman HENNINGS. Doctor, do we not always declare, whether an act be committed by a young person or an old person, that it is a crime to commit murders?

Dr. KAHN. That is right.

Chairman HENNINGS. And that is not delinquency.

Dr. KAHN. No.

I guess all States exempt that crime from the statute dealing with delinquency.

Chairman HENNINGS. Yes, they do.

Dr. KAHN. As are certain other offenses which result in life imprisonment.

Chairman HENNINGS. That is right.

Dr. KAHN. The chart I am going to turn to now addresses itself to much more limited issues than to prevention or protection of a community, but issues which I think are quite important.

KR0412

Mr. SULLIVAN. May I comment before you start on another topic?

Dr. KAHN. Yes; please do.

Mr. SULLIVAN. I would like to thank our special counsel, Mr. Ernest A. Mitler, and Mr. Mel Harris for the construction of this chart, which we are very impressed with, and I am sure the Senators will agree, and the Congressmen, it is a very comprehensive expression of, I think, what you will present to the committee.

Do you want to move that forward?

Dr. KAHN. While they are moving the chart in place, I might say that it addresses itself to one single problem, which is complicated. That is, the problem is: Given antisocial or asocial behavior, how are we going to try to organize community efforts for early location of the difficulty before the problems are too severe, and for effective action to prevent intensification of the problem and continued maladjustment?

The premise is that there is no choice but to find the problem early and to do something effective about it, and to make sure what we do is effective enough to decrease future difficulties.

If it will not upset the recording system, I will move up to the chart now.   Is that all right, Mr. Counsel?

I am not going to address myself to this half of the chart, which is going to be discussed by a witness cooperating with me who I am going to introduce in a few moments.   At the moment, let me turn to the chart on this side.

The heading is "Community Functions in Dealing With Delinquents," and it is an attempt to dramatize the fact that there are 4 or 5 jobs which have to be done, and every community has to decide how to do them.

Chairman HENNINGS. Let this chart be marked "Exhibit No. 6" and be made a part of the record.

(The chart referred to was marked "Exhibit No. 6" and follows:)



This Chart is an Excerpt from Forthcoming Book "Planning Community Services for Children in Trouble"
by Alfred J. Kahn, Citizen's Comm. for Children of N. Y. C. Inc.

**KR0414**

Some communities need many agencies, some need a few, some need a few personnel, some need a whole gamut of services. But if one thinks in terms of functions, one can identify the gaps and one can clarify what it takes to keep the whole structure in operation.

There is, first, a stage which is represented by the people here, rather than by word, which we might call case finding. That is the discovering of the kids who in some way are deviant, are in difficulty, and are not getting along.

This is before they are actually themselves in any serious difficulty with a law or a protective society. I am referring to the fact that a child may not be getting along in school, in not a mild way, transitional way, but the sort of thing a teacher is worried about; or a child in a settlement house who is acting up in one way or another; the child in a family receiving help from a public welfare department, aid to dependent children, and the visitor recognized there was something wrong in the relationships.

A child in a housing project who is participating with his friends in defacing the elevator and the walls and making it impossible for the family to abide by the rules.

A child who on a visit to a health station with his mother is recognized by the public health nurse as in some way in difficulty.

This is the earliest stage at which the community can recognize that something is going wrong. The teacher, the settlement worker, the cop on the beat, the nurse in the health station, the pediatrician, are suddenly in a position to see that there is something not quite right.

I am not talking about the transitional thing, the unserious thing that they dismiss with a laugh or with a bit of advice, but the sort of thing that begins to worry them.

And what I am suggesting here is that if at this moment, this very first moment of case finding, there can be recognition that the system of community services must come into action, we may be in a position to really head off the more serious trouble that develops later.

Now, this case finding gets to a second phase: The child who already is doing something which technically is delinquent. He may have gone into the 5 and 10 and stolen something. He may have broken some windows and been apprehended. He may have done something much more serious which is also encompassable within the definition, and he is picked up by the policeman on the beat, or reported to a local detective after a theft.

There, too, we have case finding, but we are beginning to be in channels there.

The first thing that becomes very clear is that unless these people have some basis for separating out the unserious from the serious, the trivial from the worrisome, we are going to miss major opportunities.

In a recent study in New York City which we conducted, we studied 200 children in the late stages of difficulties, in the training schools, on parole, and so forth, and we asked ourselves, "How many of them could have been discovered at this phase more than 2 years before the difficulty which got them into the court and the training school, and so forth?"

The answer was, 147 out of 200 were discoverable at least more than 2 years before; 80 of the 200 were discoverable 5 and more years before, as representing serious enough problems for something to have been done of a more basic character.

**KR0415**

We found it was not that they were not known to any of these agencies, and it was not even that some of these agencies did not try to do something, but what they tried to do was trivial, segmented, not systematic, did not lead to the effective action we need.

And this, therefore, represents, from our point of view, a phenomenon that we call the loss of major opportunities for community protection and prevention.

There are many technical problems here which I will not go into, as to how one trains teachers and pediatricians, and so forth, to do this, but the important thing is, if professionals in contact with children can come to recognize themselves as having opportunities and know what the chances are, and have some simple direction as to what the procedures are for getting help when help is needed, we will have begun a case finding that represents major opportunity. And this is not textbook theory.

Many public health nurses around the country, many teachers around the country, many settlement workers around the country, are doing this, but it is segmented effort. It is not systematic effort, and it does not have the full organization and training opportunity that it requires.

The next step is what we call case study.

Now, at the level of brief screening, really major decisions are made, and this is why we say, in the orientation and training of this staff a very large number of the situations so uncovered get dropped by informal handling.

The teacher makes a classroom adjustment. The health nurse makes a suggestion to the parent. The minister talks to the family and offers some informal help of one kind or another. The situation can be dropped.

But these personnel must be able to recognize which cases require more careful or more complete expert help, and there we have a phenomenon which we call case study. Somebody has to look at the situation in a thorough way to help us make a long-range decision.

If it has been an arrest by the policeman because there is delinquency, there has to be a probation officer who knows how to do the kind of evaluation which can guide the judge as to what will be effective with this child.

If it is a matter of a case known to the welfare department, there have to be skilled public welfare personnel who can do an adequate study, rather than people who do a clerical job just figuring out budgets, and so forth.

If it is a settlement house, they have to have a staff.

If it is a teacher, and if it is a problem which is too complicated for her, she needs guidance work staff and social work staff in her school who can help her decide what the situation requires. We call that case study.

In our own research going back to those 200 cases, we found that well over half the cases did not have, even after they reached this next serious level of not being dropped, did not have a professionally adequate case study, that is, a case study which would meet the standard of people who are trained in this field and who know what you have to understand about a child to make a wise decision, about training school, about probation, about informal work in the church, about recreation program, about anything else that would help the child.

KR0416

I see Mr. Sherwood Norman of National Probation and Parole Association here, and he will tell us that this case study sometimes takes place in the detention facility, the situation is so serious we do not dare leave the child at home or in the community while making the decision.

And the problem is that in many spots around the country, there are not adequate detention facilities with trained staff able to do this kind of study.

Sometimes it is done in the court while the child lives at home. Sometimes it is done in the school's social service department. Sometimes it is done in a clinic, and so forth.

Mr. SULLIVAN. May I interrupt?

Dr. KAHN. Yes.

Mr. SULLIVAN. If you can, would you highlight it a little more? We have 3 or 4 people who came from upstate and will have to be going back this afternoon, and I would hate to have to ask them to wait over. If you could.

Dr. KAHN. I certainly shall. I was timing myself according to my original instructions, but I will watch my schedule.

Mr. SULLIVAN. That is all right.

Dr. KAHN. The next phase of this is a phase which we call resource location, service planning and referral.

Having made the case study, there are people who have to find the spots in the training schools, and many of our State training schools are overcrowded; find the treatment spots in the clinic; find the recreation programs, and so forth, and get the child there.

In our own research, we find this is one of the major problems. There is sort of a referral made in a letter or a phone call, no follow-up, no adequate explanation to the family; no follow-through, time after time, to make sure that the child has gotten here.

Many children are lost between case study and referral, and this is why we talked before about a community system of services which will assure case accountability.

The people who have carried a kid this far and know enough about him to understand what it is going to take to help him before he is a major community problem, have to have a system of operation which will get him to the service and will keep him there until the service takes; and if it does not take, will make sure that he gets somewhere else.

We call this case accountability.

Mr. SULLIVAN. According to your concept of case accountability, you believe there must be some central accounting procedure to keep track of the hard-core families.

Dr. KAHN. I would say all of the kids who get into the system in such a way as to need some kind of attention of this sort. There are various devices tried around the country. The welfare department here is experimenting with what they call a task force where they have a meeting of all the major agencies, deciding who is going to carry on and who will follow the family to make sure it does not get lost.

In Montclair, N. J., the Council of Social Agencies runs a conference committee. Philadelphia is experimenting with something else. But every community, depending on its size, needs some kind of device.

This, I think, is one of the things that needs most emphasis around the country. We cannot just study kids and pass them along. We

KR0417

found that very large numbers—I am not going to take your time on statistics now—we found that very large numbers get lost in these gaps between the stages and gaps between the agencies, or in the failure of people to follow through, and this is not—this is a pervasive lack. It transcends the practices of individual agencies and institutions.

Following the publication of this report to which I am referring, we have had correspondence from many States in the Union indicating that we might just as well have used their data; the finding would have been identical.

I have run several workshops of people in several States, and have gone to several State welfare conferences and picked up data all around the country.

To indicate this is a national problem, one has to give emphasis to what we call responsibility and accountability, the idea being that an agency which has rendered incomplete or unsuccessful service has some obligation to assure continuity of community concern when its own contacts end.

If I may at this point, Mr. Chairman, I would like to interrupt my testimony. I want to come back in a few moments.

Chairman HENNINGS. Yes, indeed.

Dr. KAHN. I want to introduce a gentleman who will present a dramatic case illustration, after which I would like to make some comments.

Chairman HENNINGS. We will be pleased to have you do that, Dr. Kahn.

Dr. KAHN. I met this gentleman during the summer when he was investigating a dramatic case in New Jersey for NBC television, the so-called Night Line program, the case of Ronald Marrone; and I was rather impressed with the fact, and I think you will be, too, that here was a journalist, not a social worker or a social scientist or anybody working in this field, investigating an individual case, who emerged with the same conclusions that I had, and I think to hear his tapes and to hear his story, Mr. Walter McGraw will present to you some of the facts we are trying to deal with, and then I would like to talk for a few more minutes.

Chairman HENNINGS. We welcome you, Mr. McGraw, and we will be glad to hear from you—in accordance with the suggestion made.

You are a producer of radio and television documentaries, I believe, Mr. McGraw.

## STATEMENT OF WALTER McGRAW, PRODUCER OF RADIO AND TELEVISION DOCUMENTARIES

Mr. McGRAW. That is right, sir.

Chairman HENNINGS. And you specialize in subjects relating to criminology, and your tapes have been heard on NBC radio on the program Night Line, and you deal with actual cases involving real people.

We are very glad to hear from you, sir.

Mr. McGRAW. Thank you, sir.

Dr. KAHN. This chart illustrates, by the way, what Mr. McGraw is going to say.

Chairman HENNINGS. Let this chart be marked "Exhibit No. 7" and made a part of the record.

KR0418

(The chart referred to was marked "Exhibit No. 7" and follows:)







Chairman HENNINGS. Proceed in your own fashion, please, Mr. McGraw.

Mr. McGRAW. Thank you.

This series of reports was presented on NBC's Night Line program, just to illustrate this same point that Dr. Kahn has been bringing out, this matter of lost opportunities.

Here was a case where you had a boy who had gotten into trouble, where a lot of things had been done for him, but although everybody was working with the best of intentions, he was allowed to run loose as a sick boy until such time as a girl was murdered.

**KR0419**

We went over to the actual people who were involved, talked to his schoolteachers, his parents, tried to find out where this opportunity was lost.

To find out about the case, the first one we talked to was the girl's mother. Her name was Ruth Starr Zeitler. She was a very quiet girl. They came from a good neighborhood, a good family. But then, so did the boy.

Here is what the mother had to say.

(Playing of tape.)

Mr. McGRAW. The tape that was heard was Mrs. Zeitler, the girl's mother, detailing that the girl disappeared. For 1 week they did not hear anything from this girl, and then 1 week from the day she disappeared, her body was found.

Three days later, after questioning hundreds——

Chairman HENNINGS. That is illustrated, I take it, by this lower picture.

Mr. McGRAW. The very end; yes.

Chairman HENNINGS. Yes.

Mr. McGRAW. Three days later, Ronnie Marrone confessed to the killing.

We went in to find out what kind of a boy this was. We went to the neighbors involved, and this was fairly typical of the reaction we got. It was from one John Latanzio.

Mr. MITLER. I suggest you go ahead and present the case.

Mr. McGRAW. John Latanzio said roughly that the boy had always been in trouble. He mentioned many of the things that you can see there on the chart. He pointed out that women's panties had been stolen from clotheslines, and that houses had been broken into.

He also mentioned that 2 girls, one 5 and one 8, had both, one time or another, been molested by this boy.

Chairman HENNINGS. And there had been no formal complaint, according to your chart there.

Mr. McGRAW. We asked about that. He didn't come to trial on one case. He went to trial, and the charges were dropped on the other.

Chairman HENNINGS. Why were they dropped, Mr. McGraw? Insufficient evidence, or what?

Mr. McGRAW. Legally, insufficient evidence. According to the neighbors, because the police were not active enough. According to the police——

Chairman HENNINGS. In other words, a case was not properly made or not properly prepared.

Mr. McGRAW. And the police say it was not properly prepared because they didn't have the cooperation from the parents, the parents being unwilling to subject their daughters to such publicity and such a procedure.

Chairman HENNINGS. Yes.

Mr. McGRAW. All right.

This is John Latanzio.

Mr. MITLER. Would you describe who is talking?

Mr. McGRAW. I just did. John Latanzio was a newspaperman and a neighbor that we talked to about this particular case, and the boy's background in the neighborhood.

Mr. MITLER. All right, this is his voice.

**KR0420**

(Playing of tape.)

Mr. McGraw. The next person we went to was the mother of one of those girls who was molested. Why had nothing been done? Had she been willing to pursue the case?

This is the story she told us.

(Playing of tape.)

Mr. McGraw. That was the general opinion around that neighborhood. We wondered why, since everybody spoke so highly of the parent and spoke of it as being such a firm family unit, the family had done nothing.

Well, we found the family had tried to do things. At the age of 9, they took the boy to a psychiatrist. The only thing they got out of that particular meeting was that he had an inferiority complex.

At another time the boy was described, as you will hear, as, I believe you pronounce it "schenzophrenic," or something like that.

Chairman Hennings. Schizophrenic.

Mr. McGraw. Yes. I was trying to imitate his mispronunciation. And his only understanding of that word was, "Well, that is sort of a split personality. But then, doesn't everybody have that? Aren't you happy sometimes and sad at other times?" This is about all they got out of the psychological help they had.

We asked Mrs. Marrone——

Chairman Hennings. How much help was there, Mr. McGraw?

Mr. McGraw. There was one visit to a psychiatrist at the age of 9, and then later they went to the Menlo Park Diagnostic Center.

Chairman Hennings. Yes, I see that on the chart.

Mr. McGraw. The mother's opinion of her boy was as follows:

(Playing of tape.)

Mr. McGraw. The mother couldn't really see anything wrong with this boy, who was much too good.

I asked the father if he thought there was anything he could have done to keep the boy out of the present situation, and this is his answer:

(Playing of tape.)

Mr. McGraw. It was at that time, then, that he went to Menlo Park. And at Menlo Park there are two stories. Menlo Park said that they made specific recommendations that they wanted him back, and they also made another specific recommendation, but that was not followed through.

The father and mother did not understand it. Why, I don't know. Here is their answer to that situation:

(Playing of tape.)

Dr. Kahn. Could we just say Menlo Park is the Jersey diagnostic center, and it has a procedure where people can go voluntarily, as well as court commitment, and in this instance the child went voluntarily.

(Playing of tape.)

Mr. McGraw. I asked Commissioner Tramberg of the New Jersey Department of Institutions and Agencies if this was a usual recommendation, and he said yes, it was quite usual that parents be recommended for help as well as the children who got into trouble.

**KR0421**

As for the boy, he was there on a voluntary basis. He was not committed by any court. The Menlo Park Diagnostic Center could not hold him.

The boy himself, according to his parents, said he had not confessed to killing this girl. He had made a statement telling how he had done it, but he had not confessed. He expected to go to trial. He expected to be found guilty. And then he expected to come home again. And he had asked his mother if she would have some strawberries in the freezer for him.

And this is the boy that was let run loose for so long.

Chairman HENNINGS. May I ask you this question, Mr. McGraw: Was insanity interposed as a defense in this case at his trial?

Mr. McGRAW. There was no defense.

Chairman HENNINGS. He entered a plea of guilty?

Mr. McGRAW. Of no defense.

Chairman HENNINGS. Of nolo contendere?

Mr. McGRAW. Yes. And he was sentenced to life imprisonment.

Chairman HENNINGS. Did he have counsel?

Mr. McGRAW. He did.

Chairman HENNINGS. Dr. Kahn?

Representative ANFUSO. Senator, before Mr. McGraw leaves, I wonder whether I may ask a question.

Chairman HENNINGS. Indeed; yes, sir.

Representative ANFUSO. I asked my colleagues on this floor, around this table, before I asked this question, whether it is a fair question, because I may be a little bit prejudiced. I am sure it was not intentional, and I do not think it was done with an ulterior motive, but why was the name, the actual name, of Ronald Marrone used? Why could not "John Doe" have been used to make the illustration?

I want you to know that I am very sincere about this, because I do not like any wrong impressions to be created. The newpapers will carry that name throughout the country. I would resent it just as much as if a Negro name——

Chairman HENNINGS. I would like to say, Mr. Anfuso, that I knew nothing about the chart, and Senator Kefauver did not, but I would like to have some explanation of it, as to the use of the name. I assume it was given wide publicity at the time.

Mr. MITLER. Senator Hennings, if I may explain, this case was a rather recent case, and was carried on the front pages of the newspapers in a good part of America. The pictures here are pictures that were used in newspapers, and the case, as I said, was publicized on the first pages of all the New York papers, all the New Jersey papers, and most of the papers of the east coast, and the trial and every stage of the case was covered completely.

Chairman HENNINGS. It has been the policy of this committee, I might say, Congressman Anfuso, never to use any of the children themselves as witnesses or to use any names of so-called delinquents or children in trouble.

Representative ANFUSO. I would say this——

Chairman HENNINGS. But apparently this is a notorious case, and I would like to have your observations on it.

Representative ANFUSO. Senator, I thank you for your explanation, but I insist on my point. That case is over. There will be other cases and many more involving boys of all nationalities. I say

**KR0422**

that in making illustrations in conducting the lectures, and in colleges, or in presenting illustrations before any committee of Congress or in making illustrations, I think that fictitious names should be used.

I would make the same statement if a Negro boy had been used as an illustration, or a Jewish boy, or an Irish boy. As I said before I asked that question, I wanted to know from my own colleagues whether I was making a prejudicial statement which might indicate that I had prejudicial interest in the matter.

Chairman HENNINGS. Well, as I say, Senator Kefauver and I saw this for the first time today, and I would like to have counsel answer the Congressman, if he cares to do so.

Mr. SULLIVAN. Congressman, may I comment to this extent: The subcommittee has never, since I have been chief counsel and since Senator Hennings has been chairman, and Senator Kefauver as well, used the names of individuals in any manner in which they may be affected adversely in the public eye.

However, in this particular case, I think the——

Chairman HENNINGS. Unless it is a matter of court record.

Mr. SULLIVAN. I think the presentation was by Mr. McGraw, and Mr. McGraw is as entitled as anyone else to present whatever he chooses before this subcommittee, and I think his choice of the particular case is most impressive, and I feel that there is no serious adverse effect upon the Marrone family or Mr. Marrone, inasmuch as it was widely publicized at the time.

Mr. MITLER. I wanted to add that these tapes were played over a national hookup over NBC on Night Line for the month of August, am I correct, Mr. McGraw, and they were nationally played with the name mentioned?

Mr. McGRAW. Yes, as part of the newspaper coverage of a case and trial which was then in progress, and which has since been concluded. This is a closed case.

Mr. SULLIVAN. I think also it is entirely evident from the presentation on the chart that it is done in a constructive manner, and not a destructive manner.

I mean there is no intent to destroy anybody's character or affect adversely anyone's character. I think the chart will bring that out, as will Dr. Kahn when he testifies with respect to the particular incidents or when he testifies with respect to his views on what was done in this particular case.

Chairman HENNINGS. Well, the Congressman has made his point. He certainly is entitled to his point of view, and it is a respectable point of view, I am sure.

But I do want to assure him that the committee has no intention to degrade nor humiliate nor to further emphasize the tragic circumstances such as this.

Now may we proceed, Dr. Kahn?

## STATEMENT OF DR. ALFRED J. KAHN—Resumed

Dr. KAHN. In just about 2 or 3 minutes, I would like to wind up my comments, if I may.

First, as somebody who works in this field, I want to say that I appreciate the Congressman's emphasis on anonymity of delinquents,

KR0423

an emphasis which has been the emphasis of this committee and all professionals working in this field.

Chairman HENNINGS. We never use the name of a child, except a court record.

Dr. KAHN. That is right. And the press has traditionally not used the name of delinquents, either, except in instances of capital offenses where the case usually goes to another court.

I wanted to say that it seems to me that this, of course, is an extreme case, the incidents are extreme, but the training schools, the probation caseloads, the adult prisons, the reformatories, are full of cases of young people who represent community lost opportunities; young people who are not picked up at the screening phase, or are not studied adequately at the study phase, or are not referred to services because there are not enough services, or are not followed through at the point of referral.

And this, it seems to me, is the point which must be emphasized in today's testimony: The opportunities are there. We can find the kids. The problem is one of doing something sound.

By way of winding up, I just want to indicate, as well, that we obviously need a very elaborate gamut of diversified treatment services and resources to deal with the wide range of causative factors.

There are kids who need training schools. There are others who need guidance clinics. There are some who need vocational agencies, some who need church services, some who need group programs, any number of other things, of which these are only a few illustrations.

And I know that from your other reports and from the work your staff has done, that your committee will give particular attention to two or three needs which have had emphasis around the country recently, particularly the need for residences, residential treatment centers for adolescents, homes for young people who have to leave institutions but do not have families to go back to, as well as the kind of need described by the Governor and Mr. McCloskey, ways of providing satisfactory opportunity not only for recreation but for learning trades and jobs for young people who are at loose ends, and who are wandering about our cities, who do not have adequate incentives really to prepare themselves for adequate adulthood.

Chairman HENNINGS. Well, is not part of it, Dr. Kahn, that every kid wants to feel wanted and useful, wants to feel that he amounts to something; that somebody, too, cares for him.

Dr. KAHN. He wants to feel he has a chance some way to attain success in our society, and this is the sort of thing we have to help.

In winding up, I just want to say that although this structure looks at one case, obviously this structure will not exist unless we have agencies for coordination, for planning, for research, for evaluation throughout the country, in various cities, agencies appropriate to the kind of community.

The youth board is one approach. Other approaches can be used elsewhere. But somebody has to look at the whole system, or there are gaps and there is not case accountability.

And, finally, somebody has to see from time to time what works and what doesn't work, and we have to honestly say where we are failing and where new things had better be tried, because this is not a matter of ceremony; it is a matter of the lives and deaths of kids.

**KR0424**

And unless we really make sure that it is not only a neat system with a pretty chart, but a system that works, we are not doing our job.

Thank you, gentlemen.

Chairman HENNINGS. We thank Mr. McGraw on behalf of the committee, and we thank you, Dr. Kahn, for your illuminating and most helpful testimony here today.

You have gone to a great deal of trouble to be here, and to prepare your statement and your evidence, and we feel sure that it will be of great help to us.

Dr. KAHN. Thank you.

Mr. SULLIVAN. May I add, Dr. Kahn, if you have any additional statement you would like to submit for the record, we would be glad to receive it.

Dr. KAHN. I shall.

Chairman HENNINGS. At this time, the hour of noon being well past, and we are running behind, the committee will rise, and reconvene at 2 o'clock.

(Whereupon, at 12 : 40 p. m., the subcommittee recessed, to reconvene at 2 p. m., of the same day.)

AFTERNOON SESSION

Chairman HENNINGS. The committee will please come to order. Our next witness, Mr. Counsel?

Mr. SULLIVAN. The next witness we have, Senator, is Professor Frank J. Cohen, if he would be good enough to come forward.

Chairman HENNINGS. Professor Cohen.

Mr. SULLIVAN. I think in his presentation, Sherwood Norman will join him at the table, and John W. Poe.

Chairman HENNINGS. Gentlemen, we welcome you here. On behalf of the committee, on behalf of the Senate, I express our appreciation at this time for your taking the time and trouble to come here and enlighten us and guide us and give us the benefit of your views.

You may proceed in any manner that you please.

Mr. SULLIVAN. I would like, before you start, gentlemen, to also ask Mr. Arthur W. Popper to come forward and join the group. Mr. Popper.

Chairman HENNINGS. We are glad to see you here today, sir.

Mr. POPPER. Thank you.

Chairman HENNINGS. I am sorry we were a little late in starting the hearing this afternoon. We had lunch with Governor Harriman, and the snow storm delayed us, and we just got back a few minutes ago.

## STATEMENT OF FRANK J. COHEN, DIRECTOR OF STUDENT SERVICES, GRADUATE SCHOOL OF PUBLIC ADMINISTRATION AND SOCIAL SERVICE, NEW YORK UNIVERSITY

Chairman HENNINGS. You may proceed in any fashion that you please.

Mr. COHEN. I am going to confine my remarks to the growth of Youth House in New York City.

Chairman HENNINGS. I think if each of you gentlemen would state for the record your respective positions, it would be helpful to us in the hearings when they are printed.

**KR0425**

Mr. COHEN. Thank you.

Speaking of the Youth House and serving as a consultant to the Youth House, having formerly been its executive director and currently associated with New York University, teaching the principles of institutional administration, I thought it might be of interest to the committee in terms of how our detention program was developed in New York City since 1944.

We feel that the changes have improved the situation with respect to the detention of youngsters primarily because we have made the detention experience a step in the rehabilitative process in contrast to merely using it as a custodial period while the child is awaiting final disposition of his case.

Secondly, we introduced the use of a trained staff to treat with the problems of children rather than the traditional methods of punishment for nonconformity.

Thirdly, we brought into the picture a full educational program through the local board of education, so that we continue the educational activities of the child while in detention. In fact, a good deal of remedial work is going on in that detention period.

Chairman HENNINGS. That, Professor Cohen, is most unusual, because in many of the places we visited and many of the detention homes in which I happened to have been, they do nothing but custodial work.

Mr. COHEN. That is right.

Chairman HENNINGS. Yes. It is very interesting.

Mr. COHEN. That is the reason I am pointing it out, and indicating what a difference it made in the actual operation of the detention setting.

In addition, we have provided an organized leisure-time program for the profitable occupation of the free time of the child, so this is again one further step of removing the child from idleness.

Through this experience and through this approach, we have been able to reach the children in detention. The response has been phenomenal.

I might indicate that in its introduction, it was a very devastating experience. These youngsters brought all of their hostilities and all of their destructiveness into the detention home.

However, it soon became known to them, and it has followed throughout the years, that our interest was directed toward assisting and helping them, so that controls were established through understanding rather than through punishing methods of control.

I was rather interested in two points you made this morning.

One about the labeling of youngsters. We take it for granted that these youngsters who commit delinquent acts are serious monsters or they are so calloused that they are indifferent to the social attitudes with respect to them.

In many meetings I have had with these youngsters, this question of having a record, this question of having been labeled, is one that plays a very important part in the lives of these youngsters, as they expressed the feeling that "As long as I have this record, it doesn't really make much difference what I do; this record will always be in front of me."

It is a thought I had that this committee might want to come to grips with—the use of the term of "children in trouble," rather than

KR0426

the labeling of "delinquents," and it would make probably a very deep impression.

Chairman HENNINGS. I might say, Profesor Cohen, at the outset of this committee's work 5 years ago I initiated the use of the words "children in trouble" instead of "delinquents," because I have always felt that is a misnomer, and semantically is not accurate.

So we have tried to proceed on that basis.

Mr. COHEN. I think it is a very helpful step.

I think the other point which I think is worth making is that the severity of their behavior is no criterion to their personality structure.

You may have children brought into detention on charges of chronic truancy whose personalities may be seriously warped and who may be a threat to themselves as well as to the community at large.

You may bring in youngsters who are guilty of offenses which are serious in their impact, yet they would have a structure that gives good evidence of the possibilities of reclamation and rehabilitation.

And so we need to direct our efforts more toward the potential possibilities of treatment and rehabilitation, rather than by emphasizing the nature of the offense.

Chairman HENNINGS. Or the punitive approach.

Mr. COHEN. That is correct. I wanted to make one other point that was made this morning with respect to what we call the hard core.

Prior to 1944 we maintained up to 50 youngsters in our city prison, or the Tombs, because they were considered too dangerous to maintain in shelters. I might add that 1 year after the opening of Youth House, and in which we participated and encouraged, there was the establishment of the Young law, which prohibits the placement of any juvenile in a setting that approximates a jail.

Chairman HENNINGS. You mean they put them in the old Tombs?

Mr. COHEN. They used to put them in the old Tombs. They had a section in the old Tombs where as many as 50 of them were held.

Since 1945 Youth House has taken every child and every youngster that has been remanded by the children's courts and has been able to contain them. This only gives evidence, and I think some encouragement, that when we think of the hard core we should not think in terms of youngsters who are really beyond the pale. We may have failed with them in other areas.

But it seems to me that we must intensify our work with them, as evidenced by the experience of Youth House, that it really does not matter today whether they are the type of youngster where previously they were placed in the city prison, because they are very well contained within the Youth House setting.

In addition to these various forces, I feel that a great step has been taken in terms of making the detention experience also a period of observation and study.

All too often we think of detention as merely a custodial setting. The two are really not mutually exclusive. In fact, I feel they are complementary, so that the court has the benefit of the observation and experience of the individual child in detention, and it helps and facilitates the court's direction of the child and planning for that child.

So often, despite the record which seemed so dark regarding a child, the period he spends in detention may throw great light on the

possibilities of rehabilitation and treatment. This the court is using to a great extent.

I want to make one other point in my brief remarks, and that is, Youth House is governed by a group of civic-minded citizens, representing the three religious faiths, appointed by the mayor, and although the funds for the operation are provided for by the city, the detention setting as such is operated as a private agency.

And this is a good example of how, through private citizen work and government work, we can carry through a function at a very high level such as now is being carried out at Youth House, and rather effectively.

Chairman HENNINGS. I like the expression "Youth House," too. We get into this business of the tyranny of words sometimes, and talk about a house of detention, and I have seen some pretty bad places. And once a boy or girl has been in a house of detention, that is another brand, is it not?

Mr. COHEN. This is another, and we are very proud of that, and we are proud that our sister city of Newark, N. J., has now changed its name from the Essex County Parental School to the Essex County Youth House, and we are rather flattered by the experience, because we feel that each and every one of these steps are positive steps and constructive steps in terms of handling the child.

I would like to conclude very emphatically, and that is that Youth House has been able to maintain its operation without the usual brand of punishment or intimidation or threat, and it is great evidence that by coming to grips with the problem of the child in detention, that at that particular critical period much can be gained by giving the individual child the feeling that society is not necessarily critical or punishing, and that it is interested in trying to help him overcome his situation and, as such, I think Mr. Poe, who is going to give you a synopsis of the actual operation, will help to carry through this point.

One other observation I would like to get into the record, and that is a feeling we had when we started our detention setting, and it is true today. We feel that once a child has been committed to an institution, transfer should be effected immediately. As you probably know, not only in New York City but throughout the country, children remain in temporary detention care for prolonged periods awaiting the transfer to the training schools to receive them.

I wish the Governor was here, because I feel in his administration much has happened to expand the State facilities so that there is greater movement.

But we have had sometimes half of the detention homes filled with youngsters who are awaiting, for months, awaiting transfer. Usually the temporary detention——

Chairman HENNINGS. You have dormitories, professor?

Mr. COHEN. We have, for the most part, individual rooms.

Chairman HENNINGS. Good.

Mr. COHEN. And Mr. Poe will explain our new setting, which is going to be entirely of individual rooms.

I want to emphasize that it is a very critical period in the youngster's life when he is committed, and he should be able to come to grips with the institution to which he has been committed as quickly as possible. We do this with adult prisoners in 24 hours, and it seems

**KR0428**

to me that with children it is even more essential, because they feel they are coming to grips with it, and also they feel that there is nothing for them to gain by remaining in their setting.

Temporary care cannot provide the long-term care, and I think this should be stressed in terms of time.

This leads me again to the final point, and that is, prior to the opening of Youth House, we had children who remained in temporary care for very many months awaiting adjudication.   We feel that this, too, is a very negative and destructive experience for the child, awaiting adjudication.

Following the opening of Youth House, we arranged with the courts that no child should remain in detention for more than 5 weeks pending disposition, and that is now being lived up to to a degree of about 95 percent, and that 5 percent variable is one to be expected because of special situations.

But it also evidences that when there is a focus in that direction, it can be achieved.

Thank you.

Chairman HENNINGS. A very fine statement, Professor Cohen.

I think you are doing more here than any place we have been with respect to the so-called former houses of detention.   We used to see signs over buildings called Homes for the Friendless, Homes for the Incurable, and so on, and you can imagine the feeling of anybody going into a place such as that with that over the door, Home for the Friendless, Home for the Incurables, and I think it applies equally well, with equal force, to the so-called houses of detention.

Mr. COHEN. I want to state Mr. Arthur Popper has been the president of the board of directors of the Youth House, and I want to indicate he was the great encouraging force for me to write the original thesis of the Youth House education, and it was through his efforts and those of Mrs. Ethel H. Wise that I wrote this thesis, and it was through their encouragement that we put it into operation.

Mr. SULLIVAN. May I ask—you mentioned that it was financed publicly but operated by private individuals, private citizens.

Mr. COHEN. That is correct.

Mr. SULLIVAN. May I ask, was it at the beginning that type of an institution?   In other words, was it inaugurated by the city, or by the citizens first and then financed by the city?

Mr. COHEN. Prior to the opening of Youth House in 1944, detention was carried out by the Society for the Prevention of Cruelty to Children.   They operated as a private agency without responsibility to the local authorities.

It was through a discussion with the then Mayor LaGuardia, suggesting this type of setting, and I might indicate that this was only set up for 1 or 2 years as an experimental and demonstration project. It is now completing its 14th year.

Mr. SULLIVAN. Thank you.

Chairman HENNINGS. Thank you very much, Professor Cohen, for your splendid statement and the information you have given us.

Which other of the gentlemen is next?

KR0429

## STATEMENT OF JOHN W. POE, EXECUTIVE DIRECTOR, YOUTH HOUSE, NEW YORK CITY, N. Y.

Mr. Poe. My name is John W. Poe. I am the present executive director, and I have the honor to have followed Mr. Cohen as executive director.

Chairman Hennings. We are glad to have you here, Mr. Poe.

Mr. Poe. I would like to read a statement.

During the current year, ending December 31, 1957, more than 5,000 boys and girls, between the ages of 7 and 16 years, will have spent from 1 day to 5 weeks at Youth House, where they have been sent on charges of juvenile delinquency pending children's court adjudication.

Had space been available, many more children would have been detained.

These 5,000 boys and girls have represented every race, color, and creed. Their offenses have run the gamut from simple truancy to grand larceny, arson and homicide.

Much has been said about the Youth House philosophy of detention care in an institution setting. While we are basically constituted to provide temporary detention care, we have in no manner minimized this objective by the institution of nonpunitive methods of control.

We recognize that many of the boys and girls who come to us approach us with hardened attitudes—but, this is a facade—and is due primarily to their life experiences.

Now, there are two approaches we can use in handling the youngsters who are hardened and defiant:

1. We can meet them at the gang level and fight it out along these lines—with all the explosions that follow; or

2. We can receive them with the basic objective of changing their concepts of adults and authority in which they look upon the adults' attitude as indifferent or punishing. When we have achieved this objective, we have given purpose to making the experience a step in the rehabilitative process.

In our control of boys and groups, it is our feeling that just because a boy comes in with a chip on his shoulder, there is no justification in using violence to bring about conformity. We do try to exercise proper influence to demonstrate that violence does not settle anything.

We have instances in which hostile boys, upon admittance, refuse to be searched. We don't force this issue at the point, but will stand the boy aside. Later, however, through patience, the boy is ultimately brought around to being searched. When this has been achieved, a great step forward has been made toward having the youngster accept, without force, other areas of authority.

It is our feeling that all of these youngsters want to be trusted; want to be liked; want to be useful; and are constantly searching out areas of adequacy. Our program in detention is geared to meet these needs.

KR0430

We know that an individual whose whole life has been disorganized, cannot immediately become an organized person. We recognize that many steps have to be taken to achieve a modicum of conformity when a whole life's pattern has been disorganized.

When we speak of trust, it is difficult to trust when we know there have been serious phases of behavior. And yet, each summer, in spite of some serious deviant behavior problems, from 25 to 40 youngsters have been allowed to go to an outside city playground area each day, accompanied by 5 to 6 recreation workers, and over a period of 5 years, there hasn't been a single boy who has run away.

These boys have gone out of the building since the present facility does not have playground space.

The fact that none of the boys ran away is no accident. It does demonstrate that, in spite of serious behavior problems, we can get them to control their desire to run away, through our being able to get over to them the fact that we do trust them.

Structurally, Youth House is set up departmentally, having administrative, social service, medical, household, custodial, food service, and maintenance divisions. No single division stands by itself, but by the integration of all of our services, which include social service, recreation, and the living situation which are brought together into a central focus around the child, we have thus made our detention facility a child-centered institution. It is within this realm that we have established our rehabilitative process.

The board of education operates a special school within the Youth House setting, known as one of the "600" schools. Although operating as a separate unit, the same basic philosophy of the nonpunitive approach applies. The school and institution over the years have achieved a uniform method of approach in the handling of children in detention. The agency is extremely fortunate in this respect. Members of the school faculty attend and participate in the weekly diagnostic seminar—part of the in-service-training program at Youth House.

Pivotal in the function of the institution is the role played by the professionally trained social worker. It is the social worker who meets the bus from the courts and provides new admissions with an orientation of Youth House in terms of its philosophy, procedures, and program.

Here the new arrival learns what to expect in terms of his own adjustment to a new life experience. But of equal importance to the social worker is the opportunity given to study the reactions of the youngsters that, in some instances, involve diagnostic determination at the point of entry. In some instances, hospitalization is indicated after the boy has been seen by the psychiatrist.

Through these initial meetings with the groups, we may place an older boy with a younger group if he is immature for his chronological age group, or, we may place an overly aggressive youngster with an older group where the situation warrants.

We do not place a youngster on the basis of the offense committed, as this is no criterion of personality structure.

What we try to achieve is a compatible group.

The social worker alerts the entire staff to any significant fact pertaining to a boy upon admission, when such information is obtained.

KR0431

To aid the social worker in providing the courts with studies of the child under care, those staff members having direct contact with the child send in periodic behavior and adjustment reports, and this information is made available to the court, to assist it in making disposition.

We feel that an adequate in-service-training program is basic to the effective and efficient operation of the institution. On that fact, we have utilized the director of our clinical services to conduct the in-service-training sessions. These in-service-training meetings as well as the weekly diagnostic seminars and meetings held at the department level, keep staff abreast of current techniques. The value of these in-service-training meetings cannot be overemphasized.

We hold that an institution without a well conceived program designed to make constructive use of leisure time, will fail utterly in meeting the basic needs of the child.

The leisure time program of Youth House is designed——

Chairman HENNINGS. Where is Youth House located, may I ask, Mr. Poe?

Mr. POE. It is located at the present time at 331 East 12th Street.

Chairman HENNINGS. East 12th?

Mr. POE. East 12th Street. We do have an annex, housing 50 boys, on Welfare Island.

In speaking of Youth House, I might state that also includes the girls. We have a division in the Bronx in which 102 girls are at the present time detained.

Chairman HENNINGS. Thank you.

Mr. POE. The leisure-time program of Youth House is designed to make the fullest possible use of the child's time, within the limited facilities that we have at our command. Recognizing the inadequacy of our present structure from the point of its physical setup, we have made the widest possible use of our swimming pool, gymnasium, arts and crafts program, and music area to help the child to achieve some satisfactory life experience in terms of his own personal capabilities.

Because we recognize that detention represents a traumatic experience in the life of most children and that their interest span is often short, we have designed the kind of program that will enable every child to participate in a many and varied program each day.

When the new Youth House opens at the beginning of the year, it will provide increased residence capacity, all with individual rooms. In addition, our recreation program will be greatly enlarged, because at that time we will have increased recreational facilities including three large playground areas within the facility.

We have given due consideration to the importance of religious education. Representatives of the three major religious faiths minister to the spiritual needs of each child, according to his own religious beliefs. This program is being enlarged and improved by providing appropriate chapels for each of the three major faiths.

I would like to emphasize that we have a Boys' Council, made up of democratically elected members. This is, by no means, to infer that self-government has been established, but we do have a participating group who meets with me weekly as executive director to discuss their problems. This serves as a safety valve, because we are providing an acceptable process to present a grievance, and not resorting to a previous community pattern of destruction.

**KR0432**

The members of this council are elected by their peers and are not to be confused with so-called staff-elected monitors. It is true that in all instances the boys do not make good selections, but often their ability to determine inherent leadership among themselves is remarkable.

Through weekly discussions with the council members, we are able to learn of our weaknesses and our strengths in working with the children. For the child this represents a new experience, but a worthwhile one, for we are giving substance to our expressed interest in the welfare of the children in detention.

It is our feeling that the Youth House philosophy of care, in which the child in trouble is helped to come to grips with his own problems, and from that point to modify his behavior into socially acceptable patterns, is more nearly geared to the child's needs and community's needs rather than in using the institution as a purely custodial or negatively restraining force.

Thank you.

Chairman HENNINGS. Mr. Poe, thank you very much for that statement. It is very enlightening to know that you are doing what you are doing.

I know that in my own city, until rather recently the so-called house of detention was almost adjacent to the city jail, and the children could see the prisoners being held, the adult prisoners being held for trial within a distance of 50 yards, and it was a scandalous thing, and there were no private rooms. There were more or less large dormitories.

And certainly there were no efforts to rehabilitate or to study or to do anything for them except to bring them into juvenile court and make a disposition of the case.

Mr. POE. We try to operate Youth House, Senator, as much as possible as a social agency and not a jail. As a matter of fact, there is no place for uniformed officers of any kind at Youth House.

Chairman HENNINGS. That is wonderful. And, of course, no corporal punishment.

Mr. POE. There is absolutely no corporal punishment, no punishment of any kind, and no deprivation.

Chairman HENNINGS. You have no so-called cells?

Mr. POE. No, sir.

Chairman HENNINGS. Where they are put in solitary, and so on, as they are in some of our penitentiaries?

Mr. POE. As a technique of operation, Senator, when a boy gets into difficulty, he is not handled by the person with whom he has the difficulty; rather, he is referred to a social worker who tries to help him mobilize enough strength within himself to correspond with agency requirements.

So, therefore, there is no threat, because the social worker who has already appeared in the role of giving orientation to this boy has presented herself as his friend; and therefore, when she tries to work out his problems with him, there is a much better chance of bringing conformity than by a punitive approach.

Chairman HENNINGS. Well, by your background, too, Mr. Poe, I see that you have done a great deal of work in this field, and before your coming to Youth House, you were with the Department of Public Assistance in Philadelphia, Riverdale Children's Association,

KR0433

Riverdale-on-the-Hudson, and in 1953 you came in as the director of Youth House.

I think they are very fortunate, indeed, in having you as director.

Mr. POE. Thank you.

Chairman HENNINGS. Our next witness, I believe, Mr. Sullivan, is Mr. Sherwood Norman.

Mr. Norman is the director of the detention services of the National Probation and Parole Association.

Mr. Norman is a graduate of Antioch College. I have two people in my office who are graduates from Antioch College, so I know a little about Antioch.

You study and then work a year and go out and get a job.

Mr. NORMAN. Yes, sir.

Chairman HENNINGS. Get some practical experience.

Mr. POE. Senator, before Mr. Norman starts, I would like to point out that we have the architect's rendering of the new Youth House for Boys that has just been completed, and it is about to be opened, on January 1, and I was thinking probably the Senators might want to take a look at it.

Chairman HENNINGS. Yes, indeed, we would.

I was just going to ask Senator Kefauver if he had any questions, and ask Mr. Sullivan if he had any further questions before we pass on to Mr. Norman.

Senator KEFAUVER. Before Mr. Norman testifies, I think for the record it would be of interest to know how much the new Youth House is going to cost, Mr. Poe.

Mr. POE. The cost of the building itself?

Senator KEFAUVER. Yes.

Mr. POE. That building cost roughly around $5.5 million, with an additional appropriation of $3 million for furniture and equipment.

Senator KEFAUVER. Is it being financed exclusively by the city of New York?

Mr. POE. By the city of New York; yes, sir.

Senator KEFAUVER. It is certainly a great deal of vision that the city has shown.

How many will this new building house?

Mr. POE. I think Mr. Cohen here, who participated in the original architectural drawings, is in a much better position to discuss the intimate details than I, because I came in on it later.

Mr. COHEN. It is set up to provide for 250 boys in the initial base of residence. In addition to the 250 beds, and these will all be in individual rooms, these are two settings for reception of 30 boys who will be maintained in groups of 15, rather than the larger groups of 25, which represents each separate dormitory setting.

In addition to that, there are three special settings for the more disturbed child. They will be maintained in smaller groups. There will be 2 settings for 5 boys each, and 1 for 10 boys.

So that when you know initially that a boy is going to present a more serious problem, you will be able to make this initial placement in a unit of a smaller group where supervision can be carried out on a more intensive level.

I might indicate in addition to that, it is going to have a full medical setup, providing for infirmary with 15 beds.

This gives you a total of 315 beds in the institution.

KR0434

Senator KEFAUVER. This is only for boys, as I understand it.

Mr. COHEN. That is correct, and it is going to be adjacent to what is presently the girls' institution.

Senator KEFAUVER. How large a facility is the girls' institution?

Mr. COHEN. The girls have a facility for a total capacity of 102. At the present time, plans are in the making for the extension of that facility to bring it up to approximately 150.

Senator KEFAUVER. What is the annual budget for Youth House, all of their activities?

Mr. COHEN. I am sorry?

Senator KEFAUVER. The annual budget for the operation of Youth House.

Mr. POE. The present budget is around $1,200,000 for the boys; around $535,000 for the girls.

I would just like to point out for the Senator——

Senator KEFAUVER. That is all appropriated by the city of New York?

Mr. COHEN. Yes.

Mr. POE. Yes.

I would like to point out, these are the dormitory areas. This is area A for 100 boys, 25 on each floor, 75 here.

This is a special services wing of the operation in which is housed the three religious chapels, and all of the activity areas of the boys, such as arts and crafts and metalwork and sciences.

This is a gymnasium and swimming pool in this wing. There is space for 75 boys in this wing, a school, a dining room, and the top floor will house the specially disturbed boys, the boys that cannot be detained in your normal areas.

Chairman HENNINGS. Yes.

Mr. POE. And this is the administrative building here. These are the three outside playground areas.

Chairman HENNINGS. How large is the swimming pool?

Mr. POE. It is a regulation swimming pool, 60 by 120 feet.

Senator KEFAUVER. I might say the reason Senator Hennings asked that is that he is quite a swimmer in our Senate Office Building.

Mr. POE. We would like to invite him down.

Chairman HENNINGS. We have a pool in the Senate Office Building 24 feet long.

Mr. COHEN. I think the record should also show that although the municipality is providing the money for the budget, the present arrangement is for the State to share equally for the costs of the temporary detention; and in place of the local contribution, the city now contributes an equal share for the maintenance of New York City children who are held in the training schools.

Senator KEFAUVER. Is this facility large enough, that is, this new facility, to take care of your needs in New York City?

Mr. POE. Present needs; yes, sir.

Senator KEFAUVER. Present needs?

Mr. POE. Yes, sir. We do not know what tomorrow will hold.

Senator KEFAUVER. Thank you, Mr. Chairman.

Chairman HENNINGS. Thank you very much.

KR0435

Mr. Sullivan, have you any questions?

Mr. SULLIVAN. I have no questions.

Chairman HENNINGS. I would like to say a word about Mr. Sherwood Norman.

Some of us who know something about the National Probation and Parole Association know what magnificent work you gentlemen are doing, Mr. Norman.

Mr. Norman has been with the association since 1945, and as consultant he has helped communities to develop specially designed detention homes of their own.

He has also written widely on the subject, his publications including, Detention for the Juvenile Court, and The Design and Construction of Detention Homes for the Juvenile Court, and New Goals for Juvenile Detention, which are the recognized standards in that field.

He is now completing Standards for the Detention of Children and Youth, which is to be published, I understand, in 1958. Mr. Norman, is that correct?

Mr. NORMAN. Yes, sir.

Chairman HENNINGS. We are very glad to have you here, sir, and we would like to have you proceed in your own manner to testify before this committee.

## STATEMENT OF SHERWOOD NORMAN, DETENTION CONSULTANT, NATIONAL PROBATION AND PAROLE ASSOCIATION

Mr. NORMAN. Thank you. I am very happy to do so, Senator Hennings.

I have a statement which was prepared for the Juvenile Delinquency Conference in Washington 2 years ago, but which has not been published, and I think perhaps is pertinent enough for the committee to make use of.

I am not speaking, then, from a prepared paper. I am just talking informally about——

Chairman HENNINGS. Would you like to put your prepared paper in the record, Mr. Norman?

Mr. NORMAN. Indeed I would. I would be very happy to do so.

Chairman HENNINGS. We will be very glad to have it included in the record and made a part of these proceedings.

Mr. NORMAN. I would also like to include a statement by the National Probation and Parole Association approved by its board of trustees, on Senate bill 1455, and similar bills, to control juvenile delinquency. I do not know whether you have that or not, but if you do not, that certainly should be included in the record. I would also like to submit a statement on juvenile detention I have written for the NPPA and an article entitled "Regional Detention Centers" from the NPPA News.

Chairman HENNINGS. Mr. Norman, without objection these will be marked "Exhibits 8, 9, 10, and 11," and will be made a part of the record of these proceedings.

KR0436

(The documents referred to were marked "Exhibits Nos. 8, 9, 10, and 11" and read as follows:)

### Exhibit No. 8

#### Detention of Children in the United States

Paper presented at Juvenile Delinquency Conference, Washington, D. C., June 28, 1954, by Sherwood Norman, Director of Detention Services, National Probation and Parole Association

Jail and substandard detention care for children is a national disgrace. One hundred thousand children from 7 to 17 are held in county jails and police lock-ups, most of which are substandard for adults. This situation exists in over 2,500 counties in the United States which are too small to justify the construction of a special detention home and in many which have detention homes lacking proper staff and program. Thousands of other children are held in basement cells or behind bars in detention homes which offer nothing more than the cold storage of physical care and custody. The pity of it is that many of these children picked up for minor delinquencies do not require detention at all. As a result, they are thrown in contact with more sophisticated youngsters and pick up their first lessons in crime. If the juvenile courts had adequate probation service, most children would remain in the community under the supervision of a probation officer while awaiting court disposition. Only children who are a danger to themselves or the community or who are almost certain to run away need secure custody.

Still more thousands (over 2,000 in 1 State alone) are removed from unfit homes through no fault of their own and placed in secure custody detention. These dependent and neglected children are often held in detention homes for the convenience of officials or lack of shelter facilities such as emergency foster homes.

##### SPECIAL BUILDING REQUIRED

Detention is a specialized type of care. Improperly given in a jail or poor detention home it can arouse hostilities in youngsters which will backfire against society. To prevent this, a secure but nonjail-like building is called for. It must be fireproof and specially designed but with varied indoor and outdoor activity within a confined setting. The program must allow for visual control since constant supervision is necessary. A detention home building is a waste of taxpayers' money if improperly designed or built too large or too small. Most of them are improperly designed and built too large or too small.

##### TOO MANY ARE DETAINED

The fact is that recent NPPA surveys show many communities are detaining far too many children. Police and probation officers are using detention as a convenient substitute for supervising the child in the community. Often the size of a detention home is determined not by careful study of existing practices, but by current trends in the number of detentions. Thus detention homes gradually grow into larger and larger dumping grounds for the unsolved problems of children and youth.

##### INSUFFICIENT PROBATION SERVICE

National Probation and Parole Association surveys have shown that existing practices and working relationships betwen agencies often need to be revised if the right size detention home is to be constructed. The addition of one probation officer to supervise children in the community costs far less than a 24-hour staff required for these same children in a detention institution. Probation supervision serves the same purpose as bail in the adult court. It stresses responsibility for the child's behavior being assumed by parent and by the child himself, whereas placing the youngster in detention relieves them both of responsibility.

##### DETENTION—A SPECIALIZED TYPE OF CARE

If the situation is so serious as to require the child's detention, no time should be lost, no expense spared, to begin the process of rehabilitation. The detention home does not need to be large, but it must provide more than physical care

KR0437

and secure custody.   We should be willing to pay for specialized care of socially sick kids, as we are willing to pay for hospital care of physically sick youngsters.

To the child, detention care should provide protection from himself, activities of meaning to him, people who believe in him, and skilled help in defining and understanding his problems.   To the court, detention care should provide custody, study, and observation of the more disturbed child.   To the community, a good detention home should give protection from further anti-social behavior and constitute an important first step in changing the direction of this behavior. Good detention care should interpret authority to the child through positive rather than negative associations.   In order to do this, the nature of the building, the personnel, and the program must show the child that while his antisocial behavior is not approved by society, he himself is wanted and respected, not rejected.

The detention period is a crucial experience for a child.   His relationship to adults—to authority—is twisted.   The type and training of detention personnel and the type of detention program may reinforce his hostile attitude toward society—or may lead him to the conviction that authority works on behalf of his best interests.   If the detention experience does not help the child to reinterpret authority he may strike back at society—gun in hand.

### DISTRICT DETENTION HOMES A NATIONAL NEED

How can such detention be given when over 2,500 counties in the United States have from one to a few dozen children a year to detain?  Larger counties can afford to have detention homes, the vast majority must depend on the local jail. There are some counties which use the detention facilities of other counties, but such intercounty cooperation is the exception rather than the rule.

County autonomy is a strong factor in American Government.   However, when specalized serviices are unavailable or impractical at the county level, the State should assume responsibility for providing them.   Detention is clearly one of these services.   Counties of under 100,000 population or having less than 50 children a year to detain should be eligible for child detention services according to National Probation and Parole Association standards.

A small, specially designed district detention home, strategically located with regard to highways and population centers, could serve a group of counties. Each county could pay a per diem varying with the county tax rate.   Such a plan might well be tried in the form of a pilot project and, if successful, extended to all the smaller counties throughout the State.

### OBJECTIONS TO DISTRICT DETENTION UNFOUNDED

Objections to district detention homes have been raised on the grounds that transporting children long distances for temporary care is impractical.   However, this is a relative matter, inasmuch as there are police officers who object to taking children a mile or two from their headquarters, while others consider it routine to transport children who need detention care from 50 to 200 miles in geographically large counties.   A system of district detention homes in the average State should not require transporting children such distances.   Moreover, since most counties are under 50,000 in population, there would be relatively few occasions in which such transportation would be required for detention.

Another objection which has been raised is that the use of a district facility by a number of different county juvenile courts would present jurisdictional problems.   If this objection is valid, these jurisdictional problems would have become evident where district detention already exists.   Such is not the case.   Small counties without detention homes of their own are making use of already established detention facilities in other counties, in such States as New York, Michigan, Virginia, Ohio, and Oregon.   A central detention facility is used in New Hampshire, Rhode Island, and Delaware.   In States where the statutes positively prohibit placing children under juvenile court age in jail, the use of district detention by the various jurisdictions has not been found impractical.

### FEDERAL AND STATE ACTION REQUIRED

The Federal Government and all but half a dozen States have failed to accept any responsibility for jail and substandard detention care for children, which smaller counties can do nothing about.   A State agency ought to be given legal responsibility to accomplish the following:

KR0438