John W. Dillon (SBN 296788)
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KNIFE RIGHTS, INC.; ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P., | Case No. 23-cv-0474-JES-DDL |
| Plaintiffs, | Hon. James E. Simmons, Jr. Magistrate Judge Hon. David D. Leshner |
| v. | **APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| CALIFORNIA ATTORNEY GENERAL ROB BONTA, | |
| Defendants. | **Part III: Bates No. KR0439-KR1044** |

1. Set standards for detention care, provide detention consulting services, State inspection of detention homes with published reports.

2. Provide State subsidies to county detention homes meeting basic recommended standards.

3. Encourage the development of a joint detention home owned by one county, but serving other counties on a per diem basis, by providing a State subsidy for construction.

4. Construct and operate district detention homes for the use of geographically related counties, each too small to justify constructing and maintaining its own building.

We can only expect counties of 100,000 or over to develop approved detention homes and avoid the use of jails until such time as the State establishes approved district detention homes or the Federal Government recognizes that children in our jails is a national disgrace and provides funds to the States to correct it. With a detention home at hand the police soon find it a convenient place to dump children picked up for delinquency. The answer to the problem lies in more active control of detention admissions by the juvenile court and coordinated police and probation practices. Responsibility for detention clearly lies with the juvenile court whose jurisdiction should attach at the time a child is taken into custody, as provided in the National Probation and Parole Association's Standard Juvenile Court Act.

### PLANNING FOR DETENTION

Counties planning to build new detention facilities should seek the professional guidance of the National Probation and Parole Association. As a guide to the steps which should be taken in planning detention homes:

1. Enlist the participation of the community social planning council or a citizen committee, the nucleus of which may later serve as an advisory committee. Planning should involve not only agencies immediately concerned, but related agencies. The detention of children is a community problem and should be met with well-advised community action.

2. Clearly distinguish between detention and shelter care. Provide temporary shelter care (for children who do not require secure custody) in subsidized foster family homes, receiving homes, or in larger communities, small temporary care institutions with supporting casework staff.

3. Secure basic statistical data including existing annual capacity, usual occupancy, and length of stay.

4. Evaluate the policies and practices of the police and the juvenile court as they relate to the use of detention in the light of approved National Probation and Parole Association standards and goals.

5. Examine the adequacy of probation services to see if sufficient staff is available to interview children before they are detained, rather than determining the need for detention after they have already been detained by the police.

6. Examine the adequacy of other community services for children to see where lacks in services have failed to check family and child maladjustments which lead to delinquency and the necessity of detention.

7. Examine county population trends and consider these in the light of reduced use of detention resulting from improved practices and added services where needed.

Extreme variation in the use of detention in comparable communities clearly shows that some police departments and juvenile courts use detention either as a convenience, as a panic reaction to the child's offense, or as a punishing device. In other jurisdictions, if a delinquent child needs to be removed from his home but does not require secure custody, emergency foster homes are used. It is not coincidental that where detention is used sparingly, it is usually found that other social services to children are well developed.

### NEW CONCEPTS

A 2-year survey of detention and shelter care in California soon to be published points out the importance of providing protective services to children while they are in the community before delinquency and parental neglect require court action. Detention homes are necessary. If properly used, properly designed, and properly staffed, they need not be necessary evils. However, we must stop thinking of delinquency in terms of coddling on the one hand or of retaliation on the other. We must see delinquency as a social sickness calling for direct treatment by strengthening family casework and counseling services

KR0439

in the community and strengthening probation and detention services available to the courts. To achieve this goal, a long-term job of public education lies ahead.

---

Exhibit No. 9

Statement of the National Probation and Parole Association, New York, N. Y., on S. 1455 and Similar Bills to Control Juvenile Delinquency

The National Probation and Parole Association is a nonprofit, voluntary, national agency which for approximately 35 years has provided consultation to and made studies of community services and programs related to juvenile delinquency. Through the committee on law of its board of trustees, it has reviewed S. 1455 and several other bills to similar effect and offers the following observations on them.

1. The experience of our association is that these bills would, if enacted, serve a useful and important purpose in the nationwide effort to deal with the problem of juvenile delinquency.

2. There are aproximately 3,500 probation officers serving in juvenile courts, most of them without the essential professional training in a school of social work. The need is for no less than 20,000 officers, properly trained. The committees should consider that our criminal courts also have jurisdiction over youthful offenders. The number and training of probation officers in these courts is as far from the need as is the situation with respect to juvenile court officers. It is clear that since these courts deal with the most disturbed young offenders in our communities, the training of probation officers should receive top priority consideration.

3. With respect to research, it is our belief that what is needed is a basic research plan formulated by the Federal Government, and maintained by it. Under this plan and as a part of it, grants should be made available within the States and to the States. Such a comprehensive approach is not authorized in the present bills. Grants made available as under the present bills would have greater value and meaning as part of an overall plan.

Such a program would have a scope which no single State would be likely to undertake either through its own resources or with Federal assistance. In support and as part of an overall comprehensive research plan, the support to the State research programs would have increased significance.

4. We endorse the grants to the States for assistance in planning and for direct services and special projects, in view of the present backwardness and lack of adequate facilities in many communities.

We stress, however, the need for greatest concentration of Federal funds first for training of personnel, and second for research.

5. In the light of the existing need, it is our view that the proposed appropriations should be increased substantially.

6. We endorse the proposal to establish a Federal advisory council on juvenile delinquency. The advice and interest of a sizable, responsible citizen committee can bring to the Department, at little cost, the points of view of many agencies and individuals carrying a considerable part of the work done to stem delinquency. At the same time, comprising individuals and representing agencies of important prestige, the council would be able to assist materially in public interpretation of problems and remedies.

---

(Supplemental statement submitted by Mr. Sherwood Norman for inclusion in the record.)

Exhibit No. 10

Statement on Juvenile Detention by Sherwood Norman, Director of Detention Services, National Probation and Parole Association

WHAT DETENTION IS

Juvenile detention is the temporary care of children and youth in restricting facilities pending disposition by the juvenile court or their return to another jurisdiction or agency.

Detention is for the protection of the child and the community.

It is not for the shelter of dependent and neglected children.

KR0440

It is not for punishment or retaliation.

It is not for the purpose of rehabilitation, although it should begin the process.

It is not for psychotic children or for those who require longer term clinical study.

It is not for material witnesses who could be held in shelter (unrestricting) facilities.

It is not for the convenience of police or probation officers.

It is not a substitute for probation or other child welfare services.

Juvenile detention is the focal point of delinquency. To it come children with whom parents, teachers, and community agencies have failed. At this point the child's belief in himself is usually shattered or distorted. The detention experience should begin the process of rehabilitation. It can demonstrate to the child a new and constructive concept of authority, or it can contribute to his delinquency by giving him delinquency status and pushing him further from the treatment he needs. It usually does the latter.

### DETENTION IN THE UNITED STATES TODAY

I believe the subcommittee knows that the detention of children throughout the United States today is a national disgrace; that over 100,000 children from 7 to 17 are held in police lockups and in county jails, most of which are unfit for Federal prisoners. It makes little difference whether or not they are separated from adult prisoners. Youngsters get an education in crime behind bars.

Children in jail live in a state of enforced idleness. Often they are placed in solitary confinement. When held with other juveniles they are usually without supervision of any kind so that older, sophisticated youngsters physically and sexually abuse younger children and there is no one to hear their cries. Murders and suicides have occurred as a result of this situation, which is the usual situation for the detention of children throughout the country.

The principal reason for this state of affairs is that in our efforts to localize the treatment of delinquents we have given responsibility for juveniles to courts of lower jurisdiction, the county and probate courts instead of courts of general jurisdiction which would permit State or circuit court coverage. Most county courts cannot get the professional probation and detention services needed to cope with seriously disturbed delinquents.

At least 2,500 counties in the United States have too few children who need detention to justify the construction and staffing of the specially designed, fireproof, secure but non-jail-like detention facilities required. As long as small counties must be responsible for providing their own probation and detention services, we are unlikely to see much change in this situation.

A number of counties have attempted to solve the problem by providing make-shift facilities in private homes, hospitals, county institutions, and courthouses. Nearly all these makeshift detention facilities are either firetraps, children's jails or unrealistic "homes" where the mom and pop in charge are able to hold only the "nice" delinquents, while more disturbed and disturbing youngsters, who most need skilled help, are sent to the jail. The fact is that 95 percent of our juvenile jurisdictions still use county jails or operate childrens' jails known as detention homes.

These facilities fail to offer the detention services necessary to counteract the damaging effects of confining delinquents together at a crucial time in their lives.

Until there is a change in juvenile court jurisdiction, or unless the State participates in developing a system of regional or district detention homes, which will be described later, little can be done to correct the situation in counties of under 100,000 population.

For larger counties there is growing evidence of a more constructive approach to the detention of children. Although these counties represent only 5 percent of the juvenile court jurisdictions, they include —— (sic) percent of the population.

### WHAT NPPA HAS BEEN DOING ABOUT IT

The National Probation and Parole Association has been actively engaged in improving detention conditions since 1945, when it made a nationwide survey of the best detention homes to be found in order to develop some standards in this field. The publications, Detention for the Juvenile Court and Design and Construction of Detention Homes for the Juvenile Court, have been used widely throughout the country, together with direct field consultation services which

KR0441

are offered by the association without charge.  The detention standards stress the importance of special control over admissions, a specially designed building, and professionally directed staff.

During the past 12 years, NPPA detention services have involved State and local detention surveys, field visits, analysis of detention home plans and other forms of detention consultation.  Five significant developments have emerged:

A clearer definition of juvenile detention.
A new type of architecture.
A new concept of program and staff requirements.
Special procedures for controlling admissions.
State responsibility toward regional detention.

### A CLEARER DEFINITION OF DETENTION

A clearer definition of detention as distinct from shelter care has become generally accepted.  The "all-purpose institution" for dependent and neglected as well as delinquent children, under the misnomer of "detention home," is no longer regarded as sound.  To our knowledge, less than half a dozen out of the 100 detention homes constructed during the past 10 years have included facilities for dependent and neglected children.  The definition which introduces this statement is standard.

### A NEW TYPE OF ARCHITECTURE

A new type of architecture has been tested during the past 10 years in nearly 100 buildings, especially designed and constructed for the detention of children. Each new building has replaced a county jail or makeshift detention facility and has, in some respects, embodied the concepts set forth in the Design and Construction of Detention Homes for the Juvenile Court.

Between 1950 and 1957 California alone has spent over $17 million on detention home construction.  The Riverside, Calif., facility won an architectural award.  Lane County, Eugene, Oreg., has just erected one of the finest small juvenile court and detention homes in the country.  Portland, Seattle, and Denver each have new detention homes, while the Midwest has been notable in erecting a number of small 20-bed facilities for boys and girls which have proved successful in meeting sound standards of detention care.  The cost of detention facilities runs up to $25 per square foot, since it is comparable to mental hospital construction.  Twenty-bed facilities, such as found in St. Paul and Minneapolis, Des Moines, Kansas City, Kans.; Canton, and Lorain, Ohio; South Bend, and Monroe, La., cost between $200,000 and $350,000 to build.

Family type detention homes for less than 15 children are recommended for an individual county only as a stopgap measure until regional detention homes serving groups of counties can be constructed.

Characteristic of nearly all the new detention homes is their division into group units of less than 16 individual sleeping rooms adjacent to a unit living area, with at least 100 square feet for each child for quiet, project, and active programs.  These units are designed with maximum visual control, nonjail-like security features and interview rooms for casework and clinical services.  Nearly all of the recently built detention homes have medical and school facilities and a rumpus room or gymnasium separate from the living quarters.

The new detention home in Boston, like New York City Youth House, includes a swimming pool.  Philadelphia was the first large city to construct a detention home for small segregated units of less than 16 children within the same building, but with quick access to centralized dining, school, and activity areas and offices for medical, psychiatric, and casework staff easily accessible to the units.  Toledo has 4 separate group units with a maximum of 11 children in each.

Detroit has a $4½ million building in the planning stage with small sized units and larger activity areas within the units, in addition to centralized activity areas.

Indianapolis is now constructing a unique $2 million, all air-conditioned, juvenile court and detention home, using the same principles of design but in a unique, compact, single-story structure.

A number of the California juvenile halls have also used sound principles of design except that the population of their group units is large, and a spreadout arrangement of buildings or group units makes staff supervision and professional services to children within the units extremely difficult.

**KR0442**

The specially designed, attractive, non-jail-like but secure detention home building is here to stay. Its activity and living areas need to be enlarged and its outdoor play areas need to be better designed and better equipped. However, it has already more than proved its value in providing for better supervision, better program, less tension among the children, and safer working conditions for the staff.

A new concept of program and staff requirements has gone beyond the care and custody function. It is increasingly recognized that children cannot merely be stored for the court. They require more than alert round-the-clock supervision; they require a program with clearly defined objectives. These objectives as promulgated by NPPA are:

1. Physical care and secure custody which fosters growth and minimizes the damaging effects of confinement.

2. Study and observation of the detained child to provide a professional report to the probation department and the court regarding the child's strong points, weaknesses, and needs as observed by the detention staff and interpreted by the detention social worker and the clinical staff serving the detention facility and the court.

3. Satisfying and constructive individual and group activities indoors and out, without which society has little right to take over the function of parents who failed, and without which study of the child in detention is not valid. A varied, well-balanced program of school, quiet and active, and routine and creative activities, without which detention care is likely to be destructive; group discussion adapted to the special needs and capabilities of disturbed children in confinement and preferably under the direction of a social group worker.

4. Individual guidance through social casework which helps the child use the detention experience to better understand himself and come to grips with his problems.

Application of the above standards in terms of staff and program can be best seen in the youth houses of New York City and Newark, N. J. However, other detention homes have made remarkable progress in achieving them.

Public school systems in an increasing number of communities have been accepting their responsibility under the law to provide school programs for detained children, regardless of their stay. Instead of retired or substitute teachers, training in special education is now required in more and more detention home schools. The 12-month program is a reality, and a number of detention home schools have become a special resource for the public school system to develop techniques of handling difficult youngsters.

Good detention schools are reported in New York City, Philadelphia, Detroit, Chicago, Cincinnati, Denver, Los Angeles, and Oakland, Calif. Most of the California juvenile halls have public school programs within them. Special conferences between detention administrators and school principals are held, and there is close cooperation between the detention committee of the State probation and parole association, the State consultant on detention and the State department of education. In general, detention home schools in the caliber of their programs and in their handling of behavior are generally far in advance of the planned activities during the nonschool hours of detained children.

Staff for detention homes is moving away from residential personnel toward the 40-hour workweek. This has added tremendously to the size of detention staffs. (It takes 5 persons to fill 1 position around the clock for 168 hours per week, including vacations, sick leave, national holidays, etc.) It has also added to operational costs. While increase in staff is in line with present-day personnel standards, lack of sufficient increase in salary has tended to lower the quality of personnel and make for considerable turnover. Trained personnel for group counselors directly in charge of children is out of the question for some time, but untrained personnel should be under the close direction of persons with training in social casework and social group work. Except in the very smallest homes this cannot be done by probation officers, nor even by the detention home superintendent responsible.

Most of the better detention homes today employ one or more recreation directors or specialists in such activities as sports, dramatics, music, and arts. Some are secured by volunteers supervised by staff persons. The Essex County Youth House employs two professionally trained social group workers in addition to recreation personnel.

The most significant gain in detention has been the development of treatment services within the detention home and observation and study of the child by trained personnel. This does not mean that the detention home is being used

KR0443

as a treatment resource or as a study home. It does mean that children under juvenile court age, who are sick enough to require secure custody, are sick enough to receive individual and group treatment by the best trained personnel available. It does mean that day-to-day observation of the detained child is evaluated by a qualified person and made available to the probation officer and the court. A child entering the detention homes of Buffalo, Indianapolis, Toledo, and Detroit, as well as the New York and Newark Youth Houses, is assured of the ear of a trained worker within the institution who is not responsible for the supervision of a group or the administration of the detention home. Before behavior problems become acute they are often avoided by careful planning of program, and the judicious use of casework. When behavior crises occur, the caseworker is present within the institution to work through the problem with the child and help him understand himself with relation to it. As gatherer and interpreter of information from the school, group counselor, chaplain, recreation staff, and even the cook, the social caseworker is in a unique position to evaluate the child's strengths, problems, and potentialities. This information is invaluable to the probation officer with whom the detention caseworker frequently confers. The detention caseworker is concerned with the child's adjustment within the detention home, and as part of the detention staff, works closely with the group supervisor. The caseworker's training also makes it possible to identify a child's need for clinical study on the basis of observation within the detention home. With the social caseworker and the social group worker teamed up with a consulting psychiatrist, the treatment or social-service unit in the detention facility is the best guaranty against delinquency contagion. It is also the best guaranty against indiscriminate and damaging isolation—the modern substitute for corporal punishment. More important of all, social service units in detention homes make possible a degree of inservice training not otherwise achieved.

A growing number of detention homes of all sizes have successfully employed one or more trained social workers on their staff, and either employ their own psychiatrist or use court or community clinical services.

It must be made clear that the casework and clinical services in detention do not justify detaining children for study who do not require secure custody. The detention home cannot be a substitute for the longer term diagnostic and treatment center.

### SPECIAL PROCEDURES FOR CONTROLLING ADMISSIONS

Special procedures for controlling admissions are developing—but too slowly. New buildings tend to stimulate the overuse of detention so that many children are detained who might better have been left in the custody of their parents.

Advances in the detention care of children bid fair to be wiped out if juvenile courts fail to take the initiative in controlling detention admissions. Police detentions of 2 to 5 days or longer, in which children are held by law-enforcement officers without authorization by the juvenile court, result in many children being detained unnecessarily. Not only is unnecessary detention damaging to the child in giving him delinquency status and further reason to fight the world, but it fills the detention home with a constant turnover of many as yet unsophisticated boys and girls. When this occurs, the program cannot be geared to the more disturbed youngsters who require secure custody pending court disposition.

Studies of detention practices show that in some parts of the country the number of children detained, including those being held only overnight, is less than 5 percent of the total referred to the court for delinquency; in other sections, with comparable police-to-court referral practice, more children are detained and released than are referred to the court for delinquency. Local custom rather than thoughtful policy appears to be the reason for the difference.

NPPA field studies have shown that where the rate of detaining is high, special probation staff, special procedures, and cooperative efforts on the part of court and law-enforcement agencies can bring the rate down. Fears that some children will not be detained who ought to have usually proved unfounded, especially when effective casework with the undetained youngster is applied. The experience of communities that have low rates of detention shows that nondetained children, like adult offenders out on bail, rarely run away or commit other offenses pending court disposition.

The development of well-staffed intake units within the probation departments of juvenile courts is a recent trend which holds promise for more effective control over detention admissions. Some of these units have personnel on duty or on call after court hours to interview child and parents and determine whether

KR0444

the child should be held in detention or released in the custody of his parents pending court hearing. Where court intake units have worked closely with law-enforcement agencies, a better mutual understanding of police problems and juvenile court practice has resulted.

### DEVELOPMENTS ON THE STATE LEVEL

The large number of counties unable to provide detention services because of the small size of their jurisdictions clearly places a responsibility upon the State. So far only one State, Connecticut, has accepted this responsibiilty with respect to its juvenile court, probation, and detention services. Through its State juvenile court, well-controlled intake to regional detention facilities is provided regardless of the size of the community in which a child is apprehended. Thus, for 15 years the Connecticut State Juvenile Court has never found it necessary to place a child in jail. There is much to be done in this area, for America's lockup complex is tending to make delinquent youngsters indifferent to police arrest and routine detention.

### STATE RESPONSIBILITY AND REGIONAL DETENTION

State responsibility for developing better standards and bringing about regional detention is gaining ground. California has had a State consultant on detention since 1945; Virginia since 1950; and New York has acquired one just this year. Three States, New York, Michigan, and Virginia, reimburse counties for detention care but provide no clearly defined standards of detention for them to meet. Only Ohio has developed satisfactory State standards for detention. California is now in the process of developing them.

Regional detention has always existed whenever one county makes its detention home available to others on a courtesy or per diem basis. However, this is no satisfactory method of providing detention service to small counties. Judges change, detention facilities become filled, and the small county has no appeal if the quality of detention care is poor.

In over 50 years of juvenile courts, 2 or more counties have never yet combined to construct their own detention home, even though permissive legislation in several States has encouraged it. This method of obtaining regional detention appears to be unsatisfactory.

Connecticut, Massachusetts, and Delaware have State-operated detention homes, while Maryland is in the process of constructing one. The Connecticut State Juvenile Court operates its own regional detention homes and is the only State which can boast that it has never had a child in jail during the past 15 years. The Massachusetts Youth Service Board, a State agency, has been given responsibility by the legislature to construct and operate regional detention homes for the use of local juvenile courts. Gradually, jail detention is disappearing in Massachusetts and clinical services are being provided for children detained in regional detention homes so that study may take place before, rather than after, court disposition.

Regional detention raises some questions. Will it hamper police investigation or the scheduling of court hearings? Will the transportation of the few children who need to be detained be too expensive? These problems have been worked out satisfactorily through arrangements with local and State police cooperating with the juvenile court and the State agency. The State's money is better spent on a few gallons of gasoline and sufficient manpower to diagnose and treat youth in trouble than on jail-like detention which cages them as though they were adult criminals.

### NEW STANDARDS

The National Probation and Parole Association's 12 years of experience in detention consultation and study throughout the Nation has been brought to bear in Standards for the Detention of Children and Youth, to be published in 1958. These standards cover admission control, detention care, planning and building detention facilities, and regional detention. They are intended to serve not as a rigid blueprint, but as a guide to communities to help them avoid pitfalls and to plan with the experience of other communities behind them.

The National Probation and Parole Association has worked closely with the United States Children's Bureau and other national agencies in developing the detention standards. They have been subjected to critical review by leading detention home administrators throughout the country, juvenile court judges, and outstanding professional people in closely related fields.

KR0445

## DETENTION AND COMMUNITY PLANNING

Nowhere does a community's detention picture come into focus as sharply as when children are detained for the court. Behind the type of care, behind the rate of detaining, and behind the length of stay, lie the adequacy, inadequacy, or complete lack of related community services for troubled children.

To plan for a detention home without examining the police, casework, clinical, and child-care resources of the community and the State, is shortsighted planning indeed, for there is usually a direct relationship between them and the detention of children.

If citizens have a stake in their delinquency problem, they have a stake in planning services required to meet it. Experience of the past 50 years has shown how unlikely it is to expect any substantial progress without citizen action. We cannot rely on judges or other public officials to do the job alone. Well-informed citizen groups with professional staff for guidance and working closely with the agencies concerned can go far beyond seeing that a good detention home is available. They can make sure that overemphasis on detention is avoided; that the court's probation staff is well-enough staffed to control intake through cooperation with law-enforcement agencies and after-court-hours service where needed. They can make sure that the detention program has specific objectives in its care of children and that a sufficient staff of well-qualified personnel is employed. Above all, a citizens group can rally support for greater State responsibility in setting standards, providing consultation to local communities, and building and operating regional detention homes where satisfactory facilities are lacking. There is nothing which teamwork between well-informed citizens and professionals cannot accomplish but we need to set our sights high. This is the hope of the future.

### FEDERAL AND STATE HELP NEEDED

Experience with 50 years of juvenile courts has shown that we are unlikely to expect substantial progress without informed citizen action. We cannot rely on judges or other public officials to do the job alone. However, citizens are going to need help from the States and from the Federal Government if the blight of jail and cold-storage detention for our troubled and troubling children is to be wiped out. Therefore, any action by the Government of the United States to provide matching funds to States or any other constructive assistance on this problem is respectfully suggested.

--------

(The following article was submitted by Mr. Sherwood Norman for inclusion in the record.)

### EXHIBIT No. 11

[From the NPPA News, January 1957, vol. 36, No. 1]

### REGIONAL DETENTION CENTERS

#### (By Sherwood Norman)

(This is the third article of a series on detention prepared by Sherwood Norman, NPPA Director of Detention Services. The next article, Who Should Be Detained?, will appear in the March issue.—Ed.)

The incarceration of children and youth awaiting court hearings in the United States is a national disgrace.

Nobody knows exactly how many youngsters are confined in jail-like places of detention, but the 1950 census counted 6,681 boys and girls of 18 and under in jail on a single day. Well over 100,000 children awaiting juvenile court hearings are annually incarcerated in jails and police lockups for lack of proper detention facilities.

#### NO MORE MAKESHIFTS

The answer to the problem does not lie in creating more makeshift children's jails—like those often found in private homes, courthouses, homes for the aged, mental hospitals, and even in homes for dependent and neglected children, many of them firetraps—and calling them detention homes. We already have too many detention rooms, secured with a steel door (which has an opening through which to shove food) and bars or heavy screens over the windows.

KR0446

Such jail-like detention makes the hostile youngster more hostile and the withdrawn more withdrawn, and pushes the treatable child further from the reach of treatment. Yet it is no solution to build modern detention homes unless these homes have staff for program, for guidance, and for short-term clinical study.

### STUDY AND TREATMENT PROGRAM

Delinquent children need secure custody. They require not leniency, which causes them to thumb their noses at society; not destructive punishment, which gives them cause for even greater resentment and hostility when they return to the community; not custodial care, which merely holds them in purgatory. They need an immediate treatment program.

This calls for a special building, secure but not jail-like, with sufficient space to invite activity, not to encourage idleness. It calls for professional staff to provide schooling, recreation, clinical services, and guidance. Groups should be kept small, with the children separated by age and problem as far as possible. A report to the court, throwing light on the offender's strengths and potentialities as well as his problems, is important. Few juvenile courts have such detention service.

### THE SMALL COUNTY'S PROBLEM

It is not hard to see why. Our country is made up of over 2,500 small county jurisdictions which detain too few children to justify constructing a specially designed fireproof building, let alone employing the staff required for good detention care and clinical study. Many sizable communities have no trained case-workers, psychologists, or psychiatrists; smaller communities have even more difficulty providing such professional services.

Various "solutions" to this problem of the small county which cannot afford its own detention service have been proposed.

1. Use of the detention homes of larger counties by the smaller counties, on a per diem basis. This type of cooperative regional detention works satisfactorily where a good detention home is conveniently located, willing to share its facilities, and not forced to cut off such courtesy use by overcrowding or a whim of the county administration.

2. Construction and operation of a joint facility by two or more counties. This has never yet been achieved, because intercounty cooperation is so difficult to get. It cannot be relied on to solve most counties' difficulties.

3. State construction and State operation of strategically located regional detention homes—the only practical solution.

### STATE OPERATED REGIONAL DETENTION

This plan, in operation in Connecticut for 15 years, has eliminated the use of jails for children. But Connecticut has a State juvenile court, which can bring equally good judicial and probation services to every community, however small. Is regional detention practical for county juvenile courts?

Vermont, New Hampshire, Rhode Island, and Maryland have allowed their training schools (for delinquents) to be used for children awaiting court hearings. This is most unsatisfactory, but it has proved that a central detention center can serve separate county courts.

Massachusetts is the first State to construct and operate a regional detention home for children awaiting disposition in local courts. Delaware has almost completed a State-constructed detention home; Maryland has one in the planning stage. The objective in each case is uniformly good detention and diagnostic service throughout the State.

Regional detention raises some questions: Will it hamper police investigations or the scheduling of court hearings? How expensive will be the transportation of the few children who need to be detained? These problems have been worked out satisfactorily. The State's money is better spent on a few gallons of gasoline and sufficient manpower to diagnose and treat youth in trouble than on jail-like detention which cages them as though they were confirmed criminals.

Throughout the country busy county judges with juvenile court jurisdiction are forced to sanction the use of jails and jail-like detention for lack of proper regional facilities. Public support from organized groups is needed to assist these judges to spotlight the damaging effects of improper detention.

The State, too, must be jolted into taking responsibility. Special consultants on detention should be employed; statewide standards need to be set up, and no subsidies should be granted to counties unless those standards are met. (At

KR0447

present some States subsidize county detention but do not enforce any standards.)

Only State-operated regional study-detention homes can practically replace improper detention in counties too small to build and operate their own facility. Only informed citizen action is likely to bring this about.

Mr. NORMAN. Any bill in which the Federal Government can help the States to tackle this problem of delinquency is one that we certainly would support.

Now, I was delighted to hear Mr. Cohen's presentation and Mr. Poe's, because I feel in some way Mr. Cohen, through his courage, and I would also say the courage of Mr. Popper and the Board of Youth House, we have been able throughout the country to tell people that some of the theories which we very strongly believe in are actually being practiced, and this is a tremendous help in our work.

Chairman HENNINGS. Not only are they being practiced, but that they work.

Mr. NORMAN. That they work, yes indeed, and more and more communities are developing both buildings and staff and program which are in line with some of the things that are being done at Youth House.

But the problem is tremendous throughout the country, as I know you gentlemen know only too well. The picture is one of 100,000, at least 100,000, boys and girls under the age of the usual juvenile court. New York State has its jurisdiction only up to 16. The other States, about three-fourths of them have their jurisdiction up to 18, and possibly Senator Kefauver's question as to whether this would be large enough was thinking of the States where the jurisdiction goes higher.

Chairman HENNINGS. Yes. In my own State it is 17.

Mr. NORMAN. Yes. It varies a little bit, and sometimes——

Chairman HENNINGS. What is it in Tennessee?

Senator KEFAUVER. Eighteen, I believe.

Mr. NORMAN. Yes. And sometimes it is boys up to 17 and girls to 18, protecting the girls a little longer, and so on.

However, this situation is not just a matter of building more detention homes. It is not as simple as that. Frankly, I do not believe it can be helped very much until the States begin to take some real responsibility for what I think is a national disgrace, to have this many children behind the bars of jails such as pictured here.

Chairman HENNINGS. These are pictures of cells, obviously.

(The photos referred to are on file with the subcommittee.)

Mr. NORMAN. Well, this, if you can imagine youngsters behind the bars of jail cells like this, and some that you really cannot imagine, this is the typical situation in, I would say, 2,500 jurisdictions throughout the country.

Now, I put this high, at what seems to be high. Actually, it is a very conservative figure, because most counties, may I say, are really too small to build their own specially designed facilities.

Senator KEFAUVER. You said 2,500. I think there are only 3,300 counties all over the United States.

Mr. NORMAN. That is correct. But I think you will find that there are 2,500 below the population of about 100,000, and except in exceptional counties, counties below 100,000 population have too few children to justify putting up a specially designed fireproof building, which is required for this purpose.

**KR0448**

Therefore, we have a situation throughout the country as a whole which has developed because, I frankly believe, no one has pointed it out.

The judges, reluctant in some cases to put children behind bars of a jail, are in effect forced to do so when there is no other facility. And, as you may know, several States have State laws that actually forbid—Virginia, for example, which happens to come to mind—placing any child under the age of 14 in jail.

And yet when a youngster of 13 or 12 is a menace to himself and to society, a judge is sometimes forced to place a child behind bars, breaking the State law, which the child has himself broken.

Senator KEFAUVER. On that point, Mr. Chairman, may I ask a question?

Mr. NORMAN. Yes.

Senator KEFAUVER. We found an alarming situation some time back that in most of the jurisdictions, they still either place children, youth, in jails with regular criminals, or, if they do have separate places, they are no different from what you see here, that is, the same kind of facility that you put hardened criminals in.

Has that situation improved substantially within the last few years? Can you tell us what percentage of youthful offenders are put in prisons with hardened criminals?

Mr. NORMAN. No, because there are several questions involved here, one a matter of statistics. We do not even know—we talk so much about delinquency, but we haven't yet, as I know you know, developed the statewide statistics which will tell us exactly what the picture is.

Very few States have developed those.

Chairman HENNINGS. Do you not think, Mr. Norman—we went into that some years ago—statistics on the subject would be so unreliable because of the variable in age?

Mr. NORMAN. Yes.

Chairman HENNINGS. And because of cases being handled outside of court?

Mr. NORMAN. Yes.

Chairman HENNINGS. Or because of adjustments being made at a police station by the family, or political intervention?

Mr. NORMAN. That is right.

Chairman HENNINGS. I am always wary when looking at any statistics on this subject, really.

Mr. NORMAN. Well, except that we can get statistics of any child under a certain age, with perhaps a few exceptions because the child lied about his age, perhaps, we can get statistics to show at least how many entered the jail and were registered in the jail.

Chairman HENNINGS. Yes, you can show that, certainly.

Mr. NORMAN. There are many we cannot show that were held in police station lockups. That is one of the most difficult things. Therefore, our figure of 100,000 is an estimate, and we feel it is a conservative estimate from what our fieldmen have discovered.

Chairman HENNINGS. Yes.

Mr. NORMAN. Going back to this problem you raised, Senator, not only youngsters who are hardened offenders, but children who have not even committed any offense whatsoever—dependent and neglected

**KR0449**

children—are held in jails, and some of them with the hardened adult offenders.

Now, this situation is simply because child welfare services, boarding homes, and so forth, have not been developed, and the jail is the only place of shelter.

Of course, the youngster is not locked up, but being in the corridor of a jail, he is still behind bars.

This is a child welfare problem, we feel. Detention is for youngsters who need secure custody, and I would like to address myself to that. The other is rather a side issue.

Again, I would like to answer one other phase of your question, Senator. Frankly, from what we have seen, we think it is a relatively unimportant matter as to whether a youngster is held with adult offenders or separately. Now, before you raise an exclamation mark, let me explain why.

When youngsters are held separate from adults, they are usually put in the women's division of the jail. As soon as some women come into these small jails, the youngsters are moved out into the adult sections, so that they are almost always at some time going to be held with adults.

The problem of holding youngsters in a separate part of the jail is pretty serious sometimes, because holding them in an entirely separate part of the jail usually means far away from any supervision, even that afforded by other adult prisoners, and you have older, aggressive youngsters of 16 and 17 who have been apprehended for assault, abusing and assaulting younger children, and there is no one to hear their cries.

This is pretty typical. It is not unusual.

I think that what we need to do is to get the children out of jails completely, and I think this is a national concern as well as a State concern, and there are very few States, so far, that have made any move toward solving the problem.

The problem, however, is not as simple as just getting the children out of the jails. If it stopped there, it would be relatively easy. We can always find a house and fix it up, remodel it, and this is what many communities have done, with the result we have jumped from the frying pan into the fire, and we have had youngsters in a firetrap very often, handled by a mom and pop supervisor who lives in the place, who does not have the time, with all the housekeeping duties, to supervise them all the time, and you have this lack of supervision; plus the fact that the more disturbed youngsters who really need the kind of help that is being given at Youth House, and which I am delighted to hear is still carrying on with the program of retaining these youngsters in the program, these youngsters are relegated to the jail.

And we say, "Why not? Why not send off the more hardened offenders to the jail, the hoodlums and the young criminals," they have been called.

Quite frankly, we think, and I am sure Mr. Cohen's observations and others would bear us out, that if there is personnel to work with those youngsters, this is the time to do it, and not after they have become older and really hardened offenders.

We think that to write them off is really a defeatist attitude, and we think that detention homes can be constructed and staffed not only

KR0450

to retain them but to begin the process of rehabilitation with these youngsters.

May I say that the case against jail detention is stronger today than it ever was before because of our knowledge of dealing with these disturbed children. To put them into the jail merely gives them the delinquency status which they themselves crave at the time.

I think that we have to give these youngsters a different type of status, and we cannot do this in a jail cell.

Now, as far as where we go from the jail and how do we develop something other than these makeshift facilities, I do not know whether I can take the time to tell you personally about 1 or 2 of them. Would you care to hear them?

Chairman HENNINGS. I would like very much to hear them.

Mr. NORMAN. For example, one I recall quite vividly, it was in a Midwestern State, was below the ground level, had small windows not more than 10 inches wide, I would say, long, to just above the ground level, barred. The outside of the building was stone around the basement area, but it was a frame building above that.

It was holding dependent and neglected children. They called it a detention home because the children were held for the court.

Actually, it was a combination of child-welfare shelter and a detention facility.

The delinquents were held below ground, behind a door, a steel door, with an opening through which food was shoved. The matron in charge didn't dare to enter the room when there were older delinquents in it. Children of all ages were held in it.

I would say it was not larger than 12 by 18 feet at the most. It had eight Army cots without springs, but with boards which were fitted where the springs would normally go, and very lumpy mattresses, believe me.

They placed in this dungeon children awaiting juvenile court hearing who were supposed to be protected by the juvenile court; and if any of the dependent children upstairs should misbehave a little or get out of line, they were threatened with being put in the dungeon below, and sometimes as young as 7- or 8-year-old children.

Chairman HENNINGS. As it is called in the penitentiary, the hole.

Mr. NORMAN. Right. You will find, by contrast, very nice homes. There are some not too far from this State where mom and pop have everything just like home, just as you would want to see it, and the windows are secured by detention screens, not jail-like, very pleasant

You sort of wonder, though, how the more seriously disturbed delinquents can manage to keep everything in such apple-pie order. Of course, the answer is, they don't. They are down in the jail. The detention home is reserved for the nice delinquents.

We feel that this has got to be changed. It can only be changed by constructing and staffing the kind of detention homes which measure up to sound national standards which we have been trying to develop.

And I am glad to report there are an increasing number of communities that have developed just such homes. They are not houses of detention.

I was out at St. Paul just last week, where they dedicated a new detention home which I just wish you could see. It is a beauty. It

KR0451

is comparable to this model over here, which is not of any particular community, but it is an ideal, a model-type detention home.

This St. Paul facility——

Chairman HENNINGS. Is this one being constructed, or simply a projection?

Mr. NORMAN. This is designed simply to show the principles of designing a small detention home.

Chairman HENNINGS. Yes.

Mr. NORMAN. But there are many that have been constructed similar to it; and the one at St. Paul, I would say, would be at least similar to it, equal to it.

The problem, of course, is in staffing them with the kind of personnel capable of responding to leadership with training in the field of social work. And this is an uphill battle; but here, too, we are beginning to develop detention homes throughout the country which are approaching the kind of standards that Frank Cohen and Youth House have developed here.

I think maybe we might even be exceeding it in some respects, for this reason: That we have been very strong on keeping the groups that live in the dormitory—which, by the way, individual rooms is our standard, too—to a maximum of 15 children. There is one being built now in Akron, Ohio, where five girls, as you may remember, murdered a matron several years ago.

We made a survey there, and the bond issue for $1,500,000 was passed, and the building is now being designed. The maximum capacity will be 12.

Chairman HENNINGS. What is the source of your funds, Mr. Norman?

Mr. NORMAN. Our funds are primarily from private sources, individuals who are members of the association and contribute small amounts. We have about 30,000 small contributors.

Chairman HENNINGS. I contribute to a group known as the Missouri Association for Social Welfare which has the same objectives. Do you know anything about that group?

Mr. NORMAN. No; not except as it is a local organization, whereas ours is national.

Chairman HENNINGS. Yes. This is a State organization.

Mr. NORMAN. And social welfare, of course, would cover a great range of activity.

Chairman HENNINGS. They are specially interested in this problem of jails and detention homes.

Mr. NORMAN. I am very glad of it, because in Missouri there is 1 community, I cannot name it right off, but I know I would recognize it if you would name it, which has planned its new facility for 9 other counties to use on a regional basis, and I wanted, before I closed, to bring out this possibility as a solution.

Many people have suggested that several counties could combine and build a facility. This has never come about in 50 years of juvenile court. There are a few counties in northern Virginia that have the money set aside and are trying to find a site to do it.

To my knowledge, this is the only place in the country that has ever done it. California has had a law enabling counties to do it;

20873—58——6

KR0452

it has never taken advantage of it.   So they have a detention home on one side of the river, and another one on the other, and each county has its own.

The next possible step is this idea of being generous and opening a detention home to the use of surrounding counties.   Lynchburg, Va., now is having a survey to determine if this is possible.

However, there is—it has been done in many cases.   However, it is not satisfactory, because judges change, the detention home gets filled up, and the situation is something over which the participating counties have no control.

So, we do not think this is any real solution to the problem.

We think the only solution can come through some State participation:

First, by establishing a consultant and standard-setting services on the State level.

At present there are none.   California is trying to develop them. They have had a consultant for some time, and I am happy to report that New York State now has a consultant on detention.   Unfortunately, the salaries paid are not as high as they should be, but still these people are doing a fine job, and it is a step.

However, setting standards and providing subsidies, as is done in New York and Michigan and Virginia, does not solve the problem. It seems to me we must look to the State to actually construct and operate the regional detention facilities at strategic points throughout the State for the use of those counties too small to build and operate their own.

This is practical in the sense that it is now being done in the State of Massachusetts; Maryland now has a detention home under construction or just about to be under construction; Delaware, I believe you know, has one.

Chairman HENNINGS. Yes, I know.

Mr. NORMAN. And Connecticut has for 15 years kept children out of jails through the use of its regional detention homes.

The State of Utah has a detention home which is not State-operated, but it shows that even 150 miles away, counties are willing to send their youngsters to a satisfactory detention home instead of keeping them in their local jails, and it has worked.

So we think that anything the Federal Government can do to stimulate the development of State initiative in this area in which counties are too small to develop their own detention homes will be a very real contribution.

You may have other questions.   I could talk a great deal about some of the standards.

Chairman HENNINGS. I am sure you could, Mr. Norman.

Mr. NORMAN. I know the time is short.

Chairman HENNINGS. We would like to hear from you for several days if those days were available.

The Chair is compelled to make this announcement with relation to the witnesses to follow: that we are running quite far behind, and we appreciate so much that all of you have come here to give us enlightenment and help and guidance.   If I may make this suggestion: if the statements are in writing, prepared texts, they can be made a part of the record, and if we could limit—I do not like to set an

arbitrary time limit on witnesses, but we have eight more witnesses scheduled for today, so I would just beseech other witnesses to bear in mind that fact, that we are going to be here 3 days, and we are trying to get as much as we can into the record, and we appreciate all the enlightenment, as I say, that you have given us.

We could talk about this for days and even weeks, indeed, and learn much from all of you. Unfortunately, time does go along.

How far behind are we, Mr. Sullivan?

Mr. Sullivan. We are somewhat behind.

Chairman Hennings. Gentlemen, thank you very much. I want to say on behalf of the committee—Senator Kefauver, do you have any questions to ask these gentlemen, any further questions?

Senator Kefauver. I do not think so. Mr. Popper is here, and might like to say a word.

Mr. Popper. I just want to express my thanks to you for permitting Mr. Cohen and Mr. Poe to present our philosophy of detention care to you for your consideration.

Chairman Hennings. I had understood, Mr. Popper—I did not mean to be rude—I had understood that you were at the table in your capacity——

Mr. Popper. It is quite all right.

Chairman Hennings (continuing). As chairman——

Mr. Popper. I was not needed.

Chairman Hennings (continuing). But you were not to make a statement.

Mr. Popper. Mr. Cohen and Mr. Poe are well qualified.

Senator Kefauver. You are chairman of the board of directors, just backing up your men; is that the idea, Mr. Popper?

Mr. Popper. Yes, that is right.

Chairman Hennings. You are doing a splendid work, gentlemen, and we are most grateful to you for coming and giving us this inspiration and information.

Our next witness, Mr. Counsel?

Mr. Sullivan. Would Mr. James R. Dumpson please step forward? Mr. Dumpson was here this morning, and in view of the fact time ran out, we were not able to hear him.

Chairman Hennings. I am sorry, Mr. Dumpson.

As you see, these things go along, and people ask questions, and we all become very much interested in what all the witnesses have to say.

Mr. Dumpson. I understand perfectly.

Chairman Hennings. And I am sorry you had to return this afternoon, having been here this morning.

You might tell us something about yourself, Mr. Dumpson, and then make such statement as you can give us.

I know that you have written articles, I know that you have been assigned by the United Nations as adviser and chief of training in social welfare to the Government of Pakistan.

Mr. Dumpson. That is correct.

Chairman Hennings. And that you are now director of the bureau of child welfare, and have been since March 1955.

Mr. Dumpson. That is right.

KR0454

## STATEMENT OF JAMES R. DUMPSON, INCOMING FIRST DEPUTY COMMISSIONER OF WELFARE, NEW YORK CITY

Chairman HENNINGS. We are very glad to hear from you, Mr. Dumpson.

Mr. DUMPSON. Thank you, Mr. Chairman.

I think, Mr. Chairman, the quickest way for me to submit my statement is to read it, which will not take more than 10 minutes.

If I try to do it otherwise——

Chairman HENNINGS. You proceed in your own manner, Mr. Dumpson.

I do not want to set any arbitrary limit on any of the ladies and gentlemen who have been good enough to come here and help us in these hearings.

I just wanted to call your attention to the fact that we do run short of time because we have only 3 days, and many, many witnesses.

Mr. DUMPSON. Thank you.

Chairman HENNINGS. That does not apply to you, sir.  I am not singling you out.  Counsel just reminded me we were running way behind time.  Please proceed, sir.

Mr. DUMPSON. In submitting to this committee this statement on one of the major contributions of the New York City's Department of Welfare in the area of prevention, I believe it is important to summarize our conviction about the propriety of our role in delinquency prevention.

We are committed to the proposition that sound family life and living is one of the most effective resources for preventing juvenile delinquency.  It is the family that initially transmits to children the bases for behavior reactions, social attitudes, and ethical values.  It is also the family, in the first instance, that is the incubator of the social and emotional stress that eventually lead to behavior which we call delinquent.

In New York City, our youth board has established that 75 percent of our delinquent children come from only 1 percent of all the families in this city.  This fact alone dramatizes the importance of turning to the family unit if we are to hope to succeed in preventive efforts.

The New York City Department of Welfare has a considerable degree of responsibility for 137,164 families with over 150,000 children. For 127,000 of these children—almost all of them are under 16 years of age—we provide the financial assistance that assures to them basic creature comforts.

When one thinks of the problems that daily confront these families in double trouble or double jeopardy, one realizes that to the families themselves their difficulties must at times appear to be triple travail or quadruple quandaries even into the third and fourth generations.

We believe that the city's public welfare department has an opportunity, indeed an obligation, to administer services designed to rehabilitate and strengthen socially healthy family living, to prevent family breakdown, and to assure for these 150,000 children protection against social and emotional damage—the kind of damage that most generally precedes antisocial behavior.

This conviction leads us to urge that all levels of government participate in assuring that the public welfare program in New York

City has the variety of resources—adequate counseling staff, adequate assistance grants, and the complementary housing, health, and employment services to translate into effective services our conviction about our broad responsibility to the families we are called upon to serve.

This conviction about the preeminent importance of the family in prevention of social illness, of which juvenile delinquency is but one manifestation, led us to take steps to make more effective the efforts of all public agencies in dealing with the multiproblem families in New York City.

The creation by the mayor of his interdepartmental committee on multiproblem families on recommendation of the commissioner of welfare was the result of several specific attempts by city departments to reverse total breakdown among a group of families in private housing developments and in public housing projects. In one, the initial action was taken by the city department of buildings when complaints were received of tenant destruction, misuse, and failure to use properly the property.

Study of the situation clearly revealed that the tenants, many of whom were receiving public assistance, had problems that not only resulted in misuse of the property, but that threatened the health and welfare of the entire community.

The close working together of the departments of buildings, welfare, health, sanitation, police, education, and the landlord and the local voluntary agencies, was clearly indicated. Leadership responsibility for coordinating rehabilitation activity with this group of troubled and troublesome families was accepted and continues to be carried by a neighborhood settlement house in the area.

In the public housing project, impetus for coordinated activities with the problem families came from a detailed study done by the Citizens' Housing and Planning Council of New York. After an assessment of the special needs of the problem families in this project, all of whom were threatened with eviction as undesirable tenants, major responsibility for coordinating the joint efforts of a number of public and voluntary agencies with the housing manager was assumed by our department. In each instance, important conclusions became apparent for work with the seriously neglectful, deteriorating, disintegrating families, and it is these conclusions which we think have significance for other public welfare departments throughout the country.

1. That in no instance was housing, health, moral standards, or neglected children a single problem. Rather, we found that these families had a multiplicity of serious, interrelated problems, the overt expression of which might be, for example, vandalism, or juvenile delinquency, or alcoholism, or marital problems. In other words, these were people and families in double trouble. The need for the concerted action of many agencies with a variety of services became quite apparent.

2. That these were families who had been known to a number of voluntary and public social agencies, each of whom had focused on a part of the family's difficulties, but all of whom had repeatedly failed. The single agency approach did not reach the multiplicity of needs of these families. Information regarding families varied from agency to agency to the extent that the same family was often not

KR0456

recognizable when presented to a committee of the agencies. We also discovered a deflection of the services of the agencies because there was a deplorable lack of primary responsibility on the part of any one agency for coordinating help to the family.

3. That, in the public interest, and to make truly effective the preventive and rehabilitative service of the community, primary initiative, in most instances, had to be taken by one agency.

As a result of the department of welfare's experience with the two mentioned projects, Welfare Commissioner Henry L. McCarthy recommended to Mayor Robert Wagner the establishment of the interdepartmental committee. The mayor's committee, established in February 1957, under the chairmanship of the commissioner of welfare, included the appointed heads of 12 city departments: health, education, housing, police, courts, hospitals, buildings, parole, youth board, mental-health board, and the president of the city council.

By the mayor's directive, the committee was to do three things:

1. Determine the method whereby the city agencies could sharpen and make more effective their coordinated efforts for the multiproblem families.

2. Marshall all community resources—voluntary and public—in a coordinated effort to obtain the most immediate and essential services for the multiproblem families.

3. Assure a minimum of duplication and to focus the effort and energies of all concerned toward those areas where the problems are greatest and the need for the service most acute.

The committee has been in operation, as I have said, since February, and they are working in the following manner:

1. Develop principles for designating the agency which would assume primary responsibility for coordination in each situation.

2. Reemphasize through inservice training programs the absolute necessity of coordination on the level of the workers of agencies who have direct contact with the families; i. e., the public health nurse, the hospital medical-social worker, the social investigator in the department of welfare, the school representative or child guidance worker, the manager of a housing project, the worker from the youth board, the worker from the police department's juvenile-aid bureau or PAL, the probation or parole officer, as well as the various workers from the voluntary agencies and the churches.

We believe that identification of and help to these families, to be effective, must be organized on the local neighborhood level of the families.

3. The mayor's committee, therefore, set up a coordinating and review committee in each of four boroughs which—

(a) Identify the families most acutely in need of multiservices;

(b) Identify the specific problems of these families;

(c) Determine the plan of action in each situation;

(d) Evaluate the effectiveness of the plan; and

(e) Report to the mayor's committee their findings and results.

The overall mayor's committee receives and evaluates reports from the borough committees and takes the appropriate action which falls within their jurisdiction and makes appropriate recommendations to the mayor and his committee.

KR0457

It was understood at the outset that cases referred to the committee would receive priority treatment by the participating agencies. There was recognition that mistakes and failures of the past would probably emerge with great clarity in the light of current review. But assessing blame or creating guilt feelings about past activity on the part of the agencies is not a function of the committee.

The borough committees meet biweekly in each borough for 3½ to 4 hours. Each committee includes a representative from each of the public departments on the mayor's committee, under the chairmanship of a staff member of the department of welfare. The representatives are empowered to act for and to commit their departments in whatever plan of action is agreed upon in dealing with a family. Voluntary and other community representatives are invited to meetings, as indicated, when cases known to them are under discussion.

All agencies may present for review, discussion, and action families that in the judgment of the individual agency represent a threat to themselves, their children, and therefore to the community. Prior to presentation of a case, each committee member receives a written statement from the secretary, who is a member of our staff, giving the identifying information on the family, and prepares a review of his agency's information and experience with the family.

After full discussion of all available information on the family, plans are evolved for followup action. Clear-cut responsibility is assigned to each agency, and one agency is designated for the primary role in the coordination of the activity. A definite date is set for all of the agencies to report back to the committee.

This structure assures that top priority is given to these so-called hard core families in the utilization of the agencies' service; that the agency representatives can responsibly commit the agency and its services in a plan of action; and that there will be continuity of committee personnel regularly attending the meetings.

The number of cases considered to date is relatively small and the time the committee has been in operation is short.

However, it is abundantly clear that agencies serving these hard core, delinquency producing families, can be effective if their services are coordinated within a total treatment plan.

To be sure, the effort has many problems to resolve: How to give treatment priority to a group of families and not neglect other families which, without help, may become multiproblemed; how to secure and retain the quantity and quality of staff in public departments required to deal effectively with families presenting the most serious and crucial of human difficulties; how to assist families who must continue to live in inadequate housing; how to rehabilitate families who are required to live on a basic budgetary allowance which does not include the items frequently necessary for reversing family tension and disintegration.

Notwithstanding these problems, we are convinced that the Interdepartmental Committee on Multiproblem Families is a most effective and proper way to make the maximum use of public health and welfare services in getting help to families whose continued failure in healthy social living will continue to place greater and greater drains on the communities' resources in terms of delinquency, crime, destruction of property, increased illness rates, alcoholism, narcotic addiction, as well as the loss of human productivity.

**KR0458**

These are the families who produce the major percentage of delinquency incidence in New York City; these are the families which have top priority in our efforts to prevent juvenile delinquency.

The treatment of juvenile delinquency is important, but equally if not more important is its prevention.

We have never given the kind of recognition to strengthening and supporting healthy family living that it deserves in our country. Herein lies one of our most effective measures for delinquency prevention. Crash programs may be needed to stem a crisis.

But, in the long run, in terms of economy of human and material resources, in terms of demonstrated effectiveness, prevention of delinquency must rest on a broad community program of health and welfare services for families and children.

Government must assume the leadership in assuring that every community has immediately available to its citizens adequate coverage of the services required to stem the tide of delinquency and other antisocial behavior which threatens to overtake the entire family.

To the extent that we are able to reduce the number of neglectful, inadequate families with their multiplicity of social, economic, and emotional problems we shall reduce the number of children and youth whose behavior we classify as delinquent.

Chairman HENNINGS. Thank you very much for your appearance here today, and I would like to ask Senator Kefauver if he has any questions to ask Mr. Dumpson.

Senator KEFAUVER. No. I have enjoyed Mr. Dumpson's statement very much. It will be very useful to the committee.

Chairman HENNINGS. It is very enlightening, and you have been of great help to us.

Mr. DUMPSON. Thank you.

Chairman HENNINGS. Thank you for coming, Mr. Dumpson.

The next witness, Mr. Counsel.

Mr. SULLIVAN. Will Mr. Ralph Whelan come forward, please?

## STATEMENT OF RALPH WHELAN, EXECUTIVE DIRECTOR, NEW YORK CITY YOUTH BOARD

Mr. SULLIVAN. Mr. Chairman, Mr. Whelan is going to make a short statement, because he has another engagement this afternoon and has to leave.

Chairman HENNINGS. We appreciate your coming today, Mr. Whelan.

Mr. WHELAN. It is good to be with you.

Chairman HENNINGS. I ask that this organizational chart of the New York City Youth Board be marked "Exhibit No. 12" and be made part of the record.

(The chart referred to was marked "Exhibit No. 12" and faces this page.)

Mr. SULLIVAN. Mr. Whelan is the executive director of the New York City Youth Board, and in that capacity is very close to the overall delinquency picture.

Mr. WHELAN. There are other members of my staff here who are going to be witnesses, also, Senator, so they can fill in details.

Chairman HENNINGS. I understand so.

KR0459



**KR0460**

JANUARY, 1957

Mr. WHELAN. We appeared at your hearing in 1953, and at that time I outlined the Youth Board's many-faceted approach to the problem of delinquency.

Chairman HENNINGS. I remember that you testified at that time, Mr. Whelan. You may proceed.

Mr. WHELAN. As you know, basic to our work is the early detection of children and young people in trouble and the provision of a battery of services to meet their revealed needs. At the heart of our philosophy, since our inception, has been our determination to "reach-the-unreached," to treat the hard core of juvenile delinquency.

We are now operating in New York City's 14 areas of highest delinquency with a program which is across the board, serving the individual, the family, the group and the community. Our experience in meeting fundamental human needs has shown that the fountainhead of juvenile delinquency can be found in a small minority of delinquent families. Our studies, which have been substantiated by research in many parts of the country, indicate that this group must be reached and helped if lasting progress is to be made against juvenile delinquency.

In New York City, our research reveals, fewer than 1 percent of the families make up the hard core responsible for some 75 percent of the juvenile delinquency. These families are characterized by such problems as alcoholism, mental illness, desertion, promiscuity, gross physical ailments, severe marital discord, gross neglect, and behavior patterns of delinquency and crime in one or both parents and the older children.

Resistance to help have prevented the community's many agencies from giving them adequate or effective service.

These families are known to a variety of agencies, the major of which are courts, police and welfare department; some have been in contact with as many as 15 agencies. Often, however, they have fallen between the various services which are striving to help them, or become lost in a jungle of social services because of the lack of centralization of responsibility for meeting their multiple needs.

To make possible the fixing of responsibility for serving each of the families in the hard core, the Youth Board is setting up a register of multiproblem families. Moving promptly to meet the urgent needs of these families, we have entered into contract with the city's leading family service agencies to help us concentrate on this group.

The Youth Board's own demonstration project, service to families and children, established to determine how best hard core families could be helped, has recently been transferred, just this past week, to the Department of Welfare and will serve multiproblem families in high delinquency neighborhoods.

The concept of hard core is not limited to our work with families. Our experience with teen-age gangs has shown us that out of an average membership of 30 in a fighting gang, the hard core can range from 1 or 2 to 5, or so. Like the hard core of multiproblem families, these individuals, identified by our gang workers as the leadership, must be reached before the destructive activities of the gang can be redirected into positive action. This involves location, identification, cultivation, stimulation, guidance, and direction.

KR0461

The end result is reconciliation of the gang to the community and the salvaging of its members for constructive, contributing lives as normal, adjusted citizens.

Later, staff members of the Council of Social and Athletic Clubs, the Street Club project, will present in detail the operations—the "how" of this project which is serving on the frontiers of social work.

At this time I should like only to indicate its overall scope and direction by telling you that we are currently working directly with 60 fighting gangs and are in contact with 15 to 20 others. Further, that in the last 2 years there have been no gang wars between the groups with which we are working.

We look forward to the day when we can also reach out to the many unaffiliated groups who hang around the streets and possess by their very idleness and lack of direction the potentiality of becoming fighting gangs.

As you gentlemen know, another important facet of our program is contracting with group-work and recreation agencies in the community settlement houses, community centers, boys' clubs, and others, to take on additional young people for service. As in the other segments of our program, our interest is in reaching the individuals and groups who have not been served in the past.

In this area of service it means involving in the program of the agency the loose-end, hang-around, aimless youngsters who, up until the present, have not been attracted to or interested in the types of programs offered to them.

It is a pleasure to be able to report that a recent survey has indicated that the agencies in contact with the youth board are succeeding in this aim and that the young people in youth board-supported programs are the kind which our agency was set up to serve.

While our programs of intensive professional service to children, young people, and families in need of help have been evolving, developing, and gaining in scope and effectiveness, it has become increasingly clear to us that the fight against delinquency must ultimately be won by the united and wholehearted effort of the entire community.

We have, therefore, expanded the work of our department of borough planning and community coordination which stimulates and encourages citizen groups in the local communities to identify individual neighborhood needs and to formulate programs to meet them.

Also involved in this project is the participation, on a neighborhood level, of young people themselves in helping to plan and work for the prevention of delinquency and the elimination of situations which lead to youth crime.

In the area of coordination and planning, the youth board also had its citywide planning and coordinating unit. Through committees of outstanding professionals and laymen, this unit brings great skill and experience to bear in pinpointing the problems of the total community conducive to delinquency and assesses its resources to cope with them. The areas with which the citywide unit is currently dealing are: the multiproblem family; group work and recreation in high-hazard areas; jobs and rehabilitation for hard-to-reach and hard-to-place youth; problems of changing neighborhoods and shifting population; the role of the volunteer in delinquency prevention; the role

KR0462

of religious groups in delinquency prevention and control; and problems in the area of protective and correctional services.

Three recent and representative projects to come out of the deliberations of the committees are:

The establishment of a pilot vocational-guidance and job-placement unit for young people in one of the city's high-delinquency areas which goes out to the difficult-to-place individuals and groups which most need its services. This unit is specially designed to overcome negative and rejecting attitudes toward employment and to help young people make adjustments not only to work but to community life in general.

Further, there has been the organization of citizen groups in three typical changing neighborhoods in different parts of the city to aid newcomers and oldtimers in learning to live together and plan together for the continuing welfare of their community.

Also, there is our project studying ways in which community volunteers can be utilized to supplement the work of trained personnel in leisure-time agencies serving young people. It is anticipated that this study will produce a blueprint setting forth the best methods for recruiting, training, and making use of the services of interested citizens.

Last week, at its November meeting, the youth board approved a proposal of one of its committees that a pilot camp be established which would offer a sound rehabilitative setting to serve youths between the ages of 16 and 18 years.

The program of this camp would provide guidance and counseling with appropriate recreational and educational programs to complement and supplement the work program. In the rehabilitative treatment of these youths the moral and spiritual values would be stressed. This program would be geared to meet the needs of 50 boys between the ages of 16 and 18 years who are on the threshold of delinquency. The camp would be staffed by highly qualified personnel in the fields of education, medicine, psychology, psychiatry, recreation, and social work.

The youth board considers this proposal as part of a sound coordinated program for the care of children and youth between the ages of 16 and 18 years particularly—those for whom few services and facilities exist and who require help and ofttimes placement away from their deplorable home conditions.

As the youth board looks to the future, it is guided both by the experience gained in a decade at the forefront of the city's delinquency prevention effort and by a comprehensive program of action research. Through research we keep a constant check on the needs of the community and the efficacy of our various programs. We sharpen our tools and refine our methods; we open new paths of service.

Currently, our research department is maintaining its index of youngsters in trouble which helps us to determine where our efforts should be concentrated. It is studying the operations of our street club project to learn more about why young people join gangs and how their negative activities can be controlled and rechannelled. The multiproblem family is under its careful scrutiny and, having completed a study of the characteristics of this hard-core group, it is examining new ways to reach and to help it.

KR0463

A progress report has just been published on one of its most far-reaching projects. During the past 4 years the youth board has been giving the first widespread application, as a predictive device, the scale developed by Professors Sheldon and Eleanor Glueck, of Harvard University.

This scale is based on family relationships in the home. It can, according to our half-way report, serve as a social Geiger counter to ascertain in advance those children and families most in need of preventive services before serious trouble develops.

I have presented the youth board's program in brief outline. The problem of juvenile delinquency continues to be complex and deeply rooted. No single approach can hope to have, in isolation, a significant effect. But a total, many-faceted, coordinated program, such as the one which the city of New York, through its youth board, is conducting, will, we are confident, more than justify the cost, the countless hours, and the limitless devotion, dedication, and hard work which are being invested in its young people.

We feel we are moving more in the direction of pinpointing and isolating the hard-core group of families, youth, and even hard-core communities, that are responsible for the major proportion of our delinquency problem, and it is in this area that we are moving at this time.

Chairman HENNINGS. Thank you very much.

Mr. SULLIVAN. May I ask a question with respect to the operations of the youth board?

Have they approached somewhat the ideas that Mr. Kahn expressed, that Professor Kahn expressed this morning?

Mr. WHELAN. I am sorry, I was not here.

Mr. SULLIVAN. As far as an index——

Mr. WHELAN. We are developing an index at this point.

Mr. SULLIVAN. Of multiproblem families?

Mr. WHELAN. Of registered multiproblem families in the youth board, for the purpose of fixing responsibility for the service to these families; yes.

Chairman HENNINGS. We are very grateful to you for coming, Mr. Whelan.

Mr. WHELAN. Thank you, Senator.

Chairman HENNINGS. I want to compliment you on behalf of the committee for the fine work you are doing, and for the work you have done, and you are a dedicated man in this field.

Mr. WHELAN. Thank you very much.

Chairman HENNINGS. Senator Kefauver, would you like to make a statement?

Senator KEFAUVER. I just want to say it is good to see Mr. Whelan again. He is keeping up his enthusiastic interest and doing a lot of good.

I remember your testimony some 3 years ago when you moved on from that point.

Mr. WHELAN. Thank you very much, Senator.

Chairman HENNINGS. Thank you very much, Mr. Whelan.

KR0464

Mr. Sullivan. The next witness will be Dr. William Jansen, superintendent of the board of education.

Chairman Hennings. Dr. Jansen, we welcome you here on behalf of the committee, and we would be very glad to hear from you on any phase of this subject you care to discourse upon.

## STATEMENT OF DR. WILLIAM JANSEN, SUPERINTENDENT, BOARD OF EDUCATION, CITY OF NEW YORK

Dr. Jansen. Thank you, Senator Hennings.

I shall try to be brief, and for that reason I am not going into an introductory statement, but right to the things we are concerned with in our schools.

I think we all know that delinquent children and potentially delinquent children are somewhat frustrated children. They have the same intentions as do other children. They want affection, they want somebody to trust them, they want a feeling of success.

And so in our schools we try to adapt a curriculum to these children so that there is a chance of their achieving some success in their classroom work.

Our attendance officers are not truant officers in the old sense of the term, but they are rather more like social workers. They seek in a sympathetic way to find the cause of absence from school.

We have a bureau of child guidance with social workers and psychiatrists and psychologists. We wish it were larger, but to the extent that we have it, we do try increasingly to get at the children at a younger and younger age.

Mr. Whelan mentioned the Glueck study which is carried on in several of our schools where we hope to get some criterion that will predict the kind of child who is likely to become delinquent.

We have an interesting program with somewhat older children. There are many of these disturbed children who may become delinquent who feel that if they could only go out and work, they would be all right.

So during the past year, we have set up a program where we have some of these boys working on a cooperative program. A cooperative program is a program where the boy goes to school 1 week and goes to work the other week, and the 2 boys work as a pair. One is always in school, and one is always at work.

In all these cases, we have first gone to the employer and have informed him that these boys that we are sending him are boys who are not up to average in every respect, that they are troubled youths, and we ask him to put them under the wing of some very understanding member of their staff. And it has worked very well.

Some of these boys, after being on this part-time cooperative plan, have decided that school is not so bad, and they have gone back to full-time schooling. Some have gone to full-time jobs in the places where they were tried on this experimental basis.

I think one of the activities that you want to hear about, in fact, it was mentioned in one of the letters to me, was the school of the P. S.

KR0465

600 group. These are schools for youngsters for whom we do not have all the facilities in the regular day schools, but for whom we can supply facilities if we bring them together in one school.

We have 2 kinds of 600 schools. We have those where the young people—the boy comes in the morning and goes home in the afternoon, just as he would in a regular day school. In these schools we have very small classes. We have shop experiences for these youngsters, we have counselors, to a limited extent we have social workers and psychologists, not to the extent we would like to have them.

And we hope somehow, somebody will catch on with this youngster and the youngster will feel that there is somebody who is interested in him.

In addition, in these schools we try to get groups of people who take an interest in these boys outside of school, because that is where their trouble is, and in 1 school here in Manhattan, the New York Rotary Club has taken a tremendous interest, and 1 boy of national fame is a graduate of 1 of these 600 schools, thanks to the school and thanks to the work that the Rotarians did with him outside of school.

In another borough, in the Bronx and in upper Manhattan, we have groups of interested citizens who have joined together and call themselves Friends of the 600 School, and these people try to do something to keep these boys out of trouble in their home environment outside of school.

Of course, we do not have success with every boy. Some of them do not respond to this kind of school system, this kind of school, because the forces that they are struggling against in the community are too much for them.

So we have another kind of 600 school, which we operate in an institution. You heard this afternoon some mention of Youth House. We operate the school in Youth House, and we try there to get under the skin of some of these boys, try to make them realize that there is somebody who is interested in them.

We try hard to find out some hidden talent, and sometimes we are successful. Sometimes, of course, it does not work. It would be ridiculous for me to claim that we have any 100-percent cure.

But we do have considerable success with these 600 schools of these two types: one where they go home each day; the other one where they are in an institution, and we have them during the normal school hours.

Now, Mr. Whelan, when he spoke, mentioned some of the difficulties we have. We have the difficulties of those families who, although offered psychiatric service, will not accept it, the resister family.

This kind of family frequently has to be taken to court and effective measures used to get the kind of service that the family needs.

We also have other children who just cannot be rehabilitated in their home environment, and they have to be committed to an institution.

One of the difficulties at the present time is that there is not enough space in institutions for these children who need to be taken away from their home environment for a half-year or a year or two years, to really be rehabilitated, and we have all too many cases which have gone to the courts and have been paroled back to us because there is no place to which to send them.

**KR0466**

If we could get more of the kind of institution, the right kind of institution, that was mentioned by some of the earlier speakers, I think it would be of tremendous help to the schools.

Chairman HENNINGS. Do you not think, Dr. Jansen, that many people expect too much of the schools? By that I mean many families, many people in the community, expect teachers to do it all.

Dr. JANSEN. I am afraid that is all too true. We are just one agency.

Chairman HENNINGS. We have heard that in other cities.

Dr. JANSEN. Yes. We are only one agency in society.

Chairman HENNINGS. Yes, of course.

Dr. JANSEN. And the home should have more responsibility than the school. But in some of these cases, I am afraid that is not true.

That, in brief, is my statement. If you want it written out in any detail, I will be glad to write it out and send it, or if there are any questions that you would like me to answer, I would be glad to do that.

Chairman HENNINGS. Dr. Jansen, it is a splendid statement that you made.

If you would like to write it out, we would be most grateful to you, and make it part of the record and part of the hearings when they are printed.

We would like to let you exercise your own option as to that.

Dr. JANSEN. Thank you.

Chairman HENNINGS. And we thank you very much for coming here today——

Dr. JANSEN. All right, sir.

Chairman HENNINGS (continuing). Taking your time out of a busy schedule, on this day of the great blizzard, to come down here——

Dr. JANSEN. I am glad to be here.

Chairman HENNINGS (continuing). And enlighten us and give us the benefit of your views.

Senator Kefauver, have you any questions to ask Dr. Jansen?

Senator KEFAUVER. Dr. Jansen, I am interested in all your statement, but particularly I had heard Mr. Charles Silver, the president of the school board, talk about the 600 schools and the program of getting organizations who are interested in child welfare, but who, unfortunately, are too interested usually in talking about it to actively participate and give time and thought and real work in dealing with children.

You seem to be accomplishing that kind of liaison cooperation in the 600 schools. Mr. Silver——

Chairman HENNINGS. We have not found that in any other city, have we, Senator Kefauver, anything quite comparable to this?

Senator KEFAUVER. Probaly not on this scale.

Chiarman HENNINGS. Not on this scale.

Senator KEFAUVER. I think it is a very great program, and I know Mr. Silver's interest, along with yours, in it.

Dr. JANSEN. We could use even more than we have, but there are a lot of wonderful people, people interested in the Scout movement and all these other movements.

One thing that worries me, that as people have increasing leisure, you would think that it would be easier to get volunteers to help with troubled children, but it isn't so, and I think we have got to change the thinking of the people of the Nation to make them realize that a little

KR0467

part of their extra leisure time ought to go to the benefit of the community.

Chairman HENNINGS. It is a very hard job, because, having been president of the Big Brothers organization, and being national director of it now, we have considerable trouble in recruiting the sort of men we want to look after these boys before they get into trouble.

Dr. JANSEN. Theoretically, it ought to be easier, because people have more leisure.

Chairman HENNINGS. It should be.

Dr. JANSEN. Yes.

Chairman HENNINGS. It is a strange paradox.

Senator KEFAUVER. Too many people think that they have discharged their obligation when they contribute some money and just express an interest; but what the children really need, the kids really need, is somebody who will take the time out and play games with them and give of themselves. And you seem to be making headway in that direction here.

Dr. JANSEN. Well, we have had some measure of success. We are only willing to admit that it isn't all we would like to do.

Chairman HENNINGS. I was particularly interested in your confirmation of a view I have held for a long time, Dr. Jansen, that a child, boy or girl, wants to feel wanted and wants to feel important.

Dr. JANSEN. That is right.

Chairman HENNINGS. That they amount to something.

Dr. JANSEN. That is right.

Chairman HENNINGS. And that they count for something, and that pattern has run throughout the course of these hearings. We have heard that in a great many places.

Dr. JANSEN. Yes. If the only place they can feel important is the gang, then they go to the gang.

Chairman HENNINGS. That is right, exactly.

Mr. Sullivan?

Mr. SULLIVAN. The Governor this morning when he was here mentioned something about the 600 schools or the difficulty the city might have been having with respect to placing these children in the schools.

Is there overcrowding in your 600 school units?

Dr. JANSEN. Well, we had wanted more of these 600 schools, but some well-meaning individuals questioned their value, and only last week a committee that had been appointed came out with its report recommending that as soon as possible we double the number of these schools. They found them very helpful.

Mr. SULLIVAN. Yes.

Chairman HENNINGS. What committee was that, Dr. Jansen?

Dr. JANSEN. Well, it was a committee of which Presiding Justice Hill of the children's court was the chairman, and the committee had a number of social workers from the local universities, some schoolmen, some interested civic groups on it, and they made, I think, a very thorough study of the program of the 600 schools, and recommended one for girls, also, which was——

Mr. SULLIVAN. Their conclusion was, it effectively takes care of the problem as far as dropoffs; is that it?

KR0468

# COUNCIL OF SOCIAL AND ATHLETIC CLUBS



**KR0469**

Dr. Jansen. No.   It takes care effectively of those children who can be rehabilitated without being taken out of their home environment.   That is, a reasonable number of them.

Chairman Hennings. Yes.

Dr. Jansen. And if we can rehabilitate them in their home environment, that is about one-fifth the cost of putting them in an institution.

Chairman Hennings. And much better.

Dr. Jansen. We think so.

Chairman Hennings. Thank you very much, Dr. Jansen; thank you very much, indeed, for coming here today.

Our next witness, Mr. Counsel?

Mr. Sullivan. I would like to call on Mr. Arthur Rogers and the three workers he has with him today.

Chairman Hennings. We are very glad to have Mr. Rogers and you gentlemen.

Mr. Sullivan. They are Mr. Hugh Johnson, Mr. Aaron Schmais, and Mr. Harrison Lightfoot, who will join him at the table there.

Chairman Hennings. I have had the pleasure of knowing Mr. Rogers; and the others, I think, Mr. Rogers, if you would be good enough to tell us something about yourself for the record, and about Mr. Johnson and Mr. Lightfoot and Mr. Schmais—is that the correct pronunciation?

Mr. Schmais. Yes, sir.

Chairman Hennings. If you will proceed, please.

## STATEMENT OF ARTHUR J. ROGERS, DIRECTOR OF COMMUNITY RELATIONS, COUNCIL OF SOCIAL AND ATHLETIC CLUBS, NEW YORK CITY YOUTH BOARD; ACCOMPANIED BY HUGH JOHNSON, AARON SCHMAIS, AND HARRISON LIGHTFOOT, STREET CLUB WORKERS

Mr. Rogers. I am the director of the council of social and athletic clubs, which is commonly called the street club project.

On my left here is Mr. Hugh Johnson, who is the chief of the street club project; and Mr. Lightfoot is coordinator for Manhattan and the Bronx; and Mr. Schmais is a supervisor in the Bronx.

And I do not want you to get the impression this is all brass from the street club project, because everybody goes into the field.   It is a total fieldwork project.

Chairman Hennings. It is a working crew.

Mr. Rogers. That is right.   And these gentlemen on both sides of me have, well, I could say 15 to 20 years in this type of work.

My part—I submitted an outline of our project to you.   It is an organizational outline——

Chairman Hennings. Yes; I have a copy of that.   Let it be marked "Exhibit No. 13" and be made a part of the record.

(The chart referred to was marked "Exhibit No. 13" and faces this page.)

20873—58——7

KR0470

Mr. ROGERS (continuing). Which quickly shows just what our organizational setup is. And my function is primarily introductory, and I would like to first of all state that our policy is this: Working with fighting gangs as distinguished from defensive groups or unaffiliated groups in the community.

Chairman HENNINGS. You mean gangs like the Egyptian Kings?

Mr. ROGERS. That is right.

Chairman HENNINGS. And such others?

Mr. ROGERS. That is right, Senator. It is part of their nature, fighting. It is indigenous to their existence, fighting.

Chairman HENNINGS. Yes.

Mr. ROGERS. And the defensive group, why, they might have been brought through a fighting stage, or they might not have been a fighting group, and then again they might be a group that would give a fight a hug if it came along.

And then there is the unaffiliated group which, well, hangs around corners, there may be a ball team or a basketball team. It is without direction, and they possess within them, by their very idleness and lack of guidance, the potential of becoming a fighting group.

So our classification at this point that we are working with are the fighting gangs, and of course we look forward as a goal, as a normal and natural ultimate, to work with the younger boys before they ever become fighting groups.

We are at this time in 10 areas of the city, and at this time we are operating 3 lounges, and these lounges are a meeting place which several gangs use together, they use the facilities, and in friendship and in cooperation.

We have in the budget at this time two more lounges which we are in the process of trying to locate places for, and that has to be a strategic location and it has to serve the purposes of the project.

Now, our basic purpose is to redirect the destructive activity into constructive channels. In the course of our work we work with the individual members of the gang, the gang as a group. We utilize all community resources, and we consult with our technical advisory committees, and at this time we have 2 of them, 1 in Brooklyn, the chairman of which is District Attorney Silver, and 1 in Queens, which is District Attorney Frank O'Connor, and these committees are made up of experts in the field; I mean they represent the police department, the board of education, the settlement houses, and agencies that work with people in the community.

I think that I would like to point out also that our policy with the police, with whom we work very closely, is based on the fact that when we are accepted by a gang and we are accepted as a worker with the gang, that they understand that if the worker knows there is going to be a rumble or a bopping session or a fight, that the police are immediately notified; that we are not there to implement the violation of the law.

Senator HENNINGS. No.

Mr. ROGERS. Second, that if we know of anybody who is pushing dope, the police are immediately notified; or if anyone is carrying a gun or a "beast," the police are notified immediately, also.

KR0471

Chairman HENNINGS. How abonut a switchblade knife?

Mr. ROGERS. Notified. Any lethal weapon.

Chairman HENNINGS. Yes.

Mr. ROGERS. It is a matter of clearance——

Chairman HENNINGS. What is the New York law with relation to the length of the blade of a knife to constitute a weapon, do you happen to know that?

Mr. ROGERS. I do not know the exact law. Nine inches. It is the blade.

Chairman HENNINGS. In most States, you know, carrying a concealed weapon is an offense, and a knife with a blade over a certain length is considered a weapon.

Mr. ROGERS. Right.

Chairman HENNINGS. Not a pocketknife such as I have on the end of my watch chain.

Proceed.

Senator KEFAUVER. While we are on switchblades, this is a very interesting chart that Mr. Mitler got up. There are over a million switchblades, yearly, sold by mail order.

Chairman HENNINGS. Senator Kefauver introduced a bill relating to switchblade knives.

(The chart referred to is on file with the subcommittee.)

Senator KEFAUVER. To try to stop the interstate shipment of these big ones like that. Is that really a menace? Do you find many boys with them?

Mr. ROGERS. That is a real menace.

Chairman HENNINGS. And it advertises Startling Speed and Black Beauty. I remember in my district attorney days, those knives were commonly used——

Mr. ROGERS. That is right.

Chairman HENNINGS. And we had quite a problem, because a fight would start and everybody would have a switchblade knife, and sometimes it resulted in the death of some participants in the fight.

Mr. ROGERS. That is right.

Mr. SULLIVAN. I think from these investigations and Mr. Mitler's own work in that regard, it has been indicated that a good portion of these knives are imported from overseas.

Chairman HENNINGS. That is right.

Mr. SULLIVAN. And bills have been introduced to try to stop that traffic, as well.

Chairman HENNINGS. Do they not come from Germany?

Mr. SULLIVAN. A lot of them come from Italy, I understand.

Chairman HENNINGS. Spain.

Senator KEFAUVER. May I ask, that questionnaire on the 58 percent purchased by boys from 11 to 15, and 42 percent from 16 to 20, is that a survey which has been made?

Chairman HENNINGS. I believed that this is a valuable chart and should be made part of the record. Let it be marked "Exhibit No. 14."

KR0472

(The chart referred to was marked "Exhibit No. 14," and follows:)



## QUESTIONNAIRE ON SWITCHBLADES

NUMBER OF SWITCHBLADES PURCHASED

AGE IN YEARS

Mr. MITLER. Yes, Senator.   We got the records from two concerns that are importing the knives, the stiletto knives, and we got the names and addresses of the people who they were shipping the knives to.

Chairman HENNINGS. In what magazine did those advertisements appear, Mr. Mitler?

Mr. MITLER. I think Argosy is one, some in the mechanical magazines, and some in the sporting and hunting magazines.

Chairman HENNINGS. I have seen them in magazines.   I have seen them advertised.

Mr. MITLER. In response to several hundred questionnaires that we sent out, these concerns are sending out about 3,000 or 4,000 of these knives each month, but they have gotten them from overseas, and we found out that the average age, 58 percent of the purchasers were between 11 and 15, a great many were 11 and 12 years old, and we brought many of the people into the office, we questioned some of the people, some of the young boys, and although many of them were getting the knives as souvenirs, we found that many of the boys had been in trouble in the District of Columbia area and Maryland that had purchased these knives.

I think another interesting feature, just one other point, is that in one of the States, Ohio, which has an internal law prohibiting the sale of these knives, that in Ohio, instead of getting them internally, what they were doing was they were sending all over the country for the knives.

Chairman HENNINGS. Yes.

Thank you, Mr. Mitler.

Excuse that interruption, please.

Mr. ROGERS. Now we were noting the age range there of the fighting gangs, the 11 or 12, 13, right on up to 20; and it ties in, the statistics that Mr. Mitler has, with our own practical experience in the field.

I would like to say something about our personnel at this time. We have seventy-some-odd, 72 workers in the field, and as Mr. Whelan said, we are working with 60 fighting gangs, and in contact with 15 or 20 others.

Chairman HENNINGS. How many fighting gangs do you think there are, Mr. Rogers?

Mr. ROGERS. Well, there has been estimated——

Chairman HENNINGS. In the five boroughs.

Mr. ROGERS (continuing). Estimated around 110, 80 to 110.

The problem with that, Senator, is if you take a group, a group might break off into 2 or 3 groups, and our workers—when we say we are working with 60 gangs, 1 worker may be handling 3 segments of 1 gang in the area which will come together in a time of crisis or conflict.

Chairman HENNINGS. Yes.

Mr. ROGERS. So when we say around a hundred——

Chairman HENNINGS. Sort of an alliance, so to speak?

Mr. ROGERS. Exactly. In an organizational basis, I do not want to go into what these gentlemen are going to say.

Chairman HENNINGS. Proceed, Mr. Rogers.

Mr. ROGERS. As far as the backgrounds of the men are concerned who are in this project, it averages from a college education to master's, and with a master's, for example, in your senior street club worker, he has to have a master's degree, and your supervisor has to have a master's degree plus 3 years of experience—plus 1 of experience, to qualify.

Chairman HENNINGS. That is a very high criterion.

Mr. ROGERS. That is right. And a coordinator has to have his master's degree in social work, and 7 years of experience, 3 of which were in supervision.

But the remarkable thing is that the young men that have come into this work are dedicated people, and in the senior street club worker, in the supervisor, we utilize the master's from an allied field, psychology, education, and so forth.

Chairman HENNINGS. We had 1 of the boys 3 or 4 years ago, I do not remember his name now——

Mr. ROGERS. Kenny Marshall.

Chairman HENNINGS. And his techninque was most interesting to me, because I had never heard of its being done in any other city in the country. He does not infiltrate in the sense Senator Kefauver suggests he infiltrates. He does not come in under any false pretenses.

Mr. ROGERS. No.

Chairman HENNINGS. I do not know whether that connotation inclined to infiltrate—he affiliates, in a sense.

Mr. ROGERS. That is right. That is better, Senator.

Let me close by saying that in order to—this service, it is not too old, it goes back to maybe 1950, 1949. In some of the experimental

**KR0474**

years, we have at the youth board instituted an inservice-training program, which allows for orientation of new workers, and the training of men on the job.

In summary, this project has worked with approximately 115 gangs since it has been in operation. None of the gangs which it worked with originally are any longer bothering. We are in contact right now with 3,000 to 4,000 young people in this community.

Chairman HENNINGS. How many men have you, Mr. Rogers?

Mr. ROGERS. Seventy-two in the field.

Chairman HENNINGS. Seventy-two.

Mr. ROGERS. And we have 20 in process to come in.

Chairman HENNINGS. Yes.

Mr. ROGERS. And as Mr. Whelan pointed out, it is the hard core. You have got to work with the leadership and redirect, and so forth.

Actually, to present this to you gentlemen this afternoon, we have broken it up in broad social work concept of intake, supervision, and discharge; and actually it is contact with us, work with the gang, and termination.

Mr. Schmais will discuss how we make contact, and in the broad outline of social work we call it "intake."

Chairman HENNINGS. You gentlemen proceed in such order as you please.

Mr. SCHMAIS. Before entering a discussion on actually how we initiate work with the gang, I would like to make some comments.

While we break it up here into three stages, that is, beginning, middle, and end, these are somewhat arbitrary. There is tremendous overlapping, there is regression, speeding up, sometimes you have to move on different levels with different boys.

In the individual groups there are differences. So your movement with them would vary.

However, through all our work, the same basic areas, generic areas, that we will discuss will pertain. Some of these are subcategories that may be met at different times with different groups or workers, but again this will always happen with each worker and each group.

Actually, before starting work with a gang, we proceed upon scientific lines in the sense that we do not go out in the streets until we know what we are looking for and where we are looking at, and we conduct a survey.

And essentially, the survey is designed to determine the existence of conflict groups, the extent, the degree, the nature of their conflict, their pathology, their involvement, antisocially.

We try to find out what the type of neighborhood is that they come from, what their differences have been with other groups, how do they see themselves, how does the neighborhood see them, and possibly how they view the neighborhood.

Around the gang itself, you try to acquire very specific information. We try to learn the name or names of the group. We try to get a roster of its membership. We try to find out grossly where the gang——

Chairman HENNINGS. Do they keep rosters, generally, of the membership?

Mr. SCHMAIS. No, sir. Around this area we will probably contact police, probation, bureau of attendance, who might know the names of these boys.

KR0475

Chairman Hennings. Yes, sir.

Mr. Schmais. We would try to find out exactly where their hangouts are in the gross location of the group. We try to learn as much about their history as possible, both of the group and its members.

We try to determine what its average age is, its ethnic background, its racial, its class background.

Generally, we try to find out why they have been involved antisocially. Many times it is a situational thing with a shifting neighborhood, or an occasional use of a settlement-house swimming pool, or what have you.

Around these areas of inquiry, there are very pertinent things we have to know, and these are the history of the group, the history of its membership, the kind of individuals in these groups, the kind of needs that they themselves see as wanting.

We have to understand what the group sees as the reason for their conflict, and how other groups in the neighborhood perceive them.

In the survey, however, our immediate type of survey is done along liaison lines. We would contact all the existing public agencies. This would include the police, hospitals, board of education, and so forth.

We would also include, in contacting the agencies in the area, settlement houses, private and public.

(Discussion off the record.)

(Whereupon, at 4:30 p. m., the subcommittee recessed, subject to call.)

(The following was submitted for the record:)

### I. INTRODUCTION

Street club work is founded on the premise that the need to belong to a primary group of one's contemporaries is generic to all people. This is particularly important in adolescence. The gang is basically a friendship group. Inherent in the gang are potentialities for the positive growth of its members. Gang life serves as a transition between family life and community living. Here, for example, recognition, group loyalty, leadership qualities, and community responsibility, so important in adult life, can be nurtured and given beneficial direction. The street club worker is the catalytic agent to this end.

In working with street clubs, the project's approach has involved the application of sound, generic social work principles. Depending upon the situation, it has used group and casework methods or combines them. However, in contrast to the group worker or caseworker, who functions within the formal agency setting and to whom clients usually come with some degree of awareness of the services of the agency, the street club worker is a stranger who enters the lives of the boys without their request for help.

*A. Basic principles and assumptions*

As a basis for work with street clubs, the following principles were formulated by the Youth Board staff:

1. Participation in a street club, like participation in any natural group, is a part of the growing up process of adolescence. Such primary group associations possess potentialities for positive growth and development. Through such a group, the individual can gain security and develop positive ways of living with other individuals. Within the structure of his group the individual can develop such characteristics as loyalty, leadership, and community responsibility.

2. While the protection of the community at times necessitates the use of repressive measures in dealing with the antisocial street clubs, these methods do not bring about basic changes in attitudes or behavior.

3. Street club members can be reached and will respond to sympathy, acceptance, affection, and understanding when approached by adults who possess these characteristics and reach out to them on their own level.

4. The positive relationship that is developed between a worker and a street club can serve as a catalytic agent for modifying antisocial attitudes and be-

KR0476

havior. This relationship can also be used to enable the individual member to meet his needs in more positive ways.

5. To be effective, work with street clubs must be coordinated, unified, and applied on a saturation basis.

6. Because of the close relationship that workers necessarily must develop with club members, and because of such factors as group loyalty, distrust, and fear of other clubs, it is imperative that a worker be assigned to only one club.

On the basis of these assumptions, the following goals were formulated:

1. Reduction of antisocial behavior, particularly street fighting.
2. Friendly relationships with other street clubs.
3. Increased democratic participation within the club.
4. Broadened social horizons.
5. Responsibility for self-direction.
6. Improved personal and social adjustment of the individual.
7. Improved community relations.

In terms of implementing these principles the sine qua non was the establishment of positive meaningful relationships with the clubs and their members. Three phases are involved in building such relationships. They include (1) locating the club, (2) establishing contact, (3) gaining acceptance, and (4) terminating relations.

Historically, the council doesn't work in an area unless a priority need is demonstrated by that area. Frequently community leaders and lay people contact the agency indicating that a gang problem exists. If it is evident that the area in question can use our services, again on a priority basis, a survey team will be assigned to do a thorough study of the area. The survey team will be concerned with most of the following: the ethnic composition of the population, the nature of population shifts, the history of the neighborhood, the quantity and quality of existing social services, and income level of population. They will seek information on gangs previously and currently active in the vicinity around such areas as their size, structure, ethnic composition, hangouts, social and antisocial activities, contact with community agencies, viz., PAL, CYO, Board of Education, JAB, etc.

This preliminary part of the survey is done systematically. Lists of community resources are compiled and workers are assigned specific contacts. The job then entails an intepretation of the survey and the function of the Council of Social and Athletic Clubs. Very little contact is made with the youngsters at this point although the workers will be noting their impressions. After this information is pulled together, the locations of groups are charted on a map and areas of focus are then indicated. An attempt is made at this point to determine big name groups. Workers are then asked to pinpoint the groups and give a current evaluation of their status. The worker frequently arranges an introduction to groups through community center personnel. When this is possible he explains to the group members his survey plan and the function of the agency. He tells the group that he'll be around the neighborhood for a few weeks, and sometimes gets introduced to the club's officers, i. e., the president, vice president, war councilor, etc.

Where direct introduction is not possible, the worker will utilize the "hanging around" method. By observing pool rooms, candy stores, hallways, and street corners, introducing himself to small-business men in contact with teen-agers, and speaking with youngsters themselves, his knowledge of the community broadens and he becomes known to the neighborhood. Regarded as a curiosity, the worker continually explains his job. He is careful not to commit himself as being assigned to any particular group or neighborhood. Throughout this survey the worker records his contacts for he will eventually have to organize this material in a specific form.

At this point the survey team has produced a large body of knowledge. Many groups have been contacted by workers. Those high priority groups we have met have been described thoroughly enough for the agency to assign workers to specific groups. The club has been located; we now concern ourselves with establishing contact. The worker approaches the clubs from a new aspect: he is no longer on a survey; he is assigned to them. The members are upset. It is one thing to have someone ask them questions and leave, but it is quite another thing to have an adult "hanging around." The reaction again is one of suspicion: "You're a cop." The worker responds to this by structuring his role. He explains that his job is to help the members to do the things they want to do such as trips, organize teams, hold club meetings, etc. Although they're interested in this aspect of the job, they're still concerned about the worker's relationship to the police. The worker then informs the groups that he

KR0477

is not a policeman but as a citizen member of the community and street-club worker, he cannot condone behavior which represents a danger to the community or the gang member himself.   This applies specifically in three areas: (1) Potential or actual gang fights, (2) individual possession of firearms, (3) sale of narcotics.   In these instances the worker will notify his supervisor who in turn will notify the police.   It is essential that all club members understand this thoroughly, as the acceptance of this interpretation is a key factor in the developing process of relationships.

We have now contacted the group and structured our role around programing and relationship to authority.   The next process is that of gaining acceptance. The group begins to test the worker: Why does he like them?   How far can they go?   Will he still accept them if they're "bad"?   The worker undergoes a series of tests as the group tries to learn about him.   They're concerned about his salary, future, marital status, past achievements, etc.   They get hostile and rebel against his relationship with authority.   Then they calm down and tell him they don't need him around.   The worker, during these stages of contact, structuring, and gaining acceptance tends to concentrate on the leadership group.   He learns a great deal about internal group dynamics and assesses individual and group needs.

The worker provides small group program experiences, movies, trips downtown; he arranges to use a gymnasium or a clubroom.   Even though the group responds to these activities, in many instances the antisocial orientation is so strong that members continue to be involved with police and courts.   The worker makes prison and court visits and brings word to the group of the members who are in difficulty.   The results of police action give the worker a chance to stress the society at large's reaction to serious antisocial behavior.

The worker has been servicing the group for some months now, and his concern becomes that of deepening and intensifying his relationship.   The youngsters understand his job, they trust him, and are having a satisfying experience with an adult.   The worker understands and anticipates their needs.   He provides a stable source of service to them; he listens and is warm and considerate.

The worker and group have now shared a number of experiences; these serve as an anchor in discussions and much time is spent reliving some of these.   By this time the group should be either involved in a community center or have a satisfactory ongoing social program as provided by the worker.   The problems earlier encountered around program are now relatively few; so that the worker has more time to concentrate upon individual personal problems, group clique or splintering problems, or problems of radical group change which require supportive use of relationship by the worker.   This tends to ease the change of status as the group becomes socialized and leadership functions and group tone alters.   The worker at varying stages has made referral for jobs or family counseling services. He makes home visits at individual members' requests or on his own judgment, aided by his supervisor.

When the group is no longer fighting, is integrated into community servicing agencies, and the internal strength of group members gained during the worker-street club relationship are adequate, the worker begins to consider termination. He evaluates with his supervisor the group's position and a plan for termination is formulated.   Frequently, the worker informs the group that he is leaving them 1 month before.   He usually diminishes service in terms of the number of field contacts per week.   There is an accent on program, farewell parties, and possibly a closing bus trip and picnic.   The worker evaluates for the group their progress and plans for the future.   There is always an understanding that the worker and the agency remain available to the member after the formal termination of relationship.

In dealing with the "fighting street club" or gang, we have had to evolve special techniques.   Primary among these is the process called mediation.

*Mediation*

Mediation meetings are an absolutely essential process utilized by the Council of Social and Athletic Clubs.   Once conflict develops between individuals, groups, nations, etc., the civilized approach that mankind has learned is to sit down, discuss the grievances, compromise differences, and work toward common agreements.

Once a conflict has developed between two street clubs, the workers of both groups involved should begin at once to attempt to determine the cause of the conflict.   In addition to talking with the youngsters, the workers should be in contact with any who can shed light on the problem.

**KR0478**

Once the difficulties are known, each worker should concentrate on talking out the problems with the leader and members of their respective groups. Close coordination between both workers through the unit supervisor is imperative.

When a worker senses a point of readiness on the part of his group for a mediation, he should communicate this information to his supervisor, worker, or workers involved. A series of preparatory sessions should be held with the members of each group separately. It is vitally important that the real leader of each faction of both conflict groups be involved in this process.

Grievances should be outlined and discussed as well as suggestions and agreements for resolving the conflict. Once the proposed grievances and potential agreements are clarified, the worker from each group should attend meetings of the opposite group along with the group's own worker so that both groups will have advance knowledge of each other's grievances and objectives.

In terms of timing the process described up to this point should be paced to the readiness of the groups. The groups should not be pressured.

Once mediation is agreed upon, prompt action should be taken to locate a mutually acceptable neutral place. At times, because of neighborhood tensions it might be necessary to keep the location of the site confidential until the time of the meeting. Next an appropriate person, one of dignity, respect, and understanding, should be selected as arbitrator. The use of the impartial arbitrator contributes the following:

1. Lends a sense of dignity and control to the meeting.

2. It insures the presence of an impartial objective non-Youth Board salaried person's presence as an observer who can verify, if necessary, as to the conduct and nature of the meeting.

3. Gives the agency an opportunity to involve lay people in better understanding its work.

In terms of the representatives of the groups who are to attend the meeting, they should assemble and be met by their worker and his supervisor, and any additional workers that may be indicated, in their own neighborhoods. Even though it has been previously agreed that no weapons can be carried, each youngster involved should be carefully searched. If girls are involved in the meeting arrangements will, of course, have to be made for the services of a female social worker. Close communication is essential as it is important that one group gets settled and acclimated to the meeting room before the second group arrives. A period of 10 to 20 minutes is suggested. Upon arrival before entering the meeting room each group should be searched again.

The meeting should be attended by the arbitrator, a person from the administrative staff of the council, the two supervisors involved, the worker for each group and, depending on the seriousness of the tension, additional workers if necessary. Again it is a question of not having too few workers so as to be able to handle the situation, yet on the other there should not be so many that the youngsters involved are smothered.

In regard to the arbitrator, a briefing session should have been held with him prior to the meeting at which he learns something of the background of each group, the conflict between them, and grievances and objectives, as well as the names of the representatives of each group.

The meeting should be turned over to the arbitrator who combines understanding, a sense of confidence, and at the same time a crispness of approach.

Usually primary spokesmen for each group have been decided upon. The arbitrator then elicits the grievances of both groups on a give-and-take basis. This litany may take anywhere from 1 hour to 1½ hours and at times feelings will run high. During points of the meeting when hostility is running high, the arbitrator and staff can be most helpful if they remain calm and keep the meeting moving.

If the mediator gets blocked in the handling of the meeting, the staff—usually the top administrative person and not the workers involved—should be prepared to actively assist the mediator. This is not a taking over of the meeting from the mediator.

Also the arbitrator and/or the administrative person should be prepared, if situations get too excited or tense or deadlocked, to call brief recess periods for private discussion between each group and their workers and supervisors. This should be done sparingly, only when necessary.

Finally, agreement proposals should be elicited from both sides and thoroughly discussed. Once there is a meeting of the minds they should be carefully phrased and ratified verbally by both groups.

KR0479

Most times, because of the suspicion and distrust on the part of both groups, the agreements and subsequent truce should be set for a definite short-range period to give both groups a chance to try it out and not involve them in something that seems too large or overwhelming for them. If this is the case, a date, preferably within a month, should be set for a second meeting. In the interim a machinery for handling violations of the agreement should be set up. This usually involves the workers of both groups and designated representatives of each group.

*The fair one*

At times during the first mediation meeting, while grievances are being aired, both groups may feel that they cannot settle their differences by words alone and a fair fight is proposed. This process should never be promoted or introduced by staff and when it can be avoided every effort should be made to do so, but when there is no alternative except continued conflict, careful arrangements should be made for a "fair one" in a gymnasium with proper athletic equipment including boxing gloves, a competent referee, and sufficient personnel to keep the situation under control. The attendance at such meetings should be limited solely to the participants, staff, referee, etc. Again the place of such an event should be confidential and the outcome impartial, and, if the groups so desire, also confidential. In other words, it is invariably the desire of both groups that no decision be reached in such contests.

Again the local police should be aware of the fact that the "fair one" is going to be held, where and when, etc. Again also no publicity should be given to the event.

---

STATEMENT REGARDING THE TREATMENT OF THE ADOLESCENT OFFENDER IN THE NEW YORK CITY DEPARTMENT OF CORRECTION

(By Frederick C. Rieber, Deputy Commissioner)

The new Brooklyn House of Detention for Men, located at 275 Atlantic Avenue, Brooklyn 1, N. Y., was built at a cost of approximately $11 million to replace the antiquated, century-old bastille-like fortress known as the Raymond Street Jail.

While the new Brooklyn House of Detention for Men was originally built to replace the old Raymond Street jail, the Department of Correction faced serious problems of overcrowding and proper segregation of its adolescent charges in its various borough detention facilities, and the omnipresent adolescent-delinquency problem was causing grave concern in the community at large. In our city, all male adolescents over 16 years of age, if they could not afford bail or if they had been declared unbailable by the court, had been held by the Department of Correction in one of its four male detention institutions. They were detained for periods ranging from 1 day to a year or more, and yet at no time during this administration had these adolescents been permitted to be doubled up in one cell, or come in contact with the adult detainees.

The average daily population of these adolescents (16–20) throughout the department runs about 500 to 700 daily, approximately 12,000 yearly, and is spread out in the 4 detention institutions. There formerly was no program of counseling, social service, educational or recreational services available. Recognizing that our detention institutions were vital stations on the road of criminal procedure on which the inmate traveled to the official disposition of his case, the commissioner in the early part of 1957 designated the new Brooklyn institution as the department's adolescent remand shelter, because such a facility, though in the planning stages, was not available. She then transferred all detained adolescents to the new Brooklyn House of Detention for Men, from the various detention sites. At that time she stated, "The pioneering program in counseling and rehabilitation which was started on July 28, 1955, as an experimental pilot project at the Manhattan House of Detention for Men, for the adolescents being held for court disposition, has proved to us that it is in our detention institutions that the most damaging first impression is made on our youth, and that every human effort must be bent toward making it a constructive experience. We must, and intend to, use all the resources and techniques of our social, medical, psychiatric and psychological, vocational and guidance counseling services, and all other available tools for reeducation in our detention institutions, particularly as they involve our youth. Our correctional rehabilitation programs must

KR0480

start in detention before the delinquent pattern is further set. It is false economy to defer full implementation of a good overall rehabilitation program, and will cost far more, economically and socially, to wait until inmates are committed to a sentence institution. By that time it may be too late."

The new institution is of fireproof construction, has a cell capacity for 817 inmates. There are 28 dayrooms, 2 gymnasiums, a library, study hall, 2 recreation roofs, and an auditorium with chapel accouterments. The facilities permit extensive classification and segregation programs, modern medical treatment, provision for recreation and religious needs, closed circuit TV, a physical interior as light, airy, and clean as modern design will permit, and an organization of functional units to conform with modern prison management methods.

Immediately upon admission to the institution each adolescent must go through a comprehensive series of interviews and examinations in order to determine his physical, social, educational, and psychological needs. The process begins with a shower and a complete medical and physical examination by the institutional doctor. He is then given institutional clothing and his street clothes are cleaned before being returned to him. The youth is then temporarily assigned to a cell on the fifth floor, which is the reception section. The following day he is given a complete battery of psychological tests in order to evaluate his personality and emotional maturity. His permanent housing assignment is made according to his age, past record, type of offense, type of group he will best get along with and whether or not he will be a behavior problem during his stay. For proper supervision, prevention of contamination of first offenders and recidivists, a program has been developed to keep them beneficially occupied, provide for a release of tensions, and modification of hostile attitudes. A scientific classification and housing program is in effect throughout the entire institution during the adolescent's stay there. To the best of our knowledge this is the first such program in penology for detention cases.

Our surveys have indicated that close to 80 percent of the adolescents detained will be released back to the community rather than being sentenced to a correctional institution. The rehabilitation program thus is not only geared for adjustment to institutional life but to an attempt to change attitudes toward society and to return him as a law-abiding citizen to the community. A social investigator provides the necessary social services toward this end. He contacts families, refers parents to the institutional staff member working with the youth, counsels individuals, makes community contacts for the family and the detainee, and provides employment referrals where required.

The religious needs of the adolescents are provided by five chaplains who conduct services for the various religious denominations weekly and on special religious holidays. About 60 percent of the boys attend these services on a voluntary basis. The chaplains provide individual spiritual guidance as well for those youths who request it. This phase of the rehabilitation program is one of the department's most important services to the youths and their families.

Another aspect of the rehabilitation services is the institutional recreation program. The adolescents are kept constructively occupied from morning to night. Each morning and afternoon groups of approximately 120 are taken to the gymnasium and the open roofs for basketball, softball, volleyball, and other physical activities. Quiet games, such as checkers, chess, and scrabble are provided for them in the dayrooms on their housing floors. Television is also available. These activities are supervised by the assistant supervisor of recreation, 6 recreation officers and 4 part-time recreation leaders. The librarian provides a selection of approved books to the inmate population.

Although a majority of the inmates had discontinued their education on their own volition prior to being arrested, one-third (approximately 100) of the 15-, 16-, and 17-year-olds had their schooling interrupted during their stay in the Brooklyn House of Detention for Men. The commissioner of correction has urged that a "600"-type school program, conducted by the Board of Education of the city of New York, be instituted. It is intended that qualified teachers from the New York City "600" schools be provided by the board of education so that by continuing the schooling of these boys, they will be motivated to complete their education when returned to society. Plans are being formulated to renovate a two-story wing of the building to provide classroom facilities.

The department of correction definitely needs an institution built specifically for the housing and programing necessary to take care of the city's adolescents being held for trial or court disposition. Currently it is planned to erect one adolescent remand shelter (male) on a city-owned site in the Borough of the

KR0481

Bronx. As was stated previously, this institution is still in the planning phase. Funds for preliminary architectural plans have been allocated.

Some youngsters upon conviction and sentence are transferred to the adolescent section of the Rikers Island Penitentiary. This institution is in close liaison with the new Brooklyn House of Detention and reports concerning social data, personality patterns, and institutional adjustment are forwarded with the youngster. More intensive classification and treatment programs are in operation at Rikers Island than the Brooklyn detention facility could implement due to the rapid turnover there. At Rikers Island, youths are again segregated from adults and, on the basis of previous and institutional testing, are housed in 1 of 4 dormitories with youths of their own personality patterns. Thus, the aggressive youngster is kept from the passive adolescent. After intensive classification by the classification team consisting of psychiatrists, psychologists, rehabilitation counselors, social workers, vocational guidance staff, and representatives of the educational program, the youth enters upon a program of vocational training, academic instruction, if needed, recreation, and therapy. The approximately 350 adolescents at Rikers Island may select 1 of 16 vocational training areas such as printing, automotive maintenance, body and fender work, tailoring, carpentry, metal operations, and others. Academic education is provided as well, ranging from literacy work through high-school-level instructions.

Because these youths have been the failures of mass education, class sizes have been limited to about 15 where individual instruction is assured. Upon request, or if his actions deem it necessary, the adolescent is taken into individual or group therapy by the youth diagnostic team. Supervised recreation is stressed, so that all free time can be converted into beneficial activities. This may take the form of arts and craftwork, viewing TV, or participating in intramural athletic events and talent shows. Vocational guidance is handled by two rehabilitation counselors who are in contact with public and private agencies and employers who are apprized of the adolescent's work potential, interests, and institutional training. An adolescent inmate council has been formed so that direct liaison might be effected between the youths and the institutional administration and a feeling of self-determination encouraged.

There are many serious gaps in the department's programing for adolescents. Aftercare work is practically nonexistent though the department hopes to initiate some work in this area through private funds on an experimental basis. Research is sadly deficient because adequate and trained personnel is not at our disposal. Recruitment is slow and staff turnover rapid due to the salary levels at which the department is authorized to hire. However, present achievements have been dramatic and gratifying when compared with past results. As Commissioner Kross has so aptly stated, "We have pulled ourselves out of the depths and are now on a plateau from which we can finally see the vast mountains we must climb ahead." Thank you for your interest in our work.

---

[From the Kings County Grand Juror, May 1957, official organ of the Kings County Grand Jurors' Association, Inc.]

DEPARTMENT OF CORRECTION PROFILE

"One of the prerogatives of our grand juries is free access to the public prisons. Our proper interest in these penal institutions demands knowledge about the agency in charge of them * * *."

At present the department has 1,569 uniformed (custodial) and 706 civilian employees, a total full time staff of 2,275 to carry on its big job. The pay of its employees, particularly the civilian staff, is sadly inadequate. This is in the face of the fact that workers in prison institutions have to be a higher type of personnel. They deal with human beings in detention and must, perforce, be capable of responsibility above that demanded or expected of personnel in other city departments or private firms. And then there is the ever-present hazard involved in their work environment * * *. Surely men and women must be dedicated to service above the ordinary to work for such dismal wages in penal institutions. One wonders that they make themselves available at all * * *.

Heading the department of correction since the beginning of 1954 is Commissioner Anna M. Kross, the capable and energetic lady of distinguished record as a lawyer, judge, and social worker. Concerning her efforts as commissioner of correction, we quote very briefly from a New York Times' editorial of December

KR0482

29, 1954, captioned "Correction versus Custody": "Commissioner of Correction Kross is applying to the problem of overcrowded city prisons a philosophy born of wide experience and far-reaching vision. Since she took office on January 1, 1954, this philosophy has taken concrete shape in a program that deserves public recognition and support."

Currently carrying the big load of the department's work with Commissioner Kross is her able lieutenant, Deputy Commissioner Frederick C. Rieber. A quiet man, as tireless on the job as he is highly capable, he should be better known to us * * *. A lawyer by profession * * * during World War II he served in the United States Army Intelligence * * * and * * * following his war service he worked 8 years with the New York City Department of Investigation. He became thoroughly familiar with the functions and operations of the correction and police departments and other agencies. This tied in appropriately with his comprehensive knowledge of all courts, their procedures and practices * * *. He is in full charge of the department's reorganized legal division * * *.

There are other key men who deserve notice for the good work they are doing in the administration of this understaffed, overworked department of correction. Space limitations at this time prevent us from giving them due recognition here.

The New York City Department of Correction is not a self-seeking agency with cushy jobs set up for political favorites. It does not have a highly paid public relations staff to sell the public on its program and needs. Its rehabilitation work is apt ot be misunderstood and ridiculed out of public ignorance and community indifference. Many citizens, grand jurors among them, properly perturbed about increasing crime, particularly among youths, would have the department of correction operate as the department of punishment. No mollycoddling attempts at rehabilitation for them. Commissioner Kross doesn't think it's mollycoddling to try to reeducate and rehabilitate first offenders, juveniles, and adolescents.

It will take a lot of money to set up a good rehabilitation system. "I am convinced," says Mrs. Kross, "that a dollar spent to keep a youth from becoming a hardened criminal will save the taxpayers 20 times as much in prison upkeep." We think it's worth a good try, at the least.

The aims and program of the department of correction should be better known to the community. It needs and deserves the support of the public. And grand jurors may fittingly be in the forefront of that support.

————

STATEMENT OF JOSEPH H. LOUCHHEIM, DEPUTY COMMISSIONER, NEW YORK STATE DEPARTMENT OF SOCIAL WELFARE, SUBMITTED TO THE SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY

Mr. Chairman, members of the Senate Subcommittee To Investigate Juvenile Delinquency, I am happy to report that New York State has made substantial progress in extending its training-school facilities in the last 3 years. For the first time since 1947—when the State set up an annex facility for 60 boys at New Hampton—the State has established additional major training-school facilities. These include the Otisville State Training School for Boys, with a capacity of 276, set up in 1955; and the Highland State Training School for Boys, with a capacity of 140, set up last month.

Other facilities were added, increasing the bed capacity from 1,292 at the beginning of 1955 to a capacity of 1,769 today, an increase of 37 percent.

In addition, we have extended our institutional services substantially by increasing our training school staffs from 900 to 1,125 in the last 3 years. Most of these 225 new positions were professional posts.

I should like briefly to give the background of these important developments. I want to make it crystal clear at the very outset that the division of State institutions and agencies in the State department of social welfare, which is the unit of government responsible for the State training schools, is involved in the treatment and not the prevention of delinquency. Nothing that we do, except in an extremely indirect way, can serve to prevent delinquency. In a State as large and complex as New York, there is of necessity a division of responsibility among the units of State government for various aspects of the delinquency problem.

In order to understand how the State training schools function in the treatment of delinquency, it is important to understand certain basic elements which underlie the treatment of delinquents in New York State. The first of these elements is the concept of State and local responsibility. The local children's court, through its associated probation services and such other resources as mental hygiene clinics, determines in the first instance whether the child is delinquent and

KR0483

what shall be done with him. It decides at what point a child shall be committed to an institution for treatment and care and within some broad limitations it decides whether this shall be at a State training school or a private institution. As with the whole broad field of child welfare, which is supervised by the State department of social welfare, we believe that local responsibility for delinquent children is extremely important, because it means that the individual child is handled within the context of the community in which he lives and that the full resources of the community are used in treating him by those who are closest to those resources.

The second basic element in the institution treatment of delinquency in New York State is the relationship between public and private institutions caring for delinquent children. Private institutions for the care of delinquents exist to a unique degree in New York State and for many years took care of the majority of children committed to institutions. Even today they care for 40 percent of the committed delinquents. Since January 1, 1956, the State on a 50–50 basis has shared with the localities the cost of caring for children in the private institutions and the localities have shared equally with the State the cost of care in State institutions.

The responsibilities and programs of the State training schools cannot be clearly understood without an understanding of the private schools. The private schools historically have played a very important part in the institution treatment of delinquents. They have pioneered in many areas of institution treatment such as psychiatric and casework services. They have been in a position to experiment. They have had a distinct advantage in their ability to control their intake. Because of this and some other factors they have to a considerable degree absorbed the more treatable delinquents, the milder problems, and indeed have been in a position to return untreatable cases to the courts for recommitment to the State training schools.

The result of this is that the State training schools have served and still do serve by and large as the agency for the care and treatment of that group of delinquents that is least amenable to treatment. Their charges have been screened through all the local resources of court and probation services. They have, in part, been rejected by the private institutions, or have failed in private institutions. The responsibility of the State training schools therefore is considerably complicated by this screening process which has eliminated the more hopeful cases before the point of commitment.

Through the years until 1950, the need for institutions for delinquents has decreased rather than increased. Since the establishment of children's courts in New York State in 1922 and until 1949 (except for World War II), admissions to State and private institutions decreased from 3,000 a year to less than 1,500 a year. This decrease cannot be explained except on the basis of the expansion of community services—child welfare, mental hygiene, and probation—which by their nature limit the use of institutions to the more serious delinquents. As a result, private institutions gradually closed through the years, and the capacities of the State training schools decreased.

There was little room in institutions therefore to meet the increase which began in 1950, and pressure of intake was serious by 1952 when commitments reached the prewar rate of 1,800. By 1955, the rate had gone up an additional 600, to 2,400. The impact of this increase, however, was almost entirely on the State training schools. The intake in private institutions increased only 25 percent from 1949 to 1956, while the admissions to State training schools increased 103 percent.

To meet this sharp increase in the demand for institution care, the citizen group that heads up the department, the State board of social welfare, acted to expand the bed capacity in existing institutions, to establish two new facilities, to increase training school staff, to extend institutional programs, and to strengthen our central office consultation service.

As a result today New York State is providing a considerably expanded and differentiated program of State training school care.

At Hudson, there is a training school for girls which serves the entire State and operates its own parole program.

At Industry, we have a training school for boys, which serves the western and northern counties, covering most of the State and operates its own aftercare program.

At Warwick, Otisville, and Highland we have institutions serving boys from the greater New York area and, with a full operation of Highland, will include counties up as far as Albany. This plan resulted from the determination that,

KR0484

with the opening of Otisville, geography was no longer the single suitable basis for classifying the State training schools. Very careful exploration of the best way to group children for care led to the differentiation of Otisville and Warwick to serve two different age groups within the same geographical area. We did this because we found that age is the best rough guide to the differing needs of children in institutional care. When the school at Highland was opened this year, the same principle was applied, so that Highland is geared to the children 13 years of age and younger, Warwick admits the 14-year-olds, and Otisville, the 15- and 16-year-olds. There is considerable flexibility in the use of the three schools since, while age is the first classification step, ease of transfer makes it possible to move children back and forth between Warwick and Highland or between Warwick and Otisville as the needs of the children require.

This three-institution plan also involved establishing the Home Service Bureau in New York City as the service agency for Highland, Warwick, and Otisville, to carry on the field work and parole supervision formerly carried by the individual training school. The disadvantages of a separate field agency have been counteracted largely by maintaining effective liaison between the Home Service Bureau and the institutions which it serves.

At New Hampton, we have the annex, a specialized security-treatment unit serving Industry, Warwick, and Otisville. Established 11 years ago as an experimental unit for the most seriously disturbed delinquent boys, it has demonstrated its value as an integral part of a diversified treatment program and serves as a model in its field.

While all these moves have been dictated by our pressing problem for space, we have intensified our efforts to improve the effectiveness of the job we have to do.

We have established certain basic standards which we are trying to adhere to although all of them are not possible under present high-intake conditions. We believe that 400 is the maximum institution size which can be operated effectively. While this is in contrast to some of the thinking around the country, we have found that the larger populations within some limits can make possible a varied internal program to meet the needs of different children and can provide a number of special programs which would be hard to provide for a smaller group. I have in mind not only psychiatric and casework services but also remedial education programs, recreational activities and vocational training. We believe that within a given institution the size of the cottage unit should not exceed 20. We have established our school programs on the basis of 15 children to a class in grades 5 and up and 10 children in grades 4 and below. We have established caseload standards which are not ideal but which are substantial advances over what has been provided in the past. We now provide for maximum caseloads of 80 for fieldworkers, including resident and parole cases, and 40 for special caseloads such as boarding care, parole residence homes and annex parolees. We are aiming toward a standard of 40 to 50 children per resident caseworker.

Within this broad departmental framework, we believe that the best development of each institution is achieved by allowing maximum flexibility so that each institution is free to explore the programs and services that will be most effective for it. The extent to which our institutions have developed imaginative and effective programs, which enjoy wide recognition, reflects the degree to which we have succeeded in realizing this flexibility.

---

(Articles submitted by Abraham G. Novick, superintendent, New York State Training School for Girls, for inclusion in the record.)

### CLASSIFICATION AND TREATMENT

By Abraham G. Novick, Superintendent, New York State Training School for Girls, Hudson, N. Y.; President, National Association of Training Schools and Juvenile Agencies. Paper Prepared for Publication in the January Issue of the National Probation and Parole Association Journal

Juvenile institutions in the United States vary in function, organization, and services to such a degree that it is impossible to discuss the subject of classification and treatment without some frame of reference. The small treatment center catering to 25 youngsters, for example, is quite different from the larger private training school with a controlled intake. The latter, in turn, differs

markedly from the public training school, which has an unselected intake. and in most States has little control over its size. In many States the antisocial act itself, as determined by the court, becomes primary in the decision to send a youngster to a public training school. Where community treatment facilities are meager, the institution will receive even mental defectives and psychotics who have been adjudicated as delinquents. Fortunately, there are beginning to be some organized misgivings about utilizing the State training school as a dumping ground. Throughout the country, efforts are being made to examine the role of the State training school in the total child welfare field, although the process is still in its infancy.[1]

Because classification and treatment programs in large and undifferentiated institutions are much more difficult to organize and put into operation than in settings which select its clientele, this article will confine itself to programs within State training schools. Even in States where there are central diagnostic facilities, with commitments made to parent bodies rather than to individual institutions, or in States where institutions do have some limited power to reject adolescents who are obviously incapable of mentally or physically benefiting from the school's program, personality variations in the youngsters received are so prevalent as to place a premium on a varied institutional program. The training school, therefore, must have within its program some means of differentiating individuals according to their needs and requirements.

Two trends are noticeable in the training school field today. One is the establishment of a centralized diagnostic center for statewide institutional placement. and the other is an increase and sharpening of diagnostic facilities within the individual institution itself where centralized facilities are nonexistent. The idea of a centralized facility seems to be gaining considerable support. It is an interesting phenomenon that in many areas of the country, recognition and authorization are given to the establishment of diagnostic centers before institutional facilities are available to carry out recommendations. The word "diagnosis" carries with it a magical connotation in this day and age. Legislators are apt to support the establishment of a diagnostic center where institutional treatment units may be meager and unproductive. For a central diagnostic service to be effective, it is necessary to have considerable differentiation in treatment facilities. The same criticism can, of course, be leveled at diagnostic units that are developed at the institutional level where insufficient treatment services exist.

Regardless of what facilities are available, however, the purpose of diagnostic services are the same whether centrally or locally situated. It is necessary to know as much as possible about a youngster before he can be properly placed.

### CLASSIFICATION PROCEDURES

Placement begins with choice of institution in areas fortunate enough to have such an opportunity. It then involves placement in a cottage unit or living group that would best meet the requirements of the youngster involved. It includes an individualized assignment to a school or vocational program. It also involves placing the boy or girl with adult leaders who are most qualified to meet the needs of the youngster. If the problems of the child are best met through close supervision, he would not be helped if he is assigned to a cottage unit with considerable freedom in controls. Placement also means consideration of the personality make-up of the group to which the boy or girl is assigned. If he is withdrawn, fearful and anxious, for example, assignment to a group of aggressive boys will only increase his insecurity and prevent adjustment.

Considerable knowledge of the juvenile must be secured in order to be able to make such decisions. This is usually obtained through community social histories. psychological testing, personal interviews, and observation. The reception process, however, is not only diagnostic in character but is also the beginning of treatment. It is during this period that the youngster has his

---

[1] A workshop on State training schools was held at the 1957 American Orthopsychiatric Association Annual Conference, and another is scheduled for the 1958 conference. The Eastern Regional Conference of the Child Welfare League has scheduled an institute on this subject in 1958. The Children's Bureau and National Association of Training Schools and Juvenile Agencies have jointly issued a publication on Guides and Goals for Institutions Serving Delinquent Children. The same two organizations, together with Rutgers University, and with funds from the child welfare division of the American Legion, sponsored a staff training institute for institutional executives in the public training school field in April 1957.

20873—58——8

KR0486

initial experience with the institution and its staff members. He receives an introduction to institutional policy and the methods by which it operates. Initial experiences may very often color the manner in which the youngster will adjust to his future placement, although they may not be conclusive. Experiences during reception can carry over for some period after the youngster has been assigned to a cottage and program.

Where a central diagnostic facility is not available, the desired information can be secured by placing the youngster in a special living unit designed for reception or orientation purposes. Here his behavior can be observed by his cottage parents or group leaders. A social worker interviews him and evaluates his feelings and problems. He is seen by the educational director to ascertain his attitudes toward education and his problems regarding learning. He will evaluate the boy's past school achievement and learn about his vocational interests for academic and vocational placement. He is interviewed by the chaplain to determine the extent to which religion may have played a role in his past life and what it might be able to do for the youngster while he is at the school and for his future adjustment. He is given a thorough physical examination, and health problems are noted. He is seen and tested by the psychologist who will evaluate the boy's personality. The psychiatrist interviews the boy and gives his diagnosis and prognosis as well as enumerating the youngster's strengths, weaknesses and needs. The psychiatrist will analyze the dynamics of the boy's development and make recommendations for care and treatment.

Institutions equipped with staff and facilities to organize such an orientation program (this is becoming much more common than otherwise, and is increasingly being recognized as a necessity in institutional administration) will usually plan for an assignment or classification committee meeting where findings and recommendations are presented. In order for committee deliberations to have greater meaning, there should be considerable sharing of ideas throughout the orientation period and not be confined to a single meeting. To bring this about, it is advisable to place in charge of the orientation process the clinical director or the person given the responsibility of directing care, training, and treatment in the institution.

With a reception period organized in this fashion, it is possible to secure a clear picture of a youngster's problems and needs. Recommendations would be made for cottage placement which would take into consideration its group structure and composition, as well as the nature of its leadership. The institution would be familiar with the youngster's interests and intelligence, his status requirements and past school achievement for appropriate school assignment and vocational placement.

### GROUP AND INSTITUTIONAL SIZE

To have available a diagnostic picture of a youngster, would be useless if the institution does not possess the necessary facilities for treatment. There should be a sufficient number of group living units which would allow for variation in placement. If the training school is to individualize treatment, an intimate understanding of a youngster's drives, interests, and behavior patterns is required with opportunity for close relationships with adults. This can only be accomplished if groups are held small. No living or cottage group should be larger than 20. Fifteen would even be better but this might be too difficult to attain in the present scheme of things. Other groupings within the institution should also remain small in order to further individualization efforts. The size of these particular groups would be determined by their particular function. Academic class groups should not be larger than 15. Remedial class groups should have a maximum size of 5 to 8. Size of vocational groups should be related to the amount of facilities available to enable the youngster to be gainfully occupied throughout the period of class instruction. Club and special interest groups should also be small to permit considerable give and take among group members and their leader.

The larger the group, the greater the possibility of failure to recognize individual needs. The larger the group, the greater the possibility of group disturbances and the formation of subgroups with destructive characteristics. Informal groups are part and parcel of group living in general, whether in an institution or in the community, and other factors will produce them. However, the large group decreases the possibility of its members to respond to the leader's control and influence. It leads to peer control of the group and the retention of delinquent values.

KR0487

A large institution, in itself, can also inhibit desired treatment procedures. It has been recommended in many circles that the training school's capacity should be limited to 150 children.[2]  No effective research has ever been instituted to determine optimum size of an institution.  There is no question, however, that the larger the institution, the more difficult will it be to communicate treament concepts.  More supervisory levels are required in organization and more people are involved in giving direct service.  There is a greater danger of staff misunderstanding and even refusal to accept, either openly or surreptitiously, the administrative program.  In the large insitution, the superintendent and his top assistants can easily be psychologically and physically removed from their clientele and from staff who have immediate contact with children.

There are a few positive factors in having large institutions.  Possibilities for more staff and varied facilities are prevalent.  More funds are apt to be authorized by legislatures and budget divisions, who are sensitive to numbers and size.  Although the trend in this country is away from huge undifferentiated institutions to smaller facilities with specific functions, it is possible to decentralize treatment programs in larger institutions and overcome some of the negative features of large organizations.

An institution may be divided into a number of self-sufficient divisions, according to size and physical layout, each with its own staff and director functioning under a supervising superintendent.  Classification of the divisions might be based on age, maturity, vocational and academic interests, supervisory controls, emotional problems, and similar factors, considered individually or in combination.  Under such an organizational system, each division becomes almost an institution in itself, as far as care and treatment are concerned, with the added advantage of having centralized services based on the number of youngsters in the total institution rather than in the individual divisions.  It requires additional personnel in the way of teachers, group leaders and social workers, as well as more facilities to serve a decentralized organization, but it individualizes program and service in large institutions.

### INSTITUTIONAL ORGANIZATION FOR TREATMENT

Organization of treatment facilities and program is another important area of institutional administration.  Present-day clinical services were primarily developed in community voluntary agencies, especially in child guidance and mental hygiene clinics.  Unique eligibility requirements for aid evolved from these settings.  The client or patient must want help and must be capable of entering into a meaningful relationship with the clinician.  To seek such help implies possession of sufficient anxiety and recognition of need.  In the case of children, one or both parents must usually become similarly involved.  These concepts are in keeping with traditional American democratic principles and are a result of our heritage and cultural background.  In fact, our traditions regarding individual initiative have made "authority" a nasty word in our vocabulary.

The training school, however, is an authoritative setting.  The children it receives are committed via the children's courts against their will.  It is not a voluntary process no matter how permissive the general climate of the institution may be.  Yet authoritative institutions in their efforts to individualize their programs, largely at the encouragement and insistence of the clinical disciplines, have adopted the typical organization and methods of operation of the voluntary community agency in the treatment area.  Institutions which have a plentiful supply of clinical personnel, assign their children to case workers on an individual basis, and efforts are made to help them with their problems of adjustment.  Facilities with a small clinical staff usually limit their casework service to a few children who have unusual difficulties in making an adjustment.  Psychiatrist, psychologist, and social worker become members of a clinical team and constitute a separate department in the organizational plan.  The clinical team's relationship to other departments is usually defined in idealistic rather than in typical organizational and administrative terms.  They are expected to work closely with the personnel having direct care responsibilities for the children but on a voluntary teaching basis, where possibly only those staff members who are interested and eager to receive understanding and

---

[2] Children's Bureau, National Association of Training Schools and Juvenile Agencies, Child Welfare League of America, American Psychiatric Association.

KR0488

clarification of problems secure the benefit of clinical contact. On the other hand, those staff members who reject interpretations which require change on their part usually remain untouched by clinical influences.

There are two major, but very often conflicting, elements in training school administration in the country today. One is control and discipline, and the other is treatment. Cottage staff especially are conflicted by what appears to be two opposing forces. They are expected to keep control in their cottage units; in fact they are even rated on their ability to run a smooth organization. On the other hand, they are directed to individualize their approach and treat each child differently. This can be a divisive policy when discipline and control are at stake.

The conflict is not resolved through the traditional institutional organization of clinical and cottage services in separate departments. Clinical personnel do not have the responsibility for cottage operation. Their relationship is primarily advisory and heavily concentrated on individual adjustment rather than the concerns of the group. Cottage staff supervisors are usually too few in number and concerned primarily with group controls and cottage routines. Even assuming that there was a sufficient supply of cottage staff supervisors and that they were trained and experienced, the existence of two lines of opposing interests as defined administratively by function and duties would only continue the basic conflict of cottage staff. The cottage parent's dilemma is expressed in his complaint that if the social worker was required to care for 20 children she would not call for special treatment for the youngster in her caseload who has violated cottage regulations. The social worker, on the other hand, protests that the cottage parent lacks understanding of the child's behavior and the professional training which would make it possible for him to do a decent job. Very often, unconsciously perhaps, the conflict is furthered by the administration. Under pressure from the community, which is deeply concerned about runaways and aggressive behavior, the superintendent may be quite contented to have a cottage parent who is able to have control in his cottage unit even though clinical considerations may not be fully appreciated. When nothing is done in such a situation, status quo, of course, continues. In addition, delinquents have a brilliant knack in recognizing staff differences and playing one against the other to suit their own needs.

Another problem that must be taken into consideration in the administrative organization of treatment facilities is that of informal group formation by the children in the training school. The conflicts and problems of growing up and the struggles with the adult world can be tolerated and even rejected by the youngsters within the confines of their own groups. The delinquent adolescent can join his neighborhood gang which accepts and preserves the values that cannot be tolerated by the rest of the community. Peer relationships and groupings are just as important within the institution and serve a similar purpose. They counteract adult efforts to change their behavior and act as a bulwark in maintaining their personality structures and personal values. At the same time they offer protection and security to those involved. These informal groups do not necessarily have to be destructive in character, although their size, strength, and antisocial characteristics can be directly correlated to the extent to which the institution can direct their energies and focus their interests toward constructive goals.

The traditional form of institutional structure with clinical and cottage life personnel in separate departments makes very little dent in informal group activities. The effect of weekly clinical contacts, for example, is minimal in comparison to the influences of the children's own informal group leaders. Most of the youngsters seem to play one role in the clinical office and a completely different one in the cottage setting or in any other institutional group.

It has been the writer's experience that in those States where mental hygiene and school guidance clinics, family and child guidance agencies, probation services and other facilities of similar character and scope are available in sufficient number, the juveniles who are committed to the training school show very little anxiety about their behavior. A majority of those children who recognize and show sufficient concern about their problems are helped in their communities and are not committed. As a result, the clinician finds comparatively few children in the training school who have enough overt anxiety about their behavior to respond to a face-to-face contact, the typical tool of traditional clinical operations.

KR0489

## NEW TREATMENT STRUCTURE

All of these factors, therefore, make it necessary to consider a different treatment structure than has been in existence heretofore. Modifications of traditional forms of treatment have been made in a few training schools in this country in recognition of the problems involved. One institutional treatment organization will be described in detail because of its sharp departure from the usual structural form.[3] This is especially true in the way the role of the social worker has been redefined.

In this new treatment structure, clinic and cottage life are eliminated as separate departments. Social workers are assigned to supervise the activities of the children and cottage staff in 1 or 2 cottage units. They have direct authority over the cottage staff and are required to offer supervision and guidance to the cottage parents in handling the youngsters under their direction. Cottage parents are looked upon as technicians with the professional supervision supplied by trained social workers. Social workers and cottage staff are thus responsible for a common treatment process. The latter share their total problems with their social worker supervisors, who are ready to help them resolve the complicated conflicts and decisions posed by the necessity to carry on disciplinary and treatment activities at the same time. The social workers, as supervisors, are expected to evaluate the cottage parents' strengths and weaknesses and help them develop on the job.

The social worker becomes involved in cottage disciplinary matters. "Discipline" and "authority" are sometimes anxiety-producing words in clinical circles. In actual practice, however, there are almost no settings in which clinical services are offered without authoritative connotations. Children, for example, do not come to child-guidance clinics under their own volition. When one considers the pain that is involved in revealing one's own inner thoughts and conflicts, as well as the resistance that is involved in change, the authoritative connotations in clinical services can be well understood. In addition, the setting of eligibility requirements and agency limitations of service also involve authority and discipline to the clients and patients concerned. Discipline or authority cannot be avoided; only the manner in which either is utilized is important to the treatment process. Experience of a year with the new treatment program has demonstrated that the traditional client-worker relationship is not affected by the stronger authoritative role played by the social worker. In fact, the feeling has been that the relationship is strengthened because the youngster must come to grips with his problems quickly, without being able to play one staff member against the other.

In addition to supervisory responsibilities, social workers direct their attention to the cottage group itself. The cottage group is the key area for treatment during the youngster's stay in the training school. What happens to him within the cottage group determines whether he is going to respond positively or continue his own way and means of avoiding change. The nature of the group climate therefore becomes a very important part of treatment; the failure to understand the way a youngster feels at a certain moment; the influence that such a child might have upon others within the group; the effects of rules, regulations, and procedures which may be obvious and necessary, but completely unacceptable to the group or its subgroups.

Social workers, in this phase of their duties, sit down with the group and cottage staff members to discuss everyday problems. The discussion might revolve around the meaning of a regulation, or the introduction of a rule to allow for total participation in a cottage activity. Should the cottage adopt special procedures for listening to certain television programs? Would the group prefer to stay up late one evening to watch a certain program and thereby be too tired to participate in another activity the next morning? What should be the proper clothing to wear to school? Problems of adjustment might be the topic, if appropriate for general group discussion. Why did a certain youngster get into difficulty and what were the group's feelings as to the manner in which the problem was handled. Suitable films and other visual aids might be utilized to stimulate discussion.

---

[3] New York State Training School for Girls, Hudson, N. Y. Another modified form of treatment organization is utilized at Hawthorne-Cedar Knolls School, Hawthorne, N. Y., where cottage parents and caseworkers have common supervisors.

KR0490

The purpose of this phase of the social worker's role is to permit children to participate in areas which are of immense concern to them. Decisions arrived at by adults alone are matters to fight and disregard. Individual violation of group deliberations, however, incurs the displeasure of peers. It might also result in unpleasant retaliations, but the reasons behind deviation also become a topic of discussion to deter group rejection. Conforming to group decisions is also furthered through group rewards for esprit de corps, such as attendance at special dances. Social workers are expected to participate in the group's activities, and as much as is possible and appropriate, become part of the group.

Another important role of the social worker in this treatment-organization plan is to work with those informal groups that are stable and not constantly changing in membership. Content may be in the form of activity, discussion, or in a combination of the two. Focus is on helping the subgroups make an adjustment to the total structured unit, participate in its activity and to assume meaningful and positive roles within the group. Discussion within these groups very often is similar to that of the larger structured grouping. The small, more homogeneous group, however, permits more personal involvement, encourages greater interaction among its members and can better satisfy individual needs. The group members share their difficulties and express themselves in a manner which is not noticeable in individual contacts.

Informal groups are encouraged to take on special tasks within the cottage unit in keeping with whatever skills they possess. Such groups within the institution have assumed responsibilities like making curtains for the cottage, preparing and caring for area flower gardens, making and selling various articles for the purpose of creating a cottage recreation fund, etc. Group incentives, through special rewards, plus the relationship that is developed with the social worker, permit energy and drives to be diverted from destructive pursuits to highly responsible transactions. Status and satisfaction achieved, supports further adaptation.

The social worker is also called upon to work with other types of small groups. Selection of membership is based on common interests or problems, personality factors or on other criteria that would create some homogeneity and promote group interaction.

Change of behavior does not usually take place without the development of some anxiety and guilt. Some of this can be handled within the group. The sharing of experience, the discussion of various problems, the support which staff and peers give to individual youngsters are anxiety- and guilt-allaying features. With some children this is not sufficient. They require individual attention which social workers are expected to offer. Contact does not necessarily have to be on a long-term basis. Very often 1 or 2 individual interviews in conjunction with group participation can allay the child's anxiety sufficiently for him to benefit from continued group contact.

Social workers in their everyday contact with the cottage group and other groupings, and being familiar with the needs of each youngster under their care, are in a position to determine who would require the individual interview, as well as how much of it would be needed.

The psychiatrist and psychologist in this organization plan act primarily as consultants to the social worker, in addition to having classification and diagnostic duties. Problems related to personality functioning and intelligence might be referred to the psychologist by the social worker for selected testing of the youngsters concerned. The psychiatrist is called in for consultations to analyze the dynamics of certain behavior patterns and to give advice as to approaches to these difficulties. Depending upon the amount of psychiatric time that is available, he sees a few youngsters in therapy, either individually or in groups. He is also utilized in case conferences as an aid to staff training and development, either as requested by the social worker concerned, in formal planned meetings by the director of the program, or in other areas of the institutional organization, such as the academic and vocational schools.

### TREATMENT RESULTS

Experience with this new treatment structure has led to a number of conclusions on the part of the institution's administrative and treatment staff.

1. It eliminates the traditional conflict between cottage staff and clinical personnel, by making them both responsible for the same process with similar concerns.

2. It dynamically changes the focus and program content of peer groups so that new behavior patterns are constantly strengthened.

KR0491

3. It makes it possible for children to become conscious of a different way of securing satisfaction and status with a constant diminishing need to fight it.

4. It lessens the gap between authority, as represented by the institutional staff, and the youngsters themselves.

5. It deals directly with the key repository of delinquent values, through recognition of and work with informal groups.

6. It affords the necessary training and supervision of cottage staff who hold key responsibilities in institutional life.

7. The tendency of the delinquent to fool staff and play one member against the other is radically narrowed, requiring him to face up to his behavior.

8. It produces a climate that allows for children participation in rule setting and behavior control, with a corresponding lessening of superimposed methods of operation.

9. Cottage staff are happier, more accepting of suggestions, less rigid in their relationships with children, anxious to adopt treatment approaches, constantly seek out social work supervisors for advice around treatment needs of their youngsters, and concerned about gaining a reputation of running a good cottage. This is due to the fact that the new treatment structure transfers the conflict between treatment and control from cottage staff to social workers as supervisors, who are in a better position to resolve it. Cottage staff are no longer expected to be superhumans, competent in all areas of human endeavor.

### CONCLUSIONS

Training schools in the United States today are in a period of transition from a custodial form of organization with simple goals to a treatment-oriented structure focused on individualization of program, change in personal values of their clients, and developing self-understanding and control, which have been superimposed on older custodial considerations. As a result, throughout the country, training schools are in different stages of development possessing features of the old as well as of the new. It is interesting, however, and very sound to see these institutions developing here and there, their own forms of treatment, designed to meet training-school problems, needs, and considerations. On its road toward developing into truly treatment-oriented institutions, they face considerably grave problems, such as unselected intake, undifferentiated and large populations, lack of appropriate staff, poor salaries in certain categories, and weak legislative and budgetary support. They are problems that are recognized, but are only slowly being overcome, with progress noticeable in many areas throughout the country. The problems are not insurmountable, and training schools can acquire the tools for treatment service.

The classification and treatment program described in this article stems from training-school experience. As further attempts are made to evaluate its program, and study its treatment needs and requirements, new forms of institutional organization will no doubt develop. This is something that should be encouraged through increased public support as well as legislative and budgetary interest. Treatment approaches and forms are not necessarily endemic to small treatment centers. It is possible to offer the necessary services in the training school if authorization can be forthcoming from the appropriate decision-making bodies. The combination of public support and understanding and skilled administrators can very well do the trick.

------

[Published in Federal Probation, June 1956]

### ACHIEVING INTEGRATION BETWEEN THE JUVENILE DELINQUENT AND HIS COMMUNITY [1]

By Abraham G. Novick, Superintendent, New York State Training School for Girls, Hudson

The rise in juvenile delinquency, as demonstrated by all available statistics, has made it a topic of everyday conversation. The publicity given to some of the more gruesome acts of violence, and newspaper stress on the sensational, has led to an almost unhealthy concern with the problem, at times bordering on hysteria. Unfortunately, periods of hysteria do not produce well-thought-out

[1] Paper presented at the National Conference of Social Work, San Francisco, June 1, 1955.

KR0492

plans for solving problems but tend to create fear, anxiety, and a convenient medium to express hostility.

In the public eye today, juvenile delinquency is alternately the direct result of progressive education, horror comics, TV programs, permissiveness of parents, and other "pet peeves" of our present society. The situation is investigated and reinvestigated. Conferences are called to study the problem. Forums led by expert panels are held. All come to the conclusion that juvenile delinquency is a problem.

This is not a new phenomenon. Each generation of adults has been concerned about the behavior of its children and has looked for a scapegoat on which to place the blame for its delinquency. At the same time, adults have always sought a panacea which in one swoop would cure the problem. It is sufficient to note that delinquency has always risen during periods of stress and strain, and the era in which we are living is no exception.

This period of hysteria has led to an increase in commitments, more police action, more community restrictions, and, in general, the tendency to rely upon punishment as a solution to the problem. It is interesting that adults, having learned to control their aggressiveness and antisocial feelings, tend to resent the fact that others are not exercising such control. Their equilibrium seems to be threatened when others express themselves without restriction. In a sense, their desire to punish the wayward strengthens their own controls. They may also be expressing their guilt in feeling responsible for the conditions that have produced delinquency in their children.

The tendency to react with hostility and punishment in dealing with the delinquent does not lead to changes in behavior but only serves to further segregate the delinquent from the world about him. An analysis of the developmental process leading to the "acting out" of personal problems reveals why punishment, as contrasted to discipline, acts as a deterrent to treatment and the subsequent integration between the delinquent and his community.

### CHARACTER DEVELOPMENT

The newborn child operates on the basis of the pleasure principle. Instinctual drives must be immediately gratified, otherwise the child becomes tense and unhappy. It isn't too long, however, before he learns to tolerate mild frustrations related to meeting his bodily needs. Since he knows that he will be fed, he can accept delays and regulation, bolstered by his mother's love, affection, and warmth which he receives in the process. Expression of other primitive and antisocial feelings, particularly those involving aggression, are similarly modified under the expert tutelage of the parents. It can now be said that he is operating on the basis of the reality principle.

The modification of instinctual, antisocial drives, which takes place primarily during the first 3 years of life, depends entirely upon the kind of relationship that the child has had with his parents, especially with his mother. If there has been a firm and warm relationship, and frustration of antisocial expression has been within the child's endurance, he will be able to accept substitute gratifications, pleasing to his parents and to society. However, if the relationship between the mother and child is defective, through either neglect on the part of the parent, undue repression of the child's desires, inconsistent handling, or separation of the mother from the child for any length of time, then the development of controls will be affected. The child will continue to express his instinctual antisocial drives in one degree or another. If frustrated, he will be unable to tolerate the resulting tension, thereby producing temper tantrums, biting, kicking, breaking of objects, and other signs of aggression. If the child has strong instinctual drives, and if the environment is not very favorable, his behavior will be that much more severe.

The child goes into the next stage of character development with difficulties in establishing relationships with people. If the adults and children coming in contact with him are able to satisfy his desires they will be liked. They will be hated if they frustrate his needs. Guilt feelings concerning his antisocial behavior are lacking because of defective development of inner controls, and because his relationships with people are established only on a self-gratifying level. In order to feel guilty about unacceptable behavior a person must first learn to modify such behavior, and develop some concern for other individuals. If he has not had this experience, guilt will not be present.

The severity of the delinquent pattern manifested is directly related to the degree of the character disturbance just described. When delinquent behavior, such as lying, stealing, or being unmanageable at home appears very early in

KR0493

life, the character defect is pronounced, and there are usually indications of severe disorganization in family-child relationships. If the delinquency has a definite pattern, showing itself only in certain areas, such as stealing from only a particular individual, stealing only certain objects, running away from home, or arson, then the character defect is not as great. These are neurotic, although antisocial symptoms, and indicate that controls over some instinctual drives have been developed but are lacking for others. Delinquent behavior that does not appear until adolescence will reveal very little pathology in early development and is primarily a result of environmental conflict. The behavior shown is usually antisocial without any neurotic characteristics. The behavior has been triggered by the adolescent problems of growing up, or by some traumatic experience in the family constellation. The symptoms are usually a repetition of antisocial behavior of an early period in life, when controls were first developed.

With this concept of the development of delinquency, it is fairly easy to see that punishment and severe restrictions, in themselves, will not produce any effective change in the personalities of the children concerned. They may for a time prevent the expression of antisocial behavior but sooner or later it will come to the fore. Restrictive measures of a punishing variety, the base of which is usually hostility and resentment on the part of the punisher, only emphasize the rejecting factors of the early period of development which produced the antisocial behavior in the first place. They only tend to further segregate the delinquent from his community.

### TREATMENT OF DELINQUENCY

Effective treatment of delinquency depends upon the establishment of a strong emotional relationship with an adult who will reeducate the delinquent. The child with a strong character defect will find it very difficult to establish such a relationship because of his inability to maintain a contact which will endure frustration. His needs are on a narcissistic and infantile level, requiring the total time, interest, and concern of the adult. The degree to which this relationship can be established will determine the success of his reeducation.

It is now easy to see why some of the plans presented and methods utilized to treat delinquency have not been too successful. Increased recreation facilities, improved housing conditions, bigger and better schools might alleviate some of the more gross manifestations of delinquency but they don't touch upon the basic elements which produce the condition in the first place. Better facilities and living conditions are important because they affect the dignity of the individual. They help to eliminate the economic deterioration and deprivation which are characteristic of so many of our delinquent homes and which so very often contribute to family disorganization. Neither do restrictive measures such as curfew, censorship of reading matter, television, movie, and radio programs prevent delinquency. They merely have an effect upon the manner in which the delinquency will be expressed.

Let us examine some of the attempts at integrating the delinquent and his community, from the point of view of the treatment need to establish a close relationship with the child. Recreation programs for the delinquent cannot be on a mass basis. It must be in small groups with warm and understanding leadership. It is very difficult to attract delinquents to participation in established recreation programs. The gang offers many more opportunities for pleasurable expression. Those who do manage to gravitate toward the community playground or settlement house bring their behavior patterns with them. Teamwork, sportsmanship, sharing facilities and equipment, consideration of others, and other cardinal principles of recreation center structure are foreign terms to the delinquent. If he is to be reached it must occur in small groups with understanding and trained leadership.

The transfer of families living in slums to public housing facilities has not lowered the incidence of delinquency. It is unfortunate, but the delinquent must take his personality along with him. Public housing projects could become more meaningful to the delinquent family if they were equipped with special management centers. Such facilities would not only have housing managers but specialized staff to conduct parent-education programs, and recreation activities for both adults and children, and serve as counselors to the residents when necessary.

Education laws throughout the country compel children to attend school until a specified age. Since school is where the child spends so much of his day, it plays an important role in his development.

KR0494

Truancy is almost a universal characteristic of the American delinquent pattern. It is so, because the delinquent child is usually unable to sublimate his instinctual drives through school study and activity. Since gratification of his instincts are of primary concern, he does not have the inclination nor energy to concentrate on schoolwork. Since our classes are almost universally over-crowded, and schoolwork is based on a set curriculum, it is fairly difficult for the average teacher to divert her attention from the total group and concentrate her efforts on the difficult youngster. The delinquent child requires specialized teaching methods where knowledge is acquired through projects on the subject to be learned. Learning must take place through doing. Needless to say, the teacher's personality is of vital importance. Warmth, interest, concern, pa-tience, and ingenuity are the required attributes. With the country's schools 12,000 teachers short of their requirements, it is probably too much to expect that a dent can be made in the incidence of delinquency in the classroom. It is possible to expect, however, that the child with problems be recognized and that he be referred to available community or school facilities for treatment. Many schools do not want to bother with the delinquent. He is too tough to handle and too disturbing to normal school operations. Many other schools do not have any clinical facilities to which they can refer problems. To counteract this con-dition it should be possible to assign, according to need, teachers with the proper personality and understanding to work with those children who require special attention.

Child guidance clinics, casework agencies, psychiatric clinics, and other agen-cies offering direct treatment services, within their limits, are doing an excellent job in treating disorders that have delinquent characteristics. By and large, however, their intake is limited to milder forms of disturbances and to families who are willing and interested in receiving the services offered. The large de-linquent areas of our cities would hardly be touched by these services. Attempts in recent years have been made to go out to the delinquent areas and reach children and parents who would ordinarily not ask for help. Aggressive case-work, and working with gang groups in their natural habitat, are efforts of this nature. This type of work is in keeping with the importance of establishing a close relationship with the delinquent and gaining his confidence. If we are going to be successful in the early treatment of delinquency and to integrate the delinquent into the stream of community life, considerable effort must be expended with sufficient financial support to discover new methods of over-coming the resistance, suspicion, and hostility of families who require assistance, yet do not give any sign of seeking it.

One of the big problems in helping the delinquent is the manner in which he expresses his difficulties. The fact that he "acts out" his problems could lead to legal complications. Even with children under treatment, the probability that delinquent behavior will continue for some time until reeducation takes effect, could bring him to the attention of the police. The child will be referred to court, and the legal phase of the delinquent's career will begin. Some of the milder delinquents will be helped by the probationary process. Those children possessing a more serious character defect will not respond. The need to gratify instinctual drives will override any consideration of future conse-quences. These are the children who will be committed to the training school.

Placement in an institution is obviously a process of segregation. We must remember, however, that the delinquent has already segregated himself from his community through his actions, distrust, and life history. The value of the institution to the delinquent is that it offers a setting which combines controls, protection, and a totality of treatment which he has not experienced in his com-munity. If the institution has the proper atmosphere for treatment, sufficient facilities and staff to offer the necessary services, then the primary factors are present for helping the delinquent who cannot be tolerated in his community.

Integration of the delinquent child to his community cannot take place until some modification is made in his behavior and outlook on life. In the training school, treatment of the delinquent must center around the relationship that is established between the child and other children in the institution and with adults on its staff. An atmosphere must be created which will enable the child to want to give up his negative behavior and acquire socially accepted methods of adjustment. This cannot be accomplished by pure custodial care or through repressive measures under close supervision. This child may not be a problem under such an approach during his stay in the institution; but, once this close supervision is removed, he reverts back to his former behavior. The goal is to help the child acquire controls within himself. This can be accomplished if the

delinquent has an opportunity to express his negative and aggressive feelings; having them accepted by the staff as logical behavior in view of the child's background and experiences; giving him the chance to receive the attention, affection, and consistent handling he needs; and making it possible for him to acquire status and self-esteem in socially accepted channels.

Since the training school is a group setting, the importance of group living and the assignment of children to groups on a scientific basis cannot be over-emphasized. If the delinquent is able to make an adequate adjustment to his cottage group, he takes the initial step toward making an eventual adjustment in his community. It is in the group that the delinquent experiences controls in operation and it is there that he is helped to absorb group thinking in relation to his own unique ideas and goals. No matter how he acts in the group, he finds that he must respond to the group's goals, interests, and pattern. At the same time he receives considerable security in becoming a member of a group of children with similar problems. He becomes aware that his difficulties are not entirely unique but that his feelings and complaints are shared by others.

Probably the greatest satisfaction that the child can receive in the training program is learning to trust adults. In cottage life the development of a relationship with the group leader, as a helping person, is an important goal. The group leaders must know their children; they must be aware of their likes and differences so that they can prepare their program and carry out their group activities in light of the membership of their group.

The group program requires a casework emphasis to meet the child's needs. It is with the caseworker that the child can talk of his experiences, problems, and anxieties. His difficulties in adjustment, his relationships with cottage staff, teachers, and youngsters are shared with the worker. Fantasy and exaggeration, hostility, and totality of outlook are skillfully broken down to help him face reality. New-found strengths and reactions can be tested out by the child in the casework interview. The caseworker can interpret the child to cottage staff, teachers, and other personnel, so that a common approach can be adopted.

The academic and vocational programs offer opportunities for the discovery and development of skills. For the delinquent it is important that this not be made an end in itself, but a means to help the child gain confidence in himself and acquire a sense of importance.

Too often the institution isolates itself from the community. This is a common practice with institutions having delinquents as their clientele. Isolation only breeds community fear and lack of understanding of the institution's purpose. Such a policy fails to evaluate the dividends that are accrued for both staff and child from community contracts. For the staff, integration brings status and recognition in direct proportion to the standing of the institution. To the delinquent it further emphasizes their importance as individuals, and serves as another example of adult interest in their welfare and adjustment.

In its concentration on services, and in the improvement of treatment techniques, an institution, at times, tends to forget that it is an intermediate stepping stone toward the eventual return of the child to his community. The delinquent child may make an excellent adjustment in the institution but will usually have considerable misgivings, fear, and conflict when it is time for him to leave and return to his community. Newly found controls over behavior do not necessarily breed confidence.

To lessen the impact of institutionalization, the child should not only receive visits from relatives, which is common practice, but be permitted to go home for vacations. This reduces his feelings of segregation, and allows for a preliminary evaluation of what he might face at home. Home visits tend to break up fantasies about parents which disturbed children build for themselves while away from home. Upon return to the institution they are more apt to come to grips with their problems and face reality, even though they may be initially upset.

Problems of desegregation and integration are not solved through lectures on the methods of looking for a job or on the difficulties of returning to school. The training school should be working with the family while the child is in the institution. This can be accomplished with a field staff of caseworkers who will work directly with the parents while the child is in the institution. Parents of delinquents, like their children, have little trust in the willingness of other adults to help them. They are usually deprived and harassed people who can use help if they can be induced to accept it. With the child removed from the family picture, the vicious circle of cause and effect in the development of the

KR0496

behavior is broken. As a result, such parents are enabled very often to consider the circumstances which produced the behavior difficulties in their child. While the child is in the institution, plans are already being made toward his eventual return. Upon the child's return to the community, the aftercare caseworker works with him as well as the family around the problems of adjustment, which may be related to home, school, job, recreation, or to the difficulties of living in the community on a different basis than heretofore. We must not forget that, after all, a child is part of a family; that concentration on the child to the exclusion of the parents is not total treatment.

It is necessary to stress, once again, the importance of the institution as a treatment tool for delinquency. Overt, hostile behavior, often leading to violence, is not going to be tolerated by society. A controlled and structured setting is desirable and required for the antisocial child not responding to community treatment efforts. There are a number of factors, however, that have tended to operate against the full use of such a facility.

1. There is still too great a tendency to look upon the institution as the last resort, to be tried only after other efforts have failed, rather than a service which might be offered early in the treatment timetable as suitable to children with certain kinds of problems.

2. The training school has been the subject of considerable criticism. Good and bad facilities have been lumped together, as if evil was endemic to the training school setting. If public apathy and indifference permit poor services, we will not have good institutions. There is nothing to prevent the training school from carrying out its assigned functions if it has good personnel and salaries, appropriate intake policies, varied facilities to work with different categories of delinquents, and removal from the political field of operation.

3. It is sometimes difficult to secure trained personnel for the institution. The above two factors play a role in this, but there are others as well. Institutions are usually removed from cultural and training centers, making recruitment difficult. There is also still some doubt that effective treatment can be given in an authoritative setting. We forget at times that authority is present in one form or another in any setting. It is not authority itself, but the manner in which it is used that determines effective treatment.

These factors need to be overcome in order to take full advantage of a service that is vital in the treatment of delinquency.

### CONCLUSIONS

There is room for considerable research and experimentation in the field of delinquency, to determine how we can better reach children and families before they become serious problems and completely segregated from the communities. There is considerable necessity for overall coordination of programs to meet the needs of delinquents and their families, to counteract the hysterical reactions and pressures for pet programs and quick solutions during periods of stress. The trained, initiated, and interested citizenry must supply the social action required to persuade local, State, and Federal legislatures and administrations to grant the necessary funds for effective programs. We know a lot more about the characteristics and origin of delinquency than we are led to believe. What we need is more and better coordination of effort, and more successful methods of communicating what we know to the general public and to our decisionmaking bodies.

---

STATEMENT SUBMITTED BY DONALD D. SCARBOROUGH, SUPERINTENDENT, NEW YORK STATE VOCATIONAL INSTITUTION, WEST COXSACKIE, N. Y.

MEMORANDUM TO UNITED STATES SENATE COMMITTEE ON JUVENILE DELINQUENCY, CONCERNING THE NATURE AND PROGRAM OF THE NEW YORK STATE VOCATIONAL INSTITUTION, WEST COXSACKIE, N. Y.

This is a reformatory-type institution in the New York State Department of Correction, established for the care and treatment of young offenders between the ages of 16 and 21, from any part of the State. The institution was opened in 1935, and replaced the House of Refuge, Randall's Island, New York City, which had been in continuous operation from December 1824 to 1935, under the auspices of the Society for the Prevention of Juvenile Delinquency in the City of New York. That institution was originally operated as a private venture, later subsidized by the State, and eventually was taken over by the New York State

**KR0497**

Department of Correction a few years prior to the opening of the New York State Vocational Institution.

The intake of the New York State Vocational Institution, originally by direct commitment from any court, is currently through the transfer of youths committed by the various courts to the New York State Reception Center at Elmira. Release on parole is authorized by the New York State Executive Department Division of Parole, and supervision and aftercare are under the direction of that agency.

All types of commitments—juvenile delinquents, wayward minors, youthful offenders, misdemeanants, and felons—may be received at the New York State Vocational Institution, but currently the only juvenile delinquents are a few transferred from State training schools and an occasional youth adjudicated a juvenile delinquent before the age of 16 and subsequently committed after the age of 16. On the average, from 500 to 600 new inmates are received annually, and of these slightly more than half have been adjudicated as wayward minors or youthful offenders. The average stay in the institution, counting the 2 months originally spent at the reception center, is approximately 15 months, and the remainder of the sentence, whether it be a maximum of 3 years for wayward minors, youthful offenders, or misdemeanants, or a maximum of 5 years on a felony conviction, is spent under parole supervision.

Thus it is obvious from the above that whereas the institution does not deal directly with juvenile delinquents, it does receive youths a majority of whom have been juvenile offenders, and many have previously been adjudicated juvenile delinquents, and have been in training schools. Of 521 new admissions for the year ending March 31, 1957, only 93 had never been arrested before and, for the remaining 428, 1,102 previous arrests were recorded. Twenty-eight had been arrested 6 times or more. Of the 1,102 arrests of 521 individuals, 290 of those arrested ended in commitments to institutions. (These 290 commitments involved only 163 individuals for an average of almost 2 commitments per person committed.)

It is therefore obvious that this institution is engaged with the problems of youths who have so recently been juvenile delinquents that for practical purposes they may in many respects be included in the problems of juvenile delinquency.

The New York State Vocational Institution operates under the New York State correction law and is subject to many of the rules and procedures covering other institutions in the New York State Department of Correction, providing a setting more authoritative than is found in the average training school. However, many procedures are quite similar to some of the procedures in the more progressive types of training school. Those who come are failures; and in addition to the requirements of housing, medical attention, and safe custody, major emphasis is placed upon educational and related activities, including vocational training, related technical subjects, health, recreation, and physical education, counseling, and religious life, which are carried on in a fashion similar to training-school procedures and the procedures of many schools for exceptional children. All inmates in the New York State Vocational Institution come by transfer from the New York State Reception Center where all inmates 16 to 21 years of age committed to the department of correction are studied, diagnosed, and classified for transfer to appropriate institutions for treatment. To this institution come the younger, more hopeful cases, at the rate of approximately 550 a year.

Upon arrival at the institution, after a brief period of local orientation, they are assigned to programs of activities in accordance with the circumstances described above. Each such inmate is also assigned to an individual counselor who, from time to time, holds interviews, checks progress, and in many other ways assists the inmate in adjustment to environment, the utilization of opportunities, and preparation for release and eventual activities in free society.

In many of the vocational trades (the total list includes electrical work, sheetmetal trades, machine shop practice, auto mechanics, masonry, plumbing, welding, printing, upholstering, woodworking, painting, shoe repair, tailoring, laundry practice, barbering, and bakery as organized trade instruction, and dairy farming, general farming, vegetable growing, and a number of other activities on an unorganized basis) courses of instruction are standardized and approved by the University of the State of New York, and certificates are issued to those who participate. A considerable number of inmates get additional on-the-job training in the various maintenance activities of the institution.

KR0498

From time to time, the progress made by members of these different groups is appraised, and the program committee, at weekly meetings, evaluates such progress and determines whether the youth is considered ready for parole.

Although emphasis is placed upon the acquiring of trade skills in these trade-instruction classes, the major objectives are teaching good work habits, acceptance of individual responsibility, and the ability to live successfully in free society. Thus, the program of treatment at this institution is quite similar to the program of training school so far as philosophy of treatment is concerned, but the activities are conducted in a manner and on a level suited to the age of the group involved.

In anticipation of parole, further preparole counseling is given and if the inmate is actually released, he is under the care of a parole officer according to the usual procedures governing such matters.

From the foregoing brief description of the activities of this institution, it is obvious that we are dealing with the problems of juvenile delinquency as they become somewhat more acute and more aggravated with older youths. The major difference between this institution and a training school is, perhaps, that we operate in a somewhat more authoritative setting.

While we have no reliable figures as to success on parole, we do know that a considerable number of those released are absorbed in their communities, and are not further known to be involved in illegal activities. The New York State Executive Department Division of Parole, who supervises parolees of this institution, do have figures and other data concerning success on parole and, inasmuch as their work will no doubt be covered in other reports, nothing is included here.

———

STATEMENT SUBMITTED TO THE SENATE SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY BY JOSEPH M. LINDA, DIRECTOR, BOYS' TRAINING SCHOOLS HOME SERVICE BUREAU, NEW YORK STATE DEPARTMENT OF SOCIAL WELFARE

### PHILOSOPHY, FUNCTION AND SERVICES

Impetus for the reorganization of what, prior to January 1956, had been the aftercare service of Warwick State Training School was provided by the development of Otisville State Training School in May 1955. An analysis of trends in the incidence of delinquency in New York City and the metropolitan area made it clear that the development of additional State training schools could be anticipated in order to serve the increasing number of delinquent boys in need of care.

The immediately twofold problem which the New York State Department of Social Welfare considered around reorganization was—

1. Through what structure could aftercare services best be provided; i. e., a centralized service versus individual institutional programs.

2. What structure would facilitate the provision of casework and counseling services to the families of boys while they were at the training schools.

The State department of social welfare's decision was implemented with reorganization, which in effect created the Boys' Training Schools Home Service Bureau in January 1956. A clarification of the bureau's function and services were defined at that time as follows: (A) Casework and counseling services to the families of boys in care. This, of course, means working with families with a view toward securing their maximum participation in the total treatment program for the boys; involving them in visits to the boy at the institution, encouraging them to write, send packages, to plan for special visits, and to participate responsibly in the plan for a boy's return. (B) Responsibility for the total aftercare plan for boys returned to the community and for necessary services to these boys, including assistance in the areas of school placement, employment; providing supportive help to both boys and families where there is evidence of severely strained family relationships; providing direct care services, i. e., placement of boys in a residential or boarding home where family crises necessitated such a plan. (C) The coordination and integration of home service bureau services with the services provided by the State training schools to the boys in care.

In summary, therefore, the Boys' Training Schools Home Service Bureau was charged specifically with three major functions; (1) Service to families of boys committed to the training schools. (2) Responsibility for the total aftercare supervision of boys released from the training schools. (3) Coordination and integration of our services with the services provided by the training schools.

KR0499

We believe the reorganization has assured the attainment of several major objectives. These include: (1) Training schools are now able to more clearly focus on their primary responsibility for the day to day internal programing and service for boys in care. (2) Duplication of effort in the provision of aftercare services provided by individual training schools has been avoided. (3) Centralization has assured best possible use of professional staff time, energies, and skills. (4) Reorganization has enabled home service bureau to more effectively cooperate with all social agencies in the community which share, in many instances, responsibility for special areas of service, either to the boy or to the family.

From the point of view of function, while boys are in the institutions, we see our role as copartners with the training school staff in providing a total service to the boy and the family which is directed toward strengthening family functioning in the community. This means, in effect, that while we carry major responsibility for service to families and the training schools carry major responsibility for boys in care, each service must be seen as functionally inseparable and as an integrated process. Considered as an integrated service, the total efforts and professional resources and services of both the training schools and Home Service Bureau must be directed toward increasing each family's capacity to function more harmoniously within society and within their immediate communities. Treatment, therefore, as provided by this integrated service, can only be effective as it strives to achieve some change, either in the boy or in the family, or in both, thereby enabling them, despite their limitations, problems, stresses, and strains to meet reality demands established by the community and its social order.

The direction of our development over the past 2-year period is basically rooted in our conviction that only a professionally trained social work staff can, through its special knowledge, training, insights, and skills, provide the kind of sensitive, understanding guidance and counseling which many of our families and boys need. It is true that we have, through training and good supervision, been able to help staff of other disciplines such as psychology, sociology, vocational guidance, etc., function as youth parole workers. For the greater part, they not only are doing the job well, but also are bringing to our social work staff a keener more meaningful understanding of their own knowledge and insights. The basic orientation and care of our service, nevertheless, is social casework.

Since 1956, we have made real progress toward the development of a professional service. In January 1956, we had but three youth parole workers of a staff of 12 who met present requirements of 2 years of graduate study in a school of social work or 1 year of study in a school of social work, plus 2 years of experience in a social agency. Through the department's training program, our own recruitment efforts and the participation of staff itself in the recruiting process, we now have a total of 14 youth parole workers of a staff of 24 who meet the required social work training qualification. We have, in addition, one staff member who will return in July 1958 after completion of training and another whose appointment will be effective in March 1958. Several others of our temporary staff are competing for apprenticeship grants in the near future.

Pofessional training for our supervisory staff is, perhaps, even a more pressing need. We believe professional training, through educational leaves, will be made available to them in the very near future.

As of November 1957, we had a total of 2,175 boys in care. Of this number, 845 were in care at the training schools (Warwick, Otisville, Highland, and the annex). There were 1,330 boys in aftercare supervision. Of this latter group, approximately 25 percent, or 333 boys, were of school age (under 16). Approximately 1,000 boys were over 16. Of the 1,330 boys, all but 55 were in their own homes or with relatives. The 55 boys were in direct care, i. e., either in a residential unit (16 boys) or in boarding homes (39 boys). We find within this group our most seriously disturbed boys. They are weak, extremely dependent, socially and emotionally immature, impulsive, hostile, often unpredictable, and explosive. We are able to help a good many of these boys through specially assigned staff, who carry small caseloads (ranging from 25 to 40 boys).

We now have a total of 23 districts. While the average caseload should be 80 per worker, staff shortages, turnover, etc., during the year meant that workers at times were carrying as many as 130 boys. As of the end of the year, we had 3 vacancies in our total of 27 youth parole worker positions. Our four supervisory positions are now filled.

Although we have accepted, conceptually and as a matter of policy, responsibility for services to families, we have not actually been able to implement this to any great extent in practice. We see two major reasons for this: (1) Our

KR0500

present caseloads, which average 80, are much too high, thereby limiting the amount of staff time which can be devoted to serving families. (2) We have not as yet been able to evaluate, even broadly, the kinds of services which our families need. We are at present in the process of attempting to develop, jointly with the staff of Otisville Training School, a study which, in effect, would give us a base for identifying at the point of commitment the major family problems which contributed to the boy's delinquent behavior. While we have not completed the basic material from which we hope to get some insights as to the character of our families' needs, we have been able to determine that there is a sizable segment of boys who have come from physically intact homes, where family disorganization, nevertheless, has been in process for many years. We have, in addition, elicited the fact that a great many families have never, prior to the boy's commitment to the training school, been served by any family agency in the community. It is further interesting to note that approximately 65 percent of our families live within the high delinquency geographic areas served by the 14 youth board referral units. This group has, in effect, been identified as part of the 1 percent hard core group of difficult to reach families which present, for our community, a major challenge in terms of developing protective, preventive, and treatment services.

### SPECIAL SERVICES

Our basic casework and counseling services to boys, as we indicated earlier, is dependent primarily upon a highly qualified, professionally trained, social work staff. It is our hope that caseloads in the not-too-distant future can be reduced to approximately 60 families per worker. While future research might confirm that even this figure is too high, we do know that it would certainly permit our staff to reach and to serve a greater number of families than they are now able to reach.

Within the short span of our agency's existence we have been able to strengthen services to a considerable extent. Much of this has been accomplished through the assignment of highly skilled workers to specialized areas of service. Such areas of service include the Seamen's House program in which there are a total of 16 boys in residence; boarding home program in which there are approximately 44 boys in care; the aftercare service for the annex in which there are approximately 60 in care (of the 60, 30 are in care at the institution and 30 are in aftercare). It is our hope that within the coming year, we shall be able to assign a special undistricted worker to serve approximately 20 to 25 families in aftercare which present serious problems of family disorganization.

In May 1957, we were able to engage on a part-time basis, the services of a skilled group therapist. The therapist has assumed responsibility for helping our social work staff develop group therapy skills. This will enable staff to reach out to groups of boys many of whom do not appear to be able to respond to the helping efforts of the caseworker in a 1-to-1 relationship.

In September, we were fortunate in securing the services of a consultant psychiatrist especially interested in serving disturbed adolescents. While we do not believe 8 hours of consultant service for our staff is sufficient, it is a modest beginning. Whatever added service is necessary must await further evaluation both of client needs and staff development. At present, the psychiatrist's time is used for diagnosis and direct treatment; for consultation of individual staff; for seminars to groups of staff. We are beginning to feel that his major contribution in the future will be in the area of staff training.

In 1957, one of our youth parole workers, with special skills in remedial reading, organized a small group of boys who were severely retarded in reading (a few were nonreaders). The group met weekly and, for a period of time, twice weekly. Each boy, over a period of 6 months, made progress. One of the more significant observations made of the group is that very little encouragement and motivational support was given to the boys by their families.

Because we are serving a sizable segment of Puerto Rican boys, we have provided opportunity for staff to attend Spanish classes. These are held regularly for 1-hour periods each Friday. Lessons are give by a youth parole worker with 7 years of teaching experience in Puerto Rico.

We see several major challenges for the immediate future.

Our recruiting and retaining of competent, professionally trained staff is perhaps our major problem. In the New York City area, the problem is especially acute. There is a critical shortage of trained personnel. Competing agencies, especially county courts and the board of education provide more attractive salaries with increment scales reaching maximums ($7,200 to $8,100) which

KR0501

encourage staff retention in a career service. Our youth parole worker maximum is $5,580, after 5 years of service. Our supervisor maximum after 5 years of service is $6,150.

Our second major problem is how, under our present structure, we can really implement in practice the partnership function inherent in the total service which we and the training schools must provide while boys are in care. We believe State training schools need to continually examine whether their programs are effectively serving boys who, for the greater part, appear poorly equipped to manage their day-to-day problems rooted in family conflict, disruption, and disorganization. We, on the other hand, need to examine how we can help the disorganized family, often immobile, often overwhelmed by the added pressures of impoverished depressed neighborhoods, community prejudicies, and the cultural demands of complex urban living.

Third. We believe that major responsibility for such continued evaluation should be centered in budgeted research which can assure through adequate funds and the necessary skilled personnel an ongoing base for dynamic change in program and services. This, of course, can and should be implemented by operating field staff when feasible.

Fourth. We need to examine how our own and strengthened community services can more effectively help the large group of boys who become involved in further antisocial behavior which brings them to adult courts for trial and disposition. We are finding that this group approximates 40 percent of our total of boys discharged from parole supervision.

For our Department, Boys' Training Schools Home Service Bureau is not just another State program. We have been imbued by the Department's interest and support. Its consultant services, its provision for staff professional training, its strong support for upgrading youth parole worker positions, its participation in staff meetings—all have contributed immeasurably toward the development of a meaningful, skilled professional service.

For such leadership, understanding, and support, we are grateful.

———

STATEMENT BY JOSEPH F. PHELAN, JR., EXECUTIVE DIRECTOR, THE CHILDREN'S VILLAGE, DOBBS FERRY, N. Y., SUBMITTED TO THE SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY OF THE COMMITTEE ON THE JUDICIARY, UNITED STATES SENATE

The Children's Village was one of the first private institutions in the United States to build an open, unfenced cottage community which sought to provide a homelike environment for troubled children. It was one of the first institutions in the country to establish a mental-hygiene clinic and a formal course for training institutional personnel. In over a century of service, the Children's Village has cared for more than 55,000 children. Located in Dobbs Ferry, N. Y., it is today devoted to the treatment of disturbed and delinquent boys of all races and creeds, from 10 to 15 years of age. The majority of its children come from New York City and New York State, although our present population includes boys from nine other States. Referrals are made by children's courts, welfare departments, and private social agencies.

Boys live in family-style cottages and attend school on grounds. Shelter, food, clothing, medical and dental care, therapy, education, recreation, religious training—all are provided on a 220-acre campus where a staff of 254 people care care for 300 boys. Residence is year round and the average length of stay is approximately 18 months.

Despite the institution's role during a century of service to children, the board of directors realized in 1953 that the village was falling short of its potential ability to help the increasingly disturbed and delinquent youngsters who were making up a growing proportion of the boys referred to it. Therefore, the board engaged the Child Welfare League of America to study the program and make recommendations. The resulting survey added up to a concept of intensive individual care within decentralized groups, using the village resources differently for each child's particular needs.

An increasing proportion of boys sent to the Children's Village for treatment and training within the last 12 years has belonged to the hard core who are classified as delinquent or predelinquent because of antisocial behavior or repeated community offenses. Usually their behavior is the result of emotional disturbance, in most cases because of home and environmental failure. These

20873—58——9

KR0502

youngsters bring with them emotional crises of the first magnitude and behavioral patterns that are dangerous to themselves and to others. Some are aggressive, extremely hostile children with gang experience. Ninety percent have a record of persistent truancy, 70 percent are markedly retarded in school even though intelligence usually exceeds achievement levels. A good many were apprehended for shoplifting, auto thefts, vandalism, and other nuisances before admission to the village. Probation had usually been unsuccessful. Some of the boys are not aggressive, but withdrawn—almost out of contact with others—yet quite as liable to blow up in uncontrollable outbursts. Our concern is to help such boys overcome the emotional damage inflicted by early experiences and to enable them to profit from the total personality approach given by members of the staff, which will fit them for a constructive role in society. We have found that ours is a demanding task, requiring highly individualized treatment for every child. Consequently, during the period of care, the personality of every child is under continuous study. His activities are prescribed in response to his individual physical, emotional, and spiritual needs. This concept is based upon the results of studies by various criminologists which indicate that little change in behavior is shown among boys who have been discharged from placement in reformatories and prisons, where the delinquent mainly is quarantined from society so that he cannot kill or abuse other people, or steal or deface property.

In approaching this transition in 1954, the Children's Village introduced a new program to meet obvious needs, a program which has required substantially increased expenditures. This was a courageous step indeed for a responsible board of directors already faced with operating deficits and no endowment. The decision was based on the principle that the institution existed to serve the community, and, if the type child being referred by the community exhibited peculiar needs, an individual approach was the only answer. Effecting the transition was a technical and sensitive process.

The purpose of this presentation is to outline some of the significant changes that have occurred during the past 3½ years in transforming the Children's Village from a rehabilitative and custodial institution to an individual treatment school.

### APPROACH TO TRANSITION

Most important in its development was the recruitment and selection of qualified staff to carry out the objectives. It was found necessary to attract and keep presonnel who were well trained, having sound past experience with children, and who enjoyed working with boys. Staff gradually was enlarged to twice that of the previous program. Since many youngsters have not had attention and understanding from their parents, one of the major needs was to furnish substitute parental influences for the transitional period of their adjustment. Many of the boys come from homes without a father, so that the cottage father and male teacher fill an especially important function as an example, and as a man genuinely concerned about the boy's welfare. Thus, the quality of character and personality of staff selected became the principal resource of the new program—from cottage parents, teachers, counselors, chaplains, and administrators, to watchmen, painters, carpenters, and plumbers—likeable men and women with whom boys could identify.

Another development was consideration of the total atmosphere and physical plant within which to conduct such a program, since institutional appearance generally emphasizes to children their isolation from the community. In the cottages, which are the boys' temporary homes for periods averaging 18 months, and in the classrooms and the workshops, where demands are gaged to each boy's personal needs, staff members must first strengthen their pupils' individual feeling of security, and show that they care about how well their youngsters get along with the projects they take on, and about the progress they make in responding to treatment as well as in learning. Attractive buildings in good repair enhance a child's sense of security and of being loved and well cared for, so that reconditioning of the physical plant was a top priority and has required a total expenditure of $1½ million to date.

The curriculum of the school and the approach to educational processes had to be given full consideration. It was recognized that the school was an important part of the total treatment experience of the boy. Group sessions in reading, for example, first ascertain what reasons each boy had to induce him to overcome reading disability. Once motivation was established, every available aid to learning was applied in small classes (7 to 12 pupils), supplemented by individual sessions conducted by trained volunteer "reading mothers" from nearby Westchester towns.

**KR0503**

Another development during the transition period which enabled individualization to take place among such a large number of delinquent boys was the development of the unit system. This system provides for closer relationships between boys and staff and, in essence, establishes 4 small institutions within the overall agency, each of which functions by means of participation of approximately 26 professional staff members with approximately 72 boys, on a 24-hour-a-day, seven-days-a-week, treatment basis. This organizational structure within the total institutional setting has created a much-improved impact on all boys in residence. In addition, it has provided the more intensive attention needed by all of these boys.

The transition and reorganization of the Children's Village program might aptly be described as a metamorphosis, in which a school with a general education program for all boys has changed to a school with different treatment programs for each boy. Briefly, the integration-decentralization process has involved (1) crystallization of the institution as 4 units within the total operation; (2) consequent spread of responsibility for program planning, with the major share carried by professional teams at the unit level, including both supervisors and practitioners; (3) resulting opportunity to gear activities more closely to boys' interests and needs to develop pilot projects, for example, furthering pioneering in educational techniques for disturbed boys, beginning of group therapy, beginning of casework for parents; (4) increased medical and dental services to all boys; (5) expanded organization of volunteer services, resulting in more productive relationships between volunteers, boys, and staff; (6) strengthening staff, operations, and relationships; and improving interdepartmental communication, including improvement in record keeping and clerical services.

A program of this nature demands flexibility of administration and constant intercommunication on all levels of operation, in order to be prepared for any eventuality. In service to disturbed boys, such readiness requires dissemination of information about each boy to staff members working with him. They need to know how he is likely to act in given situations, what reactions he needs from others. In addition to communication and flexibility in administration, integration must take place, so that staff will be not only sufficiently informed, but sufficiently trained and responsible to make the best use of information for each boy.

For both boy and staff, this process is more effective when a boy is well known to a few staff members than when he is superficially known to many. In order to effect the kind of integration and communication desired, several methods were adopted by the administration—such as frequent meetings of department heads with the executive director, practitioner staff, supervisory staff, department meetings, as well as informal meetings among all staff.

### HIGHLIGHTS OF PROGRAM

A plan for each boy is the basis of the service rendered at the Children's Village. In essence, this results in 300 different programs for 300 different boys. Individual counseling is at the heart of the program, with the treatment plan for each boy initiated on the basis of psychiatric, medical, and psychological diagnosis. The plan is continually modified according to how the boy responds to his cottage parents, other boys, men and women teachers, religious guidance, and volunteers helping to enrich the social life, as well as every other contact which the boy has in the course of 24-hours-a-day, 7-days-a-week, year-round treatment.

This is accomplished through utilization of the staff team approach. The adjustment process in the school requires decisions made from day to day, on classwork, tasks, and satisfactions in the cottage, recreation, therapy given by psychiatric social workers, and periodic sessions with the boy's educational adviser. It demands maximum flexibility within a structure in which responsibilities of each treatment team member are clearly assigned and frequent communication, both formal and informal, is afforded, so that the knowledge of each boy's progress and problems is fully shared by the entire staff team. In this way, program changes required by a boy's physical, spiritual, and emotional growth can be accomplished within his own unit, rather than moving him to another one, so that a boy placed in a given unit now remains there for his entire length of stay.

Each boy's treatment plan and experiences while at Children's Village are geared to his return to society and include contact with the specific home, school, job, neighborhood, or military service to which the boy will go when he leaves.

KR0504

128                              JUVENILE DELINQUENCY

Work with parents while the boy is in the institution and after he is discharged from it is an integral part of the job. Placement in collaboration with school guidance officers and, where applicable, local social agencies is an important function which is presently being expanded at Children's Village.

In general, highlights of program and organizational development within the last 3½ years cover many changes, including (a) new emphasis on thorough and continuous study of each boy's emotional drives and difficulties, aimed at helping him to modify those which resulted in trouble for him and his community; (b) developing channels of communication between all departments to permit exchange of information about each boy's case among all staff members who work with him; (c) recruiting a highly trained, professional staff and organizing all volunteer services under staff supervision; (d) rehabilitation of the physical plant to accommodate new methods and principles; (e) improving financial control and administration in order not to compromise standards of care; (f) development of special methods which have changed some boys from gang leaders to gang busters, and given many who had retreated into a world of their own the confidence and ability to live in the real world with others.

For all staff, new and old, inservice courses have been inaugurated, and opportunity and incentives for individual study provided.

Departmental organization had to be established in order to provide the maximum kind of integration and vertical administrative responsibility for each boy in residence.

Another vital aspect of residential treatment is integration of boy population into total program. This has been greatly enhanced by the organization of a community youth council, designed to provide boys with a therapeutic learning activity by engaging them in planned group experiences with one another and with staff, consistent with clinically determined treatment needs, in which discussion is focused on specific topics related to the general welfare of the school which are within the competence, understanding, and emotional readiness of the participants. Representatives on the council are selected by both boys and staff, and the council works on projects of interest to boys—for example, a welcoming committee for new boys, taking polls of boys' opinions, developing procedures for the operation of the PX, approving applications from boys who want to set up their own businesses on campus (shoeshines, car washes, greeting cards, et cetera). This aspect of program has helped immeasurably to sensitize the members of the staff to the needs of youngsters living in a therapeutic community.

In a program of this nature, with varying degrees of delinquent behavior, it is necessary to constantly evaluate the population in order to provide the services required to meet its needs and to build program resources which have real therapeutic value. Examples from the educational area illustrate that experiments in classroom activity with boys whose emotional problems represented opposite sides of the same coin helped us to establish a class composed of hostile, aggressive boys with gang experience and to gradually transform this group into a constructive team of adolescents through vigorous, challenging activities led by an ex-boxing-camp teacher whose boys could accept him as a leader and with whom they could identify. Boys made and sold such items as picnic tables and benches, and used the money to buy insignia for their jackets. With their emotional needs on the way to satisfaction, they began to recognize their need for academic skills in order to complete work in which they were interested and so move successfully on to academic studies. Today, the village maintains four such classes for this type of boy. A totally different type of class was an art group, through which withdrawn boys whose aggressions are deeply repressed found an opportunity for low-pressure learning. Other experiments in education included the use of food as therapy in some classes, night rather than day classes for boys who accept schoolwork as adult when held in the evenings, use of simplified textbooks on rugged American heroes with whom boys could identify, among the titles Andy Jackson and Tom Edison. As boys move into their academic studies after overcoming their emotional blocs, they sometimes make up as much as 2 years' academic work in 6 months' time. Twice as many boys stay in these classes twice as many hours as was possible under our prior program. Although 90 percent of the boys referred to the Children's Village have records of truancy, only 3 percent attempt to cut classes at the village, and, although 70 percent are retarded readers, the entire population is enrolled in school classes and is using books.

When a runaway has committed a community offense, he will, if treatment plans permit, be required to assist in repairing the damage. Corporal punishment is, of course, not permitted. Punishment at the village is creative. It is

designed to teach, to help the youngster learn from his misdoing. For example, a youngster who was stealing from the boys' PX was given the task of making an inventory of all items. He received staff help in organizing the work, but he took up many an afternoon when he would have preferred to play. By the time he had finished the inventory, he had also finished stealing.

Religious education is another program area in which individualized attention has been strengthened at the village. Resident Protestant and Catholic chaplains are trained and participate in all conferences on boys, contributing their understandings of the boys' spiritual needs; and there is also a visiting rabbi who participates in the spiritual life program. Physical space has been set aside for worship, and plans for chapels are under way. In addition to campus services and classes, boys sometimes participate in worship in local communities, attending as cottage family groups accompanied by their cottage parents. Through separate services, all boys worship according to their own religious denomination. All three faiths, however, participate in religious assemblies in order to preserve fellowship while allowing for a diversity of belief.

Community affiliation with the village and acceptance of the share of responsibility for helping to solve its problems developed gradually from initial liaison set up by the village between the professional survey team of the Child Welfare League and the local citizens' committee. In 1954, the village policy of openly admitting deficiencies and asking community help in remedying them produced a sound base for the next step, which now has been taken. Communities have been invited into the village, not merely for public relations purposes, but to serve as another means of therapy for boys. During the past 3½ years, good community relations have been transformed into active community service. The great importance of this service in the treatment of boys who have been rejected by their families and other adults is that it helps overcome the human fear of being an outcast. Off-campus experiences are necessarily limited to supervised excursions which must be carefully organized. Bringing the community onto the campus provides a daily bridge between the institution and the world and shows the boys that outsiders are truly concerned for their welfare. It further increases a sense of community responsibility for all children.

Stemming from a substantial nucleus of individual and group volunteers, there exists today a Volunteer Advisory Council made up of representatives of participating groups from the community. This council acts and advises the administration of the school on all volunteer matters and is currently responsible for the integration of the volunteer program into the total institutional program. In addition, this group serves as a citizens' advisory council in matters of interpretation of public relations, fund raising, and resources for volunteers.

We have also been fortunate in gaining the cooperation of local police, who meet with boys on various occasions and give them sympathetic advice which is well received. This contact with the law is considered a part of therapy.

Of no less importance is our indebtedness to the press for their consistent week-by-week interpretation to the local communities of changes being made in the Village and of problems involved in the making. In the past 3 years, there has not been a single week when local papers have not printed at least one significant story about progress at Children's Village. This, too, is service, both to the Village and to the community.

### RESULTS OF PROGRAM

Most larger residential institutions for children were originally custodial in nature—they cared for orphans or children from destitute homes. With the development of Federal aid to dependent children programs and community foster home programs, these institutions have changed fundamentally during the last two decades. More referrals of delinquent or disturbed children to such institutions has become the trend.

Results thus far indicate that there are effective methods of treating delinquent and seriously disturbed children. But these methods can be used only when there are enough skilled people to help the individual child understand himself, so that he will change his behavior because he wants to do so for his own good.

New policies during the past 3 years at Children's Village point a way toward more widespread application of individualized treatment methods. A large institution, originally conceived for the care of dependent boys, has learned to treat delinquent and disturbed boys effectively. Last year, more than 100 representatives of public and private child welfare groups in the United States, Europe, the Middle and Far East, were sent to Children's Village to study its methods.

KR0506

Comprehensive appraisal of the results of the current program must await long-term aftercare and followup. It has already been possible to shorten the period of residence to an average of 18 months, a 25-percent reduction in the previous average treatment time. A preliminary study conducted in 1956 indicated that 73 percent of the boys discharged from the institution after treatment, had made an adequate to good adjustment in their home communities during the following year. An analysis of the reasons why 27 percent did poorly has indicated the following major needs, listed in the order of priority:

(1) More intensive follow-up in the community by the social workers, particularly during the first 9 months after the boy's return.

(2) Increased educational and vocational guidance services in order to place the boy in the community school that will most adequately meet his needs, together with better liaison between the institution and the community school.

(3) More specialized help in job finding.

(4) Placement of some boys in group residences, foster homes, or hostels, when the family is not equipped to care for them.

(5) Adequate facilities in some communities for occupation of leisure time.

For an institution like Children's Village to provide services to meet these needs, as well as to maintain results already accomplished during the boys' stay at the Village, an additional expenditure of $100,000 a year would be required.

Boys' responses to the therapy briefly described earlier is one of the factors which has now reduced Village runaway statistics to less than the national average for open institutions of comparable size caring for disturbed children. Also contributing to the reduction are new security measures which help boys to realize that the Village cares enough about them to keep close tabs on their whereabouts. Boys move from place to place with passes, and telephone communication between staff members at points of boys' departure and arrival sets a time limit on their movements. When a boy runs away, the last staff member working with him is required to make a report, partly for clinical use in interpreting any incident which may have caused the run, and partly to increase staff sense of responsibility for accounting for boys. This staff-to-staff following of the boys' movements supplements periodic rollcalls for groups of boys in cottages and elsewhere during the day. At night, eight watchmen cover the fully lighted grounds. In charge of the entire security system is a custodial staff trained in both treatment methods and police techniques.

Changes in the basic program have resulted in corresponding changes in the area of management and services essential for daily operations. Improved business management and personnel, machines, purchasing practices, and the incorporation of modern cost accounting principles have kept pace with the new program developments. Despite these procedures to maintain an efficient and economical program adequate to meet children's needs, the present cost of care amounts to $4,900 per year. Public and private agencies referring boys to the Village pay an average of $3,500, leaving a balance of $1,400 for each child, which, despite certain other income, results in the necessity for the agency to raise, through private contributions, a minimum of $300,000 annually. Thus a tremendous burden is placed on the private institution, which must meet the gap in operational costs as well as the cost of capital expenditures and depreciation of the physical plant. Moreover, equally vital to a well-balanced, enlightened, and progressive program of treatment are the areas of research and the development of experimental and pilot projects, the financing of which presents a distinct problem and challenge.

### CONCLUSIONS AND RECOMMENDATIONS

The problem of juvenile crime will, in all probability, increase, as will public concern about it. Ultimate answers can come only when the public is willing to pay for services to all delinquent and disturbed children which observe standards and use methods now available to relatively few such children. Joseph H. Reid, executive director of the Child Welfare League of America, has recommended that training schools for juvenile delinquents should consider admitting frankly to the public that the tools provided them are insufficient. Vocational education, athletic programs, military training and discipline, have not accomplished maximum results, he says, because "the problems of delinquent children require definitive therapeutic treatment. Without it, we are wasting the lives of our children and also our budgets."

Although delinquents represent only 3 percent of our young people, 3 percent is more than present institutions can service without financial resources in order to achieve good results.

KR0507

The challenge of growing need makes us seek systematic answers which offer the promise of enduring results, and enduring results for the root problems of disturbed young people can come only through a concentration of treatment skills on the individuals concerned.

It is preferable for a child who has been in trouble to stay at home with his own family. However, in some cases the home environment is and will continue to be a cause of the delinquency. A foster home is the next best choice, but it is unsuitable for the seriously disturbed child. Thus, when homes and foster homes are unsuitable, or not available, placement in institutions becomes necessary.

We shall not reverse the swelling current of juvenile crimes until communities allocate enough money privately and publicly for preventive and treatment facilities. Nor should this money be provided without first establishing a sound plan and blueprint for the coordination and expansion of existing services, including the institution as part of such community services. There is inescapable need for both and, unfortunately, there are severe shortages of experienced personnel equipped to supply the needed services.

The most vital need of the Children's Village, and other private institutions, is the assurance that present high standards can be maintained in a period of rising costs, and that the agency will be financially equal to the particular program emergencies as they become evident. In dealing with a large population of disturbed children, there must be, at every meaningful moment, flexibility sufficient to permit exercise of individual judgment. When aftercare and followup procedures merit special staff attention, for example, a greater concentration of trained personnel must supply this attention, but without diluting the daily work of caseworkers with boys still at the Village.

Basic recognition should be given by the Federal Government to the need for the establishment of grants to private agencies pioneering in the field of delinquency, to assist such agencies to continue the already promising work being accomplished. In addition, such moneys should be distributed to community agencies for the purposes of early detection, diagnosis, and treatment of children.

Programs for each boy differ in accordance with indicated requirements, but the aims are identical for all—to help boys understand themselves, conquer their problems, develop the confidence, and gain the incentives that are the foundation for responsible, participating citizenship.

We believe the ultimate benefits in enabling society to deal positively with challenges of seriously disturbed juvenile behavior are worth this relatively small investment.

The experience of the Children's Village indicates that a custodial institution can develop into a treatment resource for the community by applying the methods of the small experimental treatment centers. In the process, it should be possible to train the personnel required to make public training schools and reformatories better able to return their wards to society as good citizens.

---

STATEMENT OF ERNST PAPANEK, EXECUTIVE DIRECTOR OF WILTWYCK SCHOOL, NEW YORK, SUBMITTED TO THE SENATE SUBCOMMITTEE TO INVESTIGATE JUVENILE DELIQUENCY

It is with great satisfaction and great interest that those in the field of juvenile delinquency are following the work of your subcommittee because it expresses to us the concern of the United States Senate and therefore the concern of the community with the problem. We are very grateful for the intensive and outstanding job being done by your committee and its staff. We are eager to cooperate and we are looking forward to its findings and, where possible, hope for legal decisions to support and promote the fight against juvenile delinquency. We are glad and grateful for the opportunity to testify and to report on our modest contribution to this tremendous task.

This committee has had a chance to listen to so many outstanding experts that I would like to concentrate here on the approach and program of Wiltwyck School for Boys and, with your permission, will begin and end with only a few general remarks on the overall problem.

Wiltwyck School for Boys is a residential treatment center which tries to reeducate and treat in its institution at Esopus 100 severely disturbed youngsters and in its continued care group home and foster homes in New York City, about 25 boys who were at the institution and had in some ways improved and it takes care of about 50 boys in aftercare, who have already joined their fami-

KR0508

lies again.  After more than 3 years' experimenting, we set up in 1953 this
new program, hoping soon to add a residence home for continued care in the
city and to extend our aftercare.  We do not believe that the method we use
is the only possible one—we do not even know whether we will succeed with the
cases we take—but we hope and believe that a critical evaluation of our approach
will contribute not only to the discovery of new and promising methods of
treatment, but also to the development of new preventional techniques.

Your subcommittee has published that in 1954 over 1,333,000 children in the
United States came to the attention of the police.  Other statistics inform us
that 50 percent of all adult criminals begin their life of crime before reaching
21 and that crime costs the United States $15 billion a year.  I shall not attempt
to check on this last figure and discover perhaps an error of a billion or two in
either direction.  In any case, this tremendous sum is infinitely less important
than the insecurity, loss of morale, and violence to dignity and humanity that
individuals as well as society suffer through crime.  There can be no doubt
that the problem of juvenile delinquency is a serious one for our entire society.

It does not belittle its importance for our time and our failure to cope with it
to say that youth of today is not worse or better than youth was before, and that
juvenile delinquency is as old as mankind.  When Cain slew Abel and when
Jacob's sons sold their brother Joseph to the Egyptians, the percentage of
juvenile delinquency in relation to the total population may well have been
higher than the horrifying figures we read today.

Is it the parents who are primarily responsible for juvenile delinquency?
Since the parents are closest to the children, more responsibility can, of course,
be traced to them; but the whole community is actually responsible—the schools,
the churches, the recreational facilities and the lack thereof, the highly im-
portant reaction of the community to crime and criminals; the comics, the films
television, the radio.

When addiction to narcotics, alcohol, and gambling increases among grownups,
addiction to narcotics, alcohol, and gambling increases among children and
juveniles.  When insecurity, hostility, and distrust are rampant, when racketeers
and black marketeers flourish in a society, children and youth form their picture
of life, human relationships, and work in the community on these patterns.  They
learn that crime does pay.  If children have been impressed by adults they trust
and like, if these adults have given them other and more constructive, acceptable
values, and have exemplified these values, the youngsters will not so easily
succumb to the "fashion" of crime, as one of our former Wiltwyck boys once
called it.

Considering what sort of world we offer our children—a world of wars and up-
heavals, of ever bigger and better bombs, of economic and social insecurity, of
bad housing and bad schooling, of insufficient playgrounds and recreation centers,
of child labor, broken families, frustration, hostility, anxieties, confusion—
children and youth aren't doing so badly after all.  If they react with rock and roll
and some even with vandalism to community property—a community in which
they have no status and no function—and just a few with juvenile delinquency,
we should not complain about our children and youth but do something our-
selves to remedy the frightful situation.  If we offer our children The Blackboard
Jungle as a mirror of their lives, setting them a standard to which they then be-
lieve they are expected to aspire, we can hardly expect better than what we are
getting from our youngsters.  Youth in danger becomes a danger.  But we should
recognize that even under these distressing conditions, for which they are not re-
sponsible, from 94 to 99 percent of all children—depending on just what you call
juvenile delinquency—never become delinquents.

There is not one single cause of juvenile delinquency—there are so many
causes indeed that the list would fill a volume.  Consequently, there is not one
single treatment.  Most so-called juvenile delinquents are not only psychiatric
deviates; they are social deviates as well.  When we discuss their reeducation
and treatment, we must consider the contributing emotional, medical, and social
factors.

Society has suffered most seriously from the social deviations of its juvenile
delinquents, and it has reacted accordingly.  The astonishing fact is that, while
for hundreds and thousands of years, law and public opinion the world over
have agreed that a child is unfit to assume control of property or to contract
personal obligations, only a few decades ago did a new judicial philosophy place
children and juveniles under the legal disability and immunity of their age.

In search for incentives to motivate human beings to adopt socially acceptable,
constructive behavior, men for centuries have imagined that reward and punish-

**KR0509**

ment are the best tools for the job. As such, reward or punishment, both always proved unreliable and unsatisfactory.

With our present knowledge of psychology, however, in our present democratic society, reward and punishment are pretty well outdated; they should certainly play a far less important role than heretofore and, if possible, they should be dropped entirely. If some emotional relief flows from the satisfactory feeling that no wrong can go unpunished, such relief is usually less helpful to the wrongdoer than to the punisher or observer. And the punisher's sense of self-righteousness and superiority has no constructive educational value for him either.

Deterrence—sometimes emotional, perhaps, but not ethical—effected by punishment is of no more educational value than is retributive punishment. It appeals only to selfish fear, not to insight or morality. It may sometimes succeed with cowards—actually it fosters cowardice. We know that in England when picking pockets was still punishable with public hanging, uncaptured pickpockets regularly did a thriving business picking the pockets of fascinated spectators at the hangings. In his natural struggle to overcome external difficulties through his own personal endowments, the child or grownup threatened with deterrent punishment will be inclined to overcompensate for his inferiority feeling toward the punisher, try to outwit him, to be smarter than the victim he has just seen punished and to do everything not to get caught.

Human behavior is not determined solely by conditioned reflexes; even the desire to avoid punishment will not serve as a sufficient deterrent. It will work only where patterns of social responses have been well established by emotional and intellectual factors.

Some people believe that Pavlov's dog experiments with conditioned reflexes and other similar animal experiments prove that at least temporary success can be achieved with deterrent punishment, and that repeated periodic application can bring lasting results. We maintain that to reward a dog with food for secreting saliva at the sound of a bell, or to punish him for not obeying his master is quite all right—for a dog. Obedience is all we expect of him; from a human being we expect more, and we cannot get it by taming him through fear. Education and, where necessary, therapy must enable human beings to respond with more than reflexes, reactions, and repressions of instincts and drives. Education or reeducation must help the unsocialized child or adult to become an understanding, cooperative, yet spontaneous, independent, and happy member of human society, for if he is not part of that society, he is not a human being.

Punishment may sometimes be helpful in preventing further wrongdoing when other more ethical, more constructive, and more beneficial emotional and intellectual reactions to wrongdoing and other more ethical and fruitful motivations for right doing cannot be immediately attained. But such negative motivations always lead to unhealthy responses, and we often have a hard job undoing and mitigating the mischief they have done—before we can start with proper treatment.

Jean Jacques Rousseau and later Herbert Spencer favored what they called natural or logical punishment—we prefer to call it logical or natural consequences. These are inflicted not by the whim of any individual but they follow naturally and logically as physical or social results of bad behavior.

But even the most natural and logical consequence is useless if not understood and interpreted as such by the one who suffers it. Without insight into the misbehavior and its logical consequences, there will not only be no incentive to improvement, but there will be built up in the culprit natural and logical defenses, which will overcompensate his inferiority feelings, and instill in him the hope that by denying guilt and rejecting retaliation he cannot only keep his self-respect but gain the respect of his fellowmen, at least some of them. Above all that already mentioned, we will soon find that punishing teaches the child how to punish; scolding teaches him how to scold. By showing him that we understand, we teach him understanding; by helping him, we teach him how to help; by cooperating, we teach him how to cooperate.

Here we should also like to stress that society and its representatives, in enforcing consequences, must always avoid humiliating the so-called culprit, and must always help him accept and bear these consequences. In this way we can make clear the educational purpose of our actions, show the young offender that society is not hostile, and that cooperating is to the advantage of the individual as well as of the community. This will correlate the well-being and progress of the child or the immature grownup with those of the community, and will make him willing and able to join and support the community.

**KR0510**

If punishment is an expression of pessimism and lack of confidence on the part of the punisher in his own educational and therapeutic abilities, rewards—in form of tokens of distinction, concessions, premiums, gifts and favors—are hardly less so. This sort of compensation for creditable performance deprives the performer of his natural joy in accomplishment. This appeal to other, unrelated, not highly moral instincts, through bribing does not offer any constructive stimulation or improve motivation.

Encouragement by approval and assent to the efforts made, acclaim and praise are not only highly appreciated, but they are often necessary to help disheartened and tired children. It gives them confidence in themselves, stimulates them to make greater demands on themselves and to rise to a higher level of self-judgment. Of course, praise must be earned or it loses its value. If it conflicts with the child's self-evaluation, it only belittles his work or makes him accessible to bribes not related to his efforts and achievements.

There is a lot of satisfaction for every human being in the feeling of accomplishment in overcoming difficulties, in successfully finishing a job. If we teach children how to overcome difficulties, these difficulties can even exercise a stimulating and strengthening effect.

A child, confronted with situations which he has not learned to expect and to master, feels lost, insecure, upset, aggressive. To meet these situations, to escape difficulties, he may create many symptoms. He may become delinquent, he may become neurotic. Frustration imposes and increases the pattern of delinquency and neurosis.

Children who have not known understanding, social acceptance, significance, friendship or love, or who have misinterpreted or misused them when offered in an overprotective and unchallenging way, will easily suffer, as they grow up, from frustration, insecurity, anxiety and tension, often exploding into aggressive, antisocial behavior. Unguided guilt feelings, following such behavior, promote still more insecurity, still more anxiety and tension which, in turn, explode into vengefulness and more aggressiveness—the reaction to their own hopelessness and frustration. Therapy must attempt to interrupt this vicious "vicious circle."

In this process of education and treatment, understanding and "permissiveness" are the first steps, the preliminary stage; we understand under this unfortunate term only that knowingly, but not approvingly, we are ready to disregard their deviate behavior and still accept them, still like them and still be willing to help them to get rid of it—in spite of so many failures. Reorientation and reeducation will often demand that the child experiences the consequences of his actions—beneficial only if constructive help is offered to the child simultaneously. This help will, in the course of time, enable him to face the consequences. The danger that such an offer of help will be abused or misinterpreted is negligible, whereas almost always deliverance from anxiety and tension may be expected in the "offender," a feeling of relief at being given a way out, at finding a helping hand. These are the best bases for treatment and constructive education.

Consequences are closely connected with the concept of responsibility. We rightly have found that legal responsibility for delinquent acts of a sick juvenile mind should be abolished. But we are wrong if we believe that the abolishment of legal responsibility also means abolishment of social and psychological responsibility. The latter is necessary for all interpersonal human relationships. Abolishment of punishment does not mean complete abolishment of all educational, social, and psychological consequences. No treatment nor reeducation, as a matter of fact, no education or growth can be achieved without them.

We cannot help the delinquent (or any other) child by making education too easy for him, nor can we help him if we make it too hard for him. We must enable him to relearn what his role in society is and what his responsibilities are in it. The sense of belonging and the social feelings for other human beings are without meaning if they are not interrelated with, not derived from, or do not lead to social and psychological responsibility. It is no overstatement to say that many children, and groups as well, become delinquent because they were considered only children or inadequate in comparison with others, and were prevented from taking a responsible place in their family or community. They then overcompensate their feeling of social and emotional inferiority and act it out in neurotic or delinquent fashion.

KR0511

INSTITUTIONAL CARE AND MILIEU THERAPY AS TREATMENT APPROACH FOR JUVENILE DELINQUENTS

The 1-to-1 therapeutic relationship between patient and therapist is in most of these cases not enough. Group therapy and so-called milieu therapy can give him a better chance to—

(a) see himself mirrored by more than just the therapist who is also permissive. He will see the reactions of the more critical members of the group, in whose understanding and acceptance he is deeply interested, while the therapist continues to protect him against too heavy demands by the group and its individual members;

(b) he can test the interpretations and orientations received from the therapist by the reactions of his peers and check on his own reactions to them;

(c) he can test and learn to control the consequences of his behavior in a sheltered environment, and he can try out his interpretations of his own and others' behavior among equals who are "in the same boat" with him.

Milieu therapy, constructively structured, in a very active community of children or young people, guided and counseled by well-trained and experienced adults, gives the juvenile delinquent an opportunity to learn by experiencing, by living and doing, in an understanding, nonthreatening, moderately challenging and moderately competitive, accepting, friendly and cooperative environment that his concept of a hostile world, which he thought he had to fight, was wrong. Here he can gain new perceptions that are less biased; he can find new incentives and motivations to tolerate more frustrations, to make positive choices, to take on responsibility and, at the same time, to practice, to experiment, and to learn by trial and error how to make responsible use of what he has learned for his daily living.

This is why we believe that in most cases of juvenile delinquency, in which thorough treatment and reeducation are indicated, these should be given in an institutional setting, which provides an environment with all the facilities and limitations, permitting the juvenile delinquent no other way out but recovery.

Institutional care should be considered only for those children who can profit by its educational program of individualized treatment in the regulated and well-planned environment of a children's community. Disturbed children who do not need institutional care should be referred to foster-care agencies. The latter, of course, must be equipped to train and supervise the foster parents, specially selected for this purpose. Children in trouble need a variety of reeducation and treatment, and every institution concerned should be geared to this special task. Every institution to which a child is sent by a juvenile court should be founded on, and geared to, the principles of reeducation and treatment, and on these principles alone.

In some cases, the therapeutically and educationally oriented approach started with a change in title of the institutions, without change in content. Children's prisons and reformatories became training schools, children's villages, boys' towns or junior republics. But even the change in name alone has often led to important changes in the care of the children and has inspired the children themselves with the idea that they no longer belonged to a class apart, that they no longer belonged to an abnormal community—an attitude which had produced in many of them such sense of inferiority as to affect their entire future life.

All these institutions serve the children separated from their natural environment, from their families. This separation not only creates additional emotional disorders but also disorganizes the child's normal physical and psychological routine. His feelings of security and belonging and his loyalties are thus uprooted. To separate the so-called juvenile delinquent from other members of society, and then to provide only custodial care, is neither constructive to the individual treated this way, nor to the community which has to carry a moral and financial burden. We cannot do this to young people who, in most cases, through no fault of their own, but because society has failed them, become a burden to themselves and a liability to the community. They must be reeducated and cured, in their own interest as well as in the interest of the society.

Wiltwyck does not compete with the child's family; it does not seek to serve as a substitute for the family; it simply endeavors to supply other, very much

KR0512

needed factors in the social adjustment process: a sheltered environment for temporary treatment, specialized education, an intensive guided and constructive social and work experience necessary for the particular child. The group staff of the institution is made up of counselors or educators, male and female, not parents—cottage parents—or the like; the caseworkers are social workers, the teachers are teachers. The director is the director of the institution, not a father or grandfather substitute. All workers are, of course, friendly, pleasant, understanding and loving professionals; but they must in no way pretend to be members of the boy's family.

The counsellors (2 in each of 8 groups of 12 or 13 boys and 4 relief and 2 activity counsellors—all of them college graduates) are directly responsible for the day-to-day living of the boys in their care. Aside from setting the tone of the group in terms of necessary routines, i. e., school attendance, health habits, table manners, etc., it is their function to guide their boys, through educative processes. The counselor uses his own good relationship, as well as the good relationship of the boys to one another, to interest the boys in a good functioning as a group. He does on-the-spot treatment which is in his hand as long as he can handle it. The counsellor informs and consults with senior counsellors, head counsellors, caseworkers, and therapists in scheduled and unscheduled meetings and through exchange of written reports.

The function of our institution is treatment and education. Its emphasis is on healing, and this may sometimes prevail even over certain demands of a healthy normality. We know it is not healthy in a normal situation to keep a child in bed for long periods, but the curing process sometimes requires such an arrangement for weeks or even months, in the sickroom or the hospital. So the institution, too, must sometimes employ healing methods which would under different circumstances be considered unwholesome. Certainly the institution is not a hospital either and it should never imitate a hospital. Although we do believe that the children in our charge are sick and emotionally disturbed, we do not believe that they need or could profit by the setup and treatment facilities of a mental hospital.

The organized daily life of Wiltwyck, the setup of its institutions and school, its activities and its recreational program, its atmosphere and spirit, are all part of an education and treatment process which must also provide the proper therapeutic environment for psychotherapy, psychiatric casework and group therapy, psychodrama, remedial and accessory therapy such as art therapy, music therapy, etc. All education, the treatment and reeducation of our emotionally and socially disturbed youngsters is child-centered and focused on human relations. We try to help them to adjust or readjust to a normal life in society, so that they will be able to lead in their community a personally satisfying and a socially constructive life.

In a large percentage of children who get into trouble we find that feeling guilty and ashamed for having failed in school has not only made them truants but also defensive and hostile toward a society which demanded of them the knowledge of the three R's but did not help them to acquire it. Relief from this emotional pressure must be provided and remedial help by an expert teacher is often the most important, sometimes the only, treatment and cure.

Harmonious life requires a successful relationship to society, work, friendship, and love, all closely interwoven. All work has economic, social, and psychological implications. Human beings enjoy working and achieving mastery over materials and tools, unless misuse, misinterpretation, and misguidance corrupt their attitude toward work. They like to promote their own well-being and that of their community by their work. To pay them with special rewards (we do not mean the logical compensation for production of goods or for rendering services in the economic process) is to negate the ethical, psychological, and social character of work, achievement, and duty.

We, therefore, offer our children every opportunity to work and accomplish, to contribute to community needs by working without payment, and the opportunity to earn money by additional work. We consider it very important that work and worker should never be dishonored by being forced to work under penalty.

Every child receives a weekly allowance to use as he pleases. He will need advice and help on how to spend it; he also needs advice, help, and opportunity for hobbies and leisure time.

It seems to us that the most important role of any treatment center is to make clear to its children what their role is in society and what the role of others is, so that they can understand the division and variety of functions and

KR0513

accept them. "Socializing" the antisocial or asocial child consists mainly of showing him, interpreting for him, making him understand, accept, and respect the role and function of others and himself in society. Every pretense, introduction of wrong facts or incorrect interpretations, or the like are especially dangerous here.

### FUNCTIONAL DEMOCRACY BUT NO SELF-GOVERNMENT DECEPTION

It is important to develop in our children a genuine desire for order, companion, and spontaneous social cooperation, as well as love for fair play. This can be achieved only by untiring explanation and guidance, and by practical demonstration arranged in cooperation with the children themselves.

Whenever possible, they elect representatives to committees with a clearly defined function—a usually most important food committee, a job committee, a canteen committee, a sports committee, etc., as well as a student council—authorized to discuss, with representatives of staff and administration, current community problems. They suggest improvements and, where possible, help execute and carry out their own decisions. Such participation in administration—not the pretense of self-government—must be meaningful and functional in the daily life of the children if it is to be educational and constructive.

An example from the Wiltwyck setup: Among others we had a committee to handle the allowance of the dogs. This committee was formed when one day a boy suggested that Butch (our first dog) should also get his allowance in the same way as the boys had it. Butch, he said, was an intelligent dog. He went to school with the boys and, therefore, was entitled to it. The whole assembly, boys and staff, decided against my opinion that a dog was not entitled to an allowance. Defeated by this decision, I asked maliciously what would Butch now do with the allowance; he did not know how to handle it. One boy suggested having a committee appointed consisting of 3 boys and 1 counsellor to handle the allowance for the dog and so it was decided.

Regular house meetings, held by the counsellors, are the backbone of the community education.

Very successful also are the general assemblies of all the boys and the staff, held once a week by the executive director. These meetings and assemblies serve two main purposes.

1. Group therapy through working out of group tensions, airing of general hostilities and dissatisfactions, constructive shaping of group expression and group opinion, the settling of group complaints, socialization and cooperation in and with the community.

2. Gradual education in democratic community procedures, free speech, respect for the opinion of others, courageous but disciplined opposition to them, organized elections of representatives and committees, understanding of, and purposeful cooperation with the administration.

When talking of "milieu" or "environmental treatment," we should add that the "larger environment" plays a very important role in our treatment, namely, the parents (their visits to the boys and frequent home visits of the boys), the churches of Esopus, the YMCA and settlement houses in Kingston and Poughkeepsie, the participation in the "Little League" games of the American Legion (the boys participate individually on various local teams), the free shopping trips to neighborhood communities, invitations of neighbors—adults and children—to our parties, performances, movies, ball games, etc., and the invitations of our boys to parties, performances, and individual homes of our neighbors, the sports contests with neighborhood schools, and other agencies.

One of the teachers who is ordained as a minister takes care of the interdenominational Protestant chapel services and Protestant religious education. Arrangements for Sunday services at the local church and religious education on released time for the Catholic boys are made with the priest of the local church.

Home visits are a part of the treatment. They are very frequently given, only on a casework basis, and cannot be earned or be used for reward or punishment. Where boys have no home to go to, we try to get temporary foster parents for home visits and for visits to the boys. When this is impossible, the caseworker from time to time takes the boy to New York City for a full day.

The very numerous activities are flexible and children are allowed to choose on a daily basis what they would enjoy most, but they have to stay with the activity chosen.

We use activities as well as dancing, dramatics, art therapy or other remedial therapy not only to widen the cultural horizon of our children, important as that

**KR0514**

is. The main purpose is to show to a discouraged child that he is not "too stupid," as they themselves often say, to learn reading or some other subject, but to prove to him that he does not need to rely on delinquent acts to get status. But how can you prove this to him than by making him able to read and write and therefore achievement in the subject is important.

Horseback riding and care of the animals serve many therapeutic purposes: (1) to overcome the feeling of helplessness and inferiority, since even a small boy can be shown that he is able to handle a big horse if he knows how; (2) to prove that the horse responds positively if you treat him well and throws you if you mistreat him. Conclusions concerning interpersonal relations can readily be drawn from this, such as, e. g., it pays to cooperate. Again and again we have had the experience that an autistic boy, unwilling to talk to anybody and unable to establish friendly relations with anyone, will first start talking to horses, pigs, goats or cows—and only then can he begin establishing relationships with human beings so that he can receive psychotherapy.

No doors are locked, or better, no doors where children can get out. There are doors locked where we don't want them to get in as, for instance, where records are kept or the ice cream for Sunday, etc.

So-called clinical services (psychiatric and psychological services, casework, group, art, and remedial therapy) are not separated from other services but are a part of the whole treatment process. There is no clinic (besides the infirmary). Thus we try, as stated above, to surround and encircle the child with all necessary services available, and to integrate them so that there is no other escape for him than to get well again.

It is usually the same caseworker who sees the boy, the parents, and community collaterals, mainly with the purpose of mobilizing and using their help in the treatment process; and also, wherever possible, to improve the family relationship in preparation for the return of the boy to the community. In special cases, some psychotherapy is also done by caseworkers with 1 or 2 members of the boy's family. In such cases, the worker sees the family member on a once-a-week basis in addition to his regular casework sessions.

Much emphasis is laid on group therapy, with either "living groups" or ad hoc "therapy groups." Group sessions are also held with parents in the city.

Wiltwyck is accepting boys between the ages of 8 and 12 years (in exceptional cases, under 8) and, unfortunately, some of our boys are 13, 14, and 15 before we can place them somewhere else.

Children are admitted only from the children's courts of the five New York City boroughs or from the New York City department of welfare as referring agencies. They have to be diagnosed by a city psychiatrist as severely emotionally disturbed, with behavior or character disorders, psychopathic, or sociopathic personalities, neurotics, schizophrenics, or suffering from organic brain disorders.

Wiltwyck accepts for admission fire setters who are not displaying too severe a compulsive pathology, epileptics whose attacks are controllable by medication and physically handicapped children who can still follow a minimal institutional routine.

We do not accept, at present, children with an I. Q. lower than 75 where emotional problems are not involved in these findings, nor mentally deficient children, because we believe that this type of children would not benefit from our verbal approach with no other restrictions than personal presence and influence of staff.

It takes from 1 to 4 years to obtain results which enable us to return the boys to their community, but we are troubled at having to send many of them back to environments which had contributed to their becoming delinquent.

All the boys discharged from the institution stay, at least for 6 months, under our after-care casework supervision. Only a small percentage of the boys can return to their homes without risking disaster again. Unfortunately, we are not able to find enough adequate homes for boys who could or should leave the school, but who have no family to which to return. There are also not enough facilities for boys who have made progress at Wiltwyck but still need treatment or help in another institution after having outgrown our program. The success of our treatment at the institution is gravely threatened by these facts; efforts and endeavors are frustrated, money spent is wasted, and valuable space for new boys might have to be taken up by boys who are ready to leave but have no place where they hopefully can go.

KR0515

## RESULTS, SUCCESS AND FAILURES

Do we have success with our method? We will not really know this exactly for 30 or 40 years; but we can already see trends and results which are encouraging. In two studies which William and Joan McCord of Harvard University describe in their book, Psychopathy and Delinquency,[1] and in an article, "Two Approaches to the Cure of Delinquency,"[2] they compare test results of boys in Wiltwyck with those of boys in a New England State Training School not run on the principles of milieu therapy just discussed. Here are some of their findings:

"A comparison of the 0–8 month category and the 9–23 month category showed that the tendency of behavior disorders and psychopaths to view authority figures as punitive and threatening decreased significantly (P–.05) [at Wilwyck]. The proportion of answers (to the authority stories) which pictured authority figures as punishing significantly decreased as from 45 to 26 percent.

"Because counselors protect as well as restrict, Wiltwyck seems to teach the child to apreciate the beneficial role of some authority figures. By emphasizing 'consequences,' rather than arbitrary punishment, the school apparently inculcates a respect for legitimate authority.

"A comparison of the 0–8 month category and the 9–23 month category showed that the tendency of neurotic and psychotic children to withdraw from a threatening or frustrating situation decreased significantly (P–.05). For psychopaths and behavior disorders the proportion of withdrawn alternatives chosen on the Rover test did not change.

"A comparison of the 0–8 month category and the 9–23 month category showed that the proportion of neurotics and psychotics rated as 'realistic' in their self-perception significantly increased (P–.05).

"During the first 8 months at Wiltwyck, the behavior disorders and psychopaths had more aggressive fantasies on the Rover, more hostile views toward authority, and less guilt than did the normal children. Yet, after the boys had been at Wiltwyck for at least 9 months, they had less aggressive fantasies, a less punitive view of authority, and almost as much guilt.

"Thus, in milieu therapy, society seems to have an effective instrument for the treatment of psychopathy. Our study indicates that the psychopathic child, if treated in a permissive environment, can be changed."[3]

"When asked, 'What do most of the boys in the school like to do best?' however, the delinquents partially lowered their inhibitive guards. The answers seemed revelatory both of the actual conditions within the school and of the respondents' projected desires:

|  | Wiltwyck percent answered | New England percent answered |
|---|---|---|
| Constructive Activities: (e. g., sports, schoolwork, read, work with horses) | 74 | 29 |
| Destructive activities: (e. g., smoke, fight, steal) | 11 | 48 |
| Neutral activities: (e. g., see movies, play marbles, fool around) | 15 | 23 |

To the question, 'If you could be anyone in the world, whom would you be?'

|  | Wiltwyck percent answered | New England percent answered |
|---|---|---|
| Myself | 50 | 22 |
| Power figure (e. g., Samson, God, President) | 16 | 37 |
| Positive ideal (e. g., Franklin, Carver, a counselor) | 16 | 11 |
| Worst enemy (e. g., "The guy who beats me") | 10 | 5 |
| Don't know | 8 | [1] 25 |

[1] McCord, Two Approaches to the Cure of Delinquency, pp. 460–462.

[1] William and Joan McCord: Psychopathy and Delinquency. Grune and Stratton, New York, 1956.

[2] William and Joan McCord: Two Approaches to the Cure of Delinquency, Journal of Criminal Law, Criminology and Police Science, vol. 44, No. 4, Novemer–Decemer 1953.

[3] McCord, Psychopathy and Delinquency, pp. 147–164.

KR0516

In conclusion, I should like to repeat that we do not believe that all cases of juvenile delinquency or emotional disturbance in children can be treated by the methods described. Many new approaches will have to be considered. Not all disturbances are alike; nor can they all be treated alike; but certainly a society that fights its poverty and suffers from little or no unemployment will achieve far greater success in its fight on so-called juvenile delinquency. A society that teaches its children to understand and respect the opposite sex, and other races; that believes in the values of human life and instills this belief in its children, will be taking a long step toward the elimination of juvenile delinquency. A society that teaches its children how to make good use of their leisure time, how to avoid idleness, a society based on common and understandable ideals, a society that gives its children humaneness and an ethical or religious sense—that society will come close to its goal of delinquency prevention.

When Lombroso put forward physical anomalies as the basic causes of criminal behavior, he was not simply giving a biological interpretation to medieval beliefs about being possessed by evil spirits to be driven out of the criminal by physical means or, if necessary, by the destruction of the body possessed. Today we know that in criminals biological anomalies do exist, conditions which may be treated by tranquilizers, electroshock, or lobotomy.

Long before the world had learned that whippings in the woodshed, or in public, prison, expulsion, cutting off of a limb, or hanging, as crime deterrents did not work, poets, philosophers, and scientists spoke about treatment through understanding, affection, and love.

More than 150 years ago the great Swiss educator, Johann Heinrich Pestalozzi, wrote in How Gertrude Teaches Her Children: "Man is good and wants to be good; but in so doing he also wants to be happy; if he is bad, you may be sure that someone has blocked the road on which he wished to achieve this goal." [4]

In a democracy the whole community can only advance when it can profit from the cooperation and contribution of as many members of its society, and each individual in a democratic society will advance further and better if many or all members of the community will contribute to their best ability. Children who by their violent reaction to frustration, unhappiness, lack of love and friendship, by independent thinking and action have proved that they want understanding, friendship, love, and accomplishment and that they want to contribute their creative abilities to an accepting society—they are not expendable.

STATEMENT OF REV. ROBERT E. GALLAGHER, EXECUTIVE DIRECTOR, CATHOLIC CHARITIES GUIDANCE INSTITUTE, NEW YORK, N. Y., SUBMITTED TO THE SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY OF THE SENATE COMMITTEE ON THE JUDICIARY

A delinquent is a child or youth who habitually fails to exercise moral responsibility toward himself, his community, and his God. Through the many programs of the archdiocese of New York the church focuses on the development or restoration of the personal moral responsibility of the child.

### EDUCATION

The Catholic school system of the archdiocese of New York provides Catholic children and youth a sound and comprehensive education which includes moral training as well as factual knowledge. The stress on intellectual development is matched by a strong emphasis on respect for God's law and the laws of society. These schools inculcate in the minds of students of all ages the individual's obligation to his Creator and man's concomitant obligation to respect the rights of his fellowmen as God-given. This stress on man's obligations to God and to his fellowmen is bolstered and supported by a thorough appreciation of the rights of the individual in 20th-century society.

These attitudes are developed in our Catholic schools through a curriculum that has as its core a body of fundamental and absolute principles. Man has been created by God and man will one day return to God. Every human action is to be interpreted in light of this basic fact. The full and complete structure of religious principles emanating from this fundamental belief strengthens and gives unity to all the courses in science, language, the arts, etc., offered in Catholic schools.

---

[4] Johann Heinrich Pestalozzi: Leonard und Gertrude, 1781: Collected Works. L. W. Seyfarth, Liegnitz, 1899–1902.

KR0517

The educational program of the archdiocese presently services 201,765 children and youth in more than 400 elementary and secondary schools in addition to 20,000 at colleges and universities.

### RELIGIOUS INSTRUCTION

The child in the public school has available the opportunity for religious and moral training at a religious training center of his own faith under the released-time program. The archdiocese is providing weekly religious instruction to 89,668 Catholic children attending elementary, junior high, and high schools at 371 centers.

This opportunity for moral training is admittedly minimum. At least the released-time program gives recognition to the necessity for a child to learn right from wrong and the Ten Commandments, the primary guideposts for moral living. It is inconsistent indeed for a community to be alarmed by youthful lawlessness and at the same time to decry any attempt to teach fundamental morality to the child in the public school.

### FAMILY-LIFE EDUCATION

The preliminary report of this subcommittee soundly states "Better children can come only from better parents." The proper training of children within the family is the first order of business for the married couple.

With this general objective in view, the Family Life Bureau of the Archdiocese of New York pursues four objectives, all rooted in the basic purpose of marriage itself.

First, to train young people prior to marriage and indeed prior to engagement in such basic ideals as the choosing of the right partner, the nature and purpose of marriage itself, and the religious and moral aspects of the married state.

The conferences on dating and courtship and the conferences for engaged couples have within the past year been attended by 10,000 young Catholics.

Secondly, to indoctrinate married couples in the ideals of their vocation and to inspire them to live a happier life together, in order that their children might be educated in the home atmosphere most conducive to wholesome growth.

Thirdly, to teach parents the solid principles of child rearing and sound methods of discipline.

The conferences for the married couples of the archdiocese, which deal exclusively with the husband-wife relationship and the parent-child relationship, along with other conferences on the parent-educator role, have been attended by 12,000 Catholics during the past year.

Finally, to organize married couples into leadership groups for the purpose of promoting good family life in the community.

The Christian family movement embraces 500 couples well organized in 40 parishes of the New York archdiocese.

The family-life program in which over 22,500 engaged and married couples annually participate is a growing activity in New York. While no one can estimate its impact on parents or children at this time, its full flowering is watched with some expectancy that it is a long-range step in the right direction of delinquency prevention.

### LEISURE-TIME ACTIVITIES

The leisure-time activities of the archdiocese are provided as a means of involving youth in moral and religious training and of preserving contact with religious influence.

The Catholic Youth Organization of the Archdiocese of New York operates and supervises a program for over 250,000 youth between 8 and 21. A fourfold program of spiritual, social, cultural, and athletic activities is provided.

With each parish as the center for the youth of each neighborhood, this program of activities utilizes the priests and adult leaders of each parish. The central Catholic Youth Organization office, through its county offices, services the parish program.

In providing this positive program of activities, the Catholic Youth Organization wishes to exercise a constructive influence over the leisure time of its youth through wholesome activities that are character building, supplementing the hours that each youth spends in school or in the home. Such an organized program, while being secondarily preventive, is available also as a part of a corrective program for some delinquent youth.

20873—58——10

KR0518

## COMMUNITY ACTION

The potentially delinquent child is especially vulnerable to the confusing, materialistic, amoral climate around him. The various Catholic organizations in New York have relentlessly opposed the decline of moral standards witnessed in the growing lack of decency, the false values frequently created by advertising, the lurid reporting by some newspapers, immorality in certain magazines and comics, and prurient entertainment. At the same time the church has made every effort to improve the moral standards of the community.

## CHILD GUIDANCE

The delinquent or disturbed child is a principal and direct concern of the Catholic charities of the Archdiocese of New York which operates a variety of remedial programs.

The Catholic Charities Guidance Institute, a licensed psychiatric clinic for children and youth from 8 to 18, is the largest Catholic facility of its kind in the country with 35 years of continuous service and is staffed by 61 highly trained psychiatrists, psychologists, psychiatric social workers, and educational specialists. The guidance institute annually treats almost 1,600 disturbed children.

The individual disturbed delinquent child is a source of bewilderment to himself and to his family, to his school, and to his community. The attempt to unravel the mysteries of his personality frequently confounds even the professional. A thorough painstaking diagnosis of the whys and wherefores is the first imperative. Seldom is a single cause uncovered and the complexity of causes is limitless.

A diagnosis which points toward an organic defect is found in a minority of cases. More frequently amoral family situations and an immediate community devoid of standards are the setting in which is found the child who lives by impulse and without respect for authority. In most of the situations of the delinquent or predelinquent child examined at the clinic, the core problem is an emotional disturbance in the child, the genesis of which is found in a damaged child-parent relationship. This problem in turn relates to the earlier life experiences of the parents themselves and their relationships toward each other and their own families.

Clinical experience, therefore, points to caution about panaceas and exaggerated claims of success.

The clinical emphasis of the guidance institute is on treatment. This involves weekly sessions with one or both parents and child for a period of 6 months to 2 years. Again, there are no shortcuts, no rules of thumb. Based on the diagnostic findings an attempt is made to remedy the psychological damage. Ataraxic drugs have been employed in selective cases under careful clinical supervision with some limited success. An evening clinic in the Bronx and Westchester have made possible involvement of fathers. Here favorable improvement in many situations has been achieved.

The ultimate therapeutic goal of the guidance institute is to help the child to exercise proper moral responsibility in his own actions.

The guidance institute, together with other child-guidance clinics, is unable to meet fully the demands for service. More careful screening of delinquents referred for clinical treatment is needed. Not every delinquent needs psychiatric care and everyone who needs it cannot profit therefrom. Additional clinical research is needed. The training of additional clinical personnel is paramount.

## VOLUNTEER PROGRAMS

The Catholic Big Brothers of the Archdiocese of New York supplies friendly counseling and guidance to delinquent and predelinquent boys on an individual basis. Four hundred and forty-seven boys were served this year by volunteer Big Brothers under professional supervision. The Big Brothers are professional and business men who give of themselves and their own time. They are an example of citizen participation and personal charity in action. In view of the fact that a third of delinquent boys have no father in the home, these volunteer Big Brothers are performing a needed service. At the same time they are rendering an effective service. Thus far this year 17 percent of all referrals made by the Juvenile Aid Bureau to private agencies were handled by Big Brother organizations. A recent study of the Juvenile Aid Bureau reports that more than half of the youth referred to private agencies during the month of

KR0519

October 1951 were never reported to the police again during the subsequent 5 years.

Groups of Catholic Big Sisters in the metropolitan area provide similar services for girls. They also follow up on religious problems of children appearing in court with the child's local parish.

### INSTITUTIONAL CARE

The training of the committed Catholic delinquent is provided by a variety of Catholic institutions within the archdiocese of New York. The unique pattern of sectarian child care in New York City has proved advantageous to the children and the community for almost a century.

The Sisters of Good Shepherd, a worldwide group dedicated exclusively to the care of the delinquent girls, maintain five facilities. They annually care for 787 court-committed girls. During the past year these Sisters established an apartment-type facility for unmarried mothers known to the courts.

Lincoln Hall, a modern cottage-type institution, last year served 493 delinquent boys. This program is operated by the Christian Brothers who have served the delinquent boy since 1863.

The Astor Home conducted by the Coronet Charity Sisters is 1 of 3 residential treatment and research centers established by the State in 1952. This pilot project is geared toward research and training and renders intensive therapeutic care for 45 children. Significant directions in the treatment of severely disturbed children are being developed at the Astor Home.

These institutional programs are maintained by religious orders with a century or more of tradition and experience in the field. They have kept pace with every scientific and educational advance for more effective programs of rehabilitation. Psychiatric, psychological, and casework services have been incorporated to provide an integrated treatment program.

The primary aim of these institutional programs is to return the delinquent to his family and to the community better equipped for moral living and for personal and community achievement.

### PARTNERSHIP WITH GOVERNMENT

The partnership of concern and of action between local governmental and voluntary agencies is the New York City pattern. This partnership exists in all phases of coordination, program, and service. It is and has been the sound practice of local government to purchase service from voluntary agencies.

The result of this partnership is a network of services unparalled in the Nation. It has prevented surrender to government and has maintained the interest and support of voluntary groups. Recognition is given to the prior obligation of the people on the scene and of ongoing agencies to deal with their own problems. Citizens and voluntary groups in turn are challenged to respond to the need for action.

In conclusion, we compliment the overwhelming majority of the children and youth of New York City and their parents. They are good. The boys and girls of our town are seriously preparing for successful parenthood and effective citizenship. Despite the materialism around them, they daily succeed in living moral and happy lives.

————

STATEMENT OF HENRY G. HOTCHKISS, PRESIDENT, FEDERATION OF PROTESTANT WELFARE AGENCIES, INC., NEW YORK CITY

I am Henry G. Hotchkiss, president of the Federation of Protestant Welfare Agencies, Inc. Our agency serves as the coordinating, central service, and standard-setting body for social welfare programs operated by Protestant and nonsectarian groups in the New York City area. We welcome this opportunity to present briefly the work of the Federation of Protestant Welfare Agencies and its agencies in treatment and prevention of juvenile delinquency to this important committee of the United States Senate. We believe that the whole job of treatment and prevention of juvenile delinquency can be done by neither the public agencies nor the private agencies working alone. This requires teamwork of both public bodies and the voluntary agencies—and teamwork in planning and financing. Obvious and serious concerns to us for the long-range consideration of juvenile delinquency are (1) the need for more neighborhood center programs in underserved parts of the city, (2) inadequate long-term financing of many youth services, (3) lack of camping space, (4) need for

KR0520

bilingual workers in centers for Puerto Rican young people, (5) a serious personnel shortage, (6) the need for expanded foster boarding and adoption services—particularly for babies, (7) lack of treatment facilities for treating the emotionally disturbed, and (8) inadequate public reimbursement, particularly for institutions which are striving to provide more specialized care.

We have 219 affiliated and associated agencies. In general, the agencies fall into four categories: health, aging, family, and child care, group work and youth services.

We are concerned with combating and controlling juvenile delinquency in several ways. In our division on group work and youth services, we have 28 agencies engaged in group work and recreation activities. Last year these agencies served more than 210,000 individuals through neighborhood houses, settlements, YMCA, and YWCA programs; 25 have programs located in the areas of highest delinquency in our city. Our agencies are open to children and youth regardless of race, creed, or national origin. The federation staff offers consultation to boards and executives of agencies in encouraging the inclusion of the socalled hard-to-serve youth in their programs.

Special grants were made by the federation last year to place Spanish-speaking workers in certain agencies that were located in areas rapidly becoming a haven for our United States citizens in Puerto Rico that are coming to the city. Believing that home visits by an individual of the same language and cultural background could be effective in drawing the newcomers into the oncoming life of the community, the federation has encouraged it through consultation and funds. These workers have made a bridge between the community and the newcomers. In March of this year, the bilingual case work and referral service was opened in East Harlem under qualified social-work direction to help with the variety of personal and family problems besetting the newcomers to the city. This program is operated by three of our affiliated agencies and is open to any person in need.

We all recognize that delinquency has no single cause nor cure. Circumstances which lead to one individual's break with society may have a completely opposite effect upon another individual subject to the same circumstances. We know that all efforts need to be harnessed toward offering our children and teenagers a home with parents who care and opportunity to develop a place for themselves in our society. Through the varied programs of the neighborhood centers and Y branches there are activities which may well challenge the interest and ability of a large number. Through contact with adults who are trained in directing the energies of youth toward socially acceptable goals, and through the opportunity to gain status for good, an individual may begin to realize his potential.

We have had stories of individuals who broke with their former gang associates when the program in an agency challenged them. One of our agencies has a basketball league—some of the teams are known gangs. Through their weekly practice and frequent matches with others, these boys are beginning to find the satisfaction of teamwork for something, rather than in opposition against something or some gang. Gradually, the leaders in the program are finding avenues of interest for these boys in other aspects of the year-round program of the agency. I cite this example as indicative of the kind of preventive program Protestant agencies in New York City are offering. These are sponsored by various denominational groups and independent boards of Protestant citizens. It is not unusual to find the participants in a program of almost every other faith than that of the sponsors. Our agencies have chosen time and again to remain in a neighborhood where the population changed leaving pitifully few of their own persuasion in residence. They chose to stay to meet the needs of the community. Our federation staff helps agencies in evaluation of services with constant emphasis on inclusiveness of all who need and can make use of the agency's program.

As a federation, we are concerned not only with the group work programs but with family and child welfare programs which support and supplement the child and his family in times of stress. I understand that you are having speakers from Wiltwyck School for Boys and Children's Village. Both of these are affiliated members of the federation and I need not elaborate on that type of Protestant effort as they are representative of the group.

I should tell you, Mr. Chairman and members of the committee, of the part the federation agencies play in cooperation with the public programs. Through the New York City Youth Board, on which I am honored to sit on the advisory board, agencies related to the federation are encouraged to be partners with a public agency in services to the youth of the city. Ten of our agencies have

KR0521

a total of 25 contracts with the youth board for group work service. This means that about 2,200 additional young people are being served through this joint effort. Our casework agencies have contracts for intensive casework service to approximately 300 individuals and families.

We have, in the federation, a special committee on juvenile delinquency that was appointed 2 years ago. It is made up largely of prominent community people supplemented by 3 or 4 agency executives. Its job is to keep informed on the trends in juvenile delinquency in the city and to become well acquainted with our agencies located in the high delinquency areas. This committee, from time to time, makes recommendations on programs which the federation may endorse in the interest of controlling delinquency. The committee, likewise, encourages member agencies of the federation in their partnership role to the public agencies in delinquency prevention efforts. You might call this our "watchdog" committee.

There are not enough trained workers, not enough caseworkers in the child caring agencies and institutions, there are not enough skilled group workers for the intensive work in the youth serving agencies and not enough caseworkers in the agencies seeking to meet family problems. I would like to tell you some of the things the federation is doing to help meet this shortage. Four years ago our board voted to give yearly $2,500 as a scholarship to the New York School of Social Work for a Protestant who would want to work in New York City after receiving this training. Two years ago, two candidates were found who could continue their studies with half the grant and the amount was split. This year, we again have two people on scholarship by dividing our amount. One is a second-year student at the New York school and the other a young Puerto Rican with a brilliant record of undergraduate work at Hunter College. We likewise have broadened our base and include in our scholarship program New York University School of Public Administration and Social Service and the Louis M. Rabinowitz School of Social Work at Hunter College. Actually, this could be called a pilot project which we hope other Protestant agencies will take inspiration from and do likewise.

The spring of 1957 the federation inaugurated a work study program with the schools of social work and member casework agencies. The 2-year graduate study necessary for a professional degree has been lengthened to 3 years and in so doing developed a work plan for the student in a cooperating agency. The agency makes an agreement with the student for salary and tuition during the study. I might add that our agencies may receive public reimbursement for as much as a third of the cost through the department of public welfare. Our agencies began this fall selecting candidates for this program.

Right now there are seven students enrolled in the schools of social work and giving part-time service to their sponsoring agencies under the work study plan. These are workers who cannot afford to undertake full-time graduate study except under a work study plan. Our agencies are now also looking for means of utilizing untrained personnel outside of the work study arrangement. A unit of 4 such workers in training has been established in 1 agency, with a special in-service training program and special supervisory procedures to prepare them to carry professional responsibilities. Other agencies are preparing to follow a comparable procedure.

The incidence of juvenile delinquency has risen in various sections of our country. We need to share our experiences and pool our efforts in plans for intensified service. Because of time limitations it has not been our intention to discuss police matters and correctional procedures that are called for when delinquency prevention has failed. Individual and family problems must be carefully weighed against community responsibility and resources. I appreciate the opportunity you have given me to tell of the Federation of Protestant Welfare Agencies and its concern in this matter.

————

STATEMENT BY HERSCHEL ALT, JEWISH BOARD OF GUARDIANS, SUBMITTED TO THE SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY OF UNITED STATES SENATE COMMITTEE ON THE JUDICIARY

As your subcommittee undoubtedly has observed, delinquency is a many-sided problem and calls for action on many fronts. Unfortunately, its breadth and complexity inspire many unsound proposals and make it difficult to choose the most fruitful point of attack.

I assume that you would wish to have me begin by telling you about the Jewish Board of Guardians, particularly its work with delinquent children.

KR0522

We believe that this should have special interest for your investigation because it highlights some of the measures that should be taken to prevent and control delinquent behavior as well as to rehabilitate the individual delinquent child.

For more than half a century the JBG, as we are now known, has pioneered in the prevention and treatment of delinquency and remains today the major resource of the Jewish community of metropolitan New York in dealing with this problem. But our responsibility goes beyond the child classified as delinquent. Guided by the logic implicit in its work with the delinquent child, the agency has become a comprehensive mental-health facility providing a network of services for the emotionally disturbed child from the age of 2 on, whether he is or is not delinquent.

We often speak of the basic changes which have taken place in our work as a progression from correction to treatment to prevention. Moreover, the development of the agency has been characterized by a spirit of pioneering and a determination to stretch the limits of treatability, ever more extending service to children usually considered untreatable.

<div align="center">HISTORY</div>

The forerunner of the present agency was the Jewish Protectory—now the Hawthorne Cedar Knolls School—which was established in 1906 to serve delinquent and neglected boys between the ages of 7 and 16. In 1917 a girls' division, known as the Cedar Knolls School, was established on the same grounds.

Very soon, however, the community leaders who sponsored these institutions recognized that it was not enough to reeducate children who had already committed offenses; it was even more important to help families and children before they got into trouble.

This conviction led to the establishment, within 10 years after the founding of the protectory, of a volunteer service in the children's courts. A corps of Big Sisters and Big Brothers stood ready to help every child who appeared in the court.

Before long the volunteers recognized that professional workers might be able to help in ways volunteers could not, and by 1921 they were instrumental in establishing a professional treatment service which brought to the delinquent child the skills of the psychiatrist and the social worker.

The professional unit quickly took the form of a child-guidance service for children referred by courts, schools, hospitals, and social agencies. The Hawthorne Cedar Knolls School could not help but be influenced by what was taking place in the city. The conventional training school regimen which the school followed, with its emphasis on routine, strict discipline and hard work, could not but be affected by this new program. Gradually its focus changed from training to treatment, the fences were removed, the detention cells abolished and the original rigid and repressive features were replaced by more flexible and therapeutic methods. The way in which the Hawthorne program was transformed could, in our opinion, serve as a valuable object lesson to all State schools for delinquents interested in adopting progressive methods.

The concern of the agency that treatment be brought to children as early as possible led to the establishment 10 years ago of the Child Development Center to specialize in the study and treatment of the preschool child. This is a laboratory project and is expected to add to the basic knowledge about child growth which is an essential requirement to any successful treatment of psychological problems.

The two most recently established residential treatment centers, the Henry Ittleson Center for Child Research and the Linden Hill School are, like the Child Development Center, intended to serve as laboratory and research projects for the study and treatment of the young, as well as the adolescent, psychotic child. The Henry Ittleson Center has already laid the foundation for a broad investigation of the beginnings of mental illness in children. The Linden Hill School is about to launch a similar program for the treatment and study of the adolescent psychotic.

As a result of the development I have described, the agency's facilities now include a court treatment service and a number of mental health clinics in the different parts of the city which provide outpatient treatment to the emotionally disturbed and delinquent child while he remains in his own home.

For those children whose difficulties cannot be successfully dealt with while they continue to live in their own home and neighborhood, the agency maintains 4 residential treatment centers: Hawthorne Cedar Knolls School, with 200

<div align="center">**KR0523**</div>

beds; Linden Hill School, with 27 beds; Stuyvesant Residence Club, with 25 beds; Henry Ittleson Center for Child Research, 21 beds—or a total of 273 inpatient beds. It also cooperates in the maintenance of specialized academic curricula for the education of the children in residence at Hawthorne, Linden Hill, and Ittleson, as well as a therapeutic nursery school at the Child Development Center. A summer camp for boys and girls with problems similar to those treated at the various clinics is another of its important facilities.

Children are referred to the agency by public and voluntary agencies, including schools and courts, as well as members of the medical profession and, more and more, parents themselves are applying for help.

On any 1 day the agency is responsible for the treatment and guidance of approximately 1,500 children, and their families, from the age of 2 to 21, and throughout the year is involved in a treatment relationship with approximately 5,000 families and children.

Its staff includes 450 workers, of whom about 250 are in the professional categories. This includes about 35 child psychiatrists—25 as members of the staff and 10 fellows and residents being trained to qualify for this specialty; 80 psychiatric case workers; 40 teachers. In addition, the staff includes a number of psychologists, group workers, psychiatric nurses, social scientists, and research technicians. Besides its paid staff, about 250 volunteer workers are actively engaged in the work of the agency. This includes Big Brothers and Big Sisters who serve as friends to individual children as well as volunteers who help in a variety of activities such as teaching, extracurricular projects—art, dancing, etc.

The total budget for the fiscal year 1956–57 of the parent agency and its affiliated organizations was something over $2,500,000.

Beyond its inpatient and outpatient treatment services to the disturbed and delinquent child, it maintains accredited and informal professional training programs in child psychiatry, psychiatric social work, psychology, and teaching. In recent years it has established a broadly planned research program with the purpose of achieving a fuller understanding of the problems of the children the agency works with, what it does to help them, and what results are achieved.

The way the agency's network of services developed points to a number of important factors which need to be taken into account in any community program for the delinquent child. By bringing together under single direction a number of different services which any one child may need in the course of treatment, we have in the structure of the JBG in microcosm many of the elements which should be found in any sound community program.

Through our court services and our outpatient clinics, we try to get to children as early as possible after the appearance of their problems is noted. We proceed by evaluation and diagnosis of what needs to be done and then assign the child to the treatment facility which can best serve him. This may be one providing psychotherapy alone; or a combination of psychotherapy and a carefully adapted educational plan; or it may be a period of treatment away from home in one of the residential centers. The fact that these services are provided under the same direction means ease of transfer, conservation of all that is known about the child as he moves from one treatment division to another and the avoidance of fresh and misdirected starts in treatment. It means that basic responsibility rests with a single agency and is only delegated as necessary to a particular treatment division. It means both continuity in treatment and accountability in responsibility.

The record of the growth of the agency clearly establishes another basic principle, namely, the importance of doing everything possible to deal with the situation while the child is still in the community and in his own home because, ultimately, he must return to the community. It may be surprising to you to be told that after a record of 50 years in implementing this principle, which took the form of movement from the institution back to the community, we have only recently found that after strengthening our court service we could further reduce the number of children whom the courts committed to our Hawthorne School.

I do not believe that any community has as yet exhausted fully the possibilities of prevention and treatment for the child in his own home through probation, social services, mental-health clinics and special schools, and many children are still committed to training schools who could much more advantageously, from the standpoint of the child as well as the community, be successfully treated while he remains in the community.

KR0524

### PREVENTION

In dealing with both medical and social disorders, prevention is a magic word. But unfortunately we have not been able to isolate the carriers of the delinquency germ as we have those of typhoid fever. Although in an absolute sense we do not know enough as yet to prevent social disorders such as delinquency, we know many things we can do to limit the exent of the problem.

It is important to be sure that what we do in prevention as well as treatment is based on the fullest understanding we have of delinquency as a form of behavior—what is behind it and how it can be dealt with.

We see the disturbed child—and this includes most delinquents—as one who has been deprived in the most elementary affectional needs. An important ingredient which treatment must provide, therefore, is restitution for this deprivation. This includes both psychotherapy and satisfying life experience, relationship of confidence and trust between the child and adults, opportunities for creative experience and all activities which engender self-respect and respect from their associates, as well as useful occupation. These are some of the things all disturbed children need.

When we consider delinquency more specifically, we must recognize that since the roots of human character have not changed, the kind of delinquency we have at any time must be a product of the social conditions which exist at that time. Apart from whether delinquency has or has not increased, we know that there appears to be a wider sanction for violent behavior, an increase in social disrespect and a widening gap between social and individual values. Since violence breeds violence, we may wonder how far two world wars, the ever-present fear of total destruction through nuclear weapons and the unprecedented rate of technological change have contributed to the constant flux and instability in social values. Since the delinquent is an isolate, lacking in roots and a sense of belonging, the present social instability must be an important force in his maladjustment.

We know that all measures that safeguard family life and contribute to the security of parents assure the healthy growth of children, so that protection of economic standards through social insurance, adequate housing, wholesome neighborhoods, are all elements in prevention.

Our own agency has been able to test the validity of these assumptions about the forces that contribute to delinquency. During the war years and since, we have carried on a number of activities with the aim of preventing delinquency. In general, these have had a twofold purpose. First, they seek to bring to all those who play an important part in the lives of children as full an understanding as possible of their emotional needs as a basis for dealing intelligently with them.

Their other purpose was to mobilize the natural interest of adults in a better environment for children. An example of this was our work in the Brownsville-East New York area. This, it will be recalled, was the neighborhood in which Murder, Inc., was born and which in general produced a highly disproportionate number of delinquent children. During the war we undertook a two-pronged effort in this area: improvement of the attitudes toward children on the part of the residents as well as the agencies in the neighborhood, and help on an individual basis to parents and children who were already in difficulty. As an indication of the effectiveness of this kind of community effort the number of children from this area arraigned in the children's court on delinquency charges dropped by two-thirds.

During the war years, too, the agency engaged in a number of cooperative activities with several community centers, nurseries, and Hebrew schools. The chief emphasis in this effort was to help the community center or school to do a better job for all the children in its care. The focus was not only on the child who presented a problem which called for general or specialized treatment, but equally on the program of the center or school to see how effectively its operations served the needs of growing children.

This brings me to an important issue in prevention. We know that in our present-day complex society the family alone cannot carry the total burden of child rearing. It must turn to community agencies for help. There is much agreement about the vital part which the school plays in the life of children, but even though this is so, we have not yet been able to establish or consistently safeguard some of the most important requirements for the fulfillment of its role. The teacher must stand close to the parents. She must know her children, therefore her group must be small enough to permit her to achieve this. Education must give as much attention to the child as to subject-

KR0525

matter, and this means that the leadership of the educational system must be in the hands of men who are oriented to the growth of children in contrast to curriculum and administration.

I know that some of you may be surprised to learn that I differ from any of my colleagues when I say that a disproportionate emphasis is being placed on bringing the psychiatrist, social worker, and all the remedial skills into the schools. Unquestionably the mental-health professions have an important contribution to make to the building and operation of an educational system. The educational function, however, must remain intact—the responsibility of its own profession, with its own autonomy and authority. Too often, members of other professions are called in as repair crews to patch up what is breaking down, rather than to help build a sound basic structure in the first place. The pity of it is that at the moment we are doing neither—neither building a sound structure nor providing the repairs for the inadequate one in existence.

Our work with the delinquent child throws light on another phase of prevention. We know something of the process by which he substitutes social for antisocial goals; we know the process through which you can build his confidence in adult leaders who become to him models of social behavior.

We need to utilize this knowledge. Every adult dealing with children must accept the responsibility which goes with the recognition that he serves as an example to every child. Adults must settle for themselves what they are for, so that they represent to children positive direction rather than the uncertainty which adds to bewilderment and insecurity. We must be sure that adult behavior will develop the confidence of children in the representatives of the organized community, in the fairness and consideration of the policeman, of the youth leader, and of the teacher.

So long as the public press continuously reports how criminals escape consequences for their misdeeds as well as incidents of dishonesty on the part of leaders in business or public life, we cannot hope to have youngsters acquire the essential confidence in the social order which is a requisite to decent citizenship. I think it is important that leaders of our Government, up to the presidential office, should be sensitively aware of the impact of the behavior of those in public office and leadership positions upon the values and attitudes of our young people.

While we are on the subject of prevention it is important to stress that in the field of delinquency, prevention and treatment are but two sides of the same coin, two phases of a single effort, and one can hardly be considered apart from the other. Each delinquent child unsuccessfully treated becomes a focus of infection—a force—for more delinquent behavior, while each delinquent successfully treated becomes an agent of social health.

Moreover, treatment must remain the foundation of prevention. It is from treatment that we learn about the roots of maladjustment; it is from treatment, too, that we gain insight into the mainsprings of human behavior and the potentialities for healthful living with which every human being is endowed.

We now logically come to what perhaps may be the core question: How can treatment facilities be made more adequate? The starting point is our knowledge of what works and what does not work. We have at our disposal a body of tested methods. Our difficulty lies in our limited use of them. It is usually a case of too little and too late. The major obstacles are: lack of sufficient funds; lack of an adequate supply of qualified personnel; poor logistics in agency alinements; the absence of clear lines of responsibility and accountability; and, very often, public attitudes unrelated to the considerations of public protection, safety, and the rehabilitation of the child.

It seems unnecessary to reaffirm for your subcommittee the importance of the treatment of delinquency as a phase of our common life. We must bring to it a sense of responsibility and a respect for the scientific as well as tested commonsense elements involved in dealing with it. We must also be ready to provide the wherewithal. We have proof that sound methods soundly carried out bring the results we seek and wrong methods or partial, haphazard, and irresponsible work bring failure. Thus, for example, there is a tremendous variation in the results achieved by various agencies and institutions. To my knowledge, this is true of the rate of recidivism of the youngsters discharged from such institutions. A great many leaders of our worst gangs are drawn from this recidivist group.

It does not need any argument to show how the number of delinquent children would be materially reduced if the institutional treatment now provided were improved. Although our own agency will never be satisfied with the results of its work until we have sufficient knowledge and use it with sufficient skill so

KR0526

that every child whom we undertake to treat gets better, nonetheless I am presently going to cite some of the facts, first, because little information of this character is available and, second, because I believe they do support many of the pleas I have made.

In 1950 the agency made a followup study of the progress of 100 boys discharged from our Hawthorne Cedar Knolls School. It was found that over 70 percent had made good adjustments 5 years after their release. When contrasted with the rates of recidivism experienced in other correctional institutions, the rate of success proved to be extremely high.

A study of the factors which account for the general decline in delinquent behavior among the special population group whom our agency serves no doubt would throw light on the forces back of delinquency as well as the kind of social action and remedial measures that can be effective in reducing it. Between the years 1930 and 1940 the number of Jewish children appearing in the children's courts of New York City declined from 1,400 to 256. A variety of social factors must have played a part in this reduction. At the same time, we are warranted in assuming that the services to children and families provided by this and other agencies must have had a good deal to do with it.

It is of further interest to point out that there was an increase in delinquency among Jewish children during the war years. However, the total number remained small and the ratio of increase was somewhat less than that for the population as a whole. We find that since 1940 it has not exceeded 5 percent, often falling below 4 percent of the total, as compared with the ratio of Jewish population to the total of 27 to 25 percent.

These results have been achieved even though our resources, too, are not as adequate as we would like to see them. We do not have sufficient resources to employ the professional staff we need in our outpatient services and thus are able to treat only 1 out of 4 children who apply to us. The capacity of the Hawthorne Cedar Knolls School is not equal to meet the total need for residential treatment for the children referred by the courts and from time to time our waiting list presents a serious problem.

Moreover, there are many things that we know would contribute to more successful treatment if we could afford them. We do not have all the clinical staff we need; our average population per cottage is larger than it should be to get the best results; our aftercare service to the children discharged from the school is, in our opinion, far from adequate, so that much of our investment is lost; our research funds are not sufficient to help us fully analyze what we do, so as to improve our methods.

These deficiencies are a source of great anxiety to us because we have seen so many delinquent boys and girls who have come to us after every other treatment effort has been exhausted and to whom our Hawthorne School represents the last resource. Over and over we have been able to watch the progress of such children over a decade or longer and have seen hopelessness yield to hope and repeated failure followed by unbelievable success—dividends in human values which more than warrant the investment.

Lest we assume that the results I have cited are as good as they are because we help children who are easy to treat and that scientific methods are only effective with the mildly disturbed or mildly delinquent, I can only tell you that the reverse is the truth. We have always accepted the aggressive and defiant child, even those who have committed homicidal acts.

Delinquency remains a challenge to our way of life and the establishment of a program for its elimination calls for courage, creativity, and the highest level of social planning and statesmanship. The partial and piecemeal efforts we have thus far relied upon are not meeting the situation and must be replaced by a broad and inclusive approach which takes into account what we know about the problem and which is backed by sufficient resources to break through to the basic health and goodness of our young people.

---

STATEMENT OF RAFAEL R. GAMSO, M. D., MEDICAL SUPERINTENDENT, RIVERSIDE HOSPITAL, NORTH BROTHER ISLAND, NEW YORK, N. Y.

Riverside Hospital was established for the examination, treatment, and rehabilitation of young drug addicts in July of 1952. The hospital is located on North Brother Island, a 13-acre island north of the Triborough Bridge and east of the lower Bronx. It is reached by a ferry leaving from the foot of East 134th Street in the Bronx. The hospital consists of a main building, in which are

KR0527

housed the male patients and most of the professional and administrative offices; a school building; a building housing the female patients, living quarters for nurses, as well as the offices of the vocational training program; a recreation building; and several service buildings; as well as two empty buildings which might be available for expansion if extensive renovation were done and staff provided. The hospital is under the jurisdiction of the Department of Hospitals of the City of New York. The cost of operation is shared by the city and State, with the city paying the major share. The hospital may treat drug addicts from any part of the State who are under 21 years of age at the time of first admission.

It receives patients either without commitment or by commitment in accordance with the public health law (art. 33, title VII, secs. 3360–3366). In practice almost all patients are processed and placed under hospital control in accordance with the law. The program involves a complete study of the individual, a period of inpatient care which may vary from 1 month up to a year or more, continuous supervision as an outpatient after the patient leaves the hospital, and repeated periods of inpatient treatment if necessary.

There are several unique aspects of the hospital program. All patients are drug users or drug addicts. It is possible to interview and work with the family; to have patients in the hospital participate in activities away from North Brother Island which should be of value in guiding them in the use of their leisure time or directing them to activities which they could explore for employment purposes after they leave the hospital. The patients' homes are in the vicinity so that they can be seen in the aftercare clinic. The proximity of other psychiatric hospitals and other city hospitals makes it possible for Riverside Hospital to take advantage of other professional staff in the organization and operation of the hospital program.

The participation of the school and the diversified professional staffs assigned to the hospital expands the program beyond that of a limited medical facility to one in which a total rehabilitation program can be organized. There is great effort to create a therapeutic community, utilizing all the aspects of the facility, its plant and personnel. We attempt to create a program which will provide an opportunity for the patient to develop understanding, to grow and mature and learn to accept responsibility, and develop standards of behavior which would be acceptable in the community.

It should be noted that when the hospital was established there were no trained or experienced personnel available. Drug addiction had received so little attention that it was not possible to recruit personnel who had had experience in this field. Similarly, there was a relative shortage of persons who had worked in treatment institutions for delinquents or for disturbed adolescents, staff had to obtain experience and training while in service at the hospital. All personnel affect patients. The professional staff must be well trained, experienced, mature, and have good judgment as well as the ability to maintain good relationship with the patients. The nonprofessional personnel must have understanding of the work which is being done by the hospital, the emotional attitudes of patients, and all the varying factors which go toward developing acceptable and cooperative programs for the rehabilitation of the patient.

Patients are assigned to work with employees in the service divisions, such as engineering, housekeeping, dietary, stores, and others, so that the patient may obtain training and experience with employees working in productive activities. It was necessary to conduct intensive in-service training. These efforts must be continuous since it is not easy for employees who are not trained in professional fields to work with patients. It is often easier for them to do the work themselves than to train, supervise, direct, and redirect patients whose interests often are elsewhere.

Among the difficulties which we encounter is the insufficiency of staff which precludes the possibility of sending workers on home visits or to do fieldwork with the friends and relatives of patients. Likewise, there is not sufficient staff to conduct treatment for families of patients. It is our hope that this deficiency may be overcome in the future. Among the problems which beset many of our patients are lack of cohesive understanding and cooperative families; exposure to a high incidence of antisocial behavior among their peers; residence in congested areas and in substandard housing; relatively low family income; drug use by a relatively large minority of the population in the areas in which they live; and membership in minority racial groups.

In addition to withdrawing individuals from drugs our program must include education and reorientation of the drug user to socially acceptable behavior,

strengthening of their family ties, and the relationship of the patient to the community, improvement of the community attitude toward these deviant individuals, obtaining cooperation of community agencies, and long-term supervision by experienced, well-trained staff after the patient leaves the hospital, as well as repeated periods of inpatient treatment if necessary.

There is need for an increased number of inpatient facilities, properly staffed with diversified programs to provide the services needed by patients who vary remarkably in the types of services which they need and their ability to use them. There must be prolonged followup and posthospitalization services, adequately staffed with well trained, experienced staff. There should be simplified procedures for transfer of patients from inpatient to outpatient status and vice versa for all drug users of all ages and for the transfer of patients among various types of institutions as the need varies for stricter or less supervised institutional care. There should be participation of community agencies and opportunities for job placement, availability of recreational facilities, adequate housing, family counseling, and family guidance, and other necessary services. A very important thing would be provision of a convalescent residence or halfway house which patients could go to if the homes from which they come are not suitable for their return at that time. For some patients there would be need for long-term rehabilitation and training camps such as the forestry camps which have been established for other groups.

Drug addiction among preadults is but one manifestation of juvenile delinquency. However, this behavior has serious consequences since the person who uses drugs tends to become involved in criminal acts in order to earn the money to pay for the drugs; because he loses interest in normal activities and does not make any contribution to society, does not usually work, and tends to be careless in other aspects of behavior such as respect for other people's rights and property, and of his own personal hygiene and habits. There is a tendency for drug addiction to spread as association with drug addicts causes a youth to do what his peers are doing.

Experience through the years has shown that very few drugs addicts are helped by a period of imprisonment alone. Many factors enter into the involvement of patients in drug usage. Among the basic features are emotional difficulties with which users are unable to cope. Narcotic drugs relieve anxiety, thereby decreasing the discomfort created by the underlying emotional factors. This plus the need for medical supervision of the withdrawal syndrome makes it desirable for treatment to be conducted in a hospital. Riverside Hospital is psychiatric in nature and the emphasis is upon the personality and the emotional needs of the patient. The patients are young and are in need of education and the type of group participation and group activities which are conducted in a residence facility, or in a school. Under the supervision of the bureau of child welfare, Public School 619, Bronx, was established by the board of education and opened in coordination with the hospital on North Brother Island.

The hospital is staffed with the professional disciplines which are believed to have value in the study of personality factors, the treatment of mental and emotional disabilities, and the development of inherent resources. The staff includes psychiatrists, internists, dentists, psychiatric social workers, psychologists, nurses, recreation leaders, occupational therapists, vocational rehabilitation counselors, and chaplains. There is close coordination of all disciplines. The treatment program for each patient is individually prescribed to meet his or her needs as determined by psychiatric and psychological examination, review of his previous life's history, and observation of the patient's response to test situations in school and vocational assignments at the hospital.

The drug user, when he first comes into the hospital, wishes to go off the drugs so as to meet the pressures which caused entry into the hospital. In most cases, after withdrawal from drugs is completed and the patients regain physical strength, they lose interest in further therapy. They almost always state that they are able to take care of themselves and stay off drugs without further help from the hospital. Experience has shown that very few patients are benefited for any length of time by withdrawal from drugs alone. It requires a prolonged period of hospital and clinic treatment before the patients realize that the use of drugs is harmful and that they can manage their lives without the use of drugs, and before they acquire sufficient interest in normal aspects of life, such as school, work, recreation, social activities, and normal relationships with other persons so that they are willing and able to resist the temptations to return to drugs.

The nature of obtaining drugs and the handling of drugs and related activities is such that drugs users become fearful of authority, distrustful of people

KR0529

and agencies who might help them, and suspicious of treating personnel. Most drug users come from disorganized families, where they have not had a person in whom they could have faith, so that this pattern of distrust and disbelief is easily developed. This attitude has its onset early in life, often long before drug usage begins. One of the major problems involved in treatment is to acquire the confidence and the cooperation of the patients. The treatment situation is so structured that after adequate study of the patient, a program is developed, including psychotherapy, classroom work and vocational training, using hospital facilities, with constant attention to this problem of confidence of the patient in the treating staff. At the same time effort is made to develop within the patient a sense of responsibility, and an understanding of his part in developing what is to him a new attitude toward living.

Experience has shown that for many patients an initial period of hospitalization is merely an introduction to the idea of living without drugs and that the difficulties of making adjustment in living without drugs does not become apparent to them until after they leave the hospital. It has been observed that with many of them, even though they may revert to the use of drugs, they have now found that this is something which upsets them. They then are returned to the hospital and on this readmission they make a more serious attempt to understand themselves and why they went back to drugs. They may participate better in hospital programs after readmission. It is recognized that most patients will need the advice and guidance of the hospital staff over a prolonged period of time; that therapy must be continuous during the period of hospitalization, continue through attendance at the clinic, and for a period of readmissions if necessary. It has been found that as this contact is maintained and reinforced by repeated discussion and evaluation of the patients' problems with the staff member, there is increasing evidence to indicate that the patient is making better adjustment in the community. The adjustments are in several areas. The basic one is a decrease in the use of drugs or actual abstinence from the use of drugs. Other aspects are better relationships with family and friends, better ability to work and support themselves, and decreased delinquent or criminal activities.

When a patient is separated from inpatient care and leaves North Brother Island, he is carried on a transfer to the therapeutic leave census and continues to be seen in therapy at the After Care Clinic by the personnel who conducted therapy in the hospital. If the patient requires further inpatient care, because of return to the use of drugs, or other reasons, that patient is then returned to inpatient care as a transfer from therapeutic leave without a break in the therapeutic relationship. This realistic approach recognizes that continuous long-term therapy both in and out of the hospital is necessary to change the patient's attitudes toward life and the dependency on the narcotic drugs.

This observation with regard to the need of preadult drug users for long-term continuous supervision and guidance by professional personnel would seem to apply to other juvenile delinquents. It has been observed that many patients come from a hard core of families who have had many contacts with social agencies over long periods of time. These families apparently did not make effective use of the agencies, usually made 1 or 2 contacts, did not maintain follow through and failed to see the benefits which would have resulted from proper use of the social agencies. It seems, therefore, that some authoritative supervision must be maintained so that there may be continuous long-term contact between the delinquent, the delinquent's family, and the treating agency.

The Riverside Hospital program has attempted to utilize in a coordinated fashion the community resources that are available. Referrals are made to the division of vocational rehabilitation of the State of New York. Other community agencies or casework agencies are contacted with regard to family problems. Patients have been taken on trips to beaches, parks, museums, and other public places of interest and entertainment. Private individuals and agencies have cooperated and there have been trips to ball parks, theaters, and other places of entertainment. These trips are under the supervision of the recreation department. They have served as recreation but are primarily a positive aspect of the treatment program whereby the patient is not isolated from the community but is encouraged to maintain interests in normal community and social activities.

The background of the adolescent drug users, their experiences and family relationships are very similar to those found in the usual juvenile delinquent. Many of the findings and techniques that are in use at Riverside Hospital have broad application in dealing with juvenile delinquents. It has been the experience of the community agencies that lack of motivation and ability to follow through makes this group of young people and their families a difficult and

**KR0530**

unrewarding group to attempt to serve. Then, too, there has been an element of reluctance and uncertainty in dealing with the juvenile delinquent, and, in particular the drug user, because of the unpredictability of their behavior. With a coordination of approach and a sharing of experiences among the agencies in this field, more positive results could be achieved. This would entail a granting of priority to the young people and their families, as they are not able to withstand the frustration of a waiting list, and a more aggressive reaching out to the young person and their families than is the present mode of practice of most agencies.

Riverside Hospital has now been in existence for 5½ years. During that period it has amassed a wealth of experience in dealing with delinquent adolescents. It has developed an experienced staff in all the clinical departments. The staff of the hospital is active in addressing professional groups and parent groups interested in drug addiction and juvenile delinquency.

There are numerous public, private, and voluntary agencies active in different fields of the delinquency problem. Each of them was established to meet a specific need in a particular area or for a particular group. Through time and growth each has developed its own procedures and methods. There is need for a great deal of cross-fertilization of ideas, exchange of information, and elimination of duplication. Experience at some of the agencies has given them a wealth of information and knowledge which should be shared with others.

Riverside Hospital is an ideal place for the study of juvenile delinquency and is a fertile training facility for persons who would work with delinquents, as well as for all persons who are interested in adolescents and persons with emotional difficulties. There is a shortage of trained personnel, and it would be wise to make such training available to as many interested persons as possible.

---

### The Prehospitalization Personality Structure, Generalized Into Five Syndromes

The prehospitalization personality structure of patients at Riverside Hospital generalized into five descriptive groups by Dr. Donald Gerard, associate visiting psychiatrist at Riverside Hospital and a member of the research staff of the New York University Research Center for Human Relations

#### INDEPENDENT VARIABLE SET III

#### 1. The conforming, passive-inadequate youth

In his prehospitalization and predrug-use life, he was an unassertive, generally obedient, quiet youth who had few friends, stayed away from trouble and gangs, expected little of himself in school or work, accepted his familial situation in which he had definite, often excessive chores, responsibilities, and controls, without evident protest. His self-concept was that of a weak, inadequate male from whom aggressiveness or self-assertiveness had been removed (castrated?) or in whom it had never existed. Although subtle evidences of manipulativeness, or unconscious denial of this self-concept, or resentment toward attempts to master the fantasied castrator may be evinced in dreams, fantasies, or projective psychological material, the facade, the persona is that of an inadequate passive, incompetent child.

#### 2. The "true delinquent" or the "cat"

In his prehospitalization and predrug-use life, he was a shrewd youth who was in or out of trouble, not risking trouble through flagrant misbehavior of a provocative face to face nature, but avoiding identification with benevolent adults; demandingness, complaint, projection are evident as a counterpart with manipulativeness, keeping cool—He sees delinquent goals and values as better values than those of the squares; however, he will not throw the glove in the face of authority. He gets out of school those limited skills which are delinquency syntonic, e. g., automechanics is valued as a background for car theft. Commonly he is a handsome and graceful youth, well mannered, and well dressed. He is proud of his ability as a thief or a troublemaker, and seeks to charm, often successfully, the well-intentioned therapist or educator, into doing things for him. He probably has avoided institutional treatment or control for delinquency by the sincerity of his promise to reform and the tears of regret he weeps for his sad family who will be disgraced by his downfall. Parenthetically, he may exhibit subtle anxiousness or project in dreams, associations, or in formal psychologic test material evidence of serious developmental arrest or defects.

KR0531

However these characteristics are not available for public inspection. The persona looks strong, intact, and adequate.

### 3. The adjustment problem, behavior problem youth, the malcontent acting out type

In his prehospitalization and predrug-use life he was evidently in troubles of a minor but cumulatively impressive nature; he had attendance and disciplinary problems with school. If he worked he either was fired or quit, moving from one job to the next. With his family, he felt distant and tried to get even further away from it. He is stubborn, superficially self-reliant, distrustful, unable to accept help, or support from adults. Unlike the passive, conforming youth, he seeks to compensate for his weak masculine identification and dependent wishes by a facade of strength, vigor, activity—he may hold a minor police record, with such charges as street fighting, destructive activity, or theft. In psychiatric evaluation one observes that he experiences a great deal of internal conflict and the evidence is right on the surface.

### 4. The youth with debilitating anxiety

In his prehospitalization and predrug use life, he had struggled against an active disorganizing and disruptive process in which he experienced extreme anxiety, feelings of inadequacy and lowered self-esteem. Though moralistic, striving toward conventional goals in work, education and marriage, he finds himself unable to carry out the required roles and relationships for these goals. His hold on reality is tenuous. In situations which are perceived by him as stressful, he becomes unrealistic and confused. In general he attempts to maintain intellectual controls and defenses, and to avoid situations which require emotional participation. In formal psychiatric interviews, paranoid trends and thinking disturbances are noted, which strongly suggest, as does his defective ego functioning noted in projective psychologic test material, that he is a borderline or incipient schizophrenic.

### 5. Overtly psychotic

In his predrug use and prehospitalization life, he has displayed a variety of maladjusted behaviors, at home, school, community, ranging from the merely silly to the homicidal * * * at least in intent. At the time we observed him, he showed affective blunting or inappropriateness, bizarre behavior, loss of judgment, special symptoms, e. g. hallucination or delusions, all sufficient to make the diagnosis of schizophrenia. He rarely progresses in the hospital to deterioration or progressive loss of contact or control requiring mental hospitalization, but rather usually improves in the protective hospital situation to an often dramatic extent. * * *

––––––

STATEMENT OF H. DANIEL CARPENTER, DIRECTOR OF HUDSON GUILD, NEW YORK, N. Y., SUBMITTED TO THE SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY OF THE UNITED STATES SENATE COMMITTEE ON THE JUDICIARY

My name is Daniel Carpenter. I am the director of the Hudson Guild Neighborhood House, located in an area of Manhattan known as Chelsea. In the time I have I would like to present a kind of case study of a neighborhood at work—a story of local people, agencies and institutions at work in a changing neighborhood in New York City to try to keep it from complete deterioration, to prevent crime and juvenile delinquency and to upgrade it in every way possible. First, however, I want to give you a brief description of the Chelsea area, and secondly, something about Hudson Guild, so that you will know and understand the frame of reference from which I am making this presentation.

The Chelsea area is a 1-square-mile area of Manhattan, bounded by 34th Street on the north, 14th Street on the south, the Avenue of the Americas to the east, and the Hudson River on the west. It is a mixed use area, with business, industry, and residence intermingled, and it is surrounded by probably the greatest concentration of industry in the world. The residential buildings built before 1900 are made up of brownstones, tenements, rooming houses, and some few modern and high-rent apartments which have been built since 1920. By and large, it is a low-income neighborhood with low rentals prevailing, except for the exorbitant rents charged in the rooming houses. According to the 1950 census, the area had about 61,000 people. There are something over 30 different nationalities living in the Chelsea area, with a predominance of Irish, Italian, Puerto Rican, and Greek, with a small but growing Negro group. It is estimated today that the Puerto Rican people make up about a third of the population.

KR0532

The religion is predominantly Catholic, with a growing number of people of the Jewish faith, and with the number of people of the Protestant faith remaining static. Over the last 10 years the area has experienced extremely rapid change. Major change consists of the old-time residential population withdrawing, with Negroes and Spanish-speaking families coming in in the largest number. There are many assets in the area, in addition to people, such as good churches, good schools, good institutions, active business groups, and well-organized labor groups, as well as veterans' and other civic organizations. But there are also many liabilities and problems. Deterioration in buildings is probably the most devastating due to the conversions and the overcrowding in the rooming houses. Intergroup relations are not the best, with conflict between Puerto Ricans and non-Puerto Ricans here and there throughout the area. There is lack of pride in the area, and bewilderment on the part of many people in knowing what to do or how to do it.

Now let me brief you on Hudson Guild. It has been a place in Chelsea where all peoples, regardless of race, creed, or national origin, are able to come for help and to feel at home, since it was founded in 1895. Hudson Guild is interested in the whole family, and its program reflects concern for all ages and all members of the family, ranging from the nursery and child-care center up through to the day center for the aged, at the other end of life. I won't spend any time on the scope of the program, but only refer you to the pamphlets which you have before you, which describe the Guild more fully than I have time to here. The Hudson Guild, in addition to providing programs and services for the whole family, is interested in the conditions under which these people live. It is concerned, too, with working with people to help them improve their conditions and build a better kind of neighborhood life. It is its aim, also, to create a sense of partnership between the people in the area and the agencies, so that it isn't a question of doing things for people but of people working together for their common good. In other words, we are, as the whole settlement movement is, here in New York and throughout the United States, dedicated to helping people to build better neighborhoods.

Furthermore, it is with the conviction that if we are going to get at some of the root causes of "juvenile delinquency" we must look into the community and study its impact upon the family; and if we are going to prevent delinquency, it means upgrading and strengthening our community and neighborhood life, by preventing or eliminating blighted conditions and by bringing order out of disorganization.

The case study I want to present starts in 1947, and covers the period from 1947 to 1957. It will include only the hightlights of some of the projects and experiments that we have carried on, which I think would be of interest to you in your search for means to prevent juvenile delinquency. In 1947, the Elliott Houses, the first postwar public-housing project in New York City, was tenanted. At this time the first Negro families in large numbers came to live in Chelsea. Along with the tenanting of the public-housing project, we had the first big influx of Puerto Rican families into the area, taking up places in the rooming houses. The impact of this rapid immigration and the resultant overcrowding led to actual outbreaks of street fighting in 1949. This outbreak of street fighting took place even though a great deal of work had been done to try to bridge the gap between the old and the new. Nevertheless, it got out of hand in the summer of 1949.

Immediately following the outbreak, we brought together young people whom we knew were involved in the organization of the fight, principally the non-Puerto Rican young adults and the older teen-agers in the community, some of the Puerto Rican adults we knew, along with parents, interested citizens, and local police officials. This group sat down for three nights running, to see if it could be discovered how and why the fighting started and what could be done about it. You probably will be interested to know how this open street fighting actually started. As we dug into the situation, we found that three teen-age girls in the area, who were a little bored at the time, would go into the park or up to a street corner and stand near a group of Puerto Rican young adults. The girls would stand there for a moment and then they would start to laugh. The Puerto Rican young people, naturally, would turn to them and say something in Spanish, and at that point the girls would run away screaming, giving the impression that they had been insulted or assaulted. As a result, their brothers and boy friends would come forth and an argument between them and the Puerto Ricans would ensue. This gradually built up into actual fighting. The last straw was a little incident where a Puerto Rican was alleged to have bitten an Irish kid, and on that evening the street fighting broke out. As we talked

KR0533

through and got into the factors leading up to the fighting, we found that it was a Greek kid who bit the Irish boy, but that made no difference at all; everyone was out to get the Puerto Ricans by that time.

Now, the point of this story is that by moving in quickly, by involving the parents, by bringing everyone in and having them sit down together, the young adults that were involved were served notice, very directly, that this kind of conduct would not be tolerated, and if it happened again, drastic action would be taken. This was gotten over to them by their peers, not someone from the outside. It was the community talking to them, and I think it really made the difference. And from that time to date, we haven't had anything of that nature in the area, even though factors were present which made us feel we were sitting on a powder keg.

Because we knew trouble would continue unless some positive measures were initiated, we started an expanded English-teaching program, using an English-through-pictures method that was developed at Harvard, to help with the very basic problem of communication. This brought literally thousands of Puerto Ricans into the English classes in the area.

In 1952, we found that we needed—not only at Hudson Guild but at all the agencies—to know more about the people who were now living in the area, what they thought of the area, and what they thought of each other. For that reason, we asked the Center for Human Relations Studies at New York University to help us make a study of people's attitudes. I have the study here and you have copies before you. Out of this survey, one of the important things we found was that people were concerned with what happened. They were not as apathetic as we had believed; they did want to do something, but they didn't know how. There were no channels through which they could work. They wanted help with their children, not blind censure of their inadequacies. Here was a challenge for us—to find ways to involve the people themselves in doing something about their own problems, their own families, their own kids, and so forth.

In 1953, we started what we called the new-neighbors project. This is 1 of the 3 programs that I want to emphasize to you as an experimental approach to some of the problems of a changing area of New York City. We had been unable to get very close to the Puerto Rican families in the area. We thought we knew what they wanted, and what they needed, but most of the time we were way off the mark. Foundation funds were secured to permit us to hire a couple of very good Spanish-speaking people, who went into the neighborhood and knocked on every door, not with a program, but just to talk with the new neighbors about their concerns, to find out what they thought their problems were, and in the meantime, to get some idea of which people in the Puerto Rican community could take responsibility and had capacity for leadership. At the end of about 4 months of this kind of work, 4 main needs were crystallized: (1) That the Puerto Rican people wanted a Spanish-speaking organization that they could belong to; (2) they wanted English classes around the clock; because their work was so irregular, they could not get to classes that were held at just 1 time each night; (3) they needed help in getting shelter, because there is no group more discriminated against when it comes to housing as the Puerto Ricans; (4) they wanted a better relationship with the police. On the basis of these four needs, a program was developed with the Puerto Rican people themselves, with as much emphasis as possible on involving non-Puerto Ricans. One of the problems we have not been able to overcome is the mobility of the Puerto Rican people. This is understandable because they are living under conditions that are, on the whole, terrible. They are constantly on the move, and those who have the greatest capacity for leadership are the ones who move most frequently, in an attempt to improve and better their conditions; so we are always, so to speak, running fast to stay in one place. Another complication is the fact that every time you knock on a door, and it is opened to you, you become a party to many fantastic problems—family problems and welfare problems—and these complicate our whole approach to the Puerto Rican community because so many of the problems are just unsolvable. Nevertheless, we cannot turn our backs on them, and, consequently, we are heavily burdened with an endless number of what we might call family service problems.

A Spanish-speaking club has been organized, and has served a real need. Other organizations in the area have also been urged to organize such groups. English classes have been expanded, and are now being taught over a closed-circuit television project, which I will also describe later on.

20873—58——11

KR0534

The housing problem is one which continues to baffle us because there seems to be no end to it. There are hundreds of families, actually thousands, living in one room for which they pay exorbitant rents, and there seems to be very little hope that even within a generation they can expect anything better. Through a weekly housing clinic, we have helped them to get rent adjustments; we have helped them to know how to work with their landlord and to get the best deal they can without exploitation. However, most of the time, if the law codes are enforced, a family may be evicted because it is living in violation of one of the codes.

The fourth aspect of the program had to do with the police, and here it was a matter of developing understanding. For a while we promoted classes in Spanish for the policemen, and we have served as an intermediary between the Puerto Rican people and the police on many problems.

As we pursued our work in the new-neighbors project, we came to a building called the New California Hotel. Upon visiting it, we found that there were more than 600 people living in 98 rooms. It was about the most filthy, degrading, indecent situation one could imagine. Through the leadership of the deputy commissioner of building and the commissioner of welfare, we were able to work out a project with the owner and the tenants, the health department, the local public schools, and Hudson Guild, whereby we could attack the New California Hotel problem as a team. This has been one of the most productive demonstrations of teamwork that we have experienced in the last several years. Through this team approach we have been able to upgrade from unbelievable conditions what would be considered a solid mass of hard-core or multiproblem families to a degree of decency. As a result of the work with the tenants of the New California, the amount of destruction has been cut down. Cleanliness has been maintained; the people are beginning to take some pride in the building, as well as in keeping their own apartments in somewhat better condition, and they have begun to participate in things outside the New California Hotel, at the school, and Hudson Guild. The parents have registered their children for play school and camp during vacation periods, and have joined the English classes themselves. The women were organized into a homemakers club, and at the end of the first year prepared a luncheon consisting of Puerto Rican delicacies for the commissioners of the city departments involved in the project. This activity gave the group of about 15 women a great uplift and a sense of dignity and importance. To have had the privilege of preparing lunch for high-level city officials was, as one woman said, "out of this world." The principal point I want to make here, though, is that juvenile delinquency and crime were rampant prior to the start of the New California Hotel project, yet today it is negligible. The project is explained in more detail in some of the literature I have given you.

The success of this project prompted a recommendation to the mayor that the same approach be tested in a larger area. After an examination of several blocks, it was decided to select the 300 block on West 27th Street. More city departments were invited to participate, and while we had 1 owner at the New California, we had 49 in the 300 block, many different kinds of housing and many more people. First to be organized were the owners, then followed the tenants, and finally they were all brought together into one organization. Through this work we are satisfied that the approach is a valid one, and that it will upgrade a block and help to develop the kind of life there which will be a strong deterrent to juvenile delinquency.

While the New California Hotel project was being worked out, the New York City Youth Board was able to come into the Chelsea area with a full program of aid for the youth-service agencies, whereby 12 workers were provided to supplement the various private agencies in the area to enable them to increase their work with youth. The impact of this new leadership, along with the other programs carried on in the area and the involvement of people and organizations, has had a telling and very successful effect. The delinquency rate in Chelsea today is on the downgrade as reported by city officials. This indicates the validity of the various things we have been trying to do. In the period from 1947 until today we have had no teen-age gang warfare, as other areas of the city have, and we feel pretty sure that we can keep it from appearing here in the future. On the other hand, we are confident that if it does, we can very quickly stamp it out.

In addition to the programs I have mentioned, it became clear to us that we still had not reached down to the roots of the community in terms of organization, so that the potential power of the people and their own organizations could be mobilized. For that reason, we applied to a foundation for help in getting

KR0535

funds to see if we couldn't demonstrate that an organization could be built in an area such as Chelsea that would be self-sustaining and could work effectively on many local problems that the people themselves were concerned with. We were successful in getting funds to sponsor a project on a 3-year basis, known as the Chelsea citizens project, which is now about 1½ years old. On November 17 of this year we held a permanent organizing convention, where we brought together 76 organizations, representing labor, business, churches, social agencies, social clubs, veterans' groups, political parties, nationality groups; in fact, every legitimate organized group in the Chelsea area. They adopted their own bylaws and elected their own officers and charted out a program which covers everything from delinquency to improved housing, recreation, health, and many other things that affect the area.

Now, this organization was started with the conviction that the greatest hope for sound communities lies in the mobilization of the people themselves. In general, our approach in New York City, where we have had dramatic increases in crime and juvenile delinquency, has been to saturate the area with police, strengthen the local agencies with Youth Board personnel, and then hope that things would get better as a result of these measures. If this does not work, and things get worse, we relocate the people, bring on the bulldozers, and build a new neighborhood. In this approach, the people have been ignored. It is our feeling that the really sound approach to problems of the community, including juvenile delinquency, is through the people. Unless we can mobilize the strength which is there, all our efforts will be something like bailing water out of a leaky boat. Every time we stop, the boat will sink.

We believe, too, that the community and the kind of community life that exists has a tremendous impact on the families. In every community there are strong parents and weak parents. The weak get along fairly well in a healthy community, where there is communication and a sense of pride, standards of conduct, and certain social pressures. This kind of community can give the home support. The churches, the agencies, the schools, the PTA's and other groups are on the job and can immediately move into a situation which begins to get bad. In a community that is deteriorating, that is disorganized, where the agencies are withdrawing and the people with leadership capacities are withdrawing, there is no support for weak families. They just get mired down in a deteriorating community, and we all know too well the result.

We believe there is strong interplay between the community and the family. When the family is out of step with the community, and the community out of step with the family, we are in trouble. Let me give you an example. One of the families I know quite well had a little tow-headed kid who was too young to go to school. He spent his time out on the street, climbing on cars and dancing on the hoods and roofs of the cars. One day one of the workers at the guild grabbed him and pulled him off the roof of a car. He twisted and turned and shouted and kicked, but the worker took him home. There she met a hostile and belligerent father who demanded to know why the worker was bringing his child home. When she told him why, he said, "Well, I don't care. I don't care what he did. I am going to get out of this neighborhood as fast as I can, and the sooner the better," etc. The worker stood her ground, and showed the father that when he escaped to his dream cottage in his dream community, he was going to take along a little tow-headed kid, who was growing up with complete disregard of property, of people, or anything else, and this child would enter this paradise with all the bad habits he was picking up here because of his father's attitude toward the community. Fortunately, the father happened to be an intelligent fellow, and the next day he came to Hudson Guild and asked if he couldn't talk some more about his youngster. As a result he became a very active parent volunteer for several months before he finally did leave the area. Still, the sort of attitude that this man showed at the beginning is typical of what happens when an area begins to go downhill. Only an alert community can counteract it.

The last project I want to speak of is the Chelsea closed-circuit television program which was opened last week. This project was initiated to test what this new medium (television) could contribute to the enrichment of education, to the speeding up of learning of English by non-English-speaking people; as a housing management aid; to the development of a sense of pride in the community, and to greater communication between families in a public-housing project. It is financed by a grant from the fund for the advancement of education of the Ford Foundation. The sponsors of this pioneering project are the New York City Board of Education and Language Research, Inc. It will tie 600 homes in the Elliott housing project to the local public school, to the neighborhood

**KR0536**

house, and to the city health center. We are now working with a group of teenagers to help them develop a regular weekly teen-hour on the closed circuit, as well as involving the families in the Elliott houses in program planning and participation before the cameras. Teaching of English and Spanish, the development of health programs, and many other courses of adult education and family life will become the regular program. The leaflets you have before you describe the project in detail. This is our latest experiment in exploring ways of improving the life of a big city neighborhood.

In closing, let me say that I realize that I have not touched on many important aspects of the problem of juvenile delinquency, but there is no one answer or panacea for this perplexing situation. Nevertheless, I can't help but feel that we will see an ever-increasing rise in juvenile delinquency and crime, just so long as we allow the deterioration of neighborhood life, whether it be in the slums or in the improved areas of the cities or the suburbs.

---

STATEMENT OF HON. JOHN M. MURTAGH, CHIEF CITY MAGISTRATE OF THE CITY OF NEW YORK, SUBMITTED TO THE SENATE SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY

A juvenile or children's court is a 20th century development. Such courts are based on a recognition that children differ from adults in responsibility, and that an attitude of understanding and helpfulness rather than one of segregation and punishment should characterize society's dealing with the youthful offender. Under children's court statutes, the delinquent child is to be treated like the neglected or dependent child. Official recognition is given to the fact that, whatever the immediate act may be that brings a child into the court, the issues presented are in essence problems involving understanding, guidance, and protection, rather than criminal responsibility, guilt, or punishment.

The dividing line between a child and a youth or adolescent is not easy to draw. Most States have not shared New York's feeling that the differentiation can be made at the 16-year level. In a majority of States, the age limit for original jurisdiction over delinquency cases is 18 years or higher, while a number of other States set the age limit at 17; 18 is the age adopted for the Federal courts' delinquency proceedings.

Because the line between childhood and adulthood cannot be clearly drawn at the age of 16, New York has developed special ways of dealing with adolescents who have not yet attained the hypothetical maturity of voting age. The Wayward Minor Act and the youthful offender law provide special procedures for dealing with adolescents over 16. The Girls Term Act, applicable only to the city of New York, provides additional special procedures for dealing with certain female adolescents. Quite aside from these provisions, the public health law establishes special procedures for dealing with the drug addict who is under the age of 21.

Our Wayward Minor Act provides that one over 16 but under 21 years of age, who so conducts himself as to endanger his own health and morals or those of his family or the community (though not charged with the commission of a crime) may, upon the complaint of a parent, police officer, or other interested person, be adjudged a "wayward minor." Such adolescents, after adjudication as wayward minors, may be placed on probation for a period not to exceed 2 years or may be committed to a reformatory for an "indeterminate" period not to exceed 3 years. The wayward minor determination is not a conviction of a crime but amounts simply to an adjudication of status.

In New York City, we have special magistrates' courts known as the adolescent courts. These courts exist for the arraignment, examination, hearing, trial, or determination of crimes and offenses committed by adolescents. They serve to protect the adolescent from coming into conflict with older and more experienced offenders. The adolescent courts may entertain a wayward minor proceeding with respect to adolescents between 16 and 21 years of age upon the complaint of a parent, police officer, or other interested person.

In 3 of the 5 counties, namely, Kings, Queens, and Richmond, they also have the power to substitute a wayward minor charge for a criminal charge upon consent of the district attorney, in the case of adolescents between the ages of 16 through 18 years of age, thereby retaining the treatment of the adolescent at the point of first contact, with the magistrates' courts, and avoiding the necessity of processing him through the grand jury or the court of special sessions. Under this procedure, before the adolescent is arraigned on

**KR0537**

a criminal charge, he is interviewed by a probation officer who obtains historical data to be furnished to the presiding magistrate. This data does not concern itself with guilt or innocence but is designed to enlighten the magistrate as to the adolescent's background and provide him with a basis for considering the youth for treatment as a wayward minor. The attorney for the adolescent and the assistant district attorney assigned to the court confer prior to the hearing regarding the adolescent's background and to determine whether the adolescent disputes the allegations made against him in the criminal complaint. If the defendant denies the charge, the hearing or trial will proceed in the same manner as against an adult. If the crime charged be vicious in nature, for example, robbery, felony, rape, etc., or the defendant has a previous record of serious crime or mental institutional care, he will not be considered for treatment as a wayward minor. In such a case, if a prima facie case is established, he will be held for further proceedings by the grand jury or in the court of special sessions.

Where the defendant does not deny the truth of the complaint and appears to be an accidental offender with reasonably good prospects for rehabilitation, the court proceeds with the hearing. If no case is made out, the defendant is discharged. If a prima facie case is established, the wayward minor procedure is then explained to the adolescent, his parent, and attorney. The magistrate then directs that a wayward minor complaint be drawn, and it is signed by the parent. The basis of the complaint is that the adolescent has committed the crime charged and is therefore in danger of becoming morally depraved. The adolescent is then arraigned on this new charge, advised of his rights, and given a trial to determine if he is a wayward minor.

The magistrate makes no determination at this point, but, after an advisory talk and suitable admonition to the adolescent and his parents, reserves decision on the original charge and on the wayward minor complaint, pending a probation investigation which is consented to by the adolescent. The adolescent is then paroled or continued in bail to return on a definite date for the court's decision.

After the probation investigation and prior to the adolescent's return, the assistant district attorney and the magistrate who heard the case read the probation report. If, after reading the probation report, the assistant district attorney is prepared to consent to the dismissal of the original charge and the substitution of the charge of wayward minor, he states his consent for the record. If the magistrate concurs, he will, on the appearance of the youth and his parents before him, dismiss the criminal charge and adjudge the adolescent a wayward minor and impose sentence.

If, after reading the probation report, the assistant district attorney refuses to consent to the substitution of a wayward minor charge, the wayward minor complaint is dismissed and the adolescent is held for the grand jury or for the court of special sessions. This does not, of course, preclude the possibility of treating the adolescent as a youthful offender in the court of special sessions or the county court.

Under the youthful offender law, a youth of 16, 17, or 18 years of age, charged with the commission of a crime, who has not previously been convicted of a felony and whose alleged crime is not one punishable by death or life imprisonment may, upon his own consent, be investigated to determine whether he should be given the specialized treatment and status known as youthful offender or whether he be dealt with as an adult criminal. The decision as to this question is made by the judge of the trial court to which the youth is brought on the basis of the judge's belief as to the possibilities of the youth's rehabilitation. Such youthful offender procedure may be initiated by the grand jury, the district attorney, or on the judge's own motion, but it does not occur until after the youth reaches the trial court. If found eligible for youthful offender treatment, the charge of "youthful offender" is substituted for the criminal charge against him. Upon a plea of guilty, or upon being guilty after a nonjury trial to determine whether he committed the criminal acts originally charged, the youth is adjudicated a youthful offender and thus avoids the stigma of a criminal record and the numerous disadvantages which would result if he were convicted of a crime. As a youthful offender, he may be committed to a reformatory for an "indefinite" term up to 3 years, or he may receive a suspended sentence involving a 3- to 5-year period of probation.

Through a private agency known as the youth counsel bureau, the adolescent court also seeks to establish contact at the very outset with every arrested youth and his family. The youth counsel bureau does some preliminary screening,

20873—53——12

KR0538

chiefly to determine whether there should be a recommendation for parole. Quite beyond that function, if the youth should be discharged by the magistrate because there is no case against him, the youth counsel bureau often volunteers to assist him in his readjustment to the community with a view to avoiding further incidents such as the one that brought him before the court in the first place.

In New York County, there is a special magistrates' court, with citywide jurisdiction, known as girls term. Originally, it was a court created in similar manner to the adolescent court to enable magistrates in appropriate cases to substitute the wayward minor procedure in cases of female adolescents charged with vagrancy under section 887 of the Code of Criminal Procedure. Because of the excellent services available to the court, the community in increasing degree began to present girls to the court who were delinquent or behavioral problems before they were charged with the commission of a crime. This type of case eventually became almost the exclusive work of the court. By a statute civil in nature and modeled on that of the Children's Court Act, the court was in 1951 given statutory recognition.

Under the Girls Term Act, the court has jurisdiction of girls between the ages of 16 and 21 who are charged with wayward behavior and girls between 16 and 18 who are neglected. The court functions much like children's court with informal hearings, probation investigations, and an attempt at individualized planning instead of routinized sentencing. Some of the cases are disposed of prior to arraignment by methods resembling those of the bureau of adjustment in children's court. The court is fundamentally a civil court, the basic philosophy of which is that it is more important to adjust than to adjudicate.

Attached to the court is a psychiatric clinic which was opened in May 1949 under the sponsorship of the New York City Youth Board and the city magistrates' courts and which at the time was the eighth psychiatric court clinic to be established in the United States. Approximately $46,000 a year has been allotted for salaries. This budget provides for the employment of a full-time clinic administrator, a consultant psychiatrist, 2 part-time psychiatrists, 1 full-time counseling psychologist, 2 full-time psychiatric social workers, and 3 clerical staff. The clinic provides psychiatric evaluation and treatment. Adolescents suffering from emotional disturbances are referred by the court and probation staff. After psychiatric evaluation of the problem and a determination as to whether a psychological illness exists, a decision is made in regard to accepting the adolescent for treatment. Experience in this clinic has convinced us that it is a necessary adjunct to any court dealing with adolescents, not only for diagnosis but for therapeutic purposes.

Girls term and the psychiatric clinic exemplify the kind of progress which we are seeking to attain through the magistrates' courts in dealing with adolescents. They provide valuable guideposts for future planning.

Sections 3360 to 3366 of the Public Health Law of the State of New York, enacted in 1951, provide special procedures for dealing with youths under 21 years of age who are addicted to the use of drugs. These laws provide that a person under 21 years of age may be adjudged a drug user by a magistrate and thereupon be required to undergo custodial or postcustodial examinations, care, treatment, and guidance, with a view toward rehabilitation.

The custodial care is made available at the hospital maintained on North Brother Island in New York City or may be provided at any other institution designated by the State commissioner of health. The adolescent drug user is compelled to continue a full course of treatment, rehabilitation, and aftercare, even though such a course might require a period as long as 3 years. The actual extent and duration of the custodial and postcustodial care in such case is determined with the advice, guidance, and recommendations of those in charge of the treatment facilities. The procedures are not criminal in nature and the adjudication is not a conviction for any purpose. Proceedings are instituted by petition, which may be signed by a duly licensed physician, peace officer, parent, guardian, relative, or friend. The parties are known as petitioner and respondent, not as complainant and defendant.

As soon as sections 3360 to 3366 of the public health law became effective, a special magistrates' court was created known as narcotics term to process appropriate cases. The narcotics term court, although located in New York County, has citywide jurisdiction. It deals with all persons under the age of 21 years.

When we consider how complex and baffling is the problem of juvenile delinquency, it is not surprising that New York City's judicial system for dealing with the problem is so intricate. Steps should, however, be taken to improve and simplify the system.

**KR0539**

The New York State Legislature has enacted legislation known as the Youth Court Act designed to promote efficiency and simplicity by vesting almost complete jurisdiction over these problems in a single court. The act was originally to have become effective February 1, 1957, but at a subsequent session of the legislature the effective date was postponed to April 1, 1958.

The Youth Court Act contemplates the creation of a youth court in the court of general sessions in New York County and in the county courts of the four other counties of the city. The new court is to have jurisdiction over all youths from the age of 16 to 21 immediately after arrest until ultimate disposition. Sessions of the youth court are to be separate from other sessions of the county courts. Judges are to be assigned to the court from the county court for a term of 1 year. Provisions for youthful offender treatment are to be extended to include youths from 16 to 21, thus extending the age to include youths in the 19 and 20 age category. The primary purpose of the legislation is to consolidate virtually all proceedings involving youths from 16 to 21 within the framework of a single court.

The act obviously contemplates a drastic change in the judicial handling of youth problems in New York State. It has been the subject of considerable criticism. Much of the criticism has been directed at provisions of the law that provide for privacy of court proceedings. There is considerable merit to this criticism.

There are other respects in which the desirability of the act is questionable. In dealing with the problem of juvenile delinquency for many years the magistrates' courts have developed an experience and a tradition that is of value. Being a large court with 54 judges, each of whom has authority to preside in any of the 5 boroughs, the court has a large body of experienced judicial personnel from which to draw judges for service in youth courts. In any group of judges, only a percentage have the interest and special ability to deal effectively with youth problems. Such judges can be recruited only from a court with a substantial number of judges. Under the proposed Youth Court Act, judges would be drawn for service in the youth court for a period of a year, and this selection would be made in each county from a group of judges of from 4 to 9 in number. It is obviously contemplated that the assignment would be rotated. It is manifest therefore that frequently the judge presiding, even though a lawyer and judge of general ability, would neither have the interest nor the ability to deal with this specific problem. I believe therefore that it would have been wiser to have created the youth court within the magistrates' courts system. There is much agitation for the repeal of the act before its effective date. I believe it should be repealed.

The contribution that any court can make to the solution of the problem of juvenile delinquency is at best but a limited contribution. No judicial system can be expected to prevent or to "cure" the antisocial conduct of youth. It is an unfortunate truth that by the time either the juvenile court or the youth court is called upon to cope with the delinquent the roots of emotional and behavioral maladjustment are deeply embedded in personality and character. The weakness of family life is the key to the tragic phenomenon of juvenile delinquency. To quote two of the foremost authorities on juvenile deliquency, Sheldon and Eleanor Glueck:

"Little progress can be expected in the prevention of delinquency until family life is strengthened by a large-scale, continuous, pervasive program designed to bring to bear all the resources of mental hygiene, social work, education, and religious and ethical instruction upon the central issue. We must break the vicious circle of character-damaging influence on children exerted by parents who are themselves the distorted personality products of adverse parental influences, through intensive instruction of each generation of prospective parents in the elements of mental hygiene and the requisites of happy and healthy family life. A tremendous multiplication of psychiatric, social, and other resources for improving the basic equipment of present and prospective parents for a wholesome parental role has become indispensable. Without this, we shall continue the attempt to sweep back the mounting tides of delinquency with an outworn broom" (Unraveling Juvenile Delinquency, Sheldon and Eleanor Glueck, Harvard University Press, 1950, at p. 287).

The basic answer to juvenile delinquency lies in a happy family life. Just so long as society is so far from being perfect, just so long as so many families are inadequate materially, emotionally, spiritually, and otherwise, just so long are we likely to have the phenomenon of juvenile delinquency. The fundamental answer is not to be found in more vigorous police enforcement or sterner justice. The fundamental answer is to be found primarily in an im-

**KR0540**

proved society, a society that will give greater recognition to its dependence on God and will more adequately provide for the humblest of His children.

It is difficult to think of the problem of juvenile delinquency without reference to drug addiction. It has been estimated that every year since 1949 approximately 500 new cases of addicts between 16 to 20, inclusive, have become known to the authorities in the city of New York. The great majority of these are users of heroin. The average young addict must spend from $40 to $80 a week for drugs. He seldom has a legitimate source of income to support the habit. He must either become a pusher or resort to other criminal activities to support his habit.

The judicial approach to this phase of the problem of juvenile delinquency of necessity must be based on existing law and police procedures. Since the enactment of the Harrison Act of 1914, the approach to the problem of narcotic addition in the United States has been a penal approach almost to the exclusion of a public health approach. Early decisions of the Supreme Court of the United States, *Webb* v. *U. S.* (249 U. S. 96 (1919)), *Jin Fuey Moy* v. *U. S.* (254 U. S. 189 (1920)), and *U. S.* v. *Behrman* (258 U. S. 280 (1922)), gave support for the interpretation of the Harrison Act which would forbid the medical profession from treating the addict. The Supreme Court of the United States departed from this interpretation in *Linder* v. *U. S.* (268 U. S. 5 (1925)), when in a unanimous opinion written by Mr. Justice McReynolds it said at page 18:

"The enactment under consideration levies a tax, upheld by this Court, upon every person who imports, manufactures, produces, compounds, sells, deals in, dispenses or gives away opium or coca leaves or derivatives therefrom, and may regulate medical practice in the States only so far as reasonably appropriate for or merely incidental to its enforcement. It says nothing of 'addicts' and does not undertake to prescribe methods for their medical treatment. They are diseased and proper subjects for such treatment, and we cannot possibly conclude that a physician acted improperly or unwisely or for other than medical purpose solely because he has dispensed to one of them, in the ordinary course and in good faith, four small tablets of morphine or cocaine for relief of conditions incident to addiction."

But by 1925 the medical profession had largely withdrawn from the treatment of drug addiction, and the Federal Government has since proceeded as if the Webb, Jin Fuey Moy, and Behrman cases were the law. This is a serious error and is in large measure responsible for the spread of drug addiction to the youth. We have successfully driven the medical profession away from a problem that is fundamentally medical in nature. The addict is a sick person with an almost irresistible compulsion. We are denying him the solace and comfort of the medical practitioner. We have driven him into the hands of the underworld. By our error we have created a nucleus of thousands of addicts who furnish a basic demand for illegal narcotics. We have also furnished the racketeers with thousands of addict pushers who risk possible arrest while the real culprit goes unpunished. Our legislation dealing with narcotics is as unwise as the 18th amendment and the Volstead Act. The 18th amendment bred and financed organized crime in the 1920's. Since that time, our erroneous approach to the narcotic problem has been the principal means of financing the underworld.

It is submitted that the United States Senate could do nothing more effective in the field of juvenile delinquency than to clarify the Harrison Act so as to remove all doubt as to the right of the medical profession to treat the narcotic addict.

TESTIMONY SUBMITTED TO THE SENATE SUBCOMMITTEE ON JUVENILE DELINQUENCY BY POLICE COMMISSIONER STEPHEN P. KENNEDY

### I. THE ROLE OF THE POLICE IN JUVENILE DELINQUENCY

Seven out of eight young offenders in conflict with the law come first to the attention of the police. Police agencies operate 7 days a week and 24 hours a day.

It is therefore important that the police effectively exercise a dual responsibility: First, that the potential delinquent act is discovered. Second, the police must handle each offense so that a recurrence can be prevented if it is possible. This dual responsibility demands that a police department provide both intelligent law-enforcement facilities to prevent crimes and a corps of skilled investigators trained to arrive at the best disposition of each case involving a youth.

KR0541

Having thoroughly investigated the case, the police should follow through. In an appropriate case, this is accomplished by referral to the public or private agency best equipped to handle the problem from that point on. Police agencies can and should initiate the rehabilitative process, but they are not equipped, and should not be expected to engage in rehabilitation of children.

## II. THE YOUTH DIVISION OF THE NEW YORK CITY POLICE DEPARTMENT

The basic principles set forth above are carried through in the New York City Police Department by all members of the force and, in particular, the officers attached to the youth division. The division was created to coordinate as well as supplement the work of the department in the youth field. It is important to remember that the police officer on patrol is also charged with the primary responsibility in youth work. In all of the department's training, and in its daily task, every officer must master the basic principles of handling disturbed juveniles.

To supplement their efforts in the field, the Police Department of the City of New York has developed 3 specialized groups within the department, and 2 outside the department, which present a balanced police program for the prevention and control of juvenile delinquency.

### A. The youth squads

This unit is comprised of 155 selected men and is primarily responsible for the intelligently aggressive law enforcement phase of our program.

Constantly aware of the rights of individuals and the special approach often necessary in handling disturbed youths, the youth squads nevertheless must be alert and ready to intervene in the overt criminal acts which do exist among a small percentage of the young people of this city. The youth squads are mobile, assigned in teams to cars on a citywide basis. A 24-hour patrol is maintained which concentrates primarily on the known breeding places of youth crime. Where violence is expected, these squads can be immediately summoned by radio to take necessary police action. They maintain a gang file, an incident location file, and other records specially pertaining to the youth crime problem in the city. These squads are the strong right arm of our youth program.

### B. The Juvenile Aid Bureau

Three hundred and fifty-five men and women are assigned in 13 units throughout the city to perform the second major function in our broadly conceived youth program. The Juvenile Aid Bureau, formed in 1930, is the departmental agency to which other police officers and members of the public refer juveniles who, by their acts, give indication that they are getting into trouble. The trained JAB unit worker makes an investigation into each case referred to him. He visits the child's home and makes an analysis of the problems and environment out of which the delinquent is developing his antisocial behavior. On the basis of the investigation, the officer will either make an arrest, release the child with a warning, or, if the case gives promise, will refer the child to the appropriate social agency, public or private.

In November of this year, the mayor and the board of estimate, by an additional appropriation to the police department, made it possible for 100 additional workers to be assigned to this important function. This enabled the JAB—for the first time—to install a two-platoon system which permits us to strategically assign the personnel on overlapping patrol tours during peak periods of juvenile delinquency and in high hazard areas. It also enables the bureau to extend its investigative powers into the area of the more serious crimes which result in arrests, and into the age groups of 16 to 21. Prior to this autumn, the bureau's caseload permitted concentration only upon the less serious types of criminal behavior and children under the age of 16.

JAB personnel are chosen for their educational background and for demonstrated ability in youth work. They are given an inservice training course which provides the skill and knowledge required to make effective referrals to the multitude of social agencies established in this city. As a link between the police officer on patrol and the rehabilitative social agencies, the JAB plays a vital role in crime prevention.

### C. The precinct youth patrolman

In 1945 a program was devised to assign a patrolman in every precinct to the job of becoming the expert in local conditions affecting youth. Formerly, each precinct youth patrolman was responsible to his immediate superior, the precinct captain. Since March of this year, however, the youth patrolmen, while

KR0542

still assigned to the precincts, became a part of the Juvenile Aid Bureau, responsible to the local JAB unit supervisor.

Their responsibility and duties remain the same. They are experts on the local level. This is where the youth program must be at its best to be most effective. The precinct youth patrolman's function is to know and understand the social-educational and religious resources available, both public and private, to fight delinquency in his precinct. He is required to know who are the disturbed youths in the area, what and where the available facilities and possibilities for recreation are, and to seek out and become familiar with the public-spirited citizens in the neighborhood who can help a child who needs it.

### D. The precinct youth council

In nearly all precincts there are many public-spirited citizens whose assistance and cooperation are actively sought. Under the supervision of the precinct youth patrolman, these civic-minded adults are organized into youth councils which are called upon to discover neighborhood hazards for youths, to help neighborhood agencies obtain volunteers, to assist in obtaining part-time work for juveniles, to cooperate with schools, day-care centers, and recreation centers in promoting their programs, and in general to carry out the functions which are beyond the scope of the police role in dealing with the youth situation.

### E. The Police Athletic League

The police department recognizes that a recreation program, no matter how well constructed, is not the answer to juvenile delinquency. We feel, however, that a recreation program designed for areas which have no recreational facilities and staffed by trained workers who actively try to reach those of our youth who may benefit from such a program, has a very important place in crime prevention.

Since the early 1930's this department has sponsored one of the largest youth recreation programs in the country. The Police Athletic League, known as PAL, operates 12 full-time recreation centers, 40 part-time centers, 12 playgrounds, 33 play streets, a summer camp, a vocational placement bureau, and an extremely varied recreation program which includes everything from boxing to participation in a fife, drum, and bugle corps. Registration in the PAL last year numbered over 82,000 children. For the most part, these children are served in areas of the city which are not provided with other recreational facilities. Moreover, there is an active program, both by the staff of the recreation centers (who are all civilians, both professional and volunteer) and by the precinct youth patrolmen, to encourage participation by children who will most benefit from a recreation program.

The latest development in this area involves the assignment, in several of our centers, of group workers, in cooperation with the New York City Youth Board, who make it their business to encourage the integration of problem children into the program of PAL. This experiment is in its infancy, but already it has shown much promise.

### F. The deputy commissioner in charge of the youth program

The youth squads, the juvenile aid bureau, the precinct youth patrolmen, the precinct youth councils, and the PAL are all under the supervision and administration of the deputy commissioner in charge of the youth program. In the case of the Police Athletic League, this administrative control exists by reason of the fact that the deputy commissioner is, ex officio, the president of the PAL, which is a private corporation.

In addition to his other duties, the deputy commissioner serves as the police commissioner's representative on the parole commission of the City of New York, and at meetings of the New York City Youth Board. Thus, communication with city agencies in related fields is maintained from the highest level, and this communication is encouraged right down the line to the precinct youth patrolman.

The integration of the department's youth program under one administrative head took place in March of this year, and was given a new impetus by the assignment of the 100 additional men in November. By supplementing the work of the patrol and detective forces with these groups of specialists, the police department presents a well-rounded program for delinquency detection, prevention, and control.

The delinquency problem cannot be solved by police alone, or indeed by any single form of rehabilitation or control. There must be as many varieties of corrective measures as there are forms of delinquency. The efforts of the entire

KR0543

community—the home, the church, the private agency, the public agency and all those in authority, must be coordinated and inspired. The public must be informed of its own resources, or lack of them, and then those resources must be applied and supplied with intelligence and devotion before we can begin to meet this most pressing problem.

---

STATEMENT OF JOHN WARREN HILL, PRESIDING JUSTICE, DOMESTIC RELATIONS COURT, CITY OF NEW YORK

Hon. THOMAS C. HENNINGS, Jr.,
*Chairman, Subcommittee To Investigate Juvenile Delinquency,*
*Washington, D. C.*

DEAR SENATOR HENNINGS : I certainly have not been unmindful of your request that I give you a short statement of some of my thinking on this subject of delinquency in 1958. It has been very difficult to find time to do this.

There is no purely domestic problem which is giving us more concern than this fact of the steady and continued increase in the upward trend of delinquency over the last 10 years. Nineteen hundred and fifty-seven saw no reversal in this trend. In our court in New York City there was a 13.1 percent increase in the intake of alleged delinquents in 1957 over 1956. Our intake of 10,181 such children in 1956 constituted a 121 percent increase over 1947.

There can be no doubt that this great increase in delinquency can be attributed in large part to the extraordinary tensions under which we now live as individuals and families. Wars have always meant disruption and letdown in family life and family unity. The clouds that have been overhead during the last 10 years have been as dark and ominous as any war clouds. The ominous news brought into the home by the morning paper keeps the average family under continuous nervous strain. Ten years of it have had a cumulative effect with demoralizing results. The dreads that grip the parents are all exceedingly disturbing to the child. If the parents cannot feel secure in the home, certainly that home does not offer security to the child.

I sometimes feel that our forebears who faced perils and dangers and inconveniences equally if not more disturbing got more out of their religion than we do today; that for them religion was a very vital experience and a working factor in their lives in which they found security and a peace which is not too generally experienced today.

Certainly, families crack up or let down far more rapidly today than ever before. We all know that the larger proportion of our delinquents come from the broken or nonfunctioning home.

We are suffering today in this Nation from a serious lack of respect for law and authority. We have always, from our infancy, been a disciplined people. Today, we are getting away from a belief in the efficacy of discipline. This cynicism, and it is just that, pervades the thinking of the adults in too many homes and is creating too many young rebels who in turn have no respect for those in authority, which includes the teacher and the police officer.

I'm afraid that there is more concern today about the so-called evil of repression than there is about the value of a well-ordered, disciplined life. Unlimited self-expression for youngsters is, in certain quarters, highly overvalued, I believe. That restraint is an evil is for the most part the belief of those who disbelieve in rules, regulations, and discipline. Justice Cardozo once said in effect that good government is grounded in self-restraint. In my opinion, it is destructive of what we call character for a child to be brought up in an unorganized and undisciplined culture. It is certainly time that parents stop reading all the confusing and conflicting advice that is currently handed out today on the subject of child guidance and get back to the basic rules in bringing up their children. Application of commonsense principles, which includes mantaining respect for parental and duly constituted authority, is essential to stop this headlong flight on the part of too many of our children from lives of discipline to those of unhindred self-expression.

Successful parents are those who through patience and understanding are able to love their children in every situation and to show and demonstrate this love in convincing manner. Such parents wisely refrain from all the "overs" : overindulgence, overrestraint and overpermissiveness, each one of which should be avoided. They remember and apply the rule that a firm hand and a firm "No" are called for on proper occasion ; but they ever have in mind the fact that too many little "No's" and "Don'ts" cheapen authority and make the big "No" more difficult to enforce. These parents know too that love of God and country are

KR0544

fundamental virtues that must be taught, and taught not only by precept but by parental example.

These simple truths should be told and repeated and repeated to parents. The New York State Department of Mental Hygiene is already conducting a sound program of education of parents. This work should be encouraged. And, as suggested, lay groups, including the clergy, should be organized to teach and to preach.

There are many things that could be said. Children's courts should not be swerved from their statutory duty of reclaiming and rehabilitating the child. They should not be disturbed by the hue and cry to punish and bear down hard. The communities in this country have yet to properly equip children's courts so as to enable them to apply real, rehabilitative treatment. It is a rare court that has clinical facilities, adequate probation staff and proper and adequately staffed temporary shelter and long-term care facilities. As a matter of fact, the remand and commitment in themselves, while not used for that purpose, constitute a substantial form of punishment for the child. And the communities which cry most loudly for punishment are generally those which have failed to furnish their children's court with these treatment facilities. It is a crying shame but a well-known fact that the rate of recidivism among children turned out by these overcrowded and inadequately staffed State institutions for delinquent children is shockingly high.

The cost of staffing courts adequately with clinics and probation officers and of furnishing completely staffed as well as sufficient placement facilities is trifling in comparison with the cost to society of unreclaimed delinquents. And before we discard the thinking and planning of the last 50 years for the socialized treatment of the delinquent child on the ground that that kind of treatment fails, we should finance well thought out and guided programs of community cooperation for prevention of delinquency and should equip our courts and our child-caring institutions so that they can actually reclaim to usefulness a large and creditable number of our delinquent children and substantially reduce the rate of recidivism among those children who cannot be treated at home but must be sent away for long-term care to a State institution.

REMARKS BY COUNCIL PRESIDENT ABE STARK SUBMITTED TO THE SPECIAL SUBCOMMITTEE OF JUVENILE DELINQUENCY OF THE UNITED STATES SENATE

Mr. Chairman and members of the committee, may I thank you for your kind invitation to testify before this subcommittee of the United States Senate. All of us recognize that the problem of juvenile delinquency is not limited to the city of New York. During the past decade, we have witnessed an alarming increase in antisocial behavior on the part of young people throughout the country. Since the problem is nationwide in scope, it requires nationwide action. It calls for bold leadership from the White House and active financial support from both Houses of Congress.

Let me congratulate you upon your resolute determination to hold these hearings, but hearings alone are not enough. With all due respect for what you are trying to do, gentlemen, may I suggest that the time has come for us to stop thinking in terms of holding hearings and start thinking in terms of voting money.

The United States Senate has held hearings on juvenile delinquency for 4 consecutive years—hearings that have cost the taxpayers a half million dollars. Yet Congress has not authorized a single penny in direct Federal aid for delinquency prevention.

At the last session of Congress, a bill was introduced which provided for an annual appropriation of $11 million. This bill was never passed. May I respectfully call your attention to the fact that New York City spends three times as much money on delinquency prevention each year. With a population of 8 million people, New York's program is $33 million. With a population 20 times as large, for 170 million Americans, the Federal Government proposes to spend one-third as much money as the city of New York.

During the past several days we have witnessed the shocking spectacle of two highly placed Federal officials casting doubt on the possibility of spending even this pitifully inadequate amount.

The Secretary of Health, Education, and Welfare—Marion Folsom—has pleaded with Congress not to curtail the existing social-welfare program and has seemingly ruled out any new programs. Furthermore, the Secretary of State, John Foster Dulles, has advised the American people that we may have to give up certain fringe benefits in order to answer the challenge of sputnik. Gentle-

KR0545

men, if we are not concerned with the future of our children, if they are to be classified as fringe benefits, then what are we trying to preserve in our struggle for survival? The Nation's legacy is its children and nothing else. With all this talk about guided missiles, let's not be misguided ourselves because of a missile. We must not sacrifice those essential human services that represent the heart and conscience of the United States.

With many years of legislative experience, gentlemen, you are certainly aware of the fact that no one today seriously questions the validity or advisability of direct Federal aid to the farmer. But apparently the Federal Government has lulled itself into acting as though the cities do not exist and has refused to provide any Federal money for today's most serious problem confronting urban communities—the problem of juvenile delinquency. Certainly there is sufficient precedent. Congress, as early as 1935, established a formula of Federal aid to dependent children. But children in all family-income levels—low, middle, and high—in town and country alike can be contaminated by the behavioral disease known as juvenile delinquency.

Recognizing the importance of metropolitan life in American society, we must reorient our thinking. The Federal Government must provide funds so that the State and local authorities can expand their youth service programs. If necessary, we should establish a new Bureau of Delinquency Prevention within the Department of Health, Education, and Welfare, instead of treating it as a small subdivision of the Children's Bureau in Washington.

With a sizable quota of Federal funds, municipalities such as the city of New York could enlarge their programs of fieldwork, guidance, casework, referrals, and mass recreation. We could offer increased financial assistance to private youth agencies. As a result, many public and private youth agencies which are now forced to close their doors during holidays, weekends, summer months, and evening hours could remain open 365 days of the year.

Gentlemen, the studies conducted by the Children's Bureau disclose the fact that delinquency rates among youngsters enrolled in supervised activities are two-thirds lower than among those who do not participate in this type of program. Furthermore, in the city of New York, there has not been a single uprising among any of the 40 youthful gangs with whom the Youth Board has been working for the past 18 months.

Certain steps have been undertaken by the city of New York which may be of value to other communities. We are in the midst of coordinating the delinquency prevention program of all 11 public and 150 private youth agencies. We are encouraging local community councils to enlist the support of parents and volunteers. We have established Youth Board headquarters in 17 areas of highest delinquency. We have aided young people in job placement services and provided rehabilitation centers for youngsters who have gotten into trouble with the law, staffed with probation and psychiatric personnel. We are embarking upon a pilot project of isolating the 1 percent of the family population that is responsible for 75 percent of all known cases of delinquency. We have expanded after-school activities, of the board of education, the park department, housing authority, and the PAL, bringing the total number of after-school centers to 400 and the total number of playgrounds to 700. A separate youth division has been established within the police department. The social services of the welfare department, particularly with regards to the children of working mothers, have been enlarged. We have called upon the professional skills of outstanding educators and sociologists so that we can better understand the reasons for delinquency and then follow those methods which offer the greatest hope for success. We must provide the most modern building facilities and programs aimed at the prevention of delinquency rather than the apprehension of hardened criminals. Prevention is always cheaper and more successful than punishment.

But even in a city as large as New York, we must always think in terms of neighborhood needs. In particular I should like to cite the example of a neighborhood with which I am especially familiar—the Brownsville community. At one time, Brownsville was known as a congested, underprivileged tenement district. Brownsville was not a bad community, but it did suffer from a bad reputation. It was scorned and slandered as a breeding ground for Murder, Inc. Men and women shied away from coming to the area. Young men and women would hesitate before making a date with someone living in Brownsville. A large part of the responsibility for that ill-deserved reputation stemmed from sensational stories and libelous books which injured the reputation of the good people of the community. The novel entitled "Amboy Dukes," which

**KR0546**

was later made into a picture called City Across the River, depicted Brownsville as a community of rebellious youngsters and negligent parents. In the attempt to sell more books, in an effort to overdramatize, the author viewed this neighborhood as a hunting ground for thugs, dope addicts, criminals, and delinquents.

But Brownsville did have a real problem—a problem of a restless group of young people with no place to go and nothing to do except to get into trouble. There were no well-organized, directed, and creative outlets for their energies and emotions. They stood on street corners; they hung around candy stores; they sometimes disturbed their neighbors. These young people were not criminals. They were boys and girls, who merely needed a chance to succeed, to prove themselves, and to do something worthwhile with their lives.

In the early 1940's the situation came to a head. The board of education issued an order limiting the use of school playgrounds to children under 15 years of age.

This sudden order dramatized the total lack of recreational facilities for teen-agers. A few determined youngsters, and I, as chairman, took the situation in our own hands and formed the Brownsville Boys' Club. The first meeting was held in a local library. A membership drive was started among the local gangs. As a result of petition campaigns, the board of education finally reopened some of its playgrounds to older children. However, Brownsville Boys' Club was in business to stay. With a membership fee of a penny a month, every youth was welcomed into the ranks.

We rented a small reconverted store for $35 a month. We planned a program, engaged a director, and embarked upon a drive to expand the work of the boys' club. We called upon interested citizens from the Brownsville community and other sections of the city in order to raise money for a new clubhouse to be built on a site called Nanny Goat Park.

From an original goal of $40,000, the plans for the Brownsville Boys' Club were gradually expanded to provide for a building valued at $1,500,000. Between 1945 and 1953, when the new building was opened, we conducted an unparalled fund-raising campaign. The board of directors, the alumni, the women's division and the men's group held countless events to raise money for the new building. Men and women from all walks of life gave generously of their time and energies to make the boys' club dream a living reality.

Throughout these years, the club continued to operate from its small inadequate store. Yet in spite of physical limitations, great good was achieved. More than 75 gangs of teenage youngsters were induced to join the club—gangs bearing such colorful names as the Bruins, Sackonions, Square Deals, and Atoms. A paid staff of professional workers was hired to supervise their activities. With the opening of the new building in September 1953, the tempo increased tremendously. New and unusual activities became a regular part of the club's program. Included in the operation were a child-guidance clinic, day-care center, a cerebral-palsy pavilion, summer camping on the roof, arts and crafts, carpentry and metal shops, swimming, basketball, games, club meetings, medical and dental clinics, photographic instruction and playground activities. Within a short time, the club was being used by 10,000 young people from Brownsville, east New York, east Flatbush, and Canarsie. At all times the guiding philosophy was summarized by the slogan: "It's better to build boys than to mend men."

Under private and voluntary operation, the Brownsville Boys' Club was open only 40 hours a week. Over the weekends and during holidays, the building was not available. As a result, the board of directors conceived of a plan to enable the club to remain open twice as many hours, 365 days of the year. Through negotiations with the board of estimate and the department of parks, the $1,500,000 building was turned over to the city of New York, fully paid for, together with a cash gift of $100,000 to sustain the operational cost. The formal transfer of the Brownsville Boys' Club to the city of New York in January 1955 also permitted the department of parks to save $2 million which would have gone into the erection of a new center at Betsy Head Park in the same area. Under park-department operation, the Brownsville Recreation Center as it is now called, has increased its schedule of activities and is available to more children, more often than ever before. It is operated on a completely nonsectarian basis. Brownsville today is a peaceful community—a community in which children and adults can live in comfort and contentment.

Having dealt with this problem of delinquency during most of my adult life, there are certain observations and experience that I have gained. It is comparatively simple for public officials to develop an air of self-righteous com-

KR0547

placency in dealing with the social problems of our times. This morning we could very easily pat each other on the back and say that all is right with the world. I could compliment the Federal Government and you could congratulate the city of New York, but that is not our purpose in being here. If everything were fine, there would be no need for these hearings.

I believe that no institution is above criticism. Even our schools must be ready to stand up to the inquiring searchlight of inspection. I firmly believe that one of the growing symptoms of delinquency is the incidence of truancy among schoolchildren. Flagrant absenteeism is often the first step toward delinquency, for idleness without supervision breeds unrest among children. Once the student feels that he will not be punished for violating school regulations, he is more likely to violate the laws of society. The truant pupil creates havoc with the school system. He interferes with the curriculum. He undermines the morale of other students who attend classes regularly. And he wastes a valuable seat by preventing proper use of our existing classroom facilities. At the first signs of truancy, the full weight of the parents' responsibility and the school's authority should be invoked in order to prevent these youngsters from getting into real trouble with the law.

Some people have suggested that we station a policeman in every school of our city. This would cost at least $5 million a year during school hours alone. I would rather see a joint Federal-State-city program of subsidies to existing boys' clubs, settlement houses, community centers, and after-school programs, with half of the money made available by the Federal Government and the other half provided on a matching basis by the city and State. Such a program needs a coordinator—under the direction of a single administrator charged with this responsibility.

What I am about to say may not be diplomatic, but it needs to be said. There is entirely too much petty jealousy and too little acceptance of responsibility in dealing with the needs of children. Each agency—public or private—is jealous of its own prerogatives. To all intents and purposes, the average youth agency tries to work alone and forgets that other institutions exist. As a result, they overlap and duplicate each other's functions; they fail to derive maximum benefit from their combined resources.

At times the professional social workers are reluctant to accept volunteers. They take the attitude that no one without a couple of professional degrees can understand a child. And the lay people who serve on boards of directors so often adopt a penny-pinching attitude in refusing to recognize the professional status of trained youth workers. Too many parents in our modern day and age are so anxious to play mahjong, scrabble, or a game of poker, that they are willing to throw their children on anyone who will assume the responsibility. How many parents tonight know what their teen-age children are doing?

It is not the function of any public or private institution to serve as glorified babysitters for selfish parents who take no interest in their own sons and daughters. Community living should be a family experience. What our city needs, and perhaps other communities as well, is an army of men and women who will volunteer their time, 1 or 2 evenings a week, in order to work with children at supervised youth centers. These parents and volunteers would serve under the direction of trained staff members. If necessary, they would go into the streets and try to persuade more youngsters to enter supervised programs. It is one thing to build a magnificent youth center; it is quite another matter to have it used to its fullest extent.

In conclusion, it is my profound conviction that youngsters need a place to go and a program to follow to avoid the pitfalls of juvenile delinquency. Children combine into gangs because they desire the company of other youngsters their own age. But instead of becoming gang members, they just as easily become club members, working toward a wholesome future and a creative life.

--------

STATEMENT TO THE SENATE SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY, PRESENTED BY GERALD J. CAREY, ASSISTANT TO THE CHAIRMAN, NEW YORK CITY HOUSING AUTHORITY

The New York City Housing Authority runs not only the country's largest housing operation, but probably also the most complex. Private landlords can run their businesses by collecting rent and paying maintenance bills. A public housing authority must do much more.

KR0548

We select sites, we supervise design, we finance, we demolish slums, we build new housing, we select tenants. And when we have rented our buildings, we have only done part of our job.

The housing authority does not simply own and rent single buildings. We are creators and redevelopers of entire neighborhoods. We are an important factor in city planning. We must therefore do much more than provide decent living quarters for our own tenants. In a deeper sense we are responsible for contributing to improved living conditions in the entire neighborhood that we so drastically affect when we construct a housing project of from several hundred to several thousand apartments.

Because juvenile delinquency is a serious problem in many of the neighborhoods in which we build, it is a serious problem for us as well. Even though studies have shown that most of the juvenile vandalism and gang fights that may be found within the area of public housing projects are brought in from the general neighborhood outside, we are nevertheless affected by it.

A public-housing project, even though its outlines are clearly defined, is not an island sufficient unto itself. What happens to the surrounding neighborhood will sooner or later happen to us. And we can protect ourselves best by contributing to the improvement of the entire neighborhood.

The housing authority has more than enough to do just in running its housing operation. We cannot let ourselves be drawn into conducting a massive social welfare agency at the same time. But, by cooperating with, and actively assisting the various public and private social agencies, we can help them work more effectively. In turn, they are then able to help us to do our job more efficiently.

Let me therefore outline to you how the housing authority works with public and private agencies to promote the development of community services in the neighborhoods of which public housing becomes a part. The largest and most difficult part of this job is arranging for a suitable recreation program.

At the time we choose a site for a public housing project we get a summary of the community services and facilities located within a 10-block radius of the proposed project. This summary, prepared by the Community Council of New York, a coordinating agency for the city's voluntary as well as public social and health agencies, lists the neighborhood's schools, playgrounds, auditoriums, gymnasiums, child day-care facilities, public-health stations, church recreation programs and facilities, etc.

We therefore know long before we start construction what facilities are already available. We then call together the people who are running all of these programs, as well as interested community leaders, and tell them the kind of project we plan to build. We ask for their ideas of what they feel is necessary to supplement the already available facilities in order to best meet the needs of the new population and of the entire neighborhood.

I would like to make several important points in regard to the planning of the facilities that are to go into a public housing project:

1. We try to plan in terms of the neighborhood's broad needs, rather than build a self-contained community center. The principle we work under is that the entire neighborhood is the unit of planning.

2. We therefore try to supplement, not duplicate, the facilities the neighborhood already offers.

3. The best way to promote the development of a stable neighborhood is to make the housing project part of it. All of our facilities are therefore open to the entire surrounding neighborhood.

Let me give you an example of how this operates in real life. In the near future we will begin the construction of a low-income project of 635 apartments that will be located on the lower East Side. We have already done a substantial amount of construction on the lower East Side, and these projects contain various community facilities. In addition, there are comparatively extensive private agency facilities in this part of the city.

Since the community facilities we were allowed to build are strictly limited by regulations that I will shortly outline, we asked the leaders in the area what kind of facilities they felt were most necessary. They asked for two kinds of facilities: for teen-agers and for the aged. The preschool, the pre-teen, the young adult, were groups they felt they could more or less accommodate with their present facilities. We are therefore now trying to get a go-ahead from the lending agency that will permit us to build suitable teen-age recreation facilities at this project. However, trying to accommodate teen-age needs is a difficult problem for reasons that I will later explain.

KR0549

While we are discussing with the neighborhood agencies what facilities they need, we are also determining if one of them will undertake to run the community recreation center we expect to build. If one steps forward, we make them a partner in the planning operation and give them a role in suggesting and determining the design of the future facilities.

If no agency in the neighborhood feels capable of financing and administering the new program, we go outside the neighborhood and get in touch with the major coordinating organizations for the city's social agencies. These would include such groups as: the Community Council, United Neighborhood Houses, the Day Care Council, the New York City Youth Board, and the major sectarian coordinating agencies.

I should stress that no matter what the sectarian origin of the agencies that sponsor our recreation programs, the programs themselves are nonsectarian.

In our search for a sponsoring agency, we sometimes get in touch with an agency that is being displaced from its own neighborhood by various changes and is looking for a new location. Under today's high-cost conditions, agencies are much more amenable than they used to be to moving into our facilities. They are spared the cost of constructing a new building and can therefore devote a larger part of their funds to the actual program.

When the administrative board of an agency is ready to commit itself to come into and run one of our community centers, they make a formal application to us which gives full details about their finances, program, and other necessary information.

The extensiveness of the public housing program in New York City, which now has 86 projects either fully or partly tenanted, and under present plans will comprise 124 projects within approximately 5 years, has created a growing problem in regard to sponsors for our community centers.

In areas of the city that have not been extensively developed before the advent of public housing, no agencies are available to run recreation programs. In other cases, when neighborhoods are built up, we find increasingly that we are running out of agencies who can undertake to handle these programs.

In these instances we design the community-recreation space on our own initiative under a directive from Mayor Wagner to build facilities even when an agency is not immediately available. The mayor's feeling, and ours, is that we are building in terms of the long-term future and cannot allow neighborhood facilities to be constricted by present exigencies.

If no sponsor is available when the recreation space is completed, we may temporarily rent the space to selected special service organizations such as clinics, nursing services, family case work services, or in certain cases to the board of education for use as elementary schools. When a suitable sponsor for the recreation program becomes available, the center is turned over to them.

I would like to point out that not only are we using up most of the suitable agencies because of the extensiveness of our building program, but the increasing diversity and complexity of the programs that social agencies are now conducting makes these programs more difficult to finance. Also, the social agencies report that it is increasingly difficult to raise funds from private sources.

Let me give you an example of how one of the better run programs in our projects has expanded and grown more expensive.

When Hamilton House ran a recreation program in its own building, which had to be demolished for the construction of Governor Smith Houses, its 1947 budget for this program was $17,000 and it served 200 people. As Hamilton-Madison House, the agency moved into Gov. Alfred E. Smith Houses on the lower East Side. Today, the agency works with 1,200 children and adults. The enlarged program and the increased services that have become part of it have brought the agency's budget to $81,000, exclusive of contributions from public agencies.

I must point out that the social agencies' concept of what a suitable recreation program must offer to meet today's needs is vastly different from simply providing bats and balls and a play supervisor to blow a whistle.

The agencies insist that if they are to keep some of these youngsters from using the bats on each other they must work with the youngsters on a level much deeper than simple play supervision. For example, Hamilton-Madison House employs nine full-time group workers to work with young children and teen-agers. They not only play with them, but explore their family and school problems where necessary, and try to improve their personal adjustment where such problems are evident. Programs of this type are expensive.

KR0550

The growing shortage of sponsoring agencies, and the increasing cost of running full-scale recreation programs even where private agencies agree to sponsor them, has made it necessary to make increasing use of public funds.

These public funds are being used in two ways: One way is to provide supplementary aid to private agencies. These contributions come from the board of education, the youth board, the department of welfare, and the mental health board. For example, the mental health board is giving funds to the Henry Street Settlement House to run a mental health center in LaGuardia Houses. Funds have been given to other sponsoring agencies in public housing projects for similar programs.

The second way public funds are being used in public housing community centers is by the board of education itself running recreation centers that have no private agency sponsors. In this program, the board of education runs the public housing community center as an annex of, and supplement to, nearby public school recreation centers.

To give you an idea of the extensiveness of public aid in the overall public housing community center recreation programs, let me point out that we at present have 66 community centers in our projects, most of them in low-income projects and the rest in our earlier middle-income projects. Of these 66, 34 are sponsored by the board of education and 32 by private agencies.

So far as the source of funds is concerned, not counting the housing authority's contributions in staff and facilities, about 60 percent, $651,750, is provided by private agencies and the rest, $493,500, comes from public funds, most of it from the board of education and the youth board. In addition, the youth board provides many agencies with salaried workers. And some of the private funds actually come from such sources as the Greater New York Fund and foundations. The total money from all sources, exclusive of the housing authority's contributions, that is spent on recreation programs is $1,145,250.

So far this presentation has been concerned with the establishment and financing of recreation programs in the community centers established in public housing projects. Our projects also provide space for other community services. In different projects these include day-care centers for preschool children, public health well-baby stations, and public library branches. These programs do not present us with the same kind of sponsorship problem because they are financed almost entirely by public funds.

Day-care centers provide nursery school care for pre-school-age children whose mothers cannot give them proper supervision because they work, are ill, or for other pressing reasons. These centers are run by private agencies. However, they only provide 2 percent of the funds. The rest comes from the department of welfare and, to a small extent, from parents' fees. The minimum charge to the parent is $2 per child per week. Getting a sponsor for the day-care centers is largely the responsibility of the department of welfare. These nursery schools, like the recreation programs and all other community facilities in public housing projects, are open to the entire neighborhood.

Some of our older middle-income projects have day-care centers, some of which are run as cooperatives by a community board of directors and the parents. Such cooperatively run centers receive no contributions from the department of welfare, but the housing authority insists they must be supervised by an appropriate and responsible agency. For example, several of them are supervised by appropriate departments of such local colleges as Brooklyn College, Queens College, and Mills College, who utilize them as teacher-training aids. There are 76 centers for preschool- and school-age children located in housing projects. The total budget for this program, which receives no direct contribution from the housing authority, is $5,384,300.

Public health department well-baby clinics, which provide free pediatric care in low-income neighborhoods, are now set up in 28 public-housing projects at the request of the department of health. The department of health tells us where it would like to have facilities for such a clinic and we then build a facility providing about 2,000 square feet of space in the community center. These clinics are run by the health department, which pays us rent for the space.

When we build facilities for library branches in our projects, it is on the basis of an agreement under which the public library pays for the cost of the construction plus a monthly rental that meets all carrying charges. There are 12 library branches located in our projects. An example of the differing rules under which we operate in our different programs is the fact that we are allowed to build library branches in our State- and city-subsidized projects, but not in federally subsidized projects.

KR0551

As I have tried to show, the greatest difficulty in establishing community services is in setting up broad-range recreation programs. Most of the other services are more easily provided. It is these recreation programs, however, along with the supplementary casework programs that have been joined to them, that are most important in trying to cope with the problem of juvenile delinquency.

Besides the difficulties that I have already outlined, our efforts to provide neighborhoods with the necessary recreation and other services are made more difficult by the differing regulations imposed upon us by the Public Housing Administration, which oversees federally subsidized public housing, and the New York State Division of Housing, which oversees State-subsidized public housing.

Let me give you several examples of the Federal and State regulations governing Housing Authority contributions to community recreation programs.

Under State rules, the Housing Authority pays the salaries of 2 recreation workers and 1 full-time porter. We also provide $1 per year for each dwelling unit in the project to be used for recreation materials—games, paints, paper, small craft tools, athletic supplies, etc. In addition, we provide the basic equipment for the center—chairs for the meeting rooms, large play facilities such as ping-pong tables, kitchen equipment, benches, tables, etc. We provide this once and the agency must replace them.

With every agency we have a formal lease and the rental is $1 per year. The lease also provides that there is to be no discrimination in the use of facilities and that the facilities must be available to residents of the entire neighborhood. We maintain a supervisory relationship with the agency.

While Federal rules are fundamentally the same, the major difference is in the staff we provide and the kind of work it is allowed to do. Thus, in federally subsidized projects, the Housing Authority is allowed to provide only one salaried recreation worker and he is not allowed to work with youngsters in what the regulations term "face-to-face leadership." This means the worker we provide cannot work directly with groups of youngsters, but can only function as a program supervisor and coordinator. These limitations have made agencies more reluctant to sponsor programs in federally subsidized projects than in those that are State-subsidized because the latter offers them a larger and more flexible free staff.

The Federal regulations also have greater restrictions in the amount of space in the project we can devote to community facilities. Under State rules we can freely allocate 9 square feet of space just for community recreation facilities for every dwelling unit in the project. In addition, we can build in other facilities. If we want to go above the standard amount for recreation, we must consult with the State commissioner of housing.

Under Federal rules we are allowed 10 square feet per dwelling unit for all community facilities. A day-care center or a health station uses up a substantial part of the allocation—particularly in a small project. As a consequence, in comparatively small projects we must sometimes decide what facilities are to be entirely omitted. In addition, library branches are not permitted.

One of the critical problems that arises in regard to allocation of space in both State and Federal projects is the building of gymnasiums for teen-agers. While it is generally agreed that a gymnasium is critically important for the development of an adequate recreation program, a suitable gym requires so much space that it cuts seriously into the allocation available to community facilities in smaller projects.

As an example, let me cite a current problem. As I pointed out in the beginning, we were asked to concentrate on facilities for teen-agers and the aged in a proposed project on the lower East Side. In this project, which will have 635 apartments, the normal space allocation for recreation facilities would therefore be 5,715 square feet. However, we need 3,500 square feet just to build a suitable gymnasium and lockers. As presently visualized, a community center that would provide adequately for both teen-agers and the aged will require a total of 9,500 square feet, almost 4,000 square feet more than the rules usually allow. However, we will discuss the problem with the lending agency and we hope that they will make allowances as they sometimes have in other special situations in the past.

While it would be possible for me to go into much greater detail regarding our program of community services, I have attempted to restrict this presentation to material that I hoped would be most pertinent to your interests and most applicable to the country as a whole. I hope I have been of assistance in providing you with some of the information you are seeking.

KR0552

STATEMENT SUBMITTED TO THE SENATE SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY BY HON. IRVING BEN COOPER, CHIEF JUSTICE, COURT OF SPECIAL SESSIONS OF THE CITY OF NEW YORK

Senator Hennings, the deep concern manifested by you and the members of your committee with the throbbing issues involved in the subject matter of your inquiry prompts the hope that I can convey, in response to your gracious invitation, the deep conviction which compels the views herein expressed.

### FOREWORD

For many years I have sought, and benefited from, the notions expressed to me by dedicated jurists throughout the land who have devoted their professional lives in an attempt to meet the enormous challenges and multifarious problems which youth enmeshed in the criminal law daily present. Such consultation is indeed imperative, for as Mr. Justice Oliver Wendell Holmes so wisely observed:

"The life of the law has not been logic, it has been experience. The felt necessities of the time; the prevalent moral and political theories; intentions of public policy avowed or unconscious; even the prejudices which judges share with their fellow men, have a great deal more to do than the syllogism in determining the rules by which men should be governed."

### YOUTH'S CHALLENGE

Your distinguished committee does well to be profoundly disturbed by adolescent crime. The intentions of youth toward one another forecasts the near future of society, and reflects the moral climate of the neighborhoods, districts, and boroughs in and through which their intentions were formed.

They seem to show the marks of delayed adolescence, of failure to accept responsibility, of purposelessness in the face of life and destiny. At the threshold of maturity they express what they feel to be the temper of their generation in two biting phrases, "myself alone and nobody else" and "collecting my subsistence—the main thing." The temper is generalized irresponsibility.

Delinquents are notoriously poor in institutional affiliations and associations, and so are thwarted in their outreachings toward self-fulfillment. I find Erich Fromm's observations on that point, in his Escape From Freedom strikingly factual:

"It would seem that the amount of destructiveness to be found in individuals is proportionate to the amount to which expansiveness of life is curtailed. By this we do not refer to individual frustrations of this or that instinctive desire but to the thwarting of the whole of life, the blockage of spontaneity of the growth and expression of man's sensuous, emotional, and intellectual capacities. Life has an inner dynamism of its own; it tends to grow, to be expressed, to be lived. * * * The more the drive toward life is thwarted the stronger is the desire toward destruction; the more life is realized the less is the strength of destructiveness. Destructiveness is the outcome of unlived life."

### THE DETERMINED OFFENDER

The determined offender against the "peace and dignity of the people" presents a challenge not to be evaded. The right to move safe and unmolested through the city, to be secure at work and at home, to be protected against frauds and schemers, is the supreme luxury of civilization. For it the community pays a huge price, and is intolerant of failure or lag on the part of its agents and instruments. It cannot be patient with or concerned about the welfare of offenders while they threaten its security and comfort.

It is no news that society is shot through with various types of criminal and quasi-criminal groups at all levels, from the most brutal to the most privileged and intellectual, protected by every device against discovery and punishment. A therapy such as probation for these is as cologne to gangrene. We do not hesitate to commit the insane to hospitals, repeaters and hardened offenders to prison, probationers who abuse the community's mercy to jail. After these are put away, for the community's and their own good, there remains a huge backlog of persons who any average man admits are worth saving.

**KR0553**

The charter of courts is in the law. Courts, having defined the intent of laws, must execute them within the tolerances which they permit. Laws define the acts which the community considers reprehensible. The community, in registering abhorrence by a punishment based on loss of freedom, is in effect alerting its members to the wisdom of self-control.

The community must understand that the youthful crime situation is serious in the sense that to a child diphtheria, poliomyelitis, or smallpox are serious. The child needs all that can be done for him—isolation for a time, understanding treatment, a period of guarded convalescence. Some diseases require long periods of guided physical reeducation—in the community. The young offender needs similar help.

The community needs assurance that he has worth and the power to compensate for his fault; that the offender understands he has been out of step and wants to get back into line. For the community, in the shape of the parents with adolescent children, is all too conscious of the narrow line that separates their own youngsters from the youthful lawbreaker. This insight can change their attitude toward the court's functions and needs.

### SUBSTANCE—NOT FORM

We pay dearly for injecting "bigness" into the house of law. It is the sensational or "outstanding" crime that seems to be the criterion of what is important to the community. We must not look to the degree of the crime alone. A few spots on the lung may indisputably indicate that T. B. has made inroads; medicine does not wait for the whole lung to be involved. Likewise, the commission of a lesser degree of crime may well signify worse things to come. The fact of the matter is that the major share of criminal offenses are of less rather than more serious degree. Fortunately, also, first offenders vastly outnumber habitual lawbreakers. Most of the individuals who appear before these courts are not in any sense, other than the offenses with which they are charged, criminals. They look and act like the people one meets in subways, schools, churches, lodges, and shops. They differ among themselves somewhat in moral sensitiveness, in understanding of what they have done, in desire to make restitution, in capacity to turn their experience to ultimate gain.

Equally true is it that most judicial tribunals in the Nation with jurisdiction over such endless legions of offenders are so inadequately equipped with professional staffs to cope with this tremendous problem that they cannot complete their mission with assurance. It is this inadequacy that often accounts for "making" criminals and the inability to stem recidivism. How right was Chief Justice Charles Evans Hughes when he noted:

"The Supreme Court of the United States and the courts of appeal will take care of themselves. Look after the courts of the poor, who stand most in need of justice. The security of the Republic will be found in the treatment of the poor and ignorant; in indifference to their misery and helplessness lies disaster."

And from Judge Learned Hand:

"If we are to keep our democracy, there must be one commandment—thou shalt not ration justice."

We do wrong to organize our system of courts as functional to handling degrees, rather than persons held accountable for the commission, of offenses. And so they come to us with deep wounds induced by the factors above described. With only bandaids to bind up most of them, what chance of healing is there? What of reinfection?

### THE DILEMMA OF SENTENCING

The court's asset as an instrument for prompt hearings and trials can become a liabiilty if it lacks the essential aids needed for determining the circumstances on which crimes were based and out of which they grew, the degree of the defendants' educability, and the best and quickest means for returning them to or for removing them from the community. It would be all too easy for the court to deteriorate into a swift-moving panorama of human misery with the bare facts and the law applicable to them the only elements.

KR0554

Fingerprinting or criminal recording is a legal tool whose cost no one begrudges. The offender ordinarily referred to as "hardened" or "habitual" is identified beyond question by his fingerprints and the number and seriousness of his previous convictions. There is little the court can do except to guard his legal rights to a fair trial, impose a sentence that will afford the community relief from his activities for the time being, and return him to the consideration of the correction department.

Surely it is not less important to have instruments to identify educable, as well as habitual, offenders.

Until the extent of character deterioration is known and the probable nature of the remediable measures needed to meet the condition determined, the court cannot complete its mission with assurance. Until it has staff assistance as competent in this field as those trained in legal procedure, it must often act uncertainly. Mr. Justice Cardozo pointed up the problem:

"Run your eyes over the life history of a man sentenced to the chair. There, spread before you in all its inevitable sequency, is a story of the rake's progress more implacable than any that was ever painted by a Hogarth. The correctional school, the reformatory, Sing Sing, or Dannemora, and then at last the chair. The heavy hand of doom was on his head from the beginning. The sin, in truth, is ours—the sin of a penal system that leaves the victim to his fate *when the course that he is going is written down so plainly. * * *"* (italic mine).

### GROPING IN THE DARK

And so they come before the court, month in and month out, day after day, an apparently unending line of human misery and tragedy. How are we equipped to handle them?

These are issues that face judges as they approach the fateful act of sentencing. After interminable hours of listening to charges and countercharges, quibbling and evasions; painstaking establishment of self-evident facts; and the final officially established legal description of an act, judges often find themselves merely at the beginning of what they should know in order to act professionally.

What judges want to know, at this point is:

Why did he commit his act? Others about him somewhat similarly placed, have not so acted. What was there in his experience to turn him criminal?

What of his home, his relations with parents, siblings, and neighbors? With social institutions? With peer groups? With friends and boon companions?

Who has influenced him? After whom did he mold himself? What variety of activities did he participate in?

What has work, love, marriage, parenthood meant to him and how has he behaved in these relations?

Most important of all, what variety of opportunities was open to him? Did he participate in his culture and cherish it? Was he proud to be an American, a Jew, a Catholic, a Negro?

What interests does he now have? What skills? Whom does he love? Hate?

It is inadequate answers to these inquiries that pose the dilemmas of sentencing.

Succinctly, when a justice is beset by fear that a sentence he is about to impose cannot in the nature of things be apposite, his professional sense is outraged. What he wants to know is what kind of person with what needs he is sentencing; and into what kind of institution or community, with what resources and what hazards for moral recovery, he is committing him. It is not impossible for a sentence to be a greater injustice than the criminal act: Equivalent to putting a child with a common cold into a smallpox ward for treatment.

Not until courts are adequately staffed with adequate allied professional skills will we be able to identify the youthful offender with good moral potential, who can be safely returned to the community to line up with the orderly citizen, from the hairtrigger, perverted or psychopathic first offender who needs institutionalized care.

### THE PRESENTENCE INVESTIGATION

A presentence investigation ought to be a routine aspect of treatment for every first offender brought before the court regardless of the degree of the crime. The objection that this kind of investigation is so costly that there is no hope of its being generally applied cannot be allowed. Lack of it costs millions in money and untold years of human suffering and community apprehension. It must be attempted, and attempted on a national scale, because only so, at this

KR0555

stage of our understanding of human behavior, can society acquire the kind of knowledge that will enable it to heal itself of lesions set up by cherished social habits of waywardness, greed, and irresponsibility.

Such an investigation prepared only by properly trained personnel might reveal undisclosed, as well as discovered, ailments. The defendant's arrest may prove to be only a symptom of greater danger. Need for institutional care or confinement may well come to light only in that way.

Very frequently such a presentence inquiry will reveal the need for the good of both community and delinquent that he be handled carefully until he stops bawling and thrashing around long enough to take cognizance of himself as a person. So long as hatred dominates his attitude toward society, he cannot rally his inner forces. Today's youth needs reassurance that the basic attitudes of adults—the power groups of society—are humanly friendly and co-operative within the established areas of responsible behavior.

Careful inquiries reveal that many youths enmeshed in the criminal law have a first and primary need—immersion in a tepid bath of human acceptance and good will. The community has not excluded him forever, and he should not be permitted to conclude that it has. Under proper guidance astonishing but true is the fact that he quickly lines up with the orderly citizen.

The number of such delinquents capable of rehabilitation is considerable. One thing is certain. The community cannot permit courts to fail in their efforts to understand and meet the needs of this group. Rehabilitation under the court's guidance is as much an arm of correction as Sing Sing and Alcatraz, and not less important. The court must be able to turn over to medical agencies and institutions youths needing physical and mental treatment. It must continue to work on behavior problems growing out of the failure of the city's cultural institutions to integrate individuals of normal average powers. In thus enlarging the scope of its activities the court takes on additional complex and taxing duties for whose methods, methods, and results it must assume full responsibility. This responsibility cannot be passed over to another group of professional persons, as is the case with the prison groups, but must be carried on under the supervision of the court which has retained technical control of the defendant. He is not discharged of his offense, but remains in the custody of the court, which can recall him and commit him if he fails to respond to its efforts.

### GENERALIZED IRRESPONSIBILITY

Dr. Albert Schweitzer gives us this powerful commentary:

"Example is not the main thing in influencing others; it is the only thing."

Short of an act which disturbs the community's peace and comfort, we immerse ourselves and luxuriate in delinquency. Stung by a crime, the community turns not upon itself or the criminal, but against police, court, lawyers, judges, probation officers, prison officials, parole boards—the professional groups it has employed to protect it.

Youth offenses are the bud stage of criminality. They follow in the main patterns of adult desires. But they are less cerebral, less variegated, and more lusty. To consider youthful crime as something foisted on an innocent and law-abiding community rather than as an aspect of its own thought of itself and its own action, is to be naive beyond sanity.

The health of the community lies in the absence of disease rather than in its resources for isolating the sick and providing for their cure. Crime is beginning to be understood as an aspect of man's mental-emotional-moral nature. This nature, assailed by many forces both within and without his bodily frame, is susceptible to many infections. Some are capable of destroying their victim, and more important still, of infecting others. Public health authorities have learned to follow a typhoid or other carrier from State to State, even across the Nation, once it has become aware of his existence. We follow the determined offender through his fingerprints, but not the youth in his most infectious stage.

Juvenile crime is crime at the source. The youthful criminal may be self-infected, he has frequently been infected by another or he may have been conditioned by the mores of his gang or his neighborhood or even his family. He may be so naive and unacquainted with morality as not to be aware of his entrance into the age of responsibility.

It is in the courts that the dramas behind the figures presented in the annual reports of the Federal Bureau of Investigation, and in the local police reports on which the national profile is based, that the significance of these figures unfolds

**KR0556**

and takes on life. And it is from the court records that cities, towns, and villages: might, if they wish, learn what kind of crimes are committed, who are committing them, the conditions that breed or facilitate certain crimes, and the community prophylaxis called for to prevent (by promoting community moral health and so capacity to resist) situations injurious to the commonweal.

Thank you for the encouragement which comes from the knowledge that you and your committee are conducting an extremely important inquiry in vital fashion. I stand ready if I can be of further service.

---

EXCERPTS FROM THE 1954 AND 1955 ANNUAL REPORTS OF THE OFFICE OF THE DISTRICT ATTORNEY OF KINGS COUNTY SUBMITTED BY EDWARD S. SILVER, DISTRICT ATTORNEY OF KINGS COUNTY, FOR INCLUSION IN THE HEARINGS OF THE SENATE SUBCOMMITTEE TO INVESTIGATE JUVENILE DELINQUENCY

### THERE ARE NO "PINK PILLS" FOR JUVENILE DELINQUENCY

#### OVERALL COORDINATING AGENCY NEEDED

There can be no question that the problem of juvenile delinquency is most serious. Unfortunately, there are no pink pills or magic formulas for this dire social disease. Federal, State, and city government must tackle this problem with earnestness and speed and provide the wherewithal to train and procure the necessary personnel and physical plant to do the job.

Delinquents do not happen, they develop. As in many diseases, early symptoms can be spotted by trained personnel and if attacked soon enough, delinquency can in most cases be prevented from breaking out in a more virulent form. Indeed this long-range method is now being tried in two Bronx grade schools.

An agency should be created (or one in existence, the New York City Youth Board might be adopted for this purpose) to integrate various agencies which are coping with the problem piecemeal, but not on an overall war plan. I have in mind such agencies as New York City youth boards; child guidance bureau, bureau of attendance, and other bureaus of our elementary and high school system; New York City Mental Health Board; juvenile aid bureau (police department); precinct youth councils; youth counsel bureau; settlement houses; YMCA, YMHA and CYO; and many other private and public agencies that are all tackling some phase of the problem, but often with no coordination with what other agencies are doing or how other agencies can fit in with the overall job on hand.

This overall plan [1] calls for a four-pronged attack on (1) the traits and characteristics of the delinquent himself, (2) the family life (little can be done in the field of prevention until family life is strengthened through a continuous program of mental hygiene, social work, education, and religious and ethical teaching), (3) the school, and (4) leisure time.

"* * * The specialization of each agency in one group of factors does not eliminate the harmonious participation of all community agencies in a well-conceived general plan of attack." [2]

Let us count up our assets and put them to their best use. What we have is surely not enough. Money will have to be made available for personnel and facilities. There may be resistance from some to retain positions or authority—but I am confident that good will and honesty, catalyzed by the seriousness of the problem, will prevail.

The excitement created by a particularly terrifying incident understandably spurs various organizations and individuals into action and the creation of some "project" to curb delinquency. Well meaning as it might be it can only muddy the waters unless it fits into an overall integrated plan. And this can be done only by an agency that should exist to integrate the forces we have, extend services, and create new ones if needed. It is important also that such an agency shall have the courage to say "No" to a group, well meaning as they may be, if the plan proposed is not well planned and does not fit into an overall scheme.

---

[1] See Delinquents in the Making—Paths To Prevention, pp. 188–210 (Sheldon and Eleanor Glueck, Harper & Bros. (1952)).
[2] Supra, p. 208.

KR0557

### "SCARE 'EM TO DEATH"

Facts and figures concerning juvenile delinquency, however bleak, should by all means be given to the people. That is a basic tenet of democracy. At the same time, however, they should not be exaggerated nor should a particular statistic be blown up out of proportion to create a headline or in the hope that it might be a spur and an aid to obtaining additional funds for a proposed budget.

One city agency issues a news release stating the city's delinquency rate (age 16 to 21) has jumped an "unprecedented 52.7 percent during 1954." After citing other "scare" figures, the release claims a need for more than doubling its present budget to $5 million. Because I work closely with the agency which does a fine, constructive job, I know it justly needs a much larger budget than it has. I do, however, deplore the exaggeration of a problem that, unfortunately, needs no exaggeration.

Let us look at some real figures—the official figures of the adolescent court for Brooklyn (age 16 to 19). Total arraignment figures for 1954 were 2,346 and for 1953, 2,051—an overall increase of 14 percent. A close examination shows that for felonies both years were the same (929) and for misdemeanors 1954 (915) was 6 percent over 1953 (862). The bulk of the increase came in summary offenses, in the main disorderly conduct—401 in 1954 to 188 in 1953.

Let us take the official figures of the youth counsel bureau which gets its referrals of adolescents in trouble from various courts (ages 16–21). The totals for the city show an increase of 10 percent for 1954 (5,438) over 1953 (4,940). Incidentally, Brooklyn was the only borough showing a decrease of 8 percent for 1954 (1,309) over 1953 (1,412).

If we take the official police department report we find arrests for the entire city (16 to 21 age group) up 15.8 percent from 1953 (10,771) to 1954 (12,470).

The juvenile aid bureau of the police department which deals with those between the ages of 16 to 21, but in the main under 16, involving offenses and complaints where no arrest is indicated, showed a rise of 18.7 percent for 1954 (23,205) over 1953 (19,556).

Another city agency in a news release, not satisfied with showing a city-wide increase of alleged delinquents of 17 percent for 1954 (7,734) over 1953 (6,610), cites the single month of January 1955 to indicate an increase of 56 percent, and for girls an increase of 135 percent, involving a total of 162 girls for the entire city. Its release does not point out that for the entire year 1954 there were 7 percent fewer girls (389) in trouble than in all of 1953 (418). Nor does the release point out that the years 1946 and 1947 had less than the year 1945 and 1950 had less alleged delinquents than the year 1949.

Incidentally, so far as Kings County is concerned, it showed only a 10 percent increase for 1954 (2,453) over 1953 (2,218), the lowest increase of any county.

Surely the problem is sufficiently serious and alarming to warrant marshaling all of our forces. But, I submit, it is a disservice to our democratic form of government to make it appear that we are "bursting at the seams." After all, we should not forget that over 97 percent of our adolescents are decent kids who get into no trouble at all.

#### THE STREET GANG PROBLEM IN BROOKLYN

In the evening of May 12, 1950, a "rumble" (gang fight) took place in Prospect Park between 2 gangs and among other injuries inflicted on members of both gangs, a boy was shot and killed.

Like all such incidents it aroused the feelings of the community to a high pitch. Dr. Henry J. Carpenter, a leader in the Brooklyn Council of Social Planning, called a meeting of leading citizens and officials to see what could be done with the problem. It was proposed that some voluntary organization be formed to cope with the situation. I objected strenuously to such a plan. I maintained that this was as much a public problem as sewers, hospitals, roads, or tunnels.

Members of the Youth Board of New York City were present and I called upon them to see if they would get us the funds to set up the machinery to tackle this problem. With commendable speed and unusual understanding the funds (approximately $60,000) were made available. Even more important,

**KR0558**

the machinery and personnel and know-how of the youth board was made available. The project was first known as the detached-workers project and later became the Council of Social and Athletic Clubs. I am proud to say that your district attorney has been the chairman of its board of directors from the outset.

We gathered people whose daily tasks were working with young people—the police, probation officers, judges of juvenile and adolescent courts, school officials, heads of settlement houses, clergymen of all faiths, and so forth. A personnel committee was formed. The project was launched and funds were provided. A professional staff was carefully selected, consisting of 12 specialists who could go into troubled areas and deal on a personal basis directly with gang leaders and members, in order to break down the barriers of suspicion, gain their confidence, and learn what led them into antisocial activity.

This was in 1951. The project has been a definite success. The budget, which originally was $60,000, is now about $100,000. At periodical meetings the board reviews the reports of its men in the field. Experiences are analyzed and new approaches devised to fit particular situations. Our hopes and efforts have been justified. In the areas where we have operated, gang fights with zip guns, switchblade knives, and clubs, which were common occurrences when we began, have all but disappeared. Now these groups play baseball and basketball with each other, with accepted standards of sportsmanship. Whereas previously they regarded "cops" with contempt and hatred, they now recognize that "cops" are their friends who can help them. It is planned to organize the "alumni" of these groups to work with the younger members. That this can be accomplished has been demonstrated.

It is heartening to read in Deputy Mayor Henry Epstein's report to Mayor Wagner—Perspectives on Delinquency Prevention—at page 25 :

"The youth board proposes doubling the number of street clubs served in the present project areas ; extension of service to other neighborhoods in equal volume is also suggested. I strongly recommend that every cent requested for this work be appropriated without delay.

"There are precious few private agencies willing to undertake the difficult area the youth board has cut out for itself. There is no agency in a position to carry this work through on the scale of the youth-board operation. Their leaders have the spirit, the will, and the know-how ; money is needed to quadruple staff on this operation. It means reaching directly a pretty obstreperous sector of youth, some of them before they get into serious trouble.

The street clubs project needs an increase of $508,000 by 1957–58. * * *"

This 5-year-old project should teach us too that the problems of delinquency are dynamic, complex, and multifaceted with no quick or magic solution. But it shows, too, that with time, patience, and know-how it can be successfully tackled. This project should encompass our entire borough ; indeed, the entire city.

The youth board, and all who have participated in it can take a real pride in this job. Much of the shortcomings are due to the fact that there were not sufficient funds: First, to extend the program to other areas ; secondly, to intensify the program with various social services within each area ; and thirdly, to engage sufficient persons in the area of operation to collect and evaluate data for scientific evaluation of the project. Only when these are done will the full value of the operation be felt.

*     *     *     *     *     *     *

### "Operation Veteran"

#### PLAN TO PREVENT JUVENILE DELINQUENCY

While the problem of juvenile delinquency concerns everybody, it is only natural that as the district attorney it should concern me and my staff even more.

In the beginning of the year it occurred to me that we are not even beginning to take advantage of either the manpower or the physical facilities available to aid in the fight against this troublesome problem. I therefore devised a plan that I felt is workable, not too expensive, and would be effective.

After consultation with representatives of the Youth Board of the City of New York and the Board of Education, and after much research, I addressed a communication on September 16, 1955, to the then deputy mayor, Henry Epstein, which I set forth in full at the end of this section.

KR0559

A reading of this letter gives the plan in detail. In a word, it is one which contemplates the use of volunteer workers under expert paid supervision and the utilization of facilities that are already in existence, both private and public. In the main, it provides for the use of the public schools, and their facilities.

The deputy mayor referred the matter to the youth board, who, after some study, submitted it to a subcommittee for further study and recommendation. The subcommittee finally approved the plan but felt it would be wiser to limit it at the start to those agencies in the area that are now in operation, and to augment them by the volunteer plan. It is contemplated that later the idea would spread with the use of school properties where centers are needed but do not now exist.

Among other things, it was seriously felt that there was a real necessity for the coordination of volunteer groups interested in working toward the prevention and control of juvenile delinquency. It pointed out that volunteer operations are ineffective unless there is sustained professional help and direction and it was vital to create a greater awareness on the part of professionals on the value and contributions to be made by volunteers. The committee felt that in the past well-intentioned volunteers generally lost interest because the professionals did not give them a feeling that they were really wanted in the jobs they undertook.

I am happy to report that the youth board accepted the recommendation of the subcommittee and made an initial appropriation of $15,000 to put this program into operation. It is hoped that before long the necessary personnel will be found to begin to implement the idea.

LETTER OF DISTRICT ATTORNEY

SEPTEMBER 16, 1955.

Hon. HENRY EPSTEIN,
*Deputy Mayor, City of New York,*
*City Hall, New York, N. Y.*

DEAR MR. EPSTEIN: I know you feel as keenly as I do that there is too much talk about the serious problems of juvenile delinquency and not enough "doing."

I am sure too I needn't tell you that one of the fronts on which we must attack the serious problem of juvenile delinquency is providing for the youths' leisure time. At our pleasant conference a few weeks ago, I outlined to you a plan that I thought should be tried out for the utilization of our veteran groups who would act as volunteers in this project.

In my capacity as district attorney, and before that, as chief assistant, I am fully aware of the seriousness of this problem and at the same time realize the limited number of trained professional persons to deal with the problem, as well as the very difficult problem of getting funds for such a project.

It was with this in mind that I began to think of the possibility of using volunteers to supplement the work of a small paid staff. It occurred to me that the veteran groups were a wonderful source from which to draw volunteers for such work.

*Operation Veteran*

May I state that on Friday, September 9, last, I met with the heads of the veteran organizations in Kings County (American Legion, Catholic War Veterans, Disabled War Veterans, Jewish War Veterans, and Veterans of Foreign Wars), and they all were enthusiastic about the plan and pledged their fullest support and expressed their confidence that the veterans would be glad to meet this challenge.

In this connection, I would like to mention that the majority of the veterans, particularly of World War II, are at the present time fathers of children and teen-agers, and they have a full realization of the problem that confronts us all. Aside from this, as patriotic men, they are anxious to do what they can to solve this very difficult problem.

I think we ought to keep in mind that the veterans give us a source from which to draw men efficient in various sports and crafts, as well as persons of all racial and religious groups.

I like the idea of calling this project operation veteran.

As I explained to you in our conference, one of the difficulties with so many of the projects is that they are not properly organized and supervised. Since my plan envisions the use of the playgrounds and other facilities of our ele-

**KR0560**

mentary high school buildings, I discussed this plan with Dr. Edward J. Bernath, associate superintendent, division of community education, who has taken the matter up with Dr. Jansen. They have both expressed their approval and aid for the plan.

It is planned that the veterans will give us sufficient manpower to get between 200 and 300 veteran volunteers. This will allow for dropouts, illness, unforeseen difficulties, etc. Roughly, it is planned that each candidate who desires to enter this work will complete a questionnaire giving his name, address, occupation, etc., time available, and his specific interests, such as baseball, basketball, boxing, music (bands and glee clubs, quartets, etc.), dramatics, arts, crafts, etc. We would ask him to indicate the number of evenings he can give to this cause and it is our thought that he should give at least 2 evenings per week so that there would be some continuity of relationship. The volunteers would then be screened and an orientation and training program would be provided to be operated by the New York City Youth Board.

It should not be too difficult to get the radio and TV stations to give us their help to publicize and lend encouragement to the participants by appearing on their medium to display their skills or in some kind of a healthful competitive show of skills.

I have discussed this matter with Judge Nathaniel Kaplan, chairman of the New York City Youth Board, Ralph W. Whelan, its executive director, and often with James E. McCarthy, deputy executive director, and I am happy to say that they are all enthusiastic about the plan. They see in it tremendous possibilities.

As part of the plan, business organizations will be approached to underwrite the program cost of the operation. Thus, one organization may provide the funds for outfitting a baseball or basketball team. Another may provide funds for activities, such as photography, etc.

Although it is expected that we must get from the city the funds to provide for program expenditures, it is safe to assume that the community will have to provide more money than the city, and it is even possible that after a year or two the community can provide all the necessary funds. But the plan cannot be launched with any degree of success unless the city provides the money to get the experiment going under the supervision and coordination of the New York City Youth Board.

In order that you might have an idea of what the city would have to supply, I set forth a budget breakdown of what I feel is necessary. These figures have been compiled after numerous consultations with Mr. James E. McCarthy, deputy executive director of the New York City Youth Board.

*Budget breakdown*

For the first years of operation, the following budget breakdown is proposed, in order to launch the program:

| | |
|---|---:|
| Director | $9,000 |
| Assistant director | 6,100 |
| Secretary | 2,765 |
| Fee for special services [1] | 2,000 |
| Office rental | 2,000 |
| Office supplies | 500 |
| Printed stationery and forms | 400 |
| Contact expenses in field | 600 |
| Office equipment | 2,000 |
| Recreation and sports equipment [2] | 3,000 |
| Postage | 300 |
| Telephone and other communication | 400 |
| Carfare | 600 |
| Cleaning service | 700 |
| Total | 30,365 |

[1] For bringing in well-known and leading athletes in all fields to help and advise in particular fields and to inspire the youths in the areas.
[2] To get project under way.

*The area*

The area selected for initiating a pilot operation is the Williamsburg section of Brooklyn. I am attaching hereto three maps, map I, which gives the delinquency rates for the Williamsburg area; map II, which shows the same area

KR0561

and the police precincts it covers; and map III, to show the area in relationship
to the rest of Brooklyn.   The boundaries of this area are as follows:
(Then follows a description of the boundaries of the area, health districts,
and precincts in it.)
Like all projects, I am sure we will find that some of the ideas we have will
not work out, while others that we do not think about can be nicely incorporated
in it.   Again, too, of course, modifications can be made to the area proposed
should it be deemed advisable.

*Pilot plan*

In a real sense, this is a pilot scheme.   If and when we put it into operation
and run it for at least a year, we will then be in a position to know whether
the plan really works, and I can see no reason why it shouldn't.   Later when
we have had some actual experience, tested and tried the plan, we can use it in
other areas in Brooklyn, and possibly throughout the city as a whole.   For the
present, however, the Williamsburg area will be the laboratory for the experi-
mentation.
The street club plan was tried for a number of years in Brooklyn, before we
knew it worked, and is now, as you know, working in Harlem and the Bronx.   I
have had the satisfaction of being chairman of this advisory board on street
clubs in Brooklyn for 5 years.

*Resources of the area*

(Then follows a detailed outline of the private agencies in the area, what
public schools have recreational facilities and the types, day or evening, and
what schools have none.)
Of the foregoing 25 schools, there are 14 schools which are in no way being
utilized with either after-school playgrounds or evening community centers,
with or without youth board programs, and only 5 that are utilized in the
evening.   The daytime programs go to 5:30 p. m.

*Description of the area*

According to the 1950 statistics, the total population of Williamsburg was
193,895, composed of 167,089 white, 11,270 Negro, 14,952 Puerto Ricans, and 584
others.

*Age groupings in population, 1940–50, Williamsburg area*

| Age groups | 1940 popu-lation | 1950 popu-lation | Percent change | 1950 popu-lation (estimated) | Percent change over 1950 |
|---|---|---|---|---|---|
| All ages | 195, 655 | 193, 895 | −0. 9 | 215, 000 | −11. 8 |
| Under 6 years | 15, 982 | 23, 753 | +48. 6 | 21, 000 | −8. 0 |
| 6 to 15 | 33, 672 | 28, 041 | −16. 7 | 39, 000 | +39. 3 |
| 16 to 20 | 20, 782 | 13, 950 | −32. 0 | 13, 000 | −5. 4 |
| 21 and over | 125, 219 | 128, 151 | +2. 3 | 142, 000 | +10. 9 |

We note that the age group 16 to 20 years decreased in the 10-year period,
1940 to 1950, by one-third.   For the borough as a whole, the decrease in this
age group was proportionately less than for this area.   The age group 6 to 15
years also showed a decrease both in the area and in the borough.   However, the
younger age group, children who at the time of the census in 1950, were under
6 years of age, increased 48.6 percent in the area in the past 10 years.   These
children are now 6 to 10 years and of particular concern to youth planning
organizations.
It is most important to note that the group, for example, listed as 6 to 15 years
which shows a decrease from 1940 to 1950, is as of 1955, 39.3 percent higher.
This is a most important age group.
(A description of the racial and ethnic groups in the area then follows:)

*The veterans' role*

About 200 to 300 selected veterans from the various veteran groups will be
asked to give a minimum of 2 evenings a week to this program.   After their
initial screening by the two project members, they will be assigned to small
groups based on their interests, abilities, etc., and will participate in a training
session.   The major part of the training sessions will be handled by the staff
of this project.   However, specialists in a variety of fields will be used to enrich
the training program.   It is envisioned that through these training sessions they

**KR0562**

will begin to develop growing understanding of the needs and behavior of children and teen-agers and so understanding, be better prepared to cope with them. Moreover, the training sessions may help to broaden their program abilities and thereby increase their contribution to this type program. As quickly as possible, however, the veteran will be assigned to the different recreation and group work operations in Williamsburg. At the beginning, these will be limited to ongoing programs where increased staff and diversified abilities will enrich the program. They will function as integral members of the staff of their assigned project, receiving their immediate supervision from the supervisors of these programs. Some may operate as recreation teachers, and others may be used in areas such as shopwork, music, as receptionist, and a variety of other fields limited only by the aptitude and interest of the volunteers. The staff of the project will continue its interest in the veterans, keeping records of their development and assuring their correct use where they are best fitted.

*Veteran women auxiliaries*

It should be mentioned that in the planning of this work it is hoped to involve the women auxiliaries of the various veteran organizations. They can be of great use in conducting and chaperoning dances and various functions, such as sewing and cooking, that might fall particularly in their line.

*Business organizations*

The business organizations in this area, both individually and through chambers of commerce, etc., will be approached and interested in this program. They will be reminded that a healthier community is better for business, as well as of their basic responsibility in making it a better neighborhood. They will be able to participate in the program by underwriting specific program costs. For example, $250 will equip a junior baseball team, $350 will equip a regular baseball team. Some organizations may wish to participate with others in financing a league or in contributing to cost of activities such as photography, etc.

*Citizenship participation*

I think it is of the utmost importance in such a project to involve as many citizens as possible, whether individuals or business concerns. We must dissipate the impression that only some political unit, city, State or Federal, can handle these problems.

The fact that the citizens will be part of the project will not only make them aware of the seriousness of the problem, but they will be made to feel that they have a personal stake in its operation and success.

Business concerns would not only be rendering a great public service but they would get more than their just share in advertising value for what they do in this project. I am sure that the press (particularly in Brooklyn sections), would be glad to publish the standings in the baseball and basketball leagues and give other reports on the work that is being done.

Much can be gained if we can also involve the parents of the children in the area in this work. Even if they come only as spectators, it is a link between home and child that is very helpful in the overall picture.

*Citizens advisory committee*

In connection with this project, it is contemplated that we would create a citizens advisory committee which might be known as the Citizens Advisory Committee of the Veterans Service Project.

While I have given some thought to the names, we would provide on it a place for the veterans' organizations, the youth board, the board of education, police department (J. A. B.), representatives of the various religious and racial groups, commerce and industry, labor unions, P. A. L., Precinct Youth Council, representatives from some of the organizations serving Williamsburg, as well as other persons whose daily tasks bring them close to the problem.

I believe I have given you enough of the plan I have in mind to enable you to try to get us the necessary funds from the board of estimate.

I have every confidence that the mayor and you will give it your sympathetic consideration.

Sincerely yours,

EDWARD S. SILVER,
*District Attorney, Kings County.*

KR0563

STATEMENT PREPARED FOR THE UNITED STATES SENATE SUBCOMMITTEE ON JUVENILE DELINQUENCY WITH RESPECT TO THE WISCONSIN SEX DEVIATE LAW SUBMITTED UPON REQUEST OF THE COMMITTEE BY SANGER B. POWERS, DIRECTOR, DIVISION OF CORRECTIONS, WISCONSIN STATE DEPARTMENT OF PUBLIC WELFARE

WISCONSIN'S EXPERIENCE IN THE ADMINISTRATION AND TREATMENT EFFECTIVENESS OF ITS SEX DEVIATE LAW : 1951–56

### I. HISTORICAL BACKGROUND

Wisconsin's Sex Crimes Law (sec. 959.15, Wisconsin Stats.) enacted by the 1951 legislature became effective on July 27, 1951. This legislation provides for a medical approach, within a legal frame of reference, to the problem of the sex offender. The constitutionality of the law has been established in the case of *State ex rel. George E. Volden, Plaintiff in Error* v. *Franz G. Hass, Sheriff, Dane County, Defendant in Error* (264 Wisconsin 127).

The sex crimes law passed the Wisconsin Legislature without dissenting vote in either senate or assembly and without debate. The legislation had been authored by a large citizens' committee which contained representation from organized labor, church groups, private social agencies, community organizations, the bar, University of Wisconsin, Marquette University, and prominent citizens interested in public welfare problems. Separate hearings on the proposed bill were held by senate and assembly committees. The excellence of the arguments presented by the representatives of the citizens' committee referred to earlier and the fact that there was no opposition accounts for the passage of this legislation without debate.

### II. BASIC PROVISIONS OF THE LAW

#### A. *Definition and jurisdiction*

The sex crimes law establishes two categories of sex crimes. The first category includes rape, sexual intercourse without consent, indecent behavior with a child, or an attempt to commit any such offenses. The second category includes any other crime except homicide or attempted homicide if the court finds that the defendant was probably directly motivated by a desire for sexual excitement in the commission of the crime.

Any court with jurisdiction to try an offender for any offense falling within either of the above categories has jurisdiction to commit under the sex crimes law.

It is mandatory upon the courts to commit to the State department of public welfare for a "presentence social, physical and mental examination" any person who has been convicted of rape in violation of section 944.01, sexual intercourse without consent in violation of section 944.02, indecent behavior with a child in violation of section 944.11, or for attempting to commit rape or have sexual intercourse without consent. For all other sex crimes the court may, after conviction, commit the offender to the department of public welfare for a presentence social, physical and mental examination if the department certifies that it has adequate facilities for making such examination and is willing to accept such commitment.

Thus, the Wisconsin Statutes provide for two broad categories of sex crimes. In the first category are found the aggressive, assaultive offenses and sexual offenses against children. Upon conviction of any such offense, the offender must be committed for a presentence physical, social, and mental examination under the sex crimes law. For all other sex crimes it is discretionary with the court whether to handle the offender under the sex crimes law or under the criminal statutes. It might be noted that in the second category of offenses are found a wide variety of offenses such as sodomy, incest, arson, the circulation of indecent, obscene, or pornographic material, and some misdemeanors such as disorderly conduct, provided that the offense meets the statutory definition of a sex crime as noted previously. The courts are authorized in determining whether or not the offense might be classified as a sex crime to take testimony after conviction if necessary.

#### B. *Report by the department*

The State department of public welfare is required by statute to submit to the committing court a report of its findings and recommendations within 60 days

KR0564

of commitment for the presentence study. This report includes a complete social investigation, along with a résumé of the psychological tests including projective tests plus the psychiatric appraisal.

### C. Disposition of cases after return to court

If the State department of public welfare "recommends specialized treatment for the offender's physical or mental aberrations," the court then must order the offender brought before the court and then "shall either place him on probation * * * with the requirement as a condition of such probation that he receive outpatient treatment in such manner as the court shall prescribe, or commit him to the department" for treatment. The department's responsibility for treatment of the individual does not lessen its obligation to the public for the offender's safekeeping. The Wisconsin State Prison has thus been designated as the facility where those convicted of sex crimes are to be sent for either diagnosis or treatment.

In the event that the department does not find the person studied to be sexually deviated, it reports such fact to the court and the case must then be disposed of under the provisions of the Criminal Code.

### D. Duration of control

All commitments of sex deviates to the State department of public welfare for treatment are for an indeterminate period. Persons so committed may be released by the department on parole if it appears to the satisfaction of the department, upon recommendation by a special review board (consisting of two psychiatrists and an attorney at law), that the offender is capable of making an acceptable adjustment to society. The department is obligated to keep every person committed to it under supervision and control so long as in its judgment such control is necessary for the protection of the public. A percentage, as yet unknown because of the relatively brief existence (6 years) of the law, are incapable of responding to treatment and pose a continuing threat to the public because they possess neither the will nor the capacity to change. The duration of control over such cases will prove lengthy since no case is discharged without psychiatric clearance and after a finding that the offender no longer represents a threat to society.

The department of public welfare by administrative order may discharge a person committed under the Sex Crimes Law upon finding that he has received maximum benefits through therapy and is no longer a threat to society providing total time under department supervision is equal to the maximum for which he might have been sentenced as a misdemeanant or 2 years if convicted of a felony.

If the department determines that a person cannot safely be discharged, the law requires the department to issue an order directing that the offender remain subject to its control beyond the normal discharge date and to make application to the committing court for a review of that order at least 90 days before the normal discharge date. If after a hearing the court finds that discharge from the control of the department of public welfare of the person to whom the order applies "would be dangerous to the public because of the person's mental or physical deficiency, disorder or abnormality, the court shall confirm the order." If confirmed, the order remains in effect for 5 calendar years unless the offender is previously discharged. If the department wishes to retain control beyond the 5-year period, the process of a new order and application to the court for a judicial review is repeated at 5-year intervals.

### E. Constitutional safeguards

The law provides for (1) commitment to the department only after conviction; (2) the right to appeal such conviction; (3) judicial review of all orders continuing control, and (4) application to the court by an offender for a reexamination of his mental condition not oftener than semiannually during any period of extended control.

### F. Voluntary admissions

Persons believing themselves to be afflicted by a mental or physical condition which may result in sexual action dangerous to the public may apply to the State department of public welfare for voluntary admission to an institution for diagnosis. Treatment may also be provided, if the need for such is determined in the diagnostic process.

**KR0565**

*G. Sex deviate facility*

The Wisconsin State Prison at Waupun has been designated by the department of public welfare as its sex deviate facility.   Plans are in preparation for the establishment at some future date of a medically oriented institution for the diagnosis and treatment of the sex offender.

Presently the diagnostic function is performed in the majority of cases at the prison.   Such services on occasion are provided by the Wisconsin Diagnostic Center, the Milwaukee Guidance Clinic, the Milwaukee County Hospital for Mental Diseases, and outpatient clinics in larger cities throughout the State.

The treatment of those committed as deviated is carried out at the prison, but other State-operated mental institutions are also utilized on occasion.

### III. DIAGNOSES AND TREATMENT

*A. The diagnostic process*

When an individual is committed to the department for study and diagnosis the following procedure is instituted :

1. The field service (probation and parole staff) makes a comprehensive social investigation that covers the offense, the victim and a longitudinal history of the offender.

2. Upon receipt of the social history at the institution, the offender is interviewed by a psychiatric social worker who prepares a report of special significance to the psychologist and the examining psychiatrist.

3. The offender is then given a full battery of psychological tests including projective testing.   The results of this testing along with the social history and the medical examination are then forwarded to the psychiatrist assigned to the case.

4. The psychiatrist interviews the offender, studies all available reports, evaluates the man, and forwards his psychiatric appraisal to the department.

5. The department then makes its findings and report to the court.

6. The man is returned to court for judicial disposition.

*B. The treatment process*

When an offender has been returned to court after a finding of sexual deviation and the court elects to commit him to the department for treatment rather than to use probation (with the added requirement of outpatient psychotherapy), he is returned to the sex-deviate facility located within the Wisconsin State Prison.   At this time he is placed in the orientation program established for all new prison inmates.   During this orientation period he is introduced to all facets of the institutional program including work, education, recreation, religious, and social services.   Necessary dental work is performed and he is evaluated for work or school placement and custodial requirements.   He is then released into the general prison population and is assigned to a psychiatrist who henceforth is responsible for his treatment program.

The source of the`man's emotional conflict having been pinpointed previously through the projective testing, he is now placed in psychotherapy which will relate to his needs as indicated by the psychological examination and in keeping with his ability to profit by and respond to such treatment.   The intensity and frequency of such therapeutic contact varies from individual to individual; psychiatric interviews are presently had on an average of once every 2 weeks. On the average this form of treatment extends over a 10½-month period in the case of those released to parole supervision.

### IV. EXPERIENCE IN THE OPERATION OF THE LAW

From July 26, 1951, when the law became effective, through June 30, 1956, a total of 821 men and 1 woman were studied under the sex-crimes law.   Of this group, 376 were returned to court with a finding of sufficient psychiatric deviation in the sexual area to warrant commitment under the law, while 22 were returned to court with a finding of psychosis or mental deficiency with recommendations for handling under the Mental Health Act.   Of these 376 deviates, 311 were committed to the department for treatment at the sex-deviate facility at Waupun, while 65 were placed on probation with the stipulation that outptaient psychotherapy be obtained.   Of the remaining offenders examined, 418 were found to be not deviated and were returned to court for sentencing under the Criminal Code.

**KR0566**

Of this latter number, 240 were placed on probation while 162 were sentenced to either the State prison or the State reformatory. Dispositions in the remaining 16 cases included such things as commitment to a county home, fine, or jail sentence.

### A. Parole experience

Of the 311 men committed to the sex-deviate facility for treatment, 225 had been paroled up through June 30, 1956 (the first parole grant was made on July 18, 1952). Over this 5-year period only 35 parolees (15 percent of those paroled) are known to have violated the conditions of parole and were returned to the institution for further treatment. Fourteen of the violations resulting in return to the institution were violations of rules rather than commission of new sex offenses.

This low parole violation rate has been rather startling, since the sex offender for years has frequently been regarded as hopeless and a poor candidate for rehabilitative treatment. The violation rate is substantially less than the rate for the nondeviated sex offender or the normal felony offender. This argues for the basic premise of Wisconsin's sex crimes law—that the deviated sex offender requires psychiatric and medical treatment and is essentially a psychiatric rather than a custodial problem.

### B. Record of discharged sex offenders

Through June 30, 1956, the department discharged a total of 142 men from all further supervision and control. The first such discharge was made on December 19, 1952. Only 6 of those discharged are known to have committed new sex offenses subsequent to discharge—3 by indecent exposure, 1 by disorderly conduct, and 2 by taking indecent liberties with a minor. It should be noted that of the 6 dischargees who committed new offenses, 3 had initially been committed because of indecent exposure or disorderly conduct and had been discharged not because it was felt that they were completely cured, but rather since the department could not make a finding that their release would constitute a danger to the public (even though they might make nuisances of themselves subsequently).

### C. Extension of control

Up to June 30, 1956, a total of 35 men were returned to court for a hearing on a department order extending its control over them. These orders were confirmed in 33 of the 35 cases returned to court. In the remaining two cases the courts determined that while the men were in need of further psychiatric care, they must be regarded as nuisances rather than as a danger to the public (the statutory requirement for continuance of control).

### V. CONCLUSION

The experience thus far in Wisconsin with the sex-crimes law has been most successful by any standard one wishes to use. Despite some physical plant inadequacies, a dedicated staff has not only made the operation of the sex crimes law a success, but has proved that most cases of sexual deviancy will respond to psychiatric treatment.

It is our feeling that an adequate program providing for the individual treatment of the sex offender can have a significant impact on the problem of juvenile delinquency, since many such offenders are involved in offenses with juveniles or in offenses which contribute to delinquency—ranging from the possession and distribution of pornographic literature to the introduction of juveniles into deviant sexual behavior.

---

STATEMENT SUBMITTED TO THE UNITED STATES SENATE INVESTIGATING COMMITTEE ON JUVENILE DELINQUENCY BY MRS. SANFORD SCHWARZ

The attached statement is a description of a project undertaken by lay people to create more healthful attitudes in a school community setup. In this area inmigration of non-English-speaking persons and the general overall deterioration of the neighborhood, physically and socially, is being strongly felt.

The New York City Youth Board offered us as citizens at large an opportunity in its area hearings to learn how this problem was being met by other lay persons and professionals. The amateur or volunteer who lives in the neighborhood, motivated by strong self-interest to help upgrade the community where his family and children live, needs the strongest encouragement and direction, so it

KR0567

seems to us, from city agencies such as the youth board. To participate in the public hearings, to have the benefit of contact and consultation between us, the lay people and the professionals, help to bring about sustained volunteer participation for the common good. This, it would appear, is the crux of securing and holding on to volunteer activity on behalf of better neighborhoods. In short, people who care and who approach the problem of juvenile delinquency from this fundamental premise, that a healthy character in a neighborhood helps to limit social disorganization and its natural result, juvenile delinquency, need the city's recognition and support.

In addition to the help given by the youth board to the citizens of the school area in which we live, a volunteer agency interested in human relations has also come forward with a substantial program that not only recognizes the efforts of the "indispensable amateurs" but goes further in setting up a youth program in which our forces will mesh.

### UNITED NEIGHBORS

The United Neighbors group was set up 5 years ago in Public School 9, an elementary school in a former silk-stocking neighborhood, 82d Street and West End Avenue, New York City, by mothers who felt the need to take positive steps toward easing an increasingly difficult school situation.

What was once a homogeneous school population was struggling with almost 50 percent of its children described as linguistically handicapped and culture conflicts appeared in both school and neighboring community. Families were moving to the suburbs with speed.

The mothers who intended to remain both in the neighborhood and have their children remain in the public school were motivated by self-interest to help the whole climate of the area in which their young children moved. They were, it must be said, aware, too, of the American tradition in helping the newcomer find his way.

Taking a cue from the United Nations for our name, we called ourselves United Neighbors, and indeed stressed that there were more things that unite us than divide us. Living in the same area, we shared the same public school and were equally concerned about our children's education, health, safety, and recreation.

In an area where there are no natural boundaries, no center for communal activities, we took the school as the focal point and used its boundaries as an area of manageable dimensions. The school serves over 1,200 children from about 20 blocks. Within this wedge, we found resources, the library, the museum, the church, the synagogue, and the area's most precious asset: people who cared. The programs that followed, both in school and neighborhood, always were planned and initiated by the parents and other citizens who were looking for ways and means to channel their concern about creating a healthy atmosphere where they lived. Most important was the wholehearted cooperation of principal and teachers and their parallel activity in the classrooms to make our programs come to life for the children.

For almost 2 years the United Neighbors have had an ongoing coffee canteen in the school once a week early in the morning. When young mothers have just deposited their children in the school, they are invited to have coffee together. Here in a simple face-to-face relationship where one can sew or drink coffee if one has difficulty with the language, we have come to know our neighbors better; they in turn have come to feel a sense of neighborliness and acceptance. Their children in turn, proud to see their parents participating on a par with others, move more easily and comfortably among their peers, and thereby find their place in an American school community.

As an example of one of many projects, the mothers in this sophisticated metropolitan community put together a patchwork quilt during the United Neighbors coffee canteen sessions. This colorful quilt, characteristic of an activity in the early days of the history of our country, shows the diversity of the ethnic groups in our schools and at the same time the unity for the common good that binds us all.

×

KR0568

# PLAINTIFFS' EXHIBIT T

**KR0569**

# Calendar No. 2025

85TH CONGRESS }     SENATE     {     REPORT
*2d Session* }                        No. 1980

## SWITCHBLADE KNIVES

JULY 28, 1958.—Ordered to be printed

Mr. MAGNUSON, from the Committee on Interstate and Foreign Commerce, submitted the following

## REPORT

[To accompany H. R. 12850]

The Committee on Interstate and Foreign Commerce, to whom was referred the bill (H. R. 12850) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

### II. SUMMARY OF THE BILL

Section 1 defines the terms used in the bill.

Section 2 prohibits the manufacture for, or transportation or distribution in, interstate commerce, of switchblade knives or of other concealed-blade knives which open by operation of interia or gravity or both. Section 3 would also prohibit the manufacture, sale, or possession of such knives within any Territory or possession of the United States, within Indian country (as defined in sec. 1151 of title 18 of the United States Code); or within the special maritime or territorial jurisdiction of the United States (as defined in sec. 7 of title 18 of the United States Code). Persons violating these sections would be subject to a fine of not more than $2,000 or to imprisonment for not more than 5 years, or both.

Exceptions to these provisions are made in the following cases:

(1) The transportation of switchblade knives by common and contract carriers in the ordinary course of business;

(2) The manufacture, sale, transportation, distribution, or possession of such knives pursuant to contract with the Armed Forces;

1

KR0570

(3) The handling of switchblades by the Armed Forces or by any member or employee thereof in the performance of his duty; or

(4) The possession of a switchblade knife with a blade 3 inches or less in length by a one-armed person.

Section 5 of the bill amends section 1716 of title 18 of the United States Code to prohibit the mailing of switchblade knives except in connection with Armed Forces or other Government orders.

It should be particularly noted that the proposed legislation does not affect the possession, or manufacture for, or sales in, intrastate commerce of switchblade knives within States which freely permit their use. Nor would the bill interfere with switchblade control measures in those States where their use is subject to statewide or local regulation.

It is also important to add that the bill's exemption relating to the Armed Forces is not intended to sanction surplus sales of switchblade knives to the public.

### III. NEED FOR AND BACKGROUND OF THE LEGISLATION

The problem of the use of switchblade and other quick-opening knives for criminal purposes has become acute during recent years—particularly by juvenile delinquents in large urban areas. During the present Congress a special study of juvenile delinquency was made by a subcommittee of the Committee on the Judiciary of the Senate. In its report (S. Rept. No. 1429, 85th Cong., 2d sess.) the subcommittee pointed up the switchblade menace as follows:

The subcommittee's investigation disclosed that many of these knives were manufactured abroad and distributed by firms in this country who handle numerous items in addition to switchblade knives.

It was established that these items were being widely distributed through the mail by distributors to the various States that had local laws prohibiting possession, sale, or distribution of switchblade knives. This fact, the subcommittee feels, points out the need for Federal control of the interstate shipment of these instruments, since local legislation is being systematically circumvented through the mail-order device.

In the United States 2 manufacturers have a combined production of over 1 million switchblade knives a year. Both concerns are important cutlery manufacturers and the manufacture of switchblade knives represents only a small part of their business. It is estimated that the total traffic in this country in switchblade knives exceeds 1,200,000 per year.

The questionnaires returned by police chiefs throughout the country indicate that many switchblade knives have been confiscated from juveniles. The police chiefs, almost without exception, indicate that these vicious weapons are on many occasions the instrument used by juveniles in the commission of robberies and assaults. Of the robberies committed in 1956, 43.2 percent were by persons under 21 years

KR0571

of age. A switchblade knife is frequently part of the perpetrator's equipment in this type of crime. In New York City alone in 1956, there was an increase of 92.1 percent of those under 16 arrested for the possession of dangerous weapons, one of the most common of which is the switchblade knife.

As a result of this study, a bill (S. 2558) to prohibit the manufacture for, or distribution in, interstate commerce of switchblade knives was introduced by Senator Kefauver and referred to your committee. The present measure, which was passed by the House of Representatives on June 27, 1958, is similar to the Senate bill but, unlike the latter, is not aimed specifically at sales to juveniles.

Hearings on the bill were held by your committee on July 23, 1958, with witnesses representing New York State groups concerned with juvenile delinquency and law enforcement problems. A representative of a New York cutlery firm also appeared in support of the bill. Testimony received indicated that 12 States, including New York, have already enacted legislation to prohibit the manufacture, sale, or possession of switchblade and similar knives. It was stressed, however, that so long as the interstate channels of distribution remain open the problem of enforcing the State laws will be extremely difficult.

In supporting enactment of this measure, however, your committee considers that the purpose to be achieved goes beyond merely aiding States in local law enforcement. The switchblade knife is, by design and use, almost exclusively the weapon of the thug and the delinquent. Such knives are not particularly adapted to the requirements of the hunter or fisherman, and sportsmen generally do not employ them. It was testified that, practically speaking, there is no legitimate use for the switchblade to which a conventional sheath or jackknife is not better suited. This being the base, your committee believes that it is in the national interest that these articles be banned from interstate commerce.

### IV. REPORTS OF GOVERNMENT AGENCIES

The reports on this legislation by Government agencies to the House committee are set forth in the appendix of this report.

The Department of Justice did not recommend enactment of this legislation. The Secretary of Commerce recommended against enactment of this legislation. The Bureau of the Budget shared the views of the Department of Justice and the Department of Commerce but had no objection to the enactment of those provisions of the bill dealing with the mailability of such knives. The Secretary of the Army, speaking for the Department of Defense, had no objection to the enactment of the legislation with the included amendment to exempt from the prohibitions contained therein the manufacture, sale, possession, transportation, distribution, or introduction into interstate commerce of switchblade knives by the Armed Forces or members and employees thereof, acting on the performance of their duties. The Post Office Department recommended enactment of the legislation with respect to the mailability of switchblade knives if an appropriate amendment were made giving the Postmaster General the right to request an explanation from the sender, in writing, that the law is being complied with. Such an amendment was adopted by the House committee and is included in the present measure.

**KR0572**

4                      SWITCHBLADE KNIVES

The appendix also includes copies of reports to your committee from the Interstate Commerce Commission and the Civil Aeronautics Board.

In compliance with subsection 4 of rule XXIX of the Standing Rules of the Senate, changes in existing law made by the bill are shown as follows (new matter is printed in italic; and existing law in which no change is proposed is shown in roman):

### SECTION 1716 OF TITLE 18 OF THE UNITED STATES CODE

§ 1716. Injurious articles as nonmailable.

All kinds of poison, and all articles and compositions containing poison, and all poisonous animals, insects, reptiles, and all explosives, inflammable materials, infernal machines, and mechanical, chemical, or other devices or compositions which may ignite or explode, and all disease germs or scabs, and all other natural or artificial articles, compositions, or material which may kill or injure another, or injure the mails or other property, whether or not sealed as first-class matter, are nonmailable matter and shall not be conveyed in the mails or delivered from any post office or station thereof, nor by any letter carrier.

The Postmaster General may permit the transmission in the mails, under such rules and regulations as he shall prescribe as to preparation and packing, of any such articles which are not outwardly or of their own force dangerous or injurious to life, health, or property.

The Postmaster General is authorized and directed to permit the transmission in the mails, under regulations to be prescribed by him, of live scorpions which are to be used for purposes of medical research or for the manufacture of antivenin.  Such regulations shall include such provisions with respect to the packaging of such live scorpions for transmission in the mails as the Postmaster General deems necessary or advisable for the protection of Post Office Department personnel and of the public generally and for ease of handling by such personnel and by any individual connected with such research or manufacture.  Nothing contained in this paragraph shall be construed to authorize the transmission in the mails of live scorpions by means of aircraft engaged in the carriage of passengers for compensation or hire.

The transmission in the mails of poisonous drugs and medicines may be limited by the Postmaster General to shipments of such articles from the manufacturer thereof or dealer therein to licensed physicians, surgeons, dentists, pharmacists, druggists, cosmetologists, barbers, and veterinarians, under such rules and regulations as he shall prescribe.

The transmission in the mails of poisons for scientific use, and which are not outwardly dangerous or of their own force dangerous or injurious to life, health, or property, may be limited by the Postmaster General to shipments of such articles between the manufacturers thereof, dealers therein, bona fide research or experimental scientific laboratories, and such other persons who are employees of the Federal, a State, or local government, whose official duties are comprised, in whole or in part, of the use of such poisons, and who are designated by the head of the agency in which they are employed to receive or

KR0573

send such articles, under such rules and regulations as the Postmaster General shall prescribe.

All spirituous, vinous, malted, fermented, or other intoxicating liquours of any kind are nonmailable and shall not be deposited in or carried through the mails.

*All knives having a blade which opens automatically (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both, are nonmailable and shall not be deposited in or carried by the mails or delivered by any postmaster, letter carrier, or other person in the postal service. Such knives may be conveyed in the mails, under such regulations as the Postmaster General shall prescribe—*

> *(1) to civilian or Armed Forces supply or procurement officers and employees of the Federal Government ordering, procuring, or purchasing such knives in connection with the activities of the Federal Government;*
>
> *(2) to supply or procurement officers of the National Guard, the Air National Guard, or militia of a State, Territory, or the District of Columbia ordering, procuring, or purchasing such knives in connection with the activities of such organization;*
>
> *(3) to supply or procurement officers or employees of the municipal government of the District of Columbia or of the government of any State or Territory, or any county, city, or other political subdivision of a State or Territory, ordering, procuring, or purchasing such knives in connection with the activities of such government; and*
>
> *(4) to manufacturers of such knives or bona fide dealers therein in connection with any shipment made pursuant to an order from any person designated in paragraphs (1), (2), and (3).*

*The Postmaster General may require, as a condition of conveying any such knife in the mails, that any persons proposing to mail such knife explain in writing to the satisfaction of the Postmaster General that the mailing of such knife will not be in violation of this section.*

Whoever knowingly deposits for mailing or delivery, or knowingly causes to be delivered by mail, according to the direction thereon, or at any place at which it is directed to be delivered by the person to whom it is addressed, anything declared nonmailable by this section, unless in accordance with the rules and regulations authorized to be prescribed by the Postmaster General, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

Whoever knowingly deposits for mailing or delivery, or knowingly causes to be delivered by mail, according to the direction thereon or at any place to which it is directed to be delivered by the person to whom it is addressed, anything declared nonmailable by this section, whether or not transmitted in accordance with the rules and regulations authorized to be prescribed by the Postmaster General, with intent to kill or injure another, or injure the mails or other property, shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

Whoever is convicted of any crime prohibited by this section, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life, if the jury shall in its discretion so direct, or, in the case of a plea of guilty, or a plea of not guilty where the defendant has waived a trial by jury, if the court in its discretion, shall so order.

# APPENDIX

UNITED STATES DEPARTMENT OF JUSTICE,
OFFICE OF THE DEPUTY ATTORNEY GENERAL,
*Washington, D. C., May 20, 1957.*

Hon. OREN HARRIS,
   *Chairman, Committee on Interstate and Foreign Commerce,*
      *House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This is in response to your request for the views of the Department of Justice concerning the bill (H. R. 7258) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

On April 12, 1957, the Department of Justice reported to the committee on two similar bills, H. R. 2849 and H. R. 4013. The views expressed in that report, copies of which are enclosed, are equally applicable to the bill now under consideration.

The Bureau of the Budget has advised that there is no objection to the submission of this report.

Sincerely,

WILLIAM P. ROGERS,
*Deputy Attorney General.*

APRIL 12, 1957.

Hon. OREN HARRIS,
   *Chairman, Committee on Interstate and Foreign Commerce,*
      *House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This is in response to your request for the views of the Department of Justice relative to the bill (H. R. 2849 and H. R. 4013) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

The bills would prohibit the introduction, or manufacture for introduction, into interstate commerce, or the transportation or distribution in interstate commerce, of switchblade knives. They would also prohibit the manufacture, sale, or possession of switchblade knives within Indian country as defined in section 1151 of title 18 of the United States Code, or within the special maritime and territorial jurisdiction of the United States as defined in section 7 of title 18. Violators would be subject to a maximum fine of $2,000 and/or imprisonment for not more than 5 years. Section 4 of H. R. 2849 would exempt from its application common carriers, contract carriers, and freight forwarders with respect to any switchblade knife shipped, transported, or delivered for shipment in interstate commerce in the ordinary course of business. Section 4 of H. R. 4013 would provide a similar exemption, plus two others. It would exempt the manufacture, sale, transportation, distribution, possession, or introduction of switchblade knives into interstate commerce pursuant

6

KR0575

to contract with the Armed Forces. Also, it would exempt the possession of switchblade knives by members of the Armed Forces to whom such knives were issued by the Federal Government.

The Department of Justice is unable to recommend enactment of this legislation.

The committee may wish to consider whether the problem to which this legislation is addressed is one properly within the police powers of the various States. As you know, Federal law now prohibits the interstate transportation of certain inherently dangerous articles such as dynamite and nitroglycerin on carriers also transporting passengers. The instant measures would extend the doctrine upon which such prohibitions are based by prohibiting the transportation of a single item which is not inherently dangerous but requires the introduction of a wrongful human element to make it so.

Switchblade knives in the hands of criminals are, of course, potentially dangerous weapons. However, since they serve useful and even essential, purposes in the hands of persons such as sportsmen, shipping clerks, and others engaged in lawful pursuits, the committee may deem it preferable that they be regulated at the State rather than the Federal level.

The Bureau of the Budget has advised that there is no objection to the submission of this report.

Sincerely,

WILLIAM P. ROGERS,
*Deputy Attorney General.*

———

THE SECRETARY OF COMMERCE,
*Washington, D. C., June 25, 1957.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This letter is in reply to your request dated May 8, 1957, for the views of this Department with respect to H. R. 7258, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

H. R. 7258 would prohibit and prescribe penalties for the manufacture, sale, or possession of switchblade knives, and their mailing or their introduction into interstate commerce. Exemptions from these prohibitions would include supply or procurement officers and employees of the Federal Government, of the municipal government of the District of Columbia, of the government of any State, Territory, county, city, or other subdivision of a State or Territory; supply and procurement officers (but not the members, it appears) of the National Guard, the militia of a State, Territory, or the District of Columbia, when any of these persons are acting in connection with the activities of such governments and organizations. The Department of Commerce does not recommend enactment of H. R. 7258.

While this proposed legislation recognizes that there are legitimate uses that have need for switchblade knives, the exemptions would appear to assume that the most significant of those uses lie in Government activities. To us, this ignores the needs of those who derive and augment their livelihood from the "outdoor" pursuits of hunting,

**8**                    SWITCHBLADE KNIVES

fishing, trapping, and of the country's sportsmen, and many others. In our opinion, there are sufficient of these that their needs must be considered.

Again, we feel that the problem of enforcement posed by the many exemptions would be huge under the proposed legislation.

For these reasons, the Department of Commerce feels it cannot support enactment of H. R. 7258.

We have been advised by the Bureau of the Budget that there would be no objection to the submission of this report to your committee.

Sincerely yours,

SINCLAIR WEEKS,
*Secretary of Commerce.*

_____

EXECUTIVE OFFICE OF THE PRESIDENT,
BUREAU OF THE BUDGET,
*Washington, D. C., June 13, 1957.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, House Office Building,*
*Washington, D. C.*

MY DEAR MR. CHAIRMAN: This is in reply to your letter of May 8, 1957, requesting the views of the Bureau of the Budget on H. R. 7258, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

On April 1, 1957, in reporting to your committee on two similar bills, H. R. 2849 and H. R. 4013, the Bureau of the Budget pointed out that the Departments of Commerce and Justice had raised serious questions as to whether this problem is more properly a subject for the police powers of the States.

The Bureau of the Budget believes that these questions are equally applicable to H. R. 7258 and has no further comment to offer at this time.

Sincerely yours,

PERCY RAPPAPORT,
*Assistant Director.*

_____

DEPARTMENT OF THE ARMY,
*Washington, D. C., July 16, 1957.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: Reference is made to your request for the views of the Department of Defense with respect to H. R. 7258, 85th Congress, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes. The Secretary of Defense has delegated to the Department of the Army the responsibility for expressing the views of the Department of Defense thereon.

The purpose of the bill is generally as stated in its title.

The Department of the Army on behalf of the Department of Defense would interpose no objection to enactment of the bill, pro-

vided it is amended to exempt from the prohibitions contained therein the manufacture, sale, possession, transportation or distribution of switchblade knives by the Armed Forces or members and employees thereof acting in the performance of their duties, thereby expanding the exemption pertaining to the ordering, procuring, or purchasing of such weapons by those persons which now appears in section 4 (2) of the bill. This amendment could be accomplished by amending section 4 (2) of the bill to read as follows: "(2) to the Armed Forces or any member or employee thereof acting in the performance of his duty."

It is noted also that section 4 (5) does not extend the exemption to manufacturers of or bona fide dealers in switchblade knives in connection with shipments to persons designated in section 4 (4).

Subject to the foregoing, the Department of the Army on behalf of the Department of Defense has no objection to enactment of H. R. 7258, 85th Congress, which is similar to H. R. 4013, 85th Congress, on which this Department submitted a similar report to your committee on April 12, 1957.

The enactment of this proposal would result in no additional cost to the Department of Defense.

This report has been coordinated within the Department of Defense in accordance with procedures prescribed by the Secretary of Defense.

The Bureau of the Budget advises that there is no objection to the submission of this report.

Sincerely yours,

WILBER M. BRUCKER,
*Secretary of the Army.*

--------

POST OFFICE DEPARTMENT,
OFFICE OF THE GENERAL COUNSEL,
*Washington, D. C., April 16, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: Reference is made to your request for a report on H. R. 7258, H. R. 9820, and H. R. 10618, similar bills to prohibit the introduction, or manufacture for introduction, into interstate commerce of switch-blade knives, and for other purposes.

The attention of this Department has been directed to advertisements in newspapers and magazines with respect to knives, which, according to the advertisements may be ordered for transmission through the mails collect-on-delivery. Obviously, weapons advertised in this manner can be purchased by anyone. The so-called Army surplus stores, hardware and other stores, carry similar weapons. The question of how to prevent their reaching the wrong hands is more than a Federal problem and difficult of solution. Many States have laws prohibiting concealed carrying of knives with blades over designated lengths.

Although the mailing of firearms is controlled by statute (18 U. S. C. 1715), the mailing of hunting knives, switch-blade knives, and other similar weapons is not so controlled. Any one of the subject bills would do much to correct this situation. However, in order to eliminate controversy as to the procedure to be followed in the en-

KR0578

forcement of this proposed law, it is believed that section 5 of the bill should be supplemented by the addition of the following paragraph:

"The mailability of any such knife may be determined by the Postmaster General by inspection thereof and upon the failure or refusal of the sender to explain satisfactorily to the Postmaster General, in writing, why the postal regulations prescribed in accordance with this act were not complied with."

This Department recommends enactment of the legislation contained in section 5 of the measures, amended as suggested.

In advising this Department with respect to this report the Bureau of the Budget called attention to the fact that it had cleared the reports of the Departments of Commerce and Justice which objected to those portions of the subject bills which would prohibit the introduction of switchblade knives into interstate commerce.

The Department of Justice has raised the question as to whether the amendment suggested by this Department would be broad enough to authorize the inspection of first-class mails without a search warrant. It is the opinion of this Department that the language would not authorize such inspection, nor was such procedure intended.

Sincerely yours,

HERBERT B. WARBURTON,
*Acting General Counsel.*

———

THE SECRETARY OF COMMERCE,
*Washington, D. C., April 21, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This letter is in reply to your request dated January 9, 1958, for the views of this Department with respect to H. R. 9820, and your request of February 13, 1958, with respect to H. R. 10618, identical bills to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

These bills differ only slightly from H. R. 7528, which was introduced for the same general purposes during the 1st session of the 85th Congress. In the present bills the definition includes knives which open automatically "by operation of inertia, gravity, or both." Also, the present bills prescribe penalties for the manufacture, sale, or processing of switchblade knives, whereas the earlier bill dealt with manufacture, sale, or possession.

The general intent of these legislative proposals appears to be to improve crime prevention by control of the use of the switchblade knife as a weapon of assault. This approach gives rise to certain objections. One is that, at best, it is an indirect approach which addresses itself to only one of many implements usable by an assailant. This casts doubt upon the resulting effectiveness in the reduction of crime in relation to its enforcement problems. Another objection is that it could lead to the elimination of the legitimate supply of switchblade knives in this country. This would ignore the legitimate needs and uses for these knives on the part of those who derive and augment their livelihood from "outdoor" pursuits, such as hunting, fishing, trapping, etc., as well as those of the country's sportsmen, and many others. We feel that these objections are valid,

SWITCHBLADE KNIVES                    **11**

In thus expressing our views we do not wish to be construed as taking a light view regarding the widespread use of the switchblade knife as a dangerous and lethal weapon. In view of the apparent relation between the switchblade knife and juvenile delinquency, we would strongly support the enactment and vigorous enforcement of appropriate legislation prohibiting sale of switchblade knives to, and their possession by, juveniles, to the extent such sale and possession can be found to be subject to Federal jurisdiction.

Not being convinced that H. R. 9820 and H. R. 10618 would yield desirable results outweighing their undesirable ones, this Department recommends against enactment of these bills.

We have been advised by the Bureau of the Budget that there would be no objection to the submission of this report to your committee.

Sincerely yours,

SINCLAIR WEEKS,
*Secretary of Commerce.*

———

UNITED STATES DEPARTMENT OF JUSTICE,
OFFICE OF THE DEPUTY ATTORNEY GENERAL,
*Washington, D. C., March 14, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This is in response to your request for the views of the Department of Justice relative to the identical bills (H. R. 9820 and H. R. 10618) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

Except as to section 5 and except for two other minor differences, these bills are identical with H. R. 2849 and H. R. 4013 on which the Department reported to the committee on April 12, 1957. The views expressed in that report, copies of which are enclosed, are equally applicable to the bills under consideration.

As for section 5 of the instant bills, it is noted that section 1716 of title 18, United States Code, which it would amend, deals with the mailability of articles intrinsically dangerous. Section 1715, on the other hand, deals with the mailability of firearms, items more analogous to switchblade knives in that both require the introduction of a wrongful element to make them dangerous. Therefore, if the committee is favorably disposed to recommend the amendment of title 18 with respect to the mailability of switchblade knives, section 1715 would seem to be the more appropriate section for such amendment.

The Bureau of the Budget has advised that there is no objection to the submission of this report.

Sincerely yours,

LAWRENCE E. WALSH,
*Deputy Attorney General.*

KR0580

12                     SWITCHBLADE KNIVES

EXECUTIVE OFFICE OF THE PRESIDENT,
BUREAU OF THE BUDGET,
*Washington, D. C., April 15, 1958.*

Hon. OREN HARRIS,
   *Chairman, Committee on Interstate and Foreign Commerce, House
      of Representatives, House Office Building, Washington, D. C.*

MY DEAR MR. CHAIRMAN: This will acknowledge your letters of
January 9, 1958, and February 13, 1958, requesting the views of this
Office with respect to H. R. 9820 and H. R. 10618, bills to prohibit
the introduction, or manufacture for introduction, into interstate
commerce of switchblade knives, and for other purposes.

The Bureau has previously reported to your committee in connec-
tion with H. R. 2849 and H. R. 4013 on April 1, 1957, and H. R. 7258
on June 13, 1957.   On those occasions, we pointed out that the
Departments of Commerce and Justice had raised serious questions as
to whether the problem is not more properly a subject for the police
powers of the various States.   These questions appear to be equally
applicable to those sections of the subject bills controlling the intro-
duction of switchblade knives in interstate commerce.

With respect to section 5 of the bills which would make such knives
nonmailable, the Postmaster General, in the reports which he is making
to your committee, recommends enactment subject to certain pro-
cedural amendments set forth in his report.

While we have doubts as to the effectiveness of such limitation in
controlling the wrongful use of switchblade knives, this Bureau would
have no objection to the enactment of those provisions of the bills
dealing with mailability of switchblade knives if amended as suggested
by the Postmaster General.

Sincerely yours,

PHILLIP S. HUGHES,
*Acting Assistant Director for Legislative Reference.*

——————

DEPARTMENT OF THE ARMY,
*Washington, D. C., April 18, 1958.*

Hon. OREN HARRIS,
   *Chairman, Committee on Interstate and Foreign Commerce,
      House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: Reference is made to your request for the
views of the Department of Defense with respect to H. R. 9820,
85th Congress, a bill to prohibit the introduction, or manufacture for
introduction, into interstate commerce of switchblade knives, and
for other purposes.   The Secretary of Defense has delegated to the
Department of the Army the responsibility for expressing the views
of the Department of Defense thereon.

The purpose of the bill is generally as stated in its title.

The Department of the Army, on behalf of the Department of
Defense, would interpose no objection to the above-mentioned bill
provided it is amended to excempt Armed Forces operations from the

prohibitions contained therein. This could be accomplished by amending section 4 (b) of the bill to read as follows:

"(b) The manufacture, sale, transportation, distribution, possession or introduction into interstate commerce of switchblade knives—

"(1) by the Armed Forces or any member or employee thereof acting in the performance of his duty; or

"(2) pursuant to contract with the Armed Forces."

It is also noted that there appears to be a technical error on page 2 of the bill. In line 12 of that page, the word "processes" should be "possesses." (See, in this connection, sec. 3 of H. R. 4013 and H. R. 7258, 85th Cong., in which the word "possesses" is used.)

Subject to the foregoing comments, the Department of the Army on behalf of the Department of Defense has no objection to enactment of H. R. 9820, which is similar to H. R. 4013 and H. R. 7258, 85th Congress, and on which this Department submitted similar reports to your committee on April 12, 1957, and July 16, 1957, respectively.

The enactment of this proposal would result in no additional cost to the Department of Defense.

This report has been coordinated within the Department of Defense in accordance with procedures prescribed by the Secretary of Defense.

The Bureau of the Budget advises that there is no objection to the submission of this report.

Sincerely yours,

WILBER M. BRUCKER,
*Secretary of the Army.*

DEPARTMENT OF THE ARMY,
*Washington, D. C., April 18, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: Reference is made to your request for the views of the Department of Defense with respect to H. R. 10618, 85th Congress, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes. The Secretary of Defense has delegated to the Department of the Army the responsibility for expressing the views of the Department of Defense thereon.

The purpose of the bill is generally as stated in its title.

The Department of the Army, on behalf of the Department of Defense, would interpose no objection to the above mentioned bill provided it is amended to exempt Armed Forces operations from the prohibitions contained therein. This could be accomplished by amending section 4 (b) of the bill to read as follows:

"(b) The manufacture, sale, transportation, distribution, possession or introduction into interstate commerce of switchblade knives—

"(1) by the Armed Forces or any member or employee thereof acting in the performance of his duty; or

"(2) pursuant to contract with the Armed Forces."

**14**                    SWITCHBLADE KNIVES

It is also noted that there appears to be a technical error on page 2 of the bill.   In line 12 of that page, the word "processes" should be "possesses."   (See, in this connection, sec. 3 of H. R. 4013 and H. R. 7258, 85th Cong., in which the word "possesses" is used.)

Subject to the foregoing comments, the Department of the Army on behalf of the Department of Defense has no objection to enactment of H. R. 10618, which is similar to H. R. 4013 and H. R. 7258, 85th Congress, and on which this Department submitted similar reports to your committee on April 12, 1957, and July 16, 1957, respectively.

The enactment of this proposal would result in no additional cost to the Department of Defense.

This report has been coordinated within the Department of Defense in accordance with procedures prescribed by the Secretary of Defense.

The Bureau of the Budget advises that there is no objection to the submission of this report.

Sincerely yours,

WILBER M. BRUCKER,
*Secretary of the Army.*

———

INTERSTATE COMMERCE COMMISSION,
*July 23, 1958.*

Hon. WARREN G. MAGNUSON,
*Chairman, Committee on Interstate and Foreign Commerce,*
*United States Senate, Washington, D. C.*

DEAR CHAIRMAN MAGNUSON: Your letter of July 21, 1958, addressed to the Chairman of the Commission and requesting comments on an act, H. R. 12850, passed by the House of Representatives on June 26, 1958, to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes, has been referred to our Committee on Legislation.   After consideration by that Committee, I am authorized to submit the following comments in its behalf:

The broad objective of this proposed legislation, which would prohibit the interstate shipment and the use of the mails for the conveyance of switchblade knives, and the manufacture, use, or sale of switchblade knives within Indian country or the special maritime and territorial jurisdiction of the United States, is not related to the jurisdiction or functions of the Interstate Commerce Commission, and for that reason we are not in a position to express an opinion with respect to its merits.

It is noted, however, that the measure properly provides that sections 2 and 3 thereof shall not apply to "any common carrier or contract carrier, with respect to any switchblade knife shipped, transported, or delivered for shipment in interstate commerce in the ordinary course of business;".

Respectfully submitted.

HOWARD FREAS,
*Chairman.*

HOWARD FREAS,
ANTHONY ARPAIA,
ROBERT W. MINOR,
*Committee on Legislation.*

KR0583

SWITCHBLADE KNIVES                    15

CIVIL AERONAUTICS BOARD,
*Washington, D. C.*

Hon. WARREN G. MAGNUSON,
*Chairman, Committee on Interstate and Foreign Commerce,*
*United States Senate, Washington, D. C.*

DEAR SENATOR MAGNUSON: This is in reply to your letter of July 21, 1958, asking the Board for a report on H. R. 12850, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.  In your letter you point out that there is pending before the committee a similar bill, S. 2558, on which the Board has submitted its report. You request that the Board submit its report on H. R. 12850 at the earliest possible date.

As was stated in the Board's report on S. 2558, the proposed legislation does not come within the jurisdiction of the Board.  Accordingly, the Board expresses no opinion on this matter and has no recommendation to make in regard to either S. 2558 or H. R. 12850.

Sincerely yours,

JAMES R. DURFEE, *Chairman.*

O

**PLAINTIFFS' EXHIBIT U**

KR0585

# Criminal Use of Switchblades: Will the Recent Trend Towards Legalization Lead to Bloodshed?

PAUL A. CLARK[†]

## I. INTRODUCTION

In the 1950s, there was a widespread perception that switchblade knives were the tool of thugs and juvenile delinquents. In the late 1950s and early 1960s, switchblades were banned, or severely restricted, in almost every state.[1] New York, for example, banned switchblades in 1954, but allowed exceptions for those who could show they were being used for professional or sporting purposes.[2] Today, possession of a switchblade is a crime in just twenty states.[3] In a few other states, there are such severe restrictions on switchblades so as to be effectively banned. For example, Arkansas and Oklahoma have banned carrying any switchblade on or about the person, whether concealed or not.[4] In most other states, switchblades are illegal to buy, sell, or transfer and are considered deadly weapons. They are illegal to carry concealed, and illegal for felons to possess.[5] In

---

[†] J.D. University of Chicago, 2005; Ph.D. The Catholic University of America, 1995. The author has clerked for the Hon. Robert Eastaugh, Alaska Supreme Court, and the Hon. Consuelo Callahan, Ninth Circuit Court of Appeals. He currently practices law in New Jersey.

[1] The only states that never placed significant restrictions on switchblades are Alabama, Georgia, Kentucky, Idaho, Iowa, North Carolina, South Carolina, South Dakota, Utah and West Virginia, although, even in these states, they were usually illegal to carry concealed. States that banned switchblades in the 1950s include: California, 1957 (People v. Bass, 225 Cal. App. 2d 777, 780 (1963) (although blades less than two inches are legal in California); New York, 1954 (*see infra*, Note 2); Pennsylvania, 1956 (Sale of Switch Blades, 15 Pa. D. & C. 2d 405 (1958)); Texas, 1957 (Curson v. State, 313 S.W.2d 538, 540 (Tex. App. 1958)); Virginia, 1955 (Charles Woltz, Criminal Law, VA. L. R. 42:7 (1956)); Wisconsin, 1959 (Wis. Stat. 941.24); Michigan, 1961 (People v. Crow, 13 Mich. App. 594 (1968)); and Illinois, 1967 (People v. Sullivan, 46 Ill.2d 399 (1970)).

[2] Act of Mar. 26, 1954, ch. 268, 1954 N.Y. Laws; New York Penal Law 265.20(6) (West 2013). This was apparently a concession to sportsmen who opposed the ban. *See infra* Sec. III.

[3] In addition to the states listed in note 1, switchblades are currently banned in Colorado (COL. REV. STAT. § 18-12-102), Connecticut (illegal over 1.5 inches (CONN. GEN. STAT. § 53-206)), Hawaii (HAW. REV. STAT. § 134-51), Kansas (KAN. STAT. ANN. § 21-4201), Louisiana (LA. REV. STAT. § 14:95), Maine (ME. REV. STAT. § 43-1055), Massachusetts (illegal over 1.5 inches (MASS. GEN. LAW Ch. 269 § 10)), Minnesota (MINN. STAT. § 609.02 (6)), Montana (MONT. CODE ANN. § 45-8-331), Nevada (NEV. STAT. § 202.355), New Jersey (N.J. REV. STAT. § 2C:39-3e), New Mexico (N.M. STAT. ANN. 30-1-12), and Washington (WASH. REV. CODE § 9.41.250). There are narrow exceptions in some of these states. For example, in New York, it is an affirmative defense that a knife was possessed while physically engaged in hunting or fishing. New York Penal Law 265.20(6) (West 2013).

[4] ARK. CODE ANN. § 5-73-120 (2005); OKLA. STAT. ANN. §21-1272 (West 2002) ("It shall be unlawful for any person to carry upon or about his or her person . . . any . . . switchblade knife . . . whether such weapon be concealed or unconcealed.").

[5] *See, e.g.*, OHIO REV. CODE ANN. §§ 2923.13, 2923.20(1), (3) (LexisNexis 2010); *see also, e.g.*, MD. CODE ANN., § 27-339 (LexisNexis 2010); *see also, e.g.*, MD. CODE ANN., CRIM. LAW § 4-101,

KR0586

1958, Congress enacted the federal Anti-Switchblade Act, which banned interstate sale of switchblades, and outlawed them in federal territories or on federal waters.  Because few states had domestic switchblade factories at that time, the federal act made it illegal to purchase switchblades in most states.

In recent years, however, several states and the federal government have liberalized these restrictions.  Oregon legalized switchblades in 1984, Florida in 2003, New Hampshire in 2010, and Missouri in 2012.  In 2010, Arizona legalized the carrying of deadly weapons, including switchblades, which had been legal to own but not to carry.[6]  In 2010, Georgia repealed its law against carrying concealed knives, and now any knife with a blade of five inches or less (including a switchblade) may be legally carried.[7]  In 2013, five states—Alaska, Indiana, Kansas, Tennessee, and Texas—repealed laws banning switchblades.[8]  Moreover, in 2009, the United States Congress amended the federal Anti-Switchblade Act to clarify that pocketknives which could be opened with one hand are not switchblades.[9]

Critics of switchblade bans have three basic criticisms.  First, they argue that such laws, even assuming they made sense once, are outdated and no longer serve any useful purpose.  As one wag said, "I think that the people of New Hampshire can safely lower their guard now that the youngest members of the Sharks and the Jets are in their 80s."[10]  As one story on the Indiana repeal explained:

> "It was an obsolete law," said state Sen. Jim Tomes, a Republican from Posey County who supported the change. His argument: There is very little difference between the illegal spring-loaded switchblade of the past and the one-handed, spring-assisted handheld knives that are legally on

105 (LexisNexis 2012); DEL. CODE ANN., §11- 222 (2007).  Delaware, like many states, also makes it a felony to carry a concealed switchblade.  DEL. CODE ANN. § 11-1457(b)(1) (2007).

[6] Marc Lacey, *Pushing a Right to Bear Arms, The Sharp Kind*, N.Y. TIMES, Dec. 5, 2010, at 1 *available at* http://perma.cc/CP5D-Q72W.

[7] GA. CODE ANN. § 16-11-125.1 (West 2012). *See also* Ed Stone, *GA Bills: SB 308 The Common Sense Lawful Carry Act*, EXAMINER.COM, http://perma.cc/3UKG-JCPP (last visited Feb. 4, 2014).

[8] Maureen Hayden, *Indiana to Lift Decades-Old Ban on Switchblades*, NEWS AND TRIBUNE, Jun. 5, 2013.  There appears to have been little opposition to these repeals even from law enforcement.  One article quotes an Indiana sheriff as saying "Switchblades get sensationalized in movies a lot, but they are no more dangerous than any other knife."  Elkhart, *Switchblades now Popping up as Ban in State Nears End*, ASSOCIATED PRESS, Jun. 16, 2013, 3:00AM, *available at* http://perma.cc/M9X3-Y496.  *See also* Dion Lefler, *Bill Legalizing Switchblades Passes Senate*, THE WICHITA EAGLE, Apr. 3, 2013, http://perma.cc/UP8Q-84FA (noting the bill passed the Senate unanimously but was opposed by at least one house member).

[9] *See infra*, note 34.

[10] Evan F. Nappen, *Miracle in New Hampshire*, KNIVES 2013, 174, 174–75 *available at* http://perma.cc/Z6G-SSYD (last visited Feb. 10, 2014).

KR0587

the market and widely sold today.[11]

Second, opponents argue that many knife laws are so vague as to what is legal or illegal that innocent people commit crimes without knowing. For example, the Alaska statute passed in 2013 legalized switchblades and gravity knives for anyone sixteen or over.[12]  Sponsors explained that the legislation was for "clarifying that hunting, fishing and utility knives which are easily opened with one hand do not qualify as a switchblade . . . [and] protect Alaskans who carry one of these knives from running afoul of local laws."[13]  Third, opponents of the bans also argue that such laws are selectively enforced.[14]

Supporters of knife bans counter that knives are dangerous weapons and getting them off the street can only make society safer.  As one critic states: "[T]hese knives are, I would say inherently dangerous, they have only one purpose.  They are just deadly."[15]  They also argue that possession of a switchblade indicates a propensity towards violence and lawlessness.[16]  Another argument is that allowing citizens to carry concealed switchblades may result in criminals carrying more deadly weapons—setting off a kind of arms race between citizens and criminals.

The movement towards liberalizing knife laws appears to have been jumpstarted by the expansion of gun rights.  In Georgia, for example, the concealed weapons law was "criticized for permitting the arrest of any Georgian carrying a concealed knife, even if that person has a Georgia firearms license and is carrying a firearm."[17]  Knife advocates may have been encouraged by recent court cases which have held that the Second Amendment to the United States Constitution guarantees the right of private citizens to bear arms.  Whether the Second Amendment protects knife ownership is an interesting question, but not one this Article will address.[18]  What this Article hopes to accomplish is to analyze the historical record (with particular focus on Oregon and Florida, where

---

[11] Hayden, *supra* note 8.

[12] *See* AK HB33 *available at* http://perma.cc/HQ6T-QMWE.

[13] Will Gandergriff, *House Passes Knife Rights Act*, THE ALASKA HOUSE MAJORITY, http://perma.cc/F48W-T6G7 (last visited Mar. 5, 2014).  *See generally* Statement of Rep. Mark Neuman (R) House Judiciary Committee Hearing, Feb. 27, 2013, 2:06:30–49PM *available at* http://perma.cc/UB5B-8K5V.

[14] Dan Tuohy, *Switchblade Knives Now Legal in New Hampshire*, N.H. UNION LEADER, May 20, 2010, at A1, A10, *available at* http://perma.cc/4ED2-N4KV.

[15] Hearing before the Committee on Interstate and Foreign Commerce on H.R. 12850 and S. 2558, 85th Cong. 2d session (1958), at 24.

[16] *Id.* at 22; *see also infra* Sec. IV.

[17] Stone, *supra* note 7.

[18] *See generally* David B. Kopel et al., *Knives and the Second Amendment*, 47 U. MICH. J.L. REFORM 167, 167–215 (2013).  This appears to be one of the very few scholarly articles addressing knife laws.  The article also argues that knife laws are often vague and lead to prosecution of innocent people.

KR0588

switchblades were legalized some time ago) to examine the potential dangers associated with ownership and prohibition of switchblades.[19]

There does not appear to have ever been any academic study of how frequently switchblades or pocketknives are used in crime. One article in the *British Medical Journal* estimated that at least half of all assaults with edged weapons in Britain involved ordinary kitchen knives.[20] While there have occasionally been articles in the popular press about switchblades, these are frequently misleading. For example, one oft-cited article in the *Wall Street Journal* in 2000 reported:

> While the U.S. crime rate is falling, the use of knives in murders is rising slightly as a percentage of overall killings. Federal Bureau of Investigation figures show that knives were used in 13.3% of the nation's 14,088 murders in 1998, the most recent year for which weapons statistics are complete, compared with 12.7% of 22,084 killings in 1994.[21]

This article was, at best, misleading. In fact, the use of knives in murders generally fell throughout the 1990s. From 1991 through 1997 the average rate of knife use in murder was 13.64%, and picking out one year when the rate was at its lowest gives a false impression that knife use in murder was on the rise.[22] Moreover, the article clearly implies that the availability of switchblades and similar knives may be responsible for this alleged rise in knife crime—but fails to provide any evidence of this.

Given the trend towards liberalizing switchblade laws in the United States, it is time for a more systematic examination of how legalization and criminalization may affect violent crime. The Uniform Crime Reports published each year by the FBI contain a fair amount of data on the use of edged weapons in crime, including a state-by-state breakdown. Hopefully, an examination of this data will help to determine whether switchblade

---

[19] Although the Internet seems full of discussion of switchblades and a number of popular publications discuss them, there has been almost no scholarly research on use of switchblades in crime, or even on the use of knives in crime generally. As the March 2006 FBI Law Enforcement Bulletin dealing with the issue in 2006 noted, "[a]lmost all the research on edged weapon assaults has come from Great Britain." *Id.* at 14.

[20] "Unfortunately, no data seem to have been collected to indicate how often kitchen knives are used in stabbings, but our own experience and that of police officers and pathologists we have spoken to indicates that they are used in at least half of all cases." Emma Hern, *Reducing Knife Crime*, 330 BRITISH MED. J. 1221, 1221 (2005). Such is the lack of hard statistics about the use of different types of knives in crime.

[21] *See* Robert Johnson, *Sales of Switchblades in U.S. Get a Boost From Internet*, W. ST. J., Mar. 7, 2000, *available at* http://perma.cc/J9T3-TVSL.

[22] *See infra* Table 1 showing the rate of knife-use in murder.

KR0589

legislation has had any effect on the use of knives in violent crime. Of course, given the large number of states to legalize switchblades in the last three years, in another few years we should have a fairly large amount of data to examine; in the meantime, we have data from a few states.

## II. What is a "Switchblade"?

The problem of defining terms has plagued philosophers and legislators for millennia. There is a famous story that Plato once defined "human" as a "featherless biped," so Diogenes the Cynic plucked a chicken and carried it around mocking Plato by showing people "Plato's man."[23]

One may think that the difference between a legal pocketknife and an illegal switchblade is as obvious as the difference between a human and a chicken, but police, prosecutors, and courts have frequently had trouble differentiating. Traditionally, a "switchblade" is a knife that has a spring loaded blade that snaps open when a button is pressed; however, 15 U.S.C. § 1241(b) provides:

> The term "switchblade knife" means any knife having a blade which opens automatically—
> (1) by hand pressure applied to a button or other device in the handle of the knife, or
> (2) by operation of inertia, gravity, or both.[24]

Under the federal definition of switchblade, there is no mention of a spring. In fact, a blade which opens with a spring is not a "switchblade" as long as there is no button in the handle. In fact, there are a wide range of spring-assisted opening knives which open by pressing on the blade, not the handle.[25]

The word "automatically" suggests that the knife must have some sort of internal mechanism, but "automatically" is not defined in the statute, and subsection 2 includes knives that open automatically "by operation of inertia," which seems to be a contradiction.[26] For example, an opinion of the Pennsylvania Attorney General on the 1956 Pennsylvania statute banning knives that opened "automatically" opined that a knife whose

---

[23] Joseph Cropsey, Plato's World: Man's Place in the Cosmos 116 (1995).

[24] *See also* 19 C.F.R. § 12.95 (containing a slightly expanded definition including listing specific types of knives and as switchblades).

[25] Many web sites advertise these types of knives. *See, e.g., Black Carbon Fiber Handle & Black Blade Assisted Opening Pocket Knife Milano Godfather Style*, http://perma.cc/TZ9G-VST2. This knife is virtually indistinguishable from a traditional switchblade, except it is legal under federal law (unless it can be opened by inertia).

[26] 19 C.F.R. § 12.95.

KR0590

"blade, either by gravity or by motion given to it by the flip of the wrist, 'automatically' extends to an open position" is a switchblade.[27]  In any event, the definition includes knives which can be opened "by inertia," that is, by a flick of the wrist.  Most, if not all, pocketknives can be opened by inertia.  An estimated 80% of pocketknives sold in the United States are designed to be opened one handed, usually by using the thumb to open the blade while the fingers of the same hand hold the handle.[28]  Virtually all of these knives could be considered a switchblade.

Knives which open by inertia or gravity are also referred to as gravity knives.  Many states classify switchblades and gravity knives as different types of knives.  In New York, for example, the definition of gravity knife is almost the same as 15 U.S.C. § 1241(b)(2), while a switchblade is the same as section (b)(1).[29]  For purposes of this paper, the term "switchblade" will be used in the federal definition to apply to both gravity knives and classic spring-loaded blades as switchblades.  Different states may define switchblades differently, and some states do not provide any definition at all.[30]

To illustrate this ambiguity, consider the story of John Irizzary:

> On March 9, 2007, at approximately 11:55 a.m., New York City Police Department (NYPD) officer Brendan R. McCabe, a 16-year veteran of the force, was on foot patrol in uniform at the Broadway Junction subway station in Brooklyn, New York.  He observed defendant walk past him in the station with an instrument jutting out of his right front pocket.  Officer McCabe testified that he recognized the instrument to be a cutting tool in the form of a gravity knife.  He stopped defendant and said, "You know you're not allowed to carry that knife."  The defendant immediately informed the officer that he was employed at a U-Haul facility and that he used the

---

[27] Sale of Switch-blades, 15 Pa. D. & C. 2d 405 (1958).

[28] Chris Strohm, *Knife Fight*, CONGRESSDAILY, Jul. 17, 2009, *available at* http://perma.cc/A2AM-WUFV.  A Wall Street Journal article noted that "the trend in the industry is to make exposing the blade quickly easier in manual folding knives." Johnson, *infra* note 118.

[29] The federal statute was actually modeled on the New York statute although there are some minor differences.  New York, Penal Law § 265.00 (5) states: "Gravity knife means any knife which has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force which, when released, is locked in place by means of a button, spring, lever or other device." (Internal quotes omitted.)

[30] *See, e.g.*, State v. Weaver, 736 P.2d 781, 782 (Alaska 1987) (noting that "[n]either 'switchblade' nor 'gravity knife' is defined in the criminal law statutes" but judicially defining a gravity knife as "operating automatically or semi-automatically.").  Some states also use Webster's Dictionary to define "switchblade."  *See* McMillan v. Commonwealth, 686 S.E.2d 525, 528 (Va. App. 2009); Brock v. State, 424 S.W.2d 436 (Tex. App. 1968).

KR0591

> instrument for cutting sheet rock as directed by his employer . . . He had not altered the instrument in any way.  The instrument was a Husky Sure-Grip Folding Knife ("Husky"), described on its packaging as a "Folding Lock-Back Utility Knife."   The instrument is colored silver, about three and one half inches long when in its closed position, and about 6 inches in its open position, with a one inch cutting edge.[31]

It might seem obvious that a utility knife with a one-inch cutting blade designed for cutting sheet rock is not a switchblade, but that is far from obvious.  In fact, as the Court went on to explain:

> Defendant's Husky is capable of being opened by an adept person with the use of sufficient centrifugal force.  Officer McCabe demonstrated this after three strenuous attempts to open the Husky using one hand and centrifugal force.[32]

In other words, the knife could be snapped open with a flick of the wrist.

So Officer McCabe, the 16-year veteran of the force who arrested Mr. Irizzary, looks to have been on firm ground in his belief that the Husky, which could be opened by inertia, was an illegal weapon.[33]  Irizarry's Husky clearly met the definition of an illegal knife under either New York or federal law as it was in 2007.

In 2009, however, the Department of Homeland Security proposed banning the importation of any folding knife that could be opened with one hand because they were being classified as illegal switchblades.[34]  This proposal caused a public outcry, and prompted Congress to add an exception providing that penalties for possession of a switchblade under federal law will not apply to "a knife that contains a spring, detent, or other mechanism designed to create a bias toward closure of the blade and that requires exertion applied to the blade by hand, wrist, or arm to overcome the bias toward closure to assist in opening the knife."[35]  Because one would not want a pocket knife flopping open in one's pocket, most pocket

---

[31] U.S. v. Irizarry, 509 F. Supp. 2d 198, 199–200 (2007) (internal references omitted).  After Irizarry was arrested he was found to have a gun, but luckily for him he was prosecuted in federal court which held that the stop was unconstitutional.

[32] *Id.* at 204.

[33] *Id.* at 200.

[34] Shawn Zeller, *A Cutting Edge Debate Over Switchblades*, CQ ROLL CALL., Jun. 29, 2009, at 1503, *available at* http://perma.cc/T56X-QZQ6; *see also* David Alan Coia, *Is Your Utility Pocket Knife A Homeland Security Threat?*, HUMAN EVENTS, Jul. 14, 2009, 3:01 AM, *available at* http://perma.cc/6MRF-7L9E.

[35] 15 U.S.C. § 1243 (1958).

KR0592

knives have some sort of mechanism designed to keep the knife closed. This 2009 amendment was designed to ensure that ordinary pocket knives were not illegal.  While the intent of Congress seems clear, the statute is poorly drafted. When read literally, it does not apply to any knife that does not "require[] exertion applied to the blade by hand . . . to assist in opening the knife."[36]  Thus, read literally, any knife that can be snapped open by inertia is still illegal.[37]

In fact, in many jurisdictions, people have been prosecuted for possession of what the owners reasonably regarded as ordinary pocketknives.  In a recent California case, Gilbert R. was convicted in juvenile court of possession of a switchblade.[38]  A police officer stopped and frisked Gilbert, finding a pocketknife on him.[39]  The officer "discovered she could open it with a flick of her wrist."[40]  Gilbert was arrested and ultimately convicted of illegal possession.[41]

The California Court of Appeal in 2012 overturned the conviction based on an exception in the statute virtually identical to the federal exception.[42]  The Court explained:

> The legislative history for Senate Bill No. 274 reflects its purpose was to "narrow[]" existing statutory "language to only allow knives to fall under the exemption from the switchblade law if that one-handed opening knife contains a detent or other mechanism.  Such mechanisms ensure there is a measure of resistance (no matter how slight) that prevents the knife from being easily opened with a flick of the wrist. Moreover, a detent or similar mechanism is prudent and a matter of public safety as it will ensure that a blade will not inadvertently come open.  Although some one-handed opening knives can be opened with a strong flick of the wrist, so long as they contain a detent or similar mechanism that provides some resistance to

---

[36] *Id.*

[37] The California Court of Appeal interpreting a virtually identical state provision reasoned: "[F]or the amendment exemption to apply, the knife must be one that 'opens with one hand utilizing thumb pressure applied solely to the blade of the knife or a thumb stud attached to the blade' *and* has the detent or resistance mechanism.  The knife in question was not of that type: It opened by merely a flick of the wrist, not with pressure on the blade or thumb stud."  *In re* Angel R., 163 Cal. App. 4th 905, 912 (2008).  This holding was recently called into question by *In re* Gilbert R., 211 Cal. App. 4th 514 (2012), which appears to have held that so long as the detent mechanism is functioning in the least degree the exception applies.

[38] In re *Gilbert R.*, 211 Cal. App. 4th at 516

[39] *Id.*

[40] *Id.*

[41] *Id.* at 517.

[42] *Id.* at 520.

KR0593

opening the knife, then the exemption is triggered.  These knives serve an important utility to many knife users, as well as firefighters, EMT personnel, hunters, fishermen, and others."[43]

The Court of Appeal's decision provided a further explanation of the purpose of this exception:

> Sam Martin of Plaza Cutlery at South Coast Plaza testified as a knife and cutlery expert called by the defense.  He explained that while military or law enforcement personnel and others trained in the use of knives might be able to open the knife with relative ease by a flick of the wrist, lay users generally would not be able to do so, at least at first.  But with practice, "[t]hose who have it in their hand a good number of hours a day would learn a dexterity that could indeed flip the blade like this open."  Martin demonstrated that the knife did not easily open because it had a "positive detent, . . . a mechanism which holds the blade in the closed position and you have to provide enough resistance to overcome that for the blade to swing open." Martin held the knife upside down and shook it, but the blade did not descend despite the shaking. Martin explained the detent operated as "a positive retention device" to keep the blade closed. The detent feature was held in place by a "set screw," which had become "a little bit wobbly," reducing the detent pressure by approximately 15 percent according to Martin, but he explained it remained "well within" the manufacturer's parameters, "functioning in all [sic] fashion."[44]

This case reveals one of the potential problems with switchblade statutes: the statutes are frequently so convoluted that an ordinary person (not to mention the police officer, prosecuting attorney, and trial judge) could not tell the difference between a legal knife and an illegal knife.  In fact, the California Court of Appeal decisions themselves are inconsistent, as prior to *Gilbert R.*, the Court has repeatedly interpreted the statute to prohibit any knife that could be opened with a flick of the wrist.[45]

---

[43] *Id. citing* ASSEMBLY COMM. ON PUBLIC SAFETY, ANALYSIS OF SENATE BILL 274, 2001 – 2002 Reg. Sess. 1–2 (Cal. 2001).

[44] *In re* Gilbert R., 211 Cal. App. 4th 514, 516−17 (2012).

[45] People v. Recinos, No. B206800, 2009 WL 2939688 (Cal. App. Sept. 15, 2009); In re *Angel R.*, 163 Cal. App. 4th at 907.

Most pocket knives are designed to be opened manually (usually by using the thumb of the hand holding the knife). As the knife expert in the Gilbert case explained, a spring can weaken over time, through use or corrosion, and knives that could not be flicked open when new may be able to be flicked open once they are broken in. In other words, virtually every pocketknife in existence is potentially a switchblade.[46] Thus the California Court of Appeal held that when a pocket knife is "accidentally damaged so that the resistance mechanism did not function," the knife becomes illegal.[47] Thus, a knife that was legal when purchased may at some point become an illegal switchblade.

Furthermore, some jurisdictions do not have the exception found in both federal and California law. In Ohio, for example, "gravity knives" are not defined by statute, but the Ohio Court of Appeals has held that any knife that can be opened with a flick of the wrist is a gravity knife.[48] In New York, any pocket knife that can be opened by a flick of the wrist and locks open is an illegal "gravity knife."[49] The State need only prove that the defendant knew she had a knife, and she need not be aware that it has the characteristics that make it an illegal gravity knife.[50] In New York City alone, there appear to be thousands of arrests each year for possession of a gravity knife.[51]

While New York courts have repeatedly upheld convictions for "gravity knives" that can be opened with centrifugal force, the federal

---

[46] In fact, nothing in the federal definition of switchblade states that the knife must be held by the handle. Even knives that cannot be flipped open by holding the handle can always be flipped open by holding the knife blade and using the inertia of the handle when the handle is heavier than the blade.

[47] In re *Angel R.*, 163 Cal. App. 4th at 908.

[48] State v. Cattledge, No. 10AP-105, 2010 WL 3972574, at *4, *6 (Ohio Ct. App. Oct. 12, 2010). The court also outlined several characteristics that aid in finding whether a folding knife is a deadly weapon:

> the following characteristics may, but not always, support a finding that a folding knife is a deadly weapon within the definition of R.C. 2923.11(A): (1) a blade that can easily be opened with one hand, such as a knife with a switch, a spring-loaded blade, or a gravity blade capable of instant one-handed operation; (2) a blade that locks into position and cannot close without triggering the lock; (3) a blade that is serrated; (4) a blade tip that is sharp; (5) an additional design element on the blade, such as a hole, that aids in unfolding the knife with one hand; (6) does not resemble an "ordinary" pocket knife.

*Id.; see also In re* Gochneaur, No. 2007–A–0089, 2008 WL 3126172, at *3 (Ohio Ct. App. Jul. 25, 2008) (holding that "knives opening easily with one hand may be considered (for obvious reasons), as being designed or adapted for use as weapons").

[49] *See* N.Y. PENAL LAW § 265.00 (McKinney 2013).

[50] *See, e.g.*, People v. Herbin, 86 A.D.3d 446, 447 (N.Y. 2011).

[51] In one case the arresting officer testified "he had been an officer for 4 1/2 years and had made approximately ten arrests of his own for possession of a gravity knife and participated in two dozen other arrests for the same crime." People v. Brannon, 16 N.Y.3d 596, 600 (2011). From the number of reported cases it appears that New York has more prosecutions for possession of switchblades and gravity knives than all other states combined.

KR0595

district court in New York examined the legislative history of the state and declared that "[t]he legislature's plan in making items such as gravity knives 'per se' weapons under New York law was to ban only those items that are manufactured as weapons, not to criminalize the carrying of utility cutting instruments which are widely and lawfully sold."[52]   Thus the federal court held that possession of knives that can be opened with a flick of the wrist "was not a crime" in New York.[53]   Senior Judge Weinstein pointed out that holding it a crime to possess an "instrument supplied by his employer for cutting and installing sheet rock" would effectively "transform thousands of honest mechanics into criminals, subject to arrest at the whim of any police officer."[54]   Judge Weinstein was not exaggerating; he noted that "[i]n fiscal year 2006 Home Depot alone sold over 67,000 Huskies in the State of New York."[55]

Recorded cases across the country are full of examples of courts trying to figure out what is or is not an "ordinary" pocket knife and what is a switchblade.  In California, for example, it is illegal to carry any concealed knife except for "the types of hunting and folding knives designed primarily for use in various outdoor recreational activities."[56]  In a case from Alaska, the Court of Appeals stated that "the statutory definition of 'deadly weapon' is ambiguous" and therefore "[t]o resolve this ambiguity in the meaning of deadly weapon, we look to the legislative history of the statutes at issue."[57]   Apparently, in Alaska, to know what is or is not a legal weapon to carry, the average citizen was expected to research legislative history.  The New Jersey Supreme Court has gone so far as to hold: "In using general language, the legislature intended to allow juries and judges to define, through the use of their own community standards and through an evaluation of the relevant facts and circumstances, what constitutes manifestly inappropriate possession of an object in each individual case."[58]   Both these cases would appear to run afoul of the Supreme Court's holding in *Bouie v. City of Columbia* that "a criminal statute must give fair warning of the conduct that it makes a crime."[59]

---

[52] U.S. v. Irizarry, 509 F. Supp. 2d 198, 209 (2007).

[53] *Id.*

[54] *Id.* at 199.

[55] *Id.* at 209.

[56] *In re* George W., 80 Cal. Rptr. 2d 868, 870 (Cal. Ct. App. 1998).  *See also* ALASKA STAT. § 11.61.220 (West 2013); FLA. STAT. ANN. § 790.01(13) (West 2013); KAN. STAT. ANN. § 500-080 (West 2013); N.C. GEN. STAT. § 14-269(a) (West 2013).

[57] Liddicoat v. State, 268 P.3d 355, 360 (Alaska Ct. App. 2011) (holding that based on legislative history a steak knife could be regarded as a deadly weapon).

[58] State v. Kelly, 118 N.J. 370, 372 (1990) (upholding conviction for possession of carpet cutter when woman armed herself in response to threat from a man who "on many occasions he had beaten her severely.").

[59] Bouie v. City of Columbia, 378 U.S. 347, 350 (1964).  The danger is that the difference between a legal object and an illegal object may be so subtle that one cannot tell what is legal or illegal.

In *D.J. v. State*,[60] the trial court held that the pocket knife carried by the defendant was not an ordinary pocket knife "because it was larger and heavier than a common pocketknife, snaps out in a smooth action and locks into place, and the blade has serrations, is very sharp, and very pointy."[61] The Court of Appeals overturned, noting that "[i]n this case, the three-inch knife carried by D.J. lacks any of the weapon-like characteristics we noted in *T.S.W.*, and includes features we have previously held to not distinguish a knife from a common pocketknife."[62] The idea that a knife could become illegal because it is too sharp would be laughable if people were not going to jail for these offenses.[63]

Virginia Code § 18.2-311 prohibits possession of any "switchblade knife, ballistic knife, or like weapons." Virginia Code § 18.2-308(A) further prohibits the concealed carry of various weapons, including "any dirk, bowie knife, switchblade knife, ballistic knife . . . [or] any weapon of like kind as those enumerated" in the statute.[64] The Virginia Court of Appeals has explained that "a 'weapon of like kind' includes a knife that, while not possessing the exact physical properties of the enumerated knives, has the characteristics of a fighting knife just the same."[65] One defendant was convicted of possession of an illegal weapon in part because "Ohin's knife blade also locks securely when opened, much like a switchblade or a butterfly knife, and can be retracted only when unlocked."[66] The Court also went on to say that "Ohin's knife . . . has a fixed blade, sharp point, and single-sharpened edge affording it unquestionable utility as a stabbing weapon."[67] This case suggests that any pocket knife which is sharp, pointy, and locks in place is an illegal weapon, yet in a concurring opinion in 2009, two judges of the Virginia Court of Appeals accused Virginia courts of lacking any coherent rules defining illegal knives:

---

[60] D.J. v. State, 83 So. 3d 857 (Fla. Dist. Ct. App. 2011).

[61] *Id.* at 858; In re *George W.*, 80 Cal. Rptr. 2d at 858.

[62] In re *George W.*, 80 Cal. Rptr. 2d at 858; *see also* C.R. v. State, 73 So. 3d 825, 827 (Fla. Dist. Ct. App. 2011) (reversing the trial court which held that a pocket knife was not "ordinary" because it had "a clip to attach to a belt, a knob that makes the blade easy to open, a locking mechanism, and a textured handle").

[63] State v. Manning, No. 18347, 2001 WL 127860 at *1 (Ohio Ct. App. 2001) (the court found the knife in question to be a deadly weapon; the blade was less than two inches in length but was "pointed and sharp" and could be opened "using only one hand.").

[64] VA. CODE ANN. § 18.2–308(A).

[65] Ohin v. Commonwealth, 622 S.E.2d 784, 786 (Va. Ct. App. 2005).

[66] *Id.* at 787. A feature to lock the blade in the open position prevents the blade from collapsing on the fingers of the user and has become a regular feature on most pocket knives today.

[67] *Id.* (*quoting* Delcid v. Commonwealth, 526 S.E.2d 273, 275 (Va. Ct. App. 2000) and *citing* Richards v. Commonwealth, 443 S.E.2d 177, 179 (Va. Ct. App. 1994) (noting that a "retractable blade that can be locked into place" gives a knife a weapon-like quality)) (internal quotation marks and citation omitted).

KR0597

> A review of these [illegal knife] cases demonstrates the perplexity that exists among law enforcement officers, prosecutors, trial judges, and appellate judges over the scope of this statute. In an attempt to define its terms, we have resorted to embracing the "I know it when I see it" logic of Justice Stewart, *see Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J. concurring), by including a picture of the offending knife in our opinion.[68]

A common criticism of laws such as the knife laws of New York, Ohio, and Virginia is that they give enormous discretion to police, leading to arbitrary enforcement. As we saw in the Irizarry case, the Court held that the statute was interpreted so broadly that it subjected citizens "to arrest at the whim of any police officer."[69] In Virginia and New York, virtually any pocket knife is potentially an illegal weapon and police can arrest the owner. In reality, police do not arrest everyone who carries a pocket knife, but the statute allows police to arrest those people they believe are really criminals.[70] So, for example, an elderly white man in a suit carrying a pocketknife will not be arrested but a young black man in a t-shirt will be arrested for the exact same knife. Markus D. Dubber, for example, argues that as courts have struck down vagrancy and loitering statutes as vague and giving police too much discretion, police are now using possession offenses to do essentially the same thing, targeting undesirable elements of the community.[71] Police can always cite a "suspicious bulge" to initiate a stop and frequently can use possession of drugs (including alcohol or tobacco), burglary tools, or weapons to make an arrest.[72]

Moreover, there is substantial evidence that such knife laws are a

---

[68] McMillan v. Commonwealth, 686 S.E.2d 525, 531 (Va. Ct. App. 2009) (en banc) (Petty, J. concurring) (overturning conviction for felon in possession of concealed weapon).

[69] United States v. Irizarry, 509 F. Supp. 2d 198, 199 (E.D.N.Y. 2007).

[70] The author of this article resides in the New York area, asked NYPD officers about the pocketknife law, and was told by more than one officer that as long as a person is not doing something he should not be doing, he does not to worry about carrying a pocketknife.

[71] Markus Dirk Dubber, *Policing Possession: The War on Crime and the End of Criminal Law*, 91 J. OF CRIM. L. AND CRIMINOLOGY 4, 829, 856–57, 910–11 (2001). Courts have also acknowledged the need for sufficiently precise weapons definitions in preventing "arbitrary and discriminatory application of our concealed weapons statute." A.P.E. v. People, 20 P.3d 1179, 1184 (Col. 2001) (en banc) (reversing conviction for possession of knife which was determined to be a deadly weapon because it was "ugly").

[72] In New York City, for example, between 2004 and 2009 police conducted over 2.8 million stops of suspects and in 10.4% of all stops "suspicious bulge" was given as the reason for the stop; yet guns were found in only 0.15% of cases. Floyd, v. City of New York, 08 Civ. 1034, Decision and Order, (S.D.N.Y May 16, 2012).

KR0598

pretext for arresting suspicious characters.. The *Irizarry* case showed that Home Depot sold 67,341 Huskies in 2006.[73]  Despite selling these apparently illegal gravity knives by the hundreds of thousands, the state of New York has made no attempt to actually prevent their sale by Home Depot or anyone else.  The fact that the New York Police Department does not seem to take any action to prevent "gravity knives" from being sold strongly suggests that the real intent of the law is to give police a basis for arresting selected suspects.

Of course, a case could also be made that the *Irizarry* case was a perfect example of the usefulness of such laws.  After all, Irizarry had a concealed gun.  So when the officer saw he had a pocket knife, he immediately had probable cause to arrest him for possession of a gravity knife.  Had the officer not found a gun, the cop may well have let him off with a warning or a citation.  Perhaps Irizarry was planning to commit a robbery or other crime with the gun, and the alertness of the officer prevented a serious crime.  We will never know.

With the above caveat that there is substantial disagreement between jurisdictions as to what qualifies as a "switchblade," this Article will follow the federal definition and use the term to refer to any folding knife that can be opened by means of a spring mechanism or by inertia.  Of course, when we turn to looking at individual states that have legalized switchblades, those states may have their own definitions.

### III. WHY NOT BAN SWITCHBLADES?

In 1958, Senator Estes Kefauver (D-TN), a sponsor of legislation to ban switchblades, framed the issue as thus:

> A value judgment must be exercised in determining whether a ban should be imposed on the transportation and distribution of an article.  In the case of the switchblade knife, the question resolves itself into whether the antisocial, negative and criminal uses this knife is put to sufficiently outweigh the occasional constructive uses that can be made of the knife to justify the prohibition contained in the legislation.[74]

---

[73] *Irizarry*, 509 F. Supp. 2d at 209.
[74] *An Act to Prohibit the Introduction, or Manufacture for Introduction, into Interstate Commerce of Switchblade Knives, and for other Purposes and a Bill to Amend Title 18 of The United States Code in Order to Prohibit the Sale to Juveniles of Switchblade Knives which have been Transported or Distributed in Interstate Commerce, and for other Purposes: Hearing on H.R. 12850 and S. 2558 Before the Comm. on Interstate and Foreign Commerce*, 85th Cong. 4 (1958) [hereinafter *Hearings on H.R. 12850 and S. 2558*] at 4.

KR0599

Senator Kefauver's statement seems reasonable, and more than fifty years later, we are in a good position to try to answer this question. First, let us examine the "occasional constructive uses . . . of the knife"[75] and then turn to negative aspects; in particular, by looking at the arguments put forth by advocates of banning these knives.

There is no question that a knife which can be opened with one hand is useful in a wide variety of situations, as both courts and legislatures have acknowledged. Examples of situations in which one hand is needed to open a knife are numerous. A fisherman might get a hook through his hand and need to use the other hand to cut the fishing line. A person attacked by a dog or wild animal may have her hand or arm caught in the jaws of an animal. A person attacked by an assailant may have her hand restrained by the assailant. A medical provider may need to use one hand to push pressure on a wound and need to use the other hand to cut away clothing or restraints. Representative Jennifer Coffey, who sponsored legislation legalizing switchblades in New Hampshire, for example, is an emergency medical technician who emphasized the use of such knives by first responders.[76] As the New Hampshire Union Leader reported:

> The bill took shape after Coffey, the vice president of the Andover Rescue Squad, was looking for a new tool for her job an emergency medical technician. She was looking for an all-in-one tool with an automatic mechanism, a knife that would free up use of one hand. As she shopped around, Coffey said she discovered what she wanted she could not legally buy in the state. And though state law provided an exemption for EMTs, along with law enforcement, hunters and others, she found the exemption would not apply when she was off-duty.[77]

There have certainly been people who have carried switchblades for protection who were not juvenile delinquents or violent criminals. For example, in one story from the 1960s, entitled "Coeds in Michigan Carrying Weapons in the Wake of Series of Five Slayings," reported:

> "My boyfriend gave me this switchblade," said Roni Freidman, of Portland, Maine, a pretty 19-year-old Blonde nursing student at the University of Michigan. "And I

---

[75] *Id.*

[76] Lacey, *supra* note 6, at 1.

[77] Tuohy, *supra* note 14, at A1, A10. The article also noted that "[t]he bipartisan bill sailed through the New Hampshire legislature, with committees hearing support for the change from law enforcement officers, wildlife groups and outdoors people."

KR0600

carry it everywhere," she said.  "When you are scared you do these things."[78]

The usefulness of a one-hand opening knife is not seriously in dispute, but the vast majority of pocket knives can be opened by one hand, so who needs a spring-loaded switchblade?[79]  In other words, setting aside the problem that most pocketknives could be considered switchblades, is there a legitimate use for spring opening automatic knives?  Under ordinary circumstances, one can open a pocket knife with one's thumb in less than a second.[80]  Of course, there will be people who, through medical problems like arthritis or nerve damage, may have trouble opening a pocket knife one handed; one of the reasons given for ending the switchblade ban in Indiana is precisely this reason.[81]  The primary reason given for utility of a switchblade over a normal pocketknife is that when one is in an emergency situation (for example, a wild animal is chewing on your hand, or a medic is attempting to apply pressure to a bleeding wound), one's fine motor skills will deteriorate greatly, and in a life threatening situation one cannot afford to be fidgeting around trying to get a knife open.  Yet, despite admitting that there may be extreme situations in which an automatically opening knife might be useful, surely these situations are rare.

Ultimately, then, we must balance the dangers of switchblades against their utility.  Of course, there are dangers associated with both legalization and prohibition of switchblades.  Because there is very little difference between a switchblade and an ordinary pocket knife, innocent owners of pocket knives may find themselves under arrest and with a criminal record for possession of objects they reasonably believed were legal.[82]

Another potential problem is that when someone does commit a crime, the presence of an "illegal weapon" or "deadly weapon" can turn a minor offense into a felony, or subject the offender to enhanced penalties.  The

---

[78] Karl Mantyla, *Coeds in Michigan Carrying Weapons in the Wake of Series of Five Slayings*, NASHUA TELEGRAPH, Apr. 18, 1969, at 3.

[79] There are some critics of one-hand opening knives.  *See, e.g.*, Mark Fritz, *How New, Deadly Pocketknives Became a $1 Billion Business*, WALL ST. J., Jul. 25, 2006, at B1, *available at* http://perma.cc/7PFL-GFXG (noting, for example, that many pocket knives can be "flicked open with one finger faster than the widely outlawed switchblade.").  Nonetheless, there is no jurisdiction which has outlawed one-handed opening knives per se.  When DHS threatened to ban their import, Congress overwhelmingly rejected the idea.

[80] *See id.*

[81] *Indiana Panel Advances Bill Legalizing Switchblades*, NEWS-SENTINEL, Jan. 16, 2013, http://perma.cc/V6ZW-VY5Z.

[82] But surely there must be a way for the law to distinguish "good" pocket knives from "bad" switchblades.  The only way states seem to be able to give clear guidance as to what is legal or illegal is a restriction on blade length, that is, any folding knife with a blade length of over a certain length is illegal regardless of any other features.  This type of statute gives clear guidance to citizens and enforcers as to what is legal and illegal.

problem is that two offenders with essentially identical crimes may receive very different sentences based on minor differences making one knife legal and another a deadly weapon.[83]  This is true for almost every state in the country, because even most states that permit possession of switchblades classify them as deadly weapons.

Another danger that must be considered with every criminal statute is that some people will be falsely accused, arrested, and convicted.  A witness may mistakenly believe an object is a switchblade when it is not, or it may simply be a case of arresting the wrong person.  Furthermore, not every case will have the object available for examination by police.[84]  For serious crimes like murder and robbery, the fact that innocent people will be wrongly convicted is not much of an argument, but for marginal crimes when the harm to society is small, the danger of false conviction is a reasonable concern.

Finally, there are always associated costs to any criminal law.  With marginal offenses, enforcement costs such as time and expense of policing and prosecuting the offense may not be worth the benefit to society.  Even keeping firearms out of the hands of criminals is notoriously difficult, so keeping knives out of the hands of criminals may not be possible.

There are also unintended consequences of banning some weapons.  In some states, such as in the case of the Virginia statute cited above, the penalties for carrying a concealed weapon or being a felon in possession of a weapon are the same for a knife or a gun.  Although a full exploration of alternatives to switchblades is beyond the scope of this paper, heightened penalties for the use or possession of knives might lead some would-be criminals to conclude that they may as well carry a gun.[85]

If the above are the practical and legal concerns with banning

---

[83]  *See, e.g.*, State v. Gotcher, 759 P.2d 1216, 1220 (Wash. Ct. App. 1988) (reversing defendant's conviction for committing burglary with a deadly weapon when he possessed a switchblade).

[84]  For example, there is the novelty "switchblade comb" which looks like a switchblade when closed but has a comb instead of a knife blade.  *Switchblade Comb*, ARCHIE MCPHEE, http://perma.cc/ZGJ4-2UVC (last visited Feb. 26, 2014).  Under federal law this is considered an illegal switchblade and may not be imported. Letter from John Durant, Dir., Commercial Rulings Division, to John Kelly, Gen'l Mgr, Allied Import Corp. (Oct. 3, 1989) *available at* http://perma.cc/7PVF-VKGX. The reasoning provided was that the comb could easily be replaced by a knife blade, and therefore, the mechanism operated as a sham to import knife parts. *Id.* at 2–3.

[85]  This is common criticism of banning one type of weapon that is easily replaceable.  For example, Gary Kleck has argued that banning all handguns would likely result in their substitution by more deadly shotguns and rifles.  *See generally* Gary Kleck, *Handgun-Only Gun Control: A Policy Disaster in the Making, in* FIREARMS AND VIOLENCE: ISSUES OF PUBLIC POLICY, 167, 186–94 (Don B. Kates, Jr. ed., 1984);  *see also* David B. Kopel, *Peril or Protection: The Risks and Benefits of Handgun Prohibition*, 12 ST. LOUIS U. PUB. L. REV. 285, 329 (1993) (arguing the same).  As in the case of knives, the substitution for guns in many circumstances is probable, but the overall impact is more debatable.  At least in the case of armed robbery use of a firearm means the victim is less likely to resist, so while a firearm is more deadly than a knife it is less likely to be actually used to injure a victim.

KR0602

switchblades, what are the arguments for banning them?  To answer this, this Article will go back to the federal legislation enacted in the 1950s and examine how these bans began.

### IV. THE HISTORY OF SWITCHBLADE LEGISLATION: WHY WERE THEY BANNED?

Some of the most famous movies of the 1950s prominently featured switchblades, including Stalag 17 (1953), From Here to Eternity (1953), Blackboard Jungle (1955), Oklahoma (1955), Rebel Without A Cause (1955), Twelve Angry Men (1957), and High School Confidential (1958).[86]  Although "West Side Story" was not made a movie until 1961, it debuted on Broadway in 1957.[87]  Switchblades came to be associated with crime, and especially juvenile delinquency in New York.  Whether this perception was correct or not, we may never know, but there is no question that switchblades were quite popular in the 1950s.  A Senate judiciary report published in 1958 estimated that more than 1.2 million switchblades were purchased in the United States each year.[88]

One of the first attempts to ban switchblades was introduced in the New York legislature in 1953, but failed to pass.[89]  In 1954, Governor Dewey supported a weaker plan to ban the sale, but not the possession, of switchblades in New York.[90]  A legislative report on that bill explained:

> This bill prohibits the sale of switchblade knives in this State.  It also makes possession of such knives unlawful except for persons who require their use in a business, trade or profession or for sportsmen holding hunting, trapping and fishing licenses under the Conservation Law.  Last year there were 4,420 felonious assaults and 99 homicides reported in New York City in which knives were used.  Analysis indicates that over one-third of these crimes involved the use of switchblade knives.[91]

Within a few years, about ten states had banned the sale or possession

---

[86] For a longer list of movies from this period featuring switchblades, *see Switchblades in the Movies (1920-1969)*, ASSISTEDKNIFE.COM, http://perma.cc/YSE9-98Q9 (last visited Feb. 26, 2014).

[87] WEST SIDE STORY (Mirisch Pictures, Inc. and Seven Arts Prods. 1961); Jack Gottlieb, *West Side Story Fact Sheet*, WEST SIDE STORY, http://perma.cc/364G-CVHB (last visited Feb. 18, 2014).

[88] S. Rep. No. 1429, at 6 (1958).

[89] J.F. Wilkinson, Jr., *Plan Letter Drive on Switchblades*, BROOKLYN EAGLE, Jan. 5, 1954, at 1.

[90] *Id.*

[91] Memorandum of Governor Thomas E. Dewey, *reprinted in* 1954 Legis. Ann. 385 (New York, 1954).

of switchblades.[92]  In 1957, several bills were introduced in Congress to ban switchblades or to prevent them from being mailed across state lines.

The Eisenhower Administration opposed banning switchblades.  When asked for the opinion of the Department of Justice, Deputy Attorney General William Rogers wrote the Commerce Committee:

> The Department of Justice is unable to recommend enactment of this legislation. . . . Switchblade knives in the hands of criminals are, of course, potentially dangerous weapons.  However, since they serve useful and even essential purposes in the hands of persons such as sportsmen, shipping clerks and others engaged in lawful pursuits, the committee may deem it preferable that they be regulated at the State rather than the federal level.[93]

The Secretary of Commerce, Sinclair Weeks, expressed similar views stating that the proposed bill ignored the needs of many legitimate users of switchblades.[94]  The administration did not oppose a ban on mailing switchblades, although the Administration expressed "doubts as to the effectiveness of such limitations in controlling the wrongful use of switchblades."[95]  The broader ban on possession also ran into trouble as many legislators did not believe that the federal government had constitutional authority to prohibit possession of switchblades and regarded that as a state or local matter.[96]

While some witnesses acknowledged that a switchblade might have some usefulness, Pino testified:

> Actually, these knives are, I would say inherently dangerous, they have only one purpose.  They are just deadly.  They are lethal weapons and they are suited for crime, that is all they are suited for.  So the sportsmen really have nothing substantial to complain about.  But

---

[92] S. Rep. No. 1429, at 7, 27.

[93] *Hearings on H.R. 12850 and S. 2558, supra* note 74, at 11–12 (letter from of William Rogers, Deputy Att'y Gen.).

[94] *Id.* at 12 (letter from Sinclair Weeks, Sec'y of Commerce).

[95] *Id.* at 15 (letter from Phillip S. Hughes, Acting Dir. for Legis. Reference, Exec. Office of the President).

[96] For example, Senator Butler commented, "We have no business to legislate on possession, that is a state and local matter."  The Chairman of the committee, Senator Warren Magnuson, expressed similar reservations, as did Senator Thurmond (S.C.), a noted advocate of states' rights.  *Id.* at 22, 25. This opposition to a general ban meant that a ban would be enacted only in federal territories.

they do complain.[97]

Similarly, John E. Cone, a local New York judge who headed a movement to ban switchblades in New York, testified: "You see, the possession of these knives are [sic] only for three purposes, mainly: murder, assault, robbery, possibly even rape."[98]  He later added: "I think you will find this type of knife only in the hands of juveniles and in the hands of footpads around our city. . . . Footpads, highwaymen, thugs."[99]

Fortunately, the claims of Cone and Pino are empirically verifiable to some extent.  According to manufacturers' numbers provided to the committee, there were at least 1.2 million switchblades sold in the United States each year.[100]  We also know that for the years 1957 and 1958, there were an average of 8,145 homicides, 71,210 robberies, and 112,235 aggravated assaults.[101]  Even assuming that half of all these crimes used knives, and further assuming that every knife used was a switchblade, there would have been 95,795 violent crimes involving switchblades.[102]  Even using these extremely cautious presuppositions, and further assuming that 95,795 different switchblades were used for crimes, with six million switchblades in circulation, it would mean that only 1.6% of switchblades were used in murder, assault, or robbery.  In fact, the use rate is almost certainly well under 1%.[103]  Given that 99% of switchblades were never used for any illegal purpose, the assertion that they are only used for or suited for murder, assault, and robbery is demonstrably false.

As to how such knives cause crime, Cone told a story of how possession of switchblades led to criminal activity.[104]  He explained how one young person accidentally hit another young boy with a stick, and then:

---

[97] *Hearings on H.R. 12850 and S. 2558, supra* note 74, at 24.

[98] *Id.* at 7.

[99] *Id.* at 22.

[100] S. Rep. No. 1429, at 6 (1958).

[101] Fed. Bureau of Investigation, Uniform Crime Reports for the United States 5 (1960).

[102] These are obviously extremely liberal estimates.  The first classification of murder weapons in the UCR is from 1960, and this shows less than 20% use of knives in murder, the UCR from 1965 shows that knives were used in one-third of all aggravated assaults, and no weapon was used in 42% of robberies in 1965.  To err on the side of caution, the author assumed a use rate of one-half, although one-third of robberies and assaults utilizing knives is probably a more accurate estimate.  *Id.* at 59.  *See infra* Table 1.

[103] In reality there were probably far more than 6 million traditional switchblades in circulation, since that was only the number sold in the previous five years, and it is highly unlikely that every knife used in a crime was a switchblade.  Moreover, those criminals who used a switchblade for a crime likely used the same weapon repeatedly.  Thus, a more realistic estimate is that less than 1/10 of one percent of switchblades in circulation were used in crime.

[104] *Hearings on H.R. 12850 and S. 2558, supra,* note 74, at 23.

KR0605

> He, as youngsters are prone to do, yelled some angry
> words to the lad who hit [him with] the stick, who in turn
> yelled back more angry words.  They rushed together
> quickly, and unfortunately the boy who hit the stick had a
> switchblade in his pocket.  I say to you, before he had time
> to think of the consequences of his act, or the other lad to
> think of it, the knife was out, in a twinkling of an instant it
> was buried in his chest and he was dead.  Had he had a
> Boy Scout knife, the other kid would have had warning,
> the tragedy would not have occurred.  But with this deadly
> thing there could be only one result.[105]

One thing to bear in mind is that the typical Boy Scout knife, or jackknife, in the 1950s was designed to be opened with two hands.  The one-handed opening knives described above have come to dominate the market since the ban of switchblades.  With that point in mind, we see two distinct arguments made by Cone.  The argument typically made is that because switchblades open so quickly, an assailant can surprise a victim who does not know the other person has a switchblade, and thus it is harder to defend oneself.  Similarly, the Alaska Court of Appeals explained the danger from switchblades was that they are "easily concealed and quickly brought to bear."[106]

The second argument made by Cone is that the assailant will have more time to think about what he is doing.  However, while an extra two to three seconds to deploy a knife might give a victim enough time to run away, it seems unlikely that a boy angry enough to stab another will cool off in two to three seconds.

Senator Cotton expressed his opinion that "those knives are exactly the things that fascinate a perfectly good boy."[107]  The Senator did not elaborate, but he seems to have been arguing that many boys would carry switchblades who would not carry other types of pocketknives, simply because they are so fascinating, and presumably they will be more inclined to use such knives.

Thus, there were five distinct arguments against switchblades used by advocates of the legislation: (1) they have no legitimate use; (2) someone found with one is likely a criminal (i.e. the proxy theory); (3) they are attractive to otherwise good boys who will misuse them; (4) their ease of use makes it more likely a person will use them in anger; and (5) their quickness and concealability makes them harder to defend against than

---

[105] *Id.*
[106] State v. Weaver, 736 P. 2d 781, 783 (Alaska 1987).
[107] *Hearings on H.R. 12850 and S. 2558, supra* note 74, at 27.

other knives commonly carried.

Pino confidently predicted that fewer switchblades would mean less crime:

> We don't expect that by passing a bill like this we will completely solve the problem. But the fewer of these weapons we have around the less is going to be the incidence of crimes.[108]

The Senate Committee had surprisingly little hard data on the use of switchblades.[109]  Senator Thurmond asked Cone if more wounds were caused by switchblades or other types of pocketknives, and Cone responded:  "The jackknife is no problem.  We have no objection to them at all.  They serve a legitimate purpose."[110]  Although the Committee Report lists a number of figures on the volume of switchblades confiscated, it gave almost no numbers on how often they were used in crime.  One of the very few statistics was that "[i]n Kansas City 15 switchblades were used in assaults and robberies in 1956."[111]  Given that there were 269 armed robberies and 175 aggravated assaults in Kansas City, Missouri in 1956, fifteen switchblades out of 444 assaults and robberies (about 3.3%) does not appear to be a very large number.[112]

The Congressional Committee sent questionnaires to municipal and military police across the country and collected a wide assortment of anecdotes.  Although these anecdotes confirm the prevalence of switchblades, they provide little solid information on how often they were used in crime.  In one section, the report explains that military regulations forbade switchblades on post, and further notes:

> During 1956 at Fort Bragg, N.C., it was necessary for the military police to confiscate from military personnel 161

---

[108] *Id.*

[109] As the Oregon Supreme Court stated, the congressional report "offers no more than impressionistic observations on the criminal use of switch-blades." State v. Delgado, 692 P. 2d 610, 612 (Or. 1984).

[110] *Hearings on H.R. 12850 and S. 2558, supra* note 74, at 24 (1958).  Indeed, one is almost surprised at the attitude of some witnesses towards other knives. Senator Thurmond went on to ask Cone about carrying a combat knife with an eight-inch blade, and Cone said as long as it was carried openly it was not a problem to carry it in public. *Id.*

[111] *Id.* at 3.

[112] FED. BUREAU OF INVESTIGATION, *supra* note 101, at 97.  This number does not include assaults or robberies from Kansas City, Kansas where there were 143 armed robberies and ninety-eight aggravated assaults in 1956.  These numbers were provided by W.E. Parker acting head of the Kansas City, Missouri PD.  *See The Kansas City Trouble*, TIME, Jan. 27, 1958, *available at* http://perma.cc/RD6G-Z4BD (detailing efforts to keep switchblades and razor blades out of Kansas City, Missouri public schools).

KR0607

*CRIMINAL USE OF SWITCHBLADES*

> switchblade knives, an average of 3 a week. At Fort Sill, Okla., in 1956, 75 of these knives were confiscated as a result of aggravated assault.[113]

Given these types of numbers from just two posts in one year, it seems likely that tens of thousands of switchblades were in the hands of military personnel.

## V. PROVISIONS AND ENFORCEMENT OF THE FEDERAL ANTI-SWITCHBLADE ACT

Congress did not believe it had constitutional authority to ban the possession of switchblades in the states, but the legislation did place some significant restrictions on switchblades. 15 U.S.C. § 1242 bans the "transport[ation] or distribut[ion] in interstate commerce" of switchblades, which means that a manufacturer or distributor cannot sell across state lines.[114] Violation of the Act is a felony and the offender may be sentenced to up to five years in jail. The Act does not restrict individuals from purchasing a switchblade where they are legal and bringing it back to her home state, but presumably this statute would greatly restrict access to switchblades in many states where there was or is no domestic manufacturer. While there are numerous local manufacturers in states such as Oregon and Florida, lack of competition from foreign manufacturers undoubtedly increases the price of switchblades, making them more expensive than their non-switchblade equivalent.[115]

The other major provision of the federal Anti-Switchblade Act is that it is a felony to possess a switchblade "within any Territory or possession of the United States, within Indian country (as defined in section 1151 of title 18), or within the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18)."[116] This provision is actually fairly broad, as the special maritime jurisdiction includes all navigable waters of the United States not within the jurisdiction of any state, as well

---

[113] *Hearings on H.R. 12850 and S. 2558, supra* note 74 at 3 (Statement by Senator Estes Kefauver). Notably this does not say that 75 switchblades were used in assaults, and it is not clear how many of these knives were used for an illegal purpose. FED. BUREAU OF INVESTIGATION, *supra* note 101, at 97.

[114] 15 U.S.C. § 1242 (2012).

[115] For example, Benchmade Knife Company has a factory in Clackamas, Oregon and appears to be a major seller of switchblades in Oregon. BENCHMADE KNIFE COMPANY, http://perma.cc/LP7G-W8FQ (last visited Feb. 26, 2014). A review of their products shows that their switchblades frequently cost well over $100. Similarly, The Knife Factory in Saint Augustine, Florida advertises "a full line of automatics." KNIFE FACTORY, http://perma.cc/8UJB-HN4H (last visited Feb. 26, 2014); as does Arizona Custom Knives, also in Saint Augustine. ARIZONA CUSTOM KNIVES, http://perma.cc/D89L-UXWL (last visited Feb. 26, 2014).

[116] 15 U.S.C. § 1245 (2012).

as any U.S. flagged vessel.  It is therefore illegal for a fisherman in Alaska, California, Oregon, or Florida to take a switchblade on a fishing boat outside her home state.

The main point of the law was to support states that did ban switchblades.  Congressional witnesses expressed to the Committee that "in your own State you can manufacture them, if they are going to be permitted, and there would be no problem."[117]  Senator Thurmond also acknowledged this and asked "Have we gained anything?"[118]  It seems clear that with millions of switchblades in circulation and with them remaining legal in most states at that time, expectations were low for any immediate effect.

As to enforcement of the Act, it does not appear that the Act has ever been enforced very vigorously with respect to interstate transport. Although the federal government has actively stopped importation of knives believed to be illegal, the number of criminal prosecutions for selling or purchasing knives across state lines appears to be very small. There are only a handful of recorded prosecutions, despite reports of widespread distribution.[119]  In fact, when one considers that prior to the 2009 amendment to the Anti-Switchblade Act, the vast majority of pocketknives were illegal, it is fair to say the Act was violated with impunity, at least with regard to knives that could be opened by force of inertia.

As we saw, the Eisenhower administration was opposed to a switchblade ban, and while the President did not veto the Act, the administration probably did not make enforcement a priority.  There are also two important exceptions to the Act.  Interstate distributors are permitted to sell to individuals with one arm and "the Armed Forces or any member or employee thereof acting in the performance of his duty."[120] Yet, in addition to these two exceptions, the U.S. Post Office has adopted regulations permitting switchblades to be mailed interstate to "[s]upply to procurement officers or employees of the municipal government of the District of Columbia, or of the government of any state or territory, or of any county, city, or other political subdivision of a state or territory."[121] This provision goes back at least to 1971.[122]  While the provision was

---

[117] *Hearings on H.R. 12850 and S. 2558, supra* note 74, at 26 (Statement by Senator Estes Kefauver).

[118] *Id.*

[119] Robert Johnson, *Sales of Switchblades in U.S. Get a Boost from Internet*, WALL ST. J., Mar. 7, 2000, http://perma.cc/Z5LQ-MZBB (last visited Feb. 26, 2014).

[120] 15 U.S.C. § 1244 (2012).

[121] U.S. POSTAL SERV., PUB. NO. 52, MAILING STANDARDS OF THE UNITED STATES POSTAL SERVICE PUBLICATION 52, HAZARDOUS, RESTRICTED, AND PERISHABLE MAIL, § 442 *available at* http://perma.cc/5R3G-TP6N (last visited Feb. 26, 2014).

[122] 39 C.F.R. § 124.6 (1971).

KR0609

clearly intended to ensure that state and local governments would not be affected by the ban, the provision is worded quite broadly. Manufacturers and distributors have taken advantage of this provision and will ship switchblades interstate to anyone who certifies that he or she is an employee of a state or local government.[123]

One criticism of the Anti-Switchblade Act is simply that it has not been enforced effectively, and federal regulations create exceptions which allow millions of people to purchase them legally, not to mention people who falsely claim to be a state or local employee. If these criticisms are correct, naturally, the Anti-Switchblade Act will have had little or no effect on crime.

While the above criticisms of the Act are valid, anecdotal evidence suggests that the Act has significantly reduced the possession of traditional spring-loaded switchblades. This author spent six years in the Marine Corps from 1986 to 1992, and virtually every marine carried a pocket knife—it was simply basic equipment. Yet in this author's six years in the Marine Corps, he never once saw a Marine with a traditional switchblade. It follows that traditional switchblades are far less prevalent today than they were in the 1950s (with the exception of a few states like Oregon, where they are legal and common).

Thus, the criticism of lack of enforcement is not persuasive, at least as it relates to traditional, spring-loaded switchblades. The criticism is more forceful with respect to other types of pocketknives. Although any knife that could be snapped open by inertia was theoretically illegal, the sponsors of the Act made clear that they were not banning ordinary pocketknives. The Act was never enforced to include non-traditional switchblades, and when the administration suggested banning the importation of pocketknives, Congress overwhelmingly rejected the proposal. So while the Anti-Switchblade Act seems to have been successful in significantly reducing the number of spring-loaded switchblades, these knives appear to have been replaced by other types of pocketknives that are identical for almost all practical purposes. If this last criticism is valid, one would not expect to see any effect on crime as a result of the Anti-Switchblade Act.

VI. THEORIES AND METHODOLOGY

As we have just seen, advocates of banning switchblades argued that switchblades are uniquely suited for criminal purposes and predicted that the ban would reduce crime in general, and knife crime in particular. If these knives are so valuable for criminal purposes, then we would expect murders, robberies, and especially assaults to increase as more of such

---

[123] The author has a sample form used by a distributor on file, which requires the purchaser to affirm he or she is an employee of a state or local government.

knives are introduced into a community. Because murders and robberies are far more likely to use a firearm than a knife, the presence of more switchblades might not affect these numbers very much, even if they are heavily used in crime. We would expect to see the greatest effect on aggravated assault.

First, the sheer volume of aggravated assault is much larger than murder or robbery.[124] The larger number of assaults than murder or robbery is explained by the fact that assaults are much more likely to be unplanned and spontaneous,[125] such as the incident described by Judge Cone's testimony. Second, knives are much more common in assaults than murder or robbery.[126] The presence of deadly weapons means that verbal arguments are far more likely to escalate into aggravated assault.

The alternative hypothesis is that switchblade knives are not different from other pocketknives in any significant respect, and so long as other pocketknives are widely available, the ban or introduction of switchblades will have no discernible effect on crime.

Of course, given that there were millions of switchblades in circulation when states began to ban them, it could take years before the ban had any real impact on crime. Conversely, when a state legalizes switchblades after a long period of prohibition, we would expect the supply to grow rapidly among the criminal element if these knives are uniquely useful for criminal purposes by footpads, highwaymen, and thugs. Because switchblades cannot be sold interstate, one might expect that it would take some time before they become widely available. At least in recent years, however, the market has shown a remarkable ability to provide switchblades soon after legalization. Soon after legalization in Missouri, an article in the St. Louis Post Dispatch, reported: "After the state law change, customers flocked to stores to shop for switchblades, which had been banned for years."[127] Although sale of switchblades across state lines is theoretically illegal, there have been reports of widespread internet sales.[128]

A second theory worth exploring is the proxy theory; that is, even if switchblades are no more dangerous than any other knife, people who use switchblades are likely to be violent criminals.[129] If the proxy theory is

---

[124] In 2012, there were 14,827 murders in the U.S., 354,520 robberies, and 760,739 aggravated assaults. FED. BUREAU OF INVESTIGATION, *supra* note 101, at 97 (Table 1).

[125] As one court put it: "Assaults and batteries are frequently the result of transient ebullitions of passion." Gillman v. State, 51 So. 722, 723 (Ala. 1910).

[126] *See infra* Tables 2–4.

[127] Michael D. Sorkin, *Pocket Knife Sales Soar on Renewed Popularity*, ST. LOUIS POST-DISPATCH, Dec. 30, 2012, http://perma.cc/5RSM-8DNP (last visited Feb. 26, 2014).

[128] *See generally* Johnson, *supra* note 111.

[129] One author has described the use of proxies for law enforcement as "taking an innocent characteristic, believing it to be correlated with a real or potential threat, and using that characteristic to

KR0611

correct, switchblade laws are an excellent tool used by police to identify and arrest potentially violent criminals. There is an obvious logic here. If switchblades are criminalized, then only criminals will have switchblades. Law-abiding citizens will carry other types of pocketknives which are legal. Thus, if switchblades are illegal, we would expect them to be an excellent proxy for other criminal behavior.

There are two potential flaws with this proxy theory. First, if the definition of switchblade is unclear, many otherwise law-abiding citizens may end up arrested for possession of knives they honestly believed were legal. Because possession offenses are typically strict liability offenses, the state need not prove that the defendant had any intent to break the law.[130] Second, the proxy theory assumes that violent criminals are more likely to break switchblade laws than other citizens, but that may not be true. Again, if the utility between a switchblade and ordinary knife is minimal, violent criminals may well have no trouble complying with the ban. In fact, as many of these statutes are obscure and complicated, professional criminals are likely to be the ones who are most familiar with these statutes. Hence, it is entirely possible that most people who violate switchblade statutes are just ordinary citizens who are ignorant that their pocket knife is illegal. If this is true, then the proxy theory is the exact opposite, and innocent citizens are more likely to possess illegal knives than professional criminals.[131]

Yet, if the proxy theory is correct, then we would expect laws against switchblades to reduce crime even if switchblades are harmless, because it will lead to more violent criminals being arrested and imprisoned. Accordingly, we should again see a reduction in crime when switchblades are outlawed and an increase in crime when they are legalized.

Of course, there will be other factors that might affect the use of switchblades, regardless of their legal status. The main factor one would expect to affect use of knives is the prevalence of firearms. There is an old saying "Don't bring a knife to a gun fight."[132] Knife wielders are unlikely

---

enforce the law." Lindsey B. Lawrence, *The Money-Laundering Conundrum: Mugging Privacy in the Assault on Crime? In* THE FUTURE OF FINANCIAL PRIVACY, 165 (Washington: Competitive Enter. Inst., 2000).

[130] *See, e.g.*, People v. Voltaire, 852 N.Y.S.2d 649, 652 (Crim. Ct. 2007) *quoting* People v. Visarities, 220 A.D. 657 (N.Y. 1927) ("mere possession of per se weapon, if knowing and voluntary, constitutes the offense") (sic).

[131] Because a person can be in constructive possession of an object, such as a switchblade in one's vehicle which is unknown to the driver, a person can be convicted of a possession offense effectively without *mens rea* or *actus reus*. *See* Dubber, *supra* note 71, at 916–17.

[132] This expression was made popular in the movie "The Untouchables" (1987) in which Sean Connery's character, armed with a shotgun, tells the knife wielding assassin sent to kill him: "Just like a Wop to bring a knife to a gunfight!" The particular knife in the movie, not surprisingly, was a switchblade. The expression has entered the English language as a kind of proverb. *See* USINGENGLISH.COM, http://perma.cc/9BAH-JERA (last visited Mar. 5, 2014).

to attack those who they think may have guns. For example, among aggravated assaults on the general public, knives and guns are used in about equal numbers, whereas in aggravated assaults on police officers, an aggressor is twice as likely to use a gun as a knife.[133]

Secondly, if a potential criminal has access to guns as well as knives, the criminal seems likely to opt for the more powerful weapon. Some researchers have challenged the assumption that criminals will substitute knives for guns when guns are not available.[134] Nevertheless, statistics on the use of guns and knives in crime have consistently shown that when gun use in crime goes up, knife use goes down. This is consistent with the theory that knife control may be counterproductive, as the weapon substituted for a knife may be a gun. If the penalty for possession of a knife and gun are the same, then presumably criminals would opt for a gun.

In fact, if we look at the use of knives in crime, there is a steady increase in the use of knives in murder, aggravated assault, and armed robbery throughout the 1960s and 1970s. Across the country as a whole, violent crime doubled between 1958 and 1967.[135] Although we can never know what might have happened otherwise, there is no indication that the federal Anti-Switchblade Act (in conjunction with state bans) had any significant effect on violent crime across the country. Violent crime involving knives also increased dramatically in the 1960s and 1970s.[136]

Table 1 shows the U.S. homicide rate per 100,000 from 1951 through 2000, followed by (when available) the homicide rate using knives (or other cutting instruments), the U.S. robbery rate, the robbery rate using knives, the aggravated assault rate, and the assault rate using knives. Note that all of the crime data is for knives and other "cutting instruments"; for ease of reference, this entire category is referred to simply as knives. Note, also, that the first year the UCR classified robbery by weapon used was 1974; thus, these numbers have been supplemented by including the rate of armed robbery from 1964 to 1980.

---

[133] In 2010, there were 137,857 aggravated assaults using firearms and 127,509 using knives. *Uniform Crime Reports 2012, Table 19*, FBI, *available at* http://perma.cc/P36J-FZ5C (last visited Mar. 12, 2014). However, in assaults on police officers, there were 1,831 assaults with firearms and 884 with knives. *Uniform Crime Reports 2012, Table 70*, FBI, *available at* http://perma.cc/4X28-92SX (last visited Mar. 12, 2014). 884 seems like a high figure, although many of these may have been on undercover officers or attacks by mentally unstable suspects. In any event, it is clear that when attacking a person who has a gun, an assailant is more likely to use a gun than a knife.

[134] *See generally* Lisa Stolzenberg & Stewart J. D'Alessio, *Gun Availability and Violent Crime: New Evidence from the National Incident-Based Reporting System*, 78 SOC. FORCES 1461 (2000).

[135] *See infra* Table 1.

[136] *Id.*

KR0613

TABLE 1: U.S. VIOLENT CRIME RATE PER 100,000 INHABITANTS 1951–2000[137]

| Year | Homicide Rate | w/ Knives | Robbery | % Armed Robbery | w/ Knives | Ag. Assault | w/ Knives |
|------|------|------|------|------|------|------|------|
| 1951 | 4.4 | | | | | | |
| 1952 | 4.6 | | | | | | |
| 1953 | 4.5 | | | | | | |
| 1954 | 4.2 | | | | | | |
| 1955 | 4.1 | | | | | | |
| 1956 | 4.1 | | | | | | |
| 1957 | 4.0 | | | | | | |
| 1958 | 4.8 | | | | | | |
| 1959 | 4.9 | | 40.3 | | | 67.3 | |
| 1960 | 5.1 | | 60.1 | | | 86.1 | |
| 1961 | 4.8 | 1.16 | 58.3 | | | 85.7 | |
| 1962 | 4.6 | 1.11 | 59.7 | | | 88.6 | |
| 1963 | 4.6 | 1.05 | 61.8 | | | 92.4 | |
| 1964 | 4.9 | 1.18 | 68.2 | 57% | | 106.2 | |
| 1965 | 5.1 | 1.17 | 71.7 | 57.6% | | 111.3 | |
| 1966 | 5.6 | 1.25 | 80.8 | 58.3% | | 120.3 | 40.42 |
| 1967 | 6.2 | 1.24 | 102.8 | 57.8% | | 130.2 | 42.71 |
| 1968 | 6.9 | 1.29 | 131.8 | 60.3% | | 141.3 | 43.80 |
| 1969 | 7.3 | 1.49 | 148.4 | 61.5% | | 154.5 | 46.04 |
| 1970 | 7.9 | 1.70 | 172.1 | 63.3% | | 164.8 | 46.14 |
| 1971 | 8.6 | 1.71 | 188.0 | N/A | | 178.8 | 50.06 |
| 1972 | 9.0 | 1.71 | 180.7 | 66.1% | | 188.8 | 49.65 |
| 1973 | 9.4 | 1.67 | 183.1 | 65.9% | | 200.5 | 49.32 |
| 1974 | 9.8 | 1.72 | 209.3 | 65.9% | 27.42 | 215.8 | 52.22 |
| 1975 | 9.6 | 1.70 | 220.8 | 65.0% | 27.38 | 231.1 | 54.31 |
| 1976 | 8.8 | 1.57 | 199.3 | 63.5% | 25.91 | 233.2 | 54.80 |
| 1977 | 8.8 | 1.68 | 190.7 | 63.3% | 25.17 | 247.0 | 57.30 |
| 1978 | 9.0 | 1.69 | 195.8 | 62.5% | 24.87 | 262.1 | 59.23 |
| 1979 | 9.7 | 1.86 | 218.4 | 62.3% | 28.83 | 286.0 | 64.35 |
| 1980 | 10.2 | 1.97 | 251.1 | 62.2% | 32.40 | 298.5 | 67.16 |
| 1981 | 9.8 | 1.90 | 258.4 | | 33.85 | 289.3 | 63.65 |
| 1982 | 9.1 | 1.90 | 238.8 | | 32.48 | 289 | 67.05 |
| 1983 | 8.3 | 1.81 | 216.7 | | 29.47 | 279.4 | 66.78 |
| 1984 | 7.9 | 1.67 | 205.7 | | 27.56 | 290.6 | 67.42 |
| 1985 | 8 | 1.69 | 209.3 | | 27.84 | 304 | 69.01 |
| 1986 | 8.6 | 1.77 | 226 | | 30.51 | 347.4 | 76.43 |
| 1987 | 8.3 | 1.68 | 213.7 | | 28.85 | 352.9 | 75.52 |
| 1988 | 8.5 | 1.62 | 222.1 | | 30.21 | 372.2 | 76.30 |
| 1989 | 8.7 | 1.58 | 234.3 | | 31.40 | 385.6 | 75.52 |
| 1990 | 9.4 | 1.65 | 256.3 | | 30.76 | 422.9 | 82.47 |
| 1991 | 9.8 | 1.59 | 272.7 | | 30.0 | 433.4 | 79.75 |
| 1992 | 9.3 | 1.35 | 263.7 | | 27.95 | 441.9 | 80.43 |
| 1993 | 9.5 | 1.21 | 256 | | 25.60 | 440.5 | 77.53 |
| 1994 | 9 | 1.143 | 237.8 | | 22.59 | 427.6 | 76.11 |
| 1995 | 8.2 | 1.07 | 220.9 | | 20.10 | 418.3 | 76.55 |
| 1996 | 7.4 | 1.00 | 201.9 | | 18.17 | 391 | 70.77 |

[137] For ease, the author used the UCR "Data tool" for crime rate data when available (that is, crime rates going back to 1960); otherwise, the author used the printed volumes of UCR data prior to 1960 and for weapon specific data. *Id.*

| 1997 | 6.8 | 0.87 | 186.2 | | 15.83 | 382.1 | 68.40 |
|------|-----|------|-------|--|-------|-------|-------|
| 1998 | 6.3 | 0.84 | 165.5 | | 14.56 | 361.4 | 66.50 |
| 1999 | 5.7 | 0.75 | 150.1 | | 12.61 | 334.3 | 59.51 |
| 2000 | 5.5 | 0.74 | 145 | | 12.18 | 324 | 58.32 |

Thus, as we see from the above chart, the murder rate with knives almost doubled between 1960 and 1980, the rate of aggravated assaults with a knife doubled between 1965 and 1990, and the rate of knife use in armed robbery remained relatively constant (although the rate of robberies using a weapon increased significantly between 1964 and 1975). Moreover, the effect on crime overall appears to be even more dismal. After 1958, violent crime of all types skyrocketed. The reasons for this are complicated and still debated by criminologists, but it is difficult to look at the huge increases in violent crime and conclude that the switchblade laws had much success in reducing crime.

Strictly speaking, of course, the above numbers do not prove anything, especially because we have nothing with which to compare these numbers. Nevertheless, these numbers provide us with a starting point and a point of comparison for individual state crime statistics. These numbers also should be viewed in conjunction with the rate at which guns were used in crime. While the assault and murder rates with knives increased throughout the 1960s and '70s, the use of guns in crime increased even faster. This is shown in Table 2.

TABLE 2: PERCENTAGE OF GUNS AND KNIVES USED IN MURDER IN U.S. 1961–2012

| Year | % Guns | % Knives | Year | % Guns | % Knives |
|------|--------|----------|------|--------|----------|
| 1961 | 52.5 | 24.1 | 1987 | 59.1 | 20.3 |
| 1962 | 54.2 | 24.2 | 1988 | 60.7 | 19.1 |
| 1963 | 56.0 | 22.8 | 1989 | 62.4 | 18.2 |
| 1964 | 55 | 24 | 1990 | 64.1 | 17.5 |
| 1965 | 57.2 | 23.0 | 1991 | 65.4 | 16.2 |
| 1966 | 59.3 | 22.3 | 1992 | 68.1 | 14.5 |
| 1967 | 63.6 | 20.0 | 1993 | 69.6 | 12.8 |
| 1968 | 65.4 | 18.7 | 1994 | 70.0 | 12.7 |
| 1969 | 64.5 | 19.9 | 1995 | 68.0 | 13.0 |
| 1970 | 65.4 | 18.9 | 1996 | 67.8 | 13.5 |
| 1971 | 65.1 | 19.8 | 1997 | 67.8 | 12.8 |
| 1972 | 66.2 | 19.0 | 1998 | 64.9 | 13.3 |
| 1973 | 67.0 | 17.8 | 1999 | 65.2 | 13.2 |
| 1974 | 67.9 | 17.6 | 2000 | 65.6 | 13.5 |
| 1975 | 65.8 | 17.7 | 2001 | 63.4 | 13.1 |
| 1976 | 63.8 | 17.8 | 2002 | 66.7 | 12.6 |
| 1977 | 62.5 | 19.1 | 2003 | 66.9 | 12.6 |
| 1978 | 63.6 | 18.8 | 2004 | 66.0 | 13.2 |
| 1979 | 63.3 | 19.2 | 2005 | 68.0 | 12.9 |
| 1980 | 62.4 | 19.3 | 2006 | 67.9 | 12.2 |
| 1981 | 62.4 | 19.4 | 2007 | 68.0 | 12.1 |
| 1982 | 60.2 | 20.9 | 2008 | 66.9 | 13.4 |
| 1983 | 58.3 | 21.8 | 2009 | 67.1 | 13.4 |

KR0615

| 1984 | 58.4 | 21.2 | 2010 | 67.5 | 13.1 |
|------|------|------|------|------|------|
| 1985 | 58.7 | 21.1 | 2011 | 67.7 | 13.4 |
| 1986 | 59.1 | 20.5 | 2012 | 69.3 | 12.4 |

Between 1961 and 2012, the percentage of guns used in murder increased from one year to the next thirty-one times, and in those thirty-one years, the percentage of knives used in murder decreased twenty-four times. Similarly, the percentage of guns used in murder decreased from one year to the next eighteen times, and in those eighteen years when gun usage decreased as a percent of murder, knife usage increased fifteen times. In the three years when gun use in murder was unchanged (1981, 1987 and 1997), the change in knife usage was either .2 or less. Thus, there is a strong statistical correlation between use of guns and knives in murder: when gun use goes up, knife use usually falls, and vice versa. It is not a precise 1:1 correlation. During the late 1960s and early 1970s, gun violence was increasing even faster than knife violence. Even so, the combined total percent of knives and guns used in murder has been remarkably consistent at around 80%, with the lowest combined total at 76.5% and the highest at 85.5%.

In 1961, the U.S. murder rate was 4.8 per 100,000; the rate peaked in 1980 at 10.2. So while knife use in murder decreased from 24% to 19% by weapon used, the murder rate with knives increased from 1.16 in 1961 to 1.97 in 1980 (see Table 1).

So in looking at knife violence, we need to look at knife crime in conjunction with gun crime. If we only looked at the percentage of knives used in murder, we might conclude that knife control is working because between 1961 and 2011, knife murders as a percentage fell almost in half, from 24% to 13%. However, the knife numbers only look good because there has been such a huge increase in gun violence. Moreover, insofar as knife laws may have deterred possession of dangerous knives, these laws may have encouraged criminals to turn to guns (as opposed to even less dangerous weapons, or no weapon at all).

TABLE 3: PERCENT OF GUNS AND KNIVES USED IN AGGRAVATED ASSAULT IN THE U.S. 1965–2012

| Year | % Guns | % Knives | Year | % Guns | % Knives |
|------|--------|----------|------|--------|----------|
| 1965 | N/A | N/A | 1989 | 21.5 | 19.9 |
| 1966 | 18.8 | 33.6 | 1990 | 23.1 | 19.5 |
| 1967 | 20.9 | 32.8 | 1991 | 23.6 | 18.4 |
| 1968 | 23.1 | 31.0 | 1992 | 24.7 | 18.2 |
| 1969 | 23.8 | 29.8 | 1993 | 25.1 | 17.6 |
| 1970 | 24.3 | 28.0 | 1994 | 24.0 | 17.8 |
| 1971 | 25.1 | 27.0 | 1995 | 22.9 | 18.3 |
| 1972 | 25.3 | 26.3 | 1996 | 22.0 | 18.1 |
| 1973 | 25.7 | 24.6 | 1997 | 20.0 | 17.9 |
| 1974 | 25.4 | 24.2 | 1998 | 18.8 | 18.4 |
| 1975 | 24.9 | 23.5 | 1999 | 18.0 | 17.8 |

| 1976 | 23.6 | 23.5 | 2000 | 18.1 | 18.0 |
|------|------|------|------|------|------|
| 1977 | 23.2 | 23.2 | 2001 | 18.3 | 17.8 |
| 1978 | 22.4 | 22.6 | 2002 | 19.0 | 17.8 |
| 1979 | 23.0 | 22.5 | 2003 | 19.1 | 18.2 |
| 1980 | 23.9 | 22.0 | 2004 | 19.3 | 18.6 |
| 1981 | 23.6 | 22.0 | 2005 | 21.0 | 18.9 |
| 1982 | 22.4 | 23.2 | 2006 | 21.9 | 18.7 |
| 1983 | 21.2 | 23.9 | 2007 | 21.4 | 18.8 |
| 1984 | 21.1 | 23.2 | 2008 | 21.4 | 18.9 |
| 1985 | 21.3 | 22.7 | 2009 | 20.9 | 18.7 |
| 1986 | 21.3 | 22.0 | 2010 | 20.6 | 19.0 |
| 1987 | 21.4 | 21.4 | 2011 | 21.2 | 19.1 |
| 1988 | 21.1 | 20.5 | 2012 | 21.7 | 18.7 |

TABLE 4: PERCENT OF GUNS AND KNIVES USED IN ROBBERY IN THE U.S.
1973–2012

| Year | % Guns | % Knives | Year | % Guns | % Knives |
|------|--------|----------|------|--------|----------|
| 1973 | N/A  | N/A  | 1993 | 42.4 | 10.0 |
| 1974 | 44.7 | 13.1 | 1994 | 41.6 | 9.5 |
| 1975 | 44.8 | 12.4 | 1995 | 41.0 | 9.1 |
| 1976 | 42.7 | 13.0 | 1996 | 40.7 | 9.0 |
| 1977 | 41.6 | 13.2 | 1997 | 39.7 | 8.5 |
| 1978 | 40.8 | 12.7 | 1998 | 38.2 | 8.8 |
| 1979 | 39.7 | 13.2 | 1999 | 39.9 | 8.4 |
| 1980 | 40.3 | 12.9 | 2000 | 40.9 | 8.4 |
| 1981 | 40.1 | 13.1 | 2001 | 42.0 | 8.7 |
| 1982 | 39.9 | 13.6 | 2002 | 42.1 | 8.7 |
| 1983 | 36.7 | 13.6 | 2003 | 41.8 | 8.9 |
| 1984 | 35.8 | 13.4 | 2004 | 40.6 | 8.9 |
| 1985 | 35.3 | 13.3 | 2005 | 42.1 | 8.8 |
| 1986 | 34.3 | 13.5 | 2006 | 42.2 | 8.6 |
| 1987 | 33.0 | 13.5 | 2007 | 42.8 | 8.3 |
| 1988 | 33.4 | 13.6 | 2008 | 43.5 | 7.7 |
| 1989 | 33.2 | 13.4 | 2009 | 42.6 | 7.7 |
| 1990 | 36.6 | 12.0 | 2010 | 41.4 | 7.9 |
| 1991 | 39.9 | 11.0 | 2011 | 41.3 | 7.8 |
| 1992 | 40.3 | 10.6 | 2012 | 41.0 | 7.8 |

We see that the use of knives or cutting instruments in armed robbery is fairly low. Between 1974 and 1989, knives were used relatively consistently in about 13% of robberies. Of course, the robbery rate increased substantially during this time, so the actual numbers of robberies with knives increased. Nevertheless, given the relatively small percent of knives used in robbery, knife legislation is unlikely to have a serious effect on robbery.

There is a noticeable drop in the rate of knife use in robbery beginning in 1990, and during this period the rate of robbery overall also decreased substantially. There were no significant knife laws passed anywhere in the late 1980s or early 90s that would have affected knife use, so the apparent reason for the decline was the increased use of firearms. During the 1980s the percent of robberies with guns was consistently in the low to mid 30%

KR0617

range.  This percentage of gun robberies increased substantially after 1990.  This again suggests that the availability of guns is the single greatest factor affecting use of knives in crime.[138]  The conclusion to be drawn from this data is that unless the government can effectively keep guns out of the hands of criminals, reducing the availability of knives is unlikely to be effective.

## VII. INDIVIDUAL CASE STUDIES: OREGON, FLORIDA, AND NEW HAMPSHIRE

### A. Oregon

Oregon banned the possession of switchblades in 1957, making it one of the first states to do so.[139]  Switchblades remained illegal until the Oregon Supreme Court, on December 28, 1984, declared the ban to be an unconstitutional infringement on the constitutional right to bear arms as guaranteed in the Oregon Constitution.[140]

At the same time, the Oregon Court of Appeals was considering a related provision which made it illegal to carry any knife concealed, other than an "ordinary pocket knife."[141]  The court held that "ordinary" was not a meaningful distinction, and therefore all pocketknives were covered by this exception.[142]  The court further held that because a switchblade is a type of pocketknife, it was not illegal to carry a concealed switchblade.[143]  Within a few months, however, the legislature amended the statute, making it illegal to carry a switchblade concealed, and this restriction was upheld by the courts.[144]  Since 1985, it has been legal in Oregon to carry a switchblade or other knife if it is not completely concealed.[145]  The knife is not considered "concealed" so long as enough is visible that it is "readily identifiable as a weapon," even if most of the knife is not visible.[146]  Many

---

[138] The correlation between knives and guns in robbery, though still significant, is less with respect to homicide and assault, primarily because from the mid-1970s through the 1980s, the percentage of gun-use fell substantially, while knife-use remained constant.  Thomas B. Marvell & Carlisle E. Moody, *Specification Problems, Police Levels, and Crime Rates*, 34 CRIMINOLOGY, NO. 4. 609 (1996).

[139] State v. Delgado, 692 P.2d at 614 n.7.

[140] *Id.* at 614.

[141] State v. Pruett, 586 P.2d 800, 801 (1978*)*.

[142] *Id.* (noting that it is not "reasonable to uphold a statute by determining as a matter of Law that a particular knife is as a matter of Fact "an ordinary pocket knife." . . . [because] [t]hat leaves the statute even less certain of meaning").

[143] State v. Ramer, 671 P.2d 723, 724 (Or. Ct. App. 1983).

[144] State v. Smoot, 775 P.2d 344, 345 (Or. Ct. App. 1989) (upholding statute banning concealed carry of switchblades).

[145] State v. Johnson, 772 P.2d 426 (Or. Ct. App. 1989)

[146] State v. Turner, 191 P.3d 697, 701 (Or. Ct. App. 2008).  This seems to differ from the statutes of other states that consider switchblades *per se* dangerous weapons.  Even states where switchblades

switchblades and other pocketknives are now designed with a pocket/belt clip to allow them to be carried so that they are open to view. Thus, a switchblade could be carried with a pocket clip so that just the top of the knife is visible, so it would be impossible to tell that it was a switchblade.

Whether the open carry requirement has any effect on crime is arguable. In theory, if a knife is carried openly, then potential victims, or police, know about the threat and can protect themselves better. It might be true that some people who do not want to display a knife will choose to carry an "ordinary" pocketknife which they can legally carry concealed. While the open carry requirement might deter some people from carrying switchblades, if these knives are so valuable to criminals as opponents claim, it is hard to imagine that a ban on concealed carry will dissuade many would-be criminals.

There are a surprisingly large number of knife manufacturers in Oregon. Benchmade Knives is one of the largest domestic producers of switchblades. Benchmade started operations in California but set up a factory in Oregon in 1990, apparently to take advantage of the growing market for switchblades there.[147] Kershaw Knives, founded in Tualatin, Oregon in 1974, advertises a wide variety of switchblades.[148] Although it is unclear how quickly knife manufacturers were able to flood the Oregon market, certainly by the late 1980s switchblades were quite common in Oregon.

If we look at the overall rate of violent crime in Oregon, the state has long had an admirably low rate of violent crime. Violent crime in Oregon peaked in the mid-1980s and has declined dramatically ever since. Aggravated assault as a percent of the national average peaked in 1985, although it increased only 3% from the previous year. Murder as a percent of the national average peaked in 1986, and armed robbery in 1987. Table 5 shows the rate of aggravated assault, robbery, and homicide in Oregon from 1971 to 2000.

TABLE 5: RATE OF AGGRAVATED ASSAULT, ROBBERY, AND HOMICIDE IN OREGON 1971–2000

| Year | Agr. Assault Rate | Agr. Assault % of National | Robbery Rate | Robbery % of National | Homicide Rate | Homicide % of National |
|------|-------------------|----------------------------|--------------|-----------------------|---------------|------------------------|
| 1971 | 157.7 | 89.20% | 110.4 | 58.72% | 3.2 | 37.65% |

---

are not banned entirely, but are considered dangerous weapons, it appears to be illegal to carry them in any way that disguises the fact that they are switchblades. For example, the West Virginia statute provides, "A deadly weapon is concealed when it is carried on or about the person in such a manner that another person in the ordinary course of events would not be placed on notice that the deadly weapon was being carried." W.VA. CODE § 61-7-2 (2010).

[147] *See* BENCHMADE KNIFE COMPANY, *supra* note 115.

[148] *See* KERSHAW STORE, http://perma.cc/S7RE-3FDF (last visited Feb. 26, 2014).

KR0619

| 1972 | 143.1 | 76.69% | 109.5 | 60.60% | 5.5 | 61.80% |
|---|---|---|---|---|---|---|
| 1973 | 159 | 80.14% | 99.4 | 54.29% | 4.9 | 52.69% |
| 1974 | 198.7 | 92.76% | 130.8 | 62.49% | 5.6 | 57.73% |
| 1975 | 269.4 | 116.57% | 130.3 | 59.02% | 6.2 | 64.58% |
| 1976 | 285 | 122.21% | 132.7 | 66.58% | 4.2 | 47.73% |
| 1977 | 286.9 | 116.15% | 124.1 | 65.08% | 5.1 | 57.95% |
| 1978 | 325 | 123.00% | 131.1 | 66.96% | 5 | 55.56% |
| 1979 | 366.2 | 128.04% | 130.6 | 66.70% | 4.2 | 43.30% |
| 1980 | 291.4 | 97.62% | 152.4 | 69.78% | 5.1 | 50.00% |
| 1981 | 251.9 | 86.84% | 180.6 | 69.90% | 4.4 | 44.90% |
| 1982 | 260.6 | 90.11% | 167.3 | 70.06% | 5.1 | 56.04% |
| 1983 | 273 | 97.78% | 170.3 | 75.12% | 4.1 | 49.40% |
| 1984 | 287.8 | 99.17% | 168.6 | 81.96% | 4.8 | 60.76% |
| **1985** | **310.1** | **102.38%** | **185.6** | **88.68%** | **4.7** | **58.75%** |
| 1986 | 286.1 | 82.35% | 205.9 | 91.10% | 6.6 | 76.74% |
| 1987 | 292.2 | 83.18% | 196 | 91.89% | 5.6 | 67.50% |
| 1988 | 307.2 | 82.98% | 193 | 86.90% | 5.1 | 60.00% |
| 1989 | 315.4 | 82.27% | 151.8 | 64.79% | 4.8 | 55.17% |
| 1990 | 311.8 | 73.52% | 144.3 | 56.30% | 3.8 | 40.43% |
| 1991 | 301.5 | 69.58% | 150.1 | 55.04% | 4.6 | 46.94% |
| 1992 | 313.5 | 70.96% | 151.4 | 57.41% | 4.7 | 50.54% |
| 1993 | 323.7 | 73.52% | 129.6 | 50.63% | 4.6 | 48.42% |
| 1994 | 337.2 | 78.86% | 138.2 | 58.12% | 4.9 | 54.44% |
| 1995 | 355.8 | 85.06% | 137.9 | 62.43% | 4.1 | 50.00% |
| 1996 | 318.6 | 81.50% | 122.2 | 60.53% | 4 | 54.05% |
| 1997 | 295.1 | 77.23% | 117.5 | 63.10% | 2.9 | 42.65% |
| 1998 | 268.5 | 74.48% | 105.2 | 63.56% | 3.8 | 60.03% |
| 1999 | 252.6 | 75.56% | 86.2 | 57.43% | 2.7 | 47.37% |
| 2000 | 229.9 | 70.96% | 84.4 | 58.21% | 2 | 36.36% |

TABLE 5A: AGGRAVATED ASSAULT AND ROBBERY IN OREGON AS A
PERCENT OF NATIONAL AVERAGE RATE 1971–2000



### 1. Aggravated Assault

From 1975 through 1983, the rate of aggravated assault in Oregon was 289.9 per 100,000 inhabitants.  From 1985 through 1990, the rate of aggravated assault rose 4.8% to 303.8 per 100,000.  However, during this same period, the national rate of aggravated assault rose 35.3% (from 268.4 from 1975 through 1983, to 363.2 for 1985 through 1990).  In the five years prior to the legalization of switchblades in Oregon, the assault rate was 94.3% of the national average, and in the five years following legalization, it declined to 86.6% of the national average.  The ten year trends are even more striking.  In the ten years following legalization, the aggravated assault rate in Oregon dropped to 79.96% of the national average, and continued to fall.  In the ten years prior to legalization, the aggravated assault rate in Oregon was 107.75% of the national average.  Thus, we see a significant decline in the Oregon aggravated assault rate in the decade following legalization, and this trend has continued ever since.

### 2. Robbery

The numbers for robbery tell a slightly different story, and are not as clear cut as the assault numbers.  In the five years prior to legalization, the robbery rate in Oregon was 73.36% of the national average, and in the ten years prior to legalization, the rate was 69.12% of the national average.  In the five years after legalization, the Oregon robbery rate increased to 84.67% of the national average, which is clearly a significant increase.  However, in the following years, the robbery rate plummeted, and in the ten years following legalization the robbery rate was 70.09% of the national average.  Thus, while there was a short term rise in robberies in the four years from 1985 through 1988, robberies fell hugely in 1989 and have remained well below the national average ever since.  Moreover, looking at the robbery numbers for the 1980s, we see a clear trend.  From 1979 through 1984, Oregon robberies rose each year from 67% to 82% of the national average.  This trend continued through 1987 when it peaked at 92% of the national average, and then began to decline rapidly.  Thus, the increase in the years immediately following legalization can be explained as part of a trend that preexisted the 1984 legalization decision.  More convincing, however, is the long term trend which has seen almost thirty years of robbery rates well below the national average.

### 3. Homicide

In the five years prior to legalization, the Oregon murder rate was 52.22% of the national average.  In the five years following, the murder rate increased to 63.63%; however, in the next five years, the murder rate fell to 48.15% of the national average.

KR0621

Following within a year or two of the legalization of switchblades in Oregon, there was a substantial decrease in the rate of violent crime. Whether this decrease can be traced to legalization is questionable, but it certainly is not the result we would expect if switchblades contribute to violent crime. Because the legalization of switchblades should not affect non-violent crime, the rise or fall of non-violent crime should be independent of knife crimes. If non-violent crime were falling or remaining even during a period of time that violent crime was increasing, then this would suggest something other than just a general increase in criminal activity is responsible for the rise in violent crime. On the other hand, if non-violent crime rises and falls proportionately to violent crime, this suggests that both categories of crime are being influenced by the same factors. In other words, factors such as incarceration rates would be expected to influence both the violent and non-violent crime rates, while weapons laws should only affect the violent crime rate.

In fact, if we look at the non-violent crime rate in Oregon, we see that non-violent crime was low in the early 1980s, followed by a peak in 1988, and falling off sharply thereafter. See Table 6.

TABLE 6: RATE OF PROPERTY CRIME IN OREGON (PER 100,000) 1971–2000



Thus, the story for property crime as well as violent crime tells a consistent story. Property crime peaked in 1988, aggravated assault as a percent of the national average peaked in 1985, and the armed robbery and murder rates in Oregon in absolute terms (not as a percent of the national average) both peaked in 1986. Thus, both property and violent crime began to fall in the late 1980s, although it is significant for our study that

KR0622

violent crime began to decline before property crime, again a surprising result if switchblades contribute to violent crime.

Of course, to put these declines in proper perspective, we need to see if there are other factors that explain Oregon's reduction in crime in the late 1980s. Crime across the country declined dramatically beginning in the early 1990s, for reasons which are still hotly debated by criminologists.[149] The reduction in crime in Oregon appears to have presaged a reduction across the country, but it began several years earlier in Oregon. Unfortunately, there is no clear reason why this occurred. Of the various reasons suggested for reduction in crime nationally, none of them seem to apply in Oregon. Marvel and Moody, for example, have argued that having more police prevents crime.[150] But the number of police compared to the population in Oregon remained constant from 1986 to 1994, at 1.6 per 1000 residents.[151] Another factor suggested by criminologists is the incarceration rate.[152] Yet while the incarceration rate in Oregon increased rapidly in 1990 and following years, the incarceration rate was relatively constant through the 1980s, meaning this is not a plausible explanation for the sudden decrease in the mid 1980s.[153] Donohue and Levitt have argued that abortion rates have affected crime by reducing the highest criminal cohorts, pointing out that the five states that legalized abortion in 1969 or 1970 saw declines before the declines in crime began nationally.[154] But Oregon was not one of the five states to legalize abortion early, and by Donohue and Levitt's own terms, this should not have affected the crime rate in Oregon. Lott and Mustard have argued that liberalization of concealed carry laws in Oregon helped reduce crime, but the shall-issue laws in Oregon came into effect in 1990, several years after the decline began.[155]

Finally, some writers have suggested a link between crime and the

---

[149] Stephen D. Levitt, *Understanding Why Crime Fell in the 1990s: Four Factors that Explain the Decline and Six that Do Not*, 18 J. OF ECON. PERSP., NO. 1, 163–90 (Winter 2004).

[150] Thomas B. Marvell & Carlise E. Moody, *supra* note 140, at 609–46.

[151] Criminal Justice Comm'n, *Public Safety Plan* 17 (Mar. 2001), *available at* http://perma.cc/L92G-W9CN; Oregon Annual Crime Report, 1995 at 7–3, http://perma.cc/3GY3-BH8N.

[152] *See* Steven D. Levitt, *The Effect of Prison Population Size on Crime Rates: Evidence from Prison Overcrowding Litigation*, 111 THE Q. J. OF ECON. NO. 2 (1996).

[153] *Public Safety Plan*, supra note 151, at 37–38. Oregon adopted sentencing reform in November 1989 that caused incarceration rates to rise thereafter.

[154] John J. Donohue & Steven D. Levitt, *The Impact of Legalized Abortion on Crime*, 116 THE Q. J. OF ECON. NO. 2, 379, 395 (2001). The five early legalization states were Alaska, California, Hawaii, New York and Washington. Moreover, Oregon had both a lower abortion rate and a greater reduction in crime from 1985 to 1997 than either of its neighbors California and Washington. *Id.* at 398.

[155] John Lott & David Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. LEGAL STUD. 1 (1997).

KR0623

economy.[156]  If we look at Oregon unemployment rates, the unemployment rate peaked in Oregon in the winter of 1982 to 1983 at 21.1%.  As crime continued to increase from 1982 through 1986 as the unemployment rate was falling, there appears to be no correlation between unemployment and crime in Oregon.[157]  Accordingly, the reason for the decrease in crime in Oregon in the mid 1980s appears to be even more of a mystery than the nationwide decrease in crime.  In fact, the Oregon Supreme Court's rulings on knives appear to be one of the few important changes in Oregon law in the mid 1980s.  Obviously, this does not prove that the introduction of switchblades caused the reduction in crime, but we see no major changes in Oregon that would compensate for the introduction of switchblades, assuming such introduction was a problem.

In addition to the overall crime rates, we also have statistics on the rate at which knives were used in violent crime in Oregon.  The rate of knife use in assault and robbery in Oregon follows the same pattern noted for the overall crime rate.  The rate of knife assault in Oregon peaked in 1985 at 58.3, while the rate of robbery using a knife peaked in 1986 at 29.1.  As a percent of the national average, knife robbery peaked a year later in 1987.  In the following years, the rate of knife use in assault declined slightly, while the rate of knife use in robbery declined markedly.  The rate of knife use in assault and robbery is shown in Table 7.

TABLE 7: AGGRAVATED ASSAULT AND ROBBERY USING FIREARMS AND KNIVES IN OREGON 1975–1993

| Year | % Agr Assault w/ Firearm | % Agr Assault w/ Knife | Rate of Assault w/ Knife | Knife Rate as % of National | % Robbery w/ Firearm | % Robbery w/ Knife | Rate of Robbery w/ Knife | Knife Rate as % of National |
|------|------|------|------|------|------|------|------|------|
| 1975 | 15.98% | 14.55% | 39.1 | 71.99% | 43.00% | 9.53% | 12.4 | 45.29% |
| 1976 | 16.32% | 13.08% | 37.0 | 67.52% | 41.86% | 11.43% | 15.2 | 58.66% |
| 1977 | 16.32% | 13.08% | 38.0 | 66.32% | 39.43% | 11.61% | 14.3 | 56.81% |
| 1978 | 15.61% | 13.61% | 43.9 | 74.12% | 39.35% | 13.32% | 17.4 | 69.96% |
| 1979 | 15.37% | 13.21% | 48.0 | 74.59% | 40.22% | 12.86% | 16.8 | 58.27% |
| 1980 | 19.08% | 14.23% | 41.0 | 61.05% | 40.44% | 12.16% | 18.5 | 57.10% |
| 1981 | 21.24% | 17.61% | 44.4 | 69.76% | 36.97% | 11.88% | 21.5 | 63.52% |
| 1982 | 20.09% | 17.85% | 46.5 | 69.35% | 36.10% | 12.02% | 20.1 | 61.88% |
| 1983 | 18.98% | 16.75% | 46.0 | 68.88% | 33.62% | 11.02% | 18.9 | 64.13% |
| 1984 | 18.72% | 18.37% | 52.9 | 78.46% | 30.95% | 11.87% | 20.1 | 72.93% |
| **1985** | 20.26% | 18.70% | 58.3 | 84.48% | 30.64% | 13.20% | 24.6 | 88.36% |
| 1986 | 19.20% | 19.54% | 55.6 | 72.75% | 32.34% | 14.16% | 29.1 | 95.38% |
| 1987 | 19.18% | 17.81% | 51.8 | 68.59% | 34.42% | 14.30% | 28.2 | 97.75% |
| 1988 | 22.04% | 17.29% | 52.9 | 69.33% | 34.37% | 14.21% | 27.4 | 90.70% |
| 1989 | 22.57% | 17.81% | 57.3 | 75.87% | 31.24% | 14.30% | 22.1 | 70.38% |
| 1990 | 20.52% | 17.50% | 54.5 | 66.08% | 28.64% | 13.45% | 19.5 | 63.39% |

[156] *See* Levitt, *supra* note 150, at 163.

[157] *See Historical State Unemployment Rates Since 1976*, http://perma.cc/N7PR-2YDJ (last visited Feb. 26, 2014).

KR0624

| 1991 | 20.67% | 18.31% | 50.1 | 62.82% | 28.96% | 12.70% | 17.2 | 57.33% |
| 1992 | 22.32% | 17.62% | 52.1 | 64.78% | 30.47% | 13.30% | 19.9 | 71.20% |
| 1993 | 24.01% | 16.28% | 55.1 | 71.07% | 32.49% | 11.84% | 16.8 | 65.63% |

TABLE 7A: AGGRAVATED ASSAULT AND ROBBERY USING FIREARMS AND KNIVES IN OREGON 1975–1993



The rate of knife use in armed robbery is particularly striking. The use of knives in armed robbery increased quite dramatically, in the late 1970s and early 1980s, remaining high until 1988 when the knife-involved robbery rate fell sharply. So the rate of knife robbery and the percentage of robberies committed with knives was significantly higher in the four years following legalization of switchblades. In itself, this would suggest that legalization may have led to greater use of knives in robbery. However, the large declines in the rate of knife robbery in the following years suggests that legalization did not have such an effect, as it is hard to imagine why the effect of legalization would be only temporary.

Once again, we see a general correlation between use of knives and guns in armed robbery.[158] The rate of gun use in robbery declined from

---

[158] For nineteen years, from 1975 through 1994, in twelve of those years, the percentage of knives and guns used in armed robbery were inversely correlated (i.e. one moved down when the other moved up). In five years (1981, 1983, 1987, 1988, and 1990) both declined, while in 1986 and 1992 both went up. It is reasonable to assume that the substitution effect is stronger with respect to robbery than for assault, because robberies are more likely to be planned.

KR0625

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1517   Page 189 of 607

about 40% in the 1970s to about 30% in the mid 1980s and early 1990s Accordingly, part of the reason for the increase in knife use in the mid 1980s is the reduction in the use of firearms and their replacement with knives. What is most surprising is that in the late 1980s and early 1990s, the use of knives in robbery decreased, while the use of guns in robbery did not increase. So, for example, from 1975 through 1980 the rate of armed robbery using either a knife or a gun was always above 50% (averaging about 52%), while in the 1990s the rate of robbery with a knife or gun had declined to about 43%. Assuming there is a substitution factor between knives and guns, the temporary increase in the rate of knife use in robbery might be explainable if criminals in Oregon were having trouble obtaining firearms. Even if we assume the substitution effect was that fewer criminals used guns because switchblades were more readily available, that is not necessarily a bad effect, as most people consider guns to be more dangerous than knives.

If we look at the numbers for aggravated assault, in the four years preceding the legalization of switchblades, knives were used in 17.65% of aggravated assaults. In the four years following legalization, the rate of knife use in assault rose slightly to 18.34% of assaults. Not only is the increase very modest, but it is consistent with the ten year trend which showed a rise in knife use.

As a percentage of the national average, the rate of assault with knives in the ten years prior to 1985 was 70.2%, while in the following nine years the average very slightly increased to 70.64%. The assault rate with knives was 71.61% of the national average in the four years prior to 1985 and 73.79% of the national average in the four years following legalization. This is a small increase, but this is entirely attributable to one year, 1985, in which the rate peaked as a percent of the national average at 84.48%. In fact, both 1984 and 1985 saw significant increases in the rate of knife use in assault, which suggests that the increase in 1985 was part of a trend unrelated to legalization. It seems likely that the supply of switchblades in Oregon in 1985 was fairly low. With the exception of a slight two-year blip in 1984 and 1985, the rate of knife assault as a percent of the national average was consistently around 70% from 1975 through 1993.

It is also interesting to compare the rate of knife and gun use in assaults. We see less of a replacement correlation with assault than we saw with other crimes. This makes sense because many assaults will be spontaneous and unplanned using whatever weapon happens to be available. The numbers from Oregon show a steady increase in the rate of assault with both guns and knives between 1975 and 1986. From 1987 through 1993, the knife rate decreased slightly while the gun rate for assault increased slightly. One way to explain the increase in the rate of gun use in assaults is that more criminals carry guns in response to more law abiding citizens carrying switchblades. We could imagine a kind of

KR0626

personal arms race: if switchblades are legal, perhaps more criminals will resort to firearms.  While this is a theory to be examined for other states, in Oregon, the data provides minimal support for this theory.  What the trends in Oregon seem to show is that there was a general increase in the use of both guns and knives for many years prior to 1985.  Moreover, 1986 and 1987 actually show a slight decrease in the rate that firearms were used in crime.  Thus, we see no correlation between legalization of switchblades and the increase in gun use in assault.

The Oregon data suggests that the legalization of switchblades did not cause an increase in violent crime.  The data is somewhat mixed for the first couple of years following legalization, but by the late 1980s and early 1990s, we see a clear decrease in violent crime overall, and a clear decrease in the rate of knife use in violent crime.  Thus, the Oregon experiment indicates that the legalization of switchblades did not cause an increase in violent crime.

*B. Florida*

In 1985, the Florida legislature passed a statute providing as follows:

> It is unlawful for any person to manufacture, display, sell, own, possess, or use a ballistic self-propelled knife which is a device that propels a knifelike blade as a projectile and which physically separates the blade from the device by means of a coil spring, elastic material, or compressed gas.[159]

On its face, this does not appear to describe or apply to switchblades, but rather ballistic knives; that is, an object that shoots a knifelike blade. Indeed, according to the chief sponsor of this legislation in 1985, it was intended to cover objects that shot knife blades up to 35 feet.[160] Switchblades do not usually use a "coil spring," certainly not "elastic material," nor "compressed gas," from which the statute seems clearly to be referring to a spear-gun-like mechanism.[161]

---

[159] FLA. STAT. § 790.225 (1985).

[160] *See* House of Representatives Staff Analysis of HB 1227 at 2, *available at* http://perma.cc/5UMX-8MWN 9 (last visited Feb. 26, 2014).

[161] *See generally* State v. Darynani, 774 So. 2d 855 (Fla. Dist. Ct. App. 2000).  Although the Florida Court of Appeals in *Darynani* asserted that "It is common knowledge that a switchblade operates on a coil spring or other device that springs the blade out from the handle or casing," in fact, most switchblades use a leaf spring, not a coil spring.  *See Switchblade Knife LEAF SPRINGS,* http://perma.cc/AC39-57F4 (last visited Feb. 26, 2014).  However, some traditional switchblades do not use a coil spring.  *Switchblade Knife COIL SPRINGS,* http://perma.cc/YAF5-SRBZ (last visited Feb. 26, 2014).  Ballistic knives, however, use a coil spring or sometimes compressed gas.  *Ballistic*

**KR0627**

It is not entirely clear when the state began using this statute to prosecute people for possession of switchblades, but in 2000 Pariya Darynani was prosecuted for selling switchblades at a flea market.[162] Darynani argued that the statute did not cover switchblades.[163]   The trial court ruled that they did not know exactly what the statute covered so any prosecution under the statute was unconstitutional because it did not give owners of switchblades fair notice that such objects are illegal.[164]   The Court of Appeals in a unanimous, per curiam decision, reversed the trial court, declaring that "it seems apparent the Legislature intended to distinguish switchblade knives from folding-type knives that require manual and deliberate removal of the knife blade from the handle or casing."[165]   As a result, the court interpreted the statute to ban all switchblades, including knives equipped with a leaf spring, and the court's language could even be interpreted to ban gravity knives, although there are no reported cases of prosecution for gravity knives in Florida.

In 2003, the Florida legislature amended the statute to clarify that the projectile in question must physically separate from the knife, thereby legalizing switchblades.[166]   The bill was passed unanimously by both houses of the legislature and signed by the governor in June of 2003.[167] The statute now reads: "This section shall not apply to: (a) Any device from which a knifelike blade opens, where such blade remains physically integrated with the device when open."[168]

Aside from once again illustrating that courts and citizens do not know what to make of such statutes, the benefit of this story for a researcher is that we have a clear date at which switchblades were legalized.  Although it is unclear how many prosecutions there were under this statute or when they began precisely, spring-operated switchblades were clearly illegal between the time the Court of Appeals ruled in 2000 and the legislature changed the law in 2003.  Other than apparently not being able to carry a concealed switchblade, there are no other restrictions on adults owning or

---

*Knife*, Wikipedia, Feb. 12, 2014 5:45pm, http://perma.cc/S6MJ-3EB6.  There is no indication that the knife in the *Darynani* case had a coil spring.

[162] *Darynani,i* at 857–58 (Fla. Dist. Ct. App. 2000).

[163] *Id.*

[164] *Id.* at 857.  In legal terms, he argued that the statute was unconstitutionally vague.

[165] *Id.* at 858.  The Court did not look at legislative history which might have resolved this issue. A per curiam opinion (literally "by the court") means the opinion was unsigned and usually means the court did not take the argument very seriously and could dismiss it without much discussion.  Had they checked the legislative history the meaning of the statute would have been clear.

[166] *House of the Rep. Staff Analysis of HB 1227, available at* http://perma.cc/QDU4-U5QK  (last visited Feb. 26, 2014).

[167] *Id.*

[168] Fl. Stat. § 790.225 (2013).

KR0628

carrying switchblades in Florida.[169]    There are a number of Florida switchblade manufacturers, making them common in that region.[170]

Of course, one could argue that the 2003 legalization might not be expected to do very much—the statute never covered "gravity knives." Without including gravity knives, a switchblade ban might be ineffective.

In any event, Florida showed a clear decline in knife use in both armed robbery and assault following the legalization of traditional switchblades in 2003.  The rates from 1995 to 2011 are shown in Table 8 below.

TABLE 8: FLORIDA CRIME RATE 1995–2011

| Year | Ag Assault | Ag As as % national ave. | Robbery | Rob. as % national ave. | Homicide | Homicide as % national ave. |
|------|-----------|--------------------------|---------|--------------------------|----------|------------------------------|
| 1995 | 715.1 | 170.95% | 299.9 | 135.76% | 7.3 | 89.02% |
| 1996 | 702.2 | 179.59% | 289.2 | 143.24% | 7.5 | 101.35% |
| 1997 | 688.7 | 180.24% | 276.1 | 148.28% | 6.9 | 101.47% |
| 1998 | 639.9 | 177.06% | 242.7 | 146.65% | 6.5 | 103.17% |
| 1999 | 590.5 | 176.64% | 211.6 | 140.97% | 5.7 | 100.00% |
| 2000 | 563.2 | 173.83% | 199.0 | 137.24% | 5.6 | 101.82% |
| 2001 | 551.7 | 173.16% | 200.7 | 135.15% | 5.3 | 94.64% |
| 2002 | 530.1 | 171.28% | 195.2 | 133.61% | 5.5 | 98.21% |
| **2003** | **500.6** | **169.47%** | **185.4** | **130.11%** | **5.4** | **94.74%** |
| 2004 | 495.8 | 171.79% | 172.5 | 126.19% | 5.4 | 98.18% |
| 2005 | 497.2 | 170.98% | 169.6 | 120.45% | 5.0 | 89.29% |
| 2006 | 485.6 | 168.90% | 188.8 | 126.37% | 6.2 | 108.77% |
| 2007 | 473.2 | 166.74% | 209.1 | 141.67% | 6.6 | 117.86% |
| 2008 | 449.7 | 162.52% | 196.9 | 135.14% | 6.3 | 116.67% |
| 2009 | 410.6 | 155.12% | 166.7 | 125.24% | 5.5 | 110.00% |
| 2010 | 369.8 | 146.57% | 138.7 | 116.46% | 5.2 | 108.33% |
| 2011 | 348.0 | 142.92% | 134.4 | 114.77% | 5.2 | 107.50% |

Violent crime was declining throughout this period both in Florida and nationally.   However, in the years 1995 through 2003, the decline in violent crime in Florida basically kept pace with the national decline, and in the years 2004 through 2011, there was a clear decrease in both aggravated assault and robbery as a percent of the national average. Interestingly, there was an increase in the murder rate of about 8% compared to the national average, which was about the same rate of decrease for aggravated assault and robbery.

---

[169] Other than what the statute calls a "common pocketknife," all other knives are treated equally. FL. STAT. 790.001 (2013).  Unlike many states where switchblades are *per se* "deadly weapons" they are not treated as such in Florida.

[170] Microtech Knives was established in 1994 in Vero Beach, Florida and advertises a wide variety of military style switchblades.  *History*, MICROTECH, http://perma.cc/3DV2-E4PX (last visited Mar. 1, 2014).

KR0629

TABLE 9: VIOLENT CRIME IN FLORIDA AS A PERCENT OF NATIONAL AVERAGE

|  | Aggravated assault | Robbery | Homicide |
|---|---|---|---|
| 1995-2002 average | 175.34% | 140.11% | 98.71% |
| 2004-2011 average | 160.69% | 125.79% | 107.08% |

TABLE 10: RATE OF PROPERTY CRIME IN FLORIDA (PER 100,000) 1995–2011



TABLE 11: FLORIDA AGGRAVATED ASSAULT USE OF FIREARMS AND KNIVES BY PERCENTAGE 1995–2011

| Year | Ag Assault w/ Firearm | Ag Assault w/ Knife | Ag Assault w/ Knife as % of National | Robbery w/ Firearm | Robbery w/ Knife | Rob. w/ Knife as % of National |
|---|---|---|---|---|---|---|
| 1995 | 21.9 | 19.4 | 106.01% | 38.9 | 6.6 | 72.53% |
| 1996 | 23.8 | 19.1 | 105.52% | 40.8 | 8.2 | 91.11% |
| 1997 | 20.7 | 18.3 | 102.23% | 40.8 | 7.3 | 85.88% |
| 1998 | 17.4 | 18.4 | 100.00% | 39.5 | 6.8 | 77.27% |
| 1999 | 15.3 | 18.5 | 103.93% | 38.0 | 6.9 | 82.14% |
| 2000 | 14.0 | 18.6 | 103.33% | 37.5 | 7.1 | 84.52% |
| 2001 | 14.1 | 18.3 | 102.81% | 39.0 | 7.3 | 83.91% |
| 2002 | 14.7 | 17.8 | 100.00% | 39.0 | 7.3 | 83.91% |
| **2003** | **15.1** | **18.0** | 98.90% | **39.0** | **7.0** | 78.65% |
| 2004 | 15.7 | 17.8 | 95.70% | 38.3 | 7.5 | 84.27% |
| 2005 | 17.1 | 17.8 | 94.18% | 39.7 | 7.4 | 84.09% |
| 2006 | 18.3 | 17.7 | 94.65% | 42.0 | 6.9 | 80.23% |
| 2007 | 20.2 | 17.9 | 95.21% | 46.9 | 6.7 | 80.72% |
| 2008 | 20.2 | 17.7 | 93.65% | 46.7 | 6.3 | 81.82% |
| 2009 | 19.8 | 17.0 | 90.91% | 44.2 | 6.3 | 81.82% |
| 2010 | 19.2 | 17.8 | 93.68% | 42.6 | 6.6 | 83.54% |
| 2011 | 19.8 | 17.5 | 91.62% | 42.0 | 6.2 | 79.49% |

TABLE 11A: AGGRAVATED ASSAULT AND ROBBERY IN FLORIDA AS A
PERCENT OF NATIONAL AVERAGE 1995–2011



Florida shows a clear decline in knife use for armed robbery and assault, both in the rate per 100,000 and as a percent of the national average.

With respect to aggravated assault, in the eight years prior to 2003 the average rate of knife use was 18.55%, and in the eight years after it was 17.64% (a decline of 4.9%). With respect to robbery, in the eight years prior to 2003 the rate of knife use was 7.19%, and in the eight years after it was 6.74% (a decline of 6.3%).[171]   These decreases are not huge, to be sure, and they are accompanied by an increase in the use of firearms. One explanation for the decrease in knife use as a percentage of crime is that criminals had wider access to firearms and preferred firearms to knives, switchblade or not. Certainly the numbers indicate that wider availability of switchblades in Florida did not lead to wider use of knives in violent crime.

Moreover, the percentage at which knives were used in robbery and assaults in Florida is well below the national average. The national average of cutting instruments used in aggravated assaults was 18.84% between 2004 through 2011, while in Florida it was 17.64%. Between 1995 and 2002, on average knives in the United States were used in

---

[171] If we used 2001 through 2003 as the comparison years (because of uncertainty regarding how strenuously the law was enforced prior to 2000), the numbers would be virtually identical and show a slight decline.

KR0631

18.01% of aggravated assaults.  The 4.9% drop in knife usage in Florida in the eight years following legalization is all the more dramatic when noting that nationally, knife use in aggravated assaults actually increased by about 5%.  To put this in further perspective, it should be noted that gun use in aggravated assaults in Florida rose from 17.74% in the eight years before legalization to 18.9% in the years following, although this rise was almost identical to the rise seen on the national level over the same period (which rose from 19.64% to 20.7%).  Thus, when compared to the national average, we see the rate of gun usage in aggravated assault remaining about the same but a significant decrease in use of knives.  This is surely not the result one would expect if switchblades were heavily used in violent crime.

The national average for use of cutting instruments in robbery between 2004 and 2011 was 8.21%, while in Florida the rate was only 6.74%.  In contrast, the rate of gun usage in Florida is only slightly higher than in the United States as a whole, 42.8% compared to 42.06% between 2004 and 2011.  Although it should be noted that the rate of knife-involved robbery in Florida has been constantly lower than the national average, which has also been declining.  The national rate of knife usage in robbery between 1995 and 2003 averaged 8.72%.  Thus, the national average declined 5.8% while Florida declined 6.3%, just barely beating the national average.  Using the national average as a comparison, the decline in use of knives in Florida robberies suggests that the legalization of switchblades had little effect on the use of knives in robbery.

### C. New Hampshire

Although New Hampshire legalized switchblades only in May of 2010,[172] it presents something of a unique case that makes it worthwhile to examine, despite limited data.  For one thing, the Northeast consistently has higher rates of knife use in violent crime than other parts of the country.[173]  While the reasons for this are not entirely clear, two factors are clearly relevant.  Most states in the Northeast have strict gun control, and these laws may have made it more difficult for criminals to acquire guns, and therefore they turn to knives as an alternative.  Conversely, the lower overall ownership of firearms in the northeast means that victims of crime are less likely to be armed with a gun, and therefore criminals may not

---

[172] H.B. 1665-FN, (N.H. 2010), *available at* http://perma.cc/7YZ-AL5Y.

[173] In 2012, for example, the Northeast region, as defined by the FBI Uniform Crime Reports, showed that knives were used in 15.4% of homicides; in 22.7% assaults; and in 10.1% robberies.  All three categories were higher than the other three regions (South, Midwest, and West).  *See Uniform Crime Reports (2012)*, FBI, *available at* http://perma.cc/6UAQ-8FDV (last visited Mar. 6, 2014).  Prior year UCR report similar results.  *See Uniform Crime Reports*, FBI, *available at* http://perma.cc/3F3E-G4GK (last visited Mar. 6, 2014).

KR0632

think they need more powerful weapons.  The second factor is that there appears to be a long culture of knife use in northeastern cities such as New York, Boston, and Philadelphia.

New Hampshire, like other northeastern states, has knife crime rates that are much higher than the national average.  Thus, in many ways, New Hampshire is the polar opposite of Oregon.  Oregon never seems to have had a serious problem with knife crime, and so legalization of switchblades in Oregon may be expected to have little effect on crime.  In the northeast, where knife use is more prevalent, we would expect to see a greater effect on crime rates from legalization.

The New Hampshire Act became effective May 18, 2010.[174]  The new statute not only repealed the provision prohibiting possession of a switchblade, but also removed any restriction on carrying concealed knives.[175]  It should also be noted that in 2011, the legislature passed a further provision which prevented any local government from restricting knives.[176]  There are a number of companies in New Hampshire that are advertising switchblades for sale.[177]

In the short time since the legalization of switchblades and the end of all restrictions on knife carry, knife violence in New Hampshire has shown a marked decline, although violent crime and property crime have risen.

Table 12 shows the crime rate in New Hampshire from 2001 through 2012.  Tables 14 and 15 show the rate of knife violence in assaults and robberies from 2005 through 2012.

TABLE 12: NEW HAMPSHIRE ASSAULT AND ROBBERY RATES 2001–2012

| Year | Ag Assault | Ag Assault as % of National | Robbery | Robbery as % of National |
|------|-----------|------------------------------|---------|---------------------------|
| 2001 | 97.2 | 30.51% | 35.3 | 23.77% |
| 2002 | 93.0 | 30.05% | 32.4 | 22.18% |
| 2003 | 77.8 | 26.34% | 37.2 | 26.11% |
| 2004 | 93.8 | 32.50% | 38.5 | 28.16% |
| 2005 | 74.3 | 25.55% | 27.9 | 19.82% |
| 2006 | 93.9 | 32.66% | 34.7 | 23.23% |
| 2007 | 82.8 | 29.18% | 33.4 | 22.63% |
| 2008 | 97.5 | 35.24% | 32.1 | 22.03% |
| 2009 | 95.2 | 35.97% | 34.3 | 25.77% |
| 2010 | 100.4 | 39.79% | 34.3 | 28.80% |
| 2011 | 118.2 | 49.03% | 36.0 | 31.66% |
| 2012 | 118.7 | 48.15% | 38.9 | 33.45% |

[174] H.B. 1665-FN, (N.H. 2010), *available at* http://perma.cc/7YZ-AL5Y.

[175] Felons are still prohibited from carrying any concealed weapon, however.

[176] H.B. 544 (N.H. 2011), *available at* http://perma.cc/99AK-MH8D.

[177] White Mountain Knives, in Barrington, advertises a small selection of switchblades. WHITE MOUNTAIN KNIVES, http://perma.cc/D6TA-S9W3 (last visited Feb. 19, 2014).  Highlander Arms in Spofford advertises it is a distributor of Benchmade knives. HIGHLANDER ARMS, http://perma.cc/5X3C-V3MY (last visited Feb. 19, 2014).

TABLE 13: NEW HAMPSHIRE PROPERTY CRIME RATE PER 100,000 2005–2011



We see a small but steady increase in property crime in New Hampshire between 2005 and 2011.  This suggests that part of the increase in violent crime is explained by the same causes of the increase in property crime.  While the robbery rate increase is consistent with the increase in property crime, the rate of increase in aggravated assaults for 2011 is substantially higher than the increase in property crime.

TABLE 14: NEW HAMPSHIRE USE OF KNIVES OR CUTTING INSTRUMENTS IN AGGRAVATED ASSAULT 2005–2012

| Year | Total Ag Assaults in NH | Ag Assaults w/ Gun | Ag Assaults w/ Knife | % of Ag Assaults w/ Knife | % of National |
|------|------|------|------|------|------|
| 2005 | 825 | 112 | 286 | 34.7% | 183.60% |
| 2006 | 884 | 140 | 309 | 35% | 187.17% |
| 2007 | 713 | 130 | 233 | 32.7% | 173.94% |
| 2008 | 1,023 | 167 | 343 | 33.6% | 177.78% |
| 2009 | 1,151 | 191 | 392 | 34% | 181.82% |
| **2010** | **1,220** | **202** | **401** | **32.9%** | **173.16%** |
| 2011 | 1,435 | 171 | 409 | 28.6% | 149.74% |
| 2012 | 1,386 | 177 | 406 | 29.3% | 156.35% |

Admittedly, two full years of data is of limited value statistically, but the first year of switchblade legalization in New Hampshire (2010) saw a decline in the rate of knife use in aggravated assaults.  In the two following years, there was a dramatic decline in the rate at which knives were used in assaults.  Between 2005 and 2009, knives or cutting instruments were used

KR0634

in 34% of assaults. There was a slight decline in 2010, but in 2011 and 2012 the percentage was 28.95%, which is a drop of 15% in the rate at which knives were used in assaults over the prior five-year period. Surprisingly, there was also a significant decline in the use of firearms in assault in 2011 and 2012. The rate of knife use compared to the national average declined from 180.62% to 153.05% of the national average in the five years prior to 2011 and 2012. A decrease in the rate of both knives and guns in aggravated assaults in the two and a half years following legalization and concealed carry of all types of knives is certainly not what we would expect if switchblades were a serious criminal problem.

The New Hampshire numbers are particularly interesting because the overall assault rate in these years increased (actually doubling from 2007 to 2011), but the rate of knife assault has declined. On the one hand, it could be argued that if the overall assault rate increased, the experiment with legalizing switchblades was a failure, as the obvious goal is not just to reduce knife crime but to reduce all crime. In this instance, however, we can see that the crime rate was trending up prior to legalization, and nonviolent crime also rose, suggesting that legalization was probably not responsible for the increase of assaults. What is more interesting is that despite the fact that switchblades and other concealed knives were more prevalent on the streets of New Hampshire, this did not result in these knives being used more frequently in assault.

TABLE 15: NEW HAMPSHIRE USE OF KNIVES OR CUTTING INSTRUMENTS
IN ROBBERY 2005–2012

| Year | Total Robbery in NH | Rob. w/ Guns | Rob. w/ Knife | % of Rob. w/ Knife | % of National |
|------|---------------------|--------------|---------------|--------------------|---------------|
| 2005 | 332 | 75 | 44 | 13.25% | 150.57% |
| 2006 | 380 | 75 | 72 | 18.95% | 220.35% |
| 2007 | 174 | 44 | 24 | 13.79% | 166.14% |
| 2008 | 353 | 76 | 48 | 13.60% | 176.62% |
| 2009 | 431 | 85 | 72 | 16.71% | 217.01% |
| 2010 | 427 | 94 | 50 | 11.71% | 148.10% |
| 2011 | 450 | 111 | 57 | 12.67% | 162.44% |
| 2012 | 454 | 104 | 65 | 14.32% | 184.06% |

With respect to armed robbery, we have a small sample size, and while the numbers are not as dramatic as for assault, there is a significant decrease in the rate of knife use in robberies. From 2005 through 2009, an average 15.26% of robberies used knives in New Hampshire. Obviously there was a huge decrease in 2010, but even 2011 and 2012 averaged 13.5%. As a percent of the national rate, New Hampshire averaged 186.14% from 2005 to 2009, and there is a clear decline in the use of knives in armed robbery following legalization.

**KR0635**

TABLE 15A: NEW HAMPSHIRE KNIFE USE IN AGGRAVATED ASSAULT AND ROBBERY AS A PERCENT OF NATIONAL AVERAGE 2005–2011



Again, with the caveat that two and half years is not a very large sample size, we see a clear decline in the rate of knife use in robbery and assault. Yet, at this same time there was a significant increase in overall crime as well as an uptick in the use of firearms used in robbery in 2010 and 2011. From 2005 through 2009, firearms were used 21.77% of robberies, and this percentage increased to 22.01% in 2010 and 24.67% in 2011. Although long-term trends remain unknown, this uptick in the use of firearms could be a result of the legalization of the possession and concealed carry of knives. If robbers are concerned that victims may be armed with knives, robbers may be arming themselves with guns in response. It is harder to explain the increase in crime as a reaction to the legalization of knives and concealed carry of knives. If the rate of knife usage declines, even if they are replaced by guns, there is no apparent reason that should increase in the total number of crimes.

Of course, it is entirely possible that the increase in crime in 2010 through 2012 is simply unrelated to the legalization of knives. This theory is supported by the fact that there was a trend of increasing assault and robbery in New Hampshire in the three years preceding the legalization, and there is a clear trend of increasing property crime during these years.

With respect to homicide, the number of murders each year in New Hampshire is so small that the statistics are not very useful. However, the reader may be interested to know that on average from 2005 through 2009 there were 12.2 homicides per year in New Hampshire and a knife was used in 31.15% of the cases. In 2010, the rate of knife use in murder in

KR0636

New Hampshire increased to 38.46%, and in 2011 fell to 25.0%, and 21.4% in 2012.[178]

### D. Missouri

Missouri legalized switchblades in July 2012, but news accounts suggest people began purchasing switchblades in large numbers that year.[179] We obviously have extremely limited data for Missouri, and while statistically these numbers are not worth much weight, the following table shows the crime rate for knife use in the Show-Me State for 2012 compared to earlier years.

TABLE 16: MISSOURI USE OF KNIVES OR CUTTING INSTRUMENTS IN CRIME[180]

|               | Ag Assault w/ Knife | Robbery w/ Knife | Murder w/ Knife |
|---------------|---------------------|------------------|-----------------|
| 2012          | 13.13%              | 5.81%            | 7.46%           |
| Prior 5 years | 13.40%              | 5.60%            | 9.04%           |

Again the reader is cautioned not to put much weight on these numbers, especially as one would not expect a partial year of legalization to have much effect. Despite this, there is very little change in the knife use in assault or robbery, and while the rate of use in homicide is significant, there were only 29 knife murders in Missouri in 2012.

### E. Arizona

Before concluding this article, a brief comment on Arizona is in order. As noted earlier, Arizona legalized carrying any concealed weapon, either a firearm or anything else, without a permit.[181] Although switchblades had been legal, this law made them easier to carry. Therefore, this general concealed carry law only incidentally affected knife owners.[182] Moreover, the effect on knife use seems likely to be overshadowed by the more significant change in permitting concealed carry of firearms without a permit. Presumably, if a would-be criminal can legally carry a knife or a

---

[178] *Uniform Crime Reports 2012, Table 20*, FBI, *available at* http://perma.cc/CN9Y-U3Y5 (last visited Mar. 6, 2014). While there was a decrease in the rate of knife use in homicide, the samples are so small, the author would not wish to place any emphasis on the murder rate.

[179] Michael D. Sorkin, *Pocket knife sales soar on renewed popularity*, ST. LOUIS POST DISPATCH, Dec. 30, 2012, *available at* http://perma.cc/5RSM-8DNP.

[180] Based on data from the Uniform Crime Reports, 2007–2012. *See Uniform Crime Reports*, FBI, *available at* http://perma.cc/V769-RLRM (last visited Mar. 1, 2014).

[181] Lacey, *supra* note 6, at 1; *see also* S.B. 1153 (Ariz. 2010), *available at* http://perma.cc/76LB-A8MP.

[182] *See* Kevin Kiley, *Arizona's concealed-weapon law takes effect*, ARIZ. REPUBLIC, Jul. 29, 2010, *available at* http://perma.cc/X3P8-PX2X.

KR0637

gun, then he or she would choose the gun.  We would typically expect that if guns are more prevalent, then knife crime would tend to decrease anyway, so a decrease in knife crime may have more to do with an increase in gun carrying.  However, some people may be far more comfortable carrying a pocketknife—even a switchblade—than carrying a gun.  Thus, the law might have more effect on a knife-user than one would initially suspect.  At the end of the day, however, Arizona data is difficult to interpret given the context of the law change, which might have a very small effect on knife use.

That said, I present here limited data on Arizona crime comparing knife use in crime since 2010 with the prior five years, as shown in the table below.

TABLE 17: ARIZONA USE OF KNIVES OR CUTTING INSTRUMENTS IN CRIME[183]

|  | Ag Assault w/ Knife | Robbery w/ Knife | Murder w/ Knife |
|---|---|---|---|
| 2010-12 | 17.20% | 9.94% | 13.86% |
| Prior 5 years | 17.06% | 10.25% | 11.72% |

As can be seen, the effect on knife crime of the concealed weapons law on assault and on armed robbery appears quite small, with a very slight increase in knife use in assaults, and a small decrease in use of knives in robbery.  These numbers suggest the new law had little effect on knife use in crime, but this is somewhat surprising given the liberalization of firearm carrying laws.  One would expect to see a far larger decrease in armed robbery using knives if robbers are concerned about encountering armed citizens.  Even more surprising is the increase in knife use for murder after the new law.  One might have thought that the Arizona law would lead to an "arms race" where citizens and criminals become more heavily armed, but preliminary data suggests the law has not had that effect.

## VIII. CONCLUSIONS

It should be emphasized that conclusions at this point are preliminary and based on limited data.  As more data becomes available for New Hampshire and other states that have recently legalized switchblades, hopefully more definitive conclusions can be reached.  Proponents of banning switchblades predicted that the ban would reduce crime.[184]  Based

---

[183] Based on data from the Uniform Crime Reports, 2005–2012.  *See Uniform Crime Reports*, FBI, *available at* http://perma.cc/73FQ-TFM7 (last visited Mar. 6, 2014).

[184] *Hearings on H.R. 12850 and S. 2558, supra* note 74, at 27 (statement by Mr. Pino, New York state senator).

KR0638

on existing data there is no evidence that switchblade bans have had any significant effect either on crime overall, or on the use of knives in crime. After the widespread banning of switchblades in the United States in the late 1950s, violent crime skyrocketed.  After switchblades were legalized in Oregon and Florida, violent crime also fell.  This is particularly true with respect to aggravated assault where knives are far more common than in other types of violent crime.  The New Hampshire data is even more striking, because the use of knives in crime dropped significantly after legalization in a culture where knife use in crime was common, although the overall crime rate (both violent and non-violent) rose.

With respect to the rate at which knives have been used in violent crime, following the bans in the 1950s the use of knives in crime continued to increase, but the use of guns in crime increased even faster. Accordingly the decrease in the *percentage* of crimes committed with knives appears to be due to the increase in availability and use of firearms. Given the lack of solid data on the use of knives in crime during the 1950s, it is possible that the widespread criminalization of switchblades may have encouraged criminals to switch to guns.  That is, while the juvenile delinquent of the 1950s carried a switchblade, the juvenile delinquents of the 1960s and '70s were more likely to carry guns.

In all three states that legalized switchblades (Oregon, Florida, and New Hampshire), there was an overall decrease in the percentage of crimes committed with knives.  There are two theories with respect to these declines.  First, there may simply be no relationship between legalization and decreased rate of knife use in crime.  Under this theory, switchblade laws simply have no effect on criminal behavior.  An alternative theory however, is that if knives are more prevalent, would-be criminals will turn to guns in order to be more heavily armed than law-abiding citizens who now may arm themselves with knives.  The data from New Hampshire is consistent with this theory, although not conclusive given the limited data. In any event, there is no data showing that legalization of switchblades has caused any significant increase in the rate of knife use in crime.

The data is consistent with the observation of critics of bans that there is no practical difference between switchblades and other pocket knives.  If these knives have only cosmetic differences, it makes sense that banning them or legalizing them will have little to no effect on crime.[185] Furthermore, there is no evidence of any proxy effect or utility in crime fighting that might make cosmetic differences relevant.  That is to say, even cosmetic difference (like gang colors) might be a useful law

---

[185] Although strictly beyond the scope of this paper, this data suggest that whenever the government bans something which has readily available alternatives, or merely induces cosmetic changes to a product that there is unlikely to be any significant effect on human conduct.

KR0639

enforcement tool for identifying criminals and ultimately fighting crime. Such circumstances would be difficult to document statistically. There is no doubt anecdotal evidence from law enforcement that have utilized switchblade laws to arrest suspects they "just knew were up to no good." But there is no evidence from the data on the states surveyed here that such laws have any significant effect on crime.

**KR0640**

**PLAINTIFFS' EXHIBIT V**

KR0641

# Antique American
# Switchblades



## Mark Erickson

## Identification & Value Guide

KR0642

# Contents

Introduction ............................................ 6

Parts Terminology ................................. 10

Styles, Shapes & Trade Names of Blades ...... 11

Grading Switchblade Knives ..................... 12

Blade Chart .......................................... 17

Handle Chart ........................................ 19

Function Chart ...................................... 20

Measuring Wiggle, Droop and Wobble .......... 21

Grading List .......................................... 21

George Schrade 1860-1940 ..................... 22

Manufacture Timeline ............................. 24

**KNIVES**

Aerial Cutlery Manufacturing Co. ............... 25

Aerial & Olsen Knife Co. Knives ................. 28

Automatic Knife Company ......................... 30

Bowie Knife Co. ..................................... 32

Buffalo Cutlery Company .......................... 33

Camillus Cutlery Co. ............................... 34

CASE W.R. Case & Sons .......................... 36

Cattaraugus Cutlery Company .................... 39

Challenge Cutlery Corporation ................... 40

Colonial Knife Company ........................... 42

Crandall Cutlery Company ........................ 49

Cutino Cutlery Company .......................... 50

Edgemaster .......................................... 51

E. Weck & Son ...................................... 57

Flylock Knife Company ............................ 59

George Schrade Knife Co. ........................ 64

Hatch Cutlery Company ........................... 70

JCN Co. ............................................... 80

KA-BAR ............................................... 81

Keen Kutter .......................................... 84

Keenwell Brown Mfg Co. .......................... 87

Korn's–Patent George W. Korn .................. 89

L.L. Bean Inc. ....................................... 91

Norvell–Shapleigh Hardware Co. ................ 92

Press Button Knife .................................. 94

PRESTO .............................................. 101

Queen Cutlery Company .......................... 109

R.C. Kruschke ...................................... 111

Remington ........................................... 113

Russell Automatic Knife Co. ..................... 115

Schrade Cutlery Company ........................ 116

Schrade Walden Cutlery Corp. .................. 131

Schrado .............................................. 137

Shapleigh Hdw Co. ................................ 138

Union Cutlery Company ........................... 141

Utica Cutlery Company ............................ 142

Wade & Butcher .................................... 143

Blade Illustration Guide .......................... 144

Celluloid ............................................. 155

Patterns, Nicknames and Misc. Terminology ....... 156

Miscellaneous Switchblade Tang Stamps ......... 158

Trademarks, Etches & Marketing Names ......... 159

Switchblade Manufacturers ...................... 160

Bibliography ......................................... 160

**KR0643**

# Introduction

What do you think of when you hear the word switchblade? Do images of gangs from the 1950s come to mind? Maybe you think of large, intimidating Italian stilettos in the hands of dangerous criminals? Those are the images that were thrust in front of the American public by sensationalistic and narrow-minded media and politicians during the 1950s. Certain members of Congress took it upon themselves to convince everyone that these knives were to blame for much of the crime in this country. They were trying to find a way to outlaw switchblade knives in the United States. They painted images of switchblade knives as the "weapon of choice" for gang members and dangerous criminals. They wanted the public to believe that these "evil knives" were relatively new to this country and that their only possible use was as a dangerous weapon. They never mentioned the fact that switchblade knives were a useful tool appreciated by hunters, fishermen, trappers, store clerks, farmers, mechanics, firemen and many others in this country. Switchblades were very popular with women, especially in the early 1900s. Not only did having a switchblade in the purse save many broken fingernails, switchblades were also very handy tools to have in the sewing kit. They often still turn up in old sewing machine drawers. Switchblade knives were extremely handy for the fisherman and there was a time when most tackle boxes were not complete without a switchblade knife inside. They were also very popular watch fobs and many gentlemen put them on the end of their watch chains.

Somehow the Congressmen who were feverishly trying to outlaw these knives, and gain attention for themselves, overlooked all of these facts. They didn't bother to mention that the majority of the switchblades manufactured in the United States prior to 1958 measured from 2 ¼ inches to 4 inches closed and could be comfortably carried in the pocket or coin purse. It also escaped their attention that many were designed to put on a chain with your keys. Does this sound like a group of dangerous weapons, with no other purpose than to maim or kill? It saddens me to realize that we had a Congress that could be manipulated into outlawing interstate commerce of one of the most useful and beloved tools in the history of our country. Maybe they should have outlawed hammers while they were at it. They are certainly dangerous weapons in the hands of a criminal.

## History

Would it surprise you to know that switchblade knives had actually been in this country for over 75 years when these public figures were busy telling congress how switchblades were new to this country. The manufacture of switchblades in the United States began in the 1880s, shortly after the first switchblade patents were granted in this country. They were in mass production by the mid 1890s and fast becoming the most useful cutting tool one could carry and gaining in popularity and public acceptance. Over a 50-year period from the mid 1890s to the mid 1940s there had been approximately 20 different companies who had manufactured switchblade knives in this country. There were switchblades specifically designed for hunters, fishermen, soldiers, farmers, veterinarians, mechanics, office workers, seamstresses, high school girls, Boy Scouts and also for Girl Scouts. How's that for a list of dangerous criminals? They were also a very popular advertising giveaway and can be found with advertising from around the country, both on the handles and etched on the side of the blades.

The origins of the switchblade knife go back much farther than one might imagine. I know that they were being manufactured in England in the mid 1800s and France and Italy were making them well before that. I am very confident that they were brought to this country from Europe by the mid 1800s, and quite possibly before that.

## As a Collectible

Fortunately knives are appreciated and sought after by collectors from around the world, so the value of knives, especially antique collectible knives, seems to be on a steady rise. Collectors the world over are constantly hunting for knives to add to their collections and the demand for antique knives is very high. Collector fever is very catchy and can make people do strange things. The hunt for a particular knife can be extremely challenging and exciting. The price that a collector is willing to pay for a knife can depend upon many things and the harder it is to find, usually the higher the price a collector is willing to pay. This behavior quite often leads to exorbitant prices being paid for very rare knives and surprisingly you don't often hear of buyer's remorse when it comes to rare antique knives. You do, on the other hand, hear a lot of "oohs" and "ahhs" whenever these knives are brought out for other collectors to appreciate.

If you ask most collectors why they collect knives you'll most likely hear something like "for the joy of collecting", or "I've loved knives since I was a boy", or possibly "I love the hunt." I have yet to have someone tell me "as an investment", and yet there is obviously

KR0644

**PLAINTIFFS' EXHIBIT W**

KR0645



About Us    Contact Us    USD

0



**KR0646**

LATAMA is a name that all switchblade enthusiasts are familiar with. No other manufacturer has never equaled the overall quality and variety of switchblade designs that LATAMA has produced.

LATAMA's history has been argued to extend as far back as before World War 2. But, LATAMA's initial switchblade collection spanned less than ten years, and those were prior to the enactment of the 1958 Federal Switchblade Act.

Almost all of LATAMA's production has imported into the U.S. extending back to out origins. Americans have always been the principal consumers of LATAMA switchblades. Prior to the Federal Switchblade Act, LATAMA dominated retailers across America, providing all major outlets with cutlery.

After World War 2, the demand for steel, brass, and nickel was high, and the resources in Europe were exhausted from the war. Seeing this, LATAMA drew from skilled artisans in Maniago, Italy. They were able to establish switchblade manufacturing as a "cottage industry" there. Individual artisans were financed and supplied from America with the raw materials for manufacturing knives. This decentralized approach towards the manufacturing of LATAMA switchblades makes up the wide variety of designs produced.

One of the rare LATAMA designs is the 'square' button models produced in very limited quantities. They were created as samples or prototypes but did not appeal to the retailers who wanted to stay with the traditional button and sliding safety models. The button is positioned where the front bolster meets the scale, almost touching the bolster. Most square button models have a very novel safety feature; a small piece of brass pivots under the button to prevent it from being depressed. The safety is released by pivoting the top, front bolster, and then a small extension on the bottom end of the bolster catches the brass safety and pivots it from under the button.

Another unique characteristic of the square-button is the way it locks up the blade in the closed position. Unlike the lock-up with the traditional button, these required a cut-out in the blade. The button tops a post with a distinct lathed or shape to it. The post bisects the inside of the knife, extending through both liners. When the blade is closing, the shape of the button post connects with the cut-out, and the button is pulled down and pops back up as it is seated in the blade.

One of the things that has always separated LATAMA from other switchblades is attention to detail. The fit and finish LATAMA switchblade is superior to its era.

Walt tells us the recent story about Latama and his passion for this historic Italian switch blade



# A Timeline of the Switchblade

When you hear the mention of Italian switchblade stiletto, you can instantly conjure up a picture in your head. While the word is most often associated with an Italian switchblade, its origins date back to fixed blade daggers from the 1400s.

**The Early Years (the 1400s to the 1800s)**

The English and Italian word 'stiletto' is derived from the Latin word 'stilus.' This refers to a knife with a long thin blade designed primarily for thrusting. Initially used by knights to penetrate chainmail armor, the stiletto evolved to become the weapon of choice for mercenaries and assassins from the 1500s through the 1800s.

Three cities in Italy were primarily producing switchblade knives: Frosolone, Scarperia, and Maniago. The classic 'S' guard stiletto types were made in Maniago and most recognizable among Americans.

The earliest known Italian catalog shows different spring-fired examples, dating back to 1896. These first models and the switchblades made in Maniago were made entirely by hand up until World War 2.

### Pre-World War 2

Before the war, production numbers were small for these knives and were made mainly by individual knife makers belonging to cooperatives. The purpose of these was to help the makers increase their buying power of materials and the selling and distributing of their knives.

Most switchblades that are found from that era are stamped with "Maniago" on the blade or "S. Coop" (for Societa Cooperativa). A maker's name may have been stamped on the blade as well, but those were few and far between.

The traditional "S" guard type was the most common Maniago stiletto style early on, and they are still seen in today's modern version. While these were the more popular style, other variations did exist, including the knives with the Maltese-style handguards. The most common blade type was the bayonet shape, but dagger and kris shapes were also used.

The earliest stiletto switchblades featured genuine stag handles, but soon horn became the material most often used. Very few early examples have been found with wood, mother-of-pearl, and ivory handles.

Another trait shared by these pre-war models was they were primarily "pick-lock" type. The back spring had a rounded tab that stuck out over the top bolsters on the side. The tab is pushed away from the bolster to unlock and manually close the blade.

### World War 2 (1939-1945)

Nearly all switchblade examples from the beginning of World War 2 were fired by traditional oval or round firing buttons set in the front handle. These same models also each had small sliding safety buttons, which, when sliding forward towards the

firing button, would prevent the firing button from being pushed. GIs returning home from the war brought back the Italian switchblade, which would soon become a hit in America.

## The 1950s

After World War 2 the popularity of the switchblades exploded. Department stores such as Macy's were selling them. Every kid and young man wanted one if they didn't already have one. Box office movies like "Rebel Without a Cause" and "West Side Story" portrayed the switchblade as both the defender of justice and a tool of fear.

Partially driven by the developments of the war, but also the demand for products, switchblades from Maniago stepped into the modern age following the war. Previously, all knives were made by hand and assembled one at a time. After the war, many makers started to stamp out or manufacture parts in groups and produced the knives into batches instead of individually. The faster mechanization of knives led to greater productivity of all things world-wide, which impacted many companies, from General Motors in the U.S. to an individual knife maker in Maniago. The demand became so great in the U.S. during the 1950s that men, women, and even children were assembling knives in Maniago and could barely keep up with production.

But the early 1950s brought forward some negativity to the switchblade. Senator Estes Kefauver of Tennessee said that a ban on switchblades would significantly decrease gangs and violence. In 1958, the federal ban was enacted in the United States, making the manufacturing, distribution, and ownership of switchblades a federal crime. The law was written with the word 'territory' and not 'state,' which meant that individual states began interpreting and enforcing their own laws. This could range from siding with the federal government to offering no laws against the production or ownership of switchblade knives.

Even though America had been Italy's largest import market, they were not their only customers. While it was a massive loss for Maniago, they continued to make switchblades on a smaller scale for other customers worldwide.



### The Second Half of the 20th Century

The second half of the twentieth century saw small knife shops in Maniago continue to produce switchblades as laws started to lighten in America. Around 1980, switchblades from Maniago began finding their way back to the U.S. despite the federal import laws. Since the federal act, the Italian switchblade stiletto has had a renaissance and is nearly as popular today as it first was in the 1950s.

**KR0651**

## The 21st Century

Most states in America have overturned the ban on switchblades, and only about half a dozen states still consider switchblades illegal. But, many of these states have various requirements or restrictions on them. The federal ban on transporting switchblades across state lines is still in effect, but it is rarely enforced.



Subscribe

**KR0652**

Sign up to get the latest on sales, new releases and more …

Enter your email address...

Sign Up

## Quick Links

Search

Privacy Policy

Return Policy

Terms and Conditions

## Additional Services

Premium Horn

Knife Restoration

## Company Info

About Us

Contact Us

## Get In Touch

Call Us: 631.668.5995

Email: pick@latama.net

© 2023 LATAMA.

         

KR0653

# PLAINTIFFS' EXHIBIT X

KR0654

# The History of Bans on Types of Arms Before 1900

David B. Kopel[*]

Joseph G.S. Greenlee[**]

## Table of Contents

Introduction ................................................................................3

I. English history ........................................................................6
A. Arms Bans in England ..................................................... 6
B. Repeating Firearms in England...................................... 10
    1. The Kalthoff Repeating Rifle ............................ 12
    2. The Lorenzoni repeating handguns and rifles . 13

II. The Colonial Period and Early Republic ........................14
A. The English Colonies ..................................................... 15
B. New Sweden .................................................................. 17
C. New Netherland............................................................. 18
D. Arms Mandates in Colonial America............................. 21
    1. Who was required to keep or bear arms? ........ 21
    2. Types of mandatory arms................................. 24
E. Repeating Arms ............................................................. 37
F. Cannons......................................................................... 40
G. Overview ....................................................................... 44

III. Nineteenth Century Advances in Arms ........................47
A. James Madison and James Monroe, .................................
the founding fathers of modern firearms ............................ 48
B. The American system of manufacture ............................ 48
C. The revolution in ammunition ....................................... 51

   [*] Adjunct Professor Constitutional Law, University of Denver, Sturm College of Law; Senior Fellow, University of Wyoming College of Law, Firearms Research Center; Research Director, Independence Institute, Denver, Colorado; Adjunct Scholar, Cato Institute, Washington, D.C. http://davekopel.org.

   [**] Director of Constitutional Studies, FPC Action Foundation, Las Vegas, Nevada; Policy Advisor for Legal Affairs, Heartland Institute, Arlington Heights, Illinois; http://josephgreenlee.org. The authors would like to thank Connor Cheadle for research assistance.

1

D. Advances in repeating arms..............................................54
E. Continuing advances in firearms were well-known to the Founders   63
F. Perspective ................................................................66

IV. Firearms bans in the 19th Century............................................69
A. Georgia ban on handguns, Bowie knives, and other arms69
B. Tennessee ban on many handguns .................................70
C. Arkansas ban on many handguns, and Bowie knives....71
D. Florida licensing law for repeating rifles and handguns72

V. Bowie Knives.................................................................76
A. The history of Bowie knives and Arkansas toothpicks ..78
    1. What is a Bowie knife?...................................78
    2. What is an Arkansas toothpick? ......................80
    3. The crime in the Arkansas legislature ............80
B. Survey of Bowie knife statutes.......................................82

VI. Other weapons.............................................................116
A. Daggers, dirks, and other sharp weapons ...................117
    1. Daggers and dirks.........................................117
    2. Sword canes ................................................121
    3. Spears........................................................123
    4. Razors........................................................124
    5. Butcher knives ............................................125
    6. Swords.......................................................125
B. Slungshots and other flexible impact weapons ...........126
    1. Slungshots and colts.....................................129
    2. Slingshots...................................................139
    3. Sand Clubs .................................................141
    4. Blackjacks ..................................................142
    5. Billies vs. Billy clubs ....................................143
C.   Rigid impact weapons ..............................................144
    1. Knuckles ....................................................144
    2. Loaded Canes..............................................148
D. Cannons .....................................................................148

VII. Doctrinal Analysis ......................................................151
A.   Summary of possession or sales bans......................152
B.   The constitutional and racial background of possession or sales bans
    ..............................................................................154
C. Modern doctrines .......................................................157

**KR0656**

    1. "Dangerous and unusual" versus "not typically possessed by law-abiding citizens": The distinction applied to slungshots and brass knuckles. ....................................... 157

    2. How many jurisdictions make a tradition? .... 160

D. Application of history and modern doctrine .......................
to particular types of laws.................................. 164

    1. Sales prohibitions on slungshots and knucles 164

    2. Modern semiautomatic firearms and magazines165

    3. Minors ............................................................. 169

    4. Penalties for criminal misuse ........................ 170

Conclusion.................................................................................173

## INTRODUCTION

This Article describes the history of bans on particular types of arms in America, through 1899. It also describes arms bans in England until the time of American independence. Arms encompassed in this article include firearms, knives, swords, blunt weapons, and many others. While arms advanced considerably from medieval England through the nineteenth-century United States, bans on particular types of arms were rare.

The U.S. Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen* instructed lower courts to decide Second Amendment cases "consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history."[1] *Bruen* examined the legal history of restrictions on the right to bear arms through 1899.[2] This Article focuses on one aspect of the legal history of the right to *keep* arms: prohibitions on particular types of arms.

Part I describes prohibitions on possession of firearms and other arms in England. The launcegay, a type of light lance for horsemen, was banned, as

---

[1] N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 2126–27 (2022) (discussing District of Columbia v. Heller, 554 U.S. 570 (2008)).

[2] The further from the Founding, the less useful the legal history. While the Court did address some laws from the late nineteenth century, laws after 1900 were pointedly not examined: "We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

were small handguns, although the handgun ban was widely ignored. A class-based handgun licensing law was apparently little enforced. While most firearms were single-shot, repeating firearms existed for centuries in England, with no special restrictions.

Part II covers America from the colonial period through the Early Republic. No colonial law banned any particular arm. The Dutch colony New Netherland came the closest when it limited the number of flintlocks colonists could bring into the colony, in an effort to quash the trading of flintlocks to Indians. In the British colonies, there were many laws requiring most people, including many women, to possess particular types of arms. This Article is the first to provide a complete, item-by-item list of every mandated arm. Some private individuals owned repeating (multi-shot) firearms and cannons, but such arms were far too expensive for a government to mandate individual possession.

As summarized in Part III, the nineteenth century was the greatest century before or since for firearms technology and affordability. When the century began, an average person could afford a single-shot flintlock musket or rifle. By the end of the century, an average person could afford the same types of firearms that are available today, such as repeaters with semiautomatic action, slide action, lever action, or revolver action. Ammunition had improved even more.

The rest of the article describes nineteenth century laws forbidding particular types of arms. Part IV examines the four prohibitory laws on particular types of firearms: Georgia (most handguns), Tennessee and Arkansas (allowing only "Army & Navy" type handguns, *i.e.* large revolvers), and Florida (race-based licensing system for Winchesters and other repeating rifles).

Part V turns in depth to the most controversial arm of nineteenth-century America: the Bowie knife. Sales were banned in a few states, and possession was punitively taxed in a few others. The mainstream approach, adopted in most states that regulated Bowies, was to ban concealed carry, to forbid sales to minors, or to impose extra punishment for criminal misuse. As Part V explains, Bowie knife laws usually applied to various other weapons too.

Part VI summarizes the nineteenth century laws about the various other weapons. These include other sharp weapons (such as dirks, daggers, and sword canes), flexible impact arms (such as slungshots and blackjacks), rigid impact arms (such as brass knuckles), and cannons. Possession bans were rare, whereas laws on concealed carry, sales to minors, or extra punishment for misuse were more common.

KR0658

Part VII applies modern Second Amendment doctrine to the legal history presented in the Article. It suggests that some arms prohibitions and regulations may be valid, but bans on modern semiautomatic rifles and magazines are not.

If this Article described only possession bans for adults, it would be very short. Besides outright bans on possession, the Article also describes laws that forbade sales or manufacture. These are similar to possession bans, at least for future would-be owners.[3] Even with sales or manufacture bans included, this Article would still be very short. So for all arms *except* firearms, the Article provides a comprehensive list of nonprohibitory regulations, such as concealed

---

[3] A sales ban that allows existing owners to continue possession is not as intrusive as a ban on all possession. But because a sales ban is a ban on new possession, it should be analyzed as a similar to a prohibition, rather than a regulation, as the Ninth Circuit explained in *Jones v. Bonta*:

> [E]ven though this is a commercial regulation, the district court's historical analysis focused not on the history of commercial regulations specifically but on the history of young adults' right to keep and bear arms generally. *See* [*Jones v. Becerra*, 498 F. Supp. 3d 1317, 1325–29 (S.D. Cal. 2020)]. The district court was asking the right question.
>
> "Commerce in firearms is a necessary prerequisite to keeping and possessing arms for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017). We have assumed without deciding that the "right to possess a firearm includes the right to purchase one." *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017). And we have already applied a similar concept to other facets of the Second Amendment. For example, "[t]he Second Amendment protects 'arms,' 'weapons,' and 'firearms'; it does not explicitly protect ammunition." [*Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014)]. Still, because "without bullets, the right to bear arms would be meaningless," we held that "the right to possess firearms for protection implies a corresponding right" to obtain the bullets necessary to use them. *Id.* (citing *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)).
>
> Similarly, without the right to obtain arms, the right to keep and bear arms would be meaningless. *Cf. Jackson*, 746 F.3d at 967 (right to obtain bullets). "There comes a point . . . at which the regulation of action intimately and unavoidably connected with [a right] is a regulation of [the right] itself." *Luis v. United States*, 578 U.S. 5, 136 S. Ct. 1083, 1097, 194 L. Ed. 2d 256 (Thomas, J., concurring in the judgment) (quoting *Hill v. Colorado*, 530 U.S. 703, 745, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000) (Scalia, J., dissenting)). For this reason, the right to keep and bear arms includes the right to purchase them. And thus laws that burden the ability to purchase arms burden Second Amendment rights.

*Jones v. Bonta*, 34 F.4th 704, 715–16 (9th Cir. 2022).

carry bans, limits on sales to minors, and extra punishment for use in a crime. This Article is the first to provide a full list of all colonial, state, and territorial restrictions on these arms. We also list some local restrictions, such as by a county or municipality, but we have not attempted a comprehensive survey of the thousands of local governments. To be sure, however, the nonprohibitory regulations were not as severe as arms prohibitions. They still allowed peaceable adults to keep and bear the regulated arms. Laws that forbade a particular arm to be kept or carried were historical rarities.

# I.   ENGLISH HISTORY

According to *Bruen*, old English practices that ended long before American independence are of little relevance.[4] The only applicable English precedents are those that were adopted in America and continued up through the Founding Era.[5] For prohibition of particular types of arms, there are no such English precedents. Section A describes what prohibitions did exist at some point in England. Section B describes the availability of repeating arms, which were expensive, in England and the Continent.

## A. Arms Bans in England

In 1181, King Henry II enacted the Assize of Arms, which required all his free subjects to be armed, except for Jews, who were forbidden to have armor.[6] The Assize grouped people into wealth categories. Every male in a particular category had to have certain quantities of particular types of arms and armor—

---

[4]    English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution. . . . Sometimes, in interpreting our own Constitution, 'it is better not to go too far back into antiquity for the best securities of our liberties,' *Funk* v. *United States*, 290 U. S. 371, 382, 54 S. Ct. 212, 78 L. Ed. 369 (1933), unless evidence shows that medieval law survived to become our Founders' law.

*Bruen*, 142 S. Ct. at 2136 (brackets omitted).

[5] "A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice." *Id.* at 2136.

[6] 27 Henry II, art. 3 (1181).

no more and no less.[7] The Assize was prohibitory in that a person could own only the specified arms and armor for his particular income group. But the Assize was more concerned with armor than with weapons, and was not prescriptive about ownership of swords, knives, bows, or blunt weapons.[8]

The Assize of Arms was replaced in 1285 by the Statute of Winchester, under Edward I.[9] It required all males in certain income groups to have *at least* particular quantities of arms and armor.[10] The Statute of Winchester created

---

[7]

> Let every holder of a knight's fee have a hauberk, a helmet, a shield and a lance. And let every knight have as many hauberks, helmets, shields and lances, as he has knight's fees in his demesne.
>
> Also, let every free layman, who holds chattels or rent to the value of 16 marks, have a hauberk, a helmet, a shield and a lance. Also, let every layman who holds chattels or rent worth 10 marks an "aubergel" and a headpiece of iron, and a lance.
>
> Also, let all burgesses and the whole body of freemen have quilted doublets and a headpiece of iron, and a lance.
>
> . . .
>
> Any burgess who has more arms than he ought to have by this assize shall sell them or give them away, or in some way alienate them to such a man as will keep them for the service of the lord king of England. And none of them shall keep more arms than he ought to have by this assize.
>
> Item, no Jew shall keep in his possession a shirt of mail or a hauberk, but he shall sell it or give it away or alienate it in some other way so that it shall remain in the king's service.
>
> . . .
>
> Item, the justices shall have proclamation made in the counties through which they are to go that, concerning those who do not have such arms as have been specified above, the lord king will take vengeance, not merely on their lands or chattels, but their limbs.

27 Henry II, art. 3 (1181), *in* English Historical Documents 448 (David Douglas & G.W. Greenaway eds., 2d ed. 1981).

[8] We use the distinct terms "arms" and "armor" in the modern sense; a knife is an "arm" and a Kevlar vest is "armor." In medieval England, and early nineteenth century America, the two terms were not so different; the one often included the other.

[9] 13 Edward I, ch. 6 (1285), *in* 1 Statutes of the Realm 97–98 (1800).

[10]

> It is commanded, That every Man have in his house Harness for to keep the Peace after the antient Assise; that is to say, Every Man between fifteen years of age, and sixty years, shall be assessed and sworn to Armor according to the quantity of their Lands and Goods; that is to wit, [from] Fifteen Pounds Lands,

*Journal of Legislation* [50:2

only mandatory minima for arms, not maxima.[11] Persons could own whatever quantity they chose above the minima, and they could also own arms that were not mandatory for their income group.

In 1383, King Richard II outlawed the possession of "launcegays."[12] The ban was restated the following decade after its lack of enforcement led to a "great Clamour."[13] Launcegays were a type of light spears, "occasionally used as a dart," and considered "offensive weapons."[14] The heavier war lance was not prohibited.

---

and Goods Forty Marks, an Hauberke, [a Breast-plate] of Iron, a Sword, a Knife, and an Horse; and [from] Ten Pounds of Lands, and Twenty Marks Goods, an Hauberke, [a Breast-plate of Iron,] a Sword, and a Knife; and [from] Five Pound Lands, [a Doublet,] [a Breast-plate] of Iron, a Sword, and a Knife; and from Forty Shillings Land and more, unto One hundred Shillings of Land, a Sword, a Bow and Arrows, and a Knife; and he that hath less than Forty Shillings yearly, shall be sworn to [keep Gis-armes,] Knives, and other [less Weapons]; and he that hath less than Twenty Marks in Goods, shall have Swords, Knives, and other [less Weapons]; and all other that may, shall have Bows and Arrows out of the Forest, and in the Forest Bows and [Boults.]

*Id.* (Brackets in original of *English Historical Documents*).

[11] *Id.*

[12]

It is ordained and assented, and also the King doth prohibit, That from henceforth no Man shall ride in Harness within the Realm, contrary to the Form of the Statute of Northampton thereupon made, neither with Launcegay within the Realm, the which Launcegays be clearly put out within the said Realm, as a Thing prohibited by our Lord the King[.]

7 Richard II, ch. 13 (1383), *in* 2 STATUTES OF THE REALM 35 (1816).

[13]

Our Lord the King, considering the great Clamour made to him in this present Parliament, because that the said Statute is not holden, hath ordained and established in the said Parliament, That the said Statutes shall be fully holden and kept, and duly executed; and that the said Launcegayes shall be clear put out upon the Pain contained in the said Statute of Northampton, and also to make Fine and Ransom to the King.

20 Richard II, ch. 1 (1396–97), *in* 2 STATUTES OF THE REALM 93 (1816).

[14] GEORGE CAMERON STONE, A GLOSSARY OF THE CONSTRUCTION, DECORATION AND USE OF ARMS AND ARMOR IN ALL COUNTRIES AND IN ALL TIMES 410 (1999) ("LANCE-AGUE, LANCEGAYE. A light lance, occasionally used as a dart. It was carried in place of the war lance in the 14th century; the latter, at the time, was about fourteen feet long and very heavy."); NATHAN BAILEY, AN UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY BEING ALSO AN INTERPRETER OF HARD WORDS (2d ed. 1724) ("LAUNCEGAYS, Offensive Weapons prohibited and disused.").

KR0662

There were many English laws based on class rule. For example, a 1388 statute from the notorious Richard II forbade servants and laborers from carrying swords and daggers, except when accompanying their masters.[15] During the late seventeenth century, until the Glorious Revolution of 1688, laws against hunting by commoners were interpreted so as to make firearms possession illegal for most of the population; the bans were often evaded.[16]

A 1541 statute from King Henry VIII outlawed handguns less than one yard in length and arquebuses and demihakes (types of shoulder guns) less than three-fourths of a yard in length. Additionally, people with an annual income below 100 pounds were prohibited from possessing any handgun, crossbow, arquebus, or demihake without a license.[17] Licenses were granted at discretion, as a reward from one's superiors.[18]

No license was needed by inhabitants of market towns or boroughs, anyone with a house more than two furlongs (440 yards) outside of town, persons who lived within five miles of the coasts, within 12 miles of the Scottish border, or

---

[15] 12 Richard II ch. 6 (1388).

[16] NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY, E. GREGORY WALLACE, & DONALD E. KILMER, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS AND POLICY 2136–38 (Aspen Publishers, 3d ed. 2021).

[17]

> [T]hat noe pson or psons of what estate or degree he or they be, excepte he or they in their owne right or in the right of his or their Wyeffe to his or their owne uses or any other to the use of any suche pson or psons, have landes tente fees annuyties or Office to the yerely value of one hundred pounde, from or after the laste daye of June next comynge, shall shote in any Crosbowe handgun hagbutt or demy hake, or use or kepe in his or their houses or elswhere any Crosbowe handgun hagbut or demy hake, otherwise or in any other manner then ys hereafter in this Present Acte declared. . . .
>
> [N]o pson or psons, of what estate or degree soever he or they be, from or after the saide laste daye of June shall shote in carye kepe use or have in his house or els where any handgune other then suche as shalbe in the stock and gonne of the lenghe of one hole Yarde, or any hagbutt or demyhake other then suche as shalbe in the stock and gune of the lenghe of thre quarters of one Yarde. . .

33 Henry VIII, ch. 6, § 1 (1541), *in* 3 STATUTES OF THE REALM 832 (1817).

Hackbut is an archaic spelling of arquebus, a type of long gun. A demihake was a short hackbut. JOHNSON ET AL., *supra* note 16, at 2116–17.

[18] The Tudor monarchs handed out many licenses—including to commoners whom the king wanted to reward, and to nobles to allow their servants to be able to use the arms outside the home. LOIS G. SCHWOERER, GUN CULTURE IN EARLY MODERN ENGLAND 65–73 (2016).

on various small islands.[19] The Henrican 1541 statute "[g]radually . . . fell into disuse. Soon, only the £ 100 qualification was enforced. . . ."[20] The law was obviously contrary to *Heller* and is no precedent for today.[21]

In 1616, King James I outlawed dags—a type of small handgun.[22] As he noted, they were already technically illegal (due to the minimum barrel length rule from Henry VIII), but the law was being disregarded.[23] So was James's new order against dags.[24]

We are unaware of any evidence that launcegays were ever an issue in colonial America. We are likewise unaware of any American source recognizing the Henry VIII or James I handgun laws at all, let alone their application in America.

## B. Repeating Firearms in England

In the words of Harold Peterson, Curator for the National Park Service, and one of the twentieth century's greatest experts on historic arms, "The desire for . . . repeating weapons is almost as old as the history of firearms, and there were numerous attempts to achieve this goal, beginning at least as early as the opening years of the 16th century."[25]

The first known repeating firearms were 10-shot matchlock arquebuses that date to between 1490 and 1530.[26] "The cylinder was manually rotated around a central axis pin."[27] While it "failed to . . . become a popular martial or utilitarian firearm" due to its complicated and expensive design,[28] King Henry VIII (reigned 1509–1547) owned a similar gun.[29]

Henry VIII also owned a multi-shot combination weapon called the Holy Water Sprinkler. "It is a mace with four seperate steel barrels, each 9" long.

---

[19] Henry VIII, ch. 6 (1541).

[20] ROBERT HELD, THE AGE OF FIREARMS: A PICTORIAL HISTORY 65 (1956).

[21] *Bruen*, 142 S. Ct. at 2141 n.10 (noting that the last attempted prosecutions, which failed, were in 1693).

[22] A Proclamation Against Steelets, Pocket Daggers, Pocket Dagges and Pistols (R. Barker printer 1616).

[23] *Id.*

[24] SCHWOERER, *supra* note 18, at 182.

[25] HAROLD L. PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA 1526–1783, at 215 (1956).

[26] M.L. BROWN, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY, 1492–1792, at 50 (1980).

[27] *Id.*

[28] *Id.* at 50–51.

[29] W.W. GREENER, THE GUN AND ITS DEVELOPMENT 81–82 (9th ed. 1910).

KR0664

These barrels are formed into a wooden cylinder held with four iron bands, two of which have six spikes each."[30] Although made in Germany, these were sometimes referred to as "Henry VIII's walking staff,"[31] because "with it, he is represented to have traversed the streets at night, to see that the city-watch kept good order."[32]

The first known repeater capable of firing more than 10 shots was invented by a German gunsmith in the sixteenth century.[33] It could fire 16 superimposed rounds in Roman candle fashion[34]—meaning that one load was stacked on top of another and the user "could not stop the firing once he had started it."[35]

Charles Cardiff seemingly had something similar in mind with this 1682 patent, which protected "an Expedient with Security to make Musketts, Carbines, Pistols, or any other small Fire Armes to Discharge twice, thrice, or more severall and distincte Shotts in a Singell Barrell and Locke with once Primeing."[36] While his firearms have been lost to time, they apparently contained "two fixed locks, with a separate touch hole for each, the forward one

---

[30] Lewis Winant, Firearms Curiosa 14 (1955).

[31] 3 The London Magazine, Jan.–June, 1829, at 46 (3d ser., 1829). It was sometimes called by the similar name, "Henry VIII's walking-stick." *See* 2 William Howitt, John Cassell's Illustrated History of England 610 (1858).

[32] 3 The London Magazine, Jan.–June 1829, at 46 (3d ser., 1829). According to one popular anecdote, Henry VIII was arrested while making his rounds in disguise one winter night for carrying his Holy Water Sprinkler. When his jailer discovered his true identity the next morning, those responsible feared execution, but instead received a raise for fulfilling their duties. *See id.*

[33] *16-Shot Wheel Lock*, America's 1st Freedom, May 10, 2014, http://bit.ly/2tngSDD.

[34] "[T]his oval-bore .67-caliber rifle . . . was designed to fire 16 stacked charges of powder and ball in a rapid 'Roman candle' fashion. One mid-barrel wheel lock mechanism ignited a fuse to discharge the upper 10 charges, and another rearward wheel lock then fired the remaining six lower charges." *Id.* There was some variety in the way such firearms functioned, as demonstrated by firearms historian Lewis Winant's description of another 16-shot German repeater from the 16th or 17th century: "The gun may be used as a single-shot, employing the rear lock only, or it may be charged with sixteen superposed loads so that the first pull of the trigger will release the wheel on the forward lock and fire nine Roman candle charges, a second pull will release the wheel on the rear lock and set off six more such charges, and finally a third pull will fire the one remaining shot." Winant, Firearms Curiosa, *supra* note __, at 168–70.

[35] Winant, Firearms Curiosa, *supra* note __, at 166.

[36] *Id.* at 167.

*Journal of Legislation* [50:2

to fire a Roman candle series of charges, and the rear one to fire one or more charges after the series of explosion started by the forward lock."[37]

By the time of Cardiff's patent, however, more effective repeating arms had existed for several decades. "Successful systems" of repeating arms "definitely had developed by 1640, and within the next twenty years they had spread throughout most of Western Europe and even to Moscow."[38] "[T]he two principal magazine repeaters of the era" were "the Kalthoff and the Lorenzoni. These were the first guns of their kind to achieve success."[39]

### 1. The Kalthoff Repeating Rifle

"The Kalthoff repeater was a true magazine gun. In fact, it had two magazines, one for powder and one for balls. The earliest datable specimens that survive are two wheel-lock rifles made by Peter Kalthoff in Denmark in 1645 and 1646."[40] "[T]he number of charges in the magazines ran all the way from six or seven to thirty."[41]

Kalthoff repeaters "were undoubtedly the first magazine repeaters ever to be adopted for military purposes. About a hundred flintlock rifles of their pattern were issued to picked marksmen of the Royal Foot Guards and are believed to have seen active service during the siege of Copenhagen in 1658, 1659, and again in the Scanian War of 1675–1679."[42]

Kalthoff-type repeaters "spread throughout Europe wherever there were gunsmiths with sufficient skill and knowledge to make them, and patrons wealthy enough to pay the cost."[43] There were nineteen known gunsmiths, and perhaps others, who "made such arms in an area stretching from London on the west to Moscow on the east, and from Copenhagen south to Salzburg."[44]

---

[37] *Id.*

[38] HAROLD L. PETERSON, THE TREASURY OF THE GUN 229 (1962).

[39] *Id.*

[40] *Id.* The wheellock was invented by Leonardo da Vinci in the late 16th century. Vernard Foley, *Leonardo and the Invention of the Wheellock*, SCIENTIFIC AM., Jan. 1998, at 96. "When a wound-up steel wheel was released, the serrated wheel struck a piece of iron pyrite. A shower of sparks would ignite the powder in the pan. The wheellock mechanism is similar to the ignition for today's disposable cigarette lighters." JOHNSON ET AL., *supra* note 16, at 2151. The wheel-lock was superior to its predecessor, the matchlock, because it could be kept always ready for sudden use and was more reliable, albeit much more expensive. *Id.*

[41] PETERSON, THE TREASURY OF THE GUN, *supra* note 38, at 230.

[42] *Id.*

[43] *Id.*

[44] *Id.*

KR0666

### 2. The Lorenzoni repeating handguns and rifles

"The Lorenzoni also was developed during the first half of the Seventeenth Century."[45] It was a magazine-fed Italian repeating pistol that "used gravity to self-reload."[46] In being able to self-reload, Lorenzonis are similar to semiautomatic firearms. The Lorenzonis' ammunition capacity was typically around seven shots. The gun's repeating mechanism quickly spread throughout Europe and to the American colonies, and the mechanism was soon applied to rifles as well.[47]

On July 3, 1662, famed London diarist Samuel Pepys wrote about seeing "a gun to discharge seven times, the best of all devices that ever I saw, and very serviceable, and not a bawble; for it is much approved of, and many thereof made."[48] Abraham Hill patented the Lorenzoni repeating mechanism in London on March 3, 1664.[49] The following day, Pepys wrote about "several people [] trying a new-fashion gun" that could "shoot off often, one after another, without trouble or danger, very pretty."[50] It is believed that Pepys was referring to a Lorenzoni-style firearm in his March 4, 1664 entry,[51] and perhaps he also was in his 1662 entry.

Despite Hill's patent, "[m]any other English gunsmiths also made guns with the Lorenzoni action during the next two or three decades."[52] Most notably, famous English gunsmiths John Cookson and John Shaw adopted the Lorenzoni action for their firearms. So did "a host of others throughout the 18th century."[53]

"The Kalthoff and Lorenzoni actions . . . were probably the first and certainly the most popular of the early magazine repeaters. But there were many others. Another version, also attributed to the Lorenzoni family, boasted brass tubular magazin1es beneath the forestock . . . Guns of this type seem to

---

[45] *Id*

[46] MARTIN DOUGHERTY, SMALL ARMS VISUAL ENCYCLOPEDIA 34 (2011)

[47] PETERSON, THE TREASURY OF THE GUN, *supra* note 38, at 232.

[48] 4 THE DIARY OF SAMUEL PEPYS 258 (Henry B. Wheatley ed., 1893).

[49] The patent was for a "gun or pistol for small shot carrying seven or eight charges of the same in the stock of the gun. . . ." CLIFFORD WALTON, HISTORY OF THE BRITISH STANDING ARMY. A.D. 1660 TO 1700, at 337 (1894).

[50] 7 PEPYS, *supra* note 48, at 61.

[51] PETERSON, THE TREASURY OF THE GUN, *supra* note 38, at 232.

[52] *Id*.

[53] PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 215.

have been made in several parts of Europe during the Eighteenth Century and apparently functioned well."[54] Repeaters were expensive in seventeenth and eighteenth centuries, and so were presumably owned almost entirely by economic elite. By around the middle of the nineteenth century, they would become broadly affordable. No English law before 1776, or, for that matter, in the following two hundred years, made any distinction regarding repeating firearms.[55]

## II. THE COLONIAL PERIOD AND EARLY REPUBLIC

This Part describes the arms rights, arms mandates, and most common arms in the American colonies and Early Republic. According to *Bruen*, colonial laws are relevant to the extent that they show a wide tradition that existed when the Second Amendment was ratified.[56]

Sections A–C describe the arms prohibitions of the British, Dutch, and Swedish colonies within the future thirteen original United States. As with English traditions that did not survive American independence, Dutch and Swedish traditions not practiced in America's Founding Era are of little relevance—especially those that the British did not accept upon assuming control of the colonies.[57]

Section D lists the types of arms that were so common in America that colonial governments could mandate their ownership. Arms possession mandates applied to militiamen, to some women, and to some men who were exempted from militia duty.

Sections E and F describe the prevalence of repeating arms and cannons, which were far too expensive for mandatory general ownership. There were no laws against private ownership of such arms. Section G summarizes the situation in the United States at the time of the ratification of the Second Amendment.

---

[54] PETERSON, THE TREASURY OF THE GUN, *supra* note 38, at 233.

[55] In 1871 an annual tax was imposed for persons who wanted to carry handguns in public, and in 1920 a licensing system for handgun and rifle possession was introduced. Neither law distinguished single-shot guns from repeaters. JOHNSON ET AL., *supra* note 16, at 2168–69.

[56] *Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.") (emphasis in original).

[57] *See id.* at 2136 (It is dubious "to rely on an 'ancient' practice that had become 'obsolete in England at the time of the adoption of the Constitution' and never 'was acted upon or accepted in the colonies.'") (quoting Dimick v. Schiedt, 293 U.S. 474, 477 (1935)).

## A. The English Colonies

The 105 colonists who set sail on December 20, 1606, to establish the first permanent English settlement in North America, embarked with express and perpetual rights granted by the Royal Charter of King James I. Among the perpetual rights was to bring "sufficient Shipping, and Furniture of Armour, Weapons, Ordinance, Powder, Victual, and other things necessary for the said Plantations and for their Use and Defence there."[58] There were no restrictions on the types of arms they could bring or import.

The arms rights had been granted to the Virginia Company in perpetuity by the 1606 charter issued by King James I, and reiterated in a 1609 charter. The rights applied to all settlers of the Virginia Colony. The Virginia Charter was the first written arms rights guarantee for Englishmen; back in England, the first written guarantee would not come until the 1689 English Bill of Rights.[59]

The 1620 Charter of New England gave the inhabitants the same rights, including arms rights, as the Virginia colony.[60] Like the Virginia Charter, the Charter of New England contained no restrictions on the types of arms.

The 1606 Virginia Charter covered such a vast territory that it is a founding legal document of all the original 13 states, plus West Virginia, Kentucky, and

---

[58] 7 FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3783, 3786 (Francis Newton Thorpe ed., 1909); RICHARD MIDDLETON, COLONIAL AMERICA: A HISTORY, 1565–1776, at 48 (3d. ed. 2002) (2003 reprint).

The 105 colonists included "some 35 gentlemen, an Anglican minister, a doctor, 40 soldiers, and a variety of artisans and laborers." *Id.*

A previous attempt in 1585 to establish a colony at Roanoke Island, North Carolina, had failed.

[59] 1 Wm. & Mary, sess. 2, ch. 2 (1689).

[60] The New England Charter declared that it was lawful for
our loving Subjects, or any other Subjects who become our loving Subjects," to "att all and every time and times hereafter, out of our Realmes or Dominions whatsoever, to take, load, carry, and transports in . . . Shipping, Armour, Weapons, Ordinances, Munition, Powder, Shott, Victuals, and all Manner of Cloathing, Implements, Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the said Plantation, and for their Use and Defense, and for Trade with the People there.

3 FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, *supra* note 58, at 1834–35. For the New England and Virginia colonies, such imports and exports were untaxed for the first seven years. *Id.* at 1835, 3787–88.

*Journal of Legislation*

Maine.[61] Similarly, the 1620 Charter of New England is a founding legal document of the New England states (except Vermont), Pennsylvania, New York, and New Jersey.[62]

To encourage immigration to America, all emigrants from England "and every of their children" born in America were guaranteed "all Liberties, Franchises and Immunities . . . as if they had been abiding and born, within this our Realm of *England*, or any other of our said Dominions."[63] Subsequent colonial charters often declared that American colonists had the rights of Englishmen.[64] So in addition to the express arms guarantees in the early colonial charters, the colonists were protected by the 1689 English Bill of Rights, which secured the right of "the subjects which are Protestants [to] have arms for their defence."[65]

All colonies except Pennsylvania required that arms be kept in most homes.[66] In addition to militia statutes, which typically covered males ages 16 to 60, many people not in the militia had to have the same arms as militiamen. As described *infra*, the nonmilitia mandates applied to men exempt from militia duties because of occupation (*e.g.*, doctors), infirmity, or advanced age.

---

[61] Before becoming separate states, West Virginia and Kentucky were part of Virginia, and Maine part of Massachusetts.

[62] 1 *id.* at iv–xiii.

[63] 7 *id.* at 3788 (Virginia, 1606); 3 *id.* at 1839 (New England, 1620) (slight differences in phrasing and spelling).

The colonists who sailed to establish the New England colony, unlike their Virginia predecessors, included many families, and thus women and children. MIDDLETON, *supra* note 58, at 70. In New England, where "[m]ost couples . . . raised large families, with between five and seven children commonly surviving to adulthood," providing the population growth that made the colonies viable. *Id.* at 89. "Twenty thousand people came to New England in the 1630s; thereafter the flow slowed to a trickle. The natural population increase, however, caused the number of towns in Massachusetts to grow from twenty-one in 1641 to thirty-three by 1647." *Id.*

[64] *See* 1 FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, *supra* note 58, at 533 (Connecticut); 2 *id.* at 773 (Georgia); 3 *id.* at 1681 (Maryland); 3 *id.* at 1857 (Massachusetts Bay); 5 *id.* at 2747 (Carolina, later divided into North and South Carolina); 6 *id.* at 3220 (Rhode Island).

[65] English Bill of Rights, 1 William & Mary, sess. 2, ch. 2 (1689) ("The subjects which are protestants may have arms for their defence suitable to their conditions and as allowed by law.")

[66] Pennsylvania did not have a militia mandate until the adoption of the 1776 state constitution following Independence. PA. CONST. of 1776, § 5; 9 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682-1801, at 77 (1903) (enacted 1777). During the French & Indian War, in 1755, the colonial legislature had enacted a statute for voluntary militia companies. 5 *Id.* at 197 (1898).

Arms possession mandates sometimes applied to heads of households, including women. Besides that, arms carrying was often mandatory, and to comply with a carry mandate, a person at least had to have access to arms.

There were no prohibitions on any particular type of arm, ammunition, or accessory in any English colony that later became an American State. The only restriction in the English colonies involving specific arms was a handgun and knife carry restriction enacted in Quaker-owned East New Jersey in 1686.[67]

Today's New Jersey was once part of New Netherland. New Netherland was not subdivided into different colonies. After the English seized New Netherland from the Dutch in 1664, East Jersey, West Jersey, and New York were created as separate colonies. The 1684 East Jersey restriction on carry was in force at most eight years, and was not carried forward when East Jersey merged with West Jersey in 1702.[68] That law imposed no restriction on the possession or sale of any arms.

## B. New Sweden

New Sweden existed from 1638 to 1655. It included parts of the future states of Delaware, New Jersey, Maryland, and Pennsylvania. Its core was the region around the lower Delaware River and the Delaware Valley. The area

---

[67] The East Jersey law forbade the concealed carry of "any Pocket Pistol, Skeines [Irish-Scottish dagger], Stilladoes [stilettos], Daggers or Dirks, or other unusual or unlawful Weapons." Further, no "Planter" (frontiersman) could "Ride or go Armed with Sword, Pistol, or Dagger," except when in government service or if "Strangers" (*i.e.* travelers). 23 THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW-JERSEY 289–90 (1758).

[68]

> By 1694, East New Jersey provided that no slave "be permitted to carry any gun or pistol . . . into the woods, or plantations" unless their owner accompanied them. [An Act Against Wearing Swords, &c., ch. 9, in Grants, Concessions, and Original Constitutions of the Province of New Jersey 341 (2d ed. 1881)]. If slave-owning planters were prohibited from carrying pistols, it is hard to comprehend why slaves would have been able to carry them in the planter's presence. Moreover, there is no evidence that the 1686 statute survived the 1702 merger of East and West New Jersey. See 1 Nevill, Acts of the General Assembly of the Province of New-Jersey (1752). At most eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment.

*Bruen*, 142 S. Ct. at 2144.

abounded in excellent locations for trade with Indians. In the course of trading, the colonists often sold firearms and cannons to Indians.

At the time, the Swedish Empire ruled Finland, and Finns constituted a large portion of New Sweden's settlers. A substantial subpopulation of the Finnish settlers were the Savo-Karelians, who, unlike many newcomers to North America, already had extensive experience inhabiting wooded frontiers and trading with indigenous peoples, namely the Lapps. In the New World, the Savo-Karelian Finns learned more woodcraft from the Delaware Indians. "On no other part of the colonial American frontier was such rapid and comprehensive acceptance of Indian expertise in hunting and gathering achieved."[69] The Finns hunted with flintlock rifles and shotguns, and many settlers were capable of manufacturing and repairing their own arms.[70]

We are aware of no law in New Sweden against the possession of any type of arm, ammunition, or accessory. Rather, the New Swedes used modern firearms (flintlocks) and cannons. Having friendly relations with nearby Indians, they traded these arms freely with them.

The Dutch Republic conquered New Sweden in 1655, assimilating it into New Netherland. The Dutch hoped the Swedes would continue to immigrate because "the Swedish people are more conversant with, and understand better than any other nation . . . hunting and fowling."[71] When the English gained control of the region a decade later, they too acknowledged the Finns' unique and welcome backwoods expertise.[72]

## C. New Netherland

New Netherland stretched from Cape Henlopen (on the south side of the Delaware Bay) north to Albany, New York, and eastward to Cape Cod (in far southeastern Massachusetts). The colony included parts of present-day New York, New Jersey, Connecticut, and Delaware, in addition to small outposts that the colony claimed in Rhode Island and Pennsylvania.[73] New Netherland was part of the Dutch Republic, an industrial powerhouse that led the world

---

[69] Terry G. Jordan & Matti E. Kaups, The American Backwoods Frontier: An Ethical and Ecological Interpretation 232 (1988).

[70] *See id.* at 222–24.

[71] 2 John R. Brodhead, Documents Relative to the Colonial History of the State of New-York Procured in Holland, England, and France 242 (E. B. O'Callaghan ed., 1858).

[72] Jordan & Kaups, *supra* note 69, at 150.

[73] Charles McLean Andrews, Colonial Self-Government: 1652–1689, at 74 (1904).

in arms manufacturing. Dutch arms earned a reputation for reliability and affordability, and often made their way to America.[74]

The West India Company—a Dutch chartered company of merchants—founded New Netherland in 1624 and ruled it autocratically. The founding of New Netherland being motivated by commerce, the colonists soon began trading firearms.[75] This caused a problem that would last as long as the colony itself because their customers were often Indians who threatened the colony's existence.[76]

In 1639, "the Director General and Council of New Netherland hav[ing] observed that many persons . . . presumed to sell to the Indians in these parts, Guns, Powder and Lead, which hath already caused much mischief," made it "most expressly forbidden to sell any Guns, Powder or Lead to the Indians, on pain of being punished by Death."[77] In 1645, having been "informed with certainty, that our enemies [the Indians] are better provided with Powder than we," New Netherland reaffirmed the death penalty for "all persons . . . daring to trade any munitions of War with the Indians," and required vessels to obtain permission to travel with munitions, to ensure that they were not secretly engaging in such trade.[78] This prohibition was renewed in 1648.[79]

New Netherland continued to wrestle with the problem of colonists providing arms to Indians in the 1650s. A 1652 ordinance established another ban on the trading of firearms from "[p]rivate persons" to Indians.[80] But the ordinance "is not among the Records, and seems, indeed, not to have been very strictly enforced."[81] Indeed, in 1653, New Netherland's Directors noted that the colony's Director General had "been obliged . . . to connive somewhat in

---

[74] *See* DAVID J. SILVERMAN, THUNDERSTICKS: FIREARMS AND VIOLENT TRANSFORMATION OF NATIVE AMERICA 25 (2016); H. Ph. Vogel, *The Republic as an Arms Exporter 1600-1650*, *in* THE ARSENAL OF THE WORLD: THE DUTCH ARMS TRADE IN THE SEVENTEENTH CENTURY 13–21 (Jan Peit Puype & Macro van der Hoeven eds., B.J. Martens, G. de Vries & Jan Peit Puype trans., 1996) (Dutch edition 1993).

[75] SILVERMAN, *supra* note 74, at 96–98.

[76] *See generally* Shaun Sayres, *"A Dangerous Liberty": Mohawk-Dutch Relations and the Colonial Gunpowder Trade, 1534–1665*, Master's Thesis in History, U. of N.H. (2018), https://scholars.unh.edu/cgi/viewcontent.cgi?article=2173&context=thesis.

[77] LAWS AND ORDINANCES OF NEW NETHERLAND, 1638-1674, at 18–19 (E. B. O'Callaghan ed., 1868).

[78] *Id.* at 47.

[79] *Id.* at 101.

[80] *Id.* at 128.

[81] *Id.*

regard to the" trading ban; they instructed him "to deal herein with a sparing hand, and take good care that through this winking no more ammunition be sold to the Indians than each one has need of for the protection of his house and for obtaining the necessaries of life, so that this cruel and barbarous Nation may not be able, at any time, to turn and employ their weapons against ourselves there."[82] The Director General and his Council did not deal sparingly enough; instead, as a 1656 law pointed out, they personally profited from the Indian arms trade.[83]

Consequently, previous restrictions were "revive[d] and renew[ed]," with "the following amplification":

> That henceforth no person, of what nation or quality soever he may be, shall be at liberty to bring into the Country for his own or ship's use any sort of Snaphance or Gunbarrels, finished or unfinished, not even on the Company's permit, save only, according to order, one Carbine, being a firelock of three to three and a half feet barrel and no longer.[84]

In addition to limiting the number of flintlocks colonists could bring into the colony, the law targeted the smuggling of arms by requiring all private ships to submit to searches "both on their arrival and departure."[85]

In 1664, after the Duke of York's English forces conquered New Netherland with ease, New Netherland became the British colony of New York.[86]

---

[82] *Id.*

[83]
> [T]he Director General and Council of New Netherland are to their regret informed and told of the censure and blame under which they are lying among Inhabitants and Neighbors on account of the non-execution of their previously enacted and frequently renewed Edicts . . . some not only presuming that the Director General and Council connive with the violators, but even publicly declaring that the Director General and Council aforesaid have made free the importation and trade in Contraband which, for that reason, is carried on with uncommon licentiousness and freedom.

*Id.* at 236–37.

[84] *Id.* Another 1656 law "forb[ade] the admission of any Indians with a gun or other weapon, either in this City or in the Flatland, into the Villages and Hamlets, or into any Houses or any places." *Id.* at 235.

[85] *Id.* at 237–38.

[86] CARL P. RUSSELL, GUNS ON THE EARLY FRONTIERS 10 (1957).

KR0674

The one-flintlock law of 1656 is the only a restriction on a particular type of arm in what would become the original thirteen American states. It was enacted out of desperation at the end of a futile decades-long attempt to restrict gun sales to adversaries who threatened the colony's survival. The law did not ban any colonist from possessing flintlocks or limit how many they could own; it limited the number they could bring into the colony. No English colony enacted a similar restriction. The one-flintlock import limit vanished upon the British takeover of New Netherland.

### D. Arms Mandates in Colonial America

Subsection 1 describes who was required to possess or carry arms. Subsection 2 lists the various types of arms whose possession was mandatory. In colonial America, "the gun was more abundant than the tool. It furnished daily food; it maintained its owner's claims to the possession of his homestead among the aboriginal owners of the soil; it helped to win the mother country's wars for possession of the country as a whole."[87]

### 1. Who was required to keep or bear arms?

The most common age for militia service in the colonies was 16 to 60 years of age. Typical militia statutes required militia-eligible males to own at least one cutting weapon (such as a sword or bayonet) and at least one firearm.[88]

Many colonies also required ownership by people who were *not* in the militia. These included males with occupational exemptions from the militia and males who were too old for militia service.[89] No state authorized female

---

[87] 1 CHARLES WINTHROP SAWYER, FIREARMS IN AMERICAN HISTORY 1 (1910).

[88] *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U.L.J. 495, 533–89 (2019).

[89] For example, Delaware exempted certain occupations from routine militia service, but still ordered them to be armed and ready to serve in an emergency:

> [A]ll Justices of the Peace, Physicians, Lawyers, and Millers, and Persons incapable through Infirmities of Sickness or Lameness, shall be exempted and excused from appearing to muster, except in Case of an Alarm [an attack on the locality]: They being nevertheless obliged, by this Act, to provide and keep by them Arms and Ammunition as aforesaid, as well as others. And if an Alarm

service in the militia, but several—Massachusetts, Maryland, Virginia, New Hampshire, Vermont, and Connecticut—at least sometimes required females to have the same arms as militiamen.[90] Like males who were militia-exempt because of age or occupation, armed females were part of their communities' emergency defense. Whenever a small town was attacked, everybody who was able would fight as needed, including women, children, and the elderly.[91]

---

happen, then all those, who by this Act are obliged to keep Arms as aforesaid . . . shall join the General Militia.

LAWS OF THE GOVERNMENT OF NEW-CASTLE, KENT AND SUSSEX UPON DELAWARE 176–77 (1741).

[90] In order of enactment:

Maryland: "every housekeeper or housekeepers within this Province shall have ready continually upon all occasions within his her or their house for him or themselves and for every person within *his her or their house* able to bear armes one Serviceable fixed gunne of bastard muskett boare," plus, a pound of gunpowder, four pounds of shot, and firearms ignition accessories. 1 ARCHIVES OF MARYLAND 77 (enacted 1639) (William Hand Browne ed., 1885) (emphasis added).

Virginia: "ALL persons except negroes to be provided with arms and ammunition or be fined at pleasure of the Governor and Council." WILLIAM WALLER HENING, 1 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 226 (1823) (enacted 1639).

Massachusetts: "all inhabitants." 2 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 134 (Nathaniel B. Shurtleff ed. 1853) (enacted 1645). *Cf. id.* at 99 (requiring arms training for children of both sexes, ages 10–16).

Rhode Island: "that every Inhabitant of the Island above sixteen or under sixty years of age, shall always be provided with a Musket," a pound of gunpowder, twenty bullets, a sword, and other accessories. *Acts and Orders of 1647, in* COLONIAL ORIGINS OF THE AMERICAN CONSTITUTION: A DOCUMENTARY HISTORY 183–84 (Donald S. Lutz ed., 1998).

Connecticut: "all persons that are above the age of sixteene yeares, except magistrates and church officers, shall beare arms . . . ; and every male person within this jurisdiction, above the said age, shall have in continuall readines, a good muskitt or other gunn, fitt for service, and allowed by the clark of the band." 1 PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 542–43 (J. Hammond Trumbull ed., 1850) (enacted 1650).

New Hampshire: every "Householder" to have musket, bandoliers, cartridge box, bullets, powder, cleaning tools, and a sword. 2 LAWS OF NEW HAMPSHIRE: PROVINCE PERIOD 285 (Albert Stillman Batchellor ed., 1904) (enacted 1718).

Vermont: "every listed soldier and other householder" must have a firearm, a blade weapon, gunpowder, bullets, and cleaning equipment. VERMONT STATE PAPERS, BEING A COLLECTION OF RECORDS AND DOCUMENTS, CONNECTED WITH THE ASSUMPTION AND ESTABLISHMENT OF GOVERNMENT BY THE PEOPLE OF VERMONT; TOGETHER WITH THE JOURNAL OF THE COUNCIL OF SAFETY, THE FIRST CONSTITUTION, THE EARLY JOURNALS OF THE GENERAL ASSEMBLY, AND THE LAWS FROM THE YEAR 1779 TO 1786, INCLUSIVE 307 (1823).

[91] *See* STEVEN C. EAMES, RUSTIC WARRIORS: WARFARE AND THE PROVINCIAL SOLDIERS ON THE NEW ENGLAND FRONTIER, 1689-1748, at 28–29 (2011).

As *Heller* observed, "Many colonial statutes required individual arms-bearing for public-safety reasons."[92] Colonies required arms carrying to attend church,[93] public assemblies,[94] travel,[95] and work in the field.[96]

The carry mandates referred to a "man" or "he," except in Massachusetts, which mandated carry by any "person."[97] They did not require that the individual carry of a specific type of firearm, and sometimes allowed a sword instead of a firearm. Nor did they require that the carrier personally own the firearm; the statutes presumed that a person engaged in the listed activities would have ready access to a firearm.

---

[92] *Heller*, 554 U.S. at 601.

[93] Proceedings of the Virginia Assembly, 1619, in LYON GARDINER TYLER, NARRATIVES OF EARLY VIRGINIA, 1606-25, at 273 (1907) (enacted 1619); 1 HENING, *supra* note 90, at 198 (1632); VIRGINIA LAWS 1661-1676, at 37 (1676) (enacted 1665); THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 102 (William Brigham ed., 1836) (enacted 1656) (Apr. 1 through Nov. 30, militiamen only); *id.* at 115 (1658) (changing Apr. 1 to Mar. 1); *id.* at 176 (1675) (year-round); 3 ARCHIVES OF MARYLAND, *supra* note 90, at 103 (1642); 1 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 95–96 (J. Hammond Trumbull ed. 1850) (enacted 1643); RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649, at 131–32 (Charles J. Hoadly ed., 1857) (enacted 1644) (New Haven was a separate colony from Connecticut until 1662); DAVID J. MCCORD, 7 STATUTES AT LARGE OF SOUTH CAROLINA 417–19 (1840) (enacted 1740, re-enacted 1743) (militiamen only); 19 THE COLONIAL RECORDS OF THE STATE OF GEORGIA, Part 1, at 137–40 (Allen D. Candler ed., 1904) (enacted 1770, militiamen only).

[94] 1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 190 (Nathaniel B. Shurtleff ed., 1853) (enacted 1637); 2 *id.* at 38 (1638 repeal of 1637 law; replaced in 1643 with instruction for each town's militia head to "appoint what armes to bee brought to the meeting houses on the Lords dayes, & other times of meeting."); 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (John Russell Bartlett ed., 1856) (enacted 1639) ("none shall come to any public Meeting without his weapon").

[95] 1 HENING, *supra* note 90, at 127 (Virginia, 1623); *id.* at 173 (1632); 1 MASS. BAY RECS. at 85 (1631, travel to Plymouth); *id.* at 190 (1636) ("travel above one mile from his dwelling house, except in places wheare other houses are neare together"); 1 RECORDS OF THE COLONY OF RHODE ISLAND at 94 (1639) ("noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword"); 3 ARCHIVES OF MARYLAND at 103 (1642) ("any considerable distance from home").

[96] 1 HENING, *supra* note 90, at 127 (Virginia, 1624); *id.* at 173 (1632).

[97] 1 Mass. Bay Recs. at 190 (1637, meetings), repealed the next year, 1 Mass. Bay Recs. at 190; 1 *id.* at 85 (travelers, 1631), 1 *id.* at 190 (travelers, 1636).

### 2. Types of mandatory arms

The statutes that required the keeping of arms—by all militia and some nonmilitia—indicate some of the types of arms that were so common during the colonial period that it was practical to mandate ownership. Collectively, the colonial statutes mandated ownership of a wide range of arms.

We will list the different types of mandated arms, starting with cutting weapons.

### Knives, swords, and hatchets

- *Backsword*.[98] "A kind of sabre. A sword having a straight, or very slightly curved, single-edged blade."[99]
- *Bayonet*.[100] A knife attached to the muzzle of a gun.[101]
- *Broad Sword*.[102] "A sword with a straight, wide, single-edged blade. It was the military sword of the 17th century" and "also the usual weapon of the common people."[103]

---

[98] 2 BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE AMERICAN TRADITION, Part 2, at 14 (Arthur Vollmer ed., 1947) (Connecticut 1650).

[99] STONE, *supra* note 14, at 84 ("Back Sword").

[100] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 176, 177 (1775), 205 (1775), 256 (1784); Part 3 (Delaware), at 28 (1785); Part 4 (Georgia), at 7 (1755, 57 (1765), 80 (1773), 122 (1778); Part 5 (Maryland), at 102 (1756); Part 6 (Massachusetts), at 200 (1758), 223 (1776); 231 (1776-7); 246 (1781); Part 7 (New Hampshire), at 82 (1776), 104, 105 (1780), 116 (1780); Part 8 (New Jersey), at 12 (1713), 16 (1722), 20 (1730), 25, 26, 27 (1746), 33, 34, 37 (1757), 41 (1777), 64 (1779), 70 (1781); Part 9 (New York), at 267 (1778), 271 (1778), 311 (1782), 326 (1783); Part 12 (Rhode Island), at 37 (1705), 39 (1718), 90 (1767), 99 (1774), 184 (1781), 197 (1781), 201 (1781), 203 (1781), 204, 206 (1793), 217, 219 (1798); Part 13 (South Carolina), at 9 (1703), 24 (1721), 40 (1747), 67 (1778); Part 14 (Virginia), at 78 (1723), 105 (1738), 146, 150 (1755), 206, 210 (1757), 258, 274, 277 (1775), 306 (1775), 322, 323 (1777).

[101] *See* STONE, *supra* note 14, at 107 ("Bayonet").

[102] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 8 (New Jersey), at 81 (1781); Part 9 (New York), at 311 (1782); Part 10 (North Carolina, at 21 (1756), 29 (1760), 35 (1764), 42 (1766), 52 (1774).

[103] STONE, *supra* note 14, at 150–51.

- *Cutlas, Cutlass, Cutlace*.[104] "A broad curving sword; a hanger; used by soldiers in the cavalry, by seamen, etc."[105]
- *Cutting-Sword*.[106] A category of "short, single-edged" swords, which included cutlasses and hangers.[107]
- *Hanger*.[108] "A short broad sword, incurvated towards the point."[109]
- *Hatchet*.[110] "A small ax with a short handle, to be used with one hand."[111] A popular substitute for a sword.[112]
- *Jack-knife*.[113] A folding pocket-knife, with blades ranging from three to twelve inches.[114]
- *Rapier*.[115] "A sword especially designed for thrusting and provided with a more or less elaborate guard."[116]

---

[104] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 131 (1741); Part 8 (New Jersey), at 41, 45 (1777); Part 10 (North Carolina), at 11 (1746), 39 (1766), 49 (1774); Part 13 (South Carolina), at 68 (1778).

[105] 1 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated) ("Cutlas"); *see also* STONE, *supra* note 14, at 198 ("a family of backswords.")

[106] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 223 (1776), 231 (1776-7); Part 14 (Virginia), 78 (1723), 105 (1738), 145, 146 (1755), 150, 151 (1755), 211 (1757).

[107] PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 79–80.

[108] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 4 (Georgia), at 122 (1778); Part 5 (Maryland), at 91 (1756); Part 7 (Maryland), at 105 (1780); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 53 (1702), 80 (1721), 89 (1724), 116 (1739), 134 (1743), 148 (1744), 165 (1746), 188 (1755), 227 (1764), 243 (1772), 252 1775); Part 10 (North Carolina), at 10 (1746), 19 (1756), 26 (1760), 32 (1764), 39 (1766), 49 (1774); Part 12 (Rhode Island), at 204, 206 (1793), 217 (1798).

[109] 1 WEBSTER, *supra* note 105, (unpaginated).

[110] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 4 (Georgia), at 7, 35 (1755), 69 (1765), 80, 109 (1773), 122 (1778); Part 6 (Massachusetts), at 133 (1689), 199 (1758), 223 (1776), 231 (1776-7); Part 7 (New Hampshire), 31 (1692), 82 (1776), 117 (1780); Part 8 (New Jersey), at 10 (1693); Part 13 (South Carolina), at 9 (1703), 17 (1707), 24 (1721), 40, 52 (1747).

[111] 1 WEBSTER, *supra* note 105, (unpaginated).

[112] *See* PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 87–88.

[113] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 223 (1776); Part 7 (New Hampshire), at 82 (1776).

[114] GEORGE G. NEUMANN, SWORDS & BLADES OF THE AMERICAN REVOLUTION 231 (3d ed. 1991).

[115] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 53 (1702).

[116] STONE, *supra* note 14, at 524–26.

- *Scabbards.*[117] "The sheath of a sword."[118]
- *Scimeter, scymiter, simeter, semeter, cimeter.*[119] "The strongly curved Oriental sabre."[120]
- *Sword.*[121] "An offensive weapon worn at the side, and used by hand either for thrusting or cutting."[122]
- *Tomahawk.*[123] "An Indian hatchet."[124]

---

[117] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 200 (1758), 223 (1776), 246 (1781), 263 (1789); Part 7 (New Hampshire), at 82 (1776), 104 (1780).

[118] 2 WEBSTER, *supra* note 105, (unpaginated).

[119] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 14 (Virginia), at 59 (1701).

[120] STONE, *supra* note 14, at 545 ("Scymiter, Scimeter"). "Guard" means a handguard, a barrier between the handle and the blade.

[121] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 5 (1638), 12 (1650), 18 (1658), 28 (1673), 30 (1673), 44 (1677), 46 (1687), 60, 61, 63 (1702), 92, 94, 95 (1715), 123, 124, 129 (1741), 131, 138 (1741), 150, 151, 156 (1754), 256 (1784); Part 4 (Georgia), at 57 (1765), 80 (1773), 122 (1778); Part 5 (Maryland), at 6 (1638), 17 (1678), 25 (1681), 32 (1692), 39 (1695), 42 (1699), 51 (1704), 66 (1715), 91 (1756); Part 6 (Massachusetts), at 21 (1643), 25 (1643), 29 (1645), 39 (1647), 59 (1649), 68 (1658), 86, 91 (1671), 100, 105 (1672), 129 (1685), 133 (1689), 139 (1693); Part 7 (New Hampshire), at 12, 13 (1687), 31 (1692), 52 (1718), 82 (1776), 105 (1780); Part 8 (New Jersey), at 5 (1675); 8 (1682), 12 (1713), 16 (1722), 20 (1730), 25, 27, 30 (1746), 33, 35, 37 (1757), 41, 45 (1777); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 52, 53 (1702), 80 (1721), 89, 90 (1724), 116 (1739), 118 (1739), 134 (1743), 148, 150 (1744), 164, 165 (1746), 188 (1755), 227, 229 (1764), 243, 245 (1772), 252, 255 (1775), 273 (1778), 311 (1782); Part 10 (North Carolina), at 7 (1715), 10, 13 (1746), 19 (1754), 26 (1760), 32 (1764), 39 (1766), 49 (1774), 123 (1781); Part 11 (Pennsylvania), at 10, 14 (1676), 16 (1676); Part 12 (Rhode Island), at 3 (1647), 26 (1701), 34, 37 (1705), 42 (1718), 90, 95 (1767), 204, 206 (1793), 217, 219 (1798); Part 13 (South Carolina), at 9 (1703), 17 (1707), 24, 31 (1721), 40 (1747); Part 14 (Virginia), at 48 (1684), 50 (1684), 65, 66 (1705), 211 (1757), 277 (1775), 322 (1777), 424 (1784).

[122] 2 WEBSTER, *supra* note 105, (unpaginated).

[123] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 223 (1776), 231 (1776-7); Part 7 (New Hampshire), at 82 (1776); Part 8 (New Jersey), at 41 (1777), 70 (1781); 10 (North Carolina), at 57 (1777), 62 (1777), 69 (1778); Part 13 (South Carolina), at 68 (1778); Part 14 (Virginia), at 274 (1775), 322 (1777).

[124] 2 WEBSTER, *supra* note 105, (unpaginated).

*Pole arms*

- *Halberd, Halbard, Halbart.*[125] "[A] polearm bearing an axehead balanced by a break or fluke and surmounted by a sharp point."[126]
- *Half-Pike.*[127] "A small pike carried by officers."[128]
- *Lance.*[129] "A spear, an offensive weapon in form of a half pike, used by the ancients and thrown by the hand. It consisted of the shaft or handle, the wings and the dart."[130]
- *Partisan.*[131] "A broad-bladed pole arm usually having short, curved branches at the base of the blade."[132]
- *Pike.*[133] "A military weapon consisting of a long wooden shaft or staff, with a flat steel head pointed; called the spear."[134]
- *Spontoon, Espontoon.*[135] A six-foot-long pole arm.[136] Sometimes "spontoon" was used interchangeably with "half-pike," but "spontoon" sometimes described a more decorative type.[137]

---

[125] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 14 (Virginia), at 151 (1755), 211 (1757). Some towns and counties were required to provide halberds. *See e.g.*, BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 3 (Delaware), at 5 (1741), 14 (1756), 22 (1757); Part 6 (Massachusetts), at 49 (1653), 68 (1658), 80 (1669), 88 (1671), 102 (1672), 130 (1685), 135 (1690), 143 (1693), 168 (1738), 170 (1742), 201 (1758); Part 7 (New Hampshire), at 57 (1718); Part 11 (Pennsylvania), at 12 (1676); Part 14 (Virginia), at 277 (1775).

[126] PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 93; *see also* STONE, *supra* note 14, at 275 ("Halbard, Halbart, Halberd").

[127] THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, FROM 1665 TO 1678, at 208 (J. Hammond Trumbull ed., 1852) (1673 Connecticut); BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 7 (New Hampshire), at 105 (1780).

[128] 1 WEBSTER, *supra* note 105, (unpaginated).

[129] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 52 (1702).

[130] 2 WEBSTER, *supra* note 105, (unpaginated).

[131] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 14 (Virginia), at 151 (1755).

[132] STONE, *supra* note 14, at 484 ("Partizan").

[133] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 25 (1666), 46 (1687); Part 6 (Massachusetts), at 22 (1643), 86 (1671), 100 (1672); Part 9 (New York), at 4 (1694), 16 (1691), 53 (1702).

[134] 2 WEBSTER, *supra* note 105, (unpaginated).

[135] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 7 (New Hampshire), at 105 (1780); Part 12 (Rhode Island), at 204 (1793), 217 (1798); Part 14 (Virginia), at 424 (1784).

[136] *See* NEUMANN, *supra* note 114, at 191.

[137] *See* PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 286–87.

*Firearms*

- Bastard muskets[138] "In military affairs, bastard is applied to pieces of artillery which are of an unusual make or proportion."[139] Bastard muskets were shorter and lighter than typical muskets.
- *Caliver*.[140] "A kind of handgun, musket or arquebuse."[141]
- *Carbine*.[142] "A short gun or fire arm, carrying a ball of 24 to the pound, borne by light horsemen, and hanging by a belt over the left shoulder. The barrel is two feet and a half long, and sometimes furrowed."[143]
- Case of pistols.[144] Handguns were often sold in matched pairs. A "case of pistols"—sometimes called a "brace of pistols"—is such a pair.[145]

---

[138] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 30 (1673), 60 (1702); 92 (1715); Part 5 (Maryland), at 6 (1638); Part 6 (Massachusetts), at 41 (1647), 45 (1647), 56 (1660), 86 (1671), 129 (1685), 139 (1693); Part 7 (New Hampshire), at 52 (1718).

[139] 1 WEBSTER, *supra* note 105, (unpaginated).

[140] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 30 (1673); Part 6 (Massachusetts), at 124 (1677).

[141] 2 WEBSTER, *supra* note 105, (unpaginated).

[142] 2 The Public Records of the Colony of Connecticut, From 1665 to 1678, at 207 (J. Hammond Trumbull ed., 1852) (1673 Connecticut); BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 28 (1673), 30 (1673), 46 (1687)**,** 57 (1696), 60 (1702), 92 (1715), 124 (1741), 131 (1741), 151 (1754), 202 (1775); Part 5 (Maryland), at 17 (1678), 25 (1681), 32 (1692), 39 (1695), 42 (1699), 51 (1704), 66 (1715), 91 (1756); Part 6 (Massachusetts), at 59 (1660), 91 (1671), 105 (1672), 116 (1675), 132 (1685), 139 (1693); Part 7 (New Hampshire), at 13 (1688), 52 (1718); Part 8 (New Jersey), at 30 (1746), 45 (1777); Part 9 (New York), at 5 (1694), 16 (1691), 47 (1710), 53 (1702), 80 (1721), 116 (1739), 134 (1743), 148 (1744), 165 (1746), 188 (1755), 243 (1772), 252 (1775), 273 (1778), 311 (1782); Part 10 (North Carolina), at 21 (1756), 29 (1760), 35 (1764), 42 (1766), 52 (1774), 75 (1778); Part 11 (Pennsylvania), at 14, 16 (1676); Part 12 (Rhode Island), at 29 (1701), 45 (1730), 95 (1767); Part 13 (South Carolina), at 31 (1721); Part 14 (Virginia), at 50 (1684), 65, 66 (1705), 78 (1723), 105 (1738), 145 (1755).

[143] 1 WEBSTER, *supra* note 105, (unpaginated).

[144] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 46 (1687), 92 (1715), 131 (1741), 151 (1754), 256 (1784); Part 6 (Massachusetts), at 139 (1693); Part 8 (New Jersey), at 30 (1746); 45 (1777); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 53 (1702), 80 (1721), 89 (1724), 116 (1739), 134 (1743), 148 (1744), 188 (1755), 227 (1764), 243 (1772), 252 (1775), 273 (1778), 311 (1782); Part 10 (North Carolina), at 13 (1746), 21 (1756), 29 (1760), 35 (1764), 42 (1766), 52 (1774), 75 (1778); Part 12 (Rhode Island), at 45 (1730); Part 14 (Virginia)), at 65, 66 (1705), 78 (1723), 105 (1738), 145, 150 (1755).

[145] Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 WILLAMETTE L. REV. 699, 709, 719 (2008).

- *Firelock.*[146] "A musket, or other gun, with a lock, which is discharged by striking fire with flint and steel."[147] Today, commonly called a flintlock. As of the late eighteenth century, all modern firearms were flintlocks.
- *Fowling piece.*[148] "A light gun for shooting fowls."[149]
- *Fusee, fuse, fuze, fuzee, fusil.*[150] "[A] light, smoothbore shoulder arm of smaller size and caliber than the regular infantry weapon."[151]
- *Matchlock.*[152] "[T]he lock of a musket which was fired by a match."[153] The standard firearm of the early seventeenth century. During the century Americans shifted from matchlocks to flintlocks (a/k/a firelocks), which were more reliable and faster to reload.

---

[146] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 18 (1656), 60 (1702), 92 (1715), 123, 129 (1741), 131, 138 (1741), 150, 156 (1754), 236 (1780); Part 3 (Delaware), at 2, 3 (1741), 28 (1785); Part 5 (Maryland), at 6 (1638), 102 (1756); Part 6 (Massachusetts), at 25 (1643), 124 (1677), 139 (1693), 255 (1781); Part 7 (New Hampshire), at 52 (1718), 116 (1780); Part 8 (New Jersey), at 5 (1675), 8 (1682); Part 9 (New York), at 267 (1778), 271 (1778), 282 (1779), 287 (1780), 310 (1782), 326 (1783); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 204 (1793), 217 (1798); Part 14 (Virginia), at 65 (1705), 78 (1723), 146, 150 (1755), 206, 211 (1757), 274 (1775), 322 (1777).

[147] 1 WEBSTER, *supra* note 105 (unpaginated).

[148] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 4 (Georgia), at 146 (1784).

[149] 1 WEBSTER, *supra* note 105 (unpaginated).

[150] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 3 (Delaware), at 11 (1756), 17 (1757); Part 4 (Georgia), at 146 (1784); Part 7 (New Hampshire), at 105 (1780); Part 8 (New Jersey), at 12 (1713), 16, 18 (1722), 20 (1730), 25, 26, 27 (1746), 33, 35, 37 (1757); Part 9 (New York), at 16 (1691), 46 (1702), 52 (1702), 80 (1721), 90 (1724), 118 (1739), 136 (1743), 150 (1744), 164 (1746), 188 (1755), 229 (1764), 245 (1772), 255 (1775); Part 10 (North Carolina), at 13 (1746); Part 12 (Rhode Island), at 42 (1718), 90 (1767), 99 (1744), 206 (1793), 219 (1798); Part 13 (South Carolina), at 30, 32 (1721); Part 14 (Virginia), at 59 (1701), 65 (1705), 78 (1723), 105 (1738).

[151] GEORGE C. NEUMANN, BATTLE WEAPONS OF THE AMERICAN REVOLUTION 19 (2011).

[152] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 8 (1638), 14 (1650), 18, 19 (1656), 30 (1673); Part 5 (Maryland), at 6 (1638); Part 6 (Massachusetts), at 2 (1631), 25 (1643), 29 (1645), 34 (1645), 39 (1647), 86 (1671); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 3 (1647).

[153] 2 WEBSTER, *supra* note 105 (unpaginated).

*Journal of Legislation*

- *Musket.*[154] "The term 'musket' has always referred to a heavy military gun. In the 16th an 17th century it was a matchlock."[155] "Later the name came to signify any kind of a gun used by regular infantry."[156]
- *Pistol.*[157] "A small fire-arm, or the smallest fire-arm used, differing from a musket chiefly in size. Pistols are of different lengths, and borne by horsemen in cases at the saddle bow, or by a girdle. Small pistols are carried in the pocket."[158]
- *Rifle.*[159] "A gun about the usual length and size of a musket, the inside of whose barrel is rifled, that is, grooved, or formed with spiral channels."[160]

---

[154] 2 The Public Records of the Colony of Connecticut, From 1665 to 1678, at 207 (J. Hammond Trumbull ed., 1852) (1673 Connecticut); BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 5 (1638), 12 (1650), 28 (1673), 30 (1673), 46 (1687), 60 (1702), 92 (1715), 256 (1784); Part 3 (Delaware), at 2 (1741), 3 (1741), 11 (1756), 17 (1757); Part 4 (Georgia), at 6 (1755), 80 (1773), 146 (1784); Part 5 (Maryland), at 6 (1638); Part 6 (Massachusetts), at 2 (1631), 10 (1634), 25 (1643), 29 (1645), 39 (1646), 45 (1647), 56 (1660), 86 (1671), 116 (1675-6), 124 (1677), 129, 131 (1685), 139 (1693); Part 7 (New Hampshire), at 12 (1687), 52 (1718), 104 (1780); Part 8 (New Jersey), at 25, 27 (1746), 12 (1713), 18 (1722), 20, 23 (1730), 33, 35, 37 (1757), 41 (1777), 64 (1779), 70 (1781); Part 9 (New York), at 16 (1691), 4 (1694), 46 (1702), 52 (1702), 80 (1721), 90 (1724), 117 (1739), 136 (1743), 150 (1744), 164 (1746), 180 (1746), 188 (1755), 229 (1764), 245 (1772), 255 (1775), 271, 273 (1778), 282 (1779), 233 (1780), 310, 311 (1782), 326 (1783); Part 12 (Rhode Island), at 3 (1647), 22 (1677), 26 (1701), 42 (1718), 147 (1779), 184 (1781), 204 (1793), 217 (1798); Part 13 (South Carolina), at 40 (1747), 67 (1778); Part 14 (Virginia), at 59 (1701), 65 (1705), 78 (1723), 105 (1738), 258 (1775), 306 (1775), 312 (1775), 424 (1784).

[155] PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA, *supra* note 25, at 14.

[156] STONE, *supra* note 14, at 461 ("Musquet, Musket"). Stone notes that the musket was originally "a matchlock gun too heavy to be fired without a rest, therefore the smallest of cannon. As many cannon were given the names of birds and animals, this was called a musket, the falconer's name for the male sparrow hawk, the smallest of hawks." *Id.*

[157] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 57 (1696); Part 4 (Georgia), at 74 (1766); Part 5 (Maryland), at 17 (1678), 25 (1681), 32 (1692), 39 (1695), 42 (1699), 51 (1704), 66 (1715), 91 (1756); Part 6 (Massachusetts), at 91 (1671), 105 (1672), 132 (1685); Part 8 (New York), at 81 (1781); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 52, 53 (1702); Part 10 (North Carolina), at 123 (1781); Part 11 (Pennsylvania), at 14, 16 (1676); Part 12 (Rhode Island), at 29 (1701), 95 (1676), 206 (1793), 219 (1798); Part 13 (South Carolina), at 31 (1721); Part 14 (Virginia), at 59 (1701), 150 (1755), 419 (1782).

[158] 2 WEBSTER, *supra* note 105, (unpaginated).

[159] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 4 (Georgia), at 146 (Georgia 1784); Part 8 (New Jersey), at 41 (1777), 70 (1784); Part 9 (New York), at 310 (1782); Part 12 (Rhode Island), at 204 (1793), 217 (1798); Part 13 (South Carolina), at 68 (1778); Part 14 (Virginia), at 258 (1775), 274 (1775), 306 (1775), 322 (1777), 425 (1784).

[160] 2 WEBSTER, *supra* note 105, (unpaginated).

- *Snaphaunce.*[161] "During the 17th century, *snaphaunce* commonly referred to any flintlock system."[162]

*Armor*

In the usage of the time, "arms" included missile weapons (*e.g.*, guns, bows, cannons), cutting weapons (*e.g.*, knives, swords, bayonets), and blunt impact weapons (*e.g.*, clubs, slungshots, canes). As *Heller* explained, "arms" also included armor: "Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'"[163] Also cited in *Heller*, Samuel Johnson's and Thomas Sheridan's dictionaries defined "arms" as "weapons of offence, or armour of defence."[164] Also cited was the first dictionary of *American* English, by Noah Webster, defining "arms" as "Weapons of offense, or armor for defense and protection of the body."[165]

As described in Part 1.A., England's 1181 Assize of Arms mandated ownership of certain armor and also restricted types of armor by economic class. No armor restrictions existed in America.

---

[161] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 124 (1677).

[162] NEUMANN, *supra* note 114, at 8; *see also* RICHARD M. LEDERER, JR., COLONIAL AMERICAN ENGLISH 216 (1985) ("snaphance (*n.*) A flintlock.").

[163] *Heller*, 554 U.S. at 581 (quoting 1 TIMOTHY CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY (1771)).

[164] 1 SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE 107 (4th ed.); T. SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1796) (slightly different capitalization in Sheridan).

[165] 1 WEBSTER, *supra* note 105, (unpaginated).

The *Heller* Court relied on Johnson, Sheridan, and Webster in its analysis of the Second Amendment's text. For Johnson, *see Heller*, 554 U.S. at 581 ("arms"), 582 ("keep"), 584 ("bear"), 597 ("regulate"). For Sheridan, *see id.* at 584 (defining "bear"). For Webster, *see id.* at 581 ("arms"), 582 ("keep"), 584 ("bear"), 595 ("militia").

- *Breastplate.*[166] "A plate, or set of plates, covering the front of the body from the neck to a little below the waist."[167]
- *Buff coat.*[168] "A heavy leather coat . . . . originally made of buffalo leather."[169] "It was a long skirted coat, frequently without a collar."[170]
- *Corslet.*[171] "Originally it meant leather armor . . . . [l]ater its meaning was strictly plate armor for the body only."[172]
- *Cotton coat.*[173] "A thick cotton coat which covered part of the arms and thighs, made in one piece," which protected against arrows.[174]

---

[166] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 46 (1687); Part 7 (New Hampshire), at 13 (1687); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 53 (1702), 80 (1721), 89 (1724), 116 (1739), 134 (1743), 148 (1744), 165 (1746), 188 (1755), 227 (1764), 243 (1772), 252 (1775), 273 (1778), 311 (1782); Part 10 (North Carolina), 29 (1760), 35 (1764), 41–42 (1766), 52 (1774); Part 12 (Rhode Island), 45 (1718), 206 (1793), 219 (1798); Part 14 (Virginia), at 65 (1705), 78 (1723), 105 (1738), 145, 150 (1755).

[167] STONE, *supra* note 14, at 143.

[168] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 78 (1666), 95 (1671), 107 (1672).

[169] STONE, *supra* note 14, at 152.

[170] *Id.*

[171] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 29 (1646), 56 (1660), 86 (1671), 100 (1672); THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO THE UNION WITH NEW HAVEN COLONY, MAY 1665, at 14 (J. Hammond Trumbull ed., 1850) (1637, "Harteford 21 Coslets, Windsor 12, Weathersfeild 10, Agawam 7"); BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2, at 7–8 (Connecticut, 1638, "corseletts or cotton coates": Wyndsor (12), Hartford (20), Weathersfield (8), Seabrook (3), Farmington (3), Fairfield (6), Strattford (6), Southhampton (3), Pequett (3); *id.* at 13–14 (Connecticut, 1650, "cotton coates or corseletts": Wyndsor (9), Hartford (12), Weathersfield (8), Seabrook (3), Farmington (3), Fairfield (6), Strattford (6), Southhampton (3), Pequett (3).

[172] STONE, *supra* note 14, at 192 ("Corselet, Corslet").

[173] A 1638 act required Connecticut towns to keep "corseletts" or "cotton coates": Wyndsor (12), Hartford (20), Weathersfield (8), Seabrook (3), Farmington (3), Fairfield (6), Strattford (6), Southhampton (3), Pequett (3). BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 7–8. A 1642 act ordered 90 coats "basted with cotton wooll and made defensive against Indean arrowes; Hartford 40, Wyndsor 30, Wethersfield 20." *Id.* at 10. A 1650 act required Connecticut towns to keep "cotton coates" or "corseletts": Wyndsor (9), Hartford (12), Weathersfield (8), Seabrook (3), Farmington (3), Fairfield (6), Strattford (6), Southhampton (3), Pequett (3). *Id.* at 13–14.

[174] Walter Hough, *Primitive American Armor*, *in* ANNUAL REPORT OF THE BOARD OF REGENTS THE SMITHSONIAN INSTITUTION 647 (1895).

KR0686

- *Crupper.*[175] "The armor for the hind quarters of a horse."[176]
- *Helmet.*[177] "Generally any headpiece, specifically the open headpiece of the time of the Norman conquest."[178]
- *Pectoral.*[179] "A covering for the breast, either defensive or ornamental."[180]
- *Quilted coat.*[181] "Armor made of several thicknesses of linen, or other cloth, quilted or pour-pointed together."[182]

## Ammunition

Of course ammunition and gunpowder were mandatory. While many laws required owning certain quantities of gunpowder and ammunition, some required specific types of ammunition.

- *Buck shot.*[183] Multiple large pellets often used for deer hunting.[184]

---

[175] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 46 (1687); Part 7 (New Hampshire), at 13 (1687); Part 9 (New York), at 4 (1694), 16 (1691), 46 (1702), 53 (1702), 80 (1721), 89 (1724), 116 (1739), 134 (1743), 148 (1744), 165 (1746), 188 (1755), 227 (1764), 243 (1772), 252 (1775), 273 (1778), 311 (1782); Part 10 (North Carolina), at 29 (1760), 35 (1764), 42 (1766), 52 (1774); Part 12 (Rhode Island), 45 (1718), 206 (1793), 219 (1798); Part 14 (Virginia), at 65 (1705), 78 (1723), 105 (1738), 145, 150 (1755).

[176] STONE, *supra* note 14, at 195 ("Crupper, Croupiere Bacul").

[177] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 256 (1784); Part 6 (Massachusetts), at 29 (1646) ("head peeces"), 56 (1660) ("head peece"), 86 (1671) ("head piece"), 100 (1672) ("head-piece").

[178] STONE, *supra* note 14, at 289.

[179] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 60 (1702).

[180] STONE, *supra* note 14, at 492.

[181] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 78 (1666), 95 (1671), 107 (1672).

[182] STONE, *supra* note 14, at 520 ("Quilted Armor").

[183] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 223, 228 (1776); Part 7 (New Hampshire), at 82 (1776).

[184] R.A. STEINDLER, THE FIREARMS DICTIONARY 250 (1970) (the largest shotgun pellets are "small & large buck shot").

*Journal of Legislation*

- *Swan shot, Goose shot*.[185] "Large shot, but smaller than buckshot, used for hunting large fowl, small game, and occasionally used in battle."[186]

*Equipment*

Mandatory equipment included tools for carrying or loading ammunition, and for cleaning or repairing firearms.

- *Bandoleer*.[187] "A large leathern belt, thrown over the right shoulder, and hanging under the left arm; worn by ancient musketeers for sustaining their fire arms, and their musket charges, which being put into little wooden cases, and coated with leather, were hung, to the number of twelve, to each bandoleer."[188]
- *Worm*.[189] A corkscrew-shaped device attached to the end of a ramrod that is used for cleaning and for extracting unfired bullets and other ammunition components from firearms.[190]

---

[185] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 10 (North Carolina), at 8 (1715), 10 (1746), 19 (1756), 26 (1760), 32 (1764), 39 (1766), 49 (1774); Part 13 (South Carolina), 68 (1778); Part 14 (Virginia), at 59 (1701).

[186] MARK M. BOATNER III, ENCYCLOPEDIA OF THE AMERICA REVOLUTION 1085 (3d ed. 1994) ("Swan Shot").

[187] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 5 (1650).

[188] 1 WEBSTER, *supra* note 105, (unpaginated) ("Bandoleers").

[189] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 18 (1656), 60 (1702), 92 (1714), 123 (1741), 131 (1741), 150 (1754); Part 3 (Delaware), at 11 (1756), 17, 18 (1757); Part 4 (Georgia), at 7 (1755), 57 (1765), 80 (1773), 122 (1778); Part 6 (Massachusetts), at 25 (1643), 41 (1645), 45 (1647), 56 (1649), 86 (1671), 129 (1685), 139 (1693), 223 (1776), 246 (1781), 263 (1789); Part 7 (New Hampshire), at 52 (1718), 82 (1776), 104 (1780); Part 8 (New Jersey), at 5 (1758), 8 (1758), 41 (1777), 64 (1779), 70 (1781); Part 10 (North Carolina), at 19 (1756), 26 (1760), 32 (1764), 39 (1766), 49 (1774); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 147 (1779), 191 (1781); Part 13 (South Carolina), at 9 (1703), 17 (1707), 24 (1721), 40 (1747), 68 (1778).

[190] GEORGE C. NEUMANN & FRANK J. KRAVIC, COLLECTOR'S ILLUSTRATED ENCYCLOPEDIA OF THE AMERICAN REVOLUTION 264 (1975); STEINDLER, *supra* note __, at 278; LEDERER, JR., *supra* note __, at 246 ("wormer").

- *Horn, Powderhorn*.[191] "A horn in which gunpowder is carried by sportsmen."[192] Most horns came from cattle, rams, or similar animals.[193]
- *Rest*.[194] "A staff with a forked head to rest the musket on when fired, having a sharp iron ferule at bottom to secure its hold in the ground."[195]
- *Shot bag*.[196] This term may refer to a charger or to a bag for carrying bullets.[197]
- *Scourer*.[198] A ramrod.[199]

---

[191] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 18 (1656), 166 (1758), 169 (1759); Part 4 (Georgia), at 6 (1755), 57, 69 (1765), 80, 109 (1773), 122 (1778), 146 (1784); Part 6 (Massachusetts), at 133 (1689), 199 (1758), 229 (1776), 250 (1781); Part 7 (New Hampshire), at 31 (1692); Part 8 (New Jersey), at 5 (1758), 8 (1682), 12 (1713), 16, 18 (1722), 20, 23 (1730), 25, 27 (1746), 33, 34, 37 (1757); Part 9 (New York), at 271 (1778), 310 (1782); Part 10 (North Carolina), at 57 (1777), 62 (1777), 69 (1778), 101 (1781); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 204 (1793), 217 (1798); Part 13 (South Carolina), at 24 (1721), 40 (1747), 52 (1747); Part 14 (Virginia), at 323 (1777).

[192] 1 WEBSTER, *supra* note 105, (unpaginated).

[193] RAY RILING, THE POWDER FLASK BOOK 13 (1953).

[194] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 5 (1638), 12 (1650), 18 (1656); Part 6 (Massachusetts), at 25 (1643), 29 (1645), 86 (1671); Part 5 (Maryland), at 6 (1638); Part 12 (Rhode Island), at 3 (1647).

[195] 2 F. W. FAIRHOLT, COSTUME IN ENGLAND: A HISTORY OF DRESS TO THE END OF THE EIGHTEENTH CENTURY 293 (H. A. Dillon ed., 4th ed. 1910) ("Musket-Rest"); *see also* STEPHEN BULL, ENCYCLOPEDIA OF MILITARY TECHNOLOGY AND INNOVATION 184 (2004) ("[A] forked pole about four feet in length").

[196] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 18 (1656), 166 (1758), 169 (1759); Part 4 (Georgia), at 69 (1765), 80 (1773); Part 9 (New York), at 271 (1778), 310 (1782); Part 10 (North Carolina), at 57 (1777), 62 (1777), 69 (1778), 101 (1781); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 204 (1793), 217 (1798); Part 13 (South Carolina), at 24 (1721), 40 (1747); Part 14 (Virginia), at 258, 274 (1775), 306 (1775), 323 (1777).

[197] RILING, *supra* note __, at 256–57, 430–31; JIM MULLINS, OF SORTS FOR PROVINCIALS: AMERICAN WEAPONS OF THE FRENCH AND INDIAN WAR 43–44 (2008).

[198] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 18 (1656); Part 6 (Massachusetts), at 41 (1645), 45 (1647), 86 (1671), 100 (1672); Part 11 (Pennsylvania), at 10 (1676).

[199] CHARLES JAMES, AN UNIVERSAL MILITARY DICTIONARY 791 (4th ed. 1816).

- *Charger.*[200] A bulb-shaped flask for carrying powder, attached to metal components that release a premeasured quantity of the powder.[201]
- *Priming wire, Picker.*[202] Used to clean the flashpan and the touch hole (the small hole where the fire from the priming pan connected with the main powder charge).[203]
- *Cartridge Box.*[204] A box for storing and carrying cartridges.[205]

In America, unlike England, militiamen were never required to own bows and arrows. By the time that immigration to America began, the age of the bow was passing away. Only Massachusetts, which always valued education highly, required girls and boys to be taught archery. A 1645 statute ordered "that all youth within this jurisdiction, from ten years old to the age of sixteen

---

[200] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 18 (1656); Part 7 (New Hampshire), at 31 (1692); Part 11 (Pennsylvania), at 10 (1676).

[201] STONE, *supra* note 14, at 563.

[202] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 18 (1656), 60 (1702), 92 (1715), 123 (1741), 131 (1741), 150 (1754), 256 (1784); Part 3 (Delaware), at 11 (1756), 17, 18 (1757), 28 (1785); Part 4 (Georgia), at 7 (1755), 57 (1765), 80 (1773), 122 (1778); Part 6 (Massachusetts), 41 (1645), 86 (1671), 100 (1672), 129 (1685), 139 (1693), 223 (1776), 246 (1781), 263 (1789); Part 7 (New Hampshire), at 52 (1718), 82 (1776), 104 (1780); Part 8 (New Jersey), at 5 (1675), 41 (1777), 64 (1779), 70 (1781); Part 10 (North Carolina), at 19 (1756), 26 (1760), 32 (1764), 39 (1766), 49 (1774); Part 11 (Pennsylvania), at 10 (1676); Part 12 (Rhode Island), at 147 (1779), 191 (1781), 211 (1793), 230 (1798); Part 13 (South Carolina), at 9 (1703), 17 (1707), 24 (1721), 40 (1747), 68 (1778).

[203] NEUMANN & KRAVIC, *supra* note __, at 264.

[204] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 2 (Connecticut), at 123 (1741), 131 (1741), 150 (1754); Part 3 (Delaware), at 2, 3 (1741), 11 (1756), 17 (1757), 28 (1785); Part 4 (Georgia), at 6 (1755), 57 (1765), 122 (1778), 146 (1784); Part 6 (Massachusetts), at 131 (1685), 133 (1689), 139 (1693), 223 (1776), 231 (1776), 246 (1781), 255 (1781), 263 (1789); Part 7 (New Hampshire), at 12 (1687), 52 (1718), 82 (1776), 104 1780), 116 (1780); Part 8 (New Jersey), at 8 (1682), 12 (1713), 16, 18 (1722), 20, 22 (1730), 25, 27, 30 (1746), 33, 35, 37 (1757), 41, 45 (1777); Part 9 (New York), at 4 (1694), 16 (1691), 52, 53 (1702), 80 (1721), 90, 91 (1724), 118 (1739), 136 (1743), 150 (1744), 154 (1746), 164 (1746), 180 (1746), 188 (1755), 230 (1764), 245 (1772), 252, 255 (1775), 267 (1778), 271, 273 (1778), 282 (1779), 310, 311 (1782), 326 (1783); Part 10 (North Carolina), at 11 (1746), 19, 21 (1756), 39 (1766), 49 (1774), 101, 108 (1781); Part 12 (Rhode Island), at 206 (1793), 219, 230 (1798); Part 13 (South Carolina), at 9 (1703), 16 (1707), 24 (1721), 40 (1747); Part 14 (Virginia), at 65, 66 (1705), 78 (1723), 105 (1738), 145, 146, 150 (1755), 206, 210 (1757), 274 (1775), 322, 323 (1777), 425 (1784).

[205] RILING, *supra* note __, at 483. "Cartouche" is the French word for "cartridge." Cartouche boxes were used for carrying paper cartridges; these contained the bullet and a measured quantity of gunpowder, wrapped in paper. *Id.*

years, shall be instructed . . . in the exercise of arms," including "small guns, half-pikes, bows and arrows &c."[206]

### E. Repeating Arms

Repeating arms were far too expensive to mandate. Some did end up in North America.[207] These included mid-1600s repeaters using a revolving cylinder that was rotated by hand.[208] An English Cookson repeater with a 10-round magazine is "believed to have found its way into Maryland with one of the early English colonists." It later became "perhaps the capstone of the collection of arms in the National Museum at Washington, D.C."[209] "Beginning about 1710 commerce brought wealth to some of the merchants in the northern Colonies, and with other luxuries fancy firearms began to be in demand."[210]

In 1722 Boston's John Pim demonstrated a gun he had built. According to an observer, the gun "loaded but once" "was discharged eleven times following, with bullets, in the space of two minutes, each which went through a double door at fifty yards' distance."[211] Another Boston gunsmith, Samuel Miller, advertised a 20-shot repeater, which he would demonstrate for a fee.[212]

However, there are no presently known records, such as newspaper advertisements, of an American before the Revolution manufacturing repeaters for sale as a business.[213]

With the Revolution underway in 1777, Joseph Belton of Philadelphia demonstrated a musket that shot 16 rounds all at once. The observers included top military leaders General Horatio Gates and Major General Benedict Arnold

---

[206] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 6 (Massachusetts), at 26, 31 (1645).

[207] "A few repeating arms were made use of in a military way in America." 1 SAWYER, *supra* note 87, at 28–29. For example, there is "record that [Louis de Buade de] Frontenac in 1690 astonished the Iroquois with his three and five shot repeaters." *Id.* at 29.

[208] *See, e.g.*, 2 *id.* at 5 (six-shot flintlock); CHARLES EDWARD CHAPEL, GUNS OF THE OLD WEST 202–03 (1961) (revolving snaphance).

[209] *The Cookson Gun and the Mortimer Pistols*, AMERICAN RIFLEMAN, vol. 63, at 3, 4 (Sep. 29, 1917).

[210] 1 SAWYER, *supra* note 87, at 31.

[211] Samuel Niles, A Summary Historical Narrative of the Wars in New England, *in* 5 MASSACHUSETTS HISTORICAL SOCIETY COLLECTIONS, 4th ser., at 347 (1837).

[212] NEW-ENGLAND WEEKLY JOURNAL, Mar. 2, 1730.

[213]

and one of America's greatest scientists, David Rittenhouse.[214] At their recommendation, the Continental Congress ordered one hundred Belton guns, but wanted them to fire 8 shots, not 16.[215] (Gunpowder availability was very tight.) However, Belton demanded what the Congress deemed "an extraordinary allowance," which the Continental Congress could not afford. [216]

The U.S. Congress that in 1789 sent the Second Amendment to the States for ratification included men who had served in the Continental Congress, and who were therefore well aware that 16-shot repeaters were possible, albeit very expensive.[217]

---

[214] Letter from Joseph Belton to the Continental Congress (Jul. 10, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS, COMPILED 1774–1789, *supra* note **Error! Bookmark not defined.**, at 139.

> Philadelphia July 10th 1777
>
> Having Carefully examined M. Beltons New Constructed Musket from which He discharged Sixteen Balls loaded at one time, we are fully of Opinion that Muskets of his Construction with some small alterations, or improvements might be Rendered, of great Service, in the Defense of lives, Redoubts, Ships &c, & even in the Field, and that for his Ingenuity, & improvement he is Intitled to a hansome reward from the Publick.
>
> Dav. Rittenhouse  B Arnold  Charles Wm Seale  Horatio Gates  G Nash  Th F Proctor J W Strickland

[215] Report of the Continental Congress (May 3, 1777), *in* 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 324 (Worthington Chauncey Ford ed., 1907).

> Resolved, That John Belton be authorized and appointed to superintend, and direct, the making or altering of one hundred muskets, on the construction exhibited by him, and called 'the new improved gun,' which will discharge eight rounds with once loading; and that he receive a reasonable compensation for his trouble, and be allowed all just and necessary expences.

[216] Report of the Continental Congress (May 15, 1777), in 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, *supra* note 215, at 361.

[217] Delegates who served in the Second Continental Congress in 1777 include Roger Sherman, Lyman Hall, both Charles Carroll(s), future Supreme Court Justice Samuel Chase, John Adams, Samuel Adams, Elbridge Gerry, John Hancock, John Witherspoon, future first U.S. Supreme Court Chief Justice John Jay, future Supreme Court Justice James Wilson, Benjamin Harrison (father and grandfather of two future Presidents), Richard Henry Lee, and Francis Lightfoot Lee. *List of delegates to the Continental Congress*, Wikipedia, https://en.wikipedia.org/wiki/List_of_delegates_to_the_Continental_Congress.

After the war, Belton moved to England, where he made 7-shot repeaters for the British East India Company.[218] During the war, some British forces used the breechloading single-shot Ferguson Rifle, which "fired six shots in one minute" in a government test on June 1, 1776.[219] The Royal Navy's 1779 Nock volley gun had seven barrels (six outer barrels around a center barrel) that fired simultaneously.

When the Second Amendment was ratified, the state-of-the-art repeater was the Girardoni air rifle. It could consecutively shoot 21 or 22 rounds in .46 or .49 caliber, utilizing a tubular spring-loaded magazine.[220] Although an air gun, the Girardoni was ballistically equal to a powder gun.[221] It could take an elk with one shot.[222] The tubular magazine was quick to reload with speedloading tubes. A Girardoni could fire 40 times before the air bladder needed to be pumped up again.[223]

At the time, "there were many gunsmiths in Europe producing compressed air weapons powerful enough to use for big game hunting or as military weapons."[224] The Girardoni was invented for the Austrian army around 1779; 1,500 were issued to sharpshooters and remained in service for 25 years,

---

[218] It could be reloaded by switching in a preloaded metal magazine. *See* Jonathan Ferguson, *"Flintlock Repeating – 1786"* youtube.com/watch?v=-wOmUM40G2U.

[219] ROGER LAMB, AN ORIGINAL AND AUTHENTIC JOURNAL OF OCCURRENCES DURING THE LATE AMERICAN WAR 309 (1809). Because the Ferguson was loaded from the breech, not the muzzle, reloading was much faster. PAUL LOCKHART, FIREPOWER: HOW WEAPONS SHAPED WARFARE 173 (2021).

[220] JAMES B. GARRY, WEAPONS OF THE LEWIS AND CLARK EXPEDITION 100–01 (2012).

[221] JOHN PLASTER, THE HISTORY OF SNIPING AND SHARPSHOOTING 69–70 (2008).

[222] JIM SUPICA, ET AL., TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM 31 (2013).

[223] Pumping was not fast. It took about 1,500 strokes to completely fill the air reservoir. A modern writer called the Girardoni "a stone cold killer at up to 100 yards." He reported from test firing that the muzzle velocity of the .46 caliber bullet was 900 foot-pounds per second—comparable to a 21st century 45 ACP handgun. But the Girardoni could be too delicate. "The rudimentary fabrication methods of the day engineered weak threading on the [air] reservoir neck and this was the ultimate downfall of the weapon. The reservoirs were delicate in the field and if the riveted brazed welds parted the weapon was rendered into an awkward club as a last resort." John Paul Jarvis, *The Girardoni Air Rifle: Deadly Under Pressure*, Guns.com, Mar. 15, 2011, https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure.

[224] GARRY, *supra* note 220, at 91.

*Journal of Legislation* [50:2

including in the Napoleonic Wars.[225] Isaiah Lukens of Pennsylvania manufactured Girardoni rifles,[226] as did "many makers in Austria, Russia, Switzerland, England, and various German principalities."[227]

Meriwether Lewis is believed to have acquired from Lukens the Girardoni rifle that he famously carried on the Lewis and Clark Expedition.[228] Lewis mentioned it in his journal at least twenty-two times. Sixteen times, Lewis was demonstrating the rifle to impress various Native American tribes encountered on the expedition—often "astonishing" or "surprising" them,[229] and making the point that although the expedition was usually outnumbered, the smaller group could defend itself.[230]

### F.  Cannons

Cannons were manufactured and privately owned in colonial America. When the Quaker-dominated Pennsylvania legislature would not fund a militia in 1747, Benjamin Franklin and some friends arranged a lottery to purchase some cannons and borrowed other cannons from New York.[231] During the French and Indian War, Georgia's legislature authorized militia officers to impress privately owned cannons for use by the militia.[232]

On the frontiers, cannons were kept to defend fortified buildings against attacks by Indians, the French, or Spanish. In a seaport, the greatest concern might be resistance to bombardment by an enemy fleet.

---

[225] GERALD PRENDERGHAST, REPEATING AND MULTI-FIRE WEAPONS 100–01 (2018); GARRY, *supra* note 220, at 91–94.

As a testament to the rifle's effectiveness, "[t]here are stories that Napoleon had captured air riflemen shot as terrorists, making it hard to recruit men for the air rifle companies." *Id.* at 92.

[226] Nancy McClure, *Treasures from Our West: Lukens Air Rifle*, BUFFALO BILL CENTER FOR THE AMERICAN WEST, Aug. 3, 2014, https://centerofthewest.org/2014/08/03/treasures-west-lukens-air-rifle/.

[227] GARRY, *supra* note 220, at 99.

[228] *Id.*

[229] *See e.g.*, 6 MERIWETHER LEWIS & WILLIAM CLARK, THE JOURNALS OF THE LEWIS & CLARK EXPEDITION at 233 (Gary Moulton ed. 1983) (Jan. 24, 1806, entry) ("My Air-gun also astonishes them very much, they cannot comprehend it's shooting so often and without powder; and think that it is *great medicine* which comprehends every thing that is to them incomprehensible.").

[230] *See generally id.* (13 vols.).

[231] 1 JAMES PARTON, LIFE AND TIMES OF BENJAMIN FRANKLIN 267 (1864). The authors thank Clayton Cramer for bringing this example to our attention.

[232] BACKGROUNDS OF SELECTIVE SERVICE, *supra* note 98, Part 4 (Georgia), at 24 (1755).

**KR0694**

In December 1774, when tensions with Great Britain were rising towards war, a meeting of "Freeholders and other Inhabitants of the Town," chaired by revolutionary firebrand Samuel Adams, complained that "a Number of Cannon, the Property of a respectable Merchant in this Town were seized & carried off by force" by the British.[233]

As during the French & Indian war, private contributions of cannons to the common cause were necessary. In New Jersey in September 1777, Brigadier-General Forman lent the state militia his personal "three Pieces of Field Artillery." These would establish a militia artillery company.[234]

A Pennsylvania law to disarm "disaffected" persons authorized militia officers to "take from every such person" various weapons. The weapons listed were apparently common enough that some members of the public possessed them: "any cannon, mortar, or other piece of ordinance, or any blunderbuss, wall piece, musket, fusee, carbine or pistols, or other fire arms, or any hand gun; and any sword, cutlass, bayonet, pike or other warlike weapon."[235]

In 1783, Boston passed a fire-prevention law forbidding citizens who kept cannons in their home or outbuildings from keeping them loaded with gunpowder.[236] Any "cannon, swivels, mortars, howitzers, cohorns, fire-arms, bombs, grenades, and iron shells of any kind" that were stored loaded with gunpowder could be confiscated and "sold at public auction" back to private individuals.[237]

At sea, privately owned cannons were especially important. As long as there had been American vessels, some merchant or other civil ships carried cannons for protection against pirates.

---

[233] Boston Gazette, Jan. 2, 1775.

[234] 1776-1777 N.J. Acts 107, ch. 47.

[235] 1779 Pa. Laws 193, sec. 5.

[236] 1783 Mass. Acts 218, ch. 13.

The law also applied to firearms. According to *Heller*, "That statute's text and its prologue, which makes clear that the purpose of the prohibition was to eliminate the danger to firefighters posed by the 'depositing of loaded Arms' in buildings, give reason to doubt that colonial Boston authorities would have enforced that general prohibition against someone who temporarily loaded a firearm to confront an intruder (despite the law's application in that case)." 554 U.S. at 631–32.

[237] *Id.*

Under longstanding international law, governments during wartime issued letters of marque and reprisal.[238] The letters authorized privately owned ships, *privateers*, to attack and capture the military or commercial ships of the enemy.[239] The captured property (*prizes*) would be divided among the privateer's crew and owners, according to contract. Typically, prizes were put up for auction in a friendly port. A captured ship might be kept by the privateers, or sold.

Naval combat at the time used cannon fire, so anyone issued a letter of marque or reprisal would have to buy a significant number of cannons to turn his civil vessel into a warship for offensive use.

In the American Revolution, the Massachusetts Bay Colony was the first to issue letters of marque and reprisal, in November 1775.[240] The Continental Congress followed suit later that month.[241]

During the war, the number of American privateers far exceeded the combined number of warships of the Continental Navy and the State naval militias. Every privateer, by definition, was armed at private expense.[242]

Operating up and down the Atlantic seaboard, in the British West Indies, and even off the West African coast, American privateers were rarely strong enough to engage a British navy warship. Instead, they massively damaged

---

[238] To be precise, a letter of marque authorizes the holder to enter enemy territory. A letter of reprisal authorizes the holder to transport a captured prize to the holder's nation.

Cases on letters of marque and reprisal include Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64 (1800); Bas v. Tingy, 4 U.S. (4 Dall.) 37 (1800) (Quasi-War with France); Schooner Exchange v. M'Faddon, 11 U.S. (7 Cranch) 116 (1812); The Thomas Gibbons, 12 U.S. (8 Cranch) 421 (1814) (War of 1812); Prize Cases, 7 U.S. (2 Black) 635 (1862) (Civil War).

For legal history, a leading survey is Theodore M. Cooperstein, *Letters Of Marque And Reprisal: The Constitutional Law And Practice Of Privateering*, 40 J. MAR. L. & COM. 221 (2009) (including a thorough bibliography of authorities).

[239] *See* ERIC J. DOLIN, REBELS AT SEA: PRIVATEERING IN THE AMERICAN REVOLUTION (2022). Capturing a military ship happened only rarely. A privateer had a much better chance of outgunning an enemy merchant ship.

[240] An Act & Resolve for Encouraging the Fixing out of Armed Vessels, Mass. Gen. Ct., Nov. 1, 1775; DOLIN at 11.

[241] 3 J. Cont. Cong. 373 (Nov. 25, 1775); 4 J. Cont. Cong. 229-30 (Mar. 23. 1776).

[242] Acquiring at private expense was achieved by purchase in the United States, often with shareholder financing, or by seizure from enemy vessels.

Privateers frequently sought investors for outfitting a ship, in exchange for a share of the prize. Among such investors were George Washington and Robert Morris. *See* FORREST MCDONALD, WE THE PEOPLE 38, 43 (1968) (Washington); Francis R. Stark, *The Abolition of Privateering and the Declaration of Paris*, in 8 STUDS. IN HIST., ECON. & PUB. L. 343 (1897) (Morris).

KR0696

British commercial shipping. The captured prizes—including gunpowder, firearms, and silver—were crucial to the American war effort.[243] The privateers did not win the war by themselves; the war could not have been won without them.[244]

The U.S. Constitution grants Congress the powers to "grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water."[245] The congressional power is predicated on the existence of ships that can be outfitted with privately-purchased cannon, and of small arms for seamen, such as firearms and swords.

Wartime privateering aside, cannons were outfitted on commercial ships for protection against pirates. A peacetime 1789 advertisement in Philadelphia touted a store "where owners and commanders of armed vessels may be supplied, for either the use of small arms or cannon, at the shortest notice."[246] The ad was published again in 1799.[247] In 1787, Paul Revere, already famous as a silversmith, opened an iron and brass foundry and copper mill that soon went into the business of casting bells and cannons.[248]

---

[243] DOLIN at xix.

[244] In the words of Secretary of the Navy John Lehman (1981–87):

> From the beginning of the American Revolution until the end of the War of 1812, America's real naval advantage lay in its privateers. It has been said that the battles of the American Revolution were fought on land, and independence was won at sea. For this we have the enormous success of the American privateers to thank even more than the continental Navy.

JOHN LEHMAN, ON SEAS OF GLORY, HEROIC MEN, GREAT SHIPS, AND EPIC BATTLES OF THE AMERICAN NAVY 41–42 (New York: The Free Press, 2001).

[245] U.S. CONST., art. I, § 8. Pursuant to the text, the power to grant such letters lies in the federal legislative branch, not the executive, although the former may delegate to the latter. *See* William Young, *A Check on Faint-Hearted Presidents: Letters of Marque and Reprisal*, 66 WASH. & LEE L. REV. 895, 905–06 (2009).

A unified national approach to international war being necessary, the Constitution restricts State international warfare, including issuing letters of marque and reprisal. U.S. CONST., art. I, § 10.

[246] Edward Pole, *Military laboratory, at No. 34, Dock street near the Drawbridge, Philadelphia: where owners and commanders of armed vessels may be supplied, for either the use of small arms or cannon, at the shortest notice, with every species of military store*. Phil., 1789, https://www.loc.gov/item/rbpe.1470090a/.

[247] GAZETTE OF THE UNITED STATES, AND PHILADELPHIA DAILY ADVERTISER, July 1, 1799, p.2, https://chroniclingamerica.loc.gov/lccn/sn83025881/1799-07-01/ed-1/seq-2/.

[248] *See Revere's Foundry & Copper Mill*, The Paul Revere House, https://www.paulreverehouse.org/reveres-foundry-copper-mill/.

The freedom Americans always enjoyed to possess the arms of one's choosing was reflected in Ira Allen's defense when he was seized by British forces in 1796 while transporting 20,000 muskets and 24 "field pieces" (cannons and other artillery) from France to America. Allen said the arms were for Vermont's militia, whereas the British suspected he planning to arm a Canadian revolt against the British. He was prosecuted in Britain's Court of Admiralty. At trial, the idea of one individual possessing 20,000 arms was received with skepticism. Allen retorted that in America, "[a]rms and military stores are free merchandise, so that any who have property and choose to sport with it, may turn their gardens into parks of artillery, and their houses into arsenals, without danger to Government."[249] The arms were restored to Allen.[250]

## G. Overview

The Revolution had started when Americans resisted with arms the Redcoats' attempt to confiscate arms at Lexington and Concord on April 19, 1775. Before that, to effectively disarm the Americans, the British had banned the import of firearms and gunpowder into the colonies,[251] prevented Americans from accessing arms stored in town magazines,[252] and confiscated

---

[249] IRA ALLEN, PARTICULARS OF THE CAPTURE OF THE OLIVE BRANCH, LADEN WITH A CARGO OF ARMS 403–04 (1798).

[250] *Id.*

[251] King George III imposed an embargo on arms and gunpowder imports on October 19, 1774. 5 ACTS OF THE PRIVY COUNCIL OF ENGLAND, COLONIAL SERIES, A.D. 1766-1783, at 401 (Burlington, Can.: TannerRitchie Pub., 2005) (James Munro & Almeric Fitzroy eds., 1912). Secretary of State Lord Dartmouth sent a letter that day "to the Governors in America," announcing "His Majesty's Command that [the governors] do take the most effectual measures for arresting, detaining, and securing any Gunpowder, or any sort of arms and ammunition, which may be attempted to be imported into the Province under your Government. . . ." Letter from Earl of Dartmouth to the Governors in America, Oct. 19, 1774, *in* 8 DOCUMENTS RELATIVE TO THE COLONIAL HISTORY OF THE STATE OF NEW YORK 309 (1857). The order, initially set to expire after six months, was "repeatedly renewed, remaining in effect until the Anglo-American peace treaty in 1783." David B. Kopel, *How the British Gun Control Program Precipitated the American Revolution*, 6 CHARLESTON L. REV. 283, 297 (2012).

[252] For example, Massachusetts's Royal Governor Thomas Gage "order'd the Keeper of the Province's Magazine not to deliver a kernel of powder (without his express order) of either public or private property. . . ." JOHN ANDREWS, LETTERS OF JOHN ANDREWS, ESQ., OF BOSTON 19–20 (Winthrop Sargent ed., 1866); *id.* at 39 ("a Guard of soldiers is set upon the Powder house at the back of ye. Common, so that people are debar'd from selling their own property.");

KR0698

arms and ammunition.[253] During the Revolution the British government devised a plan for the permanent disarmament of the Americans after an American surrender.[254]

Naturally, after facing the threat of disarmament and thus certain destruction, America's Founders were extremely protective of the right to arms. Before, during, and after the Revolution, no state banned any type of arm, ammunition, or accessory. Nor did the Continental Congress, the Articles of Confederation Congress, or the federal government created by the U.S. Constitution in 1787.[255] Instead, the discussions about arms during the

---

Letter from Thomas Gage to Earl of Dartmouth, Nov. 2, 1774, *in* 1 AMERICAN ARCHIVES, 4th ser., at 951 (Peter Force ed., 1843) (Gage stating that he issued "an order to the Storekeeper not to deliver out any Powder from the Magazine, where the Merchants deposit it.").

[253] *See* O.W. Stephenson, *The Supply of Gunpowder in 1776 in* 30 THE AMERICAN HISTORICAL REVIEW 272 (J. Franklin Jameson ed., 1925) ("Within a few hours of the time when the minute-men faced the redcoats on Lexington green and at Concord bridge, Governor Dunmore, down in Virginia, laid hold of the principal supplies in the Old Dominion."); Brown, *supra*, at 298 ("the American Revolution was nearly precipitated in Virginia on the night of April 20–21 [1775], for in Williamsburg Gov. Dunmore had ordered the Royal Marines to remove the colony gunpowder supply from the magazine. As in Massachusetts the plan was discovered and the militia called to arms. . . . Lord Dunmore . . . placated the irate populace by making immediate restitution for the powder."). The British had wanted to confiscate arms door-to-door, but Governor Gage deemed it too dangerous a proposition. Extract of a Letter from Governor Gage to the Earl of Dartmouth, Dec. 15, 1774, *in* 1 AMERICAN ARCHIVES, *supra* note 252, 4th. Ser., at 1046 ("Your Lordship's idea of disarming certain Provinces, would doubtless be consistent with prudence and safety; but it neither is or has been practicable, without having recourse to force, and being master of the Country.").

[254] Colonial Under Secretary of State William Knox presented the plan to disarm Americans:

> The Militia Laws should be repealed and none suffered to be re-enacted, & the Arms of all the People should be taken away . . . nor should any Foundery or manufactuary of Arms, Gunpowder, or Warlike Stores, be ever suffered in America, nor should any Gunpowder, Lead, Arms or Ordnance be imported into it without Licence.

William Knox, *Considerations on the Great Question, What Is Fit to be Done with America, Memorandum to the Earl of Shelburne, in* 1 SOURCES OF AMERICAN INDEPENDENCE: MANUSCRIPTS FROM THE COLLECTIONS OF THE WILLIAM L. CLEMENTS LIBRARY 176 (Howard Peckham ed., 1978).

[255] As far as we know, only one person has ever claimed the contrary. That person is President Joseph Biden, who has repeatedly stated that when the Second Amendment was ratified, people could not possess cannons. He has repeated the claim despite repeated debunking by factcheckers. *See* Glenn Kessler, *Biden's False Claim that the 2nd Amendment*

ratification of the Constitution and the Bill of Rights centered on ensuring that the people had enough firepower to resist a tyrannical government. There is no evidence that any of the Founders were concerned about individuals having too much firepower. After a long, grueling war against the world's strongest military, limiting individuals' capabilities was not a concern.

Americans' hostility to any limit on their ability to resist a tyrannical government was demonstrated by their response to a Pennsylvania order—issued while the States were debating the Constitution—directing lieutenants of the militia "to collect all the public arms" to "have them repaired" and then reissued.[256] "Public arms" were firearms owned by a government and given to militiamen who could not afford to purchase a firearm themselves.[257]

Pennsylvanians fiercely opposed the recall. Even though militiamen were free to acquire whatever personal arms they could afford, they denounced the order as "a temporary disarming of the people."[258] They suggested that "our Militia . . . may soon be called to defend our sacred rights and privileges, against the despots and monarchy-men" who supported the order.[259]

Because "the people were determined not to part with" and "refused to deliver up the arms," the Pennsylvania government "cancelled the order."[260] If the people threatened armed resistance to the government's attempt to temporarily recover its own arms, an attempt to ban any privately owned arms would have been met with even greater opposition.[261]

---

*Bans Cannon Ownership*, WASHINGTON POST, June 28, 2021; D'Angelo Gore, *Biden Repeats False Claims at Gun Violence Meeting*, FACTCHECK.ORG, Feb. 7, 2022, https://www.factcheck.org/2022/02/biden-repeats-false-claims-at-gun-violence-meeting/; Louis Jacobson, *Joe Biden's dubious claim about Revolutionary War cannon ownership*, POLITIFACT, June 29, 2020, https://www.politifact.com/factchecks/2020/jun/29/joe-biden/joe-bidens-dubious-claim-about-revolutionary-war-c/.

[256] 33 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 739 (John Kaminski et al. eds., 2019).

[257] David B. Kopel & Stephen P. Halbrook, *Tench Coxe and the Right to Keep and Bear Arms in the Early Republic*, 7 WM. & MARY BILL RTS J. 347 (1999) (describing public arms programs of the Jefferson and Madison administrations).

[258] An Old Militia Officer of 1776, PHILADELPHIA INDEPENDENT GAZETTEER, Jan. 18, 1788, *in* 33 DOCUMENTARY HISTORY, *supra* note 256, at 740.

[259] PHILADELPHIA FREEMAN'S JOURNAL, Jan. 23, 1788, *in* 33 DOCUMENTARY HISTORY, *supra* note 256, at 741.

[260] PHILADELPHIA INDEPENDENT GAZETTEER, Apr. 30, 1788, *in* 34 DOCUMENTARY HISTORY, *supra* note 256, at 1266.

[261] Pennsylvania's experience is relevant to modern-day confiscation laws. According to *Bruen*, "if some jurisdictions actually attempted to enact analogous regulations during this

Firearms and cutting weapons were ubiquitous in the colonial era, and a wide variety existed of each. Repeating arms and cannons were freely owned by those who could afford them. The historical record up to 1800 provides no support for general prohibitions on any type of arms or armor.

## III. Nineteenth Century Advances in Arms

This Part describes how the nineteenth century brought the greatest advances in firearms before or since. The century began with the single-shot muzzleloading blackpowder muskets and ended with semiautomatic pistols employing detachable magazines and centerfire ammunition with modern smokeless powder. Then Part IV will examine the very small lawmaking response to the immense technological changes.

Here in Part III the technological changes are summarized. Many of the advances detailed below had already been invented long before 1791, as described in Parts I.B. and II.D. But firearms incorporating these advances were quite expensive. Compared to single-shot firearms, repeating firearms require closer fitting of their more intricate parts. As of 1750, firearms manufacture was a craft industry.[262] Firearms were built one at time by a lone craftsman or perhaps in a workshop.[263] The labor cost of building an advanced firearm was vastly higher than for a one-shot musket, rifle, or handgun.[264]

Advanced firearms were made possible by the American industrial revolution. That revolution created machine tools—tools that can make uniform parts and other tools.[265] Thanks to machine tools, the number of

---

timeframe [the eighteenth century], but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality. 142 S. Ct. at 2131.

[262] Johnson et al., *supra* note 16, at 2210. Some of this Part is based on *The Evolution of Firearms Technology from the Sixteenth Century to the Twenty-first Century*, which is Chapter 23 in Johnson et al., *supra* note 16. Much more detail about the technological developments described in this Part is presented in that chapter, available online at http://firearmsregulation.org/www/FRRP3d_CH23.pdf.

[263] *Id.*

[264] *Id.* at 2199.

[265] *Id.* at 2208–14.

human labor hours to manufacture advanced firearms plunged, while machinists prospered.[266]

### A. James Madison and James Monroe, the founding fathers of modern firearms

U.S. Representative James Madison is well-known as the author of the Second Amendment and the rest of the Bill of Rights. What is not well-known is how his presidency put the United States on the path to mass production of high-quality affordable firearms.

Because of weapons procurement problems during the War of 1812, President Madison's Secretary of War James Monroe, who would succeed Madison as President, proposed a program for advanced weapons research and production at the federal armories, which were located in Springfield, Massachusetts, and Harpers Ferry, Virginia. The Madison-Monroe program was to subsidize technological innovation.[267] It was enthusiastically adopted with the support of both the major parties in Congress: the Madison-Monroe Democratic-Republicans, and the opposition Federalists.[268] Generous federal arms procurement contracts had long lead times and made much of the payment up-front, so that manufacturers could spend several years setting up and perfecting their factories.[269] The program succeeded beyond expectations, and helped to create the American industrial revolution.

### B. The American system of manufacture

The initial objective was interchangeability, so that firearms parts damaged in combat could be replaced by functional spare parts.[270] If there are

---

[266] *See* FELICIA JOHNSON DEYRUP, ARMS MAKERS OF THE CONNECTICUT VALLEY: A REGIONAL STUDY OF THE ECONOMIC DEVELOPMENT OF THE SMALL ARMS INDUSTRY, 1798-1870, at 217 app'x A, tbl. 1 (1948) (from 1850 to 1940, average annual wages in the arms industry always exceeded wages in overall U.S. industry, sometimes by large margins).

[267] ROSS THOMSON, STRUCTURES OF CHANGE IN THE MECHANICAL AGE: TECHNOLOGICAL INNOVATION IN THE UNITED STATES 1790-1865, at 54-59 (2009).

[268] JOHNSON ET AL., *supra* note 16, at 2209.

[269] *Id.*

[270] Thomas Jefferson had previously attempted to bring interchangeable gun parts to America after meeting with French inventor Honoré Blanc, who was developing such a system, While ambassador to France in 1785, Jefferson wrote to U.S. Secretary of Foreign Affairs (under the Confederation government) John Jay about the meeting:

KR0702

two damaged firearms found after a battle, and their parts could be combined into one functional firearm, that was the first step. After that would come higher rates of factory production. And after that, it was hoped, production at lower cost than artisanal production. Achieving these objectives for the more intricate and closer-fitting parts of repeating firearms would be even more difficult.

To carry out the federal program, the inventors associated with the federal armories first had to invent machine tools. Consider for example, the wooden stock of a long gun. The back of the stock is held against the user's shoulder. The middle of the stock is where the action is attached. (The action is the part of the gun containing the moving parts that fire the ammunition.) For many guns, the forward part of the stock would contain a groove to hold the barrel.

---

> An improvement is made here in the construction of muskets, which it may be interesting to Congress to know. . . . It consists in the making every part of them so exactly alike, that what belongs to any one, may be used for every other musket in the magazine. . . . Supposing it might be useful to the United States, I went to the workman; he presented me the parts of fifty locks taken to pieces, and arranged in compartments. I put several together myself, taking pieces at hazard as they came to hand, and they fitted in the most perfect manner. The advantages of this, when arms need repair, are evident.

Letter from Thomas Jefferson to John Jay, Aug. 30, 1785, *in* 1 MEMOIRS, CORRESPONDENCE, AND PRIVATE PAPERS, OF THOMAS JEFFERSON 299 (Thomas Jefferson Randolph ed., 1829). Jefferson also wrote to Patrick Henry and Henry Knox about Blanc. 8 THE PAPERS OF THOMAS JEFFERSON 455 (Julian P. Boyd ed., 1953) (1990 3d printing); 9 *id.* at 214; 15 *id.* at 421–43, 454–55. In 1801, President Jefferson recounted his experience with Blanc to James Monroe, while expressing hope for Eli Whitney's plan for interchangeable gun parts:

> mr Whitney . . . has invented moulds & machines for making all the peices of his locks so exactly equal, that take 100 locks to pieces & mingle their parts, and the hundred locks may be put together as well by taking the first pieces which come to hand. this is of importance in repairing, because out of 10. locks e.g. disabled for the want of different pieces, 9 good locks may be put together without employing a smith. Leblanc in France had invented a similar process in 1788. & had extended it to the barrel, mounting & stock. I endeavored to get the US. to bring him over, which he was ready for on moderate terms. I failed & I do not know what became of him.

Letter from Thomas Jefferson to James Monroe, Nov. 14, 1801, *in* 35 THE PAPERS OF THOMAS JEFFERSON 662 (Barbara B. Oberg ed., 2008).

*Journal of Legislation*

Making a stock requires many different cuts of wood, few of them straight. The artisanal gunmaker would cut with hand tools such as saws and chisels. Necessarily, one artisanal stock would not be precisely the same size as another.

To make stocks faster and more uniformly, Thomas Blanchard invented fourteen different machine tools. Each machine would be set up for one particular cut. As the stock was cut, it would be moved from machine to machine. By mounting the stock to the machine tools with jigs and fixtures, a manufacturer could ensure that each stock would be placed in precisely the same position in the machine as the previous stock. The mounting was in relation to a bearing — a particular place on the stock that was used as a reference point. To check that the various parts of the firearm, and the machine tools themselves, were consistent, many new gauges were invented.[271] What Blanchard did for stocks, John H. Hall, of the Harpers Ferry Armory, did for other firearms parts.

Hall shipped some of his machine tools to Simeon North, in Connecticut. In 1834, Hall and North made interchangeable firearms. This was the first time that geographically separate factories had made interchangeable parts.[272]

Because Hall "established the efficacy" of machine tools, he "bolstered the confidence among arms makers that one day they would achieve in a larger, more efficient manner, what he had done on a limited scale. In this sense, Hall's work represented an important extension of the industrial revolution in America, a mechanical synthesis so different in degree as to constitute a difference in kind."[273]

The technological advances from the federal armories were widely shared among American manufacturers. The Springfield Armory built up a large network of cooperating private entrepreneurs and insisted that advances in manufacturing techniques be widely shared. By mid-century, what had begun as the mass production of firearms from interchangeable parts had become globally known as "the American system of manufacture"—a system that encompassed sewing machines, and, eventually typewriters, bicycles, and automobiles.[274]

---

[271] DEYRUP, *supra* note 266, at 97–98; THOMSON, *supra* note 267, at 56–57.

[272] THOMSON, *supra* note 267, at 58; MERRITT ROE SMITH, HARPERS FERRY ARMORY AND THE NEW TECHNOLOGY: THE CHALLENGE OF CHANGE 212 (1977).

[273] SMITH, *supra* note 272, at 249.

[274] *See, e.g.*, DAVID R. MEYER, NETWORKED MACHINISTS: HIGH-TECHNOLOGY INDUSTRIES IN ANTEBELLUM AMERICA 81–84, 252–62, 279–80 (2006).

KR0704

Springfield, in western Massachusetts on the Connecticut River, had been chosen for the federal armory in part because of its abundance of waterpower and for the nearby iron ore mines. Many private entrepreneurs, including Colt and Smith & Wesson, made the same choice. The Connecticut River Valley became known as the Gun Valley. It was the Silicon Valley of its times, the center of industrial revolution.[275]

### C. The revolution in ammunition

The gunpowder charge in a gun's firing chamber must be ignited by a primer. Before 1800, the primer was a small quantity of gunpowder in the gun's firing pan. The gunpowder in the firing pan was connected to the main powder charge in the firing chamber via a small opening, the touch-hole. In a flintlock, the priming powder in the firing pan is ignited by a shower of sparks from flint striking steel. In the older matchlock guns, the powder charge was ignited by the lowering of a slow-burning hemp cord to touch the firing pan. In either system, the user pressed the trigger to start the process.

Then in the 1810s, the percussion cap began to spread.[276] It used a primer made of chemical compounds, known as fulminate. The percussion cap sat on a nipple next to the firing chamber. When the user pressed the trigger, a hammer would strike the fulminate. The explosion would then ignite the gunpowder charge. Percussion ignition was faster and far more reliable than priming pan ignition.[277] Percussion cap guns "shot harder and still faster than the best flintlock ever known."[278]

Retrofitting flintlocks to convert them to percussion ignition was easy.[279] So starting in the 1810s, anyone's old flintlock from 1791 could suddenly became more powerful than any firearm that had existed in 1791.

---

[275] *Id.* at 73–103, 229–80.

[276] "[T]he percussion cap was developed as a result of Reverend Alexander Forsyth's bringing out in 1807 his detonator lock—the most important development in guns since gunpowder." 23 LEWIS WINANT, FIREARMS CURIOSA 23 (Odysseus 1996) (1955); *see* Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35, 72 (2023). There were other systems of percussion ignition. For example, Washington, D.C., dentist Edward Maynard invented the tape primer; similar to the tapes still used today in toy cap guns. The percussion cap proved to be the best system. *See* JOHNSON ET AL. at 2215–16.

[277] J.F.C. FULLER, ARMAMENT AND HISTORY 113 (Da Capo Pr. 1998) (1945).

[278] HELD, *supra* note 20, at 171.

[279] LOCKHART at 167.

The bullets of 1791 were spheres. That is why a unit of ammunition today is still called "a round." In the early nineteenth century, conoidal bullets were invented. These are essentially the same type of bullets used today. The shape is far more aerodynamically stable, allowing longer shots with much better accuracy. The back of the bullet helped to prevent the expanding gas of the gunpowder explosion from exiting the barrel before the bullet did. As the result, the gas gave the bullet a stronger push, imparting more energy and making the bullet more powerful.[280]

In 1846, modern metallic cartridge ammunition was invented. Instead of the bullet, gunpowder, and primer being three separate items to insert into a firearm one at a time, ammunition was now a single unit, the cartridge. The bullet, gunpowder, and primer were all contained in a metal case.[281]

An initial result of the cartridge was to make breechloading firearms become very common.[282] Instead of loading from the front of the barrel (the *muzzle*), a firearm could be loaded from the back of the barrel (the *breech*), near

---

[280] JOHNSON ET AL., *supra* note 16, at 2127. For example, in the Minié ball, the base of the bullet was hollowed out. Therefore, the gunpowder explosion would force the rim to the base to expand outward to the size of the rifle bore. LOCKHART, at 178–80.

[281] GREENER, *supra* note 29, at 773; DEYRUP, *supra* note 266, at 28; HELD, *supra* note 20, at 183–84.

[282] Breechloaders had always existed, and their inherent advantage in faster reloading was obvious. The great firearms designer John M. Hall patented a breechloader in 1811 that was adopted by the U.S. Army in 1819. About 50,000 Hall Rifles were produced through the 1840s. ROY THEODORE HUNTINGTON, HALL'S BREECHLOADERS (1972). It could shoot as far as a thousand yards, at a rate of 8 or 9 shots per minute. However, before the invention of the metallic cartridge, all breechloaders, including the British Ferguson Rifle of the American War of Independence, shared a basic problem. In a muzzleloader, the opening at bottom of the barrel, near the trigger, is sealed shut by a breechblock. The barrel is open only at the muzzle. When the gunpowder charge in the barrel explodes, the breechblock at the base of the muzzle prevents gas from blowing back to the user. For a breechloader, the breechblock must be movable. The user moves the breechblock, inserts the bullet and ammunition into the empty barrel bore at the base of the muzzle, and then moves the breechblock back into place. If all goes well, the breechblock prevents any expanding gas from escaping the breech. However, the breechblock's fit on the barrel must be absolutely tight and perfect. Over time, wear and near on a movable breechblock would weaken the seal. As a result, some gunpowder gas would escape and blow back towards the user. This could make shooting much less comfortable. The metallic cartridge solves the problem. The base of the metal shell has a wide rim that seals the bottom of the barrel. PAUL LOCKHART, FIREPOWER: HOW WEAPONS SHAPED WARFARE 173–75 (2021). The first metallic cartridge had been invented in 1812, but not until 1846 was a metallic cartridge invented that would seal (*obturate*) the breech. *Id.* at 256–57.

the trigger. Even a novice could quickly learn to shoot nine shots a minute from the single-shot breechloading Sharps' rifle, brought to market in 1850.[283]

The combination of the modern cartridge and breechloading ammunition greatly facilitated the development of repeating firearms, as will be described in the next section.

In 1866 the centerfire metallic cartridge was invented. In a rimfire (the metallic cartridge created in 1846), the primer is contained in the base of the cartridge, next to the cartridge wall. In a centerfire, the primer is contained in a small cup at the center of the base of the cartridge. The centerfire is more reliable and easier to manufacture.[284] Today, most firearms use centerfire ammunition, while the venerable rimfire is still widely used for .22 caliber or smaller guns.

A stupendous development in ammunition was the invention of a new type of gunpowder in 1884. Previously, all gunpowder had been "blackpowder," the same product the Chinese had first formulated in the 900s.[285] In the West ever since the 1400s, blackpowder had always been improving, with changes in the ratio of ingredients and refinements in the shapes of individual grains of powder.[286] Then in 1884 came white powder (a/k/a smokeless powder), with an entirely different formulation.[287] Smokeless powder burned far more efficiently, imparting much more power to bullets.[288] Firearms now shot further and with a flatter trajectory than ever before.[289] White, smokeless powder is still the gunpowder in use today, with continuing refinements.

Because lead bullets are relatively soft, they abrade from friction when being spun by the rifling as they travel down the barrel. Built-up lead residue makes the gun barrel less accurate. That problem was solved in 1882 with the invention of the jacketed bullet. A thin coating of copper or nickel on the lead bullet would keep it intact during its movement through the barrel.[290]

---

[283] *Sharps' Breech-loading Patent Rifle*, SCIENTIFIC AMERICAN, Mar. 9, 1850.

[284] *See* LOCKHART at 264.

[285] The ingredients of blackpowder are sulfur, charcoal, and saltpeter. JOHNSON ET AL., *supra* note 16, at 2126, 2225.

[286] *See, e.g.*, ARTHUR PINE VAN GELDER & HUGO SCHLATTER, HISTORY OF THE EXPLOSIVES INDUSTRY IN AMERICA (Ayer 2004) (1927).

[287] Insoluble nitrocellulose, soluble nitrocellulose, and paraffin. JOHNSON ET AL., *supra* note 16, at 2225.

[288] GREENER, *supra* note 29, at 560.

[289] *See* LOCKHART at 271–72.

[290] *See* LOCKHART at 273.

With blackpowder, the muzzle velocity of a good firearm was around 1,000 feet per second.[291] Smokeless powder promptly doubled that to about 2,000 fps. The change increased range and stopping power.[292]

### D. Advances in repeating arms

During the nineteenth century, repeating arms became some of America's most popular arms. "Flintlock revolving pistols had been given trials and some practical use very early in the nineteenth century, but the loose priming powder in the pan of each cylinder constituted a hazard that was never eliminated."[293] It was the invention of the percussion cap that made it possible for repeating firearms to become widely adopted.

The first American military contract for repeating firearms was the U.S. Navy's 1813 purchase of 200 repeating muskets and 100 repeating pistols from Joseph Chambers, who also sold firearms to the State of Pennsylvania.[294]

In 1821, the *New York Evening Post* lauded New Yorker Isaiah Jennings for inventing a repeater, "importan[t], both for public and private use," whose "number of charges may be extended to fifteen or even twenty . . . and may be fired in the space of two seconds to a charge."[295] "[T]he principle can be added to any musket, rifle, fowling piece, or pistol" to make it capable of firing "from two to twelve times."[296] "About 1828 a New York State maker, Reuben Ellis, made military rifles under contract on the Jennings principle."[297] However, neither of the New York repeaters became major commercial successes.

---

[291] As a bullet travels downrange, air friction reduces velocity.

[292] The muzzle velocities of modern handguns are around 1,000 fps; modern rifles are around 2,000 to 3,000 fps.

[293] CARL P. RUSSELL, GUNS ON THE EARLY FRONTIER 91 (1957).

[294] PETERSON, TREASURY OF THE GUN, at 197.

[295] *Newly Invented Muskets*, N.Y. EVENING POST, Apr. 10, 1822, *in* 59 ALEXANDER TILLOCH, THE PHILOSOPHICAL MAGAZINE AND JOURNAL: COMPREHENDING THE VARIOUS BRANCHES OF SCIENCE, THE LIBERAL AND FINE ARTS, GEOLOGY, AGRICULTURE, MANUFACTURES, AND COMMERCE 467 (Richard Taylor ed., 1822).

[296] *Id.* The writer added:

> As a sporting or hunting gun, its advantages are not less important. It enables the sportsman to meet a flock with twice the advantage of a double barrel gun, without any of its incumbrances, and it enables the hunter to meet his game in any emergency. The gun has been shown to many different officers of our army and navy, and has been highly approved of, and indeed no one who has seen a fair trial of its powers has ever been able to find an objection to it.

*Id.* at 468.

[297] WINANT, FIREARMS CURIOSA, *supra* note __, at 174.

Pepperbox handguns had been around for a long time and became a mass market product starting in the 1830s.[298] These pistols had multiple barrels that could fire sequentially; four to eight barrels were most common.[299] Starting in 1847, the leading American manufacturer was Ethan Allen.[300]

"Ethan Allen was a pioneer in the transition from handmade to machine-made and interchangeable parts."[301] "The Allen pepperbox was the first American double-action pepperbox and it was a big success. . . . As quickly as the trigger could be pulled fully back, the hammer was released and the gun fired."[302] "For a dozen years and more after the Colt revolver was first made, sales of Allen's far outstripped those of Colt's."[303] "The Allens were very popular with the Forty Niners," who headed to California in 1849 for the Gold Rush.[304] "The pepperbox was the fastest shooting handgun of its day. Many were bought by soldiers and for use by state militia. Some saw service in the Seminole Wars and the War with Mexico, and more than a few were carried in the Civil War."[305] Their last use in a major engagement by the U.S. Cavalry was in an 1857 battle with the Cheyenne.[306]

The first American patent for a revolver was issued to Samuel Colt in 1836. Like pepperboxes, revolvers fire repeating rounds, but revolvers use a rotating cylinder that lines up each firing chamber, in sequence, behind a single barrel. The difference improves the balance of the gun, by reducing the front weight. The Colt revolvers were the best firearms of their time and priced accordingly.

Colt's first notable sales were to the Navy of the Republic of Texas (1839) and then to the Texas Rangers. For rapidity of fire, the ordinary single-shot

---

[298] The first pepperboxes were made with matchlock ignition. Around 1790, Henry Nock invented the "first commonly produced flintlock pepperbox, a six-barreled long gun. A Closer Look at Pepperbox Pistols, TheFirearmBlog.com, Dec. 8, 2021, https://www.thefirearmblog.com/blog/2021/12/08/wheelgun-wednesday-pepperbox-pistols/.

[299] Jack Dunlap, American British & Continental Pepperbox Firearms 148–49, 167 (1964); Lewis Winant, Pepperbox Firearms 7 (1952). An American-made 10-shot model was patented in 1849. Winant at 58. The manufacturer, Pecare & Smith, was one of five American firearms manufacturers exhibiting at the famous 1851 Crystal Palace Exhibition in London. *Id.* at 62 (So was Samuel Colt, who won a prize.)

[300] Winant at 27. He was not the same person as the Revolutionary War Vermont patriot. He was the ancestor of the twenty-first century furniture maker.

[301] Winant at 28.

[302] Winant at 28.

[303] Winant at 28.

[304] Winant at 30.

[305] Winant at 30.

[306] Winant at 30.

*Journal of Legislation*

firearm had always been far outmatched by the ordinary bow. The 1841 Battle of Bandera Pass was a turning point in the Texas-Indian wars. A Texan with two five-shot Colt revolvers could keep up with the Comanche rate of bow fire.[307]

Colt's first big success was the Colt Navy Revolver. With one modification by the user, the Colt could be quickly reloaded by swapping out an empty cylinder for a fresh, preloaded cylinder.[308]

Pin-fire revolvers with capacities of up to 21 rounds entered the market in the 1850s in Europe, but pinfires had only modest sales in America.[309] The American-made Walch 12-Shot Navy Revolver had six chambers holding two rounds that fired separately. It was used in the Civil War and made its way to

---

[307] Like other Indians, the Comanche also had firearms and were highly proficient users. Like the Englishmen of 1500, the Indians were also highly proficient with the bow, which Americans were not. The heyday of English archery had ended long before the 1607 establishment of the Virginia Colony at Jamestown. An Indian raid might commence with firearms, and then transition to rapid fire from bows.

The Comanche controlled a very large area, from eastern New Mexico to East Texas. As a regional power, they were the equals and sometimes the superiors of the Spanish, Mexicans, French, English, Americans, and Texans, all of whose expansion they bottled up for many years. The Comanche economy was based on the trade of slaves (people of any race, but mainly people of other Indian tribes, who were captured in war or raids) and horses (also captured from enemies) to adjacent powers for other goods, including firearms. *See* PEKKA HÄMÄLÄINEN, THE COMANCHE EMPIRE (2008). Like the economy of other tribes, such as the Utes, who were highly successful in capturing people for trade, the Comanche economy was based on predation of humans. *See* ANDRÉS RESÉNDEZ, THE OTHER SLAVERY: THE UNCOVERED STORY OF INDIAN ENSLAVEMENT IN AMERICA (2016).

[308] The Colt Navy was a cap and ball revolver. It was loaded from the front of the cylinder. The user would pour premeasured gunpowder into a chamber from a cup. Then the user would insert the bullet and wad. The wad is a small greased cloth; it fills the empty space around the bullet, and prevents expanding gunpowder gas from escaping the muzzle before the bullet does. The powder, bullet, and the wad surrounding the bullet would be rammed into place by a hinged ramrod underneath the barrel. Next, the user would insert a percussion cap on a nipple on the back of the just-loaded cylinder chamber. Finally, the user would rotate the cylinder, to bring the next chamber into loading position. So although a cap and ball revolver could quickly fire five or six shots, reloading took a while.

As a result, users developed an expedient. In the Colt Navy, the barrel is attached to the frame of the gun by a single pin. Users would file the pin so that it was easy to remove. Then, the user could speedily detach the barrel, replace the empty cylinder with a fresh preloaded cylinder, and then put the barrel back into place and reinsert the pin. The process was slower than swapping detachable magazines today, but it allowed continuous fire with only a short pause to reload.

[309] SUPICA ET AL., *supra* note 202, at 48–49; WINANT, PEPPERBOX FIREARMS, *supra* note 299, at 67–70.

KR0710

the western frontier, although not in large numbers.[310] In 1866, the 20-round Josselyn belt-fed chain pistol debuted. Some later chain pistols had greater capacities.[311] These models never came close to challenging conventional revolvers or pepperboxes for popularity.

The 1857 expiration of Colt's patent for its cap and ball revolvers brought new companies into the revolver business. During the Civil War, combatants used revolvers from 37 different companies.[312] In a cap and ball revolver, the bullet, gunpowder, and percussion cap must be inserted one at a time into each of the five or six firing chambers.

Smith and Wesson brought out a revolver entirely different from the Colt patent. The 1857 Smith & Wesson Model 1 was a breechloader using metallic cartridges.[313] Now, when reloading an empty firing chamber, the user only had to insert one item, not three. Smith & Wesson invented a special cartridge for the revolver: the .22 Short Rimfire. It is still in use today.[314] "The S&W factory in Springfield, Massachusetts, couldn't keep up with the demand—the new revolver and its unique cartridge were such a hit with the American public that they flew off store shelves nationwide."[315]

While repeating handguns were widely available before the Civil War, repeating long guns were not. As with most advances in technologies, the early stages saw inventions that advanced the state of knowledge but did not win commercial success. In the 1830s, the Bennett and Haviland Rifle used a chain-drive system with 12 rectangular chambers—each loaded with powder and ball—to fire 12-rounds consecutively.[316] Alexander Hall's rifle with a 15-round rotating cylinder (like a revolver) was introduced in the 1850s.[317] In 1851, Parry Porter created a rifle with a 9-shot canister magazine; it was said to be

---

[310] CHAPEL, *supra* note 208, at 188–89.

[311] WINANT, FIREARMS CURIOSA, *supra* note 297, at 204, 206.

[312] JOHN F. GRAF, STANDARD CATALOGUE OF CIVIL WAR FIREARMS 187–233 (2008) (20 models from Colt, plus 73 models from 36 other manufacturers).

[313] The design had been patented in 1855 by Rollin White, who licensed it to Smith & Wesson. Patent No. 12,648, *Improvement in Repeating Fire-Arms* (Apr. 3, 1855).

[314] Reloading was one round at a time. The cylinder would be rotated to a loading gate on the bottom or side of the frame. The gate would be opened, and one cartridge inserted. Then the user would rotate the cylinder so that the next chamber could be loaded.

[315] LOCKHART at 257.

[316] NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 711 (9th ed. 2007).

[317] FLAYDERMAN, *supra* note 317, at 713, 716.

able to fire 60 shots in 60 seconds.[318] In 1855, Joseph Enouy invented a 42-shot Ferris Wheel pistol.[319]

An 1855 alliance between Daniel Wesson (later, of Smith & Wesson) and Oliver Winchester led to a series of famous lever-action repeating rifles. First came the 30-shot Volcanic Rifle, which an 1859 advertisement boasted could be fired 30 times within a minute.[320] But like the previous repeating rifles, it did not sell well.

Then came the 16-shot Henry Rifle in 1861, a much-improved version of the Volcanic. Tested at the Washington Navy Yard in 1862:

> 187 shots were fired in three minutes and thirty-six seconds (not counting reloading time), and one full fifteen-shot magazine was fired in only 10.8 seconds . . . hits were made from as far away as 348 feet, at an 18-inch-square target. . . . It is manifest from the above experiment that this gun may be fired with great rapidity.[321]

"Advertisements claimed a penetration of eight inches at one hundred yards, five inches at four hundred yards, and power to kill at a thousand yards."[322]

"[F]ueled by the Civil War market, the first Henrys were in the field by mid-1862."[323] Indeed, the most famous testimonial for the Henry came from Captain James M. Wilson of the 12th Kentucky Cavalry, who used a Henry Rifle to kill seven of his Confederate neighbors who broke into his home and ambushed his family. Wilson praised the rifle's 16-round capacity: "When attacked alone by seven guerillas I found it [the Henry rifle] to be particularly useful not only in regard to its fatal precision, but also in the number of shots

---

[318] *A New Gun Patent*, ATHENS (Tenn.) POST, Feb. 25, 1853, http://bit.ly/2tmWUbS (reprinted from N.Y. Post); 2 SAWYER, *supra* note 87, at 147.

[319] WINANT, FIREARMS CURIOSA, *supra* note 297, at 208.

Before the invention of the metallic cartridge, every repeating firearm had a risk of chain fire. The gunpowder fire might leak to another primer and set it off. In the worst case, every round would be ignited. The result could destroy the gun and injure the user. *See* LOCKHART at 258. The buyers of repeating firearms before the metallic were balancing risks: the risk of a chain fire versus the risk of not having a second, third, or additional shot available in an emergency.

[320] HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST 26–27 (1952).

[321] R.L. WILSON, WINCHESTER: AN AMERICAN LEGEND 11–12 (1991).

[322] PETERSON, THE TREASURY OF THE GUN, *supra* note 38, at 240.

[323] *Id.* at 11.

KR0712

held in reserve for immediate action in case of an overwhelming force."[324] Soon after, Wilson's entire command was armed with Henry rifles.[325]

About 14,000 Henrys were produced, by the Henry factory operating as fast as it could.[326] Building a rifle that complicated took extra time. Over 8,000 were purchased by Union soldiers for personal use. The War Department bought about 1,700.

Deployed in far larger numbers during the war—over 100,000—was the 7-shot Spencer repeating rifle.[327] The internal magazine was located in the rifle's buttstock, and was fast to reload with patented tubes that poured in 7 fresh rounds of ammunition.[328] The most common use of Spencers was by cavalrymen, who had always been first in line for repeating firearms. President Lincoln, a gun enthusiast, test-fired a Spencer on the White House lawn and was impressed. A Spencer could fire 20 aimed shots per minute.[329]

The Union's repeating rifles were supplied by private businesses operating at maximal capacity. If the U.S. government's own factories had been able to produce repeaters like the Henry or Spencer for the entire infantry, the war would have been much shorter. But the federal factories did not have the capacity for mass production of repeaters. They were struggling just to produce the necessary huge quantities of the infantry rifle that had been the state of the art in the late 1840s: the single-shot muzzleloading rifled musket. It was not until two years into the war when all the infantry were supplied with that arm. As for the Confederacy, none of its armories had the capability of producing anything as complex as a Spencer or Henry.[330]

After the Confederacy surrendered at Appomattox, the defeated Confederates were allowed to take their firearms home. As with the Union forces, some of the Confederates' arms had been brought to service by individual soldiers, and some had been supplied by their armies' ordnance

---

[324] H.W.S. Cleveland, HINTS TO RIFLEMEN 181 (1864).

[325] Andrew L. Bresnan, *The Henry Repeating Rifle*, RAREWINCHESTERS.COM, Aug. 17, 2007, https://www.rarewinchesters.com/articles/art_hen_00.shtml.

[326] GRAF, at 101.

[327] JOHN F. GRAF, STANDARD CATALOGUE OF CIVIL WAR FIREARMS 112, 171–72 (2008).

[328] *See Blakeslee cartridge box*, CivilWar@Smithsonian, https://civilwar.si.edu/weapons_blakeslee.html (patent no. 45,469, Dec. 20, 1864).

[329] LOCKHART at 259.

[330] LOCKHART at 260–62. "The limitations of the factory economy, and not some kind of stodgy, conservative resistance to new technology, were what would delay the large-scale use of repeating rifles in combat." *Id.* at 262.

departments. The Union soldiers of course took home the guns that they had
bought; as for the arms that had been issued by the government, Union soldiers
were allowed to buy them for an eight-dollar deduction from their monthly pay.

Shortly after the Civil War, the Henry evolved into the 18-shot Winchester
Model 1866, which was touted as having a capacity of "eighteen charges, which
can be fired in nine seconds."[331] Another advertisement contained pictures of
Model 1866 rifles underneath the heading, "Two shots a second."[332] "[T]he
Model 1866 was widely used in opening the West and, in company with the
Model 1873, is the most deserving of Winchesters to claim the legend 'The Gun
That Won the West.'"[333] Over 170,000 Model 1866s were produced, many of
them sold to foreign militaries who recognized the firearm as a game-changer.
Then came the Winchester Model 1873, whose magazine ranged from 6 to
25.[334] Over 720,000 Model 1873s were produced by 1919.[335]

Separate from the Winchester and Henry patents was the 1873 Evans
Repeating Rifle. With an innovative rotary helical magazine, it held 34 rounds.
The Evans had some commercial success—about 12,000 made—although far
from the level of the Winchesters.[336] All of the Winchesters and Henrys are
still made today.[337]

The Henry rifle had appeared during the Civil War, and its improved
version, the 1866 Winchester, during Reconstruction, in the same year that
Congress sent the Fourteenth Amendment to the States for ratification.
During Reconstruction, no government in the United States attempted to
prohibit the possession of any particular type of firearm. Rather, the major gun
control controversy of the time was efforts to prevent the freedmen in the
former Confederate states from having firearms at all, or only having them

---

[331] LOUIS A. GARAVAGLIA & CHARLES G. WORMAN, FIREARMS OF THE AMERICAN WEST 1866-
1894, at 128 (1985). The Winchester 1866 was made in a variety of calibers. Only the smallest
caliber could hold 18 rounds.

[332] PETERSON, THE TREASURY OF THE GUN, *supra* note 38, at 234–35.

[333] *Id.* at 22. The gun was a particularly strong seller in the West. R.L. WILSON, THE
WINCHESTER: AN AMERICAN LEGEND 34 (1991).

[334] ARTHUR PIRKLE, WINCHESTER LEVER ACTION REPEATING FIREARMS: THE MODELS OF
1866, 1873 & 1876, at 107 (2010).

[335] FLAYDERMAN, *supra* note 317, at 306–09.

[336] DWIGHT DEMERITT, MAINE MADE GUNS & THEIR MAKERS 293–95 (rev. ed. 1997);
FLAYDERMAN, *supra* note 317, at 694.

[337] The Henry is made by Henry Repeating Arms, in Wisconsin. The Winchesters are made
by Uberti, an Italian company that specializes in reproductions of historic guns. The modern
Henrys and Ubertis are built for modern ammunition and calibers.

KR0714

with a special license.[338] These restrictions were rebuffed by the Second Freedmen's Bureau Act, the Civil Rights Act, and then the Fourteenth Amendment.[339]

The final quarter of the nineteenth century saw more iconic Winchesters, namely the Model 1886, and then the Model 1892, made legendary by Annie Oakley, and later by John Wayne.[340] These arms had a capacity of 15 rounds.[341] Over a million were produced from 1892 to 1941.[342]

The first commercially successful repeating long guns, the Henrys and Winchesters, had been lever actions. After firing one round, the user moves a lever down and then up to eject the empty metal case and reload a fresh cartridge into the firing chamber. Pump action guns came next; to eject and reload, the user pulls and then pushes the sliding fore-end of the gun, located underneath the barrel. The most famous pump-action rifle of the nineteenth century was the Colt Lightning, introduced in 1884. It could fire 15 rounds.[343]

In bolt action guns, discussed below, the user moves the bolt's handle in four short movements: up, back, forward, down. For semiautomatic rifles, no manual steps are needed to eject the empty shell and reload the next cartridge. The semiautomatic can be fired as fast as the user can press the trigger. Each press of the trigger fires one new shot. The Girardoni rifle of the Founding Era had a similar capability, although its internal mechanics were not the same as a semiautomatic.[344]

Meanwhile, revolvers kept getting better. The double-action revolver allows the user to shoot as fast as he or she can press the trigger. In the earlier, single-action revolvers, the user first had to cock the hammer with the thumb.[345] The first double-action revolver was invented in England in 1851, but it was expensive and did not make much impact in America.[346] Double-action

---

[338] *McDonald v. City of Chicago*, 561 U.S. 742, 771 (2008).

[339] *Id.* at 773–75.

[340] *Model 1892 Rifles and Carbines*, WINCHESTER REPEATING ARMS, http://bit.ly/2tn03IN.

[341] *Id.*

[342] FLAYDERMAN, *supra* note 317, at 307–12.

[343] *Id.* at 122. Pump action guns are also called slide action.

[344] For the Girardoni, the user had to tip the rifle slightly to roll a new bullet into place.

[345] The most common American pepperboxes, by Ethan Allen, had been double-action. *See* text at note __.

[346] *Revolver: Double Action Revolver*, FIREARMS HISTORY, TECHNOLOGY & DEVELOPMENT, July 1, 2010, http://firearmshistory.blogspot.com/2010/07/revolver-double-action-revolver.html.

revolvers in America took off with the 1877 introduction of three models by Colt.

The other improvement was fast reloading. As described above, in the early revolvers the five or six chambers in a cylinder had to be reloaded one chamber at a time. For the Colt Navy revolver, there was a work-around that allowed quickly removing an empty cylinder and replacing it with a preloaded one.[347]

More straightforward were revolver improvements that allowed the user to access the entire back side of the cylinder at once. The first top-break revolver was the 1870 Smith & Wesson Model 3. Releasing a hinge made the cylinder and barrel fall forward, so that all chambers were exposed for reloading. Just as fast to reload, and sturdier, was the 1889 Colt Navy with its swing-out cylinder. Virtually all modern revolvers are swing-out. The user presses a knob that releases the cylinder to swing out from the revolver (usually to the left of the frame), so that all six chambers are exposed at once.

In the early revolvers, the user had to rotate the cylinder before adding each round. With a top-break or the swing-out, the user could quickly drop in one round after another.

With a simple accessory, users could drop in all six rounds at once. The first speedloader for a revolver was patented in 1879. A revolver speedloader holds all 6 (or 5) fresh cartridges in precise position so that they can be dropped into an empty cylinder all at once. With practice, the speedloader is a fast reload, although not as fast as swapping detachable magazines.

As described above, rifles with tubular magazines—such as 22-shot Girardoni or the 7-shot Spencer—had their own speedloaders; the rifle speedloaders were precisely-sized tubes to pour in a new load of ammunition.

As for detachable box magazines, the first one was invented in 1862,[348] but they did not catch on until the advent of semiautomatic firearms, beginning in the last fifteen years of the nineteenth century.

The first functional semiautomatic firearm was the Mannlicher Model 85 rifle, invented in 1885.[349] Mannlicher introduced new models in 1891, 1893, and 1895.[350] Semiautomatic handguns before the turn of the century included

---

[347] *See* text at note ___.

[348] The 1862 model was the 10-round Jarre harmonica pistol. WINANT, CURIOUSA, at 244–45. As the name implied, the magazine stuck out horizontally from the side of the firing chamber, making the handgun awkward to carry. SUPICA ET AL., at 33.

[349] U.S. NAVY SEAL SNIPER TRAINING PROGRAM 87 (2011).

[350] JOHN WALTER, RIFLES OF THE WORLD 568–69 (3rd ed. 2006).

KR0716

the Mauser C96,[351] Bergmann Simplex,[352] Borchardt M1894,[353] Borchardt C-93,[354] Fabrique Nationale M1899,[355] Mannlicher M1896 and M1897,[356] Luger M1898 and M1899,[357] Roth-Theodorovic M1895, M1897, and M1898,[358] and the Schwarzlose M1898.[359] The ones that became major commercial successes were the Mauser and the Luger, both of which would sell millions in the following decades, to militaries and civilians. The Luger used a detachable magazine; the original Mauser's internal magazine was reloaded with stripper clips.

American-made semi-automatic handguns, rifles, and shotguns were just around the corner, to be introduced in the early years of the twentieth century.[360]

### E. Continuing advances in firearms were well-known to the Founders

While the Founders could not foresee all the specific advances that would take place in the nineteenth century, the Founders were well aware that firearms were getting better and better.

Tremendous improvements in firearms had always been part of the American experience. The first European settlers in America had mainly owned matchlocks. When the trigger is pressed, a smoldering hemp cord is lowered to the firing pan; the powder in the pan then ignites the main gunpowder charge in the barrel.[361]

---

[351] DOUGHERTY, *supra* note 46, at 84.

[352] *Id.* at 85.

[353] *Springfield Armory Museum – Collection Record*, REDISCOV.COM, http://ww2.rediscov.com/spring/VFPCGI.exe?IDCFile=/spring/DETAILS.IDC,SPECIFIC=9707,DATABASE=objects.

[354] Leonardo Antaris, *In the Beginning: Semi-Automatic Pistols of the 19th Century*, AMERICAN RIFLEMAN, Jan. 4, 2018.

[355] *Id.*

[356] *Id.*

[357] *Id.*

[358] *Id.*

[359] *Id.*

[360] Many of the first American semiautomatics were invented by John Moses Browning, the greatest of all American firearms inventors. The semiautomatics of the twenty-first century are refinements of the work of Browning, Borchaldt, Mauser, and the other great inventors of their time.

[361] *See* text at notes ___.

As described *infra*, the first firearm more reliable than the matchlock was the wheel lock, invented by Leonardo da Vinci.[362] In a wheel lock, the powder in the firing pan is ignited when a serrated wheel strikes a piece of iron pyrite.[363] The wheel lock was the first firearm that could be kept loaded and ready for use in a sudden emergency. Although matchlock pistols had existed, the wheel lock made pistols far more practical and common.[364] The wheel lock was the "preferred firearm for cavalry" in the sixteenth and seventeenth centuries.[365] The proliferation of wheel locks in Europe in the sixteenth century coincided with the homicide rate falling by half.[366]

However, wheel locks cost much more than a matchlock. Moreover, their moving parts were far more complicated than the matchlocks'. Under conditions of hard use in North America, wheel locks were too delicate and too difficult to repair. The path of technological advancement often involves expensive inventions eventually leading to products that are affordable to average consumers and are even better than the original invention. That has been the story of firearms in America.

The gun that was even better than the wheel lock, but simpler and less expensive, was the flintlock. The earliest versions of flintlocks had appeared in the mid-sixteenth century. But not until the end of the seventeenth century did most European armies replace their matchlocks with flintlocks. Americans, individually, made the transition much sooner.[367]

Indian warfare in the thick woods of the Atlantic seaboard was based on ambush, quick raids, and fast individual decision-making in combat—the opposite of the more orderly battles and sieges of European warfare. In America, the flintlock became a necessity.

Unlike matchlocks, flintlocks can be kept always ready.[368] There is no smoldering hemp cord to give away the location of the user. Flintlocks are more reliable than matchlocks—all the more so in adverse weather, although still

---

[362] *See* text at notes ___.

[363] *See* text at notes ___.

[364] *See* LOCKHART at 80.

[365] *See* LOCKHART at 80.

[366] *See* Carlisle E. Moody, *Firearms and the Decline of Violence in Europe: 1200-2010*, 9 REV. EUR. STUD. 53 (2017)

[367] *See* LOCKHART at 106.

[368] With the caveat that gunpowder is hygroscopic, and too much water could ruin the gunpowder. Hence the practice of storing a firearm on the mantel above the fireplace.

KR0718

far from impervious to rain and moisture. Flintlocks are also simpler and faster to reload than matchlocks.[369]

Initially, the flintlock could not shoot further or more accurately than a matchlock.[370] But it could shoot much more rapidly. A matchlock more than a minute to reload once.[371] In experienced hands, a flintlock could be fired and reloaded five times in a minute, although under the stress of combat, three times a minute was a more typical rate.[372] Compared to a matchlock, a flintlock was more likely to ignite the gunpowder charge instantaneously, rather than with a delay of some seconds.[373] "The flintlock gave infantry the ability to generate an overwhelmingly higher level of firepower."[374]

The Theoretical Lethality Index (TLI), which will be discussed further in the next section, is a measure of a weapon's effectiveness in military combat. The TLI of a seventeenth century musket is 19 and the TLI of an eighteenth century flintlock is 43.[375] So the transition of firearm type in the American colonies more than doubled the TLI. There is no reason to believe that the American Founders were ignorant of how much better their own firearms were compared to those of the early colonists.

As described in Part II.E, founders who had served in the Continental Congress knew of Joseph Belton's 16-shot firearm.[376] Likewise, the 22-shot Girardoni rifle famously carried by Lewis & Clark was no secret, and it had been invented in 1779. As of 1785, South Carolina gunsmith James Ransier of Charleston, South Carolina, was advertising four-shot repeaters for sale.[377]

The founding generation was especially aware of one of the most common firearms of their time, the Pennsylvania-Kentucky rifle. The rifle was invented by German and Swiss immigrants in the early eighteenth century. It was

---

[369] JOHNSON ET AL., *supra* note 16, at 2189–90; GREENER, *supra* note 29, at 66–67; CHARLES C. CARLTON, THIS SEAT OF MARS: WAR AND THE BRITISH ISLES 1585-1746, at 171–73 (2011).

[370] *See* LOCKHART at 105.

[371] *See* LOCKHART at 107.

[372] *See* LOCKHART at 107–08.

[373] *See* LOCKHART at 104.

[374] LOCKHART at 107.

[375] TREVOR DUPUY, THE EVOLUTION OF WEAPONS AND WARFARE 92 (1984).

[376] Delegates to the 1777 Continental Congress included the two Charles Carrolls from Maryland, future Supreme Court Chief Justice Samuel Chase, John Adams, Samuel Adams, Francis Dana, Elbridge Gerry, John Hancock, John Witherspoon (President of Princeton, the great American college for free thought), Benjamin Harrison (father and grandfather of two Presidents). Francis Lightfoot Lee, a d Richard Henry Lee (hero of the *1776* musical).

[377] COLUMBIAN HERALD (Charleston), Oct. 26, 1785.

*Journal of Legislation*

created initially for the needs of frontiersmen who might spend months on a hunting expedition in the dense American woods. "What Americans demanded of their gunsmiths seemed impossible": a rifle that weighed ten pounds or less, for which a month of ammunition would weigh one to three pounds, "with proportionately small quantities of powder, be easy to load," and "with such velocity and flat trajectories that one fixed rear sight would serve as well at fifty yards as at three hundred, the necessary but slight difference in elevation being supplied by the user's experience."[378] "By about 1735 the impossible had taken shape" with the creation of the iconic Pennsylvania-Kentucky rifle.[379]

As for the most common American firearm, the smoothbore (nonrifled) flintlock musket, there had also been great advances. To a casual observer, a basic flintlock musket of 1790 looks very similar to flintlock musket of 1690. However, improvements in small parts, many of them internal, had made the best flintlocks far superior to their ancestors. For example, thanks to English gunsmith Henry Nock's 1787 patented flintlock breech, "the gun shot so hard and so fast that the very possibility of such performance had hitherto not even been imaginable."[380]

The Founders were well aware that what had been impossible or unimaginable to one generation could become commonplace in the next. With the federal armories advanced research and development program that began in the Madison administration, the U.S. government did its best to make the impossible possible.

## F. Perspective

In the early nineteenth century, the finest maker of flintlock shotguns was Old Joe Manton of London. A "strong, plain gun" from Manton cost hundreds of dollars. By 1910, a modern shotgun, "incomparably superior, especially in fit, balance, and artistic appearance" to Manton's cost about ten dollars.[381]

Military historian Trevor Dupuy created a "Theoretical Lethality Index" (TLI) to compare the effectiveness of battlefield weapons from ancient times through the twentieth century.[382] While the TLI was never intended describe weapon utility in civilian defense situations, such as against home invaders, it

---

[378] HELD, *supra* note 20, at 142.

[379] *Id.*

[380] *Id.* at 137.

[381] CHARLES ASKINS, THE AMERICAN SHOTGUN 21–22 (1910). Ten dollars in 1913 is approximately equal to $250 today. Three hundred dollars in 1913 would be over $7,000 today.

[382] TREVOR DUPUY, THE EVOLUTION OF WEAPONS AND WARFARE (1984).

KR0720

is a usable rough estimate for community defense situations, such as militia use. According to Dupuy, the TLI of an 18th century flintlock (the common service arm of the American Revolution) was 43.[383] The TLI of the standard service arm 112 years after the Second Amendment was ratified—the 1903 Springfield bolt-action magazine-fed rifle—is 495.[384] Dupuy did not calculate a TLI for late twentieth century firearms. Using Dupuy's formula, Kopel calculated the TLI for two modern firearms: an AR semiautomatic rifle is 640, and a 9mm semiautomatic handgun is 295.[385]

Again, the TLI has nothing to do with personal defense. An AR rifle is not always twice as good as a 9mm pistol for defense against a rapist or home invader. The modern rifle might be better or worse than the modern handgun, depending on other circumstances.

For militia utility, the 11-fold advance from the single-shot flintlock to the magazine-fed bolt action rifle of 1903 is enormous. The founding generation did not precisely predict the Springfield bolt action or its 11-fold improvement over the long guns of the founding period. The Founders did do all they could to make that improvement take place.

---

[383] *Id.* at 92.

[384] *Id.* The previous U.S. military standard rifle was the 1892 bolt action Krag–Jørgensen. Its underperformance in the 1898 Spanish-American War led the War Department to start looking for something better. *See* LOCKHART at 279–80.

The British had adopted the bolt action magazine-fed Lee-Metford rifle in 1888, and the Germans the Mauser Gewehr 98 in 1898. The 1903 Springfield was essentially a modified Mauser, for which the U.S. government had to pay damages to settle a patent suit. The Springfield 1903 stayed in service through the Vietnam War, although it lost is role as the standard rifle during World War II to the semiautomatic M1 Garand. A huge number of twentieth and twenty-first century American hunting rifles are variants of the Springfield; many use the Springfield's famous .30-'06 cartridge. It is "the most flexible, useful, all-around big game cartridge available to the American hunter." CARTRIDGES OF THE WORLD ___ (17th ed. 2022).

[385] David Kopel, *The Theoretical Lethality Index is useful for military history but not for gun control policy*, REASON.COM/VOLOKH CONSPIRACY, Nov. 1, 2022.

A modern mid-power handgun, such as 9mm, is far superior to a flintlock long gun of the late 1700s in reliability and rate of fire. But handguns have much shorter barrels than long guns. As a result handguns, even the best modern ones, have lesser range than rifles. While the difference usually does not matter for personal defense, longer range is often very important in military combat, such as militia use. Hence the modern handgun's rating far below modern rifles in the combat-oriented TLI.

As firearms historian Robert Held wrote in 1957, "the *history* of firearms" came to an end in the late nineteenth century.[386] Although manufacturing quality has always been improving, design refinements continue, and ergonomics are the better than ever, in the twentieth century there were no major innovations in firearms. For the average citizen, the nineteenth century brought in the revolver action, the lever action, the pump action, and the semiautomatic action. Those are still the types of firearms that are most common today.[387] The firearms you can own today are better-manufactured and more affordable versions of types that were introduced before 1900.

The big exception is for optics, thanks to lasers (now broadly affordable), high-power scopes, and handheld computers integrated with scopes, for long range hunting.

During the nineteenth century, bans on particular types of firearms were rare. As will be described in the next Part, there were four state statutes that aimed at particular firearms. Three of them covered handguns, old and new; one of them aimed at repeating rifles.

---

[386] HELD, *supra* note 20, at 186 ("Although the age of firearms today thrives with ten thousand species in the fullest heat of summer, the *history* of firearms ended between seventy and eighty years ago. There has been nothing new since, and almost certainly nothing will come hereafter."). According to Held, any modern bolt-action is "essentially" an updated version of the Mauser bolt-actions of the 1890s or the Mannlicher bolt-actions of the 1880s. "All lever-action rifles are at heart Henrys of the early 1860s," and all semi-automatics "descend from" the models of the 1880s. *Id.* at 185.

[387] Also still common today are firearms that were typical in the eighteenth century and before: single-shot and double-barrel (2-shot) guns.

The automatic firearm—what is commonly called a machine gun—was invented by Hiram Maxim in 1884. During the nineteenth century, it had strong sales to militaries, except in the United States. There, the military was mainly a "frontier constabulary." Unlike France, Germany, and other European states, the United States was not engaged in a arms race with nearby rivals that might invade. Maxim contacted American firearms manufacturers with offers to license his machine gun system for their models. He was universally rebuffed, sometimes with colorful language. The first and only machine gun marketed to American consumers was the Thompson submachinegun, starting in 1920. In the consumer market, it was a failure. The gun was popular with criminals, especially bootleggers, and had some sales to law enforcement. The National Firearms Act of 1934 followed the lead of several state laws starting in the mid-1920s, and imposed a stiff tax and registration system on machine guns. *See* JOHN ELLIS, THE SOCIAL HISTORY OF THE MACHINE GUN (1986),

The Thompson finally found a constructive role in World War II, where it was widely issued to American and British special forces, such as paratroopers.

KR0722

## IV. Firearms bans in the 19th Century

This Part describes bans on particular types of firearms in the nineteenth century. The discussion also notes some Bowie knife legislation that was enacted along with some of the handgun laws. Bowie knives will be discussed in much more detail in Part V.

### A. Georgia ban on handguns, Bowie knives, and other arms

Between 1791 and the beginning of the Civil War in 1861, there was one law enacted against acquiring particular types of firearms. An 1837 Georgia statute made it illegal for anyone "to sell, or to offer to sell, or to keep or to have about their persons, or elsewhere" any:

> Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks,[388] sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols.[389]

Horse pistols were the only type of handgun not banned in Georgia. These were large handguns, usually sold in a pair, along with a double holster that was meant to be draped over a saddle. They were too large for practical carry by a person who was walking.

At the time, there was no right to arms in the Georgia Constitution. In 1846, the Georgia Supreme Court held the statute unconstitutional.[390] The court explained that the Second Amendment stated an inherent right, and nothing in the Georgia Constitution had ever authorized the state government to

---

[388] A fighting knife originally created in Scotland. Harold L. Peterson, Daggers & Fighting Knives of the Western World 60 (1968).

[389] 1837 Ga. Laws 90, sec. 1. Although section 1 of the act was prohibitory, Section 4 contained an exception allowing open carry of some of the aforesaid arms, not including handguns: "*Provided, also*, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view…" The same section also allowed vendors to sell inventory they already owned, through the next year.

[390] Nunn v. State, 1 Ga. 243 (1846).

KR0723

violate the right.[391] For all the weapons, including handguns, the ban on concealed carry was upheld, while the sales ban, possession ban, and open carry ban were held unconstitutional.[392] The U.S. Supreme Court's 2008 *District of Columbia v. Heller* extolled *Nunn* because the "opinion perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause."[393] *Nunn* was a leader among the many antebellum state court decisions holding that a right enumerated in the U.S. Bill of Rights was protected against state infringement.[394]

### B. Tennessee ban on many handguns

After the end of Reconstruction, the white supremacist legislature of Tennessee in 1879 banned the sale "of belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols"—that is, large handguns of the sort carried by military officers, artillerymen, cavalrymen, etc. These big and well-made guns were already possessed in quantity by many former Confederate soldiers. The big handguns were more expensive than smaller pistols. Although some ordinary Confederate infantrymen did have handguns, many infantrymen had only long guns.

Because officers and cavalrymen tended to come from the upper strata of society, the effect of the 1879 Tennessee law was to make new handguns unaffordable to poor people of all races. The vast majority of the former slaves were poor, and so were many whites. While some Jim Crow era laws had a focused racial impact, the Tennessee statute was one of many Jim Crow laws that disadvantaged black people *and* poor whites, both of whom were viewed with suspicion by the ruling classes.

The ban on sales of small handguns was upheld under the Tennessee state constitution because it would help reduce the concealed carrying of handguns.[395]

---

[391] *Id.* at 250–51.

[392] *Id.* at 251.

[393] *Heller*, 554 U.S. at 612.

[394] *See* Jason Mazzone, *The Bill of Rights in Early State Courts*, 92 Minn. L. Rev. 1 (2007); Akhil Reed Amar, The Bill of Rights 145–56 (1998) (discussing "the Barron contrarians").

[395] State v. Burgoyne, 75 Tenn. (7 Lea) 173 (1881).

KR0724

### C. Arkansas ban on many handguns, and Bowie knives

Arkansas followed suit with a similar law in 1881. That law also forbade the sale of Bowie knives, dirks (another type of knife), sword-canes (a sword concealed in a walking stick), and metal knuckles. In a prosecution for the sale of a pocket pistol, the Arkansas Supreme Court rejected a constitutional defense. The statute was "leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person. It does not abridge the constitutional right of citizens to keep and bear arms for the common defense; for it in no wise restrains the use or sale of such arms as are useful in warfare."[396]

The 1868 Arkansas Constitution's right to arms, still in effect, states, "The citizens of this State shall have the right to keep and bear arms for their common defence."[397] Similarly, the right to arms provision of the Tennessee Constitution, as adopted in 1870 and still in effect, states, "the citizens of this State have a right to keep and to bear arms for their common defense; but the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime."[398]

In both states, the "common defense" language was interpreted by the courts as protecting an individual right of everyone, but only for militia-type arms. Such arms included the general types of handguns used in the U.S. military. When Congress was drafting the future Second Amendment, there was a proposal in the Senate to add similar "common defence" language. The Senate rejected the proposal.[399]

Whatever the merits of the state courts' interpretations of the state constitutions, the Tennessee and Arkansas statutes are unconstitutional under the Second Amendment. The U.S. Supreme Court in *Heller* repudiated the notion that the Second Amendment is for only military-type arms. Dick

---

[396] Dabbs v. State, 39 Ark. 353, 357 (1885).
[397] ARK. CONST. of 1868, art. I, § 5 (retained in 1874 Ark. Const.).
[398] TENN. CONST. of 1870, art. I, § 26.
[399] Senate Journal, 1st Cong., 1st Sess. 77 (Sept. 9, 1789).

Heller's 9-shot .22 caliber revolver was certainly not a military-type handgun.[400]

### D. Florida licensing law for repeating rifles and handguns

The closest historic analogue to twenty-first century bans on semiautomatic rifles is an 1893 Florida statute that required owners of Winchesters and other repeating rifles to apply for a license from the board of county commissioners.[401] In 1901 the law was extended to also include handguns.[402] As amended, "Whoever shall carry around with, or have in his manual possession, in any county in this State, any pistol, Winchester rifle, or other repeating rifle, without having a license from the county commissioners of the respective counties of this State," should be fined up to $100 or imprisoned up to 30 days.[403]

The county commissioners could issue a two-year license only if the applicant posted a bond of $100.[404] The commissioners were required to record "the maker of the firearm so licensed to be carried, and the caliber and number of the same."[405] The bond of $100 was exorbitant. It was equivalent to over $3,400 today.[406]

A 1909 case involved Giocomo Russo's petition for a writ of mandamus against county commissioners who had refused his application for a handgun carry license.[407] Based on his name, Russo may have been an Italian immigrant. At the time, Italians were sometimes considered to be in a separate racial category. When Russo applied, the county commissioners said that they only issued licenses to applicants whom they knew personally, and they did

---

[400] Dick Heller's particular handgun, a single action Buntline revolver manufactured by High Standard, is identified at Plaintiffs' Motion for Summary Judgment, Exhibit A, Parker v. District of Columbia, 311 F. Supp. 2d 103 (D.D.C. 2004), https://web.archive.org/web/20111117110734/http://www.gurapossessky.com/news/parker/documents/SJExhibitA.pdf.

[401] 1893 Fla. Laws 71, ch. 4147.

[402] 1901 Fla. Laws 57, ch. 4928.

[403] *Id.* Codified at REVISED GENERAL LAWS OF FLORIDA, §§ 7202–03 (1927).

[404] *Id.*

[405] *Id.*

[406] Fed. Reserve Bank of Minneapolis, Consumer Price Index 1800, https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1800-. 2022=884.6. 1893=27. 1901= 25. Avg. = 26.

[407] State v. Parker, 57 Fla. 170, 49 So. 124 (1909).

KR0726

not think the applicant needed to carry a handgun.[408] Russo argued that the licensing statute was unconstitutional.[409]

The Florida Supreme Court denied Russo's petition for a writ of mandamus.[410] According to the court, there were two possibilities: 1. If the statute is constitutional, then mandamus to the county commissioners would be incorrect, because they acted within their legal discretion. 2. If the statute is unconstitutional, then mandamus would be improper, because a writ of mandamus cannot order an official to carry out an unconstitutional statute.[411] Either way, Russo was not entitled to a writ of mandamus.[412] Pursuant to the doctrine of constitutional avoidance, the court declined to opine on the statute's constitutionality.[413]

Decades later, a case arose as to whether a handgun in an automobile glove-box fit within the statutory language, "on his person or in his manual possession."[414] By 5–2, the Florida Supreme Court held that it did not; no license was necessary to carry a handgun or repeating rifle in an automobile.[415] A four Justice majority granted the defendant's petition for habeas corpus because of the rule of lenity: in case of ambiguity criminal statutes should be construed narrowly.[416] Automobile travelers "should be recognized and accorded the full rights of free and independent American citizens," said the majority.[417]

Justice Rivers H. Buford concurred with the majority.[418] His opinion went straight to the core problem with the statute.

Born in 1878, Buford had worked from ages 10 to 21 in Florida logging and lumber camps. In 1899, at the suggestion of a federal judge who owned a logging camp, Buford began the study of law. He was admitted to the Florida bar the next year. In 1901, he was elected to the Florida House of Representatives. Later, he was appointed county prosecuting attorney, elected

---

[408] *Id.* at 171–72.
[409] *Id.*
[410] *Id.* at 173.
[411] *Id.*
[412] *Id.*
[413] *Id.* at 172–73.
[414] Watson v. Stone, 148 Fla. 516, 518 (1941).
[415] *Id.* at 522–23.
[416] *Id.* at 517–23.
[417] *Id.* at 522–23.
[418] *Id.* at 523–24.

state's attorney for the 9th district, and elected state attorney general. He was appointed to the Florida Supreme Court in 1925.[419] As of 1923, "His principal diversion is hunting."[420]

The Florida Constitution of 1885 had provided: "The right of the people to bear arms in defence of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne."[421]

Concurring, Justice Buford wrote that the statute should be held to violate the Florida Constitution and the Second Amendment:

> I concur in the judgment discharging the relator because I think that Section 5100, R.G.S., § 7202, C.G.L., is unconstitutional because it offends against the Second Amendment to the Constitution of the United States and Section 20 of the Declaration of Rights of the Constitution of Florida.
>
> Proceedings in habeas corpus will lie for the discharge of one who is held in custody under a charge based on an unconstitutional statute. [citations omitted]
>
> The statute, supra, does not attempt to prescribe the manner in which arms may be borne but definitely infringes on the right of the citizen to bear arms as guaranteed to him under Section 20 of the Declaration of Rights of the Florida Constitution.[422]

He explained the history of the exorbitant licensing laws of 1893 and 1901:

> I know something of the history of this legislation. The original Act of 1893 was passed when there was a great influx of negro laborers in this State drawn here for the purpose of working in turpentine and lumber camps. The same condition existed when the Act was amended in 1901 and the Act was passed for the purpose of disarming the negro laborers and to thereby reduce the unlawful homicides that were prevalent in turpentine and saw-mill camps and to give the white citizens in sparsely settled areas

---

[419] 3 History of Florida: Past and Present 156 (1923); *Justice Rivers Henderson Buford*, Florida Supreme Court, https://supremecourt.flcourts.gov/Justices/Former-Justices/Justice-Rivers-Henderson-Buford.

[420] 3 History of Florida, *supra* note 419, at 156.

[421] Fla. Const. of 1885, art. I, § 20.

[422] *Watson*, 148 Fla. at 523–24.

KR0728

a better feeling of security. The statute was never intended to be applied to the white population and in practice has never been so applied. We have no statistics available, but it is a safe guess to assume that more than 80% of the white men living in the rural sections of Florida have violated this statute. It is also a safe guess to say that not more than 5% of the men in Florida who own pistols and repeating rifles have ever applied to the Board of County Commissioners for a permit to have the same in their possession and there had never been, within my knowledge, any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention of the Constitution and non-enforceable if contested.[423]

Justice Buford had described some of the changed societal conditions underlying the 1893 and 1901 enactments. There may have been additional factors involved. Repeating rifles had been around for decades.[424] By the 1880s, manufacturing improvements had made such rifles affordable even for some poor people. Blacks were using such rifles to drive off lynch mobs, such as in famous 1892 incidents in Paducah, Kentucky and Jacksonville, Florida.[425]

In sum, the nineteenth century history of firearms bans is not helpful for justifying prohibitions today on semiautomatic firearms. The only pre-1900 statutory precedent for such a law is Florida in 1893, and it is dubious. Before that, there were three prior sales prohibitions that covered many or most handguns. One of these was held to violate the Second Amendment, and the other two are plainly unconstitutional under *Heller*. Accordingly, renewed

---

[423] *Id.* at 524.

[424] *See* text at notes 320–343.

[425] In Jacksonville,

[W]hen a white man, having been killed by a negro, and threats of lynching the prisoner from the Duval County Jail being made, a large concourse, or mob of negroes, assembled around the jail and defied the sheriff of the county ingress to the building. This mob, refusing to disburse upon the reading of the riot act by the sheriff, he called for assistance from the militia to aid him in enforcing the laws.

REPORT OF THE ADJUTANT-GENERAL FOR THE BIENNIAL PERIOD ENDING DECEMBER 31, 1892, at 18, *in* [Florida] *Journal of the Senate* (1893); NICHOLAS J. JOHNSON, NEGROES AND GUN: THE BLACK TRADITION OF ARMS 110–12 (2014).

*Journal of Legislation*

attention is being given to precedents involving Bowie knives, which we will examine next.

## V. BOWIE KNIVES

Starting in 1837, many states enacted legislation about Bowie knives. Defending Maryland's ban on many modern rifles, state Attorney General Brian Frosh argues that nineteenth century laws about Bowie knives provide a historical analogy to justify the present ban.[426] Prohibitory laws for adults, however, were exceptional. As with firearms, sales bans or bans on all manner of carrying existed, but were rare.

Section A explains the definition and history of Bowie knives, and of a related knife, the Arkansas toothpick. Part B is a state-by-state survey of all Bowie knife legislation in the United States before 1900.

Among the 221 state or territorial statutes with the words "Bowie knife" or "Bowie knives," only 5 were just about Bowie knives (along with their close relative, the Arkansas toothpick). Almost always, Bowie knives were regulated the same as other knives that were well-suited for fighting against humans and animals—namely "dirks" or "daggers." That same regulatory category frequently also included "sword-canes." About 98 percent of statutes on "Bowie knives" treated them the same as various other blade arms. Bowie knives did not set any precedent for a uniquely high level of control. They were regulated the same as a butcher's knife.

Bowie knives and many other knives were often regulated like handguns. Both types of arms are concealable, effective for defense, and easy to misuse for offense.

For Bowie knives, handguns, and other arms, a few states prohibited sales. The very large majority, however, respected the right to keep and bear arms, including Bowie knives. These states allowed open carry while some of them forbade *concealed* carry. In the nineteenth century, legislatures tended to prefer that people carry openly; today, legislatures tend to favor concealed carry. Based on history and precedent, legislatures may regulate the mode of carry, as the U.S. Supreme Court affirmed in *Bruen*.[427]

---

[426] Supplemental Brief for Appellees, *Bianchi v. Frosh* (No. 21-1255) (4th Cir.),

[427] *Bruen*, 142 S. Ct. 2150 ("The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. . . . States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly.").

KR0730

Besides regulating the mode of carry, many states restricted sales to minors. They also enacted special laws against misuse of arms.

Of the 221 state or territorial statutes cited in this article, 115 come from just 5 states: Mississippi, Alabama, Georgia, Virginia, and North Carolina. This is partly because these were the only states whose personal property tax statutes specifically included "Bowie knife" in their lists of taxable arms, along with other knives, such as "dirks."

Before delving into the Bowie knife laws, here is a glossary of the arms types that often appear in the same statutes as Bowie knives:

*Bowie knife.* This was the marketing and newspaper term for old or new models of knives suitable for fighting, hunting, and utility. There was no common feature that distinguished a "Bowie knife" from older knives. For example, a "Bowie knife" could have a blade sharpened on only one edge, or on two edges. It could be straight or curved. It might or might not have a handguard. There was no particular length.[428]

*Arkansas toothpick.* A loose term for some Bowie knives popular in Arkansas.[429]

*Dagger.* A straight knife with two cutting edges and a handguard.

*Dirk.* Small stabbing weapons, with either one or two sharpened edges.[430] Originally, a Scottish fighting knife with one cutting edge.[431] Many nineteenth century laws forbade concealed carry of "dirks" and/or "daggers." The statutory formula of "bowie knife + (dirk and/or dagger)" covered many knives well-suited for defense or offense. The category does not include pocket knives.

*Sword-cane.* A sword concealed in a walking stick. Necessarily with a slender blade.

*Slungshot.* The original slungshot was a nautical tool, a rope looped on both ends, with a lead weight or other small, dense item at one end.[432] It helps sailors accurately cast mooring lines and other ropes.[433] A slungshot rope that is shortened to forearm length and spun rapidly is an effective blunt force

---

[428] *See* text at notes __.

[429] *See* text at notes __.

[430] "Dirks in America were small stabbing weapons, usually small daggers but sometimes single edged." Mark Zalesky, publisher of *Knife Magazine*, email to David Kopel, Nov. 19, 2022.

[431] Peterson, Daggers & Fighting Knives of the Western World, *supra* note 388, at 60.

[432] *See* text at notes __.

[433] *See* text at notes __.

weapon.[434] As will be detailed in Part VI.B.1, many slungshots were made of leather instead of rope, intended for use as weapons, and very easily concealed.

*Colt.* Similar to a slungshot.[435]

*Knucks, knuckles.* Linked rings or a bar, often made of metal, with finger holes. They make the fist a more potent weapon. Laws about knuckles are also detailed in part VI.

*Revolver.* A handgun in which the ammunition is held in a rotating cylinder.

*Pistol.* Often a generic term for handguns. Sometimes used to indicate non-revolvers, as in a law covering "pistols or revolvers."

## A. The history of Bowie knives and Arkansas toothpicks

### 1. What is a Bowie knife?

The term "Bowie knife" originated after frontiersman Col. Jim Bowie used one at a famous "Sandbar Fight" on the lower Mississippi River near Natchez, Mississippi, on September 19, 1827.

The knife had been made by Rezin Bowie, Jim's brother. According to Rezin, the knife was intended for bear hunting. He stated, "The length of the knife was nine and a quarter inches, its width one and a half inches, single-edged, and blade not curved."[436] Nothing about the knife was novel.

The initial and subsequent media coverage of the Sandbar Fight was often highly inaccurate.[437] As "Bowie knife" entered the American vocabulary, manufacturers began labeling all sorts of large knives as "Bowie knives." Some of these were straight (like Rezin's) and other had curved blades. Rezin's knife was single-edged, but some "Bowie knives" were double-edged. Rezin's knife did not have a clip point, but some so-called "Bowie knives" did. Likewise, some had crossguards (to protect the user's hand), and others did not. "Bowie knife" was more a sloppy marketing term than a description of a particular type of knife—just as some people today say "Coke" to mean many kinds of carbonated beverages. (The difference is that true "Coke" products, manufactured by the Coca-Cola Company, do exist; there never was a true "Bowie knife," other than the one used at the Sandbar Fight.) Manufacturers slapped the "Bowie knife"

---

[434] *See* text at notes __.

[435] 1 SHORTER OXFORD ENGLISH DICTIONARY 444 ("4. A short piece of weighted rope used as a weapon").

[436] R.P. Bowie, *Letter to the Editor*, PLANTER'S ADVOCATE, Aug. 24, 1838, *reprinted in* MARRYAT, 1 A DIARY IN AMERICA, WITH REMARKS ON ITS INSTITUTIONS 291 (1839).

[437] *See id.* at 289–91.

label on a wide variety of large knives that were well-suited for hunting and self-defense. In words of knife historian Norm Flayderman, "there is no one specific knife that can be exactingly described as a Bowie knife."[438]

From the beginning, laws about "Bowie knives" have been plagued by vagueness. For example, a Tennessee statute against concealed carry applied to "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick. . . ."[439]

When Stephen Hayes was prosecuted for concealed carry, the witnesses disagreed about whether his knife was a Bowie knife.[440] One said it was too small and slim to be a Bowie knife and would properly be called a "Mexican pirate-knife."[441] The jury found Haynes innocent of wearing a Bowie knife but guilty on a second charge "of wearing a knife in shape or size resembling a bowie-knife."[442] Note the disjunctive "form, shape *or* size." On appeal, the Tennessee Supreme Court agreed that the legislature could not declare "war against the name of the knife."[443] A strict application of the letter of the law could result in injustices, "for a small pocket-knife, which is innocuous, may be made to resemble in form and shape a bowie-knife or Arkansas tooth-pick."[444] The court affirmed the conviction, held that the statute must be construed "within the spirit and meaning of the law," and relied on the judge and jury to make the decision as a matter of fact.[445]

---

[438] NORM FLAYDERMAN, THE BOWIE KNIFE: UNSHEATHING AN AMERICAN LEGEND 490 (2004).

[439] 22 Tenn. Gen. Assemb. Acts 200, ch. 137.

[440] Haynes v. State, 24 Tenn. (5 Hum.) 120, 120–21 (1844).

[441] *Id.* at 121.

[442] *Id.*

[443] *Id.* at 122.

[444] *Id.*

[445] *Id.* at 122–23.

Similarly, a North Carolina law prohibited carrying "concealed about his person any pistol, bowie knife, dirk, dagger, slung-shot, loaded cane, brass, iron or metallic knuckles, or razor, or other deadly weapon of like kind." Defendant argued that his butcher's knife was not encompassed by the statute. He argued that the statute applied to weapons "used only for purposes offensive and defensive." The North Carolina Supreme Court disagreed, for such an interpretation would allow concealed carry of "deadly weapons of a very fatal type; as for example, a butcher's knife, a shoe knife, a carving knife, a hammer, a hatchet, and the like." Defendant had argued that a broad interpretation would

### 2. What is an Arkansas toothpick?

As for "Arkansas Toothpick," Flayderman says that it was mainly another marketing term for "Bowie knife."[446] But he notes that some Mississippi tax receipts, and some other writings, expressly distinguish an "Arkansas Toothpick" from a "Bowie knife."[447]

Mark Zalesky, publisher of *Knife Magazine*, explains:

> The idea of the "Arkansas toothpick" being a large dagger seems to stem from Raymond Thorp's 1948 book *Bowie Knife* (Thorp actually did some good research, but much of the book is complete nonsense); *The Iron Mistress* novel and movie in 1951/52; and the subsequent interest in Bowie, Crockett, the Alamo etc. during the 1950s and early 1960s. You are dealing with a definition that has changed over the years.[448]

But as of 1840, "Most evidence supports the idea that 'Arkansas toothpick' was originally a 'frontier brag' of sorts, a casual nickname for any variety of bowie knife but particularly types that were popular in Arkansas." [449]

### 3. The crime in the Arkansas legislature

The sandbar fight had taken place in 1827. Jim Bowie died on March 6, 1836, as one of the defenders of the Alamo. In 1840, he would become the namesake of Bowie County, the northeasternmost in Texas. According to Zalesky, "we first see the term 'Bowie knife' beginning to come into use in 1835

---

> embrace small and large pocket knives, and like useful practical things that men constantly carry in their pockets and about their persons, and are more or less deadly instruments in their character. The answer to this is, that these things are not ordinarily carried and used as deadly weapons, but for practical purposes, and the ordinary pocket knife cannot be reckoned as per se a deadly weapon; but it would be indictable to so carry them for such unlawful purpose if deadly in their type and nature. If one should carry a pocket knife, deadly in its character, as a weapon of assault and defense, he would be indictable, just as he would be if he carried a dirk or dagger.

State v. Erwin, 91 N.C. 545, 546–48 (1884).

[446] FLAYDERMAN, THE BOWIE KNIFE, *supra* note at __, at 265–74.

[447] *Id.*

[448] Mark Zelesky, email to David Kopel, Nov. 10, 2022.

[449] Mark Zelesky, email to David Kopel, Nov. 19, 2022.

KR0734

and by mid-1836 it was everywhere. It is clear that such knives existed before the term for them became popular."[450]

The first legislation about Bowie knives, from Mississippi and Alabama in mid-1837, may have been a response to a continuing problem of criminal misuse. Legislative attention to the topic was surely intensified by an infamous crime in late 1837, which may have helped lead to the enactment of several laws in succeeding weeks. Historian Clayton Cramer explains:

> Two members of the Arkansas House of Representatives turned from insults to Bowie knives during debate as to which state official should authorize payment of bounties on wolves. Speaker of the House John Wilson was president of the Real Estate Bank. Representative J.J. Anthony sarcastically suggested that instead of having judges sign the wolf bounty warrants, some *really* important official should do so, such as the president of the Real Estate Bank.

> Speaker Wilson took offense and immediately confronted Anthony, at which point both men drew concealed Bowie knives. Anthony struck the first blows, and nearly severed Wilson's arm. Anthony then threw down his knife (or threw it at Wilson), then threw a chair at Wilson. In response, Wilson buried his Bowie knife to the hilt in Anthony's chest (or abdomen, depending on the account), killing him. "Anthony fell, exclaiming, 'I'm a dead man,' and immediately expired."[451] "The Speaker himself fell to the floor, weak from loss of blood. But on hands and knees he crawled to his dead opponent, withdrew his Bowie, wiped it clean on Anthony's coat, replaced it in its sheath, and fainted."[452] While Wilson was expelled from the House, he was acquitted at trial, causing "the most intense indignation through the entire State."[453]

---

[450] *Id.*

[451] Quoting WILLIAM F. POPE, EARLY DAYS IN ARKANSAS 225 (Dunbar H. Pope ed., 1895); *The Murder in Arkansas*, 54 NILES' NATIONAL REGISTER 258 (June 23, 1838).

[452] RAYMOND W. THORP, BOWIE KNIFE 4 (1991).

[453] Clayton Cramer, email to David Kopel, Nov. 2022, quoting and citing POPE, *supra* note __, at 225–26; THORP, *supra* note __, at 1–5; *General Assembly*, ARKANSAS STATE GAZETTE, Dec. 12, 1837, at 2 (expulsion two days later); *The trial of John Wilson . . .* , SOUTHERN RECORDER (Milledgeville, Ga.), Mar. 6, 1838; *The Murder in Arkansas*, NILES' NATIONAL REGISTER, *supra*.

## B. Survey of Bowie knife statutes

Section B surveys every Bowie knife statute enacted by any American state or territory in the nineteenth century. Jurisdictions are discussed chronologically, by date of first enactment.

In the footnotes, a cite to an enacted statute also includes a string cite of re-enactments of the same statute, such as part of a recodification of the criminal code.

*Mississippi* (1837).

The first "Bowie knife" law was enacted by Mississippi on May 13, 1837. The statute punished three types of misuse of certain arms: "any rifle, shot gun, sword cane, pistol, dirk, dirk knife, bowie knife, or any other deadly weapon."[454]

It was forbidden to use such arms in a fight in a city, town, or other public place.[455] It became illegal to "exhibit the same in a rude, angry, and threatening manner, not in necessary self defence."[456] Finally, if one of the arms were used in a duel and caused a death, the duelist would be liable for the debts owed by the deceased.[457] All these provisions would later be enacted by some other states.

Another Bowie knife law was also signed on May 13 by Governor Charles Lynch. The state legislature's incorporation of the town of Sharon empowered the local government to pass laws "whereby . . . the retailing and vending of ardent spirits, gambling, and every species of vice and immorality may be suppressed, together with the total inhibition of the odious and savage practice of wearing dirks, bowie knives, or pistols."[458] Similar language appeared in the incorporation of towns in 1839 and 1840.[459]

Starting in 1841, the state annual property tax included "one dollar on each and every Bowie Knife."[460] The tax was cut to fifty cents in 1850.[461] But then raised back to a dollar, and extended to each "Arkansas tooth-pick, sword cane,

---

[454] 1837 Miss. L. pp. 291–92.

[455] *Id.*

[456] *Id.*

[457] *Id.*

[458] 1837 Miss. Laws 294.

[459] 1839 Miss. Laws 385, ch. 168, p. 385 (Emery); 1840 Miss. Laws 181, ch. 111 (Hernando).

[460] 1841 Miss. Laws 52, ch. 1; 1844 Miss. Laws 58, ch. 1.

[461] 1850 Miss. Laws 43, ch. 1.

KR0736

duelling or pocket pistol."[462] In the next legislature, pocket pistols were removed from the tax.[463]

When the Civil War came, the legislature prohibited "any Sheriff or Tax-Collector to collect from any tax payer the tax heretofore or hereafter assessed upon any bowie-knife, sword cane, or dirk-knife, and that hereafter the owner of any howie-knife, sword-cane or dirk-knife shall not be required to give in to the tax assessor either of the aforesaid articles as taxable property."[464] That was a change for before, when tax collectors were allowed to confiscate arms from people who could not pay the property tax.[465]

After the Confederacy surrendered, the legislature was still controlled by Confederates, and an arms licensing law for the former slaves was enacted.

> [N]o freeman, free negro or mulatto, not in the military service of the United States Government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife, and on conviction thereof, in the county court, shall be punished by fine, not exceeding ten dollars, and pay the costs of such proceedings, and all such arms or ammunition shall be forfeited to the informer, and it shall be the duty of every civil and military officer to arrest any freedman, free negro or mulatto found with any such arms or ammunition, and cause him or her to be committed for trial in default of bail.[466]

As detailed in Justice Alito's opinion and Justice Thomas's concurrence in *McDonald v. Chicago*, laws such as Mississippi's prompted Congress to pass the Second Freedmen's Bureau Bill, the Civil Rights Act, and the Fourteenth Amendment, all with the express intent of protecting the Second Amendment rights of the freedmen.[467]

---

[462] 1854 Miss. Laws 50, ch. 1.

[463] 1856–57 Miss. Laws 36, ch. 1 ("each bowie knife, dirk knife, or sword cane").

[464] 1861–62 Miss. Laws 134, ch. 125 (Dec. 19, 1861).

[465] Alabama's system of confiscating arms for unpaid taxes and then selling them at public auction is described *infra*.

[466] 1865 Miss. L. ch. 23, pp. 165-66.

[467] 561 U.S. 742 (2010).

*Journal of Legislation*

After the war, the Auditor of Public Accounts had to "furnish each clerk of the board of supervisors" with a list of taxable property owned by each person. This included "pistols, dirks, bowie-knives, sword-canes, watches, jewelry, and gold and silver plate."[468]

Concealed carry was outlawed for "any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description."[469] There was an exception for persons "threatened with, or having good and sufficient reason to apprehend an attack."[470] Also excepted were travelers, but not "a tramp."[471] Sales to minors or to intoxicated persons were outlawed.[472] A father who permitted a son under 16 to carry concealed was criminally liable.[473] Students at "any university, college, or school" could not carry concealed.[474]

The forbidden items for concealed carry were expanded in 1896: "any bowie knife, dirk knife, butcher knife, pistol, brass or metalic knuckles, sling shot, sword or other deadly weapon of like kind or description."[475] Two years later, the legislature corrected the spelling of "metallic," and provided that the jury "may return a verdict that there shall be no imprisonment," in which case the judge would impose a fine.[476]

*Alabama* (1837).

The legislature imposed a $100 per knife tax on the sale, transfer, or import of any "Bowie-Knives or Arkansaw Tooth-picks," or "any knife or weapon that shall in form, shape or size, resemble" them. The $100 tax was equivalent to about $2,600 dollars today.[477]

Additionally, if any person carrying one "shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought."[478]

---

[468] 1871 Miss. Laws 819–20; 1876 Miss. Laws 131, 134, ch. 104; 1878 Miss. Laws 27, 29, ch. 3; 1880 Miss. Laws 21, ch. 6; 1892 Miss. Laws 194, 198, ch. 74; 1894 Miss. Laws 27, ch. 32; 1897 Miss. Laws 10, ch. 10.

[469] 1878 Miss. Laws 175–76, ch. 46.

[470] *Id.*

[471] *Id.*

[472] *Id.*

[473] *Id.*

[474] *Id.*

[475] 1896 Miss. Laws 109–10, ch. 104.

[476] 1898 Miss. Laws 86, ch. 68.

[477] Fed. Reserve Bank of Minneapolis, *supra* note __ (2022=884.6. 1837 = 34).

[478] ACTS PASSED AT THE CALLED SESSION OF THE GENERAL ASSEMBLY OF THE STATE OF ALABAMA 7 (Tuscaloosa: Ferguson & Eaton, 1837) (June 30, 1837).

KR0738

Then in 1839 Alabama outlawed concealed carry of "any species of fire arms, or any bowie knife, Arkansaw tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon."[479] An 1856 statute prohibited giving a male minor a handgun or bowie knife.[480]

According to the U.S. Supreme Court's analysis of the historical record, concealed carry bans are constitutionally unproblematic, as long as open carry is allowed. Or vice versa. The American legal tradition of the right to arms allows the legislature to regulate the mode of carry.[481]

The exorbitant $100 transfer tax was replaced with something less abnormal. The annual state taxes on personal property included $2 on "every bowie knife or revolving pistol."[482] Even that amount was hefty for a poor person. As the defense counsel in an 1859 Texas case examined *infra* had pointed out, a person who could not afford a firearm could buy a common butcher knife (which fell within the expansive definition of "Bowie knife") for no more than 50 cents.[483] As described next, the cost of manufacturing a high-quality Bowie knife was a little less than $3, which approximately implies a retail price around $6. Whether a knife cost 50 cents or 6 dollars, an annual $2 tax likely had an effect in discouraging ownership, as the tax was so high in relation to the knife's value. The cumulative annual taxes on the knife would far exceed the knife's cost.

The legislature having aggressively taxed Bowie knives, there were not enough of them in Alabama when the Civil War began in 1861. The legislature belatedly recognized that the militia was under-armed. In military crisis, the legislature appropriated funds for the state armory at Mobile to manufacture Bowie knives:

---

[479] ACTS PASSED AT THE ANNUAL SESSION OF THE GENERAL ASSEMBLY OF THE STATE OF ALABAMA 67–68 (Tuscaloosa: Hale & Eaton, 1838 [1839]) (Feb. 1, 1839).

[480] ACTS OF THE FIFTH BIENNIAL SESSION OF THE GENERAL ASSEMBLY OF ALABAMA, HELD IN THE CITY OF MONTGOMERY, COMMENCING ON THE SECOND MONDAY IN NOVEMBER, 1855, at 17 (1856).

[481] *Bruen*, 142 S. Ct. at 2150.

[482] 1851-52 Ala. Laws 3, ch. 1.

[483] Cockrum v. State, 24 Tex. 394, 395–96 (1859) ("A common butcher-knife, which costs not more than half a dollar, comes within the description given of a bowie-knife or dagger, being very frequently worn on the person. To prohibit such a weapon, is substantially to take away the right of bearing arms, from him who has not money enough to buy a gun or a pistol.").

KR0739

Whereas there is a threatened invasion of our State by those endeavoring to subjugate us; and whereas there is a great scarcity of arms, and the public safety requires weapons to be placed in the hands of our military, therefore

. . . [S]ix thousand dollars . . . is hereby appropriated . . . to purchase one thousand Bowie-knife shaped pikes [similar to a spear], and one thousand Bowie knives for the use of the 48th regiment, Alabama militia.[484]

The Governor was authorized to draw further on the treasury, as he saw appropriate, "to cause arms of a similar, with such improvements as he may direct, to be manufactured for any other regiment or battalion of militia, or other troops."[485]

If Alabama legislatures starting in 1837 had not suppressed the people's acquisition of militia-type knives, then the 1861 wartime legislature might not have been forced to divert scarce funds to manufacture Bowie knives for the militia. The men and youth of Alabama militia could have just armed themselves in the ordinary course of affairs, buying large knives for themselves for all legitimate uses.

The legislature had appropriated $6,000 to buy 2,000 Bowie knives and pikes. This works out to $3 manufacturing cost per knife or pike.

A little later, a wartime tax of 5% on net profits was imposed on many businesses, including "establishments for manufacturing or repairing shoes, harness, hats, carrigos [horse-drawn carriages], wagons, guns, pistols, pikes, bowie knives."[486]

After Reconstruction ended, an 1881 concealed carry ban applied to "a bowie knife, or any other knife, or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or any air gun."[487] "[E]vidence, that the defendant has good reason to apprehend an attack may be admitted in the mitigation of the punishment, or in justification of the offense."[488]

Throughout the nineteenth century, and all over the United States, grand and petit juries often refused to enforce concealed carry laws against defendants who had been acting peaceably. The statute attempted to address

---

[484] 1861 Ala. Laws 214-15, ch. 22 (Nov. 27, 1861).

[485] *Id.*

[486] 1862 Ala. Laws 8, ch. 1.

[487] 1880–81 Ala. Laws 38–39, ch. 44.

[488] *Id.*

KR0740

the problem: "grand juries . . . shall have no discretion as to finding indictments for a violation of this, act . . . if the evidence justifies it, it shall be their duty to find and present the indictment."[489] To make the law extra-tough, "the fines under this act shall be collected in money only" (rather than allowing payment by surrender of produce, livestock, personal chattels, etc.).[490]

Shortly after the end of the Civil War, the unreconstructed white supremacist legislature had enacted a harsh property tax, designed to disarm poor people of any color. It was $2 on "all pistols or revolvers" possessed by "private persons not regular dealers holding them for sale."[491] For "all bowie-knives, or knives of the like description," the tax was $3.[492] If the tax were not paid, the county assessor could seize the arms.[493] To recover the arms, the owner had to pay the tax plus a 50% penalty.[494] After 10 days, the assessor could sell the arms at auction.[495]

Later, the arms seizure provisions were removed, and the tax reduced to levels for other common household goods. "All dirks and bowie knives, sword canes, pistols, on their value, three-fourths of one percent; and fowling pieces and guns, on their value, at the rate of seventy-five cents on the one hundred dollars."[496]

State law provided that county assessors could require a person to disclose under oath the taxable property he owned, by answering questions such as "What is the value of your household and kitchen furniture, taxable library, jewelry, silverware, plate, pianos and other musical instruments, paintings, clocks, watches, gold chains, pistols, guns, dirks and bowie-knives . . ."[497] The tax rate was 3/4 of 1% of the value.[498]

---

[489] *Id.*
[490] *Id.*
[491] 1865-66 Ala. Laws 7, ch. 1 (Feb. 22, 1866); 1866-67 Ala. Laws 263, ch. 260.
[492] 1865-66 Ala. Laws 7, ch. 1 (Feb. 22, 1866); 1866-67 Ala. Laws 263, ch. 260.
[493] 1865-66 Ala. Laws 7, ch. 1 (Feb. 22, 1866); 1866-67 Ala. Laws 263, ch. 260.
[494] 1865-66 Ala. Laws 7, ch. 1 (Feb. 22, 1866); 1866-67 Ala. Laws 263, ch. 260.
[495] 1865-66 Ala. Laws 7, ch. 1 (Feb. 22, 1866); 1866-67 Ala. Laws 263, ch. 260.
[496] 1874-75 Ala. Laws 6, ch. 1.
[497] 1875-76 Ala. Laws 46, ch. 2; 1876-77 Ala. Laws 4, ch. 2.
[498] 1875-76 Ala. Laws 46, ch. 2; 1876-77 Ala. Laws 4, ch. 2.

KR0741

The tax was cut in 1882 to 55 cents per hundred dollars of value.[499] Then raised to 60 cents for inter alia, "all dirks and bowie knives, swords, canes, pistols and guns; all cattle, horses, mules, studs, jacks and jennets and race horses; all hogs, sheep and goats."[500]

Separately, the legislature imposed occupational taxes. At the time, state sales taxes were rare, and the occupational tax levels sometimes approximated the amount that a vendor might have collected in sales taxes. "For dealers in pistols, bowie knives and dirk knives, whether the principal stock in trade or not, twenty-five dollars."[501] Finally, in 1898, the license for pistol, bowie, and dirk sellers become $100.[502] Separately, there was a $5 tax for wholesale dealers in pistol and rifle cartridges, raised to $10 for dealers in towns of 20,000 or more.[503] The wholesale license also authorized retail sales.[504]

State legislative revisions to municipal charters gave a municipality the power "to license dealers in pistols, bowie-knives and dirk-knives."[505]

---

[499] For "silverware, ornaments and articles of taste, pianos and other musical instruments, paintings, clocks, gold Furniture, and silver watches, and gold safety chains; all wagons or other vehicles; all mechanical tools and farming implements; all dirks and bowie knives, swords, canes, pistols and guns; all cattle, horses, mules, studs, jacks and-jennets, and race horses; all hogs, sheep and goats."1882 Ala. Laws 71, ch. 61.

[500] 1884 Ala. Laws 6, ch. 1.

[501] 1874 Ala. Laws 41, ch. 1. *See also* 1875-76 Ala. Laws 82, ch. 1 ($50); 1886 Ala. Laws 36, ch. 4 (adding "pistol cartridges"); 1892 Ala. Laws 183, ch. 95 ($300, "provided that any cartridges whether called rifle or pistol cartridges or by any other name that can be used in a pistol shall be deemed pistol cartridges within the meaning of this section").

[502] 1898 Ala. Laws 190, ch. 9036.

[503] *Id.*

[504] *Id.*

[505] 1878 Ala. Laws 437, ch. 314 (Uniontown); 1884 Ala. Laws 552, ch. 314 (Uniontown) (adding dealer in "brass knuckles"; "the sums charged for such licenses" may "not exceed the sums established by the revenue laws of the State. . . ."); 1884-85 Ala. Laws 323, ch. 197 (Tuscaloosa) ("to license and regulate pistols or Shooting galleries, the game of quoits, and all kind and description of games of chance played in a public place; . . . and dealers in pistols, bowie-knives and shotguns or fire arms, and knives of like kind or description") (unusually broad, not repeated for other charters); 1888 Ala. Laws 965, ch. 550 (Faunsdale); 1890 Ala. Laws 764, ch. 357 (Uniontown); 1890 Ala. Laws 1317, ch. 573 (Decatur) (to license dealers in "pistols, or pistol cartridges, bowie knives, dirk knives, whether principal stock in trade or not, $100.00."); 1892 Ala. Laws 292, ch. 140 (Demopolis) (same as Decatur); 1894 Ala. Laws 616, ch. 345 (Columbia) (same); 1894-95 Ala. Laws 1081, ch. 521, p. 1081 (Tuskaloosa) (to license and collect an annual tax on "gun shops or gun repair shops" and "dealers in pistols or pistol cartridges or bowie knives or dirk knives."); 1896 Ala. Laws 71, ch. 62 (Uniontown) ("to license . . . dealers in pistols, bowie knives, dirk knives or brass knuckles"); 1898-99 Ala. Laws 1046,

*Georgia* (1837).

As discussed *supra*, the legislature in 1837 forbade the sale, possession, or carry of Bowie and similar knives, pistols (except horseman's pistols), dirks, sword-canes, and spears.[506]

The Georgia Supreme Court held all of the law to violate the Second Amendment, except a section outlawing concealed carry.[507]

After the November 1860 election of Abraham Lincoln, with a secession crisis in progress, the Georgia legislature forbade "any person other than the owner" to give "any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for purpose of offence or defence."[508] The act was not be construed to prevent "owners or overseers from furnishing a slave with a gun for the purpose of killing birds, &c., about the plantation of such owner or overseer."[509]

An 1870 statute forbade open or concealed carry of "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon" at "any court of justice, or any general election ground or precinct, or any other public gathering," except for militia musters.[510]

The old 1837 statute against concealed carry was updated in 1882 to eliminate the exception for a "horsemen's pistol."[511] Thus, concealed carry remained illegal with "any pistol, dirk, sword in a cane, spear, Bowie-knife, or any other kind of knives manufactured and sold for the purpose of offense and defense."[512] Any "kind of metal knucks" was added in 1898.[513]

---

ch. 549 (Fayette) (maximum dealer license fee shall not exceed "Pistols, pistol cartridges, bowie knives, dirk knives, whether principal stock in trade or not, $50.00"); 1898 Ala. Laws 1102, ch. 566 (Uniontown) (same as previous Uniontown charter); 1898 Ala. Laws 1457, ch. 704 (Uniontown) (same).

[506] ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF GEORGIA PASSED IN MILLEDGEVILLE AT AN ANNUAL SESSION IN NOVEMBER AND DECEMBER, 1837, at 90–91 (Milledgeville: P. L. Robinson, 1838) (Dec. 25, 1837).

[507] *Nunn*, 1 Ga. 243.

[508] 1860 Ga. Laws 56–57, ch. 64.

[509] *Id.*

[510] 1870 Ga. Laws 421, ch. 285; 1879 Ga. Laws 64, ch. 266 (creating law enforcement officer exception).

[511] 1882-83 Ga. Laws 48-49, ch. 93.

[512] *Id.*

[513] 1898 Ga. Laws 60, ch. 106.

KR0743

*Journal of Legislation* [50:2

Furnishing "any minor" with "any pistol, dirk, bowie knife or sword cane" was outlawed in 1876.[514]

A $25 occupational tax was enacted in 1882 for "all dealers in pistols, revolvers, dirk or Bowie knives."[515] The tax was later raised to $100, adding dealers of "pistol or revolver cartridges."[516] Then the tax was reduced to $25.[517] But raised back to $100 in 1890.[518] In 1892, "metal knucks" were added, and the ammunition expanded to "shooting cartridges."[519] The tax was cut to $25 in 1894.[520]

The state property tax statute required taxpayers to disclose all sorts of personal and business property, including by answering, "What is the value of your guns, pistols, bowie-knives and such articles?"[521] The same question was included in the municipal charter for the town of Jessup.[522] And in the new charter for Cedartown.[523]

*South Carolina* (1838).

The legislature received a "petition of sundry citizens of York, praying the passage of a law to prevent the wearing of Bowie Knives, and to exempt managers of elections from militia duty." A member "presented the presentment of the Grand Jury of Union District, in relation to carrying Bowie knives, and retailing spirituous liquors." The knife and liquor issues were referred to the Judiciary Committee.[524]

The legislature did not enact any law with the words "bowie knife" in 1838, or in the nineteenth century.

---

[514] 1876 Ga. Laws 112, ch. 128 (O. no. 63).

[515] 1882-83 Ga. Laws 37, ch. 18.

[516] 1884-85 Ga. Laws 23, ch. 52; 1886 Ga. Laws 17, ch. 54.

[517] 1888 Ga. Laws 22, ch. 123.

[518] 1890 Ga. Laws 38, ch. 131.

[519] 1892 Ga. Laws 25, ch. 133.

[520] 1894 Ga. Laws 21, ch. 151; 1896 Ga. Laws 25, ch. 132; 1898 Ga. Laws 25, ch. 150 (changing ammunition to "shooting cartridges, pistol or rifle cartridges").

[521] 1884 Ga. Laws 30, ch. 457; 1886 Ga. Laws 26, 28, ch. 101; 1888 Ga. Laws 261, ch. 103; 1889 Ga. Laws 993, ch. 640.

[522] 1888 Ga. Laws 261, ch. 103.

[523] 1889 Ga. Laws 993, ch. 640.

[524] 1838 S.C. Acts (Journal to the Proceedings) 29, 31.

KR0744

*Tennessee* (1838).

Like Georgia, Tennessee enacted Bowie knife legislation just a few weeks after the nationally infamous December crime on the floor of the Arkansas House of Representatives.

In January 1838, the Tennessee legislature statute forbade sale or transfer of "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick."[525]

Further, if a person "shall maliciously draw or attempt to draw" such a concealed knife "for the purpose of sticking, cutting, awing, or intimidating any other person," the person would be guilty of a felony.[526] Whether the carrying was open or concealed, if a person in "sudden rencounter, shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony."[527] Civil officers who arrested and prosecuted a defendant under the act would receive a $50 per case bonus; the Attorney General would receive $20 for the same, to be paid by the defendant.[528]

The concealed carry ban was upheld against a state constitution challenge.[529] The court said that the right to arms was an individual right to keep militia-type arms, and a Bowie knife would be of no use to a militia.[530]

In *Day v. State*, the 1838 law against drawing a Bowie knife was applied against a victim who had drawn in immediate self-defense.[531] Upholding the

---

[525] ACTS PASSED AT THE FIRST SESSION OF THE TWENTY-SECOND GENERAL ASSEMBLY OF THE STATE OF TENNESSEE: 1837-8, 200–01 (Nashville: S. Nye & Co., 1838) (Jan. 21, 1838).

[526] *Id.*

[527] *Id.*

[528] *Id.*

[529] Aymette v. State, 21 Tenn. (2 Hum.) 154 (1840).

[530] *Id.* at 158 ("These weapons would be useless in war. They could not be employed advantageously in the common defence of the citizens. The right to keep and bear them is not, therefore, secured by the constitution.").

[531] Day v. State, 37 Tenn. (5 Sneed.) 496 (1857).

> It seems that during an altercation between the defendant and Bacon, at the house of the latter, the defendant was ordered by Bacon to leave the house, which he did, Bacon following him to the door, with a large bottle in his hand. While Bacon was standing upon the door-step, the defendant approached him and, laying his left hand upon Bacon's shoulder, told him not to rush upon him,

*Journal of Legislation*

conviction the Tennessee Supreme Court noted that laws against selling and carrying Bowie knives were "generally disregarded in our cities and towns."[532] Likewise, a post-Reconstruction statute, allowed carrying only of Army or Navy type pistols.[533] When a person's "life had been threatened within the previous hour by a dangerous and violent man, who was in the wrong," the victim carried a concealed pistol that was not an Army or Navy type.[534] The conviction was upheld, citing *Day v. State*.[535]

The legislature in 1856 forbade selling, loaning, or giving any minor "a pistol, bowie-knife, dirk, or Arkansas tooth-pick, or hunter's knife."[536] The act "shall not be construed so as to prevent the sale, loan, or gift to any minor of a gun for hunting."[537]

In October 1861, after Tennessee had seceded from the Union, all the laws against importing, selling, or carrying "pistols, Bowie knives, or other weapons" were suspended for the duration of the war.[538]

In 1869, the legislature forbade carrying any "pistol, dirk, bowie-knife, Arkansas tooth-pick," any weapon resembling a bowie knife or Arkansas toothpick, "or other deadly or dangerous weapon" while "attending any election" or at "any fair, race course, or public assembly of the people."[539]

*Virginia* (1838).

A few weeks after the Arkansas legislative crime, Virginia made it illegal to "habitually or generally" carry concealed "any pistol, dirk, bowie knife, or any other weapon of the like kind."[540] If a habitual concealed carrier were prosecuted for murder or felony, and the weapon had been removed from concealment within a half hour of the infliction of the wound, the court had to formally note the fact.[541] Even if the defendant were acquitted or discharged,

---

at the same time drawing a large knife from beneath his vest, which he held in his right hand behind him, but made no effort to use.
*Id.* at 496–97.

[532] *Id.* at 499.

[533] Text at notes __.

[534] *Coffee v. State*, 72 Tenn. (4 Lea.) 245, 246 (1880).

[535] *Id.*

[536] 1855-56 Tenn. Pub. Acts 92, ch. 81.

[537] *Id.*

[538] 1861 Tenn. Pub. Acts 16–17, ch. 23.

[539] 1869-70 Tenn. Pub. Acts 23-24, ch. 22.

[540] ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, PASSED AT THE SESSION OF 1838, at 76-77 (Richmond: Thomas Ritchie, 1838) (Feb. 3, 1838).

[541] *Id.*

he could be prosecuted within a year for the unlawful carry.[542] Or alternatively, in the original prosecution, a jury that acquitted for the alleged violent felony still had to consider whether the defendant was a habitual carrier, drew within the half-hour period, and if so, convict the defendant of the concealed carry misdemeanor.[543]

The law was simplified in 1847 to simply provide a fine for habitual concealed carry by "[a]ny free person," with "one moiety of the recovery to the person who shall voluntarily cause a prosecution for the same."[544]

An 1881 statute forbade concealed carry, even if not habitual, of "any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind."[545]

Whether or not concealed, carrying "any gun pistol, bowie-knife, dagger, or other dangerous weapon to a place of public worship" during a religious meeting was forbidden in 1869.[546] So was carrying "any weapon on Sunday, at any place other than his own premises, except for good and sufficient cause."[547]

After the Civil War, the state property tax law included in the list of taxable items of personal property: "The aggregate value of all rifles, muskets, and other fire-arms, bowie-knives, dirks, and all weapons of a similar kind."[548] There was an exception for arms issued by the state "to members of volunteer companies."[549]

The legislature in 1890 forbade selling "to minors under sixteen years of age" any "cigarettes or tobacco in any form, or pistols, dirks, or bowie knives."[550]

---

[542] *Id.*

[543] *Id.*

[544] 1847 Va. Acts 110; 1870 Va. Acts 510, ch. 349.

[545] 1881 Va. Acts 233, ch. 219; 1883-84 Va. Acts 180, ch. 144 (1884); 1896 Va. Acts 826, ch. 745 (allowing "the hustings judge of any husting court" to issue one-year concealed carry permits).

[546] 1875 Va. Acts 102, ch. 124; 1877 Va. Acts 305, ch. 7.

[547] 1875 Va. Acts 102, ch. 124; 1877 Va. Acts 305, ch. 7.

[548] 1874 Va. Acts 282–83, ch. 239; 1875 Va. Acts 164, ch. 162; 1881 Va. Acts 499, ch. 119; 1883 Va. Acts 563, ch. 450; 1889 Va. Acts 19, ch. 19; 1889 Va. Acts 200, ch. 244; 1893 Va. Acts 931, ch. 797.

[549] 1874 Va. Acts 282–83, ch. 239; 1875 Va. Acts 164, ch. 162; 1881 Va. Acts 499, ch. 119; 1883 Va. Acts 563, ch. 450; 1889 Va. Acts 19, ch. 19; 1889 Va. Acts 200, ch. 244; 1893 Va. Acts 931, ch. 797.

[550] 1889-90 Va. Acts 118, ch. 152; 1893-94 Va. Acts 425-26, ch. 366.

KR0747

*Journal of Legislation* [50:2

*Florida* (1838).

Two months after the Arkansas homicide, the Florida legislature supplemented an 1835 statute against concealed carry in general. The new statute provided that any person who wants to "vend dirks, pocket pistols, sword canes, or bowie knives" must pay an annual $200 tax.[551] Any individual who wants to carry one openly must pay a $10 tax.[552] The county treasurer must give the individual a receipt showing that the open carry tax has been paid.[553]

After the Civil War, a new Black Code forbade "any negro, mulatto, or other person of color, to own, use or keep in his possession or under his control, any Bowie-knife, dirk, sword, fire-arms or ammunition of any kind, unless he first obtain a license to do so from the Judge of Probate of the county."[554] The applicant needed "the recommendation of two respectable citizens of the county, certifying to the peaceful and orderly character of the applicant."[555] A person who informed about a violation could keep the arms.[556] Violators of the statute "shall be sentenced to stand in the pillory for one hour, or be whipped, not exceeding thirty-nine stripes, or both, at the discretion of the jury."[557]

There were no published Florida statutory compilations from 1840 until 1881. By then, the 1838 tax law ($200 annually for vendors; $10 for open carry), had been replaced with a $50 occupational license tax for vendors.[558] The merchant license tax was raised to $100 in 1889 for vendors of "pistols, bowie knives, or dirk knives."[559] Additionally, The "merchant, store-keeper, or dealer" could not sell the items "to minors."[560] The tax was cut to $10 in 1893, but extended to cover sellers of "pistols, Springfield rifles [the standard U.S. Army rifle], repeating rifles, bowie knives or dirk knives."[561]

---

[551] 1838 Fla. Laws 36, ch. 24 (Feb. 10, 1838).

[552] *Id.*

[553] *Id.*

[554] 1865 Fla. Laws 25, ch. 1466.

[555] *Id.*

[556] *Id.*

[557] *Id.*

[558] 1 Digest of the Laws of the State of Florida, from the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One Inclusive 873 (James F. McClellan, comp.) (1881) (Fla. ch. 174, § 24, item 14).

[559] 1889 Fla. Laws 6, ch. 3847 (2d reg. sess.); 1891 Fla. Laws 9, ch. 4010 (3d regular sess.).

[560] 1889 Fla. Laws 6, ch. 3847 (2d reg. sess.); 1891 Fla. Laws 9, ch. 4010 (3d regular sess.).

[561] 1893 Fla. Laws 18, ch. 4115 (4th regular sess.); 1895 Fla. Laws 14, ch. 4322 (5th regular sess.).

KR0748

*North Carolina* (1840).

In 1840, North Carolina prohibited "any free Negro, Mulatto, or free Person of Colour" to "wear or carry about his or her person, or keep in his or her house, any Shot-gun, Musket, Rifle, Pistol, Sword, Dagger or Bowie-knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions."[562] An 1846 statute forbade "any slave" to receive "any sword, dirk, bowie-knife, gun, musket, or fire-arms of any description whatsoever, or any other deadly weapons of offence, or any lead, leaden balls, shot, powder, gun cotton, gun flints, gun caps, or other material used for shooting."[563] There were exceptions if "a slave" with "written permission" from a "manager" were picking up items for the manager, or if the items were "to be carried in the presence of such manager."[564]

The state property tax laws covered Bowie knives and other arms. The arms were tax-exempt if the owner did not use or carry them:

> on all pistols (except such as shall be used exclusively for mustering, and also those kept in shops and stores for sale) one dollar each; on all bowie knives, one dollar each; and dirks and sword canes, fifty cents each; (except such as shall be kept in shops and stores for Sale) Provided, however, that only such pistols, bowie knives, dirks, and sword canes, as are used, worn or carried about the person of the owner. . . .[565]

In the arms licensing law for free people of color, the Black Code continued to treat Bowie knives like firearms. "If any free negro shall wear or carry about his person, or keep in his house, any shot-gun, musket, rifle, pistol, sword, dagger, or bowie-knife," he shall be guilty of a misdemeanor, unless he had been issued a one-year license from the court of pleas and quarter-sessions.[566] When the Civil War drew near, the legislature repealed the licensing law, and

---

[562] 1840 N.C. Sess. Laws 61, ch. 30–31.

[563] 1846 N.C. Sess. Laws 107, ch. 42.

[564] *Id.*

[565] 1850 N.C. Sess. Laws 243, ch. 121. *See also* 1856-57 N.C. Sess. Laws 34, ch. 34 (raising the tax on dirks and sword canes to 65 cents); 1866 N.C. Sess. Laws 33–34, ch. 21, § 11 (one dollar on "every dirk bowie-knife, pistol, sword-cane, dirk-cane and rifle cane (except for arms used for mustering and police duty) used or worn about the person of any one during the year"; tax did not "apply to arms used or worn previous to the ratification of this act").

[566] 1856 N.C. Sess. Laws 577, ch. 107, § 66.

KR0749

forbade "any free negro" to "wear or carry about his person or keep in his house any shot gun, musket, rifle, pistol, sword, sword cane, dagger, bowie knife, powder or shot."[567]

An 1877 private act banned concealed carry in Alleghany County, under terms similar to what would be enacted statewide in 1879.[568] The statewide statute outlawed concealed carry of "any pistol, bowie knife, dirk, dagger, slungshot, loaded cane, brass, iron or metallic knuckles or other deadly weapon of like kind," "except when upon his own premises."[569]

An 1893 statute made it illegal to "in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or slingshot."[570] A loaded cane had a hollowed section filled with lead.[571] It is a powerful impact weapon.[572]

As the legislature revised municipal charters, it specified what sorts of arms-related taxes the municipality could impose. There was much variation, and sometimes the legislature set maxima.[573]

---

[567] 1860–61 N.C. Sess. Laws 68, ch. 34 (Feb. 23, 1861).

[568] 1877 N.C. Sess. Laws 162–63, ch. 104.

[569] 1879 N.C. Sess. Laws 231, ch. 127.

[570] 1893 N.C. Sess. Laws 468–69, ch. 514.

[571] *See* Part VI.C.2.

[572] *Id.*

[573] In chronological order: Wilmington: to tax "every pistol gallery . . . on all pistols, dirks, bowie-knives or sword-canes, if worn about the person at any time during the year." 1860 N.C. Sess. Laws 219–20, ch. 180. Charlotte: $50 on "every pistol, bowie-knife, dirk, sword-cane, or other deadly weapons worn upon the person, except a pocket knife, without special permission of the board of aldermen." 1866 N.C. Sess. Laws 63, ch. 7, § 19. Salisbury: "on all pistols, except when part of stock in trade, a tax not exceeding one dollar; on all dirks, bowie-knives and sword canes, if worn about the person at any time during the year, a tax not exceeding ten dollars." 1868 N.C. Sess. Laws 202, ch. 123. Lincolnton: $5 for worn weapons. 1870 N.C. Sess. Laws 73, ch. 32. Lumberton: Can tax "pistols, dirks, bowie knives or sword canes" as seen fit. 1873 N.C. Sess. Laws 279, ch. 7; 1883 N.C. Sess. Laws 808, ch. 89 (Lumberton recharter); Asheville: anyone "selling pistols, bowie knives, dirks, slung shot, brass knuckles or other like deadly weapons, in addition to all other taxes, a license tax not exceeding fifty dollars." 1883 N.C. Sess. Laws 872, ch. 111. Waynesville: like Ashville, but $40. 1885 N.C. Sess. Laws 1097, ch. 127. Reidsville: $25 "On every pistol, bowie-knife, dirk, sword-cane, or other deadly weapon, except carried by officers in the discharge of their duties." 1887 N.C. Sess. Laws 885, ch. 58, § 50. Rockingham: to tax pistols, dirks, bowie knives, or sword canes. 1887 N.C. Sess. Laws 988, ch. 101. Hickory: $50 on sellers; "sling-shots" replaces "slung shot." 1889 N.C. Sess. Laws 956, ch. 238. Marion: $25 on every "pistol, bowie-knife, dirk, sword-cane or other deadly weapon, except carried by officers in discharge of their duties." 1889 N.C. Sess. Laws 836, ch. 183, § 27. Mount Airy: $10 on open carry of "a pistol, bowie-knife, dirk, sword-cane or other deadly

KR0750

*Washington territory* (1854).

Similar to 1837 Mississippi, the Washington Territory provided a criminal penalty for, "Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon . . ."[574]

*California* (1855).

California adopted a more elaborate version of the 1837 Mississippi law that if a person killed another in a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword or other dangerous weapon," the duelist would have to pay the decedent's debts.[575] The duelist would also be liable to the decedent's family for liquidated damages.[576]

*Louisiana* (1855).

The legislature banned concealed carry of "pistols, bowie knife, dirk, or any other dangerous weapon."[577]

During Reconstruction, when election violence was a major problem, the legislature forbade carry of "any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed weapon" within a half-mile of a polling place when the polls were open, or within a half-mile of a voter registration site on registration days.[578]

---

weapon, except guns, shot-guns, and rifles for shooting game." Wadesborough: "on all pistols, dirks, bowie-knives, or sword-canes." 1891 N.C. Sess. Laws 705, ch. 26. Columbus: same. 1891 N.C. Sess. Laws 902, ch. 101. Buncombe: same. 1891 N.C. Sess. Laws 1423, ch. 327. Asheville: $500 on vendors selling "pistols, bowie-knives, dirks, slung-shots, brass or metallic knuckles, or other deadly weapons of like character." 1895 N.C. Sess. Laws 611, ch. 352. Morven: "on all pistols, dirks, bowie knives, or sword canes." 1897 N.C. Sess. Laws 115–16, ch. 71. Lilesville: same. 1897 N.C. Sess. Laws 237, ch. 130. Mount Airy: $75 on "every vendor or dealer in pistols and other deadly weapons." 1897 N.C. Sess. Laws 154, ch. 90. Salisbury: same $500 as Asheville. 1899 N.C. Sess. Laws 503, ch. 186. Monroe: Same, but $100. 1899 N.C. Sess. Laws 968, ch. 352. Manly: tax "on all pistols, dirks, bowie knives or sword canes." 1899 N.C. Sess. Laws 766, ch. 260.

[574] 1854 Wash. Sess. Laws 80, ch. 2; 1859 Wash. Sess. Laws 109, ch. 2; 1862 Wash. Sess. Laws 284, ch. 2; 1869 Wash. Sess. Laws 203–04, ch. 2; 1873 Wash. Sess. Laws 186, ch. 2.

[575] 1855 Cal. Stat. 152–53, ch. 127.

[576] *Id.*

[577] 1855 La. Acts 148, ch. 120; 1898 La. Acts. 159, ch. 112 (same).

[578] 1870 La. Acts 159–60, ch. 100; 1873 La. Acts. 27, ch. 98.

KR0751

Giving a person "under age of twenty-one years" any "any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person" was forbidden.[579]

*New Hampshire* (1856).

Like all of the Northeast, New Hampshire in mid-century had no interest in Bowie knife laws. But Bowie knives did appear in a legislative resolution that considered Bowie knives and revolvers to be effective for legitimate defense.

On May 19, 1856, U.S. Sen. Charles Sumner (R-Mass.) delivered one of the most famous speeches in the history of the Senate, "The Crime Against Kansas."[580] Among the crimes he described, pro-slavery settlers in the Kansas Territory were trying to make Kansas a slave territory, by attacking and disarming anti-slavery settlers, in violation of the Second Amendment. Sumner turned his fire on South Carolina Democrat Andrew Butler:

> Next comes the Remedy of Folly . . . from the senator from South Carolina, who . . . thus far stands alone in its support. . . . This proposition, nakedly expressed, is that the people of Kansas should be deprived of their arms.
>
> . . .
>
> Really, sir, has it come to this? The rifle has ever been the companion of the pioneer, and, under God, his tutelary protector against the red man and the beast of the forest. Never was this efficient weapon more needed in just self-defence than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached. And yet, such is the madness of the hour, that, in defiance of the solemn guaranty, embodied in the Amendments of the Constitution, that "the right of the people to keep and bear arms shall not be infringed," the people of Kansas have been arraigned for keeping and bearing them, and the senator from South Carolina has had the face to say openly, on this floor, that they should be disarmed — of course, that the fanatics of Slavery, his allies and constituents, may meet no

---

[579] 1890 La. Acts 39, ch. 46.
[580] Speech of Hon. Charles Sumner, in the Senate of the United States, 19th and 20th, May 1856.

KR0752

> impediment. Sir, the senator is venerable . . . but neither his years, nor his position, past or present, can give respectability to the demand he has made, or save him from indignant condemnation, when, to compass the wretched purposes of a wretched cause, he thus proposes to trample on one of the plainest provisions of constitutional liberty.[581]

That wasn't even close to the worst that Sumner said about Brooks that day. Most notably, he compared Butler to Don Quixote:

> The senator from South Carolina has read many books of chivalry, and believes himself a chivalrous knight, with sentiments of honor and courage. Of course he has chosen a mistress to whom he has made his vows, and who, though ugly to others, is always lovely to him; though polluted in the sight of the world, is chaste in his sight; — I mean the harlot Slavery.[582]

Three days later, Butler's nephew, U.S. Rep. Preston Brooks (D-S.C.) snuck up behind Sumner while he working at his desk on the Senate floor and assaulted him with a cane.[583] He nearly killed Sumner, who was not able to resume his Senate duties for two and a half years.[584] The assault was widely applauded in the South.[585] The attack symbolized a broader problem: In the slave states, the law and the mobs suppressed any criticism of slavery, lest it inspire slave revolt.[586] Even in free states, abolitionist speakers were attacked by mobs.[587]

---

[581] *Id.* at 64–65.

[582] *Id.* at 9.

[583] *See* Gregg M. McCormick, Note, *Personal Conflict, Sectional Reaction: The Role of Free Speech in the Caning of Charles Sumner*, 85 Tex. L. Rev. 1519, 1526–27 (2007).

[584] *See id.* at 1527.

[585] *See id.* at 1529–33.

[586] *See id.* at 1519–20 ("Prior to the Sumner-Brooks affair, the suppression of abolitionist mailings, the Congressional Gag Rule, the murder of Reverend Lovejoy, and suppression of antislavery speech in the Kansas Territory served as concrete examples of slavery's threat to Northern rights.").

[587] *See, e.g., McDonald*, 561 U.S. at 846 (Thomas, J., concurring) ("Mob violence in many Northern cities presented dangers as well."); Michael Kent Curtis, *The Fraying Fabric of Freedom: Crisis and Criminal Law in Struggles for Democracy and Freedom of Expression*, 44 TEX. TECH. L. REV. 89, 102 (2011) ("In the North, mobs disrupted abolitionist meetings and destroyed the presses of anti-slavery newspapers.").

In response, the New Hampshire legislature on July 12 passed a resolution "in relation to the late acts of violence and bloodshed by the Slave Power in the Territory of Kansas, and at the National Capital."[588] As one section of the resolution observed, it was becoming difficult for people to speak out against slavery unless they were armed for self-defense:

> Resolved, That the recent unmanly and murderous assaults which have disgraced the national capital, are but the single outbursts of that fierce spirit of determined domination which has revealed itself so fully on a larger field, and which manifests itself at every point of contact between freedom and slavery, and which, if it shall not be promptly met and subdued, will render any free expression of opinion, any independence of personal action by prominent men of the free States in relation to the great national issue now pending, imprudent and perilous, unless it shall be understood that it is to be backed up by the bowie-knife and the revolver.[589]

Despised as Bowie knives and revolvers were by some slave state legislatures, New Hampshire recognized that the First Amendment is backed up by the Second Amendment, as a last resort.

*Texas* (1856).

Bowie knives were omnipresent in Texas. The Texan had won their independence from Mexico at the April 21, 1836, Battle of San Jacinto. Outnumbered, they had routed the Mexican army, in part thanks to their deadly Bowie knives.[590]

Many Texans carried a Bowie knife. Texans were described as "desperate whittlers of sticks," who would start whittling whenever a conversation began.[591] But the Texans were not carrying Bowie knives because they were whittling addicts. As a visiting British diplomat reported, murder and other crime was rampant, and "the Perpetrators escape with the greatest impunity .

---

[588] 1856 N.H. Laws 1781–82, ch. 1870.

[589] *Id.*

[590] *See* Charles Edwards Lester, Sam Houston and His Republic 97 (1846).

[591] *See* Joseph William Schmitz, Texas Culture 1836-1846, at 22 (1960); N. Doran Maillard, History of the Republic of Texas from the Discovery of the Country to the President Time 213 (1842).

. . It is considered unsafe to walk through the Streets of the principal Towns without being armed. The Bowie Knife is the weapon most in vogue."[592]

After a decade as an independent republic, Texas joined the United States on December 29, 1845. An 1856 statute provided that if a person used a "bowie knife" or "dagger" in manslaughter, the offense "shall nevertheless be deemed murder, and punished accordingly." A "bowie knife" or "dagger" were defined as "any knife intended to be worn upon the person, which is capable of inflicting death, and not commonly known as a pocket knife."[593]

The Texas Supreme Court upheld the law in *Cockrum v. State*.[594] Under the Second Amendment and the Texas Constitution right to arms and the Second Amendment, "The right to carry a bowie-knife for lawful defense is secured, and must be admitted."[595] However, extra punishment for a crime with a Bowie knife did not violate the right to arms.[596]

In the chaotic years after the Civil War, the legislature prohibited carrying "any gun, pistol, bowie-knife or other dangerous weapon, concealed or unconcealed," within a half mile of a polling place while the polls are open.[597]

Then came one of the most repressive anti-carry laws enacted by an American state in the nineteenth century. It did not apply to long guns. It did apply to "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense."[598] Both open and concealed carry were

---

[592] Francis Sheridan, letter to Garraway, July 12, 1840, 15 BRITISH CORRESPONDENCE Q. 221; SCHMITZ at 80.

[593] Tex. Penal Code arts. 611–12 (enacted Aug. 28, 1856), *in* 1 A DIGEST OF THE GENERAL STATUTE LAWS OF THE STATE OF TEXAS: TO WHICH ARE SUBJOINED THE REPEALED LAWS OF THE REPUBLIC AND STATE OF TEXAS (Williamson S. Oldham & George W. White, comp.) 458 (1859). *See also* art. 493 (doubling penalty for assault with intent to murder, if perpetrated with "a bowie knife, or dagger"); 1871 Tex. Gen. Laws 20, ch. 26 (doubling penalty for perpetrator "in disguise").

[594] 24 Tex. 394 (1859).

[595] *Id.* at 402.

[596] *Id.* at 403. "Such admonitory regulation of the abuse must not be carried too far. It certainly has a limit. For if the legislature were to affix a punishment to the abuse of this right, so great, as in its nature, it must deter the citizen from its lawful exercise, that would be tantamount to a prohibition of the right." *Id.*

[597] 1870 Tex. Gen. Laws 139, ch. 73.

[598] 1871 Tex. Gen. Laws 25–26, ch. 34; 1887 Tex. Gen. Laws 7, ch. 9 (amending); 1889 Tex. Gen. Laws 33, ch. 37; 1897 Tex. Gen. Laws 24, ch. 25.

forbidden.[599] The exceptions were "immediate and pressing" self-defense, or in a person's home or business, or travelers with arms in their baggage.[600] Another section of the bill banned all firearms, plus the arms previously listed, from many places, including churches, all public assemblies, and even "a ball room, social party, or social gathering."[601] The Act did not apply in any county proclaimed by the Governor "as a frontier county, and liable to incursions of hostile Indians."[602]

The Texas Supreme Court upheld the handgun carry ban in 1872.[603] According to the court, the statutory exceptions to the carry ban (travelers, or in response to a specific threat, or in militia service) sufficiently allowed the exercise of the right to bear arms.

The court stated that the Texas right to arms protected only arms that "are used for purposes of war," such as "musket and bayonet . . . the sabre, holster pistols and carbine . . . the field piece, siege gun, and mortar, with side arms [military handguns]."[604] In contrast, the Constitution did not cover arms "employed in quarrels and broils, and fights between maddened individuals," such as "dirks, daggers, slungshots, swordcanes, brass-knuckles and bowie knives."[605]

In 1889, written consent of a parent, guardian, "or someone standing in lieu thereof" was required to give or sell to a minor a pistol, "bowie knife or any other knife manufactured or sold for the purpose of offense of defense," and various other weapons.[606] The statute did not apply to long guns.[607]

*New Mexico* (1858).

The territory's first Bowie knife law outlawed giving "to any slave any sword, dirk, bowie-knife, gun, pistol or other fire arms, or any other kind of

---

[599] 1871 Tex. Gen. Laws 25–26, ch. 34; 1887 Tex. Gen. Laws 7, ch. 9 (amending); 1889 Tex. Gen. Laws 33, ch. 37; 1897 Tex. Gen. Laws 24, ch. 25.

[600] 1871 Tex. Gen. Laws 25–26, ch. 34; 1887 Tex. Gen. Laws 7, ch. 9 (amending); 1889 Tex. Gen. Laws 33, ch. 37; 1897 Tex. Gen. Laws 24, ch. 25.

[601] 1871 Tex. Gen. Laws 25–26, ch. 34; 1887 Tex. Gen. Laws 7, ch. 9 (amending); 1889 Tex. Gen. Laws 33, ch. 37; 1897 Tex. Gen. Laws 24, ch. 25.

[602] 1871 Tex. Gen. Laws 25–26, ch. 34; 1887 Tex. Gen. Laws 7, ch. 9 (amending); 1889 Tex. Gen. Laws 33, ch. 37; 1897 Tex. Gen. Laws 24, ch. 25.

[603] English v. State, 35 Tex. 473 (1872).

[604] *Id*. at 476.

[605] *Id*. at 475. The Texas court was plainly wrong that Bowie knives are not used in warfare. *See* text at notes __.

[606] 1887 Tex. Gen. Laws 221–22, ch. 155.

[607] *Id*.

deadly weapon of offence, or any ammunition of any kind suitable for fire arms."[608] Slavery in New Mexico was usually in the form of peonage.[609] The Comanche and Ute Indians, among others, brought captives from other tribes to the territory and sold them to buyers of all races.[610]

Concealed and open carry were prohibited in 1859. The scope was expansive:

> any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or called . . .[611]

New Mexico was part of a pattern: legislative enthusiasm for Bowie knife laws was greatest in slave states. After slavery was abolished by the 13th Amendment in December 1865, the most oppressive Bowie knife controls and gun controls were enacted in areas where slavery had been abolished by federal action, rather than by choice of the legislature before the Civil War.

An 1887 statute forbade almost all carry of Bowie knives and other arms.[612] It applied to defined "deadly weapons":

> all kinds and classes of pistols, whether the same be a revolver, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards [small, thin daggers], butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed

---

[608] 1856 N.M. Laws 68, ch. 26.

[609] *See* ANDRÉS RESÉNDEZ, THE OTHER SLAVERY: THE UNCOVERED STORY OF INDIAN ENSLAVEMENT IN AMERICA (2016).

[610] *See id.*

[611] 1859 N.M. Laws 94–96; 1864-65 N.M. Laws 406–10, ch. 61.

Territorial statues were published bilingually. The arms list in Spanish: "ninguna pistola de cualesquiera clase que sea, ni bowie knife (cachillo de cinto) [*s.i.c.* cuchillo, lit., belt knife] Arkansas toothpick, daga española, huracana, ó cualesquiera otra arma mortifera de cualesquiera clase ó descripcion."

[612] 1886-87 N.M. Laws 55–58, ch. 30.

KR0757

> canes: as also slung shots, bludgeons or any other deadly weapons
> with which dangerous wounds can be inflicted . . .[613]

A person carrying a deadly weapon was not allowed to "insult or assault another."[614] Nor to unlawfully "draw, flourish, or discharge" a firearm, "except in the lawful defense of himself, his family or his property."[615]

The law forbade carrying "either concealed or otherwise, on or about the settlements of this territory."[616] The statute defined a "settlement" as anyplace within 300 yards of any inhabited house.[617] The exceptions to the carry ban were:

> in his or her residence, or on his or her landed estate, and in the
> lawful defense of his or her person, family, or property, the same
> being then and there threatened with danger . . .[618]

Travelers could ride armed through a settlement.[619] If they stopped, they had to disarm within 15 minutes, and not resume until the eve of departure.[620] Hotels, boarding houses, saloons, and similar establishments had to post bilingual copies of the Act.[621]

Law enforcement officers "may carry weapons . . . when the same may be necessary, but it shall be for the court or the jury to decide whether such carrying of weapons was necessary or not, and for an improper carrying or using deadly weapons by an officer, he shall be punished as other persons are punished. . . ."[622]

*Ohio* (1859).

Without limiting open carry, the legislature prohibited concealed carry of "a pistol, bowie knife, dirk, or any other dangerous weapon."[623] The jury must acquit if it were proven that the defendant was "engaged in pursuit of any

---

[613] *Id.*
[614] *Id.*
[615] *Id.*
[616] *Id.*
[617] *Id.*
[618] *Id.*
[619] *Id.*
[620] *Id.*
[621] *Id.*
[622] *Id.*
[623] 1859 Ohio Laws 56–57.

lawful business, calling, or employment, and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property, or family…"[624]

*Kentucky* (1859).

"If any person, other than the parent or guardian, shall sell, give, or loan, any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt [similar to a slungshot], cane-gun, or other deadly weapon which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars."[625]

In 1891, an occupational license tax was enacted: "To sell pistols," $25. "To sell bowie-knives, dirks, brass-knucks or slung-shots," $50.[626]

*Indiana* (1859).

Except for travelers, no concealed carry of "any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon."[627] Open carry of such weapons was unlawful, if "with the intent or avowed purpose of injuring his fellow man."[628]

It was forbidden in 1875 to give any person "under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person."[629] Or to give such person pistol ammunition.[630]

*Nevada* (1861).

If a person fought a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon," and killed his opponent or anyone else, the killing was murder in the first degree.[631]

---

[624] *Id.*
[625] 1859 Ky. Acts 245, ch. 33.
[626] 1885 Ky. Acts 154, ch. 1233; 1891 Ky. Acts 346, ch. 103 (Nov. 11, 1892); 1891-92 Ky. Acts 1001, ch. 217 (June 9, 1893).
[627] 1859 Ind. Acts 129, ch. 78; 1881 Ind. Acts 191, ch. 37.
[628] *Id.*
[629] 1875 Ind. Acts 59, ch. 40.
[630] *Id.*
[631] 1861 Nev. Stat. 61.

*Idaho territory* (1863).
 Like Nevada.[632]

*Montana territory* (1864).
 No concealed carry "within any city, town, or village" of "any pistol, bowie-knife, dagger, or other deadly weapon."[633] Duelists who kill using "a rifle, shot-gun, pistol, bowie-knife, dirk, small sword, back-sword, or other dangerous weapon" are guilty of murder.[634]

*Colorado territory* (1867).
 No concealed carry "within any city, town or village" of "any pistol, bowie-knife, dagger or other deadly weapon."[635]

*Arizona territory* (1867).
 Split from the New Mexico Territory in 1863, the new Arizona Territory did not copy New Mexico's 1859 comprehensive carry ban. Instead, the laws targeted misuse. Anyone "who shall in the presence of two or more persons, draw or exhibit" any "dirk, dirk knife, bowie knife, pistol, gun, or other deadly weapon," "in a rude, angry or threatening manner, not in necessary self defence" was guilty of a crime.[636] So was anyone "who shall in any manner unlawfully use the same in any fight or quarrel."[637]
 Carrying "maliciously or with design therewith, to intimidate or injure his fellow-man," was specifically forbidden for everyone "in the Counties of Apache and Graham, over the age of ten years."[638] The arms were "any dirk, dirk-knife, bowie-knife, pistol, rifle, shot-gun, or fire-arms of any kind."[639]
 Reenacting the statute against drawing a gun in a threatening manner, the 1883 legislature added a proviso against persons "over the age of ten and under the age of seventeen years" carrying concealed or unconcealed "any dirk, dirk-knife, bowie-knife, slung-shot, brass-knuckles, or pistol" in any city, village, or

---

[632] 1863 Ida. Sess. Laws 441, ch. 3; 1864 Ida. Sess. Laws 303–04, ch. 3.
[633] 1864-65 Mont. Laws 355.
[634] 1879 Mont. Laws 359, ch. 4; 1887 Mont. Laws 505, ch. 4.
[635] 1867 Colo. Sess. Laws 229, ch. 22; 1876 Colo. Sess. Laws 304, ch. 24; 1881 Colo. Sess. Laws 74 (post-statehood); 1885 Colo. Sess. Laws 170; 1891 Colo. Sess. Laws 129 ("any pistol, revolver, derringer, bowie-knife, razor, dagger, sling-shot or other deadly weapon").
[636] 1867 Ariz. Sess. Laws 21; 1875 Ariz. Sess. Laws 101.
[637] *Id.*
[638] 1883 Ariz. Sess. Laws 21–22, ch. 19.
[639] *Id.*

town.[640] Concealed carry of those same arms in a city, village, or town was forbidden for everyone in 1887.[641] And then everywhere in 1893, for "any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife or weapon except a pocket-knife not manufactured and used for the purpose of offense and defense."[642]

In 1889 Arizona enacted an open carry ban in "any settlement town village or city," for any "firearm, dirk, dagger, slung shot, sword-cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense."[643] Arriving travelers could carry for the first half hour, or on the way out of town.[644] Hotels had to post notices about the no carry rule.[645] Carry was also forbidden at public events, and even at some private social gatherings.[646]

*Illinois* (1867).

The legislature's revision of the municipal charter of Bloomington allowed the town "To regulate or prohibit" concealed carry of "any pistol, or colt, or slung-shot, or cross knuckles, or knuckles of brass, lead or other metal, or bowie-knife, dirk-knife, dirk or dagger or any other dangerous or deadly weapon."[647]

Only a "father, guardian or employer" or their agent could give a minor "any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character."[648]

*Kansas* (1868).

No carrying of "a pistol, bowie-knife, dirk or other deadly weapon" by any "person who is not engaged in any legitimate business, any person under the

---

[640] 1883 Ariz. Sess. Laws 65–66, ch. 36.
[641] 1887 Ariz. Sess. Laws 726, ch. 11.
[642] 1893 Ariz. Sess. Laws 3, ch. 2.
[643] 1889 Ariz. Sess. Laws 30–31, ch. 13.
[644] *Id.*
[645] *Id.*
[646] *Id.*
[647] 1867 Ill. Laws 650.
[648] 1881 Ill. Laws 73.

influence of intoxicating drink, and any person who has ever borne arms against the government of the United States."[649]

No furnishing of "any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind"[650] "Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor."[651]

*West Virginia* (1868).

An 1868 statute copied Virginia's law against "habitually" carrying a concealed "pistol, dirk, bowie knife, or weapon of the like kind."[652] Justices of the Peace had a duty to enforce the statute.[653]

Then in 1882, West Virginia adopted a law similar to the Texas carry ban of 1871.[654] Without restricting carry of long guns, it broadly outlawed carrying pistols, Bowie knives, and numerous other arms.[655] Among the exceptions were that the person had "good cause to believe he was in danger of death or great bodily harm."[656] Additionally, there was a prohibition on selling or furnishing such arms to a person under 21.[657]

The West Virginia Supreme Court of Appeals in *State v. Workman* upheld the statute, because the arms protected by the Second Amendment:

> must be held to refer to the weapons of warfare to be used by the militia, such as swords, guns, rifles, and muskets—arms to be used in defending the State and civil liberty—and not to pistols, bowie-knives, brass knuckles, billies, and such other weapons as are usually employed in brawls, street-fights, duels, and affrays, and are only habitually carried by bullies, blackguards, and

---

[649] 1868 Kan. Sess. Laws 378, ch/ 31.

[650] 1883 Kan. Sess. Laws 159, ch. 55.

[651] *Id.*

[652] Code of West Virginia Comprising Legislation to the Year 1870, ch. 148, p. 692.

[653] 1872-73 W.V. Acts 709, ch. 226, *in* CONSTITUTION AND SCHEDULE ADOPTED IN CONVENTION AT CHARLESTON, APRIL 9TH, 1872 (Charleston, W.V.: John W. Gentry, 1874).

[654] 1882 W.V. Acts 421–22, ch. 135.

[655] *Id.*

[656] *Id.*

[657] *Id.*

desperadoes, to the terror of the community and the injury of the State.[658]

*Maryland* (1870).

Any person who was arrested in Baltimore, brought to the station house, and found to be carrying "any pistol, dirk, bowie knife," various other weapons, "or any other deadly weapon whatsoever" would be fined 3 to 10 dollars.[659]

It became illegal in 1872 in Annapolis to carry concealed "any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron, or other metal knuckles, or any other deadly weapon."[660]

A ban on carrying "with the intent of injuring any person," was enacted in 1886 for "any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor or any other dangerous of deadly weapon of any kind whatsoever, (penknives excepted)."[661]

*District of Columbia* (1871).

The Legislative Assembly of the District of Columbia prohibited concealed carry of "any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles."[662]

In 1892, Congress enacted a similar statute for D.C., with additional provisions.[663] It prohibited concealed carry of the same weapons as 1871, plus "blackjacks."[664] A concealed carry permit valid up to one month could be issued by any Judge of Police Court, with "proof of the necessity," and a bond.[665]

---

[658] State v. Workman, 14 S.E. 9, 11 (W. Va. 1891).

[659] 1870 Md. Laws 892, ch. 473. Reenactments, changes in the fine amount: 1874 Md. Laws 243–44, ch. 178; 1884 Md. Laws 249–50, ch. 187; 1890 Md. Laws 606–07, ch. 534; 1898 Md. Laws 533, ch. 123.

[660] 1872 Md. Laws 56–57, ch. 42.

[661] 1886 Md. Laws 602, ch. 375.

[662] 1 THE COMPILED STATUTES IN FORCE IN THE DISTRICT OF COLUMBIA, INCLUDING THE ACTS OF THE SECOND SESSION OF THE FIFTIETH CONGRESS, 1887–89 (William Stone Albert & Benjamin G. Lovejoy, comps.) 178, § 119 (1894) (citing Leg. Assem., July 20, 1871).

[663] 27 Stat. 116–17, ch. 159 (July 13, 1892).

[664] *Id.*

[665] *Id.*

Open carry was lawful, except "with intent to unlawfully use."[666] The statute was not to be construed to prevent anyone "from keeping or carrying about his place of business, dwelling house, or premises" the listed arms, or from taking them to and from a repair place.[667]

Giving a deadly weapon to a minor was forbidden.[668] Vendors had to be licensed by Commissioners of the District of Columbia.[669] The license itself was "without fee," but the licensee could be required to post a bond.[670] Sellers had to keep a written list of purchasers, which was subject to police inspection.[671] Weekly sales reports to the police were required.[672]

*Nebraska* (1873).

No concealed carry of weapons "such as a pistol, bowie-knife, dirk, or any other dangerous weapon."[673] As in Ohio, there was a "prudent man" defense.[674]

A revised municipal charter for Lincoln made it unlawful in the city to carry "any concealed pistol, revolver, dirk, bowie knife, billy, sling-shot, metal knuckles, or other dangerous or deadly weapons of any kind."[675] The city's police were authorized to arrest without a warrant a person found "in the act of carrying" concealed "and detain him."[676]

*Missouri* (1874).

Concealed carry was forbidden in many locations:

> [A]ny church or place where people have assembled for religious worship, or into any school-room, or into any place where people may be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for other than militia drill or meetings, called under the militia law of this state, having concealed about

---

[666] *Id.*
[667] *Id.*
[668] *Id.*
[669] *Id.*
[670] *Id.*
[671] *Id.*
[672] *Id.*
[673] 1873 Neb. Laws 724; 1875 Neb. Laws 3; 1899 Neb. Laws 349, ch. 94.
[674] 1873 Neb. Laws 724; 1875 Neb. Laws 3; 1899 Neb. Laws 349, ch. 94.
[675] 1895 Neb. Laws 209–10.
[676] *Id.*

KR0764

> his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon…[677]

This was similar to the 1871 Texas statute, but unlike Texas, it applied only to concealed carry.

Like states from 1837 Mississippi onward, Missouri forbade the exhibit of "any kind of firearms, bowie knife, dirk, dagger, slung shot or other deadly weapon, in a rude, angry or threatening manner, not in the necessary defence of his person, family or property."[678]

The exhibiting statute and the concealed carry statute were combined in 1885.[679] The new law also forbade carrying the listed weapons when intoxicated or under the influence.[680] Providing one of the arms to a minor "without the consent of the parent or guardian" was outlawed.[681]

*Arkansas* (1874).

Antebellum Arkansas had legislation against concealed carry, but not specifically about Bowie knives.

The 1874 election was the first in which the voting rights of former Arkansas Confederates were fully restored.[682] They elected Democratic majorities and ended Reconstruction.[683] In 1875, the new state legislature banned the open or concealed carry of "any pistol of any kind whatever, or any dirk, butcher or Bowie knife, or sword or spear in a cane, brass or metal knucks, or razor, as a weapon."[684]

The next year, the state Supreme Court heard a case of a man who had been convicted of carrying a pocket revolver.[685] In *Fife v. State*, the Arkansas court quoted with approval a recent Tennessee case stating that the state constitution right to arms covered,

---

[677] 1874 Mo. Laws 43; 1875 Mo. Laws 50–51.

[678] 1877 Mo. Laws 240.

[679] 1885 Mo. Laws 140.

[680] *Id.*

[681] *Id.*

[682] *Civil War through Reconstruction, 1861 through 1874*, THE ENCYCLOPEDIA OF ARKANSAS HISTORY & CULTURE, http://www.encyclopediaofarkansas.net/encyclopedia/entry-detail.aspx?entryID=388.

[683] *Id.*

[684] 1874-75 Ark. Acts 156–57 (Feb. 16, 1875).

[685] Fife v. State, 31 Ark. 455, 455–56 (1876).

KR0765

Such, then, as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties, as well as of the State. Under this head, with a knowledge of the habits of our people, and of the arms in the use of which a soldier should be trained, we hold that the rifle, of all descriptions, the shot gun, the musket and repeater, are such arms, and that, under the Constitution, the right to keep such arms cannot be infringed or forbidden by the Legislature.[686]

The Arkansas court continued: "The learned judge might well have added to his list of war arms, the sword, though not such as are concealed in a cane."[687] The pocket pistol not being a war arm, the defendant's conviction was upheld.[688] Needless to say, *Fife*'s protection of "the rifle of all descriptions" makes *Fife* and the 1875 statute poor precedents for today's efforts to outlaw common rifles.

Two years later, a conviction for concealed carry of "a large army size pistol" was reversed:[689]

[T]o prohibit the citizen from wearing or carrying a war arm . . . [was] an unwarranted restriction upon [the defendant's] constitutional right to keep and bear arms.

If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege."[690]

The legislature responded in 1881 with a new statute against the sale or disposition of "any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as

---

[686] *Id.* at 460.
[687] *Id.*
[688] *Id.* at 461.
[689] Wilson v. State, 33 Ark. 557, 560 (1878).
[690] *Id.*

are used in the army or navy."[691] As discussed *supra*, the 1881 Arkansas statute might have been consistent with the state constitution, but it is contrary to modern Second Amendment doctrine.[692]

*Wisconsin* (1874).

Some municipal charters enacted or amended by the Wisconsin legislature included provisions authorizing localities to regulate or prohibit concealed carry "of any pistol or colt, or slung shot, or cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon."[693]

*Wyoming* (1882).

As in other states, it was unlawful to "exhibit any kind of fire arms, bowie knife, dirk, dagger, slung shot or other deadly weapon in a rude, angry or threatening manner not necessary to the defense of his person, family or property."[694]

---

[691] 1881 Ark. Acts 191–92, ch. 96 § 3. The carry ban in section 1 was phrased slightly differently from the quoted sales ban in section 3. The section 1 carry ban applied to "or a sword, or a spear in a cane." The section 1 carry ban could, in isolation, be read as a banning all sword carry. Whereas section 3 is only about concealed swords—that is swords/spears in a cane.

The best reading of the statute as whole is application to sword canes, and not to ordinary swords. A ban on sword sales or open carry would have directly defied the Arkansas Supreme Court's recent *Wilson* decision. Such defiance seems unlikely, since the legislature was adjusting the law (by allowing open carry of Army & Navy handguns) to comply with the Arkansas Supreme Court ruling.

[692] Text at notes __.

[693] 1874 Wis. Sess. Laws 334 (Milwaukee); 1875 Wis. Sess. Laws 471, ch. 262 (Green Bay); 1876 Wis. Sess. Laws 218, ch. 103 (Platteville); 1876 Wis. Sess. Laws 737, ch. 313 (Racine); 1877 Wis. Sess. Laws 367, ch. 162 (New London); 1878 Wis. Sess. Laws 119–20, ch. 112 (Beaver Dam); 1882 Wis. Sess. Laws 309, ch. 92 (Lancaster); 1882 Wis. Sess. Laws 524, ch. 169 (Green Bay); 1883 Wis. Sess. Laws 713, ch. 183 (Oshkosh); 1883 Wis. Sess. Laws 990, ch. 341 Sturgeon Bay); 1883 Wis. Sess. Laws 1034, ch. 351 (Nicolet); 1885 Wis. Sess. Laws 26, ch. 37 (Kaukauna); 1885 Wis. Sess. Laws 753, ch. 159 (Shawano); 1885 Wis. Sess. Laws 1109, ch. 227 (Whitewater); 1887 Wis. Sess. Laws 336, ch. 124 (Sheboygan); 1887 Wis. Sess. Laws 1308, ch. 161 (Clintonville); 1887 Wis. Sess. Laws 754, ch. 162 (La Crosse); 1887 Wis. Sess. Laws 1308, ch. 409 (Berlin); 1891 Wis. Sess. Laws 699, ch. 123 (Menasha); 1891 Wis. Sess. Laws 61, ch. 23 (Sparta); 1891 Wis. Sess. Laws 186, ch. 40 (Racine).

[694] 1882 Wyo. Sess. Laws 174, ch. 81; 1884 Wyo. Sess. Laws 114, ch. 67.

KR0767

*Oklahoma territory* (1890).

Oklahoma had a confusing statute, although what matters for present purposes is that the law applied to "any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense."[695] Section 1 forbade anyone to "carry concealed on or about his person, or saddle bags" the aforesaid arms, which do not include long guns.[696] Section 2 made it illegal "to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon."[697] Unlike section 1, section 2 applied to carry in general, not just concealed carry.[698] Whereas the residual term of section 1 was anything "manufactured or sold for the purpose of defense," the section 2 residual was "any other offensive or defensive weapon."[699] What the difference was is unclear. Section 3 banned sales of the aforesaid items to minors.[700] The statute affirmed the legality of carrying long guns for certain purposes, such as hunting or repair.[701]

*Iowa* (1887).

There was no state legislation on Bowie knives in the nineteenth century, notwithstanding the California Attorney General's claim in a brief that "Iowa banned their possession, along with the possession of other 'dangerous or deadly weapon[s],' in 1887."[702]

---

[695] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[696] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[697] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[698] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[699] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[700] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[701] 1890 Okla. Sess. Laws 495, ch. 25; 1893 Okla. Sess. Laws 503, ch. 25.

[702] Defendant's Supplemental Brief in Response to the Court's Order of September 26, 2022, *Duncan v. Bonta*, at 41–42 (Case No. 17-cv-1017-BEN-JLB) (S.D. Cal. Nov. 10, 2022). The brief's cite is Declaration of Robert Spitzer, p. 24, electronic page no. 163 of 230, available at https://michellawyers.com/wp-content/uploads/2022/11/2022-11-10-Dec-of-Robert-Spitzer-ISO-Defendants-Supp-Brief-re-Bruen.pdf. The Declaration reproduces without comment an 1887 Council Bluffs municipal ordinance making it illegal to "carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms" and many other weapons, including Bowie knives. The California Attorney General reads "or found in his possession" as a ban on possession in the home. In context, the more appropriate reading would be for concealed carrying that did not involve wearing the weapon, for example, carrying in a bag. If the Council Bluffs government really meant something as monumental as outlawing all firearms in the home, the ordinance would be a very oblique way of saying so.

*Michigan* (1891).

A charter revision allowed the town of Saginaw to make and enforce laws against concealed carry of "any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag [a small bag with a handle; used as an impact weapon], false knuckles [same as metal knuckles, but could be made of something else], or other dangerous weapon."[703]

*Vermont* (1891).

No possession "while a member of and in attendance upon any school," of "any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon."[704]

*Rhode Island* (1893).

No concealed carry of "any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy [club], brass or metal knuckles, slung shot, pistol or fire arm of any description, or other weapon of like kind of description."[705]

*Local ordinances on Bowie knives.*

As described above, state legislative enactments of municipal charters sometimes authorized a municipality to regulate Bowie knives, usually by taxation of dealers or owners, or by prohibition of concealed carry. Additionally, there were Bowie knife laws that were simply enacted by municipalities, without any need for state action. Here is a list of such laws, taken from the Declaration of Robert Spitzer as an expert supporting a California arms prohibition statute.[706] The cities are in alphabetical order by state. The year is often the year of publication of the municipal code, and not necessarily the date of enactment. All the ordinances covered Bowie knives and various other weapons.

Against concealed carry: Fresno, California (1896); Georgetown, Colorado (1877); Boise City, Idaho (1894); Danville, Illinois (1883); Sioux City, Iowa (1882); Leavenworth, Kansas (1863); Saint Paul, Minnesota (1871); Fairfield,

---

[703] 1891 Mich. Pub. Acts 409, ch. 257; 1897 Mich. Pub. Acts 1030, ch. 465. Sand bags are discussed in Part VI.B.3, knuckles in Part VI.C.1.
[704] 1891 Vt. Acts & Resolves 95, ch. 85.
[705] 1893 R.I. Pub. Laws 231, ch. 1180.
[706] Spitzer, *supra* note ___,

Nebraska (1899); Jersey City, New Jersey (1871) (and no carrying of "any sword in a cane, or air-gun"); Memphis, Tennessee (1863).[707]

No carrying: Nashville, Tennessee (1881); Provo City, Utah territory (1877).[708]

Against hostile display: Independence, Kansas (1887).[709]

Against carry with intent to do bodily harm: Syracuse, New York (1885).[710]

Extra punishment if carried by someone who breached the peace or attempted to do so: Little Rock, Arkansas (1871);[711] Denver, Colorado (1886).[712]

No sales or loans to minors by a "junk-shop keeper or pawnbroker . . . without the written consent of the parent or guardian of such minor." Fresno, California (1896).[713]

## VI. OTHER WEAPONS

This Part covers restrictions on arms other than firearms or Bowie knives. Most of these restrictions were enacted in statutes that also covered Bowie knives, so the statutes were quoted in Part V. Here in Part VI, we will repeat or cross-reference the citations, but rarely quote at length.

The arms covered in this Article are in two broad classes. *Missile weapons* send a projectile downrange. Firearms, bows, and cannons are missile weapons. *Impact weapons* strike an adversary while being held by the user. Knives and swords are impact weapons, as are clubs, blackjacks, and slungshots.[714]

Section A covers sharp weapons that are not Bowie knives. The main categories are "daggers and dirks." Also included in Section A are sword canes, spears, swords, butcher knives, razors, and swords.

Section B addresses flexible impact weapons. That is, handheld weapons with a heavy tip and a flexible body, meant to be swung. The most important of these, in terms of number of laws enacted, is the slungshot. Section B also

---

[707] *Id.* at 10, 19, 21, 23–25, 35–36, 43, 45, 66.
[708] *Id.* at 68, 70.
[709] *Id.* at 26–27.
[710] *Id.* at 51.
[711] *Id.* at 7.
[712] *Id.* at 7, 13.
[713] *Id.* at 10.

[714] Some weapons can cross over from one category to another. A firearm can be used as a club, and a knife can be thrown as a missile. A spear can be thrown as a missile or held while striking in close combat.

covers colts, blackjacks, sand clubs, sand bags, and billies. Additionally, Section B addresses slingshots; although they are missile weapons, they are sometimes confused with slungshots, including perhaps in statutes.

Section C covers rigid impact weapons. These are brass knuckles, knuckles made from other materials, and loaded canes (hollow canes filled with lead).

Section D deals with cannons.

### A. Daggers, dirks, and other sharp weapons

*1. Daggers and dirks*

Dirks are fighting knives. They can come in a variety of sizes and shapes. We start with a list of every Bowie knife statute that also included dirks. If daggers were included in a statute, along with Bowie knives and dirks, a parenthetical so notes.

As previously described, an 1837 Georgia ban on sale and open carry of dirks was held to violate the Second Amendment, whereas a ban on concealed carry was upheld.[715] But a similar law was enacted in Arkansas in 1881.[716] Other laws were:

No possession by "any slave." North Carolina (1846);[717] New Mexico Terr. (1858).[718]

No possession by black people; licenses for black people. Mississippi (1865);[719] Florida (1865).[720]

Extra punishment for misuse or carrying with malign intent. Mississippi (1837);[721] California (1855);[722] Indiana (1859);[723] Nevada (1861);[724] Idaho

---

[715] Nunn v. State, *supra*.

[716] *See* text at note ___, *supra*.

[717] *See* text at note ___, *supra*.

[718] *See* text at note ___, *supra*.

[719] *See* text at note ___, *supra*.

[720] *See* text at note ___, *supra*.

[721] *See* text at note ___, *supra*.

[722] *See* text at note ___, *supra*.

[723] *See* text at note ___, *supra*.

[724] *See* text at note ___, *supra*.

KR0771

(1863);[725] Montana (1864);[726] Arizona Terr. (1867);[727] Missouri (1873) (also daggers);[728] Wyoming Terr. (1882) (also daggers);[729] Maryland (1883);[730] D.C. (1892).[731]

No concealed carry. Alabama (1838);[732] Virginia (1838) (if "habitually") (1881);[733] Louisiana (1855, 1898);[734] Ohio (1856);[735] Indiana (1859) (also daggers);[736] West Virginia (1868) ("habitually");[737] Montana (1864) (in towns);[738] Maryland 1872 (for Annapolis);[739] D.C. (1871, 1892) (also daggers);[740] Georgia (1873);[741] Nebraska (1873);[742] Missouri (1873) (certain locations) (also daggers);[743] North Carolina (1877) (for one county), 1879 (statewide) (both also for daggers), (1884);[744] Arizona (1883, by persons 10–16 in towns) (1887) (everyone in towns), 1893 (generally, adding daggers);[745] Rhode Island (1893) (also daggers);[746] Mississippi (1896).[747]

No open or concealed carry in certain locations. Tennessee (1869) (horse races);[748] Georgia (1870) (churches, court houses);[749] Louisiana (1870, 1873) (polling places);[750] Vermont (1891) (schools) (also daggers).[751]

---

[725] *See* text at note ___, *supra.*
[726] *See* text at note ___, *supra.*
[727] *See* text at note ___, *supra.*
[728] *See* text at note ___, *supra.*
[729] *See* text at note ___, *supra.*
[730] *See* text at note ___, *supra.*
[731] *See* text at note ___, *supra.*
[732] *See* text at note ___, *supra.*
[733] *See* text at note ___, *supra.*
[734] *See* text at note ___, *supra.*
[735] *See* text at note ___, *supra.*
[736] *See* text at note ___, *supra.*
[737] *See* text at note ___, *supra.*
[738] *See* text at note ___, *supra.*
[739] *See* text at note ___, *supra.*
[740] *See* text at note ___, *supra.*
[741] *See* text at note ___, *supra.*
[742] *See* text at note ___, *supra.*
[743] *See* text at note ___, *supra.*
[744] 1883-1884 Va. Acts 180, ch. 143.
[745] *See* text at note ___, *supra.*
[746] *See* text at note ___, *supra.*
[747] *See* text at note ___, *supra.*
[748] *See* text at note ___, *supra.*
[749] *See* text at note ___, *supra.*
[750] *See* text at note ___, *supra.*
[751] *See* text at note ___, *supra.*

KR0772

No carry while intoxicated. Missouri (1873).[752]

No carry, with a few exceptions. Texas (1871) (daggers);[753] Arkansas (1874, 1881);[754] West Virginia (1882);[755] N.M. Terr. (1887) (also "all kinds of daggers" plus "poinards," which are a type of small, slim dagger);[756] Ariz. Terr. (1889) (in towns) (also daggers);[757] Oklahoma Terr. (1890) (also daggers).[758]

Specific property or vendor taxes. Florida (1835, 1881, 1889, 1893);[759] North Carolina 1850, 1856–57, 1866);[760] Alabama (1865–66, 1866–67, 1875-76, 1877–78, 1882, 1884, 1898);[761] Mississippi (1871, 1876, 1878, 1880, 1892, 1894, 1897);[762] Virginia (1874, 1875, 1881, 1883, 1889, 1893); Georgia (1882, 1884, 1886, 1888, 1892);[763] Kentucky (1891).[764]

Authorizing certain municipalities to license and tax vendors. North Carolina (1860–99);[765] Illinois (1867) (also daggers);[766] Wisconsin (1874–91) (allowing concealed carry bans) (also daggers);[767] Alabama (1878–98).[768]

Exemption from seizure for unpaid property taxes. Mississippi (1861).[769]

Restricting sales to minors. Tennessee (1856);[770] Indiana (1875);[771] Illinois 1881 (transfers only by father, guardian, employer);[772] West Virginia (1882);[773] Kansas (1882) (also banning possession by minors);[774] Missouri (1885)

---

[752] *See* text at note ___, *supra.*
[753] *See* text at note ___, *supra.*
[754] *See* text at note ___, *supra.*
[755] *See* text at note ___, *supra.*
[756] *See* text at note ___, *supra.*
[757] *See* text at note ___, *supra.*
[758] *See* text at note ___, *supra.*
[759] *See* text at note ___, *supra.*
[760] *See* text at note ___, *supra.*
[761] *See* text at note ___, *supra.*
[762] *See* text at note ___, *supra.*
[763] *See* text at note ___, *supra.*
[764] *See* text at note ___, *supra.*
[765] *See* text at note ___, *supra.*
[766] *See* text at note ___, *supra.*
[767] *See* text at note ___, *supra.*
[768] *See* text at note ___, *supra.*
[769] *See* text at note ___, *supra.*
[770] *See* text at note ___, *supra.*
[771] *See* text at note ___, *supra.*
[772] *See* text at note ___, *supra.*
[773] *See* text at note ___, *supra.*
[774] *See* text at note ___, *supra.*

KR0773

(parental consent);[775] Florida (1889);[776] Texas (1889) (parental permission) (also daggers);[777] Oklahoma (1890) (also daggers);[778] Virginia (1890);[779] Louisiana (1890);[780] D.C. (1892);[781] North Carolina (1893).[782]

The next list is Bowie knife statutes that also included daggers, but not dirks:

Free blacks need a license to carry or possess. N.C. (1856).[783]

Free blacks may not carry or possess. N.C. (1861).[784]

Extra punishment for misuse. Texas (1856).[785]

No concealed carry. Montana Terr. (1864);[786] Colorado Terr. (1867) (state reenactments in 1876, 1885, 1891).[787]

No open or concealed carry in certain locations. Virginia (1869) (religious meetings).[788]

No open or concealed carry generally, with a few exceptions. N.M. Terr. (1859) ("Spanish dagger").[789]

The following laws about dirks or daggers were enacted in statutes that did not mention Bowie knives:

No carry. Harrisburg, Pennsylvania (1873) ("dirk-knife").[790]

No concealed carry. Wisconsin (unless with reasonable cause) (1872) (dirk or dagger);[791] South Carolina (1880) (dirk or dagger);[792] (1897) (dirk or

---

[775] *See* text at note ___, *supra.*

[776] *See* text at note ___, *supra.*

[777] *See* text at note ___, *supra.*

[778] *See* text at note ___, *supra.*

[779] *See* text at note ___, *supra.*

[780] *See* text at note ___, *supra.*

[781] *See* text at note ___, *supra.*

[782] *See* text at note ___, *supra.*

[783] *See* text at note ___, *supra.*

[784] *See* text at note ___, *supra.*

[785] *See* text at note ___, *supra.*

[786] *See* text at note ___, *supra.*

[787] *See* text at note ___, *supra.*

[788] *See* text at note ___, *supra.*

[789] *See* text at note ___, *supra.*

[790] 1873 Pa. Laws 735–36.

[791] 1872 Wis. Sess. Laws 17, ch.7.

[792] 1880 S.C. Acts 447–48, no. 362.

KR0774

dagger);[793] Oregon (1885) (dirk or dagger);[794] Michigan (1887) (dirk or dagger).[795]

Carrying concealed created a presumption that the weapon was being carried for use against another person. New York (1866) ("dirk or dagger (not contained as a blade of a pocket knife)").[796]

Sureties could be required for carry if the carrier had previously threatened to breach the peace. Oregon (1853) (dirk or dagger);[797] Wisconsin (1878) (dirk or dagger).[798]

On the whole, whatever combination of "bowie knives," "dirks," and "daggers" that a statute mentioned by name may not have been of great practical importance. Statutes that mentioned at least two of the three often had a catchall that included other "dangerous weapons." So if a statute said "Bowie knives, dirks, and other dangerous weapons," the statute might be applied to carrying a dagger.

This possibility would be less likely in property tax or vendor tax statutes, which did not typically include catchalls. Thus, a person who owned a dagger might not be liable for a property tax applicable to "bowie-knives and dirks."

### 2. Sword canes

Except as noted, all these sword cane laws also applied to Bowie knives.

Sales ban. Georgia (1837).[799] Held to violate the Second Amendment. Arkansas (1881).[800]

No giving to "any slave." N.M. Terr. (1859).[801]

No giving to "any slave or free person of color." Georgia (1860).[802]

---

[793] 1897 S.C. Acts 423, no. 251.

[794] 1885 Or. Laws 33.

[795] 1887 Mich. Pub. Acts 144, No. 129.

[796] 1866 N.Y. Laws 1523, ch. 716.

[797] 1853 Or. Laws 220, ch. 17.

[798] Revised Statutes of the State of Wisconsin, Passed at the Extra Session of the Legislature Commencing June 4, 1878, and Approved June 7, 1878, at 1121, ch. 196, sec. 4834 (1878).

[799] *See* text at note ___, *supra*.

[800] 1881 Ark. Acts 191, ch. 96. See note ___ for why we read the statute as a ban on spear canes and sword canes, not swords in general.

[801] *See* text at note ___, *supra*.

[802] 1860 Ga. Laws 56, No. 64.

*Journal of Legislation*

No possession or carry by "any free negro." North Carolina (1861).[803]

No concealed carry. Georgia (1852);[804] D.C. (1871, 1892);[805] Ariz. Terr. (1891);[806] Oklahoma (1890,[807] 1893[808]); R.I. (1893).[809]

No concealed carry except for travelers. Kentucky (1813, Bowies not included);[810] Indiana (1820,[811] 1831,[812] 1843,[813] 1859,[814] 1881,[815] Bowies added in 1881); Arkansas (1837, 1881);[816] Georgia (1852,[817] 1883,[818] 1898[819]) (Bowies in 1883 and 1898); California (1863,[820] 1864[821]) (Bowies in neither); Nevada (1867).[822]

No carry in most circumstances. Tennessee (1821,[823] 1870,[824] 1879 ("sword cane" or "loaded cane");[825] Texas (1871,[826] 1887,[827] 1889[828]) (1887 and 1889 including bowies); Arkansas (1875,[829] 1881[830]); N.M. Terr. 1887; [831] Ariz. Terr.

---

[803] 1860-1861 N.C. Sess. Laws 68, ch. 34.

[804] 1851-1852 Ga. Laws 269, no. 165.

[805] *See* text at note ___, *supra.*

[806] 1893 Ariz. Terr. Laws 3, no. 2.

[807] 1890 Okla. Sess. Laws 495, art. 47, sec. 1.

[808] 1893 Okla. Terr. Laws 503, art. 45, sec. 3.

[809] 1893 R.I. Laws 231–32, ch. 1180.

[810] 1812 Ky. Acts 100, ch. 89.

[811] 1819 Ind. Acts 39, ch. 23.

[812] 1831 Ind. Acts 192, ch. 26, sec. 58.

[813] 1843 Ind. Acts 982, ch. 53, sec. 107.

[814] 1859 Ind. Acts 129, ch. 78, sec. 1.

[815] 1881 Ind. Acts 191, ch. 37, sec. 82.

[816] *See* text at note ___, *supra.*

[817] 1851–1852 Ga. Laws 269, No. 165.

[818] 1882–1883 Ga. Laws 49, No. 93.

[819] 1898 Ga. Laws 60, No. 106.

[820] 1863 Cal. Stat. 748.

[821] 1864 Cal. Stat. 115, ch. 128.

[822] 1867 Nev. Stat. 66, ch. 30.

[823] 1821 Tenn. Laws 15, ch. 13.

[824] 1870 Tenn. Laws 55, ch. 41.

[825] 1879 Tenn. Laws 231, ch. 86.

[826] 1871 Tex. Gen. Laws 25, ch. 34, sec. 1–2.

[827] 1887 Tex. Gen. Laws 7.

[828] 1889 Tex. Gen. Laws 33, ch. 37.

[829] 1874–75 Ark. Acts 156.

[830] 1881 Ark. Acts 191, ch. 96.

[831] *See* text at note ___, *supra.*

(1889) ("within any settlement, town, village or city") (including Bowies);[832] Idaho (1889) ("any city, town or village").[833]

Carrying concealed created a presumption that the weapon was being carried for use against another person. New York (1866).[834]

No transfer to minors. Georgia (1876) (including Bowies);[835] Oklahoma (1890,[836] 1893[837]); Texas (1897) (parental permission, including Bowies).[838]

Special taxation. Mississippi (1854,[839] 1856–57,[840] 1865 (including bowies),[841] 1871, 1876, 1878, 1880, 1892, 1894, 1897;[842] N.C. (1858–59,[843] 1866,[844] 1887,[845] 1889,[846] 1898,[847] including Bowies).

Authorizing municipal regulation: N.C. (1860–99) (various laws allowing taxes on sales, carrying, or possession).[848]

## 3. Spears

Sales and concealed carry ban. Georgia (1837).[849] Sales ban held to violate the Second Amendment, concealed carry ban upheld.[850]

No carry. Texas (1871) (unless carried openly with reasonable cause);[851] Arkansas ("spear in a cane") (1881).[852]

---

[832] 1889 Ariz. Terr. Laws 30, No. 13, sec. 1.
[833] 1888 Ida. Laws 23, sec. 1.
[834] 1866 N.Y. Laws 1523, ch. 716.
[835] 1876 Ga. Laws 112 ch. 128.
[836] 1890 Okla. Terr. Laws 495, art. 47, sec. 3.
[837] 1893 Okla. Terr. Laws 503, art. 45, sec. 3.
[838] 1897 Tex. Gen. Laws 221, ch. 155.
[839] 1854 Mich. Pub. Acts 50, ch. 1.
[840] 1856-1857 Mich. Pub. Acts 36.
[841] 1867 Miss. Laws 412, ch. 317.
[842] *See* text at note ___, *supra*.
[843] 1858-1859 N.C. Sess. Laws 35–36, ch. 25.
[844] 1866-1867 N.C. Sess. Laws 63.
[845] 1887 N.C. Sess. Laws 885, ch. 58.
[846] 1889 N.C. Sess. Laws 836, ch. 183.
[847] 1897 N.C. Sess. Laws 154, ch. 90.
[848] *See* text at note ___, *supra*.
[849] *See* text at note ___, *supra*.
[850] *See* text at note ___, *supra*.
[851] 1871 Tex. Gen. Laws 25, ch. 34.
[852] 1881 Ark. Acts 191. No. 96.

KR0777

No concealed carry. Georgia (1852);[853] Arizona Terr. (1889) ("within any settlement, town, village, or city," unless with reasonable cause),[854] (1893);[855] Oklahoma Terr. (1890).[856]

No transfer to minors. Oklahoma Terr. (1890).[857]

### 4. Razors

During the nineteenth century, men shaved with straight-edge razors. These consisted of a single straight blade, sharpened on one edge. Often, the blade could fold into the handle, like a pocket-knife.

No concealed carry. D.C. (1871, 1892) ("razors, razor-blades");[858] Maryland (1872) (Annapolis), (1886, 1890);[859] Tennessee (1879);[860] South Carolina (1880, 1887, 1897);[861] Virginia (1881, 1884,[862] 1896); Illinois (1881);[863] North Carolina (1883);[864] Michigan (1887);[865] Colorado (1891);[866] Rhode Island (1893).[867]

No carry in most circumstances. Arkansas (1875, 1881);[868] West Virginia (1882) (exception for peaceable citizen with good cause).[869]

Carry limited to self-defense. Maryland (1894).[870]

West Virginia in the late nineteenth century prohibited carrying handguns and many other weapons (but not long guns) in public in most circumstances. In a case where a train passenger sued a railroad for facilitating his arrest for carrying a razor, the state supreme court explained:

---

[853] 1851-52 Ga. Laws 269, No. 165.

[854] 1889 Ariz. Terr. Laws 30.

[855] 1893 Ariz. Terr. Laws 3, No. 2, sec.1.

[856] 1890 Okla. Terr. Laws 495, art. 47, sec. 1.

[857] 1890 Okla. Terr. Laws 495, art. 47, sec. 3.

[858] *See* text at note ___, *supra.*

[859] *See* text at note ___, *supra.*

[860] *See* text at note ___, *supra.*

[861] *See* text at note ___, *supra.*

[862] 1883-1884 Va. Acts 180, ch. 143.

[863] 1881 Ill. Laws 74.

[864] *See* text at note ___, *supra.*

[865] *See* text at note ___, *supra.*

[866] *See* text at note ___, *supra.*

[867] *See* text at note ___, *supra.*

[868] *See* text at note ___, *supra.*

[869] *See* text at note ___, *supra.*

[870] An 1874 Maryland law forbade the carry of "any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon" in Kent, Queen Anne's, or Montgomery counties. 1874 Md. Laws 366.

KR0778

The razor was undoubtedly added to this section on account of the proneness of the Americanized African to carry and use the same as a deadly weapon. To such the razor is what the machete is to the Cuban. It is his implement of livelihood in time of peace, and his weapon of destruction in time of war. This is matter of common report. . . . The excuse given by the plaintiff, that he was carrying such razor to shave himself while in the country, is not a legal one. Such an excuse might be given by every person thus carrying a razor, and, if allowed as sufficient, would render the law of no affect.[871]

### 5. Butcher knives

No concealed carry. Mississippi (1888,[872] 1898);[873] Rhode Island (1893).[874]

No carry in most circumstances. Arkansas (1837,[875] 1875);[876] N.M. Terr. (1887).[877]

No carry to public assemblies or gatherings. Texas (1870).[878]

### 6. Swords

Banning carry. Idaho (1889) ("any city, town or village").[879]

Extra punishment for use in a crime. California (1855) ("small-sword, back-sword" used in a duel);[880] Nevada (1861) (same as California);[881] Mont. Terr. (1864) (a homicide in a duel with a "small sword, back-sword" is murder).[882]

---

[871] Claiborne v. Chesapeake & O. Ry. Co., 46 W.Va. 363, 370–71 (1899).

[872] 6 THE LAWS OF TEXAS 1822-1897, at 63 (H. P. N. Gammel ed., 1898).

[873] 1896 Miss. Laws 109, ch. 104.

[874] 1893 R.I. Laws 231–32, ch. 1880, sec. 1.

[875] REVISED STATUTES OF THE STATE OF ARKANSAS, ADOPTED AT THE OCTOBER SESSION OF THE GENERAL ASSEMBLY OF SAID STATE, A. D. 1837, at 280 (William Mck. Ball & Sam C. Roane ed., 1838).

[876] 1875 Ark. Acts 156.

[877] *See* text at note ___, *supra.*

[878] *See* text at note ___, *supra.*

[879] 1888 Ida. Laws 23, sec. 1.

[880] *See* text at note ___, *supra.*

[881] *See* text at note ___, *supra.*

[882] *See* text at note ___, *supra.*

KR0779

## B. Slungshots and other flexible impact weapons

This section describes a variety of weapons that are obscure to the twenty-first century reader. Although there are many books describing the history of firearms and knives, there is only one book on the history of flexible impact weapons, Robert Escobar's *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons*.[883] "At their most basic, they are all small, concealable, flexible and weighted bludgeons," he explains.[884]

It is extremely easy to make such a weapon at home. For example, take a sock and put some pocket change or a few tablespoons of sand or dirt in the toe.[885] Grasp the sock by the other end. You now have a flexible impact weapon. You can swing it and strike whoever is attacking you.

---

[883] ROBERT ESCOBAR, SAPS, BLACKJACKS AND SLUNGSHOTS: A HISTORY OF FORGOTTEN WEAPONS (2018). "[T]ry to find a group of weapons used as broadly as our was or for as long while having as little written about it." *Id.* at 241.

Proper techniques of defensive use are detailed in MASSAD AYOOB, FUNDAMENTAL OF MODERN POLICE IMPACT WEAPONS (1996).

[884] ESCOBAR, *supra* note __, at 9.

[885] Should you be alone in the outdoors and decide that you need a weapon, you can turn "your socks, or wrapped up shirt, into an impromptu sand-club" by adding dirt. "Throw in a rock or two if they are handy and you're even more prepared." *Id.* at 21.

Some examples of improvised flexible impact weapons, for good or ill:

During the 1863 anti-draft riots in New York City, two criminals, apparently taking advantage of the fact that the police were busy trying to suppress the riots, ordered two women to vacate their home within a day, or else the criminals would burn it. In defense, the women "tied stout cords to heavy lead fishing sinkers . . . What these amounted to, ironically, were crude versions of the slung-shot so highly favored by the New York thugs themselves." JAMES MCCAGUE, THE SECOND REBELLION: THE STORY OF THE NEW YORK CITY DRAFT RIOTS OF 1863, at 155 (1968).

In 1861, an English sailor fashioned a "slung shot" from "four revolver bullets" with "some paper round them" and attached to "a lanyard." Adolphus Manton, in PROCEEDINGS OF THE CENTRAL CRIMINAL COURT, 25th November 1861, at 78, reprinted at ref. no. t18611125-55 (Cent. Crim. Ct., London, Nov. 25, 1861), *in* The Proceedings of the Old Bailey, 1674-1913, www.oldbaileyonline.org.

During the eighteenth century, English criminals often used a "stocking filled with sand or lead shot." Rictor Norton, *St. Giles's Footpads & James Dalton's Gang: Footpads & Street Robbers*, *in* The Georgian Underworld: A Study of Criminal Subcultures in Eighteenth-Century England (website), http://rictornorton.co.uk/gu09.htm.

A leader of a women's auxiliary during the 1936–37 auto workers strike in Flint, Michigan, recalled, "we all carried a hard-milled bar of soap in one pocket and a sock in the other. That way, we couldn't be charged with carrying a weapon. But if somebody was creating trouble on the picket line, we'd slip that bar of soap into the sock and swing that sock very fast and sharp."

KR0780

With these weapons, a blow to the head could be fatal, but usually not. A blow anywhere else on the body was unlikely to be lethal.[886] As Escobar explains:

> these objects were not designed to inflict maximum damage. You do not put a soft or semi-soft covering on a weapon to increase its destructive capabilities nor do you make its striking surface smooth when it could be angular. You also don't use loads like lead powder, shot or sand instead of solid metal . . . [T]he lead pod inside most saps and jacks is about the size of a spoon head so there is little margin for errors if you want to maximize the impact.[887]

The vagueness of the term "Bowie knife"—which does not consistently describe any particular type of knife—was discussed in Part V.A. Definitions of categories of flexible impact weapons are even more confusing.[888] The meaning "depends on the year, who you ask(ed); and what country or part of the country you occupy when asked."[889] The "deliciously sloppy usages of the

---

It was as good as a blackjack." STRIKING FLINT: GENORA (JOHNSON) DOLLINGER REMEMBERS THE 1936-37 GENERAL MOTORS SIT-DOWN STRIKE AS TOLD TO SUSAN ROSENTHAL (1995), web reprint available at
https://www.marxists.org/history/etol/newspape/amersocialist/genora.htm#women.

In 2018, organized crime leader Whitey Bulger was transferred to the general prison population, and within hours was murdered by another inmate with "a lock in a sock." Bulger v. Hurwitz, 2023 WL 2335958 at *2 (4th Cir. Mar. 3, 2023).

[886] "Many police departments allowed head shots only in cases where deadly force was deemed necessary." ESCOBAR, *supra* note __, at 232.

[887] *Id.* at 237.

[888] "Perhaps because they thrived outside of polite society, their names are colorful, sometimes comical, and never really used consistently." *Id.* at 11. Various names were "slungshot, blackjack, jack, jacksap, billyjack, slapjack, flat sap, spoon sap, slap-stick, slapper, zapper, slock, sand-club, sandbag, billet, billie, convoy, cosh, life-preserver, persuader, starter, bum starter, priest, fish priest, Shanghai tool, monkey fist, Sweet William, joggerhead, beavertail." *Id.*

[889] *Id.* at 12. Changes in usage are nothing new. As of the eighteenth and early nineteenth centuries, a "gun" meant a long gun; handguns were called "pistols." Later, "gun" came to encompass everything that fired a bullet. Today, and in the twentieth century, "pistol" is sometimes used as a synonym for handgun, although the more precise meaning is a semiautomatic handgun, as distinct from a revolver.

past" make it difficult to determine what particular type of flexible impact weapon is being discussed in historical sources.[890]

Escobar's book provides an appendix of definitions, which he calls "more art than science," an effort to put "a sensible framework over the whole mess."[891] According to Escobar, "[s]aps and jacks" were shorthands "for everything except slingshots."[892]

Whatever the term used for a particular flexible impact weapon, the class as a whole has the following characteristics:

- Non-lethal except for a blow to the head. Even then, less likely to be lethal than a firearm or knife strike to the head.
- Exceptionally compact and easy to conceal, because they are flexible.[893] Unlike firearms or knives, which are rigid.
- Silent, like blade arms, and unlike firearms.
- Unlikely to cause surface bleeding, unlike firearms or blades.

We now turn to the flexible impact weapon that led to the most legislation in the nineteenth century, the slingshot.

---

[890] *Id.* at 17.

[891]

> If you're thinking everything mentioned in this appendix must have made research a complete nightmare, you are correct. It was difficult enough to find references to any of our terms and the fun only began then. . . . I was not . . . interested in proposing a codified way of this for book but instead wanted to put a sensible framework over the whole mess that goes with the modern meanings of the terms while still honoring the past. In short, it's more art than science . . .

*Id.* at 226–27.

[892] *Id.* at 11.

[893] "Saps and jacks remain half hidden even when openly brandished." *Id.* at 11. A sap has the stopping power of a billy club, "but in a much smaller package. [For a law enforcement officer] This made it an ideal backup in case you lost your bafa ton in a scuffle or while running." *Id.* at 73.

### 1. Slungshots and colts

The "slungshot was a tool turned weapon."[894] In the original slungshot, one end of the rope is wound around a lead weight, or other small, dense item.[895] Sailors use slungshots to cast mooring lines and other ropes over water. Resources on a ship at sea are very finite, and slungshots are easy to construct.[896] Definitionally, "slungshot" has been more stable than its flexible weapon cousins.[897]

The term slungshot, however, was applied to many items that had nothing to do with nautical affairs or ropes. Many slungshots were manufactured from leather and hardly looked like sailors' tools.

Compared to other flexible impact weapons, "slungshots are the clear champion in terms of pure impact. One strike to the head, without regard to particular target, usually results in the immediate cessation of hostility in the opponent or defense in the victim. Whether or not full unconsciousness does mercifully come, the person is usually incapacitated and in for unpleasant long

---

[894] *Id.* at 39.

[895] "A weight, usually hard loaded, tied to the end of a rope or similar material which swings freely. The end was often a sling, presumably indicating a common linguistic link between it, the ancient sling and the slingshot." *Id.* at 14. "[A]t heart just a small round weight surrounded by a clever knot", "It was tied so that one or two ends of the rope trail away from the ball shaped knot, providing material for the handle. A common additional feature once weaponized was a loop at the opposite end of the load so the entire contraption could be secured to the wrist. The original purpose" "was to allow one to cast a line across open water." *Id.* at 41.

[896] One could be made with a "bit of rope, cloth, sand, fishing weights and more." *Id.* at 44.

[897] "Slungshots are always called slungshots and clubs . . . generally called clubs." *Id.* at 133.

"The term appears common in the mid-19th century and *usually* describes the right weapon or at least something close to it." *Id.* at 226.

> Still you can unsurprisingly encounter instances where it is used to describe our entire subject matter and more (like brass knuckles). The most important note on slungshot as a term is that once into modernity but prior to the late 19th century it is written about very often while our other terms are almost non-existent. That's good in that eytmologists say that sap and blackjack only started later, it's bad in that we don't know if that means any kind of sap would have been called a slungshot back then or that the slungshot configuration was simply much more popular in those days.

*Id.*

KR0783

term effects. So it hits harder. . . ."[898] "One reason is simply the length. Both saps and blackjacks are normally less than 10 inches long."[899] A slungshot could be 22 inches.[900] The slungshot "provided the reach of a substantial club while fitting easily inside a pocket. Unlike a club, knife or brass knuckles, it could be held in a closed hand completely unseen while being ready to instantly lash out. This was very likely a factor in the slungshot's later popularity with street criminals."[901] Compared to other impact weapons, "The slungshot was even more suited for a sneak attack. With its long coiled shaft/handle and small load taking up little space in a pocket, it could be quickly unleashed and strike a man from a much greater distance than a sap or jack."[902]

A variety of slungshot, known as a "life-preserver" was popular with burglars in Victorian England. Besides the advantage of concealability, the life-preservers were "less lethal for dealing with interruptions; murder only being a way of increasing police attention after the fact."[903]

Slungshots were popular with criminals for obvious reasons, but they were also carried at least sometimes by the law-abiding. An 1863 cartoon from the English humor magazine *Punch*, titled "Going Out to Tea in the Suburbs," shows a "society outing" of men and women "armed to the teeth," with "the life-preserver" as "the most common choice in the arsenal."[904] The cartoon, subtitled "A Pretty State of Things for 1862," portrays in exaggerated fashion the public response to the garroting scare of 1862.[905]

According to a historian of New Orleans life during Reconstruction, the "people fairly bristled with lethal weaponry: revolvers, pepperbox pistols,

---

[898] *Id.* at 45.

[899] *Id.*

[900] CLIFFORD W. ASHLEY, THE ASHLEY BOOK OF KNOTS (1944)

[901] ESCOBAR, *supra* note __, at 44.

[902] *Id.* at 233.

[903] *Id.* at 76.

Attorney Abraham Lincoln's most famous case was the Almanac Trial of 1858. According to the charges, one evening around midnight Duff Armstrong fatally hit James Metzger in the head with a "slung-shot," made of "a copper ball covered with lead, sewn into a leather bag and attached to a strap." A witness who had been about 150 feet away claimed he could clearly identify Armstrong as the perpetrator because the moon was full that night. Lincoln won an acquittal by producing an almanac showing that the moon was at quarter phase, and about to set. JOHN EVANGELIST WALSH, MOONLIGHT: ABRAHAM LINCOLN AND THE ALMANAC TRIAL (2000).

[904] ESCOBAR, *supra* note __, at 78.

[905] "Going Out to Tea in the Suburbs," PUNCH'S ALMANACK FOR 1863 (Jan.-June); Andy Croll, *Who's afraid of the Victorian underworld?* THE HISTORIAN 30, 34 (Winter 2004).

KR0784

dirks, bowie knives and slung-shots—a private arsenal concealed in the pockets and waist bands of respectable gentlemen and proletarian thugs alike."[906]

According to Escobar, "Court records of the 1800's have many cases of civilians (e.g. neither professional criminal nor cop) using slungshots, etc."[907] But "[a]t least in the incidents combed for this book, a man bringing one out after being threatened comes up rarely. As a reminder, the slungshot is particularly well suited to the sneak attack as it is not seen until it hits and does so from a surprising distance."[908] A "man avenging himself for a perceived slight to his honor via a possibly deadly sucker punch with these comes up quite a bit."[909]

In sum, "It's clear they were often carried by criminals with ill intent but also by men who just wanted to be ready to defend (or I guess avenge) themselves. Granted, it looks like men with short fuses who were more prone to break the law via assault than your average Joe."[910]

Slungshot laws are different from the laws on other arms that have been discussed above. Starting in 1849, eight states and one territory outlawed sales and manufacture. Vermont (1849);[911] New York (1849),[912] (1881),[913] (1884),[914] (1889);[915] Massachusetts (1850),[916] (1882);[917] Kentucky (1855);[918] Florida

---

[906] Dennis C. Rousey, *Black Policemen in New Orleans During Reconstruction* in A QUESTION OF MANHOOD: A READER IN U.S. BLACK MEN'S HISTORY AND MASCULINITY, vol. 2 THE 19TH CENTURY: FROM EMANCIPATION TO JIM CROW 85, 89 (Darlene Clark Hine & Earnestine Jenkins eds., 2001).

[907] ESCOBAR, *supra* note __, at 131.

[908] *Id.* at 74.

[909] *Id.*

[910] *Id.* at 75.

[911] 1849 Vt. Acts & Resolves 26.

[912] 1849 NY Laws 403, ch. 278.

[913] 1881 N.Y. Laws 102.

[914] 3 THE REVISED STATUTES, CODE AND GENERAL LAWS OF THE STATE OF NEW YORK 3330 (Clarence F. Birdseye ed., 1890).

[915] 1889 N.Y. Laws 167, ch. 140.

[916] 1850 Mass. Acts 401, ch. 194, sec. 2.

[917] THE PUBLIC STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS, ENACTED NOVEMBER 19, 1881; TO TAKE EFFECT FEBRUARY 1, 1882, at 1163 (1886).

[918] 1855 Ky. Acts 96, ch. 636. This restriction was restated the following year. 1856 Ky. Acts 97, ch. 636.

(1868),[919] (1893);[920] Dakota Terr. (1877),[921] (1883);[922] Illinois (1881);[923] Minnesota (1886);[924] Pennsylvania (1889).[925]

Illinois also prohibited possession. Vermont prohibited possession for interpersonal use, and Maryland did the same for carrying. The laws still allowed use as tool, such as for nautical purposes.[926] The Kentucky sales ban was repealed later in the century.[927]

The nine jurisdictions with slungshot sales bans were the most for any weapon in America in the nineteenth century. Only metallic knuckles, discussed in Part VI.C.1, came close.

Most jurisdictions did not ban slungshot sales. The majority approach was similar to Bowie knives:

No giving to "any slave or free person of color," except by "the owner." Georgia (1860).[928]

---

[919] Digest of the Laws of the State of Florida, from the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive 403 (James F. McClellan ed., 1881).

[920] 1893 Fla. Laws 52.

[921] 1877 N.D. Laws 794, ch. 38, sec. 455.

[922] 1883 Dakota Terr. Laws 1211, sec. 456.

[923]

> That whoever shall have in his possession, or sell, give or loan, hire or barter, or whoever shall offer to sell, give, loan, hire or barter, to any person within this state, any slung-shot or metallic knuckles, or other deadly weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdmeanor, and upon conviction shall be fined in any sum not less than ten dollars ($10) nor more than two hundred dollars ($200).

1881 Ill. Laws 73.

[924] The Penal Code of the State of Minnesota to Take Effect January 1, A. D. 1886, at 127 (1885).

[925]

[926] The first section of the Vermont statute made it a misdemeanor to manufacture or transfer a slungshot. The second section made it a felony to "carry, or be found in the possession of, use or attempt to use, as against any other person, any instrument, or weapon, of the kind usually known as a slung shot."1849 Vt. Acts & Resolves 26. The felony punishment for violating the second section suggests that it referred to possessing or carrying the slungshot for the purpose of using it against another person.

The Maryland law forbade concealed carry of slungshots and open carry if done "with the intent or purpose of injuring any person." 1886 Md. Laws ch. 395.

The Vermont and Maryland laws apparently intended to outlaw all use of slungshots in fighting, while still allowing use as a nautical tool and for similar purposes.

[927] Text at notes *infra*.

[928] *See* text at note ___, *supra*.

KR0786

No concealed carry. California (1864);[929] Nevada (1867);[930] Wisconsin (1872);[931] Alabama (1873);[932] Illinois (1881);[933] North Carolina (1877, Alleghany County; 1879 statewide);[934] Dakota Terr. (1877);[935] Mississippi (1878);[936] South Carolina (1880);[937] Virginia (1884);[938] Missouri (1885);[939] Arizona Terr. (1887) (in towns) (1893) (in general); Oregon (1885);[940] Arizona (1887);[941], Michigan (1887);[942] Rhode Island (1893);[943] Maryland (1894) (unless reasonable cause);[944] District of Columbia (1899).[945]

Carrying concealed created a presumption that the weapon was being carried for use against another person. New York (1866),[946] (1884);[947] Minnesota (1891).[948]

No open or concealed carry in most circumstances. N.M. Terr. (1859, 1887);[949] California (1863);[950] Texas (1871) (without reasonable cause);[951]

---

[929] 1864 Cal. Stat. 115, ch. 128.

[930] 1867 Nev. Stat. 66, ch. 30.

[931] 1872 Wis. Sess. Laws 17, ch. 7.

[932] 1873 Ala. Laws 130–31, no. 87.

[933] 1881 Ill. Laws 73.

[934] *See* text at note ___, *supra*.

[935] 1877 N.D. Laws 794, ch. 38, sec. 456.

[936] *See* text at note ___, *supra*.

[937] THE GENERAL STATUTES AND THE CODE OF CIVIL PROCEDURE OF THE STATE OF SOUTH CAROLINA, ADOPTED BY THE GENERAL ASSEMBLY OF 1881–82, at 699 (1882).

[938] 1883-1884 Va. Laws 180, ch. 143.

[939] 1 THE REVISED STATUTES OF THE STATE OF MISSOURI 854 (1889).

[940] 1 THE CODES AND GENERAL LAWS OF OREGON 977 (William Lair Hill ed., 1887).

[941] REVISED STATUTES OF ARIZONA 726 (1887).

[942] 3 THE GENERAL STATUTES OF THE STATE OF MICHIGAN 3800 (Andrew Howell ed., 1890).

[943] 1893 R.I. Laws 231–32, ch. 1180.

[944] 1894 Md. Laws 834.

[945] 1899 U.S. Stat. 1270, ch. 429, sec. 117.

[946] 1866 N.Y. Laws 1523, ch. 716.

[947] 3 THE REVISED STATUTES, CODE AND GENERAL LAWS OF THE STATE OF NEW YORK 3330 (Clarence F. Birdseye ed., 1890).

[948] 2 GENERAL STATUTES OF THE STATE OF MINNESOTA, IN FORCE JANUARY 1891, at 517 (1891).

[949] *See* text at note ___, *supra*.

[950] 1863 Cal. Stat. 115–16, ch. 128.

[951] 1871 Tex. Gen. Laws 25.

*Journal of Legislation* [50:2

Harrisburg, Pennsylvania (1873);[952] Tennessee (1879);[953] West Virginia (1882);[954] Dakota Terr. (1883);[955] Arizona Terr. (1889) ("within any settlement, town, village, or city," unless with reasonable cause).[956]

No carry to public assemblies or gatherings. Texas (1871);[957] Missouri (1885).[958]

Ban on carry with intent to injure. Maryland (1882).[959]

Sales to minors. Kentucky (1859) (parental permission);[960] Indiana (1875);[961] West Virginia (1882);[962] Kansas (1882) (also banning possession by minors);[963] Missouri (1885) (under 21);[964] New York (1889) (18, unless police magistrate consents);[965] Oklahoma (1890) (under 21);[966] Texas (1897, parental consent).[967]

Limiting carry by young people. Nevada (1881) (under 18),[968] (1885) (under 21);[969] Ariz. Terr. (1883, ages 10-16, in towns).[970]

Specific taxation. Kentucky (1891) (occupational tax for vendors).[971]

Authorizing municipalities to regulate. Illinois (1867) (Bloomington, concealed carry, "colt, or slung-shot");[972] Wisconsin (1874–91) (concealed carry, "colt, or slung shot");[973] Michigan (1891) (Saginaw, concealed carry).[974]

---

[952] 1873 Pa. Laws 735–36.

[953] 1879 Tenn. Pub. Acts 231, ch. 86, sec. 1.

[954] *See* text at note ___, *supra*.

[955] 1883 Dakota Terr. 1211, sec. 456.

[956] 1889 Ariz. Terr. Laws 30.

[957] 2 A DIGEST OF THE LAWS OF TEXAS: CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST, FROM 1754 TO 1874, at 1323 (George W. Paschal ed., 4th ed. 1874).

[958] 1 THE REVISED STATUTES OF THE STATE OF MISSOURI 854 (1889).

[959] *See* text at note ___, *supra*.

[960] *See* text at note ___, *supra*.

[961] *See* text at note ___, *supra*.

[962] *See* text at note ___, *supra*.

[963] *See* text at note ___, *supra*.

[964] *Id.*

[965] 1899 N.Y. Laws 1341, ch. 603.

[966] 1890 Okla. Terr. Laws 495, art. 47, sec. 3.

[967] *See* text at note ___, *supra*.

[968] 1881 Nev. Stat. 143.

[969] 1885 Nev. Stat. 51.

[970] *See* text at note ___, *supra*.

[971] *See* text at note ___, *supra*.

[972] *See* text at note ___, *supra*.

[973] *See* text at note ___, *supra*.

[974] *See* text at note ___, *supra*.

KR0788

No possession. Illinois (1881).[975]

In the nineteenth century, "colt" seems to have been an alternative term for "slungshot." The Shorter Oxford English Dictionary defines a "colt" as "4. A short piece of weighted rope used as a weapon, *spec. (Naut.)* a similar instrument used for corporal punishment, *slang*, M18."[976]

An 1855 Kentucky prohibiting slungshot sales also applied to two other types of arms:

> That any person or persons who may hereafter be found guilty of vending, buying, selling, or doling in the weapons popularly known as colts, brass knuckles, slung-shots, or any imitation or substitute therefor, shall forfeit or pay 25 dollars.[977]

The Kentucky ban on sale of "colts," stayed on the books for several decades, and was eventually replaced with a ban only on sales to minors, plus a tort cause of action for anyone injured with the listed weapons as a result of an illegal sale.[978]

---

[975] 1881 Ill. Laws 73.

[976] 1 SHORTER OXFORD ENGLISH DICTIONARY 444.

[977] 1855 Ky. Acts 96, ch. 636. This restriction was restated the following year. 1856 Ky. Acts 97, ch. 636.

[978] One might guess that "colts" referred to the revolvers produced by Colt's Manufacturing Co., in New Haven, Conn. The first models of Samuel Colt's revolver handguns were introduced in the late 1830s, and by 1855 they were a huge commercial success. Protected by a patent that did not expire until 1857, they faced no competition in the category of high-quality modern revolver.

The theory that the Kentucky legislature was taking aim at the Colt's revolvers is buttressed by the late nineteenth century version of the statute, which changed the spelling to "Colt's."

By the time Kentucky's revised statute changed "colts" to "Colt's," and banned sales only to minors, the Colt's Manufacturing revolver patent was expired; there were many companies selling high-quality modern revolvers at affordable prices. At that point, a sales restriction on Colt's revolvers only would have made no sense, although perhaps similar revolvers could be said to be covered by "or any imitation of substitute therefor."

Even so, in the latter nineteenth century a Kentucky ban on revolvers "similar" to Colt's would be the opposite of gun control efforts of the time in other states. As discussed in Part IV.B. & C., those were bans on the most concealable handguns, and they exempted large handguns ("Army and Navy" models) like the Colt's.

KR0789

In short, the laws for slungshots/colts are the most restrictive of any of the weapons examined in this article. Most jurisdictions that chose to regulate followed the typical course for other weapons—such as concealed carry bans or limits on sales to minors. As for bans on carry in general, there are of course the usual suspects, namely some of the jurisdictions that also banned open handgun carry, and likewise banned carrying most other weapons, while still allowing long gun open carry. However, the Dakota Territory banned slungshot carry, and Dakota was not among the jurisdictions that banned handgun carry.

More importantly, there were nine states or territories that at some point banned manufacture or sale, and two of them banned possession. This is substantially more than the number that imposed such restrictions on any other arm in the nineteenth century.

We reviewed every pre-1900 case on Westlaw with the words "slungshot," "slung shot," or "slung-shot." Few of them are instructive on right to arms law. Some involve some other weapon, such as a gun or knife, and simply quote a statute that also mentions slungshots.[979] Many involve homicides or assaults; a defendant of course could not raise the right to arms.[980] A few asked whether

---

We suggest that the 1855 Kentucky statute was not about handguns. If the successor statutes were, they were anomalous to the extent that they singled out large handguns for stricter regulations than small handguns.

[979] *See, e.g.*, State v. Seal, 47 Mo. App. 603 (1892) (defendant convicted of "exhibiting a gun in a rude, angry and threatening manner"; statute also applied to slungshots); People v. Izzo, 60 Hun. 583, 39 N.Y. St. Rep. 166, 14 N.Y.S. 906 (1st Dept. 1891) (conviction for carrying a concealed dagger with intent to use in a crime reversed because of improper testimony; statute also applied to slungshots).

[980] *See, e.g.,* State v. Marshall, 35 Or. 265, 57 P. 902 (1899) (insanity defense for assault with a slungshot); People v. Turner, 118 Cal. 324. 50 P. 537 (1897) (cross-examination of victim who identified defendant as perpetrator of assault with a slungshot); People v. Wyman, 15 Cal. 70 (1860) (upholding conviction of manslaughter for stabbing victim in the ribs; victim's nose had been broken, and a physician testified that the break was not caused by a knife, and "might have been made a slungshot, a round stick, or possibly with the fist"); State v. Melton, 102 Mo. 683, 15 S.W. 139 (1891) (claim of self-defense not supported by the facts); State v. Fowler, 52 Iowa 103, 2 N.W. 983 (1879) (admissibility of witness testimony in support of self-defense); State v. Yeaton, 53 Me. 125 (1865) (refused entrance to an event at a private school, defendants assaulted the school personnel with slungshots); People v. Casey, 72 N.Y. 393 (1872) (defendant convicted of assault with a sharp weapon; indictment had also mentioned "certain knife, pistol, slung-shot, billy and club"; jury conviction of sharp weapon was implausible, since evidence showed a bludgeon and not a cut, but defendant's attorney had failed to object below); People v. Emerson, 6 N.Y.Crim.R. 157, 20 N.Y.St.Rep. 155 N.Y.S. 374 (Sup. Ct. N.Y. County 1888) (defendant convicted of running an illegal lottery; prosecution was correctly allowed to

a municipality had the power to enact an ordinance.[981] Two cases involved sailors who carried slungshots, and the courts did not consider the slungshots to indicate anything nefarious about the sailors' characters.[982] In a lawsuit about a "rough and abusive" passenger who had been struck by a train employee with a slungshot and ejected from a slow-moving train for not paying the fare, an Illinois appellate court ruled that the trial court had improperly excluded evidence that the train employee had legitimate defensive purposes for carrying a "billy or slungshot" (terms that the court used interchangeably).[983]

The one case that addressed the constitutionality of slungshot laws in depth was the 1871 *English v. State*, which upheld the recently enacted Texas statute against public carry of handguns and many other arms, while allowing long gun carry.[984] As for the Second Amendment right to bear arms, the Texas Supreme Court held that arms protected were the types of arms useful in a militia:

---

introduce testimony about the nature of "a lottery policy," just as other cases allow testimony about "the nature and description of a weapon commonly known as a 'slungshot,' or, under section 508, what is an instrument adapted or commonly used for the commission of burglary, etc.").

[981] *See, e.g.* Collins v. Hall, 92 Ga. 411, 17 S.E. 622 (1893) (municipality did not have the power to enact on concealed carry ban on various arms, including slungshots); Ex parte Caldwell, 138 Mo. 233, 39 S.W. 761 (1897) (municipal law imposing fine for carrying concealed weapons was consistent with city charter; defendant's weapon not specified, but ordinance included slungshots).

[982] Gardner v. Bibbins, 1 Blatchf. & H. 356, 9 F.Cas. 1159 (S.D.N.Y. 1833) ("He produces the evidence of a laborer, to prove that the libellant was in possession of a slung-shot on shore, which might have been used as a dangeous weapon . . . but he does not pretend, in his own deposition, that he ever regarded those circumstances as importing any danger to him or to the vessel."); Smith v. U.S., 1 Wash. Terr. 262 (1869) ("The evidence excluded appears to have been offered for the purpose of showing that Butler . . . 'had a slung-shot on board the bark Marinus at the time of the affray.' It nowhere appears in the evidence that Butler, at the time of the affray, was making an assault upon the prisoner, or attempting or threatening to make any.").

[983] Chicago, B. & Q.R. Co. v. Boger, 1 Ill. App. 472 (1877) ("The appellant offered to prove by the witness that a short time before he had had trouble with roughs and confidence men jumping on the train as it was passing out of the city, where he had been attacked by them, and that he carried the billy for his personal protection against any future assault. We think this evidence should have been admitted to the jury.").

[984] English v. State, 35 Tex. 473 (1871).

Arms of what kind? Certainly such as are useful and proper to an armed militia. The deadly weapons spoken of in the statute are pistols, dirks, daggers, slungshots, swordcanes, spears, brass-knuckles and bowie knives. Can it be understood that these were contemplated by the framers of our bill of rights? Most of them are the wicked devices of modern craft.

> . . .

To refer the deadly devices and instruments called in the statute "deadly weapons," to the proper or necessary arms of a "well-regulated militia," is simply ridiculous. No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit. The word "arms" in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense. The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine; of the artillery, the field piece, siege gun, and mortar, with side arms.

The terms dirks, daggers, slungshots, sword-canes, brass-knuckles and bowie knives, belong to no military vocabulary. Were a soldier on duty found with any of these things about his person, he would be punished for an offense against discipline.[985]

The Texas State Constitution right to arms guaranteed "the right to keep and bear arms in the lawful defense of himself or the state, under such regulations as the legislature may prescribe."[986] The language authorizing regulations in the 1866 Constitution was a change from the 1845 statehood Constitution, and the 1836 Constitution of the Republic of Texas.[987] The court

---

[985] *Id.* at 474, 476–77.

[986] Tex. Const. of 1868, art. I, § 13: "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the legislature may prescribe."

[987] Tex. Const. of 1845, art. I, § 13: "Every citizen shall have the right to keep and bear arms in the lawful defence of himself or the State." Tex. Const. of 1836, Declaration of Rights,

KR0792

held that "arms" in the Texas Constitution meant the same thing as in the Second Amendment.

According to the court, the carry ban was a reasonable regulation: "We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."[988] As for Texans' preferences for carrying arms, it came from the pernicious Spanish influence on the State—which had once been part of New Spain, and then part of the United States of Mexico:

> A portion of our system of laws, as well as our public morality, is derived from a people the most peculiar perhaps of any other in the history and derivation of its own system. Spain, at different periods of the world, was dominated over by the Carthagenians, the Romans, the Vandals, the Snevi, the Allani, the Visigoths, and Arabs; and to this day there are found in the Spanish codes traces of the laws and customs of each of these nations blended together into a system by no means to be compared with the sound philosophy and pure morality of the common law.[989]

The English decision did not mention the 1856 *Cockrum* case, stating that the right to keep and bear Bowie knives is protected by Texas Constitution and the Second Amendment, while misuse in violent crime is not.[990]

### 2. Slingshots

Slingshots are entirely different from slungshots. A slungshot is an impact weapon, and a slingshot is a missile weapon. The first slingshot law does not appear until 1872, the next one 1886, and the remainder in the 1890s.

---

§ 14: "Every citizen shall have the right to bear arms in defence of himself and the republic. The military shall at all times and in all cases be subordinate to the civil power."

[988] *English*, 35 Tex. at 478–79.

[989] *Id.* at 480.

[990] Text at notes____.

According to Escobar, "we don't know if 'slingshot' was a confused attempt to outlaw slungshots, but it's a good guess."[991]

Today we think of actual slingshots as children's toys, as famously carried by mischievous cartoon character Dennis the Menace. Dennis was not inclined to "malicious mischief," but if he had been, the expected result would have been a broken window or a dead bird. However, a slingshot can also be a formidable weapon.

In the legions of classical Rome, the legionnaire soldier was expected to be proficient with a sling and a rock. Every Roman soldier carried a sling. So if a soldier's sword were lost or broken in combat, he could still use the sling.[992]

The Bible story of the young shepherd David killing the giant Goliath with a sling reflects the typicality of slings as combat weapon in ancient times.[993]

To be sure, a "slingshot" is not a "sling." But a powerful slingshot hurling a rock is certainly a weapon that can be, and has been, used for hunting, for defense, and for offense.

The following statutes restricted "slingshots." Whether they were meant to apply to slungshots or to slingshots is unknown.

No concealed carry. Wisconsin (1887),[994] Mississippi (1896),[995] (1898);[996] Maryland (1872) (in Annapolis);[997] Washington (1886);[998] Colorado (1891);[999] South Carolina (1897).[1000]

No sales to minors. North Carolina (1893).[1001]

Authorizing municipal regulation. Michigan (1891) (Saginaw, concealed carry);[1002] Nebraska (1895) (Lincoln, concealed carry).[1003]

---

[991] ESCOBAR, *supra* note __, at 105.

[992] Heather Pringle, *Ancient Slingshot Was as Deadly as a .44 Magnum: An excavation in Scotland shows that Roman soldiers used lead ammo with lethal accuracy*, NAT'L GEOGRAPHIC, May 23, 2017, https://www.nationalgeographic.com/history/article/ancient-slingshot-lethal-44-magnum-scotland.

[993] 1 Samuel 17.

[994] 1887 Wis. Sess. Laws 1308, ch. 4.

[995] 1896 Miss. Laws 109–10, ch. 104.

[996] 1898 Miss. Laws 86, ch 68.

[997] 1872 Md. Laws 57, ch. 43.

[998] 1885–86 Wash. Terr. Laws 81–82.

[999] 1891 Colo. Sess. Laws 129.

[1000] 1897 S.C. Acts 423, no. 251.

[1001] *See* text at note___,

[1002] *See* text at note___,

[1003] *See* text at note___,

KR0794

If the laws applied to actual slingshots, they fit into the mainstream established by Bowie knife laws. There were no prohibitions on possession, open carry, or sales to adults. If the laws applied to slungshots, they add to the total of states with standard restrictions, rather than prohibitions on sales.

### 3. Sand Clubs

A sand club is a small bag of sand attached to a short handle.[1004] A sand club is also called a "sand bag" or "sandbag." If a sand club is filled with something other than sand, such as lead pellets, it might be called a "blackjack" or a "sap." All these clubs were often carried by law enforcement officers.

One advantage for either law enforcement or criminal use is that a sand club does not leave a mark on the target.[1005] The "ability here outstrips that of saps, jacks, slungshots and all their variations" because of the soft load.[1006]

The sand club "might be the only easily adjustable impact weapon known to man. . . If you want up its destructive capabilities . . . just add water. Wet sand weighs more."[1007]

The only specific state laws we found on these arms were bans on carry with intent to injure. Maryland (1882) ("sand-club");[1008] Michigan (1891) (Saginaw, concealed carry, "sand bag").[1009] The pervasive law enforcement use was perhaps an indicia that responsible citizens might choose similar arms.

---

[1004] "A long sausage-shaped bag of sand used as a weapon." ERIC PARTRIDGE, A DICTIONARY OF SLANG AND UNCONVENTIONAL ENGLISH (1971). *See also* ESCOBAR, *supra* note __, at 19 ("a sand-club, formed by filling an eel-skin with sand"), quoting 1 THE LONDON MEDICAL RECORD 576 (Ernest Abraham Hart ed., 1873) (describing an 1871 homicide in San Francisco).

Like other flexible impact weapons other than the slungshot, a sand club is sometimes called a "sap." For example, in a 1983 case,

> Officer Casey testified that at first he thought the object, which was very common in the North Park area of Pittsburgh, was a "sap." That is, a sock filled with sand that when swung, according to the officer, was "almost a stone, and [if] you hit somebody in the side of the head or temple with it, you'll kill him. It's a very effective weapon."

Commonwealth v. Hook, 313 Pa. Super. 1, 459 A.2d 379, 384 n.2 (1983) (Popovich, J., dissenting).

[1005] ESCOBAR, *supra* note __, at 19, 21.

[1006] *Id.* at 21.

[1007] *Id.*

[1008] *See* text at note___,

[1009] *See* text at note___,

### 4. Blackjacks

Blackjack laws begin to appear in the last quarter of the nineteenth century. The dating indicates that the statutes were referring to the modern blackjack.[1010]

The "classic modern blackjack" is "a coil spring body with cylindrical shaped head and a hard load. As such this focuses the impact into a small area and loses the soft sap's lower peak force distribution."[1011] The "blackjack" is distinct from the broader, earlier nineteenth century use of "jack" to refer to all sorts of flexible impact weapons.

The blackjack became "a police constant for about 100 years."[1012] "Policemen's uniforms in the U.S. had a special pocket where they were stored."[1013] Theodore Roosevelt carried one when he was Police Commissioner of New York City, and when he was President of the United States.[1014]

Blackjacks were favored by law enforcement officers for the same reasons that officers liked saps and jacks in general:

> [E]ven in the days when law enforcement had much freer rein than today, stabbing a suspect with a knife you technically should or should not have had on you was going to be a problem. Shooting him would be even more complicated. By process of elimination we can understand how saps became the go to backup tool for an officer. At least you were already officially issued a club . . . In this way saps came to straddle that unique middle ground between law and lawless that was their place for so long.[1015]

---

[1010] *Id.* at 85. But confusingly, "Later authors apparently then applied the term retroactively to all kinds of saps. . . ." *Id.* In San Francisco, "unlike elsewhere," "the term slungshot" was "applied almost universally" to blackjacks. *Id.* at 101.

[1011] *Id.* at 127. Yet "there were modern blackjacks with other methods of construction," according to very early twentieth century order forms, and some of these variants were still being made in the 1970s. *Id.*

[1012] *Id.* at 135.

[1013] *Id.* at 11.

[1014] R.L. Wilson & Gregory C. Wilson, Theodore Roosevelt: Outdoorsman 138 (1971).

[1015] Escobar, *supra* note __, at 105–06.

Starting in 1881, New York banned sale or manufacture, with a police exemption that Roosevelt used.[1016] The New York law was eccentric. Other jurisdictions that specifically regulated blackjacks imposed lesser restrictions.

No concealed carry. North Carolina (Alleghany County, 1877),[1017] statewide (1879);[1018] Maryland (1886);[1019] D.C. (1892); Rhode Island (1893);[1020] Maryland (1894) (unless reasonable cause).[1021]

Carrying concealed created a presumption that the weapon was being carried for use against another person. New York (1866);[1022] Michigan (1887).[1023]

No carry. Tennessee (1879);[1024] Oklahoma (1890),[1025] (1893).[1026]

Limiting Sales to Minors. Oklahoma (1890),[1027] (1893);[1028] New York (1889).[1029]

## 5. Billies vs. Billy clubs

A "billy" or "billie" can be confusing. They are not the same as a "billy club." "A policeman's old fashioned billy club was usually a solid piece of turned hardwood."[1030] In contrast, "the words billie and billet were used for saps and blackjacks in particular from the late nineteenth century to early in the 20th century."[1031]

Specific laws were as follows:

---

[1016] 1881 N.Y. Laws 102; 1884 N.Y. Laws 46, ch. 46, § 7; 1889 N.Y. Laws 167, ch. 140; 1899 N.Y. Laws 1341, ch. 603.

[1017] 1876-1877 N.C. Sess. Laws 162–63, ch. 104.

[1018] 1879 N.C. Sess. Laws 231, ch. 127.

[1019] 1866 Md. Laws 602, ch. 375.

[1020] 1893 R.I. Laws 231–32, ch. 1880, sec. 1.

[1021] 1894 Md. Laws 834 (1894).

[1022] 1866 N.Y. Laws 1523, ch. 716.

[1023] 1887 Mich. Acts 144, No. 129.

[1024] 1879 Tenn. Pub. Acts 231, ch. 86, sec. 1.

[1025] 1890 Okla. Terr. Laws 495.

[1026] 1893 Okla. Terr. Laws 503.

[1027] 1890 Okla. Terr. Laws 495.

[1028] 1893 Okla. Terr. Laws 503.

[1029] 1889 N.Y. Laws 167, ch. 140.

[1030] ESCOBAR, *supra* note __, at 9.

[1031] *Id.* at 226. *See id.* at 3 (Describing a 1910 hardware store catalogue: "Notice that the sap and blackjacks are just called billies." The slungshot has a separate heading.).

Ban on carry with intent to injure. Maryland (1882) (billy).[1032]
No concealed carry. Rhode Island (1893) (billy), Michigan (1897).[1033]
No carry, with some exceptions. Okla. Terr. (1890) (billy).[1034]
Authorizing municipal regulation. Michigan (1891) (Saginaw, concealed carry, "billie");[1035] Nebraska (1895) (Lincoln, concealed carry, billy).[1036]

<center>C. Rigid impact weapons</center>

*1. Knuckles*

Knuckles are devices attached to one's second through fifth fingers to make the fist a more powerful weapon. They can be made of brass, other metals, or non-metallic material.[1037]

Abraham Lincoln's friend, the lawyer Ward Hill Lamon, served as his bodyguard for Lincoln's midnight train ride into Washington, D.C., to assume the presidency. Lamon carried a pair of "fine pistols, a huge bowie knife, a black-jack, and a pair of brass knuckles."[1038]

Six states banned sales, and some of them also banned manufacture. Vermont (1849);[1039] Massachusetts (1850);[1040] Kentucky ("brass knuckles" 1856);[1041] Florida ("metallic knuckles") (1868),[1042] (1893);[1043] New York ("metal

---

[1032] *See* text at note___,

[1033] 1897 Mich. Acts 1030, sec. 15.

[1034] *See* text at note___,

[1035] 1891 Mich. Acts 409, no. 257.

[1036] *See* text at note___,

[1037] Knuckles are "fashioned from a single piece of metal." ESCOBAR, *supra* note __, a 9. They are descendants of the *cestus*, a glove worn by Greek and Roman boxers, sometimes loaded with a weight. *Id.* at 199; *cf.* VIRGIL, THE AENEID, book 5 ("The gloves of death—with seven distinguished folds Of tough bulls' hides; the space within is spread With iron or heavy loads of lead."), *in* 14 THE WORKS OF JOHN DRYDEN (1808) (Dryden's translation of the Aeneid).

[1038] HAROLD HOLZER, LINCOLN PRESIDENT-ELECT: ABRAHAM LINCOLN AND THE GREAT SECESSION WINTER 1860-1861, at 391 (2008).

[1039] 1849 Vt. Acts & Resolves 26.

[1040] 1850 Mass. Acts 401, ch. 194.

[1041] 1856 Ky. Acts 96, ch. 636.

[1042] 1868 FL Laws 95, ch. 7, sec. 11.

[1043] 1893 FL Laws 52, ch. 4124.

KR0798

knuckles") (1881),[1044] (1889),[1045] (1899);[1046] Arkansas (1881) ("metal knuckles").[1047]

The Kentucky ban was later repealed.[1048] Only Illinois outlawed possession for adults (1881),[1049] (1893).[1050] Kansas included knuckles in the long list of arms, other than rifles and shotguns, for which possession by minors was forbidden (1882).[1051]

The majority approach was nonprohibitory:

No concealed carry. D.C. (1871) ("brass or other metal knuckles");[1052] Maryland 1872 (for Annapolis, "brass, iron, or other metal knuckles");[1053] Wisconsin (unless with reasonable cause) ("brass knuckles") (1872);[1054] Alabama ("brass knuckles") (1873);[1055] North Carolina (1877, Alleghany County, "brass, iron or metallic knuckles") (1879, statewide);[1056] Mississippi (1878),[1057] (1896),[1058] (1898)[1059] "brass or metallic knuckles"); Washington Terr. (1886);[1060] Michigan (1887);[1061] Arizona Terr. (1893) ("brass knuckles, or other knuckles of metal");[1062] Rhode Island (1893) ("brass or metal knuckles"); South Carolina (1897).[1063]

Carrying concealed created a presumption that the weapon was being carried for use against another person. Illinois ("steel or iron knuckles")

---

1044 1881 N.Y. Laws 102.

1045 1889 N.Y. Laws 167, ch. 140.

1046 1899 N.Y. Laws 1341, ch. 603.

1047 *See* text at note___,

1048 Text at notes *supra*.

1049 1881 Ill. Laws 73.

1050 1893 Ill. Laws 477–78.

1051 *See* text at note___,

1052 *See* text at note___,

1053 *See* text at note___,

1054 1872 Wis. Sess. Laws 17, ch.7.

1055 1873 Ala. Laws 130–31, no. 87.

1056 *See* text at note___,

1057 *See* text at note___,

1058 1896 Mich. Pub. Acts 109, ch. 104.

1059 1898 Mich. Pub. Acts 86, ch. 68.

1060 1885-86 Wash. Terr. Laws 82.

1061 1887 Mich. Pub. Acts 144, no. 129.

1062 1893 Ariz. Sess. Laws 3, no 2.

1063 1897 S.C. Acts 450–52, no. 251.

KR0799

(1874),[1064] (1879);[1065] New York ("metal knuckles") (1866),[1066] (1881);[1067] South Carolina ("metal knuckles") (1880).[1068]

No carry in most circumstances. Texas (1871) ("brass-knuckles");[1069] Arizona Terr. (1889) ("brass knuckles" "within any settlement, town, village or city");[1070] Okla. Terr. (1890) ("metal knuckles").[1071]

No carry by minors. Ariz. Terr. (1883) ("brass-knuckles," ages 10–16, in towns).[1072]

No sales to minors. Indiana (1875) ("knucks");[1073] Kansas (1882) (also banning possession by minors, "brass knuckles");[1074] West Virginia (1882);[1075] Texas (1897) (parental permission, "knuckles made or any metal or hard substance").[1076] No transfer to minors. Oklahoma (1890).[1077] No sales to a minor without written consent of a police magistrate. New York (1889).[1078]

Authorizing municipal regulation. Illinois (1867) (Bloomington, concealed carry, "cross knuckles, or knuckles of brass, lead or other metal");[1079] Wisconsin (1874–91) (concealed carry, "cross knuckles, or knuckles of lead, brass or other metal");[1080] Michigan (1891) (Saginaw, concealed carry, "false knuckles" [non-metallic]);[1081] Nebraska (1895) (Lincoln, concealed carry, "metal knuckles").[1082]

---

[1064] 1874 Ill. Laws 360, ch. 38, sec. 56.

[1065] REVISED STATUTES OF THE STATE OF ILLINOIS, 1880, at 365 (Harvey B. Hurd ed., 1880).

[1066] 1866 N.Y. Laws 1523, ch. 716.

[1067] 1881 N.Y. Laws 102.

[1068] 1880 S.C. Acts 448, no. 362.

[1069] *See* text at note___,

[1070] 1889 Ariz. Terr. Laws 30.

[1071] *See* text at note___,

[1072] *See* text at note___,

[1073] *See* text at note___,

[1074] *See* text at note___,

[1075] *See* text at note___,

[1076] *See* text at note___,

[1077] 1890 Okla. Terr. Laws 495, art. 47, sec. 3.

[1078] 1889 NY Laws 167, ch. 140.

1893 Fla. Laws 51, 52, ch. 4124.

Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind, usually known as slung shot, or metallic knuckles, shall be punished by imprisonment not exceeding three months, or by Penalty.

[1079] *See* text at note___,

[1080] *See* text at note___,

[1081] *See* text at note___,

[1082] *See* text at note___,

License required to sell. South Carolina ("metal knuckles") (1891).[1083]

While the statutes varied in what kind of "knuckles" were illegal, a Texas court ruled that "brass knuckles" encompassed knuckles made of steel or other materials.[1084]

Throughout this article we have focused on laws that named specific weapons. However, it should be recognized that many laws, particularly those involving public carry, had catch-all phrases such as "other deadly weapon." These laws might encompass weapons not named in the statute. Such a law against concealed carry in Missouri was held to encompass "a pair of brass knucks."[1085]

Consistent with the express text of the Missouri state constitution, the Missouri Court of Appeals said that *concealed* carry of knuckles was not part of the right to arms.[1086] Alabama's statute against concealed carry had an exception for carrying a firearm or knife with good reason to apprehend an attack. Defendant had indisputably been carrying knuckles because of danger of imminent attack, but his conviction was upheld, because the statutory exception allowing concealed carry did not include knuckles. The Alabama Supreme Court held that the trial court:

> did not err in ruling that this provision did not embrace brass knuckles, slung-shots, or weapons of like kind. . . . The carrying concealed of a barbarous weapon of this class, which is usually the instrument of an assassin, and an index of a murderous heart, is absolutely prohibited by section 3776 of the Criminal Code of

---

[1083] 1891 S.C. Acts 1101–02, no. 703.

[1084] Harris v. State, 22 Tex. App. 677, 3 S.W. 477 (1887).

[1085] State v. Hall, 20 Mo. App. 397 (1886) (statute prohibited concealed carry of "fire arms, bowie knife, dirk, dagger, slungshot, or other deadly weapon").

[1086] A St. Louis ordinance forbade concealed carry without a permit of "cross-knuckles, or knuckles of lead, brass or other metal." "In the constitution the citizen has many priceless rights guaranteed to him; but unluckily for appellant, the 'right' to carry concealed in his hip pocket knuckles of brass, a weapon of dangerous and deadly character, is not a 'right' protected by any constitutional guaranty." City of St. Louis v. Vert, 84 Mo. 204, 209 (1884); Mo. Const. of 1875, art. II, § 17 ("[T]he right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons.").

this state. The law does not recognize it as a weapon of self-defense.[1087]

### 2. Loaded Canes

A loaded cane has a hollowed section filled with lead.[1088] It is a powerful impact weapon.[1089]

No concealed carry. N.C. 1877 (Alleghany County),[1090] 1879 (statewide).[1091]

No carry in most circumstances. Tennessee (1821),[1092] (1870),[1093] (1879) ("sword cane" or "loaded cane");[1094] Oklahoma Terr. (1893).[1095]

No disposing to a minor. N.C. (1879).[1096]

### D. Cannons

As detailed in Part II.F, the laws of the colonial and Founding laws presumed personally owned cannons. Under the Constitution, cannons were necessary so that Congress could "grant Letters of Marque and Reprisal."[1097] Such letters were granted during the War of 1812.[1098] Cannons were advertised for sale in an 1813 newspaper ad in Newport, Rhode Island, one of America's busiest seaports.[1099]

---

[1087] Bell v. State, 89 Ala. 61, 8 So. 133 (1890).

[1088] Harry Schenawolf, *Loaded Cane – How Revolutionary War Officers and Gentlemen Protected Themselves from Drunken Soldiers and Muggings*, REVOLUTIONARY WAR J., June 28, 2019, https://www.revolutionarywarjournal.com/loaded-cane-how-revolutionary-war-officers-and-gentlemen-dealt-with-drunken-soldiers-and-riff-raff/.

[1089] *Id.*

[1090] 1877 N.C. Sess. Laws 162–63, ch. 104.

[1091] 1879 N.C. Sess. Laws ch. 127, p. 231.

[1092] 1821 Tenn. Pub. Acts 15, ch. 13.

[1093] 1870 Tenn. Pub. Acts 55, ch. 41.

[1094] 1879 Tenn. Pub. Acts 231, ch. 86.

[1095] 1893 Okla. Sess. Laws 503, art. 45.

[1096] 1893 N.C. Sess. Laws 468–69, ch. 514.

[1097] U.S. CONST., art. I, § 8.

[1098] 2 Stat. 755 (1812). The privateers "were of incalculable benefit to us, and inflicted enormous damage" on Great Britain. THEODORE ROOSEVELT, THE NAVAL WAR OF 1812, at 416 (1882).

[1099] *The Rhode-Island Republican. [volume]* (Newport, R.I.), June 10, 1813, https://chroniclingamerica.loc.gov/lccn/sn83025561/1813-06-10/ed-1/seq-4/.

**KR0802**

An international declaration in 1856 prohibited signatory nations from issuing letters of marque and reprisal.[1100] The United States chose not to join. During the Civil War, the Confederacy issued letters of marque and reprisal.[1101] The Spanish-American War of 1898, like previous naval wars, generated cases about the ownership of prizes.[1102]

On the land, legislation provided rules for cannon owners. The 1881 Pennsylvania legislature made it a misdemeanor to "knowingly and willfully sell" to buyers "under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon."[1103] By implication, sales of cannons to persons 16 and over was legal.

Most cannon laws nineteenth-century cannon laws prevented people from firing cannons in certain locations, typically public ones. In 1844, Ohio forbade anyone to "fire any cannon . . . upon any public street or highway, or nearer than ten rods to the same," "except in case of invasion by a foreign enemy or to suppress insurrections or mobs, or for the purpose of raising drowned human bodies, or for the purpose of blasting or removing rocks."[1104]

Other localities also prevented people from firing cannons in certain locations. Northern Liberties Township, Pennsylvania (1815),[1105] Cincinnati,

---

[1100] Paris Declaration respecting Maritime Law, art. 1 (1856) ("Privateering is and remains abolished."). Later, the United States announced it would comply with the Declaration, even the U.S. has never formally joined the Declaration.

[1101] COOPERSTEIN, *supra* note __, at 246. Congress in 1863 passed and President Lincoln signed a law authorizing privateering for three years, but no letters were granted. *See* 12 Stat. 758 (1863); Nicholas Parrillo, *The De-Privatization of American Warfare: How the U.S. Government Used, Regulated, and Ultimately Abandoned Privateering in the Nineteenth Century*, 19 YALE J.L. & HUMANITIES 1, 72–73 (2007).

[1102] The Paquete Habana, 175 U.S. 677 (1900) (applying customary international law that coastal fishing vessels may not be seized).

For contemporary arguments in favor of issuing letters of marque and reprisal against pirates around Somalia, see Todd Emerson Hutchins, Comment, *Structuring a Sustainable Letters of Marque Regime: How Commissioning Privateers Can Defeat The Somali Pirates*, 99 CALIF. L. REV. 819 (2011); Joshua Stauba, *Letters of Marque: A Short-Term Solution to an Age Old Problem*, 40 J. MAR. L. & COM. 261 (2009).

[1103] 1881 Pa. Laws 111, no. 124.

[1104] 1844 Ohio Laws 17, sec. 1.

[1105] A DIGEST OF ACTS OF ASSEMBLY, RELATING TO THE INCORPORATED DISTRICT OF THE NORTHERN LIBERTIES 94 (1847) ("within the regulated parts . . . in said township, without permission from the president of the board of commissioners").

KR0803

*Journal of Legislation* [50:2

Ohio (1828),[1106] Jersey City, New Jersey (1843),[1107] St. Louis, Missouri (1843),[1108] Detroit, Michigan (1848),[1109] Dayton, Ohio (1855),[1110] Peoria, Illinois (1856),[1111] (1869),[1112] Chicago, Illinois (1861),[1113] San Francisco, California (1869),[1114] Meriden, Connecticut (1869),[1115] Dover, New Hampshire (1870),[1116] Little Rock, Arkansas (1871),[1117] Martinsburg, West Virginia

---

[1106] ACT INCORPORATING THE CITY OF CINCINNATI, AND THE ORDINANCES OF SAID CITY NOW IN FORCE 43 (1828) ("within the limits of said city"); *id.* at 43–44 ("It shall not be lawful for any person or persons having charge or being on board of any boat upon the Ohio river . . . to cause any cannon . . . to discharge its contents towards the city").

[1107] ORDINANCES OF JERSEY CITY 9 (1844) ("within this city . . . unless in defense of his property or person").

[1108] THE REVISED ORDINANCES OF THE CITY OF SAINT LOUIS, REVISED AND DIGESTED BY THE FIFTH CITY COUNCIL 304 (1843) ("within the city").

[1109] THE REVISED CHARTER AND ORDINANCES OF THE CITY OF DETROIT 199 (1855) ("within this city, unless by permission of the Mayor or two Aldermen").

[1110] LAWS AND GENERAL ORDINANCES OF THE CITY OF DAYTON 229 (1862) ("within the bounds of the building lots, or cemetery ground in this city, or within one hundred yards of any public road, within this corporation, except by permission of council").

[1111] THE CITY CHARTER, WITH THE SEVERAL LAWS AMENDATORY THERETO, AND THE REVISED ORDINANCES, OF THE CITY OF PEORIA, ILLINOIS 168 (James M. Cunningham ed., 1857) ("in said city, without permission from the mayor or city marshal").

[1112] THE CITY CHARTER AND THE REVISED ORDINANCES OF THE CITY OF PEORIA, ILLINOIS 254 (James M. Cunningham ed., 1869) ("in said city, without permission from the mayor or superintendent of police").

[1113] 1861 Ill. Private Laws 144, sec. 78 ("within the city limits . . . without permission from the mayor or common council").

[1114] THE GENERAL ORDERS OF THE BOARD OF SUPERVISORS, CITY AND COUNTY OF SAN FRANCISCO 13 (1869) ("within that portion of this city and county lying between Larkin and Ninth Streets and the outer line of the streets forming the water-front, except by special permission").

[1115] THE CHARTER AND BY-LAWS OF THE CITY OF MERIDEN 135 (1875) ("within the limits of said city").

[1116] THE CHARTER, WITH ITS AMENDMENTS AND THE GENERAL ORDINANCES OF THE CITY OF DOVER 32 (1870) ("within the compact part of any town").

[1117] A DIGEST OF THE LAWS AND ORDINANCES OF THE CITY OF LITTLE ROCK 231 (George E. Dodge & John H. Cherry eds, 1871) ("No person shall fire or discharge any cannon . . . without permission from the may which permission shall limit the time of such firing, and shall be subject to be revoked by the mayor at any time after it has been granted.").

KR0804

(1875),[1118] La Crosse, Wisconsin (1881),[1119] Lynchburg, Virginia (1887),[1120] and Lincoln, Nebraska (1895).[1121]

These regulations indicate both that private citizens possessed cannons and that they were common enough to place limitations on where they could be fired.

The obvious dangers of firing a cannon in town are justifications for the discharge restrictions. The near-complete absence of any other restrictions in the nineteenth century might be explained by great rarity of use of cannons in crime. Cannons are often fixed in a single location, such as a rooftop. If wheeled, they must be slowly moved by draft animals. It would seem difficult for criminals to make use of them.[1122]

## VII. DOCTRINAL ANALYSIS

This Part offers doctrinal suggestions based on the legal history above.

- Part A summarizes bans on sales or possession of particular arms.
- Part B describes the constitutional background following the adoption of the Fourteenth Amendment; notwithstanding clear congressional intent to make the Bill of Rights enforceable against the States, the Supreme Court held that States could disregard the Bill of Rights, including the Second Amendment.

---

[1118] ORDINANCES AND BY-LAWS OF THE CORPORATION OF MARTINSBURG, BERKELEY CO., WEST VIRGINIA 25 (1875) ("within such parts of the town which are or shall be laid out into lots, or within two hundred yards of said limits").

[1119] Charter and Ordinances of the City of La Crosse 202 (1888) ("within the limits of the city of La Crosse, without having first obtained written permission from the mayor").

[1120] THE CODE OF THE CITY OF LYNCHBURG, VA 116 (Thomas D. Davis ed., 1887) ("in the city" or "within one hundred yards of any dwelling-house without the consent of the owner or occupant of such house").

[1121] 1895 Neb. Laws 238, art. 26, sec. 8 ("in any street, avenue, alley, park, or place, within the corporate limits of the city").

[1122] Mortars are a different story. They are short tubes and man-portable. The rear sits on the ground and the front is elevated by legs, such as a bipod. Some of the above laws also covered mortars. The absence of legislative attention, other than discharge restrictions for inappropriate places, may, as with cannons, be the result of the rarity of criminal use. We guess that few criminals were interested in bombarding fortified buildings.

KR0805

- Part C applies legal history to two core Second Amendment doctrines. First, *Heller*'s affirmation on prohibitions of "dangerous and unusual weapons." Second, the *Bruen* question of how many jurisdictions make a precedential "tradition."
- Part D applies history and doctrine to four specific issues:
  - First, the historical bans on slungshots and knuckles might be justifiable under *Heller*'s allowance of bans on arms "not typically possessed by law-abiding citizens."
  - Second, bans on modern semiautomatic firearms and magazines lack historical support.
  - As for minors, the final third of the nineteenth century provides substantial support for limitations on purchases by minors of some arms without parental consent. The tradition of restrictions on minors does not support modern long gun bans for young adults, 18–20.
  - Finally, penalties for misuse of a particular arm in a violent crime are supported by tradition. They do not involve activity that is protected by the Second Amendment.

### A. Summary of possession or sales bans

From 1607 through 1899, American bans on possession or sale to adults of particular arms are uncommon. For firearms, the bans are:

- Georgia (1837), all handguns except horse pistols.[1123] Held unconstitutional in *Nunn v. State*.[1124]
- Tennessee (1879)[1125] and Arkansas (1881).[1126] Bans on sales of concealable handguns. Based on militia-centric interpretations of the state constitutions, the laws did not ban the largest and most powerful revolvers, namely those like the Army or Navy models.

---

[1123] *See* text at note ____.
[1124] *See* text at note ____.
[1125] *See* text at note ____.
[1126] *See* text at note ____.

**KR0806**

- Florida (1893).[1127] Discretionary licensing and an exorbitant licensing fee for repeating rifles. The law was "never intended to be applied to the white population" and "conceded to be in contravention of the Constitution and non-enforceable if contested."[1128]

For some nonfirearms arms, several states enacted sales bans:

- Bowie knife. Sales bans Georgia, Tennessee, and later in Arkansas.[1129] Georgia ban held to violate the Second Amendment.[1130] Prohibitive transfer or occupational vendor taxes in Alabama and Florida, which were repealed.[1131] Personal property taxes at levels high enough to discourage possession by poor people in Mississippi, Alabama, and North Carolina.[1132]
- Dirk. Georgia (1837) (held to violate Second Amendment);[1133] Arkansas (1881).[1134]
- Sword cane. Georgia (1837), held to violate the Second Amendment.[1135] Arkansas (1881).[1136]
- Slungshot or "colt." Sales bans in nine states or territories.[1137] The Kentucky ban was later repealed.[1138] Illinois also banned possession.[1139]
- Metallic knuckles. Sales bans in six states, later repealed in Kentucky.[1140] Illinois also banned possession.[1141]
- Sand club or blackjack. New York (1881).[1142]

---

[1127] *See* text at note ____.
[1128] *See* text at note ____.
[1129] *See* text at note ____.
[1130] *See* text at note ____.
[1131] *See* text at note ____.
[1132] *See* text at note ____.
[1133] *See* text at note ____.
[1134] *See* text at note ____.
[1135] *See* text at note ____.
[1136] *See* text at note ____.
[1137] *See* text at note ____.
[1138] *See* text at note ____.
[1139] *See* text at note ____.
[1140] *See* text at note ____.
[1141] *See* text at note ____.
[1142] *See* text at note ____.

KR0807

*Journal of Legislation* [50:2

### B. The constitutional and racial background of possession or sales bans

The legal background of the laws discussed above was very different than it is today. The Supreme Court in *Barron v. Baltimore* had said that the Bill of Rights was not binding on the states.[1143] Some state courts, which Akhil Amar calls "the *Barron* contrarians," had taken a different view.[1144] These include the Georgia Supreme Court in *Nunn v. State*, which used the Second Amendment to overturn a statute prohibiting handguns, Bowie knives, and various other arms.[1145]

After the Civil War, the Fourteenth Amendment was ratified, with express congressional intent to make the Bill of Rights, specifically including the Second Amendment, enforceable against the States, as among the "privileges or immunities of citizens of the United States."[1146] But the U.S. Supreme Court mostly nullified the Privilege or Immunities Clause in the *Slaughterhouse Cases*.[1147] The Court's decisions in *United States v. Cruikshank*[1148] and *Presser v. Illinois*[1149] had seemed to many to affirm the *Slaughterhouse* approach specifically for Second Amendment rights.

The idea that the Fourteenth Amendment's Due Process Clause might "incorporate" individual elements in the Bill of Rights did not appear until the Court's 1897 incorporation of the Fifth Amendment Takings Clause in *Chicago, Burlington & Quincy Railroad Company v. Chicago*.[1150] It took the Court until the 1920s to begin "selective incorporation" of parts of the First Amendment, until the 1940s to begin incorporating the criminal law and procedure provisions of Amendments Four, Five, Six, and Eight, until 2010 to incorporate the Second Amendment,[1151] and 2019 to incorporate the Excessive Fines Clause of the Eighth Amendment.[1152] So in the nineteenth century, reasonable legislators might believe they had no obligation to respect anything in the U.S. Bill of Rights, including the Second Amendment.

---

[1143] 32 U.S. 2 (7 Pet.) 43 (1833)

[1144] AMAR, at __.

[1145] *See* text at note ____.

[1146] *McDonald*, 561 U.S. at 838–60 (Thomas, J., concurring).

[1147] 83 U.S. (16 Wall.) 36 (1873).

[1148] 92 U.S. (2 Otto ) 542 (1875).

[1149] 116 U.S. 252 (1886).

[1150] 166 U.S. 226 (1897).

[1151] McDonald v. City of Chicago, 561 U.S. 742 (2010).

[1152] Timbs v. Indiana, 139 S.Ct. 682 (2019).

KR0808

Many states had their own state constitution guarantees of the right to keep and bear arms.[1153] But New York did not, and that is a partial explanation of its eccentric ban on the sale or manufacture of blackjacks and sand clubs.[1154] The other most prohibitive states were Tennessee and Arkansas, with their bans on sales of all handguns except the most powerful ones, the Army & Navy type revolvers.[1155] Both states also banned sales of Bowie knives, and Arkansas did the same for sword canes.[1156] In both states, the supreme courts had interpreted the state constitutional right to arms as solely applicable to militia-suitable arms.[1157]

Even with a militia-centric premise, the Tennessee and Arkansas legislatures and courts were incorrect. The Tennessee Supreme Court in *Aymette* had upheld a statute against Bowie knives on the grounds that such knives are not militia-type arms.[1158] The 1836 Texas War of Independence and the 1861–65 Civil War decisively proved the opposite. Indeed, the Tennessee legislature suspended the Bowie knife law for the duration of the Civil War.[1159] During the war, the Alabama legislature, having used property taxes to discourage Bowie ownership, had to pay for manufacturing Bowie knives of the state militia.[1160]

Overall, restrictions on the right to keep and bear arms in the nineteenth century were most frequent in slave states that later became Jim Crow states.[1161] The modern precedential value of these white supremacy laws may be limited.[1162]

---

[1153] *See* JOHNSON ET AL., *supra* note 16, at 791–804 (texts of all state guarantees, and years of enactment).

[1154] In 1909, the legislature enacted a statutory Bill of Rights, including a verbatim copy of the Second Amendment. N.Y. Civil Rights L, § 4; 1909 N.Y.L. ch. 14. As a mere statute, it could not override any other statute the legislature chose to enact.

[1155] *See* text at note ____.

[1156] *See* text at note ____.

[1157] *See* text at note ____.

[1158] *See* text at note ____.

[1159] *See* text at note ____.

[1160] *See* text at note ____.

[1161] *See* text at note ____.

[1162] *See* Justin W. Aimonetti & Christian Talley, *Race, Ramos, and the Second Amendment Standard of Review,* 107 VA. L. REV. ONLINE 193 (2021) (arguing that Jim Crow gun control laws are not valid precedents today).

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1701   Page 373 of 607

This does not mean that all nineteenth century arms control laws were entirely racist. In the slave/Jim Crow states, laws that disarmed poor whites as well as blacks were enacted.[1163]

A good refutation of the notion that *every* arms control laws is necessarily racist is the law of Massachusetts. During the nineteenth century, the state Constitution right to arms was interpreted in the standard way, as an important but not unlimited right of all people.[1164] The Massachusetts right was interpreted to protect the rights of everyone to own and carry arms. Unlike some restrictive Southern cases, Massachusetts courts never claimed that only militia-type arms were protected.[1165] A person's right to bear arms could be restricted if a court found that the person had been carrying in a manner leading to a breach of the peace. If so, the person could only continue to carry if he posted a bond.

Massachusetts was always a leading anti-slavery state and was the first state in which the highest court held slavery to violate the state constitution. By the end of the nineteenth century, Massachusetts was the only state that had *not* outlawed at least some interracial marriages.[1166] In anti-racist Massachusetts, the right to own and carry arms was necessarily respected. *And* Massachusetts was an early adopter of a ban on sales of slungshots and brass knuckles.[1167]

The Massachusetts story does not prove or disprove the wisdom of sales bans on slungshots and brass knuckles. It does disprove the notion that *all* historic arms control laws were motivated by racial animus.

---

[1163] For example, the laws in some southeastern states imposed relatively high annual property taxes on owning Bowie knives or handguns. The Tennessee and Arkansas bans on sales of handguns other than the Army & Navy models favored people who could afford the largest and most powerful handguns. Many former officers of the Confederate military had retained their service handguns; then as now, military officers tend to be disproportionately from the better-educated and wealthier classes. So were cavalrymen, which is to say men who could afford to bring their own horse to military service. A former Confederate infantry private likely retained his service musket, but he would not necessarily be able to afford the most expensive type of modern handguns.

[1164] Mass. Const. of 1780, pt. 1, art. XVII.

[1165] *See*, *e.g.*, Commonwealth v. Murphy, 44 N.E. 138 (Mass. 1896) (upholding ban on armed parades without advancing permission, citing to state cases that states may regulate the mode of carry); Commonwealth v. Blanding, 3 Pick. 304 (Mass. 1825) ("The liberty of the press was to be unrestrained, but he who used it was to be responsible in case of its abuse; like the right to keep fire arms, which does not protect him who uses them for annoyance or destruction.)

[1166] Peggy Pascoe, What Comes Naturally: Miscegenation Law and the Making of Race in America (2010).

[1167] *See* text at note ____.

## C. Modern doctrines

*1. "Dangerous and unusual" versus "not typically possessed by law-abiding citizens": The distinction applied to slungshots and brass knuckles.*

*Heller* cited a litany of precedents for the prohibition of carrying certain arms. Some of the sources called such arms "dangerous and unusual" and others said "dangerous or unusual."[1168] From these precedents, *Heller*

---

[1168] *Heller* at 627, citing, in order: 4 WILLIAM BLACKSTONE, COMMENTARIES *148–49 (1769) ("The offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton, 2 Edw. III. c.3. upon pain of forfeiture of the arms, and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour."); 3 THE WORKS OF THE HONOURABLE JAMES WILSON 79 (Bird Wilson ed., 1804) ("In some cases, there may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people."); JOHN A. DUNLAP, THE NEW-YORK JUSTICE 8 (1815) ("It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, in such manner as will naturally cause terror to the people."); CHARLES HUMPHREYS, COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822) ("Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land, which is punishable by forfeiture of the arms, and fine and imprisonment. But here it should be remembered, that in this country the constitution guarranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily."); 1 WILLIAM OLDNALL RUSSELL, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271–72 (2d ed. 1831) ("as where people arm themselves with dangerous and unusual weapons; in such a manner as will naturally cause a terror to the people; which is said to have been always an offence at common law, and is strictly prohibited by several statutes."); HENRY J. STEPHEN, SUMMARY OF THE CRIMINAL LAW 48 (1840) ("Riding or going armed with dangerous or unusual Weapons" is "[b]y statute of Northampton, 2 Edw. III, c. 3, . . . a misdemeanor, punishable with forfeiture of the arms and imprisonment during the king's pleasure."); ELLIS LEWIS, AN ABRIDGMENT OF THE CRIMINAL LAW OF THE UNITED STATES 64 (1847) ("where persons openly arm themselves with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, an affray may be committed without actual violence."); FRANCIS WHARTON, A TREATISE ON THE CRIMINAL LAW OF THE UNITED STATES 726 (2d ed. 1852) ("there may be an affray where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, and is strictly prohibited by the statute [Statute of Northampton]."); *State v. Langford*, 10 N.C. 381, 383–84 (1824) ("there may be an affray when there is no actual

*Journal of Legislation*

extrapolated a rule that the government may forbid possession (not just carrying) of arms that are dangerous *and* unusual.[1169]

*Bruen*, noting some of the many nineteenth-century laws against concealed carry, inferred the principle that governments may regulate the *manner* of carry.[1170] That is, the government may require that carry be open rather than concealed (in compliance with nineteenth century sensibilities), or the government may require that carry be concealed rather than open (in compliance with modern sensibilities in some areas). As for the jurisdictions that prohibited *all* modes of handgun carry, the Court dismissed them as outliers.[1171]

We can synthesize two subrules from *Heller*'s dangerous and unusual rule and from *Bruen*'s modes of carry rule. Subrule 1: the types of arms for which possession can be prohibited can include those for which carry in every mode was historically prohibited. Subrule 2: in applying subrule 1, outlier jurisdictions that banned all modes of handgun carry are low-value precedents. The subrules provide some additional structure for "dangerous and unusual," and reduce judicial temptation to use the phrase for epithetical jurisprudence.[1172]

---

violence: as when a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people; which is said always to have been an offence at common law, and is strictly prohibited by statute."); *O'Neill v. State*, 16 Ala. 65, 67 (1849) ("It is probable, however, that if persons arm themselves with deadly or unusual weapons for the purpose of an affray, and in such manner as to strike terror to the people, they may be guilty of this offence, without coming to actual blows."); *English v. State*, 35 Tex. 473, 476–77 (1872) ("Blackstone says, the offense of riding or going round with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land."); *State v. Lanier*, 71 N.C. 288, 289 (1874) ("The elementary writers say that the offence of going armed with dangerous or unusual weapons is a crime against the public peace by terrifying the good people of the land, and this Court has declared the same to be the common law in *State* v. *Huntley*, 3 Ired. 418.").

[1169] *Heller*, 554 U.S. at 627 (emphasis added).

[1170] "The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. . . . States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly." *Bruen*, 142 S. Ct. at 2150.

[1171] *See* Part VII.B.2, *infra*.

[1172] *Cf.* Joseph H. Drake, Note, *Epithetical Jurisprudence and the Annexation of Fixtures*, 18 MICH. L. REV. 405 (1919-1920) (creating the phrase); Jerome Frank, *Epithetical Jurisprudence and the Work of the Securities and Exchange Commission in the Administration of Chapter X of the Bankruptcy Act*, 18 N.Y.U. L.Q. REV. 317 (1941) (popularizing it).

KR0812

Therefore, the 1871 Texas and 1890 Oklahoma Territory laws against almost all carrying of handguns are of little value in assessing the constitutional status of other arms that were also prohibited from carry in those jurisdictions.

As *Bruen* points out, just because a weapon might have been considered "dangerous and unusual" at one point in time does not prevent it from becoming "common" later; if so, it becomes protected. *Bruen* articulates the rule in response to claims that handguns had been considered dangerous and unusual in the colonial period:

> Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." [*Heller*] *Id*., at 629, 128 S. Ct. 2783, 171 L. Ed. 2d 637. Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.[1173]

The *Bruen* argument above is *arguendo*. Handguns were never "dangerous and unusual." To the contrary, they were mandatory militia arms for officers and horsemen, who were expected to bring their own handguns to militia service.[1174]

As described in Part III.D, firearms with ammunition capacities over ten rounds were never considered "dangerous and unusual" in the nineteenth century. However, during the alcohol prohibition era of the 1920s and early 1930s, six states enacted laws that limited ammunition capacity in certain contexts, albeit less severely than prohibitory twenty-first century laws.[1175] If

---

[1173] Bruen, 142 S. Ct. at 2143.

[1174] *See* Part II.D.

[1175] 1927 R.I. Pub. Laws 256, §§ 1, 4 (banning sales of guns that fire more than 12 shots semi-automatically without reloading); 1927 Mich. Pub. Acts ch. 372, § 3 (prohibiting sale of firearms "which can be fired more than sixteen times without reloading"); 1933 Minn. Laws ch. 190 (prohibiting the "machine gun," and including semi-automatics "which have been changed, altered or modified to increase the magazine capacity from the original design as manufactured by the manufacturers"); 1933 Ohio Laws 189, 189 (license needed for semi-

KR0813

it were to be argued that these restrictions from the days of Prohibition were permissible at the time as "dangerous and unusual" laws, that argument could no longer be applied today. Today (unlike in 1690 or 1925), Americans own over one hundred million handguns and hundreds of millions of magazines with capacities over 10 rounds.[1176]

### 2. How many jurisdictions make a tradition?

*Bruen* offers some guidelines for how the government can carry its burden of proof to demonstrate a "historical tradition of firearm regulation" necessary to uphold a law.[1177] *Bruen* held that "the historical record compiled by respondents does not demonstrate a tradition" of restricting public handgun carry.[1178] Here is list of the (insufficient) sources cited by advocates of the notion that the right to "bear Arms" can be prohibited or can be limited only to persons whom the government believes have shown a "special need." For some of these sources, the Court was not convinced by the advocates' characterization of the laws, but the Court addressed them *arguendo*:[1179]

---

automatics with capacity of more than 18); 1933 Cal. Stat., ch. 450 (licensing system for machine guns, defined to include semi-automatics actually equipped with detachable magazines of more than ten rounds); 1934 Va. Acts ch. 96, §§ 1(a), 4(d) (regular sess.) (defining machine guns as anything able to fire more than 16 times without reloading, and prohibiting possession for an "offensive or aggressive purpose"; presumption of such purpose when possessed outside one's residence or place of business, or possessed by an alien; registration required for "machine gun" pistols of calibers larger than .30 or 7.62 mm).

All these laws were later repealed. See David B. Kopel, *The History of Firearms Magazines and of Magazine Prohibition*, 78 ALBANY L. REV. 849, 864–66 (2015) (Michigan repeal in 1959; R.I. limit raised to 14 and .22 caliber exempted in 1959, full repeal in 1975; Ohio limit raised to 32 and .22 caliber exempted in 1971, full repeal in 2014, statute had not applied to sale of magazines, but only to unlicensed insertion of a magazine into a firearm); 1963 Minn. Sess. L. ch. 753, at 1229 (defining "machine gun" as automatics only); 1965 Stats. of Calif., ch. 33, at 913 ("machine gun" fires more than one shot "by a single function of the trigger"); 1975 Va. Acts, ch. 14, at 67 (defining "machine gun" as automatics only); 1979 N.C. Sess. Laws 1230, ch. 895, § 1 (eliminating licensing for pump guns).

[1176] "48.0% of gun owners – about 39 million individuals – have owned magazines that hold over 10 rounds (up to 542 million such magazines in total" and "approximately 171 million handguns." William English, PhD, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned, at 1–2 (May 13, 2022), https://bit.ly/3HaqmKv.

[1177] *Bruen*, 142 S. Ct. at 2130.

[1178] *Id.* at 2138.

[1179] *Id.* at 2144 ("even if" the government's reading were correct, the record would not justify the challenged regulation).

- Two colonial statutes against the carrying of dangerous and unusual weapons (1692 Massachusetts, 1699 New Hampshire).[1180]
- One colonial law restricting concealed carry for everyone and handgun carry for "planters," a/k/a frontiersmen (1686 East Jersey).[1181]
- Three late-18th-century and early-nineteenth-century state laws that "parallel[] the colonial statutes" (1786 Virginia, 1795 Massachusetts, 1801 Tennessee).[1182]
- Two nineteenth-century common-law offenses for going armed for a wicked or terrifying purpose (1843 North Carolina, 1849 Alabama).[1183]
- Four statutory prohibitions on handgun carry (1821 Tennessee,[1184] 1870 Tennessee,[1185] 1871 Texas (without reasonable cause),[1186] 1887 West Virginia (without good cause).[1187]
- One state statute against going armed to the terror of the public (1870 South Carolina).[1188]
- Eleven nineteenth-century surety statutes, requiring that a person found by a court to have threatened to breach the peace must post a bond in order to continue carrying. (1836 Massachusetts,[1189] 1870 West Virginia,[1190] and "nine other jurisdictions"[1191]).
- Two Western territory laws banning handgun carry (1869 New Mexico,[1192] 1881 Arizona).[1193]

---

[1180] *Id.* at 2142–43. Like many of the "dangerous and unusual" laws cited by *Heller*, these laws intended to prohibit "bearing arms to terrorize the people." *Id.* at 2143.

[1181] *Id.* at 2143.

[1182] *Id.* at 2144–45.

[1183] *Id.* at 2145–s46.

[1184] *Id.* at 2147.

[1185] *Id.* at 2153. This law was interpreted by courts, however, as allowing the carry of "large pistols suitable for military use." *Id.*

[1186] *Id.* at 2153.

[1187] *Id.*

[1188] Bruen at ___.

[1189] *Id.* at 2148–50.

[1190] *Id.* at 2152–53.

[1191] *Id.* at 2148. "'[U]nder surety laws . . . everyone started out with robust carrying rights' and only those reasonably accused [of creating fear of an injury or breach of the peace] were required to show a special need in order to avoid posting a bond." *Id.* at 2149 (quoting *Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017).

[1192] *Id.* at 2154.

[1193] *Id.*

KR0815

- Two Western territory laws banning the carry of any arms in towns, cities, and villages (1875 Wyoming,[1194] 1889 Idaho.)[1195]
- One Western territory law banning all handgun carry and most long-gun carry (1890 Oklahoma).[1196]
- One Western State law instructing but not convincing large cities to ban all carry (1881 Kansas).[1197]

So the general rule seems to be: In any given time period, it is possible to find several jurisdictions that in some way prohibited the exercise of the right to bear arms. But the aggregate of jurisdictions with prohibitory laws is insufficient to overcome the mainstream approach of respecting the right to bear arms.

Let us put aside the Court's *arguendo* treatment of tendentious claims, such as assertions that laws against carrying dangerous and unusual weapons to terrify the public were actually prohibitions on peaceable defensive carry. For laws that actually did prohibit peaceable carry in many circumstances, there are:

- East Jersey, which for a few years in the late seventeenth century prohibited any form of handgun carry by "planters" (frontiersmen).
- Tennessee in 1821, but later the state supreme court and state statute acknowledged the right to open carry of Army & Navy revolvers (the best and most powerful handguns of the time). Texas 1871 and West Virginia 1887. All three state supreme courts at the relevant time interpreted their state constitutional rights to arms as militia-centric.
- Two Western Territories with general prohibitions on defensive handgun carry, and three with prohibitions on such carry in towns. All the territorial restrictions were later repudiated by statehood constitutions and jurisprudence thereunder.[1198]
- A Kansas state legislature instruction for large towns to ban handgun carry, which most towns apparently ignored.[1199]

---

[1194] *Id.*
[1195] *Id.*
[1196] *Id.*
[1197] *Id.* at 2155–56.
[1198] Johnson et al., *supra* note 16, at 517–18.
[1199] *Id.*

From this list, we might cull even further, by eliminating the state laws that were upheld only because the relevant state constitutions were interpreted as militia-centric, in contrast to *Heller*'s interpretation of the Second Amendment. We could also cull the territorial laws that were repudiated by the people of the territories as soon as they could form their own constitutions. The list of precedential carry bans is thus reduced to "half a colony" for eight years (East Jersey),[1200] and one state instruction to local governments that was ignored (Kansas). That leaves carry bans with only two feeble precedents relevant to the Second Amendment.

Our analysis indicates that *Bruen* was correctly decided, there being very few good precedents for general bans on bearing arms. However, we did not write the *Bruen* opinion. Justice Thomas's list of precedents, not ours, is legally controlling. That list shows that even substantial handfuls of restrictive minority precedents are insufficient to overcome the text of the Second Amendment.

On the other hand, some advocates suggest that *Bruen*'s long list of insufficient precedents does not provide the controlling rule. Rather, they say that one of our articles does. In discussing the use of historical analogies, Justice Thomas's opinion cited with approval a legal history article we had written about the "sensitive places" doctrine. The doctrine is based on *Heller*'s statement that bearing arms can be prohibited in "sensitive places such as schools and government buildings."[1201] Our article had surveyed the history of locational limits on bearing arms, and *Bruen* cited the article:

> Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018) . . . . We therefore can assume it settled that these

---

[1200] *Bruen*, 142 S. Ct. at 2144 ("At most eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment.").

[1201] 554 U.S. at 626.

KR0817

locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment.[1202]

The above suggests that "relatively few" precedents may be needed for "uncontested" laws. Perhaps this is particularly true for laws that simply affect the fringe of a right (putting a few places off-limits for bearing arms) as opposed to laws with broader restrictions. Certainly there was lots of litigation in the nineteenth century challenging various restrictions on keeping and bearing firearms and knives, including the cases described in Parts IV and V.[1203]

### D. Application of history and modern doctrine to particular types of laws

#### 1. Sales prohibitions on slungshots and knuckles

If we are going to count historical precedents as rigorously as *Bruen* did, it is not clear that even the most prohibitory laws from the nineteenth century— the bans on slungshot sales and manufacture in nine states or territories—can clear the hurdle. Nor can such laws be retroactively justified under *Heller* and *Bruen* as covering "dangerous and unusual" weapons. We do not have manufacturing data, but it seems unlikely that slungshots and knuckles were so rare as to be considered "unusual."

However, another part of *Heller* may provide reconciliation. The "Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes . . ."[1204] Based on Escobar's overview, legitimate defensive carry of slungshots was not common; carry by people who were not professional criminals was mainly for fast revenge to verbal insults,

---

[1202] *Id.* at 2133. It is correct that bans on polling places were not contested. The ban on courthouses was in fact contested, and, in our view, correctly upheld. *See* State v. Hill, 53 Ga. 472, 477–78 (1874):

> [T]he right to go into a court-house and peacefully and safely seek its privileges, is just as sacred as the right to carry arms, and if the temple of justice is turned into a barracks, and a visitor to it is compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives, or bristling with guns and bayonets, his right of free access to the courts is just as much restricted as is the right to bear arms infringed by prohibiting the practice before courts of justice.

[1203] *See* David B. Kopel, *The First Century of Right to Arms Litigation*, 14 GEORGETOWN J.L. & PUB. POL'Y 127 (2016).

[1204] *Heller*, 554 U.S. at 625.

KR0818

rather than for protection against violent attack. Some of the judicial remarks quoted in Part VI are, while not conclusive, supportive of this interpretation.[1205]

This approach distinguishes slungshots and knuckles from blackjacks, which were highly favored by law enforcement officers. Some modern courts have ruled that widespread law enforcement use is powerful evidence that a type of arm *is* "typically possessed by law-abiding citizens for lawful purposes." The principle was recognized for electric weapons, such as stun guns or tasers, in Justice Alito's concurrence in *Caetano v. Massachusetts* and by the Michigan Court of Appeals.[1206] The Connecticut Supreme Court took the same approach for "police batons."[1207]

Our analysis of nongun, nonblade arms is tentative. While the history of flexible impact weapons is told only in a single book, recently published, there is no similar scholarship of which we are aware regarding knuckles.[1208] This Article being the only post-*Heller* article to examine flexible and rigid impact weapons, we do not claim to have resolved every legal issue. We do point out that, as with Bowie knives, the mainstream historical American approach was nonprohibitory.

### 2. Modern semiautomatic firearms and magazines

Today the most controversial bans on particular arms today are possession or sales bans on semiautomatic rifles and on magazines with capacities over

---

[1205] *See* text at note ____.

[1206] Caetano v. Massachusetts, 577 U.S. 411, 419 (2016) (Alito, J., concurring) (noting that Massachusetts "allows law enforcement and correctional officers to carry stun guns and Tasers, presumably for such purposes as nonlethal crowd control. Subduing members of a mob is little different from 'suppress[ing] Insurrections,' a traditional role of the militia"); People v. Yanna, 297 Mich. App. 137, 145, 824 N.W.2d 241, 245 (2012) ("By some reports, nearly 95 percent of police departments in America use Tasers" so there is "there is 'no reason to doubt that the majority of Tasers and stun guns are used only for lawful purposes").

[1207] State v. DeCiccio, 315 Conn. 79, 105 A.3d 165, 200 (2014) ("expandable metal police batons, also known as collapsible batons, are instruments manufactured specifically for law enforcement use as nonlethal weapons. Furthermore, the widespread use of the baton by the police, who currently perform functions that were historically the province of the militia; see, e.g., D. Kopel, "The Second Amendment in the Nineteenth Century," 1998 BYU L.Rev. 1359, 1534; demonstrates the weapon's traditional military utility"). The court also relied on military use to hold that "dirk knives" are Second Amendment arms. 105 A.3d at 192–93.

[1208] A Westlaw search for law journal articles with "knuckles" in the title yielded no results.

*Journal of Legislation*

10 or (less often) 15 rounds. These bans are unsupported. First, "[d]rawing from America's "historical tradition," the Supreme Court has held that "the Second Amendment protects" arms that are "'in common use at the time.'"[1209] Thus, in *Heller*, the Court held that because "handguns are the most popular weapon chosen by Americans" and therefore in common use, "a complete prohibition of their use is invalid."[1210] Concurring in *Caetano*—a *per curiam* reversal of case that upheld a stun gun prohibition—Justices Alito and Thomas reasoned that because "stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment."[1211]

As for the ever-shifting category of so-called "assault weapons," "about 24.6 million individuals – have owned an AR-15 or similarly styled rifle (up to 44 million such rifles in total)."[1212] The best estimate for magazines over 10 rounds is 542 million, owned by 48 percent of gun owners.[1213] The firearms and magazines are unquestionably in common use; according to the Court's interpretation of legal history, they cannot be banned.

Being common arms, the firearms and magazines cannot be treated as "dangerous and unusual weapons." A weapon that is "unusual" is the antithesis of a weapon that is "common." So an arm "in common use" cannot be dangerous *and* unusual.[1214] The Supreme Court *per curiam* in *Caetano* did not address dangerousness of stun guns because the Court had already determined that the lower court's "unusual" analysis was flawed.[1215] Concurring, Justices Alito and Thomas elaborated:

> As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual. Because the Court rejects the lower court's conclusion

---

[1209] *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).

[1210] *Heller*, 554 U.S. at 529.

[1211] 136 S.Ct. at 1033 (Alito, J., concurring).

[1212] English, *supra* note __, at 2; David B. Kopel, *Defining "Assault Weapons"*, THE REGULATORY REV (Univ. of Pennsylvania), Nov. 14, 2018 ("assault weapon" bills have encompassed almost every type of firearm, other than machine guns), https://www.theregreview.org/2018/11/14/kopel-defining-assault-weapons/.

[1213] English, *supra* note __, at 24–25.

[1214] See *Friedman v. City of Highland Park, Illinois*, 784 F.3d, 406, 409 (7th Cir. 2015) (if "the banned weapons are commonly owned … then they are not unusual.").

[1215] 136 S. Ct. at 1028.

KR0820

that stun guns are "unusual," it does not need to consider the lower court's conclusion that they are also "dangerous."[1216]

As some of the most popular arms in America,[1217] semiautomatic rifles and magazines cannot be "dangerous and unusual."

None of the above analysis of the rules from pre-*Bruen* cases is new, nor was most of it disputed even by lower courts that upheld bans pre-*Bruen*. The courts agreed that semiautomatic firearms and standard magazines are "in common use," or they assumed commonality *arguendo*. The courts upheld the bans by applying interest-balancing, which *Bruen* forbids.[1218]

What this Article demonstrates is that such a ban cannot be rescued by historical analogy. In considering analogies, *Bruen* states that there are "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."[1219] "How" means: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense."[1220] "Why" means: "whether that burden is comparably justified."[1221]

As Part IV showed, the history of nineteenth century bans on particular types of firearms is close to nil. Likewise, as described in Part II, the only colonial analogy was the New Netherland limit on flintlock quantity, and that briefly existing law disappeared when New Netherland was assimilated into the American colonies, where there were zero laws against particular types of arms.[1222]

The 1837 Georgia ban on most handguns and on "Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the

---

[1216] *Id.* at 1031 (Alito, J., concurring) (emphasis in original).

[1217] The number of AR rifles (just one type of "assault weapon") is larger than the "total U.S. daily newspaper circulation (print and digital combined) in 2020 . . . 24.3 million" for weekdays. *See Newspapers Fact Sheet,* Pew Research Center (June 29, 2021), https://pewrsr.ch/3CNXFS0.

[1218] *See, e.g.*, Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011) ("Heller II"); New York State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242 (2d Cir. 2015); Worman v. Healey, 922 F.3d 26 (1st Cir. 2019).

[1219] *Bruen*, 142 S. Ct. at 2132–33. In *Bruen*'s analysis, *Heller* and *McDonald* declared that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* at 2133 (citing McDonald, 561 U.S. at 767).

[1220] *Id.*

[1221] *Id.*

[1222] Part II.A (English colonies), Part II.C (New Netherland).

same as arms of offence or defence; pistols, dirks, sword-canes, spears" was held in 1846 to violate the Second Amendment in *Nunn v. State*.[1223] Being much closer to the Founding than are post-Reconstruction enactments, *Nunn* is powerful precedent. All the more so given the *Heller* Court's extollation of *Nunn,*

The 1879 Tennessee and 1881 Arkansas laws against the sale of handguns smaller than the Army & Navy models, and bans on the sale of certain blade arms, were validated under state court decisions that held the state constitution right to arms to be applicable only to militia-type arms.

Even if those precedents controlled the Second Amendment, which they do not, they did not ban guns because they were supposedly too powerful, as modern rifles and magazines are sometimes claimed to be. To the contrary, the Tennessee and Arkansas laws banned concealable firearms that were, being smaller, *less* powerful than the large, state-of-art revolvers that were recognized to be constitutionally protected. So the Tennessee and Arkansas laws against small, concealable handguns have a very different "why" than bans on modern rifles and rifles.

Indeed, modern prohibition advocates point to similarities between modern AR semiautomatic rifles and modern military automatic rifles such as the M16 and M4. The prohibitionist argument thus concedes the very strong militia suitability of AR rifles. That makes prohibition unconstitutional under every nineteenth century case precedent, including the ones that upheld bans on certain arms. The unanimous judicial view of the time was that, at the least, no government could outlaw militia-suitable arms.

The only arguable nineteenth-century statutory precedent for bans on modern rifles and magazines is Florida's 1893 licensing law for Winchesters and other repeating rifles. That law was conceded to be unconstitutional and was "never intended to be applied to the white population.[1224]

Bans on modern rifles and magazines cannot be rescued by diverting attention away from the legal history of firearms law, and instead pointing to laws about other arms. Dozens of state and territorial legislatures enacted laws about Bowie knives, as well as dirks and daggers.[1225] Prohibitory laws for these blades are fewer than the number of bans on carrying handguns,[1226] and *Bruen*

---

[1223] *See* text at note ____.
[1224] *See* text at note ____.
[1225] *See* text at note ____.
[1226] *See* text at note ____.

found the handgun laws insufficient to establish a tradition constricting the Second Amendment.[1227]

As for other nonblade impact weapons, the sales and manufacture bans in a minority of states for slungshots and knuckles could be considered as involving arms "not typically possessed by law-abiding citizens for lawful purposes."[1228]

Other flexible impact arms, most notably blackjacks, were "typically possessed by law-abiding citizens for lawful purposes," especially by law enforcement officers. Likewise, modern semiautomatic rifles and standard magazines are also highly preferred by today's law enforcement officers.

For blackjacks and sand clubs, only one state, New York, enacted a sales and manufacture ban. That came at a time when the legislature was unencumbered by a Second Amendment enforceable against the states or by a state constitution right to arms. As *Bruen* teaches, a lone eccentric state does not create a national legal tradition.

For every arm surveyed in this article, the mainstream American legal tradition was to limit the mode of carry (no concealed carry), to limit sales to minors (either with bans or requirements for parental permission), and/or to impose extra punishment for use in a crime.

The fact that most states banned concealed carry of Bowie knives is not a precedent to criminalize the mere possession of modern rifles and magazines.

*3. Minors*

Restrictions on transfers of particular arms to minors were numerous in the last third of the nineteenth century. In two previous articles, we provided the legal history of age-based firearm restrictions.[1229] In the present article, we have described many age restrictions for other arms, in Parts V and VI.

Some of those restrictions listed an age, while others simply said "minor." The distinction is important today, regarding laws that prohibit arms for young adults 18–20, who today are legally recognized as adults. Similarly, if an 1870 law had limited the exercise of a civil right only to "voters," that law today

---

[1227] *See* text at note ____.

[1228] *Heller*, 554 U.S. at 625.

[1229] Kopel & Greenlee, *The Second Amendment Rights of Young Adults*, *supra* note __; David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. U. L.J. 119 (2018).

would not be a good precedent for restricting the civil rights of women, although it might still be a good precedent for restricting the right for non-citizens.

The following laws, in chronological order of first enactment, restricted sales of at least one type of arm based on age; some of them also restricted nonsale transfers: Alabama (1856, male minor); Tennessee (1856, minor); [1230] Kentucky (1859, minor, parental permission), Indiana (1875, age 21), Georgia (1876, minor), Illinois (parent or employer consent, age 18), West Virginia (1882, age 21), Kansas (1883, minor, also banning possession), Missouri (1885, minor parental consent), Texas (1889, minor, parental consent), Florida (1889, minor), Louisiana (1890, age 21), New York (1889, consent of police magistrate), Oklahoma Terr. (1890, age 21), Virginia (1890, "minor under sixteen years of age"), D.C. (1892, minor), North Carolina (1893, minor). A few laws limited carry based on age: Nevada (1881, no concealed carry, age 18) (1883, raised to 21), Arizona Terr. (1883, ages 10 to 16, no carry in towns).[1231]

Only Kansas criminalized possession of a regulated arm based on age.[1232] None of the age restrictions applied to rifles or shotguns.[1233] Moreover, the first laws come over 60 years after the Second Amendment, and only three of them precede the Fourteenth Amendment.[1234] According to *Bruen*, "late-19th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."[1235] Earlier evidence shows that in the colonial and founding eras, no age-based firearm restrictions applied to 18-to-20-year-olds, and as part of the militia, they were required to possess a wide array of firearms, edged weapons, and accoutrements.[1236] Thus, whatever may be concluded from analogies to statutory precedents, modern restrictions on long gun acquisition by young adults ages 18 to 20 are constitutionally dubious, and bans on possession appear indefensible.

*4. Penalties for criminal misuse*

---

[1230] *See* text at note ____.

[1231] *See* Kopel & Greenlee at note ____.

[1232] *See* text at note ____.

[1233] *See* text at note ____.

[1234] *See* text at note ____.

[1235] 142 S.Ct. at 2154 n.28.

[1236] Kopel & Greenlee, *The Second Amendment Rights of Young Adults*, *supra* note __, at 533–89.

KR0824

As described in Parts V and VI, there were also many laws imposing extra penalties of use of particular arms in violent crimes,[1237] We have not surveyed the colonial criminal codes to look for analogues. There was a longstanding tradition in common law, sometimes codified in statutes, with special punishment for breaches of the peace involving weapons.[1238]

For the most part, the search of precedents is unnecessary. Perpetrating criminal homicides, armed robberies, or armed burglaries is not conduct that is protected by the Second Amendment. Violent crimes with firearms, Bowie knives, or other arms harm "the security of a free State."[1239] Likewise, the First

---

[1237] *See* text at note ____.

[1238] *See, e.g.,* David B. Kopel & George A. Mocsary, *Errors of Omission: Words Missing from the Ninth Circuit's Young v. State of Hawaii,* 2021 U. Ill. L. Rev. Online 172, 174–83 (May 13, 2021).

[1239] U.S. Const. Amend. II. "Such admonitory regulation of the abuse must not be carried too far. It certainly has a limit. For if the legislature were to affix a punishment to the abuse of this right, so great, as in its nature, it must deter the citizen from its lawful exercise, that would be tantamount to a prohibition of the right." Cockrum v. State, 24 Tex. 394, 403 (1859) (upholding law imposing extra punishment for use of a Bowie knife in manslaughter).

Beyond the scope of this Article are extra penalties for possessing arms while committing a nonviolent crime. For example, body armor is a Second Amendment "arm." *See Heller* 554 U.S. at 581 (quoting dictionary definitions of "arms" that include "armour for defence" or "any thing a man wears for his defence"). Laws that punished arms possession in the course of a crime even if the possession had nothing to do with a crime might raise constitutional problems. A bill introduced in the U.S. Senate in 1999 would have imposed a sentence enhancement of up to 36 months for committing any crime while using body armor—for example, if the proprietor of a liquor store, who always wore body armor for protection from robbers, filled out his tax forms at work and cheated on the taxes. S. 254, § 1644, U.S. Sen., 106th Cong., 1st Sess. (1999) (Sen. Lautenberg); David B. Kopel & James Winchester, *Unfair and Unconstitutional: The New Federal Juvenile Crime and Gun Control Proposals,* Independence Institute Issue Paper no. 3-99, Part VIII (June 3, 1999).

Today's U.S. Sentencing Guidelines impose a two-step (up to 36 months) sentence enhancement for possessing a firearm during a drug trafficking crime. The only exception is if the defendant can show that any connection of the gun to the crime was "clearly improbable." U.S.S.G. § 2D1.1(b)(1) Cmt. 11. One federal district court recently held that there was "a substantial question" for appellate review as to whether the "clearly improbable" standard is consistent "with the nation's traditions of firearm regulation." United States v. Alaniz, No. 1:21-cr-00243-BLW, 2022 WL 4585896, *3 (D. Ida. Sept. 29, 2022).

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1717   Page 389 of 607

Amendment freedom of speech does not protect verbal or written conspiracies in restraint of trade, in violation of antitrust laws.[1240]

---

[1240] *See, e.g.*, Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949) (First Amendment does not "make it . . . impossible ever to enforce laws against agreements in restraint of trade").

KR0826

## CONCLUSION

According to the Supreme Court's *Bruen* decision, the Second Amendment's textual "unqualified command" about "the right to keep and bear arms" is not violated by established traditions in our legal history for regulation of the right. No bans on types of arms from English legal history are relevant to Second Amendment analysis under *Bruen*, for none were adopted in America. During the colonial period and the Founding Era, there were no bans in the English colonies or the new nation on types of arms.

Under *Bruen*, the nineteenth century is relevant to the extent that it informs the original meaning.[1241] Thus, legal history close to the Founding is most important, and the latter part of the century much less so.[1242] Based on this Article's survey of all state and territorial laws before 1900, bans on the sale or possession of any type of arm are eccentricities that do not overcome the plain text of the Second Amendment. Punitive taxation of some arms existed in three southeastern states, but these laws did not create a national tradition. Bans on concealed carry were very common, and under *Heller* and *Bruen* limitations on the mode of handgun carry have been expressly stated to be constitutional, as long as some mode of carry (open or concealed) was allowed.

The deviant jurisdictions that entirely banned carry of Bowie knives, daggers, or other arms are almost entirely the same as the few that restricted handgun carry. *Bruen* held that a few repressive jurisdictions did not establish a national tradition allowing a general ban on carrying handguns.

In contrast, many American jurisdictions limited sales to minors or imposed enhanced punishment for misuse of certain weapons. For at least some weapons, there is an established American tradition in favor of such laws.

---

[1241] *Bruen*, 142 S. Ct. at 2136 ("when it comes to interpreting the Constitution, not all history is created equal. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.") (quoting *Heller*, 554 U. S., at 634–35 (emphasis added in *Bruen*); *id.* at 2132 (the Second Amendment's "meaning is fixed according to the understandings of those who ratified it").

[1242] *Id.* at 2137 ("*Heller*'s interest in mid- to late-19th-century commentary was secondary. . . . In other words, this 19th-century evidence was 'treated as mere confirmation of what the Court thought had already been established'" by earlier evidence. (quoting Gamble v. United States, 139 S. Ct. 1960, 1975–76 (2019)); *Heller*, 554 U.S. at 614 ("discussions [that] took place 75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources.").

*Journal of Legislation*

As described in Part III, firearms improved more in the nineteenth century than in any century before or since. Although repeating arms had been around for centuries, during the nineteenth century they became affordable to an average consumer. The semiautomatic handgun with detachable magazines was an innovation of the nineteenth century. Despite the amazing technological progress during the nineteenth century, only one American statute—a racist Florida law from 1893—treated repeating firearms worse than other firearms. Indeed, the two most repressive handgun laws from the Jim Crow period—Tennessee (1879) and Arkansas (1881)—privileged the most powerful repeating handguns above lesser handguns. American legal history from 1606 to 1899 provides no precedent for special laws against semiautomatic firearms or against magazines.

The mainstream of American legal history supports controls on the mode of carry, limitations for minors, and punishment for misuse. The mainstream history does not support prohibitions of arms that are well-known to be kept for lawful purposes, including self-defense.

KR0828

**PLAINTIFFS' EXHIBIT Y**

KR0829

1  ROB BONTA
   Attorney General of California
2  R. MATTHEW WISE
   Supervising Deputy Attorney General
3  JANE REILLEY
   Deputy Attorney General
4  KATRINA UYEHARA
   Deputy Attorney General
5  State Bar No. 349378
     1300 I Street, Suite 125
6    P.O. Box 944255
     Sacramento, CA 94244-2550
7    Telephone:  (916) 210-7867
     Fax:  (916) 324-8835
8    E-mail:  Katrina.Uyehara@doj.ca.gov
   *Attorneys for Defendant Rob Bonta, in his*
9  *official capacity as Attorney General of the*
   *State of California*

10

IN THE UNITED STATES DISTRICT COURT

11

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12

13

14

| | |
|---|---|
| **KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P.,** | 3:23-cv-00474-JES-DDL |
| Plaintiffs, | **EXPERT REPORT AND DECLARATION OF BRENNAN RIVAS** |
| **v.** | Dept: 4B |
| **CALIFORNIA ATTORNEY GENERAL ROB BONTA,** | Judge: The Honorable James E. Simmons, Jr. |
| Defendant. | Action Filed: 3/15/2023 |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXPERT REPORT AND DECLARATION OF BRENNAN RIVAS

I, Brennan Rivas, declare under penalty of perjury that the following is true and correct:

The California Department of Justice has asked me to provide an expert opinion in the above-captioned matter. My declaration and report below presents and explicates that opinion in detail. This report and declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this report and declaration.

## BACKGROUND AND QUALIFICATIONS

1.  I am a professional historian and independent scholar. During the 2021-2022 academic year, I was the Lloyd Lewis Fellow in American History at The Newberry Library. From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University. From 2019 to 2020, I was a Lecturer in American History at Texas Christian University (TCU). My educational background includes a Ph.D. in History from TCU, where my dissertation explored the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

2.  I have studied historical laws restricting the carrying, sale, and possession of certain weapons. Part and parcel of that process is examining the historical justifications and purposes of these laws and seeking to understand how Americans from previous eras balanced weapon regulation in response to urgent societal problems with the right to bear arms for constitutionally protected, lawful purposes.

3.  I have authored multiple publications on this topic, including a peer-reviewed article in the *Southwestern Historical Quarterly*, a chapter in an edited collection published in 2023 by Oxford University Press entitled *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and*

1

KR0831

*Society*, and a 2022 article, "Enforcement of Public Carry Restrictions: Texas as a Case Study (June 2022), published in the *UC Davis Law Review*.

4.  I am currently completing a book manuscript based upon my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period. This manuscript has undergone the first round of peer-review and is currently under contract with an academic press.

5.  I have provided expert witness testimony in *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); *Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C.); *Duncan v. Bonta*, 17-cv-1017 (S.D. Cal.); *Brumback v. Ferguson*, No. 1:22-cv-03093 (E.D. Wash.); *Christian v. Nigrelli*, No. 22-cv-00695 (W.D.N.Y.); *Frey v. Nigrelli*, Case No. 21 Civ. 5334 (NSR) (S.D.N.Y.); *Sullivan v. Ferguson*, No. 3:22-cv-5403 (W.D. Wash); *Siegel v. Platkin*, No. 22-cv-7463 (RMB) (AMD) (D.N.J.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *Oregon Firearms Federation, Inc. v. Kotek*, No. 22-cv-01815-IM (D. Or.); *NSSF v. Jennings*, No. 22-cv-01499-RGA (D. Del.); *Jones v. Bonta*, No. 3:19-cv-01226-L-AHG (S.D. Cal.); *Weise v. Bonta*, No. 2:17-cv-00903-WBS-KJN (E.D. Cal.); *Nguyen v. Bonta*, No. 3:20-cv-02470-WQH-BGS (S.D. Cal.); *Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal.); *May v. Bonta*, No. 8:23-cv-01696 (C.D. Cal.); *Carralero v. Bonta*, No. 8:23-cv-01798 (C.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617-KJM-AC (E.D. Cal.); *Nichols v. Bonta*, No. 3:11-cv-09916-SJO-SS (C.D. Cal.); *Wolford v. Lopez*, No. 1:23-cv-00265-LEK-WRP (D. Haw.); *Kipke v. Moore*, No. 1:23-cv-01293-GRL (D. Mar.); *State of Ohio v. City of Columbus*, No. 22-cv-00657 (Com. Pleas, Fairfield County, OH); *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077-JLK (D. Col.); and *Schoenthal v. Raoul*, No. 3:22-cv-50326 (N.D. Ill.).

6.  A true and correct copy of my current curriculum vitae is attached as **Exhibit 1** to this declaration.

2

## RETENTION AND COMPENSATION

7.  I am being compensated for services performed in the above-entitled case at an hourly rate of $200/hour for research, $250/hour for document preparation, and $350/hour for deposition and trial testimony. My compensation is not contingent on the results of my expert analysis or the substance of my opinions or any testimony in this matter.

## BASIS FOR OPINION AND MATERIALS CONSIDERED

8.  Counsel for Defendant provided me with the operative Complaint in this matter, copies of the relevant statutes being challenged, and other case-related documents pertinent to this matter. Other than these documents, my report is based on my own independent research.

9.  In my report, I cite to a variety of scholarly articles, laws, cases, popular and learned commentaries, and various other related materials on which I based my opinions. For this report and declaration, I also consulted numerous publications related to the history of knife manufacture in the United States.

## OPINIONS

### I.  DEFINING DEADLY WEAPONS

10. Over the course of the nineteenth century, the technology and availability of weapons changed profoundly. It is therefore unsurprising that nineteenth-century Americans regulated weapons through state laws and local ordinances. A fundamental feature of their regulatory approach was to distinguish between two types of weapons: arms suitable for militia service or hunting, versus concealable weapons associated with interpersonal violence and known as *deadly weapons*.[1]

---

[1] There are some exceptions to this tendency, such as sales restrictions that applies to all firearms rather than just pistols, or certain sensitive place laws that prohibited all firearms in addition to deadly weapons. *See* Ohio 1880 at 78-90, **Exhibit 2**, establishing a minimum age for the sale of "any air-gun, musket, rifle-gun, shot-gun, revolver, pistol, or other firearm, of any kind or description whatever, or ammunition for the same." *See also* John A. Hockaday, et al, *Revised Statutes of the State of Missouri* (Jefferson City: Carter & Regan, State Printers, 1879), 224 § 1274, **Exhibit** 3, prohibiting the carrying of "any firearms, bowie-

3

KR0833

11. In the decentralized, agricultural environments that characterized early American life, hunting knives, rifles, muskets, and shotguns were important tools present in most rural homes. Men used these arms for militia service and for the occasions when they were required to participate in local policing efforts through the *posse comitatus*; but otherwise, they would have much more frequently used such weapons for hunting—be it killing predatory animals, driving birds away from their crops, or hunting for meat. Firearms borne for these purposes were carried openly, by a shoulder strap or attached to a saddle. Various accoutrements necessary for them to function, such as powder flasks, were also visible. Rifles, muskets, and shotguns that could not readily be concealed on a person were not likely to be used in the commission of crimes, especially crimes of passion that resulted in murder or manslaughter. Those offenses were much more likely to be committed with bare hands, blunt instruments, or other types of deadly weapons such as concealable knives and pistols.[2]

12. A series of socio-economic and political factors caused Americans of the nineteenth century to be more likely to publicly carry and use deadly weapons such as dirks, bowie knives, and pocket pistols. Rates of homicide, violence, and crime were rising in many parts of the country, and the lethality of weapons rose in tandem. The greater prevalence of deadly weapons in public spaces, and the bloody consequences, prompted American people across the country to turn to weapon regulations as a solution. These regulations tended to focus upon readily concealable "deadly weapons" like knives and pistols rather than the firearms used for militia and hunting purposes. Deadly weapons were associated with crime and

---

knife, dirk, dagger, slung-shot, or other deadly weapon" at "public assemblages." Nonetheless, this distinction between deadly weapons and militia or hunting weapons was foundational to nineteenth-century regulatory policies.

[2] Guns were used in less than half of the murders of unrelated adults, and less than ten percent of martial murders during the seventeenth and eighteenth centuries. See Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 115.

KR0834

needless bloodshed, and the people habitually carrying them were presumed to be ruffians, burglars, and assassins—those ready to settle personal difficulties with blood rather than by reason and law.

13. The other feature shared by deadly weapons was their suitability for concealment, and in fact, deadly weapons were often referred to as "concealed weapons" for the straightforward reason that they were designed to be carried concealed.[3] An 1886 law journal synthesized this point by saying:

> A statute making it indictable for one to carry concealed about his person any 'pistol, bowie-knife, razor, or other deadly weapon of the like kind,' embraces a butcher's knife. The words 'other deadly weapon of the like kind' imply similarity in the deadly character of weapons, such as can be conveniently concealed about one's person, to be used as a weapon of offence and defense.[4]

## II.   LARGE KNIVES

14. For much of the nineteenth century, the carrying of large knives posed a serious threat to American communities. Even though the revolver was patented in 1836, it did not circulate in numbers sufficient to saturate the American consumer market until the latter 1800s. Prior to the mid- to late nineteenth century when revolvers began to circulate, handguns were single-shot devices useful only as a small club after their lone round had been fired. Fighting knives, on the other hand, worked in both dry and wet conditions and never needed to be reloaded. There were so many different styles and names of knives that Americans sometimes struggled to distinguish them from one another. To make matters even more complicated,

---

[3] For example, see "What They Think of It: The State Press on the Carrying of Concealed Weapons," *Daily Constitution* (Atlanta, Georgia), April 11, 1879, 4, **Exhibit 4**; and "Concealed Weapons: What Is Thought of the Practice by the Press of the State," *Daily Constitution* (Atlanta, Georgia), March 27, 1879, 1, **Exhibit 5**. The articles quote numerous other newspapers from Georgia which condemn carrying deadly weapons in terms that associate going armed and carrying deadly weapons with the habit of carrying concealed weapons.

[4] "Concealed Weapons," *Criminal Law Magazine and Reporter* 8, no. 4 (October 1886), 410, **Exhibit 6**. This was quoted in *State v. Erwin*, 91 N. C. 545 (1884).

KR0835

these definitions might vary geographically, change over time, and were not set in stone during the nineteenth century.[5]

15. One of the most common terms for these knives in the eighteenth and early nineteenth centuries was *dirk*. The "dirk knife" originated in Scotland as a knife carried into battle or for martial ornamentation by soldiers. It has come to be identified as having a straight blade.[6] A variation of this knife, known as the naval dirk, tended to be curved for a brief period during the late eighteenth and early nineteenth centuries.[7]

16. Dirks were Scottish variations of European daggers, which connoted double-edged blades and could vary in length. Some daggers lent themselves to concealment while others were quite large and designed for defensive use in a swordfight.[8] Stiletto knives—which were slender, sharply tapered blades—also evolved from the dagger. These knives have historically been considered weapons because they are designed for stabbing and are not conducive for hunting or other purposes.[9]

---

[5] Worthen, *Arkansas Made*, I:267-268. See also *Haynes v. State*, 24 Tenn. 120 (1844), in which the case revolved around whether carrying a so-called "Mexican pirate knife" was indictable under a law pertaining to bowie knives, Arkansas toothpicks and "any knife or weapon that shall in form, shape or size resemble" them. The defendant was indicted and convicted for carrying a knife *resembling* a bowie, and the appellate court upheld the conviction as within the spirit and meaning of the law. See also 1838 Tenn. ch. 137, **Exhibit 7** (discussed below at Paragraph 32 and accompanying notations).

[6] Harold Leslie Peterson, *American Knives: The First History and Collectors' Guide* (New York: Scribner, 1958), 19 ("The blade was straight, single-edged and triangular in cross section.").

[7] Peterson, *American Knives*, 96-101 (Curved blade supplanted straight blades around the year 1800, but were subsequently replaced by a straight-bladed standard naval model known as the "model of 1869.").

[8] On European daggers, see Chris McNab, ed., *Knives and Swords: A Visual History* (New York: DK Publishing, 2010), 76-83, 156-165. The quillon dagger, in which the user's hand was protected by large quillons protruding between the handle and the blade, was an old design. A modification emerged in the early modern period by which the quillons faced forward and could be used to parry sword thrusts from an enemy. This "left-hand dagger" was called a *maingauche*.

[9] On knives as weapons, including stilettos, see Norman Strung, *An Encyclopedia of Knives* (Philadelphia: J. B. Lippincott Company, 1976), 94-100.

KR0836

## A. Hunting Knives, Bowie Knives, and Arkansas Toothpicks

17. In North America, hunting knives were popular among both Europeans and Native Americans. Colonial and later traders, like the Hudson's Bay Company, included large knives in their transactions with Indigenous groups. Cartouche knives were long and single-bladed, similar to a butcher knife. Buffalo knives had a clipped tip, meaning that they had double-sided blades only near the tip.[10] The secondary edge, known as the *swedge*, allows the blade to penetrate flesh more effectively. This style of knife blade allowed hunters to deliver an efficient death blow to wounded large game, like buffalo.[11]

18. Bowie knives and Arkansas toothpicks, which became the best-known of the nineteenth-century fighting knives, derived from the older blade types discussed above. The bowie knife took its name from a man named Jim Bowie who was born in Kentucky in 1796 and died at the Alamo during the Texas Revolution in 1836.[12] He began carrying a large hunting knife in a leather scabbard in 1826, after an enemy tried to assassinate him in the street.[13] The following year, Bowie used it to great effect in a duel that turned into a melee and became the subject of nationwide news coverage.[14] His death at the Alamo cemented the legend of his namesake knife, which became one of the most widely denounced deadly weapons of the antebellum nineteenth century. Though the shape and length of the original bowie knife remains a mystery, the term came to describe a large knife with clipped

---

[10] On cartouche and buffalo knives in the Indian trade, see James A. Hanson et al, *The Encyclopedia of Trade Goods: Volume 2: Gun Accessories and Hand Weapons of the Fur Trade* (Chadron, NE: Museum of the Fur Trade, 2021), 176-186.

[11] Hanson et al, *Encyclopedia of Trade Goods*, II: 176-186; on swedges, see Strung, *An Encyclopedia of Knives*, 59-61.

[12] William R. Williamson, "Bowie, James," *Handbook of Texas Online*, accessed February 25, 2023, https://www.tshaonline.org/handbook/entries/bowiejames. Published by the Texas State Historical Association.

[13] Clifford Hopewell, James Bowie, Texas Fighting Man: A Biography (Austin: Eakin Press, 1994), 25-30.

[14] "Terrible Recontre," *Niles' Register* (Baltimore, Maryland), November 17, 1827, 182: https://archive.org/details/sim_niles-national-register_1827-11-17_33_844/page/182/mode/1up.

**KR0837**

blade—one with a sharpened swedge that made it more lethal. Bowie knives had long blades, often measuring 8 to 12 inches, and the point of the knife was generally aligned with the handle to make it a more effective weapon.[15] The phrase "Arkansas toothpick" could be used interchangeably with "bowie knife" during the nineteenth century, but when used today it generally refers to a knife that was generally similar to a bowie but double-edged and tapered.[16]

19. Fighting knives did exist prior to the 1830s, and the exact styling of the original Bowie knife remains unknown, but Bowie's life story became a vehicle for Americans to discuss and address the growing problem of knife-violence. As rates of violence rose during the nineteenth century, people were more likely to carry and use large knives; the increased presence of knives—even if ostensibly carried for personal defense—had the regrettable consequence of exacerbating the problem.[17] This was especially notable in southern areas, where bowie knives were quite common and known to be associated with needless bloodshed.[18]

---

[15] On bowie knives having tips aligned with their handles, see Strung, *An Encyclopedia of Knives*, 96.

[16] For more information on the mysterious origins of the bowie knife, see Peterson, *American Knives*, 26-27; Sid Latham, *Knives and Knifemakers* (New York: Winchester Press, 1973), 104-112. On the interchangeable use of "bowie knife" and "Arkansas toothpick" during the nineteenth century, see Peterson, *American Knives*, 59. For an explanation of these knife styles as understood by modern collectors, see Strung, *An Encyclopedia of Knives*, 95-97.

[17] See "Another Victim of the Bowie Knife," Cheraw Gazette (Cheraw, South Carolina), September 6, 1837, 3: https://chroniclingamerica.loc.gov/lccn/sn88084121/1837-09-06/ed-1/seq-3/.

[18] For examples, see "Carrying Concealed Weapons," *Daily Picayune* (New Orleans, Louisiana), July 25, 1840, **Exhibit 8** (denouncing those who ""go habitually armed, making an arsenal of their persons" and that "where offence is given or injury sustained, even the code of *honor* has laid down other means of redress than an instant appeal to the Bowie knife," and questioning "incessantly carrying concealed weapons."); "The Bowie Knife," *Southern Argus* (Columbus, Mississippi), June 7, 1842, **Exhibit 9** ("The small dagger worn in former times, has given place to this more formidable invention, and the Bowie knife, throughout the West, is now the most common weapon of attack or defence."); and "Bowie Knife," *The Slave's Friend* 3, no. 2 (1838), 17, **Exhibit 10** ("People in slave states often carry such knives about them," and "When they get angry they draw the knife, and sometimes *stab one another!*").

Expert Report and Declaration of Dr. Brennan Rivas (3:23-cv-00474-JES-DDL)

KR0838

## B. Folding Knives and Pocketknives

20. Folding knives are inherently weaker than fixed-blade weapons. In fixed-blade knives, the steel which forms the blade extends into the handle to provide strength and stability. This is referred to as the *tang*. In order to fold into the handle, folding blades cannot have a long tang. Instead, a *bolster* must support the hinge that connects the base of the blade to the handle. This style has been more useful for pocketknives and penknives that are small, lightweight, and utilitarian for everyday purposes.[19]

21. In addition to their weakness in comparison to fixed blades, folding blades are significantly more complex to design, craft, and assemble. There are more component parts, and they have to enable efficient movement of the blade and the spring. The spring of a folding knife is a metal piece that uses tension to assist the blade in staying either open or closed rather than slipping open or shut based upon movement, gravity, etc. This is a safety feature that prevents the knife from sliding open within a pocket or collapsing shut during use.[20] Prior to industrialization and mass production, specialized cutlers handmade blades and springs that had to fit and function in harmony together. This process required the specialized knowledge and tools of properly trained craftsmen.[21]

22. Some large folding knives were produced during the nineteenth century, including some folding bowie knives. One example from the mid-nineteenth century features a 6 3/8-inch blade that does not fit entirely within the handle when folded shut. The folded knife was inserted within a metal-tipped leather scabbard, which protected the user from the portion of the blade that extended beyond the

---

[19] On the design features and relative weakness of folding blades, see Strung, *An Encyclopedia of Knives*, 25-27, 99-100. On the various types of folding knives and their historical uses, see Peterson, *American Knives*, 129-142.

[20] On the design and complexity of folding blades, see Latham, *Knives and Knifemakers*, 94-96; Strung, *An Encyclopedia of Knives*, 25-27, 38-39. See also "Understanding Bias Toward Closure and Knife Mechanisms," *American Knife and Tool Institute*, https://www.akti.org/resources/additional-definitions/.

[21] Peterson, *American Knives*, 146.

9

KR0839

handle when folded. Such a knife was likely defined as a bowie knife in the nineteenth century as a result of its blade size rather than classified separately based upon its folding style. Even today, this blade is described as "[a]n English folding bowie knife."[22] An 1820 Alabama law taxed various deadly weapons like dirks, pistols, and sword canes, and included within that list any "dirk knife with a spring to prevent it from shutting."[23] Based upon blade length and overall size, folding knives could be categorized into dirks, bowies, etc. versus pocket knives.[24] These folding knives might use springs to lock the blade into an open or closed position, but they were not automatic opening knives, and those sharing essential features with fighting knives were likely to be regulated as such.

### C. The Manufacturing of Knives

23. From the medieval period through much of the nineteenth century, the center of knife-making in the Anglophone world was Sheffield, England. The cutlery trade was divided into smiths, strikers, grinders, and hafters who hammered, tempered, sharpened, and polished knives in a time-consuming craftwork process that remained largely unchanged until the nineteenth century. Sheffield workers were so well-known for the quality of their products and their specialized knowledge that American smiths and cutlers struggled to turn out knives of a comparable quality. Though American smiths and cutlers produced knives, imports from Sheffield dominated the knife market until the approximately the mid-nineteenth century.[25]

---

[22] Frederick John Stevens, *Fighting Knives: An Illustrated Guide to Fighting Knives and Military Survival Weapons of the World* (New York: Arco Publishing Company, 1980), pictured 10-11.

[23] 1820 Ala. 10, § 3, **Exhibit 11** ("for every dirk, one dollar: for every sword cane, one dollar; for every pocket or side pistol, one dollar: for every dirk knife with a spring to prevent it from shutting, one dollar,").

[24] Some nineteenth-century laws specifically distinguished between regulated knives and pocket knives, further indicating that knives were classified based upon blade length and overall size rather than folding style versus fixed-blade. For example, see 1846 Fla., ch. 75, **Exhibit 12** (cited below, see Paragraph 28 and accompanying notations).

[25] On the Sheffield process and dominance of Sheffield knives in the early

---

10

KR0840

24. Industrialization in the nineteenth century dramatically altered the method of making knives and transformed the cutlers' trade from one of highly skilled craftsmen to a mechanized process that employed less skilled workers. In the United States, the path to mechanization went through the John Russell Manufacturing Company of Deerfield, Massachusetts. Facing significant competition from Sheffield manufacturers and a consumer bias in favor of Sheffield-made products, Russell turned to steam and water power to streamline knife-making. Eventually, he "set up a true assembly-line production."[26] Competitors embracing new methods of mechanized, mass production emerged, and the trade oriented itself primarily around New England.[27]

25. Russell and his American competitors struggled to find workers with the proper training. He recruited Sheffield cutlers to share trade secrets about tempering and other aspects of the industry. Beginning in the 1840s, the company manufactured a useful outdoor knife that was popular among western trappers, travelers, and mountain-men called the Green River knife. This "ruggedly constructed hunting knife" featured a blade of 8¾ inches and unadorned wood handle. Green River knives "were often shipped dull so that individual owners could sharpen them as they wished."[28] The success of this knife burnished the reputation of Russell Manufacturing, and the company eventually produced a full array of cutlery for dining, cooking, and other purposes. This included a series of hunting knives, some of which featured clipped blades, swedges, and other characteristics of fighting knives.[29]

United States, see Peterson, *American Knives*, 143-147; Robert L. Merriam et al, *The History of the John Russell Cutlery Company: An Illustrated Story of the Famous Green River Knives* (Bete Press, 1976), 6-7.

[26] On the innovations of John Russell, and quotation, see Peterson, *American Knives*, 148.

[27] Peterson, *American Knives*, 148-149.

[28] Merriam et al, *John Russell Cutlery*, 13. The intended purpose of a knife could dictate the way in which the edge would need to be sharpened, especially for knives used in skinning animal hides.

[29] A complete reprinting of the company's 1884 catalog can be found in

11

KR0841

## D.  Switchblade Manufacture in the United States

26. Switchblade knives were, for the most part, a product of the industrial revolution and were not produced in significant numbers prior to the turn of the twentieth century. Though well-trained European craftsmen appear to have made a handful of "spring-fired folding blade" knives in the latter eighteenth century, the rarity of these devices shows that they were not produced in numbers at all comparable to regular folding blades or fixed blades.[30] Mechanization and interchangeable parts made the manufacture of delicate componentry achievable on a scale never seen before. In the United States, the first patent for a switchblade knife was issued in 1877, and production did not begin in noteworthy numbers until approximately the 1890s.[31]

27. These early switchblades swung open from a folded position, and many were essentially automatic-opening pocketknives.[32] The stiletto-style dagger was not unheard of in the United States, but the sturdier and more popular bowie knife overshadowed it as a weapon of choice for those going armed, and therefore as an object of societal concern.[33] It appears as though Italian stiletto-style switchblades

Merriam et al., *John Russell Cutlery*, with hunting knives, sheath knives, skinning knives, and fish scaling knives on pp. 105-109, and barlows and pocket knives on pp. 116-118.

[30] In the published works about switchblades that I was able to locate and consult for this report, the earliest recorded switchblade is dated to the latter 1700s. According to Zinser et al., "The first spring-fired blade that can be authenticated appeared in Europe, probably Italy, in the late eighteenth century, with knifemakers in other countries, especially France and England, not far behind." Mark Erickson says: "The origins of the switchblade knife go back much farther than one might imagine. I know that they were being manufactured in England in the mid 1800s and France and Italy were making them well before that. I am very confident that they were brought to this country from Europe by the mid 1800s, and quite possibly before that." These statements show that few examples of automatic opening knives dated prior to the nineteenth century exist, with even fewer examples in the United States than in Europe. See Tim Zinser et al, *Switch Blades of Italy* (Nashville: Turner, 2003), 7-9, quotation at 7; Mark Erickson, *Antique American Switchblades: Identification and Value Guide* (Iola, WI: Krause Publications, 2004), 6.

[31] Erickson, *Antique American Switchblades*, 22-24.

[32] On the size and styling of early switchblade knives produced in the United States, see Erickson, *Antique American Switchblades*, 25-143.

[33] Some nineteenth-century regulations specifically named *stiletto* knives. See 1821 Tenn. ch. 13, **Exhibit 13** ("a dirk, sword cane, French knife, Spanish

became much more widely available in the twentieth century, largely as a result of soldiers' exposure to European-made weapons during World War II.[34] The relative rarity of automatic opening knives meant that restrictions from that period generally did not specifically name automatic-opening knives. But nineteenth-century Americans did regulate the knives that posed a societal danger—especially fighting knives like bowies and dirks—and these regulations applied to what few automatic-opening dirks and bowie knives existed at that time just as much as the more common fixed-blade versions.

## III. KNIFE REGULATIONS IN THE NINETEENTH CENTURY

28. The response on the part of Americans confronting knife-violence was the regulation of such weapons. Because fighting knives were associated with personal rather than militia use, and they were readily concealable beneath a coat or within a waistband, they fell under regulations pertaining to deadly weapons. Americans restricted the presence of deadly weapons in public spaces through various mechanisms, including public carry laws. In 1801, a Tennessee law prohibiting "privately" carrying "any dirk, large knife, pistol or any other dangerous weapon."[35] Similar laws existed in numerous states during the antebellum nineteenth century, including: Kentucky, which restricted the carrying of "a pocket pistol, dirk, large knife, or sword in a cane,"[36]; Louisiana, which prohibited "any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon,"[37]; Indiana, which restricted "any dirk, pistol, sword in cane, or any other unlawful weapon,"[38]; and Mississippi, which restricted the carrying of "any pistols,

---

stiletto, belt or pocket pistols. . .").

[34] Zinser et al, *Switch Blades of Italy*, 5 ("Considering that both the term [switchblade] and the knife [Italian stiletto] arrived in this country almost simultaneously in the years after World War II, it is perhaps not surprising that the two are essentially synonymous.").

[35] Tenn. 1801 ch. 22 § 6. **Exhibit 14**.

[36] 1812 Ken., ch. 89, **Exhibit 15**.

[37] 1813 La., ch. 5, **Exhibit 16**.

[38] 1819 Ind., ch. 23, **Exhibit 17**.

KR0843

dirk or other such offensive weapons."[39] Laws enacted later used the specific phrase "bowie knife," such as Virginia, which regulated the carrying of "any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue,"[40]; and Alabama, whose laws pertained to "a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of fire arms, or air gun."[41] The state of Florida did not use the term "bowie knife," but distinguished restricted knives from regular pocket knives; an 1846 law regulated the public carrying of "any dirk, pistol or other arm or weapon, except a common pocket knife."[42]

29. Deadly weapon laws curtailing the carrying of large knives in public spaces were not the only regulations adopted by nineteenth-century Americans. Some states taxed their possession while others prohibited their sale. Alabama, North Carolina, and Mississippi taxed the personal possession of certain weapons, including large knives like dirks and bowies.[43] In some instances, these taxes were relegated to such knives that had actually been worn or carried in public, but that was not universally the case.[44] The rates themselves could be quite high. For instance, Alabama's 1866 tax upon pistols, revolvers, and knives such as bowie knives was $2 and provided no exceptions.[45] The immediate postbellum South was

---

[39] 1821 Miss., ch. 49, **Exhibit 18**.
[40] 1838 Vir., ch. 101, **Exhibit 19**.
[41] 1840 Ala., ch. 7, **Exhibit 20**.
[42] 1846 Fla., ch. 75, **Exhibit 12**.
[43] 1820 Ala. 10, § 3, **Exhibit 11**; 1838 Fla. 36, **Exhibit 21**; 1844 Miss. ch. 8, Art. 16, § 1, **Exhibit 22**; 1850 N. C. ch. 121, § 5, **Exhibit 23**; 1851 Ala. ch. 1, § 1, **Exhibit 24**; 1856 N. C. ch. 34, § 23 (4), **Exhibit 25**; 1858 N. C. ch. 25, § 27 (15), **Exhibit 26**; 1866 Ala. ch. 260, § 2 (10), **Exhibit 27**; A. J. Walker, ed., *Revised Code of Alabama* (Montgomery: Reid & Screws, 1867), 169, **Exhibit 28**. The Mississippi tax was repealed in 1861. See 1861 Miss. ch. 125, **Exhibit 29**.
[44] 1856 N. C. ch. 34, § 23 (4), **Exhibit 25**; 1858 N. C. ch. 25, § 27 (15), **Exhibit 26**.
[45] 1866 Ala. ch. 260 § 2 (10), **Exhibit 27**.

KR0844

a tremendous cash-poor society, so this tax—which amounts to approximately $38 today—was quite high.[46]

30. Florida Territory presents an apt illustration of how taxes could be used in conjunction with carry restrictions to create a comprehensive deadly weapon policy. In 1835, the territorial government enacted a public carry law with a steep fine of $50 to $500 for violations and an exemption for "carrying arms openly, outside of all their clothes."[47] Unsatisfied with the policy—which appears to have resulted in widespread open-carry of deadly weapons—leaders established a new series of prohibitive taxes designed to further reduce the presence of deadly weapons in public. This 1838 enactment held that anyone who chose "to vend dirks, pocket pistols, sword canes, or bowie knives" had to first pay an annual tax of $200, "and all persons carrying said weapons openly shall pay . . . a tax of ten dollars annually."[48]  In 2023 dollars, the annual occupation tax would amount to approximately $6,300, and the annual open carry tax would amount to approximately $320.[49] In a sparsely populated, rural environment, these taxes were clearly designed to discourage trade in and public carry of deadly weapons. The architects of the statute saw it as intrinsically connected to the previously enacted concealed carry restriction—as a way of more effectively reducing the number of weapons carried in public spaces.[50] Later in the nineteenth century, municipalities

---

[46] See: https://www.in2013dollars.com/us/inflation/1866?amount=2

[47] John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources.

[48] 1838 Fla., ch. 24. This tax is not included within the Duke Repository, indicating that that database captures only a portion of the occupation and personal taxes in force, even at the state/territorial level, during the nineteenth century. More research remains to be done on the subject.

[49] The amounts reach $319.14 and $6,382.73. See: https://www.in2013dollars.com/us/inflation/1838?amount=200.

[50] The title of the 1838 tax was "An Act in addition to An Act, (approved January 30, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly."

Jesup, Georgia and Cedartown, Georgia also imposed personal taxes on the value of residents' dirks and bowie knives.[51]

31. Jurisdictions also levied occupation taxes upon dealers in deadly weapons, including large knives. Alabama, Georgia, and Mississippi did so in revenue bills, meaning that they were reenacted time and time again.[52] A tax of $100 per year upon dealers in pistols, toy pistols, shooting cartridges, dirks, and bowie knives was included in Georgia revenue bills in 1884, 1886, 1888, 1890, 1892, and 1894.[53] Alabama's occupation tax applied to dealers in pistols, bowie knives, and dirks (and sometimes firearm cartridges). The policy first emerged in 1876 and built upon a previous policy of taxing personal possession of deadly weapons.[54] The personal taxes, which appear to have been used through the 1860s,

[51] The municipal charters of Jesup, Georgia and Cedartown, Georgia assessed taxes based upon a questionnaire that included the prompt, "What is the value of your guns, pistols, bowie knives and such articles?" 1888 Ga. ch. 103, "Amending Charter of Jesup," § 46, Art. 30, **Exhibit 30**; 1889 Ga., ch. 640, "New Charter for Cedartown," §36, Art. 30, **Exhibit 31**.

[52] The town of Leicester, North Carolina also assessed "privilege taxes" upon "professions, callings, trades, occupations, and all other business carried on in said town," which appears to have included the sale of pistols, dirks, bowie knives, and sword canes. The organization of the article makes it somewhat unclear whether the tax upon these items was assessed based upon personal possession or trade. See 1891 N. C., ch. 327, "An Act to charter the town of Leicester in the county of Buncombe, North Carolina," § 44. **Exhibit 32**.

[53] For the purposes of this report, I did not extend research beyond the year 1900. It is possible that this revenue requirement continued in Georgia beyond 1894, but additional research would be required to confirm that. See 1884 Ga., ch. 52 "For Support of State Government, 1885-86," § 2, Art. 18, **Exhibit 33**; 1886 Ga., 14 "General Tax Act for 1887 and 1888," § 2, Art. 18, **Exhibit 34**; 1888 Ga., ch. 123 "General Tax Act for 1889 and 1890," § 2, Art. 17, **Exhibit 35**; 1890 Ga., ch. 131 "General Tax Act," § 2, Art. 16, **Exhibit 36**; 1892 Ga., ch. 133 "General Tax Act," § 2, Art. 16, **Exhibit 37**; 1894 Ga., ch. 151 "General Tax Act for 1895 and 1896," § 2, Art. 16, **Exhibit 38**. The Georgia occupation tax appears to have started in 1882 with an annual tax of $25 per place of business, which was subsequently raised to $100. See 1882 Ga. ch. 18, "For Support of State Government, 1883-84," § 2, Art. 18, **Exhibit 39**.

[54] See: Wade Keyes et al, eds., *Code of Alabama 1876* (Montgomery: Barrett & Brown, printers for the State, 1877), 292, **Exhibit 40**; 1886 Ala., ch. 3, § 5 (17), **Exhibit 41**; Robert C. Brickell et al, eds., *Code of Alabama* (Nashville: Marshall & Bruce), 194; William L. Martin, ed., *Code of Alabama* (Atlanta: Foote & Davies, 1897), 1137 and accompanying notation, **Exhibit 42**; 1898 Ala. ch. 903, § 16, (66), **Exhibit 43**. The presence of these taxes in state statutes pertaining to taxation and licensing indicates that they are annual taxes that remained in force unless modified or repealed. On Alabama personal taxes, see above at Paragraph 29 and

Expert Report and Declaration of Dr. Brennan Rivas (3:23-cv-00474-JES-DDL)

**KR0846**

specifically exempted "regular dealers holding them for sale."[55] The occupation taxes, however, applied to all dealers "whether principal stock in trade or not."[56] Shortly afterward, a group of hardware merchants faced charges for selling pistols without paying the tax and obtaining the proper paperwork. The state supreme court upheld the occupation tax as applying to any business that sold any of the enumerated weapons without obtaining the required license.[57] Alabama law allowed municipalities to levy local taxes upon any occupation that the state already taxed, meaning that additional local taxes may have applied in towns and cities across the state.[58]

32. The state of Tennessee went so far as to prohibit the sale of certain kinds of knives during the nineteenth century. An 1838 law criminalized "any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons whatsoever" who "shall sell or offer to sell, or shall bring into this State, for the purpose of selling, giving or disposing of in any manner whatsoever, any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick."[59] The law was suspended[60] during the Civil War, but Tennessee did not abandon sales prohibitions as a form of weapon regulation. In 1879 the state prohibited the sale of pocket pistols altogether—as did Arkansas in 1881.[61]

---

accompanying notation; see also below, n. 51.

[55] 1866 Ala. ch. 260, § 2 (10), **Exhibit 27**; A. J. Walker, ed., *Revised Code of Alabama* (Montgomery: Reid & Screws, 1867), 169, **Exhibit 28**.

[56] *Code of Alabama 1876*, 292; 1886 Ala., ch. 3, § 5 (17), **Exhibit 41**.

[57] *Porter & Co. v. State*, 58 Ala. 66 (1877).

[58] Robert C. Brickell et al., eds., *Code of Alabama* (Nashville: Marshall & Bruce, 1887), 191 n 11 (Describing an amendment to Section 499 to read in part "but no city (except Mobile, Montgomery, Marion, Brewton, Cullman and Selma), or town, or county shall assess, levy or collect any license tax on any business or occupation, upon which the state does not assess, levy, or collect such license tax."), **Exhibit 44**.

[59] 1838 Tenn. ch. 137, **Exhibit 7**.

[60] 1862 Tenn. ch. 23, **Exhibit 45**.

[61] 1879 Tenn. ch. 96, **Exhibit 46**; Ark. 1881 ch. 96 §3, **Exhibit 47**.

17

KR0847

# CONCLUSIONS

33. Switchblade knives were not available in significant numbers in the United States until the closing years of the nineteenth century at the earliest. Though there are few or no examples of nineteenth-century restrictions that specifically name "switchblades," the absence of such specific regulations is the result of an absence of such knives rather than an unwillingness to regulate dangerous fighting knives. To the contrary, the knives to which nineteenth-century Americans were exposed and which concerned them—like bowie knives, dirks, daggers, and Arkansas toothpicks—were subject to regulation. These regulations took the form of public carry restrictions, personal taxes, occupation taxes, and sales restrictions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 19 , 2023, at Fort Worth, Texas.


_____
*Brennan Rivas*
Dr. Brennan Rivas

KR0848

# EXHIBIT 1

KR0849

# Brennan Gardner Rivas
## Curriculum Vitae · Oct 2023

## Employment

Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022

Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
University, Clements Center for Southwest Studies, 2020-2021

Lecturer in American History (full-time), Texas Christian University, Department of History,
2019-2020

## Education

Ph.D., History, Texas Christian University, 2019
Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
the Lone Star State, 1836-1930"
Advisor: Gregg Cantrell

M.A., History, Texas Christian University, 2013
Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"

B.A. with Honors, History, Oklahoma State University, 2010

## Publications

*Refereed Journal Articles*

"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*

"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
on the Place of Guns in American Law and Society* (New York: Oxford University Press,
2023)

"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
(May 2022)

"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*

"Reflections on the American Gun Control Culture," *The Panorama: Expansive Views from the
Journal of the Early Republic*, October 17, 2023.

"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
Press, 2019.

Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
*Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

1

KR0850

## Public History

"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made by History Blog* (Jun 2022)
~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures

"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)

"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"

"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
~ Public lecture featuring special insights for genealogical researchers

"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
~ Research presentation focusing on interpretation of county court records

"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Firearm Issues Research Grant, 2023-2024
~ Awarded by the Harvard Injury Control Research Center, from grant funding from the Robert Wood Johnson Foundation, for research related to firearm issues

Lloyd Lewis Fellowship in American History, 2021-2022
~ Awarded by the Newberry Library to scholars using its collection to research topics in American history

Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books

The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students

Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*

Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights.

Status: Editing manuscript

2

KR0851

"Going Armed: The Law and Culture of Carrying Deadly Weapons in the Nineteenth Century"
Aim: Scholarly article uncovering the ways in which nineteenth-century gun-toters carried their
     deadly weapons, and why they generally did so concealed.
Status: Writing in progress

## University Teaching Experience
*Instructor of Record*
Lecturer in American History, Texas Christian University                    2019-2020
     "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
     "American History since 1877: The Quest for Equality" (HIST 10613)
     "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*
Teaching Assistant, Texas Christian University                    2017-2018
     American History to 1877 (HIST 10603)
     American History since 1877 (HIST 10613)

*Teaching Interests*
American History, Legal History, Southwestern Borderlands, Civil War Era, American West,
Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks
Panelist, "Use and Abuse of History in Second Amendment Litigation," and "Going Armed:
     Nineteenth Century Views on Open Carry," Current Perspectives on the History of Guns
     and Society, Wesleyan University, Middletown, Connecticut, October 2023
"Masculinity, Honor-Violence, and Gun Reform in the Early U.S.," Race, Gender, and Firearms
     in the Early Republic, Society for Historians of the Early American Republic Annual
     Meeting, Philadelphia, Pennsylvania, July 2023
"Second Amendment Panel—Issues in Cases Post-*Bruen*," Strategic Litigation Convening: Anti-
     Democracy Efforts and Political Violence Post-*Bruen*, Institute for Constitutional Advocacy
     and Protection, Georgetown Law, Washington, D. C., June 2023
"A Case for More Case Studies," Originalism, the Supreme Court, Gun Laws, and History, Late-
     Breaking Roundtable, American Historical Association Annual Meeting, Philadelphia,
     Pennsylvania, January 2023
"Military Disarmament Orders and the Role of Reconstruction Historiography after *Bruen*,"
     Current Perspectives on the History of Guns and Society Symposium, Wesleyan University,
     Middletown, Connecticut, October 2022
"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations,"
     Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina,
     November 2021
"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at
     the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis,
     California, October 2021
"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021
"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical
     Association Annual Meeting, Corpus Christi, Texas, February 2019

3

KR0852

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service

Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020
  ~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development

Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016
  ~ Provide honest and confidential information to prospective graduate students

Graduate Student Mentor, 2015
  ~ Informal departmental program designed to ease the transition for incoming graduate students

## Second Amendment Subject Matter Expert

*Duncan et al v. Bonta*, California, Case No. 17-1017-BEN-JLB, S.D. Cal.

*Miller et al v. Bonta*, California, Case No. 3:19-cv-01537-BEN-JLB, S.D. Cal.

*Angelo et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-01878-RDM, D. D.C.

*Hanson et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-02256-RC, D. D.C.

*Christian et al v. Nigrelli et al*, New York, No. 22-cv-00695 (JLS), W.D. N.Y.

*Frey et al v. Nigrelli et al*, New York, Case No. 21 Civ. 5334 (NSR), S.D. N.Y.

*Brumback et al v. Ferguson et al*, Washington, No. 1:22-cv-03093-MKD, E.D. Wash.

*Sullivan et al v. Ferguson et al*, Washington, Case No. 3:22-cv-5403, W.D. Wash.

*Siegel v. Platkin,* New Jersey, No. 22-CV-7463 (RMB) (AMD), D. N.J.

*NAGR v. Campbell*, Massachusetts, No. 1:22-cv-11431-FDS, D. Mass.

*Oregon Firearms Federation, Inc. v. Kotek*, Oregon, No. 2:22-cv-01815-IM, D. Ore.

*NSSF v. Jennings*, Delaware, No. 22-cv-01499-RGA, D. Del.

*Chavez v. Bonta*, California, No. 3:19-cv-01226-L-AHG, S.D. Cal. (f/k/a *Jones v. Bonta*)

*Nguyen v. Bonta*, California, No. 3:20-cv-02470-WQH-BGS, S.D. Cal.

*Baird v. Bonta*, California, No. 2:19-cv-00617-KJM-AC, E.D. Cal.

*Nichols v. Bonta*, California, No. 3:11-cv-09916-SJO-SS, C.D. Cal.

*Wiese v. Bonta*, California, No. 2:17-cv-00903-WBS-KJN, E.D. Cal.

*Rocky Mountain Gun Owners v. Polis*, Colorado, No. 23-cv-01077-JLK, D. Col.

*Wolford v. Lopez*, Hawaii, No. 1:23-cv-00265-LEK-WRP, D. Haw.

*Novotny v. Moore*, Maryland, No. 1:23-cv-01295-GRL, D. Mary.

*Kipke v. Moore*, Maryland, No. 1:23-cv-01293-GRL, D. Mary.

*Ohio v. Columbus*, Ohio, No. 2022-cv-00657, Ct. Com. Pleas, Fairfield Cty, Ohio

4

KR0853

## Professional Memberships

Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association

5

**KR0854**

# EXHIBIT 2

KR0855

79

conformity to law; or, with the consent and approbation of the probate court, in productive real estate within this state, the title to which shall be taken in the name of the guardian as such; and to manage such investments, and when deemed proper, change the same into any other investment of the above classes; but no real estate so purchased shall be sold by the guardian, except with the consent and approbation of the probate court; and if said guardian fail to loan or invest the money of his ward within such reasonable time, he shall account on settlement for such money and interest thereon, calculated with annual rests; and also to settle and adjust, when necessary or desirable, the assets which he may receive, in kind, from an executor or administrator, as may be most advantageous to his wards, but before such settlement and adjustment shall be valid and binding, it shall be approved by the probate court, and such approval entered on its journal; and with the like approval, to hold the assets as received from the executor or administrator, or what may be received in the settlement and adjustment of said assets.

Eighth—To obey and perform all orders and judgments of the proper courts touching the guardianship.

SEC. 3.   That sections six thousand one hundred and eighty-nine and six thousand two hundred and sixty-nine be and the same are hereby repealed.   *Repeals.*

SEC. 4.   This act shall take effect and be in force from and after its passage.

THOS. A. COWGILL,
*Speaker of the House of Representatives.*
R. G. RICHARDS,
*President pro tem. of the Senate.*

Passed March 25, 1880.

---

[Senate Bill No. 1.]

AN ACT

Supplementary to chapter eight (8), title one (1), part four (4), of the revised statutes of Ohio.

SECTION 1.   *Be it enacted by the General Assembly of the State of Ohio,* That the following section be enacted as supplementary to chapter 8, title 1, part 4, of the revised statutes with sectional number as herein provided:

Section 6986a.   That whoever sells, barters, or gives away to any minor under the age of fourteen years, any air-gun, musket, rifle-gun, shot-gun, revolver, pistol, or other fire-arm, of any kind or description whatever, or ammunition for the same, or whoever being the owner, or having charge or control of any such air-gun, musket, rifle-gun, shot-gun, revolver, pistol or other fire-arm knowingly permits the same to be used by such minor, shall be deemed guilty of a misdemeanor, and   *Penalty for selling or giving, etc., fire-arms to minors.*

KR0856

60

upon conviction thereof shall be fined in any sum not exceeding one hundred dollars, or be imprisoned in jail not exceeding thirty days or both.

SEC. 2.   This act shall take effect and be in force from and after its passage.

THOS. A. COWGILL,
*Speaker of the House of Representatives.*
R. G. RICHARDS,
*President pro tem. of the Senate.*

Passed March 25, 1880.

———————

[Substitute for House Bill No. 72.]

AN ACT

To amend section 3897 of the revised statutes.

SECTION 1.   *Be it enacted by the General Assembly of the State of Ohio,* That section three thousand eight hundred and ninety-seven of the revised statutes be so amended to read as follows:

Section 3897.   In city districts of the first class, the board of education shall consist of two members for each ward, except in districts organized under a law providing for one member only for each ward, in which districts the board may at any time, by a vote of a majority of its members, provide that thereafter each ward shall be represented by two members, and thereupon proceed to choose one additional member for each ward, to serve until the next annual election for city officers, and until the election and qualification of his successor; and each member of the board shall be an elector of the ward for which he is elected or appointed: provided, that in city districts of the first class, having a population, according to the last federal census, of one hundred and fifty thousand and over, the board of education shall consist of thirty-seven members, twelve of whom shall be elected at the April election of the current year, to hold office as follows:   The four members who receive the highest number of votes for three years, the four who receive the next highest number of votes for two years, the four who receive the next highest number of votes for one year: and thereafter there shall be elected, annually, four members to serve for three years.   In case of a tie vote the choice of terms shall be determined by lot.   And the remaining twenty-five members shall consist of those members of the board of education elected at the April election in 1879, and whose terms of office do not expire until April, 1881; that, beginning with the April election of 1881, one member shall be elected from each ward of said cities; and such of said members as shall have been elected by wards having an odd numerical

<span style="margin-left:2em">**Board of education in city districts of the first class; how constituted.**</span>

KR0857

# EXHIBIT 3

KR0858

Sec. 1271.   *Abandonment of children.*—If any father or mother of any child under the age of six years, or any other person to whom such child shall have been confided, shall expose such child in a street, field or other place, with intent wholly to abandon it, he or she shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding five years, or in the county jail not less than six months.   (G. S. 781, § 39.)

Sec. 1272.   *Mistreatment of apprentices.*—If any master or mistress of an apprentice or other person having the legal care and control of any infant, shall, without lawful excuse, refuse or neglect to provide for such apprentice or infant, necessary food, clothing or lodging, or shall unlawfully and purposely assault such apprentice or infant, whereby his life shall be endangered, or his health shall have been or shall be likely to be permanently injured, the person so offending shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding three years, or by imprisonment in the county jail not exceeding one year, or by a fine of not more than one thousand dollars, or by both such fine and imprisonment. (New section.)

Sec. 1273.   *Abandonment of wife or child.*—If any man shall, without good cause, abandon or desert his wife, or abandon his child or children under the age of twelve years born in lawful wedlock, and shall fail, neglect or refuse to maintain and provide for such wife, child or children, he shall, upon conviction, be punished by imprisonment in the county jail not more than one year, or by a fine of not less than fifty, nor more than one thousand dollars, or by both such fine and imprisonment.   No other evidence shall be required to prove that such husband was married to such wife, or is the father of such child or children, than would be necessary to prove such fact or facts in a civil action. (Laws 1867, p. 112, amended—*m.*)

Sec. 1274.   *Carrying deadly weapons, etc.*—If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct, on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose, other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor, any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the county jail not exceeding three months, or by both such fine and imprisonment.   (Laws 1874, p. 43; laws 1875, p. 50, and laws 1877, p. 240, amended.)

Sec. 1275.   *Above section not to apply to certain officers.*—The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property.   (New section.)

Sec. 1276.   *Fire arms not to be discharged near court house.*—Hereafter it shall be unlawful for any person in this state, except he be a sheriff or other officer in the discharge of official duty, to discharge or fire off any

---

(*m*)  Wife held to be a competent witness to prove fact of abandonment.   43 Mo. 429.   The fact that the defendant has brought suit for divorce is no defense.   52 Mo. 172.

gun, pistol or fire arms of any description, in the immediate vicinity of any court house, church or building used for school or college purposes. (Laws 1879, p. 90, § 1.)

Sec. 1277. *Punishment.*—Any person, guilty of a violation of the preceding section, shall be deemed guilty of a misdemeanor, and, upon conviction, shall be punished by a fine of not less than five dollars nor more than twenty dollars, or by imprisonment in the county jail not exceeding twenty days. (Laws 1879, p. 91, § 2.)

Sec. 1278. *Immediate vicinity defined.*—The term immediate vicinity, as used in this article, shall be construed and held to mean a distance not exceeding two hundred yards. (Laws 1879, p. 91, § 3.)

Sec. 1279. *Intoxicated stage driver.*—Every person who, whilst actually employed in driving any stage, coach, wagon, omnibus, hack or other vehicle, shall be intoxicated to such a degree as to endanger the safety of any person therein, shall be deemed guilty of a misdemeanor, and shall, upon conviction, be punished by fine not less than twenty nor more than one hundred dollars. (G. S. 814, § 31.)

Sec. 1280. *Intoxicated pilot or engineer.*—Every person who, whilst actually employed in discharging the duties of a pilot or engineer on any steamboat, or of a conductor or engineer on railroad cars, shall be intoxicated to such a degree as to endanger the safety of such steamboat or cars, or of any person or passenger therein, shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding three years, or in the county jail not exceeding one year, or by fine not exceeding one thousand dollars. (G. S. 814, § 32.)

Sec. 1281. *Drunken conductor, whilst in charge of train.*—If any person shall, while in charge of a locomotive engine running upon the railroad of any such corporation, or while acting as the conductor of a car, or train of cars, on any such railroad, be intoxicated, he shall be deemed guilty of a misdemeanor. (G. S. p. 342, § 40.)

Sec. 1282. *Punishment for certain offenses.*—Every person who shall be convicted of murder in either degree, or manslaughter in the first degree, or who shall be convicted and sentenced to the penitentiary for any of the offenses specified in sections twelve hundred and fifty-three, twelve hundred and fifty-four, twelve hundred and fifty-five, twelve hundred and fifty-six, twelve hundred and fifty-seven, twelve hundred and fifty-eight, twelve hundred and fifty-nine, twelve hundred and sixty, twelve hundred and sixty-one, twelve hundred and sixty-two and twelve hundred and sixty-six, shall be forever disqualified from voting at any election, or holding any office of honor, trust or profit under the laws of this state, or of any city, or town thereof, or sitting as a juror in any case. (G. S. 782, § 40, am'd.)

---

# ARTICLE III.

### OFFENSES AGAINST PUBLIC AND PRIVATE PROPERTY.

| SECTION | | SECTION | |
|---|---|---|---|
| 1283. | Arson in first degree. | 1296. | Burglary, second degree, continued. |
| 1284. | Dwelling house, defined. | 1297. | Burglary, second degree, continued. |
| 1285. | Arson in second degree. | 1298. | Burglary, second degree, continued. |
| 1286. | Building containing public records. | 1299. | What breaking not burglary. |
| 1287. | Arson in third degree. | 1300. | Burglary in first and second degrees, how punished. |
| 1288. | Burning brewery, etc. | | |
| 1289. | Burning boat or vessel. | 1301. | Burglary and larceny. |
| 1290. | Arson in fourth degree. | 1302. | Robbery in first degree. |
| 1291. | Punishment for arson. | 1303. | Robbery in second degree. |
| 1292. | Burglary in first degree. | 1304. | Robbery in third degree. |
| 1293. | Burglary in second degree. | 1305. | Robbery, how punished. |
| 1294. | Burglary, second degree, continued. | 1306. | Attempt to blackmail, how punished. |
| 1295. | Burglary, second degree, continued. | 1307. | Grand larceny defined. |

R S—15

# EXHIBIT 4

KR0861

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1753   Page 425 of 607

## WHAT THEY THINK OF IT.

**The State Press on the Carrying of Concealed Weapons.**

**NEWNAN LEADER:** The fact is, this country needs more judges of Judge Lester's grit.

[The remainder of the page consists of dense newspaper columns reporting excerpts from various Georgia newspapers on the carrying of concealed weapons, including items headed by paper names such as COLUMBUS ENQUIRER, SOUTH GEORGIAN, CLARKESVILLE EXPRESS, MACON TELEGRAPH, CRAWFORDVILLE DEMOCRAT, ALBANY NEWS, BUTLER HERALD, ATHENS WATCHMAN, DARIEN GAZETTE, AUGUSTA EVENING SENTINEL, GAINESVILLE FREE PRESS, GRIFFIN SUN, NORTHEASTERN PROGRESS, GRAND JURY OF OGLETHORPE, MONROE ADVERTISER, SAVANNAH NEWS, WALKER COUNTY MESSENGER, and others.]

KR0862

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

# EXHIBIT 5

KR0863

CONCEALED WEAPONS: WHAT IS THOUGHT OF THE PRACTICE BY THE PRESS OF TH...
The Daily Constitution (1876-1881): Mar 27, 1879;
ProQuest Historical Newspapers: The Atlanta Constitution
pg. 8_3

## CONCEALED WEAPONS.

**What Is Thought of the Practice by the Press of the State.**

VALDOSTA TIMES: The Albany tragedy has put the press to discussing the habit of carrying concealed weapons. It is a correctly practice, and cause no end it pretends to honor and bravery. Our observation has been that cowards alone strut around with pistols in their pockets.

FRANKLIN REGISTER: Since the murder of Colonel Bob Alston, the press of the state is heavily down on the carrying of concealed weapons. It should be, and if there is any law by which this dangerous and cowardly practice can be suppressed, it should be enacted and enforced.

SAVANNAH RECORDER: In the Gibson trial is was a clear case of voluntary manslaughter. If we only had a law allowing two thirds of the jury to bring in a verdict, we would have fewer mistrials, and more speedy justice. Perjurers do sit upon juries, and no oath with them is sacred.

SAVANNAH NEWS: Several brutal murders which have occurred in various portions of the state within the past few months have started the friends of law and order and impressed all good citizens with the necessity for a more certain and speedy administration of the criminal laws, and it is to be hoped that public sentiment will be brought to bear in such a manner as will secure that result.

ABBEVILLE WATKIN?: There is no protection for the law-abiding portion of the community against the "pistol toters," except in the enforcement of the laws made to fit just such cases, and a grand jury-man who will not assist in putting a "true bill" against every person violating this law should have its cases withdrawn from the jury-box. It is the duty of every good citizen to aid in putting down the nefarious practice of carrying concealed weapons.

COVINGTON STAR: Public opinion must frown it down, and every citizen must keep a watchful eye on all suspicious persons and report to the proper officers every infringement of the law that comes within their knowledge. When you do this, no one will be bad enough to commit any depredation, besides laying himself liable to the heavy penalties of the law. Let every good citizen do his duty in this matter and the evil and pernicious practice of carrying concealed deadly weapons may soon be entirely broken up.

ELBERTON GAZETTE: In the unsettled portion of the country, where bloodshed is abound, and on the poorly protected Texas border, it is proper that men should arm themselves to defend person and property; but in a civilized country it is no act of bravery or quality of valor to carry a deadly weapon concealed about his person. The man who does so totes the first step in the committal of a crime, and the sooner our laws are shaped in that direction the sooner will the pernicious habit be broken up.

COLUMBUS ENQUIRER: A law badly executed, or not at all, is worse than no law.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

KR0864

# EXHIBIT 6

KR0865

manner should be abused, the party would be liable to indictment at common law."

### IV. DANGEROUS AND DEADLY WEAPONS.

A statute making it indictable for one to carry concealed about his person any " pistol, bowie-knife, razor, or other deadly weapon of like kind," embraces a butcher's knife. The words "other deadly weapon of like kind " imply similarity in the deadly character of weapons, such as can be conveniently concealed about one's person, to be used as a weapon of offence and defence.[1]

### V. DEFECTIVE WEAPONS.

1. *No justification or excuse.*—One who carries concealed about his person all the pieces of a pistol, which could readily be put together so as to make an effective weapon, is guilty of carrying concealed weapons, though at the time he carried them concealed the pieces were separated and incapable of use as a fire-arm until put together.[2]

In *Atwood* v. *State*,[3] it was held that carrying a pistol, the tubes of which were battered, and the lock so out of order that it could not be discharged by the trigger, is within the act, and the court say, " Until the pistol has lost so many of its parts that it has ceased to be a fire-arm, and is incapable of use as such, carrying it concealed, in the absence of the exculpatory circumstances mentioned in the statute, is an indictable offence. A fire-arm is a weapon acting by the force of gunpowder, and a pistol is a small, light fire-arm. The pistol earliest in use was a matchlock arm, and yet a fire-arm, the lock containing a match for firing it. This was succeeded by the ' flint and steel ' lock, and this by the percussion lock. The manner in which the weapon can be fired does not enter into its definition, however it may affect its value and utility. The ' flint and steel ' lock had not entirely disappeared when the first statute against carrying concealed weapons was enacted. Carrying such a pistol concealed, though it was without a flint, or other appliance by which it could be fired, was, and

[1] *State* v. *Erwin*, 91 N. C. 545.
[2] *Hutchinson* v. *State*, 62 Ala. 3; S. *C*, 34 Am. Rep. 1.

[3] 53 Ala. 508.

Digitized by Google          Original from
UNIVERSITY OF MICHIGAN

KR0866

# EXHIBIT 7

KR0867

200

to perform the duties enjoined on them by the second section of an act, passed at Nashville, the 19th of February, 1836, chapter XLVIII, that it shall be the duty of the several county surveyors to do and perform said services within their respective counties, and that said county surveyors shall be allowed the same fees, and be subject to the same penalties that said principal surveyors were entitled to, and liable for, in processioning said lands, and that said county surveyors shall return a plat and certificate of each tract so processioned by them to the entry taker of the county, who shall forthwith record the same in his survey book, for which services the said entry taker shall be allowed the same fees as for other services of the same kind, and that said several tracts of land shall be liable to attachment and final judgment for all expenses in processioning and recording the same.

<div align="right">

JOHN COCKE,
*Speaker of the House of Representatives.*
TERRY H. CAHAL,
*Speaker of the Senate.*

</div>

Passed January 18th, 1838.

---

## CHAPTER CXXXVII.

An Act to suppress the sale and use of Bowie Knives and Arkansas Tooth Picks in this State.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That if any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons whatsoever, shall sell or offer to sell, or shall bring into this State, for the purpose of selling, giving or disposing of in any other manner whatsoever, any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansaw tooth pick, such merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons for every such Bowie knife or knives, or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick so sold, given or otherwise disposed of, or offered to be sold, given or otherwise disposed of, shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a period not less than one month nor more than six months.

*(margin: Knives not to be sold or given away)*

SEC. 2.   That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in

*(margin: Not to be worn)*

form, shape or size resemble a Bowie knife or Arkansas tooth pick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

Sec. 3. That if any person shall maliciously draw or attempt to draw any Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick, from under his clothes or from any place of concealment about his person, for the purpose of sticking, cutting, awing, or intimidating any other person, such person so drawing or attempting to draw, shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this State for a period of time not less than three years, nor more than five years.

*Penalty of drawing a knife*

Sec. 4. That if any person carrying any knife or weapon known as a Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife, on a sudden rencounter, shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this State, for a period of time not less than three years, nor more than fifteen years.

*Penalty for using knife*

Sec. 5. That this act shall be in force from and after the first day of March next. And it shall be the duty of the several judges of the circuit courts in this State to give the same in charge to the grand jury every term of the respective courts, and any civil officer who shall arrest and prosecute to conviction and punishment any person guilty of any of the offences enumerated in this act, shall be entitled to the sum of fifty dollars, to be taxed in the bill of costs, and the attorney general shall be entitled to a tax fee of twenty dollars in each case, when a defendant shall be convicted, and no prosecutor required on any presentment or indictment for any of the offences enumerated in this act.

*Of prosecutions*

<div align="center">

JOHN COCKE,
*Speaker of the House of Representatives.*
TERRY H. CAHAL,
*Speaker of the Senate.*

</div>

Passed January 27th, 1838.

<div align="center">26</div>

Digitized from Best Copy Available

KR0869

# EXHIBIT 8

KR0870

## Carrying Concealed Weapons.

When Cæsar was advised by his friends to be more cautious of the security of his person, and not to walk among the people without arms or any one to defend him, he always replied to the admonitions, "He that lives in fear of death every moment feels its tortures: I will die but once."

Why brave men—citizens whose duty it is to cultivate the arts of peace, should go habitually armed, making an arsenal of their persons, has always appeared to us an inscrutable mystery—we could never divine it. We see but two horns to the dilemma—such a man is momentarily afraid of his own life, and his mind is therefore eternally on the rack, or, he but pants for an opportunity to act the assassin, and is therefore little better than a fiend in human form, to be despised by the truly brave man and to be abhorred by the man governed by religious principles. It is not characteristic of brave nations to carry concealed weapons, nor is it, so far as our observation has extended, indicative of brave men.— Concealed weapons are the insignia of the footpad, the burglar and the mercenary bravo; and by the man unconscious of wrong and fearless of danger they never should be worn. It is as unmanly to inflict a wanton injury, as it is not to resent a premeditated offence; and he who would do the one or submit to the other is but a cowardly poltroon who deserves to be scouted from society; but where offence is given or injury sustained, even the code of *honor* has laid down other means of redress than an instant appeal to the Bowie knife.

The South is accounted chivalrous, truly chivalrous, and well has she earned that proud distinction. Her sons never faultered in the charge, nor retreated before the enemy, but were always first to do battle for their rights—last to lay down their arms while these rights were withheld from them. Now the question which Southrons should ask themselves is, "Will the habit of incessantly carrying concealed weapons about our persons preserve to us that brave and chivalrous character which we have gained in many a well fought field—or rather, is it not calculated to degrade us and sink us down to the level of Spanish brigands or piratical assassins?" To this last interrogatory the breast of every brave American must beat a responsive *yes.* We do hope to see the time when every man who carries concealed weapons will be looked upon in the degraded light of a loafer, or worse—we wish to see the potential voice of public opinion frown the system down, for "it is more honored in the breach than the observance;" and with Cæsar we believe that "he who lives in fear of death every moment feels its tortures."

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

KR0871

# EXHIBIT 9

KR0872

# SOUTHERN ARGUS.

VOL. VIII.] COLUMBUS, MISSISSIPPI, JUNE 7, 1842. (NO.XXXVII.

PUBLISHED EVERY TUESDAY MORNING BY S. DAVIS, AT FOUR DOLLARS PER ANNUM IN ADVANCE--OR FIVE WITHIN THE YEAR.

**The Southern Argus,**

IS PUBLISHED EVERY TUESDAY MORNING AT Four dollars per annum payable in advance, or Five at the end of the year. No subscription received for less time than six months, nor any discontinued, until all arrearages are paid, unless at the option of the Publisher.

ADVERTISEMENTS, will be inserted at $1 per square, (ten lines or less,) for the first insertion and fifty cents for each continuance.

ADVERTISEMENTS, when not marked with the number of insertions, will be published until forbid and charged as above.

### *Liabilities of those who take* NEWS-PAPERS.

The Law is, and so the courts decide, that all persons to whom a paper is sent is responsible for the payment, if he receives the paper, or make use of it—even though he never subscribed for it. His duty in such case, is not to take the paper from the office or place where it is left, but to notify the publisher that he does not wish for it. If papers are sent to a Post-Office, Store, Tavern, or other places, and are not taken by the person to whom they are sent the Post-Master, Store or Tavern keeper, &c. is responsible for the payment unless he immediately gives notice, to the publisher, that they are not taken from the officer or place where they are sent.

Extract from the Post-Office Regulations, page 50, section 118: "In every instance in which papers come to your office that are not taken out by the person to whom they are sent, you will give immediate notice to the publisher, adding the reasons, if known, why the papers are not taken out."

### REMITTANCES BY MAIL.

FROM THE POST MASTER GENERAL.

*"A Postmaster may enclose money in a letter to the Publisher of a Newspaper, to pay the subscription of a third person, and frank the letter, if written by himself."*

NOTE.—Some subscribers may not be aware of the above regulation. It will be seen, that by requesting the Post Master where they reside, to frank their letters containing money, he will do so upon being satisfied that the letters contain nothing but what refers to the subscription.

THE BOWIE KNIFE.—The Washington (Ark.) Telegraph, gives us some facts connected with the history of this terrible instrument, and its inventor, a man named Black:—

This far-famed deadly instrument had its origin, we believe, in Hempstead county. The first knife of the kind was made in this place, by Mr. Jas. H. Black, for a man named James Bowie who was killed at the Alamo, in Texas, and hence it is sometimes called the *Black* knife, and sometimes called the *Bowie* knife. The small dagger worn in former times, has given place to this more formidable invention, and the Bowie knife, throughout the West, is now the most common weapon of attack or defence. Could each of these knives speak for itself, a catalogue of bloody deeds would be unfolded! One would tell of assassinations and lawless assaults—another of murders committed in secret, to gratify revenge or avarice and another of unavoidable violence and unfortunate rencounters. What acts, of infamy and moral degradation—what scenes of domestic sorrow heartrending distress would be exhibited! One would inform us how it was plunged, at the dead hour of night, into the bosom of its sleeping victim, and another tell us how it leaped forth to take sudden satisfaction for some fancied insult. Some would point to the penitentiary and gallows--others to mourning and afflicted families, and friends and exclaim, "We have been the instruments of men's passions—behold the fruits!"

But terrible as have been the uses of the Bowie knife, we cannot say that if it had not been invented, the dark consequences of the passions of men would have been in any great degree prevented. As long as those passons are unsubdued, they will be liable to outbreaks, and would have found other instruments of vengeance, if there had never been a Bowie knife; and when we have improved our minds, and learned to govern our passions, and to confine them in their proper channels, we will have no use for Bowie knives and pistols.

Whilst on this subject, we cannot forbear mentioning the sad dispensation with which Mr. James H. Black, the inventor of this knife has been visited. Several years since he lost his eyesight and the green earth and the shining heavens are to him alike, unchangeable dark. The events of the past must give employment to his mind, nor do we imagine that the thought of his having invented the Bowie knife will for a moment disturb his bosom's lonely quietude; for whilst the manufacturer of the article afforded the means of a comfortable subsistance, its appearance did *not* create, nor would its suppression have destroyed the stormy passion of the soul.

A BEUTIFUL SENTIMEMT.—However dark and disconsolate the path of life may to be any man, there is an hour of a deep and undisturbed repose at hand when the body may sink into a dreamless slumber. Let not the imagination be startled, if his resting place instead of being a bed of down, shall be a bed of gravel, or the rocky pavement of a tomb. No matter where the poor remains of a man may be the repose is deep and undisturbed, the sorrowful bosom heaves no more, the tears are dried up in their fountains, the aching head is at rest. and the stormy waves of earthly tribulation unheeded over the place of graves. Let armies engage in fearful conflict, over the very bosom of the dead not one of the sleepers hear the spirit stirring triumph or respond to the rending shouts of victory.

"How quiet those countless millions slumber in the arms of their mother earth! The voice of thunder shall not awaken them the loud cry of the elements—the wind—the waves—nor even the giant tread of the earthquake, shall be able to cause an inquietude in the chamber of death. They shall rest and pass away, the lats great battle shall be fought, and then a silver voice at first heard shall raise to a tempest and penetrate the voiceless grave For the trumpets shall sound and the dead shall hear his voice.',

BANK LYRICS.—We found the following yesterday written on the back of a bank note:

Hark, from the banks an awful crash,
Ye patriots hear the cry;
Here is a note that calls for cash,
But, oh, "tis all in my eye!"

## SOUTHERN ARGUS.

***Columbus, Miss. June. 3, 1842.***

THE LION'S SKIN TORN FROM THE BACK OF A BRAVING ASS.

WISE AND STANLY—The Hon. Henry A. Wise, after having blustered and roared so furiously as to keep the nation in a constant state of excitement, has at length very quietly confessed himself a coward in apologziing to Mr. Stanly for ungentlemanly violence which he has offered him. We do not object to a gentleman making an apology to another, when he is satisfied that he has done him injustice, but we do most decidedly despise that bullying and dastardly spirit, which will induce a man to commit the grossest violence upon the feelings of another and withhold all reparation until it is a reluctantly squeezed out of by his apprehension of a fight.

Some few weeks since, we published a short extract of a speech said to have been delivered before the General Conference held at the city of Baltimore in 1826,-by Rev. T. Griffin, one of the delegates from Mississippi,—which we clipt from the Natchez Free Trader. Mr. Griffin has written a letter to the Editor of the Free Trader in reply to said report, giving an outline of the original. In order to 'set Mr. Griffin right before the public,' as well as to give publicity to the same, we cheerfully copy. Read it:

From the Natchez Free Trader.

*An old fashion Methodist—Letter from Rev. Thomas Griffin—His Speech in the General Conference.*

The following pithy letter will explain itself. A few weeks since, we adverted to Mr. Griffin's speech and quoted him as having said that the abolitioinists should be "rammed, crammed, jammed and double damn into a forty-four pounder and shot into h-ll." This, it will be seen, was an error, though we can scarcely regret it, as it has been the means of drawing from him an outline of his famous speech. What he says on the subject of *abolition* is admirable—more pointed than any thing we have ever seen in print, and we hope the eastern papers, and particularly the *Cincinnati Anti-Abolitionist*, will give it an extensive cirulation. We are sure the *Picayune*, and other papers that have copied our article will set Mr. Griffin right before the public. Our venerable correspondent may be assured, we had no wish to disturb his retirement for we have known him from childhood and many of his nearest relatives have ever been among our most valued friends; but we quoted his remarks for the moral influence that the words of an old and faithful Preacher of the Gospel always evert. Writing from the impression of an interview that accurred seven years ago, we made an error which his letter will now correct.

MADISON COUNTY, 5th May, 1842.

Mr. Editor--In the language of Chas V. of Germany I thought I had "grown old before my time." For several years I have been in private life, and was willing to let my body and name descend in silence to the grave, and I courted neither slab nor willow to tell where I lay. But you have deemed in proper to draw me from my beloved retirement, and my name is in the *Free Trader* and the New Orleans *Picayune*, and yesterday I learned it was in another of the public prints! The reason I notice this is because my words have been made to say what I never intended to say. The statement you have made is true in part. If you publish this, you will have the true state of the case. It is known to you that Missouri had formed a constitution and come forward for admission into the Union.---It is to well known, the commotion and discussion thus produced for me to detail the cause. I passed through Washington city soon after this case was disposed of, but it was obvions the *excitement* had not subsided. On the 1st May, 1826, the Methodists held their General Conference in Baltimore. We had not been in session but a few days, when a resolution was introduced to *prohibit slave-holders from filling official stations in the church in future.* The delegates from some of the non-slaveholding States began to come down upon the subject in a manner very new and unexpected. A man would have thought there was scarcely any crime on earth *but slavery.* A variety of *new coined* expresions were employed, to render those connected with slavery as ridiculous as possible. In fact it appeared as if we southernors would be blown away like chaff before the tempest. Dr. Capers of South Carolina, made a powerful sympathetic appeal. Some few others from the south made speeches. But they were too much like suppliants for my feelings. It was the first time I ever had a seat in so learned a body of men. Though not very old, I knew I was old enough to be wiser than I was, I was sensible of my defective education, and the few years of my ministerial action had been spent on the frontiers of the Union. But I knew that was not the time to flinch from responsibility. If I had tried I could not have made *a set speech.* It was neither more nor less than the vent of my natural feelings---*an off hand shot.* I well remember the outlines and point I sprung upon them. Bishop Roberts was in the chair. I had spoken but a few words before there was a call, "*Speak louder—speak louder!*" With excited feelings, I told them if they would only be still, they should *hear* me. (Yes! and we warrant they did *hear* him, if they could hear *thunder.* EDITOR.)

I began by observing, "that I was willing to concede, that I had lived longer than I had lived to profit, and many things have passed me unimproved. But among the few I had noticed, *northern men coming to the South.* Sir, said I, when they first come among us, it seems as if THEY could see us all *damn'd and double-damn'd, ramn'd, cramn'd, and jamn'd into a forty six pounder, and blown into the fiery vaults of a deep damnation!!* Nay, pious zeal will not stop *there.* It seems *they would get on their knees and invoke the thunder bolts of an avenging God,* TO SINK OUR SIN MURDERED SOULS TO THE LOWEST HELL!!! But ☞ in twelve months time ☜ they become a *leetle* smoother on the subject, and if they contemplate a *permanent stay*—if they have either worth, or merit, or *intrigue,* they are sure to form alliances with our *slave-holding* families. We have young ladies in the south—charming ones too—owning no slaves and entirely unconnected with slavery. But *northern* gentleman always seem, some how or other, to see peculiar charms in *those* young ladies whose parents possess *the largest number of "niggers."*—Who ever heard of a Mississippi yankee fancying a girl that owned no slaves? Sir, if a stranger was in that gallery, he would conclude that we southerners were a pack of cannibals, who kill and eat their slaves. We have heard much about blood-stained hands. I am almost startled, and look around for them.—*Where are they*? I would ask a question—how came slaves in this country?—*northern men, northern* money and *nothern* ships, brought them to America. They kept them *at home* until they cut down their forest and so exhausted their farms that they would scarcely grow a crop of sedge, and *then,* with shrewdness and foresight, peculiar to the north, they sent them to us *on speculation* just as they sent us rum, and staves and wooden nutmegs. Our fathers gave them value received, and now *we* are to be condemned, without mixture of mercy, for holding the *same* property these northerners once possessed. It is possible, should the period arrive in the south when our lands are worn out, and slaves become a bill of cost to us, we shall become *very patriotic, moral* and *religious,* like our northern bretheren, and wash our hands of slavery. We are told here that it is one of the most heaven daring, God-provoking, hell-deserving crimes that man can commit. But I wonder, when Jesus Christ came from heaven to earth to set men right, that he did not touch the subject. I wonder that the Apostles, who denounced the smallest transgression, should have entirely passed over *this* ENORMOUS OFFENCE! And if it be offensive and sinful, I wish some one would just put their fingure on the place, in Holy Writ. *We* have no difficulty in pointing to the passages where slavery is recorded and sanctioned, and rules prescribed for the owner and the owned. We are told the time has come, that something must be done. The venerable man, whose remains lay under that pulpit, (Bishop Asbury,) and Dr. Coke, thought so, many years ago, and made such a move as they thought prudence dictated, and what was the consequence? Laws were made more rigorous, and every avenue to information closed to the negro—and while he remained in the same or a worse condition in body, his mind was void of that instruction that might have saved his soul from sin. That was the result of *intermeddling.* Some of our bretheren seem to take pride that they labor in free communities. Sir, why this *ministerial* pride? What have the *church* or *ministry* done? Nothing, literally nothing.—Policy and the Legislature have, in all cases, moved in advance. The church should *stand aloof.* In conclusion, Mr. President, I see there is strength enough in this assembly to pass any resolution they please. But here, in my place, as one of the representatives of Mississippi, I tell you *I never will aid in executing it.* And if the resolution should be adopted, you may send ship loads of northern men to execute it, but permit me to say in advance, whenever they come to the south and meddle with southern institutions, they will find their situations very delicate, *if not perilous in the extreme.*"

This is the substance of what I said, though I may have said much more.—Judge Lane of Vicksburg, was present and heard me. Mr. Editor, you make me say that at the close of an hour's speaking, I said *they* ought to be damned &c, whereas you will see from the above, that I represented them as willing to see *us* damned, &c. I throw the mantle over your mistake, as no doubt you followed the best light you were possessed of. I should be willing that you give this a place in your paper as it will correct the error. I *have* made many a rough speech in my time. For all the errors I have committed, I ask compassion of God and man; and if I have done no good, I carry with me into retirement, a consciousness that I have wished to injure no man. Our actions are public property, but our conscience is private, which we may enjoy if it is what it should be. I should be glad if those prints that have transcribed the article from the Free Trader, would correct it, if in accordance with their feelings; if not, I shall not complain, as it is a trifle to what I have encountered.—You will pardon me, Mr. Editor, for this long letter. That prosperity may accompany you in life, peace and quietude in death, and on the wings of Seraphs may your flight be from a world of gloom to glory, is the sincere prayer of an old fashioned Methodist Preacher.

THOMAS GRIFFIN.

☞ We are authorised to announce **Alexander M. Clayton,** Esq. of Holly Springs, as a candidate for the office of Judge of the High Court of Errors and Appeals, to fill the vacancy occasioned by the resignation of Judge Trotter. Election to take place on the first Monday in August next.

For the Southern Argus.

A MOUNTAIN IN LABOR.—The Editor of the Natches Free Trader of the 16th inst., must have been in severe labor, and brought forth—not a mouse, but about half a column of philipic against Henry Clay, which for falsity, "out herods Herod," and is worthy only of its paternity--and only because, *a committee of the House of Representatives* in Congress had said that it appeared from the *facts* embodied in that report, "to have become *a part* of the tactics of the army of the United States to squander the public treasuries for the benefit of *favorites and contractors,*" his ire is aroused to a pitch, which reminds me of knight errantry.—I do not think him *exactly* a Don Quixotte,–but I believe he would make an excellent *squire,*—why not publish the "*facts*" and let your readers know what they were—is there anything astounding in them, that they must be kept back, or are these "*favorites and contractors,*" too good locofocos to have it known who they were, and what was the amount of their population.

No doubt our *valiant squire* is doing good battle for his champion be he Benton, be he Calhoun, or, be he Buchanan—or, perhaps Van Buren [illegible] and expects when the field is won, to pick up some crumbs from his masters table.

That the whole sum and substance of this was intended as a philipic against Mr. Clay is evident from the following extract "For if there is any one thing that seems peculiar in the policy of Mr. Clay, it is his unscrupulous and indiscriminate hostility to military men."

I will inform the writer that if falsehood admits of comparison, that this assertion out lies lying, I have no other term to use.

Mr. Clay an enemy to military men --where was Mr. Clay in 1811 '12. Did not his zeal call patriotism to the field,—his eloquence aroused the nation to arms —his votes in congress for rewarding merit shew his desire to create emulation in the army,—his appointment as minister to negotiate the treaty of peace by Madison, and a democratic Senate shew in what manner his talents and patriotism were then appreciated,—and in the presidential canvass of 1828 the manner in which his services in that negotiation were applauded by those who now cry crucify him! crucify him! are matters of history, and fresh in the recollection of every one who was an attentive observer of that exciting election. But where then was your Bentons,—your Buchanans,—your Ingersolls,—your Wrights,—your Woodburys,—and a host of others, now flaming democrats; either openly espousing the cause of our enemies and glorying in their success, or *fencemen.* Where was Mr. Van Buren in that dark day,—did not he as State Senator in New York coalesce with the "Hartford convention," to supercede Madison, and place Clinton in his place? If there was any one theory "that seems peculiar to" *their* "policy," then, "it was their unscrupulous hostility to military men.—Witness Bentons attack on Gen Jackson in the streets of Nashville, and his pompous card then published,—recollect the resolution of a legislature "that it was inconsistant with a moral and religious people to rejoice at our victories."–Where was Buchanan, Wright, Ingersoll,—*rank and leading federalists, of blue light stamp.*—Woodbury was *a'fence man,* and Mr. Van Buren "for consistency's sake" did all he could to elect Clinton in 1812. And failing in that in 1813, "for consistency's sake" come out an advocate of the war;—a peace man in 1812 and a war man in 1813, and all "for consistency's sake."—Well he *was* consistent,—he had his eye on the main chance, to pander on the spoils of office,—to arrive at the highest dignity and retire with a fortune.

He has accomplished his object,–was *he* a friend of military men when he persecuted Gov. Tompkins the then patriotic Gov. of New York, to the death.–

But our redoubtable Sancho says, "he (Clay) endeavored to tear the well earned laurels from the brow of Gen. Jackson." Ask Mr. Calhoun, then Secretary of war,—if any "tearing of laurels," was performed, was not he the father of it,–did not he in his official capacity demand in Cabinet council that Gen. Jackson *should be tried before a court martial* for his seizing on the fortress of St. Mark in Florida, making prisoner of the Governor, and taking into his possession, the archives of a nation at amity with us,–and was not John Q. Adams the then Secretary of State, the advocate of Gen. Jackson, and by his masterly correspondence with the Spanish minister quieted the affair.

Shew me, I ask you the instance whenever Mr. Clay assailed the fame of Gen. Jackson as a warrior. No sir, it is not to be found, as an opposer of his policy, as President of the United States, he never lisped a sylable against his high and honorable fame as a general.

But again, "he (Mr. Clay) was the rival of Gen. Harrison," and, had *he* lived 'he would have become 'his reviler and persecutor." Pandomonium with its skilful vulcan could not have forged a baser falsehood. Mr. Clay the rival of Gen. Harrison—Did not he contrary to the remonstrances of many friends voluntarily withdraw from the canvass,–did he not on all occasions display his eloquence in hurling a deserved censure on the detractors from the fame of that departed hero,—and where was *you Mr. Redoubtable squire then, armed cap-a-pie.* Were your columns then [illegible]evoted to *vindicating* 'the well ea[illegible] fame of 'military men" or were th[illegible] denouncing one of our bravest, [illegible] lauding a citizen, who in all his [illegible]ltifarious somersetts has acted "fo[illegible] consistency's sake."

It w[illegible] said by a celebrated writer in the early history of our republic that "the paladiu[illegible] liberty may pull down the pillars of [illegible]edom,—a licentious press like the un[illegible] tongue is full of deadly poison," t[illegible]cklessness with which some of ou[illegible]als assail every theory oppo[illegible] to the men they wish to elevate to power, has been proverbial.

Let me tell th[illegible] authors of these slanders these "Ja[illegible] Cades" of our country, who so[illegible] so feeling notes to the *dear* [illegible] time will come when the[illegible]e torn from their hy[illegible] indignation of an abused nati[illegible] hurl them down, down to conte[illegible] and ignominy. Where has the re[illegible]ces of the nation evaporated dur[illegible] the last seven years?—Where w[illegible] national credit then? and where is it now?—compare it even with the credit of our republic in 1792 and where is it? Where Mr. Editor of the Free Trader is the credit of your own State[illegible] specie you have none, ex[illegible] and then an "*accidental*" dollar [illegible]ping from one pocket to ano[illegible]d at last detected, is seized an[illegible] to foreign countries at 20 to 25 [illegible]ent premium.

[illegible] go on a little while, put the [illegible] chaliced cup to your confiding [illegible]itizens lips a little longer,--heap [illegible] on burden and give it the sweet s[illegible]ing name of democracy,—Jack C[illegible] did it, Cromwell did it, and we kn[illegible] *their* fate.

LACON.

Columbus Miss. May 30, 1842.

EAST INDIA COTTON.—As there have been of late many contradictory statements, throughout the U. States. as to the success or failure of the culture of cotton in the East Indies, we publish the following letter from Mr. FINNIE addressed to a correspondent of the Natchez Courier; and leave those interested, to judge for themselves. Mr. F. says the correspondent, was the principle of an emigrating company, under captain Bayless, who left the city of Natchez in the spring of 1840, for the purpose of introducing the culture of cotton into the different presidencies of India.

"Kootramucksanpoor, Jan. 11, 1842. Banks of the Junna.

Yours, under date of August 7th 1841, was received on Christmas day, when surrounded by my American companions at our first meeting since we separated in April last. All of the number present had enjoyed good health.–We numbered at our festive board, six Americans, (two of whom are American Missionaries,) four Englishmen and one Scotchman, and one lady, *Mrs.* B. I send you some of my published articles relative to our prospects here. The young men that were at Bombay and Madras Presidencies, are, I believe on the eve of returning home—those from Bombay I know are; I do not believe, however, it is because they could not succeed; one of them has been sick; they were, I believe in some respects disappointed. But an Englishman might as well go to the United States to plant Cotton, and attempt it in New York, and give it up, and say it would not grow in America, as for those who have only been to Madras and Bombay to say that cotton would not grow in India, because they failed in their attempts, I am just as sure of making cotton here, as if I were on the banks of the Mississippi. Our late arrival in the country, a misunderstanding of what we required, and the drouth here, has prevented us from making it profitable this year, yet we have made some. I have made about 20 bales on my own account. There has been two showers of rain lately—one on the 18th December, the other on the 1st of January. I called out the ploughs (200 in number) for four or five days and have now upwards of 1000 acres ploughed and cross-ploughed at a cost of 12½ cents per day for each plough, the natives finding themselves and bullocks. The wages of a laboring man is $1 62½ cts. per month, he furnishing his own subsistence. There are large qualities of native cotton grown here, it is sown broad cast like oats, and not cultivated at all.

The land here is laid out in a manner similar to our townships, each containing some 5000 acres. I am now constituted a "Zemendar" or Landlord, and have control of a tract of land as above mentioned, containing a village of 2000 inhabitants, and although this number of people derive their subsistence from my tract, yet not more than one third of it is cultivated.

I have a large quantity of Burgs, (wild land,) grown up in grass, which has not been tilled within the memory of the oldest inhabitants upon it, and some of my tenants are 90 years old. There are millions of acres in my neighborhood uncultivated,—the people being naturally indolant. At the commencement of the rains, I offered them this good land one one year for nothing, them and also offered to loan money to assist them to bring the land into cultivation, but they wholly declined making an effort. I accordingly hired them to do for me what they would not attempt for themselves, and that too at a price that would not purchase a negro a single meal. They do not understand the management of horses, but plough with bullocks. The native plough is of rude construction, but acts admirably in the place of our Coulter plough in tough land; until theirs has passed through it once or twice it is almost impossible to use our ploughs.

There has been a great drouth this year; the rain ceased in August, just a month sooner than usual, and consequently our crop did not turn out as it otherwise would have done,–but had we been prepared in time, and been able to plant a full crop, it would have made a handsome profit this year. I see that the papers in the South are rejoicing at what they call our failure, and that a letter of one of our party has been published; the opinions it contained were evidently formed before the writer had an opportunity of forming a correct one. Notwithstanding all these unfavorable expressions, I beg leave to exercise an opinion, and I now assert, as a few years will prove, that cotton can be produced here fifty per cent cheaper than in the United States. It requires more energy, industry and perseverance here than in the States to get things under way, but after we have once learned the people how to use our implements, they handle them with a good deal of dexterity. When I first commenced ploughing with our ploughs, it took three of the natives to manage a single plough and the bullocks: then I got two of them to manage it, and finally one man, after some practice, manages both the plough and bullocks with ease. The natives are afraid of horses unless it is those whose profession or cast it is to take care of them. The bullocks here are a fast walking and a fast trotting animal, and capable of enduring any degree of heat without injury, and will trot in a carriage all day.

I have six natives and one white man as overseers, (but the natives will perform double the work for 'Burra Saib,' as they call me, than for any one else,) and I have been very successful in training the natives in my way of doing business; that I can give an order and have it executed expeditiously without going near them. I cannot describe the thrilling sensations I experienced, while my Arab Steed was bounding to and fro among 200 ploughs which I had in operation at one time; to me it was a scene peculiarly interesting. I am so well convinced of what can be done that I shall plant 500 acres or more on my own responsibility, though there are individuals of our own number so disheartened that they will not risk any thing in that way. The English are not planters, and will not plant themselves, and the people of India are not hasty in adopting new modes, but if all the people here were to commence a good system of cotton cultivation immediately, the world would be filled with cotton bales; but they are not going to adopt any new thing hastily, but they will gradually, and no doubt in another century India will furnish the English and China markets, if not the whole of Europe, with cotton; but years must elapse before the market can be influenced by Indian produce. Our good friends of the "*Free Trader*" forget that the consumption is increasing almost in the same ratio with the production of the article.

From my preceeding remarks upon the low rents of lands and cheapness of labor, you may judge whether or not this is the country for a poor but industrious man; you can, in my opinion, start business here with what two or three negroes would cost in Mississippi, and in ten years be better off than nine-tenths of the planters there. You can live in greater luxury, at infinitely less cost, than in any part of the world.

Government has built me a large comfortable house, which is furnished in a plain substantial manner. I am situated in an out of the way place for Europeans to visit, but can soon reach an English station upon an Arab Steed. We travel as far on horseback in one day, as an Englishman or native would in three. They generally move with their tents, and whole household establishment, which requires them to go slowly; or if they wish to go to any place expeditiously, they go by "Duk" in a Palanquin, borne on men's shoulders. In the Palanquin, you can recline at full length, or sit upright just as you please, and in this way be carried 100 miles in 24 hours and perfectly at your ease. Twelve or sixteen men go with the Palanquin and change alternately, and fresh sets of bearers take you about ten miles each. I came from Calcutta in this way; it is of course expensive.

I have found the climate delightful so much so, that if my friends were here, I would not exchange it for any part of the world I have yet seen.—There are two or three months in the year that are disagreeable, during the prevalence of the hot winds; at those periods no European is expected to do anything but make themselves as comfortable as possible, and there are such conveniences for comfort that you can enjoy almost any degree of temperature that you may wish.—For instance, we have a lattice formed of truss-truss grass, at the the door on the side of the house the wind comes in at, usually the west; this the "Beatly," or water carrier, keeps constantly wet with water, and the air is thus preserved gratefully cool, and diffuses a delightful odour through the house; and then, there is a "Panker" suspended from the ceiling, and reaches entirely across the room, and is kept in motion by a man pulling a rope which is attached to the Panker and passes through the wall to the outside of the house. Every room has a Panker, which in our sleeping apartments are kept in motion through the night. Even during the hot months, the mornings and evenings are delightfully cool and pleasant, and those periods are devoted to business or pleasure as we choose.

What is called the rainy season commences about the middle of June.—Do not imagine that it rains constantly far from it, but very much like your April showers, only more violent. It has rained but little this year, but enough for me to form a pretty correct idea of what it will be in ordinary seasons. The rains usually cease about the middle of September, and the nights and mornings are pleasant but the weather pretty warm during the month of October, but not unbearable even to Europeans unless they are very effeminite. November, December, January and February, are delightfully cool and pleasant, no shivering freezing, but cold enough to dress in cloth, and to render a fire, mornings and evenings agreeable. With regard to the healthiness of the climate here, this section of the country is not to be compared to Mississippi for the violence of its diseases. When we all met at Christmas, each exclaimed to the other "how well you are looking," and none of us had been in the least sick, although we lived in tents during the last hot winds. I am delighted with the country and climate, and intend bringing my brother out as soon as he completes his collegiate course at La Grange, Ala.

My friends here are situated as follows: Mr. Mercer is at Rhat, about 60 miles distant from me; I have only seen him once since we parted. Mr. Terry is at Chonk, about 35 miles from me.—Mr. Blount of Georgia, is at Summuspere, about 20 miles and Captain Bayles is 10 miles distant.

Our society here are English, Irish, and Scotch officers and their families, than whom there are not a more honorable class of men. The military and civil servants of government, are the only persons with a few exceptions, in the country; a few merchants, and a few large land-holders and indigo planters, are all that reside here.

In my next, I will say something of Egypt. I visited every thing worthy of note in that part of the country, and old Mahomed Ali was not the least among the curiosities at that time.

THOS. J FINNIE.

### A GOOD JOKE.

We clip the following extract from the "Mobile Ledger" by which it appears that Mississippi is about distinguishing herself again in the financial world; not, however, by repudiating a debt, but by negotiating a loan! aye, and with the General Government too! and for the modest sum of *only* 'Twelve Millions of Dollars!!' As far as our information extends, we are unable to learn that such a firm as that of "Fulcher Rickards & Co." now exists in Aberdeen or elsewhere. It is true that the renowned city of Aberdeen once rejoiced in a *shinplaster* shop which graced its issues with the above flaming signature, but like many other "promising institutions," it has long since gone the way of all flesh. There is no telling, however, (as Shocco would say when lecturing 'Hiram' on finance) what the 'recuperative energies or the elastic powers of our institutions are'; and therefore it may be possible, however improbable, that some great financial character, heretofore unknown to public fame, has "*waked up*" this defunct "*paper mill,*" and now has it in full tide of operation.—If it is so, and that the patriotism of the individual prompts him to furnish "Capting Tyler" and the "Guard" with Twelve Millions of what General Cocke would call "*quawzi cash,*" merely for the purpose of preventing the balance of trade being too heavy against our beloved country, we can only say, that we have no "constitutional scruples." But now to the extract:—So. ARGUS.

'IMPORTANT NEGOTIATION.'

We are informed on the highest authority, that a member of the highly respectable firm of Fulcher Rickards & Co. (private bankers) of Aberdeen, Mississippi, is now in this city, on his way to Washington, for the purpose of taking the balance of the "*Twelve Million Loan,*" recently authorised by the General Government. One of the partners of said firm (Mr. Rickards) went post haste to the seat of government some two weeks ago, with the view of preventing Hope & Co. of Amsterdam, from taking said loan until Mr. Oliver, the member of said firm of Fulcher, Rickards & Co., now in this city, should reach Washington with all the surplus capital that said [illegible] to invest in the [illegible] Mississippi.

KR0873

# EXHIBIT 10

KR0874

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1766   Page 438 of 607

# THE
# SLAVE'S FRIEND.

Vol. III. No. II.                Whole No. 26.



### BOWIE KNIFE.

These horrid weapons are usually called *Bowie* knives. They were invented by a man who lived in the state of Louisiana. His name was Buie. It is a French name, and is pronounced *Bóo-e*. Afterwards he went to Texas, and was killed there in battle.

People in slave states often carry such knives about them. When they get angry they draw the knife, and sometimes *stab one another !*

A man who keeps a shop in Broadway, New York city, sells Bowie knives.

KR0875

# EXHIBIT 11

KR0876

poll tax : for all pleasure carriages, two per centum, on every hundred dollars of their estimated value, to be ascertained by the oath of the party giving in the same to the assessor : for every horse kept exclusively for the saddle or pleasure carriage, one dollar : for every race horse, five dollars.: for every public race tract, twenty dollars : for every stud horse or jack-ass, the amount for which said stud or jack may stand by the season : for every head of neat cattle, (oxen used in the yoke excepted) which may be owned by any one man, over and above twenty-five head, four cents : for every billiard table kept for play, two hundred dollars: for each licence granted to hawkers or pedlars, fifty dollars for each county in which they trade, to be paid to the clerk of the court at the time of taking out the same : on all goods sold at auction, other than those which are exempted by law, two per centum on the amount of sale : on every practising attorney, five dollars: on every practising physician, five dollars : for every gold watch kept for use one dollar : for every silver or other watch kept for use, fifty cents : and for every clock kept for use, one dollar : for money loaned at interest, twenty-five cents for every hundred dollars : for every dirk, one dollar : for every sword cane, one dollar : for every pocket or side pistol, one dollar : for every dirk knife with a spring to prevent it from shutting, one dollar : and on the sale of every pack of playing cards, an additional tax of one dollar.

*Pleasure carriage.* *Horse for saddle or carriage.* *Racehorse* *Race tract* *Studs and Jacks.* *Cattle.* *Billiard tables.* *Pedlars.* *Auctions.* *Attornies.* *Physicians* *Watches.* *Clocks.* *Money at interest.* *Dirks,* *Cards.*

Sec. 4. *And be it further enacted,* That on every original writ, and subpoena in chancery, there shall be paid at the time of taking out the same, to the clerks of the circuit courts in each and every county, the sum of fifty cents, and on every writ of error and appeal one dollar : and it shall be the duty of the clerks aforesaid, respectively to make a return of the same, and pay over the money thus collected to the tax collectors of their respective counties, on or before the day on which the said tax collectors may be required to settle their accounts, with the Treasury of this State.

*tax on writ*

Sec. 5. *And be it further enacted,* That for every tavern license in any city or town, there shall be paid as tax twenty dollars : for keeping a house of public entertainment in any city or town without retailing spirituous liquors, ten dollars : on every retailer of spirituous liquors in any city or town, twenty-five dollars : on every retailer of spirituous liquors in the country, or on the road or highways, without keeping accommodations for man and horse, fifteen dollars : and on all houses of public entertainment on the roads and highways, retailing spirituous liquors, ten dollars, which tax shall be paid to the clerk issuing the license, and by him immediately to the tax collectors, and the clerk shall receive for his services the fees heretofore allowed for issuing licenses : and no county tax shall be paid on licenses except such as may be levied by the county court of such county.

*Tax on tavern licences and retailers.*

Sec. 6. *And be it further enacted,* That on all shares of Bank stock in any bank in the state, held by any individual, partnership, or body corporate, there shall be levied and collected yearly a revenue at the rate of fifty cents on each share of one hundred dollars : *Provided nevertheless,* that if any bank in this state shall refuse to pay specie for their notes after the first day of July next, then and in that case, there shall be levied and collected an additional tax of fifty cents on each share held as aforesaid in any bank or banks so refusing to pay specie for their notes: And the President and Directors or Cashier, on making out their last dividend for each preceding year shall return the

*Bank stock taxable.* *When to pay over.*

# EXHIBIT 12

KR0878

1846.

lowing manner, and not otherwise, that is to say—In all criminal prosecutions, the Solicitor's fee shall be taxed in the bill of costs and collected by the Sheriff with the other costs of the case, and be by him paid over to the Solicitor: *Provided,* That in all instances where said fee or any part thereof cannot be so collected, and it shall so appear by the return of the Sheriff, then the same shall be a charge upon the Treasury of the State.

*Proviso.*

SEC. 2. *Be it further enacted,* That all acts or parts of acts conflicting with the provisions of this act, be, and the same are hereby repealed.

*Repeal.*

[Passed the Senate, December 22, 1846.  Passed the House of Representatives, December 26, 1846.  Approved, December 29, 1846.]

---

## CHAPTER 75.—[No. 5.]

AN ACT amendatory of the Criminal Laws now in force in this State.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Florida in General Assembly convened,* That hereafter, if any person shall be convicted, whether upon indictment now pending or hereafter to be presented, of any of the offences, the punishment of which under the provisions of an act approved, February 27th, 1839, entitled, an act to amend an act entitled, an act relating to crimes and misdemeanors, approved, February 10th, 1832, is prescribed to be a fine not exceeding fifteen hundred dollars nor less than two hundred dollars, and imprisonment not exceeding six months, nor less than thirty days, at the discretion of the court, he shall be fined in any sum not exceeding fifteen hundred dollars and not less than ten dollars, and imprisoned for any time not exceeding six months and not less than one month, at the discretion of the court.

*Punishment of certain offences.*

SEC. 2. *Be it further enacted,* That if any person or persons shall either himself or by his servant, or agent, sell or barter to any slave or slaves, any vinous or spirituous liquors of any description, without an express license in writing from the person having control of said slave or slaves authorising said slave to purchase the same, or buy or barter with any slave or slaves any article whatever, without license as aforesaid, he, she, or they so offending, on conviction thereof before the Circuit court, shall be fined in a sum not less than twenty-five dollars nor more than two hundred dollars, or imprisoned not exceeding three months, at the discretion of the Judge.

*Selling liquor to slaves.*

*Trading with slaves.*

SEC. 3. *Be it further enacted,* That hereafter it shall not be lawful for any person in this State to carry arms of any kind whatsoever secretly, on or about their person, and if any dirk, pistol or other arm or weapon, except a common pocket knife, shall be seen or known to be secreted upon the person of any one in this State, such person so offending, shall on conviction, be fined not exceeding five hundred dollars and not less than five dollars, or imprisoned not exceeding six months and not less than ten days, at the discretion of

*Carrying arms secretly.*

*Criminal Laws. Criminal Cases. Chancery.*   CHAP. 75—76—77.   21

1846.

the court:  *Provided, however,* That this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes; and it shall be the duty of the Judges of the Circuit courts in this State to give the matter contained in this act in special charge to the Grand Juries in the several counties in this State, at every session of the courts.

SEC. 4. *Be it further enacted,* That all laws or parts of laws, so far as the same conflict with the foregoing section, be and the same Repeal. are hereby repealed:  *Provided, however,* That no conviction or sentence already rendered or pronounced under the acts referred to in the preceding sections, shall be in anywise affected by this act.

[Passed the House of Representatives, January 5, 1847. Passed the Senate, January 6, 1847. Approved, January 6, 1847.]

## CHAPTER 76.—[No. 6.]

### AN ACT relative to Costs in Criminal cases.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Florida in General Assembly convened,* That in all cases of a conviction for crimes or misdemeanors under the Costs of prosecution. laws of this State, the costs of prosecution shall be included and entered up in the judgment rendered against the convicted person, unless the jury trying the cause expressly find otherwise.

SEC. 2. *Be it further enacted,* That in all cases not capital, when it shall be made to appear from due proof made in open court, that the When party person convicted is wholly unable to pay costs, and that the judgment unable to pay has in other respects been complied with, the court before which costs. such person was convicted shall have power to discharge him or her without the payment of costs.

SEC. 3. *Be it further enacted,* That no defendant in a criminal When defenprosecution who shall be acquitted or discharged therefrom, shall be dant not liable liable for any costs or fees of the court, or of any Justice of the for costs. Peace, or any ministerial officer, or for any charge of subsistence while detained in custody.

[Passed the House of Representatives, December 19, 1846. Passed the Senate, December 26, 1846. Approved, December 29, 1846.]

## CHAPTER 77.—[No. 7.]

### AN ACT to amend the several acts relative to proceedings in Chancery.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Florida in General Assembly convened,* That Plea, demurit shall be the duty of the defendant, unless the time shall be other- rer, answer wise enlarged for cause shown by a Judge of the court, upon motion when filed. for that purpose, to file his plea, demurrer or answer to the bill in the Clerk's office, on the rule day next succeeding that of entering his

KR0880

# EXHIBIT 13

KR0881

13

equity in this state, where any person or persons may be surrendered by his or their bail in discharge of themselves, it shall and may be lawful for the person or persons so surrendered to take the benefit of the prison rules of the county, under the same rules, regulations, and restrictions prescribed for the benefit of defendants arrested and in custody under a writ of *capias ad satisfaciendum.*

*take the benefit of prison rules.*

JAMES FENTRESS,
Speaker of the House of Representatives.
W. HALL,
Speaker of the Senate, *pro tem.*
October 18, 1821.

## CHAPTER XII.

*An Act prescribing certain duties of Sheriffs in this state.*

*Be it enacted by the General Assembly of the State of Tennessee,* That hereafter it shall not be lawful for any sheriff within this state to appoint more than two deputies within the county for which he shall have been appointed sheriff, nor shall it be lawful for a Justice of the Peace to act as deputy sheriff during his continuance in office : *Provided* nothing herein shall be so construed as to apply to, or prohibit special deputations on urgent occasions, and deputations for the purpose of holding elections.

*Sheriff to, appoint not more than two deputies. No Justice to be a deputy.*

JAMES FENTRESS,
Speaker of the House of Representatives.
W. HALL,
Speaker of the Senate, *pro tem.*
October 19, 1821.

## CHAPTER XIII.

*An Act to prevent the wearing of dangerous and unlawful weapons.*

*Be it enacted by the General Assembly of the State of Tennessee,* That from and after the passage of this act, each and every person so degrading himself, by carrying a dirk, sword cane, French knife, Spanish stiletto, belt or pocket pistols, either public or private, shall pay a fine of five dollars for every such offence, which may be recovered by warrant before any Justice of the Peace, in the name of the county and for its use, in which the offence may have been committed ; and it shall be the duty of a Justice to issue a warrant on the application on oath of any

*Fine for carrying weapons.*

Digitized from Best Copy Available

KR0882

16

person applying ; and that it shall be the duty of every Judge, Justice of the Peace, Sheriff, Coroner and Constable within this state to see that this act shall have its full effect : *Provided nevertheless,* That **Exception** nothing herein contained shall affect any person that **as to travel-** may carry a knife of any size in a conspicuous man-**lers and the** ner on the strop of a shot pouch, or any person that **strop of a shot** may be on a journey to any place out of his county or **pouch.** state.

<div style="text-align:center">

JAMES FENTRESS,
Speaker of the House of Representatives.
W. HALL,
Speaker of the Senate, *pro tem.*

</div>

October 19, 1821.

<div style="text-align:center">

CHAPTER XIV.

*An Act directing the proceedings in cases of forcible entry and detainer.*

</div>

SEC. 1. *Be it enacted by the General Assembly of the State of Tennessee,* That no person or persons shall enter upon or into any lands, tenements or other possessions, and detain or hold the same but where entry is given by law, and then only in a peaceable manner.

**What shall** SEC. 2. *Be it enacted,* That if any person shall enter **be a forcible** upon or into any lands, tenements, or other posses-**entry and de-** sions and detain and hold the same with force or **tainer.** strong hand, or with weapons, or by breaking open the doors, windows or other part of a house whether any person be in it or not, or by any kind of violence whatsoever, or by threatening to kill, maim, or beat the party in possession, or by such words, circumstances or actions as have a natural tendency to excite fear or apprehension of danger, or by putting out of doors or carrying away the goods of the party in possession, or by entering peaceably, and then turning by force or frightening by threats or other circumstances of terror, the party out of possession, in such case every person so offending shall be deemed guilty of a forcibly entry and detainer, within the meaning of this act.

**Whatever** SEC. 3. *Be it enacted,* That no person who shall **makes an en-** lawfully or peaceably enter upon, or into any lands, **try forcible,** tenements, or other possessions, shall hold or keep **makes a de-** the same unlawfully, and with force or strong hand, **tainer forci-** **ble.** or weapons, or violence, or menaces, or terrifying words, circumstances or actions aforesaid, and it is

Digitized from Best Copy Available

KR0883

# EXHIBIT 14

KR0884

( 259 )

grants, deeds, or mesne conveyances not being proved and registered within this state, it shall and may be lawful for such person or persons to prove and register his, her, or their grants, deeds or mesne conveyances.

Sec. 2. *Be it enacted,* That this act shall be in force until the end of the next stated session of the general assembly.

## CHAP. XXI.

An ACT *to amend an act, entitled,*" An act to ascertain the boundaries of land, and for perpetuating testimony.—PASSED NOVEMBER 6, 1801.

BE it enacted by the General Assembly of the State of Tennessee, That all the privileges, benefits, and advantages arising under or accruing to others, by virtue of an act, entitled, " An act to ascertain the boundaries of land, and for perpetuating testimony, passed at Knoxville in the year 1799, shall extend to the citizens resident south of French Broad and Holston, and between the rivers Big Pigeon and Tennessee, holding or claiming, or that may hold or claim land by right of occupancy, so far as may respect their rights to, or the conditional or boundary lines of their respective claims or rights of occupancy and pre-emption in that tract of country, any thing in the proviso to the fourth section of said recited act to the contrary notwithstanding.

## CHAP. XXII.

An ACT *for the restraint of idle and disorderly persons.*—PASSED NOVEMBER 13, 1801.

WHEREAS it becomes necessary for the welfare of the community, to suppress wandering, disorderly and idle persons :

Section 1. BE *it enacted by the General Assembly of the State of Tennessee,* That any person or persons who have no apparent means of subsistence, or neglect applying themselves to some honest calling for the support of themselves and families, every person so offending, who shall be found sauntering about neglecting his business, and endeavoring to maintain himself by gaming or other undue means, it shall and may be lawful for any justice of the peace of the county wherein such person may be found, on due proof made, to issue his warrant for such offending person, and cause him to be brought before said justice, who is hereby empowered, on conviction, to demand security for his good behaviour, and in case of refusal or neglect, to commit him to the goal of the county, for any term not exceeding five days, at the expiration of which time he shall be set at liberty if nothing criminal appears against him, the said offender paying all charges arising from such imprisonment ; and if such person shall be guilty of the like offence from and after the space of thirty days, he, so offending, shall be deemed a vagrant, and be subject to one month's imprisonment, with all costs accruing thereon, which if he neglects or refuses to pay, he may be continued in prison until the next court of the county, who may proceed to try the said offender, and if found guilty by a verdict of a jury of good and lawful men, said court may proceed to hire the offender for any space of time not exceeding six months, to make satisfaction for all costs, but if such person or persons so offending, be of ill fame, so that he or they cannot be hired for the costs, nor give sufficient security for the same and his future good behaviour, in that case it shall and may be lawful for the said court to cause the offender to recive not exceeding thirty nine lashes, on his bare back, after which he shall be set at liberty, and the costs arising thereon shall become a county charge ; which punishment may

KR0885

( 260 )

be inflicted as often as the person may be guilty, allowing thirty days between the punishment and the offence.

Sec. 2. *Be it enacted*. That it shall not be lawful for any person or persons of ill fame or suspicious character, to remove him or themselves from one county to another in this state, without first obtaining a certificate from some justice of the peace of said county or captain of his company, setting forth his intention in removing, whether to settle in said county, or if travelling, to set forth his business and destination, and if such traveller should be desirous to stay in any county longer than ten day, he shall first apply to some justice of said county for leave, and obtain a certificate for that purpose, setting forth the time of his permission, and if such person shall be found loitering in said county after the expiration of his permit, or fail to obtain the same agreeable to the true intent and meaning of this act, such person or persons so offending, may be apprehended by any person or persons, and carried before some justice of the peace, who may enquire into his character and business; and fine him at his discretion, not exceeding ten dollars : but if said traveller shall be found on examination, to be a person of ill fame, and there is reason to suspect he is loitering in said county for evil purpose, attempting to acquire a living by gambling, or other bad practices, such justice shall have power to commit any person of like character, until he shall find good and sufficient security for his good behaviour, for any time not exceeding ten days, and said justice of the peace or court of the county shall proceed against such offender, in the same manner as is heretofore prescribed for vagrants.

Sec. 3 *Be it enacted*, That all and every keeper or keepers, exhibitor or exhibitors, of either of the gaming tables commonly called A. B. C. or E. O. tables, or faro bank, or of any other gaming cloth table, or bank of the same, or like kind, under any denomination whatever, shall be deemed and treated as a vagrant, and moreover it shall be the duty of any judge or justice of the peace, by warrant under his hand, to order such gaming table or cloth to be seized and publicly burned or destroyed ; said warrant shall be directed to some one constable within the county, whose duty it shall be, forthwith to execute the same : *Provided,* That nothing herein contained, shall be so construed as to extend to billiard tables.

Sec. 4. *Be it enacted*, That it shall not be lawful for any house keeper to harbor any idle person of the character aforesaid, for any longer time than is heretofore specified, under the penalty of twenty dollars for every such offence, to be recovered by warrant before any justice of the peace of the county where the offence is committed.

Sec 5 *Be it enacted*, That it shall be the duty of each justice of the peace, on information being made on oath to him or them, that there is a person or persons of the aforesaid description, loitering in his or their county, then and in that case he or they shall issue his or their warrant against such person or persons agreeable to this act : *And provided,* he or they shall neglect or refuse so to do, it shall be deemed a misdemeanor in office, for which he or they shall be impeachable, and on conviction be removed from office.

Sec 6 *Be it enacted*, That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his

Digitized from Best Copy Available

KR0886

own view, or upon the information of any other person on oath, to bind such person or persons to their good behaviour and if he or they fail to find securities, commit him or them to goal and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizances, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law.

Sec 7. *Be it enacted*, That if any person or persons shall unlawfully cut out or disable the tongue, put out an eye, slit a nose, bite or cut off a nose, ear or lip, or cut off or disable any limb or member, or stab any person whatsoever, in doing so, to maim, wound or disfigure in any of the manners before mentioned, such person or persons so offending, their counsellors, aiders and abettors, knowing of, and privy to the offence, shall be and are hereby declared to be felons, and shall suffer as in case of felony : *Provided nevertheless*, he or they shall be entitled to benefit of clergy, and be further liable to an action of damages to the party injured.

Sec 8. *Be it enacted*, That all fines inflicted by this act, shall be one half to him that will sue for the same, and the other half to the use of the county.

Sec. 9 *Be it enacted*, That all laws and parts of laws, which come within the meaning and purview of this act, are hereby repealed.

## CHAP. XXIII.

A**n** ACT *to authorise the several county courts of pleas and quarter sessions to remit and mitigate fines and forfeitures on recognizances as therein mentioned* —(PASSED OCTOBER 12, 1801.)

Section 1. B*E it enacted by the General Assembly of the State of Tennessee*, That the several courts of pleas and quarter sessions in this state, shall have power to remit or mitigate all fines by them inflicted, and all forfeitures on recognizances, previous to entering final judgment thereon : Provided, a majority, or any number not less than nine of the justices of said county be present when such remittance or mitigation shall be made.

Sec 2. *Be it enacted*, That so much of any other act as comes within the purview and meaning of this act is hereby repealed.

## CHAP. XXV.

A**n** ACT *concerning administrations granted on the estates of persons dying intestate therein mentioned* —(PASSED NOVEMBER 10, 1801.)

W**HEREAS** heretofore the courts of pleas and quarter sessions, during the being of the temporary government called Franklin, granted administrations on the estates of persons who died intestate, and have issued letters of administration accordingly, in virtue and by authority of which, the persons so administering, have proceeded to administer upon the goods and chattels, rights and credits of their intestates respectively : And whereas it will contribute to the peace and quiet of families, that administrations on such estates, so as aforesaid granted, be deemed and declared valid,

Sec 1. B*E it enacted by the General Assembly of the State of Tennessee*, That all administrations granted by any of the said courts of pleas and quarter sessions, and letters of administration by any of the aforesaid courts issued, on the estate or estates of any person who died intestate, and all proceedings in virtue of such letters of administration had and done, of, and concerning any such estate, agreeably to, and in conformi-

Digitized from Best Copy Available

# EXHIBIT 15

KR0888

[   100   ]

Governor to accept of the servires of any volunteer company or compa-
accept of ies (not exceeding three thousand as aforesaid) who fhall
the services tender their services within such time, and for such term,
of volunteer
companies & not exceeding fix months, as the Governor in his discre-
to commissi tion, fhall proclaim and appoint. And the Governor fhall
on officers defignate and commiffion for that purpose, all officers ne-
ceffary and proper for the command of such officers.

Sec. 3. *Be it further enacted,* That all volunteer officers,
non-commiffioned officers, muficians and privates, whose
service may be tendered and accepted under the provifions
of this act, fhall, at such place or places of redezvous as the
Volunteers to Governor fhall appoint within this ftate, be entitled to re-
to receive mo ceive in advance, the sum of ten dollars, to be taken and
ney in advance confidered as a part of their pay.

Sec. 4. *Be it further enacted,* That the forces to be raised
and organized, as provided by this act, fhall be disposed of
according to the discretion of their Governor (that discretion
Forces when subject only to the requisitions of the general government)
raised how to and fhall be liable to be marched to any place, and engaged
be diposed of in the service of the U. States, as the exigencies of the pres-
ent war may, in the opinion of the executive, require.

Sec. 5. *Be it further enacted,* That the governor of this
The Governor commonwealth, for the purpose of carrying into effect the
authorized to third section of this act, fhall be authorized to draw from the
draw money Treasury of this ftate, any sums of money that may be
from the trea necessary therefor; or in case of deficiency in the public
sury or bor funds, to borrow from any Bank or individuals, upon the
row from beft terms he can obtain such additional sums as may be
banks necessary for the purpose aforesaid.

Sec. 6. *Be it further enacted,* That the powers vested in
the Governor by the firft and second sections of this act,
fhall be exercised and carried into effect by him to such ex-
tent, and in such a manner and time, as his own discretion
and the emergency of public affairs may dictate.

---

## CHAP. LXXXIX.

*AN ACT to prevent persons in this Commonwealth from
wearing concealed Arms, except in certain cases.*

Approved, February 3, 1813.

Sec. 1. **B**E it enacted by the general assembly of the com-
monwealth of Kentucky, That any person in
this commonwealth, who fhall hereafter wear a pocket
pistol, dirk, large knife, or sword in a cane, concealed
as a weapon, unless when travelling on a journey, fhall be
fined in any sum, not less than one hundred dollars; which

KR0889

[ 101 ]

may be recovered in any court having jurisdiction of like sums, by action of debt, or on the presentment of a grand jury—and a prosecutor in such presentment shall not be necessary. One half of such fine shall be to the use of the informer, and the other to the use of this commonwealth.

This act shall commence and be in force, from and after the first day of June.

---

### CHAP. XC.

*AN ACT to amend the Militia Law.*

Approved February 3, 1813.

Sec. 1. BE it enacted by the General Assembly of the Commonwealth of Kentucky, That if any non-commissioned officer, musician or private, failing to march, or furnishing an able bodied substitute in his place, when ordered and lawfully called on, or leaving the service without a discharge from the proper officer, shall be considered as a deserter, & treated as followeth, to wit: Any person may apprehend such deserter, and deliver him to the officer commanding such detachment, or any recruiting officer within this commonwealth, and take his receipt for the same ; which receipt shall describe the name of such deserter, and the length of time he was to serve, and by whom he was delivered—which receipt shall be assignable ; and the reward for taking and so delivering such deserter, as aforesaid, shall be a credit for a tour or tours of duty for the length of time such deserter was bound to serve ; and said deserter shall serve out the term of time aforesaid before he shall be discharged, in addition to the time he was to serve, if such term of time is then required ; otherwise shall serve said tour or tours, when required so to do. And any person holding such receipt, when he is called on to perform a tour or tours of duty, and producing the same to the captain calling on him, it shall be the duty of said captain to receive the same, and give the owner thereof a credit for as many tours as is therein contained.

*Persons failing to perform tour of duty considered a deserter*

Sec. 2. And where any delinquent militia-man shall belong to any society who hold a community of property, the sheriff shall call on the agent or superintender of the common stock, or firm of said society, or compact, for the same ; and if he fails to pay the same as before described, the sheriff shall make distress, and sell so much of the property belonging to said stock, as will satisfy the fine, cost, &c. as is before directed.

Sec. 3. *And be it further enacted,* That brigade inspectors and brigade quarter masters, when not taken from the line, shall each be entitled to the rank, pay, and emoluments

*Brigade inspectors quarter masters, adjutants and pay-masters*

# EXHIBIT 16

KR0891

172

greeable to the assessment; and the said trustees shall at the end of the time for which they were elected, render an account of the same to the parish judge, and should any sums be unappropriated, the same shall be paid into the hands of the parish judge in trust for the succeeding trustees, and in case of default of the trustees whose term of time is thus expired, it shall be the duty of the parish judge to summon them to a settlement, enter judgment and issue execution for arrearages if necessary.

*Render account*

*Penalty for default.*

SECT. 3. *And be it further enacted,* That the trustees shall appoint one clerk and one collector, whose term of service shall expire at the same time with that of the trustees, which said officers shall be entitled to such fees as the said trustees may deem proper to allow them.

*Clerk and collector.*

*Fees.*

STEPHEN A. HOPKINS,
*Speaker of the house of representatives.*
J. POYDRAS,
*President of the senate.*
APPROVED, March 25th, 1813.
WILLIAM C. C. CLAIBORNE,
*Governor of the state of Louisiana.*

AN ACT

*Against carrying concealed weapons, and going armed in public places in an unnecessary manner.*

*Preamble*

Whereas assassination and attempts to commit the same, have of late been of such frequent occurrence as to become a subject of serious alarm to the peaceable and well disposed inhabitants of this state; and whereas the same is in a great measure to be attributed to the dangerous and wicked practice of carrying about in public places concealed and deadly weapons, or going to the same armed in an unnecessary manner, therefore;

SECT. 1. *Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened,* That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol or any other deadly weapon concealed in his bosom, coat or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine not to exceed fifty dol-

*Penalty for carrying concealed weapons.*

KR0892

# 173

esclaves) et pour son usage, d'une piastre sur chaque mille piastres, suivant le tableau des taxes; et lesdits administrateurs, à l'expiration du terme pour lequel ils auront été élus, en rendront compte au juge de la paroisse, et, s'il restait en caisse des fonds disponibles, ils seront versés entre les mains du juge de paroisse qui les gardera jusqu'à la nomination d'autres administrateurs, et si lesdits administrateurs, à l'expiration du terme pour lequel ils auront été élus, négligeaient de rendre le compte susdit, il sera du devoir du juge de paroisse de les sommer de rendre leurs comptes et de les poursuivre en justice et de lancer contre eux des mandats d'exécution pour les sommes arriérées, s'il le juge nécessaire.

*Redition de compte.*

*Peines pour défaut.*

SECT. 3. *Et il est de plus décrété*, Que lesdits administrateurs nommeront un commis et un collecteur de taxe, dont le tems de service finira en même tems que celui des administrateurs et qui auront droit à la compensation que les administrateurs jugeront à propos de leur accorder.

*Commis et collecteur.*

*Compensation.*

<div align="center">

STEPHEN A. HOPKINS,
*Orateur de la Chambre des Représentans,*
J. POYDRAS,
*Président du Sénat.*

Approuvé le 25 Mars 1813.
Wm C. C. CLAIBORNE,
*Gouverneur de l'État de la Louisiane.*

</div>

## ACTE

*Pour défendre de porter des armes cachées et de se présenter armé d'une manière inutile dans les endroits publics.*

Vu qu'il s'est commis dernièrement des assassinats et qu'il a été essayé d'en commettre d'autres de manière à causer de sérieuses allarmes aux habitans paisibles et bien disposés de cet etat, et vu qu'on doit en grande partie attribuer la cause de ces assassinats à la coûtume pernicieuse et condamnable de porter dans des endroits publics, des armes cachées et dangereuses, ou de s'y rendre armé d'une manière inutile,

*Preambule.*

SECT. 1ère. *Il est décrété par le sénat et la chambre des Représentans de l'État de la Louisiane réunis en Assemblée Générale*, Qu'à dater de la passation de cet acte, toute personne qui sera trouvée armée d'aucune arme cachée, tels que poignard, dague, couteau, pistolet ou toute autre arme meurtrière dans son habit ou ailleurs sur lui et qui ne seront point ostensibles, toute personne coupable de cette contravention, sera, sur conviction du fait, devant un juge-de-paix, condamné à une amende qui n'excédera pas

*Peines contre ceux qui portent des armes cachées.*

KR0893

## 174

**How distributed.**

lars nor less than twenty dollars, one half to the use of the state, and the balance to the informer; and should any person be convicted of being guilty of a

**For the second offence.**

second offence before any court of competent jurisdiction, shall pay a fine not less than one hundred dollars to be applied as aforesaid, and be imprisoned for a time not exceeding six months.

**Penalty for stabbing &c.**

SECT. 2. *And be it further enacted*, That should any person stab or shoot, or in any way disable another by such concealed weapons, or should take the life of any person, shall on conviction before any competent court suffer death, or such other punishment as in the opinion of a jury shall be just.

**Suspected persons may be searched.**

**Fine.**

**Sureties of the peace.**

SECT. 3. *And be it further enacted*, That when any officer has good reason to believe that any person or persons have weapons concealed about them, for the purpose of committing murder, or in any other way armed in such a concealed manner, on proof thereof being made to any justice of the peace, by the oath of one or more credible witnesses, it shall be the duty of such judge and justice to issue a warrant against such offender and have him searched, and should he be found with such weapons, to fine him in any sum not exceeding fifty dollars nor less than twenty dollars, and to bind over to keep the peace of the state, with such security as may appear necessary for one year; and on such offender failing to give good and sufficient security as aforesaid; the said justice of the peace shall be authorised to commit said offender to prison for any time not exceeding twenty days.

STEPHEN A. HOPKINS,
*Speaker of the house of representatives.*
J. POYDRAS,
*President of the senate.*
APPROVED, March 25th, 1813.
WILLIAM C. C. CLAIBORNE,
*Governor of the state of Louisiana.*

⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨⟨

## AN ACT

*To establish a permanent seat of justice in and for the parish of St. Tammany.*

**Commissioners.**

SECT. 1. *Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened*, That Thomas Spell, Robert Badony, Benjamin Howard, Joseph Hertraire and Ben-

KR0894

## 175

cinquante piastres et qui ne sera pas moindre de vingt piastres, dont moitié au profit de l'état, et le reste au profit du dénonciateur; et toute personne convaincue de récidive devant toute cour de jurisdiction compétente, sera condamnée à une amende qui ne pourra être moindre de cent piastres dont il sera disposé comme ci-dessus et à un emprisonnement qui ne pourra excéder six mois.

<span style="float:right">Distribution.<br>Recidive.</span>

Sect. 2. *Et il est de plus décrété*, Que toute personne qui poignardera, blessera ou tirera en aucune manière sur toute autre personne ou personnes avec des armes ainsi cachées, ou qui leur ôtera la vie, sur conviction du fait devant toute cour de jurisdiction compétente, sera condamnée à mort ou à toute autre peine que le jury pourra trouver juste dans son opinion.

<span style="float:right">Peine de mort.</span>

Sect. 3. *Et il est de plus décrété*, Que lorsque tout officier public a des raisons suffisantes de croire qu'une ou plusieurs personnes portent des armes cachées dans l'intention de commettre un meurtre, ou que d'aucune manière cette personne ou personnes portent des armes cachées, sur preuve authentique du fait et sur le témoignage d'une ou plusieurs personnes dignes de foi, devant un juge-de-paix, il sera du devoir dudit juge-de-paix de faire conduire pardevant lui le coupable, le faire fouiller, et en cas qu'il soit trouvé sur lui des armes cachées, il aura le pouvoir de le condamner à une amende qui ne pourra excéder cinquante piastres, ni être moindre de vingt piastres et de lui faire donner telle caution qu'il pourra trouver convenable pour conserver la tranquillité de l'état pendant une année, et si ledit coupable ne fournit pas bonne et suffisante caution, ledit juge-de-paix est autorisé de le faire emprisonner pour un tems qui ne pourra excéder vingt jours.

<span style="float:right">Pouvoir de fouiller.<br><br>Amende.<br><br><br>Caution.</span>

STEPHEN A. HOPKINS,
*Orateur de la Chambre des Représentans,*
J. POYDRAS,
*Président du Sénat,*

Approuvé 25 Mars 1813.
Wm. C. C. CLAIBORNE,
*Gouverneur de l'Etat de la Louisiane.*

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### ACTE

*Pour fixer d'une manière permanente le lieu des séances de la cour de paroisse de St.-Tammany.*

Sect. 1ère. *Il est décrété par le sénat et la chambre des représentans de l'état de la Louisiane réunis en assemblée générale*, Que Thomas Spell, Robert Badony, Benjamin Howard, Joseph Kerraire et

<span style="float:right">Commissaires.</span>

KR0895

# EXHIBIT 17

KR0896

[ 39 ]

## CHAPTER XXIII.

*AN ACT to prohibit the wearing of conceal-*
*ed weapons.*

APPROVED, January 14, 1820.

SEC. 1. BE it enacted by the General
*Assembly of the State of Indiana*, That
any person wearing any dirk, pistol,
sword in cane, or any other unlawful
weapon, concealed, shall be deemed
guilty of a misdemeanor, and on convic-
tion thereof, by presentment or indict-
ment, shall be fined n any sum not ex-
ceeding one hundred dollars, for the use
of county seminaries: *Provided however*,
that this act shall not be so construed as
to affect travellers.

*Persons wearing concealed weapons indictable*

*Proviso*

## CHAPTER XXIV.

*AN ACT supplemental to "an act for the*
*appointment of County Surveyors.*

APPROVED, January 14, 1820.

SEC. 1. BE it enacted by the General
*Assembly of the State of Indiana*, That
whenever hereafter any dispute may
arise about the division of any land
within this state, wherein the county
surveyor of the county, where the lands
lie, may be a party, or in any manner
interested, it shall be lawful for the Cir-
cuit Court on application of either par-

*County surveyor interested in partition Circuit court to appoint surveyor*

KR0897

Digitized from Best Copy Available

[ 40 ]

ty, to appoint some suitable person in said county, whose duty it shall be to proceed to divide the same, for which service, the person so appointed, shall be entitled to the same fees as county surveyors are entitled to, for similar services.

---

## CHAPTER XXV.

*AN ACT authorizing the arrest and securing fugitives from Justice.*

APPROVED, January 14, 1820.

SEC. 1. *BE it enacted by the General Assembly of the State of Indiana,* That if any person shall commit any crime in any of the United States, or the territories thereof, and shall flee into this state, it shall be lawful for any Judge of the Supreme or Circuit Court, or justice of the peace, within this state, on the oath or affirmation of any person charging such fugitive with a crime, to issue his warrant, and cause such fugitive to be arrested, and brought before him, and after hearing the proofs and allegations for and against such fugitive, if in the opinion of such Judge or justice, the proof is evident, or presumption strong, as to the guilt of the person charged, it shall be the duty of such Judge or Justice, to commit such fugitive from justice, to the common jail of the county, where such arrest may be made, for any length of time, not exceeding one month,

Fugitives from justice to be apprehended

Justice to issue his warrant and proceedings thereon

Fugitive to be committed

KR0898

Digitized from Best Copy Available

# EXHIBIT 18

KR0899

1821

## CHAP. XLIX.

An Act, to prohibit the carrying or wearing of concealed weapons.

SEC. 1. *Be it enacted by the Senate and House of Representatives of the State of Mississippi, in General Assembly convened,* That from and after the passage of this act, any person or persons convicted before any magistrate of his or their wearing or carrying any pistols, dirk or other such offensive weapons, concealed about his or their persons, shall forfeit and pay the sum of fifty dollars for every such offence, to be applied to the use of the literary fund : *Provided,* That in all cases of persons travelling, they shall not be bound by the provisions of this act.

COWLES MEAD,
*Speaker of the House of Representatives.*
JAMES PATTON,
*Lieutenant-Governor and President of the Senate.*
APPROVED, NOVEMBER 28, 1821.
GEO. POINDEXTER.

---

## CHAP. L.

An Act, to regulate the salaries of the district attorneys of the third and fourth Judicial Districts.

Salaries fixed.

SEC. 1. *Be it enacted by the Senate and House of Representatives of the State of Mississippi, in General Assembly convened,* That the district attorneys of the third and fourth judicial districts of this State, shall hereafter receive for their services the sum of six hundred dollars per annum, payable quarter yearly, out of any money in the treasury, not otherwise appropriated.

Repealing clause.

SEC. 2. *And be it further enacted,* That so much of the acts as allows the district attorney of the third judicial district, the sum of four hundred dollars, and the district attorney of the fourth judicial district, the sum of eight hundred dollars, be, and the same is hereby repealed.

COWLES MEAD,
*Speaker of the House of Representatives.*
JAMES PATTON,
*Lieut. Gov. and President of the Senate,*
APPROVED, NOVEMBER 28, 1821.
GEO. POINDEXTER.

KR0900

# EXHIBIT 19

KR0901

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1793   Page 465 of 607

CHAP. 99.—An ACT to prevent free persons of colour who leave the state from returning to it in certain cases.

( Passed April 7, 1838. )

**Free negroes leaving state to be educated not permitted to return.**

1. *Be it enacted by the general assembly,* That if any free person of colour, whether infant or adult, shall go or be sent or carried beyond the limits of this commonwealth for the purpose of being educated, he or she shall be deemed to have emigrated from the state, and it shall not be lawful for him or her to return to the same; and if any such person shall return within the limits of the state contrary to the provisions of this act, he or she being an infant, shall be bound out as an apprentice until the age of twenty-one years, by the overseers of the poor of the county or corporation where he or she may be, and at the expiration of that period, shall be sent out of the state agreeably to the provisions of the laws now in force, or which may hereafter be enacted to prohibit the migration of free persons of colour to this state; and if such person be an adult, he or she shall be sent in like manner out of the commonwealth; and if any person having been so sent off, shall thereafter return within the state, he or she so offending shall be dealt with and punished in the same manner as is or may be prescribed by law in relation to other persons of colour returning to the state after having been sent therefrom.

**Infants so returning how dealt with.**

**Adults how punished.**

**Commencement.**

2. This act shall be in force from and after the first day of August next.

---

CHAP. 100.—An ACT abolishing the punishment of burning in the hand in all cases.

(Passed February 8, 1838.)

**Burning in hand abolished.**

1. *Be it enacted by the general assembly,* That so much of any law of this commonwealth as authorizes or inflicts the punishment of burning in the hand in any case whatever, shall be, and the same is hereby repealed. And every person who may be hereafter convicted of any offence within the benefit of clergy, shall be punished in the mode now prescribed by law, except only the burning in the hand.

**Commencement.**

2. This act shall be in force from the passing thereof.

---

CHAP. 101.—An ACT to prevent the carrying of concealed weapons.

[Passed February 2, 1838.]

**Penalty for carrying concealed weapons.**

1. *Be it enacted by the general assembly,* That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offence forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and in each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.

**Courts to ascertain if murders or felonies be perpetrated by concealed weapons.**

2. *And be it further enacted,* That if any person shall hereafter be examined in any county or corporation court upon a charge of murder or felony, perpetrated by shooting, stabbing, maiming, cutting or wounding, and it shall appear that the offence charged was

KR0902

in fact committed by any such weapon as is above mentioned, and that the same was hidden or concealed from or kept out of the view of the person against whom it was used, until within the space of one half hour next preceding the commission of the act, or the infliction of the wound, which shall be charged to have caused the death, or constituted the felony, it shall be the duty of the examining court to state that the fact did so appear from the evidence; and if the court shall discharge or acquit the accused, such discharge or acquittal shall be no bar to an indictment for the same offence in the superior court having jurisdiction thereof, provided the same be found within one year thereafter.   And whether the accused shall be by such court sent on for further trial or discharged, it shall be lawful to charge in the indictment that the offence was committed in any of the modes herein before described; and upon the trial it shall be the duty of the jury (if they find the accused not guilty of the murder or felony) to find also whether the act charged was in fact committed by the accused, though not feloniously, and whether the same was committed or done with or by means of any pistol, dirk, bowie knife, or other dangerous weapon, which was concealed from or kept out of the view of the person on or against whom it was used, for the space before mentioned, next preceding such use thereof; and if the jury find that the act was so committed, they shall assess a fine against the accused, and it shall be lawful for the court to pronounce judgment as in cases of misdemeanor.

*Acquittal no bar to indictment in superior court.*

*Offence how charged in indictment.*

*Verdict of jury what to contain.*

*Penalty.*

3. This act shall be in force from and after the first day of June next.

*Commencement.*

---

**CHAP. 102.—An ACT to extend the act for the temporary relief of the banks of this commonwealth.**

(Passed February 20, 1838.)

1. *Be it enacted by the general assembly*, That the first, second and seventh sections of the act passed on the twenty-fourth day of June, eighteen hundred and thirty-seven, entitled, " an act for the temporary relief of the banks of this commonwealth, and for other purposes," shall be, and the same are hereby continued in force till the twentieth day of March next.

*Laws for temporary relief of banks extended.*

*See post, ch. 109. Acts extra session 1837, pp. 3, 4, § 1, 2, 7.*

2. *Be it further enacted*, That so much of the provisions of the act, entitled, " an act increasing the banking capital of the commonwealth," passed March the twenty-fifth, eighteen hundred and thirty-seven, as relates to the Bank of Virginia, the Farmers bank of Virginia, and the Bank of the Valley of Virginia, shall be and the same is hereby suspended until the first day of April next.

*Part of act increasing banking capital suspended. Acts 1836-7, pp. 63-74.*

3. This act shall commence and be in force from the passage thereof.

*Commencement.*

---

**CHAP. 103.—An ACT further to extend the act for the temporary relief of the banks of this commonwealth.**

[Passed March 16, 1838.]

1. *Be it enacted by the general assembly*, That the first, second and seventh sections of the act passed on the twenty-fourth day of June, eighteen hundred and thirty-seven, entitled, " an act for the temporary relief of the banks of this commonwealth," be and the same is hereby continued in force till the expiration of the present session of the legislature, any law to the contrary notwithstanding.

*Laws for temporary relief of banks further extended.*

2. This act shall be in force from its passage.

*Commencement.*

KR0903

# EXHIBIT 20

KR0904

## CHAPTER SEVENTH.

### *Of Miscellaneous Offences.*

Section 1. It shall be unlawful for any person or persons, or any company, corporation, or unchartered banking association, to make, emit, issue, or put in circulation, any note, bill, bond, draft, check, or post note, or paper of any name or description whatsoever, to answer the purpose of money, or for general circulation, and for every such note, bill, bond, draft, check, post note, or other paper so made, emitted, issued, or put in circulation, such person or persons, and each and every individual of said company, corporation, or unchartered banking association, so making, issuing, emitting, or putting in circulation, such note, bill, bond, draft, check, post note, or other paper, shall be held to be guilty of a misdemeanor, and shall be liable to be indicted therefor, and, upon conviction, shall be fined for every such offence at the discretion of the jury trying the same, not less than one hundred, nor more than five hundred dollars, and that upon failure to pay the fine, shall be imprisoned in the county jail for a term not exceeding twelve months.

*Unchartered banking companies.*

Section 2. If any person or persons shall sign any note, bill, bond, draft, check, post note, or any paper of other name or description whatsoever, as cashier or president, or under any other name, or in the name of any company, incorporation, or unchartered banking association, to be put in circulation to answer the purposes of money, such president, or cashier, or other person, under any other name, so signing said note, bill, bond, draft, check, post note, or paper as aforesaid, shall be deemed guilty of a misdemeanor, and shall be liable to be indicted, and, upon conviction, shall be fined for every such offence, in a sum not less than one hundred, nor more than five hundred dollars, at the discretion of the jury trying the same, and the signatures of the person or persons so charged, to the note, bond, bill, draft, check, post note, or paper aforesaid, shall be taken and held to be proof of such signing, unless the fact of signing be denied on oath by the defendant.

*Signing notes or bills.*

Section 3. It shall be unlawful for any person or persons, within the limits of this State, to pass off, issue, emit, or put in circulation, any note, bill, bond, check, draft, or post note, of any incorporation, company, or unchartered banking association; and any person or persons violating the provisions of this section, shall be deemed guilty of a misdemeanor, and shall be liable to be indicted, and upon conviction, shall be fined for every such note, bill, bond, check, draft, post note, or other paper so issued, emitted, passed off, or put in circulation, not less than twenty, nor more than one hundred dollars, at the discretion of the jury trying said offence.

*Passing off or circulating notes or bills.*

Section 4. Every one who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly

KR0905

weapon, pistol or any species of fire arms, or air gun, unless such *Carrying con-cealed wea-pons.* person shall be threatened with, or have good cause to apprehend an attack, or be travelling, or setting out on a journey, shall on conviction, be fined not less than fifty nor more than three hundred dollars: It shall devolve on the person setting up the excuse here allowed for carrying concealed weapons, to make it out by proof, to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description.

Section 5. If any person shall at the same election vote more than once for the same candidate for the same office, or for different candidates for the same office, either in the same or in different precincts, or vote when he is not legally authorized so to do, he shall upon conviction, be adjudged guilty of a misdemeanor, and fined in the sum of two hundred dollars, and be imprisoned in the county jail not exceeding one year. *Illegal voting.*

Section 6. Every apothecary, druggist, or other person, who *Apothecaries selling pois-onous drugs without label.* shall sell and deliver any arsenic, corrosive sublimate, prussic acid, or other substance, either solid or liquid, usually denominated poisonous, without having the word 'poison,' written or printed on a label attached to the vial, box or parcel, in which the same is sold, or shall sell and deliver any tartar emetic, without having the true or common name thereof written or printed upon a label attached to the vial, box or parcel containing the same, shall upon conviction, be adjudged guilty of a misdemeanor, and punished by a fine not exceeding one hundred dollars.

Section 7. Every apothecary, druggist, or other person, who *Selling to slaves.* shall give, sell or deliver, any of the drugs described in the preceding section, or any other drug or medicine, poisonous in its nature, to any slave, without an order in writing from the owner or manager of such slave, designating the drug or medicine, either by name, or the effect to be produced by it, he or she so offending, shall on conviction, be held guilty of a misdemeanor, and punished by a fine not exceeding two hundred dollars, and may also be imprisoned not exceeding three months.

Section 8. Every person who shall buy, sell or receive from any *Trading with slaves.* slave, any commodity of any kind or description, without the leave or consent of the master, owner, or overseer of such slave, verbally or in writing, expressing the articles permitted to be sold or bartered, first obtained, shall on conviction, be fined in a sum not less than ten, nor more than one hundred dollars, and may be imprisoned not more than three months.

Section 9. Every sheriff, coroner, constable, clerk, or justice of *Officers fail-ing to pay mo-ney collected.* the peace, who shall within three days after demand made, fail or refuse to pay over any money received or collected by him in his official capacity, shall be deemed guilty of a misdemeanor, and on conviction, shall be fined in a sum not less than one half, and not exceeding the entire amount received or collected: *Provided,* that *Proviso.* the party entitled to such money, shall remain in the county, or

KR0906

# EXHIBIT 21

KR0907

( 36 )

the statute of which this is an amendment, she shall make her election either of dower or of a childs part, within twelve months after the probate of the will or granting letters of administration, or she shall be confined to her dower.

*Widow may make her election of dower.*

Sec. 2. That if a widow take dower, she shall be entitled only to a life estate in the real property, to return at her death, to the estate of her deceased husband for distribution; if she takes a childs part, she shall have in the property set apart to her, a fee simple estate in the real property, and an absolute title to the personal property including slaves, with power to control or dispose of the same by will, deed or otherwise.

*Fee simple title in widow.*

Passed February 6th 1838.—Approved 8th Feb. 1838.

———

No. 24. AN ACT in addition to An Act, (approved January 30th, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly.

Section 1. Be it enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person or persons in this Territory to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum, and all persons carrying said weapons openly shall pay to the officer aforesaid a tax of ten dollars per annum; and it shall be the duty of said officer to give the parties so paying a written certificate, stating that they have complied with the provisions of this act. Four fifths of all monies so collected to be applied by the county courts to county purposes, the other fifth to be paid to the prosecuting attorney.

*Venders to get license.*

*moneys how appropriated.*

Sec. 2. Be it further enacted, That if any person shall be known to violate this act, he or they so offending, shall be subject to an indictment, and on conviction, to a fine of not less than two hundred nor exceeding five hundred dollars, at the discretion of the court.

*Penalty.*

Sec. 3. Be it further enacted, That it shall be the duty of the several Judges of the Superior Courts of this Territory, to give this act in charge to the grand jurors of their respective districts at each term of the court.

*Judges to charge grand juries.*

Passed 5th Febuary, 1838.—Approved 10th Feb. 1838.

# EXHIBIT 22

KR0909

Case 3:23-cv-00474-JES-DDL  Document 34-4  Filed 03/06/24  PageID.1801  Page 473 of 607

Offices again separated, February 24, 1844 s. 12, a, 16. But see March 5, 1846, a. 17, s 12.

The other sections of this act, of a general nature, have been re-enacted or superseded. They make several provisions of local and particular relief.

ART. 16. *An Act to Amend and Reduce into one the several Acts in relation to the Revenue of this State, and for other purposes —February* 4, 1844 .. 57 *to* 8 6.

§ 1. *Rates of Taxation.* The following taxes shall be assessed and collected within this state, to wit : An *ad valorem* tax of three-tenths of one per cent. on all lands of this state, not excepted by the ordinance admitting this state into the Union, or specially exempted by provisions of this act—on all money loaned at interest by individuals, or employed by them in the purchase of notes, bonds, checks, bills of credit of any description whatever as security for money advanced—on all goods, wares, and merchandize sold by any regular merchant—on all bank stock, subscribed for in any incorporated bank in this state, which shall not have paid a bonus for its charter, or been exempted by the provisions thereof (except stock subscribed for and owned by the state, or some incorporated literary or charitable institution.) An *ad valorem* tax of two and one-half per cent. on all merchandize sold by an auctioneer or transient vender of goods ; an *ad valorem* tax of one per cent, on each pleasure-carriage, watch, and clock (except such as are kept for sale by merchants and artizans.) A tax of ten dollars on each nine or ten pin alley, or any alley of the same kind kept for public play ; a tax of fifty dollars per annum on each theatre and each race track ; and one dollar on each and every Bowie knife ; a tax of one cent on each head of cattle over the number of twenty owned by any one individual ; a poll tax of fifty cents on every free free white male between the ages of twenty-one and fifty years; a tax of one dollar and a half on each and every free colored male between the age of twenty one and fifty years; and of seventy-five cents for each and every slave under sixty and over five years of age ; and on each slave under the age of five years, twenty-five cents ; an *ad valorem* tax of two per cent. on all gold or silver above the amount of fifty dollars manufactured otherwise than into coin, except jewelry worn about the person, and such as is kept for sale by merchants or artizans ; an *ad valorem* tax of three-tenths of one per cent., on each piano ; an *ad valorem* tax of one per cent. on each race, saddle, or carriage horse, and each horse kept by livery-stable keepers for hire : a *ad valorem* tax of one-fourth of one-per cent. on all public toll ferries, bridges, and turnpikes ; a tax of two dollars on each duelling or pocket pistol, except such as are kept for sale by merchants or artizans, or kept for use by military companies ; for each stallion or jackass, for whose services as such money or other valuable thing is received, a sum equal to the price of one mare, to be demanded and collected at any time during the season by the assessor, who shall pay over the same to the tax collector.

Tax on slaves and land changed a. 17, s. 1.

6. *In what County Person and Property Assessed.* Every person shall be assessed in the county in which he resides at the time of assessment, for each and every article and item of taxation which he or she is liable to pay under the provisions of the first section of this act : and when the line between two counties divides a tract of land, it shall, if occupied, be assessed in the county in which the occupant resides ; if unoccupied, each part shall be assessed in the county in which the same may lie ; and all personal property owned by any person in any county other than that of his or her residence, shall be assessed in the county in which the same is situated ; and if he or she

KR0910

# EXHIBIT 23

KR0911

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1803   Page 475 of 607

## REVENUE.

## CHAPTER CXXI.

### AN ACT to provide for the increase of the Public Revenue, and for other purposes.

Sec. 1. *Be it enacted by the General Assembly of the State of North-Carolina, and it is hereby enacted by the authority of the same,* That hereafter there shall be levied annually the sum of three cents upon every dollar of interest secured or actually due from or by any solvent debtor or debtors, whether from individuals, companies, corporations, or in any other way ; upon all sums of money at interest, whether in this State or out of it, at any time during the year next preceding the time the owner or owners thereof shall give in his, or her or their tax list : *Provided,* that guardians shall give in the money of each of their wards as a distinct and separate fund, and not as a fund held in common. *[Tax on interest.]*

Sec. 2. Be *it farther enacted,* That hereafter there shall be levied annually the sum of twenty cents upon every hundred dollars employed in buying and selling slaves, and that there there shall be levied annually the sum of ten cents upon every hundred dollars vested in every other species of trade ; and the sum of three cents upon every dollar of dividend or profit actually due or received upon sums of money vested in steam vessels (excepting the profits of such vessels as are under the burden of twenty tons,) or vested in stocks of any kind, or on shares of any incorporated or trading company, whether in this State or out of it, at any time during the year immediately preceding the time when the owner or owners thereof shall give in his, her or their tax list : *Provided,* that this act shall only authorize the taxing of such profits as the banks of this State shall make from trading in *[On capital in trading for slaves, and other species of trade, vessels, and trading companies.]* *[Proviso.]*

KR0912

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1804   Page 476 of 607

stocks and bonds as distinguished from "bills receivable," *and provided further*, that every person shall have thirty dollars of interest, dividend or profit, and an amount equal to the sum of interest, which he, she or they owe, or pay, or secure to be paid on his, her or their own debt or debts, which shall not be subject to the tax imposed by this act; *and provided further*, that this act shall not extend to the interest or dividends accruing to any literary institution, or to funds appropriated for public or private charities, devoted to the purposes of education, or to the maintenance of the poor or afflicted.

Sec. 3. *Be it further enacted*, That so much of the capital stock in trade of any merchant or jeweler, wholesale or commission merchant, as is now taxed by the 14th section of the 102 chapter of the Revised Statutes, shall be exempt from the provisions of this act: *Provided*, that the interest on all bonds, or notes, which any such merchant, jeweler, wholesale or commission merchant may own over and above the amount of the interest upon his own indebtedness and thirty dollars, shall not be considered as a part of his capital stock in trade, but shall be subject to the tax imposed by the first section of this act.

*On merchants & jewellers.*

Sec. 4. *Be it further enacted*, That hereafter, there shall be imposed and levied annually the following taxes, to wit : On all Surgeon Dentists, all practicing Physicians, all practicing Lawyers and on all other persons, (except Ministers of the Gospel of every denomination, Governor of the State and Judges of the Supreme and Superior Courts) whose practice, salaries or fees, or all together, shall yield an annual income of five hundred dollars, the sum of three dollars for the first five hundred, and two dollars for every additional five hundred dollars.

*On Dentists, Physicians and Lawyers.*

Sec. 5. *Be it further enacted*, That there shall be imposed and levied annually an *ad valorem* tax of one per centum on all gold and silver plate, and ornamental jewelry,

KR0913

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1805   Page 477 of 607

in use by the owner or owners thereof, of the value of fifty On plate, dollars or upwards; on all sulkies, gigs, buggies, barouches, jewelry, vehicles, carriages, and all other pleasure vehicles whatsoever, in use &c. by the owner or owners thereof, of the value of seventy-five dollars and under one hundred dollars, fifty cents; on all of the value of one hundred dollars, and under two hundred dollars, one dollar; on all of the value of two hundred dollars and under three hundred dollars, two dollars; on all of the value of three hundred dollars and under four hundred dollars, three dollars; and on all of the value of four hundred dollars and upwards, four dollars; on all gold watches, one dollar, and on all silver watches twenty-five cents, in use, (except such of each as are kept in shops and stores for sale;) on all harps in use by the owner or owners thereof, two dollars; on all piano fortes in use by the owner or owners thereof, one dollar; on all pistols (except such as shall be used exclusively for mustering, and also those kept in shops and stores for sale,) one dollar each; on all bowie knives, one dollar each; and dirks and sword canes, fifty cents each; (except such as shall be kept in shops and stores for sale:) *Provided, however*, that only such pistols, bowie knives, dirks, and sword canes, as are used, worn or carried about the person of the owner, shall be subject to the above named taxes; on all retailers of wines, cordials, or spirituous liquors, *ten dollars*; on all billiard tables, *one hundred dollars*; on all bowling allies, whether called " nine pin," or " ten pin " allies, or by any other name, *twenty five dollars;* on every pack of playing cards, *twenty five cents;* and every merchant, shop keeper and public dealer, in goods, wares, merchandise, or other thing, shall be liable for the same, and shall state on oath how many packs he or she has sold within the year preceding the time he or she shall give in his or her tax list; on all mortgages and deeds of trust, which shall be registered, the sum of one dollar; and the register in each and every county shall be liable for the same, and

KR0914

he is hereby required to give in to the justice taking the list of taxable property, the number of mortgages and deeds of trust by him registered in the preceding year, under a penalty of one hundred dollars, to be collected by the sheriff, and to pay the amount of taxes thereon, after deducting six per centum for his commissions; and the said register shall not be required to register any mortgage or deed of trust, until the person or persons presenting the same, shall have paid the tax hereby imposed, in addition to the fees now by law established.

**Toll bridges, ferries.**

Sec. 6. *Be it further enacted,* That the owner or owners of every toll-bridge or ferry in this State, shall hereafter pay annually a tax equal to five times the sum of the largest toll by him or them demanded and received.

**Insurance companies.**

Sec. 7. Be *it further enacted,* That the agent or agents of all insurance companies, not incorporated in this State, shall hereafter pay an annual tax of fifty dollars in every county where such agency shall be established, to be collected and accounted for by the sheriffs of the several counties as other taxes; and in case the said agent or agents shall fail to pay the tax hereby imposed, he or they shall be individually liable for a tax of one hundred dollars, to be collected by the sheriff of the county where such failure takes place, by distress and sale of the property of the said agent or agents, to be applied three-fourths to the use of the State and one-fourth to the use of the sheriff collecting the same.

**Circus riders and the like.**

Sec. 8. Each and every company of circus riders or equestrian performers, and each and every person or company who shall exhibit any collection of animals, commonly known as a menagerie, for reward, shall, previously to exhibiting or performing in any county in this State, pay to the sheriff thereof fifty dollars; and all Ethiopian serenaders, comic singers, and performers on musical instruments, who exhibit or perform for reward, five dollars, as a tax to the State, to be accounted for by the sheriff as other State taxes: and on paying such tax, the sheriff who receives the same shall give

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1807   Page 479 of 607

a license to exhibit or perform in his county, which license
shall contain a list of such animals, or personal performers,
or other articles to be exhibited, and in that case, such com-
pany or person shall be authorized and permitted to perform
and exhibit, as aforesaid, in such county, and no other, for
the space of one year thereafter; and each and every com-
pany of circus riders or equestrian performers, or Ethiopian
serenaders, comic singers and performers on musical instru-
ments, or exhibiter of any collection of animals, commonly
known as a menagerie, who shall perform or exhibit in any
county in this State, without previously having paid the tax
herein directed, shall be liable to a forfeiture of one hundred
dollars, to be collected by the sheriff, by distress and sale of
the property of such delinquent, and to be applied one half
to the use of the State and the other half to the use of the
sheriff.

Sec. 9. *Be it further enacted,* That the taxes, by this act re-
act imposed, shall be returned on oath to the justices of the
several counties in this State, appointed to take the list of
taxables and taxable property; and shall be collected by the
sheriffs of the several counties at the same time, and in the
same manner in which they now collect other State taxes,
and shall by them be paid into the treasury of the State at
the same time and under the same penalties which are now
prescribed by law, for the collection and payment of other
State taxes.

Sec. 10. Each and every person shall annually render to
the justice of the peace appointed to take the list of taxa-
bles and taxable property, the amount of tax which he,
either in his own right, or in the right of any other person
or persons whomsoever, either as guardian, attorney, agent
or trustee, or in any other manner whatsoever is liable for,
under the revised[?] laws of this State; and it shall be the duty
of the said justice to administer the following oath to each
and every person giving a list of taxables and taxable prop-

KR0916

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1808   Page 480 of 607

erty: You, A. B., do solemnly swear, (or affirm, as the case
may be,) that you, either in your own right or the right of any
other person, or persons whomsoever, either as guardian, attor-
ney, agent or trustee, or in any other manner whatsoever, are
not liable for more taxes, under the laws of this State, than the
amount which you have now listed, and that in all other res-
pects, the list by you now delivered, contains a just and true ac-
count of all the property which by law you are bound to list
for taxation, to the best of your knowledge and belief: so
help you God.

Sec. 11.   *Be it further enacted,* That it shall be the du-
ty of every justice of the peace who shall take a list of tax-
able property, before administering the oath aforesaid, to
call over to each person giving in his taxables, all the ar-
ticles and subjects of taxation which he may be bound to
list.

Sec. 12.   Each and every person liable to pay taxes by
and under the provisions of this act, who shall fail to list
their taxable property, or any part thereof, or refuse to take
the oath herein prescribed, shall, in addition to the payment
of a double tax, forfeit and pay into the public treasury the
sum of one hundred dollars for each year's failure or refusal;
and it shall be the duty of the several sheriffs aforesaid, to
levy, collect and account for the same, as in case of double
tax, unless the county court shall, within nine months there-
after, on satisfactory cause shown by such delinquent, order
said forfeiture to be released and remitted.

Sec. 13.   It shall be the duty of the several sheriffs to fur-
nish the Attorney General and the Solicitors of their respec-
tive circuits, at the first superior court which shall happen
after the tax lists are placed in their hands for collection,
with a list of all the persons liable for taxes under this act,
and who have failed to give in their taxable property or any
part thereof; and, upon such information, or any other in-
formation, or upon good reason to believe that any person

*[margin note: Justice to read over taxables.]*

*[margin note: Penalty for failing to list taxables.]*

*[margin note: Duty of sheriffs, Attorney General and Solicitors.]*

KR0917

has failed to list his taxable property, the Attorney General and Solicitors of the several circuits, shall have power and authority to file bills in the several courts of equity in this State, against each and every person failing to render a list of taxables and taxable property as by this act required, and compel a discovery upon oath, which discovery shall not be held and deemed evidence to convict such person for any penalty by this act annexed to such failure.

Sec. 14. It shall be the duty of the Public Treasurer to have prepared and printed, on suitable paper, forms of tax-lists, with all the articles subject to taxation and to be listed under this act and all other laws now in force, mentioned *seriatim* over the heads of parallel columns, in which the amount or quantity of each article to be listed is to be set down; and shall furnish to each county court clerk in this State two copies of the same for each tax collection district in said county; and the cost of preparing and printing the same shall be paid out of the public treasury. *Forms, Treasurer to prepare*

Sec. 15. It shall be the duty of the justice appointed to take the list of taxable property, to list the articles herein required to be listed in separate columns. And the clerks of the several county courts shall record, advertise and return the same to the Comptroller's office, in the same manner, and in case of failure, under the same penalties, forfeitures and liabilities as are now prescribed by law in relation to other taxes. *Duty of justices and clerks.*

Sec. 16. It shall be the duty of the register in each and every county, on or before the first day of September in each and every year, to furnish the Comptroller with a certificate of the name of the clerk of the county court, and the sureties to his bond for the faithful discharge of his duties in office; which certificate, when certified by the Comptroller, shall, on motion of the Treasurer, for judgment against any such clerk, and his sureties, be deemed equally valid in law, with the bond of such clerk, and the court shall give judgment and award execution thereon accordingly. *Certificate, register to furnish.*

KR0918

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1810   Page 482 of 607

**Penalty.**

Sec. 17.  If any register shall fail to furnish the Comptroller with such certificate as directed in the last section, he shall forfeit and pay the sum of one thousand dollars, in each case, to be recovered by the Treasurer for the use of the State.

**Court shall not tax.**

Sec. 18.  *Be it further enacted*,  That all the persons and property herein taxed, shall not be liable to be taxed by the several county courts.

**Repealing clause.**

Sec. 19.  *And be it further enacted*,  That an act, entitled " An Act to increase the Revenue of the State " and ratified on the 29th day of January, 1849, and all other laws and clauses of laws coming within the meaning and purview of this act, be, and the same are hereby repealed: *provided*, that this repealing clause shall not affect the collection of any taxes now due under the revenue laws of this State.

[Ratified 28th January, 1851.]

REVISAL OF PUBLIC LAWS.

# CHAPTER CXXII.

AN ACT for revising and digesting the Public Statute Laws of this State.

Sec. 1.  *Be it enacted by the General Assembly of the State of North-Carolina, and it is hereby enacted by the authority of the same*,  That three commissioners be appointed by the Governor, to collate, digest and revise, all the public statute laws of this State now in force, and including those which

KR0919

# EXHIBIT 24

KR0920

# LAWS OF ALABAMA.

———

[No. 1.]  AN ACT  <span style="float:right">1851-'52</span>

Further to equalize and improve the Revenue Laws.

SEC. 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened,* That there shall also be annually assessed and paid on all passes, canals or channels, or property of the like kind, estimated in the manner of. mills, distilleries, manufacturing establishments, &c., the same tax as is paid on toll bridges, turnpikes and ferries, that is to say for each hundred dollars of the real value of property twenty-five cents, ................................................... $0 25  *Property taxed.*

On all money which is purposely kept out at interest, whether lent to persons, corporations or companies, in or out of this State, in any form or manner whatever, and whether the evidence of such indebtedness is annually or otherwise renewed or not, and on which tax is not paid in some other form or manner to the State annually, the same rate shall be annually assessed and paid as on money loaned out at or under the legal rate of interest, that is to say for each hundred dollars, and at that rate, twenty-five cents...................................... 25  *Tax on money at interest.*

On every deck or part of a deck of playing cards sold or kept for use, ten cents.......................... 10  *Cards.*

On every bowie knife or revolving pistol, two dollars ....................................................... $2 00  *Bowie knive and pistols.*

SEC. 2. *Be it further enacted,* That hereafter, to provide against omissions and evasions, all lands shall be assessed and taxes paid thereon in the county in which it lies, whether a tract be divided by a county line or not.  *Whose land shall be assessed*

SEC. 3. *Be it further enacted,* That the property of soldiers who served in the war with Mexico, and of those who served in the Florida war, as well as those who served in the war of 1812, and of their widows in case of their decease, is exempt from taxation to the extent the same is exempt from execution.  *Soldiers exempt*

SEC. 4. *Be it further enacted,* That licenses may hereafter be granted by judges of probate of the different counties to practice the daguerrean art at one station in the  *Daguerreotypists.*

KR0921

**4**

county or in a village not having more than five hundred inhabitants on the applicant paying as a State tax.. $5 00

In towns with not more than four thousand inhabitants ..... ...... ...... ...... ...... ......$10 00

In cities with more than four thousand inhabitants. 25 00

To practice the art generally any where in the State ..... ...... ...... ...... ...... 50 00

Circus companies. For the exhibition of a circus, feats of activity and slight of hand, for each exhibition not exceeding twenty-four hours ..... ...... ...... ...... 10 00

Ten-pin alleys. These provisions are to supersede rates prescribed in the code. A license may be obtained as aforesaid for a ten pin alley at any watering place for six months only by paying annually as heretofore, ten dollars ..... .:. ...... ...:..... ......$10 00

Billiard tables. And for a billiard table...... ...... ......... 25 00

But if used for a longer time during the year, under any pretence, the owner or proprietor of the alley or billard table shall be liable to indictment in the same manner as if no license had been granted. And it is

Duties of judge of probate, treasurer, &c. hereby expressly made the duty of the judge of probate of each county by himself or agent to enquire of every person doing or offering to do any business for which a license is required under this or any other act, and ascertain whether the law has been complied with, and if not to cause the person to be bound over to court. When any citizen, assessor or other public officer may have information and believe that money due for the tax will be lost to the treasury by removals or otherwise, unless received immediately, the same may be paid to the county treasurer, who is required to give duplicate receipts therefor, one to the person paying, the other to the judge of probate, who shall endorse it to the collector. The treasurer shall pay the same over to the collector so soon as collections commence to be paid over by him as other money, and the treasurer charging himself with any portion thereof which belongs to the county treasury. And all moneys due the county treasury shall be paid over as soon as collections are completed to the county treasurer, or it shall be the duty of the treasurer as well as that of the solicitor of the district in his absence or default, in the name of the county, on three days,

How taxes may be collected. previous notice, to move for and obtain a judgment for the same, the interest and costs; and ten per cent. damages may be added by the court, if the circumstances require it, against any officer and his securities on their official bonds or other person holding the same.

5                                                    1851–'52.

SEC. 5. *Be it further enacted*, That instead of a transcript or copy of the assessment books by the assessor, the judge of probate is required to make out and forward to the comptroller of public accounts an abstract of the same in such form as said comptroller may prescribe and direct; and the court of commissioners may make such allowance to said judge therefor as they may think adequate and just. And the judge and commissioners shall hereafter receive $2 50 per day (five cents per mile for travel and ferriage) while closely and necessarily engaged in examining the books and performing other duties in connection with the revenue; but the judge and one commissioner only shall be competent to do all such duty in the event a fuller attendance is not deemed indispensable by the court. *{Judge of probate to make abstract. / Per diem of judge and commissioners.}*

SEC. 6. *Be it further enacted*, That hereafter the tax collector shall pay the assessor his commissions or other dues, taking from him duplicate receipts, one to be received, allowed and filed by the comptroller if necessary and if the same be correct. And it shall hereafter be the duty of the tax collectors of the several counties to record the receipts they obtain from the comptroller as early as practicable in the office of the judge of probate of the respective counties, in such accessible form or place as the judge may prescribe, so as to readily detect, by reference to the different counties, any errors or deficiences in the comptroller's office. *{How assessor shall be paid. / Tax-collectors to record receipts.}*

SEC. 7. *Be it further enacted*, That after either the assessor or collector shall have faithfully given the notices required by law to give in or pay taxes, if any person, without sufficient cause, fail or refuse to appear and give in or pay tax, and it thereby becomes necessary for such officer to visit the residence of such person, said officer is authorised to charge therefor (if in a city or town twenty-five cents, if in the country) fifty cents, to be charged and collected at the same time and in the same manner as taxes. But if either of said officers presume to charge or collect any such sum when the proper notice had not been given in good faith, or when from other cause it was improper, the same may be recovered back with costs before any justice of the county. *{Extra charges for failure to give in.}*

SEC. 8. *Be it further enacted*, That no higher nor additional tax shall be paid on account of the code adopted at the present session coming into operation and changing the tax year so as to make it end on the 31st of August or other time; and to provide against that as well as to avoid *{New Code not to interfere with tax laws.}*

# EXHIBIT 25

KR0924

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1816   Page 488 of 607

offer to take them on the most favorable terms to the company.

**President to make return.** SEC. 5. *Be it further enacted,* That it shall become the further duty of the said president to make a full and fair return of the sale of said bonds to the next annual meeting of the stockholders of the company, in which return shall be stated the amount of bonds sold, the name of each purchaser and the rate of interest at which he purchased the bonds he holds on the company.

SEC. 6. *Be it further enacted,* That the bonds hereby authorized to be issued shall not be sold under par.

SEC. 7. *Be it further enacted,* That this act shall take effect from and after its ratification. [*Ratified the 2d day of February,* 1857.]

---

*Chap.* 33.    AN ACT TO EXTEND THE TIME OF PAYMENT OT THE BONDS DUE FROM THE SEABOARD AND ROANOKE RAILROAD COMPANY TO THE STATE.

**Extends the time of payment five years.** SEC. 1. *Be it enacted by the General Assembly of the State of North-Carolina, and it is hereby enacted by the authority of the same,* That the time of payment of the bonds held by the State against the Seaboard and Roanoke Company, be extended five years from the first day of January, 1857: *Provided,* Said company pays semi-annually the interest thereon, at the rate of six per cent. per annum. [*Ratified the 2d day of February,* 1857.]

---

# REVENUE.

*Chap.* 34.         AN ACT ENTITLED "REVENUE."

SEC. 1. *Be it enacted by the General Assembly of the State of North-Carolina, and it is hereby enacted by the authority of the same:*

The following taxes shall be annually collected and paid by the citizens and other persons, and by owners of property situate in the State, besides the taxes which by any other

KR0925

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1817   Page 489 of 607

law may be imposed on them: unless the property in this chapter described shall be expressly exempt from taxation by this or some other law: the property and estate hereby exempted from taxation, are all such and their profits, as may belong to the State, or may belong to or be set apart for the University and colleges, institutes, academies and schools for the education of youth, or the support of the poor or afflicted, or specially set apart for and appropriated to divine worship. *Exemptions.*

2. There shall be annually levied upon all real property, with the improvements thereon, including entries of land, fifteen cents on every hundred dollars value thereof. *Land tax.*

3. If any person shall sell his real property and shall have no estate within reach of the sheriff to satisfy the taxes imposed thereon at the time when they become demandable, the land shall be bound for the same, and the land shall be bound in like manner for all the taxes, both real and personal, due from the original owner. *Land bound.*

4. Upon every free male, between twenty-one and forty-five years of age, a tax of fifty cents; and upon every slave of either sex, between twelve and fifty years of age, a tax of fifty cents shall be paid by the owner, unless when the owner may be a non-resident, then the hirer shall list and pay the tax: *Provided, however,* That the county court may exempt from a poll tax such poor and infirm persons, and disabled and insane slaves as they may declare and record, to be fit objects for exemption: *Provided further,* That the tax imposed by law for the insane asylum of North-Carolina of one and three-fourth cents on every one hundred dollars worth of land, and five and one-fourth cents on every taxable poll, is hereby discontinued. *Poll tax.* *Proviso.*

5. Upon each toll gate of a turnpike road, a tax of fifteen dollars shall be paid by every owner, and a tax of five dollars per gate by every person who may be permitted to erect gates across a highway; and a tax equal to seven times the largest toll by the owner demanded upon every public ferry, and a tax of fifteen dollars on every toll bridge. *Toll gate s.*

6. Upon every studhorse or jackass let to mares for a price, a tax of six dollars, unless the value of the highest season for one mare shall exceed that sum, in which case a *Studs and Jacks.*

KR0926

1856–'57.——Chap. 34.

tax of the highest price shall be paid, and they shall be listed by resident owners.   Owners residing out of the State, of such as are kept within the same to be let to mares, shall pay the tax forthwith to the sheriff of any county in which the animal may stand, and in case of failure to do so the sheriff shall forthwith distrain and sell it for the tax.

On collateral descents.

7. Upon the value of all real and personal estate which shall descend upon, be devised or bequeathed to, or shall become distributable among other persons than lineal descendants, or to or for the benefit of the father or mother, or any lineal ancestor of the deceased, where the real estate descended or devised, or both descended and devised, on or to any heir or devisee, shall be of the value of three hundred dollars, or the personal estate bequeathed to any legatee, or distributive share, or both legacy and distributive share, shall be of the value of two hundred dollars; the following taxes shall be paid:

(1) When such collateral relation shall be a brother or sister of the deceased, or any descendant of a brother or sister, a tax of one per cent.

(2) When such collateral relation shall be a brother or sister of the father or mother of the deceased, or any descendant of a brother or sister of the father or mother of the deceased, a tax of two per cent.

(3) When such collateral relation shall be in any other degree of consanguinity to the deceased than is above described, or the legatee or devisee shall be a stranger in blood to the deceased, a tax of three per cent: *Provided however,* That no devise or bequest, or distributive share to the widow of the deceased, nor any devise or bequest to the wife or widow of a son of the deceased, nor to the husband of a daughter of the deceased, whether she be living or dead, shall be taxed; nor shall the husband of any deceased wife receiving her estate after her death, be subject to any tax therefor, unless the same would have been taxable had she been living.

Proviso.

Executor or administrator to retain.

8. The executor or administrator of every such deceased person, on his settlement of the estate, shall retain out of the legacy or distributive share of every such legatee, or next of kin, the tax properly chargeable thereon; and, in case he

KR0927

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1819   Page 491 of 607

may have sold any real estate and there shall be a surplus in his hands not needed to pay debts and charges, he shall retain the proper tax of each person entitled to such surplus; which taxes he shall pay to the clerk of the court of pleas and quarter sessions of the county wherein the will was proved or administration granted.

9. If the executor or administrator shall fail to retain and pay the tax to the clerk, it shall be deemed a breach of his bond, if one shall have been executed, and the same shall be put in suit, on behalf of the State, by the county solicitor; or such executor, or administrator, with his sureties may be sued in equity at the cost of the State, in case of failure. *On failure to retain may be sued.*

10. Whenever the personal property in the hands of such executor or administrator (the same not being needed to be converted into money in the course of administration) shall be of an uncertain value, he shall apply to the county court, to appoint three impartial persons of probity to assess the value thereof; and such assessment being returned to the court and confirmed, shall be conclusive of the value. *How to act when the value is uncertain.*

11. The executor or administrator, as soon as he may ascertain that the land of the deceased will not be needed to pay his debts, shall report to the clerk of the court who receives the tax on personalty, an account of such real estate, and the tax thereon shall be paid by the heirs and devisees thereof respectively, to the said clerk; the value of the real estate to be ascertained as provided in the preceding section in relation to personalty, and the heir and devisee being duly notified of the motion to appoint commissioners. *Executor or administrator to report.*

12. If they, or any of them, fail to pay said tax within twelve months after the report of the executor or administrator, the clerk shall report such default to the commissioner for the judicial circuit; who, thereupon, shall cause a *scire facias* to issue to the defaulting person, to show cause why judgment shall not be rendered against him for the tax, and the real estate be sold to pay the same; and the court shall render judgment and cause the tax to be collected and paid to the clerk. *Scire facias in certain cases.*

13. The clerk shall keep a record of the taxes on the real and personal estate received by him in virtue of the six pre- *Clerk to keep a record.*

KR0928

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1820   Page 492 of 607

ceding sections, and shall return to the comptroller a correct account of the same with his annual statement of other taxable property; and he shall annually return upon oath to the court of pleas and quarter sessions of his county, at the term next preceding the time at which the sheriff may settle with the comptroller, a correct account of the same, and immediately pay the money to the sheriff of the county, retaining three per cent. thereof for his services.

**Commissioners.**

14. The governor shall appoint in each judicial circuit, one or more commissioners, whose duty it shall be to institute and attend to all suits brought to enforce the collection of the tax laid in section *seven* of this chapter; and to bring suits and take such other steps as may be necessary to enforce the collection of all taxes due and unpaid, which have heretofore been laid on property real and personal, descended or devised to collateral relations; and the commissioners shall receive such compensation for their services as the governor may allow.

**Intermeddlers in estates.**

15. In all cases where estates descend, or are devised to collateral relations, or strangers in blood, and the same shall be divided or settled, or an attempt be made to divide or settle them, without any lawful administration being had upon such estates, any person intermeddling in said estates, shall forfeit and pay the sum of five hundred dollars; to be sued for in the name of the State, in the superior court of the county wherein the testator or intestate had his domicil at the time of his death, and accounted for, when collected, as public tax.

**Administration.**

16. Whenever any person shall die, leaving no lineal descendants, and leaving property liable to the tax imposed by the *seventh* section of this chapter, and no administration shall be had on the estate, within three months thereafter, it shall be the duty of the county court, upon being informed of the fact, to grant administration thereof to the clerk of the county court, who shall retain and account for the tax according to the preceding sections of this chapter.

**Duty of commissioners.**

17. It shall be the duty of the commissioners to institute suit for all penalties incurred by clerks for failing to collect and account for the tax on collateral descents; which penalties shall be accounted for as public tax.

KR0929

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1821   Page 493 of 607

18. Every conveyance made by such deceased person with intent fraudently to evade the collection of said taxes, or any of them, shall, as against the State, be void ; and the same shall be chargeable at the suit of the State, on the property conveyed, in the hands of such vendee or donee, and his assignee. *Fraudulent conveyance void.*

19. Upon every dollar, more than six dollars, of net interest, not previously listed, either received during the year, next preceding the first day of April, or during that time, accrued, or converted into principal so as to become an interest-bearing subject, (whether demandable or not) on money owed, by solvent debtors, wherever they may reside, a tax of four cents. *Tax on interest.*

20. Upon every dollar, more than six dollars, of net dividend or profit, not previously listed, actually due or received during the year, ending on the said first day of April: upon money invested in steam vessels of twenty tons burden or upward, or in *stocks* of any *kind*, or in *shares* of any *incorporated* or *trading* company, whether in or out of the State, and herein shall be included all *bank* dividends, *bonds* and *certificates* of debt, of any other State, a tax of four cents. *On dividends, profits, &c.*

21. Such net interest, dividend, or profit, shall be ascertained by deducting from the whole amount thereof, such interest as during that time had accrued against the payer of the tax. *How ascertained.*

22. Upon every hundred dollars employed in buying and selling slaves, upon speculation, a tax of thirty-three and one-third cents: upon all sums of one hundred dollars and upward, employed in any other species of trade, for profit, by buying and selling, not in this chapter specially taxed, a tax of twenty cents; whether these trades be carried on with cash or upon credit. *Tax on capital.*

23. Upon each sulky, gig, buggy, barouche, carriage, and other pleasure vehicles in use by the owner, or by his consent, of the value of fifty dollars, and upwards, there shall be paid a tax of one per cent. upon the value thereof. *Pleasure vehicles.*

(2) Upon all gold and silver plate and ornamental jewelry in use, except ornamental jewelry worn by females, of as great a value as twenty-five dollars, one and one-fourth *Plate, &c.*

3

KR0930

per cent. on the value: on each gold watch in use, one dollar and twenty-five cents; on each silver or other watch in use, thirty cents.

**Harps and pianos.**

(3) On each harp in use, two dollars and fifty cents; on each piano forte in use, one dollar and fifty cents.

**Pistols, &c.**

(4) On every pistol, except such as are used exclusively for mustering, and on every bowie-knife, one dollar and twenty-five cents; on dirks and sword canes, sixty-five cents: *Provided, however,* That of said arms, only such shall be taxable, as at some time within the year have been used, worn or carried about the person of the owner, or of some other, by his consent.

**Retailers and canes.**

(5) On all licensed retailers of wines, cordials, or spirituous liquors, thirty dollars; on all gold-headed walking canes, in use by the owner, fifty cents; on all silver-headed walking canes, in use by the owner, twenty-five cents.

**Tavern keepers.**

(6) All keepers of houses of public entertainment, whether in town or country, whose annual receipts amount to three hundred dollars or more, shall pay a tax of one-fourth of one per cent.: *Provided,* That nothing herein contained shall authorize the keepers of such houses to retail spirituous liquors, without taking a license to sell the same from the county courts, and paying tax for the same.

**Billiard tables.**

(7) On each public billiard table, one hundred and twenty-five dollars, except when there are more than one kept by the same individual in the same room; in that case, a tax of one hundred and twenty-five dollars, shall be paid on the first, and sixty-five dollars on each additional table; on each private billiard table, twenty-five dollars.

**Bowling alleys.**

(8) On each public bowling alley, commonly called nine pin or ten pin, or by what other name called, fifty dollars, and for each additional bowling alley, fifteen dollars.

**Livery stables.**

(9) On each livery stable, twenty-five dollars.

**Cards.**

(10) On each pack of playing cards, thirty-five cents, to be paid by the seller; and every merchant, shop-keeper, retailer, inn or ordinary or tavern-keeper, or public dealer in goods, wares and merchandise, or other thing, shall list the number of packs he may have sold during the year.

**Peddlers of patent medicines, &c.**

(11) On all peddlers of patent soap, medicines for killing crows, chinches and other vermin, for the curing of head-

# Exhibit 26

KR0932

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1824   Page 496 of 607

and 15th lines the words "first volume of public acts," and insert the words "each of the volumes embracing both the public and private acts." [*Ratified the 16th day of February, 1859.*]

---

# REVENUE.

---

AN ACT ENTITLED REVENUE.

**District board of valuation, how appointed.** SECTION 1. *Be it enacted by the General Assembly of the State of North-Carolina, and it is hereby enacted by the authority of the same,* That at the first Court of Pleas and Quarter Sessions for each county, held after the first day of July, 1859, and at the same term every four years thereafter, the court shall appoint one justice of the peace, and two freeholders, men of skill and probity, for each captain's district in the county, who shall be styled the district board of valuation of their respective districts. The clerk shall issue a notice of his appointment to each man, within ten days, and the sheriff shall serve the same within twenty days after adjournment of the court. Should the court fail to make the required appointments, or should, from any cause, a vacancy occur, any three justices of the peace may make the required appointments, or fill the vacancy.

**Board to ascertain value.** 2. This district board of valuation shall, as near as practicable, ascertain the cash value of every tract of land, or other real estate, with the improvements thereon, situate in their district, either by viewing the premises or otherwise.

**May call and swear witnesses.** 3. In estimating the value, the board may call and swear witnesses to testify thereto, and they shall take into the estimate any fishery appurtenant thereto or used with the land ; also all mines of metal, stone or coal, or other material discovered, or supposed to exist, whereby the price of land is enhanced ; also, all machinery and fixtures for manufacturing or mechanical purposes, that have been erected or used on the land. When a tract of land shall be in one or more districts, the board of the district in which the owner resides shall ascertain the value of the whole tract ; and if the owner reside in neither of the districts, the board

KR0933

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1825   Page 497 of 607

of the district in which the larger part may lie, shall ascertain the value of the whole.

4. The owner of the land, or (if he be a non-resident) his agent shall furnish the district board with a list, including land entries, setting forth the separate tracts, and also the several contiguous bodies or tracts of land owned by him in the district, together with the names of the water courses, or other noted places on, or nearest to which they may be situated, and the number of acres in each separate tract or contiguous body of land. *Owner to furnish list.*

5. Town lots shall be listed separately, and each lot be numbered according to the plot of the town. Each separate body or tract of land, and each town lot shall be separately and distinctly valued and returned. *Town lots.*

6. The district boards shall, in each case, administer the following oath to the person furnishing the required list: "You, A. B., do solemnly swear that the list, by you furnished, contains a full statement of every tract of land and town lot in this district, for the taxes of which you are liable, either in your own right or the right of any other person, either as guardian, attorney, agent or trustee, or in any other manner whatsoever, to the best of your knowledge and belief, so help you God." *Oath.*

7. If any person shall refuse to furnish the list required above, or to take the oath prescribed in the preceding section, he shall be deemed guilty of a misdemeanor, and the justices of the peace of said board shall bind him over to appear at the next term of the Superior Court of the county to answer the charge; and, on conviction or submission, he shall be fined at the discretion of the court. *Refusal to take oath.*

8. When the owner of the land, or (if he be a non-resident of the State) his agent, be not a resident of the district where the land is situated, the required list, with affidavits of the same import as the above required oath, subscribed and sworn to before and certified by a justice of the peace, may be transmitted to the district board of valuation, and if received before the board shall be ready to value the land contained in the list, such list shall be received as though tendered and sworn to by the owner or agent in person. *Non-residents.*

KR0934

9. When the board of valuation are not furnished with a list sworn to as above required, or the owner or agent refuses to answer to the correctness of the statement as to the number of acres contained in any tract of land, they may procure a county or other surveyor, and have the same surveyed. And the surveyor may recover the amount of his fees and all expenses out of the owner of the land, before a justice of the peace, by warrant or attachment.

*When list is not furnished.*

10. The district boards of valuation shall, as soon as practicable after their appointment, proceed to value all real property in their respective districts, as above directed, complete the lists by the first of January, after their appointment, and annex the following affidavit, subscribed and sworn to before a justice of the peace, who shall certify the same: "We do solemnly swear that we have diligently enquired, and do not believe that there is any real property in the ——— district of ——— county, subject to taxation, that is not entered and valued in the above list, and the foregoing valuation of real property, with the improvements thereon, and privileges thereto attached, is in our judgment and belief the actual value thereof in cash; and that in assessing the same, we have endeavored to do equal justice to the public and to the individuals concerned, so help us God." This list and valuation shall remain in the hands of the justice of the peace of the board, and be open to the inspection of any one who wishes to examine it, until returned as hereinafter directed.

*Boards to value real property.*

11. On the second Monday of January, after the appointment of the district boards of valuation, the persons who were appointed as justices of the peace to be members of the different district boards, shall meet at the court house, and organize themselves into a county board of valuation, by electing, by ballot, one of their number chairman, and another secretary. In case a justice of the peace of any district board, from any cause cannot attend, the older of the two members of the board shall take his place.

*Justices to meet.*

12. To this county board of valuation shall the district boards of valuation make returns of their lists. This board shall carefully examine and compare all the lists, and if, in their opinion, the real property throughout the county shall

*Boards to make returns of lists.*

KR0935

not have been assessed by a uniform standard of value, they may re-assess any district or any separate tract or tracts or lots of land.

13. If any one deem that too high a valuation was put on his land, he may apply to the county board of valuation for redress, and they shall duly consider the case and decide as in their judgment is right. The board may call, swear and examine witnesses, or in person view the land about the value of which they are in doubt.

*When valued too high.*

14. Two-thirds of the entire number of the members, composing the county board of valuation, shall form a quorum for the transaction of business, and the decision of a majority of the members present shall stand as the decision of the board.

*Two-thirds to be a quorum.*

15. If in the opinion of the county board of valuation, any tract or tracts of land or town lots have been assessed at too low a value, they shall make lists of such tracts or lots, and post them in at least two conspicuous places in the court house, at the time of their adjournment. After they shall have examined and compared the lists, heard the complaints of all who may feel themselves aggrieved by the valuation of their property, the board shall post the lists as above required, and adjourn until the first Monday in April following, when they shall again meet at the court house, hear the complaints of all who may feel themselves aggrieved by their former action, or by the original valuation, and decide each case as to them may appear right; and from this decision there shall be no appeal.

*When valued too low.*

16. When the county boards of valuation shall have performed the duty on them imposed, they shall return the lists received of the district boards of valuation, as by them revised and corrected, to the clerk of the county court, before whom they shall subscribe and swear to the following affidavit annexed to the lists returned: "We solemnly swear that the foregoing lists have been carefully examined and compared, and, in our judgment and belief, they do, as now corrected, exhibit the actual cash value of every tract or lot of land in this county, with the improvements thereon and privileges thereto attached; and in the discharge of our duties we have endeavored to do equal justice to the public

*Lists to be returned to clerk.*

KR0936

and the individuals concerned, so help us God." The clerk, on receiving the lists from the county board of valuation, shall record them in alphabetical order, keeping the return of each district separate from the other.

**Compensation.** 17. Each member of the county and district boards of valuation shall receive, out of the county treasury, such compensation as the county court may allow, which, however, shall in no case exceed two dollars a day for the time engaged in the discharge of his duties.

**Takers of tax lists—how appointed.** 18. At the first court of pleas and quarter sessions of each county, held after the first day of April in each year, the court shall annually appoint, for each captain's district, a justice of the peace or a freeholder of known skill and probity, to take the lists of taxable subjects, and the names of the appointees and of the districts for which they were appointed, shall, during the term, be advertised at the court house, by the clerk. Should the court fail to make such appointments, any three justices of the peace of the county may meet at the office of the county court clerk, on or before the first day of July, and appoint the takers of the lists of taxables, and the clerk shall record such appointments.

**Appointments of takers of tax lists.** 19. Notices of all appointments of takers of tax lists, as soon as made, shall be issued by the clerk to the sheriff, who shall serve them within ten days on each appointee, whose duty it shall be to advertise at three several places within the district, at least ten days before the time of listing, the places and times where and when he will attend for the purpose of receiving the lists of taxables; and the days thus determined on shall be between the second Monday in July and first Thursday in August.

**Persons incapable of taking lists.** 20. Should any person appointed to take the list of taxables, from any cause, become incapable to perform the duties, another shall be appointed by any three justices of the peace of the county, to be notified by the sheriff for that purpose, and the person thus appointed shall take the list of taxables.

**Penalty for refusing to serve.** 21. If any person appointed to assess the value of lands, or to take the lists of taxables, shall refuse or wilfully fail to discharge the duties of his appointment, he shall be deemed guilty of misdemeanor.

22. Every person appointed to take the list of taxables, shall, before he enters upon the discharge of his duties, take the following oath, administered by a justice of the peace: "I, A. B., do solemnly swear that I will well and faithfully discharge the duties imposed by law on me as the taker of the list of taxables in ——— district, ——— county, without prejudice or partiality, to the best of my skill and ability, so help me God." *Oath.*

23. Every person appointed to take the list of taxables, shall, on taking the above oath, be invested with full power to administer oaths, and with all the other powers of a justice of the peace, so far as the same may be necessary to the proper discharge of his duties. Every person so appointed shall receive such compensation for his services as the county court may in its discretion allow, to be paid out of the county treasury. *Powers of takers of tax lists.*

24. Every taker of the list of taxables shall be furnished, by the clerk of the county court, with a fair copy of the returns made by the last preceding board of valuation of the assessment of real estate in his district, and with the necessary number of printed forms of tax bills, furnished by the comptroller, under the provisions of this act. *Clerk to furnish copy of returns by preceding board.*

25. All the property and other subjects of taxation shall be annually taxed, as by this act enacted, unless such property be expressly exempt from taxation by this or some other act; and the property and estate hereby exempted from taxation, are all such and their profits as may belong to the United States, or to this State, or may belong to or be set apart and exclusively used for the university and colleges, institutes, academies and schools for the education of youth, or the support of the poor or afflicted, or specially set apart for and appropriated to the exercises of divine worship or the propagation of the gospel, or such as may be set apart and kept for grave yards belonging to churches, religious societies, cities, towns or counties. *To be taxed annually.* *Exemptions.*

26. The taxes shall be annually collected and paid: First, to the sheriffs, on all property and subjects of taxation required to be listed, as per schedule A; secondly, to the sheriffs, on all property and subjects of taxation which are not required to be listed, but an account of which is to be *How collected and paid.*

3

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1830   Page 502 of 607

rendered on oath to the sheriffs, as per schedule B; thirdly, to the clerks of courts, and to the treasurer of the State, as per schedule C.

### Schedule A.

27. The following subjects shall be annually listed, and be taxed the amounts specified:

**Land.**    (1) Real property, with the improvements thereon, (including entries of land,) twenty cents on every hundred dollars of its value.

**Polls.**    (2) Every taxable poll eighty cents; *Provided,* That the county court may exempt from poll tax such poor and infirm persons, and disabled and insane slaves as they may declare and record fit objects of exemption.

**Gates, &c.**    (3) Every toll gate on a turnpike road, and every toll bridge, five per cent. on the gross receipts, and every gate permitted by the county court to be erected across a highway, fifteen dollars.

**Ferries.**    (4) Every ferry one per cent. on the total receipts of tolls during the year.

**Studhorses, &c.**    (5) Every studhorse or jackass, let to mares for a price, belonging to a resident of the State, six dollars, unless the highest price demanded for the season for one mare shall exceed that sum, in which case the amount thus demanded shall be paid as tax. The subject shall be listed, and the tax paid in the county in which the owner resides.

**Interest, &c.**    (6) Every dollar of net interest, not previously listed, received or accrued, (whether demandable or not,) on or before the first day of July of every year, on bonds or certificates of debt of the United States, of this State, (unless exempt by chapter 90 of the Revised Code, entitled "Public Debt,") or of any other State or government, or of any county or corporation, municipal or private, or on any bond, note, contract, account, or other claim or demand against solvent debtors, wherever they may reside, four cents.

**Dividend and profit.**    (7) Every dollar of net dividend or profit, not previously listed, declared, received, or due on or before the first day of July in each year, upon money, or capital invested in steam vessels of twenty tons burden or upwards, or in shares in any bank or other incorporation or trading company, four cents.

KR0939

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1831   Page 503 of 607

(8) Such net interest, dividend and profit shall be ascertained by deducting from the aggregate amount of interest, dividends and profits accrued in favor of the person listing, the amount of interest accrued against him during the year ending on the first day of July.  *How ascertained.*

(9) Every note shaver, or person who buys any note or notes, bond or bonds made by individuals, shall list the profits made and received or secured on all such purchases made by him during the year ending on the first day of July, whether made for cash or in exchange for other notes or bonds, and pay a tax of ten per cent. on the aggregate amount of such profits, in addition to the tax imposed by this act on the interest he may receive on such notes or bonds; *Provided*, There shall be no deduction made from the profits in consequence of any losses sustained.  *Note shavers.*

(10) Every person resident in this State, engaged in the business of buying and selling slaves, whether the purchases or sales be made in or out of the State, for cash or on a credit, one-half of one per cent. on the total amount of all his purchases, during the twelve months ending on the first day of July of each year.  *Negro traders.*

(11) Every person resident in this State, not a regular trader in slaves, who may buy a slave or slaves to sell again, whether such purchase or sale be made in or out of the State, for cash or on credit, one-half of one per cent. on the total amount of his purchases during the twelve months ending on the first day of July of each year.  *Not regular traders.*

(12) Every carriage, buggy or other vehicle kept for pleasure or for the conveyance of persons, of the value of fifty dollars or upwards, one per cent. on its value.  *Carriages, &c.*

(13) All gold and silver plate, and gold and silver plated ware, and jewelry worn by males, including watch-chains, seals and keys, when collectively of greater value than twenty-five dollars, one per cent on their entire value.  *Plate, &c.*

(14) Every watch in use one per cent. on the value; *Provided*, That all watches worn by ladies shall be exempt from taxation. Every harp in use, $2.50; every piano in use, $1.50.  *Watches.*

(15) Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one  *Dirks, &c.*

KR0940

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1832   Page 504 of 607

at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

Dentists, physicians, &c.

(16) Every resident surgeon-dentist, physician, lawyer, portrait or miniature painter, daguerrian artist, or other person taking likenesses of the human face; every commission merchant, factor, produce broker, and auctioneer; every State and county officer, and every person in the employment of incorporated or private companies, societies, institutions or individuals, and every other person, (except ministers of the gospel and judges of the superior and supreme courts) whose annual total receipts and income, (whether in money or otherwise) in the way of practice, salary, fees, wages, perquisites and emoluments, amount to, or are worth five hundred dollars or upwards, one per cent. on such total receipts and income.

Liquors, &c.

(17) Every resident of the State that brings into this State, or buys from a non-resident, whether by sample or otherwise, spirituous liquors, wines or cordials for the purpose of sale, ten per cent. on the amount of his purchases.  Every person that buys to sell again, spirituous liquors, wines or cordials from the maker in this State, his agent, factor or commission merchant, five per cent. on his purchases.

Collateral descent.

(18) Upon all real and personal estate, whether legal or equitable, above the value of one hundred dollars, situated within this State, which shall descend, or be devised or bequeathed to any collateral relation, or person, other than a lineal ancestor or descendant, or the husband or wife of the deceased, or husband or wife of such ancestor or descendant, or to which such collateral relation may become entitled under the law for the distribution of intestates' estates, and which real and personal estate may not be required in payment of debts and other liabilities, the following per centum tax upon the value thereof, shall be paid :

(*Class* 1) If such collateral relation be a brother or sister, a tax of one per cent.

(*Class* 2) If such collateral relation be a brother or sister of the father or mother of the deceased, or child of such brother or sister, a tax of two per cent.

(*Class* 3) If such collateral relation be a more remote re-

KR0941

# EXHIBIT 27

KR0942

259                               1866–7.

No. 259.]                 AN ACT

To relieve the Trustees of Lagrange College, in Franklin
county.

SECTION 1. *Be it enacted by the Senate and House of
Representatives of the State of Alabama in General Assembly convened,* That the trustees of Lagrange college and
their securities be and they are hereby relieved from any
and all liabilities which they or any of them may have
incurred under the provisions of an act entitled "An Act
to loan a certain fund to Lagrange college, in the county
of Franklin," and that all notes, bonds, deeds of trust,
or mortgage, or other security given by said trustees,
pursuant to the requirements of said entitled act, be cancelled by the comptroller of public accounts.

*Relieved from liabilities.*

Approved, January 29, 1867.

————

No. 260.]                 AN ACT

To establish Revenue Laws of the State of Alabama.

CHAPTER I—*Exemptions.*

SECTION 1. *Be it enacted by the Senate and House of
Representatives of the State of Alabama in General Assembly convened,* That the following rules as to the taxation
of persons and property are hereby established, to-wit :

*Rules prescribed, and exemptions.*

1. All lands subject to taxation must be taxed in proportion to their value.

2. All lands belonging to citizens of the United States
residing out of the State cannot be taxed higher than
lands belonging to persons residing therein.

3. No tax can be imposed on land the property of the
United States.

4. All the navigable waters within the State are to
remain forever public highways, free to the citizens of
the State and the United States, without any tax, impost
or toll thereon imposed by the State.

5. The following persons and property are exempt
from taxation :

All property belonging to the State, or any county,
city or town thereof, or the State Bank, or its branches.

All property of the United States.

KR0943

All religious books kept by ministers of the gospel and colporteurs, for sale or gratuitous distribution, on hand at any one time, to an amount not exceeding in value five hundred dollars' worth in any one year.

All property of literary, scientific and benevolent institutions, actually used for the purposes for which said institutions were created, not exempting, however, any of such property when employed in any other than the regular business of such institutions.

Houses of religious worship, and their appurtenances.

Places and monuments of the dead, and implements of burial.

All tools and implements in actual use of any calling, occupation or trade, to the value of one hundred dollars.

All insane persons and their property, to the value of one thousand dollars.

All disabled or crippled persons, whose taxable property does not exceed five hundred dollars, from any poll tax.

All lands donated by acts of Congress to railroads in this State remaining unsold and uncultivated.

## CHAPTER II—*Subjects of Taxation.*

SEC. 2. *Be it further enacted*, That taxes are to be assessed by the assessor in each county on and from the following subjects, and at the following rates, to-wit:

*Poll tax.*

1. On every male inhabitant between the ages of eighteen and fifty, (except those persons between the ages of eighteen and twenty-one, the emoluments of whose labor go to parents or masters) the sum of two dollars; and to insure the payment of such tax, it shall be the duty

*Corporations, &c., give number of employees.*

of all partnerships, associations, corporations, officers or individuals to return to the assessor the number and names of persons in their employment on the first day of February of each year, as clerks, book-keepers, overseers, deputies, agents, workmen, journeymen, or laborers subject to such tax, which tax the assessor shall assess against such employer, by them to be deducted out of the hire, wages or salary of such employees as before enumerated; and upon the failure of any employer to make return of such employees when called upon by the assessor to do so, the assessor shall proceed to ascertain the number of such employees from the best sources of information practicable, and such employer so failing shall be held liable in double the amount of the tax.

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1836   Page 508 of 607

2. On all real estate, to be estimated at its market value in money, according to the best judgment the assessor can form by information, inspection or otherwise, taking into consideration its location, whether in town, city or the country, its proximity to local advantages, its quality of soil, growth of timber, mines, minerals, quarries, or coal beds, and the amount and character of improvements, three-tenths of one per cent. *ad valorem.*

*Real estate, 3-10 of 1 per cent.*

3. On all mills, foundries, forges, mining establishments, quarries, lime or marble works, gin and carriage making shops, tanneries, and other manufacturing establishments.

*Articles taxed 3-10 of 1 per cent.*

On all wharves and wharf boats, toll bridges and ferries, turnpikes, and all passes, channels or canals, where tolls are charged.

On all stocks of goods, wares and merchandise on hand to be assessed upon not less than the largest amount on hand at any one time during the preceding year, and this shall include all merchandise kept on plantations for sale, or to be dealt out to laborers; *Provided,* That any goods, wares or merchandise offered for sale by any dealear or person, commencing business subsequent to the first day of January of the current tax year, shall become at once liable to the tax levied by this act, and must be estimated upon the maximum amount thereof.

On all horses and mules not used strictly for agricultural purposes, except studs, jacks and race horses.

On all cattle on the excess over five head.

On all household furniture, on the excess over three hundred dollars.

On all libraries not exempted by law, on the excess over three hundred dollars.

On all clocks kept for use, and

On all other property, real, personal, or mixed, not otherwise specified and taxed herein, or exempted therefrom—and this shall not be construed to tax the crops produced upon lands within this State taxed under the second paragraph of this section, as real estate—three tenths of one per cent. *ad valorem; Provided,* No hogs, sheep, goats, or poultry, kept or raised for the use of any family, or work oxen, or animals used for agricultural purposes exclusively, and no farming tools and implements of husbandry necessary on the farm, shall be taxed by this act.

4. On all vehicles not exclusively used for agricultural purposes.

KR0945

On all jewelry, plate and silver ware, ornaments and articles of taste, pianos and other musical instruments, and paintings, except family portraits.

*Articles taxed ½ of 1 per cent.*

On all cotton presses and pickeries.

On all studs, jacks, and race horses.

On all gold and silver watches, and gold safety chains.

On all money hoarded, or kept on deposit subject to order, either in or out of the State, except funds held subject to draft in the prosecution of a regular exchange business, and except also money kept on hand to defray current family expenses, for a period not exceeding one year.

On all money loaned, and solvent credits bearing interest, from which credits the indebtedness of the tax payer shall be deducted, and the excess only shall be taxed.

On all money employed in buying or trading in paper, or in a regular exchange business, or invested in paper, whether by individuals or corporations, except where the money so employed or invested is otherwise taxed as capital.

On the capital stock, actually paid in, of all incorporated companies, created under any law of the State, whether general or special, (except railroads,) and not exempted by their charter from such tax. except any portion that may be invested in property and taxed otherwise as property, one half of one per cent. *ad valorem.*

5. On the gross amount of all sales at auction, made in or during the tax year preceding the assessment, except those made by or under the direction of executors, administrators, and guardians, as such, by order of court or under legal process, and under any deed, will, or mortgage, at the rate of one fourth of one per cent *ad valorem.*

*Auction sales ½ of 1 per cent.*

6. On the gross amount of premiums, (after deducting threfrom all return premiums,) received from their business in this State during such tax year, by any insurance company not chartered by this State, and doing business herein by agents or otherwise, at the rate of one per cent.

*Premiums 1 per cent.*

7. On the gross amount of commissions or sums charged or received in or during such tax year, by any factor, commission merchant, or auctioneer, in buying, selling, or any other act done in the course of their business.

*Gross commissions, &c., 1 per cent.*

KR0946

On the gross receipts, during such tax year, of all cotton pickeries, and from the storage of cotton, or other merchandise, or produce, at the rate of one per cent. *Cotton pickeries 1 per cent.*

8. On every pack, or part of a pack of playing cards, sold by wholesale, retail, or otherwise disposed of, during such tax year, fifty cents. *Playing cards 50 cents.*

9. On every legacy, where letters testamentary have not been taken out in this State, received by any person other than the child, adopted child, grandchild, brother, sister, father, mother, husband, or wife, and on all property given by deed or otherwise, to any such person, on the amount or value thereof, to be assessed to the beneficiary, guardian, trustee, or legal representative, at the rate of three per cent. *Bowie knives 3 per cent.*

10. On all pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each, and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and said tax shall be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment, when demanded by the assessor, said pistols, revolvers, bowie knives, or knives of like description, shall be seized by him, and unless redeemed by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same shall be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, shall be paid over to the person from whom the said pistol, revolver, bowie knife, or knives of like description, were taken, and the net amount collected by him shall be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto. *Pistols $2 00. Bowie knives. How collected.*

11. On all steamboats, vessels, and other water crafts plying in the navigable waters of the State, at the rate of one dollar per ton of the registered tonnage thereof, which shall be assessed and collected at the port where such vessels are registered, if practicable; otherwise, at any other port or landing within the State where such vessels may be; but this shall not include flat-bottom *Steamboats $1 00 per ton.*

# EXHIBIT 28

KR0948

4. All property of literary, scientific, and benevolent institutions, *Societies.* actually used for the purposes for which said institutions were created, not exempting, however, any of such property when employed in any other than the regular business of such institutions.

5. Houses of religious worship, and their appurtenances. *Houses of worship*

6. Places and monuments of the dead, and implements of burial. *Burial places.*

7. All tools and implements in actual use of any calling, occupation or trade, to the value of one hundred dollars. *Tools of trade.*

8. All insane persons and their property, to the value of one *Insane persons.* thousand dollars.

9. All disabled or crippled persons, whose taxable property does *Crippled.* not exceed five hundred dollars, from any poll tax.

10. All lands donated by acts of congress to railroads in this state *Railroad lands.* remaining unsold and uncultivated.

———

## ARTICLE II.

*Subjects and rates of assessment by assessors as to property and persons.*

SECTION.
434.  Subjects and rates of assessment by assessors.

SECTION.
435.  Assessment of incomes, &c.

§ 434. *Subjects and rates of assessment by assessors.*—[a]Taxes must be *a.* 19 Feb'y, 67, assessed by the assessor in each county on and from the following p. 269. § 2. subjects, and at the following rates, to-wit:

1. On every male inhabitant between the ages of eighteen and *Polls.* and fifty, (except those persons between the ages of eighteen and twenty-one, the emoluments of whose labor go to parents or masters) the sum of two dollars; and to insure the payment of such tax, all partnerships, associations, corporations, officers or individuals must return to the assessor the number and names of persons in their employment on the first day of February of each year, as clerks, book-keepers, overseers, deputies, agents, workmen, journeymen, or laborers subject to such tax, which tax the assessor shall assess against such employers, by them to be deducted out of the hire, wages or salary of such employees as before enumerated; and upon the failure of any employer to make return of such employees when called upon by the assessor to do so, the assessor must proceed to ascertain the number of such employees from the best sources of information practicable, and such employer so failing shall be held liable in double the amount of the tax.

2. On all real estate, to be estimated at its market value in money, *3-10 of 1 per ct.* according to the best judgment the assessor can form by information, inspection or otherwise, taking into consideration its location, *Real Estate.* whether in town, city or the country, its proximity to local advantages, its quality of soil, growth of timber, mines, minerals, quarries, or coal beds, and the amount and character of improvements, three-tenths of one per cent. *ad valorem.*

3. On all mills, foundries, forges, mining establishments, quarries, *Mills.* lime or marble works, gin and carriage making shops, tanneries, and other manufacturing establishments;

On all wharves and wharf boats, toll bridges and ferries, turnpikes, and all passes, channels or canals, where tolls are charged; *Wharves, &c.*

On all stocks of goods, wares and merchandise on hand to be assessed upon not less than the largest amount on hand at any one *Merchandise.*

KR0949

time during the preceding year, and this shall include all merchandise kept on plantations for sale, or to be dealt out to laborers; but any goods, wares or merchandise offered for sale by any dealer or person, commencing business subsequent to the first day of January of the current tax year, shall become at once liable to the tax levied by this act, and must be estimated by the maximum amount thereof;

*Horses.* On all horses and mules not used strictly for agricultural purposes, except studs, jacks and race horses;

*Cattle.* On all cattle on the excess over five head;

*Furniture.* On all household furniture, on the excess over three hundred dollars;

*Libraries.* On all libraries not exempted by law, on the excess over three hundred dollars;

*Clocks.* On all clocks kept for use; and

*Other property.* On all other property, real, personal, or mixed, not otherwise specified and taxed herein, or exempted therefrom—and this shall not be construed to tax the crops produced upon lands within the state taxed under the second subdivision of this section, as real estate—three-tenths of one per cent. *ad valorem;* but no hogs, sheep, goats, or poultry, kept or raised for the use of any family, or work oxen, or animals used for agricultural purposes exclusively, and no farming tools and implements of husbandry necessary on the farm, shall be taxed by this act.

*⅕ of 1 per cent.* *Vehicles.* *Jewelry, &c.* 4. On all vehicles not exclusively used for agricultural purposes; On all jewelry, plate and silver ware, ornaments and articles of taste, pianos and other musical instruments, and paintings, except family portraits;

*Cotton presses.* On all cotton presses and pickeries;

*Studs, &c.* On all studs, jacks, and race horses;

*Watches, &c.* On all gold and silver watches, and gold safety chains;

*Money hoarded.* On all money hoarded, or kept on deposit subject to order, either in or out of the state, except funds held subject to draft in the prosecution of a regular exchange business, and except also money kept on hand to defray current family expenses, for a period not exceeding one year;

*Money loaned.* On all money loaned, and solvent credits bearing interest, from which credits the indebtedness of the tax payer shall be deducted, and the excess only shall be taxed;

*Money employed.* On all money employed in buying or trading in paper, or in a regular exchange business, or invested in paper, whether by individuals or corporations, except where the money so employed or invested is otherwise taxed as capital;

*Stock of corporations.* On the capital stock, actually paid in, of all incorporated companies, created under any law of the state, whether general or special, (except railroads,) and not exempted by their charter from such tax, except any portion that may be invested in property and taxed otherwise as property, one-half of one per cent. *ad valorem.*

*⅕ of 1 per cent.* *Auction sales.* 5. On the gross amount of all sales at auction, made in or during the tax year preceding the assessment, except those made by or under the direction of executors, administrators and guardians, as such, by order of court or under legal process, and under any deed, will or mortgage, at the rate of one-fourth of one per cent.

*1 per cent.* 6. On the gross amount of premiums, (after deducting therefrom all return premiums,) received from their business in this state during such tax year, by any insurance company not chartered by this state, and doing business herein by agents or otherwise, at the rate of one per cent.

*Foreign insurance companies on premium.* *Gross commissions, &c.* 7. On the gross amount of commissions or sums charged or re-

KR0950

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1842   Page 514 of 607

ceived in or during such tax year, by any factor, commission merchant, or auctioneer, in buying, selling, or any other act done in the course of their business;

On the gross receipts, during such tax year, of all cotton pickeries, and from the storage of cotton, or other merchandise, or produce, at the rate of one per cent. *Cotton.*

8. On every pack, or part of a pack of playing cards, sold by wholesale, retail, or otherwise disposed of, during such tax year, fifty cents. *Cards, 50 cents.*

9. On every legacy, where letters testamentary have not been taken out in this state, received by any person other than the child, adopted child, grandchild, brother, sister, father, mother, husband, or wife, and on all property given by deed or otherwise, to any such person, on the amount or value thereof, to be assessed to the beneficiary, guardian, trustee, or legal representative, at the rate of three per cent. *Legacies, 3 per cent.*

10. On all pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice ; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto. *Pistols, knives.*

11. On all steamboats, vessels, and other water crafts plying in the navigable waters of the state, at the rate of one dollar per ton of the registered tonnage thereof, which must be assessed and collected at the port where such vessels are registered, if practicable ; otherwise, at any other port or landing within the state where such vessels may be; but this does not include flat-bottom sail boats, or other like craft, employed exclusively in the transportation of wood, lumber, or coal, which shall only be assessed at the rate of twenty-five cents per ton. *Steamboats.* *Other boats.*

12. On the gross profits of all banking associations, created under the laws of the United States, at the rate of two per cent. *Banking companies.*

13. On all acts of incorporation granted by the general assembly, other than acts incorporating cities or towns, and acts incorporating manufacturing companies, an *ad valorem* tax of one tenth of one per cent. on the estimated value of the interest involved, or capital authorized as a bonus, to be due and payable to the tax collector of the county in which the office of such incorporation may be located, whenever such corporation shall commence actual operation; and this shall apply to all such acts passed by the general assembly of 1866–7. *Acts of incorporation.*

14. On all dividends declared or earned and not divided by incorporated companies created under the laws of this state, (except rail- *Dividends.*

KR0951

roads,) to be assessed to and paid by the companies earning or declaring the same, a tax of one per cent.

**Gross receipts of railroads.**

15. On the gross receipts of all railroads and horse railroad companies, for freight and passengers, within the limits of this state, a tax of one half of one per cent.; but upon any railroad extending beyond the limits of this state, this tax shall only be assessed upon such *pro rata* portion of the receipts of such company, as the length of the road within the state may bear to the entire length of the road upon which the earnings accrue.

**Petroleum.**

16. On the gross receipts of all petroleum and oil companies, or distillers of coal oil, a tax of one per cent.

**b. 19 Feb'y, 67, p. 264, § 4.**

§ 435. *Assessment of incomes, salaries, &c.*—[b]There must be assessed and collected upon the annual gains, profits, or incomes, of every person residing within the state, from whatever sources derived, and upon all salaries and fees of public officers, and upon the salaries of all other persons, upon the excess of such gains, profits, incomes, fees, or salaries, over five hundred dollars, at the rate of one per cent. In estimating the annual gains, profits, or income, of any person, all national, state, county and municipal taxes assessed to and paid by such person within the year, except the tax assessed under this section, must be deducted therefrom; also, all income derived from dividends, or on shares in the capital stock of any incorporated company, (where such tax has been assessed and paid by such incorporated company;) also, the amount paid by any person for the rent of the homestead used, or the rental value of the same, if owned by himself or his family; also, when any person rents buildings, lands, or other property, or hires labor to cultivate such lands, or to conduct any other business from which such income is actually derived, or pays interest upon any actual incumbrance thereon, the amount actually paid for such rent, labor, or interest, or the rental value of any lands cultivated as above, if owned by the occupant thereof, must be deducted; also, the amount paid out for usual ordinary repairs, not including any new buildings or permanent improvements, must be deducted; *Provided,* That any person shall be exempted from the operations of this section, upon whose gross receipts, commissions, or profits, taxes are assessed under the provisions of the preceding section.

---

## ARTICLE III.

### *Licenses and taxes to be collected by the probate judge.*

SECTION.
436.  Taxes collected by probate judge.
437.  Licenses issued by the probate judge.
438.  Tax on distilleries payable to probate judge, &c.

SECTION.
439.  To what time, person and place licenses are restricted.

**a. 19 Feb'y, 67, p. 265, § 4.**

§ 436. *Taxes collected by the probate judge.*—[a]Taxes must be assessed and collected by the judge of probate, as follows, to-wit:

**Legacy.**

1. On every legacy subject to assesment, left by any will on which letters testamentary are taken out in this state, there must be assessed and collected by the judge of probate of the county in which such letters are taken out, a tax of one-half of one per cent. *ad valorem,* and if not paid on the receipt of such legacy, such judge must issue execution for the amount of such assessment, against the exec-

KR0952

# EXHIBIT 29

KR0953

## CHAPTER CXXV.

AN ACT to prohibit the assessment and collection of taxes on Bowie-knives, Sword-canes and Dirk-knives.

SECTION 1. *Be it enacted by the Legislature of the State of Mississippi,* That it shall not be lawful for any Sheriff or Tax-Collector to collect from any tax payer the tax heretofore or hereafter assessed upon any bowie-knife, sword-cane, or dirk-knife, and that hereafter the owner of any bowie-knife, sword-cane or dirk-knife, shall not be required to give in to the tax assessors either of the aforesaid articles as taxable property, any law to the contrary notwithstanding.

SEC. 2. *Be it further enacted,* That this act be in force and take effect from and after its passage.

Approved, December 19, 1861.

---

## CHAPTER CXXVI.

AN ACT to amend the laws in relation to the State University.

**Of trustees.**

SECTION 1. *Be it enacted by the Legislature of the State of Mississippi,* That the State University at Oxford shall hereafter be under the control and management of a Board of Trustees—thirteen in number, of whom the Governor of the State for the time being shall be one, and shall be the President of said Board; in the absence of the Governor a President *pro tem.* shall be elected by the Trustees from among their number present. The remaining twelve Trustees shall be chosen by a joint convention of the two Houses of the Legislature during its present session.

**Tenure of office of trustees.**

SEC. 2. *Be it further enacted,* That the said Trustees when elected shall be notified by the Governor to assemble at the University at an early day, to be fixed upon by him, and when so assembled they shall proceed to devide the twelve Trustees so elected by lot, into three equal classes and the members of the first class shall hold their

office for the term of two years from the day of their election, those of the second class four years and those of the third class six years, and four Trustees shall be chosen by the Legislature in joint convention at every regular session to supply the places of the class whose term is about to expire.

SEC. 3. *Be it further enacted,* That vacancies in said Board, happening in the recess of the Legislature by non-acceptance, death, resignation, removal from the State or otherwise, shall be filled by the remaining Trustees, by election to continue until the end of the next regular session of the Legislature, the vacancy or vacancies shall be filled by the Legislature in the mode above directed, at the session succeeding the same.

*Of vacancies.*

SEC. 4. *Be it further enacted,* That the Board of Trustees created in pursuance of this act, shall possess all the powers vested in the present Board of Trustees of said University, and it shall be their duty to present to the Legislature at the commencement of each regular session a full report of the operation and condition of the University and a detailed statement, of all expenditures of money on account thereof, and also to recommend such measures as they may think necessary for the interest, improvement and efficiency thereof.

*Powers of trustees.*

SEC. 5. *Be it further enacted,* That all laws in conflict with the provisions herein contained are hereby repealed, and that this act shall take effect from its passage.

Approved, December 19, 1861.

---

## CHAPTER CXXVII.

AN ACT for the relief of the Register and Receiver of the Land Office at Washington, Mississippi.

WHEREAS, By an ordinance, passed by the Convention of the State of Mississippi, dated the 26th day of January, 1861, entitled an ordinance supplemental to an ordinance entitled an ordinance concerning the jurisdiction and property of the United States of America in the State of Missis-

KR0955

# EXHIBIT 30

KR0956

## AMENDING CHARTER OF JESUP.

### No. 103.

An Act to alter and amend an Act entitled '' An Act to incorporate the town of Jesup, and to confer certain powers on the Commissioners thereof, and for other purposes therein named,'' approved October 24, 1870, so as to increase the number of Aldermen of said town to six ; to enlarge, prescribe and define the term of office of the Mayor and Aldermen of said town, and prescribe the salary of the Mayor thereof; create the office of Clerk, Treasurer, Marshal, Assistant Marshal, Policemen and Town Attorney and Town Physician, and Assessors of said town, and authorize the Mayor and Aldermen thereof, to define their duties and powers, term of office, oath, bond, costs and salary ; to fix a time for elections of all officers of said town; to designate the corporate name of said town ; to authorize the Mayor and Aldermen of said town to own and hold property for said town, both real and personal, as well beyond, as in its corporate limits ; to authorize the collection of *ad valorem* taxes, and all property in said town, not exceeding one and one half per cent. of its value ; to authorize the collection of licenses or business taxes on all businesses carried on in said town ; to prescribe for the working of the streets by certain inhabitants of said town, and authorize the discharge of that service by the payment of money ; to authorize the issuing of executions for unpaid taxes against person and property ; to prescribe the time for the sale of property under tax executions ; to authorize the Mayor and Aldermen of said town to buy in property at tax sales ; to provide for the registration of voters and the payment of registration fee ; to create a Board of Health ; to prescribe qualifications of voters in said town ; to more clearly define the limits of said town ; to authorize the Mayor and Aldermen of said town to pass ordinances regulating and preventing the running at large of certain animals in the streets of said town ; to prohibit and regulate the walking on the streets of said town of disreputable characters after nine o'clock at night ; to prevent and punish for the use of vulgar and obscene language ; to define, prohibit and punish lewd and disorderly conduct ; to establish and regulate markets ; to license and control all places of public amusement ; and to license performances, circuses and shows ; to prescribe fire limits ; to prohibit the discharge of fire arms and to pass all ordinances for the welfare of said town ; to abate nuisances, define fire proof buildings and regulate and control the erection of such within said town ; to borrow money and contract loans for the public good of said town ; to authorize the Mayor and Aldermen of said town to lay out streets,

Heading.

KR0957

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1849   Page 521 of 607

alleys and public squares in said town; to widen or alter or close up any street, alley or public square of the same; to provide for the taking and payment for property for that purpose, and prescribe the manner of doing the same; to give the Mayor and Aldermen of said town complete jurisdiction over the streets, sidewalks, drains and public squares; and to regulate license and control the sale of liquor in said town and to prescribe the amount of license therefor; and to confer upon the Mayor and Aldermen of said town other and further powers and privileges and for other purposes as in this Act hereinafter specified."

SECTION I. *Be it enacted by the General Assembly of the State of Georgia, and it is hereby enacted by authority of the same,* That the

*Former charter amended.* above recited Act be, and the same is hereby, altered, changed and amended as hereinafter and to say.

SEC. II. *And be it further enacted by the authority aforesaid,*

*Election for Mayor and Aldermen.* That on the first Saturday in January, 1889, an election by ballot shall be held in the council room in said town for a Mayor and six Aldermen, and that all male persons who are legal voters in the

*Qualifications of electors.* county of Wayne and residents of the town of Jesup for a space of thirty days next immediately preceding that time shall be entitled to vote at said election which shall be held by any three

*Managers.* freeholders of said town who are not candidates and who shall be appointed by the Mayor in office at that time, and if he fails to appoint may act on request of any citizen; and the person receiving the highest number of votes at said election for Mayor shall serve as such until the first Saturday in January, 1890 and the three persons receiving the highest number of votes for Aldermen at said election, shall serve as such until the first Saturday in

*Respective terms.* January 1891, and the three persons receiving the next highest number of votes at said election shall serve as Alderman of said town until the first Saturday in January, 1890; and that an election in accordance with the provisions of this Act shall be held on the

*Annual election.* first Saturday in January of each and every year for a Mayor and three Aldermen to fill the seats of those whose terms shall expire that year, and that the Mayor so elected shall hold his office for the space of one year; and the Aldermen so elected, for two years, and until their successors are elected and qualified.

SEC. III. *And be it further enacted,* That no person shall be

*ligibility.* eligible to the office of Mayor of said town, who has not attained the age of thirty years, and no person shall be elected Alderman who has not attained the age of twenty-five years, and who is not a legal voter of said town and a resident thereof for at least one year previous to his election.

SEC. IV. *And be it further enacted,* That should the Mayor's

*Election to fill vacancy.* office or that of Aldermen be made vacant by death, removal, resignation, or otherwise, the Mayor and Board, or Board of

KR0958

Amending Charter of Jesup.

Aldermen, by resolution, shall order an election to fill such vacancy, which shall take place after ten days' notice has been given by publication in the paper where the legal advertisement of the said town of Jesup is done.

SEC. V. *Be it further enacted*, That the Mayor and Aldermen of said town in addition to the oath required of all civil officers of this State, shall take and subscribe the following oath of office: I ——————————— do solemnly swear, that I will truly and faithfully discharge all of the duties required of me as——— ——— of the town of Jesup, and will not vote for or encourage any measure or ordinance which is not, in my judgment, for the best welfare of the inhabitants of said town, and that when sitting as a Judge of the police court of said town, or trying cases on appeal therefrom, I will do equal justice between the rich and the poor, the high and the low, and the judgments render according to the opinion I entertain of the evidence and the law, as I understand it, so help me God. *Official oath.*

SEC. VI. *Be it further enacted*, That neither of the Aldermen of said town shall receive any salary or compensation for his services; and all meetings of the Mayor and Aldermen of said town shall be in public, except when engaged in executive business, and the Mayor and three Aldermen shall constitute a quorum for the transaction of business. *No salaries. Quorum.*

SEC. VII. *And be it further enacted*, That all elections for Mayor and Aldermen of said town, after the election herein provided to take place on the first Saturday in January, 1889, shall be held by the Clerk of the town of Jesup and a member of the Board of Aldermen and one freeholder, or by three freeholders, residents of said town, and shall be held at the place where the meetings of the Mayor and Aldermen are held. And the polls at such elections shall be opened at seven o'clock in the morning and closed at six o'clock in the evening; and that no person shall be entitled to vote at such elections who is not a qualified voter of the county of Wayne, a resident of the town of Jesup for six months next before the day of such election, who has not paid all taxes due to said town, county and this State, and who shall not have been registered as hereinafter provided. *Management of elections.*

SEC. VIII. *Be it further enacted*, That it shall be the duty of the Clerk of the town of Jesup to open books for the registration of voters, on the first Saturday in September before each annual election, (after the first election herein provided for to be held on the first Saturday in January, 1889), at ten o'clock A. M., and keep the same open from day to day, from ten A. M. to six P. M. until the first Saturday in October, when the same shall at six P. M. finally close; in which shall be inscribed the name of the person entitled to vote in said town and his place of residence and occupation; and the said Clerk must not permit any one to register *Registration.*

who is not entitled to do so, and if he does so knowingly, he shall be discharged from office. Each person registered shall pay to the clerk of said town a registration fee of fifty cents, which shall be used as the Mayor and Aldermen of said town may prescribe. And no person who is not registered shall be allowed to vote at any election in said town for officers thereof, or for any measure or matter affecting the same.

*Fee.*

Sec. IX. *Be it further enacted,* That the superintendents of all elections for Mayor and Aldermen held by authority of this Act, shall have the same conducted according to parts 1, 2, 3, 4, 6, 7 and 11 of section 1288 of the Code of 1882 of this State, and said parts of said section are hereby made applicable to such elections, and which are hereby adopted as a part of this amended charter, and the superintendents of such elections shall make return thereof to the Mayor and Aldermen of said town.

*Conduct of elections.*

Sec. X. *Be it further enacted,* That any person who shall hereafter vote more than once at any election held in said town, and under authority of this Act, or who shall vote at any such election, when he has not resided in this State one year, in the county of Wayne and said town six months, next preceding the election at which he so voted; or who shall vote at such election, who has not paid all taxes, which, since the adoption of the present Constitution of the State, have been required of him previous to the year in which said election occurs, and which he has had an opportunity of paying agreeable to law; or who has not registered as provided by this Act; or who has been convicted in any court of competent jurisdiction in this State, of embezzlement of public funds, malpractice, bribery or larceny, or any crime involving moral turpitude and punishable by the laws of this State with imprisonment in the Penitentiary, unless such person shall have been pardoned; or any person who shall buy or sell at any such election, or offer to buy or sell, a vote or votes, shall be indicted for a misdemeanor, and on conviction in any court in said county having jurisdiction, shall be punished as prescribed by section 4310 of the Code of Georgia.

*Illegal voting.*

*Indictment for, and punishment.*

Sec. XI. *And be it further enacted,* That any voter at such elections, may challenge any person who offers to vote, and any person so challenged shall take the following oath, to-wit: (and if he refuses to do so, his vote shall be rejected)   "I ——————— swear that I am 21 years old; am a citizen of the United States; have resided the last twelve months in this State; six months in this county and town; have paid all taxes which have been required of me to pay, and which I have had an opportunity of paying agreeable to law, and have never been convicted of any offense against the laws of this State or the United States, which debars me from voting, so help me God."

*Challenges.*

*Oath of person challenged.*

SEC. XII. *And be it further enacted by the authority aforesaid*, That the Mayor and Aldermen of said town shall, at the first regular meeting in each year after their organization, elect a Clerk, a Treasurer, Marshal, assistant Marshal, such policemen as they see proper, three Assessors and a Town Attorney and a Town Physician of said town; and the said Mayor and Aldermen are hereby authorized and empowered to define and prescribe the powers and duties, the term of office, oath and bond of such officers when the same is not done herein, but they may, in their discretion, elect an assistant Marshal and policemen, Town Attorney and Physician only, when in their discretion it may be proper to do so, and fix at pleasure the number of policemen, and may remove any of such officers, at their discretion, for breach of duty, and establish their fees and salaries; and any such salary, fees and compensation can, at any time, be reduced, increased or abolished at any regular meeting of the Mayor and Aldermen. *[margin: Town officers. Powers of Mayor and Aldermen as to.]*

SEC. XIII. *Be it further enacted by the authority aforesaid*, That said Mayor and Aldermen shall be known as the Mayor and Aldermen of the town of Jesup, and shall, by such, their corporate name, plead and be impleaded, sue and be sued, and do all other acts relative to their corporate capacity; shall have and use a corporate seal; shall be capable in law to purchase, hold, receive and possess and retain for the use and benefit of the town of Jesup, forever or for any number of years, any estate, real or personal, either within or without the limits of said town, and whether the same be necessary for the administration of the government of said town or not. *[margin: Corporate name and powers of Mayor and Aldermen.]*

SEC. XIV. *And be it further enacted*, That said Assessors to be appointed by the Mayor and Aldermen of said town, shall, at the first appointment of Assessors be appointed, one for one year, one for two years, and one for three years, and ever thereafterwards one Assessor shall be elected and qualified annually, and shall hold his office for the term of three years and until his successor is elected and qualified, except when an appointment is made to fill a vacancy, and shall take the following oath: "I——————— do solemnly swear that I will faithfully perform the duties of Assessor for the town of Jesup, and will make a true and just valuation of all property assessed;" and it shall be the duty of the Assessors to assess and value annually, all real estate in said town liable for taxation, at a true and just valuation, and to enter their assessment of the same in a book to be kept for that purpose, and return the same to the Mayor and Aldermen of said town, and file it with the Clerk of Council of said town on or before the 1st day of March of each and every year; in which return they shall describe the property assessed, by number, metes and bounds or other sufficient description, so as to give a sufficient identification thereof; and after said return is made and filed, and on or before *[margin: Assessors. Terms. Oath. Their duties. Property digest.]*

KR0961

Amending Charter of Jesup.

*Returns.* the 1st day of May in each and every year, every person, or agent of every person claiming said assessed real estate or any part of the same, shall return his name, or the name of his principal when the return is made by an agent, to the Clerk of Council of the town of Jesup, and write the same opposite the property claimed or owned by him, or the name of the person for whom he is agent, and as such agent make such return ; and where the person or agent claims a portion only of any particular piece of property assessed, he shall specify in writing, and clearly describe the portion he claims and the interest of the claimant therein ; and if the person making such return, makes the same as trustee, he shall specify in the return for whom he is trustee, giving the names of the *cestui que trusts.*

*How regulated.*

SEC. XV. *And be it further enacted by authority aforesaid,* That *Failure to return.* if, on the first day of May of any year there is any such real estate assessed in said town which has not been so returned by the owner or claimant thereof, it shall be the duty of the Clerk of Council of said town to issue an execution against said real estate *Execution for.* which has not been so returned by the owner or owners thereof, as non-returned property, which execution shall plainly describe the property against which it is issued so as to sufficiently, and with reasonable certainty identify the same, and shall be directed *Levy.* to the Marshal of the town of Jesup, requiring him to levy upon that particular property, and out of the same to make, by levy and sale, the amount of the taxes due on said property for that year, and that the sale of non returned property shall be adver- *Advertisement and sale.* tised once a week for twelve weeks before the day of sale, and that when any property is sold as non-returned property as aforesaid, when the same was not returned and the terms of this Act author- izing such sale shall have been fully complied with, and the same *If not re- deemed, ab- solute title to vest in purchaser.* is not redeemed within the time hereinafter mentioned, that then and in that case the sale of the same shall absolutely and entirely divest the claim and title to the same from all persons before and at the time of such sale, claiming or owning the same or any inter- est therein, and shall vest the title thereto absolutely and uncon- ditionally in the purchaser at such sale, and his heirs and assigns ; and that any person who will make oath before any officer author- ized by the laws of this State to accept an affidavit, that he is the owner, or agent of the owner, stating the name of the real owner, (and if such affidavit is made by a trustee, he shall state who are the *cestui que trusts* for whom he claims) of such property and that *Re-convey- ance.* he desires to get a re-conveyance of the same, he may do so on paying the amount of the purchase money at such sale and all costs and charges and ten per cent. on all the same at any time within *Limit to.* twelve months from the day of the sale ; and that whenever prop- erty is sold as non-returned property, as aforesaid, and brings more than the amount of the taxes and costs attending such sale, the

KR0962

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1854   Page 526 of 607

---
Amending Charter of Jesup.
---

Marshal shall pay the excess to the Treasurer of said town and take his receipt for the same, which balance shall be held by said Treasurer for the space of two years, from the date of the sale, when, if no person has made claim to the same as hereinafter provided, the same shall become the property of the said Mayor and Aldermen, and be by them used for the best wel are of said town, and no suit at law or in equity shall be brought to recover such excess, after said period of two years, and when any person within said period of twelve months shall redeem such non-returned property as aforesaid, it shall be the duty of the Treasurer to pay any such excess as aforesaid over to the person redeeming the same, and his receipt on the back of such affidavit, and if such excess is claimed after a period of one year and within said period of two years by any owner or claimant, then it shall only be necessary for such owner or claimant or agent of such, to make an affidavit that he was the owner of such non-returned property, or the agent of the owner, and name in his affidavit the owner, and stating that the time in which to redeem the same having elapsed, he desires to have paid to him such excess, and on his receipt on the back of such affidavit, the Treasurer shall pay him the same. *[margin: Surplus to be held two years.] [margin: Covered into town treasury.] [margin: Regulation as to refunding.]*

Sec. XVI. *Be it further enacted by authority aforesaid,* That when any property, real or personal, has been returned, as in this Act required, and the person returning the same shall make default in the payment of any prescribed taxes for that year, then it shall be the duty of the Treasurer to issue his tax executions against such person, which shall be directed to the Marshal, requiring him to make the amount of such taxes out of the person making such return by seizure of the property of such person. And it shall be the duty of the Marshal to levy such execution first upon the personal property of said defaulter, if any is to be found, and if not, to make return of that fact and then levy on the real estate of such person ; and the sale of such property shall be advertised once a week for four weeks preceding the day of sale of such property ; and such sale shall pass the title to the same as effectually and as absolutely as would the deed of the person or persons against whom such execution was issued.   Whenever property has been sold as aforesaid for non-payment of taxes, and when return has been made, the person against whom the execution is issued may redeem the same at any time within twelve months from the day of the sale, on paying the amount for which it is sold and the costs and charges aforesaid, and ten per cent. on all the same. *[margin: Default of taxes.] [margin: Execution to issue.] [margin: Levy.] [margin: Advertisement and sale.] [margin: Redemption.]*

Sec. XVII. *Be it further enacted by the authority aforesaid,* That all sales herein provided for in this Act shall take place on a regular Sheriff's sale day, between the regular hours of Sheriffs' sales provided for in this State.   And on the day of sales herein provided for it shall be the duty of the Marshal to offer the property *[margin: Time of sales.] [margin: Conduct of.]*

KR0963

252      PART III.—TITLE I.—Municipal Corporations.

levied, the same being realty, first for rent for one year, and if an amount is not offered sufficient to pay the taxes and costs, then for rent for five years, then for rent for ten years, then for twenty years; and if he receives no such sufficient bid, then to offer for sale one-fourth undivided interest, and if he then receives no bid sufficient as aforesaid, he shall then offer the whole for sale and shall knock it off to the highest bidder, after crying the same according to the laws of the land; and that the amount to be charged for advertising the sale of such property shall be the same as now prescribed by the general laws of this State, and a fee of one dollar for levy, one dollar for selling and five per cent. commission on the amount realized at the same and one dollar for signing the deed, **Fees for.** shall be paid the Marshal for his costs in that behalf; and the Clerk shall receive fifty cents for each execution issued.

**Claims— how filed and returned.** Sec. XVIII. *Be it further enacted by the authority aforesaid,* That any person not a party to any such execution claiming property levied on may file his claim to the same, as claims are now filed to property levied on under mean or ordinary process in the State, and as by the practice now obtaining generally in the courts of this State; and when property so levied on is so claimed, it shall be the duty of the Marshal to return the execution and claim to the Superior Court of said county, where it shall be tried and disposed of as other claim cases.

**Corporate limits.** Sec. XIX. *And be it further enacted by the authority aforesaid,* That the corporate limits of said town shall be defined and are hereby prescribed to be all the area lying within the measurements and limits to say: Within the square described within a line drawn parallel with and one mile southward of a line drawn through the center of Cherry street in said town, and parallel with the same and at right angles with Broad street, and a line running parallel with and one mile northward of the said center line of said Cherry street, and parallel with said first described line; and a line drawn parallel with and one mile eastward of the center line of Broad street, and at right angles with said Cherry street, and said first two described lines; and a line drawn parallel with and one mile westward of the center line of Broad street, and the line last above described, which is hereby declared to be what is meant in the above recited Act, by the term "one mile in all directions from **Area.** the depot in said town." The area of said town forming a square with sides two miles long and embracing four square miles within its corporate limits.

Sec. XX. *Be it further enacted by the authority aforesaid,* That the Mayor and Aldermen of said town shall have power and authority from time to time to make, ordain and establish such **By-laws.** by-laws, ordinances, rules and regulations as shall to them appear necessary for the security, welfare, convenience and interest of said town and the inhabitants thereof, and for preserving the health, morals, peace, order and good government of the same.

KR0964

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1856   Page 528 of 607

Amending Charter of Jesup

Sec. XXI. *Be it further enacted by the authority aforesaid,* That the Mayor and Aldermen of said town may, by ordinance, prohibit all intoxicated persons, tramps and lewd women from walking or idling in the streets, squares and alleys of said town, after the hour of 9 o'clock at night, and to provide a penalty by ordinance for the use of vulgar and obscene language, and to punish lewd and disorderly conduct within the limits of said town, and to pass ordinances establishing and regulating markets, and licensing and controlling all places of public amusement, and all performances, circuses and shows of every nature, and defining the meaning of the words "intoxicated persons," "tramps," and "lewd women," as used in this section of this Act.    *Vicious characters. Obscenity and lewdness. Public places.*

Sec. XXII. *And be it further enacted by the authority aforesaid,* That the Mayor and Aldermen of said town are hereby authorized and empowered, whenever they see fit to do so, to create a Board of Health for said town, to consist of any number not over ten male persons, twenty-one years of age, and shall have and are hereby given power to define their term of office, which shall not be over five years; their oath, duties, qualifications and bond, if any, and prescribe their fees, if any, and confer on them, by ordinances, such powers as are usually and generally conferred upon such bodies.    *Board of Health.*

Sec. XXIII. *And be it further enacted by the authority aforesaid,* That no ordinance, by-law or resolution of said Mayor and Aldermen of a public character shall be binding within the limits of said town or person within the same, natural or artificial, until the same shall have been published for the space of once a week for four weeks in the newspaper in which the proceedings of the Mayor and Aldermen of said town and the legal advertising of said town is done. And it shall be the duty of the Mayor and Aldermen of said town to select as the official organ of said town any paper which has a general circulation in the county of Wayne and said town.    And that the Mayor and Aldermen of said town shall cause the proceedings of each meeting of Council to be published in such paper, and no ordinance or by-law shall pass the Board of Aldermen of said town and become a by-law or ordinance thereof until the same shall have been introduced and read once at the regular meeting of said Mayor and Aldermen when the same is introduced, and twice at the next regular meeting of said Mayor and Aldermen, before the same passes and becomes a law; and the regular meetings of the Mayor and Aldermen of said town shall be on the first and third Mondays in each and every month.    *Publication of ordinances, etc. Official organ. Passage of ordinances, etc.*

Sec. XXIV. *And be it further enacted by the authority aforesaid,* That all ordinances, by-laws and resolutions shall be spread at length upon the minutes of the Council at the meeting when the same are adopted, and before the next regular meeting, by the Clerk of Council; and he shall also keep a full and explicit minute    *Minutes of proceedings.*

KR0965

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1857   Page 529 of 607

book of all regular, special or call meetings of the Mayor and Aldermen of said town, in which he shall give a detail minute of all their actings and doings, and shall specify the Mayor and Aldermen who are present, giving their names, and those who are absent, giving their names.

Sec. XXV. *And be it further enacted by the authority aforesaid,* That all executions for taxes shall be signed by the Clerk of Council of said town, which shall be directed to the Marshal of said town, and shall be returnable before the Mayor and Aldermen of said town, and the proceeds of all such shall be paid to the Treasurer of said town, and that at all tax sales under executions for taxes due said Mayor and Aldermen, the Mayor and Aldermen of said town may bid in the property so offered for sale in the name of the Mayor and Aldermen of said town, and have a deed of realty or a bill of sale of personalty of the same made by the Marshal of said town to them, and shall hold the same for the use of said town, provided the same does not bring more at such sale than the amount of the taxes and cost due on said execution.

*Executions and sales for taxes.*

*How regulated.*

Sec. XXVI. *And be it further enacted by the authority aforesaid,* That the Mayor and Aldermen of said town shall have the authority and power to levy and collect a tax upon all taxable property within the limits of said town, upon real and personal property, money, stock in corporations, choses in action, incomes and commissions derived from the pursuit of any profession, faculty, trade or calling, upon dividends, banks, insurance, and other like companies or their agencies; and upon all other sources of profit, not expressly prohibited or exempt by the laws of this State; thus to raise such sum of money as may be necessary for the safety, convenience, benefit and interest of said town, the maintaining the municipal government and the payment of the debts thereof: *Provided,* the rate of taxation shall not exceed one and one half per centum upon a fair valuation of the property taxed: *Provided,* that nothing in this Act shall be construed to authorize the said town, nor the Mayor and Aldermen of said town, to levy or collect any tax of any kind upon the property of any railroad or express company not subject to taxation for county purposes under the laws of this State as they existed on the 4th day of December, 1888, nor shall they levy any tax whatever upon the business, income, or agencies of either class of said corporations.

*General tax.*

*Limit to rate.*

*Exemptions.*

Sec. XXVII. *And be it further enacted by the authority aforesaid,* That the Mayor and Aldermen of said town shall have the sole and exclusive right to grant licenses to sell or retail liquors within the limits of said town, and of fixing the rates and amounts of such licenses, and the terms and conditions upon which they shall issue, and to declare such licenses void when said terms and conditions are not complied with.

*Liquor licenses.*

KR0966

Amending Charter of Jesup.

SEC. XXVIII. *And be it further enacted by the authority afore-said,* That if any assessment of any estate authorized by this Act shall be deemed erroneous, the owner or agent of any such real estate who may be dissatisfied with such assessment shall have the privilege of making complaint to the said Mayor and Aldermen of said town within twenty days after the date of the report of the Assessors, which complaint must be made in writing ; and upon such complaint being made, the assessment complained of shall be immediately referred to three arbiters, one chosen by the Mayor and Aldermen of said town, one by the party complaining and the third by the two so chosen, whose award in the matter shall be made within ten days, and shall be conclusive and final. {Complaint from assessment.} {How referred.}

SEC. XXIX. *And be it further enacted by the authority aforesaid,* That all taxes and assessments due the said town of Jesup shall rank as debts due the public, whether in the administration of the assets of the decedent or otherwise, and tax executions in favor of said town of Jesup shall have the same lien on property as judgments have by law. {Taxes and assessments to rank as primary liens.}

SEC. XXX. *And be it further enacted by the authority aforesaid,* That the said Mayor and Aldermen of said town shall be vested with authority and power of a Justice of the Peace, so as to suppress all riots, breaches of the peace, and commit for violations of the criminal laws of Georgia within the limits of said town, and to arrest, confine or bind over all offenders against the laws of this State to answer for such offenses before the proper tribunal, and may issue warrants on affidavits made before them, and may hold courts of inquiry as other Justices of this State, when the offense was committed in said town. {Judicial functions of Mayor and Aldermen.}

SEC. XXXI. *And be it further enacted by the authority aforesaid,* That the Mayor and Aldermen of said town shall have power to compel all male persons within the corporate limits of said town, between the ages of sixteen and fifty years, except those herein-after exempted, to work on the public streets of said town not more than ten days during each year : *Provided,* that any person subject to work on said streets may commute the services so required by the payment, to the officer of said town authorized to receive and receipt for the same, the sum of fifty cents for each day he is required to work. {Street work.} {Commutation tax.}

SEC. XXXII. *And be it further enacted by the authority aforesaid,* That the Mayor and Aldermen of said town shall have the authority and power to widen, straighten or alter any street, alley, lane, way or square in said town, and to open, lay out and establish any new street, alley, lane, way or square of whatever nature ; but whenever said Mayor and Aldermen shall exercise the power to widen, extend or straighten a street, alley, lane, way or square, or to open, lay out and establish any new street, alley, lane, way or square to the injury of private rights, there shall be appointed {Improvement of streets, etc.}

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1859   Page 531 of 607

five freeholders, two by the Mayor and Aldermen, two by the

*Damages—how assessed.*

owner of said land, and the other by the arbitrators so chosen, of character and responsibility, who shall assess the damages sustained by the owner or owners of the lot or lots, over and through which pass the said streets, lanes, alleys, ways or squares so

*Appeal from award.*

widened, extended, straightened, opened, laid out or established, and from which award an appeal can be had to the Superior Court

*Proviso.*

of said county of Wayne by either party : *Provided,* private property shall not be so taken for such public purposes, until the damages so assessed shall be first paid by the authorities of said town.

SEC. XXXIII *And be it further enacted by the authority aforesaid,*

*Work-housess etc.*

That the Mayor and Aldermen of said town shall have the power and authority to establish work-houses and to cause labor and confinement therein, and also on the streets, drains, squares and commons in said town, by all persons who shall have been convicted of any offense against the ordinances, by-laws, rules and regulations of said town, and so sentenced by the proper tribunal.

SEC. XXXIV. *And be it further enacted by the authority aforesaid,* That the Mayor and Aldermen of said town shall have the authority and power by ordinances or resolutions or either, to order the

*Paving.*

occupant of any lot to make such pavements or sidewalks, and repairs of the same, as they may deem necessary, and upon the failure of any person to comply with such order within the time prescribed, the said Mayor and Aldermen may cause the same to be done, and shall levy and collect the expenses thereof, by execution issued, directed and returned as tax executions against the lands, goods and chattels of the owner or owners of such.

SEC. XXXV. *And be it further enacted by the authority aforesaid,*

*Stock law.*

That the Mayor and Aldermen of said town shall have the authority to regulate and control, or prohibit the running at large of any dogs, horses, mules, cattle, hogs or other stock within the limits of said town.

SEC. XXXVI. *And be it further enacted by the authority aforesaid,*

*Abatement of nuisances.*

That the Mayor and Aldermen of said town shall have the authority and power, by ordinances, resolutions or order, to cause to be abated, within the limits of said town, any nuisance which may tend to the immediate annoyance of the citizens generally, and which may be manifestly injurious to the public health and safety, which may tend greatly to corrupt the manners and morals of the people of said town, or any considerable portion thereof, whether the same be a nuisance at common law, or by statute of this State, or by ordinances of said town passed in conformity with law, and to enforce the order of the abatement and the removal of such nuisances by the Marshal, or other civil force of said town.

KR0968

Amending Charter of Jesup.

SEC. XXXVII. *And be it further enacted by the authority afore-* *said,* That the Mayor and Aldermen of said town shall secure a just and proper accountability, by requiring bonds, with sufficient penalties and securities, from all persons entrusted with the receipt, custody or disbursement of money, and shall, as often as once a year, cause to be published for the use of the inhabitants, a particular account of the receipts and expenditures, and a schedule of town property and of the town debts.

*Indemnity bonds.*

SEC. XXXVIII. *And be it further enacted by the authority afore-* *said,* That it shall be the duty of the Clerk of the Mayor and Aldermen of said town, to furnish the superintendents presiding at all elections for Mayor and Aldermen of said town, at the time of opening the polls on the day of said elections, a complete list of the names, arranged in alphabetical order, which shall have been registered according to the provisions heretofore set forth, together with the occupation or business, and place of residence in said town, certified under the hand of said Clerk or other officer, and the seal of said town, which list shall be kept before the said Superintendents during such elections, and afterward deposited by them in the office of said Clerk, to be safely kept by him.

*Registration lists.*

SEC. XXXIX. *And be it further enacted by the authority aforesaid,* That it shall be the duty of said Superintendents to allow no one to vote at said elections unless he be qualified to do so under the provisions of this Act; and to that end they shall be authorized to administer the oath prescribed in section 11 of this Act.

*Duty of election superintendents.*

SEC. XL. *And be it further enacted by the authority aforesaid,* That the Mayor and Aldermen of said town shall have power to borrow money and contract loans for the public good when, in their judgment, it shall be for the interest of said town to do so, and to issue bonds and pledge the property, faith and credit of said town for the payment of debts so incurred, where now allowed by law

*Authorities may borrow money and issue bonds.*

SEC. XLI. *And be it further enacted by the authority aforesaid,* That the Mayor's Court of said town is hereby established and declared to be a court of record, and shall be presided over, and its sessions shall be held by the Mayor or the Mayor *pro tempore* of said town, and shall be held as often as the presiding officer of said court may determine; and the Clerk of Council of said town is hereby declared to be Clerk of the Mayor's Court; said court shall have jurisdiction and cognizance of and over all offences against any violations of the ordinances and by-laws and rules and regulations of said town committed within its limits, and shall have power to impose on each person convicted thereof, such punishment as may be prescribed in the ordinance, rules and regulations of said town, and not inconsistent with the provisions of this Act, for violations of the same, and shall have the power to fine or imprison or fine and imprison for contempt, and may enforce the col-

*Mayor's Court a court of record.*

*Its jurisdiction and powers.*

17

KR0969

Amending Charter of Jesup.

lection of fines by execution issued, directed and returned as tax executions are provided to issue in this Act, and shall enforce all such imprisonments by *mittimus* directed to the Marshal or Assistant Marshal of said town, and in all prosecutions in said town,

**Proceedings before Mayor's Court.** and the same shall be commenced by affidavits as prescribed in section 4715 of the Code of Georgia, upon which a warrant shall issue and be signed by the presiding officer of said Mayor's Court which shall be in form of warrant described in section 4716 of the Code of Georgia, except that it shall be directed only to the Marshal or Assistant Marshal or Policeman of said town, and shall require the person therein named to be taken before the said Mayor's Court of the town of Jesup for trial, and on this warrant an affidavit, the issue of guilty or not guilty shall be formed and the trial proceed whenever the case is sounded in open court, unless continued under the rules of law as far as they can be applied to said court, and it shall only be necessary in such affidavit to

**Absolute formality unnecessary.** describe the offence alleged with sufficient particularity as that the Judge of said court may readily understand the nature of the charge and no more ; and if such affidavit and warrant should be dismissed for want of informality, either on *demurrer* before trial, or be detected afterwards and at any time before judgment, and whether the case is pending before the Mayor's Court on appeal before the Mayor and Aldermen, the same be *nolle prosequied*, and another and another, and another sued out, and so on, from each dismissal until one should be drafted sufficient for the purpose, and from the judgment of said Mayor's Court there shall be an appeal within ten days, to the Mayor and Aldermen of said town, in council

**Trial.** assembled, which shall be tried at the next regular meeting of said Mayor and Aldermen of said town after it is entered, unless con-

**Continuance. Appeal.** tinued under the rules of law granting ———— continuance in this State, as far as the same can be applicable, and before such appeal is received the defendant shall pay all costs and give bond for his personal appearance to abide the final judgment in said case, and whenever a person is arrested by authority of this Act, it shall be lawful for him to enter into a bond to be approved by the Marshal

**Appearance bond.** of said town, conditioned for the faithful appearance of such person to answer such charge, when the same shall be heard, and shall be payable to the Mayor and Aldermen of said town of Jesup, which bond shall be forfeited on the non-appearance of the defendant in the same manner in said court as penal bonds are

**Certiorari.** forfeited in Superior Courts of this State.   And no *certiorari* shall be allowed or granted to the decision of said Mayor's Court, until the same has been appealed before the Mayor and Aldermen and the decision there confirmed or sustained in whole or in part, and until all costs have been paid to the Clerk of Council of said town, and bond given for the appearance of the petitioner in *certiorari* to

KR0970

answer the final judgment of the court in that matter, but there <span style="float:right">Not to is-<br>sue—when.</span> shall be no appeal or *certiorari* from a fine or commitment for contempt, but such fine for contempt shall not exceed five dollars or imprisonment for contempt, not exceeding five days, and the presiding officer of said Mayor's Court, or the presiding officer over the Council, when sitting on appeal cases shall have the power to summon any witness residing in the county of Wayne or in said town, to appear and testify for either prosecution or defense. But the Mayor, or Mayor *pro tempore*, who heard the case in the Police Court, shall not be allowed to sit in the trial of the said case in appeal before the Mayor and Aldermen of said town.

SEC. XLII. *And it is further enacted by the authority aforesaid,* <span style="float:right">Fines, pen-<br>alties and<br>forfeitures.</span> That the Mayor and Aldermen of said town shall have the power and authority to impose and inflict such fines, penalties and forfeitures for the violation of any ordinance, by-law, rule or regulation of said town as shall, in their judgment, be conducive to the interest, welfare, good order of and proper government of said town, and may for such violations of such ordinances, by-laws, <span style="float:right">Maximum<br>of fines.</span> rules and regulations, punish by a fine, not to exceed one hundred dollars or imprisonment in the guard house of said town not to exceed thirty days, or work on the chain gang on the public works, streets, alleys, and so forth, of said town of Jesup, not to exceed sixty days; or if said town of Jesup has no chain gang, to work <span style="float:right">Imprison-<br>ment and<br>chain-gang<br>—maxi-<br>mum sen-<br>tence.</span> for the space of sixty days on any chain gang under control of the authorities of Wayne county; and if said town has no established guard-house, to be confined in the jail of Wayne county for thirty days; and any one or more of these penalties may be ordered, in <span style="float:right">Both pen-<br>alties per-<br>missible.</span> the discretion of the presiding officer of said Mayor's Court, or the Mayor and Aldermen when sitting to try appeals; that is to say, they may fine one hundred dollars and sentence to labor for sixty days on any such public works, and sentence to imprisonment for thirty days in any such prison, or may fine a less sum than one hundred dollars, and imprisonment in such prison for a term less than thirty days, and sentence to labor for a term less than sixty days, or may impose any one of said penalties or put the sentence <span style="float:right">Sentence<br>may be al-<br>ternative.</span> in the alternative—that is, sentence to labor or confinement, to be discharged on payment of a fine not exceeding one hundred dollars and costs; and it shall be sufficient description of the punishment to be inflicted for the violation of any ordinance of said town for the Mayor and Aldermen thereof to say in such ordinance that the violation of such ordinance shall be punished as prescribed in this section of this charter, referring to it by number, without setting it out in full in the ordinance, if they so choose.

SEC. XLIII. *And be it further enacted by the authority aforesaid,* That the Mayor and Aldermen of said town are authorized, and <span style="float:right">Taxes.</span> it is their duty and power to prescribe by ordinance annually, and within thirty days after the assessment of said Assessors' is filed,

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1863   Page 535 of 607

*Amending Charter of Jesup.*

as in this Act provided, the amount of taxes for that year; and they may, in their judgment, collect said taxes in semi annual payments, or they may collect the whole in one yearly payment, and they shall prescribe in said ordinance fixing the taxes yearly, when and how it shall be paid.   If collected in semi-annual payments, the first payment shall be collectible on the first of June and the second payment on the first of December.   If collected in annual payments it shall be due and collectable on the first of September, and execution may issue for such taxes thirty days after they are due and payable.

**Payments of.**

**Time of collection.**

SEC. XLIV. *And be it further enacted by the authority aforesaid,* That the Mayor and Aldermen of said town shall have power, and it is their duty annually to prescribe the annual license for each and every year and what, as provided in this amended charter, shall be licensed, and to pass ordinances punishing all persons who carry on any of said businesses without first taking out such licenses.

**Licenses.**

SEC. XLV. *And be it further enacted by the authority aforesaid,* That the Mayor and Aldermen of said town may, at any time, elect annually a Town Attorney, and define his duties and prescribe his salary by proper ordinances or resolutions, and his oath of office; but they may, if they see fit to do so, not regularly employ an attorney by the year, but may in their discretion employ the services of an attorney at law only when in their judgment it is necessary to do so.

**Town At- torney.**

SEC. XLVI. *Be it further enacted by the authority afor said,* That all persons claiming or owning personal property of every or any nature and sort in the limits of said town, or who is engaged in any sort of business shall, on or before the first day of May of each and every year, make a return of the same to the Clerk of said Council, together with the value of the same, under oath, in which return the following facts shall be set forth:

**Returns**

**Under oath.**

**Specifica- tions:**

1st.   What and how many businesses are you engaged in, either individually or as a partner, or otherwise, in said town?

2nd.   How much capital have you in any bank or banking house doing business in said town?

3rd.   How much capital has any bank or banking-house in said town of which you are president?

4th.   How much capital or stock have you in any business or loan association in said town?

5th.   How much capital have you in stocks and bonds of any association in said town?

6th.   How much money have you on hand?

7th.   What is the gross value of your notes, accounts or other obligations for money, and the market value thereof—whether the same are against persons or debtors within or without the State?

KR0972

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1864   Page 536 of 607

Amending Charter of Jesup.

8th.  What is the value of your merchandise of all kinds on hand?

9th.  How much capital have you invested in bonds, except bonds of the United States as are by law exempt from taxation? *Specifications:*

10th.  What is the value of your household furniture, including your table ware?

11th.  What is the value of your kitchen furniture?

12th.  What is the value of your office furniture?

13th.  What is the value of your pianos, organs, or other musical instruments?

14th.  What is the value of your sewing machines?

15th.  What is the value of your gold watches?

16th.  What is the value of your silver watches?

17th.  What is the value of your watches made from material other than gold or silver?

18th.  What is the value of your gold and silverware?

19th.  What is the value of your diamonds and jewelry worn by owner or not?

20th.  What is the value of your horses?

21st.  What is the value of your mules and asses?

22nd.  What is the value of your cattle?

23rd.  What is the value of your sheep?

24th.  What is the value of your goats?

25th.  What is the value of your hogs?

26th.  What is the value of your carriages, wagons and buggies?

27th.  What is the value of your agricultural tools, implements and machinery?

28th.  What is the value of your library, pictures, paintings and statuary?

29th.  What is the value of your cotton, corn and other farm products on hand or for sale?

30th.  What is the value of your guns, pistols, bowie knives and such articles?

31st.  What is the value of your portable saw-mills, saw-mills, gins, engines and other machinery, or of such other machinery, stationary, and otherwise, and not returned as part of the realty?

32nd.  What is the value of your property not herein mentioned?

Sec. XLVII.  *Be it further enacted by the authority aforesaid,* That it shall be the duty of the Clerk of Council to issue an execution against any and all personal property of every kind, describing it sufficiently, so that it may readily be identified from such description, which is not returned for taxation as provided in this Act.  Which execution shall be issued, returned and directed as provided for executions against non-returned property, and that all provisions of this Act applying to the sale of property under tax executions for returned or unreturned real property respectively *Where no return made,* *Execution to issue.*

KR0973

shall apply to the sale of returned or unreturned personal property and that moneys realized from such sales of returned or un-returned property shall be held, disbursed and disposed of and accounted for in the same manner respectively as is provided elsewhere in this Act, for the disbursement, disposition and accounting of moneys received from the sale of returned or unre-turned real property respectively, as the case may be, and that the same statute of limitations prescribed in those cases respectively be, and the same hereby, is made to apply respectively in cases of returned or unreturned personal property.

**Proceeds of sale—how held and disbursed.**

Sec. XLVIII. *And be it further enacted by the authority aforesaid,* That all and any persons who have lost one arm, or one leg, or a leg and arm, or both legs and both arms, or a foot or a hand, or an eye, or a foot and hand, or both hands and both feet, and all persons who are physically, from deformity, injury or accident, or disease, unable to perform manual labor, shall be exempt from the performance of street duty as provided in this Act.

**Exemption from street duty.**

Sec. XLIX. *And be it further enacted by the authority aforesaid,* That the Mayor of said town shall receive a salary not to exceed two hundred and fifty dollars per annum, and that the Mayor and Aldermen of said town, in Council assembled at their first meeting in each and every year, shall by resolution prescribe the amount of such salary, and they may order payment of the same monthly, quarterly, semi-annually or annually, as to them may seem best, and the resolution fixing the salary shall fix the time of payment.

**Salary of Mayor.**

Sec. L. *And be it further enacted by the authority aforesaid,* That the Mayor and Aldermen of said town may, at any time, elect annually a City Physician and define his duties and powers by proper ordinances and fix his salary, or, in their discretion, they may only employ the services of one when in their judgment it is necessary, without regularly electing one.

**City Phys-ician.**

Sec. LI. *Be it further enacted by the authority aforesaid,* That all laws and parts of laws in conflict with this Act be, and the same are hereby, repealed.

Approved December 26, 1888.

KR0974

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1866   Page 538 of 607

AMENDING CHARTER OF THE TOWN OF NORWOOD.

No. 105.

An Act to amend an Act entitled an Act to incorporate the town of Norwood on the Georgia Railroad, in Warren county, and provide for the election of Mayor and Councilmen of said town, and for other purposes herein contained, approved Oct. 7th 1885.

SECTION I. *Be it enacted by the General Assembly of the State of Georgia,* That the above recited Act be amended by striking out the word three in the third line, in third section of said Act, and substituting the word five so that said section when so amended shall read as follows: "That an election shall be held in said town on the first Monday in November next for a Mayor and five Councilmen who shall serve for fourteen months, or until their successors are elected and qualified; said election to be held on the first Monday in January stately after the first." *[Third section of old charter altered. Section as amended.]*

SEC. II. *Be it futher enacted,* That the figures 779 in the second line of the sixth section of said Act be stricken out and 797 (c) be substituted therefor, so that said section when so amended shall read as follows: That the provisions of the new Code of Georgia from section 774 to 797 (c) inclusive, and not in conflict with this Act be, and the same are hereby made applicable to said corporation and the officers elected as herein provided and their successors in office. *[Sixth section altered. Section as amended.]*

SEC. III. *Be it further enacted,* That all laws and parts of laws in conflict with this Act be, and the same are hereby, repealed.

Approved December 26, 1888.

KR0975

# EXHIBIT 31

KR0976

Sec. XXI. *Be it further enacted,* That all laws and parts of laws in conflict with this Act be, and the same are hereby repealed. Approved November 11, 1889.

---

## NEW CHARTER FOR CEDARTOWN.

### No. 640.

An Act to amend, consolidate and supersede the several Acts incorporating the town of Cedartown, in the county of Polk ; to confer additional powers upon the corporate authorities thereof, and otherwise to amend the charter of said town, and for other purposes.

Section I. *The General Assembly of the State of Georgia do enact,* That, from and after the first Tuesday of February, 1890, the several Acts incorporating the town of Cedartown, in the county of Polk, as well as the various Acts amendatory thereof, be, and the same are hereby amended, consolidated and superceded ; that the town of Cedartown shall continue to exist, but is hereby constituted a city under the name of the "City of Cedartown ; " that from and after the said first Tuesday of February, 1890, the charter of said city shall be and read as contained in the foregoing and following several sections.

*Corporate name.*

Sec. II. *Be it further enacted,* That the said city of Cedartown is hereby incorporated, and that the inhabitants of the territory hereinafter designated are made a body corporate, and that the municipal government of the city of Cedartown, in the county of Polk, and State of Georgia, shall be vested in a Mayor, Recorder and five Councilmen, who are hereby constituted a body politic under the name and style of the Mayor and Council of the City of Cedartown, and by that name shall succeed to all the rights and liabilities of the present corporation of the town of Cedartown, after the said first Tuesday in February, 1890; that said municipal government shall have perpetual succession, and shall have power and authority to make, ordain and establish from time to time such by-laws, ordinances, resolutions, rules and regulations as shall appear to them necessary and proper for the good government, security, welfare and interest of said city of Cedartown and the inhabitants thereof; and for preserving the health, morals, peace and good order of the same, not in conflict with the Constitution

*Corporate powers.*

KR0977

Case 3:23-cv-00474-JES-DDL    Document 34-4    Filed 03/06/24    PageID.1869    Page 541 of 607

and laws of this State or of the United States; and shall have power and authority, and in and by said corporate name to contract and be contracted with, to sue and be sued, to plead and be impleaded in any of the courts of this State; to have and use a common seal; to hold all property, real or personal, now belonging to said town to the use of said city, for the purposes and interests for which the same were granted or dedicated; to acquire by gift or purchase, or otherwise, such other real or personal property, within or without the limits of said city as may hereafter be deemed necessary or proper for corporate purposes; and to use, manage, improve, sell, convey, rent or lease any and all of said property, as may be deemed advisable for corporate interest.

SEC. III.  *Be it further enacted*, That the corporate limits of said city shall extend one-half of a mile in all directions from the court house square in said city, excepting on the east side as hereinafter provided for; the boundary line shall be known and described as follows: Commencing on the north side of Rockmart street at a point one-half of a mile from the court house square and running west, forming a part of a circle, to, and crossing the Rome road (Main street) at a point one-half of a mile from the court house square; thence west to, and crossing Cave Spring street, one-half of a mile from the court house square; thence south and crossing Prior street one-half mile from the court house square; thence south to, and crossing Main street on the south at a point one-half mile from the court house square; thence east to "Vineyard Hill," to the point forming the southeast corner of what is known as the "Eastern Extension;" thence directly north to the south side of Rockmart street and the northeast corner of said Eastern Extension, said last two lines being straight.  The question of extending the city limits shall be submitted to the people of the district to be included; and if two thirds of the tax-payers shall petition the Mayor, Recorder and Council of the city to extend the corporate lines so as to include them, the same shall be done; and in case any individual living beyond the limits of said city shall petition said Mayor, Recorder and Council to be included within the corporate lines, the same shall be done. *(Corporate limits.)* *(Boundary line.)* *(Question of extending city limits must be submitted to the people.)*

SEC. IV.  *Be it further enacted*, That an election under this charter shall be held at the county court house in said city, or at such other place as the Mayor and Council may direct or designate in said city, on the first Tuesday in January, 1890, and on the first Tuesday in January of each year thereafter, for Mayor, Recorder and five Councilmen, who shall hold their office for one year, and until their successors are elected and qualified; and should there *(Annual elections.)*

KR0978

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1870   Page 542 of 607

fail to be an election held in said city at the time above specified, from any cause whatever, or should a vacancy in the office of Mayor, Recorder and Councilmen occur, from death, resignation or otherwise, the Mayor (or Mayor *pro tem.*) of said city shall order an election held in said city for Mayor, Recorder and Councilmen (or Mayor, Recorder and Councilman, as the case may be) by publishing said notice in some newspaper of said city. Said notice

**Proviso.** shall be given ten days before said election ; *Provided, however,* that if any one of said offices shall become vacant at any time within sixty days of the current annual municipal election, the Mayor *pro tem.* shall act and become Mayor, and his place filled by appointment from the legal voters of said city.

Sec. V.   *Be it further enacted,* That the superintendents of

**Superintendents of election.** all municipal elections shall be appointed by the old or retiring Council ; that all said elections held under this Act shall be conducted according to parts 1, 2, 3, 4, 6 and 7 of Section 1288 of the Code of 1882 of this State ; and said parts of said section are hereby made applicable to such elections, and which are hereby adopted as a part of this charter ; and the superintendents of such

**Returns.** elections shall make return thereof to the Mayor and Council of said city as soon as the same can be consolidated ; and Mayor and Council shall hear and determine and decide all contests within ten days after such election, and their decision shall be final and binding.   The superintendents of all municipal elections shall consist of three freeholders within the corporate limits of said city, and said superintendents shall take and subscribe an oath for the due performance of their duty as such, and shall have all the powers incident to superintendents of State and county elections in this State.

Sec. VI.   *Be it further enacted,* That any person who shall vote

**Penalty for illegal voting.** at any city or municipal election when he has not resided in this State one year, and in the county of Polk for six months, and said city of Cedartown for sixty days, next preceding the election at which he so voted, or who shall vote at such election, who has not paid all taxes, fines and assessments in lieu of street duty, which he has had an opportunity of paying agreeable to law, or who has not registered according to this Act, or who has been convicted in this State of any crime involving moral turpitude, punishable in this State by imprisonment in the penitentiary, unless pardoned, or any person who shall buy or sell a vote, shall be indicted for a misdemeanor, and on conviction in any court in this county having jurisdiction, shall be punished as prescribed in Section 4310 of the Code of Georgia of 1882.

KR0979

New Charter for Cedartown.

Sec. VII.  *Be it further enacted,*  That the Mayor, Recorder and Councilmen shall, before entering upon the discharge of their duties, each take and subscribe an oath to discharge faithfully the duties of their office ; and this oath shall be also required to be taken by each person appointed to office by them.   Any officer of this State authorized to administer an oath shall be qualified to administer the same. <span style="float:right">Oath of office.</span>

Sec. VIII.  *Be it further enacted,*  That the Mayor, Recorder and Council of said city shall have special power and authority therein to lay off, vacate, close, open, alter, widen, curb, pave and keep in good order and repair all streets, avenues, alleys, lanes, sidewalks, cross-walks, drains, sewers, gutters for the use of the public, or any citizen of said city, and to improve and light the same, and have them kept free from any obstructions of any kind ; to regulate the width of the sidewalks and cross-walks on the streets, and to order the sidewalks, cross-walks and footways to be curbed and paved and kept in good order, free from filth of any kind, by the owners and occupants thereof, or of the real property next adjacent thereto ; and if such owner or occupant thereof shall fail or refuse to so curb, pave, remove obstructions, or clean such sidewalk when so ordered, the Mayor and Council shall have the same done, and the cost of the same when done shall become a lien on such adjacent property, and the same shall be collected by execution, to be levied on such property, which shall be sold under the same rules and regulations as govern other Marshal's sales in said city ; to establish and regulate markets ; to prescribe the time for holding the same ; to prevent injury or annoyance to the public or individuals from anything dangerous, offensive or unwholesome ; to prevent hogs, cattle, sheep, horses, mules, goats, asses, and all other animals and fowls of all kinds, from going at large in said city, or in any prescribed territory therein ; to protect places of divine worship ; to abate or cause to be abated anything which, in the opinion of the Council, is a nuisance ; to regulate the keeping and selling of gunpowder, kerosene, and all other combustible and hazardous articles of merchandise ; to guard against danger and damage by fire ; to regulate the running and management of steam engines and locomotives, whether for factories, furnace, cotton gins or railroads, within the corporate limits of said city, or for any and all sorts of vehicles, howsoever drawn or propelled, that may traverse or cross any streets, avenues, alleys, lanes or roads ; to guard against and prevent the fast driving or riding of any horses on the main streets of said city ; to provide, lay out, improve and maintain public parks, squares or pleasure <span style="float:right">Duties and powers of the Mayor, Recorder and Council.</span> <span style="float:right">Markets.</span> <span style="float:right">Nuisances.</span>

New Charter for Cedartown.

**Cemeteries** grounds and walks; to provide places for the burial of the dead, and to regulate interments therein; to provide for the regular building of houses, or other structures, and for the making of street and division fences for the owners of adjacent property; the drainage of lots by proper drains and ditches; to define the duties and prescribe the powers of all officers or agents appointed by them; fix their salary and term of office; require and take from them such bonds as will protect the tax-payers of said city, and conditioned for the faithful discharge of their duties; to erect or authorize the erection of gas works, or prohibit the same; to erect or prohibit the erection of water works in the city; to prevent injury to the springs and water sources within said city; to regulate and provide for the weighing of hay, coal, cotton and all other articles of merchandise bought and sold by weight within said city; to provide a revenue for the city, and appropriate the same to its expenses; to provide suitable ordinances for the annual assessment of taxes on all property, real or personal, subject to State and county tax, within the corporate limits of said city; to levy a special tax on all professions and callings, or business carried on in said city.

**Gas and water works.**

SEC. IX.   *Be it further enacted,*  That the Mayor, Recorder and Council shall have authority to grant licenses to public wagons, drays, carts, trucks and other vehicles conveying persons or property for hire in said city, and to prescribe fees for such licenses, and to levy and collect a special tax from any person, firm or corporation following or carrying on any profession, business, trade or avocation in said city.

**Special license and taxes.**

SEC. X.   *Be it further enacted,*  That said Mayor, Recorder and Councilmen shall have power to levy and collect by execution or other legal process, a tax upon all the property, both real and personal, within the corporate limits of said city, and upon all banking, insurance and other capital employed therein, including all cash, notes, mortgages or other evidence of debts held in said city. *Provided,* that the rate of tax hereby authorized shall not exceed three-fourths of one per cent. upon the assessed value of such property. Said Mayor, Recorder and Council shall have power to levy and collect a special tax upon all shows, circuses and other exhibitions; and on all peddlers and itinerant traders and venders of goods or medicines; all keepers of pool and billiard tables and all otherlike tables; ten-pin alleys, and all other alleys or places kept for the purpose of playing on or renting; also upon all dogs within the corporate limits.

**Property tax.**

**Proviso.**

**Special taxes.**

KR0981

New Charter for Cedartown.

SEC. XI. *Be it further enacted,* That it shall be the duty of the Mayor, Recorder and Council of said city, on or before the first day of March, 1890, and annually thereafter, on or by said first day of March, to appoint three upright, intelligent and discreet freeholders of said city, to serve as a Board of Tax Assessors for said city for the term of one year, and until their successors are appointed and qualified; and if from any cause the place of any one or more of said Borrd of Assessors is made vacant, said Mayor, Recorder and Councilmen shall cause the same to be supplied by appointment, as before provided; and before entering upon the discharge of their duties, said Board of Assessors shall each take and subscribe an oath to faithfully and impartially report all real estate in said city, subject to taxation, and assess the same at the reasonable and just value thereof, on the first day of May of each year. It shall be the duty of said assessors, between the first days of May and July of each year, to make out a complete list of all lots in said city, as shown by the maps thereof, and all real estate in said city not divided into lots, and to assess for taxation each lot and parcel of land at its reasonable and just value, on said first day of May of each year; the list so made out shall show the name of the owner, if known, and his residence, the number of the lot, if platted or numbered; if not, then such description shall be given as is necessary to locate the property, opposite which description shall be set its value as assessed by said board. *(margin: Board of Tax Assessors. Assessors oath. Their duties.)*

SEC. XII. *Be it further enacted,* That all processes, writs, warrants, subpœnas, executions or other papers shall be issued by the Recorder of the Council, in the name of the Mayor of said city, and signed by said Recorder; and it shall be the duty of the Marshal of said city to serve all such processes,, and to levy all executions as may be placed in their hands in favor of said city, and to advertise and sell the property so levied upon in the manner prescribed in section 36 of this Act. *(margin: Writs and processes.)*

SEC. XIII. *Be it further enacted,* That the Mayor, Recorder and Council shall have power to require every male inhabitant of said city, who is subject to road duty under the laws of this State, to work such length of time on the streets of said city, as said Mayor, Recorder and Council shall by ordinance direct; or they may prescribe a commutation tax to be paid by such persons in lieu of said work; and they shall have power to enforce obedience to their laws and ordinances under this section by a fine, imprisonment, or work on the streets as provided in section 41 of this Act, and no tax paid in lieu of such work, nor any money arising from fines or forfeitures for failure of persons to perform such work, shall *(margin: Street work. Commutation tax.)*

KR0982

New Charter for Cedartown.

be used for any purpose except in payment for work done, or improvements put on the streets or sidewalks.

Sec. XIV. *Be it further enacted,* That said Mayor, Recorder and Councilmen shall have power and authority to establish and maintain a system of sewerage and drainage in and around said city, for the health, cleanliness and comfort of its inhabitants; and in all cases where it becomes necessary to take or use private property or injure private rights, and the owners of said property or the persons so injured, and the Mayor, Recorder and Council cannot agree as to the amount of damages to be paid to the injured party, the damages shall be assessed as is provided in section 44 of this Act; and the same rights of appeal, etc., as therein provided, shall also prevail in condemning property in this section. And said Mayor, Recorder and Council shall have entire and absolute control and jurisdiction of all soil pipes, private drains and sewers, water closets and privy vaults in said city, with full power to prescribe their location, structure, uses and preservations, and to make such regulations concerning them in all particulars as may seem best for the preservation of health and the comfort of the inhabitants of said city, with power also to require changes in or the total discontinuance of any such contrivances and structures.

*Sewerage and drainage.*

*Damages for condemned property.*

Sec. XV. *Be it further enacted,* That said Mayor, Recorder and Council shall have power and authority to establish and maintain a system of water works for said city and the inhabitants thereof, and they shall have power to acquire any property or rights either within or without said city limits necessary or appropriate for affording a complete and sufficient supply of water for said city; and said Mayor, Recorder and Council shall have power to cause such examinations and surveys to be made for the work contemplated in this section, as shall be necessary or proper to the selection of the most advantageous location or site for locating all the works and appliances for the purpose of bringing the water and distributing it in the city, and for carrying out the object of this section; and for such purpose, said city, by its officers, agents, servants or employes shall have the right and power to enter upon the land or water of any person which might be necessary for the proper construction, operation and security of their works, and condemn and take such land, water and right-of-way, first making just compensation therefor as provided by law for private property taken for public use, and all damages to be assessed as provided for in section 44 of this Act.

*System of water-works.*

Sec. XVI. *Be it further enacted,* That said Mayor, Recorder and Council shall have power and authority to light the streets in

KR0983

New Charter for Cedartown.

said city by means of gas, electricity, or such other means as they may see proper to adopt, and for this purpose they shall have power to lay mains and pipes along any street or highway in said city. *Gas and electric lights.*

SEC. XVII. *Be it further enacted,* That said Mayor, Recorder and Council shall have power and authority to establish and fix fire limits in said city, and from time to time to extend and enlarge the same in their discretion ; within which fire limits, when established, it shall not be lawful for any person to erect other than fire-proof buildings ; and should any person erect or cause to be erected any building or other structure not fire-proof within the fire limits so established, said Mayor, Recorder and Council, after giving ten days' notice, shall cause the same to be removed at the expense of the owner, to be collected by execution, as provided in section 36 of this Act. And should the owner of such buildings or structures fail or refuse so to do, such owner may be punished as prescribed in section 41 of this Act. And should any person, after receiving like notice, continue to work on and aid in erecting such building or other structure, they shall be liable to the like penalties. Said Mayor, Recorder and Council shall have power to determine, either from their own knowledge or from the advice of competent persons appointed to examine the same, what buildings or other structures are fire-proof, and what buildings are not. *Fire limits.* *Buildings that are not fire-proof may be removed.*

SEC. XVIII. *Be it further enacted,* That any person, company, or corporation owning real estate in said city, desiring to improve the same, or which has already been improved, located upon any street, avenue or alley, the grade of which has not been fixed and established, shall possess the right to have the grade of such street, avenue or alley permanently established by complying with the following requirement, to-wit : The owner, his agents or attorney shall make affidavit stating the ownership and the description of the property, and the improvements done, or to be done. That such improvements have, or are to cost, above the sum of two hundred dollars, and that he desires to have the grade of such street or alley permanently established. Said affidavit, or a copy thereof, shall then be served on the Mayor, Recorder and Council, who shall, within thirty days thereafter, have the necessary surveys made, and fix the grade of such street or alley, and make a plat showing the same, and shall deliver it to the applicant, together with the affidavit of the surveyor, showing that the same is correct and fair, and upon the same being filed, together with the original affidavit of the applicant, in the office of the Clerk of the Superior Court of Polk county for record, the owner shall thereupon have a vested right to such grade, and shall be entitled to recover dam- *Grade of street must be permanently established*

KR0984

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1876   Page 548 of 607

ages from said city for any injury done to said property, should the city thereafter alter such grade.

SEC. XIX.  *Be it further enacted,* That said Mayor, Recorder and Council shall have authority to organize and maintain a fire department at the expense of said city.

*Fire department.*

SEC. XX.  *Be it further enacted,* That said Mayor, Recorder and Council shall have authority to regulate, restrict or prohibit the sale of spirituous, malt or intoxicating liquors or bitters in said city, and the violation of any ordinance adopted by authority of this section shall be punished as is prescribed in section 41 of this Act.

*Sale of liquors.*

SEC. XXI.  *Be it further enacted,* That it shall not be lawful for any person holding any office in said city, whether by election or by appointment, to be interested, either directly or indirectly, in any contract to which said city is a party ; and any contract made in violation of this section shall be void as against said city, and any such officer violating this provision shall be dismissed from his office, and, in addition, shall be punished as prescribed in section 41 of this Act.

*Officers prohibited from participating in contracts.*

SEC. XXII.  *Be it further enacted,* That said Mayor, Recorder and Council shall have authority to appoint a Board of Health for said city, and also a Board of Water Commissioners and Gas Commissioners, and also Street Commissioners and City Attorney, and such number of Marshals and Deputy Marshals as they shall deem proper and necessary, and such other officers and agents as may be necessary to the interest of said city ; to prescribe their duties and fix their compensation.  Any of said officers and agents may be appointed from their body, and they shall have power at any time to remove any of said officers or agents.

*Board of Health.*

*Subordinate officers.*

SEC. XXIII.  *Be it further enacted,* That said Mayor, Recorder and Council may compel the payment of any tax, fine, assessment or forfeiture by execution, levy and sale as prescribed in section 36.

*Executions*

SEC. XXIV.  *Be it further enacted,* That said Mayor, Recorder and Council shall provide by ordinance the manner in which bonds for the appearance of offenders against the ordinances may be forfeited and collected.

*Appearance bonds*

SEC. XXV.  *Be it further enacted,* That the Mayor, Recorder and Council shall require to be kept in books provided for that purpose, full and correct accounts of all the acts and doings of said Mayor, Recorder and Council and all other officers and agents of said city, and such books shall be at all times subject to inspection by any citizen tax-payer of said city ; said Mayor, Recorder and

*Minutes.*

KR0985

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1877   Page 549 of 607

New Charter for Cedartown.

Council shall also make or cause to be made, by the person having such matters in charge, an annual statement and account, under *Annual statements.* oath, of the financial condition of said city; such account shall be a full and itemized statement of all moneys collected, when and from what source collected, of all amounts paid out, and when and on what account paid out, the sums due the city and from what source due, the existing liabilities of said city and the balance on hand. This statement and account shall be made and published on or before the first day of January in each year.

SEC. XXVI. *Be it further enacted,* That said Mayor, and in his absence, the Mayor *pro tem.,* shall preside at all meetings of the *Duties of the Mayor.* Council, but the Mayor shall have no vote except in case of a tie. The Mayor shall have the revision of all ordinances, orders and resolutions passed by the Council, and said Mayor shall have five days after the meeting at which any ordinance and order or resolution was passed, in which to file with the Recorder of the Council, in writing, his dissent thereto, which, when filed, shall have the effect to defeat such ordinance, order or resolution; but, notwithstanding such veto, said Recorder and Council may by a vote of two-thirds of all the members of the Council pass such ordinance, order or resolution, and in the absence of the Mayor, the veto power may be exercised by the Mayor *pro tem.*

SEC. XXVII. *Be it further enacted,* That if any person, after having been tried and convicted before the Mayor or Mayor *pro tem.,* shall be dissatisfied with such judgment of conviction, such person shall have the right to *certiorari* the same to the Superior *Appeal from Mayor's court.* Court of Polk county, under the same rules and regulations as governs in cases of *certiorari* from the Justice to the Superior Court of this State, except that in all cases of *certiorari* the party dependant shall pay the costs which have accrued, and give a good and sufficient bond, to be judged of and approved by the presiding officer, payable to said Mayor, Recorder and Council, conditioned to pay such fine and costs as may have been adjudged against him, as well as all future costs in said case.

SEC. XXVIII. *Be it further enacted,* That the salary of the *Salaries.* Mayor and all other officers and agents of said city shall be fixed at the first regular meeting of each newly elected Council, or when elected and appointed to office, and shall not be changed during the year, or the time for which they were elected or appointed; that sections 786, part (a), 794 and 795 of the Code of Georgia for 1882 are hereby adopted and declared to be a part of this Act.

SEC. XXIX. *Be it further enacted,* That the Mayor, Recorder and Council shall have authority to pass such ordinances as they

New Charter for Cedartown.

Manufacturing enterprises may be exempt from taxation.

may deem best for the exempting from city or municipal taxation any manufacturer, person, company or corporation for a period of not longer than eight years.

Sec. XXX.   *Be it further enacted*, That the Mayor, Recorder and Council of said city shall have full power, whenever they may deem necessary, to require all railroads in said incorporation to make crossings on their several roads for the convenience of the traveling public, and to keep the same open for travel; and to pass all ordinances needful for the carrying out of the provision of this section; and in case the railroads, as aforesaid, shall fail and refuse to fix said crossings when notified so to do, the Mayor, Recorder and Council shall have power to put the same across such railroads at the expense of said railroad, and may issue their execution and levy and collect the same, as is provided in section 36 of this Act for issuing, directing, levying and selling property of individuals.

Railroad crossings.

Sec. XXXI.   *Be it further enacted*, That it shall be the duty of the Recorder of the city to open books for the registration of voters on the first Saturday in November, 1890, and every year thereafter before each annual election, at 10 o'clock a. m., and keep the same open from day to day, from 10 a. m. to 6 p. m., until the first Saturday in December, when the same shall, at 6 p. m., finally close; in which said book shall be inscribed the names of the persons entitled to vote in said city, and his place of residence, and occupation; and the Recorder must not permit any one to register who is not entitled to do so, and if he does so knowingly he shall be discharged from office.   Each person registered shall pay to the Recorder of said city a registration fee of five cents, which shall be used as the Mayor, Recorder and Council of said city may prescribe, and no person who is not registered shall be allowed to vote at any election in said city for officers thereof, or for any measure or matter effecting the same, unless such person has become 21 years of age after said books were closed.

Books of registration.

Registration fee.

Sec. XXXII.   *Be it further enacted*, That the superintendent of all elections for Mayor, Recorder and Council, held by authority of this Act, shall have the same conducted according to parts 1, 2, 3, 4, 6 and 7 of section 1288 of the Code of 1882 of this State, and said parts of said sections are hereby made applicable to such elections, and which are hereby adopted as a part of this charter, and the superintendents of such elections shall make return thereof to the Mayor, Recorder and Council of said city as soon as the same can be consolidated, and said Mayor, Recorder and Councilmen

Manner of holding elections.

KR0987

shall hear and decide all contests within ten days after such elec- Contests.
tions, and their decisions shall be final.

SEC. XXXIII. *Be it further enacted,* That any person who
shall vote at any city or municipal election when he has not re- Qualified
sided in this State one year, and in the county of Polk and said city voters.
of Cedartown for the space of six months, next preceding the elec-
tion at which he so voted, or who shall vote at such election who
has not paid all taxes, fines and assessments in lieu of street duty,
which he has had an opportunity of paying agreeable to law, or
who has not registered according to this Act, or who has been con-
victed in this State of embezzlement of public funds, malpractice,
bribery or larceny, or any crime involving moral turpitude punish-
able in this State by imprisonment in the penitentiary, unless par-
doned, or any person who shall buy or sell a vote or votes, shall be
indicted for a misdemeanor, and on conviction in any court in this Punish-
county having jurisdiction, shall be punished as prescribed in sec- ment for
illegal vot-
tion 4310 of the Code of Georgia. ing.

SEC. XXXIV. *Be it further enacted,* That all taxes, fines and Taxes,fines
assessments due the city of Cedartown, shall rank as debts due the and assess-
ments.
public, whether in the administration of the assets of the decedent
or otherwise; and tax executions in favor of the city shall have the
same lien on property as judgments have by law.

SEC. XXXV. *Be it further enacted,* That the Mayor, Recorder
and Council of said city of Cedartown shall have power and au-
thority to borrow money and contract loans for the public good, Authority
to borrow
when, in their judgment, it shall be for the interest of said city to money.
do so; also to issue bonds and pledge the property, faith and credit
of said city for the payment of debts so incurred, where now al-
lowed by law, as prescribed in section 508, parts i, j, k, and l of
the Code of Georgia for 1882, which said sections are adopted as
part of this Act.

SEC. XXXVI. *Be it further enacted,* That all persons owning or
claiming personal property of any and every kind, sort or description,
subject to taxation, living or residing within the corporate limits of
said city, or who is engaged in any sort of business or calling,
either by himself or agent, in said city, shall, on or by the first day
of July of each year, make a return of the same to the Tax As- Tax re-
turns.
sessor, together with the value of the same on the first day of May
of each year, under oath and upon the blanks furnished by the City
Tax Assessor; in which returns all the personal property owned by
the person on the first day of May must be included, and all the
following facts and questions must be fully set forth and answered:

New Charter for Cedartown.

1. What and how many businesses are you engaged in, either individually or as a partner or otherwise, in said town?

2. How much capital have you in any bank or banking house doing business in the city?

3. How much capital has any bank or banking house in said town, of which you are president?

4. How much capital or stock have you in any business or loan association or building and loan association in this city?

5. How much capital have you in stocks and bonds of any association of any kind in this city?

6. How much money have you on hand?

7. What is the gross value of your notes, book accounts, or other obligations for money, and the market value thereof—whether the same are against persons or debtors within or without the State?

8. What is the value of your merchandise of all kinds on hand?

9. How much capital have you invested in bonds—except bonds of the United States—as are by law, exempt from taxation?

10. What is the value of your household furniture, including your tableware?

11. What is the value of your kitchen furniture?

12. What is the value of your office furniture?

*Questions to be propounded to and answered by all tax payers.*

13. What is the value of your pianos, organs or other musical instruments?

14. What is the value of your sewing machines?

15. What is the value of your gold watches?

16. What is the value of your silver watches?

17. What is the value of your watches made from material other than gold or silver?

18. What is the value of your gold and silver ware?

19. What is the value of your diamonds and jewelry, worn by owner or not?

20. What is the value of your horses?

21. What is the value of your mules and asses?

22. What is the value of your cattle?

23. What is the value of your sheep?

24. What is the value of your goats?

25. What is the value of your hogs?

26. What is the value of your carriages, wagons and buggies?

27. What is the value of your agricultural tools, implements and machinery?

28. What is the value of your library, pictures, paintings and statuary?

KR0989

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1881   Page 553 of 607

New Charter for Cedartown.

29.  What is the value of yout cotton, corn, and other farm products, on hand and for sale?

30.  What is the value of your guns, pistols, bowie knives and such articles?

31.  What is the value of your portable saw-mill or saw mills, gins, engines and all other machinery, stationary and otherwise, and not returned as part of the realty?

32.  What is the value of all other property not herein mentioned?

SEC. XXXVII.   *Be it further enacted,* That if any person shall fail or refuse to make such returns under oath by the first day of July in each year, the Board of Tax Assessors shall assess the personal property of the person so failing to make returns, at double the actual cash value thereof of said property; and if any person shall make any returns of personal property which the Board of Assessors may deem incorrect, then said Board shall assess such personal property, and fix such value upon it as they may deem just and reasonable.  If the owners of any real or personal property conceive that said assessors have placed too great a value on such property, such owners or their agents may appeal to a Board of Arbitration, provided the same is done within thirty days after the taxes become due; said last named Board of Arbitrators to be selected as follows, and from the freeholders of the city of Cedartown : the party or parties that feel aggrieved shall select one freeholder; the Mayor, Recorder and Council shall select another, and the two thus selected shall agree upon the third freeholder; the Board of Arbitrators thus selected shall proceed to hear and determine the value or values of the property in dispute at the time when the Tax Assessor placed his valuation on the same.  The action of said Board of Arbitrators shall be final in the premises. If any tax payer thinks any property has been assessed too low by the Board of Assessors, then such person can and shall have the right to have such assessment reviewed by a Board of Arbitrators, selected in the manner as herein provided for; where persons appeal iu cases where they think the valuation is too great, the action of said Board of Arbitrators shall he final in the premises.  The lists of all real estate assessed as herein provided, and all personal property returned by the owner or owners, or assessed as herein provided, shall be completed by said Board of Assessors and returned by them to the Mayor, Recorder and Council, on or before the first day of August, of each year; and within fifteen days thereafter said City Council shall ascertain and declare the rate to be levied and collected from such assessments and returns, and the tax so levied shall be due and payable on the fifteenth day of September in the

*Penalty for failure to make tax returns.*

*Right to appeal to board of arbitrators.*

*How selected.*

*When assessors lists shall be closed.*

KR0990

New Charter for Cedartown.

year for which they are levied.   And when the taxes so levied are not paid before the fifteenth day of October in each year, the same **Manner of collecting taxes.** shall be collected as follows:   An execution shall be issued by the Recorder, directed to the Marshal of said city, against the real and personal estate of each defendant or defaulter, and in case of real estate, the owner of which is unknown, against the said real property, describing the same by number and location, which execution shall be levied by a Marshal or his deputy of said city, and after advertising the same once a week for four weeks, in some news- **Marshal's sales.** paper published in said city, he shall sell the property so levied on before the door of the Mayor's court house or room in said city, on some regular Sheriff's sale day and within the legal hours of Sheriff's sales; and the deed of said Marshal or his deputy shall be as effectual to pass the title to property thus sold, as the deed **Proviso.** of the owner of such property; *Provided,* that the property thus sold may be redeemed by the owner thereof within six months from such sale, upon such owner paying to the purchaser the amount paid out by him in such purchase, together with twenty per cent. on the same.   The Mayor, Recorder and Council shall prescribe, by ordinance, the compensation to be paid said assessors.

Sec. XXXVIII.   *Be it further enacted,* That the Mayor shall **Mayor's duties.** be chief executive officer of said city, and it shall be his duty to see that the ordinances, rules, acts, regulations and resolutions of the Council are faithfully executed, and during any absence or disability of the Mayor, the Recorder and Council shall select one of their number who, during such absence or disability, shall act as **Mayor pro tem.** Mayor *pro tempore,* with all the powers and duties of the Mayor.

Sec. XXXIX.   *Be it further enacted,* That the Mayor, Recorder and Councilmen before entering upon the discharge of their **Oath of office.** duties shall each take and subscribe an oath to discharge the duties of their office, and this oath they shall also require to be taken by each person appointed by them.

Sec. XL.   *Be it further enacted,* That if the office of Mayor, Recorder or Councilman shall, or any one of them shall become **Vacancies —how filled.** vacant at any time more than sixty days previous to a regular election for Mayor, Recorder and Councilmen, it shall be the duty of the Mayor, or, in case of a vacancy in the office of Mayor, the Recorder and remaining Councilmen, to fill said vacancy by selecting a qualified citizen or citizens of said city to fill said vacancies for the balance of the year.

Sec. XLI.   *Be it further enacted,* That in all elections for **Managers of elections.** Mayor, Recorder and Councilmen, the election shall be managed and presided over by three freeholders of said city, and the persons

KR0991

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1883   Page 555 of 607

New Charter for Cedartown.

elected either as Mayor, Recorder or Councilman shall take and subscribe the oath of office, hereinbefore prescribed, before some officer of this State authorized to administer an oath, and the certificate of such managers shall be sufficient authority to the person elected. The managers of said election shall be selected by the old or retiring Mayor, Recorder and Councilmen.

SEC. XLII. *Be it further enacted,* That the Mayor of said city shall have jurisdiction to try all persons charged with violation of any law or ordinance, rule or regulation of said city, and to punish such persons when properly convicted, by fine not to exceed one hundred dollars, imprisonment in the calaboose of said city not to exceed fifty days, and to work at hard labor on the streets or such other public works of said city as the Mayor shall adjudge, not to exceed fifty days. Any one, or all of these punishments may be inflicted, in the discretion of said Mayor or person acting as Mayor in the trial of offenses. *(Jurisdiction of the Mayor.)*

SEC. XLIII. *Be it further enacted,* That the Mayor of said city shall be invested with authority and power of a Justice of the Peace, so as to suppress all riots, breaches of the peace, and commit for violations of the criminal laws of Georgia within the limits of said city, and to arrest, confine or bind over all offenders against the laws of this State, to answer for such offenses before the proper tribunal; and may issue warrants on affidavits made before him, and may hold courts of inquiry, as other Justices of this State, when the offense was committed in said city. *(Mayor has powers of Justice of the Peace.)*

SEC. XLIV. *Be it further enacted,* That the Mayor's Court of said city is hereby established and declared to be a Court of Record, and shall be presided over and its sessions shall be held by the Mayor or the Mayor *pro tempore* of said city, and shall be held as often as said officer of said court may determine; and the Recorder of said city is hereby declared to be Clerk or Recorder of the Mayor's Court. Said court shall have jurisdiction and cognizance of and over all offenses against any violations of the ordinances and by-laws and rules and regulations of said city, and shall have power to impose on each person convicted thereof such punishment as may be prescribed in the ordinances, rules and regulations of said city, and not inconsistent with the provisions of this Act for violations of the same; and shall have the power to fine or imprison, or fine and imprison, for contempt, and may enforce the collections of fines by execution issued, directed and returned as tax executions are provided to issue in this Act, and shall enforce all such imprisonments by *mittimus,* directed to the Marshal or Deputy Marshal of said city, and in all prosecutions in said city, *(Mayor's Court established.)* *(Its powers.)*

KR0992

New Charter for Cedartown.

and the same shall be commenced by affidavits as prescribed in Section 4715 of the Code of Georgia, upon which a warrant shall issue and be signed by the presiding officer of said Mayor's Court, which shall be in form of warrant described in Section 4716 of the Code of Georgia, except that it shall be directed only to the Marshal or Deputy Marshal, or Policeman of said city, and shall require the person therein named to be taken before the said Mayor's Court of the city of Cedartown for trial; and on this warrant and affidavit the issue of guilty or not guilty shall be formed, and the trial proceed whenever the case is sounded in open court, unless continued under the rules of law as far as they can be applied to said court; and it shall only be necessary, in such affidavit, to describe the offense alleged, with sufficient particularity as that the Judge of said Court may readily understand the nature of the charge and no more; and if such affidavit and warrant should be dismissed for want of informality, either on demurrer before trial or be detected afterwards, and at any time before judgment, and whether the case is pending before the Mayor's Court on appeal before the Mayor and Council, the same will be *nolle prosequied*, and another, and another, and another, be sued out, and so on from each dismissal until one should be drafted sufficient for the purpose, and from the judgment of said Mayor's Court, there shall be an appeal within ten days, to the Mayor and Council of said city after it is entered, unless continued under the rules of law granting continuance in this State, as far as the same can be applicable; and before such appeal is received, the defendant shall pay all costs, and give bond for his personal appearance to abide the final judgment in said case; and whenever a person is arrested by authority of this Act, it shall be lawful for him to enter into a bond to be approved by the Marshal of said city, conditioned for the faithful appearance of such person to answer such charge, when the same shall be heard, and shall be made payable to the City Council of said city of Cedartown; which bond shall be forfeited on the non-appearance of the defendant in the same manner in said court as penal bonds are forfeited in Superior Courts of this State.   And no *certiorari* shall be allowed or granted to the decision of said Mayor's Court until the same has been appealed before the Mayor and Council and the decision there confirmed or sustained in whole or in part until all costs have been paid to the Recorder of the Court of said city and bond given for the appearance of the petitioner in *certiorari* to answer the final judgment of the Court in that matter; but there shall be no appeal or *certiorari* from a fine or commitment for contempt; but such fine for contempt shall not exceed five dollars or

*Form of warrant.*

*Appeal.*

*Appearance bond.*

*Certiorari.*

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1885   Page 557 of 607

imprisonment for contempt not exceeding five days; and the presiding officer of said Mayor's Court, or the presiding officer over the Council when sitting on appeal cases, shall have the power to summon any witness residing in the county of Polk or in said city to appear and testify for prosecution or defense. But the Mayor or Mayor *pro tempore*, who heard the case in the Police Court, shall not be allowed to sit in the trial of the said case in appeal before the Mayor and Council of said city.

SEC. XLV.   *Be it further enacted*, That if, in the judgment of the Mayor, Recorder and Council, it shall at any time become necessary to open, widen, or in any manner alter any street, alley, sidewalk or other passway in said city, they shall have full power to order the same done, upon complying with the following rules :  If the owner of the property to be affected by such alteration conceives that he will be damaged thereby, and if such owner and said Mayor, Recorder and Council shall be unable to agree as to the fact of such damage, or the amount thereof, said Mayor, Recorder and Council shall cause to be served on such owner or his agent, notice of their intention to condemn such property, describing in such notice, the property sought to be condemned, and to state the quantity sought to be taken, and the purpose for which it is to be taken ; which notice shall, also, state the time and place the proceedings to condemn such property will be had, which shall not be less than five nor more than ten days from such time of service.  It shall be the duty of said Mayor, Recorder and Council to select one upright and intelligent freeholder of said city, and the owner of such property, or his agent, may select one such person, or if he shall fail or refuse to make such selection, then it shall be the duty of the Justice of the Peace of the militia district in which said city is situated, to select some intelligent and upright citizen freeholder, as aforesaid ; and it shall be the duty of the two persons selected, in either way above named, to select a third upright and intelligent citizen of said city ; and it shall then be the duty of said three persons to inspect the property sought to be condemned, and to hear such evidence pertaining thereto, as the parties may offer, taking into consideration the enhanced value, if any, of the property by reason of the opening, widening or altering such streets, alleys, sidewalks, or other passways, as the case may be ; and from the decision of said freeholders there shall be an appeal by either party to the Superior Court of Polk county, under the same rules and regulations as govern appeals from Justices' Courts to the Superior Court.  The Mayor, Recorder and Council, upon payment, or tender to the owner, or his agent, of any sum found by said arbitrators, shall have the right to

Authority to open or widen streets.

Damages for condemned property.

Selection of arbitrators.

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1886   Page 558 of 607

proceed to open, widen, or alter such street, alley, or sidewalk, notwithstanding any appeal by the owner of such premises.

SEC. XLVI.   *Be it further enacted,* That nothing in this Act **Does not effect system of public schools.** shall be construed so as to repeal or annul " An Act to authorize the town of Cedartown, in Polk county, Georgia, to establish and maintain a system of public schools for said town," approved September 9th, 1887, and any and all acts amendatory thereof, but said Act is adopted and made a part of this Act.

SEC. XLVII.   *Be it further enacted,* That any and all ordinances, **Ordinances not inconsistent with this Act remain in force.** rules and regulations now of force in said town of Cedartown, and not inconsistent with this Act, shall be and remain in full force and effect after the first Tuesday of February, 1890, until altered, amended or repealed by said Mayor, Recorder and Council.

SEC. XLVIII.   *Be it further enacted,* That all laws and parts of laws in conflict herewith, the same be, and are hereby repealed.

Approved November 11, 1889.

---

## AMENDING CHARTER OF ATHENS.

### No. 642.

An Act to amend the charter of the city of Athens, to fix the term of office of the Mayor of said city, and for other purposes.

SECTION I.   *Be it enacted by the General Assembly of the State of* **Mayor's term of office.** *Georgia,* That hereafter the Mayor of the city of Athens shall be chosen for a term of two years or until his successor is elected and qualified.   The provisions of this Act shall apply to the Mayor, who shall be chosen at the annual election held on the first Wednesday in December, 1889, and the Mayor of said city shall be elected biennially thereafter on the first Wednesday in December under the same rules and regulations as now govern the election of Mayor and Aldermen of said city.

SEC. II.   *Be it further enacted,* That all laws and parts of laws in conflict with this Act be, and the same are hereby repealed.

Approved November 11, 1889.

KR0995

# EXHIBIT 32

KR0996

SEC. 4. That said association shall have power to make such laws **By-laws.** and regulations as may be necessary for the government of the association not inconsistent with the laws of North Carolina.

SEC. 5. That the place of business of said association shall be at **Location.** Red Springs in the county of Robeson and state of North Carolina.

SEC. 6. That said association is founded for the purpose of en- **Objects.** couraging and fostering all industrial enter prises including manufacturing, agriculture, horticulture, and the raising and improve- **Fairs.** ment of live stock by holding fairs annually, or oftener, as the interests of said association may require, and by awarding premiums for the exhibition of articles and for other purposes for which said association is created.

SEC. 7. That said association may purchase and hold real estate to **May buy and hold real and** an amount not exceeding twenty-five thousand dollars, and personal **personal estate.** property to an amount not exceeding five thousand dollars. That said association may purchase real estate and sell the same and convey such real estate to purchasers in fee-simple. That all purchases and sales of real estate shall be determined by a stock vote, and all conveyances shall be signed by the president and secretary of said association.

SEC. 8. That the par value of shares in the stock of said associa- **Shares.** tion shall be ten dollars per share. That the private property of **Stockholders not** stockholders shall not be liable for the debts of the association. **personally liable.**

SEC. 9. That all laws and parts of laws inconsistent with this act **Repealing clause.** are hereby repealed.

SEC. 10. That this act shall be in force from and after its ratification.

Ratified the 9th day of March, A. D. 1891.

---

## CHAPTER 327.

### An act to charter the town of Leicester in the county of Buncombe, North Carolina.

*The General Assembly of North Carolina do enact:*

SECTION 1. That the town of Leicester in the county of Buncombe, **Name.** be and the same is hereby chartered under the name and style of the town of Leicester, and that J. B. Wilson shall be mayor of said town and that D. F. Summey, R. D. F. Robeson, R. T. Poor, Lon Wells **Commissioners.** and M. E. Hayes, and their successors in office, shall be commissioners of said town, and shall be and are hereby declared a body corporate and politic, with succession during the corporate existence of said town, and shall be styled the commissioners and aldermen of the town

KR0997

1414      1891.—PRIVATE—CHAPTER 327.

**Powers.** [of] Leicester; and as such shall have power to sue and be sued, plead and be impleaded, and have and use a common seal and acquire real and personal estate to the amount of ten thousand dollars. That the

**Term of office.** said J. B. Wilson and the commissioners aforesaid shall continue in office as such and perform all the duties pertaining to their offices of mayor and commissioners of said town until their successors shall be elected and qualified as hereinafter provided.

**Corporate limits.** SEC. 2. That the corporate limits of said town shall be and are hereby declared to be included within and up to the following boundaries, to-wit, one-half mile in every direction from the brick store known as the Hampton and Brown house.

**Officers.** SEC. 3. That the officers of said town shall consist of a mayor and five commissioners to be elected by the qualified voters of said town annually on the first Monday in May.

**Election.** SEC. 4. Said election of said mayor and commissioners shall be held at the brick store of Hampton and Brown in said town and no person shall be entitled to vote at said election or at any election in said town for municipal purposes unless he shall be an elector of the State of North Carolina and shall have resided ninety days next preceding the day of election within the said corporation.

**Appointment of registrar.** SEC. 5. It shall be the duty of the commissioners of said town, on the second Monday in March in each year, to appoint a registrar and

**Judges of election.** two judges of election, who shall be qualified voters of said town, and who shall within ten days thereafter be notified of their appointment by the constable of said town; the registrar so appointed shall immediately make publication at the door of the brick house and three other public places in said town of his appointment as such. He shall be furnished with a registration book by the commissioners

**Duties of registrar.** of said town, and it shall be his duty to register the qualified voters of said town in such a manner that said book shall show an accurate list of the names of the qualified voters residing in said town; he shall also, between the hours of sunrise and sunset on each day (Sundays excepted), for thirty days preceding each election, keep open said book for the registration of any electors residing in said town entitled to register whose names have never before been registered in said town, or do not appear on the registration book; but the commissioners of said town may, if they think proper, upon giving thirty days' notice at four public places in said town, require an entirely new registration of voters before any election held therein.

**Oath of election officers.** SEC. 6. The registrar and judges of election, before entering upon the discharge of their duties, shall take the oath prescribed by article six, section four of the constitution of North Carolina, before some justice of the peace of Buncombe county.

**Duties of election officers concerning registration, &c.** SEC. 7. It shall be the duty of [the] registrar and judges of election to attend at the polling place in said town with the registration book on Monday preceding the election from the hour of nine o'clock

KR0998

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1890   Page 562 of 607

A. M. to the hour of five o'clock P. M., when and where the said book shall be opened to the inspection of the electors of said town, and any of the electors shall be allowed to object to the name of any person appearing in said book. In case of any such objection the registrar shall enter upon his book opposite the name of the person so objected to the word "Challenged," and shall appoint a time and place on or before election day, when he, together with said judges of election, shall hear and decide said objection, giving due notice to the voter so objected to: *Provided*, that nothing contained in this section shall be construed to prohibit the right of any elector to challenge or object to the name of any person registering or offering to register at any time other than that specified. Any person challenged or objected to [who] shall be found not duly qualified as provided for in this charter his name shall be erased from the registration book, and he shall not be allowed to vote at any election held in said town for municipal purposes. <span>Challenges.</span>

SEC. 8. The said judge of election, together with the registrar, who shall take with him the registration book, shall assemble at the polling place on the day of election held in said town and shall open the polls at seven o'clock, A. M. They shall superintend said election and keep the polls open until sunset, when the polls shall be closed and [the] votes for mayor and commissioners shall be counted out by them. They shall keep poll-books and write in them the names of every person voting at said election, and at the close thereof shall certify said poll-lists and deposit them with the clerk and treasurer of said town, and said poll-books shall in any trial for illegal or fraudulent voting be received as evidence; if for any cause any of the judges of election shall fail to attend, the registrar shall appoint some discreet person or persons to fill the vacancy who shall be sworn by him before acting. <span>Duties on day of election.</span>

SEC. 9. The voters shall vote by ballot, having the name of the mayor and commissioners on one ballot, either in writing or printing, on white paper and without any device, and the person having the highest number of votes shall be declared elected by the judges of election, who shall certify said fact to the town clerk and treasurer, and in case of a tie the judges of election shall determine by ballot who is elected. <span>Ballots.</span>

SEC. 10. That no person shall be eligible to any office in said town unless he shall be [a] qualified voter therein. <span>Eligibility to office.</span>

SEC. 11. That immediately after each election it shall be the duty of the town clerk and treasurer to notify in writing the mayor and commissioners elect of their election. <span>Duty of clerk to notify officers elect.</span>

SEC. 12. That the mayor and commissioners elect shall, within three days after being notified by the town clerk and treasurer, before some justice of the peace in said county take the oath prescribed for <span>Oath of mayor and commissioners.</span>

KR0999

1416                    1891.—Private—Chapter 327.

public officers, and an oath that they will faithfully and impartially discharge the duties imposed on them by law.

**Penalty for refusing to qualify.**   Sec. 13. That any person elected mayor or commissioner of said town under the provisions of this charter refusing to qualify and act as such for one month after such election shall forfeit and pay the sum of ten dollars, one-half to the person suing for the same and the other half to said town, to be applied by the commissioners of said town to the use and benefit thereof; said sum shall be recovered in any ordinary civil action before a justice of the peace of said county in the name of the State of North Carolina.

**Quorum.**   Sec. 14. That a majority of said commissioners shall constitute a quorum for the transaction of business.

**Duties of mayor.**   Sec. 15. That the mayor when present shall preside at all the meetings of the commissioners; he shall also have power to call meetings when he may deem it necessary, and may vote only in case of a tie. In the absence or sickness of the mayor the commissioners of said town shall select one of their own number to act as mayor *pro tempore*, who shall, while acting as such, have all power and authority conferred by this charter on the mayor of said town.

**Vacancies, how filled.**   Sec. 16. If for any cause there should be a vacancy in the office of mayor or commissioner of said town, the board of commissioners thereof shall be and are hereby empowered to fill said vacancy or vacancies, and their appointee or appointees shall hold office until the next regular election herein provided for.

**Election of clerk and treasurer.**   Sec. 17. That said commissioners shall at the first meeting after their election select one of their own number or some other discreet person as town clerk and treasurer, who shall hold office for one year or until a successor shall be elected and qualified. He shall act as secretary to the board of commissioners and treasurer of said town, and before entering upon the discharge of the duties of the office **Bond.** shall give good and sufficient bond with sureties to be approved by the board of commissioners of said town in the sum of such bond as [the] commissioners may require, payable to the state of North Carolina and conditioned upon his faithful accounting for and paying over all moneys that may come into his hands as treasurer of said town and for the faithful discharge of his duties as secretary of said board of commissioners. The commissioners of said town may require of **Monthly statements.** said clerk and treasurer a monthly statement and exhibit of receipts and disbursements, and if he fails for thirty days after having been required to make such exhibit to render the same, it shall be and is hereby declared a breach of his official bond, and the commissioners are authorized and empowered to declare the office vacant and to appoint his successor. All suits entered on the official bond of any of the officers of said town shall be in the name of the state of North Carolina, to the use of the board of commissioners of the town of Leicester against the said official and his sureties.

KR1000

Sec. 18. The said commissioners shall, at the first meeting after their election, select some one to act as constable of said town, who shall hold his office for one year or until his successor is elected and qualified.   He shall before entering upon the discharge of the duties of his office enter into bond in such sum as the said commissioners may require, with good and sufficient sureties to be approved by the board of commissioners, payable to the state of North Carolina and conditioned upon his faithfully executing and returning to the proper authorities all process that may come into his hands as said constable, upon his faithfully accounting for and paying over to the proper authority all moneys that may come into his hands from any source as said constable, upon his faithfully collecting and paying over all taxes levied by the commissioners of said town, and in all other respects executing to the best of his ability and honestly and faithfully all the duties imposed upon him by this charter or by the board of commissioners of said town. *Town constable. Duties and term. Bond.*

Sec. 19. The commissioners of said town shall have power to make such by-laws and adopt such regulations or ordinances for the government of said town as a majority of them may deem necessary to promote the interest and insure the good order and government of said town, for the improvement of the streets and the preservation of the health of the same, and to make all such other police regulations as the interest, comfort and convenience of the citizens of the said town may require. *By-laws and ordinances.*

Sec. 20. The commissioners of said town may pass laws for abating and preventing nuisances of any kind therein. *Nuisances.*

Sec. 21. Any person or persons violating any ordinance of said town shall be deemed guilty of a misdemeanor, and shall be punished upon conviction thereof before the mayor of said town by a fine not exceeding fifty dollars or by imprisonment not exceeding thirty days. *Violation of ordinances a misdemeanor.*

Sec. 22. In all cases where an offender has been convicted before the mayor of said town for the violation of any ordinances thereof and a fine has been imposed on such offender [for] the said violation the mayor of said town, at the time of entering judgment agains such offender thereof, may order that on failure to pay such fine to the constable of said town for the space of one day, such offender so convicted shall, by the constable of Leicester, [be] put the [to] work on the streets of said town for a time to be fixed by the mayor, not exceeding ten days, when he shall be discharged. *Offenders may be sentenced to work on streets.*

Sec. 23. The mayor of said town shall have power to hear and determine all charges or indictments against any person or persons for the violation of the ordinances of said town, and in addition thereto shall have all the power, jurisdiction and authority of a justice of the peace over all crimes and criminal offences committed within the corporate limits of said town. *Power of mayor to try warrants.*

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1893   Page 565 of 607

**Duties and powers of constable.**

Sec. 24. The constable of said town shall execute all process placed in his hands by the mayor; shall have authority to preserve the peace of said town, and within the corporate limits thereof shall have the authority in criminal matters and be entitled to the same fees as a sheriff has in the county; and in the collection of the taxes of the said town levied by the authorities thereof shall have the same power and authority as are given to sheriff[s] by law, except as hereinafter provided for by this charter.

**Officer cannot make contract with corporation.**

Sec. 25. It shall not be lawful for the mayor or any commissioner of said town, clerk or constable, or any other official officer of said town to demand or receive, either directly or indirectly, any consideration for work or labor done or material furnished to said town by said official : *Provided, however,* that the commissioners of said town may determine the compensation or salary of the mayor, town clerk and treasurer and town constable.

**Powers to lay out streets.**

Sec. 26. The commissioners of said town shall have power to open and lay out any new street or streets within the corporate limits of said town whenever a majority of them may think necessary, and shall have power at any time to widen, enlarge, make narrower, change, extend or discontinue any street or streets or any part thereof within the corporate limits of said town, and shall have power to condemn and appropriate any land necessary for the purpose of this section or making compensation as hereinafter provided to the owner or owners of said lands. It shall be the duty of the commissioners of said town to tender through their clerk and treasurer the amount they may think the owner of any land may

**Damages.**

be entitled to [as] damages for the opening out, changing or discontinuing any street or streets across his lands; and if such amount shall not be accepted in full satisfaction therefor, the mayor of said town shall have the power to issue an order directed to the town

**Condemnation of land.**

constable, commanding him to summon as jurors six citizens of said town, freeholders, connected neither by consanguinity nor affinity with the mayor or commissioners of said town or the person or persons over whose lands said street proposed to be changed or discontinued runs, or over whose lands said proposed new street will run; said order shall direct the town constable to summon said jurors to meet on the land over which the proposed street is to be laid out or changed, or discontinued, on a day not exceeding ten days from the day of summoning them, and the owner or owners of said lands

**Procedure.**

shall be notified by the constable of said town of the summoning of said jurors and the time and place of their meeting and the purpose of their meeting for five days before the day when the said jurors will meet to open and lay out any new street or alter, change or discontinue any street already laid out. Said jurors, attended by the constable, after being sworn by the mayor to do strict and impartial justice between the parties, shall proceed to lay open, lay out, change,

KR1002

Case 3:23-cv-00474-JES-DDL    Document 34-4    Filed 03/06/24    PageID.1894    Page 566 of 607

narrow or widen such street or streets as the case may be, and shall assess the damages sustained by the owner or owners of such land, and in assessing the damages they shall consider the improvements to said land or lands, caused by the opening, laying out and changing, making narrow or wider of said street or streets, and such estimated improvements shall be deducted from the damages assessed by them. And the said jurors shall under their hands and seals make a return of their proceedings to the mayor of said town, and the board of commissioners of the said town shall make compensation to such owner or owners of said land for the amount of damages so assessing [assessed]. On the return of the report of said jurors to the mayor of said town, and the payment or tender of payment to the owner or owners of said lands by the town clerk and treasurer, under the order and direction of said commissioners of said town, of the amount of damages so assessed, said new street or streets so laid out, altered or changed, made narrower or wider shall be in all respects one of the streets of said town and under the control of the board of commissioners of said town.

SEC. 27. That the said commissioners shall have power to construct and repair sidewalks on any of the streets of said town. *Sidewalks.*

SEC. 28. That the commissioners of said town may establish a market and regulate the same, and prescribe at what place in the corporation shall be sold marketable things, and in what manner, whether by weight or measure. *Market.*

SEC. 29. That they may erect at some suitable place within said corporation public scales for the purpose of weighing fodder, hay, oats or rye in straw, and live stock on foot offered for sale in said town, and for the purpose of weighing the same may appoint a weigher, fix his fees and determine by whom they shall be paid, and they may require all persons buying or selling the articles mentioned in this section within the corporate limits of said town to have the same weighed at said scales by said public weigher. *Public scales.* *Weigher; fees.*

SEC. 30. That the commissioners of said town may take such measures as they may deem requisite, or pass such ordinances or regulations as they may think necessary to prevent the entrance into or spreading within the limits of said town of any contagious or infectious disease or diseases, and may take any action necessary in their opinion to preserve the public health of said town. *Contagious diseases.*

SEC. 31. The board of commissioners of said town shall have power annually to levy and cause to be collected taxes for necessary town purposes on all real property, all moneys, credits, investments in bonds, stocks, joint stock companies and all other personal property, and on the taxable polls within the limits of said town: *Provided, however,* that the taxes levied by them shall not exceed thirty cents on the hundred dollars valuation on all real and personal property and sixty cents on each taxable poll, and the valuation of all prop- *Taxes.* *Thirty cents on $100.*

KR1003

1420                    1891.—Private—Chapter  327.

erty within said town as taxed by said town commissioners shall be the same as that at which it is assessed for taxation for state and county purposes.

**Taxes, when payable. Duty of constable.**

Sec. 32. That all taxes levied by said town commissioner; shall be due and payable on the ..... of each year to the constable of said town, and after that time may be collected by him distraining any personal property of the tax-payer to be found in said town.

**Advertisement for listing taxes.**

Sec. 33. On the first Monday in July of each and every year, the clerk and treasurer of said town shall by advertisement at the court-house door and from [four] other public places in said town notify all persons in said town liable to taxation to come forward and make returns of their tax-list to him within thirty days of publication of said notice; all persons within said town and liable to taxation shall

**Tax-payer to make returns.**

make returns of all their taxable property to said town clerk under oath, and he is hereby authorized and empowered to administer to such tax-payers on oath that he will well and truly return all property owned by him within said town and liable to taxation under the provisions of the charter. Said list so returned shall state the age of the tax-payer and all property real or personal liable to taxation owned by him, with an accurate description of all real property owned by him when he is required by law to return the same to the list-taker of Leicester township to be assessed for taxation for state and county purposes.

**Taxes, how listed; in case of infants, &c.**

Sec. 34. All persons owning any property within said town liable to taxation for town purposes, shall return the same to the town clerk as provided in section thirty-three of this charter, and all property therein liable to such taxation owned by minors, lunatics or persons *non compos mentis* shall be returned as herein provided by their guardian, if they have such.

**Taxes to be listed by executors, &c.**

Sec. 35. All property liable to taxation for town purposes in said town, and held by executors, administrators or trustees, shall be returned by them in that capacity; and the individual property of all such guardians, executors, administrators or trustees shall be first distrained or attached by the constable for the satisfaction of the taxes due on all property so returned by them; and the constable of said town is hereby authorized, at any time after the taxes may be due the town on said property, as aforesaid, to distrain any personal property of said guardian, executor, administrator or trustee to be found in said town.

**Tax-list to be made out by clerk.**

Sec. 36. The town clerk and treasurer of said town shall make out a full and complete list of all taxable property in said town so returned to him, and of all the taxable polls in said town, and if any person or persons in said town liable to taxation shall fail to make return to the clerk as herein provided for, for thirty days after the third Monday in October of each year, the town clerk shall make return of the taxable property of such person or persons, and his

KR1004

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1896   Page 568 of 607

age if he is liable to poll-tax; and such person or persons so failing to make returns of their property and poll shall be liable to double property and poll-tax, to be collected as other property and poll-taxes. The town clerk of the said town shall complete the tax-list and place it or a certified copy thereof in the hands of the constable of said town on the third Monday in November of each year. Such tax-list or copy thereof, certified by the clerk, when placed in the hands of the town constable shall have the force and effect of an execution.

SEC. 37. The lien of the town taxes shall attach to all real property subject to taxation on and after the third Monday in November of each year, and shall continue until such taxes, together with any penalty that shall accrue thereon, shall be paid. All personal property liable to taxation of tax-payers within the town shall be liable to be seized and sold, after ten days' notice at the court-house and four other public places in said town, in satisfaction of taxes by the town constable after said taxes shall have become due and payable.

SEC. 38. Whenever the taxes due of [to] said town shall be unpaid the constable of said town shall immediately proceed to collect them as follows : First. If the party charged, or his agent, have personal property in said town equal in value to the taxes charged against him, the constable shall seize and sell the same under [the same] rules as sheriffs are required to sell personal property under execution, and his fees for such levy or sale shall be fifty cents. Second. If the party charged has not personal property to be found in said town of sufficient value to satisfy his taxes the constable of said town shall levy upon any lands of the delinquent to be found within the town. The levy shall contain an accurate description of the lands, with the name of the owner or owners, the amount of taxes due by the delinquent, and a list thereof shall be by the constable returned by [to] the town clerk and treasurer, who shall enter the same in a book to be kept for that purpose, charging therefor twenty-five cents for each levy. Third. The constable shall notify the delinquent of such levy and the day and places of sale by service of a notice stating these particulars on him personally if he be a resident of said town; if the delinquent does not reside in said town, but his residence is known or can by reasonable diligence be ascertained, the notice shall be mailed postpaid to such delinquent; if the residence of the delinquent cannot with reasonable diligence be ascertained, the constable shall post a notice substantially as above described at the court-house door and four other public places in said town at least thirty days before the sale of the land, and this last mentioned notice shall be posted as in all cases of sale of land for taxes in said town. Fourth. The sale shall be made at the court-house in said town and shall be on one of the days prescribed for sale of real estate under execution, and shall be conducted in all respects as are sales under execution. If the delinquent reside out of said town and his address be known to the constable the constable

KR1005

1422                    1891.—PRIVATE—CHAPTER 327.

shall within one month after the sale mail to him notice of the sale and the date thereof, of the name and address of the purchaser of the same, bill and of the amount of the taxes and cost to be paid by such delinquent as a condition on [of] its redemption.

**Sale of land; method.** SEC. 39. The whole tract or lot of land belonging to a delinquent person or company shall be set up for sale at the same time and shall be struck off to him who will pay the amount of the taxes for the smallest part of the land. At all such sales the mayor may become a bidder and purchase the whole lot or tract of land for the taxes due and expenses for the use of the town in case no one will offer to pay the taxes and cost for a less quantity.

**Time to redeem.** SEC. 40. The delinquent may retain possession of the property for twelve months after the sale, and within that time may redeem it by paying the purchaser the amount paid by him and twenty-five per centum in addition thereto; at the time of said payment to the **Twenty-five per cent. added.** purchaser he shall give to the delinquent a receipt thereof [therefor]. If he shall refuse or cannot be found in said town the delinquent may pay the same to the town clerk and treasurer; he shall give a receipt therefor and such payment shall be equivalent to payment to the purchaser. After such payment to the purchaser or town clerk all rights under the purchase shall cease.

**Receipt to purchaser at tax sale.** SEC. 41. At the time of such purchase of real estate for taxes the town constable on receipt of the amount bid for such real estate shall give the purchaser a receipt, stating the amount bid, by whom, and for what purpose, and describing the land sold, stating further the owner of said land and the amount of taxes due.

**On failure to redeem, deed to be executed.** SEC. 42. If the delinquent, his agent or attorney, shall fail to redeem as provided in section forty-one hereof for twelve months, at the expiration of that time the purchaser may present his receipt referred to in section forty-one hereof, and the town constable of said town shall execute a deed in fee to the purchaser, and if the purchaser is dead to his heirs at law or assignee for the land for which said purchaser agreed to pay the amount called for in the receipt, and for **Fee of constable.** said service the constable shall be allowed one dollar to be paid by the purchaser. The deed from the constable to the purchaser shall be registered in the register's office of Buncombe county within six months from the time of the executing and delivering thereof, and when so registered shall convey to the grantee all the estate in the land for which the said purchaser bid which the delinquent, his agent or attorney had at the time of the sale for taxes.

**Redemption of property bid in by mayor.** SEC. 43. All real estate bid in by the mayor of said town for the use of the town at sales made by the constable for taxes may be redeemed as hereinbefore provided by the payment on the part of the delinquent, his agent or attorney, of the amount bid and twenty-five per centum additional to the town clerk and treasurer within twelve months.

KR1006

SEC. 44. The commissioners of said town shall have power to **Privilege taxes.** annually levy and cause to be collected for the necessary expenses of said town such privilege taxes as shall seem to them fair and equitable on the professions, callings, trades, occupations, and all other business carried on in said town: that is to say, on every merchant, **Merchants, lawyers, doctors, &c.** lawyer, physician, dentist, druggist, artisan, mechanic, daguerrean artist or other picture; on all officers or agents of incorporated companies; on all clerks or employees of other persons or corporations; on every drummer, unless the state license under which he acts shall **Drummer.** have been issued to such drummer by the treasurer of the state in the name of such drummer and not in the name of the person, firm or corporation for whom he is acting or doing business; on all editors, printers, butchers, tinners, carpenters, shoemakers, wheel- **Privilege tax on numerous occupations.** wrights, carriage, buggy or wagon-makers, jewelers, liquor dealers, confection grocers, bar-tenders, harness-makers, saddlers, blacksmiths, billiard or bagatelle-table, public or private boarding inns, or ten-pin alley; on all lectures for reward, on all riding or pleasure vehicles, on all gold, silver or metal watches, on all pianos, on all pistols, dirks, bowie-knives or sword canes, on every livery-stable and every distillery, on every hotel, boarding-house, restaurant or eating saloon, on all draught carts, wagon, carriage, buggies, on all horses, cattle, sheep, hogs, goats or dogs, owned or kept in said town, on every stallion [or] jackass kept or exhibited in said town, on all itinerant traders, peddlers or bankers, on all and every person or persons, company or companies who may exhibit, sing, play, act or perform, or anything for which they charge or receive any gratuity, fee or pay or reward whatsoever within the limits of said town; and the commissioners of said town shall prescribe when the license tax herein provided for shall be due and payable.

SEC. 45. The board of commissioners of said town shall have full **License tax on liquor dealers.** and complete control of the sale or vending of spirituous or malt liquors, wines or cider within the limits of said corporation, and may permit the same to be sold by persons of good moral character resident therein ; shall prescribe the rules and regulations under which the same may be sold ; shall prescribe the license tax therefor, which **Not less than $1,000.** shall not be less than one thousand dollars annually, and when the same shall be due and payable, and shall have full power and authority to revoke and amend any license by them granted at any time without refunding any part of the license tax.

SEC. 46. That it shall be the duty of the town clerk and treasurer **Ordinances to be posted.** to post all ordinances adopted by the board of commissioners of said town at the court-house and four other public places in said town for five days, and all ordinances shall go into effect from and after the expiration of five days from the time they shall have been posted.

SEC. 47. That all laws heretofore passed for the better government **Repealing clause.**

KR1007

# EXHIBIT 33

KR1008

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1900   Page 572 of 607

For Support of State Government 1885–86.

# TITLE II.

### TAXES.

### ACTS.

For support of State Government for 1885–86.
For new Capitol.
Record of tax defaulters.
Correct returns of property for taxation.

## FOR SUPPORT OF STATE GOVERNMENT 1885–86.

### No. 52.

An Act to levy and collect a tax for the support of the State Government and the public institutions; to pay the interest and maturing principal of the Public Debt, and for educational and other purposes herein mentioned, for each of the fiscal years eighteen hundred and eighty-five and eighteen hundred and eighty-six, and to prescribe what persons, professions and property are liable to taxation; to prescribe the method of collecting said taxes, and to provide penalties and forfeitures for non-payment of taxes, and for other purposes.

**Tax for 1885-6.**

SECTION I. *Be it enacted by the General Assembly of the State of Georgia,* That the Governor be authorized and empowered, with the assistance of the Comptroller General, to assess and levy a tax on the taxable property of this State of three-tenths of one per cent. for each of the fiscal years eighteen hundred and eighty-five and eighteen hundred and eighty-six.

**Three-tenths of one per cent.**

**Specific Taxes.**

SEC. II. *Be it further enacted by the authority aforesaid,* That in addition to the *ad valorem* tax on real and personal property, as required by the Constitution, and provided for in the preceding section, the following specific taxes shall be levied and collected for each of said fiscal years eighteen hundred and eighty-five and eighteen hundred and eighty-six:

KR1009

For Support of State Government 1885–86.

*First.*—Upon each and every male inhabitant of the State, on the <span style="float:right">Poll Tax.</span> first day of April, between the ages of twenty-one and sixty years, a poll tax of one dollar for each of said years 1885 and 1886, which tax shall be for educational purposes ; *Provided,* this tax shall not <span style="float:right">Proviso.</span> be demanded of crippled, maimed and disabled Confederate soldiers, <span style="float:right">Confederate Soldiers.</span> relieved of such tax under and by authority of an Act approved <span style="float:right">diers.</span> July 23, 1883.

*Second.*—Upon every practitioner of law, medicine or dentistry, <span style="float:right">Practitioners of Law,</span> ten dollars, and no municipal corporation or county authorities shall <span style="float:right">Medicine</span> levy any additional tax on said professions, either as license fee or <span style="float:right">and Dentistry.</span> otherwise.

*Third.*—Upon every daguerrean, ambrotype, photographic and <span style="float:right">Daguerrean and</span> similar artist, ten dollars. <span style="float:right">other artist.</span>

*Fourth.*—Upon every person carrying on the business of auction- <span style="float:right">Auctioneers.</span> eer, twenty-five dollars for each county in which they may carry on such business.

*Fifth.*—Upon every keeper of a pool, billiard or bagatelle table, <span style="float:right">Keepers of Pool, Bil-</span> kept for public use, whether in a saloon, bar-room, hotel or other <span style="float:right">liard or Bagatelle</span> public place, twenty-five dollars for each table. <span style="float:right">tables.</span>

*Sixth.*—Upon every keeper of any other table, stand, or place for <span style="float:right">Keepers of other</span> the performance of any game or play, and upon the keeper of any <span style="float:right">tables and games.</span> flying horses, or any other game or play (unless kept for exercise or amusement, not prohibited by law, and not kept for gain, directly or indirectly), twenty-five dollars in each county.

*Seventh.*—Upon every keeper of a ten-pin alley, or alley of like <span style="float:right">Ten-pin Alleys.</span> character, kept for public play, twenty-five dollars for each place of business.

*Eighth.*— Upon every traveling vendor of patent or proprietary <span style="float:right">Traveling Vendors of</span> medicines, special nostrums, jewelry, paper, soap, or other articles <span style="float:right">Medicines.</span> of like character, twenty-five dollars in each county where they may offer such articles for sale ; *Provided,* this shall not apply to <span style="float:right">Proviso.</span> maimed Confederate soldiers who are now, or may hereafter be, li- <span style="float:right">Confederate Soldiers.</span> censed by the Ordinaries of the various counties to peddle without license, in conformity with section 534 of the Code of Georgia of 1882.

*Ninth.*—Upon every person or firm soliciting policies of insur- <span style="float:right">Agents of Insurance</span> ance, or otherwise acting as agent of an insurance company, ten dol- <span style="float:right">Companies. Matri-</span> lars in each county in this State in which such firm, person or <span style="float:right">monial,</span> agent may solicit business ; and upon every person or firm soliciting <span style="float:right">Natal or Nuptial</span> business, or acting as agent for any matrimonial, natal or nup- <span style="float:right">Associations.</span> tial association or company, twenty-five dollars for each company in each county in the State in which such person, firm or agent may solicit business.

*Tenth.*—Upon each emigrant agent or employer or employee of <span style="float:right">Emigrant Agents.</span> such agent doing business in this State, the sum of five hundred dollars for each county in which such business is conducted.

*Eleventh.*—Upon every traveling vendor using boats for the pur- <span style="float:right">Vendors traveling in boats.</span> pose of selling goods on the rivers within the limits of this State, the sum of fifty dollars in each county where they may sell their

KR1010

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1902   Page 574 of 607

For Support of State Government 1885-86.

**Proviso, Confederate Soldiers.** wares, and said tax shall be a lien on the boat and its contents without regard to ownership thereof; *Provided,* this shall not apply to maimed Confederate soldiers, who are now, or may hereafter be, licensed by the Ordinaries of the various counties to peddle without license, in conformity with section 534 of the Code of Georgia of 1882.

**Lightning Rod dealers.** *Twelfth.*—Upon all itinerant lightning rod dealers, the sum of twenty-five dollars for each and every county in which they may operate.

**Agents for Pianos and Musical Instruments.** *Thirteenth.*—Upon every person or firm who, as agent for, resident or non-resident owners, holds or keeps for hire or sale any piano or pianos, or other musical instrument, the sum of twenty-five dollars for each county in which such person or firm does business.

**Shows and Exhibitions.** *Fourteenth.*—Upon all shows and exhibitions (except such as histrionic, musical, dramatical, operatic and elocutionary), including side shows accompanying circus companies, twenty five dollars in each and every city or town of five thousand inhabitants; twenty dollars in cities or towns of four thousand and under five thousand inhabitants, and fifteen dollars in city or town of less than four thousand inhabitants; said tax so collected shall be for educational purposes.

**Circus Companies.** *Fifteenth*—Upon every circus company, two hundred dollars each day it may exhibit in the State of Georgia; said tax shall be for educational purposes.

**Dealers in Liquors.** *Sixteenth.*—Upon all dealers in spirituous or malt liquors, intoxicating bitters, or brandy fruits, whether dealing in either or all thereof, the sum of fifty dollars for each place of business in each **Proviso.** county where the same are sold; *Provided,* this tax shall not relieve such dealers from any local tax or prohibitory law in reference to the retail of spirituous or intoxicating liquors, nor be required of those who sell by wholesale spirits manufactured of apples, peaches, grapes or other fruits grown on their own lands when sold in quantities not less than five gallons; *Provided,* that nothing in this Act **Proviso, excepting Domestic Wines.** shall be so construed as to levy a tax on domestic wines manufactured from grapes grown on their own lands; said tax shall be for educational purposes.

**Sewing Machine Agents.** *Seventeenth.*—Upon any person who, as agent of any sewing machine company, or as agent for any dealers in sewing machines, or as a peddler of sewing machines, shall sell sewing machines, ten dollars in each county where said person may do business as such agent or peddler for such sewing machine company, or dealers in sewing machines, for the purpose of selling single machines to consumers, and not for the purpose of selling to other dealers exclusively. The Tax Collector shall issue to such person as pays said **License.** tax a license, which the licensee shall keep conspicuously posted at **Proviso, Confederate Soldiers.** his place of business, or on his peddling vehicle; *Provided,* that the tax of ten dollars shall not apply to maimed Confederate soldiers who are now, or who may hereafter be, licensed by the Ordinaries of

KR1011

the various counties to peddle, in conformity with section 534 of the Code of 1882 ; *Provided further*, that such maimed soldier shall peddle such machines in his own right, and not as agent or employee of another.   This tax upon such agents shall operate as a lien upon any property of the person or firm (for whom the agent is doing business) to be found in this State.   Before such agent or peddler shall be authorized to sell sewing machines, as agent for any sewing machine company, or as agent for any dealers in sewing machines, he shall make record of the fact of his being such agent or peddler with the Ordinary of the county in which he proposes to do business. Upon failure to do so, or to post the license as herein required, he shall be liable to indictment for a misdemeanor, and on conviction shall be fined in a sum of not less than fifty dollars nor more than one hundred dollars, at the discretion of the court trying the same. One-half of such fine shall go to any person who shall report the violation of this law. <span style="float:right">Lien.</span> <span style="float:right">Record of Agency.</span> <span style="float:right">Penalty.</span>

*Eighteenth.*—And upon all dealers in pistols, toy pistols, revolvers, pistol or revolver cartridges, dirks or bowie knives, the sum of one hundred dollars for each place of business in each county where the same are sold. <span style="float:right">Dealers in Pistols, etc.</span>

*Nineteenth.*—Every individual or firm, or his or their agents, engaged in the business of selling or buying farm products for future delivery (commonly called "futures") shall pay a tax of five hundred dollars, each, per annum to the Tax Collector of the county where each business is carried on ; *Provided*, that this tax shall not be demanded of any cotton warehouseman, dealer in cotton, or any provision broker who takes orders in the regular course of their trade only for the actual and *bona fide* delivery of cotton and other produce so ordered, and where by the terms of the contract it is not left to the option of the party so ordering, or the party taking such order, to avoid the delivery of the produce or products by paying the difference in the market price of such produce or products at the time of delivery ; *Provided further*, that such cotton warehouseman, dealer in actual cotton, or any provision broker does not carry on the business of buying futures in connection with his or their other business. <span style="float:right">Dealers in Futures.</span> <span style="float:right">Proviso.</span> <span style="float:right">Proviso.</span>

*Twentieth.*—On each Iron Safe Company, selling or dealing in new iron safes by itself, or agent, and all dealers in iron safes, selling or dealing in new iron safes, and any individual or company making a regular business of dealing in or selling second-hand iron safes in this State, shall pay to the Tax Collector of each county in which they may do business, the sum of twenty-five dollars at the time of commencement of business for each fiscal year or fractional part thereof, and all safes belonging to such companies, dealers, their agents or others shall be liable to seizure and sale for payment of such loss. <span style="float:right">Dealers in Iron Safes.</span> <span style="float:right">Lien.</span>

*Twenty-first.*—Upon all itinerant traders and peddlers in buggies, wagons, carts, carriages or like vehicles, the sum of twenty-five dollars for each county in which they do business ; *Provided*, that <span style="float:right">Buggies, Wagons, etc.</span>

KR1012

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1904   Page 576 of 607

so much of paragraph 17 of this section as relates to obtaining and posting license, and the penalty for failure so to do, shall be applicable to the license required under this paragraph.

**Peddlers of Stoves, etc.**   *Twenty-second.*—Upon every peddler of stoves or ranges for cooking purposes, the sum of one hundred dollars in every county in which such peddler may do business. So much of paragraph ·17, **Licenses and Penalty.** section 2, as relates to obtaining, posting and recording license, and penalty for violating the law in the matter of peddlers of sewing machines, shall apply to peddlers of stoves and ranges, except the tax shall be $100.00 instead of $10.00.

**Hirers or sellers of Billiard tables, etc.**   *Twenty-third.*—Upon every person or firm, for himself, or agent for resident or non-resident owners, who holds or keeps for hire or sale any billiard, pool or other table of like character, the sum of fifty dollars for each county in which such person or firm does business.

**Return and payment of taxes.**   Sec. III. *Be it further enacted by the authority aforesaid.* That the taxes provided for in paragraphs 1, 2 and 3 of second section of this Act shall be returned to the Tax Receiver in the county of the residence of the person liable for such tax, and shall by the Receiver of Tax Returns be entered upon his digest of taxable property, and that the taxes provided for in paragraphs 4, 5, 6, 7, 8, 9, 10, 11, 12, **In counties where avocations are carried on.** 13, 14, 15, 16, 17, 18, 19, 20, 21, 22 and 23 of section second of this Act shall be returned and paid to the Tax Collectors of the counties where such vocations are carried on.

**Payment of certain taxes.**   Sec. IV. *Be it further enacted by the authority aforesaid,* That the taxes provided for in paragraphs 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22 and 23 of second section of this Act shall be paid in full for the fiscal years for which they are levied to the Tax Collectors of the counties where such vocations are carried on, as the time of commencing to do business specified in said paragraphs.

**Insurance companies.**   Sec. V. *Be it further enacted by the authority aforesaid,* That all foreign and home insurance companies doing business in this State shall pay one per cent. on all premiums in money or otherwise received by them, and in addition to the tax imposed by this Act upon the gross receipts of such insurance companies, all such companies doing brokerage business in this State, such as discounting notes, bills, drafts or exchange, lending money, or in any manner doing a business pertaining to banking or brokerage business, shall be taxed upon the capital so employed in the same manner and at the same rate as other moneyed capital in the hands of private individuals is taxed.

**Building and Loan and like Associations.**   Sec. VI. *Be it further enacted by the authority aforesaid,* That the presidents of all building and loan associations, and other associations of like character, shall be required to return to the Tax Receiver of the county where such associations are located, at its true market value, the stock of such associations owned by the stockholders thereof, upon which, as shown by the books of such associations, no advance has been made, or money borrowed thereon, by the individual stockholders therein, to be taxed as other moneyed capi-

KR1013

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1905   Page 577 of 607

For Support of State Government 1885-86.

tal in the hands of private individuals is taxed; *Provided,* that no Proviso. tax shall be required of real estate and building associations to be paid upon any portion of its capital which has been loaned or advanced to a shareholder upon real estate, upon which real estate tax is payable by said shareholder.

SEC. VII. *Be it further enacted by the authority aforesaid,* That the Manufacturing and presidents of all manufacturing and other incorporated companies other companies. (or their agents), other than railroad, insurance, telegraph, telephone, express, sleeping and palace car companies, shall be required to return all their property whatever of their respective companies, Returns. at its true market value, to the Tax Receiver of the county where the same is located, or where the principal business of each company is located, to be taxed for State and county purposes as other property in this State is taxed.

SEC. VIII. *Be it further enacted by the authority aforesaid,* That all ex- Express, press, telegraph, telephone and sleeping and palace car companies telephone, doing business in this State shall pay a tax of one per cent. of sleeping their gross receipts; and the superintendent or general agent of car companies. each express, telegraph, telephone and sleeping and palace car com- nies. pany doing business in this State shall make a quarterly return, Returns. under oath, as follows: on the last day of March, June, September and December in each year to the Comptroller-General, showing an account of their gross receipts during the quarter ending on that day, and said taxes herein levied upon such gross receipts, as shown by said quarterly returns, shall be paid by the respective companies to the Comptroller-General at the time of making said returns.

SEC. IX. *Be it further enacted,* That every sewing machine com- Sewing pany selling or dealing in sewing machines, by itself or its agents, companies. in this State, and all wholesale dealers in sewing machines, selling sewing machines manufactured by companies that have not paid the tax herein required to other wholesale or retail dealers, shall pay the sum of two hundred dollars for each fiscal year, or fractional part thereof, to the Comptroller-General at the time of commencement of business for each fiscal year or fractional part thereof, and all sewing machines belonging to such companies, dealers, or their agents, in possession of such companies, dealers, their agents or others, shall be liable to seizure and sale for the payment of such Lien. tax. This tax shall be for the whole State, and such companies, their general agents and wholesale dealers, shall not be liable for any Wholesale dealers for county tax or license fees by the counties for selling sewing ma- different chines therein. In cases where wholesale dealers sell sewing machines companies. manufactured by different companies, such dealers shall pay the tax above provided for separately for each company whose manufacture of machines may be sold by such dealers, unless each of said companies has itself paid such tax. Any person who shall violate the provisions of this section shall be liable to indictment for misdemeanor, Penalty. and on conviction shall be fined in a sum not more than two hundred and fifty dollars and not less than fifty dollars, in the discretion of the court trying the same, and one-half of such fine shall be paid to

KR1014

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1906   Page 578 of 607

any person who may report the violation of the provisions of this section.

**Banks and Banking Associations.** Sec. X. *Be it further enacted by the authority aforesaid,* That no tax shall be assessed upon the capital of banks or banking associations organized under the authority of this State or of the United States, and located within this State, but the shares of the stockholders of **Shares, how taxed.** such bank or banking association, whether resident or non-resident owners, shall be taxed in the county where such bank or banking associations are located, and not elsewhere, at their true and full market value, at the same rate provided in this Act for the taxation of moneyed capital in the hands of private individuals; *Provided,* **Proviso.** that nothing in this section contained shall be construed to relieve such bank or banking associations from the tax on property owned by them, as provided for in section 7 of this Act.

**Railroad companies.** Sec. XI. *Be it further enacted by the authority aforesaid,* That the presidents of all railroad companies doing business in this State **Returns** shall make returns to the Comptroller-General, as now provided by law, for the taxation of the property or gross receipts or net income of railroads, and shall pay to the Comptroller-General the tax to which such property or gross receipts or net income may be subject according to the provisions of this Act, and the laws now in force relating to the tax on railroads, and on failure to make returns or refusal to pay tax, said companies shall be liable to all the penalties now provided by law.

**Returns to Comptroller-General.** Sec. XII. *Be it further enacted by the authority aforesaid,* That the presidents or principal agents of all the incorporated companies herein mentioned, except such as are required to make returns to the Tax Receivers of the counties, shall make returns to the Comptroller-General under the rules and regulations provided by law for such returns and subject to the same penalties and modes of procedure for the enforcement of taxes from companies or persons required by law to make returns to the Comptroller-General.

**Oath in making returns.** Sec. XIII. *Be it further enacted by the authority aforesaid,* That the oath to be administered to all persons making returns of their taxable property shall be in the following words: "You do solemnly swear that you will true answers make to all lawful questions which I may put to you touching the return you are about to make, and that you will make a true return of all your cash or moneyed capital, and every other species of property, as your own or as agent for any other person or persons, at its true and full market value, on the first day of April preceding, to the best of your knowledge and belief, so help you God;" and it shall be the duty of the officer **Duty of receiver of returns.** receiving such returns to require of each and every person taking such oath touching all his taxable property, and the market value of the same, and to propound such questions as may be published by the Comptroller-General under the law, for the purpose of eliciting full and true returns of the taxable property of this State.

**Time for receiving returns.** Sec. XIV. *Be it further enacted by the authority aforesaid,* That the Comptroller-General is authorized and empowered to order the Tax

KR1015

Receivers of this State to commence receiving the returns of taxable property immediately after the first day of April of the year 1885 and 1886, and that the Comptroller-General is empowered and requested to cause the taxes to be collected and paid into the State Treasury by the 20th of December of each of said years 1885 and 1886. *Time for collection of taxes.*

Sec. XV. *Be it further enacted by the authority aforesaid,* That all laws and parts of laws in conflict with this Act be, and the same are hereby repealed.

Approved December 22, 1884.

---

## FOR NEW CAPITOL.

### No. 184.

An Act to provide means for the completion of the new Capitol by authorizing the levy and collection of a special tax therefor, and for other purposes.

Section I. *Be it enacted by the General Assembly of this State,* That the Governor be, and he is hereby authorized and empowered, by and with the assistance of the Comptroller-General, to assess and levy, in addition to the general State tax, an annual tax of one-half tenth of one per cent. on all the taxable property of this State, for the purpose of raising the funds necessary to complete the new Capitol now being erected. *Special tax for new Capitol. One-half tenth of one per cent.*

Sec. II. *Be it further enacted by the authority aforesaid,* That the tax authorized herein shall be specially levied and collected, and separate accounts shall be kept of the same, and the moneys arising therefrom shall be applied only to the completion of the Capitol building as aforesaid. So soon as the amount required to meet the expenditure yet to become due on the present contract, including the necessary expenses of carrying out the same to the State, shall have been raised, the tax herein authorized shall cease, and shall no longer be levied or collected; *Provided,* that this tax shall not be estimated by any county authorities in assessing the taxes for county purposes. *Specially levied and collected. Separate accounts to be kept. Application of moneys. When tax shall cease. Proviso.*

Sec. III. *Be it further enacted by the authority aforesaid,* That all laws and parts of laws in conflict with this Act be, and the same are hereby repealed.

Approved September 22, 1885.

KR1016

PART I.—TITLE II.—Taxes.

## RECORD OF TAX DEFAULTERS.

### No. 393.

An Act to require the Tax Collectors of the several counties of this State to record the names of all persons who have not paid their State and county taxes in their respective counties; to prescribe how such record shall be kept and how taxes collected from such persons shall be credited, and for other purposes.

*Record to be kept of tax defaulters.*

SECTION I. *Be it enacted by the General Assembly of the State of Georgia,* That from and after the passage of this Act, it shall be the duty of the Tax Collectors of the several counties of this State to record in a book kept for the purpose, in alphabetical order and by militia districts, the names of all persons who have not paid their taxes, placing opposite the name of such person the amount he is due for such tax, said record to be made in a well-bound book, to be furnished at the expense of the county, and the record so required to *Record to be filed.* be made shall be filed by the first day of July of each year with the court or Board of Commissioners having charge and control of the county affairs.

*Tax collected after record made, how applied.*

SEC. II. *Be it further enacted,* That when any tax shall be collected after said record is made, it shall be applied to oldest tax demand against said person paying the same.

*Pay of tax-collector.*

SEC. III. *Be it further enacted,* That for the service in making said record, the Tax Collector shall have the sum of five dollars for every hundred names so recorded on said book, to be paid out of *Failure to discharge the duty.* the county treasury, and for his failure to discharge the duties herein required of him, such Collector shall forfeit one-fourth of his commissions.

SEC. IV. *Be it further enacted,* That all laws and parts of laws in conflict with this Act be, and the same are hereby repealed.

Approved October 15, 1885.

---

## CORRECT RETURNS OF PROPERTY FOR TAXATION.

### No. 457.

An Act to provide for the correct returns of the property in this State for the purpose of taxation, and for other purposes.

*List of questions for tax payers.*

SECTION I. *Be it enacted by the General Assembly of the State of Georgia,* That for the purpose of having a full and correct return of the real and personal property in this State, it shall be the duty of the Receiver of Tax Returns to present a list to each tax-payer, which shall contain the following :

KR1017

Correct Returns of Property for Taxation.

How many acres of land, except wild lands, do you own, or of how many are you the holder, either as parent, husband, trustee, executor, administrator, or agent? Where is the same located by number, district and section? What is the value thereof?

How many city or town lots, with improvements thereon, and what is the value thereof?

How many shares in the bank of which you are president, and what is the value thereof?

How much capital have you in the bank of which you are president, as a sinking fund, or surplus fund, and not represented in the value of the shares?

How much property, real and personal, does the bank of which you are president own, not used in the banking business, and what is the value thereof?

How much money or capital has the building association, or the building and loan association, of which you are the president, in loans?

How much money on hand? How many notes, or other obligations for money, and the value thereof?

The value of merchandise of all kinds on hand?

The amount of capital invested in shipping and tonnage?

The amount of capital invested in stocks of companies, other than such companies as are required to be returned by the president, or their agents, either to the Tax Receiver or the Comptroller-General?

How much capital invested in bonds, except bonds of the United States and such bonds of this State as are by law exempt from taxation?

How much capital has the manufacturing company of which you are president, or agent, invested in the manufacture of woolen or cotton fabrics, and what is the value of your stock on hand, and what is your surplus fund?

How much capital have you invested in iron works, foundries and machine shops, including machinery?

How much capital have you invested in mining, and what is your surplus fund?

What is the value of your household furniture, including your tableware?

What is the value of your kitchen furniture?

What is the value of your office furniture?

How many pianos, organs and other musical instruments, and the value of the same?

What is the value of your library, paintings, pictures and statuary?

The value of your gold watches?

The value of your silver watches?

The value of your watches made from materials other than gold or silver?

KR1018

The value of gold and silverware ?

The value of diamonds and jewelry ?

The number of horses and the value thereof ?

The number of mules and asses, and the value thereof ?

The number of cattle, and the value thereof ?

The number of sheep, and the value thereof ?

The number of goats, and the value thereof ?

The number of hogs, and the value thereof ?

The number of wagons, carriages and buggies, and the value thereof ?

The value of agricultural tools, implements and machinery ?

The value of cotton, corn and other farm products on hand and for sale?

The value of guns, pistols, bowie-knives and such articles ?

The value of sewing machines ?

The value of all other personal property not herein mentioned ?

**Personal property includes what.**    SEC. II. *Be it further enacted,* That personal property shall be construed, for purposes of taxation, to include all goods, chattels, moneys, credits and effects, whatsoever they may be, all ships, boats and vessels belonging to the inhabitants of this State, whether at home or abroad, and all capital invested therein; all money within or without the State due the person to be taxed; all stocks and securities, whether in corporations within this Sate or in other States, owned by citizens of this State, unless exempt by the laws of the United States or of this State.

**Oath of tax payer.**    SEC. III. *Be it further enacted,* That the oath to be attached to the lists provided for in this Act shall be as follows: "I do solemnly swear that I have carefully read (or have heard read) and have duly considered the questions propounded in the foregoing tax list, and that the value placed by me on the property returned, as shown by said list, is at the true market value thereof; and I further swear that I returned, for the purposes of being taxed thereon, every species of property that I own in my own right, or have control of, either as agent, executor, administrator or otherwise; and that, in making said return for the purpose of being taxed thereon, I have not attempted, either by transferring my property to another or by any other means sought to evade the laws governing taxation in this State. I do further swear that, in making said return, I have done so by estimating the true worth and value of every species of property contained therein." **Signature and attestation of oath.** Which oath shall be subscribed by the persons making the return, and the administration and taking of the oath shall be attested by the Receiver of Tax Returns.

**Comptroller-General to furnish lists.**    SEC. IV. *Be it further enacted,* That it shall be the duty of the Comptroller-General to have the lists provided for in this Act printed, with the oath required by preceding sections attached thereto, and at the time of forwarding the digests to the Receivers of Tax Returns, as now required by law, he shall forward to each Receiver of Tax Returns a sufficient number of such lists to enable

KR1019

*Correct Returns of Property for Taxation.*

them to take the returns of the tax-payers of their respective counties.

Sec. V. *Be it further enacted,* That all laws and parts of laws in conflict with this Act be, and the same are hereby repealed.

Approved October 20, 1885.

KR1020

# EXHIBIT 34

KR1021

General Tax Act for 1887 and 1888.

# TITLE II.

## TAXES.

### ACTS.

General Tax Act for 1887 and 1888.
Tax for new capitol.
Providing for correct tax returns.

### GENERAL TAX ACT FOR 1887 AND 1888.

An Act to levy and collect a tax for the support of the State government and the public institutions; to pay the interest of the public debt, and for educational and other purposes herein mentioned, for each of the fiscal years eighteen hundred and eighty-seven and eighteen hundred and eighty-eight, and to prescribe what persons, professions and property are liable to taxation; to prescribe the method of collecting said taxes, and to provide penalties and forfeitures for non-payment of taxes, and for other purposes.

General *ad valorem* tax

SECTION I. *Be it enacted by the General Assembly of the State of Georgia*, That the Governor be authorized and empowered, with the assistance of the Comptroller-General, to assess and levy a tax on the taxable property of this State of two and sixty hundredths of a mill for each of the fiscal years eighteen hundred and eighty-seven and eighteen hundred and eighty-eight.

Specific taxes.

SEC. II. *Be it further enacted by the authority aforesaid*, That in addition to the *ad valorem* tax on real and personal property, as required by the Constitution and provided for in the preceding section, the following specific taxes shall be levied and collected for each of said fiscal years eighteen hundred and eighty-seven and eighteen hundred and eighty-eight:

Poll tax.

First—Upon each and every male inhabitant of the State, on the first day of April, between the ages of twenty-one and sixty years, a poll tax of one dollar for each of said years 1887 and

KR1022

PART I.—TITLE II.—Taxes. 15

General Tax Act for 1887 and 1888.

1888, which tax shall be for educational purposes: *Provided,* Exemptions. this tax shall not be demanded of blind persons, nor of crippled, maimed or disabled Confederate soldiers relieved of such tax under and by authority of an Act approved July 23d, 1883.

Second—Upon every practitioner of law, medicine or dentistry, Lawyers, dentists, presidents of each of the banks in the State, each agent or firm doctors and officers negotiating loans and charging therefor, the presidents of each of various companies of the railroad companies, presidents of each of the express, telegraph, telephone, electric light and gas companies doing business in this State, and in case the president of any such companies do not reside in this State, then in such case upon the superintendent or general agent of such companies who may reside in this State, ten dollars, and no municipal corporation or county authorities shall levy any additional tax on said professions either as license fee or otherwise.

Third—Upon every daguerrean, ambrotype, photographic and Daguerrean and other artists. similar artist, ten dollars.

Fourth—Upon every person carrying on the business of auc- Auctioneers. tioneer, for pay or compensation, twenty-five dollars for each county in which they may carry on such business.

Fifth—Upon every keeper of a pool, billiard or bagatelle table Keepers of pool and kept for public use, whether in a saloon, bar-room, hotel or other other tables. public place, twenty-five dollars for each table.

Sixth—Upon every keeper of any other table, stand or place Gaming tables, for the performance of any game or play, and upon the keeper stands, etc of any flying horses, or any other game or play (unless kept for exercise or amusement, not prohibited by law, and not kept for gain, directly or indirectly), twenty-five dollars in each county.

Seventh—Upon every keeper of a ten-pin alley, or alley of Ten-pin alleys. like character, kept for public play, and upon every keeper of a Shooting gallery. shooting gallery, twenty-five dollars for each place of business.

Eighth—Upon every traveling vendor of patent or proprietary Traveling vendors. medicines, special nostrums, jewelry, paper, soap or other articles of like character, twenty-five dollars in each county where they may offer such articles for sale.

Ninth—Upon every insurance agent (whether person or firm) Insurance agents. doing business in this State, ten dollars, and upon every agent of a matrimonial, natal or nuptial company doing business in this State, fifty dollars, which said agents must pay for each county in which he or they shall solicit business for any of their companies. Said tax shall be paid by said agents to the Comptroller-General and shall be in addition to the license fee required of insurance companies by the Act approved March 19, 1869. The receipt of the Comptroller-General for the payment of this tax, together with his certificate as provided by said Act approved

KR1023

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1915   Page 587 of 607

March 19, 1869, shall constitute the license for said agents to transact business for their companies in each of the counties designated by said certificates.

**Emigrant agents and their employers.** Tenth—Upon each emigrant agent, or employer or employee of such agent doing business in this State, the sum of five hundred dollars for each county in which such business is conducted.

**Vendors in boats.** Eleventh—Upon every traveling vendor using boats for the purpose of selling goods on the rivers or waters within the limits of this State, the sum of fifty dollars in each county where they may sell their wares, and said tax shall be a lien on the boat and its ownership without regard to the ownership thereof.

**Itinerant lightning-rod dealers.** Twelfth—Upon all itinerant lightning-rod dealers or agents, the sum of twenty-five dollars for each and every county in which they may operate.

**Agents for musical instruments.** Thirteenth—Upon every person or firm who, as agent for resident or non-resident owners, holds or keeps for hire or sale any piano or pianos, or other musical instrument, twenty-five dollars for each county in which such person or firm does business.

**Shows and exhibitions.** Fourteenth—Upon all shows and exhibitions (except such as histrionic, musical, dramatic, operatic and elocutionary), including side-shows accompanying circus companies, twenty-five dollars in each and every city or town of five thousand inhabitants; twenty dollars in cities or towns of four thousand and under five thousand inhabitants, and fifteen dollars in cities or towns of less than four thousand inhabitants; said tax, so collected, shall be for educational purposes.

**Circus companies.** Fifteenth—Upon every circus company, two hundred dollars each day it may exhibit in the State of Georgia; said tax shall be for educational purposes.

**Liquor dealers.** Sixteenth—Upon all dealers in spirituous or malt liquors, intoxicating bitters or brandy fruits, or domestic wines, whether dealing in either or all thereof, fifty dollars for each place of business in each county where the same are sold: *Provided*, this tax **Proviso.** shall not relieve such dealers from any local tax or prohibitory law in reference to the retail of spirituous or intoxicating liquors, nor be required of those who sell by wholesale spirits manufactured of apples, peaches, grapes, blackberries or other fruits grown on their own lands, when sold in quantities not less than five gallons: *Provided*, that nothing in this Act shall be so construed as to levy a tax on dealers in domestic wines manufactured from grapes grown on their own lands; said tax shall be for educational purposes.

**Sewing machine companies.** Seventeenth—Upon every sewing machine company selling or dealing in sewing machines, by itself or its agents, in this State, and upon all wholesale dealers in sewing machines selling sewing

KR1024

General Tax Act for 1887 and 1888.

machines manufactured by companies that have not paid the tax Wholesale dealers. herein required, two hundred dollars for each fiscal year or fractional part thereof, to be paid to the Comptroller-General at the time of commencement of business, and in addition to the above amount, said companies or wholesale dealers shall furnish the Comptroller-General a list of all agents authorized to sell machines, List of agents. and shall pay to said Comptroller-General the sum of ten dollars Agents' tax. for each of their agents, in each county, for each fiscal year or fractional part thereof, and upon the payment of said sum, the Comptroller-General shall issue to each of said agents a certificate of authority to transact business in this State; and all sewing machines belonging to such companies, dealers or their agents, in possession of such companies, dealers, their agents or others, shall be liable to seizure and sale for the payment of such license fees and tax. This tax shall be for the whole State, and such companies, their agents and wholesale dealers, shall not be liable for any county tax or license fees by the counties for selling sewing machines therein; and said agents shall be required to register their names with the Ordinary and exhibit their license from Registry of sewing machine agents. the Comptroller-General at the time of registering, and thereafter keep the same posted on their wagons or vehicles, or at their places of business. When a company or wholesale dealer transfers an agent from one county to another, said company or dealers shall notify the Comptroller-General in advance of said transfer. In cases where wholesale dealers sell sewing machines man- Dealers for several companies. ufactured by different companies, such dealers shall pay the license fees and tax above provided for separately for each company whose manufacture of machines may be sold by such dealers, unless each of said companies has itself paid such license fees and tax. Any person who shall violate the provisions of this Penalty. section shall be liable to indictment for misdemeanor, and on conviction shall be fined not more than five hundred dollars and not less than one hundred dollars, in the discretion of the court trying the same. If said fine is not paid within the time prescribed by the court, such person so fined shall be imprisoned as prescribed in section 4310 of the Code.

Eighteenth—Upon all dealers in pistols, toy pistols, revolvers, Dealers in arms. pistol or revolver cartridges, dirks or bowie knives, one hundred dollars for each place of business in each county where the same are sold.

Nineteenth—Upon every individual or firm, or his or their Dealers in futures. agents, engaged in the business of selling or buying farm products for future delivery (commonly called "futures"), five hundred dollars each per annum for the county where each business is carried on: *Provided*, that this tax shall not be demanded of any cotton ware- Proviso.

2

18 PART I.—TITLE II.—Taxes.

houseman, dealer in cotton or any provision broker who takes orders in the regular course of their trade only for the actual and *bona fide* delivery of cotton and other produce so ordered, and where, by the terms of the contract, it is not left to the option of the party so ordering, or the party taking such order, to avoid the delivery of the produce or products by paying the difference in the market price of such produce or products at the time of delivery: *Provided further*, that such cotton warehouseman, dealer in actual cotton or any provision broker does not carry on the business of buying futures in connection with his or their other business.

**Iron safe companies**

**Dealers.**

Twentieth—Upon each iron safe company selling or dealing in new iron safes by itself or agent, and upon all dealers in iron safes selling or dealing in new iron safes, and upon any individual or company making a regular business of dealing in or selling second-hand iron safes in this State, twenty-five dollars for each county in which they may do business at the time of the commencement of their business for each fiscal year or fractional part thereof, and all safes belonging to such companies, dealers, their agents or others shall be liable to seizure and sale for payment of such tax. Before such agent or dealer shall be authorized to sell iron safes, as agent for any iron safe company, or as agent

**Records.**

for any dealers in iron safes, he shall make record of the fact of his being such agent or dealer with the Ordinary of the county in which he proposes to do business; and it shall be the duty of said Ordinary to immediately notify the Comptroller-General, and upon failure to register with the Ordinary, as herein required,

**Penalty.**

he shall be liable to indictment for a misdemeanor, and on conviction shall be fined not less than fifty dollars nor more than one hundred dollars, at the discretion of the court trying the same, or be imprisoned, as prescribed in section 4310 of the Code.

**Peddlers of vehicles.**

Twenty-first—Upon all itinerant traders and peddlers in buggies, wagons, carts, carriages or like vehicles, twenty-five dollars for each county in which they do business. So much of paragraph 20, section 2, as requires agents or dealers in iron safes to record their agency with the Ordinaries of counties and provides penalties for failing to do so shall apply to the itinerant traders and peddlers named in this paragraph, and it shall be the duty of all Ordinaries to immediately notify the Comptroller-General when such agencies are recorded.

**Peddlers of stoves, etc.**

Twenty-second—Upon every peddler of stoves or ranges for cooking purposes, the sum of one hundred dollars in every county in which such peddler may do business. So much of paragraph 20, section 2, as requires agents or dealers in iron safes

KR1026

General Tax Act for 1887 and 1888.

to record their agency with the Ordinaries of counties and provides penalties for failing to do so shall apply to peddlers of stoves and cooking ranges, and it shall be the duty of all Ordinaries to immediately notify the Comptroller-General when such agencies are recorded.

Twenty-third—Upon every person or firm, for himself or agent for resident or non-resident owners, who holds or keeps for hire or sale any billiard, pool or other table of like character, fifty dollars for each county in which such person or firm does business. *Dealers in billiard and like tables.*

Twenty-fourth—*Be it further enacted by the authority aforesaid*, That blind persons and Confederate soldiers relieved by the proviso in paragraph first of this section from the payment of the tax designated in that paragraph shall be relieved also from the payment of the taxes designated in paragraphs 6, 7, 8 and 11 of this section if carrying on and dependent upon the kinds of business designated therein: *Provided*, that before any person shall be entitled to the benefit of any of the exemptions provided for in this paragraph, he shall go before the Ordinary of the county in which he proposes to carry on business and make and file an affidavit setting forth the facts that he is entitled to such exemption, and that he is the proprietor of the business he proposes to conduct and is conducting the same for himself and not for another. *Relief of blind persons and Confederate soldiers.* *Proviso.*

Twenty-fifth—Upon every traveling agent of any nurseryman vending trees or shrubbery in this State, the sum of twenty-five dollars in each county in which said agent may canvass. *Agents of nurseries, etc.*

SEC. III. *Be it further enacted by the authority aforesaid*, That the taxes provided for in paragraphs 1, 2 and 3 of second section of this Act shall be returned to the Tax Receiver in the county of the residence of the person liable for such tax, and shall, by the receiver of tax returns, be entered upon his digest of taxable property, and that the taxes provided for in paragraphs 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21, 22 and 23 of section second of this Act shall be returned and paid to the Tax Collectors of the counties where such vocations are carried on. *Returns of taxes in par.1,2 and 3, sec. 2nd.* *Of other taxes.*

SEC. IV. *Be it further enacted by the authority aforesaid*, That the taxes provided for in paragraphs 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21, 22 and 23 of second section of this Act shall be paid in full for the fiscal years for which they are levied to the Tax Collectors of the counties where such vocations are carried on at the time of commencing to do the business specified in said paragraphs. *Payment of certain taxes.*

KR1027

General Tax Act for 1887 and 1888.

**Insurance companies**

SEC. V. *Be it further enacted by the authority aforesaid*, That all foreign and home insurance companies doing business in this State shall pay one per centum on all premiums in money or otherwise received by them: *Provided*, this shall not include return premiums on canceled policies, and in addition to the tax imposed by this Act upon the gross receipts of such insurance companies, all such companies doing brokerage business in this State, such as discounting notes, bills, drafts or exchange, lending money or in any manner doing a business pertaining to banking or brokerage business, shall be taxed upon the capital so employed in the same manner and at the same rate as other moneyed capital in the hands of private individuals is taxed.

**Building and loan associations.**

**Returns.**

SEC. VI. *Be it further enacted by the authority aforesaid*, That the presidents of all building and loan associations, and other associations of like character, shall be required to return to the Tax Receiver of the county where such associations are located, at its true market value, the stock of such associations owned by the stockholders thereof, upon which, as shown by the books of such associations, no advance has been made, or money borrowed thereon, by the individual stockholders therein, to be taxed as other moneyed capital in the hands of private individuals is taxed:

**Proviso.**

*Provided*, that no tax shall be required of real estate and building associations, to be paid upon any portion of their capital which has been loaned or advanced to a shareholder upon real estate, upon which real estate tax is payable by said shareholder.

**Returns of corporations generally.**

SEC. VII. *Be it further enacted by the authority aforesaid*, That the presidents of all manufacturing and other incorporated companies (or their agents), other than railroad, insurance, telegraph, telephone, electric light, express, sleeping and palace car companies, shall be required to return all their property whatever of their respective companies at its true market value to the Tax Receiver of the county where the same is located, or where the principal business of each company is located, to be taxed for State and county purposes as other property in this State is taxed.

**Tax on express, telegraph and electric light companies.**

SEC. VIII. *Be it further enacted*, That all persons or companies, including railroad companies, doing an express, telegraph or electric light business and charging the public therefor in this State, shall pay a tax of one and one-half per cent. on their gross receipts, and all persons, or the superintendent or general agent of each telegraph, express or electric light company, or the president of each railroad company doing such business in

**Returns.**

this State, shall make a quarterly return under oath as follows: on the last day of March, June, September and December in each year to the Comptroller-General, showing a full account of their

KR1028

gross receipts during the quarter ending on such date, and said taxes herein levied upon such gross receipts, as shown by said quarterly returns, shall be paid by the respective persons or companies to the Comptroller-General at the time of making such returns; the gross receipts herein named shall be construed to mean the full amount of all money received within this State. If any person, superintendent, agent or president, as the case may be, whose duty it is to make returns under this paragraph, shall fail so to do within thirty days after the time herein required, such person, superintendent, agent or president shall be liable to indictment, and upon conviction shall be punished as prescribed in section 4310 of the Code of 1882. *Penalty for failure.*

*Second*—That each telephone company shall pay a tax for each of the years 1887 and 1888 of one dollar for each telephone station or box with instruments complete rented or used by their subscribers, and the superintendent or general manager of the company shall make returns under oath and payments to the Comptroller-General on the dates named in the first paragraph of this section. *Telephone companies. Returns.*

*Third*—That each company doing business in this State as a sleeping or palace car company only shall pay a tax of two thousand dollars per year for each of the years 1887 and 1888, which tax shall be payable in quarterly installments to the Comptroller-General on the dates named in the first paragraph of this section. *Sleeping or palace car companies.*

SEC. IX. *Be it further enacted by the authority aforesaid,* That no tax shall be assessed upon the capital of banks or banking associations, organized under the authority of this State, or of the United States, and located within this State, but the shares of the stockholders of such bank or banking associations, whether resident or non-resident owners, shall be taxed in the county where such bank or banking associations are located, and not elsewhere, at their true and full market value, at the same rate provided in this Act for the taxation of moneyed capital in the hands of private individuals: *Provided,* that nothing in this section contained shall be construed to relieve such banks or banking associations from the tax on property owned by them, as provided for in section VII of this Act. *Bank stock. Where taxed. Proviso.*

SEC. X. *Be it further enacted by the authority aforesaid,* That the presidents of all railroad companies doing business in this State shall make returns to the Comptroller-General, as now provided by law; for the taxation of the property or gross receipts or net income of railroads, and shall pay to the Comptroller-General the tax to which such property or gross receipts or net income may be subject, according to the provisions of this Act *Returns for railroad companies. Payment of their taxes.*

KR1029

General Tax Act for 1887 and 1888.

and the laws now in force relating to the tax on railroads, and on failure to make returns or refusal to pay tax, said companies shall be liable to all the penalties now provided by law.

**Returns of corporations.** SEC. XI. *Be it further enacted by the authority aforesaid*, That the presidents or principal agents of all the incorporated companies herein mentioned, except such as are required to make returns to the Tax Receivers of the counties, shall make returns to the Comptroller-General, under the rules and regulations provided by law for such returns and subject to the same penalties and modes of procedure for the enforcement of taxes, from companies or persons required by law to make returns to the Comptroller-General.

**Oath for tax returns.** SEC. XII. *Be it further enacted by the authority aforesaid*, That the oath to be administered to all persons making returns of their taxable property shall be the oath required under the Act of October 20th, 1885, to be attached to the printed lists furnished under said Act and presented to each tax-payer: *Provided*, that **Proviso.** non-residents, females and sick persons may subscribe to the oath herein required before any person authorized by law to administer oaths, and cause same to be delivered to the Tax Receiver.

**When returns are to be received.** SEC. XIII. *Be it further enacted by the authority aforesaid*, That the Comptroller-General is authorized and empowered to order the Tax Receivers of this State to commence receiving the returns of taxable property immediately after the first day of April of the years 1887 and 1888, and that the Comptroller-General is empowered and required to cause the taxes to be collected and **Time of payment.** paid into the State treasury by the 20th of December of each of said years 1887 and 1888.

SEC. XIV. *Be it further enacted by the authority aforesaid*, That all laws and parts of laws in conflict with this Act be, and the same are hereby repealed.

Approved December 22d, 1886.

KR1030

# EXHIBIT 35

KR1031

# TITLE II.

## TAXES.

### ACTS.

General Tax Act for 1889 and 1890.
Providing for finishing payments on New Capitol.
Providing for furnishing New Capitol.
Creating Sinking Fund to retire maturing Bonds.

### GENERAL TAX ACT FOR 1889 AND 1890.

### No. 123.

An Act to levy and collect a tax for the support of the State government and the public institutions; for educational purposes in instructing children in the elementary branches of an English education only; to pay the interest of the public debt, and to pay maimed Confederate soldiers such amounts as are allowed them by law, for each of the fiscal years eighteen hundred and eighty-nine and eighteen hundred and ninety, and to prescribe what persons, professions and property are liable to taxation; to describe the method of receiving and collecting said taxes; to prescribe the method of ascertaining the property of this State subject to taxation; prescribe additional questions to be propounded to tax payers, and to provide penalties and forfeitures for non-payment of taxes, and for other purposes.

SECTION I. *Be it enacted by the General Assembly of the State of Georgia,* That the Governor be authorized and empowered, with the assistance of the Comptroller-General to assess and levy a tax on the taxable property of this State of two and seven-tenths mills per centum for the fiscal year eighteen hundred and eighty-nine, and two and four-tenths mills per centum for the fiscal year eighteen hundred and ninety. And the Governor be, and is hereby, authorized and empowered by and with the assistance of the Comp-

General ad valorem tax.

KR1032

20                    PART I —TITLE II.—Taxes

General Tax Act for 1889 and 1890.

Special educational tax.

troller-General to assess and levy, in addition to the foregoing general State tax, a tax of one-half of a mill for the year eighteen hundred and eighty-nine, and a tax of one mill for the year eighteen hundred and ninety, on all of the taxable property of this State for the purpose of raising the funds necessary to meet the appropriations by this General Assembly for educational purposes in instructing children in the elementary branches of an English education only.

Specific taxes.

SEC. II. *Be it further enacted by the authority aforesaid,* That in addition to the *ad valorem* tax on real and personal property, as required by the Constitution, and provided for in the preceding section. the following specific taxes shall be levied and collected for each of the said fiscal years, eighteen hundred and eighty-nine and eighteen hundred and ninety.

Poll tax.

First—Upon each and every male inhabitant of the State, between the ages of twenty-one and sixty years, on the first day of April, a poll tax of one dollar for each of the said years, 1889 and 1890, which tax shall be for educational purposes in instructing children in the elementary branches of an English education only ; *Provided,* this tax shall not be demanded of blind persons, nor of crippled, maimed or disabled confederate soldiers, relieved of such tax under and by authority of an Act approved July 23, 1883.

Exemptions.

Lawyers, doctors, dentists and officers of various companies.

Second—Upon every practitioner of law, medicine or dentistry, presidents of each of the banks in the State, each agent or firm negotiating loans, and charging therefor, the presidents of each of the railroad companies, presidents of each of the express, telegraph, telephone, electric light and gas companies, doing business in this State, and in case the presidents of any such companies do not reside in this State, then in such case, upon the superintendent or general agent of such companies who may reside in this State, ten dollars and no muncipal corporation or county authorities shall levy any additional tax on said professions either as license fee or otherwise.

Photographic and other artists.

Third—Upon every daguerrean, ambrotype, photographic, and similar artist, ten dollars in each county in which they may carry on business.

Keepers of billiard and other tables.

Fourth—Upon every person carrying on the business of auctioneer, for pay or compensation, twenty-five dollars for each county in which they may carry on such business.

Gaming tables, etc.

Fifth—Upon every keeper of a pool, billiard or bagatelle table kept for public use, whether in a saloon, bar-room, hotel or other public place, twenty-five dollars for each table.

Sixth—Upon every keeper of any other table, stand or place for the performance of any game or play, and upon the keeper of

KR1033

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1925   Page 597 of 607

any flying horses, or any other game or play, (unless kept for exercise or amusement not prohibited by law), and not kept for gain, directly or indirectly, twenty-five dollars in each county.

Seventh—Upon every keeper of a ten pin alley, or alley of like character, kept for public play, and upon every keeper of a shooting gallery, twenty-five dollars for each place of business. **Ten-pin alleys and shooting galleries.**

Eighth—Upon every traveling vendor of patent or proprietary medicines, special nostrums, jewelry, paper, soap, or other articles of like character, twenty-five dollars in each county where they may offer such articles for sale. **Traveling vendors.**

Ninth—Upon every local insurance agent doing business in this State, ten dollars for each county in which they shall solicit business, and upon every agent of a matrimonial, natal or nuptial company, or traveling, special or general agent, of life, fire, accident, or other insurance company doing business in this State, fifty dollars, which said agents must pay before he or they shall be authorized to act as an agent for any of their companies. Said tax shall be paid by said agents to the Comptroller-General, and shall be in addition to the license fee required of insurance companies by the Act approved October 24, 1887. The receipt of the Comptroller-General for the payment of this tax, together with his certificate, as provided by said Act, approved October 24, 1887, shall constitute the license for said agents to transact business for their companies, as designated by said certificates: *Provided*, this tax shall not be required of agents of assessment, life insurance companies, or mutual aid societies. **Insurance agents.**

Tenth.—Upon each emigrant agent, or employer or employé of such agent doing business in this State, the sum of five hundred dollars for each county in which such business is conducted. **Emigrant agents, etc.**

Eleventh —Upon every traveling vendor using boats for the purpose of selling goods on the rivers or waters within the limits of this State, the sum of fifty dollars in each county where they may sell their wares, and said tax shall be a lien on the boat and its contents without regard to the ownership thereof. **Vendors in boats.**

Twelfth.—Upon all itinerant lightning rod dealers or agents, the sum of twenty-five dollars for each and every county in which they may operate. **Itinerant lightning-rod dealers.**

Thirteenth.—Upon all shows and exhibitions (except such as histrionic, musical, operatic and elocutionary) including side shows accompanying circus companies, twenty-five dollars in each and every city or town of five thousand inhabitants, twenty dollars in cities or towns of four thousand and under five thousand inhabitants, and fifteen dollars in cities or towns of less than four thousand inhabitants. Said tax, so collected, shall be for educational purposes. **Shows and exhibitions**

KR1034

22  PART I.—TITLE II.—Taxes.

General Tax Act for 1889 and 1890.

**Circus companies.** Fourteenth—Upon every circus company, two hundred dollars each day it may exhibit in the State of Georgia; said tax shall be for educational purposes.

**Liquor dealers.** Fifteenth—Upon all dealers in spirituous or malt liquors, intoxicating bitters or brandy fruits or domestic wines, whether dealing in either or all thereof, fifty dollars for each place of business in each county where the same are sold: *Provided*, this tax shall not relieve such dealers from any local tax or prohibitory law in reference to the retail of spirituous or intoxicating liquors, nor be **Proviso.** required of those who sell by wholesale spirits manufactured of apples, peaches, grapes, blackberries or other fruits grown on their own lands, when sold in quantities not less than five gallons: *Provided*, that nothing in this Act shall be so construed as to levy **Domestic wines exempt.** a tax on dealers in domestic wines manufactured from grapes or berries purchased by or grown on lands owned, leased or rented by said dealer. Said tax shall be for educational purposes.

**Sewing machine peddlers.** Sixteenth—Upon every peddler or traveling agent selling or offering to sell sewing machines, the sum of twenty five dollars for each county in which they do business.

**Dealers in arms.** Seventeenth—Upon all dealers in pistols, toy pistols shooting with metallic caps, or cartridges, dirks or bowie knives, twenty-five dollars for each place of business in each county where the same are sold.

**Dealers in futures.** Eighteenth—Upon every individual or firm, or his or their agents, engaged in the business of selling or buying farm products, sugar, coffee and salt and meat for future delivery (commonly called "futures"), five hundred dollars each per annum for the county where such business is carried on: *Provided*, that this tax shall not be demanded of any cotton warehouseman, dealer in **Proviso.** cotton, or any provision broker, who takes orders in the regular course of their trade only for the actual and *bona fide* delivery of cotton and other produce so ordered, and where, by the terms of the contract, it is not left to the option of the party so ordering, or the party taking such order, to avoid the delivery of the pro- **Additional proviso.** duce or products by paying the difference in the market price of such produce or products at the time of delivery: *Provided further*, that such cotton warehouseman, dealer in actual cotton or any provision broker does not carry on the business of buying futures in connection with his or their other business.

**Stove or clock peddlers.** Nineteenth—Upon every peddler of stoves or ranges for cooking purposes, or clocks, the sum of one hundred dollars in every county in which such peddler may do business.

**Billiard and pool tables.** Twentieth—Upon every person or firm, for himself or agent for resident or non resident owners, who holds or keeps for hire or sale any billiard, pool or other table of like character, fifty dollars for each county in which such person or firm does business.

KR1035

PART I—TITLE II.—Taxes.   23

General Tax Act for 1889 and 1890.

Twenty-first—*Be it further enacted by the authority aforesaid,* That blind persons and Confederate soldiers relieved by the proviso in paragraph first of this section, from the payment of the tax designated in that paragraph shall be relieved, also, from the payment of the taxes designated in paragraphs 6, 7, 8 and 11, of this section, if carrying on and dependent upon the kinds of business designated therein: *Provided,* that before any person shall be entitled to the benefit of any of the exemptions provided for in this paragraph, he shall go before the Ordinary of the county in which he proposes to carry on business, and make and file an affidavit, setting forth the facts that he is entitled to such exemption, and that he is the proprietor of the business he proposes to conduct, and is conducting the same for himself and not for another. <sup>Relief of blind persons and Confederate soldiers.</sup> <sup>Proviso.</sup>

Sec. III. *Be it further enacted by the authority aforesaid,* That the taxes provided for in paragraphs 1 and 2, of section 2, of this Act, shall be returned to the Tax Receiver in the county of the residence of the person liable to such tax, and shall, by the Receiver of Tax Returns, be entered upon his digest of taxable property, and that the taxes provided for in paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 17, 18, 19 and 20, of section 2, of this Act, shall be returned and paid to the Tax Collectors of the counties where such vocations are carried on. <sup>Return, entry, etc., of certain taxes.</sup>

Sec. IV. *Be it further enacted by the authority aforesaid,* That the taxes provided for in paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20, of section 2, of this Act, shall be paid in full for the fiscal years for which they are levied to the Tax Collectors of the counties where such vocations are carried on at the time of commencing to do the business specified in said paragraphs.   Before any person taxed by paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 17, 18, 19 and 20, of section 2, of this Act, shall be authorized to carry on said business, they shall go before the Ordinary of the county in which they propose to do business and register their names, place of business, and at the same time pay their taxes to the Tax Collector; and it shall be the duty of said Ordinary to immediately notify the Comptroller-General and the Tax Collector.   Any person failing to register with the Ordinary, as herein required, shall be liable to indictment for a misdemeanor, and on conviction, shall be fined not less than fifty dollars, nor more than two hundred dollars, at the discretion of the court trying the same, or be imprisoned as prescribed by section 4310 of the Code. <sup>Payment of certain taxes.</sup> <sup>Registry with Ordinary.</sup> <sup>Fine for failure to register.</sup>

Sec. V. *Be it further enacted by the authority aforesaid,* That all foreign and home insurance companies doing business in this State shall pay one per cent. on all premiums in money or otherwise received by them: *Provided,* this shall not include return pre- <sup>Insurance companies.</sup> <sup>Proviso.</sup>

KR1036

PART I.—TITLE II.—TAXES.

General Tax Act for 1879 and 1880.

miums on cancelled policies; and in addition to the tax imposed by this Act upon the gross receipts of such insurance companies, all such companies doing brokerage business in this State, such as discounting notes, bills, drafts or exchange, lending money, or in any manner doing a business pertaining to banking or brokerage business, shall be taxed upon the capital so employed in the same manner and at the same rate as other moneyed capital in the hands of private individuals is taxed.

**Building and Loan Associations.** SEC. VI. *Be it further enacted by the authority aforesaid.* That the presidents of all building and loan associations, and other associations of like character, shall be required to return to the Tax Receiver of the county where such associations are located, at its true market value, the stock of such associations owned by the stockholders thereof, (upon which, as shown by the books of such associations, no advance has been made, or money borrowed thereon, by the individual stockholders therein) to be taxed as other moneyed capital in the hands of private individuals is taxed:

**Proviso.** *Provided,* That no tax shall be required of real estate and building associations, to be paid upon any portion of their capital which has been loaned or advanced to a shareholder upon real estate, upon which real estate tax is payable by said shareholder.

**Returns of corporations, generally.** SEC. VII. *Be it further enacted by the authority aforesaid,* That the Presidents of all manufacturing and other incorporated companies (or their agents) other than railroad, insurance, telegraph, telephone, express, sleeping and palace car companies, shall be required to return all their property whatever of their respective companies at its true market value to the Tax Receiver of the county where the same is located, or where the principal business of each company is located, to be taxed for State and county purposes as other property in this State is taxed.

**President must answer under oath.** The President of every manufacturing company shall be required to answer under oath, in addition to those now provided by law, the following questions:

**Questions specified.** First—What is the value of raw material on hand April 1st?

Second—What is the value of manufactured goods or articles on hand April 1st?

Third—What amount of money, bonds, notes, accounts, and choses-in-action of every kind did you own on April 1st?

Fourth—And what other property of every kind did your company own on April 1st?

And such company shall be taxed upon its entire property so ascertained.

**Tax on express, telegraph and electric light companies.** SEC. VIII. *Be it further enacted,* That all persons or companies, including railroad companies, doing an express or telegraph business, and charging the public therefor, in this State, shall pay two and one-half per cent. on their gross receipts; and all persons, or the Superintendent or General Agent of each telegraph or express

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1929   Page 601 of 607

General Tax Act for 1889 and 1890.

company, or the President of each railroad company doing such <span>Quarterly returns.</span> business in this State shall make a quarterly return under oath as follows: On the last day of March, June, September and December in each year to the Comptroller-General, showing a full account of their gross receipts during the quarter ending on such <span>Showing gross receipts.</span> date, and said taxes herein levied upon such gross receipts as shown by said quarterly returns shall be paid by the respective persons or companies to the Comptroller-General at the same time of making such returns.   The gross receipts herein named shall be construed to mean the full amount of all money received from business done within this State.   If any person, superintendent, <span>Penalty for failure.</span> agent or president, as the case may be, whose duty it is to make returns under this paragraph, shall fail to do so within thirty days after the time herein required, such person, superintendent, agent or president, shall be liable to indictment, and upon conviction shall be punished as prescribed in section 4310 of the Code of 1882.

Second—That each telephone company shall pay a tax for each <span>Telephone companies.</span> of the years, 1889 and 1890 of one dollar for each telephone station or box with instruments complete, rented or used by their subscribers, and the superintendent or general manager of the <span>Returns.</span> company shall make returns under oath and payments to the Comptroller General on the dates named in the first paragraph of section.

Third—That each non resident person or company whose <span>Non-resident owners of sleeping-cars.</span> sleeping cars are run in this State, except the sleeping cars of railroad companies that are taxed as hereinafter provided for, shall be taxed as follows:   Ascertain the whole number of miles of the <span>How taxed.</span> lines of railroads over which such sleeping cars are run, and ascertain the entire value of all the sleeping cars of such person or company, then tax such sleeping cars at the regular tax rate, in the same proportion to the entire value of such sleeping cars that the length of lines in this State, over which such cars run bears to the length of the lines of all the railroads over which such sleeping cars are run.   The return shall be made to Comptroller General by <span>Returns.</span> the president, manager, general agent or person in control of such cars in this State.   The Comptroller General shall frame such questions as will elicit the information sought, and answers thereto shall be made under oath.   If the president, manager general agent or person in control of such sleeping cars, shall fail or refuse to answer under oath the questions so propounded, then the Comptroller General shall get the information from such source or sources as he may, and he shall assess a double tax on such <span>Double tax where no return.</span> sleeping cars.   If the taxes herein provided for are not paid, the Comptroller General shall issue execution against the owner of such cars, which may be levied by the sheriff of any county in

KR1038

26                      PART I.—TITLE II.—Taxes.

General Tax Act for 1889 and 1890.

**Levy, where tax not paid.** this State upon the sleeping car or cars of the owner who has failed to pay the taxes.

**Bank stock.** Sec. IX. *Be it further enacted by the authority aforesaid*, That no tax shall be assessed upon the capital of banks or banking associations organized under the authority of this State or of the United States and located within this State, but the shares of the stockholders of such bank or banking associations, whether resident or non-resident owners, shall be taxed in the county where **Where taxed.** such bank or banking associations are located and not elsewhere, at their true and full market value, at the same rate provided in this Act for the taxation of moneyed capital in the hands of private individuals: *Provided,* that nothing in this section contained shall be construed to relieve such banks or banking associations from the tax on property owned by them as provided for in section **Proviso.** seven of this Act: *Provided further*, that nothing herein contained shall be construed to levy any tax on real and personal property held or owned by any bank or banking association, the value of which is represented in the market value of its shares of stock That each bank and banking association shall pay tax on its surplus and individual profits.

**Returns for railroad companies.** Sec. X. *Be it further enacted by the authority aforesaid*, That the presidents of all the railroad companies doing business in this State shall make returns to the Comptroller-General, as now provided by law, for the taxation of the property, of the gross receipts or net income of such railroads, and shall pay to the Comptroller- **Payment of their taxes.** General the tax to which such property or gross receipts or net income may be subject according to the provisions of this Act, and the laws now in force relating to the tax on railroads, and on failure to make returns, or refusal to pay tax, said companies shall **President must answer under oath.** be liable to all the penalties now provided by law. The Comptroller-General shall cause questions to be printed as hereinafter set out, which shall be answered under oath by the president of each railroad company doing business in this State, to-wit:

**Value of tracks, etc.** First—What is the value of your tracks, including main, side and spur tracks and road-bed in this State?

**Of depot buildings.** Second—What is the value of your depot buildings within this State?

**Water tanks, etc.** Third—What is the value of your water tanks, pumps, stationary engines, wood sheds, saws and coal structures within this State?

**Other buildings.** Fourth—What is the value of all other buildings owned by your company within this State and used for railroad purposes? And in this way the real value of the road shall be ascertained. All property owned by railroad companies and not used for railroad purposes shall be returned to the Tax Receiver of the county where it is situated.

KR1039

Fifth—How many locomotives does your company own, and <span>Locomotives and cars.</span> what is the value of each? How many passenger cars, and the value of each? How many sleeping cars, and the value of each? How many express cars, and the value of each? How many baggage cars, and the value of each? How many mail cars, and the value of each? How many freight cars, and the value of each? How many ''cab'' or ''caboose'' cars, and the value of each? How many stock cars, and the value of each? How many platform cars, and the value of each? How many of all other kinds of cars not herein enumerated, and the value of each?

Sixth—What is the value of hand cars, pole cars, crank cars <span>Tools and implements.</span> and tools and implements of every kind used in railroading that are kept and used within this State by your company?

Seventh—And the president of every railroad company resident in this State, and every railroad company whose principal place of doing business is in this State, shall also pay tax on all <span>Money and unpaid dividends.</span> money of his railroad company on hand on April 1, in each year, and on such dividends as have been declared but not paid out on hand at said date.

Eighth—All the property of railroad companies doing business <span>Tax rate.</span> in this State shall be taxed at the same rate as property of natural <span>Exceptions</span> persons is taxed, except as follows:

1st—Except that portion of the property of each railroad <span>First.</span> company that is exempt by its charter from taxation.

2nd—Except in the case of a railroad company doing busi- <span>Second.</span> ness in this State, and whose line of road runs into another State, then its locomotives and cars shall be taxed as follows: The value <span>How ascertained.</span> of all its locomotives and cars shall be ascertained; the length of the line of such railroad company shall be ascertained, and locomotives and cars of such railroad company shall be taxed at the regular tax rate in the same proportion to the entire value of its locomotives and cars that the line in this State bears to the entire line of said company.

3rd—Except in case of a railroad company chartered by the <span>Third.</span> laws of another State, but who has a place of general business here, its money on hand, and declared but unpaid dividends o hand in this State on April 1st in each year, shall be taxed as fol lows: Ascertain the entire length of said line of railroad and the <span>How determined.</span> entire money on hand as aforesaid in this State, then such money in this State is to be taxed in the same proportion to the entire money aforesaid that the length of the line in this State bears to the entire line.

Ninth—In the event the Comptroller-General is dissatisfied with <span>Assessors provided for.</span> the returns made by any railroad company of its property for taxation, he shall report the same to the Governor, who shall appoint three competent and disinterested men to examine the property

KR1040

Genera1 Tax Act for 1889 an l 189).

and assess the same, who shall be paid each, four dollars per diem for the actual number of days so employed. If the railroad company is dissatisfied with such assessment, arbitration can be had as now provided by law.

**Non-resident operators of sleeping cars.**

Tenth—That every railroad company that pulls over its road sleeping cars of any person or corporation not a resident of this State, and except such sleeping cars as are taxed as property of railroad companies as herein provided, such railroad company shall pay a license for pulling such cars in each of the years 1889

**License tax determined.**

and 1890, as follows: A railroad company whose line is not less than fifty, nor more than one hundred miles long, shall pay a license of one hundred dollars. If more than one hundred and not more than one hundred and fifty miles long, one hundred and fifty dollars. If more than one hundred and fifty, and not more than two hundred miles long, two hundred dollars. If two hundred and fifty miles long, two hundred and fifty dollars, and if longer than two hundred and fifty miles, three hundred dollars. Which license tax shall be paid to the Comptroller-General.

**Returns of corporations.**

SEC. XI. *Be it further enacted by the authority aforesaid*, That the presidents or principal agents of all the incorporated companies herein mentioned, except such as are required to make returns to the Tax Receivers of the counties, shall make returns to the Comptroller-General, under the rules and regulations provided by law for such returns, and subject to the same penalties and modes of procedure for the enforcement of taxes from companies or persons required by law to make returns to the Comptroller-General.

**Oath for returns.**

SEC. XII. *Be it further enacted by the authority aforesaid*, That the oath to be administered to all persons making returns of their taxable property shall be the oath required under the Act of October 20, 1885, to be attached to the printed lists furnished

**Proviso.**

under said Act, and presented to each tax payer: *Provided*, that non-residents, females and sick persons may subscribe the oath herein required before any person authorized by law to administer oaths, and cause same to be delivered to the Tax Receiver.

**When returns are to be received.**

SEC. XIII. *Be it further enacted by the authority aforesaid*, That the Comptroller-General is authorized and empowered to order the Tax Receivers of this State to commence receiving the returns of taxable property immediately after the first day of April of the years 1889 and 1890, and that the Comptroller-General is empowered and required to cause the taxes to be collected and paid into the State Treasury by the 20th of December each of said of years 1889 and 1890.

**Owners of vessels, boats, etc.**

SEC. XIV. *Be it further enacted by the authority aforesaid*, That any person or company, resident of this State, who is the owner of a vessel, boats or water craft of any description, shall answer under oath the number of vessels, boats and other water crafts

KR1041

Case 3:23-cv-00474-JES-DDL   Document 34-4   Filed 03/06/24   PageID.1933   Page 605 of 607

General Tax Act for 1889 and 1890.

owned by them and the value of each, and make a return of the <span style="font-size:smaller">Must return same.</span> same to the Tax Receiver of the county of the residence of such person or company, and the same shall be taxed as other property is taxed: *Provided*, however, that this section shall not apply to <span style="font-size:smaller">Proviso.</span> vessels, boats or other water crafts owned by corporations or joint stock companies upon whose capital stock a tax is paid as provided in section seven of this Act.

SEC. XV. *Be it further enacted by the authority aforesaid*, That in <span style="font-size:smaller">Returns must be for par value.</span> returning property for taxes, all property shall be returned at its value—promissory notes, accounts, judgments, mortgages, liens of all kinds, and all choses-in-action shall be given in at their value, whether solvent or partially solvent. Every person shall return for taxes all jewelry, and all other property of every kind owned <span style="font-size:smaller">Property of wife or minor children.</span> by his wife and minor children, unless the members of his or her family return their property for taxation. In addition to the questions now propounded to tax payers by the Tax Receivers, questions shall be framed by the Comptroller General to reach all <span style="font-size:smaller">Additional questions:</span> property upon which a tax is imposed by this Act; and especially the following questions:

First—The number of horses, mules, oxen, cows, sheep, hogs, <span style="font-size:smaller">Live stock;</span> goats, and of all other animals upon which a tax is imposed by law, and state the value of each.

Second—The kind and value of property owned by the wife and <span style="font-size:smaller">Wife's and minor children's property.</span> minor children of the tax payer, and not returned for taxes by the owners thereof.

Third—Whether solvent or partially solvent, give the value of <span style="font-size:smaller">Securities.</span> your bonds, stocks of non resident companies or corporations or of companies or corporations in this State whose capital stock is not returned by the president of such company or corporation, all notes, accounts, judgments, mortgages, liens and other choses in action of every kind, whether such bonds, stocks, notes, etc., are held by the tax payer in Georgia or held by some other person for him, either in or out of this State. There shall be no deduction from the value of property returned for taxes on account of any indebtedness of such tax payer.

SEC. XVI. *Be it further enacted by the authority aforesaid*, That all laws and parts of laws in conflict with this Act be and they are hereby repealed.

Approved December 26, 1888.

KR1042

# EXHIBIT 36

KR1043

# TITLE II.

## TAXES.

### ACTS.

General Tax Act.
Amending General Tax Act, Increasing Tax Rate.
Amending General Tax Act, Relieving Certain Liquor Dealers.
Amending General Tax Act, Increasing Tax on Liquor Dealers and Relieving Certain Itinerant Doctors, etc.
Amending General Tax Act, as to Peddlers of Merchandise.
Tax Executions of Municipal Corporations, Interest on, Law Amended.
Board of Equalization as to Taxable Property.
Garnishments for Municipal Taxes.

### GENERAL TAX ACT.

### No. 131.

An Act to levy and collect a tax for the support of the State Government and the public institutions ; for educational purposes in instructing children in the elementary branches of an English education only ; to pay the interest of the public debt, and to pay maimed Confederate soldiers and widows of Confederates such amounts as are allowed them by law, for each of the fiscal years eighteen hundred and ninety-one and eighteen hundred and ninety-two, and to prescribe what persons, professions and property are liable to taxation ; to prescribe the methods of receiving and collecting said taxes ; to prescribe the method of ascertaining the property of this State subject to taxation ; prescribe additional questions to be propounded to tax-payers, and to provide penalties and forfeitures for non-payment of taxes, and for other purposes.

SECTION I. Be it enacted by the General Assembly of the State of Georgia, That the Governor be authorized and empowered, with the assistance of the Comptroller-General, to assess and levy a tax on taxable property of this State for

Rate of general tax

KR1044