John W. Dillon (SBN 296788)
jdillon@dillonlawgp.com
DILLON LAW GROUP APC
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

KNIFE RIGHTS, INC.; ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P.,

Plaintiffs,

v.

CALIFORNIA ATTORNEY GENERAL ROB BONTA,

Defendants.

Case No. 23-cv-0474-JES-DDL

Hon. James E. Simmons, Jr.
Magistrate Judge Hon. David D. Leshner

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**Part IV: Bates No. KR1045-KR2128**

the fiscal year of eighteen hundred and ninety-one, two and four-tenths mills, and for the fiscal year eighteen hundred and ninety-two, two and one-half mills, and the Governor be, and is hereby authorized and empowered, by and with the assistance of the Comptroller-General, to assess and levy, in addition to the foregoing general State tax, a tax of one and one-third mills for the year eighteen hundred and ninety-one, and a tax of one and one-third mills for the year eighteen hundred and ninety-two, on all the taxable property of this State, for the purpose of raising the funds necessary to meet the appropriations by this General Assembly for educational purposes in instructing children in the elementary branches of an English education only.

Tax for educational purposes.

SEC. II. Be it further enacted by the authority aforesaid, That in addition to the *ad valorem* tax on real and personal property, as required by the Constitution, and provided for in the preceding section, the following specific taxes shall be levied and collected for each of the said fiscal years, eighteen hundred and ninety-one and eighteen hundred and ninety-two.

Specific taxes.

First.—Upon each and every male inhabitant of the State, between the ages of twenty-one and sixty years, on the first day of April, a poll tax of one dollar for each of the said years, in 1891 and 1892, which shall be for educational purposes in instructing children in the elementary branches of an English education only; *provided*, this tax shall not be demanded of blind persons, nor of crippled, maimed or disabled Confederate soldiers, relieved of such taxes under and by authority of an Act approved July 23, 1883.

Poll.

Exemptions.

Second.—Upon every practitioner of law, medicine or dentistry, presidents of each of the banks of the State, each agent or firm negotiating loans and charging therefor, the presidents of each of the railroad companies, presidents of each of the express, telegraph, telephone, electric light and gas companies doing business in this State, and in case the presidents of any such companies do not reside in this State, then in such case, upon the superintendent or general agent of such companies who may reside in this State, ten dollars, and no municipal corporation or county authorities shall levy any additional tax on said possessions, either as license fee or otherwise.

Lawyers, doctors, dentists and presidents of certain corporations.

If presidents of such corporations be non-residents.

Municipal corporations forbidden to tax professions.

Third.—Upon every daguerrean, ambrotype, photographic and similar artist, ten dollars in each county in which they may carry on business.

Photographic and similar artists.

Fourth.—Upon every person carrying on business of auctioneer for pay or compensation, twenty-five dollars for each county in which they may carry on such business.

Auctioneers.

Fifth.—Upon every keeper of a pool, billiard or bagatelle table kept for public use, whether in a saloon, barroom, hotel or other public place, twenty-five dollars for each table.

Keepers of pool, billiard or bagatelle tables.

Sixth.—Upon every keeper of any other table, stand or place for the peformance of any game or play, and upon the keeper of any flying horses, or any other game or play (unless kept for exercise or amusement not prohibited by law), and not kept for gain, directly or indirectly, twenty-five dollars in each county.

Keepers of others tables, games, etc.

Seventh.—Upon every keeper of a ten pin alley or alley of like character, kept for public play, and upon every keeper of a shooting gallery, twenty-five dollars for each place of business.

Ten pin and other alleys. Shooting galleries.

Eighth.—Upon every traveling vendor of patent or proprietary medicines, special nostrums, jewelry, paper, soap, or other articles of like character, twenty-five dollars in each county where they may offer such articles for sale.

Peddlers.

Ninth.—Upon every local insurance agent or firm of agents doing business in this State, ten dollars for each county in which they shall solicit business, and upon every agent of a matrimonial, natal or nuptial company, one hundred dollars for each county in which they shall do business, and upon every traveling or special or general agent of life, fire, accident or other insurance company doing business in this State, fifty dollars, which said tax must be paid before said agent shall be authorized to act as an agent for any of their companies. Said tax shall be paid by said companies to the Comptroller-General, and shall be in addition to the license fee required of insurance companies by the Act approved October 24, 1887. The receipt of the Comptroller-General for the payment of this tax, together with his certificate, as provided by said Act approved October 24, 1887, shall constitute the license for said agents to transact business for their companies, as designated by said certificates ; *provided*, this tax shall not be required of agents of assessments, life insurance companies or mutual aid societies.

Local insurance agents. Agents of matrimonial and similar companies. Traveling, special or general insurance agents. Such taxes, how paid. Licenses. Not required of agents of assessment or mutual aid societies.

Tenth.—Upon each emigrant, agent or employer or employee of such agent doing business in this State, the sum five hundred dollars for each county in which such business is conducted.

Emigrant agents.

Eleventh.—Upon every traveling vendor using boats for the purpose of selling goods on the rivers or waters within the limits of this State, the sum of fifty dollars in each county where they may sell their wares, and said tax shall be a lien on the boat and its contents, without regard to the ownership thereof.

Peddlers in boats. Such tax a lien.

Lightning rod dealers or agents.

Twelfth.—Upon all intinerant lightning-rod dealers or agents, the sum of fifty dollars for each and every county in which they operate.

Shows and exhibitions.

Thirteenth.—Upon all shows and exhibitions (except such as histrionic, musical, operatic and elocutionary), including side-shows accompanying circus companies, fifty dollars in each and every city or town of five thousand inhabitants, forty dollars in cities or towns of four thousand and under five thousand inhabitants, and thirty dollars in towns of less than four thousand inhabitants. Said tax, so collected, shall be for educational purposes.

Circus companies.

Fourteenth—Upon every circus company, three hundred dollars each day it may exhibit in the State of Georgia. Said tax shall be for educational purposes.

Liquor dealers.

Fifteenth.—Upon all dealers in spirituous or malt liquors, intoxicating bitters or brandy fruits or domestic wines, whether dealing in any or all thereof, fifty dollars for each place of business in each county where the same are sold;

Proviso.

*provided*, this tax shall not relieve such dealers from any local tax or prohibitory law in reference to the retail of spirituous or intoxicating liquors, nor be required of those who sell by wholesale spirits manufactured of apples, peaches, grapes, blackberries or other fruits grown on their own lands, when sold in quantities not less than five gallons;

Dealers in domestic wines exempt.

*provided*, that nothing in this Act shall be so construed as to levy a tax on dealers in domestic wines manufactured from grapes or berries purchased by or grown on lands owned, leased or rented by said dealer. Said tax shall be for educational purposes.

Dealers in pistols and other weapons.

Sixteenth.—Upon all dealers in pistols, toy pistols, shooting cartridges, dirks or Bowie-knives, one hundred dollars for each place of business in each county where the same are sold.

Dealers in "futures," etc.

Seventeenth.—Upon every individual or firm, or his or their agents, engaged in the business of selling or buying through regularly organized stock and cotton exchanges or boards of trade, farm products, sugar, coffee, and salt and meat, railroad stock and bonds, and stocks and bonds of all kinds, not intended for *bona fide* sale and delivery, but for future delivery (commonly called "futures"), one thousand dollars each per annum for each county where such business is carried on;

Provisos.

*provided*, that this tax shall not be demanded of any cotton warehouseman, dealer in cotton, or any provision broker who takes orders in the regular course of their trade only for the actual and *bona fide* delivery of cotton and other produce so ordered, and where, by the terms of the contract, it is not left to the option of the party so ordering,

or the party taking such order, to avoid the delivery of the produce or products by paying the difference in the market price of such produce or products at the time of delivery; *provided further*, that such cotton warehouseman, dealer in actual cotton, or any provision broker, does not carry on the business of buying "futures" in connection with his or their other business, and upon every individual or firm, or his or their agents, engaged in a like business when they take orders on their own account and determine the loss or gain between them and their patrons by market reports received from any other source whatever, and whose business is generally denominated "bucket shops," the sum of ten thousand dollars.

"Bucket shops."

Eighteenth.—Upon every peddler of stoves or ranges for cooking purposes, the sum of one hundred dollars in every county in which such peddler may do business.

Peddlers of stoves or ranges.

Nineteenth.—Upon every person or firm, for himself or agent for resident or non-resident owners, who holds or keeps for hire or sale any billiard, pool or other table of like character, fifty dollars for each county in which such person or firm does business.

Dealers in billiard tables and tables of like character.

Twentieth.—Upon each peddler of clocks, one hundred dollars in every county of the State in which said peddler may do business.

Clock peddlers.

Twenty-first.—Upon all itinerant doctors, dentists, opticians or specialists of any kind, doing business in this State, ten dollars for each county in which they may do business.

Itinerant doctors, dentists, etc.

Twenty-second.—Upon all packing houses doing a cold storage business in this State, whether carried on by the owners thereof, or by their agents, five hundred dollars in each county where said business is carried on.

Cold storage.

Twenty-third.—Upon all brewing companies, and upon each agent of non-resident brewing companies, two hundred dollars.

Brewing companies and agents

Twenty-fourth.—Upon each pawnbroker, fifty dollars for each place of business.

Pawnbrokers.

Twenty-fifth.—Upon all mercantile and collecting agencies, commercial agencies, and all other agencies of like character, fifty dollars in every county where they have an established office.

Commercial and collecting agencies, etc.

SEC. III. Be it further enacted by the authority aforesaid, That the taxes provided for in paragraphs 1 and 2 of section 2 of this Act shall be returned to the Tax-Receiver in the county of the residence of the person liable to such tax, and shall by the Receiver of Tax Returns be entered upon his digest of taxable property, and that the taxes provided for in paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16,

Returns of taxes provided for in pars. 1 and 2 of sec. 2.

17, 18, 19, 20, 21, 22, 23, 24 and 25 of section 2 of this Act shall be returned and paid to the Tax-Collectors of the counties where such vocations are carried on.

Of taxes provided for in other paragraphs of section 2, except par. 9.

To whom and when to be paid.

SEC. IV. Be it further enacted by the authority aforesaid, That the taxes provided for in paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 and 25 of section 2 of this Act shall be paid in full for the fiscal years for which they are levied to the Tax-Collectors of the counties where such vocations are carried on at the time of commencing to do the business specified in said paragraphs. Before any person taxed by paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 16, 17, 18, 19, 20, 21, 22, 23, 24 and 25 of section 2 of this Act shall be authorized to carry on said business, they shall go before the Ordinary of the county in which they propose to do business and register their names, place of business, and at the same time pay their taxes to the Tax-Collector; and it shall be the duty of said Ordinary to immediately notify the Comptroller-General and the Tax-Collector. Any person failing to register with the Ordinary, or, having registered, fail to pay the tax, as herein required, shall be liable to indictment for a misdemeanor, and on conviction, shall be fined not less than double the tax, or be imprisoned as prescribed by section 4310 of the Code, or both, in the discretion of the court; one-half of said fine shall be applied to payment of the tax and the other to fund of fines and forfeitures for use of officers of court.

Registration of business required.

Failure to register or pay tax.

Insurance companies on gross receipts.

Proviso.

SEC. V. Be it further enacted by the authority aforesaid, That all foreign and home insurance companies doing business in this State shall pay one *per centum* on all premiums, in money or otherwise, received by them; *provided*, this shall not include return premiums on cancelled policies; and, in addition to the tax imposed by this Act upon the gross receipts of such insurance companies, all such companies doing brokerage business in this State, such as discounting notes, bills, drafts or exchange, lending money or in any manner doing a business pertaining to banking or brokerage business, shall be taxed upon the capital so employed in the same manner and at the same rate as other moneyed capital in the hands of private individuals is taxed.

On Insurance companies doing brokerage business.

Returns of building and loan and similar associations.

SEC. VI. Be it further enacted by the authority aforesaid, That the presidents of all building and loan associations and other associations of like character shall be required to return to the Tax-Receiver of the county where such associations are located, at its true market value, the stock of such associations owned by the stockholders thereof (upon which, as shown by the books of such associations, no advance has been made or money borrowed thereon by the individual

Case 3:23-cv-00474-JES-DDL Document 34-5 Filed 03/06/24 PageID.1942 Page 7 of 1085

stockholders therein), to be taxed as other moneyed capital in the hands of private individuals is taxed; *provided*, that no tax shall be required of real estate and building associations to be paid upon any portion of their capital which has been loaned or advanced to a shareholder upon real estate, upon which real estate tax is payable by said shareholder.

Proviso.

SEC. VII. Be it further enacted by the authority aforesaid, That the presidents of all manufacturing and other incorporated companies (or their agents), other than railroad, insurance, telegraph, telephone, express, sleeping and palace car companies, shall be required to return all their property whatever, of their respective companies, at its true market value to the Tax-Receiver of the county where the same is located, or where the principal business of each company is located, to be taxed for State and county purposes as other property in this State is taxed; save and except, that all canals or slackwater navigation companies shall make through their respective executive officers or stockholders in possession of the same returns to the Tax-Receiver of each county in which the same is located, or through which the same shall pass, in whole or in part, of the right of way, locks and dams, toll-houses, structure and all other real estate owned or used by the company, or the stockholders thereof; *provided*, this Act shall not make subject to taxation any property of canals or navigation companies which is not subject to taxation by the laws of the State as now existing. The president of every manufacturing company shall be required to answer under oath, in addition to those now provided by law, the following questions: 1st, What is the value of raw material on hand April 1st? 2d, What is the value of manufactured goods or articles on hand April 1st? 3d, What amount of money, bonds, notes, accounts and choses in action of every kind did you own on April 1st? 4th, What other property of every kind did your company own on April 1st? and such company shall be taxed upon its entire property so ascertained.

Returns for corporations generally.

Of canal or slackwater companies.

Proviso.

Oath of presidents of manufacturing companies.

SEC. VIII. Be it further enacted, That all persons or companies, including railroad companies, doing an express or telegraph business, and charging the public therefor, in this State, shall pay two and a half per centum on their gross receipts, and all persons, or the superintendent or general agent of each telegraph or express company, or the president of each railroad company doing such business in this State, shall make a quarterly return, under oath, as follows: On the last day of March, June, September and December, in each year, to the Comptroller-General, showing a full

Tax on express and telegraph companies.

Returns.

KR1050

account of their gross receipts during the quarter ending on such date; and said taxes herein levied upon such gross receipts as shown by said quarterly returns shall be paid by the respective persons or companies to the Comptroller-General at the same time of making such returns; the gross receipts herein named shall be construed to mean the full amount of all money received from business done within this State. If any person, superintendent, agent or president as the case may be, whose duty it is to make returns under this paragraph, shall fail to do so within thirty days after the time herein required, such person, superintendent, agent or president, shall be liable to indictment, and upon conviction shall be punished as prescribed in section 4310 of the Code of 1882.

Payment of taxes.

Failure to make return.

Telephone companies.

Second.—That each telephone company shall pay a tax for each of the years 1891 and 1892, of one dollar for each telephone station or box with instruments complete, rented or used by their subscribers, and the superintendent or general manager of the company shall make returns under oath and payments to the Comptroller-General on the dates named in the first paragraph of this section.

Returns and payment of tax.

Sleeping car companies.

Third.—Each sleeping car company doing business in Georgia shall pay a tax of two and a half per cent. on gross receipts of said company received in the State of Georgia from sale of sleeping car tickets from a place to a place in said State of Georgia, and the superintendents or general manager shall make return, under oath, to the Comptroller-General, as provided in first paragraph of this section, and pay the taxes required by such returns at the time of making such quarterly statements.

Returns and payment of tax.

Sewing machine companies and dealers.

SEC. IX. Be it further enacted, That every sewing machine company selling or dealing in sewing machines, by itself or its agents, in this State, and all wholesale and retail dealers in sewing machines selling machines manufactured by companies that have not paid the tax required herein, shall pay two hundred dollars for each fiscal year or fractional part thereof, to be paid to the Comptroller-General at the time of commencement of business, and said companies or dealers shall furnish the Comptroller-General a list of all agents authorized to sell machines of their manufacture or under their control, and shall pay to said Comptroller-General the sum of five dollars for each of said agents, for each fiscal year or fractional part thereof, for each county in which said agent may do business for said company. Upon the payment of said additional sum, the Comptroller-General shall issue to each of said agents a certificate of authority to transact business in this State, and such companies, dealers and

Lists of agents to be furnished and tax paid to Comptroller-General

agents, having paid the taxes required herein, shall be exempted from any county or corporation tax for selling said sewing machines. Before doing business under this Act, all sewing machine agents shall be required to register their names with the Ordinaries of those counties in which they intend to operate, and exhibit to said Ordinaries their license from the Comptroller-General, and to keep such license pasted on their vehicles or at their places of business. Wholesale or retail dealers in sewing-machines shall be required to pay the tax provided herein for each manufacture of sewing machines sold by them, except the manufactures of such companies as have paid the tax required by this Act. All unsold sewing machines belonging to sewing machine companies, dealers or their agents, in possession of said companies, dealers, their agents or others, shall be liable to seizure and sale for payment of such license fees and tax. Any person who shall violate the provision of this section shall be liable to indictment for misdemeanor, and, on conviction, shall be fined not more than five hundred dollars and not less than one hundred, in the discretion of the court trying the same. If said fine is not paid within the time prescribed by the court, such person so fined shall be imprisoned as prescribed in section 4310 of the Code. None of the provisions of this section shall apply to licensed auctioneers selling second-hand sewing machines, or to officers of the law under legal process, or to merchants buying and selling machines on which a license tax has been paid as herein provided, and who keep the said machines and sell and deliver them at their places of business, such sales not being on commission.

Exemption

Registry, etc.

Dealers to pay for each manufacture.

Machines liable to seizure and sale for tax.

Penalty for violating this section

Provisions not to apply to auctioneers, etc.

SEC. X. Be it further enacted by the authority aforesaid, That no tax shall be assessed upon the capital of banks or banking associations organized under the authority of this State, or of the United States and located within this State, but the shares of the stockholders of such bank or banking associations, whether resident or non-resident owners, shall be taxed in the county where such bank or banking associations are located, and not elsewhere, at their true and full market value, at the same rate provided in this Act for the taxation of moneyed capital in the hands of private individuals ; *provided*, that nothing in this section contained shall be construed to relieve such banks or banking associations from the tax on property owned by them, as provided for in section 7 of this Act ; *provided further*, that nothing herein contained shall be construed to levy any tax on real or personal property held or owned by any bank or banking association, the value of which is represented in the market value

No tax on capital of banks.

Shares of stockholders to be taxed.

Provisos.

Surplus and undivided profits.

of its shares of stock, that each bank and banking association shall pay tax on its surplus and undivided profits.

Returns for railroad companies.

SEC. XI. Be it further enacted by the authority aforesaid, That the presidents of all railroad companies doing business in this State shall make returns to the Comptroller-General, as now provided by law for the taxation of the property, of the gross receipts or net income of such railroads, and shall pay to the Comptroller-General the tax to which such property or gross receipts or net income may be subject according to the provisions of this Act, and the laws now of force relating to the tax on railroads; and on failure to make returns or refusal to pay tax, said companies shall be liable to all the penalties now provided by law, and the Comptroller-General is hereby required, upon failure of such companies to make returns, or if made and not satisfactory to said officer, to proceed against such railroads, as provided in section 826(d) of the Code of 1882.

Payment of tax.

Failure to make return or pay tax.

Returns for all corporations, with certain exceptions, to be made to Comptroller-General

SEC. XII. Be it further enacted by the authority aforesaid, That the presidents or principal agents of all the incorporated companies herein mentioned, except such as are required to make returns to the Tax-Receiver of the counties, shall make returns to the Comptroller-General under the rules and regulations provided by law for such returns, and subject to the same penalties and modes of procedure for the enforcement of taxes from companies or persons required by law to make returns to the Comptroller-General.

General rules applicable.

Vessels, boats, etc.

SEC. XIII. Be it further enacted by the authority aforesaid, That any person or company, resident of this State, who is the owner of a vessel, boats or water-craft of any description, shall answer, under oath, the number of vessels, boats and other water-crafts owned by them and the value of each, and make a return of the same to the Tax-Receiver of the county of the residence of such person or company, and the same shall be taxed as other property is taxed.

Property to be returned at its value.

SEC. XIV. Be it further enacted by the authority aforesaid, That in returning property for taxes, all property shall be returned at its value—promissory notes, accounts, judgments, mortgages, liens of all kinds and all choses in action shall be given in at their value, whether solvent or partially solvent. Every person shall return for taxes all jewelry and other property of every kind owned by his wife and minor children, unless the members of his or her family return their property for taxation. In addition to the questions now propounded to tax-payers by the Tax-Receivers, questions shall be framed by the Comptroller-General to reach all property upon which a tax is imposed by this Act, and especially the following questions:

Returns for wife and minor children.

Additional questions for tax-payers.

First.—The number of horses, mules, oxen, cows, sheep, hogs, goats, and of all other animals upon which a tax is imposed by law, and state the value of each.

Second.—The kind and value of property owned by the wife and minor children of the tax-payer and not returned for taxes by the owner thereof.

Third.—Whether solvent or partially solvent, give the value of your bonds, stocks of non-resident companies or corporations, or of companies or corporations in this State, whose capital stock is not returned by the president of such company or corporation, all notes, accounts, judgments, mortgages, liens and other choses in action of every kind, whether such bonds, stocks, notes, etc., are held by the tax-payers in Georgia, or held by some other person for him, either in or out of this State. There shall be no deduction from the value of property returned for taxes on account of any indebtedness of such tax-payer.

No deductions for indebtedness of tax payers.

Oaths to be administered persons making returns.

SEC. XV. Be it further enacted by the authority aforesaid, That the oath to be administered to all persons making returns of their taxable property shall be the oath required under the Act of October 20, 1885, to be attached to the printed list furnished under said Act, and presented to each tax-payer; *provided*, that non-residents, females and sick persons may subscribe the oath herein required before any person authorized by law to administer oaths, and cause same to be delivered to the Tax-Receiver.

Oaths of non-residents, females and sick persons.

When returns shall be received

SEC. XVI. Be it further enacted by the authority aforesaid, That the Comptroller-General is authorized and empowered to order the Tax-Receivers of this State to commence receiving the returns of taxable property immediately after the 1st day of April of the years 1891 and 1892, and that the Comptroller-General is empowered and required to cause the taxes to be collected and paid into the State Treasury by the 20th of December of each of said years 1891 and 1892.

When taxes to be collected.

SEC. XVII. Be it further enacted by the authority aforesaid, That blind persons and Confederate soldiers relieved by the proviso in paragraph 1 of section 2, from the payment of the tax designated in that paragraph, shall be relieved also from the payment of the taxes designated in paragraphs 6, 7, 8 and 11 of section 2, if carrying on and dependent upon the kinds of business designated therein; *provided*, that before any person shall be entitled to the benefit of any of the exemptions provided for it in this section, he shall go before the Ordinary of the county in which he purposes to carry on business, and make and file an affidavit setting forth the facts that he is entitled to such exemptions,

Relief of blind persons and Confederate soldiers.

Proviso.

# EXHIBIT 37

KR1055

# TITLE II.

## TAXES AND PUBLIC DEBT.

### ACTS.

General Tax Act.
Repealing Act Creating Board of Equalization.
Providing Sinking Fund to Retire Maturing State Bonds.

### GENERAL TAX ACT.

No. 133.

An Act to levy and collect a tax for the support of the State Government and the public institutions; for educational purposes in instructing children in the elementary branches of an English education only; to pay the interest on the public debt, and to pay maimed Confederate soldiers and widows of Confederates such amounts as are allowed them by law for each of the fiscal years eighteen hundred and ninety-three and eighteen hundred and ninety-four, and to prescribe what persons, professions and property are liable to taxation; to prescribe the methods of receiving and collecting said taxes; to prescribe the method of ascertaining the property of this State subject to taxation; prescribe additional questions to be propounded to tax-payers, and to provide penalties and forfeitures for non-payment of taxes, and for other puposes.

General *ad valorem* tax for 1893 and 1894.

Section 1. Be it enacted by the General Assembly of the State of Georgia, That the Governor be authorized and empowered, with the assistance of the Comptroller-General, to assess and levy a tax on the taxable property of this State for each of the fiscal years eighteen hundred and ninety-three and eighteen hundred and ninety-four of two mills and ninety-three one hundredths of a mill, and the Governor be, and is, hereby

authorized and empowered, by and with the assistance of the Comptroller-General, to assess and levy, in addition to the foregoing general State tax, a tax of one mill and forty-four one hundredths of a mill for each of the years eighteen hundred and ninety-three and eighteen hundred and ninety-four on all of the taxable property of this State, for the purpose of raising the funds necessary to meet the appropriations of this General Assembly for educational purposes in instructing children in the elementary branches of an English education only.

General tax for educational purposes.

SEC. 2. Be it further enacted by the authority aforesaid, That in addition to the *ad valorem* tax on real estate and personal property, as required by the Constitution, and provided for in the preceding section, the following specific taxes shall be levied and collected for each of the said fiscal years eighteen hundred and ninety-three and eighteen hundred and ninety-four.

Specific taxes.

*First.*—Upon each and every male inhabitant of the State, between the ages of twenty-one and sixty years, on the days fixed for return of property for taxation, a poll tax of one dollar, which shall be for educational purposes in instructing children in the elementary branches of an English education only; *provided*, this tax shall not be demanded of blind persons, nor of crippled, maimed or disabled. Confederate soldiers, relieved of such taxes under and by authority of an act approved July 23, 1883.

Poll tax.

Persons exempt.

*Second.*—Upon every practitioner of law, medicine or dentistry, presidents of each of the banks of the State, each agent or firm negotiating loans and charging therefor, the presidents of each of the railroad companies, presidents of each of the express, telegraph, telephone, electric light and gas companies doing business in this State, and in case the presidents of any such companies do not reside in this State, then in such case, upon the superintendent or general agent of such companies who may reside in this State, ten dollars, and no municipal corporation or county authorities shall levy any additional tax on said professions either as a license fee or otherwise.

Lawyers, physicians, dentists, loan ag'ts corporation, presidents, superintendents or general agents.

No additional tax by municipal corporations.

*Third.*—Upon every daguerrean, ambrotype, photographic and similar artist, ten dollars in each county in which they may carry on business.

Photographic and similar artists.

*Fourth.*—Upon every person carrying on the business of auctioneer, for pay or compensation, twenty-five dollars for each county in which they may carry on such business.

Auctioneers.

*Fifth.*—Upon every keeper of a pool, billiard or bagatelle table, kept for public use, whether in a saloon, barroom, hotel or other public place, twenty-five dollars for each table.

Keepers of billiard tables, etc.

Keepers of other tables, games, etc.

*Sixth.*—Upon every keeper of any other table, stand or place for the performance of any game or play, and upon the keeper of any flying horses, or any other game or play (unless kept for exercise or amusement not prohibited by law and not kept for gain, directly or indirectly), twenty-five dollars in each county.

Ten pin and other alleys. Shooting galleries.

*Seventh.*—Upon every keeper of a ten pin alley or alley of like character, kept for public play, and upon every keeper of a shooting gallery, twenty-five dollars for each place of business.

Travelling venders of patent medicines, etc.

*Eighth.*—Upon every travelling vendor of patent or proprietary medicines, special nostrums, jewelry, paper, soap or other merchandise, fifty dollars in each county where they may offer such articles for sale.

Local insurance agents, etc.

*Ninth.*—Upon every local insurance agent or firm of agents doing business in this State, ten dollars for each county in which they shall solicit business, and upon every agent of a matrimonial, natal or nuptial company, one hundred dollars for each county in which they shall do business, and upon every traveling or special or general agent of life, fire, accident or other insurance company doing business in this State, fifty dollars, which said tax must be paid before said agents shall be authorized to act as agents for any of their companies. Said tax shall be paid by said companies to the Comptroller-General, and shall be in addition to the license fee required of insurance companies by the act approved October 24th, 1887. The receipts of the Comptroller-General for the payment of this tax, together with his certificate as provided by said act approved October 24th, 1887, shall constitute the license for said agents to transact business for their companies as designated by said certificates; *provided,* this tax shall not be required of agents of assessment life insurance companies or mutual aid societies; *provided further,* that railroad ticket agents selling accident insurance tickets shall not be deemed insurance agents in the sense of this section, and this section shall not apply to railroad ticket agents selling accident insurance tickets, and that railroad ticket agents who sell accident insurance tickets shall not be required to pay the said tax.

Special or general insurance agents. To whom tax to be paid by such agents. What shall constitute the license of such agents. Not required of agents of assessment or mutual aid companies. Nor of railroad ticket agents selling accident insurance.

Emigrant agents, etc.

*Tenth.*—Upon each emigrant agent or employer or employee of such agents doing business in this State, the sum of five hundred dollars for each county in which such business is conducted.

Venders using boats. Lien for tax.

*Eleventh.*—Upon every traveling vendor using boats for the purpose of selling goods on the rivers or waters within the limits of the State, the sum of fifty dollars in each county

where they may sell their wares, and said tax shall be a lien on the boat and its contents, without regard to the ownership thereof.

*Twelfth.*—Upon all itinerant lightning rod dealers or agents, the sum of fifty dollars for each and every county in which they operate.

Itinerant lightning rod dealers or agents.

*Thirteenth.*—Upon all shows and exhibitions (except such as histrionic, musical, operatic and elocutionary), including the side-shows accompanying circus companies, fifty dollars in each and every city or town of five thousand inhabitants; forty dollars in cities or towns of four thousand and under five thousand inhabitants, and thirty dollars in towns of less than four thousand inhabitants. Said tax, so collected, shall be for educational purposes.

Shows and exhibitions.

*Fourteenth.*—Upon every circus company or others, giving an exhibition beneath or within a canvas enclosure advertised in print or by parade, or in any manner whatsoever as a circus, menagerie, hippodrome, spectacle or show implying a circus, three hundred dollars each day it may exhibit in the State of Georgia. Said tax shall be for educational purposes.

To be for educational purposes.

Circuses, etc.

*Fifteenth.*—Upon all dealers in spirituous or malt liquors, intoxicating bitters or brandy fruits or domestic wines, whether dealing in any or all thereof, one hundred dollars for each place of business in each county where the same are sold; *provided*, this tax shall not relieve such dealers from any local tax or prohibitory law in reference to the retail of spirituous or intoxicating liquors, nor be required of those who sell by wholesale spirits manufactured of apples, peaches, grapes, blackberries or other fruits grown on their own lands when sold in quantities not less than five gallons; *provided*, that nothing in this act shall be so construed as to levy a tax on dealers in domestic wines manufactured from grapes or berries purchased by or grown on lands owned, leased or rented by said dealer. Said tax shall be for educational purposes.

Liquor dealers. Tax to be for educational purposes.

*Sixteenth.*—Upon all dealers in pistols, toy pistols shooting cartridges, dirks, Bowie knives or metal knucks, one hundred dollars for each place of business in each county where the same are sold.

Dealers in pistols, etc.

*Seventeenth.*—Upon every individual or firm, or his or their agents, engaged in the business of selling or buying through regularly organized stock and cotton exchanges or boards of trade, farm products, sugar, coffee and salt and meat, railroad stock and bonds, and stock and bonds of all kinds, not intended for *bona fide* sale and delivery, but for future delivery (com-

Dealers in "futures."

monly called "futures"), one thousand dollars each per annum for each county where such business is carried on; *provided*, that this tax shall not be demanded of any cotton warehouseman, dealer in cotton, or any provision broker who takes orders in the regular course of their trade only for the actual and *bona fide* delivery of cotton and other produce so ordered, and where by the terms of the contract it is not left to the option of the party so ordering, or the party taking such order, to avoid the delivery of the produce or products, by paying the difference in the market price of such produce or products at the time of delivery; *provided further*, that such cotton warehouseman, dealer in actual cotton, or any provision broker does not carry on the business of buying "futures" in connection with his or their other business, and upon every individual or firm, or his or their agents, engaged in a like business, when they take orders on their own account and determine the loss or gain between them and their patrons by market reports received from any other source whatever, and whose business is generally denominated "bucket shops," the sum of ten thousand dollars.

Not applicable to those taking orders for actual delivery, etc.

If dealing in "futures" not also carried on.

"Bucket shops."

Peddlers of stoves or ranges.

*Eighteenth.*—Upon every peddler of stoves or ranges for cooking purposes, the sum of one hundred dollars in every county in which such peddler may do business.

Sellers, etc. of billiard and like tables.

*Nineteenth.*—Upon every person or firm, for himself or agent for resident or non-resident owners, who holds or keeps for hire or sale any billiard, pool or other table of like character, fifty dollars for each county in which such person or firm does business.

Clock peddlers.

*Twentieth.*—Upon each peddler of clocks one hundred dollars in each county of the State in which said peddler may do business.

Itinerant doctors, dentists, etc.

*Twenty-first.*—Upon all itinerant doctors, dentists, opticians or specialists of any kind, doing business in this State, ten dollars for each county in which they may do business; *provided*, the provisions of this paragraph shall not apply to persons whose fixed place of business is in a county of this State and have paid the tax required by paragraph 2 of section 2.

Packing houses or cold storage.

*Twenty-second.*—Upon all packing houses or dealers doing a a cold storage business in this State, whether carried on by the owners thereof or by their agents, five hundred dollars in each county where said business is carried on.

Breweries.

*Twenty-third.*—Upon all brewing companies, and upon each agent of non-resident brewing companies, two hundred dollars.

Case 3:23-cv-00474-JES-DDL Document 34-5 Filed 03/06/24 PageID.1953 Page 18 of 1085

*Twenty-fourth.*—Upon each pawnbroker, fifty dollars for each place of business.

Pawnbrokers.

*Twenty-fifth.*—Upon all mercantile and collecting agencies, commercial agencies, and all other agencies of like character; fifty dollars in every county where they have an established office.

Collecting and commercial agencies, etc.

SEC. 3. Be it further enacted by the authority aforesaid, That the taxes provided for in paragraphs 1 and 2 of section 2 of this act shall be returned to the tax-receiver in the county of the residence of the person liable to such tax, and shall by the receiver of tax returns be entered upon his digest of taxable property, and that the taxes provided for in paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 and 25 of section 2 of this act shall be returned and paid to the tax-collectors of the counties where such vocations are carried on.

Tax returns and payment.

SEC. 4. Be it further enacted by the authority aforesaid, That the taxes provided for in paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 and 25 of section 2 of this act shall be paid in full for the fiscal years for which they are levied, to the tax-collectors of the counties where such vocations are carried on at the time of commencing to do business specified in said paragraphs. Before any person taxed by paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 and 25 of section 2 of this act shall be authorized to carry on said business, they shall go before the ordinary of the county in which they propose to do business and register their names, place of business, and at the same time pay their taxes to the tax-collector; and it shall be the duty of said ordinary to immediately notify the Comptroller-General and the tax-collector. Any person failing to register with the ordinary, or having registered, failing to pay the tax as herein required, shall be liable to indictment for misdemeanor, and on conviction shall be fined not less than double the tax, or be imprisoned as prescribed by section 4310 of the Code, or both in the discretion of the court; one-half of said fine shall be applied to the payment of the tax, and the other to the fund of fines and forfeitures for use of officers of court.

Payment of taxes on vocations.

Registration of business, etc.

Penalty for failure to register.

SEC. 5. Be it further enacted by the authority aforesaid, That all foreign and home insurance companies doing business in this State shall pay one *per centum* on all premiums, in money or otherwise, received by them; *provided*, this shall not include return premiums on cancelled policies; and, in addition to the

Tax on gross receipts of insurance companies.

Additional tax where brokerage or banking business is done.

tax imposed by this act upon the gross receipts of such insurance companies, all such companies doing brokerage business in this State, such as discounting notes, bills, drafts or exchange, lending money or in any manner doing a business pertaining to banking or brokerage business, shall be taxed upon the capital so employed in the same manner and at the same rate as other moneyed capital in the hands of private individuals is taxed.

Tax on gross receipts of guaranty and similar companies.

SEC. 6. Be it further enacted by the authority aforesaid, That all foreign and home fidelity guarantee companies, or other companies furnishing bonds, or similar associations, doing business in this State, shall pay one per centum on all premiums in money or otherwise received by them, and the agents, general, special or local, as the case may be, of said companies shall make returns to the Comptroller-General on the same terms and in the same manner as insurance companies.

How returns to be made.

Returns of building and loan and similar associations.

SEC. 7. Be it further enacted by the authority aforesaid, That the presidents of all building and loan associations, and other associations of like character, shall be required to return to the tax-receiver of the county where such associations are located, at its true market value, the stock of such associations owned by the stockholders thereof (upon which, as shown by the books of such associations, no advance has been made or money borrowed thereon by the individual stockholders therein), to be taxed as other moneyed capital in the hands of private individuals is taxed; *provided*, this shall not exempt such associations from paying the fees required by the act approved October 19th, 1891.

Tax upon stock in, etc.

Returns, generally of corporations.

SEC. 8. Be it further enacted by the authority aforesaid, That the presidents of all manufacturing and other incorporated companies (or their agents), other than railroad, insurance, telegraph, telephone, express, sleeping and palace car companies, shall be required to return all their property whatever, of their respective companies, at its true market value to the tax-receiver of the county where the same is located, or where the principal business of each company is located, to be taxed for State and county purposes as other property in this State is taxed; save and except, that all canal or slackwater navigation companies shall make through their respective executive officers or stockholders in possession of the same, returns to the tax-receiver of each county in which the same is located or through which the same shall pass, in whole or in part, of the right of way, locks and dams, toll houses, structures and all other real estate owned or used by the company or the stockholders

Returns of canal or slack water navigation companies.

thereof; *provided*, this act shall not make subject to taxation any property of canal or navigation companies which is not subject to taxation by the laws of the State as now existing. The president of every manufacturing company shall be required to answer under oath, in addition to those now provided by law, the following questions:

Questions to be answered by presidents of manufacturing companies.

*First.*—What is the value of raw material on hand on the day fixed for return of property for taxation?

*Second.*—What is the value of manufactured goods or articles on hand on the day fixed for the return of property for taxation?

*Third.*—What amount of money, bonds, notes, accounts and choses in action of every kind did you own on the day fixed for return of property for taxation?

*Fourth.*—What other property of every kind did your company own on the day fixed for the return of property for taxation? And such company shall be taxed upon its entire property so ascertained.

SEC. 9. Be it further enacted by the authority aforesaid, That all persons or companies, including railroad companies doing an express or telegraph business and charging the public therefor, in this State, shall pay two and one-half per centum on their gross receipts, and all persons, or the superintendent or general agent of each telegraph or express company, or the president of each railroad company doing such business in this State, shall make a quarterly return, under oath, as follows: On the last day of March, June, September and December, in each year, to the Comptroller-General, showing a full account of their gross receipts during the quarter ending on such date; and said taxes herein levied upon such gross receipts as shown by said quaterly returns, shall be paid by the respective persons or companies to the Comptroller-General at the same time of making such returns; the gross receipts herein named shall be construed to mean the full amount of all money received from business done within this State. If any person, superintendent, agent or president, as the case may be, whose duty it is to make returns under this paragraph, shall fail to do so within thirty days after the time herein required, such person, superintendent, agent or president shall be liable to indictment, and upon conviction shall be punished as prescribed in section 4310 of the Code of 1882.

Tax on persons or companies doing express or telegraph business.

Returns of such persons or companies.

To whom and when tax to be paid.

Meaning of "gross receipts."

Penalty for failure to make returns.

*Second.*—That each telephone company shall pay a tax of one dollar for each telephone station or box with instruments complete, rented or used by their subscribers, and the superin-

Tax on telephone companies.

Returns and payment of tax.

tendent or general manager of the company shall make returns under oath and payments to the Comptroller-General on the dates named in the first paragraph of this section.

Sleeping cars.

*Third.*—That each non-resident, person or company whose sleeping cars are run in this State shall be taxed as follows: Ascertain the whole number of miles of railroads over which such sleeping cars are run, and ascertain the entire value of all sleeping cars of such person or company, then tax such sleeping cars at the regular tax rate imposed upon the property of this State, in the same proportion to the entire value of such sleeping cars that the length of the lines in this State over which such cars run bears to the length of the lines of all railroads over which such sleeping cars are run. The return shall be made to the Comptroller-General by the president, manager, general agent or person in control of such cars in this State. The Comptroller-General shall frame such questions as will elicit the information sought, and answers thereto shall be made under oath. If the officers above referred to in control of such sleeping cars shall fail or refuse to answer under oath the questions so propounded, then the Comptroller-General shall obtain the information from such sources as he may, and he shall assess a double tax on such sleeping cars. If the taxes herein provided for are not paid, the Comptroller-General shall issue executions against the owners of such cars, which may be levied by the sheriff of any county in this State upon the sleeping car or cars of the owner who has failed to pay these taxes.

By and to whom returns to be made.

Questions to be framed by Comptroller-General.

Penalty for failure to answer questions.

Collection of unpaid tax.

Sewing machine companies and dealers in sewing machines. Lists of agents.

Sec. 10. Be it further enacted by the authority aforesaid, That every sewing machine company selling or dealing in sewing machines, by itself or its agents, in this state, and all wholesale and retail dealers in sewing machines selling machines manufactured by companies that have not paid the tax required herein. shall pay two hundred dollars for the fiscal year or fractional part thereof, to be paid to the Comptroller-General at the time of commencement of business, and said companies or dealers shall furnish the Comptroller-General a list of agents authorized to sell machines of their manufacture or under their control, and shall pay to said Comptroller-General the sum of five dollars for each of said agents, for the fiscal year or fractional part thereof, for each county in which said agent may do business for said company. Upon the payment of said additional sum, the Comptroller-General shall issue to each of said agents a certificate of authority to transact business in this State, and such companies, dealers and agents, having paid the taxes re-

Tax for agents.

Certificate to be issued to agents.

quired herein, shall be exempted from any county or corporation tax for selling said sewing machines. Before doing business under this Act, all sewing machine agents shall be required to register their names with the ordinaries of those counties in which they intend to operate, and exhibit to said ordinaries their license from the Comptroller-General, and to keep such license posted on their vehicles or at their place of business. Wholesale or retail dealers in sewing machines shall be required to pay the tax provided herein for each manufacture of sewing machines sold by them, except the manufacture of such companies as have paid the tax required by this Act. All unsold sewing machines belonging to sewing machine companies, dealers or their agents in possession of said companies, dealers, their agents or others, shall be liable to seizure and sale for payment of such license, fees and tax. Any person who shall violate the provisions of this section shall be liable to indictment for a misdemeanor, and on conviction shall be punished as prescribed in section 4310 of the Code. None of the provisions of this section shall apply to licensed auctioneers selling second-hand sewing machines, or to officers of the law under legal process, or to merchants buying and selling machines on which a license tax has been paid as herein provided, and who keep the said machines and sell and deliver them at their places of business, such sales not being on commission.

Exemption from county or corporation tax.

Registration, etc. of sewing machine agents.

Tax to be paid by dealers.

Lien on machines for taxes.

Penalty for violation of this section.

Certain exemptions from provisions of this section.

SEC. 11. Be it further enacted, by the authority aforesaid, That no tax shall be assessed upon the capital of banks or banking associations organized under the authority of this State, or, of the United States, and located within this State, but the shares of the stockholders of such bank or banking associations whether resident or non-resident owners, shall be taxed in the county where such bank or banking associations are located, and not elsewhere, at their true and full market value, at the same rate provided in this act for the taxation of moneyed capital in the hands of private individuals; *provided*, that nothing in this section contained shall be construed to relieve such banks or banking associations from the tax on property owned by them and provided for in section 7 of this act; *and provided further*, that nothing herein contained shall be construed to levy any tax on the real or personal property held or owned by any bank or banking association doing business in this State, the value of which is represented in the market value of the shares of its stock as returned to the tax-receiver by said bank and banking associations.

No tax on capital stock of banks.

Shares of stockholders to be taxed.

Banks not relieved from property tax.

Property not taxed when its value represented in value of stock.

Case 3:23-cv-00474-JES-DDL Document 34-5 Filed 03/06/24 PageID.1958 Page 23 of 1085

Returns for railroad companies.

SEC. 12. Be it further enacted by the authority aforesaid, That the president of all railroad companies doing business in this State shall make returns to the Comptroller-General, in the manner provided by law for the taxation of the property of the gross receipts on net income of such railroads, and shall pay the Comptroller-General the tax to which such property or gross receipts or net income may be subject according to the provision of this act and the laws now of force relating to the tax on railroads; and on failure to make returns or refusal to pay tax, said companies shall be liable to all penalties now provided by law, and the Comptroller-General is hereby required, upon failure of such companies to make returns, or if made, and not satisfactory to said office, to proceed against such companies as provided in section 826(d) of the Code of 1882.

Payment of tax.

Penalty for failure to make returns or pay tax.

Returns of corporations where not required to be made to tax receivers, to be made to Comptroller-General.

SEC. 13. Be it further enacted by the authority aforesaid, That the presidents and principal agents of all the incorporated companies herein mentioned, except such as are required to make returns to the tax-receivers of the counties, shall make returns to the Comptroller-General under the rules and regulations provided by law for such returns, and subject to the same penalties and the modes of procedure for the enforcement of taxes from companies or persons required by law to make returns to the Comptroller-General.

General rules for, etc.

Returns of owners of vessels, etc.

SEC. 14. Be it further enacted by the authority aforesaid, That any person or company, resident of this State, who is the owner of a vessel, boats, or water-craft of any description, shall answer, under oath, the number of vessels, boats and other water-crafts owned by them and the value of each, and make returns of the same to the tax-receiver of the county of the residence of such person or company, and the same shall be taxed as other property is taxed.

General rules governing returns of property.

SEC. 15. Be it further enacted by the authority aforesaid, That in returning property for taxes, all property shall be returned at its value; promissory notes, accounts, judgments, mortgages, liens of all kinds and all choses in action shall be given in at their value, whether solvent or partially solvent. Every person shall return for taxes all jewelry and other property of every kind owned by his wife and minor children, unless the members of his or her family return their property for taxation. In addition to the questions now propounded to tax-payers by the tax-receivers, questions shall be framed by the Comptroller-General to reach all property upon which a tax is imposed by this Act, and especially the following questions:

Additional questions to be asked tax-payers.

*First.*—The number of horses, mules, oxen, cows, sheep, hogs, goats, and of all other animals upon which a tax is imposed by law and state the value of each.

*Second.*—The kind and value of property owned by the wife and minor children of the tax-payer and not returned for taxes by the owner thereof.

*Third.*—Whether solvent or partially solvent, give the value of your bonds, stocks of non-resident companies or corporations, or of companies or corporations in this State whose capital stock is not returned by the president of such company or corporation, all notes, accounts, judgments, mortgages, liens and other choses in action of every kind, whether such bonds, stocks, notes, etc., are held by the tax-payers in Georgia, or held by some other person for him, either in or out of this State. There shall be no deduction from the value of property returned for taxes on account of any indebtedness of such tax-payer.

Oath to be taken by persons making returns.

SEC. 16. Be it further enacted by the authority aforesaid, That the oath to be administered to all persons making returns of their taxable property shall be the oath required under the act of October 20th, 1885, to be attached to the printed list furnished under said Act, and presented to each tax-payer; *provided*, that non-residents, females and sick persons may subscribe the oath herein required before any person authorized by law to administer oaths, and cause same to be delivered to the tax-receiver.

When returns may be received.

SEC. 17. Be it further enacted by the authority aforesaid, That the Comptroller-General is authorized and empowered to order the tax-receivers of this State to commence receiving the returns of taxable property immediately after the first day of April of each of the years eighteen hundred and ninety-three (1893) and eighteen hundred and ninety-four (1894), and that the Comptroller-General is empowered and required to cause the taxes to be collected and paid into the State Treasury by the 20th of December of each of the years 1893 and 1894.

When taxes to be collected.

Exemptions of blind persons and Confederate soldiers.

SEC. 18. Be it further enacted by the authority aforesaid, That blind persons and Confederate soldiers, relieved by the proviso in paragraph 1, section 2, from the payment of the tax designated in that paragraph, shall be relieved also from the payment of the taxes designated in paragraphs 6, 7, 8 and 11 of section 2, if carrying on and dependent upon the kinds of business designated therein; *provided*, that before any person shall be entitled to the benefit of any of the exemptions provided for in this section, he shall go before the ordinary of the

3

KR1067

county in which he purposes to carry on business, and make and file an affidavit setting forth the facts that he is entitled to such exemptions, that he is proprietor of the business he proposes to conduct, and is conducting the same for himself and not for others.

Day to be fixed for making return of taxes.

SEC. 19. Be it further enacted, That immediately after the first day of April of each of the years 1893 and 1894, the Governor, Comptroller-General and State Treasurer shall fix a day between January 1st and April 1st of each of the years 1893 and 1894 as a day for making a return of taxes instead of April 1st, which day shall not be fixed until after April 1st of each of the years 1893 and 1894.

SEC. 20. Be it further enacted by the authority aforesaid, That all laws and parts of laws in conflict with this Act be, and they are, hereby repealed.

Approved December 23, 1892.

---

REPEALING ACT CREATING BOARD OF EQUALIZATION.

No. 113.

An Act to repeal an act approved August 14th, 1891, entitled an act to provide a Board of Equalization of real and personal property subject to taxation in this State, and for other purposes, and to restore the law as it existed prior to August 14th, 1891.

Act of August 14, 1891, providing for Board of Equalization, repealed.

SECTION 1. Be it enacted by the General Assembly of the State of Georgia, That an act, approved August 14th, 1891, entitled an act to provide a Board of Equalization of real and personal property subject to taxation in this State, be, and the same is, hereby repealed.

Former laws affected by said Act revived.

SEC. 2. Be it further enacted, That all laws which were, in any way repealed or modified by the act hereby repealed be, and the same are, hereby restored to full force.

SEC. 3. Be it further enacted, That all laws and parts of laws in conflict with this Act be, and the same are, hereby repealed.

Approved December 22, 1892.

# EXHIBIT 38

KR1069

# TITLE II.

## TAXES AND PUBLIC DEBT.

### ACTS.

General Tax Act for 1895 and 1896.
Creation of Sinking Fund to Retire State Bonds.
Manner of Entering on Digest Names of Colored Tax-payers.

### GENERAL TAX ACT FOR 1895 AND 1896.

No. 151.

An Act to levy and collect a tax for the support of the State government and the public institutions, for educational purposes in instructing children in the elementary branches of an English education only; to pay the interest on the public debt, and to pay maimed Confederate soldiers and widows of Confederates such amounts as are allowed them by law for each of the fiscal years eighteen hundred and ninety-five and eighteen hundred and ninety-six; and to prescribe what persons, professions, and property are liable to taxation; to prescribe the methods of receiving and collecting said taxes; to prescribe the method of ascertaining the property of this State subject to taxation; prescribe additional questions to be propounded to tax-payers, and to provide penalties and forfeitures for non-payment of taxes, and for other purposes.

General ad valorem tax.

SECTION I. Be it enacted by the General Assembly of the State of Georgia, That the Governor be authorized and empowered, with the assistance of the Comptroller-General, to assess and levy a tax on the taxable property of this State for each of the fiscal years eighteen hundred and ninety-five and eighteen hundred and ninety-six of two mills and $\frac{80}{100}$ths of a mill, and the Governor be, and is, hereby authorized and empowered, by and with the assistance of the Comptroller-General, to assess and levy, in addition to the foregoing general State tax, a tax of one mill and one-half of a mill for each of the years eighteen hundred and ninety-five and eigh-

Ad valorem tax for school purposes.

teen hundred and ninety-six on all of the taxable property of this State, for the purpose of raising the funds necessary to meet the appropriations of this General Assembly for educational purposes in instructing children in the elementary branches of an English education only.

Specific taxes.

SEC. II. Be it further enacted by the authority aforesaid, That, in addition to the *ad valorem* tax on real estate and personal property, as required by the Constitution and provided for in the preceding section, the following specific taxes shall be levied and collected for each of said fiscal years eighteen hundred and ninety-five and eighteen hundred and ninety-six.

Poll tax.

*First.*—Upon each and every male inhabitant of the State, between the ages of twenty-one and sixty years, on the days fixed for return of property for taxation, a poll tax of one ($1) dollar, which shall be for educational purposes in instructing children in the elementary branches of an English education only; *provided,* this tax shall not be demanded of blind persons, nor of crippled, maimed, or disabled Confederate soldiers, relieved of such taxes under and by authority of an Act approved July 23, 1883.

Exemptions from poll tax.

Lawyers, doctors, dentists, corporation presidents, loan agents, etc.

*Second.*—Upon every practitioner of law, medicine, or dentistry, presidents of each of the banks of the State, each agent or firm negotiating loans and charging therefor, the presidents of each of the railroad companies, presidents of each of the express, telegraph, telephone, electric light, and gas companies doing business in this State, and in case the presidents of any such companies do not reside in this State, then, in such case, upon the superintendent or general agent of such companies who may reside in this State, ten ($10) dollars, and no municipal corporation or county authorities shall levy any additional tax on said professions either as a license fee or otherwise.

Photographic artists.

*Third.*—Upon every daguerrean, ambrotype, photographic, and similar artist, ten ($10) dollars in each county in which they may carry on business; *provided,* this tax shall not be required of any ex-Confederate soldier.

Exemption

Auctioneers.

*Fourth.*—Upon every person carrying on the business of auctioneer, for pay or compensation, twenty-five ($25) dollars for each county in which they may carry on such business.

Keepers of pool, billiard, or bagatelle tables.

*Fifth.*—Upon every keeper of a pool, billiard, or bagatelle table, kept for public use, whether in a bar-room, hotel, or other public place, twenty-five ($25) dollars for each table.

Keepers of gaming places, etc.

*Sixth.*—Upon every keeper of any other table, stand, or place for the performance of any game or play; and upon the keeper of any flying-horses, or any other game or play, unless kept for exercise or amusement not prohibited by law, and not kept for gain, directly or indirectly, twenty-five ($25) dollars in each county.

Keepers of ten-pin alleys, etc.

*Seventh.*—Upon every keeper of a ten-pin alley, or alley of like character, kept for public play, and upon every keeper of a shooting-gallery, twenty-five ($25) dollars for each place of business.

Shooting galleries.

Peddlers.

*Eighth.*—Upon every traveling vendor of patent or proprietary medicines, special nostrums, jewelry, paper, soap, or other merchandise, fifty ($50) dollars in each county where they may offer such articles for sale.

Local insurance agents.

Agents of matrimonial companies, etc.

Travelling, special, or general insurance agents.

License of such agents.

Exemption from.

*Ninth.*—Upon every local insurance agent or firm of agents, or insurance broker or firm of brokers doing business in this State, ten ($10) dollars for each county in which they shall solicit business; and upon every agent of a matrimonial, natal, or nuptial company, one hundred ($100.00) dollars for each county in which they shall do business; and upon every traveling or special or general agent of life, fire, accident, or other insurance company doing business in this State, fifty ($50) dollars, which said tax must be paid before said agents shall be authorized to act as agents for any of their companies. Said tax shall be paid by said companies to the Comptroller-General, and shall be in addition to the license fee required of insurance companies by the Act approved October 24, 1887. The receipts of the Comptroller-General for the payment of this tax, together with his certificate, as provided by said Act, approved October 24, 1887, shall constitute the license for said agents to transact business for their companies as designated by said certificates; *provided,* this tax shall not be required of agents of assessment life insurance companies or mutual aid societies; *provided further,* that railroad ticket agents selling accident insurance tickets shall not be deemed insurance agents in the sense of this section, and this section shall not apply to railroad ticket agents selling accident insurance tickets, and that railroad ticket agents who sell accident insurance tickets shall not be required to pay the said tax; *provided further,* that this tax shall not be required of agents of industrial life insurance companies writing what are known as industrial life insurance premiums, on which are payable, in weekly instalments, not exceeding $1.05 per week.

Emigrant agents.

*Tenth.*—Upon each emigrant agent or employer or employee of such agents doing business in this State, the sum of five hundred dollars for each county in which such business is conducted.

Vendors using boats

Tax to be lien on boat and contents.

*Eleventh.*—Upon every traveling vendor using boats for the purpose of selling goods on the rivers or waters within the limits of this State, the sum of fifty ($50.00) dollars in each county where they may sell their wares, and said tax shall be a lien on the boat and its contents, without regard to the ownership thereof.

Itinerant lightning-rod dealers or agents.

*Twelfth.*—Upon all itinerant lightning-rod dealers or agents, the sum of fifty ($50.00) dollars for each and every county in which they operate.

*Thirteenth.*—Upon all shows and exhibitions (except such as histrionic, musical, operatic, and elocutionary), including the side-shows accompanying circus companies, fifty ($50.00) dollars in each and every city or town of five thousand inhabitants; forty dollars in cities or towns of four thousand and under five thousand inhabitants, and thirty dollars in towns of less than four thousand inhabitants; said tax, so collected, shall be for educational purposes.

Shows and exhibitions

Tax to be used for educational purposes

*Fourteenth.*—Upon every circus company, or others giving an exhibition beneath or within a canvas enclosure, advertised in print or by parade, or in any manner whatsoever as a circus, menagerie, hippodrome, spectacle, or show implying a circus, three hundred dollars each day it may exhibit in the State of Georgia; said tax shall be for educational purposes.

Circus companies, etc.

Tax to be used for educational purposes

*Fifteenth.*—Upon all dealers in spirituous or malt liquors, intoxicating bitters, or brandy fruits or domestic wines, whether dealing in any or all thereof, one hundred dollars for each place of business in each county where the same are sold; *provided,* that parties engaged in the manufacture of spirituous or malt liquors under license by the government, who are prohibited by any local law from selling the same in the county where manufactured, shall not be subject to this tax unless they carry on the business of retailing or wholesaling such spirituous or malt liquors in some other county where the sale is not prohibited; *provided,* this tax shall not relieve such dealers from any local tax or prohibitory law in reference to the retail of spirituous or intoxicating liquors, nor be required of those who sell by wholesale spirits manufactured of apples, peaches, grapes, blackberries, or other fruits grown on their own lands when sold in quantities not less than five gallons; *provided,* that nothing in this act shall be construed as to levy a tax on dealers in domestic wines manufactured from grapes or berries purchased by or grown on lands owned, leased, or rented by said dealer; said tax shall be for educational purposes.

Liquor dealers.

Exemptions from tax.

Tax to be used for educational purposes

*Sixteenth.*—Upon all dealers in pistols, toy pistols shooting cartridges, pistol or rifle cartridges, dirks, bowie-knives, or metal knucks, twenty-five dollars for each place of business in the county where the same are sold.

Dealers in pistols and other weapons.

*Seventeenth.*—Upon every individual or firm, or his or their agents, engaged in the business of selling or buying through regularly organized stock and cotton exchanges, or boards of trade, farm products, sugar, coffee, and salt and meat, railroad stocks and bonds, and stocks and bonds of all kinds, not intended for *bona fide* sale and delivery, but for future delivery (commonly called "futures"), one thousand dollars each per annum for each county where such business is carried on; *provided,* that this tax shall not be demanded of any cotton warehouseman, dealer in cotton, or any pro-

Dealers in "futures."

Exemptions from

Case 3:23-cv-00474-JES-DDL Document 34-5 Filed 03/06/24 PageID.1966 Page 31 of 1085

vision broker who takes orders in the regular course of their trade, only for the actual and *bona fide* delivery of cotton and other produce so ordered, and where, by the terms of the contract, it is not left to the option of the party so ordering, or the party taking such order, to avoid the delivery of the produce or products by paying the difference in the market price of such produce or products at the time of delivery; *provided further*, that such cotton warehouseman, dealer in actual cotton, or any provision broker does not carry on the business of buying "futures" in connection with his or their other business, and upon every individual or firm, or his or their agents, engaged in a like business, when they take orders on their own account and determine the loss or gain between them and their patrons by market reports received from any source whatever, and whose business is generally denominated "bucket shops," the sum of ten thousand dollars.

Peddlers of stoves or ranges.

*Eighteenth.*—Upon every peddler of stoves or ranges for cooking purposes, the sum of one hundred dollars in every county in which such peddler may do business; and upon each traveling vendor of patent churns and patent fences, the sum of ten dollars in each county in which they offer such articles for sale.

Peddlers of churns and fences

Packing houses.

*Nineteenth.*—Upon all packing-houses or dealers doing business in this State, whether carried on by the owners thereof or by their agents, fifty dollars ($50) in each county where said business is carried on.

Keepers for hire or sale of billiard tables, etc.

*Twentieth.*—Upon every person or firm, for himself or agent for resident or non-resident owners, who keeps or holds for hire or sale any billiard, pool, or other table of like character, fifty ($50) dollars for each county in which such person or firm does business.

Clock peddlers.

*Twenty-first.*—Upon each peddler of clocks, one hundred dollars in each county of the State in which said peddler may do business.

Itinerant doctors, dentists, etc.

*Twenty-second.*—Upon all itinerant doctors, dentists, opticians, or specialists of any kind doing business in this State, ten dollars for each county in which they may do business; *provided*, the provisions of this paragraph shall not apply to persons whose fixed place of business is in a county of this State and have paid the tax required by paragraph 2 of section 2.

Exemptions from.

Brewing companies.

*Twenty-third.*—Upon all brewing companies, two hundred dollars.

Pawn-brokers.

*Twenty-fourth.*—Upon each pawn-broker, fifty dollars for each place of business.

Commercial agencies.

*Twenty-fifth.*—Upon all mercantile and collecting agencies, commercial agencies, and all other agencies of like character, fifty dollars in every county where they have established an office.

General tax returns

SEC. III. Be it further enacted by the authority aforesaid, That the taxes provided for in paragraphs 1 and 2 of section 2 of this Act, shall be returned to the tax-receiver in the county of the resi-

dence of the persons liable to such tax, and shall, by the receiver of tax-returns, be entered upon his digest of taxable property, and that the taxes provided for in paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25 of section 2 of this Act shall be returned and paid to the tax-collectors of the counties where such vocations are carried on.

General rule as to whom and when taxes to be paid.

SEC. IV. Be it further enacted by the authority aforesaid, That the taxes provided for in paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25 of section 2 of this Act shall be paid in full for the fiscal years for which they are levied to the tax-collectors of the counties where such vocations are carried on at the time of commencing to do business specified in said paragraphs. Before any person taxed by paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25 of section 2 of this Act shall be authorized to carry on said business, they shall go before the ordinary of the county in which they propose to do business and register their names, place of business, and at the same time pay their taxes to the tax-collector, and it shall be the duty of said ordinary to immediately notify the Comptroller-General and the tax-collector. Any person failing to register with the ordinary, or, having registered, failing to pay the tax as herein required, shall be liable to indictment for misdemeanor, and, on conviction, shall be fined not less than double the tax, or be imprisoned as prescribed by section 4310 of the Code, or both, in the discretion of the court. One-half of said fine shall be applied to the payment of the tax, and the other to the fund of fines and forfeitures for use of officers of court.

Registration of business.

Failure to register to pay business tax.

Tax on insurance companies or brokers.

SEC. V. Be it further enacted by the authority aforesaid, That all foreign and home insurance companies, or insurance brokers placing insurance on property in this State, doing business in this State, shall pay one *per centum* on all premiums in money or otherwise received by them; *provided*, this shall not include return premiums on cancelled policies; *provided further*, that this shall not apply to mutual, co-operative, or assessment fire companies organized for mutual protection against losses by fire, and receiving no premiums other than the assessment of its own members; and in addition to the tax imposed by this Act upon the gross receipts of such insurance companies, all such companies doing brokerage business in this State, such as discounting notes, bills, drafts, or exchange, lending money, or in any manner doing a business pertaining to banking or brokerage business, shall be taxed upon the capital so employed in the same manner and at the same rate as other moneyed capital in the hands of private individuals is taxed.

Exemptions from.

Insurance companies doing brokerage business.

Fidelity guarantee companies etc.

SEC. VI. Be it further enacted by the authority aforesaid, That all foreign and home fidelity guarantee companies, or other companies

furnishing bonds, or similar associations doing business in this State, shall pay one *per centum* on all premiums, in money or otherwise, received by them, and the agents, general or special or local, as the case may be, of said companies shall make returns to the Comptroller-General on the same terms and in the same manner as insurance companies.

Returns of building and loan associations, etc.

SEC. VII. Be it further enacted by the authority aforesaid, That the president of all building and loan associations or other associations of like character shall be required to return to the tax-receiver of the county where such associations are located, at its true market value, the stock of such associations owned by the stockholders thereof (upon which, as shown by the books of such association, no advance has been made or money borrowed thereon by the individual stockholders therein), to be taxed as other moneyed capital in the hands of private individuals is taxed; *provided*, that no tax shall be required of building and loan associations to be paid upon any portion of their capital which has been loaned or advanced to a shareholder upon real estate, upon which real estate tax is payable by said shareholders; *and provided further*, that the taxes required by this section shall be in lieu of all other taxes and licenses, whether State, county or municipal, against said associations, except a business license by the town or city in which the principal office of any such association is located, and except a fee required to be paid the State Treasurer by the Act approved October 19, 1891.

Exemption from.

This tax to be in lieu of others.

Returns of corporations, other than railroad, insurance, express, etc., companies.

SEC. VIII. Be it further enacted by the authority aforesaid, That the presidents of all manufacturing and other incorporated companies, or their agents, other than railroad, insurance, telegraph, telephone, express, sleeping and palace car companies, shall be required to return all their property whatever of their respective companies at its true market value to the tax-receiver of the county where the same is located, or where the principal business of each company is located, to be taxed for State and county purposes as other property in this State is taxed; save and except that all canal or slack-water navigation companies shall make, through their respective executive officers or stockholders in possession of the same, returns to the tax-receiver of each county in which the same is located, or through which the same shall pass, in whole or in part, of the right of way, locks and dams, toll-houses, structures, and all other real estate owned or used by the company or the stockholders thereof; *provided*, this Act shall not make subject to taxation any property of canal or navigation companies which is not subject to taxation by the laws of this State as now existing. The president of every manufacturing company shall be required to answer under oath, in addition to those now provided by law, the following questions:

Canal or slack-water navigation companies.

Questions to be answered by presidents of manufacturing companies.

*First.*—What is the value of raw material on hand on the day fixed for return of property for taxation?

*Second.*—What is the value of manufactured goods or articles on hand on the day fixed for the return of property for taxation?

*Third.*—What amount of money, bonds, notes, accounts, and choses in action of every kind did you own on the day fixed for return of property for taxation?

*Fourth.*—What other property of every kind did your company own on the day fixed for the return of property for taxation?

And such company shall be taxed upon its entire property so ascertained.

Tax on companies doing express or telegraph business.

SEC. IX. Be it further enacted by the authority aforesaid, That all persons or companies, including railroad companies, doing an express or telegraph business and charging the public therefor, in this State, shall pay two and one-half *per centum* on their gross receipts, and all persons, or the superintendent or general agent of each telegraph or express company, or the president of each railroad company doing such business in this State, shall make a quarterly return, under oath, as follows:

Returns of.

On the last day of March, June, September, and December, in each year, to the Comptroller-General, showing a full account of their gross receipts during the quarter ending on such date; and said taxes herein levied upon such gross receipts as shown by said quarterly returns shall be paid by the respective persons or companies to the Comptroller-General at the same time of making such returns; the gross receipts herein named shall be construed to mean the full amount of all money received from all business done within this State. If any person, superintendent, agent, or president, as the case may be, whose duty it is to make returns under this paragraph, shall fail to do so within thirty days after the time herein required, such person, superintendent, agent, or president shall be liable to indictment, and upon conviction shall be punished as prescribed in section 4310 of the Code of 1882.

Failure to make return.

Tax on telephone companies.

*Second.*—That each telephone company shall pay a tax of one dollar for each telephone station or box with instruments complete, rented or used by their subscribers, and the superintendent or general manager of the company, shall make returns, under oath, and payments to the Comptroller-General on the dates named in the first paragraph of this section.

Returns of.

Sleeping-cars.

*Third.*—That each non-resident person or company, whose sleeping-cars are run in this State, shall be taxed as follows: Ascertain the whole number of miles of railroads over which such sleeping-cars are run, and ascertain the entire value of all sleeping-cars of such person or company, then tax such sleeping-cars at the regular tax rate imposed upon the property of this State, in the

same proportion to the entire value of such sleeping-cars, that the length of the lines in this State over which such cars run bears to the length of the lines of all railroads over which such sleeping-cars are run. The returns shall be made to the Comptroller-General by the president, manager, general agent, or person in control of such cars in this State. The Comptroller-General shall frame such questions as will elicit the information sought, and answers thereto shall be made under oath. If the officers above referred to in control of such sleeping-cars shall fail or refuse to answer, under oath, the questions so propounded, then the Comptroller-General shall obtain the information from such sources as he may, and he shall assess a double tax on such sleeping-cars. If the taxes herein provided for are not paid, the Comptroller-General shall issue executions against the owners of such cars, which may be levied by the sheriff of any county in this State upon the sleeping-car or cars of the owner who has failed to pay these taxes.

Returns of.

Failure to make proper return.

Failure to pay tax.

SEC. X. Be it further enacted by the authority aforesaid, That every sewing-machine company selling or dealing in sewing-machines, by itself or its agents in this State, and all wholesale and retail dealers in sewing-machines selling machines manufactured by companies that have not paid the tax required herein, shall pay two hundred dollars for the fiscal year, or fractional part thereof, to be paid to the Comptroller-General at the time of commencement of business, and said companies or dealers shall furnish the Comptroller-General a list of agents authorized to sell machines of their manufacture, or under their control, and shall pay to said Comptroller-General the sum of five dollars for each of said agents for the fical year, or fractional part thereof, for each county in which said agent may do business for said company. Upon the payment ot said additional sum, the Comptroller-General shall issue to each of said agents a certificate of authority to transact business in this State, and such companies, dealers, and agents, having paid the taxes required herein, shall be exempted from any county or corporation tax for selling said sewing-machines. Before doing business under this act, all sewing-machine agents shall be required to register their names with the ordinaries of those counties in which they intend to operate and exhibit to said ordinaries their license from the Comptroller-General, and to keep such license posted on their vehicles or at their places of business. Wholesale or retail dealers in sewing-machines shall be required to pay the tax provided herein for each manufacture of sewing-machines sold by them, except the manufacture of such companies as have paid the tax required by this Act. All unsold sewing-machines belonging to sewing-machine companies, dealers, or their agents, in possession

Sewing-machine companies or dealers.

Lists of agents.

Tax on agents.

Agent's certificate

Exemption from county or corporation tax.

Registration of agents, etc.

Tax for each manufacture of machines.

Lien on unsold machines.

Case 3:23-cv-00474-JES-DDL Document 34-5 Filed 03/06/24 PageID.1971 Page 36 of 1085

of said companies, dealers, their agents, or others, shall be liable to seizure and sale for payment of such fees, license, and tax. Any person who shall violate the provisions of this section shall be liable to indictment for a misdemeanor, and on conviction shall be punished as prescribed in section 4310 of the Code. None of the provisions of this section shall apply to licensed auctioneers selling second-hand sewing-machines, or to officers of the law under legal process, or to merchants buying and selling machines on which a license tax has been paid, as herein provided, and who keep the said machines and sell and deliver them at their places of business, such sales not being on commission.

Penalty for violations of this section.

Exemptions.

SEC. XI. Be it further enacted by the authority aforesaid, That no tax shall be assessed upon the capital of banks or of banking associations organized under the authority of this State or of the United States, and located within this State; but the shares of the stockholders of such bank or banking associations, whether resident or non-resident owners, shall be taxed in the county where such bank or banking associations are located, and not elsewhere, at their true and full market value at the same rate provided in this Act for taxation of moneyed capital in the hands of private individuals; *provided*, that nothing in this section contained shall be construed to relieve such banks or banking associations from the tax on property owned by them and provided for in section 8 of this Act.

Tax on bank stock.

SEC. XII. Be it further enacted by the authority aforesaid, That the president of all railroad companies doing business in this State shall make returns to the Comptroller-General in the manner provided by law for the taxation of the property, of the gross receipt or net income of such railroads, and shall pay the Comptroller-General the tax to which such property or gross receipts or net income may be subject according to the provisions of this Act and the laws now of force relating to the tax on railroads; and, on failure to make returns or refusal to pay tax, said companies shall be liable to all the penalties now provided by law, and the Comptroller-General is hereby required, upon failure of such companies to make returns, or if made and not satisfactory to said officer, to proceed against such companies as provided in section 826(d) of the Code of 1882.

Returns of railroad companies.

Payment of tax

Failure to make return or pay tax.

SEC. XIII. Be it further enacted by the authority aforesaid, That the president and principal agents of all the incorporated companies herein mentioned, except such as are required to make returns to the tax-receivers of the counties, shall make returns to the Comptroller-General, under the rules and regulations provided by law for such returns, and subject to the same penalties and the modes of procedure for the enforcement of taxes from companies or persons required by law to make returns to the Comptroller-General.

Corporations to make returns to Comp.-General, etc

Case 3:23-cv-00474-JES-DDL Document 34-5 Filed 03/06/24 PageID.1972 Page 37 of 1085

Questions to be answered by owners of vessels, etc.

SEC. XIV. Be it further enacted by the authority aforesaid, That any person or company, resident of this State, who is the owner of a vessel, boats, or water-craft of any description, shall answer under oath the number of vessels, boats, and other water-crafts owned by them and the value of each, and make returns of the same to the tax-receiver of the county of the residence of such person or company, and the same shall be taxed as other property is taxed.

Returns of and tax on.

General rule as to returns for ad valorem tax.

SEC. XV. Be it further enacted by the authority aforesaid, That in returning property for taxes, all property shall be returned at its value; promissory notes, accounts, judgments, mortgages, liens of all kinds, and all choses in action shall be given in at their value, whether solvent or partially solvent. Every person shall return for taxes all jewelry and other property of every kind owned by his wife and minor children, unless the members of his family or her family return their property for taxation. In addition to the questions now propounded to tax-payers by the tax-receivers, questions shall be framed by the Comptroller-General to reach all property upon which a tax is imposed by this Act, and especially the following questions:

Additional questions for to be framed by Comp.-General

Especially.

*First.*—The number of horses, mules, oxen, cows, sheep, hogs, goats, and of all other animals upon which a tax is imposed by law, and state the value of each.

*Second.*—The kind and value of property owned by the wife and minor children of the tax-payer and not returned for taxes by the owner thereof.

*Third.*—Whether solvent or partially solvent, give the value of your bonds, stock of non-resident companies or corporations, or of companies or corporations in this State whose capital stock is not returned by the president of such company or corporation, all notes, accounts, judgments, mortgages, liens, and other choses in action of every kind, whether such bonds, stocks, notes, etc., are held by the tax-payers in Georgia, or held by some other person for him either in or out of this State. There shall be no deduction from the value of property returned for taxes on account of any indebtedness of such tax-payer.

No deduction on account of indebtedness of tax-payer.

Oath of person making return.

SEC. XVI. Be it further enacted by the authority aforesaid, That the oath to be administered to all persons making returns of their taxable property shall be the oath required under the Act of October 20, 1885, to be attached to the printed list furnished under said Act and presented to each tax-payer; *provided*, that non-residents, females, and sick persons may subscribe the oath herein required before any person authorized by law to administer oaths, and cause same to be delivered to the tax-receiver.

SEC. XVII. Be it further enacted by the authority aforesaid, That the Comptroller-General is authorized and empowered to order the tax-receivers of this State to commence receiving the returns of taxable property immediately after the first day of April of each of the years eighteen hundred and ninety-five (1895) and eighteen hundred and ninety-six (1896), and that the Comptroller-General is empowered and required to cause the taxes to be collected and paid into the State treasury by the 20th of December of each of the years 1895 and 1896.

When returns to be received

When taxes to be paid.

SEC. XVIII. Be it further enacted by the authority aforesaid, That blind persons, Confederate soldiers, and all other persons so deformed by nature as to render them unfit for manual labor, relieved by the proviso in paragraph 1, section 2, from the payment of the tax designated in that paragraph, shall be relieved also from the payment of the taxes designated in paragraphs 6, 7, 8, and 11 of section 2, if carrying on and dependent upon the kinds of business designated therein; *provided*, that before any person shall be entitled to the benefit of any of the exemptions provided for in this section, he shall go before the ordinary of the county in which he proposes to carry on business, and make and file an affidavit setting forth the facts that he is entitled to such exemption, that he is proprietor of the business he proposes to conduct, and is conducting the same for himself, and not for others.

Exemptions of blind persons, soldiers, and persons deformed.

SEC. XIX. Be it further enacted by the authority aforesaid, That immediately after the first day of March of each of the years 1895 and 1896, the Governor, Comptroller-General, and State Treasurer shall fix a day between January the 1st and April the 1st of each of the years 1895 and 1896, as a day for making a return of taxes, instead of April 1st, which day shall not be fixed until March 1st of each of the years 1895 and 1896, as provided by Act approved December 20, 1893.

Day for making returns, how fixed.

SEC. XX. Be it further enacted by the authority aforesaid, That all laws and parts of laws in conflict with this Act be, and the same are, hereby repealed.

Approved December 18, 1894.

# EXHIBIT 39

KR1082

# TITLE II.

## TAXES.

## ACTS.

### FOR SUPPORT OF STATE GOVERNMENT 1883-84.

To extend time for returning wild lands and payment of taxes thereon for 1882.
Taxation of railroads by counties and municipal corporations on property not used in their ordinary business.
For taxing rolling stock and personal property of railroads partly in this and partly in other States.
Amending of Act of September 28th, 1881, as to record of wild land returns, notification to owner, etc.

### FOR SUPPORT OF STATE GOVERNMENT 1883-84.

No. 18

An Act to levy and collect a tax for the support of the State Government and the public institutions; to pay the interest and maturing principal of the public debt and for educational and other purposes herein mentioned for each of the fiscal years eighteen hundred and eighty-three and eighteen hundred and eighty-four.

Tax for 1883-4.

Not to exceed two and one-half tenths of one per cent.

SECTION I. *Be it enacted by the General Assembly of the State of Georgia*, That the Governor be authorized and empowered, with the assistance of the Comptroller-General, to assess and levy a tax on the taxable property of the State, which will not exceed two and one-half tenths of one per cent. for each of the fiscal years eighteen hundred and eighty-three and eighteen hundred and eighty-four.

Specific taxes.

SEC. II. *Be it further enacted by the authority aforesaid*, That in addition to the *ad valorem* tax on real and personal property, as required by the Constitution, and provided for in the preceding section, the following specific taxes shall be levied and collected for each of said fiscal years of eighteen hundred and eighty-three and eighteen hundred and eighty-four :

First—Upon every practitioner of law, medicine, or dentistry, ten dollars; and no municipal corportion or county authorities, shall levy any additional tax on said professions, either as license, fee or otherwise.

Practitioners of law, medicine and dentistry.

Second—Upon every daguerrean, ambrotype, photographic and similar artist, ten dollars.

Daguerrean and similar artists.

Third—Upon every person carrying on the business of an auctioneer, twenty-five dollars for each county in which they may carry on such business.

Auctioneers

Fourth—Upon every keeper of a pool, billiard or bagatelle table, kept for public use (whether in a saloon, barroom, hotel or other public place), twenty-five dollars for each table.

Keepers of pool, billiard and bagatelle tables.

Fifth—Upon every keeper of any other table, stand or place, or any game or play, with or without a name (unless kept for exercise or amusement, not prohibited by law, and not kept for gain, directly or indirectly), fifty dollars in each county.

Of any other table, stand or place for games.

Sixth—Upon every keeper of a ten pin alley, or other alley of like character kept for public play, twenty-five dollars for each place of business.

Tenpin and other alleys.

Seventh—Upon every traveling vendor of patent or proprietary medicines, special nostrums, jewelry, paper, soap or other articles of like character, twenty-five dollars in each county where they may offer such articles for sale; *provided*, this shall not apply to maimed Confederate soldiers, who are now, or may hereafter be licensed, by the ordinaries of the various counties to peddle without license, in conformity with section 534, Code of 1872.

Traveling Vendors of patent medicines, etc.

Eighth—Upon every person or firm soliciting policies of insurance or otherwise acting as agent of an insurance company, ten dollars in each county in this State in which such firm, person or agent may solicit business, and upon every person or firm soliciting business, or acting as agent for any matrimonial, natal, or nuptial association or company, twenty-five dollars for each company in each county in which such person, firm or agent may solicit business.

Agents of insurance companies.

Of matrimonial, natal or nuptial associations.

Ninth—Upon each emigrant agent, employer or emeployé of such agent doing business in this State, the sum of five hundred dollars for each county in which such business is conducted.

Emigrant agents and their employes.

Tenth—Upon traveling vendors using boats for the purpose of selling goods on the rivers within the limits of this State, the sum of fifty dollars in each county where they may sell their wares, and said tax shall be a lien on the boat and its contents without regard to ownership thereof.

Traveling Vendors using boats.

Eleventh—Upon all lightning rod dealers, the sum of twenty-five dollars for each and every county in which they may operate.

Lightning-rod dealers.

Twelfth—Upon every person or firm who, as agent for resident or non-resident owner, holds or keeps for hire or sale on commission any piano or pianos, or other musical instruments, the sum of twenty-five dollars for each county in which such person or firm does business.

Agents for dealers or owners of musical instruments.

Thirteenth—Upon each and every male inhabitant in this State, on the first day of April, between the ages of twenty-one and sixty

Poll-tax.

years, a poll tax of one dollar for each of said years 1883 and 1884, which tax shall be for educational purposes.

Shows and Exhibitions.

Fourteenth—Upon all shows and exhibitions (except such as histrionic, musical, dramatical, operatic and elocutionary), including side-shows accompaying circus companies, twenty-five dollars in each and every city or town of five thousand inhabitants; twenty dollars in city or town of four thousand and under five thousand inhabitants; and fifteen dollars in city or town with less than four thousand inhabitants; said tax so collected shall be for educational purposes.

Circus Companies.

Fifteenth—Upon every circus company, two hundred dollars each day it may exhibit in the State of Georgia; said tax shall be for educational purposes.

Liquor dealers.

Proviso.

Sixteenth—Upon all dealers in spirituous or malt liquors and intoxicating bitters, whether dealing in either or all thereof, the sum of twenty-five dollars for each place of business in each county where same are sold; *provided*, this tax shall not relieve such dealers from any local tax or prohibitory law in reference to the retail of spirituous and intoxicating liquors or intoxicating bitters, nor be required of those who sell by wholesale spirits manufactured of apples, peaches, grapes or other fruits grown on their own lands when sold in quantities not less than five gallons; said tax shall be for educational purposes.

Sewing Machine Agents and dealers.

Proviso in favor of maimed confederate soldiers.

This tax to be a lien on property of principal.

Record to be made with Ordinary.

Penalty for failure.

Seventeenth—Upon every person acting as the agent, other than the general agent or manager of sewing machine companies, or of wholesale dealers in sewing machines, or of the general agent or manager of sewing machine companies, or any person selling for a retail dealer, or any retail dealer who shall peddle sewing machines, ten dollars in each county where said person may do business as such agent of such sewing machine company, or as the agent of any general agent or manager of sewing machine companies, or as the agent of any wholesale or retail dealer in sewing machines, or such peddler for the purpose of selling single machines to consumers, and not for the purpose of selling to other dealers exclusively; *provided*, that this tax of ten dollars shall not apply to maimed Confederate soldiers, who are now or may hereafter be licensed by the ordinaries of the various counties to peddle without license, in conformity with section 534, Code of 1873; *provided, further*, that such maimed soldiers shall peddle said machines in their own right, and not as agent or employés of another. This tax upon such agents shall operate as a lien upon any property of the person or firm (for whom the agent is doing business) to be found in the State; and before such agent or peddler, being a retail dealer, shall be authorized to sell sewing machines as an agent of such sewing machine company, or as the agent of a general agent or manager of sewing machine companies, or as the agent of such wholesale or retail dealer in sewing machines as herein defined, he shall make record of the fact of his being such an agent with the ordinary of the county in which he or she proposes to do business, and upon failure to do so shall be liable to indictment, and on conviction shall be fined in a sum of not less than fifty dollars, nor

more than one hundred dollars, at the discretion of the court trying same, and one-half of such fine shall go to any person who shall report the violation of this law.

Dealers in weapons.

Eighteenth—And upon all dealers in pistols, revolvers, dirk or Bowie knives, the sum of twenty-five dollars for each place of business in each county where the same are sold, and said tax shall be for educational purposes. The tax provided by this paragraph shall be assessed against all dealers in the articles herein enumerated, on and after the first day of April, 1883, and such dealer shall not be liable for said tax of twenty-five dollars prior to the first of April, 1883.

Returns for taxes in certain paragraphs.

Of counties where avocations are carried on.

SEC. III. *Be it further enacted by the authority aforesaid,* That the taxes provided for in paragraphs 1, 2 and 13, shall be returned to the tax receiver in the county of the residence of the person liable for such tax, and shall by the receiver of tax returns be entered upon his digest of taxable property; and that the taxes provided for in paragraphs 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, 17 and 18 of section II of this Act, shall be returned and paid to the tax collectors of the counties where such vocations are carried on.

Payments of certain taxes.

SEC. IV. *Be it further enacted by the authority aforesaid,* That the taxes provided for in paragraphs 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, 17 and 18, of section II of this Act, shall be paid in full for the fiscal years for which they are levied to the tax collectors of the counties where such vocations are carried on at the time of commencing to do business specified in said paragraphs.

Insurance companies.

When brokerage business is done.

Farm products for future delivery.

Proviso.

SEC. V. *Be it further enacted by the authority aforesaid,* That all foreign and home insurance companies doing business in this State shall pay one per cent. on all premiums in money or otherwise received by them, and in addition to the tax imposed by this Act on the gross receipts of such insurance companies; all such companies doing a brokerage business in this State, such as discounting notes, bills, drafts or exchange, lending money, or in any manner doing a business pertaining to banking or brokerage business, shall be taxed upon the capital so employed in the same manner and at the same rate as other moneyed capital in the hands of *private* individuals is taxed; and every individual or firm engaged in the business of selling or buying farm products for future delivery (commonly called "futures") shall pay a tax of two hundred dollars each per annum; *provided,* that this tax shall not be demanded of any cotton warehouseman, dealer in actual cotton, or any provision broker who takes orders in the regular course of their trade.

Building and loan associations.

Proviso.

SEC VI. *Be it further enacted by the authority aforesaid,* That the president of all building and loan associations, or associations of like character, shall be required to return to the tax receiver of the county where such associations are located, at its true market value, the stock of such associations owned by the stockholders thereof, upon which, as shown by the books of such associations, no advance has been made on money borrowed thereon by the individual stockholders therein, to be taxed as other money capital in the hands of private individuals is taxed; *provided,* that no tax shall be re-

Case 3:23-cv-00474-JES-DDL Document 34-5 Filed 03/06/24 PageID.1979 Page 44 of 1085

quired of real estate and building associations to be paid upon any portion of its capital which has been loaned or advanced to a shareholder upon real estate, upon which real estate tax is payable by said shareholder.

Returns to be made by Presidents of manufacturing and other corporations.

SEC. VII. *Be it further enacted by the authority aforesaid*, That the president of all manufacturing and other incorporated companies (or their agents), other than railroad, insurance, telegraph, telephone, express, sleeping and palace car companies shall be required to return all of their property whatever of their respective companies, at its true market value, to the tax receiver of the county where same is located (or where the principal business of each company is located), to be taxed for State and county purposes, as other property in this State is taxed.

Taxes and returns for express, telegraph, telephone, sleeping and palace car companies.

SEC. VIII. *Be it further enacted by the authority aforesaid*, That all express, telegraph, telephone and sleeping and palace car companies doing business in this State shall pay a tax of one per cent. on their gross receipts, and the superintendent or general agent of each express, telegraph, telephone, sleeping and palace car company doing business in this State shall make a quarterly return, under oath, as follows: on the last day of March, June, September and December of each year to the Comptroller-General, showing an account of their gross receipts during the quarter ending on that day, and said taxes herein levied upon such gross receipts, as shown by said quarterly returns, shall be paid by the respective companies to the Comptroller-General at the time of making said return.

Sewing machine companies and wholesale dealers.

SEC. IX *Be it further enacted*, That each sewing machine company, home or foreign, selling or dealing in sewing machines, of home or foreign manufacture, by itself or its agents, in this State, and all wholesale dealers in sewing machines selling sewing machines of home or foreign manufacture to other wholesale or retail dealers shall pay the sum of two hundred dollars for each fiscal year or fractional part thereof to the Comptroller-General at the time of commencement of business for each fiscal year or fractional part thereof, and all sewing machines belonging to such companies, dealers or their agents, in possession of such companies, dealers, their agents or others, shall be liable to seizure and sale for the payment of such tax.

Not liable for local taxes.

This tax shall be for the whole State, and such companies, their general agents and wholesale dealears, shall not be liable for any county tax or license fees by the counties for selling sewing machines therein.

Tax to be paid for each company.

In cases where wholesale dealers sell sewing machines manufactured by different companies, such dealers shall pay the tax above provided for separately for each company whose manufacture of machines may be sold by such dealers. Any person who, after the first day of April, 1883, shall violate the provisions of this section shall be liable to indictment, and on conviction shall be fined in a sum of not more than two hundred and fifty dollars and not less than fifty dollars, in the discretion of the court trying the same, and one-half of such fine shall be paid to any person who may report the violation of the provisions of this section.

SEC. X. *Be it further enacted by the authority aforesaid*, That each iron safe company selling or dealing in new iron safes, by itself or

agent, and all dealers in iron safes selling or dealing in new iron safes, and any individual or company making a regular business in dealing in or selling second hand iron safes in this State, shall pay to the Comptroller-General two hundred dollars at the time of commencement of business for each fiscal year or fractional part thereof, and all safes belonging to such companies, dealers or their agents, in possession of such companies, dealers, their agents or others, shall be liable to seizure and sale for payment of such tax.

Iron safe companies and dealers in iron safes.

SEC. XI. *Be it further enacted by the authority aforesaid*, That no tax shall be assessed upon the capital of banks or banking associations organized under the authority of this State, or of the United States, and located in this State, but the shares of the stockholders of such banks or banking associations, whether resident or non-resident owners, shall be taxed in the county where such banks or banking associations, whether resident or non-resident owners, shall be taxed in the county where such banks or banking associations are located, and not elsewhere, at the same rate provided in this Act for the taxation of moneyed capital in the hands of private individuals; *provided*, that nothing in this section contained shall be construed to relieve such banks or banking associations from the tax on property owned by them as provided in section 7 of thisAct.

Banks and Banking Associations.

Proviso.

SEC. XII. *Be it further enacted by the authority aforesaid*, That the presidents of all railroad companies doing business in this State shall make return to the Comptroller-General as now provided by law for the taxation of the property or gross receipts or net income of railroads, and shall pay to the Comptroller-General the tax to which such property or gross receipts or net income may be subject, according to the provisions of this Act and the laws now in force relating to tax on railroads; and on failure to make returns or refusal to pay tax, said companies shall be liable to all the penalties now provided by law.

Returns and payment of tax on railroad companies.

Penalty for failure to return and pay tax.

SEC. XIII. *Be it further enacted by the authority aforesaid*, That the president or principal agents of all incorporated companies herein mentioned, except such as are required to make return to the tax receivers of the counties, shall make returns to the Comptroller-General, under the rules and regulations provided by law for such returns, and subject to the same penalties and modes of procedure for the enforcement of taxes from companies or persons required by law to make returns to the Comptroller-General.

Returns for corporations to be made to Comptroller General, except such as are to be made to tax receivers.

SEC. XIV. *Be it further enacted by the authority aforesaid*, That the oath to be administered to all persons making returns of their taxable property shall be in the following words: "You do solemnly swear that you will true answers make to all lawful questions which I may put to you touching the return you are about to make; and that you will make a true return of all your cash or moneyed capital, and every other species of property at its true and full market value, on the first day of April, preceding, to the best of your knowledge and belief, so help you God;" and it shall be the duty of the officers receiving such returns to inquire of each and every person taking such oath, touching all his taxable property and the market value of same, and to propound such questions as may be published

Oath to be taken in making returns.

Duty of officers to make inquiry.

Case 3:23-cv-00474-JES-DDL Document 34-5 Filed 03/06/24 PageID.1981 Page 46 of 1085

by the Comptroller-General under the law for the purpose of eliciting full and true returns of the taxable property of this State.

Power of Comptroller-General as to time for making returns and payment.

SEC. XV. *Be it further enacted by the authority aforesaid*, That the Comptroller-General is authorized and empowered to order the tax receivers of this State to commence receiving the returns of taxable property immediately after the first day of April of the years 1883 and 1884, and the Comptroller-General is empowered and required to cause the taxes to be collected and paid into the State Treasury by the twentieth day of December of each of said years 1883 and 1884.

SEC. XVI. *Be it further enacted by the authority aforesaid*, That all laws and parts of laws in conflict with this Act be, and the same are hereby repealed.

Approved December 9, 1882.

---

## TO EXTEND THE TIME FOR RETURNING WILD LANDS AND PAYMENT OF TAXES THEREON FOR 1882.

No 38.

An Act to extend the time for returning wild lands for taxation in this State, and for the payment of taxes due on such lands for the year 1882, and for other purposes herein mentioned.

Act of Sep. 28, 1881, requiring returns made and taxes paid in counties where wild lands lie.

WHEREAS, the General Assembly of the State of Georgia passed an Act, approved Sepember 28, 1881, providing for the return of wild lands to the receiver of tax returns and the tax thereon to be paid to the tax collectors of the counties where such lands are located; and *whereas*, the said law going into effect before the provisions of the same were generally known to the owners of such lands, thereby causing a large number of such owners to be late in making their returns of such lands to the proper receiver for taxation, as required by the Act above mentioned; and *whereas*, in a number of counties in this State delays have occurred in the levying of the tax for county purposes, whereby owners or their agents of such lands in such counties have been unable to ascertain the amount of tax due for the present year and to pay the same to the tax collector in the time prescribed by law: therefore,

Time extended for returning wild lands.

Tax receivers to receive returns of wild land for 1882 and report same to Comptroller-General.

SECTION I. *Be it enacted by the General Assembly of Georgia*, That the time for returning wild lands in this State for the year 1882 be extended until the first day of February, 1883, and the receivers of the several counties are hereby empowered and required to receive such returns as may be made of such lands as provided by said Act of September 28, 1881, and to enter same upon wild land digest retained in their county showing returns of such lands for the year 1882, and when such returns as may be made under provision of this Act are received by them, they shall forward a copy of same to the Comptroller-General so that he may enter the same on the digest

# EXHIBIT 40

KR1090

§ 491. *Licenses issued by probate judge ; contents ; rights limited ; fee for issuing.*—Upon the payment of such amount to the probate judge, he shall issue the license, which shall set forth the name of the person, firm, company, or corporation, the business which it is proposed to carry on, and the location where it is to be established ; or, if a peddler, whether he proposes to travel on foot, on horse, or in a wagon ; and such license shall not be transferable, nor shall it entitle the holder thereof to carry on or exercise any other business or profession than the one therein named, nor at any other location than the one therein specified ; and the probate judge shall be paid for making out such license a fee of not more than fifty cents by the person receiving the same. (1)

§ 492. *List of licenses granted, and amount of taxes received therefor furnished solicitor for grand jury.*—The probate judge in each county, on the first day of each circuit court, must furnish to the acting solicitor, to be by him laid before the grand jury, a statement in writing showing the licenses granted and the taxes received thereon within the last twelve months preceding such court, to whom and for what such license was granted.

§ 493. *Quarterly list, with money received, certified to auditor : per cent. allowed probate judge.*—In the second week in March, and every three months thereafter, the judge of probate shall forward to the auditor of the state a certified list of all licenses issued by the probate judge, together with the money received by him on such licenses, and shall receive the same per cent. for such services as is allowed by law for receiving and paying out money for the counties.

§ 494. *License for one year : expires December 31 : after July first half prices of licenses, and for what required.*—All licenses shall expire on the thirty-first day of December in each year, and shall be for one year, unless the business licensed shall commence after the first of July, in which case the price of the license shall be one-half the amount of a year's license. The prices of licenses shall be as follows, to-wit :

*a* As amended. Feb. 9, 1877, p. 16

1. *a* For each public race track, at or within five miles of any city or town containing less than five thousand inhabitants, one hundred dollars ; at or within five miles of any city or town containing more than five thousand inhabitants, two hundred dollars.

2. For retailers of spirituous, vinous or malt liquors, on any steamboat or water craft, one hundred dollars ; in any city, town or village of less than one thousand inhabitants, or any other place, fifty dollars ; and in any city, town or village of more than one thousand, and less than five thousand inhabitants, one hundred dollars ; in any city of over five thousand inhabitants, one hundred and twenty-five dollars.

Any person who sells or disposes of spirituous, vinous or malt liquors, or intoxicating bitters, in any quantity less than one quart shall be deemed a retail dealer ; but each retailer of spirituous, vinous or malt liquors, outside the following described boundaries in the city of Mobile, to-wit :

Right bank of Mobile river on the east, Church street on the south, Joachim street on the west, St. Michael street on the north, including those settled on the north side of St. Michael street, on the west side of Joachim, and on the south side of Church street, shall be charged a state license of seventy-five dollars ; but dealers in lager beer exclusively shall be charged one-fourth the rates

(1) In absence of licensed principal, clerk may legally carry on business under the license.- 37 Ala. 151.

charged for license for selling ardent spirits; and any person who takes out and pays for a retail license, shall not be required to take out a license as a wholesale dealer; and when a retail license is taken out after the first of January, the price of the license shall be the same as for a license for twelve months.

3. For wholesale dealers in spirituous, vinous or malt liquors, in any place of less than one thousand inhabitants, thirty dollars; in any place of over one thousand and under three thousand inhabitants, fifty dollars; in any city of over three thousand inhabitants, seventy-five dollars; but wholesale dealers living outside of the limits prescribed in preceding section in the city of Mobile, shall be charged fifty dollars.

Any person dealing in said articles who shall sell, barter or exchange, or in any way dispose of or permit to be taken, spirituous, vinous or malt liquors in any quantity less than one quart, or who shall permit the same to be drunk by the glass or single drink in or about his place of business, shall be deemed a retail dealer; and any dealer so disposing of spirituous, vinous or malt liquors, only in quantity of one quart or more, shall be deemed a wholesale dealer; but any person having taken out a license as a retail dealer, is authorized to sell at wholesale without additional license.

4. For compounders and rectifiers of spirituous or vinous liquors, one hundred dollars. Any person who rectifies, purifies, or refines distilled spirits or wines, by any process, or who mixes distilled spirits or wines with any chemicals, or compounds liquors for sale under any name, shall be deemed a compounder and rectifier; but a wholesale dealer, who pays under the preceding paragraph an equal or larger license tax, shall be exempt from this tax.

5. For distillers of spirituous liquors, fifty dollars; but this shall not apply to the distilling of fruits.

6. For brewers, fifteen dollars.

7. For pawn brokers, fifty dollars.

8. For peddlers in a wagon, forty dollars; for peddlers on a horse, twenty dollars; for peddlers on foot, ten dollars. A peddler's license shall entitle him to peddle only in the county where it is taken out; but this shall not apply to any articles produced or manufactured in this state, except as otherwise provided. And it is hereby made the duty of justices of the peace and notaries public in this state to demand of peddlers in their several precincts their licenses; and unless they exhibit the same, or show that they have a right under the law to peddle the articles carried by them without a license, such justices and notaries public must issue warrants for the arrest of such peddlers, returnable to any court in said county having criminal jurisdiction, which warrants may be executed by the sheriff or any constable of the county. (1) *a* But it shall be lawful for any citizen of this state having but one arm or one leg, or who labors under any other physical disability of making a livelihood by labor, to peddle in any county in this state by taking out a license in any one county, the payment of such license tax to be evidenced by the receipt of any judge of probate. Before such person shall engage in peddling he shall obtain a certificate from two regularly practicing physicians, setting forth the character of the disability under which he labors, and that the same is sufficient to bring him within this provision;

*a* March 8, 1876, p. 101.

(1) Making it misdemeanor to peddle without license constitutional.—51 Ala. 52.

KR1092

and the certificate shall be a condition precedent to this exemption.*

10. For bowling alleys, for the use of which money or other compensation is charged, twenty-five dollars for each alley.

11. For billiard tables, for the use of which money or any compensation is charged, twenty-five dollars for each table; and this amount for every billiard table on the premises where a bar or drinking saloon is kept, whether its use is charged for or not. (2)

12. For any table on which the game of pool is played, one hundred dollars.

13. For bagatelle or jenny lind tables, fifty dollars; and the same amount for any other table or device of any kind from which any kind of profit is derived to the keeper.

b Amendment, Jan. 22, 1877, p. 12.

14. *b* For theatres in towns or cities containing more than two thousand inhabitants, $50 00; in towns or cities containing less than two thousand inhabitants, $25 00; but the owners or managers of theatres holding such licenses must issue tickets of admission to all persons whom they admit to their exhibitions, and must thereon assign a particular seat to each such visitor in such part of the theatre as the convenience of the owners or managers may require.

15. For dealers in pistols, bowie-knives and dirk-knives, whether the principal stock in trade or not, fifty dollars.

16. For peddlers of medicines or other articles of like character, twenty-five dollars for each county in which they peddle.

17. For each sewing machine company, selling sewing machines by themselves or their agents, one hundred dollars as a state tax. The payment of this tax to the state, evidenced by the receipt of any probate judge, shall exempt the company from payment of this state tax in any other county; but each county in which the company may have an agent, a license of twenty dollars shall be paid for county purposes.

c Amendment, Feb. 9, 1877, p. 18.

18. *c* For each exhibition of a circus in towns or cities having more than five thousand inhabitants, one hundred dollars; in all other places, fifty dollars.

19. For each exhibition of a menagerie or museum, twenty dollars.

20. For each exhibition of a side-show accompanying a circus, menagerie or museum, ten dollars.

21. For each exhibition of feats of legerdemain or slight-of-hand, or other exhibition, or entertainments, ten dollars.

22. For concerts, musical entertainments and public lectures, where charges are made for admission and not given for charitable purposes, each entertainment five dollars.

23. For each shooting gallery, twenty-five dollars.

24. For each chicken or cock pit, twenty-five dollars.

§ 495. *Fifty per cent. may be added by county; commissions of probate judge.*—The courts of county commissioners are hereby authorized to add to the price of licenses, for county purposes, such sums as they may designate, not to exceed fifty per cent. on the state licenses, except as herein otherwise provided, and the judge of probate is allowed two and a half per cent. for the collection and payment of the license money to the officer to whom it is to be paid, to be deducted from his said collections.

§ 496. *Retailing on steamboats; licenses posted up, and forfeited*

* Subdivision 9, requiring drummers, commercial travelers or agents, who sell by samples, to pay license tax, repealed December 14, 1876, p. 11.

(2) 49 Ala. 37.

# EXHIBIT 41

KR1094

Case 3:23-cv-00474-JES-DDL Document 34-5 Filed 03/06/24 PageID.1987 Page 52 of 1085

No. 3.] AN ACT. [H. B. 940.

To fix the rate of taxation in this State.

SECTION 1. *Be it enacted by the General Assembly of Alabama*, That on all property liable to taxation in this State, there shall be assessed and collected a tax of five and one-half tenths of one per centum for the fiscal year ending September 30th, 1888, and five-tenths of one per centum for each year thereafter.

Where collected.

Approved February 28th, 1887.

---

No. 4.] AN ACT [H. B. 211.

To amend sections 4 and 11, and sub-division 8 of section 2, sub-divisions 2, 5 and 6 of section 6, and sub-divisions 2, 3, 4, 5, 6, 9, 10, 17, 18, 20, 29, 31, 32, 33 and 34 of section 14, and to repeal sub-division 8 of section 6, of an act entitled "An Act to levy taxes for the use of the State and the counties thereof," approved December 12, 1884, and for other purposes.

SECTION 1. *Be it enacted by the General Assembly of Alabama*, That sections 4 and 11, and sub-division 8 of section 2, and sub-divisions 2, 5 and 6 of section 6, and sub-divisions 2, 3, 4, 5, 6, 9, 10, 17, 18, 20, 29, 31, 32, 33 and 34 of section 14 of an act to levy taxes for the use of the State and the counties thereof, approved December 12, 1884, be and they are hereby amended so as to read as follows: That sub-division 8 of section 2 be amended so as to read as follows: 8. The following property to be selected by the head of each family, viz: household and kitchen furniture, not to exceed in value one hundred and fifty dollars; one yoke of oxen, one cart or wagon, two cows and calves, twenty head of stock hogs, ten head of sheep, all poultry, all agricultural products of the preceding year which are on hand, in the hands of the producer on the first of January thereafter, provisions and supplies on hand for the current year for the use of the family and the making of the crop, all wearing apparel, all looms and

Sections amended.

Property exempt.

KR1095

spinning wheels, kept for use of the family, farming tools to the value of twenty-five dollars, tools and implements of mechanics to the value of twenty-five dollars, one sewing machine in each family when the taxable property does not exceed two hundred and fifty dollars; *Provided*, that no property or subject of taxation shall be exempt from taxation, nor shall any credit, abatement, or deduction be allowed therefrom, unless such property or subject of taxation is entered by the tax-payer upon his assessment list and returned by him under oath to the tax assessor.

Proviso.

SEC. 2. That section 4 be amended so as to read as follows: All taxes, unless otherwise herein directed, shall become due and payable on the first day of October in each year, and shall become delinquent if not paid on or before the thirty-first day of December in each year, except in cases where parties are about to remove from the county, and except also poll taxes, which shall become delinquent if not paid on or before the first day of December in each year, after which last date as to poll taxes, the tax collector may proceed to enforce payment by garnishment, or the seizure and sale of personal property, as herein provided for the collection of other delinquent taxes.

When taxes are due.

SEC. 3. That sub-divisions 2, 5 and 6 of section 6, be amended so as to read as follows:

2. On gross amount of premiums (after deducting therefrom the expenditures, losses paid and return premiums) received from their business in this State during each tax year by any life, fire or marine insurance company not chartered by this State, and doing business herein by agents or otherwise, at the rate of one per cent., each agent in this State of any insurance company organized under the laws of any other State or country and doing business in this State, shall annually, in the month of January, return to the assessor of the county in which such agency is located, a sworn statement of the gross receipts of such agency for the year ending on the first day of the month, including all notes, accounts and other things received or agreed upon as a compensation for insurance at such agency, with a statement of expenditures, losses paid and return premiums, and the company shall be charged with taxes at the place of such agency on the amount

Insurance companies.

Agent must make statement.

so returned, and the agent shall also be personally responsible for such taxes, and may retain in his hand a sufficient amount of the company's assets to pay the same unless the same shall be paid by the company, but no corporation not incorporated under the laws of the State, nor any foreign society, firm or partnership shall do business in this State except through an agent duly authorized, and accrdited for the purposes of said business and for all purposes connected with licenses and taxation and service of process, said agent to be appointed by authentic act, and a certified copy of the act to be deposited in the office of the Auditor of this State. Any person or firm who shall fill up or sign a policy or certificate of insurance, on open marine or fire insurance policy, or otherwise issue by a corporation or association, or persons not located or represented in this State by a legally authorized agent, shall be considered an agent of such corporation, or association, and shall be liable for all licenses, taxes and penalties enforced by the provisions of this act, upon such person, corporation and association, as if represented by a legally appointed agent; any agent or company refusing or failing to make returns within the time prescribed by law or refusing to pay the amount assessed as tax shall forever be debarred from doing business in this State.

Agent responsible for taxes.

Foreign companies must have an agent.

Who are agents.

Penalty.

5. On the gross receipts during such tax year of all cotton pickeries, cotton seed oil mills, and from the storage of cotton or merchandise or produce, and on the gross amount of income, of all gas works, electric light companies, water works, ferries, toll bridges, public mills and gins used in ginning for tolls, cotton compresses, after deducting the expense of carrying on such business at the rate of one per cent.

Oil and gas works.

6. On the gross amount of the receipts by any and every telegraph, telephone, and express company, derived from the business done by it in this State, at the rate of two dollars on the hundred dollars.

Telegraph and express companies.

SEC. 4. That section 11 be amended so as to read as follows: Section 11. On the last secular day in March and every three months thereafter, the judge of probate shall forward to the auditor of the State a certified list of all licenses issued by him, and at the same time pay to the State treasurer the money received by him for

Judge of probate makes return to auditor.

such licenses belonging to the State, and to the county treasurer the portion belonging to the county, and shall receive two and a half per cent. for the collection and payment of the license money to the officer, State or county, to whom it is to be paid, to be deducted from his said collection. If any probate judge fails to comply with the provisions of this section within ten days after the date at which he is required to make a report of licenses issued and money received by him, the auditor shall forthwith report the facts to the Governor, who shall cite said judge to show why he has not made returns of such certified lists of licenses as required by law, and if such judge fails to show sufficient cause for such failure, the Governor shall direct the attorney general to institute impeachment proceedings against such delinquent probate judge before the Supreme Court of the State.

Penalty on probate judges for failure.

SEC. 5. That subdivisions 2, 3, 4, 5, 6, 9, 10, 17, 18, 29, 31, 32 and 34 of section 14 be amended so as to read as follows: Section 14, subdivision—

Steamboat and railroad license.

2. For the retail of spirituous, vinous or malt liquors on any steamboat or water craft or on any sleeping, dining or buffet car, two hundred and fifty dollars, for the collection of which the State shall have a preferred lien on all such steamboats or other water crafts and cars named for the amount required by law to be paid for such licenses to retail vinous, spirituous or malt liquors on such steamboat or water craft and cars, to be enforced wherever such liquors are retailed by any person on any such boat or water craft or cars, with the knowledge or consent of the captain or conductor without having first procured a license, as provided by law, and the tax collector of any county, where such vessels may ply or cars run, is required to enforce this lien, in the same manner, and by the same proceedings as are authorized for the collection of taxes on steamboats and on railroad cars.

How enforced.

3. For retailers of spirituous, vinous, or malt liquors, except as hereinafter provided in any city, town, village, or any other place of less than one thousand inhabitants, one hundred and twenty-five dollars, and in any city, town or village of more than one thousand inhabitants and less than three thousand inhabitants, one hundred and seventy-five dollars, and any city con-

Retail license.

KR1098

taining three thousand inhabitants or more, and less than ten thousand inhabitants, two hundred and fifty dollars, in any city of more than ten thousand inhabitants, three hundred dollars. *Provided, further*, that dealers in lager beer exclusively, shall be charged one-fourth of the rates charged for retailers of spirituous, vinous or malt liquors, as graded above, and any person who takes out and pays for a retail license shall not be required to take out a license as a wholesale dealer, and when a retail license is taken out after the first day of January and before the first day of July, the price of the license shall be the same as for a license for twelve months.

Lager beer.

4. For wholesale dealers in spirituous, vinous or malt liquors in any place, two hundred dollars. Any person dealing in said articles, who shall sell, barter or exchange, or in any way dispose of, or permit to be taken, spirituous, vinous or malt liquors in any quantity less than one quart, or who shall permit the same to be drunk by the glass, or single drink, in or about his place of business, shall be deemed a retail dealer, and any dealer so disposing of spirituous, vinous or malt liquors, only in the quantity of one quart or more, shall be deemed a wholesale dealer, but any person having taken out a license as a retail dealer, is authorized to sell at wholesale without additional license.

Wholesale dealers.

5. For compounders and rectifiers of spirituous, or vinous liquors, two hundred dollars; any person who rectifies, purifies or refines distilled spirits or wines by any process, or who mixes distilled spirits or wines with any chemicals, or compounds liquors for sale under any name, shall be deemed a compounder and rectifier.

Rectifiers.

6. For distillers of spirituous liquors, two hundred dollars; but this shall not apply to the distilling of fruits.

Distillers.

9. For peddlers in a wagon drawn by one horse or other animal, forty dollars; if drawn by two horses or other animals, fifty-five dollars; for peddlers on a horse or other animal, twenty-five dollars; for peddlers on foot, fifteen dollars; for peddlers accompanied by singers or performers on any musical instrument, one hundred dollars; *provided*, that peddlers of tin ware only, who shall pay all lawful fees and one-third of the

Peddlers.

license fees herein provided, shall be entitled to such license; *Provided further*, that peddlers of wooden and stone or clay hollow-ware only, shall not be required to procure a license. A peddler's license shall entitle him to peddle only in the county where it is taken out; and it is hereby made the duty of county court judges, justices of the peace, notaries public, mayors, recorders and intendants of cities or towns, sheriffs, deputy sheriffs, constables, city or town marshals, policemen, and all other officers authorized by law to make arrests, to demand of peddlers, itinerant dealers and travelling agents their licenses, and unless they exhibit same, or show that they have the right to peddle the goods carried by them, or to carry on the business they are engaged in, without a license, such county court judges, justices, notaries, with powers of a justice, mayors, recorders, intendants, must issue warrants for the arrest of such peddlers, itinerant dealers or travelling agents, returnable to any court in the county having criminal jurisdiction, which warrants may be executed by the sheriff, deputy sheriff, any constable of the county, any city or town marshal, policeman or any other officer having authority to make arrests; but it shall be lawful for any person having but one arm, or but one leg, or who labors under any other physical disability, of making a livelihood by labor, to peddle in any county in the State free of license on the filing of the certificates of two regularly licensed physicians, in the office of probate of the county of his permanent residence, to the effect that such cripple is permanently disabled, and that he cannot by labor make a livelihood for himself and family. This shall not be so construed as to require a license on peddlers of fish, oysters, game, fresh meats, poultry, fruit and all farm products raised by the seller.

Auctioneers.

10. Upon transient or itinerant auctioneers or dealers in goods, wares or merchandise, other than licensed peddlers and traveling agents of wholesale dealers in said articles, making sale thereof by sample, fifty dollars; itinerant dealers in fruit trees, vines, shrubs or plants of any kind, fifty dollars.

Fruit tree dealers.

Pistols, &c.

17. For dealers in pistols or pistol cartridges, or bowie knives, or dirk knives, whether principal stock in trade or not, three hundred dollars.

KR1100

18. For peddlers of medicines or other articles of like character, spectacles or eye-glasses, one hundred dollars for each county in which they peddle. For peddlers of medicines, with vocal or instrumental music, or both, two hundred and fifty dollars for each county in which they peddle.

Medicines.

20. For each sewing machine, stove, range or clock company selling sewing machines, stoves, ranges or clocks, either themselves or by their agents, or through consignees, and all persons who engage in the business of selling sewing machines, stoves, ranges or clocks, shall pay to the State twenty-five dollars for each county in which they may so sell, but when merchants engaged in a general business keep sewing machines, stoves, ranges or clocks as a part of their stock in trade, they shall not be required to pay the tax herein provided, in the county in which they are engaged in such general business.

Sewing machines, stores and clocks.

29. For each company of traders, or fortune tellers, usually known as gypsies, ten dollars for each county.

Fortune tellers.

31. For fortune tellers, twenty-five dollars.

32. The owner or master of any steamboat or other water craft plying in any rivers of the State, who engage in the business of buying, selling or bartering any goods, wares, merchandise, produce or commodity whatever on or from said boat, must pay a license of two hundred and fifty dollars, and the party so licensed shall thereby be entitled to carry on such business on the boat therein named, in any county in which said boat is navigated, provided cities and towns in which such person engages in such business, may impose such license as is exacted of like business in said city or town. The owner, conductor, or person in charge of every supply car, or car from which any goods, wares or merchandise are sold, whether to the servants of the railroad company or others, must pay a license of one hundred dollars, and the person so licensed shall thereby be entitled to carry on such business in the car therein named in any county in which said car is run or drawn, but each of said counties may charge a license therefor of ten dollars.

Steamboats.

Selling goods on cars.

33. For travelling agents of wholesale dealers in goods, wares and merchandise a tax of ten dollars, to

be taken out in only one county, and should any such agent fail to take out such license all contracts made by him shall be void, and in any proceedings to enforce any such contract, the burden of proof shall be upon the party selling such goods, wares and merchandise, to show that such license has been taken out at the time such contract was made.

Drummers.

34. Each dealer in playing cards, five dollars. Any person who engages in the business of buying or selling futures for speculation or on commission, shall pay a license tax of three hundred dollars, provided this shall not be held to legalize any contract which would otherwise be invalid.

Playing cards.

Dealing in futures.

SEC. 15. *Be it further enacted,* That sub-division eight of section six is hereby repealed.

SEC. 16. *Be it further enacted,* That the one-fourth of one per cent. levied and assessed in the county of Lee for the tax year beginning January 1st, 1886, to reimburse the State for the investment of certain revenues in the compromise and settlement of the railroad bonded indebtedness of said county, shall be collected by the tax commissioner of said county as he collects the State and county tax, and shall be paid into the State Treasury, and the postponement of said tax of one-fourth of one per cent. shall not be construed to be for any other year than the tax years 1887 and 1888.

Lee county.

Approved December 11, 1886.

---

No. 5.] AN ACT [H. B. 245.

To make appropriations for the ordinary expenses of the Executive, Legislative and Judicial Departments of the State, for interest on the public debt, and for public schools.

SECTION 1. *Be it enacted by the General Assembly of Alabama,* That the following sums of money, or so much of each sum as may be necessary, be and they are hereby appropriated for the purposes hereinafter specified, to be paid out of any moneys in the Treasury not otherwise appropriated, for the fiscal years end-

KR1102

# EXHIBIT 42

KR1103

## ARTICLE 15.

LICENSE TAXES; FROM WHOM AND FOR WHAT BUSINESSES REQUIRED; PRICES; COUNTY LEVY.

**4122** (629). **Persons required to take out licenses, and prices to be paid therefor.**—Licenses are required of all persons engaging in, or carrying on any business, or doing any act in this section specified, for which shall be paid, for the use of the state, the following taxes, to wit:

1. For each public race-track, at or within five miles of any city or town containing less than five thousand inhabitants, one hundred dollars; at or within five miles of any city or town containing more than five thousand inhabitants, two hundred dollars.

2. For the retail of spirituous, vinous, or malt liquors, on any steamboat or other water-craft, or on any sleeping, dining, or buffet car, two hundred and fifty dollars, for which the state shall have a preferred lien on such steamboat or other water-craft, and cars named; and such lien may be enforced whenever any such liquors are retailed by any person on such steamboat or other water-craft, or cars, with the knowledge or consent of the captain, or conductor, without having first procured a license therefor, as provided by law; and the tax-collector of any county in which such steamboat or other water-craft may ply, or cars run, is required to enforce such lien in the same manner, and by the same proceedings, as are authorized for the collection of taxes on steamboats and on railroad-cars.

3. For retailers of spirituous, vinous or malt liquors except as hereinafter provided, in any city, town, village, or any other place of less than one thousand inhabitants, one hundred and fifty dollars; in any city, town, or village of more than one thousand inhabitants and less than three thousand inhabitants, two hundred dollars; in any city containing three thousand inhabitants or more, and less than ten thousand inhabitants, two hundred and seventy-five dollars; and in any city of more than ten thousand inhabitants, three hundred and twenty-five dollars. But dealers in lager-beer exclusively shall be charged one-fourth of the above rates. Any person who pays for and takes out a license as a retailer, shall not be required to pay for and take out a license as a wholesale dealer in such liquors; and when a retail license is taken out after the first day of January, and before the first day of July, the price of the license shall be the same as for a license for twelve months. Any person who sells or disposes of spirituous, vinous, or malt liquors, or intoxicating bitters, in any quantity less than a quart, shall be deemed a retail dealer; *Provided*, nothing in this paragraph shall be so construed as to alter, repeal or modify any license now authorized and required to be paid to any district, city or municipality for municipal purposes.

Feb. 18, 1895, p. 1192, §48.

Allred v. State, 89 Ala. 112; State v. Fleming, 112 Ala. 179.

4. For wholesale dealers in spirituous, vinous, or malt liquors in any place, two hundred dollars. Any person dealing in said arti-

cles, who shall sell, barter, or exchange, or in any way dispose of, or permit to be taken, spirituous, vinous, or malt liquors, in any quantity less than one quart, or who shall permit the same to be drunk by the glass, or single drink, in or about his place of business, shall be deemed a retail dealer; and any dealer so disposing of spirituous, vinous, or malt liquors, only in the quantity of one quart or more, shall be deemed a wholesale dealer; but any person having taken out a license as retail dealer is authorized to sell at wholesale without additional license.

5. For compounders and rectifiers of spirituous or vinous liquors, two hundred dollars. Any person who rectifies, purifies or refines distilled spirits or wines, by any process, or who mixes distilled spirits or wines with any chemicals, or compounds liquors for sale under any name, shall be deemed a compounder and rectifier.

Dec. 10, 1892, p. 71.

6. For distillers of spirituous liquors, twenty-five dollars; but this shall not apply to the distilling of fruits.

Grant v. State, 73 Ala. 13; Johnson v. State, 44 Ala. 414.

Feb. 18, 1895, p. 1192, §45.

7. For brewers, one hundred dollars. Every agency of a brewery of another state doing business in this state, shall pay the same license.

8. For bowling-alleys, for the use of which money or other compensation is charged, twenty-five dollars for each alley; and for each bowling-alley kept in connection with a drinking-saloon, whether compensation is charged or not, twenty-five dollars.

9. For each billiard-table, for the use of which money or other compensation is charged, and which is not kept in connection with the business of a barroom or drinking-saloon, twenty-five dollars.

10. For each billiard-table kept in connection with the business of a barroom or drinking-saloon, whether its use be charged for or not, fifty dollars.

11. For each table upon which the game of pin-pool is played, one hundred dollars.

12. For each table upon which a game of pool is played with fifteen balls, more or less, and not pin-pool, for the use of which money or other thing of value is charged, or when kept in connection with a barroom or drinking-saloon, whether its use be charged for or not, fifty dollars.

13. For each bagatelle or Jenny-Lind table, or any other table or device of any kind from which any kind of profit is derived by the keeper, fifty dollars.

14. For each table or device, or set of domino-bones, kept in connection with a barroom or drinking-saloon for use in playing the game commonly known as dominoes, twenty-five dollars; and for each dice-box and dice kept in a barroom or drinking-saloon, twenty-five dollars.

15. For each theatre in towns or cities containing more than eight thousand inhabitants, one hundred dollars; but this price shall not be charged for licenses for open-air or summer theatres, such as at Mobile on the bay-shore, and known as Frascati, but for each

such open-air or summer theatre, twenty-five dollars; in towns or cities containing less than eight thousand and more than two thousand inhabitants, fifty dollars; and in towns or cities containing less than two thousand inhabitants, twenty-five dollars; but the owner or manager of any theatre holding any such license must issue tickets of admission to all persons whom they admit to their exhibitions, and must thereon assign a particular seat to each such person, in such part of the theatre as the convenience of such owner or manager may require. This license shall only extend to dramatic and operatic exhibitions; and if any doubt arises as to the character of an entertainment proposed to be exhibited in any theatre, the judge of probate of the county in which the theatre is situated shall determine whether or not it is covered by the theatrical license.

16. For each public hall let for hire, twenty-five dollars.

17. For each concert, musical entertainment, public lecture, or other public exhibition or entertainment, where charges are made for admission, or for the use of any instrument or device, or the participation in any exercise or entertainment, not given for charitable, school, or religious purposes, and not otherwise provided for, five dollars; but the provisions of this subdivision shall not apply to exhibitions or entertainments given in theatres, where the owner or manager thereof has taken out license as owner or manager.

Mosby v. State, 98 Ala. 50.

18. For each day's exhibition of a circus in towns or cities having more than five thousand inhabitants, or within two miles thereof, one hundred and fifty dollars; in all other places, one hundred dollars.

19. For each exhibition of a menagerie or museum, twenty dollars.

20. For each exhibition of a side-show accompanying a circus, menagerie, or museum, ten dollars.

21. For each exhibition of feats of legerdemain or sleight of hand, or other exhibition or entertainment of like kind, ten dollars.

22. For each fortune-teller, twenty-five dollars.

23. For each company of traders or fortune-tellers, usually known as gypsies, ten dollars for each county.

24. For each shooting-gallery, twenty-five dollars.

25. For each skating-rink, twenty-five dollars.

26. For dealers in playing-cards, five dollars.

27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.* Dec. 13, 1892, p. 183.

Porter v. State, 58 Ala. 66.

28. For dealers in cigarettes, whether principal stock in trade or Feb. 18, 1895, p. 1192, §14.

*As amended by revenue committee.

72

KR1106

# EXHIBIT 43

KR1107

## REVENUE LAWS.

No. 903) AN ACT (H. 935

To amend the Revenue Laws of the State of Alabama.

Section 1. Be it enacted by the General Assembly of Alabama, That section 3911 of the Code be amended so as to make sub-division four of said section read as follows: 4. "All stocks of goods, wares and merchandise, the assessment to be on the average amount on hand during the preceding year, but the amount so assessed shall in no case be less than the capital actually employed in the business of the originally invoiced price of said goods, wares and merchandise, to be taken and furnished to the tax assessor as hereinafter provided, and this shall include all goods, wares and merchandise kept on plantations or elsewhere, or by railroad companies or manufacturing companies, or other associations, corporations or persons, for sale or to be dealt out to laborers or employees for profit, or on account of their wages; and shall include all goods, wares and merchandise offered for sale by any person commencing business subsequently to the first day of October of the current year, but in such case the tax shall be apportioned according to the date at which the business shall be commenced, so that if commenced after the first day of January, the tax shall be three-fourths of the tax for the whole year; if commenced after the first day of April, the tax shall be one-half of the tax for the whole year: Provided, that the assessment herein provided for shall not include the products raised on the farms, in the hands of the original producer.

Goods, wares or merchandise

Sec. 2. Be it further enacted, That section 3912 of the Code be amended so as to make sub-division three of said section read as follows: 3. On the gross incomes of all toll-bridges and ferries, and also all canals, ditches, channels, passes, tram-roads

Gross incomes

and poll-roads, used for transporting timber or other valuable commodities of commerce, at the rate that property is taxed.

Sleeping car companies

Sec. 3. Be it further enacted, That section 3915 of the Code be amended so as to read as follows: That each sleeping car company doing business in this State, for one or more passengers, other than interstate, taken up at one point in this State, and delivered at another point in this State, and transported wholly within this State, shall pay in advance on the first day of January of each year, to the State treasurer, a privilege tax of twelve hundred and fifty dollars, and no sleeping car company which has paid the privilege tax hereby required shall be liable to pay any other privilege tax in this State. but its real estate, fixtures and other local property, shall be subject to taxation as other property in this State.

Building and loan associations

Sec. 4. Be it further enacted, That section 3916 of the Code be amended so as to read as follows: Each building and loan association organized under the laws of this State or any other State or county, doing business in this State, shall pay in advance, on the first day of each year, to the State treasurer, a privilege tax of one dollar for each one thousand dollars of the first one hundred thousand dollars paid in on its capital stock, and fifty cents for each one thousand dollars paid in on its capital stock over one hundred thousand dollars, but shall not be required to pay taxes upon its mortgages or real estate. And every such association, foreign or domestic, shall also be assessed for taxation, and shall pay taxes upon its office furniture and real estate in this State.

County taxes

Sec. 5. Be it further enacted, That section 3985 of the Code be amended so as to read as follows. It shall be the duty of the Court of County Commissioners at the term commencing on the first day of the June term to levy the amount of taxes required for the expenses of the county for the current year, not to exceed one-half of one per cent. on the value of the taxable property, and the amount of other subjects of taxation in the county, as assessed for revenue to the State, as shown by the book of assessments after it has been corrected.

Case 3:23-cv-00474-JES-DDL Document 34-5 Filed 03/06/24 PageID.2002 Page 67 of 1085

Duty of collector

Sec. 6. Be it further enacted, That section 4030 of the Code be amended so as to read as follows: It is the duty of the collector, when engaged in the collection of taxes, for any year, if he discovers that any person or property within his county has not been assessed by the assessor with the tax or taxes lawfully chargeable to such person or property for that year, or any preceding year, not more than five years before that time, forthwith to assess and collect the taxes due on the same, and in writing notify the assessor of the fact so discovered in order that proper assessment of unassessed taxes may be made; and the collector has the same authority to administer oaths and propound questions as the assessor has, and any party failing or refusing to answer such questions or to give in his property shall be liable to the same penalties as provided in cases where parties fail or refuse to give in their property to the assessor, or answer the questions required to be propounded by the assessor: Provided, that in such assessments of escaped taxes the taxpayer on giving notice to the tax collector, shall have the right to have his assessment passed on by the Court of County Commissioners, and such assessment modified, allowed or rejected, as the evidence adduced to said Court shall require.

Redemption of lands

Sec. 7. Be it further enacted, That section 4097 of the Code be amended so as to read as follows: When lands which have been bid in by the State are redeemed, the judge of probate must, during the month in which such redemption is made, remit the State treasurer, at the expense of the State, the proportion of the redemption money belonging to the State, and pay into the county treasury the proportion of such money belonging to the county and to the proper authorities the proportion belonging to the school fund, if any; and upon all such money so paid over during the month of collection, he is entitled to commissions at the rate of two and one-half per cent., which he may deduct therefrom; but he shall not be allowed any commissions on any money not so paid over; and on the last business day in March, and every three months thereafter, the judge of probate shall certify to the auditor and

KR1110

Case 3:23-cv-00474-JES-DDL Document 34-5 Filed 03/06/24 PageID.2003 Page 68 of 1085

to the county treasurer, upon blanks to be furnished by the auditor, a full and correct statement of all real estate bid in by the State and redeemed, showing separately the amount of State, county and school taxes, and penalties and costs, received by him on such redemption.

License money

Sec. 8. Be it further enacted, That section 4132 of the Code be amended, so as to read as follows. "During the month in which any license money is received by the judge of probate, he must remit to the State treasurer, at the expense of the State, all money received by him for licenses belonging to the State, and pay to the county treasurer all money received by him for licenses belonging to the county; and upon all such money so remitted or paid during the week of collection, he is entitled to two and one-half per cent., which he may deduct therefrom; but he shall not be allowed any commission on any money not so remitted or paid; and on the last business day in March, and every three months thereafter, the judge of probate shall forward to the auditor a certified list of all licenses issued by him, stating therein for what business issued, the amount collected for each license, from whom collected, and the date thereof. If any judge of probate fails to comply with the provisions of this section, within ten days after the date at which he is required to make a report of licenses issued and money received by him, the auditor shall forthwith report the facts to the governor, who shall cite such judge to show why he has not made returns of such certified list of licenses, as required by law; and if such judge fails to show sufficient cause for such failure, the governor shall direct the attorney general to institute impeachment proceedings against him before the Supreme Court.

Impeachment

Commissions issued to officers; prices of

Sec. 9. Be it further enacted, That every person holding an office under the authority of this State, shall be required to take out a commission for the same, to be issued by the secretary of State, and the following fees shall be paid to said secretary of state for the commissions so issued by him, to be paid by the secretary of state into the State treasury, to-wit: Commissioners of deeds in other

States, five dollars; members of the General Assembly, county superintendents of education, justices of the peace, constables, notaries public and county tax commissioners, one dollar. And the judges of the several Courts, the chancellors, the attorney general, the solicitors, the secretary of state, the auditor, the State treasurer, the superintendent of education, the commissioner of agriculture, the railroad commissioners, the clerk of the Supreme Court, the clerks of the City Courts, the clerks of the Circuit Courts, registers in chancery, the convict inspectors, the State tax commissioner, examiners of public accounts, the sheriffs, the tax assessors, tax collectors, county treasurers, county commissioners, or members of the board of revenue, two dollars and fifty cents. That any officers, who by virtue of such office, shall receive either fees or salary as compensation for services as such officer not hereinbefore mentioned, whether existing now or hereafter created, shall be commissioned as aforesaid, and shall pay for such commission, one dollar; and any such officer exercising the duties of his office without having first secured a commission, shall be guilty of a misdemeanor. This section shall apply only to officers hereafter elected or appointed.

Oaths

Sec. 10. Be it further enacted, That annually, before commencing to perform the duties for the correction of errors in the assessments, on the second Monday in July of each year, each member of the board of revenue, or Court of County Commissioners, shall take and subscribe the oath set out hereinafter. And it shall be the duty of the auditor to forward annually, in June of each year, to the chairman of such boards of Courts, printed forms for such oaths, together with a circular letter, setting out in full section 3982 of the Code, with the penalties provided by law for failure to comply with the same; and directing that said oath shall be taken and entered upon the minutes of the board or Court, said oath shall be in form and substance, as follows: State of Alabama.—Before me (to be administered by any judge, register, justice of the

Duty of Auditor

peace or notary public), personally appeared——— —————————, members of the board of revenue, or Court of County Commissioners, of ——————— county, who on oath declare, and say that while engaged in the duty of correcting errors in assessments or passing on the assessment of escaped taxes, they will fix a value on all property assessed for taxes at its fair cash market value; and that they will in no case, where the facts are brought to their knowledge, reduce the value of any property for taxation, below the fair market value of the property, or what the property would sell for cash, and that they will make diligent effort and inquiry to ascertain the value of all property to be passed on by them. Sworn to and subscribed before me, this ———— day of July, 18—.

Telegraph companies

Sec. 11. Be it further enacted, That section 3913 of the Code shall be amended, so as to read as follows: 3913. Each telegraph company doing business between points wholly within this State, and without reference to its interstate commerce or governmental business, shall pay, in advance, on the first day of January of each year, to the State treasurer, a privilege tax, based on the mileage of the telegraph line operated by it in this State, as follows: Each telegraph company, whose lines within the State do not exceed one hundred and fifty miles, shall pay at the rate of one dollar per mile; each company whose lines within the State exceed one hundred and fifty miles, shall pay five hundred dollars, together with one dollar for each mile of such lines; and each long-distance telephone company, whose lines within the State do not exceed one hundred and fifty miles shall pay at a rate of fifty cents per mile; and each long-distance telephone company whose lines within the State exceed one hundred miles, shall pay two hundred and fifty dollars; and no telegraph company which has paid the privilege tax herein required shall be liable to pay any additional privilege tax or other tax in this State, except licenses required by cities and towns; and except upon its real estate, fixtures and other local property, which shall be subject to taxation as other property in the State. The payment of such privilege tax to the treasurer

shall be accompanied by a sworn report to the auditor, showing the number of miles of telegraph line operated by such company within this State; and in default of the payment of such tax or the making of such report for sixty days after the first day of January, a penalty of double the amount of such tax shall be imposed upon and collected of such defaulting company.

Telephone companies

Sec. 12. Be it further enacted, That section 3943 of the Code shall be amended, so as to read as follows: 3943. The president, secretary or manager of every telephone company, except long-distance telephone companies, owning or operating lines, must annually, on or before the first day of February, make, under oath, to the assessor of the county in which such instruments are located, or such lines are operated, a return of the number of miles of telephone wire in the county belonging to such company, and the value thereof, the number of poles, batteries, instruments and articles of like kind in the county, connected with its business, and the value thereof, and the amount of the gross receipts of such company from its business done in the county during the preceding tax year; and in case such return is not made by any company within the required time, the assessor must ascertain, from the best information he can obtain, the amount and value of such property, and the amount of such receipts; and on the property and receipts so returned or ascertained, the assessor shall assess the taxes against such company; and when there has been a failure on the part of the company to make a return of such property and receipts within the required time, the assessor shall add to the assessment against such company a penalty of fifty per cent. on the amount thereof. Such assessment, as well as the assessment of other taxable property of such company in the county, must be entered by the assessor in the book of assessments.

Long distance telephone

Sec. 13. Be it further enacted, That section 3974 of the Code shall be amended, so as to read as follows: "3974. The president, secretary, auditor or managing agent, in this State, of every telegraph or long-distance telephone company, whose line, or any part thereof, in within the State, must an-

nually, on or before the first day of February of each year, make under oath, to the auditor, a return of the number of miles of telegraph wire in the State belonging to such company, and the number of poles, batteries, instruments and articles of all kinds, in the State connected with its business, specifying the several counties in which such property is situated, and the items of property situated in each of such counties; and if any of such companies, its officers, or agents, fail to make such return within the time specified, the auditor must ascertain such items of property and values from the best information he can obtain."

Report of auditor to State board

Sec. 14. Be it further enacted, That section 3975 of the Code shall be amended, so as to read as follows: "3975. Report of auditor to State board, assessment and proceedings thereon. The auditor must lay before the State board of assessment, at its next meeting thereafter, such returns; and when not made by any company, he must report to the board the items of property and values of the company failing to make returns, as ascertained by him; and thereupon the board must proceed to examine such returns and reports, determine the value of such property, and assess the same for taxation, as in the case of assessments of the property of railroad companies; and it may add to the assessment against any telegraph or long-dis tance telephone company, failing to make returns within the required time, a penalty of not exceeding fifty per cent. thereon. Upon the completion of the assessment against any telegraph or long-distance telephone company by the board, the auditor shall give to the tax assessor of the several counties in which such property is situated, and the superintendent or managing agent of such company in this State, the same notification touching such assessment as is required of him in case of assessments against railroad companies; and thereupon such assessors must act in reference to such assessment, and to the assessment of any other property of such company taxable in their counties, as they are directed to act in case of assessments against railroad companies by the State board of assessment."

Case 3:23-cv-00474-JES-DDL Document 34-5 Filed 03/06/24 PageID.2008 Page 73 of 1085

Exemption

Sec. 15. Be it further enacted, That paragraph 2 of section 3907 of the Code be amended, so as to read as follows: "2. All bonds of the United States and of this State, all property, real and personal, of the State, and of the counties and municipal corporations in the State; all cemeteries, and all lots in incorporated cities or towns, or within one of any city or town, to the extent of one acre, and all lots one mile or more distant from such cities or towns, to the extent of five acres, with the buildings thereon, when the same are used exclusively for religious worship, for schools or for purposes purely charitable; all school furniture and personal property used exclusively for school purposes; and all property, real or personal, to an extent not exceeding twenty-five thousand dollars in value, that may be used exclusively for agricultural or horticultural associations of a public character."

Licenses

Sec. 16. Be it further enacted, That section 4122 of the Code be amended, so as to read as follows: "Licenses are required of all persons engaged in or carrying on any business or doing any act in this section specified, for which shall be paid for the use of the State, the following taxes, to-wit:

## LICENSES.

### ABSTRACTS.

1st. Abstract companies and persons pursuing the business of furnishing abstracts of title, in towns or cities of twenty thousand inhabitants or more, thirty dollars. In towns and cities from ten to twenty thousand inhabitants, twenty dollars. In towns and cities of less than ten thousand inhabitants, ten dollars.

### AUCTIONEERS.

2d. For each auctioneer, in any city or town of twenty thousand inhabitants or over, a license tax of fifty dollars per annum; in cities or towns of eight thousand inhabitants, and less than twenty thousand, thirty dollars per annum; in cities and

towns of five thousand inhabitants, and less than eight thousand, twenty dollars per annum; in cities or towns of more than one thousand and less than five thousand, five dollars per annum. The term auctioneer, within the meaning of the foregoing provisions, shall be deemed to apply to any person selling goods, wares, merchandise, live stock, or other things of value, at public outcry except as otherwise herein provided, whether a charge is made for the same or not. In the following cases, sales at public outcry may be made for a compensation, without license: First. The estate of a decedent by the personal representative or his agent, according to law, or by the provisions of the will. Second. Property conveyed by deed of trust, mortgage or decree or order. Third. Any person may sell the agricultural products arising from his own or other labor under his control, or his real or personal estate, not purchased or sold on speculation. Fourth. All sales under legal process. For transient or itinerant auctioneers or dealers in goods, wares and merchandise, other than licensed peddlers, and other than traveling agents or wholesale dealers in said articles, making sale thereof by sample, fifty dollars.

## BAGATELLE OR JENNY LIND TABLES.

3d. For each bagatelle or Jenny Lind table, or any other table or device of any kind from which any kind of profit is derived by the keeper, fifty dollars.

## BASE BALL PARK.

4th. For each base ball or foot ball park, where admission fees are charged, fifty dollars.

## BOTTLERS.

5th. For each bottler or bottling association, other than bottlers of mineral water, twenty-five dollars.

## BILLIARD TABLES.

6th. For each billiard table, for the use of which money or other compensation is charged, and which is not kept in conection with the business of a barroom or drinking saloon, twenty-five dollars.

7th. For each billiard table kept in connection with the business of a barroom or drinking saloon, whether its use be charged for or not, fifty dollars.

## BOWLING ALLEYS.

8th. For bowling or ten-pin alleys, for the use of which money or other compensation is charged, twenty-five dollars, for each alley; and for each bowling or ten pin alley, kept in connection with a drinking saloon, whether compensation is charged or not, twenty-five dollars.

## BILL POSTERS.

9th. For each bill poster or person pursuing the business of posting bills, in cities and towns, of twenty thousand inhabitants or more, tweny-five dollars; in towns and cities from ten to twenty thousand inhabitants, fifteen dollars. In towns and cities of less than ten thousand inhabitants, five dollars.

## BROKERS OR COMMISSION MERCHANTS.

10th. For each broker or commission merchant or dealer in merchandise for a commission, in towns and cities of less than five thousand inhabitants, ten dollars. In towns and cities of five thousand and less than ten thousand inhabitants, fifteen dollars. In towns and cities of ten thousand and less than twenty-five thousand inhabitants, twenty-five dollars. In towns and cities of twenty-five thousand inhabitants or more, fifty dollars.

## BICYCLES.

11th. Each person owning and using a bicycle upon any of the streets of any town or city, or upon any of the public roads of any county within this State, shall pay a privilege tax, in lieu of all other taxes, of twenty-five cents for each bicycle, to be levied for the State only; said license to be taken out as other licenses are required to be taken out, and the payment of such license tax, to be evidenced by the certificate of the probate judge, for which he may charge a fee of not more than ten cents.

12th. Each person or firm keeping bicycles for rent or hire, ten dollars.

## BOOK AGENTS.

13th. Any person other than a merchant paying an advalorem tax on his stock of goods, who shall receive subscriptions for or shall in any manner furnish books, maps, prints, pamphlets, or periodicals, shall pay a privilege tax of ten dollars in each county of this State in which he shall do business. Provided, That this shall not apply to persons distributing or selling by subscription any religious books, pamphlets or periodicals. Provided, further, That no license shall be required of any person who was a Federal or Confederate soldier during the civil war, or to any indigent or disabled person who only sells or furnish books, maps, prints, pamphlets or periodicals to persons residing in the county where such indigent or disabled person resides.

## BREWERS.

14th. For breweries, one hundred dollars. Every agency of a brewery of another State doing business in this State shall pay the same license; and any person, whether retail dealer or not, selling the goods or product of any brewery, shall be deemed and held an agent, unless such brewery shall have an established agency in this State.

## CIGARETTE DEALERS.

15th. For each dealer in cigarettes, whether principal stock in trade or not, in any place outside of the incorporated towns and villages, five dollars. In incorporated towns and cities of five thousand or less, ten dollars. In towns and cities of more than five thousand, and not exceeding ten thousand inhabitants, twenty dollars. In towns and cities of more than ten thousand and not exceeding twenty thousand inhabitants, twenty-five dollars. In all other places thirty-five dollars.

## CIGAR AND TOBACCO STANDS.

16th. For each cigar dealer, whose principal stock in trade is cigars and tobacco, in towns and cities of twenty thousand or more inhabitants, ten dollars. In towns and cities of less than twenty thousand inhabitants, five dollars.

## CIRCUSES.

17th. For each day's exhibition of a circus, in towns or cities having more than five thousand inhabitants, or within two miles thereof, one hundred and fifty dollars; in all other places, one hundred dollars. Every building, space, tent or area, where feats of horsemanship, or acrobatic sports are exhibited, shall be regarded as a circus. For each exhibition of a pony or dog show, exhibiting in towns and cities having more than ten thousand inhabitants, thirty-five dollars. In all other places, twenty-five dollars. For each exhibition of a side show accompanying a circus, menagerie, or museum, ten dollars.

## COLD STORAGE.

18th. Any person doing a cold storage business, ten dollars.

## COMMERCIAL OR MERCANTILE AGENCIES.

19th. Each and every person, partnership, or corporation, who engage in the business of inquiring into and reporting upon the credit and standing of persons engaged in business in this State, shall pay a license tax of three hundred dollars; and the payment of this tax to the State, evidenced by the receipt of any judge of probate, shall exempt such person, partnership, or corporation, from the payment of such tax in any other county; and payment of such tax shall not, when it has been paid by such person, partnership, or corporation, be required of any of their agents or correspondents in the State.

## CONCERTS OR EXHIBITIONS.

20th. For each concert, musical entertainment, public lecture, or other public exhibition or entertainment, where charges are made for admission, or for the use of any instrument or device, or the participation in any exercise or entertainment, not given for charitable, school, or religious purposes, and not otherwise provided for, five dollars; but the provisions of this subdivision shall not apply to exhibitions or entertainments given in theatres, where the owner or manager thereof has taken out a license as owner or manager.

## COLLECTING AGENCIES.

21st. Each collecting agency in towns and cities of twenty thousand inhabitants or more, twenty-five dollars; in towns and cities of less than twenty thousand inhabitants, ten dollars. This tax shall be paid whether such agency has paid the tax as required of commercial, mercantile, mutual benefit, or protective agent or not.

## CONSTRUCTION COMPANIES.

22d. For each construction company doing business in this State, twenty-five dollars.

## COMPOUNDERS AND RECTIFIERS.

23d. For compounders and rectifiers of spirituous or vinous liquors, two hundred dollars. Any person who rectifies, purifies or refines distilled spirits or wines by any process, or who mixes distilled spirits or wines with any chemicals, or compounds liquors for sale under any name, shall be deemed a compounder and rectifier.

## COTTON BUYERS.

24th. Each person engaged in the business of buying cotton, other than merchants buying from their customers who are indebted to them, and officers of cotton factories in this State buying cotton for their own factories, ten dollars.

## CORPORATIONS.

25th. All corporations doing business in this State, whether organized in this State or another State or county, not otherwise specifically required to pay a license tax, shall pay annually the following privilege taxes: Corporations whose paid up capital stock is under $10,000, ten dollars. Corporations whose paid up capital stock exceeds $10,000, and does not exceed fifty thousand dollars, twenty-five dollars; when the paid up capital stock exceeds $50,000 and not over one hundred thousand dollars, forty dollars; where the paid up capital stock exceeds one hundred thousand dollars and does not exceed two hundred thousand, seventy-five dollars; where the paid up capital stock exceeds two hundred thousand dollars, and does not exceed three hundred thousand dollars, one hundred and twenty-five dollars; where the paid up capital stock exceeds three hundred thousand dollars and does not exceed four hundred thousand dollars, one hundred and seventy dollars; where the paid up capital stock exceeds four hundred thousand dollars and does not exceed five hundred thousand dollars, two hundred dollars; where the paid up capital stock exceeds five hundred thousand dollars and does not exceed one million

dollars, three hundred dollars; where the paid up capital stock exceeds one million dollars, five hundred dollars. When application is made for the license herein provided, it shall be accompanied by the affidavit of the president or other chief officer of the corporation showing the amount of the capital stock of such corporation, but the payment of this tax in one county in the State, as evidenced by the license or official certificate of the judge of probate shall be sufficient: Provided, That the provisions of this subdivision shall not apply to banks and banking institutions regularly organized as such.

### COAL OR COKE AGENTS OR DEALERS.

26th. Each person, firm or corporation, or their agents, who deal in coal or coke, in towns or cities of twenty thousand or more inhabitants, twenty dollars; in towns and cities over five thousand inhabitants and less than twenty thousand inhabitants, ten dollars. In towns and cities of five thousand inhabitants or less, five dollars. Provided, This shall not apply to persons or companies who sell in quantities of five bushels, or less, or persons who mine their own coal and sell the same in wagon load lots.

### CARDS, DEALERS IN.

27th. For each dealer in playing cards, five dollars.

### CANE RACKS.

28th. (See devices).

### DISTILLERS.

29th. For distillers of spirituous liquors, twenty-five dollars; but this shall not apply to the distilling of fruits.

### DOG SHOWS.

30th. (See circuses).

DETECTIVE AGENCIES.

31st. For each detective agency, company or corporation doing business in this State, fifty dollars.

DEVICES.

32d. For each device used by persons as a source of profit to themselves, such as throwing at wooden figures, or any object of like character, cane racks, knife racks, striking an object to test the strength, blowing to test the lungs, or other device of like character, for each county in which it is operated, twenty-five dollars. But this subdivision shall not be so construed as to legalize the operation of any device which is now prohibited by law.

DUMMY AND ELECTRIC RAILWAYS.

33d. For each dummy railroad or electric railroad or railway, being operated in this State, the following license taxes: In counties of forty thousand inhabitants or over, fifty dollars; in counties of thirty thousand inhabitants and less than forty thousand, forty dollars; in counties of less than thirty thousand inhabitants, ten dollars.

DICE AND DICE BOXES AND DOMINOES.

34th. For each table or device, or set of domino bones, kept in connection with a barroom or drinking saloon for use in playing the game commonly known as dominoes, twenty-five dollars; and for each dice-box and dice kept in a barroom or drinking saloon, twenty-five dollars.

ELECTRIC LIGHT, GAS AND WATER WORKS.

35th. For each water works company or corporation, electric light and power company or corporation, gas company or corporation operated by a person or company or corporation for public uses, other than a municipality, shall pay to the State the following license taxes: In cities or towns over twenty thousand inhabitants, one hundred dollars; in cities or towns of ten thousand inhabitants, and less than twenty thousand, fifty dollars; in cities

and towns of five thousand inhabitants and less than ten thousand, twenty-five dollars; in cities or towns of less than five thousand inhabitants, fifteen dollars.

## EYE GLASSES.

36th. (See peddlers).

## EXPRESS COMPANIES.

37th. (Express companies, see Sec. 24).

## FEATHER RENOVATORS.

38th. For each person, firm or agent, soliciting or engaged in cleaning and renovating feathers, in each county, ten dollars.

## FEES. (See also Stocks and Bonds.)

39th. For dealers in securities, such as notes, accounts, judgments, witness tickets, in counties of fifty thousand inhabitants or over, thirty dollars; in counties of thirty to fifty thousand inhabitants, fifteen dollars; in counties of fifteen to thirty thousand inhabitants, ten dollars; in counties of less than fifteen thousand inhabitants, five dollars. This tax shall apply to the showing of any evidence of indebtedness; but no broker who has paid a privlege tax as such, shall be required to pay this tax.

## FERRIES AND TOLL BRIDGES.

40th. For each toll-bridge, or bridges where thoroughfare tolls are charged for animals or vehicles crossing the same, or ferry, when not within two miles of the corporate limits of a town or city of two thousand inhabitants, where the income is more than three hundred dollars, and less than six hundred dollars per annum, five dollars; for same, where income is over six hundred dollars per annum, ten dollars; for same, in or within two miles of the corporate limits of any town or city of two thousand inhabitants, and less than five thousand,

fifty dollars; for same, in or within two miles of the corporate limits of a town or city of five thousand inhabitants or more, seventy-five dollars.

## FLYING JENNIES.

41st. The operator of set of flying jennies, called also 'hobby horses,' and 'merry-go-rounds,' shall pay to the State the following license tax: In cities and towns of twenty thousand inhabitants or over, or within one mile of such, for each week, five dollars; or for each month, ten dollars; or for each year, thirty dollars; in cities or towns of less than twenty thousand inhabitants, or within one mile of such, for each week, two dollars and fifty cents; for each month, five dollars; for each year, twenty dollars. In any locality in the State, other than is provided above, for each week, one dollar; or each month, two dollars and fifty cents; or for each year, ten dollars.

## FUTURES, DEALERS IN.

42d. For each person or firm engaged in the business of buying or selling futures for speculation, or on a commission, one hundred dollars; but this shall not be held to legalize any contract which would otherwise be invalid.

## FORTUNE TELLERS.

43d. For each fortune teller, five dollars.

## FRUIT STANDS.

44th. For each fruit stand, in cities and towns over ten thousand inhabitants, five dollars. In other places, two dollars and fifty cents.

## GYPSIES AND TRADERS.

45th. For each company of traders, usually known as gypsies, ten dollars for each county.

## HORSE DEALERS.

46th. For each person or firm, bringing into any county of this State, for sale, any horses, mules, jacks, or jennets, by the car load, ten dollars on each car: to be paid in the county in which such stock is offered for sale.

## INSURANCE COMPANIES.

47th. For each insurance company filing copy of charter, or deed of settlement, and financial statement, one hundred dollars; to be paid to the insurance commissioner, as prescribed in section 2601 of the Code of 1896. And all taxes and fees shall be paid as is in said section provided. And this act does not amend or repeal in any way the law now existing as to insurance companies.

48th. For each insurance company doing a banking business, in addition to other special tax, fifty dollars.

## ICE FACTORIES.

49th. For each ice factory, with a capacity of ten tons per day, twenty-five dollars; for each ice factory with a greater capacity than ten tons per day, fifty dollars.

## ITINERANT TRADERS, AUCTIONEERS, AND DEALERS.

50th. For transient, or itinerant auctioneers, or traders, or dealers in goods, wares and merchandise, other than licensed peddlers, and other than traveling agents of wholesale dealers in said articles, making sale thereof by sample, fifty dollars; and this tax shall apply to all dealers who are migratory and do not pay an ad valorem tax.

## KNIFE AND CANE RACKS.

51st. Knife and cane racks. (See devices).

Case 3:23-cv-00474-JES-DDL Document 34-5 Filed 03/06/24 PageID.2020 Page 85 of 1085

## LAUNDRIES.

52d. Each laundry, other than those run by hand power, ten dollars; this shall apply to laundries run by hotels for profit, and shall not apply to laundries in towns and villages of less than one thousand inhabitants.

## LIGHTNING ROD AGENTS.

53d. Each company or person who sells, or delivers or erects lightning rods in this State, shall pay to the State a license tax of fifty dollars. The payment of this tax to the State, evidenced by the receipt of any judge of probate, shall exempt such company, or person, from the payment of such tax in any other county; but in each county in which such company, or person, carries on such business, a license tax of ten dollars shall be paid for county purposes.

## LEGERDEMAIN OR SLEIGHT-OF-HAND.

54th. For each exhibition of feats of legerdemain, or sleight-of-hand, or other exhibition or entertainment of like kind, ten dollars.

## LIQUORS, DEALERS IN.

55th. For the retail of spirituous, vinous or malt liquors, on any steamboat, or other water craft, or any sleeping, dining, or buffet car, two hundred and fifty dollars, for which the State shall have a preferred lien on such steamboat, or other water craft, and cars named; and such lien may be enforced whenever any such liquors are retailed by any person on such steamboat, or other water craft, or cars, with the knowledge or consent of the captain, or conductor, without having first procured a license therefor, as provided by law; and the tax collector of any county in which such steamboat, or other water craft, may ply, or cars run, is required to enforce such lien, in the same manner, and by the same proceedings, as are authorized for the collection of taxes on steamboats and on railroad cars.

For retailers of spirituous, vinous, or malt liquors, except as hereinafter provided, in any city, town, village, or any other place of less than one thousand inhabitants, one hundred and seventy-five dollars; in any city, town or village of more than one thousand inhabitants, and less than three thousand inhabitants, two hundred and twenty-five dollars; in any city containing three thousand inhabitants or more, and less than ten thousand inhabitants, three hundred dollars; and in any city of more than ten thousand inhabitants, three hundred and fifty dollars. But dealers in lager beer exclusively shall be charged one-fourth of the above rates. Any person who pays for and takes out a license as a retailer, shall not be required to pay for, and take out a license as a wholesale dealer in such liquors; and when a retail license is taken out, after the first day of January, and before the first day of July, the price of the license shall be the same as for a license for twelve months. Any person who sells, or disposes, of spirituous, vinous, or malt liquors, or intoxicating bitters, in any quantity less than a quart, shall be deemed a retail dealer: Provided, Nothing in this paragraph shall be so construed as to alter, repeal, or modify any license now authorized and required to be paid to any district, city or municipality, or for municipal purposes.

For wholesale dealers in spirituous, vinous, or malt liquors in any place, three hundred and fifty dollars. Any person dealing in said articles, who shall sell, barter, or exchange, or in any way dispose of, or permit to be taken, spirituous, vinous or malt liquors, in any quantity less than one quart, or who shall permit the same to be drunk by the glass, or single drink, in or about his place of business, shall be deemed a retail dealer; and any dealer so disposing of spirituous, vinous, or malt liquors, only in the quantity of one quart or more, shall be deemed a wholesale dealer; but any person having taken out a license as retail dealer is authorized to sell at wholesale without additional license.

Any person engaged in the business of selling cider at retail, or in quantities of less than one gallon, where he is not the manufacturer thereof, whether it be his principal stock in trade or not, shall pay a license tax of ten dollars: Provided, That this shall not apply to retail liquor dealers.

(See also compounders and rectifiers, distillers, brewers.)

### MENAGERIES AND MUSEUMS.

56th. For each exhibition of menagerie or museum, twenty-five dollars. (See also circuses, concerts and exhibitions).

### MACHINE SLOTS.

57th. For each machine such as nickle-in-the-slot or other device of like character, whether the same is charged for or not, two dollars. This shall apply to phonographs, weighing machines, music boxes, etc., having the nickle, or penny in the slot device.

### MERCANTILE AGENCIES.

58th. Mercantile agencies. (See commercial agencies).

### MONEY LENDERS.

59th. Each company, corporation or association doing business in this State, whose sole or principal business is the loaning of money, whether organized in this State, or in another State or country, and which is not elsewhere subjected to a privilege tax in this section shall pay to the State as other license taxes are paid, one hundred dollars. Provided, the provisions of this sub-division shall not apply to banks, or banking institutions, regularly organized as such.

## NEWS COMPANIES.

60th. Each news company doing business in this State, three hundred dollars.

## OILS.

61st. Each agency, person, firm or corporation, selling illuminating or lubricating oils at wholesale, that is to say, in quantities of twenty-five gallons or more, shall pay a privilege or license tax to the State, of one-half of one per centum on their gross sales; and the State tax comissioner, or his deputy, is authorized and directed to collect and pay such privilege tax into the State treasury, retaining out of the amount collected ten percentum thereof for the compensation and fees of himself and deputies for doing said work; and said State tax commissioner or said deputies, with the approval of the State board of compromise, may collect and receive a gross sum as said privilege or license tax from any corporation, firm, person or agency, selling oils in this State, and said gross sum may be so received and collected in place of and in full settlement of said license tax, so that oils upon which said gross sum has so been paid in full settlement, shall not be subject to the license tax imposed by this section. And this license shall run as other licenses in the State from January to January: Provided, That for the year 1899 three-fourths only of the annual license shall be charged and collected; and the State tax commissioner or his deputies may require sworn statements to be made by said agencies, persons, firms, or corporations, of their gross amounts of sales, for the previous calendar year which may be accepted with the approval of the State board of compromise for fixing the amount of said license for the current year. Any agency, person, firm, or corporation, failing to make said sworn statement when so required, forfeits to the State three times the amount of said license.

## PAWNBROKERS.

62d. For each pawnbroker, fifty dollars.

Case 3:23-cv-00474-JES-DDL Document 34-5 Filed 03/06/24 PageID.2024 Page 89 of 1085

## PATENT RIGHTS.

63d. Each person who shall sell or offer to sell the right to manufacture, or use, any machinery or other thing patented under the laws of the United States for each county in which he shall sell or offer to sell such patented machinery or other thing, five dollars.

## PEDDLERS.

64th. For each peddler of medicines or other articles of like character, one hundred dollars for each county in which they peddle; and for each peddler of spectacles or eye glasses, five dollars for each county in which they peddle; for peddlers of medicines with vocal or instrumental music, or both, two hundred and fifty dollars for each county in which they peddle; for peddlers in wagon drawn by one horse, or other animal, forty dollars; in a wagon drawn by two horses, or more, or other animals, fifty-five dollars; on a horse, or other animal, twenty-five dollars; on foot, fifteen dollars; when accompanied by singers or performers on any musical instruments, one hundred dollars; but peddlers of tinware only, and peddlers of wooden and stone- or clay hollowware only, and tanners who manufacture leather goods and peddle these only, shall not be required to procure license. A peddlers' license shall entitle him to peddle only in the county where it is taken out. Any person may demand of peddlers, itinerant dealers and traveling agents their license, and unless they exhibit the same, or show that they have a right under the law to peddle the articles carried by them, or to carry on the business they are engaged in without a license, such person may and is hereby authorized to arrest such peddlers, itinerant dealer or traveling agent, and carry him before the nearest county court judge, justice of the peace, mayor, recorder, intendant of any town, or notary public exercising the power of a justice of the peace, and such officer as such peddler, itinerant dealer or traveling agent is car-

ried before must, if he finds such person to be dealing without a license, forthwith issue a warrant for his arrest, returnable to any Court of the county having criminal jurisdiction, which warrant may be executed by the sheriff, or by any constable of the county, any city or town marshal, policeman, or any officer having authority to make arrests. It shall, however, be lawful for any person having but one arm or leg, or whose sight has been impaired as a result of exposure, injury or disease during his service in the Confederate army, or any other disabled Confederate soldier who is permanently disabled from any cause, or any person who has lost his eye sight in any way so that he is incompetent to perform manual labor (if he shall secure the certificate of a physician and the certificate of the judge of probate of such facts), to peddle in any county of the State free of license; nor shall this act be so construed as to require a license of peddlers of fish, oysters, game, fresh meats, poultry, fruit and all form products raised by the seller, nor any dealer in books or other literature. For each peddler of clocks doing business in this State, a State license tax of five hundred dollars, and a county license tax of two hundred and fifty dollars for each county in which such business is carried on. That all the citizens of this State, who have resided here for five years next before the passage of this act, who were soldiers of the Confederate States of America, or engaged in the naval service thereof, and do not own property exceeding in value one thousand dollars, be allowed to peddle any produce or merchandise, in any and all of the counties of this State, except in any incorporated village, town or city, without the payment of the license required of such peddlers. That any such soldiers or sailors desiring such license to peddle, must apply to the judge of probate of any county in this State, and make and submit his proof of having been such soldier, or sailor and if it is sufficient to satisfy said judge, he will issue the license without payment of money therefor and such license shall be authority to peddle such commodities in any of the counties of this

State: Provided, That under this act there shall be no peddling of patent medicines.

## PHOTOGRAPHERS.

65th. For each traveling photograph gallery going from county to county in railroad car, twenty-five dollars.

For each traveling photographer, traveling in any other way, ten dollars.

## PISTOL, BOWIE OR DIRK KNIVES.

66th. For dealers in pistol, bowie or dirk knives, whether principal stock in trade or not, one hundred dollars.

## PISTOL OR RIFLE CARTRIDGES.

67th. For wholesale dealers in pistol or rifle cartridges, in towns or cities of twenty thousand or more inhabitants, ten dollars. In all other places, five dollars: Provided, That the wholesale dealers license shall entitle them to sell at retail.

## PUBLIC HALLS.

68th. For each public hall, let to hire, twenty-five dollars.

## POOL TABLES.

69th. For each pool table upon which the game of pin pool is played, one hundred dollars.

For each table upon which a game of pool is played with fifteen balls, more or less, and not pin pool, for the use of which money or other thing of value is charged or when kept in connection with a bar-room or drinking saloon, whether its use is charged for or not, fifty dollars.

## PLUMBERS OR GAS-FITTERS.

70th. For each person or firm doing the business of a plumber and gas fitter, or either, in towns or cities of twenty thousand or more inhabitants, ten dollars.

In all other places, five dollars.

# EXHIBIT 44

KR1135

record, book, paper, contract, return, or other document, or of the official statement of any account between him and the state, in the office of the auditor or treasurer, certified by the auditor, if the original is in his office, or by the treasurer, if in his office, under the great seal of the state, shall be received as evidence in any case in which the original would be competent, unless the defendant shall deny under oath that he made or executed such original.

**627. Assessor and collector may contract for stationery, printing, etc.**—The tax-collector and tax-assessor are authorized to purchase necessary books and stationery, and to contract for the necessary printing in their respective offices, with the approval of the court of county commissioners. Ib. sec. 132.

**628. Penalty against officer failing to pay over money collected.**—Upon a verdict being returned in favor of the state, in any suit brought by the state against any officer charged with the collection of any revenue for the state, and his sureties, or either, for the recovery of any such revenue collected by him, a judgment must be rendered for the amount of such verdict, and twenty per cent. thereon. * Ib. sec. 41.

---

## CHAPTER 9.

### LICENSES.

ARTICLE 1.—Business and callings for which licenses are required; prices of licenses.

2.—Issue and expiration of licenses, and other general provisions.

### ARTICLE I.

BUSINESS AND CALLINGS FOR WHICH LICENSES ARE REQUIRED; PRICES OF LICENSES.

**629. Persons required to take out licenses, and prices to be paid therefor.**—Licenses are required of all persons engaging in, or carrying on any business, or doing any act in this section Dec. 12, 1884, p. 3, sec. 14.

---

* On Feb. 18, 1887, "An act to amend section 499 of the Code of Alabama," was approved (Pamph. Acts 1886–7, p. 143); and the section, as amended, is as follows:

"Section 499. **Cities and towns may adopt provisions of this chapter.**—Any incorporated city or town in this state may, by an ordinance, adopt the provisions of this chapter, regulating the assessment and collection of taxes by such city officers or agents, so far as the same may be applicable, and shall have the same right to sell property and make titles to property sold for taxes, as is provided for collecting state and county taxes; but any such city or town must first, by ordinance, adopt such parts of this chapter for said purposes as they desire to put in force; but no city (except Mobile, Montgomery, Marion, Brewton, Cullman and Selma), or town, or county shall assess, levy or collect any license tax on any business or occupation, upon which the state does not assess, levy, or collect such license tax. Nothing herein contained shall affect the provisions of the act for the reduction and funding of the debt of the city of Mobile, approved March 9th, 1875. The city council of Opelika may assess, levy and collect a license tax on banks or bankers, the keepers of livery stables, of meat markets, and those engaged in the business of running drays and hacks for hire." The provisions of the chapter referred to (chapter 2 of title VII. of part 1 of Code of 1876) were superseded by subsequent legislation embodied in this Code, in which no provision of like import to that embraced in section 499 of Code of 1876 was contained; and hence, it was omitted by the commissioners from this Code. The chapter referred to corresponds, in subject-matter, with this title of this Code.

specified, for which shall be paid, for the use of the state, the following taxes, to-wit:

Subd. 1.

1. For each public race-track, at or within five miles of any city or town containing less than five thousand inhabitants, one hundred dollars; at or within five miles of any city or town containing more than five thousand inhabitants, two hundred dollars.

Subd. 2.

2. For the retail of spirituous, vinous, or malt liquors, on any steamboat or other water-craft, or on any sleeping, dining, or buffet-car, two hundred and fifty dollars, for which the state shall have a preferred lien on such steamboat or other water-craft, and cars named; and such lien may be enforced whenever any such liquors are retailed by any person on such steamboat or other water-craft, or cars, with the knowledge or consent of the captain, or conductor, without having first procured a license therefor, as provided by law; and the tax-collector of any county in which such steamboat or other water-craft may ply, or cars run, is required to enforce such lien in the same manner, and by the same proceedings, as are authorized for the collection of taxes on personal property.

Subd. 3.

3. For retailers of spirituous, vinous, or malt liquors in any city, town, village, or any other place, of less than one thousand inhabitants, one hundred and twenty-five dollars; in any city, town, or village of more than one thousand, and less than three thousand inhabitants, one hundred and seventy-five dollars; and in any city or town containing three thousand or more, and less than ten thousand inhabitants, two hundred and fifty dollars; and in any city of more than ten thousand inhabitants, three hundred dollars. But dealers in lager beer exclusively shall be charged one-fourth of the above rates. Any person who pays for and takes out a license as a retailer, shall not be required to pay for, and take out a license as a wholesale dealer in such liquors; and when a retail license is taken out after the first day of January, and before the first day of July, the price of the license shall be the same as for a license for twelve months. Any person who sells or disposes of spirituous, vinous, or malt liquors, or intoxicating bitters, in any quantity less than a quart, shall be deemed a retail dealer.

Subd. 4.

4. For wholesale dealers in spirituous, vinous, or malt liquors in any place, two hundred dollars. Any person dealing in said articles, who shall sell, barter, or exchange, or in any way dispose of, or permit to be taken, spiritous, vinous, or malt liquors, in any quantity less than one quart, or who shall permit the same to be drunk by the glass, or single drink, in or about his place of business, shall be deemed a retail dealer; and any dealer so disposing of spirituous, vinous, or malt liquors, only in the quantity of one quart or more, shall be deemed a wholesale dealer.

Subd. 5.

5. For compounders and rectifiers of spirituous or vinous liquors, two hundred dollars. Any person who rectifies, purifies, or refines distilled spirits or wines, by any process, or who mixes distilled spirits or wines with any chemicals, or compounds liquors for sale under any name, shall be deemed a compounder and rectifier.

# EXHIBIT 45

KR1138

owner thereof; and upon a failure to comply with the conditions of such delivery bond, the proceedings thereon shall be as at present prescribed by law in case of forfeited delivery bonds.

SEC. 5. *Be it further enacted*, That this Act shall not apply to fiduciaries, or defaulters, or tax sales; and that it take effect from and after its passage.

EDWIN A. KEEBLE,
*Speaker of the House of Representatives.*
EDWARD S. CHEATHAM,
*Speaker of the Senate.*

Passed, February 5, 1862.

---

## CHAPTER 22.

AN ACT to dismiss suits in certain cases.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee*, That all suits now pending against citizens of this State, for a violatien of Section 4747 of the Code of Tennessee, shall be dismissed by the Court before whom the same are pending: *Provided*, the defendant pay or secure the cost.

EDWIN A. KEEBLE,
*Speaker of the House of Representatives.*
EDWARD S. CHEATHAM,
*Speaker of the Senate.*

Passed, February 4, 1862.

---

## CHAPTER 23.

AN ACT to amend the law respecting Bowie Knives and other weapons.

*Be it enacted by the General Assembly of the State of Tennessee*, That all laws forbidding the importation, manufacture, selling, or giving away of Bowie knives

or other weapons, and all laws prohibiting the carrying of pistols, Bowie knives, or other weapons, openly and unconcealed, be suspended during the existing war.

EDWIN A. KEEBLE,
*Speaker of the House of Representatives.*
EDWARD S. CHEATHAM,
*Speaker of the Senate.*

Passed, October 30, 1861.

---

## CHAPTER 24.

AN ACT to amend the Fee Bill and for other purposes.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That the Clerks of the County Courts of this State be entitled to receive and they are hereby allowed fifty cents for taking the Bond required to be executed by the fourth Section of an Act passed by the General Assembly of the State of Tennessee, on the 15th day of March, 1860, entitled an Act to prevent the adulteration of spirituous liquors in this State.

SEC. 2. *Be it further enacted,* That said fee shall be paid by the person executing the Bond, and that this Act take effect from and after its passage.

SEC. 3. *Be it further enacted,* That when any of the Clerks of the Circuit Courts in this State are in the army of the State or of the Confederate States of America, or have been for any part of the fiscal year ending the first day of September last, and their deputies failed to make a sworn statement to the Comptroller of the treasury of the taxes and revenue belonging to the public treasury, and received by them on or before the first day of October last, or when they failed to pay over to the Treasurer of the State the taxes and revenue received by them, and belonging to the public treasury, on or before the first day of

# EXHIBIT 46

KR1141

## CHAPTER XCV.

AN ACT to change the day in which the Criminal Docket shall be taken up for Marshall County, Tennessee.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That an Act passed March 22nd, 1877, entitled, "An Act to repeal the Act establishing a Criminal Court in the counties of Williamson, Maury, Giles and Marshall," be so amended that Section 5 of said Act shall hereafter read, that the Criminal Docket shall be taken up on the second Monday of the term of court, instead of the first Thursday of the term, as heretofore fixed by said Act, and that the second Monday of the term shall be the day on which the criminal part of said term of court shall commence for said Marshall County hereafter.

SEC. 2. *Be it further enacted,* That this Act take effect from and after its passage, the public welfare requiring it.

Passed March 14, 1879.

H. P. FOWLKES,
*Speaker of the House of Representatives.*
J. R. NEAL,
*Speaker of the Senate.*

Approved March 17, 1879.

ALBERT S. MARKS,
*Governor.*

---

## CHAPTER XCVI.

AN ACT to Prevent the Sale of Pistols.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That it shall be a misdemeanor for any person to sell, or offer to sell, or to bring into the

State for the purpose of selling, giving away, or otherwise disposing of belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol; *Provided* that this Act shall not be enforced against any persons now having license to sell such articles until the expiration of such present license.

Sale of pistols forbidden.

SEC. 2. *Be it further enacted,* That any person guilty of a violation of this Act, shall be subject to presentment or indictment, and on conviction, shall pay a fine of not less than twenty-five nor more than one hundred dollars, and be imprisoned at the discretion of the court.

Penalty.

SEC. 3. *Be it further enacted,* That it shall be the duty of the Criminal and Circuit Judges, and other Judges whose courts have criminal jurisdiction, to give this Act specially in charge to the grand jury at each term of the court.

Judges to charge.

SEC. 4. *Be it further enacted,* That it shall be the duty of the grand juries to send for witnesses, in all cases where they have good reason to believe, that the provisions of this Act have been violated. And upon satisfactory evidence of its violation, they shall make presentments of the same without a prosecutor.

Grand jury powers.

SEC. 5. *Be it further enacted,* That all laws and parts of laws in conflict with this Act be, and the same are hereby repealed.

SEC. 6. *Be it further enacted,* That this Act shall take effect from and after its passage, the public welfare requiring it.

Passed March 14, 1879.

H. P. FOWLKES,
*Speaker of the House of Representatives.*

J. R. NEAL,
*Speaker of the Senate.*

Approved March 17, 1879.

ALBERT S. MARKS,
*Governor.*

---

## CHAPTER XCVII.

AN ACT to amend the Law Taxing Wagons.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That sub-Section 38 of Section 553*a*

KR1143

# EXHIBIT 47

KR1144

Case 3:23-cv-00474-JES-DDL Document 34-5 Filed 03/06/24 PageID.2037 Page 102 of 1085

buildings and grounds shall hereafter be used exclusively for State purposes, the title to the same being in the State.

SEC. 2. That this act take effect and be in force thirty days after its passage, allowing that time for said county to vacate said rooms, &c.

Approved, April 1st, 1881.

---

## No. XCVI.

AN ACT To Preserve the Public Peace and Prevent Crime.

SECTION
1 Carrying of certain weapons constituted a misdemeanor; *proviso*, excepting officers, and persons journeying.
2 Carrying such weapons otherwise than in the hand, a misdemeanor.
3 Selling or disposing of such weapons, a misdemeanor.
4 Violation of act punishable by fine from $50 to $200.
5 Justices of the Peace knowing of violations of provisions of act and refusing to proceed, to be fined and removed.
6 Same penalty denounced any other officer knowing of such offense.
7 Violators of act how proceeded against.
8 Conflicting laws repealed; act in force 90 days after passage.

*Be it enacted by the General Assembly of the State of Arkansas:*

SECTION 1. That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor; *Provided*, That officers, whose duties require them to make arrests, or to keep and guard prisoners, together with the persons summoned by such officers, to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. *Provided, further*, That nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey, or upon his own premises.

SEC. 2. Any person, excepting such officers, or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as in [is] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be deemed guilty of a misdemeanor.

SEC. 3. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person *any person* any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

SEC. 4. Any person convicted of a violation of any of the provisions of this act, shall be punished by a fine of not less than fifty nor more than two hundred dollars.

SEC. 5. Any justice of the peace in this State, who, from his own knowledge, or from legal information, knows, or has reasonable grounds to believe, any person guilty of the violation of the provisions of this act, and shall fail or refuse to proceed against such person, shall be deemed guilty of a nonfeasance in office, and upon conviction thereof, shall be punished by the same fines and penalties as provided in section four of this act, and shall be removed from office.

SEC. 6. Any officer in this State, whose duty it is to make arrests, who may have personal knowledge of any person carrying arms contrary to the provisions of this act, and shall fail or refuse to arrest such person and bring him to trial, shall be punished, as provided in section four of this act.

SEC. 7. All persons violating any of the provisions of this act may be prosecuted in any of the courts of this State, having jurisdiction to try the same.

SEC. 8. All laws or parts of laws, in conflict with the provisions of this act are hereby repealed, and this act to take effect and be in force ninety days after its passage.

Approved, April 1st, 1881.

# PLAINTIFFS' EXHIBIT Z

KR1147

ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
JANE REILLEY
Deputy Attorney General
KATRINA UYEHARA
Deputy Attorney General
State Bar No. 349378
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7867
Fax: (916) 324-8835
E-mail: Katrina.Uyehara@doj.ca.gov
*Attorneys for Defendant Rob Bonta, in his official capacity as Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA,**<br><br>Defendant. | 3:23-cv-00474-JES-DDL<br><br>**EXPERT REPORT AND DECLARATION OF ROBERT SPITZER**<br><br>Dept: 4B<br>Judge: The Honorable James E. Simmons, Jr. |

## EXPERT REPORT AND DECLARATION OF ROBERT SPITZER

I, Robert Spitzer, declare under penalty of perjury that the following is true and correct:

The California Department of Justice has asked me to provide an expert opinion in the above-captioned matter. My declaration and report below provides that opinion in detail. This report and declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this report and declaration.

## PROFESSIONAL BACKGROUND AND QUALIFICATIONS

1. I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland. I was also a visiting professor at Cornell University for thirty years. I am currently an adjunct professor at the College of William and Mary School of Law. I earned my Ph.D. in Government from Cornell University. I reside in Williamsburg, Virginia.

2. I am the author of 16 books on subjects relating to American politics, and I have been studying and writing about gun policy for nearly forty years. My first publication on the subject appeared in 1985. Since then, I have published six books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology. The ninth edition of the book was published in August 2023 by Routledge Publishers. My two most recent books on gun policy, *Guns Across America* (Oxford University Press in 2015, 2017) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws. I am frequently interviewed and quoted in the national and international media on

gun-related matters. For over twenty years, I have been a member of the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence).

3. I have provided written testimony as an expert witness in the following cases: *Worman v. Healey*, No. 1:17-10107-WGY (D. Mass.); *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v. Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Miller v. Bonta*, No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, 19-cv-1662 (S.D. Cal.); *Rupp v. Bonta*, 17-cv-00746 (C.D. Cal.); *Gates et al. v. Polis*, No. 1:22-cv-01866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Township*, Case No. 18-cv-13443 (E.D. Mich.); *State v. Misch*, No. 173-2-19 Bncr (Vt. Super. Ct. Bennington County); *National Association for Gun Rights, Inc. v. City of Highland Park*, 22-cv-4774 (N.D. Ill.); *National Association for Gun Rights & Capen v. Campbell*, No. 22-cv-11431 (D. Mass.); *Abbott et al. v. Connor*, No. 20-00360 (D. Haw.); *National Association for Gun Rights v. Shikada*, No. 1:22-cv-00404 (D. Haw.); *Santucci v. Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Shikada*, No. 1:22-cv-00323 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez*, No. 1:22-CV-00404 (D. Haw.); *Abbot v. Lopez*, No. 20-00360 (D. Haw.); *Santucci v. City & County of Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*, 19-cv-00617 (E.D. Cal.); *Nichols v. Newsom*, No. 11-cv-9916 (C.D. Cal.); *Delaware State Sportsmen's Association, Inc. v. Delaware Department Of Safety And Homeland Security*, No. 1:22-cv-00951 (D. Del.); *Mark Fitz, Grayguns, Inc. v. Rosenblum*, No. 22-cv-01859 (D. Ore.); *Harrel v. Raoul*, No. 23-141 (S.D. Ill.); *Mitchell, et al. v. Atkins, et al.*; No. 19-cv-5106 (W.D. Wash.); *Keneally et al., v. Raoul, et al.*, No. 23-cv-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, No. 2:23-cv-01130 (E.D.N.Y.); *Lane v. James*, No. 22-cv-10989 (S.D.N.Y.); *Rocky Mountain Gun Owners, et. al. v. The Town of Superior*, No. 22-cv-02680 (D. Colo.); *Wiese v. Bonta*, No. 17-cv-00903

(E.D. Cal.); *Harrel v. Raoul*, No. 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, No. 23-cv-209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, No. 23-cv-215-NJR (S.D. Ill.); *Herrera v. Raoul*, No. 23-cv-532 (N.D. Ill.); *Association Of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Platkin et al.*, No. 3:18-cv-10507 (D. N.J.); *Cheeseman et al. v. Platkin et al.*, No. 1:22-cv-04360 (D. N.J.); *Ellman et al. v. Platkin et al.*, No. 3:22-cv-04397 (D. N.J.); *Banta v. Ferguson*, No. 23-cv-00112 (E.D. Wash.); *Hartford v. Ferguson*, No. 23-cv-05364 (W.D. Wash.); *Koppel v. Bonta*, No. 8:23-cv-00813 (C.D. Cal.); *Calce v. City of New York*, No. 1:21-cv-08208 (S.D.N.Y); and *Doe v. Bonta*, No. 8:23-cv-01324 (C.D. Cal.).

4. I have co-authored amicus briefs in numerous cases, including *Nordyke v. King*, U.S. Court of Appeals for the Ninth Circuit, 319 F.3d 1185 (2003), *Republic of Iraq et al. v. Beaty et al.*, U.S. Supreme Court, 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S. Supreme Court, 561 U.S. 724 (2010); *Ezell v. Chicago*, U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011); and *People of the State of Illinois v. Aguilar*, Illinois Supreme Court, No. 08 CR 12069 (2012).

5. I have also presented written testimony to the U.S. Congress on "The Second Amendment: A Source of Individual Rights?," submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

6. A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this declaration.

**RETENTION AND COMPENSATION**

7. I have been retained by the California Department of Justice to render expert opinions in this case. I am being compensated at a rate of $500 per hour. My compensation is not contingent on the results of my expert analysis or the substance of my opinions or testimony in this matter.

**BASIS FOR OPINION AND MATERIALS CONSIDERED**

8. Counsel for Defendant provided me with the operative Complaint in this matter, copies of the relevant statutes being challenged, and other case-related documents pertinent to this matter. Apart from these documents, my report is based on my independent research.

9. In my report, I cite a variety of scholarly articles, laws, cases, popular and learned commentaries, and various other related materials on which I based my opinions.

**OPINIONS**

**I. INTRODUCTION**

10. In this report, I examine the history of switchblade regulation in the U.S., and then compare it with the regulatory history of other non-firearms weapons, including "fighting knives" (the most famous of which was the Bowie knife) and various types of clubs.

11. Knives are an ancient technology, and have been widely present in America throughout its history, including in the history of the Indigenous people who occupied the lands long before the arrival of Europeans. As this document demonstrates, however, the regulation of knives in America was not only common, but ubiquitous, extending back through U.S. history. The regulation of various types of clubs (another type of non-firearm weapon) was similarly omnipresent in the

U.S., extending to every state in the country, and spanning numerous types of named clubs and similar striking implements.

12. All of these weapons were subject to the same regulatory sequence: when various weapons or weapons technologies were developed, began circulating in civil society, and came to be associated with criminality or threats to public order and safety, a variety of governmental regulations and restrictions were subsequently enacted.[1] Restrictions on switchblades are but a more recent example of a longstanding weapons regulatory tradition in America extending from the Nation's earliest days up to the present. As this Declaration shows, the Complainant's assertion in this case that the California switchblade law[2] "has no historical pedigree nor justification in the Nation's history and tradition of arms regulation"[3] is entirely incorrect.

## II. THE STORY OF SWITCHBLADES

13. The dictionary definition of a switchblade knife is "a pocketknife having the blade spring-operated so that pressure on a release catch causes it to fly open."[4] Federal law defines a switchblade as: "any knife having a blade which opens automatically: (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both."[5] Similarly, California law defines a switchblade as "a knife having the appearance of a pocketknife and includes a spring-blade knife, snap-blade knife, gravity knife, or

---

[1] Robert J. Spitzer, "Understanding Gun Law History After *Bruen*: Moving Forward by Looking Back," *Fordham Urban Law Journal* 51(2023): 60, 70-71.

[2] Cal. Penal Code, §§17235, 21510, 21590.

[3] Complaint For Declaratory and Injunctive Relief, Case 3:23-cv-00474-JES-DDL, Filed 03/15/23, 7, ¶ 27.

[4] *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/switchblade. Spring-loaded knives are also referred to as "automatic knives." https://www.schrade.com/the_schrade_story/

[5] 15 U.S.C. §1241 (b), https://www.govinfo.gov/content/pkg/USCODE-2011-title15/html/USCODE-2011-title15-chap29.htm. A useful primer on different types of knives is Dave Gilson, "Is That a Switchblade in Your Pocket?" *Mother Jones*, December 10, 2012, https://www.motherjones.com/politics/2012/12/knife-types-switchblade/

any other similar type knife…which can be released automatically by a flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade or by any mechanism whatsoever"; however, California's definition of "switchblade" differs from the dictionary definition and the federal definition, in that it only includes knives with blades that "are two or more inches in length."[6]

**A. The History of Switchblades**

14. Spring-loaded knives of the sort now known as switchblades, where the blade of the knife is released from a knife handle through the force of a coiled spring or similar mechanism, date to experimental prototypes in the eighteenth century. At the end of the nineteenth century, inventor George Schrade "designed, developed and patented the first ever push button automatic knife."[7] Yet switchblades did not circulate appreciably or come to be associated with illegal behavior in the U.S. until well into the twentieth century. More specifically, greater knife circulation (including among young people and returning members of the military at the end of World War II, some of whom brought switchblade-type knives home with them),[8] its association with criminality, and depictions in news and popular culture, led to greater public attention and awareness in the 1950s,[9] which helped prompt a wave of anti-switchblade legislation, culminating in the enactment of a federal anti-switchblade law in 1958.[10] By one account, all but ten states

[6] Cal. Penal Code, §17235.

[7] Schrade's initial patent was 1892. https://www.schrade.com/the_schrade_story/

[8] "A Brief History of Switchblade Knives and the Federal Switchblade Act," https://kniferights.org/wp-content/uploads/A-Brief-History-of-Switchblade-Knives-and-the-Federal-Switchblade-Act-05252023.pdf The military has only issued switchblades to parachutists.

[9] Paul A. Clark, "Criminal Use of Switchblades: Will the Recent Trend Towards Legalization Lead to Bloodshed?" *Connecticut Public Interest Law Journal* 13(2014): 219, 236; David B. Kopel, Clayton E. Cramer, and Joseph E. Olson, "Knives and the Second Amendment," *University of Michigan Journal of Law Reform* 47(2013): 176.

[10] Anti-Switchblade Act of 1958, 15 U.S.C. § 1243 (1958). The law restricts the importation and interstate transport of switchblades, but exempts the military, law enforcement, and people with one arm. In 2009 Congress amended the law to

enacted anti-switchblade laws in the 1950s, and even states without switchblade laws had pre-existing legislative restrictions against concealed weapons carrying, including knives.[11]

15. As a result of the sparse literature on the history of, and motivations for the enactment of, anti-switchblade laws, some people belittle or dismiss the motivations for enactment of such laws as the product of "Hollywood's sensationalism,"[12] and little more than "a widespread perception that switchblade knives were the tool of thugs and juvenile delinquents."[13] For example, Paul A. Clark, a critic of switchblade knife restrictions, argued that Congress's enactment of the 1958 federal law was based on "little hard data" and little more than an "assortment of anecdotes."[14] Yet these explanations are inadequate and, to some degree, inaccurate.

16. In order to better understand the provenance of switchblade policy, I conducted a search of newspapers.com[15] to chronicle references to switchblades, beginning in 1870 and continuing up to 1959. Several trends emerged. First, I uncovered virtually no references to switchblade-type pocket knives, aside from some pertaining to machine parts (not hand-held knives) used in manufacturing that utilized what were also termed switchblades, until the early twentieth century. The first multiple newspaper accounts of switchblades appeared in the mid-1920s, increasing in the 1930s and persisting through the years of World War II (1941-45). During this period, relatively few switchblade crimes were reported, but those

---

exempt from restriction pocket knives that could be opened with one hand. 123 Stat. 2183 (2009).

[11] Clark, "Criminal Use of Switchblades," 219; Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80(2017): 63-67.

[12] Kopel, Cramer, and Olson, "Knives and the Second Amendment," 176.

[13] Clark, "Criminal Use of Switchblades," 219.

[14] Clark, "Criminal Use of Switchblades," 240.

[15] Newspapers.com says it is the largest online newspaper archive, incorporating over 24,000 newspapers and over 916 million pages. Searches of "automatic knife" yielded mostly references to industrial or manufacturing cutting devices, along with scattered advertisements for switchblade-type pocket knives.

crimes that did receive coverage were often reprinted in many newspapers. After World War II, however, from the late 1940s through the mid-1950s, news reports and stories of switchblade crimes exploded in numbers (as set forth in more detail below).

17. Second, instances of reported criminality involving switchblades during the pre-World War II period occurred almost entirely in Southern states.

18. Third, the reported crimes nearly always involved African Americans, who were nearly always the perpetrators and victims, as the news accounts were generally careful to identify the race of the assailants and victims when they were Blacks.[16]

19. Fourth, an appreciable number of the perpetrators were women—a notable fact since violent crime, especially in prior decades, was and is typically committed by men.

20. Reasons for the absence of remedial legislation to restrict switchblades through the 1930s appears to be two-fold. First, the number of incidents of switchblade crimes, based on the relatively few instances of such reports confined to one part of the country, was relatively low up through the 1930s, compared with overall violent crime. Second, switchblade criminality seemed confined to African American communities in Southern states. Given a racist society where dominant whites in white-controlled Southern segregationist states were relatively unconcerned about crime that occurred within the confines of the African American community (as long as the criminality did not affect whites in appreciable numbers), it is not surprising that white leaders would take little interest in moving to address crime problems that did not affect the white community.

21. Moreover, my survey of switchblade news stories in newspapers.com reflects a rising tide of switchblade crime stories during this time period

[16] When crimes were committed by whites, news accounts never mentioned their race.

(particularly switchblade crimes committed by juveniles, as detailed below). While this aggregate summary of news stories, summarized below, is a blunt measurement of switchblade criminality, it is nevertheless revealing.

22. From 1921 to 1939, a search of the term "switchblade" in newspapers.com yielded a total of 424 stories; from 1940 to 1945,[17] the search found 612 stories; from 1946 to 1950, it produced 824 stories; from 1951 to 1955, 9,713 stories; and from 1956 to 1959, 19,929 stories. These numbers likely underestimate the number of newspaper stories about "switchblades" because, as noted below in Paragraph 26, many news stories simply reported "knife stabbings," without specifying that the knife involved was a switchblade.

23. In addition, I also searched the *New York Times* newspaper archives[18] using the same "switchblade" term. The earliest story reported an instance of a crime committed with a switchblade in New York City in 1944,[19] suggesting that switchblade crime continued to be confined mostly to Southern states until after World War II.

24. It is important to note that the aggregate numbers of stories spanning many thousands of newspapers in America are inflated by the fact that single criminal incidents were reprinted in dozens or more newspapers thanks to the sharing of wire service news. That is, the total number of stories vastly exceeds the

[17] The U.S. entered World War II at the end of 1941, but the country was transitioning to a war footing before the Pearl Harbor attack on December 7, 1941. The entrance of millions of young men into military service, and the country's total mobilization for war, helped suppress domestic crime.

[18] The "Times Machine" is "a browser-based digital replica of all issues of The New York Times from 1851-2002." https://help.nytimes.com/hc/en-us/articles/115014772767-New-York-Times-Archived-Articles-and-TimesMachine-; *see also* https://timesmachine.nytimes.com.

[19] "Marine Charged in Girl's Murder," *New York Times*, October 8, 1944, https://timesmachine.nytimes.com/timesmachine/1944/10/08/84003274.html?pageNumber=45. The account involved a Marine accused of murdering a woman with a switchblade. The next switchblade story appeared in 1949, describing the arrest of a 16-year-old in possession of a switchblade. "Recommending Lawyer Puts Him in Need of One," *New York Times*, February 19, 1949, https://timesmachine.nytimes.com/timesmachine/1949/02/19/86767576.html?pageNumber=30. The *Times* archive dates back to the mid-1800s.

number of discrete instances of switchblade crime because most of them are single instances that were reported in many newspapers. But given that this was true throughout (though not limited to) this entire time period, it allows for meaningful comparison of aggregate news stories totals over time. Without question, the data buttress the conclusions that switchblade crimes increased after World War II, spread to areas of the country outside of the South, and that public debate over how to address the problem also escalated.

25. The massive increase in news coverage in the 1950s cannot be dismissed as simply hype or irrational fear, as these contemporaneous news accounts of switchblade crime demonstrate. Similarly, the wave of anti-switchblade laws during this time cannot be dismissed as the product of Hollywood-induced hysteria or media frenzy, as these news stories were reporting on actual switchblade crimes, and also on the spreading national debate concerning how best to address the related switchblade crime and juvenile delinquency problems.

### B. Switchblades, Juveniles, and Crime

26. In addition to the commission of switchblade crime, another related, rising societal concern was easy switchblade accessibility and acquisition by children and teenagers (and instances where juvenile switchblade acquisition and criminality overlapped). For example, these concerns came together in a widely circulated magazine article published in 1950 in the then-popular national magazine, *Woman's Home Companion,* titled, "The Toy That Kills."[20] In it, the author chronicled the spread, easy access, and availability of switchblades, especially among young people. Unlike traditional pocket knives, switchblades' ease of opening and thin, sharp, pointed blade lent them to be used impulsively and lethally as stabbing and slashing instruments. Article author Jack Harrison Pollack was forceful in expressing dismay over the knives' baneful consequences, but he

[20] Jack Harrison Pollack, "The Toy That Kills," *Woman's Home Companion*, November 1950, https://kniferights.org/wp-content/uploads/2017/07/TheToyThatKills.pdf

was also careful not to exaggerate the problem, saying that up to that time, switchblades were responsible for "a few dozen children killed, somewhat more wounded. But the point is, all these unnecessary tragedies are increasing." Pollack explained the weapon's operation this way: "To open it, you merely press a button and instantly the blade darts out like a snake's tongue and locks firmly in that position. Any child can operate it easily with one hand. An ordinary penknife takes two hands and doesn't have a dagger-tip point."

27. Pollack's nationwide investigation included interviews with police and prosecutors, eyewitness accounts of switchblade sales to children as young as twelve, examination of police crime records, and detailed accounts of several switchblade stabbings, one of which he witnessed. He investigated among other things the ease with which children and teens could purchase the knives in six of the country's largest cities. Pollack wrote, "I was stunned to find how many crimes of violence revolve around a switchblade. Most newspapers merely report a 'knife stabbing,' neglecting to tell you a switchblade was the culprit." Among Pollack's interviewees was a homicide police captain in Cleveland who reported: "Last year we had one hundred and sixty-nine stabbings, one hundred and forty of them with switchblade knives. During the same period switchblades were responsible for one fourth of our homicides. Half of the killers were under twenty-three." Pollock's conclusion: "Every expert with whom I talked—including the nation's leading sportsmen—agreed that switchblade knives have no legitimate use in civilian life." He concluded with five recommendations, mostly exhorting parents to keep switchblades away from their children, to cooperate with police, and to "[w]ork for passage of a state law which bans switchblades and controls other dangerous knives."[21]

28. A sidebar attached to the story included approving quotes from John M. Gleason, then national President of the International Association of Chiefs of

[21] All preceding quotes from Pollack, "The Toy That Kills."

Police, whose comments included: "teen-agers are being killed needlessly by a gadget [i.e., switchblades] which should be brought under greater control. The WOMAN'S HOME COMPANION deserves thanks for publicizing such a problem." Pollack's article was widely reprinted and reported in newspapers around the country.

29. The Pollack article certainly brought more attention to the switchblade problem, but increasing news stories of actual switchblade crimes from around the country also continued to chronicle the growing problem. For example, the police chief of Paterson, New Jersey commented in 1952, the year that the state adopted an anti-switchblade law, that "in the majority of knife assaults investigated by police, the weapon used was a switchblade knife."[22] New York Governor Thomas E. Dewey (R) reportedly said that, of 4420 felonious assaults and 99 homicides in New York City committed in 1953, over a third of those crimes were committed with switchblades.[23] Beyond these data, police, prosecutors, judges, editorial writers, and good government groups all supported restrictions on switchblades. Many of the news stories in the 1950s also covered calls and efforts to press for anti-switchblade measures, in addition to continued reporting of switchblade crime.

### C. Calls for Anti-Switchblade Regulation

30. By the time Congress enacted the Anti-Switchblade Act of 1958, at least twenty states had enacted similar laws. One critic of switchblade knife restrictions dismissed Congress's action as based on "surprisingly little hard data on the use of switchblades" and a simple collection of "anecdotes"[24] by congressional investigators. Another charged that this and other laws were simply the product of irrational "moral panic."[25]

---

[22] "Switchblade Law Hailed by Walker; To Curb Slashings," *The News* (Paterson, NJ), June 19, 1952, https://www.newspapers.com/image/526740433
[23] "Switchblade Knife Law Is Signed by Governor," *Binghamton (N.Y.) Press and Sun-Bulletin*, March 28, 1954, https://www.newspapers.com/image/254405992
[24] Clark, "Criminal Use of Switchblades," 240.
[25] Rick Fuller, "The Man Who Created Moral Panic," *Medium*, July 13, 2021, https://authorrickf.medium.com/the-man-who-created-moral-panic-7ccd2a439c47

31. Yet Congress's information gathering preceding the enactment of the 1958 law revealed much more extensive and systematic efforts to gauge problems connected with switchblades than critics suggest. The U.S. Senate investigation was led by Sen. Estes Kefauver (D-TN), who was chief sponsor of the switchblade bill. Kefauver first won national attention in 1950 when he chaired a special Senate committee to investigate organized crime. Testifying before the Senate Commerce Committee in 1958, Kefauver reported results from the Senate Subcommittee on Juvenile Delinquency's investigation of the extent to which the knives contributed to criminality and were falling into the hands of juveniles. It found that about 1.2 million switchblades were sold in the country annually, including 200,000 imported knives, and that 5 million had been sold in the previous five years, "principally to juveniles."[26] Kefauver also reported that in 1956 hundreds of switchblades had been confiscated from soldiers stationed at three American military bases.[27] The committee surveyed local police departments, marshals, and sheriffs around the country. Testimony from the subcommittee counsel indicated that police chiefs throughout the country reported almost without exception that switchblades posed a significant criminal threat, that the knives were often used by juvenile criminals in particular, and that they supported new federal legislation.[28] Among the comments solicited by the subcommittee in the previous year's investigation, the San Francisco Chief of Police reported "that a substantial amount of our juvenile crimes of violence involve the use of this type of knife."[29] Correspondence from the Des

[26] "Switchblade Knives," Hearing Before the Committee on Interstate and Foreign Commerce, U.S. Senate, July 23, 1958, 1, 5, https://www.google.com/books/edition/Switchblade_Knives/bSoTAAAAIAAJ?hl=en&gbpv=1&dq=%E2%80%9CSwitchblade+Knives,%E2%80%9D+Hearing+Before+the+Committee+on+Interstate+and+Foreign+Commerce,+U.S.+Senate,+July+23,+1958,&pg=PA20&printsec=frontcover

[27] "Switchblade Knives," 3. Switchblades were not military issue, except to parachutists.

[28] "Switchblade Knives," 5.

[29] *Congressional Record*, U.S. Senate, July 16, 1957, 11795, https://www.govinfo.gov/content/pkg/GPO-CRECB-1957-pt9/pdf/GPO-CRECB-1957-pt9-5.pdf

Moines, Iowa Police Department dated July 8, 1957, reported from a local store owner who said that the typical purchasers of switchblades were "from 14 to 18 years" of age.[30] A police chief from Longview, Texas said that "teen-agers are the ones who are buying most of these knives."[31]

32. Bearing in mind that record-keeping in the 1950s pertaining to criminal offenses, types of weapons used, and sales data was far more primitive, limited, decentralized, and incomplete than what exists today, the subcommittee made a strenuous effort to gather the best information available at the time. Beyond that, opinions from criminal justice and child welfare interests uniformly supported anti-switchblade legislation.

## III. Historical Regulation on the Bowie Knife and Similar Long-Bladed Knives

33. In addition to the switchblade-specific regulations discussed above, knives have been subject to regulation throughout U.S. history.

### A. Historical Knife Regulations

34. The Bowie knife is generally credited with having been invented by the brother of adventurer Jim Bowie, Rezin Bowie. The knife was named after Jim Bowie, who reputedly killed one man and wounded another using the "big knife" given to him by his brother in the alternately notorious or celebrated "Sandbar Duel" in 1827.[32]

---

[30] *Congressional Record*, 11795.
[31] *Congressional Record*, 11795.
[32] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/entries/bowie-knife-2738/; William C. Davis, *Three Roads to the Alamo* (NY: HarperCollins, 1998), 207-8. Davis persuasively dismisses the claim of a blacksmith, James Black, that he invented or styled the distinctive knife for Rezin Bowie (676–77). David Kopel says, erroneously, that "Jim Bowie used a traditional knife at a famous 'sandbar fight' on the lower Mississippi River in 1827." Rezin Bowie had just developed the distinctive knife his brother used in the fight, so it could not have been "traditional." David Kopel, "Bowie knife statutes 1837-1899," *The Volokh Conspiracy*, November 20, 2022, https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

35. The "Bowie knife" rapidly became known beginning in the 1830s for the distinctive type of long-bladed and usually single-edged knife with a hand guard identified with Bowie, the man after whom the knife was named. While Bowie knives initially "came in a variety of forms—with or without guards, with differently shaped blades"—they eventually became more standardized as "a large knife with a cross guard and a blade with a clipped point."[33] The distinctive features of the Bowie knife are revealed in Robert Abels' book, *Bowie Knives*, which includes pictures of nearly one hundred such knives made between 1835 and 1890.[34] The Bowie legend, the explosive growth and spread of Bowie-related mythology (only magnified by his death at the Alamo in 1836), and the knife's distinctive features, encouraged its proliferation,[35] referred to by one historian as "the craze for the knives."[36]

36. As was true of other knives with long, thin blades,[37] Bowie knives were widely used in fights and duels, especially at a time when single-shot pistols were often unreliable and inaccurate.[38] Indeed, such knives were known as "fighting knives"[39] that were "intended for [interpersonal] combat."[40] In the early nineteenth century, "guns and knives accounted for a growing share of the known

[33] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/entries/bowie-knife-2738/.
[34] Robert Abels, *Bowie Knives* (NY: Abels, 1979).
[35] Virgil E. Baugh, *Rendezvous at the Alamo* (Lincoln, NE: University of Nebraska Press, 1985), 39–63.
[36] Davis, *Three Roads to the Alamo*, 583.
[37] Other such long-bladed, thin knives of varying configurations typically named in laws barring their carrying included the Arkansas toothpick, the Spanish stiletto, dirks, daggers, and the like.
[38] Davis, *Three Roads to the Alamo*, 164, 208; Baugh, *Rendezvous at the Alamo*, 42; Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," *Oldwest*, n.d., https://www.oldwest.org/bowie-knife-history/; Norm Flayderman, *The Bowie Knife* (Lincoln, RI: Andrew Mowbray, 2004), 485; Paul Kirchner, *Bowie Knife Fights, Fighters, and Fighting Techniques* (Boulder, CO: Paladin Press, 2010), 35-44.
[39] Randall Roth, *American Homicide* (Cambridge, MA: Harvard University Press, 2009), 218.
[40] Flayderman, *The Bowie Knife*, 59.

weapons that whites used to kill other whites."[41] In 1834, for example, a grand jury in Jasper County, Georgia deplored "the practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens."[42]

37. Homicide rates increased in the South in the early nineteenth century, as did laws restricting the carry of concealed weapons (including, but not limited to, knives). Dueling also persisted during this time, even as the practice was widely deplored by religious and other groups, in newspapers, by anti-dueling societies and political leaders.[43]

38. Bowie knife writer Norm Flayderman provides abundant and prolific evidence of the spread and early criminal use of Bowie knives in the 1830s, quoting from dozens of contemporaneous newspaper and other accounts, and providing references to literally hundreds of additional articles and accounts attesting to the widespread use of Bowie knives in fights, duels, brawls and other criminal activities.[44] Flayderman concludes that, as early as 1836, "most of the American public was well aware of the Bowie knife."[45] All this contributed to widespread enactment of laws prohibiting dueling in the states.[46] In 1839, Congress passed a

[41] Roth, *American Homicide*, 218.
[42] Quoted in Roth, *American Homicide*, 218–19.
[43] Baugh, *Rendezvous at the Alamo*, 51.
[44] Flayderman, *The Bowie Knife*, 25–64; 495–502.
[45] Flayderman, *The Bowie Knife*, 43. Very much like the allure of contemporary assault weapons to some (*see* Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 12–15, 65; David Altheide, "The cycle of fear that drives assault weapon sales," *The Guardian*, March 2, 2013, https://www.theguardian.com/commentisfree/2013/mar/02/cycle-fear-assault-weapon-sales; Rukmani Bhatia, "Guns, Lies, and Fear," *American Progress*, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear/), the Bowie knife's notorious reputation also, if perversely, fanned its sale and acquisition (*see* Flayderman, *The Bowie Knife*, 46).
[46] A search for the word "duel" in the Duke Center for Firearms Law database of

measure barring dueling in the District of Columbia.[47] Both pistols and knives were prominently used in such affairs.[48]

39. At least three state court cases dealt in some manner with fighting knives like the Bowie knife. In the 1840 case of *Aymette v. State*,[49] the Supreme Court of Tennessee upheld the conviction of William Aymette for wearing a Bowie knife concealed under his clothes under a state law of 1837–1838, ch. 137, sec. 2, providing "that, if any person shall wear any bowie-knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or size resemble a bowie-knife or Arkansas toothpick, under his clothes, or keep the same concealed about his person such person shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined in a sum not less than two hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months."[50] In its decision, the court concluded that the prohibition against wearing the named weapons was well justified in that they "are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin."[51] The court continued, "The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens. . . ."[52] Further, the court added that the state law existed "to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms. . . ."[53]

---

old gun laws yields 42 results. See https://firearmslaw.duke.edu/repository/search-the-repository/.

[47] H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838, https://history.house.gov/Records-and-Research/Listing/lfp_032/.

[48] Roth, *American Homicide*, 180–83, 210–17.

[49] Cited in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

[50] *Aymette v. State*, 21 Tenn. 152, 153 (Tenn. 1840).

[51] *Aymette v. State*, 156.

[52] *Aymette v. State*, 157.

[53] *Aymette v. State*, 157.

40. Four years later, the Tennessee Supreme Court again dealt with a Bowie knife law violation and challenge. In the case of *Haynes v. Tennessee* (1844),[54] Stephen Haynes was indicted for carrying a concealed Bowie knife. He was convicted of wearing a knife that resembled a Bowie knife but appealed his conviction on the grounds that he was actually carrying a "Mexican pirate knife," which reputedly had a shorter, narrower blade. (At the trial, witnesses disagreed as to the proper name for the knife in question.) He also argued that the state law, in listing various types of knives including those "similar" to Bowie knives, was "too indefinite" and could therefore lead to "absurd consequences" that "must follow its enforcement. . . ."[55] On appeal, the court upheld his conviction and commended the Tennessee state legislature's enactment: "The design of the statute was to prohibit the wearing of bowie knives and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life; the carrying of which by truculent and evil disposed persons but too often ended in assassination."[56] The court continued: "The design, meaning, and intent was to guard against the destruction of human life, by prohibiting the wearing [of] heavy, dangerous, destructive knives, the only use of which is to kill. . . ."[57] The court noted that the state law "wisely provides against bowie knives, Arkansas tooth picks, or any other weapon in form, shape or size, resembling them."[58] Noting the similarity among knives and the possibility of an unjust outcome where, say, a person might be convicted of carrying a mere pocket knife, the court posed this question: "what is to protect against conviction, when the words of the statute cover the charge, and its true spirit and meaning does not?" Their answer: "the judge and jury who try the case."[59] As the author of a book on Bowie knives noted, "the fact

[54] *Haynes v. Tennessee*, 24 Tenn. 120 (1844).
[55] *Haynes v. Tennessee*, 122.
[56] *Haynes v. Tennessee*, 122.
[57] *Haynes v. Tennessee*, 123.
[58] *Haynes v. Tennessee*, 122.
[59] *Haynes v. Tennessee*, 123.

that the term 'bowie knife' had never been precisely defined did not help his [Haynes's] case."[60]

41. A third state court case relevant to the legal status of Bowie knives is *Cockrum v. State of Texas*, 1859.[61] The *Cockrum* case involved John Cockrum, who was charged with the murder of his brother-in-law, William Self, with a Bowie knife.[62] Under Texas law, "a homicide, which would otherwise be a case of manslaughter, if committed with a bowie-knife or dagger, shall be deemed murder and punished as such. . . ."[63] The court upheld the added penalty provision of the law relating to use of a Bowie knife, despite the court's very expansive interpretation of the right to bear arms, but reversed and remanded the man's conviction because of an error related to statutory changes and jury instructions. It described the Bowie knife as "an exceeding destructive weapon," an "instrument of almost certain death," and "the most deadly of all weapons in common use."[64]

---

[60] Kirchner, *Bowie Knife Fights, Fighters, and Fighting Techniques*, 43.
[61] *Cockrum v. State*, 24 Tex. 394 (1859), https://constitution.org/1-Constitution/2ll/2ndcourt/state/177st.htm. David Kopel says that a fourth case, *Nunn v. State*, 1 Ga. 243 (1846), is a "major state supreme court case[s] involving Bowie knives." "The legal history of bans on firearms and Bowie knives before 1900," *The Volokh Conspiracy*, November 20, 2022, https://reason.com/volokh/2022/11/20/the-legal-history-of-bans-on-firearms-and-bowie-knives-before-1900/. But *Nunn* involved a man who was prosecuted for carrying a pistol (openly, not concealed), not a knife. A state law criminalized concealed carry of various named weapons, including pistols and Bowie knives, whereas a different provision allowed for open carrying of named weapons, including Bowie knives, but failed to include pistols on that list. Noting the "great vagueness" in the statute's wording, the court reversed the man's conviction and wrote that there was a constitutional right to open carry "for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State." By contrast, the court upheld the constitutionality of the concealed carry restrictions and noted that those restrictions were enacted "to guard and protect the citizens of the State against the unwarrantable and too prevalent use of *deadly weapons*." 246; italics in original.
[62] https://www.genealogy.com/ftm/p/i/l/Karen-Pilgrim-TX/WEBSITE-0001/UHP-0254.html
[63] *Cockrum v. State*, 394.
[64] *Cockrum v. State*, 403–04. Kopel says, incorrectly, that "Bowie knives. . . were regulated the same as a butcher's knife." According to the Duke Center for Firearms Law Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/search-the-repository/) six states had laws that restricted butcher knives by name, whereas 42 states restricted Bowie knives by name. See **Exhibits B and D**. Kopel, "Bowie knife statutes 1837-1899."

Further, the court said: "He who carries such a weapon . . . makes himself more dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon."[65]

42. All of these cases underscore historical courts' recognition of the dangerous nature and nefarious use of Bowie knives, not only by the courts' characterizations of them, but by the fact that they are treated in the same restrictive and prohibitory manner in law as other dangerous, deadly weapons, including pistols and various named clubs.[66]

43. The ubiquity of the concern about the criminological consequences of carrying Bowie knives and other, similar long-bladed knives is seen in the widespread adoption of laws barring or restricting these weapons.[67] In the 1830s, at least six states enacted laws barring the carrying of Bowie knives by name.[68] From then to the start of the twentieth century, every state plus the District of Columbia (with the sole exception of New Hampshire) restricted Bowie knives: a total of at least 42 states (including the District of Columbia) barred or restricted Bowie

---

[65] *Cockrum v. State*, 403.

[66] Among the notorious incidents attached to the Bowie knife was its use by two of the conspirators in the Lincoln assassination in 1865. The plan was to assassinate President Lincoln, Vice President Andrew Johnson, and Secretary of State William Seward. The man assigned to attack Seward, Lewis Powell, entered the Seward home armed with a pistol and a Bowie knife. When one of Seward's sons tried to stop him, Powell tried to shoot him, but his gun misfired, so he used it as a club against the son. When he encountered another son, Powell slashed him with his Bowie knife, the weapon he then used to attack Seward who, thanks to a neck collar, survived. David Morgan, "Lincoln assassination: The other murder attempt," *CBS News*, May 10, 2015, https://www.cbsnews.com/news/lincoln-assassination-the-other-murder-attempt/; https://www.history.com/topics/american-civil-war/william-seward. John Wilkes Booth also carried what was later identified as a Bowie knife, which he used to slash the man who accompanied Lincoln to the theater and who tried to stop Booth after he shot the president. Booth slashed the man in the arm with his knife to make his escape. https://lincolnconspirators.com/2018/12/31/cloak-and-daggers-cutting-through-the-confusion-of-the-assassination-knives/

[67] The near-immediate effort in the states to restrict Bowie knives was noted, for example, in Davis, *Three Roads to the Alamo*, 582, and in Flayderman, *The Bowie Knife*, 53–54.

[68] A seventh state, Massachusetts, criminalized the carrying of fighting knives using labels that would have included the Bowie knife in an 1836 law.

knives by name; and another 8 states enacted laws restricting the category or type of knife embodied by the Bowie knife but without mentioning them by name (see **Exhibits B and D**) totaling 49 states plus the District of Columbia.[69]

44. For example, 15 states banned all carrying of Bowie knives (by banning both concealed carry and open carry), while others imposed taxes on individuals' acquisition or possession of them. Georgia sought to stamp out Bowie knife circulation (as well as that of other named weapons) in an 1837 law: "it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons . . . Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c."[70] The desirability and utility of concealed-carry restrictions was precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also discouraging the settlement of private grievances and disputes in public through weapons-fueled violence.

45. States were imaginative and persistent in their effort to suppress fighting knives and other weapons. For example, an 1881 Arkansas law combined no-carry provisions (whether concealed or openly) applying to "any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knuck[le]s, razor, or any pistol of any kind whatever" with another provision in the same law that made it a misdemeanor to "sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person" the aforementioned weapons, including "any kind of

[69] Bowie law enactment by decade: 1830s: 6 states; 1840s: 4 states; 1850s: 11 states; 1860s: 13 states; 1870s: 19 states; 1880s: 20 states; 1890s: 21 states; 1900s: 13 states. See **Exhibit B**.

[70] 1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, § 1.

cartridge."[71] Even though the law allowed persons to have the weapons on their own premises, it begs the question of how, exactly, a person could legally obtain such weapons in the first place if they weren't already owned within a family before the 1881 law was enacted.

46. States relied on a variety of regulatory techniques to suppress Bowie knife carrying: 29 states enacted laws to bar their concealed carry; 15 states barred their carry whether concealed or openly; 7 states enacted enhanced criminal penalties for those who used the knives to commit a crime; 4 states enacted regulatory taxes attached to their commercial sale; 3 states imposed a tax for those who owned the knives; 10 states barred their sale to specified groups of people; and 4 states enacted penalties for brandishing the knives (see **Exhibits B and D**). In addition, these laws would often expressly exempt from restriction common pocket knives.[72]

**B. The Difficulties of Prohibiting Knife Possession**

47. The extensive and ubiquitous nature of these Bowie knife prohibitions raises a further question: given the universal agreement that these knives were dangerous, why not simply ban their possession outright? The answer is two-fold. First, America was a developing nation-state in the nineteenth century. The federal and state governments did not yet possess the maturity, powers, tools, or resources to implement any measure as sweeping as a knife ban, especially since knives are

[71] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § §1-3. The law also made exceptions for military weapons, for officers, and legal transport for people on a journey, a common exception in such laws.

[72] E.g., 1896-99 Alaska Sess. Laws 1270, An Act To Define And Punish Crimes In The District Of Alaska And To Provide A Code Of Criminal Procedure For Said District, chap. 6, § 117; 1893 Ariz. Sess. Laws 3, An Act To Regulate And Prohibit The Carrying Of Deadly Weapons Concealed, § 1; 1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1; John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources, 1835; 1821 Tenn. Pub. Acts 15-16, An Act to Prevent the Wearing of Dangerous and Unlawful Weapons, ch. 13.

technologically very simple to produce, and metal-working was a common and ordinary part of everyday life. After all, the front-line administrative entity on which we today relay for law enforcement, the police, barely existed in the way we think of policing today in most places in most of nineteenth century (up to this time policing fell to a haphazard mix of the watch system, constables, militias, and vigilantes). Modern police forces only came in to being in a handful of large cities before the Civil War, and did not reach maturity until the early twentieth century.[73]

48. Second, the chief (though not only) remedy enacted by the states to address the problem of knife fighting was both more focused and feasible: to bar the carrying of knives, along with the other two categories of weapons that also threatened public safety, clubs and pistols. The fact that all three types of weapons—knives, clubs, and pistols—were consistently treated together is conclusive evidence that all were considered so dangerous and inimical to public safety that they were subject to anti-carry and other restrictive laws and bundled together in legislative enactments.

## IV. HISTORICAL RESTRICTIONS ON CLUBS AND OTHER BLUNT WEAPONS

49. Finally, the aforementioned history of regulating knives is consistent with the U.S.'s history of regulating another category of dangerous, non-firearm weapon: clubs.

50. Like knives, clubs date to ancient times, and are even simpler to produce technologically. Yet their simplicity and commonality did not impede efforts to regulate them when the need arose.

---

[73] Chris McNab, *Deadly Force* (Oxford, Great Britain: Osprey Publishing, 2009), 13-24; William R. Kelly and Daniel P. Mears, *The Reinvention of Policing* (Lanham, MD: Rowman & Littlefield, 2023), 54-58. Boston created a police force in 1838, New York City created a standing police force in 1845, followed by Chicago in 1851, Philadelphia in 1854, and Baltimore in 1857 (23). Jill Lepore, "The Invention of the Police," *The New Yorker*, July 13, 2020, https://www.newyorker.com/magazine/2020/07/20/the-invention-of-the-police. Both McNab and Lepore emphasize the role of slavery and slave suppression as key to the development of policing.

51. Among the most widely and ubiquitously regulated harmful implements in U.S. history were various types of clubs and other blunt weapons.[74] Most were anti-carry laws, which also generally encompassed pistols and specific types of knives, although some of the laws extended prohibitions to these weapons' manufacture, possession, sale, or use in crime.[75] As the table in **Exhibit C** shows, at least five distinct types of clubs and blunt objects were regulated in the United States. Notably, every state in the nation had laws restricting one or more types of clubs. According to a detailed reference book on the subject of these blunt instruments by Robert Escobar, they were considered "objectionable objects, once feared but now forgotten."[76] Escobar provides what he calls "a family history" of these blunt weapons, but adding that "[i]t's a disreputable family to say the least, black sheep even within the study of weaponry."[77] They have been described as "wicked, cowardly, 'Soaked in blood and cured in whiskey.'"[78] Those who carried them (excluding police) "were called vicious, devils and lurking highwaymen."[79] These club-type blunt objects compose a family of objects used for striking others, and while they vary in name and construction, the categories are "somewhat fluid."[80]

52. Among the types of clubs regulated in U.S. laws, 15 states barred bludgeon carrying. A bludgeon is a short stick with a thickened or weighted end used as a weapon.[81] The earliest state anti-bludgeon law was in 1799; 12 such state laws were enacted in the 1700s and 1800s, and 4 in the early 1900s (as with each of

[74] See **Exhibits C and D**.
[75] E.g. see 1917 Cal. Sess. Laws 221-225; 1923 Cal. Stat. 695.
[76] Robert Escobar, *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons* (Columbus, OH: Gatekeeper Press, 2018), 1.
[77] Escobar, *Saps, Blackjacks and Slungshots*, 2.
[78] Escobar, *Saps, Blackjacks and Slungshots*, 2.
[79] Escobar, *Saps, Blackjacks and Slungshots*, 2.
[80] Escobar, *Saps, Blackjacks and Slungshots*, 1.
[81] https://www.merriam-webster.com/dictionary/bludgeon.

these chronological categories, the state law total exceeds the total number of states because some states enacted the same or similar laws in multiple centuries).

53. A billy[82] club is a heavy, hand-held rigid club,[83] usually made of wood, plastic, or metal,[84] that is traditionally carried by police, often called a nightstick or baton.[85] Escobar cites an early reference to the billy club in an 1854 New Orleans newspaper article in the *Daily True Delta* that referred to "police armed with batons,"[86] a synonym for a billy club. As this reference suggests, police have long adopted the billy club, or similar striking implements, as part of their on-duty weaponry. At least 16 states had anti-billy club laws, totaling 46 laws; the earliest law appears to have been enacted in Kansas in 1862,[87] followed by a New York law in 1866.[88] Fourteen states enacted such laws in the 1800s; 11 states did so in the early 1900s.

54. At least 14 states barred the carrying of "clubs" more generically, without specifying the type. The oldest anti-club law was 1664; 7 states enacted these laws in the 1600s-1700s, 7 states in the 1800s, and 2 in the early 1900s.

---

[82] Sometimes spelled billie club.

[83] Some versions were made to have some flexibility to increase their striking power. See Escobar, *Saps, Blackjacks and Slungshots*, 118-19.

[84] https://www.merriam-webster.com/dictionary/billy%20club. Escobar discusses a Civil War veteran and later police officer, Edward D. Bean, who experimented with various types of billy clubs to improve their striking power and durability by utilizing leather, often adhered to wood, to reduce the likelihood that the club would break on use. *Saps, Blackjacks and Slungshots*, 118. One of the earliest references to a "billy" was an 1857 newspaper article describing "an indiscriminate attack with slung-shot, billies, clubs, &c." "Local Intelligence," *Delaware Republican*, June 15, 1857, https://bit.ly/3V9nVO7.

[85] Escobar, *Saps, Blackjacks and Slungshots*, 2, 69-70, 105, 113-30.

[86] Escobar, *Saps, Blackjacks and Slungshots*, 105.

[87] C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources, 1862.

[88] Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources, 1866.

55. Anti-slungshot laws were enacted by 43 states, with 71 laws enacted in the 1800s and 12 in the 1900s. A slungshot (or slung shot), also referred to as "a type of blackjack,"[89] is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle that was developed roughly in the 1840s (the first "known use" of slungshot was 1842[90]). By one account, "[s]lungshots were widely used by criminals and street gang members in the 19th Century. They had the advantage of being easy to make, silent, and very effective, particularly against an unsuspecting opponent. This gave them a dubious reputation, similar to that carried by switchblade knives in the 1950s, and they were outlawed in many jurisdictions. Their use as a criminal weapon continued at least up until the early 1920s."[91] Escobar concurs that slungshots and blackjacks "were a regular part of criminal weaponry. . .and gangsters could be merciless in their use."[92]

56. In a criminal case considered the most famous of those involving lawyer Abraham Lincoln, the future president defended a man charged with murdering another using a slung shot. In the 1858 trial of William "Duff" Armstrong, Lincoln succeeded in winning Armstrong's acquittal.[93]

57. These weapons were viewed as especially dangerous or harmful when they emerged in society, given the ubiquity of state laws against carrying them enacted after their invention and their spreading use by criminals and as fighting implements. These devices were invented and appeared in society during an identifiable period of time in the mid-nineteenth century, sparking subsequent wide-

---

89 Escobar, *Saps, Blackjacks and Slungshots*, 228.

90 See https://www.merriam-webster.com/dictionary/slungshot. Escobar agrees with this rough date. See *Saps, Blackjacks and Slungshots*, 67.

91 "Slungshot," https://military-history.fandom.com/wiki/Slungshot.

92 Escobar, *Saps, Blackjacks and Slungshots*, 86.

93 Lincoln was able to discredit the testimony of a witness who claimed to see Armstrong strike the victim with a slung shot at night because of the full moon. Lincoln used as evidence an Almanac to prove that on the night in question, there was no full moon. Judson Hale, "When Lincoln Famously Used the Almanac," *Almanac*, May 4, 2022, https://www.almanac.com/abraham-lincoln-almanac-and-murder-trial.

ranging prohibitions. The earliest anti-slungshot law was enacted in 1850; 43 states legislated against them in the 1800s (including the District of Columbia), and 11 states in the early 1900s (note this incorporates multiple laws enacted in more than one century by a few states).

58. Sandbags, also known as sand clubs, were also a specific focus in anti-carry laws as well. Consisting of nothing more than sand poured into a bag, sack, sock, or similar tube-shaped fabric (although the weight could also be something dense and heavy, like a lock in the end of a sock),[94] their particular appeal was that they could be dispensed with by simply pouring the sand out, leaving nothing more than an empty cloth bag. (Alternately, they could be made heavier by adding water to the sand.) The first anti-sandbag law was 1866, with 10 states enacting such laws—7 in the 1800s and 7 in the early 1900s.

59. Only 4 states did not have any prohibitions in any of these five categories (bludgeons, billy clubs, clubs, slung shots, and sand bags), but 3 of those 4 (Montana, Ohio, and Washington State) had blanket legislative provisions against the carrying of any concealed/dangerous/deadly weapons. One state, New Hampshire, may not have enacted such a law during this time but did later.[95]

## CONCLUSIONS

60. The regulation of switchblades in America follows almost precisely the regulatory pattern identified with other weapons throughout American history (see below). After a new weapon or weapons technology is invented or developed, is

[94] https://www.ferrislawnv.com/criminal-defense/weapons-offenses/dangerous-weapons/; Escobar, *Saps, Blackjacks and Slungshots*, 20-22. Escobar dates the earliest reference to sandbags as weapons to the 1600s (22).

[95] Up to 2010, New Hampshire had this law on the books: "159:16 Carrying or Selling Weapons. Whoever, except as provided by the laws of this state, sells, has in his possession with intent to sell, or carries on his person any stiletto, switch knife, blackjack, dagger, dirk-knife, slung shot, or metallic knuckles shall be guilty of a misdemeanor; and such weapon or articles so carried by him shall be confiscated to the use of the state." In 2010, the law was amended when HB 1665 was enacted to exclude stilettos, switch knives, daggers, and dirk-knives. Compare N.H. Rev. Stat. § 159:16 with 2010 New Hampshire Laws Ch. 67 (H.B. 1665). In 1923, New Hampshire enacted an extensive licensing system for handgun carrying: 1923 N.H. Laws 138.

replicated, begins to spread into civil society, and then becomes identified with criminality, violence, or a threat to public safety and good order, calls to regulate or restrict the weapon, through various policy tools or means, escalate, often leading to new laws. In the case of switchblades, racist white society took little interest when switchblades were a part of interpersonal violence among African American communities in the South before World War II. But after the war, as switchblades increased in circulation around the country and were identified as a threat to adolescents and other criminality, calls for regulation escalated, leading to anti-switchblade laws in at least 40 states and a federal law in 1958. As this report illustrates, and as summarized below, this was precisely the pattern for certain types of knives and clubs in the nineteenth century.

61. Not only is there an extensive historical pedigree of anti-switchblade laws, but there also exists a well-established historical tradition of regulating non-firearm weapons generally, including "fighting knives" and various types of clubs, under which every state in the Nation enacted such a restriction from the late 1700s through the early 1900s.

62. In fact, the extensive restrictions imposed against Bowie knives in particular are as close to a historical twin to modern switchblade laws as one might contemplate. As discussed above, legislation simply banning weapons like the Bowie knife or various types of clubs outright was less common than other methods of regulation. This approach is attributable to the fact that a ban could not have been feasibly implemented at a time when the U.S. was an emerging and developing nation-state lacking the capability to enforce it. As the nineteenth century wore on, however, many states became more imaginative in utilizing other policy tools to restrict such weapons, including regulatory taxes and restrictions imposed on weapons transfers or commercial sale.

63. In addition, switchblades, Bowie knives, and fighting clubs like the slungshot share not only a close connection with criminality, but also the same

nefarious, "bad boy" reputation that had the perverse consequence of fanning their sale and acquisition. As noted earlier, commentary on the slungshot identified this very parallel, in that "[s]lungshots were widely used by criminals and street gang members in the 19th Century. . . . This gave them a dubious reputation, similar to that carried by switchblade knives in the 1950s . . . ."[96]

64. More generally, sweeping claims like those of David Kopel and his colleagues that "Prohibitions on carrying knives in general, or of particular knives, are unconstitutional"[97] is not only ahistorical, but wrong. As this declaration demonstrates, nothing in American history and law supports the sweeping proposition that anti-knife carry laws are unconstitutional, illegal, or improper. The truth is literally the opposite: that multitudinous and varied restrictions on fighting knives and clubs were not only the norm, but the policy default in America when such weapons became available, entered society, and came to be identified as a threat to public safety and good order. The enactment of anti-switchblade laws in at least 40 states in the 1950s follows nearly identically past restrictions on similar weapons examined here.

65. The first purpose of any government is to protect the lives, health, and safety of its people.[98] The many laws examined in this report arise from this central fact of governance. Public safety was no less a prime concern of American government early in its history than it was and is today.

[96] "Slungshot," https://military-history.fandom.com/wiki/Slungshot.
[97] Kopel, Cramer, and Olson, "Knives and the Second Amendment," 167.
[98] "The primary purpose of government is to maintain order and stability so that people can live safely, productively, and happily." "Government," Annenberg Classroom, https://www.annenbergclassroom.org/glossary_term/government/

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 18, 2023, at Williamsburg, VA.

Robert J. Spitzer
Dr. Robert Spitzer

30

Expert Report and Declaration of Dr. Robert Spitzer (3:23-cv-00474-JES-DDL)

KR1178

# EXHIBIT A

1

KR1179

# EXHIBIT A

November 2023

## Curriculum Vitae

## Robert J. Spitzer

## Distinguished Service Professor, Emeritus
## SUNY Cortland

Address: 5333 Center St.
Williamsburg, VA 23188
(607) 423-1781
Robert.spitzer@cortland.edu; robertjspitzer53@gmail.com
https://sites.google.com/site/robertspitzercortland/

Education: A.B. (Political Science), summa cum laude, SUNY College at Fredonia, 1975.
M.A. Cornell University, 1978.
Ph.D. Cornell University, 1980.

Positions Held:

Adjunct Professor, College of William and Mary School of Law, Spring 2023-present.
Affiliated Scholar, Government Department, College of William and Mary, 2023-present.
Department Chair, SUNY Cortland, 2008-2020.
Interim Department Chair, SUNY Cortland, 2004-2005.
Distinguished Service Professor, SUNY Cortland, 1997-2021.
Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-1990, 1992-2017.
Professor, SUNY Cortland, 1989 to 1997.
Continuing Appointment, SUNY Cortland, 1986.
Associate Professor, SUNY Cortland, 1984 to 1989.
Department Chair, SUNY Cortland, 1983 to 1989.
Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985, 1986, 1988.
Copy Editor, Administrative Science Quarterly, 1982 to 1983.
Adjunct Professor, Tompkins-Cortland Community College, 1982-83.
Assistant Professor, SUNY Cortland, 1979 to 1984.
Instructor, Cornell University, 1979.

Instructor, Eisenhower College, 1978-1979.
Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.

Honors:

Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London, England, 2020.
Founding member, Regional Gun Violence Research Consortium, coordinated with the Rockefeller Institute of Government. Consortium of gun policy experts from eight states to advance research on gun policy, 2018-present.
Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees, SUNY System Administration, campus leadership teams, and the leadership team of the Research Foundation (RF) for SUNY, 2018-2021.
Member, Scholars Strategy Network, 2015-present. Created to improve public policy and strengthen democracy by connecting scholars and their research to policymakers, citizens associations, and the media.
Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor of the Year Award for 2013.
Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.
Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.
Winner, State University of New York's Chancellor's Excellence in Scholarship and Creative Activities Award, 2003.
SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi Kappa Phi, 1994-95.
Winner, New York State/United University Professions Excellence Award, 1991, for "outstanding professional performance and superior service."
Member, New York State Commission on the Bicentennial of the U.S. Constitution, 1986-1990.
Member, New York State Ratification Celebration Committee for U.S. Constitution Bicentennial, 1987-88.
Member, National Bicentennial Competition on the Constitution and the Bill of Rights, 1987-1991.
Who's Who in the World, 1996.
Dictionary of International Biography, 1995.
Who's Who in the East, 1995-96; 1997-98
Ex officio member, Cortland County Bicentennial Committee, 1987-89.
Chair, SUNY Cortland Bicentennial Committee, 1987-89.
Phi Eta Sigma, SUNY Cortland, 1994.
Phi Kappa Phi, SUNY Cortland, 1990.
Men of Achievement (1986)
Contemporary Authors, vol. 112 (1985) and subsequent updates.

International Authors and Writers Who's Who, 1985-present.
International Who's Who in Education, Winter 1985-86.
Herbert H. Lehman Graduate Fellowship, 1975-79.
Who's Who Among Students in American Universities and Colleges, 1974-75.
Phi Beta Kappa Club, SUNY College at Fredonia, 1975.
Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.

Research Fellowships and Projects:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.

Publications and Papers:

BOOKS:

The Presidency and Public Policy: The Four Arenas of Presidential Power (University, AL: The University of Alabama Press, 1983). A study of the President's relations with Congress in the making of domestic policy. Revised version of doctoral dissertation.

The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press, 1987). A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

The Presidential Veto: Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

Editor, The Bicentennial of the U.S. Constitution: Commemoration and Renewal (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial. Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert Spitzer.

President and Congress: Executive Hegemony at the Crossroads of American Government (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, Media and Public Policy (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

The Politics of Gun Control (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021; 9th ed. 2024). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, Politics and Constitutionalism: The Louis Fisher Connection, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

The Right to Bear Arms: Rights and Liberties Under the Law (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment “right to bear arms” from legal, historical, and political perspectives. Published as part of the “America’s Freedoms” Series edited by Donald Grier Stephenson.

Essentials of American Politics, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

The Presidency and the Constitution: Cases and Controversies, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

We the People: Essentials Edition, co-authored with Benjamin Ginsberg, Theodore Lowi, Margaret Weir, Caroline Tolbert, Andrea Campbell (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021; 14th ed. 2023).

Gun Control: A Documentary and Reference Guide (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

The Gun Debate: An Encyclopedia of Gun Rights and Gun Control, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

Guns across America: Reconciling Gun Rules and Rights (New York: Oxford University Press, 2015; revised paperback ed. 2017); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

The Gun Dilemma: How History Is Against Expanded Gun Rights (New York: Oxford University Press, 2023). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Book Series Editor, Series on American Constitutionalism, SUNY Press, 1996-present. Books include:

Daniel Hoffman, Our Elusive Constitution, (1997)
Martin Sheffer, God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment, (1999)
Daniel Levin, Representing Popular Sovereignty: The Constitution in American Political Culture, (1999)

Robert Spitzer, ed., Politics and Constitutionalism, (2000)
Laura Langer, Judicial Review in State Supreme Courts (2002)
Ian Brodie, Friends of the Court (2002)
Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2002)
Artemus Ward, Deciding to Leave: The Politics of Retirement from the United States Supreme Court (2003)
James T. McHugh, Ex Uno Plura: State Constitutions and Their Political Cultures (2003)
Stephen Newman, ed., Constitutional Politics in Canada and the United States (2004).
Stephen Kershnar, Justice for the Past (2004).
Timothy R. Johnson, Oral Arguments and Decision Making on the U.S. Supreme Court (2004).
Christopher P. Banks, David B. Cohen, and John C. Green, eds., The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics (2005)
Kenneth D. Ward and Cecilia R. Castillo, eds., The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory (2005).
G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform (2006).
Frank P. Grad and Robert F. Williams, State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments (2006).
G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform, 3 vols. (2006).
Cary Federman, The Body and the State: Habeas Corpus and American Jurisprudence (2006).
Christopher S. Kelley, ed., Executing the Constitution: Putting the President Back into the Constitution (2006).
David Fagelson, Justice as Integrity: Tolerance and the Moral Momentum of Law (2006).
Christopher Shortell, Rights, Remedies, and the Impact of State Sovereign Immunity (2008).
Robert Blomquist, The Quotable Judge Posner (2010).
Kirk A. Randazzo, Defenders of Liberty or Champions of Security? (2010).
Pamela Corley, Concurring Opinion Writing on the U.S. Supreme Court (2010).
Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2nd ed. 2010).
Julia R. Azari, et al., eds., The Presidential Leadership Dilemma (2013).
Stephen A. Simon, Universal Rights and the Constitution (2014).
Kirk A. Randazzo and Richard W. Waterman, Checking the Courts (2014).
Anthony Maniscalco, Public Spaces, Marketplaces, and the Constitution (2015).
Goirgi Areshidze et al., eds., Constitutionalism, Executive Power, and the Spirit

of Moderation (2016).
Peter J. Galie, et al., eds., New York's Broken Constitution (2016).
Robert J. Hume, Ethics and Accountability on the U.S. Supreme Court (2017).
Michael A. Dichio, The U.S. Supreme Court and the Centralization of Federal Authority (2018).
Clyde H. Ray, John Marshall's Constitutionalism (2019).
Daniel P. Franklin, et al., The Politics of Presidential Impeachment (2020).
Robert M. Howard, et al., Power, Constraint, and Policy Change: Courts and Education Finance Reform (2021).
Mark C. Dillon, The First Chief Justice (2022).

Book Series Editor, Presidential Briefing Books, Routledge, 2015-present.
Mary Stuckey, Political Rhetoric (2015)
Michael A. Genovese, Presidential Leadership in an Age of Change (2015)
Christopher Fettweis, Making Foreign Policy Decisions (2016)
Nancy Maveety, Picking Judges (2016)
Richard S. Conley, Presidential Relations with Congress (2017)
Andrew L. Stigler, Governing the Military (2019)
Graham G. Dodds, The Unitary Presidency (2020)

Member, Board of Editors for the Encyclopedia of Guns in American Society, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, Issues: Understanding Controversy and Society, ABC-CLIO, 2011-2016.

BOOK CHAPTERS:

"Third Parties in New York," in Governing New York State (formerly New York State Today), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.: SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in Social Regulatory Policy: Recent Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO: Westview Press, 1988), 111-141.

"The President's Veto Power," in Inventing the American Presidency: Early Decisions and Critical Precedents, ed. by Thomas Cronin (Lawrence, KA: University Press of Kansas, 1989), 154-179.

"President and Congress," in The CQ Guide to the Presidency, ed. by Michael Nelson (Washington, D.C.: Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in Encyclopedia of American Political Parties and Elections, ed. by L. Sandy Maisel (New York: Garland Pub., 1991): American Labor Party, Benjamin Bubar, closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, American Government: Freedom and Power (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in Encyclopedia of the American Legislative System, ed. by Joel Silbey (NY: Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in The Presidency and the Persian Gulf War, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York: Praeger, 1993).

"Is the Separation of Powers Obsolete?" in The Presidency Reconsidered, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in Understanding the Presidency, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the Encyclopedia of the American Presidency, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the Encyclopedia of the United States Congress, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

"The President, Congress, and the Fulcrum of Foreign Policy," in The Constitution and the Conduct of American Foreign Policy, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in The Executive Office of the President, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the Oxford Historical Guide to American Government (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in Liberty Under Law, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

"Multi-Party Politics in New York," in Multi-Party Politics and American Democracy, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of “Cultures” and “Debates” boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, We the People (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

“Gun Control: Constitutional Mandate or Myth?” in Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

“The Right to Life Party” and related entries in The Encyclopedia of American Third Parties, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

“New York, New York: Start Spreadin’ the News,” in Prayers in the Precincts, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

“The Clinton Crisis and Its Consequences for the Presidency,” in The Clinton Scandal and the Future of American Politics, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

“Saving the Constitution from Lawyers,” in Politics and Constitutionalism, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

“Gun Control and Policy” and “Veto Power” for the Encyclopedia of American Political History, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in The Constitution and Its Amendments, ed. by Roger Newman (NY: Macmillan, 2001).

“Lost and Found: Researching the Second Amendment,” in The Second Amendment in Law and History, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in The Oxford Companion To United States History ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in The Presidency and the Law: The Clinton Legacy, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

"The Veto King: The 'Dr. No' Presidency of George Bush," in Honor and Loyalty: Inside the Politics of the Bush White House, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the Encyclopedia of Guns in American Society, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; 2nd ed. 2011; 3rd ed. 2023): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the Encyclopedia of the American Presidency, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for The Encyclopedia of New York State, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," Transformed By Crisis: The Presidency of George W. Bush and American Politics, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in Debating the Presidency, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in Thinking About the Presidency, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," Executing the Constitution, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in Social Issues in America: An Encyclopedia, 8 vols.,

ed. By James Ciment (NY: M.E. Sharpe, 2006).

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," The Presidency and the Challenge of Democracy, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

"Right to Bear Arms," Encyclopedia of American Civil Liberties, 4 vols., ed. By Paul Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," Gun Violence: Opposing Viewpoints, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," Presidential Power in America, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," Encyclopedia of American Government and Civics ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," Encyclopedia of Political Communication ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in Leadership at the Crossroads, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in Encyclopedia of Issues in U.S. Public Policy, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in Winning the Presidency 2008, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in Debating Reform: Conflicting Perspectives on How to Fix the American Political System, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" You Asked: 20 Questions About America, U.S. Department of State, 2010.

"Liberals and the Presidency," Contending Approaches to the American Presidency, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" The American Presidency in the 21st Century, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in Governing America, ed. By Paul Quirk and William Cunion (New York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for Issues: Understanding Controversy and Society, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," Encyclopedia of Applied Ethics, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" Winning the Presidency 2012, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." American Government. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," American Governance, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," American Presidents and the Constitution, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," The George W. Bush Presidency, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Stricter Gun Laws are Reasonable and Sensible," Gun Control in the United States: A Reference Handbook, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," Guns: Interdisciplinary Approaches to Politics, Policy, and Practice, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," Presidential Leadership and the Trump

Presidency: Executive Power and Democratic Governance, Charles Lamb and Jacob Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Looking Down the Barrel of the 2020 Elections," The 2020 Presidential Election: Key Issues and Regional Dynamics, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," Developments in American Politics 9, Gillian Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today" and "US tragedies from guns have often – but not always – spurred political responses," The Conversation on Guns, James A. Densley, ed. (Baltimore: Johns Hopkins University Press, 2023).

"To Brandish or Not to Brandish: The Consequences of Gun Display," New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, 2024).

ARTICLES:

"Jamestown: Anatomy of an All-American City," Sunday Buffalo Courier Express Magazine, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, The Journal of Politics, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," Presidential Studies Quarterly, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," Presidential Studies Quarterly, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," National Civic Review, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," Party Line, 17 (September 1984).

"Shooting Down Gun Myths," America, June 8, 1985, pp. 468-69. Reprinted in: the Des Moines Register, October 24, 1985; Criminal Justice, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); U.S. News and World Report educational study unit on Gun

Control, April/May, 1987; Gun Control, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and The Informed Argument, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY: Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," America, June 15, 1985.

"The Item Veto Reconsidered," Presidential Studies Quarterly 15(Summer, 1985): 611-17.

"Promoting Policy Theory: Revising the Arenas of Power" Policy Studies Journal, 15 (June 1987), 675-89. Reprinted in Public Policy Theories, Models, and Concepts, ed. by Daniel C. McCool (Prentice-Hall, 1995).

"A Course Module: The Politics of Abortion," NEWS for Teachers of Political Science, 53 (Spring, 1987).

"But for A Single Vote...," New York Delegate, July, 1987. Abridged version appeared on editorial page of the Rochester Times Union, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", Election Politics, 5 (Summer, 1988): 14-16.

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," Policy Studies Journal, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," Policy Studies Journal, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," PS: Political Science and Politics, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," PS: Political Science and Politics, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," Oklahoma City University Law Review, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," Congress and the Presidency, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," Pace Law Review, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" The Spectator, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," Political Science Quarterly, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," Presidential Studies Quarterly, 28 (Fall 1998): 799-805.

"Clinton's Impeachment Will Have Few Consequences for the Presidency," PS: Political Science and Politics, 32 (September 1999).

"The Gun Dispute," American Educator, 23 (Summer 1999): 10-15. Reprinted in Annual Editions: Criminal Justice (Dushkin/McGraw-Hill, 2000); and in Criminology (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," Congress Monthly, September/October 2000.

"Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, Silveira v. Lockyer (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," Presidential Studies Quarterly 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the *Emerson* Case," St. John's Law Review 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," Focus on Law Studies 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," Fordham Law Review 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," PS: Political Science and Politics 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, The PRG Report 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, American Literary History 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, Injury Prevention 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," Albany Government Law Review 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," Presidential Studies Quarterly 38(June 2008): 329-46.

"Still Saving the Constitution from Lawyers: A Response," Gonzaga Law Review 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," Government, Law and Policy Journal 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," Presidential Studies Quarterly 42(September 2012): 637-55.

"Gun Laws," New York State Bar Association Journal 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," Presidents and Executive Politics Report 35(Fall 2012).

"Writing the Gun Debate," Los Angeles Review of Books, February 10, 2013.

"A Historical Look at Gun Control in America," WCNY Magazine, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," PS: Political Science and Politics 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," The Islamic Monthly, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," White House Studies 12(October 2013): 125-46.

"A Look at the 2014 Elections," WNCY Magazine, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," Albany Law Review, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," Social Science Docket, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," The Critique (July/August 2016).

"Gun Law History in the United States and Second Amendment Rights," Law and Contemporary Problems 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" Items: Insights from the Social Sciences, Social Science Research Council, October 17, 2018.

"Effective Gun Regulation Can Be Compatible with Gun Rights," The Regulatory Review, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Law and Contemporary Problems 83, 3(2020): 231-55.

"Understanding Gun Law History After *Bruen*: Moving Forward by Looking Back," Fordham Urban Law Journal 51 (2023): 57-115.

OP-ED ARTICLES:

"Court Rulings on 2nd Amendment: No Individual Right to Keep Arms," Des Moines Register, October 24, 1985.

"Gun Control and Pressure Politics," Syracuse Post-Standard, November 30, 1985.

"Pocket Vetoes and Abuse of Power," Rochester Times Union, January 7, 1987.

"But for One Vote, a Different Nation," Rochester Times Union, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," Rochester Times Union, September 14, 1987.

"The Great Gun Fallacy," Syracuse Post-Standard, March 30, 1989.

"Four Cases on Right to Bear Arms," Syracuse Post-Standard, April 22, 1989.

"Don't Start Line-Item Veto," Syracuse Post-Standard, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," Syracuse Post-Standard, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," Los Angeles Times, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" Christian Science Monitor, September 19, 1997.

“Assault Weapons Ban,” Christian Science Monitor, April 16, 1998.

“As a National Candidate, Pataki Faces Big Hurdles,” Syracuse Post-Standard, February 10, 1999.

“Gun Industry Doesn’t Know What’s Good for It: Regulation,” Syracuse Post-Standard, April 20, 1999.

“The Gun Saga in Congress,” Intellectual Capital, 4 (May 13-20, 1999).

“Hidden Gun Control or Consumer Protection?” Intellectual Capital, 4 (June 10-17, 1999).

“Welcome to Soviet – er, New York – Politics,” Intellectual Capital 5(February 10-17, 2000).

“Gun Control After Columbine,” Intellectual Capital 5(April 20-27, 2000).

“Good May Come From Shooting Tragedies,” The Catholic Review, March 30, 2000.

“Why Would Anyone Want the Job Now?” Chicago Tribune, November 15, 2000.

“The Supreme Court, Bush, and the Election of the Century,” Syracuse Post-Standard, December 18, 2000.

“Ashcroft Playing Politics With the Right to Bear Arms,” Syracuse Post-Standard, June 12, 2001.

“Exposure Erodes Clout of NRA,” Columbus Dispatch, April 24, 2003.

“Hazing Scandals,” Syracuse Post-Standard, November 6, 2003.

“Endorsement Fever,” with Glenn Altschuler, Syracuse Post-Standard, February 18, 2004.

“NRA Loses Its Political Firepower,” Los Angeles Times, April 12, 2004. Also in the Deseret News.

“A ‘Tortured’ Interpretation of the President’s Vast Powers,” Syracuse Post-Standard,

June 18, 2004.

"Clearing the Air," Syracuse Post-Standard, August 4, 2004.

"Why Gun Ban Died Quietly," San Jose Mercury News, Sunday "Perspectives," September 19, 2004.

"To Pledge or Not to Pledge," Christian Science Monitor, August 18, 2005. Also published in the Deseret News, Sacramento Bee, the Fresno Bee, the Modesto Bee, the Ithaca Journal, the Johnstown Breeze, Yahoo.com, and World News Network (wn.com), among others.

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But Static," Syracuse Post-Standard, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network (www.hnn.us), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" Syracuse Post-Standard, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network (www.hnn.us) January 7, 2008.

"The 'Pocket Veto' Peril," Los Angeles Times, January 8, 2008. Reprinted in the St. Louis Post-Dispatch, St. Paul Pioneer Press, Wilmington Star News (NC), News and Observer (NC), The Morning Call (Pa.), Contra Costa Times (CA), the Sun News (FL), The Vindicator, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, Cleveland Plain Dealer, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, Syracuse Post-Standard, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge (www.thefacultylounge.org), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network (www.hnn.us), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network (www.hnn.us), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network (www.hnn.us),

January 12, 2009.

"Early Voting for New York Elections," Cortland Standard, May 27, 2009.

"A Better Way to Run Our Elections," Syracuse Post Standard, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post (www.huffingtonpost.com), posted December 22, 2009.

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post (www.huffingtonpost.com), posted January 4, 2010.

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post (www.huffingtonpost.com), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post (www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com), posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5, 2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard*, January 16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post*, September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post*, October 24, 2011.

"The GOP and Presidential Power," *The Huffington Post*, January 3, 2012.

"The Disappearing Faculty," *The Huffington Post*, February 1, 2012.

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

"Why We've Learned Nothing from Watergate," *The Huffington Post*, June 20, 2012.

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post*, June 29, 2012.

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard*, July 4, 2012.

"Aurora Won't Change Anything," *Salon*, July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill*, January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News*, January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News*, January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard*, January 7, 2014.

"An Assault Weapons Gambit Backfires," *New York Daily News,* April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle,* April 13, 2014.

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog,* American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine,* June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him." *Washington Post,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,* January 1, 2016.

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington Post,* June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Guns Return to American Elections," *US Election Analysis 2016: Media, Voters and the Campaign,* Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 18, 2016.

"Gun Rules and Rights: Where's the Problem?" Guns Issue, CLOG, 2017.

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News,* August 16, 2017.

"Private Militias and Gun Rights," *Syracuse Post Standard,* August 20, 2017.

"Americans Used to Be Good at Gun Control. What Happened?" *New York Times,* October 3, 2017.

"An American Standoff," *New York Daily News,* October 8, 2017.

"Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting," *Washington Post,* February 15, 2018.

"The NRA's Journey from Marksmanship to Political Brinkmanship," *The Conversation,* February 23, 2018.

"How to Keep the Deadliest Guns Out of Dangerous Hands," *New York Daily News,* March 5, 2018.

"You Can Report a Bad Driver; Why Not an Angry Gun Owner?" *Syracuse Post Standard,* March 11, 2018.

"Here's What Trump Doesn't Know about Knives, Guns and Murder," *Washington Post,* May 9, 2018.

"'Stand Your Ground' Laws Have Failed to Stem Crime or Improve Safety," Rockefeller Institute of Government, June 4, 2018.

"What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'" *CNN.com,* September 13, 2018.

"The Gun Safety Issue is Actually Helping Democrats," *New York Times,* November 12, 2018.

"Impeachment: Be Careful What You Ask For," *Syracuse Post Standard,* December 30, 2018.

"Why the Supreme Court Will Almost Surely Strike Down New York City's Gun Law," *New York Daily News,* January 24, 2019.

"Why 'Vice' Deserves an Oscar," *Los Angeles Times,* February 7, 2019.

"One Year Later: Parkland Shifted the Politics of Guns," *Syracuse Post Standard,* February 17, 2019.

"There's No Second Amendment Right to Large-Capacity Magazines," *New York Times,* August 6, 2019.

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts*, The Center for Firearms Law at Duke University, October 10, 2019.

"William Barr's Upside-Down Constitution," *History News Network*, December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News,* October 14, 2020.

"Guns and the 2020 Elections," *US Election Analysis 2020,* Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 15, 2020.

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.

"The Problem with a Self-Pardon," *History News Network*, January 14, 2021.

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation,* November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot*, February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK*, February 19, 2022.

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot,* May 1, 2022.

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today," *The Conversation,* May 25, 2022.

"The NRA wasn't always opposed to gun restrictions," *Chicago Sun-Times,* May 27, 2022.

"Originalism, History, and Religiosity are the Faults of Alito's Reasoning in *Dobbs*," *History News Network,* May 29, 2022.

"US tragedies from guns have often – but not always – spurred political responses," *The Conversation,* June 8, 2022.

"How the Supreme Court rewrote history to justify its flawed gun decision," *NBC THINK*, June 23, 2022.

"The Road Ahead for Gun Laws in New York State," *New York Daily News*, June 28, 2022.

"Understanding the New Gun Policy Collision," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, July 12, 2022.

"Guns at voting sites have long sparked fears of intimidation and violence – yet few states ban their presence," *The Conversation,* November 2, 2022.

"Guns at voting sites have long sparked fears of intimidation, violence," *Syracuse Post-Standard,* November 4, 2022.

"What our past tells us about young people and guns," *The Hill,* March 28, 2023.

"Stand-Your-Ground, the Castle Doctrine, and Public Safety," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 3, 2023.

"For Most of U.S. History We've Had Both Gun Rights and Gun Regulations," *TIME.com*, June 6, 2023.

"Is domestic abuse really protected by the Second Amendment?" *The Hill,* July 14, 2023.

"America's Original Gun Control," *The Atlantic Monthly,* August 12, 2023. 163

"The Unusual Thing About Hunter Biden's Indictment," *CNN.com*, September 15, 2023.

TESTIMONY, BRIEFS, AND REPORTS:

"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting: Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and Sine Die Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA, February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article ("Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, *amicus curiae* brief in the case of *Nordyke v. King*, U.S. Court of Appeals,

Ninth Circuit, 319 F.3d 1185 (2003).

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.*, U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S. 742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

Co-author, *amicus* brief in the case of *Ezell v. Chicago*, U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar*, Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety

Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Baker*, No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts state assault weapons restrictions. In 2019 the U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education to research and investigate the causes of gun violence in a multi-state effort. February 2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta*, U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.

PAPERS AND PRESENTATIONS (NOT INCLUDING THOSE GIVEN ON THE CORTLAND CAMPUS):

"The President as Policy-Maker: The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party: The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic: Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

"Biting the Bullet: Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power: Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power: The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto: Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete? An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington, D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the Washington Post, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in The Politics of Gun Control," Gettysburg College, Gettysburg, PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit, the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November

1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes: The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"College and Life: Really the Same," SUNY Cortland Commencement Address, May 14, 2017.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?" Clemson University, SC, April 17, 2018.

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action, Hamilton, NY, June 20, 2018.

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference on "The Second Amendment: Its Meaning and Implications in Modern America," Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15, 2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke University, Durham, NC, September 27, 2019.

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol Association v. NYC*, November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association, Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University (virtual), April 5, 2022.

"Scholars' Circle: Gun Control," June 30, 2022 (virtual).

"Gun Rules and Regulations," Clubhouse AverPoint, July 2, 2022 (virtual).

"A Nation in Crisis: Are Guns the Problem?" Center for Ethics and Human Values' Civil Discourse Forum, The Ohio State University, Columbus, OH, September 23, 2022.

"Explaining the 2022 Midterm Elections," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 13, 2022.

"The Gun Rights 2.0 Movement: Public Policy Consequences," 2022 National Research Conference on Firearm Injury Prevention, Omni Shoreham Hotel, Washington, D.C.,

November 29-December 1, 2022.

“Gun Law History in America,” OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., February 16, 2023.

“The Obama Presidency and Gun Policy,” Paper Presented for Hofstra University’s 13th Presidential Conference on The Barack Obama Presidency, Hempstead, NY, April 19-21, 2023.

“Gun Law History and Virginia,” League of Women Voters, Williamsburg, Va., June 22, 2023.

“Gun Policy in the U.S.: Past, Present, Future,” College of William and Mary, Williamsburg, Va., September 21, 2023.

“Historical Gun Laws Pertaining to Minors,” 2023 Cooper-Walsh Colloquium, Conference on *Public Health, History, and the Future of Gun Regulation After Bruen*, Fordham University School of Law, New York City, NY, October 12-13, 2023.

“Presidential Impeachment: What It Is, How It Works, Why It Matters,” OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 19, 2023.

PANEL PARTICIPATION:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans: An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political

Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western

Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, "The Unitary Executive in a Separated System," APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, "The Culpability of Congress," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, "Keeping the Modern Presidency in Check and Balance," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Presidential Endings: George W. Bush and the Final Two Years," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Staffing and Decisionmaking in the White House," APSA, Boston, August 28-31, 2008.

Panel Chair, "Early Assessments of the Obama Presidency," APSA, Washington, D.C., September 2-5, 2010.

Discussant, "Historical Perspectives on the Presidency," APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, "Politics and Presidential Travel," APSA, Washington, D.C., August 27-31, 2014.

Discussant, "The Obama Presidency and Constitutional Law," APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, "Executive Power and Democratic Functioning in the Trump Era," APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, "Assessing the Presidency of Donald Trump," APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, "Gun Law, Politics, and Policy," Midwest Political Science Association, April 17, 2021 (virtual).

Roundtable, "Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race," Midwest Political Science Association, Chicago, April 7, 2022.

BOOK REVIEWS:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

PL94-142: An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative Science Quarterly, September, 1984.

The Evolution of American Electoral Systems, by Paul Kleppner, et al., reviewed in the American Political Science Review, December, 1983.

A Case of Third Party Activism, by James Canfield, reviewed in Perspective, July-August, 1984.

Winners and Losers: Campaigns, Candidates and Congressional Elections, by Stuart Rothenberg, reviewed in the American Political Science Review, December, 1984.

The Political Presidency, by Barbara Kellerman, reviewed in Perspective, January-February, 1985.

Presidents and Promises, by Jeff Fishel, reviewed in the American Political Science Review, December, 1985.

The Elections of 1984, ed. by Michael Nelson, reviewed in Perspective, May/June, 1985.

Economic Conditions and Electoral Outcomes, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in Perspective, May/June, 1986.

Presidential Transitions: Eisenhower Through Reagan, by Carl M. Brauer, in Perspective, January/February, 1987.

Religion and Politics in the United States, by Kenneth D. Wald, in Journal for the Scientific Study of Religion, September, 1988.

Abortion and Divorce in Western Law, by Mary Ann Glendon, in The Annals of the American Academy of Political and Social Science, September, 1988.

The American Political Economy, by Douglas Hibbs, in Perspective, Spring, 1988.

God in the White House, by Richard G. Hutcheson, Jr., in Perspective, Fall, 1988.

The Reagan Legacy, Charles O. Jones, ed., in Social Science Quarterly, June, 1989.

Dilemmas of Presidential Leadership From Washington Through Lincoln by Richard Ellis and Aaron Wildavsky, in Perspective, September, 1989.

Taming the Prince by Harvey Mansfield, Jr., in Governance, April, 1990.

Public Policy and Transit System Management, ed. by George M. Guess, in Perspective, Spring, 1991.

The Myth of Scientific Public Policy, by Robert Formaini, in Perspective, Winter, 1992.

The Bush Presidency: First Appraisals, ed. by Colin Campbell and Bert Rockman in Public Administration Review, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies

Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives, Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H. Richard Uviller and William G. Merkel, Journal of American History, March 2004.

Power Without Persuasion: The Politics of Direct Presidential Action, by William G. Howell, Perspectives on Politics, June 2004.

The George W. Bush Presidency: An Early Assessment, ed. By Fred Greenstein, Perspectives, Spring 2004.

The Invention of the United States Senate, by Daniel Wirls and Stephen Wirls, Perspectives, Summer 2004.

The Mythic Meanings of the Second Amendment, by David C. Williams, Law and Politics Book Review, April 2004.

Empowering the White House, by Karen M. Hult and Charles E. Walcott, Rhetoric and Public Affairs, Fall 2005.

Defining Americans: The Presidency and National Identity, by Mary E. Stuckey, Perspectives, Spring 2005.

Presidential Leadership: Rating the Best and Worst in the White House, ed. By James Taranto and Leonard Leo, Rhetoric and Public Affairs, Summer 2006.

A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, by Saul Cornell, American Journal of Legal History, October 2006.

The Founders' Second Amendment: Origins of the Right to Bear Arms, by Stephen Halbrook, Law and Politics Book Review 18(October 2008).

Out of the Shadow: George H.W. Bush and the End of the Cold War, by Christopher Maynard, Journal of American History (September 2009).

Guns, Democracy, and the Insurrectionist Idea, by Joshua Horwitz, Law and Politics Book Review 19(June 2009).

Talking Together, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

Accidental Presidents, by Philip Abbott, Presidential Studies Quarterly, June 2010.

The Co-Presidency of Bush and Cheney, by Shirley Anne Warshaw, Congress and the Presidency, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution, by Heidi Kitrosser, Congress and the Presidency 42(2015).

The Six-Shooter State: Public and Private Violence in American Politics by Jonathan Obert and The Lives of Guns ed. by Jonathan Obert, Andrew Poe and Austin Sarat, Perspectives on Politics 17(September 2019).

The Toughest Gun Law in the Nation by James B. Jacobs and Zoe Fuhr, Criminal Law and Criminal Justice Books, March 2020.

Warped Narratives: Distortion in the Framing of Gun Policy by Melissa K. Merry, Perspectives on Politics 18(September 2020).

The Uses and Misuses of Politics: Karl Rove and the Bush Presidency by William G. Mayer, Presidential Studies Quarterly (December 2022).

SELECTED MEDIA APPEARANCES/QUOTATIONS:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN,

and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Ali Velshi"; "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021). Quoted in or by the New York Times, the Washington Post, Time Magazine, Newsweek, Der Spiegel (Germany), USA Today, the Los Angeles Times, the Wall Street Journal, the Christian Science Monitor, the Boston Globe, the Chicago Tribune, the Philadelphia Inquirer, the Miami Herald, Houston Chronicle, the St. Louis Post-Dispatch, San Francisco Chronicle, the Dallas Morning News, the Baltimore Sun, the Detroit Free Press, the Seattle Post-Intelligencer, Newsday, the Denver Post, Kansas City Star, Dallas News, Pittsburgh Post-Gazette, New Orleans Times Picayune, Orlando Sentinel, Columbus Dispatch, Buffalo News, San Jose Mercury News, Albany Times-Union, St. Petersburg Times, Arkansas Democrat-Gazette, Newark Star-Ledger, Bergen Record, Congress Daily, The Hill, CQ Report, Rolling Stone, The Nation, Ladies Home Journal, the National Journal, The Spectator, Legal Times, Financial Times, Toronto Globe, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events conducted by five academics from area colleges.

PROFESSIONAL ASSOCIATIONS:

Scholars Strategy Network.
American Political Science Association.
Center for the Study of the Presidency.
Presidents and Executive Politics Section (formerly the Presidency Research Group), APSA; served on Governing Board of PRG, 1991 to 2003.
New York Political Science Association.
Pi Sigma Alpha.
Phi Kappa Phi.

TEACHING AREAS:

American Government: courses taught include Law and Politics, Introduction to American Government, The Legislative Process, Political Parties and Social

Movements, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

Public Policy: courses taught include Politics and Policy, Introduction to Public Policy, Gun Policy. Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.

TEACHING-RELATED AWARDS:

Three-time recipient of the SUNY Cortland Student Government Association Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students." (The only faculty member ever to win this award more than once.)

OTHER PROFESSIONAL ACTIVITIES

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science

Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, PRG Report, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics, American Political Science Association, 1997.

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press, University of Chicago Press, University of California Press, Princeton University Press, Cornell University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan, University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press, HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge, University of Alabama Press, American Political Science Review, PS, Comparative Politics, American Journal of Political Science, Policy Studies Journal, Policy Studies Review, Political Science Quarterly, the Journal of Politics, Western Political Quarterly, Polity, Social Science Quarterly, Political Behavior, American Politics Quarterly, Political Communication, Legislative Studies Quarterly, Government and Policy, Congress and the Presidency, Social Science Journal, Journal of Policy History, Political Research Quarterly, Presidential Studies Quarterly, Politics and Policy, and the National Science Foundation.

SELECTED COMMUNITY SERVICE

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present; for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County, 2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).
Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's (N.Y.) Odyssey 2010 Project, 1996.

**EXHIBIT B**

KR1232

# EXHIBIT B: BOWIE KNIFE LAWS BY TYPE#

| STATE | No Concealed Carry | No Carry | Greater Criminal Penalty | Tax/Punish for Sale | Tax Owner-ship | No Sale to Barred Groups* | No brandish |
|---|---|---|---|---|---|---|---|
| Alabama | 1839,1841 1876,1879 | | 1837 | 1837,1897 | 1837,1867 | 1876 | |
| Alaska | | | | | | | |
| Arizona | 1893,1901 | 1889 | | | | | |
| Arkansas | 1875 | 1881 | 1871 | 1881 | | | |
| California | 1896 | | | | | 1896 | 1855,1858 |
| Colorado | 1862,1877 | 1881 | | | | | |
| Connecticut | | | | | | | |
| Delaware | | | | | | | |
| District of Columbia | 1871 | | | | | | |
| Florida | | | | 1838a | | | |
| Georgia | 1837***,1873 | | | 1837*** | | 1860 | |
| Hawaii | | 1852,1913 | | | | | |
| Idaho | 1909 | 1879 | | | | | |
| Illinois | 1876,1881 1883 | | | | | 1881 | |
| Indiana | | 1859 | | | | | |
| Iowa | 1882,1887 1900 | | | | | | |
| Kansas | 1862,1863 1887 | | | | | 1883 | |
| Kentucky | | | | | | 1859 | |
| Louisiana | 1855 | 1870 | | | | | |
| Maine | | | | | | | |
| Maryland | 1872,1884 1886,1890 | | | | | | |
| Massachusetts | | | | | | | |

| Michigan | 1891 | | | | | | |
|---|---|---|---|---|---|---|---|
| Minnesota | 1884 | | | | | | |
| Mississippi | 1878,1896^ | | 1837,1838 | | 1841** | | 1840 |
| Missouri | 1871,1883 1890,1897 | 1917,1923 | | | | | |
| Montana | 1864 | | 1879 | | | | |
| Nebraska | 1890,1899 | 1872 | | | | | |
| Nevada | | | 1873 | | | | |
| New Hampshire | | | | | | | |
| New Jersey | | | | | | | |
| New Mexico | 1859,1887 | | | | | | |
| New York | | 1885 | | | | | |
| North Carolina | 1879 | | | | 1856,1858 | 1846b | |
| North Dakota | | | | | | | |
| Ohio | 1859,1880 | | | | | | |
| Oklahoma | 1890,1903 | 1890,1891 | | | | | |
| Oregon | | | | | | | |
| Pennsylvania | 1897 | | | | | | |
| Rhode Island | 1893,1896 1908 | | | | | | |
| South Carolina | | | | | | 1923 | |
| South Dakota | | | | | | | |
| Tennessee | 1838,1863 1867 | 1869,1881 1893 | 1838,1856 | 1838,1867 | | 1856,1867 | |
| Texas | | 1871 | 1856 | | | 1897 | |
| Utah | | 1877 | | | | | |
| Vermont | | | | | | | |
| Virginia | 1838,1867, 1887 | | 1838 | | | | |
| Washington | | | | | | | 1854,1859 1869 |
| West Virginia | 1870 | 1882,1891 | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1925 | | | | | |
| Wisconsin | 1883 | | | | | | |
| Wyoming | | | | | | | 1884 |

Source: https://firearmslaw.duke.edu/repository/search-the-repository/ unless otherwise noted.

*Barred groups included Native Americans/Indians, African Americans/Enslaved, minors.

#Table excludes laws that punish carry/use of "knives" or "sharp or dangerous weapons" but do not mention Bowie knives by name.

** 1841 Miss. Chap. 1, p. 52. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

^ 1896 Miss. L. chap. 104, pp. 109-10. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

***https://dlg.galileo.usg.edu/georgiabooks/pdfs/gb0439.pdf, pp. 210-211.

a 1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838). See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

b 1846 N.C. L. chap. 42. See https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

**EXHIBIT C**

1

KR1236

EXHIBIT C

DANGEROUS WEAPONS RESTRICTIONS
(YEARS OF ENACTMENT)

| STATE[1] | BOWIE KNIVES | Bludgeon | Billy/Billie Clubs | Clubs | Slung Shot | Sand Bag Sand Club | Pistols | Any Concealed /Deadly/Dangerous Weapon |
|---|---|---|---|---|---|---|---|---|
| Alabama | 1837,1839, 1841,1867, 1876,1877, 1879,1892 | | | 1805 | 1873 | | 1839, 1841 | |
| Alaska | 1896† | | | | 1896-99 | | 1896 | 1896 |
| Arizona | 1867,1889, 1901 | | | | 1873, 1889 1893, 1901 | | 1889 | 1867 |
| Arkansas | 1871,1875, 1881 | | | 1835 | 1871 | | 1820, 1837 | |
| California | 1855, 1896 | 1849, 1853, 1876 | 1917, 1923 | | 1864, 1923 | 1917, 1923 | 1850, 1864 | 1849 |
| Colorado | 1862,1867, 1877, 1881 | 1876 | | | 1886 | | 1862 | 1862 |
| Connecticut | 1890† | | | | 1890 | | 1890, 1923 | |
| Delaware | 1881† | | | 1797 | | | 1852 | |
| District of Columbia | 1858,1871, 1892 | | | | 1871 | | 1857, 1871 | |
| Florida | 1835,†1838 ,1847,1868 ,1893† | | 1888 | | 1868, 1888 | | 1887 | |

[1] In addition to state laws, this chart provides the year of enactment of local ordinances adopted within the states.

| Georgia | 1837,1860, 1873 | 1816 | | | 1860 | | 1837 | |
|---|---|---|---|---|---|---|---|---|
| Hawaii | 1852, 1913 | | | | 1852, 1913 | | 1913 | |
| Idaho | 1864†1875, 1879, 1909 | 1875 | | | 1879 | | 1909 | 1864 |
| Illinois | 1876, 1881 | 1845 | | | 1881, 1893 | | 1881 | |
| Indiana | 1859 | | | 1804, 1855, 1881, 1905 | 1875, 1905 | | 1820 | 1831 |
| Iowa | 1882,1887, 1900 | | 1882 | | 1882 | 1887, 1900 | 1882, 1887, 1897, 1929 | |
| Kansas | 1862,1863 1868,1883, 1887 | | 1862, 1887 | | 1883, 1887, 1899 | | 1901 | |
| Kentucky | 1859 | | | 1798 | 1859 | | 1812, 1813 | |
| Louisiana | 1870 | | | | | | 1813 | 1813, 1842, 1870 |
| Maine | 1840,1841, 1884† | | | 1786 | | | 1840 | 1841 |
| Maryland | 1872,1886, 1888, 1890 | 1809, 1874, 1886 | 1872, 1874 1884, 1886 1890, 1927 | | 1886 | 1890 | 1872 | |
| Massachusetts | 1836† | | | 1750 | 1850, 1927 | | 1751 | |
| Michigan | 1891 | 1927, 1929 | 1887, 1891, 1927, 1929 | 1913 | 1887, 1891, 1929 | 1887, 1891, 1927, 1929 | 1887 | |
| Minnesota | 1882 | | | | 1882, 1888 | 1888 | 1881 | 1882 |
| Mississippi | 1837,1838, 1878 | | | 1799, 1804 | 1878 | | 1838,1878 | |
| Missouri | 1871,1897, 1917, 1923 | | 1871, 1897, 1923 | 1818,1923 | 1883, 1888, 1897, 1917 | | 1873 | |
| Montana | 1864,1879, 1885 | 1887 | | | | | 1864, 1865 | 1888 |
| Nebraska | 1877,1890, 1899 | 1858 | 1872, 1890, 1899 | | 1890 | | 1881 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Nevada | 1873 | 1872 | | | 1881 | | 1881, 1925 | |
| New Hampshire | | | | | | | | |
| New Jersey | 1871,1905† | 1799, 1877, 1927 | 1871, 1927 | | 1871, 1873, 1927 | 1871, 1927 | 1686 | |
| New Mexico | 1852†1853, 1859,1864 1887 | 1887 | | | 1853, 1859, 1869, 1887 | | 1852, 1853 | |
| New York | 1866,1885, 1911† | 1911, 1913, 1931 | 1866, 1881, 1884, 1885, 1900, 1911, 1913, 1931 | 1664 | 1866 | 1866, 1881, 1900, 1911, 1913, 1931 | 1891 | |
| North Carolina | 1840,1856, 1858,1860, 1879 | | | | 1879 | | 1792, 1840 | |
| North Dakota | 1895,1915† | 1915 | 1915 | | 1895 | 1915 | 1895 | |
| Ohio | 1859,1880, 1890 | | | | | | 1859 | 1788, 1859, 1880 |
| Oklahoma | 1890,1891, 1903 | | 1890, 1891 | | 1890, 1891, 1903 | 1890 | 1890 | |
| Oregon | 1885† | | 1898, 1917 | | 1885, 1917 | 1917 | 1853 | |
| Pennsylvania | 1897 | | 1897 | | 1851 | | 1851 | |
| Rhode Island | 1893,1896, 1908 | | 1893, 1908 | | 1893, 1896 | | 1893 | |
| South Carolina | 1880, 1923 | | | | 1880 | | 1880 | |
| South Dakota | 1903† | | | | 1877, 1903 | | 1877 | |
| Tennessee | 1838,1856, 1863,1867, 1871,1881, 1893 | | | | 1879, 1882, 1893 | | 1821 | |
| Texas | 1856,1871, 1879,1897 | | | 1899 | 1871, 1879, 1889, 1897, 1899 | | 1870 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Utah | 1877 | | | | | | 1877, 1888 | |
| Vermont | 1892,1895† | | | | 1895 | | 1895, 1897 | |
| Virginia | 1838,1887 | | | 1792 | 1887 | | 1794 | |
| Washington | 1854, 1859 1869 | | | | | | 1881 | 1854, 1859, 1869, 1881, 1883, 1892, 1896, 1897 |
| West Virginia | 1870,1882, 1891, 1925 | | 1870, 1882, 1891, 1925 | | 1891 | | 1870 | |
| Wisconsin | 1883, 1896 | | | | 1883, 1888 | | 1858 | 1883 |
| Wyoming | 1884,1890 1899,1925 | 1876, 1893 | | | 1884, 1890, 1899 | | 1876 | |
| Total Laws | 136 | 25 | 44 | 17 | 79 | 21 | 66 | 24 |

SOURCE: https://firearmslaw.duke.edu/repository/search-the-repository/

† States that prosecuted/regulated/barred knives more generally without specifically mentioning Bowie knives.

**EXHIBIT D**

1

KR1241

**EXHIBIT D**

**DANGEROUS WEAPONS LAWS**

**ALABAMA**

Harry Toulmin, A Digest of the Laws of the State of Alabama : Containing the Statutes and Resolutions in Force at the End of the General Assembly in January, 1823. To which is Added an Appendix; Containing the Declaration of Independence; the Constitution of the United States; the Act authorizing the People of Alabama to form a Constitution and State Government; and the Constitution of the State of Alabama Page 627, Image 655 (1823) available at The Making of Modern Law: Primary Sources. 1805
Negroes and Mulattoes, Bond and Free – 1805, Chapter I, An Act respecting Slaves. – Passed March 6, 1805: Sec. 4. And be it further enacted, that no slave shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, except the tools given him to work with, or that he is ordered by his master, mistress, or overseer, to carry the said articles from one place to another, but all and every gun , weapon, or ammunition, found in the possession or custody of any slave, may be seized by any person, and upon due proof made thereof, before any justice of the peace of the county or corporation where such seizure shall be made, shall, by his order, be forfeited to the seizer, for his own use; and moreover, every such offender shall have and receive, by order of such justice, any number of lashes, not exceeding thirty-nine, on his bare back for every such offense : Provided nevertheless, That any justice of the peace may grant, in his proper county, permission in writing to any slave, on application of his master or overseer, to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year, and revocable at any time within such term, at the discretion of the said justice, and to prevent the inconveniences arising from the meeting of slaves.

1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, §§ 1, 2.
Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened, That if any person carrying any knife or weapon, known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife,

by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.
And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

1839 Ala. Acts 67, An Act to Suppress the Evil Practice of Carrying Weapons Secretly, § 1
That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4.
Everyone who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of firearms, or air gun, unless such person shall be threatened with, or have good cause to apprehend an attack, or be travelling, or setting out on a journey, shall on conviction, be fined not less than fifty nor more than three hundred dollars: It shall devolve on the person setting up the excuse here allowed for carrying concealed weapons, to make it out by proof, to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description.

The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources.
Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed

by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 882, Image 898 (1877) available at The Making of Modern Law: Primary Sources.
Offenses Against Public Peace, § 4109. Carrying Concealed Weapons – Any person who, not being threatened with, or having good reason to apprehend, an attack, or traveling, or setting out on a journey, carries concealed about his person a bowie knife, or any other knife or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or an air gun, must be fined, on conviction, not less than fifty, nor more than three hundred dollars; and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than six months. (Footnote – Not unconstitutional. – 1 Ala. 612 Co-extensive only with necessity – 49 Ala. 355. . .)

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 989, Image 1005 (1877) available at The Making of Modern Law: Primary Sources.
Proceedings In Circuit and City Courts, § 4809. Carrying Concealed Weapons. – In an indictment for carrying concealed weapons, it is sufficient to charge that the defendant "carried concealed about his person a pistol, or other description of fire-arms," or "a bowie-knife, or other knife or instrument of the like kind or description," without averring the want of a legal excuse on his part; and the excuse, if any, must be proved by the defendant, on the trial, to the satisfaction of the jury.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which

the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 901, Image 917 (1877) available at The Making of Modern Law: Primary Sources.
Offenses Against Public Health, etc. § 4230 (3751). Selling, giving, or lending, pistol or bowie knife, or like knife, to boy under eighteen. – Any person who sells, gives, or lends, to any boy under eighteen years of age, any pistol, or bowie knife, or other knife of like kind or description, must on conviction, be fined not less than fifty, nor more than five hundred dollars.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permenent Acts of the Session of 1876-7 have been Incorporated Page 883, Image 899 (1877) available at The Making of Modern Law: Primary Sources.

Carrying Weapons, Dangerous or Unusual Weapons | Alabama | 1873
Offenses Against Public Justice, &c. § 4110. Carrying, concealed, brass knuckles and slung-shots. – Any person who carries, concealed about his person, brass knuckles, slung-shot, or other weapon of like kind or description, shall, on conviction thereof, be fined not less than twenty, nor more than two hundred dollars, and may also, at the discretion of the court trying the case, be imprisoned in the county jail, or sentenced to hard labor for the county, for a term not exceeding six months. § 4111. Carrying rifle or shot-gun walking canes. – Any person who shall carry a rifle or shot-gun walking cane, shall, upon conviction, be fined not less than five hundred dollars, nor more than one thousand dollars, and be imprisoned in the penitentiary not less than two years.

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery [Alabama], with the Charter Page 148-49, Image 148-49 (1879) available at The Making of Modern Law: Primary Sources.
§ 428. Any person who, not being threatened with or having good reason to apprehend an attack, or travelling or setting out on a journey, carries concealed about his person a bowie-knife or any other knife of like kind or description, or a pistol or fire-arms of any other kind or description, air gun, slung-shot, brass-knuckles, or other deadly or dangerous weapon, must, on conviction, be fined not less than one nor more than one hundred dollars.

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, Entitled "An Act to Adopt a Code of Laws for the State Alabama " with Such

Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources.
[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

## ALASKA

Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905 139 1906.
That it shall be unlawful for any person to carry concealed about his person, in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

1896-99 Alaska Sess. Laws 1270, An Act To Define And Punish Crimes In The District Of Alaska And To Provide A Code Of Criminal Procedure For Said District, chap. 6, § 117.
That it shall be unlawful for any person to carry concealed about his person in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

## ARIZONA

Coles Bashford, The Compiled Laws of the Territory of Arizona, Including the Howell Code and the Session Laws From 1864 to 1871, Inclusive: To Which is Prefixed the Constitution of the United States, the Mining Law of the United States, and the Organic Acts of the Territory of Arizona and New Mexico Page 96, Image 102 (1871) available at The Making of Modern Law: Primary Sources, 1867.

An Act to prevent the improper use of deadly weapons, and the indiscriminate use of fire arms in the towns and villages of the territory. § 1. That any person in this Territory, having, carrying or procuring from another person, any dirk, dirk knife, bowie knife, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry or threatening manner, not in necessary self defense, or who shall, in any manner, unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this Territory, shall be fined in any sum not less than one hundred nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, in the discretion of the court, or both such fine and imprisonment, together with the cost of prosecution.

1889 Ariz. Sess. Laws 16, An Act Defining And Punishing Certain Offenses Against The Public Peace, § 1.
If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried.

1893 Ariz. Sess. Laws 3, An Act To Regulate And Prohibit The Carrying Of Deadly Weapons Concealed, § 1.
It shall be unlawful for any person to have or carry concealed on or about his person any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife of weapon except a pocket-knife not manufactured and used for the purpose of offense and defense.

1901 Arizona 1251-53, Crimes Against the Public Peace, §§ 381, 385, 390.
§ 381. It shall be unlawful for any person (except a peace officer in actual service and discharge of his duty) , to have or carry concealed on or about his person, any pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles or other knuckles of metal, bowie-knife or any kind of knife or weapon, except a pocket knife, not manufactured and used for the purpose of offense and defense.
§ 385. If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in saddlebags, any pistol, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie- knife or any other

kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition shall forfeit to the county in which he is convicted the weapon or weapons so carried.
§ 390. Persons travelling may be permitted to carry arms within settlements or towns of the territory, for one half hour after arriving in such settlements or towns, and while going out of such towns or settlements; and sheriffs and constables of the various counties of this territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties . . .

1901 Ariz. Acts 1252, Crimes and Punishments, §§ 387, 391.
§ 387. If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering, to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty or more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.
§ 391. It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted in a conspicuous place in his bar room, or reception room . . . a plain notice to travelers to divest themselves of their weapons in accordance with section 382 . . .

**ARKANSAS**

Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835).
Race and Slavery Based | Arkansas | 1835
§ 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and

receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offense.

Josiah Gould A Digest of the Statutes of Arkansas All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 380 381–82. 1837.
Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor.

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 230-231, Image 230-231 (1871) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Arkansas | 1871
City Ordinances, § 287. Whenever there shall be found upon the person of any one, who has been found guilty of a breach of the peace, or for conduct calculated to provoke a breach of the peace, any pistol, revolver, bowie-knife, dirk, rifle, shot gun, slung-shot, colt, or knuckles of lead, brass or other metal; or when, upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of any one while in the act or commission of the act aforesaid, such person shall be fined not less than twenty-five nor more than five hundred dollars, in addition to the penalty for the breach of the peace aforesaid.

Act of Feb. 16, 1875,1874-75 Ark. Acts 156.
§ 1. That any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which said offense shall have been committed, shall be fined in any sum not less than twenty-five nor more than one hundred dollars, to be recovered by presentment or indictment in the Circuit Court, or before any Justice of the Peace of the county wherein such offense shall have been committed; Provided, That nothing herein contained shall be so construed as to prohibit any person wearing or carrying any weapon aforesaid on his own premises, or to prohibit persons traveling through the country, carrying such weapons while on a journey with their baggage, or to prohibit any officer of the law wearing or carrying such weapons when engaged in the discharge of his official duties, or any person summoned by any such officer to assist in the execution of any legal process, or any private person legally authorized to execute any legal process to him directed.

1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § §1-3.
§ 1. That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. Provided, that officers whose duties require them to make arrests or to keep and guard prisoners, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. Provided, further, that nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey or upon his own premises.
§ 2. Any person, excepting such officers, or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as is used in the army or navy of the United States, in any manner except uncovered and in his hand, shall be deemed guilty of a misdemeanor.
§ 3. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person *any person* any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.
https://cite.case.law/ark/83/26/

1923 Ark. Acts 379, An Act to Regulate the Ownership of Pistols and Revolvers, No. 430.
Be It Enacted by the People of the State or Arkansas:
From and after the passage of this Act, it shall be unlawful for any person to own or have in his custody or possession any pistol or revolver, except as herein provided:
Section 1. Any person having in his possession or custody any pistol or revolver, shall within 60 days from the approval of this Act, present such firearm to the county clerk of the county, where he resides, and it shall be the duty of the said county clerk to enter upon a separate record provided for that purpose, the name, age, place of residence, and color of the party, together with the make, calibre and number of said pistol or revolver.

**CALIFORNIA**

1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127.
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53. To Which are Prefixed the Declaration of Independence, the Constitutions of the United States and of California, the Treaty of Queretaro, and the Naturalization Laws of the United States Page 663-664, Image 682-683 (1853) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | California | 1853
Compiled Laws of California, § 127.
If any person shall be found having upon him or her any picklock, crow, key, bitt, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, shop, warehouse, or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any money, goods, and chattels, every person so offending shall, on conviction thereof, be imprisoned in the county jail not more than two years; and if any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., Etc. Page 334, Image 340 (1861) available at The Making of Modern Law: Primary Sources.
Crimes and Punishments, Art. 1904. That any person in this state having, carrying or procuring from another person any dirk, dirk-knife, bowie-knife, sword, sword-cane, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry and threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same, in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this state, shall be fined in any sum not less than one hundred, nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, at the discretion of the court, or both such fine and imprisonment, together with the costs of prosecution; which said costs shall, in all cases be computed and collected in the same manner as costs in civil cases. . . provided, nevertheless, that no sheriff, deputy sheriff, marshal, constable or other peace officer, shall be held to answer under the provisions of this act, for drawing or exhibiting any of the weapons herein-before mentioned, while in the lawful discharge of his or their duties. . .

Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon Page 261, Image 272 (1868) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | California | 1864
An Act to Prohibit the Carrying of Concealed Weapons, § 1.
Every person not being peace-officer, provost-marshal, enrolling-officer, or officer acting under the laws of the United States in the department of the provost-marshal of this State, State and Federal assessors, collectors of taxes and licenses while in

the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the county jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. § 2. Such persons, and no others, shall be deemed travelers within the meaning of this act, as may be actually engaged in making a journey at the time.

William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. 1878
Ordinances of the City of Los Angeles, § 36. In future, no persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not to exceed ten days. It is hereby made the duty of each police officer of this city, when any stranger shall come within said corporate limits wearing or carrying weapons, to, as soon as possible, give them information and warning of this ordinance; and in case they refuse or decline to obey such warning by depositing their weapons in a place of safety, to complain of them immediately.

L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896 Page 37, Image 35 (1896) available at The Making of Modern Law: Primary Sources. Misdemeanors. § 53.
No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon, or any combustible or dangerous material, without the written consent of the parent or guardian of such minor.

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Fresno, § 8.
Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, § 5.
Carrying Weapons | California | 1917
§ 5. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver, or other firearm, or any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, or bombshell or any other dangerous or deadly instrument or weapon, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

1923 Cal. Stat. 695 An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person
Dangerous or Unusual Weapons, Felons, Foreigners and Others Deemed Dangerous By the State | California | 1923
§ 1. On and after the date upon which this act takes effect, every person who within the State of California manufactures or causes to be manufactured, or who imports into the state, or who keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles, or who carries concealed upon his person any explosive substance, other than fixed ammunition, or who carries concealed upon his person any dirk or dagger, shall be guilty of a felony and upon a conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.
§ 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the

State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person.

**COLORADO**

1862 Colo. Sess. Laws 56, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1.
If any person or persons shall, within any city, town, or village in this Territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in a sum not less than five, nor more than thirty-five dollars.

1867 Colo. Sess. Laws 229, Criminal Code, § 149.
Carrying Weapons | Colorado | 1867
If any person or persons shall, within any city, town or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person, any pistol, bowie-knife, dagger or other deadly weapon, such person shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than five nor more than thirty-five dollars. The provision of this section shall not be construed to apply to sheriffs, constables and police officers, when in the execution of their official duties.

1876 Colo. Const. 30, art. II, § 13.
Post-Civil War State Constitutions | Colorado | 1876
That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when hereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

1876 Colo. Sess. Laws 304, General Laws, § 154:
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, such person, on conviction shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail no exceeding six months.

Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, Together with the Charter of Georgetown, and the Amendments Thereto: A Copy of the Patent Heretofore Issued to Georgetown by the

Government of the United States, and the Rules and Order of Business Page 100, Image 101 (1877) available at The Making of Modern Law: Primary Sources.
Offenses Affecting Streets and Public Property, § 9.
If any person or persons, within the corporate limits of Georgetown, shall be found carrying concealed, upon his or her person, any pistol, bowie knife, dagger, or other deadly weapon, such person shall, on conviction thereof, be fined in a sum not less than five dollars, nor more than fifty dollars.

Colo. Rev. Stat 1774, Carrying Concealed Weapons—Penalty—Search Without Warrant—Jurisdiction of Justice, § 248. (1881)
No person, unless authorized so to do by the chief of police of a city, mayor of a town or the sheriff of a county, shall use or carry concealed upon his person any firearms, as defined by law, nor any pistol, revolver, bowie knife, dagger, sling shot, brass knuckles or other deadly weapon . . . .

Isham White, The Laws and Ordinances of the City of Denver, Colorado Page 369, Image 370 (1886) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Colorado | 1886
City of Denver, Slung Shot – Brass Knuckles, § 10.
Whenever there shall be found upon the person of anyone who is guilty of a breach of the peace, or of conduct calculated to provoke a breach of the peace, any slung shot, colt, or knuckles of lead, brass or other metal, or, when upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of anyone while in the act of commission of the acts aforesaid, such person shall upon conviction be fined not less than twenty-five dollars nor more than three hundred dollars.

**CONNECTICUT**

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.
Good Order and Decency § 192.
Every person who shall carry in said City, any steel or brass knuckles, pistol, or any slung shot, stiletto or weapon of similar character, or shall carry any weapon concealed on his person without permission of the Mayor or Superintendent of Police in writing, shall, on conviction, pay a penalty of not less than five, nor more than fifty dollars for every such offense.

**DELAWARE**

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, § 6.
Race and Slavery Based | Delaware | 1797
And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1.
That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and peace officers.

Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix Page 987, Image 1048 (1893) available at The Making of Modern Law: Primary Sources.
An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1.
§ 1. That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and other peace officers.
§ 2. That if any person shall, except in lawful self-defense discharge any firearm in any public road in this State, shall be deemed guilty of a misdemeanor and upon

conviction thereof shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one month, or both at the discretion of the court.

**DISTRICT OF COLUMBIA**

1 William B. Webb The Laws of the Corporation of the of Washington Digested and Arranged under Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18, 1858.
It shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles within the City of Washington; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapon shall forfeit and pay upon such conviction not less than twenty dollars nor more than fifty dollars; which fines shall be prosecuted and recovered in the same manner as other penalties and forfeitures accruing to the city are sued for and recovered: Provided, That the Police officers when on duty shall be exempt from such penalties and forfeitures.

An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872).
Carrying Weapons | | 1871
Ch. XXV. Be in enacted by the Legislative Assembly of the District of Columbia, That it shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles, within the District of Columbia; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapons shall forfeit and pay, upon such a conviction, not less than twenty dollars nor more than fifty dollars, which fine shall be prosecuted and recovered in the same manner as other penalties and forfeitures are sued for and recovered: Provided, That the officers, non-commissioned officers, and privates of the United States army, navy, and marine corps, police officers, and members of any regularly organized militia company or regiment, when on duty, shall be exempt from such penalties and forfeitures.

Washington D.C. 27 Stat. 116 (1892)
CHAP. 159.–An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.

SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: Provided, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: Provided, further, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: Provided further, That nothing contained in the first or-second sections of this act shall be so construed as to apply. to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition.

SEC. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment

in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years.

SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case.

SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties, to be by them approved, conditioned in such penal sum as they shall fix to the United States for the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine. Any police officer failing to arrest any person guilty in his sight or presence and knowledge, of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars.

SEC 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed.

**FLORIDA**

John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources, 1835.
An Act to Prevent any Person in this Territory from Carrying Arms Secretly. Be it Enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person in this Territory to carry arms of any kind whatsoever secretly, on or about their persons; and if any dirk, pistol, or other arm, or weapon, except a common pocket-knife, shall be seen, or known to be secreted upon the person of any one in this Territory, such person so offending shall, on conviction, be fined not exceeding five hundred dollars, and not less than fifty dollars, or imprisoned not more than six months, and not less than one month, at the discretion of the jury: Provided, however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes; and it shall be the duty of judges of the superior courts in this Territory, to give the matter contained in this act in special charge to the grand juries in the several counties in this Territory, at every session of the courts.

1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838).
No. 24. An Act in addition to An Act, (approved January 30th, 1835) entitled An Act to prevent any person in this Territory from carrying arms secretly.
Section 1. Be it enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person or persons in this Territory to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum, and all persons carrying said weapons openly shall pay to the officer aforesaid a tax of ten dollars per annum; and it shall be the duty of said officer to give the parties so paying a written certificate, stating that they have complied with the provisions of this act. Four fifths of all monies so collected to be applied by the county courts to county purposes, the other fifth to be paid to the prosecuting attorney.
Sec. 2. Be it further enacted, That if any person shall be known to violate this act, he or they so offending, shall be subject to an indictment, and on conviction, to a fine of not less than two hundred nor exceeding five hundred dollars, at the discretion of the court.

Sec. 3. Be it further enacted, That it shall be the duty of the several Judges of the Superior Courts of this Territory, to give this act in charge to the grand juriors [sic] of their respective districts at each term of the court.
Passed 5th February 1838.—Approved 10th Feb. 1838.
https://www.google.com/books/edition/Acts_of_the_Legislative_Council_of_the_T/-LIwAQAAMAAJ?hl=en&gbpv=1&dq=%22vend+dirks,+pocket+pistols,+sword+canes,+or+bowie+knives%22&pg=PA36&printsec=frontcover

Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425.
Manufacturing or selling slung shot: Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind usually known as slung-shot, or metallic knuckles, shall be punished by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars.

1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, chap. 7, § 10.
Sentence Enhancement for Use of Weapon | Florida | 1868
Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace, is armed with or has on his person slung shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding three months, or by fine not exceeding one hundred dollars.

James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, Page 403, Image 419 (1881) available at The Making of Modern Law: Primary Sources. [1868] Offences Against Public Peace, § 13.
Whoever shall carry arms of any kind whatever, secretly, on or about their person, or whoever shall have about or on their person any dirk, pistol or other arm or weapon, except a common pocket knife, upon conviction thereof shall be fined in a sum not exceeding one hundred dollars, or imprisoned in the county jail not exceeding six months.

Florida Act of Aug. 6, 1888, chap. 1637, subchap. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) 2423.
Persons Engaged in criminal offense having weapons. – Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the

public peace is armed or has on his person slung-shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding one year and by fine not exceeding fifty dollars.

## GEORGIA

Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions Page 599, Image 605 (1821) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Georgia | 1816
Offences Against the Public Peace, (1816) § 19.
If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with intent feloniously to break and enter into any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, or shall have upon him any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, with intent to steal any goods or chattels; every such person shall be deemed a rogue and vagabond, and on conviction, shall be sentenced to undergo an imprisonment in the common jail of the county, or in the penitentiary, at hard labour, for such period of time as the jury shall recommend to the court.

1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4.
§ 1 . . . it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c.
§ 2. And be it further enacted by the authority aforesaid, That any person or persons within the limits of this State, violating the provisions of this act, except as hereafter excepted, shall, for each and every such offence, be deemed guilty of a high misdemeanor, and upon trial and conviction thereof, shall be fined, in a sum

not exceeding five hundred dollars for the first offence, nor less than one hundred dollars at the direction of the Court; and upon a second conviction, and every after conviction of a like offence, in a sum not to exceed one thousand dollars, nor less than five hundred dollars, at the discretion of the Court.
§ 3. And be it further enacted by the authority aforesaid, That it shall be the duty of all civil officers, to be vigilant in carrying the provisions of this act into full effect, as well also as Grand Jurors, to make presentments of each and every offence under this act, which shall come under their knowledge.
§4. And be it further enacted by the authority aforesaid, That all fines and forfeitures arising under this act, shall be paid into the county Treasury, to be appropriated to county purposes: Provided, nevertheless, that the provisions of this act shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise: Provided, also, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view: And provided, nevertheless, that the provisions of this act shall not extend to prevent venders, or any other persons who now own and have for sale, any of the aforesaid weapons, before the first day of March next.

1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1.
[A]ny person other than the owner, who shall sell or furnish to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defense, shall, on indictment and conviction, be fined by the Court in a sum not exceeding five hundred dollars, and imprisoned in the common Jail of the county not exceeding six months . . .

R. H. Clark, The Code of the State of Georgia (1873) § 4528 – Deadly weapons not to be carried in public places
No person in this State is permitted or allowed to carry about his or her person, any dirk, bowie knife, pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State, except militia muster grounds; and if any person or persons shall violate any portion of this section, he, she or they shall be guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or

imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the Court.

**HAWAII**

1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1852
§ 1. Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons: and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate.

1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1913
§ 3089. Persons not authorized; punishment. Any person not authorized by law, who shall carry, or be found armed with any bowie-knife, sword-cane, pistol, air-gun, slung-shot, or other deadly weapon, shall be liable to a fine of not more than Two Hundred and Fifty Dollars and not less than Ten Dollars, or in default of payment of such fine, to imprisonment of a term not exceeding one year, nor less than three months, upon conviction for such offense, unless good cause be shown for having such dangerous weapon; and any such person may be immediately arrested without warrant by the high sheriff, or any sheriff, policeman, or other officer or person.

**IDAHO**

Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho 354 (M. Kelly, Territorial Printer 1875).
Carrying Weapons | Idaho | 1875
§ 133. If any person shall have found upon him or her any pick-lock, crow-key, bit or other instrument or tool, with intent feloniously to crack and enter into any dwelling-house, store, shop, warehouse, or other building containing valuable property, or shall be found in the aforesaid buildings with intent to steal any money, goods and chattels, every person so offending shall, on conviction thereof, be imprisoned in the Territorial prison for a term not less than one year nor more

than five years; and if any person shall have upon him or her any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894 Page 118-119, Image 119-120 (1894) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Idaho | 1879
Carrying Concealed Weapons, § 36.
Every person not being a sheriff, deputy sheriff, constable or other police officer, who shall carry or wear within the incorporated limits of Boise City, Idaho, any bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or other dangerous or deadly weapons, concealed, unless such persons be traveling or setting out on a journey, shall, upon conviction thereof before the city magistrate of said Boise City, be fined in any sum not exceeding twenty-five dollars for each offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment.

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.
Carrying Weapons | Idaho | 1909
If any person, (excepting officials of a county, officials of the State of Idaho, officials of the United States, peace officers, guards of any jail, any officer of any express company on duty), shall carry concealed upon or about his person any dirk, dirk knife, bowie knife, dagger, slung shot, pistol, revolver, gun or any other deadly or dangerous weapon within the limits or confines of any city, town or village, or in any public assembly, or in any mining, lumbering , logging, railroad, or other construction camp within the State of Idaho . . . .

## **ILLINOIS**

Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A. D. 1844-’5: Together with an Appendix Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force Page 176, Image 188 (1845) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | Illinois | 1845
Criminal Jurisprudence, § 139. If any person shall be found,, having upon him or her, any pick-lock, crow, key, bit, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, warehouse, shop or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any goods and chattels, every such person so offending, shall, on conviction, be deemed a vagrant, and punished by confinement in the penitentiary, for any term not exceeding two years. And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined, in a sum not exceeding one hundred dollars, or imprisoned, not exceeding three months.

Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874. Comprising the Revised Acts of 1871-2 and 1873-4, Together with All Other General Statutes of the State, in Force on the First Day of July, 1874 Page 360, Image 368 (1874) available at The Making of Modern Law: Primary Sources.
Disorderly Conduct: Disturbing the Peace, § 56.
Whoever, at a late and unusual hour of the night time, willfully and maliciously disturbs the peace and quiet of any neighborhood or family, by loud or unusual noises, or by tumultuous or offensive carriage, threatening, traducing, quarreling, challenging to fight or fighting, or whoever shall carry concealed weapons, or in a threatening manner display any pistol, knife, slungshot, brass, steel or iron knuckles, or other deadly weapon, day or night, shall be fined not exceeding $100.

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park [Illinois] Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources.
Misdemeanors, § 39.
No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by written permission of the Captain of Police.

Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882 Page 375, Image 392 (1882) available at The Making of Modern Law: Primary Sources. [1881]
Deadly Weapons: Selling or Giving to Minor. § 54b.
Whoever, not being the father, guardian, or employer or the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25), nor more than two hundred ($200).

Revised Ordinances of the City of Danville [Illinois] Page 66, Image 133 (1883) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Danville. Concealed Weapons. § 22.
Whoever shall carry concealed upon or about his person any pistol, revolver, derringer, bowie-knife, dirk, slung-shot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon of like character, capable or being concealed upon the person, or whoever shall in a threatening or boisterous manner, flourish or display the same, shall be fined not less than one dollar, nor more than one hundred dollars; and in addition to the said penalty shall, upon the order of the magistrate before whom such conviction is had, forfeits the weapon so carried to the city.

Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88. Possession or sale forbidden, § 1.
Be it enacted by the people of the state of Illinois represented in the General Assembly. That whoever shall have in his possession, or sell, or give or loan, hire or barter, or whoever shall offer to sell, give loan, have or barter, to any person within this state, any slung shot or metallic knuckles, or other deadline weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor . . .

**INDIANA**

1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4.
And be it further enacted, That no slave or mulatto whatsoever shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive, but all and every gun weapon and ammunition found in the possession or custody

of any negro or mulatto, may be seized by any person and upon due proof thereof made before any justice of the peace of the district where such seizure shall be, shall by his order be forfeited to the seizor, for his use and moreover every such offender shall have and receive by order of such justice any number of loashes not exceeding thirty nine on his or her bare back, well laid for every such offense.

1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1.
That any person who shall shoot a gun, pistol, or other weapon, or throw a stone, stick, clubs, or any other substance whatever at or against any locomotive, or car, or train of cars containing persons on any railroad in this State, shall be deemed guilty of a misdemeanor . . .

1859 Ind. Acts 129, An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide Punishment Therefor.
§ 1. Be it enacted by the General Assembly of the State of Indiana, That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars.

1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, And Prescribing Penalties Therefore, § 1.
That if any person shall draw or threaten to use any pistol, dirk, knife, slung shot, or any other deadly or dangerous weapon upon any other person he shall be deemed guilty of a misdemeanor, and upon conviction therefor, shall be fined in any sum not less than one nor more than five hundred dollars, to which may be added imprisonment in the county jail not to exceed six months; That the provisions of this act shall not apply to persons drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law.

The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1 Page 366, Image 388 (1881) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Indiana | 1881
Crimes. § 1957. Attacking Public Conveyance. 56. Whoever maliciously or mischievously shoots a gun, rifle, pistol, or other missile or weapon, or throws a stone, stick, club, or other substance whatever, at or against any stage-coach,

locomotive, railroad-car, or train of cars, or street-car on any railroad in this State, or at or against any wharf-boat, steamboat, or other water-craft, shall be imprisoned in the county jail not more than one year nor less than thirty days, and fined not more than one hundred dollars nor less than ten dollars.

1905 Ind. Acts 677, Public Conveyance—Attacking, § 410.
Sensitive Places and Times | Indiana | 1905
Whoever maliciously or mischievously shoots a gun, rifle, pistol or other weapon, or throws a stone, stick, club or any other substance whatever, at or against any stage coach, or any locomotive, railroad car, or train of cars, street car, or interurban car on any railroad in this state, or at or against any wharf-boat, steamboat, or other watercraft, shall be imprisoned in the county jail not less than thirty days nor more than one year, and fined not less than ten dollars nor more than one hundred dollars.

**IOWA**

S. J. Quincy, Revised Ordinances of the City of Sioux City. Sioux City, Iowa Page 62, Image 62 (1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1882
Ordinances of the City of Sioux City, Iowa, § 4.
No person shall, within the limits of the city, wear under his clothes, or concealed about his person, any pistol, revolver, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or any bowie-knife, razor, billy, dirk, dirk-knife or bowie-knife, or other dangerous weapon. Provided, that this section shall not be so construed as to prevent any United States, State, county, or city officer or officers, or member of the city government, from carrying any such weapon as may be necessary in the proper discharge of his official duties.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1887
Carrying Concealed Weapons Prohibited, § 105.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sand bag, air guns of any description, dagger, bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device; provided that

this section shall not be construed to prohibit any officer of the United States, or of any State, or any peace officer, from wearing and carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1900
Ordinances City of Des Moines, Weapons, Concealed, § 209.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sand bag, air guns of any description, dagger, bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. Provided, that this section shall not be construed to prohibit any officer of the United States or of any State, or any peace officer from wearing or carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

1913 Iowa Acts 307, ch. 297, § 2
§ 1. It shall be unlawful for any person, except as hereinafter provided, to go armed with and have concealed upon his person a dirk, dagger, sword, pistol, revolver, stiletto, metallic knuckles, picket billy, sand bag, skull cracker, slung-shot, or other offensive and dangerous weapons or instruments concealed upon his person.

**KANSAS**

C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1862
An Ordinance Relating to Misdemeanors, § 23.
For carrying or having on his or her person in a concealed manner, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city, a fine not less than three nor more than one hundred dollars.

Samuel Kimball, Charter, Other Powers, and Ordinances of the City of Lawrence Page 149, Image 157 (1866) available at The Making of Modern Law: Primary Sources, 1863.
Nuisances, § 10. Any person who shall in this city have or carry concealed or partially concealed, upon his person, any pistol, bowie knife or other deadly weapon, shall, on conviction, be fined not less than one nor more than ten dollars; Provided, This section shall not apply to peace officers of the city or state. The carrying of a weapon in a holster, exposed to full view, shall not be deemed a concealed or partially concealed weapon under this section.

The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources, 1868.
Crimes and Punishments, § 282. Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

Revised Ordinances of the City of Salina, Together with the Act Governing Cities of the Second Class: Also a Complete List of the Officers of Salina During its Organization as a Town and City of the Second and Third Class Page 99, Image 100 (1879) available at The Making of Modern Law: Primary Sources. 1879 Ordinances of the City of Salina, An Ordinance Relating to the Carrying of Deadly Weapons, § 1. That it shall be unlawful for any person to carry on or about his person any pistol, bowie knife, dirk, or other deadly or dangerous weapon, anywhere within the limits of the city of Salina, save and except as hereinafter provided. § 2. This ordinance shall not apply to cases when any person carrying any weapon above mentioned is engaged in the pursuit of any lawful business, calling or employment and the circumstances in which such person is placed at the time aforesaid, are such as to justify a prudent man in carrying such weapon, for the defense of his person, property or family, nor to cases where any person shall carry such weapon openly in his hands, for the purpose of sale, barter, or for repairing the same, or for use in any lawful occupation requiring the use of the same. § 3. Any person violating any of the provisions of this ordinance shall, upon

conviction thereof before the police court, be fined in any sum not less that twenty-five nor more than one hundred dollars.

1881 Kan. Sess. Laws 92, c. 37, § 24.
The Council shall prohibit and punish the carrying of firearms, or other dangerous or deadly weapons, concealed or otherwise, and cause to be arrested and imprisoned, fined or set to work, all vagrants, tramps, confidence men and persons found in said city without visible means of support or some legitimate business.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council Page 162, Image 157 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1887
Weapons, § 27. Any person who in this city shall draw any pistol or other weapon in a hostile manner, or shall make any demonstration or threat of using such weapon on or against any person; or any person who shall carry or have on his or her person, in a concealed manner, any pistol, dirk, bowie-knife, revolver, slung-shot, billy, brass, lead, or iron knuckles, or any deadly weapon, within this city, shall be fined not less than five dollars, nor more than one hundred dollars: Provided, that this ordinance shall not be so construed as to prohibit officers of the law while on duty from being armed.

Bruce L. Keenan, Book of Ordinances of the City of Wichita Published by Authority of a Resolution Adopted by the City Council April 24, 1899, under the Direction of Judiciary Committee and City Attorney, and Formally Authorized by

Ordinance No. 1680 Page 46, Image 70 (1900) available at The Making of Modern Law: Primary Sources. 1899
Ordinances of the City of Wichita, Carrying Unconcealed Deadly Weapons, § 2. Any person who shall in the city of Wichita carry unconcealed, any fire-arms, slungshot, sheath or dirk knife, or any other weapon, which when used is likely to produce death or great bodily harm, shall upon conviction, be fined not less than one dollar nor more than twenty-five dollars. Using or Carrying Bean Snapper, § 3. Any person who shall, in the city of Wichita, use or carry concealed or unconcealed, any bean snapper or like articles shall upon conviction be fined in any sum not less than one dollar nor more than twenty-five dollars. Carrying Concealed Deadly Weapons, § 4. Any person who shall in the city of Wichita, carry concealed about his person any fire-arm, slung shot, sheath or dirk knife, brass knuckles, or any weapon, which when used is likely to produce death or great bodily harm, shall upon conviction, be fined in any sum not exceeding one hundred dollars.

**KENTUCKY**

1798 Ky. Acts 106. No negro, mulatto, or Indian whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive but all and every gun, weapon and ammunition found in the possession or custody of any negro, mulatto or Indian may be seized by any person and upon due proof thereof made before any justice of the peace of the county where such seizure shall be shall by his order, be forfeited to the seizor for his own use, and moreover every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her back, well laid for every such offense.

1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.
If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.

**LOUISIANA**

1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unneccessary Manner, § 1.
Carrying Weapons | Louisiana | 1813

Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened, That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine . . . .

Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841 at 252 (E. Johns & Co., New Orleans, 1842).
Carrying Weapons | Louisiana | 1842
[A]ny person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him, that do not appear in full open view, any person so offending, shall, on conviction thereof, before an justice of the peace, be subject to pay a fine not to exceed fifty dollars, nor less than twenty dollars . . . .

Louisiana 1855 law 1855 La. L. Chap. 120, Sec. 115, p. 148
Sec. 115, Be it further enacted, &c., That whoever shall carry a weapon or weapons concealed on or about his person, such as pistols, bowie knife, dirk, or any other dangerous weapon, shall be liable to prosecution by indictment or presentnient, and on conviction for the first offence shall be fined not less than two hundred and fifty dollars nor more than five hundred dollars, or imprisonment for one month; and for the second offence not less than five hundred dollars nor more than one thousand dollars, or imprisonment in the parish prison at the discretion of the court, not to exceed three months, and that it shall be the duty of the Judges of the District Courts in this State to charge the Grand Jury, specially as to this section.
https://babel.hathitrust.org/cgi/pt?id=osu.32437123281277&view=1up&seq=300&q1=Bowie

1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the Freedom of Party Election . . . , § 73.
Subject(s): Sensitive Places and Times
[I]t shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed

guilty of a misdemeanor; and on conviction shall be punished by a fine of not less than one hundred dollars, and imprisonment in the parish jail not less than one month . . . .

La. Const. of 1879, art. III.
Post-Civil War State Constitutions | Louisiana | 1879
A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed.

**MAINE**

An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in CUMBERLAND GAZETTE (Portland, MA.), Nov. 17, 1786, at 1. On October 26, 1786 the following was passed into law by the Massachusetts Assembly: That from & after the publication of this act, if any persons, to the number of twelve, or more, being armed with clubs or other weapons; or if any number of persons, consisting of thirty, or more, shall be unlawfully, routously, rioutously or tumultuously assembled, any Justice of the Peace, Sheriff, or Deputy ... or Constable ... shall openly make [a] proclamation [asking them to disperse, and if they do not disperse within one hour, the officer is] ... empowered, to require the aid of a sufficient number of persons in arms ... and if any such person or persons [assembled illegally] shall be killed or wounded, by reason of his or their resisting the persons endeavoring to disperse or seize them, the said Justice, Sheriff, Deputy-Sheriff, Constable and their assistants, shall be indemnified, and held guiltless.

1821 Me. Laws 285, ch. 76, § 1.
Be it enacted by the Senate, and House of Representatives, in Legislature assembled, That it shall be within the power, and be the duty of every Justice of the Peace within this county, to punish by fine not exceeding five dollars, all assaults and batteries that are not of a high and aggravated nature, and to examine into all homicides, murders, treasons, and felonies done and committed in this county, and commit to prison all persons guilty, or suspected to be guilty of manslaughter, murder, treason or other capital offence; and to cause to be staid and arrested, all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State, or such others as may utter any menaces or threatening speeches; and upon view of such Justice, confession of the delinquent or other legal conviction of any such offence, shall require of the offender to fund sureties to appear and answer for his offence,

at the Supreme Judicial Court, or Circuit Court of Common Pleas, next to be held within or for the same county at the discretion of the Justice, and as the nature or circumstances of the case may require;

The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix Page 709, Image 725 (1847) available at The Making of Modern Law: Primary Sources.
Justices of the Peace, § 16.
Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may, on the complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term, not exceeding one year, with the right of appeal as before provided.

1841 Me. Laws 709, ch. 169, § 16.
If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having resonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884 Page 928, Image 955 (1884) available at The Making of Modern Law: Primary Sources.
Prevention of Crimes, § 10.
Whoever goes armed with any dirk, pistol, or other offensive and dangerous weapon, without just cause to fear an assault on himself, family, or property, may, on complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties to keep the peace for a term not exceeding one year, and in case of refusal, may be committed as provided in the preceding sections.

**MARYLAND**

The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The

Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1809 If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent feloniously to break and enter into any dwelling-house, ware-house, stable or out-house, or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, warehouse, stable or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, every such person shall be deemed a rouge and vagabond, and, on being duly convicted thereof, shall be sentenced to undergo a confinement in the said penitentiary for a period of time not less than three months nor more than two years, to be treated as law prescribes.

1872 Md. Laws 57, An Act To Add An Additional Section To Article Two Of The Code Of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," To Prevent The Carrying Of concealed Weapons In Said City, § 246.
Carrying Weapons | Maryland | 1872
It shall not be lawful for any person to carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected. . .

John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 incorporated therein Page 1457, Image 382 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Maryland | 1874
Election Districts–Fences. § 99.
It shall not be lawful for any person in Kent county to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof before any justice of the peace of said county, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county until the same shall be paid.

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local

Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1884
City of Baltimore, § 742.
Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall be taken before any of the police justices of the peace of the said city, and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found, which said fine shall be collected as other fines are now collected; provided, however, that the provisions of this section shall not apply to those persons who, as conservators of the peace are entitled or required to carry a pistol or other weapon as a part of their official equipment.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1:
That from and after the passage of this act, it shall not be lawful for any person in Calvert County to carry, on the days of election and primary election within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for each such offense. . .

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the State Page 468-469, Image 568-569 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Maryland | 1886
Concealed Weapons, § 30.
Every person, not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie- knife, slung-shot, billy, sand-club, metal knuckles, razor, or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted,)

concealed upon or about his person; and every person who shall carry or wear any such weapon openly, with the intent or purpose of injuring any person, shall, upon conviction thereof, be fined not more than five hundred dollars, or be imprisoned not more than six months in jail or in the house of correction.

John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-1892, and of 1892-1893, up to the Summer Recess of 1893 Page 297-298, Image 306-307 (1893) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Maryland | 1890
Ordinances of Baltimore, § 742A.
Every person in said city of Baltimore not being a conservator of the peace, entitled or required to carry such weapons as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie-knife, sling-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (pen knives excepted.) concealed upon or about his person; and every person who shall carry or wear such weapons openly, with the intent or purpose of injuring any person, shall, upon a conviction thereof, be fined not more than five hundred dollars, and be imprisoned not more than six months in jail or in the house of correction; that this act shall not release or discharge any person or persons already offending against the general law in such cases made and provided, but any such person or persons may be proceeded against, prosecuted and punished under the general law of this State as if this act had not been passed.

**MASSACHUSETTS**

1 Records of the Governor and Company of the Massachusetts Bay in New England 211-12 (Nathanial B. Shurtleff ed., 1853). 1637.
Whereas the opinions & revelations of Mr. Wheeleright & Mrs. Hutchinson have seduced & led into dangerous errors many of the people heare in Newe England, insomuch as there is just cause of suspition that they, as others in Germany, in former times, may, upon some revelation, make some suddaine irruption vpon those that differ from them in judgment, for prevention whereof it is ordered, that all those whose names are vnderwritten shall (vpon warning given or left at their dwelling houses) before the 30th day of this month of November, deliver in at Mr. Canes house, at Boston, all such guns, pistols, swords, powder, shot, & match as

they shalbee owners of, or have in their custody, vpon paine of ten pound for ev'y default to bee made therof ; which armes are to bee kept by Mr. Cane till this Court shall take further order therein. Also, it is ordered, vpon like penulty of x', that no man who is to render his armes by this order shall buy or borrow any guns, swords, pistols, powder, shot, or match, vntill this Court shall take further order therein. . . . The like order is taken for other townes, changing the names of those who shall deliver their armes, & keepe them. . . . It was ordered, that if any that are to bee disarmed acknowledg their siun in subscribing the seditions -libell, or do not

justify it, but acknowledg it evill to two magistrates, they shalbee thereby freed from delivering in their armes according to the former order./ file:///C:/Users/Bob/Downloads/ocm3522063_vol1.pdf

1749-51 Mass. Acts 339, An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, ch. 12. 1751
"Whereas the Provision already made by Law has been found insufficient to prevent Routs, Riots, and tumultuous Assemblies, and the evil Consequences thereof : Wherefore,
Be it enacted by the Lieutenant Governour Council and House of Representatives, That from and after the Publication of this Act, if any Persons to the Number of Twelve or more, being Arm'd with Clubs or other Weapons, or if any Number of Persons consisting of Fifty or upwards, whether armed or not, shall be unlawfully riotously or tumultuously assembled; any Justice of the Peace, Field-Officer or Captain of the Militia, Sheriff of the County or Under-Sheriff, or any Constable of the Town, shall among the Rioters, or as near to them as he can safely come, command Silence while Proclamation is making, and shall openly make Proclamation in these or the like Words,
Our Sovereign Lord the KING, chargeth and commandeth all Persons, being assembled, immediately to disperse themselves, and peaceably to depart to their Habitations, or to their lawful Business, upon the Pains contained in the Act of this Province made in the twenty-fourth Year of His Majesty King GEORGE the Second, for preventing and suppressing of Riots, Routs, and unlawful Assemblies. GOD save the King.
And if such Persons so unlawfully assembled, shall after Proclamation made, not disperse themselves within one Hour, it shall be lawful for every such Officer or Officers and for such other Persons as he or they shall command to be assisting, to seize such Persons, and carry them before a Justice of Peace: And if such Person shall be killed or hurt by Reason of their resisting the Persons so dispersing or seizing them, the said Officer or Officers and their Assistants shall be indemnified and held guiltless…"
The following links to a version of this law that is contemporaneous with the original session law, but seems to have been published separately as a notice: An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, 1750. https://firearmslaw.duke.edu/wp-content/uploads/2020/03/1749-51-Mass.-Acts-339.pdf

1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1, 2.

All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . ; § 2 That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.

Theron Metcalf, The Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835; to Which are Subjoined, an Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, Both Passed in February 1836; and to Which are Prefixed, the Constitutions of the United States and of the Commonwealth of Massachusetts Page 750, Image 764 (1836) available at The Making of Modern Law: Primary Sources.
Of Proceedings to Prevent the Commission of Crimes, § 16.
If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1850 Mass. Gen. Law, chap. 194, §§ 1, 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 10.
Whoever when arrested upon a warrant of a magistrate issued against him for an alleged offense against the laws of this state, and whoever when arrested by a sheriff, deputy sheriff , constable, police officer, or watchman, while committing a criminal offense against the laws of this state, or a breach or disturbance of the public peace, is armed with, or has on his person, slung shot, metallic knuckles, bills, or other dangerous weapon, shall be punished by fine . . .

1850 Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164 (1873) § 11.
Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles, shall be punished by fine not less than fifty dollars, or by imprisonment in the jail not exceeding six months.

Third Annual Report of the Park Commissioners of the City of Lynn for the year ending December 20, 1891, at 23, Ordinances. 1891

The Board of Park Commissioners of the City of Lynn, by virtue of its authority to make rules for the use and government of the Public Parks of said City, and for breaches of such rules to affix penalties, hereby ordains that within the limits of Lynn Woods, Meadow Park and Oceanside, except with the prior consent of the Board, it is forbidden: . . .

3. To throw stones or other missiles; to discharge or carry firearms, except by members of the police force in the discharge of their duties; to discharge or carry fire – crackers, torpedoes or fireworks; to make fires; to have any intoxicating beverages; to sell, to offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions; to play games of chance, or have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

Rules and Regulations Governing the Public Parks within the City of Lowell, at 58 (1903)

The Board of Park Commissioners of the City of Lowell, by virtue of its authority to make rules and regulations for the use and government of the Public Parks and Commons of said City, and to fix penalties for breaches of rules and regulations, hereby ordains that, within such Public Parks and Commons, except by and with the consent of the Board: . . .

3. It is forbidden to throw stones, balls or other missiles; to discharge or carry firearms, fire crackers, torpedoes or fire-works; to make fires; to have any intoxicating beverages; to sell, offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions, to play games of chance, or to have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to commit any obscene or indecent act; to solicit the acquaintance of, or to follow, or in any way annoy visitors to said Parks and Commons.

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)

Carrying Weapons | Massachusetts | 1927

Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk

knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . . .

**MICHIGAN**

1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefore, § 1.
It shall be unlawful for any person, except officers of the peace and night-watches legitimately employed as such, to go armed with a dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sand bag, skull cracker, slung shot, razor or other offensive and dangerous weapon or instrument concealed upon his person.

1891 Mich. Pub. Acts 409, Police Department, pt 15:. . . . And all persons who shall carry concealed on or about their persons, any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag, false knuckles, or other dangerous weapon, or who shall lay in wait , lurk or be concealed, with intent to do injury to any person or property, who shall threaten to beat or kill another or injure him in his person or property . . . shall be deemed a disorderly person, and upon conviction thereof may be punished by a fine not exceeding one hundred dollars and the costs of prosecution, and in imposition of any such fine and costs the court may make a further sentence that in default of payment, such offender be imprisoned in the city prison. . .

1913 Mich. Pub. Acts 452, An Act Defining the Crime of Felonious Assault and Prescribing Punishment Therefor, § 1.
Whoever shall assault another with a gun, revolver, pistol, knife, iron bar, club, brass knuckles or other dangerous weapon, but without intending to commit the crime of murder, and without intending to inflict great bodily harm less than the crime of murder, shall be deemed guilty of a felonious assault, and upon conviction shall be punished by imprisonment in the State Prison for a term not exceeding three years or by imprisonment in the county jail for a term not exceeding one year, in the discretion of the court.

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

Dangerous or Unusual Weapons | Michigan | 1927
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1929
It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

**MINNESOTA**

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources.
Concealed Weapons – License, § 1.
It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2. Any such weapons or weapons, duly adjudged by the municipal court of said city to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about

their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1888
Making, Selling, etc., Dangerous Weapons, §§ 333-334.
§ 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor.
Carrying, using, etc., certain Weapons . . . .
§ 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

**MISSISSIPPI**

1799 Miss. Laws 113, A Law For The Regulation Of Slaves. No Negro or mulatto shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun, weapon and ammunition found in the possession or custody of any negro or mulatto may be seized by any person . . . every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

1804 Miss. Laws 90, An Act Respecting Slaves, § 4. No Slave shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with . . .

1837 Miss. Law 289-90, An Act To Prevent The Evil Practice Of Dueling In This State And For Other Purposes, § 5.
That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any person shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Laws of the State of Mississippi ; embracing all Acts of a Public Nature from January Session, 1824, to January Session 1838, Inclusive Page 736, Image 738 (Jackson, 1838) available at The Making of Modern Law: Primary Sources, 1838. An Act to Prevent the Evil Practice of Dueling in this State, and for other Purposes, § 5. Be it further enacted, That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town, or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any persons shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Volney Erskine Howard, The Statutes of the State of Mississippi of a Public and General Nature, with the Constitutions of the United States and of this State: And an Appendix Containing Acts of Congress Affecting Land Titles, Naturalization, &c, and a Manual for Clerks, Sheriffs and Justices of the Peace Page 676, Image 688 (1840) available at The Making of Modern Law: Primary Sources. 1840 Crimes, Misdemeanors and Criminal Prosecution, § 55. If any person having or carrying any dirk, dirk knife, Bowie knife, sword, sword cane, or other deadly weapon, shall, in the presence of three or more persons, exhibit the same in a rude, angry and threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in the circuit or criminal court of the proper county, shall be fined in a sum not exceeding five hundred dollars, and be imprisoned not exceeding three months.

1878 Miss. Laws 175, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, § 1.

That any person not being threatened with or having good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a long journey, or peace officers, or deputies in discharge of their duties, who carries concealed in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offense by a fine of not less than five dollars nor more than one hundred dollars . . .

**MISSOURI**

Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates Page 374, Image 386 (1818) available at The Making of Modern Law: Primary Sources. 1818.
Slaves, § 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. § 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes or of the owners of such as are slaves.

Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Missouri | 1871
Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10.
§ 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife,

dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence.
§ 10. Nothing in the preceding section shall be so construed as to prevent any United States, State, county or city officer, or any member of the city government, from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure"
§ 1274.
If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the siting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit and such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

William K. Amick, The General Ordinances of the City of Saint Joseph (A City of the Second Class) Embracing all Ordinances of General Interest in Force July 15, 1897, together with the Laws of the State of Missouri of a General Nature Applicable to the City of St. Joseph. Compiled and Arranged Page 508, Image 515 (1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Missouri | 1897
Concealed Weapons – Carrying of, § 7.
Any person who shall in this city wear under his clothes or carry concealed upon or about his person, or be found having upon or about his person concealed, any pistol or revolver, colt, billy, slung shot, cross knuckles or knuckles of lead, brass

or other metal, dirk, dagger, razor, bowie knife, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, shall be deemed guilty of a misdemeanor.

Joplin Code of 1917, Art. 67, § 1201. Missouri. Weapons; Deadly.
If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.

1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17.
Sensitive Places and Times | Missouri | 1923
Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half inches in length, any sling shot, brass knucks [sic], billy, club or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than two years. Provided, that this section shall not apply to any person

or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes.

**MONTANA**

1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1.
If any person shall within any city, town, or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie-knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than twenty five dollars, nor more than one hundred dollars.

1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23.
If any person shall, by previous appointment or agreement, fight a duel with a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon, and in so doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall be punished accordingly [death by hanging].

1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63.
Every person in this territory having, carrying, or procuring from another person, any dirk, dirk-knife, sword, sword-cane, pistol, gun, or other deadly weapon, who shall in the presence of one or more persons, draw or exhibit any of said deadly weapons in a rude or angry or threatening manner, not in necessary self defense, or who shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county in this territory shall be fined in any sum not less than ten dollars nor more than one hundred dollars, or imprisoned in the county jail not less than one month nor more than three months, at the discretion of the court, or by both such fine and imprisonment, together with the costs of prosecution, which said costs shall in all cases be computed and collected in the same manner as costs in civil cases; and all fines and forfeitures arising under the provisions of this act shall be paid into the county treasury for school purposes: Provided, that no sheriff, deputy

sheriff, constable, marshal, or other peace officer, shall be held to answer, under the provisions of this act, for drawing or exhibiting any of the weapons hereinbefore mentioned while in the lawful discharge of his or their duties.

1887 Mont. Laws 549, Criminal Laws, § 174.
If any person shall have upon him or her any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

**NEBRASKA**

1858 Neb. Laws 69, An Act To Adopt And Establish A Criminal code For The Territory Of Nebraska, § 135.
And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon with intent to assault any person, every such person, on conviction, shall be fined in a sum not exceeding one hundred dollars. . .

Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska Page 36, Image 36 (1872) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1872
Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1.
Be it ordained by the Mayor and Councilmen of the City of Nebraska City, That it shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy slung shot, brass or other metallic knuckles, or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb; Provided, that nothing herein contained shall prevent the carrying of such weapon by a civil or military officer, or by a soldier in the discharge of his duty, nor by any other person for mere purposes of transportation from one place to another.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1890
Ordinances of Omaha, Concealed Weapons, § 10.

It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of the city of Omaha. Any person guilty of a violation of this section shall, on conviction, be fined not exceeding one hundred ($100) dollars for each and every offense; nothing in this section, however, shall be so construed as to prevent the United States Marshals and their deputies, sheriffs and their deputies, regular or special police officers of the city, from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties. Provided, however, If it shall be proved from the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

Compiled Ordinances of the City of Fairfield, Clay County, Nebraska Page 34, Image 34 (1899) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1899
Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor and Council of the City of Fairfield, Nebraska: § 1.
It shall be unlawful for any person to carry upon his person any concealed pistol, revolver, dirk, bowie knife, billy, sling shot, metal knuckles, or other dangerous or deadly weapons of any kind, excepting only officers of the law in the discharge or their duties; and any person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be subject to the penalty hereinafter provided. § 2. Any such weapon or weapons, duly adjudged by the Police Judge of said city to have been worn or carried by any person in violation of the first section of this ordinance, shall be forfeited or confiscated to the City of Fairfield and shall be so adjudged.

**NEVADA**

Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of 1861 to 1873, Inclusive Page 563, Image 705 (Vol. 1, 1873) available at The Making of Modern Law: Primary Sources.
Of Crimes and Punishments, §§ 35-36.

§ 35. If any person shall by previous appointment or agreement, fight a duel with a rifle, shotgun, pistol, bowie knife, dirk, smallsword, backsword, or other dangerous weapon, and in doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guiltily of murder in the first degree and upon conviction thereof shall be punished accordingly.
§ 36. Any person who shall engage in a duel with any deadly weapon although no homicide ensue or shall challenge another to fight such duel, or shall send or deliver any verbal or written message reporting or intending to be such challenge, although no duel ensue, shall be punished by imprisonment in the State prison not less than two nor more than ten years, and shall be incapable of voting or holding any office of trust or profit under the laws of this State.

David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1077, Image 1085 (1885) available at The Making of Modern Law: Primary Sources.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Nevada | 1881
An Act to prohibit the carrying of concealed weapons by minors. § 1.
Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months or by both such fine and imprisonment.

## **NEW HAMPSHIRE**

New Hampshire - Acts and Laws June 1701:
That every justice of the peace within this province, may cause to be stayed and arrested all affrayers, rioters, disturbers or breakers of the peace, or any other that shall go armed offensively, to put his Majesty's subjects in fear by threatening speeches; and upon view of such justice, confession of the Party, or legal proof of any such offence, the justice may commit him to prison, until he the offender find such sureties as is required for his good behavior, and cause his arms or weapons to be taken away, and apprized and answered to his Majesty, as forfeited: And may further punish the breach of the peace, in any person that shall smite or strike another by fine to the King, not exceeding twenty shillings, or require bond for their good behavior, and to pay all just costs; as also may make out hue and cry

after run-away-servants, thieves, and other criminals. https://heinonline-org.proxy.wm.edu/HOL/Page?handle=hein.ssl/ssnh0240&id=1&collection=ssl&index=ssl/ssnh

New Hampshire Public Carry Prohibition (1708)*
And every justice of the peace within this province, may cause to be stayed and arrested, all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches : And upon view of such justice, confession of the offender, or legal proof of any such offence, the justice may commit the offender to prison, until he or she find such sureties for the peace and good behaviour, as is required, according to the aggravations of the offence ; and cause the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use. And may also punish the breach of the peace in any person, who shall smite, or strike another, by fine to the King, not exceeding twenty shillings; and require bond with sureties for the peace, till the next court of general sessions of the peace, or may bind the offender over to answer for said offence at said court, as the nature and circumstances of the offence may require.
*The original law is dated this way: "PASS'D 11 TH OF WM. 3" King William III ruled from 1689-1702, so the 11th year of his reign would be 1699. See: https://heinonline-org.proxy.wm.edu/HOL/Page?collection=ssl&handle=hein.ssl/ssnh0244&id=68&men_tab=srchresults

New Hampshire - Acts and Laws, 1743, 9-10:*
That if twelve persons or more, being armed with clubs, or other weapons; or that if fifty persons or more, whether armed or not, shall be unlawfully, riotously, tumultuously or routerously assembled, any of the officers aforesaid, shall make a proclamation, in manner and form aforesaid; and if such persons so unlawfully assembled, shall not thereupon immediately disperse themselves, according to said proclamation, each of them, and every one who shall wilfully hinder any such officer (who shall be known, or shall openly declare himself to be such) making the said proclamation, shall forfeit and pay a fine not exceeding the sum of five hundred pounds, at the discretion of the said superior court, (which only shall have cognizance of the offense,) considering the aggravations attending the same, and shall be whipt thirty stripes on the naked back at the publick whipping-post, and suffer twelve months imprisonment, and once every three months, during said twelve months, receive the same number of stripes aforesaid.
https://heinonline-org.proxy.wm.edu/HOL/Print?collection=ssl&handle=hein.ssl/ssnh0244&id=10

file:///C:/Users/Bob/Downloads/i-1.pdf
*This law was "made and passed in the Seventeenth Year of His present Majesty's Reign," which would calculate in the reign of King George II (1727-1760) as the year 1743.

1923 N.H. Laws 138
SECTION 1. Pistol or revolver, as used in this act shall be construed as meaning any firearm with a barrel less than twelve inches in length.
SECT. 2. If any person shall commit or attempt to commit a crime when armed with a pistol or revolver, and having no permit to carry the same, he shall in addition to the punishment provided for the crime, be punished by imprisonment for not more than five years.
SECT. 3. No unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another shall own or have in his possession or under his control a pistol or revolver, except as hereinafter provided. Violations of this section shall be punished by imprisonment for not more than two years and upon conviction the pistol or revolver shall be confiscated and destroyed.
SECT. 4. No person shall carry a pistol or revolver concealed in any vehicle or upon his person, except in his dwelling house or place of business, without a license therefor as hereinafter provided. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment not exceeding one year or by both fine and imprisonment.
SECT. 5. The provisions of the preceding sections shall not apply to marshals, sheriffs, policemen, or other duly appointed peace and other law enforcement officers, nor to the regular and ordinary transportation of pistols or revolvers as merchandise, nor to members of the army, navy, or marine corps of the United States, nor to the national guard when on duty, nor to organizations by law authorized to purchase or receive such weapons, nor to duly authorized military or civil organizations when parading, or the members thereof when at or going to or from their customary places of assembly.
SECT. 6. The selectmen of towns or the mayor or chief of police of cities may, upon application of any person issue a license to such person to carry a loaded pistol or revolver in this state, for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury' to his person or property or for any other proper purpose, and that he is a suitable person to be licensed. The license shall be in duplicate and shall bear the name, address, description, and signature of the licensee. The original thereof shall be delivered to the licensee, the duplicate shall be preserved by the selectmen of towns and the chief of police of the cities wherein issued for a period of one year.

SECT. 7. Any person or persons who shall sell, barter, hire, lend or give to any minor under the age of twenty-one years any pistol or revolver shall be deemed guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred dollars or be imprisoned not more than three months, or both. This section shall not apply to fathers, mothers, guardians, administrators, or executors who give to their children, wards, or heirs to an estate, a revolver.
SECT. 8. No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who is an unnaturalized foreign-born person or has been convicted of a felony against the person property of another, except upon delivery of a written permit to purchase, signed by the selectmen of the town or the mayor or chief of police of the city. Before a delivery be made the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward to the chief of police of the city or selectmen of the town one copy thereof and shall retain the other copy for one year. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than one year, or by both such fine and imprisonment.
SECT. 9. Whoever, without being licensed as hereinafter provided, sells, advertises, or exposes for sale, or has in his possession with intent to sell, pistols or revolvers, shall be punished by imprisonment for not more than two years.
SECT. 10. The selectmen of towns and the chief of police of cities may grant licenses, the form of which shall be prescribed by the secretary of state, effective for not more than one year from date of issue, permitting the licensee to sell at retail pistols and revolvers subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:
1. The business shall be carried on only in the building designated in the license.
2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.
3. No pistol or revolver shall be delivered (a) to a purchaser not personally known to the seller or who does not present clear evidence of his identity; nor (b) to an unnaturalized foreign-born person or a person who has been convicted of a felony and has no permit as required by section 8 of this act.
A true record, in duplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which shall be prescribed by the secretary of state and shall be signed by the purchaser and by the person effecting the sale, and shall include the date of sale, the caliber, make,

model, and manufacturer's number of the weapon, the name, address, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded to the selectmen of the town or the chief of police of the city and the other copy retained for one year.
SECT. 11. If any person in purchasing or. otherwise securing delivery of a pistol or revolver shall give false information or offer false evidence of his identity he shall be punished by imprisonment punished, for not more than two years.
SECT. 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol or revolver. Possession of any such firearms upon which the same shall have been changed, altered, removed, or obliterated, shall be presumptive evidence that such possessor has changed, altered, removed or obliterated the same. Violations of this section shall be punished by a fine of not more than two hundred dollars or by imprisonment for not more
than one year, or both.
SECT. 13. All licenses heretofore issued within the state permitting the carrying of pistols or revolvers upon the person shall expire at midnight of July 31, 1923.
SECT. 14. This act shall not apply to antique pistols or revolvers incapable of use as such.
SECT. 15. All acts and parts of acts inconsistent herewith are hereby repealed, and this act shall take effect upon its passage.

**NEW JERSEY**

The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290 (1881) (1686)
An Act Against Wearing Swords, Etc. Whereas there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks, stilettoes, skeines, or any other unusual or unlawful weapons, by reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. . . And be it further enacted by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer: And if such person shall again offend against this law, he shall be in like manner committed

upon proof thereof before any justice of the peace to the common jail, there to remain till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. And be it further enacted by the authority aforesaid, that no planter shall ride or go armed with sword, pistol or dagger, upon the penalty of five pounds, to be levied as aforesaid, excepting all officers, civil and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions through this Province, behaving themselves peaceably.

Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | New Jersey | 1799
[An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2.
And whereas diverse ill disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purpose into execution; Be it further enacted, That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwelling-house or out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New Jersey | 1871
An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument

or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources. Carrying Weapons, Registration and Taxation | New Jersey | 1873

An Ordinance In Relation to the Carrying of Dangerous Weapons. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. § 2. That policemen of Jersey City, when engaged in the performance of police duty, the sheriff and constables of the County of Hudson, and persons having permits, as hereinafter provided for, shall be and are excepted from the prohibitions of the first section of this ordinance. § 3. The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper. All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders; nor shall any such permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control . Permits shall not be granted for a period longer than one year, and shall be sealed by the seal of the court. The possession of a permit shall not operate as an excuse unless the terms of the same are strictly complied with. In cases of emergency, permits may be granted by a single Justice of the Municipal Court, or by the Chief of Police, to be in force not longer than thirty days, but such permit shall not be renewable. §4. That no person shall, within the limits of Jersey City, carry any air gun or any sword cane. § 5. The penalty for a violation of this ordinance shall be a fine not exceeding fifty dollars, or imprisonment in the city prison not exceeding ten days, or both fine and imprisonment not exceeding the aforesaid amount and time, in the discretion of the court.

Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871 Page 304, Image 350 (1877) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | New Jersey | 1877
An Act Concerning Disorderly Persons, § 2.
And whereas, diverse ill-disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses (as well as places of public resort or assemblage), with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purposes into execution; if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement with an intent to break and enter into any building: or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or near any dwelling house, warehouse, stable, barn, coach-house, smoke-house, or out-house, or in any enclosed yard or garden, or area belonging to any house, or in any place of public resort or assemblage for business, worship, amusement, or other lawful purposes with intent to steal any goods or chattels, then he or she shall be deemed and adjudged a disorderly person.

An Ordinance Concerning Firearms and Other Deadly Weapons, PLAINFIELD, N.J., GEN. ORDINANCES §§ 1-2 (1902 Daily Press) (approved April 9, 1895).
An Ordinance Concerning Firearms and Other Deadly Weapons
The Inhabitants of the City of Plainfield, by their Common Council, do enact as follows:

Section 1. That no person shall fire or discharge any gun, fowling piece or firearms within the limits of the City of Plainfield, under a penalty of a fine not exceeding twenty dollars for every such offence; PROVIDED, however, that this section shall not apply to the use of such weapons at any military exercise or review, or target practice duly authorized by the military authority of this State, or by the Common Council, or the Mayor, or in the lawful defence of the person, family or property of any citizen; and PROVIDED further that this section shall not apply to the discharge of blank cartridges or charges of powder on the fourth day of July.

Sec 2. That no person shall carry within the limits of the City of Plainfield concealed upon or about his person, any pistol, dirk, butcher or bowie knife, stilletto, dagger, sword, or spear in a cane, brass or metal knuckles, razor, slug

shot, or other deadly weapon, under a penalty of a fine not exceeding twenty dollars for each and every offence; PROVIDED that this section shall not apply to officers of the law or persons who are threatened with bodily harm."
An Ordinance Concerning Firearms and Other Deadly Weapons, PLAINFIELD, N.J., GEN. ORDINANCES §§ 1-2 (1902 Daily Press) (approved April 9, 1895). The Charter and General Ordinances of the City of Plainfield, New Jersey: In Force May 9th, 1902 (Plainfield, NJ: The Daily Press Print, 1902), 125-126. An Ordinance Concerning Firearms and Other Deadly Weapons, §§ 1-2. Approved April 9, 1895.
1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.
Any person who shall carry any revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable by a fine not exceeding two hundred dollars or imprisonment at hard labor, not exceeding two years, or both;. . . .

**NEW MEXICO**

1852 N.M. Laws 67, An Act Prohibiting the Carrying a Certain Class of Arms, within the Settlements and in Balls, § 1.
That each and every person is prohibited from carrying short arms such as pistols, daggers, knives, and other deadly weapons, about their persons concealed, within the settlements, and any person who violates the provisions of this act shall be fined in a sum not exceeding ten dollars, nor less than two dollars, or shall be imprisoned for a term not exceeding fifteen days nor less than five days.

1853 N.M. Laws 406, An Act Prohibiting The Carrying Of Weapons Concealed Or Otherwise, § 25.
That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slung shot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called under the penalties and punishment which shall hereinafter be described.

1859 N.M. Laws 94, § 1-2.

§ 1. That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, of any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or called, under the penalities and punishment which shall hereinafter be described. § 2. Be it further enacted: That if any person shall carry about his person, either concealed or otherwise, any deadly weapon of the class and description mentioned in the preceeding section, the person or persons who shall so offend, on conviction, which shall be by indictment in the district court, shall be fined in any sum not less than fifty dollars, nor more than one hundred dollars, at the discretion of the court trying the cause, on the first conviction under this act; and for the second conviction, the party convicted shall be imprisoned in the county jail for a term of not less than three months, nor more than one year, also at the discretion of the court trying the cause.

1864-1865 N.M. Laws 406-08, An Act Prohibiting the Carrying of Weapons Concealed or Otherwise, ch. 61, § 25, 1864.
That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slungshot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called, under the penalties and punishment which shall hereinafter be described.

An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887).
Brandishing, Carrying Weapons, Dangerous or Unusual Weapons, Firing Weapons, Transportation | New Mexico | 1887
§ 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted. . . .

**NEW YORK**

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 687, Image 689 (1894) available at The Making of Modern Law: Primary Sources.
Race and Slavery Based | New York | 1664
Laws of the Colony of New York. And be it further enacted by the authority aforesaid that it shall not be lawful for any slave or slave to have or use any gun, pistol, sword, club or any other kind of weapon whatsoever, but in the presence or by the direction of his her or their Master or Mistress, and in their own ground on Penalty of being whipped for the same at the discretion of the Justice of the Peace before whom such complaint shall come or upon the view of the said justice not exceeding twenty lashes on the bare back for every such offense.

Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New York | 1866
An Act to Prevent the Furtive Possession and use of slung-shot and other dangerous weapons. Ch. 716, § 1.
Every person who shall within this state use, or attempt to use or with intent to use against any other person shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any possess any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword-cane or air-gun shall be deemed guilty of felony, and on conviction thereof be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment. § 2. The having possession of any of the weapons mentioned in the first section of this act by any other than a public officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of the provisions of this act.

George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January 1, 1881, Arranged Alphabetically According to Subjects Page 321, Image 324 (Vol. 1, 1881) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New York | 1881
Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9.
Every person who shall within this state use, or attempt to use, or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any instrument or weapon of the kind commonly known as a slung-shot, billy, sand club or metal knuckles, and any dirk shall be deemed guilty of felony, and on conviction thereof may be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources.
Carrying, Using, Etc., Certain Weapons, § 410.
A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 215, Image 216 (1885) available at The Making of Modern Law: Primary Sources.
[Offenses Against the Public Peace and Quiet,] § 7.

Any person who shall carry about his or her person any dirk, bowie knife, sword or spear cane, pistol, revolver, slung shot, jimmy, brass knuckles, or other deadly or unlawful weapon, or shall use any deadly or unlawful weapon, with intent to do bodily harm to any person, shall be subject to a fine of not less than twenty-five nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor longer than three months, or to both such fine and imprisonment.

1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1900
Making, et cetera, dangerous weapons. – A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slunghsot, billy, sand-club or metal knuckes, or who, in any city or incorporated village in this state, without the written consent of the police magistrate, sells or gives any pisol or other firearm, to any person under the age of eighteen years or without a like consent sells or gives away any air-gun, or spring-gun, or other instrument or weapon in which the propelling force is a spring or air to any person under ht age of twelve years, or who sells or gives away any instrument or weapon commonly known as a toy pistol, in or upon which any loaded or blank cartridges are used or may be used, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1911
Section[] eighteen hundred and ninety-six . . . [is] hereby amended . . . § 1896. Making and disposing of dangerous weapons. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, to any person; or a person who offers, sells, loans, leases or gives any gun, revolver, pistol or other firearm or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.
Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slunghsot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.

1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1, Carrying and Use of Dangerous Weapons
Carrying Weapons, Dangerous or Unusual Weapons | New York | 1913
§ 1. A person who attempts to use against another, or who carries or possesses, any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb or bombshell, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instruments or weapon, is guilty of a felony.

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.
Dangerous or Unusual Weapons | New York | 1931
A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

**NORTH CAROLINA**

Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792)
Item, it is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, be so hardy to come before the King's justices, or other of the King's Ministers doing their office with force and arms, nor bring no force in affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic, likely "in"] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. And that the King's Justices in their presence, Sheriffs and other ministers in their bailiwicks, Lords of Franchises, and their bailiffs in the same, and Mayors and Bailiffs of cities and boroughs, within the same cities and boroughs, and boroughholders, constables and wardens of the peace within their wards shall have power to execute this etc. [in original] And that the Justices assigned, at thier coming down into the country , shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertain to their office.

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 73, Image 73 (1847) available at The Making of Modern Law: Primary Sources, 1840.
Crimes and Punishments, 1840 – 1. – Ch. 30, If any free negro, mulatto, or free person of color shall wear, or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger, or bowie knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying thereof, he or she shall be guilty of a misdemeanor and may be indicted therefor.

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation

Has Ceased to Exist Page 75, Image 75 (1847) available at The Making of Modern Law: Primary Sources, 1846.
Crimes and Punishments, 1846 – 7- Ch. 42. It shall not be lawful for any person or persons to sell or barter and deliver, to any slave, or slaves, any gun cotton, fire arms, swords, dirks or other side arms, unless those articles be for the owner or employer, and by the written order of the owner or employer of such slave or slaves, under the penalty of one hundred dollars for each offence, to be recovered, by warrant, before any Justice of the Peace, and applied, one half to the use of the party suing for the same, and the other half to the wardens of the poor of the county; and, moreover, may be indicted in the County or Superior Courts of Law; and the defendant, on conviction, shall be fined or imprisoned at the discretion of the Court; the fine, however, not to exceed fifty dollars, or the imprisonment three months.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15.
The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34, § 23, pt. 4, 1856.
On every pistol, except such as are used exclusively for mustering, and on every bowie-knife, one dollar and twenty five cents; on dirks and swordcanes, sixty five cents: Provided, however, That of said arms, only such shall be taxable, as at some time within the year have been used, worn or carried about the person of the owner, or of some other, by his consent.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15, 1858.
The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

1860-1861 N.C. Sess. Laws 68, Pub. Laws, An Act to Amend Chapter 107, Section 66, of the Revised Code, Relating to Free Negroes Having Arms, ch. 34, § 1, 1860.

That chapter 107, section 66, of the Revised Code be amended to read as follows: If any free negro shall wear or carry about his person or keep in his house any shot gun, musket, rifle, pistol, sword, sword cane, dagger, bowie knife, powder or shot, he shall be guilty of a misdemeanor, and upon conviction fined not less than fifty dollars.

North Carolina: N.C. Sess. Laws (1879) chap. 127, as codified in North Carolina Code, Crim. Code, chap. 25 (1883) § 1005, Concealed weapons, the carrying or unlawfully, a misdemeanor.
If any one, except when on his own premises, shall carry concealed about his person any pistol, bowie knife, dirk, dagger, slungshot, loaded case, brass, iron or metallic knuckes or razor or other deadly weapon or like kind, he shall be guilty of a misdemeanor, and be fined or imprisoned at the discretion of the court. And if anyone not being on his own lands, shall have about his person any such deadly weapon, such possession shall be prima facie evidence of the concealment thereof. . .

**NORTH DAKOTA**

1895 N.D. Rev. Codes 1293, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7312-13.
§ 7312. Carrying or using slung shot. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.
§ 7313. Carrying concealed weapons. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapon, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5.
§ 1. Any person other than a public officer, who carries concealed in his clothes any instrument or weapon of the kind usually known as a black-jack, slung-shot, billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol or other dangerous fire arm loaded or unloaded, or any person who carries

concealed nitro-glycerin, dynamite, or any other dangerous or violent explosive, or has the same in his custody, possession or control, shall be guilty of a felony. . . .

## OHIO

1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . . , ch. 6.
Sentence Enhancement for Use of Weapon | Ohio | 1788
Burglary . . . If the person or persons so breaking and entering any dwelling house, shop, store or vessel as aforesaid, shall commit, or attempt to commit any personal abuse, force, or violence, or shall be so armed with any dangerous weapon or weapons as clearly to indicate a violent intention, he, she or they so offending, upon conviction thereof, shall moreover, forfeit all his, her or their estate, real and personal, to this territory, out of which the party injured shall be recompensed as aforesaid, and the offender shall also be committed to any gaol [jail] in the territory for a term not exceeding forty years.

1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1.
Carrying Weapons | Ohio | 1859
[W]hoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court.

Joseph Rockwell Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860. With Notes of the Decisions of the Supreme Court Page 452, Image 464 (1860) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1859
An Act to Prohibit the Carrying or Wearing of Concealed Weapons, §§ 1-2.
§ 1. Be it enacted by the General Assembly of the State of Ohio, that whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court. Sec.

§ 2. If it shall be proved to the jury, from the testimony on the trial of any case presented under the [section of this act banning the carrying of concealed weapons], that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused.

Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880 Page 1633, Image 431 (Vol. 2, 1879) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1880
Offences Against Public Peace, § 6892.
Whoever carries any pistol, bowie-knife, dirk, or other dangerous weapon, concealed on or about his person, shall be fined not more than two hundred dollars, or imprisoned not more than five hundred dollars, or imprisoned not more than three months, or both.

**OKLAHOMA**

1890 Okla. Laws 495, art. 47
Brandishing, Carrying Weapons, Hunting, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Oklahoma | 1890
§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.
§ 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.
§ 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.
§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under to other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of

intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.
§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise.
§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.
§ 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.
§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety, §§ 18-19.
§ 18. Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind is guilty of a misdemeanor.
§ 19. Every person who carries upon his person, whether concealed or not or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

General Laws Relating to Incorporated Towns of Indian Territory Page 37, Image 33 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1890
Revised Ordinances of the Town of Checotah, Ordinance No. 11, § 3.
To wear or carry any pistol of any kind whatever, or any dirk, butcher knife or bowie knife, or a sword, or a spear in a cane, brass or metal knuckles or a razor, slung shot, sand bag, or a knife with a blade over three inches long, with a spring handle, as a weapon.

Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 495-496, Image 511-512 (1891) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1891
Concealed Weapons, §§ 1, 2, 4-10.
§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.
§ 2. It shall be unlawful for any person in this territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.
§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.
§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.
§ 6. Any person violating the provisions of any one of the forgoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.
§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.
§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.
§ 10. Any person violating the provisions of section seven, eight, or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

Wilson's Rev. & Ann. St. Okla.(1903) § 583, c. 25.
It shall be unlawful for any person in the territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

**OREGON**

1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2.
§ 1. It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.
§ 2. Any person violating any of the provisions of section one of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than ten dollars nor more than two hundred dollars, or by imprisonment in the county jail not less than five days nor more than one hundred days, or by both fine and imprisonment, in the discretion of the court.

Laws of Oregon (1885), An Act to Prevent Persons from Carrying Concealed Weapons, § 1-4, p. 33, as codified in Ore. Code, chap. 8 (1892) § 1969.
It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oregon | 1898
An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.
It shall be unlawful for any person to carry any sling shot, billy, dirk, pistol or any concealed deadly weapon or to discharge any firearms, air gun, sparrow gun, flipper or bean shooter within the corporate limits of the city, unless in self-defense, in protection of property or an officer in the discharge of his duty; provided, however, permission may be granted by the mayor to any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission.

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, §§ 7-8.
Carrying Weapons | Oregon | 1917
§ 7. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver or other firearm, or any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sandclub, sandbag, metal knuckles, bomb or bomb-shell, or any other dangerous or deadly weapon or instrument, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or a breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.
Any person who violates the provisions of this section shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than $50.00 nor more than $500.00, or by imprisonment in the county jail for not less than one month nor more than six months, or by imprisonment in the penitentiary for not exceeding five years.
§ 8. Whenever any person shall be arrested and it shall be discovered that such person possesses or carries or has possessed or carried upon his person any loaded pistol, revolver or other firearm, or any weapon named or enumerated in Section 7

of this Act, in violation of any of the sections of this Act, it shall be the duty of the person making the arrest to forthwith lay an information for a violation of said section or sections against the person arrested before the nearest or most accessible magistrate having jurisdiction of the offense, and such magistrate must entertain and examine such information and act thereon in the manner prescribed by law.
Section 11. Any person not a citizen of the United States of America, who shall be convicted of carrying a deadly weapon, as described in Sections 1, 2 and 7 of this Act, shall be guilty of a felony and on conviction thereof shall be punished by imprisonment in the State prison for a period not exceeding five years.

**PENNSYLVANIA**

1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough, § 4.
That any person who shall willfully and maliciously carry any pistol, gun, dirk knife, slung shot, or deadly weapon in said borough of York ,shall be deemed guilty of a felon, and being thereof convicted shall be sentenced to undergo an imprisonment at hard labor for a term not less than 6 months nor more than one year and shall give security for future good behavior for such sum and for such time as the court before whom such conviction shall take place may fix . . . .

Laws of the City of Johnstown, Pa., Embracing City Charter, Act of Assembly of May 23, 1889, for the Government of Cities of the Third Class, General and Special Ordinances, Rules of Select and Common Councils and Joint Sessions Page 86, Image 86 (1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Pennsylvania | 1897
An Ordinance for the Security of Persons and Property of the Inhabitants of the City of Johnstown; The preservation of the Public Peace and Good Order of the City, and Prescribing Penalties for Offenses Against the Same, § 12.
No person shall willfully carry concealed upon his or her person any pistol, razor, dirk or bowie-knife, black jack, or handy billy, or other deadly weapon, and any person convicted of such offense shall pay a fine of not less than five dollars or more than fifty dollars with costs.

**RHODE ISLAND**

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1.

No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his persons . . . [additional fine provided if intoxicated while concealed carrying].

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, §§1-3.
Carrying Weapons, Sentence Enhancement for Use of Weapon | Rhode Island | 1893
§ 1. No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his person: Provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act.
§ 2. Any person convicted of a violation of the provisions of section 1 shall be fined not less than twenty dollars nor more than two hundred dollars, or be imprisoned not less than six months nor more than one year.
§ 3. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section 1, such person, upon complaint and conviction , in addition to the penalties provided in section 2, shall be subject to a fine of not less than five dollars nor more than twenty five dollars, and the confiscation of the weapon so found.

General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010-1011, Image 1026-1027 (1896) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Rhode Island | 1896
Offences Against Public Policy, §§ 23, 24, 26.
§ 23. No person shall wear or carry in this state any dirk, bowie-knife, butcher knife, dagger, razor, sword-in-cane, air-gun, billy, brass or metal knuckles, slung-shot, pistol or fire-arms of any description, or other weapons of like kind and description concealed upon his person: provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge

of such duties, while actually engaged in such duties, are exempted from the provisions of this and the two following sections.
§ 24. Any person convicted of a violation of the provisions of the preceding section shall be fined not less than ten nor more than twenty dollars, or be imprisoned not exceeding three months, and the weapon so found concealed shall be confiscated
. . . .
§ 26. No negative allegations of any kind need be averred or proved in any complaint under the preceding three sections, and the wearing or carrying of such concealed weapons or weapons shall be evidence that the wearing or carrying of the same is unlawful; but the respondent in any such case my show any fact that would render the carrying of the same lawful under said sections.

1908 (January Session) R.I. Pub. Laws 145, An Act in Amendment of section 23 of chapter 283 of the General Laws
Carrying Weapons | Rhode Island | 1908
§ 23. No person shall wear or carry in this state any dirk, dagger, razor, sword-in-cane, bowie knife, butcher knife, or knife of any description having a blade of more than three inches in length, measuring from the end of the handle, where the blade is attached to the end of said blade, any air gun, billy, brass or metal knuckles, slung-shot, pistol or firearms of any description, or other weapons of like kind and description, concealed upon his person: Provided, that officers or watchmen whose duties require them to arrest or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provision of this and the two other following sections.

**SOUTH CAROLINA**

1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894). § 129 (2472.)
§ 1. Be it enacted by the Senate and House of Representatives of the State of South Carolina, not met and sitting in General Assembly, and by the authority of the same, That any person carrying a pistol , dirk, dagger, slung shot, metal knuckles, razor, or other deadly weapon usually used for the infliction of personal injury, concealed about his person shall be guilty of a misdemeanor and upon conviction thereof, before a Court of competent jurisdiction shall forfeit to the County the weapon so carried concealed and be fined in a sum not more than two hundred dollars, or imprisoned for not more than twelve months, or both, in the discretion of the Court.

§ 2. It shall be the duty of every Trial Justice, Sheriff, Constable, or other peace officer, to cause all persons violating this Act to be prosecuted therefor whenever they shall discover a violation hereof.

Act of Feb. 20, 1901, ch. 435, §1, 1901 S.C. Acts 748
Sec. 1. Be it enacted by the General Assembly of the State of South Carolina: That from and after the first day of July 1902 it shall be unlawful for any one to carry about the person whether concealed or not any pistol less than 20 inches long and 3 pounds in weight. And it shall be unlawful for any person, firm or corporation to manufacture, sell or offer for sale, or transport for sale or use into this State, any pistol of less length and weight. Any violation of this Section shall be punished by a fine of not more than one hundred dollars, or imprisonment for not more than thirty days and in case of a violation by a firm or corporation it shall forfeit the sum of one hundred dollars to and for the use of the school fund of the County wherein the violation takes place to be recovered as other fines and forfeitures: Provided, this Act shall not apply to peace officers in the actual discharge of their duties, or to persons while on their own premises.

1923 S.C. Acts 221
If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, of or attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days.

**SOUTH DAKOTA**

S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471.
§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.
§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

S.D. Rev. Code, Penal Code 1150 (1903) §§ 470, 471
§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.
§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

**TENNESSEE**

Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources. 1801
An Act for the Restraint of Idle and Disorderly Persons § 6. Be it enacted, That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to jail, and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law.

1821 Tenn. Pub. Acts 15-16, An Act to Prevent the Wearing of Dangerous and Unlawful Weapons, ch. 13.
Robert Looney Caruthers, A Compilation of the Statutes of Tennessee, of a General and Permanent Nature, from the Commencement of the Government to the Present time: With References to Judicial Decisions, in Notes, to Which is Appended a New Collection of Forms Page 100, Image 105 (1836) available at The Making of Modern Law: Primary Sources. 1821
An Act of 1821, § 1. Every person so degrading himself by carrying a dirk, sword cane, Spanish stiletto, belt or pocket pistols, either public or private, shall pay a fine of five dollars for every such offence, which may be recovered by warrant before any justice of the peace, in the name of the county for its use, in which the offence may have been committed; and it shall be the duty of a justice to issue a warrant on the application, on oath, of any person applying; and it shall be the duty of every judge, justice of the peace, sheriff, coroner, and constable within this state, to see that this act shall have its full effect: Provided, that nothing herein contained shall affect any person that may be on a journey to any place out of his county or state.

1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch 137, § 2.

That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas toothpick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1.
That if any merchant, . . . shall sell, or offer to sell . . . any Bowie knife or knives, or Arkansas tooth picks . . . such merchant shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a period not less than one month nor more than six months.

1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4.
That if any person carrying any knife or weapon known as a Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife, on a sudden rencounter [sic], shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this state, for a period of time not less than three years, nor more than fifteen years.

Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-1871 Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources. [1856]
Offences Against Public Policy and Economy. § 4864.
Any person who sells, loans, or gives, to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor, and shall be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 190, Image 191 (1863) available at The Making of Modern Law: Primary Sources.
Offences Affecting Public Safety: Carrying Concealed Weapons, § 3.
It shall not be lawful for any person or persons to carry concealed about his or their persons any pistol, Bowie-knife, dirk, or any other deadly weapon; and any person so offending, shall upon conviction thereof before the Recorder, be fined not less than ten nor more than fifty dollars for each and every offence.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.
Police Regulations Of The State, Offences Against Public Peace, §§ 4746, 4747, 4753, 4757.
§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor.
§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding section.
§ 4753. No person shall ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any dangerous weapon, to the fear or terror of any person.
§ 4757. No person shall either publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, except a knife, conspicuously on the strap of a shot-pouch, or on a journey to a place out of his county or State.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources.
Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864.
Any person who sells, loans or gives to any minor a pistol, bowie-knife, dirk, Arkansas toothpick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor and shall be fined not less than twenty-five dollars, and imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.
Police Regulations Of the State. Offences Against Public Peace. Concealed Weapons. §§ 4746-4747.
§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor. Selling such weapons misdemeanor.
§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the state for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding Section.

James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code Page 108, Image 203 (Nashville, 1871) available at The Making of Modern Law: Primary Sources. 1869
Elections.
§ 2. That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon.
§ 3. That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court.

Tenn. Pub. Acts (1879), chap. 186, as codified in Tenn. Code (1884). 5533: It shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, loaded cane, slung-shot or brass knucks, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol used in warfare, which shall be carried openly in hand.

William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix Page 340-341, Image 345-346 (1881) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1. That every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined form ten to fifty dollars, at the discretion of the court, but upon conviction of every such subsequent offense, shall be fined fifty dollars; Provided, however, that no ordinary pocket knife and common walking-canes shall be construed to be deadly weapons.

Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises Page 364-365, Image 372-373 (1893) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Nashville, § 738.
Every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks, or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court; but, upon conviction of every subsequent offense, shall be fined fifty dollars; Provided, however, That no ordinary pocket-knife and common walking canes shall be construed to be deadly weapons. . .

**TEXAS**

A Digest of the General Statute Laws of the State of Texas: to Which Are Subjoined the Repealed Laws of the Republic and State of Texas (Austin, Texas: Williamson S. Oldham & George W. White, comp., 1859)
Texas, Chapter 3, Act of August 28, 1856
Art. 493. If any person shall assault another with intent to murder, he shall be punished by confinement in the Penitentiary, not less than two years, nor more than seven years. If the assault be made with a bowie-knife, or dagger, the punishment shall be doubled. Page 520
https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=538&q1=bowie%20knife
Art. 610. If any person be killed with a *bowie knife* or *dagger*, under circumstances which would otherwise render the homicide a case of manslaughter, the killing shall nevertheless be deemed murder, and punished accordingly. [emphasis in original] Page 534

https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=552&q1=bowie%20knife

1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons.
§ 1. Be it enacted by the Legislature of the State of Texas, That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he had reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and on conviction thereof shall, for the first offense, be punished by fine of not less then than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fined imposed and collected shall go into the treasury of the county in which they may have been imposed; provided, that this section shall not be so contrued as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.
§ 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879).
Art. 163.
If any person other than a peace officer, shall carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election , during

the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished as prescribed in article 161 of the code.

1879 Tex. Crim. Stat. tit. IX, Ch. 4 (Penal Code)
Art. 318. If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, he shall be punished by fine of not less than twenty-five nor more than one hundred dollars; and, in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.
Art. 319. The preceding article shall not apply to a person in actual service as a militiaman, nor to a peace officer or policeman, or person summoned to his aid, not to a revenue or other civil officer engaged in the discharge of official duty, not to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack, upon legal process.
Art. 320. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball-room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other fire-arm, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of a knife manufactured and sold for the purposes of offense and defense, he shall be punished by fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.
Art. 321. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.
Art. 322. Any person violating any of the provisions of articles 318 and 320, may be arrested without warrant by any peace officer, and carried before the nearest justice of the peace for trial; and any peace officer who shall fail to refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by fine not exceeding five hundred dollars.
Art. 323. The provisions of this chapter shall not apply to or be enforced in any county which the governor may designate, by proclamation, as a frontier county and liable to incursions by hostile Indians.

1897 Tex. Gen. Laws 221, An Act To Prevent The Barter, Sale And Gift Of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, Or Knuckles Made Of Any Metal Or Hard Substance To Any Minor Without The Written Consent Of The Parent Or Guardian Of Such Minor. . ., chap. 155.
That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less then twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment and during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is submitted.

Theodore Harris, Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General Character in Force August 7th, Page 220, Image 225 (1899) available at The Making of Modern Law: Primary Sources.
Brandishing | Texas | 1899
Ordinances of the City of San Antonio, Ordinances, ch. 22, § 4.
If any person shall, within the city limits, draw any pistol, gun, knife, sword-cane, club or any other instrument or weapon whereby death may be caused, in a threatening manner, or for the purpose of intimidating others, such person shall be deemed guilty of an offense.

**UTAH**

Dangerous and Concealed Weapon, Feb. 14, 1888, reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14.
Any person who shall carry any slingshot, or any concealed deadly weapon, without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force 105, 106-7 (1877) (Provo, Utah).
§ 182: Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot, false knuckles, bowie knife, dagger or any other dangerous or deadly weapon, is guilty of an offense, and liable to a fine in any sum not exceeding twenty-five dollars; Provided, that nothing in this section, shall be

construed to apply to any peace officer, of the United States, the Territory of Utah, or of this city.[1]

**VERMONT**

Laws of Vermont, Public Acts, No. 85.—An Act Against Carrying Concealed Weapons, Ch. 85, p. 95. 1892.
Section 1. A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.
Sec. 2. A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars.
Approved November 19, 1892.
https://www.google.com/books/edition/Acts_and_Laws_Passed_by_the_Legislature/DXFOAQAAIAAJ?hl=en&gbpv=1&dq=Vermont+%22while+a+member+of+and+in+attendance+upon+any+school,%22++%22any+firearms,+dirk+knife,+bowie+knife,+dagger+or+other+dangerous+or+deadly+weapon%22%C2%A0&pg=PA95&printsec=frontcover

Ordinances of the City of Barre, Vermont
Carrying Weapons, Firing Weapons | Vermont | 1895
CHAPTER 16, § 18.
No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.
CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any

[1] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

weapon concealed on his person without permission of the mayor or chief of police in writing.[2]

[2] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

## VIRGINIA

1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays.
Be it enacted by the General Assembly, that no man, great nor small, of what condition soever he be, except the Ministers of Justice in executing the precepts of the Courts of Justice, or in executing of their office, and such as be in their company assisting them, be so hardy to come before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and their bodies to prison, at the pleasure of a Court; nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison by any Justice on his own view, or proof of others, there to abide for so long a time as a Jury, to be sworn for that purpose by the said Justice shall direct, and in like manner to forfeit his armour to the commonwealth; but no person shall be imprisoned for such offence by a longer space of time than one month.

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) available at The Making of Modern Law: Primary Sources.
Race and Slavery Based | Virginia | 1792
[An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792),] §§ 8-9.
§8. No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.
§ 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.

Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap. 101, at 76; 1838.
Be it enacted by the general assembly, That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from this use of which the death of any person might probabily ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offense forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and in each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.

1847 Va. Laws 127, c. 14, § 16.
If any person shall go armed with any offensive or dangerous weapon without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may be required to find sureties for keeping the peace for a term not exceeding twelve months, with the right of appealing as before provided.

Staunton, The Charter and General Ordinances of the Town of Lexington, Virginia Page 87, Image 107 (1892) available at The Making of Modern Law: Primary Sources, 1867.
Ordinances of The Town of Lexington, VA, Of Concealed Weapons and Cigarettes, § 1. If any person carrying about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty dollars nor more than one hundred dollars; and any of such weapons mentioned shall be forfeited to the town. Nothing in this section shall apply to any officer of the town, county or state while in the discharge of his duty.

The Code of Virginia: With the Declaration of Independence and the Constitution of the United States; and the Constitution of Virginia Page 897, Image 913 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Virginia | 1887
Offences Against the Peace, § 3780. Carrying Concealed Weapons, How Punished. Forfeiture and Sale of Weapons. If any person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty nor more than one hundred dollars, and such pistol, dirk, bowie-knife, razor, slung-shot, or any

weapon of the like kind, shall be forfeited to the commonwealth and may be seized by an officer as forfeited; and upon the conviction of the offender the same shall be sold and the proceeds accounted for and paid over as provided in section twenty-one hundred and ninety: Provided, that this section shall not apply to any police officer, town or city sergeant, constable, sheriff, conservator of the peace, or collecting officer, while in the discharge of his official duty.

**WASHINGTON**

1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1854
Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1859
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife or other dangerous weapon, shall, on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32.
Brandishing | Washington | 1869
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year and be fined in any sum not exceeding five hundred dollars.

1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy, ch. 73, § 929.
Carrying Weapons | Washington | 1881
If any person carry upon his person any concealed weapon, he shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than thirty days[.]

1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15.
Carrying Weapons | Washington | 1881
[T]o regulate the transportation, storage and sale of gunpowder, giant powder, dynamite, nitro-glycerine, or other combustibles, and to provide or license magazines for the same, and to prevent by all possible and proper means, danger or risk of injury or damages by fire arising from carelessness, negligence or otherwise . . . to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols and firearms, firecrackers, and detonation works of all descriptions[.]

William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956, Image 731 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.
Brandishing | Washington | 1881
Flourishing Dangerous Weapon, etc. Every person who shall in a manner likely to cause terror to the people passing, exhibit or flourish, in the streets of an incorporated city or unincorporated town, any dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine in any sum not exceeding twenty-five dollars. Justices of the peace shall have exclusive original jurisdiction of all offenses arising under the last two preceding sections.

1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6, § 29, pt. 15.
Carrying Weapons | Washington | 1883
[The city has power] to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols, and fire-arms, fire crackers, bombs and detonating works of all descriptions . . . .

Albert R. Heilig, Ordinances of the City of Tacoma, Washington Page 333-334, Image 334-335 (1892) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1892
Ordinances of the City of Tacoma, An Ordinance Defining Disorderly Persons and Prescribing the Punishment for Disorderly Conduct Within the City of Tacoma. All persons (except police officers and other persons whose duty it is to execute process or warrants or make arrests) who shall carry upon his person any concealed weapon consisting of a revolver, pistol or other fire arms or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling shot or metal knuckles, or

any instrument by the use of which injury could be inflicted upon the person or property of any other person.

Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896 Page 309-310, Image 315-316 (1896) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1896
Ordinances of Spokane, An Ordinance to Punish the Carrying of Concealed Weapons within the City of Spokane, § 1.
If any person within the City of Spokane shall carry upon his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned until such fine and costs are paid; provided, that this section shall not apply to police officers and other persons whose duty is to execute process or warrants or make arrests, or persons having a special written permit from the Superior Court to carry weapons

Richard Achilles Ballinger, Ballinger's Annotated Codes and Statutes of Washington: Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956-1957, Image 731-732 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1897
Carrying Concealed Weapons, § 7084.
If any person shall carry upon his person any concealed weapon, consisting of either a revolver, pistol, or other fire-arms, or any knife, (other than an ordinary pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars nor more than one hundred dollars, or imprisonment in the county jail not more than thirty days, or by both fine and imprisonment, in the discretion of the court: Provided, That this section shall not apply to police officers and other persons whose duty it is to execute process or warrants or make arrests.

**WEST VIRGINIA**

1870 W. Va. Code 692, Of Offenses against the Peace, ch. 148, § 7.
If any person, habitually, carry about his person, hid from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, he shall be fined fifty dollars. The informers shall have one half of such fine.

1870 W. Va. Code 703, For Preventing the Commission of Crimes, ch. 153, § 8.
If any person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family, or property, he may be required to give a recognizance, with the right of appeal, as before provided, and like proceedings shall be had on such appeal.

1882 W. Va. Acts 421–22
Carrying Weapons | West Virginia | 1882
If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peacable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife.

1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7.

Carrying Weapons | West Virginia | 1891
If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises, any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the State, from carrying a revolver or other pistol, dirk or bowie knife.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a.
Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible, Registration and Taxation | West Virginia | 1925
§ 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court. . . .

**WISCONSIN**

1858 Wis. Rev. Stat. 985, Of Proceedings to Prevent the Commission of Crime, ch. 175, § 18.
If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any other person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1872 Wis. Sess. Laws 17, ch. 7, § 1, An Act to prohibit and prevent the carrying of concealed weapons.
SECTION 1. If any person shall go armed with a concealed dirk, dagger, sword, pistol, or pistols, revolver, slung-shot, brass knuckles, or other offensive and dangerous weapon, he shall, on conviction thereof, be adjudged guilty of a misdemeanor, and shall be punished by imprisonment in the state prison for a term of not more than two years, or by imprisonment in the county jail of the proper county not more than twelve months, or by fine not exceeding five hundred dollars, together with the costs of prosecution, or by both said fine and costs and either of said imprisonments; and he may also be required to find sureties for keeping the peace and against the further violation of this act for a term not exceeding two years: provided, that so going armed shall not be deemed a violation of this act whenever it shall be made to appear that such person had reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, or to any person under his immediate care or custody, or entitled to his protection or assistance, or if it be made to appear that his possession of such weapon was for a temporary purpose, and with harmless intent.

1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, chap. 6, § 3, pt. 56.
To regulate or prohibit the carrying or wearing by any person under his clothes or concealed about his person any pistol or colt, or slung shot, or cross knuckles or knuckles of lead, brass or other metal or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon and to provide for the confiscation or sale of such weapon.

Charter and Ordinances of the City of Superior; Also Harbor Act, Municipal Court Act, Rules of the Common Council and Board of Education Page 390, Image 481 (1896) available at The Making of Modern Law: Primary Sources. 1896 Ordinances of the City of Superior, Carrying Concealed Weapons, § 18. It shall be unlawful for any person, other than a policeman or other officer authorized to maintain the peace or to serve process, to carry or wear any pistol, sling-shot, knuckles, bowie knife, dirk, dagger or any other dangerous weapon within the limits of the City of Superior, and any person convicted of a violation of this section shall be punished by a fine of not less than ten (10) dollars nor more than one hundred (100) dollars.

**WYOMING**

1884 Wyo. Sess. Laws, chap. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983.
Whoever shall, in the presence of one or more persons, exhibit any kind of fire-arms, Bowie Knife, dirk, dagger, slung-shot or other deadly weapon, in a rude, angry or threatening manner not necessary to the defense of his person, family or property, shall be deemed guilty of misdemeanor, and on conviction thereof, shall be punished by a fine not less than ten dollars, nor more than one hundred dollars, or by imprisonment in the county jail not exceeding six months . . . .

Wyo. Comp. Laws (1876) chap. 35 § 127, as codified in Wyo. Rev. Stat., Crimes (1887) Having possession of offensive weapons. § 1027.
If any person or persons have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail not exceeding six months.

A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 131-132; Image 132-133 (1893) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Wyoming | 1893
Revised Ordinances of the City of Rawlins, Article VII, Carrying Firearms and Lethal Weapons, § 1.
It shall be unlawful for any person in said city to keep or bear upon the person any pistol, revolver, knife, slungshot, bludgeon or other lethal weapon, except the officers of the United States, of the State of Wyoming, of Carbon County and of the City of Rawlins. § 2. Any person convicted of a violation of the preceding section shall be fined not exceeding one hundred dollars, or imprisoned in the city

jail not exceeding thirty days. § 3. Persons not residing in said city shall be notified of this Ordinance by the police or any citizen, and after thirty minutes from the time of notification, shall be held liable to the penalties of this article, in case of its violation. § 4. The city marshal and policemen of the city shall arrest, without warrant, all persons found violating the provisions of this article, and are hereby authorized to take any such weapon from the person of the offender and to imprison the offender for trial, as in case of violations of other Ordinances of said city.

SOURCE: https://firearmslaw.duke.edu/repository/search-the-repository/

# PLAINTIFFS' EXHIBIT AA

KR1344

ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
KATRINA UYEHARA
Deputy Attorney General
State Bar No. 349378
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7867
Fax: (916) 324-8835
E-mail: Katrina.Uyehara@doj.ca.gov
*Attorneys for Defendant Rob Bonta, in his official capacity as Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

**KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P.,**

Plaintiffs,

**v.**

**CALIFORNIA ATTORNEY GENERAL ROB BONTA,**

Defendant.

3:23-cv-00474-JES-DDL

**EXPERT REPORT AND DECLARATION OF ROBERT ESCOBAR**

Dept: 4B
Judge: The Honorable James E. Simmons, Jr.

**EXPERT REPORT AND DECLARATION OF ROBERT ESCOBAR**

I, Robert Escobar, declare under penalty of perjury that the following is true and correct:

The California Department of Justice has asked me to provide an expert opinion in the above-captioned matter. My declaration and report below provides that opinion in detail. This report and declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this report and declaration.

**BACKGROUND AND QUALIFICATIONS**

1. I received a Bachelor's degree in history from the University of Dallas in 1995. This institution requires a thesis and defense for completion of an undergraduate degree. My thesis was on the Boxer Rebellion in China (1899-1901), an event that has a strong connection to the martial arts history of Asia. Since graduating college, my primary occupation has been in business as a project manager and analyst, but I have maintained a deep interest in martial arts and the history of weapons.

2. In martial arts, I have attained a 2nd degree black belt in Goju-Ryu karate and a 1st degree black belt Kobudo (Okinawan-Japanese weapons). I am a black belt member of Budo-Kai International, a martial arts organization which conducts regular seminars, and several of the head instructors leading these seminars have experience in law enforcement or the military or in providing training to one or both. Additionally, I have trained in various martial arts for over 25 years. Besides the martial arts mentioned above, I have been trained in Krav Maga (Israeli military martial art); Brazilian Ju-Jitsu; hybrid wrestling (mixed martial arts); boxing; and HEMA (Historical European Martial Arts).

3. I am a certified Six Sigma© Black Belt, a project management certification, and am currently employed as a Project Manager at FORVIS, a

national public accounting firm. In addition to my primary occupation, I am engaged on a variety of writing and research projects, including researching historical weapons.

4. I am the author of *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons* (Gatekeeper Press 2018). This work identified and addressed a large gap in the history of impact weaponry and martial arts and was used as a source by the California Attorney General's Office in *Fouts, et al. v. Becerra*, in addition to my testimony in that case. I am also the author of *Deadly Ingenuity: A History of Unusual Weapons from around the World and across time* (Gatekeeper Press 2023). This work sheds light on some historical weapons and fighting techniques that have not been surveyed before. The book offers a wide-ranging discussion, covering weaponry and martial arts history from different centuries and continents.

5. My research on historical weapons has been praised by a range of scholars and authorities on weapons and self-defense, including Massad Ayoob, a noted firearms and self-defense instructor; Thomas Jodziewicz, Ph.D., Professor Emeritus, former Chair of the Department of History (University of Dallas) and president of the Texas Catholic History Society; Ashley Sharpe, Ph.D., Anthropologist- Smithsonian Tropical Research Institute; and Sir Christopher Ricks, FBA (Fellowship of the British Academy, a distinction granted by the United Kingdom to leading academics), former professor at Oxford University, currently the William M. and Sara B. Warren Professor of the Humanities at Boston University.

6. I have completed an extensive level of research on the following weapons: (1) "saps" ("soft," and hard stunning bludgeons, see below); (2) "blackjacks" (very small, dense clubs that flex during use, see below; (3) "slungshots" (essentially pocket flails, quite popular for the majority of American history), which are still made and sold today, usually called monkey fists; (4)

"nunchaku" (commonly known as nunchucks); and (5) "billies" (short clubs of various sorts); and (6) small edged weapons (both professionally made and improvised such as ice picks and prison shanks/shivs) I have also conducted extensive research into the straight razor, another weaponry niche which I will address in an upcoming book. Through this research and my years of research regarding historical weapons in general and street weapons in particular, I have gained expertise in the origins and uses of a similar close combat weapon, the switchblade. My research has included studying a range of source material—from court cases to medical evidence and hands on experiments—in order to apprise the effectiveness of these weapons in the hands of both the law and lawless, the trained and untrained.

7. In my research over the years, I have read and collected a wide variety of sources and antique specimens on the subject of the street weapons of the western world. By necessity this has included a plentitude of police and criminal history from court records and newspaper articles in the U.S. and U.K., memoirs by law enforcers and breakers, as well as current and past training manuals made by law enforcement and martial artists. Additionally, I have interviewed people with practical experience with these tools.

8. Moreover, my ongoing martial artist training, including earning a black belt in certain weapons (including kobudo), supplements my scholarly research with some level of physical experience.

9. My conclusions are based on as clinical and fair an assessment of objective facts as I could produce. I was trained in historical methodology, although not at a graduate school level. My statements and conclusions in this document are not based on my personal opinion regarding whether or not weapons should be legally allowed for civilians.

10. I have provided expert witness testimony in *Fouts, et al. v. Becerra*, No. 3:19-cv-1662 (S.D. Cal.).

11. A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this declaration.

## RETENTION AND COMPENSATION

12. I have been retained by the California Department of Justice to render expert opinions in this case. I am being compensated at a rate of $150 per hour. My compensation is not contingent on the results of my expert analysis or the substance of my opinions or any testimony in this matter.

## BASIS FOR OPINION AND MATERIALS CONSIDERED

13. Counsel for Defendant provided me with the operative Complaint in this matter, copies of the relevant statutes being challenged, and other case-related documents pertinent to this matter. Other than these documents, my report is based on my own independent research.

## OPINIONS

### I. THE APPEAL OF THE SWITCHBLADE TO CRIMINALS

14. My research of the history of bladed weapons for this report shows a clear preference by criminals for edged-weapons that are culturally understood to be inherently frightening, including switchblades and their historical precursors.

#### A. Early Spanish-Version of the Modern Switchblade: The Navaja

15. While a common word in Spanish today for knife, in historical weaponry, the term "Navaja" specifically refers to the signature Spanish fighting knife of antiquity. These large folding knives were the Spanish version of the Italian stiletto in a cultural context. They were strongly linked to criminal users, specifically the infamous Barateros in the 18th and 19th centuries. These were gangsters who controlled neighborhoods and extorted or robbed citizens in various ways, most famously with an extortion racket in gambling dens.[1] Rather than opening noiselessly or with a slight click as is the norm with any unfolding knife

[1] Henry George O'Shea, *O'Shea's Guide to Spain and Portugal* (1889).

that locks into place once fully deployed, Navajas had a ratchet mechanism that purposefully clicked loudly and progressively as the blade was being unfolded.[2] This loud, multi-click sound advertised the weapon's preparation for use in the same intimidating way that a shotgun being cocked does. To quote Blade Magazine, "In fact, it became the knife of choice among muggers who would rob people in alleyways and other dark urban areas. Victims knew they were about to be robbed when they heard the unmistakable popping sound the Navaja made when a mugger opened it."[3]

**B. Australian Gang Usage of the Straight Razor**

16. Criminal gangs in Australia (to name just one country) embraced the straight razor, even though it is a poor choice as a weapon despite its namesake. Note the name "straight razor" actually refers to the obsolete folding shaving aid that was ubiquitous before the advent of the safety razor. Straight razors (also known as cut-throat razors) are delicate compared to knives both in blade and overall body; they were not designed or built to withstand stress.

17. Self-defense instructor Ray Floro, creator of Floro Fighting Systems, is an edged weapon expert and instructor who "has instructed the US Special Forces, Korean Special Forces, various SWAT teams, New Zealand Police…"[4] In a video dedicated to switchblades, he describes their blades "as brittle as glass." Similarly, in conducting research for this report, I dropped a straight razor onto a hardwood floor from roughly elbow height. The handle broke, making the entire knife inoperable. Another weakness is that a straight razor is a folding blade with no locking mechanism of any kind. The risk of self-injury is thus extremely high compared to any other edged weapon. And yet, many gangs used this instrument as

[2] For an audible demonstration of the knife being unfolded, see the YouTube Video "Spanish Navaja .. (Navaja Arabe 101t..JJ Martinez)", https://youtu.be/UMLjtPvx2QI?si=ggtNj2BAO3tUdyLL.

[3] Mike Ableson, *The Navaja: A Spanish Gem*, Blade (Nov. 16, 2022), https://blademag.com/buyers-guides/the-navaja-a-spanish-gem.

[4] Raymond Floro, *About Page*, Raymond Floro (Dec. 18, 2023), https://rayfloro.net/about/.

a proud symbol of their gang and the violence they were capable of. Returning to Australia, the razor gangs from that country's past (1920s and 1930s) are legendary. Entire books have focused on them, such as *Daughter of the Razor: An Australian True Crime Story* (2016), *Razor: Tilly Devine, Kate Leigh and the Razor Gangs* (2001), *The Law of the Razor* (2008).

18. It is well-documented that the razor was the proud symbol of these gangs and that it was used to leverage the fear the public felt towards it. A common tactic was to slice the face of a living victim with one and leave them to be a walking advertisement of the gang's menacing presence.[5] Mr. Floro and martial arts instructor Bradley Steiner, the author of the only book on the razor as a weapon (Close Shaves, 1980), both attest to the tremendous intimidation factor the sight of a straight razor produces when brandished.[6]

19. In these two historical precedents (the Navaja and straight razor), violent criminals can be seen embracing knives that are readily concealable and seen by others as particularly frightening. Switchblades fall comfortably into this category of weapons that are particularly well-suited for criminal purposes.

## II. DANGERS IN USING AN AUTOMATIC KNIFE FOR SELF-DEFENSE

20. An automatic knife is by its nature the most complicated type of knife on the market. Comparing it to a fixed blade knife (the simplest) is in my opinion like comparing an AR-15 to a revolver, a revolver generally being considered the apex of reliability and simplicity in firearms. To better understand the dangers and impracticality of using an automatic knife for self-defense, it is helpful to first understand the three major knife categories. All knives can be classified into three categories: (1) fixed blade, (2) folding, and (3) out to the front ("OTF").

[5] "The 1920s: the Razor Wars", Sidney Crime Museum (Dec. 18, 2023), https://www.sydneycrimemuseum.com/crime-stories/1920s-the-razor-wars/.

[6] Bradley J. Steiner, *Close Shaves: The Complete Book of Razor Fighting* (1989), https://azinelibrary.org/approved/32973698-Close-Shaves-Steiner.pdf.

21. A fixed blade knife is, for all intents and purposes, one solid object featuring no moving parts. As such, it requires no preparatory actions to be taken once in-hand in order be ready for combat. Both folding and OTF knives contain their blades inside of the handle. Consequently, both require preparatory actions once in hand to release the blade before it can be used for defense. Automatic versions of those two types require multiple mechanical parts to enable this, as detailed below under Mechanical Failure. Their complex nature may be why Men's Gear magazine selected 15 knives as the best options for self-defense in 2023 without even one being an automatic knife.[7]

22. Similarly, the Contemporary Fighting Arts website explicitly warns readers against using automatic knives for self-defense: "Avoid using spring blades (i.e. switchblades, stilettos or other novelty knives) when engaged in knife combat. Spring blades are inherently dangerous when knife fighting for some of the following reasons: The internal spring can malfunction in a time of need. The structural integrity of the knife is usually poor and will not hold up in knife combat. The hand grips are usually too thin and often slippery for real world combat situations. They look menacing and have a criminal stigma attached to them."[8]

**A. Mechanical Failure: Failing to Open or Lock**

23. Any automatic mechanism that handles the unfolding or OTF opening requires small moving parts to work in unison. A switch (often a button) and safety (if present and set to the lock position) *and* blade locking mechanism (a different part from the safety lock, which is what ensures the knife will not fold back in on the owner during use) must each work successfully for the knife to be usable in combat. As with any machine or tool, mechanical failure is possible. Moving parts designed to work in unison can fail for a variety of reasons including wear,

[7] "15 Best Self-Defense Knives: Keep Yourself Safe With These Top Picks", *MensGear.net*, https://mensgear.net/self-defense-knives/.

[8] "Knife Fighting", ContemporaryFightingArts.com, https://contemporaryfightingarts.com/knife-fighting/.

misalignment, rust, breakage or shoddy construction.[9] A switchblade is no exception and involves a higher chance of mechanical failure than other weapons that are more commonly used for self-defense.

**B. User Error**

24. The difficulties presented by using a switchblade properly also make switchblades a suboptimal self-defense weapon for the average person. Deployment of a switchblade in a self-defense emergency would require reaching into a pocket, removing the unseen item in the correct orientation (so the button is where the appropriate digit can engage it), gripping it an unnatural way (detailed below), pressing the button/flipping the switch and then changing grips into a natural, effective one for combative purposes. And all of that is assuming the safety is already off, which presents another hurdle to proper deployment.

25. Any unfolding switchblade requires the user to hold the knife handle in a precarious and unnatural manner in order to let the blade unfold. The back of the handle would rest in the palm. Meanwhile, the fingers and thumb would pinch the sides of the handle. The cutting edge in this way is on the side opposite the palm and does not come into contact with any part of the person's hand. In short, the

[9] A YouTube search for, "Switchblade fail" brings up a variety of videos on common switchblade operational issues and how to fix them. A sampling of these is provided: "Switchblade Knife: Broken Spring Repair in Pictures", YouTube (Dec. 18, 2023), https://youtu.be/IGkhQsiYQvI?si=-CB1RemUFZhtPKVd; "How to fix your automatic knife - Switchblade with button hard to press", YouTube (Dec. 18, 2023), https://youtu.be/SLSrgXvrsFQ?si=Na20xUX3W525k99-; "How to fix your automatic knife - Switchblade with slow or partial opening", YouTube (Dec. 18, 2023), https://youtu.be/5EeBbfAa0PM?si=v9uw_51A8Ok3kdtl; "How to fix on OTF automatic knife misfire", YouTube (Dec. 18, 2023), https://youtube.com/shorts/EaKTvPdVvn0?si=PPfNbDygtVaaA3Xd; "Most Common Problem With OTF Automatic Knives...Simple Fix :)", YouTube (Dec. 18, 2023), https://youtu.be/5EeBbfAa0PM?si=R02RmAzQ1gkOFETe; "SWITCHBLADE OTF KNIFE MECHANISM MALFUNCTION PART 1", YouTube (Dec. 18, 2023), https://youtu.be/mYXJJ4fnAWo?si=EOeIDln9Kj3IiWWY; "Switchblade Test Fail on Deployment l", YouTube (Dec. 18, 2023), https://youtube.com/shorts/uxcUK6LP5vw?si=sxvucSnW3U5LVwn4; "What to Do When Your OTF Knife Comes Off Track", YouTube (Dec. 18, 2023), https://youtu.be/Mzn5F8INPR4?si=aiMcJrZR89Cv7Rnw".

object is not fully grasped. Not even one of the five fingers encircles the object, so that one entire side (lengthwise) is exposed.

26. Therefore, any unfolding, automatic knife must be held only partially so the opening action can take place, otherwise the back of the unfurling blade will be blocked by the user's fingers. The natural, intuitive way to hold a knife handle or anything of similar size and shape is with the fingers and thumb fully encircling the handle/object. In fact, knife fighting martial arts call this the "natural grip" (see grips overview below in this sub-section). This means automatic knives cannot be used for self-defense until a significant grip adjustment is made, a transition from A to B and back to A with A being the natural grip and B being the open ready position.

27. This is a multi-step fine motor skill operation that requires repeated practice and training in a realistic, adrenalized simulation if it is to be relied upon in a self-defense scenario.

28. If a user operates the opening switch while holding the handle in the most natural position, various undesired outcomes will result. For a single-edged blade, the back of the blade would open into the user's fingers and be unable to unfold for use. A double-edged blade would propel a cutting edge into the user's own hand (inside of the fingers). In either of those two scenarios, there is the additional problem that the interrupted opening of the blade means the entire process must be reset. The operation must be restarted by reinserting the blade inside the handle, effectively reloading the spring. Once that is done, the button must be pressed again.

**C. Additional Dangers Presented by Switchblades**

29. There are three additional dangers presented by both kinds of automatic knives.

30. The first danger is failure to lock. A manually operated knife is locked into place when opened by the user. The person thereby has tactile confirmation

that the blade has been securely locked and the knife is now safe to use. Anyone who opens a folding knife one or two handed will easily feel the locking action. This is because their hand is in direct contact with the blade itself as it is locked into place. That is not the case with an automatic knife. No part of either hand is touching the blade, so the user must trust that the blade locking action completed normally. Locking may fail to take place for the same reasons any machine action can fail (see mechanical failure causes above). In the midst of a sudden self-defense situation, the user is unlikely to realize that this failure occurred due to the touchless operation just described. They would therefore be unaware that they are wielding a blade that can close back down on their fingers with its cutting edge. And it will do so if pressure is brought to bear on the back of the blade or even point depending on the exact angle with the latter. Either way, this can easily occur in the unpredictable tussle of battle where any number of body parts or foreign objects (wall, door, side of a car, etc.) can provide the needed resistance to the blade to encourage it to close. This realistic danger is precisely why folding combat knives have locks in the first place.

31. The second danger is from failure to disengage the safety lock. The safety that many automatic knives feature is perfectly analogous to a firearm's safety. This sensible precaution ensures the knife is not accidentally triggered. And if engaged, then it must be flipped before the knife can be used in self-defense. This adds an additional step involving a small button or switch and fine motor skills to those already listed earlier to the muscle-memory/training requirements for the user. The overall dynamic is similar to firearms: there is a safety that should be engaged when walking around. Thus, it must be disengaged and then the "trigger" must be operated for defense use. Without a substantial amount of training, it is highly unlikely that an individual would be able to quickly and safely disengage a switchblade's safety lock—and then safely deploy the switchblade, as described above—in a self-defense situation.

32. Finally, switchblades present the substantial danger of accidentally opening. If a user fails to use the safety lock when stowing the automatic knife, accidental pressure on the button could trigger the switchblade to open. The owner may be unaware of this as the knife rests in a pocket, handbag, or other location. Should the need arise to quickly extract the knife from clothing or a bag, the user will be surprised to find the knife in the opposite position they expected. They could also cut themselves on the exposed blade.

33. The many pitfalls to automatic knives detailed in this section may be why the famous knives of the U.S. military and militaries around the world are all fixed blade. The fact that militaries the world over clearly prefer fixed blade knives to switchblades underscores the fact that switchblades are not well-suited for self-defense.

## III. IN COMPARISON TO OTHER TYPES OF WEAPONS, SWITCHBLADES ARE PARTICULARLY ILL-SUITED FOR SELF-DEFENSE

34. For several reasons, switchblades are particularly ill-suited to be used as weapons for self-defense. First, unlike weapons such as handguns, pepper spray, or tasers that can end or impede a threat from a distance, switchblades are strictly close-quarters weapons that require hand-to-hand combat skills in order to use safely and effectively against a threat.

35. Second, multiple knife and self-defense writers have observed that using a knife combatively is an action that lies beyond a mental threshold many are incapable of crossing. For example, Gershon Ben Keren is a 5th Degree Black Belt in Krav Maga, the martial art used by the Israeli military. He works in the security industry and holds Master Degrees in Criminology and Criminal Psychology, as well as Psychology. He states that, when compared to chemical sprays and batons, "Knives are used differently, they are not used just to cause pain but to cut and destroy tissue, and cause blood loss regardless of the part of the body which is targeted—they are also generally used at close range, rather than at distance. This

makes it hard to argue that they are by nature a defensive tool, in the same way that a spray, stick or flashlight could be represented as. This is not to say that a knife couldn't be used in a defensive capacity or manner just that inherently it would be difficult to argue that it is anything but an offensive weapon."[10]

36.    Former police officer and current martial arts instructor Mike Pesesko warns watchers of his video on self-defense in the case of a home invader that he does not believe the average person will be psychologically capable of using a knife on an intruder.[11]

37.    Marc 'Animal' MacYoung is a former streetfighter, bodyguard, bouncer, correctional institute Director and security guard. He mentions the significant mental barrier there is to using a knife effectively on an attacker in conjunction with the concept of, "resistance to kill," which in short is that most people feel said resistance and that this resistance increases the closer you get to the opponent.[12]

38.    Combatives instructor Hock Hochheim is, "a former military police patrolman and investigator, a former Texas patrol officer and detective, and former private investigator." Although there are many instructors who teach the use of the knife, including Mr. Hochheim, he corroborates that there is a considerable anti-knife movement/belief in martial arts and self-defense communities. Regarding the anti-knife stance, he states, "I get the message from several Krav Maga, self-defense and combatives schools around the world…"[13]

---

[10] Gershon Ben Keren, "Defensive Knife Carry", BostonKravMaga.com (Dec. 18, 2023), https://www.bostonkravmaga.com/blog/krav-maga/krav-maga-weapons/defensive-knife-carry.html.
[11] "Choosing the Best Home Defense Weapon (Besides Guns), YouTube (Dec. 18, 2023), https://youtu.be/y-PnGz65W-I?si=_CjO1Lb-uzzSF6dV.
[12] Marc "Animal" MacYoung & Dianna Gordon MacYoung, "The Cost of Using a Knife", *No Nonsense Self-Defense* (Dec. 18, 2023) http://www.nononsenseselfdefense.com/costknife.htm.
[13] "Should You Even Dare Use A Knife To Defend Yourself?" Force Necessary: Hock's Hand, Stick, Knife and Gun Combatives (Dec. 18, 2023), https://www.forcenecessary.com/should-you-even-dare-use-a-knife-to-defend-yourself/.

39. As observed by Master Sergeant Ron Engelnam, combat veteran and head coach for Krav Maga Israel, "Very often the people who carried knives ended up getting stabbed with their own knives… This makes sense to me… If you pull out a knife and are not prepared to kill the person in front of you with it, chances are it's going to be used against you."[14]

## CONCLUSIONS

40. Knives—including switchblades—are offensive and deadly weapons by the nature of their design. Without proper training they can be turned against their own user. They have also been dropped in the ultra-intense, adrenalized situation of a self-defense encounter. And the overall danger of self-harm is higher than commonly understood. Additionally, multiple experts feel people will fail to use one when it matters most because it is a vicious, up-close implement.

41. Automatic knives, including switchblades, present a multitude of pitfalls in addition to those shared by all knives. They utilize a combination of small, moving parts. These parts have to work in unison as designed for the knife to be usable for self-defense. Like any contraption with moving parts, they are susceptible to mechanical failure for a variety of reasons. A fixed blade knife does not possess this weakness.

42. The chance for user error, present with all knives as seen in multiple news stories, is increased greatly with automatic knives. This is because a combination of fine motor skill movements and hand position changes including one so counterintuitive that it cannot be found in any taught knife hold must be used in rapid succession to successfully draw out and open an automatic knife in an emergency. A panicked response or overly enthusiastic grip can cause a user to accidentally trigger the opening mechanism before desired. For both types of

[14] "Why Carrying a Knife for Self Defense in Stupid", YouTube, https://youtu.be/R-uwsfgUDOc?si=iC9kWdjBxE_5bNUM.

automatic knives, OTF and unfolding, this can make the knife unusable until further action is taken—action that an attacker is unlikely to afford the knife owner.

43. In sum, switchblades are widely regarded as poor weapons of choice for self-defense.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 20, 2023, at Dallas, TX.

Robert Escobar

Robert Escobar

# EXHIBIT  A

KR1360

# ROBERT ESCOBAR

317 Stoneledge
Irving, TX 75063

robert_escobar@sbcglobal.net
469.371.3224

## SUMMARY

A Six Sigma Black Belt, Robert has extensive experience at leading projects as well as launching and managing company level initiatives within finance, accounting and real estate organizations. More than once in his career, Robert has led a project his employer considered the largest in its history. Strengths include strategic analysis, process improvement, facilitation, communication and risk management.

## PROFESSIONAL EXPERIENCE

**BKD-FORVIS,** Dallas**,** TX **2015 – PRESENT**

**Project Manager**

1 First Project Manager in the company's new project management office.
2 Led the adoption, implementation, training and support of Smartsheet©. These duties included acting as the internal consultant and one-man support team for the entire company *in addition to* leading various projects.
3 Led what was described as the largest project the company had ever undertaken, a 4 year initiative to create a SharePoint-based intranet, file retention and sharing system with automated record retention. This was while supporting Smartsheet as mentioned above.
3 Implemented the Human Resource department's implementation of a new onboarding and offboarding software.
4 Led multiple merger projects when BKD and DHG merged into FORVIS, creating a top ten national public accounting firm.

**CELERITY,** McLean**,** VA **2010 – 2015**

**Consultant**

1 Project Manager at Fannie Mae's national REO (Real Estate Owned) center. Worked on a transformational project that client was taking on to deal with the unprecedented downturn in the housing market.
2 Supported various lines of business during a highly challenging time and in a variety of capacities.

**JP MORGAN CHASE,** Irving, TX **2007 – 2010**

**Manager- Risk Audit Management & Quality** (August 2007 – January 2009)

1 Critical leader in the launch of an organization wide risk management and process improvement program. This included personally interviewing and auditing 13 operational teams, designing and overseeing the testing of 221 individual processes and working with management to identify and address critical risks.
2 Recommended and created the company's 1st ever centralized repository of policies & procedures. This assisted in passing critical bank audits as well as improving efficiency through the use of automated updates and workflows.
3 Selected to serve on all offshore outsourcing initiative project teams. In this capacity, identified and addressed a critical gap wherein these projects were not being properly vetted for compliance with legal and regulatory requirements, including the Gramm-Leach-Bliley and Bank Secrecy Acts.

**TOWN NORTH BANK,** Dallas, TX **2006 – 2007**

**Bank Officer- Business Systems Analyst** (April 2006 – August 2007)

1 Successfully led vendor selection, contract negotiation and implementation of a new payment processing partnership, realizing $20,000/month in savings and negotiating the out of court settlement of a potentially expensive corporate dispute.
2 Selected to act as "Internal Consultant" for the Mortgage Warehouse line of business, whose continued growth was highlighted as a Critical Success Factor for the bank. This included observing and interviewing employees and management, documenting processes, identifying operational risk and identifying efficiency solutions. Was then asked to participate in the development of the department's 5 Year Strategic Plan and lead exercises designed to improve the strategic planning capabilities of team management.
3 Audited all company departments on the security and efficiency of their paper based systems, creating a detailed deployment plan on how and where to best implement imaging. This included creating a standardized imaging audit procedure and tool set.
4 Chosen as Project Manager for the deployment of SharePoint 2007 throughout the organization. SharePoint was a new tool for the company subsequently utilized for managing and documenting audits, projects, policies and procedures.

**WASHINGTON MUTUAL BANK,** Irving, TX **2004 – 2006**

**Project Manager- Risk Implementation Specialist** (Aug 2004 – April 2006)
1 Completed a 'Top Ten' Commercial Group project (e.g. Lockbox Conversion) which touched the entire customer base. In addition, led 3 of the Commercial Group's top 20 projects and 2 of the top 16 in 2005.
2 Designed a Risk Rating tool and methodology used to categorize and prioritize all identified process breakages and risks. Also, created the communication vehicle for the program that captured these.
3 One of the primary drivers of the company's first structured project prioritization effort. This involved creating and launching a local project governance board and acting as Council Chair.
4 Led initiative to review all MFL title policies. This put the company concurrent with policy review work for the first time since process inception. Also, identified a solution that eliminated the need to review most Title Policies going forward, thus greatly reducing cycle time and workload. Implementation involved successfully negotiating with the Chief Legal Officers from the nation's largest title companies.

**TRANSAMERICA REAL ESTATE TAX SERVICE**, Dallas, TX **1998 – 2004**

**Manager- Property Strategy** (July 2003 – July 2004)
1 Set the company strategy for the purchase of tax assessor data nationwide (average yearly expenditure of $1.9 million), reducing costs by $120,000 in 2004.
2 Responsible for maintaining the quality of the company's largest database while reducing manpower by 60%.
3 Acting as Project Manager for a new product initiative with 9 separate staffs.
4 Coached, mentored and motivated a staff of business analysts and IT programmers in exceeding departmental goals in a time of significant change.
5 During corporate merger, managed three operational teams as well as one of eight 'Transition' projects.

**Team Lead** (Mar. 2002 – July 2003)
1 Participated as the only associate on all three company Six Sigma Black Belt implementation teams, contributing to each and acting as the central liaison.
2 Led department associates in increasing the company's database quality by 600%, realizing $10 million in savings over a two-year period.
3 Managed a large, cross-functional project that affected over 80 associates and redesigned a core company process (credited with $1 million annual savings).

## EDUCATION

**University of Dallas**, Irving, TX
Bachelor of Arts in History – May 1995

## PROFESSIONAL TRAINING

1 Proficient with Project Management Institute (PMI) methodology, 2006-2007

2. Systemation © Practical Facilitation & Thriving on Conflict 2005
3. All Washington Mutual Bronze Certification training classes, 2004-2005
4. Six Sigma Black Belt Training and Certification, 2002 – 2003
5. Breakthrough Leadership Training I & II, 2003
6. 7 Habits of Highly Effective People, 2002
7. Toastmasters International, 2003-2005

## HONORS & ACHIEVEMENTS

- Promoted to Bank Officer within 1st year of company service, 2007
- Lightning Strikes Award ($2,000) received in first six months of company service, 2006
- Washington Mutual Silver Award, 2004
- Nominated by Sr. Vice President to be the only 'Transaction' Project Manager not from management, 2003
- Chosen by executive team to be the only Six Sigma Green Belt promoted to Black Belt, 2002
- Best Presentation, Team Lead Conference, 2002
- Best Supporting Team, 1998
- Perfect Attendance, Year, 1997

## COMPUTER SKILLS

Net G Certifications: MS Word; Excel; PowerPoint; Access; FrontPage; HTML/Web Publishing
Recognized as the first Transamerica associate to achieve Mastery Level Certification in any Net G subject
Proficient with MS SharePoint; Mainframe; AS/400; QMF for Windows; RPG; SQL

# PLAINTIFFS' EXHIBIT AB

KR1364

Deposition of

# Professor Robert J. Spitzer

February 07, 2024

Volume I

Knife Rights Inc.

vs.

Rob Bonta Attorney General

aptus.
COURT REPORTING
www.aptusCR.com | 866.999.8310

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

KNIFE RIGHTS, INC., et al.,

Plaintiffs,

vs. No. 23-cv-474-JES-DDL

CALIFORNIA ATTORNEY GENERAL
ROB BONTA, et al.,

Defendants.
________________________________/

REMOTE DEPOSITION OF

PROFESSOR ROBERT J. SPITZER

VOLUME I

Appearing from Williamsburg, Virginia

Wednesday, February 7, 2024

Reported by:
KATHLEEN BACA
CSR No. 10267

JOB No. 10134987

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

KNIFE RIGHTS, INC., et al.,

Plaintiffs,

vs. No. 23-cv-474-JES-DDL

CALIFORNIA ATTORNEY GENERAL
ROB BONTA, et al.,

Defendants.
_______________________________/

Remote deposition via Zoom videoconference of PROFESSOR ROBERT J. SPITZER, Volume I, taken on behalf of Defendants, appearing from Williamsburg, Virginia, beginning at 10:04 a.m. and ending at 1:05 p.m. on Wednesday, February 7, 2024, before KATHLEEN BACA, Certified Shorthand Reporter No. 10267.

APPEARANCES:

(All parties appeared via videoconference.)

For Plaintiffs:

DILLON LAW GROUP APC
BY: JOHN W. DILLON, ESQ.
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
760.642.7150
jdillon@dillonlawgp.com

For Defendants:

OFFICE OF THE ATTORNEY GENERAL
BY: S. CLINTON WOODS, ESQ.
KATRINA UYEHARA, ESQ.
1300 I Street
17th Floor
Sacramento, California 95814
Clint.Woods@doj.ca.gov
Katrina.Uyehara@doj.ca.gov

Volume I
Professor Robert J. Spitzer
Knife Rights Inc. vs.
Rob Bonta Attorney General

# I N D E X

| | PAGE |
|---|---|
| EXAMINATION BY MR. DILLON | 5 |

## E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition of Professor Robert Spitzer and Request to Produce Documents - 4 pages | 12 |
| Exhibit 2 | Complaint for Declaratory and Injunctive Relief - 16 pages | 13 |
| Exhibit 3 | Expert Report and Declaration of Robert Spitzer - 196 pages | 15 |
| Exhibit 4 | Supreme Court case, District of Columbia v Heller - 66 pages | 74 |

Page 4
www.aptusCR.com
KR1369

Williamsburg, Virginia - Wednesday, February 7, 2024

10:04 a.m.

PROFESSOR ROBERT J. SPITZER,

having been administered an oath remotely, was examined and testified as follows:

EXAMINATION BY MR. DILLON

MR. DILLON: All right. Good morning, everyone. My name is John Dillon. I'll be taking the-- Professor Spitzer's deposition today. I'm counsel for the plaintiff in the matter of Knife Rights v Rob Bonta, Attorney General of California. That's Case No. 23-cv-474-JES-DDL.

**Q. Good morning, Professor Spitzer. Is that how I should refer to you today is Professor Spitzer is your preferred --**

A. It's perfectly fine.

And let me just add, I want to thank all of you for allowing me to do this remotely. It's very helpful.

**Q. I don't think anyone is going to complain about the remote depositions these days. I found people tend to enjoy doing them from their offices rather than traveling all over the place.**

 A. Exactly.

**Q. All right. So I'll be asking you various questions today about this case and the expert report that was exchanged between parties that you submitted on behalf of defendants in this case.**

**So can you please state your full name for the record?**

A. Robert James Spitzer.

**Q. Okay. And, Mr. Spitzer, have you been retained by the defendants in this case?**

A. Yes, I have.

**Q. And can you describe what the scope of your retention is?**

A. I was asked to research information about switchblades and related weapons' history pertaining to comparative -- comparing with modern switchblades, which of course, are a modern invention.

**Q. Okay. So before we really get into all this stuff there is a number of admonitions I would like to go over with you.**

**First, have you ever been deposed before?**

A. Yes, I have.

**Q. Okay. And I imagine it was a fair number of times. Correct?**

A. Actually, only a couple times.

**Q. Okay. And what case were you deposed before?**

A. One case was Massachusetts in 2017. It was a First Circuit Court of Appeals. I believe it was Worman vs Healey, although the name might have changed.

And I was also deposed more recently for a case in Oregon in early last year.

**Q. Okay. And did you have the same role in those cases as you do now?**

A. The issues at stake were different, but, yes, as a -- as someone who would research the historical questions pertaining to old weapons' laws particular to the circumstances of those challenges -- yeah -- or those cases.

**Q. Okay. And are all the matters in which you've been deposed listed in your CV?**

A. They are listed in the materials I submitted, perhaps, at the beginning of my submission and also on my CV.

**Q. Okay. So I just want to remind you you're under oath and you have sworn to tell the truth and the effect of that oath is the same as if you were testifying in court.**

**Do you understand that?**

A. Yes, I do did.

**Q. And although the deposition be is being**

conducted remotely, it doesn't change the fact that we're going to conduct it as if we're all in the same room and your oath still applies.

Do you understand that?

A. Yes, I do.

Q. And I'll note that no notes are going to be allowed during the deposition and you may not read from anything other than the exhibits that's presented by me or your counsel.

Do you understand that?

A. Yeah. I have a pad in front of me with some -- you know, I like to have a pad in front of me.

Is that okay?

Q. So you're saying you write down stuff as we're going to be talking?

A. Yes.

Q. Okay. Yeah, that's fine. I'm referring to prewritten notes. You can't be referencing those or looking on another screen or looking at text messages or e-mails or anything like that while we're conducting the deposition.

Do you understand that?

A. Okay. Yes.

Q. Okay. So I'll also note that during the deposition you're not permitted to communicate with

anyone or even your attorney while a question is pending. That is to say, again, no text messages, e-mail, Chat or electronic communications of any kind are permitted during questioning.

Do you understand that?

A. Yes.

Q. Okay. And also be aware that no one else is permitted to be in the room with you during your deposition.

Do you understand that?

A. I told my wife not to come in.

Q. Okay. You know, luckily I don't have a problem. I have kids; I've had them bust in. If your wife mistakenly does that, we'll forgive you.

A. Thank you.

Q. All right. So please answer audibly and only after I've finished asking the full question. And that's -- also helps, you know, so we don't talk over and it also helps the court reporter be able to write down each person's words effectively. So just make sure that only one person is speaking at a time.

Do you understand that?

A. Yes.

Q. I'd also ask that you don't guess when providing responses. But if appropriate I'll ask you to

 provide an estimate based off your best recollection and experience or expertise.

Do you understand that?

A. Yes.

Q. Along those same lines, please don't try to use any hand gestures when answering any of my questions. So if I ask you, you know, how many times did this happen? Don't hold up one or two. Please answer audibly there. And someone that speaks with my hands I understand the problem.

Do you understand that?

A. Yes.

Q. Okay. You're also entitled to request a break at any time to use the restroom. You know, have a break for any other reason. If you need a break, please let me know and I'll accommodate that request.

The only I'm thing I'm going to ask is that if there is a question pending I ask that you answer before we take the break.

Do you understand?

A. Yes.

Q. All right. And your attorney may make objections to, you know, questions that I ask. They are objections for the judge to consider later. So you're required to answer unless you're told specifically by

your counsel not to answer a question.

Do you understand that?

A. Yes.

Q. Okay. And note that the court reporter is recording all the questions, answers and objections and will reduce that information to transcript form. After which the deposition ends you'll be able to have the opportunity to read that transcript and correct any inaccuracies.

Do you understand that?

A. Yes.

Q. Okay. And if you make any changes in your testimony that are inconsistent with the answers given during the deposition, I will be entitled to comment on those discrepancies at trial to question your veracity.

Do you understand that?

A. Yes.

Q. Finally, any reason today why you can't give your best testimony?

A. No.

Q. Are you suffering from any medical condition that would prevent you from giving your best testimony?

A. No.

Q. Are you currently on any medication that would prevent you from giving your best testimony today?

A. No.

**Q. Do you have any questions about the procedures which I just described?**

A. No, sir.

MR. DILLON: Okay. All right. So the first thing I'm going to do is I'm just going to -- let's see. I'm going to screen share here.

**Q. Okay. Do you see the document on the screen before you?**

A. Yes, I do.

MR. DILLON: Okay. I'm going to be introducing this as Plaintiff's Exhibit 1, which I e-mailed your counsel a copy of and it's posted on the screen.

(Exhibit 1 was premarked and identified during the proceeding.)

(Mr. Dillon screen shares Exhibit 1.)

MR. DILLON: Q. So can you read the title of that document?

A. Notice of Deposition of Professor Robert Spitzer and Request to Produce Documents.

**Q. Okay. Have you seen this document before?**

A. Yes.

**Q. Have you reviewed it in full?**

A. Yes.

**Q. And are you prepared to testify regarding the subject matter identified in this notice of deposition?**

A. Yes.

MR. DILLON: Okay. Now I'm going to be introducing a new exhibit, Plaintiff's Exhibit 2.

(Exhibit 2 was premarked and identified during the proceeding.)

(Mr. Dillon screen shares Exhibit 2.)

MR. DILLON: Let's go to that.

**Q. Do you see the document on the screen before you?**

A. Yes.

**Q. And can you read the title of that document?**

A. Complaint for Declaratory and Injunctive Relief.

**Q. Okay. Have you seen this document before?**

A. I believe I have.

**Q. Okay.**

A. If this is the document that I cited once or twice in my submission, then the answer is yes.

**Q. Okay. I can scroll through if you want to refresh your memory here.**

**Does this document look familiar?**

A. I believe it does. Yes. How many pages is it? You don't have to go to the end.

**Q. Let's see.**

A. Does it say?

**Q. 15.**

A. Okay. Thank you.

**Q. All right. And have you read this document in full?**

A. Yes.

**Q. And you're prepared to testify regarding the subject matter identified in this document?**

A. In general terms, yes. I have not read it in awhile though.

**Q. Okay. Let's do this here. So are you aware that plaintiffs are challenging California Penal Code Sections 17235, 21510, and 21590 in this case?**

A. If that pertains to the California switchblade law, then yes.

**Q. Okay. And are you familiar with California Penal Code Section 17235?**

A. Pertinent to switchblades I have read it, yes.

**Q. So you're familiar with the definition of switchblades under California law?**

A. I couldn't recite it for you verbatim right now, but in general terms, yes.

**Q. And, again, you're generally familiar with California Penal Code Section 21510?**

MR. WOODS: I'm just going to interpose an objection to the extent familiarity implies that he's a lawyer or providing a legal opinion. It's beyond the scope.

But you can answer.

MR. DILLON: I'm just asking if you read these Penal Code Sections and you are generally familiar with this subject?

A. Yes.

**Q. Okay. And, again, you're generally familiar with California Penal Code Section 21590 as it relates to this case?**

A. Yes.

MR. DILLON: Okay. I'm going to share screen here. I'm going to turn to what I'm marking as Plaintiff's Exhibit 3, which I believe your counsel has e-mailed to you and it's also posted on the screen in front of you.

(Exhibit 3 was premarked and identified during the proceeding.)

(Mr. Dillon screen shares Exhibit 3.)

MR. DILLON: Q. Can you see that document?

A. Yes.

**Q. Can you read the title of that document?**

A. Expert Report and Declaration of Robert

Spitzer.

Q. And you've seen this document before?

A. Yes.

Q. And are you the author of this report?

A. Yes.

Q. And did anyone else assist in authoring the report?

A. No.

Q. Are the facts and information in this report true and correct?

A. To the best of my knowledge, yes.

Q. And are you prepared to testify regarding the subject matter identified in this expert report?

A. Yes.

Q. Just for future reference, you know, I'm going to refer to this report a number of times and I'll likely just say your report. So I just wanted the acknowledgment you know I'm talking about this expert report that you submitted in this case.

Is that correct?

A. Yes.

Q. Do you understand that?

A. Yes.

Q. Okay. So what steps have you taken to prepare for the deposition today?

A. To prepare for the deposition I went back and reread this document, the report and declaration I prepared. I looked at some of the sources that I drew on. Let's see. And I read through the initial complaint that gave rise to the challenge.

**Q. And when you say that you referenced some of the original sources, what sources were those?**

A. I don't have the list. I went back and looked at some -- something I had written at -- sort of general information about the switchblade controversy and about the historical cases that I cited in my declaration.

**Q. Okay. Since learning about your deposition in this case, other than your counsel, did you talk, text or e-mail or communicate with anyone regarding your deposition?**

A. No.

**Q. And going back to your report here. I'm going to scroll down, if I can.**

**So listed under your report under what's entitled Exhibit A, is this your curriculum vitae?**

A. Yes, it is.

**Q. Okay. So going up here -- sorry about that.**

**Okay. So as part of your report today you conducted a search of Newspapers.com.**

**Is that correct?**

A. Yes.

**Q. And in that search you specifically searched for references to the term "switchblades"?**

A. Yes, I did.

**Q. And the time period for this search you started in 1870 and went through 1959.**

**Is that correct?**

A. I believe that's right, yes.

**Q. Did you conduct any other searches not mentioned in the report?**

A. No. I did also conduct a search of the New York Times but I did mention that in the report too.

**Q. Okay. Thank you.**

**Did you conduct a search for the term, you know, quoting -- I quote "auto knife" or "auto knives"?**

A. I may have.

**Q. So you did conduct other searches?**

A. Yeah. Back when I originally was doing this work, yeah.

**Q. Okay. Did you conduct a search for the term "automatic knife"?**

A. No. No.

**Q. Did you conduct a search for the term "automatic knives"?**

A. No.

Q. Did you conduct a search for the term "automatic pocket knife"?

A. No.

Q. Did you conduct a search for the term "automatic pocket knives"?

A. No.

Q. Did you conduct a search for the term "Jack-O-Matic knife"?

A. No.

Q. Did you conduct a search for the term "push-button knife"?

A. I do not believe so, no.

Q. Did you conduct a search for the term "push-button knives"?

A. No.

Q. Are you aware that all of the terms I just referenced are various terms that describe and identify switchblades or automatically opening knives?

A. Yes.

Q. Let's share this here. So I'm going to direct you to Page 7, Paragraph 16 of your report, beginning on Line 15 with the word "First."

Can you read that first sentence, please?

A. "First, I uncovered virtually no reference to switchblade-type pocket knives, aside from some

pertaining to the machine parts (not hand-held knives) using in manufacturing that utilized what were also termed switchblades, until the early twentieth century."

**Q. All right. So can you elaborate on what you mean by that statement "switchblade-type pocket knives"?**

A. Well, it is a generic reference to what we today think of and understand to be a switchblade. That is a knife that -- where the blade is in -- is stored in the handle and it is opened through depressing a button or trigger or something similar. And through spring loading when you depress the trigger the knife comes out of the handle and is deployed.

**Q. So when you say you uncovered no references to a switchblade-type pocket knife you found, you're saying you found virtually no reference to any automatically opening knife?**

A. Well, I wouldn't say that exactly. It seems to me that there were references to knives that we think of as switchblades on, perhaps, a few random instances in these early newspapers.

So I would not say there were zero, but it was extremely few in the search that I conducted.

**Q. All right. So is it virtually no references or a few references?**

A. Well, as it says, virtually no references,

which doesn't mean zero; it's more than zero, but it's a very, very small number.

**Q. And what would your estimate be on that?**

A. I don't know that I could peg a number to it. I did this in November or so of last year. And I didn't keep a copy because there really -- it wasn't the key feature I was interested in because no automatic-type knives, switchblade-type knives existed in the 19th century. That wasn't the key question.

**Q. Okay. And did you conduct a search for the term switchblade-type pocket knives in the Newspapers.com?**

A. No. I do not believe I did.

**Q. Okay. So would you agree that automatically opening knives are pocket knives?**

A. To the extent that you could fit one in your pocket, yes.

**Q. Okay. And then further down again in Paragraph 16, starting on Line 18, you state, "The first multiple newspaper accounts of switchblades appeared in the mid-1920s, increasing in the 1930s and persisting through the years of World War II (1941 through 1945.)"**

**Is that correct?**

A. Yes.

**Q. Okay. And what were these stories about**

**during this period?**

A. They were references primarily to switchblade-related crimes.

**Q. So was each story a specific reference to a crime committed with a switchblade?**

A. Well, I didn't log and count each individual story. So I cannot say with certainty that each and every story was a switchblade crime.

The chief observation was that there were scattering of these stories during the World War II years. Remembering also that during World War II, millions of young men who are those most likely to commit crimes were in uniform and were abroad under arms. And that during wartime crime levels -- at least violent crime levels -- tend to be lower than during peace time.

**Q. Okay. And how many stories were there that you referenced from the mid 1920s to the 1930s?**

A. I provided an account. I think it's on the next page. I don't recall what the exact numbers are.

**Q. Okay. We'll get to those specific counts.**

**So what you're referring to here you specify later on in your report with the specific story numbers?**

A. Yes.

**Q. Okay. And, again, we'll get into the key**

details of this a little bit later.

But were there any duplicates to the stories that you found in the search?

A. Yes, there were.

Q. And how many stories that -- you know, the results that you found were duplicates?

A. I did not do an account of the duplicate stories. There is much more analysis that could be done with this massive amount of information but I didn't have the time or the resources. And I'm not sure California has the treasury to pay me to do that degree of research, especially in this time frame.

Q. Okay. Do you have an estimate of how many stories were duplicates that you reviewed?

A. I do not. But it was clear immediately that -- because just like today, wire service stories -- news stories are reprinted and transmitted around the country on wire services of various kinds. In these days it was mostly AP, UP, that sort of thing. And it was common and customary for other newspapers to pick up stories that originated in some other location.

Q. Okay. All right. So, again, in Paragraph 16, the last line, it states "During this period, relatively few switchblade crimes were reported, but those" -- and going on to Page 8 -- "those crimes that did receive

**coverage were often reprinted in many newspapers"**

**Is that correct?**

A. Yes.

**Q. And the years that you're referencing with this statement, is that from 1941 to 1945 or is that a bigger range of years?**

A. It looks -- yeah, that sentence would reference not only the World War II years, but the previous decade as well.

**Q. Does that include -- so it's starting from the mid 1920s through 1945?**

A. Yes. I believe that was my intention in that sentence.

**Q. Okay. And when you say that relatively few switchblade crimes were reported, are you referring to police reports or news reports?**

A. News reports. Sometimes the news reports included police information. But other times it was simply a report of discussing what the reporter uncovered.

**Q. Okay. So your search from mid 1920 to 1945 resulted in, you know, relatively few switchblade crimes.**

**Is that correct?**

A. Compared to later, yes.

**Q. Okay. And what do you mean by "relatively few and compared to later"? How many crimes were reported in that period?**

A. Well, again, I'm counting number of newspaper stories, not number of crimes. And understanding that the constant throughout this entire period is the reputation of news stories and multiple newspapers throughout this entire period.

So given that as a constant, I'm making that statement in comparison to the numbers to come in the -- at the end of the 1940s and up to 1959.

**Q. Okay. So -- but you don't have any idea of the actual number of crimes committed, do you?**

A. No. I did not do that analysis. It's number of stories, not number of crimes.

**Q. Okay. And, again, on the top of Page 8 here, kind of starting on the Page 7 to the top of Page 8, you state that "Few crimes" -- "A few crimes that were reported were often reprinted in many newspapers."**

**Is that correct?**

A. Yeah.

**Q. Okay. So if a single crime that happened it could have been reported five, 10 times by different newspapers.**

**Is that correct?**

A. Yes.

**Q. And in your search on Newspapers.com that would result in 10 different results in your search?**

A. Yes.

**Q. Okay. And then on Page 8 in Paragraph 16. So the top of Page 8 here. You also state "From 1940s through the mid 1950s, news reports and stories of switchblade crimes exploded in numbers."**

**Is that correct?**

A. Yes.

**Q. What do you mean by "exploded in numbers"?**

A. The numbers rose very, very dramatically.

**Q. Okay. And how many unique or separate crimes did you find news reports for during that time?**

A. Again, I didn't count the number of crimes. My unit of analysis was the story -- the number of stories not the number of crimes.

**Q. Okay. And, again, were there duplicate stories during this period?**

A. Yes.

**Q. And did you review any actual police reports?**

A. Raw police reports, no.

**Q. And did you confirm the accuracy of the facts reported in these articles?**

A. No.

**Q. Okay. Did you review any original source documents aside from the Newspapers.com articles?**

A. It depends on what you mean by original source.

**Q. Police reports, firsthand accounts of any crime, anything like that?**

A. Not police reports. I don't know that they would even be accessible or available through the Internet. In terms of first -- in terms of firsthand accounts, some of these stories reported firsthand accounts as in interviews with police officials or interviews with victims, that sort of thing.

**Q. Okay. So, again, I'll direct you to Page 8 and this is in Paragraph 17. You state, "Second, instances of reported criminality involving switchblades during the pre-World War II period occurred almost entirely in the Southern states."**

**Is that correct?**

A. Yes.

**Q. And what do you mean by "Instances of reported criminality involving switchblades"?**

A. Well, when you -- when I read news stories about switchblade crimes, you would want to know what the date line is. Where is the story from. And so you might read a story in a Northern newspaper, but it's

reporting a crime in a Southern state.

So that is relevant in terms of where these instances occurred. And taking that into account, that yielded the comment that -- the sentence you just read.

**Q. Okay. So you reference -- you reviewed each of these newspaper results and identified each instance where there was a crime reported in a Southern state?**

A. Well, as I was looking through the newspapers I'm looking to see where did this time occur. And I was struck immediately by the fact that virtually every story was reporting a switchblade crime in a Southern state. It was kind -- it kind of jumped out at me after reading a few stories. Again, this is in the pre-World War II era.

**Q. Okay. But you didn't review every single story or incident.**

**Is that correct?**

A. Yes. That's correct. I did not.

**Q. Okay. About how many reports or articles did you review?**

A. Well, I did not keep a count of each and every story I looked at. I certainly did not look at every story that accounts for the tabulations that come a little later on in my document.

**Q. Okay. Would you say you reviewed half of the**

**stories you tabulated in your report?**

A. Oh, fewer than half.

**Q. How about a fourth?**

A. I'm -- I cannot assign a number to it because I didn't keep track. I looked at a great many. But it was a small percentage of the grand total of stories that I report in my document.

**Q. Okay. What would you estimate that percentage to be?**

A. I couldn't peg a number to it. I would add that when you look at the total number of stories when you get to the 1950s, it's clear that the percentage of stories I would have looked at would have been very much smaller than the percentage of stories that I looked at from the 1920s or 1930s, for example. Because there were far fewer stories early on.

**Q. Okay. So would I be correct in saying you reviewed less than 10 percent of the total stories?**

A. I -- I -- the percentage would be higher for the earlier time periods because there were fewer stories. I couldn't -- honestly, I could not put a percentage number on that with any certainty.

**Q. Okay. But it was relatively few when you're considering the total amount of stories.**

**Is that correct?**

 A. That is right.

**Q. So, again, we'll go to Page 8, Paragraph 20 here. You state that there -- and I'm paraphrasing here. There are two reasons for the absence of remedial legislation to restrict switchblades during the 1930s."**

**Is that correct?**

A. Yes.

**Q. And you list the first reason -- first the number of incidents of switchblade crimes was relatively low up to the 1930s.**

**Is that correct?**

A. Yes.

**Q. And the second switchblade criminality seemed confined to African American communities in the Southern states.**

**Is that correct?**

A. Yes.

**Q. And you go on to state that "White leaders would take little interest in moving to address crime problems that did not affect the White community."**

**Is that correct?**

A. Yes.

**Q. What is the basis of claim?**

A. America in the 1930s was a segregated racist society. And in pretty much any and every type of

policy you could think of separate but equal was still the law of the land, as you know. Housing policies, employment policies, government assistance programs, which there were many during the depression of the 1930s, but normally and in most instances African Americans did not benefit from those programs, at least not in the way that White people did. Especially in the South, where most African Americans lived at the time.

I mean, I didn't include a footnote here, but it would be easy enough to do that. But it was a racist society and the notion that Whites -- that White rulers -- Whites governed Southern states uniformly -- local governments, county governments, state governments. I think it's reasonable to conclude that they would have taken little interest in enacting public policies to protect African Americans from crime visited upon other African Americans.

**Q. Okay. And could it be that the actual incidents in the African American community were also relatively low?**

A. Well, low compared to what?

**Q. Well, reviewing the -- you state earlier that -- go back to "The number of incidents of switchblade crimes was relatively low up to through the 1930s." Right?**

A. Yes.

**Q. Okay. And, you know, while there seems to be crimes committed in the Southern states, could that also be a relatively low amount of crime?**

A. Compared to what? Compared to overall crime?

**Q. Sure.**

A. Well, I guess I would say it this way. Crimes were routinely reported, in general, in the American media. And that goes back hundreds of years. Crime news is always news, like it is today. And in terms of switchblade crime, my attentive conclusion was that -- this subcategory, switchblade crime, tended to be confined to the African American communities of the South.

**Q. And what do you base that off of? Just the Newspapers.com articles?**

A. Yes.

**Q. Okay.**

A. And I would just add it's because the news reports were careful to identify when these crimes were committed by African Americans. Typically, they would use the term Negro and they were often -- they were typically identified as such when they were the perpetrators or the victims or both.

**Q. Okay. So I'm going to direct you to Page 9,**

**Paragraph 21. It's going to be the top of the page here.**

**You state "While this aggregate summary of news stories, summarized below, is a blunt measurement of switchblade criminality, it is nevertheless revealing.**

**Is that correct?**

A. Yes.

**Q. Now, is this a blunt measurement because you're relying on news stories that are anywhere from 65 to 154 years old?**

A. No.

**Q. That's not why it's a blunt measurement?**

A. No.

**Q. Why is it a blunt measurement?**

A. Well, because of the reasons I described in the report. There is a high degree of the story redundancy, as we have been talking about.

One incident being reported in many, many, newspapers. And I did not engage in the kind of filtering that would have identified the number of instances as opposed to the number of news reports. And you're using a source of information that is newspapers, which aren't an imperfect source. Because we can safely assume that not all crime was reported. Not all

reported crime made it to the newspapers to be reported as a story.

However, as a proxy for what's going on in society, it's a reasonable, if blunt measurement of switchblade criminality.

**Q. Okay. Is it fair to say it's also blunt measurement because there is no way to verify the information in these stories?**

A. Well, there might be ways to verify the information. Again, the basic news stories were -- maybe the legal equivalent would be a finding of fact, that is, certain events occurred. They had to be reported to the authorities in some manner.

And in -- and then there would be -- there would be news reports forthcoming because a standard reporter's beat would be the police station -- would be, you know, following the police to a crime scene to report the occurrences at the crime scene, things like that.

So in terms of accuracy, reporters by this time are professionalized; they are following journalistic standards. And there is good reason to believe that the accounts that are provided may not be a completely accurate representation of all pertinent facts, but are -- provide general, reliable and useful

 information about what's going on the ground in general terms in the U.S.

**Q. Okay. And that's because you did verify the information in these articles.**

**Is that correct?**

A. I did not -- I did not track back specific instances to obtain more information about them beyond what appeared in these news stories; that is correct.

**Q. And as these are news stories at best, these are secondhand accounts of events that were recorded to them.**

**Is that correct?**

A. Well, I guess secondhand -- well, secondhand account? If a crime occurs and the reporter talks to the victim or a police officer, let's say, does that constitute a secondhand account?

**Q. As a secondhand account. So for purposes of this question --**

A. Okay.

**Q. -- were they be secondhand accounts?**

A. By your definition, certainly, yes.

**Q. Okay. All right. So directing you to Paragraph 22 here. This is where it seems like you got the more specific information with the amount of results that you got in your switch -- or your search of**

Newspapers.com.

Is that correct.

A. Yes.

Q. Okay. So in Newspapers.com you searched the term "switchblades" in the period of 1921 to 1939.

Is that correct?

A. Yes.

Q. And that resulted in 424 stories with the word "switchblade" mentioned?

A. Yes.

Q. And you searched the term "switchblade" in the period between 1940 to 1945.

Is that correct?

A. Yes.

Q. And that resulted in 612 stories with the word "switchblade" mentioned?

A. Yeah.

Q. And you searched the term "switchblade" in the period between 1946 to 1950.

Is that correct?

A. Yes.

Q. And that resulted in 824 stories with the word "switchblade" mentioned?

A. Yes.

Q. And you searched term "switchblade" for the

 period of 1951 to 1955. Correct?
A. Yes.
Q. And that resulted in 9,713 stories with the word "switchblade" mentioned?
A. Yes.
Q. And you searched the term "switchblade" for the period of 1956 to 1959.
Is that correct?
A. Yes.
Q. And that resulted in 19,929 stories with the word "switchblade" mentioned?
A. Yes, it did.
Q. Okay. So, again, in Paragraph 22 you state that "These numbers likely underestimate the number of newspaper stories about 'switchblades' because, as noted below in Paragraph 26, many news stories simply reported 'knife stabbings' without specifying that the knife involved was a switchblade."
Is that correct?
A. Yes.
Q. Okay. Did you conduct a separate search for the term or the terms "knife stabbing"?
A. No.
Q. Okay. How do you know that "Many news stories simply reported 'knife stabbings' when a switchblade was

**involved?"**

A. That is in Paragraph 26, I believe.

**Q. Scroll down to Paragraph 26. So can you take a look at Paragraph 26, which is on the screen now, and can you direct me to how you know that many of these stories that reported knife stabbings involved switchblades?**

A. I believe it's because this -- this story that appeared in this magazine called Woman's Home Companion about switchblades, the author of the research or the author of the article -- Pollack was his last name -- was because he reported that knife crimes didn't necessarily specify that the knife used in the crime was a switchblade.

So that's from a contemporaneous observation from this story.

**Q. Okay. So you're basing that statement in Paragraph 22 off of Mr. Pollack's statement that's quoted in Paragraph 26?**

A. Yeah. Yes.

**Q. So you have no personal knowledge that in the number of these stories that describe knife stabbings, they involved a switchblade, do you?**

A. Say again. That the number --

**Q. You have no personal knowledge that many of**

**the news stories that simply reported knife stabbings involved switchblades?**

A. No, it's not personal. I'm citing a secondary source.

**Q. So did you find a number of stories that reference a knife stabbing in which the actual criminal incident involved a switchblade?**

A. Well, if it involved a switchblade and it said "switchblade," then it would be included in the account.

If it was a crime that involved a stabbing, simply referencing a knife without mentioning switchblades, it would not have made it into my tabulations.

**Q. Okay. So the sole basis for your claim that many didn't specify that a switchblade was used was this Pollack comment in Paragraph 26?**

A. Well, I think there is other information, such as the Congressional Hearings from the 1957, '58 made a similar point; that is to say, in the tabulation of crimes and crimes statistics the information gathered did not necessarily indicate the type of knife used.

In other words, it was not a standard piece of information that police authorities would have reported. And so --

**Q. So if none of these reports that you reference**

 **in, you know, all acts of articles or the Senate Report identified what type of knife was used, how can you come to the determination that a switchblade was used?**

A. Well, the point is we don't know.

**Q. So you have no idea?**

A. Well, the counterquestion is, is every knife crime during this time period a switchblade knife crime? Surely the answer is no. It's not reasonable to assume that every knife crime that is committed with a switchblade.

So there has to be a difference between the number of switchblade knife crimes on the one hand versus the number of knife crimes on the other. And the statistics --

**Q. Excuse me.**

**So you have no idea in these stories that just describe a knife stabbing, you have no idea whether or not a switchblade was used.**

**Is that correct?**

MR. WOODS: Objection. Argumentative.

I'd also say that counsel let the witness finish his statement.

MR. DILLON: Okay. So I'll ask the question again and I just need a yes or no here.

**Q. So when you state that many news stories**

**simply reported knife stabbings, you have no idea whether those incidents involved a switchblade.**

**Is that correct?**

A. I think the answer is yes.

**Q. Okay.**

A. That is, if the stories only mentioned a knife, didn't mention switchblade, I would not know if a switchblade was involved. And, indeed, police authorities and others may well not have known as well from the time, precisely because they did not keep systematic track of the type of knife used in every knife crime.

**Q. Okay. And, again, just to clarify. Earlier you state that many of the switchblade stories that you reviewed were often reprinted by many newspapers.**

**Is that correct?**

A. Yes.

**Q. Okay. And would this result in an overreporting of stories involving switchblades?**

A. No.

**Q. Okay. Can you explain that?**

A. Sure.

Newspapers reprint stories all the time, every day, and that have done so for hundreds of years. So it isn't just switchblade stories or crime stories. It's

stories of every variety that, even today, if you pick up an actual newspaper and read the stories, you'll see many of them come from other news organizations or wire services like AP and UPI, et cetera.

So it's simply ubiquitous reporting practice that publications reprint stories from other parts of the country and from other services that make available for reprinting news stories. So it happens with switchblades, but it happens with crimes, it happens with politics, it happens with every subject matter you can think of that's reported in the news.

**Q. Okay. So let's go down -- let's go back up -- sorry -- to Paragraph 23 here.**

**You state that you also conducted a New York Times newspaper archive search. Is that correct?**

A. Yes.

**Q. Is that similar to the Newspapers.Com search that you conducted?**

A. Well, it's -- it's similar in that I searched for the term "switchblade," but it's different because the search is one, and only one newspaper.

**Q. Okay. Let's see. And in Paragraph 23, you state the earliest reported instance of a crime committed with a switchblade was in New York City in 1944 in a New York Times newspaper archive search.**

**Correct?**

A. Yes.

**Q. So prior to 1944 New York Times -- the New York Times search that you conducted resulted in zero crimes reported with a switchblade?**

A. In zero stories about switchblade crimes, yes.

**Q. Okay. And the 1944 crime that's referenced in the New York Times article, was that a crime where a Marine reportedly murdered a woman with a switchblade.**

**Is that correct?**

A. Yes.

**Q. Okay. Was the Marine convicted?**

A. I do not know.

**Q. Did you confirm whether or not he, in fact, murdered the woman with a switchblade?**

A. No.

**Q. And in -- on Page 9 -- if we go to footnote No. 19. You also reference the next switchblade story which appeared in 1949. Correct?**

A. Yes.

**Q. Okay. And this was a 16-year-old who was arrested for possession of a switchblade?**

A. Yes.

**Q. Was he convicted?**

A. That, I don't know.

**Q. Okay. Did you confirm whether he, in fact, had a switchblade?**

A. No.

**Q. So you have no idea if a crime was actually committed, do you?**

A. Well, he was arrested for being 16-years-old and in possession of a switchblade. That seems to be a pretty clear fact based on the reporting.

**Q. So you have the fact that he was arrested but not convicted. Is that correct?**

A. I do not know what the outcome of the case was. That's correct.

**Q. Okay. And then in all of these news stories that you found in both your New York Times search and Newspaper.Com search, did you confirm any convictions of any of the reported crimes?**

A. As I indicated, I did not conduct detailed research on the crimes reported in the news stories because my unit of analysis is the story, not the crime.

**Q. Okay. So, again, in Paragraph 24 at the end -- at the end of the Page 9, it states "That is, the total number of stories vastly exceeds the number of discrete instances of switchblade crime because most of them are single instances that were reported in many newspapers. Correct?**

A. Yes.

**Q. Okay. And you go on to state, "Without question, the data buttress the conclusions that switchblade crimes increased after World War II, spread to areas of the country outside of the South, and that public debate over how to address the problem also escalated." Correct?**

A. Yes.

**Q. And the basis of that opinion is the Newspaper.com article results?**

A. Yes. And my reading of them accumulating in the numbers that are in the report.

**Q. And your reading of minority of the stories. Correct?**

A. Yes.

**Q. Okay.**

A. I would call them my sampling of -- my reading sampling of the stories.

**Q. Okay. Do you know how many of the stories that you reviewed were descriptions of unique violent crimes committed with a switchblade? And, for example --**

A. No.

**Q. -- I would say the story regarding the Marine who murdered a woman with a a switchblade.**

A. What about that story?

**Q. Do you know how many of the stories that you reviewed were an incident of a violent crime along those lines?**

A. No, I do not.

**Q. Okay. Do you know how many of the stories that you reviewed discussed a situation like that 16-year-old who was just possessing a switchblade knife?**

A. I do not.

**Q. Do you have any idea what the relative numbers are between actual violent crimes involving a switchblade or just possession crimes involving --**

A. No.

**Q. -- switchblade --**

A. I did not engage in that level of analysis.

MR. WOODS: Dr. Spitzer, make sure to let him finish the question.

THE WITNESS: Oh, sorry. Yes. My apologies.

MR. DILLON: Q. So do you -- did you find any hard data or original source material that would provide verifiable conviction data regarding switchblade crimes?

A. I don't know what you mean "verifiable conviction data." What do you mean?

**Q. Well, did you review any source material that would be able to verify that an individual was actually**

**convicted of a crime involving a switchblade?**

A. No. I did not engage in that sort of research.

**Q. Okay. And, again, I'll direct you to Page 10, Paragraph 24. Towards the end you state that "Public debate over how to address the problem also escalated." Correct?**

A. Yes.

**Q. And this escalation of the public debate is seen through many news stories that you found in your search results?**

A. Yes.

**Q. And how many of those stories were discussions of switchblade policy of potential legislation?**

A. I could not put a number on it. But there were a notable number of such stories.

**Q. What do you mean notable? Is that a majority of the stories?**

A. I could not put a number on that.

**Q. Okay. Was it more than the number of unique incidences of switchblade crimes?**

A. I could not say.

**Q. Okay. So from 1921 to 1939 of your search you couldn't tell me how many were discussions of switchblade policy?**

A. I do not recall any stories. Now, my memory is less than complete, but I do not recall any stories pertaining to the public policy surrounding switchblade knives in the 1920s and '30s.

**Q. How about from 1940 to 1945?**

A. It seems to me I recall, perhaps, a very small number of stories that -- during the World War II period that referenced discussions in state legislatures or city governments talking about, you know, should we reenact an anti-switchblade law of some kind.

I think those discussions began to appear -- again, this is going off my memory of going through these articles. I think they was a sprinkling during the World War II years. Not many, but a few.

**Q. Okay. So the number of stories that discussed the policy and potential legislation that would increase from 1946 to 1950?**

A. Yes.

**Q. And, again, that would continue to increase from 1951 to 1955?**

A. Yes.

**Q. And, again, say it increased from 1956 to 1959?**

A. Yes.

**Q. Okay. All right. So I'm going to direct you**

to Page 10 of your report. In your Section B titled Switchblades, Juveniles and Crime, you rely on the source of Woman's Home Companion article titled "The Toy That Kills.

Is that correct?

A. Yes.

Q. Okay. And this was a magazine article written by Jack Harrison Pollack?

A. Yes.

Q. Okay. And let's -- actually, sorry. I'm going to go back to the shared screen again.

In Paragraph 26 you state "Unlike traditional pocket knives, switchblades' ease of opening and thin, sharp, pointed blade lent them to be used impulsively and lethally as stabbing and slashing instruments."

Do you see that?

A. Yes.

Q. Okay. What is the basis of that claim?

A. Well, that's a paraphrase of the argument that Pollack makes in his article.

Q. Okay. So that's not your argument?

A. No.

Q. And did you verify, you know, Pollack's statement in any way?

A. Well, as I just said, it's a paraphrase of the

argument that he makes in the article. I read the article multiple times and, you know, I go -- in that same paragraph I go on to talk about what he has to say about switchblades.

**Q. Okay. But specifically to this claim that he made in this article, did you verify the source of that claim?**

A. Well, he does that. Again, this is all about his article. His analysis, his reporting. So I'm drawing on his article to answer the question what did he learn about switchblades during this period. It was a widely cited article. It appeared in a national magazine. It was reprinted in quite a number of places as well.

**Q. Okay. And do you know anything about Jack Harrison Pollack's background or experience or expertise?**

A. Oh, I just read a brief bio about him somewhere. He was a reporter who reported on, you know, to topical issues of the day, not just on knives or crimes.

**Q. So you're not aware of him being like a knife designer or an expert on knives, are you?**

A. I do not know that.

**Q. Okay. Do you have any knowledge or expertise**

**in the use of knives or the design of knives that would support the claim by Jack Pollack here?**

A. You're referring to the sentence that you read there just now?

**Q. Yeah. Referring to the "Unlike traditional pocket knives, switchblades' ease of opening and thin, sharp, pointed blade lent them to be used impulsively and lethally as stabbing and slashing instruments."**

**Do you have any expertise on the use of knives?**

A. Do I personally?

**Q. Yes.**

A. Not with respect to switchblades, no. With respect to other kinds of knives, yes.

**Q. Can you describe your expertise with other knives?**

A. Well, I guess it would fall into two categories. One, is that since I was a boy I've always owned pocket knives like you would use in Boy Scouts. I was a Boy Scout. And I have been the cook for my family ever since I was an adult. And I use all kind of knives in the kitchen.

**Q. Okay. Other than Mr. Pollack's claim here, did you have any basis to support the notion that their -- switchblades' ease of opening led them to be**

**used impulsively?**

A. Do I have personal knowledge of that assertion? Is that what you're asking?

**Q. Yeah.**

A. Well, I have never owned a switchblade, so in that respect the answer is no. But I certainly understand that a switchblade is easy to open. That's the chief characteristic of a switchblade.

**Q. But you have no basis to say that the ease of opening lent them to be used impulsively and lethally?**

A. Well, based on criminology literature we know that ease of use facilitates use. So the ease of pulling a trigger on a handgun, for example, facilitates its use by a person who has one and thinks its use is appropriate. So if you --

**Q. But not criminally. Is that correct? Just use in general?**

A. Well, I would say criminal use and other kind of uses as well. Not solely criminal.

The use of ease facilitates its use. So I think it is an assertion that is supported by the criminology literature and the characteristics of switchblades.

**Q. Okay. And what criminology literature are you referring to?**

A. Well, there are many -- okay. Well, okay. There is a criminologist named Phillip Cook. He's at Duke University. He's one of the most eminent criminologists in the county. And he's written about -- he's not the only one, but he's mentioned one source, has written about something called weapons instrumentality effect or the instrumentality effect, which references the relationship between the tool that a person has to do harm and the likelihood that harm will ensue. And that principal endorses the logic of this sentence in Paragraph 26.

**Q. So the ease of use will cause them to be used impulsively?**

A. Will facilitate that impulsive use.

**Q. Okay. And other than this Phillip Cook, do you have a specific article that references the impulsive use of switchblades?**

A. Well, some of this writing that is Pollack's article, some of the writing in the Senate Investigative Committee Report talks about police accounts of switchblade crimes and the rapidity with which things occur because of ease of deploying the knife because it's a long, thin -- tends to be a long, thin blade.

Obviously easier to pierce the surface with a long, thin, sharp blade than a blunter blade. A steak

knife is sharper than a butter knife. You could probably hurt a person with a butter knife, but a lot easier to do it with a steak knife because it has a sharp point on it end and it's a sharper blade.

So that principal, I think, is applicable to this description.

**Q. All right. But the Pollack article and the references that you referred to in the Senate Report, those aren't criminology studies, are they?**

A. Well, Pollack is not -- was not a criminologist. I believe he was a reporter.

**Q. Okay.**

A. But he's dealing in the realm of information about criminality.

**Q. Okay. And Mr. Pollack's article was written in 1950. Correct?**

A. Yes.

**Q. And in Paragraph 26 here, it states "At the time switchblades were responsible for few a dozen children killed, somewhat more wounded." Correct?**

MR. WOODS: Sorry, Counsel. Where are you?

MR. DILLON: Sorry. It starts -- the paragraph starts with Page 10, but the specific quote I referenced goes onto Page 11.

**Q. It states "At the time switchblades were**

**responsible for a few dozen children killed, somewhat more wounded." Correct?**

A. Yes. This is the direct quote from Pollack's article.

**Q. Okay. So Pollack is saying that up until 1950 there are just a few dozen children killed, somewhat more wounded?**

A. That is what he is saying, yes. That's what he wrote.

**Q. Okay. Would you say that this claim supports or contradicts your Newspaper.com and New York Times analysis search regarding switchblade crimes?**

A. Well, it is common about a point in time. My Newspaper.com newspaper account is across time. And is most meaningful when across time.

So he's talking about a point in time that is up to this point. So it's, I suppose, in the broadest sense consistent with. But he's making a very specific comment at a very specific point in time.

**Q. And he's stating that relatively few children have been killed, somewhat have been wounded up until 1950?**

A. That's when the article was published. So I believe he means up to that present time, yes.

**Q. Okay. So he's considering all the preceding**

**time before 1950?**

A. I do not know.

**Q. Is that how you would interpret that statement?**

A. Well, the best way to interpret it would be to go back to the article and see the full sentence and paragraph. But he seems to be saying that, yeah -- I mean, this is my wording here -- up to that time, he's saying yes, that's -- that seems to be the gist of what he was saying in his article -- up to that point. I'm assuming he did not go back to the 1920s.

**Q. Okay. So, again, going to Page 11 here, Paragraph 27. You describe Pollack's nationwide investigation. Do you see that? It's the first sentence in Paragraph 27 of Page 11.**

A. Yes.

**Q. You refer to Pollack's nationwide investigation. Do you see that?**

A. Yes.

**Q. And can you describe what this nationwide investigation consisted of?**

A. Well, I cannot repeat for you here and now his methodology because he -- which he did discuss in the article. But it included, as I say here, interviews with police and prosecutors, eyewitness accounts of

sales of switchblade knives to children. I remember reading a couple of those accounts in his article. Examine police reports. Accounts of switchblade stabbings. And he said he witnessed a switchblade stabbing. He reported that in his story.

**Q. Okay. And you say -- so it states that this nationwide investigation included interviews with, quote, "police, prosecutors, eyewitness accounts, examination of police crime reports, and detailed accounts of several switchblade stabbings." Correct?**

A. Yes.

**Q. Okay. Did you verify the statements made by the police, prosecutors referenced in this article?**

A. No.

**Q. Okay. Do you know who the prosecutors were that provided statements to Mr. Pollack?**

A. If he mentioned any by name they would be in the article. I do not recall --

**Q. If you didn't mention the name, they wouldn't be in the article?**

A. Say again.

**Q. So he described interviews with prosecutors, but he didn't include the name of the prosecutors. Do you understand that to be true?**

A. That may be true. My assumption is -- going

off my memory of having read this several months ago, that he did not name -- he certainly did not give the name of each and every individual that he talked to in researching the article. That, however, is not unusual at all.

**Q. Okay. But we have no way to verify the source of the information. Is that correct?**

A. Well, the story appeared in 1950, so I'm not sure how one would do that in the year 2024.

**Q. Okay. And in reference to the eyewitness accounts that he describes in his report, did you verify those?**

A. No.

**Q. Do you know who made them?**

A. Well, he said that he was a witness and that he talked to other people who were witness to or involved in switchblade crimes.

**Q. But you don't know who these other people are?**

A. I do not, unless he mentioned them by name.

**Q. Okay. Did you verify the police crime records that Mr. Pollack references in his article?**

A. No.

**Q. Okay.**

(Reporter requests recess.)

(Recess taken 11:17 a.m. - 11:28 a.m.)

MR. DILLON: Q. All right. So real quick. Let me direct you to Page 11, Paragraph 27.

When we spoke about this quote earlier, but I just want to confirm, you quote Pollack stating "I was stunned to find out how many crimes of violence revolve around a switchblade. Most newspapers merely report a knife stabbing, neglecting to tell you a switchblade was a culprit." Correct?

A. Yes.

**Q. Okay. And we discussed the fact that we have no idea how to verify it. Is that correct?**

MR. WOODS: Objection. Misstates testimony.

MR. DILLON: Q. Earlier we discussed if the knife used wasn't identified, then how did Pollack know a switchblade was used. Correct?

A. Well, I'm relying on the basic veracity of his reporting. And there is no reason not to believe that many -- a certain number of knife crimes occurred that did involve a switchblade, but where the use of a switchblade was not specifically reported as such.

**Q. But you didn't verify that comment, did you?**

A. Well, no, because I'm relying on the reporter's reporting. I did not independently verify, no.

**Q. Is it fair to say that due to the fact that**

 **this is an article written in a magazine from 1950, it would be nearly impossible to verify such a comment?**

A. Not necessarily.

**Q. How would you verify a comment like this?**

A. It would be possible to go back and do other research and confirm the fact that when police reported crimes or tabulated criminal information, did they include weapon use? If so, did they mention a knife? If so, did they stipulate switchblades?

And you would probably find that in some instances they may have stipulated yes, a switchblade was involved. In other instances, they would not have noted that information because they were not required to note that information. It was not customarily tabulated in that way. And that gets to Pollack's sort of basic point that I believe he's correct. It makes perfect sense.

**Q. But -- so what you're relying on is an assumption that certain crimes that had a switchblade weren't identified in this report. Correct?**

A. It is very likely.

**Q. Okay. But you haven't done any of this verification, have you?**

A. No.

**Q. Okay. So again in Paragraph 27 starting on**

**Line 15 it says "Among Pollack's interviewees was a homicide police captain in Cleveland who reported: 'Last year we had 169 stabbings, 140 of them with switchblade knives.'"**

**Do you see that?**

A. Yes.

**Q. Okay. And did you confirm this quote regarding the number of stabbings that occurred?**

A. I did not, but I assume that the magazine editors did.

**Q. And so you didn't go and verify this independently?**

A. I did not. No, indeed.

**Q. Do you know who made this claim?**

A. The author -- oh, well, he's reporting police captain in Cleveland.

**Q. Do you know who this police captain is?**

A. Unless he mentioned the police captain's name, no.

**Q. Okay. Did Pollack attach or include any data or evidence or even police reports with this magazine article that would support his claims?**

A. No. Nor would it have been appropriate for him to do so.

**Q. So is it fair to say this article is**

**unverifiable?**

A. No.

**Q. Okay. How is it verifiable?**

A. Well, in two respects. One, is that you're relying on the verification of the editors of the magazine because it's important to remember that a reputable publication bases it's reputation on the veracity of the information that it publishes. That was true in 1950, just as it is true more recently.

And, secondly, it seems to me there probably would be ways to confirm the notion that sort general crime status takes from Cleveland in -- you know, in the 1950s or 1949, 1950, where this data came from and whenever it was gathered by reporter Pollack.

**Q. Okay. But you didn't verify it?**

A. No.

**Q. Okay. So it's unverified?**

A. Unverified by me.

**Q. Okay. And you relied on this unverified article in your expert report. Right?**

A. Well, I think it's a mistake to call it an unverified article. I relied on the article as one source of information judged by the fact that I quoted it and talked about in my report.

**Q. Have you found any evidence that would**

**specifically support the claim that this was a verified article and all the claims in it were verified?**

MR. WOODS: Objection. Argumentative.

You can answer.

THE WITNESS: Should I go ahead?

MR. WOODS: Yes. Yes.

THE WITNESS: Understand, the article was published by a -- at the time, a reputable national magazine. They have not only a professional obligation but a reputational interest in making sure that the stories that they publish are accurate and that the reporter is not making stuff up. That is the job of an editor.

And editing is low visibility, but it's essential in respected publications like magazines and newspapers.

MR. DILLON: Q. So you're assuming that the editors verified these statements. Correct?

A. Yes, I am.

**Q. Okay. So we have an article that has not been objectively verified. Correct?**

MR. WOODS: Objection. Argumentative.

You can answer.

THE WITNESS: No. No. I don't think that's a fair statement.

MR. DILLON: Q. Am I correct in saying that you testified that you're assuming the article was verified?

A. I'm assuming that the editors did the job that they are hired and paid to do of this publication.

**Q. So you haven't confirmed that. Correct?**

A. Independently by me, no.

**Q. Okay. And then let's go down to Page 12 here, Paragraph 29. It references a quote from a police chief of Patterson, New Jersey from 1952 stating "In the majority of knife assaults investigated by police, the weapon was used was a switchblade knife." Correct?**

A. Yes.

**Q. Okay. And, again, you didn't verify this claim, did you?**

A. If you could scroll down to Footnote 22. Let's see. No. It was from a newspaper article reporting on what this police chief from Patterson, New Jersey said.

**Q. Okay. And you didn't review the police reports in Patterson, New Jersey from 1952?**

A. No. I would be astonished if they were still available.

**Q. Okay. So this is coming from a news article titled "Switchblade Law Hailed by Walker."**

**Is that correct?**

A. Yes.

**Q. And you didn't verify the information contained in that article, did you?**

A. No.

**Q. Okay. So, again, Page 12, Paragraph 29. We have a statement from the New York Governor Thomas E. Dewey regarding 4,420 felonious assaults and 99 homicides in New York City committed in 1953, over a third were committed by switchblades.**

**Do you see that?**

A. Yes.

**Q. And did you verify this claim?**

A. No. I accepted the word of Governor Thomas Dewey.

**Q. All right. So on Page 12 you reference a Anti-Switchblade Act in the U.S. Senate investigation.**

**Do you recall that?**

A. Yes.

**Q. I'm just going to ask you about it here.**

**And when was that Senate investigation conducted?**

A. I believe -- well, the law was passed in 1958. There were Senate investigations, I believe, in 1957 and '58. And so the investigations by their staffs and

others -- I don't know when those actually began. I presume in 1957.

**Q. Okay. So these claims are approximately 66 years old?**

A. I think that's right.

**Q. Okay. I'm off by a couple years; it's all right.**

A. Don't hold me to the math.

**Q. I'm a lawyer; not a mathematician.**

A. Ditto.

**Q. Sounds good.**

**So as a part of your report you didn't provide any crime data relating to switchblades from 1958 to 2024, did you?**

A. I did not, no.

**Q. Okay. You also didn't provide any crime data relating to knives in general from 1958 to 2024, did you?**

A. You mean knives used in crime?

**Q. Yes.**

A. No.

**Q. And going back to the Senate report. You referenced "This report found that 1.2 million switchblades were sold in the country annually."**

**Is that correct?**

A. Yes.

**Q. And in that same paragraph you reference the fact that the report also stated that 5 million had been sold in the previous five years.**

**Is that correct?**

A. I guess that's right if that's what it says, yes.

**Q. Here. Let's pull this up just to confirm.**

**So I'm highlighting a section here on your report. There we go.**

**Can you read that out loud for me?**

A. Yeah. "It found that about 1.2 million switchblades were sold in the country annually, including 200,000 imported knives, and that 5 million had been sold in the previous five years 'principally to juveniles.'"

Those last three words were in quotes.

**Q. Okay. Hold on one second here.**

**Okay. Professor Spitzer, can you tell me what a Bowie knife is?**

A. Yes. A Bowie knife is a knife developed in the late 1820s named after the adventurer Jim Bowie developed by his brother Rezin Bowie. His name is spelled R-e-z-i-n but it's pronounced Reason.

And it was a long -- there are variations.

There was a long-bladed knife with a clipped end. And, typically, Bowie knife is sharp -- the more modern iteration sharp on one side. And they were widely used in fights, criminality, dual, and other types of activities back in the 19th century.

**Q. Okay. Do you know if there is any legal definition of a Bowie knife?**

A. Virtually every state restricted Bowie knives in state law in the 19th century. And I cannot say -- I mean, they referenced -- they generally tend to simply reference Bowie knives as Bowie knives, as though they were universally understood. There are varying definitions, but knives being what they are, they can vary in size and configuration and things like that.

**Q. Okay. Can you tell me what the -- what a fighting knife is?**

A. Yes. A Bowie knife is type of fighting knife. A fighting knife is a long-bladed thin knife sharpened that was widely used and recognized as such as being used in interpersonal fights, in duals, in criminality. And it was generally distinguished from other types of knives that were shorter, that had wider blades. And, obviously, there were lots and lots of kind of knives 200 years ago, just as there are today.

**Q. Okay. So do the characteristics of the knife**

**define it as a fighting knife or is it how it's used that defines it as a fighting knife?**

A. Well, it's sort of both, I believe. Well, no, that's not correct. Fighting knife by definition is a long, thin-bladed knife.

**Q. So would a kitchen knife be considered a fighting knife?**

A. No.

**Q. Isn't that a long, thin-bladed knife?**

A. I think not in the way a Bowie knife or a dirk or a dagger would be considered. Blade not strong enough. Point not sharp enough. And the nature of the handle probably different too.

And, again, understanding that there are thousands of different types of knives of every variety, especially today.

**Q. Okay. So you're stating that the type of metal and the sharpness of the point of the knife helps determine whether it's a fighting knife?**

A. I wouldn't say type of metal, no. I mean, in the early 19th century metallurgy was more primitive than it is today, but --

**Q. Sorry. I interrupted you.**

A. No. No.

A fighting knife would need to be sturdy

enough to withstand the force of use in a way that it -- I mean, if I pulled a kitchen carving knife out of the drawer and tried to pierce a dense object, that knife might well bend, for example, because it's not designed for thrusting. It's designed for cutting.

**Q. Okay. Is it fair to say that fighting knives is a pretty broad definition?**

A. It's a broad definition, yes.

**Q. And is it fair to say that a Bowie knife is a pretty broad definition?**

A. It's a subcategory within that. And there tends to be some dispute about what is and is not a fighting knife. Even -- a Bowie knife, I should say, in the context of the 19th century. But all you have to do is look at the legislative enactments of almost every state in a few court cases and it becomes pretty clear they knew what they were talking about the 19th century when they said "Bowie knife."

**Q. Okay. So in your report you reference the 1840 case -- and I'm going to butcher the name, I'm sure -- but Aymette v State. Is that correct?**

A. Aymette. Yeah.

**Q. Aymette. Okay.**

**So you're familiar with this court case?**

A. Yeah.

**Q. Okay. And in this case the defendant was convicted of wearing a Bowie knife concealed under his clothes as a violation of state law.**

**Is that correct?**

A. Yes.

**Q. Can you see Paragraph 39 up here?**

A. Yes, sir.

**Q. Okay. So starting on page -- or sorry -- Line 6. Can you read what the law of Tennessee was at that time?**

A. Yes, from 1837. "If any person shall wear any Bowie knife or Arkansas toothpick or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas toothpick" -- which was a very similar type of knife -- "under his clothes or keep the same concealed about his person, such persons shall be guilty of a misdemeanor and upon conviction thereof, shall be fined in the sum not less than $200 and shall be imprisoned in the county jail not less than three months and not more than six months."

**Q. So that law doesn't prohibit the possession of Bowie knives, does it?**

A. That is correct.

**Q. And that law doesn't prohibit the sale of Bowie knives?**

A. Yes. That's right.

**Q. And that law doesn't prohibit the purchase of Bowie knives in Tennessee. Is that correct?**

A. That's right.

**Q. And that law doesn't prohibit the importation of Bowie knives?**

A. That's right.

Although, I should add parenthetically that it's possible other provisions of that law may have referenced some of the things you just mentioned. So I wouldn't want to say with certainty that it didn't do these things without seeing the full text of the law. Because sometimes you would have a law like that and there would be other sections later on that may have regulated those things.

To my recollection, they do not include those regulatory devices.

**Q. And is it fair to say that if there were laws that prohibited -- you know, for example, the possession purchase of Bowie knives at that time, you would also be under criminal conviction for those statutes as well?**

MR. WOODS: Objection. Vague.

You can answer.

THE WITNESS: Well -- well, criminal penalties customarily accompany violations, if that's what you're

getting at.

MR. DILLON: Yeah.

**Q. So in Tennessee at this time you could not carry a Bowie knife concealed. And the defendant in this case was being convicted and charged with carrying a Bowie knife concealed. Correct?**

A. Yes.

**Q. Do you think it would be a reasonable assumption that if -- just possessing a Bowie knife was under a separate prohibition in Tennessee during that time, he would also be charged with that crime?**

MR. WOODS: Objection. Calls for speculation.

You can answer.

THE WITNESS: Well, I think the answer is yes. Because if you're carrying it concealed; you're also in possession by definition.

MR. DILLON: Q. Okay. Again, in that case the defendant wasn't being prohibited for open carrying the Bowie knife.

Is that correct?

A. That's right.

**Q. And just to clarify what I mean "open carrying," I'm referring to wearing any Bowie knife or any weapon on your belt or where it's visible or can be plainly seen.**

**Do you understand that?**

A. Yes, I do.

That's right. In other words, if he displayed it openly, presumably you would not have run afoul of the Tennessee law in 1840.

**Q. Okay. So, again, under this case there is no law prohibiting the ownership of a Bowie knife. Correct?**

A. Not that I know of.

**Q. So, again, in Aymette v State, the court was only dealing with a law that prohibited the concealed carry component. Correct?**

A. It was a concealed carrying case, yes.

MR. DILLON: Okay. I'm going to now introduce another exhibit here. This would be Plaintiff's Exhibit 4. Pull this up.

(Exhibit 4 was premarked and identified during the proceeding.)

(Mr. Dillon screen shares Exhibit 4.)

MR. DILLON: Q. Okay. The document I have in front of you on screen is a copy of the court case -- the Supreme Court case, District of Columbia v Heller with the citation 554 U.S. 570 from 2008.

**Q. Do you see that?**

A. Yes, I do.

**Q. Okay. Are you familiar with this case?**

A. Yes.

**Q. Okay. So while I move stuff around -- I want to -- so I scrolled down to Page 15 of the District of Columbia v Heller decision.**

**Can you see that?**

A. Yes.

**Q. All right. And there is a section here that's highlighted. Do you see that highlighted section?**

A. Yes, I do.

**Q. Can you read the first two sentences of the highlighted paragraph?**

A. Okay. "Those who believe that the Second Amendment preserves only a militia-centered right place great reliance on the Tennessee Supreme Court's 1840 decision in Aymette v State, the case does not stand for that broad proposition; in fact, the case does not mention the word 'militia' at all, except in its quoting of the Second Amendment."

**Q. Okay. I want you to just come down. I'm going to actually highlight this section here.**

**Can you read the highlighted portion here that continues onto the next page?**

A. Yes. "This odd reading of the right is, to be sure, not the one we adopt -- but it is not petitioners'

reading either. More importantly, seven years earlier the Tennessee Supreme Court had treated the state constitutional provision as conferring a right 'to all the free citizens of the state to keep and bear arms for their defence'; and 21 years later the court held that the 'keep' portion of the state constitutional right included the right to personal self-defense."

**Q. Can you keep going, please?**

A. Oh. "The right to keep arms involves, necessarily, the right to use such arms for all the ordinary purposes, and in all the ordinary modes usual in the country, and to which arms are adapted, limited by the duties of a good citizen in times of peace."

**Q. You don't need to refer to the internal cite there, but thank you for reading that.**

A. Sure.

**Q. You also go on to reference in your report a case Haynes v Tennessee.**

**Is that correct?**

A. Yes.

**Q. Okay. And that case -- the Steven Haynes, he was indicted for carrying a concealed Bowie knife.**

**Is that correct?**

A. I think so. I would have to double check, but I'm sure you're right.

**Q. Okay. Again, like the Aymette case, he wasn't convicted for merely possessing a Bowie knife, was he?**
A. I believe not.
**Q. Okay. And to your understanding he wasn't convicted for purchasing a Bowie knife, was he?**
A. I don't recall. Again, I would need to actually go back and look at the case to make sure that provisions of the law that were applicable.
**Q. Okay. To your knowledge and from what you remember, he wasn't convicted for openly carrying Bowie knife, was he?**
A. I do not believe so. I would have to double check. I take your word for it.
**Q. Okay. I'm also going to refer -- reference another state that's called Cockrum V State of Texas.**
**Do you recall that case?**
A. Yes.
**Q. And this was a case that discussed the added penalty provision for committing manslaughter; if it was committed with a Bowie knife, that would be deemed a murder.**
**Do you recall that?**
A. Yes.
**Q. Okay. So I'm going to pull up your report here.**

**Can you read in Paragraph 41 -- let's see. Can you read line -- we'll start at 11, Line 11.**

A. Okay. Start with the word "It"?

**Q. Yes.**

A. Let's see. "It described" -- meaning the court, I believe -- "It described the Bowie knife as 'an exceeded destructive weapon' an 'instrument of almost certain death' and 'the most deadly of all weapons in common use.'"

**Q. Okay. And that's a reference to the court in decision Cockrum v State?**

A. Yes.

**Q. Okay. So in Cockrum v State, the court stated that Bowie knives were common use?**

A. Used the phrase common use?

**Q. I'll pull it up again.**

A. I'm sorry.

**Q. So at the -- on Line 13 you use quotes when you said "The most deadly of all weapons in common use." Correct?**

A. I see. Yeah. It does use the phrase "common use." Yeah, circulating in society, yes.

**Q. And that is the court stating that. Correct? You're quoting the court?**

A. Yes.

**Q. Okay. And in the Cockrum case, there wasn't a prohibition of purchasing Bowie knives. Correct?**

A. Correct.

**Q. And there was no prohibition on transferring or selling Bowie knives?**

A. I believe that is right.

**Q. And there was no prohibition of owning or possessing Bowie knives. Correct?**

A. That's right.

**Q. And there was also no reference to a prohibition on carrying Bowie knives either openly or concealed. Correct?**

A. I think that's right.

**Q. Okay.**

A. I believe the law was solely confined to the enhanced penalty if you use a Bowie knife in a crime.

**Q. Okay. So even with the court describing a Bowie knife as an exceedingly destructive weapon, that case -- or state of Texas appears to prohibit the possession of it. Correct?**

A. Oh, the case did not. But that's not what the case was about.

**Q. Okay. But under the case, merely discuss the -- the statute that if one unlawfully committed a homicide with a Bowie knife, that person would be tried**

**for murder. Correct?**

A. Yes.

**Q. Okay. I'm going to pull up your report again and ask you to read Paragraph 42.**

A. "All of these cases underscore historical courts' recognition of the dangerous nature and nefarious use of Bowie knives, not only by the courts' characterizations of them, but by the fact that they are treated in the same restrictive and prohibitory manner in law as other dangerous, deadly weapons, including pistols and various named clubs."

**Q. Okay. So when considering the various historical laws, arms' regulations or Bowie knife regulations, you state that these Bowie knives are regulated in the same restrictive and prohibitive manner in law as pistols.**

**Is that correct?**

A. Yes. Including -- yes, and clubs.

**Q. Okay. And, again, you know, we referenced the court case of District of Columbia v Heller.**

**Do you recall that case?**

A. Yes.

**Q. And are you generally aware of the decision of that case -- what the court concluded?**

A. Yes.

 MR. WOODS: Objection to the extent that it's beyond the scope.

You can answer.

MR. DILLON: Q. Okay.

A. I'm generally aware of the ruling of the court.

**Q. And the court in Heller decided that the District of Columbia could not ban the possession of handguns.**

**Is that correct?**

A. Yes. Of working handguns.

**Q. And they say you can't ban the possession of working handguns in that decision?**

A. Well, you could own -- under old DC law, you could own a gun if it was not working. If you disassembled it, for example.

Part of the court's example is it's not really useful as a weapon if you've taken the weapon apart and you want --

**Q. Did the court invalidate that law?**

A. The DC law, yeah, I believe it did.

**Q. Okay. So do you believe that as Bowie knives were treated under the law the same as pistols that you could ban Bowie knives?**

MR. WOODS: Objection to the extent that it's

beyond the scope.

You can answer if you can.

A. Well -- could you ask me that again, please?

**Q. So you state that Bowie knives were treated under the law the same as pistols, looking back over the various arms' regulations in our country's history. Correct?**

A. Yes.

**Q. Okay. And then we're aware that the Supreme Court has stated that you cannot ban possession of handguns. Correct?**

A. Well, it said you had a right to own a handgun for personal protection in a home.

**Q. And the DC law that prohibited possession of handguns was invalidated. Correct?**

A. I believe it was, yes.

**Q. Okay. So based off of that, your knowledge of those two facts, is it your opinion that Bowie knives can be prohibited -- the possession of Bowie knives can be prohibited?**

MR. WOODS: Objection to the extent it's beyond the scope.

You can answer if you can.

THE WITNESS: Yeah. I would be reluctant to crawl into the minds of the Supreme Court justices and

I'm not a lawyer. But I -- there -- under Heller it's clear that certain types of weapons can be subject to prohibition.

For example, the court said that military style weapons could be, you know, barred from civilian use. So if there was an argument to be made -- a public policy argument to be made about other types of weapons with respect to imposing a similar prohibition, I think, yes, you could formulate an argument depending on the dangers in society and the needs of public policy, that there could be circumstances where, yes, you could restrict or even bar certain types of weapons.

MR. DILLON: Q. So I asked about barring the possession of a Bowie knife.

What is your opinion?

MR. WOODS: Same objection. Beyond the scope.

You can answer.

THE WITNESS: Well --

MR. DILLON: I'm just looking for your opinion. I don't want what the court can or can't do or their interpretation.

MR. WOODS: Same objection.

You can answer.

THE WITNESS: In the context of the 19th century, which is when Bowie knives were a major

 problem, I think the sum total of public policy making in the 19th century would answer that as yes.

MR. DILLON: Q. Even though Bowie knives were treated the same as pistols?

A. Well, understand, when I -- I don't -- the saying doesn't mean identical. That is to say, when you look at the state laws of the 19th century and they were trying to restrict the painful consequences of interpersonal weapons, specifically pistols, fighting knives, clubs.

And when they wrote their laws, they typically -- not in every instance, but in almost every instance, they typically listed those weapons in the same category. So anti-carry provisions or even open-carry sometimes or sales restrictions or other things.

So when they were making the policy in the 19th century, they were putting those things together. I don't mean to say that they are identical in every respect. Obviously, a knife is dangerous but less dangerous than a pistol.

And handguns in the 19th century were less lethal and far less reliable, especially in the early 19th century than the handgun of today. So technology has changed. Threats to public safety changed. So all

of those factors are in play in making public policy. And then by extension, sculpting constitutional law.

MR. DILLON: Q. And you state in your report in Paragraph 42 -- I'm quoting -- "The fact that they are treated in the same restrictive and prohibitory manner in law as other dangerous, deadly weapons, including pistols and various clubs."

Is that correct?

A. That is a quote, yes.

**Q. Okay. And just a second ago you mentioned that knives are less dangerous than a pistol.**

**Is that correct?**

A. In the -- in the current year, yes.

**Q. Okay. And that would include -- when you say "knives" that's a Bowie knife, pocket knife, switchblade knife -- does that include all that when you say "knives"?**

A. No. And, in fact, in the 19th century they often specifically carved out exceptions for pocket knives. And it would specifically say "Excepting pocket knives." You know like a -- you know, like a Boy Scout's pocket knife, if you will.

**Q. Okay. So pocket knives were explicitly exempted from a lot of these Bowie knife regulations or knife regulations?**

A. That is right. Not in every instance, but in many instances, yes.

**Q. Okay. Do you have an estimate of how many times there is a carve out for pocket knives?**

A. I did not do a tabulation of that. It would be possible to do. But it was a non-trivial number.

**Q. Okay. And, again, I just want to go back to this. So -- I want to confirm.**

**You state that knives are less dangerous than pistols. Correct?**

A. Depends on the time period. If it's 1830 --

**Q. I'm talking about right now present time, are knives less dangerous than pistols?**

A. In present day, handgun far more dangerous than a knife.

**Q. Okay. Thank you.**

**So on Paragraph 4 on Page 20 here you state that "In the 1830s, at least six states enacted laws barring the carrying of Bowie knives by name."**

**Is that correct?**

A. Yes.

**Q. And when you say they barred the carrying of Bowie knives, is that they ban both the open carry and the concealed carry of Bowie knives?**

A. I believe that at least one of those laws was

any carrying. I would have to look at them again. They are mostly concealed carry at this point.

But I do have a table that summarizes the laws, the states, the years.

**Q. Yeah. We'll get to that table. So I'm just trying to narrow this down.**

**You say that "At least six states enacted laws barring the carrying of Bowie knives." And just a second ago you testified that most of those are concealed carrying restrictions?**

A. Of the six, you mean, from the 1830s?

**Q. Yes.**

A. I think that's right. Yeah. I would have to double check, but I think that's right.

**Q. So is it fair to say that these six states, they weren't outright bans on all form of carrying. Correct?**

A. I believe that's right.

**Q. Okay. Now, off the top of your head do you know which states you're referring to here specifically?**

A. No, not off the top of my head.

**Q. All right. And I know you have your Exhibit A attached to your report and we can get to that. I just wanted to clarify.**

A. Sure.

Q. Again, on Page 20 within Paragraph 43 you have a Footnote 68. And it's listed at the bottom of Page 20.

And it states "A seventh state, Massachusetts, criminalized the carrying of fighting knives using the labels that would have included the Bowie knife in an 1836 law."

Is that correct?

A. Yes.

Q. Now, you state that it criminalized the carrying of fighting knives.

Was that a broad carry restriction, both open and concealed carry?

A. With respect to the Massachusetts law, do you mean?

Q. Yes.

A. I'd have to go back and look at the law.

Q. Okay. So we're talking about Bowie knives, so I'm going to scroll up here.

This is your Exhibit B, Bowie Knife Laws By Type. Correct?

A. Yes.

Q. All right. And if I --

A. Oh.

Q. -- look down here, I don't see anything listed

**for Massachusetts.**

A. Yeah. It's --

**Q. Maybe -- do you know what? If we go down do Exhibit C, you have your Dangerous Weapons Restrictions Years of Enactment. I'll scroll down to Page 3 of your Exhibit C and there is Massachusetts. And it lists a law 1836.**

**Do you see that?**

A. Yeah.

**Q. And that's under Bowie knife?**

A. Yeah.

**Q. Okay. So you just -- I'm going to say probably a typo, put that under this exhibit is -- didn't put it in under Exhibit B.**

**Is that correct?**

A. Sorry. What is Exhibit B?

**Q. Exhibit B would be your chart describing Bowie knives. Is that correct?**

A. Yeah. Well, no, because Exhibit B is laws that mention Bowie knives by name. The Massachusetts law did not mention Bowie knives by name, but it did talk about fighting knives, clearly contemplating including Bowie knives. So that's why --

(Simultaneous speaking.)

MR. DILLON: Okay. Thank you.

So I'm going to jump down. I see -- you know, scrolling. Down I think this is your Exhibit D.

**Q. You list a number of states along with references to various laws throughout this country's history.**

**Is that correct?**

A. Yes.

**Q. All right. So I'm going to scroll down here and I'm seeing 1749, 1814. I'm trying to find the 1836 law.**

A. Yep.

**Q. Is this the 1836 law that you were referring to --**

A. I believe it is.

**Q. -- Footnote 68 on Page 20.**

A. Yes. Yes.

**Q. It is. Okay.**

**Can you read the highlighted text here for me?**

A. "If any person shall go armed with a dirk, dagger, sword, pistol or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person or to his family or property, he may on complaint of any person having reasonable cause to fear an injury or breach of the peace be required to find sureties for keeping the

peace, for a term not exceeding six months with the right of appealing as before provided."

**Q. Now, would you describe that law as a prohibition on the carrying of the listed weapons, both open and concealed?**

A. I would say not prohibition. I would say it is a restriction or regulation, that is --

**Q. Okay.**

A. -- if you want to carry any of these weapons, and here that wording at the start, I believe, is clear, would include a Bowie knife.

If you have fear that you're going to be attacked, let's say. And then you can point a surety, sort of like a bond, for keeping the peace as it says, for six months, which you would lose in case you violate the terms of the agreement or the law with respect to Massachusetts.

**Q. Okay. And under this provision you would be required to pay -- or to find that surety after there was a complaint of a person having reasonable cause to fear an injury or breach of peace.**

**Is that correct?**

A. If there was a complaint, yes.

**Q. Okay. So it would be reasonable to describe this as a surety law?**

A. It is, indeed, a surety law. That is correct. And it covered both concealed and open carry since it doesn't stipulate. It simple says "Shall go on."

**Q. Is it fair to say that, you know, if I'm in 1836, you know, Massachusetts and I had a reasonable cause to carry any of these weapons, and there was no complaint filed against me, I would have no problem carrying these weapons?**

MR. WOODS: Objection. Calls for speculation.

You can answer.

THE WITNESS: Well, I think that is what the law would contemplate, yes.

MR. DILLON: Q. Okay. So, again, going back -- let's see -- to Page 20 here of your report. You talk about the six states that bar the carrying of Bowie knives.

Are these six other laws or five other laws that you're referring to other than the 1836 Massachusetts law, are they similar to the surety law here or are they broad restrictions on carrying?

MR. WOODS: Objection. Ambiguous.

You can answer if you can. Go ahead.

THE WITNESS: I would need to go back and look at the actual laws to examine the provisions.

MR. DILLON: Q. Okay. And, again, going back

to that 1836 Massachusetts law. Did it prohibit the purchase of any type of knife?

A. No. No. At least not in the provision we saw, no.

**Q. And under that provision it didn't ban the possession of any type kind of knife or weapon, did it?**

A. The possession of what?

**Q. Of any kind of knife or bladed weapon.**

A. I do not believe so.

**Q. Okay. All right. I'm going to direct you to Paragraph 43.**

**You state that "From then to the start of the twentieth century, every state plus the District of Columbia restricted Bowie knives; a total of at least 42 states, (including the District of Columbia) barred or restricted Bowie knives by name; and another 8 states enacted laws restricting the category or type of knife embodied by the Bowie knife, but without mentioning them by name, totaling 49 states plus the District of Columbia." Correct?**

A. Yes. Although there is error in there.

**Q. What is the error?**

A. New Hampshire did have a similar law. I discovered it after I wrote this document.

**Q. And when you say similar law, what type of law**

**did New Hampshire have?**

A. It was pertaining to restrictions on concealed carrying of various types of weapons. And I believe it included knives as well. I don't have the text in front of me, but I actually -- I eventually found the New Hampshire law too so...

**Q. Okay. So when you say "barred" or "restricted," what do you mean by that in Paragraph 43?**

A. Well -- well, barred or restricted -- imposed various types of restrictions. Barring carrying, barring open carrying, barring concealed carrying, barring any carry or like the surety law we just talked about.

**Q. That would also include various like tax ordinances or restrictions on slaves.**

**Is that correct?**

A. It would have included those, too, yes.

**Q. Okay. So when you say, you know, there are 49 states, plus the District of Columbia, that barred or restricted Bowie knives, that came in a -- what's the way to say that? It came in multiple different ways? It wasn't an outright prohibition. Correct?**

MR. WOODS: Objection. Ambiguous.

You can answer.

THE WITNESS: Well, it came in multiple

different ways, that is correct. However, some of the laws are -- I'll give you an example -- have the effect of outright can't have.

And the example that comes to mind is the case of an 1881 Arkansas law that said you cannot carry it concealed it, you cannot carry it openly. You cannot carry it at all. You cannot buy it, sell it, trade it, exchange it, et cetera. Which leaves you the question, if you wanted to own, let's say, a Bowie knife, how could you get it? Because you can't buy it. You can't sell it. You can't trade it. You can't give it. You can't carry it.

Did they say we are, you know, banishing these knives forever? No, it didn't say that. But it's interesting because there was a series of regulatory devices, the sum total of which was to make it functionally almost impossible to get such a knife, unless maybe you inherited it through your family, let's say.

So, again, you're seeing multiple regulatory techniques being utilized. The best that the government had the capability to do at the time and --

MR. DILLON: Q. And you --

MR. WOODS: You got to let him finish.

(Simultaneous speaking.)

MS. REPORTER: Okay. I need one person speaking at a time, please. You guys are speaking over each other and it's hard to hear.

MR. DILLON: Sorry about that.

**Q. Okay. So with regard to this 1881 Arkansas law -- and correct me if I'm wrong -- you're basically saying they're restricting, you know, these Bowie knives and other weapons in so many different ways it amounted to an outright prohibition.**

**Is that correct?**

A. I would call it a de facto prohibition, yeah.

**Q. Okay. And this was an 1881 Arkansas law?**

A. I believe so.

**Q. Were there any laws prior to 1881 that were similar to this Arkansas law?**

A. I cannot say offhand. I would have to look.

**Q. Okay. All right. Let's go back to the shared screen here.**

**You see Paragraph 44 of your report up on the screen?**

A. Yes.

**Q. Okay. And in Paragraph 44 you state that there are 15 states that banned all carrying of Bowie knives by banning both concealed care and open care.**

**Is that correct?**

A. Yes.

**Q. Do you know which states these were?**

A. Not offhand, no.

**Q. Okay. And if I went down to your Bowie knife exhibit, would we be able to identify these states?**

A. I believe we could, yes.

**Q. Okay. So I'm going to scroll down here. If we go to Exhibit B, Bowie Knife Laws By Type, that's attached to your report.**

**Would this be where I would look to find that information that you discussed in Paragraph 44?**

A. Yes.

**Q. Okay. And so you say the 15 states banned all carrying of Bowie knives. So looking at your Exhibit B, I see a column that states "No carry."**

**Is that the column that would describe prohibitions on banning of carrying of all Bowie knives?**

A. Yes.

**Q. Okay. And so the first state listed under that column would be Arizona and had a 1889 law.**

**Is that correct?**

A. Yes.

**Q. And all the laws listed in this column, you claim that they were banned on both the open carry and concealed carry of Bowie knife?**

 A. Under the no carry column, yes.

**Q. Okay. So I'm going to highlight -- let me see if I can highlight. I'm going to point to Colorado that's listed in Exhibit B. And under the "No carry" column, it lists 1881.**

**Do you see that?**

A. Yes.

**Q. So if I go down to your Exhibit D, would I be correct in stating that that law is listed in your Exhibit D where you list the various states and laws?**

A. I assume it is.

**Q. Okay. So I just did a search for just the term Colorado and we scrolled down on Exhibit D here. And I'm looking for 1881 date for a law. Let's see. This -- I'm finding this one. Is that the one you were referring to -- Colorado Revenue Stat 1774, Carrying Concealed Weapons - Penalty - Search Without Warrant - Jurisdiction of Justice 248 (1881).**

A. I believe it is.

**Q. Can you read the highlighted text, please.**

A. "No person, unless authorized so to do by the chief of police of a city, mayor of a town or the sheriff of a county, shall use or carry concealed upon his person any firearms, as defined by law, nor any pistol, revolver, Bowie knife, dagger, sling shot, brass

knuckles or other deadly weapon."

**Q. Okay. So would you classify that as a concealed carrying restriction or a carry -- or a restriction that bans all carry?**

A. It is a concealed carry.

**Q. Okay. And scroll back up here to Exhibit B. See the state Idaho, it lists an 1879 law under the no carry column.**

**Do you see that?**

A. Yes.

**Q. Again, I'm going to do a term search, scroll down and bring up your Exhibit D within your report. We have the state Idaho. I'm looking for an 1879 date for a provision.**

**Do you see that? Is that the law you referenced in Exhibit B?**

A. Yes. I believe it is.

**Q. Okay. And can you read the highlighted text, please?**

A. "Every person not being a sheriff, deputy sheriff, constable or other police officer, who shall carry or wear within the incorporated limits of Boise City, Idaho, any Bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles or other dangerous or deadly weapons, concealed, unless such

persons be traveling or setting out on a journey, shall, upon conviction thereof before the city magistrate of said Boise City, be fined in any sum not exceeding twenty-five dollars or each offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment."

**Q. Okay. So would you classify this as a concealed carry restriction or a restriction on both open carry and concealed carry?**

A. The wording here does say concealed carry.

**Q. Okay. Go back up to Exhibit B here. Dropping down to Louisiana. We have a date here as 1870 under the no carry column.**

**Do you see that?**

A. Yes, I do.

**Q. Okay. And, again, I'm just going to -- if I could spell. I'm going to go -- there we go. All right.**

**So I'm going -- I did a word search and we're scrolling down. Listed under Kansas, it's the territory of Louisiana. There we go.**

**So this is your Exhibit D. You identified the state of Louisiana where you have the various restrictions listed under there.**

**Do you see that?**

A. Yes.

**Q. And so I'm going to scroll down. I found the 1870 statute. Is that the 1870 restriction that you referred to --**

A. I assume it is, unless there is another 1870 law below it.

**Q. Okay.**

A. No, there is not.

**Q. So, again, can you just read the highlighted section. You don't have to read the whole thing.**

A. "It shall be unlawful for any person to carry any gun, pistol, Bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration."

**Q. Okay. That's good.**

**So would this be a broad restriction on the open and concealed carry of these listed weapons?**

A. Concealed or unconcealed. Yes.

**Q. Now, is this -- does this specifically restrict concealed or unconcealed carrying on a day of an election?**

A. Well, as it says, on the day of election or

registration or revision of registration.

So I don't know, without knowing history of Louisiana electoral law and procedures, how many days they incorporate it.

Obviously, the provision resolves around election-related activities.

**Q. So is it fair to say that it didn't restrict concealed and open carrying of these weapons on days it didn't involve elections?**

A. That would be correct, yes. Or election or election-related activities. So, for example, if we didn't know how long registration lasted or what point of the calendar year, et cetera. But, obviously, it's not 365 days a year. I think we can assume that.

**Q. Okay. So referring to, you know, these 15 states -- sorry. Strike that.**

**So in Paragraph 44 you state that 15 states banned all carrying of Bowie knives by banning both concealed and open carry.**

**So I just referenced three of the states that you list in the 15 reference. And each of those, by your categorization, were either concealed carry restrictions or the election restrictions.**

**Is that correct?**

A. Yes. That's what the table reports.

**Q. Okay. So referring to your statement in Paragraph 44, would you state that 15 states banned all carrying of Bowie knives?**

A. No. Although, I would say two things. One, is I would want to go back and look at other provisions within those respective laws to see if there was a separate paragraph that also talked about any carry or open carry. And the other thing is I may have simply been mistaken.

**Q. Okay.**

A. And if that's the case, then the number shouldn't be 15 but should be 13. And I appreciate you pointing that out to me, by the way. It's important to me to try to get these things right. But it's a great deal of data, as you can see.

**Q. Yes. I understand.**

**So do you think that there are other discrepancies in the remaining 12 laws that you reference?**

A. I hope not.

**Q. Okay. So I'm pulling up Paragraph 46 on Page 22.**

**Do you see that?**

A. Not yet.

**Q. Oh, did I not share that? I'm sorry.**

**So, again, referring to Paragraph 46 on Page 22.**

A. Got it.

**Q. All right. Can you read Paragraph 46 for me?**

A. "States relied on a variety of regulatory techniques to suppress Bowie knife carrying; 29 states enacted laws to bar their concealed carry; 15 states" -- or now 13 states -- "barred their carry whether concealed or open; 7 states enacted enhanced criminal penalties for those who used the knives to commit a crime; 4 states enacted regulatory taxes attached to their commercial sale; 3 states imposed a tax for those who owned the knives; 10 states barred their sale to specified groups of people; and 4 states enacted penalties for brandishing the knives."

And also -- in our prior discussion -- in addition, these laws would often expressly exempt from restriction common pocket knives.

**Q. Okay. Thank you for that.**

**So reviewing the summary of the laws and restrictions in Paragraph 46, none of these laws that you reference here enacted prohibitions on the purchase, sale, possession, and carrying of any type of knife. Correct?**

MR. WOODS: Objection. Vague and ambiguous.

You can answer if you can.

THE WITNESS: You mean a single law that did all of those things?

MR. DILLON: Q. Correct.

A. Purchased, possession, sale -- and what else?

**Q. And carry.**

A. Well, the Arkansas law I talked about earlier would be in that ballpark, I would say. There might be a handful of others that combined provisions in varying ways to have that effect.

But by and large, these -- this count is divided by laws that did one thing or something else.

**Q. Okay.**

A. Although I would add that the laws also have an additive effect. That is, if a state enacts a no concealed carry law in one year, and then say a few years later enacts a no sale law, the cumulative effect of two laws enacted at different times could have a similar suppressing effect. But I haven't analyzed the laws in that way.

**Q. Okay. And how many states prohibited possession of Bowie knives?**

A. As I recall there were some laws that used the word "possession" or "possess". But I don't have that information in front of me.

Q. Okay. And then looking at Footnote 72 on Page 22.

A. Mm-hmm.

Q. This would be a footnote that's attached "In addition these laws would often expressly exempt the restriction of common pocket knives."

Do you see that?

A. Yes.

Q. So I see -- if I'm counting correctly, you cite approximately five state laws that expressly exempted pocket knives.

Is that correct?

A. I believe so.

Q. Okay. And do you believe -- are there more than these five laws?

A. I'm sure there are.

Q. You're sure there --

A. I'm sure there are.

MR. WOODS: Let him finish, Dr. Spitzer.

THE WITNESS: Oh, yeah.

MR. DILLON: Q. Do you know how many had pocket knife exemptions?

A. I did not tabulate that number.

Q. Okay. And you say that 29 states enacted laws to bar the concealed carrying of Bowie knives.

Is that correct?
A. Yes.
Q. Are these largely the same laws that would have prohibited the concealed carry of pistols or handguns?
A. For the most part they probably are.
Q. Okay. And going back to Paragraph 46. You state that seven states enacted criminal penalties for those who used knives to commit a crime.
Is that correct?
A. Yes.
Q. Now, referring to the California laws that are being challenged in this case. Are you aware of any imposed enhanced penalties regarding switchblades?
A. I do not recall.
Q. And you state that four states enacted regulatory taxes attached to the commercial sale of Bowie knives.
Is that correct?
A. Yes.
Q. And are you aware that the laws challenged in this case do not impose any regulatory tax on commercial sales of switchblades?
A. I believe that's right. I take your word on that. Yeah, I believe that's right.

**Q. And you state that three states in Paragraph 46 -- sorry -- let me rephrase that.**

**In Paragraph 46 you state that three states impose the tax for those who own knives.**

**Is that correct?**

A. Yes.

**Q. And, again, referring to the laws being challenged in this case. There is no law -- California law that imposes a tax on switchblades being --**

A. Well --

(Simultaneous speaking.)

MR. DILLON: Q. Sorry. Can you repeat the answer?

A. Well, I would actually need -- be desirous of seeing the actual text of the law to compare it to these respective categories.

I'm assuming by the way you're asking the questions that the answer is yes. But, again, for my own purposes, I would want to actually compare the provisions of the contemporary California law with these historical categories to make sure.

**Q. Okay. So in Paragraph 46 you state that there is 10 states that bar the sale of Bowie knives to specified groups of people. Correct?**

A. Yes.

**Q. And were these groups of people that were barred from purchasing or being sold Bowie knives?**

A. I would need to see --

MR. WOODS: Objection. Ambiguous.

You can answer if you can.

THE WITNESS: I would need to see the actual laws to make sure. But I know that it included African Americans before the Civil War, enslaved persons and perhaps freed Blacks as well. It would have included minors, those under the age of 21, and probably some other categories too. I think I stipulated them somewhere.

MR. DILLON: Okay. Let's see. I think you had a legend attached to Exhibit B here. Bowie Knife Laws By Type. I'm scrolling down.

**Q. So you have a legend. Can you read out the relevant portion here --**

A. Yes.

**Q. -- with regard to prohibitions on groups of people?**

A. Barred groups included Native Americans, African Americans, the enslaved and minors.

**Q. Okay. Do you know how many of those 10 laws referenced that ban of sale of Bowie knives to specified groups prohibited people based off of race or ethnicity?**

A. Those before the Civil War -- I couldn't say for certain. The laws that were restrictive with respect to enslaved persons or African Americans were all before 1861, so...

**Q. Okay. And to your knowledge are the California laws that are being challenged in this case, do they restrict any specified group of people?**

A. I'd have had to see the law. It might pertain -- it might include a restriction on minors, for example. But I don't recall.

**Q. Okay. And so, to your knowledge, you don't -- you're not aware of any restriction on any group of people?**

A. Well, I would be reluctant to say without seeing the actual law.

**Q. Okay. And then, finally, we have -- in Paragraph 46, you state that four states enacted penalties for brandishing knives. Correct?**

A. Yes.

MR. WOODS: Hold on. Do you want to show him Paragraph 46?

MR. DILLON: We can do that. That's fine. I highlighted that section there.

**Q. Do you see that?**

A. Yes, sir.

**Q. Okay. So bear with me one second here. Scrolling down to Paragraph 47. Starting with the highlighted portion here with the words "The federal."**

**Can you read that portion of Paragraph 47 until you get to "Everyday life"?**

A. "The federal and state governments did not yet possess the maturity, powers, tools, or resources to implement any measure as sweeping as a knife ban, especially since knives are technologically very simple to produce, and metal-working was a common and ordinary part of everyday life."

Was that where you said to do stop?

**Q. Yes. That's perfect. Thank you.**

A. Yeah.

**Q. So you're saying one of the reasons why there weren't any possession bans was because the federal and state governments didn't have the tools necessary to implement such a ban.**

**Is that correct?**

A. Policy, tools, yes.

**Q. Okay. So were there no bans on the possession of anything in the 19th century?**

MR. WOODS: Objection. Calls for speculation.

You can answer if you can.

THE WITNESS: I have no idea.

MR. DILLON: Q. And what was the basis of this quote?

A. Well, it's based on an understanding that America was a developing nation state in the late 1700s and most of the 1800s. It was an overwhelmingly agrarian society. Over 90 percent of Americans were subsistence farmers and lived on farms in rural areas.

The government -- federal government, state governments were relatively primitive compared to how we think about governance today. Governments -- the government did far fewer things because it lacked the resources, the capabilities and the powers to do things that today we take as customary.

In the realm of governmental activity, America was a developing nation state. It didn't have a modern police force or policing in the way we think of policing today. After all, if you witness a crime or if you violate the law, you call the police. It's the first thing one does. You call 911.

Not only was there no 911 in the 19th century, but there was no modern policing as we think of it today. So the police are the front-line enforcement vehicle of a modern developed, mature nation state.

And we didn't have that in the 19th century. There was primitive policing, but it raises the question

 of if you imposed -- let's say you wanted to just banish Bowie knives through legislative FEHA, how could that possibly have been done in the 19th century?

And the answer is the government didn't have the capabilities, the policy tools, the bureaucracy, the resources to hire the people, to train professionals to behave in a professional way, to do all the things that a functioning, modern state takes for granted, but that did not exist or that existed only in the most primitive form in most of the 1800s.

**Q. Okay. So are you aware of any state or federal legislative history where they discuss banning the possession of any weapon, but they -- "We want to ban this weapon, but we can't because we just can't enforce it"?**

MR. WOODS: Objection. Ambiguous.

Answer if you can.

THE WITNESS: That's -- that isn't a possible question for me to answer.

MR. DILLON: Q. I'm just asking if you're aware of any legislative history. Are you?

A. I have examined legislative histories in my many years studying American politics.

**Q. Have you ever come across a discussion that even indicated that "Hey, we want to implement a ban on**

**any product, but we just don't have the means to enforce the ban"?**

A. Well, they didn't know what they didn't know. That is to say they could not contemplate an institution that did not exist. And so there were certainly be debates what about what could or could not be done.

But it is beyond my imagining that, let's say, a legislator in the state in the early or middle part of the 19th century, would have said "Well, we would like to ban these knives, but, gee, we don't have a developed police force because we're still a struggling developing nation state."

There could have been no such debate. At this time in our history, 150 years ago or 200 years ago.

MR. DILLON: Q. So you're saying you don't think the legislators were capable of contemplating that?

A. The legislators of the 19th century behaved like legislators of today. Shocking though that may seem. That is to say, they dealt with problems when problems typically were thrust upon them. And they struggled with the best way to do things in the context of the resources available and the parameters of the time of law and politics.

And so they addressed the problems as best

they could. And I think the Bowie knife example of policy-making across the states, illustrates how they kind of struggled with "Well, let's say no carry. No concealed carry or let's tax them or regulate sales," things like that. So they are struggling with tools and implements to get closer to where they wanted to be.

**Q. Okay. Now, again, referring to your statement that we have been discussing here.**

**Is one of the reasons why, you know, there was no prohibitions on possession of knives the fact that they are just everywhere? Like in -- you know, part of everyday use?**

A. Well, interestingly enough, they certainly -- knives generally, of course, were ubiquitous. But notice that they did two things.

One was they isolated a name, the very specific types of knives, not just Bowie knives, the Arkansas toothpick, the Spanish stiletto, dirks, daggers.

So they were able to identify certain types of knives that they wanted to suppress and regulate. And they, you know, acted on that effort. So they were able to make distinctions, just as the California law makes a very specific distinction of a switchblade versus other kind of knives, like a pocket knife or a kitchen carving

knife, let's say.

**Q. What is your understanding of the difference between a, quote, "switchblade" and a "pocket knife"?**

A. Well, a pocket knife -- since the time I was a boy, was a knife of a blade of oh, I'm using a ruler here, oh maybe three, four inches. It can be shorter; it can be longer that you manually pull out of the handle. And use for purposes you would use knives for.

And a switchblade, although the definition is a little more complex, is a knife that is a long, thin-bladed knife with a sharp point where the blade is recessed in the handle. And by pressing a lever or a button or similar thing, it's spring loaded so it pops out of the handle of its own accord.

There are also gravity knives and other types of knives that complicate it a little bit. But the classic understanding of a switchblade is the spring-loaded knife where the blade appears by punching a button.

**Q. Okay. But both switchblades and pocket knives are carried in the pocket. Is that correct?**

A. They both can be carried in the pocket, yes.

**Q. And both of them are folding knives. Is that correct?**

A. They both fold. Well, for the most part,

although there is as variety of knife where the blade pops out of the end of the handle, if you see what I mean.

**Q. Okay. So I'll rephrase it.**

**So both are referring to knives in which the blade is stored within the handle. Is that correct?**

A. Yes.

**Q. Okay. So scrolling down, the remaining portions of your report discuss what I would describe as impact weapons, such as clubs, batons, sand bags, slug shots.**

**Is that correct?**

A. Yes.

**Q. And these aren't bladed weapons. Correct?**

A. That is right.

**Q. Okay. And in Paragraph 51 on Page 24, let's -- I'm going to highlight a section here.**

MR. WOODS: Counsel, we've been going for about an hour and a half. If you're going to switch subjects, would this be a good time for a break?

MR. DILLON: Let me finish this question because I am going to actually plan to wrap up within the next five, 10 minutes at most.

MR. WOODS: That's fine.

MR. DILLON: Okay.

**Q. All right. So in Paragraph 51, it starts off with "Among the most widely and ubiquitously regulated harmful implements in U.S. history were various types of clubs and other blunt weapons."**

**Do you see that?**

A. Yes, sir.

**Q. Can you read the next sentence -- sorry. That pop-up keeps getting in the way.**

A. Yes. "Most were anti-carry laws, which also generally encompassed pistols and specific types of knives, although some of the laws extended prohibitions to these weapons' manufacture, possession, sale or use in crime."

**Q. Okay. So, again, like the Bowie knives we referenced earlier, the majority of the restrictions were concealed carry restrictions or carry restrictions?**

A. Yes.

**Q. Okay. And can you tell me of all the restrictions on what I'm going to call impact weapons or clubs or other blunt weapons, when were most of these regulations enacted?**

A. In general, they were mostly enacted from the -- from early to mid 1800s, accelerating after the Civil War to the start of the 20th century.

**Q. Okay. So can you give me a date range of when**

**most of these were implemented?**

A. Well, there is the specific date range in one of the tables, I believe, that I included. And what we -- what one finds is that the regulations accompanied the circulation of these weapons; that is to say, club -- these types of clubs were not -- did not appear to be common in the early 1800s or before, except for club -- you know, a simple generic club. But became more common in the pre Civil War period and then much more common after the Civil War.

But I believe those -- the years are in a table somewhere.

**Q. Okay. I'm pulling up your report again. Exhibit C, Dangerous Weapons Restrictions and Years of Enactment.**

**Do you see that?**

A. Yeah.

**Q. Okay. So -- and here you list the -- across the top -- you list the various types of weapon. And then you list the date and state that it was enacted.**

**Is that correct?**

A. Yes.

**Q. Okay. Would it be fair to say that most of the regulations, excluding pistols and Bowie knives, were enacted after 19 -- or 1860?**

A. I believe the largest number of them, yes, were enacted after the Civil War period.

MR. DILLON: Okay. If we can do just a five-minute break just so I can review my notes and then I'll finish up the last couple questions.

MR. WOODS: Fine with me.

(Recess taken 12:59 p.m. - 1:04 p.m.)

MR. DILLON: Okay. At this time I'm going to just conclude my initial questions and allow opposing counsel time to ask any questions that they want.

MR. WOODS: No questions from me.

MR. DILLON: Okay. I think that's it.

MS. REPORTER: Mr. Woods, do you want a copy?

MS. WOODS: Yes, please.

(Deposition concluded at 1:05 p.m.)

CERTIFICATE

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ X ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 02/19/2024.

Kathleen Baca

KATHLEEN BACA, CSR #10267

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Knife Rights Inc. vs. Rob Bonta Attorney General

Date of Deposition: 02/07/2024

Job No.: 10134987

I, PROFESSOR ROBERT J. SPITZER, hereby certify under penalty of perjury under the laws of the State of ________________ that the foregoing is true and correct.

Executed this ______ day of __________________, 2024, at ____________________.

_________________________________
PROFESSOR ROBERT J. SPITZER

NOTARIZATION (If Required)

State of ________________

County of _______________

Subscribed and sworn to (or affirmed) before me on this _____ day of ____________, 20__, by________________________, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: ______________________________ (Seal)

DEPOSITION ERRATA SHEET

Case Name: Knife Rights Inc. vs. Rob Bonta Attorney General
Name of Witness: Professor Robert J. SPITZER
Date of Deposition: 02/07/2024
Job No.: 10134987
Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

DEPOSITION ERRATA SHEET

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

_______ Subject to the above changes, I certify that the transcript is true and correct

_______ No changes have been made. I certify that the transcript is true and correct.

_____________________________________
PROFESSOR ROBERT J. SPITZER

**$**

**$200** 71:18

**(**

**(1881)** 98:18

**1**

**1** 12:12,15,17

**1.2** 66:23 67:12

**10** 25:23 26:3 29:18 47:4 49:1 54:23 104:13 108:23 109:23 117:23

**10:04** 5:2

**11** 54:24 56:12,15 59:2 78:2

**11:17** 58:25

**11:28** 58:25

**12** 64:8 65:6,16 103:18

**12:59** 120:7

**13** 78:18 103:12 104:8

**140** 61:3

**15** 14:3 19:22 61:1 75:4 96:23 97:13 102:15,17,21 103:2, 12 104:7

**150** 114:14

**154** 33:11

**16** 19:21 21:19 23:22 26:5

**16-year-old** 43:21 46:8

**16-years-old** 44:6

**169** 61:3

**17** 27:14

**1700s** 112:4

**17235** 14:14,18

**1749** 90:9

**1774** 98:16

**18** 21:19

**1800s** 112:5 113:10 118:23 119:7

**1814** 90:9

**1820s** 67:22

**1830** 86:11

**1830s** 86:18 87:11

**1836** 88:7 89:7 90:9, 12 92:5,18 93:1

**1837** 71:11

**1840** 70:20 74:5 75:15

**1860** 119:25

**1861** 110:4

**1870** 18:6 100:12 101:3,5

**1879** 99:7,13

**1881** 95:5 96:5,12,14 98:5,14

**1889** 97:20

**19** 43:18 119:25

**19,929** 37:10

**1920** 24:21

**1920s** 22:18 24:11 29:15 48:4 56:11

**1921** 36:5 47:23

**1930s** 21:21 22:18 29:15 30:5,10,24 31:5,25

**1939** 36:5 47:23

**1940** 36:12 48:5

**1940s** 25:11 26:6

**1941** 21:22 24:5

**1944** 42:25 43:3,7

**1945** 21:22 24:5,11, 21 36:12 48:5

**1946** 36:19 48:17

**1949** 43:19 62:13

**1950** 36:19 48:17 54:16 55:5,22 56:1 58:8 60:1 62:9,13

**1950s** 26:7 29:12 62:13

**1951** 37:1 48:20

**1952** 64:10,21

**1953** 65:9

**1955** 37:1 48:20

**1956** 37:7 48:22

**1957** 39:18 65:24 66:2

**1958** 65:23 66:13,17

**1959** 18:6 25:11 37:7 48:23

**19th** 21:8 68:5,9 69:21 70:14,17 83:24 84:2,7,18,22, 24 85:18 111:22 112:20,24 113:3 114:9,18

**1:04** 120:7

**1:05** 120:16

**2**

**2** 13:5,6,8

**20** 30:2 86:17 88:1,3 90:15 92:14

**200** 68:24 114:14

**200,000** 67:14

**2008** 74:23

**2017** 7:2

**2024** 5:1 58:9 66:14, 17

**20th** 118:24

**21** 33:1 76:5 109:10

**21510** 14:14,25

**21590** 14:14 15:11

**22** 35:23 37:13 38:18 64:16 103:22 104:2 106:2

**23** 42:13,22

**23-cv-474-jes-ddl** 5:14

**24** 44:20 47:5 117:16

**248** 98:18

**26** 37:16 38:2,3,4,19 39:16 49:12 53:11 54:18

**27** 56:13,15 59:2 60:25

**29** 64:9 65:6 104:6 106:24

**3**

**3** 15:16,19,21 89:5 104:12

**30s** 48:4

**365** 102:14

**39** 71:6

**4**

**4** 74:16,17,19 86:17 104:11,14

**4,420** 65:8

**41** 78:1

**42** 80:4 85:4 93:14

**424** 36:8

**43** 88:1 93:11 94:8

**44** 96:19,22 97:11 102:17 103:2

**46** 103:21 104:1,4,21 107:7 108:2,3,22 110:17,21

**47** 111:2,4

**49** 93:19 94:18

**5**

**5** 67:3,14

**51** 117:16 118:1

**554** 74:23

**570** 74:23

**58** 39:18 65:25

**6**

**6** 71:9

**612** 36:15

**65** 33:10

**66** 66:3

**68** 88:2 90:15

**7**

**7** 5:1 19:21 25:17 104:9

**72** 106:1

**8**

**8** 23:25 25:16,17 26:5,6 27:13 30:2 93:16

**824** 36:22

**9**

**9** 32:25 43:17 44:21

**9,713** 37:3

**90** 112:6

**911** 112:19,20

**99** 65:8

**A**

**a.m.** 5:2 58:25

**able** 9:19 11:7 46:25 97:5 115:20,22

**abroad** 22:13

**absence** 30:4

**accelerating** 118:23

**accepted** 65:14

**accessible** 27:8

**accommodate** 10:16

**accompanied** 119:4

**accompany** 72:25

**accord** 116:14

**account** 22:19 23:7 28:3 35:14,16,17 39:9 55:14

**accounts** 21:20 27:5,10,11 28:23 34:23 35:10,20 53:20 56:25 57:2,3,8,10 58:11

**accumulating** 45:11

**accuracy** 26:23 34:20

**accurate** 34:24 63:11

**acknowledgment** 16:18

**Act** 65:17

**acted** 115:22

**activities** 68:5 102:6,11

**activity** 112:14

**acts** 40:1

**actual** 25:13 26:21 31:18 39:6 42:2 46:11 92:24 108:15 109:6 110:15

**adapted** 76:12

**add** 5:19 29:10 32:19 72:8 105:14

**added** 77:18

**addition** 104:17 106:5

**additive** 105:15

**address** 30:19 45:6 47:6

**addressed** 114:25

**administered** 5:5

**admonitions** 6:19

**adopt** 75:25

**adult** 51:21

**adventurer** 67:22

**affect** 30:20

**afoul** 74:4

**African** 30:14 31:5,8,16,17,19 32:13,21 109:7,22 110:3

**age** 109:10

**aggregate** 33:3

**ago** 58:1 68:24 85:10 87:9 114:14

**agrarian** 112:6

**agree** 21:14

**agreement** 91:16

**ahead** 63:5 92:22

**allow** 120:9

**allowed** 8:7

**allowing** 5:20

**ambiguous** 92:21 94:23 104:25 109:4 113:16

**Amendment** 75:14,19

**America** 30:24 112:4,14

**American** 30:14 31:19 32:8,13 113:23

**Americans** 31:6,8,16,17 32:21 109:8,21,22 110:3 112:6

**amount** 23:9 29:24 32:4 35:24

**amounted** 96:8

**analysis** 23:8 25:14 26:16 44:19 46:15 50:9 55:12

**analyzed** 105:19

**annually** 66:24 67:13

**answer** 9:16 10:9,18,25 11:1 13:20 15:5 40:8 41:4 50:10 52:6

63:4,23 72:23 73:13, 14 81:3 82:2,23 83:17,23 84:2 92:10, 22 94:24 105:1 108:13,18 109:5 111:24 113:4,17,19

**answering** 10:6

**answers** 11:5,13

**anti-carry** 84:14 118:9

**anti-switchblade** 48:10 65:17

**AP** 23:19 42:4

**apart** 81:18

**apologies** 46:18

**appealing** 91:2

**Appeals** 7:3

**appear** 48:11 119:6

**appeared** 21:20 35:8 38:9 43:19 50:12 58:8

**appears** 79:19 116:18

**applicable** 54:5 77:8

**applies** 8:3

**appreciate** 103:12

**appropriate** 9:25 52:15 61:23

**approximately** 66:3 106:10

**archive** 42:15,25

**areas** 45:5 112:7

**argument** 49:19,21 50:1 83:6,7,9

**Argumentative** 40:20 63:3,22

**Arizona** 97:20

**Arkansas** 71:12,14 95:5 96:5,12,15 105:7 115:18

**armed** 90:19

**arms** 22:14 76:4,9,10, 12

**arms'** 80:13 82:6

**arrested** 43:22 44:6,9

**article** 38:11 43:8 45:10 49:3,7,20 50:1,2,6,9,10,12 53:16,19 54:7,15 55:4,23 56:6,10,24 57:2,13,18,20 58:4, 21 60:1 61:22,25 62:20,22 63:2,7,20 64:2,17,24 65:4

**articles** 26:24 27:2 28:19 32:16 35:4 40:1 48:13

**aside** 19:25 27:2

**asked** 6:14 83:13

**asking** 6:2 9:17 15:6 52:3 108:17 113:20

**assault** 90:21

**assaults** 64:11 65:8

**assertion** 52:3,21

**assign** 29:4

**assist** 16:6

**assistance** 31:3

**assume** 33:25 40:8 61:9 98:11 101:5 102:14

**assuming** 56:11 63:17 64:2,4 108:17

**assumption** 57:25 60:19 73:9

**astonished** 64:22

**attach** 61:20

**attached** 87:23 97:9 104:11 106:4 107:17 109:14

**attacked** 91:13

**attentive** 32:11

**attorney** 5:13 9:1 10:22

**audibly** 9:16 10:9

**author** 16:4 38:10,11 61:15

**authoring** 16:6

**authorities** 34:13 39:23 41:9

**authorized** 98:21

**auto** 18:15

**automatic** 18:21,24 19:2,5

**automatic-type** 21:7

**automatically** 19:18 20:15 21:14

**available** 27:8 42:7 64:23 114:23

**aware** 9:7 14:12 19:16 50:22 80:23 81:5 82:9 107:13,21 110:12 113:11,21

**awhile** 14:11

**Aymette** 70:21,22,23 74:10 75:16 77:1

**B**

**back** 17:1,8,17 18:18 31:23 32:9 35:6 42:12 49:11 56:6,11 60:5 66:22 68:5 77:7 82:5 86:7 88:17 92:14,23,25 96:17 99:6 100:11 103:5 107:7

**background** 50:16

**bags** 117:10

**ballpark** 105:8

**ban** 81:8,12,24 82:10 86:23 93:5 109:24 111:8,18 113:14,25 114:2,10

**banish** 113:1

**banishing** 95:13

**banned** 96:23 97:13, 24 102:18 103:2

**banning** 96:24 97:17 102:18 113:12

**bans** 87:16 99:4 111:16,21

**bar** 83:12 92:15 104:7 106:25 108:23

**barred** 83:5 86:22 93:15 94:7,9,19 104:8,13 109:2,21

**barring** 83:13 86:19 87:8 94:10,11,12

**base** 32:15

**based** 10:1 44:8 52:11 82:17 109:25 112:3

**bases** 62:7

**basic** 34:10 59:16 60:15

**basically** 96:6

**basing** 38:17

**basis** 30:23 39:14 45:9 49:18 51:24 52:9 112:1

**batons** 117:10

**bear** 76:4 111:1

**beat** 34:16

**began** 48:11 66:1

**beginning** 7:17 19:21

**behalf** 6:5

**behave** 113:7

**behaved** 114:18

**believe** 7:3 13:17,24 15:16 18:8 19:12 21:13 24:12 34:23 38:2,8 54:11 55:24 59:17 60:16 65:23, 24 69:3 75:13 77:3, 12 78:6 79:6,15 81:21,22 82:16 86:25 87:18 90:14 91:10 93:9 94:3 96:13 97:6 98:19 99:17 106:13,14 107:24,25 119:3,11 120:1

**belt** 73:24

**bend** 70:4

**benefit** 31:6

**best** 10:1 11:19,22,25 16:11 35:9 56:5 95:21 114:22,25

**beyond** 15:3 35:7 81:2 82:1,22 83:16 114:7

**bigger** 24:6

**bio** 50:18

**bit** 23:1 116:16

**Blacks** 109:9

**blade** 20:8 49:14 51:7 53:23,25 54:4 69:11 116:5,11,18 117:1,6

**bladed** 93:8 117:14

**blades** 68:22

**blunt** 33:4,9,13,15 34:4,6 118:4,20

**blunter** 53:25

**Boise** 99:22 100:3

**bond** 91:14

**Bonta** 5:12

**bottom** 88:2

**Bowie** 67:20,21,22,23 68:2,7,8,11,17 69:10 70:9,13,18 71:2,12, 14,22,25 72:3,6,20 73:4,6,9,19,23 74:7 76:22 77:2,5,10,20 78:6,14 79:2,5,8,11, 16,18,25 80:7,13,14 81:22,24 82:4,18,19 83:14,25 84:3 85:15, 24 86:19,23,24 87:8 88:6,18,20 89:10,17, 20,21,23 91:11 92:16 93:14,16,18 94:20 95:9 96:7,23 97:4,8,14,17,25 98:25 99:23 101:12 102:18 103:3 104:6 105:22 106:25 107:18 108:23 109:2,14,24 113:2 115:1,17 118:14 119:24

**boy** 51:18,19,20 85:21 116:5

**brandishing** 104:15 110:18

**brass** 98:25

**breach** 90:24 91:21

**break** 10:13,14,15,19 117:20 120:4

**brief** 50:18

**bring** 99:12

**broad** 70:7,8,10 75:17 88:12 92:20 101:19

**broadest** 55:17

**brother** 67:23

**bureaucracy** 113:5

**bust** 9:13

**butcher** 70:20

**butter** 54:1,2

**button** 20:9 116:13, 19

**buttress** 45:3

**buy** 95:7,10

**C**

**calendar** 102:13

**California** 5:13 14:13, 15,17,21,25 15:11 23:11 107:12 108:8, 20 110:6 115:23

**call** 45:17 62:21 96:11 112:18,19 118:19

**called** 38:9 53:6 77:15

**Calls** 73:12 92:9 111:23

**cane** 99:24

**capabilities** 112:12 113:5

**capability** 95:22

**capable** 114:16

**captain** 61:2,16,17

**captain's** 61:18

**care** 96:24

**careful** 32:20

**carried** 116:21,22

**carry** 73:4 74:12 86:23,24 87:2 88:12, 13 91:9 92:2,6 94:12 95:5,6,7,12 97:15, 24,25 98:1,4,23 99:3,4,5,8,22 100:8, 9,10,13 101:11,20 102:19,22 103:7,8 104:7,8 105:6,16 107:4 115:3,4 118:16

**carrying** 73:5,15,18, 23 74:13 76:22 77:10 79:11 86:19, 22 87:1,8,10,16 88:5,11 91:4 92:8, 15,20 94:3,10,11 96:23 97:14,17 98:16 99:3 101:23 102:8,18 103:3 104:6,23 106:25

**carve** 86:4

**carved** 85:19

**carving** 70:2 115:25

**case** 5:13 6:3,5,10 7:1,2,6 14:14 15:12 16:19 17:13 44:11 70:20,24 71:1 73:5, 17 74:6,13,21,22 75:1,16,17 76:18,21 77:1,7,16,18 79:1, 19,21,22,23 80:20, 21,24 91:15 95:4 103:11 107:13,22 108:8 110:6

**cases** 7:8,13 17:11 70:16 80:5

**categories** 51:18 108:16,21 109:11

**categorization** 102:22

**category** 84:14 93:17

**cause** 53:12 90:21,24 91:20 92:6

**century** 20:3 21:9 68:5,9 69:21 70:14, 17 83:25 84:2,7,18, 22,24 85:18 93:13 111:22 112:20,24 113:3 114:9,18 118:24

**certain** 34:12 59:18 60:19 78:8 83:2,12 110:2 115:20

**certainly** 28:22 35:21 52:6 58:2 114:5 115:13

**certainty** 22:7 29:22 72:11

**cetera** 42:4 95:8 102:13

**challenge** 17:5

**challenged** 107:13,21 108:8 110:6

**challenges** 7:12

**challenging** 14:13

**change** 8:1

**changed** 7:4 84:25

**changes** 11:12

**characteristic** 52:8

**characteristics** 52:22 68:25

**characterizations** 80:8

**charged** 73:5,11

**chart** 89:17

**Chat** 9:3

**check** 76:24 77:13 87:14

**chief** 22:9 52:8 64:9, 18 98:22

**children** 54:20 55:1, 6,20 57:1

**Circuit** 7:3

**circulating** 78:22

**circulation** 119:5

**circumstances** 7:12 83:11

**citation** 74:23

**cite** 76:14 106:10

**cited** 13:19 17:11 50:12

**citing** 39:3

**citizen** 76:13

**citizens** 76:4

**city** 42:24 48:9 65:9 98:22 99:23 100:2,3, 5

**Civil** 109:8 110:1 118:24 119:9,10 120:2

**civilian** 83:5

**claim** 30:23 39:14 49:18 50:5,7 51:2,23 55:10 61:14 63:1 64:15 65:13 97:24

**claims** 61:22 63:2 66:3

**clarify** 41:13 73:22 87:24

**classic** 116:17

**classify** 99:2 100:7

**clear** 23:15 29:12 44:8 70:16 83:2 91:10

**clearly** 89:22

**Cleveland** 61:2,16 62:12

**clipped** 68:1

**closer** 115:6

**clothes** 71:3,15

**club** 119:6,8

**clubs** 80:11,18 84:10 85:7 117:10 118:4, 20 119:6

**Cockrum** 77:15 78:11,13 79:1

**Code** 14:13,18,25 15:7,11

**Colorado** 98:3,13,16

**Columbia** 74:22 75:5 80:20 81:8 93:14,15, 20 94:19

**column** 97:15,16,20, 23 98:1,5 99:8 100:13

**combined** 105:9

**come** 9:11 25:10 28:23 40:2 42:3 75:20 113:24

**comes** 20:11 95:4

**coming** 64:24

**comment** 11:14 28:4 39:16 55:19 59:21 60:2,4

**commercial** 104:12 107:17,22

**commit** 22:13 104:10 107:9

**committed** 22:5 25:13 32:3,21 40:9 42:24 44:5 45:21 65:9,10 77:20 79:24

**Committee** 53:20

**committing** 77:19

**common** 23:20 55:13 78:9,14,15,19,21 104:18 106:6 111:10 119:7,9,10

**communicate** 8:25 17:14

**communications** 9:3

**communities** 30:14 32:13

**community** 30:20 31:19

**Companion** 38:9 49:3

**comparative** 6:16

**compare** 108:15,19

**compared** 24:25 25:2 31:21 32:5 112:9

**comparing** 6:16

**comparison** 25:10

**complain** 5:22

**complaint** 13:14 17:5 90:23 91:20,23 92:7

**complete** 48:2

**completely** 34:24

**complex** 116:10

**complicate** 116:16

**component** 74:12

**concealed** 71:2,16 73:4,6,15 74:11,13 76:22 79:12 86:24

87:2,10 88:13 91:5 92:2 94:2,11 95:6 96:24 97:25 98:17, 23 99:3,5,25 100:8, 9,10 101:13,20,21, 23 102:8,19,22 104:7,9 105:16 106:25 107:4 115:4 118:16

**conclude** 31:14 120:9

**concluded** 80:24 120:16

**conclusion** 32:11

**conclusions** 45:3

**condition** 11:21

**conduct** 8:2 18:9,11, 14,17,20,23 19:1,4, 7,10,13 21:10 37:21 44:17

**conducted** 8:1 17:24 20:22 42:14,18 43:4 65:22

**conducting** 8:20

**conferring** 76:3

**configuration** 68:14

**confined** 30:14 32:13 79:15

**confirm** 26:23 43:14 44:1,15 59:4 60:6 61:7 62:11 67:8 86:8

**confirmed** 64:6

**Congressional** 39:18

**consequences** 84:8

**consider** 10:24

**considered** 69:6,11

**considering** 29:24 55:25 80:12

**consisted** 56:21

**consistent** 55:18

**constable** 99:21

**constant** 25:6,9

**constitute** 35:16

**constitutional** 76:3,6 85:2

**contained** 65:4

**contemplate** 92:12 114:4

**contemplating** 89:22 114:16

**contemporaneous** 38:15

**contemporary** 108:20

**context** 70:14 83:24 114:22

**continue** 48:19

**continues** 75:23

**contradicts** 55:11

**controversy** 17:10

**convicted** 43:12,24 44:10 47:1 71:2 73:5 77:2,5,10

**conviction** 46:21,23 71:17 72:21 100:2

**convictions** 44:15

**cook** 51:20 53:2,15

**copy** 12:13 21:6 74:21 120:13

**correct** 6:24 11:8 16:10,20 17:25 18:7 21:23 24:2,24 25:20, 25 26:9 27:18 28:17, 18 29:17,25 30:6,11, 16,21 33:7 35:5,8,12 36:2,6,13,20 37:1,8, 19 40:19 41:3,16 42:15 43:1,10,19 44:10,12,25 45:7,14 47:7 49:5 52:16 54:16,20 55:2 57:10 58:7 59:8,11,15 60:16,20 63:18,21 64:1,6,12 65:1 66:25 67:5 69:4 70:21 71:4,23 72:3 73:6,20 74:8,12 76:19,23 78:20,23 79:2,3,8, 12,20 80:1,17 81:10 82:7,11,15 85:8,12 86:10,20 87:17 88:8, 21 89:15,18 90:6 91:22 92:1 93:20 94:16,22 95:1 96:6, 10,25 97:21 98:9 102:10,24 104:24 105:4 106:12 107:1, 10,19 108:5,24 110:18 111:19 116:21,24 117:6,12, 14 119:21

**correctly** 106:9

**counsel** 5:11 8:9 11:1 12:13 15:16 17:13 40:21 54:21 117:18 120:10

**count** 22:6 26:15 28:21 105:11

**counterquestion** 40:6

**counting** 25:4 106:9

**country** 23:18 42:7 45:5 66:24 67:13 76:12

**country's** 82:6 90:4

**counts** 22:21

**county** 31:13 53:4 71:19 98:23

**couple** 6:25 57:2 66:6 120:5

**course** 6:17 115:14

**court** 7:3,22 9:19 11:4 70:16,24 74:10, 21,22 76:2,5 78:6, 10,13,23,24 79:17 80:20,24 81:6,7,20 82:10,25 83:4,20

**court's** 75:15 81:17

**courts'** 80:6,7

**coverage** 24:1

**covered** 92:2

**crawl** 82:25

**crime** 22:5,8,14,15 25:22 27:6 28:1,7,11 30:19 31:16 32:4,5, 9,11,12 33:25 34:1, 17,18 35:14 38:13 39:10 40:7,9 41:12, 25 42:23 43:7,8 44:4,19,23 46:3 47:1 49:2 57:9 58:20 62:12 66:13,16,19 73:11 79:16 104:11 107:9 112:17 118:13

**crimes** 22:3,13 23:24, 25 24:15,23 25:2,5, 13,15,18 26:8,13,15, 17 27:23 30:9 31:24 32:3,7,20 38:12 39:20 40:12,13 42:9 43:5,6 44:16,18 45:4,21 46:11,12,21 47:21 50:21 53:21 55:12 58:17 59:5,18 60:7,19

**criminal** 39:6 52:18, 19 60:7 72:21,24 104:9 107:8

**criminality** 27:15,21 30:13 33:5 34:5 54:14 68:4,20

**criminalized** 88:5,10

**criminally** 52:16

**criminologist** 53:2 54:11

**criminologists** 53:4

**criminology** 52:11, 22,24 54:9

**culprit** 59:8

**cumulative** 105:17

**current** 85:13

**currently** 11:24

**curriculum** 17:20

**customarily** 60:14 72:25

**customary** 23:20 112:13

**cutting** 70:5

**CV** 7:15,18

**D**

**dagger** 69:11 90:20 98:25

**daggers** 115:19

**dangerous** 80:6,10 84:20,21 85:6,11 86:9,13,14 89:4 90:20 99:25 101:12 119:14

**dangers** 83:10

**data** 45:3 46:20,21,23 61:20 62:13 66:13, 16 103:15

**date** 27:24 98:14

99:13 100:12 118:25 119:2,20

**day** 41:24 50:20 86:14 101:13,14,23, 25

**days** 5:23 23:19 100:5 102:3,8,14

**DC** 81:14,21 82:14

**de** 96:11

**deadly** 78:8,19 80:10 85:6 99:1,25

**deal** 103:15

**dealing** 54:13 74:11

**dealt** 114:20

**death'** 78:8

**debate** 45:6 47:6,9 114:13

**debates** 114:6

**decade** 24:9

**decided** 81:7

**decision** 75:5,16 78:11 80:23 81:13

**declaration** 15:25 17:2,11

**Declaratory** 13:14

**deemed** 77:20

**defence'** 76:5

**defendant** 71:1 73:4, 18

**defendants** 6:5,10

**define** 69:1

**defined** 98:24

**defines** 69:2

**definition** 14:20 35:21 68:7 69:4 70:7,8,10 73:16

116:9

**definitions** 68:13

**degree** 23:11 33:17

**dense** 70:3

**depending** 83:9

**depends** 27:3 86:11

**deployed** 20:12

**deploying** 53:22

**deposed** 6:21 7:1,5, 15

**deposition** 5:11 7:25 8:7,21,25 9:9 11:7, 14 12:20 13:2 16:25 17:1,12,15 120:16

**depositions** 5:23

**depress** 20:11

**depressing** 20:9

**depression** 31:4

**deputy** 99:20

**describe** 6:12 19:17 38:22 40:17 51:15 56:13,20 91:3,24 97:16 117:9

**described** 12:3 33:16 57:22 78:5,6

**describes** 58:11

**describing** 79:17 89:17

**description** 54:6

**descriptions** 45:20

**design** 51:1

**designed** 70:4,5

**designer** 50:23

**desirous** 108:14

**destructive** 78:7

79:18

**detailed** 44:17 57:9

**details** 23:1

**determination** 40:3

**determine** 69:19

**developed** 67:21,23 112:23 114:10

**developing** 112:4,15 114:11

**devices** 72:17 95:16

**Dewey** 65:8,15

**difference** 40:11 116:2

**different** 7:9 25:23 26:3 42:20 69:13,15 94:21 95:1 96:8 105:18

**Dillon** 5:8,9,10 12:5, 11,17,18 13:4,8,9 15:6,14,21,22 40:23 46:19 54:22 59:1,13 63:17 64:1 73:2,17 74:14,19,20 81:4 83:13,19 84:3 85:3 89:25 92:13,25 95:23 96:4 105:4 106:21 108:12 109:13 110:22 112:1 113:20 114:15 117:21,25 120:3,8, 12

**direct** 19:20 27:13 32:25 38:5 47:4 48:25 55:3 59:2 93:10

**directing** 35:22

**dirk** 69:10 90:19 99:23

**dirks** 115:18

**disassembled** 81:16

**discovered** 93:24

**discrepancies** 11:15 103:18

**discrete** 44:23

**discuss** 56:23 79:23 113:12 117:9

**discussed** 46:7 48:15 59:10,13 77:18 97:11

**discussing** 24:19 115:8

**discussion** 104:16 113:24

**discussions** 47:13,24 48:8,11

**displayed** 74:3

**dispute** 70:12

**distance** 101:16

**distinction** 115:24

**distinctions** 115:23

**distinguished** 68:21

**District** 74:22 75:4 80:20 81:8 93:13,15, 19 94:19

**Ditto** 66:10

**divided** 105:12

**document** 12:8,19,22 13:10,13,16,19,23 14:5,9 15:22,24 16:2 17:2 28:24 29:7 74:20 93:24

**documents** 12:21 27:2

**doing** 5:24 18:18

**dollars** 100:4

**double** 76:24 77:12 87:14

**dozen** 54:19 55:1,6

**Dr** 46:16 106:19

**dramatically** 26:12

**drawer** 70:3

**drawing** 50:10

**drew** 17:3

**Dropping** 100:11

**dual** 68:4

**duals** 68:20

**due** 59:25

**Duke** 53:3

**duplicate** 23:7 26:18

**duplicates** 23:2,6,14

**duties** 76:13

**E**

**e-mail** 9:3 17:14

**e-mailed** 12:13 15:17

**e-mails** 8:20

**earlier** 29:20 31:22 41:13 59:3,13 76:1 105:7 118:15

**earliest** 42:23

**early** 7:6 20:3,20 29:16 69:21 84:23 114:8 118:23 119:7

**ease** 49:13 51:6,25 52:9,12,20 53:12,22

**easier** 53:24 54:3

**easy** 31:10 52:7

**editing** 63:14

**editor** 63:13

**editors** 61:10 62:5 63:18 64:4

**effect** 7:21 53:7 95:2 105:10,15,17,19

**effectively** 9:20

**effort** 115:22

**either** 76:1 79:11 102:22

**elaborate** 20:4

**election** 101:13,24,25 102:10,23

**election-related** 102:6,11

**elections** 102:9

**electoral** 102:3

**electronic** 9:3

**embodied** 93:18

**eminent** 53:3

**employment** 31:3

**enacted** 86:18 87:7 93:17 104:7,9,11,14, 22 105:18 106:24 107:8,16 110:17 118:21,22 119:20,25 120:2

**enacting** 31:15

**Enactment** 89:5 119:15

**enactments** 70:15

**enacts** 105:15,17

**encompassed** 118:10

**endorses** 53:10

**ends** 11:7

**enforce** 113:15 114:1

**enforcement** 112:22

**engage** 33:20 46:15 47:2

**enhanced** 79:16 104:9 107:14

**enjoy** 5:24

**enslaved** 109:8,22 110:3

**ensue** 53:10

**entire** 25:6,8

**entirely** 27:17

**entitled** 10:13 11:14 17:20

**equal** 31:1

**equivalent** 34:11

**era** 28:14

**error** 93:21,22

**escalated** 45:7 47:6

**escalation** 47:9

**especially** 23:12 31:7 69:16 84:23 111:9

**essential** 63:15

**estimate** 10:1 21:3 23:13 29:8 86:3

**et** 42:4 95:8 102:13

**ethnicity** 109:25

**events** 34:12 35:10

**eventually** 94:5

**everyday** 111:5,11 115:12

**evidence** 61:21 62:25

**exact** 22:20

**exactly** 6:1 20:17

**examination** 5:8 57:9

**examine** 57:3 92:24

**examined** 5:6 113:22

**example** 29:15 45:22 52:13 70:4 72:19 81:16,17 83:4 95:2,4 102:11 110:10 115:1

**exceeded** 78:7

**exceeding** 91:1 100:3

**exceedingly** 79:18

**exceeds** 44:22

**Excepting** 85:20

**exceptions** 85:19

**exchange** 95:8

**exchanged** 6:4

**excluding** 119:24

**Excuse** 40:15

**exempt** 104:17 106:5

**exempted** 85:24 106:11

**exemptions** 106:22

**exhibit** 12:12,15,17 13:5,6,8 15:16,19,21 17:20 74:15,16,17, 19 87:22 88:20 89:4, 6,13,14,16,17,19 90:2 97:5,8,14 98:4, 8,10,13 99:6,12,16 100:11,22 109:14 119:14

**exhibits** 8:8

**exist** 113:9 114:5

**existed** 21:8 113:9

**experience** 10:2 50:16

**expert** 6:3 15:25 16:13,18 50:23 62:20

**expertise** 10:2 50:17, 25 51:9,15

**explain** 41:21

**explicitly** 85:23

**exploded** 26:8,11

**expressly** 104:17 106:5,10

**extended** 118:11

**extension** 85:2

**extent** 15:2 21:16 81:1,25 82:21

**extremely** 20:22

**eyewitness** 56:25 57:8 58:10

**F**

**facilitate** 53:14

**facilitates** 52:12,13, 20

**fact** 8:1 28:10 34:11 43:14 44:1,8,9 59:10,25 60:6 62:23 67:3 75:17 80:8 85:4,18 115:10

**facto** 96:11

**factors** 85:1

**facts** 16:9 26:23 34:25 82:18

**fair** 6:23 34:6 59:25 61:25 63:25 70:6,9 72:18 87:15 92:4 102:7 119:23

**fall** 51:17

**familiar** 13:23 14:17, 20,24 15:7,10 70:24 75:1

**familiarity** 15:2

**family** 51:20 90:22 95:18

**far** 29:16 84:23 86:14 112:11

**farmers** 112:7

**farms** 112:7

**fear** 90:21,24 91:12, 21

**feature** 21:7

**February** 5:1

**federal** 111:3,6,16 112:8 113:12

**FEHA** 113:2

**felonious** 65:8

**fewer** 29:2,16,20 112:11

**fighting** 68:16,17,18 69:1,2,4,7,19,25 70:6,13 84:9 88:5,11 89:22

**fights** 68:4,20

**filed** 92:7

**filtering** 33:21

**finally** 11:18 110:16

**find** 26:14 39:5 46:19 59:5 60:10 90:9,25 91:19 97:10

**finding** 34:11 98:15

**finds** 119:4

**fine** 5:18 8:17 100:6 110:22 117:24 120:6

**fined** 71:18 100:3

**finish** 40:22 46:17 95:24 106:19 117:21 120:5

**finished** 9:17

**firearms** 98:24

**first** 6:21 7:3 12:5 19:22,23,24 21:19 27:9 30:8 56:14 75:11 97:19 112:18

**firsthand** 27:5,9,10

**fit** 21:16

**five** 25:23 67:4,15 92:17 106:10,15 117:23

**five-minute** 120:4

**fold** 116:25

**folding** 116:23

**following** 34:17,21

**follows** 5:6

**footnote** 31:9 43:17 64:16 88:2 90:15 106:1,4

**force** 70:1 112:16 114:11

**forever** 95:14

**forgive** 9:14

**form** 11:6 71:13 87:16 113:10

**formulate** 83:9

**forthcoming** 34:15

**found** 5:23 20:14,15 23:3,6 44:14 47:10 62:25 66:23 67:12 94:5 101:2

**four** 107:16 110:17 116:6

**fourth** 29:3

**frame** 23:12

**free** 76:4

**freed** 109:9

**front** 8:11,12 15:18 74:21 94:4 105:25

**front-line** 112:22

**full** 6:6 9:17 12:24 14:6 56:6 72:12

**functionally** 95:17

**functioning** 113:8

**further** 21:18

**future** 16:15

**G**

**gathered** 39:20 62:14

**gee** 114:10

**general** 5:13 14:10,23 17:9 32:8 34:25 35:1 52:17 62:11 66:17 118:22

**generally** 14:24 15:7, 10 68:10,21 80:23 81:5 115:14 118:10

**generic** 20:6 119:8

**gestures** 10:6

**getting** 73:1 118:8

**gist** 56:9

**give** 11:18 58:2 95:2, 11 118:25

**given** 11:13 25:9

**giving** 11:22,25

**go** 6:20 13:9,25 30:2, 18 31:23 42:12 43:17 45:2 49:11 50:2,3 56:6,11 60:5 61:11 63:5 64:8 67:10 76:17 77:7 86:7 88:17 89:3 90:19 92:3,22,23 96:17 97:8 98:8 100:11,17,21 103:5

**goes** 32:9 54:24

**going** 5:22 8:2,6,15 10:17 12:6,7,11 13:4 15:1,14,15 16:15 17:17,22 19:20 23:25 32:25 33:1 34:3 35:1 48:12,25 49:11 56:12 57:25 65:20 66:22 70:20 74:14 75:21 76:8 77:14,24 80:3 88:19 89:12 90:1,8 91:12 92:13,25 93:10 97:7 98:2,3 99:11 100:16, 17,19 101:2 107:7 117:17,18,19,22 118:19 120:8

**good** 5:9,15 34:22 66:11 76:13 101:18 117:20

**governance** 112:10

**governed** 31:12

**government** 31:3 95:21 112:8,11 113:4

**governmental** 112:14

**governments** 31:13, 14 48:9 111:6,17 112:9,10

**Governor** 65:7,14

**grand** 29:6

**granted** 113:8

**gravity** 116:15

**great** 29:5 75:15 103:14

**ground** 35:1

**group** 110:7,12

**groups** 104:14 108:24 109:1,19,21, 25

**guess** 9:24 32:7 35:13 51:17 67:6

**guilty** 71:17

**gun** 81:15 101:12

**guys** 96:2

**H**

**Hailed** 64:25

**half** 28:25 29:2 117:19

**Hampshire** 93:23 94:1,6

**hand** 10:6 40:12

**hand-held** 20:1

**handful** 105:9

**handgun** 52:13 82:12 84:24 86:14

**handguns** 81:9,11,13 82:11,15 84:22 107:5

**handle** 20:9,12 69:13 116:8,12,14 117:2,6

**hands** 10:10

**happen** 10:8

**happened** 25:22

**happens** 42:8,9,10

**hard** 46:20 96:3

**harm** 53:9

**harmful** 118:3

**Harrison** 49:8 50:16

**Haynes** 76:18,21

**head** 87:19,21

**Healey** 7:4

**hear** 96:3

**Hearings** 39:18

**held** 76:5

**Heller** 74:22 75:5 80:20 81:7 83:1

**helpful** 5:21

**helps** 9:18,19 69:18

**Hey** 113:25

**high** 33:17

**higher** 29:19

**highlight** 75:21 98:2, 3 117:17

**highlighted** 75:9,12, 22 90:18 98:20 99:18 101:9 110:23 111:3

**highlighting** 67:9

**hire** 113:6

**hired** 64:5

**historical** 7:10 17:11 80:5,13 108:21

**histories** 113:22

**history** 6:15 82:6 90:5 102:2 113:12, 21 114:14 118:3

**hold** 10:8 66:8 67:18 110:20

**home** 38:9 49:3 82:13

**homicide** 61:2 79:25

**homicides** 65:9

**honestly** 29:21

**hope** 103:20

**hour** 117:19

**hours** 101:14

**Housing** 31:2

**hundreds** 32:9 41:24

**hurt** 54:2

**I**

**Idaho** 99:7,13,23

**idea** 25:12 40:5,16,17 41:1 44:4 46:10 59:11 111:25

**identical** 84:6,19

**identified** 12:15 13:2, 6 14:9 15:19 16:13 28:6 32:23 33:21 40:2 59:14 60:20 74:17 100:22

**identify** 19:17 32:20 97:5 115:20

**II** 21:22 22:10,11 24:8 27:16 28:14 45:4 48:7,14

**illustrates** 115:2

**imagine** 6:23

**imagining** 114:7

**immediately** 23:15 28:10

**impact** 117:10 118:19

**imperfect** 33:24

**implement** 111:8,18 113:25

**implemented** 119:1

**implements** 115:6 118:3

**implies** 15:2

**important** 62:6 103:13

**importantly** 76:1

**importation** 72:5

**imported** 67:14

**impose** 107:22 108:4

**imposed** 94:9 104:12 107:14 113:1

**imposes** 108:9

**imposing** 83:8

**impossible** 60:2 95:17

**imprisoned** 71:19 100:4

**imprisonment** 100:6

**impulsive** 53:14,17

**impulsively** 49:14 51:7 52:1,10 53:13

**inaccuracies** 11:9

**inches** 116:6

**incidences** 47:21

**incident** 28:16 33:19 39:7 46:3

**incidents** 30:9 31:19, 23 41:2

**include** 24:10 31:9 57:23 60:8 61:20 72:16 85:14,16 91:11 94:14 110:9

**included** 24:18 39:9 56:24 57:7 76:7 88:6 94:4,17 109:7,9,21 119:3

**including** 67:14 80:10,18 85:7 89:23 93:15

**inconsistent** 11:13

**incorporate** 102:4

**incorporated** 99:22

**increase** 48:16,19

**increased** 45:4 48:22

**increasing** 21:21

**independently** 59:23 61:12 64:7

**indicate** 39:21

**indicated** 44:17 113:25

**indicted** 76:22

**individual** 22:6 46:25 58:3

**information** 6:14 11:6 16:9 17:10 23:9 24:18 33:23 34:8,10 35:1,4,7,24 39:17, 20,23 54:13 58:7 60:7,13,14 62:8,23 65:3 97:11 105:25

**inherited** 95:18

**initial** 17:4 120:9

**Injunctive** 13:14

**injury** 90:22,24 91:21

**instance** 28:6 42:23 84:12,13 86:1

**instances** 20:19 27:15,20 28:3 31:5 33:22 35:7 44:23,24 60:11,12 86:2

**institution** 114:4

**instrument** 78:7

**instrumentality** 53:7

**instruments** 49:15 51:8

**intention** 24:12

**interest** 30:19 31:15 63:10

**interested** 21:7

**interesting** 95:15

**interestingly** 115:13

**internal** 76:14

**Internet** 27:9

**interpersonal** 68:20 84:9

**interpose** 15:1

**interpret** 56:3,5

**interpretation** 83:21

**interrupted** 69:23

**interviewees** 61:1

**interviews** 27:11,12 56:24 57:7,22

**introduce** 74:14

**introducing** 12:12 13:5

**invalidate** 81:20

**invalidated** 82:15

**invention** 6:17

**investigated** 64:11

**investigation** 56:14, 18,21 57:7 65:17,21

**investigations** 65:24, 25

**Investigative** 53:19

**involve** 59:19 102:9

**involved** 37:18 38:1, 6,23 39:2,7,8,10 41:2,8 58:17 60:12

**involves** 76:9

**involving** 27:15,21 41:19 46:11,12 47:1

**isolated** 115:16

**issues** 7:9 50:20

**iteration** 68:3

J

**Jack** 49:8 50:15 51:2

**Jack-o-matic** 19:8

**jail** 71:19 100:5

**James** 6:8

**Jersey** 64:10,19,21

**Jim** 67:22

**job** 63:12 64:4

**John** 5:10

**journalistic** 34:22

**journey** 100:1

**judge** 10:24

**judged** 62:23

**jump** 90:1

**jumped** 28:12

**Jurisdiction** 98:18

**Justice** 98:18

**justices** 82:25

**Juveniles** 49:2

**juveniles.'** 67:16

K

**Kansas** 100:20

**keep** 21:6 28:21 29:5 41:10 71:15 76:4,6, 8,9

**keeping** 90:25 91:14

**keeps** 118:8

**key** 21:6,9 22:25

**kids** 9:13

**killed** 54:20 55:1,6,21

**Kills** 49:4

**kind** 9:3 25:17 28:12 33:20 48:10 51:21 52:18 68:23 93:6,8 115:3,25

**kinds** 23:18 51:14

**kitchen** 51:22 69:6 70:2 115:25

**knew** 70:17

**knife** 5:12 18:15,21 19:2,8,11 20:8,11, 14,16 37:17,22,25 38:6,12,13,22 39:1, 6,11,21 40:2,6,7,9, 12,13,17 41:1,7,11, 12 46:8 50:22 53:22 54:1,2,3 59:7,14,18 60:8 64:11,12 67:20, 21 68:1,2,7,16,17, 18,25 69:1,2,4,5,6,7, 9,10,18,19,25 70:2, 3,9,13,18 71:2,12, 14,15 73:4,6,9,19,23 74:7 76:22 77:2,5, 11,20 78:6 79:16,18, 25 80:13 83:14 84:20 85:15,16,22, 24,25 86:15 88:6,20 89:10 91:11 93:2,6, 8,17,18 95:9,17 97:4,8,25 98:25 99:23 101:12 104:6, 23 106:22 109:14 111:8 115:1,25 116:1,3,4,5,10,11,18 117:1

**knives** 18:15,24 19:5, 14,18,25 20:1,5,18 21:8,11,15 48:4 49:13 50:20,23 51:1, 6,10,14,16,19,21 57:1 66:17,19 67:14 68:8,11,13,22,23 69:15 70:6 71:22,25 72:3,6,20 78:14 79:2,5,8,11 80:7,14 81:22,24 82:4,18,19 83:25 84:3,10 85:11, 15,17,20,21,23 86:4, 9,13,19,23,24 87:8 88:5,11,18 89:18,20, 21,22,23 92:16 93:14,16 94:4,20 95:14 96:7,24 97:14, 17 102:18 103:3 104:10,13,15,18 105:22 106:6,11,25 107:9,18 108:4,23 109:2,24 110:18 111:9 113:2 114:10 115:10,14,17,21,25 116:8,15,16,20,23 117:5 118:11,14 119:24

**knives.'** 61:4

**know** 8:12 9:12,18 10:7,14,16,23 16:15, 18 18:15 21:4 23:5 24:22 27:7,23 31:2 32:2 34:17 37:24 38:5 40:1,4 41:7 43:13,25 44:11 45:19 46:2,6,22 48:9 49:23 50:2,15,19,24 52:11 56:2 57:15 58:14,18 59:14 61:14,17 62:12 66:1 68:6 72:19 74:9 80:19 83:5 85:21 87:20,22 89:3 90:1 92:4,5 94:18 95:13 96:7 97:2 102:2,12, 15 106:21 109:7,23 114:3 115:9,11,22 119:8

**knowing** 102:2

**knowledge** 16:11

38:21,25 50:25 52:2 77:9 82:17 110:5,11

**known** 41:9

**knuckles** 99:1,24

L

**labels** 88:6

**lacked** 112:11

**land** 31:2

**large** 105:11

**largely** 107:3

**largest** 120:1

**lasted** 102:12

**late** 67:22 112:4

**law** 14:16,21 31:2 48:10 64:25 65:23 68:9 71:3,9,21,24 72:2,5,9,12,13 74:5, 7,11 77:8 79:15 80:10,16 81:14,20, 21,23 82:5,14 85:2,6 88:7,14,17 89:7,21 90:10,12 91:3,16,25 92:1,12,19 93:1,23, 25 94:6,12 95:5 96:6,12,15 97:20 98:9,14,24 99:7,15 101:6 102:3 105:2,7, 16,17 108:8,9,15,20 110:8,15 112:18 114:24 115:23

**laws** 7:11 72:18 80:13 84:7,11 86:18,25 87:4,7 88:20 89:19 90:4 92:17,24 93:17 95:2 96:14 97:8,23 98:10 103:6,18 104:7,17,20,21 105:12,14,18,20,23

106:5,10,15,24 107:3,12,21 108:7 109:7,15,23 110:2,6 118:9,11

**lawyer** 15:3 66:9 83:1

**leaders** 30:18

**learn** 50:11

**learning** 17:12

**leaves** 95:8

**led** 51:25

**legal** 15:3 34:11 68:6

**legend** 109:14,16

**legislation** 30:5 47:14 48:16

**legislative** 70:15 113:2,12,21,22

**legislator** 114:8

**legislators** 114:16, 18,19

**legislatures** 48:8

**lent** 49:14 51:7 52:10

**let's** 12:6 13:9 14:1, 12 17:4 19:20 35:15 42:12,22 49:10 64:8, 17 67:8 78:1,5 91:13 92:14 95:9,18 96:17 98:14 109:13 113:1 114:7 115:3,4 116:1 117:17

**lethal** 84:23

**lethally** 49:15 51:8 52:10

**level** 46:15

**levels** 22:14,15

**lever** 116:12

**life** 111:5,11

**likelihood** 53:9

**limited** 76:12

**limits** 99:22

**line** 19:22 21:19 23:23 27:24 61:1 71:9 78:2,18

**lines** 10:5 46:4

**list** 17:8 30:8 90:3 98:10 102:21 119:18,19,20

**listed** 7:15,16 17:19 84:13 88:2,25 91:4 97:19,23 98:4,9 100:20,24 101:20

**lists** 89:6 98:5 99:7

**literature** 52:11,22,24

**little** 23:1 28:24 30:19 31:15 116:10,16

**lived** 31:8 112:7

**loaded** 116:13

**loading** 20:11

**local** 31:13

**location** 23:21

**log** 22:6

**logic** 53:10

**long** 53:23,25 67:25 69:5,9 102:12 116:10

**long-bladed** 68:1,18

**longer** 116:7

**look** 13:23 28:22 29:11 38:4 70:15 77:7 84:7 87:1 88:17,25 92:23 96:16 97:10 103:5

**looked** 17:3,8 28:22 29:5,13,14

**looking** 8:19 28:8,9 82:5 83:19 97:14 98:14 99:13 106:1

**looks** 24:7

**lose** 91:15

**lot** 54:2 85:24

**lots** 68:23

**loud** 67:11

**Louisiana** 100:12,21, 23 102:3

**low** 30:10 31:20,21, 24 32:4 63:14

**lower** 22:15

**luckily** 9:12

**M**

**machine** 20:1

**magazine** 38:9 49:7 50:13 60:1 61:9,21 62:6 63:9

**magazines** 63:15

**magistrate** 100:2

**major** 83:25

**majority** 47:17 64:11 118:15

**making** 25:9 55:18 63:10,12 84:1,17 85:1

**manner** 34:13 80:9, 15 85:6

**manslaughter** 77:19

**manually** 116:7

**manufacture** 118:12

**manufacturing** 20:2

**Marine** 43:9,12 45:24

**marking** 15:15

**Massachusetts** 7:2 88:4,14 89:1,6,20 91:17 92:5,19 93:1

**massive** 23:9

**material** 46:20,24

**materials** 7:16

**math** 66:8

**mathematician** 66:9

**matter** 5:12 13:2 14:9 16:13 42:10

**matters** 7:14

**mature** 112:23

**maturity** 111:7

**mayor** 98:22

**mean** 20:5 21:1 25:1 26:11 27:3,20 31:9 46:22,23 47:17 56:8 66:19 68:10 69:20 70:2 73:22 84:6,19 87:11 88:15 94:8 105:2 117:3

**meaning** 78:5

**meaningful** 55:15

**means** 55:24 114:1

**measure** 111:8

**measurement** 33:4,9, 13,15 34:4,7

**media** 32:9

**medical** 11:21

**medication** 11:24

**memory** 13:22 48:1, 12 58:1

**men** 22:12

**mention** 18:12 41:7 57:19 60:8 75:18

89:20,21

**mentioned** 18:10 36:9,16,23 37:4,11 41:6 53:5 57:17 58:19 61:18 72:10 85:10

**mentioning** 39:11 93:18

**merely** 59:6 77:2 79:23

**messages** 8:19 9:2

**metal** 69:18,20

**metal-working** 111:10

**metallic** 99:24

**metallurgy** 69:21

**methodology** 56:23

**mid** 22:18 24:11,21 26:7 118:23

**mid-1920s** 21:21

**middle** 114:8

**mile** 101:16

**military** 83:4

**militia** 75:18

**militia-centered** 75:14

**million** 66:23 67:3,12, 14

**millions** 22:12

**mind** 95:4

**minds** 82:25

**minority** 45:13

**minors** 109:10,22 110:9

**minutes** 117:23

**misdemeanor** 71:17

**Misstates** 59:12

**mistake** 62:21

**mistaken** 103:9

**mistakenly** 9:14

**Mm-hmm** 106:3

**modern** 6:16,17 68:2 112:15,21,23 113:8

**modes** 76:11

**months** 58:1 71:20 91:1,15

**morning** 5:9,15

**move** 75:3

**moving** 30:19

**multiple** 21:20 25:7 50:2 94:21,25 95:20

**murder** 77:21 80:1

**murdered** 43:9,15 45:25

**N**

**name** 5:10 6:6 7:4 38:11 57:17,19,23 58:2,3,19 61:18 67:23 70:20 86:19 89:20,21 93:16,19 115:16

**named** 53:2 67:22 80:11

**narrow** 87:6

**nation** 112:4,15,23 114:12

**national** 50:12 63:8

**nationwide** 56:13,17, 20 57:7

**Native** 109:21

**nature** 69:12 80:6

**nearly** 60:2

**necessarily** 38:13 39:21 60:3 76:10

**necessary** 111:17

**need** 10:15 40:24 69:25 76:14 77:6 92:23 96:1 108:14 109:3,6

**needs** 83:10

**nefarious** 80:7

**neglecting** 59:7

**Negro** 32:22

**never** 52:5

**nevertheless** 33:5

**new** 13:5 18:12 42:14,24,25 43:3,4,8 44:14 55:11 64:10, 19,21 65:7,9 93:23 94:1,5

**news** 23:17 24:16,17 25:7 26:7,14 27:22 32:10,19 33:4,10,22 34:10,15 35:8,9 37:16,24 39:1 40:25 42:3,8,11 44:13,18 47:10 64:24

**newspaper** 21:20 25:4 27:25 28:6 37:15 42:2,15,21,25 55:14 64:17

**Newspaper.com** 44:15 45:10 55:11, 14

**newspapers** 20:20 23:20 24:1 25:7,19, 24 28:8 33:20,23 34:1 41:15,23 44:25 59:6 63:16

**Newspapers.com** 21:12 26:2 27:2 32:16 36:4 42:17

**Newspapers.com.** 17:24 36:1

**non-trivial** 86:6

**normally** 31:5

**Northern** 27:25

**notable** 47:16,17

**note** 8:6,24 11:4 60:14

**noted** 37:15 60:13

**notes** 8:6,18 120:4

**notice** 12:20 13:2 115:15

**notion** 31:11 51:24 62:11

**November** 21:5

**number** 6:19,23 16:16 21:2,4 25:4,5, 13,14,15 26:15,16, 17 29:4,10,11,22 30:9 31:23 33:21,22 37:14 38:22,24 39:5 40:12,13 44:22 47:15,16,19,20 48:7, 15 50:13 59:18 61:8 86:6 90:3 103:11 106:23 120:1

**numbers** 22:20,23 25:10 26:8,11,12 37:14 45:12 46:10

**O**

**oath** 5:5 7:20,21 8:3

**object** 70:3

**objection** 15:2 40:20 59:12 63:3,22 72:22 73:12 81:1,25 82:21 83:16,22 92:9,21 94:23 104:25 109:4 111:23 113:16

**objections** 10:23,24 11:5

**objectively** 63:21

**obligation** 63:9

**observation** 22:9 38:15

**obtain** 35:7

**obviously** 53:24 68:23 84:20 102:5, 13

**occur** 28:9 53:22

**occurred** 27:16 28:3 34:12 59:18 61:8

**occurrences** 34:18

**occurs** 35:14

**odd** 75:24

**offense** 100:4

**offensive** 90:20

**offhand** 96:16 97:3

**officer** 35:15 99:21

**offices** 5:24

**officials** 27:11

**oh** 29:2 46:18 50:18 61:15 76:9 79:21 88:24 103:25 106:20 116:5,6

**okay** 6:9,18,23 7:1,7, 14,19 8:13,17,23,24 9:7,12 10:13 11:4,12 12:5,8,11,22 13:4, 16,18,21 14:4,12,17 15:10,14 16:24 17:12,22,23 18:13, 20 21:10,14,18,25 22:17,21,25 23:13, 22 24:14,21 25:1,12, 16,22 26:5,13,18 27:1,13 28:5,15,19, 25 29:8,17,23 31:18 32:2,18,25 34:6 35:3,19,22 36:4 37:13,21,24 38:17 39:14 40:23 41:5,13, 18,21 42:12,22 43:7, 12,21 44:1,13,20 45:2,16,19 46:6 47:4,20,23 48:15,25 49:7,10,18,21 50:5, 15,25 51:23 52:24 53:1,15 54:12,15 55:5,10,25 56:12 57:6,12,15 58:6,10, 20,23 59:10 60:22, 25 61:7,20 62:3,15, 17,19 63:20 64:8,14, 20,24 65:6 66:3,6,16 67:18,19 68:6,15,25 69:17 70:6,19,23 71:1,8 73:17 74:6, 14,20 75:1,3,13,20 76:21 77:1,4,9,14,24 78:3,10,13 79:1,14, 17,23 80:3,12,19 81:4,22 82:9,17 85:10,14,23 86:3,7, 16 87:19 88:18 89:12,25 90:17 91:8, 18,24 92:13,25 93:10 94:7,18 96:1, 5,12,17,22 97:4,7, 13,19 98:2,12 99:2, 6,18 100:7,11,16 101:7,18 102:15 103:1,10,21 104:19 105:13,21 106:1,14, 24 107:7 108:22 109:13,23 110:5,11, 16 111:1,21 113:11 115:7 116:20 117:4, 8,16,25 118:14,18, 25 119:13,18,23 120:3,8,12

**old** 7:11 33:11 66:4 81:14

**once** 13:19

**one-half** 101:16

**open** 52:7 73:18,22 86:23 88:12 91:5 92:2 94:11 96:24 97:24 100:9 101:14, 20 102:8,19 103:8 104:9

**open-carry** 84:15

**opened** 20:9

**opening** 19:18 20:16 21:15 49:13 51:6,25 52:10

**openly** 74:4 77:10 79:11 95:6

**opinion** 15:3 45:9 82:18 83:15,20

**opportunity** 11:8

**opposed** 33:22

**opposing** 120:9

**ordinances** 94:15

**ordinary** 76:11 111:10

**Oregon** 7:6

**organizations** 42:3

**original** 17:7 27:1,3 46:20

**originally** 18:18

**originated** 23:21

**outcome** 44:11

**outright** 87:16 94:22 95:3 96:9

**outside** 45:5

**overall** 32:5

**overreporting** 41:19

**overwhelmingly** 112:5

**owned** 51:19 52:5 104:13

**ownership** 74:7

**owning** 79:7

**P**

**p.m.** 120:7,16

**pad** 8:11,12

**page** 19:21 22:20 23:25 25:16,17 26:5, 6 27:13 30:2 32:25 33:1 43:17 44:21 47:4 49:1 54:23,24 56:12,15 59:2 64:8 65:6,16 71:8 75:4,23 86:17 88:1,3 89:5 90:15 92:14 103:22 104:2 106:2 117:16

**pages** 13:24

**paid** 64:5

**painful** 84:8

**paragraph** 19:21 21:19 23:22 26:5 27:14 30:2 33:1 35:23 37:13,16 38:2, 3,4,18,19 39:16 42:13,22 44:20 47:5 49:12 50:3 53:11 54:18,23 56:7,13,15 59:2 60:25 64:9 65:6 67:2 71:6 75:12 78:1 80:4 85:4 86:17 88:1 93:11 94:8 96:19,22

97:11 102:17 103:2, 7,21 104:1,4,21 107:7 108:2,3,22 110:17,21 111:2,4 117:16 118:1

**parameters** 114:23

**paraphrase** 49:19,25

**paraphrasing** 30:3

**parenthetically** 72:8

**part** 17:23 66:12 81:17 107:6 111:11 114:8 115:11 116:25

**particular** 7:11

**parties** 6:4

**parts** 20:1 42:6

**passed** 65:23

**Patterson** 64:10,18, 21

**pay** 23:11 91:19

**peace** 22:16 76:13 90:25 91:1,14,21

**peg** 21:4 29:10

**Penal** 14:13,18,25 15:7,11

**penalties** 72:24 104:10,15 107:8,14 110:18

**penalty** 77:19 79:16 98:17

**pending** 9:2 10:18

**people** 5:23 31:7 58:16,18 104:14 108:24 109:1,20,25 110:7,13 113:6

**percent** 29:18 112:6

**percentage** 29:6,8, 12,14,19,22

**perfect** 60:16 111:13

**perfectly** 5:18

**period** 18:5 22:1 23:23 25:3,6,8 26:19 27:16 36:5,12,19 37:1,7 40:7 48:7 50:11 86:11 119:9 120:2

**periods** 29:20

**permitted** 8:25 9:4,8

**perpetrators** 32:24

**persisting** 21:21

**person** 9:21 52:14 53:9 54:2 71:11,16 79:25 90:19,22,23 91:20 96:1 98:21,24 99:20 101:11

**person's** 9:20

**personal** 38:21,25 39:3 52:2 76:7 82:13

**personally** 51:11

**persons** 71:16 100:1 109:8 110:3

**pertain** 110:9

**pertaining** 6:15 7:11 20:1 48:3 94:2

**pertains** 14:15

**pertinent** 14:19 34:24

**petitioners'** 75:25

**Phillip** 53:2,15

**phrase** 78:15,21

**pick** 23:20 42:1

**piece** 39:22

**pierce** 53:24 70:3

**pistol** 84:21 85:11 90:20 98:25 99:23 101:12

**pistols** 80:11,16 81:23 82:5 84:4,9 85:7 86:10,13 107:4 118:10 119:24

**place** 5:25 75:14 101:16

**places** 50:13

**plainly** 73:25

**plaintiff** 5:12

**Plaintiff's** 12:12 13:5 15:16 74:15

**plaintiffs** 14:13

**plan** 117:22

**play** 85:1

**please** 6:6 9:16 10:5, 8,15 19:23 76:8 82:3 96:2 98:20 99:19 120:14

**plus** 93:13,19 94:19

**pocket** 19:2,5,25 20:5,14 21:11,15,17 49:13 51:6,19 85:15, 19,20,22,23 86:4 104:18 106:6,11,22 115:25 116:3,4,20, 21,22

**point** 39:19 40:4 54:4 55:13,16,17,19 56:10 60:16 69:12, 18 87:2 91:13 98:3 102:12 116:11

**pointed** 49:14 51:7

**pointing** 103:13

**police** 24:16,18 26:21,22 27:5,7,11 34:16,17 35:15 39:23 41:8 53:20 56:25 57:3,8,9,13 58:20 60:6 61:2,15, 17,18,21 64:9,11,18, 20 98:22 99:21 112:16,18,22 114:11

**policies** 31:2,3,16

**policing** 112:16,21,25

**policy** 31:1 47:14,25 48:3,16 83:7,10 84:1,17 85:1 111:20 113:5

**policy-making** 115:2

**politics** 42:10 113:23 114:24

**Pollack** 38:11 39:16 49:8,20 51:2 54:7,10 55:5 57:16 58:21 59:4,14 61:20 62:14

**Pollack's** 38:18 49:23 50:16 51:23 53:18 54:15 55:3 56:13,17 60:15 61:1

**polls** 101:14

**pop-up** 118:8

**pops** 116:13 117:2

**portion** 75:22 76:6 109:17 111:3,4

**portions** 117:9

**possess** 105:24 111:7

**possessing** 46:8 73:9 77:2 79:8

**possession** 43:22 44:7 46:12 71:21 72:19 73:16 79:20 81:8,12 82:10,14,19 83:14 93:6,7 104:23 105:5,22,24 111:16, 21 113:13 115:10 118:12

**possible** 60:5 72:9

86:6 113:18

**possibly** 113:3

**posted** 12:13 15:17

**potential** 47:14 48:16

**powers** 111:7 112:12

**practice** 42:5

**pre** 119:9

**pre-world** 27:16 28:13

**preceding** 55:25

**precisely** 41:10

**preferred** 5:17

**premarked** 12:15 13:6 15:19 74:17

**prepare** 16:24 17:1

**prepared** 13:1 14:8 16:12 17:3

**present** 55:24 86:12, 14

**presented** 8:8

**preserves** 75:14

**pressing** 116:12

**presumably** 74:4

**presume** 66:2

**pretty** 30:25 44:8 70:7,10,16

**prevent** 11:22,25

**previous** 24:9 67:4, 15

**prewritten** 8:18

**primarily** 22:2

**primitive** 69:21 112:9,25 113:9

**principal** 53:10 54:5

**principally** 67:15

**prior** 43:3 96:14 104:16

**probably** 54:2 60:10 62:10 69:13 89:13 107:6 109:10

**problem** 9:13 10:10 45:6 47:6 84:1 92:7

**problems** 30:20 114:20,21,25

**procedures** 12:2 102:3

**proceeding** 12:16 13:7 15:20 74:18

**produce** 12:21 111:10

**product** 114:1

**professional** 63:9 113:7

**professionalized** 34:21

**professionals** 113:6

**Professor** 5:4,11,15, 16 12:20 67:19

**programs** 31:3,6

**prohibit** 71:21,24 72:2,5 79:19 93:1

**prohibited** 72:19 73:18 74:11 82:14, 19,20 105:21 107:4 109:25

**prohibiting** 74:7

**prohibition** 73:10 79:2,4,7,11 83:3,8 91:4,6 94:22 96:9,11

**prohibitions** 97:17 104:22 109:19 115:10 118:11

**prohibitive** 80:15

**prohibitory** 80:9 85:5

**pronounced** 67:24

**property** 90:23

**proposition** 75:17

**prosecutors** 56:25 57:8,13,15,22,23

**protect** 31:16

**protection** 82:13

**provide** 10:1 34:25 46:20 66:12,16

**provided** 22:19 34:23 57:16 91:2

**providing** 9:25 15:3

**provision** 76:3 77:19 91:18 93:3,5 99:14 102:5

**provisions** 72:9 77:8 84:14 92:24 103:5 105:9 108:20

**proxy** 34:3

**public** 31:15 45:6 47:5,9 48:3 83:6,10 84:1,25 85:1

**publication** 62:7 64:5

**publications** 42:6 63:15

**publish** 63:11

**published** 55:23 63:8

**publishes** 62:8

**pull** 67:8 74:16 77:24 78:16 80:3 116:7

**pulled** 70:2

**pulling** 52:13 103:21 119:13

**punching** 116:18

**purchase** 72:2,20 93:2 104:22

**Purchased** 105:5

**purchasing** 77:5 79:2 109:2

**purposes** 35:17 76:11 108:19 116:8

**push-button** 19:11, 14

**put** 29:21 47:15,19 89:13,14

**putting** 84:18

**Q**

**question** 9:1,17 10:18 11:1,15 21:9 35:18 40:23 45:3 46:17 50:10 95:8 112:25 113:19 117:21

**questioning** 9:4

**questions** 6:3 7:11 10:7,23 11:5 12:2 108:18 120:5,9,10, 11

**quick** 59:1

**quite** 50:13

**quote** 18:15 54:23 55:3 57:8 59:3,4 61:7 64:9 85:9 112:2 116:3

**quoted** 38:19 62:23

**quotes** 67:17 78:18

**quoting** 18:15 75:18 78:24 85:4

R

**R-E-Z-I-N** 67:24

**race** 109:25

**racist** 30:24 31:10

**raises** 112:25

**random** 20:19

**range** 24:6 118:25 119:2

**rapidity** 53:21

**Raw** 26:22

**read** 8:7 11:8 12:18 13:13 14:5,10,19 15:6,24 17:4 19:23 27:22,25 28:4 42:2 50:1,18 51:3 58:1 67:11 71:9 75:11,22 78:1,2 80:4 90:18 98:20 99:18 101:9, 10 104:4 109:16 111:4 118:7

**reading** 28:13 45:11, 13,17 57:2 75:24 76:1,15

**real** 59:1

**really** 6:18 21:6 81:17

**realm** 54:13 112:14

**reason** 10:15 11:18 30:8 34:22 59:17 67:24

**reasonable** 31:14 34:4 40:8 73:8 90:21,24 91:20,24 92:5

**reasons** 30:4 33:16 111:15 115:9

**recall** 22:20 48:1,2,6 57:18 65:18 77:6,16, 22 80:21 105:23 107:15 110:10

**receive** 23:25

**recess** 58:24,25 120:7

**recessed** 116:12

**recite** 14:22

**recognition** 80:6

**recognized** 68:19

**recollection** 10:1 72:16

**record** 6:7

**recorded** 35:10

**recording** 11:5

**records** 58:20

**reduce** 11:6

**redundancy** 33:18

**reenact** 48:10

**refer** 5:16 16:16 56:17 76:14 77:14

**reference** 16:15 19:24 20:6,15 22:4 24:8 28:5 39:6,25 43:18 58:10 65:16 67:2 68:11 70:19 76:17 77:14 78:10 79:10 102:21 103:19 104:22

**referenced** 17:6 19:17 22:18 43:7 48:8 54:24 57:13 66:23 68:10 72:10 80:19 99:16 102:20 109:24 118:15

**references** 18:3 20:13,18,23,24,25 22:2 53:8,16 54:8 58:21 64:9 90:4

**referencing** 8:18 24:4 39:11

**referred** 54:8 101:4

**referring** 8:17 22:22 24:15 51:3,5 52:25 73:23 87:20 90:12 92:18 98:16 102:15 103:1 104:1 107:12 108:7 115:7 117:5

**refresh** 13:22

**regard** 96:5 109:19

**regarding** 13:1 14:8 16:12 17:14 45:24 46:21 55:12 61:8 65:8 107:14

**registration** 101:15, 16,17 102:1,12

**regulate** 115:4,21

**regulated** 72:15 80:15 118:2

**regulation** 91:7

**regulations** 80:13,14 82:6 85:24,25 118:21 119:4,24

**regulatory** 72:17 95:15,20 104:5,11 107:17,22

**related** 6:15

**relates** 15:11

**relating** 66:13,17

**relationship** 53:8

**relative** 46:10

**relatively** 23:23 24:14,22 25:1 29:23 30:9 31:20,24 32:4 55:20 112:9

**relevant** 28:2 109:17

**reliable** 34:25 84:23

**reliance** 75:15

**relied** 62:19,22 104:5

**Relief** 13:15

**reluctant** 82:24 110:14

**rely** 49:2

**relying** 33:10 59:16, 22 60:18 62:5

**remaining** 103:18 117:8

**remedial** 30:4

**remember** 57:1 62:6 77:10

**Remembering** 22:11

**remind** 7:19

**remote** 5:23

**remotely** 5:5,20 8:1

**repeat** 56:22 108:12

**rephrase** 108:2 117:4

**report** 6:3 15:25 16:4, 7,9,13,16,17,19 17:2,17,19,23 18:10, 12 19:21 22:23 24:19 29:1,7 33:17 34:18 40:1 45:12 49:1 53:20 54:8 58:11 59:6 60:20 62:20,24 66:12,22, 23 67:3,10 70:19 76:17 77:24 80:3 85:3 87:23 92:14 96:19 97:9 99:12 117:9 119:13

**reported** 23:24 24:15 25:2,19,23 26:24 27:10,15,20 28:7 32:8 33:19,25 34:1, 13 37:16,25 38:6,12

39:1,23 41:1 42:11, 23 43:5 44:16,18,24 50:19 57:5 59:20 60:6 61:2

**reportedly** 43:9

**reporter** 9:19 11:4 24:19 35:14 50:19 54:11 58:24 62:14 63:12 96:1 120:13

**reporter's** 34:16 59:23

**reporters** 34:20

**reporting** 28:1,11 42:5 44:8 50:9 59:17,23 61:15 64:18

**reports** 24:16,17 26:7,14,21,22 27:5,7 28:19 32:20 33:22 34:15 39:25 57:3,9 61:21 64:21 102:25

**representation** 34:24

**reprint** 41:23 42:6

**reprinted** 23:17 24:1 25:19 41:15 50:13

**reprinting** 42:8

**reputable** 62:7 63:8

**reputation** 25:7 62:7

**reputational** 63:10

**request** 10:13,16 12:21

**requests** 58:24

**required** 10:25 60:13 90:25 91:19

**reread** 17:2

**research** 6:14 7:10 23:12 38:10 44:18 47:3 60:6

**researching** 58:4

**resemble** 71:13

**resolves** 102:5

**resources** 23:10 111:7 112:12 113:6 114:23

**respect** 51:13,14 52:6 83:8 84:20 88:14 91:16 110:3

**respected** 63:15

**respective** 103:6 108:16

**respects** 62:4

**responses** 9:25

**responsible** 54:19 55:1

**restrict** 30:5 83:12 84:8 101:23 102:7 110:7

**restricted** 68:8 93:14, 16 94:8,9,20

**restricting** 93:17 96:7

**restriction** 88:12 91:7 99:3,4 100:8 101:3, 19 104:18 106:6 110:9,12

**restrictions** 84:15 87:10 89:4 92:20 94:2,10,15 100:24 102:23 104:21 118:15,16,19 119:14

**restrictive** 80:9,15 85:5 110:2

**restroom** 10:14

**result** 26:3 41:18

**resulted** 24:22 36:8, 15,22 37:3,10 43:4

**results** 23:6 26:3 28:6 35:24 45:10 47:11

**retained** 6:10

**retention** 6:13

**revealing** 33:6

**Revenue** 98:16

**review** 26:21 27:1 28:15,20 46:24 64:20 120:4

**reviewed** 12:24 23:14 28:5,25 29:18 41:15 45:20 46:3,7

**reviewing** 31:22 104:20

**revision** 101:15,17 102:1

**revolve** 59:5

**revolver** 98:25

**Rezin** 67:23

**right** 5:9 6:2 9:16 10:22 12:5 14:5,22 18:8 20:4,23 23:22 30:1 31:25 35:22 48:25 54:7 59:1 62:20 65:16 66:5,7 67:6 72:1,4,7 73:21 74:3 75:8,14,24 76:3,6,7,9,10,25 79:6,9,13 82:12 86:1,12 87:13,14,18, 22 88:23 90:8 91:2 93:10 96:17 100:18 103:14 104:4 107:24,25 117:15 118:1

**Rights** 5:12

**rise** 17:5

**Rob** 5:12

**Robert** 5:4 6:8 12:20 15:25

**role** 7:7

**room** 8:3 9:8

**rose** 26:12

**routinely** 32:8

**ruler** 116:5

**rulers** 31:12

**ruling** 81:5

**run** 74:4

**rural** 112:7

**S**

**safely** 33:24

**safety** 84:25

**sale** 71:24 104:12,13, 23 105:5,17 107:17 108:23 109:24 118:12

**sales** 57:1 84:15 107:23 115:4

**sampling** 45:17,18

**sand** 117:10

**saw** 93:4

**saying** 8:14 20:14 29:17 55:5,8 56:7,9, 10 64:1 84:6 96:7 111:15 114:15

**says** 20:25 61:1 67:6 91:14 92:3 101:25

**scattering** 22:10

**scene** 34:17,18

**scope** 6:12 15:4 81:2 82:1,22 83:16

**Scout** 51:20

**Scout's** 85:22

**Scouts** 51:19

**screen** 8:19 12:7,8, 14,17 13:8,10 15:14, 17,21 38:4 49:11 74:19,21 96:18,20

**scroll** 13:21 17:18 38:3 64:16 88:19 89:5 90:8 97:7 99:6, 11 101:2

**scrolled** 75:4 98:13

**scrolling** 90:2 100:20 109:15 111:2 117:8

**sculpting** 85:2

**search** 17:24 18:2,5, 11,14,20,23 19:1,4, 7,10,13 20:22 21:10 23:3 24:21 26:2,3 35:25 37:21 42:15, 17,21,25 43:4 44:14, 15 47:11,23 55:12 98:12,17 99:11 100:19

**searched** 18:2 36:4, 11,18,25 37:6 42:19

**searches** 18:9,17

**second** 27:14 30:13 67:18 75:13,19 85:10 87:9 111:1

**secondary** 39:3

**secondhand** 35:10, 13,16,17,20

**secondly** 62:10

**section** 14:18,25 15:11 49:1 67:9 75:8,9,21 101:10 110:23 117:17

**sections** 14:14 15:7 72:14

**see** 12:6,8 13:10 14:1 15:22 17:4 28:9 42:2,22 49:16 56:6, 14,18 61:5 64:17 65:11 71:6 74:24 75:6,9 78:1,5,21 88:25 89:8 90:1 92:14 96:19 97:15 98:2,6,14 99:7,9,15 100:14,25 103:6,15, 23 106:7,9 109:3,6, 13 110:8,24 117:2 118:5 119:16

**seeing** 72:12 90:9 95:20 108:15 110:15

**seen** 12:22 13:16 16:2 47:10 73:25

**segregated** 30:24

**self-defense** 76:7

**sell** 95:7,11

**selling** 79:5

**Senate** 40:1 53:19 54:8 65:17,21,24 66:22

**sense** 55:18 60:17

**sentence** 19:23 24:7, 13 28:4 51:3 53:11 56:6,15 118:7

**sentences** 75:11

**separate** 26:13 31:1 37:21 73:10 103:7

**series** 95:15

**service** 23:16

**services** 23:18 42:4,7

**setting** 100:1

**seven** 76:1 107:8

**seventh** 88:4

**shape** 71:13

**share** 12:7 15:14 19:20 103:25

**shared** 49:11 96:17

**shares** 12:17 13:8 15:21 74:19

**sharp** 49:14 51:7 53:25 54:4 68:2,3 69:12 116:11

**sharpened** 68:18

**sharper** 54:1,4

**sharpness** 69:18

**sheriff** 98:23 99:20, 21

**Shocking** 114:19

**shorter** 68:22 116:6

**shot** 98:25

**shots** 117:11

**show** 110:20

**side** 68:3

**similar** 20:10 39:19 42:17,19 71:15 83:8 92:19 93:23,25 96:15 105:19 116:13

**simple** 92:3 111:9 119:8

**simply** 24:19 37:16, 25 39:1,11 41:1 42:5 68:10 103:8

**simultaneous** 89:24 95:25 108:11

**single** 25:22 28:15 44:24 105:2

**sir** 12:4 71:7 110:25 118:6

**situation** 46:7

**six** 71:20 86:18 87:7, 11,15 91:1,15 92:15, 17

**size** 68:14 71:13

**slashing** 49:15 51:8

**slaves** 94:15

**sling** 98:25

**slug** 117:10

**slung-shot** 99:24

**small** 21:2 29:6 48:6

**smaller** 29:14

**society** 30:25 31:11 34:4 78:22 83:10 112:6

**sold** 66:24 67:4,13,15 109:2

**sole** 39:14

**solely** 52:19 79:15

**somewhat** 54:20 55:1,6,21

**sorry** 17:22 42:13 46:18 49:10 54:21, 22 69:23 71:8 78:17 89:16 96:4 102:16 103:25 108:2,12 118:7

**sort** 17:9 23:19 27:12 47:2 60:15 62:11 69:3 91:14

**Sounds** 66:11

**source** 27:1,4 33:23, 24 39:4 46:20,24 49:3 50:6 53:5 58:6 62:23

**sources** 17:3,7

**South** 31:8 32:14 45:5

**Southern** 27:17 28:1, 7,11 30:14 31:12

32:3

**Spanish** 115:18

**speaking** 9:21 89:24 95:25 96:2 108:11

**speaks** 10:9

**specific** 22:4,21,23 35:6,24 53:16 54:23 55:18,19 115:17,24 118:10 119:2

**specifically** 10:25 18:2 50:5 59:20 63:1 84:9 85:19,20 87:20 101:22

**specified** 104:14 108:24 109:24 110:7

**specify** 22:22 38:13 39:15

**specifying** 37:17

**speculation** 73:12 92:9 111:23

**spell** 100:17

**spelled** 67:24

**Spitzer** 5:4,15,16 6:8, 9 12:21 16:1 46:16 67:19 106:19

**Spitzer's** 5:11

**spoke** 59:3

**spread** 45:4

**spring** 20:10 116:13

**spring-loaded** 116:18

**sprinkling** 48:13

**stabbing** 37:22 39:6, 10 40:17 49:15 51:8 57:5 59:7

**stabbings** 37:17,25 38:6,22 39:1 41:1 57:4,10 61:3,8

**staffs** 65:25

**stake** 7:9

**stand** 75:16

**standard** 34:15 39:22

**standards** 34:22

**start** 78:2,3 91:10 93:12 118:24

**started** 18:6

**starting** 21:19 24:10 25:17 60:25 71:8 111:2

**starts** 54:22,23 118:1

**Stat** 98:16

**state** 6:6 21:19 25:18 26:6 27:14 28:1,7,12 30:3,18 31:13,22 33:3 37:13 40:25 41:14 42:14,23 45:2 47:5 48:8 49:12 68:8,9 70:16,21 71:3 74:10 75:16 76:2,4,6 77:15 78:11,13 79:19 80:14 82:4 84:7 85:3 86:9,17 88:4,10 93:12,13 96:22 97:19 99:7,13 100:23 102:17 103:2 105:15 106:10 107:8,16 108:1,3,22 110:17 111:6,17 112:4,8,15,23 113:8, 11 114:8,12 119:20

**stated** 67:3 78:13 82:10

**statement** 20:5 24:5 25:10 38:17,18 40:22 49:24 56:4 63:25 65:7 103:1 115:7

**statements** 57:12,16

63:18

**states** 23:23 27:17 30:15 31:12 32:3 44:21 54:18,25 57:6 86:18 87:4,7,15,20 88:4 90:3 92:15 93:15,16,19 94:19 96:23 97:2,5,13,15 98:10 102:16,17,20 103:2 104:5,6,7,8,9, 11,12,13,14 105:21 106:24 107:8,16 108:1,3,23 110:17 115:2

**stating** 55:20 59:4 64:10 69:17 78:23 98:9

**station** 34:16

**statistics** 39:20 40:14

**status** 62:12

**statute** 79:24 101:3

**statutes** 72:21

**steak** 53:25 54:3

**steps** 16:24

**Steven** 76:21

**stiletto** 115:18

**stipulate** 60:9 92:3

**stipulated** 60:11 109:11

**stop** 111:12

**stored** 20:8 117:6

**stories** 21:25 22:10, 17 23:2,5,8,14,16, 17,21 25:5,7,15 26:7,17,19 27:10,22 28:13 29:1,6,11,13, 14,16,18,21,24 33:4, 10 34:8,10 35:8,9 36:8,15,22 37:3,10,

15,16,24 38:6,22 39:1,5 40:16,25 41:6,14,19,23,25 42:1,2,6,8 43:6 44:13,18,22 45:13, 18,19 46:2,6 47:10, 13,16,18 48:1,2,7,15 63:11

**story** 22:4,7,8,23 26:16 27:24,25 28:11,16,22,23 33:17 34:2 38:8,16 43:18 44:19 45:24 46:1 57:5 58:8

**Strike** 102:16

**strong** 69:11

**struck** 28:10

**struggled** 114:22 115:3

**struggling** 114:11 115:5

**studies** 54:9

**studying** 113:23

**stuff** 6:19 8:14 63:12 75:3

**stunned** 59:5

**sturdy** 69:25

**style** 83:5

**subcategory** 32:12 70:11

**subject** 13:2 14:9 15:8 16:13 42:10 83:2

**subjects** 117:20

**submission** 7:17 13:20

**submitted** 6:4 7:16 16:19

**subsistence** 112:7

**suffering** 11:21

**sum** 71:18 84:1 95:16 100:3

**summarized** 33:4

**summarizes** 87:3

**summary** 33:3 104:20

**support** 51:2,24 61:22 63:1

**supported** 52:21

**supports** 55:10

**suppose** 55:17

**suppress** 104:6 115:21

**suppressing** 105:19

**Supreme** 74:22 75:15 76:2 82:9,25

**sure** 9:20 23:10 32:6 41:22 46:16 58:9 63:10 70:21 75:25 76:16,25 77:7 87:25 106:16,17,18 108:21 109:7

**Surely** 40:8

**sureties** 90:25

**surety** 91:13,19,25 92:1,19 94:12

**surface** 53:24

**surrounding** 48:3

**sweeping** 111:8

**switch** 35:25 117:19

**switchblade** 14:15 17:10 20:7 22:5,8 23:24 24:15,22 26:8 27:23 28:11 30:9,13 31:24 32:11,12 33:5 34:5 36:9,11,16,18, 23,25 37:4,6,11,18, 25 38:14,23 39:7,8, 9,15 40:3,7,10,12,18 41:2,7,8,14,25 42:20,24 43:5,6,9, 15,18,22 44:2,7,23 45:4,21,25 46:8,12, 14,21 47:1,14,21,25 48:3 52:5,7,8 53:21 55:12 57:1,3,4,10 58:17 59:6,7,15,19, 20 60:11,19 61:3 64:12,25 85:15 115:24 116:3,9,17

**switchblade-related** 22:3

**switchblade-type** 19:25 20:5,14 21:8, 11

**switchblades** 6:15,16 14:19,21 18:3 19:18 20:3,19 21:20 27:15, 21 30:5 36:5 37:15 38:7,10 39:2,12 41:19 42:9 49:2 50:4,11 51:13 52:23 53:17 54:19,25 60:9 65:10 66:13,24 67:13 107:14,23 108:9 116:20

**switchblades'** 49:13 51:6,25

**sword** 90:20 99:24

**sworn** 7:20

**systematic** 41:11

**T**

**table** 87:3,5 102:25 119:12

**tables** 119:3

**tabulate** 106:23

**tabulated** 29:1 60:7, 14

**tabulation** 39:19 86:5

**tabulations** 28:23 39:13

**take** 10:19 30:19 38:3 77:13 107:24 112:13

**taken** 16:24 31:15 58:25 81:18 120:7

**takes** 62:12 113:8

**talk** 9:18 17:13 50:3 89:22 92:15

**talked** 58:3,16 62:24 94:12 103:7 105:7

**talking** 8:15 16:18 33:18 48:9 55:16 70:17 86:12 88:18

**talks** 35:14 53:20

**tax** 94:14 104:12 107:22 108:4,9 115:4

**taxes** 104:11 107:17

**techniques** 95:21 104:6

**technologically** 111:9

**technology** 84:24

**tell** 7:20 47:24 59:7 67:19 68:15 118:18

**tend** 5:24 22:15 68:10

**tended** 32:12

**tends** 53:23 70:12

**Tennessee** 71:9 72:3 73:3,10 74:5 75:15 76:2,18

**term** 18:3,14,20,23 19:1,4,7,10,13 21:11 32:22 36:5,11,18,25 37:6,22 42:20 91:1 98:13 99:11

**termed** 20:3

**terms** 14:10,23 19:16, 17 27:9 28:2 32:10 34:20 35:2 37:22 91:16

**territory** 100:20

**testified** 5:6 64:2 87:9

**testify** 13:1 14:8 16:12

**testifying** 7:22

**testimony** 11:13,19, 22,25 59:12

**Texas** 77:15 79:19

**text** 8:19 9:2 17:13 72:12 90:18 94:4 98:20 99:12 108:15

**thank** 5:19 9:15 14:4 18:13 76:15 86:16 89:25 104:19 111:13

**the--** 5:10

**thereof** 71:17 100:2

**thin** 49:13 51:6 53:23, 25 68:18

**thin-bladed** 69:5,9 116:11

**thing** 10:17 12:6 23:19 27:12 101:10 103:8 105:12 112:19 116:13

**things** 34:18 53:21 68:14 72:10,12,15 84:16,18 103:4,14 105:3 112:11,12 113:7 114:22 115:5,

15

**think** 5:22 20:7,18 22:19 31:1,14 39:17 41:4 42:11 48:11,13 52:21 54:5 62:21 63:24 66:5 69:10 73:8,14 76:24 79:13 83:8 84:1 87:13,14 90:2 92:11 102:14 103:17 109:11,13 112:10,16,21 114:16 115:1 120:12

**thinks** 52:14

**third** 65:10

**Thomas** 65:7,14

**thousands** 69:15

**Threats** 84:25

**three** 67:17 71:19 102:20 108:1,3 116:6

**thrust** 114:21

**thrusting** 70:5

**time** 9:21 10:14 18:5 22:16 23:10,12 26:14 28:9 29:20 31:8 34:21 40:7 41:10,23 54:19,25 55:13,14,15,16,19, 24 56:1,8 63:8 71:10 72:20 73:3,11 86:11, 12 95:22 96:2 114:14,24 116:4 117:20 120:8,10

**times** 6:24,25 10:7 16:16 18:12 24:18 25:23 42:15,25 43:3, 4,8 44:14 50:2 55:11 76:13 86:4 105:18

**title** 12:18 13:13 15:24

**titled** 49:1,3 64:25

**today** 5:11,16 6:3 11:18,25 16:25 17:23 20:7 23:16 32:10 42:1 68:24 69:16,22 84:24 112:10,13,17,22 114:19

**told** 9:11 10:25

**tool** 53:8

**tools** 111:7,17,20 113:5 115:5

**toothpick** 71:12,14 115:18

**top** 25:16,17 26:6 33:1 87:19,21 119:19

**topical** 50:20

**total** 29:6,11,18,24 44:22 84:1 93:14 95:16

**totaling** 93:19

**town** 98:22

**Toy** 49:3

**track** 29:5 35:6 41:11

**trade** 95:7,11

**traditional** 49:12 51:5

**train** 113:6

**transcript** 11:6,8

**transferring** 79:4

**transmitted** 23:17

**traveling** 5:25 100:1

**treasury** 23:11

**treated** 76:2 80:9 81:23 82:4 84:4 85:5

**trial** 11:15

**tried** 70:3 79:25

**trigger** 20:10,11 52:13

**true** 16:10 57:24,25 62:9

**truth** 7:20

**try** 10:5 103:14

**trying** 84:8 87:6 90:9

**turn** 15:15

**twentieth** 20:3 93:13

**twenty** 100:5

**twenty-five** 100:4

**twice** 13:20

**two** 10:8 30:4 51:17 62:4 75:11 82:18 103:4 105:18 115:15

**type** 30:25 39:21 40:2 41:11 68:17 69:17, 20 71:15 88:21 93:2, 6,17,25 97:8 104:23 109:15

**types** 68:4,21 69:15 83:2,7,12 94:3,10 115:17,20 116:15 118:3,10 119:6,19

**typically** 32:21,23 68:2 84:12,13 114:21

**typo** 89:13

**U**

**U.S.** 35:2 65:17 74:23 118:3

**ubiquitous** 42:5 115:14

**ubiquitously** 118:2

**unconcealed** 101:13, 21,23

**uncovered** 19:24 20:13 24:20

**underestimate** 37:14

**underscore** 80:5

**understand** 7:23 8:4, 10,22 9:5,10,22 10:3,10,11,20 11:2, 10,16 16:22 20:7 52:7 57:24 63:7 74:1 84:5 103:16

**understanding** 25:5 69:14 77:4 112:3 116:2,17

**understood** 68:12

**uniform** 22:13

**uniformly** 31:12

**unique** 26:13 45:20 47:20

**unit** 26:16 44:19

**universally** 68:12

**University** 53:3

**unlawful** 101:11

**unlawfully** 79:24

**unusual** 58:4

**unverifiable** 62:1

**unverified** 62:17,18, 19,22

**UPI** 42:4

**use** 10:6,14 32:22 51:1,9,19,21 52:12, 14,17,18,20 53:12, 14,17 59:19 60:8 70:1 76:10 78:14,15, 18,19,21,22 79:16 80:7 83:6 98:23 115:12 116:8 118:12

**use.'** 78:9

**useful** 34:25 81:18

**uses** 52:19

**usual** 76:11

**utilized** 20:2 95:21

**V**

**Vague** 72:22 104:25

**variations** 67:25

**variety** 42:1 69:15 104:5 117:1

**various** 6:2 19:17 23:18 80:11,12 82:6 85:7 90:4 94:3,10,14 98:10 100:23 118:3 119:19

**vary** 68:14

**varying** 68:12 105:9

**vastly** 44:22

**vehicle** 112:23

**veracity** 11:15 59:16 62:8

**verbatim** 14:22

**verifiable** 46:21,22 62:3

**verification** 60:23 62:5

**verified** 63:1,2,18,21 64:3

**verify** 34:7,9 35:3 46:25 49:23 50:6 57:12 58:6,11,20 59:11,21,23 60:2,4 61:11 62:15 64:14 65:3,13

**versus** 40:13 115:24

**victim** 35:15

**victims** 27:12 32:24

**violate** 91:15 112:18

**violation** 71:3

**violations** 72:25

**violence** 59:5 90:22

**violent** 22:15 45:20 46:3,11

**Virginia** 5:1

**virtually** 19:24 20:15, 23,25 28:10 68:8

**visibility** 63:14

**visible** 73:24

**visited** 31:16

**vitae** 17:20

**vs** 7:4

**W**

**Walker** 64:25

**want** 5:19 7:19 13:21 27:23 59:4 72:11 75:3,20 81:19 83:20 86:7,8 91:9 103:5 108:19 110:20 113:13,25 120:10,13

**wanted** 16:17 87:24 95:9 113:1 115:6,21

**War** 21:22 22:10,11 24:8 27:16 28:14 45:4 48:7,14 109:8 110:1 118:24 119:9, 10 120:2

**Warrant** 98:17

**wartime** 22:14

**wasn't** 21:6,9 59:14 73:18 77:1,4,10 79:1 94:22

**way** 31:7 32:7 34:7 49:24 56:5 58:6 60:15 69:10 70:1 94:21 103:13 105:20 108:17 112:16 113:7 114:22 118:8

**ways** 34:9 62:11 94:21 95:1 96:8 105:10

**we'll** 9:14 22:21,25 30:2 78:2 87:5

**we're** 8:2,14,20 82:9 88:18 100:19 114:11

**we've** 117:18

**weapon** 60:8 64:12 71:13 73:24 79:18 81:18 90:21 93:6,8 99:1 101:12 113:13, 14 119:19

**weapon'** 78:7

**weapons** 53:6 78:8, 19 80:10 83:2,5,7,12 84:9,13 85:6 89:4 91:4,9 92:6,8 94:3 96:8 98:17 99:25 101:20 102:8 117:10,14 118:4,19, 20 119:5,14

**weapons'** 6:15 7:11 118:12

**wear** 71:11 99:22

**wearing** 71:2 73:23

**Wednesday** 5:1

**went** 17:1,8 18:6 97:4

**weren't** 60:20 87:16 111:16

**White** 30:18,20 31:7, 11

**Whites** 31:11,12

**widely** 50:12 68:3,19 118:2

**wider** 68:22

**wife** 9:11,14

**Williamsburg** 5:1

**wire** 23:16,18 42:3

**withstand** 70:1

**witness** 40:21 46:18 58:15,16 63:5,7,24 72:24 73:14 82:24 83:18,24 92:11,23 94:25 105:2 106:20 109:6 111:25 112:17 113:18

**witnessed** 57:4

**woman** 43:9,15 45:25

**Woman's** 38:9 49:3

**Woods** 15:1 40:20 46:16 54:21 59:12 63:3,6,22 72:22 73:12 81:1,25 82:21 83:16,22 92:9,21 94:23 95:24 104:25 106:19 109:4 110:20 111:23 113:16 117:18,24 120:6,11, 13,14

**word** 19:22 36:8,15, 22 37:4,11 65:14 75:18 77:13 78:3 100:19 105:24 107:24

**wording** 56:8 91:10 100:10

**words** 9:20 39:22 67:17 74:3 111:3

**work** 18:19

**working** 81:11,13,15

**World** 21:22 22:10,11 24:8 45:4 48:7,14

**Worman** 7:3

**wouldn't** 20:17 57:19 69:20 72:11

**wounded** 54:20 55:2, 7,21

**wrap** 117:22

**write** 8:14 9:19

**writing** 53:18,19

**written** 17:9 49:7 53:4,6 54:15 60:1

**wrong** 96:6

**wrote** 55:9 84:11 93:24

**Y**

**yeah** 7:12 8:11,17 18:18,19 24:7 25:21 36:17 38:20 51:5 52:4 56:7 67:12 70:22,25 73:2 78:21, 22 81:21 82:24 87:5, 13 89:2,9,11,19 96:11 106:20 107:25 111:14 119:17

**year** 7:6 21:5 58:9 61:3 85:13 102:13, 14 105:16

**years** 21:22 22:11 24:4,6,8 32:9 33:11 41:24 48:14 66:4,6 67:4,15 68:24 76:1,5 87:4 89:5 105:17 113:23 114:14 119:11,14

**Yep** 90:11

**yielded** 28:4

**York** 18:12 42:14,24, 25 43:3,4,8 44:14 55:11 65:7,9

**young** 22:12

**Z**

**zero** 20:21 21:1 43:5, 6

# PLAINTIFFS' EXHIBIT AC

KR1515

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P.,

Plaintiffs,

vs.

CALIFORNIA ATTORNEY GENERAL ROB BONTA,

Defendants.

CASE NO. 3:23-cv-00474-JES-DDL

REMOTE DEPOSITION UPON ORAL EXAMINATION OF
DAVID T. HARDY

FEBRUARY 15, 2024
10:09 A.M.

(All participants appeared remotely)

TAKEN AT THE INSTANCE OF THE DEFENDANTS

REPORTED BY:
MONNA J. NICKESON, RPR, CRR, CCR, CSR CA 14430
JOB: 6449173

APPEARANCES:

FOR THE PLAINTIFFS:

John Dillon, Esq.
Dillon Law Group, APC
2647 Gateway Road, Suite 105, No. 255
Carlsbad CA 92009

FOR THE DEFENDANTS:

Katrina Uyehara
Jane Reilley
Deputy Attorneys General
California Department
Justice Attorney General
1300 I Street
Sacramento CA 95814

I N D E X

KNIFE RIGHTS, ET AL. VS. CALIFORNIA ATTORNEY GENERAL ROB BONTA
CASE NO. 3:23-cv-00474-JES-DDL
FEBRUARY 15, 2024

| WITNESS: DAVID T. HARDY | PAGE |
| --- | --- |
| EXAMINATION BY MS. UYEHARA: | 4 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | Complaint for Declaratory and Injunctive Relief | 12 |
| Exhibit 2 | Knife Rights National Constitution Day Second Amendment Virtual Rally 2020 | 14 |
| Exhibit 3 | Of Arms and the Law | 43 |
| Exhibit 4 | Gun Freedom Radio, Our Guests: David T. Hardy | 49 |

BE IT REMEMBERED that on FEBRUARY 15, 2024, at 10:09 A.M., the remote deposition of DAVID T. HARDY was taken before Monna J. Nickeson, Certified Realtime Reporter, Registered Professional Reporter, Certified Livenote Reporter, Certified Court Reporter (WA 3322), Certified Shorthand Reporter (ID 1045), (OR 16-0441), (CA 14430), the following proceedings took place:

DAVID T. HARDY

having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MS. UYEHARA:

Q. Good morning, my name is Katrina Uyehara, and I'm a deputy Attorney General with the California Department of Justice. I'm joined this morning by my colleague, Jane Reilley, who is working on this case as well. We represent the defendant California Attorney General Rob Bonta in this lawsuit. 10:09

We are here regarding the case of Knife Rights, Inc., et al., versus California 10:09

Attorney General Rob Bonta. This case is in the U.S. District Court for the Southern District of California. The case number is 3:23-CV-00474. 10:09

Can you please state your full name for the record? 10:10

A. It's David Theo Hardy. 10:10

Q. Have you ever taken -- or have been -- sorry -- a party of a deposition before? 10:10

A. Yep. I've been practicing law for 49 years, so I think that's safe to say. 10:10

Q. Have you ever been deposed before? 10:10

A. Yeah, oh, probably four or five times. 10:10

Q. Do you recall which cases those were in? 10:10

A. There was one up in Denver where I gave courtroom testimony. And there was another -- I'm afraid they all blend together in my mind. Along the way -- oh, I was deposed, like, 20 years ago on a civil case. 10:11

Q. Do you happen to know how many of those times you acted as an expert witness? 10:11

A. The case in Denver and the other one I was deposed on. And, actually, come to think 10:11

of it, the one 20 years ago. 10:11

Q. And on which topics were you an expert for? 10:11

A. The two recent ones were both bear arms challenges. And the one 20 years ago was on the -- basically the custom of how you purchase a firearm. 10:11

Q. And so the one in Denver was a challenge to a Colorado or Denver firearm regulation? 10:11

A. Yes. 10:11

Q. And then the other one most recent one was also a challenge to some sort of firearm regulation as well? 10:12

A. Yes. I can't recall what it was, though. 10:12

Q. And then have you ever testified in court before? 10:12

A. Let's see. There was the case I mentioned where I testified in Denver. Other than that -- let's see. There was -- going back some years ago, I was a witness for the prosecution in a drunk driving case. And I testified in my own divorce case. So I think that's the limit. 10:12

Q. Okay. I'll go through some basic admonitions and then we'll go ahead and get started here. 10:12

A deposition, as you know, is similar to testimony in court in that you're under oath. You've just been sworn in and are testifying under the penalty of perjury. During this deposition, you must reply fully and truthfully to the questions asked. 10:12

Do you understand? 10:13

A. Just kidding. Yes. Uh-huh. 10:13

Q. I do not intend to ask you any trick questions. If you do not understand a question, please let me know and I will repeat it or clarify it. I say this because if you answer a question, we'll assume that you understood it. This is important because for some reason if the answer to that question is used in trial, we're making it clear on the record now that it's your responsibility to let us know whether you understand the question or not. 10:13

Do you understand these procedures? 10:13

A. Of course. 10:13

Q. You're not required to speculate or 10:13

guess as to matters of which you have no personal knowledge. 10:13

Do you understand this requirement? 10:13

A. Oh, yeah. 10:13

Q. I also want to remind you that the court reporter cannot record shrugs, uh-huh, or other nonverbal responses or gestures. So please be sure to provide verbal responses to my questions. 10:13

A. Uh-huh. Yes. 10:14

Q. Also, the court reporter can only record one of us at a time. So I'll try not to interrupt you, and I would ask that you do the same for me. 10:14

Is that all right? 10:14

A. Oh, sure. 10:14

Q. There may be circumstances where I ask you a question where I would be asking for an estimate. I would ask you not to answer any questions with a speculation or a guess. It's okay to say you don't know an answer to a question, but I'm entitled to your best recollection in cases where I'm asking for something -- or asking where you might estimate something. 10:14

Once the deposition is transcribed, you may request an opportunity to review it. If you feel that any of your answers were transcribed differently from those you gave, you may make notes to that effect. 10:14

However, defendant does have a right to comment at trial on any of those changes which you make to the deposition transcript. If you want this opportunity to review the transcript, you need to request that before the end or at the end of the deposition. 10:14

Do you understand these procedures? 10:14

A. Yep. 10:15

Q. From time to time, your lawyer, Mr. Dillon, may make objections. Unless Mr. Dillon specifically instructs you not to answer the question, you're required to answer the question. 10:15

Does that make sense? 10:15

A. Oh, yes. 10:15

Q. One more point before we begin. If you need to take a break at any time, please let me know and we'll accommodate that request. Although there will be breaks, it would be best to not take a break between a pending question 10:15

and an answer. 10:15

Understood? 10:15

A. Of course. 10:15

Q. Are you able to provide complete and truthful testimony this afternoon? 10:15

A. Well, yes. 10:15

Q. Is there any reason why you feel you cannot give your best testimony today? 10:15

A. No. 10:15

Q. Are you suffering from any medical condition that would prevent you from giving your best testimony today? 10:15

A. No. 10:15

Q. Have you taken any medications or any other substances in the last 24 hours that would affect your ability to understand my questions or answer truthfully today? 10:16

A. No. 10:16

Q. Did you prepare for today's deposition? 10:16

A. Oh, yes. 10:16

Q. And how did you prepare? 10:16

A. I reviewed my report. I reviewed the complaint. I think that was about it. Well, yesterday I did talk to Mr. Dillon for a 10:16

time on the phone. And I think that was it. 10:16

Q. So the documents you reviewed were limited to the complaint and the two expert reports, Professor Spitzer's and Dr. Rivas'? 10:16

A. Yes. I don't actually think I reviewed those in preparation for this deposition, but I have reviewed them in the past. 10:16

Q. And did you speak with anyone besides Mr. Dillon in preparation for this deposition? 10:16

A. No. 10:16

Q. And did you speak with anyone about this deposition today besides Mr. Dillon? 10:16

A. No. 10:16

Q. And to confirm on the record, you have reviewed the complaint filed by the plaintiffs? 10:17

A. Yes. 10:17

Q. And did you have any role in preparing it? 10:17

A. Oh, role? Sorry, I couldn't hear too well. 10:17

Q. No worries.

A. No, I had no role in preparing it. 10:17

Q. All right. I'm going to share my screen and show the complaint at issue in this case. We're introducing this as our first exhibit. 10:17

(Exhibit 1 was identified.) 10:17

BY MS. UYEHARA: 10:17

Q. Can you see a copy of the complaint on screen? 10:17

A. Oh, yes, now I can. 10:17

Q. And you can confirm this is the complaint that you reviewed in preparation for your deposition today? 10:17

A. I think so. 10:17

Q. I'll scroll through to the bottom here so you can confirm that this is indeed the correct document. 10:17

Is that a copy of the complaint that you reviewed for your deposition today? 10:18

A. It seems to be. 10:18

Q. When did you first become involved in this case? 10:18

A. I know that it was Mr. Dillon gave me a phone call. I don't remember when, however. It was not that long ago. 10:18

Q. Perhaps in December, November? 10:18

A. Around in there. 10:18

Q. What is your relationship with the organization Knife Rights? 10:18 10:18

A. I know the leader of it, Doug Ritter, and that's about it. 10:18 10:19

Q. And how do you know Mr. Ritter? 10:19

A. I've met him at several meetings, Second Amendment Foundation, and so on. 10:19 10:19

Q. Would you consider yourselves to be friends? 10:19 10:19

A. I'd say friend, yep. 10:19

Q. And then how often are you in contact with one another? 10:19 10:19

A. I might run into him twice a year. 10:19

Q. Can you describe what his organization Knife Rights is? 10:19 10:19

A. All I know is that it's concerned with the right to basically own and carry knives. 10:19 10:19 10:19

Q. How would you describe their organizational mission? 10:19 10:19

A. To try to protect rights to, you know, have and possess knives. I don't know anything beyond that. 10:19 10:19 10:20

Q. Are you a member of their 10:20

organization? 10:20

A. No. 10:20

Q. Do you donate to the organization? 10:20

A. Never have. 10:20

Q. And have you ever attended any of their events? 10:20

A. I don't think so. 10:20

Q. I'm going to introduce our second exhibit here, which is a copy from the Knife Rights website about a speaking event held on September 15, 2020 as part of the National Constitution Day Second Amendment virtual rally, the 35th gun rights policy conference. 10:20

(Exhibit 2 was identified.)

BY MS. UYEHARA:

Q. Mr. Hardy, do you recall speaking at this event? 10:20

A. I've spoken at a good number of them, and that would be in the timeframe when I probably would have been speaking, yes. 10:20 10:21

Q. What do you mean by the timeframe in which you would have been speaking? 10:21

A. Well, yeah, 2020 through the current day, and probably go back to 2018, 2019. 10:21

Q. And can you read this part right 10:21

here that includes your name? 10:21

(The Court Reporter requested clarification.) 10:21

BY MS. UYEHARA: 10:21

Q. Could you please read this highlighted portion which includes your name? 10:21

A. This is an opportunity to hear firsthand from the nation's 2A leaders and make your voice heard. This year's roster includes Alan Gottlieb, Mercedes and Matt Schlapp, John Lott, Mark Walters, David Hardy, and some others. 10:21

Q. Thank you. 10:21

Do you recall any other speaking events for Knife Rights? 10:21

A. Well, that was -- 10:22

MR. DILLON: Objection. Lacks foundation. 10:22

THE WITNESS: Well, that was the gun rights policy conference. I've never attended a Knife Rights conference, so I don't recall speaking at any of them either. 10:22

BY MS. UYEHARA: 10:22

Q. Do you recall whether or not you 10:22

were paid for your presentation at this conference? 10:22

A. Oh, at that conference there? No. I don't think I've ever been paid for any of the gun rights policy appearances. 10:22

Q. Are you aware of Knife Rights' judicial and legislative efforts to overturn knife legislation nationally? 10:22

A. In a general sense. 10:22

Q. Are you aware -- 10:22

A. I don't know about -- much of the litigation. I'm just aware that there is some of it. 10:23

Q. Are you aware that their judicial and legislative efforts also involve overturning switchblade legislation? 10:23

A. Uh-huh. Given that that's what -- that this is the case of exactly that, I suppose I am aware, yes. 10:23

Q. And what is your opinion on their efforts to overturn knife legislation nationally? 10:23

A. Well, I would think there were some statutes that need to be overturned. I wouldn't have any opinion much beyond that. 10:23

Q. Would you say you're in favor of them, oppose them, or neutral? 10:23
A. Somewhere between oppose them and neutral. 10:23
Q. Can you explain your answer? 10:23
A. Well, I don't think that regulation of weaponry generally has a beneficial effect. On the other hand, you know, I collect arms and I've got a decent edged weapon collection, but it's not really something that is deep in my being. 10:23
Q. Can you describe some of the edged arms in your collection? 10:24
A. I've got them going back to the bronze age, early bronze age, arrowheads, spearheads, that sort of thing. Early bronze age in Greece ended about 2000 BC, so these are pretty good things. 10:24
And then I have a modern Bowie made after the style of the 1840s. Probably a few others. Several swords, that sort of thing. But for me, that's lightweight collecting. 10:24
Q. Do you have any switchblades in your collection? 10:24
A. No. 10:25

Q. And earlier, I believe you said that there were some -- that you were not a fan of gun regulation generally, and there were some laws that you suggested might or should be overturned. 10:25

What laws are those? 10:25

A. Well, I mean, it's -- I don't like permitting systems generally. Restrictions on type of arms as a general rule are nonfunctional. That matter of thing, you know. 10:25

Q. Mr. Hardy, what do you mean by types of arms? 10:25

A. Well, if you're talking about a specific firearm or class of firearms, unless there is something unusual about it, I don't see the sense of regulating one aspect of a weapon as opposed to all the other aspects of it. 10:26

Q. Have you worked with The Dillon Law Firm before? 10:26

A. Have I -- excuse me? 10:26

Q. Sorry. 10:26

Have you worked with The Dillon Law Firm before? 10:26

A. I'm -- I probably have because I've 10:26

had contact with John somewhere in the past, but I can't recall exactly where. 10:26 10:26

Q. In the past, you mean, like, at a conference or -- 10:26 10:26

A. I just recall that when he contacted me, I don't think that was the first contact I've had with him. But I don't have any recollection of what the contact was. 10:26 10:26 10:26 10:26

Q. And so you might have worked on a case with The Dillon Law Firm before? 10:26 10:26

A. Might have, yeah. 10:26

Q. In your initial discussions with Mr. Dillon about this case, what was discussed about this case? 10:26 10:27 10:27

MR. DILLON: Objection. Just privileged information. 10:27 10:27

THE WITNESS: Just, you know, that it was a challenge to switchblade laws in California. I don't recall anything else. 10:27 10:27 10:27

BY MS. UYEHARA: 10:27

Q. What area of expertise were you asked by The Dillon Law Firm to opine about? 10:27 10:27

A. The concept of keeping and bearing of arms, and in particular, the historical record for regulations of the type being 10:27 10:27 10:27

challenged. 10:27

Q. And did you advertise your expert services in any way? 10:27

A. No. 10:27

Q. And do you have a written agreement governing your engagement as an expert in this case? 10:27

A. No. Verbal. 10:27

Q. Are you being compensated for your work in this case? 10:28

A. Yes. 10:28

Q. At what rate? 10:28

A. $150 an hour. 10:28

Q. So you submitted a rebuttal expert report in support of plaintiff's case. I'm going to put it on the screen now and you can confirm that this is indeed the report. 10:28

BY MS. UYEHARA:

Q. Do you see a copy of your report titled "Rebuttal Report and Declaration of David T. Hardy Rebutting Expert Reports and Declarations of Robert Spitzer and Dr. Brennan Rivas"? 10:28

A. Yes. 10:28

Q. Did you write this document? 10:28

A. Yes. 10:28

Q. And at the end, is this your signature under penalty of perjury on page 16? 10:28 10:28

A. Yep, yes. 10:29

Q. What information did you review in preparing this document? 10:29 10:29

A. I'm tempted to say a lifetime of study, but I reviewed the expert witness reports of Rivas and Spitzer. I probably did some research on my own, but those are the main things I recollect looking at. 10:29 10:29 10:29 10:29 10:29

Q. Do you recall what sort of independent research you did in preparation of your report? 10:29 10:29 10:29

A. It would probably have been something on the internet just to verify some of their sources. That matter of thing. 10:29 10:29 10:29

Q. So the only documents or sources you reviewed in addition to the actual reports were sources that were within their articles or within their reports? 10:29 10:30 10:30 10:30

A. That were mentioned in their reports. 10:30 10:30

Q. In preparing your report, did you review the penal code sections at issue in this 10:30 10:30

case? 10:30

A. Can you repeat that? 10:30

Q. In preparing your report, did you review the penal code sections at issue in this case? 10:30

A. No, I don't believe I did. 10:30

Q. Are you aware that California's law permits switchblades that are less than two inches in length? 10:30

A. Yes, I recall that. 10:30

Q. Besides your internet research, did you consult any libraries or any databases? 10:30

A. No. 10:30

Q. You spent two pages of your report describing your analysis of the Bruen opinion; is that correct? 10:30

A. Around that. 10:31

Q. In fact, your report includes the word "Bruen" at least 12 separate times, correct? 10:31

A. The word what? Pardon? 10:31

Q. Bruen. 10:31

A. Oh, Bruen. Okay. Yes. 10:31

MS. UYEHARA: Ms. Court Reporter, can you hear me clearly as well or do I 10:31

need to speak louder? I'm using a new microphone today. 10:31

THE COURT REPORTER: Yes. Off the record. 10:31 10:32

(An off-the-record discussion was held.) 10:32 10:32

BY MS. UYEHARA: 10:32

Q. Returning to my previous question, your report includes the word "Bruen" at least 12 separate times; is that correct? 10:32 10:32 10:32

A. I suspect that's right. 10:32

Q. Why did you choose to include this discussion of the Bruen case? 10:32 10:32

A. As I understand it, that's at the heart of what's being debated in this case. And Bruen is your most recent precedent, at least until they come down with another one this term. And so, yeah, that's where I start my analysis. 10:32 10:32 10:32 10:32 10:32 10:32

Q. Did the Dillon firm request that you include this analysis or was that your own decision? 10:32 10:33 10:33

A. I think it was my own decision. 10:33

Q. And why did you choose not to include any exhibits to your report? 10:33 10:33

A. I don't think I could come up with any. I mean, what I was analyzing was the other expert witnesses, and they had the exhibits. So the question was, did those exhibits check out? 10:33

Q. And were there any exhibits that you wanted to include but ultimately decided not to? 10:33

A. No, I can't think of any. 10:33

Q. And has anyone other than plaintiff's counsel assisted you in writing this? 10:33

A. No. 10:33

Q. We're going to transition now to some questions about your background and qualifications. 10:33

Did you graduate high school? 10:33

A. Yes. 10:33

Q. And where did you attend college? 10:34

A. University of Arizona. 10:34

Q. In what year? 10:34

A. I started in 1969 and graduated in 1972. 10:34

Q. And what was the focus of your studies there? 10:34

A. Speech arts was my major and government my minor. 10:34
Q. Can you describe what speech arts is? 10:34
A. Well, the department of speech was divided into two segments. One was speech arts, which was essentially the history of speech, is persuasive speech. And the other was speech science, which is essentially treating problems with speaking. 10:34
Q. And in your studies, you focused on both of those or you had to choose a track? 10:34
A. I chose the speech art side. I did take I think six units of speech therapy because that was required. 10:35
Q. And did any of those studies involve historical research? 10:35
A. The speech arts end did because it was surveying basically great speeches throughout history. So that would have actually started with Aristotle, as I recall. 10:35
Q. And in those studies, did you spend substantial time, like, researching or identifying those speeches? 10:35
A. Well, yes. 10:35

Q. Do you have an advanced degree in history? 10:35
A. No. 10:35
Q. And so for your studies, would you have to dig up copies of historical speeches or were they mostly given to you as a student? 10:35
A. Mostly given to you as reading assignments. That matter of thing. 10:36
Q. But occasionally, you would have to research or find a speech on your own? 10:36
A. Yes. 10:36
Q. And where did you attend law school? 10:36
A. University of Arizona. 10:36
Q. And what was your first job out of law school? 10:36
A. Let's see now. It was probably -- I clerked during law school. So I think my first job would have been with Browning and Wilson-Druke, Browning and Wilson, hyphen, D-r-u-k-e. 10:36
Q. And was that a law firm? 10:36
A. Yes. 10:36
Q. And what kind of work did you do there? 10:36
A. I was only there for a year. They 10:36

dissolved the partnership. And so it was sort of, you know, stuff you give the new guy.

Q. And what kind of stuff do you give the new guy?

A. Yeah, simple motions, that matter of thing. Deposition or two, you know, meeting with clients, that sort of stuff. Occasionally representing someone in city court on misdemeanors. That matter of thing.

Q. Was it a criminal law practice?

A. No. Mostly civil. There was some criminal, but mostly civil. Back in those days we were more generalists than is true today.

Q. Mr. Hardy, you also worked at the Interior Department; is that correct?

A. Oh, yes.

Q. And what kind of work did you do there?

A. The weirdest legal work I have ever done in my life. I represented the United States Fish and Wildlife Service with emphasis on their law enforcement division. When I say weird, you've never lived until you've listened to an undercover lizard buy going down. No kidding. I had to do it. It was like

practicing law in a Far Side cartoon. 10:38

Q. And after your work there at the Interior Department, you moved on to private practice; is that correct? 10:38

A. Yes. Came back here to Tucson -- or Phoenix first, then Tucson. 10:38

Q. And then what would you say is the legal focus of your private practice? 10:38

A. At the moment, semi-retired, so I'm only working 50 hours a week. But largely on Second Amendment right to arms. That matter of thing. 10:38

Q. And in your time in private practice, has that been the majority of the work that you've done? 10:38

A. I'd say about 50-50 over, you know, that's 20-odd years. I'd say about 50-50. More now and less at the beginning. 10:39

Q. And when you say Second Amendment work, what kind of things are we talking about? 10:39

A. Writing law review articles, sometimes handling cases. That matter of thing. 10:39

Q. And what kind of Second Amendment cases do you find yourself handling? 10:39

A. Well, there was -- I submitted an amicus brief in the Bruen case. Also, in McDonald v. Chicago and in D.C. versus Heller. I've submitted a few at the circuit levels, but I don't recall the captions. That's basically it. 10:39

Q. Is it fair to characterize that a lot of your Second Amendment work has been in amici role, filing amicus briefs? 10:40

A. Yeah, a lot of it. I doubt a majority, but a lot of it. 10:40

Q. And most of your work in the Second Amendment space has been in the capacity as a legal academic scholar. Is that a correct characterization of your work? 10:40

A. Yeah, probably. 10:40

Q. What books have you written? 10:40

A. Seven of them. The most recent is "Dred Scott: The Inside Story" which was great fun to research and write it. Then before that was "I'm from the Government and I'm here to kill you" which was a summary of basically the Federal Tort Claims Act and how fouled up it is. 10:41

Before then, there was one book on 10:41

shortwave radio listening. One book on origins and development of the Second Amendment. One book on Michael Moore, the only one that paid worth a dang. Those are the ones that I recollect. 10:41

Q. And so of the books you've written (indecipherable) -- 10:41

(The Court Reporter requested clarification.) 10:41

BY MS. UYEHARA: 10:41

Q. And of the books you've written, is only one of them on the Second Amendment? 10:41

A. Let's see now. Yes, I believe that's right. 10:41

Q. And can you describe a short summary of that book? 10:41

A. Well, it basically went back and took the original materials and reproduced them in a format I saw used in I believe it was the English historical papers, where instead of the author -- (audio disruption). 10:42

MR. DILLON: Is anyone else getting this? 10:42

MS. UYEHARA: I just muted him, so it might be still going if we unmute him. 10:42

But you said the word "author" and it happened on repeat for some reason. 10:42

MR. DILLON: Try unmuting him again and see what happens. 10:42

MS. UYEHARA: Okay. It's going to send him a request to unmute. 10:42

MR. DILLON: Here, let me -- I'm going to call Dave and let him know what's going on. I don't know if he can tell you. 10:43

MS. UYEHARA: Sounds good. 10:43

(A recess was taken.) 10:51

BY MS. UYEHARA: 10:51

Q. Mr. Hardy, how many hours did you spend working on this case in preparing your rebuttal report here? 10:51

A. I don't actually recall. I mean, I kept track of it, but it's just not something off the top of my head. 10:52

Q. If you had to estimate? 10:52

A. Somewhere between 20 and 30 hours. 10:52

Q. Okay. And earlier, we spoke about the amicus brief that you filed in Bruen. 10:52

A. Uh-huh. Yes. 10:52

Q. And that amicus brief you filed as an attorney, correct? 10:52

A. Well, yes. 10:52

Q. Do you recall on behalf of whom you filed that brief for? 10:52

A. Firearms Policy Coalition, one of their associated organizations. So I don't recall the name, but it might be something like Firearms Policy Coalition Foundation or something like that. There were some other parties listed, but that was the lead party. 10:53

Q. And in your brief, you were an attorney, as we just mentioned; you weren't working as a historian or in a historical capacity, correct? 10:53

A. Well, in preparing a brief on constitutional history, you're sort of doing both. 10:53

Q. But your brief was closer or akin to legal, like, cases and I suppose, like, legal argument? 10:53

MR. DILLON: Objection. Argumentative. And vague and ambiguous. 10:53

THE WITNESS: Well, I mean, it wasn't in the sense of being focused on case law. It was more history than anything else, going back into the original 10:53

history rather than analyzing case law. 10:53
BY MS. UYEHARA: 10:53
Q. And so it was a discussion of Framer era history? 10:53 10:54
A. Could you say that again? 10:54
Q. So it was a discussion of Framer era history? 10:54
A. Oh, yes. Yes. 10:54
Q. And the original public meeting of the Second Amendment, I assume? 10:54
A. Yes. 10:54
Q. And was your amicus brief based on -- sorry, I just had something pop up on my screen here. 10:54
And was your amicus brief based on your articles you wrote as a legal scholar? 10:54
A. It was -- 10:54
MR. DILLON: Objection. Vague and ambiguous. 10:54
THE WITNESS: I don't think it cited any of my articles. It might have, but I don't think so. It was more on original research more than anything else. 10:54
BY MS. UYEHARA: 10:54
Q. And when you say original resource 10:54

[sic] you mean, like, Framer era documents? 10:54

A. Yes, yes. But by original, I also mean consulting the original documents as opposed to consulting a book which discusses them. That matter of thing. 10:54 10:55 10:55 10:55

Q. And did you research those documents from databases? 10:55 10:55

A. It's over 50 years of my life, so some are databases and some are long before the internet existed. 10:55 10:55 10:55

Q. I'm going to ask you a couple more questions about some of the other parties you might have worked with. 10:55 10:55 10:55

I believe Knife Rights was one of the parties on that amicus brief; is that correct? 10:55 10:55 10:55

A. They might have been. I don't recall. 10:55 10:55

Q. There were many organizations that you represented on that amicus brief, correct? 10:55 10:55

A. I don't know about many, but there were several. 10:56 10:56

Q. So in addition to Knife Rights, you've worked with a lot of different other Second Amendment organizations. Can you list 10:56 10:56 10:56

some of those organizations you've worked with? 10:56

A. Let's see. Second Amendment Foundation. I haven't done it in many years, but some years ago, I did some work with the Gun Owners of America. I've done some with Tucson Rod and Gun Club. Those are the ones that I recall. 10:56

Q. Would it be fair to characterize those as pro gun organizations? 10:56

A. Oh, yes. 10:56

Q. And what's your relationship with the Second Amendment Foundation? 10:57

A. They've given me some awards. I don't have any, you know, ongoing legal relationship with them. 10:57

Q. How would you describe their organizational mission? 10:57

A. I think to promote research into the Second Amendment. 10:57

Q. I'm going to pull up an exhibit here. It's a copy of a web page from the Second Amendment Foundation website titled "2A Legal Pioneer David Hardy Inducted Into The Second Amendment Hall of Fame." 10:57

Have you been on this website 10:57

before? 10:57

A. I'm waiting for the image to come up. Oh -- 10:57

Q. It's -- 10:58

A. Yeah, I remember that. 10:58

Q. Do you recall this web page titled "2A Legal Pioneer David Hardy Inducted Into The Second Amendment Hall of Fame"? 10:58

A. Yes, I think I saw it. 10:58

Q. And when did you receive this award? 10:58

A. About a year or two ago. 10:58

Q. Can you read this highlighted portion from the article? I can zoom in also, if it's too zoomed out. 10:58

A. Upon learning of this award, Hardy said he was deeply honored, adding, quote, "I don't think the battle will ever end, but I think that the grounds of the battle are shifting decidedly in our favor," unquote. 10:58

Q. And what battle are you referring to, Mr. Hardy? 10:58

A. The conflict over the Second Amendment and the right to keep and bear arms. 10:58

Q. And if you had to describe that conflict a little bit more precisely? 10:59

MR. BRAZIER: Objection. Vague and ambiguous. 10:59 10:59

THE WITNESS: I don't know if there's a way to describe it more precisely. 10:59 10:59 10:59

BY MS. UYEHARA: 10:59

Q. And at the end of this quote here you state: 10:59 10:59

I think that the grounds of the battle are shifting decidedly in our favor. 10:59 10:59

What you are you referring to? 10:59

A. The conflict over the right to keep and bear arms. 10:59 10:59

Q. And on what grounds is that conflict shifting in your favor, in the Second Amendment Foundation's favor? 10:59 10:59 10:59

MR. DILLON: Objection. Compound. Speculation. 10:59 10:59

THE WITNESS: When I first began, my first law review article was written in 19 -- are you still there? 10:59 10:59 11:00

BY MS. UYEHARA: 11:00

Q. Yes, I'm still here. 11:00

A. Okay. I saw -- the image was weird, doing strange things on the computer. 11:00 11:00

There was nothing really seriously written on the subject. It was -- in fact, my law review editor proposed that I add in a section to an article that I was already writing on the Second Amendment. 11:00 11:00 11:00 11:00 11:00

And my reaction was, but that's just something about the National Guard and the militia and that sort of thing. We all know that. And he said, no, go out and research it. So I did, and found, no, there was an entirely different side to the question. 11:00 11:00 11:00 11:00 11:00 11:00

And then today, we have -- we have, you know, the three great cases. And Bruen totally changed the nature of that field of intellectual endeavor. I mean, at one point, it was almost ludicrous, and another point it's the law of the land. 11:00 11:00 11:00 11:00 11:01 11:01

Q. So when you stated that, "the grounds of the battle are shifting decidedly in our favor," are you referring to Bruen? Is that a fair characterization? 11:01 11:01 11:01 11:01

A. That would have been one of the references, yes. 11:01 11:01

Q. And what other references would you say? 11:01 11:01

A. I could give you an hour's disquisition on that. Obviously, the two earlier cases, Heller and McDonald. But there was also a -- several major shifts in the entire way of thinking about it. 11:01

Earliest days, it was myself, Steve Halbrook, Joyce Malcom, and a few others writing on the Second Amendment, publishing in small law reviews. 11:01

Then in '83, Don Kates got published in the Michigan Law Review, which is one of the Big Ten, and that brought the whole idea to the attention of the big names in common law who would be reading -- wouldn't be reading the small reviews but would read Michigan. 11:02

And then the big names started coming on, Akhil Amar, Sanford Levinson of Texas, William Van Alystine, then of Duke. And then finally, in the final stage, the courts started to come around. 11:02

But this -- you know, this process, it took decades. That's what I mean by the battle shifting in our favor. 11:02

Q. And those people that you just mentioned, I believe they're all legal 11:02

academics and legal scholars? 11:02

A. Yes. 11:02

Q. And what is your relationship with the National Rifle Association, also known as the NRA? 11:02 11:03 11:03

A. With the NRA itself, I'm a life member and whatever the grade is, one step beyond life. I forget. But that's my status with them. 11:03 11:03 11:03 11:03

Presently, there's no attorney-client privilege involved in any of that. And I often attend their board meetings, although I'm not a member of the board. 11:03 11:03 11:03 11:03

Q. And so you are a life member of NRA or something above that? 11:03 11:03

A. Yes, yes. Life member. They have a number of things they've classified beyond the life member, and I just can't remember which one of them I am. 11:03 11:03 11:03 11:03

Q. And do you receive any special benefits as part of that membership? 11:03 11:03

A. No. The only benefit of the membership is you get the magazine. It's a nice magazine, but, yeah, not a terribly rewarding thing. 11:03 11:04 11:04 11:04

Q. Do you pay a membership fee in order to maintain your status? 11:04

A. Well, not as a life member. I paid that back in the 1980s. 11:04

Q. And so after you paid a certain amount of dues, I presume that's when you become more than a life member? 11:04

A. Yeah, or you become a life member. Then you don't pay annual dues. 11:04

Q. And when did you first join the NRA? 11:04

A. I think it was 1979, and became a life member in 1985, I think. 11:04

Q. Can you describe what the NRA is? 11:04

A. It was founded in 1871. So originally devoted to rifle practice. I've seen some of their old minutes of the board meetings, and they were pretty funny because they had -- at one point, Richard Gatling was a member of the board of directors. And so he donated a Gatling gun for the first prize in the national rifle matches. 11:05

Over the years, as a result of the Cincinnati members meeting in 1970 -- 1977, it became a more political organization. And at that point, they had to make a choice of two 11:05

courses, and they chose to follow actually the one that was more -- that involved less of a change than the other one. It's pretty complicated. 11:05 11:05 11:05 11:06

Q. Earlier, Mr. Hardy, you said you attended board meetings. I assume that's not something an average or usual NRA member gets to do. 11:06 11:06 11:06 11:06

Is that something special that you're invited to? 11:06 11:06

MR. DILLON: Objection. Argumentative. Lacks foundation. Speculation. 11:06 11:06 11:06

THE WITNESS: No. Any board meeting can be attended by any member. 11:06 11:06

BY MS. UYEHARA: 11:06

Q. And so you choose to attend board meetings? 11:06 11:06

A. Yes, yes. 11:06

Q. Have you ever donated any money or your services to the NRA? 11:06 11:06

A. Other than -- 11:06

MR. DILLON: Objection. 11:06

THE WITNESS: Oh. Other than my dues, I don't think so. 11:06 11:06

BY MS. UYEHARA: 11:06

Q. And so you've never fundraised for them in any capacity? 11:06

A. I never, pardon? 11:06

Q. Fundraised with them in any capacity? 11:06

A. Oh, no. 11:06

Q. I'm going to introduce another exhibit of the Of Arms and the Law, which I believe is your personal website, Mr. Hardy. 11:07

A. Yes. 11:07

(Exhibit 3 was identified.) 11:09

BY MS. UYEHARA: 11:07

Q. Can you see the page on your screen? 11:07

A. Oh, yes. Yes. 11:07

Q. And can you confirm that this is a copy of your personal website? 11:07

A. Yes, my blog. 11:07

Q. What is the focus on your blog, Mr. Hardy? 11:07

A. What arms laws and the Second Amendment. 11:07

Q. Down here on the left-hand side, could you read this for me? 11:07

A. It says: 11:07

Click here to join the NRA or renew your membership online. Special discount: Annual membership $25, regular $35, for a great magazine and benefits. 11:07 11:07 11:07 11:08

Q. Mr. Hardy, is that an advertisement for the NRA on your website? 11:08 11:08

A. Yes. 11:08

Q. Do you receive a referral fee for people who sign up using that link? 11:08 11:08

A. Yes. I think it's, like, $5. And what was puzzling me was I haven't seen any of that in at least a year. So maybe nobody's using my website anymore. 11:08 11:08 11:08 11:08

Q. If you had to estimate how much money you've made in referral fees? 11:08 11:08

A. It would be under $100 over maybe 10 years. 11:08 11:08

Q. You're still part of that program, correct? 11:08 11:08

A. I guess. As I say, I haven't heard from them in a year, but I guess I am. 11:08 11:08

Q. Besides those referral fees, you haven't been paid by the NRA in any capacity? 11:09 11:09

A. Yeah. Now, that's NRA proper. There's also the NRA Civil Rights Defense Fund, 11:09 11:09

and I've gotten grants from them. It's a separate corporation but obviously closely related. 11:09

Q. Is the NRA Civil Rights Defense Fund a nonprofit? 11:09

A. Yes. 11:09

Q. And the grants you received I assume were for research? 11:09

A. Mostly, yeah. 11:09

Q. Do you recall how much you received in grants from their civil rights organization component? 11:09

A. I'm just trying to think. I think in the last year, it might have been 40 or $50,000, in that ballpark somewhere. 11:09

Q. Do you recall when you first received one of these grants? 11:10

A. Yes. It would be back around the year -- early in the 2000s. It might have been 2001 or 2003, around in there. 11:10

Q. Do you recall how many grants you've received from the NRA? 11:10

A. Probably a couple of dozen. Two or three dozen. 11:10

Q. If you had to estimate the total 11:10

amount of grant money that you -- you received? 11:10

A. That would be over 20 years, so certainly it would be in the hundreds of thousands over that time. It might be 200. Might be 3, but probably 2. 11:10 11:10 11:11 11:11

Q. And did the grants require you to research certain topics or put out certain kind of papers? 11:11 11:11 11:11

A. It would depend upon the nature of the grant. Sometimes it was with regard to a very specific project. Sometimes it was a broader attempt to investigate some issue. 11:11 11:11 11:11 11:11

Q. And what kind of specific issues did you investigate? 11:11 11:11

A. Well, let's see. There was -- I've got one that will be coming out. And it's on -- we're getting hypertechnical here. I understand it's on whether the statute of Northumberland in 1328 and the royal decrees of the Tutor monarchs were applicable in the American colonies, and whether Americans in 1791 would have any way of having found those sources. Like I say, it's getting technical. 11:11 11:11 11:11 11:11 11:12 11:12 11:12 11:12 11:12

One of the -- yeah. One of the interesting things is that the -- we have much 11:12 11:12

better ideas of English medieval and early modern sources than did anyone at the colonial time, even though they were much nearer in time because the English records were just horrible shape until the 18th -- or 19th and 20th centuries. All the stuff we regard as normal, they didn't have. Nobody had in 1791. 11:12

Q. That's interesting. 11:12

A. Yeah. 11:12

Q. And so these grants, I assume you wrote papers and things like reports? 11:13

A. Oh, yeah. 11:13

Q. Are those released on the NRA website or where do those get published, if anywhere? 11:13

A. I don't know. I know that the Civil Rights Defense Fund has a website, but I don't know what's on it. 11:13

Q. So is the research for the Civil Rights Defense Fund themselves to utilize? 11:13

A. Could you say that again? Sorry. I've got some high frequency hearing loss. 11:13

Q. No worries.

Is your research for the Civil Rights Defense Fund to use in their own work? 11:13

A. Not really. I don't know that they have any of their own work. They just give out grants. 11:13 11:13 11:13

Q. Does your grant require you to publish a paper or publish your findings or anything like that? 11:13 11:13 11:13

A. That's sort of assumed because when you go in to ask for the grant, you're talking often about what you intend to write upon. So it's pretty much assumed that you will get published. 11:14 11:14 11:14 11:14 11:14

Q. And just to confirm, you've received these grants over a period of about two decades? 11:14 11:14 11:14

A. Yep. 11:14

Q. All right. What's your relationship with Gun Freedom Radio? 11:14 11:14

A. I may have appeared on it from time to time. I've appeared on a fair number of radio programs. But that's the only relationship I can think of. 11:14 11:14 11:14 11:14

Q. And so, yes, you have appeared. And I'm introducing another exhibit, Gun Freedom Radio's web page where it says, "Our guests: David T. Hardy," and it has a summary of some 11:14 11:15 11:15 11:15

of your work and says you were featured on their 100th episode. 11:15

A. Uh-huh. 11:15

(Exhibit 4 was identified.) 11:15

BY MS. UYEHARA: 11:15

Q. Do you recall this, Mr. Hardy? 11:15

A. Actually, I don't. 11:15

Q. Can you describe what Gun Freedom Radio is? 11:15

A. I have no recollection of that at all. I mean, if I knew the human being behind it I might have better luck recalling it. 11:15

Q. Yeah, I'm not sure if there's a singular human being who runs the radio. 11:15

But so you've been on a variety of different Second Amendment podcasts, radio shows, and things like that? 11:15

A. Oh, yes. 11:15

Q. And for this particular one, I assume you don't recall whether or not you were paid for this appearance? 11:16

A. I'm sure I wasn't. I don't think I've ever been paid for a radio thing or a podcast. 11:16

MS. UYEHARA: All right. So looking 11:16

at my notes, I'm at a good stopping point for now, if we want to take a short break, because I know we started around 10:00. Does that sound good? 11:16

THE WITNESS: Yep. 11:16

MR. DILLON: Sounds good. 11:16

MS. UYEHARA: Let's take a ten-minute break. We'll come back at 11:26. 11:16

(A recess was taken.) 11:26

BY MS. UYEHARA: 11:26

Q. Prior to drafting your report -- 11:26

THE COURT REPORTER: Your audio is really low. 11:27

MS. UYEHARA: Okay. 11:27

THE COURT REPORTER: Now it's okay. 11:27

MS. UYEHARA: Thank you for letting me know. 11:27

BY MS. UYEHARA: 11:27

Q. Prior to drafting this report, what independent research have you done of historical laws? 11:27

MR. DILLON: Objection. Vague and ambiguous. 11:27

THE WITNESS: Well, 50 years of 11:27

research. I mean... 11:27

BY MS. UYEHARA: 11:27

Q. Have you researched historical firearm laws? 11:27

A. Oh, yes. Yes. 11:27

MR. DILLON: Objection. 11:27

BY MS. UYEHARA: 11:27

Q. And does that include laws about ammunition storage, militia use, things of that nature? 11:27

A. Oh, yeah. 11:27

Q. And how much research have you done on historical dangerous weapons laws? 11:27

MR. DILLON: Objection. Vague and ambiguous. 11:27

BY MS. UYEHARA: 11:27

Q. When I say dangerous weapons, I mean Bowie knives, (indecipherable) -- 11:28

(The Court Reporter requested clarification.) 11:28

BY MS. UYEHARA: 11:28

Q. By dangerous weapons, I mean Bowie knives, Arkansas toothpicks, pocket pistols, and things of that nature. 11:28

A. Well, a good amount of it. I mean, 11:28

it's like I say, this has been 50 years of my life. 11:28

Q. Would you say your research has primarily been on primary sources, like the laws themselves? 11:28

A. A lot of it -- 11:28

MR. DILLON: Objection. Vague and ambiguous. 11:28

THE WITNESS: A lot of it would be in the primary sources. I've researched everywhere, including the Library of Congress rare books division. So, yes, I've done a lot of research. 11:28

BY MS. UYEHARA: 11:28

Q. Mr. Hardy, my understanding of your publications is that a lot of them are in law reviews or law journals; is that correct? 11:29

A. Yes. 11:29

Q. Have you been published in any history peer-reviewed journals? 11:29

A. There was one coauthored piece on the Third Amendment -- yes, I do like them obscure -- and that one may have been in a peer-reviewed historical journal, but that's the only one I can think of. 11:29

Q. And the bulk of your work, I assume around 25 different articles, maybe more, have been in law review journals, correct? 11:29

A. Yeah. 11:29

Q. And in those law review articles, has the primary focus been legal theories, the law? 11:29

MR. DILLON: Objection. Compound. Vague and ambiguous. 11:29

THE WITNESS: More the original historical sources and interpreting them. There wasn't a whole lot of case law on the subject to begin with. 11:30

BY MS. UYEHARA: 11:30

Q. And not a lot of legal theory either? 11:30

MR. DILLON: Same objections. 11:30

THE WITNESS: It depends on what you want to talk about in terms of legal theory. I mean, at one level, it's all legal theory. 11:30

BY MS. UYEHARA: 11:30

Q. Would you say the history is legal theory, is that what you just said? 11:30

A. It contributes to legal theory, yes. 11:30

Q. And when did you start researching historical firearms-related laws? You said 50 years ago? 11:30 11:30 11:30

A. Uh-huh. Yes. Well, my first law review article was in 1974, so that was 50 years ago. And I believe I'd started in before that article. So upwards of 50 years. 11:30 11:30 11:30 11:30

Q. And what would you say are the primary time periods you've researched? 11:31 11:31

A. Really, from about the 11th century onward, with obviously more emphasis on the American experience, which would really be from the 18th century onward. 11:31 11:31 11:31 11:31

Q. If you had to categorize your research, which I realize is difficult, what percentage of your research is America focused versus European or international focused? 11:31 11:31 11:31 11:31

A. I'd say American focus about 80 percent. Might be 90, but 80 or 90 percent. 11:31 11:31

Q. And then, if we had to break down that 80 or 90 percent, what percentage would you say is Framer era research? 11:31 11:31 11:31

A. Of the 90 percent, I'd say probably three-quarters. 11:32 11:32

Q. And then what would that other 11:32

quarter be? 11:32

A. Either before or after, you know, going back in the medieval period and forward to the present day, pretty much. So I regard the framing as roughly 1789 to 1870. And, you know, so it would be everything outside of that time period. 11:32

Q. And so you'd say the primary focus of your research is Framer era? 11:32

A. Yeah, I would say so. 11:32

Q. In both of the expert reports that you responded to, they focused on the Framer era and then also in, you know, 1868 post-Civil War era. 11:32

A. Uh-huh. 11:32

Q. How much research have you done in that post-Civil War reconstruction era? 11:33

MR. DILLON: Objection. Vague and ambiguous. 11:33

THE WITNESS: Well, a fairly good amount, although Steve Halbrook has done the best work in that field. 11:33

BY MS. UYEHARA: 11:33

Q. And your research in later American history, the reconstruction era, has your 11:33

research also been digging up historical laws and reviewing those laws? 11:33

A. Well, yeah, laws of the Congressional Globe, which preceded the congressional record and the history of the period generally. 11:33

Q. Would you say you're a historical weapons expert broadly or would you say your primary focus is firearms? 11:33

MR. DILLON: Objection. Vague and ambiguous. Argumentative. 11:33

THE WITNESS: I think I could say arms in general. 11:33

BY MS. UYEHARA: 11:33

Q. And I'm going to list some weapons, and you can tell me whether or not you've researched those particular weapons. 11:34

Bowie knives? 11:34

A. Oh, yes. 11:34

Q. Arkansas toothpicks? 11:34

A. Arkansas, yeah. There was no precise definition of them, by the way. All these are nicknames. 11:34

Q. Dirks? 11:34

A. Yeah. 11:34

Q. Daggers? 11:34
A. Oh, yeah. 11:34
Q. Other large knives? 11:34
A. I think in general, and swords. 11:34
Q. And then other dangerous impact weapons? 11:34
A. I'm generally familiar with those. 11:34
Q. Slungshots? 11:34
A. Oh, yeah. 11:34
Q. Clubs? 11:34
A. Sure. 11:34
Q. And when you're researching historical laws, what is your primary method of research? 11:34 11:35
A. Looking for the laws. I mean, these days you find an awful lot on the internet. In earlier days, we weren't so lucky. So you were going to go down and one way or another find hard copy. And some of them I found in the Library of Congress. And so, you know, some are available, some are not. 11:35
Q. And so do you rely on online databases? 11:35
A. I use those quite often. 11:35
Q. Which ones do you use most 11:35

frequently?

A. A simple internet search to begin with, and then you go to Google Scholar and Google Books is a standard -- my standards.

Q. Would you say your historical research is primarily focused on discovering these laws?

MR. DILLON: Objection. Vague and ambiguous.

THE WITNESS: I -- I don't know about discovering. Sometimes discovering, sometimes interpreting, sometimes putting things in context. I like discovering them, but, yeah.

MS. UYEHARA: Ms. Nickeson?

THE COURT REPORTER: I got it.

MS. UYEHARA: Thank you.

BY MS. UYEHARA:

Q. Would you say you spend more of your time discovering these laws or interpreting them?

MR. DILLON: Objection. Vague and ambiguous.

THE WITNESS: Probably more interpreting than discovering just because

the discovery process is now history. 11:36

BY MS. UYEHARA: 11:36

Q. And when we say interpreting laws, do you mean -- what do you mean? 11:36

A. Well, putting them all in the context of subject and history and trying to understand different aspects of them and all that matter of thing. I mean, what are the trends that we're looking at here? 11:37

Q. And earlier, you stated that you spent some time discovering laws. 11:37

What challenges do you face in trying to discover those historical laws? 11:37

A. Up until the internet, you know, you're talking about digging through a hard copy. So I think there are three different sets published of the papers of Thomas Jefferson. So you'd go plowing through those. And then you've got the others of the framing period, their paperwork. 11:37

Lately, I've been doing some on the Fourteenth Amendment, and there I've been looking in collections in the manuscript division of the Library of Congress, which gets a little complicated because back at that time 11:38

they didn't have photocopy machines. So if you're looking for papers written by this one person, you better find everybody he wrote to because they're the ones who will have his letters. He won't unless he's one that goes to the expense of having somebody hand transcribe every letter he has going in and out. So it can get fairly complicated. 11:38

Q. And how would you describe the challenges when it comes to digging up historical laws as opposed to someone's personal effects? 11:38

MR. DILLON: Objection. Vague and ambiguous. 11:38

THE WITNESS: Well, that all depends on the time period. The British laws, today we have a fairly good, comprehensive information on those in print. And also, online, actually. 11:39

But a whole bunch of early state laws, you're going to have to track down one at a time. And, you know, the hard copy may not always be available. I mean, I'm stuck with what I can get here in Tucson and at the university law library. 11:39

And then beyond that, I wind up doing things like heading to the Library of Congress. 11:39

So, yeah, it was quite -- at the outset, it was quite a bit of work. As I say, today things are much easier. 11:39

BY MS. UYEHARA: 11:39

Q. I assume a lot of work is being done still to uncover a bunch of historical laws; is that correct? 11:39

MR. DILLON: Objection. Vague and ambiguous. 11:39

THE WITNESS: I would say a fair amount is being done. I think the biggest breakthroughs there were really back in the 1980s. But there's still work being done, yes. 11:40

BY MS. UYEHARA: 11:40

Q. As a practicing attorney, do you get to spend a lot of your time doing historical research? 11:40

A. These days, yes, because as I say, I'm semi-retired. Earlier, it was, you know, the main job is to pay the rent and, you know, writing is something that you do in your spare 11:40

time. 11:40

Q. If you had to estimate how much time you spend weekly doing historical research? 11:40

A. Probably five or ten hours. 11:40

Q. And how would you define the different roles of lawyers and historians in gathering history? 11:40

MR. DILLON: Objection. Vague and ambiguous. 11:40

THE WITNESS: An interesting question. I think there is a substantial overlap between the two functions. And there's a certain rivalry, which you may have noticed. 11:40

And there's some difference in approaches that a -- I think a historian is more inclined to accept things at face value than is a lawyer. We're a cynical bunch. 11:41

And the -- I once had a friend who had a law professor tell him just that, that, you know, we tend to look at things as, what were this guy's opportunities to observe, what were his biases, did he personally observe it, is it hearsay, and 11:41

pass it through all of those tests rather than just accepting that, you know, James Madison wrote Thomas Jefferson on this date and said he didn't really favor a Bill of Rights, and finally was won over by Jefferson's arguments to the contrary. 11:41

Well, maybe so. That's what he was saying, but was that the real fact? I don't know. So I think we tend to be a bit better investigators at that sort of thing. 11:42

BY MS. UYEHARA: 11:42

Q. How would you define the different roles of lawyers and historians when it comes to preserving history? 11:42

MR. DILLON: Objection. Vague and ambiguous. 11:42

THE WITNESS: Preserving history? I'm having trouble grasping that concept. 11:42

BY MS. UYEHARA: 11:42

Q. When I say preserving history, I mean discovering it, making sure that it's around for future generations. 11:42

A. Oh, okay. Yeah. I don't know that there's much difference in those two roles. I mean, you're out there to find what you can 11:43

find. 11:43

Q. And you just spoke about how lawyers and historians might interpret history differently. 11:43

A. Uh-huh. 11:43

Q. Is there any other claims you'd make about how they interpret history differently? 11:43

MR. DILLON: Objection. Vague and ambiguous. 11:43

THE WITNESS: That's a pretty broad question. I would have to think about it. 11:43

BY MS. UYEHARA: 11:43

Q. And earlier, you also spoke about sort of the context that surrounds history. 11:43

A. Uh-huh. 11:43

Q. Would you say lawyers or historians have the primary role in developing that context? 11:43

MR. DILLON: Objection. Vague and ambiguous. Speculation. 11:43

THE WITNESS: I would say historians have the advantage there. 11:44

BY MS. UYEHARA: 11:44

Q. And when it comes to seeding that history in legal arguments, would you say 11:44

that's the role of lawyers or historians? 11:44

MR. DILLON: Same objection. 11:44

THE WITNESS: I couldn't catch the beginning of the question. 11:44

BY MS. UYEHARA: 11:44

Q. When it comes to seeding that history in legal argument, is that a lawyer's role or a historian's role? 11:44

A. I think probably both. 11:44

Q. Could you explain what you mean by both? 11:44

A. Well, I think putting them in a legal context involves both the historical end and the legal end. So I don't know that either would have an advantage. 11:44

Q. And I suppose what would you say is the primary responsibility of historians when it comes to Second Amendment era history? 11:45

MR. DILLON: Objection. Vague and ambiguous. Argumentative. Speculation. 11:45

THE WITNESS: I don't know that they would have any particular obligation when it comes to Second Amendment history, I mean, anything peculiar to the Second Amendment, other than the general duty, 11:45

which is to try to find things and hopefully recount them in an impartial manner. 11:45

BY MS. UYEHARA: 11:45

Q. All right. Thank you, Mr. Hardy. 11:45

We're going to turn now to some questions about your report more specifically. 11:45

A. Uh-huh. 11:45

Q. In paragraph 27 of your report, and I can bring this up on the screen if that would be helpful. 11:45

A. I have a hard copy here. Oh, yeah, I've got it. 11:46

Q. In paragraph 27 of your report, you state that the data cited by Dr. Spitzer, quote, "consists of highly generalized and difficult to replicate internet news articles which are inherently unreliable," end quote. 11:46

Can you explain what you mean by this statement? 11:46

A. I think this might be -- I might have as a hardcopy a draft of my statement because paragraph 27 in the one I'm looking at doesn't read like that. 11:47

Q. I can bring up this copy. 11:47

A. Okay. 11:47

(The Court Reporter requested clarification.) 11:47

(An off-the-record discussion was held.) 11:47

BY MS. UYEHARA: 11:47

Q. Can you see the report, Mr. Hardy? 11:47

A. Yes. 11:47

Q. All right. And you see paragraph 27 right here? 11:47

A. Yes. And it does appear to be the same as my hard copy, but what -- 11:47

Q. I see what you're -- right here. The last sentence here says: 11:48

The data cited also consists of highly generalized and difficult to replicate internet news articles which are inherently unreliable. 11:48

A. Uh-huh. 11:48

Q. This is in reference to Dr. Spitzer's newspapers.com analysis? 11:48

A. Yes. 11:48

Q. Can you explain what you mean by this statement? 11:48

A. Well, the problem is, with a lot of 11:48

it, it's very generalized. It's not a report of a specific incident. It's a report of basically whenever the word "switchblade" came up. So you have numerous references. 11:48

In fact, I'd say from my recollection, a majority of the references were talking about legislative matters rather than about a specific use of a knife in a crime. 11:48

Q. Did you review the news articles that were cited by Dr. Spitzer? 11:48

A. As I recall, yes. 11:49

Q. How many? 11:49

A. I don't remember. 11:49

Q. A couple hundred, some of them? 11:49

A. I can't remember. 11:49

Q. Do you recall how long you spent reviewing them? 11:49

A. Maybe a couple of hours. 11:49

Q. And in your opinion, why are the internet newspaper articles inherently unreliable? 11:49

A. Unreliable is probably too strong a term, but often irrelevant because, as I say, you know, they're discussing legislation rather than actual use. 11:49

Q. And in the pieces that discuss legislation, was that about legislation concerning the regulation of switchblades? 11:49 11:49 11:50

A. Yes. And -- 11:50

Q. And that would fall -- go ahead. 11:50

A. It came under two headings. One was proposals to regulate switchblades, and the other was the actual -- the enactment of the law. That sort of thing. 11:50 11:50 11:50 11:50

Q. And a moment ago you just said that unreliable is perhaps too strong of a word. 11:50 11:50

How would you characterize it now? 11:50

A. Largely irrelevant, I think. 11:50

Q. And can you explain why? 11:50

A. Well, you're discussing legislation. That's totally different from the standpoint of discussing, you know, use, actual cases involving criminal use. 11:50 11:50 11:50 11:50

What you have then is a legislator or somebody along the lines of a legislator discussing what he thinks should be done and as opposed to, you know, a report that something actually happened. 11:50 11:51 11:51 11:51 11:51

And it's within the realm of human experience that legislators sometimes are not 11:51 11:51

the most reliable sources for factual information. 11:51

Q. Did any of the legislators you reference discuss specific instances of switchblade crime? 11:51

A. Yes, some of them did. 11:51

Q. And is it your contention that those are inaccurate? 11:51

MR. DILLON: Objection. Misstates testimony. 11:51

THE WITNESS: I wouldn't say they are inaccurate. I would say that I wouldn't count on them. 11:51 11:52

BY MS. UYEHARA: 11:52

Q. And do you recall how many of the newspapers you reviewed had specific -- referenced specific incidents of switchblade crime? 11:52

A. No. But I seem to recall it was -- we're talking, like, one article out of five, maybe it was as low as one out of ten. 11:52

Q. And so you don't contend any of the newspapers as being inaccurate? 11:52

A. Well -- 11:52

MR. DILLON: Objection. 11:52

Argumentative. 11:52

THE WITNESS: Yeah, if we're talking about the political type, the legislative issues, I have no proof they were inaccurate, but I would regard them as unreliable. That is, I cannot say that they are inaccurate because I am unaware of any proof to the contrary. 11:52 11:52 11:52 11:52 11:52 11:52 11:53

On the other hand, given that the source is a legislator advocating for something that he wants, it's something I wouldn't necessarily trust. 11:53 11:53 11:53 11:53

BY MS. UYEHARA: 11:53

Q. And did you keep track of how many newspapers cited specific instances of switchblade crime? 11:53 11:53 11:53

A. No, I did not count. 11:53

Q. So your one in five or one in ten is an estimate? 11:53 11:53

A. Yes. 11:53

Q. And do you believe historical newspapers are an important resource for historians conducting research? 11:53 11:53 11:53

MR. DILLON: Objection. Vague and ambiguous. 11:53

THE WITNESS: Oh, yes. 11:53

BY MS. UYEHARA: 11:53

Q. Can you explain why? 11:53

A. Well, they're like any other source, you know, they're recounting what was, you know, occurring with possibly some bias. 11:53

And also, they're important because if you're discussing the popular understanding of the Fourteenth Amendment or the Second Amendment, the newspapers can reflect what people of the time were reading and thus believing to be true, whether or not it was. So I think they have that relevance also. 11:54

Q. So if you have to state your -- the issue you take most with about Professor Spitzer's newspaper.com analysis? 11:54

MR. DILLON: Objection. Vague and ambiguous. 11:54

THE WITNESS: I don't know if there would be any one thing. Obviously, it's quite difficult to report on -- to do studies of crime prior to very much the modern age. I mean, the FBI reports don't start in until 1930s, and aren't really reliable until the 1970s. 11:55

And so it's very hard to form a picture of crime as a general proposition much before the very modern period. 11:55

BY MS. UYEHARA: 11:55

Q. What is your understanding of police records in the 19th century? 11:55

MR. DILLON: Objection. Vague and ambiguous. 11:55

THE WITNESS: I suspect very few of them survived, and probably vary from place to place. But, I mean, you know, most of that sort of thing, frankly, even up into the modern age, tends to get discarded. 11:55

BY MS. UYEHARA: 11:56

Q. And would you agree that newspapers provide a glimpse into society at a specific time? 11:56

A. Oh, sure. 11:56

Q. And do you agree generally that some local newspapers are available only digitally? 11:56

MR. DILLON: Objection. Vague and ambiguous. 11:56

THE WITNESS: I don't know only -- yeah. I don't know only digitally. I know there are a number that are available that 11:56

way, and I suspect will have encountered some that aren't. So yeah, it's -- maybe there are some are that are only available digitally, but I'm not familiar with those. 11:56

BY MS. UYEHARA: 11:56

Q. Would you agree that there are many historical newspapers that are not accessible online? 11:56

A. Oh, sure. Sure. 11:56

Q. And that many newspaper collections are stored exclusively in print? 11:56

A. Yeah. 11:57

Q. And in microfilm as well? 11:57

A. Pardon? 11:57

Q. In microfilm as well? 11:57

A. Yeah. That's -- I don't know if there are any in microfilm that are not available digitally, but I wouldn't be surprised if there were some. 11:57

Q. And would you agree that local historical newspapers are less likely to be preserved than national newspapers? 11:57

A. Of course, yes. I've done research in that area, and in the Dred Scott case, there's one local newspaper that, 11:57

unfortunately, like, three issues of it survived over a period of five years, and none of them was the issue I wanted. 11:57 11:57 11:57

But the one nice thing about it was, apparently, back in the 19th century, people didn't worry about copyright infringement a whole lot. So one newspaper would steal it from another newspaper, reprint the article in its entirety, and that was okay so long as you credited the other newspapers with it. 11:57 11:57 11:57 11:58 11:58 11:58 11:58

So often you can find stories that come from newspapers that have long since vanished, but they're recounted in a different local newspaper. 11:58 11:58 11:58 11:58

Q. If you were tasked with trying to get an estimate of switchblade crime in the 19th century, how would you go about your own analysis? 11:58 11:58 11:58 11:58

MR. DILLON: Objection. Compound. Vague and ambiguous. 11:58 11:58

THE WITNESS: Probably news reports, recognizing the big limitations on that. But probably news reports simply because that's the best thing that's left. 11:58 11:58 11:58 11:58

BY MS. UYEHARA: 11:58

Q. And in Dr. Spitzer's report, do you think he recognizes those limitations? 11:58 11:58
A. I think he recognizes them, yes. 11:58
Q. And earlier, you said one in five or one in ten; if you had to choose one? 11:59 11:59
A. My memory seems to be more like one in ten, but I might guess one in five to be conservative. 11:59 11:59 11:59
Q. And what do you know about newspapers.com? 11:59 11:59
A. It's a database. I tend to use newspaperarchive.com. But newspapers.com is -- I believe it's tied in with the government at some level, and is just one of the two sources. 11:59 11:59 11:59 11:59
Q. Did you know that newspapers.com is the largest online newspaper archive in the world? 11:59 11:59 11:59
A. No, I didn't. I might switch over from newspaper archive. 11:59 12:00
Q. And are you aware that newspapers.com is constantly growing? 12:00 12:00
A. I wouldn't be surprised at all. 12:00
Q. And are you aware that it adds millions of new pages every month? 12:00 12:00
A. I was not aware, no. 12:00

Q. In your research, you attempted to replicate Dr. Spitzer's search of newspapers.com; is that correct? 12:00
A. Yes. 12:00
Q. And that search was conducted on newspapers.com, correct? 12:00
A. Yes. 12:00
Q. What search terms did you use? 12:00
A. I recall switchblade, Bowie knife, or just Bowie probably. I may have used some others, but those are the two that I recollect. 12:00
Q. I'm sorry. Could you restate those again? 12:00 12:01
A. Yes. I know I searched for switchblade and I think I searched for Bowie. There may have been others, but those are the two that I recall. 12:01
Q. And did you search switchblades, plural? 12:01
A. I don't think so. 12:01
Q. And did you search switchblade knife? 12:01
A. Not those two words together. 12:01
Q. And what about the term switchblade knives? 12:01

A. Not those two words together. 12:01
Q. Did you search for automatic knife? 12:01
A. No. 12:01
Q. Did you search for automatic knives? 12:01
A. No. 12:01
Q. Did you search for spring-assisted knife? 12:01
A. No. 12:01
Q. Did you search for spring-assisted knives? 12:01
A. No. 12:01
Q. Do you know if you used the exact same search terms as Dr. Spitzer? 12:01
A. As I recall, I tried to, anyway. 12:02
Q. I believe Dr. Spitzer also searched switchblade knife, and that is a term you did not search for, correct? 12:02
A. I did not search for those two words. I'm saying two words because the search for switchblade would have picked up switchblade knife. 12:02
Q. And do you agree that using different search term could cause the searches to result in a different number of articles? 12:02
A. Oh, sure. 12:02

Q. And in conducting your own research of newspapers.com, you stated that from 1921 to 1939, Dr. Spitzer found 424 stories. 12:02

Is it correct your same search resulted in 417 stories? 12:02

A. I seem to recollect that's the number. Now, when I did it, I did it a second time and I actually came up with a slightly different number. So it was slightly larger. So it may have been added in since I did the first try, or possibly the computer's arbitrary. 12:03

Q. So those searches weren't conducted at the same time? 12:03

A. No. This was a second search and just to go back and confirm. 12:03

Q. Do you recall what number you received on your second search? 12:03

A. Trying to see if I have my notes still. No. I don't recall, but it was slightly larger. 12:03

Q. And are you aware that Dr. Spitzer's original number was slightly larger than your own? 12:04

A. As I recall, yes. 12:04

Q. And are you aware that the difference between your 417 stories and Dr. Spitzer's 424 stories is less than a 1.8 percent difference? 12:04
A. Oh, sure. 12:04
Q. And in conducting your own research of newspapers.com, you stated that from 1940 to 1945, Dr. Spitzer found 612 studies. 12:04
Is it correct that your search -- 12:04
(The Court Reporter requested clarification.) 12:04
BY MS. UYEHARA: 12:04
Q. 612 stories. 12:04
Is it correct that your search resulted in 610 stories? 12:04
A. I seem to recall that's correct. 12:04
Q. Are you aware that this is less than a 0.04 percent difference? 12:04
A. Oh, yes. 12:04
Q. In your report, you also stated that from 1946 to 1950, Dr. Spitzer found 824 stories. 12:05
Is it correct that your search resulted in 820 stories? 12:05
A. As I recall, those are the numbers. 12:05

Q. And are you aware that is less than a half percent difference? 12:05

A. I think that's mathematically correct. 12:05

Q. And you stated that from 1951 to 1955, Dr. Spitzer found 9,713 stories. 12:05

Is it correct that your search resulted in 9,677 stories? 12:05

A. Something like that. 12:05

Q. Would it be helpful if I pulled up the report, Mr. Hardy? 12:05

A. Yeah, sure. Or just give me the paragraph. I can just take your word for the numbers. 12:06

Q. I'll still give you the paragraph, though. This is paragraph 25 on page 10. 12:06

A. Okay. I've got it. 12:06

Q. In your research, you stated that from 1956 to 1959 Dr. Spitzer found 19,929 stories. 12:06

Is it correct that your search resulted in 19,896 stories? 12:06

A. Yes. 12:07

Q. And are you aware that's less than a 0.02 percent difference? 12:07

A. I'm sure that's the correct number. 12:07

Q. Are you aware that your independent research of newspapers.com at most was around 1.8 percent different from Dr. Spitzer's research? 12:07

A. It sounds like the number, yep. 12:07

Q. Are you aware that most of the time your independent research resulted in less than half a percent difference? 12:07

A. That sounds reasonable. 12:07

Q. And would you agree that your search results from newspapers.com is largely consistent with Dr. Spitzer's research of the website? 12:07

A. Yeah, I would say that. 12:07

MR. DILLON: Objection. Vague and ambiguous. 12:07

BY MS. UYEHARA: 12:07

Q. In paragraph 26 of your report, you stated one of the problems with Dr. Spitzer's research was, quote, "that it does not appear that Professor Spitzer actually reviewed every search result that he obtained," end quote. 12:07 12:08

Are you aware that in order to review every search result he obtained, Dr. 12:08

Spitzer would need to review 31,502 newspaper search results? 12:08

A. Yes. It would be quite a task. 12:08

Q. In your opinion, would reviewing over -- sorry. 12:08

In your opinion, would reviewing over 30,000 newspapers be necessary to support his claim that switchblade crime increased over the relevant time periods? 12:08

MR. DILLON: Objection. Argumentative. Vague and ambiguous. 12:08

THE WITNESS: You know, I'd have to say yes, but that's precisely why I wouldn't make a statement like switchblade crime increased over the period. 12:08

I mean, it's -- how do you -- going back to before there were any reliable statistics, how do you judge from the number of newspapers articles what was happening with regard to crime? We don't know. 12:09

BY MS. UYEHARA: 12:09

Q. And in the newspapers stories that you reviewed, did they not discuss crime? 12:09

MR. DILLON: Objection. Vague and 12:09

ambiguous. 12:09

THE WITNESS: Some did. But what I'm saying is, you can't -- you really judge a trend by number of newspaper reports. I mean, do we know that the database of newspapers is uniform, that they're -- the same proportion of articles were reported at the end as at the start of the period we're discussing? 12:09

Do we know how many are duplicative of describing the same incident? As I said, newspapers were not loathed to steal from each other under the copyright laws of the time. 12:10

I just think the judging that there was an increase would be pushing the data farther than it can be taken. Maybe there was. Maybe there wasn't. 12:10

BY MS. UYEHARA: 12:10

Q. And what would you account the rise of the term "switchblade" to if not crime? 12:10

MR. DILLON: Objection. Speculation. Vague and ambiguous. 12:10

THE WITNESS: It's a good point, yeah. It would probably be in relation to 12:10

crime. They're not much good for carving up your dinner. 12:10

But on the other hand, as I say, how many of them are redundant reports of the same incident? Is the reporting uniform over the period? We don't know. 12:11

BY MS. UYEHARA: 12:11

Q. In paragraph 27 of your report, you state that Dr. Spitzer's claim that his research, quote, "likely underestimated the number of newspaper stories about switchblades because many new stories likely reported knife stabbings," end quote, is unfounded. 12:11

What is the basis for your opinion? 12:11

A. Well, if you just have the information that there was a knife stabbing, you really shouldn't speculate that it might have been specifically a switchblade knife. I mean, it could have been, yeah. But on the other hand, you know, was it? What are the probabilities of it? 12:11

Those you can't really judge from -- what you have is an absence of information. And it's really hard to draw a conclusion off of an absence of information. 12:12

Q. But you would agree that it's likely that some of those articles that report knife stabbings refer to a switchblade? 12:12
A. Yes.
MR. DILLON: Objection. Speculation. Argumentative. Vague and ambiguous. 12:12
BY MS. UYEHARA: 12:12
Q. Did you independently -- 12:12
MR. REILLEY: Madam Reporter, did we get the witness' last answer? 12:12
THE COURT REPORTER: Yes, ma'am. 12:12
BY MS. UYEHARA: 12:12
Q. Did you independently try to verify any of the articles that addressed only knife crimes or stabbings? 12:12
MR. DILLON: Objection. Vague and ambiguous. 12:12
THE WITNESS: No. 12:12
BY MS. UYEHARA: 12:12
Q. And you would agree, then, that the number of newspaper stories about switchblades is likely underreported? 12:13
MR. DILLON: Objection. Speculation. Argumentative. 12:13

THE WITNESS: Likely. We don't know to what extent, but likely. 12:13

BY MS. UYEHARA: 12:13

Q. Give me one moment here, looking at my notes. 12:13

Mr. Hardy, we're going to be transitioning over to some questions about Dr. Rivas' report as opposed to Dr. Spitzer's report. But, of course, as you know, there's some overlap between the reports as well. 12:13

A. Yes. 12:13

Q. And how would you define fighting knives? 12:13

A. Any knife that would be more useful for offense or defense than for any other purpose. 12:14

Q. Are there any common characteristics that those knives share? 12:14

A. The only thing I can think of would be that there's a greater tendency for a fighting knife to be double-edged than single-edged. 12:14

Beyond that, they all, like most of the things in arms' history, they reflect different approaches to the same general issue. 12:14

Everybody thinks they have the best design. 12:14

Q. And when we're talking about fighting knives, what time period are you speaking about? 12:14

A. That's a general term that I would use throughout human history. 12:14

Q. In Dr. Rivas' report, he focused on the reconstruction era of history. And for purposes of our deposition today, when we say fighting knives, we mean knives of that era. 12:15

A. Okay. 12:15

Q. How would you define fighting knives from that era, the 19th century? 12:15

A. Same way I would define them for any other period. 12:15

Q. Would you say there is a common link that is similar across fighting knives? 12:15

A. Apart from being -- well, being more likely to be double-edged, apart from that, like I say, there's -- everybody had their own opinion as to how to design one. So they didn't have much in common, other than that they were knives. 12:15

Q. And, Mr. Hardy, would you consider a Bowie knife a fighting knife? 12:15

A. Yes. 12:15

Q. And I believe earlier you said you own one? 12:16

A. Oh, yes. Yes. (Demonstrating.) Replica of a Gambler's Bowie of the 1840 period when the Bowie knife was at its peak. And this thing is so sharp, I can literally shave hair off my arm with it. 12:16

Q. Could you describe the knife for the court reporter, Mr. Hardy? 12:16

A. It is a Bowie knife, model of a Gambler's Bowie of about 1840. It has a clipped point. And I don't know what the handle is made out of. And has a bit of a hilt, which was another characteristic to give your hand some protection if the other guy's blade slid down toward your thumb. Made by Rex Kimball, the late Rex Kimball. 12:17

Q. Can you describe what the clipped point is for? 12:17

MR. DILLON: Objection as to scope. 12:17

THE WITNESS: I think it was to inhibit your opponent from simply grabbing the blade because you could grab one along the spine and then take it out of action. 12:17

So I think basically it's a sharpened back edge which will, you know, inhibit him from trying to grip it. 12:17

BY MS. UYEHARA: 12:17

Q. If you have to estimate the average length of a Bowie knife, what would you put that as? 12:17

A. Fairly long. This one looks to be about ten inches. I think most Bowie's were eight inches or more. 12:17

Q. It's fair to say you researched Bowie knives before preparing your report? 12:17

A. Could you say that again? 12:17

Q. Yes. 12:18

It's fair to say you researched Bowie knives prior to the submission of your report? 12:18

A. Yes. 12:18

Q. And what is your understanding of Bowie knives in the 19th century? 12:18

MR. DILLON: Objection. Vague and ambiguous. 12:18

THE WITNESS: Well, named for Jim Bowie. There is some dispute as to whether the original one was made by his brother, I 12:18

think, or a different knifesmith. They became fairly famous, and large numbers were produced in England at the Sheffield company and shipped over here. 12:18

BY MS. UYEHARA: 12:18

Q. And why did the Bowie knife become famous? 12:18

A. Mostly Jim Bowie and the Alamo and all of that. But it was a really useful weapon in self-defense until the Colt revolvers became popular in about 1850s, I think. They were around before then, but started becoming really popular in 1850s. 12:19

Prior to then, pistols were a single shot. So if you were being mobbed, you might at best hit one of the attackers and the rest would get to you. 12:19

With a Bowie knife, it's not quite that simple, which -- one of the abolitionist speakers said something about the Bowie knife is more sacred to us than the Bible, or something to that effect. 12:19

And I think that was part of it, because he was at risk of getting on the receiving end of a mob attack. And in the 12:19

event of a mob attack, you find one of these much more useful than a single shot pistol. 12:19 12:19

Q. And what is the evidence for the basis of your claim that Bowie knives are good for self-defense? 12:19 12:19 12:20

A. They just are. I mean, the historical record, as I said, this guy -- and now I forget his name, but he was faced with being mobbed several times and got out of it with his Bowie knife. 12:20 12:20 12:20 12:20 12:20

Q. And so is that based on historical reports you read? 12:20 12:20

A. Yes, on some historical reports and also just the nature of the knife. 12:20 12:20

Q. Can you describe what characteristics of the nature of the knife make it particularly well suited for self-defense? 12:20 12:20 12:20

A. Well, you've got a -- in this case, the Gambler's Bowie, a very broad blade, and a long one. Broad means you can make it sharper because you can carry the edge back farther. 12:20 12:20 12:20 12:20

So you've got a cross guard, which inhibits -- protects your hand a little bit, at least. And you've got the clip point to inhibit your opponent from grabbing. So I 12:21 12:21 12:21 12:21

think those would be the critical attributes. 12:21

Q. Would you say it's fair to characterize the Bowie knife as intimidating? 12:21

MR. BRAZIER: Objection. Argumentative. Speculation. 12:21

THE WITNESS: As what? 12:21

BY MS. UYEHARA: 12:21

Q. As intimidating. 12:21

MR. DILLON: Same objection. 12:21

THE WITNESS: I've got some high frequency loss. I still couldn't pick up the word. 12:21

BY MS. UYEHARA: 12:21

Q. Is it fair to characterize the Bowie knife as an intimidating weapon? 12:21

A. Yes, I think so. 12:21

Q. And it's intimidating in part because of its size? 12:21

A. That's a big factor in it, yes. 12:21

Q. In the 19th century, how would you characterize public opinion about surrounding the knife? 12:22

MR. DILLON: Objection. Vague and ambiguous. Speculation. 12:22

THE WITNESS: I don't know that I 12:22

could characterize public opinion generally. 12:22

BY MS. UYEHARA: 12:22

Q. Have you done research on the public perception of the Bowie knife? 12:22

MR. DILLON: Objection. Vague and ambiguous. 12:22

THE WITNESS: I don't recall doing such. 12:22

BY MS. UYEHARA: 12:22

Q. So is your knowledge on the Bowie knife primarily related to your own ownership of one? 12:22

A. No. Just historically it was interesting. 12:22

Q. But you've not done research -- historical research on public opinion of the Bowie knife? 12:23

A. No. 12:23

MR. DILLON: Objection. Argumentative. Misstates testimony. 12:23

BY MS. UYEHARA: 12:23

Q. And you've done research on dangerous weapon laws generally in the 19th century, correct? 12:23

A. Yes. 12:23

Q. And what would you consider to be a dangerous weapons law? 12:23

MR. DILLON: Objection. Vague and ambiguous. 12:23

THE WITNESS: Well, we might more accurately say weapons law since, by definition, a weapon is dangerous. 12:23

I would consider a statute that limited the carrying, possession, or probably marketing of a weapon. 12:23

BY MS. UYEHARA: 12:23

Q. And in the 19th century, what would you consider was the primary way these weapons were restricted? 12:24

MR. DILLON: Objection. Vague and ambiguous. 12:24

THE WITNESS: Well, for the most part, they weren't restricted. Where you did find restrictions, they appeared to have been mostly on acquisition, that is a receipt or transfer, and not on possession itself. As I said, even those were very small minority of jurisdictions. 12:24

BY MS. UYEHARA: 12:24

Q. Can you describe the different ways acquisition was regulated in the 19th century?

MR. DILLON: Objection. Vague and ambiguous.

THE WITNESS: I just recall that there were a few states or cities where you had restrictions on the transfer of the Bowie knife and Arkansas toothpicks, that sort of thing.

I don't recall any that would relate to possession. There were some taxing statutes. But other than those, I don't recall anything that related to possession.

BY MS. UYEHARA:

Q. In Dr. Rivas' report, she discusses some of the various taxes upon acquiring a weapon or sale of a weapon.

In paragraph 37 of your report you state, quote, "Dr. Rivas also discusses the taxation of certain knives while conceding that pistols were also taxed. As discussed above, Heller, McDonald, and Bruen make clear that the history of pistol regulation was not such as to pass the text history and tradition test," end quote.

Can you explain what you mean by the cases made clear the history of pistol regulation was not such to pass the text history and tradition test? 12:25 12:25 12:25 12:25

A. I'm speaking in general terms there. But what I'm expressing is the fact that the three cases make clear that the pistol regulations, at least involved in those cases, did not pass text history and tradition. 12:25 12:26 12:26 12:26 12:26

And my point is that we shouldn't be citing statutes that include pistols within their scope if, you know, we're going to follow McDonald and Bruen. You know, if -- at least, we should be suspicious of any statute. 12:26 12:26 12:26 12:26 12:26

I mean, there is historical precedent citing this is sufficient to prove that it passes the test. If another weapon listed in the same statute has already been held not to pass that test, that means that statute was not enough to persuade the Supreme Court. So we ought to at least be quite suspicious of it. 12:26 12:26 12:26 12:26 12:26 12:27 12:27 12:27

Q. Are you aware of any taxation statute that has not been held -- taxation of firearm statute that has not been upheld by the 12:27 12:27 12:27

Supreme Court? 12:27

A. There are only a few taxation of firearms. One would be the National Firearms Act, which was upheld in United States vs. Miller. I've got some interesting writings on that. And the other is the -- what do you call -- Pitman Robertson tax -- I don't think that's ever been challenged. 12:27

Q. And so you said we should be skeptical -- I'm rephrasing it here -- you said we should be skeptical of laws that tax pistols or handguns? 12:27

A. We should be skeptical of laws that tax knives and handguns. And skeptical in the sense of, this probably doesn't pass Bruen muster because the pistol part of it didn't, probably the knife part wouldn't either. 12:28

Q. And you state that even though Bruen didn't -- Bruen, Heller, and McDonald didn't involve taxation schemes, correct? 12:28

A. Yep. 12:28

Q. Is it your expert opinion that any historical laws that involve pistol or handgun regulation cannot be considered under the Bruen framework? 12:28

MR. DILLON: Objection. Misstates testimony. Vague and ambiguous. Argumentative. 12:28 12:28 12:28

THE WITNESS: Well, you can consider it, but Bruen itself says that the Sullivan law anyway does not pass muster. So at least the history up until that point in time was not such that the court would say it was sufficient for text history or tradition. 12:28 12:28 12:28 12:28 12:29 12:29 12:29

So if you wind up with basically, here is a law that regulates two items, and one item is struck down by the Supreme Court, the regulations on the one item, then you have to ask yourself if the two items are the same thing, in this case, arms, don't you have a problem there with text history and tradition. As the Supreme Court itself said, the other part of it is invalid. 12:29 12:29 12:29 12:29 12:29 12:29 12:29 12:29 12:29 12:29

BY MS. UYEHARA: 12:29

Q. So we're going to pivot away a little bit from Bruen and legal analysis, and get back to the specific taxation laws at issue here. 12:29 12:29 12:29 12:29

Were you aware of laws that impose occupational taxes on weapon dealers before reading Dr. Rivas' report? 12:29
A. Yes. 12:29
Q. In what context? 12:30
A. Well, I mean, they impose them to the present day. There are -- 12:30
Q. Go ahead. 12:30
A. There are taxes -- well, there are fees to be paid for licensing as a dealer of guns, as a manufacturer of guns, that sort of thing. 12:30
Q. Were you aware of these occupational taxes in the 19th century? 12:30
A. No. 12:30
Q. And -- hold on. Let me gather my thoughts for a second. 12:30
Do you agree that occupational taxes (indecipherable) -- 12:30
(The Court Reporter requested clarification.) 12:30
BY MS. UYEHARA: 12:30
Q. Do you agree that occupational taxes disincentivized the sale of certain weapons in the 19th century? 12:31

MR. DILLON: Objection. 12:31
Speculation. Argumentative. Lacks 12:31
foundation. Legal conclusion. 12:31
THE WITNESS: Well, that would 12:31
depend upon the extent of the tax. I mean, 12:31
a small tax like with the present day taxes 12:31
are fees for a gun dealer, those started 12:31
out in 1916 as $10 a year. So that's not 12:31
going to disincentive something. Now 12:31
something substantial, yes, that would 12:31
disincentive it. 12:31
BY MS. UYEHARA: 12:31
Q. In Dr. Rivas' report, she discusses 12:31
the Florida territory and the specific 12:31
occupational taxes at issue there, and 12:31
specifically, an annual tax of $200 in 1838 for 12:31
vendors of dangerous weapons. 12:31
Do you believe a tax of $200 12:31
annually in 1838 would likely discourage the 12:31
sale of dangerous weapons? 12:32
MR. DILLON: Objection. 12:32
THE WITNESS: I believe so. 12:32
MR. DILLON: Speculation. 12:32
(The Court Reporter requested 12:32
clarification.) 12:32

THE WITNESS: Yes, it would. 12:32

BY MS. UYEHARA: 12:32

Q. And are you aware that $200 in 1838 is approximately $6,300 today? 12:32

A. Approximately. 12:32

Q. And would an annual tax of $10 in 1838 for open carry tend to discourage the carrying of those weapons? 12:32

A. Yes, it would. 12:32

Q. And are you aware that $10 in 1838 would be approximately $320 today? 12:32

A. I suspect that's right. 12:32

Q. You would agree, then, that occupational taxes in the 19th century had a tendency to discourage weapon use and carry? 12:32

MR. DILLON: Objection. Lacks foundation. Incomplete hypothetical. Argumentative. And speculation. 12:33

THE WITNESS: To the extent they existed, and there are only a few cases of that cited. And to the extent they were substantial, they would have tended to disincentivize arms ownership. 12:33

BY MS. UYEHARA: 12:33

Q. Do you agree that laws regulating 12:33

concealed carry of dangerous weapons was one of the primary ways that governments regulated weapons in the 19th century? 12:33

MR. DILLON: Objection. Vague and ambiguous. 12:33

THE WITNESS: I would say so. 12:33

BY MS. UYEHARA: 12:33

Q. And in conjunction with the occupational taxes laws, they would together discourage gun possession and carrying? 12:33

MR. DILLON: Objection. Vague and ambiguous. Speculation. Argumentative. And incomplete hypothetical. 12:34

THE WITNESS: I don't think that the concealed carry limitations would have discouraged arms ownership or carrying. 12:34

I mean, my own state, Arizona, we had a complete ban on concealed carry, no permits available, throughout most of my lifetime, and I don't think that discouraged anybody from owning arms or carrying them openly. 12:34

BY MS. UYEHARA: 12:34

Q. And so you don't think concealed carry laws discourage the concealed carrying of 12:34

weapons? 12:34

A. Well, they discourage -- 12:34

MR. DILLON: Objection. Misstates testimony. 12:34

THE WITNESS: They discourage the concealed carrying, yeah. But they don't discourage carrying in general. 12:34

BY MS. UYEHARA: 12:34

Q. And in your research of 19th century firearm regulations, what were the primary reasons governments regulated these weapons? 12:34 12:35

MR. DILLON: Objection. Vague and ambiguous. 12:35

THE WITNESS: The primary reason seemed to be a notion of fairness in the case of concealed carry, that a person carrying a concealed would have an advantage over someone who didn't know that they were carrying a weapon. And thus, a conflict might turn lethal without the person -- without a person realizing that it could go lethal. 12:35

BY MS. UYEHARA: 12:35

Q. And on what sources do you base that claim? 12:35

A. There were several court cases from that period, talking 1840s or thereabouts, where the court mentioned just that, that, you know, it was sort of sneaky to be carrying concealed, and that person might get into a fight without knowing the other person was armed. And, therefore, if you're going to carry, you should carry openly. 12:35 12:35 12:35 12:35 12:35 12:36 12:36 12:36

Q. And what weapons were usually the subject of 19th century concealed carry laws? 12:36 12:36

A. Some of them were any arm. Some of them were specific to Bowie's and Arkansas toothpicks and that matter of thing. Some of them included pistols. And as I say, some of them were any arm. 12:36 12:36 12:36 12:36 12:36

Q. Would you say 19th century legislation was particularly concerned with the concealment of these weapons? 12:36 12:36 12:36

MR. DILLON: Objection. Speculation. Vague and ambiguous. 12:36 12:36

THE WITNESS: To the extent there was regulation, yes. 12:36 12:36

BY MS. UYEHARA: 12:36

Q. And what were the primary ways that governments regulated those weapons? 12:36 12:36

MR. DILLON: Objection. Vague and ambiguous. 12:37

THE WITNESS: Well, I think we were discussing concealed carry. As far as the other regulations, yeah, they were pretty intermittent. We're talking one or two states for an unknown period of time. 12:37

Some day I want to have enough time to go back and research how long did these laws exist, but that's going to be a hell of a job. You have to go back through the session laws. 12:37

BY MS. UYEHARA: 12:37

Q. And can you describe why that's difficult? 12:37

A. Well, yeah. The session laws are not org -- they're chronologically organized. And so you will have to go back each year, year after year, and see if this statute was repealed. And it's -- it would be an enormous task. 12:38

Q. And so a law passed, let's say, in the mid 1880s could have been renewed for several years thereon or repealed shortly thereafter; and it's difficult to tell, 12:38

correct? 12:38

A. Oh, yes. Quite so. 12:38

Q. And in your expert opinion, why has not more research focused on that aspect? 12:38

MR. DILLON: Objection. Speculation. Vague and ambiguous. 12:38

THE WITNESS: I suspect because nobody ever figured it out before. And as the only guy who did figure it out, I don't have the time. 12:38

BY MS. UYEHARA: 12:38

Q. And so a law that was enacted in, let's say, 1880, it could have gone on for a decade or two decades before ever actually getting repealed; is that correct? 12:38

MR. DILLON: Objection. Vague and ambiguous. Lacks foundation. Speculation. 12:38

THE WITNESS: Sure. 12:38

BY MS. UYEHARA: 12:38

Q. And in your report, do you contend that any of the laws presented by Dr. Spitzer or Dr. Rivas do not exist? 12:39

MR. DILLON: Objection. Vague and ambiguous. 12:39

THE WITNESS: Could you run that by 12:39

me again? 12:39

BY MS. UYEHARA: 12:39

Q. Yes. 12:39

In your report, do you contend that any of the laws presented by Dr. Spitzer and Dr. Rivas do not exist? 12:39

MR. DILLON: Same objection. 12:39

THE WITNESS: I do not so contend. 12:39

BY MS. UYEHARA: 12:39

Q. Did you do any independent research to see if either of them missed any laws in their research? 12:39

A. No, I don't believe I did. 12:39

Q. Is the main contention of your report that the laws they provide are not good legal analogies to the switchblade laws at issue? 12:39

A. I would think -- 12:39

MR. DILLON: Objection. Vague and ambiguous. 12:39

THE WITNESS: -- that that's one of the big points, yes. 12:39

BY MS. UYEHARA: 12:39

Q. And in your expert opinion, which type of historical laws would California need 12:40

to identify in order to defend its switchblade laws? 12:40

MR. DILLON: Objection. Vague and ambiguous. Speculation. Legal conclusion. 12:40

THE WITNESS: I suppose it would have to be statutes against or limiting fighting knives, preferably going down to possession of fighting knives, and within the relevant timeframe, the timeframe of the framing or framings. 12:40

And to the extent we're talking about state laws and state constitutions, I'd want to see a constitute -- state constitutional provision that is something like the Second Amendment, maybe not the same words because those were not often used in state constitutions, but doesn't have -- at least the right -- the state right does not have limits on it which are not found in the Second Amendment such as right to keep and bear arms for the common defense. And so I would leave those out. 12:41

BY MS. UYEHARA: 12:41

Q. So if the state constitution had a more limited Second Amendment right, you would 12:41

not include those states in your analysis; is that correct? 12:41

A. I might include them, but I would -- if -- several of the statutes from that period were in particular carrying concealed weapons, and also some (indecipherable) types of weapons. 12:41

(The Court Reporter requested clarification.) 12:41

THE WITNESS: And on types of weapons were upheld specifically because the state constitution had the for-the-common-defense limitation. 12:42

And so they said, this is -- for the common defense means, basically, militia use. And, therefore, arms that are not suitable for the militia are not protected under the state constitution. The Second Amendment doesn't have that limitation. 12:42

So for that reason, I would tend to push those cases to the side and not to consider them as establishing very much. 12:42

BY MS. UYEHARA: 12:42

Q. And so regulations that focus on fighting knives are the closest analogy to the 12:42

switchblade laws at issue in this case? 12:42

A. Yes, I think so. 12:42

Q. And those laws did exist in the 19th century, correct? 12:42

MR. DILLON: Objection. Vague and ambiguous. 12:43

THE WITNESS: Well, they did exist in certain jurisdictions. I don't think they dealt with possession. The question becomes how widespread need it be? And there I've got an article coming out on it, but, yeah. 12:43

BY MS. UYEHARA: 12:43

Q. Mr. Hardy, you have an article coming out on what? 12:43

A. Mentioning the question of how widespread -- well, let me back up. Where our reasoning here is that if the framing generations were okay with a restriction, that would indicate that their understanding of the right to keep and bear arms when they ratified it was also okay with those restrictions. 12:43

But then we have to go further and say, how widespread did those restrictions have to be before we can reach that conclusion? I 12:44

mean, the fact that -- I mean, the analogy is the First Amendment where we're talking about does not protect defamation, except when it does, fighting words, obscenity. And the reasoning is that the Americans, when they've ratified the amendments, would have understood that those things were not legally protected. 12:44

Well, that's pretty much -- that is simple because I think it's pretty much uniform. I mean, any Englishman or American in 1791 would have understood you can't do these things, and wouldn't have thought that ratifying freedom of speech in press would let you do them. 12:44

Then we get down to other questions, like how many -- if something is not universally accepted as a restriction, how many acceptances does it take? And that's something that Bruen doesn't answer except indirectly. It indirectly suggests that it takes at least a fair amount of such acceptances. 12:45

Q. Mr. Hardy, you said regulations of fighting knives would be a good analogy in this case; and you said fighting knives of the Framer era, correct? 12:45

What would you consider to be fighting knives of the Framer era? 12:45

A. You know, the Bowie would fit within Fourteenth Amendment framing anyway. So would be the Arkansas toothpick. I guess the Scottish dirk, although I don't think there's any single good definition of that other than it was a knife. I think those would pass at least Fourteenth Amendment purposes as fighting knives known at the time. 12:45 12:45 12:45 12:45 12:46 12:46 12:46 12:46

MS. UYEHARA: Okay. I've reached the end of my listed questions today here, Mr. Hardy. Can we go on a 10-minute break so I can see if I missed any questions -- 12:46 12:46 12:46 12:46

THE WITNESS: Sure. Okay. 12:46

MS. UYEHARA: Wonderful thank you. 12:46

THE COURT REPORTER: Are you going to want a copy of it? 12:54 12:54

MR. DILLON: Yes, please. 12:56

(A recess was taken.) 12:57

BY MS. UYEHARA: 12:57

Q. Mr. Hardy, I just have just a few more questions for you related to your prior published work. 12:57 12:57 12:57

A. Uh-huh. 12:57

Q. And so we mentioned earlier that a lot of your work has been published in law journals. 12:57 12:58 12:58

I believe you had one article that was submitted to -- or that was published by a history journal; is that correct? 12:58 12:58 12:58

A. Yeah, I think one of them was. 12:58

Q. Do you submit a lot of your law articles to history journals? 12:58 12:58

A. No, I can't say as I have. 12:58

Q. And is there any reason you prefer legal journals to submit your work to? 12:58 12:58

A. I'm a lawyer. 12:58

Q. Yes, but your articles are so -- they seem to focus on history. 12:58 12:58

A. Uh-huh. Yep. But it's just -- law reviews I know. Law reviews are instinctive to me. How the rest of the world functions, I don't know very much about. 12:58 12:58 12:58 12:58

MS. UYEHARA: That makes sense. All right. Thank you so much, Mr. Hardy. That's the last of my questions for you. 12:58 12:59

Mr. Dillon, did you have any questions? 12:59 12:59

MR. DILLON: I have no questions 12:59

today. 12:59

(THEREUPON, the deposition of DAVID T. HARDY concluded at 12:59 p.m.)

(SIGNATURE RESERVED)

ERRATA SHEET

CHANGES IN FORM AND SUBSTANCE REQUESTED BE MADE IN THE FOREGOING ORAL EXAMINATION TRANSCRIPT:
(NOTE: If no changes are desired, please sign and date where indicated below.)

CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | _____________ | _____________ | ______ |
| ___ | ___ | _____________ | _____________ | ______ |
| ___ | ___ | _____________ | _____________ | ______ |
| ___ | ___ | _____________ | _____________ | ______ |
| ___ | ___ | _____________ | _____________ | ______ |
| ___ | ___ | _____________ | _____________ | ______ |
| ___ | ___ | _____________ | _____________ | ______ |
| ___ | ___ | _____________ | _____________ | ______ |
| ___ | ___ | _____________ | _____________ | ______ |
| ___ | ___ | _____________ | _____________ | ______ |
| ___ | ___ | _____________ | _____________ | ______ |

I, DAVID T. HARDY, hereby declare under penalty of perjury that I have read the foregoing deposition and that the testimony contained therein is a true and correct transcript of my testimony, noting the corrections above.

DAVID T. HARDY

SUBSCRIBED AND SWORN BEFORE ME
THIS______DAY OF_________, 2024.

_______________________________
(Notary Public) MY COMMISSION EXPIRES:___________

C E R T I F I C A T E

I, MONNA J. NICKESON, CCR, CSR, CLR, RPR, CRR, the undersigned Certified Court Reporter, authorized to administer oaths and affirmations in and for the states of Washington (3322), Oregon (16-0441), Idaho (1045), and California (14430), do hereby certify:

That the sworn testimony and/or proceedings, a transcript of which is attached, was given before me at the time and place stated therein; that the witness was duly sworn or affirmed to testify to the truth; that the testimony and/or proceedings were stenographically recorded by me and transcribed under my supervision. That the foregoing transcript contains a full, true, and accurate record of all the testimony and/or proceedings occurring at the time and place stated in the transcript.

That I am in no way related to any party to the matter, nor to any counsel, nor do I have any financial interest in the event of the cause.

IN WITNESS WHEREOF I have set my hand on February 23, 2024.

Monna J. Nickeson

MONNA J. NICKESON, CCR, CSR, CLR, RPR, CRR

John Dillon

jdillon@dillonlawgp.com

February 23, 2024

RE: Knife Rights, et al. v. CA Attorney General Rob Bonta

2/15/24, DAVID T. HARDY, JOB NO. 6449173

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure. Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

_X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Knife Rights, et al. v. CA Attorney General Rob Bonta

DAVID T. HARDY (#6449173)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

________________________________   _______________

WITNESS                                    Date

**&**

**&** 118:24 119:9

**0**

**0.02** 81:25
**0.04** 80:18
**00474** 1:6 3:3 5:4

**1**

**1** 3:9 12:5 119:1
**1.8** 80:3 82:4
**10** 44:16 81:16 101:8 102:6,10 113:13
**100** 44:16
**100th** 49:2
**1045** 4:8 117:6
**105** 2:4
**10:00** 50:3
**11th** 54:10
**12** 3:9 22:19 23:10
**1300** 2:10
**1328** 46:19
**14** 3:10
**14430** 1:24 4:9 117:6
**15** 1:15 3:4 4:2 14:11
**150** 20:13
**16** 21:3
**16-0441** 4:9 117:6
**1789** 55:5
**1791** 46:22 47:7 112:11
**1838** 101:16,19 102:3,7,10
**1840** 89:5,12
**1840s** 17:20 105:2
**1850s** 91:11,13
**1868** 55:13
**1870** 55:5
**1871** 41:14
**1880** 107:13
**1880s** 106:23
**18th** 47:5 54:13
**19** 37:20
**19,896** 81:22
**19,929** 81:19
**1916** 101:8
**1921** 79:2
**1930s** 72:24
**1939** 79:3
**1940** 80:7
**1945** 80:8
**1946** 80:21
**1950** 80:21
**1951** 81:5
**1955** 81:6
**1956** 81:19
**1959** 81:19
**1969** 24:22
**1970** 41:23
**1970s** 72:25
**1972** 24:23
**1974** 54:5
**1977** 41:23
**1979** 41:11
**1980s** 41:4 61:16
**1985** 41:12
**19th** 47:5 73:6 75:5,17 88:13 90:20 93:20 94:24 95:13 96:2 100:14,25 102:14 103:3 104:9 105:10 105:16 111:3

**2**

**2** 3:10 14:14 46:5
**2/15/24** 118:5
**20** 5:21 6:1,5 28:17 31:20 46:2
**200** 46:4 101:16,18 102:3
**2000** 17:17
**2000s** 45:19
**2001** 45:20
**2003** 45:20
**2018** 14:24
**2019** 14:24
**2020** 3:11 14:11,23
**2024** 1:15 3:4 4:2 116:23 117:22 118:3
**2025.520** 118:9 118:12
**20th** 47:5
**23** 117:22 118:3
**24** 10:15
**25** 44:3 53:2 81:16
**255** 2:4
**26** 82:19
**2647** 2:4
**27** 66:9,14,23 67:9 85:8
**2a** 15:8 35:22 36:7

**3**

**3** 3:12 43:12 46:5
**30** 31:20 119:1
**30,000** 83:7
**31,502** 83:1
**320** 102:11
**3322** 4:7 117:5
**3468** 117:23
**35** 44:3
**35th** 14:13
**37** 96:18
**3:23** 1:6 3:3 5:4

**4**

**4** 3:6,12 49:4
**40** 45:14
**417** 79:5 80:2
**424** 79:3 80:3

**43** 3:12
**49** 3:12 5:11

**5**

**5** 44:10
**50** 28:10 34:8 50:25 52:1 54:2,5,7
**50,000** 45:15
**50-50** 28:16,17

**6**

**6,300** 102:4
**610** 80:15
**612** 80:8,13
**6449173** 1:25 118:5 120:2

**8**

**80** 54:18,19,21
**820** 80:24
**824** 80:21
**83** 39:10

**9**

**9,677** 81:8
**9,713** 81:6
**90** 54:19,19,21 54:23
**92009** 2:5
**95814** 2:10

**a**

**a.m.** 1:15 4:2
**ability** 10:16
**able** 10:4
**abolitionist** 91:19
**above** 40:15 96:21 116:20 118:6
**absence** 85:23 85:25
**academic** 29:14
**academics** 40:1
**accept** 62:17
**acceptances** 112:18,21
**accepted** 112:17
**accepting** 63:2
**accessible** 74:7
**accommodate** 9:23
**account** 84:20
**accurate** 117:15
**accurately** 95:7
**acquiring** 96:16
**acquisition** 95:21 96:2
**act** 29:23 98:4
**acted** 5:23
**action** 89:25
**actual** 21:19 68:25 69:8,17
**actually** 5:25 11:5 25:21 31:16 42:1 49:7 60:19 69:23 79:8 82:22 107:14
**add** 38:3
**added** 79:10
**adding** 36:16
**addition** 21:19 34:23
**addressed** 86:15
**adds** 76:23
**administer** 117:4
**admonitions** 7:2
**advanced** 26:1
**advantage** 64:22 65:15 104:18
**advertise** 20:2
**advertisement** 44:5
**advocating** 71:10
**affect** 10:16
**affirmations** 117:4
**affirmed** 117:11
**afraid** 5:19
**afternoon** 10:5
**age** 17:15,15,17 72:23 73:13
**ago** 5:21 6:1,5 6:22 12:24 35:4 36:11 54:3,6 69:10
**agree** 73:15,19 74:6,20 78:22 82:11 86:1,21 100:18,23 102:13,25
**agreement** 20:5
**ahead** 7:2 69:5 100:8
**akhil** 39:17
**akin** 32:17
**al** 3:2 4:25 118:4 120:1
**alamo** 91:8
**alan** 15:10
**alystine** 39:18
**amar** 39:17
**ambiguous** 32:21 33:19 37:2 50:24 51:15 52:8 53:9 55:19 56:11 58:9,23 60:14 61:12 62:9 63:16 64:9,20 65:20 71:25 72:18 73:8,22 75:20 82:17 83:11 84:1,23 86:7 86:18 90:22 93:24 94:7 95:5,17 96:4 99:2 103:5,12 104:13 105:20 106:2 107:6,17

107:24 108:20 109:4 111:6
**amendment** 3:11 13:8 14:12 28:11,19 28:24 29:8,13 30:2,12 33:10 34:25 35:2,12 35:19,22,24 36:8,23 37:15 38:5 39:8 43:22 49:16 52:22 59:22 65:18,23,25 72:9,10 109:15 109:20,25 110:19 112:2 113:4,9
**amendments** 112:6
**america** 35:5 54:16
**american** 46:21 54:12,18 55:24 112:10
**americans** 46:21 112:5
**amici** 29:9
**amicus** 29:2,9 31:22,24 33:12 33:15 34:15,20
**ammunition** 51:9
**amount** 41:6 46:1 51:25
55:21 61:14 112:21
**analogies** 108:16
**analogy** 110:25 112:1,23
**analysis** 22:15 23:19,21 67:21 72:16 75:18 99:23 110:1
**analyzing** 24:2 33:1
**annual** 41:9 44:3 101:16 102:6
**annually** 101:19
**answer** 7:16,18 8:19,21 9:16 9:17 10:1,17 17:5 86:11 112:19
**answers** 9:3
**anybody** 103:21
**anymore** 44:13
**anyway** 78:14 99:6 113:4
**apart** 88:18,19
**apc** 2:4
**apparently** 75:5
**appear** 67:11 82:21
**appearance** 49:21
**appearances** 2:1 16:5
**appeared** 1:17 48:18,19,22 95:20
**appearing** 118:18 119:7
**applicable** 46:20
**approaches** 62:16 87:25
**approximately** 102:4,5,11
**arbitrary** 79:12
**archive** 76:16 76:19
**area** 19:21 74:24
**argument** 32:19 65:7
**argumentative** 32:21 42:12 56:11 65:20 71:1 83:11 86:6,25 93:5 94:21 99:3 101:2 102:18 103:12
**arguments** 63:6 64:25
**aristotle** 25:21
**arizona** 24:20 26:13 103:17
**arkansas** 51:23 56:20,21 96:8 105:12 113:5
**arm** 89:8 105:11,15
**armed** 105:7
**arms** 3:12 6:5 17:8,13 18:9 18:12 19:24 28:11 36:23 37:13 43:9,21 56:13 87:24 99:17 102:23 103:16,21 109:21 110:16 111:21
**arrowheads** 17:15
**art** 25:13
**article** 36:13 37:20 38:4 54:5,7 70:20 75:8 111:11,14 114:4
**articles** 21:20 28:21 33:16,21 53:2,5 66:17 67:17 68:9,20 78:24 83:19 84:7 86:2,15 114:9,14
**arts** 25:1,3,7,18
**asked** 7:9 19:22
**asking** 8:18,23 8:24

**aspect** 18:16 107:4
**aspects** 18:17 59:7
**assignments** 26:8
**assisted** 24:11 78:6,9
**associated** 32:5
**association** 40:4
**assume** 7:16 33:10 42:6 45:7 47:10 49:20 53:1 61:8
**assumed** 48:7 48:10
**attached** 117:9
**attack** 91:25 92:1
**attackers** 91:16
**attempt** 46:12
**attempted** 77:1
**attend** 24:19 26:12 40:12 42:17
**attended** 14:5 15:21 42:6,15
**attention** 39:13
**attorney** 1:7 2:9 3:2 4:18,22 5:1 31:25 32:11 40:11 61:19 118:4 120:1
**attorneys** 2:8
**attributes** 93:1
**audio** 30:21 50:13
**author** 30:21 31:1
**authorized** 117:4
**automatic** 78:2 78:4
**available** 57:21 60:23 73:20,25 74:3,18 103:19
**average** 42:7 90:5
**award** 36:10,15
**awards** 35:13
**aware** 16:6,10 16:12,14,19 22:7 76:20,23 76:25 79:22 80:1,17 81:1 81:24 82:2,7 82:24 97:23 100:1,13 102:3 102:10
**awful** 57:16

**b**

**b** 119:1
**back** 6:22 14:24 17:14 27:12 28:5 30:17 32:25 41:4 45:18 50:8 55:3 59:25 61:15 75:5 79:16 83:17 90:2 92:21 99:24 106:9,11,18 111:17
**background** 24:15
**ballpark** 45:15
**ban** 103:18
**base** 104:24
**based** 33:12,15 92:11
**basic** 7:1
**basically** 6:6 13:18 25:19 29:5,22 30:17 68:3 90:1 99:11 110:15
**basis** 85:14 92:4
**battle** 36:17,18 36:20 37:10 38:19 39:23
**bc** 17:17
**bear** 6:4 36:23 37:13 109:21 111:21
**bearing** 19:23
**becoming** 91:12
**began** 37:19
**beginning** 28:18 65:4
**behalf** 32:2
**believe** 18:1 22:6 30:13,19 34:14 39:25 43:10 54:6 71:21 76:13 78:15 89:2 101:18,22 108:13 114:4
**believing** 72:12
**beneficial** 17:7
**benefit** 40:22
**benefits** 40:21 44:4
**best** 8:22 9:24 10:8,12 55:22 75:24 88:1 91:16
**better** 47:1 49:12 60:3 63:10
**beyond** 13:24 16:25 40:8,17 61:1 87:23
**bias** 72:6
**biases** 62:24
**bible** 91:21
**big** 39:12,13,16 75:22 93:19 108:22
**biggest** 61:14
**bill** 63:4
**bit** 36:25 61:5 63:9 89:14 92:23 99:23

**blade** 89:17,24 92:19
**blend** 5:19
**blog** 43:18,19
**board** 40:12,13 41:16,19 42:6 42:14,17
**bonta** 1:7 3:3 4:23 5:1 118:4 120:1
**book** 29:25 30:1,3,16 34:4
**books** 29:17 30:6,11 52:12 58:4
**bottom** 12:14
**bowie** 17:19 51:18,22 56:18 77:9,10,15 88:25 89:5,6 89:11,12 90:6 90:12,16,20,24 91:6,8,18,20 92:4,10,19 93:3,14 94:5 94:11,18 96:8 113:3
**bowie's** 90:9 105:12
**brazier** 37:1 93:4
**break** 9:22,25 50:2,8 54:20 113:13
**breaks** 9:24
**breakthroughs** 61:15
**brennan** 20:22
**brief** 29:2 31:22,24 32:3 32:10,14,17 33:12,15 34:15 34:20
**briefs** 29:9
**bring** 66:10,25
**british** 60:16
**broad** 64:10 92:19,20
**broader** 46:12
**broadly** 56:8
**bronze** 17:15 17:15,16
**brother** 90:25
**brought** 39:12
**browning** 26:18,19
**bruen** 22:15,19 22:22,23 23:9 23:13,16 29:2 31:22 38:13,20 96:22 97:13 98:15,18,19,24 99:5,23 112:19
**bulk** 53:1
**bunch** 60:20 61:9 62:19
**buy** 27:24

**c**

**c** 117:1,1
**ca** 1:24 2:5,10 4:9 118:4,9,12 118:21 120:1
**california** 1:1,7 2:9 3:2 4:19,22 4:25 5:3 19:19 108:25 117:6
**california's** 22:7
**call** 12:23 31:8 98:7
**capacity** 29:13 32:13 43:3,6 44:23
**captions** 29:5
**carlsbad** 2:5
**carry** 13:18 92:21 102:7,15 103:1,15,18,25 104:16 105:8,8 105:10 106:4
**carrying** 95:10 102:8 103:10 103:16,22,25 104:6,7,17,19 105:4 110:5
**cartoon** 28:1
**carving** 85:1
**case** 1:5 3:3 4:21,24 5:1,3 5:21,24 6:19 6:23,24 12:3 12:21 16:18 19:10,13,14 20:7,10,15 22:1,5 23:13 23:15 29:2 31:14 32:24 33:1 53:12 74:24 92:18 99:16 104:16 111:1 112:24
**cases** 5:15 8:23 28:22,25 32:18 38:13 39:3 69:17 97:2,7,8 102:20 105:1 110:21
**catch** 65:3
**categorize** 54:14
**cause** 78:23 117:20
**ccp** 118:9,12
**ccr** 1:24 117:2 117:24
**center** 1:4
**centuries** 47:6
**century** 54:10 54:13 73:6 75:5,17 88:13 90:20 93:20 94:25 95:13 96:2 100:14,25 102:14 103:3 104:9 105:10 105:16 111:4

**certain** 41:5 46:7,7 62:13 96:20 100:24 111:8
**certainly** 46:3
**certified** 4:4,6 4:7,8 117:3
**certify** 117:7
**challenge** 6:9 6:13 19:18
**challenged** 20:1 98:8
**challenges** 6:5 59:12 60:10
**change** 42:3 120:4,7,10,13 120:16,19
**changed** 38:14
**changes** 9:7 116:2,3
**characteristic** 89:15
**characteristics** 87:17 92:16
**characterizati...** 29:15 38:21
**characterize** 29:7 35:8 69:12 93:3,14 93:21 94:1
**check** 24:5
**chicago** 29:3
**choice** 41:25
**choose** 23:12 23:24 25:12 42:17 76:5
**chose** 25:13 42:1
**chronologica...** 106:17
**cincinnati** 41:23
**circuit** 29:4
**circumstances** 8:17
**cited** 33:20 66:15 67:15 68:10 71:15 102:21
**cities** 96:6
**citing** 97:11,16
**city** 27:8
**civil** 5:21 27:11 27:12 44:25 45:4,11 47:16 47:19,24 55:13 55:17 118:19 118:21
**claim** 83:8 85:9 92:4 104:25
**claims** 29:23 64:6
**clarification** 15:3 30:9 51:20 67:3 80:11 100:21 101:25 110:9
**clarify** 7:15
**class** 18:14
**classified** 40:17
**clear** 7:19 96:22 97:2,7
**clearly** 22:25
**clerked** 26:17
**click** 44:1
**client** 40:11
**clients** 27:7
**clip** 92:24
**clipped** 89:13 89:19
**closely** 45:2
**closer** 32:17
**closest** 110:25
**clr** 117:2,24
**club** 35:6
**clubs** 57:10
**coalition** 32:4,7
**coauthored** 52:21
**code** 21:25 22:4 118:9,12,19,21
**colleague** 4:20
**collect** 17:8
**collecting** 17:22
**collection** 17:9 17:13,24
**collections** 59:23 74:10
**college** 24:19
**colonial** 47:2
**colonies** 46:21
**colorado** 6:9
**colt** 91:10
**come** 5:25 23:17 24:1 36:2 39:20 50:8 75:12
**comes** 60:10 63:13 64:24 65:6,18,23
**coming** 39:17 46:16 111:11 111:15
**comment** 9:7
**commission** 116:25
**common** 39:13 87:17 88:16,22 109:21 110:13 110:15
**company** 91:4
**compensated** 20:9
**complaint** 3:9 10:24 11:3,17 12:2,7,11,17
**complete** 10:4 103:18
**completed** 118:7,17 119:6
**completion** 119:10
**complicated** 42:4 59:25 60:8
**component** 45:12

**compound** 37:17 53:8 75:19
**comprehensive** 60:17
**computer** 37:25
**computer's** 79:11
**concealed** 103:1,15,18,24 103:25 104:6 104:16,17 105:5,10 106:4 110:5
**concealment** 105:18
**conceding** 96:20
**concept** 19:23 63:18
**concerned** 13:17 105:17
**concerning** 69:3
**concluded** 115:3
**conclusion** 85:24 101:3 109:4 111:25
**condition** 10:11
**conducted** 77:5 79:13
**conducting** 71:23 79:1 80:6
**conference** 14:13 15:20,21 16:2,3 19:4
**confirm** 11:16 12:10,15 20:17 43:16 48:12 79:16
**conflict** 36:22 36:25 37:12,14 104:20
**congress** 52:12 57:20 59:24 61:3
**congressional** 56:4,5
**conjunction** 103:8
**conservative** 76:8
**consider** 13:9 88:24 95:2,9 95:14 99:4 110:22 113:1
**considered** 98:24
**consistent** 82:13
**consists** 66:16 67:15
**constantly** 76:21
**constitute** 109:13
**constitution** 3:11 14:12 109:24 110:12 110:18
**constitutional** 32:15 109:14
**constitutions** 109:12,17
**consult** 22:12
**consulting** 34:3 34:4
**contact** 13:13 19:1,6,8 118:9 118:20
**contacted** 19:5
**contained** 116:19
**contains** 117:15
**contend** 70:22 107:20 108:4,8
**contention** 70:7 108:14
**context** 58:13 59:6 64:14,18 65:13 100:5
**contrary** 63:6 71:8
**contributes** 53:25
**copies** 26:5
**copy** 12:7,17 14:9 20:19 35:21 43:17 57:19 59:16 60:23 66:12,25 67:12 113:18
**copyright** 75:6 84:13
**corporation** 45:2
**correct** 12:16 22:16,20 23:10 27:15 28:4 29:14 31:25 32:13 34:16,20 44:19 52:17 53:3 61:10 77:3,6 78:17 79:4 80:9,14 80:16,23 81:4 81:7,21 82:1 94:25 98:20 107:1,15 110:2 111:4 112:25 114:6 116:20
**corrections** 116:5,20 118:14,15 119:3,4
**counsel** 24:11 117:19 118:18 118:22 119:7
**count** 70:13 71:17
**county** 1:3
**couple** 34:11 45:23 68:14,18
**course** 7:24 10:3 74:23

87:9
**courses** 42:1
**court** 1:1 4:7 5:2 6:18 7:5 8:6,11 15:2 22:24 23:3 27:8 30:8 50:13,16 51:19 58:16 67:2 80:10 86:12 89:10 97:21 98:1 99:8,14 99:19 100:20 101:24 105:1,3 110:8 113:17 117:3
**courtroom** 5:18
**courts** 39:19
**credited** 75:10
**crime** 68:8 70:5 70:18 71:16 72:22 73:2 75:16 83:8,15 83:20,24 84:21 85:1
**crimes** 86:16
**criminal** 27:10 27:12 69:18
**critical** 93:1
**cross** 92:22
**crr** 1:24 117:3 117:24
**csr** 1:24 117:2 117:24
**current** 14:23
**custom** 6:6
**cv** 1:6 3:3 5:4
**cynical** 62:18

**d**

**d** 3:1 26:20
**d.c.** 29:3
**daggers** 57:1
**dang** 30:4
**dangerous** 51:13,17,22 57:5 94:24 95:3,8 101:17 101:20 103:1
**data** 66:15 67:15 84:16
**database** 76:11 84:6
**databases** 22:12 34:7,9 57:23
**date** 63:3 116:4 118:16 119:5 120:24
**dave** 31:8
**david** 1:13 3:5 3:13 4:3,11 5:7 15:11 20:21 35:23 36:7 48:25 115:2 116:18,22 118:5 120:2
**day** 3:11 14:12 14:24 55:4 100:7 101:6
106:8 116:23
**days** 27:12 39:6 57:16,17 61:22
**ddl** 1:6 3:3
**dealer** 100:10 101:7
**dealers** 100:2
**dealt** 111:9
**debated** 23:15
**decade** 107:14
**decades** 39:22 48:14 107:14
**december** 12:25
**decent** 17:9
**decided** 24:7
**decidedly** 36:19 37:10 38:19
**decision** 23:22 23:23
**declaration** 20:20
**declarations** 20:22
**declaratory** 3:9
**declare** 116:18
**decrees** 46:19
**deep** 17:10
**deeply** 36:16
**defamation** 112:3
**defend** 109:1
**defendant** 4:22 9:6
**defendants** 1:8 1:18 2:6
**defense** 44:25 45:4 47:17,20 47:25 87:15 91:10 92:5,17 109:22 110:13 110:15
**define** 62:5 63:12 87:12 88:12,14
**definition** 56:22 95:8 113:7
**degree** 26:1
**demonstrating** 89:4
**denver** 5:17,24 6:8,9,20
**department** 2:9 4:19 25:5 27:15 28:3
**depend** 46:9 101:5
**depends** 53:18 60:15
**deposed** 5:12 5:21,25
**deposition** 1:12 4:3 5:9 7:4,8 9:1,8,11 10:20 11:7,11,14 12:12,18 27:6 88:9 115:2 116:19 118:19

118:23,25 119:8,10
**deputy** 2:8 4:18
**describe** 13:15 13:20 17:12 25:3 30:15 35:16 36:24 37:4 41:13 49:8 60:9 89:9 89:19 92:15 96:1 106:14
**describing** 22:15 84:11
**description** 3:8
**design** 88:1,21
**desired** 116:3
**determined** 118:18,23 119:7
**developing** 64:17
**development** 30:2
**devoted** 41:15
**difference** 62:15 63:24 80:2,4,18 81:2 81:25 82:9
**different** 34:24 38:11 49:16 53:2 59:7,16 62:6 63:12 69:16 75:13 78:23,24 79:9 82:4 87:25 91:1 96:1
**differently** 9:4 64:4,7
**difficult** 54:15 66:17 67:16 72:21 106:15 106:25
**dig** 26:5
**digging** 56:1 59:15 60:10
**digitally** 73:20 73:24 74:4,18
**dillon** 2:3,4 9:15,15 10:25 11:10,14 12:22 15:17 18:19,23 19:10,13,15,22 23:20 30:22 31:3,7 32:20 33:18 37:17 42:11,23 50:6 50:23 51:6,14 52:7 53:8,17 55:18 56:10 58:8,22 60:13 61:11 62:8 63:15 64:8,19 65:2,19 70:9 70:25 71:24 72:17 73:7,21 75:19 82:16 83:10,25 84:22 86:5,17,24 89:21 90:21 93:9,23 94:6 94:20 95:4,16 96:3 99:1 101:1,21,23 102:16 103:4 103:11 104:3 104:12 105:19 106:1 107:5,16 107:23 108:7 108:19 109:3 111:5 113:19 114:23,25 118:1
**dillonlawgp....** 118:2
**dinner** 85:2
**directors** 41:19
**dirk** 113:6
**dirks** 56:24
**discarded** 73:13
**discount** 44:2
**discourage** 101:19 102:7 102:15 103:10 103:25 104:2,5 104:7
**discouraged** 103:16,21
**discover** 59:13
**discovering** 58:6,11,11,13 58:20,25 59:11 63:21
**discovery** 59:1
**discuss** 69:1 70:4 83:24
**discussed** 19:13 96:21
**discusses** 34:4 96:15,19 101:13
**discussing** 68:24 69:15,17 69:21 72:8 84:9 106:4
**discussion** 23:5 23:13 33:3,6 67:4
**discussions** 19:12
**disincentive** 101:9,11
**disincentivize** 102:23
**disincentivized** 100:24
**dispute** 90:24
**disquisition** 39:2
**disruption** 30:21
**dissolved** 27:1
**district** 1:1,1 5:2,3
**divided** 25:6
**division** 27:22 52:12 59:24
**divorce** 6:24

**document** 12:16 20:25 21:6
**documents** 11:2 21:18 34:1,3,6
**doing** 32:15 37:25 59:21 61:1,20 62:3 94:8
**don** 39:10
**donate** 14:3
**donated** 41:20 42:20
**double** 87:21 88:19
**doubt** 29:10
**doug** 13:4
**dozen** 45:23,24
**dr** 11:4 20:22 66:15 67:20 68:10 76:1 77:2 78:13,15 79:3,22 80:2,8 80:21 81:6,19 82:4,13,20,25 85:9 87:7,8 88:7 96:15,19 100:3 101:13 107:21,22 108:5,6
**draft** 66:22
**drafting** 50:12 50:20
**draw** 85:24
**dred** 29:19 74:24
**driving** 6:23
**druke** 26:19
**drunk** 6:23
**dues** 41:6,9 42:25
**duke** 39:18
**duly** 4:12 117:11
**duplicative** 84:10
**duty** 65:25

**e**

**e** 3:1 26:20 117:1,1 118:9 118:12 119:1 120:3,3,3
**earlier** 18:1 31:21 39:3 42:5 57:17 59:10 61:23 64:13 76:4 89:2 114:1
**earliest** 39:6
**early** 17:15,16 45:19 47:1 60:20
**easier** 61:6
**edge** 90:2 92:21
**edged** 17:9,12 87:21,22 88:19
**editor** 38:3
**effect** 9:5 17:7 91:22
**effects** 60:12
**efforts** 16:7,15 16:21
**eight** 90:10
**either** 15:23 53:16 55:2 65:14 98:17 108:11
**eliot** 1:2
**emphasis** 27:21 54:11
**enacted** 107:12
**enactment** 69:8
**encountered** 74:1
**endeavor** 38:15
**ended** 17:17
**enforcement** 27:22
**engagement** 20:6
**england** 91:3
**english** 30:20 47:1,4
**englishman** 112:10
**enormous** 106:20
**entire** 39:5
**entirely** 38:10
**entirety** 75:9
**entitled** 8:22
**episode** 49:2
**era** 33:4,6 34:1 54:22 55:9,13 55:14,17,25 65:18 88:8,10 88:13 112:25 113:2
**errata** 116:1 118:14,16 119:3,5
**esq** 2:3
**essentially** 25:7 25:9
**establishing** 110:22
**estimate** 8:19 8:24 31:19 44:14 45:25 62:2 71:19 75:16 90:5
**et** 3:2 4:25 118:4 120:1
**european** 54:17
**event** 14:10,17 92:1 117:20
**events** 14:6 15:15
**everybody** 60:3 88:1,20
**evidence** 92:3
**exact** 78:12
**exactly** 16:18 19:2
**examination** 1:12 3:6 4:15

116:3
**except** 112:3,19
**exclusively** 74:11
**excuse** 18:21
**exhibit** 3:9,10 3:12,12 12:4,5 14:9,14 35:20 43:9,12 48:23 49:4
**exhibits** 3:7 23:25 24:4,5,6
**exist** 106:10 107:22 108:6 111:3,7
**existed** 34:10 102:20
**expense** 60:6
**experience** 54:12 69:25
**expert** 5:23 6:3 11:3 20:2,6,14 20:21 21:8 24:3 55:11 56:8 98:22 107:3 108:24
**expertise** 19:21
**expires** 116:25
**explain** 17:5 65:10 66:19 67:23 69:14 72:3 97:1
**expressing** 97:6
**extent** 87:2 101:5 102:19
102:21 105:21 109:11

**f**

**f** 117:1
**face** 59:12 62:17
**faced** 92:8
**fact** 22:18 38:2 63:8 68:5 97:6 112:1
**factor** 93:19
**factual** 70:1
**fair** 29:7 35:8 38:21 48:19 61:13 90:11,15 93:2,14 112:21
**fairly** 55:20 60:8,17 90:8 91:2
**fairness** 104:15
**fall** 69:5
**fame** 35:24 36:8
**familiar** 57:7 74:4
**famous** 91:2,7
**fan** 18:2
**far** 28:1 106:4
**farther** 84:17 92:21
**favor** 17:1 36:19 37:10,15 37:16 38:20 39:23 63:4
**fbi** 72:23
**featured** 49:1
**february** 1:15 3:4 4:1 117:22 118:3
**federal** 29:23 119:1,8,9
**fee** 41:1 44:8
**feel** 9:3 10:7
**fees** 44:15,22 100:10 101:7
**field** 38:14 55:22
**fight** 105:6
**fighting** 87:12 87:21 88:3,10 88:12,17,25 109:7,8 110:25 112:4,23,24 113:2,9
**figure** 107:9
**figured** 107:8
**filed** 11:17 31:22,24 32:3
**filing** 29:9
**final** 39:19
**finally** 39:19 63:5
**financial** 117:20
**find** 26:10 28:25 57:16,18 60:3 63:25 64:1 66:1 75:11 92:1
95:20
**findings** 48:5
**firearm** 6:7,9 6:14 18:14 51:4 97:25 104:10
**firearms** 18:14 32:4,7 54:2 56:9 98:3,3
**firm** 18:20,24 19:10,22 23:20 26:21
**first** 4:12 12:3 12:20 19:6 26:14,17 28:6 37:19,20 41:10 41:20 45:16 54:4 79:11 112:2
**firsthand** 15:8
**fish** 27:21
**fit** 113:3
**five** 5:13 62:4 70:20 71:18 75:2 76:4,7
**florida** 101:14
**focus** 24:24 28:8 43:19 53:6 54:18 55:8 56:9 110:24 114:15
**focused** 25:11 32:23 54:16,17 55:12 58:6 88:7 107:4

**follow** 42:1 97:12
**following** 4:9
**follows** 4:14 118:8
**foregoing** 116:3,19 117:14
**forget** 40:8 92:8
**form** 73:1 116:2
**format** 30:19
**forward** 55:3
**fouled** 29:23
**found** 38:10 46:22 57:19 79:3 80:8,21 81:6,19 109:20
**foundation** 13:8 15:18 32:7 35:3,12 35:22 42:12 101:3 102:17 107:17
**foundation's** 37:16
**founded** 41:14
**four** 5:13
**fourteenth** 59:22 72:9 113:4,9
**framer** 33:3,6 34:1 54:22 55:9,12 112:25 113:2
**framework** 98:25
**framing** 55:5 59:19 109:10 111:18 113:4
**framings** 109:10
**frankly** 73:12
**frcp** 119:1
**freedom** 3:12 48:17,23 49:8 112:13
**frequency** 47:22 93:11
**frequently** 58:1
**friend** 13:11 62:20
**friends** 13:10
**full** 5:5 117:15
**fully** 7:8
**fun** 29:20
**functions** 62:12 114:18
**fund** 44:25 45:4 47:17,20 47:25
**fundraised** 43:2,5
**funny** 41:17
**further** 111:23
**future** 63:22

**g**

**gambler's** 89:5 89:12 92:19
**garrison** 1:3
**gateway** 2:4
**gather** 100:16
**gathering** 62:7
**gatling** 41:18 41:20
**general** 1:7 2:8 2:9 3:3 4:18,23 5:1 16:9 18:9 56:13 57:4 65:25 73:2 87:25 88:5 97:5 104:7 118:4 120:1
**generalists** 27:13
**generalized** 66:16 67:16 68:1
**generally** 17:7 18:3,8 56:6 57:7 73:19 94:2,24
**generations** 63:22 111:19
**gestures** 8:7
**getting** 30:22 46:17,23 91:24 107:15
**give** 10:8 27:2,3 39:1 48:2 81:12,15 87:4 89:15
**given** 16:17 26:6,7 35:13 71:9 117:10
**giving** 10:11
**glimpse** 73:16
**globe** 56:4
**go** 7:1,2 14:24 38:9 48:8 57:18 58:3 59:18 69:5 75:17 79:16 100:8 104:22 106:9,11,18 111:23 113:13
**goes** 60:5
**going** 6:21 12:1 14:8 17:14 20:16 24:14 27:24 30:25 31:5,8,9 32:25 34:11 35:20 43:8 55:3 56:15 57:18 60:7,21 66:6 83:16 87:6 97:12 99:22 101:9 105:7 106:10 109:7 113:17
**good** 4:17 14:18 17:18 31:10 50:1,4,6 51:25 55:20 60:17 84:24

85:1 92:4 108:15 112:23 113:7
**google** 58:3,4
**gotten** 45:1
**gottlieb** 15:10
**governing** 20:6
**government** 25:2 29:21 76:13
**governments** 103:2 104:11 105:25
**grab** 89:24
**grabbing** 89:23 92:25
**grade** 40:7
**graduate** 24:17
**graduated** 24:22
**grant** 46:1,10 48:4,8
**grants** 45:1,7 45:11,17,21 46:6 47:10 48:3,13
**grasping** 63:18
**great** 25:19 29:19 38:13 44:3
**greater** 87:20
**greece** 17:17
**grip** 90:3
**grounds** 36:18 37:9,14 38:19
**group** 2:4
**growing** 76:21
**guard** 38:7 92:22
**guess** 8:1,20 44:20,21 76:7 113:5
**guests** 3:12 48:24
**gun** 3:12 14:13 15:19 16:5 18:3 35:5,6,9 41:20 48:17,23 49:8 101:7 103:10
**guns** 100:11,11
**guy** 27:2,4 92:7 107:9
**guy's** 62:23 89:16

**h**

**h** 120:3
**hair** 89:7
**halbrook** 39:7 55:21
**half** 81:2 82:9
**hall** 35:24 36:8
**ham** 1:3
**hand** 17:8 43:23 60:6 71:9 85:3,20 89:16 92:23 117:21
**handgun** 98:23
**handguns** 98:12,14
**handle** 89:14
**handled** 118:8
**handling** 28:22 28:25
**happen** 5:22
**happened** 31:2 69:23
**happening** 83:20
**happens** 31:4
**hard** 57:19 59:15 60:22 66:12 67:12 73:1 85:24
**hardcopy** 66:22
**hardy** 1:13 3:5 3:13 4:3,11 5:7 14:16 15:11 18:11 20:21 27:14 31:13 35:23 36:7,15 36:21 42:5 43:10,20 44:5 48:25 49:6 52:15 66:5 67:7 81:11 87:6 88:24 89:10 111:14 112:22 113:13 113:22 114:21 115:3 116:18 116:22 118:5
120:2
**head** 31:18
**heading** 61:2
**headings** 69:6
**hear** 11:22 15:7 22:25
**heard** 15:9 44:20
**hearing** 47:22
**hearsay** 62:25
**heart** 23:15
**held** 14:10 23:6 67:5 97:19,24
**hell** 106:10
**heller** 29:3 39:3 96:22 98:19
**helpful** 66:11 81:10
**high** 24:17 47:22 93:10
**highlighted** 15:6 36:12
**highly** 66:16 67:16
**hilt** 89:15
**historian** 32:12 62:16
**historian's** 65:8
**historians** 62:6 63:13 64:3,16 64:21 65:1,17 71:23
**historical** 19:24 25:17 26:5 30:20 32:12

[historical - interesting]

50:22 51:3,13 52:24 53:11 54:2 56:1,7 57:13 58:5 59:13 60:11 61:9,20 62:3 65:13 71:21 74:7,21 92:7 92:11,13 94:17 97:15 98:23 108:25

**historically** 94:14

**history** 25:7,20 26:2 32:15,24 33:1,4,7 52:20 53:23 55:25 56:5 59:1,6 62:7 63:14,17 63:20 64:3,7 64:14,25 65:7 65:18,23 87:24 88:6,8 96:23 96:24 97:2,4,9 99:7,9,18 114:6,9,15

**hit** 91:16

**hold** 100:16

**honored** 36:16

**hopefully** 66:2

**horrible** 47:4

**hour** 20:13

**hour's** 39:1

**hours** 10:15 28:10 31:13,20 62:4 68:18

**huh** 7:11 8:6,10 16:17 31:23 49:3 54:4 55:15 64:5,15 66:8 67:19 113:25 114:16

**human** 49:11 49:14 69:24 88:6

**hundred** 68:14

**hundreds** 46:3

**hypertechnical** 46:17

**hyphen** 26:19

**hypothetical** 102:17 103:13

**i**

**idaho** 117:6

**idea** 39:12

**ideas** 47:1

**identified** 12:5 14:14 43:12 49:4

**identify** 109:1

**identifying** 25:24

**image** 36:2 37:24

**impact** 57:5

**impartial** 66:2

**important** 7:17 71:22 72:7

**impose** 100:1,6

**inaccurate** 70:8 70:12,23 71:5 71:7

**inches** 22:9 90:9,10

**incident** 68:2 84:11 85:5

**incidents** 70:17

**inclined** 62:17

**include** 23:12 23:21,25 24:7 51:8 97:11 110:1,3

**included** 105:14 118:14 119:3

**includes** 15:1,6 15:9 22:18 23:9

**including** 52:11

**incomplete** 102:17 103:13

**increase** 84:16

**increased** 83:8 83:15

**indecipherable** 30:7 51:18 100:19 110:6

**independent** 21:13 50:21 82:2,8 108:10

**independently** 86:9,14

**indicate** 111:20

**indicated** 116:4

**indirectly** 112:19,20

**inducted** 35:23 36:7

**information** 19:16 21:5 60:18 70:2 85:16,23,25

**infringement** 75:6

**inherently** 66:18 67:17 68:20

**inhibit** 89:23 90:3 92:25

**inhibits** 92:23

**initial** 19:12

**injunctive** 3:10

**inside** 29:19

**instance** 1:18

**instances** 70:4 71:15

**instinctive** 114:17

**instructs** 9:16

**intellectual** 38:15

**intend** 7:12 48:9

**interest** 117:20

**interesting** 46:25 47:8 62:10 94:15 98:5

**interior** 27:15 28:3
**intermittent** 106:6
**international** 54:17
**internet** 21:16 22:11 34:10 57:16 58:2 59:14 66:17 67:17 68:20
**interpret** 64:3 64:7
**interpreting** 53:11 58:12,20 58:25 59:3
**interrupt** 8:13
**intimidating** 93:3,8,15,17
**introduce** 14:8 43:8
**introducing** 12:3 48:23
**invalid** 99:20
**investigate** 46:12,14
**investigators** 63:10
**invited** 42:10
**involve** 16:15 25:16 98:20,23
**involved** 12:20 40:11 42:2 97:8
**involves** 65:13
**involving** 69:18
**irrelevant** 68:23 69:13
**issue** 12:2 21:25 22:4 46:12 72:15 75:3 87:25 99:24 101:15 108:17 111:1
**issues** 46:13 71:4 75:1
**item** 99:13,14
**items** 99:12,16

**j**

**j** 1:24 4:4 117:2 117:24
**james** 63:2
**jane** 2:8 4:20
**jdillon** 118:2
**jefferson** 59:18 63:3
**jefferson's** 63:6
**jes** 1:6 3:3
**jim** 1:3 90:23 91:8
**job** 1:25 26:14 26:18 61:24 106:11 118:5
**john** 2:3 15:10 19:1 118:1
**join** 41:10 44:1
**joined** 4:20
**journal** 52:24 114:6
**journals** 52:17 52:20 53:3 114:3,9,12
**joyce** 39:7
**judge** 83:18 84:4 85:22
**judging** 84:15
**judicial** 16:7,14
**jurisdictions** 95:24 111:8
**justice** 2:9 4:19

**k**

**k** 26:20
**kaagan** 1:3
**kates** 39:10
**katrina** 2:7 4:17
**keep** 36:23 37:12 71:14 109:21 111:21
**keeping** 19:23
**kept** 31:17
**kidding** 7:11 27:25
**kill** 29:22
**kimball** 89:18 89:18
**kind** 26:23 27:3 27:17 28:20,24 46:7,13
**knew** 49:11
**knife** 1:2 3:2,10 4:25 13:3,16 14:9 15:15,21 16:6,8,21 34:14,23 68:8 77:9,22 78:2,7 78:16,21 85:12 85:16,18 86:2 86:15 87:14,21 88:25,25 89:6 89:9,11 90:6 91:6,18,20 92:10,14,16 93:3,15,22 94:5,12,18 96:8 98:17 113:8 118:4 120:1
**knifesmith** 91:1
**knives** 13:19,23 51:18,23 56:18 57:3 77:25 78:4,10 87:13 87:18 88:3,10 88:10,12,17,23 90:12,16,20 92:4 96:20 98:14 109:7,8 110:25 112:23 112:24 113:2 113:10
**know** 5:22 7:4 7:14,21 8:21 9:23 12:22 13:4,6,17,23,23 16:11 17:8 18:10 19:17 27:2,6 28:16 31:8,9 34:21

35:14 37:3 38:8,13 39:21 47:16,16,18 48:1 50:3,18 55:2,6,13 57:20 58:10 59:14 60:22 61:23,24 62:22 63:2,9,23 65:14,21 68:24 69:17,22 72:5 72:6,19 73:11 73:23,24,24 74:16 76:9,15 77:14 78:12 83:12,21 84:5 84:10 85:6,20 87:1,9 89:13 90:2 93:25 97:12,13 104:18 105:4 113:3 114:17 114:19
**knowing** 105:6
**knowledge** 8:2 94:11
**known** 40:4 113:10

**l**

**l.p.** 1:4
**lacks** 15:17 42:12 101:2 102:16 107:17
**land** 38:17
**large** 57:3 91:2
**largely** 28:10 69:13 82:12
**larger** 79:9,21 79:23
**largest** 76:16
**late** 89:18
**lately** 59:21
**law** 2:4 3:12 5:10 18:19,23 19:10,22 22:7 26:12,15,17,21 27:10,22 28:1 28:21 32:24 33:1 37:20 38:3,17 39:9 39:11,13 43:9 52:16,17 53:3 53:5,7,12 54:4 60:25 62:21 69:9 95:3,7 99:6,12 106:22 107:12 114:2,8 114:16,17
**laws** 18:4,6 19:18 43:21 50:22 51:4,8 51:13 52:5 54:2 56:1,2,3 57:13,15 58:7 58:20 59:3,11 59:13 60:11,16 60:21 61:9 84:13 94:24 98:11,13,23 99:24 100:1 102:25 103:9 103:25 105:10 106:10,12,16 107:21 108:5 108:11,15,16 108:25 109:2 109:12 111:1,3
**lawsuit** 4:23
**lawyer** 9:14 62:18 114:13
**lawyer's** 65:7
**lawyers** 62:6 63:13 64:2,16 65:1
**lead** 32:9
**leader** 13:4
**leaders** 15:8
**learning** 36:15
**leave** 109:22
**left** 43:23 75:24
**legal** 27:19 28:8 29:14 32:18,18 33:16 35:14,23 36:7 39:25 40:1 53:6,15,19,21 53:23,25 64:25 65:7,13,14 99:23 101:3 108:16 109:4 114:12 118:7
**legally** 112:7
**legislation** 16:8 16:16,21 68:24 69:2,2,15 105:17
**legislative** 16:7 16:15 68:7 71:3
**legislator** 69:19 69:20 71:10
**legislators** 69:25 70:3
**length** 22:9 90:6
**lethal** 104:20 104:22
**letter** 60:7
**letters** 60:5
**letting** 50:17
**level** 53:20 76:14
**levels** 29:4
**levinson** 39:17
**libraries** 22:12
**library** 52:11 57:20 59:24 60:25 61:2
**licensing** 100:10
**life** 27:20 34:8 40:6,8,14,16,18 41:3,7,8,12 52:2
**lifetime** 21:7 103:20
**lightweight** 17:22

**likely** 74:21 85:10,12 86:1 86:23 87:1,2 88:19 101:19
**limit** 6:25
**limitation** 110:13,19
**limitations** 75:22 76:2 103:15
**limited** 11:3 95:10 109:25
**limiting** 109:6
**limits** 109:19
**line** 118:15 119:4 120:4,7 120:10,13,16 120:19
**lines** 69:20
**link** 44:9 88:16
**list** 34:25 56:15
**listed** 32:9 97:18 113:12
**listened** 27:23
**listening** 30:1
**literally** 89:7
**litigation** 16:12
**little** 36:25 59:25 92:23 99:23
**lived** 27:23
**livenote** 4:6
**lizard** 27:24
**ln** 116:6
**loathed** 84:12
**local** 73:20 74:20,25 75:14
**locked** 118:12 119:1
**long** 12:24 34:9 68:16 75:9,12 90:8 92:20 106:9
**look** 62:22
**looking** 21:11 49:25 57:15 59:9,23 60:2 66:23 87:4
**looks** 90:8
**loss** 47:22 93:11
**lot** 29:8,10,11 34:24 52:6,9 52:13,16 53:12 53:15 57:16 61:8,20 67:25 75:7 114:2,8
**lott** 15:11
**louder** 23:1
**low** 50:14 70:21
**luck** 49:12
**lucky** 57:17
**ludicrous** 38:16

**m**

**ma'am** 86:12
**machines** 60:1
**madam** 86:10
**made** 17:19 44:15 89:14,17 90:25 97:2 116:2
**madison** 63:3
**magazine** 40:23,24 44:4
**main** 21:10 61:24 108:14
**maintain** 41:2
**major** 25:1 39:4
**majority** 28:14 29:11 68:6
**make** 9:5,8,15 9:19 15:8 41:25 64:6 83:14 92:16,20 96:22 97:7 118:14 119:3
**makes** 114:20
**making** 7:19 63:21
**malcom** 39:7
**manner** 66:3
**manufacturer** 100:11
**manuscript** 59:23
**mark** 15:11
**marketing** 95:11
**matches** 41:21
**materials** 30:18
**mathematically** 81:3
**matt** 15:10
**matter** 18:10 21:17 26:8 27:5,9 28:11 28:22 34:5 59:8 105:13 117:19
**matters** 8:1 68:7
**mcdonald** 29:3 39:3 96:22 97:13 98:19
**mean** 14:21 18:7,11 19:3 24:2 31:16 32:22 34:1,3 38:15 39:22 49:11 51:1,17 51:22,25 53:20 57:15 59:4,4,8 60:23 63:21,25 65:10,24 66:19 67:23 72:23 73:11 83:16 84:5 85:19 88:10 92:6 97:1,15 100:6 101:5 103:17 112:1,1,10
**means** 92:20 97:19 110:15
**medical** 10:10

**medications** 10:14
**medieval** 47:1 55:3
**meeting** 27:6 33:9 41:23 42:14
**meetings** 13:7 40:12 41:17 42:6,18
**member** 13:25 40:7,13,14,16 40:18 41:3,7,8 41:12,19 42:7 42:15
**members** 41:23
**membership** 40:21,23 41:1 44:2,3
**memory** 76:6
**mentioned** 6:20 21:22 32:11 39:25 105:3 114:1
**mentioning** 111:16
**mercedes** 15:10
**met** 13:7
**method** 57:13
**michael** 30:3
**michigan** 39:11 39:15
**microfilm** 74:13,15,17
**microphone** 23:2
**mid** 106:23
**militia** 38:8 51:9 110:15,17
**miller** 1:3 98:5
**millions** 76:24
**mind** 5:20
**minor** 25:2
**minority** 95:24
**minute** 50:8 113:13
**minutes** 41:16
**misdemeanors** 27:9
**missed** 108:11 113:14
**mission** 13:21 35:17
**misstates** 70:9 94:21 99:1 104:3
**mob** 91:25 92:1
**mobbed** 91:15 92:9
**model** 89:11
**modern** 17:19 47:2 72:23 73:3,13
**moment** 28:9 69:10 87:4
**monarchs** 46:20
**money** 42:20 44:15 46:1
**monna** 1:24 4:4 117:2,24
**month** 76:24
**moore** 30:3
**morning** 4:17 4:20
**motions** 27:5
**moved** 28:3
**muster** 98:16 99:6
**muted** 30:24

**n**

**n** 3:1
**name** 4:17 5:5 15:1,6 32:6 92:8
**named** 90:23
**names** 39:13,16
**nation's** 15:8
**national** 3:10 14:11 38:7 40:4 41:21 74:22 98:3
**nationally** 16:8 16:22
**nature** 38:14 46:9 51:10,24 92:14,16
**nearer** 47:3
**necessarily** 71:12
**necessary** 83:7 118:14 119:3
**need** 9:10,22 16:24 23:1 83:1 108:25 111:10
**neutral** 17:2,4
**never** 14:4 15:20 27:23 43:2,4
**new** 23:1 27:2,4 76:24 85:12
**news** 66:17 67:17 68:9 75:21,23
**newspaper** 68:20 74:10,25 75:7,8,14 76:16,19 83:1 84:4 85:11 86:22
**newspaper.co...** 72:16
**newspaperar...** 76:12
**newspapers** 70:16,23 71:15 71:22 72:10 73:15,20 74:7 74:21,22 75:10 75:12 83:7,19 83:23 84:6,12
**newspapers.c...** 67:21 76:10,12 76:15,21 77:3 77:6 79:2 80:7 82:3,12
**nice** 40:24 75:4

**nickeson** 1:24 4:4 58:15 117:2,24
**nicknames** 56:23
**nobody's** 44:12
**nonfunctional** 18:10
**nonprofit** 45:5
**nonverbal** 8:7
**normal** 47:6
**north** 1:3
**northumberla...** 46:19
**notary** 116:25
**notating** 118:15 119:4
**note** 116:3
**notes** 9:5 50:1 79:19 87:5
**noticed** 62:14
**noting** 116:20
**notion** 104:15
**november** 12:25
**nra** 40:5,6,14 41:10,13 42:7 42:21 44:1,6 44:23,24,25 45:4,22 47:13
**number** 3:8 5:3 14:18 40:17 48:19 73:25 78:24 79:7,9 79:17,23 82:1 82:6 83:19 84:4 85:11 86:22 118:15 119:4
**numbers** 80:25 81:14 91:2
**numerous** 68:4

**o**

**oath** 7:6
**oaths** 117:4
**objection** 15:17 19:15 32:20 33:18 37:1,17 42:11,23 50:23 51:6,14 52:7 53:8 55:18 56:10 58:8,22 60:13 61:11 62:8 63:15 64:8,19 65:2 65:19 70:9,25 71:24 72:17 73:7,21 75:19 82:16 83:10,25 84:22 86:5,17 86:24 89:21 90:21 93:4,9 93:23 94:6,20 95:4,16 96:3 99:1 101:1,21 102:16 103:4 103:11 104:3 104:12 105:19 106:1 107:5,16 107:23 108:7 108:19 109:3 111:5
**objections** 9:15 53:17
**obligation** 65:22
**obscenity** 112:4
**obscure** 52:23
**observe** 62:24 62:25
**obtained** 82:23 82:25
**obviously** 39:2 45:2 54:11 72:20
**occasionally** 26:9 27:7
**occupational** 100:2,13,18,23 101:15 102:14 103:9
**occurring** 72:6 117:16
**odd** 28:17
**offense** 87:15
**office** 118:11
**oh** 5:13,20 8:4 8:16 9:20 10:21 11:22 12:9 16:3 22:23 27:16 33:8 35:10 36:3 42:24 43:7,15 47:12 49:18 51:5,11 56:19 57:2,9 63:23 66:12 72:1 73:18 74:9 78:25 80:5,19 89:4 107:2
**okay** 7:1 8:21 22:23 31:5,21 37:24 50:15,16 63:23 67:1 75:9 81:17 88:11 111:19 111:22 113:11 113:15
**old** 41:16
**once** 9:1 62:20
**ones** 6:4 30:4 35:6 57:25 60:4
**ongoing** 35:14
**online** 44:2 57:22 60:19 74:8 76:16
**onward** 54:11 54:13
**open** 102:7
**openly** 103:22 105:8
**opine** 19:22
**opinion** 16:20 16:25 22:15 68:19 83:4,6 85:14 88:21 93:21 94:1,17 98:22 107:3

108:24
**opponent** 89:23 92:25
**opportunities** 62:23
**opportunity** 9:2,9 15:7
**oppose** 17:2,3
**opposed** 18:17 34:4 60:11 69:22 87:8
**oral** 1:12 116:3
**order** 41:1 82:24 109:1
**oregon** 117:5
**org** 106:17
**organization** 13:3,16 14:1,3 41:24 45:11
**organizational** 13:21 35:17
**organizations** 32:5 34:19,25 35:1,9
**organized** 106:17
**original** 30:18 32:25 33:9,22 33:25 34:2,3 53:10 79:23 90:25 118:10 118:20,22
**originally** 41:15
**origins** 30:1
**ought** 97:21
**outset** 61:5
**outside** 55:6
**overlap** 62:12 87:10
**overturn** 16:7 16:21
**overturned** 16:24 18:5
**overturning** 16:16
**own** 6:24 13:18 21:10 23:21,23 26:10 47:25 48:2 75:17 79:1,24 80:6 88:20 89:3 94:12 103:17
**owners** 35:5
**ownership** 94:12 102:23 103:16
**owning** 103:21

**p**

**p.m.** 115:3
**page** 3:5,8 21:3 35:21 36:6 43:14 48:24 81:16 118:15 119:4 120:4,7 120:10,13,16 120:19
**pages** 22:14 76:24 118:14
118:17,17 119:3,6,6
**paid** 16:1,4 30:3 41:3,5 44:23 49:21,23 100:10
**paper** 48:5
**papers** 30:20 46:8 47:11 59:17 60:2
**paperwork** 59:20
**paragraph** 66:9,14,23 67:9 81:13,15 81:16 82:19 85:8 96:18
**pardon** 22:21 43:4 74:14
**part** 14:11,25 40:21 44:18 91:23 93:17 95:19 98:16,17 99:19
**participants** 1:17
**particular** 19:24 49:19 56:17 65:22 110:5
**particularly** 92:17 105:17
**parties** 32:9 34:12,15
**partnership** 27:1
**party** 5:9 32:9 117:18
**pass** 63:1 96:24 97:3,9,19 98:15 99:6 113:8
**passed** 106:22
**passes** 97:17
**past** 11:8 19:1 19:3
**pay** 41:1,9 61:24
**pdf** 118:12 119:1
**peak** 89:6
**peculiar** 65:24
**peer** 52:20,24
**penal** 21:25 22:4
**penalty** 7:7 21:3 116:18 118:16 119:5
**pending** 9:25
**people** 39:24 44:9 72:11 75:5
**percent** 54:19 54:19,21,23 80:4,18 81:2 81:25 82:4,9
**percentage** 54:16,21

**perception** 94:5
**period** 48:13 55:3,7 56:6 59:20 60:16 73:3 75:2 83:15 84:9 85:6 88:3,15 89:5 105:2 106:7 110:4 118:18 119:7
**periods** 54:9 83:9
**perjury** 7:7 21:3 116:19 118:17 119:6
**permits** 22:8 103:19
**permitting** 18:8
**person** 60:3 104:16,21,21 105:5,6
**personal** 8:2 43:10,17 60:12
**personally** 62:25
**persuade** 97:20
**persuasive** 25:8
**pg** 116:6
**phoenix** 28:6
**phone** 11:1 12:23
**photocopy** 60:1
**pick** 93:11
**picked** 78:20
**picture** 73:2
**piece** 52:21
**pieces** 69:1
**pioneer** 35:23 36:7
**pistol** 92:2 96:23 97:2,7 98:16,23
**pistols** 51:23 91:14 96:21 97:11 98:11 105:14
**pitman** 98:7
**pivot** 99:22
**place** 4:10 73:10,11 117:10,17
**plaintiff's** 20:15 24:11
**plaintiffs** 1:5 2:2 11:18
**please** 5:5 7:14 8:8 9:22 15:5 113:19 116:3
**plowing** 59:18
**plural** 77:19
**pocket** 51:23
**podcast** 49:24
**podcasts** 49:16
**point** 9:21 38:15,16 41:18 41:25 50:1 84:24 89:13,20 92:24 97:10 99:7
**points** 108:22
**police** 73:5
**policy** 14:13 15:20 16:5 32:4,7
**political** 41:24 71:3
**pop** 33:13
**popular** 72:8 91:11,13
**portion** 15:6 36:13
**possess** 13:23
**possession** 95:10,22 96:11 96:13 103:10 109:8 111:9
**possibly** 72:6 79:11
**post** 55:13,17
**practice** 27:10 28:4,8,14 41:15
**practicing** 5:10 28:1 61:19
**preceded** 56:4
**precedent** 23:16 97:16
**precise** 56:22
**precisely** 36:25 37:5 83:13
**prefer** 114:11
**preferably** 109:7
**preparation** 11:6,10 12:11 21:13
**prepare** 10:19 10:22
**preparing** 11:21,25 21:6 21:24 22:3 31:14 32:14 90:12
**present** 55:4 100:7 101:6
**presentation** 16:1
**presented** 107:21 108:5
**presently** 40:10
**preserved** 74:22
**preserving** 63:14,17,20
**press** 112:13
**presume** 41:6
**pretty** 17:18 41:17 42:3 48:10 55:4 64:10 106:5 112:8,9
**prevent** 10:11
**previous** 23:8
**primarily** 52:4 58:6 94:12

**primary** 52:4 52:10 53:6 54:9 55:8 56:9 57:13 64:17 65:17 95:14 103:2 104:10 104:14 105:24
**print** 60:18 74:11
**prior** 50:12,20 72:22 90:16 91:14 113:23
**private** 28:3,8 28:13
**privilege** 40:11
**privileged** 19:16
**prize** 41:20
**pro** 35:9
**probabilities** 85:21
**probably** 5:13 14:20,24 17:20 18:25 21:9,15 26:16 29:16 45:23 46:5 54:23 58:24 62:4 65:9 68:22 73:10 75:21,23 77:10 84:25 95:11 98:15,17
**problem** 67:25 99:17
**problems** 25:10 82:20
**procedure** 118:19,21
**procedures** 7:23 9:12
**proceedings** 4:10 117:9,13 117:16
**process** 39:21 59:1
**produced** 91:3
**professional** 4:5
**professor** 11:4 62:21 72:15 82:22
**program** 44:18
**programs** 48:20
**project** 46:11
**promote** 35:18
**proof** 71:4,8
**proper** 44:24
**proportion** 84:7
**proposals** 69:7
**proposed** 38:3
**proposition** 73:2
**prosecution** 6:23
**protect** 13:22 112:3
**protected** 110:17 112:7
**protection** 89:16
**protects** 92:23
**prove** 97:16
**provide** 8:8 10:4 73:16 108:15
**provided** 118:19 119:8
**provision** 109:14
**public** 33:9 93:21 94:1,4 94:17 116:25
**publications** 52:16
**publish** 48:5,5
**published** 39:10 47:14 48:11 52:19 59:17 113:24 114:2,5
**publishing** 39:8
**pull** 35:20
**pulled** 81:10
**purchase** 6:7
**purpose** 87:16
**purposes** 88:9 113:9
**push** 110:21
**pushing** 84:16
**put** 20:16 46:7 90:6
**putting** 58:12 59:5 65:12
**puzzling** 44:11
**pwgg** 1:4

**q**

**qualifications** 24:16
**quarter** 55:1
**quarters** 54:24
**question** 7:14 7:16,18,21 8:18,22 9:17 9:18,25 23:8 24:4 38:11 62:11 64:11 65:4 111:9,16
**questions** 7:9 7:13 8:9,20 10:17 24:15 34:12 66:7 87:7 112:15 113:12,14,23 114:22,24,25
**quite** 57:24 61:4,5 72:21 83:3 91:18 97:21 107:2
**quote** 36:16 37:7 66:16,18 82:21,23 85:10 85:13 96:19,25

**r**

**r** 26:20 117:1 120:3,3

**r&s** 119:1,9
**radio** 3:12 30:1 48:17,20 49:9 49:14,16,23
**radio's** 48:24
**rally** 3:11 14:13
**rare** 52:12
**rate** 20:12
**rather** 33:1 63:1 68:7,24
**ratified** 111:21 112:6
**ratifying** 112:13
**reach** 111:25
**reached** 113:11
**reaction** 38:6
**read** 14:25 15:5 36:12 39:15 43:24 66:24 92:12 116:6,19
**reading** 26:7 39:14,14 72:11 100:3 118:24 119:9
**reads** 116:6
**real** 63:8
**realize** 54:15
**realizing** 104:21
**really** 17:10 38:1 48:1 50:14 54:10,12 61:15 63:4 72:24 84:3 85:17,22,24 91:9,12
**realm** 69:24
**realtime** 4:5
**reason** 7:18 10:7 31:2 104:14 110:20 114:11 116:6 120:6,9,12,15 120:18,21
**reasonable** 82:10
**reasoning** 111:18 112:5
**reasons** 104:11
**rebuttal** 20:14 20:20 31:15
**rebutting** 20:21
**recall** 5:15 6:15 14:16 15:14,22 15:25 19:2,5 19:19 21:12 22:10 25:21 29:5 31:16 32:2,6 34:18 35:7 36:6 45:10,16,21 49:6,20 68:11 68:16 70:15,19 77:9,17 78:14 79:17,20,25 80:16,25 94:8 96:5,10,13
**recalling** 49:12
**receipt** 95:22
**receive** 36:10 40:20 44:8
**received** 45:7 45:10,17,22 46:1 48:12 79:18
**receiving** 91:25
**recent** 6:4,12 23:16 29:18
**recess** 31:11 50:10 113:20
**recognizes** 76:2 76:3
**recognizing** 75:22
**recollect** 21:11 30:5 77:11 79:6
**recollection** 8:23 19:8 49:10 68:6
**reconstruction** 55:17,25 88:8
**record** 5:6 7:20 8:6,12 11:16 19:25 23:4,5 56:5 67:4 92:7 117:15
**recorded** 117:13
**records** 47:4 73:6
**recount** 66:2
**recounted** 75:13
**recounting** 72:5
**redundant** 85:4
**refer** 86:3
**reference** 67:20 70:4
**referenced** 70:17 118:6
**references** 38:23,24 68:4 68:6
**referral** 44:8 44:15,22
**referring** 36:20 37:11 38:20
**reflect** 72:10 87:24
**regard** 46:10 47:6 55:4 71:5 83:20
**regarding** 4:24
**registered** 4:5
**regular** 44:3
**regulate** 69:7
**regulated** 96:2 103:2 104:11 105:25
**regulates** 99:12
**regulating** 18:16 102:25
**regulation** 6:10 6:14 17:6 18:3

69:3 96:23 97:3 98:24 105:22
**regulations** 19:25 97:8 99:14 104:10 106:5 110:24 112:22
**reilley** 2:8 4:21 86:10
**relate** 96:10
**related** 45:3 54:2 94:12 96:13 113:23 117:18
**relation** 84:25
**relationship** 13:2 35:11,15 40:3 48:16,21
**released** 47:13 118:22
**relevance** 72:13
**relevant** 83:9 109:9
**reliable** 70:1 72:25 83:17
**relief** 3:10
**rely** 57:22
**remember** 12:23 36:5 40:18 68:13,15
**remembered** 4:1
**remind** 8:5
**remote** 1:12 4:2
**remotely** 1:17
**renew** 44:1
**renewed** 106:23
**rent** 61:24
**repealed** 106:20,24 107:15
**repeat** 7:14 22:2 31:2
**rephrasing** 98:10
**replica** 89:5
**replicate** 66:17 67:16 77:2
**reply** 7:8
**report** 10:23 20:15,17,19,20 21:14,24 22:3 22:14,18 23:9 23:25 31:15 50:12,20 66:7 66:9,14 67:7 68:1,2 69:22 72:21 76:1 80:20 81:11 82:19 85:8 86:2 87:8,9 88:7 90:12,17 96:15,18 100:3 101:13 107:20 108:4,15
**reported** 1:24 84:8 85:12
**reporter** 4:5,6 4:6,7,8 8:6,11 15:2 22:24 23:3 30:8 50:13,16 51:19 58:16 67:2 80:10 86:10,12 89:10 100:20 101:24 110:8 113:17 117:3
**reporting** 85:5
**reports** 11:4 20:21 21:9,19 21:21,23 47:11 55:11 72:23 75:21,23 84:5 85:4 87:10 92:12,13
**represent** 4:22
**represented** 27:20 34:20
**representing** 27:8
**reprint** 75:8
**reproduced** 30:18
**request** 9:2,10 9:23 23:20 31:6
**requested** 15:2 30:8 51:19 67:2 80:10 100:20 101:24
110:8 116:2 119:1,9,10
**require** 46:6 48:4
**required** 7:25 9:17 25:15 118:20
**requirement** 8:3
**research** 21:10 21:13 22:11 25:17 26:10 29:20 33:23 34:6 35:18 38:9 45:8 46:7 47:19,24 50:21 51:1,12 52:3 52:13 54:15,16 54:22 55:9,16 55:24 56:1 57:14 58:6 61:21 62:3 71:23 74:23 77:1 79:1 80:6 81:18 82:3,5,8 82:13,21 85:10 94:4,16,17,23 104:9 106:9 107:4 108:10 108:12
**researched** 51:3 52:10 54:9 56:17 90:11,15

**researching** 25:23 54:1 57:12
**reserved** 115:4
**resource** 33:25 71:22
**responded** 55:12
**responses** 8:7,8
**responsibility** 7:20 65:17
**rest** 91:16 114:18
**restate** 77:12
**restricted** 95:15,19
**restriction** 111:19 112:17
**restrictions** 18:8 95:20 96:7 111:22,24
**result** 41:22 78:24 82:23,25
**resulted** 79:5 80:15,24 81:8 81:22 82:8
**results** 82:12 83:2
**retired** 28:9 61:23
**return** 118:17 119:6
**returning** 23:8
**review** 9:2,9 21:5,25 22:4 28:21 37:20 38:3 39:11 53:3,5 54:5 68:9 82:25 83:1 118:8,10 118:13 119:2
**reviewed** 10:23 10:23 11:2,6,7 11:17 12:11,18 21:8,19 52:20 52:24 70:16 82:22 83:24
**reviewing** 56:2 68:17 83:4,6
**reviews** 39:9,15 52:17 114:17 114:17
**revolvers** 91:10
**rewarding** 40:25
**rex** 89:17,18
**richard** 41:18
**rifle** 40:4 41:15 41:21
**right** 8:15 9:6 12:1 13:18 14:25 23:11 28:11 30:14 36:23 37:12 48:16 49:25 66:5 67:9,10 67:13 102:12 109:18,19,21 109:25 111:21 114:21
**rights** 1:2 3:2 3:10 4:25 13:3 13:16,22 14:10 14:13 15:15,20 15:21 16:5,6 34:14,23 44:25 45:4,11 47:17 47:20,25 63:5 118:4 120:1
**rise** 84:20
**risk** 91:24
**ritter** 13:5,6
**rivalry** 62:13
**rivas** 11:4 20:23 21:9 87:8 88:7 96:15,19 100:3 101:13 107:22 108:6
**road** 2:4
**rob** 1:7 3:3 4:23 5:1 118:4 120:1
**robert** 20:22
**robertson** 98:7
**rod** 35:6
**role** 11:20,22 11:25 29:9 64:17 65:1,8,8
**roles** 62:6 63:13,24
**roster** 15:9
**roughly** 55:5
**royal** 46:19
**rpr** 1:24 117:2 117:24
**rule** 18:9
**rules** 119:8
**run** 13:14 107:25
**runs** 49:14

**s**

**s** 120:3
**sacramento** 2:10
**sacred** 91:21
**safe** 5:11
**sale** 96:17 100:24 101:20
**sanford** 39:17
**saw** 30:19 36:9 37:24
**saying** 63:8 78:19 84:3
**says** 43:25 48:24 49:1 67:14 99:5
**schedule** 118:10
**schemes** 98:20
**schlapp** 15:10
**scholar** 29:14 33:16 58:3
**scholars** 40:1
**school** 24:17 26:12,15,17
**science** 25:9
**scope** 89:21 97:12

**scott** 29:19 74:24
**scottish** 113:6
**screen** 12:2,8 20:16 33:14 43:14 66:10
**scroll** 12:14
**sealed** 118:20
**search** 58:2 77:2,5,8,18,21 78:2,4,6,9,13 78:17,18,19,23 79:4,15,18 80:9,14,23 81:7,21 82:11 82:23,25 83:2
**searched** 77:14 77:15 78:15
**searches** 78:23 79:13
**second** 3:11 13:8 14:8,12 28:11,19,24 29:8,12 30:2 30:12 33:10 34:25 35:2,12 35:19,22,24 36:8,22 37:15 38:5 39:8 43:21 49:16 65:18,23,24 72:9 79:7,15 79:18 100:17 109:15,20,25 110:18
**section** 38:4
**sections** 21:25 22:4
**see** 6:19,21 12:7 18:16 20:19 26:16 30:13 31:4 35:2 43:14 46:15 67:7,9 67:13 79:19 106:19 108:11 109:13 113:14
**seeding** 64:24 65:6
**seem** 70:19 79:6 80:16 114:15
**seemed** 104:15
**seems** 12:19 76:6
**seen** 41:16 44:11
**segments** 25:6
**self** 91:10 92:5 92:17
**semi** 28:9 61:23
**send** 31:6
**sense** 9:19 16:9 18:16 32:23 98:15 114:20
**sentence** 67:14
**separate** 22:19 23:10 45:2
**september** 14:11
**seriously** 38:1
**service** 27:21
**services** 20:3 42:21
**session** 106:12 106:16
**set** 117:21
**sets** 59:17
**seven** 29:18
**several** 13:7 17:21 34:22 39:4 92:9 105:1 106:24 110:4
**shape** 47:5
**share** 12:1 87:18
**sharp** 89:7
**sharpened** 90:2
**sharper** 92:20
**shave** 89:7
**sheet** 116:1
**sheffield** 91:3
**shifting** 36:19 37:10,15 38:19 39:23
**shifts** 39:4
**shipped** 91:4
**shooting** 1:3
**short** 30:15 50:2
**shorthand** 4:8
**shortly** 106:24
**shortwave** 30:1
**shot** 91:15 92:2
**show** 12:2
**shows** 49:17
**shrugs** 8:6
**sic** 34:1
**side** 25:13 28:1 38:11 43:23 110:21
**sign** 44:9 116:3 118:16 119:5
**signature** 21:3 115:4 117:23 118:22,24,24 119:9
**similar** 7:5 88:17
**simple** 27:5 58:2 91:19 112:9
**simply** 75:23 89:23
**single** 87:22 91:14 92:2 113:7
**singular** 49:14
**six** 25:14
**size** 93:18
**skeptical** 98:10 98:11,13,14
**slid** 89:17
**slightly** 79:8,9 79:21,23
**slungshots** 57:8
**small** 39:9,15 95:24 101:6

**sneaky** 105:4
**society** 73:16
**solutions** 118:7
**somebody** 60:6 69:20
**someone's** 60:11
**sorry** 5:9 11:22 18:22 33:13 47:21 77:12 83:5
**sort** 6:13 17:16 17:21 21:12 27:1,7 32:15 38:8 48:7 63:10 64:14 69:9 73:12 96:9 100:11 105:4
**sound** 50:4
**sounds** 31:10 50:6 82:6,10
**source** 71:10 72:4
**sources** 21:17 21:18,20 46:23 47:2 52:4,10 53:11 70:1 76:14 104:24
**southern** 1:1 5:2
**space** 29:13
**spare** 61:25
**speak** 11:9,13 23:1
**speakers** 91:20
**speaking** 14:10 14:16,20,22 15:14,22 25:10 88:4 97:5
**spearheads** 17:16
**special** 40:20 42:9 44:2
**specific** 18:14 46:11,13 68:2 68:8 70:4,16 70:17 71:15 73:16 99:24 101:14 105:12
**specifically** 9:16 66:7 85:18 101:16 110:11
**speculate** 7:25 85:17
**speculation** 8:20 37:18 42:13 64:20 65:20 84:23 86:6,25 93:5 93:24 101:2,23 102:18 103:12 105:20 107:6 107:17 109:4
**speech** 25:1,3,5 25:6,8,8,9,13 25:14,18 26:10 112:13
**speeches** 25:19 25:24 26:5
**spend** 25:22 31:14 58:19 61:20 62:3
**spent** 22:14 59:11 68:16
**spine** 89:25
**spitzer** 20:22 21:9 66:15 68:10 78:13,15 79:3 80:8,21 81:6,19 82:22 83:1 107:21 108:5
**spitzer's** 11:4 67:21 72:16 76:1 77:2 79:22 80:3 82:4,13,20 85:9 87:8
**spoke** 31:21 64:2,13
**spoken** 14:18
**spring** 78:6,9
**stabbing** 85:16
**stabbings** 85:13 86:3,16
**stage** 39:19
**standard** 58:4
**standards** 58:4
**standpoint** 69:16
**start** 23:18 54:1 72:24 84:8
**started** 7:3 24:22 25:21 39:16,20 50:3 54:6 91:12 101:7
**state** 5:5 37:8 60:20 66:15 72:14 85:9 96:19 98:18 103:17 109:12 109:12,13,17 109:18,24 110:12,18 118:9,12
**stated** 38:18 59:10 79:2 80:7,20 81:5 81:18 82:20 117:10,17
**statement** 66:20,22 67:24 83:14
**states** 1:1 27:21 96:6 98:4 106:7 110:1 117:5
**statistics** 83:18
**status** 40:8 41:2
**statute** 46:18 95:9 97:14,18 97:20,24,25 106:19

**statutes** 16:24 96:12 97:11 109:6 110:4
**steal** 75:7 84:12
**stenographic...** 117:13
**step** 40:7
**steve** 39:6 55:21
**stipulation** 118:21
**stopping** 50:1
**storage** 51:9
**stored** 74:11
**stories** 75:11 79:3,5 80:2,3 80:13,15,22,24 81:6,8,20,22 83:23 85:11,12 86:22
**story** 29:19
**strange** 37:25
**street** 2:10
**strong** 68:22 69:11
**struck** 99:13
**stuck** 60:24
**student** 26:6
**studies** 24:25 25:11,16,22 26:4 72:22 80:8
**study** 21:8
**stuff** 27:2,3,7 47:6
**style** 17:20
**subject** 38:2 53:13 59:6 105:10
**submission** 90:16
**submit** 114:8 114:12
**submitted** 20:14 29:1,4 114:5
**subscribed** 116:23
**substance** 116:2
**substances** 10:15
**substantial** 25:23 62:11 101:10 102:22
**suffering** 10:10
**sufficient** 97:16 99:9
**suggested** 18:4
**suggests** 112:20
**suitable** 110:17
**suite** 2:4
**suited** 92:17
**sullivan** 99:5
**summary** 29:22 30:15 48:25
**supervision** 117:14
**support** 20:15 83:7
**suppose** 16:19 32:18 65:16 109:5
**supreme** 97:20 98:1 99:13,18
**sure** 8:8,16 49:13,22 57:11 63:21 73:18 74:9,9 78:25 80:5 81:12 82:1 107:18 113:15
**surprised** 74:19 76:22
**surrounding** 93:21
**surrounds** 64:14
**surveying** 25:19
**survived** 73:10 75:2
**suspect** 23:11 73:9 74:1 102:12 107:7
**suspicious** 97:14,22
**switch** 76:18
**switchblade** 16:16 19:18 68:3 70:5,17 71:16 75:16 77:9,15,21,24 78:16,20,21 83:8,14 84:21 85:18 86:3 108:16 109:1 111:1
**switchblades** 17:23 22:8 69:3,7 77:18 85:11 86:22
**swords** 17:21 57:4
**sworn** 4:12 7:6 116:23 117:8 117:11
**systems** 18:8

**t**

**t** 1:13 3:5,13 4:3,11 20:21 48:25 115:3 116:18,22 117:1,1 118:5 120:2,3,3
**take** 9:22,25 25:14 50:2,7 72:15 81:13 89:25 112:18
**taken** 1:18 4:3 5:8 10:14 31:11 50:10 84:17 113:20
**takes** 112:20
**talk** 10:25 53:19
**talking** 18:13 28:20 48:8 59:15 68:7 70:20 71:2

[talking - time]

88:2 105:2 106:6 109:11 112:2
**task** 83:3 106:21
**tasked** 75:15
**tax** 98:7,11,14 101:5,6,16,18 102:6
**taxation** 96:20 97:23,24 98:2 98:20 99:24
**taxed** 96:21
**taxes** 96:16 100:2,9,14,18 100:23 101:6 101:15 102:14 103:9
**taxing** 96:11
**technical** 46:23
**tell** 4:12 31:9 56:16 62:21 106:25
**tempted** 21:7
**ten** 39:12 50:8 62:4 70:21 71:18 76:5,7 90:9
**tend** 62:22 63:9 76:11 102:7 110:20
**tended** 102:22
**tendency** 87:20 102:15
**tends** 73:13
**term** 23:18 68:23 77:24 78:16,23 84:21 88:5
**terms** 53:19 77:8 78:13 97:5
**terribly** 40:24
**territory** 101:14
**test** 96:24 97:4 97:17,19
**testified** 4:14 6:17,20,24
**testify** 117:12
**testifying** 7:7
**testimony** 5:18 7:5 10:5,8,12 70:10 94:21 99:2 104:4 116:19,20 117:8,12,16
**tests** 63:1
**texas** 39:18
**text** 96:24 97:3 97:9 99:9,18
**thank** 15:13 50:17 58:17 66:5 113:16 114:21
**theo** 5:7
**theories** 53:6
**theory** 53:15,20 53:21,24,25
**therapy** 25:14
**thereabouts** 105:2
**thereon** 106:24
**thing** 17:16,21 18:10 21:17 26:8 27:6,9 28:12,23 34:5 38:8 40:25 49:23 59:8 63:10 69:9 72:20 73:12 75:4,24 87:19 89:7 96:9 99:16 100:12 105:13
**things** 17:18 21:11 28:20 37:25 40:17 46:25 47:11 49:17 51:9,24 58:13 61:2,6 62:17,22 66:1 87:24 112:7,12
**think** 5:11,25 6:24 10:24 11:1,5 12:13 14:7 16:4,23 17:6 19:6 23:23 24:1,9 25:14 26:17 33:20,22 35:18 36:9,17,18 37:9 41:11,12 42:25 44:10 45:13,13 48:21 49:22 52:25 56:12 57:4 59:16 61:14 62:11,16 63:9 64:11 65:9,12 66:21 69:13 72:13 76:2,3 77:15,20 81:3 84:15 87:19 89:22 90:1,9 91:1,11,23 93:1,16 98:7 103:14,20,24 106:3 108:18 111:2,8 112:9 113:6,8 114:7
**thinking** 39:5
**thinks** 69:21 88:1
**third** 52:22
**thomas** 59:17 63:3
**thought** 112:12
**thoughts** 100:17
**thousands** 46:4
**three** 38:13 45:24 54:24 59:16 75:1 97:7
**thumb** 89:17
**tied** 76:13
**time** 8:12 9:14 9:14,22 11:1

25:23 28:13 46:4 47:3,3 48:18,19 54:9 55:7 58:20 59:11,25 60:16 60:22 61:20 62:1,2 72:11 73:17 79:8,14 82:7 83:9 84:14 88:3 99:8 106:7,8 107:10 113:10 117:10,17 118:10,18,25 119:7
**timeframe** 14:19,21 109:9 109:9
**times** 5:14,23 22:19 23:10 92:9
**titled** 20:20 35:22 36:6
**today** 10:8,12 10:17 11:14 12:12,18 23:2 27:13 38:12 60:17 61:6 88:9 102:4,11 113:12 115:1
**today's** 10:19
**together** 5:19 77:23 78:1 103:9
**took** 4:10 30:18 39:22
**toothpick** 113:5
**toothpicks** 51:23 56:20 96:8 105:13
**top** 31:18
**topics** 6:2 46:7
**tort** 29:23
**total** 45:25
**totally** 38:14 69:16
**toward** 89:17
**track** 25:12 31:17 60:21 71:14
**tradition** 96:24 97:4,9 99:10 99:18
**transcribe** 60:6
**transcribed** 9:1 9:4 117:14
**transcript** 9:8 9:10 116:3,20 117:9,15,17 118:6,8,10,13 118:13,22 119:2,2
**transfer** 95:22 96:7
**transition** 24:14
**transitioning** 87:7
**treating** 25:10
**trend** 84:4
**trends** 59:9
**trial** 7:19 9:7
**trick** 7:12
**tried** 78:14
**trouble** 63:18
**true** 27:13 72:12 116:19 117:15
**trust** 71:12
**truth** 4:12,13 4:13 117:12
**truthful** 10:5
**truthfully** 7:9 10:17
**try** 8:12 13:22 31:3 66:1 79:11 86:14
**trying** 45:13 59:6,13 75:15 79:19 90:3
**tucson** 28:5,6 35:6 60:25
**turn** 66:6 104:20
**tutor** 46:20
**twice** 13:14
**two** 6:4 11:3 22:8,14 25:6 27:6 36:11 39:2 41:25 45:23 48:13 62:12 63:24 69:6 76:14 77:11,17,23 78:1,18,19 99:12,15 106:6 107:14
**type** 18:9 19:25 71:3 108:25
**types** 18:11 110:6,10

**u**

**u** 26:20
**u.s.** 5:2
**uh** 7:11 8:6,10 16:17 31:23 49:3 54:4 55:15 64:5,15 66:8 67:19 113:25 114:16
**ultimately** 24:7
**unaware** 71:7
**uncover** 61:9
**under** 7:6,7 21:3 44:16 69:6 84:13 98:24 110:18 116:18 117:14
**undercover** 27:24
**underestimated** 85:10
**underreported** 86:23
**undersigned** 117:3
**understand** 7:10,13,21,23

8:3 9:12 10:16 23:14 46:18 59:7
**understanding** 52:15 72:8 73:5 90:19 111:20
**understood** 7:17 10:2 112:6,11
**unfortunately** 75:1
**unfounded** 85:13
**uniform** 84:6 85:5 112:10
**united** 1:1 27:20 98:4
**units** 25:14
**universally** 112:17
**university** 24:20 26:13 60:25
**unknown** 106:7
**unmute** 30:25 31:6
**unmuting** 31:3
**unquote** 36:19
**unreliable** 66:18 67:18 68:21,22 69:11 71:6
**unusual** 18:15
**upheld** 97:25 98:4 110:11
**upwards** 54:7
**use** 47:25 51:9 57:24,25 68:8 68:25 69:17,18 76:11 77:8 88:6 102:15 110:16
**used** 7:19 30:19 77:10 78:12 109:17
**useful** 87:14 91:9 92:2
**using** 23:1 44:9 44:13 78:22
**usual** 42:7
**usually** 105:9
**utilize** 47:20
**uyehara** 2:7 3:6 4:16,18 12:6 14:15 15:4,24 19:20 20:18 22:24 23:7 30:10,24 31:5 31:10,12 33:2 33:24 37:6,22 42:16 43:1,13 49:5,25 50:7 50:11,15,17,19 51:2,7,16,21 52:14 53:14,22 55:23 56:14 58:15,17,18 59:2 61:7,18 63:11,19 64:12 64:23 65:5 66:4 67:6 70:14 71:13 72:2 73:4,14 74:5 75:25 80:12 82:18 83:22 84:19 85:7 86:8,13 86:20 87:3 90:4 91:5 93:7 93:13 94:3,10 94:22 95:12,25 96:14 99:21 100:22 101:12 102:2,24 103:7 103:23 104:8 104:23 105:23 106:13 107:11 107:19 108:2,9 108:23 109:23 110:23 111:13 113:11,16,21 114:20

**v**

**v** 29:3 118:4 120:1
**vague** 32:21 33:18 37:1 50:23 51:14 52:7 53:9 55:18 56:10 58:8,22 60:13 61:11 62:8 63:15 64:8,19 65:19 71:24 72:17 73:7,21 75:20 82:16 83:11,25 84:23 86:6,17 90:21 93:23 94:6 95:4,16 96:3 99:2 103:4,11 104:12 105:20 106:1 107:6,16 107:23 108:19 109:3 111:5
**value** 62:18
**van** 39:18
**vanished** 75:13
**variety** 49:15
**various** 96:16
**vary** 73:10
**vendors** 101:17
**verbal** 8:8 20:8
**verify** 21:16 86:14
**veritext** 118:7,9 118:11,20
**versus** 4:25 29:3 54:17
**virtual** 3:11 14:12
**voice** 15:9
**vs** 1:6 3:2 98:4

**w**

**wa** 4:7
**waiting** 36:2
**waived** 118:24 118:24

**[waiving - wrote]**

**waiving** 118:21
**walters** 15:11
**want** 8:5 9:9 50:2 53:19 106:8 109:13 113:18
**wanted** 24:7 75:3
**wants** 71:11
**war** 55:14,17
**washington** 117:5
**way** 5:20 20:3 37:4 39:5 46:22 56:22 57:18 74:1 88:14 95:14 117:18
**ways** 96:1 103:2 105:24
**weapon** 17:9 18:17 91:9 93:15 94:24 95:8,11 96:17 96:17 97:17 100:2 102:15 104:19
**weaponry** 17:7
**weapons** 51:13 51:17,22 56:8 56:15,17 57:6 95:3,7,14 100:24 101:17 101:20 102:8 103:1,3 104:1 104:11 105:9 105:18,25 110:5,7,11
**web** 35:21 36:6 48:24
**website** 14:10 35:22,25 43:10 43:17 44:6,13 47:14,17 82:14
**week** 28:10
**weekly** 62:3
**weird** 27:23 37:24
**weirdest** 27:19
**went** 30:17
**whereof** 117:21
**widespread** 111:10,17,24
**wildlife** 27:21
**william** 39:18
**wilson** 26:19,19
**wind** 61:1 99:11
**witness** 3:5 5:23 6:22 15:19 19:17 21:8 32:22 33:20 37:3,19 42:14,24 50:5 50:25 52:9 53:10,18 55:20 56:12 58:10,24 60:15 61:13 62:10 63:17 64:10,21 65:3 65:21 70:11 71:2 72:1,19 73:9,23 75:21 83:12 84:2,24 86:11,19 87:1 89:22 90:23 93:6,10,25 94:8 95:6,18 96:5 99:4 101:4,22 102:1 102:19 103:6 103:14 104:5 104:14 105:21 106:3 107:7,18 107:25 108:8 108:21 109:5 110:10 111:7 113:15 117:11 117:21 118:13 118:16 119:2,5 120:24
**witnesses** 24:3
**won** 63:5
**wonderful** 113:16
**word** 22:19,21 23:9 31:1 68:3 69:11 81:13 93:12
**words** 77:23 78:1,19,19 109:16 112:4
**work** 20:10 26:23 27:17,19 28:2,15,20 29:8,12,15 35:4 47:25 48:2 49:1 53:1 55:22 61:5,8 61:16 113:24 114:2,12
**worked** 18:19 18:23 19:9 27:14 34:13,24 35:1
**working** 4:21 28:10 31:14 32:12
**world** 76:17 114:18
**worries** 11:24 47:23
**worry** 75:6
**worth** 30:4
**write** 20:25 29:20 48:9
**writing** 24:11 28:21 38:5 39:8 61:25
**writings** 98:5
**written** 20:5 29:17 30:6,11 37:20 38:2 60:2
**wrote** 33:16 47:11 60:3 63:3

KR1667

**x**

**x** 3:1 119:1

**y**

**yeah** 5:13 8:4 14:23 19:11 23:18 27:5 29:10,16 36:5 40:24 41:8 44:24 45:9 46:24 47:9,12 49:13 51:11 53:4 55:10 56:3,21,25 57:2,9 58:14 61:4 63:23 66:12 71:2 73:24 74:2,12 74:16 81:12 82:15 84:25 85:19 104:6 106:5,16 111:12 114:7
**year** 13:14 24:21 26:25 36:11 44:12,21 45:14,19 101:8 106:18,18,19
**year's** 15:9
**years** 5:11,21 6:1,5,22 28:17 34:8 35:3,4 41:22 44:17 46:2 50:25 52:1 54:3,6,7 75:2 106:24
**yep** 5:10 9:13 13:11 21:4 48:15 50:5 82:6 98:21 114:16
**yesterday** 10:25

**z**

**zoom** 36:13
**zoomed** 36:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# PLAINTIFFS' EXHIBIT AD

KR1672

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

KNIFE RIGHTS, INC., ELIOT KAAGAN JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P.,

Plaintiffs,

vs.

CALIFORNIA ATTORNEY GENERAL ROB BONTA,

Defendant.

CASE NO. 3:23-CV-00474-JES-DDL

VIDEOCONFERENCE DEPOSITION OF MICHAEL D. JANICH
Appearing Remotely From
FIRESTONE, COLORADO
Thursday, February 8, 2024
Volume I

Reported by:
SHURI GRAY
CSR No. 3786
Job No. 6449120
PAGES 1 to 88

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

______________________________

KNIFE RIGHTS, INC., ELIOT KAAGAN JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P.,

Plaintiffs,

vs.

CALIFORNIA ATTORNEY GENERAL ROB BONTA,

Defendant.

______________________________

CASE NO. 3:23-CV-00474-JES-DDL

Videoconference Deposition of MICHAEL D. JANICH, Volume I, taken on behalf of Defendant, all participants attending remotely, beginning at 2:06 p.m. and ending at 4:15 p.m. on Thursday, February 8, 2024, before SHURI GRAY, Certified Shorthand Reporter No. 3786.

APPEARANCES:

For Plaintiffs:

DILLON LAW GROUP APC
(Appearing via videoconference)
BY: JOHN W. DILLON, ESQ.
Gateway Road, Suite 105, No. 255
Carlsbad, California 92009
(760) 642-7150
jdillon@dillonlawgp.com

For Defendant:

ROB BONTA
ATTORNEY GENERAL OF CALIFORNIA
(Appearing via videoconference)
BY: KATRINA UYEHARA, DEPUTY ATTORNEY GENERAL
JANE REILLEY, DEPUTY ATTORNEY GENERAL
1300 I Street, Suite 125
Sacramento, California 94244-2550
(916( 210-7867
katrina.uyehara@doj.ca.gov

INDEX

| WITNESS | EXAMINATION |
|---|---|
| MICHAEL D. JANICH<br>Volume I | |
| BY MS. UYEHARA | 5 |
| BY MR. DILLON | 86 |

DEPOSITION EXHIBITS

| NUMBER | DESCRIPTION | IDENTIFIED |
|---|---|---|
| Exhibit A | Complaint for Declaratory and Injunctive Relief | 10 |
| Exhibit B | Rebuttal expert report | 14 |
| Exhibit C | Interview with Michael Janich | 37 |

FIRESTONE, COLORADO; Thursday, February 8, 2024

2:06 p.m.

MICHAEL D. JANICH,

having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MS. UYEHARA:

Q Good morning. My name is Katrina Uyehara, and I am a Deputy Attorney General with the California Department of Justice. I'm joined by my colleague Jane Reilley, who is also working on this case. We represent the defendant California Attorney General Rob Bonta in this lawsuit.

We are here regarding the case Knife Rights, Inc., et al., versus California Attorney General Rob Bonta. This is in the US District Court for the Southern District of California, and the case number is 3:23-CV-00474.

Please state your full name for the record.

A Michael Duane Janich.

Q Have you ever taken a deposition before?

A Yes, I have.

Q How many times?

A Two times that I recall.

Q In which cases?

A One was testimony in front of a subcommittee of Congress, and another was regarding a lawsuit against Paladin Press, a former employer.

Q Were both times as an expert witness or as a party?

A Both times were as a witness.

Q On which topics have you previously testified as an expert witness for?

A One was with regard to the conduct of operations investigating the losses of American POWs and MIAs in Vietnam, Laos and Cambodia. And then the other was regarding a lawsuit which was a sexual harassment lawsuit filed against my former employer.

Q And only one of those testimonies were in court; correct?

A It was a deposition, but it was -- I was not called on the stand in court.

Q So I do not intend to ask you any trick questions. If you do not understand a question, please let me know, and I will repeat and/or clarify it. I say this because if you answer a question, we will assume that you understood it.

This is important because if for some reason the answer to that question is used in trial, we are

making it clear on the record now that it is your responsibility to let us know whether you understood the question or not.

Do you understand these procedures?

A Yes, I do.

Q You are not required to speculate or guess as to matters of which you have no personal knowledge.

Do you understand this requirement?

A Yes, I do.

Q I also want to remind you that the court reporter cannot record shrugs, uh-huhs or other non-verbal responses or gestures. So please be sure to provide verbal responses to my questions.

Also, the court reporter can only record one of us at a time; so I'll try not to interrupt you, and I would ask that you do the same for me.

Is that all right?

A Yes.

Q There may be circumstances where I ask you a question where I would be asking for an estimate. I would ask you not to answer any questions with a speculation or guess. It's okay to say you don't know the answer to a question, but I am entitled to your best recollection in cases where I am asking for something where you might be able to make an estimate.

Once the deposition is transcribed, you may request an opportunity to review it. If you feel that any of your answers are transcribed differently from those you gave, you may make notes to that effect. However, defendant does have a right to comment at trial on any of those changes which you make to the deposition transcript.

If you want the opportunity to review the transcript, you need to request that before the end or at the end of the deposition.

Do you understand these procedures?

A Yes, I do.

Q From time to time your lawyer, Mr. Dillon, may make objections. Unless Mr. Dillon specifically instructs you to not answer the question, you are required to answer the question.

Does that make sense?

A Yes, it does.

Q One more point before we begin. If you need to take a break at any time, please let me know, and we'll accommodate that request. Although there will be breaks, it would be best to not take a break between a pending question and an answer. Understood?

A Yes.

Q Great. We'll go into some competency questions

now.

Are you able to provide complete and truthful testimony this afternoon?

A Yes, I am.

Q Is there any reason why you feel you cannot give your best testimony today?

A No.

Q Are you suffering from any medical condition that would prevent you from giving your best testimony today?

A No.

Q Have you taken any medications or any other substances in the last 24 hours that would affect your ability to understand my questions or answer truthfully today?

A No.

Q Did you prepare for today's deposition?

A Yes, I did.

Q In what way?

A I reviewed Mr. Escobar's original report. I reviewed my response to his report. I also reviewed the original complaint.

Q And are those all of the documents that you reviewed?

A Yes.

Q Did you speak with anyone or write to anyone about this deposition?

A I spoke with Mr. Dillon in preparing for the deposition so that I understood the procedures. I also notified my employer that I would be unavailable during this time.

Q And have you reviewed the complaint that was filed by the plaintiffs?

A Yes, I have.

Q And did you have any role in preparing it?

A No, I did not.

Q We're going to present a copy of the complaint now as our Exhibit A. I am going to put it on the screen for you to be able to see it as well.

(Deposition Exhibit A was marked for identification by the court reporter.)

BY MS. UYEHARA:

Q Give me one moment.

Can you see this copy of the complaint?

A Yes.

Q I'll scroll through it as well. Is this the operative complaint that you have reviewed in preparation for this deposition?

A Yes, it is.

Q Okay. When did you first become involved with

this case?

A I was first involved -- became involved when I was contacted by Mr. Ritter. I believe that was the latter part of December of last year.

Q Who is Mr. Ritter?

A Mr. Ritter is the -- from kniferights.org. I'm not sure of his exact title, but he's the driving force behind kniferights.org.

Q And you said he contacted you in December?

A As I recall, yes.

Q Have you worked closely with Mr. Ritter before this case?

A I've known him for a number of years, but I've never worked with him in any official capacity.

Q Have you worked with the Dillon Law Firm before?

A No.

Q And did anyone tell you what they wanted you to do for this case?

A When I was first approached, they asked me to be an expert witness based on my knowledge of the use of knives in self-defense. They felt that my knowledge would be relevant to this case.

Q Did you advertise your expert services in any way?

A No, I did not.

Q Upon being asked about this case back in December, what were you told about the case?

A I was told that there was pending litigation against the State of California regarding a motion to legalize automatic knives in the state.

Q Do you have a written agreement governing your engagement as an expert in this case?

A I received an agreement to participate as an expert witness from Mr. Dillon, and I completed that agreement.

Q Are you being compensated for your work in this case?

A Yes, I am.

Q At what rate?

A $150 per hour.

Q How did you determine your hourly rate for the work in this case?

A That is my standard rate when I teach self-defense classes; so I carry that rate across to my other professional services.

Q To date, how many hours have you worked on this case?

A Approximately nine hours.

Q How did you spend those hours?

A The majority of it was in reviewing Mr. Escobar's original expert report and then preparing my rebuttal to his report, and then any follow up to proofread and create the final report.

Q So you would estimate that you spent most of your time reviewing the documents in preparation for your report?

A That's correct.

Q If you had to estimate, how much time did you spend drafting your report?

A I would estimate about six hours.

Q So to date you have earned $1,350 from plaintiffs' counsel on this case?

A If the math is correct, yes.

Q What is your best estimate of how many additional hours you will work on this case?

A I honestly don't know. I don't know where -- what else will be required of me.

Q What field or fields do you consider yourself to be an expert in?

A I consider myself to be an expert in the fields of self-defense, fields of knives and their history, manufacturing, design of knives, as well as the defensive use of various other self-defense weapons.

Q Of those areas you just listed, which ones are

you being asked to provide opinions and testimony about in this case?

A Primarily the use of knives in self-defense, but also the utility of knives in general terms, specifically as they would apply to automatic knives.

Q So you also submitted a rebuttal expert report in support of plaintiffs' case. I am going to put that on the screen now, and you can verify that this is a copy of that report.

(Deposition Exhibit B was marked for identification by the court reporter.)

BY MS. UYEHARA:

Q Do you see a copy of your rebuttal expert report on the screen?

A I do.

Q And do you recognize this document as the document that was filed for you in this case?

A Yes.

Q All right. I apologize. Sorry. I need to pull it back up.

So is this your signature signed under penalty of perjury on page 22?

A Yes, it is.

Q And what information did you review in preparing this document?

A I reviewed Mr. Escobar's original report, and then there were specific references that I made in my rebuttal citing other literary sources or historical sources regarding the history of knives, other historical works that are in my library.

Q Did you do any online research?

A The primary online research that I did was with regard to the links that were provided in Mr. Escobar's report, and then there was also a report that I had found with regard to the use of kitchen knives, kitchen cutlery in criminal acts.

Q And did anyone assist you in writing this report?

A No. Mr. Dillon reviewed the report. There were some small changes that we discussed in preparing the final report, but the work itself is my own.

Q Now, I am going to ask a couple of questions about your background and your qualifications as an expert.

Did you graduate high school?

A Yes.

Q Did you attend college?

A Yes.

Q In what year did you graduate from college?

A I graduated from college in 1983.

Q And what was the focus of your studies there?
A Asian studies.
Q Can you describe what that major entails?
A I was -- at that time, I was working -- I was active duty military. My job was as a Chinese Mandarin and Vietnamese linguist; so much of my college credit was derived from my formal study at the Defense Language Institute in those languages and then related studies relating to Asian history and culture.
Q Which languages did you learn there?
A Chinese Mandarin and Vietnamese.
Q Do you have any additional education, like a master's degree or a Ph.D.?
A No, I don't.
Q And did your studies in your undergraduate career involve martial arts or self-defense training at all?
A I have been training in the martial arts for almost 50 years, but that was not related to my formal studies in college.
Q So you first began studying martial arts and self-defense training 50 years ago?
A Almost 50 years ago, yes.
Q And when did you start working in the military or with the intelligence agency?

A In 1980. I enlisted in the military after completing basic training. I went to the language school to learn Chinese Mandarin. After that, went to the technical school that qualified me in my military occupational specialty. So I actually began applying my skills in 1981 at the National Security Agency.

Q When did you first begin teaching?

A I first began teaching martial arts when I was about 16 years old, shortly after earning my first black belt.

Q And was that professionally with a studio or in what capacity?

A It was part of a martial arts club. So we had a -- we operated a studio, but it wasn't -- it was a commercial studio, but it wasn't very active as a commercial venture. It was more of a club than a commercial business.

Q When was the first time you began getting paid for your self-defense teaching?

A I would say that would be when I first started teaching public seminars which was 1997.

Q And which organization were those public seminars with?

A My business is Martial Blade Concepts, LLC. The LLC was formed somewhat thereafter. I believe it

was formed in 2003, if I recall. So most of my teaching has been under that business name.

Q Currently, what is your primary source of employment?

A I work for the Spyderco Knife Company in Golden, Colorado.

Q And are there any other companies you are currently employed with or by?

A I also operate still Martial Blade Concepts, LLC, and I teach actively under that company name.

Q Do any of your employers manufacture or sell any knives that are currently illegal in California under the Switchblade statutes at issue in this case?

A Yes, Spyderco.

Q Are your employers aware of your involvement in this case?

A Yes.

Q Are they supportive of your involvement in this case?

A Yes.

Q You have designed over a dozen knives that are currently manufactured and sold by various knife companies; is that correct?

A They have been manufactured over time. Not all of them are still in current production.

Q Do you currently earn any income from the manufacture or sale of the knives that you designed?
A Yes, I do.
Q Are any of the knives that you designed currently illegal in California under the Switchblade statutes in issue in this case?
MR. DILLON: Objection. Legal conclusion. You can go ahead and answer.
BY MS. UYEHARA:
Q You can answer, Mr. Janich.
A There is one knife that I designed that cannot be imported into the US; so technically it would be illegal in California, but it's to a degree a moot point because the knife cannot be brought into the United States.
Q Was that knife designed for an international company?
A It was designed for Spyderco, but it is produced in Taiwan and then drop shipped to other countries, but it cannot be imported into the US.
Q Do you and/or any of the companies you work for stand to gain financially if the Switchblade statutes at issue in this case are struck down?
A No.
Q Can you explain how you designed your version

of the Spyderco Endura 4?

A The Endura 4 -- I did not design the Endura 4. That was designed by Sal Glesser, the founder of Spyderco. There is a version of it that I modify that is custom ground to shorten the blade length to make it legally compliant in specific jurisdictions.

Q And how was that knife modified to make it legally compliant in the state of Colorado?

A By shortening the blade, by grinding it with the grinder and then hand finishing it to shorten the blade. I also removed the texturing from the back of the blade.

Q And that knife was shortened to what length?

A Three and a half inches, which is the Colorado state law.

Q And can you explain what you did to the texturing of the handle.

A There's a thing called jimping, which is basically textured grooves that are on the back of the blade, and those can be abrasive to the thumb. So I prefer to remove those; so I grind those off and finish the blades smooth.

Q And what purpose are those textured grooves meant to serve?

A From a utility standpoint, they can provide

extra perches for the thumb. When the knife is used defensively, they can be too abrasive for the thumb and might cause injury to the user.

Q And is that why you have a preference for removing those grooves?

A Yes.

Q Can you list all of the commercial knife companies you have worked with?

A Spyderco, Master of Defense, Blackhawk Blades, Combat Elite. As far as having knives produced, those are the only ones.

Q And with those companies you work primarily with the design of knives; correct?

A Yes.

Q Can you describe your work with The Best Defense Television series in the Outdoor Channel?

A I was the subject matter expert and cohost of The Best Defense for its original 11-year run. So for 11 seasons of that show I appeared on camera as one of the cohosts. I also was a role player in some of the dramatic scenarios that we did.

I was an instructor of self-defense instructional methodology that included both -- that included unarmed tactics, use of various different contact distance weapons, including knives, as well as

the use of firearms in self-defense.

I also presented quite a bit of instruction as far as home security, home safety, and just all aspects of self-defense.

Q Can you describe the premise of the television series.

A Basically what it was designed to do is to provide the viewers with instructional information regarding all aspects of self-defense. Typically, we would have a dramatic scenario that would first show the worst-case scenario with the victim being successfully victimized, and then we would show various options as far as different self-defense tactics, aspects of awareness and avoidance that could make them able to avoid a situation, and then these were punctuated with instructional segments that would provide greater detail on the skills that were shown in the dramatic scenarios.

Q To your knowledge, did any of those segments involve switchblade knives?

A No, they did not.

Q How many knives do you own, if you had to estimate?

A If I had to estimate, I would say between four and five hundred.

Q Of those knives, how many are functional?

A Currently, the vast majority. I'd say there's only maybe two or three that are currently disassembled and under repair.

Q Do you have any collectible knives or knives that would be considered non-operational besides those that are in repair?

A When you say collectible knives, could you be more specific, please.

Q A knife that doesn't serve its operational purposes.

A I might have a few kind of more of a -- either a tourist trinket type of knife or more of a novelty type of knife where it's not highly functional, but those would be the exception to the rule. Those would be very few of the knives in my entire collection.

Q Of the knives in your collection, how many of them are switchblades?

A Approximately 60.

Q And of what lengths are those switchblades?

A They range from keychain models that are approximately 2 inches long overall, all the way up to, I believe the largest one is about 13 inches overall.

Q If you had to estimate, what is the length of the majority of the switchblades in your collection?

A I would estimate that most of those would be in

the medium range; so looking at blade lengths of approximately three to four inches with an overall length of approximately eight to nine inches.

Q Recognizing, for the record, that you do not live in California, can you estimate what percentage of your knives would be illegal in California?

MR. DILLON: Objection. Legal conclusion.

THE WITNESS: Shall I proceed?

MR. DILLON: Yeah, go ahead.

THE WITNESS: As far as the automatic knives, I would say that all but maybe one or two would be illegal in California. So if I estimate that I have 60 total, then approximately 58 of those would be illegal in California.

BY MS. UYEHARA:

Q Do you typically carry a knife?

A Yes.

Q What kind?

A I carry one of the designs that I did for Spyderco called a Yojimbo 2.

Q Can you describe the Yojimbo 2?

A It is a folding knife with a 3.2-inch blade. It has a what's called a Wharncliffe blade profile. It has a straight cutting edge, and it is a lock blade knife. It has a compression lock mechanism.

Q Can you explain what a Wharn blade profile is?
A It's a Wharncliffe blade profile. So it's a perfectly straight cutting edge, and then the spine of the blade tapers down to meet the edge.
Q When you carry this knife, do you carry it openly or publicly?
A I carry it in my pocket, clipped to the top of my pocket.
Q Do you carry a knife in your car?
A Yes.
Q Where do you store that in your car?
A I store it in the center console. It is a rescue knife. It's designed for cutting seatbelts and breaking windows in the event of an auto accident.
Q What knife is your preferred choice for self-defense?
A The Yojimbo 2 that I mentioned earlier.
Q And this was a folding knife; correct?
A Correct.
Q It is not a fixed-blade knife?
A No, it is not.
Q Would you consider that knife to be a switchblade?
A No, it is not.
Q How would you categorize the knife?

A It is a manual one-hand opening knife.

Q Why do you choose not to carry a switchblade for self-defense?

A I travel very frequently, and I teach in many areas of the country. I also teach overseas. And because the knife laws differ significantly from one place to another, self-defense skills, reliability and consistency are very important.

So if I were to travel to a jurisdiction that did not allow switchblade knives, I would have to change my practices, and that would affect my ability to defend myself effectively. My reflexes wouldn't transfer over as readily.

Q Are there any jurisdictions you have been to where you know you would not have been able to take the switchblade knife?

A Yes.

Q What jurisdiction?

A The state of California. Typically, before I travel on a trip, I will research the knife laws in that area to make sure that I'm legally compliant, even with the knife that I choose to carry on a daily basis. If I have any issues with regard to blade length or anything of that nature, then I carry an alternate knife.

Q And for the knife that you usually carry, did

you design that knife?

A Yes, I did.

Q When did you design that knife?

A I designed it in 2009. It was commercially released in 2011.

Q And why did you design it the way that you did?

A I designed it primarily for its efficiency as a personal defense weapon, but it also works very well as a utility tool.

Q Can you describe what you mean by utility tool?

A For everyday cutting chores, regardless of what those might be, in any type of utilitarian context, everything from opening boxes, opening mail. If you happen to be a tradesperson, the blade is actually very similar to what you might find on a utility knife that you would find at Home Depot. So it serves basically the same roles that you might have for a knife of that type.

Q Can you describe what makes this knife a good knife for self-defense?

A The Wharncliffe blade profile that I mentioned earlier; so it's a specific style of blade. Its history goes back to -- there was actually a member of British aristocracy who designed it back in the early part of the 19th century.

But that blade profile, because of its straight cutting edge, it cuts with full power all the way to the point; so therefore it has -- it offers, from a mechanical standpoint, great cutting efficiency.

Q Your expert report in this case focuses on rebutting the opinions of Robert Escobar; is that correct?

A Yes.

Q In this case, do you consider it your role to rebut any of the opinions of Robert Spitzer or Brennan Rivas?

A No.

Q Were you asked to review or opine on either Spitzer or Rivas's declarations?

A No.

Q So you do not intend to offer any testimony or opinions related to Spitzer or Rivas's testimony or their opinions in this case; correct?

A That's correct.

Q In your report, you state Escobar is a skilled historian and researcher, particularly in regard to his research on impact weapons.

Would you agree with that characterization?

A That's correct.

Q Do you consider yourself to be a historian?

A Yes, I do.

Q Do you consider yourself to be an expert in any field of history?

A Yes, with regard to the history of weapons, edged weapons, things of that nature, I am quite knowledgeable.

Q And your knowledge of the history of weapons, is that something you have built on your own, or did you take any formal classes?

A It's been primarily through my own research and reading.

Q And what kind of resources did you consult in developing your knowledge of this history?

A I have an extensive library of books on the history of all different types of weapons. I also have had the privilege over time with working with some people who are extremely knowledgeable in those fields and learning directly from them.

Q So you would say your knowledge of the history of weapons is primarily from other individuals and books that you have read?

A That's correct.

Q Have you ever been paid to research historical documents?

A No, I haven't.

Q Have you ever been paid to research histories of historical weaponry?

A I have written articles for Nash magazines where I have been paid for the publication of the article, and those have included information that was the product of research, but I haven't been paid as a researcher per se.

Q Do you recall on what kinds of weapons those articles were about?

A Various types of weapons, primarily. So balisong knives, again various -- various types of knives.

Q Any of them switchblades?

A Yes.

Q Have you ever been involved with recording or preserving the history of historical weaponry?

A Yes.

Q Can you explain the Counter-Blade Concepts, CBC system of self-defense you designed?

A The CBC is a system of unarmed defenses against edged weapon and other contact distance attacks. The CBC is a system of self-defense. It's an unarmed system defending against edged weapon attacks and other contact distance weapon attacks. So impact weapons, other things that require an attacker to make physical contact

with you versus a projectile weapon or something that would be applied from a distance.

Q Is my understanding correct that it focuses on unarmed defense tactics against someone coming at you with an edged or impact weapon?

A That's correct.

Q What inspired you to create the self-defense method?

A From the time that I started learning the martial arts early on, the idea of facing somebody who might be armed with a knife was one of the things that was most concerning to me. So a large portion of my martial arts study was focused on being able to be prepared for that particular threat. And it's something that has been a lifelong pursuit of mine.

After the attacks on September 11th, the fact that edged weapons were used in the hijacking of the planes that were used, I applied even more focus in my training to develop the Counter-Blade Concepts system.

Q And why were you primarily concerned with the threat of edged weapons in particular?

A It was just something that I felt was very scary to me, something that I wanted to be prepared for.

Q Were you personally threatened with an edged weapon before the creation of CBC?

A No, I was not.

Q In developing CBC, you analyzed hundreds of criminal assaults with knives and other edged weapons; is that correct?

A That is correct.

Q In your career, I assume you've also trained many people who have had to defend themselves from knives and other edged weapons; is that correct?

A Yes.

Q About how many people would you estimate you have trained?

A Hundreds. I don't have an exact number.

Q Despite training hundreds of individuals, is it correct that you have not been able to identify a single incident in which a switchblade was used to threaten or physically attack another person?

A Based on the research that I have done, that's correct.

Q And that is based on your research and your experience with training other individuals; correct?

A Yes.

Q Do you know of an instance when a switchblade was used for self-defense specifically?

A No, I don't.

Q In your expert opinion, do you believe it's

important for a person to be trained in how to use a knife for self-defense before attempting to use a knife in a real-life self-defense situation?

A Yes.

Q What type of training do you believe is necessary?

A I believe responsible training for the use of any weapon, anyone who is going to carry a weapon in self-defense, should have proper training to be able to use that weapon effectively and safely.

Q And what kind of training do you believe is necessary? Classroom training, drills, sparring?

A It needs to be hands-on training that is relevant to the application of that weapon in self-defense.

Q In paragraphs 31 and 32 of your rebuttal expert report, you reference Mr. Escobar's statement that, quote, bringing a folding knife into play under the stress of a self-defense situation is difficult, end quote; and that, quote, bringing a knife to bear in a high-stress self-defense situation is difficult, end quote.

Do you agree with both of these statements? Yes or no.

A Yes.

Q Do you believe that wielding a knife can be dangerous?

A To who?

Q In general. Is the action of wielding a knife, can that be dangerous?

MR. DILLON: Objection. Vague and ambiguous.

THE WITNESS: You would have to clarify what you mean by dangerous in that circumstance. If you're using a knife for self-defense, the capability to use the knife to stop the attacker is the entire point. So from the attacker's point of view, then certainly there would be danger involved. But dangerous in this context, I'm not sure exactly what you mean.

BY MS. UYEHARA:

Q From a defender's point of view, wielding a knife, can that be dangerous?

A Yes.

Q Can you explain why the quadricep is an important target for knife defense?

A The quadriceps muscle is responsible for the mechanical function of extending the knee. If that muscle is severed, then the person loses the capability to support weight on that leg, and it results in what I call a mobility kill. Essentially you take the person's mobility away. And when using a knife in self-defense,

again the context is primarily that you're defending against a contact distant threat. By taking the person's mobility, you can create distance and create safety and therefore stop the threat decisively and keep yourself safe.

Q Can you explain why the brachial nerve is another important target for knife defense?

A The median and ulnar nerves I believe are what you are referring to. The brachial nerve would be different. So the median and ulnar nerves are the nerves that are primarily responsible for the control of the motor functions of the arm. By being able to sever those nerves, what you do is you take away the arm's capability to wield the weapon effectively, again creating stopping power in a self-defense context.

Q Would you say that when using a knife for self-defense, the target is the underlying muscles and nerves of the attacker?

A It's one of the primary targets, yes.

Q What else would you consider to be a primary target?

A In the Martial Blade Concepts system that I teach, I have three levels of targeting. The first would be the mechanical aspects of the body, which would be muscles and connecting tendons. The second would be

the nerves that would allow again the person to wield a weapon effectively, and then the third, which is an ancillary effect, would be blood loss, so major blood vessels which are typically co-located with the first two.

Q And did you list those three in order of most effective to least effective for self-defense?

A Yes.

Q Is it your opinion that knives are used for self-defense?

A Yes.

Q Is it your opinion that when knives are used in self-defense they're typically not used well?

A My opinion is that with proper training knives can be used well. As far as a characterization that they're typically not used well, that's inaccurate.

Q So you would deny ever making a statement to that effect?

A Can you quote the specific statement that you're referring to, please.

Q "When knives are used in self-defense, they typically are not used well."

MR. DILLON: Objection. Lacks foundation. Vague and ambiguous.

THE WITNESS: I'm not quite sure what context

that I made that statement.

BY MS. UYEHARA:

Q I'll introduce now Exhibit C. And I'll pull that up on the screen.

(Deposition Exhibit C was marked for identification by the court reporter.)

BY MS. UYEHARA:

Q Can you see this document on the screen?

A Yes.

Q And have you seen this document before?

A Yes.

Q When did you recall last seeing it?

A Just before this deposition.

Q And do you recall this interview?

A Yes, I do.

Q Now, I am going to search for a specific portion to show you.

Here the person interviewing you said: "What problems are in play when someone who defended him or herself using a knife has to explain those actions in court?"

You responded: "The biggest problem in the application of the knife in this way is that it is very rare. The court system more frequently sees people who use knives feloniously in the commission of a crime, and

if knives are used in self-defense, they are typically not used well."

Do you recall making the statement?

A Yes, I do.

Q And do you agree with the statement?

A In that context, yes.

Q What is the basis for your statement that the court system more frequently sees people who use knives feloniously in the commission of a crime?

A When knives are typically -- when a situation results in an incident being examined by the court, typically it has to do with the felonious use of knives. The use of knives in self-defense is much less common.

Q And what evidence did you use to formulate that opinion? Did you review court records?

A That was based primarily on the experience that I have had in training law enforcement officers. I have also been involved in legal consultation for various incidents involving knives, some of which were claimed to be incidents of self-defense.

Q So you did not review any court records to formulate that opinion?

A No, I didn't.

Q And then what is the basis for your statement that if knives are used in self-defense, they are

typically not used well?

A What I mean by that is that it was -- the use of a knife typically did not reflect proper training.

Q And what would you describe as proper training?

A Training that would allow you to use the knife responsibly and ethically to be able to stop the threat, consistent with the requirements of self-defense in modern society.

Q And then in your 50 years of studying self-defense and edged weapons, have you ever used a knife against a person for self-defense?

A I've never had to injure another person with a knife in self-defense.

Q Generally, do you believe criminals do not have preferences for weapons that are culturally understood to be inherently frightening?

MR. DILLON: Objection. Vague and ambiguous.

BY MS. UYEHARA:

Q You may answer the question.

A In the context I recall that -- that statement being made by Mr. Escobar. Specifically that was his assertion that that was a preference of criminals, and I disagreed with that.

Q So you do not believe that criminals have preferences for weapons that are culturally understood

to be inherently frightening?

MR. DILLON: Objection. Misstates testimony.

THE WITNESS: I mean --

BY MS. UYEHARA:

Q You would not say that criminals have preferences for weapons that are inherently frightening?

A In the context of Mr. Escobar's statement, his emphasis was that criminals would specifically choose weapons that they would use in more of an intimidating way or a frightening way. Based on my analysis of the use of knives in self-defense, they are used as weapons. They are not used primarily as methods of intimidation.

Q And do you think the intimidation factor of a weapon is not a primary reason why a person chooses a particular weapon?

A In the analysis that I have done of various knife attacks, the intimidation aspect of it was not a prevalent factor. The intent of the criminal was primarily to cause injury. It was not used to provide or to create intimidation.

Q And so you don't think that criminals would choose weapons that are inherently frightening -- that they would not choose weapons that are inherently frightening just based on intimidation value?

A I don't believe that's their primary

consideration.

Q Do you believe it is a consideration?

A In a minority of circumstances, yes.

Q Do you not consider a switchblade to be inherently frightening?

A No, I don't.

Q And on what evidence do you base that opinion?

A I base that on familiarity with any object. Once you realize what a switchblade is, you appreciate it in the context of its overall historical value and its history of use, history of legitimate use, that it has no inherently intimidating aspects.

Q Do you believe that individuals who aren't as familiar with switchblades and knives would consider them to be inherently frightening?

A It's possible.

Q And on what evidence do you base that opinion?

A I believe it's possible for anyone who is unfamiliar with something to be intimidated or frightened by it, regardless of the nature of what it might be.

Q And you would say most people are not familiar with the switchblade?

MR. DILLON: Objection. Speculation.

THE WITNESS: I would say that most people have

some understanding of what a switchblade is, primarily from the media; but as far as personal familiarity, that would vary.

BY MS. UYEHARA:

Q Can you describe what you mean by media?

A Primarily movies and the depiction of switchblades in movies.

Q And how would you characterize those depictions?

A Dramatized.

Q Do you consider a switchblade to be more inherently frightening than an ordinary pocket knife?

A No, I don't.

Q And what evidence do you base that opinion?

A My knowledge of knives and their -- their use in all different contexts.

Q In paragraph 14 of your rebuttal expert report, you stated, your research indicated that "the most commonly used type of knife in criminal assaults is some form of kitchen knife."

Do you recall making that statement?

A Yes.

Q Can you explain your research procedures and methods?

A As you mentioned earlier, I had analyzed

hundreds of knife attacks as part of analyzing those attacks and the development of the Counter-Blade Concepts system, in addition to looking at the type of attack and the mechanics of the attack. I was also looking at the type of weapons used, and the vast majority of the videos that I analyzed, a kitchen knife, some type of kitchen knife was the most prevalent weapon.

Q And from where did you primarily view these videos?

A From a variety of online sources, YouTube, LiveLeak, also through law enforcement sources, like the Law Enforcement Training Network and other surveillance videos that were provided to me by security personnel.

Q Did you review any documents or conduct any studies to come to your conclusion?

A I did not personally provide any formal, formal analysis of that. There are other people who have, and the analysis is generally consistent with my findings as well.

Q The law enforcement officers you trained with also, quote, "explained that because kitchen knives are inexpensive and readily available, criminals prefer them because they can be easily disposed of if the criminals fear they will be searched."

Do you recall making that statement?

A Yes.

Q And how many law enforcement officers did you interview to reach that conclusion?

A I have trained scores of law enforcement officers over my career, and based on the feedback that they have given me. I also currently have two law enforcement officers who are certified instructors under me who work for one of the nearby jurisdictions, and I'm in regular contact with them as far as crime trends in our area, and it's one of the things that they have shared with me repeatedly over time.

Q And what are the names of the two officers you routinely work with?

A Jessie Pollock is one, and then John. I'm trying to remember John's last name. I'm sorry. I don't recall at the moment.

Q Do you know which departments they work for?

A Longmont, Colorado.

Q And they currently work for each of those departments?

A Yes.

Q For that department?

A Yes.

Q Of the factors that you listed, being that

kitchen knives are, one, inexpensive; two, widely available; and, three, they are easily disposed of in fear of a search, which of those three reasons do you believe is the most prominent reason they are used in crime?

A They are readily available.

Q So you would agree that the prevalence of kitchen knives in crime is highly related to their accessibility and usage in the average American kitchen?

A Yes.

MR. DILLON: Objection. Argumentative.

BY MS. UYEHARA:

Q In paragraph 19 of your rebuttal expert report, you stated that when you, quote, "first began collecting knives about 50 years ago, switchblades were more difficult to find. Now they are readily available in most areas of the United States as they were before the passage of the Federal Switchblade Act."

Do you recall making this statement?

A Yes.

Q And on what evidence did you base this opinion?

A The fact that I have been a knife collector for 50 years, and my interest in all different types of knives. When you look at the availability, you can find some knives that are readily available and others that

were not.

Q Do you have an expert opinion as to how many Americans currently own the type of switchblade that's currently prohibited under California law?

A I don't know.

Q If you had to estimate, how many Americans rely on a switchblade with a blade longer than 2 inches for self-defense?

MR. DILLON: Objection. Speculation.

THE WITNESS: I don't know.

MS. UYEHARA: All right. We will take a short break now, a ten-minute break, and we'll come back at 2:10. Does that sound good?

THE WITNESS: Okay. Yes.

MS. UYEHARA: Thank you.

(Recess.)

BY MS. UYEHARA:

Q Mr. Janich, I am going to circle back to a few of the questions we asked at the beginning just to reverify your answers and ask a few follow-up questions.

A Okay.

Q You stated that you heard about this case from Mr. Ritter, who I assume is a leader in Knife Rights; is that correct?

A Yes.

Q And how do you know each other?

A I met Doug for the first time a number of years ago at The Blade Show in Atlanta; so I'm familiar with his work with Knife Rights. We see each other primarily at trade shows.

Q Can you describe Knife Rights as an organization?

A It's an organization that specializes in efforts to fight for rights with regard to the carry and use and possession of knives, essentially analogous to what you might find for like the NRA or similar firearms organizations, essentially preserving the right to carry and own knives for all citizens.

Q And are you aware of the primary ways they fight for those rights?

A I know that they're very active as far as their legal actions, challenging various laws that they feel are unfair and might limit people's rights to carry and possess knives.

Q Are you aware of any work they have done with state legislatures to overturn or challenge laws that restrict knives?

A In general terms, yes. I know they have been somewhat successful in their efforts.

Q And are you a member of Knife Rights?

A No, I'm not.

Q And then what did Mr. Ritter share about the case?

A He simply stated that Mr. Escobar had provided his legal report, his expert report as far as the viability of switchblades for personal defense, and he asked if I would be willing to review the report and consider providing a rebuttal to it.

Q And so at that point is when you first reviewed the report?

A Yes. I spoke with Mr. Dillon, and once we agreed that I would be -- I would be willing to participate as an expert witness, at that point I was provided with the full report.

Q And that was also sometime in December?

A Either December or early January. I don't recall.

Q And you stated earlier that your employer Spyderco was supportive of your efforts to join this litigation; is that correct?

A Yes.

Q And how did you know that?

A I spoke with my boss directly. I explained to her what -- in general terms what this entailed; that it was essentially Knife Rights addressing the California

knife law, and that Doug Ritter had asked me to be an expert witness, and I asked her permission to be able to move forward with it, and she gave me her permission.

Q Was she also familiar with Knife Rights' work and with Doug Ritter?

A Yes.

Q And are you getting paid by Spyderco for your work on this case?

A I'm drawing my regular salary. I'm not getting any special compensation for my work on this case.

Q But you are not required to take any paid time off today for this deposition?

A I am a salaried employee, so I was allowed to use this time.

Q So your employer allowed you to use this time today for this deposition, and you are getting paid your regular salary rate?

A Yes.

MR. DILLON: Objection. Argumentative.

BY MS. UYEHARA:

Q If California law were to fall, are there knives that your employer would sell in the state of California?

A Yes.

Q And you can say affirmatively that they would

sell different knives in California if the law were to fall?

A Spyderco currently only produces a very small number of automatic knives; so of the 300 plus knives that we have, I believe there are five SKUs that could be sold in California; so it wouldn't be any substantial change to our current business practice.

Q Are those five knives all automatic?

A Yes. They're various -- they are actually two different models, five variations, or actually six variations of two models.

Q Could you list the two models and the different variations?

A The Autonomy is the first one. It was a knife we developed for the Coast Guard. It's a rescue knife, and there is an original version with an orange handle and no safety. It was designed for carrying in a pouch by Coast Guard rescue swimmers.

There is another Coast Guard version that has an orange handle and a safety. And then there's an all black version. And then there is an Autonomy 2, which is a variation of the original design, and that is available in several different edged configurations, but the same basic model.

Q And what is the blade length on both of those

models?

A Three and a half inches.

Q Can you estimate how many more knives your company would sell if the California law fell?

MR. DILLON: Objection. Speculation.

THE WITNESS: I don't know.

BY MS. UYEHARA:

Q Your employer sells knives all around the country and internationally; is that correct?

A Yes.

Q Do you have estimates of how much revenue your company brings in for its knife sales?

A I am aware of that information, but --

MR. DILLON: Objection. Privileged information.

THE WITNESS: By company policy we are not allowed to discuss that.

BY MS. UYEHARA:

Q You spoke earlier about certain knives that you designed. Can you list the knives that you have designed that have been sold?

A The entire list of everything historically or what?

MR. DILLON: Objection. Vague and ambiguous.

BY MS. UYEHARA:

Q How many knives did you design?
A Approximately a dozen.
Q And how many of them are on the market today?
A Currently, let's see, seven.
Q And other than the knives you've designed, how many of them are automatic or would fall under the definition of switchblade?
A None of them.
Q Are they fixed-blade knives?
A They are -- three them are fixed blades.
Q And how would you classify the other nine?
A The other are either manual opening -- manual opening folders for the most part, and then there's the one that cannot be imported, and it is a one of a kind mechanism; so it's -- it's not easily classified.
Q And you stated your preferred knife is the Yojimbo 2; correct?
A Yojimbo 2, yes.
Q Yojimbo 2. And is that knife legal to carry and own in California?
MR. DILLON: Objection. Legal conclusion.
THE WITNESS: You would have to look at the specific -- California, to my knowledge, does not have preemption where the state law would take priority. So there can be various municipalities that have more

stricter laws than the state law. So its legality would depend upon the specific area of California that you are talking about.

BY MS. UYEHARA:

Q Are you aware of certain parts of the state where you could carry the knife?

A I believe in most areas of the state it would be legal. Certain areas, like Los Angeles, if I recall correctly, have a three-inch blade length limit; so it would be primarily a matter of blade length and the legality of making sure you were legally compliant with any municipal laws.

Q What would happen if someone tried to use a switchblade for self-defense without the proper training?

MR. DILLON: Objection. Incomplete hypothetical. Lacks foundation. Speculation.

BY MS. UYEHARA:

Q What if I bought a switchblade and was out on the street with it today and attempted to use it for self-defense? What would you consider could be some of the worst that could happen?

A It's a very broad question. One of the things -- the situations that I have been involved in where I have had to draw a knife and be prepared to

defend myself, the mere presentation of the knife was enough to cause the potential threat to back down. So the simple ability to operate a switchblade and be able to deploy it effectively could diffuse the situation entirely. So that's one element or one possibility.

From there, when you look at the physical elements of it, it would depend upon the nature of the attack, the skill of each person, the size of each person. There are many different variables; so there's no way for me to address that authoritatively.

Q Is there any concern that a person who's using a switchblade for the first time may struggle to pull out the blade or activate the knife?

MR. DILLON: Objection. Speculation.

THE WITNESS: As I stated before, anyone who is going to carry any type of an implement for self-defense needs to be familiar with it and have proper training to be able to trust that under stress.

BY MS. UYEHARA:

Q And you stated before that there's a concern that a knife or a switchblade could be used against the person trying to use it for self-defense?

MR. DILLON: Objection. Misstates his testimony.

THE WITNESS: I don't believe I stated that.

BY MS. UYEHARA:

Q Did you state earlier that with any weapon there is a concern that it could be used against the person who is wielding it?

A I believe that's Mr. Escobar's statement. It's not my own.

Q And so you don't agree that a weapon can be used against its user?

A With proper training, you retain the weapon. You retain control over the weapon, and you use it effectively. That's a common cliché or a common misconception that you'll hear by critics of self-defense, but I don't agree with that.

Q All right. In paragraph 22 of your report, you stated that the only thing that differentiated switchblades from ordinary pocket knives was the convenience and ease with which they could be opened.

Do you recall making that statement?

A Yes.

Q And what is the basis for your opinion?

A I believe it's a simple matter of fact that the convenience with which -- any time you have any type of an automatic function versus a manual function, that becomes a matter of convenience and ease of use.

Q And in paragraph 30 of your report, you stated

that, quote, All automatic opening knives are merely a type of folding pocket knife, end quote.

Would you consider out the front knives to be folding pocket knives?

A There would be a special category. In general terms, you would have side folding knives or folding pocket knives. You would also have out the fronts as a special category.

Q And would you consider switchblades to fall in both the folding pocket knife category and the out the front knives category?

A Yes.

Q Which category is more common for switchblades, out the front knives or folding?

A Historically, if you look at the number of switchblades that have been produced throughout history, the side folding -- the folding variety are more common than the out the front.

Q And you stated that switchblades can be quite long in length; correct? I'll rephrase that question.

What is the longest switchblade you own?

A The longest would be 13 inches overall.

Q And 13 inches would not fit in your pocket; correct?

A No. That knife is a collector's item. It

certainly is a functional knife, but it wouldn't be suitable for daily carry, and certainly it would not be legal to carry in many jurisdictions even if automatic knives were allowed, because blade length considerations would still prevail.

Q What is the longest knife you would carry in your pocket?

A Again, it would depend upon the jurisdiction in which I was located.

Q In your collection, assuming that the knife is legal, what is the length of the blade or knife that would fit best in your pocket?

A As far as personal preference, something like the Jumbo that I designed, which has a four-inch blade, would be the largest that I would prefer to comfortably carry. It's a matter of personal preference.

Q Would a knife, say, of six inches fit in your pocket?

A It could, yes.

Q Would a knife of eight inches?

A When you talk about closed length, I would say that the -- for most males, the maximum would probably be around perhaps seven inches closed, just based on the depth of our pockets.

Q And for females?

A For females, again, it would depend upon clothing. Typically, female's pockets tend to be much shallower; so they would -- if they were to carry in a pocket, they would be much more limited based on the depth of the pocket itself.

Q So in paragraph 25 of your report, you stated that, quote, "American knife users clearly prefer the convenience of knives that can be opened with only one hand."

In that quote, "In most five designs, this is done manually by using thumb pressure to a purchase on the blade to it rotate into the open position."

On what evidence do you base your opinion that American knife users, quote, clearly prefer, end quote, knives that can be opened with one hand?

A Knowledge of the knife market and having worked professionally in the knife market for about 20 years, just seeing what people prefer as far as purchasing, which products are most successful, and then also familiarity with the consumers -- knife consumers and what they prefer to carry.

Q And so you haven't conducted any studies or surveys or polls or anything of that nature?

A Not a formal study, but it's based on extensive experience.

Q Is it your opinion that there are more Americans who own, quote, knives that can be opened with one hand, end quote, than Americans that own fixed-blade knives?

A When you say "own," that's one thing. When you talk about carry on a daily basis as a utility tool, it's very different. So ownership and daily carry are two separate categories.

Q Let's start with daily carry, then.

Do you believe there are more Americans who carry knives that can be opened with one hand than fixed-blade knives?

A Yes.

Q When it comes to ownership, do you believe that more Americans carry knives that can be opened with one hand versus fixed-blade knives?

A When it comes to ownership, you would have to include things like kitchen cutlery and things of that nature; so the numbers become somewhat skewed. You'd have to be more specific as far as the category of knife and the purpose of its use.

Q Let's pull average kitchen knives out of our equation here and just consider knives that people would purchase for self-defense.

A As far as knives for self-defense, I would say

that folding knives would be much more prevalent.

Q Is there any reason that a fixed-blade knife might be more beneficial for self-defense than a folding knife?

A Fixed blades are easier to bring into action because they don't have the mechanical function of folding. However, fixed blades in many cases are restricted as far as legal carry, so in many jurisdictions are not an option.

Q You stated that fixed-blade knives would be easier to draw. Is there a concern about drawing a folded knife and the potential for injury?

A There's a concern with any knife, drawing any knife quickly and under stress and a potential for injury.

Q So you'd state that -- you stated that one of the benefits of fixed-blade knives is that they can be drawn. You are talking specifically about speed?

A Speed and also reliability, the simplicity of the --

Q Go ahead.

A The simplicity of the action. The fact that once you grasp the handle of the knife, if the sheath is properly designed, then the action of drawing it is relatively simple.

Q Is there a concern with folding knives that they might not deploy accurately or efficiently?

A It's a mechanical object. Therefore, it requires a secondary action of pivoting the blade into the open position; so it's simply a more complicated process.

Q In your experience, have you seen individuals struggle to deploy a folding knife?

A Yes.

Q Were those instances in your self-defense classes?

A As part of the training in Martial Blade Concepts we focus very heavily on the ability to draw the knife under stress, and for beginning students it's challenging. With practice they can develop that skill readily.

Q How long would you say it takes an average person to develop the skill to draw a folding knife effectively?

A The time that it takes really is -- it's more of a matter of a person's diligence in training properly and also the methodology they use, but in most cases -- I teach many two-day seminars, and typically within a matter of a few hours most people can get to the point to where they are efficient and reliable in their

ability to draw a knife.

Q And why do you think individuals struggle with drawing folding knives? Drawing them open, I should say.

A It's like any new skill, it takes practice to be able to master, especially as we introduce the type of stress that you might experience if you were actually attacked.

Q Do you believe that individuals are concerned about cutting themselves when drawing open the knife?

A I think anyone handling a knife is concerned with the potential of cutting themselves.

Q Do you believe that concern is greater, though, with a folding knife than opposed to like a fixed-blade knife, the concern that in drawing the knife you might cut yourself?

A I think the opening methodology, when people are unfamiliar with it, they might at first have a concern, but again with proper training they overcome that readily.

Q Does your CBC method recommend automatic or thumb pressure knives?

A CBC is Counter Blade Concepts; so that's the unarmed skills. Martial Blade Concepts is the system of using an edged weapon in self-defense.

Q Apologies. MBC.

A Yes, so MBC. The reason I typically do not recommend automatic knives, but the reason is that in very few instances are automatic knives available with matching training blades. So a training knife is necessary for proper training, and very few companies have ever produced automatic knives as trainers.

Q Can you describe what a training knife is and what purpose it serves?

A A training knife is essentially a knife that is mechanically identical to the live blade version, the sharpened version; but the blade is completely blunted, so there is no sharp edge or no sharp point so you can make safe contact with a training partner.

Q And are those training knives usually the same weight or handle as the original knife?

A When properly produced, yes.

Q And you stated that most automatic knives do not have training versions?

A Correct.

Q Are training knives usually made by the same manufacturer of the original knife?

A Yes.

Q And why do many automatic knives -- if you had to guess, why do they not have training equivalents?

A Training knives typically, from a commercial perspective, are not as commercially popular. They don't sell as well as the live blade versions. So the idea of an automatic knife with a trainer, the cost is usually the same as the live blade, and most people are not willing to make that investment.

Q And do most training knives -- what kinds of knives often have training knife equivalents?

A Knives that are specifically designed for self-defense. So if you have a knife designed -- for example, the Yojimbo 2 has a matching training knife; so it's optimized for self-defense.

Q And so would you admit then most automatic knives are not designed for self-defense?

MR. DILLON: Objection. Argumentative. Lacks foundation. Speculation.

THE WITNESS: If you look at the knife market overall, what you'll find is that there are many knives that are designed as -- and marketed as self-defense weapons that also do not have trainers; but a commitment to make a trainer is typically a choice of the individual manufacturer, and even then it's a very, very small part of the market, so it doesn't necessarily reflect the suitability of knives for self-defense in general. It reflects the lack of commitment on the part

of the manufacturer.

BY MS. UYEHARA:

Q So you would state that there are varying levels of commitment by different knife manufacturers to develop training knives?

A That's correct.

Q And you recommend for your students in MBC that they practice with a knife that has a training knife equivalent?

A Yes.

Q In your MBC classes, is there interest among participants in automatic knives?

A Yes.

Q And do you usually recommend to them that there aren't training knife equivalents, and that's something they should be aware of?

A When people ask me about knife selection, the easiest method for them to be able to choose a knife that has a matching trainer is to start with the knives that already have matching trainers and then narrow the market from there. So the methodology to allow them to become involved in the training readily, you start with what is most successful, what is also already accessible.

Q Could you name the top three knives that you

guys recommend in MBC for self-defense purposes?

A The three that have trainers that are produced by Spyderco, those are typically my recommendations; so the Yojimbo 2, the Endura Lightweight, and then also the Delica Lightweight. All three of those have matching trainers, and because they have various handle sizes and different price points, they are typically my best recommendations.

Q Do automatic knives that Spyderco sells have training knife equivalents?

A No, they don't.

Q Has there been any discussion about developing those?

A No.

Q In your report you state, quote, "I can say unequivocally that the quality of today's switchblades knives is extremely high."

Can you state what you mean -- can you explain what you mean by that statement?

A In Mr. Escobar's report, most of his comments were related to switchblades that were being imported into the US back in the 1950s, specifically Italian style switchblades, and when you compare that style of knife and the type of construction of those knives to what is currently being produced by manufacturers in the

US, they're vastly different as far as the quality, the precision and tolerances of their construction, the quality of the materials used, the heat treating of the steel. Modern switchblades are a far cry from the ones that were available back before the Federal Switchblade Law.

Q Can you explain further what you mean by quality of the switchblade knives?

A The quality is manufacture. So when you look at the manufacturing methodology, many of the switchblades that Mr. Escobar was referring to as being unsuitable, those were typically of the traditional Italian switchblade variety; so those are typically made by hand. They are made with very crude cutlery methodology, lots of hand work. When you compare that to what's being made today, most you see CNC machining, computer numerical control machining.

So you're holding very, very tight tolerances within a thousandth of an inch, using much higher quality materials, much higher quality engineering. The design and execution of the knives themselves is far superior to anything that was available decades ago.

Q And I assume modern switchblades is not something an average American could forge or make in their own home?

MR. DILLON: Objection. Speculation. Lacks foundation.

THE WITNESS: When it comes to making any type of knife, I believe that's beyond the capabilities of most average hobbyists.

BY MS. UYEHARA:

Q Traditionally, many knives were made from iron. In early America, metalworking was a very common skill, and that might account for why some switchblades were made differently back then. Would you say the modern switchblade today is made of forged steel?

A No. The forging process is very different than the rolling process for creating steel. Most modern knife blades are not forged. When you look at the forging process, what you are doing is typically forging an individual blade by hammering it to shape, at least a rough shape before finished grinding.

Most knives are made by what is called a stock removal method. So you start off with a flat sheet of steel that is usually laser cut -- what's called a stock removal. So you're starting with a sheet of steel. Typically that is laser cut into rough shape, and then the machining processes create the finished blade, blade shape. And then it would be heat treated and tempered to render a furnished knife blade.

That's in contrast to what you would imagine with a typical blacksmith, taking a piece of steel and hammering it to shape.

Q And I believe you said that was a rolling forging method?

A So steel is rolled in steel mills to create the sheet stock. So again when you go back to a traditional blacksmith, they might be working with -- starting with steel of various shapes and sizes versus the idea of something that is a flat sheet that is produced by a steel mill.

Q At paragraph 51 of your report you state your opinion, quote, that "a 2.5 inch blade is the absolute minimum for a knife suitable for self-defense."

Do you recall stating that?

A Yes.

Q Now, what evidence do you base that opinion?

A I base that -- first of all, I created the Martial Blade Concepts system based on what I consider to be the legal worst-case scenario as far as legal knife carry.

So when you look at municipalities such as Chicago and Boston, as well as for federal employees working in US federal buildings, the maximum blade length that they can legally carry is 2.5 inches.

So in creating the tactics of Marshall Blade Concepts, I specifically used that as the least common denominator, if you will, or worst-case scenario, to be able to have a system of tactics that is effective and reliable when using a knife in self-defense.

Q In Martial Blade Concepts, do you ever recommend knives shorter than two and a half inches for self-defense?

A No.

Q The effectiveness of the length of a knife blade, as you said earlier, is affected by various factors such as the size of the person wielding it and the other person, and so there are no instances in which you would recommend a knife under two and a half inches, not even for, say, a small person or a small attacker?

MR. DILLON: Objection. Vague and ambiguous. Compound.

THE WITNESS: So the dynamics that we discussed earlier were the dynamics of a self-defense situation. So when you look at the disparity of size, you look at again the type of attack and everything like that, those are very dynamic.

When it comes to blade length in particular, what it comes down to is the ability of a blade of a particular length to be able to effect specific

anatomical targets, which we have also discussed previously; so the ability to stop an attacker by targeting -- targeting the limbs, being able to cut muscles and tendons, being able to cut adjacent nerves to stop them from being a lethal threat.

BY MS. UYEHARA:

Q And so a knife under two and a half inches would be effective for cutting some of those nerves and tendons that we mentioned earlier?

A Correct.

Q Can you state other evidence that you have relied on for the basis of this opinion that a 2.5-inch blade is the minimum for self-defense?

A One of the demonstrations I'll do in my MBC classes is a demonstration called pork man. Essentially what it entails is taking a pork tenderloin about five pounds and butterflying that; so you are slitting it up the center, wrapping it around a wooden dowel, lashing it on with butcher's twine and then wrapping it in plastic wrap.

So what you create is an analog for a human limb. It's about the same size as a human forearm, human bicep and tricep or the lower portion of the thigh, the quadriceps muscle.

And by using that as an analog for those

targets, we then quantify the destructive capacity of a knife by doing representative cuts the same way we would if we were employing MBC tactics, and then quantifying the destructive capacity of the knife.

And what we find is when you drop below two and a half inches, you can't cut deeply enough to affect the targets that will render an attacker unable to continue a lethal force threat.

Q Earlier you stated that one of the ways to use a knife for self-defense is blood loss. You could initiate blood loss with a knife that's two inches or under two and a half inches; correct?

A Yes.

Q And your opinion is that blood loss itself would not be enough for self-defense?

A I've written or coauthored an entire book that disproves the belief that blood loss is an effective way of stopping an attacker in self-defense, a book called Contemporary Knife Targeting. And that book basically disproves a long-held belief that blood loss was the preferred goal when using a knife as a defensive weapon.

That was actually in the context of World War II combative tactics for the military, and when applied to a self-defense context is inappropriate.

Q So when facing blood loss, an attacker is not

necessarily likely to back off?

A What it comes down to is in self-defense you are trying to stop the attacker; so the ability to stop someone reliably and decisively is a key. The longer somebody is able to continue the attack, the greater the danger to you. And blood loss takes time to take effect. So a person has to lose basically 30 percent of their blood volume until they get to the point to where they go unconscious and are no longer a threat. That takes significant time.

Q And when you say the goal is to stop one -- when you say the goal of self-defense is to stop someone, you mean physically stopping their limbs or their nerves or some other part of their body?

A It's the most reliable method. They may choose to stop sooner, but from a reliability standpoint, from the ability to physically disable somebody and to render them incapable of continuing to attack you, that's the way that we express stopping power in MBC.

Q And would most of those injuries be permanent physical injuries to that attacker?

A They could be repaired medically, depending upon the nature of the injury.

Q Can you speak a little bit more to the book you mentioned earlier. What is the title of that book

again?

A Contemporary Knife Targeting.

Q And could you describe the premise once again.

A There was a gentleman by the name of Chris Grouse, who is a friend of mine. He was a law enforcement officer in Littleton, Colorado, and he was an instructor in what's called PPCT. It's a system of law enforcement defensive tactics. And he was a master instructor in that system.

They were still in the curriculum of that system, citing a thing called the Timetable of Death, which was written by W.E. Fairbairn in his book -- actually two books, All in Fighting, and then a book called Get Tough, which were World War II-era training manuals for training British commandos and the British Home Guard.

And in the Timetable of Death he identified the major arteries of the body and supposedly the time that it would take if one of those arteries were severed for a person to bleed to unconsciousness and then bleed to death. And this was part of again the training for military British military during World War II.

That timetable was never medically validated. So Chris Grouse came to me, and he was a student in my MBC system as well as being a law enforcement trainer,

and basically he said that he wanted to look into the realities of that timetable. He asked me what my opinion of it was.

One of my mentors was Colonel Rex Applegate, who was the close combat instructor for the OSS during World War II, the predecessor of the CIA, and he also worked personally with Fairbairn during World War II.

And Colonel Applegate basically told me that the timetable was not medically validated. It was simply a way of instilling confidence in soldiers back in World War II.

So Chris Grouse set about doing research with the Denver medical examiner, who enlisted a number of vascular surgeons to essentially come up with a modern expression of that timetable.

And what it showed was that, first of all, blood loss is heavily influenced by heart rate. A rapid heart rate, the more quickly someone bleeds. But that even then, the times involved were vastly different than what Fairbairn stated. Most of his he stated were in a matter of seconds. In fact, it was a much longer time frame for somebody to bleed to the point to where they were incapacitated.

So I helped Chris write a paper for PPCT to petition them to change their curriculum. And then that

paper later became the basis for a manuscript for a book, and that became Contemporary Knife Targeting.

Q You stated that some of the students of your MBC concept class are law enforcement. Would you state that most of the people who take your class are law enforcement officers?

A No.

Q Who is the average participant in those types of classes?

A The average participant is a civilian who is interested in self-defense.

Q And how much do you usually charge for those types of classes?

A I leave that up to my -- my hosts. So I have a standard fee. As I stated earlier, my fee is $150 per hour when I teach. So essentially that over the span of whatever the duration of the course would be, plus my expenses as far as travel, lodging, et cetera.

Q If you had to estimate, on average, how much do your clients spend for a training course with MBC?

A I would say, on average, probably around $250 to $300 for a two-day class.

Q Are you aware of any other studies, research papers, academic tests, et cetera, that also conclude that two-and-one-half-inch blades is the minimum for

self-defense?

A Not that I know of.

Q You say that a two-and-a-half-inch blade is necessary to make cuts of a sufficient depth to sever key nerves and muscles in an attacker; correct?

A Yes.

Q Would you agree that knives with longer blade lengths are more deadly or dangerous than knives with shorter blade lengths?

A Knives with longer blade lengths can cut more deeply, because they have a longer cutting edge. As far as their deadliness or inherent danger, it affects their mechanical capability to cut. It doesn't necessarily make them inherently more dangerous.

Q But you could inflict more damage on a person with a knife with a longer blade; correct?

A You could cut more effectively. You could also access in some cases other targets. In the MBC system, it wouldn't matter. Our targets remain the same.

Q What do you mean by your targets remain the same?

A The anatomical targets that we cut remain the same. When you look at historically different types of blades and different types of tactics, there are certain tactics -- for example, the ones that I was referring to

taught by Fairbairn during World War II, those -- in order to access some of the targets that he recommended, you need to have a minimum blade length of a certain length just to be able to reach that anatomical target.

Q Are you talking about, like, organs or...

A It depends again upon the system and the tactics that are being taught. In the case of Fairbairn, for example, one of the things that he recommended was targeting the aorta. So the descending aorta, that would require a knife of significant blade length.

Q On the heart; correct?

A It descends from the heart, yes.

Q And what length blade was that, do you recall?

A Typically six inches.

Q Six inches. Okay.

A That would depend upon the stature of the attacker.

MS. UYEHARA: All right. So that is all of the questions I have for now. Could we take a five-minute break for me to review my notes, and then when we come back from break, opposing Counsel, you can also ask questions that you would like at that time.

MR. DILLON: Okay.

MS. UYEHARA: We'll be back at 3:02.

(Recess.)

BY MS. UYEHARA:

Q Mr. Janich, we are just going to do the same thing we did before. We are going to go through a few other questions and follow-up questions on some of the things you stated earlier, and then at the end we'll let Mr. Dillon ask any questions that he'd like.

A Okay.

Q Okay. First of all, can you describe kind of like the general knife category. So there's automatic knives, and what would you say is the other, manual?

MR. DILLON: Objection. Vague.

BY MS. UYEHARA:

Q I'm sorry. Mr. Janich, what did you say?

A I was going to say, when you look at folding knives, you would have manually open knives, and I would kind of categorize those in two broad categories. One would be one-hand opening knives, and then those that would require two hands to open, like a traditional pocket knife or a Swiss Army Knife.

And then you would have automatic knives and then specialty knives, any type of unique mechanisms, say, like a Filipino balisong knife or any other exotic mechanism that might require some other type of mechanical operation that is other than a simple folding

blade.

Q And would you say all switchblade knives are automatic?

A Switchblade and automatic knives, those two terms are usually used interchangeably.

Q But would you say all switchblades are automatic?

A I use those terms interchangeably. So something that would fall -- when you consider a switchblade, in my opinion, what you would have is something that would be -- that would operate as a true switchblade.

When you look at legal interpretations of switchblades, there may be other types of knives that the law chooses to incorporate into that definition, but it doesn't necessarily change the nature of the knives themselves.

Q And so you stated that -- I believe you stated two top selling knives that Spyderco sells for self-defense; right? And there are four or five different variations of those knives. Are those knives automatic?

A No.

Q And are they legal in California?

A Again, legality depends upon location, because

California does not have preemption, as far as the overriding state law with regard to blade length. Different municipalities may have different laws. So there's no way to state categorically that they're legal or illegal.

Q In the state of California you can have a blade that's over two and a half inches or longer as long as it's not an automatic or a switchblade. Are either of those Spyderco knives, do they fall into that category?

MR. DILLON: Objection. Compound.

THE WITNESS: Could you please clarify that.

BY MS. UYEHARA:

Q Are both of the Spyderco knives, your top-selling knives, are they both over two and a half inches, and they're not automatic; correct?

A Correct. One has a blade length of about three inches. The other one is about three and three-quarters.

Q Okay. Earlier you said that Americans prefer carrying automatic knives. What is the basis for that opinion?

A I said that Americans prefer carrying one-hand opening knives, not specifically automatic knives. Again, that is based on my experience, having worked in the knife industry for 20 years, looking at the sales of

various types of knives, what is most popular, talking to various knife dealers, talking to consumers.

Q And so that preference by the average American is not based on any research papers or specific studies that were conducted?

A I don't have the specific statistics that I can cite. Again, it's based on over 20 years of experience working in the industry.

Q Would you consider that evidence to be anecdotal then?

MR. DILLON: Objection. Argumentative.

THE WITNESS: I would say that 20 years of experience is a significant way of understanding the preferences of the knife community and also having designed and manufactured knives for the 20-year period, having a good feeling for what consumers want.

BY MS. UYEHARA:

Q And we're going to go back a little bit to our discussion of Knife Rights from earlier. Can you describe your relationship with that organization?

A I don't have a relationship with the organization. As I said, Doug Ritter, I have known him as a casual friend over the past few years, meeting him at various trade shows. And we have a cordial friendship.

When he asked me to help in this, this is the first time that I've ever been officially engaged in any type of support of Knife Rights.

Q Have you ever donated to Knife Rights as an organization?

A No.

Q I'm sorry. I did not hear your answer.

A No.

MR. DILLON: Objection. Outside the scope and privileged.

BY MS. UYEHARA:

Q Have you ever offered any classes to Knife Rights or their members?

A There was one time that I -- I'm trying to remember exactly what it was. I donated I believe it was some instructional videos to a Knife Rights' fundraiser or something of that nature.

Q And that was with the intent of supporting the organization; correct?

A It was a favor for Doug Ritter. He asked me personally. He said they were doing a fundraiser, if there was anything that I could contribute.

Q Can you estimate the value of that course that you offered?

A I don't recall.

Q Okay. We're going to return a little bit to the resources you relied on for drafting your report.

So there were no attached exhibits or sources or other sorts of documents to your report. Was that your decision or counsel's?

MR. DILLON: Objection. Privileged.

THE WITNESS: Where I cited specific sources, I included the name of the source and the authors in there. I wasn't -- I wasn't tasked with providing any other attachments or anything similar to that. I simply cited the sources that I used.

BY MS. UYEHARA:

Q And many of the sources you used are sources that Robert Escobar relied on; correct?

A No. The sources cited in his report, in most cases there were a number of YouTube videos that he was citing, a lot of internet materials. Most of the sources that I was citing were published books with one or two exceptions.

Q And are those books publicly accessible?

A They were published, whether they're still accessible or not. Some of them were published by Paladin Press, which closed in 2017, so the commercial availability of them may be limited now, but they certainly were publicly accessible.

Q And besides books, what other resources did you rely on in developing your report?

A There was the one study with regard to the use of kitchen knives in criminal acts that's cited specifically in my report.

Q And besides that report, are there any other academic papers that you relied on in drafting your report?

A Not that I recall. And in addition to the books and the one kitchen knife report that you relied on, did you do any independent polling or surveying of either law enforcement individuals, your clients or other persons in the knife industry in reliance for your report?

MR. DILLON: Objection. Compound. Vague and ambiguous.

THE WITNESS: My report was prepared based again on my personal knowledge, my understanding and my experience. I didn't do anything specific to try to expand that knowledge or experience to support the preparation of this report.

BY MS. UYEHARA:

Q And did you interview any individuals in preparing to -- in support of your report?

A No.

MS. UYEHARA: All right. Give me one second to review my notes.

All right. That is all the questions I have.

Thank you, Mr. Janich, for taking the time for this deposition today.

Mr. Dillon, do you have any questions that you'd like to ask?

MR. DILLON: Just one question.

EXAMINATION

BY MR. DILLON:

Q Mr. Janich, In your expert opinion, does the fact that an individual may struggle to deploy a weapon in a self-defense scenario negate the fact that the weapon may be a legitimate and valid self-defense weapon?

A The fact that somebody struggles to deploy a weapon is a matter of training. As I said before, if you are going to carry any weapon for self-defense, you need to invest the time to train properly to have that ability, but the -- it doesn't affect the right to the access of those weapons.

MR. DILLON: That's it. I have no questions.

MS. UYEHARA: All right. Thank you again, Mr. Janich. Thank you, Ms. Gray.

THE COURT REPORTER: Mr. Dillon, would you like

a copy?

MR. DILLON: Yes, please.

(TIME NOTED: 4:15 p.m.)

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that the foregoing pertains to the original transcript of a deposition in a Federal Case. Before completion of the proceedings, a review of the transcript was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this dates subscribed my name.

Dated: 2/15/24

SHURI GRAY, RPR

CSR No. 3786

Katrina Uyehara

katrina.uyehara@doj.ca.gov

February 16th, 2024

RE: Knife Rights, Inc., Et Al. vs. California Attorney General Rob Bonta

02/08/2024, Michael Janich, JOB NO.6449120

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

RE: Knife Rights, Inc., Et Al. vs. California Attorney General Rob Bonta

Michael Janich, JOB NO.6449120

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

________________________________   _______________

WITNESS                            Date

**&**

**&** 89:23 90:9

**0**

**00474** 1:8 2:7 5:19
**02/08/2024** 89:5

**1**

**1** 1:25 90:1
**1,350** 13:12
**10** 4:12
**105** 3:7
**11** 21:18,19
**11th** 31:16
**125** 3:18
**13** 23:22 56:22 56:23
**1300** 3:18
**14** 4:15 42:17
**150** 12:16 76:15
**16** 17:9
**16th** 89:3
**19** 45:13
**1950s** 66:22
**1980** 17:1
**1981** 17:6
**1983** 15:25
**1997** 17:21
**19th** 27:25

**2**

**2** 23:21 24:20 24:21 25:17 46:7 50:21 52:17,18,19 64:11 66:4
**2.5** 69:13,25 71:12
**2/15/24** 88:22
**20** 58:17 81:25 82:7,12,15
**2003** 18:1
**2009** 27:4
**2011** 27:5
**2017** 84:23
**2024** 1:17 2:16 5:1 89:3
**2025.520** 89:9 89:12
**210-7867** 3:20
**22** 14:22 55:14
**24** 9:13
**25** 58:6
**250** 76:21
**255** 3:7
**2:06** 2:15 5:2
**2:10** 46:13

**3**

**3.2** 24:22
**30** 55:25 73:7 90:1
**300** 50:4 76:22
**31** 33:16
**32** 33:16
**37** 4:17
**3786** 1:23 2:18 88:25
**3:02** 78:25
**3:23** 1:8 2:7 5:19

**4**

**4** 20:1,2,2
**4:15** 2:16 87:4

**5**

**5** 4:6
**50** 16:19,22,23 39:9 45:15,23
**51** 69:12
**58** 24:13

**6**

**60** 23:18 24:12
**6209** 88:24
**642-7150** 3:9
**6449120** 1:24

**7**

**760** 3:9

**8**

**8** 1:17 2:16 5:1
**86** 4:7
**88** 1:25

**9**

**916** 3:20
**92009** 3:8
**94244-2550** 3:19

**a**

**ability** 9:14 26:11 54:3 61:13 62:1 70:24 71:2 73:3,17 86:20
**able** 7:25 9:2 10:14 22:14 26:15 31:13 32:14 33:9 35:12 39:6 49:2 54:3,18 62:6 65:18 70:4,25 71:3,4 73:5 78:4
**above** 89:6
**abrasive** 20:20 21:2
**absolute** 69:13
**academic** 76:24 85:7
**access** 77:18 78:2 86:21
**accessibility** 45:9
**accessible** 65:24 84:20,22 84:25
**accident** 25:14
**accommodate** 8:21
**account** 68:9
**accurately** 61:2
**act** 45:18
**action** 34:4 60:5,22,24 61:4 88:18,19
**actions** 37:20 47:17

KR1764

**activate** 54:13
**active** 16:5 17:15 47:16
**actively** 18:10
**acts** 15:11 85:4
**actually** 17:5 27:14,23 50:9 50:10 62:7 72:22 74:13
**addition** 43:3 85:9
**additional** 13:16 16:12
**address** 54:10
**addressing** 48:25
**adjacent** 71:4
**administered** 5:5 88:8
**admit** 64:13
**advertise** 11:24
**affect** 9:13 26:11 72:6 86:20
**affected** 70:11
**affects** 77:12
**affirmatively** 49:25
**afternoon** 9:3
**agency** 16:25 17:6
**ago** 16:22,23 45:15 47:3 67:22
**agree** 28:23 33:23 38:5 45:7 55:7,13 77:7
**agreed** 48:12
**agreement** 12:7 12:9,11
**ahead** 19:8 24:9 60:21
**al** 5:16 89:4 91:1
**allow** 26:10 36:1 39:5 65:21
**allowed** 49:13 49:15 51:17 57:4
**alternate** 26:24
**ambiguous** 34:6 36:24 39:17 51:24 70:16 85:16
**america** 68:8
**american** 6:11 45:9 58:7,14 67:24 82:3
**americans** 46:3 46:6 59:2,3,10 59:15 81:19,22
**analog** 71:21 71:25
**analogous** 47:10
**analysis** 40:10 40:16 43:18,19
**analyzed** 32:2 42:25 43:6
**analyzing** 43:1
**anatomical** 71:1 77:22 78:4
**ancillary** 36:3
**anecdotal** 82:10
**angeles** 53:8
**answer** 6:22,25 7:21,23 8:15 8:16,23 9:14 19:8,10 39:19 83:7
**answers** 8:3 46:20
**aorta** 78:9,10
**apc** 3:4
**apologies** 63:1
**apologize** 14:19
**appearances** 3:1
**appeared** 21:19
**appearing** 1:15 3:5,15 89:18 90:7
**applegate** 75:4 75:8
**application** 33:14 37:23
**applied** 31:2,18 72:23
**apply** 14:5
**applying** 17:5
**appreciate** 41:9
**approached** 11:20
**approximately** 12:24 23:18,21 24:2,3,13 52:2
**area** 26:21 44:11 53:2
**areas** 13:25 26:5 45:17 53:7,8
**argumentative** 45:11 49:19 64:15 82:11
**aristocracy** 27:24
**arm** 35:12
**arm's** 35:13
**armed** 31:11
**army** 79:20
**arteries** 74:18 74:19
**article** 30:5
**articles** 30:3,9
**arts** 16:16,18 16:21 17:8,13 31:10,13
**asian** 16:2,9
**asked** 11:20 12:2 14:1 28:13 46:19 48:7 49:1,2 75:2 83:1,20

[asking - benefits]

**asking** 7:20,24
**aspect** 40:17
**aspects** 22:3,9 22:13 35:24 41:12
**assaults** 32:3 42:19
**assertion** 39:22
**assist** 15:12
**assume** 6:22 32:6 46:23 67:23
**assuming** 57:10
**atlanta** 47:3
**attached** 84:3
**attachments** 84:10
**attack** 32:16 43:4,4 54:8 70:21 73:5,18
**attacked** 62:8
**attacker** 30:25 34:10 35:18 70:15 71:2 72:7,18,25 73:3,21 77:5 78:18
**attacker's** 34:11
**attacks** 30:21 30:23,24 31:16 40:17 43:1,2
**attempted** 53:20
**attempting** 33:2
**attend** 15:22
**attending** 2:15
**attorney** 1:9 2:8 3:14,16,17 5:10,13,16 88:19 89:4 91:1
**authoritatively** 54:10
**authors** 84:8
**auto** 25:14
**automatic** 12:6 14:5 24:10 50:4,8 52:6 55:23 56:1 57:3 62:21 63:3,4,7,18,24 64:4,13 65:12 66:9 79:10,21 80:3,4,7,22 81:8,15,20,23
**autonomy** 50:14,21
**availability** 45:24 84:24
**available** 43:23 45:2,6,16,25 50:23 63:4 67:5,22
**average** 45:9 59:22 61:17 67:24 68:5 76:8,10,19,21 82:3
**avoid** 22:15
**avoidance** 22:14
**aware** 18:15 47:14,20 51:13 53:5 65:16 76:23
**awareness** 22:14

**b**

**b** 4:15 14:10 90:1
**back** 12:2 14:20 20:11,19 27:23,24 46:12 46:18 54:2 66:22 67:5 68:10 69:7 73:1 75:10 78:22,25 82:18
**background** 15:18
**balisong** 30:11 79:23
**base** 41:7,8,17 42:14 45:21 58:13 69:17,18
**based** 11:21 32:17,19 38:16 40:10,24 44:6 57:23 58:4,24 69:19 81:24 82:4,7 85:17
**basic** 17:2 50:24
**basically** 20:19 22:7 27:16 72:19 73:7 75:1,8
**basis** 26:22 38:7,24 55:20 59:6 71:12 76:1 81:20
**bear** 33:20
**began** 16:21 17:5,8,18 45:14
**beginning** 2:15 46:19 61:14
**behalf** 2:14
**belief** 72:17,20
**believe** 11:3 17:25 23:22 32:25 33:5,7 33:11 34:1 35:8 39:14,24 40:25 41:2,13 41:18 45:4 50:5 53:7 54:25 55:5,21 59:10,14 62:9 62:13 68:4 69:4 80:18 83:15
**belt** 17:10
**beneficial** 60:3
**benefits** 60:17

**best** 7:23 8:22 9:6,9 13:15 21:15,18 57:12 66:7
**beyond** 68:4
**bicep** 71:23
**biggest** 37:22
**bit** 22:2 73:24 82:18 84:1
**black** 17:9 50:21
**blackhawk** 21:9
**blacksmith** 69:2,8
**blade** 17:24 18:9 20:5,9,11 20:12,20 24:1 24:22,23,24 25:1,2,4,20 26:23 27:14,21 27:22 28:1 30:18 31:19 35:22 43:2 46:7 47:3 50:25 52:9 53:9,10 54:13 57:4,11,14 58:12 59:3,12 59:16 60:2,10 60:17 61:4,12 62:14,23,24 63:11,12 64:3 64:5 68:16,23 68:23,25 69:13 69:19,24 70:1 70:6,11,23,24 71:13 77:3,7,9 77:10,16 78:3 78:10,14 80:1 81:2,6,16
**blades** 20:22 21:9 52:10 60:5,7 63:5 68:14 76:25 77:24
**bleed** 74:20,20 75:22
**bleeds** 75:18
**blood** 36:3,3 72:10,11,14,17 72:20,25 73:6 73:8 75:17
**blunted** 63:12
**body** 35:24 73:14 74:18
**bonta** 1:10 2:9 3:13 5:13,17 89:4 91:1
**book** 72:16,18 72:19 73:24,25 74:12,13 76:2
**books** 29:14,20 74:13 84:18,20 85:1,10
**boss** 48:23
**boston** 69:23
**bought** 53:19
**boxes** 27:13
**brachial** 35:6,9
**break** 8:20,22 46:12,12 78:21 78:22
**breaking** 25:14
**breaks** 8:22
**brennan** 28:10
**bring** 60:5
**bringing** 33:18 33:20
**brings** 51:12
**british** 27:23 74:15,15,22
**broad** 53:23 79:17
**brought** 19:14
**buildings** 69:24
**built** 29:8
**business** 17:17 17:24 18:2 50:7
**butcher's** 71:19
**butterflying** 71:17

**c**

**c** 4:17 37:3,5
**ca** 89:9,12,20
**california** 1:2,9 2:2,8 3:8,14,19 5:10,13,16,18 12:5 18:12 19:5,13 24:5,6 24:12,14 26:19 46:4 48:25 49:21,23 50:1 50:6 51:4 52:20,23 53:2 80:24 81:1,6 88:4 89:4 91:1
**call** 34:24
**called** 6:18 20:18 24:20,23 68:18,20 71:15 72:18 74:7,11 74:14
**cambodia** 6:12
**camera** 21:19
**capabilities** 68:4
**capability** 34:9 34:22 35:14 77:13
**capacity** 11:14 17:12 72:1,4
**car** 25:9,11
**career** 16:16 32:6 44:6
**carlsbad** 3:8
**carry** 12:20 24:16,19 25:5 25:5,7,9 26:2 26:22,24,25 33:8 47:9,12 47:18 52:19 53:6 54:16 57:2,3,6,16 58:3,21 59:6,7 59:9,11,15 60:8 69:21,25 86:18

**carrying** 50:17 81:20,22
**case** 1:8 2:7 5:12,15,18 11:1,12,19,23 12:2,3,8,13,18 12:23 13:13,16 14:2,7,17 18:13,16,19 19:6,23 22:11 28:5,9,18 46:22 48:3 49:8,10 69:20 70:3 78:7 88:14
**cases** 6:1 7:24 60:7 61:22 77:18 84:16
**casual** 82:23
**categorically** 81:4
**categories** 59:8 79:17
**categorize** 25:25 79:17
**category** 56:5,8 56:10,11,13 59:20 79:10 81:9
**cause** 21:3 40:19 54:2
**cbc** 30:18,20,22 31:25 32:2 62:21,23
**ccp** 89:9,12
**center** 1:6 2:5 25:12 71:18
**century** 27:25
**certain** 51:19 53:5,8 77:24 78:3
**certainly** 34:11 57:1,2 84:25
**certified** 2:17 44:8 88:3
**certify** 88:4,17
**cetera** 76:18,24
**challenge** 47:21
**challenging** 47:17 61:15
**change** 26:10 50:7 75:25 80:16 91:4,7 91:10,13,16,19
**changes** 8:6 15:15
**channel** 21:16
**characterizati...** 28:23 36:15
**characterize** 42:8
**charge** 76:12
**chicago** 69:23
**chinese** 16:5,11 17:3
**choice** 25:15 64:21
**choose** 26:2,22 40:8,22,23 65:18 73:15
**chooses** 40:14 80:15
**chores** 27:11
**chris** 74:4,24 75:12,24
**cia** 75:6
**circle** 46:18
**circumstance** 34:8
**circumstances** 7:19 41:3
**cite** 82:7
**cited** 84:7,11 84:15 85:4
**citing** 15:3 74:11 84:17,18
**citizens** 47:13
**civil** 89:19,20
**civilian** 76:10
**claimed** 38:19
**clarify** 6:21 34:7 81:11
**class** 76:4,5,22
**classes** 12:20 29:9 61:11 65:11 71:15 76:9,13 83:12
**classified** 52:15
**classify** 52:11
**classroom** 33:12
**clear** 7:1
**clearly** 58:7,14
**cliché** 55:11
**clients** 76:20 85:12
**clipped** 25:7
**close** 75:5
**closed** 57:21,23 84:23
**closely** 11:11
**clothing** 58:2
**club** 17:13,16
**cnc** 67:16
**coast** 50:15,18 50:19
**coauthored** 72:16
**code** 89:9,12,19 89:20
**cohost** 21:17
**cohosts** 21:20
**colleague** 5:11
**collectible** 23:4 23:7
**collecting** 45:14
**collection** 23:15,16,24 57:10
**collector** 45:22
**collector's** 56:25
**college** 15:22 15:24,25 16:6 16:20
**colonel** 75:4,8

**colorado** 1:16 5:1 18:6 20:8 20:14 44:19 74:6
**combat** 21:10 75:5
**combative** 72:23
**come** 43:16 46:12 75:14 78:21
**comes** 59:14,17 68:3 70:23,24 73:2
**comfortably** 57:15
**coming** 31:4
**commandos** 74:15
**comment** 8:5
**comments** 66:20
**commercial** 17:15,16,17 21:7 64:1 84:23
**commercially** 27:4 64:2
**commission** 37:25 38:9
**commitment** 64:20,25 65:4
**common** 38:13 55:11,11 56:13 56:17 68:8 70:2
**commonly** 42:19
**community** 82:14
**companies** 18:7 18:23 19:21 21:8,12 63:6
**company** 18:5 18:10 19:17 51:4,12,16
**compare** 66:23 67:15
**compensated** 12:12
**compensation** 49:10
**competency** 8:25
**complaint** 4:12 9:22 10:7,12 10:19,22
**complete** 9:2
**completed** 12:10 89:7,17 90:6
**completely** 63:12
**completing** 17:2
**completion** 88:15 90:10
**compliant** 20:6 20:8 26:21 53:11
**complicated** 61:5
**compound** 70:17 81:10 85:15
**compression** 24:25
**computer** 67:17
**concept** 76:4
**concepts** 17:24 18:9 30:18 31:19 35:22 43:3 61:13 62:23,24 69:19 70:2,6
**concern** 54:11 54:20 55:3 60:11,13 61:1 62:13,15,19
**concerned** 31:20 62:9,11
**concerning** 31:12
**conclude** 76:24
**conclusion** 19:7 24:7 43:16 44:4 52:21
**condition** 9:8
**conduct** 6:10 43:15
**conducted** 58:22 82:5
**confidence** 75:10
**configurations** 50:23
**congress** 6:3
**connecting** 35:25
**consider** 13:19 13:21 25:22 28:9,25 29:2 35:20 41:4,14 42:11 48:8 53:21 56:3,9 59:23 69:19 80:9 82:9
**consideration** 41:1,2
**considerations** 57:4
**considered** 23:5
**consistency** 26:8
**consistent** 39:7 43:19
**console** 25:12
**construction** 66:24 67:2
**consult** 29:12
**consultation** 38:18
**consumers** 58:20,20 82:2 82:16
**contact** 21:25 30:21,23,25 35:2 44:10

63:14 89:9
**contacted** 11:3 11:9
**contemporary** 72:19 74:2 76:2
**context** 27:12 34:13 35:1,15 36:25 38:6 39:20 40:7 41:10 72:22,24
**contexts** 42:16
**continue** 72:7 73:5
**continuing** 73:18
**contrast** 69:1
**contribute** 83:22
**control** 35:11 55:10 67:17
**convenience** 55:17,22,24 58:8
**copy** 10:12,19 14:9,13 87:1
**cordial** 82:24
**correct** 6:16 13:8,14 18:23 21:13 25:18,19 28:7,18,19,24 29:22 31:3,6 32:4,5,8,14,18 32:20 46:24 48:20 51:9 52:17 56:20,24 63:20 65:6 71:10 72:12 77:5,16 78:12 81:15,16 83:19 84:14
**corrections** 89:14,15 90:3 90:4
**correctly** 53:9
**cost** 64:4
**counsel** 13:13 78:22 89:18,21 90:7
**counsel's** 84:5
**counter** 30:18 31:19 43:2 62:23
**countries** 19:20
**country** 26:5 51:9
**county** 1:6 2:5
**couple** 15:17
**course** 76:17,20 83:23
**court** 1:1 2:1 5:17 6:16,18 7:10,14 10:16 14:11 37:6,21 37:24 38:8,11 38:15,21 86:25
**create** 13:4 31:7 35:3,3 40:20 68:23 69:6 71:21
**created** 69:18
**creating** 35:15 68:13 70:1
**creation** 31:25
**credit** 16:6
**crime** 37:25 38:9 44:10 45:5,8
**criminal** 15:11 32:3 40:18 42:19 85:4
**criminals** 39:14 39:22,24 40:5 40:8,21 43:23 43:24
**critics** 55:12
**crude** 67:14
**cry** 67:4
**csr** 1:23 88:25
**culturally** 39:15,25
**culture** 16:9
**current** 18:25 50:7
**currently** 18:3 18:8,12,22 19:1,5 23:1,2 44:7,20 46:3,4 50:3 52:4 66:25
**curriculum** 74:10 75:25
**custom** 20:5
**cut** 62:16 68:20 68:22 71:3,4 72:6 77:10,13 77:17,22
**cutlery** 15:11 59:18 67:14
**cuts** 28:2 72:2 77:4
**cutting** 24:24 25:3,13 27:11 28:2,4 62:10 62:12 71:8 77:11
**cv** 1:8 2:7 5:19

**d**

**d** 1:14 2:13 4:3 5:4
**daily** 26:22 57:2 59:6,7,9
**damage** 77:15
**danger** 34:12 73:6 77:12
**dangerous** 34:2 34:5,8,12,16 77:8,14
**date** 12:22 13:12 89:16 90:5 91:24
**dated** 88:22
**dates** 88:20
**day** 61:23 76:22
**ddl** 1:8 2:7
**deadliness** 77:12
**deadly** 77:8

**[dealers - determine]**

**dealers** 82:2
**death** 74:11,17 74:21
**decades** 67:22
**december** 11:4 11:9 12:3 48:15,16
**decision** 84:5
**decisively** 35:4 73:4
**declarations** 28:14
**declaratory** 4:12
**deeply** 72:6 77:11
**defend** 26:11 32:7 54:1
**defendant** 1:11 2:10,14 3:12 5:13 8:5
**defended** 37:19
**defender's** 34:15
**defending** 30:23 35:1
**defense** 11:22 12:20 13:22,24 14:3 16:7,16 16:22 17:19 21:9,16,18,22 22:1,4,9,13 25:16 26:3,7 27:8,20 30:19 30:22 31:4,7 32:23 33:2,3,9 33:15,19,21 34:9,19,25 35:7,15,17 36:7,10,13,21 38:1,13,20,25 39:7,10,11,13 40:11 46:8 48:6 53:14,21 54:16,22 55:13 59:24,25 60:3 61:10 62:25 64:10,12,14,19 64:24 66:1 69:14 70:5,8 70:19 71:13 72:10,15,18,24 73:2,12 76:11 77:1 80:20 86:13,14,18
**defenses** 30:20
**defensive** 13:24 72:21 74:8
**defensively** 21:2
**definition** 52:7 80:15
**degree** 16:13 19:13
**delica** 66:5
**demonstration** 71:15
**demonstrations** 71:14
**denominator** 70:3
**denver** 75:13
**deny** 36:17
**department** 5:11 44:23
**departments** 44:18,21
**depend** 53:2 54:7 57:8 58:1 78:17
**depending** 73:22
**depends** 78:6 80:25
**depiction** 42:6
**depictions** 42:9
**deploy** 54:4 61:2,8 86:12 86:16
**deposition** 1:14 2:13 4:10 5:22 6:17 8:1,6,10 9:17 10:2,4,15 10:23 14:10 37:5,13 49:12 49:16 86:5 88:14 89:19,22 89:24 90:8,10
**depot** 27:16
**depth** 57:24 58:5 77:4
**deputy** 3:16,17 5:10
**derived** 16:7
**descending** 78:9
**descends** 78:13
**describe** 16:3 21:15 22:5 24:21 27:10,19 39:4 42:5 47:6 63:8 74:3 79:9 82:20
**description** 4:11
**design** 13:23 20:2 21:13 27:1,3,6 50:22 52:1 67:21
**designed** 18:21 19:2,4,11,16,18 19:25 20:3 22:7 25:13 27:4,7,24 30:19 50:17 51:20,21 52:5 57:14 60:24 64:9,10,14,19 82:15
**designs** 24:19 58:10
**despite** 32:13
**destructive** 72:1,4
**detail** 22:16
**determine** 12:17

**determined** 89:18,22 90:7
**develop** 31:19 61:15,18 65:5
**developed** 50:15
**developing** 29:13 32:2 66:12 85:2
**development** 43:2
**differ** 26:6
**different** 21:24 22:13 29:15 35:10 42:16 45:23 50:1,10 50:12,23 54:9 59:7 65:4 66:7 67:1 68:12 75:19 77:23,24 80:21 81:3,3
**differentiated** 55:15
**differently** 8:3 68:10
**difficult** 33:19 33:21 45:16
**diffuse** 54:4
**diligence** 61:21
**dillon** 3:4,6 4:7 8:13,14 10:3 11:15 12:10 15:14 19:7 24:7,9 34:6 36:23 39:17 40:2 41:24 45:11 46:9 48:11 49:19 51:5,14,24 52:21 53:16 54:14,23 64:15 68:1 70:16 78:24 79:7,12 81:10 82:11 83:9 84:6 85:15 86:6,8 86:10,22,25 87:2
**dillonlawgp....** 3:10
**direction** 88:10
**directly** 29:18 48:23
**disable** 73:17
**disagreed** 39:23
**disassembled** 23:2
**discuss** 51:17
**discussed** 15:15 70:18 71:1
**discussion** 66:12 82:19
**disparity** 70:20
**disposed** 43:24 45:2
**disproves** 72:17,20
**distance** 21:25 30:21,24 31:2 35:3
**distant** 35:2
**district** 1:1,2 2:1,2 5:17,18
**document** 14:16,17,25 37:8,10
**documents** 9:23 13:6 29:24 43:15 84:4
**doing** 68:15 72:2 75:12 83:21
**doj.ca.gov** 3:21 89:2
**donated** 83:4 83:15
**doug** 47:2 49:1 49:5 82:22 83:20
**dowel** 71:18
**dozen** 18:21 52:2
**drafting** 13:10 84:2 85:7
**dramatic** 21:21 22:10,17
**dramatized** 42:10
**draw** 53:25 60:11 61:13,18 62:1 62:3,3,10,15
**drawing** 49:9 60:11,13,24
**drawn** 60:18
**drills** 33:12
**driving** 11:7
**drop** 19:19 72:5
**duane** 5:21
**duration** 76:17
**duty** 16:5
**dynamic** 70:22
**dynamics** 70:18,19

**e**

**e** 89:9,12 90:1 91:3,3,3
**earlier** 25:17 27:22 42:25 48:18 51:19 55:2 70:11,19 71:9 72:9 73:25 76:15 79:6 81:19 82:19
**early** 27:24 31:10 48:16 68:8
**earn** 19:1
**earned** 13:12
**earning** 17:9
**ease** 55:17,24
**easier** 60:5,11
**easiest** 65:18
**easily** 43:24 45:2 52:15

**edge** 24:24 25:3 25:4 28:2 63:13 77:11
**edged** 29:5 30:21,23 31:5 31:17,21,24 32:3,8 39:10 50:23 62:25
**education** 16:12
**effect** 8:4 36:3 36:18 70:25 73:7
**effective** 36:7,7 70:4 71:8 72:17
**effectively** 26:12 33:10 35:14 36:2 54:4 55:11 61:19 77:17
**effectiveness** 70:10
**efficiency** 27:7 28:4
**efficient** 61:25
**efficiently** 61:2
**efforts** 47:9,24 48:19
**eight** 24:3 57:20
**either** 23:11 28:13 48:16 52:12 81:8 85:12
**element** 54:5
**elements** 54:7
**eliot** 1:5 2:4
**elite** 21:10
**emphasis** 40:8
**employed** 18:8
**employee** 49:13 88:18
**employees** 69:23
**employer** 6:4 6:14 10:5 48:18 49:15,22 51:8
**employers** 18:11,15
**employing** 72:3
**employment** 18:4
**endura** 20:1,2 20:2 66:4
**enforcement** 38:17 43:12,13 43:21 44:3,5,8 74:6,8,25 76:4 76:6 85:12
**engaged** 83:2
**engagement** 12:8
**engineering** 67:20
**enlisted** 17:1 75:13
**entailed** 48:24
**entails** 16:3 71:16
**entire** 23:15 34:10 51:22 72:16
**entirely** 54:5
**entitled** 7:23
**equation** 59:23
**equivalent** 65:9
**equivalents** 63:25 64:8 65:15 66:10
**era** 74:14
**errata** 89:14,16 90:3,5
**escobar** 28:6,20 39:21 48:4 67:11 84:14
**escobar's** 9:20 13:2 15:1,8 33:17 40:7 55:5 66:20
**especially** 62:6
**esq** 3:6
**essentially** 34:24 47:10,12 48:25 63:10 71:15 75:14 76:16
**estimate** 7:20 7:25 13:5,9,11 13:15 22:22,23 23:23,25 24:5 24:12 32:10 46:6 51:3 76:19 83:23
**estimates** 51:11
**et** 5:16 76:18 76:24 89:4 91:1
**ethically** 39:6
**event** 25:14
**everyday** 27:11
**evidence** 38:14 41:7,17 42:14 45:21 58:13 69:17 71:11 82:9
**exact** 11:7 32:12
**exactly** 34:13 83:15
**examination** 4:2 5:7 86:9
**examined** 5:5 38:11
**examiner** 75:13
**example** 64:11 77:25 78:8
**exception** 23:14
**exceptions** 84:19
**execution** 67:21
**exhibit** 4:12,15 4:17 10:13,15 14:10 37:3,5
**exhibits** 4:10 84:3

KR1773

**exotic** 79:23
**expand** 85:20
**expenses** 76:18
**experience** 32:20 38:16 58:25 61:7 62:7 81:24 82:7,13 85:19 85:20
**expert** 4:15 6:5 6:9 11:21,24 12:8,10 13:2 13:20,21 14:6 14:13 15:19 21:17 28:5 29:2 32:25 33:16 42:17 45:13 46:2 48:5,13 49:2 86:11
**explain** 19:25 20:16 25:1 30:18 34:18 35:6 37:20 42:23 66:18 67:7
**explained** 43:22 48:23
**express** 73:19
**expression** 75:15
**extending** 34:21
**extensive** 29:14 58:24
**extra** 21:1
**extremely** 29:17 66:17

**f**

**facing** 31:10 72:25
**fact** 31:16 45:22 55:21 60:22 75:21 86:12,13,16
**factor** 40:13,18
**factors** 44:25 70:12
**fairbairn** 74:12 75:7,20 78:1,8
**fall** 49:21 50:2 52:6 56:9 80:9 81:9
**familiar** 41:14 41:22 47:3 49:4 54:17
**familiarity** 41:8 42:2 58:20
**far** 21:10 22:3 22:13 24:10 36:15 42:2 44:10 47:16 48:5 57:13 58:18 59:20,25 60:8 67:1,4,21 69:20 76:18 77:11 81:1
**favor** 83:20
**fear** 43:25 45:3
**february** 1:17 2:16 5:1 89:3
**federal** 45:18 67:5 69:23,24 88:14 90:1,8,9
**fee** 76:15,15
**feedback** 44:6
**feel** 8:2 9:5 47:17
**feeling** 82:16
**fell** 51:4
**felonious** 38:12
**feloniously** 37:25 38:9
**felt** 11:22 31:22
**female's** 58:2
**females** 57:25 58:1
**field** 13:19 29:3
**fields** 13:19,21 13:22 29:17
**fight** 47:9,15
**fighting** 74:13
**filed** 6:14 10:8 14:17
**filipino** 79:23
**final** 13:4 15:16
**financially** 19:22 88:17
**find** 27:15,16 45:16,24 47:11 64:18 72:5
**findings** 43:19
**finish** 20:21
**finished** 68:17 68:23
**finishing** 20:10
**firearms** 22:1 47:11
**firestone** 1:16 5:1
**firm** 11:15
**first** 10:25 11:2 11:20 16:21 17:7,8,9,18,20 22:10 35:23 36:4 45:14 47:2 48:9 50:14 54:12 62:18 69:18 75:16 79:9 83:2
**fit** 56:23 57:12 57:17
**five** 22:24 50:5 50:8,10 58:10 71:16 78:20 80:20
**fixed** 25:20 52:9,10 59:3 59:12,16 60:2 60:5,7,10,17 62:14
**flat** 68:19 69:10
**focus** 16:1 31:18 61:13
**focused** 31:13

**focuses** 28:5 31:3
**folded** 60:12
**folders** 52:13
**folding** 24:22 25:18 33:18 56:2,4,6,6,10 56:14,17,17 60:1,3,7 61:1,8 61:18 62:3,14 79:15,25
**follow** 13:3 46:20 79:5
**follows** 5:6 89:8
**force** 11:7 72:8
**forearm** 71:22
**foregoing** 88:5 88:7,11,13
**forge** 67:24
**forged** 68:11,14
**forging** 68:12 68:15,15 69:5
**form** 42:20
**formal** 16:7,19 29:9 43:17,17 58:24
**formed** 17:25 18:1
**former** 6:4,14
**formulate** 38:14,22
**forth** 88:6
**forward** 49:3
**found** 15:10
**foundation** 36:23 53:17 64:16 68:2
**founder** 20:3
**four** 22:23 24:2 57:14 80:20
**frame** 75:22
**frcp** 90:1
**frequently** 26:4 37:24 38:8
**friend** 74:5 82:23
**friendship** 82:25
**frightened** 41:20
**frightening** 39:16 40:1,6 40:10,22,24 41:5,15 42:12
**front** 6:2 56:3 56:11,14,18
**fronts** 56:7
**full** 5:20 28:2 48:14
**function** 34:21 55:23,23 60:6
**functional** 22:25 23:13 57:1
**functions** 35:12
**fundraiser** 83:17,21
**furnished** 68:25
**further** 67:7 88:13,17

**g**

**gain** 19:22
**garrison** 1:5 2:4
**gateway** 3:7
**general** 1:9 2:8 3:14,16,17 5:10,13,16 14:4 34:4 47:23 48:24 56:5 64:25 79:10 89:4 91:1
**generally** 39:14 43:19
**gentleman** 74:4
**gestures** 7:12
**getting** 17:18 49:7,9,16
**give** 9:6 10:18 86:1
**given** 44:7 88:12
**giving** 9:9
**glesser** 20:3
**go** 8:25 19:8 24:9 60:21 69:7 73:9 79:4 82:18
**goal** 72:21 73:11,12
**goes** 27:23
**going** 10:12,13 14:7 15:17 33:8 37:16 46:18 54:16 79:3,4,15 82:18 84:1 86:18
**golden** 18:6
**good** 5:9 27:19 46:13 82:16
**governing** 12:7
**graduate** 15:20 15:24
**graduated** 15:25
**grasp** 60:23
**gray** 1:22 2:17 86:24 88:24
**great** 8:25 28:4
**greater** 22:16 62:13 73:5
**grind** 20:21
**grinder** 20:10
**grinding** 20:9 68:17
**grooves** 20:19 20:23 21:5
**ground** 20:5
**group** 3:4
**grouse** 74:5,24 75:12
**guard** 50:15,18 50:19 74:16

**guess** 7:6,22 63:25
**guys** 66:1

**h**

**h** 91:3
**half** 20:14 51:2 70:7,14 71:7 72:6,12 76:25 77:3 81:7,14
**ham** 1:6 2:5
**hammering** 68:16 69:3
**hand** 20:10 26:1 58:9,15 59:3,11,16 67:14,15 79:18 81:22
**handle** 20:17 50:16,20 60:23 63:16 66:6
**handled** 89:8
**handling** 62:11
**hands** 33:13 79:19
**happen** 27:14 53:13,22
**harassment** 6:13
**hear** 55:12 83:7
**heard** 46:22
**heart** 75:17,18 78:12,13
**heat** 67:3 68:24
**heavily** 61:13 75:17
**held** 72:20
**help** 83:1
**helped** 75:24
**high** 15:20 33:21 66:17
**higher** 67:19,20
**highly** 23:13 45:8
**hijacking** 31:17
**historian** 28:21 28:25
**historical** 15:3 15:5 29:23 30:2,16 41:10
**historically** 51:22 56:15 77:23
**histories** 30:1
**history** 13:22 15:4 16:9 27:22 29:3,4,7 29:13,15,19 30:16 41:11,11 56:16
**hobbyists** 68:5
**holding** 67:18
**home** 22:3,3 27:16 67:25 74:16
**honestly** 13:17
**hosts** 76:14
**hour** 12:16 76:16
**hourly** 12:17
**hours** 9:13 12:22,24,25 13:11,16 61:24
**huhs** 7:11
**human** 71:21 71:22,23
**hundred** 22:24
**hundreds** 32:2 32:12,13 43:1
**hypothetical** 53:17

**i**

**idea** 31:10 64:4 69:9
**identical** 63:11
**identification** 10:16 14:11 37:6
**identified** 4:11 74:17
**identify** 32:14
**ii** 72:23 74:14 74:22 75:6,7 75:11 78:1
**illegal** 18:12 19:5,13 24:6 24:11,13 81:5
**imagine** 69:1
**impact** 28:22 30:24 31:5
**implement** 54:16
**important** 6:24 26:8 33:1 34:19 35:7
**imported** 19:12 19:20 52:14 66:21
**inaccurate** 36:16
**inappropriate** 72:24
**incapable** 73:18
**incapacitated** 75:23
**inch** 24:22 53:9 57:14 67:19 69:13 71:12 76:25 77:3
**inches** 20:14 23:21,22 24:2 24:3 46:7 51:2 56:22,23 57:17 57:20,23 69:25 70:7,14 71:7 72:6,11,12 78:15,16 81:7 81:15,17
**incident** 32:15 38:11
**incidents** 38:19 38:20
**include** 59:18
**included** 21:23 21:24 30:5 84:8 89:14 90:3
**including** 21:25

**income** 19:1
**incomplete** 53:16
**incorporate** 80:15
**independent** 85:11
**index** 4:1
**indicated** 42:18
**individual** 64:22 68:16 86:12
**individuals** 29:20 32:13,20 41:13 61:7 62:2,9 85:12 85:23
**industry** 81:25 82:8 85:13
**inexpensive** 43:23 45:1
**inflict** 77:15
**influenced** 75:17
**information** 14:24 22:8 30:5 51:13,15
**inherent** 77:12
**inherently** 39:16 40:1,6 40:22,23 41:5 41:12,15 42:12 77:14
**initiate** 72:11
**injunctive** 4:13
**injure** 39:12
**injuries** 73:20 73:21
**injury** 21:3 40:19 60:12,15 73:23
**inspired** 31:7
**instance** 32:22
**instances** 61:10 63:4 70:13
**instilling** 75:10
**institute** 16:8
**instruction** 22:2
**instructional** 21:23 22:8,16 83:16
**instructor** 21:22 74:7,9 75:5
**instructors** 44:8
**instructs** 8:15
**intelligence** 16:25
**intend** 6:19 28:16
**intent** 40:18 83:18
**interchangea...** 80:5,8
**interest** 45:23 65:11
**interested** 76:11 88:18
**international** 19:16
**internationally** 51:9
**internet** 84:17
**interpretations** 80:13
**interrupt** 7:15
**interview** 4:17 37:14 44:4 85:23
**interviewing** 37:18
**intimidated** 41:19
**intimidating** 40:9 41:12
**intimidation** 40:12,13,17,20 40:24
**introduce** 37:3 62:6
**invest** 86:19
**investigating** 6:11
**investment** 64:6
**involve** 16:16 22:19
**involved** 10:25 11:2,2 30:15 34:12 38:18 53:24 65:22 75:19
**involvement** 18:15,18
**involving** 38:19
**iron** 68:7
**issue** 18:13 19:6,23
**issues** 26:23
**italian** 66:22 67:13
**item** 56:25

**j**

**jane** 3:17 5:11
**janich** 1:14 2:13 4:3,17 5:4 5:21 19:10 46:18 79:3,14 86:4,11,24 89:5 91:2
**january** 48:16
**jdillon** 3:10
**jes** 1:8 2:7
**jessie** 44:15
**jim** 1:5 2:4
**jimping** 20:18
**job** 1:24 16:5 89:5 91:2
**john** 3:6 44:15
**john's** 44:16
**join** 48:19
**joined** 5:11
**jumbo** 57:14
**jurisdiction** 26:9,18 57:8

**jurisdictions** 20:6 26:14 44:9 57:3 60:9
**justice** 5:11

**k**

**kaagan** 1:5 2:4
**katrina** 3:16 5:9 89:1
**katrina.uyehara** 3:21 89:2
**keep** 35:4
**key** 73:4 77:5
**keychain** 23:20
**kill** 34:24
**kind** 23:11 24:18 29:12 33:11 52:14 79:9,17
**kinds** 30:8 64:7
**kitchen** 15:10 15:10 42:20 43:6,7,22 45:1 45:8,9 59:18 59:22 85:4,10
**knee** 34:21
**knife** 1:5 2:4 5:15 18:5,22 19:11,14,16 20:7,13 21:1,7 23:9,12,13 24:16,22,25 25:5,9,13,15,18 25:20,22,25 26:1,6,16,20,22 26:24,25 27:1 27:3,15,17,19 27:20 31:11 33:2,2,18,20 34:1,4,9,10,16 34:19,25 35:7 35:16 37:20,23 39:3,5,11,13 40:17 42:12,19 42:20 43:1,6,7 45:22 46:23 47:4,6,25 48:25 49:1,4 50:14,15 51:12 52:16,19 53:6 53:25 54:1,13 54:21 56:2,10 56:25 57:1,6 57:10,11,17,20 58:7,14,16,17 58:20 59:20 60:2,4,12,13,14 60:23 61:8,14 61:18 62:1,10 62:11,14,15,15 63:5,8,10,10,16 63:22 64:4,8 64:10,11,17 65:4,8,8,15,17 65:18 66:10,24 68:4,14,25 69:14,21 70:5 70:10,14 71:7 72:2,4,10,11,19 72:21 74:2 76:2 77:16 78:10 79:10,20 79:20,23 81:25 82:2,14,19 83:3,4,12,16 85:10,13 89:4 91:1
**kniferights.org.** 11:6,8
**knives** 11:22 12:6 13:22,23 14:3,4,5 15:4 15:10 18:12,21 19:2,4 21:10 21:13,25 22:19 22:21,25 23:4 23:4,7,15,16 24:6,10 26:10 30:11,12 32:3 32:8 36:9,12 36:14,21 37:25 38:1,8,10,12,13 38:19,25 40:11 41:14 42:15 43:22 45:1,8 45:15,24,25 47:10,13,19,22 49:22 50:1,4,4 50:8 51:3,8,19 51:20 52:1,5,9 55:16 56:1,3,4 56:6,7,11,14 57:4 58:8,15 59:2,4,11,12,15 59:16,22,23,25 60:1,10,17 61:1 62:3,22 63:3,4,7,15,18 63:21,24 64:1 64:7,8,9,14,18 64:24 65:5,12 65:19,25 66:9 66:17,24 67:8 67:21 68:7,18 70:7 77:7,8,10 79:11,16,16,18 79:21,22 80:2 80:4,14,16,19 80:21,21 81:9 81:13,14,20,23 81:23 82:1,15 85:4
**know** 6:21 7:2 7:22 8:20 13:17,17 26:15 32:22 44:18 46:5,10 47:1 47:16,23 48:22 51:6 77:2
**knowledge** 7:7 11:21,22 22:18 29:7,13,19 42:15 52:23 58:16 85:18,20
**knowledgeable** 29:6,17
**known** 11:13 82:22

**l**

**l.p.** 1:6 2:5
**lack** 64:25
**lacks** 36:23 53:17 64:15 68:1
**language** 16:7 17:2
**languages** 16:8 16:10
**laos** 6:12
**large** 31:12
**largest** 23:22 57:15
**laser** 68:20,22
**lashing** 71:18
**law** 3:4 11:15 20:15 38:17 43:12,13,21 44:3,5,7 46:4 49:1,21 50:1 51:4 52:24 53:1 67:6 74:5 74:8,25 76:4,5 80:15 81:2 85:12
**laws** 26:6,20 47:17,21 53:1 53:12 81:3
**lawsuit** 5:14 6:3,13,14
**lawyer** 8:13
**leader** 46:23
**learn** 16:10 17:3
**learning** 29:18 31:9
**leave** 76:14
**leg** 34:23
**legal** 19:7 24:7 38:18 47:17 48:5 52:19,21 53:8 57:3,11 60:8 69:20,20 80:13,24 81:4 89:7
**legality** 53:1,11 80:25
**legalize** 12:6
**legally** 20:6,8 26:21 53:11 69:25
**legislatures** 47:21
**legitimate** 41:11 86:14
**length** 20:5,13 23:23 24:3 26:23 50:25 53:9,10 56:20 57:4,11,21 69:25 70:10,23 70:25 78:3,4 78:11,14 81:2 81:16
**lengths** 23:19 24:1 77:8,9,10
**lethal** 71:5 72:8
**levels** 35:23 65:4
**library** 15:5 29:14
**life** 33:3
**lifelong** 31:15
**lightweight** 66:4,5
**likely** 73:1
**limb** 71:22
**limbs** 71:3 73:13
**limit** 47:18 53:9
**limited** 58:4 84:24
**line** 89:15 90:4 91:4,7,10,13,16 91:19
**linguist** 16:6
**links** 15:8
**list** 21:7 36:6 50:12 51:20,22
**listed** 13:25 44:25
**literary** 15:3
**litigation** 12:4 48:20
**little** 73:24 82:18 84:1
**littleton** 74:6
**live** 24:5 63:11 64:3,5
**liveleak** 43:12
**llc** 17:24,25 18:10
**located** 36:4 57:9
**location** 80:25
**lock** 24:24,25
**locked** 89:12 90:1
**lodging** 76:18
**long** 23:21 56:20 61:17 72:20 81:7
**longer** 46:7 73:4,9 75:21 77:7,10,11,16 81:7
**longest** 56:21 56:22 57:6
**longmont** 44:19
**look** 45:24 52:22 54:6 56:15 64:17 67:9 68:14 69:22 70:20,20 75:1 77:23 79:15 80:13
**looking** 24:1 43:3,5 81:25
**los** 53:8
**lose** 73:7
**loses** 34:22
**loss** 36:3 72:10 72:11,14,17,20 72:25 73:6 75:17
**losses** 6:11
**lot** 84:17

**lots** 67:15
**lower** 71:23

**m**

**machine** 88:9
**machining** 67:16,17 68:23
**made** 15:2 37:1 39:21 63:21 67:13,14,16 68:7,10,11,18 88:9
**magazines** 30:3
**mail** 27:13
**major** 16:3 36:3 74:18
**majority** 13:1 23:1,24 43:6
**make** 7:25 8:4 8:6,14,17 20:5 20:7 22:14 26:21 30:25 63:14 64:6,21 67:24 77:4,14 89:14 90:3
**makes** 27:19
**making** 7:1 36:17 38:3 42:21 44:1 45:19 53:11 55:18 68:3
**males** 57:22
**man** 71:15
**mandarin** 16:5 16:11 17:3
**manual** 26:1 52:12,12 55:23 79:11
**manually** 58:11 79:16
**manuals** 74:15
**manufacture** 18:11 19:2 67:9
**manufactured** 18:22,24 82:15
**manufacturer** 63:22 64:22 65:1
**manufacturers** 65:4 66:25
**manufacturing** 13:23 67:10
**manuscript** 76:1
**marked** 10:15 14:10 37:5
**market** 52:3 58:16,17 64:17 64:23 65:21
**marketed** 64:19
**marshall** 70:1
**martial** 16:16 16:18,21 17:8 17:13,24 18:9 31:10,13 35:22 61:12 62:24 69:19 70:6
**master** 21:9 62:6 74:8
**master's** 16:13
**matching** 63:5 64:11 65:19,20 66:5
**materials** 67:3 67:20 84:17
**math** 13:14
**matter** 21:17 53:10 55:21,24 57:16 61:21,24 75:21 77:19 86:17
**matters** 7:7
**maximum** 57:22 69:24
**mbc** 63:1,2 65:7,11 66:1 71:14 72:3 73:19 74:25 76:4,20 77:18
**mean** 27:10 34:8,13 39:2 40:3 42:5 66:18,19 67:7 73:13 77:20
**meant** 20:24
**mechanical** 28:4 34:21 35:24 60:6 61:3 77:13 79:25
**mechanically** 63:11
**mechanics** 43:4
**mechanism** 24:25 52:15 79:24
**mechanisms** 79:22
**media** 42:2,5
**median** 35:8,10
**medical** 9:8 75:13
**medically** 73:22 74:23 75:9
**medications** 9:12
**medium** 24:1
**meet** 25:4
**meeting** 82:23
**member** 27:23 47:25
**members** 83:13
**mentioned** 25:17 27:21 42:25 71:9 73:25
**mentors** 75:4
**mere** 54:1
**merely** 56:1
**met** 47:2
**metalworking** 68:8
**method** 31:8 62:21 65:18 68:19 69:5 73:15

**methodology** 21:23 61:22 62:17 65:21 67:10,15
**methods** 40:12 42:24
**mias** 6:12
**michael** 1:14 2:13 4:3,17 5:4 5:21 89:5 91:2
**military** 16:5 16:24 17:1,4 72:23 74:22,22
**mill** 69:11
**miller** 1:5 2:4
**mills** 69:6
**mine** 31:15 74:5
**minimum** 69:14 71:13 76:25 78:3
**minority** 41:3
**minute** 46:12 78:20
**misconception** 55:12
**misstates** 40:2 54:23
**mobility** 34:24 34:25 35:3
**model** 50:24
**models** 23:20 50:10,11,12 51:1
**modern** 39:8 67:4,23 68:10 68:13 75:14
**modified** 20:7
**modify** 20:4
**moment** 10:18 44:17
**moot** 19:13
**morning** 5:9
**motion** 12:5
**motor** 35:12
**move** 49:3
**movies** 42:6,7
**municipal** 53:12
**municipalities** 52:25 69:22 81:3
**muscle** 34:20 34:22 71:24
**muscles** 35:17 35:25 71:4 77:5

**n**

**name** 5:9,20 18:2,10 44:16 65:25 74:4 84:8 88:21
**names** 44:13
**narrow** 65:20
**nash** 30:3
**national** 17:6
**nature** 26:24 29:5 41:20 54:7 58:23 59:19 73:23 80:16 83:17
**nearby** 44:9
**necessarily** 64:23 73:1 77:13 80:16
**necessary** 33:6 33:12 63:6 77:4 89:14 90:3
**need** 8:9,19 14:19 78:3 86:19
**needs** 33:13 54:17
**negate** 86:13
**neither** 88:17
**nerve** 35:6,9
**nerves** 35:8,10 35:11,13,18 36:1 71:4,8 73:14 77:5
**network** 43:13
**never** 11:14 39:12 74:23
**new** 62:5
**nine** 12:24 24:3 52:11
**no.6449120** 89:5 91:2
**non** 7:12 23:5
**north** 1:6 2:5
**notating** 89:15 90:4
**noted** 87:4
**notes** 8:4 78:21 86:2
**notified** 10:5
**novelty** 23:12
**nra** 47:11
**number** 4:11 5:18 11:13 32:12 47:2 50:4 56:15 75:13 84:16 89:15 90:4
**numbers** 59:19
**numerical** 67:17

**o**

**oath** 5:5 88:8
**object** 41:8 61:3
**objection** 19:7 24:7 34:6 36:23 39:17 40:2 41:24 45:11 46:9 49:19 51:5,14 51:24 52:21 53:16 54:14,23 64:15 68:1 70:16 79:12 81:10 82:11 83:9 84:6 85:15
**objections** 8:14
**occupational** 17:5

**offer** 28:16
**offered** 83:12 83:24
**offers** 28:3
**office** 89:11
**officer** 74:6
**officers** 38:17 43:21 44:3,6,8 44:13 76:6
**official** 11:14
**officially** 83:2
**okay** 7:22 10:25 46:14,21 78:16,24 79:8 79:9 81:19 84:1
**old** 17:9
**once** 8:1 41:9 48:11 60:23 74:3
**ones** 13:25 21:11 67:4 77:25
**online** 15:6,7 43:11
**open** 58:12 61:5 62:3,10 79:16,19
**opened** 55:17 58:8,15 59:2 59:11,15
**opening** 26:1 27:13,13 52:12 52:13 56:1 62:17 79:18 81:23
**openly** 25:6
**operate** 18:9 54:3 80:11
**operated** 17:14
**operation** 79:25
**operational** 23:5,9
**operations** 6:11
**operative** 10:22
**opine** 28:13
**opinion** 32:25 36:9,12,14 38:15,22 41:7 41:17 42:14 45:21 46:2 55:20 58:13 59:1 69:13,17 71:12 72:14 75:3 80:10 81:21 86:11
**opinions** 14:1 28:6,10,17,18
**opportunity** 8:2,8
**opposed** 62:14
**opposing** 78:22
**optimized** 64:12
**option** 60:9
**options** 22:12
**orange** 50:16 50:20
**order** 36:6 78:2
**ordinary** 42:12 55:16
**organization** 17:22 47:7,8 82:20,22 83:5 83:19
**organizations** 47:12
**organs** 78:5
**original** 9:20 9:22 13:2 15:1 21:18 50:16,22 63:16,22 88:14 89:10,21
**oss** 75:5
**outdoor** 21:16
**outside** 83:9
**overall** 23:21 23:22 24:2 41:10 56:22 64:18
**overcome** 62:19
**overriding** 81:2
**overseas** 26:5
**overturn** 47:21
**own** 15:16 22:21 29:8,10 46:3 47:13 52:20 55:6 56:21 59:2,3,5 67:25
**ownership** 59:7 59:14,17

**p**

**p.m.** 2:15,16 5:2 87:4
**page** 14:22 89:15 90:4 91:4,7,10,13,16 91:19
**pages** 1:25 89:14,17,17 90:3,6,6
**paid** 17:18 29:23 30:1,4,6 49:7,11,16
**paladin** 6:4 84:23
**paper** 75:24 76:1
**papers** 76:24 82:4 85:7
**paragraph** 42:17 45:13 55:14,25 58:6 69:12
**paragraphs** 33:16
**part** 11:4 17:13 27:24 43:1 52:13 61:12 64:23,25 73:14 74:21
**participant** 76:8,10
**participants** 2:15 65:12

**participate** 12:9 48:13
**particular** 31:14,21 40:15 70:23,25
**particularly** 28:21
**partner** 63:14
**parts** 53:5
**party** 6:6 88:19
**passage** 45:18
**past** 82:23
**pdf** 89:12 90:1
**penalty** 14:21 89:16 90:5
**pending** 8:23 12:4
**people** 29:17 32:7,10 37:24 38:8 41:22,25 43:18 58:18 59:23 61:24 62:17 64:5 65:17 76:5
**people's** 47:18
**percent** 73:7
**percentage** 24:5
**perches** 21:1
**perfectly** 25:3
**period** 82:15 89:18 90:7
**perjury** 14:22 89:17 90:6
**permanent** 73:20
**permission** 49:2,3
**person** 32:16 33:1 34:22 36:1 37:18 39:11,12 40:14 54:8,9,11,22 55:4 61:18 70:12,13,15 73:7 74:20 77:15
**person's** 34:24 35:3 61:21
**personal** 7:7 27:8 42:2 48:6 57:13,16 85:18
**personally** 31:24 43:17 75:7 83:21
**personnel** 43:14
**persons** 85:13
**perspective** 64:2
**pertains** 88:13
**petition** 75:25
**ph.d.** 16:13
**physical** 30:25 54:6 73:21
**physically** 32:16 73:13,17
**piece** 69:2
**pivoting** 61:4
**place** 26:7 88:6
**plaintiffs** 1:7 2:6 3:3 10:8 13:13 14:7
**planes** 31:18
**plastic** 71:20
**play** 33:18 37:19
**player** 21:20
**please** 5:20 6:20 7:12 8:20 23:8 36:20 81:11 87:2
**plus** 50:4 76:17
**pocket** 25:7,8 42:12 55:16 56:2,4,7,10,23 57:7,12,18 58:4,5 79:20
**pockets** 57:24 58:2
**point** 8:19 19:13 28:3 34:10,11,15 48:9,13 61:24 63:13 73:8 75:22
**points** 66:7
**policy** 51:16
**polling** 85:11
**pollock** 44:15
**polls** 58:23
**popular** 64:2 82:1
**pork** 71:15,16
**portion** 31:12 37:17 71:23
**position** 58:12 61:5
**possess** 47:19
**possession** 47:10
**possibility** 54:5
**possible** 41:16 41:18
**potential** 54:2 60:12,14 62:12
**pouch** 50:17
**pounds** 71:17
**power** 28:2 35:15 73:19
**pows** 6:11
**ppct** 74:7 75:24
**practice** 50:7 61:15 62:5 65:8
**practices** 26:11
**precision** 67:2
**predecessor** 75:6
**preemption** 52:24 81:1
**prefer** 20:21 43:23 57:15 58:7,14,18,21 81:19,22
**preference** 21:4 39:22 57:13,16 82:3

**preferences** 39:15,25 40:6 82:14
**preferred** 25:15 52:16 72:21
**premise** 22:5 74:3
**preparation** 10:23 13:6 85:21
**prepare** 9:17
**prepared** 31:14 31:23 53:25 85:17
**preparing** 10:3 10:10 13:2 14:25 15:15 85:24
**present** 10:12
**presentation** 54:1
**presented** 22:2
**preserving** 30:16 47:12
**press** 6:4 84:23
**pressure** 58:11 62:22
**prevail** 57:5
**prevalence** 45:7
**prevalent** 40:18 43:7 60:1
**prevent** 9:9
**previously** 6:8 71:2
**price** 66:7
**primarily** 14:3 21:12 27:7 29:10,20 30:10 31:20 35:1,11 38:16 40:12,19 42:1,6 43:9 47:4 53:10
**primary** 15:7 18:3 35:19,20 40:14,25 47:14
**prior** 88:7
**priority** 52:24
**privilege** 29:16
**privileged** 51:14 83:10 84:6
**probably** 57:22 76:21
**problem** 37:22
**problems** 37:19
**procedure** 89:19,20
**procedures** 7:4 8:11 10:4 42:23
**proceed** 24:8
**proceedings** 88:5,7,9,15
**process** 61:6 68:12,13,15
**processes** 68:23
**produced** 19:19 21:10 56:16 63:7,17 66:2,25 69:10
**produces** 50:3
**product** 30:6
**production** 18:25
**products** 58:19
**professional** 12:21
**professionally** 17:11 58:17
**profile** 24:23 25:1,2 27:21 28:1
**prohibited** 46:4
**projectile** 31:1
**prominent** 45:4
**proofread** 13:4
**proper** 33:9 36:14 39:3,4 53:14 54:17 55:9 62:19 63:6
**properly** 60:24 61:21 63:17 86:19
**provide** 7:13 9:2 14:1 20:25 22:8,16 40:19 43:17
**provided** 15:8 43:14 48:4,14 89:19 90:8
**providing** 48:8 84:9
**public** 17:21,22
**publication** 30:4
**publicly** 25:6 84:20,25
**published** 84:18,21,22
**pull** 14:20 37:3 54:12 59:22
**punctuated** 22:15
**purchase** 58:11 59:24
**purchasing** 58:18
**purpose** 20:23 59:21 63:9
**purposes** 23:10 66:1
**pursuit** 31:15
**put** 10:13 14:7
**pwgg** 1:6 2:5

**q**

**quadricep** 34:18
**quadriceps** 34:20 71:24
**qualifications** 15:18
**qualified** 17:4
**quality** 66:16 67:1,3,8,9,20

KR1784

67:20
**quantify** 72:1
**quantifying** 72:3
**quarters** 81:18
**question** 6:20 6:22,25 7:3,20 7:23 8:15,16 8:23 39:19 53:23 56:20 86:8
**questions** 6:20 7:13,21 8:25 9:14 15:17 46:19,20 78:20 78:23 79:5,5,7 86:3,6,22
**quickly** 60:14 75:18
**quite** 22:2 29:5 36:25 56:19
**quote** 33:18,20 33:20,22 36:19 43:22 45:14 56:1,2 58:7,10 58:14,14 59:2 59:3 66:15 69:13

**r**

**r** 91:3,3
**r&s** 90:1,9
**range** 23:20 24:1
**rapid** 75:17
**rare** 37:24
**rate** 12:15,17 12:19,20 49:17 75:17,18
**reach** 44:4 78:4
**read** 29:21
**readily** 26:13 43:23 45:6,16 45:25 61:16 62:20 65:22
**reading** 29:11 89:23 90:9
**real** 33:3
**realities** 75:2
**realize** 41:9
**really** 61:20
**reason** 6:24 9:5 40:14 45:4 60:2 63:2,3 91:6,9,12,15,18 91:21
**reasons** 45:3
**rebut** 28:10
**rebuttal** 4:15 13:3 14:6,13 15:3 33:16 42:17 45:13 48:8
**rebutting** 28:6
**recall** 5:25 11:10 18:1 30:8 37:12,14 38:3 39:20 42:21 44:1,17 45:19 48:17 53:8 55:18 69:15 78:14 83:25 85:9
**received** 12:9
**recess** 46:16 79:1
**recognize** 14:16
**recognizing** 24:4
**recollection** 7:24
**recommend** 62:21 63:3 65:7,14 66:1 70:7,14
**recommendat...** 66:3,8
**recommended** 78:2,9
**record** 5:20 7:1 7:11,14 24:4 88:8,11
**recording** 30:15
**records** 38:15 38:21
**reference** 33:17
**referenced** 89:6
**references** 15:2
**referring** 35:9 36:20 67:11 77:25
**reflect** 39:3 64:24
**reflects** 64:25
**reflexes** 26:12
**regard** 6:10 15:8,10 26:23 28:21 29:4 47:9 81:2 85:3
**regarding** 5:15 6:3,13 12:5 15:4 22:9
**regardless** 27:11 41:20
**regular** 44:10 49:9,17
**reilley** 3:17 5:12
**related** 16:8,19 28:17 45:8 66:21
**relating** 16:9
**relationship** 82:20,21
**relative** 88:18
**relatively** 60:25
**released** 27:5 89:21
**relevant** 11:23 33:14
**reliability** 26:7 60:19 73:16
**reliable** 61:25 70:5 73:15
**reliably** 73:4
**reliance** 85:13
**relied** 71:12 84:2,14 85:7

85:10
**relief** 4:13
**rely** 46:6 85:2
**remain** 77:19 77:20,22
**remember** 44:16 83:15
**remind** 7:10
**remotely** 1:15 2:15
**removal** 68:19 68:21
**remove** 20:21
**removed** 20:11
**removing** 21:5
**render** 68:25 72:7 73:17
**repair** 23:3,6
**repaired** 73:22
**repeat** 6:21
**repeatedly** 44:12
**rephrase** 56:20
**report** 4:15 9:20,21 13:2,3 13:4,7,10 14:6 14:9,14 15:1,9 15:9,13,14,16 28:5,20 33:17 42:17 45:13 48:5,5,7,10,14 55:14,25 58:6 66:15,20 69:12 84:2,4,15 85:2 85:5,6,8,10,14 85:17,21,24
**reported** 1:22
**reporter** 2:17 7:11,14 10:16 14:11 37:6 86:25 88:4
**represent** 5:12
**representative** 72:2
**request** 8:2,9 8:21
**requested** 88:16 90:1,9 90:10
**require** 30:25 78:10 79:19,24
**required** 7:6 8:16 13:18 49:11
**requirement** 7:8
**requirements** 39:7
**requires** 61:4
**rescue** 25:13 50:15,18
**research** 15:6,7 26:20 28:22 29:10,23 30:1 30:6 32:17,19 42:18,23 75:12 76:23 82:4
**researcher** 28:21 30:7
**resources** 29:12 84:2 85:1
**responded** 37:22
**response** 9:21
**responses** 7:12 7:13
**responsibility** 7:2
**responsible** 33:7 34:20 35:11
**responsibly** 39:6
**restrict** 47:22
**restricted** 60:8
**results** 34:23 38:11
**retain** 55:9,10
**return** 84:1 89:17 90:6
**revenue** 51:11
**reverify** 46:20
**review** 8:2,8 14:24 28:13 38:15,21 43:15 48:7 78:21 86:2 88:15 89:8,10,13 90:2
**reviewed** 9:20 9:21,21,24 10:7,22 15:1 15:14 48:9
**reviewing** 13:1 13:6
**rex** 75:4
**right** 7:17 8:5 14:19 46:11 47:12 55:14 78:19 80:20 86:1,3,20,23
**rights** 1:5 2:4 5:15 46:23 47:4,6,9,15,18 47:25 48:25 49:4 82:19 83:3,4,13,16 89:4 91:1
**ritter** 11:3,5,6 11:11 46:23 48:2 49:1,5 82:22 83:20
**rivas** 28:11
**rivas's** 28:14 28:17
**road** 3:7
**rob** 1:10 2:9 3:13 5:13,16 89:4 91:1
**robert** 28:6,10 84:14
**role** 10:10 21:20 28:9
**roles** 27:17
**rolled** 69:6
**rolling** 68:13 69:4

KR1786

**[rotate - shorter]**

**rotate** 58:12
**rough** 68:17,22
**routinely** 44:14
**rpr** 88:24
**rule** 23:14
**rules** 90:8
**run** 21:18

**s**

**s** 91:3
**sacramento** 3:19
**safe** 35:5 63:14
**safely** 33:10
**safety** 22:3 35:4 50:17,20
**sal** 20:3
**salaried** 49:13
**salary** 49:9,17
**sale** 19:2
**sales** 51:12 81:25
**scary** 31:23
**scenario** 22:10 22:11 69:20 70:3 86:13
**scenarios** 21:21 22:17
**schedule** 89:10
**school** 15:20 17:3,4
**scope** 83:9
**scores** 44:5
**screen** 10:14 14:8,14 37:4,8
**scroll** 10:21
**se** 30:7
**search** 37:16 45:3
**searched** 43:25
**seasons** 21:19
**seatbelts** 25:13
**second** 35:25 86:1
**secondary** 61:4
**seconds** 75:21
**security** 17:6 22:3 43:14
**see** 10:14,19 14:13 37:8 47:4 52:4 67:16
**seeing** 37:12 58:18
**seen** 37:10 61:7
**sees** 37:24 38:8
**segments** 22:16 22:18
**selection** 65:17
**self** 11:22 12:20 13:22,24 14:3 16:16,22 17:19 21:22 22:1,4,9 22:13 25:16 26:3,7 27:20 30:19,22 31:7 32:23 33:2,3,9 33:15,19,21 34:9,25 35:15 35:17 36:7,10 36:13,21 38:1 38:13,20,25 39:7,10,11,13 40:11 46:8 53:14,21 54:16 54:22 55:13 59:24,25 60:3 61:10 62:25 64:10,12,14,19 64:24 66:1 69:14 70:5,8 70:19 71:13 72:10,15,18,24 73:2,12 76:11 77:1 80:20 86:13,14,18
**sell** 18:11 49:22 50:1 51:4 64:3
**selling** 80:19 81:14
**sells** 51:8 66:9 80:19
**seminars** 17:21 17:23 61:23
**sense** 8:17
**separate** 59:8
**september** 31:16
**series** 21:16 22:6
**serve** 20:24 23:9
**serves** 27:16 63:9
**services** 11:24 12:21
**set** 75:12 88:6
**seven** 52:4 57:23
**sever** 35:12 77:4
**several** 50:23
**severed** 34:22 74:19
**sexual** 6:13
**shallower** 58:3
**shape** 68:16,17 68:22,24 69:3
**shapes** 69:9
**share** 48:2
**shared** 44:12
**sharp** 63:13,13
**sharpened** 63:12
**sheath** 60:23
**sheet** 68:19,21 69:7,10
**shipped** 19:19
**shooting** 1:6 2:5
**short** 46:11
**shorten** 20:5,10
**shortened** 20:13
**shortening** 20:9
**shorter** 70:7 77:9

**shorthand** 2:17 88:3,9
**shortly** 17:9
**show** 21:19 22:10,12 37:17 47:3
**showed** 75:16
**shown** 22:17
**shows** 47:5 82:24
**shrugs** 7:11
**shuri** 1:22 2:17 88:24
**side** 56:6,17
**sign** 89:16 90:5
**signature** 14:21 88:24 89:21,23 89:23 90:9
**signed** 14:21
**significant** 73:10 78:10 82:13
**significantly** 26:6
**similar** 27:15 47:11 84:10
**simple** 54:3 55:21 60:25 79:25
**simplicity** 60:19,22
**simply** 48:4 61:5 75:10 84:10
**single** 32:14
**situation** 22:15 33:3,19,21 38:10 54:4 70:19
**situations** 53:24
**six** 13:11 50:10 57:17 78:15,16
**size** 54:8 70:12 70:20 71:22
**sizes** 66:6 69:9
**skewed** 59:19
**skill** 54:8 61:15 61:18 62:5 68:8
**skilled** 28:20
**skills** 17:6 22:17 26:7 62:24
**skus** 50:5
**slitting** 71:17
**small** 15:15 50:3 64:23 70:15,15
**smooth** 20:22
**society** 39:8
**sold** 18:22 50:6 51:21
**soldiers** 75:10
**solutions** 89:7
**somebody** 31:10 73:5,17 75:22 86:16
**somewhat** 17:25 47:24 59:19
**sooner** 73:16
**sorry** 14:19 44:16 79:14 83:7
**sorts** 84:4
**sound** 46:13
**source** 18:3 84:8
**sources** 15:3,4 43:11,12 84:3 84:7,11,13,13 84:15,18
**southern** 1:2 2:2 5:18
**span** 76:16
**sparring** 33:12
**speak** 10:1 73:24
**special** 49:10 56:5,8
**specializes** 47:8
**specialty** 17:5 79:22
**specific** 15:2 20:6 23:8 27:22 36:19 37:16 52:23 53:2 59:20 70:25 82:4,6 84:7 85:19
**specifically** 8:14 14:5 32:23 39:21 40:8 60:18 64:9 66:22 70:2 81:23 85:5
**speculate** 7:6
**speculation** 7:22 41:24 46:9 51:5 53:17 54:14 64:16 68:1
**speed** 60:18,19
**spend** 12:25 13:10 76:20
**spent** 13:5
**spine** 25:3
**spitzer** 28:10 28:14,17
**spoke** 10:3 48:11,23 51:19
**spyderco** 18:5 18:14 19:18 20:1,4 21:9 24:20 48:19 49:7 50:3 66:3 66:9 80:19 81:9,13
**stand** 6:18 19:22
**standard** 12:19 76:15
**standpoint** 20:25 28:4 73:16

KR1788

[start - switchblade]

**start** 16:24 59:9 65:19,22 68:19
**started** 17:20 31:9
**starting** 68:21 69:8
**state** 5:20 12:5 12:6 20:8,15 26:19 28:20 47:21 49:22 52:24 53:1,5,7 55:2 60:16 65:3 66:15,18 69:12 71:11 76:4 81:2,4,6 88:4 89:9,12
**stated** 42:18 45:14 46:22 48:4,18 52:16 54:15,20,25 55:15,25 56:19 58:6 60:10,16 63:18 72:9 75:20,20 76:3 76:15 79:6 80:18,18
**statement** 33:17 36:17,19 37:1 38:3,5,7 38:24 39:20 40:7 42:21 44:1 45:19 55:5,18 66:19
**statements** 33:23
**states** 1:1 2:1 19:15 45:17
**stating** 69:15
**statistics** 82:6
**stature** 78:17
**statutes** 18:13 19:6,22
**steel** 67:4 68:11 68:13,20,21 69:2,6,6,9,11
**stipulation** 89:20
**stock** 68:18,20 69:7
**stop** 34:10 35:4 39:6 71:2,5 73:3,3,11,12,16
**stopping** 35:15 72:18 73:13,19
**store** 25:11,12
**straight** 24:24 25:3 28:1
**street** 3:18 53:20
**stress** 33:19,21 54:18 60:14 61:14 62:7
**stricter** 53:1
**struck** 19:23
**struggle** 54:12 61:8 62:2 86:12
**struggles** 86:16
**student** 74:24
**students** 61:14 65:7 76:3
**studies** 16:1,2,8 16:15,20 43:16 58:22 76:23 82:4
**studio** 17:11,14 17:15
**study** 16:7 31:13 58:24 85:3
**studying** 16:21 39:9
**style** 27:22 66:23,23
**subcommittee** 6:2
**subject** 21:17
**submitted** 14:6
**subscribed** 88:20
**substances** 9:13
**substantial** 50:6
**successful** 47:24 58:19 65:23
**successfully** 22:11
**suffering** 9:8
**sufficient** 77:4
**suitability** 64:24
**suitable** 57:2 69:14
**suite** 3:7,18
**superior** 67:22
**support** 14:7 34:23 83:3 85:20,24
**supporting** 83:18
**supportive** 18:18 48:19
**supposedly** 74:18
**sure** 7:12 11:7 26:21 34:13 36:25 53:11
**surgeons** 75:14
**surveillance** 43:13
**surveying** 85:11
**surveys** 58:23
**swimmers** 50:18
**swiss** 79:20
**switchblade** 18:13 19:5,22 22:19 25:23 26:2,10,16 32:15,22 41:4 41:9,23 42:1 42:11 45:18 46:3,7 52:7

[switchblade - time]

53:14,19 54:3 54:12,21 56:21 67:5,8,13 68:11 80:2,4 80:10,12 81:8
**switchblades** 23:17,19,24 30:13 41:14 42:7 45:15 48:6 55:16 56:9,13,16,19 66:16,21,23 67:4,11,23 68:9 80:6,14
**system** 30:19 30:20,22,22 31:19 35:22 37:24 38:8 43:3 62:24 69:19 70:4 74:7,9,11,25 77:18 78:6

**t**

**t** 91:3,3
**tactics** 21:24 22:13 31:4 70:1,4 72:3,23 74:8 77:24,25 78:7
**taiwan** 19:19
**take** 8:20,22 26:15 29:9 34:24 35:13 46:11 49:11 52:24 73:6 74:19 76:5 78:20
**taken** 2:14 5:22 9:12 88:5
**takes** 61:17,20 62:5 73:6,10
**talk** 57:21 59:6
**talking** 53:3 60:18 78:5 82:1,2
**tapers** 25:4
**target** 34:19 35:7,17,21 78:4
**targeting** 35:23 71:3,3 72:19 74:2 76:2 78:9
**targets** 35:19 71:1 72:1,7 77:18,19,20,22 78:2
**tasked** 84:9
**taught** 78:1,7
**teach** 12:19 18:10 26:4,5 35:23 61:23 76:16
**teaching** 17:7,8 17:19,21 18:1
**technical** 17:4
**technically** 19:12
**television** 21:16 22:5
**tell** 11:18
**tempered** 68:24
**ten** 46:12
**tend** 58:2
**tenderloin** 71:16
**tendons** 35:25 71:4,9
**terms** 14:4 47:23 48:24 56:6 80:5,8
**testified** 5:6 6:8
**testifying** 88:8
**testimonies** 6:15
**testimony** 6:2 9:3,6,9 14:1 28:16,17 40:2 54:24 88:11
**tests** 76:24
**textured** 20:19 20:23
**texturing** 20:11 20:17
**thank** 46:15 86:4,23,24
**thigh** 71:24
**thing** 20:18 55:15 59:5 74:11 79:4
**things** 29:5 30:25 31:11 44:11 53:24 59:18,18 78:8 79:6
**think** 40:13,21 62:2,11,17
**third** 36:2
**thousandth** 67:19
**threat** 31:14,21 35:2,4 39:6 54:2 71:5 72:8 73:9
**threaten** 32:15
**threatened** 31:24
**three** 20:14 23:2 24:2 35:23 36:6 45:2,3 51:2 52:10 53:9 65:25 66:2,5 81:16,17,18
**thumb** 20:20 21:1,2 58:11 62:22
**thursday** 1:17 2:16 5:1
**tight** 67:18
**time** 7:15 8:13 8:13,20 10:6 13:6,9 16:4 17:18 18:24 29:16 31:9 44:12 47:2 49:11,14,15 54:12 55:22 61:20 73:6,10 74:18 75:21

78:23 83:2,14 86:4,19 87:4 88:6 89:10,18 89:24 90:7
**times** 5:24,25 6:5,7 75:19
**timetable** 74:11 74:17,23 75:2 75:9,15
**title** 11:7 73:25
**today** 9:6,10,15 49:12,16 52:3 53:20 67:16 68:11 86:5
**today's** 9:17 66:16
**told** 12:3,4 75:8
**tolerances** 67:2 67:18
**tool** 27:9,10 59:6
**top** 25:7 65:25 80:19 81:14
**topics** 6:8
**total** 24:12
**tough** 74:14
**tourist** 23:12
**trade** 47:5 82:24
**tradesperson** 27:14
**traditional** 67:12 69:7 79:19
**traditionally** 68:7
**train** 86:19
**trained** 32:6,11 33:1 43:21 44:5
**trainer** 64:4,21 65:19 74:25
**trainers** 63:7 64:20 65:20 66:2,6
**training** 16:16 16:18,22 17:2 31:19 32:13,20 33:5,7,9,11,12 33:13 36:14 38:17 39:3,4,5 43:13 53:15 54:17 55:9 61:12,21 62:19 63:5,5,6,8,10 63:14,15,19,21 63:25 64:1,7,8 64:11 65:5,8 65:15,22 66:10 74:14,15,21 76:20 86:17
**transcribed** 8:1 8:3 88:10
**transcript** 8:7,9 88:11,14,16 89:6,8,10,13,13 89:21 90:2,2
**transfer** 26:12
**travel** 26:4,9,20 76:18
**treated** 68:24
**treating** 67:3
**trends** 44:10
**trial** 6:25 8:5
**tricep** 71:23
**trick** 6:19
**tried** 53:13
**trinket** 23:12
**trip** 26:20
**true** 80:11 88:11
**trust** 54:18
**truthful** 9:2
**truthfully** 9:14
**try** 7:15 85:19
**trying** 44:16 54:22 73:3 83:14
**twine** 71:19
**two** 5:25 23:2 24:11 36:5 44:7,13 45:1 50:9,11,12 59:8 61:23 70:7,14 71:7 72:5,11,12 74:13 76:22,25 77:3 79:17,19 80:4,19 81:7 81:14 84:19
**type** 23:12,13 27:12,18 33:5 42:19 43:3,5,7 46:3 54:16 55:22 56:2 62:6 66:24 68:3 70:21 79:22,24 83:3
**types** 29:15 30:10,11 45:23 76:8,13 77:23 77:24 80:14 82:1
**typical** 69:2
**typically** 22:9 24:16 26:19 36:4,13,16,22 38:1,10,12 39:1,3 58:2 61:23 63:2 64:1,21 66:3,7 67:12,13 68:15 68:22 78:15

**u**

**uh** 7:11
**ulnar** 35:8,10
**unable** 72:7
**unarmed** 21:24 30:20,22 31:4 62:24
**unavailable** 10:5
**unconscious** 73:9
**unconsciousn...** 74:20
**under** 14:21 18:2,10,13

19:5 23:3 33:18 44:8 46:4 52:6 54:18 60:14 61:14 70:14 71:7 72:12 88:10
**undergraduate** 16:15
**underlying** 35:17
**undersigned** 88:3
**understand** 6:20 7:4,8 8:11 9:14
**understanding** 31:3 42:1 82:13 85:18
**understood** 6:23 7:2 8:23 10:4 39:15,25
**unequivocally** 66:16
**unfair** 47:18
**unfamiliar** 41:19 62:18
**unique** 79:22
**united** 1:1 2:1 19:14 45:17
**unsuitable** 67:12
**usage** 45:9
**use** 11:21 13:24 14:3 15:10 21:24 22:1 33:1,2,7,10 34:9 37:25 38:8,12,13,14 39:2,5 40:9,11 41:11,11 42:15 47:10 49:14,15 53:13,20 54:22 55:10,24 59:21 61:22 72:9 80:8 85:3
**used** 6:25 21:1 31:17,18 32:15 32:23 36:9,12 36:13,15,16,21 36:22 38:1,2 38:25 39:1,10 40:11,12,19 42:19 43:5 45:4 54:21 55:3,8 67:3 70:2 80:5 84:11,13
**user** 21:3 55:8
**users** 58:7,14
**using** 34:9,25 35:16 37:20 54:11 58:11 62:25 67:19 70:5 71:25 72:21 88:9
**usually** 26:25 63:15,21 64:5 65:14 68:20 76:12 80:5
**utilitarian** 27:12
**utility** 14:4 20:25 27:9,10 27:15 59:6
**uyehara** 3:16 4:6 5:8,9 10:17 14:12 19:9 24:15 34:14 37:2,7 39:18 40:4 42:4 45:12 46:11,15 46:17 49:20 51:7,18,25 53:4,18 54:19 55:1 65:2 68:6 71:6 78:19,25 79:2,13 81:12 82:17 83:11 84:12 85:22 86:1,23 89:1

**v**

**vague** 34:6 36:24 39:17 51:24 70:16 79:12 85:15
**valid** 86:14
**validated** 74:23 75:9
**value** 40:24 41:10 83:23
**variables** 54:9
**variation** 50:22
**variations** 50:10,11,13 80:21
**variety** 43:11 56:17 67:13
**various** 13:24 18:22 21:24 22:12 30:10,11 30:11 38:18 40:16 47:17 50:9 52:25 66:6 69:9 70:11 82:1,2 82:24
**vary** 42:3
**varying** 65:3
**vascular** 75:14
**vast** 23:1 43:5
**vastly** 67:1 75:19
**venture** 17:16
**verbal** 7:12,13
**verify** 14:8
**veritext** 89:7,9 89:11
**version** 19:25 20:4 50:16,19 50:21 63:11,12
**versions** 63:19 64:3
**versus** 5:16 31:1 55:23 59:16 69:9
**vessels** 36:4
**viability** 48:6
**victim** 22:11

**[victimized - years]**

**victimized** 22:12
**videoconfere...** 1:14 2:13 3:5 3:15
**videos** 43:6,10 43:14 83:16 84:16
**vietnam** 6:12
**vietnamese** 16:6,11
**view** 34:11,15 43:9
**viewers** 22:8
**volume** 1:18 2:14 4:3 73:8
**vs** 1:8 2:7 89:4 91:1

**w**

**w** 3:6
**w.e.** 74:12
**waived** 89:23 89:23
**waiving** 89:20
**want** 7:10 8:8 82:16
**wanted** 11:18 31:23 75:1
**war** 72:22 74:14,22 75:6 75:7,11 78:1
**way** 9:19 11:25 23:21 27:6 28:2 37:23 40:10,10 54:10 72:2,17 73:19 75:10 81:4 82:13
**ways** 47:14 72:9
**weapon** 27:8 30:21,23,24 31:1,5,25 33:8 33:8,10,14 35:14 36:2 40:14,15 43:8 55:2,7,9,10 62:25 72:21 86:12,14,15,17 86:18
**weaponry** 30:2 30:16
**weapons** 13:24 21:25 28:22 29:4,5,7,15,20 30:8,10,24 31:17,21 32:3 32:8 39:10,15 39:25 40:6,9 40:11,22,23 43:5 64:20 86:21
**weight** 34:23 63:16
**went** 17:2,3
**wharn** 25:1
**wharncliffe** 24:23 25:2 27:21
**whereof** 88:20
**widely** 45:1
**wield** 35:14 36:1
**wielding** 34:1,4 34:15 55:4 70:12
**willing** 48:7,12 64:6
**windows** 25:14
**witness** 4:2 6:5 6:7,9 11:21 12:10 24:8,10 34:7 36:25 40:3 41:25 46:10,14 48:13 49:2 51:6,16 52:22 54:15,25 64:17 68:3 70:18 81:11 82:12 84:7 85:17 88:20 89:13,16 90:2 90:5 91:24
**witnesses** 88:7
**wooden** 71:18
**work** 12:12,18 13:16 15:16 18:5 19:21 21:12,15 44:9 44:14,18,20 47:4,20 49:4,8 49:10 67:15
**worked** 11:11 11:14,15 12:22 21:8 58:16 75:7 81:24
**working** 5:12 16:4,24 29:16 69:8,24 82:8
**works** 15:5 27:8
**world** 72:22 74:14,22 75:6 75:7,11 78:1
**worst** 22:11 53:22 69:20 70:3
**wrap** 71:20
**wrapping** 71:18,19
**write** 10:1 75:24
**writing** 15:12
**written** 12:7 30:3 72:16 74:12

**x**

**x** 90:9

**y**

**yeah** 24:9
**year** 11:4 15:24 21:18 82:15
**years** 11:13 16:19,22,23 17:9 39:9 45:15,23 47:2 58:17 81:25 82:7,12,23

**[yojimbo - youtube]**

**yojimbo** 24:20 24:21 25:17 52:17,18,19 64:11 66:4
**youtube** 43:11 84:16

Page 31

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**KR1794**

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# PLAINTIFFS' EXHIBIT AE

KR1798

John W. Dillon (Bar No. 296788)
Dillon Law Group APC
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Telephone: (760) 642-7150
Facsimile: (760) 642-7151
E-mail: jdillon@dillonlawgp.com

Attorney for Plaintiffs

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

KNIFE RIGHTS, INC., et al.,

Plaintiffs,

v.

CALIFORNIA ATTORNEY GENERAL ROB BONTA, et al.,

Defendants.

Case No.: 23-cv-474-JES-DDL

Hon. James E. Simmons, Jr.

**REBUTTAL REPORT AND DECLARATION OF DAVID T. HARDY REBUTTING EXPERT REPORTS AND DECLARATIONS OF ROBERT SPITZER AND DR. BRENNAN RIVAS**

Complaint Filed: March 15, 2023

**REBUTTAL TO EXPERT REPORT AND DECLARATION OF ROBERT SPITZER**

I, David T. Hardy, declare as follows:

1. I am over 18 years of age and am not a party, nor a party representative, to this action. The facts contained in my declaration are true and correct, and I would (and could) competently testify to such facts if called as a witness. My declaration is based on my own personal knowledge, education, employment background, and experience, particularly as it relates to the history of automatic opening knives, or "switchblades," and other edged weapons.

2. The organization Knife Rights, represented by the Dillon Law Group, has asked me to provide a rebuttal to the expert report and declaration of Robert Spitzer pertaining to the text, history, and tradition, if any, on the possession of automatic opening knives/switchblades. My declaration covers my background and qualifications; my retention and compensation; my opinions and the basis for those opinions; and my concluding remarks.

3. I am an attorney in private practice. My current curriculum vitae is attached hereto as **Exhibit "A**." I have published on the Second Amendment and firearm laws, beginning in 1974. My writings on these subjects have twice been cited by the U.S. Supreme Court, and by 11 U.S. Circuit Courts of Appeals. I have published a book on, and directed a documentary film on, the Second Amendment. The documentary was nominated for the ABA's Silver Gavel Award for legal education. I have also authored or coauthored amicus briefs in *District of Columbia v. Heller, McDonald v. City of Chicago,* and *NYSRPA v. Bruen.*

4. Further, I have been retained by Knife Rights, Inc. to render an expert opinion on the text, history, and tradition, if any, supporting a prohibition on the possession of "switchblade" knives. I am charging $150.00 per hour for my services.

**Introduction**

5.      We should begin with a few threshold issues. The first issue is what role a *state statutory* restriction should play in interpreting a *federal enumerated constitutional* guarantee. In my opinion, the state statutory restriction or prohibition must not conflict with the plain text of the Second Amendment, and it must be grounded in historically analogous state statutes or regulations generally enacted during the Founding era. If the state statute conflicts or is not historically analogous, it should have no bearing on interpreting the Second Amendment under the Supreme Court decisions in *Heller* and *Bruen*. This approach also has been used by the Supreme Court in holding that the words "freedom of speech" were not understood to protect defamation, obscenity, fighting words, and other First Amendment exceptions. *See Robertson v. Baldwin*, 165 U.S. 275, 281 (1897), *cf. Giles v. California*, 554 U.S. 353, 377 (2008) (Confrontation Clause).

6.      The second threshold issue is the determination of what historical evidence is relevant. The historical evidence should be timely. As *Bruen* informs us, post-ratification state or federal restriction should be viewed with skepticism for the same reason that post-enactment legislative history is so viewed. *Bruen*, 142 S. Ct. 2111, 2136-37, 2153-54 (2022). The Second Amendment was proposed in 1789 and ratified in 1791, and the Fourteenth Amendment was proposed in 1866 and ratified in 1868. To be generous, I treat the relevant period as extending through the year 1870. Thus, the state or federal restriction must fall within this relevant period. If not, it provides no assistance in interpreting the Second Amendment.

7.      Third, the state or federal restriction on arms should not be considered if it was part of a list of forbidden arms that included handguns. *Heller* and *McDonald* clearly held that handgun bans fail constitutional muster. Accordingly, if the restriction amounts to a ban, including handguns, in my opinion, this is evidence that

the drafters did not consider the Second Amendment right to keep and bear arms, and (2) if the restriction is less than a ban, it suggests that such restriction is not properly analogized to the ban at issue here.

8. Fourth, if we do construe a federal enumerated constitutional right in light of state legislative restrictions on it, we should require some showing considerably beyond, "this restriction was not unknown at the time," or "a few states or cities adopted this." What should be required is widespread acceptance, comparable to widespread acceptance that supports the defamation and obscenity exceptions to the First Amendment's freedom of speech.

9. Fifth, the state right to arms should not have limitations that are not found in the Second Amendment. The Supreme Court, early on, refused to treat the federal Bill of Rights as binding on the states (*Barron v. Baltimore*, 32 U.S. 243 (1833)), and refused to employ the Fourteenth Amendment's Privileges and Immunities Clause to do so (*United States v. Cruikshank*, 92 U.S. 542 (1876)). The Court did not use the Due Process Clause as applying the Second Amendment to the states until the *McDonald* decision in 2010.[1] Accordingly, over the period 1776-1870, no state court had to decide whether a state law passed Second Amendment muster: the only question was whether the law conformed to the *state* right to keep and bear arms.

10. This consideration is relevant in cases in California, Maryland, Iowa, and Minnesota because these states have no state constitutional right to keep and bear arms. It is also relevant in states, such as Tennessee and Arkansas, whose arms guarantees were limited to bearing arms "for the common defense," and whose courts accordingly held that their arms guarantees only covered military-style arms. *See*

[1] *Nunn v. State*, 1 Ga. 243 (1846) is best understood as employing the Second Amendment to prove the existence of a non-enumerated state constitutional right.

*Aymette v. State*, 21 Tenn. 152, 156 (1840) ("As the object for which the right to keep and bear arms is secured is of general and public nature, to be exercised by the people in a body, for their common [defense], so the arms the right to keep which is secured are such as are usually employed military equipment."). *See also Fife v. State*, 31 Ark. 455, 459-61 (1876).[2]

11. Finally, we must ask what weapons restrictions are to be considered in making this determination. As Professor Spitzer points out, switchblade restrictions largely date to the 1950s. Therefore, it is difficult to relate them to the Founding era, except by analogy. Professor Spitzer uses six analogs: (1) restrictions on Bowie knives, (2) bludgeons, (3) billy clubs, (4) clubs, (5) slung shots, and (6) pistols. In my opinion, only Bowie knives and other "fighting knives"[3] are appropriately analogous. Pistols should not be compared since *Heller*, *McDonald*, and *Bruen* held that their possession was constitutionally protected. Bludgeons, billies, clubs, and slung shots should not be considered since they bear little resemblance to automatic knives, and law enforcement's concern with these blunt weapons was that they could be used to silently knock a victim unconscious without killing him, thus facilitating a robbery. As such, in my opinion, these blunt weapons are not analogous, and should not be used to interpret the application of the Second Amendment to automatic knives/switchblades.

## Arms Restrictions as Reflected in Exhibit B

12. **Exhibit B** to Professor Spitzer's report/declaration is a chart of Bowie Knife restrictions by state and date. Comparing it with Exhibit C (which gives details)

---

[2] The First Congress considered, and voted down, a proposal to add "for the common defense" to the federal Second Amendment. See Journal of the First Session of the Senate 77 (1820).

[3] For example, dirks, Arkansas toothpicsk, *etc*., which are in statutes usually grouped with Bowie knives.

5

REBUTTAL REPORT AND DECLARATION OF DAVID T. HARDY REBUTTING EXPERT REPORTS AND DECLARATIONS OF ROBERT SPITZER AND DR. BRENNAN RIVAS

KR1803

shows it does not confer an accurate understanding of the statutes at issue, because it includes, *inter alia*, carrying concealed weapons restrictions in which Bowie knives, *etc*., are among the weapons listed (often including handguns) that must be carried openly. Such statutes may indicate that *carrying concealed weapons restrictions* meet the restrictions of text, history, and tradition, but does not indicate that a *ban* on knife possession or carry in general would do the same. Additionally, the other Bowie knife restrictions referenced in Professor Spitzer's **Exhibit B**, such as tax laws, enhancement for criminal activity, brandishing prohibitions, and prohibitions to certain groups, have no relevance to the statutes challenged in this case.

13. Specifically, to look at the first three states listed: **Exhibit B's** first entry, Alabama, lists eight entries for Bowie knives. Comparing this to Exhibit C's detailed list shows that the 1837 law enhanced punishments for homicides that used the listed weapons. The 1839 and 1841 statutes were *concealed weapons bans* that listed Bowie knives, and also pistols. The 1867 Act taxed Bowie knives and pistols, and the 1876, 1877 and 1879 laws again were concealed weapons measures. The 1892 law is a tax on dealers in pistols and Bowie knives. These laws are not historically analogous. There is no concealed carry issue presented in this case, nor does this case involve tax issues or issues connected to both automatic knives and handguns. The switchblade ban being challenged in this case far exceeds any of the regulations presented by Prof. Spitzer.

14. Alabama's 1805 measure on clubs only restricted possession by slaves, and the 1873 measure on slung shots is a concealed weapons ban. These laws are also not historically analogous; they involve a repugnant law (applicable to slaves) and a concealed weapons ban (which is not at issue in this case).

15. Alaska, the next entry, lists four statutes. All date from the late 1890s, far too late under *Bruen* standards. *Bruen*, 142 S. Ct. 2111, 2136-37, 2153-54 (2022).

Arizona has three entries for Bowie knives. The 1867 law bans the use of Bowie knives or guns in any fight or quarrel, or drawing them in a rude, angry, or threatening manner. There is nothing in this 1867 law that prohibits the manufacture, sale, purchase, transfer, possession, or even carrying of bowie knives. In fact, assuming the language of using a bowie knife "in any fight or quarrel" excludes a situation in self-defense, the restrictions under this 1867 seem to merely restrict behavior that would be deemed unlawful regardless of whether a bowie knife was involved. The 1889 Arizona measure bans carrying of pistols, Bowie knives, and dirks in any town or village for the *territory* Arizona. The 1901 statute repeats this and also restricts concealed carry of these arms. It should also be noted that with statehood in 1912, Arizona guaranteed a right to arms in its constitution, and the first state code of 1913 deleted the restrictions on open carry of arms. These also all fall well-short of the broad ban imposed by California with regard to automatically opening knives. As such, they offer little historical justification for the State's ban. Professor Spitzer's reliance on these statutes is offered only at the highest level of generalization, in what seems that any historical restrictions on certain uses, of any kind, justifies outright prohibitions. This notion is not supported by the Second Amendment text, history, and tradition.

## Arms Restrictions Reflected in Exhibit C

16. I have also examined the arms restrictions listed in **Exhibit C** to Professor Spitzer's report.

17. First, based on my review, 145 of these restrictions in **Exhibit C**, are post-1870, and not to be considered under *Bruen*. *Bruen*, 142 S. Ct. 2111, 2136-37, 2153-54 (2022). In fact, sixteen of the laws listed are from the twentieth century.

18. Additionally, of the restrictions relied on by Professor Spitzer, 32 only restrict the *concealed carry of arms* (mentioning both the Bowie knife and pistol). In

7

*REBUTTAL REPORT AND DECLARATION OF DAVID T. HARDY REBUTTING EXPERT REPORTS AND DECLARATIONS OF ROBERT SPITZER AND DR. BRENNAN RIVAS*

KR1805

other words, it was perfectly legal to manufacture, sell, purchase, transfer, possess, use, and even openly carry the weapons listed in these restrictions. Concealed carry is not at issue in this case. As such, restrictions on concealed carrying of certain weapons has little value when considering relevant historical analogues that would justify California's prohibition on switchblades.

19. Moreover, 15 of the laws cited by Professor Spitzer were racist, abhorrent laws that were only applicable to slaves, or free blacks, or Indians. Aside from the fact that this Court should not consider these racist laws to justify any regulation, they do not provide any historical justification for California's ban on switchblades, because the California ban applies to everyone, not any kind of sub-group of the people.

20. As identified above with my analysis of the Alaska laws cited in Professor Spitzer's **Exhibit B**, there are 19 laws cited by him that penalized only arms use or attempted use *in committing a crime*, or flourishing arms in a threatening manner. While these restrictions may be relied on to attempt to justify modern regulations prohibiting this kind of unlawful behavior with weapons in general, they are far from relevant in justifying any kind of outright prohibition.

21. My review of Professor Spitzer's Exhibits also show that seven regulations were "surety to keep the peace" statutes, applicable only where the person had used arms to cause terror in others, and even then, the remedy was not to disarm the individual, but to require him to post a bond that he would keep the peace. Five other regulations were taxation measures (one each in Alabama and Florida, three in North Carolina) — all of which taxed pistols together with fighting knives. Just as these tax regulations provide no justification for prohibiting pistols, they offer no justification for prohibiting an automatic knife/switchblade.

8

*REBUTTAL REPORT AND DECLARATION OF DAVID T. HARDY REBUTTING EXPERT REPORTS AND DECLARATIONS OF ROBERT SPITZER AND DR. BRENNAN RIVAS*

**KR1806**

22. Additionally, four other cited restrictions prohibited rioting, and define rioting as involving fewer people if they are armed; three restrictions prohibited dueling, mentioning pistols and knives as the weapons involved; two are restrictions on sale, one of which (FLA, 1868) relates only to slung shots, the other of which (TN, 1837-38) covers Bowie knives; two restrict (TN 1856, Memphis 1867) giving pistols or bowie knives to minors; and two restrict possession of weapons by certain classes of persons (KS, 1868: drunks and former rebels, MA, 1637, heretics' swords, muskets, and pistols).

23. Entirely absent from Professor Spitzer's report and exhibits are any outright prohibitions to the scale of California's prohibition in this case on the manufacture, sale, purchase, and possession, and open carry of switchblades. The California law challenged in this case is a complete prohibition on *all* such activities. The only relevant historical justification that could be offered to support the law would be a historical tradition of similar bans. Professor Spitzer's report fails to meet this relevant burden of proof. He makes no such showing. A scattering of a handful of sale restrictions on bowie knives throughout the relevant period is patently insufficient justification under *Heller* and *Bruen*.

**Prof. Spitzer's Newspaper.com Analysis**

24. Prof. Spitzer devotes several pages of his report discussing his internet search of newspapers.com for any reference to the term "switchblade" and his conclusions as to the results of this search. To begin, Prof. Spitzer's method is highly generalized and lacks any specificity. Based on a single search of the term "switchblade," Professor Spitzer forms several conclusions without any supporting data or evidence. His internet search is so generalized, it also does not appear to be replicable, making it unreliable.

9

*REBUTTAL REPORT AND DECLARATION OF DAVID T. HARDY REBUTTING EXPERT REPORTS AND DECLARATIONS OF ROBERT SPITZER AND DR. BRENNAN RIVAS*

**KR1807**

25. For example, going on the same website and searching the same term, "switchblade," for the period of 1921 to 1939, Professor Spitzer received "424 stories," but my search resulted in 417 stories. Searching an additional period from 1940 to 1945, Professor Spitzer received "612 stories" and I received 610 results. From 1946 to 1950, Professor Spitzer received "824 stories" and I received 820 results. From 1951 to 1955, Professor Spitzer received "9,713 stories," and I received 9,677 results. From 1956 to 1959, Professor Spitzer received "19,929 stories," and I received 19,896.

26. The fact that the search results from this website are inconsistent is its own problem. However, another major problem is that it does not appear that Professor Spitzer actually reviewed every search result that he obtained. As such, the conclusions that he reaches are highly questionable and lack any factual support. I have selected and specifically reviewed a number of the articles. Most of them consist of: (i) opinion pieces that claim "switchblades" are dangerous; (ii) summaries of legislative efforts to have the knife prohibited in various states; or (iii) duplicate articles of the first two categories. My last conclusion is supported by Professor Spitzer's own comments in which he states, "During this period, relatively few switchblade crimes were reported, but those crimes that did receive coverage were often reprinted in many newspapers." Spitzer ¶ 16.

27. Professor Spitzer also makes other unfounded claims such as, "These numbers likely underestimate the number of newspaper stories about "switchblades" because, as noted …, many news stories simply reported "knife stabbings," without specifying that the knife involved was a switchblade." Spitzer Report, ¶ 22. In sum, Professor Spitzer has no basis or data to support this claim. The data cited also consists of highly generalized and difficult to replicate internet news articles, which are inherently unreliable.

**Prof. Spitzer's Switchblade Crime Analysis**

28. Under the *Bruen* decision, policy arguments and interest balancing evaluations were explicitly rejected and cannot be considered by experts and the courts when determining the constitutionality of a arms regulation challenged under the Second Amendment. Thus, I am at a loss as to why Professor Spitzer spends any time discussing these issues in his report. Without waiving my position, I will nonetheless address this issue for purposes of rebuttal. In discussing the use of switchblades in crime, Professor Spitzer relies on two main sources (aside from his generalized internet search of the term "switchblade"). First, he quotes an article from Woman's Home Companion, titled, "The Toy That Kills." Second, he quotes the U.S. Senate investigation in support of the Federal Switchblade Act of 1958.

29. Professor Spitzer's first source is an opinion piece written by Jack Harrison Pollack in 1950, in which Pollack provides a number of quotes from the former superintendent of Rhode Island State Police, from an unidentified juvenile court judge, and unidentified "manufacturers and spokesmen for the industry," a Captain David Kerr, and Virgil W. Peterson, director of the Chicago Crime Commission. In this article, the author makes numerous claims regarding switchblades and their use in crime, but provides no sources or citations of any kind. Professor Spitzer relies on this "nationwide investigation" performed by Pollack without question or verification. Further, the article itself is from 1950 – well beyond any pertinent historical period under *Bruen*.

30. Second, Professor Spitzer relies on the U.S. Senate investigation in support of the Federal Switchblade Act of 1958 to support his conclusions regarding criminal use of switchblades. It cannot be ignored that the data that he is relying on is approximately 66 years old. Other than his reference to this 66-year-old Senate report, Professor Spitzer does not provide any crime data on switchblades, or knives

11

*REBUTTAL REPORT AND DECLARATION OF DAVID T. HARDY REBUTTING EXPERT REPORTS AND DECLARATIONS OF ROBERT SPITZER AND DR. BRENNAN RIVAS*

KR1809

of any kind. Additionally, he summarily references and then dismisses the only report that I am aware of that discusses the criminal use of switchblades.[4] Professor Spitzer labels the author of this report "one critic of switchblade knife restrictions." Spitzer ¶ 30. He also omits the fact that this report empirically contradicts the claims made that switchblades are used mostly for criminal activities:

> "Fortunately, the claims of Cone and Pino are empirically verifiable to some extent. According to manufacturers' numbers provided to the committee, there were at least 1.2 million switchblades sold in the United States each year. We also know that for the years 1957 and 1958, there were an average of 8,145 homicides, 71,210 robberies, and 112,235 aggravated assaults. Even assuming that half of all these crimes used knives, and further assuming that every knife used was a switchblade, there would have been 95,795 violent crimes involving switchblades. Even using these extremely cautious presuppositions, and further assuming that 95,795 different switchblades were used for crimes, with six million switchblades in circulation, it would mean that only 1.6% of switchblades were used in murder, assault, or robbery. In fact, the use rate is almost certainly well under 1%. Given that 99% of switchblades were never used for any illegal purpose, the assertion that they are only used for or suited for murder, assault, and robbery is demonstrably false."

*Criminal Use of Switchblades, p. 238*

31. Thus, in summary, the sources relied on by Professor Spitzer are: (i) highly generalized and provide no concrete facts; (ii) unsupported, unverifiable, and drawn from an approximately 74-year-old magazine article; and (iii) taken from a 66-year-old Senate report in which the statements made in the report are demonstrably false. The time period is also inconsistent with *Bruen*. In my opinion, Professor Spitzer's report cannot be considered relevant or factually accurate.

---

[4] Clark, Paul A., "Criminal Use of Switchblades: Will the Recent Trend Towards Legalization Lead to Bloodshed?" *Connecticut Public Interest Law Journal* 13 (2014)

**REBUTTAL TO EXPERT REPORT AND DECLARATION OF DR. BRENNAN RIVAS**

32. I also reviewed the report and declaration of Dr. Brennan Rivas. Dr. Rivas provides a summary of the history of the Bowie knife, to the extent that history can be ascertained.[5] However, her generalized description of "Large knives," "hunting knives," and "fighting knives" provides no relevance to the challenged law in this case. Thus, it offers little value in addressing the constitutionality of California's complete ban on automatic knives/switchblades.

33. Significantly, Dr. Rivas' description of legal restrictions omits significant details and outright exceptions to many of the laws in her summary of the various restrictions on certain weapons. For example, on pages 13-14, Dr. Rivas' report discusses knives' inclusion in concealed carry bans, but then lists other statutes without acknowledging they were bans *only* on concealed carry, not on open carry (let alone on possession). *See, e.g.,* LA Laws 1813, p. 172-73 (banning carry of any "concealed weapon," including a knife or pistol); VA Laws 1838, ch. 101 (penalizing carrying weapons "hidden or concealed from common observation"); FLA Laws 1846, ch. 75 (banning carrying dirks and pistols "secretly"); ALA Laws 1840, ch. 7 §4, (outlawing carrying Bowie knives, dirks or firearms "concealed about his person.").

34. As to the 1801 Tennessee law cited by Dr. Rivas, the full text of the law prohibits "private carrying" of "any dirk, large knife, pistol or any other dangerous weapon, *to the fear or terror of any person.*" If an individual were viewed to have acted in this manner, he would be required to post a surety for "good behavior." This

---

[5] The original Bowie knife vanished after its owner's death at the Alamo, and arms historians debate who created it, and how many features associated with it were original and how many were added when Britain's Sheffield Company began its mass production and export.

13

KR1811

*REBUTTAL REPORT AND DECLARATION OF DAVID T. HARDY REBUTTING EXPERT REPORTS AND DECLARATIONS OF ROBERT SPITZER AND DR. BRENNAN RIVAS*

law is certainly not analogous. Additionally, the "similar laws" referenced by Dr. Rivas from Kentucky, Louisiana, Indiana, and Mississippi also omit key details. The 1812 Kentucky law provides an exception to its carry restriction for anyone "traveling on a journey." Rivas, at 13, n. 35. The 1819 Indiana restriction only restricted the *concealed carrying* of "any dirk, pistol, sword in cane, or any other unlawful weapon." Rivas, at 13, n. 38. The 1821 Mississippi restriction had an explicit exception to its carry restriction, namely, "in all cases of persons traveling they shall not be bound by the prior visions of this act." Rivas, at 14, n. 39.

35. While Dr. Rivas describes the 1838 Virginia law to have "regulated the carrying of 'any pistol, dirk, bowie knife, or any other weapons of the like kind, from the use of which the death of any person might probably ensue,'" she omits that this regulation only applied to *concealed carry.* Rivas, at 14, n. 40. And again, Rivas' reference to the 1840 Alabama laws omits the fact that this state law only applied to concealed carry of certain weapons and provided exceptions if the individual was threatened/had good cause to carry such weapons or was on a journey. Rivas, at 14, n. 41. This same omission is made when Dr. Rivas references an 1846 Florida law as well. Rivas, at 14, n. 42.

36. These key details referenced above are important, since early American courts upheld concealed carry bans on the rationale that they only banned one mode of carrying, while leaving open carry unburdened. *See State v. Chandler*, 5 La. App. 489 (1850) ("It interferes with no man's right to carry arms (to use its words) 'in full open view,' which places men upon an equality."); *State v. Reid*, 1 Ala. 612 (1840) ("A statute which, under the [pretense] of regulating, … requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional."). To the extent a restriction on carrying can advise us regarding a restriction on possession, bans on concealed carry alone furnish no guidance as to a complete ban on possession.

14

*REBUTTAL REPORT AND DECLARATION OF DAVID T. HARDY REBUTTING EXPERT REPORTS AND DECLARATIONS OF ROBERT SPITZER AND DR. BRENNAN RIVAS*

KR1812

37. Dr. Rivas also discusses the taxation of certain knives, while conceding that pistols were also taxed. As discussed above, *Heller, McDonald*, and *Bruen* make clear that the history of pistol regulation was not such as to pass the text, history, and tradition test. As such, Dr. Rivas' regulations would not pass the test either. Moreover, the relevance of a handful of taxation laws to the challenged law in this case it highly questionable. To my understanding, California is not seeking to continue to impose a tax on switchblades — it prohibits their manufacture, import, sale, transfer, possession, and carrying of them.

38. Nevertheless, Dr. Rivas references three state laws that imposed taxes on the personal possession of certain weapons (Alabama, North Carolina, and Mississippi). Rivas, at 14. Two tax regulations imposed within the Florida territory, two tax laws imposed by the municipalities of Jesup, Georgia and Cedartown, Georgia. These tax regulations are a small minority and hardly rise to the standard of any historical tradition that is required under *Heller* and *Bruen*. The same is true for the three states that imposed occupational taxes on those who sold certain weapons. Rivas, at 16, ¶ 16.

## **CONCLUSIONS**

In summary, my conclusions, based on the above analysis and my background and qualification, are as follows: (1) over the relevant period, 1776 - 1870, there were no American restrictions on the *possession* of Bowie knives and other knives; (2) most of the laws or regulation that name the Bowie knife and other knives involved prohibitions on criminal misuse or on concealed carry; concealed carry was restricted, while open carry was not, making these statutes inapplicable and not historically analogous to possession bans; (3) almost all the laws or regulations naming Bowie knives and other knives are also applicable to handguns; and we know from *Heller* and *McDonald* that bans on handgun possession are unconstitutional, and from *Bruen*

that even "may issue" handgun permit requirements fail the text, history, and tradition test—thus, if these historical laws were insufficient to justify a ban on handguns, they would necessarily be insufficient to ban certain knives, including switchblades; (4) in any event, the laws or regulations that are invoked by Professor Spitzer and Dr. Rivas are limited to a handful of states and territories, rendering them doubtful as evidence of Americans' *general and nationwide* understanding of their right to keep and bear arms during the relevant period (*i.e.*, founding, time(s) of ratification).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that I signed my declaration on January 19, 2024, at Tucson, Arizona.

David T. Hardy

16

*REBUTTAL REPORT AND DECLARATION OF DAVID T. HARDY REBUTTING EXPERT REPORTS AND DECLARATIONS OF ROBERT SPITZER AND DR. BRENNAN RIVAS*

KR1814

# EXHIBIT A

KR1815

**David T. Hardy**
Cirriculum Vitae

8987 E. Tanque Verde, No. 265
No 265
Tucson AZ 85749

(520) 749-0241 (office)
(520) 490-9460 (cell)
dthardy@mindspring.com

## *Education*

J.D., University of Arizona 1975, with honors. Associate editor, Arizona Law Review, 1st place moot court 1st & 2nd years, won Regionals 3rd year.
B.A., University of Arizona 1972, with high honors & Honors Program (today the Honors College), in 3 years.

## Experience

10 years' governmental service, Interior Department, Washington D.C.; 33 years in private practice. Experience ranged from Endangered Species and Administrative Procedure Acts to a death penalty reversal in the Arizona Supreme Court and a 5-4 in the US Supreme Court. (details below).

27 law review articles authored, two cited by the U.S. Supreme Court, and one by eleven U.S. Circuit Courts of Appeals, and another by Larry Tribe's AMERICAN CONSTITUTIONAL LAW. Author of five books, one a NY Times best-seller.

## Selected Publications

### Legal Periodicals

*Standards of Review, the Second Amendment, and Doctrinal Chaos*, 42 S. ILL. L. J. 91 (2018).

*Criminology, Gun Control, and the Right to Arms*, 58 HOWARD L. J. 679 (2015).

*Original Popular Understanding of the 14th Amendment as Reflected in the Print Media of 1866-68,* 30 WHITTIER L. REV. 695 (2009). Cited by the Supreme Court in *McDonald v. City of Chicago*, by the plurality, and by Justice Thomas' concurrence, 561 U.S. 742, 763, n. 10, 841 (2010).

McDonald v. Chicago, *Fourteenth Amendment Incorporation and Judicial Role Reversals,* 8 N.Y.U. J. OF L. & LIBERTY 15 (2013).

*The Rise and Demise of the "Collective Right" Interpretation of the Second Amendment*, 59 CLEVELAND ST. L. REV. 315 (2011).

*The Lecture Notes of St. George Tucker: A Framing Era View of the Bill of Rights*, 103 NORTHWESTERN U. L. REV. 1527 (2009).

*Standing to Sue in the Absence of Prosecution: Can a Case Be Too Controversial for "Case or Controversy"?,* 29 THOMAS JEFFERSON L. REV. 53 (2008).

*Originalism, Its Tools, and Some Caveats*, 2 AKRON L. REV. STRICT SCRUTINY 1 (2010).

*Ducking the Bullet:* District of Columbia v. Heller *and the Stevens Dissent*, 2010 CARDOZO L. REV. DE NOVO 101 (2010).

*A Well Regulated Militia*, 15 WM. & MARY BILL OF RIGHTS JOURNAL 1237 (2007), cited in *Binderup v. Attorney General*, No. 14-4549, slip op. at 34 n. 17 (3d Cir., Sept. 7, 2016) (*en banc)*.

*The Firearm Owners' Protection Act,* 17 CUMB. L. REV. 585 (1987). Cited in a Supreme Court dissent and by eleven U.S. Circuit Courts of Appeals:

- *Staples v. United States*, 511 U.S. 610, 626 n.4 (1994) (Stevens, J., dissenting);
- *U. S. v. Andrade*, 135 F3d. 104, 109 n. 3 (1st Cir. 1998);
- *Torraco v. Port Authority*, 615 F.3d 129, 143 (2d Cir. 2010);
- *Ass'n of N.J. Rifle and Pistol Clubs v. Port Authority*, 730 F.3d 252, 256-57 (3rd Cir. 2013);
- *U.S. v. Hayden*, 64 F.3d 126, 129 (3d Cir. 1995);
- *U.S. v. Langley,* 62 F.3d 602 (4th Cir. 1995) (*en banc*);
- *United States v. Golding*, 332 F.3d 838 (5th Cir. 2003);
- *U.S. v. Kirk*, 70 F.3d 791, 798 n.1 (5th Cir. 1995), *en banc,* 105 F.3d 997, 1006-07 (1997);
- *U.S. v. McGill*, 74 F.3d 64, 67 (5th Cir. 1996);
- *U.S. v. Knutson*, 113 F.3d 27, 30 (5th Cir. 1997):
- *U.S. v. Rodriguez*, 132 F.3d 208,211 (5th Cir. 1997);
- *U.S. v. Golding*, 332 F.3 838, 841 N. 12 (5th Cir. 2003);
- *U. S. v. Cassidy*, 899 F.3d 543, 546 n.8 (6th Cir. 1990);
- *U.S. v. Choice*, 201 F.3d 837, 841 n. 5 (6th Cir. 2000);
- *U.S. v. Kenney*, 91 F.3d 884, 886 (7th Cir. 1996);
- *U.S. v. Farrell*, 69 F.3d 891, 893 (8th Cir. 1995);
- *U.S. v. Sherbondy*, 865 F.2d 996, 1002 (9th Cir. 1988);
- *U.S. v. Marchant*, 55 F.3d 509, 514 (10th Cir. 1995);
- *U.S. v. Wilkes*, 58 F.3d 1518, 1519 (10th Cir. 1995);
- *U.S. v. Haney*, 264 F.3d 1161, 1169 (10th Cir. 2001);
- *Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir. 2002);

- *U.S. v. Otiaba*, 862 F. Supp. 251, 253-54 (D.N.D. 1994) (declining to follow 2d Circuit, since "that court did not have available to it Hardy's analysis....");
- *U.S. v. Hunter*, 843 F. Supp. 235, 246 (E.D. Mich. 1994);
- *Cisewski v. Department of Treasury*, 773 F. Supp.. 148, 150 (E.D. Wis. 1991);
- *In re Two Seized Firearms*, 127 N.J. 84, 602 A.2d 728, 731 (1992);
- 2A KEVIN O'MALEY, ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS §39.09 at 36 (5th Ed. 2000);
- 78 Wisc. Opinions of the Atty'y Gen. 22 (1989).

*Armed Citizens and Citizen Armies: Origins of the Second Amendment*, 9 HARV. J. OF L. & PUB. POLICY 559 (1986). Cited in LAURENCE TRIBE, AMERICAN CONSTITUTIONAL LAW 897 n. 211 (3d Ed. 2000).

Hardy & Stompoly, *Of Arms and the Law*, 51 CHI-KENT L REV. 62 (1974).

Note, *Informants' Statements as a Basis for Stop and Frisk*, 15 ARIZ. L. REV. 677 (1973).

**Books**

DRED SCOTT: THE INSIDE STORY (2019). Gold Medal for Historical Nonfiction, African-American Historical and Genealogical Society International Book Fair.

MASS KILLINGS: MYTH, REALITY, AND SOLUTIONS (2018)

I'M FROM THE GOVERNMENT, AND I'M HERE TO KILL YOU: THE HUMAN COST OF OFFICIAL NEGLIGENCE (2017). This is actually a treatise calling for reform of the Federal Tort Claims Act and the Federal Rules of Criminal Procedure.

**Monographs and Anthologies**

OF MICE AND MEN: SURVIVING ENDANGERED SPECIES ACT LITIGATION (1993).

Chapters dealing with checks and balances, impeachment, bills of attainder, and a biography of James Madison in THE NEW FEDERALIST PAPERS (1989).

**Miscellaneous**

Directed a two-hour documentary film on the 2d and 14th Amendments, "In Search of the Second Amendment," nominated for the ABA's Silver Gavel Award.

## PRESENTATIONS

In 2018, I have presented at Southern Illinois University's symposium on "Exploring the Second Amendment: 10 Years after *Heller*," and at the St. Louis Civil War Roundtable on the *Dred Scott* case. In past years I have given Pima County Bar CLEs on Supreme Court watching and on bringing federal test cases. Back when Barbara Atwood taught Civil Procedure, Leighton Rockafellow and I would give an annual presentation on personal jurisdiction. I have often spoken at the National Firearm Law Symposium; in 2010, due to another speaker's emergency I had to give two presentations. The audience evaluations rated them No. 1 and 2 of the symposium, with scores of 3.94 and 3.88, where 4 was the highest rating.

I have appeared on ABC Nightline, Book TV, Court TV (twice), Scarborough Country and over a hundred radio shows.

## EMPLOYMENT HISTORY

**Private Practice, Tucson, Az.** 1992 – present

Primarily civil litigation and appeals. Admitted to U.S. Supreme Court, Arizona Supreme Court, 4th, 6th, and 9th Circuits, U.S. District Courts for Arizona, Colorado, and District of Columbia.

Reported decisions include:

- *Mack v. United States*, consolidated with *Pritnz v. United States*, 521 U.S. 898 (1997) (10th Amendment, 5-4 win);
- *State v. Detrich*, 178 Ariz. 380, 873 P.2d 1302 (1994) (5-0 reversal of murder conviction and death penalty);
- *Arizona Libertarian Party v. Schmerl*, 200 Ariz. 486, 28 P.3d 948 (App. 2001) (First Amendment: successful defense of Arizona electoral system);
- *Arizona Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277 (9th Cir. 2003) (successful First Amendment attack on State electoral system);
- *A. Uberti & C. v. Leonardo* , 181 Ariz. 565, 892 P.2d 1354 (1995) (*In personam* jurisdiction in product liability case).

**Office of the Solicitor, Dep't of the Interior, Wash. DC**, 1982-1992

- Ten years' agency work, mainly representing U.S. Fish and Wildlife Service, occasionally detailed to other federal agencies. GS-14.
- Continuous work under Administrate Procedure Act, Endangered Species Act, NEPA, etc.
- Chief legal advisor to USFWS Law Enforcement Division. Handled forfeitures and civil penalties, advised agents, approved prosecutions.
- Litigation: Represented FWS in variety of federal lawsuits, including *US v.*

*Dion*, 476 U.S. 734 (1986) (Eagle Act abrogates Indian hunting rights).

- Mineral, Oil and Gas Rights: Held primary staff responsibility for preparing Interior's legal position on oil, gas and mineral rights underlying Nat'l Wildlife Refuge System (68,000,000 acres) lands.
- Water Rights & Wilderness: Attorney Trish Bangert and I prepared the pivotal Solicitor's Opinion on water rights in designated Wilderness Areas. The position was subsequently adopted by the Attorney General as the position of the entire government.

**Partner, Sharp, Sando, Alfred & Hardy,** Tucson, 1976-1982

- Was assigned individual rating of "b(v)" by Martindale-Hubbell.
- Small firm general practice, torts, contracts, criminal defense.

**Associate, Browning & Wilson-Druke**, Tucson, 1975-76

- Criminal defense and civil work.

**Prior Expert Testimony Within the Last Four Years:**

*Jones v. Becerra*, 498 F.Supp.3d 1317

# PLAINTIFFS' EXHIBIT AF

KR1821

Deposition of

# Robert Escobar

February 09, 2024

Knife Rights Inc.

vs.

Rob Bonta Attorney General

aptus.
COURT REPORTING
www.aptusCR.com | 866.999.8310

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P.,

Plaintiffs,

No. 3:23-cv-00474-JES-DDL

vs.

CALIFORNIA ATTORNEY GENERAL ROB BONTA,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEO-TELECONFERENCE DEPOSITION OF

ROBERT ESCOBAR

February 9, 2024

1:00 p.m.

Sacramento, California

Job No. 10134989

Joan Theresa Cesano, CSR No. 2590
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

APPEARANCES OF COUNSEL

For Plaintiff:

DILLON LAW GROUP APC
JOHN DILLON, ESQ. (Via Zoom)
2647 Gateway Road, Ste. 105
Carlsbad, California 92009'
760.642.7150
jdillon@dillonlawgp.com

For Defendants:

OFFICE OF THE ATTORNEY GENERAL for
STATE OF CALIFORNIA
KATRINA UYEHARA, Deputy Attorney General
(Via Zoom)
JANE REILLEY, Deputy Attorney General
(Via Zoom)
1300 I Street, 17 Floor
Sacramento, California 95814
916.210.7867
Katrina.Uyehara@doj.ca.gov

INDEX OF EXAMINATION

WITNESS: ROBERT ESCOBAR

| EXAMINATION | PAGE |
| --- | --- |
| By Mr. Dillon | 5 |

* * *

Robert Escobar

Knife Rights Inc. vs. Rob Bonta Attorney General

INDEX TO EXHIBITS

| EXHIBITS | | MARKED |
|---|---|---|
| Exhibit 1 | Complaint | 9 |
| Exhibit 2 | Notice of Deposition for Robert Escobar | 10 |
| Exhibit 3 | Expert Report of Robert Escobar | 11 |
| Exhibit 4 | Photo of Benchmark Adamas Knife | 43 |
| Exhibit 5 | Photo of Buck 110 Knives | 51 |
| Exhibit 6 | YouTube video: "Switchblade Knife Broken Spring in the Repair" | 71 |
| Exhibit 7 | YouTube video link: "Most common problems with OTF automatic knives...simple fix. | 73 |
| Exhibit 8 | YouTube video: "Three variations of the Buck 110 folding knife." | 99 |
| Exhibit 9 | YouTube video: Photograph of three knives. | 117 |

Page 4

www.aptusCR.com

KR1826

SACRAMENTO, CALIFORNIA;

FRIDAY, FEBRUARY 9, 2024; 1:00 P.M.

ROBERT ESCOBAR,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. DILLON:

**Q Good morning -- good afternoon, Mr. Escobar.**

**My name's John Dillon, I'm the counsel for the plaintiffs in this case, it's Knife Rights, Inc versus Rob Bonta, Attorney General of California. This case number is 3:23-CV-00474.**

**So I'm going to be taking -- asking you questions today about this case and an expert report that you submitted in this matter on behalf of the defendants, State of California in this case.**

**Can you please state your full name for the record.**

A Robert Arthur Escobar.

**Q And Mr. Escobar, have you been retained by the defendants in this case?**

A Yes.

**Q And what is the amount you're being paid for for the work you're doing in this case?**

A $150 per hour.

**Q So just some housekeeping measures here.**

**First, have you ever been deposed before?**

A I have was thinking about that. I don't think so, maybe once in a car accident I was involved in, but I do not believe so, and certainly not as an adult.

**Q Okay. So you've never been deposed in any other case?**

A No.

**Q Have you ever taken the role as an expert witness in any case before?**

A Yes, one other. I submitted in the paperwork.

**Q Is that a case, Fouts v Bonta?**

A Yes.

**Q And in that case you weren't deposed?**

A I was not.

**Q And in that matter you provided an expert report in the role of an expert witness; is that correct?**

A Correct.

**Q So I'm going to go over certain admonitions.**

**So just to remind you, and what you just did, you are under oath and you've sworn to tell the truth, and the effect of that oath is the same as if you're testifying in**

court.

Do you understand that?

A I do.

Q And although we are conducting this remotely, and we're all in different places, this oath that you took and the rules of a deposition would apply as if we're all in the same room.

Do you understand that?

A Understood.

Q So as this is a remote deposition, I'm going to note that no notes are going to be allowed during the deposition, and you may not read from anything other than the exhibits that are presented by me or your counsel.

Do you understand that?

A I do. That means -- that sounds like I should not have the -- my declaration and rebuttal which I currently have on my PC?

Q If I do want you to refer to those, I'll bring them up and I'll take a look at those, but yeah, if I'm not specifically directing to you those documents, I'd ask that you just respond to my questions from memory.

A I shut them right now.

MS. UYEHARA: Counsel, I'm just going to object to that instruction, to the extent that the witness is allowed to refer to his materials to refresh his

recollection, as long as he discloses to you that he's doing so.

MR. DILLON: I'll allow it, as long as I know that he's referring to the documents, that's fine. I just need to make sure that they're not up when I don't know.

MS. UYEHARA: That's fine.

BY MR. DILLON:

**Q Please also be aware no one else is permitted to be in the room with you during the deposition?**

**Do you know that?**

A I do.

**Q I'm going to be asking you a lot of questions and I had ask you please answer audibly and only after I finish speaking. This one, helps me ask questions, helps you answer, but it also helps the court reporter take down everything that we're saying.**

**Do you understand that?**

A I do.

**Q Okay. So again, no hand gestures. If I ask you a question, how much of this happened, don't put up your hand with the number one.**

A I will never -- (inaudible; Court Reporter asks for clarification).

THE COURT REPORTER: Could you repeat the last thing you said, please?

THE WITNESS: Yes, I will keep my hands off the camera.

THE COURT REPORTER: Thank you.

BY MR. DILLON:

**Q Again, I'm going to ask you, don't guess when providing responses, but if appropriate, I may ask you to provide an estimate based off your best recollection.**

**Do you understand that?**

A I do.

**Q Okay. So at this time I'm just going to bring up some exhibits here. Okay.**

**So I just pulled up a document, it should be on the shared screen here.**

**Do you see a document in front of you?**

A I do.

**Q Okay. I'm going in produce this as Plaintiff's Exhibit 1.**

(Exhibit 1 marked)

**Q Can you read the title of the document on the screen, please?**

A "United States District Court for the Southern District of California," I'm not sure -- I'm -- sorry.

**Q -- sorry, my bad. Here. So I'll highlight under the title here.**

**Can you read that text for me, please?**

A Yes. "Complaint for Declaratory and Injunctive Relief, 42 -- "

**Q -- all right.**

**And have you seen this document before?**

A Yes.

**Q Okay. And have you reviewed that document in full?**

A I have.

**Q Next here -- I'm going to introduce this as Plaintiff's Exhibit 2.**

(Exhibit 2 marked)

Do you see the document up on the screen?

A I do.

**Q Okay. And again, I'm going to highlight the title of the document. Try not to get this pop-up to appear.**

**Can you read the text -- the title for me, please?**

A "Notice of Deposition of Robert Escobar and Request to Produce Documents."

**Q Okay. And have you seen this document before?**

A I have.

**Q Okay. And have you reviewed this document in full?**

A Yes.

**Q And are you prepared to testify regarding the**

subject matter identified in the Notice of Deposition?

A Yes.

Q One more introduction here, just to get it out of the way.

So I'm introducing this as Plaintiff's Exhibit 3.

(Exhibit 3 marked)

Q Do you see the new document on the screen?

A I do.

Q And again, can you read the title of this document, please?

A "Expert Report and Declaration of Robert Escobar."

Q Are you familiar with this document?

A I am.

Q And is this the declaration and report -- expert report that you submitted on behalf of defendants in this matter?

A Based on the section I'm viewing, yes.

Q Okay. And I'm going to scroll down.

A Yes.

Q Okay. And the bottom of this document here, is that your signature and date that you put on the end of this document?

A Correct.

Q And you did that under penalty of perjury;

correct?

A Yes.

Q And you're the author of this report?

A Yes, I am.

Q Did anyone else assist you in authoring this report?

A No.

Q And are all the facts and information contained within this report true and correct?

A To the best of my knowledge and ability, yes.

Q And you're prepared to testify regarding the subject matter identified in this report?

A I am.

Q And just to know, I may refer, although this is Plaintiff's Exhibit 3, I may refer to it throughout the deposition as "your report."

Do you understand that?

A I do.

Q Okay. So let's get into this.

So, Mr. Escobar, you state in your report that you're a second degree black belt -- and forgive me if I mispronouncing this -- Goju-Ryu Karate?

A Goju-Ryu Karate, correct.

Q Goju Karate.

And can you give me some background and what Goju

**Karate is?**

A Yes. All karate, proper, comes from Okinawa, which is part of Japan, but was not originally, so this is the indigenous arts from Okinawa. Goju-Ryu is one of the major styles. It's been taught in U.S. military, along with other Japanese Okinawa styles, once the U.S. military occupied that part in the world, that's World War II, so it's mostly unarmed combat: Striking, grappling, submissions, subduing opponents.

**Q Okay. And does Goju Karate have any type of specialties? For example, tae kwon do is known for kicking. Does Goju Karate have any well-known specialties or any focus?**

A It does. I would say one of the more well-known speciality is body toughening; you stand there and get, you know, beaten by instructors. So there's a specific exercise called San Chin, that would be the most famous part of the Okinawan -- (unintelligible).

(Court Reporter speaks; asks for clarification).

**Q My first time deposed; I'll go a little slower.**

**Yes, the famous art about Goju within martial arts is body toughening, physically. There's an exercise called San Chin, S-A-N, C-H-I-N.**

**Q All right.**

**So does -- Goju karate doesn't specialize in**

**using weapons, does it?**

A As it was taught to me, it does. Most karate schools will have a weaponry component.

My main martial arts teacher had many, over the decades, but my longest running sensai, who was my Goju sensai, is a well known weapons expert enthusiast, so we always trained heavily weapons.

**Q Okay. And what kind of weapons did you train with?**

A Primarily the classic -- this is a term -- kabudo, K-A-B-U-D-O, weapons, so basically karate weaponry; five to six foot staff, sai, which are metal trenchants -- forked metal trenchants; tonfa, which are batons that inspire the L-shaped impact weapons that were famous because of police use or around the world; kama, which are sickles, so bladed, razor-sharp sickles, could be one or in a pair; nanchaku, often called nunchucks, and I would say those are the main weapons.

**Q Okay. And when did you receive your first degree black belt in Goju karate?**

A To be honest, I would have to look. I didn't prepare that. It's been a while, I've been a sensai for a very long time.

It was -- I was a young adult, heading into the working world that I started studying in college, with

(inaudible) Chapman. It was in my working years, after my twenties, but I would have to look offline to find the year.

**Q Okay. And let's see. How long did it take to get your black belt in Goju karate?**

A I would say at least eight years, which is long, as these things are generally done in martial arts.

**Q All right.**

**And you also have a second degree black belt in Goju karate; is that correct?**

A I do. I received that during the pandemic. That was just a couple of years ago.

**Q And what are the requirements to go from first degree to second degree in Goju karate?**

A A demonstration of skill, a lot of pre-arranged routines, Okinawan is big on kama, showing the proper body positioning memorization, movement, but also demonstration with weapons, all the weapons that I listed, you know, your athleticism, the ability to take the punishment that I was describing earlier, the body conditioning -- you allow yourself to be struck and show that you can continue moving and performing, working with a partner in various -- they are called -- well, I'll skip the term, but in various two-man drills, you know. Typical, I would say maybe two-handed -- two-person martial arts drills,

demonstrating throws, locks, takes-down, strikes, all that kind of thing.

**Q Okay. And do you teach Goju karate?**

A I do not. I acted as an assistant instructor on and off over the years in different instances, but I am not an instructor.

**Q So you don't have your own karate academy or studio?**

A I do not.

**Q Do you have any publications or writings regarding Goju karate?**

A Not regarding Goju karate, no.

**Q And you mentioned earlier that you practice in Kobudo, and that's the Okinawan-Japanese weapons; correct?**

A Correct. So that is a separate but a martial art, and I have a first degree black belt in weapons-only art.

**Q Okay. And the weapons that you described earlier are the same weapons that you used in Budo?**

A And then in addition to many more. There are others.

**Q And these weapons are all traditional martial arts weapons.**

A Yes, I'd agree with that.

**Q So, let's see -- so does Kobudo practice in the use of knives?**

A As taught to myself, because there are teacher variations and stylistic variations and splinter styles, et cetera, you name it.

In my experience, yes, I have offensive and defensive.

**Q Is that fixed-blade knives?**

A Yes, typically it would be a wooden approximation of a Japanese dagger called a tanto, T-A-N-T-O.

**Q And you say you were specifically taught with regard to the use of knives, but is that generally taught in most Goju karate courses?**

A In any karate based curriculum, including Goju, when it gets to a high enough level, I would say it's typical knives become a part of it, but typically it would be, more again, more high level introduction.

**Q So it's not a common theme throughout the whole process of advancing through Goju karate?**

A That is correct, it is not.

**Q Have you ever conducted any professional research when it comes to Kobudo?**

A If by "professional" you mean actively paid in the way I'm being paid right now, no. In terms of for the books that I write and publish, yes.

**Q Okay. And what books or publications have you written regarding Kubudo?**

A Well, things that incorporate my knowledge of Kubudo and weapons from that training would be in both of the weapons books that I've written, which is -- those are all the books I've written; two weapons-specific books.

**Q Okay. You have also stated you're a member of the Budo-Kai International; is that correct?**

A Yes, Bodu-Kai International, correct.

**Q And for the reporter, it's B-U-D-O-K-A-I International.**

**And you stated this organization conducts regular seminars?**

A Yes, usually in the state of Oklahoma, and I live in Texas.

**Q Do you know how often they conduct these seminars?**

A It depends, on, you know, COVID threw all of that out of whack, but the goal is quarterly.

**Q Okay. And what'd these seminars consist of?**

A A lot of martial arts organizations have these larger umbrella organizations, so Budo-Kai is the umbrella within which my sensai teaches.

He's a senior member there, basically you go and learn from a variety of skills and different martial arts and different weapons from -- from the variety of instructors that are present.

So in every one that I have gone to, there's been Krav Maga, that's the Israeli military martial art, there's been ninijitsu, karate, of course, Kobudo, of course, so it depends on the specialty of the instructor and what's being offered over the weekend, for instance.

**Q Okay. But you don't act as an instructor for the Budo-Kai International, do you?**

A No, I do not.

**Q And you stated earlier you attend these seminars?**

A When I can.

**Q How many seminars of these have you attended?**

A Total? Ever since kind of the confederation, the official formation, I would say six.

**Q And you never have given a presentation or chose to speak at one of these seminars?**

A Not an official one. I have brought some of the weapon-types that I am the historian of and shown them and done informal demonstrations. Sorry. I definitely never officially taught, no, not there.

**Q Do you provide any instructions on the use of knives and in self-defense?**

A I do not.

**Q In your in report -- so I'm sharing the screen up, on Page 1 of your report. Do you see that?**

A I do.

Q I'm going to highlight some text just to make it is easier to find here, but about the second sentence in, you state that several of the head instructors leading these seminars have experience in law enforcement or the military or in providing training to one or both; is that correct?

A Yes.

Q Okay. But you don't have any experience in law enforcement or the military, do you?

A None.

Q And you have also not provided any training to law enforcement or the military?

A None.

Q And you have no experience in training law enforcement or military in the use of knives; correct?

A Correct.

Q And no experience in training law enforcement or military in general self-defense; correct?

A Also correct.

Q All right.

So in your report you also state that you've also trained in various other martial arts over 24 years; correct?

A Yes.

Q Okay. And the martial arts that you state you

**practice consists of Krav Maga, Jiu-Jitsu, hybrid wrestling, boxing and HEMA which -- let's see -- what does HEMA stand for?**

A Historical European Martial Arts.

**Q Okay. You have practiced in those martial arts that I just read out; is that correct?**

A Yes, I have.

**Q And excluding the HEMA, which we'll talk about, these other martial arts, Krav Maga, Jiu-Jitsu, hybrid wrestling and boxing, they don't specialize in using weapons, do they?**

A The only one I would maybe take exception is Krav-Maga. It the Israeli military martial art. There are always -- it's mostly defensive training, but there are practice knives and guns that get brought out in almost every class.

**Q Is that for all levels of Krav Maga?**

A Let me think about that -- let me make sure I'm accurate because my daughter started taking it in that very first summer, she's -- yes, she's learning with those safe training weapons.

**Q All right.**

**And what level in Krav Maga did you reach?**

A Intermediate. This might require a second's worth of explanation.

I've been doing martial arts for a quarter of a century and I stopped testing, so I used to go to a mixed martial arts gym, and I would wrestle with professional wrestlers, et cetera, and get encouraged to get my blue belt in BJ, Brazilian Jiu-Jitsu, and you're familiar -- of course you can go from blue belt to purple belt.

I do not test in any martial arts that I take anymore except for Goju with my original sensai Kubudo. I do want to acquire my third degree black belt in Goju, and my secondary black belt in Kobudo, but all of these modern and very specialized ones I take, I just go take the classes. I stopped paying test fees a long time ago.

**Q So you have no belt or level when it comes to Krav Maga?**

A No. I would say, you know, testifying here under oath, I would say I have intermediate Krav Maga.

**Q Okay. And how about Jiu-Jitsu? What level of Jiu-Jitsu have you gotten to?**

A I would say advanced. I wrestle with people who have their black belts, people who are professional fighters, that sort of thing.

**Q Actually I practice Jiu-Jitsu myself, so I know that the belt system is you go from white, blue, purple, brown, black.**

**What belt have you obtained in Jiu-Jitsu?**

A Well, again, referring to my first comment, since I don't test now, I don't want to take these arts. I've never tested in Jiu-Jitsu, but I've taken BJJ with coaches, both in a Budo-Kai gym and a mixed martial arts gym, on and off for years, so I would say I have purple belt skill in Jiu-Jitsu.

**Q Have you ever been awarded a purple belt from any Jiu-Jitsu gym?**

A I'm never been tested from any Jiu-Jitsu gym, so no.

**Q You've never been given a purple belt by any Jiu-Jitsu gym?**

A No, I have not.

**Q And you mentioned that in your report that you practice in hybrid wrestling.**

**Can you describe what that is?**

A Umm-umm. In most modern martial art gyms there is going to be a wrestling component because of the popularity of fighting championship, et cetera, so they will --

MS. UYEHARA: -- Robert -- you have to slow down a little bit. Okay?

A Okay. In most martial arts gym there's going to be a wrestling component. They're going to be dedicated wrestling classes; right? The classes are strictly

wrestling, even though there are other things taught in the gym, so I have done those quite a bit in multiple gyms, so I call it hybrid wrestling because it's not an official style, like Greco-Roman wrestling.

What's taught nowadays in most gyms, it's interesting, is a synthesis of judo from Japan --

**Q Okay.**

A -- et cetera, et cetera.

**Q All right.**

**So when you say you practice in hybrid wrestling, you go to gyms and participate in some sort of sparring with other individuals that would involve wrestling; is that correct?**

A Correct.

**Q Again, this isn't like an official school of hybrid wrestling; right?**

A Correct.

**Q Is that the same situation for a practice in boxing?**

A Yeah, boxing also a dedicated class offered in various gyms that I've been in, and I will take their boxing classes, with their boxing instructor, yes.

**Q So in all the martial arts that you practice in, these are personal interests or hobbies; right?**

A Correct.

**Q And you're not professionally paid to practice in any of these martial arts; correct?**

A I am not.

**Q And you're not employed in these fields where you would get a salary or paid -- be on a payroll or have any income; correct?**

A Correct.

**Q So you mentioned you have two books that you wrote; correct?**

A Yes.

**Q Okay. And do any of your publications focus specifically on knives?**

A The first one does not. It's impact, roughly, specific.

The second is fairly wide ranging and has bladed instruments in it. I would say it does not focus on knives.

(Court Reporter asks for clarification)

THE WITNESS: I'll name both books. They're long titles, I apologize.

First one is Saps, Blackjacks and Slungshots: A History of Forgotten Weapons.

And the second is Deadly Ingenuity: A History of Unusual Weapons From Around the World and Across Time.

**Q And then, real quick, I put this off, the HEMA**

**Historical European Martial Arts Practice in, is that a Hand to Hand combat system?**

A It is both Hand to Hand and weapons. It's heavily tilted towards weapons, swords, daggers, that kind of thing, battle-axes.

**Q Now, when you're dealing with swords and battle-axes, are you practicing with armor or some type of protective clothing?**

A I don't spar in armor, there are people that do, I do not do that, but I train with both actual live blades and practice blades.

**Q And now, is there, again, like a rank or belt system in the Historical European Martial Arts?**

A No, HEMA does not use the eastern method of belts and ranks and that kind of a thing. And I've been doing this, what is now called HEMA since before that acronym even existed.

A friend of mine who I used to train with back the early 90s is now a professional HEMA instructor. It's just something I've continually learned on and off over the years.

**Q Okay. And so what's your current employment?**

A I am an IT professional. I'm a project manager and I work for a public accounting firm named Forvis.

**Q And that employment has nothing to do with**

**weapons or knives of any kind; correct?**

A Correct.

**Q Now, is this a full time job with the accounting firm?**

A Yes.

**Q So going back to the two books that we mentioned earlier, one of them being Saps, Blackjacks and Slungshots: History of Forgotten Weapons; correct?**

A "Slungshots" is a very odd, historical term; correct.

**Q And the other is "Deadly Ingenuity: The History of Unusual Weapons from Around the World and Across Time"?**

A It is.

**Q And you haven't published any other books; correct?**

A I have, but they're not weapons related.

**Q Okay. Any other research papers or studies or articles involving weapons?**

A Well, I've written a few times for a subscription based publication, it's a shooting association publication called Hats and Gats, sort of a very noir theme there.

So I had written a few articles for them -- not paid. They asked me if I would write for them and I would get a free subscription, so I have written a couple of articles for them.

**Q And what were those articles regarding?**

A One on history -- history of the snob-nose revolver in the American popular consciousness.

**Q Okay. So would you say the focus of your historical research has been on impact weapons or blunt force weapons?**

A Of my research, to be exact, to answer your question, I would say street weapons; of my writing, I would say impact weapons.

**Q And in your book, Saps, Blackjacks and Slungshots, you don't discuss knives; correct?**

A No, incidentally at best.

**Q And the primary subject of that book is just various history and configurations of blunt force objects?**

A It is the only book written, I say this, you know, I think accurately, this is the only book in history on the most forgotten weapons group from all of history, that is the case I put forth in the book; a large gap, not just in impact weapons history, but in weapons martial arts history, period.

**Q Okay. And the forgotten weapons would include saps, blackjacks and slungshots?**

A Those would be the overarching terms for the whole family of weapons, correct.

**Q And those are weapons that have been used**

**throughout the United States?**

A Absolutely.

**Q And are they pretty common?**

A They still are, to a certain extent. The monkey fist key chains that are very common nowadays, I know because of the intel I receive, are still getting used on the street today. Those are slung shots.

Saps, blackjacks, miniature batons, acay (ph) clubs of various kinds, including kind of the modern standard, expandable baton, that's all within the family of weapons I'm talking about. Easiest way to consider them is pocket clubs, something small that could fit in your pocket but that packs the wallop of a large, full size baton.

**Q Okay. And so in your other book, Deadly Ingenuity, you uncover some more obscure and unusual weapons; is that correct?**

A Yes, overlooked various kinds of blade impact.

**Q And these are weapons that are found all over the world?**

A Yes.

**Q Sorry. So you're not just focusing on the weapons from the United States or any specific country; correct?**

A Very little.

**Q Okay. And the sub kind of book is The History of**

**Unusual Weapons Around the World and Across Time; correct?**

A Correct.

**Q Okay. So am I correct in saying the focus of the book would be to discuss the more rare and unusual weapons you come across in your research?**

A Yes.

**Q So that book doesn't discuss the more common weapons, does it?**

A No. I would like to make a distinction.

A weapon like the cut throat razor was very common. It's not common now, which is why the book puts it forth as an uncommon weapon, but it was extremely common just in the previous century, the 20th century.

**Q And sorry, what weapon were you referring to just --**

A -- the cut throat razor, which is the old fashioned shaving razor that folks might be able to envision when they think of old movies, et cetera.

**Q So in the book, Deadly Ingenuity, you don't discuss knives like the Bowie Knife, do you?**

A No, that would be a common knife, right.

**Q Okay. And you also don't discuss knives that are described as an Arkansas Toothpick; is that correct?**

A Correct.

**Q And you don't include any discussion on folding**

**knives, do you?**

A I've got to stop and think about that.

Well, some would argue a cut throat razor is a folding knife since it is a sharp steel blade that folds and unfolds. That would -- I'm thinking here -- no, I apologize, Mr. Dillon, I had an entire chapter dedicated for straight razors, but I am enjoying the subject so much I poured that over to be my next book, so apologies.

No, I agree with your statement.

**Q So do you discuss those straight razors in Deadly Ingenuity?**

A Mental mistake, I apologize, took me a second to realize, I moved that to a future project, and I can go full blown on that subject, which I do mention in my declaration. That is an upcoming book, my apologies.

**Q No worries.**

**And in Deadly Ingenuity you don't discuss pocket knives in there, do you?**

A No.

**Q And there's no discussion regarding switchblades?**

A Let me stop and think, but no.

**Q And no discussion regarding Balisongs or what's called Butterful Knives?**

A No.

**Q And, in fact, I have both of your books, I read**

**them, thought they were pretty interesting.**

A Thank you.

**Q So from my memory here, the only knife you really discuss in Deadly Ingenuity would be the Gaucho Knife; is that correct?**

A Yes, a whole chapter on those kind of knives, correct.

**Q And this was a knife that was used in Latin America and South America; correct?**

A Umm-umm, yes.

**Q And these are fixed-blade knives?**

A Yes.

**Q And your discussion of Gaucho Knives in your books, that didn't involve any use within the United States, does it?**

A No.

**Q So these Gaucho Knives are fixed blades, they'd be considerably different from a modern folding knife; correct?**

A Correct.

**Q And they'd also be considerably different from any modern switchblade; is that correct?**

A Any modern switchblade? Correct.

**Q You state in your report that your circle of weapons research has been praised by various scholars.**

Would be that be referring to your research on the impact weapons and these unusual weapons?

A Yes.

Q So you're not referring to any specific research regarding knives specifically, are you?

A I am not.

Q And you haven't published any kind of book regarding knives; correct?

A I have not.

Q You haven't published any research regarding switchblades specifically; correct?

A Published? No.

Q Do you have any publications regarding use of force or self-defense?

A No.

Q Let's pull up here -- and bear with me for one second.

MS. REILLEY: Counsel, if you don't mind, before we get that exhibit up, mind if we take a quick five-minute break?

MR. DILLON: I mean, sure. I can do five minutes.

MS. REILLY: Thank you, appreciate it.

(Recess)

BY MR. DILLON:

Q Mr. Escobar, in your report you state that you've

**conducted extensive research on -- and I'm paraphrasing here -- but saps, blackjacks, slung shots, nunchaku, billies and small-edged weapons, which consist of ice picks and prison shanks or shivs; is that correct?**

A I believe, we could pull the verbiage, if you'd like, I believe I didn't limit my statement by experimenting the small weapons to the just shanks and shivs. I think I mention those as examples.

**Q Okay. So down there, it's under item 6 in** paragraph six: "Small edged weapons, (both professionally and improvised), such as ice picks and prison shanks or shivs." Correct?

A Correct. So shanks and shivs are in the improvised bucket as opposed to the professional-made bucket, which are knives.

**Q Okay. And that's the research on the straight razor?**

A As well as other knife types as well and other bladed weapons types.

It's not in my writings, but I've been researching researching experiment weapons for the course of 25 years I've been interested in the subject.

So I've presented, for instance, at forensic science conferences, I've conducted tests with, like I said, knives, including classic Italian stiletto styles --

(Court Reporter speaks; ask for clarification).

THE WITNESS: I almost said it's my third deposition and ruined my whole career -- (indecipherable) I haven't changed yet, let me slow down.

I conducted experiments with all kinds of non-firearm weapons, including knives; for instance, testing an Italian Stiletto-style switch blade in impact and stabbing tests that I design and conduct on my own.

BY MR. DILLON:

**Q Okay. But you didn't reference any of those tests in your report, did you?**

A No. What I -- apparently what I was trying to describe again, that I have experimented with weapons, hands on experimentation, you know, in addition to the academic writing.

**Q Okay. And your hands-on experimentation, is there any type of video or report that you wrote regarding those specific tests?**

A No, this is for my own knowledge to be used later in potential future writing projects, and just as a curious martial artist specialist, and as a weapons historian, I guess I would describe it as that.

**Q So you have nothing that you can refer back to when referencing --**

MS. UYEHARA: Objection; vague.

BY MR. DILLON:

**Q You mentioned earlier you conducted various tests on different styles of knives; correct?**

A Yes.

**Q And you have no written report on any of these tests?**

A No, that'S just various kinds. This has been a lifetime, how well does knives slice through cardboard, tests like that.

**Q As I sit here today I couldn't find anything online --**

A No.

**Q -- that would show your testing that you completed; correct?**

A I want to be careful. I would say no, I don't think anything with a knife would be in any video I have published.

**Q Okay. And that would be on your YouTube channel; is that correct?**

A Yes, and I have over 500 videos. I'm trying to be careful. I do not believe, for instance, I have a bladed cutting experiment on there right now. It's the latest one, but it is not a knife; it's a sickle.

So no, a lot of antique knives, a lot of knife -- yeah, showing the knife itself. No hands-on videos testing

knives.

Q Okay. No publications or writings regarding knife design; is that correct?

A Correct.

Q And no publications or writings that would discuss the knife manufacturing; correct?

A Also correct.

Q No publications regarding switchblades in particular; correct?

A Correct.

Q You have no formal training or education in knife design; is that correct?

A In knife design, correct.

Q And no formal training or education in knife manufacturing; is that correct?

A Manufacturing, also correct.

Q You have no professional experience in the manufacturer of knives; correct?

A I do not.

Q You have no professional experience in design of knives; correct?

A Also correct.

Q And no professional experience in teaching self-defense; correct?

A As I stated earlier, I have acted as an assistant

instructor officially; I would not say professionally, no, because I was not head instructor. I've never run my own program or dojo.

**Q And you have no professional experience in the use of -- sorry -- in teaching the use of force techniques?**

A No.

**Q Have you been trained in the use of switchblades before?**

A Trained in the use of a switchblade specifically, no. Trained in the use of knives, but I would not say switchblades.

**Q Have you every testified as an expert witness on knives in any other legal proceeding?**

A No.

**Q Okay. So I'm going to reference your report here.**

**Bear with me one second.**

**In paragraph 15 of your report you mention the term or the knife Navaja, N-A-V-A-J-A; is that correct?**

A Correct.

**Q And what is a Navaja?**

A In Spanish it's currently kind of an umbrella term for a certain type of knives. Historically it's specifically is the kind of knife I describe in the declaration as a folding -- manually folding, hand-locking

knife.

Q Okay. So is a Navaja similar to a switchblade?

A It is -- and I thought a through line, as an historian, I would describe a Navaja as certainly the world's first famous combat folder, a folding knife that's famously used, you know, in martial arts, not just a utilitarian folding knife. So -- yeah, go ahead.

Q All right.

And these were primarily used in South America or Latin America?

A In Spain. Spain's really -- it spread from there to European countries as well as the Americas.

Q Okay. So in your report you mention that there are three main problems associated with switchblades.

Can you recall that?

A Yes. Well, can we look at the verbiage? I don't want to misspeak. It is my writing.

Q So right near paragraph 20, you have a section to -- it says: Dangers in using automatic knife for self-defense; correct?

A Correct.

Q And in paragraph 20 you describe the automatic knife as -- or you compare it to that of a -- sorry -- strike all that.

In paragraph 20 you compare a switchblade or

**automatic knife to a fixed-blade knife and you state that that comparison is like comparing a revolver to an AR15; is that correct?**

A Correct.

**Q Do you have any experience with firearms?**

A In that I'm a firearm owner, only in that sense.

**Q Do you have any professional certifications or qualifications for firearms?**

A I do not.

**Q No experience with fire manufacturing?**

A None.

**Q No experience with fire gunsmithing?**

A Gunsmithing? No.

**Q Can you provide me with an explanation of that comparison?**

A Yes.

MS. UYEHARA: Objection; vague.

BY MR. DILLON:

**Q So going back to your comparison between an automatic knife and a fixed-blade equivalent to comparing a revolver to an AR-15, can you give me more detail regarding that comment?**

A Yes. I thought a comparison was useful in the sense that revolvers are pretty famous in firearm circles for being legendary for their reliability, an older

design, very simple one, that, as the saying goes, there is nothing more reliable than a real gun.

A fixed-blade knife, to me, is kind of the equivalent. It's the original and it's the most dependable because physically it's just one solid object, essentially.

Then you move on to more complicated versions of both those weapons, firearms and knives, into ones that have multiple moving parts that work in unison, et cetera, so I thought a machine gun, if you will, or an assault rifle like an AR-15, in comparison to a revolver, that A to B, would be similar to a fixed-blade to today's modern automatic knives.

If they have an automatic functionality to the very small moving parts, they do things for you.

**Q Okay. So am I right in saying that it's your opinion that the automatic knife is equivalent to an AR-15 when it comes to the component parts?**

A No, definitely not.

(Court Reporter asks for clarification)

MS. UYEHARA: Objection for vagueness.

BY MR. DILLON:

**Q I'll just move onto the question here.**

**So what -- in your opinion, what is the difference between a manual folding knife and a**

**switchblade knife?**

A The switchblade in the sense of automatic knives as listed in (inaudible) statutes, a manually folded -- as described in the declaration -- you can feel it lock into place. You, the operator, actually pushes it into place and you get tactile confirmation that it has locked, so a human is doing all of that.

With an automatic knife, you trigger the mechanisms and then the knife does that work on its own. Thus the term "automatic."

**Q So internally I'm talking about the component part between a manual folding knife and an automatically opening folding knife.**

**What are the differences in components?**

A A manually folding knife will not have any components to propel the blade into an open and locked position because you will do that yourself with your hand.

**Q Okay. So am I correct in saying that an automatically opening and folding knife has a spring of some type that will open up the blade of the knife?**

A Yes.

**Q And a manual folding knife doesn't have the same spring that would automatically open the knife?**

A Correct, also it would be an automatic knife, in my opinion, and not a manual.

**Q So, in your opinion, adding that spring mechanism to a folding knife is the equivalent of going from a revolver to an AR-15?**

A No, I.

(Overlapping speakers; indecipherable)

MS. UYEHARA: Objection for ambiguous.

BY MR. DILLON:

**Q Go ahead and answer the question.**

A I would say -- I would not agree with you in your characterization.

Certainly what I would say is the spring is component that have to work in unison, and that sequential change in engineering makes me think of the comparison that I put in the declaration.

So it's definitely a little more than just one part; right? A spring is not going to act on its own unless it is triggered.

Then once triggered the blade has to unfold on its own as designed and then locks into place --

(Court Reporter asks for clarification).

A So it's definitely more than just a spring, is what I'm saying.

(Court Reporter speaks; off the record)

(Plaintiff's 4 marked)

**Q So I'm going to share something here. I believe**

this to be Plaintiff's Exhibit 4. I'll introduce this as a picture of two variations of a bench-made Damascus Axis knife.

Do you see that?

A I do.

Q Okay. In this picture, the top knife here is depicted as the manual opening knife, and the knife variation on the bottom is depicted as the automatically opening knife.

Do you see that?

A I do.

Q Okay. And in your opinion the difference between these knives is similar to the difference between a revolver and an AR-15?

MS. UYEHARA: Objection; calls for speculation.

BY MR. DILLON:

Q You can go ahead and answer the question.

A Could you repeat the question?

Q So looking at these knives right here, you have two knives. Do you believe that these knives are identical?

MS. UYEHARA: Objection; vague.

BY MR. DILLON:

Q Do you see Plaintiff's Exhibit 4 up on the screen?

A Yes.

**Q And do these two models of knives appear identical?**

A Identical? No.

**Q And what do you see as the difference between the knives?**

A I see a foam stud on the top most knife, the manual.

**Q Is that the only difference you see between the knives?**

A Reviewing -- there's also a component just to the right of the base of the blade, a circle, a dark circle that exists close to the logo on the base of the blade, on the manual knife that is not present on the bottom automatic knife.

**Q Can I actually have just two minutes to organize some notes here? Can we go off the record?**

(Off the record)

MR. DILLON: Back on the record. Thank you.

**Q Mr. Escobar, I'm going to direct you to Plaintiff's Exhibit 3, your report that you submitted in this case.**

A Umm-umm.

**Q In paragraph 13, you state -- or sorry -- paragraph 14 you state that your research of the history**

**of bladed weapons for this report shows a clear preference by criminals for edged weapons that are culturally understood to be inherently frightening, including switchblades and their historical precursor.**

**Is that correct?**

A Yes.

**Q And what's the basis of your claim there's a clear preference of criminals to select switchblades?**

A This is the through line with the two historical precedents that I mentioned, the Navajas in Spain.

There's clear -- there's a clear history throughout western civilization, the Americas and United States included, to restrict weapons that are seen to appeal to criminals because they are often to the nature.

A stiletto, for instance, the precursor to the stiletto switchblade, was infamous and banned under many kingdoms for that reason. That's the same reason, in my opinion, that's the same reason many state statutes to this day will have verbiage about stilettos.

Nefarious knives, nefarious in the minds of the people who being stricken at the time, being banned.

So the Navaja and the folding razors, the cut-throat razors, these were both items that were -- this is a matter of historical record. I don't think it's under, you know, dispute that they were embraced eagerly

by criminals and were understood in their culture and time to be nefarious tools; hence, the quote/unquote, the Razor Gangs of Australia, and the term, "razor gangs" showing up innumerable times in newspaper stories from the late 19 -- early 20th century, and as I indicate with some cited sources in the declaration, the Navaja was well known as a weapon preferred by criminals because the Tim days factor it implied. So I agree.

I feel that pattern repeats itself in 20th century America with the switchblade. There had been folding knives prior to the introduction of the classic Italian style stiletto switchblade, but it was the introduction of that weapon which -- and yeah, movies by James Dean, seeing Marlon Brando, you know, fighting off a biker wielding a switchblade, seeing a student pull a switchblade on his teacher in The Blackboard Jungle.

I think popular culture jumped on the switchblade as a cool, dangerous-seeming weapon, and that caused the cultural feedback that I described in my declaration where criminals, people who want to be intimidating, not just defend themselves in an honest way, are, from my decades of research, attracted to weapons that they see as intimidating and menacing, and I believe the switchblade fits into that category, that tradition.

**Q Okay. You mentioned that a number, I think,**

**movies or plays just a second ago; is that correct?**

A Those were all films, very famous films.

**Q And your statement was saying that these films depicted knives, like switchblades, in a criminal fashion; is that correct?**

A Yes.

**Q Okay.**

A I believe that's an American cinema tradition; innumerable instances of that.

**Q What is the basis for the claim that criminals actually used switchblades?**

A Well, for one thing, I would say crimes committed by criminals with switchblades.

For instance, in the rebuttal to my declaration -- I apologize, I do not how to pronounce his name, but Mr. Janusch (ph), spoke about not being aware of one incident with a switchblade being used in a crime to that effect. In my research, over the years, I've come across many, many, including recent years.

So I guess my answer to your question would be crimes committed by criminals with switchblades.

**Q And as a part of your report did you offer any police reports or studies or any publications of any kind that depicted criminal use of switchblades?**

A Only submitted what is in my report. I believe

anybody with an Internet connection and two minutes to spare can find -- I know this for a fact -- can find many certified switchblade crimes based on court reports, police testimony, things like that.

**Q And that's with a two-minute search?**

A Okay.

**Q And you didn't conduct this two-minute search, did you?**

A I searched, I did, and I've been doing this for years. So as soon as I saw that comment, it didn't strike true to me because I know I've run into stories and I have recreated my test.

If somebody Googles switchblade assaults or convicted of assault with a switchblade, they will, within just a few minutes -- find various stories. It takes work to make sure the knife isn't being misidentified; right?

But yeah, very quickly I believe anybody can test the veracity of my statement.

**Q But you didn't include any of these reports or news stories in your report?**

A No, the only source cited in my report are the ones that are present.

**Q Okay. You mentioned the Australian gang usage of the straight razor.**

**What is a straight razor?**

A This is the old fashioned folding razor that was replaced by today's common safety razor.

**Q Okay. So a straight razor is not a switchblade; correct?**

A Correct.

**Q And it would be a manually opening, folding knife?**

A Yes.

**Q And your reference to the gang usage associated with the gang usage, that was in Australia; correct?**

A It is most -- that is correct.

Where I refer to it, that is where its use -- its criminal use was most famous, but it was also famous used in Scotland, England and other countries, by gangs.

**Q In reference to any criminal use of straight razors in the United States; correct?**

A Correct.

**Q So in paragraph 17 of your report you reference a man named Ray Floro, the creator of Floro Fighting System.**

**Do you recall that?**

A I do.

**Q And in that paragraph you refer to a video that you claim is dedicated to switchblades; is that correct?**

A Correct. Mr. Janusch correctly found an error there. I used the wrong noun, a switchblade. This is in

the razor section of my declaration, and Mr. Floro's video is dedicated to razors. I used the noun "switchblade" instead of a razor, and that was my mistake.

**Q Okay. So this video has nothing to do with switchblades; correct?**

A No, it has to do with razors, which is why it is in the razor section of my declaration, correct.

**Q And his description of the knives being brutal as to last would apply to straight razors?**

A Straight razor blades, correct.

**Q And again, you didn't attach that video to your report in anyway, did you?**

A I didn't -- I don't have all of my links memorized. If it's not there, then no, I did not, with the videos.

**Q Okay. Bear with me one second here. Let's see here -- all right.**

**I'm going in introduce Plaintiff's Exhibit 5; this is the video from Ray Floro's YouTube channel.**

**Do you see that?**

A I do.

(Exhibit 5 marked)

**Q Okay. It's titled: Razor Fighting 1.MTS; is that correct?**

A Yes.

Q And I'll play this here, just a couple of seconds.

(Video played)

Q Now, is that the video you're referencing in your report?

A It is.

Q Okay. So you're not claiming that modern switchblades are as brittle as glass, are you; correct?

A No, I'm not. My point is criminals in Australia embrace a tool which is a poor weapon because, in my opinion as an historian, it has su h a nefarious and intimidating reputation, so I agree with your statement.

Q And again, that occurred in Australia?

A Umm-umm, yes.

Q And straight razors are designed and manufactured for shaving; correct?

A Strictly for shaving, correct.

Q And have you ever studied or taken classes from Ray Floro?

A Only in his online courses.

Q You have no first hand experience in what he trains?

A How do you mean?

Q Have you ever met him in-person and studied under him?

A No.

Q Okay. And again, on Page 16 or -- sorry -- Page 6, paragraph 19 of your report, you claim the Navaja and the straight razor were embraced by violent criminals; correct?

A Correct.

Q And you also claim that the switchblades would fall under this category?

A I believe they fall into that tradition, yes.

Q But again, you attached no reports, police reports, anything like that, that would support that; correct?

A No police reports related to a crime with a switchblade, yeah.

Q And both the Navaja and the straight razor they're folding blades; right?

A Yes.

Q And, to your knowledge, are either the Navaja or the straight razor legal in California?

A I do not know.

Q Okay. In paragraph 20 of your report you state that: "All knives can be classified into three categories: One, fixed-blade; two, folding, and three, out to the front or OTF."

Is that correct?

A Yes. I'm not aware of a category that wouldn't fit into one of those three umbrellas.

**Q Okay. But as there -- so that would mean there are fixed-blade folding knives and out in the front knives; right?**

A Yes.

**Q And automatically opening knives would fall into the category of folding knives?**

A They would fall into categories two and three, depending on the design.

**Q So categories two and three, mean folding knives or up front knives; correct?**

A Correct.

**Q So of the three categories, automatic knives fall under two of the main categories of knives?**

A Yes.

**Q And so by your classification, automatic knives are either folding knives or out front knives?**

A As I said a moment ago, to the best of my knowledge, yes, they could be described as either of those two. The blade unfolds in the typical manner that I think we're all aware of, or it comes out of the front.

**Q Okay. You, in paragraph 21 of your report, you state that:**

**"A fixed-blade knife is one solid object that**

requires no preparatory action be taken whilst in the hand in order to be ready for combat."

Is that correct?

A Correct.

Q But in order to deploy any type of fixed-blade knife you'd still need to place your hand on the knife and remove it from a sheath; is that correct?

A Yes.

Q And in paragraph 21 you also state that both folding knives and out the front knives contain their blade inside the handle; is that correct?

A Yes.

Q And there are -- there are multiple mechanical parts in a manual folding knife; is that correct?

MS. UYEHARA: Objection; ambiguity.

BY MR. DILLON:

Q You can go ahead and answer the question.

A Could you repeat it?

Q folding -- manual folding knives have multiple mechanical parts; is that correct?

A I would say mechanical, but not automatic.

Q Okay. So they have multiple mechanical parts; correct?

A Yes.

Q And there are multiple mechanical parts in and

**out the front knife; correct?**

A Yes.

**Q Do you know what a spring-assisted knife is?**

A I do.

**Q Can you tell me what that is?**

A In my estimate that is the most commonly unassisted flipper, so the user is going to be operating the knife in the beginning opening mechanism, the way they would with a manual folder, then the knife, as it implies, assists, it essentially takes over, you know, what is initiated manually is taken over automatically.

**Q Okay. So all folding knives, and out the front knives, would have multiple mechanical parts; correct?**

A All folding knives, I would -- what is that again, please?

**Q All folding knives would have multiple mechanical parts?**

A It varies by number, but yes.

**Q And all the out front knives would have multiple mechanical parts?**

A Right.

**Q And all assisted opening knives would have multiple mechanical parts?**

A All assisted opening knives -- yes.

**Q So having multiple mechanical parts in a knife is**

**not unique to switchblades; correct?**

A No, having, as I understand, switchblades and automatic knives, having automatically functioning parts does, but having mechanical parts, no.

**Q All right.**

**In paragraph 22 of your report, you reference the Contemporary Fighting Arts website; is that correct?**

A I do.

**Q Who wrote the article that you reference in that paragraph?**

A I have that cited in my -- but I did not have the name memorized.

**Q Okay. Is that -- you cite in a footnote in the link to "Knife Fighting, ContemporaryFightArts.com"?**

A Yes.

**Q Have you attended any training from that individual that wrote that article?**

A No.

**Q Do you know any of his credentials?**

A I do not.

**Q And this was an opinion piece that he wrote?**

A Umm, yes.

**Q And in that article it states that both an internal spring can malfunction in a time of need; is that correct?**

A It states that, yes.

**Q And are you adopting his statement as your own in your report?**

A I would not agree with your statement. I would say I found that in corroboration of my expert opinion in a pro-knife source. I talk it repeatedly in the declaration, you know, small mechanical parts can fail. Some -- well, anyway, that's how I used it.

**Q Okay. So you agree with his statement?**

A I do.

**Q And do you have any firsthand experience with internal spring malfunction in a time of need?**

A In a time of need, no, I had never had to take out a knife -- I can't say that, no.

**Q Okay. And have you conducted any tests or studies on the issue of an internal spring malfunction on an automatically opening knife?**

A I have had an automatically open knife fail, not -- to be clear -- in a time of need, but I've had a knife have needed to be repaired.

**Q Is that unique to switchblades?**

A I would say whether or not it's unique to switchblades, it happened with this automatic knife I'm talking about, and I guess I'll stop there answering.

**Q Have you had any other knives that are not**

**switchblades that have any type of failure?**

A Operational failure? I want to really make sure -- that I can say honestly I've never had a manual knife that needed repair. No, I've never taken a manual knife to get repaired.

**Q How about --**

(Court Reporter asks for clarification)

**Q How about -- I said how about a fixed-blade knife? Have you ever had any type of malfunction or need a repair?**

A I'm thinking very seriously, over the past 25 years, have I ever taken a fixed-blade knife to get repaired or has it just broken or what not -- no, no.

**Q But you are aware that fixed-blade knives can break; correct?**

A Correct.

**Q You're aware that manually opening folding knives can also break; correct?**

A Correct.

**Q Okay. Going back to the Contemporary Fighting Arts article, it also states:**

**"Structural integrity of the knife is usually followed and won't hold up in knife combat."**

**Do you recall that?**

A I do.

**Q Again, what's the basis for that claim?**

A Well, this was an opinion piece, as you stated, and I found it corroboration to a string of thoughts within the martial arts and weapons circles -- not a consensus, but a school of thought that I describe in my declaration, that automatic knives -- and how would I say this -- if I went to Amazon.com, typed in automatic knives, I would warrant a low price point would show up for most of the knives presented.

Like that writer, I agree there's a lot of cheaply made automatic knives out there. Not all of them by any stretch, but there's a lot of them out there.

**Q So there are a lot of cheaply made manually opening folding knives?**

A There are.

**Q So you could go onto Amazon and also find a lot of cheaply made folding knives?**

A Yes.

**Q Could you also go on Amazon and find a lot of cheaply blade fixed-blade knives?**

A I just want to make a distinction there.

I would say yes to the fixed-blade knife. It is so simple in instructor. If it's a half decent quality piece of steel, it's not really an issue. It would have to be a horrifically poor in quality to fail, a fixed-blade

knife.

**Q Okay. And going back to the reference on the structural integrity of the knife, have you ever conducted any tests or studies on the structural integrity of the switchblade?**

A I have.

**Q Okay. But you have no report or supporting evidence of any of kind on that?**

A No, no, just over the years conducted strike tests with various kinds of knives, including switchblades, including a classic Italian style stiletto switchblade knife.

**Q Okay. There is no way to verify any of the results that you test; right?**

A No.

MS. UYEHARA: Objection; vague.

BY MR. DILLON:

**Q And finally, in that same article, in Contemporary Fighting Arts it states that:**

**"Hand grips are usually too thin and often slippery for real world combat situations."**

**Do you recall that?**

A I do.

**Q Okay. Do you agree with that statement?**

A I agree that there are a lot -- a lot of

automatic knives that tend to have those types of grips, yes.

**Q Is this unique to just automatic knives?**

A For some reason, again, I'm not an expert in knife manufacturer design, but as a consumer and someone who has seen and studied many of them, I found that statement inside the source to ring true immediately where I have also noticed I feel like a lot of times, automatic knives have these slick, thinner handles, instead of kind of a beefier handle, so maybe you can grab, you know -- just meatier in the hand on fixed blades.

There's a lot of kinds of knives out there. Obviously there's, you know, there are exceptions to every rule, that rang true to me that often -- and I'll just stick to my guns there -- often the automatic knives, especially of the lower price points, have the kinds of handles that the writer is referring to.

**Q Okay. And when you're talking about the thinness of the handle, are you comparing it to a fixed-blade knife handle?**

A Yes. Of course there's many different kinds of fixed-blade knives, but yes, I would agree to that.

**Q Okay. So do manually-opening knives come with thin handles?**

A They -- lower price-point models, also, yes.

**Q What about higher price point models? Do they have thin grips or anything like that?**

A There are some very high-priced knives, $400 knives, that to me have handles that are not suitable for combat. I think looks sell weapons, so strong is think, it's not just functionality; right? People like something that looks cool.

I like collecting weapons. I've been collecting weapons for decades, so I don't know if it's an esthetic thing, but even some very expensive knives do not have what I would describe a robust, meaty handle, or that -- a a knife breaker's choice, pocket knives, (indecipherable) et cetera, these are convenience, ease of care, that could be a factor in design, but you do see it in more than just cheap knives, I would say, from my knowledge.

Go ahead.

**Q Okay. So the handles that you're describing, the automatic knives, they will be unofficial for being able to carry in the pocket; is that correct?**

A To slip into a pocket, I would say, yeah.

**Q And again, have you conducted any test or studies regarding the thinness or thickness of a handle in a combat situation?**

A In a combat situation? As -- yeah, as -- as a long time martial artist, I have a firm opinion that a

weapon needs to have a sizeable and robust handle that can be grasped firmly. I think combat knives in the military reinforce this.

There's a lot of thin edge weapons on the market. There are, for instance, these items called tactical spikes, so these are basically just long nails. In my opinion, people buy them only because they look wicked and mean. They're very poorly suited for self-defense because again, it's almost like a long knife, it's a very thin object with no handle, just a nail-like shaft.

I think there are plenty of poorly handled designed weapons out there, mainly knives included.

**Q Okay. So have you ever done any type of questionnaire that would seek to identify reasons why someone would buy something like the spike you just identified?**

A The questionnaire? No.

**Q I'm going to pull up your report again and I'm going to direct you to paragraph 23 of your report.**

**Do you see that?**

A I see it.

**Q And in paragraph 23 you state that:**

**"A switchblade is no exception involved a higher chance of mechanical failure than other weapons that are more commonly used for self-defense."**

**Correct?**

A Correct.

**Q And what is the basis for the claim you're making?**

A You know, being a long term martial artist and weapon enthusiast, and weapon scholar, I feel I have a good sense -- I'm a member of many weapon enthusiast community groups and have been for a long time, so many, so I see what is popular one year, what is being purchased, you know, I carried -- I talk to people all the time about what they choose to carry. I would not say questionnaire, by the way.

But so -- for my immersion in this world, that was -- I was basing that on. My knowledge from being interested in this subject and studying it for as many years as I have, that's what I was basing that on.

**Q So you haven't conducted any type of testing on chance of mechanical failure of a modern switchblade, have you?**

A No.

**Q How about testing of just folding knives in general, when it comes to chances of mechanical failure?**

A I can't think of what you would test for the chance of a mechanical failure, if that makes sense, because if anything, a knife -- any kind of machine

working properly, you can test it and great, it's working properly -- (indecipherable).

(Court Reporter speaks; instructs witness to speak slower so that he can be understood)

A I'm sorry.

I do not believe there was a way to test for how to say this -- I have never conducted a test to test for the chance of mechanical failure.

BY MR. DILLON:

**Q Okay. And you state in your report that this possibility of mechanical failure increases the danger of switchblades; is that correct?**

A The danger of it failing in time of need, successfully.

**Q You mentioned you're a gun owner earlier.**

**So generally speaking, can guns suffer from mechanical failure?**

MS. UYEHARA: Objection; scope.

MR. DILLON: You can answer the question.

A I'm not a firearm expert. I don't claim to be anywhere, so...

**Q Have you ever heard of a gun having mechanical failure?**

A Have I ever heard of a gun having mechanical failure? I would say yes.

**Q How about like a stun gun? Did they also suffer from mechanical failure?**

MS. UYEHARA: Objection; scope.

BY MR. DILLON:

**Q You can answer the question.**

A I have never studied stun guns.

**Q So you have no idea?**

A Can you repeat the question?

A Stun guns, can they suffer from mechanical failures?

A Yes, I'm not aware of any incidents of that, but yes.

**Q And based off of your knowledge of weapons in general, do you believe that pepper spray could suffer any type of mechanical failure?**

A I believe that is highly unlikely. It's just some simple mechanism.

In many instances pepper spray deployment, that I've read about, and I'm not aware of even one instance where it failed to operate successfully.

**Q Okay. So any defensive weapon that has any type of moving part, it could suffer from mechanical failure?**

A The more moving parts, the higher that risk, yes.

**Q So with your general knowledge, being a fire owner, do firearms have more parts than an automatic**

**knife?**

MS. UYEHARA: Objection; vague and ambiguous.

BY MR. DILLON:

**Q What kind of gun do you own?**

A Two 1963 Colt Cobra revolvers. I also have several antique firearms that are not in working condition.

**Q Great guns.**

**So those Colt Cobra revolvers would have more mechanical parts than a mechanical knife?**

MS. UYEHARA: Objection; vague.

BY MR. DILLON:

**Q Go ahead and answer the question.**

A I have not done a comparison.

My initial thought is that he would be comparable because you have a trigger, a triggering mechanism, you know, the same sequence of events has to take place in the chain to get that item to quote/unquote fire, so you pull on something that makes something else, you know, move, and your ammunition comes out, which is similar to the blade unfolding.

I'm not a firearms expert; just a firearms owner.

**Q Okay. So, to your knowledge, can a firearm suffer from ammunition failure?**

MS. UYEHARA: Objection.

BY MR. DILLON:

**Q Go ahead.**

A Could you describe what the ammunition failure would be?

**Q A failure for the ammunition to ignite or fire when pulling the trigger on a firearm.**

A So failure -- a defect within the ammunition itself. I would say that -- that is clearly impossible; modern ammunition is extremely reliable, and I think -- I'm not aware of one instance from street crimes and shootings, et cetera, the ammunition failed.

**Q Okay. So, in general, though, these items can have mechanical failures because they have moveable parts; correct?**

A In general, yes.

**Q Okay. But is it your professional opinion that firearms are too dangerous due to potential for mechanical failure?**

A Dangerous to whom?

**Q Dangerous in a self-defense situation.**

A To whom in that self-defense situation?

**Q To -- let's go with the user.**

A Are firearms too dangerous for the user in a self-defense situation?

**Q Are they too dangerous due to the possibility of**

**mechanical failure in a self-defense situation.**

A No, I would not say that.

**Q Okay. But you're saying that automatic knives are too dangerous in self-defense situation because of their possibility of mechanical failure?**

A What I'm saying --

MS. UYEHARA: I'm sorry, objection; vague.

Go ahead, Robert.

A What I'm saying -- and I think I point out in the declaration, I hope clearly, is that the opportunity for failure is higher with an automatic knife than other kinds.

BY MR. DILLON:

**Q Okay. And the mechanical failure, that's not unique to automatically opening knives; correct?**

A Correct. It is just, in my opinion, higher.

**Q I'm going to direct you to your report, once again, and specifically we'll be -- it will be within the subject area of paragraph 23 on Pages 7 and 8, but I'm going to be focusing on your Footnote 9, in which you list a number of YouTube links.**

**Do you see that?**

A I do.

**Q You know, as part of that footnote, you say that the moving parts designed to work in unison can fail for a**

variety reasons, including wear, misalignment, rust, breakage or shoddy construction.

Correct?

A I do.

Q And you reference these YouTube videos to support that statement; is that correct?

A I do.

(Exhibit 6 marked)

Q So I'm going to introduce Plaintiff's Exhibit 6. It's titled "Switchblade Knife Broken Spring in the Repair," and this would be the first link in your Footnote 9.

Does this look familiar to you?

A It does.

Q Do you know how this knife was broken?

A I do not.

Q This is just an incident of a single knife being repaired in a series of pictures; is that correct?

A Due to a malfunctioning spring, yes.

Q Do you know the author of this video?

A No.

Q And do you think I could go online right now and find various videos of broken manual opening knives?

A I think it would be --

MS. UYEHARA -- objection; calls for speculation.

Go ahead, Robert.

A I think -- I know it would be much easier to find videos about problems with automatic knives than with malfunctioning problems with manual knives.

BY MR. DILLON:

**Q I'm going to go to the second link in your Footnote 9. It's entitled: "How to fix your automatic knife switchblade with button hard to press."**

**Do you see that?**

A I do.

**Q And is this video the link that you attached in Footnote 9?**

A Yes.

**Q I'm going to hit "play" on this and just listen for a few seconds.**

(Video played)

**Q So in that video just then, the individual depicted in the video stated that as with all mechanical things they need to add lubricant to a switchblade knife; is that correct?**

A Yes, he states that.

**Q As he said, with any mechanical device requires lubricant at some point. Would you agree with that?**

A Yes.

**Q In fact, that would -- adding lubricant to any**

**moving or mechanical part would actually be beneficial to prevent wear; is that correct?**

A Yes.

**Q So this knife isn't actually broken; correct?**

A Well, the video title indicates that the button is not functioning properly: Switchblade with button hard to press.

**Q And to fix that he added a single one drop of lubricant to the knife of the blade; correct?**

A Umm-umm, yes.

**Q And at that point the button was no longer hard to press; correct?**

A Correct.

**Q Let's see -- again, I'm going to share another, I believe this is Plaintiff's Exhibit 7. It's the third link in your Footnote 9. It's titled: "Most common problems with OTF automatic knives...simple fix."**

(Exhibit 7 marked)

Do you see see that?

A I do.

**Q Okay. And are you familiar with this video?**

A I am.

**Q Okay. And in that video the subject in the video describes the knife as having a weak spring or a cheap knife; is that correct?**

A A weak spring, I recall, yes. I don't recall him describing it as cheap.

**Q And he's showing a problem of the opening knife -- sorry -- on opening it out the front; right? Against a surface; correct?**

A On the paper, yes.

**Q And coming into contact with a solid surface while opening would knock the blade off its track; correct?**

A Correct.

**Q And he describes this as a simple fix of just pulling on the blade until it clicks; correct?**

A With your other hand, correct.

**Q So this knife isn't actually broken; right?**

A It, in my opinion, it breaks when he opens it into that piece of paper and it then is useless until repaired.

**Q So in your opinion he's repairing the knife by putting it back on track?**

A Absolutely, I would agree.

**Q Okay. And in Footnote 9, the fourth, fifth, sixth and seventh and eighth links are all videos of a similar problem without the front knives; is that correct?**

A I included in multiple videos about out the front knives. I wasn't saying I have the numbers memorized the

way you just recited, but I included multiple videos demonstrating this problem with OTF knives.

**Q Under the subheading "user error" on Page 8 of your report, in paragraph 24 you state that:**

**"User error makes a switchblade both sub-optimal, self-defense weapon for the average person."**

**Do you recall that?**

A I do.

**Q And can you go over the individual steps that are required to just deploy a switchblade?**

A Yes. Operating under the assumptions that the folding automatic knife is in the pocket, which, in my opinion, is where it's mostly going to be held; you have to reach in. The button's on the automatic knives, this is an objective fact, that anybody can see just by looking at pictures of automatic knives. The buttons are quite small and only present generally on one side of the knife.

So the hand has to be inserted into the pocket and the handle has to be put in the correct position, so that the button is operable with the thumb, or with whichever digit the user is going to trigger it with. It then has to be brought out before pressing the button to avoid an accidental fire inside the pocket, which would stop it from coming out.

Then once out, the button would, of course, have

to be depressed.

But, as I described, an entire length-wise side of the automatic knife, on an unfolding automatic knife (indecipherable), has to be left exposed such that the user is not fully grasping the knife handle with any of the digits on that finger. That is so that the unfolding of that automatic blade can fire as designed, and then, in my opinion, as a martial artist, for an effective combat grip, that exposed side then needs to be grasped, so they have to -- they have to wrap their fingers around it, so -- it's in an actual knife fighting hold.

**Q Okay. So you mentioned how the knife would need to be correctly oriented in the pocket to be able to deploy correctly; is that correct?**

A Regardless of how it's oriented in the pocket, once the hand goes in and grasps it, the user would need to ensure that they're holding it in the proper position.

**Q And that would be the case for any folding knife; correct?**

A Yes.

**Q You also state that at least one side of the knife would have to be exposed and not have your hand blocking it in order to open the switchblade; is that correct?**

A To open any unfolding automatic knife, correct.

Q And again, that would be the same for any unfolding pocket knife; correct?

A Yes.

Q So in deploying any type of weapon you'd have to go through a certain number of steps to actually have that weapon be of use; correct?

A Yes.

Q And that would be the case with unholstering the gun; correct?

A Yes.

Q Okay. So when you're unholstering a gun the individual first needs to correctly grab onto the handle of the gun; correct?

MS. UYEHARA: Objection; scope.

MR. DILLON: Go ahead and answer.

MS. UYEHARA: You can answer, Robert.

A Yes.

BY MR. DILLON:

Q Then after grabbing the handle of the gun you'd have to remove it from the holster; right?

A Yes.

Q Possibly disengage a safety on the firearm; is that correct?

A Possibly, correct.

Q You would need to raise that gun to eye level;

right?
A Yeah, unless they were shooting from the hip, but yes.
**Q Okay. When you're doing that, you like to go -- give you have acquired sites on the gun; right?**
A If at all possible, yes.
**Q Then you got to place those sites on the target?**
A Yes.
**Q And align the sites up, so where they hit the target; correct?**
A Yes.
**Q Then you'd have to pull the trigger in order to fire the gun; correct?**
A Yes.
**Q If you're using any type of projecting taser or stun gun you'd have to go through a similar process; right?**
MS. UYEHARA: Objection; scope.
BY MR. DILLON:
**Q Go ahead.**
A Similarly, yes.
**Q So again, taking multiple steps to properly deploy a weapon in self defence, it's not unique to switchblades; right?**
A Correct, I agree.

Q And when you state that unfolding a switchblade would require the user to hold the knife -- the handle of the knife in a precarious and unnatural manner, you recall that?

A I do.

Q And again, that would be the same precarious way of holding would have to be done for any unfolding pocket knife; correct?

A This is why I'm not fond of folding knives for self-defense, but correct.

Q So you just personally prefer fixed-blade knives for self-defense; correct?

A I have A strong opinion, yeah, that's proven out to be the most reliable method, yes.

Q But it's not the only method, correct?

A No.

Q Let's go back to your --

MS. UYEHARA: Sorry to interrupt you, Counsel, but I just want to put on the record, I'm just objecting to the whole line of questioning of guns as outside of the scope of his expert opinion.

MR. DILLON: Good, okay.

Q So again, I'm going to share your report again, and I'm going to direct you to paragraph 28 of the report. You see that?

A I do.

**Q Can you read, starting with the second sentence of the paragraph 28?**

A Second sentence of paragraph 28.

"For a single-edge blade the back of the blade will open into the user's fingers and be unable to unfold for use. A double-edged blade would propel a cutting edge into the user's own hand, inside the fingers.

In either of those two scenarios there is the additional problem that the interrupted opening of a blade means the entire process must be reset; the operation must be restarted by reinserting the blade inside the handle, effectively reloading the spring. Once that is done, the button must be pressed again."

MS. REILLEY: Robert, remember to slow down.

THE WITNESS: I'm sorry.

BY MR. DILLON:

**Q So when you mention the additional problem that the interrupted opening of the blade means the entire process must be reset, what are you referring to? Like what type of knife specifically are you referring to?**

A I think one of the challenges that Mr. Henderson and I both face is that there are a variety of knives under the relevant statutes.

In that paragraph I was referring to a -- a

spring-assisted switchblade, is how I would describe it; an Italian-style -- the most recognized form of switchblade, which are still sold today -- the classic, Italian-style switchblade.

**Q So that's just -- you're referencing one design of switchblade; correct?**

A Yes.

**Q And are you aware there are many other designs of switchblades?**

A Yes.

**Q And many of those other designs don't have that problem of having to restart the entire opening process if they come in contact with something upon opening?**

A I agree, it's a continually pushing mechanism, unlike the other example we talked about, where it does get interrupted.

So there are knife types that would not experience that type of problem.

**Q Would you say that most modern, automatic knives that open up from the side are of that type that don't require to be reset?**

MS. UYEHARA: Objection; vague and ambiguous and calls for speculation.

BY MR. DILLON:

**Q Go ahead.**

A I don't have data about what exact continuously pushing versus kick spring mechanism is more prevalent in knife manufacture today, so I couldn't say.

**Q Okay. And you mentioned this before, but again, you, in paragraph 30 of your report, you mention how additional danger of switchblade is failure to lock; correct?**

A Yes.

**Q And you stated that with the manually operating knife you have a tactile conformation that the blade is locked in place; correct?**

A Yes, I spoke of earlier in the deposition, you mainly are pushing it through that locking process, yes.

**Q Are you saying there's no tactile confirmation when an automatic knife opens or locks into place?**

A Let me think about that. I think there's room for interpretation there.

An automatic knife opens and clicks into place, you know, locking into place.

To me, tactile confirmation means that I'm feeling it through, you know, my own hand, my fingers, and with an automatic knife that does not happen because I'm only grasping the handle, I'm not in any contact with the blade.

**Q So you feel you need to have contact with the**

**blade to confirm that the knife blade is locked in place?**

A I don't believe I indicate that's needed, but it -- it provides confirmation as described in my declaration.

**Q Okay. But just like any manually opening folding knife, automatic knives also lock their blades when they're open; correct?**

A They're designed to, yes.

**Q And automatically opening knives are designed to where the force of the opening generally locks it in place?**

A I would say yes.

**Q So any folding knife could have failure to lock in the opposition; is that correct?**

A Correct.

**Q And the basis of your claim that the tactile confirmation of the blade being locked open is different with a switchblade. Is that your own experience?**

A Yes, that's my experience, my feeling.

**Q So you've never done any testing or have any data that would support that claim?**

A I have done testing. In terms of hands-on testing, I don't have data. I don't know how anybody could have data. It really is a matter of feel.

I don't know how there could be data to could, to

corroborate my opinion expressed there in the declaration it's a more secure feeling. You have better confirmation when you feel it go through your fingertips.

**Q Okay. And yet, you have nothing we can reference, any testing you may have done; correct?**

A Correct.

**Q You discuss the failure to lock open a knife or a switchblade knife in a sudden self-defense situation.**

**Do you recall that?**

A Yes.

**Q So if I had a manually opening folding knife and I was in a self-defense situation, in your opinion that it would also be difficult to move that blade into place and lock it open?**

MS. UYEHARA: Objection; calls for speculation.

BY MR. DILLON:

**Q You can go ahead.**

A Could you repeat it, please?

**Q So if I had a manually opening folding knife, and I was using that in a self-defense situation, is it your opinion that it would be difficult to have the dexterity to open that knife in a fully locked position under a self-defense situation?**

MS. UYEHARA: Objection; calls for speculation and is ambiguous.

You can answer the question, Robert.

A Okay. I believe -- I believe it would require a lot of training to be able to do that successfully and reliably in a sudden self-defense situation.

BY MR. DILLON:

**Q Again, we're talking about manually opening a knife?**

A With any kind of unfolding knife.

**Q Okay. So again, this failure or difficulty in opening a knife is not unique to switchblades?**

A No. As unique as what we discussed a few moments ago, the amount of feel that you have in your hand to know that the operation successfully completed.

**Q Okay. In paragraph 31 of your report you state that the second danger of switchblades is the failure to disengage the safety lock.**

**Do you recall that?**

A I do.

**Q Okay. And you're referring to the safety that is placed on automatically opening knives that would prevent this from inadvertently opening, say, in one's pocket or your hand; is that correct?**

A When that is present on a given knife.

(Court Reporter asks for clarification).

A When that feature is present on a given knife,

yes.

BY MR. DILLON:

**Q And you also state that the safety on an automatic knife is "perfectly analogous to a firearm safety."**

**Is that correct?**

A I stated that, yes.

**Q And regarding a safety on a gun, that's there to help prevent an accidental discharge.**

**Would you agree?**

A I would agree.

**Q And these automatic knives that have these safeties incorporated into the handle, they can't be used in a self-defense situation unless that safety lock is first disengaged; correct?**

A The safety blade cannot be used, correct, until that happens.

**Q Let me share your report again. Again, I'm going to go direct you to paragraph 31 --**

A Umm-umm.

**Q -- where you state that:**

**"That without a substantial amount of training it is highly unlikely that an individual would be able to quickly and safely disengage a switchblade's safety lock and safely deploy the switchblade as described above in a**

**self-defense situation."**

**Is that correct?**

A Correct.

**Q It's your opinion today one of the additional dangers of using a switchblade for self-defense is that many switchblades have a safety mechanism?**

MS. UYEHARA: Objection; ambiguous.

Go ahead, Robert.

A What I believe I said in the declaration is the challenge is that it adds another layer, yet another fine motor skill small button operation in addition to triggering the automative knife.

**Q Okay. And that would increase the danger of a switchblade?**

A The danger of -- sorry --

MS. UYEHARA: Objection; vague.

MR. DILLON: Go ahead and answer that question.

A The danger of failure to successfully deploy, yes.

BY MR. DILLON:

**Q The danger of failure to successfully deploy. Okay.**

**And it's your opinion today that because some switchblades have this safety that there is an increase danger of the failure to successfully deploy over a**

**manually opening folding knife?**

MS. UYEHARA: Objection; ambiguity.

MR. DILLON: Go ahead.

A One more time, please?

BY MR. DILLON:

**Q So according to you, because switchblades have a safety that tough you have to disengage before you can operate it, that increases the danger of a failure to successfully deploy that blade over a manually opening folding knife; correct?**

MS. UYEHARA: Vague and ambiguous.

Go ahead, Robert.

A Same question; right?

Yes, because it doubles the number of manual operations required by the user.

BY MR. DILLON:

**Q Okay. And going back to your reference that this is perfectly analogous to firearm safety, do you also state that having a safety on a firearm increases the danger of failure to successfully deploy that firearm?**

MS. UYEHARA: Objection; scope.

(Overlapping speakers; indecipherable)

BY MR. DILLON:

**Q What was the answer to the question? Sorry.**

A I would say yes.

**Q So having a safety on a self-defense weapon increases the -- the danger in a self-defense situation?**

MS. UYEHARA: Objection; ambiguous, vague.

BY MR. DILLON:

**Q Go ahead, answer.**

A Having a safety adds an additional step required by the user, assumes the safety is engaged when the weapon is needed for self-defense.

**Q And you believe that the best self-defense weapons won't have that extra step; is that correct?**

MS. UYEHARA: Argumentative.

A I feel like your question was way too broad, and there's a universal of self-defense (inaudible) that do not require safeties in any way, so I can't say that safeties -- if you'd like to maybe rephrase the question.

BY MR. DILLON:

**Q Is it your opinion that having a safety on any self-defense weapon increases the steps taken to deploy the weapon?**

A Yes.

**Q And having that increase in the steps taken to deploy that weapon, does that increase the danger to the user?**

MS. UYEHARA: Objection; argumentative and vague.

Go ahead, Robert.

A It increases the number of steps required by the user.

BY MR. DILLON:

**Q So again, does the increase of the number of steps required to be done by the user, does that increase the dangerousness of the weapon for the user?**

A It increases the danger of unsuccessful deployment, and in my opinion, if a weapon type doesn't really doesn't require safety, like a fixed-blade, then using a version that does, only adds to the danger of unsuccessful deployments.

**Q Okay. In paragraph 32 of your report, you all state that switchblades are dangerous because of the substantial dangers of accidentally opening; is that correct?**

A Yes.

**Q And can't any folding knife accidentally open when stored in someone's pocket?**

MS. UYEHARA: Objection; overbroad. Objection; overbroad.

Go ahead, Robert.

A In my opinion it is extremely unlikely that a manually folding knife would accidentally open in the pockets.

BY MR. DILLON:

**Q How about an assisted opening knife? Would they ever accidentally open in the pocket?**

A I think it's much more likely in that case because it takes very little pressure to begin the automatic process. That's what its designed for. You barely push on it and it magically opens on its own. I think it's a much higher risk.

**Q And what's the basis of your claim that switchblades pose a substantial danger of accidentally opening?**

A The -- the switches, the buttons that are operated, are not protected in anyway. They're there so that the thumb can reach them in an emergency, so they're exposed, and as a hand -- as I described the operations you have to go through there with an automatic knife, to defend themselves, in a rushed situation of reaching in, it seems to me that exposed button could be accidentally triggered because it's out there and it's going to trigger on contact. So that could happen.

**Q All right.**

**And the basis of this claim of yours, is that based off of police reports?**

A No.

**Q Is that based off of news reports?**

A No.

**Q So what data would you base that claim off of?**

A It is physically inarguable -- inarguable, I would say, that the button increases the odds of an accidental opening inside a pocket.

I have actually done the opening of an automatic knife in my pocket in preparation for this case. I reached my hand in and just fumbled around and it did not happen every time, but it did happen.

So I don't have the case study type data/ it seems to me a mechanical, in inarguable possibility that that could happen, with such a knife.

**Q Okay. So you're basing this claim of the fact of the fact that you have just seen the buttons on various numbers of switchblades, and you think it could be easily pressed?**

A Well, I know --

MS. UYEHARA: Objection; misstated witness's prior testimony.

A So I would say I know that they can be, from owning and operating knives for decades.

BY MR. DILLON:

**Q But again, that's not unique to just switchblades; other knives can open in the pocket; correct?**

A As I stated, I think the danger is particularly

high because of the ease of automation that an automatic knife has, bit I agree, any knife could open in the pocket.

Q Then the risk of a folding knife of any kind opening in the pocket, that's only a risk to the individual that is using the knife or the owner of the knife; correct?

A Correct.

Q So, in other words, it's not like a threat to the general public that the knife may open up in my pocket; correct?

A Correct, I agree.

Q So earlier we were talking about how switchblades pose an additional danger because the need to disengage the safety that would prevent it from being on; correct?

A Yes.

Q Okay. And you also state here that the third dangerous switchblade is that they can too easily be inadvertently opened?

A We see the verbiage?

Q So in paragraph 31 here you say: The second danger is from failure to disengage the safety lock; correct?

A Yes.

Q Okay. Then in paragraph 32 you say:

**"Finally, switchblades present a substantial danger of accidentally opening."**

**Is that correct?**

A That is my belief, correct.

**Q Okay. So am I correct in summarizing the two dangers here that you depicted in your report is that switchblades require a safety be disengaged before they open and that they open too easily?**

MS. UYEHARA: Objection; misstates the witness's testimony, and compound.

BY MR. DILLON:

**Q Did i misstate your testimony?**

A Could you restate your statement?

**Q So you stated earlier that switchblades posed additional dangers because the safety that needs to be disengaged would prevent it from being opened; is that correct?**

A Unless it is operated successfully, correct.

**Q And you also state the third dangerous switchblade is that they will too easily be inadvertently opened; is that correct?**

A I agree that they can be opened more easily than other knife types.

**Q Okay. So your report, to summarize those two dangers that you list in your report, is it can't be**

**opened -- switchblades cannot be opened unless you disengage the safety and they open too easily inadvertently; correct?**

A Hmm -- I feel that's an over simplification of the two points made.

The safety being an additional manual operation, in addition to triggering the blade, those problems not existing, with a fixed-blade knife, or only half as many existing with a manually folding knife.

So that now would be how I would disagree with your characterization when it comes to the second point.

**Q Okay. So a switchblade that has a safety device on it, are those easily opened inadvertently?**

A Not if the safety is engaged.

**Q Okay. So am I correct in stating that your opinion today, generally speaking, is that switchblades are not ideal for self-defense purposes?**

A Yes.

**Q But even if it may not be ideal for self-defense, it can be used in self defense; is that correct?**

A I would agree it can be.

**Q And automatically opening knives, they're used for other purposes other than self-defense; is that correct?**

MS. UYEHARA: Objection; ambiguous.

BY MR. DILLON:

**Q Are you aware that there are automatic designs used for hunting purposes?**

A Yes.

**Q Are you aware that there are automatic knives that are designed to be used for fishing purposes?**

A Yes.

**Q Are you aware that there are automatic knives that are designed and used for various forms of recreation?**

A I would agree with that.

**Q Are you aware there are automatically opening knives that are designed and used for activities like camping?**

A Yes.

**Q So you'd agree with me that automatically opening knives are used for everyday use and utility; is that correct?**

MS. UYEHARA: Objection; overbroad.

BY MR. DILLON:

**Q You can go ahead and answer the question.**

A Yeah, I felt like everyday is too broad. Camping, fishing, hunting, things likes that, I would agree with. I wouldn't describe those as everyday.

**Q Sorry. When I said "everyday," I used the term**

**everyday use. Are you familiar with that term?**

A ABC, yes.

**Q And that term describes using various tools, including knives in various daily activities; correct?**

A I take that phrase, "everyday carry," to be something that you carry with you everyday.

**Q So that would be everyday carry; correct.**

A Yes, very common, yeah.

**Q And I reference everyday use; correct?**

A Yes.

**Q So you would agree there's definitely people out there that have a switchblade that use it to open up their Amazon boxes; correct?**

A Switchblade? I would agree there must be people who choose to use that kind of knife for that purpose.

**Q So reviewing all the various purposes that we talked about, we agreed that switchblades could be used for self-defense; correct?**

A I would say any object can be used for self-defense; might not be good for it, but it can be.

**Q And you agree switchblades can be used for hunting purposes?**

A Just to be clear, not to actually hunt, but to --

**Q -- surround that -- the act of hunting?**

A Camping, et cetera, yes.

**Q Okay. And that also goes the same for fishing, recreation and camping?**

A Outdoor recreation activities, I would agree.

**Q So you agree that bottom-act opening knives have many different lawful uses; correct?**

A I believe -- I believe knives of every kind can be used lawfully or unlawfully.

**Q And do you agree that switchblades or automatically opening knives are used lawfully?**

MS. UYEHARA: Objection; ambiguous, also calls for speculation.

BY MR. DILLON:

**Q These activities that we described, hunting, fishing, recreation and camping, do you know those activities to be lawful activities?**

A Yes.

MS. REILLY: Vague and ambiguous.

BY MR. DILLON:

**Q Okay. You agree switchblades or automatically opening knives are used in these activities; correct.**

MS. REILLY: Again, it calls for speculation, asked and answered, vague and ambiguous.

BY MR. DILLON:

**Q You can answer the question.**

A Yeah, I would say I cannot say for a fact, to

verify fact, the fact that I have verified they are used in that way.

**Q You've never hear of a knife, automatically opening knife being used for hunting purposes?**

MS. UYEHARA: Objection; calls for speculation.

BY MR. DILLON:

**Q I'm asking if you're aware of an automatically opening knife ever being used for a hunting purpose?**

A I'm aware of them being marketed for outdoor use: Camping, hunting, fishing.

(Exhibit 8 marked)

**Q At this point Plaintiff's 8, I believe.**

**All right. Do you see the picture of three knives up on the screen right now?**

A Three knives, I do.

**Q Okay. And I'm going to state that these are depictions of three variations of the Buck 110 folding knife. Do you see that?**

A I do.

**Q Have you ever seen the Buck 110 folding knife before?**

A I have.

**Q Okay. And are you aware of its marketed and understood use?**

A I wouldn't agree that I'm an expert on Buck's

marketing, no.

**Q Well, I'm not asking if you're an expert on it.**

**Have you heard of what this knife is used for?**

MS. REILLY: Calls for speculation; not to be used in the same way in every instance.

BY MR. DILLON:

**Q Are you aware of how it's marketed?**

A No. As I think I said a moment ago, I'm not well versed in Buck's marketing for this particular knife.

**Q Okay. So you can see here that there's three variations of knife.**

**Do you see that?**

A I do.

**Q One of is a manually folding knife; one is -- sorry -- a manual folding knife, two-handed opening -- two hands required to open it; a one-hand opening manual folding knife, and then the automatically opening folding knife; correct?**

A I see that, yes.

**Q Are you aware that this knife is also referred to as the Buck folding hunter knife?**

A I am not.

**Q In your report you state that "militaries over the world clearly prefer fixed-blade knives to switchblades, underscores the fact that switchblades are**

**not well-suited for self-defense; correct?**

A Correct.

**Q And how did you come to this conclusion?**

A Well, from my knowledge of reading over decades, I am definitely not aware of any national military in the world that prefers automatic knives, and I don't believe any example of that was, you know, for instance, proposed in the rebuttal to my declaration.

So I am definitely standing by that statement. No military prefers automatic knives.

**Q What do you mean by "prefer"?**

A Makes it the primary choice. It's a primary choice for combat troops; makes it the most common knife to take out into the field as a weapon.

**Q Okay. Are switchblades issued in the military in the United States?**

A Not preferred. In some cases, for instance, paratrooper example that Mr. Janus provided issued.

**Q Okay. So they are issued in the United States?**

A I would say as a very small case, yes.

**Q Were you in the military?**

A I was not.

**Q Okay. And so what's the basis of your claim that you know what knives are issued by the military?**

A I've been reading about military equipment and

studying and reading about, you know, books by authorities for a long time. So just my research.

**Q Okay. So when you state that militaries clearly prefer fixed-blade knives, you're not stating that these militaries don't use automatic knives; correct?**

A Correct.

**Q Have you ever heard of the Gerber 06 Auto knife?**

A I'm familiar with Gerber knives. I don't have every model of knife memorized, so I don't know of that exact model you're mentioning.

**Q Oh, no problem.**

**In paragraph 34 of your report, you state that:**

**"Unlike weapons such as handguns, pepper spray or tasers that can end or impede a threat from a distance, switchblades are strictly close-quarter weapons that require hand-to-hand combat skills in order to safely and effectively -- in order to use safely and effectively against a threat. Is that correct? I can pull up your report as well.**

A Yes.

**Q Okay. I have your report up here.**

A Umm-umm.

**Q Highlighted paragraph 34.**

**You see that?**

A I do.

**Q Okay. This close quarter nature of switchblade, that's not unique to switchblades; correct?**

MS. UYEHARA: Objection; ambiguous.

BY MR. DILLON:

**Q So is any other knife a close-quarter weapon?**

A I would say all -- the typical knife is a close-quarter weapon, yes.

**Q All knives would fall under the close-quarter description you use in paragraph 34; correct?**

A Yes.

**Q And that's including fixed-blade knives; correct?**

A Correct.

**Q And again, you prefer the fixed-blade knife for self-defense use?**

A Correct.

**Q That would also include something like a non-projecting taser; correct?**

A A taser where you have to actually come in contact with the individual as opposed to pulling a trigger and actually shooting out a projectile; correct?

MS. UYEHARA: Objection; scope.

BY MR. DILLON:

**Q Go ahead.**

A A stun gun that does not fire a projectile of any kind is a close-quarters weapon.

Q All right.

And that would also include all the other impact weapons that you -- you wrote your book on, the saps, blackjacks and the slung shots, those would also be considered close-quarter weapons; correct?

A Correct.

Q So other than firearms, pepper spray and some projectile-style tasers, all self-defense weapons would be considered a close-quarter weapon; correct?

MS. UYEHARA: Objection; overbroad. Ambiguous as well.

BY MR. DILLON:

Q You can go ahead and answer the question.

A I would say there are actually a variety of self-defense implements that I would not describe as close-quarter, that are not in the list that you just mentioned, like shooting tasers, et cetera.

Q Would those include items that project some sort of object at a distance?

A And those that are plain thrown.

Q So it would involve some sort of projectile of some kind?

A I agree.

Q Okay. And in the world of martial arts, these are all close-quarter combat, hand-to-hand techniques;

**correct?**

MS. UYEHARA: Objection; ambiguous as to they -- these.

BY MR. DILLON:

**Q So you studied Goju karate; correct?**

A Yes.

**Q And that's a close-quarter combat martial art; correct?**

A It is.

**Q And Jiu-Jitsu would also fall under that close-quarter combat style; right?**

A Yes.

**Q And would most any hand-to-hand martial art, fall under a close-quarter contact technique?**

A I feel like that's a little too broad, but the term martial art is quite broad, so --

**Q I'll flip it around.**

**Are there any martial arts that involve distance combat?**

A In my opinion, yes.

**Q And what would those be?**

A For instance -- (inaudible).

THE COURT REPORTER: I'm sorry, I couldn't hear that. Could you repeat that please?

THE WITNESS: I said in my opinion, yes. For

instance -- example, knife hurl.

**Q So knife throwing would involve throwing a projectile, weapon projectile; correct?**

A Yes, I would not describe that myself as close-quarters combat.

**Q Okay. But when I'm referring to martial arts, such as Jiu-Jitsu, Krav Maga, Goju Karate, tae kwon do, those are all close-quarter combat techniques; correct?**

A All the ones you just named, yes, I agree.

**Q And it's your opinion that all these -- let's say, let me rephrase that.**

**It's your opinion that various forms of martial arts are adequate self-defense measures; correct?**

MS. UYEHARA: Adequate -- objection; vague as to the word "adequate."

BY MR. DILLON:

**Q Do you believe martial arts are effective forms of self-defense?**

A Unfortunately, that's a too broad. There's a lot of good martial arts and bad martial arts out there.

**Q Okay. So of the good martial arts, they can be used for self-defense; right?**

A Good martial arts can be used for self-defense, I would agree.

**Q Okay. In paragraph 35 of your report you describe**

the fact: "There's multiple knife and self-defense writers that are observed that using a knife combatively is an action that lies beyond the mental threshold many are incapable of crossing."

Is that correct?

A Yes.

Q And would you agree with that statement?

A I agree with the statement that there are many martial arts and authorities who hold that opinion, yes.

Q And this isn't specific to switchblades; correct?

A It is not.

Q So that they are commenting on using any knife in self-defense; correct?

A Correct.

Q Do you believe that most people would generally be hesitant to use any weapon in self-defense?

MS. UYEHARA: Objection; calls for speculation.

A I believe, from my review of countless, real world self-defense situations, the average person exhibits very poor skill and effectiveness with a weapon, with their hands, unless they have been trained.

BY MR. DILLON:

Q Okay. In paragraph 40 of your report, you state that:

"Knives, including switchblades, are offensive

and deadly weapons by the nature of their design."

Do you see that?

A I do.

Q Okay. So when you say, "knives, including switchblades," are you referring to all knives?

A I am.

Q So it's your opinion today that all knives are, by their nature, deadly weapons?

A Yes.

Q And that they're designed as deadly weapons?

A I didn't say that in my declaration. I wouldn't have (indecipherable)if it were.

Q All right. So I'll rephrase that, I apologize.

So you're stating that all knives are deadly weapons by nature of their design; is that correct?

A Yes.

Q And can you elaborate on that claim?

A Yes. I believe it's very easily verified by anyone. You don't have to be a martial art expert to find the opinion -- the consensus opinion that in martial arts and weaponry circles that the second deadliest weapon someone can carry is a knife; the first, of course, being a firearm.

Q Okay. So all knives are less dangerous or deadly than handguns or firearm?

 MS. UYEHARA: Objection; overbroad.

BY MR. DILLON:

**Q Is a knife as dangerous as a handgun?**

A I want to think about that -- it definitely can be as dangerous as a handgun, in my opinion.

MR. DILLON: Madam Court Reporter, can you read back about four lines in the record, please?

(Record read)

MR. DILLON: Okay. Thank you.

**Q So, Mr. Escobar, you stated that the second deadliest weapon someone could carry is a firearm; is that correct?**

A Common self-defense (indecipherable) of weapons, yes.

**Q So the first deadliest weapon would be a firearm?**

A In my opinion, and in the opinion, I would say, a consensus in the martial arts community, yes.

**Q So a knife is not as dangerous as a handgun?**

A I would agree.

MS. UYEHARA: Objection -- objection; vague, vague.

BY MR. DILLON:

**Q You would agree with what I just said?**

A Can you state it again, please?

**Q So a knife is not as deadly as a handgun?**

A I think -- I would quibble with the phrasing there. I'll say this: A firearm can do more damage than a knife; it can kill more people, wound more people than a knife.

**Q And, in your words, a firearm is the first most deadly weapon?**

A Yes.

**Q And a knife is the second deadliest weapon; correct?**

A As I said a moment ago, those weapons carried for self-defense, yes.

**Q Okay. Now, regarding the offensive nature of the design of a knife, wouldn't the categorization of its design be based off of its intended use or circumstances surrounding these?**

MS. UYEHARA: Objection; vague.

MR. DILLON: I'll rephrase that.

**Q Is my kitchen knife, by nature of its design, an offensive weapon?**

A By nature of its design, it can be, absolutely, a deadly weapon, and if used as a weapon, just like a purposeful combat knife, it is, in my opinion, offensive in nature.

**Q Okay. But that would depend on the use that it was put to; correct?**

A The use that it was put to meaning --

**Q I'll rephrase that.**

**So if I'm in my kitchen with my kitchen knife, chopping tomatoes, I'm not using that as a weapon; correct?**

A Correct, I agree.

**Q But if I were to walk up to somebody, pull out a kitchen knife and threaten them, that would be using that weapon -- using that knife as a weapon; correct?**

A Correct.

**Q Sorry, what was the answer? You cut out.**

A I agree.

**Q Okay. So pocketknives, are they, by the nature of their design, offensive weapons?**

A All knives, combatively, are offensive by nature, in my opinion.

The smaller it is, the less so, but still, I and many others classify knives as offensive weapons when used combatively.

**Q And again, only when used combatively; correct?**

A Yes.

**Q And that would go -- you would attach that same to camping knives?**

A Yes, when used combatively, it is used offensively, yes.

**Q And that would also apply to quote/unquote, survival knives?**

MS. UYEHARA: Objection; vague.

(No answer)

BY MR. DILLON:

**Q When used combatively, you would agree that a utility knife would be an offensive weapon; correct?**

A I do.

**Q Okay. In paragraph 40 of your report you also state that: "Without proper training they can be turned against their own user."**

**Is that correct?**

A Yes, this has happened many times on the street, in my opinion, from my research.

**Q Okay. And that's not unique to switchblades; correct?**

A Correct.

**Q That would apply to all knives; in your opinion?**

A Yes, I believe my declaration spells that out that I'm speaking about all knives in that section, yes.

**Q Would that apply to other self-defense weapons?**

A Yes.

**Q I'm going to pull up your report here.**

**In paragraph 40 you state, on the third sentence: "They have also been dropped in an ultra intense**

**adrenalized situation of a self-defense encounter."**

**Can you elaborate on that statement?**

A Yes, anybody who would like to verify that statement themselves, could, again, within a matter of just single minutes, Google "man falls on his own knife," et cetera, and find the real world incidents where people have dropped the blade that they took out in a defense situation.

**Q Okay. So again, that statement applies to all knives?**

A Yes. And so, for the record, I'd like to state, we're reading from section 40, which says: Knives including switchblades," so I think that was --

**Q -- I'm just clarifying --**

A -- yeah -- yes.

**Q And would the fact or would that statement also apply to other self-defense weapons?**

A Yes.

**Q Okay. And the basis of the claim that this has happened is you've seen videos online that show people dropping a self-defense weapon in a deadly encounter?**

A That as well as written reports, police records, et cetera.

**Q When you state that the overall danger of self harm is higher than commonly understood, what are you**

**referring to specifically?**

A Can we see the verbiage? On 41?

**Q Yes, this is -- it's actually paragraph 40, I'll highlight the language.**

A Okay. Yes, this is my strong opinion, from my experience, most people who purchase a knife, just as an example, this is a subjection about knives in general, who purchased a knife, even with the thought of defense, never take training, simply put it in their pocket and walk around.

I think the average person, not someone who actually takes the trouble to train in knife fighting or a knife defense type class, does not understand the dangers of self harm that they themselves face because of how razor sharp that blade is because they haven't practiced for years, how to, you know, move without accidentally cutting yourself, et cetera.

**Q Okay. In paragraph 43 of your report --**

A Umm-umm.

**Q -- you state: "Some switchblades are widely regarded as poor weapons of choice for self-defense."**

**You see that?**

A I do.

**Q And how did you come to this conclusion?**

A This is -- I'm not saying it's a universal

consensus; right? People disagree within the knife community, within the weapons community, but from my experience discussing these matters online in various groups, this opinion is common, that switchblades are a poor choice compared to other knife types for defensive purposes. I do not have empirical, quantitative data on that.

**Q Okay. So you're basing this just on the fact of having discussions on various Internet forums and discussions --**

(Overlapping speakers; indecipherable)

A -- yes, martial arts instructors and weapons instructors, and just random knife enthusiasts, yes.

This is definitely stated as an opinion. That is my opinion on that I have found this to be a prevalent thought.

Again, I'm not saying, you know, universal in consensus by any stretch.

**Q Okay.**

(Court Reporter speaks; off the record)

**Q Actually, bear with me one second here -- so two other questions here.**

**Are you aware that switchblades are legal to purchase and possess in a majority of the country?**

MS. REILLEY: Vague and ambiguous, overbroad,

calls for legal conclusion.

MR. DILLON: You can go ahead and answer.

A I would say I'm not an expert in knife law.

MR. DILLON: All right.

At this time I have no questions and I'll hand it over to defense counsel.

MS. UYEHARA: We just have one question, Robert, and it's regarding the recreational knives we were discussing earlier.

**Q To your knowledge, are some of those recreational knives shorter than two inches in length?**

A Yes.

**Q And is it also your conclusion that some of those are currently legal in the State of California?**

MR. DILLON: Objection; legal conclusion, calls for speculation. The witness stated he's not an expert on law.

A I believe that is it, unless you had another --

THE COURT REPORTER: Did we get an answer? I don't think we have got answer to the last question.

THE WITNESS: I'm ready.

As I stated, I'm not an expert in law, but I do know -- I've seen evidence that yes, Katrina's statement is correct about knives in California.

MR. DILLON: All right.

I think that wraps it up.

Mr. Escobar, thank you for your time today. I appreciate it.

THE WITNESS: Thank you. Thanks, everyone.

MR. DILLON:  Can we go off the record?

(Exhibit 9 marked)

(Deposition concluded at 3:46 p.m.)

REPORTER'S CERTIFICATION

I, Joan Theresa Cesano, Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREON, I have subscribed my name, this 23rd day of February, 2024.

Joan Theresa Cesano, CSR No. 2590

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Knife Rights Inc. vs. Rob Bonta Attorney General

Date of Deposition: 02/09/2024

Job No.: 10134989

I, ROBERT ESCOBAR, hereby certify under penalty of perjury under the laws of the State of ________________ that the foregoing is true and correct.

Executed this ______ day of __________________, 2024, at ____________________.

_________________________________

ROBERT ESCOBAR

NOTARIZATION (If Required)

State of ________________

County of _______________

Subscribed and sworn to (or affirmed) before me on this _____ day of ____________, 20__, by________________________, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: ______________________________ (Seal)

DEPOSITION ERRATA SHEET

Case Name: Knife Rights Inc. vs. Rob Bonta Attorney General
Name of Witness: Robert Escobar
Date of Deposition: 02/09/2024
Job No.: 10134989
Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

Page _____ Line ______ Reason ______

From ________________________ to _________________________

DEPOSITION ERRATA SHEET

Page ______ Line _______ Reason _______

From ____________________________ to _____________________________

Page ______ Line _______ Reason _______

From ____________________________ to _____________________________

Page ______ Line _______ Reason _______

From ____________________________ to _____________________________

Page ______ Line _______ Reason _______

From ____________________________ to _____________________________

Page ______ Line _______ Reason _______

From ____________________________ to _____________________________

Page ______ Line _______ Reason _______

From ____________________________ to _____________________________

Page ______ Line _______ Reason _______

From ____________________________ to _____________________________

Page ______ Line _______ Reason _______

From ____________________________ to _____________________________

Page ______ Line _______ Reason _______

From ____________________________ to _____________________________

Page ______ Line _______ Reason _______

From ____________________________ to _____________________________

________ Subject to the above changes, I certify that the transcript is true and correct

________ No changes have been made. I certify that the transcript is true and correct.

_____________________________________________

ROBERT ESCOBAR

**Exhibits**

**EX 001 - ESCOBAR, R** 4:3 9:17,18

**EX 002 - ESCOBAR, R** 4:4 10:10,11

**EX 003 - ESCOBAR, R** 4:6 11:5,6 12:15 45:21

**EX 004 - ESCOBAR, R** 4:7 44:1,24

**EX 005 - ESCOBAR, R** 4:9 51:18,22

**EX 006 - ESCOBAR, R** 4:10 71:8,9

**EX 007 - ESCOBAR, R** 4:13 73:15,18

**EX 008 - ESCOBAR, R** 4:15 99:11

**EX 009 - ESCOBAR, R** 4:17 117:6

**$**

**$150** 6:3

**$400** 63:3

**(**

**(indecipherable)if** 108:12

**0**

**06** 102:7

**1**

**1** 9:17,18 19:24

**1.MTS** 51:23

**110** 99:17,20

**13** 45:24

**14** 45:25

**15** 38:18

**16** 53:2

**17** 50:18

**19** 47:4 53:3

**1963** 68:5

**1:00** 5:3

**2**

**2** 10:10,11

**20** 39:18,22,25 53:21

**2024** 5:3

**20th** 30:13 47:5,9

**21** 54:23 55:9

**22** 57:6

**23** 64:19,22 70:19

**24** 20:22 75:4

**25** 34:22 59:11

**28** 79:24 80:3,4

**3**

**3** 11:5,6 12:15 45:21

**30** 82:5

**31** 85:14 86:19 93:21

**32** 90:12 93:25

**34** 102:12,23 103:9

**35** 106:25

**3:23-CV-00474** 5:15

**3:46** 117:7

**4**

**4** 43:24 44:1,24

**40** 107:23 112:9,24 113:12 114:3

**41** 114:2

**42** 10:2

**43** 114:18

**5**

**5** 51:18,22

**500** 36:20

**6**

**6** 34:9 53:3 71:8,9

**7**

**7** 70:19 73:15,18

**8**

**8** 70:19 75:3 99:11,12

**9**

**9** 5:3 70:20 71:12 72:7,12 73:16 74:21 117:6

**90s** 26:19

**A**

**ABC** 97:2

**ability** 12:10 15:19

**absolutely** 29:2 74:20 110:20

**academic** 35:15

**academy** 16:7

**acay** 29:8

**accident** 6:7

**accidental** 75:23 86:9 92:4

**accidentally** 90:14,17,23 91:2,9,17 94:2 114:16

**accounting** 26:24 27:3

**accurate** 21:19

**accurately** 28:16

**acquire** 22:9

**acquired** 78:5

**acronym** 26:16

**act** 19:6 43:16 97:24

**acted** 16:4 37:25

**action** 55:1 107:3

**actively** 17:21

**activities** 96:13 97:4 98:3,13,15,20

**actual** 26:10 76:11

**add** 72:19

**added** 73:8

**adding** 43:1 72:25

**addition** 16:19 35:14 87:11 95:7

**additional** 80:10,18 82:6 87:4 89:6 93:14 94:15 95:6

**adds** 87:10 89:6 90:10

**adequate** 106:13,14,

15

**admonitions** 6:22

**adopting** 58:2

**adrenalized** 113:1

**adult** 6:8 14:24

**advanced** 22:19

**advancing** 17:17

**afternoon** 5:11

**agree** 16:23 31:9 43:9 47:8 52:12 58:4,9 60:10 61:24,25 62:22 72:23 74:20 78:25 81:14 86:10, 11 93:2,12 94:22 95:21 96:11,16,23 97:11,14,21 98:3,4, 8,19 99:25 104:23 106:9,24 107:7,8 109:19,23 111:6,12 112:6

**agreed** 97:17

**ahead** 39:7 43:8 44:17 55:17 63:16 68:13 69:2 70:8 72:1 77:15 78:20 81:25 84:17 87:8,17 88:3, 12 89:5,25 90:21 96:21 103:23 104:13 116:2

**align** 78:9

**allowed** 7:11,25

**Amazon** 60:16,19 97:13

**Amazon.com** 60:7

**ambiguity** 55:15 88:2

**ambiguous** 43:6 68:2 81:22 84:25 87:7 88:11 89:3 95:25 98:10,17,22 103:3

104:10 105:2 115:25

**America** 32:9 39:9,10 47:10

**American** 28:3 48:8

**Americas** 39:12 46:12

**ammunition** 68:20,24 69:3,5,7,9,11

**amount** 6:1 85:12 86:22

**analogous** 86:4 88:18

**answering** 58:24

**antique** 36:24 68:6

**anymore** 22:8

**apologies** 31:8,15

**apologize** 25:20 31:6, 12 48:15 108:13

**apparently** 35:12

**appeal** 46:14

**applies** 113:9

**apply** 7:6 51:9 112:1, 18,21 113:17

**approximation** 17:7

**AR-15** 40:21 41:11,17 43:3 44:14

**AR15** 40:2

**area** 70:19

**argue** 31:3

**argumentative** 89:11, 24

**Arkansas** 30:23

**armor** 26:7,9

**art** 13:21 16:15,16 19:2 21:13 23:17 105:7,13,16 108:19

**Arthur** 5:22

**article** 57:9,17,23 59:21 61:18

**articles** 27:18,22,25 28:1

**artist** 35:21 63:25 65:5 76:8

**arts** 13:4,22 14:4 15:7,25 16:22 18:19, 23 20:22,25 21:4,5,9 22:1,3,7 23:2,4,23 24:23 25:2 26:1,13 28:20 39:6 57:7 59:21 60:4 61:19 104:24 105:18 106:6,13,17,20,21, 23 107:9 108:20 109:17 115:12

**asks** 8:22 13:19 25:18 41:20 43:20 59:7 85:24

**assault** 41:10 49:14

**assaults** 49:13

**assist** 12:5

**assistant** 16:4 37:25

**assisted** 56:22,24 91:1

**assists** 56:10

**association** 27:20

**assumes** 89:7

**assumptions** 75:11

**athleticism** 15:19

**attach** 51:11 111:22

**attached** 53:10 72:11

**attend** 19:9

**attended** 19:11 57:16

**Attorney** 5:14

**attracted** 47:22

**audibly** 8:13

**Australia** 47:3 50:10 52:9,13

**Australian** 49:23

**author** 12:3 71:20

**authoring** 12:5

**authorities** 102:1 107:9

**Auto** 102:7

**automatic** 39:19,22 40:1,20 41:13,14,17 42:2,8,10,24 45:15 54:14,17 55:21 57:3 58:23 60:6,7,11 62:1,3,8,15 63:18 67:25 70:3,11 72:3,7 73:17 75:12,14,16 76:3,7,25 81:19 82:15,18,22 83:6 86:4,12 91:5,15 92:5 93:1 96:2,5,8 101:6, 10 102:5

**automatically** 42:12, 19,23 44:8 54:7 56:11 57:3 58:17,18 70:15 83:9 85:20 95:22 96:12,16 98:9, 19 99:3,7 100:17

**automation** 93:1

**automative** 87:12

**average** 75:6 107:19 114:11

**avoid** 75:23

**awarded** 23:7

**aware** 8:8 48:16 54:1, 22 59:14,17 67:11, 19 69:10 81:8 96:2, 5,8,12 99:7,9,23

100:7,20 101:5 115:23

**Axis** 44:2

B

**B-U-D-O-K-A-I** 18:8

**back** 26:18 27:6 35:23 40:19 45:19 59:20 61:2 74:19 79:17 80:5 88:17 109:7

**background** 12:25

**bad** 9:23 106:20

**Balisongs** 31:22

**banned** 46:16,21

**barely** 91:6

**base** 45:12,13 92:1

**based** 9:7 11:18 17:12 27:20 49:3 67:13 91:22,24 110:14

**basically** 14:11 18:22 64:6

**basing** 65:14,16 92:12 115:8

**basis** 46:7 48:10 60:1 65:3 83:16 91:8,21 101:23 113:19

**baton** 29:10,14

**batons** 14:14 29:8

**battle-axes** 26:5,7

**bear** 33:16 38:17 51:16 115:21

**beaten** 13:16

**beefier** 62:10

**begin** 91:4

**beginning** 56:8

**behalf** 5:18 11:16

**belief** 94:4

**belt** 12:21 14:20 15:5,9 16:16 22:5,6,9,10,13,23,25 23:6,7,11 26:12

**belts** 22:20 26:14

**bench-made** 44:2

**beneficial** 73:1

**big** 15:16

**biker** 47:15

**billies** 34:3

**bit** 23:22 24:2 93:2

**BJ** 22:5

**BJJ** 23:3

**black** 12:21 14:20 15:5,9 16:16 22:9,10,20,24

**Blackboard** 47:16

**blackjacks** 25:21 27:7 28:10,22 29:8 34:2 104:4

**blade** 29:18 31:4 35:7 42:16,20 43:18 45:12,13 54:21 55:11 60:20 68:21 73:9 74:8,12 76:7 80:5,7,10,12,19 82:10,24 83:1,17 84:13 86:16 88:9 95:7 113:7 114:15

**bladed** 14:16 25:15 34:19 36:21 46:1

**blades** 26:10,11 32:17 51:10 53:16 62:11 83:6

**blocking** 76:23

**blown** 31:14

**blue** 22:4,6,23

**blunt** 28:5,14

**Bodu-kai** 18:7

**body** 13:15,22 15:16,20

**Bonta** 5:14 6:15

**book** 28:10,13,15,16,18 29:15,25 30:4,7,11,19 31:8,15 33:7 104:3

**books** 17:23,24 18:3,4 25:8,19 27:6,14 31:25 32:14 102:1

**bottom** 11:21 44:8 45:14

**bottom-act** 98:4

**Bowie** 30:20

**boxes** 97:13

**boxing** 21:2,10 24:19,20,22

**Brando** 47:14

**Brazilian** 22:5

**break** 33:20 59:15,18

**breakage** 71:2

**breaker's** 63:12

**breaks** 74:15

**bring** 7:18 9:10

**brittle** 52:8

**broad** 89:12 96:22 105:15,16 106:19

**broken** 59:13 71:10,15,23 73:4 74:14

**brought** 19:16 21:15 75:22

**brown** 22:24

**brutal** 51:8

**Buck** 99:17,20 100:21

**Buck's** 99:25 100:9

**bucket** 34:14,15

**Budo** 16:18

**Budo-kai** 18:6,20 19:7 23:4

**Butterful** 31:23

**button** 72:8 73:5,6,11 75:20,22,25 80:14 87:11 91:17 92:3

**button's** 75:14

**buttons** 75:16 91:11 92:13

**buy** 64:7,15

C

**C-H-I-N** 13:23

**California** 5:2,14,19 9:22 53:19 116:14,24

**call** 24:3

**called** 13:17,23 14:17 15:23 17:8 26:16 27:21 31:23 64:5

**calls** 44:15 71:25 81:23 84:15,24 98:10,21 99:5 100:4 107:17 116:1,15

**camera** 9:2

**camping** 96:14,22 97:25 98:2,14 99:10 111:23

**car** 6:7

**cardboard** 36:8

**care** 63:13

**career** 35:3

**careful** 36:15,21

**carried** 65:10 110:10

**carry** 63:19 65:11 97:5,6,7 108:22 109:11

**case** 5:13,14,17,19, 24 6:2,10,13,15,17 28:18 45:22 76:18 77:8 91:3 92:6,9 101:20

**cases** 101:17

**categories** 53:23 54:9,11,14,15

**categorization** 110:13

**category** 47:24 53:8 54:1,8

**caused** 47:18

**century** 22:2 30:13 47:5,10

**certifications** 40:7

**certified** 49:3

**cetera** 17:3 22:4 23:19 24:8 30:18 41:9 63:13 69:11 97:25 104:17 113:6, 23 114:17

**chain** 68:18

**chains** 29:5

**challenge** 87:10

**challenges** 80:22

**championship** 23:19

**chance** 64:24 65:18, 24 66:8

**chances** 65:22

**change** 43:13

**changed** 35:4

**channel** 36:18 51:19

**Chapman** 15:1

**chapter** 31:6 32:6

**characterization** 43:10 95:11

**cheap** 63:15 73:24 74:2

**cheaply** 60:11,13,17, 20

**Chin** 13:17,23

**choice** 63:12 101:12, 13 114:21 115:5

**choose** 65:11 97:15

**chopping** 111:4

**chose** 19:14

**cinema** 48:8

**circle** 32:24 45:12

**circles** 40:24 60:4 108:21

**circumstances** 110:14

**cite** 57:13

**cited** 47:5 49:21 57:11

**civilization** 46:12

**claim** 46:7 48:10 50:23 53:3,7 60:1 65:3 66:20 83:16,21 91:8,21 92:1,12 101:23 108:17 113:19

**claiming** 52:7

**clarification** 8:23 13:19 25:18 35:1 41:20 43:20 59:7 85:24

**clarifying** 113:14

**class** 21:16 24:20 114:13

**classes** 22:12 23:25 24:22 52:18

**classic** 14:10 34:25 47:11 61:11 81:3

**classification** 54:17

**classified** 53:22

**classify** 111:18

**clear** 46:1,8,11 58:19 97:23

**clicks** 74:12 82:18

**close** 45:13 103:1

**close-quarter** 102:15 103:5,7,8 104:5,9, 16,25 105:7,11,14 106:8

**close-quarters** 103:25 106:5

**clothing** 26:8

**clubs** 29:9,12

**coaches** 23:4

**Cobra** 68:5,9

**collecting** 63:8

**college** 14:25

**Colt** 68:5,9

**combat** 13:8 26:2 39:5 55:2 59:23 61:21 63:5,23,24 64:2 76:8 101:13 102:16 104:25 105:7,11,19 106:5,8 110:22

**combatively** 107:2 111:15,19,20,24 112:6

**comment** 23:1 40:22 49:10

**commenting** 107:12

**committed** 48:12,21

**common** 17:16 29:3, 5 30:7,11,12,21 50:2 73:16 97:8 101:13 109:13 115:4

**commonly** 56:6 64:25 113:25

**community** 65:8 109:17 115:2

**comparable** 68:15

**compare** 39:23,25

**compared** 115:5

**comparing** 40:2,20 62:19

**comparison** 40:2,15, 19,23 41:11 43:13 68:14

**Complaint** 10:1

**completed** 36:14 85:13

**complicated** 41:7

**component** 14:3 23:18,24 41:18 42:11 43:12 45:11

**components** 42:14, 16

**compound** 94:10

**concluded** 117:7

**conclusion** 101:3 114:24 116:1,13,15

**condition** 68:7

**conditioning** 15:20

**conduct** 18:14 35:8 49:7

**conducted** 17:19 34:1,24 35:5 36:2 58:15 61:3,9 63:21 65:17 66:7

**conducting** 7:4

**conducts** 18:10

**confederation** 19:12

**conferences** 34:24

**configurations** 28:14

**confirm** 83:1

**confirmation** 42:6 82:14,20 83:3,17 84:2

**conformation** 82:10

**connection** 49:1

**consciousness** 28:3

**consensus** 60:5 108:20 109:17 115:1,18

**considerably** 32:18, 21

**considered** 104:5,9

**consist** 18:18 34:3

**consists** 21:1

**construction** 71:2

**consumer** 62:5

**contact** 74:7 81:13 82:23,25 91:19 103:19 105:14

**contained** 12:8

**Contemporary** 57:7 59:20 61:19

**Contemporaryfightarts.com** 57:14

**continually** 26:20 81:14

**continue** 15:21

**continuously** 82:1

**convenience** 63:13

**convicted** 49:14

**cool** 47:18 63:7

**correct** 6:20,21 11:24 12:1,9,23 15:10 16:14,15 17:18 18:6, 7 20:6,15,16,18,19, 23 21:6 24:13,14,17, 25 25:2,6,7,9 27:1,2, 8,10,15 28:11,24 29:17,23 30:1,2,3, 23,24 32:5,7,9,19, 20,22,23 33:8,11 34:4,12,13 36:3,14, 19 37:3,4,6,7,9,10, 12,13,15,16,18,21, 22,24 38:19,20 39:20,21 40:3,4 42:18,24 46:5 48:1,5 50:4,5,10,11,16,17, 23,24 51:5,7,10,24 52:8,16,17 53:5,6, 12,25 54:12,13 55:3, 4,7,11,14,20,23 56:1,13 57:1,7,25 59:15,16,18,19 63:19 65:1,2 66:12 69:14 70:15,16 71:3, 6,18 72:20 73:2,4,9, 12,13,25 74:5,9,10, 12,13,23 75:19 76:14,19,24,25 77:2, 6,9,13,23,24 78:10, 13,25 79:8,10,12,15 81:6 82:7,11 83:7, 14,15 84:5,6 85:22 86:6,15,16 87:2,3 88:10 89:10 90:15 92:24 93:7,8,11,12, 15,23 94:3,4,5,17, 18,21 95:3,15,20,24 96:18 97:4,7,9,13,18 98:5,20 100:18 101:1,2 102:5,6,18 103:2,9,11,12,15,17, 20 104:5,6,9 105:1, 5,8 106:3,8,13 107:5,10,13,14 108:15 109:12 110:9,25 111:5,6,9, 10,20 112:7,12,16, 17 116:24

**correctly** 50:24 76:13,14 77:12

**corroborate** 84:1

**corroboration** 58:5 60:3

**counsel** 5:12 7:13,23 33:18 79:18 116:6

**countless** 107:18

**countries** 39:12 50:14

**country** 29:23 115:24

**couple** 15:12 27:24 52:1

**courses** 17:11 52:20

**court** 7:1 8:15,22,24 9:3,21 13:19 25:18 35:1 41:20 43:20,23 49:3 59:7 66:3 85:24 105:23 109:6 115:20 116:19

**COVID** 18:16

**creator** 50:19

**credentials** 57:19

**crime** 48:17 53:13

**crimes** 48:12,21 49:3 69:10

**criminal** 48:4,24 50:13,15

**criminals** 46:2,8,14 47:1,7,20 48:10,13, 21 52:9 53:4

**crossing** 107:4

**cultural** 47:19

**culturally** 46:2

**culture** 47:1,17

**curious** 35:21

**current** 26:22

**curriculum** 17:12

**cut** 30:10,16 31:3 111:11

**cut-throat** 46:23

**cutting** 36:22 80:7 114:17

### D

**dagger** 17:8

**daggers** 26:4

**daily** 97:4

**damage** 110:2

**Damascus** 44:2

**danger** 66:11,13 82:6 85:15 87:13,15,18, 21,25 88:8,20 89:2, 22 90:7,10 91:9 92:25 93:14,22 94:2 113:24

**dangerous** 69:17,19, 20,23,25 70:4 90:13 93:18 94:19 108:24 109:3,5,18

**dangerous-seeming** 47:18

**dangerousness** 90:6

**dangers** 39:19 87:5 90:14 94:6,15,25 114:13

**dark** 45:12

**data** 82:1 83:20,23, 24,25 92:1,9 115:6

**date** 11:22

**daughter** 21:19

**day** 46:19

**days** 47:7

**deadliest** 108:21 109:11,15 110:8

**deadly** 25:23 27:11 29:15 30:19 31:10, 17 32:4 108:1,8,10, 14,24 109:25 110:6, 21 113:21

**dealing** 26:6

**Dean** 47:14

**decades** 14:5 47:21 63:9 92:20 101:4

**decent** 60:23

**declaration** 7:16 11:11,15 31:15 38:25 42:4 43:14 47:6,19 48:15 51:1,7 58:7 60:6 70:10 83:4 84:1 87:9 101:8 108:11 112:19

**Declaratory** 10:1

**dedicated** 23:24 24:20 31:6 50:23 51:2

**defect** 69:7

**defence** 78:23

**defend** 47:21 91:16

**defendants** 5:18,24 11:16

**defense** 95:20 113:7 114:8,13 116:6

**defensive** 17:5 21:14 67:21 115:5

**degree** 12:21 14:19 15:9,14 16:16 22:9

**demonstrating** 16:1 75:2

**demonstration** 15:15,17

**demonstrations** 19:18

**depend** 110:24

**dependable** 41:4

**depending** 54:10

**depends** 18:16 19:4

**depicted** 44:7,8 48:4, 24 72:18 94:6

**depictions** 99:17

**deploy** 55:5 75:10 76:14 78:23 86:25 87:18,21,25 88:9,20 89:18,22

**deploying** 77:4

**deployment** 67:18 90:8

**deployments** 90:11

**deposed** 6:5,9,17 13:20

**deposition** 7:6,10,12 8:9 10:18 11:1 12:16 35:3 82:12 117:7

**depressed** 76:1

**describe** 23:16 35:13, 22 38:24 39:4,22 60:5 63:11 69:3 81:1 96:24 104:15 106:4, 25

**describes** 73:24 74:11 97:3

**describing** 15:20 63:17 74:2

**description** 51:8 103:9

**design** 35:8 37:3,12, 13,20 41:1 54:10 62:5 63:14 81:5 108:1,15 110:13,14, 18,20 111:14

**designed** 43:19 52:15 64:12 70:25 76:7 83:8,9 91:5 96:6,9, 13 108:10

**designs** 81:8,11 96:2

**detail** 40:21

**device** 72:22 95:12

**dexterity** 84:21

**difference** 41:25 44:12,13 45:5,9

**differences** 42:14

**difficult** 84:13,21

**difficulty** 85:9

**digit** 75:21

**digits** 76:6

**Dillon** 5:10,12 8:3,7 9:4 31:6 33:21,24 35:9 36:1 40:18 41:22 43:7 44:16,23 45:19 55:16 61:17 66:9,19 67:4 68:3,12 69:1 70:13 72:5 77:15,18 78:19 79:22 80:17 81:24 84:16 85:5 86:2 87:17,20 88:3,5,16, 23 89:4,16 90:3,25 92:21 94:11 96:1,20 98:12,18,23 99:6 100:6 103:4,22 104:12 105:4 106:16 107:22 109:2,6,9,22 110:17 112:5 116:2, 4,15,25 117:5

**direct** 45:20 64:19 70:17 79:24 86:19

**directing** 7:20

**disagree** 95:10 115:1

**discharge** 86:9

**discloses** 8:1

**discuss** 28:11 30:4,7, 20,22 31:10,17 32:4 37:6 84:7

**discussed** 85:11

**discussing** 115:3 116:9

**discussion** 30:25 31:20,22 32:13

**discussions** 115:9,10

**disengage** 77:22 85:16 86:24 88:7 93:14,22 95:2

**disengaged** 86:15 94:7,16

**dispute** 46:25

**distance** 102:14 104:19 105:18

**distinction** 30:9 60:21

**District** 9:21,22

**document** 9:12,14,19 10:4,6,12,15,20,22 11:7,10,13,21,23

**documents** 7:20 8:4 10:19

**dojo** 38:3

**double-edged** 80:7

**doubles** 88:14

**drills** 15:24,25

**drop** 73:8

**dropped** 112:25 113:7

**dropping** 113:21

**due** 69:17,25 71:19

**duly** 5:6

**E**

**eagerly** 46:25

**earlier** 15:20 16:13,17 19:9 27:7 36:2 37:25 66:15 82:12 93:13 94:14 116:9

**early** 26:19 47:5

**ease** 63:13 93:1

**easier** 20:2 72:2

**Easiest** 29:11

**easily** 92:14 93:18 94:8,20,22 95:2,13 108:18

**eastern** 26:14

**edge** 64:4 80:7

**edged** 34:10 46:2

**education** 37:11,14

**effect** 6:25 48:18

**effective** 76:8 106:17

**effectively** 80:13 102:17

**effectiveness** 107:20

**eighth** 74:22

**elaborate** 108:17 113:2

**embrace** 52:10

**embraced** 46:25 53:4

**emergency** 91:13

**empirical** 115:6

**employed** 25:4

**employment** 26:22, 25

**encounter** 113:1,21

**encouraged** 22:4

**end** 11:22 102:14

**enforcement** 20:4,9, 12,15,17

**engaged** 89:7 95:14

**engineering** 43:13

**England** 50:14

**enjoying** 31:7

**ensure** 76:17

**enthusiast** 14:6 65:6, 7

**enthusiasts** 115:13

**entire** 31:6 76:2 80:11,19 81:12

**entitled** 72:7

**envision** 30:18

**equipment** 101:25

**equivalent** 40:20 41:4,17 43:2

**error** 50:24 75:3,5

**Escobar** 5:5,11,22,23 10:18 11:12 12:20 33:25 45:20 109:10 117:2

**essentially** 41:6 56:10

**esthetic** 63:9

**estimate** 9:7 56:6

**European** 21:4 26:1, 13 39:12

**events** 68:17

**everyday** 96:17,22, 24,25 97:1,5,6,7,9

**evidence** 61:8 116:23

**exact** 28:7 82:1 102:10

**EXAMINATION** 5:9

**examples** 34:8

**exception** 21:12 64:23

**exceptions** 62:13

**excluding** 21:8

**exercise** 13:17,22

**exhibit** 9:17,18 10:10, 11 11:5,6 12:15 33:19 44:1,24 45:21 51:18,22 71:8,9 73:15,18 99:11 117:6

**exhibits** 7:13 9:11 107:19

**existed** 26:17

**existing** 95:8,9

**exists** 45:13

**expandable** 29:10

**expensive** 63:10

**experience** 17:4 20:4, 8,14,17 37:17,20,23 38:4 40:5,10,12 52:21 58:11 81:18 83:18,19 114:6 115:3

**experiment** 34:21 36:22

**experimentation** 35:14,16

**experimented** 35:13

**experimenting** 34:7

**experiments** 35:5

**expert** 5:17 6:12,19, 20 11:11,15 14:6 38:13 58:5 62:4 66:20 68:22 79:21 99:25 100:2 108:19 116:3,16,22

**explanation** 21:25 40:14

**exposed** 76:4,9,22 91:14,17

**expressed** 84:1

**extensive** 34:1

**extent** 7:24 29:4

**extra** 89:10

**extremely** 30:12 69:9 90:22

**eye** 77:25

**F**

**face** 80:23 114:14

**fact** 31:25 49:2 72:25 75:15 92:12,13 98:25 99:1 100:25 107:1 113:16 115:8

**factor** 47:7 63:14

**facts** 12:8

**fail** 58:7,18 60:25 70:25

**failed** 67:20 69:11

**failing** 66:13

**failure** 59:1,2 64:24 65:18,22,24 66:8,11, 17,23,25 67:2,15,22 68:24 69:3,5,7,18 70:1,5,11,14 82:6 83:13 84:7 85:9,15 87:18,21,25 88:8,20 93:22

**failures** 67:10 69:13

**fairly** 25:15

**fall** 53:8,9 54:7,9,14 103:8 105:10,13

**falls** 113:5

**familiar** 11:13 22:5 71:13 73:21 97:1 102:8

**family** 28:24 29:10

**famous** 13:17,21 14:15 39:5 40:24 48:2 50:13

**famously** 39:6

**fashion** 48:4

**fashioned** 30:17 50:1

**feature** 85:25

**FEBRUARY** 5:3

**feedback** 47:19

**feel** 42:4 47:9 62:8 65:6 82:25 83:24 84:3 85:12 89:12 95:4 105:15

**feeling** 82:21 83:19 84:2

**fees** 22:12

**felt** 96:22

**field** 101:14

**fields** 25:4

**fighters** 22:21

**fighting** 23:19 47:14 50:19 51:23 57:7,14 59:20 61:19 76:11 114:12

**films** 48:2,3

**finally** 61:18 94:1

**find** 15:2 20:2 36:10 49:2,15 60:16,19 71:23 72:2 108:19 113:6

**fine** 8:4,6 87:10

**finger** 76:6

**fingers** 76:10 80:6,8 82:21

**fingertips** 84:3

**finish** 8:14

**fire** 40:10,12 67:24 68:18 69:5 75:23 76:7 78:13 103:24

**firearm** 40:6,24 66:20 68:23 69:6 77:22 86:4 88:18,19,20 108:23,25 109:11,15 110:2,5

**firearms** 40:5,8 41:8 67:25 68:6,22 69:17, 23 104:7

**firm** 26:24 27:4 63:25

**firmly** 64:2

**firsthand** 58:11

**fishing** 96:6,23 98:1, 14 99:10

**fist** 29:5

**fit** 29:12 54:2

**fits** 47:24

**five-minute** 33:20

**fix** 72:7 73:8,17 74:11

**fixed** 32:17 62:11

**fixed-blade** 17:6 32:11 40:1,20 41:3, 12 53:23 54:4,25 55:5 59:8,12,14 60:20,22,25 62:19, 22 79:11 90:9 95:8 100:24 102:4 103:11,13

**flip** 105:17

**flipper** 56:7

**Floro** 50:19 52:19

**Floro's** 51:1,19

**foam** 45:7

**focus** 13:13 25:11,16 28:4 30:3

**focusing** 29:22 70:20

**folded** 42:3

**folder** 39:5 56:9

**folding** 30:25 31:4 32:18 38:25 39:5,7 41:25 42:12,13,15, 19,22 43:2 46:22 47:11 50:1,6 53:16, 23 54:4,8,11,18 55:10,14,19 56:12, 14,16 59:17 60:14, 17 65:21 75:12 76:18 79:9 83:5,13 84:11,19 88:1,10 90:17,23 93:4 95:9 99:17,20 100:14,15, 17,21

**folds** 31:4

**folks** 30:17

**fond** 79:9

**foot** 14:12

**footnote** 57:13 70:20, 24 71:11 72:7,12 73:16 74:21

**force** 28:6,14 33:14 38:5 83:10

**forensic** 34:23

**forgive** 12:21

**forgotten** 25:22 27:8 28:17,21

**forked** 14:13

**form** 81:2

**formal** 37:11,14

**formation** 19:13

**forms** 96:9 106:12,17

**forums** 115:9

**Forvis** 26:24

**found** 29:19 50:24 58:5 60:3 62:6 115:15

**fourth** 74:21

**Fouts** 6:15

**free** 27:24

**FRIDAY** 5:3

**friend** 26:18

**frightening** 46:3

**front** 9:14 53:24 54:4, 12,18,22 55:10 56:1, 12,19 74:4,23,24

**full** 5:20 10:7,23 27:3 29:13 31:14

**fully** 76:5 84:22

**fumbled** 92:7

**functionality** 41:14 63:6

**functioning** 57:3 73:6

**future** 31:13 35:20

G

**gang** 49:23 50:9,10

**gangs** 47:3 50:14

**gap** 28:18

**Gats** 27:21

**Gaucho** 32:4,13,17

**general** 5:14 20:18 65:22 67:14,24 69:12,15 93:10 114:7

**generally** 15:7 17:10 66:16 75:17 83:10 95:16 107:15

**Gerber** 102:7,8

**gestures** 8:19

**give** 12:25 40:21 78:5

**glass** 52:8

**goal** 18:17

**Goju** 12:24,25 13:10, 12,21,25 14:5,20 15:5,10,14 16:3,11, 12 17:11,12,17 22:8, 9 105:5 106:7

**Goju-ryu** 12:22,23 13:4

**good** 5:11 65:7 79:22 97:20 106:20,21,23

**Google** 113:5

**Googles** 49:13

**grab** 62:10 77:12

**grabbing** 77:19

**grappling** 13:8

**grasped** 64:2 76:9

**grasping** 76:5 82:23

**grasps** 76:16

**great** 66:1 68:8

**Greco-roman** 24:4

**grip** 76:9

**grips** 61:20 62:1 63:2

**group** 28:17

**groups** 65:8 115:4

**guess** 9:5 35:22 48:20 58:24

**gun** 41:2,10 66:15,22, 24 67:1 68:4 77:9, 11,13,19,25 78:5,13, 16 86:8 103:24

**guns** 21:15 62:15 66:16 67:6,9 68:8 79:20

**gunsmithing** 40:12, 13

**gym** 22:3 23:4,5,8,9, 12,23 24:2

**gyms** 23:17 24:3,5, 11,21

H

**half** 60:23 95:8

**hand** 8:19,21 26:2,3 42:17 52:21 55:1,6 61:20 62:11 74:13 75:18 76:16,22 80:8 82:21 85:12,22 91:14 92:7 116:5

**hand-locking** 38:25

**hand-to-hand** 102:16 104:25 105:13

**handgun** 109:3,5,18, 25

**handguns** 102:13 108:25

**handle** 55:11 62:10, 19,20 63:11,22 64:1, 10 75:19 76:5 77:12, 19 79:2 80:12 82:23 86:13

**handled** 64:11

**handles** 62:9,17,24 63:4,17

**hands** 9:1 35:14 100:16 107:21

**hands-on** 35:16 36:25 83:22

**happen** 82:22 91:19 92:7,8,11

**happened** 8:20 58:23 112:13 113:20

**hard** 72:8 73:6,11

**harm** 113:25 114:14

**Hats** 27:21

**head** 20:3 38:2

**heading** 14:24

**hear** 99:3 105:23

**heard** 66:22,24 100:3 102:7

**heavily** 14:7 26:3

**held** 75:13

**helps** 8:14,15

**HEMA** 21:2,3,8 25:25 26:14,16,19

**Henderson** 80:22

**hesitant** 107:16

**high** 17:13,15 93:1

**high-priced** 63:3

**higher** 63:1 64:23 67:23 70:11,16 91:7 113:25

**highlight** 9:23 10:14 20:1 114:4

**Highlighted** 102:23

**highly** 67:16 86:23

**hip** 78:2

**historian** 19:17 35:22 39:4 52:11

**historical** 21:4 26:1, 13 27:9 28:5 46:4,9, 24

**Historically** 38:23

**history** 25:22,23 27:8,11 28:2,14,16, 17,19,20 29:25 45:25 46:11

**hit** 72:14 78:9

**Hmm** 95:4

**hobbies** 24:24

**hold** 59:23 76:11 79:2 107:9

**holding** 76:17 79:7

**holster** 77:20

**honest** 14:21 47:21

**honestly** 59:3

**hope** 70:10

**horrifically** 60:25

**hour** 6:3

**housekeeping** 6:4

**human** 42:7

**hunt** 97:23

**hunter** 100:21

**hunting** 96:3,23 97:22,24 98:13 99:4, 8,10

**hurl** 106:1

**hybrid** 21:1,9 23:15 24:3,10,16

I

**ice** 34:4,11

**idea** 67:7

**ideal** 95:17,19

**identical** 44:21 45:3,4

**identified** 11:1 12:12 64:16

**identify** 64:14

**ignite** 69:5

**II** 13:7

**immediately** 62:7

**immersion** 65:13

**impact** 14:14 25:13 28:5,9,19 29:18 33:1 35:7 104:2

**impede** 102:14

**implements** 104:15

**implied** 47:8

**implies** 56:9

**impossible** 69:8

**improvised** 34:11,14

**in-person** 52:24

**inadvertently** 85:21 93:19 94:20 95:3,13

**inarguable** 92:2,10

**inaudible** 8:22 15:1 42:3 89:13 105:22

**incapable** 107:4

**inches** 116:11

**incident** 48:17 71:17

**incidentally** 28:12

**incidents** 67:11 113:6

**include** 28:21 30:25 49:19 103:16 104:2, 18

**included** 46:13 64:12 74:24 75:1

**including** 17:12 29:9 34:25 35:6 46:3 48:19 61:10,11 71:1 97:4 103:11 107:25 108:4 113:13

**income** 25:6

**incorporate** 18:1

**incorporated** 86:13

**increase** 87:13,24 89:21,22 90:4,5

**increases** 66:11 88:8, 19 89:2,18 90:1,7 92:3

**indecipherable** 35:3 43:5 63:12 66:2 76:4 88:22 109:13 115:11

**indigenous** 13:4

**individual** 57:17 72:17 75:9 77:12 86:23 93:6 103:19

**individuals** 24:12

**infamous** 46:16

**informal** 19:18

**information** 12:8

**Ingenuity** 25:23 27:11 29:16 30:19 31:11,17 32:4

**inherently** 46:3

**initial** 68:15

**initiated** 56:11

**Injunctive** 10:1

**innumerable** 47:4 48:9

**inserted** 75:18

**inside** 55:11 62:7 75:23 80:8,12 92:4

**inspire** 14:14

**instance** 19:5 34:23 35:6 36:21 46:15 48:14 64:5 67:19 69:10 100:5 101:7, 17 105:22 106:1

**instances** 16:5 48:9 67:18

**instruction** 7:24

**instructions** 19:20

**instructor** 16:4,6 19:4,6 24:22 26:19 38:1,2 60:23

**instructors** 13:16 18:25 20:3 115:12, 13

**instructs** 66:3

**instruments** 25:16

**integrity** 59:22 61:3,4

**intel** 29:6

**intended** 110:14

**intense** 112:25

**interested** 34:22 65:15

**interesting** 24:6 32:1

**interests** 24:24

**intermediate** 21:24 22:16

**internal** 57:24 58:12, 16

**internally** 42:11

**International** 18:6,7,9 19:7

**Internet** 49:1 115:9

**interpretation** 82:17

**interrupt** 79:18

**interrupted** 80:10,19 81:16

**intimidating** 47:20,23 52:12

**introduce** 10:9 44:1 51:18 71:9

**introducing** 11:5

**introduction** 11:3 17:15 47:11,13

**involve** 24:12 32:14 104:21 105:18 106:2

**involved** 6:7 64:23

**involving** 27:18

**Israeli** 19:2 21:13

**issue** 58:16 60:24

**issued** 101:15,18,19, 24

**Italian** 34:25 35:7 47:12 61:11

**Italian-style** 81:2,4

**item** 34:9 68:18

**items** 46:23 64:5 69:12 104:18

J

**James** 47:14

**Janus** 101:18

**Janusch** 48:16 50:24

**Japan** 13:3 24:6

**Japanese** 13:6 17:8

**Jiu-jitsu** 21:1,9 22:5, 17,18,22,25 23:3,6, 8,9,12 105:10 106:7

**job** 27:3

**John** 5:12

**judo** 24:6

**jumped** 47:17

**Jungle** 47:16

**K**

**K-A-B-U-D-O** 14:11

**kabudo** 14:11

**kama** 14:15 15:16

**karate** 12:22,23,24 13:1,2,10,12,25 14:2,11,20 15:5,10, 14 16:3,7,11,12 17:11,12,17 19:3 105:5 106:7

**Katrina's** 116:23

**key** 29:5

**kick** 82:2

**kicking** 13:12

**kill** 110:3

**kind** 14:8 16:2 19:12 26:4,15 27:1 29:9,25 32:6 33:7 38:22,24 41:3 48:23 61:8 62:9 65:25 68:4 85:8 93:4 97:15 98:6 103:25 104:22

**kinds** 29:9,18 35:5

36:7 61:10 62:12,16, 21 70:12

**kingdoms** 46:17

**kitchen** 110:18 111:3, 8

**knife** 5:13 30:20,21 31:4 32:3,4,8,18 34:18 36:16,23,24, 25 37:2,6,11,13,14 38:19,24 39:1,5,7, 19,23 40:1,20 41:3, 17,25 42:1,8,9,12, 13,15,19,20,22,23, 24 43:2 44:3,6,7,9 45:7,14,15 49:16 50:7 54:25 55:6,14 56:1,3,8,9,25 57:14 58:14,17,18,20,23 59:3,4,9,12,22,23 60:22 61:1,3,12 62:5,19 63:12 64:9 65:25 68:1,10 70:11 71:10,15,17 72:8,19 73:4,9,24,25 74:3, 14,18 75:12,17 76:3, 5,11,12,18,22,25 77:2 79:2,3,8 80:21 81:17 82:3,10,15,18, 22 83:1,6,13 84:7,8, 11,19,22 85:7,8,10, 23,25 86:4 87:12 88:1,10 90:17,23 91:1,15 92:6,11 93:2,4,6,7,10 94:23 95:8,9 97:15 99:3,4, 8,18,20 100:3,9,11, 14,15,17,18,20,21 101:13 102:7,9 103:5,6,13 106:1,2 107:1,2,12 108:22 109:3,18,25 110:3,4, 8,13,18,22 111:3,8,9 112:7 113:5 114:6,8, 12,13 115:1,5,13

116:3

**knives** 16:25 17:6,10, 14 19:21 20:15 21:15 25:12,17 27:1 28:11 30:20,22 31:1, 18,23 32:6,11,13,17 33:5,8 34:15,25 35:6 36:3,8,24 37:1,18,21 38:11,14,23 41:8,13 42:2 44:13,19,20 45:2,6,10 46:20 47:11 48:4 51:8 53:22 54:4,5,7,8,11, 12,14,15,17,18 55:10,19 56:12,13, 14,16,19,22,24 57:3 58:25 59:14,17 60:6, 8,9,11,14,17,20 61:10 62:1,3,9,12, 15,22,23 63:3,4,10, 12,15,18 64:2,12 65:21 70:3,15 71:23 72:3,4 74:23,25 75:2,14,16 79:9,11 80:23 81:19 83:6,9 85:20 86:12 92:20, 23 95:22 96:5,8,13, 17 97:4 98:4,6,9,20 99:13,15 100:24 101:6,10,24 102:4,5, 8 103:8,11 107:25 108:4,5,7,14,24 111:15,18,23 112:2, 18,20 113:10,12 114:7 116:8,11,24

**knives...simple** 73:17

**knock** 74:8

**knowledge** 12:10 18:1 35:19 53:18 54:20 63:15 65:14 67:13,24 68:23 101:4 116:10

**Kobudo** 16:14,24

17:20 19:3 22:10

**Krav** 19:2 21:1,9,17, 23 22:14,16 106:7

**Krav-maga** 21:13

**Kubudo** 17:25 18:2 22:8

**kwon** 13:11 106:7

**L**

**L-SHAPED** 14:14

**language** 114:4

**large** 28:18 29:13

**larger** 18:20

**late** 47:4

**latest** 36:22

**Latin** 32:8 39:10

**law** 20:4,8,12,14,17 116:3,17,22

**lawful** 98:5,15

**lawfully** 98:7,9

**layer** 87:10

**leading** 20:3

**learn** 18:23

**learned** 26:20

**learning** 21:20

**left** 76:4

**legal** 38:14 53:19 115:23 116:1,14,15

**legendary** 40:25

**length** 116:11

**length-wise** 76:2

**level** 17:13,15 21:23 22:13,17 77:25

**levels** 21:17

**lies** 107:3

**lifetime** 36:8

**likes** 96:23

**limit** 34:6

**lines** 109:7

**link** 57:14 71:11 72:6, 11 73:15

**links** 51:13 70:21 74:22

**list** 70:20 94:25 104:16

**listed** 15:18 42:3

**listen** 72:14

**live** 18:12 26:10

**lock** 42:4 82:6 83:6, 13 84:7,14 85:16 86:14,24 93:22

**locked** 42:6,16 82:11 83:1,17 84:22

**locking** 82:13,19

**locks** 16:1 43:19 82:15 83:10

**logo** 45:13

**long** 8:1,3 14:23 15:4, 6 22:12 25:19 63:25 64:6,9 65:5,8 102:2

**longer** 73:11

**longest** 14:5

**lot** 8:12 15:15 18:19 36:24 60:10,12,13, 16,19 61:25 62:8,12 64:4 85:3 106:19

**low** 60:8

**lower** 62:16,25

**lubricant** 72:19,23,25 73:9

**M**

**machine** 41:10 65:25

**Madam** 109:6

**made** 60:11,13,17 95:5

**Maga** 19:2 21:1,9,17, 23 22:14,16 106:7

**magically** 91:6

**main** 14:4,18 39:14 54:15

**major** 13:5

**majority** 115:24

**make** 8:5 20:1 21:18 30:9 49:16 59:2 60:21

**makes** 43:13 65:24 68:19 75:5 101:12, 13

**making** 65:4

**malfunction** 57:24 58:12,16 59:9

**malfunctioning** 71:19 72:4

**man** 50:19 113:5

**manager** 26:23

**manner** 54:21 79:3

**manual** 41:25 42:12, 22,25 44:7 45:8,14 55:14,19 56:9 59:3,4 71:23 72:4 88:14 95:6 100:15,16

**manually** 38:25 42:3, 15 50:6 56:11 59:17 60:13 82:9 83:5 84:11,19 85:6 88:1,9 90:23 95:9 100:14

**manually-opening** 62:23

**manufacture** 82:3

**manufactured** 52:15

**manufacturer** 37:18 62:5

**manufacturing** 37:6, 15,16 40:10

**marked** 9:18 10:11 11:6 43:24 51:22 71:8 73:18 99:11 117:6

**market** 64:4

**marketed** 99:9,23 100:7

**marketing** 100:1,9

**Marlon** 47:14

**martial** 13:21 14:4 15:7,25 16:15,21 18:19,23 19:2 20:22, 25 21:4,5,9,13 22:1, 3,7 23:4,17,23 24:23 25:2 26:1,13 28:19 35:21 39:6 60:4 63:25 65:5 76:8 104:24 105:7,13,16, 18 106:6,12,17,20, 21,23 107:9 108:19, 20 109:17 115:12

**materials** 7:25

**matter** 5:18 6:19 11:1,17 12:12 46:24 83:24 113:4

**matters** 115:3

**meaning** 111:1

**means** 7:15 80:11,19 82:20

**measures** 6:4 106:13

**meatier** 62:11

**meaty** 63:11

**mechanical** 55:13,20, 21,22,25 56:13,16, 20,23,25 57:4 58:7 64:24 65:18,22,24 66:8,11,17,22,24 67:2,9,15,22 68:10 69:13,17 70:1,5,14 72:18,22 73:1 92:10

**mechanism** 43:1 56:8 67:17 68:16 81:14 82:2 87:6

**mechanisms** 42:9

**member** 18:5,22 65:7

**memorization** 15:17

**memorized** 51:14 57:12 74:25 102:9

**memory** 7:21 32:3

**menacing** 47:23

**mental** 31:12 107:3

**mention** 31:14 34:8 38:18 39:13 80:18 82:5

**mentioned** 16:13 23:14 25:8 27:6 36:2 46:10 47:25 49:23 66:15 76:12 82:4 104:17

**mentioning** 102:10

**met** 52:24

**metal** 14:12,13

**method** 26:14 79:14, 15

**militaries** 100:23 102:3,5

**military** 13:5,6 19:2 20:5,9,12,15,18 21:13 64:2 101:5,10, 15,21,24,25

**mind** 33:18,19

**minds** 46:20

**mine** 26:18

**miniature** 29:8

**minutes** 33:21 45:16 49:1,15 113:5

**misalignment** 71:1

**misidentified** 49:16

**mispronouncing** 12:22

**misspeak** 39:17

**misstate** 94:12

**misstated** 92:17

**misstates** 94:9

**mistake** 31:12 51:3

**mixed** 22:2 23:4

**model** 102:9,10

**models** 45:2 62:25 63:1

**modern** 22:10 23:17 29:9 32:18,22,23 41:12 52:7 65:18 69:9 81:19

**moment** 54:19 100:8 110:10

**moments** 85:11

**monkey** 29:4

**morning** 5:11

**motor** 87:11

**move** 41:7,23 68:19 84:13 114:16

**moveable** 69:13

**moved** 31:13

**movement** 15:17

**movies** 30:18 47:13 48:1

**moving** 15:22 41:9,15 67:22,23 70:25 73:1

**multiple** 24:2 41:9 55:13,19,22,25 56:13,16,19,23,25 74:24 75:1 78:22 107:1

**N**

**N-A-V-A-J-A** 38:19

**nail-like** 64:10

**nails** 64:6

**name's** 5:12

**named** 26:24 50:19 106:9

**nanchaku** 14:17

**national** 101:5

**nature** 46:14 103:1 108:1,8,15 110:12, 18,20,23 111:13,15

**Navaja** 38:19,21 39:2, 4 46:22 47:6 53:3, 15,18

**Navajas** 46:10

**needed** 58:20 59:4 83:2 89:8

**nefarious** 46:20 47:2 52:11

**news** 49:20 91:24

**newspaper** 47:4

**ninijitsu** 19:3

**noir** 27:21

**non-** 103:16

**non-firearm** 35:6

**note** 7:11

**notes** 7:11 45:17

**Notice** 10:18 11:1

**noticed** 62:8

**noun** 50:25 51:2

**nowadays** 24:5 29:5

**number** 5:14 8:21 47:25 56:18 70:21 77:5 88:14 90:1,4

**numbers** 74:25 92:14

**nunchaku** 34:3

**nunchucks** 14:17

**O**

**oath** 6:24,25 7:5 22:16

**object** 7:23 41:5 54:25 64:10 97:19 104:19

**objecting** 79:19

**objection** 35:25 40:17 41:21 43:6 44:15,22 55:15 61:16 66:18 67:3 68:2,11,25 70:7 71:25 77:14 78:18 81:22 84:15,24 87:7, 16 88:2,21 89:3,24 90:19 92:17 94:9 95:25 96:19 98:10 99:5 103:3,21 104:10 105:2 106:14 107:17 109:1,20 110:16 112:3 116:15

**objective** 75:15

**objects** 28:14

**obscure** 29:16

**observed** 107:2

**obtained** 22:25

**occupied** 13:7

**occurred** 52:13

**odd** 27:9

**odds** 92:3

**offensive** 17:4 107:25 110:12,19,22 111:14,15,18 112:7

**offensively** 111:25

**offer** 48:22

**offered** 19:5 24:20

**official** 19:13,16 24:4, 15

**officially** 19:19 38:1

**offline** 15:2

**Okinawa** 13:2,4,6

**Okinawan** 13:18 15:16

**Okinawan-japanese** 16:14

**Oklahoma** 18:12

**older** 40:25

**one's** 85:21

**one-hand** 100:16

**online** 36:11 52:20 71:22 113:20 115:3

**open** 42:16,20,23 58:18 76:23,25 80:6 81:20 83:7,17 84:7, 14,22 90:17,23 91:2 92:23 93:2,10 94:8 95:2 97:12 100:16

**opened** 93:19 94:16, 21,22 95:1,13

**opening** 42:13,19 44:7,9 50:6 54:7 56:8,22,24 58:17 59:17 60:14 70:15 71:23 74:3,4,8 80:10,19 81:12,13 83:5,9,10 84:11,19 85:6,10,20,21 88:1,9 90:14 91:1,10 92:4,5 93:5 94:2 95:22 96:12,16 98:4,9,20 99:4,8 100:15,16,17

**opens** 74:15 82:15,18 91:6

**operable** 75:20

**operate** 67:20 88:8

**operated** 91:12 94:18

**operating** 56:7 75:11 82:9 92:20

**operation** 80:11 85:13 87:11 95:6

**Operational** 59:2

**operations** 88:15 91:14

**operator** 42:5

**opinion** 41:17,24 42:25 43:1 44:12 46:18 52:11 57:21 58:5 60:2 63:25 64:7 69:16 70:16 74:15, 18 75:13 76:8 79:13, 21 84:1,12,21 87:4, 23 89:17 90:8,22 95:16 105:20,25 106:10,12 107:9 108:7,20 109:5,16 110:22 111:16 112:14,18 114:5 115:4,14,15

**opponents** 13:9

**opportunity** 70:10

**opposed** 34:14 103:19

**opposition** 83:14

**order** 55:2,5 76:23 78:12 102:16,17

**organization** 18:10

**organizations** 18:19, 20

**organize** 45:16

**oriented** 76:13,15

**original** 22:8 41:4

**originally** 13:3

**OTF** 53:24 73:17 75:2

**outdoor** 98:3 99:9

**overarching** 28:23

**overbroad** 90:19,20 96:19 104:10 109:1 115:25

**overlapping** 43:5 88:22 115:11

**overlooked** 29:18

**owner** 40:6 66:15 67:25 68:22 93:6

**owning** 92:20

**P**

**p.m.** 5:3 117:7

**packs** 29:13

**Pages** 70:19

**paid** 6:1 17:21,22 25:1,5 27:23

**pair** 14:17

**pandemic** 15:11

**paper** 74:6,16

**papers** 27:17

**paperwork** 6:14

**paragraph** 34:10 38:18 39:18,22,25 45:24,25 50:18,22 53:3,21 54:23 55:9 57:6,10 64:19,22 70:19 75:4 79:24 80:3,4,25 82:5 85:14 86:19 90:12 93:21, 25 102:12,23 103:9 106:25 107:23 112:9,24 114:3,18

**paraphrasing** 34:2

**paratrooper** 101:18

**part** 13:3,7,18 17:14 42:12 43:16 48:22 67:22 70:24 73:1

**participate** 24:11

**partner** 15:22

**parts** 41:9,15,18 55:14,20,22,25 56:13,17,20,23,25 57:3,4 58:7 67:23,25 68:10 69:13 70:25

**past** 59:11

**pattern** 47:9

**paying** 22:12

**payroll** 25:5

**PC** 7:17

**penalty** 11:25

**people** 22:19,20 26:9 46:21 47:20 63:6 64:7 65:10 97:11,14 107:15 110:3 113:6, 20 114:6 115:1

**pepper** 67:14,18 102:13 104:7

**perfectly** 86:4 88:18

**performing** 15:22

**period** 28:20

**perjury** 11:25

**permitted** 8:8

**person** 75:6 107:19 114:11

**personal** 24:24

**personally** 79:11

**ph** 29:8 48:16

**phrase** 97:5

**phrasing** 110:1

**physically** 13:22 41:5 92:2

**picks** 34:4,11

**picture** 44:2,6 99:13

**pictures** 71:18 75:16

**piece** 57:21 60:2,24 74:16

**place** 42:5 43:19 55:6 68:17 78:7 82:11,15, 18,19 83:1,11 84:13

**places** 7:5

**plain** 104:20

**plaintiff's** 9:16 10:10 11:5 12:15 43:24 44:1,24 45:21 51:18 71:9 73:15 99:12

**plaintiffs** 5:13

**play** 52:1 72:14

**played** 52:3 72:16

**plays** 48:1

**plenty** 64:11

**pocket** 29:12,13 31:17 63:12,19,20 75:12,18,23 76:13, 15 77:2 79:7 85:21 90:18 91:2 92:4,6,23 93:3,5,10 114:9

**pocketknives** 111:13

**pockets** 90:24

**point** 52:9 60:8 63:1 70:9 72:23 73:11 95:11 99:12

**points** 62:16 95:5

**police** 14:15 48:23 49:4 53:10,13 91:22 113:22

**poor** 52:10 60:25 107:20 114:21 115:5

**poorly** 64:8,11

**pop-up** 10:15

**popular** 28:3 47:17 65:9

**popularity** 23:19

**pose** 91:9 93:14

**posed** 94:14

**position** 42:17 75:19 76:17 84:22

**positioning** 15:17

**possess** 115:24

**possibility** 66:11 69:25 70:5 92:10

**Possibly** 77:22,24

**potential** 35:20 69:17

**poured** 31:8

**practice** 16:13,24 21:1,15 22:22 23:15 24:10,18,23 25:1 26:1,11

**practiced** 21:5 114:15

**practicing** 26:7

**praised** 32:25

**pre-arranged** 15:15

**precarious** 79:3,6

**precedents** 46:10

**precursor** 46:4,15

**prefer** 79:11 100:24 101:11 102:4 103:13

**preference** 46:1,8

**preferred** 47:7 101:17

**prefers** 101:6,10

**preparation** 92:6

**preparatory** 55:1

**prepare** 14:22

**prepared** 10:25 12:11

**present** 18:25 45:14 49:22 75:17 85:23, 25 94:1

**presentation** 19:14

**presented** 7:13 34:23 60:9

**press** 72:8 73:7,12

**pressed** 80:14 92:15

**pressing** 75:22

**pressure** 91:4

**pretty** 29:3 32:1 40:24

**prevalent** 82:2 115:15

**prevent** 73:2 85:20 86:9 93:15 94:16

**previous** 30:13

**price** 60:8 62:16 63:1

**price-point** 62:25

**primarily** 14:10 39:9

**primary** 28:13 101:12

**prior** 47:11 92:18

**prison** 34:4,11

**pro-knife** 58:6

**problem** 74:3,23 75:2 80:10,18 81:12,18 102:11

**problems** 39:14 72:3, 4 73:16 95:7

**proceeding** 38:14

**process** 17:17 78:16 80:11,20 81:12 82:13 91:5

**produce** 9:16 10:19

**professional** 17:19, 21 22:3,20 26:19,23 37:17,20,23 38:4 40:7 69:16

**professional-made** 34:14

**professionally** 25:1 34:10 38:1

**program** 38:3

**project** 26:23 31:13 104:18

**projectile** 103:20,24 104:21 106:3

**projectile-style** 104:8

**projecting** 78:15 103:17

**projects** 35:20

**pronounce** 48:15

**propel** 42:16 80:7

**proper** 13:2 15:16 76:17 112:10

**properly** 66:1,2 73:6 78:22

**proposed** 101:7

**protected** 91:12

**protective** 26:8

**proven** 79:13

**provide** 9:7 19:20 40:14

**provided** 6:19 20:11 101:18

**providing** 9:6 20:5

**public** 26:24 93:10

**publication** 27:20

**publications** 16:10 17:24 25:11 33:13 37:2,5,8 48:23

**publish** 17:23

**published** 27:14 33:7,10,12 36:17

**pull** 33:16 34:5 47:15 64:18 68:18 78:12 102:18 111:7 112:23

**pulled** 9:12

**pulling** 69:6 74:12 103:19

**punishment** 15:19

**purchase** 114:6 115:24

**purchased** 65:10 114:8

**purple** 22:6,23 23:5, 7,11

**purpose** 97:15 99:8

**purposeful** 110:22

**purposes** 95:17,23 96:3,6 97:16,22 99:4 115:6

**push** 91:6

**pushes** 42:5

**pushing** 81:14 82:2, 13

**put** 8:20 11:22 25:25 28:18 43:14 75:19 79:19 110:25 111:1 114:9

**puts** 30:11

**putting** 74:19

**Q**

**qualifications** 40:8

**quality** 60:23,25

**quantitative** 115:6

**quarter** 22:1 103:1

**quarterly** 18:17

**question** 8:20 28:8 41:23 43:8 44:17,18 48:20 55:17 66:19 67:5,8 68:13 85:1 87:17 88:13,24 89:12,15 96:21 98:24 104:13 116:7, 20

**questioning** 79:20

**questionnaire** 64:14, 17 65:12

**questions** 5:16 7:21 8:12,14 115:22 116:5

**quibble** 110:1

**quick** 25:25 33:19

**quickly** 49:17 86:24

**quote/unquote** 47:2 68:18 112:1

**R**

**raise** 77:25

**random** 115:13

**rang** 62:14

**ranging** 25:15

**rank** 26:12

**ranks** 26:15

**rare** 30:4

**Ray** 50:19 51:19 52:19

**razor** 30:10,16,17 31:3 34:17 47:2,3 49:24,25 50:1,2,3 51:1,3,7,10,23 53:4, 15,19 114:15

**razor-sharp** 14:16

**razors** 31:7,10 46:22, 23 50:16 51:2,6,9 52:15

**reach** 21:23 75:14 91:13

**reached** 92:6

**reaching** 91:16

**read** 7:12 9:19,25 10:16 11:9 21:6 31:25 67:19 80:2 109:6,8

**reading** 101:4,25 102:1 113:12

**ready** 55:2 116:21

**real** 25:25 41:2 61:21 107:18 113:6

**realize** 31:13

**reason** 46:17,18 62:4

**reasons** 64:14 71:1

**rebuttal** 7:16 48:14 101:8

**recall** 39:15 50:20 59:24 61:22 74:1 75:7 79:3 84:9 85:17

**receive** 14:19 29:6

**received** 15:11

**recent** 48:19

**Recess** 33:23

**recited** 75:1

**recognized** 81:2

**recollection** 8:1 9:7

**record** 5:21 43:23 45:17,18,19 46:24 79:19 109:7,8 113:11 115:20 117:5

**records** 113:22

**recreated** 49:12

**recreation** 96:10 98:2,3,14

**recreational** 116:8,10

**refer** 7:18,25 12:14, 15 35:23 50:12,22

**reference** 35:10 38:16 50:9,15,18 57:6,9 61:2 71:5 84:4 88:17 97:9

**referencing** 35:24 52:4 81:5

**referred** 100:20

**referring** 8:4 23:1 30:14 33:1,4 62:17 80:20,21,25 85:19 106:6 108:5 114:1

**refresh** 7:25

**regard** 17:10

**regarded** 114:21

**regular** 18:10

**REILLEY** 33:18 80:15 115:25

**REILLY** 33:22 98:17, 21 100:4

**reinforce** 64:3

**reinserting** 80:12

**related** 27:16 53:13

**relevant** 80:24

**reliability** 40:25

**reliable** 41:2 69:9 79:14

**reliably** 85:4

**Relief** 10:2

**reloading** 80:13

**remember** 80:15

**remind** 6:23

**remote** 7:10

**remotely** 7:4

**remove** 55:7 77:20

**repair** 59:4,10 71:11

**repaired** 58:20 59:5, 13 71:18 74:17

**repairing** 74:18

**repeat** 8:24 44:18 55:18 67:8 84:18 105:24

**repeatedly** 58:6

**repeats** 47:9

**rephrase** 89:15 106:11 108:13 110:17 111:2

**replaced** 50:2

**report** 5:17 6:19 11:11,15,16 12:3,6,

9,12,16,20 19:23,24 20:21 23:14 32:24 33:25 35:11,17 36:5 38:16,18 39:13 45:21 46:1 48:22,25 49:20,21 50:18 51:12 52:5 53:3,21 54:23 57:6 58:3 61:7 64:18,19 66:10 70:17 75:4 79:23,24 82:5 85:14 86:18 90:12 94:6,24,25 100:23 102:12,19,21 106:25 107:23 112:9,23 114:18

**reporter** 8:15,22,24 9:3 13:19 18:8 25:18 35:1 41:20 43:20,23 59:7 66:3 85:24 105:23 109:6 115:20 116:19

**reports** 48:23 49:3,19 53:10,11,13 91:22, 24 113:22

**reputation** 52:12

**Request** 10:19

**require** 21:24 79:2 81:21 85:2 89:14 90:9 94:7 102:16

**required** 75:10 88:15 89:6 90:1,5 100:16

**requirements** 15:13

**requires** 55:1 72:22

**research** 17:19 27:17 28:5,7 30:5 32:25 33:1,4,10 34:1,16 45:25 47:22 48:18 102:2 112:14

**researching** 34:21

**reset** 80:11,20 81:21

**respond** 7:21

**responses** 9:6

**restart** 81:12

**restarted** 80:12

**restate** 94:13

**restrict** 46:13

**results** 61:14

**retained** 5:23

**review** 107:18

**reviewed** 10:6,22

**reviewing** 45:11 97:16

**revolver** 28:3 40:2,21 41:11 43:3 44:14

**revolvers** 40:24 68:5, 9

**rifle** 41:11

**Rights** 5:13

**ring** 62:7

**risk** 67:23 91:7 93:4,5

**Rob** 5:13

**Robert** 5:5,22 10:18 11:11 23:21 70:8 72:1 77:16 80:15 85:1 87:8 88:12 89:25 90:21 116:7

**robust** 63:11 64:1

**role** 6:12,20

**room** 7:7 8:9 82:16

**roughly** 25:13

**routines** 15:16

**ruined** 35:3

**rule** 62:14

**rules** 7:6

**run** 38:2 49:11

**running** 14:5

**rushed** 91:16

**rust** 71:1

**S**

**S-A-N** 13:23

**SACRAMENTO** 5:2

**safe** 21:21

**safely** 86:24,25 102:16,17

**safeties** 86:13 89:14, 15

**safety** 50:2 77:22 85:16,19 86:3,5,8, 14,16,24 87:6,24 88:7,18,19 89:1,6,7, 17 90:9 93:15,22 94:7,15 95:2,6,12,14

**sai** 14:12

**salary** 25:5

**San** 13:17,23

**saps** 25:21 27:7 28:10,22 29:8 34:2 104:3

**scenarios** 80:9

**scholar** 65:6

**scholars** 32:25

**school** 24:15 60:5

**schools** 14:3

**science** 34:24

**scope** 66:18 67:3 77:14 78:18 79:21 88:21 103:21

**Scotland** 50:14

**screen** 9:13,20 10:12 11:7 19:23 44:25 99:14

**scroll** 11:19

**search** 49:5,7

**searched** 49:9

**second's** 21:24

**secondary** 22:10

**seconds** 52:2 72:15

**section** 11:18 39:18 51:1,7 112:20 113:12

**secure** 84:2

**seek** 64:14

**select** 46:8

**self-defense** 19:21 20:18 33:14 37:24 39:20 64:8,25 69:20, 21,24 70:1,4 75:6 79:10,12 84:8,12,20, 23 85:4 86:14 87:1,5 89:1,2,8,9,13,18 95:17,19,23 97:18, 20 101:1 103:14 104:8,15 106:13,18, 22,23 107:1,13,16, 19 109:13 110:11 112:21 113:1,17,21 114:21

**sell** 63:5

**seminars** 18:11,15,18 19:9,11,15 20:4

**senior** 18:22

**sensai** 14:5,6,22 18:21 22:8

**sense** 40:6,24 42:2 65:7,24

**sentence** 20:2 80:2,4 112:24

**separate** 16:15

**sequence** 68:17

**sequential** 43:12

**series** 71:18

**seventh** 74:22

**shaft** 64:10

**shanks** 34:4,7,11,13

**share** 43:25 73:14 79:23 86:18

**shared** 9:13

**sharing** 19:23

**sharp** 31:4 114:15

**shaving** 30:17 52:16, 17

**sheath** 55:7

**shivs** 34:4,8,12,13

**shoddy** 71:2

**shooting** 27:20 78:2 103:20 104:17

**shootings** 69:11

**shorter** 116:11

**shots** 29:7 34:2 104:4

**show** 15:21 36:13 60:8 113:20

**showing** 15:16 36:25 47:3 74:3

**shown** 19:17

**shows** 46:1

**shut** 7:22

**sickle** 36:23

**sickles** 14:16

**side** 75:17 76:2,9,21 81:20

**signature** 11:22

**similar** 39:2 41:12 44:13 68:20 74:22 78:16

**Similarly** 78:21

**simple** 41:1 60:23 67:17 74:11

**simplification** 95:4

**simply** 114:9

**single** 71:17 73:8 113:5

**single-edge** 80:5

**sit** 36:10

**sites** 78:5,7,9

**situation** 24:18 63:23,24 69:20,21, 24 70:1,4 84:8,12, 20,23 85:4 86:14 87:1 89:2 91:16 113:1,8

**situations** 61:21 107:19

**sixth** 74:21

**size** 29:13

**sizeable** 64:1

**skill** 15:15 23:6 87:11 107:20

**skills** 18:23 102:16

**skip** 15:23

**slice** 36:8

**slick** 62:9

**slip** 63:20

**slippery** 61:21

**slow** 23:21 35:4 80:15

**slower** 13:20 66:4

**slung** 29:7 34:2 104:4

**slungshots** 25:21 27:8,9 28:11,22

**small** 29:12 34:7,10 41:15 58:7 75:16 87:11 101:20

**small-edged** 34:3

**smaller** 111:17

**snob-nose** 28:2

**sold** 81:3

**solid** 41:5 54:25 74:7

**someone's** 90:18

**sort** 22:21 24:11 27:21 104:18,21

**sounds** 7:15

**source** 49:21 58:6 62:7

**sources** 47:6

**South** 32:9 39:9

**Southern** 9:21

**Spain** 39:11 46:10

**Spain's** 39:11

**Spanish** 38:22

**spar** 26:9

**spare** 49:2

**sparring** 24:11

**speak** 19:15 66:4

**speakers** 43:5 88:22 115:11

**speaking** 8:14 66:16 95:16 112:20

**speaks** 13:19 35:1 43:23 66:3 115:20

**specialist** 35:21

**speciality** 13:15

**specialize** 13:25 21:10

**specialized** 22:11

**specialties** 13:11,12

**specialty** 19:4

**specific** 13:16 25:14 29:23 33:4 35:18 107:10

**specifically** 7:20 17:9 25:12 33:5,11 38:10, 24 70:18 80:21 114:1

**speculation** 44:15 71:25 81:23 84:15, 24 98:11,21 99:5 100:4 107:17 116:16

**spells** 112:19

**spike** 64:15

**spikes** 64:6

**splinter** 17:2

**spoke** 48:16 82:12

**spray** 67:14,18 102:13 104:7

**spread** 39:11

**spring** 42:19,23 43:1, 11,16,21 57:24 58:12,16 71:10,19 73:24 74:1 80:13 82:2

**spring-assisted** 56:3 81:1

**stabbing** 35:8

**staff** 14:12

**stand** 13:15 21:3

**standard** 29:10

**standing** 101:9

**started** 14:25 21:19

**starting** 80:2

**state** 5:19,20 12:20 18:12 20:3,21,25 32:24 33:25 40:1 45:24,25 46:18 53:21 54:24 55:9 64:22 66:10 75:4 76:21 79:1 85:14 86:3,21 88:19 90:13 93:17 94:19 99:16 100:23 102:3,12 107:23 109:24 112:10,24 113:11,24 114:20 116:14

**stated** 18:5,10 19:9 37:25 60:2 72:18 82:9 86:7 92:25 94:14 109:10 115:14 116:16,22

**statement** 31:9 34:6 48:3 49:18 52:12 58:2,4,9 61:24 62:7 71:6 94:13 101:9 107:7,8 113:2,4,9,16 116:23

**states** 9:21 29:1,23 32:15 46:13 50:16 57:23 58:1 59:21 61:19 72:21 101:16, 19

**stating** 95:15 102:4 108:14

**statutes** 42:3 46:18 80:24

**steel** 31:4 60:24

**step** 89:6,10

**steps** 75:9 77:5 78:22 89:18,21 90:1,5

**stick** 62:15

**stiletto** 34:25 46:15, 16 47:12 61:11

**Stiletto-style** 35:7

**stilettos** 46:19

**stop** 31:2,21 58:24 75:24

**stopped** 22:2,12

**stored** 90:18

**stories** 47:4 49:11,15, 20

**straight** 31:7,10 34:16 49:24,25 50:3, 15 51:9,10 52:15 53:4,15,19

**street** 28:8 29:7 69:10 112:13

**stretch** 60:12 115:18

**stricken** 46:21

**strictly** 23:25 52:17 102:15

**strike** 39:24 49:10 61:9

**strikes** 16:1

**Striking** 13:8

**string** 60:3

**strong** 63:5 79:13 114:5

**struck** 15:21

**structural** 59:22 61:3, 4

**stud** 45:7

**student** 47:15

**studied** 52:18,24 62:6 67:6 105:5

**studies** 27:17 48:23 58:15 61:4 63:21

**studio** 16:8

**study** 92:9

**studying** 14:25 65:15 102:1

**stun** 67:1,6,9 78:16 103:24

**style** 24:4 47:12 61:11 105:11

**styles** 13:5,6 17:2 34:25 36:3

**stylistic** 17:2

**su** 52:11

**sub-optimal** 75:5

**subduing** 13:9

**subheading** 75:3

**subject** 11:1 12:12 28:13 31:7,14 34:22 65:15 70:19 73:23

**subjection** 114:7

**submissions** 13:9

**submitted** 5:18 6:14 11:16 45:21 48:25

**subscription** 27:19, 24

**substantial** 86:22 90:14 91:9 94:1

**successfully** 66:14 67:20 85:3,13 87:18, 21,25 88:9,20 94:18

**sudden** 84:8 85:4

**suffer** 66:16 67:1,9, 14,22 68:23

**suitable** 63:4

**suited** 64:8

**summarize** 94:24

**summarizing** 94:5

**summer** 21:20

**support** 53:11 71:5 83:21

**supporting** 61:7

**surface** 74:5,7

**surround** 97:24

**surrounding** 110:15

**survival** 112:2

**switch** 35:7

**switchblade** 32:22,23 38:10 39:2,25 42:1,2 46:16 47:10,12,15, 16,17,23 48:17 49:3, 13,14 50:3,25 51:2 53:14 61:5,12 64:23 65:18 71:10 72:8,19 73:6 75:5,10 76:23 79:1 81:1,3,4,6 82:6 83:18 84:8 86:25 87:5,14 93:18 94:20 95:12 97:12,14 103:1

**switchblade's** 86:24

**switchblades** 31:20 33:11 37:8 38:8,12 39:14 46:4,8 48:4, 11,13,21,24 50:23 51:5 52:8 53:7 57:1, 2 58:21,23 59:1 61:11 66:12 78:24 81:9 85:10,15 87:6, 24 88:6 90:13 91:9 92:14,23 93:13 94:1, 7,14 95:1,16 97:17, 21 98:8,19 100:25 101:15 102:15 103:2 107:10,25 108:5 112:15 113:13 114:20 115:4,23

**switches** 91:11

**swords** 26:4,6

**sworn** 5:6 6:24

**synthesis** 24:6

**system** 22:23 26:2,13 50:19

**T**

**T-A-N-T-O** 17:8

**tactical** 64:5

**tactile** 42:6 82:10,14, 20 83:16

**tae** 13:11 106:7

**takes** 49:15 56:10 91:4 114:12

**takes-down** 16:1

**taking** 5:16 21:19 78:22

**talk** 21:8 58:6 65:10

**talked** 81:15 97:17

**talking** 29:11 42:11 58:24 62:18 85:6 93:13

**tanto** 17:8

**target** 78:7,10

**taser** 78:15 103:17,18

**tasers** 102:14 104:8, 17

**taught** 13:5 14:2 17:1,9,10 19:19 24:1,5

**teach** 16:3

**teacher** 14:4 17:1 47:16

**teaches** 18:21

**teaching** 37:23 38:5

**technique** 105:14

**techniques** 38:6

104:25 106:8

**tend** 62:1

**term** 14:10 15:23 27:9 38:19,23 42:10 47:3 65:5 96:25 97:1,3 105:16

**terms** 17:22 28:23 83:22

**test** 22:7,12 23:2 49:12,17 61:14 63:21 65:23 66:1,6,7

**tested** 23:3,9

**testified** 5:6 38:13

**testify** 10:25 12:11

**testifying** 6:25 22:15

**testimony** 49:4 92:18 94:10,12

**testing** 22:2 35:7 36:13,25 65:17,21 83:20,22,23 84:5

**tests** 34:24 35:8,10, 18 36:2,6,9 58:15 61:4,10

**Texas** 18:13

**text** 9:25 10:16 20:1

**theme** 17:16 27:21

**thickness** 63:22

**thin** 61:20 62:24 63:2 64:4,9

**thing** 8:25 16:2 22:21 26:5,15 48:12 63:10

**things** 15:7 18:1 24:1 41:15 49:4 72:19 96:23

**thinking** 6:6 31:5 59:11

**thinner** 62:9

**thinness** 62:18 63:22

**thought** 32:1 39:3 40:23 41:10 60:5 68:15 114:8 115:16

**thoughts** 60:3

**threat** 93:9 102:14,18

**threaten** 111:8

**threshold** 107:3

**threw** 18:16

**throat** 30:10,16 31:3

**throwing** 106:2

**thrown** 104:20

**throws** 16:1

**thumb** 75:20 91:13

**tilted** 26:4

**Tim** 47:7

**time** 9:10 13:20 14:23 22:12 25:24 27:3,12 30:1 46:21 47:1 57:24 58:12,13,19 63:25 65:8,11 66:13 88:4 92:8 102:2 116:5 117:2

**times** 27:19 47:4 62:8 112:13

**title** 9:19,24 10:14,16 11:9 73:5

**titled** 51:23 71:10 73:16

**titles** 25:20

**today** 5:17 29:7 36:10 81:3 82:3 87:4,23 95:16 108:7 117:2

**today's** 41:12 50:2

**tomatoes** 111:4

**tonfa** 14:13

**tool** 52:10

**tools** 47:2 97:3

**Toothpick** 30:23

**top** 44:6 45:7

**Total** 19:12

**tough** 88:7

**toughening** 13:15,22

**track** 74:8,19

**tradition** 47:24 48:8 53:9

**traditional** 16:21

**train** 14:8 26:10,18 114:12

**trained** 14:7 20:22 38:8,10,11 107:21

**training** 18:2 20:5,11, 14,17 21:14,21 37:11,14 57:16 85:3 86:22 112:10 114:9

**trains** 52:22

**trenchants** 14:13

**trigger** 42:8 68:16 69:6 75:21 78:12 91:18 103:20

**triggered** 43:17,18 91:18

**triggering** 68:16 87:12 95:7

**troops** 101:13

**trouble** 114:12

**true** 12:9 49:11 62:7, 14

**truth** 6:24

**turned** 112:10

**twenties** 15:2

**two-handed** 15:25 100:15

**two-man** 15:24

**two-minute** 49:5,7

**two-person** 15:25

**type** 13:10 26:7 35:17 38:23 42:20 55:5 59:1,9 64:13 65:17 67:15,21 77:4 78:15 80:21 81:18,20 90:8 92:9 114:13

**typed** 60:7

**types** 34:18,19 62:1 81:17 94:23 115:5

**typical** 15:24 17:14 54:21 103:6

**typically** 17:7,14

**U**

**U.S.** 13:5,6

**ultra** 112:25

**umbrella** 18:20 38:22

**umbrellas** 54:2

**Umm** 57:22

**Umm-umm** 23:17 32:10 45:23 52:14 73:10 86:20 102:22 114:19

**unable** 80:6

**unarmed** 13:8

**unassisted** 56:7

**uncommon** 30:12

**uncover** 29:16

**underscores** 100:25

**understand** 7:2,8,14 8:17 9:8 12:17 57:2 114:13

**understood** 7:9 46:3 47:1 66:4 99:24 113:25

**unfold** 43:18 80:6

**unfolding** 68:21 76:3, 6,25 77:2 79:1,7 85:8

**unfolds** 31:5 54:21

**unholstering** 77:8,11

**unintelligible** 13:18

**unique** 57:1 58:21,22 62:3 70:15 78:23 85:10,11 92:22 103:2 112:15

**unison** 41:9 43:12 70:25

**United** 9:21 29:1,23 32:14 46:12 50:16 101:16,19

**universal** 89:13 114:25 115:17

**unlawfully** 98:7

**unlike** 81:15 102:13

**unnatural** 79:3

**unofficial** 63:18

**unsuccessful** 90:7, 11

**unusual** 25:24 27:12 29:16 30:1,4 33:2

**upcoming** 31:15

**usage** 49:23 50:9,10

**useless** 74:16

**user** 56:7 69:22,23 75:3,5,21 76:5,16 79:2 88:15 89:7,23 90:2,5,6 112:11

**user's** 80:6,8

**utilitarian** 39:7

**utility** 96:17 112:7

**UYEHARA** 7:23 8:6 23:21 35:25 40:17 41:21 43:6 44:15,22 55:15 61:16 66:18 67:3 68:2,11,25 70:7 71:25 77:14,16 78:18 79:18 81:22 84:15,24 87:7,16 88:2,11,21 89:3,11, 24 90:19 92:17 94:9 95:25 96:19 98:10 99:5 103:3,21 104:10 105:2 106:14 107:17 109:1,20 110:16 112:3 116:7

**V**

**vague** 35:25 40:17 44:22 61:16 68:2,11 70:7 81:22 87:16 88:11 89:3,24 98:17, 22 106:14 109:20,21 110:16 112:3 115:25

**vagueness** 41:21

**variation** 44:8

**variations** 17:2 44:2 99:17 100:11

**varies** 56:18

**variety** 18:23,24 71:1 80:23 104:14

**veracity** 49:18

**verbiage** 34:5 39:16 46:19 93:20 114:2

**verified** 99:1 108:18

**verify** 61:13 99:1 113:3

**versed** 100:9

**version** 90:10

**versions** 41:7

**versus** 5:13 82:2

**video** 35:17 36:16 50:22 51:1,4,11,19 52:3,4 71:20 72:11, 16,17,18 73:5,21,23

**videos** 36:20,25 51:15 71:5,23 72:3 74:22,24 75:1 113:20

**viewing** 11:18

**violent** 53:4

**W**

**walk** 111:7 114:9

**wallop** 29:13

**War** 13:7

**warrant** 60:8

**weak** 73:24 74:1

**weapon** 30:10,12,14 47:7,13,18 52:10 64:1 65:6,7 67:21 75:6 77:4,6 78:23 89:1,7,18,19,22 90:6,8 101:14 103:5, 7,25 104:9 106:3 107:16,20 108:21 109:11,15 110:6,8, 19,21 111:4,9 112:7 113:21

**weapon-types** 19:17

**weaponry** 14:3,12 108:21

**weapons** 14:1,6,7,8, 11,14,18 15:18 16:14,17,18,21,22

18:2,3,24 21:11,21 25:22,24 26:3,4 27:1,8,12,16,18 28:5,6,8,9,17,19,21, 24,25 29:11,17,19, 22 30:1,4,8 32:25 33:2 34:3,7,10,19,21 35:6,13,21 41:8 46:1,2,13 47:22 60:4 63:5,8,9 64:4,12,24 67:13 89:10 102:13, 15 104:3,5,8 108:1, 8,10,15 109:13 110:10 111:14,18 112:21 113:17 114:21 115:2,12

**weapons-only** 16:16

**weapons-specific** 18:4

**wear** 71:1 73:2

**website** 57:7

**weekend** 19:5

**well-known** 13:12,14

**well-suited** 101:1

**western** 46:12

**whack** 18:17

**what'd** 18:18

**whichever** 75:21

**whilst** 55:1

**white** 22:23

**wicked** 64:7

**wide** 25:15

**widely** 114:20

**wielding** 47:15

**witness's** 92:17 94:9

**wooden** 17:7

**word** 106:15

**words** 93:9 110:5

**work** 6:2 26:24 41:9 42:9 43:12 49:15 70:25

**working** 14:25 15:1, 22 66:1 68:6

**world** 13:7 14:15,25 25:24 27:12 29:20 30:1 61:21 65:13 100:24 101:6 104:24 107:19 113:6

**world's** 39:5

**worries** 31:16

**worth** 21:24

**wound** 110:3

**wrap** 76:10

**wraps** 117:1

**wrestle** 22:3,19

**wrestlers** 22:4

**wrestling** 21:2,10 23:15,18,24,25 24:1, 3,4,10,12,16

**write** 17:23 27:23

**writer** 60:10 62:17

**writers** 107:2

**writing** 28:8 35:15,20 39:17

**writings** 16:10 34:20 37:2,5

**written** 17:25 18:3,4 27:19,22,24 28:15 36:5 113:22

**wrong** 50:25

**wrote** 25:9 35:17 57:9,17,21 104:3

**Y**

**year** 15:3 65:9

**years** 15:1,6,12 16:5 20:22 23:5 26:21 34:22 48:18,19 49:10 59:12 61:9 65:16 114:16

**young** 14:24

**Youtube** 36:18 51:19 70:21 71:5

# PLAINTIFFS' EXHIBIT AG

KR1966

John W. Dillon (Bar No. 296788)
Dillon Law Group APC
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Telephone: (760) 642-7150
Facsimile: (760) 642-7151
E-mail: jdillon@dillonlawgp.com

Attorney for Plaintiffs

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

KNIFE RIGHTS, INC., et al.,

Plaintiffs,

v.

CALIFORNIA ATTORNEY GENERAL ROB BONTA, et al.,

Defendants.

Case No.: 23-cv-474-JES-DDL

Hon. James E. Simmons, Jr.

**MICHAEL JANICH'S EXPERT REBUTTAL REPORT AND DECLARATION REBUTTING EXPERT REPORT AND DECLARATION OF ROBERT ESCOBAR**

Complaint Filed: March 15, 2023

**REBUTTAL TO EXPERT REPORT AND DECLARATION OF ROBERT ESCOBAR**

I, Michael Janich, declare as follows:

1. I am over 18 years of age and am not a party, nor a party representative, to this action. The facts contained in my declaration are true and correct, and I would (and could) competently testify to such facts if called as a witness. My declaration is based on my own personal knowledge, education, employment background, and experience, particularly as it relates to automatic opening knives, or "switchblades."

2. The organization Knife Rights, represented by the Dillon Law Group, has asked me to provide a rebuttal to the expert report of Robert Escobar pertaining to automatic opening knives/switchblades. My declaration covers my background and qualifications; my retention and compensation; my opinions and the basis for those opinions; and my concluding remarks.

3. Counsel for Plaintiffs provided with the operative Complaint in this matter, copies of relevant statutes being challenged, and other case-related documents related to this matter. Other, than these documents, my report is based on my own independent research, knowledge, and experience.

**BACKGROUND AND QUALIFICATIONS**

4. I have been a knife collector and enthusiast for nearly 50 years and have earned a worldwide reputation as an expert in the field of knives, knife history, and the design and combative use of edged weapons. Since 1992, I have shared my knowledge of knives and their defensive use as the author of several hundred articles in more than a dozen publications, including preeminent cutlery publications such as *Blade* magazine, *Tactical Knives, Combat Knives, Knives Illustrated,* and several *Knives* annuals. I have also authored or co-authored more than a dozen books, including *Knife Fighting: A Practical Course, Street Steel,* and the revision of

*Switchblade: The Ace of Blades.* Since January 2017, I have been the edged weapons expert for the United States Concealed Carry Association (USCCA) and a featured author and contributing editor to every issue of *Concealed Carry* magazine.

5.     I am also an accomplished knife designer with more than a dozen custom and production knives to my credit. My designs have been manufactured by leading cutlery companies, including Masters of Defense, BlackHawk Blades, Spyderco, Combat Elite, and Max Knives. To date, my designs have been recognized by three U.S. patents.

6.     For the past 20 years, I have been employed full-time in the cutlery industry. I served as the Brand Manager for the Masters of Defense and BlackHawk Blades knife brands of BlackHawk Products Group and, for the past 14 years, have served as the Special Projects Coordinator for Spyderco, Inc. In those capacities, I have been responsible for assisting in the development, promotion, marketing, and product education of more than 150 knife designs.

7.     I have been training in the martial arts for 50 years and have been teaching martial arts and self-defense for 48 years. I have earned instructor credentials in the martial systems of American Self-Protection (ASP), Serrada Eskrima, Natural Spirit International, and Silat Concepts; and have trained in and researched many other martial arts disciplines. I was also personally mentored by the late Col. Rex Applegate, close-combat instructor to the OSS (Office of Strategic Services, the World War II predecessor of the CIA), and I am widely regarded as the heir to his system of handgun point shooting. I am the founder and lead instructor of the Martial Blade Concepts (MBC), Counter-Blade Concepts (CBC), Damithurt Silat, and Sobadiwan Eskrima systems of self-defense, and have been teaching those systems worldwide for more than 20 years. In addition to training hundreds of civilians, I have also provided specialized training in edged-weapon, counter-edged-

weapon, and firearm tactics to U.S. Air Marshals, Canadian Air Marshals, and numerous law enforcement agencies and SWAT teams. Since 1992, I have shared my approach to self-defense training in more than 20 full-length instructional videos. I have also served as the co-host and personal-defense subject matter expert of *The Best Defense* television series on Outdoor Channel during its entire 11-year production.

8.     Based on my knowledge of both edged weapons and the dynamics of self-defense, I have served as an expert consultant on a number of legal cases involving the use of knives in violent encounters.

9.     A true and correct copy of my current Curriculum Vitae is attached hereto as **Exhibit A**.

**RETENTION AND COMPENSATION**

10.     I have been retained by the Dillon Law Group to render expert rebuttal opinions in this case. I am being compensated at a rate of $150 per hour. My compensation is not contingent on the substance of my opinions or any testimony in this case.

**BASIS FOR OPINION AND MATERIALS CONSIDERED**

11.     Counsel for Plaintiff Knife Rights, et al., provided me with a copy of Mr. Escobar's expert report. My declaration references the content and details Mr. Escobar's report directly, but is otherwise based on my own independent personal knowledge, research, education, employment background, and specialized knowledge.

**OPINIONS**

12.     In section I, page 4, of Mr. Escobar's report, "THE APPEAL OF THE SWITCHBLADE TO CRIMINALS," he asserts that his research shows "a clear

preference by criminals for edged-weapons (sic) that are culturally understood to be inherently frightening, including switchblades and their historical precursors." He then provides archaic historical references to the Spanish *navaja* and the alleged use of *straight razors* by gangs in Australia. Neither of those references are relevant to the criminal use of edged weapons, including switchblades, in the United States or, more specifically, the State of California—especially in modern times. Additionally, nowhere in this section of Mr. Escobar's report is there any opinion or support for the proposition that switchblades are the "clear preference for criminals." There is not data to reference or review in support of his claims.

13. Mr. Escobar also refers to a single "Ray Floro" video claiming the video discusses *switchblades* and asserts that switchblades "are as brittle as glass." After searching online I found the referenced video on Ray Floro's YoutTube channel titled "Razor Fighting1.MTS." However, the video only discusses straight razors and makes no reference to switchblades of any kind. Additionally, Mr. Floro describes straight razors as "brittle as glass," not switchblades. Thus, I see no relevance to any fact in this case through Mr. Escobar's incorrect reference. In fact, most modern knives, including switchblades, are made of quality metal and would not be described as "brittle as glass" in any way.

14. In developing the Counter-Blade Concepts (CBC) system of self-defense—a curriculum specifically focused on unarmed defensive tactics against edged-weapon attacks—I have analyzed literally hundreds of videos of actual criminal assaults with knives and other edged weapons. I began this analytical process in the late 1990's and, with the proliferation of surveillance and cell phone video and Internet platforms such as YouTube, continue it to this day. Based on my analysis, I have not been able to identify a single incident in which a switchblade was used to threaten or physically attack another person. On the contrary, my research indicates the most commonly used type of knife in criminal assaults is some form of

common kitchen knife. I have corroborated this fact with many of the law enforcement officers whom I have trained. They explained that, because kitchen knives are inexpensive and readily available, criminals prefer them because they can be easily disposed of, if the criminals fear they will be searched.

15.     In addition to my own analysis, there is formal statistical evidence that indicates that kitchen knives are the weapons of choice of criminals. In the report, *The Police Killing of Persons Brandishing Knives in the United States,* by Bruece Machacynski of the American Military University (October 5, 2020), he first described the expected results of his research, citing numerous previous statistical studies:

> *It was expected that 52% of decedents would be armed with kitchen knives. This estimate is an average of the 55% kitchen knife usage reported by Hunt and Cowling (1991), the 48% reported by Karlsson (1998), and the 58% reported by Kidd et al. (2014).*

(Machacynski 2020, at 25.)

Machacynski later summarized his findings, as follows:

> *Analysis of the data revealed the type of knife brandished by the decedent was reported in 57% (n= 99) of cases (see Table 8). Of those, 44% (n = 44) of decedents were armed with kitchen knives. While this result was less than expected (H0: kitchen knife usage = 52%), the difference was not significant, and the null hypothesis was not rejected.*

(Machacynski 2020, at 92-30.)

16.     Machacynski also included a table that provided a detailed breakdown of the specific types of knives identified in the incidents studied. It revealed that only 4.6% of the incidents involved folding knives and 0.6% involved razors—the types of knives Mr. Escobar erroneously defines as the "clear preference" of criminals. Significantly, of the incidents analyzed in Machacynski's study, 29% occurred in the

State of California. Thus, Mr. Escobar's claims are not only unsupported, but explicitly contradicted by available data.

17. While Mr. Escobar is a skilled historian and researcher with regard to impact weapons (*e.g.,* saps, blackjacks, and slungshots), his anachronistic references to the Spanish *navaja* and straight razor reflect his passion for romanticized history, not the reality of modern criminal knife use in the United States. Moreover, his characterization of the *navaja* as a tool of Spain's criminal culture is also historically inaccurate. In *Sevillian Steel* by James Loriega—a book devoted to the martial arts history of the *navaja*—Loriega explains that the carry of swords by Spaniards of all classes was universal during Spain's Golden Age. When that privilege was later restricted to higher social classes, the folding *navaja* became popular among the common people. He then quotes Arturo Sánchez de Vivar's *La Navaja Clasica*, which stated, "Little by little, the *navaja* became more accepted, appreciated, and used by all classes of Spanish society; not only the working class, but the middle class and aristocracy soon adopted *navajas* as their inseparable companions." Today, the *navaja* remains a revered cultural symbol in Spain.

18. Similarly, Mr. Escobar fails to mention that switchblades were also an integral part of Spain's cutlery industry. In fact, switchblades were manufactured and actively sold in Spain through most of the 20th century, including decades after enactment of any U.S. restrictions. Despite that fact, there is no evidence that their very nature made them "a clear preference by criminals." Escobar Decl. ¶14.

19. As a lifelong knife collector, I have been personally pleased to see the substantial increase in the commercial availability of automatic knives over the past 20 years. When I first began collecting knives about 50 years ago, switchblades were more difficult to find. Now, they are readily available in most areas of the United States — as they were prior to the passage of the Federal Switchblade Act. Despite

that fact, there is absolutely no evidence to indicate that their criminal use is in any way statistically significant. If switchblades, by their very nature and design, were somehow the "clear preference" of criminals, their use in criminal acts in the United States today would be prevalent. They are not.

20. One last point regarding Mr. Escobar's erroneous statement about switchblades as the "clear preference" of criminals. Mr. Escobar makes the point in the context of him concluding, without support, that they are "culturally understood to be *inherently* frightening." Escobar Decl. ¶14, (emphasis added). Based on my knowledge of Second Amendment caselaw, the legal test is not whether a switchblade is "inherently frightening." The test focuses on whether switchblades are *both* "dangerous *and* unusual," and not their so-called "fright" factor. This is another factor that has no bearing (relevance) on the legal issues in this case.

21. As a historian, it is surprising that Mr. Escobar chose not to cite the many practical reasons that switchblade knives were preferred cutting tools for many people prior to the 1958 Federal Switchblade Act. During the first half of the 20th century, switchblade knives were widely sold and marketed as practical utilitarian cutting tools. The blades of traditional pocketknives had "nail nicks" — small grooves machined into the blade to provide a purchase[1] for the user's fingernail to open the knife. This design required two hands to open and often resulted in chipped or broken fingernails.

22. Switchblade knives, conversely, opened automatically with the push of a button or lever. This made them much easier to use one handed, especially if the user's hands were cold or he was wearing gloves. Since many cutting chores involve holding the material to be cut with one hand while operating the knife with the other,

[1] Purchase meaning to a hold or position on something for applying power advantageously, or the advantage gained by such application.

switchblade knives were incredibly convenient and practical. In fact, the only thing that differentiated them from ordinary pocketknives was the convenience and ease with which they could be opened. Just as an automobile with an automatic transmission is easier to operate than one with a manual transmission, the spring-powered opening of a switchblade knife was a matter of convenience — not of intimidation or fright — as Mr. Escobar suggests.

23. These facts were regularly touted as beneficial selling points in the advertising and sale of automatic knives throughout the United States. The book, *Antique American Switchblades,* by Mark Erickson includes numerous historical advertisements and photo graphics of point-of-sale marketing displays. These universally emphasize the practical conveniences of the knives with statements such as:

- "No more breaking of finger nails."
- "Easily opened, even with gloves or with chilled hands."
- "Eliminate broken finger nails"
- "The perfect knife for lady or gentleman"
- "One hand only required to open or close, leaving the other free to retain grip on rod, gun, or any other object."
- "Always leaves one hand free."
- "A necessity for sportsmen, hobbyists, carpenters, mechanics, electricians, whittlers."

24. This well-researched book also reflects the fact that the vast majority of switchblades manufactured, carried, and used in the United States prior to enactment of the Federal Switchblade Act closely resembled ordinary non-automatic pocketknives. They far outnumbered the Italian-style switchblades glorified in the

juvenile delinquent movies of the 1950's and demonized by politicians in Congress. Again, as an arms historian, Mr. Escobar seems to have chosen to ignore this rich, well-documented, and highly relevant American cutlery history to selectively focus on two marginally related weapons used in other countries during very different periods of history (*e.g.,* navaja and straight razors).

25. Today, American knife users clearly prefer the convenience of folding knives that can be opened with only one hand. See AKTI Report. In most knife designs, this is done manually by using the thumb to apply pressure to a purchase on the blade to rotate it into the open position. The availability of this style of knife, however, does not negate the utility of an automatic knife. Many people lack sufficient finger strength to operate manual one-handed folding knives. Others suffer from disabilities, such as arthritis, or do not possess the necessary hand strength or dexterity. For these people, the convenience of a knife with a blade that opens automatically is a tremendous practical benefit.

26. In section II of Mr. Escobar's report, "DANGERS IN USING AN AUTOMATIC KNIFE FOR SELF-DEFENSE," his comments reflect a serious lack of understanding of modern self-defense, the defensive use of knives, the technology of modern automatic knives, and firearms.

27. For example, Mr. Escobar states that:

> "An automatic knife is by its nature the most complicated type of knife on the market." Comparing it to a fixed blade knife (the simplest) is in my opinion like comparing an AR-15 to a revolver, a revolver generally being considered the apex of reliability and simplicity in firearms."

Escobar Decl. ¶ 20.

28. An AR-15 is a rifle; a revolver is a handgun. Comparing two vastly different categories of firearms is illogical and serves as a poor analogy for a serious discussion of the merits of automatic knives.

29. Mr. Escobar continues:

> "To better understand the dangers and impracticality of using an automatic knife for self-defense, it is helpful to first understand the three major knife categories. All knives can be classified into three categories: (1) fixed blade, (2) folding, and (3) out to the front ("OTF")."

Escobar Decl. ¶ 20.

30. First, through this claim, Mr. Escobar appears to agree with the Plaintiffs in this matter that automatically opening knives are merely a type of folding pocket knife. Second, "Out to the front" is not a type of knife. The correct term, which is well established in the cutlery industry, is "out-the-front" knife. Mr. Escobar's failure to use the correct terminology for this extremely popular style of automatic knife casts serious doubt on his depth of knowledge of this topic. Regardless, it seems that all parties agree that automatically opening knives are merely folding knives of some kind.

31. Further, while Mr. Escobar correctly states that bringing a folding knife into play under the stress of a self-defense situation is difficult, it is most definitely an achievable skill. In my system of Martial Blade Concepts (MBC), we emphasize this skill heavily, so students not only have the ability to use their knives effectively and responsibly in self-defense, but also have the ability to deploy them quickly and reliably under stress. Achieving this skill is a matter of practice. Professionally led training can enhance this skill, but anyone can gain proficiency and even mastery with sufficient practice and the right mindset.

32. Moreover, bringing any defensive weapon to bear in a high stress self-defense situation is difficult. Mr. Escobar's assertions are not unique to folding knives. The same is true for using any weapon in self-defense whether it is a gun, pepper spray, or knife of any kind. Nevertheless, this universal fact does not diminish the fact that these arms are used in self-defense.

33. In reviewing Mr. Escobar's martial arts credentials, I noted that the only fighting system he studied that included any type of edged-weapon training was HEMA (Historical European Martial Arts). As its name indicates, HEMA focuses on historical arms — specifically swords and other anachronistic weapons. Nothing in his training suggests that he has any significant depth of knowledge of the skills of defending oneself with small knives of a size that most commonly carried by both civilians and law enforcement. His seemingly arbitrary citing of sources like the poorly written article *Men's Gear* magazine and a lengthy list of YouTube videos as "expert" information substantiates this fact.

34. For example, in support of his claim regarding mechanical failures, Mr. Escobar references a YouTube video montage uploaded by a "Shawnta Fairchild." This video consists of a number of pictures of a disassembled switchblade in which the owner seemingly disassembled and cleaned their knife. Mr. Escobar also references a YouTube video where a man adds a drop of lubricant to the blades of an automatic knife, making it easier to push the button to release the blade. (Escobar Report ¶¶ 23, n. 9, *https://youtu.be/SLSrgXvrsFQ?si=Na20xUX3W525k99-*). This video provides no support for the assertions in Mr. Escobar's report. Adding lubricant to knives, especially all kinds of folding knives, is a part of ordinary maintenance. The same is true for any firearm. Mr. Escobar also references at least three other videos detailing how to put an out-the-front knife blade back on track if it should ever come off track. Escobar Report ¶¶ 23, n. 9. This is a simple achievement by merely pulling on the blade. However, these videos offer no support for Mr. Escobar's claims. The relevance of these videos is highly questionable, provide little value in this case, and make me question Mr. Escobar's expertise.

35. Mr. Escobar's criticisms of switchblade knives as personal-defense weapons also seem to focus primarily on the style of automatic knife depicted in the juvenile delinquent movies of the 1950's — the stereotypical Italian switchblade. His

assertion that automatic knives will fail to open completely or lock securely in the open position is a valid criticism of some Italian-style switchblades, as the opening of their blades is powered by a leaf spring that only drives the blade through the initial portion of its arc. The remainder of its opening arc relies on momentum, which may be interrupted if the blade strikes an object. The blades of some Italian-style switchblades — as well as many classic American-made switchblades — also locked via the firing button. This was not a particularly robust mechanism; however, it also was far from the only one used. Many classic Italian-style switchblades also had very mechanically sound lock mechanisms that made them perfectly suitable for serious use. In summary, Mr. Escobar's assertions regarding the dangers of switchblades failing to open completely or lock securely do not apply to the vast majority of switchblades today and are, quite frankly, outdated by approximately 50 years.

36. Moreover, a failure to open completely or a failure to lock are not unique to switchblades. These are potential issues for any folding knife. Based on Mr. Escobar's report, I am unaware of any data or study of defensive knife use that would attribute these problems to switchblades over any other folding knife. Mechanical failures exist with many forms of defensive arms. Guns, stun guns, Tasers, and pepper spray can all suffer from various mechanical or user failures. Nevertheless, they are all legitimate defensive weapons.

37. The vast majority of the switchblade knives manufactured and commercially available today are significantly different from traditional Italian switchblades. Almost all are produced with the benefit of modern computer numerical control ("CNC") machining and feature higher quality materials and precise manufacturing tolerances. Their blades are also driven by coil springs instead of leaf springs, which power the blade through its entire opening arc and virtually guarantee a positive opening. Similarly, their lock mechanisms are also far more robust than classic designs and easily rival the strength and reliability of the finest

non-automatic, manual opening folding knives. Again, Mr. Escobar's assertions entirely ignore these well-known facts.

38.    Mr. Escobar's assertion that the safety mechanisms included on many automatic knives cannot be operated quickly under stress is also flawed, as his assertions apply primarily to older, traditional switchblade designs. He explains this in his somewhat awkwardly worded statement that, "The overall dynamic is similar to firearms: there is a safety that should be engaged when walking around. Thus, it must be disengaged and then the 'trigger' must be operated for defense use. Without a substantial amount of training, it is highly unlikely that an individual would be able to quickly and safely disengage a switchblade's safety lock — and then safely deploy the switchblade, as described above—in a self-defense situation." Escobar Decl. ¶ 31.

39.    First, Mr. Escobar's claims are highly generalized and are not supported by any data or evidence of any kind. Second, under Mr. Escobar's logic, any handgun that has a safety would seemingly be more "dangerous" than a handgun that does not have a safety. As an experienced self-defense and defensive shooting instructor, I do not understand the logic of Mr. Escobar's claims. Clearly, there are many firearms that have a manual safety that are used in self-defense. While individual preferences on whether to have a manual safety on your firearm exist, Mr. Escobar's assertions lack any support and further show his lack of expertise on this subject matter. As a self-defense instructor I would always recommend that an individual should practice and train before carrying any weapon with the intent of using it for self-defense. Nevertheless, there are countless self-defense incidents where individuals were able to implement the fine motor skills required to operate a weapon in self-defense without training. And again, these facts have little relevance to the legal question at hand.

40. With that said, the safety mechanisms of most modern automatic knives are far better designed, more ergonomic, and more intuitive to operate than those of the older, traditional designs on which Mr. Escobar prefers to focus. Moreover, many modern automatically opening knives do not have a safety, but rather rely on the design of the opening mechanism itself to reduce the likelihood of an inadvertent opening. This is not unlike many modern firearms which do not incorporate a traditional manual safety (*e.g.,* Glock handguns). Again, Mr. Escobar conveniently ignores these facts in his report.

41. Mr. Escobar's flawed logic is also clearly evident in his statement, "The fact that militaries the world over clearly prefer fixed blade knives to switchblades underscores the fact that switchblades are not well-suited for self-defense." (Escobar Decl. ¶ 33.) As a military veteran, I carried both fixed blades and folding knives when I operated in the field. Most of my peers did the same, as they understood they excelled at different applications. For combat and heavy-duty use, the fixed blade was certainly preferred. However, for general utilitarian use—a far more common application—folding knives, including switchblades, were the cutting tools of choice. Unquestionably, the vast majority of knives, including switchblades, are designed to be used for all manner of lawful purposes, but can also be used in exigent circumstances for self-defense.

42. Further, switchblades and non-spring-driven gravity knives, since World War II, have been the *preferred* knives of paratroopers. In the event that a paratrooper's chute became entangled in a tree or other obstacle, he would need to cut the shroud lines to free himself. For this purpose, the United States military adopted a switchblade knife as an official-issue item to paratroopers in World War II. Although the design has evolved several times since then, automatic knives are still official-issue tools for paratroopers.

43.     Additionally, when I managed the Masters of Defense knife company,
and in my current role with the Spyderco knife company, a significant number of the
knives that I sold to both military units and individual servicemen were automatic
knives. Many switchblade manufacturers, most notably Benchmade, have earned
National Stock Numbers (NSN) for their automatic knives. These numbers expedite
the purchase of these items by military units and other government entities and are
only given to commercial products that are in high demand by such organizations.
Whether used in the field as cutting tools or weapons, switchblades offer significant
advantages to military personnel in that they allow them to rapidly and reliably access
a cutting tool with only one hand, even while wearing gloves. For these reasons, Mr.
Escobar's unsupported claims regarding military use are simply wrong.

44.     Part III of Mr. Escobar's report, titled "IN COMPARISON TO OTHER
TYPES OF WEAPONS, SWITCHBLADES ARE PARTICULARLY ILL-SUITED
FOR SELF-DEFENSE," is nothing more than a random collection of quotes that
actually apply to the defensive use of *knives in general* and have nothing specifically
to do with switchblades. (Escobar Report, ¶¶. 34-39). Nothing in these statements
offers any proof that, "switchblades are particularly ill-suited for self-defense." The
fact that Mr. Escobar felt it necessary to cite other alleged experts rather than rely on
his own expertise again suggests that his depth of knowledge in this area is severely
limited.

45.     I agree that using a knife in self-defense is difficult and that many people
do not have the commitment to do so. In my own experience, I have seen that the
same issue is true of other weapons used for self-defense, including firearms, as well
as unarmed fighting skills. Many people train in the martial arts, shoot firearms, and
even carry weapons daily, yet lack the commitment to use them to wound or kill
another human being. That is a well-documented element of human nature (as
evidenced by the critically acclaimed work of Col. David Grossman and his books,

*On Combat* and *On Killing*), but has absolutely nothing to do with the viability of switchblade knives or knives in general as self-defense weapons.

46. Mr. Escobar's "Conclusion" portion makes many sweeping statements as if they were fact. Since they reflect fundamental flaws of logic, I will address each one individually. First, he claims "Knives — including switchblades — are offensive and deadly weapons by the nature of their design." (Escobar Report. ¶ 40.) This is patently false. The felonious use of knives accounts for a tiny fraction of all knife use. Responsible citizens use knives every day as utilitarian tools and the vast majority of knives in existence today are designed to function as tools, not weapons. Further, as Mr. Escobar has no experience whatsoever, let alone expertise, in the design or manufacture of any kind of knife, his personal opinion has no factual support.

47. Mr. Escobar continues, "Without proper training they can be turned against their own user." This is a common cliché repeated throughout the self-defense community — typically by those who choose not to engage in active martial arts training. Without proper training, *all* weapons can conceivably be taken from, and potentially turned against, their user. This highlights the advantage of hands-on training, no matter what weapon one might choose to carry. Moreover, even with training, any weapon can be taken from and turned against their user. There are countless examples of guns, Tasers, and even batons being wrestled away from trained police officers and used against them. Again, Mr. Escobar's assertions are not unique to switchblades or knives in general. It is surprising that Mr. Escobar would tout his own qualifications as a martial artist and self-defense enthusiast, yet choose to echo this cliché.

48. Mr. Escobar states, "They have also been dropped in the ultra-intense, adrenalized situation of a self-defense encounter. And the overall danger of self-harm is higher than commonly understood." (Escobar Decl. ¶ 40.) He expresses these as

documented facts, yet nowhere in his report does he provide any example of them happening. Even if his conjecture were true, it again points to the advantage of receiving training and does not define the suitability of switchblades as defensive weapons or utilitarian cutting tools.

49. In paragraph 40, Mr. Escobar concludes, "Additionally, multiple experts feel people will fail to use one when it matters most because it is a vicious, up-close implement." (Escobar Decl. ¶ 40.) Once again, the commitment to use *any* lethal weapon in self-defense is a serious one. That phenomenon is not exclusive to knives, nor is it particularly exclusive to switchblades.

50. In paragraphs 41 and 42, Mr. Escobar reiterates his belief that switchblades are so mechanically intricate and their operation requires such fine motor skills that they simply cannot be operated under stress. As I noted previously, that is somewhat true for older, traditional Italian switchblade designs. However, it is not true for modern automatic knife designs, which are both ergonomically and mechanically much more advanced. Again, it reflects Mr. Escobar's narrow historian's focus rather than a broad-based understanding of modern automatic knives.

51. In my expert opinion, knives can be very viable self-defense weapons, provided they offer adequate blade length to reach key anatomical targets of an attacker that produce rapid, reliable incapacitation. In developing my Martial Blade Concepts (MBC) system of edged-weapon self-defense, I specifically focused on tactics that could be effective with blades as short as 2.5 inches in length. I did this because this blade-length limit is prescribed by the municipal laws of the cities of Chicago and Boston, and is also the maximum length allowed for carry by government employees in United States federal buildings. Through extensive empirical testing on analog cutting targets made from animal meat, wooden dowels,

string, and plastic wrap, I confirmed that MBC tactics could cut deeply enough with a 2.5-inch blade to reliably stop a violent attacker by severing key muscles and nerves. These same tactics, when executed with knives shorter than 2.5 inches did not produce cuts of sufficient depth to effectively disable an attacker of average or above-average size. For this reason, I consider a 2.5-inch blade length to be the absolute minimum for a knife suitable for self-defense. When legally permissible, I encourage my students to carry longer blades that offer even greater effectiveness as self-defense weapons. In my opinion, the cutting performance of the sub-two-inch automatic knives currently allowed by California law is inadequate for self-defense.

**CONCLUSION**

52.     Mr. Escobar is a talented and passionate historian with regard to impact and unusual weapons. I own and have read his book *Saps, Blackjacks, and Slungshots,* so I was familiar with his writing prior to reading his expert report. While he has an excellent ability to unearth obscure historical references to various weapons, his lack of hands-on training in the use of those specific weapons severely limits the accuracy of his personal insights. Instead, he relies on often repeated, but factually inaccurate, myths and clichés about specific weapons and their combative use.

53.     As a historian, Mr. Escobar also focuses intently on topics and historical timeframes that are of great interest to him, but not necessarily relevant to this case. This seems particularly true of his obsession with the use of straight razors by gangs in Australia during the 1920's and 1930's. Although only marginally relevant to the topic of modern automatic knives, it is clearly a topic of fascination to him — especially since he saw fit to mention, "I have also conducted extensive research into the straight razor, another weaponry niche which I will address in an upcoming book."

54. Most importantly, Mr. Escobar's personal training does not include any disciplines that focus on the defensive use of small knives, specifically folding knives. Again, his insights on self-defense with this class of weapon consist almost exclusively of quotes of other alleged experts and a somewhat random collection of YouTube videos. Additionally, he completely, and seemingly purposely, ignores the fact that knives are primarily cutting tools, not weapons.

55. Simply put, switchblades are a category of folding knife that opens automatically with the push of a button or operation of some other trigger mechanism. Once open, they are functionally no different than any other knife. Their automatic-opening function was originally conceived to allow them to be opened conveniently using only one hand. This gave them a significant advantage as utility tools, as they could be carried as easily as an ordinary pocketknife, yet be opened and used with less effort. For individuals with limited hand strength or ailments like arthritis that hinder their dexterity, this is a tremendous benefit. It allows them to carry and use a pocketknife that is far better suited to their physical limitations than manual folding knife designs. In the modern era, the broad acceptance of one-hand opening knives in the marketplace serves to emphasize the practical advantages these designs offer and automatically opening knives are simply one variation of how one-hand opening has achieved that.

56. In the United States, switchblades were produced and marketed for more than half a century as utilitarian tools that provide the aforementioned conveniences of operation. The number of switchblades of this type produced far outnumbered the Italian-style automatic knives introduced into the United States after World War II. In addition to their functionality as cutting tools, like other mechanical devices, these switchblades also offered an element of novelty in their operation that makes them intriguing and desirable to collectors. Despite their numbers, there was never any statistical evidence that indicated they were affiliated with criminal activity.

57. I have collected knives and trained in the defensive use of edged weapons for nearly 50 years. I have also served this Country overseas in areas where the private ownership of firearms by foreigners was strictly prohibited. In those environments, I carried and relied upon knives as primary defensive weapons. Thankfully, I have never been forced to wound another person with a knife in self-defense, but I have been in several situations where my life was in danger and my ability to draw and open a folding knife quickly and confidently turned the tables.

58. With this in mind, it is also important to note that Mr. Escobar's references to the "intimidation factor" of automatic knives focus exclusively on their criminal use. Many law-abiding citizens properly licensed to carry handguns have resolved potentially violent situations through the "defensive display" of their firearms. Based on my own personal experience and experiences recounted to me by my Martial Blade Concepts students and others, deploying a knife, quickly and confidently, against a person posing a threat is very likely to force him to withdraw. As such, the advantages that switchblades provide for swift, one-handed deployment can be a tremendous benefit to law-abiding citizens during justifiable acts of self-defense. In fact, compared to manual one-hand opening knives, they offer a huge advantage under stress in ease of deployment, the very advantage Mr. Escobar tries to turn onto its head as a liability.

59. If the defensive display of a knife is insufficient to deter a potentially lethal threat, there is absolutely no question that it could be used as an effective self-defense weapon. That fact has been proven countless times. From my personal perspective, several of my Martial Blade Concepts (MBC) students have successfully applied their knives and their skills to defend their lives. I have also interviewed numerous other people, both male and female, who have used knives effectively to defend themselves. A knife—including a switchblade—is most definitely a viable defensive weapon.

60. Like all other commercial products, the design and manufacturing quality of knives — including automatic knives — can vary considerably. However, as an avid knife collector and historian who owns dozens of period and modern automatic knives, I can say unequivocally that the quality of today's switchblade knives is extremely high. Their performance and reliability as cutting tools is every bit as good as conventional, manually operated folding knives. As such, they are equally worthy choices as both utilitarian tools and potential defensive weapons. Like any other "automatic" product, what they offer is a level of convenience and ease of use that cannot be found in their "manual" counterparts. And for many users — including those whose hand strength, dexterity, or even the bilateral use of both arms is compromised by disease, age, or frailty — that ease of use can provide a life-changing advantage.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that I signed my declaration on January 19, 2024, at Firestone, Colorado.

Michael Janich

**EXHIBIT A**

KR1989

**Michael D. Janich**
**10321 Bountiful Street**
**Firestone, CO 80504**
**303-995-8848**
**mjanich@comcast.net**

**Education:**

- B.A., Asian Studies, Pacific Western University, Honolulu, Hawaii
- Twice Graduate with Honors of the Defense Language Institute, Monterey, California and recipient of the Commandant's Award for academic excellence
- Certified as a Professional Voice Language Analyst by the National Security Agency
- Graduate with Honors of three military leadership academies
- More than 40 years of martial arts and self-defense training and teaching experience
- Personal student of the late Colonel Rex Applegate, world-renowned expert in close-combat tactics and handgun point shooting and former instructor to the Office of Strategic Services (OSS) during World War II

**Work Experience:**

2009-Present **Special Projects Coordinator** – Spyderco, Inc., Golden, CO; **Co-host, *The Best Defense* television series** – Outdoor Channel; **Founder and Lead Instructor, Martial Blade Concepts** – Firestone, CO

- Responsible for the design, prototyping, engineering, and testing of tactical knives and related products
- Personally responsible for all key technical writing regarding Spyderco products, including catalog copy, website copy, production instructions and information guides, warranty policies, marketing materials, the *byte* e-newsletter, and critical business correspondence.
- Scripted, shot, and edited product information videos for Internet, DVD, and point-of-sale use
- Prepared and conducted targeted product and sales training for both internal and external sales personnel
- Coordinated with U.S. military units and federal agencies to develop and adapt products to meet specific mission needs
- Served as co-host and subject-matter expert of ***The Best Defense*** and ***The Best Defense: Survival!***, the highest rated personal defense programs on Outdoor Channel
- Provided targeted training to civilians, law enforcement and military personnel in edged-weapon tactics and other aspects of armed and unarmed personal defense

2006-2009 **Category Manager, Knives and Tactical Lights** – BlackHawk Products Group, Norfolk, VA; **Co-host, *The Best Defense* television series** – Outdoor Channel; **Founder and Lead Instructor, Martial Blade Concepts** – Longmont, CO

- Personally responsible for the design, prototyping, testing, manufacturing oversight and marketing of tactical knives and related products
- Directed domestic and international sales programs for knives and flashlights, interfacing directly with distributors, dealers, U.S. and foreign government agencies and end users
- Personally responsible for all key technical writing related to knife and light products, including catalog copy, website copy, production instructions and information guides, warranty policies, and marketing materials.
- Prepared and conducted targeted product and sales training for both internal and external sales personnel
- Supervised vendor relations with domestic and foreign manufacturing vendors
- Served as co-host and subject-matter expert of ***The Best Defense*** and ***The Best Defense: Survival!***

2004-2006 **Director of Product Development** – Masters of Defense and BlackHawk Blades knife companies, divisions of BlackHawk Products Group, Norfolk, VA; **Founder and Lead Instructor, Martial Blade Concepts** – Longmont, CO

- Personally responsible for the design, prototyping, development and manufacturing oversight of tactical knives and related products
- Conducted in-depth analysis of market and operational trends as a basis for focused product-development strategies
- Prepared written and video-based training materials on BlackHawk products and their proper use and conducted sales and product training for both internal and external sales personnel

1994-2004 **Video Production Manager** – Paladin Press, Boulder, CO; **President** - Ronin Productions, Boulder, CO; **Founder and Lead Instructor, Martial Blade Craft** – Longmont, CO

- Personally established and supervised the video production department of a leading independent publisher of personal security titles
- Served as primary cameraman, lighting technician, sound engineer and director for approximately 100 independent studio

and field video productions

- Responsible for the editing and post-production of more than 60 full-length independent video productions
- Personally responsible for identifying, recruiting and interfacing with recognized subject-matter experts in the fields of personal security and defensive tactics
- Founded the Martial Blade Craft (MBC) and Counter-Blade Craft (CBC) systems of personal defense and provided targeted instruction in edged-weapon and counter-edged-weapon tactics to civilian, military and law enforcement students

1991-1994 **Investigation Team Leader and Interpreter** – Joint Task Force-Full Accounting (JTF-FA) Detachment One, U.S. Embassy, Bangkok, Thailand and JTF-FA Headquarters, Camp Smith, Hawaii

- Led 8-10 man teams in Vietnam and Laos during field investigations to determine the fates of American Prisoners of War/Missing In Action (POW/MIA) from the Indochina War
- Served as interpreter for senior U.S. and Vietnamese government officials during national-level negotiations and technical meetings
- Conducted unassisted debriefings of Vietnamese citizens, detainees, refugees and asylum seekers
- Compiled and prepared detailed written reports documenting field investigation results
- Translated official documents from Vietnamese to English and English to Vietnamese

1989-1991 **Intelligence Staff Officer and Debriefer** – Defense Intelligence Agency (DIA) Stony Beach Program, U.S. Consulate General, Hong Kong

- Conducted unassisted debriefings of Vietnamese asylum seekers in refugee camps throughout Asia to elicit information pertaining to incidents involving American POW/MIA from the Indochina War
- Represented the U.S. government in all matters concerning POW/MIA issues in Hong Kong, Macau and the Republic of the Philippines
- Prepared detailed written reports of information obtained during debriefings for distribution to U.S. intelligence agencies
- Provided special assistance to the Royal Hong Kong Police, Marine Police and Special Branch members concerning Vietnamese refugee affairs and detention camp security

1985-1989 **Senior Vietnamese Voice Transcriber** – U.S. Army Field Station Kunia, Wahiawa, Hawaii

- Monitored, intercepted and collected significant Vietnamese language voice traffic
- Prepared edited and verbatim transcripts of Vietnamese military communications traffic
- Performed preliminary intelligence analysis and reporting of collected information
- Served as senior Vietnamese linguistic authority on station

1982-1984 **Senior Intelligence Analyst** – National Security Agency, Fort George G. Meade, Maryland

- Performed short- and long-range analysis of Chinese-Mandarin signals intelligence traffic
- Prepared detailed reports of significant political and military events in the Peoples Republic of China for use by national-level intelligence agencies

**Skills and Qualifications:**

- Internationally recognized subject matter expert on knives and edged weapons
- Designer of more than 20 folding and fixed-blade knife designs, many of which were commercially manufactured
- Internationally recognized instructor of armed and unarmed personal-defense tactics and leading expert on edged-weapon and counter-edged-weapon methods
- Selected as one of 12 subject matter experts for initial development of the Transportation Security Administration (TSA) aircrew self-defense program
- Inducted into *Black Belt* magazine's Hall of Fame as the 2010 Weapons Instructor of the Year
- Expert photographer and videographer
- Speak, read, and write Vietnamese with a high degree of fluency
- Possess a functional working knowledge of Chinese-Mandarin and Spanish
- Held a Top Secret Special Intelligence security clearance for 15 years
- Distinguished military service was recognized through receipt of the Defense Meritorious Service Medal, the Meritorious Service Medal, the Army Achievement Medal, and the Good Conduct Medal
- Published author of more than a dozen books, over 20 instructional videos, and more than 150 articles for national and international magazines

*References and letters of recommendation available upon request*

# PLAINTIFFS' EXHIBIT AH

KR1992

Deposition of

# Dr. Brennan Rivas

February 12, 2024

Volume I

Knife Rights Inc.

vs.

Rob Bonta Attorney General

aptus.
COURT REPORTING
www.aptusCR.com | 866.999.8310

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

KNIFE RIGHTS, INC., et al.,

Plaintiffs,

vs. No. 23-cv-474-JES-DDL

CALIFORNIA ATTORNEY GENERAL ROB BONTA, et al.,

Defendants.
_______________________________/

REMOTE DEPOSITION OF

DR. BRENNAN RIVAS

VOLUME I

Appearing from Fort Worth, Texas

Monday, February 12, 2024

Reported by:
KATHLEEN BACA
CSR No. 10267

JOB No. 10134988

Volume I
Dr. Brennan Rivas

Knife Rights Inc. vs.
Rob Bonta Attorney General

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

KNIFE RIGHTS, INC., et al.,

Plaintiffs,

vs. No. 23-cv-474-JES-DDL

CALIFORNIA ATTORNEY GENERAL
ROB BONTA, et al.,

Defendants.
_______________________________/

Remote deposition via Zoom videoconference of DR. BRENNAN RIVAS, Volume I, taken on behalf of Defendants, appearing from Fort Worth, Texas, beginning at 10:00 a.m. and ending at 12:55 p.m. on Monday, February 12, 2024, before KATHLEEN BACA, Certified Shorthand Reporter No. 10267.

Page 2

www.aptusCR.com

KR1995

APPEARANCES:

(All parties appeared via videoconference.)

For Plaintiffs:

DILLON LAW GROUP APC
BY: JOHN W. DILLON, ESQ.
2647 Gateway Road
Suite 105, No. 225
Carlsbad, California 92009
760.642.7150
jdillon@dillonlawgp.com

For Defendants:

OFFICE OF THE ATTORNEY GENERAL
BY: S. CLINTON WOODS, ESQ.
KATRINA UYEHARA, ESQ.
1300 I Street
17th Floor
Sacramento, California 95814
Clint.Woods@doj.ca.gov

Volume I
Dr. Brennan Rivas
Knife Rights Inc. vs.
Rob Bonta Attorney General

# I N D E X

| | PAGE |
|---|---|
| EXAMINATION BY MR. DILLON | 5 |

# E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Expert Report and Declaration of Brennan Rivas - 317 pages | 11 |
| Exhibit 2 | Photo of Page 138 from the book American Knives - 1 page | 52 |
| Exhibit 3 | Photo of Benchmade Adamas knives - 1 page | 56 |
| Exhibit 4 | Photo of Buck knives - 1 page | 63 |
| Exhibit 5 | Pages from the book Antique American Switchblades - 6 pages | 67 |

Page 4
www.aptusCR.com
KR1997

Fort Worth, Texas - Monday, February 12, 2024

10:00 a.m.

DR. BRENNAN RIVAS

having been administered an oath remotely, was examined and testified as follows:

EXAMINATION BY MR. DILLON

MR. DILLON: Q. All right. Good morning. My name is John Dillon. I'm counsel for the plaintiffs in this matter, Knife Rights v California Attorney General Robert Bonta, Case No. 3:23-cv-00474-JES-DDL.

Good morning. How are you?

A. Good morning. I'm doing well. How are you?

**Q. What is the best way to refer to you? Ms. Rivas or Dr. Rivas or Professor Rivas?**

A. Dr. Rivas is good.

**Q. Okay. So I'll be asking you questions today about this case and expert report that you submitted on behalf of defendants.**

**Do you understand that?**

A. Yes.

**Q. And can you please state your full name for the record?**

A. Brennan Nicole Rivas.

**Q. And -- now, Dr. Rivas have you -- you've been hired by the defendants in this case. Correct?**

A. Yes.

**Q. And when were you first hired on this case?**

A. I believe I first heard about this case in, I think, November of 2023.

MS. REPORTER: I'm having problems with her audio. Are you hearing that also?

MR. DILLON: I am hearing it on my end. Maybe we should address that now before we get into it.

Let's go off the record.

(Recess taken 10:02 a.m. - 10:04 a.m.)

MR. DILLON: Q. So, Dr. Rivas, you're being paid by defendants for your expert work in this case. Correct?

A. Yes.

**Q. So before we begin to get into the substance of the deposition here there are a number of admonitions that I want to go over.**

**First, have you ever been deposed before?**

A. Yes. One time.

**Q. And when was that?**

A. About a year ago.

**Q. Okay. And what case was that for?**

A. It was a Federal case in Oregon. I forget the

name of it.

**Q. Do you recall the subject matter of that case?**

A. It was a large capacity magazine case.

**Q. Okay. And can you explain your role in that case for me?**

A. Yeah. I was talking about the sort of long arc of historical firearm regulations in the United States.

**Q. Okay. And so you were hired as an expert witness in that matter?**

A. Yes.

**Q. And you submitted an expert report in that matter?**

A. I did, yes.

**Q. Is that the only time that you've been deposed?**

A. Yes.

**Q. But you've submitted expert reports in other cases. Is that correct?**

A. Yes.

**Q. Are all the matters in which you've submitted an expert report solicited in your CV that's attached to your report in this matter?**

A. At the time I submitted it that was a full list to my -- to my knowledge or recollection. I've

possibly submitted more since then.

Q. Okay. So I want to remind you that you're under oath. You swore to tell the truth and the effect of that oath is as if you were testifying in court.

Do you understand that?

A. Yes.

Q. And will you answer truthfully in response to my questions today?

A. Yes.

Q. This deposition is being conducted remotely. However, that does not change the fact that we're conducting this deposition as if we're all in the same room.

Do you understand that?

A. Yes.

Q. And as this is a remote deposition I ask that you don't refer to any notes during your deposition and don't read from anything unless there are exhibits presented by me or you inform me that you're refreshing your memory by a specific document.

Do you understand that?

A. Yes.

Q. And also know that during your deposition you're not permitted to communicate with the defense attorney while a question is pending. That is to say no

text messages, e-mails, Chats or electronic communications of any kind will be permitted during questioning.

Do you understand that?

A. Yes.

Q. And please also be aware that no one else is permitted to be in the room with you during your deposition.

Do you understand?

A. Yes.

Q. Okay. So the court reporter today is recording all the questions, answers, objections and will reduce that information into a booklet form after the deposition ends. At which point you'll have an opportunity to read the transcript and correct any inaccuracies.

Do you understand that?

A. Yes.

Q. But if you make any changes in your testimony that are inconsistent with the answers given during the deposition, I'll be entitled to comment on those discrepancies at trial and that could damage your credibility.

Do you understand that?

A. Yes.

**Q. Is there any reason, medical or otherwise, why you can't give me your best testimony here today?**

A. No.

**Q. All right. So now as an expert witness hired in this matter you know that plaintiffs are challenging California Penal Code Sections 17235, Penal Code Section 21510 and 21590 as unconstitutional in Sacramento. Correct?**

A. I don't that have the Penal Code Section numbers memorized.

**Q. Okay. But what is your understanding of the nature of this lawsuit?**

A. It's about restrictions on switchblades and other like gravity driven knives.

**Q. Okay. And do you understand that California prohibits the manufacturing, import, sale, possession and carry of knives defined a switchblade under California law?**

A. Yes. I believe that's -- I mean, I would be happy if you repeated it, but yes.

**Q. Okay. I'm just asking generally --**

A. Okay.

**Q. -- if you're aware of the general claims in this matter.**

A. Yeah.

MR. DILLON: Okay. All right. So at this point I'm going to introduce Plaintiff's Exhibit 1. Bear with me for one second here.

(Exhibit 1 was premarked and identified during the proceeding.)

(Mr. Dillon screen shares Exhibit 1.)

MR. DILLON: Q. So if you could please turn to what I'm marking as Exhibit 1. This is -- it's also been e-mailed to your attorney and they are welcome to forward it to you once they get it.

But do you recognize this document?

A. Yes.

**Q. And can you read the title of this document for me? And I'm going to go down and highlight the relevant portion.**

**Can you see that?**

A. Yes.

**Q. Go ahead and read it for me.**

A. "Expert Report and Declaration of Brennan Rivas."

**Q. Now, is this your expert report that you submitted for this case?**

A. Yes.

**Q. And I can scroll down so you can take a look at it here. I'll scroll down to the bottom here.**

Does that look familiar to you?

A. Yes, it does.

Q. Okay. And then is it the report that you submitted on behalf of defendants in this case?

A. Yes, it is.

Q. And is that your signature at the bottom of Page 18 of your report?

A. Yes.

Q. And you signed this report under penalty of perjury. Is that correct?

A. Yes.

Q. Are you the sole author of this report?

A. Yes.

Q. Did anyone assist you in preparing this report?

A. No.

Q. Are the facts and information contained in this report true and correct?

A. Yes.

Q. And are you prepared to testify regarding the subject matter identified in your report?

A. Yes.

Q. So what steps have you taken to prepare for your deposition today?

A. Well, I re-read the report several times. And

I did have a meeting with defendant attorneys last week to just sort of go over what to expect out of the deposition, et cetera.

**Q. So the paperwork that you reviewed was just the report that you submitted. Is that correct?**

A. Yes.

**Q. Did you review any other documents?**

A. No, I did not.

**Q. Since learning about your deposition in this case did you talk, text or e-mail anyone regarding your deposition?**

A. Only -- I told some people, like my family, et cetera, that I was going to be deposed. I believe I mentioned that to various other attorneys involved in other cases, you know, letting them know that I had a deposition coming up. But I haven't talked about the substance of the report or the topic in any detail.

**Q. Okay. All right. So I'm going to scroll down. I still have your expert report on screen here. I'm going to go down what's titled Exhibit 1 attached to your report.**

**Is this a true and correct copy of your CV?**

A. Yes, it is. And it's dated October, so that's the October 2023 version of it. Yeah.

**Q. Okay. And as of October 2023 all the facts**

and information listed in your CV are true and correct?

A. Yes.

Q. Okay. All right. So I scrolled up here. We're on Page 3 of your report here.

Do you see that?

A. Yes.

Q. Okay. And I'm going to be referencing Paragraph 10 of your report. The 1880 Ohio law that you referred to in Footnote 1 as "Establishing a minimum age for the sale of any airgun, musket, rifle gun, shotgun, revolver, pistol or other firearm of any kind or description whatsoever, or ammunition for the same."

That's attached to your report as Exhibit 2. Correct?

A. I would have to -- I mean, I assume so. But I don't have the version of all the exhibits at the end of it.

Q. Okay. So I'm just going to put in the search function here Exhibit 2. There we go.

So Exhibit 2 of your report -- scroll down here. So is this the 1880 Ohio law that you were referring to in Footnote 1?

A. It looks like it to me.

Q. Okay. And this 1880 Ohio law was a prohibition as to minors defined as under the age of 14

**years old.**

**Is that correct?**

A. I'll -- I'll -- I will refer to whatever is written in the footnote and in the report. You know, I'm looking at it, I mean, yeah, it says here "under the age of 14 years." So yes.

**Q. Okay. I'm scrolling back up here so we can reference the footnote, if needed.**

**So under this law that you reference here, the 1880 Ohio law, none of the listed weapons were restricted for anyone over 14 -- or 14 years old or older. Correct?**

A. Well, that was an age-based sales restriction, so there were very likely other kinds of restrictions. But that law was specifically establishing an age minimum for the purchasing of all the enumerated weapons.

**Q. Okay. So under this law if you were over 14 years old, you would not be prohibited from purchasing any of these weapons. Correct?**

A. Yes. That's correct.

**Q. Okay. I'm also going to reference the -- your reference to Exhibit 3 in that same footnote.**

**Do you see that?**

A. I see Exhibit 3.

**Q. Okay. And in -- with your reference to Exhibit 3, you're describing a 1879 Missouri law as "Prohibiting the carry of any firearms, Bowie knife, dirk, dagger, slung-shot or other deadly weapon at public assemblages."**

**Is that correct? I can scroll down to the next page where this continues on. Footnote 1. Do you see that?**

A. I do see that.

Is it okay if I -- if I look at the report physically myself?

**Q. Yes, of course. That's no problem.**

A. I've got a printed copy of it here with me. It's just a little bit easier than being reliant on watching the scrolling.

So, yeah. I'm looking at the footnote and it's showing Exhibit 3 to be a reference to an 1879 Missouri law. Yeah.

**Q. Okay. So under this 1879 Missouri law would an individual be free to purchase any of the listed weapons?**

A. Yeah.

MR. WOODS: Objection. Beyond the scope.

You can answer if you can.

THE WITNESS: The citation to this is talking

about a sensitive places law. Not to a sales restriction.

The purpose of the footnote was to -- the purpose of the footnote was to talk about different approaches to regulation. So that's why, you know, there is a, you know, different types of regulations explained in the footnote.

MR. DILLON: Q. Okay. But under this 1879 regulation from Missouri, it also would be lawful to possess any of these listed weapons. Correct?

MR. WOODS: Same objection.

You can answer.

THE WITNESS: There -- yeah. I'll say -- like this is just one law, you know. The state of Missouri had -- I mean, I don't know specifically how many, but most states had more than one regulation pertaining to deadly weapons.

There might be an age restriction or sensitive places law and a public carry law. A lot of states have prohibitions that were very extensive and severe pertaining to like slung-shots -- off the top of my head I don't know specifically which other laws the state of Missouri had.

MR. DILLON: Q. Okay. But under this law that we're talking about right now, it does not prohibit

the possession of any these listed weapons. Correct?

MR. WOODS: Same objection.

You can answer.

THE WITNESS: Yeah. This particular section which I'm looking at the citation is Section 1274 doesn't prohibit anything beyond carrying in the context described.

MR. DILLON: Q. Okay. And under this same section here, an individual could even carry these listed weapons excluding the specific locations listed in the statute. Correct?

MR. WOODS: Same objection.

You can answer.

THE WITNESS: I would want to re-read the section first. You know, I'm not sure how much is entailed in the section. Like I said, I don't know off the top of my head all the details of Missouri state laws at the time.

MR. DILLON: Q. I'm not asking you about all Missouri state laws at the time. I'm asking you about this statute in particular.

Does it allow for the carrying of these weapons -- these listed weapons if you're not in one of these specific locations?

MR. WOODS: Same objection.

You can answer.

THE WITNESS: This -- from what I'm looking at the citation, that -- the Section 1274 is prohibiting carrying the certain weapons at specific places.

MR. DILLON: Q. Okay.

A. Yeah.

**Q. So I'm going to scroll up here and direct you to Page 4, Paragraph 11. You state in your report "In the decentralized, agricultural environments that characterized early American life, hunting knives, rifles, muskets and shotguns were important tools present in most rural homes."**

**Is that correct?**

A. Yes.

**Q. So what is a hunting knife? Or what is the definition of a hunting knife that you referenced in Paragraph 11?**

A. I did not provide or attach any sort of specific definition. I was referring to the kinds of knives that would be useful for hunting. There is various styles used for different purposes.

So I was just sort of referring generally to large knives that would be effective for people who were hunting and then had to treat or skin game, et cetera.

**Q. Okay. And you say that "These knives" --**

**referring to hunting knives or large knives -- "were present in most rural homes."**

**Is that correct?**

A. I did say that, yes.

**Q. Scrolling down to Paragraph 12. You state in your report that "Americans of the 19th century to be more likely to publicly carry and use deadly weapons such as dirks, Bowie knives and pocket pistols."**

**Is that correct?**

A. Yes.

**Q. So during the 19th century, weapons like dirks, Bowie knives and pocket pistols were commonly carried in public?**

A. Can you repeat the question, please?

**Q. So throughout the 19th century, weapons like dirks, Bowie knives and pocket pistols were commonly carried in public. Is that correct?**

A. I don't know that's correct to say. It's hard to -- it's hard to gauge how frequently they were being carried.

What does seem evident is that what weapons like that were being carried at higher rates or in higher numbers than in the 18th century, which did pose societal problems.

**Q. Okay. And, again, in Paragraph 12 -- I'm**

**going to highlight the relevant text just to point you in the right direction here. But you state "These regulations tended to focus upon readily concealable deadly weapons, like knives and pistols, rather than firearms used for militia and hunting purposes."**

**Is that correct?**

A. Yes.

**Q. And with that reference to deadly weapons like knives, are you referring to dirks, Bowie knives and pocket pistols when you're talking about concealable deadly weapons?**

A. Yes. Deadly weapons or deadly weapon restrictions generally applied to various different kinds of weapons, including various different kinds of knives. And they were usually referring to knives that were, you know, like Bowie knives or, you know, seemed especially dangerous or deadly, et cetera.

**Q. Okay. So when you state that these regulations tended to focus on readily concealable knives, I'm unclear.**

**Did the regulations prohibit weapons based on their ability to conceal them or did the regulations prohibit the act of carrying certain weapons in a concealed manner?**

MR. WOODS: Objection. Ambiguous.

You can answer if you can.

THE WITNESS: If you -- would you be willing to repeat or rephrase the question?

MR. DILLON: Yeah.

**Q. So you reference the term "Readily concealable deadly weapons" in Paragraph 12.**

**Do you recall that?**

A. Yeah.

**Q. So of the regulations you're discussing in Paragraph 12, did these regulations prohibit all weapons because of their ability to be concealed or did it prohibit the act of carrying these weapons in a concealed manner?**

A. Yeah. I mean, I -- those things are interrelated, right? There were certain common characteristics of the kinds of weapons that were included in these kinds of regulations. And a common characteristic was that they were readily concealable. And when they were carried they were often carried in a concealed manner. That's why they are lumping them together.

**Q. Okay. So I'll rephrase it.**

**Are you aware of any law that prohibited a weapon because it could possibly be concealed?**

MR. WOODS: Objection. Vague as to time.

You can answer if you can.

THE WITNESS: If -- I'm not sure how to answer that question.

MR. DILLON: Q. Okay. So during the 19th century, were there any laws that regulated any kind of weapon by the fact that it could possibly be concealed?

I'm -- I'm not sure. There is no way to know that. You know, the -- the -- it's a -- it's a notable fact -- it's a notable comment that the commonality among the kinds of the weapons that were included in these restrictions was their ability to be concealed.

And so the extent to which the concealability factor is what was driving the regulation, it's hard to measure or know that. But it does seem pretty clear from the scope and sweep of the regulatory history that the concealability of these weapons was a driving factor in their being regulated in the way that they were.

**Q. Okay. But these 19th century concealed weapons restrictions that we're talking about broadly here. Did they prohibit the act of actually carrying these weapons concealed?**

A. Yes.

**Q. Okay. All right. Let's direct you to Page 5, Paragraph 13. I'll read out the paragraph here. "The other features shared by deadly weapons was their**

**suitability for concealment, and in fact, deadly weapons were often referred to as 'concealed weapons' for the straightforward reason that they were designed to be carried concealed."**

**Did I read that correctly?**

A. Yes.

**Q. Okay. And which specific weapons are you referring to when you state that deadly weapons were "designed to be carried concealed"?**

A. Well, I would first refer to the footnote. There is multiple examples of -- I've got citations for this.

**Q. Are these citations that you're referring to in Footnote 3?**

A. Yes.

**Q. Okay. So which weapons are you referring to that were "designed to be carried concealed"?**

A. I'm referring to deadly weapons, generally speaking, that their suitability and, you know, their capacity for being carried concealed which, you know, is an essential feature of them, right? That's what I'm referring to.

Take for instance pocket pistols, specifically designed to fit within a pocket. You know, a lot of slung-shots were designed to be small and concealable.

So, you know, it's -- it's kind of a -- it's a feature of these weapons, which again, is why they are being grouped together for regulations in the ways that they were.

**Q. Okay. So with regard to knives in general, which types of knives were designed to be carried concealed?**

A. Well, again, it's hard to -- it's hard to know that. We don't even know what the original Bowie knife looked like let alone what was going through the mind of the first person who ordered one to be made, which may or may have been Jim Bowie.

So it's kind of like -- it's hard to say that every Bowie knife was manufactured and designed with the intent to be concealed. But the knives were made in such a way that they were conducive to be concealment and they were being carried concealed.

**Q. And you just referenced a Bowie knife. What is the average length of a Bowie knife?**

A. The blades are usually upwards of six inches in length.

**Q. Okay. And it's your testimony here today that Bowie knives were designed to be carried concealed?**

A. Again, that's a -- that is a -- it's a more complicated question than how you're asking it.

**Q. So were they designed to be carried concealed?**

MR. WOODS: Objection. Asked and answered.

You can answer if you can.

THE WITNESS: Okay. Could you repeat the question, please?

MR. DILLON: I'll rephrase it.

**Q. What is the basis of your claim that Bowie knives were designed to be carried concealed?**

MR. WOODS: Objection. Misstates the testimony.

You can answer if you can.

THE WITNESS: The -- would you please repeat the question?

MR. DILLON: All right. I'll go back to Paragraph 13.

**Q. You were discussing various deadly weapons. Is that correct?**

A. Yes.

**Q. And you would categorize a Bowie knife as one of these deadly weapons you're referring to in Paragraph 13. Is that correct?**

A. Yes.

**Q. Okay. And in Paragraph 13 you state that "these deadly weapons were designed to be carried concealed." Is that correct?**

A. Yes. That is what is in Paragraph 13.

**Q. Okay. So what's the basis of the claim that Bowie knives were designed to be carried concealed?**

A. The -- the primary evidence there is that most of the people who were carrying them in the 19th century were carried them concealed on their persons within coats. Some of them, you know, would have them down their backs and would reach over their shoulder to pull them out of concealment.

So the No. 1 -- you know, the best evidence that these weapons were being -- were specifically being used to be carried concealed was that people were carrying them concealed.

**Q. Okay. So they were being used in a concealed manner; not designed for a concealed manner. Correct?**

A. It's hard to ascertain the specific intention of the -- the specific intention of each and every knife, you know. So I -- again, I would say that to the question of, you know, what is an indication that deadly weapons were designed for concealment was people were carrying them concealed.

**Q. Okay. But what features of deadly weapons as you defined as a Bowie knife is consistent with the design meant to be carried concealed?**

A. I'm not sure how to answer that question.

But, again, I'll say what the point of -- the point of the section of the report is to say that the weapons -- the weapons were being carried concealed and they were being -- clearly being purchased or acquired with the intention of carrying them concealed. And that -- the -- again, the common factor that all of these weapons had is that they were conducive to being concealed.

And you asked for examples of ones that were specifically designed to be concealed and there are certainly some, you know. So the concealment was a common characteristic of them which, again, is why they were being regulated together as a group.

**Q. Okay. And your example of two weapons that were designed to be carried concealed were the pocket pistol and the -- was it the slung-shot.**

**Is that correct?**

A. Yes.

**Q. Okay. In Paragraph 13 you also refer to an 1886 law journal. Is that correct?**

A. Yes.

**Q. And this journal refers to a statute making it indictable for one to carry concealed about his person any pistol, Bowie knife, razor or other deadly weapon of the like kind. Correct?**

A. Yes. That's what it says.

**Q. Okay. And according to this quote that you have in your report from this journal, the statute would embrace a butcher's knife as an "other deadly weapon" if it was carried in a concealed manner.**

**Is that correct?**

A. Yes.

**Q. Now, you wouldn't say that there is anything about a butcher knife that's designed to be carried concealed. Right?**

A. A butcher knife is designed for specific purposes. It's not even designed to be carried on a person. So, you know, the idea is -- so, again, the question is a little more complicated than how it's coming across as you ask it.

**Q. I'll get to further questions about it. I just want my question answered.**

**Is there anything about a butcher knife that's designed to be carried concealed?**

A. I'm really not sure.

**Q. Okay. So the focus of, you know, regulations this law journal is discussing was the act of carrying certain weapons in a concealed manner. Correct?**

A. It's a lengthy -- it's a lengthy article that, you know, includes a lot of commentary, as well as

quotations and excerpts from cases. So this is just one portion of that particular law journal.

This is part of its section about -- about concealability or something like that. But it is a good illustration of what people at the time understood about concealability and these deadly weapons.

**Q. Okay. So, again, this 1886 law journal that you have in your report, it's discussing the fact that a perfectly legal butcher knife that's in, you know, thousands of homes throughout the country, is perfectly lawful in the kitchen but if you carried it concealed it would then be considered unlawful. Correct?**

A. Yes.

**Q. Okay. So it's the act of carrying this weapon concealed that is the issue under the law. Correct?**

A. Yes. In the case of the butcher knife, yes.

**Q. Again, I'll direct you to Paragraph 14. You state that "For much of the 19th century the carrying of large knives posed a serious threat to American communities."**

**Is that correct?**

A. Yes.

**Q. And what period of the 19th century are you referring to with this statement?**

A. Generally the 19th century at large, but more

particularly the maybe first half or first two-thirds of the century.

**Q. Can you give me a date range?**

A. 1800s to maybe 1850 or '60 or so.

**Q. Okay. So from 1800 to 1850 or '60 a carrying of large knives posed a serious threat to American communities.**

**Is that right?**

A. Yes.

**Q. That's because carrying large knives was a fairly common practice during this period in the 19th century. Correct?**

A. I'll refer to my previous answer about the question of the commonality and carrying weapons. It's hard to assess or gauge the commonality. But prior to the widespread availability of revolvers, which had been more or less around the mid or so 19th century, knives were a severe serious threat, you know. After that pistols became more of a threat.

The threat of knives didn't go away, but they were not kind of the regulatory focus or concern on their own the way that they might have been before.

**Q. Okay. In Paragraph 14 you refer to "fighting knives" stating that "There were so many different styles and names of knives that Americans sometimes**

**struggled to distinguish them from one another."**

**Is that correct?**

A. Yes.

**Q. And in Paragraph 14, are you using the term "large knife" -- beginning of Paragraph 14 -- and "fighting knives" interchangeably?**

A. I would have to go back and look at the use of the terms throughout, you know.

**Q. So referencing Paragraph 14 which you wrote in your report. Are you using the terms "large knives" and "fighting knives" interchangeably in this paragraph?**

A. In some ways yes and other ways no. There is -- so in some ways yes and in other ways no.

**Q. Okay. So in what ways are you using the terms interchangeably?**

A. Well, to the extent that fighting knives are generally large knives, then, yes, there is overlap there. And, you know, to the extent that fighting knives are distinguishable from something like a butcher's knife then, no, they are not necessarily the same thing.

**Q. And what distinguishes a fighting knife from a butcher's knife?**

A. Well, there are certain like design features that are different. There are certain design features

that are different.

However, both of them if, you know, carried in the wrong context or used in the wrong way can fall under identical regulations.

**Q. Okay. So what are the specific features of a fighting knife?**

A. I think that in the report I talked about certain features of fighting knives. So I would refer to that.

**Q. All right. So on Page 6 of your report, the end of Paragraph 14 under Footnote 5 you refer to the 1844 case Haynes v State.**

**Is that correct?**

A. Yes.

**Q. Are you familiar with this case?**

A. In the sense that I read it, yes. To the extent that I could, you know, know specific details about it off the top of my head, no.

**Q. Okay. Are you aware that Steven Haynes in this case was indicted for carrying a concealed Bowie knife?**

A. No. From what I do recall about the case, he was not indicted for carrying a Bowie knife. He was indicted for carrying a knife resembling a Bowie knife and that's what the appellate case was about.

**Q. Whether this other knife that he had was categorized at a Bowie knife under the law?**

A. Yeah. From what I recall of the case, the case revolves around whether or not the knife he was carrying was or was not a Bowie knife.

**Q. Okay. And he was carrying that knife concealed. Correct?**

A. I don't recall that.

**Q. Okay. Do you recall the nature of the charge that was placed against Mr. Haynes in this case?**

A. What is the -- what do you mean by nature of the charge?

**Q. Do you understand what he was being convicted of in this case?**

A. Yes.

**Q. And what was that?**

A. It's here in the footnote. "The case revolved around whether carrying a so-called 'Mexican pirate knife' was indictable under a law pertaining to Bowie knives, Arkansas toothpicks and any knife or weapon that shall in form, shape or size resemble them. The defendant was indicted and convicted for carrying a knife resembling a Bowie knife, and the appellate court upheld the conviction as within the spirit and meaning of the law."

**Q. Okay. And that's under Footnote 5 of your report. Correct?**

A. Yes.

**Q. Now, do you know if Mr. Haynes was convicted for carrying this knife in general or was he convicted of carrying this knife in a concealed manner?**

A. I'm not sure.

**Q. Okay. So you don't know if he was convicted for merely possessing this kind of knife, do you?**

A. I would need to reread the case. That wasn't really the question that I was trying to answer in putting together this footnote. Instead I was talking about different kinds of knives.

**Q. All right. In Paragraph 15 and 16 of your report you provide definitions for specific knives like dirks and daggers.**

**Is that correct?**

A. Yes.

**Q. And in Paragraph 16 you state "These knives have historically been considered weapons because they are designed for stabbing and they are not conducive for hunting or other purposes." Correct?**

A. Yes. That's what's in the report.

**Q. And you would agree that these knives -- and I'm referring to specifically dirks and daggers that you**

**mentioned in Paragraphs 15 and 16 -- these knives have been throughout the course of history been used as instruments of both offense and defense.**

**Is that correct?**

MR. WOODS: Objection. Ambiguous.

You can answer if you can.

THE WITNESS: Would you mind repeating the question?

MR. DILLON: Yeah.

**Q. So in Paragraph 16 you state that "These knives have historically been considered weapons because they are designed for stabbing and are not conducive for hunting or other purposes." Correct?**

A. Yes.

**Q. And would you agree that these knives, throughout the course of history in the United States, have been instruments of both offense and defense. Correct?**

MR. WOODS: Same objection.

You can answer if you can.

THE WITNESS: I'm -- I'm not sure of how to answer that question because that phrase of knife of -- or of other deadly weapons of offense or defense or knife or offense of defense, that actually gets used in certain specific context. And I would want to review

that before, you know, making some sort of blanket statement.

But it -- but to the extent that, you know, dirks and daggers and Bowie knives and other knives like that have been considered weapons discernible from knives that are generally used in hunting or other lawful purposes like cooking in the kitchen, yes, that -- there is a distinction between them.

MR. DILLON: Q. And just to clarify. You say there is a distinction between a Bowie knife and other large hunting knives. Is that correct?

A. Yes.

**Q. Okay. And let's go to Paragraph 7 -- sorry -- Page 7, Paragraph 18 of your report.**

**In this paragraph you describe both the Bowie knife and Arkansas toothpick. Correct?**

A. Yes.

**Q. And in your discussion of the Bowie knife you state "He began carrying a large hunting knife in a leather scabbard in 1826, after an enemy tried to assassinate him in the street."**

**Is that correct?**

A. Yes.

**Q. And you're referring to Jim Bowie with that statement. Correct?**

A. Yes.

**Q. And the knife you're referring to with this statement, that would be what would later become known a as a Bowie knife. Correct?**

A. Yes. But I'll add we don't know what the knife even looked like.

**Q. Okay. But you also describe it as a "large hunting knife." Correct?**

A. It's the -- the lore and legend, again, it may -- to the extent to which it is true and to the extent to which it is -- you know, this stuff of myth is unclear. But the story goes that Rezin Bowie, his brother, had a knife custom-made for him, which was not unusual, and he used it for hunting.

I'm not sure what purpose, specifically. We don't know what it looked like. But the story is that he gave it to Jim Bowie after Bowie -- after someone had tried to assassinate him. And that Bowie's use of the knife then made famous.

Then there is Bowie knife as a label that is attached to knives later on. Knives that we do know what they look like. So, again, we don't know what Jim Bowie's knife and Rezin Bowie's knife, which the story says was for hunting, we don't know what it looked like.

**Q. Okay. But it's described as a large hunting**

**knife. Correct?**

A. Yes. That is how -- that is how it is -- in my report, but also in the -- you know, the story of it, which, you know, I read the various articles, et cetera, that described that, yeah.

**Q. Okay. So I'll direct you to Paragraph 19 of your report.**

**You state "During the 19th century people were more likely to carry and use large knives."**

**Is that correct?**

A. I'm just scanning the paragraph real quick.

Yeah. "As rates of violence rose during the is 19th century, people were more likely to carry and use large knives."

**Q. All right. What specific dates are you referring to in this statement?**

A. Again, it's hard to pin down dates. There is tremendous variability regionally in terms of rates of violence and homicide. So, yeah.

Again, I'm talking about sort of the 19th century broadly speaking. Rates of violence in which -- during which varied tremendous regionally based on the, you know, South, the North, the West, the urban North, the slave holding South, you know, et cetera. There is a tremendous variability based on location. And

invariability throughout the 19th century in terms of violence.

So, again, it's hard to pin down specific years, you know, to say that the social concern about Bowie knives started this year and officially ended this year. I can't say that.

**Q. I'm asking you specifically regarding your statement that "People more likely to carry and use large knives. "**

**What period of time are you talking about here?**

(Ms. Rivas' screen frozen.)

MR. DILLON: Am I the only one frozen?

MR. WOODS: No.

Dr. Rivas?

MR. DILLON: Let's just go off the record for right now and then we can fix this.

(Short pause.)

MR. DILLON: Q. So, again, I'm going to be referring to -- oh, by the way, can you still see the shared screen?

A. Yes.

**Q. Okay. Good.**

**So in Paragraph 19 of your report here, you state that "As rates of violence rose during the 19th**

**century, people were more likely to carry and use large knives; the increased presence of knives -- even if ostensibly carried for personal defense -- had the regrettable consequence of exacerbating the problem."**

**Did I read that correctly?**

A. Yes.

**Q. So in Paragraph 19 you're claiming as rates of violence rose people started carrying and using large knives. Is that correct?**

(Dr. Rivas' screen frozen.)

MR. WOODS: Oh, no.

MR. DILLON: Did I lose her again?

MR. WOODS: I think we lost her again.

MR. DILLON: Okay. We'll go back off the record so we can fix the issue.

(Recess taken 10:57 a.m. - 11:00 a.m.)

MR. DILLON: Dr. Rivas, I'm unsure where I got cut off, so just I'm going to restate that. So forgive me if you heard me already.

**Q. In Paragraph 19 of the report, you state that "As rates of violence rose during the 19th century, people were more likely to carry and use large knives."**

**Is that correct?**

A. Yes. That's what's in the report.

**Q. Okay. And these large knives that were being**

**carried during this period were, by your description, ostensibly carried for personal defense.**

**Is that correct?**

A. I'm sorry. Can you repeat the question?

**Q. So in Paragraph 19 when you're describing that people were more likely to carry and use large knives due to the rates of violence rising during 19th century.**

**These large knives were being carried and, as you described it, ostensibly carried for personal defense purposes.**

**Is that correct?**

A. I'm sure some of the people who carried these knives said or understood that they were doing so for self-defense. Yeah.

**Q. Okay. And was the Bowie knife one of these large knives that were being carried and increasing numbers that you're referring to in this paragraph?**

A. Yes.

**Q. Okay. I'm going to direct you to the last sentence. You state that "This was especially noticeable in southern areas where Bowie knives were quite common and known to be associated with needless bloodshed."**

**Is that correct?**

A. That's in the report.

**Q. So during the 19th century in southern states Bowie knives were quite common. Right?**

A. Quite common in the sense of easy to acquire. Quite common in the sense that everyone was carrying them. I'm not sure what you mean.

**Q. I'm quoting what you wrote.**

**So what do you mean "They were quite common in the 19th century in the southern states"?**

A. Right. Okay. So the purpose of this -- what I'm trying to convey in the report here is that as violence goes up and increases, right, that -- that at the same time people are also carrying more weapons. Those two things are clearly interrelated.

It's hard to draw any causal connection, right? Line one feeds the other. But the increased carrying of knives, regardless of the stated intentions of the person who was carrying them, that it did have this -- it was causing more bloodshed. And that that trend was more -- was especially pronounced in southern areas.

There has long been an association between the South and Bowie knives and there is examples in the footnote.

**Q. So am I correct in stating that in your report you claim in Paragraph 19 that Bowie knives were quite**

common in the southern states during the 19th century?

A. Yes.

Q. Okay. And referring to Footnote 18 you reference three exhibits -- Exhibit 8, Exhibit 9 and Exhibit 10. Is that correct?

A. Yes.

Q. Okay. And these exhibits are cited in support of your claim that Bowie knives were common and known to be associated with needless bloodshed. Is that correct?

A. They are establishing a connection between Bowie knives and the South, generally, as a region.

Q. So they are not supporting the claim that Bowie knives were associated with needless bloodshed?

A. Well, let me reread them.

I would say that the exhibits are supporting both points.

Q. Okay. So both points, meaning that Bowie knives were quite common in the Southern areas and known to be associated with needless bloodshed.

Is that correct?

A. Yes.

Q. Okay. I'm going to share the screen again here. So I have Page 3 of your report looking at Footnote 18. I'm going to use the search function here to get us down to your attachment to your exhibit.

**Exhibit 8 -- let's see. This is an article from the Daily Picayune -- I don't know if I'm saying that correctly -- July 25, 1840.**

**Is that correct?**

A. Yeah. That's what it looks like to me.

**Q. Okay. And it's titled Carrying Concealed Weapons. Is that correct?**

A. Yes.

**Q. Are you familiar with this article?**

A. In the sense that I know I've read it once or more and I cited it, yes.

**Q. Okay. In this article, it describes the author's hope and wish that people would stop carrying concealed weapons.**

**Is that correct?**

A. I -- without rereading it in the small font that's on there right now on the screen, that sounds about right.

**Q. Okay. If you want, you can refresh your recollection here. I'm increasing the font size to make it a little more helpful.**

**Let me know when you would like me to scroll down or when you finished refreshing your recollection.**

A. You can scroll.

(Witness reading the document.)

You can scroll down.

I finished reading it.

Q. Okay. Were you able to refresh your recollection?

A. Yes.

Q. Okay. So, again, I'll restate the question I posed to you earlier.

This article, it describes the author's hopes and wishes that people would stop carrying concealed weapons.

Is that accurate?

A. Yes.

Q. Okay. And then in this portion -- I can't really highlight. Starting with the paragraph that begins with "The South is accounted chivalrous" and continuing down through that paragraph.

The author claims that carrying concealed weapons is not chivalrous, but both degrade us and sink us to the level of Spanish brigands and piratical assassins.

Is that correct?

A. Yes.

Q. Okay. So this is a single author's opinion on concealed carrying. Correct?

A. Yes.

**Q. Okay. I'm going to scroll down to Exhibit 9 attached to your report. This is a copy of the Southern Argus paper from Columbus, Missouri, June 7th, 1842.**

**Do you see that?**

A. I do.

**Q. Now, this text is pretty small also, I'll admit to that. And I actually was not successful in finding the article you've referenced there. But what I will do is scroll back up to Page 8 where you have Footnote 18.**

**You quote from this Exhibit 9 in the footnote. Is that correct?**

A. Yes.

**Q. Okay. And can you read that quote out for me in the Footnote 18.**

A. It says "The small dagger worn in former times, has given place to this more formidable invention, and the Bowie knife, throughout the West, is now the most common weapon of attack or defence."

**Q. All right. And in this article, would I be correct in stating this would support your contention that Bowie knives were quite common in the Southern areas?**

A. Can -- give me just one second.

So I would say, yes, because it's talking

  about the growth and popularity of Bowie knives, right? And in 1842, when people are talking about the West, they are not necessarily talking about like the mountain west hills; they are also talking about Western areas where people are migrating to. West, as being used, can have a sort of wider or more flexible meaning than how we generally envision West today, as kind of referring to the mountain west.

**Q. Okay. So it wouldn't be confined to just Southern areas. Correct?**

A. The carrying of Bowie knives was not just confined to Southern areas.

**Q. Okay. And this article describes a Bowie knife as the most common weapon of attack or defense. Correct?**

A. Yes.

**Q. Okay. So scrolling down to Page 9 of your report, Paragraph 20, you state "The folding knife 'style' has been more useful for pocket knives and pen knives that are small, lightweight and utilitarian for everyday purposes."**

**Is that correct?**

A. That -- I haven't gotten to the exact sentence yet, but that sounds --

**Q. Sorry. I apologize. I'll highlight the**

**relevant section.**

A. Yes. Just from a general statement, yeah.

**Q. Okay. And based off of your understanding automatically opening knives or switchblades would be folding knives.**

**Is that correct?**

A. I know -- that's hard to answer. I know that some historical examples of automatic opening knives were folding knives. But, you know, there are switchblades where they pop straight up. So they are not all folding knives.

**Q. Okay. Okay. But in both of those variations of switchblades, the entire blade would be confined within the handle of the knife.**

**Is that correct?**

A. Yes. That's my understanding.

**Q. Okay. And these folding knives, they have many utilitarian everyday purposes. Is that correct?**

A. The style of folding knives like we think of as kind of a pocket knife today, yes, that's what I'm talking about.

**Q. Okay. And at least the large majority of switchblade designs are folding knives. Correct?**

A. I'm not sure the prevalence of different designs among switchblades now versus in the past.

**Q. Okay. But you are aware that there are switchblades that are of the folding design. Correct?**

A. I'm aware of that and I ran across examples of automatic opening knives that were folding knives that were manufactured during the 19th century, but they all took the size, shape and style of what we would think of today as like a very small pocket knife or pen knife, as opposed to a longer blade or anything like that. So sort of small pocket knife type.

**Q. Okay. So small folding pocket knives would encompass at least some switchblade knives. Correct?**

A. Sometimes. Although I believe in this section of the report, I'm not talking about the automatic opening ones. I'm talking about folding knives and pocket knives, generally speaking, prior to automatic opening.

So I think that -- as I recall this section, I'm not necessarily talking about the automatic opening ones, at least not at this point. Just talking about the folding style that you would manually open more generally.

**Q. Okay. But folding style would also encompass switchblade knives. Correct?**

A. At what time? I mean, I -- are you asking me what -- I'm not sure what you're asking.

Are you asking about what I meant in the section of the report or about automatic opening knives being folding knives now or automatic opening knives being folding knives in the past? I'm not sure how to answer your question because I'm not sure what you're asking.

**Q. Okay. So you're describing how folding pocket knives are lightweight, utilitarian for everyday purposes. Correct?**

A. Yes. That's what's in the report.

**Q. Okay. And you're aware that there are switchblade designs that are folding pocket knives. Correct?**

A. Okay. Yes. I'm aware that some of them are small folding pocket knives today. Yes.

**Q. Okay. So these small folding pocket knives that open automatically, would also be -- have a utilitarian everyday purpose. Correct?**

MR. WOODS: Objection. Ambiguous.

You can answer if you can.

THE WITNESS: I mean, if they are -- if they are sharing the features of what I'm talking about with like being like a sort of small Swiss army size kind of knife, then yes.

MR. DILLON: Q. Okay. All right. As a part

Paragraph 20, you cite Footnote 19 -- I'm scrolling down here.

Footnote 19 you cite to a book "American Knives" for the various types of folding knives and their historical uses. Do you see that?

A. I do, yeah.

**Q. And you cited Pages 129 through 142 of the "American Knives" book. Correct?**

A. Yes.

MR. DILLON: Okay. Bear with me one second.

At this time I'll introduce Plaintiff's Exhibit 2. This is a copy of Page 138 of the book "American Knives."

(Exhibit 2 was premarked and identified during the proceeding.)

(Mr. Dillon screen shares Exhibit 2.)

MR. DILLON: Q. Do you see that?

A. I do.

**Q. And I'm going to direct you to the text of the bottom of Page 138 on the screen. Can you read what the text states there in italics?**

A. Yes. "Some of the more popular types of pocket knife made today."

**Q. And this text is referring to the figure -- the products in 18 different pocket knife designs above**

it. Is that correct?
A. Yes.
Q. And in the middle of this figure to the right -- I'm going to highlight a design.
Do you see the area that I'm highlighting here on the page?
A. Yes.
Q. Okay. And this design depicts a folding pocket knife with a button on the handle and is labeled "push button."
Do you see that?
A. Yes, I do.
Q. Okay. And you're aware that push button knife is another term for automatically opening knife or switchblade. Correct?
A. Yes.
Q. At this time -- in Paragraph 22 on -- starting on Page 9 but continuing onto Page 10, the last sentence of Paragraph 22 you state "These folding knives might need springs to lock the blade into an open or closed position, but they were not automatic opening knives, and those sharing essential features with fighting knives were likely to be regulated as such."
Did I read that correctly?
A. Yes.

**Q. Okay. So what are the essential fighting knives that you're referring to in paragraph?**

A. I believe that earlier in the report I had a section that talked in more detail about fighting knives. So I would refer to that.

**Q. Okay. What part of your report did you identify the features of a fighting knife?**

A. Bear with me. I'm flipping through the pages.

**Q. No problem.**

A. Hunting knives, Bowie knives and Arkansas toothpicks. Yeah.

So talking about some of the features of these larger knives. So that's Pages 7 and 8.

**Q. Okay. And so can you summarize what the essential features of a fighting knife are?**

A. Well, No. 1, that it was large. And in the case of like the Arkansas toothpick or the dagger, you know, so that was a large double-sided blade, right?

In the case of the Bowie knife is that it was large and had that clipped tip with a sharpened swedge. But, again, there were numerous different kinds of knives that were perceived to be knives of interpersonal violence as opposed to knives that had, you know, like a utility for lawful purposes. But those are some of the features of them.

**Q. These would be the essential features of fighting knives that you're referring to in Paragraph 22?**

A. Yeah. So I don't think that I was in a position to say what are -- what is the sum total or the entire, you know, library of essential features of a fighting knife.

But what I was describing here is that knives that -- much like that Haynes decision we talked about earlier, that there could be a knife that resembles a Bowie knife or resembles a knife like an Arkansas toothpick or something.

We're talking about knives that shared features with knives that were understood to have a particular design and understood to be used for interpersonal violence or crime and things of that nature.

**Q. Okay. And those features you said were as being large, having double-sided blades or having a sharpened clip point or swedge. Correct?**

A. Yeah. Those were the ones that I mentioned in the report.

**Q. Okay.**

MR. DILLON: At this point I'm going to introduce Plaintiff's Exhibit 3 to the screen.

(Exhibit 3 was premarked and identified during the proceeding.)

(Mr. Dillon screen shares Exhibit 3.)

MR. DILLON: Q. Do you see that picture? It's two folding knives.

A. Yes. I see the picture.

**Q. And this is two different models of the Benchmade Adamas AXIS knife. One is described as manual and that's at the top of the picture and the bottom of the picture is the Benchmade Adamas AXIS auto.**

**Do you see that?**

A. I do.

**Q. So just to clarify. The knife at the bottom is an automatically opening knife, or otherwise known as a switchblade. Correct?**

MR. WOODS: Objection. Lacks foundation.

You can answer if you can.

THE WITNESS: I'm not sure.

MR. DILLON: Q. As it's described in this picture as an auto knife, that would fall under the definition of a switchblade. Is that correct?

MR. WOODS: Objection. Lacks foundation.

You can answer if you can.

THE WITNESS: My initial inference reading it would be that the auto would be an automatic opening

version. That's what I would think.

MR. DILLON: Q. Okay. And neither of these folding knives have any of those essential features of fighting knives that you just referenced. Correct?

MR. WOODS: Objection. Ambiguous.

You can answer if you can.

THE WITNESS: It's hard to say. I don't know how -- I don't know how large they are. And the size of the knife would have been one feature that would -- that was relevant to Americans in the 19th century in terms of deciding whether or not a knife resembled a Bowie knife or an Arkansas toothpick.

MR. DILLON: Q. Okay. So if I was to tell you this knife had a three-and-a-half inch or four-inch blade, would that fall under your definition of a large fighting knife?

A. It --

MR. WOODS: Objection. Sorry.

Objection. Incomplete hypothetical.

You can answer if you can.

THE WITNESS: It's hard to say what Americans from the 19th century would have thought about that knife, especially when you think about Americans from the 1830s and '40s when concerns about the Bowie knives and Arkansas toothpicks were really critical and

crucial. They --

MR. DILLON: Okay. Sorry to cut you off. I'm asking what your opinion is.

**Q. You've identified at least three "essential features" of a fighting knife in your report. Is that correct?**

A. I've identified essential features of a fighting knife in terms of understanding historical regulations. So I'm not really -- I don't know how well -- to the extent to which that maps over current knife design is not -- is not what I understand my role to be in this case and my job as the expert witness.

I'm talking about historical knives and historical regulations of those knives.

**Q. Okay. And you have an understanding of what these historical knives that you describe as fighting knives are. Correct?**

A. Can you repeat the question, please?

**Q. So based off of your research and researching various types of large hunting knives, Bowie knives or fighting knives, as you describe them, are you aware of what these types of knives look like?**

A. Yes.

**Q. Okay. And based off of your experience knowing what these large fighting knives are described**

**as, you're looking at a picture in front of you here.**

**Does this picture meet those same features as a large fighting knife?**

MR. WOODS: Objection. Beyond the scope.

You can answer if you can.

THE WITNESS: Again, like I said, it would depend on the size of the knife. That's also a really -- you know, history doesn't operate in counterfactuals. It's -- I guess I interpret the question as to what extent would a 19th century American have understood this knife to be, a knife resembling a Bowie knife and it's hard to say.

MR. DILLON: Q. Okay. All right. So again, I'm going to state to you that the knife blade length on both of these knives is about three-and-a-half inches. Understanding that -- and let's just all agree that for the purposes of this question that's a three-and-a-half inch blade.

So based off your understanding of what people identified as a Bowie knife in the 19th century, using the features -- or having the features of being -- having a large blade that's double sided with a sharpened swedge, is it your expert opinion that an individual would look at this three-and-a-half inch long blade of a folding knife and determine that it's a Bowie

knife?

MR. WOODS: Objection. Beyond the scope. Calls for speculation.

You can answer if you can.

THE WITNESS: Going back to that Haynes decision, this certainly would -- I don't believe would have been called a Bowie knife, right, if it doesn't meet those characteristics.

MR. DILLON: Q. Okay. Now --

A. That --

**Q. That's it. That's good. You've answered my question.**

**Looking at this picture here, do you see a sharpened swedge on either of these knives?**

A. I don't -- I don't know -- I don't believe I see one. Again, it's -- it doesn't look like a real photo. It likes like a rendering, so it's hard to tell. But it doesn't look like there is one.

**Q. Okay. And does it appear that this -- either of these knives have a double-sided blade?**

A. No.

**Q. And neither of these knives appear to have a sharpened swedge, do they?**

A. Well, again, I can't tell from -- it looks like a rendering. It doesn't look sharpened.

**Q. I'll zoom in so we can get a really good look at the blade here.**

**Does this knife appear to have a sharpened swedge on the blade?**

A. The rendering I'm looking at doesn't appear to have a sharpened swedge.

**Q. Okay. And you keep calling it a rendering. What is the basis of your claim it's a rendering and not a picture?**

A. I don't -- I'm not claiming it's a rendering. I'm just saying like it -- it almost doesn't look like a real photo to me as I'm looking at it. It may just be a function of its being copied into this document, but it almost looks like a computer generated -- a computer-generated rendering of a knife as opposed to a an actual photograph.

**Q. Okay. Well, I'm going to represent here today that this is an actual photograph of the Benchmade Adamas AXIS manual knife and the Benchmade Adamas AXIS auto knife.**

A. Okay.

**Q. All right. And to be clear, the essential features of the folding knives that you're aware of they would not include the feature of having a button that opens the knife. Is that correct?**

MR. WOODS: Objection. Ambiguous.

You can answer if you can.

THE WITNESS: So not all folding knives are automatic opening or push-button opening knives but some of them are.

MR. DILLON: Q. Okay. But in the "essential features of fighting knives" --

A. Fighting knives.

**Q. -- having the ability to open a folding knife one-handed, is listed as a feature of a fighting knife. Correct?**

A. I would like to say that a moment ago I thought you said an essential feature of a folding knife so --

**Q. Sorry about that. Yeah. I stated an essential feature of a fighting knife is -- sorry. I'll just rephrase this whole thing.**

A. Okay.

**Q. So based off of your knowledge of a -- as you say, essential features of fighting knives, these features do not include the ability to open a folding knife with one hand. Correct?**

A. That's not in the definition and -- that did not come up in my report because I'm talking about fighting knives as they were understood and defined and

posed societal problems in the 19th century.

And these kind of knives were not available at that time. Based on the research that I did, I did not see any sort of widespread examples of automatic opening knives or push-button opening pocket knives or pen knives until the 1860s or '70s at the absolute earliest.

Although, I would refer to what's in my report regarding that. Off the top of my head I may not know the specific years perfectly.

MR. DILLON: Okay. I'm going to introduce Plaintiff's Exhibit 4. This is a picture of three different Buck 110 folding knives.

(Exhibit 4 was premarked and identified during the proceeding.)

(Mr. Dillon screen shares Exhibit 4.)

MR. DILLON: Q. Do you see that?

A. I do, yeah.

**Q. The top variation is a Buck 110 manual and in parentheses it's described as the Original 2-Handed Opener. The knife in the middle is described as the Buck 110 Manual 1-Hand Opener. And at the bottom we have the Buck 110 Auto.**

**Do you see those descriptions?**

A. I do.

**Q. And based off of your review of those**

descriptions do you understand the differences between these three knives?

A. I think I do.

Q. Okay. So the Buck 110 Manual 2-handed Opener, that would require two hands to open the knife.

Is that correct?

A. That would be my understanding.

Q. Okay. And would it be your understanding that the Buck 110 manual 1-Handed Opener would allow you to open the knife with one hand.

Is that correct?

A. Yes.

Q. Okay. And based off the description a Buck 110 Auto, this would allow you to open the knife with the push of the button on the handle.

Is that correct?

A. Yes.

Q. Okay. And, again, I'm going to state for the purposes of this picture, the blade lengths of each of these knives is approximately four inches.

Do you understand that?

A. Yes.

Q. Okay. So a four-inch knife, based off your understanding of the essential features of 19th century fighting knives in the United States, would the

**four-inch knife fall under that definition of a large-bladed knife?**

A. It's hard to say. The -- and I'm not -- it's hard to say because we don't know the substance of a lot of the trials that took place pertaining to the unlawful carrying of the weapons. And my -- my thought is that those trials revolved around what kind of knife it was. What the features of the knife were. Information we would love to know but we don't know it. That's why the Haynes' decision is kind of a big deal.

So it's very -- it's very hard to say what -- it's hard to say that there would never have been a knife with a four-inch blade that could have been considered a Bowie knife, but I think that would be going out on a limb. And so I would have to say it's hard to tell. It would be hard to say.

**Q. So based off of your view of the relevant history of "large knives" or "fighting knives" in the United States, you don't know whether or not a four-inch blade would be considered a large blade on a knife?**

A. I'm -- I'm saying that -- I'm saying that would it be possible for a knife with a four-inch blade to be considered in certain contexts a knife resembling a Bowie knife? It's possible. I don't know that -- I don't know that that ever happened.

 But, again, the 19th century restrictions, they don't define Bowie knife or Arkansas toothpick and they even go so far as to say "or any knife resembling these knives." They don't lay out specific features of those knives. That's why it -- it stands to reason to me that the trials that took place involved discussing various features of these knives.

It may be that four inches is too small to be considered -- would have been too small to be considered a problematic knife. It does seem to me that historical examples of Bowie knives all had much larger blades, six inches plus.

Again, there are some things we just can't -- we can't know with certainty about -- about the past and the instance of -- in every instance of the invocation of these laws.

**Q. Okay. So based off of your research and experience regarding 19th century large knives and fighting knives, looking at these knives, do you believe that they resemble what was commonly known to be a Bowie knife or Arkansas toothpick?**

A. No. I don't believe that these would match that description.

**Q. Okay. And, again, I can zoom in on the pictures here.**

**Do these knives appear to have a sharpened swedge?**

A. They do not, based on what I see.

**Q. Okay. And do these knives appear to have a double blade?**

A. No, they do not.

**Q. Okay. And each one of these knives is a folding knife. Correct?**

A. Yes. From what I understand.

**Q. Okay.**

MR. WOODS: John, we've been going for about an hour and a half. Is this a good time to break?

MR. DILLON: Yeah. We can take a break. How about 10 minutes.

MR. WOODS: Works for me.

MR. DILLON: All right. Let's go off the record then.

(Recess taken 11:38 a.m. - 11:50 a.m.)

MR. DILLON: All right. Dr. Rivas, at this point I'm going to introduce Plaintiff's Exhibit 5.

(Exhibit 5 was premarked and identified during the proceeding.)

(Mr. Dillon screen shares Exhibit 5.)

MR. DILLON: I'm now sharing it on the screen. It's a number of pages from the book Antique

American Switchblades written by Mark Erickson.
Q. Do you see that?
A. Yes.
Q. Do you recognize this book?
A. I do.
Q. And you cite to this book in your report in Footnote 32. Is that correct? In the -- oh. Switch over to your report here, Plaintiff's Exhibit 1. I'll highlight Footnote 32.
Do you see that?
A. Yes.
Q. And Footnote 32 states "On the size and styling of early switchblade knives produced in the United States, see Erickson Antique American Switchblades 25 through 143." Correct?
A. Yes.
Q. So going back to Exhibit 5 here. We have the title -- or the cover of Antique American Switchblades. I'm going to scroll down passing the Table of Contents and I'm going to a copy of Page 6 in the introduction of Antique American Switchblades.
Do you see that?
A. Yes.
Q. Okay. And going up to the top right portion of this book under the History section it states that

"Switchblades were in mass production by the mid 1890s and fast becoming the most useful cutting tool one could carry and gaining popularity in the public acceptance."

Is that correct? I can direct you. Let's see. Oh, my highlighting doesn't work here, but if you follow my cursor it's about there.

A. Yes. Yes. I remember reading that in the book. Yeah.

Q. Okay. And a little bit further down in that same section it also states, "There were switchblades specifically designed for hunters, fishermen, soldiers, farmers, veterinarians, mechanics, office workers, seamstresses, high school girls, Boy Scouts, and also for Girl Scouts."

Do you see that?

A. Yes.

Q. And based off of your research -- sorry. Strike that.

For this report that you submitted in this case you conducted research regarding switchblade manufacturing and production in the United States. Correct?

A. Yes.

Q. Okay. And based off that research on switchblades in the United States, you would agree with

**these statements that I just read. Correct?**

A. More or less, yes.

**Q. What do you mean more or less?**

A. Well, I mean, he's gone so far as to identify specific styles designed for the Girl Scouts. Like I did not go into that depth of research. Also, they were in mass production by the mid 1890s. That sounds -- that sounds like a good estimate, you know, based on the reading that I did, yeah.

**Q. Okay. So you're just -- you didn't do enough research to know if there were specific models designed for Boy Scouts and Girl Scouts of these other activities, do you?**

A. Well, I mean, he wrote a book on it so he definitely did some more work on it than I think I was able to do for the purposes of this report.

**Q. Okay. And in your research you found nothing that would contradict his statement about the many uses of switchblades. Correct?**

A. No. In fact, and I would say that his book -- the later sections where they show various different manufacturers and models -- does speak to the varying uses to which people were putting automatic opening knives in the, you know, very late 19th and into the 20th centuries.

**Q. Okay. And so based off of your review of this book and your own research, you would agree that the knives you referenced in American -- Antique American Switchblades would have many different lawful uses. Correct?**

A. I'm not sure which -- can you tell me which citation or citations to the book you're referring to?

**Q. Okay. I'll go back to Exhibit 1. Footnote 32. You reference Pages 25 through 143 of Antique American Switchblades. Again, you've just orally referenced the many different knife models and manufacturers that are described in these pages. Correct?**

A. Yes. Yes.

And the sentence that is supporting says "These early switchblades swung open from a folded position and many were essentially automatic opening pocket knives."

**Q. Okay. And you agree with that statement. Correct?**

A. Yes. I stand behind that statement.

And I do think his book supports that assertion that early switchblades swung open from a folded position and many were essentially automatic opening pocket knives.

Q. Okay. I'm going to scroll down again. We're on Exhibit 5 here. This is Page 23 of Antique American Switchblades. I'm scrolling up.

There is a large picture of -- I'm just going to say about 30 knives. Do you see that picture?

A. I do, yeah.

Q. Okay. And this would be -- I'm correct in classifying this as a picture of about 30 pocket style switchblades. Correct?

A. Some are larger than others and I'm not sure how big they all are. But, yes, they all look kind of like a sort of pocket-knife style or pocket knife, yes.

Q. Okay. And, again, I know you can't see the blades of all these knives but just that, you know, from their appearance, these don't seem to have any of the essential features of a fighting knife, do they?

A. Not -- not the essential features that I identified as being pertinent to defining Bowie knives and Arkansas toothpicks, et cetera.

Q. Okay. Thank you.

I'm going to scroll down again. Now we're at Page 80 of Antique American Switchblades. We see a number of displays what's titled the Jack-O-Matic knife or the Mac Master Knife.

Do you see that?

A. I do.
Q. Okay. And kind of the highlighting -- so I'll highlight this lower advertisement or display titled the Jackmaster, has about 10 jack knives on a -- looks like cardboard display.
Do you see that?
A. Yes.
Q. And what is the description of these knives that's under Jackmaster? Can you read that out for loud for me?
A. You mean the text in the yellow circle?
Q. Yes.
A. "Utility knife. Press the button and blade opens and locks itself automatically."
Q. Okay. So these are described as utility knives. Correct?
A. Yes.
Q. And the white text underneath the yellow circle, can you read that for me?
A. Yes. "Always leaves one hand free. No more broken fingernails. Handiest knife ever made. Razor steel blade."
Q. Okay. And there is some additional white text in the upper right-hand portion of that display.
Can you read that for me?

A. Can you zoom in a little bit?

**Q. Yeah.**

A. In my view -- maybe I can change this. I don't know how to. But in my view all of our faces covering up part of this and --

**Q. You can kind of move that whole box that shows up on your screen.**

A. Okay. There we go.

It says "A necessity for sportsmen, hobbyists, carpenters, mechanics, electricians" and I think it says "whittlers."

**Q. I agree. I also struggled when I read that. I couldn't read it at first. Yes, it does say "whittlers." So, again -- let me zoom out here.**

**All these knives that are depicted on this page, these would be more commonly classified as different variations of pocket knives. Correct?**

A. That would be my understanding, yes.

**Q. Okay. And, again, in your Footnote 32 -- I'm going back to your report here. In Footnote 32 you state that "This book describes the size and styling of early switchblade knives produced in the United States." Correct?**

A. Yes.

**Q. And based off of your review of this book, did**

**you come across any fighting knives or large Bowie knife style knives?**

A. I really don't -- I really don't recall. I had very limited -- I had short-term access to that book and I have long since had to return it. So I don't remember specifically what were the largest kinds of knives, including things like that.

**Q. Okay. I'm trying to move the box with all our heads on it. Okay. So I'm going to scroll down to paragraph -- or Page 13, Paragraph 28 of your report.**

**You state that "America restricted the presence of deadly weapons in public spaces through various mechanisms, including public carry laws."**

**Do you see that?**

A. That sounds right. I still don't see it.

**Q. Sorry.**

A. Yeah. Sorry. All the various screens are constantly getting in the way.

**Q. No worries.**

A. Yeah. I see that.

**Q. Okay. And based off of your research and experience, were public carry restrictions the most common mechanism that implemented the various mechanisms that you're referencing in this statement?**

A. Yes. Based on the research that I've done,

there are more likely to find various kinds of carry restrictions than you are just about any other kind of restriction pertaining to deadly weapons.

**Q. Okay. And, again, just to clarify. By public carry laws, you mean laws that restrict the method of carrying certain weapons in public. Correct?**

A. Yes.

**Q. And going to the next sentence here in Paragraph 28 you state "In 1801, a Tennessee law prohibiting 'privately' carrying 'any dirk, large knife, pistol or any other dangerous weapon.'"**

**Did I read that correctly?**

A. Yes.

**Q. And you refer to Footnote a 35 after this reference. Correct?**

A. Yes.

**Q. And that directs us to an 1801 Tennessee law that's attached as Exhibit 14. Correct?**

A. Yes.

**Q. And you state that this law prohibited privately carrying certain weapons. Right?**

A. Yes. That is what I stated.

**Q. Okay. I'll use the search box again here. We're now down at Exhibit 14 attached to your report. And I'll scroll down to the relevant section here.**

There we go.
I'm highlighting the Section 6 of your Exhibit 14. Can you see that section there?
A. Yes.
Q. Is this the section you're referring to in your citation?
A. Yes.
Q. I'll read this out loud here. It says "That if any person or persons shall publicly ride or go armed to the terror of the people or privately carry any dirk, large knife, pistol or any other dangerous weapon to the fear or terror of any person, it shall be the duty of any judge or justice in his own view or upon the information of any other person an oath to bind such person or persons to their good behavior. And if he or they fail to find sureties, commit him or them to goal. And if such person or persons shall continue to offend, he or they shall not only forfeit their recognizances, but be liable to an indictment." And it continues on from there. Correct?
A. Yes.
Q. Okay. So this is not a general prohibition on carrying weapons, is it?
A. That's --.
MR. WOODS: Objection. The document speaks

for itself.

You can answer if you can.

THE WITNESS: This is a prohibition, generally speaking, on -- on -- they use the word "private" here but privately carrying various weapons.

MR. DILLON: Q. Okay. And privately carrying, meaning the conceal carrying of weapons?

A. That's how I interpret it. That's also why I put the word specifically in the text of the report. But, yes, reading this I would interpret that as -- as carrying in a concealed manner.

**Q. Okay. And it also requires that the person who's secretly carrying go armed to the terror of the people. Is that correct?**

A. It does use that phrase. And there is a robust literature on the significance of that phrase and its use as sort of a legal -- I don't know what the right word is. Sort of like a specific legal phrase with a particular meaning. And there is literature on that.

And the most persuasive accounts of it that I have read indicate that the act of carrying the weapon was considered a terror to the people; not that it was some additional -- additional threshold that had to be met.

**Q. And what specifically are you basing this on?**

A. There is -- there is some law review of literature on it. The one that jumps to mind immediately is that Mark Proseto has an article that's called "To The Terror of the People" that's been out a couple of years now, but it's got a good roundup of the literature up to then. There may be some things that have been published since that also address that.

**Q. Okay. And if someone were to secretly carry and go armed to the terror of the people in this section, they would be required to pay a surety or security. Correct?**

A. Well, they would be -- they would policed through the common law mechanism surety which was a different -- a different mechanism than what we are familiar with now. But that was just regular policing back then.

So, yes, they would have had to, you know, appear and find someone to post a bond for them. And, you know, if they were to not meet the requirements of the bond, then they would -- the bond holders would lose their money and then they would go to jail.

That's how local policing worked in Colonial America for the most part.

**Q. Okay. So I could categorize this as a surety**

**statute. Correct?**

MR. WOODS: Objection. Document speaks for itself.

You can answer if you can.

THE WITNESS: Yes.

MR. DILLON: Okay. Sorry. Let me stop sharing and I'll get to the relevant page.

**Q. Okay. So, again, in this Paragraph 28 you also refer to an 1812 Kentucky law that "restricted the carrying of a pocket pistol, dirk, large knife or sword in a cane."**

**Is that correct?**

A. Yes. That's what I said in the report.

**Q. Okay. And that's listed in the Footnote 36 and -- which directs you to the Exhibit 15 of your report. Correct?**

A. Yes.

**Q. All right. So I've done a search function. We're now down at Exhibit 15.**

**So here Section 1 it states "Any person in this commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife or sword in a cane, concealed as a weapon, unless when traveling on a journey, shall be fined in the sum of not less than $100."**

**Do you see that?**

A. Yes.

**Q. Okay. And you describe this law as a law restricting the carrying of these previously mentioned weapons. Correct?**

A. Yes.

**Q. And after reading this section, this is a restriction on concealed carry of these weapons. Correct?**

A. Which is a restriction on --

MR. WOODS: Objection. The document speaks for itself.

You can answer.

THE WITNESS: Which is a restriction on the carrying of them, yes.

MR. DILLON: Q. But it specifically regulates concealed carry not open care. Correct?

A. It -- okay. The -- a concealed carry prohibition, even one with an exception, is still a restriction on the public carrying of weapons. Restriction doesn't -- it is not -- doesn't mean the same thing as a prohibition.

I didn't describe it as a prohibition on carrying of those weapons. I described it as a restriction upon the carrying of them, which a concealed carry of prohibition is.

**Q. Right.**

**And I'm trying to clarify this is a restriction on the act of concealed carry. Correct?**

A. Yes. It does apply specifically to concealed care.

**Q. And it is not a restriction on the act of openly carrying these weapons. Correct?**

A. It does not specifically prohibit opening carrying of these weapons.

**Q. And the law --**

A. I will say, though, that, again, the concealability and the fact that these weapons were being concealed is relevant to interpreting the laws and their application that, you know, yes, it doesn't specifically prohibit open carry, but concealed carry is what weapon carriers were doing.

**Q. Okay. But, again, it does not restrict the open carry of these weapons. Correct?**

A. It doesn't specific prohibit it.

**Q. Okay. So it also doesn't prohibit the purchase of these weapons. Correct?**

A. No, it does not.

**Q. And it doesn't prohibit the sale of these weapons. Correct?**

A. No, it does not. Not in this law.

**Q. And this law doesn't prohibit the possession of these weapons. Correct?**

A. No. This law does not.

**Q. Okay. It also allows for the conceal carry of these weapons when traveling on a journey. Is that correct?**

A. Yes. That's correct.

**Q. Okay. So, again, in Paragraph 28, you also mention an 1813 Louisiana law stating that it prohibited "Any concealed weapons such as a dirk, dagger, knife, pistol or any other deadly weapon."**

**Is that correct?**

A. Yes.

**Q. And that law is listed in Footnote 37 of your report which directs us to Exhibit 16.**

**Is that correct?**

A. Yes.

**Q. And, again, this is a restriction on the act of concealed carrying of these weapons. Right?**

A. Yes.

**Q. So this law does not prohibit the purchase of these weapons. Right?**

A. No. That one does not specifically prohibit the purchase.

**Q. And that law also does not prohibit the sale**

**of these weapons. Correct?**

A. Correct. That law does not prohibit the sale of the specified weapons.

**Q. And that law also doesn't prohibit the possession of these weapons. Correct?**

A. Correct.

**Q. And that law also does not prohibit the open carry of these weapons. Correct?**

A. It does not specifically prohibit the open carrying of them.

**Q. Okay. Again, in Paragraph 28, you also refer to an 1819 Indiana law that you state "Restricted any dirk, pistol, sword in cane, or any other unlawful weapon."**

**Is that correct?**

A. Yes.

**Q. And, again, you direct us to Exhibit 17 in Footnote 38 to support this statement. Right?**

A. Yes.

**Q. And, again, this law restricted the act of concealed carrying of these weapons. Correct?**

A. I -- based on -- my gut response is yes, because I called it a restriction. But we can always refer to it, if would you like, just to confirm.

**Q. Sure. Okay. So now we're on Exhibit 17 of**

your report. I'm scrolling down to the relevant section, kind of highlight the section here.

It states that "Any person wearing any dirk, pistol, sword in cane, or any other unlawful weapon concealed shall be deemed guilty of a misdemeanor" -- and it goes on to describe the fines or any type of conviction.

Do you see that?

A. I do, yeah.

Q. So, again, this is just a restriction on the concealed carry of these weapons. Correct?

A. Yes. It would fall under that category of being a concealed carry prohibition.

Q. And this law doesn't prohibit the purchase of these weapons. Correct?

A. That's correct.

Q. And it does not prohibit the sales or transfer of these weapons. Correct?

A. That's correct.

Q. And it doesn't prohibit the possession of these weapons. Correct?

A. That's correct.

Q. And it doesn't prohibit the open carry of these weapons. Correct?

A. No, it does not specifically prohibit open

carry of those weapons.

Q. Okay. And then, again, referring back to the statute, the end, it states "Provided, however, this act shall not be so construed as to affect travelers."

Is that correct?

A. Yes.

Q. Okay. So am I correct in stating that you would be allowed to conceal carry these weapons if you were construed as a traveler under this law?

A. Yes. That's correct.

Q. Okay. You -- all right. Let's see. You also reference an 1821 Missouri law in Paragraph 28 of your report in which you state that "Restricted the carrying of any pistols, dirks or other such offensive weapons."

Is that correct?

A. Yes.

Q. Okay. And under Footnote 39 you support this claim by referencing Exhibit 18. Is that correct?

A. Yes.

Q. And, again, this law is a restriction on the concealed carry of these weapons. Is that correct?

A. Based upon my recollection, yes.

Q. Let's go to it then. So I have Exhibit 18 of your report. I'm scrolling down. All right. I'm going to read the relevant text here.

**It states that "From and after the passage of this act, any person or persons convicted before any magistrate of his or their wearing or carrying any pistols, dirk, or other such offensive weapons, concealed about his or their person shall forfeit and pay the sum of $50 for every such offense to be applied to the use of the literary refund. Provided that in all cases of persons traveling, they shall not be bound by the provisions of this act."**

**Is that correct?**

A. Yes. That's what it says.

**Q. Okay. So, again, this is a law restricting the act of concealed carrying these weapons. Correct?**

A. That is a concealed care prohibition. Yes.

**Q. And it allows for the concealed carry of these weapons for "all cases of persons traveling." Correct?**

A. Yes. That's what it says.

**Q. And this law wouldn't prohibit the purchase, sale, transfer, possession or open carry of any of these weapons. Correct?**

A. Yes. That's correct.

**Q. The next line you reference in your report is an 1838 Virginia law that you state "Regulated the carrying of any pistol, dirk, Bowie knife, or any other weapons of the like kind from the use of which the death**

of any person might probably ensue."
Is that correct?
A. Yes.
Q. And under Footnote 40 you cite to Exhibit 19 attached to your report to support this statement?
A. Yes.
Q. Again, this law only restricts the act of concealed carrying these weapons. Correct?
A. Yes. Based -- yes. Based on my recollection, yes.
Q. Would you like me to pull up the specific statute or are you confident in your recollection?
A. I'm confident in my recollection.
Q. Okay. So being a restriction on the concealed carry of these weapons, this law would not prohibit the purchase, sale, transfer, possession or open carrying such weapons. Correct?
A. Yes. That's correct.
Q. The next law you reference in your report is 1840 Alabama law "Whose laws pertain to a Bowie knife or knife or instrument of the like kind or description by whatever name called dirk or any other deadly weapons, pistol or any other species firearm or airgun."
Do you recall that?
A. Yes.

Q. Okay. And the supporting statute is listed in Footnote 41 of your report and references Exhibit 20 attached to your report. Is that correct?
A. Yes.
Q. Okay. And, again, this law is a restriction on the active carrying these weapons concealed. Right?
A. I believe so, yes.
Q. Okay. So being a restriction on the concealed carry of these weapons, the law would not prohibit the purchase, sale, transfer, possession or even open carry of these weapons. Correct?
A. You're correct. That particular law did not.
Q. All right. And the next law you reference in your report is an 1846 Florida law.
Do you recall that?
A. Yes.
Q. And this 1846 Florida law explicitly exempted pocket knives. Is that correct?
A. Yes.
Q. And in your report you state that this law "Regulated the public carrying of any dirk, pistol or other arm or weapon, except a common pocket knife." Correct?
A. Correct.
Q. And the supporting text of the law is attached

**to your report as Exhibit 12. Is that right?**

A. Yes.

**Q. Again, this wasn't a broad restriction on all forms of public carry. Correct?**

MR. WOODS: Objection. Ambiguous.

You can answer if you can.

THE WITNESS: It -- it was like the others you've described prohibiting the concealed carry of certain weapons. Some specifically enumerated and others a little more open to interpretation.

MR. DILLON: Okay. Just to make sure -- because there was a little bit of feedback there.

Court Reporter, were you able to get that?

MS. REPORTER: Yes.

MR. DILLON: Q. Okay. And the exception for pocket knives is not the only exception that this law references. Is that right?

A. I would have to look at the law to refresh my memory.

**Q. Okay. Let's do that. Give me a minute to pull up the relevant portion.**

**Okay. All right. I'm going to scroll down to Exhibit 12 of your report. Going down to Section 3 of the relevant statute states that "Hereafter it shall not be lawful for any person in the state to carry arms of**

**any kind whatsoever secretively, on or about their person. And if any dirk, pistol, or other arm or weapon except a common pocket knife shall be seen or known to be secretive upon the person of anyone in the state, such person so offending shall, on conviction, be fined not exceeding $500, but not less that $5."**

**Do you see that?**

A. Yes.

**Q. And then scrolling down in this exhibit states that "Provided, however, that this law shall not be so construed as to prevent any person from carrying arms openly outside of all their clothes."**

**Do you see that portion?**

A. Yes.

**Q. So this law explicitly exempts the carrying of all pocket knives and also the open carrying of any such weapon. Correct?**

A. Just to clarify. It -- as I read it, it explicitly permits the open carrying of all of those prohibited weapons which are listed or described as except pocket knives. So pocket knives are, you know, okay to care either way. But people are more than likely carrying them concealed in their products.

Yeah. I do read this as an explicit protection for carrying of the otherwise restricted

weapons openly.

Q. Okay. And under this law it does not restrict the purchase of these knives -- or any of these weapons. Correct?

A. That's correct.

Q. And it also doesn't restrict the sale, transfer, possession of any of these weapons. Is that correct?

A. That's correct.

Q. Okay. In Paragraph 29 of your report you state that "Some states taxed the possession of large knives while others prohibited their sale."

Do you recall that?

A. Yes.

Q. Okay. And you state that "Alabama, North Carolina and Mississippi taxed the personal possession of certain weapons, including large knives like dirks and Bowie knives."

Is that correct?

A. Yes.

Q. Okay. And to support this claim you cite a Footnote 33 -- or sorry -- 43 in your -- on Page 14 of your report, which references Exhibits 11, 21, 22, 23, 24, 25, 26, 27, 28, and 29.

Is that correct?

A. Yes.

**Q. Okay. And, again, I can -- just to make sure we're all on the same page here -- pulled up your report. I'm highlighting the portion of Footnote 43.**

**Okay. So all of these laws imposed taxes on certain weapons. Is that a correct statement?**

A. Yes.

**Q. Okay. And non of these laws explicitly prohibited the purchase of any of them. Correct?**

A. No. The taxes did not specifically prohibit the purchase. I will say, though, that the taxes did operate, to some extent, as a disincentive to acquire the weapons because they are being taxed. And the rate of tax was fairly high, considering the relative cost of buying one such knife. So it wasn't a specific prohibition but a disincentive.

**Q. Okay. And non of these laws prohibited the sale of any weapon. Is that correct?**

A. Yes. That's correct.

**Q. And none of these laws that you list in Footnote 43 prohibited the concealed carry of any weapon. Is that correct?**

A. That's correct. Laws pertaining to carrying would have been located in other statutes.

**Q. Okay. And, again, these laws did not restrict**

**the open carry of any weapon. Is that correct?**

A. That's correct.

I'll add, though, some of the taxes -- some of the -- well, no. Your question is: Did it prohibit open carry? No. The taxes were not related to carrying of the weapons specifically.

**Q. Okay. And you also state in your worth report that even some of these tax laws only put a tax on knives that actually had been worked or carried in public.**

**Is that correct?**

A. Yes. And that's the point I was sort of thinking of or getting to. And so some of them -- and -- so, yes, some of them did include that. So the taxes applied to these weapons if they were worn in public. So weapons that were not worn or carried in public would not have been subject to the tax.

**Q. Okay. Now in Paragraph 29 of your report you state that "Others prohibited their sale."**

**Do you recall that or do you see that here?**

A. Yes.

**Q. Okay. But none of the laws in Footnote 33 and attached to your report that -- Footnote 43 references, none of those actually prohibited sale. Correct?**

A. No. Those did not pertain to sale. Those

were taxes.

**Q. So what laws are you referring to that prohibited the sale of certain weapons?**

A. Those, I believe, I get to later on. There was definitely a prohibition on the sale of Bowie knives in Tennessee. So I -- I'm turning through the pages -- later pages of the report. And so the specific sales prohibitions are later.

So I started out by talking about taxes and then talking about different kinds of taxes, some of which -- some of which based on their context, indicate that they were designed to be prohibitive taxes. So occupation taxes, for instance, so high that, you know, essentially shut down the sale of those weapons.

And then in Paragraph 32, got to discussing the Tennessee example of prohibiting the sale of certain kinds of knives.

**Q. Okay. And that Tennessee example is one example of a state law prohibiting the sale of certain knives?**

A. Yes. That's one.

**Q. Okay. Are there any others that -- I'll say this.**

**Are there any other examples of state laws prohibiting the sale of knives prior to 1850?**

A. I don't know off the top of my head other specific knife sale prohibitions. There are other weapon sale prohibitions of different weapons.

But to your question about before 1850, you know, the example pre-1850 would be the prohibited occupation taxes, such that the occupation tax for engaging in the trade of selling weapons or knives was so high that it would have all but shut down the trade.

So it's not specifically prohibition on the sale, but it functions as kind of a prohibitive tax. And the Florida territory 1838 tax would definitely be a candidate for that.

**Q. And that's a Florida territory law, not a Florida state law?**

A. Yes. From -- based on what -- based on the work that I looked into it, yeah, it was during the territorial phase.

And I believe Alabama the 1830s also had an occupation tax upon the sale of Bowie knives that was fairly high. But I don't remember the specific year or the details of that law right now.

**Q. Okay. So in Paragraph 30 -- I have it up on the screen here -- you mentioned two municipalities that pose personal taxes on dirks and Bowie knives.**

**Is that correct?**

A. I'm flipping back to Paragraph 30.

**Q. I have on the screen too, if that helps you.**

A. Yeah. I appreciate that. I think I'm also just a little old school and it's very helpful to have it physically in front of me. But I'm here at Paragraph 30 again.

**Q. Okay. In Paragraph 30 you mentioned two municipalities that impose personal taxes on dirks and Bowie knives. Correct?**

A. Can you highlight the --

**Q. Sorry. This would be the -- it's the last sentence in -- on Page 15 and continues on to Page 16.**

A. Oh, I see. Okay.

Yes. I talked about two Georgia municipalities that imposed personal taxes on the value of residents' dirks and Bowie knives.

**Q. And, again, these are not state laws. Correct?**

A. No. Those were municipal ordinances.

**Q. Okay. And the municipal ordinance from Jesup, Georgia that's attached as Exhibit 30 in your report?**

A. Okay.

**Q. That's also listed in Footnote 51 on Page 16 of your report.**

A. Yes. I see that.

**Q. Okay. And that law was enacted in 1870. Correct?**

A. I'm not -- I'm not sure.

**Q. Okay. Let's see. So Exhibit 30. I can't see the text here. So Exhibit 30, you see Part III - Title I - Municipal Corporations. And then Amending Charter of Jesup.**

**Do you see that?**

A. Yes.

**Q. And this was approved in October 24 of 1870?**

A. Well, it says "Alter and amend an act entitled" -- yada, yada -- "approved in October 1870."

So -- and then the citation says 1888. So I think it may be --

**Q. Okay.**

A. -- an amendment to an 1870 municipal ordinance. And --

(Simultaneous speaking.)

MS. REPORTER: I can't get both of you.

MR. DILLON: Yeah. Sorry.

I cut you off there.

**Q. So this was an amendment to an 1870 municipal ordinance. Correct?**

A. (Witness nods head.)

**Q. And that amendment was enacted around 1888,**

**according to your citation?**

MR. WOODS: Objection. The document speaks for itself.

You can answer.

THE WITNESS: Yeah. So it looks like the charter, which is different from an ordinance -- but it does look like the charter was issued in 1870.

And what I'm citing to is an amendment to at a charter that I think is dated 1888.

MR. DILLON: Q. Okay. And the Cedartown charter is attached as Exhibit 31 to your report.

Is that correct?

A. Yes.

**Q. Okay. And the date on that was 1889. Correct?**

A. Based on the citation, yes.

**Q. And you didn't mention any other municipal taxes on certain weapons before these dates in your report. Is that correct?**

A. No. I did not mention any in this report.

**Q. Okay. And to clarify, do the statutes that are being challenged in this case, do they impose any kind of tax on switchblades or automatically opening knives?**

MR. WOODS: Objection to the extent that it's

beyond the scope.

You can answer.

THE WITNESS: Not that I'm aware of.

MR. DILLON: Q. Okay. So in Paragraph 31 of your report you reference a number of tax regulations.

Is that right?

A. Yes.

**Q. And these tax regulations are cited in your report and attached to your report as Exhibits 30 through 43. Is that right?**

A. Yes.

**Q. Okay. And in Paragraph 32 of your report -- let's see here -- you mentioned an 1838 Tennessee law that criminalized the sale of any Bowie knives or knives or Arkansas toothpicks or any knife or weapon that shall form, shape or size resemble a Bowie knife or Arkansas toothpick.**

**Did I read that right?**

A. Yes.

**Q. And is that the Tennessee law that you referenced earlier that prohibited the sale of certain weapons?**

A. Yes.

**Q. Okay. And you also clarify in Paragraph 32 that this law was suspended during Civil War.**

**Is that right?**

A. Yes.

**Q. Was the provision ever reinstated?**

A. I believe that it was, but I would want to go back to my records to confirm that.

**Q. But it's not confirmed in your report. Correct?**

A. No. It's not confirmed in my report. Like I said, I would want to go back to my notes before making any sort of firm statement about it.

**Q. Okay. And you mentioned that in 1879 the state of Tennessee prohibited the sale of pocket pistols altogether. Correct?**

A. Yes.

**Q. And as did Arkansas 1881. Is that right?**

A. Yes.

**Q. Okay. So the 1879 Tennessee law that's attached as Exhibit 46 of your report. Right?**

A. Yes. That's what it shows in the footnote.

**Q. Okay. So I'm now sharing the screen. I have Exhibit 46 up. I'm scrolling down. Let's see.**

**Can you read the section -- relevant Section 1 here.**

A. Yes. "Be it enacted by the General Assembly of the State of Tennessee, that it shall be a

misdemeanor for any person to sell, or offer to sell, or to bring in to the state for the purpose of selling, giving away, or otherwise disposing of belt or pocket pistols or revolvers, or any other kind of pistols, except Army or Navy pistol. Provided that this act shall not be enforced against any persons now having license to sell such articles until the expiration of such present license."

**Q. Okay. So this explicitly provides for an exception to any who attains a license to sell these weapons. Is that correct?**

A. No. That --

MR. WOODS: Objection. Document speaks for itself.

You can answer.

THE WITNESS: No, that's not what it means. It means until the expiration of a present license. From what I recall, there was an appellate case about this. The dealer was able to -- the question -- it revolved around the fact that whether or not licenses expire, I don't recall the specific details, so I don't want to speak any firmness on it.

But it wouldn't be -- the license that they are talking about, from what I understand, was something along of lines of an annual license. So once -- so in

other words, people who had already obtained a license would be able to finish out their license to dispose of their current inventory. But then the idea is that no further licenses would be issued.

MR. DILLON: Q. Okay. And do you have anything attached to your report that would support that claim that no other licenses were going to be issued under this provision?

A. Well, the law doesn't go into that kind of detail. But I don't -- maybe in this report I didn't cite that case. I would have to look at the footnotes. But since we were talking more about knives, you know, I'm looking at it and I don't see that I cited the appellate case.

**Q. Okay. Again, the Arkansas law that you referenced in this section was enacted in 1881.**

**Is that correct?**

A. Yes.

**Q. Okay. So of all the laws that you reference in your report, how many explicitly prohibited the sale of any kind of knife?**

A. The laws that -- the Tennessee example is the law that specifically prohibited the sale, giving away, et cetera of certain kinds of knives.

**Q. Okay. So is that the only example of a state**

**law that explicitly prohibited the sale of any kind of knife in the 19th century?**

A. That's the only example that I found in this -- listed in this report. But I'll add that there are examples of prohibitively high occupation taxes that we can interpret as going a long way toward reducing, if not eliminating, the trade in certain kinds of deadly weapons.

**Q. So, again, there is one law in the entirety of the 19th century that explicitly prohibits the sale of any kind of knife. Correct?**

MR. WOODS: Objection. Mischaracterizes testimony.

You can answer if you can.

THE WITNESS: There is one in this report. I would hesitate to ever say that there is only this many or there is exactly that many laws from the 19th century. We -- there is no way to know that based on the ones that have been identified so far; this is the one that jumps to my mind and it's the one that's in my report. That doesn't mean that there wasn't some municipal ordinance somewhere that hasn't been found.

So based on the bank of laws that we have today and that we know about today, this is, like I said, the only example that jumps to my mind and it's

the only example of a specific sale-related one that's mentioned -- sale related of Bowie knives that's mentioned in my report.

MR. DILLON: Q. Okay. So, again, in your report where you are putting forth examples of various restrictions on knives, you've only listed one state law in the entirety of the 19th century that explicitly prohibited the sale of any kind of knife. Correct?

MR. WOODS: Objection. Asked and answered.

You can answer.

THE WITNESS: Yeah.

MR. DILLON: Q. Okay. And, again, in your report covering the various laws throughout the 19th century regarding knives, how many do you state explicitly prohibit the possession of any kind of knife?

A. I don't believe any of them use the word "possession" or "applied to possession" the way that we're thinking of it now.

**Q. Okay. And to clarify, just to make sure we're on the same page here on what we consider possession. Possession meaning I am legally allowed to hold and own and be in control of a certain object. Correct?**

A. Yes.

**Q. Okay. And so there were no laws in the 19th century that restricted or prohibited the possession of**

**any knife in your report. Correct?**

A. In my report, correct.

**Q. Yeah.**

**Okay. And lion's share of all the laws we went over today that are referenced in your report, they just restrict the act of concealed carrying of certain weapons. Correct?**

MR. WOODS: Objection. Ambiguous.

You can answer if you can.

THE WITNESS: So, yes, most of the laws mentioned in my report are carry -- carry-type restrictions. That was the primary way of regulating weapons in the 19th -- 19th century.

I would argue that it's a -- it was a more feasible way of regulating them than trying to enforce any sort of outright ban.

MR. DILLON: Q. Okay. And with regard to the tax laws that you referenced in your report, were most of these enacted post Civil War?

A. I'm not -- some taxes were post Civil War and other taxes were pre Civil War. I don't -- the number in my report -- I'd have to look. But there were taxes before the Civil War as well as including personal taxes that were sort of a disincentive to possession of those kinds of weapons, if not a disincentive to carrying

them.

But I don't have like a list of all the ones that I -- just the ones I cited. There is a lot more taxes than the ones I cited in this report. But I -- if you tell me the footnote, I can tell you what the years were of the relevant footnotes.

**Q. So I'm going to direct you to -- let's see -- it's going to be Page 16 of your report. Substantively, on Page -- or Paragraph 31 you're talking about occupational taxes and you have various footnote citations, which is 51 through 54 on Page 16.**

**Do you see that?**

A. Yes.

And Footnote 51, actually, applies to the preceding paragraph and it applies to personal taxes on the value of dirks and Bowie knives and other weapons.

**Q. And that's for the municipalities of Jesup, Georgia and Cedartown, George. Correct?**

A. Yes.

**Q. Okay. So looking at Footnotes 52 through 54, these are all tax regulations. Correct?**

A. Yes.

**Q. And based off of your research, your experience and what you have in front of you within these footnotes, most of these enacted after the Civil**

**War?**

A. Yes. Most of the --

MR. WOODS: Objection. Asked and answered.

You can answer. Go ahead.

THE WITNESS: Yes. Most of the ones that I cite here, looking at it, just glancing at it, most of them are after 1865.

MR. DILLON: Okay. At this time I think I'm going to conclude my questioning, unless defense counsel has anything they would like to ask.

MR. WOODS: Let me look at my notes.

Can we take a five-minute break.

MR. DILLON: No problem.

(Recess taken 12:51 p.m. - 12:54 p.m.)

MR. WOODS: I'm not going to have any questions.

MR. DILLON: Okay. That will conclude it.

Again, Dr. Rivas, thank you for your time and you'll get a copy of the transcript that you can review, as I mentioned earlier.

THE WITNESS: You're welcome.

MR. DILLON: But, again, thank you for your time and I appreciate you answering the questions.

MS. REPORTER: Mr. Woods, do you want a order a copy?

MR. WOODS: Yes, please.

(Deposition concluded at 12:55 p.m.)

CERTIFICATE

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ X ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 2-26-2024

Kathleen Baca

KATHLEEN BACA, CSR #10267

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Knife Rights Inc. vs. Rob Bonta Attorney General

Date of Deposition: 02/12/2024

Job No.: 10134988

I, DR. BRENNAN RIVAS, hereby certify under penalty of perjury under the laws of the State of ________________ that the foregoing is true and correct.

Executed this ______ day of __________________, 2024, at ____________________.

_________________________________

DR. BRENNAN RIVAS

NOTARIZATION (If Required)

State of ________________

County of _______________

Subscribed and sworn to (or affirmed) before me on this _____ day of ____________, 20__, by________________________, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: ______________________________ (Seal)

DEPOSITION ERRATA SHEET

Case Name: Knife Rights Inc. vs. Rob Bonta Attorney General
Name of Witness: Dr. Brennan Rivas
Date of Deposition: 02/12/2024
Job No.: 10134988
Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

Page _____ Line ______ Reason ______

From _______________________ to ________________________

DEPOSITION ERRATA SHEET

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

Page _____ Line ______ Reason ______

From ______________________ to _______________________

_______ Subject to the above changes, I certify that the transcript is true and correct

_______ No changes have been made. I certify that the transcript is true and correct.

____________________________________
DR. BRENNAN RIVAS

Exhibits

**EX 001 - RIVAS, B** 4:12 11:2,4,6,8 13:20 68:8 71:8

**EX 002 - RIVAS, B** 4:14 14:13,19,20 52:12,14,16

**EX 003 - RIVAS, B** 4:16 15:23,25 16:2, 17 55:25 56:1,3

**EX 004 - RIVAS, B** 4:18 63:11,13,15

**EX 005 - RIVAS, B** 4:19 67:20,21,23 68:17 72:2

$

**$100** 80:24

**$5** 91:6

**$50** 87:6

**$500** 91:6

1

**1** 11:2,4,6,8 13:20 14:9,22 16:7 27:10 54:16 68:8 71:8 80:20 101:22

**1-hand** 63:21

**1-handed** 64:9

**10** 14:8 44:5 53:18 67:14 73:4

**10:00** 5:2

**10:02** 6:12

**10:04** 6:12

**10:57** 41:16

**11** 19:8,17 92:23

**110** 63:12,18,21,22 64:4,9,14

**11:00** 41:16

**11:38** 67:18

**11:50** 67:18

**12** 5:1 20:5,25 22:6, 10 90:1,23

**1274** 18:5 19:3

**129** 52:7

**12:51** 108:14

**12:54** 108:14

**12:55** 109:3

**13** 23:24 26:15,21,23 27:1 28:19 75:10

**138** 52:12,20

**14** 14:25 15:6,11,18 30:17 31:23 32:4,5,9 33:11 76:18,24 77:3 92:22

**142** 52:7

**143** 68:15 71:9

**15** 35:14 36:1 80:15, 19 97:12

**16** 35:14,19 36:1,10 83:15 97:12,23 107:8,11

**17** 84:17,25

**17235** 10:6

**18** 12:7 37:14 44:3,24 47:10,15 52:25 86:18,23

**1800** 31:5

**1800s** 31:4

**1801** 76:9,17

**1812** 80:9

**1813** 83:9

**1819** 84:12

**1821** 86:12

**1826** 37:20

**1830s** 57:24 96:18

**1838** 87:23 96:11 100:13

**1840** 45:3 88:20

**1842** 47:3 48:2

**1844** 33:12

**1846** 89:14,17

**1850** 31:4,5 95:25 96:4

**1860s** 63:6

**1865** 108:7

**1870** 98:1,10,12,16, 22 99:7

**1879** 16:2,17,19 17:8 101:11,17

**1880** 14:8,21,24 15:10

**1881** 101:15 103:16

**1886** 28:20 30:7

**1888** 98:13,25 99:9

**1889** 99:14

**1890s** 69:1 70:7

**18th** 20:23

**19** 39:6 40:24 41:7,20 42:5 43:25 52:1,3 88:4

**19th** 20:6,11,15 23:4, 18 27:5 30:18,23,25 31:11,17 39:8,13,20 40:1,25 41:21 42:7 43:1,8 44:1 50:5 57:10,22 59:10,20 63:1 64:24 66:1,18 70:24 104:2,10,17 105:7,13,24 106:13

2

**2** 14:13,19,20 52:12, 14,16

**2-handed** 63:19 64:4

**20** 48:18 52:1 89:2

**2023** 6:6 13:24,25

**2024** 5:1

**20th** 70:25

**21** 92:23

**21510** 10:7

**21590** 10:7

**22** 53:17,19 55:3 92:23

**23** 72:2 92:23

**24** 92:24 98:10

**25** 45:3 68:15 71:9 92:24

**26** 92:24

**27** 92:24

**28** 75:10 76:9 80:8 83:8 84:11 86:12 92:24

**29** 92:10,24 94:18

3

**3** 14:4 15:23,25 16:2, 17 24:14 44:23 55:25 56:1,3 90:23

**30** 72:5,8 96:22 97:1, 6,7,21 98:4,5 100:9

**31** 99:11 100:4 107:9

**32** 68:7,9,12 71:9 74:19,20 95:15 100:12,24

**33** 92:22 94:22

**35** 76:14

**36** 80:14

**37** 83:14

**38** 84:18

**39** 86:17

**3:23-cv-00474-jes-ddl** 5:12

**4**

**4** 19:8 63:11,13,15

**40** 88:4

**40s** 57:24

**41** 89:2

**43** 92:22 93:4,21 94:23 100:10

**46** 101:18,21

**5**

**5** 23:23 33:11 35:1 67:20,21,23 68:17 72:2

**51** 97:23 107:11,14

**52** 107:20

**54** 107:11,20

**6**

**6** 33:10 68:20 77:2

**60** 31:4,5

**7**

**7** 37:13,14 54:13

**70s** 63:6

**7th** 47:3

**8**

**8** 44:4 45:1 47:9 54:13

**80** 72:22

**9**

**9** 44:4 47:1,11 48:17 53:18

**A**

**a.m.** 5:2 6:12 41:16 67:18

**ability** 21:22 22:11 23:11 62:9,21

**absolute** 63:6

**acceptance** 69:3

**access** 75:4

**accounted** 46:15

**accounts** 78:21

**accurate** 46:11

**acquire** 43:3 93:12

**acquired** 28:4

**act** 21:23 22:12 23:20 29:22 30:14 78:22 82:3,6 83:18 84:20 86:3 87:2,9,13 88:7 98:11 102:5 106:6

**active** 89:6

**activities** 70:13

**actual** 61:16,18

**Adamas** 56:8,10 61:19

**add** 38:5 94:3 104:4

**additional** 73:23 78:24

**address** 6:10 79:8

**administered** 5:5

**admit** 47:7

**admonitions** 6:18

**advertisement** 73:3

**affect** 86:4

**age** 14:9,25 15:6,15 17:18

**age-based** 15:13

**agree** 35:24 36:15 59:16 69:25 71:2,19 74:12

**agricultural** 19:9

**ahead** 11:18 108:4

**airgun** 14:10 88:23

**Alabama** 88:20 92:15 96:18

**allowed** 86:8 105:21

**Alter** 98:11

**altogether** 101:13

**Ambiguous** 21:25 36:5 51:19 57:5 62:1 90:5 106:8

**amend** 98:11

**Amending** 98:6

**amendment** 98:16, 22,25 99:8

**America** 75:11 79:24

**American** 19:10 30:19 31:6 52:3,8,13 59:10 68:1,14,18,21 71:3,10 72:2,22

**Americans** 20:6 31:25 57:10,21,23

**ammunition** 14:12

**annual** 102:25

**answering** 108:23

**answers** 9:12,20

**Antique** 67:25 68:14, 18,21 71:3,9 72:2,22

**apologize** 48:25

**appearance** 72:15

**appellate** 33:25 34:23 102:18 103:14

**application** 82:14

**applied** 21:13 87:6 94:15 105:17

**applies** 107:14,15

**apply** 82:4

**approaches** 17:5

**approved** 98:10,12

**approximately** 64:20

**arc** 7:7

**area** 53:5

**areas** 42:21 43:20 44:18 47:23 48:4,10, 12

**argue** 106:14

**Argus** 47:3

**Arkansas** 34:20 37:16 54:10,17 55:11 57:12,25 66:2, 21 72:19 100:15,16

101:15 103:15

**arm** 89:22 91:2

**armed** 77:9 78:13 79:10

**arms** 90:25 91:11

**army** 51:23 102:5

**article** 29:24 45:1,9, 12 46:8 47:8,20 48:13 79:4

**articles** 39:4 102:7

**ascertain** 27:16

**assassinate** 37:21 38:18

**assassins** 46:20

**assemblages** 16:5

**Assembly** 101:24

**assertion** 71:23

**assess** 31:15

**assist** 12:14

**association** 43:21

**assume** 14:15

**attach** 19:18

**attached** 7:22 13:20 14:13 38:21 47:2 76:18,24 88:5 89:3, 25 94:23 97:21 99:11 100:9 101:18 103:6

**attachment** 44:25

**attack** 47:19 48:14

**attains** 102:10

**attorney** 5:11 8:25 11:9

**attorneys** 13:1,14

**audio** 6:8

**author** 12:12 46:17

**author's** 45:13 46:8, 23

**auto** 56:10,20,25 61:20 63:22 64:14

**automatic** 49:8 50:4, 13,15,18 51:2,3 53:21 56:25 62:4 63:4 70:23 71:17,24

**automatically** 49:4 51:17 53:14 56:14 73:14 99:23

**availability** 31:16

**average** 25:19

**aware** 9:6 10:23 22:23 33:19 50:1,3 51:11,14 53:13 58:21 61:23 100:3

**AXIS** 56:8,10 61:19

**B**

**back** 15:7 26:14 32:7 41:14 47:9 60:5 68:17 71:8 74:20 79:17 86:2 97:1 101:5,9

**backs** 27:8

**ban** 106:16

**bank** 104:23

**based** 21:21 39:22,25 49:3 58:19,24 59:19 62:19 63:3,25 64:13, 23 65:17 66:17 67:3 69:17,24 70:8 71:1 74:25 75:21,25 84:22 86:22 88:9 95:11 96:15 99:16 104:18,23 107:23

**basing** 79:1

**basis** 26:7 27:2 61:8

**Bear** 11:3 52:10 54:8

**began** 37:19

**begin** 6:17

**beginning** 32:5

**begins** 46:15

**behalf** 5:20 12:4

**behavior** 77:15

**belt** 102:3

**Benchmade** 56:8,10 61:18,19

**big** 65:10 72:11

**bind** 77:14

**bit** 16:14 69:9 74:1 90:12

**blade** 49:13 50:8 53:20 54:18 57:15 59:14,18,22,25 60:20 61:2,4 64:19 65:13,20,22 67:5 73:13,22

**blades** 25:20 55:19 66:11 72:14

**blanket** 37:1

**bloodshed** 42:23 43:18 44:9,13,19

**bond** 79:19,21

**Bonta** 5:12

**book** 52:3,8,12 67:25 68:4,6,25 69:8 70:14,20 71:2,7,22 74:21,25 75:4

**booklet** 9:13

**bottom** 11:25 12:6 52:20 56:9,13 63:21

**bound** 87:8

**Bowie** 16:3 20:8,12, 16 21:9,16 25:9,12, 14,18,19,23 26:7,19 27:3,23 28:24 33:20, 23,24 34:2,5,19,23 37:4,10,15,18,24 38:4,12,17,20 40:5 42:15,21 43:2,22,25 44:8,11,13,17 47:18, 22 48:1,11,13 54:10, 19 55:11 57:11,24 58:20 59:12,20,25 60:7 65:14,24 66:2, 11,20 72:18 75:1 87:24 88:20 92:18 95:5 96:19,24 97:9, 16 100:14,16 105:2 107:16

**Bowie's** 38:18,23

**box** 74:6 75:8 76:23

**Boy** 69:13 70:12

**break** 67:12,13 108:12

**Brennan** 5:4,25 11:19

**brigands** 46:19

**bring** 102:2

**broad** 90:3

**broadly** 23:19 39:21

**broken** 73:21

**brother** 38:13

**Buck** 63:12,18,21,22 64:4,9,13

**butcher** 29:9,11,18 30:9,16

**butcher's** 29:4 32:20, 23

**button** 53:9,10,13 61:24 64:15 73:13

**buying** 93:15

**C**

**California** 5:11 10:6, 15,18

**called** 60:7 79:5 84:23 88:22

**calling** 61:7

**Calls** 60:3

**candidate** 96:12

**cane** 80:11,22 84:13 85:4

**capacity** 7:3 24:20

**cardboard** 73:5

**care** 81:16 82:5 87:14 91:22

**Carolina** 92:16

**carpenters** 74:10

**carried** 20:13,17,20, 22 22:19 24:4,9,17, 20 25:6,17,23 26:1, 8,24 27:3,6,12,24 28:3,15 29:5,9,12,19 30:11 33:2 41:3 42:1,2,8,9,12,16 94:9,16

**carriers** 82:16

**carry** 10:17 16:3 17:19 18:9 20:7 28:23 39:9,13 40:8 41:1,22 42:6 69:3 75:13,22 76:1,5 77:10 79:9 81:7,16, 17,25 82:3,15,18 83:4 84:8 85:11,13, 23 86:1,8,21 87:15, 19 88:15 89:9,10 90:4,8,25 93:21 94:1,5 106:11

**carry-type** 106:11

**carrying** 18:6,22 19:4 21:23 22:12 23:20 27:5,13,21 28:5 29:22 30:14,18 31:5, 10,14 33:20,23,24 34:5,6,18,22 35:5,6 37:19 41:8 43:4,12, 16,17 45:6,13 46:9, 17,24 48:11 65:6 76:6,10,21 77:23 78:5,7,11,13,22 80:10 81:3,14,19,23, 24 82:7,9 83:19 84:10,21 86:13 87:3, 13,24 88:8,16 89:6, 21 91:11,15,16,19, 23,25 93:23 94:5 106:6,25

**case** 5:12,19 6:2,4,5, 14,24,25 7:2,3,5 11:22 12:4 13:10 30:16 33:12,15,20, 22,25 34:3,4,10,14, 17 35:10 54:17,19 58:12 69:20 99:22 102:18 103:11,14

**cases** 7:19 13:15 30:1 87:8,16

**categorize** 26:19 79:25

**categorized** 34:2

**category** 85:12

**causal** 43:14

**causing** 43:18

**Cedartown** 99:10 107:18

**centuries** 70:25

**century** 20:6,11,15, 23 23:5,18 27:5 30:18,23,25 31:2,12, 17 39:8,13,21 40:1 41:1,21 42:7 43:1,8 44:1 50:5 57:10,22 59:10,20 63:1 64:24 66:1,18 104:2,10,18 105:7,14,25 106:13

**certainty** 66:14

**cetera** 13:3,13 19:24 21:17 39:4,24 72:19 103:24

**challenged** 99:22

**challenging** 10:5

**change** 8:11 74:3

**characteristic** 22:18 28:12

**characteristics** 22:16 60:8

**characterized** 19:10

**charge** 34:9,12

**charter** 98:7 99:6,7,9, 11

**Chats** 9:1

**chivalrous** 46:15,18

**circle** 73:11,19

**citation** 16:25 18:5 19:3 71:7 77:6 98:13 99:1,16

**citations** 24:11,13 71:7 107:11

**cite** 52:1,3 68:6 88:4 92:21 103:11 108:6

**cited** 44:7 45:11 52:7 100:8 103:13 107:3, 4

**citing** 99:8

**Civil** 100:25 106:19, 20,21,23 107:25

**claim** 26:7 27:2 43:25 44:8,12 61:8 86:18 92:21 103:7

**claiming** 41:7 61:10

**claims** 10:23 46:17

**clarify** 37:9 56:13 76:4 82:2 91:18 99:21 100:24 105:19

**classified** 74:16

**classifying** 72:8

**clear** 23:14 61:22

**clip** 55:20

**clipped** 54:20

**closed** 53:20

**clothes** 91:12

**coats** 27:7

**Code** 10:6,9

**Colonial** 79:23

**Columbus** 47:3

**comment** 9:21 23:9

**commentary** 29:25

**commit** 77:16

**common** 22:15,17 28:6,12 31:11 42:22 43:2,3,4,7 44:1,8,18 47:19,22 48:14 75:23 79:14 89:22 91:3

**commonality** 23:9 31:14,15

**commonly** 20:12,16 66:20 74:16

**commonwealth** 80:21

**communicate** 8:24

**communications** 9:2

**communities** 30:20 31:7

**complicated** 25:25 29:14

**computer** 61:14

**computer-generated** 61:15

**conceal** 21:22 78:7 83:4 86:8

**concealability** 23:12,16 30:4,6 82:12

**concealable** 21:3,10,19 22:5,18 24:25

**concealed** 21:24 22:11,13,20,24 23:6,11,18,21 24:2,4,9,17,20 25:7,15,17,23 26:1,8,25 27:3,6,12,13,14,15,21,24 28:3,5,8,10,15,23 29:5,10,19,23 30:11,15 33:20 34:7 35:6 45:6,14 46:9,17,24 78:11 80:22 81:7,16,17,24 82:3,4,13,15 83:10,19 84:21 85:5,11,13 86:21 87:5,13,14,15 88:8,14 89:6,8 90:8 91:23 93:21 106:6

**concealment** 24:1 25:16 27:9,20 28:11

**concern** 31:21 40:4

**concerns** 57:24

**conclude** 108:9,17

**concluded** 109:3

**conducive** 25:16 28:7 35:21 36:12

**conducted** 8:10 69:20

**conducting** 8:12

**confident** 88:12,13

**confined** 48:9,12 49:13

**confirm** 84:24 101:5

**confirmed** 101:6,8

**connection** 43:14 44:10

**consequence** 41:4

**considered** 30:12 35:20 36:11 37:5 65:14,20,23 66:9 78:23

**consistent** 27:23

**constantly** 75:18

**construed** 86:4,9 91:11

**contained** 12:17

**contention** 47:21

**Contents** 68:19

**context** 18:6 33:3 36:25 95:11

**contexts** 65:23

**continue** 77:17

**continues** 16:7 77:19 97:12

**continuing** 46:16 53:18

**contradict** 70:18

**control** 105:22

**convey** 43:10

**convicted** 34:13,22 35:4,5,8 87:2

**conviction** 34:24 85:7 91:5

**cooking** 37:7

**copied** 61:13

**copy** 13:22 16:13 47:2 52:12 68:20 108:19,25

**Corporations** 98:6

**correct** 6:2,15 7:19 9:15 10:8 12:10,18 13:5,22 14:1,14 15:2,12,20,21 16:6 17:10 18:1,11 19:13 20:3,9,17,18 21:6 26:17,21,25 27:15 28:17,20,25 29:6,23 30:12,15,21 31:12 32:2 33:13 34:7 35:2,17,22 36:4,13,18 37:11,16,22,25 38:4,8 39:1,10 41:9,23 42:3,11,24 43:24 44:5,9,20 45:4,7,15 46:21,24 47:12,21 48:10,15,22 49:6,15,18,23 50:2,11,23 51:9,13,18 52:8 53:1,15 55:20 56:15,21 57:4 58:6,17 61:25 62:11,22 64:6,11,16 67:8 68:7,15 69:4,22 70:1,19 71:5,13,20 72:7,9 73:16 74:17,23 76:6,15,18 77:20 78:14 79:12 80:1,12,16 81:4,8,16 82:3,7,18,21,24 83:2,6,7,12,16 84:1,2,5,6,8,15,21 85:11,15,16,18,19,21,22,24 86:5,7,10,15,18,21 87:10,13,16,20,21 88:2,8,17,18 89:3,11,12,18,23,24 90:4 91:17 92:4,5,8,9,19,25 93:6,9,18,19,22,23 94:1,2,11,24 96:25 97:9,18 98:2,23 99:12,15,19 101:7,13 102:11 103:17 104:11 105:8,22 106:1,2,7 107:18,21

**correctly** 24:5 41:5 45:3 53:24 76:12

**cost** 93:14

**counsel** 5:10 108:9

**counterfactuals** 59:9

**country** 30:10

**couple** 79:6

**court** 8:4 9:11 34:23 90:13

**cover** 68:18

**covering** 74:5 105:13

**credibility** 9:23

**crime** 55:16

**criminalized** 100:14

**critical** 57:25

**crucial** 58:1

**current** 58:10 103:3

**cursor** 69:6

**custom-made** 38:13

**cut** 41:18 58:2 98:21

**cutting** 69:2

**CV** 7:22 13:22 14:1

D

**dagger** 16:4 47:16 54:17 83:10

**daggers** 35:16,25 37:4

**Daily** 45:2

**damage** 9:22

**dangerous** 21:17 76:11 77:11

**date** 31:3 99:14

**dated** 13:23 99:9

**dates** 39:15,17 99:18

**deadly** 16:4 17:17 20:7 21:4,8,11,12,17 22:6 23:25 24:1,8,18 26:16,20,24 27:19, 22 28:24 29:4 30:6 36:23 75:12 76:3 83:11 88:22 104:7

**deal** 65:10

**dealer** 102:19

**death** 87:25

**decentralized** 19:9

**deciding** 57:11

**decision** 55:9 60:6 65:10

**Declaration** 11:19

**deemed** 85:5

**defence** 47:19

**defendant** 13:1 34:22

**defendants** 5:20 6:2, 14 12:4

**defense** 8:24 36:3,17, 23,24 41:3 42:2,10 48:14 108:9

**define** 66:2

**defined** 10:17 14:25 27:23 62:25

**defining** 72:18

**definition** 19:16,19 56:21 57:15 62:23 65:1

**definitions** 35:15

**degrade** 46:18

**depend** 59:7

**depicted** 74:15

**depicts** 53:8

**deposed** 6:20 7:16 13:13

**deposition** 6:18 8:10, 12,16,17,23 9:8,14, 21 12:24 13:3,9,11, 16 109:3

**depth** 70:6

**describe** 37:15 38:7 58:16,21 81:2,22 85:6

**describes** 45:12 46:8 48:13 74:21

**describing** 16:2 42:5 51:7 55:8

**description** 14:12 42:1 64:13 66:23 73:8 88:21

**descriptions** 63:23 64:1

**design** 27:24 32:24, 25 50:2 53:4,8 55:15 58:11

**designed** 24:3,9,17, 24,25 25:6,14,23 26:1,8,24 27:3,15,20 28:10,15 29:9,11,12, 19 35:21 36:12 69:11 70:5,11 95:12

**designs** 49:23,25 51:12 52:25

**detail** 13:17 54:4 103:10

**details** 18:17 33:17 96:21 102:21

**determine** 59:25

**differences** 64:1

**Dillon** 5:8,9,10 6:9,13 11:1,6,7 17:8,24 18:8,19 19:5 22:4 23:4 26:6,14 36:9 37:9 40:13,16,19 41:12,14,17 51:25 52:10,16,17 55:24 56:3,4,19 57:2,13 58:2 59:13 60:9 62:6 63:10,15,16 67:13, 16,19,23,24 78:6 80:6 81:15 90:11,15 98:20 99:10 100:4 103:5 105:4,12 106:17 108:8,13,17, 22

**direct** 19:7 23:23 30:17 39:6 42:19 52:19 69:4 84:17 107:7

**direction** 21:2

**directs** 76:17 80:15 83:15

**dirk** 16:4 76:10 77:10 80:10,22 83:10 84:13 85:3 87:4,24 88:22 89:21 91:2

**dirks** 20:8,12,16 21:9 35:16,25 37:4 86:14 92:17 96:24 97:8,16 107:16

**discernible** 37:5

**discrepancies** 9:22

**discussing** 22:9 26:16 29:22 30:8 66:6 95:15

**discussion** 37:18

**disincentive** 93:12,16 106:24,25

**display** 73:3,5,24

**displays** 72:23

**dispose** 103:2

**disposing** 102:3

**distinction** 37:8,10

**distinguish** 32:1

**distinguishable** 32:19

**distinguishes** 32:22

**document** 8:20 11:11,13 45:25 61:13 77:25 80:2 81:10 99:2 102:13

**documents** 13:7

**double** 59:22 67:5

**double-sided** 54:18 55:19 60:20

**draw** 43:14

**driven** 10:14

**driving** 23:13,16

**due** 42:7

**duty** 77:12

E

**e-mail** 13:10

**e-mailed** 11:9

**e-mails** 9:1

**earlier** 46:7 54:3 55:10 100:21 108:20

**earliest** 63:6

**early** 19:10 68:13 71:16,23 74:22

**easier** 16:14

**easy** 43:3

**effect** 8:3

**effective** 19:23

**electricians** 74:10

**electronic** 9:1

**eliminating** 104:7

**embrace** 29:4

**enacted** 98:1,25 101:24 103:16 106:19 107:25

**encompass** 50:11,22

**end** 6:9 14:16 33:11 86:3

**ended** 40:5

**ends** 9:14

**enemy** 37:20

**enforce** 106:15

**enforced** 102:6

**engaging** 96:7

**ensue** 88:1

**entailed** 18:16

**entire** 49:13 55:6

**entirety** 104:9 105:7

**entitled** 9:21 98:12

**enumerated** 15:16 90:9

**environments** 19:9

**envision** 48:7

**Erickson** 68:1,14

**essential** 24:21 53:22 54:1,15 55:1,6 57:3 58:4,7 61:22 62:6, 13,16,20 64:24 72:16,17

**essentially** 71:17,24 95:14

**establishing** 14:9 15:15 44:10

**estimate** 70:8

**everyday** 48:21 49:18 51:8,18

**evidence** 27:4,10

**evident** 20:21

**exacerbating** 41:4

**exact** 48:23

**EXAMINATION** 5:8

**examined** 5:6

**examples** 24:11 28:9 43:22 49:8 50:3 63:4 66:11 95:24 104:5 105:5

**exceeding** 91:6

**exception** 81:18 90:15,16 102:10

**excerpts** 30:1

**excluding** 18:10

**exempted** 89:17

**exempts** 91:15

**exhibit** 11:2,4,6,8 13:20 14:13,19,20 15:23,25 16:2,17 44:4,5,25 45:1 47:1, 11 52:12,14,16 55:25 56:1,3 63:11, 13,15 67:20,21,23 68:8,17 71:8 72:2 76:18,24 77:3 80:15, 19 83:15 84:17,25 86:18,23 88:4 89:2 90:1,23 91:9 97:21 98:4,5 99:11 101:18, 21

**exhibits** 8:18 14:16 44:4,7,15 92:23 100:9

**expect** 13:2

**experience** 58:24 66:18 75:22 107:24

**expert** 5:19 6:14 7:9, 12,18,22 10:4 11:19, 21 13:19 58:12 59:23

**expiration** 102:7,17

**expire** 102:21

**explain** 7:4

**explained** 17:7

**explicit** 91:24

**explicitly** 89:17 91:15,19 93:8 102:9 103:20 104:1,10 105:7,15

**extensive** 17:20

**extent** 23:12 32:16,18 33:17 37:3 38:10,11 58:10 59:10 93:12 99:25

**F**

**faces** 74:4

**fact** 8:11 23:6,9 24:1 30:8 70:20 82:12 102:20

**factor** 23:13,16 28:6

**facts** 12:17 13:25

**fail** 77:16

**fairly** 31:11 93:14 96:20

**fall** 33:3 56:20 57:15 65:1 85:12

**familiar** 12:1 33:15 45:9 79:16

**family** 13:12

**famous** 38:19

**farmers** 69:12

**fast** 69:2

**fear** 77:12

**feasible** 106:15

**feature** 24:21 25:1 57:9 61:24 62:10,13, 16

**features** 23:25 27:22 32:24,25 33:5,8 51:22 53:22 54:7,12, 15,25 55:1,6,14,18 57:3 58:5,7 59:2,21 61:23 62:7,20,21 64:24 65:8 66:4,7 72:16,17

**February** 5:1

**Federal** 6:25

**feedback** 90:12

**feeds** 43:15

**fighting** 31:23 32:6, 11,16,18,22 33:6,8 53:22 54:1,4,7,15 55:2,7 57:4,16 58:5, 8,16,21,25 59:3 62:7,8,10,16,20,25 64:25 65:18 66:19 72:16 75:1

**figure** 52:24 53:3

**find** 76:1 77:16 79:19

**finding** 47:8

**fined** 80:24 91:5

**fines** 85:6

**fingernails** 73:21

**finish** 103:2

**finished** 45:23 46:2

**firearm** 7:7 14:11 88:23

**firearms** 16:3 21:5

**firm** 101:10

**firmness** 102:22

**fishermen** 69:11

**fit** 24:24

**five-minute** 108:12

**fix** 40:17 41:15

**flexible** 48:6

**flipping** 54:8 97:1

**Florida** 89:14,17 96:11,13,14

**focus** 21:3,19 29:21 31:21

**folded** 71:16,24

**folding** 48:18 49:5,9, 11,17,19,23 50:2,4, 10,14,20,22 51:3,4, 7,12,15,16 52:4 53:8,19 56:5 57:3 59:25 61:23 62:3,9, 13,21 63:12 67:8

**follow** 69:6

**font** 45:16,20

**footnote** 14:9,22 15:4,8,23 16:7,16 17:3,4,7 24:10,14 33:11 34:17 35:1,12 43:23 44:3,24 47:10, 11,15 52:1,3 68:7,9, 12 71:8 74:19,20 76:14 80:14 83:14 84:18 86:17 88:4 89:2 92:22 93:4,21 94:22,23 97:23 101:19 107:5,10,14

**footnotes** 103:11 107:6,20,25

**forfeit** 77:18 87:5

**forget** 6:25

**forgive** 41:18

**form** 9:13 34:21 100:16

**formidable** 47:17

**forms** 90:4

**Fort** 5:1

**forward** 11:10

**found** 70:17 104:3,22

**foundation** 56:16,22

**four-inch** 57:14 64:23 65:1,13,19,22

**free** 16:20 73:20

**frequently** 20:19

**front** 59:1 97:5 107:24

**frozen** 40:12,13 41:10

**full** 5:23 7:24

**function** 14:19 44:24 61:13 80:18

**functions** 96:10

**G**

**gaining** 69:3

**game** 19:24

**gauge** 20:19 31:15

**gave** 38:17

**general** 5:11 10:23 25:5 35:5 49:2 77:22 101:24

**generally** 10:21 19:22 21:13 24:18 30:25 32:17 37:6 44:11 48:7 50:15,21 78:3

**generated** 61:14

**George** 107:18

**Georgia** 97:14,21 107:18

**Girl** 69:14 70:5,12

**girls** 69:13

**give** 10:2 31:3 47:24 90:20

**giving** 102:3 103:23

**glancing** 108:6

**goal** 77:16

**good** 5:9,13,14,17 30:4 40:23 60:11 61:1 67:12 70:8 77:15 79:6

**gravity** 10:14

**group** 28:13

**grouped** 25:3

**growth** 48:1

**guess** 59:9

**guilty** 85:5

**gun** 14:10

**gut** 84:22

**H**

**half** 31:1 67:12

**hand** 62:22 64:10 73:20

**Handiest** 73:21

**handle** 49:14 53:9 64:15

**hands** 64:5

**happened** 65:25

**happy** 10:20

**hard** 20:18,19 23:13 25:8,13 27:16 31:15 39:17 40:3 43:14 49:7 57:7,21 59:12 60:17 65:3,4,11,12, 16

**Haynes** 33:12,19 34:10 35:4 55:9 60:5

**Haynes'** 65:10

**head** 17:21 18:17 33:18 63:8 96:1 98:24

**heads** 75:9

**heard** 6:5 41:19

**hearing** 6:8,9

**helpful** 45:21 97:4

**helps** 97:2

**hesitate** 104:16

**high** 69:13 93:14 95:13 96:8,20 104:5

**higher** 20:22,23

**highlight** 11:14 21:1 46:14 48:25 53:4 68:9 73:3 85:2 97:10

**highlighting** 53:5 69:5 73:2 77:2 93:4

**hills** 48:4

**hired** 6:2,4 7:9 10:4

**historical** 7:7 49:8 52:5 58:8,13,14,16 66:10

**historically** 35:20 36:11

**history** 23:15 36:2,16 59:8 65:18 68:25

**hobbyists** 74:9

**hold** 105:21

**holders** 79:21

**holding** 39:24

**homes** 19:12 20:2 30:10

**homicide** 39:19

**hope** 45:13

**hopes** 46:8

**hour** 67:12

**hunters** 69:11

**hunting** 19:10,15,16, 20,24 20:1 21:5 35:22 36:13 37:6,11, 19 38:8,14,24,25 54:10 58:20

**hypothetical** 57:19

**I**

**idea** 29:13 103:3

**identical** 33:4

**identified** 11:4 12:21 52:14 56:1 58:4,7 59:20 63:13 67:21 72:18 104:19

**identify** 54:7 70:4

**III** 98:5

**illustration** 30:5

**immediately** 79:4

**implemented** 75:23

**import** 10:16

**important** 19:11

**impose** 97:8 99:22

**imposed** 93:5 97:15

**inaccuracies** 9:16

**inch** 57:14 59:18,24

**inches** 25:20 59:15 64:20 66:8,12

**include** 61:24 62:21 94:14

**included** 22:17 23:10

**includes** 29:25

**including** 21:14 75:7, 13 92:17 106:23

**Incomplete** 57:19

**inconsistent** 9:20

**increased** 41:2 43:15

**increases** 43:11

**increasing** 42:16 45:20

**Indiana** 84:12

**indication** 27:19

**indictable** 28:23 34:19

**indicted** 33:20,23,24 34:22

**indictment** 77:19

**individual** 16:20 18:9 59:24

**inference** 56:24

**inform** 8:19

**information** 9:13 12:17 14:1 65:8 77:14

**initial** 56:24

**instance** 24:23 66:15 95:13

**instrument** 88:21

**instruments** 36:3,17

**intent** 25:15

**intention** 27:16,17 28:5

**intentions** 43:16

**interchangeably** 32:6,11,15

**interpersonal** 54:22 55:16

**interpret** 59:9 78:8,10 104:6

**interpretation** 90:10

**interpreting** 82:13

**interrelated** 22:15 43:13

**introduce** 11:2 52:11 55:25 63:10 67:20

**introduction** 68:20

**invariability** 40:1

**invention** 47:18

**inventory** 103:3

**invocation** 66:15

**involved** 13:14 66:6

**issue** 30:15 41:15

**issued** 99:7 103:4,7

**italics** 52:21

**J**

**jack** 73:4

**Jack-o-matic** 72:23

**Jackmaster** 73:4,9

**jail** 79:22

**Jesup** 97:20 98:7 107:17

**Jim** 25:12 37:24 38:17,22

**job** 58:12

**John** 5:10 67:11

**journal** 28:20,22 29:3,22 30:2,7

**journey** 80:23 83:5

**judge** 77:13

**July** 45:3

**jumps** 79:3 104:20,25

**June** 47:3

**justice** 77:13

**K**

**Kentucky** 80:9

**kind** 9:2 14:11 23:5 25:1,13 28:25 31:21 35:9 48:7 49:20 51:23 63:2 65:7,10 72:11 73:2 74:6 76:2 85:2 87:25 88:21 91:1 96:10 99:23 102:4 103:9,21 104:1,11 105:8,15

**kinds** 15:14 19:19 21:14 22:16,17 23:10 35:13 54:21 75:6 76:1 95:10,17 103:24 104:7 106:25

**kitchen** 30:11 37:7

**knife** 5:11 16:3 19:15, 16 25:9,14,18,19 26:19 27:18,23 28:24 29:4,9,11,18 30:9,16 32:5,20,22, 23 33:6,21,23,24 34:1,2,4,5,6,20,23 35:5,6,9 36:22,24 37:10,16,18,19 38:2, 4,6,8,13,19,20,23 39:1 42:15 47:18 48:14,18 49:14,20 50:7,9 51:24 52:23, 25 53:9,13,14 54:7,

15,19 55:7,10,11 56:8,13,14,20 57:9, 11,12,14,16,23 58:5, 8,11 59:3,7,11,12, 14,20,25 60:1,7 61:3,15,19,20,25 62:9,10,13,16,22 63:20 64:5,10,14,23 65:1,2,7,8,13,14,20, 22,23,24 66:2,3,10, 21 67:8 71:11 72:12, 16,23,24 73:13,21 75:1 76:10 77:11 80:10,22 83:10 87:24 88:20,21 89:22 91:3 93:15 96:2 100:15,16 103:21 104:2,11 105:8,15 106:1

**knife'** 34:19

**knives** 10:14,17 19:10,20,23,25 20:1, 8,12,16 21:4,9,15, 16,20 25:5,6,15,23 26:8 27:3 30:19 31:6,10,17,20,24,25 32:6,10,11,16,17,19 33:8 34:20 35:13,15, 19,24 36:1,11,15 37:4,6,11 38:21 39:9,14 40:5,9 41:2, 9,22,25 42:6,8,13, 16,21 43:2,16,22,25 44:8,11,13,18 47:22 48:1,11,19,20 49:4, 5,8,9,11,17,19,23 50:4,10,11,14,15,23 51:2,3,4,8,12,15,16 52:4,8,13 53:19,21, 23 54:2,5,10,13,22, 23 55:2,8,13,14 56:5 57:3,4,24 58:13,14, 16,17,20,21,22,25 59:15 60:14,20,22 61:23 62:3,4,7,8,20, 25 63:2,5,6,12 64:2, 20,25 65:18 66:4,5, 7,11,18,19 67:1,4,7 68:13 70:24 71:3,18, 25 72:5,14,18 73:4, 8,16 74:15,17,22 75:1,2,7 89:18 90:16 91:16,21 92:3,12,17, 18 94:9 95:5,17,20, 25 96:7,19,24 97:9, 16 99:24 100:14 103:12,24 105:2,6, 14 107:16

**knowing** 58:25

**knowledge** 7:25 62:19

**L**

**label** 38:20

**labeled** 53:9

**Lacks** 56:16,22

**large** 7:3 19:23 20:1 30:19,25 31:6,10 32:5,10,17 37:11,19 38:7,25 39:9,14 40:9 41:1,8,22,25 42:6,8, 16 49:22 54:16,18, 20 55:19 57:8,15 58:20,25 59:3,22 65:18,20 66:18 72:4 75:1 76:10 77:11 80:10,22 92:11,17

**large-bladed** 65:2

**larger** 54:13 66:11 72:10

**largest** 75:6

**late** 70:24

**law** 10:18 14:8,21,24 15:9,10,15,18 16:2, 18,19 17:1,14,19,24 22:23 28:20 29:22 30:2,7,15 34:2,19,25 76:9,17,20 79:2,14 80:9 81:2 82:10,25 83:1,3,9,14,21,25 84:2,4,7,12,20 85:14 86:9,12,20 87:12,18, 23 88:7,15,19,20 89:5,9,12,13,14,17, 20,25 90:16,18 91:10,15 92:2 95:19 96:13,14,21 98:1 100:13,20,25 101:17 103:9,15,23 104:1,9 105:6

**lawful** 17:9 30:11 37:7 54:24 71:4 90:25

**laws** 17:22 18:18,20 23:5 66:16 75:13 76:5 82:13 88:20 93:5,8,17,20,23,25 94:8,22 95:2,24 97:17 103:19,22 104:17,23 105:13,24 106:4,10,18

**lawsuit** 10:12

**lay** 66:4

**learning** 13:9

**leather** 37:20

**leaves** 73:20

**legal** 30:9 78:17,18

**legally** 105:21

**legend** 38:9

**length** 25:19,21 59:14

**lengths** 64:19

**lengthy** 29:24

**let alone** 25:10

**letting** 13:15

**level** 46:19

**liable** 77:19

**library** 55:6

**license** 102:7,8,10, 17,23,25 103:1,2

**licenses** 102:20 103:4,7

**life** 19:10

**lightweight** 48:20 51:8

**likes** 60:17

**limb** 65:15

**limited** 75:4

**lines** 102:25

**lion's** 106:4

**list** 7:25 93:20 107:2

**listed** 14:1 15:10 16:20 17:10 18:1,10, 23 62:10 80:14 83:14 89:1 91:20 97:23 104:4 105:6

**literary** 87:7

**literature** 78:16,19 79:3,7

**local** 79:23

**located** 93:24

**location** 39:25

**locations** 18:10,24

**lock** 53:20

**locks** 73:14

**long** 7:6 43:21 59:24 75:5 104:6

**longer** 50:8

**looked** 25:10 38:6,16, 24 96:16

**lore** 38:9
**lose** 41:12 79:21
**lost** 41:13
**lot** 17:19 24:24 29:25 65:4 107:3
**loud** 73:9 77:8
**Louisiana** 83:9
**love** 65:9
**lower** 73:3
**lumping** 22:20

**M**

**Mac** 72:24
**made** 25:11,15 38:19 52:23 73:21
**magazine** 7:3
**magistrate** 87:3
**majority** 49:22
**make** 9:19 45:20 90:11 93:2 105:19
**making** 28:22 37:1 101:9
**manner** 21:24 22:13, 20 27:15 29:5,23 35:6 78:11
**manual** 56:8 61:19 63:18,21 64:4,9
**manually** 50:20
**manufactured** 25:14 50:5
**manufacturers** 70:22 71:12
**manufacturing** 10:16 69:21
**maps** 58:10
**Mark** 68:1 79:4
**marking** 11:8
**mass** 69:1 70:7
**Master** 72:24
**match** 66:22
**matter** 5:11 7:2,10, 13,23 10:5,24 12:21
**matters** 7:21
**meaning** 34:24 44:17 48:6 78:7,19 105:21
**means** 102:16,17
**meant** 27:24 51:1
**measure** 23:14
**mechanics** 69:12 74:10
**mechanism** 75:23 79:14,15
**mechanisms** 75:13, 23
**medical** 10:1
**meet** 59:2 60:8 79:20
**meeting** 13:1
**memorized** 10:10
**memory** 8:20 90:19
**mention** 83:9 99:17, 20
**mentioned** 13:14 36:1 55:21 81:3 96:23 97:7 100:13 101:11 105:2,3 106:11 108:20
**messages** 9:1
**met** 78:25
**method** 76:5
**Mexican** 34:18
**mid** 31:17 69:1 70:7
**middle** 53:3 63:20
**migrating** 48:5
**militia** 21:5
**mind** 25:10 36:7 79:3 104:20,25
**minimum** 14:9 15:16
**minors** 14:25
**minute** 90:20
**minutes** 67:14
**Mischaracterizes** 104:12
**misdemeanor** 85:5 102:1
**Mississippi** 92:16
**Missouri** 16:2,18,19 17:9,14,23 18:17,20 47:3 86:12
**Misstates** 26:9
**models** 56:7 70:11,22 71:11
**moment** 62:12
**Monday** 5:1
**money** 79:22
**morning** 5:9,13,14
**mountain** 48:3,8
**move** 74:6 75:8
**multiple** 24:11
**municipal** 97:19,20 98:6,16,22 99:17 104:22
**municipalities** 96:23 97:8,15 107:17
**musket** 14:10
**muskets** 19:11
**myth** 38:11

**N**

**names** 31:25
**nature** 10:12 34:9,11 55:17
**Navy** 102:5
**necessarily** 32:20 48:3 50:18
**necessity** 74:9
**needed** 15:8
**needless** 42:22 44:9, 13,19
**Nicole** 5:25
**nods** 98:24
**North** 39:23 92:15
**notable** 23:8,9
**notes** 8:17 101:9 108:11
**noticeable** 42:21
**November** 6:6
**number** 6:18 67:25 72:23 100:5 106:21
**numbers** 10:10 20:23 42:17
**numerous** 54:21

**O**

**oath** 5:5 8:3,4 77:14
**object** 105:22
**objection** 16:23 17:11 18:2,12,25 21:25 22:25 26:2,9 36:5,19 51:19 56:16, 22 57:5,18,19 59:4

60:2 62:1 77:25 80:2 81:10 90:5 99:2,25 102:13 104:12 105:9 106:8 108:3

**objections** 9:12

**obtained** 103:1

**occupation** 95:13 96:6,19 104:5

**occupational** 107:10

**October** 13:23,24,25 98:10,12

**offend** 77:17

**offending** 91:5

**offense** 36:3,17,23,24 87:6

**offensive** 86:14 87:4

**offer** 102:1

**office** 69:12

**officially** 40:5

**Ohio** 14:8,21,24 15:10

**older** 15:12

**one-handed** 62:10

**open** 50:20 51:17 53:20 62:9,21 64:5, 10,14 71:16,23 81:16 82:15,18 84:7, 9 85:23,25 87:19 88:16 89:10 90:10 91:16,19 94:1,5

**Opener** 63:20,21 64:4,9

**opening** 49:4,8 50:4, 14,16,18 51:2,3 53:14,21 56:14,25 62:4 63:4,5 70:23 71:17,25 82:8 99:23

**openly** 82:7 91:12 92:1

**opens** 61:25 73:14

**operate** 59:8 93:12

**opinion** 46:23 58:3 59:23

**opportunity** 9:15

**opposed** 50:8 54:23 61:15

**orally** 71:10

**order** 108:24

**ordered** 25:11

**ordinance** 97:20 98:17,23 99:6 104:22

**ordinances** 97:19

**Oregon** 6:25

**original** 25:9 63:19

**ostensibly** 41:3 42:2, 9

**outright** 106:16

**overlap** 32:17

**P**

**p.m.** 108:14 109:3

**pages** 52:7 54:8,13 67:25 71:9,12 95:6,7

**paid** 6:14

**paper** 47:3

**paperwork** 13:4

**paragraph** 14:8 19:8, 17 20:5,25 22:6,10 23:24 26:15,21,23 27:1 28:19 30:17 31:23 32:4,5,9,11 33:11 35:14,19 36:10 37:13,14,15 39:6,11 40:24 41:7, 20 42:5,17 43:25 46:14,16 48:18 52:1 53:17,19 54:2 55:3 75:10 76:9 80:8 83:8 84:11 86:12 92:10 94:18 95:15 96:22 97:1,6,7 100:4,12,24 107:9,15

**Paragraphs** 36:1

**parentheses** 63:19

**part** 30:3 51:25 54:6 74:5 79:24 98:5

**passage** 87:1

**passing** 68:19

**past** 49:25 51:4 66:14

**pause** 40:18

**pay** 79:11 87:6

**pen** 48:19 50:7 63:5

**Penal** 10:6,9

**penalty** 12:9

**pending** 8:25

**people** 13:12 19:23 27:5,12,20 30:5 39:8,13 40:8 41:1,8, 22 42:6,12 43:12 45:13 46:9 48:2,5 59:19 70:23 77:10 78:14,23 79:5,10 91:22 103:1

**perceived** 54:22

**perfectly** 30:9,10 63:9

**period** 30:23 31:11 40:10 42:1

**perjury** 12:10

**permits** 91:19

**permitted** 8:24 9:2,7

**person** 25:11 28:23 29:13 43:17 77:9,12, 14,15,17 78:12 80:20 85:3 87:2,5 88:1 90:25 91:2,4,5, 11 102:1

**personal** 41:3 42:2,9 92:16 96:24 97:8,15 106:23 107:15

**persons** 27:6 77:9, 15,17 87:2,8,16 102:6

**persuasive** 78:21

**pertain** 88:20 94:25

**pertaining** 17:16,21 34:19 65:5 76:3 93:23

**pertinent** 72:18

**phase** 96:17

**photo** 60:17 61:12

**photograph** 61:16,18

**phrase** 36:22 78:15, 16,18

**physically** 16:11 97:5

**Picayune** 45:2

**picture** 56:4,6,9,10, 20 59:1,2 60:13 61:9 63:11 64:19 72:4,5,8

**pictures** 66:25

**pin** 39:17 40:3

**pirate** 34:18

**piratical** 46:19

**pistol** 14:11 28:16,24 76:11 77:11 80:10, 22 83:11 84:13 85:4 87:24 88:23 89:21 91:2 102:5

**pistols** 20:8,12,16 21:4,10 24:23 31:19 86:14 87:4 101:12 102:4

**place** 47:17 65:5 66:6

**places** 17:1,19 19:4

**Plaintiff's** 11:2 52:11 55:25 63:11 67:20 68:8

**plaintiffs** 5:10 10:5

**pocket** 20:8,12,16 21:10 24:23,24 28:15 48:19 49:20 50:7,9,10,15 51:7,12,15,16 52:23,25 53:9 63:5 71:18,25 72:8,12 74:17 80:10,21 89:18,22 90:16 91:3,16,21 101:12 102:3

**pocket-knife** 72:12

**point** 9:14 11:2 21:1 28:1 50:19 55:20,24 67:20 94:12

**points** 44:16,17

**policed** 79:13

**policing** 79:16,23

**pop** 49:10

**popular** 52:22

**popularity** 48:1 69:3

**portion** 11:15 30:2 46:13 68:24 73:24 90:21 91:13 93:4

**pose** 20:23 96:24

**posed** 30:19 31:6 46:7 63:1

**position** 53:21 55:5 71:17,24

**possess** 17:10

**possessing** 35:9

**possession** 10:16 18:1 83:1 84:5 85:20 87:19 88:16 89:10 92:7,11,16 105:15,17,20,21,25 106:24

**possibly** 8:1 22:24 23:6

**post** 79:19 106:19,20

**practice** 31:11

**pre** 106:21

**pre-1850** 96:5

**preceding** 107:15

**premarked** 11:4 52:14 56:1 63:13 67:21

**prepare** 12:23

**prepared** 12:20

**preparing** 12:14

**presence** 41:2 75:12

**present** 19:12 20:2 102:8,17

**presented** 8:19

**Press** 73:13

**pretty** 23:14 47:6

**prevalence** 49:24

**prevent** 91:11

**previous** 31:13

**previously** 81:3

**primary** 27:4 106:12

**printed** 16:13

**prior** 31:15 50:15 95:25

**private** 78:4

**privately** 76:10,21 77:10 78:5,6

**problem** 16:12 41:4 54:9 108:13

**problematic** 66:10

**problems** 6:7 20:24 63:1

**proceeding** 11:5 52:15 56:2 63:14 67:22

**produced** 68:13 74:22

**production** 69:1,21 70:7

**products** 52:25 91:23

**Professor** 5:16

**prohibit** 17:25 18:6 21:21,23 22:10,12 23:20 82:8,15,19,20,23 83:1,21,23,25 84:2,4,7,9 85:14,17,20,23,25 87:18 88:15 89:9 93:10 94:4 105:15

**prohibited** 15:19 22:23 76:20 83:9 91:20 92:12 93:9,17,21 94:19,24 95:3 96:5 100:21 101:12 103:20,23 104:1 105:8,25

**prohibiting** 16:3 19:3 76:10 90:8 95:16,19,25

**prohibition** 14:25 77:22 78:3 81:18,21,22,25 85:13 87:14 93:16 95:5 96:9

**prohibitions** 17:20 95:8 96:2,3

**prohibitive** 95:12 96:10

**prohibitively** 104:5

**prohibits** 10:16 104:10

**pronounced** 43:19

**Proseto** 79:4

**protection** 91:25

**provide** 19:18 35:15

**Provided** 86:3 87:7 91:10 102:5

**provision** 101:3 103:8

**provisions** 87:9

**public** 16:5 17:19 20:13,17 69:3 75:12,13,22 76:4,6 81:19 89:21 90:4 94:10,16,17

**publicly** 20:7 77:9

**published** 79:8

**pull** 27:8 88:11 90:21

**pulled** 93:3

**purchase** 16:20 82:21 83:21,24 85:14 87:18 88:16 89:10 92:3 93:9,11

**purchased** 28:4

**purchasing** 15:16,19

**purpose** 17:3,4 38:15 43:9 51:18 102:2

**purposes** 19:21 21:5 29:12 35:22 36:13 37:7 42:10 48:21 49:18 51:9 54:24 59:17 64:19 70:16

**push** 53:10,13 64:15

**push-button** 62:4 63:5

**put** 14:18 78:9 94:8

**putting** 35:12 70:23 105:5

**Q**

**question** 8:25 20:14 22:3 23:3 25:25 26:5,13 27:19,25 29:14,17 31:14 35:11 36:8,22 42:4 46:6 51:5 58:18 59:10,17 60:12 94:4 96:4 102:19

**questioning** 9:3 108:9

**questions** 5:18 8:8 9:12 29:16 108:16, 23

**quick** 39:11

**quotations** 30:1

**quote** 29:2 47:11,14

**quoting** 43:6

**R**

**ran** 50:3

**range** 31:3

**rate** 93:13

**rates** 20:22 39:12,18, 21 40:25 41:7,21 42:7

**razor** 28:24 73:21

**re-read** 12:25 18:14

**reach** 27:8

**read** 8:18 9:15 11:13, 18 23:24 24:5 33:16 39:4 41:5 45:10 47:14 52:20 53:24 70:1 73:9,19,25 74:12,13 76:12 77:8 78:22 86:25 91:18, 24 100:18 101:22

**readily** 21:3,19 22:5, 18

**reading** 45:25 46:2 56:24 69:7 70:9 78:10 81:6

**real** 39:11 60:16 61:12

**reason** 10:1 24:3 66:5

**recall** 7:2 22:7 33:22 34:3,8,9 50:17 75:3 88:24 89:15 92:13 94:20 102:18,21

**recess** 6:12 41:16 67:18 108:14

**recognizances** 77:18

**recognize** 11:11 68:4

**recollection** 7:25 45:20,23 46:4 86:22 88:9,12,13

**record** 5:24 6:11 40:16 41:15 67:17

**recording** 9:12

**records** 101:5

**reduce** 9:13

**reducing** 104:6

**refer** 5:15 8:17 15:3 24:10 28:19 31:13, 23 33:8,11 54:5 63:7 76:14 80:9 84:11,24

**reference** 15:8,9,22, 23 16:1,17 21:8 22:5 44:4 71:9 76:15 86:12 87:22 88:19 89:13 100:5 103:19

**referenced** 19:16 25:18 47:8 57:4 71:3,11 100:21 103:16 106:5,18

**references** 89:2 90:17 92:23 94:23

**referencing** 14:7 32:9 75:24 86:18

**referred** 14:9 24:2

**referring** 14:22 19:19, 22 20:1 21:9,15 24:8,13,16,18,22 26:20 30:24 35:25 37:24 38:2 39:16 40:20 42:17 44:3 48:7 52:24 54:2 55:2 71:7 77:5 86:2 95:2

**refers** 28:22

**refresh** 45:19 46:3 90:18

**refreshing** 8:19 45:23

**refund** 87:7

**regard** 25:5 106:17

**region** 44:11

**regionally** 39:18,22

**regrettable** 41:4

**regular** 79:16

**regulated** 23:5,17 28:13 53:23 87:23 89:21

**regulates** 81:15

**regulating** 106:12,15

**regulation** 17:5,9,16 23:13

**regulations** 7:7 17:6 21:3,19,21,22 22:9, 10,17 25:3 29:21 33:4 58:9,14 100:5,8 107:21

**regulatory** 23:15 31:21

**reinstated** 101:3

**related** 94:5 105:2

**relative** 93:14

**relevant** 11:15 21:1 49:1 57:10 65:17 76:25 80:7 82:13 85:1 86:25 90:21,24 101:22 107:6

**reliant** 16:14

**remember** 69:7 75:6 96:20

**remind** 8:2

**remote** 8:16

**remotely** 5:5 8:10

**rendering** 60:17,25 61:5,7,8,10,15

**repeat** 20:14 22:3 26:4,12 42:4 58:18

**repeated** 10:20

**repeating** 36:7

**rephrase** 22:3,22 26:6 62:17

**report** 5:19 7:12,22, 23 11:19,21 12:3,7, 9,12,15,18,21,25 13:5,17,19,21 14:4, 8,13,20 15:4 16:10 19:8 20:6 28:2 29:3 30:8 32:10 33:7,10 35:2,15,23 37:14 39:3,7 40:24 41:20, 24 42:25 43:10,24 44:23 47:2 48:18 50:13 51:2,10 54:3,6

55:22 58:5 62:24 63:7 68:6,8 69:19 70:16 74:20 75:10 76:24 78:9 80:13,16 83:15 85:1 86:13,24 87:22 88:5,19 89:2, 3,14,20 90:1,23 92:10,23 93:4 94:7, 18,23 95:7 97:21,24 99:11,19,20 100:5,9, 12 101:6,8,18 103:6, 10,20 104:4,15,21 105:3,5,13 106:1,2, 5,11,18,22 107:4,8

**reporter** 6:7 9:11 90:13,14 98:19 108:24

**reports** 7:18

**represent** 61:17

**require** 64:5

**required** 79:11

**requirements** 79:20

**requires** 78:12

**reread** 35:10 44:14

**rereading** 45:16

**research** 58:19 63:3 66:17 69:17,20,24 70:6,11,17 71:2 75:21,25 107:23

**researching** 58:19

**resemble** 34:21 66:20 100:16

**resembled** 57:11

**resembles** 55:10,11

**resembling** 33:24 34:23 59:11 65:23 66:3

**residents'** 97:16

**response** 8:7 84:22

**restate** 41:18 46:6

**restrict** 76:5 82:17 92:2,6 93:25 106:6

**restricted** 15:11 75:11 80:9 84:12,20 86:13 91:25 105:25

**restricting** 81:3 87:12

**restriction** 15:13 17:2,18 76:3 81:7,9, 13,19,20,24 82:3,6 83:18 84:23 85:10 86:20 88:14 89:5,8 90:3

**restrictions** 10:13 15:14 21:13 23:11, 19 66:1 75:22 76:2 105:6 106:12

**restricts** 88:7

**return** 75:5

**review** 13:7 36:25 63:25 71:1 74:25 79:2 108:19

**reviewed** 13:4

**revolved** 34:17 65:7 102:20

**revolver** 14:11

**revolvers** 31:16 102:4

**revolves** 34:4

**Rezin** 38:12,23

**ride** 77:9

**rifle** 14:10

**rifles** 19:11

**right-hand** 73:24

**Rights** 5:11

**rising** 42:7

**Rivas** 5:4,16,17,25 6:1,13 11:20 40:15 41:17 67:19 108:18

**Rivas'** 40:12 41:10

**Robert** 5:12

**robust** 78:16

**role** 7:4 58:11

**room** 8:13 9:7

**rose** 39:12 40:25 41:8,21

**roundup** 79:6

**rural** 19:12 20:2

**S**

**Sacramento** 10:8

**sale** 10:16 14:10 82:23 83:25 84:2 87:19 88:16 89:10 92:6,12 93:18 94:19, 24,25 95:3,5,14,16, 19,25 96:2,3,10,19 100:14,21 101:12 103:20,23 104:1,10 105:2,8

**sale-related** 105:1

**sales** 15:13 17:1 85:17 95:7

**scabbard** 37:20

**scanning** 39:11

**school** 69:13 97:4

**scope** 16:23 23:15 59:4 60:2 100:1

**Scouts** 69:13,14 70:5,12

**screen** 11:6 13:19 40:12,21 41:10 44:22 45:17 52:16, 20 55:25 56:3 63:15 67:23,24 74:7 96:23 97:2 101:20

**screens** 75:17

**scroll** 11:24,25 13:18 14:20 16:6 19:7 45:22,24 46:1 47:1,9 68:19 72:1,21 75:9 76:25 90:22

**scrolled** 14:3

**scrolling** 15:7 16:15 20:5 48:17 52:1 72:3 85:1 86:24 91:9 101:21

**seamstresses** 69:13

**search** 14:18 44:24 76:23 80:18

**secretive** 91:4

**secretively** 91:1

**secretly** 78:13 79:9

**section** 10:7,9 18:4,5, 9,15,16 19:3 28:2 30:3 49:1 50:12,17 51:2 54:4 68:25 69:10 76:25 77:2,3,5 79:11 80:20 81:6 85:2 90:23 101:22 103:16

**sections** 10:6 70:21

**security** 79:12

**self-defense** 42:14

**sell** 102:1,7,10

**selling** 96:7 102:2

**sense** 33:16 43:3,4 45:10

**sensitive** 17:1,18

**sentence** 42:20 48:23 53:18 71:15 76:8

97:12

**severe** 17:20 31:18

**shape** 34:21 50:6 100:16

**share** 44:22 106:4

**shared** 23:25 40:21 55:13

**shares** 11:6 52:16 56:3 63:15 67:23

**sharing** 51:22 53:22 67:24 80:7 101:20

**sharpened** 54:20 55:20 59:23 60:14, 23,25 61:3,6 67:1

**short** 40:18

**short-term** 75:4

**shotgun** 14:10

**shotguns** 19:11

**shoulder** 27:8

**show** 70:21

**showing** 16:17

**shows** 74:6 101:19

**shut** 95:14 96:8

**sided** 59:22

**signature** 12:6

**signed** 12:9

**significance** 78:16

**simultaneous** 98:18

**single** 46:23

**sink** 46:18

**size** 34:21 45:20 50:6 51:23 57:8 59:7 68:12 74:21 100:16

**skin** 19:24

**slave** 39:24

**slung-shot** 16:4 28:16

**slung-shots** 17:21 24:25

**small** 24:25 45:16 47:6,16 48:20 50:7, 9,10 51:15,16,23 66:8,9

**so-called** 34:18

**social** 40:4

**societal** 20:24 63:1

**soldiers** 69:11

**sole** 12:12

**solicited** 7:22

**sort** 7:6 13:2 19:18,22 37:1 39:20 48:6 50:9 51:23 63:4 72:12 78:17,18 94:12 101:10 106:16,24

**sounds** 45:17 48:24 70:7,8 75:15

**South** 39:23,24 43:22 44:11 46:15

**southern** 42:21 43:1, 8,19 44:1,18 47:2,22 48:10,12

**spaces** 75:12

**Spanish** 46:19

**speak** 70:22 102:22

**speaking** 24:19 39:21 50:15 78:4 98:18

**speaks** 77:25 80:2 81:10 99:2 102:13

**species** 88:23

**specific** 8:20 18:10, 24 19:4,19 24:7 27:16,17 29:11 33:5, 17 35:15 36:25 39:15 40:3 63:9 66:4 70:5,11 78:18 82:19 88:11 93:15 95:7 96:2,20 102:21 105:1

**specifically** 15:15 17:15,22 24:23 27:11 28:10 35:25 38:15 40:7 69:11 75:6 78:9 79:1 81:15 82:4,8,15 83:23 84:9 85:25 90:9 93:10 94:6 96:9 103:23

**speculation** 60:3

**spirit** 34:24

**sportsmen** 74:9

**springs** 53:20

**stabbing** 35:21 36:12

**stand** 71:21

**stands** 66:5

**started** 40:5 41:8 95:9

**starting** 46:14 53:17

**state** 5:23 17:14,22 18:17,20 19:8 20:5 21:2,18 24:8 26:23 30:18 33:12 35:19 36:10 37:19 39:8 40:25 41:20 42:20 48:18 53:19 59:14 64:18 74:21 75:11 76:9,20 84:12 86:13 87:23 89:20 90:25 91:4 92:11,15 94:7, 19 95:19,24 96:14 97:17 101:12,25 102:2 103:25 105:6, 14

**stated** 43:16 62:15 76:22

**statement** 30:24 37:2,25 38:3 39:16 40:8 49:2 70:18 71:19,21 75:24 84:18 88:5 93:6 101:10

**statements** 70:1

**states** 7:8 17:16,19 36:16 43:1,8 44:1 52:21 64:25 65:19 68:12,14,25 69:10, 21,25 74:22 80:20 85:3 86:3 87:1 90:24 91:9 92:11

**stating** 31:24 43:24 47:21 83:9 86:7

**statute** 18:11,21 28:22 29:3 80:1 86:3 88:12 89:1 90:24

**statutes** 93:24 99:21

**steel** 73:22

**steps** 12:23

**Steven** 33:19

**stop** 45:13 46:9 80:6

**story** 38:12,16,23 39:3

**straight** 49:10

**straightforward** 24:3

**street** 37:21

**Strike** 69:18

**struggled** 32:1 74:12

**stuff** 38:11

**style** 48:19 49:19 50:6,20,22 72:8,12 75:2

**styles** 19:21 31:25 70:5

**styling** 68:13 74:21

**subject** 7:2 12:21 94:17

**submitted** 5:19 7:12, 18,21,24 8:1 11:22 12:4 13:5 69:19

**substance** 6:17 13:17 65:4

**Substantively** 107:8

**successful** 47:7

**suitability** 24:1,19

**sum** 55:5 80:24 87:6

**summarize** 54:14

**support** 44:7 47:21 84:18 86:17 88:5 92:21 103:6

**supporting** 44:12,15 71:15 89:1,25

**supports** 71:22

**sureties** 77:16

**surety** 79:11,14,25

**suspended** 100:25

**swedge** 54:20 55:20 59:23 60:14,23 61:4, 6 67:2

**sweep** 23:15

**Swiss** 51:23

**Switch** 68:7

**switchblade** 10:17 49:23 50:11,23 51:12 53:15 56:15, 21 68:13 69:20 74:22

**switchblades** 10:13 49:4,10,13,25 50:2 68:1,15,18,21 69:1, 10,25 70:19 71:4,10, 16,23 72:3,9,22 99:23

**sword** 80:10,22 84:13 85:4

**swore** 8:3

**swung** 71:16,23

**T**

**Table** 68:19

**talk** 13:10 17:4

**talked** 13:16 33:7 54:4 55:9 97:14

**talking** 7:6 16:25 17:25 21:10 23:19 35:12 39:20 40:10 47:25 48:2,3,4 49:21 50:13,14,18,19 51:22 54:12 55:13 58:13 62:24 95:9,10 102:24 103:12 107:9

**tax** 93:14 94:8,17 96:6,10,11,19 99:23 100:5,8 106:18 107:21

**taxed** 92:11,16 93:13

**taxes** 93:5,10,11 94:3,5,15 95:1,9,10, 12,13 96:6,24 97:8, 15 99:18 104:5 106:20,21,22,23 107:4,10,15

**tended** 21:3,19

**Tennessee** 76:9,17 95:6,16,18 100:13, 20 101:12,17,25 103:22

**term** 22:5 32:4 53:14

**terms** 32:8,10,14 39:18 40:1 57:10 58:8

**territorial** 96:17

**territory** 96:11,13

**terror** 77:10,12 78:13, 23 79:5,10

**testified** 5:6

**testify** 12:20

**testifying** 8:4

**testimony** 9:19 10:2 25:22 26:10 104:13

**Texas** 5:1

**text** 9:1 13:10 21:1 47:6 52:19,21,24 73:11,18,23 78:9 86:25 89:25 98:5

**thing** 32:21 62:17 81:21

**things** 22:14 43:13 55:16 66:13 75:7 79:7

**thinking** 94:13 105:18

**thought** 57:22 62:13 65:6

**thousands** 30:10

**threat** 30:19 31:6,18, 19,20

**three-and-a-half** 57:14 59:15,17,24

**threshold** 78:24

**time** 6:21 7:15,24 18:18,20 22:25 30:5 40:10 43:12 50:24 52:11 53:17 63:3 67:12 108:8,18,23

**times** 12:25 47:17

**tip** 54:20

**title** 11:13 68:18 98:6

**titled** 13:20 45:6 72:23 73:3

**today** 5:18 8:8 9:11 10:2 12:24 25:22 48:7 49:20 50:7 51:15 52:23 61:17 104:24 106:5

**told** 13:12

**tool** 69:2

**tools** 19:11

**toothpick** 37:16 54:17 55:12 57:12 66:2,21 100:17

**toothpicks** 34:20 54:11 57:25 72:19 100:15

**top** 17:21 18:17 33:18 56:9 63:8,18 68:24 96:1

**topic** 13:17

**total** 55:5

**trade** 96:7,8 104:7

**transcript** 9:15 108:19

**transfer** 85:17 87:19 88:16 89:10 92:7

**traveler** 86:9

**travelers** 86:4

**traveling** 80:23 83:5 87:8,16

**treat** 19:24

**tremendous** 39:18, 22,25

**trend** 43:19

**trial** 9:22

**trials** 65:5,7 66:6

**true** 12:18 13:22 14:1 38:10

**truth** 8:3

**truthfully** 8:7

**turn** 11:7

**turning** 95:6

**two-thirds** 31:1

**type** 50:9 85:6

**types** 17:6 25:6 52:4, 22 58:20,22

**U**

**unclear** 21:20 38:12

**unconstitutional** 10:7

**underneath** 73:18

**understand** 5:21 8:5, 14,21 9:4,9,17,24 10:15 34:13 58:11 64:1,21 67:9 102:24

**understanding** 10:11 49:3,16 58:8,15 59:16,19 64:7,8,24 74:18

**understood** 30:5 42:13 55:14,15 59:11 62:25

**United** 7:7 36:16 64:25 65:19 68:14 69:21,25 74:22

**unlawful** 30:12 65:5 84:13 85:4

**unsure** 41:17

**unusual** 38:14

**upheld** 34:24

**upper** 73:24

**upwards** 25:20

**urban** 39:23

**utilitarian** 48:20 49:18 51:8,18

**utility** 54:24 73:13,15

**V**

**Vague** 22:25

**variability** 39:18,25

**variation** 63:18

**variations** 49:12 74:17

**varied** 39:22

**varying** 70:22

**version** 13:24 14:16 57:1

**versus** 49:25

**veterinarians** 69:12

**view** 65:17 74:3,4 77:13

**violence** 39:12,19,21 40:2,25 41:8,21 42:7 43:11 54:23 55:16

**Virginia** 87:23

**W**

**War** 100:25 106:19, 20,21,23 108:1

**watching** 16:15

**ways** 25:3 32:12,13, 14

**weapon** 16:4 21:12 22:24 23:6 28:24 29:4 30:14 34:20 47:19 48:14 77:11 78:22 80:23 82:16 83:11 84:14 85:4 89:22 91:2,17 93:18, 22 94:1 96:3 100:15

**weapon.'** 76:11

**weapons** 15:10,17,20 16:21 17:10,17 18:1, 10,23 19:4 20:7,11, 15,21 21:4,8,11,12, 14,21,23 22:6,10,12, 16 23:10,16,19,21, 25 24:1,2,7,8,16,18 25:2 26:16,20,24 27:11,20,22 28:2,3, 7,14 29:23 30:6 31:14 35:20 36:11, 23 37:5 43:12 45:7, 14 46:10,18 65:6 75:12 76:3,6,21 77:23 78:5,7 81:4,7, 19,23 82:7,9,12,18, 21,24 83:2,5,10,19, 22 84:1,3,5,8,21 85:11,15,18,21,24 86:1,8,14,21 87:4, 13,16,20,25 88:8,15, 17,22 89:6,9,11 90:9 91:20 92:1,3,7,17 93:6,13 94:6,15,16 95:3,14 96:3,7 99:18 100:22 102:11 104:8 106:7,13,25 107:16

**wear** 80:21

**wearing** 85:3 87:3

**week** 13:1

**west** 39:23 47:18 48:2,4,5,7,8

**Western** 48:4

**whatsoever** 14:12 91:1

**white** 73:18,23

**whittlers** 74:11,14

**wider** 48:6

**widespread** 31:16 63:4

**wishes** 46:9

**Woods** 16:23 17:11 18:2,12,25 21:25 22:25 26:2,9 36:5,19 40:14 41:11,13 51:19 56:16,22 57:5, 18 59:4 60:2 62:1 67:11,15 77:25 80:2 81:10 90:5 99:2,25 102:13 104:12 105:9 106:8 108:3,11,15, 24 109:1

**word** 78:4,9,18 105:16

**words** 103:1

**work** 6:14 69:5 70:15 96:16

**worked** 79:23 94:9

**workers** 69:12

**Works** 67:15

**worn** 47:16 94:15,16

**worries** 75:19

**worth** 5:1 94:7

**written** 15:4 68:1

**wrong** 33:3

**wrote** 32:9 43:6 70:14

**Y**

**yada** 98:12

**year** 6:23 40:5,6 96:20

**years** 15:1,6,11,19 40:4 63:9 79:6 107:5

Volume I
Dr. Brennan Rivas
Knife Rights Inc. vs.
Rob Bonta Attorney General

**yellow** 73:11,18

Z

**zoom** 61:1 66:24 74:1,14

Index: yellow–zoom
www.aptusCR.com
KR2125

# PLAINTIFFS' EXHIBIT AI

KR2126

Automatic Spring Blade Knives
with locking device and safety catch

#10 Exact miniature replica of standard spring-blade, no safety. Has shackle, genuine horn handle, brass lined, brass riveted, mirror finish blade, polished decorative guard and bolster, blade 1-1/8" long, handle 1-5/8.

#14 Standard spring blade with push button release and lock, other features same as above. Also with simulated mother of pearl scales. Blade 1-7/8" long, handle 2-5/8.

#18 Same as above, blade 2-3/4" long, handle 3-3/4.

#20 Same as #14, Blade 3-3/4" long, handle 4-1/2.

#22 Same as #14, Blade 4" long, handle 5.

#28 Same as #14, Blade 5" long, handle 6.

N.B. These knives are called stilletoes. They do not have sharp edges. The steel will take and hold a sharp edge if desired.

Latama Imported Cutlery catalog circa 1948



AUTOMATIC
PUSH BUTTON KNIFE
by EDGEMASTER
ONLY
PRESS BUTTON
Blade Snaps Open!
Has the Edge on 'em all
GUARANTEED!
Eliminate Broken Fingernails
Practical........Useful........Handy
Ready for use in a JIFFY
HIGH CARBON STEEL BLADE
TEMPERED TO HOLD SHARP EDGE!
Safe!..BLADE LOCKS IN OPEN OR CLOSED POSITION
Made by Skilled Craftsmen for Durability and Heavy Duty
EDGEMASTER
MY·T·MITE
Has the Edge on 'em all
AUTOMATIC PUSH BUTTON KNIVES
SAFETY CATCH LOCKS BLADE IN OPEN OR CLOSE POSITION
SMALL...COMPACT...PRACTICAL.........THE PERFECT KNIFE FOR LADY OR GENTLEMAN
NO BROKEN FINGERNAILS...PRESS THE BUTTON...BLADE SNAPS OPEN
BLADES MADE OF FINEST HIGH CARBON STEEL...HARDENED and TEMPERED

KR2128