John W. Dillon (SBN 296788)
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

KNIFE RIGHTS, INC.; ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P.,

               Plaintiffs,

     v.

CALIFORNIA ATTORNEY GENERAL ROB BONTA,

               Defendants.

Case No. 23-cv-0474-JES-DDL

Hon. James E. Simmons, Jr. Magistrate Judge Hon. David D. Leshner

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**Part VI: Bates No. KR2147-KR2168**



**Buck 110 Manual
(Original 2-Hand Opener)**

**Buck 110 Manual
(1-Hand Opener)**

**Buck 110 Auto**



**Hogue EX-01 Manual**



**Hogue EX-A01 Auto**

**KR2148**



**Pro-Tech TR-5 SA.1 Spring Assisted**



**Pro-Tech TR-5 T501 Auto**

KR2149



**Terrain 365 P38-AT Manual**



**Terrain 365 P38-DA Dual-Action Auto**

**KR2150**

**PLAINTIFFS' EXHIBITAK**

**KR2151**

# Sporting Knives and Tools in America:
## Essential to Daily Life

## Sporting Knives and Tools

Throughout the U.S. people use knives and edged tools daily:
- At work, from construction worker to florist
- During normal activities, from opening packages to cutting apples
- In recreational activities, from camping to fishing and hunting.
- In life-saving situations by EMTs, firefighters, law enforcement and the military.

They are an essential, fundamental tool for work and play in American lives.[1]

## U.S. Sporting Knife & Tool Industry - $5.722 Billion Economic Impact[2]



- 4,704 direct U.S. Employees at 81 Companies
- 23,520 Ancillary Support Jobs in Other Industries and Services
- $953.7 Million Gross Revenues at Manufacturer/Importer Level
- $5.722 Billion Total Economic Impact on U.S. Economy

## Millions of Americans Use Knives Daily

- 34 Million hunters and anglers carry knives[3]
- 3.2 Million law enforcement officers, EMT's, firefighters, security guards carry valuable tools every hour of the day[4]
- 2.2 Million active and reserve military forces carry knives[5]
- 5.2 Million construction workers rely on knives and multi-tools[4]
- Nearly 1 Million adult volunteers in local councils throughout the U.S. and its territories help Boy Scouts of America with 2.4 Million youth members to Be Prepared[6]
- Nearly half of all Americans - 48.4% - participated in at least one outdoor activity in 2014. This equates to 141.4 Million people involved in activities where knives are often carried and used.[7]

## Majority of Knives Designed to Open Easily with One Hand[8]

- Knife users prefer easy to open, folding knives called pocket knives, one-hand opening or assisted opening and automatics, and multi-tools with one or more knife blades.
- The majority of activities using a knife require one hand free for holding something.
- Automatic knives currently are legal in approximately 34 states.
- Courts in California, Ilinois and Michigan have expressly ruled that assisted-openers are not illegal switchblades.
- The Federal Switchblade Act (1958) was amended in 2009 to clarify that these knives which have a bias toward closure are not illegal switchblades in interstate commerce.

## Billions of Dollars Benefit the U.S. Economy

- Hunters and anglers are a $76 Billion economic force annually.[3]
- Outdoor recreation including camping, backpacking, kayaking, climbing, etc. generates $646 billion in consumer spending.[9]

[1]See http://www.akti.org/resources/people-use-knives for a partial list of knife users
[2]State of the Sporting Knife & Tool Industry, American Knife & Tool Institute (published 2015; data 2014)
[3]Hunting and Fishing: Bright Stars of the American Economy, Congressional Sportsmen's Foundation, 2013
[4]U.S. Department of Labor, Occupational Employment Statistics, May 2015
[5]Wikipedia.org
[6]2014 BSA Report to the Nation
[7]Outdoor Recreation Participation Topline Report 2015, Outdoor Foundation
[8]State of the Sporting Knife & Tool Industry Survey, American Knife & Tool Institute, 2015
[9]Outdoor Industry Association.org/research



AKTI[SM]
AMERICAN
KNIFE & TOOL
INSTITUTE
EDUCATE · PROMOTE · INFORM

12/2015

KR2152

**PLAINTIFFS' EXHIBIT AL**

KR2153

John W. Dillon (SBN 296788)
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P., | Case No. 3:23-CV-0474-JES-DDL |
| Plaintiffs, | Hon. James E. Simmons, Jr. Magistrate Judge Hon. David D. Leshner |
| vs. | |
| CALIFORNIA ATTORNEY GENERAL ROB BONTA, | **DECLARATION OF DARIN PRINCE IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | |

DECLARATION OF DARIN PRINCE IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

KR2154

## DECLARATION OF DARIN PRINCE

I, Darin Prince, declare as follows:

1.      I am a party in the above-titled action, through my business North County Shooting Center, Inc. I am over the age of 18, have personal knowledge of the facts referred to in this declaration, and am competent to testify to the matters stated below. This declaration is executed in support of Plaintiffs' motion for summary judgment.

2.      I am an adult natural person, a citizen of the United States, and a resident of San Diego County, California.

3.      I am a peaceable, non-violent individual who is eligible to keep and bear arms under State and federal law.

4.      I am a member of Plaintiff Knife Rights Inc., who is also a named Plaintiffs in this matter.

5.      I am the co-owner and co-operator of North County Shooting Center, Inc. (NCSC), a federally-licensed firearms dealer and gun range located at 1440 Descanso Avenue, in San Marcos, California 92069.

6.      NCSC is both an S-Corp and a federal-and state-licensed firearms retailer and range owned by Stanley Tuma and me. As a full-service shooting range and gun store, NCSC sells firearms, ammunition, and other related accessorie including various forms and models of knives. As part of its range activities, NCSC provides firearms for rental use within its indoor shooting range. NCSC also provides various firearms training courses that take place on NCSC's premises.

1.      As a part of my Second Amendment right to keep and bear arms, as well as the Second Amendment rights of my customers and would-be customers, I wish and intend to purchase, acquire, possess, sell, transfer, and carry various models of automatically opening knives with blade lengths of two inches or more for many lawful purposes, including self-defense. Not only would I acquire these knives

personally for various lawful purposes, but through my business, I would acquire these knives and lawfully sell them to my customers and would-be customers for self-defense and other lawful purposes.

2.     It is my understanding that an automatically opening knife with a blade length of two inches or more is defined as a "switchblade" pursuant to California Penal Code section 17235.

3.     It is my understanding, pursuant to California Penal Code section 17235, "a knife having the appearance of a pocketknife and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by a flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever."

4.     It is also my understanding that under California Penal Code section 21510, "[e]very person who does any of the following with a switchblade knife having a blade two or more inches in length is guilty of a misdemeanor: (a) Possesses the knife in the passenger's or driver's area of any motor vehicle in any public place or place open to the public. (b) Carries the knife upon the person. (c) Sells, offers for sale, exposes for sale, loans, transfers, or gives the knife to any other person."

5.     Moreover, the unlawful possession or carrying of any switchblade knife is a nuisance, and thus, such knives are subject to surrender and destruction under California Penal Code §§ 18000 and 18005 according to California Penal Code section 21590.

6.     As such, it is unlawful for me to personally purchase, acquire, possess, sell, transfer, or carry knives defined as "switchblade" knives under California law. It would also be unlawful for my business, to purchase, acquire, possess, sell, transfer, or carry knives defined as "switchblade" knives under California law for sale in my shop to customers and would-be customers.

2
Declaration of Darin Prince in Support of Plaintiffs' Memorandum of Points and Authorities in Support of Notice of Motion and Motion For Preliminary Injunction; or Alternatively, Motion for Summary Judgment

KR2156

7.     To be clear, I would both personally, and through my business, purchase, acquire, possess, and carry such knives but for the State's enforcement of the laws, policies, practices, and customs at issue in this case and my reasonable fear of arrest, loss of federal firearms license, and prosecution for violation of California's Knife Ban.

8.     I already have established retail businesses and clientele in California surrounding the sale of various arms (including knives). As such, the only step required for me to begin selling automatic opening knives through PWG would be to acquire them from manufacturers and distributors. However, I am prohibited from doing so due to California law. In other words, I am ready, willing, and able to purchase and sell automatic opening knives, and the only thing stopping me is my fear of prosecution for violating California Penal Code sections 17235, 21510, and 21590. Acquiring and selling automatically opening knives with blade lengths two inches and more is not some far-off, undefinable goal that I may someday take part in. But for the challenged California Knife Ban, I would place an order tomorrow to acquire automatic opening knives and begin to sell them as part of my business.

9.     As a direct result of the California Knife Ban, myself and my business, PWG, as well as my customers and would-be customers are injured by our collective inability to legally purchase, sell, offer for sale, expose for sale, loan, transfer, or give "switchblade knives" due solely to California law. This injury would be redressed by a favorable ruling form this Court, namely, declaring unconstitutional and issuing a permanent injunction against enforcement of the challenged penal code sections. Once this absolute barrier is removed by this Court, PWG will immediately acquire, purchase, sell, offer for sale, expose for sale, and transfer, switchblade knives. Until then, my business sales and profit-generating capability are lower than they otherwise would be if I were able to purchase and then advertise, market, and sell another new line of knives ("switchblade knives") to my existing and prospective customers.

3

Declaration of Darin Prince in Support of Plaintiffs' Memorandum of Points and Authorities in Support of Notice of Motion and Motion For Preliminary Injunction; or Alternatively, Motion for Summary Judgment

KR2157

10. It is my understanding that automatically opening knives are "arms" under the plain text of the Second Amendment or any common sense meaning of the term. Moreover, I desire to keep and bear an automatically opening knife for self-defense and other lawful purposes, and this conduct is covered by the plain text of the Second Amendment.

11. Based on my review of the California Penal Code sections, there is no exception of any kind that would allow me or my customers to lawfully purchase, acquire, purchase, possess, or carry a "switchblade" knife as defined under California law.

12. NCSC brings this case on behalf of itself, and as a representative of a class of similar entities consisting of licensed California retailers too numerous to individually name or include as parties to this action. They are licensed firearms and knife retailers in California that are injured because they are now prohibited from purchasing, acquiring, selling, supplying, delivering, or giving automatically opening knives defined as "switchblades" under California law.

13. I believe that California Penal Code sections 17235, 21510. 21590 are unconstitutional and therefore respectfully request that this Court rule in Plaintiffs' favor, declare that the relevant California Penal Code sections are unconstitutional and immediately issue a permanent injunction preventing their enforcement against myself, the other named Plaintiffs, NSCS customers and would-be customers, Plaintiffs Knife Rights Inc.'s members, and all other California residents or visitors to California.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and this declaration was executed on March 1, 2023 in San Diego, California.

By: _____

Darin Prince

4

DECLARATION OF DARIN PRINCE IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; OR ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT

KR2158

**PLAINTIFFS' EXHIBIT AM**

KR2159

1    John W. Dillon (SBN 296788)
2    jdillon@dillonlawgp.com
     **DILLON LAW GROUP APC**
3    2647 Gateway Road
     Suite 105, No. 255
4    Carlsbad, California 92009
5    Phone: (760) 642-7150
     Fax: (760) 642-7151
6

7    Attorney for Plaintiffs

8
                   **UNITED STATES DISTRICT COURT**
9
            **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
10

11

12   KNIFE RIGHTS, INC., ELIOT            Case No. 3:23-CV-0474-JES-DDL
13   KAAGAN, JIM MILLER, GARRISON
     HAM, NORTH COUNTY SHOOTING           Hon. James E. Simmons, Jr.
14   CENTER, INC., and PWGG L.P.,         Magistrate Judge Hon. David D.
                                          Leshner
15                    Plaintiffs,
16
17            vs.                         **DECLARATION OF JAMES "JIM"
                                          MILLER IN SUPPORT OF PLAINTIFFS'
18   CALIFORNIA ATTORNEY                  MEMORANDUM OF POINTS AND
19   GENERAL ROB BONTA,                   AUTHORITIES IN SUPPORT OF
                                          NOTICE OF MOTION AND MOTION
20                    Defendant.          FOR SUMMARY JUDGMENT**
21

22

23

24

25

26

27

28

DECLARATION OF JAMES "JIM" MILLER IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

KR2160

### DECLARATION OF JAMES "JIM" MILLER

I, James "Jim" Miller, declare as follows:

1. I am a party in the above-titled action. I am over the age of 18, have personal knowledge of the facts referred to in this declaration, and am competent to testify to the matters stated below. This declaration is executed in support of Plaintiffs' motion for summary judgment.

2. I am an adult natural person, a citizen of the United States, and a resident of San Diego County, California. I am also an attorney licensed to practice in the State of California.

3. I am a peaceable, non-violent individual who is eligible to keep and bear arms under state and federal law.

4. I am a member of Plaintiff Knife Rights Inc., which is also a named Plaintiff in this case.

5. As a part of my Second Amendment right to keep and bear arms, I desire and intend to acquire, possess, and carry one or more automatically opening knives with a blade length of two inches or more for lawful purposes, including self-defense. If I was able to legally acquire, possess, and carry such knives, I also would use the knife for various daily, utility purposes and carry it with me on a daily basis for everyday use and self-defense.

6. Based on my review of the relevant California Penal Code sections, I know that an automatically opening knife with a blade length of two inches or more is defined as a "switchblade" pursuant to California Penal Code section 17235.

7. I also understand, pursuant to California Penal Code section 17235, a "switchblade knife' means a knife having the appearance of a pocketknife and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by a flick of a button, pressure on the handle, flip of

1

DECLARATION OF JAMES "JIM" MILLER IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

KR2161

the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever."

8.     I have also reviewed California Penal Code section 21510, which states that "every person who does any of the following with a switchblade knife …is guilty of a misdemeanor: (a) possesses the knife in the passenger's or driver's area of any motor vehicle in any public place or place open to the public, (b) carries the knife upon the person, (c) sells, offers for sale, exposes for sale, loans, transfers, or gives the knife to any other person."

9.     Finally, based on my review of California Penal Code section 21590, the "unlawful possession, carry, sale, loan, or transfer/giving of any switchblade knife is a nuisance, and thus, such knives are subject to surrender and destruction under California Penal Code §§ 18000 and 18005."

10.     These California Penal Code statutes act as a complete ban on automatically opening knives defined as "switchblades" throughout California. I refer to the above laws as California's Knife Ban.

11.     If it were not for the State of California's enforcement of the laws, policies, practices, and customs at issue in this case (the California Knife Ban), and my reasonable fear of arrest and prosecution for violation of California's Knife Ban, I would acquire, possess, and carry such an automatically opening knife with a blade of two inches or more in the state of California.

12.     I have also confirmed my legally inability to purchase any knife defined as a switchblade under California law, based on my own review of the California Penal Code sections identified above and by visiting various online and storefront knife retailers. In each of these instances, my ability to acquire, purchase, carry, or possess an automatically opening knife defined as a switchblade under California law has been denied due to California's unconstitutional Knife Ban.

13.     As a direct result of the California Knife Ban, my constitutional rights have been injured by the State's prohibition on my ability to legally purchase,

acquire, possess, and carry automatically opening knives defined as switchblades under California law. This injury would be redressed by a favorable ruling from this Court, namely, declaring the challenged California Penal Code sections unconstitutional and issuing a permanent injunction against their enforcement. Said differently, California Penal Code sections 17235, 21510, and 21590 stand as an absolute barrier to my ability to purchase, acquire, possess, loan, give, and carry automatically opening knives defined as switchblades under California law.

14.   If this case secures the relief that it seeks, that barrier will be removed. Once removed, I will immediately purchase, acquire, possess, and carry automatically opening knives defined as switchblades under California law, including my options to loan or gift one or more such knives. Until then, however, I cannot exercise my constitutional right to keep and bear automatically opening knives due to my fear of prosecution for violating California Penal Code sections 17235, 21510, and 21590.

15.   It is my understanding that automatically opening knives are "arms" under the plain text of the Second Amendment. Moreover, I desire to keep and bear an automatically opening knife for self-defense and other lawful purposes, and my conduct is covered by the plain text of the Second Amendment.

16.   Based on my review of the California Penal Code sections, there is no exception that would allow me to lawfully acquire, purchase, possess, loan, transfer/give, or carry a "switchblade" knife as defined.

17.     I believe that California Penal Code sections 17235, 21510, and 21590 are unconstitutional and respectfully request that this Court rule in Plaintiffs' favor, declare that the relevant California Penal Code sections are unconstitutional, and issue a permanent injunction preventing their enforcement against myself, the other named Plaintiffs, Plaintiffs Knife Rights Inc. and its members, and all other California residents or visitors to California.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and my declaration was executed on March 1, 2023 in San Diego, California.

By: _____

James "Jim" Miller

4

Declaration of James "Jim" Miller in Support of Plaintiffs' Memorandum of Points and Authorities in Support of Notice of Motion and Motion for Summary Judgment

KR2164

**PLAINTIFFS' EXHIBIT AN**

KR2165

Case 3:23-cv-00474-JES-DDL   Document 34-7   Filed 03/06/24   PageID.3060   Page 21 of 23

# THE TOY THAT

DO YOU remember the days when firecrackers used to kill, burn and maim scores of youngsters every year? Aroused parents finally put a stop to it. They banded together all over the country to force the passage of local ordinances governing the sale and use of fireworks—and now a firecracker casualty is a rarity.

Today we are confronted with a new toy that kills. It's not yet so widespread as the firecracker menace once was. The toll up to now is relatively small—a few dozen children killed, somewhat more wounded. But the point is, all these unnecessary tragedies are increasing. Fireworks threatened only a few days a year; the new toy threatens every day of the three hundred and sixty-five. Fortunately this new menace can be controlled just as effectively as fireworks have been—if parents will just step in and do it.

This new threat to our children's safety is a pocketknife called a switchblade. Never heard of it? Ask your boy, or your neighbor's boy. Thousands of thoughtless youngsters are carrying them.

Police officials, judges, teachers and social workers all over the country are disturbed about the increasing number of juvenile accidents in which switchblades figure. Now these authorities are not alarmists or bluenoses. They don't want to deny boys their pocketknives. They know that a knife to a growing boy is as important as a lipstick to a young lady.

But they also know that a switchblade, which is fast replacing the old-fashioned pocketknife, is another story. Its chief purpose—as any crook can tell you—is for committing violence.

Have you ever seen one? Few women realize what

a deadly weapon it can be. It isn't for practical use as is the Boy Scout or standard army knife with their two thick blades, can opener and combination bottle opener and screw driver.

No, a switchblade knife isn't as useful—but it's a lot *faster*. To open it, you merely press a button and instantly the blade darts out like a snake's tongue and locks firmly in that position. Any child can operate it easily with *one* hand. An ordinary penknife takes two hands and doesn't have a dagger-tip point.

What does this mean? Here is how one of the nation's top law-enforcement officers sums it up: "In a person's pocket, a switchblade knife is a deadly concealed weapon—as dangerous as a dagger and at close quarters as lethal as a loaded revolver." But unlike a revolver, you don't need a permit to carry it!

This is the wicked weapon which teen-agers in many communities are taking up as a fad!

The president of the International Association of Chiefs of Police, John M. Gleason, told me, "Many

otherwise well-informed parents—especially mothers —don't realize how vicious a switchblade can be."

I had no idea myself until I saw a youth stabbed with one on a Philadelphia street. Two young men were fighting with their fists. Suddenly one of them reached into his pocket. A second later his hand held an open knife. He jabbed the gleaming blade into his opponent's chest. As the blood flowed, women onlookers screamed.

While I watched the police take over, I could not help wondering if that stabbing really had to happen. How many hot-headed adolescents buy a switchblade just for show and then, in a moment of overwhelming anger, use it as a weapon?

Recently—in more innocent spirits—two teen-age boys at a high school dance in a Newark, New Jersey, suburb were playfully showing off with a three-inch switchblade. Accidentally one was shoved against the tip of the knife, which pierced his heart.

"You punctured me, Jim, please take me to a drugstore," the wounded youth moaned and collapsed.

PHOTOGRAPHS FROM PIX

## THERE'S NOTHING ILLEGAL ABOUT MANUFACTURING OR SELLING THE KNIVES DISPLAYED



**WASHINGTON, D. C.**

A perilous prize for these young men but easy to buy in the nation's capital



**NEW YORK**

Easy in New York City too, although a boy may have to lie about his age



**MINNEAPOLIS**

The choice in Minneapolis is good. Watch for the toll in the tabloids

# KILLS

A boy's ordinary pocketknife isn't too dangerous. But a switchblade knife—ever seen one? Do you know how many youngsters carry them and what police officials think about this wicked new plaything?   BY JACK HARRISON POLLACK

His seventeen-year-old companion was aghast. But his sorrow couldn't bring his best friend back to life.

When another Newark high school boy was stabbed several days later, Public Safety Director John B. Keenan observed, "A mother who would be horrified if her son carried a pistol in his pocket thinks nothing of his having an equally dangerous knife."

"There is no excuse for *anybody* carrying a switchblade," declares Essex County Prosecutor D. E. Minard. "The sooner their manufacture and sale are banned, the better off we all will be," adds Newark Magistrate LeRoy D'Aloia. Boston Police Superintendent Edward W. Fallon warns, "No youngster should carry an automatic knife unless he's looking for trouble."

Every expert with whom I talked—including the nation's leading sportsmen—agreed that switchblade knives have no legitimate use in civilian life.

Yet I was amazed—and shocked—to find that nearly everywhere in America you, I or any youngster could walk into a store and [*continued on page 88*]

• None of us knows what the international situation will be tomorrow. Naturally, as long as American boys are fighting abroad that is of paramount concern to all of us.

• But even in wartime we must not lose sight of situations on the home front which need correction.

• As Jack Harrison Pollack's factual survey reveals, teen-agers are being killed needlessly by a gadget which should be brought under greater control. The Woman's Home Companion deserves thanks for publicizing such a problem.

• As spokesman for the nation's chiefs of police, I recommend this constructive article to thoughtful American women. By following its suggestions they can help immeasurably in protecting their communities from a new threat to the safety of many children.

*John M. Gleason*
JOHN M. GLEASON
*President, International Association of Chiefs of Police*

## HERE. BUT LOOK FOR TROUBLE WHEN A SWITCHBLADE GETS INTO A YOUNGSTER'S HAND



CHICAGO

Chicago police deplore switchblade menace; youngsters get them anyway



LOS ANGELES

Of course these aren't meant for boys but Los Angeles boys will carry them



SEATTLE

And so the story goes—push-button knives aplenty all across the country

Case 3:23-cv-00474-JES-DDL Document 34-7 Filed 03/06/24 Page 23 of 23

# The Toy That Kills

*from page 39*

buy a switchblade over the counter—no questions asked. True, some places have laws against selling "dangerous knives" to minors. But let's see how these laws work.

In New York a state law forbids the sale or giving of any pushbutton knife with a blade over two and a half inches long to anyone under sixteen. But in New York City a thirteen-year-old boy recently gazed admiringly at a shiny window display of switchblade knives, daggers and stilettos. He strolled into the highly respectable cutlery store and asked to see a four-inch switchblade, its point sharp as a rapier, its blade well honed.

"That's two dollars and ninety-five cents," the salesman said.

After ringing up the sale he casually remarked, "You're sixteen, aren't you?"

The thirteen-year-older—who was average size for his age—nodded and walked out with his perilous prize.

That same day in the same city another youngster critically stabbed a playmate with a switchblade. Was he any more to blame than his indifferent elders who sanctioned the murderous knickknack?

In Washington, D. C.—only a few knife-throws from the Department of Justice building—a fifteen-year-old boy recently told a storekeeper meaningfully, "I want a switch knife—the longest you got. I don't care about the price just so it's sharp."

The merchant nodded understandingly and sold him his knife.

The price and the patter may vary but you can make the same transaction in nearly any fair-sized community in America. Sample surveys show that it is as easy for a youth to buy a switch knife as a package of cigarettes. I chaperoned youngsters who purchased them for me—while I waited outside the store—in many communities—and none had any difficulty. In some towns they're known as "spring-blades," "snap knives" or "swingback knives." Whatever the name, the article is the same.

"What do you use them for?" salesmen were asked.

"Sharpen pencils, cut string, anything," they replied.

"Why are they better than ordinary penknives?"

"You don't break your fingernails opening them."

IN MY home town switchblades have been advertised as "Safety Push-button Knives." Push-button, yes. But safety? Even a salesman warned me to be sure and keep the knife locked when not in use because his own switchblade had accidentally snapped open in his pocket and gashed his right hip.

Once while looking at switchblades in a Connecticut store, I feigned innocence, asking, "Do you think this is an appropriate gift for my twelve-year-old nephew?"

"It's ideal; you couldn't get a boy that age a nicer present," I was assured.

Later I watched my neighbor's tow-headed twelve-year-old son empty his pockets of the familiar boyhood miscellany: pennies, a ball, some nails, gum, a magnifying glass—and yes, a three-inch switchblade. When I expressed concern at his carrying such a weapon, he proudly showed me how to use it, jabbing at an imaginary enemy.

I couldn't help thinking of the twelve-year-old lad who was switch-knifed in the back last year outside his public school by an angry schoolmate to whom he refused to lend a dime.

Teachers in some areas take switch knives from pupils before allowing them to come to class. Nevertheless some boys I talked to told me they avoid detection by slipping their knives into their shoes.

Why are these switchblades so popular with youngsters? One reason is that many sources of their entertainment have glamorized them, charges Edward J. Kelly, former superintendent of Rhode Island State Police.

But one fourteen-year-old New Jersey boy got the idea elsewhere. Last spring when a twelve-year-old classmate accidentally bumped into him in school, he whipped out a handy switchblade and, as witnesses put it, "cut a

hole in the other boy." The victim later said, "I never even saw the knife—I only felt it."

"Why did you carry a switchblade knife to school?" the youthful stabber was asked.

"For protection!" he defiantly replied. "A couple of kids jabbed *me* with a switch knife last week and took thirty-three cents from me! So the next day I took sixty-seven cents out of my sister's penny bank and bought me a switchblade."

Violence begets violence.

No wonder a juvenile court judge told me, "It's only a short step from carrying a switchblade to gang warfare."

Can anything be said in defense of allowing youngsters to have these weapons? I interviewed manufacturers and spokesmen for the industry. This is their argument: "If you don't let kids have push-button knives, they'll only find other weapons to commit their crimes with—ice picks, baseball bats, even hatpins. The sale of knives isn't to blame. It is the education of these unfortunate youngsters."

Authorities consider this false reasoning. Of course people will always manage to get hold of weapons to commit *premeditated* crimes. But it is the *unintentional* stabbings committed with this too handy pocketknife that could be avoided by outlawing its manufacture. "Countless crimes would *never* be committed if switchblades were banned," Assistant United States Attorney J. Warren Wilson assured me in Washington.

It may surprise you, but crime statistics everywhere reveal that knives cause far more trouble than guns. The ratio is as high as five to one in some communities. In examining police records I was stunned to find how many crimes of violence revolve around a switchblade. Most newspapers merely report a "knife stabbing," neglecting to tell you a switchblade was the culprit.

CLEVELAND recognizes the switchblade menace. Listen to Captain David Kerr of the Homicide Detail: "Last year we had one hundred and sixty-nine stabbings, one hundred and forty of them with switchblade knives. During the same period switchblades were responsible for one fourth of our homicides. Half of the killers were under twenty-three."

Chicago—especially on the South Side—has been harassed by switchblades. "Many cuttings result from trivial disputes," reveals Virgil W. Peterson, director of the Chicago Crime Commission. "If the courts would enforce laws making it illegal to carry dangerous knives, crime would be greatly reduced."

Detroit's former Police Commissioner John H. Witherspoon tried to outlaw switchblades several years ago—but the city council failed to approve the ban. Last year Boston Police Captain Louis DiSessa asked a legislative committee to make possession of switchblade knives a criminal offense, but nothing was done.

In all my investigations I could find no good reason why anybody—youngster or adult—should be legally allowed to carry a switchblade. It's hardly a "perfect Father's Day gift," as one overzealous merchant claimed.

Psychiatrists warn that a switchblade in the irresponsible hands of alcoholics and psychopathic personalities can spell murder. Recently in Hempstead, New York, a young war-hero—who had survived three battle wounds—was quietly getting off a bus with his girl friend. Suddenly, without warning or reason, another passenger—a drunken forty-five-year-old stranger—grabbed the young man and plunged a four-inch switchblade into his chest, killing him almost instantly. Who was the killer? A man with a long police record for drunkenness and assault. He couldn't carry a gun without a permit. Why was it so *easy* for him to roam the streets with a switchblade knife?

At almost the same time, in Newark, New Jersey, a thirty-five-year-old woman accused her husband of being unfaithful. Before he had a chance to explain, she angrily yanked a switchblade from her stocking and stabbed her husband in the heart. The next day he died.

"If she had only hit her husband with a dish or a rolling pin instead!" mused a police

[*continued on page 109*]

# The Toy That Kills

*from page 88*

official. "A switchblade isn't something for anybody with a temper to have."

Newark has now declared all-out war against switchblades.

City and county law-enforcement officers are co-operating to battle the problem. Judges are handing out stiffer sentences to carriers of dangerous knives. Merchants have been ordered to remove them from their windows and threatened with stiff prison terms for selling them to minors.

The schools help too. In an unprecedented directive, Newark School Superintendent John S. Herron instructed principals and teachers to suspend—even expel—students bringing "oversized pocketknives" to school. "I have not had a single complaint since then," Dr. Herron told me.

Because the term "dangerous knife" is vague in New Jersey—as in most state laws—a down-to-earth woman legislator, Grace M. Freeman, expects soon to introduce a bill to clarify it. Under her proposal, registration of all knives over a certain length would be required. Switchblades would be outlawed flatly. And New Jersey's law on the sale and possession of other dangerous knives would be greatly tightened.

"Why put temptation in people's hands by making it so easy to buy a switchblade?" said legislator Freeman, a former schoolteacher.

BECAUSE of the growing number of knife assaults in Washington, D. C., Congress will soon be asked by the United States Attorney's office to pass a local ordinance requiring people buying switchblades to secure permits. "We want to make it as hard to buy a switchblade as a gun," Assistant United States Attorney Wilson reveals.

What the District of Columbia and Newark are doing, other places all over America should be doing.

Why aren't they?

Simply because of public apathy.

On your behalf, I have asked the authorities what women can do *now*. Here are their answers:

1. Make sure that your children don't carry switchblades or other dangerous knives.

2. If your son has a pocketknife for scouting or fishing, discourage his taking it to school, the movies or other public places. Don't let him be smart-alecky about it. Deglamorize knife-carrying to him.

3. See to it that your local storekeepers don't have flagrant window displays of dangerous knives. Help prosecute dealers who sell them to minors. Through your local woman's club or PTA you can conduct educational campaigns against switchblades and award posters to co-operating merchants which say:

> This Store Has Stopped Selling
> Switchblades and Other Dangerous
> Knives to Help Cut Down Juvenile
> Delinquency and Crime

4. Help your local law-enforcement agencies round up dangerous knives.

5. Work for passage of a state law which bans switchblades and controls other dangerous knives. To be effective, laws must be statewide because children can cross city limits to secure the forbidden weapons. Naturally, these laws must be *strictly* enforced. In one state it's against the law to carry a concealed switchblade all right, but many stores go right on selling them.

In coming days, more and more state legislatures will ponder the dangerous knife problem. They can greatly benefit from the pressure of aroused far-sighted women interested in protecting their communities.

Human nature being what it is, when a switchblade tragedy occurs too many of us deplore the incident—and then forget all about it. But as Newark Safety Director Keenan reminds us, "If we can make America safe from firecrackers, we can from knives too."

Don't be unduly alarmed.

But don't wait, either, until a youngster—it could be yours—is murdered with a "toy" pocketknife. [THE END]

KR2168