John W. Dillon (SBN 296788)
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P., <br><br> Plaintiffs, <br><br> vs. <br><br> CALIFORNIA ATTORNEY GENERAL ROB BONTA, ET AL., <br><br> Defendants. | Case No. 23-CV-0474-JES-DDL <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br><br> Date:  April 22, 2024 <br> Time:  10:00 a.m. <br> Dept:  4B <br> Judge:  The Honorable James E. Simmons, Jr. <br> Trial Date:  None set <br> Action filed:  March 15, 2023 |

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ..................................................................................... 1

II.    ARGUMENT ............................................................................................ 2

       A.    Use of Smaller or Different Types of Knives is No Defense .......... 2

       B.    Defendant Offers Unsupported Argument For The Notion
             That Banned Automatically Opening Knives Are Not
             Commonly Used Or Suitable For Self-Defense .............................. 3

       C.    Defendant Applies the Wrong Standard Under *Bruen* .................... 3

       D.    Switchblades are Arms Under the Plain Text of the
             Second Amendment ....................................................................... 5

       E.    Defendant Fails to Meet Its Burden Under *Bruen*—There
             Is No Historical Justification For The Ban .................................. 10

             1.   Switchblades Are In Common Use For Many Lawful
                  Purposes And Are Not Dangerous And Unusual Arms. .......... 10

             2.   Irrelevant Case Law Does Not Establish That
                  Switchblades Are Both Dangerous And Unusual .................... 14

             3.   Defendant's Historical Analogues are Patently
                  Insufficient ......................................................................... 16

             4.   Nuanced Analogical Reasoning is Unwarranted
                  In This Case ......................................................................... 18

             5.   "Concealed Carry" Bowie Knife Restrictions Do Not
                  Justify California Knife Ban ................................................. 20

             6.   "Concealed Carry" Impact Weapon Restrictions From
                  The Late 1800's Do Not Justify The California Knife Ban ...... 25

III.   CONCLUSION ....................................................................................... 25

# TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*Aymette v. State,* 21 Tenn. 154 (1840) ........................................................ 24

*Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023) ............................................. 4

*Barrios v. Holder,* 581 F.3d 849 (9th Cir. 2009) .................................. 15, 16

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ................................ 2, 6, 9

*City of Akron v. Rasdan*, 105 Ohio App.3d 164, 663 N.E.2d 947
(Ohio Ct. App., 1995) .................................................................................... 8

*Craft v. United States,* 403 F.2d 360 (9th Cir. 1968) ................................ 16

*United States v. Olloque,* 580 Fed. Appx. 584, 584 (9th Cir. 2014) ................... 16

*Crowlery Cutlery Co. v. U.S.,* 849 F.2d 273 (7th Cir. 1988).. ................... 15

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................ *Passim*

*Fall v. Esso Standard Oil Company,* 297 F.2d 411 (5th Cir. 1961) .................... 15

*Furman v. Georgia*, 408 U.S. 238 (1972) ................................................... 17

*Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ........................... 6

*Gamble v. United States*, 139 S.Ct. 1960 (2019) ....................................... 18

*Griffin v. State*, 47 A.3d 487 (Del. 2012) .................................................... 8

*Haynes v. State,* 24 Tenn. 120 (1844) ........................................................ 24

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) .................................. 4

*Mackall v. State*, 283 Md. 100, 387 A.2d 762 (1978) ................................. 6

*Marsh v. Chambers*, 463 U.S. 783 (1983) ................................................ 17

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...................................... 16

*New York State Rifle & Pistol Association v. Bruen,* 597 U.S. 1 (2022) ...... *Passim*

*People v. Bass*, 225 Cal.App.2d 777 (1963) .............................................. 21

*Russell Fouts v. Bonta*, 2024 WL 751001 (S.D. Cal. 2024) ....................... *Passim*

*Shannon v. United States*, 512 U.S. 573 (1994) .......................................... 4

*State v. Deciccio*, 315 Conn. 79, 128, 122, 105 A.3d 165 (2014) ........................ 7

*State v. Delgado,* 298 Or. 395, 692 P.2d 610  (Or. 1984) ..................... 2, 6, 7, 22

*State v. Herrmann*, 366 Wis. 2d 312, 325, 873 N.W.2d 257 (2015)......................7

*State v. Griffin*, 2011 Del Super LEXIS 193, *26 n.62, 2011 WL 2083893
    (Del Super Ct., May 16, 2011)........................................................................7

*State v. Montalvo*, 229 N.J. 300, 162 A.3d 270 (2017)............................................7

*State Oil Co. v. Khan*, 522 U.S. 3 (1997)..............................................................18

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023)............................................5

*United States v. Olloque*, 580 Fed. Appx. 584 (9th Cir. 2014)............................16

*United States v. Salcedo*, 453 F.2d 1201 (9th Cir. 1971).....................................16

*Virginia v. Moore*, 553 U.S. 164 (2008) ..............................................................17

**Cal. Penal Code**

Section 17235.............................................................................................1, 5, 6
Section 21510...............................................................................................1, 3
Section 21590.....................................................................................................1

**U.S. Code**

18 U.S.C. section 545................................................................................16
18 U.S.C. section 2277..............................................................................15

**U.S. Constitution**

Second Amendment ........................................................................... *Passim*
Fifth Amendment ....................................................................................... 15
Fourteenth Amendment .......................................................................10, 18

Bill of Rights ..................................................................................... 17, 18

Ohio Constitution ........................................................................................ 8

Federal Switchblade Act .......................................................................... 15

**Other Authorities**

H. Peterson, *Daggers and Fighting Knives of the Western World* 12 (2001).........7

## I.   INTRODUCTION

In its motion, Defendant claims the California Knife Ban "merely places "reasonable restrictions on certain types of switchblades knives with blades that are two inches in length or longer." ECF No. 33-1 at 2. However, the plain text of the ban imposes an extremely broad prohibition, even criminalizing the mere possession and sale of automatically opening knives by law-abiding citizens in violation of the Second Amendment. Penal Code § 21510. Specifically, the ban unconstitutionally prohibits the possession, carry, sale, offers for sale, loans, transfers, or giving of common automatically opening knives with blade lengths of two inches or longer. Penal Code §§ 17235, 21510, and 21590. Similarly, Defendant asserts that the challenged statutes are permissible under the Second Amendment because people can still use "any knives with blades shorter than two inches in length." ECF No. 33-1 at 3. But this related assertion has already been rejected in *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008).

Defendant also wrongly assert that the banned knives "do not constitute arms protected by the Second Amendment" because they are "not commonly used or suitable for self-defense." See ECF No. 33-1 at 6-9. Defendant's point is unsupported argument, and the evidence is otherwise.

Defendant next applies the wrong burden of proof standard under *New York State Rifle & Pistol Association v. Bruen,* 597 U.S. 1, 26 (2022), claiming that Plaintiffs carry the burden to show that automatically opening knives barred by the challenged statutes are not *both* "dangerous and unusual." ECF No. 33-1 at 9-11. *Bruen* made clear that the "dangerous and usual" weapons analysis falls within the *second* prong of the *Bruen* analysis; the government—and not Plaintiffs—bears the heavy burden to prove that such knives are *both* dangerous *and* unusual. *Bruen*, 597 U.S. at 21.

1   Finally, Defendant offers insufficient evidence of any relevantly similar
2   historical arms regulations that justify the challenged statutes. Instead, Defendant
3   relies on late 1800's *concealed carry* restrictions on bowie knives and other
4   unrelated impact weapons to attempt to justify the ban. Defendant's cited historical
5   laws are entirely distinct from the present ban, and come far too late after the relevant
6   Founding era. As a matter of law, the late 19th Century laws cannot contradict the
7   plain text of the Second Amendment. *Bruen,* 597 U.S. at 6. Accordingly, Plaintiffs
8   request this Court *deny* Defendant's motion.

9   **III.   ARGUMENT**

10      **A.   Use of Smaller or Different Types of Knives is No Defense.**

11   Defendant asserts the Penal Code scheme banning the mere possession and
12   sale of automatically opening knives is permissible under the Second Amendment
13   because people can use "any knives with blades shorter than two inches in length."
14   ECF No. 33-1 at 3. This precise argument was rejected in *Heller*, 554 U.S. at 629,
15   where the Supreme Court stated, it "is no answer to say … that it is permissible to
16   ban the possession of handguns so long as the possession of other firearms (i.e., long
17   guns) is allowed." *Id*. That there may be other available smaller knives is not
18   justification under *Heller*, and should be rejected as interest balancing.

19   Here, the Second Amendment protects the people's right to keep and bear
20   arms, whether firearms or less lethal arms like prohibited automatically opening
21   knife. *Heller*, 554 U.S. at 581-582, 628-629. The Second Amendment, "is the very
22   product of an interest balancing by the people and it surely elevates above all other
23   interests the right of law-abiding, responsible citizens to use arms for self-defense."
24   *Bruen,* 597 U.S. at 26. And the American tradition is steeped in protecting a citizen's
25   right to keep and bear arms, whether they are rifles, shotguns, pistols, or less lethal
26   arms like automatically opening knives (*State v. Delgado,* 298 Or. 395 (holding
27   switchblade ban unconstitutional under Second Amendment)), stun guns (*Caetano
28   v. Massachusetts*, 577 U.S. 411 (2016)), or billy clubs (*Russell Fouts v. Bonta*, 2024

WL 751001 (S.D. Cal. 2024)). It is "this balance—struck by the traditions of the American people—that demands our unqualified deference." *Bruen*, 597 U.S. at 26. Cal. Penal Code § 21510.

**B.      Defendant Offers Unsupported Argument For The Notion That Banned Automatically Opening Knives Are Not Commonly Used Or Suitable For Self-Defense.**

Defendant claims, without support, that "switchblades … regulated by the challenged statutes do not constitute 'arms' protected by the Second Amendment because they are not commonly used for self-defense." ECF No. 33-1 at 6. No evidence is offered for this groundless claim.

Further, Plaintiffs' evidence is uncontradicted. Plaintiffs have offered sworn declarations stating their choice for self-defense is a prohibited automatically opening knife; and that but for the prohibitions and criminal penalties, they would purchase such a knife for lawful purposes, including self-defense. See KR14-16, 19-22, 26-29, 34; 2155-58, and 2161-63.[1] Plaintiffs have also shown that such knives are suitable for self-defense KR1981-83; 1987-88.

**C.      Defendant Applies the Wrong Standard Under *Bruen*.**

Defendant also apply the wrong standard under *Bruen*, claiming "the particular subset of switchblades knives that are regulated under California's statutory regime are not presumptively protected by the plain text of the Second Amendment because they are … dangerous and unusual." (ECF No. 33-1 at 5). This is not the test, established in *Heller* and affirmed in *Bruen*.

According to the constitutional framework established in *Heller*, and affirmed in *Bruen*, the first question in determining the validity of a Second Amendment

---

[1] All "KR" citations in this brief refer to Plaintiffs' Appendix in Support of Plaintiffs' Motion for Summary Judgment Part 1 through Part 5, previously filed with this Court on March 6, 2024 (see ECF No. 34-2 through 34-7). The citations also support Plaintiffs' opposition herein.

challenge to an arms regulation is whether the conduct that Plaintiffs wish to vindicate is protected by the Second Amendment's plain text. *Bruen*, 597 U.S. at 3-4, 17-18. The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This text controls, and not any interest-balancing policy or means-end scrutiny arguments by Defendant because:

> "While judicial deference to legislative interest balancing is understandable — and, elsewhere, appropriate — it is not deference that the Constitution demands here. *The Second Amendment "is the very product of an interest balancing by the people," and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense.*" *See Bruen*, 597 U.S. at 26, emphasis added (citing *Heller*, 554 U.S. at 635).

Pursuant to *Bruen*, courts must first interpret the Second Amendment's text, as informed by history. *Id*. 597 U.S. at 17, 24; *and see Shannon v. United States*, 512 U.S. 573, 580 (1994) (Thomas, J.) ("[W]e turn first, as always, to the text[.]"). When the plain text of the Second Amendment covers an individual's conduct, the Constitution presumptively protects that conduct. *Bruen,* 597 U.S. at 17, 22-24; see also *Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023); and *Fouts v. Bonta*, 2024 WL 751001 at *2–5. "To justify the regulation, the government may not simply posit that the regulation promotes an important interest." *Bruen*, 597 U.S. at 17. Rather, the burden is placed on the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearms regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 17, 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)). And the "command" *is that the right to keep and bear arms "shall not be infringed."* U.S. Const. amend. II.

And *Bruen* makes clear that the "dangerous and usual weapons" analysis falls within the Court's *second* analytical prong. *Bruen*, 597 U.S. at 21 (emphasis added). See also *Fouts*, 2024 WL 751001 at *3 (holding that the question of whether a billy club is "dangerous and usual" is a claim where "*California bears the burden of proof in the second prong of the Bruen analysis*") (emphasis added; and original emphasis).

Thus, the burden is on Defendant—*not Plaintiffs*—to show that automatically opening knives are *both* "dangerous and unusual weapons" and *not* "in common use" as part of the historical inquiry required by the *second* prong of the *Bruen* analysis. If the government cannot meet its burden, the regulation is unconstitutional—full stop. No interest-balancing, means-end/scrutiny analysis can be conducted. *Id.* at *Bruen*, 597 U.S. at 19-24. And, Defendant must offer evidence that automatic opening knives are not commonly possessed by law-abiding citizens for lawful purposes, as well as evidence establishing a historical tradition of prohibiting the possession, sale, loan, transfer, or gifting of such knives. As demonstrated below, automatically opening knives, or "switchblades," have "the appearance of a pocket knife" and this Country's history is devoid of any kind of knife ban remotely similar to the current ban. Penal Code §17235.

### D. Switchblades are Arms Under the Plain Text of the Second Amendment.

The knives prohibited by the ban are indisputably "arms" covered by the plain text of the Second Amendment. The Second Amendment extends to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Bruen*, 597 U.S. at 3 ("Its reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century.'"). *Heller* also acknowledged this threshold point. *Heller*, 554 U.S. at 582. See also *United States v. Daniels*, 77 F.4th 337, 341-342 (5th Cir. 2023) (citing *Bruen*, 142 S.Ct. at 2132, and pointing out that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated").

"[B]earable arms" also include all arms "commonly possessed by law-abiding citizens for lawful purposes." *Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015). *See also Caetano v. Massachusetts*, 577 U.S. 411 (2016) (unanimously vacating a lower court decision upholding a conviction based on Massachusetts' ban on stun guns); and *Fouts*, 2024 WL 751001 at *1 ("Americans have an individual right to keep and bear arms, whether firearms or less lethal arms").

Automatically opening knives are categorically "jackknives"[2] or pocket knives. Penal Code §17235. Merriam-Webster dictionary defines "pocketknife" as "a knife that has one or more blades that fold into the handle and that can be carried in the pocket. KR139. Both Plaintiffs' and Defendant's experts agree that automatically opening knives are merely a folding pocket knife. See KR1386, KR1481-KR1482, KR1985, KR2064, KR1876, and KR1975-77. Indeed, California's definition of the term "switchblade" under Penal Code section 17235 states that a "switchblade" is a knife "*having the appearance of a pocketknife*." KR9. In the United States, "knives have played an important role in American life, both as tools and as weapons. The folding pocketknife, in particular, since the early 18th Century has been commonly carried in America and used primarily for work, but also for fighting." *State v. Delgado*, 692 P.2d 610, 613-614 (Or. 1984); *see also* KR152-KR153. "[T]hey were apparently used by a great majority of soldiers to serve their numerous personal needs." See KR293.

Knives in general are indisputably "bearable arms" commonly possessed for "lawful purposes." *Heller*, 554 U.S. at 625. Defense experts Rivas and Escobar confirm this undisputed fact. See KR2062-KR2064, KR1917-KR1920. As such, automatically opening knives are necessarily "bearable arms." In fact, according to

---

[2]  See https://www.thefree dictionary.com/jackknife; and *Mackall v. State*, 283 Md. 100, 387 A.2d 762, 769, n. 13.

defense expert Escobar, automatically opening knives fall under two of the three categories of knives. KR1876. And the *Bruen* court acknowledges that knives are protected arms noting that "[i]n the medieval period, '[a]lmost everyone carried a knife or a dagger in his belt.'" *Bruen*, 597 U.S. at 41, quoting H. Peterson, *Daggers and Fighting Knives of the Western World* 12 (2001). "While these knives were used by knights in warfare, '[c]ivilians wore them for self-protection,' among other things." *Bruen*, at 41; and *Heller*, 554 U.S. at 590. In early colonial America, "edged weapons were also absolutely necessary." KR209. At the time of the Second Amendment's ratification, every state required ordinary citizens to own some type of edged weapon as part of the militia service laws. See KR209, KR263-KR264.

Courts have held that knives are arms protected by the Second Amendment. See *State v. Deciccio*, 315 Conn. 79, 128, 122, 105 A.3d 165 (2014). (holding dirk knives were "'arms' within the meaning of the second amendment") ("[T]heir more limited lethality relative to other weapons that, under *Heller*, fall squarely within the protection of the second amendment— *e.g.*, handguns —provides strong support for the conclusion that dirk knives also are entitled to protected status); *State v. Delgado*, 692 P.2d at 613-614 (Oregon Supreme Court holding that Oregon's ban on the possession of switchblades violated the Oregon Constitution's right to arms and that a switchblade is constitutionally protected based on historical predecessors); *State v. Herrmann*, 366 Wis. 2d 312, 325, 873 N.W.2d 257, 263 (2015) (Wisconsin Court of Appeals overturning a conviction for possession of a switchblade as unconstitutional; "[w]hether knives are typically used for self-defense or home security as a general matter is beside the point. . . it is undisputed that Herrmann possessed his switchblade inside his home for his protection"); *State v. Montalvo*, 229 N.J. 300, 162 A.3d 270 (2017) (New Jersey Supreme Court holding machete-type knives are protected by the Second Amendment); *State v. Griffin*, 2011 Del Super LEXIS 193, *26 n.62, 2011 WL 2083893 (Del Super Ct., May 16, 2011) ("a

---

knife, even if a 'steak' knife, appears to be a 'bearable arm' that could be utilized for offensive or defensive purposes.") *reversed and remanded on other grounds*, *Griffin v. State*, 47 A.3d 487 (Del. 2012); *City of Akron v. Rasdan*, 105 Ohio App.3d 164, 663 N.E.2d 947 (Ohio Ct. App., 1995) (holding the "right to keep and bear arms" under the Ohio Constitution extends to knives).

Nonetheless, Defendant contends that automatically opening knives "do not constitute 'Arms' protected by the Second Amendment because they are not commonly used for self-defense." ECF No. 33-1 at 6.[3] As stated above, this is not the test under *Heller* and *Bruen*. The Second Amendment's plain text does not limit the right to keep and bear arms to only those arms that are commonly used in self-defense. Indeed, the Second Amendment's protections extend to arms that are used for self-defense and any other lawful purpose. Defendant may not unilaterally read such limitations into the Second Amendment. Both *Heller* and *Bruen* are explicit, "the Second Amendment guarantees an 'individual right to possess and carry weapons *in case of confrontation*," and confrontation can surely take place outside the home." *Bruen*, 597 U.S. at 33 (internal citation omitted; emphasis added). *Bruen* acknowledged that a showing of actual instances of self-defense use is not necessary for Second Amendment protection: "Although individuals often "keep" firearms in their home, *at the ready for self-defense*, most do not "bear" (*i.e.*, carry) them in the home beyond moments of actual confrontation. *Bruen*, 597 U.S. at 32. The act of *keeping* arms for any and all lawful purposes, such as self-defense, is the only requirement.

---

[3]  In *Fouts*, 2024 WL 751001 at *3, a case decided in February 2024, Defendant Bonta conceded that a billy club "is not an unusual weapon" and is an "arm" under the Second Amendment. *Id*. Here, however, Defendant inconsistently asserts that an automatic opening knife (essentially, a pocket knife) is "unusual and dangerous," not commonly owned, and not an "arm," *Id*. Such inconsistency is impermissible.

This fact is further solidified in *Caetano*, which held that stun guns were protected arms under the Second Amendment. *Id*. 577 U.S. at 413 (Alito, J., concurring). The Court did not require Ms. Caetano to actually use the stun gun in self-defense. *Id*. The Court did not require the parties to show that stun guns were commonly deployed in self-defense situations. *Id*. "Instead, the measure of the constitutional protection was that the stun gun was 'used' in the sense that stun guns are widely owned to satisfy a subjective need for protection and that the number in existence was in the hundreds of thousands." See *Fouts*, 2024 WL 751001 at *3. "The Constitution recognizes that citizens may simply keep an "arm" against the day when they might want to need to carry or actively use the weapon." *Id*.

In fact, while asserting the wrong standard, Defendant explicitly quotes *Heller* contradicting its own claim two separate times, "the Second Amendment only protects those weapons that are "in common use at the time' for lawful purposes like self-defense." See ECF No. 33-1 at 6-7. It could not be clearer. Controlling Supreme Court precedent repeatedly states that the arms must be in common use for lawful purposes, like self-defense. The Court did not limit this statement to a single purpose, but *any* lawful purpose. And the Court offered self-defense as an example of one lawful purpose. In any case, there is no material factual dispute that automatic opening knives are commonly owned and can be used for many lawful purposes *including* self-defense. ECF No. 33-1 at 7 (Defendant concedes common ownership); see also KR1917-20, KR1973-76, KR1986-87. Both Plaintiffs expert and Defendant's expert admit automatically opening knives can be used for self-defense and many other lawful purposes—including hunting, fishing, recreation, camping, daily use, other forms of lawful activities. *Id*.

Knives, including automatically opening knives, are unquestionably arms protected by the plain text of the Second Amendment; Plaintiffs and other similarly situated law-abiding California residents and visitors seeking to purchase, acquire,

sell, transfer, possess, loan, give, or carry these knives within California—are covered by the Second Amendment's plain text. Thus, Defendant bears the heavy burden of justifying the ban as consistent with the Nation's historical tradition of regulating such arms. *Bruen*, 597 U.S. at 17, 24; and it is not a correct application of *Bruen* to lump together other weapons as somehow analogues to justify the ban. The knife laws must be closely analogous to justify criminalizing a person's mere possession of automatically opening knives (which is nothing more than a form of pocket knife); and such laws must be from the relevant historical period—namely, 1791 (adoption of the Second Amendment) or secondarily, 1868 (Fourteenth Amendment adoption). *Bruen*, 597 U.S. at 34-37.

### E. Defendant Fails To Meet Its Burden Under *Bruen*—There Is No Historical Justification For The Ban.

#### 1. Switchblades Are In Common Use For Many Lawful Purposes And Are Not Dangerous And Unusual Arms.

Defendant incorrectly asserts that "the specific subset of switchblades … regulated by the challenged statutes do not constitute 'Arms' protected by the Second Amendment because they are not commonly used for self-defense." ECF No. 33-1 at 6. This assertion was made under Defendant's fabricated standard—not found in *Heller* or *Bruen*. As Plaintiffs have met their burden of showing that automatically opening knives are arms under the plain text of the Second Amendment, the burden shifts to Defendant to justify its regulation through relevant historical analogous firearms regulations from the appropriate time period—the Founding era.

Further, Defendant's unsupported statement that "the test for Second Amendment protection of a particular weapon is common *use*, not common *ownership*" is dubious at best. ECF No. 33-1 at 7. Defendant's claim is not found anywhere in the *Heller* or *Bruen* decisions. *See also Fouts*, 2024 WL 751001 at *3 rejecting Defendant Bonta's claim that "a billy is not commonly *used* for self-

defense" (original emphasis) and adding that, "Use is not required for Second Amendment protection").

Defendant continues with its own unique constitutional standard that wanders far from any standard in *Bruen* to also claim that "courts must consider the suitability of the weapon and the actual use of the weapon for self-defense, citing *Heller*. ECF No. 33-1 at 7. However, *Heller* does not create such a test. In fact, both *Heller* and *Bruen* explicitly reject such a claim, "We then concluded: 'A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Id*. 597 U.S. at 23.

Additionally, Defendant's claim regarding the "suitability" of switchblades as self-defense arms is misplaced, as it is merely an attempt at interest balancing that cannot be considered under the *Bruen* standard. *Id*. 597 U.S. at 23. Even if this were ignored, Defendant's claim regarding "suitability" is applicable to all folding knives and firearms in general. As such, Defendant's claim provides no support for the current ban. This fact is undisputed. Indeed, Defendant's knife/weapons expert Robert Escobar repeatedly admits that his criticisms regarding switchblades apply to *all folding knives* and can also be applied to firearms in many instances. KR1851-53: KR1891-92; KR 1897-1901; KR 1905; KR1907; KR1915; and KR1936-37. Mr. Escobar further admits that he just *personally prefers* fixed blade knives for self-defense over folding knives—not just switchblades. KR1901. One man's personal preference on what arm he chooses to keep and carry is patently insufficient to contradict the plain meaning of the Second Amendment.

Defendant also wrongly claims that "as both Plaintiffs' and Defendant's experts agree, extensive training is required to use a switchblade knife safely and effectively for self-defense. ECF No. 33-1 at 8. Plaintiff's expert did not restrict his statement to switchblades. Defense expert Janich specifically stated, "I believe responsible training for the use of any weapon, anyone who is going to carry a

weapon in self-defense, should have proper training to be able to use that weapon effectively and safely." KR1705. He also stated that his personal desire that individuals get proper training for self-defense weapons "doesn't affect the right to access of those weapons." KR1758.

Moreover, many of Defendant's arguments regarding the "suitability" of "switchblades do not address switchblades, per se, *but all knives*. Defendant states that there are "significant psychological barriers to using *knives* for self-defense" and that "the nature of such an encounter raises the significant question whether an ordinary person would be capable of effectively using *a knife* in self-defense." ECF No. 33-1 at 8. This is pure interest-balancing argument, unsupported by any evidence and rejected by *Bruen*. Importantly, neither the parties nor their experts assert that knives in general are not suitable for self-defense. Thus, Defendant's overly broad argument regarding "suitability" is irrelevant.

Defense expert Escobar also contradicts Defendant's remaining claims regarding the "suitability of switchblade knives for self-defense." ECF No. 33-1 at 7. Specifically, after admitting that he has never done any kind of testing on mechanical failures of switchblades or any kind of folding knife, Mr. Escobar admits his critique on switchblades are not unique to switchblades but to *all* folding knives. KR1891-92. As to Defendant's claim that switchblades require "the user to set the knife in their hand in a certain way to avoid injury upon deployment of the blade" (ECF No. 33-1 at 8), Mr. Escobar admits that this would be the case for any folding knife. KR1897-1901. Mr. Escobar also admits that while he personally prefers using fixed blade knives for self-defense, his preference is not the only acceptable method of self-defense. KR1901. He further admits that taking multiple steps to properly deploy a weapon in self-defense is not unique to switchblades; and in fact, it applies to using firearms in self-defense. KR1900. He admits that any folding knife, not just switchblades, could have a failure to lock in the open position. KR1905. He adds

---

that any claimed "failure or difficulty" in opening a knife is not unique to switchblades (KR1907) and that his claim that "some switchblades are widely regarded as poor weapons of choice for self-defense" is not the consensus": "I'm not saying, you know, universal in consensus by any stretch." KR1936-37. Importantly, Mr. Escobar concedes that his critiques regarding switchblades do not amount to any kind of danger to the general public. KR1915.

Mr. Escobar also concedes that automatically opening knives, as well as Bowie knives, Arkansas Toothpicks, folding knives, pocket knives, and butterfly knives *are not unusual, but common*:

Q: … [I]n your other book, *Deadly Ingenuity*, you uncover some more obscure and unusual weapons; is that correct?

A: Yes, overlooked various kinds of blade impact.

…

Q: So am I correct in saying the focus of the book would be to discuss the more rare and unusual weapons you come across in your research?

A: Yes.

Q: So that book doesn't discuss the more common weapons, does it?

A: No.…

…

Q: So, in this book, *Deadly Ingenuity*, you don't discuss knives like the Bowie knife, do you?

A: *No, that would be a common knife, right*.

Q: Okay. And you also don't discuss knives that are described as an Arkansas Toothpick; is that correct?

A: Correct.

Q: And you don't include any discussion on folding knives, do you?

A: …No, I agree with your statement.

…

Q: And in *Deadly Ingenuity* you don't discuss pocket knives …, do you?

A: No.

Q: And there's no discussion regarding switchblades?

A: Let me stop and think, but no.

Q: And no discussion regarding Balisongs or what's called butterfly knives?

A: No. *See* KR1851-53. (emphasis added).

Defendant has also failed to offer any evidence disputing Plaintiffs' complaint or evidence filed in support of Plaintiffs' summary judgment motion that switchblades are in common use, and thus, are not *both* dangerous and usual. In Plaintiffs' summary judgment motion, overwhelming evidence is presented that automatically opening knives are in common use and have been in common use for nearly 100 years in the United States. *See* ECF No. 34-1, at 10-16.

In summary, Plaintiffs have offered uncontradicted evidence that automatically opening knives are common numerically (ECF No. 34-1, at 16-19) and jurisdictionally (*Id*. at 20-21). Plaintiffs have also offered uncontradicted evidence that automatically opening knives are common categorically. *Id*. at 19-20. Defendant's motion has failed to provide *any evidence* that contradicts these uncontested facts. And Defendant's motion fails to offer any evidence that switchblades are not in common use.

### 2.   Irrelevant Case Law Does Not Establish That Switchblades Are Both Dangerous And Unusual.

Plaintiffs have provided uncontradicted evidence that automatically opening knives are in common use throughout the United States. As such, they *necessarily* cannot be both "dangerous and usual." Defendant has failed to meet its burden.

Defendant's weapons expert also concedes that switchblades are not unusual, but common. KR1851-53. Undaunted, Defendant relies on a handful of pre-*Heller* and *Bruen* cases that do not address the constitutional questions presented.

1   At the outset, Defendant's claim that "federal courts across the country have
2   long recognized that switchblades are uniquely dangerous weapons that are not
3   typically possessed for law-abiding purposes." ECF No. 33-1 at 10. However,
4   neither federal case cited by Defendant addresses these conclusory statements.
5   *Crowlery Cutlery Co. v. U.S.* was a 5th Amendment challenge to the Federal
6   Switchblade Act; the court affirmed the district court's decision dismissing the suit
7   because "(1) it was frivolous and lacked federal court jurisdiction, and (2) was a
8   waste of federal judicial resources, thereby rendering decision not to issue
9   declaratory judgment proper." 849 F.2d 273 (7th Cir. 1988). This case did not
10  address the constitutionality of a switchblade ban under the Second Amendment.

11  Additionally, Defendant's reliance on *Fall v. Esso Standard Oil Company*,
12  297 F.2d 411 (5th Cir. 1961), is misplaced. The Court in *Fall* described a switchblade
13  knife as "a dangerous weapon" under the explicit definition of 18 U.S.C.A. section
14  2277 regulating what items can be brought onto any vessel registered, enrolled, or
15  licensed under the laws of the United States. The Court explicitly stated that "*we do
16  not say, as a matter of law, that the knife was a dangerous weapon*. We say, as the
17  Act indicates, that a fair and reasonably interpretation of the term 'dangerous
18  weapon' permits a jury to find that Murphy's knife can fall within the statutory
19  meaning." *Fall*, 297 F.2d at 416 (emphasis added). This case provides no authority
20  beyond the interpretation of terms found in 18 U.S.C. § 2277, which is not at issue
21  in this case.

22  Defendant also relies on four Ninth Circuit cases to "confirm the relationship
23  between such knives and criminal activity." ECF No. 33-1 at 10-11. First, Defendant
24  has simply cited *four instances* in which a Ninth Circuit case merely identified that
25  a switchblade knife was possessed by an individual during or surrounding the
26  circumstances of a crime. Four anecdotal examples prove nothing. And a closer
27  examination of the cases contradicts Defendant's claim. *Barrios v. Holder,* 581 F.3d
28

849 (9th Cir. 2009))*, is an abrogated Ninth Circuit asylum case. The only mention of a switchblade is a witness statement that a gang member once held one to his neck *in Guatemala. Barrios,* 581 F.3d at 853. *United States v. Salcedo* notes that the appellant was convicted of smuggling heroin and the court record mentioned he was found to also have a switchblade. 453 F.2d 1201 (9th Cir. 1971). There were no charges associated with the switchblade; and in fact, it was legal to possess a switchblade in Arizona, where this incident occurred. *Craft v. United States* discusses a single incident involving an illegal importation of marijuana and of switchblades under Title 18 U.S.C. § 545. 403 F.2d 360, 3622 (9th Cir. 1968). *United States v. Olloque* involved an appeal from drug and firearms convictions. 580 Fed. Appx. 584, 584 (9th Cir. 2014). The case contains no discussion, evidence, or factual findings regarding switchblades.

Defendant's anecdotal instances where a court referenced a switchblade is insufficient to show that switchblades are *both* dangerous and usual or that they are linked to criminal activity. In short, Defendant fails to meet its burden.

### 3. Defendant's Historical Analogues are Patently Insufficient.

The historical analysis has been conducted by the Court in *Heller*. *Heller* decided the underlying historical principle: Only dangerous *and* unusual arms can be categorically banned. This Court need only apply that historical principle to the facts in this case, just as done in *Heller* and *Bruen*. There is no need for any further historical analysis. Any attempt by Defendants to engage in such analysis would be asking "to repudiate the [Supreme] Court's historical analysis," which this Court "can't do." *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012). Because Defendant's have not provided any evidence that proves the banned knives are not in common use, and thus, are both dangerous and unusual, Defendant has failed to meet its burden under *Bruen*. In any event, Defendant cannot historically support the ban at issue here. To prevail under a "historical tradition" analysis, Defendant has

the heavy burden to justify its regulation by offering appropriate historical analogues from the relevant time period, *i.e.*, the Founding era (1791).

In *Bruen*, the Court considered historical evidence supplied by respondents in their attempt to justify their prohibitions on the public carry of firearms. Although the Court looked at evidence from a wide range of historical periods: "(1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries," 597 U.S. at 34, it noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.' […] The Second Amendment was adopted in 1791; the Fourteenth in 1868." *Id.* at 34 (citing *Heller*, 554 U.S. at 634–35 (emphasis original). The Court cautioned against "giving post enactment history more weight than it can rightly bear." 597 U.S. at 35. *"To the extent later history contradicts what the text says, the text controls*." *Id*. at 36 (citation omitted).

Further, in examining the relevant history offered, the *Bruen* Court stated, "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" 597 U.S. at 36 (citing *Heller*, 554 U.S. at 614). "[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37; *see also Marsh v. Chambers*, 463 U.S. 783, 787-88 (1983); *Furman v. Georgia*, 408 U.S. 238, 319–20 (1972); and *Virginia v. Moore*, 553 U.S. 164, 168 (2008) (discussing that the Court looks "to the statutes and common law of the founding era to determine the norms that the Fourth Amendment" protects).

And while the Court in *Bruen* reviewed materials published *after* adoption of

---

Plaintiffs' Opposition to Defendant's Motion for Summary Judgment

the Bill of Rights, it did so to shed light on the public understanding in 1791 of the right codified by the Second Amendment, and only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions. "The 19th-century treatises were treated as *mere confirmation* of what the Court had already been established." 597 U.S. at 37 (citing *Gamble v. United States*, 139 S.Ct. 1960, 1976 (2019) (emphasis added).

Therefore, under binding Supreme Court precedent, 1791 must be the controlling time for the constitutional meaning of Bill of Rights provisions incorporated against the States by the Fourteenth Amendment because, as in *Heller*, the Court has looked to 1791 when construing the Bill of Rights. While *Bruen* acknowledged a *scholarly debate* on this subject, *Bruen* did not disturb these precedents, and they are therefore binding on lower courts. *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). "[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th Century to establish the original meaning of the Bill of Rights." *Bruen*, 597 U.S. at 83 (Barrett, J., concurring). In sum, under *Bruen,* some evidence *cannot* be appropriate historical analogues, such as (i) 20th-century restrictions, (ii) laws that are rooted in racism, (ii) laws that have been overturned (such as total handgun bans), and (iii) laws *inconsistent* with the original meaning of the constitutional text. *Bruen,* 597 U.S. at 34-38. These sources of evidence must be disregarded.

**4.    Nuanced Analogical Reasoning is Unwarranted In This Case.**

Defendant devotes the last section of its motion to the claim that the "surveyed restrictions"—concealed carry bowie knife and impact weapons regulations—are "relevantly similar to California's switchblade restrictions in light of their comparable burdens and justifications." ECF No. 33-1 at 17. Defendant goes so far as to say, "many of the historical laws regulating Bowie knives and other dangerous weapons were actually significantly more burdensome than California's switchblade

restrictions." *Id*. Aside from the fact that both of these claims are false, Defendant again applies the wrong standard mandated by *Bruen*.

**First**, *Bruen* identified a number of metrics for conducting the historical inquiry. The *Bruen* Court found that the "historical inquiry will be 'fairly straightforward,'" because the "challenged law addresses a 'general societal problem that has persisted since the 18th century.'" Here, there is no state law addressing a modern weapon nor an attempt to address a modern social ill in which *Bruen* acknowledges courts may have to engage in more nuanced reasoning and consider historical analogues.

In fact, Defendant does not claim that the challenged law addresses unprecedented societal concerns or dramatic technological changes that would permit a more nuanced analogous analysis. To the contrary, this case concerns a technologically simple weapon— a folding pocket knife—and an age-old social ill: criminal assault with knives. Thus, the *Bruen* inquiry is straightforward, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar historical regulation* addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26 (emphasis added). In other words, analogical reasoning is not necessary in this case—only straightforward historical prohibitions on the purchase, sale, possession, and carry of knives are relevant.

**Second**, Defendant wrongly contends that the "Bowie knife, impact weapons, and dangerous and deadly weapon restrictions" from the 19th century are relevantly similar to California's switchblade restrictions "in light of their comparable burdens and justifications." ECF No. 33-1 at 17. Moreover, Defendant improperly attempts to draw this Court into an independent means-end scrutiny analysis under the guise of an analogical inquiry. This tactic was explicitly addressed in *Bruen* and rejected:

"This does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry. Again, the Second Amendment is the 'product of an interest balancing *by the people*,' not the evolving product of federal judges. *Heller*, 554 U.S. at 635, 128 S.Ct. 2783 (emphasis altered). Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances, and contrary to the dissent's assertion, there is nothing "[i]roni[c]" about that undertaking. *Post*, at 2179. It is not an invitation to revise that balance through means-end scrutiny." *See Bruen*, 597 U.S. at 29.

Further, Defendant's historical analogues fall short of the burden imposed by *Bruen*. According to Defendant, "many of the historical analogues identified herein were far broader in scope and made no exceptions for particular types of knives—in many cases, these laws regulated all concealed knives and deadly weapons." ECF No. 33-1 at 17. Yet, Defendant omits that every *concealed* carry regulation cited by Defendant and its experts *all permitted* the purchase, sale, transfer, possession, and open carry *of all knives—including bowie knives, dirks, daggers, and any other bladed instrument.* Said differently, Defendant fails to provide a single law in the entire history of the United States that banned the ability of an individual to purchase, sell, transfer, possess, *and* open carry any kind of knife. In contrast, the California Knife Ban enforces an outright ban on all such conduct.

## 5. "Concealed Carry" Bowie Knife Restrictions Do Not Justify California Knife Ban.

The challenged ban has *no historical pedigree*, nor justification in this Nation's history and tradition of arms regulation. Nor does the ban address any kind of "unprecedented societal concerns" and "dramatic technological changes" that would require a more nuanced historical approach. *Bruen*, 597 U.S. at 27-28. This case concerns a type of folding pocket knife and an age-old social ill: criminal use of knives. KR2024. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar

historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." See *Bruen*, 597 U.S. at 26.

While Defendant claims to have "identified 136 historical laws from 49 states and the District of Columbia regulation of Bowie knives," this 30,000-foot generalization is not supported by the historical record or Defendant's own experts. For example, defense expert Rivas admits to finding only one state statute throughout the entire 19th Century that prohibited *the sale* of any kind of knife. KR2096-KR2098. Additionally, Dr. Rivas admits she was unable to identify a single law that prohibited the *possession* of any kind of knife throughout the entire 19th Century. KR2096-KR2099. The same is true for the preceding—and more relevant—Founding era. Both Prof. Spitzer[4] and Dr. Rivas also admit that the vast majority of the laws they referenced only restrict the act of *concealed carry* of certain weapons and nothing more. KR2096-KR2099, KR0830, KR1148, KR1483. This historical analysis should end here based on Defendant's experts' admissions. In short, Defendant fails to justify its *broad ban* with relevant analogous laws during and secondarily after the Founding era.

Indeed, the California Knife Ban dates only to 1957. *People v. Bass*, 225 Cal.App.2d 777, 780 (1963). Not only was this significantly past the relevant Founding era in which Defendants must provide analogous laws to justify the ban; it is also several decades after automatically opening knives were introduced into the United States and chosen by the people as a common arm.

In contrast, folding knives have long been in common use as "most colonist carried knives for their daily needs—utilizing both fixed and folding blades."

---

[4] In his report, Professor Spitzer references one 1881 Arkansas law banning the carry and sale of certain weapons. His remaining laws largely address concealed carry or are regulations on impact weapons in the late 1800s—far removed from the relevant Founding era. KR1148, 1799.

KR202. In the United States, "knives have played an important role in American life, both as tools and as weapons. The folding pocketknife, in particular, since the early 18th Century has been commonly carried by men in America and used primarily for work, but also for fighting." *State v. Delgado*, 692 P.2d at 613-614; *see also* KR152. "At the time of the Revolutionary War, they were used by a great majority of soldiers to serve their numerous personal needs." KR203. Moreover, American bans on possession or sale to legal adults of particular arms from 1607 through 1899 are *exceedingly rare*. KR0657.

> "There were no prohibitions on any particular type of arm, ammunition, or accessory in any English colony that later became an American State. The only restriction in the English colonies involving specific arms was a handgun and knife carry restriction enacted in Quaker-owned East New Jersey in 1686…. The 1684 East Jersey restriction on carry was in force at most eight years, and was not carried forward when East Jersey merged with West Jersey in 1702. That law imposed no restriction on the possession or sale of any arms." KR671; see also KR1802-KR1807.

Neither Defendant nor its experts dispute these facts. At the Founding era, the preferred means of addressing the general threat of violence was to *require* law-abiding citizens to be armed. As *Heller* observed, "Many colonial statutes required individual arms-bearing for public-safety reasons. Colonies required arms carrying to attend church, public assemblies, travel, and work in the field." KR677. The statutes that required the keeping of arms—by all militia and some non-militia—indicate some of the types of arms that were so common during the colonial period that it was practical to mandate ownership. These mandates regularly included bladed weapons/knives. *Id*. KR678.

In fact, firearms *and* cutting weapons were ubiquitous in the colonial era, and a wide variety existed of each. Yet they were not banned. The historical record up to 1800 provides no support for general prohibitions on the sale, purchase, transfer, possession, or open carry of any type of knife. KR701. In fact, during the colonial

era, there were *no bans on knives of any kind*. According to Defendants' expert, prohibitions on the sale or possession of any kind of knife were virtually non-existent throughout the entire 19th Century. KR1476, KR1483, KR209, KR2086-KR2099.

Defendants and their experts also place considerable weight on *concealed* carry restrictions on Bowie knives during the 19th Century. ECF No. 33-1 at 12-17. Ironically, however, California does not prohibit the purchase, sale, possession, transfer, loaning, or open carry of Bowie knives, dirks, daggers, or any kind of large fixed blade knife. These large "fighting knives" (as described by Defendants' experts) are legal in California. Nonetheless, it is undisputed that there are no outright prohibitions on the manufacture, sale, possession, and carry of any kind of knife during the Founding era or the 19th Century. Defendants are thus forced to rely on mid-to-late 19th Century *Bowie knife concealed carry regulations* to attempt to justify the ban. These regulations fall well short of any historical justification for California's outright prohibition on automatically opening knives and come far too late after the Founding era—contradicting the plain text of the Second Amendment.

**First**, Prof. Spitzer and Dr. Rivas were unable to identify a single prohibition on the sale, purchase, transfer, or possession on any kind of knife during the Founding era. KR830, KR1148.

**Second**, with the exception of an 1838 Tennessee law and an 1881 Arkansas law on the sale of Bowie knives, every bowie knife restriction in the 19th Century only restricted the *mode of carrying such knives*—mostly restricting concealed carry of Bowie knives, but permitting open carry.[5] KR830, KR1148; *see also* KR1476,

---

[5] According to Prof. Spitzer's expert report, six states enacted laws that restricted both open carry *and* concealed carry (Arizona (1889), Arkansas (1881), Hawaii (1852), Oklahoma (1890), Texas (1871), and West Virginia (1882). However, Hawaii was an independent kingdom in 1852, Oklahoma was a territory, and Texas and West Virginia has exceptions for good cause.

KR1483, KR209, KR2086-KR2099. Notably, Professor Spitzer states twice that 15 states banned all carrying of Bowie knives (by banning both concealed carry and open carry). KR1169. However, of these 15 state laws cited by Spitzer, four explicitly restrict *concealed* carry only; another four are city ordinances, not state laws; and one is an election day restriction. KR1233-KR1235, KR1242-KR1343.

None of these laws prohibited the possession, transfer, purchase, manufacture, loan, giving, *and* open carry of Bowie knives. KR0830, KR1148; *see also* KR1476, KR1483, KR209, KR2086-KR2099. Additionally, many of the *concealed* carry restrictions identified by defense experts explicitly permitted concealed carry for travelers or while traveling or explicitly exempted pocket knives from any kind of concealed carry restriction. KR1170, KR1450-KR1451, KR1242-KR1343. In fact, according to Defendant's expert Spitzer, many of these restrictions explicitly exempted pocket knives from their restrictions. KR1450-51. And all Plaintiffs' and Defendant's experts have stated that switchblades are merely a variation of folding pocket knife. KR1386, KR1481, KR2064.

**Third**, except the single 1838 Tennessee law, the laws referenced above all come well *after* the relevant period this Court must consider. In fact, nearly all of them come after 1870. KR1162-KR1172. And Defendant's reliance on the court decisions from *Aymette v. State* and *Haynes v. State,* which upheld two convictions of concealed carrying bowie knives, is entirely misplaced. These decisions addressed only Bowie knife *concealed carry in a single state*—Tennessee. Under theses decision, there would be no unlawful act for an individual in Tennessee to buy, purchase, sell, transfer, possess, or openly carry a bowie knife. Defendant's experts acknowledged this fact. KR1435-45.

Defense experts Rivas and Spitzer also devote considerable time discussing various state and municipal *taxation regulations* to justify Defendant's ban. These tax regulations are not sufficiently similar to the ban before this Court. Moreover,

the vast majority of these taxation regulations were implemented in the late-1800s. Overall, Defendant references four states that imposed either a personal or occupational tax on certain weapons— Alabama, North Carolina, Mississippi and Georgia. Aside from the fact that these tax laws are entirely distinguishable from the ban currently before this Court, that four outlier states enacted certain tax regulations on weapons in the late-1800s does not overrule the plain text of the Second Amendment or that the most relevant era to be considered is devoid of any regulations that justify Defendant's ban.

**6.** **"Concealed Carry" Impact Weapon Restrictions From The Late 1800's Do Not Justify The California Knife Ban.**

Defendant's reliance on mid-to-late 19th Century restrictions on various impact or blunt force weapons is also patently insufficient to justify the State's ban as they come far too late and well beyond the relevant Founding era. KR1171-KR1175, KR1484-KR1485, see also *Fouts*, 2024 WL 751001, at *5. They also discuss a completely different category of arms. Finally, defense experts' reliance on these late 1800s restrictions on impact weapons does not justify any knife ban as these impact weapon laws do not justify prohibitions on blunt force weapons themselves. *Fouts*, 2024 WL 751001 at 8-10. In fact, Mr. Escobar admits that these impact weapons have been in common use for much of this Country's history. KR1850-51.

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs' request that this Court *deny* Defendant's summary judgment motion and grant Plaintiffs cross-motion.

April 8, 2024                                  Respectfully submitted,

                                                      DILLON LAW GROUP, APC

                                                      */s/ John W. Dillon*
                                                      John W. Dillon

---