ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
JANE REILLEY
Deputy Attorney General
KATRINA UYEHARA
Deputy Attorney General
State Bar No. 349378
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7867
  Fax: (916) 324-8835
  E-mail: Katrina.Uyehara@doj.ca.gov
*Attorneys for Defendant Rob Bonta, in his
official capacity as Attorney General of the
State of California*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **KNIFE RIGHTS, INC., ELIOT KAAGAN, JIM MILLER, GARRISON HAM, NORTH COUNTY SHOOTING CENTER, INC., and PWGG L.P.,**<br><br>Plaintiffs,<br><br>v.<br><br>**CALIFORNIA ATTORNEY GENERAL ROB BONTA,**<br><br>Defendant. | 3:23-cv-00474-JES-DDL<br><br>**DEFENDANT ATTORNEY GENERAL ROB BONTA'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:       April 22, 2024<br>Time:      10:00 a.m.<br>Dept:      4B<br>Judge:     The Honorable James E. Simmons, Jr.<br>Trial Date:  None set<br>Action Filed: March 15, 2023 |

1

# TABLE OF CONTENTS

2

**Page**

Introduction ....................................................................................................... 1

Background ......................................................................................................... 2

Procedural History ........................................................................................... 4

Legal Standard ................................................................................................... 4

Argument ............................................................................................................ 5

    I.     Plaintiffs Fail to Establish That the Challenged Statutes Implicate the Second Amendment's Plain Text ................................. 5

           A.    Plaintiffs Fail To Show That the Specific Subset of Regulated Switchblade Knives Are in Common Use for Self-Defense ................................................................................. 7

           B.    The Challenged Statutes Regulate "Dangerous and Unusual" Weapons ................................................................. 12

    II.    The Challenged Statutes Are Consistent with the Nation's Historical Tradition of Regulating Similar Weapons, Notwithstanding Plaintiffs' "Divide-and-Conquer" Approach ......... 15

           A.    *Bruen* Requires This Court to Engage in Historical Analysis ............................................................................... 15

           B.    The Ninth Circuit Has Cautioned Against a Divide-and-Conquer Approach to *Bruen's* Historical Analysis ................. 16

           C.    *Bruen* Endorsed the Use of Analogues Outside of the Founding Era ........................................................................ 16

           D.    The Challenged Statutes Fit Comfortably Within a Long Tradition of Regulating Bowie Knives, Impact Weapons, and Other Dangerous and Deadly Weapons ........................... 17

Conclusion ....................................................................................................... 22

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ...................................................................................4

*Baird v. Bonta*
81 F.4th 1036 (9th Cir. 2023)..................................................................17

*Barrios v. Holder*
581 F.3d 849 (9th Cir. 2009)...................................................................14

*Bevis v. City of Naperville*
85 F.4th 1175 (7th Cir. 2023)....................................................................6

*Caetano v. Massachusetts*
577 U.S. 411 (2006) ...................................................................................6

*Cockrum v. State*
25 Tex. 394 (1859) ...................................................................................21

*Craft v. U.S.*
403 F.2d 360 (9th Cir. 1968)...................................................................14

*Crowlery Cutlery Co. v. U.S.*
849 F.2d 273 (7th Cir. 1988)...................................................................14

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*
664 F. Supp. 3d 584 (D. Del. 2023) ..........................................................5

*District of Columbia v. Heller*
554 U.S. 570 (2008) ......................................................................*passim*

*Fall v. Esso Standard Oil Co.*
297 F.2d 411 (5th Cir. 1961)...................................................................14

*Frlekin v. Apple, Inc.*
979 F.3d 639 (9th Cir. 2020)......................................................................4

*Fyock v. Sunnyvale*
779 F.3d 991 (9th Cir. 2015)...................................................................13

1
2

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page</u>

3
4

*Hartford v. Ferguson*
   2023 WL 3836230 (W.D. Wa. 2023)................................................................ 5

5
6

*In re Gilbert R*
   211 Cal.App.4th 514 (Cal. Ct. App. 2012)...................................................3, 9

7
8

*In re S.C.*
   179 Cal. App. 4th 1436 (Cal. Ct. App. 2009) .................................................. 14

9

*Kolbe v. Hogan*
   849 F.3d 114 (4th Cir. 2017) ......................................................................... 12

10
11

*Las Vegas Sands, LL v. Nehme*
   632 F.3d 526 (9th Cir. 2011) ............................................................................ 4

12
13

*McDonald v. City of Chicago*
   561 U.S. 742 (2010) ....................................................................................... 12

14
15

*Nat'l Ass'n for Gun Rights v. Lamont*
   ___ F. Supp. 3d. ___ (D. Conn., Aug. 3, 2023) .............................................. 13

16
17

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
   597 U.S. 1 (2022) ......................................................................................*passim*

18
19

*New York State Rifle & Pistol Association, Inc., et al. v. Bruen*
   142 S. Ct. 2111 (2022) ..............................................................................16, 17

20
21

*Ocean State Tactical, LLC, et al. v. State of Rhode Island, et al.*
   95 F.4th 38 (1st Cir. March 7, 2024).................................................6, 11, 18, 21

22

*Or. Firearms Fed'n v. Kotek*
   2023 WL 4541027 (D. Or. July 14, 2023) ........................................................ 5

23
24

*People ex rel. Mautner v. Quattrone*
   211 Cal. App. 3d. 1389 (Cal. Ct. App. 1989)................................................... 19

25
26

*Rupp v. Bonta*
   No. 8:17-cv-00745 (C.D. Cal. March 15, 2024) .............................................. 13

27
28

*Rupp v. Bonta*
   No. 8:17-cv-00746 (C.D. Cal. March 15, 2024) ................................................ 6

iii

1

2

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page</u>

3

4

*S.D. Myers, Inc. v. City & County of San Francisco*
    253 F.3d 461 (9th Cir. 2001) ...................................................................... 4

5

6

*Teter v. Connors*
    459 F. Supp. 3d 989 (D. Haw. 2020) ..................................................... 14

7

8

*Teter v. Lopez*
    2024 WL 719051 (9th Cir. Feb. 2, 2024) ............................................. 14

9

10

*Teter v. Lopez*
    76 F.4th 938 (9th Cir. 2023) .................................................................. 14

11

*U.S. v. Olloque*
    580 Fed. Appx. 584 (9th Cir. 2014) ...................................................... 14

12

13

*U.S. v. Salcedo*
    452 F.2d 1201 (9th Cir. 1971) ............................................................... 14

14

15

*United States v. Alaniz*
    69 F.4th 1124 (9th Cir. 2023) ....................................................... *passim*

16

17

*United States v. Perez-Garcia*
    __ F.4th ___ (9th Cir. March 18, 2024) 2024 WL 1151665 .......... 2, 16

18

19

*United States v. Salerno*
    481 U.S. 739 (1987) ................................................................................ 4

20

*Wa. State Grange v. Wa. State Republican Party*
    552 U.S. 442 (2008) ................................................................................ 4

21

22

*Willis v. City of Seattle*
    943 F.3d 882 (9th Cir. 2019) .................................................................. 4

23

24

**STATUTES**

California Penal Code
    § 17235 ........................................................................................ *passim*
    § 21510 .............................................................................. 2, 4, 9, 19
    § 21590 ...................................................................................... 2, 4

25

26

27

28

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

**COURT RULES**

Federal Rules of Civil Procedure
Rule 56.................................................................................................4
Rule 56(a) ...........................................................................................4

**OTHER AUTHORITIES**

Assem. Com. on Public Safety, Analysis of Sen. Bill No. 274 (2001-
2002 Reg. Sess.) .................................................................................3

H.R. No. 9820, H.R. No. 10618, H.R. No. 111289, 85th Cong., 2d
Sess., pp. 1–33 (1958) ......................................................................19

Sen. Rep. No. 1980, 85th Cong., 1st Sess. .............................................19

**INTRODUCTION**

Plaintiffs' motion for summary judgment rests on the faulty assumption that California law categorically bans all switchblade knives. In fact, California's longstanding statutory regime regulates only a narrow category of knives: automatically opening knives of two inches or longer without a detent or safety mechanism. Thus, Californians are permitted to own, carry, and sell pocketknives; one-handed knives; folding knives and out-the-front knives; and even automatically opening knives, provided that the blade is less than two inches. Plaintiffs' misunderstanding of the scope of California's switchblade regulations manifests itself in their arguments at both steps of the *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* framework and is fatal to their motion. 597 U.S. 1 (2022).

At the threshold stage, Plaintiffs fail to present evidence addressing whether the specific types of knives regulated by the challenged statutes are in common use. Instead, they merely provide a list of automatically opening knife models and data on pocketknife ownership in the United States generally—neither of which are relevant to the types of knives actually regulated by the challenged statutes. Thus, at the first step of the analysis, Plaintiffs fail to establish that the challenged laws proscribe a type of weapon that is in common use and thus would implicate the plain text of the Second Amendment.

Plaintiffs also urge this Court to apply an extreme interpretation of *Bruen*'s threshold inquiry that contradicts Ninth Circuit precedent. In *United States v. Alaniz*, the Ninth Circuit made clear that the common-use analysis focuses on whether the weapon is in common use *for self-defense*, and not whether the weapon is generally in use for some other unspecified lawful purpose. 69 F.4th 1124, 1129 (9th Cir. 2023); *see also Bruen*, 597 U.S. at 21. Here, Plaintiffs fail to provide any evidence that the specific knives regulated by California law are commonly used for self-defense, or even used for self-defense at all. Plaintiffs also attempt to move the "dangerous and unusual" analysis from the first step of the *Bruen* analysis to the

1

1  second, improperly shifting the burden on this issue from Plaintiffs to Defendant.

2  However, the Ninth Circuit in *Alaniz* also made clear that the dangerous and

3  unusual analysis belongs at the threshold stage. *Alaniz*, 69 F.4th at 1129.

4      Plaintiffs also attempt to avoid the second step of the *Bruen* analysis altogether

5  by contending that this Court need not engage in *any* historical analysis because

6  "*Heller* decided [that] only dangerous *and* unusual arms can be categorically

7  banned." ECF No. 34-1 at 21. On the contrary, *Bruen* explicitly directs courts to

8  conduct the historical analysis specific to the challenged regulation before it;

9  indeed, the Supreme Court acknowledged that it did not conduct an exhaustive

10  historical analysis of the full scope of the Second Amendment in *Heller* or *Bruen*.

11  *Bruen*, 597 U.S. at 31. And notwithstanding whether the weapon at issue is

12  "dangerous and unusual," a regulation pertaining to that weapon still passes

13  constitutional muster as long as it "is consistent with the Nation's historical

14  tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Finally, Plaintiffs' attempt

15  to take a "divide-and-conquer" approach to Defendant's historical analogues—

16  wherein Plaintiffs attempt to distinguish each individual analogue, rather than

17  addressing the historical tradition as a whole—is unpersuasive, particularly since

18  the Ninth Circuit disclaimed this approach in *United States v. Perez-Garcia*, __

19  F.4th ___ (9th Cir. March 18, 2024) 2024 WL 1151665, at 45. Nothing in

20  Plaintiffs' motion refutes the comprehensive historical record supporting

21  California's switchblade regulations set forth in Defendant's motion for summary

22  judgment.

23      This Court should deny Plaintiffs' motion for summary judgment.

24                          **BACKGROUND**

25      Defendant incorporates the background and asserted facts set forth in the

26  memorandum of points and authorities in support of his motion for summary

27  judgment. ECF No. 33-1 at 7–8. As discussed in that brief and summarized here,

28  the laws challenged by Plaintiffs—Penal Code sections 17235, 21510, and 21590—

have been operative for over half a century and place reasonable restrictions on certain types of switchblade knives that (1) have blades two inches in length or longer and (2) do not have a detent or similar safety mechanism.

Penal Code section 17235 defines the subset of regulated knives as follows:

> [S]witchblade knife" means a knife having the appearance of a pocketknife and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by the flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever. "Switchblade knife" does not include a knife that opens with one hand utilizing thumb pressure applied solely to the blade of the knife or a thumb stud attached to the blade, provided that the knife has a detent or other mechanism that provides resistance that must be overcome in opening the blade, or that biases the blade back towards its closed position.

Cal. Penal Code § 17235.

Thus, Plaintiffs' attempt to frame California's statutory regime as a "Knife Ban" is inaccurate and misleading. Section 17235 does not ban all knives in the State. Nor does it ban all pocketknives; rather, the statute merely states that the regulated knives have the *appearance of a pocketknife*. The subset of switchblade knives regulated here are different from pocketknives, primarily because they are automatically opening and do not have a detent or other safety mechanism. This definition does not even include all switchblades. Knives with blades shorter than two inches, or knives that may be opened with one hand and have a detent or similar mechanism "serve an important utility to many knife users, as well as firefighters, EMT personnel, hunters, fishermen, and others," and thus are legal in California. *In re Gilbert R*, 211 Cal.App.4th 514, 612 (Cal. Ct. App. 2012) (citing Assem. Com. on Public Safety, Analysis of Sen. Bill No. 274 (2001-2002 Reg. Sess.).

## PROCEDURAL HISTORY

Defendant incorporates the procedural history set forth in the brief in support of his motion for summary judgment. ECF No. 33-1 at 8–9.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a party is entitled to summary judgment only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020). When deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). And where, as here, the parties file cross-motions for summary judgment, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LL v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

Here, Plaintiffs raise facial challenges against Penal Code sections 17235, 21510, and 21590. Facial challenges are "disfavored" because "a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Wa. State Grange v. Wa. State Republican Party*, 552 U.S. 442, 449 (2008). They are "the most difficult challenge[s] to mount successfully, since the challenger must establish that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also S.D. Myers, Inc. v. City & County of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001) (holding the Ninth Circuit will apply the *Salerno* standard in facial challenges, except for certain First Amendment challenges, until directed otherwise by the Supreme Court). Accordingly, to prevail on their facial challenge, Plaintiffs must establish that the challenged regulations are "unconstitutional in *all* of [their] applications." *Willis v.*

*City of Seattle*, 943 F.3d 882, 886 (9th Cir. 2019) (emphasis added). As shown below, Plaintiffs have not met this high burden.

**ARGUMENT**

**I.    PLAINTIFFS FAIL TO ESTABLISH THAT THE CHALLENGED STATUTES IMPLICATE THE SECOND AMENDMENT'S PLAIN TEXT**

Plaintiffs fail to meet their burden of establishing that the specific subset of switchblade knives that are regulated by the challenged statutes are protected by the plain text of the Second Amendment. Under *Bruen*'s text-and-history standard for adjudicating Second Amendment claims, the party challenging a restriction must first demonstrate that the law regulates conduct that is presumptively protected by the Second Amendment. *Bruen*, 597 U.S. at 24. Following *Bruen*, several district courts across the country have held that the party challenging the regulation bears this burden.[1]

Plaintiffs make at least two analytical errors at *Bruen*'s first stage. First, they claim that "the arm does not have to be used for self-defense. When an arm is possessed by thousands for lawful purposes, it is 'in common use' and it is protected—full stop." ECF No. 34-1 at 17. And second, they assert that "even arms 'not in common use' cannot be banned so long as they are no more dangerous than other arms that are in common use." *Id*. This interpretation of *Bruen*'s threshold analysis is plainly incorrect.

To begin with, the Ninth Circuit has made clear that when analyzing common use, the correct inquiry is "whether the weapon at issue is 'in common use' today *for self-defense*." *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023)

---

[1] *Hartford v. Ferguson*, 2023 WL 3836230, *3 (W.D. Wa. 2023) (assuming "that Plaintiffs can produce evidence in support of *Bruen*'s first requirement" and then shifting the burden to government at step two); *Or. Firearms Fed'n v. Kotek*, 2023 WL 4541027, at *5 (D. Or. July 14, 2023) ("First, a plaintiff challenging a firearm regulation must show the plain text of the Second Amendment covers the conduct regulated by the challenged law."); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 593 (D. Del. 2023) (finding that "Plaintiffs have shown" that some of the challenged weapons were in common use, and then shifting the burden to the government at step two).

5

(quoting *Heller*, 554 U.S. at 580) (emphasis added); *see also Rupp v. Bonta*, No. 8:17-cv-00746, at 13 (C.D. Cal. March 15, 2024) (following *Alaniz* in placing the common use for self-defense analysis at step one of the *Bruen* framework); *Bevis v. City of Naperville*, 85 F.4th 1175, 1193 (7th Cir. 2023) (recognizing that the singular lawful purpose protected under the Second Amendment is the right to individual self-defense).

Rather than follow the analysis required in this circuit, Plaintiffs cite Justice Alito's concurrence in *Caetano v. Massachusetts* for the proposition that the mere fact that thousands own switchblades demonstrates they are in "common use."[2] ECF No. 34-1 at 17 (citing 577 U.S. 411 (2006) (Alito, J., concurring) (per curiam). The First Circuit recently rejected a similar argument in *Ocean State Tactical*, explaining that "the closest arguable support for plaintiffs' preferred rule—that a weapon cannot be banned once a large number of people own it . . . comes from a concurring opinion in *Caetano v. Massachusetts*." 95 F.4th 38, 51 (1st Cir. March 7, 2024). Like the plaintiffs in *Ocean State*, here, Plaintiffs treat the "concurring opinion as if it were binding authority." *Id*. (recognizing, in addition, that *Caetano* only addressed stun guns, a non-lethal weapon); *see also Caetano*, 577 U.S. at 420 (Alito, J., concurring) (emphasizing that the case involved non-lethal weapons that were "widely . . . accepted as a legitimate means of self-defense across the country.").[3] As detailed below, Plaintiffs have failed to establish that the particular

---

[2] And even if Plaintiffs could show that "thousands" of people possess one of the particular switchblades regulated by the challenged statutes "for lawful purposes," that showing would be patently insufficient to establish that the regulated switchblades are in common use. Given that the adult population of the United States was approximately 258.3 million as of 2020,[2] "thousands" of individuals owning a particular weapon would not come anywhere close to the number necessary to establish common use. *See, e.g. Rupp, supra*, at 30–31 (holding that ownership by 24.6 million Americans—or 2.59% of the adult population—is not sufficient to establish common use as a matter of law).

[3] It is not evident that Justice Alito's concurrence even supports a numbers-only approach. The number of stun guns in circulation was in direct response to analysis by the Massachusetts Supreme Judicial Court that observed the number of stun guns was dwarfed by the number of firearms in circulation. *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (recognizing that hundreds of thousands owning stun guns was "[t]he more relevant statistic".).

6

subset of switchblade knives that are regulated by the challenged statute are in common use for self-defense purposes, and they therefore cannot show that such knives fall within the Second Amendment's plain text.

In addition, Plaintiffs identify no legal support—pre- or post-*Bruen*—for their argument that even if the covered knives are not in common use, California may not regulate them if they are no more dangerous than other weapons that are in common use. Instead, courts are required to consider the primary use or purpose of a weapon and its suitability for self-defense. *Heller*, 554 U.S. at 629. Plaintiffs do not provide evidence on the primary use or purpose of the specific subset of switchblades that California regulates, or any evidence on their suitability for self-defense. As detailed below, Plaintiffs' evidence—general sales and ownership statistics that have little to no bearing on the types of knives actually regulated by the challenged statutes—is insufficient to meet their burden at *Bruen*'s threshold stage.

### A.   Plaintiffs Fail To Show That the Specific Subset of Regulated Switchblade Knives Are in Common Use for Self-Defense

The Second Amendment right "is not unlimited" and does not extend to "'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 629). Rather, the Second Amendment only protects those weapons that are "'in common use' today for self-defense." *Id.* (quoting *Heller*, 554 U.S. at 627); *see also Alaniz*, 69 F.4th at 1129 (recognizing at the threshold stage, courts must consider "whether the weapon at issue is 'in common use' today for self-defense") (quoting *Heller*, 554 U.S. at 580.) This analysis requires courts to consider the primary use or purpose of that weapon and whether the weapon's objective characteristics render it suitable for self-defense. *Heller*, 554 U.S. at 629 (explaining the "reasons that a citizen may prefer a handgun for home defense," including that handguns are easier to store in a location that is readily accessible in an emergency, are easier to lift and

1    aim than a long gun, and can be used with a single hand while the other hand dials
2    the police).

3        The specific subset of switchblades that are regulated by the challenged
4    statutes do not constitute "Arms" protected by the Second Amendment because
5    they are not commonly used for self-defense. *Bruen* makes clear that the test for
6    Second Amendment protection of a particular weapon is common *use*, not common
7    *ownership*. *See* 597 U.S. at 38 (referring to "commonly *used* firearms for self-
8    defense") (emphasis added). Plaintiffs do not provide any evidence that
9    switchblades are in common use for self-defense today.[4] Indeed, they never even
10   consider the suitability of the regulated switchblades and the actual use of those
11   weapons for self-defense.

12       As the record in this case clearly establishes, the switchblade knives regulated
13   by California's statutory regime are not even suitable for "ordinary self-defense."
14   *Bruen*, 597 U.S. at 60. As both Plaintiffs' and Defendant's experts agree, extensive
15   training is required to use a switchblade knife safely and effectively for self-
16   defense. *Compare* Escobar Decl., ¶ 27, 31, 40, *with* Ex. Janich Transcript at pp. 33,
17   36. A self-defense situation involving a switchblade is inherently a close-combat
18   encounter—one that will likely require the cutting of tissue, ligaments, and
19   muscles, and result in subsequent blood loss.  Escobar Decl., ¶ 34–35; *see also* Ex.
20   Janich Transcript at pp. 34–36 (identifying the quadriceps and median and ulnar
21   nerves as prime targets for knife self-defense). The nature of such an encounter
22   raises the significant question of whether an ordinary person would be capable of
23   effectively using a knife for self-defense. Esocbar Decl., ¶ 35–36. There are
24   significant psychological barriers to using knives for self-defense.

25
26
_____

27   [4] To the extent that Plaintiffs provide data from the legislative history of the
     Federal Switchblade Act from the 1950s and 1980s to prove switchblades are in
     common use today, that evidence must be disregarded because the common use
28   analysis looks only at present-day statistical data.

Aside from such psychological barriers, switchblades are generally ill-suited for self-defense. All switchblades store the blade within the handle of the knife. Both out-the-front and folding knives require the user to seat the knife in their hand in a certain way to avoid injury upon deployment of the blade. Escobar Decl., ¶ 21. In addition, many users may struggle to disengage the safety on the switchblade or may accidentally deploy the knife, causing injury to the user. Escobar Decl., ¶ 31–32; *see also In re Gilbert R.*, 211 Cal. App. 4th at 612 (recognizing that the detent exception to Penal Code section 21510 is "prudent and a matter of public safety as [a detent] will ensure the blade will not inadvertently come open"). As a result, users risk injury and delay in attempting to deploy a switchblade for self-defense.

Switchblade knives must also lock in place in order to be used for self-defense. This is supposed to happen automatically, but on occasion, these knives can fail to lock and are rendered effectively unusable. Escobar Decl., ¶ 30. In contrast, fixed blade knives must only be unsheathed to be ready to use, and folding knives without automatic features give their users tactile feedback that the knife has locked into place. Escobar Decl., ¶ 30. By their very nature, an automatic switchblade knife consists of more complicated mechanical moving parts that can fail. Escobar Decl., ¶ 21; Rivas Decl., ¶ 21

And folding switchblades can be even more difficult to use because they require an even more complicated multi-step, fine-motor-skill operation to reveal the blade of the knife. Escobar Decl., ¶ 24–28. This fine motor skill requires training and practice to be used in an actual, adrenalized self-defense scenario. Escobar Decl., ¶ 27. Bringing a folding switchblade to bear in a high-stress self-defense situation is difficult. *Compare* Escobar Decl., ¶ 26–27, *with* Ex. Janich Transcript, p. 33.[5]

---

[5] Plaintiffs note that none of Defendant's experts cite any crime data relating to switchblades from 1958 to 2024. ECF No. 34-1 at 19. But *Bruen* does not require the government to produce evidence of current crime data to justify its regulations.

In short, a switchblade is a far cry from the "quintessential self-defense weapon" discussed in *Heller* and *Bruen*. It requires its users to be trained in close hand-to-hand combat, to be psychologically prepared to slash or stab in self-defense, and to use fine motor skills to deploy the blade.[4] Because Plaintiffs cannot establish that switchblades are commonly used for self-defense, their claims fail at the threshold.

Plaintiffs also make no attempt to show that the particular subset of switchblades regulated by the challenged statutes are actually used for self-defense. This is in part due to the fact Plaintiffs misinterpret the Ninth Circuit's current precedent and incorrectly believe that the analysis is limited to whether a weapon is in common use for any unspecified "lawful purpose," and not whether the weapon is in common use for self-defense. *Compare* ECF No. 34-1 at 17, *with Alaniz*, 69 F.4th at 1129.

Despite his independent research and decades of experience in training hundreds of individuals in self-defense with bladed weapons, Plaintiffs' purported self-defense expert, Michael Janich, could not recall a single instance in which a switchblade was used for self-defense. Ex. Janich Transcript, p. 32. Mr. Janich further testified that he would not recommend switchblades for self-defense given that there are few training knives for switchblades. Ex. Janich Transcript, p. 63. Training knives—knife models that replicate the actual feel of a knife but are dull—are often used to train individuals on how to use a knife for self-defense. Ex. Janich Transcript, p. 63. Mr. Janich admitted that very few knife companies produce training knives for their automatic switchblade knives. Ex. Janich Transcript, p. 63. Thus, despite the importance of training with a knife before using it for self-defense—as recognized by both parties' experts, *see* Escobar Decl., ¶ 27, 31, 40; Ex. Janich Transcript, pp. 33, 36—it is difficult to practice using a switchblade for self-defense. And the very fact that training versions of automatic switchblade knives are so rarely produced evidences the industry's general consensus that these

10

types of knives are not commonly used for self-defense. Given the lack of evidence that the specific type of switchblades that California regulates are commonly used in self-defense, it reasonably follows that regulating them imposes no meaningful burden on residents' ability to defend themselves. *See, e.g., Ocean State Tactical*, 95 F.4th at 45 (recognizing that, since there was no known instance of someone using 10-rounds for self-defense, regulating large-capacity magazines imposed no meaningful burden on the right to self-defense).

Plaintiffs mistakenly rely on national switchblade sale estimates in an attempt to meet their burden. They allege, without evidentiary support, that "millions of [automatically-opening] knives have been sold to private citizens who may lawfully possess them in 45 states." ECF No. 34-1 at 13. And they cite the number of automatically opening knives sold by the alleged three largest online knife retailers in the country. ECF No. 34-1 at 22. But these statistics do not inform the court of how many of those switchblades are being used for self-defense; indeed, Plaintiffs admit that they list "thousands of different models of automatically opening knives *for sale for lawful use*," *id.* at 22, not those specifically used for self-defense. Moreover, the sales statistics provided by Plaintiffs are not specific to the particular subset of knives that are regulated by the challenged statutes.

Plaintiffs similarly argue that "automatically opening knives fall under the category of folding pocket knives," that "[a]ccording to estimates from American Knife & Tool Institute, as many as 35,695,000 U.S. households own a pocket knife," and that "assisted opening and one-hand opening knives—are approximately 80% of all knives sold in the United States." ECF No. 34-1 at 24. But these statistics about pocketknives do not support Plaintiffs' argument that the regulated switchblades are in common use for self-defense. Just as not all rectangles are squares, not all pocketknives are switchblades, and even fewer are the specific type of switchblades proscribed by the challenged statutes. Pen. Code, § 17235 (Switchblade knife "*does not include a knife that opens with one hand utilizing*

*thumb pressure applied solely to the blade of the knife or a thumb stud attached to the blade, provided that* the knife has a detent or other mechanism that provides resistance that must be overcome in opening the blade, or that biases the blade back towards its closed position".)[6]

Plaintiffs also suggest that automatically opening knives are prevalent in other jurisdictions. ECF No. 34-1 at 20–21. Yet, California need only ensure that its laws pass constitutional muster, not that they align with the laws of other states. Although the Supreme Court has defined the outer bounds of permissible regulations, it has not "abrogate[d] states' core responsibility of "[p]roviding for the safety of citizens within their borders." *Kolbe v. Hogan*, 849 F.3d 114, 150 (4th Cir. 2017) (en banc) (Wilkinson, J., concurring) (quoting *Heller*, 554 U.S. at 635), *abrogated on other grounds by Bruen*, 597 U.S. 1. In *McDonald*, the Court emphasized that the Second Amendment "by no means eliminates" a state's "ability to devise solutions to social problems that suit local needs and values." 561 U.S. at 785. Thus, other states' laws are ultimately not relevant to whether California's statutes are constitutional.

Plaintiffs are trying to place an evidentiary burden on the State that has no foundation in *Bruen* or any other Supreme Court Second Amendment case. In short, Plaintiffs have failed to meet their threshold burden of establishing that the specific type of switchblades regulated by the challenged statutes are in common use for self-defense.

### B.   The Challenged Statutes Regulate "Dangerous and Unusual" Weapons

In addition to being ill-suited for self-defense, the subset of switchblade knives that are regulated by the challenged statutes fall outside the scope of the Second Amendment for the separate reason that they are dangerous and unusual weapons.

---

[6] A pocketknife, a folding knife, a one-handed knife, an automatically opening knife, or a knife that shares a combination of these features is legal under section 17235's definition of "switchblade knife".

Plaintiffs mistakenly suggest "only dangerous and unusual arms can be categorically banned." ECF No. 34-1 at 25. But *Heller* made clear that proscribing dangerous and unusual arms was just one of several longstanding weapons regulations traditionally understood to be consistent with the Second Amendment. *Heller*, 554 U.S. at 626; *see also Fyock v. Sunnyvale*, 779 F.3d 991, 996–97 (9th Cir. 2015).

Plaintiffs also argue that "Defendants' experts have failed to present evidence sufficient to create a genuine factual dispute over whether automatically opening knives are dangerous and unusual." ECF No. 34-1 at 18. But this argument incorrectly places the dangerous and unusual analysis at the second step of the *Bruen* framework. *Alaniz*, 69 F.4th at 1129; *see also Rupp v. Bonta*, No. 8:17-cv-00745, at 14, fn. 5 (C.D. Cal. March 15, 2024) (recognizing that placing the dangerous and unusual at the second step of the analysis "was in direct tension with *Fyock*," "directly contradicted *Alaniz*," and "was out of step with most courts that have considered the issue"). Thus, it is Plaintiffs—not Defendant—who bear the burden of showing that switchblades are not dangerous or unusual.

Blackstone, a leading historical source cited by *Heller* and *Bruen* on this point, elaborated on this tradition and explained that "[t]he offense of riding or going armed, with dangerous *or* unusual weapons, is a crime against the public peace . . . and is particularly prohibited." 4 Blackstone, Commentaries on the Laws of England 148 (1769); *see also Bruen*, 597 U.S. at 35 (recognizing that a "long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived 14th-century English practice"). A weapon qualifies as dangerous and unusual if it has some heightened "level of lethality or capacity for inquiry" that makes the weapon "especially dangerous." *Nat'l Ass'n for Gun Rights v. Lamont*, ___ F. Supp. 3d. ___, 2023 WL 4975979, at *16 (D. Conn., Aug. 3, 2023).

13

Federal courts across the country have long recognized that switchblades are uniquely dangerous weapons that are not typically possessed for law-abiding purposes. *See Crowlery Cutlery Co. v. U.S.*, 849 F.2d 273, 278 (7th Cir. 1988) ("Switchblade knives are more dangerous than regular knives because they are more readily concealable and hence more suitable for criminal use."); *Fall v. Esso Standard Oil Co.*, 297 F.2d 411, 416–17 (5th Cir. 1961) ("It is now well settled beyond a doubt that a switchblade knife is a dangerous weapon.").[7] Numerous Ninth Circuit cases confirm the relationship between such knives and criminal activity. *See, e.g.*, *Barrios v. Holder*, 581 F.3d 849, 853 (9th Cir. 2009) (noting that in Guatemala a gang cut a person seeking immigration relief with a switchblade); *U.S. v. Salcedo*, 452 F.2d 1201 (9th Cir. 1971) (finding that a switchblade knife and a container of heroin found by a Border Control Agent supported a drug smuggling conviction); *Craft v. U.S.*, 403 F.2d 360, 362 (9th Cir. 1968) (affirming conviction for the illegal importation of marijuana and switchblades); *U.S. v. Olloque*, 580 Fed. Appx. 584, 584 (9th Cir. 2014) (affirming conviction of possession and intent to distribute drugs noting that officers found a switchblade amongst drug paraphernalia). California courts have similarly recognized that switchblades are not typically possessed by law-abiding citizens for lawful purposes. *See, e.g.*, *In re S.C.*, 179 Cal. App. 4th 1436, 1441 (Cal. Ct. App. 2009) ("A switchblade carried on the person represents a constant threat to others, whether carried in public or in private. A switchblade carried at home, for example, is dangerous to family members and house guests during an argument."). These cases provide additional evidence that the types of switchblades regulated by the challenged statutes are

---

[7] The district court in *Teter v. Connors* similarly held that butterfly knives—like switchblades—are often associated with gang activity and present a danger to public safety. 459 F. Supp. 3d 989, 992–93 (D. Haw. 2020). The district court's decision was reversed by a three-judge panel of the Ninth Circuit, *Teter v. Lopez*, 76 F.4th 938, 949-50 (9th Cir. 2023), but that opinion was vacated when the Ninth Circuit agreed to rehear the case en banc, *Teter v. Lopez*, 2024 WL 719051, at *1 (9th Cir. Feb. 2, 2024).

1  uniquely dangerous, thus placing these weapon outside the scope of the Second
2  Amendment.

3  **II.   THE CHALLENGED STATUTES ARE CONSISTENT WITH THE NATION'S
   HISTORICAL TRADITION OF REGULATING SIMILAR WEAPONS,
4  NOTWITHSTANDING PLAINTIFFS' "DIVIDE-AND-CONQUER" APPROACH**

5          Plaintiffs' motion for summary judgment also fails at the second stage of the
6  *Bruen* analysis because the challenged statutes fall comfortably within the Nation's
7  historical tradition of weapons regulation. The regulation of weapons throughout
8  U.S. history tends to follow a similar regulatory sequence: certain weapons become
9  associated with criminality or threats to public order and safety after proliferating in
10 society; and subsequently the government enacts a variety of restrictions on that
11 particular weapon, while leaving a range of alternatives available to law-abiding
12 citizens for self-defense. Spitzer Decl., ¶ 12, 60. This regulatory tradition includes
13 historical precursors to modern-day switchblade regulations, including regulations
14 of the Bowie knife and other dangerous weapons. Here, Defendant has identified
15 136 historical laws from 49 states and the District of Columbia regulating Bowie
16 knives, and even more laws regulating the use of dangerous weapons through carry
17 restrictions and taxes. Spitzer Decl., Ex. C; see also Spitzer Decl., ¶ 43–44, Ex. B,
18 C, D; Rivas Decl., Ex. 2–47. Plaintiffs attempt to isolate and distinguish discrete
19 aspects of Defendant's historical analogues, rather than rebut the broader historical
20 tradition. Plaintiffs' "divide and conquer" approach to Defendant's historical record
21 should be rejected.

22      **A.   *Bruen* Requires This Court to Engage in Historical Analysis**

23          Plaintiffs attempt to dissuade this Court from engaging in *any* historical
24 analysis, arguing that the Court is limited to the historical analysis set forth in
25 *Heller* and *Bruen*, ECF No. 34-1 at 21—notwithstanding the fact that neither case
26 addressed the historical tradition of regulating knives. Indeed, *Bruen* explicitly calls
27 for courts to engage in their own historical analysis particular to the facts of the
28 case before it. *Bruen*, 597 U.S. at 31 ("Like *Heller*, we 'do not undertake an

15

1   exhaustive historical analysis . . . of the full scope of the Second Amendment.' And

2   we acknowledge that 'applying constitutional principles to novel modern conditions

3   can be difficult and leave close questions at the margins.'"). It follows that this

4   Court must engage in an independent historical analysis here.

### B.   The Ninth Circuit Has Cautioned Against a Divide-and-Conquer Approach to *Bruen*'s Historical Analysis

7       As the Ninth Circuit recently observed in *United States v. Perez-Garcia*, "[i]n

8   applying the Second Amendment, we do not isolate each historical precursor and

9   ask if it differs from the challenged regulation in some way. We emphasize again:

10  *Bruen* does not require the Government to identify a 'historical twin' or an 18th

11  century 'dead ringer' . . . We instead examine the historical evidence as a whole."

12  *United States v. Perez-Garcia*, __ F.4th ___ (9th Cir. March 18, 2024) 2024 WL

13  1151665, at 45. Accordingly, the Ninth Circuit discounted the *Perez-Garcia*

14  plaintiffs' "divide and conquer approach to the historical evidence," because such

15  an approach "misses the forest for the trees." *Id.* Here, Plaintiffs make the same

16  methodological error as the *Perez-Garcia* plaintiffs by focusing on immaterial

17  distinctions between each of Defendant's historical analogues and the challenged

18  statutes, rather than evaluating the overarching historical tradition set forth in

19  Defendant's motion. In doing so, Plaintiffs improperly ask this Court to require

20  Defendant to produce historical analogues that are "twins" or "dead ringers" for the

21  challenged statutes—a requirement that *Bruen* expressly disclaimed. *Bruen*, 597

22  U.S. at 30.

### C.   *Bruen* Endorsed the Use of Analogues Outside of the Founding Era

25      Plaintiffs also erroneously contend that the Court is limited to Founding-era

26  laws in conducting its historical analysis. Yet *Bruen* suggested that periods outside

27  the Founding era are relevant to the analysis. *Bruen*, 142 S. Ct. at 2132 ("The

28  regulatory challenges posed by firearms today are not always the same as those that

1   preoccupied the Founders in 1791 or the Reconstruction generation in 1868.”); *id.*

2   at 2133 (describing a review of the “historical record . . . [of] 18th- and 19th-

3   century ‘sensitive places’”). Plaintiffs’ view also contravenes the Ninth Circuit’s

4   recent decisions treating post-1791 evidence as relevant under *Bruen*. *See Alaniz*,

5   69 F.4th at 1129 (finding that a “historical tradition is well-established” based on

6   the fact that “several States enacted [analogous] laws throughout the 1800s”); *Baird*

7   *v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) (noting the relevance of

8   Reconstruction-era regulations under *Bruen*). The historical analogues discussed

9   below are representative of our Nation’s robust history of regulating dangerous

10  weapons in both the Founding era and throughout American history.

      **D.**   **The Challenged Statutes Fit Comfortably Within a Long Tradition of Regulating Bowie Knives, Impact Weapons, and Other Dangerous and Deadly Weapons**

13        Defendant incorporates by reference the historical arguments in the brief in

14  support of his motion for summary judgment. ECF 33-1 at 16–19 (establishing the

15  historical tradition of regulating dangerous and deadly weapons, including the

16  Bowie knife and other impact weapons). While Defendant’s motion addresses

17  numerous analogues, no historical weapon serves as a better analogy to the types of

18  switchblade knives that California currently regulates than the Bowie knife. In the

19  antebellum era, the Bowie knife became one of the most widely regulated weapons.

20  The Bowie knife was a large, single-edged knife infamously used by Jim Bowie to

21  kill a man in a duel in 1827. Spitzer Decl., ¶ 34; see also Rivas Decl., ¶ 18. The

22  story of Jim Bowie and the mythology related to his story led to the proliferation of

23  the knife.[8] Spitzer Decl., ¶ 35; Rivas Decl., ¶ 19. The knife’s distinctive features,

24  along with Bowie’s death at the Alamo in 1836, led to widespread interest in and

25  proliferation of the knife. Spitzer Decl., ¶ 35; Rivas Decl., ¶ 15.

26

---

27      [8] This is not unlike the switchblade itself, which experienced heightened

28  popularity following its prevalence in pop culture and the media in the 1950s and 1960s. Spitzer Decl., ¶ 15.

Featuring a long, thin blade, the Bowie knife was designed for interpersonal fighting in a time when single-shot pistols were unreliable and inaccurate. Spitzer Decl., ¶ 36. The exact details of the original Bowie knife are unknown, but versions of the knife became more standardized over time. Rivas Decl., ¶ 18. For example, some folding Bowie knives existed in the nineteenth century. Rivas Decl., ¶ 22. However over time, the Bowie knife came to generally be recognized as a large, eight to twelve-inch knife with a clipped blade—one with a sharpened swedge making it more lethal, with the point generally aligned with the handle. Rivas Decl., ¶ 18. The knife was widely used in fights and duels, even though this practice was widely disfavored. Spitzer Decl., ¶ 36–37.

The public safety concerns surrounding Bowie knives and other thin long-bladed knives were ubiquitous. Spitzer Decl., ¶ 43. Accordingly, states enacted a variety of restrictions on the Bowie knife throughout the nineteenth century, including open and concealed carry prohibitions and criminal penalty enhancements, and imposed taxes on individuals and dealers. Spitzer Decl., ¶ 45–46. The First Circuit recently credited the well-established historical tradition of regulating Bowie knives, recognizing "the severe restrictions placed on Bowie knives by forty-nine states and the District of Columbia in the nineteenth century once their popularity in the hands of murderers became apparent." *Ocean State Tactical*, No. 23-1072 (upholding Rhode Island's restrictions on large capacity magazines by relying in part on historical laws regulating Bowie knives).

The challenged statutes are also relevantly similar to laws dating back to the Founding era. Plaintiffs contend that, "[a]t the time of the Founding era, the preferred means of addressing the general threat of violence, was to require law-abiding citizens to be armed." ECF No. 34-1 at 27. But in the Founding era, states also banned a variety of impact weapons they deemed dangerous and prone to criminal misuse, including bludgeons, billy clubs, slungshots, and sandbags. Impact weapons were used to strike others and were associated closely with criminal use.

18

*Id*. As a result, they were ubiquitously regulated by early state governments, which enacted laws primarily regulating their carry. *Id*. Every state in the nation had laws restricting one or more types of impact weapons. *Id*.

In determining whether regulations are relevantly similar, *Bruen* pointed courts to two different metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. Here, the challenged statutes are analogous to the aforementioned historical analogues in "how" they regulate weapons by proscribing a specific subset of particularly dangerous and deadly switchblade knives. The challenged statues are also analogous as to "why"—the laws reduce criminal activity and protect public safety. Defendant incorporates by reference the arguments set forth in his brief in support of his motion for summary judgment. ECF No. 33-1 at 17–19 (establishing that the historical analogues are relevantly similar to California's switchblade restriction in how and why they regulate switchblades). The historical analogues establish that different forms of dangerous knives have been regulated throughout history for public safety reasons.

The modest burdens imposed by California's switchblade restrictions are comparably justified by pressing public-safety concerns. In response to a rise in crime and public concern, forty states, including California, and the federal government enacted laws restricting switchblades. One California court observed that "the dramatic rise in switchblade crimes nationwide, as noted in the Congressional reports and hearings, must also have been evident to the California Legislature when it passed [Penal Code section 17235 and 21510]." *People ex rel. Mautner v. Quattrone*, 211 Cal. App. 3d. 1389, 1396 (Cal. Ct. App. 1989) (citing Sen. Rep. No. 1980, 85th Cong., 1st Sess., and H.R. No. 9820, H.R. No. 10618, H.R. No. 111289, 85th Cong., 2d Sess., pp. 1–33 (1958) [bills of the Federal Switchblade Act].) Indeed, historical laws regulating Bowie knives and other dangerous weapons were actually significantly more burdensome than California's

switchblade restrictions. ECF No. 33-1 at 17–18 (recognizing that many historical analogues were broader in scope than the challenged statutes (e.g., regulating *all* concealed knives and deadly weapons broadly) and that historical analogues were particularly burdensome in an era where the single-shot pistol was unreliable, inaccurate and widely disfavored).

Plaintiffs argue that the historical dangerous weapons laws are not analogous because "there are no outright prohibitions on the manufacture, sale, possession, and carry of any kind of knife during the Founding era, or the 19th century."[9] ECF No. 34-1 at 28. This argument is predicated on the notion that the challenged statutes impose an "outright prohibition" on switchblade knives—which, as explained above, is misplaced. Plaintiffs' primary argument in response to Defendant's historical analogues is that the challenged statutes regulate pocketknives, which have been legal throughout American history. ECF No. 34-1 at 14. But this assertion notwithstanding, "folding pocketknives" are not at issue in this case.[10] The challenged laws do not preclude Plaintiffs from owning folding pocketknives generally; the law only regulates automatic-opening switchblade knives that are two inches or longer and do not have a detent or safety mechanism. Indeed, the law expressly excludes folding knives that "open[] with one hand." (Cal. Penal Code § 17235.) As Plaintiffs recognize, many historical laws similarly had exceptions for ordinary pocketknives. ECF No. 34-1 at 29 ("many of the concealed carry restrictions identified by defense experts . . . explicitly exempted pocket knives").

This Court is not required to find a historical twin as Plaintiffs demand; rather, it must look to whether modern and historical regulations impose a comparable

---

[9] Moreover, given the historical context, there are many reasons states did not impose "outright prohibitions" that no longer ring true today. *See* Spitzer Decl., ¶ 47–48 (explaining the difficulties in prohibiting knife possession in early America).

[10] Not all switchblades are pocketknives. *See* Janich Transcript, p. 56 (stating tjat the longest switchblade in his collection is 13-inches long and would not fit in his pocket).

burden on the right of armed self-defense and whether the burden is comparably justified. *Bruen*, 597 U.S. at 29. In *Ocean State Tactical*, the First Circuit relied heavily on similar dangerous weapons laws—and, in particular, historical regulations of Bowie knives—to justify Rhode Island's law banning possession of all large-capacity magazines. If such laws can be analogized to a possession ban of a firearms magazine, then they can certainly be analogized to the subset of switchblade knives regulated by the challenged statutes, which are much more similar to Bowie knives than are large-capacity magazines.

The historical laws regulating Bowie knives and other dangerous weapons also imposed a substantial burden in a time when the precursor to the modern handgun—the single-shot pistol—was unreliable, inaccurate and widely disfavored.[11] The First Circuit recognized recently that, "[a]t the time, Bowie knives were considered more dangerous than firearms." *Ocean State Tactical*, 95 F.4th, at 48. While a "gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. . . . [t]he bowie-knife differs from these in its device and design; it is the instrument of almost certain death." *Id.* (quoting *Cockrum v. State*, 25 Tex. 394, 402 (1859).). Any argument by Plaintiff that the historical analogues compiled by Defendant did not impose a significant burden on the right to self-defense ignores this historical reality.

Plaintiffs argue that many large fighting knives, similar to the ones presented in Defendant's historical laws, are legal in California. While that may be true, large fighting knives historically posed a significant danger because of their unique concealability. Rivas Decl., ¶ 4, 12, 13. Unlike hunting rifles which had to be carried openly, large knives could be concealed and carried into public places. *Id*. The switchblade is also easily concealable and brought to bear in public and was regulated for these reasons. Moreover, states are not obligated to impose every

---

[11] In contrast, fighting knives, like the Bowie knife, worked in wet and dry conditions and did not need to be reloaded after firing a single shot. Rivas Decl., ¶ 14.

weapons restriction that is supported by the historical record; rather, legislatures have discretion to impose constitutional regulations that they believe will best protect their citizens. Thus, the fact that the Legislature has not chosen to regulate every type of large knife does not undermine the constitutionality of the challenged statutes.

## CONCLUSION

This Court should deny Plaintiffs' motion for summary judgment.


Dated: April 8, 2024                        Respectfully submitted,

                                            ROB BONTA
                                            Attorney General of California
                                            R. MATTHEW WISE
                                            Supervising Deputy Attorney General
                                            JANE REILLEY
                                            Deputy Attorney General


                                            */s/ Katrina Uyehara*
                                            KATRINA UYEHARA
                                            Deputy Attorney General
                                            *Attorneys for Defendant Rob Bonta, in his official capacity as Attorney General of the State of California*