```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3   KNIFE RIGHTS, INC.; ELIOT KAAGAN; )
     JIM MILLER; GARRISON HAM; PWGG    )
 4   L.P.,                            )
                                      )  No. 23-CV-0474-JES-DDL
 5            Plaintiffs,             )
                                      )
 6   v.                               )  May 8, 2024
                                      )
 7   ROB BONTA, California Attorney   )
     General,                         )
 8                                    )  Courtroom 4B
              Defendant.              )
 9   _____)  San Diego, California


10

11                   TRANSCRIPT OF PROCEEDINGS
                         (Motion Hearing)

12


13      BEFORE THE HONORABLE JAMES E. SIMMONS JR., DISTRICT JUDGE

14

15

16

17

18

19

20

21   COURT REPORTER:        AMANDA M. LeGORE
                            RDR, CRR, CRC, FCRR, CACSR
22                          U.S. District Court
                            333 West Broadway, Suite 420
23                          San Diego, CA 92101
                            amanda_legore@casd.uscourts.gov
24
     Reported by Stenotype:  Transcribed by Computer
25
```

```
1    APPEARANCES:

2    FOR THE PLAINTIFFS:       JOHN DILLON
                               Dillon Law Group APC
3                              2647 Gateway Road, Suite 105, No. 255
                               Carlsbad, CA  92009
4                              (760)642-7150
                               jdillon@dillonlawgp.com
5

6
     FOR THE DEFENDANT:        KATRINA UYEHARA
7                              JANE REILLEY
                               Deputy Attorneys General
8                              State of California
                               Office of the Attorney General
9                              1300 I Street, Suite 125
                               P.O. Box 944255
10                             Sacramento, CA  94244
                               (916)210-7867
11

12
     ALSO PRESENT:             DOUG RITTER
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Wednesday, May 8, 2024; 1:59 p.m.)

 2

 3                        P R O C E E D I N G S

 4

 5            THE CLERK:  Calling matter number 2, 23-CV-0474, Knife

 6   Rights, Inc., et al., versus Bonta, et al.

 7            THE COURT:  All right.  Good afternoon, everyone.

 8            ATTORNEY DILLON:  Good afternoon, your Honor.

 9            THE COURT:  Can I have appearances, please.

10            ATTORNEY DILLON:  John Dillon, counsel for plaintiffs,

11   Knife Rights, et al.

12            THE COURT:  All right.  Good afternoon, Mr. Dillon.

13            And?

14            CHAIRMAN RITTER:  Doug Ritter, chairman of Knife

15   Rights.

16            THE COURT:  All right.  Good afternoon, sir.

17            ATTORNEY UYEHARA:  Katrina Uyehara, attorney for

18   Defendant Ron Bonta, Attorney General.

19            THE COURT:  And Uyehara, you said?

20            ATTORNEY UYEHARA:  Uyehara.

21            THE COURT:  Uyehara.  Sorry.  Good afternoon.

22            ATTORNEY REILLEY:  Good afternoon, your Honor.  Jane

23   Reilley on behalf of Defendant Bonta.

24            THE COURT:  All right.  Good afternoon, Ms. Reilley.

25            So these obviously are cross-motions for summary
```

1    judgment that the parties have filed.  I reviewed each of the

2    cross-motions for summary judgment, the attached exhibits and

3    supporting documentation.  I reviewed the opposition that each

4    party has filed, as well as reply briefing that each party has

5    filed.

6         So, obviously, this is a hearing regarding the -- for

7    lack of a better term, the California statute regulating -- or

8    outlawing switchblade knives of two inches or longer.

9         So the parties had different arguments in regards to

10   the burdens that were -- that the party had carried the burden

11   in this case.

12        On the onset, *Bruen* itself did not discuss which party

13   had the initial burden.  There have been two cases only in this

14   circuit that have really discussed cases post-*Bruen*.  Neither

15   one of those cases has discussed which party has the initial

16   burden.

17        I know *Bruen* and *Heller*, and predecessor cases, talks

18   about the comparison of the Second Amendment in regards to the

19   First Amendment.  And there's a -- a circuit case -- not

20   circuit.  District court in the Central District of this

21   circuit that has discussed this issue just recently, a few

22   months ago.

23        And they are of the opinion, which seems consistent,

24   that the plaintiff or the challenger to the statute carries the

25   initial burden under the two-step test under *Bruen* to prove

1    that the -- the challenged activity is within the textual

2    analysis that the *Bruen* two-step test talks about, that is

3    within the plain text of the Second Amendment.

4           And then if they do make the proper showing, then the

5    burden switches to the Government -- in this case, the

6    defendants -- to show that the restriction is within the

7    history -- this nation's history in regards to firearm

8    restrictions.

9           So the Court, in initially addressing this matter,

10   does find that the challenging party -- in this case, the

11   plaintiff -- does have the initial burden to analyze that the

12   conduct or the -- the arm that has been restricted is within

13   the plain text of the Second Amendment.

14          And in particular, *Alaniz*, which is the -- one of the

15   two Ninth Circuit cases that address this issue, lists several

16   factors for the step one of the contextual analysis.

17          The first is whether the challenger is part of the

18   people whom the Second Amendment protects.  I don't think

19   there's any dispute here, in this case, that the plaintiffs,

20   the individuals, as well as the part -- the corporation --

21   well, not corporation but the organization plaintiffs, are

22   within the part of the people whom the Second Amendment

23   protects; lawful citizens who have the right to possess arms.

24          And the second step within the first step one of the

25   *Bruen* analysis is whether the weapon at use -- at issue is in

1   common use today for self-defense.  That's what the *Alaniz* case

2   decided.

3         The third is whether the Second Amendment's plain text

4   covers the challenger's proposed course of conduct.

5         So the questions that I have for the parties are,

6   obviously, there's two cases only in this circuit.  *Alaniz*

7   talked about whether the weapon at issue is in common use today

8   for self-defense.  I know there's been argument, in the

9   plaintiffs' briefing as well, that the issue should be whether

10  it's in common use for the lawful -- or lawful purpose, not

11  solely self-defense.

12        And *Bruen* itself talks about both self-defense and

13  lawful purpose.  So does *Heller*.  But the Court has to decide,

14  first, whether the weapon is in common use solely for a lawful

15  purpose or whether it's in common use for -- solely for

16  self-defense.  And then the Court will get to the second step,

17  if the plaintiff had met their burden in the first step.

18        So the Court's tentative, based on that analysis, as

19  to the proper procedural framework to guide this discussion, is

20  that the plaintiff has not met their burden under step one, so

21  the Court would not get to a step-two analysis.

22        That's a tentative.  I want to hear from the parties

23  because, frankly, that tentative may change after this hearing.

24        So cross-motions.  But I'm going to allow the

25  plaintiff to go first, and I'll give each party a chance to

1  reply to the other party's argument.

2          But, Mr. Dillon, whenever you're ready.

3          ATTORNEY DILLON:  All right.

4          Good afternoon.  This is John Dillon, counsel for

5  plaintiffs.

6          Considering the Court's initial statements regarding

7  the analysis that must be conducted under *Bruen*, I'm going to

8  jump to the arms question.  As it is very clear that there's no

9  dispute that the plaintiffs in this case are part of the

10 people.  And, in fact, the conduct in question has also not

11 been disputed as being covered under the plain text of the

12 Second Amendment.  So the only real question is whether the

13 arms that are being restricted by California's prohibition are

14 indeed arms under the plain text of the Second Amendment.

15         Now, the plain text analysis under *Bruen* and *Heller* is

16 very clear.  It does not involve any historical review.  It is

17 merely an application of what the text of the Second Amendment

18 says.

19         THE COURT:  That is absolutely correct.

20         ATTORNEY DILLON:  Yes.

21         Now, under *Heller*, the Supreme Court made clear that

22 the 18th century meaning of the term "arms" is no different

23 from its meaning today.  The term "arms" generally refer to

24 weapons of offense or armored defense.  And at the time of the

25 Second Amendment, the term "arms" was understood to extend to

1    bladed weapons.

2           And *Heller* found explicitly that this expansive scope

3    of the term "arms" extends prima facie to all instruments that

4    constitute bearable arms, even those that were not in existence

5    at the time of the founding.

6           Under that standard alone, there is no question that

7    switchblades -- being a folding pocketknife -- are arms under

8    the plain text of the Second Amendment.

9           Now, the Court mentioned the *United States verse*

10   *Alaniz* -- if I'm pronouncing that correctly -- and their

11   discussion of the *Bruen* standard.  I would say that it's very

12   important to first note that the *Alaniz* court did not conduct a

13   plain text analysis in their decision.  And so they did not

14   apply that test under *Bruen*.

15          The Court provided what plaintiffs would describe as

16   an incomplete and inaccurate summary of *Bruen*.  And it provides

17   nothing more than dicta.  If you go to *U.S. v. Perez* v. --

18   U.S. -- *United States v. Perez-Garcia*, in which the defendants

19   have relied on in arguing that the dangerous and unusual

20   argument is one that is applied under the plain text analysis,

21   you'll see that the Ninth Circuit clearly stated that the

22   dangerous and unusual weapons consideration was part of the

23   historical evidence in determining a tradition of permissible

24   regulation.

25          Now, what's significant about that is the dangerous

1    and unusual test is the same as the common use test.  They are

2    two sides of the same coin.  As the Court in *Caentano* stated

3    it's a conjunctive test.  If an arm is in common use, it cannot

4    be both dangerous and unusual.

5           And because that all was applied by both the *Heller*

6    and *Bruen* courts in the historical analysis, it has no

7    application under the plain text analysis.

8           Frankly, the -- the title of the analysis speaks for

9    itself.  We must consider the plain text of the Second

10   Amendment.  And we cannot unilaterally read into the Second

11   Amendment's plain text, extra conditions or qualifications that

12   these arms are not considered arms unless they are in common

13   use; and not just in common use but specifically in common use

14   for self-defense.  None of that is included in the plain text

15   of the Second Amendment, and we cannot just throw that in there

16   when it's not there.

17          THE COURT:  So if I take it, by the argument you're

18   making -- you're arguing to the Court that *Alaniz* is wrong, and

19   the Court should not follow the Ninth Circuit precedent?

20          ATTORNEY DILLON:  Well, again, I would argue that

21   *Alaniz* is not Ninth Circuit precedent.  It merely summarized

22   the decision in *Bruen*, and it quite explicitly states that it

23   did not conduct the plain text analysis under *Bruen*.

24          So it's difficult to see how it can guide this Court

25   when it didn't conduct the analysis itself.

1          THE COURT:  Okay.

2          ATTORNEY DILLON:  But we do have an analysis that's

3   been conducted in both *Heller* and *Bruen*.  And in both of those

4   Supreme Court cases, there is no discussion -- whatsoever -- of

5   whether or not the arms in question, in either *Heller* or *Bruen*,

6   are in common use for self-defense.

7          While it's discussed that the arms, and firearms in

8   general, are in common use for various lawful purposes, there's

9   not a single instance in either one of those decisions where

10  they put that condition or qualification as necessary in order

11  to determine whether the arms in question are arms under the

12  plain text of the Second Amendment.

13         Now, going -- moving on from that argument, unless the

14  Court has any additional questions, I would argue that

15  plaintiffs have sufficiently shown that under the plain text

16  analysis, that these arms are in fact arms under the Second

17  Amendment.  And the burden would then shift to the Government

18  to provide relevant historical justifications for their current

19  ban.

20         Now, as a part of this historical analysis, we have to

21  go back to *Heller*.  *Heller* involved a question of whether or

22  not handguns could be banned.  This was an arms ban case,

23  contrary -- distinguishable from *Bruen*, which was a case

24  dealing with the public carry of arms.

25         So *Heller* is the controlling authority in this case,

1   as this is an arms ban case.  And under *Heller* the Court

2   decided that based off the historical tradition in the

3   historical analysis, that only those arms that are both

4   dangerous and unusual can be banned.

5          Now, again, I mentioned *Caentano* earlier, when I

6   referenced in the plain text argument.  But this is really

7   where this argument is.  It's really where the *Heller* analysis

8   discusses this.  And it says that in order for a court to

9   conclude that an arm is dangerous and unusual, it has -- it

10  cannot be in common use.  Because, again, if an arm is not both

11  dangerous and unusual, it's -- sorry, if an arm is in common

12  use, it can't be both dangerous and unusual.

13         Now, plaintiffs have provided a significant amount of

14  evidence regarding the commonality of arms.  We have argued

15  that the automatic knives in question are common in many

16  different ways, including the fact that they're common

17  numerically.  We've shown that since the 1950s, millions of

18  these knives have been sold throughout the United States.  And

19  they continue to be sold today, with over 33 manufacturers

20  manufacturing and selling automatic knives in the United

21  States.

22         They're common jurisdictionally, as it is completely

23  legal to own and possess and even carry these knives.  And the

24  lion's share of the states in the United States -- 45 states

25  allowing for the purchase, possession, sale, and use of these

1   knives.

2          We've also argued that these knives are common

3   categorically.  It's undisputed that these knives are in fact

4   pocketknives.  They're a variation of a pocketknife.  The

5   defendant's experts have all acknowledged that these are

6   folding pocketknives that are carried in the pocket and meet

7   the definition of pocketknife in every conceivable way.

8          Now, because they are pocketknives, they belong to a

9   category of arms that is overwhelmingly common in the United

10  States, with estimates being that 35 million-plus of these

11  knives -- or homes in the United States have some sort of

12  pocketknife.  And, again, we have shown that there's no

13  distinction between --

14         THE COURT:  Well, I'm sorry for interrupting.  I was

15  going to ask a question about that for both parties.

16         ATTORNEY DILLON:  Um-hmm.

17         THE COURT:  The question is, at what point should the

18  Court be delineating between just a knife, generally; a

19  pocketknife generally; or a switchblade knife in particular?

20  In this case, that -- where the definition under the penal code

21  is less than two inches and opens up with a -- I forget the

22  exact language, the cadence that it had --

23         ATTORNEY DILLON:  Flick of the wrist or --

24         THE COURT:  Yes.

25         ATTORNEY DILLON:  Yes, your Honor.  And, actually,

1    *Heller* gives us a great understanding of what -- how we need to

2    delineate between these different arms.

3            So, in *Heller*, the question that was answered was

4    whether handguns were allowed to be banned.  They did not break

5    down the law -- or the restriction on whether or not revolvers

6    are allowed to be banned, or whether striker-fired pistols are

7    allowed to be fired, or hammer-fired pistols are allowed to be

8    banned.  They're all arm -- they're all handguns.  And at that

9    categorical level, the Court distinguished between handguns and

10   long guns.  Said that you can't ban handguns, even if you say

11   that, well, you can still have long guns.  That's not -- that

12   was an argument specifically rejected by *Heller*.  And here,

13   same thing.

14           We have ordinary pocketknives.  These are folding

15   knives.  And that's the category that they're in.  And, in

16   fact, the defense expert, Robert Escobar, explicitly stated

17   that the switchblades belong under the two categories of

18   folding knives.  Meaning folding knives and out-the-front

19   knives, in which the knife has a handle, a blade.  And that

20   blade is either folded or collapsed into the handle.  And it

21   opens into a locked position, in various ways.  And it's

22   carried in the pocket.  So plaintiffs would make the argument

23   that this is the proper level to address this ban.

24           But we've also shown that, even if you want to be more

25   specific, their commonality -- even at the level of being a,

1    quote/unquote, switchblade -- they've been in common use

2    throughout the United States for many decades.

3         THE COURT:  And I ask that question because I know

4    there's at least a district court here in the Central District,

5    in *Rupp v. Bonta*, that distinguish between automatic weapons

6    and semiautomatic weapons.

7         And they're both firearms.  They're both guns.  But

8    there's a difference between the two.  And which makes the

9    automatic weapon, the M-16 in that discussion, sufficient to

10   restrict the ability for lawful citizens to use that or possess

11   that in their self -- or any lawful purpose or self-defense.

12        So even if they're both knives, they're still -- it's

13   not just the sole discretion -- that's not the sole discussion,

14   based on the fact that there's a difference between an

15   automatic and a semiautomatic.  Correct?

16        ATTORNEY DILLON:  Well, again, you know, *Heller*

17   provides the appropriate analysis of when you're considering

18   the levels of analysis, I guess, you would apply.

19        THE COURT:  Because *Heller* even discussed that they

20   still have the ability to ban and to restrict arms to certain

21   individuals and for certain purposes.  So *Heller* didn't say you

22   can't ban firearms at all.

23        ATTORNEY DILLON:  No.  And plaintiffs have not made

24   that argument.  That's something that is very clear.  And we --

25   and in our historical analysis, in reviewing the defendants'

1   justifications, you know, it seems to be that at -- in --

2   without putting words in their mouth, my interpretation of it

3   is any restriction, whatsoever, placed on any type of arm will

4   allow for broader restrictions to be placed on any arm that

5   they can think of.

6          But in fact, you know, *Heller* court, the *Bruen* Court,

7   and this Court have all now seen the same historical evidence.

8   Most of that historical evidence consists of concealed carry

9   restrictions, and most of those concealed carry restrictions

10  were implemented after 1870.

11         And the Court, in *Heller* and *Bruen*, was explicitly

12  clear that with the sheer lack of any restrictions being found

13  in the Colonial founding eras and shortly thereafter, this late

14  period -- late-1800s laws cannot contradict the plain text of

15  the Second Amendment or the lack of any restrictions during the

16  founding.

17         THE COURT:  And I agree with you.  When we get to step

18  two, the historical analysis, the key time period is around the

19  founding of the -- or the adoption of the Second Amendment.

20  The -- around 1791, I believe, to the adoption of the

21  Fourteenth Amendment; the -- the mid to late 1800s.

22         So I agree with you in that respect.  Anything in the

23  late 1800s or, frankly, the 20th Century, at all, frankly, is

24  not as instructive.  It can be, but it's not necessarily

25  binding, instructive in regards to the historical analysis.

1          So if it were to get to step two, I think there's a

2     significant problem with -- with what I have before me today.

3     But I can't get to step two until step one has been satisfied.

4     So that's the concern I have, whether step one has been

5     satisfied.

6          I've interrupted you.  So I'm sorry.  I'll let you

7     finish your argument.  I apologize.

8          ATTORNEY DILLON:  It's not a problem.  What I was

9     going into with regard to the main concealed carry restrictions

10    that the defendants have put forth in their historical

11    analysis -- I'll just make it very clear.  While these

12    restrictions regulated the active concealed carry, each and

13    every one of these restrictions permitted the purchase, sale,

14    acquisition, possession, and even open carry of every knife

15    that's been identified; whether it's Bowie knives, Arkansas

16    toothpicks, dirks, daggers, stilettos, and even, you know,

17    switchblades.  These concealed carry restrictions did not

18    impose such broad prohibitions as we're seeing today, when it

19    comes to this state's law.

20          So -- so going back -- because, you know, the Court

21    has indicated that there's still some struggle when it comes to

22    the first step in the textual analysis, you know.  We've --

23    plaintiffs have argued that the plain text is very clear.  And

24    the decisions in *Heller* and *Bruen* make it very clear that it's

25    a very simple analysis when it comes to the plain text.  We

1    cannot read additional conditions or qualifications that do not

2    exist into the text.

3          You know, much of defendants' arguments, when it comes

4    to their plain text assertions and the burdens involved, amount

5    to a discussion regarding the common use in self-defense.  And,

6    again, we've already stated that there's nothing in the text

7    that says anything about being commonly used for self-defense.

8          And, in fact, if that is the test that the Court's

9    going to impose, we have to consider the implications of such a

10   thing.  Because just from a common sense level there are many

11   arms and many firearms -- indeed -- that aren't commonly used

12   for self-defensive purposes, whether they be bolt-action

13   hunting rifles or even muskets or black-powder firearms.  I

14   don't think anyone's going to argue that those are not commonly

15   used in self-defense anymore.  But there is no question that

16   they are arms under the Second Amendment.

17         The same is true for competition firearms, like

18   competition handguns or Olympic pistols, which the state of

19   California explicitly exempts from assault weapon regulations

20   because of their sporting purpose.  These are not used in

21   common use for self-defense by any means, yet they are

22   undoubtedly arms under the Second Amendment.  And, again, we

23   can't read that condition into it.

24         THE COURT:  I -- I understand the argument.  But I

25   know both *Heller* -- well, *Heller*, more particular than *Bruen*.

1   But *Heller* focused on -- especially in particular, a special

2   agent in that case who was denied the -- the permit, for lack

3   of a -- no, it's a concealed weapon permit to carry the firearm

4   on its own. *Heller*'s focused a lot on self-defense and not as

5   much on lawful -- for any lawful purpose.

6           *Bruen* discussed both self-defense and lawful purpose,

7   especially in the sense of the -- the text of the Second

8   Amendment being -- at least the *Bruen* court talked about the

9   whole text of this was for individuals to have this right to

10  self-defense in their home, which is why the text was created

11  at the founding of the Second Amendment.  So I know *Heller*

12  focuses mostly on self-defense.  *Bruen* talks about both lawful

13  purpose and self-defense.  But there is that discussion.

14          And, unfortunately, we have the two-step test that was

15  created by *Bruen*.  And the Court clearly said the -- the

16  Government has the burden on the second step of that test, but

17  did not say who had the first -- the burden on the first step

18  of that test.

19          So it was -- and there hasn't been a lot of cases

20  throughout the country to talk about that.  But the courts, in

21  both *Heller* and *Bruen*, did a comparative analysis to First

22  Amendment rights.  In regards to First Amendment rights, the

23  individual challenging the statute has the -- carries the

24  initial burden.  And so that's why I'm starting off with that

25  framework here, in regards to the initial burden.  But,

1    ideally, we'll got a little bit more case law clarifying these

2    issues, so we're not making new law at the district court

3    level.

4         ATTORNEY DILLON:  Yeah.  And that's exactly

5    plaintiffs' point, your Honor.  We can't make a new standard.

6    You know, we went through around 12 years of a two-part sliding

7    scale analysis under the Ninth Circuit.  That was made up by

8    the lower courts after the *Heller* decision.  And the Supreme

9    Court explicitly repudiated that act.  So I would strongly want

10   to avoid doing that again.

11        And just -- I note one last point regarding *Heller*'s

12   analysis.  *Heller*'s analysis of the Second Amendment's plain

13   text repudiates this whole claim that it is for self-defense

14   per the -- you have to have in common use for self-defense.

15        According to *Heller*, the most natural reading of "keep

16   arms" is to have weapons.  "Keep arms" was simply a common way

17   of referring to possessing arms for militiamen and everyone

18   else.  If the Court were to -- in *Heller* were to try to make

19   the claim or put some new condition that these arms have to be

20   used in actual self-defense scenarios, they wouldn't have said

21   that.  They've made it explicitly clear.  It's just the simple

22   act of possessing.

23        And that's the decision of the people that the Second

24   Amendment grants.  It pulls away the ability for the Government

25   and even the courts to decide on a case-by-case basis whether

1    the right's really worth insisting; or whether, you know, they

2    made the right choice in what arms they're going to use.

3            In the discussion that *Heller* -- in *Heller*'s

4    discussion, when it's talking about the various reasons that

5    the people have chosen a handgun as the quintessential firearm

6    for self-defense, it lists a number of reasons why people may

7    have chosen handguns.  And defendants have relied on those

8    reasons as -- to kind of bolster their argument that this shows

9    that the suitability or common use for self-defense is an

10   actual condition.  But they omit the fact that at the end of

11   that discussion the court says, whatever the reasons, the

12   people have chosen the handgun as their weapon of self-defense.

13           And it's highlighting the fact that -- unfortunately,

14   this is not for the Government and the courts to decide.  It is

15   a decision of the people, under the Second Amendment, to decide

16   what weapons they are going to use for self-defense.  And,

17   again, the definition of "arms" extends prima facie to all

18   instruments that constitute bearable arms.  There's been no

19   discussion, whatsoever, from the defendants -- or even

20   argument -- that in fact an automatically opening knife or any

21   knife in general is somehow not a bearable arm.  There's no

22   facts or evidence that would state that you couldn't use it for

23   self-defense.  In fact, both the plaintiffs' and defendants'

24   knife experts both acknowledge that they will can be used for

25   self-defense.  And it's up to the person using it to do so.

1        So, you know, we can't overcomplicate this first

2   textual analysis.  It's very clear.  What does the text say?

3   Arms.  And what are arms?  Arms are all instruments that are

4   bearable weapons of offense and defense.

5        It's very clear that these knives are weapons of

6   offense and defense.  The simple fact that -- that the state is

7   trying to claim that they're too dangerous -- too dangerous of

8   weapons that they need to be regulated concedes the point that

9   they're a weapon of offense.

10       So it's remarkable, you know, in plaintiffs' opinion,

11  how we could try to sidestep just clear definitions.  They are

12  in fact arms.  And the burden goes and shifts immediately to

13  the defendants to prove historical justification.

14       THE COURT:  Thank you very much, Mr. Dillon.

15       Who's going to argue on behalf of the defense?

16       All right.

17       ATTORNEY UYEHARA:  Good afternoon, your Honor.

18       We agree with the tentative here in this case.  We

19  believe that the *United States verse Alaniz* was not dicta, and

20  that it is binding on this Court.

21       And in that decision, the Ninth Circuit held that the

22  *Bruen* step one involves a threshold inquiry.  In alignment with

23  *Heller*, it requires's textual analysis.  And that involves

24  whether or not the weapon at issue is in common use today for

25  self-defense.  And the Ninth Circuit is not the only court to

1   hold this, so far.  The Seventh Circuit has also held this, and

2   viewed this for *City of Naperville.*  And as your Honor has

3   mentioned, in *Rupp* as well, in the Central District.

4        And so what exactly does "for self-defense" mean?

5   Well, *Heller* actually gives us some metrics.  *Heller* looks at

6   the primary use and purpose of the handgun that was at issue in

7   that case.  It also looks at the suitability of the handgun for

8   self-defense.

9        In *Heller*, the court specifically delineates there's

10  many reasons why a person would use a handgun for self-defense.

11  Mainly that they're easy to store in a location, they're

12  readily accessible in an emergency.  They're easier to lift and

13  aim than long gun, and it can be used with one hand while the

14  other hand dials the police.  All of those characteristics of

15  the handgun go to the suitability of the handgun as the

16  quintessential self-defense weapon.

17       And plaintiffs discuss the use of alternatives in

18  terms of self-defense.  But "handgun" at -- in *Heller*, what was

19  at issue was D.C.'s handgun ban.  So it wasn't -- they didn't

20  have to discuss long guns and other weapons of that nature.

21       And in this case here, we built a significant record

22  just on the issue of whether or not switchblades are suitable

23  weapons for self-defense.

24       Our expert, Robert Escobar, our self-defense expert,

25  explains in detail that switchblades require users to be

1   trained in close hand-to-hand combat.  They have to overcome

2   significant psychological barriers when using those knives to

3   slash and stab in self-defense.  It requires the cutting of

4   tissue, ligaments, muscles and results in subsequent blood

5   loss.  It also requires fine motor skills to deploy the blade

6   and the potential of self-injury.

7           Plaintiffs expert, Mr. Janich, also agrees with this.

8   He doesn't recommend these knives in his classes.

9   Specifically, automatic opening knives do not have training

10  knife complements, meaning knife models that replicate the

11  actual feel of the knife but are dull.  So, in essence, you

12  can't spar or train with these knives because they're not

13  commonly used for self-defense, or at least there's no evidence

14  in this record.

15          And, specifically, plaintiffs don't provide any

16  evidence that the subset of switchblades at issue -- those with

17  blades two inches or longer and don't have a détente or safety

18  mechanism -- that they're in common use for lawful purposes at

19  all or in common use for self-defense.

20          And since -- specifically, what plaintiffs do provide

21  is they provide sales figure estimates.  So the number of

22  automatically opening knives sold by the alleged three largest

23  online knife retailers in the country.  That does not inform

24  this Court on whether or not how many of those knives are

25  actually used for ordinary self-defense.

1          THE COURT:  Can I ask a question about that?  Because

2     I know in the plaintiffs -- both their original opening motion,

3     as well as their opposition to the defendants' motion, they

4     talk about the number -- I forget off the top of my head.  But

5     I know it's over one million, I believe, of these types of

6     knives that have been produced by the largest manufacturers.

7          So are you suggesting to the Court that the Court --

8     that plaintiff has to show that these knives are used for

9     self-defense, as opposed to just possessed and owned by

10    individuals?

11         ATTORNEY UYEHARA:  Yes, your Honor.  The plaintiffs

12    have to show that these knives are in common use for

13    self-defense.  And it's not as simple as just counting out how

14    many automatically open knives -- not even the ones that are

15    regulated by California -- are in common use.

16         THE COURT:  Well, let's take that to an analogy

17    with -- with a handgun.

18         Is the argument, in a similar analogy, that a

19    particular handgun that may be banned by the state of

20    California -- I don't have a particular gun in mind -- that the

21    plaintiff would be required to show that despite the fact that

22    this handgun may be legal in other parts of the country, that

23    it has -- that those who own it have to own it solely for

24    self-defense?

25         ATTORNEY UYEHARA:  This is exactly why the defendant

1  doesn't believe the numerical or numbers-only approach to the

2  common use test.

3       The Ninth Circuit -- and I believe the Seventh Circuit

4  as well -- has discussed how the common use test is kind of

5  circular.  Specifically, in *Friedman versus City of Highland*

6  *Park*, the Seventh Circuit there said it would be absurd to say

7  that the reason why a particular weapon could be banned is that

8  there is a statute banning it.  The Ninth Circuit has gone on

9  to say that a numbers-only approach would suggest that the

10 Constitution protects -- what the Constitution protects depends

11 on whether or not that's been regulated by the Government.

12       And the reason we look to whether or not a weapon is

13 in common use for self-defense is it also takes more dangerous

14 weapons that aren't in common use out of the equation.  For

15 instance, a rocket launcher is an arm.  Correct?  But that

16 doesn't mean that anyone can have one.

17       And so the common use for self-defense component of

18 the common use test helps to set limits on the term "arms" as

19 it was defined in the original public meaning of the Second

20 Amendment.

21       THE COURT:  And let me ask another question.  You were

22 talking earlier about your expert's opinion regarding the use

23 of a switchblade knife.  In this situation, how it required

24 training and the psychological component that you mentioned

25 earlier.

1           Couldn't the same analogy be meant -- meant to a

2  firearm itself, a handgun?

3           ATTORNEY UYEHARA:  Most certainly, your Honor.  But

4  the point is that there's specific -- especially when it comes

5  to the psychological barriers that are involved with stabbing,

6  it's much different from shooting someone across the room to,

7  you know, physically slashing at someone and feeling that --

8           THE COURT:  I guess it depends on the individual.

9           ATTORNEY UYEHARA:  I suppose, your Honor.  But that's

10  not the only evidence that we provide, that shows that -- that

11  a switchblade is an ineffective weapon for self-defense.

12           THE COURT:  Okay.  Please continue.

13           ATTORNEY UYEHARA:  Returning to the kind of

14  numbers-only or numerical argument here.  The only case that's

15  ever really done a numbers game is *Caetano versus*

16  *Massachusetts*, which -- as we discussed in our brief -- is only

17  Justice Alito's concurrence that kind of takes a numbers-only

18  approach.

19           And courts and advocates alike are not in agreement

20  that *Caetano versus Massachusetts* even endorses a numbers-only

21  approach.  There, Justice Alito's concurrence was in direct

22  response to a statement by the Massachusetts supreme judicial

23  court that said, well, the number of stun guns is less than the

24  number of handguns, and that's the end of the analysis.  And

25  that's why Justice Alito stated that there are thousands of

1    stun guns in circulation.

2           And so regardless of whether this Court takes a

3    numbers-only numerical approach, if the analysis is as we say

4    it is -- common use for self-defense -- that should be the end

5    of the inquiry there.

6           Now, if your Honor would like, we can dive into some

7    of our historical analogs, or if you have any questions at the

8    first step?

9           THE COURT:  No more questions about step one, no.

10           ATTORNEY UYEHARA:  So even if plaintiffs could

11    establish that California switchblade laws are implicated by

12    the Second Amendment's plain text, California's switchblade

13    laws are still consistent with the nation's historical

14    tradition of regulating dangerous and deadly weapons.

15           It's important to point out, at this step, that

16    plaintiffs err when they say that the Court need not engage in

17    an independent historical analysis.  That directly contravenes

18    what the Supreme Court stated in *Bruen*.  Neither *Heller* or

19    *Bruen* addressed the historical tradition of knives and other

20    impact weapons.  And *Bruen* specifically said, like *Heller*, we

21    do not undertake an exhaustive historical analysis of the full

22    history of the Second Amendment.  And they acknowledged that

23    courts would have to apply a new test here.

24           Specifically, under *Bruen*, the Government is required

25    to identify only a well-established and representative

1    historical analog; not a historical twin or dead ringer.  And

2    that's all in the singular.  That analog must be relevantly

3    similar to the challenged laws, which requires to look -- which

4    requires us to look at how and why the regulations burden a

5    law-abiding citizen's right to arm itself in self-defense.

6         We argue here, today, that the switchblade

7    restrictions are consistent with the nation's historical

8    tradition of regulating similar dangerous and deadly weapons.

9         The regulation of weapons throughout U.S. history

10   follows a similar regulatory pattern.  Certain weapons become

11   associated with criminality or threats to the public safety and

12   order.  Once those weapons proliferate in society, the

13   Government subsequently enacts a variety of restrictions on

14   that particular weapon.  And they also leave a range of

15   alternatives for law-abiding citizens for self-defense.

16        At the outset, I think it's important for us to

17   explain why we use the phrase "dangerous and deadly weapons."

18   Dangerous and deadly weapons were those that are easily

19   concealable and associated with criminal use and interpersonal

20   violence.  And they're regulated throughout American history.

21        It's also a catch-all phrase that's commonly found at

22   the end of these laws, like these carry laws, that say -- for

23   instance, I have an example here.

24             (Pause, referring.)

25             ATTORNEY UYEHARA:  That -- for example, in Washington,

1    D.C., in 1868, they had a law that made it unlawful for any

2    person or persons to carry or have concealed about their

3    persons any deadly or dangerous weapons, such as dagger,

4    pistol, Bowie knife, dirk knife, or dirk, colt, slungshot, or

5    brass or other metal knuckles within the city of Washington.

6            And so dangerous and deadly weapons is a catch-all

7    phrase.  That includes Bowie knives.  It includes, also, the

8    five other impact weapons that we included in our briefing.

9            And what those weapons have in common with

10   switchblades is that they're easily concealable and that

11   they're used in interpersonal violence and they're dangerous

12   and deadly.

13           And that's particularly important in this case here

14   because concealability has a lot to do with why these

15   restrictions were enacted, or the historical analogs were

16   enacted in the first place.

17           Traditionally, the weapon of choice was a long arm; a

18   weapon that could not be easily concealed, for obvious reasons.

19   And the single-shot pistol did not come into creation until

20   much, much later.  In early American history, it was largely

21   not favored; susceptible to problems, and things like that.

22   And so these weapons -- the Bowie knife and the five impact

23   weapons that we rely on in our briefing -- were unique in that

24   they were concealable.  And then that's why they were banned

25   publicly and concealed on the person.  That was not a --

1   concealed weapons were not a problem in the same way that they

2   were before.

3         THE COURT:  And one of those weapons you mentioned was

4   a club, if I recall correct -- is that correct?

5         ATTORNEY UYEHARA:  Yes, that is correct.

6         THE COURT:  You are aware that there is a court in

7   this district that has just recently struck down the California

8   statute with regard to billy clubs?

9         ATTORNEY UYEHARA:  Yes, your Honor.  And that is on

10  appeal with the Ninth Circuit.

11        THE COURT:  I understand it is.  But I do want to make

12  sure you're aware of that --

13        ATTORNEY UYEHARA:  Yes, your Honor.

14        THE COURT:  -- when you make in argument.  So --

15        ATTORNEY UYEHARA:  Yes, your Honor.  We're filing that

16  opening briefing today.

17        THE COURT:  Okay.

18        ATTORNEY UYEHARA:  And so -- yes, there are --

19        THE COURT:  It's persuasive authority, but it's not

20  binding authority, obviously.

21        ATTORNEY UYEHARA:  Exactly.

22        And so along with clubs, we list five other different

23  weapons.  We include billy clubs specifically.  And clubs is

24  like a more general version of the billy club that was less

25  concealable.  We also rely on bludgeons, slungshots and

1    blackjacks and sandbags as well.

2          And some of those laws go very far back.  I believe

3    our oldest club law goes back to 1699.  But most of the laws

4    are around the 1791, when the second amendment was passed; and

5    1868, when the Fourteenth Amendment was ratified.

6          And so only four states do not specifically regulate,

7    by name, any of those five impact weapons.  And of those four

8    states, three of those states had broad restrictions on

9    dangerous and deadly weapons generally.

10          And so these dangerous and deadly restrictions are

11    relevantly similar to the switchblade laws at issue because

12    they're concealable weapons that, once they began to circulate,

13    became weapons of crime and interpersonal violence, and were

14    subsequently regulated on multitudes of fronts, in many

15    different ways.

16          And then -- (pause.)  One other thing I want to point

17    out about the relative burden of the historical analogs and the

18    switchblade laws at issue is a lot of the historical analogs

19    were actually much broader than California's law.  California's

20    law only regulates switchblades that are half blades that are

21    two inches or longer and don't have a détente or similar safety

22    mechanism; which has been praised by a California Court of

23    Appeals as being a really important exception for first

24    responders, firefighters, hunters, fisherman, and the like.

25    Because it allows them to purchase knives that open with -- can

1  be opened with one hand.

2         And so the historical analogs, a lot of them are

3  actually quite broader in scope.  Specifically, an example from

4  Louisiana in 1813 restricted any concealed weapons, such as a

5  dirk, dagger, pistol, or knife generally.  It didn't say, Bowie

6  knife.  It could have just been any large knife; presumably,

7  any small knife as well.

8         And St. Louis, Missouri, there was another law,

9  concealed any pistol, revolver, colt, Billy, sling shot, and

10 the list goes on, but it ultimately ends in the catch-all that

11 says, or any knife resembling a Bowie knife or any other

12 dangerous and deadly weapon.

13        So these were sweeping laws.

14        It's not as simple as there was one law constricting

15 carry of Bowie knives, the law likely restricted five, six, ten

16 other versions of different dangerous and deadly weapons.  And

17 part of the reason these laws were also so broad was because

18 the definition of these items would change over time.

19        In our declaration from Professor Rivas, she discusses

20 how the Bowie knife has changed over time.  And in the years

21 when regulations started to come to be, the Bowie knife itself

22 was changing and becoming standardized.  And so a lot of these

23 laws have catch-all phrases that just discuss the -- the deadly

24 and dangerous nature of these weapons in general.  So they're

25 very broad in scope.

1        And so to kind of conclude our historical analogs

2   here, 49 states and the District of Columbia enacted laws

3   restricting the Bowie knife.  And 49 states regulated related

4   dangerous and deadly impact weapons generally.  So the five I

5   listed earlier.

6        Here, for similar reasons -- those being concerns

7   about their concealability and criminal use -- 40 states in the

8   federal government enacted laws restricting switchblades.

9        And so California switchblade laws are consistent with

10  our history and tradition of regulating dangerous and deadly

11  weapons.  And, for that reason, this Court should grant the

12  defendants' motion for summary judgment.

13        If the Court has any further questions --

14        THE COURT:  I do not.  Thank you.

15        ATTORNEY UYEHARA:  Thank you.

16        THE COURT:  All right.  Mr. Dillon.

17        ATTORNEY DILLON:  Yeah.  I'll limit my response to

18  just the -- the issues that were specifically brought up by the

19  defense.

20        But, first, going to the question of whether the

21  switchblades at issue are in fact arms under the Second

22  Amendment.

23        I would like to point out, the courts have already

24  held, multiple times, that knives are protected by the Second

25  Amendment and are in fact arms under the Second Amendment.

1    We have *State v. DiCiccio*.  That stated that dirk

2 knives were arms within the meaning of the Second Amendment.

3 *State v. Delgado*, which it was actually over -- overruled ban

4 on possession of switchblades as violating Oregon's

5 constitutional right to arms.  And stated that switchblades

6 were in fact arms protected by the Second Amendment.

7    In *State v. Herman*, again, it overturned the

8 conviction for possession of a switchblade as unconstitutional.

9 And specifically stated:

10    "Whether knives are typically used for self-defense

11    or home security as a general matter is beside the

12    point.  It is undisputed that Herman possessed his

13    switchblade inside his home for his protection."

14    In *State v. Montalvo*, here the New Jersey Supreme

15 Court held that machete-type knives are protected by the Second

16 Amendment.

17    And in *State v. Griffin*, the court said that:

18    "A steak knife -- a knife, even a steak knife,

19    appears to be a bearable arm that could be utilized

20    for offense or defensive purposes."

21    So this is a question that has been answered many

22 times by courts already; in the broader category of knives in

23 general.

24    Also, addressing the defendant's claim that plaintiffs

25 have used a numbers-only approach to justify in common use, we

1    in fact provided three different metrics in which you can use

2    and determine common use.  And we have shown that these knives

3    are in common use numerically.  They've been produced and sold

4    in the United States for decades and sold in the millions.

5    We've shown that they're common, categorically, as folding

6    pocketknives.  And we have also shown that they're in common

7    use jurisdictionally.  Meaning that they are able to be

8    purchased and possessed and used in approximately 45 different

9    states in the United States.

10            So we haven't used the metrics-only approach.  We've

11   given the Court many different metrics that they can go off of.

12   And, also, this is why the common use or dangerous and unusual

13   analysis falls under the historical analysis under *Bruen*, not

14   the textual analysis.  Because we can't start determining

15   whether something is or is not -- falls under the definition of

16   an arm because it may or may not be common.  What constitutes

17   an arm is very clear.  It's a definitional analysis.

18            What the Court did in *Heller* -- and you'll see this

19   throughout the discussion -- the historical discussion in

20   *Heller*.  Is they said it is clear, based off of the historical

21   review, that the only weapons that were restricted were the

22   dangerous and unusual weapons.  And again, like I said, the

23   flip side to that is common use.  It's the same test.  These

24   are not different tests by any means.

25            Now, moving on to the defendants' argument that these

1   arms are not arms because they're not suitable for

2   self-defense.

3         Again, this is not an argument that *Heller* or *Bruen*

4   addressed under the plain text analysis, and it should be

5   completely ignored.

6         It is also a means-end policy argument that's been

7   explicitly rejected by *Bruen*.  And it's not up to the courts

8   to -- or the state to determine whether something is suitable

9   enough to be used as an arm in self-defense.  This analysis

10  doesn't exist in either the Supreme Court's controlling

11  authority.  And absent entirely is any consideration on the

12  suitability of certain arms for self-defense in the plain text

13  analysis.

14        And *Heller* and *Bruen* specifically reject any such

15  claim, stating that a constitutional guarantee subject to

16  future judge's assessments of its usefulness is no guarantee at

17  all.

18        In any case, automatic knives are just as suitable as

19  any other knife for self-defense.  Plaintiffs' expert, Michael

20  Janich, repeatedly testified that automatic opening knives are

21  legitimate tools for self-defense.

22        In fact, defendants' expert, Robert Escobar, also

23  admitted that switchblades can be used for personal defense.

24  And that his personal preference to fixed-blade knives is in

25  fact his preference.  He -- he explicitly stated that his

1    opinion is not in the concensus by any means.  So -- in fact,

2    there are many experts out there that would testify that they

3    are in fact suitable for self-defense.

4           Addressing the claims that Mr. Escobar made, our

5    expert, Michael Janich, went through each and every claim that

6    Mr. Escobar made and repudiated each one of them.  And, in

7    fact, in Mr. Escobar's deposition he admits that his criticisms

8    regarding switchblades apply to all folding knives, and they

9    apply to many firearms in many cases.

10          Defendant's counsel brought up the fact that these

11   switchblade knives are concealable, that there are

12   psychological barriers when it comes to using a knife in

13   self-defense and -- you know, with regard to blood loss; you

14   know, cutting someone; the requirement of fine motor skills to

15   deploy the knife; and the possibility of self-injury if you're

16   ever using one in self-defense.  In Mr. Escobar's deposition,

17   he explicitly stated that each and every one of these claims

18   applies to all knives, all folding knives.  And they in fact

19   apply to firearms.

20          You know, there's no question that there's a

21   psychological barrier that must be overcome if you're going to

22   shoot someone in self-defense.  I think that's fairly clear.

23   There's definitely going to be wounds and blood loss when it

24   comes to using a firearm in self-defense.  You're going to have

25   to use fine motor skills when using a firearm in self-defense,

1   and that's something that defendant's expert freely admitted.

2   And, in fact, there's many more steps to implement a firearm in

3   self-defense than there would be to pull out any type of knife.

4         So the -- the suitability argument in general -- even

5   if this Court were to take that as a -- anything to rely on --

6   the defense's own expert, he -- he freely admits that it is not

7   unique to switchblades by any means.  And that in fact it

8   applies to almost every self-defense tool known to man.

9         Oh, and before I forget, you know, Mr. Escobar also

10  conceded the fact that his critiques regarding switchblades

11  don't amount to any kind of danger to the general public.  You

12  know, his critiques on the suitability of switchblades, they

13  don't in fact go to the dangerousness of the weapon to the

14  general public by any means.  In fact, at best, you could argue

15  that his statements would address the -- you know, the use of

16  the user themselves.  They don't address any dangerousness to

17  the public.

18        And, in fact, the defense expert's testimony says

19  nothing about how switchblades are uniquely more concealable

20  than any other folding knife as they -- the blade folds into

21  the handle just like any other pocketknife that's freely legal

22  in the United States and in California.

23        Defendant devotes a good amount of their argument to

24  state that the surveyed restrictions -- you know, concealed

25  carry Bowie knife and impact weapon regulations -- are

1    relevantly similar in light of their comparable burdens and

2    justifications and how the Court doesn't need to have -- find a

3    historical twin.

4         But defendants don't contest that these laws address

5    some unprecedented societal concern or dramatic technological

6    changes that would permit a more nuanced analogous -- analysis

7    under *Bruen*.

8         To the contrary, this case deals with a

9    technologically simple weapon, a folding pocketknife, and an

10   age-old social ill:  The criminal assault with knives.

11        Thus, under the *Bruen* inquiry, it's very

12   straightforward.  When a challenged regulation addresses a

13   general societal problem that has persisted since the 18th

14   century, the lack of a distinctly similar historical regulation

15   addressing the problem is relevant evidence that the challenged

16   regulation is inconsistent with the Second Amendment.

17        Now, plaintiffs have addressed all of the defendant's

18   historical evidence.  And taken as a whole, this doesn't come

19   close to any type of justification for the current ban.

20        Defense experts have identified a total of two state

21   laws that regulated the sale of any knife in the entire 19th

22   Century.  One in 1837, in Tennessee.  The other in 1881, in

23   Arkansas.  Both came after the founding era, and one was a

24   decade after the Civil War.

25        The defense experts were also not able to identify a

1   single law in the entire history of this nation that prohibited

2   the possession of any knife up until the 19 -- or -- the 20th

3   Century.

4        All of the concealed carry restrictions relied on by

5   the defense explicitly allow purchase, sale, transfer,

6   possession, and at least one form of carry in public.  This is

7   not a divide-and-conquer approach but, rather, a summary of

8   historical record.  Each and every one of the concealed carry

9   restrictions only restricted the active concealed carry.   In

10  contrast, we have a law that prohibits every aspect of owning

11  and possessing these arms.

12        And while *Heller* and *Bruen* did consider analogous --

13  analogs outside the founding, they limit -- the explicitly

14  limited these analogs -- what analogs could be considered.  And

15  no analog may be used to contradict the Second Amendment's

16  plain text, or the more relevant found here.  And it is

17  undisputed that there are no restrictions on the possession,

18  sale, transfer, acquisition, or even carry of any knife during

19  the founding era.

20        Addressing defendant's claim that these historical

21  analogs were far broader in scope than the current ban, the

22  defendant omits that every concealed carry restriction

23  permitted all of these other acts that are prohibited by

24  California's law.

25        And, moreover, in defense expert Robert Spitzer's own

1    words, restricting certain arms in so many different ways

2    amounts to a de facto approach.

3         So we have the historical analogs that purely and only

4    restricted concealed carry, versus the current ban which is --

5    according to the defense expert -- a de facto prohibition.

6         The Court also mentioned a recent case that actually

7    came out of this district, which was *Russell Fouts v. Bonta*.

8    In that case, the court -- or the defense, the State of

9    California, made the same argument.  That in common use for

10   self-defense is part of the plain text analysis.  The court

11   explicitly rejected that argument.

12        THE COURT:  Actually, the court said that the

13   Government didn't submit enough evidence to support that

14   argument.  I have the -- that's --

15        ATTORNEY DILLON:  And there is little to no evidence

16   that's been submitted --

17        THE COURT:  They didn't reject the argument.

18        ATTORNEY DILLON:  Well, they rejected the argument

19   that it is in the plain text.

20        THE COURT:  Not in the order I have right before me,

21   right now.  I don't see where they rejected the argument.  The

22   order before me says that the Government failed to submit

23   sufficient information to support the argument.

24        ATTORNEY DILLON:  Yeah.  And, again, in this case,

25   there is insufficient evidence to support the claim.

1    THE COURT:  That's different from saying this is not

2    part of the first step --

3    ATTORNEY DILLON:  Forgive me, your Honor.  I

4    apologize.

5    THE COURT:  Yeah.

6    ATTORNEY DILLON:  Lastly, just to address the impact

7    weapons restrictions that are relied on by defendant, these are

8    all mid-to-late 19th Century restrictions on various impact or

9    blunt-force weapons.  And that showing is also just

10   insufficient to justify the state's ban, because they come far

11   too late and well beyond the relevant founding era.

12       They also discuss a completely different category of

13   arms.  And, in fact, Mr. Escobar admits that these impact

14   weapons have been in common use for -- in -- sorry.  In common

15   use for much of this country's history; in his deposition in

16   this case.

17       Finally, noteworthy is that these impact weapons

18   restrictions, you know, while they did restrict various impact

19   weapons like billy clubs, sandbags, slungshots -- impact

20   weapons such as sandbags, billy clubs, slungshots, none of

21   these restrictions prohibit knives, you know.

22       And according to the defense expert's own testimony in

23   their deposition, you know, knife violence was a significant

24   problem in the mid-19th Century.  Yet no state enacted any type

25   of prohibition on the sale or prohibition on the possession of

1    knives.

2           They did restrict concealed carry in response to knife

3    violence, but they did not enact any outright prohibitions, and

4    with the exception of the 1838 Tennessee law that restricted

5    sale.

6           With that, I have nothing further, unless the Court

7    has any questions.

8           THE COURT:  No.  I don't have any other questions.

9    And then I -- I did want to offer what I said at the onset of

10   this hearing.  That I agree with your analysis in regards to

11   step two.  That, frankly, if we were -- well, I have not

12   decided to give a tentative.  A tentative is not a final

13   ruling.

14          But if the Court moves to step two, I think there's

15   something significantly lacking on the Government's behalf to

16   historical analysis that has been done.  And I don't think the

17   proper -- I don't think the burden is on the Court to conduct

18   its own historical analysis.  I think there is an issue, here,

19   with step two.  But that's -- the Court doesn't get to step two

20   until step one has been met.

21          And, obviously, the Court, listening to the arguments

22   of the parties, will have to make that decision.

23          And anything else, Mr. Dillon?

24          (Mr. Ritter and Mr. Dillon conferring.)

25          ATTORNEY DILLON:  Bear with me one moment, your Honor.

1          THE COURT:  Of course.  Take your time.

2          (Mr. Ritter and Mr. Dillon conferring.)

3          ATTORNEY DILLON:  Just a quick clarification, your

4    Honor.

5          Earlier, the Court referenced the *Rupp* decision, and

6    the Court -- stating that the semiautomatic rifles are similar,

7    like fully automatic rifles, in justifying the ban?

8          THE COURT:  No.  It wasn't in that context.  It was in

9    the context of, you know, just because something's a knife

10   doesn't mean you can -- you cannot ban another knife.  Just

11   like you cannot -- you can still ban an automatic knife --

12   weapon, as opposed to a semiautomatic weapon.  So in that

13   context.

14         ATTORNEY DILLON:  Okay.  So just to address that one

15   point.  You know, it's been argued many times over in this

16   district court and also in the *Rupp* court, with regard to the

17   difference and distinctions between semiautomatic rifles and

18   automatic rifles.

19         But here, although automatic is used for, you know,

20   switchblades in the sense that you press a button and they

21   open, there's no similarity there.  You know, it's a one-handed

22   opening knife.  And the only real distinction is whether you

23   are putting your finger on the blade of the weapon versus

24   putting your finger on a button.  This is very distinguishable

25   from the difference between a semiautomatic firearm and an

1    automatic firearm.

2           THE COURT:  And I agree with you.  I did not bring it

3    up for that -- for that issue.  But I agree with you, what

4    you're saying.

5           ATTORNEY DILLON:  Thank you, your Honor.

6           THE COURT:  Thank you.

7           Ms. Uyehara.

8           ATTORNEY UYEHARA:  It's important to recognize, here,

9    that the different metrics that plaintiffs offer -- whether it

10   be sales estimates or just a generalized submit of how many of

11   these knives are in circulation -- plaintiffs specifically do

12   not give numbers on the subset of switchblade knives at issue

13   here; which is knives that are two inches or longer and don't

14   have a détente or safety mechanism.

15          And, specifically, they don't give evidence of whether

16   or not that subset of knives is in common use for self-defense

17   or for lawful purposes.

18          We also argue that the suitability argument about

19   whether or not a particular weapon is suitable for self-defense

20   is in *Heller*.  *Heller* discusses, in great detail -- like I

21   mentioned earlier -- about what makes handguns the

22   quintessential self-defense weapon.  And that's not interest

23   balancing.  The Second Amendment right is about common use for

24   self-defense.  And that's part of the analysis *Heller* did, and

25   that's part of the analysis that this Court must also

1    undertake.

2         And it's also important to recognize that if

3    switchblades -- it's the subset of switchblade knives at issue

4    here -- are suitable for self-defense, there's no evidence in

5    the record.  There's not one single instance of a person using

6    one of these switchblade knives.  Not even the subset of

7    switchblade knives restricted by California but any switchblade

8    knife used for self-defense.

9         And both self-defense experts -- Robert Escobar and

10   Mr. Janich -- could name no instance when such a switchblade

11   was used for self-defense.  And all of the evidence points to

12   that they're ill-suited for self-defense.

13        THE COURT:  I need to ask a question here because this

14   is an issue that I've been contemplating.

15        I know you've been arguing a lot about the use for

16   self-defense.  And every time I hear the argument, I go back to

17   *Heller*, when they talk about the distinction between keep and

18   bear -- bearing arms.  And especially *Caetano* -- *Caetano*,

19   excuse me, regarding the stun guns.  And just the

20   requirement -- and I am struggling with the argument that a

21   weapon has to be used for self-defense, as opposed to the

22   second element, the second part of the Second Amendment that

23   you can keep them and you cannot just necessarily use them but

24   you have the right to retain possession, for lack of a better

25   term.

1    So I'm struggling with that argument, and I just want

2 to let you know that so you can address that further, if you --

3 if you would like.

4    ATTORNEY REILLEY:  May we have a moment, your Honor?

5    THE COURT:  Sure.

6    (Pause, Attorney Reilley and Attorney Uyehara

7    Conferring.)

8    ATTORNEY UYEHARA:  Your Honor, it depends on whether

9 or not there is a good faith belief that the person will use

10 this weapon for self-defense.  Not every person that has a

11 handgun necessarily needs to use it for self-defense.  But

12 that -- the weapon is of the character and nature that it would

13 be commonly used for self-defense.

14    Returning to our historical analogs here, the

15 historical analogs have to be taken as a whole.  It's not as

16 simple as one single-carry restriction on Bowie knives in a

17 particular state.

18    These laws were passed consecutively in different

19 years and they restricted the knives or other impact weapons in

20 a variety of different ways.

21    Notably, they also enhance the criminal penalties.  We

22 have some laws that show that when you're arrested with a Bowie

23 knife for manslaughter, it's automatically raised to murder

24 just because the nature of the knife suggested something much

25 more deadly and, you know, murderous.

1          We also have laws --

2          THE COURT:  I'm sorry for interrupting again, but I do

3     have another question.

4          The historical analysis in the -- in the -- in the

5     analogy you're using for the -- for the weapons that you've

6     discussed, I have to point out the -- the distinction here.

7     Because, on the one hand, you have argued to the Court the

8     Court should look at not knives generally in this case but

9     specifically -- in regards to step one, specifically have you

10    look at the switchblade knives.  Because it shouldn't look at

11    knives generally in regards to how the Court -- whether they're

12    in common use or not.  But then, on the second hand, you're

13    arguing that I should not look at not even knives, generally,

14    but a different category of weapon altogether.

15         So I'm struggling with that because it seems to be a

16    direct conflict with your earlier argument.

17         ATTORNEY UYEHARA:  Well, your Honor, I think it's

18    because it depends about which step of the analysis we're

19    talking about.  At the first step, we look at -- as *Alaniz*

20    said -- whether or not a weapon is in common use for

21    self-defense today.

22         So we're looking at the particular weapon that's being

23    restricted.  But at the second step of the analysis, the

24    Supreme Court has explicitly told us we need a reason by

25    analogy.  And, you know, in the case of something like an

1  assault rifle, for instance, there is no, like, perfect similar

2  analogy.  And, here, our closest analogy is Bowie knives and

3  related historical impact weapons.

4       THE COURT:  Yes.  I understand that argument.  But

5  especially with assault rifles -- and even *Bruen* talked about

6  this.  Modern weapons, obviously, that did not exist during

7  Colonial period, you -- there's a more analogous historical

8  text and tradition that you look at.  But knives existed during

9  the historical period.  So I understand maybe switchblade

10  knives did not exist.  So then -- so the question is, is --

11  which I started at the onset of this hearing.  How specific or

12  how narrow should the Court be looking at this?

13       Should I be looking at it strictly as a switchblade as

14  a type of pocketknife, as the plaintiff has suggested?  Or

15  should I look at it as -- a switchblade as a separate weapon as

16  distinct from a pocketknife and distinct from a knife

17  generally?  Because if I look at it as a knife generally, then

18  that's a different analysis the Court conducts under both

19  steps, frankly.  Especially when you're talking about the

20  historical analysis.

21       ATTORNEY UYEHARA:  I think at the second step of the

22  analysis *Bruen* makes pretty clear that we look at the how and

23  the why; why these weapons were restricted.  And the why is

24  exactly the same.  That these weapons were easily concealable,

25  they were brought into public, and they pose significant

1    danger.  And that's why they were regulated.

2         And that's not true of just Bowie knives.  That's true

3    of, also, the other five other historical impact weapons that

4    are part of our record here.

5         I also want to point out, quickly, that plaintiffs

6    misrepresent the testimony of our expert, Dr. Spitzer.  In that

7    quote he used, Spitzer was specifically talking about inner

8    Kansas law and not our regulations here at issue today.  And so

9    Spitzer talked about how, you know, you could regulate a weapon

10   many different ways.  And it was essentially de facto

11   prohibition.  And that's the case with the historical analogs.

12        As I mentioned earlier, they -- there are prohibitive

13   taxes, both on dealers and owners of the knives themselves, so

14   that they wouldn't purchase and own them.  They enhance

15   criminal penalties and general sale of prohibitions.  And you

16   take that with carry and concealed carry laws, and you have a

17   much broader prohibition on these historical impact weapons

18   generally.

19        All right.  Thank you.

20        THE COURT:  All right.  Thank you very much.

21        I want to thank all parties for your time and your

22   effort.  And, obviously, this is an issue that is very

23   important to the parties.  And, obviously, the law has changed

24   over the last several years.  So the Court will take this

25   matter under submission.  I will issue a written order.

1          This will be a dispositive order for that, that I will

2   issue.  And I appreciate the efforts you went through to brief

3   this issue before the Court.  So thank you both.

4          ATTORNEY DILLON:  Thank you, your Honor.

5          ATTORNEY UYEHARA:  Thank you.

6          THE CLERK:  This court is now in recess.

7          (Conclusion of proceedings at 3:09 p.m.)

8                          --oOo--

9

10   I certify, by signing below, that the foregoing is a correct
     stenographic transcript of the oral proceedings had in the
11   above-entitled matter this 20th day of May, 2024.  A transcript
     without an original signature or conformed signature is not
12   certified.  I further certify that the transcript fees and
     format comply with those prescribed by the Court and the
13   Judicial Conference of the United States.

14               /S/ Amanda M. LeGore

15         AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

16

17

18

19

20

21

22

23

24

25